# EXHIBIT "A"

# Vioxx MDL 1657

# Fee Allocation Committee

December 2, 2010

Common Benefit Fee Attorney

The Fee Allocation Committee has completed its extensive review of the common benefit work done in the Vioxx litigation and, in accordance with the terms of the Vioxx Settlement Agreement and Pretrial Order 6D, hereby notifies you that the Committee will recommend to Judge Fallon that you receive the common benefit fee award stated on the attached form.

In making its recommendation the Committee has taken into consideration a wide array of information, including your affidavit, presentation (if applicable), and time and cost submissions, as well as the collective knowledge of the members of the Fee Allocation Committee. The Committee has also considered the various factors listed in Pretrial Order 6D and the law applicable to awards of common benefit fees. For those firms receiving a recommendation of $0, the submitted time, if any, was not deemed to be compensable common benefit work.

Pretrial Order 6D provides that you have 14 days to notify the Committee whether you object to this recommendation. Please use the attached form to indicate your acceptance or objection. If you object, you must state in detail the basis of your objection and also indicate the specific amount of common benefit fee award to which you claim you are entitled. This information will be provided to Judge Fallon and any Special Master appointed by Judge Fallon to consider your objection.

The Fee Allocation Committee's recommendation is just that – a recommendation. Under the terms of the Settlement Agreement, Judge Fallon will make the final common benefit fee award. The Committee hopes that the overwhelming majority of common benefit fee applicants will accept the recommendation of the Committee and that Judge Fallon will authorize a prompt interim payment of the award. However, the Committee can guarantee neither the amount nor the timing of payment of the Committee's recommended award to you.

Please return the attached forms with all of the requested information to the Chair of the Fee Allocation Committee, **Russ Herman**, located at 820 O'Keefe Avenue, New Orleans LA 70113, **by December 16, 2010 <u>and</u>** the Secretary of the Fee Allocation Committee, **Andy Birchfield**, located at 218 Commerce Street, Montgomery, AL 36104.

Very truly yours,

Russ Herman, Chairman

## COMMON BENEFIT FEES AWARD FORM

### A. INSTRUCTIONS

1. The Fee Allocation Committee has completed its review of your application for common benefit fees under the terms of the Vioxx Settlement Agreement.
2. The Committee will recommend to Judge Fallon that you be awarded the common benefit fee indicated in this Form (the "Recommended Award").
3. Pursuant to Pretrial Order 6D, you must respond to accept or object to the Recommended Award within 14 days. Accordingly, you must return this completed Form no later than **December 16, 2010**.
4. If you accept the Recommended Award, indicate your acceptance by checking in the appropriate box in Section B below.
5. If you object to the Recommended Award, indicate your objection by checking the appropriate box in Section B below, fill in specific amount of common benefit award to which you believe you are entitled and attach to this From an Objection to Recommended Award stating in detail the basis of your objection and for the award requested.
6. Sign this Form in the appropriate space in Section C below.
7. Return this completed Form (and attachment, if there is an Objection) by (1) email; **and** (2) mail or overnight delivery no later than **December 16, 2010**, to:

| | |
|---|---|
| Russ M. Herman | Andy Birchfield |
| Chair of the Fee Allocation Committee | Secretary of the Fee Allocation Committee |
| 820 O'Keefe Avenue | 218 Commerce Street |
| New Orleans, LA 70113 | Montgomery, AL 36104 |
| rherman@hhkc.com | andy.birchfield@beasleyallen.com |

### B. RECOMMENDED AWARD AND RESPONSE

| Recommended Award: | $281,521.84 |
|---|---|

Response to Recommended Award: Check only one of the following:

☐    I accept the Recommended Award as my award of common benefit fees.

☐    I object to the Recommended Award and request this amount as my award:    $ _____

    (NOTE: You must attach an Objection stating in detail the basis of the objection and for the award requested.)

### C. SIGNATURE

| Signature | | | Date | _____/_____/_____ <br> (month)  (day)  (year) |
|---|---|---|---|---|
| **Printed Name** | First | MI | Last | |
| **Firm Name** | Branch Law Firm | | | |

#379620

# EXHIBIT "B"

## COMMON BENEFIT FEES AWARD FORM

### A. INSTRUCTIONS

1. The Fee Allocation Committee has completed its review of your application for common benefit fees under the terms of the Vioxx Settlement Agreement.
2. The Committee will recommend to Judge Fallon that you be awarded the common benefit fee indicated in this Form (the "Recommended Award").
3. Pursuant to Pretrial Order 6D, you must respond to accept or object to the Recommended Award within 14 days. Accordingly, you must return this completed Form no later than **December 16, 2010**.
4. If you accept the Recommended Award, indicate your acceptance by checking in the appropriate box in Section B below.
5. If you object to the Recommended Award, indicate your objection by checking the appropriate box in Section B below, fill in specific amount of common benefit award to which you believe you are entitled and attach to this From an Objection to Recommended Award stating in detail the basis of your objection and for the award requested.
6. Sign this Form in the appropriate space in Section C below.
7. Return this completed Form (and attachment, if there is an Objection) by (1) email; **and** (2) mail or overnight delivery no later than **December 16, 2010**, to:

Russ M. Herman
Chair of the Fee Allocation Committee
820 O'Keefe Avenue
New Orleans, LA 70113
rherman@hhkc.com

Andy Birchfield
Secretary of the Fee Allocation Committee
218 Commerce Street
Montgomery, AL 36104
andy.birchfield@beasleyallen.com

### B. RECOMMENDED AWARD AND RESPONSE

| Recommended Award: | $281,521.84 |
|---|---|

Response to Recommended Award:  Check only one of the following:

☐ I accept the Recommended Award as my award of common benefit fees.

☒ I object to the Recommended Award and request this amount as my award: $ 3,688,425.00

(NOTE: You must attach an Objection stating in detail the basis of the objection and for the award requested.)

### C. SIGNATURE

| Signature | *[signature: R. Branch]* | Date | 12 / 06 / 2010 (month) (day) (year) |
|---|---|---|---|
| Printed Name | First  Turner | MI  W. | Last  Branch |
| Firm Name | Branch Law Firm | | |

#379620

## COMMON BENEFIT FEES AWARD FORM

### A. INSTRUCTIONS

1. The Fee Allocation Committee has completed its review of your application for common benefit fees under the terms of the Vioxx Settlement Agreement.
2. The Committee will recommend to Judge Fallon that you be awarded the common benefit fee indicated in this Form (the "Recommended Award").
3. Pursuant to Pretrial Order 6D, you must respond to accept or object to the Recommended Award within 14 days. Accordingly, you must return this completed Form no later than **December 16, 2010**.
4. If you accept the Recommended Award, indicate your acceptance by checking in the appropriate box in Section B below.
5. If you object to the Recommended Award, indicate your objection by checking the appropriate box in Section B below, fill in specific amount of common benefit award to which you believe you are entitled and attach to this From an Objection to Recommended Award stating in detail the basis of your objection and for the award requested.
6. Sign this Form in the appropriate space in Section C below.
7. Return this completed Form (and attachment, if there is an Objection) by (1) email; **and** (2) mail or overnight delivery no later than **December 16, 2010**, to:

| | |
|---|---|
| Russ M. Herman | Andy Birchfield |
| Chair of the Fee Allocation Committee | Secretary of the Fee Allocation Committee |
| 820 O'Keefe Avenue | 218 Commerce Street |
| New Orleans, LA 70113 | Montgomery, AL 36104 |
| rherman@hhkc.com | andy.birchfield@beasleyallen.com |

### B. RECOMMENDED AWARD AND RESPONSE

| Recommended Award: | $281,521.84 |
|---|---|

Response to Recommended Award: Check only one of the following:

☐   I accept the Recommended Award as my award of common benefit fees.

☒   I object to the Recommended Award and request this amount as my award:   $ 3,688,425.00

(NOTE: You must attach an Objection stating in detail the basis of the objection and for the award requested.)

### C. SIGNATURE

| Signature | *P. Branch* | Date | 12 / 06 / 2010 |
|---|---|---|---|
| | | | (month) (day) (year) |

| Printed Name | First   Turner | MI   W. | Last   Branch |
|---|---|---|---|

| Firm Name | Branch Law Firm |
|---|---|

#379620

The Branch Law Firm ("BLF") objects to the recommended fee award in the amount of $281,521.84 on the grounds that the proposed amount is arbitrary, capricious, and unreasonable. The recommendation--which is devoid of any formula or explanation as to how the amount is derived--is contrary to the previously-accepted 6,575.75 hours the firm incurred for the common benefit of all Vioxx claimants. Further, the recommendation conflicts with the Court's October 19, 2010 Order Re Common Benefit Counsel Fees and Expenses[1], which is based, in part, on the accounting principles and compilation of hours prepared and submitted by the Court-appointed CPA, Philip A. Garrett of Wegmann Dazet & Company.

BLF's objections are summarized below and are not meant to be exhaustive at this juncture:

- The Court-appointed accounting firm, Wegmann Dazet & Company, accepted 6,575.75 hours of BLF common benefit time. *See* letter from Clifton W. Newlin, CPA of Wegmann Dazet & Company to the Branch Law Firm dated December 9, 2008, attached as Exhibit A. As the letter reflects, the accounting firm accepted the BLF's submission of common benefit hours but only requested further data in support of the firm's claimed common benefit expenses. *No request was made* with respect to the BLF's common benefit hours.

- In support of its motion to award common benefit fees, the Plaintiffs' Liaison Counsel ("PLC") submitted the affidavit of Philip A. Garrett, CPA of Wegmann Dazet & Company dated January 20, 2009. In that affidavit, attached hereto as Exhibit B, Mr. Garrett stated that he and his firm reviewed time and expenses from 109 separate law

---

[1]   Hereafter referred to as "the Court's 10/19/10 Order", a copy of which is attached as Exhibit "E".

1

firms and, in paragraph 5, confirmed that "where it was determined that a submission was not in compliance with PTO No. 6, or the procedures established by the [PLC], the submitting law firm was advised of this determination and given an opportunity to correct it." Again, no such determination had been previously made with respect to the BLF's hours.

- In January 2009, Mr. Garrett determined that the total number of common benefit counsel hours was 503,185, and on July 30, 2010, in an updated report, Mr. Garrett determined that the total number of common benefit counsel hours had increased to 562,943.55. *See* the Court's 10/19/10 Order at pp. 32-33.  Of these total hours, 6,575.75 were expended by the BLF.

- The Court relied on the total hours of common benefit counsel time submitted by Mr. Garrett in ruling that the amount of $315,250,000 should be awarded as common benefit fees.  Such total hours were "checked and approved by the Court-appointed CPA," which the Court found "to be reliable."  *See* the 10/19/10 Order at p. 33.

- The Court's award of $315,250,000 was confirmed by using a lodestar crosscheck of an hourly billable rate of $443.29 and a benchmark increase of .5 %, to reach an award equal to 6.5% of the Vioxx settlement amount of $4.85 billion.

- Thus, based on (1) the Court's award; (2) the methodology and calculations employed by the Court-appointed accounting firm; and (3) and BLF's approved hours of 6,575.75, the BLF is entitled to an award of $3,688,425.00.  This amount is fair and reasonable given that the BLF's 6,575.75 hours equals 1.17% of the total common benefit counsel hours (*i.e.*, 562,943.55) which were calculated by Mr. Garrett and on which the Court's award is based.  Accordingly, 1.17% of the $315,250,000 total fee award is $3,688,425.00.

2

- The PLC's recommendation of the meager amount of $281,521.84 reflects that it improperly, and without justification or excuse, values some firms' common benefit time greater than other firms' time, in direct contravention of the Court's 10/19/10 Order. On pages 28 and 29 of that Order, the Court stated that the fact that an attorney was not on the Plaintiffs' Steering Committee ("PSC") *is not a factor that calls "for adjustment of the benchmark percentage in this case,"* recognizing that "[t]here were many excellent, hard-working attorneys who did not make it on to the PSC simply due to limitations of committee size." (Emphasis added.)

- It is important to note that the BLF was formerly the State Liaison Counsel for New Mexico in the MDL and firm members were assigned to the Discovery and Science Committee by the PSC. At the advice and urging of members of the PLC, in October 2005 the BLF resigned its position in the MDL and joined a consortium of other firms with large number of cases pending in New Jersey[2] in order to form a cohesive prosecution team of lawyers experienced in mass tort litigation. This group pooled funds and attorney time in an effort to analyze, select, and prepare the best possible cases for trial in New Jersey for the benefit of all plaintiffs in that forum and in others.

- It is also important to consider that the BLF had *eleven (11) cases* on the trial calendar before Judge Higbee in New Jersey, *more than any other single law firm with cases filed in that forum.*

- Similarly, it is important to recognize that several members of the Fee Allocation Committee played no active or discernable role in the litigation before Judge Higbee in

---

[2]   The BLF had filed lawsuits in the MDL (780 cases), New Jersey (1,109 cases), Texas (197 cases), New Mexico (238 cases) and Washington, D.C. (170 cases) on behalf of 2,494 Vioxx claimants.

New Jersey or in the Texas MDL[3], where the BLF had cases calendared for trial, and, consequently, may not understand the valuable contributions the BLF made in those forums.  Detailed records relating to attorney time invested for the common benefit of all Vioxx clients in both New Jersey and in the Texas MDL are available, were made available, and were received, accepted, and approved by the Court-appointed accounting firm.

- Lastly, the proposed award of $281,521.84 is completely unreasonable given that the BLF was previously awarded $406,059.86 in common benefit expenses, even though Wegmann Dazet & Company requested additional documentation regarding certain claimed expenses (*see* Exhibit A) and that the amount of $267,118.14 was ultimately disapproved by the PLC (without objection from the BLF).  *See* the letter dated July 24, 2009 from Russ M. Herman to Turner W. Branch, attached as Exhibit C, and the letter dated July 24, 2009 from Turner W. Branch to Russ Herman, attached as Exhibit D.

- The costs approved per common benefit expense was twice the amount, as paid, of the proposed and recommended attorney fees herein; an unusual and non-conforming recommendation; in our opinion, totally arbitrary, capricious, unreasonable and in contradiction of the verified accountability which was unobjected to and submitted herein approximately two (2) years ago.  The Branch Law Firm would ask that it only be given fair consideration and treatment for the verified, uncontroverted and unobjected attorney fees provided and in total compliance with the rules and protocol established by the PSC and Court and ultimately approved by the Court in its Order of October 19, 2010, attached hereto as Exhibit "E".

---

[3]  The BLF had *Hobart Miller v. Merck & Co., Inc.* set for trial in the Texas MDL.

