UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION ` | * | SECTION  L |
| | * | |
| THIS DOCUMENT RELATES | * | JUDGE FALLON |
| TO ALL CASES | * | MAG. JUDGE KNOWLES |
| | * | |
| FILER: Robert E. Arceneaux/Margaret Woodward | * | February 28, 2011 |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**CO-LEAD COUNSEL'S MEMORANDUM IN SUPPORT OF MOTION FOR
ADDITIONAL DISCOVERY  PURSUING SIDE DEALS RELATED TO THE FUND
AWARDED BY THIS COURT'S ORDER OF OCTOBER 19, 2010**

MAY IT PLEASE THE COURT:

Co-lead counsel for the Objectors respectfully submit this Memorandum in support of their

Motion for Additional Discovery Related to the "Stratton" Settlement and any other undisclosed

settlements or side deals which may affect the allocation of the fund awarded by this Court's Order

of October 19, 2010.

**I.      STATEMENT OF FACTS**

**A.      Suspicions**

This Court has repeatedly expressed it commitment to "transparency" as required by *In re

High Sulfur Content Gasoline Products Liability Litigation,* 517 F. 3d 220 (5th Cir. 2008).  Yet from

Undersigned counsel's first involvement in this case, there were serious concerns that the FAC was

not toeing the same line – secrets are hard to keep within a group of hundreds of confidants.  By the

time objections were due to the FAC's January 20, 2011 proposed allocation, enough facts were

known to raise serious suspicions about the FAC's conduct.

Undersigned counsel had been in communication with Mike Stratton for some time with regard to the challenge raised by objectors to the 8% assessment sought by the PLC.[1] On October 22, 2010, in response to a congratulatory note to Mr. Stratton offering kudos for having the assessment lowered to 6.5%, the undersigned received a reply e-mail stating that the matter had been resolved for non-objectors at 6.5%, but that he had made a separate deal for his objectors "which is according to psc 'confidential. . .'."

Furthermore, the undersigned had been following the progress of the Vioxx Litigation Consortium's ("VLC's") challenge to this Court's 32% cap on attorneys fees, watching with great interest the VLC challenge to this Court's jurisdiction to abrogate attorney fee contracts in cases that were not pending before it.  Undersigned counsel was surprised to learn that the VLC's challenge had simply been dismissed, literally on the steps of the Court of Appeal; even the Tulane Litigation Clinic, which this Court had appointed to represent claimants, was unable to provide an explanation.

At a meeting among undersigned counsel, Pascal Calogero, and Russ Herman, the latter confirmed that funds had been "reserved" from the recommended allocation to pay the Stratton objectors.  Moreover, Mr. Herman supplied the Point System Guide, which showed that points were specifically assigned for work on Texas state court committees in consolidated litigation, but not for similar work on state court committees in California or New Jersey, for example.

These suspicious facts prompted the undersigned to file a motion with this Court asking for all information related to the following:

> Movers further ask the Court to order all claimants for common benefit fees to disclose, by a date determined by the Court, any and all fee sharing agreements,

---

[1] Plaintiff's Liaison Counsel, Mr. Herman, filed the motion requesting an 8% assessment, but stated in his attached affidavit that "[o]ne member of the PSC does not subscribe to the requested in this motion."  Record Document 17642-7, Affidavit, January 20, 2009, n. 1.

-2-

> settlements, or side agreements between themselves and any other persons that impact upon the ultimate amount of common benefit fees each claimant may receive despite the amount awarded by this Court.

Record Document 57345. That motion was submitted for decision on January 6, 2011, and remains pending.

Publication of the recommended allocation and objections raised additional questions. First, no other attorney applicants besides the VLC were treated as a "group" in the allocation, with all of their work pooled into a total; this combined handling of the VLC foreclosed consideration of which members, if any, actually did any common benefit work.   Second, as to the Stratton settlement, the objection filed by Snapka Law firm revealed, for the first time, that money was actually paid by the FAC, through the PSC and NSC, to Mr. Stratton, who in turn distributed it to various objectors; this favored treatment came in exchange for Stratton's stating in a letter to this Court that 7.5% was an appropriate assessment (when in fact Mr. Stratton and the members of his group were to contribute only 4%).

### B.      Confirmatory Facts

#### 1.      The Real Stratton Deal.

Attached hereto as Exhibit A is a transcript of "private proceedings between counsel," conducted on July 27, 2010.  *See* page 26 *et seq*, *infra*. Present were: FAC member Russ Herman, FAC member Andy Birchfield, FAC member Christopher Seeger, and Objector Michael Stratton, along with the court reporter who prepared the transcript.  Mr. Birchfield identified Mr. Herman as "plaintiff liaison counsel," and himself and Mr. Seeger as "co-lead counsel" for the PSC.  He further stated that Mr. Herman "is speaking on behalf of the NPC,[2]" although Mr. Herman scarcely spoke,

---

[2] Why Mr. Herman would appear in that capacity is unclear from the transcript.  The function of the
(continued...)

except to note that the Court had the authority "to reduce the 7.5 percent that we have recommended but will not increase the fund beyond 7.5 percent."  Tr., pp. 3, 5. Mr. Stratton appeared "on behalf of all the objectors to the plaintiff liaison counsel's petition for assessment." *Id.* at 3.

Mr. Birchfield recited the agreement reached to resolve the Stratton group's objection to the 8% fee assessment requested by the PLC:

> The parties have agreed that each side will recommend to the Court that there be a global assessment in the amount of 7.5 percent.  For each of the objectors who timely filed an objection to the plaintiff liaison counsel's petition, they will pay a total of a 4 percent assessment, and the difference will be disbursed from the account that's held in escrow now by Brown Greer.