Clifton W. Newlin
Robert D. Watkins
Edward G. Berbuesse, Jr.
Jon S. Folse



WEGMANN DAZET & COMPANY
A PROFESSIONAL CORPORATION
CERTIFIED PUBLIC ACCOUNTANTS

Mark D. Bohnet
_____
Lisa D. Englade
Kerney F. Craft, Jr.
_____
Philip A. Garrett

December 9, 2008

Branch Law Firm
Attn:Cynthia L. Zedalis
2025 Rio Grande Blvd., NW
Albuquerque, New Mexico 87104

Re: MDL 1657   Section L
*In Re:* Vioxx Liability Litigation

Sir or Madam:

Your submission of ___Time, and/or _X__Held Expenses for the month(s) of **All Submissions** are not in compliance with Vioxx Time and Expense Billing Guidelines. Your submission is being rejected for the following reason(s) checked below:

**Time Submitted:**

❑ Time prior to April 8, 2005 is not allowed.

❑ Time submitted is not related to matters common to **all** claimants.

❑ Time Record Summary form missing. See attached form titled "MDL 1657 Vioxx Products Liability Litigation Report of Member Firm Time."

❑ Time Record Summary form not authorized by senior partner.

❑ Time Record Summary form not recorded in quarter hour increments (i.e, .25, .50, .75).

❑ Daily time records not submitted.

❑ Daily time records not submitted in proper format. (i.e. Time records are to be submitted by month and by timekeeper.)

❑ Other: *All time is accepted. A total of 6,575.75 hours has been accepted.*

**Costs Submitted:**

❑ Cost prior to April 8, 2005 is not allowed.

❑ Held costs submitted are not related to matters common to **all** claimants.

❑ Costs Record Summary form for held expenses missing. See form attached titled "MDL 1657 Vioxx Products Liability Litigation Common Held Costs and Expenses."

❑ Cost Record Summary form for held expenses not authorized by senior partner.

❑ Receipts and/or detailed costs supports were not submitted *Please provide support for all expenses. Acceptable support that is allowed are the following. Invoices, canceled checks, receipts, and or credit card statements. We will also need to know the number of days stayed for each hotel expense.*



EXHIBIT
"A"

WEGMANN DAZET & COMPANY | A PROFESSIONAL CORPORATION | CERTIFIED PUBLIC ACCOUNTANTS
MEMBERS: AICPA PRIVATE COMPANIES PRACTICE SECTION | AN INDEPENDENT MEMBER OF THE BDO SEIDMAN ALLIANCE
NEW ORLEANS OFFICE | 111 VETERANS BLVD. | SUITE 800 | METAIRIE | LA 70005
NORTHSHORE OFFICE | 109 NEW CAMELLIA BLVD. | SUITE 106 | COVINGTON | LA 70433
(504) 837-8844 | FAX (504) 837-0856 | WWW.WDCO.BIZ

☐ Airfare not acceptable.  First class airfare shall only be allowed for cross-country flights in excess of four hours of non-stop flight time or international flights.  Reason for rejection:

_____

_____

☐ Hotel rate greater than $250 per night or the **average** room rate of the Hyatt, Hilton and Marriott hotels in that city.

☐ Other: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Vioxx Time and Expense Billing Guidelines** were issued on April 8, 2005 in Pre-Trial Order #6. This document sets forth the procedures and forms implemented by Plaintiffs' Liaison Counsel.  Please reference these guidelines for all submissions.  Only submissions for common MDL matters may be made.

**This will be your final notice.  If we don't receive a response within 30 days, we will assume a final acceptance on the approved portion of the submission only.  There will be no changes made after the 30 days have been expired.**  Our mailing address is Wegmann-Dazet & Company, 111 Veterans Memorial Blvd., Suite 800, Metairie, Louisiana, 70005 or you may email the information to vioxxmdl@wdco.biz.  If you have any questions, please contact Kristine Megna or myself at (504) 837-8844.

Very truly yours,

WEGMANN DAZET & COMPANY

Clifton W. Newlin, CPA

*Clifton Newlin /DG*

Enclosure

Copy:  Leonard A. Davis
        Herman, Herman, Katz & Cotlar



Jan 20 2009
4:37PM

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: VIOXX | : | |
| | : | **MDL Docket NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | : | |
| | : | **SECTION L** |
| | : | |
| **This document relates to ALL ACTIONS** | : | **JUDGE FALLON** |
| | : | **MAG. JUDGE KNOWLES** |

### AFFIDAVIT OF PHILIP A. GARRETT, C.P.A.

| | | |
|---|---|---|
| STATE OF LOUISIANA | : | |
| | : | SS |
| PARISH OF ORLEANS | : | |

Philip A. Garrett, being duly sworn according to law deposes and says:

1.    I am a certified public accountant.  For over 35 years I have been associated with the public accounting firm of Wegman Dazet & Company (WDC).  A copy of my curriculum vitae summarizing my training and experience in the field of public accounting is attached to this report and affidavit as Exhibit "1."

2.    Pretrial Order No. 6 required that members of the Plaintiffs' Steering Committee (PSC) in MDL 1657, and other attorneys working at their direction report their time and expenses on a monthly periodic basis in accordance with the requirements of that order.

3.    Pretrial Order No. 6 approved my retention and the retention of WDC to assist and provide accounting services to the Plaintiffs' Liaison Counsel, the PSC and the Court in MDL No. 1657, as follows:

> Plaintiff's Liaison Counsel has retained and the Court approves the retention of Philip Garrett, CPA, of the accounting firm of



EXHIBIT
"B"

> Wegmann-Dazet to assist and provide accounting services to Plaintiffs' Liaison Counsel, the Plaintiff's Steering Committee, and the Court in the MDL 1657. Wegmann-Dazet will be assisting in compiling submissions and will provide reports to Plaintiff's Liaison Counsel who shall file them with the Court on a monthly basis. These reports will include both time and expenses and will summarize, with back-up detail, the submissions of all firms. Submission of time and expense records to Wegmann-Dazet and the Court shall be considered as if filed under seal.

4.      In connection with this assignment WDC, under my supervision, reviewed the time and expense records of those counsel in MDL 1657 who submitted such records and who, I am advised, will petition the Court for an award of fees and costs for "common benefit" services in the Vioxx Litigation.

5.      During the period from April 8, 2005 through today, my work as the Court-appointed "accountant" primarily involved a review of these time and expense reports to determine whether they complied with the dictates of PTO No. 6. Where it was determined that a submission of time and expense was not in compliance with PTO No. 6, or the procedures established by Plaintiffs' Liaison Counsel, the submitting law firm was advised of this determination and given an opportunity to correct it. I routinely kept the Court advised of my ongoing activities.

6.      On April 10, 2008, the Court entered Pretrial Order No. 6C. This order was directed to the law firm members of the Negotiating Plaintiffs' Counsel (NPC) and common benefit counsel representing plaintiffs in state court Vioxx matters who contemplated seeking an award of counsel fees and reimbursement of litigation expenses from the proceeds of the Settlement Agreement with Merck & Co., Inc., other than those in MDL 1657 who were already subject to PTO No. 6. PTO No. 6C required that these additional persons report their time and

2

expenses to myself and to Plaintiffs' Liaison Counsel  no later than May 30, 2008, in accordance with the procedures of PTO No. 6.  This Order permitted common benefit counsel in state court Vioxx matters to submit reconstructed time records of their Vioxx-related common benefit work based upon good faith estimates of their services in an attempt to create contemporaneously kept time records for these counsel.  The order also directed that I review those submissions in accordance with the requirements of PTO No. 6 and the procedures established by Plaintiffs' Liaison Counsel.

7.     Collectively these orders established a procedure for reviewing all submissions of time and expense.  As part of my duties to assist in compiling submissions and making reports, among other things, I disallowed from inclusion in these submissions the following items:

a.     Any submission or report of professional time and expense in which the hours of service were not properly coded in accordance with Pretrial Order No. 6;

b.     Any item of expense for which proper receipts or other proof of payment has not been submitted;

c.     Any item of time or expense which was incurred in connection with the litigation of any individual case or group of individual cases involving a person or persons who used Vioxx, unless counsel was authorized by a member of the PSC or NPC to perform such work primarily for the common benefit of Vioxx litigants in MDL No. 1657 and the state litigation with which it is coordinated.

8.     Any items of time and expense that were disallowed are reported to the Court in the regular monthly reports provided by WDC.  Under PTO Nos. 6 & 6C, my determination as to whether to disallow any item of time and expense from inclusion in allowed time or expenses

3

was a matter of procedural convenience for the Court and not a determination on the merits. I made no subjective judgment regarding the value of any time allowed and attempted to judge solely upon objective criteria. Both orders made it clear that a disallowance by me was without prejudice to a determination by the Court of the merits of any submission at a time and manner determined by the Court.

9.   Ultimately, I reviewed submissions of time and expense from 109 separate law firms who claimed to participate in common benefit time and costs.

10.   The  review process has been ongoing since May 2005 and required the expenditure of 6,880.7 hours of professional accounting time by myself and the members of my staff through December 31, 2008.   Billings for this professional time are $716,025.41.

11.   The protocol which I observed in reviewing the time and expense submissions of the common benefit counsel consisted of three segments.

   a.   Initially, we reviewed each submission to determine if it complied with the form requirements of PTO No. 6.  Among other things, this examination focused on whether the Fee Applicant  reported time according to the guidelines of PTO No.6, whether appropriate time records were included with the submission, whether the position (e.g., partner, associate, paraprofessional or investigator) of each timekeeper was disclosed, whether the reported time was properly categorized in accordance with the requirements of PTO No. 6, and whether the Fee Applicant attached records documenting its claimed expenses.  If we discovered deficiencies in compliance with the procedural requirements of PTO No. 6, they were brought to the attention of the common benefit counsel by means of a suitably completed form letter(s).

   b.   Once we received a time or expense record that was in proper form, we examined the submission substantively to determine if there were circumstances present which would require us to disallow items of time and expense from inclusion under the terms of PTO No. 6.  If we determined that there were such items, we transmitted a letter to the common benefit counsel conditionally disallowing the inclusion of that

4

counsel's time and expenses.  In the conditional disallowance letters, we clearly advised the applicant of each type of item contained in the submission which was subject to disallowance.  Typically, we provided illustrations of each such item from the counsel's time and expense records.  The letters provided a period of time for the counsel to correct the deficiencies in its submission insofar as it was able to truthfully do so.  In most of these cases, we ultimately issued a letter approving the counsel's revised submission of time and expense.  In some of these cases, however, we were  required to disallow specific line items of time and/or expense and an appropriate letter issued.

c.      After the above outlined process, we checked the arithmetic accuracy of the summaries of time and expense submitted by each counsel based on the underlying detail records that were supplied to us. This procedure was limited to items of  time and expense.

12.  As a consequence of this process of review, Fee Applicants voluntarily withdrew from inclusion in the collective lodestar analysis substantial submissions of hours of time having a significant lodestar value.  This effort has proven itself to be beneficial as common benefit counsel have worked cooperatively, and sometimes eliminated entries that were not directly questioned by WDC.  My analysis of the submissions and reporting of common benefit counsel's time and expenses is an ongoing process, however, judging by past experience, I anticipate that approximately 10% of the time submissions still under review will be disallowed and approximately 20% of cost submissions still under review will be disallowed.  Such disallowances were incorporated into my calculations of time reported in this Report.  A complete analysis will be filed with the Court at the conclusion of my assignment.

13.  For purposes of this Report, I calculated a collective "Lodestar" value for common benefit counsel for their services as of January 14, 2009.  A Lodestar value represents the number of hours of professional service performed by common benefit counsel multiplied by an appropriate hourly rate.  For this Affidavit, counsels' hourly rates are reported using two

5

different standards:   (1) the "Actual hourly rate," which uses the current billing rates provided by counsel and (2) the "Highest billing rate," which uses the highest billing rate for each position.[1]

---

[1]In those few instances where counsel failed to provide or lacked their current billing rates, those employees that did not provide positions or rates received the average rate for the population.   Those that provided positions, but no rates received the average rate for that position.

6

14.   For both standards, the total number of hours of professional time was reported as 503,185.00 (372,208.52–MDL and 130,976.43–state).[2]

15.   Based upon the above methodologies, the total Lodestar value of the combined professional time of attorneys and para-professionals for both the MDL and state litigations was calculated as follows:

   Actual Rate     $217,128,800.40

   Highest Rate    $321,897,534.95

16.   The total Lodestar value of the professional time of attorneys and para-professionals for the MDL was calculated as follows:

   Actual Rate     $158,194,630.34

   Highest Rate    $234,078,195.97

17.   The total Lodestar value of the professional time of attorneys and para-professionals for the state common benefit counsel was calculated as follows:

   Actual Rate     $58,934,170.06

   Highest Rate    $87,819,338.98

18.   The total amount of "held expenses" as defined by PTO No. 6, incurred by common benefit counsel which has been properly documented as eligible for reimbursement under the terms of the applicable pretrial orders is $30,508,021.87, as of January 14, 2009.

19.   In addition to the reimbursable "held expenses" incurred by each common benefit counsel individually, certain reimbursable "shared expenses," as defined by PTO No. 6, were

---

[2]Of those counsel participating in both state and MDL litigations, all time reported was attributed to MDL time.    Total time is stated rounded up to the nearest whole number.

incurred by the PSC.

20.   The PSC funded many of its common expenses in this litigation by periodically levying assessments on its members.   As of January 14, 2009, PSC members each paid assessments the total of which assessments collected over the course of the litigation was $3,950,000.00.   The "shared expenses"   incurred for the administration of the MDL from the PSC's account paid from the assessments was then scrutinized.   As of January 14, 2009, the PSC incurred $3,881,646.68 in properly documented shared expenses which expenses are properly subject to reimbursement.

21.   In summary, as a result of the accounting conducted by me pursuant to the terms of the Court's pretrial orders, as of January 14, 2009, I have determined that a total of 503,184.95 hours of professional time,   having a range of lodestar values from $217,128,800.40 to $321,897,534.95 is properly documented, and that $34,389,668.55 in out-of-pocket expenses have been properly documented, are eligible for reimbursement.[3]

---

[3]Additional materials are still being submitted to WDC by common benefit counsel. Once these materials are analyzed, my findings will become the subject of a final report.

22.  Copies of all of the 109 law firm's submissions provided to WDC are attached hereto on DVD as Exhibit "2".   It is my understanding from Liaison Counsel that this Exhibit will be filed under seal.