> The aggregate amount for that list of objectors is $18,539,236.85.  That amount will be transferred to the trust account at Stratton Faxon to be disbursed to the objectors by Mr. Stratton.  Any common benefit fees will be a matter of agreement between Mr. Stratton and the individual objectors.

(Tr., p. 3).

On the following day, Mr. Stratton apparently acted upon his commitment to recommend a global assessment in the amount of 7.5% by directing such a letter to the Court; the letter recommended an assessment of 7.5% without disclosing that Mr. Stratton had secured an agreement for a 4% contribution by the members of his group.  *See* Exhibit B1, page 32 *infra*,  (Rec. Doc. 47918), and B2, page *33* infra (File and Serve Document 32379622).

### 2.    The Court's Role

In the hearing conducted by this Court on February 17, 2011, Kathy Snapka, who was among the Stratton objectors, advised that she received  no notice that Stratton was negotiating a settlement

---

[2](...continued)
NPC was to negotiate a settlement with Merck; it had no ostensible authority over the distribution of funds among common benefit attorneys.  That task was assigned to the FAC, headed by Mr. Herman.

on her behalf; that she received a copy of his July 28, 2010 letter recommending a 7.5% assessment; that she received a transmittal letter dated September 2, 2010 from Mr. Stratton, enclosing a check, drawn on his trust account, in the amount of over $336,000; that she expressed her confusion about the provenance of this check to Mr. Stratton, who then tendered her another check for over $33,000; that she searched in vain for any public or formal authorization of any settlement or distribution; that she did not see in the court's subsequent orders any reference to a depletion of the common benefit fund; that she had therefore not deposited either of the checks tendered by Mr. Stratton; and that she wished to bring this troubling matter to the court's attention.  Tr., hearing 2/17/11, pp. 10-12.

The Court stated that it did not know anything about a settlement having been achieved, only that Stratton had made, pursued, and then withdrawn his objection on behalf of a group, and had advised this Court of his recommendation of a 7.5% assessment:

> BY THE COURT:  The only thing I know of it is that there was an objection to the total sum of the common benefit fund, that Mr. Stratton represented the objectors, and I presided  -- or I gave them an opportunity to do some discovery early on. They did some discovery. They had some issues. I resolved the discovery issues, the evidentiary issues. They proceeded on with the case. I was advised that the objectors withdrew the objection. That's all that I know of it. I wasn't involved in any discussions or agreements. That's why I didn't issue any orders.

*Id* at 12.

### 3.    The VLC recommended allocation

The FAC's proposed allocation perhaps reflects the deal that was cut with the VLC to dismiss its appeal. Under the allocation, and based upon the fact, at least in part, that the VLC got points for state committee work that no other firms were even eligible to receive, the VLC is slated to receive more than $20,000,000 for its efforts. *See* Record Document 60391-1, at 7, FAC Proposed Allocation, 1/13/11, l. 7.  Yet, the VLC was one the original objectors for whom Michael Stratton was appointed Liaison Counsel. *See* Record Document 18617. Perhaps the VLC, like Snapka, has

received a check from Mr. Stratton refunding some portion of its assessment.  Such a refund would

make its $20,000,000 recommended allocation considerably more valuable than a similar award

made to an applicant who paid a higher assessment, such as the 6.5% this Court ordered in its

October 29, 2011 judgment.[3]

### 4.    Efforts at Discovery

Following the February 17th hearing, undersigned counsel asked members of the FAC for

an explanation of the Stratton settlement.  The FAC's lead and liaison counsel promised to respond

in a meeting with undersigned counsel on February 23rd.  In the meanwhile, undersigned counsel

directed written discovery requests to the FAC seeking further information about the Stratton

agreement.

Undersigned counsel met with lead and liaison counsel on February 23rd as planned; Ms.

Snapka also attended the meeting.  In that session, Liaison counsel for the FAC advised that Mr.

Stratton represented his group of objectors,  and that Ms. Snapka should address any questions she

had about the settlement to him.  He further stated that he would not respond to undersigned

counsel's questions about the settlement because the settlement was subject to a confidentiality

---

[3]The FAC's Point System Guide has a subcategory for "co-leadership role in Texas coordinated litigation" which can earn as much as 15 points.  In view of the fact that coordinated litigation occurred throughout the nation, particularly in New Jersey, for which no comparable provision was made, the question immediately comes to mind why Texas received special consideration.  Another Texas anomaly relates to the conglomeration of five Texas firms into one line across the FAC's allocation grid, and the recommended allocation of more than $20,000,000 to that combined group. This represents the only combination of claimants from different firms anywhere in the FAC's recommendation.  The special treatment becomes more intriguing against the backdrop of litigation history, for like Stratton's group, the Texas consortium objected to the assessment, took an appeal to the Fifth Circuit, then abruptly dropped its appeal with no explanation on the record for its about-face.  Mr. Herman confirmed that the Texas consortium's combined treatment in the FAC's allocation grid derived from a settlement of its claims; but he did not admit that the FAC  made any other commitments to secure the compromise.

agreement which he would not breach.  Specifically, he refused to answer either undersigned counsel's oral questions or written discovery concerning the FAC's authority to enter into an undisclosed settlement agreement and to disburse common benefit funds without a court order.