_____
PHILIP A. GARRETT, C.P.A.

Sworn & Subscribed
before me this 19th
day of January,
2009.

_____
NOTARY PUBLIC
Bar 14190

9

# VIOXX MDL 1657
## FEE ALLOCATION COMMITTEE
820 O'KEEFE AVENUE
NEW ORLEANS, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

COMMITTEE MEMBERS:

RUSS M. HERMAN - CHAIRMAN
ANDY D. BIRCHFIELD -SECRETARY
EDWARD F. BLIZZARD
THOMAS V. GIRARDI
MARK LANIER
ARNOLD LEVIN
TROY RAFFERTY
CHRISTOPHER SEEGER
PERRY WEITZ

July 24, 2009

Turner W. Branch, Esq.
*BRANCH LAW FIRM*
2025 Rio Grande Blvd. NW.
Albuquerque, NM 87104

RE:  Vioxx Common Benefit Review of Costs

Dear Turner:

The Fee Allocation Committee has reviewed your firm's common benefit cost submissions for purposes of making a recommendation to the MDL court. According to our review, your firm seeks reimbursement of a total of $673,178.27 in common benefit costs. Of these costs, the Fee Committee has not approved $267,118.41 of your firm's costs submissions. The costs we have not approved include costs you have previously withdrawn during your discussions with the Committee but a submission withdrawing the expenses has not been submitted to Wegmann Dazet. For a complete listing of costs that are not approved, please see the enclosed summary.

Please review these unapproved costs. If there are additional costs listed in the enclosed summary that you now wish to withdraw, please advise by no later than July 28th. For those expenses you wish to continue to pursue reimbursement, they will remain categorized as "in dispute" and will be presented as such to Judge Fallon. At this time, we are not aware of the procedure that the Court will use to resolve any disputed line items.

After the Fee Allocation Committee has completed its review of all common benefit cost submissions, a recommendation will be made to Judge Fallon regarding the reimbursement of such costs, including your firm's.


EXHIBIT
"C"

Turner W. Branch, Esq.
July 24, 2009
PAGE TWO


      Should you have any questions, or wish to discuss any of these matters further, please feel free to contact me at the above address and phone number or, alternatively, Andy Birchfield by phone:  (334) 495-1198 or by email: Andy.Birchfield@BeasleyAllen.com.   Until then, I remain,

                Very truly yours,

                RUSS M. HERMAN

RMH:lmf
Enclosure
cc:     Vioxx Fee Allocation Committee *(via email)*

## Branch:  Cost Review

| Submitted Cost | Date | Amount |
|---|---|---|
| Amount rejected by Wegmann Dazet | | $    86,189.93 |
| Travel (ATLA seminar)* | May 2005 | $     1,456.85 |
| Postage * | July 2005 | $          23.65 |
| Filing Fee * | September 2005 | $        250.00 |
| Travel (car rental, FL)* | September 2005 | $        322.10 |
| Storage * | September 2005 | $     2,899.35 |
| Travel to KC (limo + hotel)* | October 2005 | $     1,975.34 |
| Court TV * | November 2005 | $          17.85 |
| Court TV * | December 2005 | $          17.85 |
| Court TV * | January 2006 | $          17.85 |
| Court TV * | February 2006 | $          17.85 |
| Travel (adj. for travel) | February 2006 | $        398.58 |
| Court TV * | March 2006 | $          17.85 |
| Travel (airfare to VA)* | April 2006 | $     2,621.06 |
| NJ Litigation Fund | April 2006 | $   25,000.00 |
| Filing Fees * | May 2006 | $   20,000.00 |
| Court TV * | May 2006 | $          17.85 |
| Software (Acrobat) | May 2006 | $        960.72 |
| Travel (NJ)* | May 2006 | $     8,187.67 |
| Travel (DC)* | May 2006 | $     6,046.00 |
| Travel (Coronado, CA)* | May 2006 | $            4.57 |
| Filing Fees * | June 2006 | $          38.43 |
| Court TV * | June 2006 | $          17.85 |
| Software (MS Access) | June 2006 | $        982.05 |
| Secretarial Overtime | June 2006 | $        149.48 |
| Court TV * | July 2006 | $          17.85 |
| Secretarial Overtime | July 2006 | $        183.45 |
| Postage * | August 2006 | $     2,196.69 |
| Court TV * | August 2006 | $          17.85 |
| Postage | September 2006 | $     3,223.96 |
| Travel (limo) | September 2006 | $        600.48 |
| Postage | October 2006 | $     1,704.43 |
| Court TV * | October 2006 | $          17.85 |
| Expert (Lynn Baker) | November 2006 | $     6,500.00 |
| Court TV * | November 2006 | $          17.85 |
| Court TV * | December 2006 | $          17.85 |
| Filing Fees * | January 2007 | $        262.66 |
| Travel (DC Hotel) * | January 2007 | $        566.77 |
| Court TV * | February 2007 | $          17.85 |
| Travel (limo) | February 2007 | $        447.12 |
| Filing Fees * | March 2007 | $        559.66 |
| Court TV * | March 2007 | $          17.85 |

## Branch:  Cost Review

| Submitted Costs | Date | Amount |
|---|---|---|
| High Desert Staffing, Inc. | March 2007 | $ 476.34 |
| Court TV * | April 2007 | $ 27.80 |
| Travel (DC)* | April 2007 | $ 3,029.01 |
| Filing Fees * | May 2007 | $ 224.28 |
| Filing Fees * | June 2007 | $ 36.62 |
| Court TV * | June 20007 | $ 17.85 |
| Secretarial Overtime | June 2007 | $ 117.82 |
| Filing Fees * | July 2007 | $ 90.30 |
| Secretarial Overtime | July 2007 | $ 29.35 |
| Secretarial Overtime | August 2007 | $ 7.43 |
| Filing Fees * | September 2007 | $ 1,102.50 |
| Travel (DC)* | October 2007 | $ 5,205.73 |
| Expert (Lynn Baker) | November 2007 | $ 35,912.50 |
| High Desert Staffing, Inc. | November 2007 | $ 627.74 |
| Filing Fees | December 2007 | $ 602.00 |
| Postage | December 2007 | $ 478.83 |
| Copying | December 2007 | $ 3,933.25 |
| Research | December 2007 | $ 56.82 |
| Telephone | December 2007 | $ 580.00 |
| Travel | December 2007 | $ 15,570.38 |
| High Desert Staffing, Inc. | December 2007 | $ 633.77 |
| Client notepads * | December 2007 | $ 133.60 |
| Secretarial Overtime | December 2007 | $ 1.42 |
| Filing Fees * | January 2008 | $ 2.50 |
| Postage | January 2008 | $ 2,490.16 |
| Copying | January 2008 | $ 12,602.00 |
| Medical Records | January 2008 | $ 76.85 |
| Research | January 2008 | $ 162.73 |
| Telephone | January 2008 | $ 410.00 |
| Secretarial Overtime | January 2008 | $ 383.86 |
| Houston Call Center | January 2008 | $ 1,750.54 |
| Filing Fees | February 2008 | $ 83.70 |
| Telephone | February 2008 | $ 250.00 |
| Travel | February 2008 | $ 2,698.00 |
| Secretarial Overtime | February 2008 | $ 605.83 |
| Pro hac vice fees | | $ 2,706.00 |
| **Total** | | $ 267,118.41 |

**Note:** Costs followed by an * have
been withdrawn by the firm.

TURNER W. BRANCH
Admitted to practice in
New Mexico, Texas,
Colorado and the District
of Columbia

MARGARET MOSES BRANCH
Also admitted to practice
in Colorado

AMANDA M. ROMERO

FRANK BALDERRAMA

RYAN T. SANDERS

# BRANCH LAW FIRM®

## ATTORNEYS AND COUNSELORS AT LAW

*"In the Historic Rio Grande Corridor"*

2025 Rio Grande Boulevard, NW
Albuquerque, New Mexico 87104

Telephone (505) 243-3500
1-800-828-4529
Fax (505) 243-3534
www.branchlawfirm.com
e mail: reception@branchlawfirm.com

ARTHUR M. SOLON
(1949-2000)

Of Counsel:
HARRY STOWERS, JR.
Former Chief Justice,
New Mexico Supreme Court

July 24, 2009

Russ Herman, Esq.                                   *Via Fax (504) 561-6024 and First Class Mail*
Herman Herman Katz & Cotlar
820 O'Keefe Avenue
New Orleans, LA  70113

RE:   *Vioxx Common Benefit Review of Costs*

Dear Russ:

I am acknowledging receipt of your letter of July 24, 2009 which was received her ein my office in Albuquerque around noon.

Needless to say, I am disappointed about the fee committee's non-approval of $267,118.41 of our firm's cost submission. I really feel that I have little or no choice but to go along with the Fee Committee's recommendation and will accordingly, in the spirit of compromise and legal efficiency and economy withdraw the non-approved costs, which include previously withdrawn costs, in the Vioxx Common Benefit matter.

It is our belief that we will continue to be treated fairly on our Common Benefit Fees and that the Committee will continue to keep in mind the work done by the Branch Law Firm long before any hope or talk of settlement was made and the fact that we had eleven (11) cases on the "plaintiff's ready for trial list" in New Jersey. We are quite sure that the Committee is well aware of our commitment, time and contribution which I feel was helpful in the ultimate settlement and resolution of this litigation, be it considered "ever so small or otherwise". I am not going to do any further chest beating or self-laudation at this juncture.

Awaiting the further advice and decision of the Committee on legal fees and other matters; and in thanking the Committee for their dedication and hard work, we remain,

Most sincerely yours,

BRANCH LAW FIRM

*Best Regards*

Turner W. Branch

TWB:ps
cc:   Vioxx MDL 1657 Fee Allocation Committee *(via fax and First Class Mail)*



EXHIBIT
"D"

HOUSTON TEXAS OFFICE
808 Travis Street, Suite 1553
Houston, Texas 77002
(800) 243-3545
Fax (713) 224-1622

WASHINGTON, D.C. OFFICE
1424 K Street NW, Ste. 660
Washington, D.C., 20005
Telephone (202) 386-7365

07/24/2009 FRI 16:22   FAX                                                              ☑001

```
                        ****************************
                        *** FAX MULTI TX REPORT ***
                        ****************************

JOB NO.              2143
DEPT. ID             2090000
PGS.                 2

TX/RX INCOMPLETE     -----
TRANSACTION OK       913349547555
                     917138443755
                     912134811554
                     917136592204
                     912155924663
                     918504357020
                     912125840799
                     912123445461

ERROR                -----
```

TURNER W. BRANCH
MARGARET MOSES BRANCH
AMANDA M. ROMERO
FRANK BALDERRAMA
RYAN T. SANDERS

Also admitted to practice in Colorado
Also admitted to practice in the District of
Columbia
Also admitted to practice in Texas

# BRANCH LAW FIRM

ATTORNEYS AND COUNSELORS AT LAW

*In the Historic Rio Grande Corridor*

2025 Rio Grande Blvd., NW
Albuquerque, New Mexico 87104

BLF #: _802.0000_

Telephone
(505) 243-3500
Fax (505) 243-3534

Website
www.branchlawfirm.com

New Mexico Toll Free
1-800-562-3456

Nationwide Toll Free
1-800-828-4LAW

Of Counsel
Harry Stowers, Jr.
Former Chief Justice of the
New Mexico Supreme Court

## FACSIMILE TRANSMITTAL

**TO:**      Russ Herman, Esq.
             Herman Herman Katz & Cotlan - (505) 561-6024

             Andy D. Birchfield, Esq.
                  (334) 954-7555
             Edward F. Blizzard, Esq.
                  (713) 844-3755
             Thomas Girardi, Esq.
                  (213) 481-1554
             Mark Lanier, Esq.
                  (713) 659-2204
**CC:**      Arnold Levin, Esq.
                  (215) 592-4663
             Troy Rafferty
                  (850) 435-7020
             Christopher Seeger, Esq.
                  (212) 584-0799
             Perry Weitz, Esq.
                  (212) 344-5461

**FROM:**    Patricia R. Sanchez, Paralegal to
             Turner W. Branch, Attorney at Law

**DATE:**    July 24, 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | **MDL NO. 1657** |
| IN RE: VIOXX | : |  |
|       PRODUCTS LIABILITY LITIGATION | : | **SECTION: L** |
|  | : |  |
|  | : | **JUDGE FALLON** |
|  | : |  |
|  | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO ALL CASES**

<u>**ORDER & REASONS**</u>

     Currently pending before this Court is Plaintiff Liaison Counsel ("PLC")'s Motion for an

Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses (Rec. Doc.

17642).  Having previously resolved the issue of reimbursement of expenses,[1] the Court now

turns its attention to a determination of the appropriate common benefit fee amount.[2]

---

[1]On September 23, 2009, the Court ordered that $48.5 million, which represents 1% of
the total settlement amount in this case, be set aside as the Common Benefit Expense Fund.  *See*
Pretrial Order No. 51 (Sept. 23, 2009).  The Court also ordered that $40,049,748.16 in costs be
reimbursed at that time.  *Id.*  Those requests for reimbursement of common benefit costs were
vetted first by the Court-appointed CPA, then by a sub-committee of the Fee Allocation
Committee, and finally by the entire Fee Allocation Committee.  On December 17, 2009, the
Court ordered that an additional $49,216.08 in costs be reimbursed.  *See* Order, Rec. Doc. 30153
(Dec. 17, 2009).  Finally, the Court established a procedure whereby future common expenses
would be reviewed and reimbursed.  *See* Pretrial Order No. 51 (Sept. 23, 2009).

[2]The allocation of the common benefit fee amongst the fee applicants, which is the
responsibility of this Court pursuant to the Settlement Agreement, will not be addressed at this
time.  The Court will merely determine the appropriate total fee amount, leaving allocation for
another day.

EXHIBIT
"E"

## I.   FACTUAL BACKGROUND

To put this matter in perspective, a brief review of this litigation is appropriate.  This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib.  Merck, a New Jersey corporation, researched, designed, manufactured, marketed and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States.  Vioxx remained publicly available until September 20, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke.  Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims.  It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004.  Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[3]

California was the first state to institute a consolidated state court proceeding on October 30, 2002.  New Jersey and Texas soon followed suit, on May 20, 2003 and September 6, 2005, respectively.  On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL") conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial

---

[3]For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352

(J.P.M.L. 2005). Even after the creation of this federal MDL, many cases remained pending in

the various state courts.