On the latter question of how common benefit funds had been disbursed, on February 21, 2011,  undersigned counsel directed a subpoena duces tecum to Brown Greer, the court-appointed administrator of the common benefit fund.  Because it appeared that the FAC had invaded the common benefit fund in connection with the Stratton deal, undersigned counsel sought "documents, written or electronic, including Court orders, or directives of any person or entity, instructing disbursement of any funds from any such accounts to any attorney or law firm," and also sought to discover how much money remained in the common benefit fund.  Orran Brown objected to the subpoena on multiple grounds, including that the information could be obtained elsewhere.

In their February 23 meeting, undersigned counsel asked lead and liaison counsel for the FAC to supply the information denied by Brown Greer.  The FAC responded by serving undersigned counsel with a "courtesy" copy of its motion to quash the Brown Greer subpoena.

Undersigned counsel raised the matter again in a meeting among lead and liaison counsel for the FAC and Objectors with Special Master Juneau on February 24, 2011.  At that time, Mr. Herman advised that he, Mr. Birchfield, and Mr. Seeger had pursued settlement talks with Mr. Stratton, with the Court's encouragement, in order to resolve an apparently serious challenge to the common benefit fund.  He said that they relied on Mr. Stratton's assurances that he was negotiating with the full knowledge and consent of his "clients."  At that time, he said, "the fund belonged to nobody."  In the view of the members of the FAC, they confected a settlement  that "inured to the benefit of every claimant to the common benefit fund."  The judge was not informed of the terms of the deal, Mr. Herman said, because "he didn't want to know."

Mr. Birchfield was asked to comment on the Stratton Transcript recording his statements that he would instruct Brown Greer to wire almost $19,000,000 to Michael Stratton's trust account. Mr. Birchfield declined to comment.

As for the VLC settlement, neither Mr. Herman nor Mr. Birchfield had any cogent explanation for why Texas committee work was expressly awarded points under the FAC's Point System Guide, while other state committee work was not. They did state unequivocally, however, that no other funds had been disbursed from the common benefit fund to any other attorney (other than the refund of the assessments ordered by this Court when it reduced the 8% assessment to 6.5%, and of course the $19,000,000 paid to Michael Stratton and the objectors for which he was Liaison counsel).

### 5.    The FAC's explanations for its conduct are unsatisfactory.

In reducing the Stratton group's contribution to the common benefit fund from the 6.5% ordered by this Court, the FAC effected a distribution of attorneys' fees.   All Movants know of a "factual basis" for the Stratton distribution is the justification the parties offered in their secret meeting.   First and foremost, they compromised a pending objection to the assessment; that consideration obviously has nothing to do with the *Johnson* factors or any other approved method for allocating attorneys' fees.   Second, Mr. Stratton noted that in pursuing the objection to the 8% assessment, "we have taken depositions, had depositions taken of us, and done the legal research," all of which, in his opinion, justified an assessment of 7.5%.   Tr., p. 4.   The 7.5% assessment, however, was the amount recommended to the Court; no support for their own 4% assessment was offered for the record.   Moreover, nothing was said by anyone of the contributions made by Mr. Stratton and his co-objectors to the common benefit, which might have warranted an allocation of fees.

Recently called to account for the arrangement, the FAC has offered new justifications. None of them are satisfying.

> **a.** **Stratton and the FAC had no authority to settle a claim for common benefit trust funds without court approval, nor to disburse funds unilaterally.**

By Pretrial Order No. 52, Mr. Stratton was appointed as "Liaison Counsel for Common Benefit Fee Application Objectors."[4] The order was entered upon Mr. Stratton's unopposed motion for appointment "allowing the objectors to speak with one voice on discovery, briefing, argument, and negotiation." (Rec. Doc. 24216). Mr. Stratton also represented that "it is the intent of the objectors that the liaison reach consensus among the group before binding the group to any course of action." *Id.* Like the appointment of Plaintiff's lead and liaison counsel, then, Order 52 may have contemplated negotiation but did not relieve counsel of the obligation of polling its own members before recommending a course of action, or of securing court approval for any settlement.

In both the February 17 hearing and 24 meeting with Special Master Juneau, Mr. Herman took great pains to state that Mr. Stratton told the FAC he had authority to negotiate on behalf of his group: "Mr. Stratton then affirmed on the record in writing and before Your Honor that he had unanimous consent to negotiate and resolve all the objections." Tr., 2/17/11, p. 13. Significantly, however, Mr. Herman never addressed the question of *his own* authority to negotiate on behalf of the other claimants to the fund, whom he purportedly represented. Indeed, Messrs. Herman, Birchfield, and Seeger have not even disclosed whether their settlement was approved by the rest

---

[4]In *In re Pantopaque Products Liability Litigation*, 938 F.Supp. 266, 270 (D.N.J.1996), the court recognized that liaison counsel performs only two functions: maintaining the service list and circulating correspondence between the Court and defendants and all plaintiffs' counsel, citing the Manual Complex Lit. § 10.2 (4th ed.). The court drew a clear distinction between these limited powers and the broader powers of lead counsel.

of the PSC.  Their authority to negotiate was simply, and wrongly, assumed without any grant by the Court or the claimants.