On March 18, 2005, this Court held the first status conference in the Vioxx MDL to

consider strategies for moving forward with the proceedings. Shortly thereafter, the Court

appointed committees of counsel to represent the parties. In addition to a five member

Defendants' Steering Committee, see Pretrial Order No. 7 (Apr. 8, 2005), the Court appointed

twelve attorneys to serve on the Plaintiffs' Steering Committee ("PSC"), see Pretrial Order No. 6

(Apr. 8, 2005).[4] Thereafter, the PSC created a number of subcommittees which were tasked with

---

[4]Some have suggested that the attorneys themselves should select the Plaintiffs' Steering Committee with the attorney with the largest number of plaintiff cases having the laboring oar. *See* Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal*, 63 Vand. L. Rev. 107, 159-77 (2010). But the experience of the MDL courts suggest otherwise. *See* Carolyn A. Dubay, Federal Judicial Center, *Trends and Problems in the Appointment and Compensation of Common Benefit Counsel in Complex Multi-District Litigation: An Empirical Study of Ten Mega MDLs* (forthcoming) (July 2010 manuscript at 59). Having a large number of cases in the MDL often indicates skill at advertising, but does not guarantee the best lawyering or even the selection of those best suited to handle the matter in a cooperative endeavor which is crucial for MDL proceedings. The ability to work in a team setting tends to be more difficult for the plaintiff bar than for defense attorneys. But the efficient and successful resolution of an MDL is dependent on coordination and cooperation of lead counsel for all sides. There is room for both vigorous advocacy and professional cooperation. *See, e.g., The Sedona Conference Cooperation Proclamation* (2008), available at http://www.thesedonaconference.org/content/ tsc_cooperation_proclamation/proclamation.pdf. In an MDL setting where there can be a thousand plaintiffs' attorneys it not only takes a good lawyer to qualify for lead or liaison counsel but one who has the diplomatic skills to coordinate the efforts of a diverse group. Selecting lead and liaison counsel by a neutral party such as an MDL judge may not be the best method but as between it and the selection by other counsel it is the better way. Moreover, the selection of lead counsel by their fellow attorneys would involve intrigue and side agreements which would make Macbeth appear to be a juvenile manipulator. Frequently, recommendations by attorneys for positions on leadership committees are governed more on friendship, past commitments and future hopes than on current issues.

focusing on the many aspects of MDL management.[5]  Membership on these subcommittees was

open to all attorneys who had clients and wanted to participate and was not limited to the

members of the Steering Committee.

Furthermore, to give transparency to this litigation, the Court created a web site

accessible to all counsel and the public at large.  All motions, Court orders, opinions, recent

developments, a calendar of scheduled events, and various other matters were posted on this web

site.[6]  Throughout the litigation monthly status conferences were held in open court.  Notice of

the meetings were posted on the web site and were open to all.  Transcripts of these conferences

were posted on the Court's web site for those who could not attend.

On April 8, 2005, the Court appointed a CPA to record and review the submissions of

common benefit counsel in this MDL.  *See* Pretrial Order No. 6 (Apr. 8, 2005).  Those doing

common benefit work and incurring common benefit expenses were ordered to report the hours

and expenses to the Court-appointed CPA.  Subsequently, the Court entered Pretrial Order No.

19, which established a Plaintiffs' Litigation Expense Fund to compensate and reimburse

attorneys for services performed and expenses incurred for the common benefit.  Pursuant to this

Order, any case that was settled, compromised, dismissed, or otherwise reduced to judgment for

monetary relief, with or without trial, was subject to an assessment.  In order to avail themselves

of the initial work of the common benefit attorneys, individual plaintiffs' counsel could, for a

limited time, enter into a contract that was to dictate the assessment amount.  The "Full

_____

[5]The various consolidated state court proceedings also established similar management
structures to coordinate the litigation.

[6]*MDL-1657 Vioxx Products Liability Litigation*, http://vioxx.laed.uscourts.gov/.

-4-

Participation Option," which was one such option, established an assessment of 2% of the recovery for fees and 1% of the recovery for costs. *See* Pretrial Order No. 19 (Aug. 4, 2005). Counsel were able to select the "Full Participation Option" within 90 days of the entry of Pretrial Order 19.  Following that period, counsel could accept a "Traditional Assessment Option" providing for 6% assessment of recoveries in MDL cases and 4% assessment of recoveries in state court cases.

Discovery rapidly commenced.  The common benefit attorneys were responsible for all aspects of pre-trial preparation, including document discovery, the taking of depositions, preparation of experts, motions practice, and to some extent, coordination of federal and state court proceedings.  Millions of documents were discovered and collated.  Thousands of depositions were taken and at least 1,000 discovery motions were argued.  After a reasonable period for discovery, the Court assisted the parties in selecting and preparing certain test cases to proceed as bellwether trials.  Additionally, similar trials were scheduled in state court.

This Court conducted six Vioxx bellwether trials.[7]  The first of the bellwether trials took place in Houston, Texas, while this Court was displaced following Hurricane Katrina.  The five subsequent bellwether trials took place in New Orleans, Louisiana.  Only one of the trials resulted in a verdict for the plaintiff.  Of the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the defendant.  During the same period that this Court was

---

[7]*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. Filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. Filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. Filed Feb. 16, 2006 (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. Filed June 21, 2005) (sixth bellwether trial).

conducting six bellwether trials, approximately thirteen additional Vioxx-related cases were tried before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida. With the benefit of experience from these bellwether trials, as well as the encouragement of the several coordinated courts,[8] the parties soon began settlement discussions in earnest.

The Court appointed Negotiating Plaintiffs' Counsel ("the NPC") to explore and engage in settlement discussions with Merck. Counsel for Merck and the NPC met together more than fifty times and held several hundred telephone conferences. Although the parties met and negotiated independently, they kept this Court and the coordinate state courts of Texas, New Jersey, and California informed of their progress in settlement discussions.

On November 9, 2007, Merck and the NPC formally announced that they had reached a Settlement Agreement. *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007) ("Settlement Agreement" or "MSA"), *available at* http://www.browngreer.com/vioxxsettlement. The private Settlement Agreement establishes a pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion. *Id.* § "Recitals".[9] The Settlement Agreement is a voluntary opt-in agreement and expressly contemplates that this Court

_____

[8]The Court once again expresses its thanks to Judge Carol E. Higbee of the Superior Court of New Jersey, Judge Victoria Chaney of the Superior Court of Los Angeles County in California, and Judge Randy Wilson of the 157th Civil District Court of Harris County, Texas for their efforts in bringing this litigation to completion.

[9]For a more detailed factual background of the various mechanics of the Settlement Agreement, including the provisions for the mandatory resolution of governmental liens, *see In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) (denying motions to enjoin disbursement of interim settlement payments).

shall oversee various aspects of the administration of settlement proceedings, including

appointing a Fee Allocation Committee, allocating a percentage of the settlement proceeds to a

Common Benefit Fund, approving a cost assessment, and modifying any provisions of the

Settlement Agreement that are otherwise unenforceable.[10]  Accordingly, this Court has

consistently exercised its inherent authority over the MDL proceedings, *see* Manual for Complex

Litigation (Fourth) §§ 10.224, 14.215-16, 14.231-.216 (2004), in coordination with its express

authority under the terms of the Settlement Agreement to ensure that the settlement proceedings

move forward in a uniform and efficient manner.[11]

 As part of the Settlement Agreement, the parties included a provision that expressly

provides for a common benefit fee assessment to be fixed by the Court.  *Id.* § 9.2.  Specifically,

the Settlement Agreement provides that:

> [t]o ensure that [the common benefit attorneys] are fairly compensated but that
> their fees are in conformance with reasonable rates, an assessment of common
> benefit attorneys' fees will be imposed at no more than 8% of the gross amount
> recovered for every client that registers under the terms of the Settlement
> Agreement.

---

[10]*See, e.g.,* Settlement Agreement § 9.2.4 (establishing that the Court shall appoint a Fee
Allocation Committee); § 9.2.5 (establishing that the Court shall "provide appropriate notices
governing the procedure by which [it] shall determine the common benefit attorneys' fees and
reimbursement of common benefit expenses"); § 16.4.2 (establishing that the Court may modify
any provision of the Agreement under certain limited circumstances if the Court determines that
the provision "is prohibited or unenforceable to any extent or in any particular context but in
some modified form would be enforceable").

[11]*See e.g.,* Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's
"inherent authority over this multidistrict litigation" as well as its express authority under
Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving
the right to "issue subsequent Orders governing the procedure by which the Allocation
Committee shall carry out its function"; and providing that members appointed to the committee
may not be substituted by other attorneys "except with the prior approval of the Court").

*Id.* § 9.2.1.  Additionally, the Settlement Agreement states that this common benefit fee

assessment supersedes the assessments provided for in Pretrial Order No. 19.  *Id.* ("The

maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL

common benefit attorneys pursuant to Pretrial Order No. 19.")

 On July 17, 2008, Merck formally announced that it was satisfied that the thresholds

necessary to trigger funding of the Vioxx Settlement Program would be met.  *See Minute Entry,*

*July 17, 2008,* Rec. Doc. 15362 (July 17, 2008).  Merck further advised that it intended to waive

its walk away privileges and that it would commence funding the Vioxx Settlement Program by

depositing an initial sum of $500 million into the settlement fund, clearing the way for

distribution of interim payments to eligible claimants.  *Id.*  Eventually some 99.9% of all eligible

claimants enrolled in the program.

 The Settlement Program proceeded at a very rapid rate in order to ensure that the

plaintiffs would recover in a timely fashion.  Final payments to heart attack claimants were

completed prior to October 14, 2009, final payments to stroke claimants were completed by June

14, 2010, and final extraordinary injury payments were completed by June 29, 2010.  Thus, in

only 31 months, the parties to this case were able to reach a global settlement and distribute

$4,353,152,064 to 32,886 claimants, out of a pool of 49,893 eligible and enrolled claimants.

This efficiency is unprecedented in mass tort settlements of this size.  It was due in large part to

the ability, industry, and professionalism of the attorneys for both sides and the plan

administrators.

 Before the pay outs commenced the Court turned its attention to attorneys' fees for

primary counsel, or counsel who were retained directly by the claimants.  Primary counsel came

from nearly every state in the Union. Their fee contracts ranged from 33 1/3% to over 40%. This inconsistency of fees for attorneys doing roughly the same work and having the same responsibility seemed unsustainable and inappropriate. Moreover, one benefit of the MDL process is economy of scale, namely the principle of obtaining an economic benefit from sheer numbers. It appeared to the Court that the claimants themselves were the only ones not benefitting from this principle. Accordingly, the Court issued an Order & Reasons, which provided "that contingent fee arrangements for all attorneys representing claimants in the Vioxx global settlement shall be capped at 32% plus reasonable costs." *Order & Reasons, August 27, 2008*, Rec. Doc. 15722, 20-21 (Aug. 27, 2008) (published as *In re Vioxx Prods. Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008)). Following this Order, a group of five attorneys, identified as the Vioxx Litigation Consortium ("VLC"), filed a Motion for Reconsideration/Revision of the Court's Order Capping Contingent Fees and Alternatively for Entry of Judgment. (Rec. Doc. 17395). The matter was set for hearing and the Tulane Law Clinic was appointed to represent the claimants themselves since there was a clear conflict between the claimants and their counsel. After extensive briefing and a hearing, the Court affirmed its position with the alteration that would allow the Court to deviate from the 32% cap in appropriate rare circumstances. *In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549 (E.D. La. 2009). The Court's ruling was appealed to the Fifth Circuit Court of Appeals but after a time the appeal was withdrawn.

The PLC filed the instant motion on January 20, 2009, requesting a common benefit fee award of 8% of the $4.85 billion settlement amount. This amount was to come out of the attorneys' fees of primary counsel. The motion was sent to all parties and announced by the

Court at public status conferences.  On April 16, 2009, the Court invited any interested party to file a Notice of Objection on or before May 8, 2009.  After receiving numerous objections, the Court concluded that it would be appropriate to appoint a Liaison Counsel for the Common Benefit Fee Application Objectors and appointed Michael Stratton to this role.  *See* Pretrial Order No. 52 (Sept. 30, 2009).  Thereafter, numerous status conferences were convened, discovery was taken, briefing was submitted, and arguments were heard.  While the matter was pending before this Court, the PLC reduced its request for a common benefit fee award to 7.5% and the objectors withdrew their objections.  With this back story in mind and after considering the briefs and oral argument, the Court is now fully apprised of the factual and legal issues involved in the PLC's request and is ready to rule.

## II.     COMMON BENEFIT ATTORNEYS' FEES–LAW & ANALYSIS

### A.     Introduction

"[U]nder the 'American Rule,' the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561 (1986) (quotation omitted).  Likewise, the attorney for the prevailing litigant must generally look to his or her own client for payment of attorneys' fees. Since the nineteenth century, however, the Supreme Court has recognized an equitable exception to this rule, known as the common fund or common benefit doctrine, that permits the creation of a common fund in order to pay reasonable attorneys' fees for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries.  *See In*

*re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring).[12] This

equitable common fund doctrine was originally, and perhaps still is, most commonly applied to

awards of attorneys' fees in class actions. *E.g.*, 4 Alba Conte & Herbert B. Newberg, *Newberg*

*on Class Actions* § 13:76 (4th ed. 2002) (discussing common fund doctrine in context of class

actions); Fed. R. Civ. P. 23(h).

But the common fund doctrine is not limited solely to class actions. *See Sprague v.*

*Ticonic National Bank*, 307 U.S. 161 (1939) (employing common benefit doctrine to award fees

and costs to litigant whose success benefitted unrelated parties by establishing their legal rights);

Alan Hirsh & Diane Sheeley, Fed. Judicial Ctr., *Awarding Attorneys' Fees and Managing Fee*

*Litigation* 51 (2nd ed. 2005) ("Although many common fund cases are class actions ... the

common fund doctrine is not limited to class actions."); Manual for Complex Litigation (Fourth)

§ 14.121 (2004). As class actions morph into multidistrict litigation, as is the modern trend, the

common benefit concept has migrated into the latter area. The theoretical bases for the

application of this concept to MDLs are the same as for class actions, namely equity and her

blood brother, quantum meruit. However, there is a difference. In class actions the beneficiary

of the common benefit is the claimant; in MDLs the beneficiary is the primary attorney.