It would appear that the non-Stratton parties to the deal had even less authority than Stratton. Mr. Herman, Mr. Birchfield, and Mr. Seeger negotiated the Stratton deal; they are, not coincidentally it must be assumed, all members of the FAC.  However, they entered their appearances as "plaintiff liaison counsel" and member of the NPC (Mr. Herman) and as "co-lead counsel" (Messrs. Seeger and Birchfield). Tr., pp. 3.  Mr. Stratton allegedly appeared "on behalf of all the objectors to the plaintiff liaison counsel's petition for assessment." *Id.*  The Negotiating Plaintiff's Committee was formed to negotiate with *Merck*, not to conduct any negotiation that came down the pike.  Plaintiff's Liaison counsel was charged with keeping plaintiffs' counsel informed and carrying out "such other duties as the Court may order."  Pretrial Order 2.  Pretrial Order 6 outlined the authority of plaintiff's lead and liaison counsel to conduct a wide range of activities, including "Explore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation."  Pre-trial Order no. 6, p. 3, "Miscellaneous (3)."  Even if this authority is construed to extend to a claim relating to attorneys' fees, it confers no rights beyond "pursuit" of settlement, which falls well short of *confirming* a settlement on behalf of parties who received no notice, no opportunity to be heard, and no fairness hearing.

The limitations on the members of the FAC were even more clearly prescribed.  At a minimum, though, their roles as lead and liaison counsel of the PSC obliged them to work for the benefit of the other claimants to the common benefit fund whom they represented.  As the Manual for Complex Litigation explains, "[c]ounsel designated by the court [in leadership roles] also assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel."  Manual 5th § 10.20, p.26.  It is categorically wrong to

state, as Mr. Herman did, that "the fund belonged to nobody." It belonged to all those who had

claims against it; and if the FAC, or the PSC, had any authority over it at all, it was merely as a

fiduciary, which did not confer the power to disburse the funds held in trust. The other claimants

had as keen an interest in it as their lead counsel did, and therefore had a right to be informed.

### b.   The end cannot justify the means.

The FAC contends that its settlement with the Stratton Group accomplished the goal of

eliminating a serious challenge to the common benefit fund, and did so at a fair price. The arguable

merits of the deal, however, beg the far more serious question of the FAC's authority to enter into

such a covert arrangement and then to disburse common benefit funds without notice to the other

interested claimants and without court approval. The impropriety of its actions precludes any

argument that the ends justified the means. *Hazel-Atlas,* 322 U.S. at 247, 64 S.Ct. 997. *See also,*

*Alexander v. Robertson,* 882 F.2d 421, 424 (9th Cir.1989).

The law requires notice and judicial supervision for the express purpose of protecting against

this type of gestalt, result-oriented dealing, where subjective evaluations of what is best for the

"greater good" are left subjectively in the hands of those whose judgment may not be so clear

because of their own self-interests. "[R]egardless of the benefits a particular settlement might seem

to confer, in terms of "the greatest good for the greatest number" of parties, the niceties of statutory

and constitutional constraints must be observed." *Flagan v. Ahearn*, 134 F.3d 668 , 671(5th Cir.

1998), Smith, J., Dissenting, *rev'd, Ortiz v. Fibreboard Corp*., 527 U.S. 815, 119 S.Ct. 2295, 144

L.Ed.2d 715 (1999). "[D]ue process must mean something other than that the result is just,

otherwise some lynchings would be consistent with due process.".  Koniak, *Feasting While the*

*Widow Weeps:  Georgine v. Amchem Products, Inc.*, 80 Cornell L. Rev. 1045, 1123 (1995). The

point is, regardless of how "fair" a settlement may appear, "no one can tell whether a compromise

found to be 'fair' might have not been 'fairer' had the negotiating [attorney] possessed better information or been animated by undivided loyalty to the cause of the class. The court can reject a settlement that is inadequate; it cannot undo the partisan task of bargaining for better terms.  The integrity of the negotiating process is therefore, important."  *In re General Motors Corp Engine Interchange Litig.*, 594 F.2d 1106, 1125 n.4 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979).  *See also In re Corrugated Container Antitrust Litigation,* 643 F.2d 196, 211 n. 25 (5th Cir. 1981) ("We hasten to add that the adequacy of settlement terms cannot ordinarily redeem a settlement that was bargained by a party in a conflict position.").

Much could be said about the merits of the Stratton deal, but the FAC's settlement improperly foreclosed comment.

## II.      THE FACTS, AS PRESENTLY KNOWN, RAISE SERIOUS ISSUES.

Much has been said in these proceedings about transparency in the fee allocation process, which is universally recognized as an essential component of due process.  *In re High Sulfur Content Gasoline Products Liability Litigation, supra*, stated that one of the purposes of requiring transparency in matters of fee allocation is to allow those involved the chance to conduct a comparative analysis:

> **Appellants could not compare their awards to those of other attorneys. They were not** furnished with the hours and rates that other attorneys submitted or **informed of the Fee Committee's process, yet such information was essential to enable them to challenge how the Fee Committee valued their work.** *See In re Vitamins Antitrust Litig.*, 398 F.Supp.2d 209, 234 (D.D.C.2005) (lead counsel responsible for fee allocation must "apply a universally fair standard of allocation to all participants, including itself"). **One cannot even compare apples to oranges without knowing what the oranges are. *** After all, "[a]llocation means proportion; how does the share [one] counsel is taking compare to the shares others are getting?"** *In re Vitamins Antitrust Litig.*, 398 F.Supp.2d at 234.

517 F. 3d  at  232 (emphasis added).

As a starting point for the comparative analysis required for any distribution of a limited fund among a discrete group of claimants, one would expect *the size of the fund* to be known. Movants cannot find any case authorizing concealment from the claimants of the amount available for distribution. Yet the newly-discovered Stratton agreement accomplished exactly that: the FAC removed $18,536,000, or more than 5% of the total fund, for distribution to one group, without disclosing its action to the remaining claimants, *or to the Court*.