MDL courts have consistently cited the common fund doctrine as a basis for assessing

---

[12]Some authorities have commented on the "persistent and confusing identification of common-fund recovery as an 'exception' to the American rule on attorneys' fees," noting that in a common fund situation the funds are actually distributed "among those aligned with the plaintiff rather than extract[ed] ... from the defeated adversary." *See* Restatement (Third) of Restitution § 30 Reporter's Note a (Tentative Draft No. 3, 1994) (quoting Thomas D. Rowe, Jr., *The Legal Theory of Attorney Fee Shifting: A Critical Overview*, 1982 Duke L. J. 651, 662 (1982)). Regardless of specific taxonomy, the common-fund doctrine, as well as the Court's inherent power to assess fees to compensate appointed managing attorneys, constitute departures from the traditional rule that each litigant bears his or her own costs.

-11-

common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs. *E.g.*, *In re Genetically Modified Rice Litig.*, MDL No. 06-1811, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2010) (relying on common fund doctrine as an alternate basis to inherent managerial authority and concluding that "[b]oth sources of authority provide the same result"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 682174, at *4 (D. Minn. Mar. 7, 2008); *accord In re Zyprexa*, 594 F.3d at 128-30 (Kaplan, J., concurring).[13]

In addition to judicial precedent the Court also finds authority to assess common benefit attorneys' fees in its inherent managerial authority, particularly in light of the complex nature of this MDL. The Fifth Circuit has long recognized that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and to compensate them for their work. *See In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (1977) ("*Everglades*"). In *Everglades*, the JPML transferred all federal cases arising out of a passenger plane crash near Miami to the Southern District of Florida. *Id.* at 1008. The transferee court appointed a Plaintiffs' Committee to coordinate discovery and pretrial matters, and then to conduct bellwether trials. *Id.* The court compensated the Committee through an assessment on the contingent fees of attorneys who represented MDL

---

[13]On the other hand, some commentators take the position that the common fund doctrine does not justify assessment of common benefit fees in consolidated mass tort MDLs. Silver & Miller, *supra*, at 120-30; Restatement (Third) of Restitution § 30 cmt. b (Tentative Draft No. 3, 1994) ("By comparison with class actions, court-imposed fees to appointed counsel in consolidated litigation frequently appear inconsistent with restitution principles, since litigants may have no choice but to accept and pay for certain legal services as directed by the court. The fact that such fees may not be authorized by this Section is probably irrelevant, however, since their predominant rationale is not unjust enrichment but administrative convenience.").

plaintiffs but were not on the Committee. *Id.* The non-Committee attorneys appealed and the Fifth Circuit upheld the district court's authority to make that assessment. The Fifth Circuit explained that a district court has inherent authority "to bring management power to bear upon massive and complex litigation to prevent it from monopolizing the services of the court to the exclusion of other litigants." *Id.* at 1012. Therefore, an MDL court "may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide." *Id.* at 1014. Naturally, this authority would be "illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation." *Id.* at 1016. Assessment of those fees against other retained lawyers who benefitted from the work done was permissible and appropriate. *See id.* at 1019-20.[14] Other courts have applied this inherent authority to compensate common benefit counsel in complex litigation. *E.g.*, *In re Diet Drugs*, 582 F.3d 524, 546-47 (3rd Cir. 2009); *In re Genetically Modified Rice Litig.*, 2010 WL 716190, at *4 ("An MDL court's authority to establish a trust and to order compensations to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power."); *In re Guidant*, 2008 WL 682174, at *5; *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 265-66 (E.D.N.Y. 2006); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 653-56 (E.D. Pa. 2003); *see also* Manual for Complex Litigation (Fourth) § 22.62 (2004); Restatement (Third) of Restitution § 30 Reporter's Note b (Tentative Draft No. 3, 1994) ("In contrast to the standard view of class-action

---

[14]The Fifth Circuit also found support in "the body of law concerning the inherent equitable power of a trial court to allow counsel fees and litigation expenses out of the proceeds of a fund that has been created ... by successful litigation," which the Court discussed above. *Id.* at 1017.

fees, which explains them as restitutionary, the leading accounts of fees to court-appointed

counsel in consolidated litigation properly emphasize factors independent of restitution to justify

the imposition of a liability by court order.") (citing *Everglades*).

 In addition to equity, quantum meruit, and inherent managerial authority, the Court

derives express authority in this case from the terms of the Settlement Agreement entered into by

the parties and consented to by their primary attorneys.  Section 9.2 of the Settlement Agreement

governs common benefit fees and expressly authorizes the Court to determine common benefit

attorneys' fees.  Settlement Agreement § 9.2.5.[15]  In fact the PLC asks the Court to exercise the

aforementioned authority and award common benefit fees under the terms of the Settlement

Agreement.

 Although the Objectors have now withdrawn their objections to this fee request, the

Court has had the benefit of their briefing and argument, as well as briefs and supplemental

---

 [15]The Court takes this opportunity to discuss the initial fee assessments set by the Court
in Pretrial Order 19, as well as criticism that the NPC did an end-run around those agreements
and "used their control of settlement negotiations to make more money available for
themselves." Silver & Miller, *supra* at 132.  The PTO 19 fee assessment agreements were
reasonable and appropriate to create a fund to compensate common benefit attorneys for the
consolidated MDL discovery work that was contemplated at that early stage of the litigation.
When circumstances changed as a result of the extensive discovery, numerous trials, and through
negotiation and implementation of a global opt-in settlement, it became necessary to reevaluate
the reasonable compensation for the common benefit attorneys who accomplished those tasks.
The claimants and their attorneys acknowledged those changed circumstances when they
accepted the terms of the Settlement Agreement which supplanted the PTO 19 assessments.
Settlement Agreement § 9.2.1.  Moreover, the Court's equitable and managerial authority and
duty to award fair common benefit fees or to adjust contingent fees exists independent of
contractual agreement, and the Court's authority to do justice by reducing attorneys' fees
necessarily encompasses the corollary authority to increase fees where appropriate. *See Guidant*,
2008 WL 682174, at *11-12.

-14-

briefs from the PLC honed through the fair opportunity for objection.[16]  *Compare In re*

*Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 38 (D.N.H. 2006) ("With no adversary to

challenge the Plaintiffs' proposal, the Court has been left to fend for itself in crafting an

approach for assessing reasonableness.").  Merck has remained silent pursuant to the terms of the

Settlement Agreement.  Settlement Agreement § 9.2.6.

      The PLC contends in its briefing and argument that its requested award of 7.5% of the

settlement amount as common benefit fees is justified by other common benefit assessments and

awards in MDL cases, by the work done, by a review of the *Johnson* factors, and by a lodestar

cross-check.  Keeping in mind that the ultimate goal is reasonableness while mindful that

reasonableness, like beauty, is often in the eye of the beholder, the Court is prepared to rule.

**B.**      **Methodology for Calculation of Attorneys' Fees**

      *1.*      *Generally*

      Over the years courts have employed various methods to determine the reasonableness of

an award of attorneys' fees.  These methods include the "lodestar" method, which entails

multiplying the reasonable hours expended on the litigation by an adjusted reasonable hourly

rate, *see Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 583 & n.15 (5th Cir. 1980); the

percentage method, in which the Court compensates attorneys who recovered some identifiable

sum by awarding them a fraction of that sum; or, more recently, a combination of both methods

---

[16]This not to say that third parties have not commented upon and criticized the PLC's fee
request.  Professors Silver and Miller assert that "[the PLC] used their position to benefit
themselves at the expense of those they were charged to represent.  Conduct of this sort
establishes a predicate for fee forfeiture, not for fee enhancement."  63 Vand. L. Rev. at 135.
Professors Silver and Miller served "as paid consultants to a group of attorneys in the Vioxx
MDL who have questioned or challenged aspects of the settlement, including the fee
assessment."  *Id.* at 107 n.1.

in which a percentage is awarded and checked for reasonableness by use of the lodestar method.

In the Fifth Circuit, attorneys' fees have traditionally been calculated using the lodestar method. The resulting lodestar figure, or the product of the reasonable hours worked by the reasonable hourly rate, is then adjusted by a multiplier in light of the twelve *Johnson* factors. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.; see also Von Clark v. Butler*, 916 F.2d 255, 258 n.3 (5th Cir. 1990).[17]

The lodestar method is not without flaws, especially when employed in common fund cases. As an influential report by the Third Circuit Task Force concluded, the drawbacks of the lodestar method include:

(1) increased workload on an already overtaxed judicial system, (2) inconsistent

---

[17]In *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002), the Fifth Circuit held that "[s]tate law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." The Court will nevertheless utilize the *Johnson* framework in this case. This matter is before the court through MDL jurisdiction and the global settlement of these claims ensures that state law has supplied no rule of decision. Further, as previously noted in connection with its Order and Reasons capping attorneys' fees at 32%, this Court has the equitable and inherent authority in all federal courts to determine a fair common benefit fee as well as express authority under the Settlement Agreement. *In re Vioxx*, 650 F. Supp. 2d at 558-62; *In re Vioxx*, 574 F. Supp. 2d at 610-14.

application of the approach and widely varied fee awards, (3) illusory mathematical precision unwarranted by the realities of the practice of law, (4) potential for manipulation, (5) reward of wasteful and excessive attorney effort, (6) disincentive for early settlement, (7) insufficient flexibility for judicial control of litigation, (8) discouragement of public interest litigation, and (9) confusion and lack of predictability in setting fee awards.

*See* Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases*, 18 Geo. J. Legal Ethics 1453, 1456 (2005) (summarizing *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985)) (internal quotations omitted).

In reaction to the difficulties with the lodestar method, courts turned to awarding a percentage of the recovered common benefit fund as attorneys' fees. The popularity of this method gained momentum following the publication of the aforementioned Third Circuit Task Force report in 1985. Recognizing the "contingent risk of nonpayment" in such cases, courts have found that class or lead counsel ought to be compensated "both for services rendered and for risk of loss or nonpayment assumed by carrying through with the case." *In re Combustion, Inc.*, 968 F. Supp. 1116, 1132 (W.D. La. 1997) (summarizing the various methods used to calculate attorneys' fees); *see In re Cabletron*, 239 F.R.D. at 37 (stating that the percentage method "allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure") (quotation omitted); *see also* Samuel R. Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?*, 126 U. Pa. L. Rev. 281 (1977). Moreover, courts find that the percentage method provides more predictability to attorneys and class members or plaintiffs, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys. *See* Walker & Horwich, *supra*, at 1456-57 (citing *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D.

-17-

Cal. 1989)); *accord In re Diet Drugs*, 582 F.3d at 540.

While the United States Supreme Court has approved the percentage method in common

fund cases, it has never formally adopted the lodestar method in common fund cases. *See*

*Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 773-74 (11th Cir. 1991) (reading *Blum v.*

*Stenson*, 465 U.S. 886, 900 n.16 (1984), as the Supreme Court's "acknowledgment" of the

percentage method in common fund cases); *In re Prudential-Bache Energy Income P'ships Sec.*

*Litig.*, MDL No. 888, 1994 WL 150742, (E.D. La. Apr. 13, 1994) (tracing the history of the

various methods). Conversely, the Fifth Circuit appears to be the only Court of Appeals that has

not explicitly endorsed the percentage method. Manual for Complex Litigation (Fourth) §

14.121 (2004). However, neither has the Fifth Circuit "explicitly *disapproved* of the percentage

method of calculating fees in common fund cases." *In re OCA, Inc. Sec. & Derivative Litig.*, No.

05-2165, 2009 WL 512081, at *18 (E.D. La. Mar. 2, 2009) (emphasis added). Therefore, the

Fifth Circuit appears to tolerate the percentage method, so long as the *Johnson* framework is

utilized to ensure that the fee awarded is reasonable. *See id.*; *Strong v. BellSouth Telecomms.,*

*Inc.*, 137 F.3d 844, 851-52 & n.5 (5th Cir. 1998); *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823-

25 (5th Cir. 1996).

Accordingly, numerous district courts in this Circuit have applied a "blended" percentage

method to determine a reasonable fee award, while staying within the *Johnson* framework. *See,*

*e.g., In re OCA*, 2009 WL 512081, at *19; *In re Enron Corp. Sec., Derivative & ERISA Litig.*,

586 F. Supp. 2d 732, 766, 778 (S.D. Tex. 2008); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp.

2d 830, 859-61 (E.D. La. 2007); *In re Bayou Sorrel Class Action*, No. 04-1101, 2006 WL

3230771, at *3 (W.D. La. Oct. 31, 2006); *In re Educ. Testing Serv. Praxis Principles of Learning*

-18-

*& Teaching:  Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 628-29 (E.D. La. 2006); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 531 (N.D. Miss. 2003); *In re Combustion, Inc.*, 968 F. Supp. at 1135-36; *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 499-501 (N.D. Miss. 1996).

Keeping in line with Fifth Circuit precedent and this Court's prior experience, the Court finds that the blended percentage approach is an appropriate method for calculating reasonable common benefit attorneys' fees in this case.  Accordingly, the Court will first determine the valuation of the benefit received by the claimants and then select an initial benchmark percentage.  The Court will then determine whether the benchmark should be adjusted based on the application of the *Johnson* factors to the particular circumstances of this case.  Finally, the Court will conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award.  The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method.

### 2.    *Valuation of the Benefit Obtained*

The Settlement Agreement created a $4.85 billion fund for the compensation of Vioxx claimants.  Out of that amount, $4 billion was allotted to myocardial infarction claims, and $850 million to ischemic stroke claims.  The Court finds no reason to omit any portion of that settlement fund from consideration with respect to the reasonable amount of common benefit fees.  Accordingly, $4.85 billion is the appropriate amount for calculation of a reasonable percentage of common benefit fees.

### 3.    *Benchmark Percentage*

The next task is to determine an initial benchmark percentage.  The Court's goal in setting a benchmark percentage is not to rubber-stamp the PLC's proposed figure.  Rather, the

Court will endeavor to arrive at an independent and justified reasonable percentage appropriate to the facts particular to this global settlement.  To accomplish that end, several resources may be utilized.

First, this Court is among the many throughout the country that have considered data compiled in a pair of recent empirical studies of attorneys' fees in class action settlements, Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 31-32 (2004) ("Eisenberg & Miller 2004"), and Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) ("Eisenberg & Miller 2010"), when computing the appropriate benchmark percentage in a class settlement.  *See In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, MDL No. 08-1999, 2010 WL 3310264, at *13-14 (E.D. Wis. Aug. 16, 2010); *Murphy Oil*, 472 F. Supp. 2d at 862-64; *In re ETS*, 447 F. Supp. 2d at 630; *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006); *In re Cabletron Sys.*, 239 F.R.D. at 37 n.12, 41.  The Eisenberg and Miller studies are helpful for providing concrete evidence for the relationship between the amount recovered and the attorneys' fee award; the empirical data shows that as settlement amounts rise, the reasonable percentage of attorneys' fees decreases.  Eisenberg & Miller 2004 at 54-55; Eisenberg & Miller 2010 at 263-65.  However, given the amount of the settlement in the Vioxx MDL and the opt-in nature of the Master Settlement Agreement, the studies are of limited usefulness in determining a reasonable benchmark percentage for a common benefit fee award.[18]

---

[18] *See* William B. Rubenstein, *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 Class Action Att'y Fee Dig. 87, 89 (2009) ("As a judicially imposed *portion* of a larger privately-negotiated contingent fee, the common benefit fee is logically, therefore, generally a

Eisenberg and Miller studied settlements of class actions, and although this Court has recognized that in some respects the MDL resembles a class action, in other respects this case is quite different.