The remaining claimants were given no notice, no hearing, no opportunity to object, and no opportunity to be heard. The FAC made its own determination about whether the Stratton settlement inured to the benefit of claimants to the fund, and about how much the Stratton objectors were entitled to receive in order to compromise their claims. The FAC bound all claimants to the terms of a settlement in which all claimants had a clear interest, without permitting them to offer any input or even giving them to *know* that the deal had been struck.

 Movants and, we suspect, many others, *including the Court*, had no inkling that more than 5% of the common benefit fund had simply been spirited away. They continued to believe that the common benefit fund amounted to $315,250,000, the amount assessed by this Court's order of October 19, 2010, although by then the agreement to substantially reduce the fund had already been confected and implemented. Movants also continued to believe that the assessment against *all* claimants to the fund remained at 6.5%, the amount imposed by Court order.

Throughout the fee allocation process this Court has repeatedly referred to the need to maintain an orderly sequence of submission, proposal, objection, discovery, and review that was designed to preserve and protect all claimants' due process rights *prior to any distribution.* The Court's published methodology allowed no quarter for side deals, secret "confidential" distributions, or any other form of self-dealing. This Court has stressed, over and over again, that IT, and it alone,

will allocate the common fee fund.

It has also stressed the need for transparency, which must encompass "side deals," for the

reasons advanced by the Manual for Complex Litigation:

> Occasionally, however, litigants try to apportion damages through side agreements
> that supplement their formal settlement agreements but are not intended to be
> disclosed to others. These agreements may not of themselves be unlawful or
> unethical, and on occasion there may be legitimate reasons for not disclosing them
> to other parties. In presenting settlement agreements for judicial approval, however,
> the parties are obliged to make full disclosure of all terms and understandings,
> including any side agreements. The settling parties may request that certain terms not
> be disclosed to other parties, but must justify this to the court.

Manual Complex Lit. § 13.23 (4th ed.)

The FAC's side-deals, the true extent of which we believe is still largely unknown, raise

serious issues.  Due process, breach of fiduciary duty, and *ultra vires* acts, might all be implicated.[5]

There are potential remedies, well established in the law , which may apply, including return of the

missing funds, forfeiture of leadership positions,[6] and even forfeiture of fees.[7]

---

[5]In its negotiations with Stratton, the FAC occupied a fiduciary role to the other claimants, who had
an interest in the common benefit fund.  Fiduciary obligation is a civilian concept which includes
the ordinary duties owed under tort principles as well as the duty to handle the matter "as though
it were [the fiduciary's] own affair."  Noe v. Roussel, 310 So. 2d 806, 819 (La. 1975).  The
relationship between principal and fiduciary is distinguished by a duty of loyalty, which binds the
fiduciary "not to act in antagonism, opposition or conflict with the interest of the principal to even
the slightest extent." *Id.  See also, Gerdes v. Estate of Cush*, 953 F. 2d 201, 205 (5th Cir. 1992).
Fiduciary relationships are most commonly found in the context of financial dealings, and arise out
of a relationship necessitating great confidence and trust on the part of the principal and a high
degree of good faith on the part of the fiduciary. *See Petre v. Living Centers-East, Inc*., 935 F. Supp.
808 (E.D. La. 1996); *Schenk v. Living Centers-East, Inc*., 917 F. Supp. 432 (E.D. La. 1996).  Said
Schenk, "the definition of a fiduciary is not bound to a particular type of transaction; rather it is
determined by the nature of the relationship between the parties."  917 F. Supp. at 437.

[6]Disqualification of lead counsel is "often premised on violations of state disciplinary rules," but is
a question of federal law. Manual Complex Lit. § 10.23 (4th ed.), at n. 70.  Disbanding leadership
when serious misconduct has occurred is not a unique remedy. *See In re Pharmaceutical Industry*
(continued...)

The most significant issue may be one that transcends the parties' dispute. When Mr. Stratton wrote his July 28 letter to this Court, leading it to believe that the objectors and the PSC had settled on a 7.5% assessment, no one bothered to tell the Court that this was not the solution at all – it was just a pretense for public consumption, while the "real deal" for 4% was secretly sealed and deemed "confidential" by its confectors. Accordingly, in its October 19, 2010 Order, this Court described what it knew about the matter, and taking some comfort in the belief that all parties had agreed to reduce the assessment to 7.5%, proceeded to craft its 6.5% award: "While the matter was pending before this Court, the PLC reduced its request for a common benefit fee award to 7.5% and the objectors withdrew their objections." Order of October 19, 2010, at 10.

The Court believed this to be the case because Mr. Stratton, in the letter copied to the FAC,

---

(...continued)

*Average Wholesale Price Litigation*, 2008 WL 53278 (D.Mass.), where the court noted that complex litigation requires particularly professional conduct from attorneys, as judges are especially dependent on the assistance of counsel. *Id.* § 10.21, at 22-23. "Counsel need to fulfill their obligations as advocates in a manner that will foster and sustain good working relations among fellow counsel and with the court." *Id.* at 23. The standard for disqualification of lead counsel is different from that for disqualification of an individual plaintiff's counsel. In determining whether lead counsel should be disqualified, a court should consider if plaintiffs, given the ability to choose among numerous competent lead counsel contenders and full knowledge of their behavior, would select counsel whose behavior has raised ethical concerns. *See In re Medtronic, Inc., Implantable Defibrillator Prod. Liab. Litig.,* 434 F.Supp.2d 729, 732 (D.Minn .2006).