In a typical application for a class action fee award, the Court allocates a percentage of the class's recovery to class counsel as compensation. Fed. R. Civ. P. 23(h). Class counsel perform all the work on behalf of the class and are the sole attorneys for the class members. With few exceptions, all work done by class counsel benefits all members in the class and not just the lead plaintiffs. Thus, in a typical class action fee award the tension is between the interests of counsel in receiving reasonable compensation for their work, and class members in ensuring that counsel does not receive a windfall.

The dynamic involved in the fee application in the present case is different. The Settlement Agreement was not a class action settlement, but was rather a complicated opt-in resolution of individual personal injury claims. The vast majority of these personal injury claims were governed by a contingent fee contract between the individual claimant and his or her primary attorney. The Court, as mentioned, previously capped the amount of those contingent fee contracts at 32%. By the terms of the Settlement Agreement and this Court's Order capping fees, a common benefit award is deducted not from the claimant's portion but from the total amount of counsel fees payable under the individual contingent fee arrangements. Thus, 32% of $4.85 billion represents the total amount of possible attorney compensation, including work done by the claimant's primary attorney on his or her behalf and work done by common benefit attorneys on behalf of all Vioxx claimants. The tension in this case is between the attorneys who

_____

lower fee than the class action fee award.") (emphasis in original).

-21-

have done common benefit work and the primary attorneys who have not.

Members of the PSC and others who performed common benefit work in the MDL are undoubtedly entitled to compensation. So, too are the primary attorneys who represented individual claimants and bore the responsibility of obtaining information from them and keeping them advised of all developments. This Court has acknowledged the substantial work done by individual attorneys. *In re Vioxx*, 650 F. Supp. 2d at 564. But the undeniable fact remains that the great bulk of the work as well as the expense was borne by the attorneys who performed common benefit work. Thus, in determining a reasonable common benefit fee the Court must resolve the "taffy pull" between the interests of common benefit counsel and primary attorneys in receiving fair compensation for their respective work. At first blush to award common benefit fees might be criticized as double dipping and not appropriate. But on closer scrutiny it clearly is not. It is true that many of those who have done common benefit work have their own clients and have received or will receive a fee from them. But it is not double dipping because the common benefit fee will not come from any client. Instead it will come from the attorneys, most of whom have not done any common benefit work but have received enormous benefit from it. Thus as between a common benefit attorney who expended considerable time, resources, and took significant economic risks to produce the fee, and the primary attorney who did not, it is appropriate and equitable that the former receive some economic recognition from the beneficiary of this work.

To determine an appropriate common benefit fee in this case the Court looks to comparable MDL set-aside assessments and awards of common benefit fees. Two notable examples are found in the *Zyprexa* and *Guidant* litigations, which this Court has previously cited

as being similar to the Vioxx litigation.  In *In re Zyprexa*, the court established two separate

common benefit funds to compensate common benefit work done by two separate Plaintiffs'

Steering Committees.  The first PSC was compensated by a set-aside of 1% of the gross amount

of a master settlement, plus interest on the amount held in escrow.  *See In re Zyprexa*, 467 F.

Supp. 2d at 263.  A second fund was established to compensate the second PSC through a 3%

hold-back of any subsequent recoveries, to be split evenly between the claimant's recovery and

the fees otherwise payable to the individual attorney.  *See In re Zyprexa*, 467 F. Supp. 2d at 261;

*In re Zyprexa*, MDL No. 1596, 2007 WL 2340790, at *1 (E.D.N.Y. Aug. 17, 2007).  The court in

*Zyprexa* also capped contingent fees at 35% of amounts greater than $5,000.  *In re Zyprexa*, 424

F. Supp.2 d 488 (E.D.N.Y. 2006).

     In *In re Guidant*, the court awarded 14.375% of a global settlement amount as a common

benefit award and initially capped individual contingent fees at 20%.  *In re Guidant*, 2008 WL

451076, at *1.  The court found that the parties had contracted around a previous 4% common

benefit fee assessment by entering into a Master Settlement Agreement.  *Id.* at *11-12.  In a

subsequent reconsideration, the court capped the total attorney fees (including the share of the

common benefit award plus individual contingent fees) at the lowest of 37.18%, or a lower

contingent fee arrangement, or a state-imposed contingent fee limit.  *In re Guidant Corp.*

*Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 3896006, at *1 (D.

Minn. Aug. 21, 2008).

     Other MDL courts have also established funds for common benefit compensation by

ordering set-aside assessments of individual plaintiff settlements and awarded fees from those

funds.  *E.g.*, *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,

553 F. Supp. 2d 442, 457-58, 491-96 (E.D. Pa. 2008) (describing 9% federal and 6% state assessments later reduced to 6% and 4%, respectively; awarding less than total fund created by assessments); *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 909, 919 n.19 (N.D. Ohio 2003) (awarding common benefit fees out of $50,000,000 fund created through assessment representing 4.8% of settlement value); *In re Protegen Sling & Vesica Sys. Prods. Liab. Litig.*, MDL No. 1387, 2002 WL 31834446, at *1, *3 (D. Md. Apr. 12, 2002) (9% federal, 6% coordinated state assessments); *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 2002 WL 441342, at *1 (S.D.N.Y. Mar. 20, 2002) (6% withholding in federal cases, 4% in participating state cases); *In re Orthopedic Bone Screws Prods. Liab. Litig.*, MDL No. 1014, 2000 WL 1622741 (E.D. Pa. Oct. 23, 2000) (awarding full 12% of withheld fees); *see also* Rubenstein, *supra* at 87 (2009) (collecting cases and concluding that most common benefit assessments range from 4% to 6%); 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:9 (4th ed. 2002) ("Most [MDL] courts have assessed common benefit fees at about a 4-6% level, generally 4% for a fee and 2% for costs."); Paul D. Rheingold, *Litigating Mass Tort Cases* § 7:35 (2010) ("[P]ercentages awarded for common funds in recent MDLS ... were in the 4-6% range.") (citation omitted).

These examples demonstrate that a reasonable common benefit assessment or award can vary from MDL to MDL and that there is no mathematical formula for deriving a "correct" amount. Indeed, the Court notes that the PLC initially requested a common benefit award of 8% and contended such an amount would be presumptively reasonable. A year and a half later, after Objector's Liaison Counsel had an opportunity for discovery, the PLC reduced its common benefit award request to 7.5%. If 8% was presumptively reasonable but the PLC nonetheless

-24-

voluntarily reduced the request to 7.5%, the Court is led to conclude that even the PLC believes

that a reasonable benchmark percentage is a flexible concept.  With that this Court agrees.

In light of the foregoing, and guided by this Court's observations over the last five years

of the nature and scope of the work and effort of those attorneys who performed common benefit

work, the Court finds that 6% of the settlement amount is a reasonable benchmark percentage for

a common benefit fee award.  This figure represents about 20% of the total attorneys' fees.  This

figure is within the range of MDL awards and assessments described above.  No part of this 6%

will come from the recovery of any Vioxx claimant; rather, it will be assessed against the

contingent fee recoveries of all Vioxx primary plaintiffs' attorneys.  Furthermore, in

recommending the Settlement Agreement to their clients and participating in the Settlement

Program, all Vioxx primary plaintiffs' attorneys consented to a common benefit assessment of

up to 8%.  Accordingly, an assessment of 6% is clearly acceptable to them. It is now appropriate

to test this percentage in the crucible of the *Johnson* factors to determine whether an adjustment,

upwards or downwards, is in order.

### 4.    *Consideration of the* Johnson *Factors*

The Court will now consider the *Johnson* factors, addressing them in conjunction with

the circumstances of this case.[19]

> **(a)    The Time and Labor Required; Time Limitations Imposed by
> the Client or the Circumstances; The Preclusion of Other
> Employment by the Attorney Due to Acceptance of the Case**

---

[19]  The Fifth Circuit advises that it does "not require the trial court's findings to be so
excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper
than did the cases from which they arose." *In re High Sulfur Content Gasoline Prods. Liab.
Litig.*, 517 F.3d 220, 228-29 (5th Cir. 2008) (quoting *La. Power & Light Co. v. Kellstrom*, 50
F.3d 319, 331 (5th Cir. 1995)).  The Court shall attempt to comply with this guidance.

Throughout the Vioxx litigation, the Court has repeatedly expressed its intent and desire to see an expedited resolution. Indeed, all interested parties, including the PSC and Merck, have recognized that prompt resolution would be invaluable to those impacted by Vioxx. The Herculean effort expended by the PSC and other counsel performing common benefit work in realizing that goal can hardly be understated. They have documented and submitted over 560,000 hours of work during the course of this litigation. As a matter of fact this Court finds that this is a realistic and fair assessment of the work required to bring about the achieved result.

Counsel met and exceeded this Court's desire for expedited resolution of this matter. Following the formal appointment of the PLC and the PSC, the attorneys committed to intensive discovery and pretrial efforts. The PSC operated on many fronts, preparing pleadings and Master Class Action complaints, taking over 2,000 depositions, reviewing and compiling over 50,000,000 documents, briefing and arguing over 1,000 discovery motions, assembling a trial package, conducting bellwether trials, negotiating the global Settlement Agreement, and implementing the payout under the Agreement. The time and labor expended in this effort is impressive.

The *Johnson* court explained that the "time limitations factor imposed by the client or the circumstances" factor is intended to address "[p]riority work that delays the lawyer's other legal work" or the situation in which "a new counsel is called in to prosecute the appeal or handle other matters at a late stage in the proceedings." *Johnson*, 488 F.2d at 718. This factor encompasses the same considerations discussed in connection with the "time and labor" factor. Likewise, the "time and labor" and "preclusion of other employment" factors appear to the Court to overlap. Collectively, these three factors require the Court to give appropriate credit to the

-26-

intensive and sustained efforts of common benefit counsel to bring this litigation to a timely resolution.  Bellwether trials began within a year of the MDL designation.  Settlement was achieved within three years, interim payments began within a year of the settlement agreement, and final resolution of nearly 50,000 claims was made between one and two years thereafter.  The "time and labor" factor warrants a moderate upward variance.

### (b)    The Novelty and Difficulty of the Questions; The "Undesirability" of the Case

The Vioxx litigation was novel and difficult on a variety of levels.  Substantively, the litigation required complex medical and scientific knowledge, including analysis of pharmaceutical trials and causation issues.  Globally, the parties hotly disputed the general causation question of whether Vioxx caused the sorts of injuries alleged as well as the significance of various pharmaceutical studies.  Individually, each Vioxx case tried before this Court and the coordinated state courts involved unique, complicated, and disputed issues of specific causation. The legal aspects of the litigation were equally diverse and complicated.  As this Court previously observed:

> [T]his is essentially a products liability case, and all products liability cases pose significant challenges to plaintiffs' counsel. ... In addition, the basic challenges inherent in any products liability case were compounded in this case by a host of complex legal issues unique to the instant litigation, including (to name only a few) the learned intermediary doctrine, contributory negligence, causation, federal preemption laws, and Merck's assertion of attorney-client privilege with respect to thousands of documents in its possession.

574 F. Supp. 2d at 616-17.  Finally, the sheer magnitude of the Vioxx litigation posed its own legal, logistical, and managerial challenges.  Accordingly, the novelty and difficulty of the questions confronted by the PSC and other common benefit attorneys weighs in favor of an upward adjustment.

-27-

On the other hand, the Court finds that the complexity and difficulty of this litigation does not imply any "undesirability" in the *Johnson* framework. The *Johnson* court offered as an example a civil rights attorneys whose representation of an unpopular client may "not [be] pleasantly received by the community or his contemporaries" and "can have an economic impact on his practice." 488 F.2d at 719. The Court finds that the Vioxx litigation was not undesirable in this sense, and this factor does not affect the Court's analysis.

### (c)   The Skill Requisite to Perform the Legal Service; The Experience, Reputation, and Ability of the Attorneys

The Court recognizes the expertise possessed and employed by the PSC and other common benefit attorneys to bring this litigation to its successful resolution. The attorneys doing common benefit work are among the finest attorneys practicing in the field. However, the primary attorneys who represented individual Vioxx claimants also brought substantial skill and ability to bear in assessing cases, instructing their paralegals on properly and efficiently collecting information and filling out various forms, and assisting their clients through the settlement process. The Court cannot say that the skill required and the skill brought to bear by attorneys doing common benefit work was so superior to that possessed by primary attorneys representing individual clients as to warrant a *Johnson* adjustment which would in effect shift attorneys' fees from one group to the other. There were many excellent, hard-working attorneys who did not make it on to the PSC simply due to limitations of committee size. Accordingly, neither of these factors call for an adjustment of the benchmark percentage in this case.

### (d)   Nature and Length of the Professional Relationship with the Client

The PSC states that this factor is "neutral as it relates to the requested percentage since

there are few, if any, longstanding client relations with the Vioxx Claimants." (Rec. Doc. 17642-3 at 65). The Court agrees. "'The relationship did not antedate the litigation, nor will it likely continue beyond the closure of this case.'" *Murphy Oil*, 472 F. Supp. 2d at 866-67 (quoting *In re ETS*, 447 F. Supp. 2d at 632).

### (e)    Customary fee; Whether the Fee is Fixed or Contingent

"These factors primarily deal with the expectation of plaintiffs' attorneys at the outset of the case when measuring the risks involved and deciding whether to accept the case." *Murphy Oil*, 472 F. Supp. 2d at 866 (citing *Johnson*, 488 F.2d at 718). "In effect, these factors seek to reward the attorney for accepting the risk and achieving successful results." *Id.* The PLC argues that the Vioxx litigation was fraught with risk for plaintiffs' attorneys, and furthermore that in light of customary fees their requested 7.5% is appropriate compensation for common benefit work. The Court has already recognized the novelty and the substantial legal hurdles to successfully resolving these claims in connection with a prior *Johnson* factor. Furthermore, at an early stage in this litigation the Court established a fund to compensate attorneys for common benefit fees and expenses; accordingly, the risk assumed by common benefit attorneys was somewhat mitigated. Finally, the Court's analysis of the range of common benefit fee awards and assessments in other MDLs adequately addresses the customary fee. These factors in and of themselves do not warrant adjustment of the benchmark percentage.