[7]Fee forfeiture is an equitable remedy that requires careful consideration of all the relevant circumstances. *See Burrow v. Arce,* 997 S.W.2d 229, 240 (Tex.1999); *Gilchrist v. Perl,* 387 N.W.2d 412, 417 (Minn.1986); 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering,* § 8.21 n. 2 (Supp.2002). The Restatement 3d of the Law Governing Lawyers, § 37 also calls for partial or complete forfeiture of a lawyer's compensation under the following circumstances:

A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter. Considerations relevant to the question of forfeiture include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies.

filed into the record, and published on file and serve, specifically advised the Court of his concurrence in the 7.5% assessment. *See* Attachment B. The failure to notify the Court that the parties' concurrence in a 7.5% assessment *related only to the assessment against **other claimants and not to themselves*** created an elemental misperception of fact on which the Court proceeded to base its assessment.[8] "With this back story in mind," the Court said immediately after detailing its erroneous view of the Stratton arrangement, "[it] is now fully apprised of the factual and legal issues involved in the PLC's request and is ready to rule." *Id.*

Unaware that the Stratton group had achieved a 4% assessment for its members, the Court observed that: "after Objector's Liaison Counsel had an opportunity for discovery, the PLC reduced its common benefit award request to 7.5%. If 8% was presumptively reasonable but the PLC nonetheless voluntarily reduced the request to 7.5%, the Court is led to conclude that even the PLC believes that a reasonable benchmark percentage is a flexible concept. With that this Court agrees." *Id.,* at 25-26. The Court then proceeded to impose a 6.5% assessment. *Id.* at 31.

Further unaware that the FAC had removed more than $18,000,000 from the common benefit fund in order to make an unauthorized refund to the Stratton group of its contributions above 4%, the Court placed the common benefit fund amount at $315,250,000. *Id.*[9] It then commenced implementation of the processes by which the contributors to the fund could reclaim attorney's fees

---

[8]Although Mr. Herman maintains that the Court was not informed of the terms of the agreement because "it [the Court] didn't want to know," the FAC did not simply remain silent on the matter. Instead, it appears to have encouraged Mr. Stratton to mislead the Court, then failed to correct this Court's obvious misinterpretation of the facts

[9] None of the published numbers quite add up. Mr. Herman acknowledged that the Stratton refund of nearly $19,000,000 came from the common benefit fund; but the FAC nonetheless proposed to allocate nearly $312,000,000 in its January 13th proposal. These sorts of discrepancies fuel concerns about how much, exactly, is in the common benefit fund and where the money is coming from.

for common benefit work.  Unbeknownst to the Court, the claimants were now composed of two groups, those who had contributed 6.5% to the fund, and those who had contributed 4.0% to the fund.  On this sharply tilted playing field, only the FAC and the Stratton objectors knew of their unequal positions.  The FAC's proposed allocations made no apparent distinction between these unequally-positioned groups, and apparently the FAC did not consider it relevant to this Court's final allocation determination.

In *Chambers v. NASCO, Inc*., 501 U.S. 32, 111 S.Ct. 2123, 15 L.Ed.2d (1991), the United States Supreme Court held that, in a diversity case where state law did not provide authority for sanctioning power, no federal court need endure the indignity of a fraud being perpetrated upon it; a court possesses the "inherent power" to manage its affairs in such a way as to ensure that cases are not resolved in star chambers, or by vexatious or oppressive tactics, or through conduct that skirts the legal obligations that bind all litigants and their attorneys to use the courts in a fair, honest, and open manner:

> [T]he inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946). This "historic power of equity to set aside fraudulently begotten judgments," *Hazel-Atlas*, 322 U.S., at 245, 64 S.Ct., at 1001, is necessary to the integrity of the courts, for "tampering with the administration of justice in [this] manner ... involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public." *Id*., at 246, 64 S.Ct., at 1001. Moreover, a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud. *Universal Oil, supra*, 328 U.S., at 580, 66 S.Ct., at 1179.

501 U.S. at 44, 111 S.Ct. at 2132. [10]

---

[10]In *Hazel-Atlas Glass Co. v. Hartford-Empire Co., supra*,  the Supreme Court found fraud on the
(continued...)

There are other formulations of the concept.  Professor Moore notes that:

'Fraud upon the court should, we believe, embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.

7 J. Moore & J. Lucas, Moore's Federal Practice, at515 (2d ed.1978).  Fraud on the court "embrace[s] . . . the species of fraud which does or attempts to[] defile the court itself." *Jackson v. Thaler*, No. 09-70016 (5th. Cir. 10/9/2009) (5th. Cir., 2009), quoting *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1989).  Because the insult is primarily to the Court, undersigned counsel do not consider it their place to opine whether such offense has been given.

This Court may well discover that its powers and functions, conferred upon it not only by Article III of the Constitution, but also by the contract of the parties, have been seriously degraded. The Master Settlement Agreement vested ultimate control over the common benefit fee fund exclusively in this Court:

9.2.3. Pursuant to Sections 9.2.1 and 9.2.2, the attorneys' fees and common benefit expenses deducted by the Claims Administrator shall be deposited into an interest bearing escrow account (the "Settlement Fee and Cost Account"). The Settlement Fee and Cost Account shall be maintained at a financial institution. Funds within the Settlement Fee and Cost Account shall be administered by the Honorable Eldon E. Fallon and all awards therefrom will be subject to approval, upon due consideration by him in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson, and in accordance with established Fifth Circuit precedent . . .