### (f)    The Amount Involved and the Results Obtained

Attorneys doing common benefit work on behalf of Vioxx users have achieved a favorable and meaningful global resolution:

> This is not a case in which the class receives only illusory benefits in the form of coupons or discounts. Rather, counsel has achieved a substantial settlement in an

> efficient manner that minimizes the drain on the parties' and the Court's resources. Counsel also devised a plan for distribution of the fund and payment of claims that is practical, streamlined and fair.

*In re ETS*, 447 F. Supp. 2d at 632.

As discussed above, resolution of this multidistrict litigation through the global Settlement Agreement was vastly preferable to expensive and time-consuming case-by-case trial of individual Vioxx claims, or to piecemeal settlement. The Settlement Agreement ensured fair and comprehensive compensation to all qualified participants. The overwhelming participation rate of 99.9% further underscores the benefit of the results obtained. PSC members achieved more than a fair and adequate bargain for Vioxx users. Thus, the Court finds that this factor supports an upward adjustment of the benchmark percentage.

### (g)     Awards in Similar Cases

As the Court described above, there is a wide range of common benefit fee assessments and awards in MDL cases and other complex litigation. *E.g.*, *In re Diet Drugs*, 553 F. Supp. 2d at 457-58, 491-96 (describing various 9% federal and 6% state assessments later reduced to 6% and 4%, respectively; awarding less than total fund created by assessments); *Guidant*, 2008 WL 451076, at *1 (14.375% of settlement value); *In re Zyprexa*, 467 F. Supp. 2d at 261-63 (1% and 3% of separate settlement amounts); *In re Sulzer Hip Prosthesis & Knee Prosthesis*, 268 F. Supp. 2d at 909, 919 n.19 (awarding common benefit fees out of $50,000,000 fund created through assessment representing 4.8% of settlement value); *In re Protegen Sling & Vesica Sys.*, 2002 WL 31834446, at *1, *3 (9% federal, 6% coordinated state assessments); *In re Rezulin*, 2002 WL 441342, at *1 (6% withholding in federal cases, 4% in participating state cases); *In re Orthopedic Bone Screws*, 2000 WL 1622741 (awarding full 12% of withheld fees); *see generally*

Paul D. Rheingold, *Litigating Mass Tort Cases* § 7:46 *et seq.* (2010) (collecting fee award case histories). The 6% benchmark percentage is comfortably within that range, and not so out of line that it requires upward or downward adjustment.

**5.    *Adjusted Benchmark Percentage***

The Court has found that at least three of the *Johnson* factors warrant an upward adjustment of the benchmark percentage. Based on its observation and knowledge of the amount and nature of the common benefit work done in this case, the Court concludes that a reasonable adjustment is 0.5%. Accordingly, the Court will increase the benchmark percentage upward from 6% to 6.5% of $4,850,000,000, or $315,250,000. Primary Vioxx attorneys will still receive over 25% of the total settlement value in this matter, amounting to approximately $1,236,750,000. This should be adequate compensation for the primary attorneys, particularly in light of the benefits of economies of scale and for the relief of the burden of pretrial discovery and settlement negotiation.

**C.    Lodestar Cross-Check**

To confirm that the determined percentage-fee value in this case is appropriate, the Court believes it is important to conduct a lodestar cross-check. In the cross-check, the Court multiplies the reasonable hours worked by reasonable billing rates to calculate a time-fee value for the common benefit work performed. Then, the Court divides the percentage-fee value by the time-fee value to determine a lodestar multiplier and to test whether the percentage fee value represents an unreasonable award or "windfall" over the reasonable value of the work performed. *See, e.g., In re Diet Drugs*, 553 F. Supp. 2d at 485-86. This use of the lodestar as verification rather than as a method for determining a reasonable attorneys' fee award dates to

-31-

the mid-1990s, when courts sought to address some disadvantages to the percentage method, such as a lack of guidance on how to adjust percentage fees in light of the circumstances of a particular case. *See* Walker & Horwich, *supra*, at 1458-63 (tracing the evolution of the lodestar cross-check and its "rising use"). The application of the lodestar analysis as a cross-check is helpful in determining whether the benchmark percentage is reasonable given the circumstances of the case, and appropriate according to Fifth Circuit precedent. The lodestar cross-check is meant to be a rough analysis:

> (It) need entail neither mathematical precision nor bean counting. For example, a court performing a lodestar cross-check need not scrutinize each time entry; reliance on representations by class counsel as to total hours may be sufficient . . . . Furthermore, the lodestar cross-check can be simplified by use of a blended hourly rate . . . .

Walker & Horwich, *supra*, at 1463-64 (citing *In re Rite Aid Corp. Sec. Litig*, 396 F.3d 294, 306 (3d Cir. 2005)).[20]

The cross-check process begins with an analysis of the time logged and the appropriate hourly rate to be assigned. To assist in this process, the Court approved the retention of Philip Garrett, CPA, to receive, compile, and report the common benefit time and expense submissions of counsel. Mr. Garrett provided monthly reports of time and expenses submitted by the PLC pursuant to procedures set forth in Pretrial Order 6. The Court has reviewed these reports

---

[20] A district court's scrutinizing of attorney time includes painstaking review of each time entry under the lodestar procedure. The experience level of the attorney and the type of work performed may reduce the hourly rate. For example, the district court may ask such questions as whether the attorney was conducting the deposition or only attending a deposition; whether he or she was traveling at the time or in the office, or how many years of experience the attorney possessed. The court also compares and cross-checks the entries of different attorneys to ensure that any duplication of effort is accounted for and no over-billing occurs. These are just some examples, by no means exhaustive, of the detailed and time-consuming tasks required of the district court if the traditional lodestar method is faithfully applied.

throughout the litigation.

With respect to the number of common benefit hours submitted, Mr. Garrett provided summaries in connection with the PLC's motion in January, 2009, and again in July, 2010.  In the January, 2009 report he presented a figure of 503,185 hours of common benefit work reported by attorneys from 109 firms.  Mr. Garrett in an affidavit explained the procedures he followed to vet and disallow inadequately detailed submissions, pursuant to which the submitters "voluntarily withdrew from inclusion in the collective lodestar analysis substantial submissions of hours of time having a significant lodestar value."  Mr. Garrett later submitted an updated collective calculation for common benefit work through July 30, 2010.  The updated submission accounts for approximately 562,943.55 hours of professional time submitted by 109 law firms as of July 30, 2010.[21]  Those updated submissions were also subjected to the same vetting procedures.  Thus, the PLC has submitted documentation of 562,943.55 hours, which has been checked and approved by the Court-appointed CPA.  The Court finds those hours to be reliable and supported in light of the procedures put in place by PTO 6 and implemented by Mr. Garrett.[22]

With respect to the appropriate hourly rate, Mr. Garrett utilized each individual

_____

[21]The PLC also submitted a compilation of time reports disclosing that up to July 7, 2010, attorneys had submitted 448,195.95 hours.  Thus, out of the 562,943.55 hours submitted through July 30, 2010, at least 79.6% of the hours submitted for the lodestar calculation were attorney hours, rather than hours worked by paralegals or others.  The PLC also submitted individual breakdowns of each attorney's hours, without specifying whether the attorney is a partner or associate, or the attorney's hourly rate used in calculating the lodestar.  The PLC did not submit the ratio of partner to associate hours.

[22]This finding is sufficient for the purposes of the rough lodestar cross-check.  This finding does not preclude the Allocation Committee or the Court from disallowing any particular submissions of common benefit time when allocating the common benefit fee award.

submitter's actual reported billing rate.  In connection with the January 2009 report, the average

billing rate for all partner, associate, and other professional common benefit time was $431.51

per hour.  In connection with the July 2010 updated report, the average billing rate for all

partner, associate, and other professional common benefit time was $443.29 per hour.  The Court

recognizes that attorneys from across the country contributed common benefit work to the MDL,

and that billing rates vary among legal markets.  The Court has previously used a range of $300

to $400 per hour for members of a Plaintiffs' Steering Committee and $100 to $200 per hour for

associates to "reasonably reflect the prevailing [billable time] rates in *this* jurisdiction." *Murphy*

*Oil*, 472 F. Supp. 2d at 868-69 (emphasis added).  But in *Murphy Oil*, all of the attorneys were

local to the Eastern District of Louisiana so it was appropriate to use a rate consistent with local

standards.  In Vioxx, on the other hand, the attorneys come from states across the country.  Thus

a more national rate is the appropriate pole star to guide the Court.  Although the Court has not

been provided with the individual attorney billing rates used by Mr. Garrett to calculate the

lodestar, for the purposes of the lodestar cross-check the Court need not crunch the numbers for

individual attorneys and other legal professionals from 109 law firms across the country, or to

apply a single billing structure.[23]  The Court finds that the hourly rate of $443.29 (the average of

the billing rates for common benefit submitters) is an appropriate hourly rate from which to start

the analysis in view of the fact that it is a combined rate and does not distinguish between work

done by various level of attorneys including the work done by others.  Further, this rate is in line

---

[23]*See In re Orthopedic Bone Screws*, 2000 WL 1622741, at *8 n.18 ("[T]he hourly rate to
be used in computing counsel's lodestar is the rate that is normally charged by counsel of
comparable standing, reputation, experience and ability in the community where counsel
practices. .... Presumptively, this is the attorney's 'usual' billing rate.").

with hourly rates used by other courts supervising other national MDLs. *E.g.*, *In re Guidant*, 2008 WL 682174, at *15 (D. Minn. Mar. 7, 2008) (average attorney rate of $379.40 per hour and paralegal rate of $127.49 per hour).

Utilizing the reasonable amounts for the number of hours worked and the averaged billing rate, Mr. Garrett calculated several collective time-fee values for the common benefit services. Through January 2009, he multiplied each individual's hours, totaling 503,185 hours of common benefit work, by that individual's actual billing rate, averaging $431.51 per hour, to calculate a time-fee value for all common benefit work through January, 14, 2009, of $217,128,800.40.[24] Mr. Garrett updated his time-fee value calculation for additional hours submitted through July 30, 2010. He multiplied each submitting individual's hours, totaling 562,943.55 hours of common benefit work, by that individual's actual billing rate, averaging $443.29 per hour, to generate a total time-fee value for all common benefit work through July 30, 2010, of $249,546,751.20. The Court has found that the submitted hours are reasonable and that the actual billing rates which average $443.29 are reasonable. Accordingly, the Court accepts Mr. Garrett's calculation of a time-fee value of $249,546,751.20 for all common benefit work performed through July 30, 2010.

The next step in the lodestar cross-check is to compare the time-fee value to the Court's adjusted percentage-fee value and determine whether a lodestar multiplier is warranted.[25] That is

---

[24]Mr. Garrett also calculated a time-fee value using the same number of hours, but multiplying those hours by the highest billing rate of each category of submitter, such as partner, associate, or paralegal. The highest billing rate time-fee value was $321,897,534.95, which reflects an average billing rate of $639.72 per hour.

[25] The Supreme Court recently addressed lodestar and lodestar multiplier analysis in the context of a civil rights fee-shifting statute. *Perdue v. Kenny A. ex rel Winn*, 130 S. Ct. 1662

to say, the Court must verify its percentage calculation and determine whether the percentage fee should be increased or decreased in view of other factors. The use of a multiplier is not mandatory and depends on the circumstances of the case. Indeed, a multiplier may not be warranted if the time-fee value adequately compensates the attorneys for their services. *See, e.g,* *Strong*, 137 F.2d at 851 (affirming district court decision not to use multiplier to award additional fees). In the present case, however, the Court has already considered the *Johnson* factors and concluded that a 0.5% increase in the benchmark percentage is warranted. Therefore, it is appropriate to allow for an appropriate lodestar multiplier to the time-fee value in performing the lodestar cross-check.

The Court has concluded that 6.5% of the total settlement amount, or $315,250,000, is a reasonable common benefit fee award. To test this percentage-fee value by the lodestar method it is necessary to divide $315,250,000 by the time-fee value of the common benefit work, which is $249,546,751.20. This produces a lodestar multiplier of approximately 1.2633.[26] This lodestar multiplier is well within the range computed in other comparable MDL or mass tort cases. *See, e.g., In re Diet Drugs*, 553 F. Supp. 2d at 485-87 (E.D. Pa. 2008) (2.6 multiplier, and

---

(2010). In *Perdue*, the Supreme Court held that the lodestar analysis pursuant to U.S.C. § 1988 generally takes into account any factors that might justify a multiplier of the lodestar amount. *Id.* at 1673-75. Therefore, absent "rare" and "exceptional" circumstances, the lodestar amount is presumptively reasonable. *Id.* The Supreme Court also held that under those facts, the district court's 75% multiplier of the lodestar amount was essentially arbitrary. *Id.* at 1675-76. The Supreme Court's holding was informed by the Supreme Court's lodestar jurisprudence and the statutory purpose of § 1988. *Id.* at 1676-77. Accordingly, *Perdue* has little bearing on the use of the lodestar as a cross-check of a common benefit fee awarded as a percentage of a common fund.

[26]Mr. Garrett calculated a lodestar multiplier by dividing the PSC's requested common benefit fee of 7.5% of $4.85 billion, or $363,750,000, by the time-fee value, or $249,546,751.20, and calculated that the 7.5% fee would represent a multiplier of 1.4576 times the time-fee value.

-36-

collecting cases with multipliers between 2.4 and 4.45). Other MDL courts have applied lower multipliers. *In re Guidant,* 2008 WL 682174, at *15 (D. Minn. Mar. 7, 2008) (1.19 multiplier); *In re Orthopedic Bone Screws,* 2000 WL 1622741, at *8-9 (applying reducing factor because requested fee exceeded available funds). Therefore, the Court is satisfied that the rough lodestar cross-check demonstrates that the 6.5% blended percentage fee is well within the reasonable range. Accordingly, the Court determines that the lodestar cross-check firmly supports an award of 6.5% of the total settlement of $4.85 billion.

**D.    Fee Award**

For the foregoing reasons, the Court awards a common benefit fee of $315,250,000, which is equivalent to 6.5% of $4,850,000,000.