In accordance with established precedents, the work of the FAC was to be strictly *advisory:*

9.2.4. The Honorable Eldon E. Fallon will be asked to appoint a committee of eight

---

[10](...continued)
court where an attorney had an article published by a "neutral" expert, and then used the article to obtain a patent and a judgment for patent infringement.  In the Court's view, such conduct amounted to fraud on the court and  demanded "the interposition of equity to devitalize the ... judgment."

plaintiffs' counsel which shall include all members of the NPC and two additional plaintiffs' attorneys **to be responsible for recommending to the Honorable Eldon E. Fallon** the allocation of awards of attorneys' fees from the Settlement Fee and Cost Account.

(emphasis added).

The order forming the Fee Allocation Committee reiterated its limited advisory role. Nothing in any subsequent order suggested any retreat from this Court's ultimate authority over the fund, nor from the requirement that "all awards therefrom will be subject to approval," nor was any authority conferred upon the FAC to disburse common benefit funds for any purpose or by any means. *See e.g.*, Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's "inherent authority over this multi district litigation" as well as its express authority under Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving the right to "issue subsequent Orders governing the procedure by which the Allocation Committee shall carry out its function"; and providing that members appointed to the committee may not be substituted by other attorneys "except with the prior approval of the Court").

Moreover, this Court has justified its jurisdiction in this case on the ground that the global settlement agreement created a "quasi class action." *See* Order and Reasons, 8/27/08 (Docket Entry No. 15722), at 9 ("[T]he Court finds that the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness."). If this be true, then the members of the Fee Allocation Committee effectively served as "class counsel" in their negotiations with the Stratton group, and were obligated under Rule 23(g)(4) to "fairly and adequately represent the interests of the class." Professor Newberg, in discussing "Private settlements with class members: restricted communications," notes that "side deals," which are confected outside of judicial supervisor, are

particularly troublesome and merit special attention.

> The elimination of court review can open the door to potential abuse of the rights of absent class members, who are generally without adequate knowledge of the claims in the action. As a result, the settlement can be for substantially less than the claims are worth. In order to protect against such occurrences, the American Bar Association (ABA) Model Rules of Professional Conduct has addressed the issue and have found that the formal parties to the class action, or counsel for the formal parties, may not, without knowledge or consent of the court, communicate individual settlement proposals directly or indirectly by written or oral communication with the potential and actual class members.

4 Newberg on Class Actions § 11:75 (4th ed.).

In fact, FRCP 23(e)(3) was amended in 2003 expressly to provide that: "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal. The redactors notes, which erroneously refer to subsection (e)(2) instead of (e)(3), state that the provision is intended to require parties seeking approval of settlement "to file a statement identifying any agreement made in connection with the settlement" and is "aimed" at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." While the comment goes on to suggest that discovery with regard to these side agreements be closely controlled, the reason offered is that some such agreements "may raise concerns of confidentiality." The issue of confidentiality has already been addressed herein through orders of the Court, so there is no justification for a limitation on discovery.[11]

---

[11]The obligation of notice of a settlement is further set forth in the Local Rules, as follows:

> LR 16.4 Notice of Settlement to Clerk

> Whenever a case is settled or otherwise disposed of, counsel must immediately inform the clerk's office, the judge to whom the case is allotted, and all persons subpoenaed as witnesses. If a case is settled as to fewer than all of the parties or all of the claims, counsel must also identify the remaining parties and unsettled claims. [Amended February 1, 2011]

(continued...)

**III.** **Unfettered discovery of the Stratton Deal, the VLC deal, and any other side deals, should occur to provide this Court with information pertinent to the fee allocations, and also to provide it with the facts necessary to impose any remedies it deems appropriate to vindicate its authority.**

Discovery has been propounded to the FAC which inquires into the details of all "side arrangements" which may bear upon the allocation of fees.

### Request for Production No. 5

Identify and produce each and every document reflecting, recording, or otherwise relating to any agreement, understanding, or proposal between the PSC, FAC, NPC or any of its members, and themselves, each other, or any claimant, to any fund established for the payment of common benefit attorneys' fees or to any allocation or distribution of funds identified in response to the preceding Interrogatory. This Request includes but is not limited to any arrangement involving the Vioxx Litigation Consortium and the objectors represented by Michael Stratton as lead counsel; and it includes but is not limited to any notice to any claimants and any Court orders, rulings, or informal approvals of any such agreements.

### Interrogatory No. 5

For each and every agreement, understanding, or proposal defined by the preceding Request, state whether any member of the PSC, FAC, or NPC objected to it, and if so, identify each such objector to each agreement, understanding, or proposal, and state the basis of the objection; and state whether the Court approved it, identifying each and every Court order reflecting such approval.