This amount will be available for distribution among all attorneys who performed common benefit work in the MDL and associated state litigation. The Court will first allow the Allocation Committee designated in Pretrial Order 32 to arrive at a suggested distribution, pursuant to the Allocation Guidelines set forth in Pretrial Order 6D and consistent with the evidence produced during hearings conducted or to be conducted for the purpose of determining an appropriate distribution. If disputes arise, the Court will consider appointing a special master to evaluate the recommendation of the allocation committee and the evidence on which it based its recommendation, and to take additional evidence if necessary. The special master will submit a report of his or her findings to the Court for a final determination. The Court retains jurisdiction for purposes of supervising the allocation.

**III.    CONCLUSION**

For the foregoing reasons, IT IS ORDERED that the PLC's Motion for Award of

-37-

Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses (Rec. Doc. 17642) is

GRANTED IN PART as set forth in the foregoing Order & Reasons.

New Orleans, Louisiana, this 19th day of October, 2010.

UNITED STATES DISTRICT JUDGE

## DECLARATION OF CYNTHIA L. ZEDALIS

I, CYNTHIA L. ZEDALIS, declare and affirm as follows:

1.      I am an attorney-at-law admitted to practice law in California and am associated with claimant Branch Law Firm ("Branch") in this matter.  I have personal and first-hand knowledge of the facts set forth below, and if called and sworn as a witness, I could and would competently testify as to each of them.

2.      Pursuant to the Fee Allocation Committee's December 6, 2010 memorandum to all common benefit fee counsel, materials relating to common benefit fees were available for inspection at Russ Herman's office in New Orleans, Louisiana, on December 10, 2010.  I traveled to New Orleans on that date to review and inspect the documents in the FAC's possession.

3.      The documents, comprised of binders and clipped documents, were available for my review in a conference room at Mr. Herman's office.  Mr. Herman was present during most of my inspection, which lasted a few hours.  Mr. Herman indicated that the materials in the conference room were "everything" that the FAC had.

4.      I took notes of the materials.  My notes reflect that two binders contained the Vioxx Fee Committee Presentations of 43 firms, and three binders contained counsel's common benefit fee submissions.  Although the binders were labeled "1 of 4," "2 of 4," *etc.*, only three binders were at the office.  Mr. Herman said that a fourth binder was at Andy Birchfield's office in Alabama.  The index to Volume 3 (the third binder) indicated that Branch's fee submission follows tab 5; however, *no time sheets, counsel certification of hours, or any document whatsoever followed tab 5.*

1

5.      I asked Mr. Herman as to the whereabouts of Branch's fee submission.  Mr. Herman replied either that he never received it, or he did not know where it was.  Mr. Herman then called Andy Birchfield to inquire as to the location of Branch's fee submission.  Mr. Birchfield stated that he was in possession of volume 4, which contained the submission of the Robinson firm, and indicated that he would "look around" for Branch's materials.

6.      I explained to Mr. Herman that the materials were emailed to him in late June 2008, an event I recall quite vividly as I had prepared the materials and time sheets, and worked closely with the firm's bookkeeper, Jaime Lastra, in scanning and emailing the submission.  I also told Mr. Herman that there is confirmation that the submission had been electronically sent, and expressed my dismay as to how the accounting firm could have approved 7,087.5 hours of common benefit time but the FAC did not have the time sheets to back up those hours and other descriptive material when making its fee recommendation.  Mr. Herman then asked a member of his staff to check her emails for the submission, and also asked me to "send it again," which I did.

7.      Attached hereto as Exhibits A and B are true and correct copies of email transmissions reflecting that Branch's fee submission was sent to Mr. Herman on June 30, 2008, and again on December 10, 2010.

8.      My notes also reflect that the FAC has a list of all the participating firms and their hours for a grand total of 562,943.55.  This list identified Branch's hours as 7,087.5.  The list also indicated that Beasley, Allen reported 36,747.75 in common benefit time and Blizzard, McCarthy & Nabers reported 9,173.25 in common benefit time.  The recommended awards to these two firms, as reflected in the attached accompanying the Court's January 20, 2011 Order, is

2

$40,900,000, for Beasley, Allen, and $11,600,000, for Blizzard. These awards represent a blended hourly billable rate of $1,274.54 for Beasley, Allen, and $1,274.54 for Blizzard.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 4, 2010                         Cynthia L. Zedalis

3

# EXHIBIT "A"

**Pat Sanchez**

| | |
|---|---|
| **From:** | Cindy Zedalis |
| **Sent:** | Friday, February 04, 2011 10:59 AM |
| **To:** | Pat Sanchez |
| **Subject:** | FW: Common Benefit Time and Expenses Submission |
| **Attachments:** | Submission Doc.pdf; Exhibit 1-BLG Biographies.pdf; Exhibit 2-BLF Billing Time Detail 2004-2005.pdf; Exhibit 2-BLF Billing Time Detail 2007-8.pdf; Exhibit 2-BLF Billing Time Detail 2006.pdf |

**From:** Jaime Lastra
**Sent:** Fri 12/10/2010 2:16 PM
**To:** 'rherman@hkkc.com'; 'rvalenti@hhkc.com'
**Cc:** Cindy Zedalis
**Subject:** FW: Common Benefit Time and Expenses Submission

Dear Mr. Herman,

Pursuant to Ms. Zedalis's request, I am forwarding to you our email submission (excluding detailed expense reports) of June 30, 2008 of our common benefit time, which was send to you on June 30, 2008, 4:07pm MST.

The certification with time & expense reports will be forwarded in my next email, shortly.

Sincerely,

Jaime C. Lastra

Jaime C. Lastra
Office Manager
The Branch Law Firm
2025 Rio Grande Blvd.
Albuquerque, NM 87104
PH: 505-243-3500
FAX: 505-243-3534
jlastra@branchlawfirm.com
**PERSONAL AND CONFIDENTIAL**
THE INFORMATION IN THIS E-MAIL IS CONFIDENTIAL AND MAY BE LEGALLY PRIVILEGED. IT IS INTENDED SOLELY FOR THE ADDRESSEE. ACCESS TO THIS E-MAIL BY ANYONE ELSE IS UNAUTHORIZED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERY TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS PROHIBITED AND WILL BE PROSECUTED TO THE FULLEST EXTENT OF THE LAW. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY US IMMEDIATELY AND RETURN THE MESSAGE TO US VIA E-MAIL.

**From:** Jaime Lastra
**Sent:** Monday, June 30, 2008 4:07 PM
**To:** 'VioxxMDL@hhkc.com'
**Cc:** Cindy Zedalis; Turner W. Branch
**Subject:** Common Benefit Time and Expenses Submission

Dear Regina and Christine,

Pursuant to Pretrial Order 6A, attached is the Branch Law Firm's application for common benefit fees and expenses. Because of the length of the documents, they will be sent to you electronically in separate emails.

This email contains:

Submission Document

Exhibit 1 – Biographies

Exhibit 2 – Time Sheets

Please contact Cynthia Zedalis of this firm at czedalis@branchlawfirm.com if you have any questions.

Thank you,

Jaime Lastra

<<Submission Doc.pdf>> <<Exhibit 1-BLG Biographies.pdf>> <<Exhibit 2-BLF Billing Time Detail 2004-2005.pdf>> <<Exhibit 2-BLF Billing Time Detail 2007-8.pdf>> <<Exhibit 2-BLF Billing Time Detail 2006.pdf>>

Jaime C. Lastra
Office Manager
The Branch Law Firm
2025 Rio Grande Blvd.
Albuquerque, NM 87104
PH: 505-243-3500
FAX: 505-243-3534
jlastra@branchlawfirm.com

**PERSONAL AND CONFIDENTIAL**

THE INFORMATION IN THIS E-MAIL IS CONFIDENTIAL AND MAY BE LEGALLY PRIVILEGED. IT IS INTENDED SOLELY FOR THE ADDRESSEE. ACCESS TO THIS E-MAIL BY ANYONE ELSE IS UNAUTHORIZED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERY TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS PROHIBITED AND WILL BE PROSECUTED TO THE FULLEST EXTENT OF THE LAW. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY US IMMEDIATELY AND RETURN THE MESSAGE TO US VIA E-MAIL.

# EXHIBIT "B"

**Pat Sanchez**

| | |
|---|---|
| **From:** | Cindy Zedalis |
| **Sent:** | Friday, February 04, 2011 11:00 AM |
| **To:** | Pat Sanchez |
| **Subject:** | FW: Common Benefit Time and Expenses Submission |
| **Attachments:** | Exhibit 3-BLF Vioxx Unreimbursed Common Shared & Held Expenses.pdf; Exhibit 4-BLF Billing Time Monthly Summary Oct 2004 Jan-Dec 2005.pdf; Exhibit 4-BLF Billing Time Monthly Summary 2006.pdf; Exhibit 4-BLF Billing Time Monthly Summary 2007-Jan 2008.pdf; BLF Certification.pdf |

**From:** Jaime Lastra
**Sent:** Fri 12/10/2010 2:19 PM
**To:** 'rherman@hkkc.com'; 'rvalenti@hhkc.com'
**Cc:** Cindy Zedalis
**Subject:** FW: Common Benefit Time and Expenses Submission

Dear Mr. Herman,

Here is email 2 of 2 containing cost and expense reports, timesheet summaries and the certification previously send on June 30, 2008 at 4:20 pm, MST.

Sincerely,

Jaime C. Lastra

Jaime C. Lastra
Office Manager
The Branch Law Firm
2025 Rio Grande Blvd.
Albuquerque, NM 87104
PH: 505-243-3500
FAX: 505-243-3534
jlastra@branchlawfirm.com
**PERSONAL AND CONFIDENTIAL**
THE INFORMATION IN THIS E-MAIL IS CONFIDENTIAL AND MAY BE LEGALLY PRIVILEGED. IT IS INTENDED SOLELY FOR THE ADDRESSEE. ACCESS TO THIS E-MAIL BY ANYONE ELSE IS UNAUTHORIZED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERY TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS PROHIBITED AND WILL BE PROSECUTED TO THE FULLEST EXTENT OF THE LAW. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY US IMMEDIATELY AND RETURN THE MESSAGE TO US VIA E-MAIL.

**From:** Jaime Lastra
**Sent:** Monday, June 30, 2008 4:22 PM
**To:** 'VioxxMDL@hhkc.com'
**Cc:** Cindy Zedalis; Turner W. Branch
**Subject:** Common Benefit Time and Expenses Submission

Dear Regina and Christine,

Pursuant to Pretrial Order 6A, attached is the Branch Law Firm's application for common benefit fees and expenses. Because of the length of the documents, they will be sent to you electronically in separate emails, this is email 2 of 2.

This email contains:

Exhibit 3 – Costs and Expenses

Exhibit 4 – Timesheets Summaries

Certification

Please contact Cynthia Zedalis of this firm at czedalis@branchlawfirm.com if you have any questions.

Thank you,

Jaime Lastra

<<Exhibit 3-BLF Vioxx Unreimbursed Common Shared & Held Expenses.pdf>> <<Exhibit 4-BLF Billing Time Monthly Summary Oct 2004 Jan-Dec 2005.pdf>> <<Exhibit 4-BLF Billing Time Monthly Summary 2006.pdf>> <<Exhibit 4-BLF Billing Time Monthly Summary 2007-Jan 2008.pdf>> <<BLF Certification.pdf>>

Jaime C. Lastra
Office Manager
The Branch Law Firm
2025 Rio Grande Blvd.
Albuquerque, NM 87104
PH: 505-243-3500
FAX: 505-243-3534
jlastra@branchlawfirm.com

**PERSONAL AND CONFIDENTIAL**

THE INFORMATION IN THIS E-MAIL IS CONFIDENTIAL AND MAY BE LEGALLY PRIVILEGED. IT IS INTENDED SOLELY FOR THE ADDRESSEE. ACCESS TO THIS E-MAIL BY ANYONE ELSE IS UNAUTHORIZED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERY TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS PROHIBITED AND WILL BE PROSECUTED TO THE FULLEST EXTENT OF THE LAW. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE NOTIFY US IMMEDIATELY AND RETURN THE MESSAGE TO US VIA E-MAIL.



35778233

Feb 4 2011
3:51PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  VIOXX | ) | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | Section L |
| | ) | |
| THIS DOCUMENT RELATES | ) | JUDGE FALLON |
| TO ALL CASES | ) | MAGISTRATE KNOWLES |
| ———————————————— | ) | |

**THE BRANCH LAW FIRM'S NOTICE OF JOINDER TO THE JOINT OBJECTION OF
ERIC WEINBERG, CHRIS PLACITELLA AND PLACITELLA & ROTH TO THE FEE
ALLOCATION COMMITTEE'S RECOMMENDATION OF JAN. 20, 2011**

TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD:

Claimant THE BRANCH LAW FIRM hereby respectfully joins in the Joint Objection of

Eric Weinberg, Chris Placitella, and Placitella & Roth to the Fee Allocation Committee's

("FAC") Recommendation of January 20, 2011, filed on February 2, 2011, as it relates generally

to the FAC's methodology, and resulting formula, as being unlawful and producing an

insupportable result, including, but not limited to, the following:

(1)     "Lodestar" is the starting point of any proper analysis;

(2)     The FAC's methodology and resulting formula are far removed from any

type of Lodestar/*Johnson*[1] analysis;

(3)     The FAC's subjective formula weighs categories of participating in

measure contrary to *Johnson* and contrary to prevailing law;

---

[1]     *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cri. 1974), abrogated
on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 109 S. Ct. 933 (1989).

(4)     The FAC has used the common benefit fund and formula to settle claims by various attorneys without Court authority;

(5)     The FAC's formula does not account for or disclose private fee-sharing agreements, which change the amount of the actual allocation many claimants will ultimately receive;

(6)     The recommended allocations to claimants demonstrate how the FAC's methodology and formula have produced an unsustainable result; and

(7)     The FAC's recommended allocation is not entitled to any presumptive weight or deference, and, in fact, due to its fundamental flaws, is essentially meaningless.


Dated:  February 4, 2011                    BRANCH LAW FIRM


                                            Turner W. Branch
                                            tbranch@branchlawfirm.com
                                            2025 Rio Grande Blvd. NW
                                            Albuquerque, New Mexico 87104
                                            (505) 243-3500 (telephone)
                                            (505) 243-3534 (telephone)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Notice of Joinder in the Joint Objection of Eric Weinberg, Chris Placitella, and Placitella & Roth to the Fee Allocation Committee's Recommendation of Jan. 20, 2011 has been served upon all parties by electronically uploading the same to LexisNexis File & Service Advanced in accordance with Pretrial No. 8, and via email and U.S. Mail to Russ Herman and Andy Birchfield on this 4th day of February, 2011.

3