Undersigned counsel also sought to discover both from the FAC and from Brown Greer

---

[11](...continued)
LR 16.5 Captious Settlement Tactics

When notice of settlement is not provided as required by LR 16.4 or when a case is settled within 24 hours before trial, or after trial has commenced, and the court is not aware of circumstances that indicate that this development was reasonable, counsel must show that the failure to give notice of settlement or the failure to agree on settlement at an earlier time was not the result of captious tactics, did not constitute merely the acceptance of an offer earlier refused as part of a calculated tactic of delay in reaching a settlement to obtain further advantages in disregard of the interests of others, or did not result from some other cause amounting to interference with the orderly conduct of judicial business. If counsel fails to make this showing, the court may assess or apportion jury costs, including attendance fees, marshal's costs, mileage and per diem, against the parties or counsel deemed responsible. [Amended February 1, 2011]

whether and if so, under what circumstances, the FAC has removed other moneys from the common benefit fund.  The FAC refused to answer any of these requests, and undersigned counsel has filed a motion to compel.  The FAC also filed, purportedly on behalf of Brown Greer, a motion to quash the subpoena, despite the fact that Brown Greer is a firm of attorneys working for the Court and not the FAC.   (Undersigned counsel will soon file an opposition to the Motion to Quash.)

The FAC maintains that undersigned counsel are overstepping the proper bounds of the inquiry appropriate to this phase of the proceedings.  The FAC would restrict the objection process to the merits, *vel non,* of the recommended allocations to the 17 Objectors.    However, as undersigned counsel have shown in the pending Motion for Partial Summary Judgment or to Strike, such a blinkered view is impossible when attorneys' fees are to be allocated from a limited fund. This is so because any adjustment to the award to any claimant necessarily impacts the amount available to compensate the remaining claimants.  Thus, as the Fifth Circuit  recognized in *High Sulfur*,  "[a]llocation means proportion; how does the share [one] counsel is taking compare to the shares others are getting?"

Obstructed in its inquiries by the FAC, undersigned counsel took a hard look at the fee allocation recommended by the FAC.  Several anomalies appear from the face of the FAC's recommendations.   The chart attached as Exhibit C, at pages 34-36, *infra*, suggests another series of side-deals uninformed by the *Johnson* factors.   Undersigned counsel prepared this chart by comparing the FAC's December 2010 and January 2011 allocation grids.  During the time between the preparation of these two recommendations, the FAC, pursuant to Court order, met with various claimants, heard their informal objections to the earlier recommended allocation, and made adjustments.

The process of review and adjustment is customary and unremarkable.  Modest adjustments were to be expected in this phase of the proceedings.  What distinguishes the FAC's work, however,

is the number and startling amounts of the adjustments.  More than one-fourth of the FAC's recommended allocations were adjusted by more than 30%; more than 10% of the allocations were adjusted by 100% or more- and several by more than 300%.

The extraordinary mutability of the FAC's recommendations can only be explained in one of two ways: either the FAC was awfully careless in its original calculations, which it touts as the culmination of years of work in adherence to strict objective guidelines; or its numbers were easily susceptible to deal-making, with adjustments upwards for those willing to withdraw their objections and downward for those who refused to accept the FAC's recommendations.[12]   Neither possibility accords with the meticulous application of objective allocation criteria, as required by the Fifth Circuit and this Court.

Either possibility, however, demands that there be a full and thorough investigation. Objectors must be afforded the right to make a record for this court, and more importantly, for the appellate court which will have not have the  benefit of this Court's personal experience in this matter . Even more, discovery, public disclosure, and swift action thereon, is the only antidote to the appearance of impropriety that erodes public confidence in the judiciary. *See e.g., In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1349 (5th Cir. 1981) , where counsel was disqualified because there was a strong inference of impropriety, even though the issue was raised late in the litigation ("[T]he client may not, by delay or any other action, remove from the court the responsibility of weighing the likelihood of public suspicion of the legal profession when Canon 9 (avoiding the appearance of impropriety) is involved.).  Finally, discovery is critical for this Court to determine if its authority is in need of vindication with swift and salutary action. *See e.g., Winkler*

---

[12]  Undersigned counsel have collected a fair amount of anecdotal evidence that the FAC threatened claimants with reprisals for the refusal to negotiate or offered substantial rewards for the surrender of objections.

*v Eli Lilly*, 101 F.3d 1196, 1204 (7th Cir. 1996), "a case about attempts to discover the terms of a secret agreement" between lead counsel and the defendant that may have required lead counsel to fall on his sword during a bellwether trial and then immediately withdraw; the court of appeal reversed a lower court injunction prohibiting discovery about the matter because "[u]ntil such a substantive inquiry is made, the sparseness of the record before us leads us to believe that there is no way of knowing whether the secret agreement confirms the district court's best hopes, or plaintiffs' worst fears."

## IV.   CONCLUSION

The appearance of impropriety in the FAC's dealings with various claimants warrants further inquiry.  Only further discovery will reveal whether there are legitimate explanations for what has transpired, or whether this Court is confronting serious breaches of conduct.  In the latter case,  the Court will have panoply of remedies at its disposal, and it would be premature to address them here. The undersigned believes it has made a case, based upon the objective facts as they are presently known, to proceed with an investigation.


Respectfully submitted:


/s/ Robert E. Arceneaux                                    /s/ Margaret E. Woodward
_____                     _____
Robert E. Arceneaux, La Bar No. 01199       MARGARET E. WOODWARD, La. Bar
ROBERT E. ARCENEAUX LLC                      No.13677
47 Beverly Garden Drive                              3701 Canal Street, Suite C
Metairie, LA 70001                                       New Orleans, Louisiana  70119
(504) 833-7533 office                                   (504) 301-4333 office
(504) 833-7612 fax                                       (504) 301-4365 fax
rea7001@cox.net                                         mewno@aol.com


**CO-LEAD COUNSEL FOR OBJECTORS IDENTIFIED IN FEB. 8 ORDER**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Joint Motion To Suspend has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, February 28, 2011.

/s/ Robert Arceneaux
_____