HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: ANAPOL SCHWARTZ WEISS & COHAN
     Sol Weiss, Esquire
     Gregory S. Spizer, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER: Linda L. Golkow, RDR
    877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. WEISS:  You've all seen
 3        what I've submitted, and all I did
 4        submit was common benefit.  By
 5        that I mean, I did not submit,
 6        except for the Hatch case, any
 7        time on any individual case even
 8        though some of them Chris used to
 9        get ready for trial to drive the
10        litigation.
11            The second thing, none of
12        the 200-plus depositions we took,
13        either of the reps, the treaters,
14        are included in our submission to
15        common benefit.
16            MR. SEEGER:  Sol, did you
17        submit a three-page affidavit?  Is
18        that what you are talking about?
19            MR. WEISS:  No.  Benefit.
20            MR. LEVIN:  He's talking
21        about time submission.
22            MR. SEEGER:  Okay.
23            MR. WEISS:  So, the only
24        thing I did submit, again, is
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        liaison work of being the

2        architect, along with Dave, of

3        let's keep Merck busy by doing the

4        detail setup.  My office did

5        monitor I guess the 20 million

6        pages of detail documents that

7        came in.  We actually got copied,

8        and we checked to make sure, when

9        they started to get the same

10       detailer two or three times, and

11       they would go to Higbee and claim

12       they needed months and months and

13       months, we would go, oh, no, here

14       they are, here are the pages.

15            We also did a template for

16       New Jersey, and that's included,

17       all of the detail docs, that is,

18       all of the bulletins they got

19       every day, electric bulletins that

20       was actually embedded into, I

21       guess it was a Word monthly

22       calendar.  Our staff did that.

23       So, all you had to do was take a

24       look at the records you got from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
1        Merck for your prescribing

2        physician, plug it into the chart,

3        and you could then overlay what

4        the reps knew, what they knew and

5        when they told their docs.  We

6        actually talked to Jerry about

7        some of that stuff.

8             We did take some of the

9        early depositions that we took,

10        and we gave them to people like

11        Jerry and a couple others, and we

12        actually came up with, it must

13        have been five or six-hour

14        questions that Merck was asking

15        all of the treating doctors, all

16        of the prescribing docs.  That's

17        in there.

18             But, essentially, it's my

19        work as liaison, Dave's work in

20        helping Chris, and I helped a

21        little bit in the first trial.

22             MR. SEEGER:  Dave Jacoby, so

23        they know when you say "Dave."

24             MR. WEISS:  My partner, Dave
```

FAC Resp. Exhibit D -- 4

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      Jacoby.

2            Greg was in charge of doing

3      all of the individual case stuff.

4      Greg also did work from LMI, and

5      we did find them cheating.  LMI in

6      New Jersey, I guess they used them

7      in the MDL too, Merck used them to

8      get records.  We found some LMI

9      people actually writing letters to

10     the prescribers and treaters

11     saying that the Court ordered them

12     to relook through their documents

13     because not all the records were

14     there.  We caught them, and we had

15     a little brew ha-ha in front of

16     Higbee, very private, because they

17     were very embarrassed.

18            So, that's what we did.

19     Anything else, I'm here to answer

20     questions.

21            MR. SEEGER:  This is the

22     most refreshing presentation

23     that's over quickly.

24            MR. LANIER:  If you get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          credit for the presentation, Sol,

2          you are an all right guy.

3              MR. WEITZ:  Sol, how many

4          cases did you submit to the

5          settlement, approximately?

6              MR. WEISS:  Well, that's a

7          hard question to answer.  As

8          primary counsel?

9              MR. LEVIN:  As primary.

10             MR. WEISS:  About 800.  And

11         then we have cases where we are

12         not primary, we are local counsel

13         with Birchfield.  There are 90

14         cases that we have an arrangement

15         with Sheller.  We did a lot of his

16         work behind the scenes for

17         Sheller.  We get a piece of

18         Sheller's fees.

19             Whatever is left that you

20         don't have in diet drugs, I get.

21         There's other firms in

22         Philadelphia that we do their mass

23         tort work quietly, and we have a

24         piece of all of those cases.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          I'm going to say, Perry, when you

 2          add it all up, we are over 1,000.

 3              MR. WEITZ:  And as far as

 4          individual workup of cases that

 5          were on Judge Higbee's trial

 6          docket, how many of those cases

 7          would you say that your firm

 8          worked up?

 9              MR. SPIZER:  Trial or

10          discovery?

11              MR. WEITZ:  Trial or

12          discovery that you actually did

13          trial prep work?

14              MR. WEISS:  Abdul Malik and

15          Kimmelman were worked up the same

16          time we worked up Humeston.

17              MR. SEEGER:  And then Hatch.

18              MR. SPIZER:  Hatch.

19              MR. WEISS:  Hatch was a

20          standalone case.  We worked all

21          the way through until we got four

22          records they found that he was on

23          Celebrex and not Vioxx.

24              MR. WEITZ:  That was the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1        scuba diver.

 2               MR. WEISS:  That was the

 3        scuba diver.

 4               Rodemoyer was worked up in a

 5        group of 39, along with another

 6        one, all the way through trial.

 7               MR. SPIZER:  We were going

 8        to trial January of '08 on

 9        Rodemoyer, George Biehls and

10        Gisela Levinson -- wait, there

11        were six, actually.

12               MR. WEISS:  There were four

13        in Pennsylvania and four in New

14        Jersey.  So, we had eight of

15        the -- we had two of the four

16        trials going in January.  And they

17        were fully worked up.

18               MR. SPIZER:  We had two

19        states, Pennsylvania and New

20        Jersey.

21               MR. WEISS:  We also worked

22        up and vetted some experts that

23        were used in New Jersey.  I don't

24        know if you used them in the MDL

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        or not.  One guy, Stuart Rich.

2              MR. SPIZER:  Steve Rich.

3              MR. WEISS:  Steve Rich, who

4        we really controlled.  Some people

5        tried to burn him out, but we kept

6        him pretty well focused.  The guy

7        that you used in Humeston, and I

8        know that someone else used him.

9              MR. SEEGER:  What was he?

10             MR. WEISS:  Cardiologist.

11             MR. SEEGER:  DePace.

12             MR. WEISS:  We worked DePace

13       up.

14             I helped Eric with Madigan

15       to some extent.  I helped Eric

16       with Kostis to a large extent.

17       Kostis did an analysis that he

18       superimposed Framingham over VIGOR

19       and APPROVe.

20             MR. RAFFERTY:  Who did that?

21             MR. WEISS:  John Kostis is

22       the head of cardiology at Robert

23       Wood Johnson Memorial Hospital,

24       which is the teaching hospital at

FAC Resp. Exhibit D -- 9

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        Rutgers.

2              MR. SEEGER:  How would you

3        say that Kostis' work, just focus

4        on him for a second, contributed

5        to the common benefit?

6              MR. WEISS:  It helped us

7        understand if you are going to try

8        a case with a lot of risk factors,

9        how Vioxx was probably one of the

10       leading risks percentage wise, and

11       he could actually tell you why.

12             He looked at, I think it was

13       1,000 clients, I think a third of

14       them were ours, or it turned out

15       to be that way.  We submitted all

16       the medical records.  They were

17       tabulated.  Kostis looked at them,

18       the risk factors and the length of

19       time you were on Vioxx, and then

20       looked at APPROVe, looked at

21       VIGOR, looked at ADVANTAGE, looked

22       at VICTOR, and was able to

23       identify the risks on the Vioxx

24       arm in those trials versus these

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1    people.  And it was pretty

2    amazing.  It turned out that for

3    about 85 percent of the population

4    he looked at, of those who smoked,

5    Vioxx was the larger risk for a

6    heart attack than smoking.

7         And as you know, Chris, the

8    problem was twofold.  Initially

9    Kostis wanted to be the settlement

10   recruiter and wanted Merck to

11   adopt his philosophy, and then he

12   finally agreed he was going to

13   testify at the latest trials.  But

14   they were obviously -- they were

15   settled.

16        MR. LEVIN:  I'm working on

17   the hours here.  Your hours are

18   under review.  They haven't been

19   rejected.  They are under review.

20   Have you been contacted by the

21   accountants with regard to

22   anything?  It could be because of

23   the time that they were submitted.

24        MR. WEISS:  The first thing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          we were contacted about, Arnie,

2          was that the sheets that I used

3          were not the sheets that you used,

4          and we redid them.

5               MR. LEVIN:  That's probably

6          the reason, because you have about

7          6,900 hours and $561,000 in costs.

8               MR. WEISS:  That's right.

9          Let me tell you about the costs so

10         you know.  Costs were in the

11         Hatch.  Case, Chris and I went out

12         to Palo Alto and spent two weeks

13         with Rodney.  I had Rich and

14         another expert that we developed.

15         That's common benefit, because

16         other people used him.

17              MR. LEVIN:  These are expert

18         fees?

19              MR. WEISS:  Expert fees.  I

20         had a copy of every transcript in

21         New Jersey.  I also ordered

22         transcripts from Linda.  I wanted

23         every transcript.  Every

24         transcript we got electronically,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       and Linda embedded and also tied

2       the transcript to the CD, which we

3       had.

4               MR. LEVIN:  When I look at

5       the submissions that are under

6       review, it says MDL time and Hatch

7       time.  Now, is the MDL time really

8       New Jersey litigation time?

9               MR. WEISS:  It is.  It is

10      7300 time.

11              MR. LEVIN:  Could you make

12      sure that the accountant corrects

13      that?  Not because it matters.

14      The reason I'm saying that is, I

15      want to draw and have two charts

16      showing state litigation on one

17      side and MDL litigation on the

18      other.  And you guys are the --

19              MR. WEISS:  You guys made me

20      resubmit the time sheets --

21              MR. LEVIN:  I didn't make

22      you.

23              MR. WEISS:  Let me finish --

24      -- MDL 1657.  So all of the New

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          Jersey time had to be resubmitted.
 2              MR. LEVIN:  Is that the way
 3      we're doing it?
 4              MR. SEEGER:  I think that's
 5      the way it's been.
 6              MR. WEISS:  So you'll know,
 7      I also had to give him, because I
 8      keep contemporaneous time records,
 9      they are the designation for Vioxx
10      common benefit is 73 with four
11      zeros at the end.
12              MR. LEVIN:  And that is New
13      Jersey time, but --
14              MR. WEISS:  That's all New
15      Jersey.
16              MR. LEVIN:  This is for me.
17      I'm not being critical.
18              MR. WEISS:  I understand.
19      You are never critical with me.
20              MR. LEVIN:  Yes, I have
21      been.
22              I want to be able to get
23      those hours out to show how much
24      the state lawyers did so that it
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        is not messed up in the MDL time.

2               MR. WEISS:  So you

3        understand, none of my time was in

4        the MDL.  I did this with Chris

5        and Andy going back to when it was

6        removed from the market, I said I

7        was staying out of the MDL.

8               MR. LEVIN:  You mentioned

9        Madigan.  Was that time included

10       in the MDL time for you, when you

11       were working with Eric?

12              MR. WEISS:  Any time I

13       worked on common benefit, it was

14       7300, yes.

15              MR. LEVIN:  But you

16       considered that common benefit,

17       working with Madigan?

18              MR. WEISS:  Absolutely.

19              MR. HERMAN:  Let me ask you

20       a question about Eric Weinberg.

21              You were co-lead in New

22       Jersey?

23              MR. WEISS:  Yes.

24              MR. HERMAN:  What

FAC Resp. Exhibit D -- 15

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1      specifically did you assign him to

2      do?

3             MR. WEISS:  Eric was the guy

4      who was working up experts and

5      science.  For example --

6             MR. HERMAN:  You assigned

7      him to work up specific experts?

8             MR. WEISS:  Absolutely.

9             MR. HERMAN:  When he worked

10     them up, where did that work

11     product go?

12            MR. WEISS:  It went to me,

13     and it went to Dave Buchanan.

14            MR. HERMAN:  Okay.

15            MR. WEISS:  So you will

16     know, for example, Madigan was

17     used by the MDL people.  Elizabeth

18     Cabraser used Madigan's report in

19     the Sinclair class action.

20            MR. SEEGER:  Dave was

21     involved in this?

22            MR. WEISS:  Yes.

23            MR. LEVIN:  Sinclair was the

24     head of the monitoring of the New

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          Jersey state litigation?

2                MR. WEISS: Yes.

3                MR. HERMAN:  Liz Cabraser, I

4          want to make sure I understand,

5          used Madigan in what?

6                MR. WEISS:  In the medical

7          monitoring Vioxx class action in

8          New Jersey.  And I know Rich was

9          used by some people in the MDL, at

10          least they wanted to use him, and

11          I said okay.  I had to make sure

12          that they didn't make him go where

13          he wasn't qualified.  But there's

14          a couple of others.

15                DePace was used, I think by

16          some people in the MDL, but I know

17          he was also used by other people

18          in New Jersey.  I know he was used

19          in the MDL.  He's the

20          cardiologist.

21                MR. HERMAN:  Well, at this

22          point, I'm just trying to get a

23          handle on who was assigned to do

24          what.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           MR. WEISS:  Eric's job was

2       to work the science in New Jersey.

3           MR. HERMAN:  Who else was

4       assigned to do that?  Was he the

5       only one?

6           MR. WEISS:  It is hard to

7       say, Russ, because we didn't do it

8       the same way that you guys did it

9       or I do it in MDLs.  Eric was one

10      of the lead people that worked the

11      science.  Dave Buchanan worked the

12      science.

13          MR. HERMAN:  Did your firm

14      have Bextra and Celebrex cases

15      also?

16          MR. WEISS:  Yes.

17          MR. HERMAN:  Was Madigan

18      used in those cases?

19          MR. WEISS:  Not by me, they

20      were used by Perry.

21          MR. HERMAN:  I'm sorry?

22          MR. WEISS:  He was used by

23      Perry, not us.  And all my Bextra

24      cases were with Mark.  I think

FAC Resp. Exhibit D -- 18

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1        every one but two were in New York
 2        State Court, right, Mark?
 3              MR. LANIER:  Yes, sir.
 4              MR. WEISS:  We did develop
 5        some other cardiologists that were
 6        very good like Altobelli, a young
 7        well-qualified cardiologist who
 8        actually reviewed cases for trial
 9        and was going to testify at trial.
10        Eric was instrumental on doing
11        that.  I helped.  We took a whole
12        bunch, and I think they are in
13        this.  We took a bunch of Merck's
14        expert cardiologists in Kimmelman,
15        Humeston, the second round, in the
16        third round.  We gave you the
17        transcripts.  I know you guys had
18        them, with our pleasure.
19              I actually worked with
20        Hornbeck doing Flavahan.
21              MR. SEEGER:  Flavahan.
22              MR. WEISS:  What a favorite
23        he was.  Remember him, Mark?
24              MR. LANIER:  He was a joke.
```

FAC Resp. Exhibit D -- 19

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Put that on the record.  He was a

2          joke, he was.  Had a really good

3          accent.

4               MR. WEISS:  That's the guy

5          we caught with the article that

6          was very critical on COX-2s in

7          some offbeat publication.

8               Any other questions for us

9          or anybody else, guys?

10              MR. SEEGER:  No.  No, sir.

11         Thank you.

12              MR. WEISS:  Again, if you

13         are counting time for the detail

14         people, and if you are counting

15         time for all the trial cases that

16         we worked up, they are not here.

17         So, if that's part of the package,

18         I would like an opportunity to

19         submit the extra time.

20              MR. SEEGER:  Submit it.

21              MR. HERMAN:  Submit it.

22              MR. LEVIN:  I think you

23         ought to submit it.

24              MR. HERMAN:  Just identify

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        it when you do.

2             MR. LEVIN:  Because it will

3        be helpful.

4             MR. WEISS:  So, I'm going to

5        give you the time for those cases

6        we worked up for trial, and also

7        you want the detail time, too?

8             MR. LEVIN:  It was part of

9        Judge Higbee's plan to work them

10       up.

11            MR. WEISS:  Yes.  There was

12       12, then 29, then there was 39,

13       and, for example, Andy, do you

14       remember the first cases we worked

15       up way, way back when?

16            MR. HERMAN:  Well, Sol, in

17       fairness to you, other people are

18       submitting those hours, and I

19       think you ought to do it also.

20            MR. WEISS:  I understand,

21       but I was told they weren't

22       counting.  That's why I didn't do

23       them.

24            MR. HERMAN:  Submit them.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              MR. LEVIN:  They are

2       counting them now.

3              MR. HERMAN:  Those that were

4       worked up for trial.

5              MR. WEISS:  So, you want

6       them on these forms?

7              MR. LEVIN:  Yes.

8              MR. WEISS:  It is going to

9       say MDL 16 --

10             MR. LEVIN:  Just write a

11      cover letter to the accountant

12      saying this is a supplemental

13      submission dealing with such and

14      such.

15             MR. HERMAN:  It is not my

16      rule, but Arnold wants your blood

17      type, your thumbprint, your eye.

18      Send them as soon as you can get

19      them in, Sol.

20             MR. WEISS:  It will take a

21      couple of weeks.

22             MR. HERMAN:  Within a week?

23             MR. LEVIN:  Could you do it

24      faster?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
1              MR. WEISS:  Those individual
2         cases are not on time sheets.
3              MR. LEVIN:  Okay.  Well, as
4         fast as you can.
5              MR. WEITZ:  But it is not
6         your individual inventory of cases
7         --
8              MR. WEISS:  No, no.
9              MR. LEVIN:  He just didn't
10        keep the time.
11             MR. WEISS:  In other words
12        if we had a case called for trial,
13        I don't have my people keep time
14        sheets.  I only keep time sheets
15        on stuff I think is the common
16        benefit.
17             MR. HERMAN:  You know what
18        you ought to do?
19             MR. WEISS:  What's that?
20             MR. HERMAN:  You ought to
21        say, estimate these hours the best
22        you can as an estimate and send
23        them in.
24             MR. WEISS:  Anything else?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1                    (No response.)

2                    MR. SEEGER:   Thank you.

3                    MR. HERMAN:   Thank you.

4                         -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1                C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR

23        Notary Number:  1060147 Exp. 1.2.10

24        CCR Number:  30X10017620

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 3, 2008
- - -
HOUSTON, TEXAS
- - -

FIRM:         ANASTOPOULO & CLORE, L.L.C.
              Samuel K. Allen, Esquire


BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
              GOLKOW TECHNOLOGIES, INC.
          877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 26

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -

 2              MR. BIRCHFIELD:  Sam, just

 3         so you know, we've got Linda here,

 4         and she's taking everything down.

 5              Judge Fallon has really

 6         stressed the transparency, but he

 7         will have a transcript available

 8         for his review and however he

 9         deems that the transcript should

10         be used.

11              With that being said, the

12         floor is yours.

13              MR. ALLEN:  Well, gentlemen,

14         I know most of you, and some of

15         you I have just met today.  My

16         name is Sam Allen, and I'm a

17         partner with Mark Clore and Bob

18         Berry with Anastopoulo & Clore.

19         We have a small practice that does

20         products liability, medical

21         malpractice, and other specialty

22         litigation, but exclusively

23         litigation work.  Mark and Bob

24         were partners here in Texas for
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1    about 30 years doing specialty

2    work in medical malpractice.  We

3    were involved in Baycol pretty

4    extensively, had the Strong case

5    in working with Andy and others

6    and trying to get maximum value in

7    Baycol.  Chris and the people that

8    I'm familiar with on this panel,

9    in trying to maximize the value of

10   that, we found out that sometimes

11   it helps to have people like Mark

12   and Bob's experience in context

13   with experts, obviously, in these

14   type of litigation cases to get

15   the premier experts for the

16   bellwether cases.

17        We did the same thing in the

18   Vioxx litigation from the point of

19   view of trying to go out and get

20   some exclusive experts for

21   specific reasons, particularly for

22   bellwether cases.  We were able

23   to, with the help of Joe

24   Alexander, retain a gentleman in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        cardiology by the name of Mark

2        Entman, one of the top

3        cardiologists at the Baylor

4        College of Medicine.  He sent a

5        pretty specific detailed report to

6        Mr. Gallagher in support of

7        allowing review of cases after we

8        met with him and talked with him,

9        probably a gentleman that would

10       not have come into the Vioxx

11       litigation had it not been for

12       Mark's experience and time with

13       Mr. Entman.

14            Because the focus in, I

15       believe --

16            MR. SEEGER:  I'm sorry.  It

17       is A-N --

18            MR. ALLEN:  Mark Entman,

19       E-N-T-M-A-N.

20            We then spoke with other

21       individuals about where we could

22       be of assistance with experts.  I

23       think everybody in this room is

24       familiar with the difficulty we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1       were having with cardiovascular

2       cases, and as far as getting top

3       end cardiologists, but more

4       importantly, we were having a lot

5       more difficulty in the stroke

6       cases.  So --

7            MR. BIRCHFIELD:  Entman, was

8       he designated as the expert in the

9       Ledbetter case, do you know?

10            MR. ALLEN:  I can't tell you

11       today for sure which one that was.

12       I know he was designated in our

13       case, which was the top case to be

14       released on the Texas consolidated

15       litigation after, obviously, some

16       cases were tried outside of that.

17       Mark's case was tried outside of

18       that.  Kathy's case was tried

19       outside of that.

20            As of the e-mail that I

21       attached, we were the next case to

22       be released hopefully, called

23       Colleen Reck, death case of Fred

24       Reck.  That case was filed in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          Tarrant County, but we believe

 2          that that's going to be tried

 3          either through some consolidated

 4          issue where a judge would be

 5          assigned to it or not.  We got

 6          through discovery on that.  He was

 7          designated in that.

 8              To go back to discussing

 9          experts, we were trying to help

10          regarding the stroke cases.  We

11          were able to get John Abrahamson

12          on board and retained to help

13          also.  This is pretty much where

14          our efforts were focused in the

15          case, was helping in getting those

16          experts lined up.

17              We then spoke, I believe,

18          with Beasley Allen and maybe you,

19          Chris, regarding how we could

20          potentially get one of our cases

21          lined up for a bellwether case, a

22          stroke case for the MDL.  That's

23          what we were discussing trying to

24          get done.  After review of our
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          cases, we didn't have it.  We

 2          didn't have one that we felt was

 3          going to be one we would want to

 4          put forward, although we did feel

 5          the Reck case was one we could try

 6          successfully.  It was a gentleman

 7          who had no cardiac history

 8          whatsoever, and upon autopsy had

 9          no cardiovascular disease at all,

10          drew a large clot and died.  So,

11          we felt like that case would do

12          well.  That's how we promoted it

13          up.  It was already filed in the

14          Texas litigation and was working

15          from that point of view.

16               I'm simply here asking you

17          for reimbursement for costs of the

18          retainers of those experts, which

19          is actually -- and I think the

20          total amount we're seeking is less

21          than $100,000.

22               MR. SEEGER:  Were the

23          reports sent on either to my

24          office or somebody's office?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1            MR. ALLEN:  I attached

2       Entman's letter to Mike Gallagher

3       as part of his efforts to support

4       and willingness to support the

5       Texas consolidated litigation

6       statements, but I don't know that

7       it went further from there.

8            MR. BIRCHFIELD:  Can you get

9       that in?  Send it to Lenny Davis

10      at Russ Herman's office.

11           You've submitted those costs

12      to Wegmann?

13           MR. LEVIN:  Costs have been

14      submitted, and you just made some

15      money today.

16           MR. SEEGER:  Arnold, do you

17      have the whole amount?

18           MR. LEVIN:  You submitted

19      $197,000 in costs.  It's okay.

20      Don't look surprised.  You are

21      okay.

22           MR. ALLEN:  I think it was

23      $97,000.

24           MR. LEVIN:  I had the wrong

Page 9

1      guy.

2            MR. HERMAN:  Anything you

3      want to send, you can e-mail it to

4      ldavis@hhkc.com.  The phone number

5      is (504) 581-4892.

6            MR. SEEGER:  We just need to

7      make sure we have the expenses.

8            MR. ALLEN:  I don't want to

9      misspeak, because one of the other

10     things that was submitted as part

11     of that cost was a database

12     contribution of $50,000.  That was

13     one part of that -- part of the

14     cost that was submitted.

15            MR. LEVIN:  Ed will

16     straighten me out.

17            MR. BLIZZARD:  You submitted

18     a total cost of $101,366.40, and

19     those costs to this point have

20     been rejected.  But as Russ points

21     out, we'll do what we can to put

22     you together with the accountant

23     to make sure that everything that

24     can be done is done to comply with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1            their requirements.

 2                 Also, is Abrahamson the

 3            doctor from Massachusetts?

 4                 MR. ALLEN:  No, different.

 5                 MR. BIRCHFIELD:  John

 6            Abrahamson not from Harvard?

 7                 MR. ALLEN:  I'm not sure.

 8                 MR. BIRCHFIELD:  You are

 9            talking about a different John

10            Abrahamson.

11                 MR. ALLEN:  I believe since

12            that rejection, I filed with the

13            accountant an amended petition and

14            withdrew -- I have it right here.

15                 The main request was for

16            Abrahamson, and Richard Zane was

17            also retained.  Because 93 percent

18            of the total costs were in four

19            separate transactions, three

20            retention bills and a contribution

21            to the OCR documents and some

22            hours that were submitted on

23            behalf of preparing expert

24            packages by staff that we --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          specialized staff we hired to do

 2          that.  I think there's like 500

 3          hours or so submitted regarding

 4          those staff and individuals coming

 5          down and meeting with the experts

 6          and doing those type things to

 7          make sure we can get them on

 8          board.

 9              The other thing is, I'm here

10          really on behalf of my select

11          handful of clients because,

12          obviously, that $100,000 would

13          make a difference in their

14          recovery now that you take away

15          $100,000 from the case that you

16          really thought had more than $1

17          million value and under the new

18          structure, obviously, what's best

19          for our clients, but not

20          necessarily best for the

21          bellwether clients who would have

22          had a stronger case.

23              I want to answer any

24          questions that the board might
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          have.

2                    MR. GIRARDI:  No questions.

3                    MR. HERMAN:  Thank you.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 38

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -


FIRM:         ANDREWS & THORNTON
              Anne Andrews, Esquire
              John Thornton, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 39

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. GIRARDI:  As you can
 3         see, there's a court reporter in
 4         the room, and she's taking down
 5         these proceedings for Judge
 6         Fallon, because at the end of the
 7         day, he's the person that has to
 8         make the final evaluation of
 9         everything.
10              It is pretty much of a free
11         fashion sort of a situation.
12         Primarily, we're interested in
13         contributions to the Vioxx effort
14         as opposed to maybe individual
15         cases.  That's the format of this.
16         That's what we would like to get
17         your thoughts about with respect
18         to the record in the case.
19              MR. THORNTON:  You know you
20         are going to have Anne first.
21              MS. ANDREWS:  I'm first up
22         because I sort of started this
23         story.  I know all of you in the
24         room, some better than others.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          But the story of why our role in

2          the Vioxx litigation became of

3          interest and we think we would

4          like to be compensated for it is

5          because for several years before

6          the Vioxx litigation started, this

7          firm had focused its efforts on a

8          drug case that -- a dietary

9          supplement case involving a drug

10         now outlawed by the name of

11         Ephedra, and it took us very

12         deeply into the world of

13         cardiology.  We had a real fight

14         on our hands in that case with

15         turning around an industry, a

16         government.  In fact, you know,

17         the story of that case is not just

18         that we were able to persuade the

19         top experts in cardiology in the

20         United States, if not the world,

21         to take our side against this

22         powerful industry, but they, in

23         fact, were the main course of our

24         Daubert proceedings in an MDL that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        Ed was -- I was lucky enough to

2        work with Ed Blizzard on, and

3        Chris Seeger was familiar with

4        that litigation and even Ellen

5        Relkin from Perry's firm, Weitz &

6        Luxenberg, was a colleague of ours

7        in that litigation and remains a

8        colleague and a friend of mine

9        today.

10            Your role --

11            MR. THORNTON:  My role was

12       my role.

13            MS. ANDREWS:  And you

14       certainly know the story.

15            That trial brought us into

16       the wheelhouse of some of the

17       great cardiology experts in the

18       world who had never testified in

19       the history of litigation against

20       big pharma.  As a matter of fact,

21       they had been only ever clinical

22       researcher and provided

23       Congressional testimony and, in

24       fact, court testimony for big

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        pharma.

2              As a matter of fact, kind of

3        a centerpiece expert of this case

4        who is familiar to all of you now

5        is Dr. Douglas Zipes, who had

6        actually been a Daubert qualified

7        witness for the defense in Judge

8        Fallon's courtroom.

9              So, there was a particularly

10       interesting moment during this

11       litigation in New York where Ed

12       and John and a number of other

13       people worked very hard for many

14       years to bring it to a successful

15       conclusion in a very lengthy

16       Daubert trial when y'all were

17       transferring cases to the Vioxx

18       MDL.  We knew because of our very,

19       very close encounters and length

20       of time that we worked with

21       Douglas Zipes that he was being

22       courted by industry to work on the

23       Vioxx litigation by Pfizer, Merck

24       and others.  We knew because he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1          was sharing with us what they were
 2          asking of him at that time.
 3               So, there was a moment in
 4          time where the discussion about
 5          the drug and the events that were
 6          rapidly developing, he was often
 7          writing the Wall Street Journal
 8          about many breaking events at the
 9          time, he was a much quoted source
10          for the New York Times and the
11          Wall Street Journal, that I made
12          the bold move and retained him for
13          the Vioxx clients that we probably
14          didn't represent at that time.
15               MR. THORNTON:  For us all.
16          We didn't have any Vioxx clients.
17               MS. ANDREWS:  We didn't have
18          any Vioxx clients, but we knew
19          that this was going to be an
20          important time that Andrews &
21          Thornton was in a unique position
22          to have the access and the
23          credibility and the knowledge to
24          turn them into a very important

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          think tank.
 2                So, with that, Dr. Zipes
 3          accepted.  I want it to be very
 4          clear, and it's on the record, and
 5          the methodology of what I did and
 6          when I did it has been testified
 7          to, I'm sure some of you were
 8          present for it, I'm sure some of
 9          you have read that testimony,
10          because he was certainly
11          cross-examined any number of times
12          about it, was that he was asked by
13          Andrews & Thornton and retained to
14          review all of the medical
15          literature pertaining to COX-2s
16          and to review all sides of the
17          issue.  Everything about a
18          comprehensive analysis would be
19          made by him of the drug, of the
20          data.  We knew from working with
21          Dr. Zipes how he worked and what
22          his requirements were and what it
23          would take for him to become
24          persuaded to a position.  So, I
```

FAC Resp. Exhibit D -- 45

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1           embarked on that journey.

2                   MR. SEEGER:  Besides Mark

3           Robinson, who at the MDL did you

4           work with or coordinate with on

5           Zipes and science?

6                   MS. ANDREWS:  John Restaino

7           through Steve Skikos.

8                   MR. THORNTON:  And you met

9           with --

10                   MS. ANDREWS:  And later

11          meetings -- initially, it was

12          Steve through John, and then we

13          had a face-to-face meeting where

14          Dr. Zipes met with your firm, met

15          with Dave Buchanan.  We had a very

16          lengthy --

17                   MR. THORNTON:  That was in

18          May of 2005.

19                   MR. LEVIN:  Michelle

20          Parfitt, several, Chris Tisi.

21                   MS. ANDREWS:  But the

22          scientific presentation of the

23          plaintiffs' case had sufficient

24          enough -- had been sufficiently

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1        developed enough that there was a

2        critical kind of exquisite moment

3        in Washington where Michelle and

4        Dave and Troy Rafferty were all in

5        the same room working on the case,

6        and I was able to bring all the

7        people into the same room and let

8        them sort of hear from Dave

9        principally, Chris, and Troy was

10       also very enthusiastic, the story

11       of the plaintiffs' case

12       essentially.  He was open to it at

13       that point because he had reviewed

14       a lot of the materials.

15            MR. WEITZ:  Did that become

16       part of the MDL trial package?

17            MS. ANDREWS:  It was an off

18       the record --

19            MR. THORNTON:  I don't think

20       so.

21            MR. WEITZ:  I mean the Zipes

22       --

23            MR. THORNTON:  The Rule 26

24       report?  We circulated it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1              MR. SEEGER:  I would imagine

2         it would be --

3              MR. LEVIN:  It was used in

4         Barnett, and Barnett was part of

5         the MDL product.

6              MR. THORNTON:  Can I explain

7         what we did.  I don't want to step

8         on your --

9              MS. ANDREWS:  I'll let John

10        address what became part of the

11        trial package.

12             MR. THORNTON:  Let me

13        explain briefly what we did.  I

14        think Chris knows the story.

15             Part of what we did had a

16        lot of sensitivity.  What Zipes

17        really had in mind to do, and we

18        worked through this with a

19        consultant we used named Mark

20        Haigney, who is a top doc in his

21        own right, but not quite a

22        national class doc.  He had this

23        concept that we're going to get

24        together a panel and we're going

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1          to vet basically all the top

 2          cardiologists in America.

 3               If I may go off the record.

 4                    -  -  -

 5               (Whereupon, an

 6          off-the-record discussion was

 7          held.)

 8                    -  -  -

 9               MR. THORNTON:  The concept

10          was that we vetted through this

11          process most of the top

12          cardiologists in America to see

13          who they were working for.

14               MR. WEITZ:  When was this?

15          When was this process?

16               MR. THORNTON:  This all

17          occurred basically from March --

18          in March and April and probably

19          May as well.

20               MR. WEITZ:  Of what year?

21               MR. THORNTON:  Of '05, the

22          vetting process.

23               We came up with a concept,

24          because we knew Vioxx was going to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          be really big.  We're proud of our

2          victory in Ephedra, but we knew

3          the Ephedra industry wasn't Merck.

4          This was going to be big, and this

5          was going to be a full scale war.

6          We came up with this concept of,

7          instead of developing one expert,

8          developing a panel of experts in a

9          systematic way that would be very

10         difficult to impeach.

11              MS. ANDREWS:  They could

12         cover the disciplines that y'all

13         were advancing from

14         atherosclerosis to hypertension.

15         We knew this was going to be a

16         multidisciplinary MDL Daubert

17         hearing, and we were concerned

18         that no one expert could fill that

19         bill.  So, we wanted to really

20         push the data into a broad group

21         of people, from epidemiology,

22         through every -- these were all

23         superstars.

24              MR. THORNTON:  Sometimes we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          didn't get exactly the person we

2          were looking for, but --

3               MR. WEITZ:  Was this an

4          assignment from somebody, either

5          from the MDL or from State Court?

6               MR. THORNTON:  I would

7          describe it as our idea.  We took

8          it to Restaino and Skikos, who

9          said, this is really a good idea,

10         and then we did it.

11              MR. WEITZ:  That's

12         important, because John was the

13         co-chair of the science committee

14         for the MDL.

15              MR. THORNTON:  I understand.

16         Restaino, we've been working

17         together on cases for over a

18         decade.  Restaino said it was

19         cool, and Skikos said it was cool.

20              So, we got these guys, and

21         I've got pictures of them.  These

22         were people not only that were

23         good researchers, but they weren't

24         people that couldn't talk.  They

FAC Resp. Exhibit D -- 51

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1     were people who could command.

2     They were people of authority.

3     They were people not just with a

4     great CV, but they were opinion

5     leaders in the cardiology

6     community, because really what we

7     wanted to make sure of is that

8     Merck didn't manage to come up

9     with a whole group of opinion

10    leaders in the cardiology

11    community on the other side.

12    Believe me, the cardiologists at

13    the outset, they had read a little

14    bit from the New England Journal,

15    but they didn't understand Vioxx

16    from anything until we had this

17    panel.  So I got the people in

18    here.

19          Paul Ridker could have been

20    a tremendously dangerous guy on

21    the other side.  He is a

22    cardioepidemiologist of just

23    incredible renown.  Jeffrey Popma,

24    who did testify in the Barnett

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          trial, it turns out.  And Doug

2          Zipes, who became the star of the

3          litigation.

4                  MR. SEEGER:  He's cardio

5          also, Popma?

6                  MR. THORNTON:  Yes.

7                  MS. ANDREWS:  Yes.

8          Interventional.

9                  MR. THORNTON:  So we put

10         Haigney in and paid Haigney a lot

11         of money.  So, what we did is, we

12         came up with the most neutral

13         package of literature possible, we

14         arranged basically this panel.  We

15         paid everybody basically a

16         comparable amount to the amount

17         the pharmaceutical industry paid

18         them.  And the goal was to really

19         basically let them all meet

20         together.  Our real thought was to

21         try to put together a consensus of

22         these experts without attorneys

23         being around so we could mass

24         produce experts on the one hand,

Page 16

1          but organically through a process

2          that they couldn't be impeached

3          for.

4              I've included the panel, the

5          agenda of the first scientific

6          discussion that they had.  They

7          had this meeting without lawyers

8          present, and it achieved 100

9          percent consensus that Vioxx

10         causes heart attacks and Vioxx

11         causes death.  All these really

12         excellent, extraordinary

13         physicians, each and every one of

14         them was ready to go forward at

15         the next meeting, was interested

16         in the litigation.  Not one of

17         them said, no, it's too difficult

18         for my blood.

19             MS. ANDREWS:  Or it's not --

20         the evidence is close.  It was not

21         close.

22             MR. THORNTON:  Overwhelming.

23             MS. ANDREWS:  Overwhelming

24         evidence for us for the

Page 17

1          plaintiff's position in which they

2          agreed to come to a second meeting

3          for a slightly more in tune

4          agenda.

5               By then, by the time of the

6          second meeting, the New England

7          Journal of Medicine scandal had

8          broken.

9               MR. THORNTON:  That was very

10         helpful, because it was exactly --

11              MR. SEEGER:  That made them

12         feel like they were on the right

13         team, right?

14              MR. THORNTON:  Right.  The

15         first panel meeting was science

16         kind of removed, the

17         unimpeachable.  The second panel

18         meeting was sort of the Dave

19         Buchanan meeting, we did it, but

20         where Skikos and Anne and I really

21         presented a very strong statement

22         of just -- I've got a great little

23         cartoon here that I really enjoy.

24         I'm going to have to buy this one,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           the ability to obscure truth.

2                   And so we told them about

3           the scientific advisors, and I'll

4           tell you, there are two slides

5           that they just obsessed on.  One

6           is, of course, the --

7                   MR. SEEGER:  The Scolnick

8           e-mail.

9                   MR. THORNTON:  The Scolnick

10          e-mail.

11                  MS. ANDREWS:  They were

12          shocked.

13                  MR. THORNTON: They know

14          Scolnick.  And I remember they

15          were looking, saying, yeah, he

16          knew.  He knew.

17                  MS. ANDREWS:  The second

18          meeting was the show us meeting.

19          It really proved to us bad things

20          happen because drugs get out and

21          hurt people and we don't know for

22          many, many years what happens, but

23          you show us bad conduct in this

24          second meeting, we're all in.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              MR. THORNTON:  They weren't

2         buying the naproxen

3         rationalization.  The other one

4         was Konstam, because they think --

5         it was kind of a view that

6         Konstam's piece in defense of

7         Vioxx early threw a lot of

8         physicians off.  They had some

9         fairly grave remarks about that as

10         well.

11              MR. SEEGER:  About his piece

12         on the APPROVe data?

13              MS. ANDREWS:  Exactly.

14              MR. THORNTON:  We spent

15         $194,749 on these experts, 200

16         grand out of our little firm, and

17         at this point we were creating

18         experts --

19              MR. LEVIN:  This may be a

20         good time to go over this.

21              MR. THORNTON:  -- for the

22         greater war.

23              MR. LEVIN:  John, we have

24         the hours that you reported to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1          accountant.  We also have your

 2          costs here.

 3               MR. THORNTON:  Okay.

 4               MR. LEVIN:  But we also know

 5          from their report that all your

 6          hours are rejected.  Don't get

 7          excited.  $166,000 worth of costs,

 8          all of your costs were rejected.

 9               MR. THORNTON:  Not

10          encouraging.

11               MR. LEVIN:  This may mean

12          you filled out the wrong forms.

13               MR. SEEGER:  It is probably

14          formatting.

15               MR. LEVIN:  Call Leonard

16          Davis at Russ Herman's office,

17          (504)581-4892, and have him put

18          you as soon as possible in touch

19          with a Phil Garrett at the

20          accounting firm so that they could

21          work it out with you.  If you are

22          having any problems, give me a

23          call.

24               MR. SEEGER:  For your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          purposes, just so you know, we are

2          treating this as if every nickel

3          has been accepted.  We need the

4          accounting done.

5               MR. THORNTON:  Sure.

6               MS. ANDREWS:  And whatever,

7          wrong or right, we will fix it.

8               MR. LEVIN:  When we file it,

9          we want it to be right, but we're

10         assuming that it is right.

11              MR. WEITZ:  50 percent of --

12              MR. SEEGER:  You have a lot

13         of company in this respect.  A lot

14         of people have hours and money

15         rejected.  You are definitely not

16         the only one.

17              MR. THORNTON:  I set out

18         what the cost of these conferences

19         were just so you can understand

20         how much of this was really this

21         general expert development.

22         Because I know there's kind of the

23         sense that, well, aren't Anne and

24         John something to do with Barnett,

FAC Resp. Exhibit D -- 59

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          and certainly Barnett was the

2          vehicle by which our project was

3          realized.

4               MS. ANDREWS:  The payload

5          was delivered.

6               MR. THORNTON:  But this was

7          not a joint venture with the

8          Robinson firm.  Robinson's claim

9          to fame or the thing that he did,

10         I should say from the standpoint

11         of this, was that Robinson sent us

12         a case that met the criteria that

13         the panel was really looking for.

14         What was the panel looking for?

15         It came from Jeffrey Popma's lips.

16         How would I feel if I had a

17         patient who had these risk

18         factors?  Because we obviously

19         knew that Vioxx cases weren't

20         going to be easy, even though we

21         knew there was a good science case

22         against it, because we had a lot

23         of people with risk factors.  How

24         would I feel as a physician if I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          had a patient who was doing

2          everything right, exercising, on

3          medication, lowered lipids, all

4          that, and I gave them Vioxx for

5          symptoms and he had a heart

6          attack.  I would know in my heart,

7          now that I know this, now that

8          I've seen this, that the Vioxx

9          probably caused the heart attack.

10         That is the quintessential case

11         that we were looking for.  Mr.

12         Barnett was that case.  Mr.

13         Barnett was one of the most health

14         conscious people I've ever seen,

15         and he was the perfect -- he did

16         everything right, and Vioxx gave

17         him a heart attack, two heart

18         attacks, as a matter of fact.

19              We were not even retained by

20         Barnett until we had spent all of

21         this money and all of this time.

22         You will see a lot of our time --

23         most of Ann's time was before

24         Barnett at all.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           I might mention who Dr.

2      Shlipak is.  There's a fairly

3      large expenditure for him.  He's a

4      professor of epidemiology in

5      biostatistics in San Francisco

6      State.  I used him as a consultant

7      in the epidemiologic issues

8      because Ridker is so busy that as

9      a practical matter -- the Rule 26

10     report is kind of two halves of

11     it.  There's the Barnett half,

12     which I had very little to do

13     with, and there's the generic

14     half, which I had a lot to do

15     with.

16          MR. SEEGER:  Did you guys

17     attend any or participate in any

18     of the science committee calls

19     that John Restaino would organize,

20     or were you communicating with

21     John, reporting to him and saying,

22     hey, we've got these experts,

23     John, I want you to know we've got

24     this guy warming up?  I just need

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1            to get a sense of the structure.
 2                 MR. THORNTON:  I think there
 3            were a number of calls we
 4            participated in, but I don't think
 5            that they were formal science
 6            committee meetings.  Nobody said
 7            this was a science committee
 8            meeting.  But people were talking
 9            about the issues.  I mean, Dave
10            was on a lot of these calls.  I
11            mean, just a handful of people
12            that really were in the know as
13            far as I was concerned about all
14            those issues.
15                 MS. ANDREWS:  By the time
16            these reports were being drafted,
17            y'all were in your own state court
18            trials, and California was heating
19            up, and you guys were certainly in
20            the trenches, and everybody was
21            warming up.  We were sort of just
22            waiting for what we knew these
23            experts wanted in terms of the
24            right plaintiff.  We knew that
```

FAC Resp. Exhibit D -- 63

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1          that person was going to arrive,

 2          that case was going to arrive, and

 3          we were looking for it and

 4          interacting with a number of our

 5          colleagues.

 6               We had cases in Reno we were

 7          reviewing, and we didn't even put

 8          in time for the comprehensive

 9          review we did of the entire Reno

10          practice.  You will see Stewart

11          White probably later this

12          afternoon.  We were called in to

13          do the same thing and open up

14          another state court front.

15               But we knew that the right

16          case was going to come.  By the

17          time it arrived, there were cases

18          that had been lost, there were

19          cases that had been won.

20               MR. THORNTON:  Predictable.

21          Vioxx was not going to be all

22          victories with the patient

23          population.

24               MS. ANDREWS:  Merck had

Page 27

1        announced the scorched earth

2        policy.  And it didn't look like

3        there was going to be any changing

4        from that policy until pretty late

5        in the game.  Ellen Relkin and I

6        were working on a collaboration of

7        some of these experts with your

8        next trial.  Next thing we knew,

9        the settlement was being

10       announced.

11            MR. SEEGER:  I want you to

12       know, the reason I'm asking, and

13       what you are saying is very

14       helpful, but we're trying to get

15       down to where people actually

16       provided a common benefit.  So,

17       working up one expert for one

18       case, your own case, would be one

19       thing, but providing an expert for

20       an MDL trial like you did in

21       Barnett and working up other

22       experts that other people are able

23       to use is another.  I'm just

24       trying to connect the dots.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1              MR. WEITZ:  I know from my
 2         office that Anne and Ellen work --
 3              MR. SEEGER:  Yes.  And you
 4         are telling me you were talking
 5         with Dave, too, so those are the
 6         kinds of people, if they are in
 7         the loop, yes.
 8              MR. WEITZ:  Talking about
 9         cases, how many cases did your
10         firm have?
11              MR. THORNTON:  22.
12              MR. WEITZ:  Were they all
13         put into the settlement?
14              MR. THORNTON:  Yes.
15              MR. WEITZ:  Where were they
16         filed?
17              MR. LEVIN:  In the MDL or
18         state?
19              MS. ANDREWS:  Los Angeles.
20         State Court, Los Angeles.  MDL and
21         a few in Los Angeles.
22              MR. WEITZ:  In any of those
23         cases, were they prepared for
24         trial?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1              MR. THORNTON:  No.  No.  We
 2         were never assigned a trial date,
 3         and we didn't think that our cases
 4         were necessarily trial worthy.
 5         You might have been able to win it
 6         but --
 7              We worked with and didn't
 8         put in the time -- we were
 9         developing Michael Shlipak for the
10         retrial of the Appell and Arrigale
11         trial with Tom Brandi, a lot of
12         stuff behind the scenes.  We were
13         trying to work things out to try
14         to help the general good.
15              MS. ANDREWS:  When we were
16         called, usually when something was
17         not coming together in a case and
18         it was in Tom Brandi's case, we
19         were close with his trial team,
20         and they would say, you know, we
21         really are in trouble on this
22         issue, can you help.  And John
23         would jump on a plane, run to
24         wherever they needed us, develop
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          an expert.

2                  MR. THORNTON:  There were so

3          many people that did that.  John

4          Hornbeck.

5                  MR. WEITZ:  You should

6          submit the hours for that work.

7                  MS. ANDREWS:  We're not the

8          only ones.

9                  MR. THORNTON:  I've been

10         really bad about submitting hours.

11         A lot of this time was

12         reconstructed.  I think it is very

13         accurate reconstruction because I

14         keep -- I know what I was doing on

15         that exact day.

16                 MS. ANDREWS:  I think the

17         thing that I would like this

18         committee to know the most about

19         what we feel we did was, we

20         devised a strategy that we

21         discussed with this committee's

22         leadership, the science

23         committee's leadership that was

24         extremely unique, was very risky.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1        We had no idea if all of these

2        giants in cardiology were going to

3        jump on our team and on our side,

4        and we certainly -- when they all

5        did with the force in which they

6        did, to then go into the case

7        specific work that it would take

8        to get each one of them ready for

9        a trial never occurred.  But Doug

10       Zipes and Jeff Popma did come to

11       the only MDL trial, and the

12       benefit of that testimony we

13       certainly think you all know the

14       full value of.

15           MR. THORNTON:  It is

16       important to see what experts of

17       this quality bring to something

18       like this.  So, they see Barnett.

19       They get Barnett's series of

20       medical records.  They say he

21       meets the profile.  They are the

22       ones that found the thrombus on

23       the angiogram, and I say "they"

24       meaning Zipes and Haigney, who was

FAC Resp. Exhibit D -- 69

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          basically working as his

 2          assistant.

 3               Then we decided we should

 4          bring Popma into the case because

 5          it was the issue of whether there

 6          really was a clot or whether there

 7          wasn't a clot, but there were some

 8          issues like that.

 9               Zipes found the Q wave, that

10          it was a Q wave MI, which the

11          treaters hadn't found.  Nobody had

12          found it up until that time.

13          Zipes basically found the second

14          heart attack.  It became really a

15          big issue in the trial.  Beck in

16          his opening statement comes out

17          and calls Zipes out, I mean, Doug

18          Zipes is lying to you guys, and

19          he's made up this second heart

20          attack for litigation.  And

21          Haigney and I looked at each other

22          and said we're going to kill that.

23          And so we run down and work with

24          those DecisionQuest people, who
```

FAC Resp. Exhibit D -- 70

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          were pretty remarkable of creating

2          what we conceived, and I have one

3          color version of the slide that we

4          showed the difference in the

5          perfusion between the two dates.

6                    MR. SEEGER:  John and Anne,

7          could you take a minute to sum up.

8          One thing you just did that was

9          very helpful was saying this is

10         what I feel like our big benefit

11         was, and we get that.  It's just

12         so we can keep the schedule going.

13                   MS. ANDREWS:  We provided

14         the linchpin expert for the only

15         MDL trial that we think caused a

16         general causation finding for

17         which every plaintiff was going to

18         be able to use the benefit on a

19         multi-disciplinary approach on two

20         theories.  The fact that we

21         started it way in the beginning

22         and pulled it through to this one

23         trial -- we're not going to take

24         credit for the results in Barnett.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          We're taking credit for the

2          science that was pulled through

3          the needle and all the work it

4          took to build a fabric of that

5          trial through these experts that

6          turned the tide in this

7          litigation.  We feel that that was

8          a very important piece that only

9          our firm with these experts could

10         provide and would dare take credit

11         for among all the contributions of

12         all of you.

13              MR. THORNTON:  So many

14         contributions helped.  I mentioned

15         in the PowerPoint of all the

16         people that helped us from Dave to

17         Hornbeck to Skikos to Restaino.

18         But I think we did a little bit

19         more than that really.  I think,

20         remember, Merck knew about this

21         panel.  They knew that there were

22         these top cardiologists out there,

23         they were very agitated about it.

24         They made an in limine motion to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          keep the entire panel discussion

2          out.  So, at least we were

3          vindicated that we had not created

4          a problem with impeachment.  They

5          knew these other experts were

6          there.  We were actually trying to

7          encourage people to use other

8          experts.

9               The only unfortunate thing

10          that happened in my mind after

11          this was over, after Barnett, is

12          that everybody made Zipes the

13          superstar.  And Dr. Zipes is a

14          superstar, but there was a panel

15          of superstars.

16               MS. ANDREWS:  And Marty

17          LeWinter, terrific.

18               MR. THORNTON:  We were

19          really quite anxious that others

20          were used, because there was so

21          much talent here.

22               MR. SEEGER:  Did you work

23          with experts from any of the other

24          trials, winning or losing, other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1              than Barnett, just so we have a

2              picture?

3                   MR. THORNTON:  I worked a

4              little bit with Kronmal --

5                   MS. ANDREWS:  And with the

6              epis.

7                   MR. THORNTON:  Nothing I

8              even submitted.  Shlipak, we had

9              him set aside for the retrial in

10             California.

11                  MS. ANDREWS:  You know, Doug

12             Zipes because of the illness of

13             the epidemiologist, happened to

14             take on the third discipline of

15             epidemiology in Barnett.  He

16             carried three different

17             disciplines that, quite frankly,

18             we only ever targeted him for one.

19             So, it was a unique circumstance.

20                  MR. GIRARDI:  Anne, to your

21             credit, with a small number of

22             cases, you put out $250,000

23             basically for the benefit of

24             experts to be used in other cases.

FAC Resp. Exhibit D -- 74

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1        250, I'm just using that number,

 2        plus or minus, but that's about

 3        right.

 4             MR. SEEGER:  You submitted

 5        all of that, right?

 6             MR. LEVIN:  It is here.  It

 7        has to be moved from one column to

 8        another.

 9             MR. THORNTON:  Just to give

10        you an idea of the fact that it

11        was the experts, the compact we

12        made with the experts, because

13        they were reluctant to get

14        involved in this wild litigation,

15        was I will protect you.  We will

16        protect you.  We are not the

17        agents of Mark Robinson in the

18        Barnett case.  We are actually

19        your agents in assuring you that

20        your professional standing and

21        reputation is held up.  I was in

22        Barnett until Dr. Zipes testified,

23        and I left -- and Dr. Popma

24        testified in that trial, too.
```

FAC Resp. Exhibit D -- 75

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

 1          People don't talk about that.  He

 2          was a tremendous --

 3               MR. SEEGER:  Actually, Steve

 4          Skikos told us that.

 5               MR. THORNTON:  They were

 6          really good.  And if the war had

 7          continued, I think eventually they

 8          would have all been used.  That

 9          was fully my expectation, with the

10          possible exception of Ridker, who

11          was so darn busy that it may have

12          been another matter.

13               MR. SEEGER:  Thank you.

14          That was very helpful.

15               MR. THORNTON:  Thank you.

16               MR. GIRARDI:  Thank you.

17                    -  -  -

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

 1                C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23          Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 77

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:  ASHCRAFT & GEREL, LLP
       Christopher V. Tisi, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 78

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -

 2             MR. HERMAN:  As you can see,

 3        everything is recorded.  You are

 4        going to be getting a copy of what

 5        everybody has had to say at some

 6        point.

 7             If we can't resolve fees,

 8        the judge is going to go through

 9        some process similar to Murphy Oil

10        where he's going to have lawyers

11        come in, swear under oath, be

12        cross-examined.

13             If there's some addition or

14        subtraction you want to make to

15        your affidavit, at that point we

16        can't resolve all the fee issues,

17        I would go ahead and do that.

18        Basically that's it.

19             MR. TISI:  Okay.  Just for

20        the record, my name is Chris Tisi,

21        and I'm a senior partner at the

22        law firm of Ashcraft & Gerel.  I'm

23        going to try to be quick, as quick

24        as I can.
```

Page 3

1               Really, I do have to say

2          this.  I've been involved in a

3          couple of these things, and this

4          is the first time I've had the

5          opportunity to actually present.

6          So, I really do appreciate the

7          opportunity to do that.  Vioxx has

8          been a labor of love for me and

9          for people in my firm.

10               I've spent the better part

11          of four years, four-plus years,

12          almost five years, working on this

13          litigation, even though I think we

14          only had about 100 cases.  So, I

15          do appreciate the opportunity to

16          at least present myself and to be

17          cross-examined, if need be, not

18          only on my work, but on other

19          folks' work.  I'm happy do that.

20               I did prepare a little bit

21          of a presentation.  I'm going to

22          hand it out.  It is mostly for my

23          own guidance, so you can follow it

24          or not if you want to, but this is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

 1          it.

 2                  (Handing over document.)

 3                  I know some of you real

 4          well.  Some of you I don't know

 5          very well, and so I think I'm kind

 6          of in a unique position, because I

 7          did a lot of MDL work, but I also

 8          did a lot of work on the stateside

 9          as well, and so some of the folks

10          who did MDL work may not be aware

11          of the work we did on the

12          stateside and vice versa.  So, I'm

13          going to try to take the

14          opportunity to do both.

15                  MR. HERMAN:  I want to state

16          one other thing on the record.

17          Excuse me.

18                  A number of you know that in

19          some cases we partner with

20          Ashcraft & Gerel.  We did not do

21          that in this case.  The work that

22          Chris and his firm did was work

23          they did independently of any

24          association.  We don't have any

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          fee sharing, cost sharing or

 2          anything else in Vioxx.

 3               MR. TISI:  Thank you.

 4               This is what I'm going to

 5          do.  I'm going to go over, I

 6          think, generally speaking, what we

 7          did both on the State and Federal

 8          side, and then I want to focus

 9          primarily on the factors that

10          Judge Fallon laid out in PTO 6.

11               On the second page of this,

12          on the PSC side, I think it is

13          fair to say that I was a very

14          active member of the Plaintiffs'

15          Steering Committee; an active

16          chair, vice chair of the discovery

17          committee with Troy and Dave

18          Buchanan; very active with the

19          science and expert committee,

20          working up, I think, several key

21          experts in the case with others;

22          an active member of the briefing

23          committee; an active member of the

24          privilege committee; and an active
```

Page 6

1          member of the trial package

2          committee for both stroke and MI.

3               Now, I say "active," because

4          I think it's important to note

5          that when we did the work that we

6          did, it was not with the intent of

7          trying to have titles.  It was an

8          intent to try and actually do the

9          work, and I think we did do that.

10              I think we also contributed

11         to most of the trials -- a

12         majority of the trials that were

13         involved in both federal and state

14         court, and I think we actively

15         worked on Humeston I, on Humeston

16         II, we worked on Irvin I, Irvin

17         II, Barnett, I helped Mark and

18         others.

19              MR. HERMAN:  Let me stop

20         you.

21              Tell me what you did in

22         Barnett at Mark's request.

23              MR. TISI:  As I recall it, I

24         wasn't at the trial itself, but as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1            I recall, his primary liability

2            witness was Jerry Avorn.  Apart

3            from actually having done that

4            deposition and prepared that

5            deposition, it was the first trial

6            in which that deposition was

7            actually used.  So, I prepared not

8            only for the Daubert hearing that

9            preceded that case, although the

10           judge ultimately decided that

11           there was nothing here, because he

12           was so well qualified, but I

13           prepared with Lisa Dagostino, we

14           prepared the direct examination,

15           the counters, the cross, the

16           objections, all of those things

17           were done in anticipation of the

18           Barnett case.  So, I know that he

19           called me to help him with

20           Pechmann, but that was more

21           tangential than anything else.

22           So, that was primarily my role in

23           that case.

24                MR. BLIZZARD:  Was there a

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        better deposition taken in the
 2        case than Jerry Avorn?
 3             MR. TISI:  I tend to think
 4        he did pretty well.
 5             MR. BLIZZARD:  The lawyer
 6        did pretty well, I think.
 7             MR. SEEGER:  I agree with
 8        that.
 9             MR. TISI:  So, that's kind
10        of the overview.  But let me just
11        focus on some of the criteria that
12        I think at least I would like to
13        focus on.
14             When I was preparing to make
15        this presentation, I thought that
16        if you combined all the 14 factors
17        together, the question would be
18        whether or not, if you pulled the
19        lawyers or the firm out of a mix,
20        would the case have been
21        substantially different in the way
22        that it was rolled out.
23             MR. SEEGER:  That's a very
24        good test.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1                MR. LEVIN:  That's well put.
 2                MR. TISI:  I really do think
 3           that in several material ways, and
 4           I'm going to just highlight the
 5           ones that I really think that I'm
 6           most proud of and that we
 7           contributed to, the ways in which
 8           the case changed over time because
 9           of the work that we did.
10                I'm going to take these a
11           little bit out of order.  I'm
12           going to focus first on the preMDL
13           work and the preVioxx withdrawal
14           work.  I remember getting a call
15           from Dave Buchanan, we were
16           wrapping up the Rezulin work, and
17           Dave said, we're working on this
18           case, I would really like you to
19           work on it, it's a clinical trials
20           case.  You worked with a guy by
21           the name of Dick Kronmal, I have
22           him as an expert in this case, and
23           I would really like to get you
24           involved in the case.  That was in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1           the spring -- I keep getting the

2           years wrong.  That was in the

3           spring of 2004.

4               I went to New York, spent

5           some time with Dave, Tom Moore, a

6           couple other folks.  We went

7           through the VIGOR trial, went

8           through some of the data.  At that

9           point, he had an initial, if I

10          remember correctly, initial report

11          done for Dick Kronmal and for

12          Wayne Ray.  Over the next couple

13          of months, he spoke to me and

14          others about how to plod out the

15          discovery in the case.  We spent

16          some time, I remember during that

17          time frame, I think you were

18          taking Adam Schechter, we did some

19          work in reviewing the documents,

20          and there was a lot of preliminary

21          work being done at that period of

22          time before there any was real

23          MDL.

24               MR. SEEGER:  As you said, it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           was prior to the withdrawal, and

2           there were very few firms.  I

3           remember Dave being in my office

4           and us discussing, hey, we've got

5           to call Tisi to see if he is

6           available to help us.

7                MR. TISI:  I appreciated the

8           call, and I also do now.

9                MR. LEVIN:  And you will.

10               MR. TISI:  And really, that

11          was at that time when we didn't

12          really have that many cases.  I

13          mean, we had just a handful of

14          cases, if I remember correctly,

15          and he said, you have to get

16          involved in this, and we did.  The

17          case was obviously transformed by

18          the withdrawal of the drug from

19          the market and the establishment

20          of the MDL.

21               I know I was privileged, I

22          think, to be appointed to the

23          steering committee, and I know

24          some of you supported that, and I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           really appreciated that.  It was

2           an opportunity that I had not had

3           before.

4                We, Michelle Parfitt and I,

5           she worked more on the science

6           side, I worked more on the

7           liability side, but I really -- we

8           dove head -- I think it's fair to

9           say we dove head in.

10                Let me just back up for just

11          one second on the prespring

12          2004/2005 time.

13                Obviously there was no MDL

14          and there was no common benefit

15          work.  Now, I did have, obviously,

16          things that I did that I can

17          pinpoint by travel records and try

18          to reconstruct my time.  I did

19          pull together our time for that

20          time frame.

21                MR. LEVIN:  Did you put that

22          into the accountant?

23                MR. TISI:  We gave it to the

24          accountant.  But, quite frankly,

Page 13

1         for those of you that have worked

2         with us in the past, know that I'm

3         much better than I ever was,

4         Arnold, but, honestly, in the

5         preMDL time, there was just not --

6         we were all working on the

7         individual cases and for the

8         common good.  There was no real

9         reason to do that.  So, I

10        reconstructed what I could, and I

11        did what I did, and you have what

12        I have.

13            One thing I did not do.  If

14        I couldn't document my time in a

15        way that I felt comfortable with,

16        I didn't do it.  If I put an hour

17        of time, it is a real hour of

18        time.  I was better once the MDL

19        was put together, but in the

20        preMDL, there was just no need for

21        it.

22            The PSC work in the

23        committee and the leadership

24        factors, I think it is fair to say

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          over the next three, four years,

2          there was almost not a day where

3          Troy or Dave or I or Lenny

4          actually didn't spend time talking

5          with each other.

6               MR. SEEGER:  I don't want to

7          interrupt your presentation, but

8          there's a couple of important

9          things.  One is really everybody

10         here is very familiar with how

11         important you are in this case.

12         Why don't you dive into the stuff,

13         the real projects that you owned,

14         that you were responsible for, the

15         prep work you did behind the

16         scenes, the trial support work you

17         did, let people know that.

18              MR. TISI:  I will, but I

19         think it's also important to know,

20         and I will do that right, but I

21         think it is really important to

22         know --

23              MR. SEEGER:  Now.

24              MR. TISI:  -- the grunt

1        work, the grunt work that was

2        done, the running the

3        depositories, the scheduling, the

4        scheduling and coordination with

5        State and Federal Court.  Dealing

6        with Ted Mayer and having

7        everybody being jerked all around,

8        quite frankly, all over the

9        country on just the scheduling

10       issues.  Running discovery

11       meetings, reviewing the documents,

12       reporting to the PSC on the weekly

13       calls.  All that stuff was just

14       part of the grunt work that we

15       did.

16            But going to the next page,

17       I really want to focus on some of

18       these things, as you said, Chris,

19       that I think I'm most proud of.

20            Early on in the case, I

21       think I drafted with Richard

22       Arsenault the plaintiff profile

23       form that was used, and I think it

24       was much more streamlined than

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1           some of the other work on some of

2           the other ones that we had had.

3           We negotiated it, we briefed it, I

4           think we submitted memos to you,

5           Russ, that you submitted to the

6           judge, and he ultimately decided.

7           I think this is the first case I

8           had the opportunity to develop a

9           corresponding reciprocal

10          case-specific requirement for the

11          defense.

12                  MR. SEEGER:  Had that ever

13          been done prior?

14                  MR. TISI:  I appreciate the

15          softball.  That's a good one.  But

16          that's the first time it ever has

17          been done.

18                  MR. HERMAN:  I want to say

19          that you championed that issue.

20          That issue would not have been

21          brought to the floor without you

22          pushing it.

23                  MR. TISI:  I appreciate

24          that.  It came as a result of in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1       fen-phen, going to the depositions

2       where the defense had more

3       information about the doctors than

4       I ever had, and it was a real

5       disadvantage.  I think it was

6       something that was taken and done

7       in New Jersey, I think you

8       transported a profile form into

9       New Jersey, so, it not only had a

10      benefit for the federal litigants,

11      but it also was used in the state

12      courts.

13          MR. SEEGER:  A lot of the

14      work that you did was both in the

15      MDL and in the state courts.

16          MR. TISI:  Yes.  Now, we

17      drafted the Interrogatories,

18      totally redrafted the

19      Interrogatories, and I venture to

20      say, in almost any case,

21      Interrogatories have not been

22      substantive.  The responses that

23      we got in this case were

24      substantive, because they were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          carefully drafted, they were

2          negotiated ahead of time, and we

3          got a lot of information about

4          trials, about sales, marketing, et

5          cetera, that were actually useful

6          in the litigation.

7               We worked with Jeff and Dave

8          on the master set of Requests for

9          Production of Documents.  We

10         negotiated with the Food & Drug

11         Administration, I know Troy and

12         Russ and Lenny and others.  We

13         worked to get those documents

14         produced in a timely manner and

15         developed a schedule to get those

16         documents done.

17              We had --

18              MR. HERMAN:  Excuse me.  Do

19         you recall being in Washington

20         with us when we met with the FDA?

21              MR. TISI:  Actually, I did

22         not go to that particular meeting,

23         Russ, because I couldn't make it,

24         but I was on the phone with them

Page 19

1          repeatedly over time.

2                    MR. HERMAN:  I thought you

3          had gone with us.

4                    MR. TISI:  No.  I wanted to

5          go, but I couldn't get out of town

6          because I think we had a

7          snowstorm.  It was in the

8          wintertime.

9                    MR. LEVIN:  That's why you

10         live there.

11                   MR. TISI:  That's in

12         addition to having several people

13         at the depository.  I think we had

14         somebody pretty much living up in

15         New York at the depository during

16         that time.

17                   I want to focus and turn to

18         what I think I'm most proud of of

19         all the things.  When we got the

20         case in, most of the work that was

21         being done was depositions of the

22         corporate witnesses.  I think we

23         really pushed, I know I did, the

24         idea of going around the Merck

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          witnesses.  By that point, they

2          had pretty much gone to school on

3          just about everything we were

4          doing, and I felt that the best

5          thing that we could do was to try

6          and develop a third-party strategy

7          for getting key witnesses out in

8          front, people like Nissen, Topol,

9          Graham, Avorn and other people.

10         In retrospect, it seemed like it

11         was the right thing to do.  But at

12         the time, there was a lot of

13         controversy within the PSC and

14         elsewhere whether that was the

15         right thing to do, because a lot

16         of theses folks had had writings

17         out there, people wanted to rely

18         upon their writings, thought that

19         opening up to cross-examination

20         would not be the best thing to

21         do --

22              MR. SEEGER:  Everybody felt

23         it would be a mixed bag.

24              MR. TISI:  A mixed bag.  I

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 97

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1           think in retrospect, it seemed

2           like the right thing to do, but at

3           the time, I think I was a real

4           proponent of that, and we really

5           discussed witness by witness

6           whether that was the right thing

7           to do.  And I put a chart here of

8           just some of them.

9                David Graham, we got his

10          documents.  We filed a motion, I

11          think the ruling on David Graham

12          was one of the more important

13          discovery rulings that we got from

14          the judge.  Mike Wenkowitz and I

15          worked on the brief.  I argued it.

16          We prepped him.  Tom Kline took a

17          great deposition, but I was second

18          chair of that one and worked very

19          closely with him on that.

20               Eric Topol, I don't think

21          anybody would doubt that that was

22          a terrific deposition.  There was

23          a lot of controversy on whether

24          that was the right thing to do.

FAC Resp. Exhibit D -- 98

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1              Dr. Fries --
 2              MR. SEEGER:  I need to make
 3         this comment, because it is
 4         important.  With Topol in
 5         particular, you were very much
 6         involved in that in every way,
 7         getting our team ready, and it was
 8         one that you really wanted to
 9         take, and somebody else was
10         actually put up for it, and you
11         graciously stepped back and
12         allowed it.  But it was one that
13         you --
14              MR. TISI:  I wasn't so
15         gracious at the time.
16              MR. SEEGER:  You were pretty
17         gracious, and that's a very good
18         example of where you were very
19         much a team player.  So, I just
20         think that's important, because I
21         was involved in talking to you
22         about that.  I think it is
23         important that people know that.
24              MR. TISI:  I think the one
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 99

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1       deposition came later on in the

2       process that we kind of decided

3       was Steve Nissen, and I take

4       particular pride in that.  When I

5       took that one, he was a

6       participant in both of the

7       Advisory Committees involving

8       Vioxx, and I think having him on

9       board saying that I was pretty

10      much duped by the company in the

11      original -- if it had the

12      opportunity to be played more, I

13      think it was played in the

14      Illinois case --

15              MR. BIRCHFIELD:  It was.

16              MR. TISI:  -- it would have

17      been used more as time went on.

18              There were some we didn't

19      decide to take.  We really spent a

20      lot of time talking about

21      FitzGerald, whether that was the

22      right thing to do.  We decided

23      against it.  But the fact that we

24      didn't take it didn't mean that

FAC Resp. Exhibit D -- 100

Page 24

1          there was a lot of work that was

2          not done to vet that issue.  So,

3          we spent a lot of time on that.

4                  Marvin Konstam, et cetera.

5                  So, while there was a lot of

6          questions about the wisdom of that

7          strategy, I think these

8          depositions really were the

9          backbone or a backbone of trials,

10         and virtually all of these

11         depositions, to one extent or

12         another, played a role in the

13         trials that came after, I think.

14                 MR. SEEGER:  I don't think

15         we had these, but in Humeston II,

16         and you know the difference in

17         Humeston I and II, we did play

18         Graham, Topol, Fries, and Avorn

19         was live.

20                 MR. TISI:  Avorn was live.

21                 Let me talk about Avorn for

22         a second, since you raised it.

23                 MR. SEEGER:  Which, by the

24         way, you helped us obtain him for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          that trial.

2                    MR. TISI:  Originally, I

3          remember, Chris, you said to me,

4          if you can get him, I'd be very

5          happy.

6                    MR. SEEGER:  And I was

7          happy.

8                    MR. TISI:  We got him, and

9          we originally decided to develop

10         him as a hybrid witness, which was

11         really difficult to do.  We

12         originally were going to -- and

13         this is where we worked on

14         Humeston, as well, but we

15         originally were going to call him

16         in Humeston as a witness, and we

17         spent some time as a fact witness

18         bringing him out, because he

19         obviously had a role.

20                    We decided in the end of the

21         game that it was probably a better

22         idea to kind of develop him into a

23         hybrid, and I think the result was

24         a really good, you know, saying,

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          look, this is what you knew and

2          this is what you thought, and then

3          now let's show you what the

4          company really had and now tell me

5          what you really think.  And I

6          think because of waiting and

7          developing that strategy, I think,

8          made that a much more effective

9          deposition.  But it took a lot of

10         time to develop that.

11             MR. BIRCHFIELD:  Chris, on

12         Avorn, and I would have to agree

13         with Ed, I think it was probably

14         one of the best depositions taken

15         in the litigation.

16             MR. SEEGER:  I agree as

17         well.

18             MR. BIRCHFIELD:  But him

19         testifying live at Humeston,

20         that's the first time he's

21         testified live at trial?

22             MR. TISI:  Ever.

23             MR. BIRCHFIELD:  Ever, in

24         any litigation.  Can you tell us a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          little bit about how you were

2          instrumental in getting him live?

3               MR. TISI:  We did.  I'll be

4          honest, I was very concerned about

5          the idea of exposing him live

6          because his deposition testimony

7          was so good, I didn't want to

8          undermine that in subsequent

9          hearings, but we talked about it.

10         The compromise, or what we came up

11         with was he was going to show up

12         at the trial, I was there to prep

13         him, we helped him out, we worked

14         with him, and I think his

15         testimony went across very well.

16              MR. SEEGER:  You are being

17         way too modest.  I mean, the truth

18         is, there was a lot of

19         apprehension on your part and on

20         his.  I was on the phone with

21         you -- I was in the middle of the

22         trial, and I was on the phone with

23         you constantly.  You were also

24         talking with Mark.  Mark, I don't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          think, had a lot of success

2          convincing you, and I remember

3          calling you and saying, Chris,

4          this is one for the team, just do

5          it, and he did it.

6               MR. TISI:  I'll just add,

7          because I want to add one point,

8          because everybody thinks of

9          Humeston/Hermans as a dual trial.

10          That case, up until the eve of

11          trial, was a four-plaintiff trial,

12          as you know, Perry.  It's

13          something I want to talk to the

14          committee about at the end of

15          this, because I didn't put in for

16          my time on that because I

17          didn't --

18               MR. BIRCHFIELD:  You should.

19               MR. RAFFERTY:  You should.

20               MR. HERMAN:  You obviously

21          didn't put in a lot of time that

22          you spent on the case.

23               MR. SEEGER:  Why did you do

24          that?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1              MR. TISI:  Well, because

2         Judge Fallon's order reads clearly

3         work for trials and verdicts.

4         That was a four-person --

5              MR. HERMAN:  Let me just

6         say, to the extent you can

7         supplement, because what his

8         intent is, is that if a trial was

9         set and it was worked up for

10        trial, even if it wasn't tried,

11        those hours count.

12             MR. TISI:  Okay.  Well, I

13        will recreate that and submit

14        that, but I appreciate that.

15             But it really was a

16        four-person trial.  We went

17        through focus groups, we did all

18        the discovery.  Now I'm going out

19        of order on where I wanted to go,

20        but --

21             MR. SEEGER:  You don't need

22        this anyway.

23             MR. TISI:  We did three or

24        four motions in limine, we worked

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          up the case to get it ready.  I

2          remember arguing the Avorn issue

3          in front of Judge Higbee.  So, I

4          think it's --  I will submit with

5          that, but I read him literally to

6          say if it was a trial, if it was a

7          bellwether trial, and since my

8          case was pulled off the docket the

9          day or two days before, I think

10         two business days before the trial

11         began, I didn't submit that time.

12         But I will do that.

13              MR. WEITZ:  Chris, it is

14         important that you think about any

15         other cases that you did the same

16         thing in, because we think that it

17         is very important to be able to

18         demonstrate to the judge the

19         people that helped move the

20         dockets, that put pressure on

21         Merck and forced them to --

22              MR. SEEGER:  But you were

23         helping us all prepare for trial.

24              MR. TISI:  I stayed for an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

 1          extra week-and-a-half to work on

 2          the case.

 3                  MR. LEVIN:  Right.  Please

 4          expedite that --

 5                  MR. TISI:  I will get that

 6          done.

 7                  MR. LEVIN:  -- because the

 8          fact that that's in for you helps

 9          us with regard to the overall

10          picture of the whole case.

11                  MR. HERMAN:  I want to say

12          one thing from my point of view.

13          This was your first PSC

14          appointment by a federal judge.

15                  MR. TISI:  Yes.

16                  MR. HERMAN:  I don't know if

17          it was Troy's first, but you and

18          Troy did outstanding work, as far

19          as from my perspective, as

20          compared with some others that

21          were appointed to the PSC.  It

22          certainly --

23                  MR. SEEGER:  Who are

24          veterans of PSCs.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1            MR. HERMAN:  Yes.  Let me

2       tell you that it's certain from

3       just going through the MDL

4       process, it certainly made Chris

5       and Andy and myself a lot more

6       comfortable that you could be

7       called on, you weren't going to

8       give anybody back talk, you would

9       get the job done, and you did it

10      well.

11           MR. TISI:  So, the

12      third-party aspect is something I

13      take pretty carefully and I'm

14      particularly proud of.

15           I took a bunch of

16      depositions in the case.  I mean,

17      apart from Dr. Avorn, which we've

18      discussed, and apart from Steven

19      Nissen, which I've discussed, I

20      took the vice president of

21      scientific and medical affairs,

22      Peter Honig.  I took Gil Block,

23      who ran the Alzheimer's studies.

24      I had actually prepared to take

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          Wayne Ray, and the interesting

2          thing about Wayne Ray, that kind

3          of developed over a year.  We had

4          learned during the course of

5          preparing him for his preservation

6          testimony that there was some

7          facts that he was aware of that

8          hadn't come out before, and that

9          was the extent to which Merck had

10         had backdoor conversations with

11         Peter Honig at the FDA prior to

12         the first Advisory Committee.  It

13         took us several months to develop

14         that.  And we did, Dave and I and

15         others, and really worked up that

16         issue, and we were about ready to

17         offer him up for a deposition when

18         the settlement was announced.

19              But I had actually prepared

20         for his testimony.  It was going

21         to be really good.  I'm still

22         regretting that we didn't get a

23         chance to take it.  We had to pull

24         it back because we wanted to

FAC Resp. Exhibit D -- 110

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1      develop that fact portion of it.

2      So, I wanted to highlight that as

3      something that had been done, and

4      it obviously was interrupted by

5      the settlement.

6           David Graham, Eliav Barr,

7      other folks we worked on.

8           Science and expert

9      committee.  Michelle and I worked

10     up, I think sometimes it is very

11     interesting to look at the people

12     that were actually named, but a

13     lot of work gets done looking at

14     the people you vetted who you

15     didn't choose for generic experts.

16     I know Michelle traveled all over

17     the country, met with Dr. Singh,

18     Dr. Lipiky, Dr. -- the former FDA

19     person, a bunch of people who were

20     in our affidavits, went all over

21     the country to try and see who we

22     could name.  Some of theses folks

23     we decided in the end of the day

24     were probably not people we wanted

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1        to show.  But that took a lot of

2        time.

3            We worked on the expert

4        reports for Dr. Gueriguian, Dr.

5        Avorn, Dr. Kronmal.  Michelle and

6        I worked with Mike and Lisa

7        Dagostino on the stroke project

8        and Dr. Feldman.  So, we did a lot

9        of that stuff.

10           We were asked by the PSC to

11       work on the privilege committee

12       with Anthony and the other folks.

13       We met repeatedly with Special

14       Master Rice, did a lot of

15       briefing, did a lot of arguing.

16       It is the first case that I ever

17       remember where I ever got one

18       privileged document before the end

19       of the litigation, and I did

20       promise and I will put it on the

21       record, that if Anthony ever got a

22       document before the end of the

23       litigation, I owe him dinner, and

24       I still haven't dealt with that

Page 36

1        yet.  But we did get those

2        documents, and I think that was a

3        good thing.

4              Law and briefing, we did a

5        lot of briefing.  That's in the

6        affidavit.  I can tell it is

7        lunchtime, and I'm not going to

8        spend a lot of time on that.  But

9        we did do a lot on that.

10             I wanted to go to the

11        bellwether trial issue, because I

12        think that that's an important

13        point.  Some of you were fortunate

14        to try some of these cases, and I

15        always was very -- I know we were

16        very envious of the opportunity to

17        be able to do so.  But I was also

18        pleased that I was asked, and

19        Michelle, as well, were asked on

20        several occasions to lend whatever

21        support we could to preparing

22        witnesses, briefing, preparing

23        stuff that went into the trials of

24        these cases.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1              As I said, in almost all of
 2         these cases, I remember sitting in
 3         the courtroom for Irvin I with
 4         Lisa doing the trial cuts for
 5         Topol and the objections of Topol,
 6         doing the counters and working on
 7         all of those issues.  We did the
 8         same thing for Curfman, we worked
 9         on the counters, the objections,
10         all of those things that went into
11         the trial package ultimately.
12              MR. SEEGER:  Were you
13         involved in the taking of Curfman?
14              MR. TISI:  Peripherally.  I
15         was involved in arranging it.  I
16         mean, that really was taken by
17         Don, and he ran with it.  But in
18         terms of cutting it and making it
19         trial ready, all of that stuff,
20         that was something that we worked
21         on.
22              One thing I didn't mention
23         on the PSC side I wanted to
24         mention, is the work done by the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          trial package committee.  We --

2                MR. SEEGER:  Have you seen

3          the trial package?

4                MR. TISI:  I have seen it.

5                MR. SEEGER:  That was a

6          joke, for the record.

7                MR. TISI:  It is a pretty

8          amazing trial package.  I mean, if

9          we had gone forward with this

10         litigation further, that trial

11         package would have been the core

12         of everything that had come on

13         following.  The case was pretty

14         much ready to be tried in a much

15         more --  the goal was really to

16         get cases that could be tried for

17         less money, that could be tried

18         with documents and that wouldn't

19         be as expensive as the first

20         couple trials were.

21               Trial involvement.  I'll

22         touch on that really briefly.  All

23         of these cases, Irvin I, Irvin II,

24         sat with Troy during Irvin II,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          working with Dr. Kapit, I think.

2                    MR. HERMAN:  Did you help

3          with Madigan?

4                    MR. TISI:  No, no.  There's

5          an inside joke there somewhere.

6                    MR. HERMAN:  Actually, it is

7          not.  Do you know anything about

8          him?

9                    MR. RAFFERTY:  Do you know

10         who Dr. Magidan is?

11                   MR. TISI:  It is a familiar

12         name, quite frankly.

13                   MR. SEEGER:  I think that

14         just spoke volumes.

15                   MR. TISI:  Oh, he was the

16         guy from Philadelphia.  I do

17         remember that.

18                   I actually remember, Andy,

19         we were getting ready to

20         cross-examine Alise Reicin, and

21         you asked me, could you go through

22         the Advisory Committee transcripts

23         and see if you can put together a

24         cross-examination that will help

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          me contribute to the results of

2          the Advisory Committee.  I think

3          we did a pretty good job in giving

4          you that.  I think that was that

5          big chart.

6                    MR. BIRCHFIELD:  It was the

7          highlight.

8                    MR. TISI:  It was a good

9          thing, and hopefully that was

10         helpful.  All of those things are

11         listed in my affidavit.  I don't

12         want to go through all of that

13         stuff.  But I think it's fair to

14         say that we spent a lot of time on

15         most of the trials that were out

16         there, and when asked, we always

17         put ourselves forward to assist if

18         we couldn't actually try the case.

19         We put ourselves in a position,

20         and it was constant.

21                    I mean, I think that what's

22         key and one of the things that

23         Judge Fallon made clear is the

24         consistency of work throughout the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1              time.  I can tell you from my own

2              perspective, we worked, I know I

3              did, Michelle to a lesser extent,

4              but --

5                   MR. SEEGER:  Could you take

6              a few minutes to talk about

7              Michelle's contribution?  I think

8              we are very familiar with yours,

9              but maybe less so --

10                  MR. TISI:  Well, like I

11             said, Michelle spent a lot of

12             time, particularly early on,

13             working and vetting the experts.

14             I think that that was her main

15             task.  I think she was appointed

16             to work by John and Carlene, and

17             ultimately Shelly, to work on the

18             Daubert committee.  So, we spent a

19             lot of time with the various

20             experts, vetting them, vetting

21             their reports, vetting their CVs,

22             working with them on their

23             opinions, helping draft their

24             reports and editing their reports

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          that would be ready as the case

2          got forwarded.  She spent a lot of

3          time on that, particularly in the

4          early days.

5               MR. BIRCHFIELD:  She was

6          very helpful in filtering out some

7          that would not have been effective

8          witnesses for us.

9               MR. TISI:  Exactly.

10              MR. SEEGER:  Are there

11         certain experts that your firm

12         were the point person or

13         gatekeepers for?

14              MR. TISI:  Obviously I think

15         Avorn, I was.  I think that --

16              MR. SEEGER:  Or you brought

17         to the litigation?

18              MR. TISI:  Gueriguian was

19         another one that we worked on

20         developing the expert report and

21         getting him ready for the

22         deposition.

23              MR. BLIZZARD:  You can't get

24         him ready for a depo.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1           MR. TISI:  Not anymore.  But

2      actually, funny story about

3      Gueriguian.  When he left the FDA,

4      I think I was the guy that

5      actually found him.

6           MR. RAFFERTY:  That was for

7      fen-phen.

8           MR. TISI:  He was very good

9      early on, and then he became a

10      little more...

11           But in any event, a lot of

12      the experts, and lot of the

13      efforts to Daubertize a lot of the

14      experts was something that

15      Michelle had done.

16           MR. RAFFERTY:  One thing

17      that Chris did a lot of, too, that

18      doesn't get talked a lot about is

19      not only a lot of the substantive

20      work, but also a lot of the

21      organizational work and the

22      day-to-day dealings with a lot of

23      our discovery issues that we

24      encountered.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

 1              MR. TISI:  Remember, Troy,

 2         when the Farquhar issue came up or

 3         the document --

 4              MR. SEEGER:  I remember

 5         that.

 6              MR. TISI:  -- or the

 7         document that was --

 8              MR. SEEGER:  The memo.

 9              MR. TISI:  The memo that

10         came up.  I mean, that was the

11         kind of thing, and that took days

12         of time before that ultimately got

13         before the judge.  It was like one

14         of those things that you wake up

15         on a Monday morning and you get a

16         phone call saying that you have to

17         deal with that issue, and it was

18         an issue that lasted a whole

19         while.  Those are the kinds of

20         things.

21              It is impossible for me,

22         quite frankly, to kind of

23         illustrate all of those things

24         that came up.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

```
 1              I remember there was an

 2         issue with Dr. Rarick and whether

 3         she had an expert report in the

 4         MDL, and we had a fight with Ted

 5         Mayer about whether it was even

 6         appropriate to name her and

 7         cross-notice her in the MDL.  We

 8         went back and forth on that issue.

 9         There were just so many instances

10         where you wake up one morning and

11         the date -- I mean, we all do

12         that.

13              MR. BIRCHFIELD:  Chris, we

14         all recognize that you did

15         excellent work and you've been

16         here throughout the course of the

17         litigation, so, your work is

18         recognized and appreciated, and

19         you are a team player.

20              MR. BLIZZARD:  Historically,

21         I have been a hypercritic,

22         sometimes excessively so, of the

23         kind of work product that MDLs

24         turn out in terms of its usability
```

FAC Resp. Exhibit D -- 122

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          in trial.  That was not the case

2          here.  The work product from the

3          witness standpoint, I thought, was

4          very useful in trials.  I think

5          you were a big part of that, and I

6          appreciate that.  So, to me, hours

7          says something, and I know from

8          what's been said that you are not

9          great about keeping them.

10              MR. TISI:  I'm much better.

11          For the record and for my senior

12          partners, I'm much better.

13              MR. BLIZZARD:  But

14          ultimately it is the work product

15          that counts, and you had a big

16          hand in making this a great work

17          product.

18              MR. SEEGER:  I can't think

19          of an important part of this

20          litigation that you were not

21          central to.

22              MR. TISI:  I appreciate it.

23              MR. SEEGER:  I would have to

24          stretch my imagination.

FAC Resp. Exhibit D -- 123

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1              MR. TISI:  I appreciate

2         that, and it has been a pleasure

3         working with all of you as well.

4              MR. SEEGER:  Thank you.

5                   -   -   -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1                C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 125

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: AUDET & PARTNERS, LLP
        Susanne Scovern, Esquire
        HOVDE DASSOW & DEETS, LLC
        Robert Dassow, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
    877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 126

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. DASSOW:  I feel like I'm
 3        coming to Congress and I'm looking
 4        for a bailout.
 5              Susanne and I decided to do
 6        this together, and we'll explain
 7        why in a few minutes.
 8              What's important is, we were
 9        fighting Merck at the beginning of
10        the litigation.  In the middle of
11        the litigation, we were fighting
12        Merck.  And at the end of the
13        litigation, we were fighting
14        Merck.  We worked out of New
15        Jersey, and we were always, always
16        fully engaged in this litigation
17        from the beginning.
18              I guess what I would like to
19        do first, fellows, is talk to you
20        a little bit about our firms.  The
21        partners are myself and Boyd
22        Hovde, Rick Hovde and Nick Deets.
23        Our partners, just by way of
24        background, two are in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          International Trial Academy.

 2          Three of us are in the National

 3          American Trial Academy.  As long

 4          as I can remember, we've been

 5          preeminent lawyers with regard to

 6          Martindale-Hubbell.  We've got 100

 7          years of combined experience with

 8          regard to trial advocacy.  We have

 9          tried over 300 cases between all

10          of us.  I think that what I can

11          say about our Indianapolis firm is

12          we're always ready to go and try

13          cases.

14               MR. HERMAN:  One thing I

15          would like to note, if you'll work

16          it in, is you either had a joint

17          venture, whether it is a business

18          joint venture, but apparently a

19          work effort joint venture of some

20          sort.  So, would you give us some

21          detail on that.

22               MR. DASSOW:  Sure.  I can

23          tell you about that, and at the

24          bottom of the slide, Russ, you can
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          see it says separate fee

2          applications, but we've got a

3          common benefit.  Essentially what

4          happened was, early on, Susanne

5          and I got together, we knew each

6          other from prior litigation.  We

7          get along obviously very well.  We

8          work well together.  What we did

9          was, we essentially worked

10         together sort of like Chris and

11         Mark would work together with

12         regard to the trials, but

13         obviously they did different

14         things.  So, that's kind of what

15         we were doing.  Does that answer

16         your question, Russ?

17              MR. HERMAN:  Well, do you

18         have a cross fee participation at

19         all?

20              MR. DASSOW:  We do not.

21              MR. HERMAN:  And no joint

22         clients?

23              MR. DASSOW:  No joint

24         clients whatsoever.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          Does that help?  Does that
 2      demarcate what we're talking
 3      about?
 4          MS. SCOVERN:  Our clients
 5      were better than his.
 6          MR. DASSOW:  I'll let
 7      Susanne tell you about her firm,
 8      and then we'll keep moving on.
 9          MS. SCOVERN:  My firm
10      consists of eight attorneys, and
11      our Vioxx team that was dedicated
12      during the course of the
13      litigation consisted of five
14      attorneys.  Bill Audet is the
15      principal owner of the firm.
16      Myself, I have 20 years of
17      litigation experience.  We had two
18      six-year associates who did most
19      of the law and motion work for
20      Robb and I, and Adel, a third year
21      associate.  We also had some
22      paralegals and legal assistants,
23      legal litigation assistants to
24      assist us.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1              Bill Audet was the person

2        most responsible for organizing

3        us.  He organized us, and he

4        conducted mini-seminars of our

5        counsel and about a dozen other

6        firms both in the Midwest and on

7        the West Coast.

8              MR. DASSOW:  This is preMDL.

9        This is early on in January of '05

10       that we started doing this.

11             MS. SCOVERN:  Right.  And we

12       got together with trial experts

13       and litigation strategy experts

14       early on, like Robb said, and

15       mapped out the cases and trial

16       strategy that we wanted to

17       endeavor in mostly in New Jersey.

18       We had a few cases that we also

19       filed in California in front of

20       Judge Chaney.  But the bulk of our

21       cases and the counsel that we

22       worked with were filed in New

23       Jersey.

24             At one time, our firm had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1    two trial cases of the bellwether

2    case of Benjamin LoPresti in New

3    Jersey and the Anderson case in

4    California, plus, as Robb will

5    describe later, we had several New

6    Jersey trial pool cases.

7         Bill was also responsible

8    for organizing the Merck profile

9    form along with Dave Buchanan from

10   Chris Seeger's office.  They

11   worked in tandem with the MDL

12   attorneys with the defense profile

13   sheet and the Merck profile form

14   and got that adopted by Judge

15   Higbee early on.  I think it was

16   around March of 2006, she adopted

17   the New Jersey Merck profile form.

18        Our firms also, as I

19   mentioned before, were

20   instrumental in the initial

21   bellwether cases in New Jersey.

22   In October of 2005, Robb and I, at

23   Judge Higbee's request from the

24   CMC, went through all of our case

FAC Resp. Exhibit D -- 132

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        inventory and came up with our

2        best New Jersey trial case.  At

3        that time, she was focused on

4        trying a few cases at the same

5        time, but she did not want to deal

6        with conflict of law issues, and

7        so she wanted to focus on New

8        Jersey cases.  Our New Jersey case

9        that we proposed was Benjamin

10        LoPresti.

11            In November of 2005, she

12        selected that as a bellwether case

13        to be tried with other New Jersey

14        liaison counsel.  At the time, it

15        was the Hatch case with Anapol

16        Schwartz and also the McFarland

17        case with Seeger Weiss.  She

18        scheduled us for an April 2006

19        trial date, and so we had five

20        months to prepare for that trial

21        date.  And essentially Robb and I

22        dropped everything we were doing

23        and concentrated on that.  We were

24        involved in multiple discovery

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          meetings and teleconferences with

2          our New Jersey liaison counsel,

3          and we were one of the first firms

4          to review thousands of sales reps

5          documents that came through.

6               In looking at those sales

7          rep documents, we were the first

8          firm that went to Judge Higbee on

9          a series of redaction issues

10         involving prescribing depositions

11         that were redacted, Vioxx payments

12         to physicians that were redacted

13         and sales rep bonuses that were

14         redacted, and we had a couple of

15         in-camera motions with her

16         bringing forward those redacted

17         documents.

18               We also, in doing our

19         analysis of the sales reps

20         documents, discovered a window

21         into the widespread financial ties

22         between Merck and the doctors who

23         prescribed or recommended Vioxx.

24         Through the health education

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        learning programs that actually

2        Ken Soh from Mark Lanier's office

3        gave me the heads up on, those

4        programs -- after the Ernst trial,

5        he forwarded a lot of documents to

6        my office, and it kind of started

7        on looking at and tracking the

8        money that Merck was paying to

9        physicians.  This became something

10       of great interest to Judge Higbee

11       early on, and that permeated the

12       litigation all the way up into

13       settlement.  I will get into a

14       little bit more detail about that.

15            We also were the first firm

16       to give the American Express

17       reports of all the sales reps in

18       their custodial files.  We really

19       pressed Judge Higbee to open up

20       and to expose the amount of

21       payment that was going to the

22       Merck physicians through the

23       marketing department at Merck and

24       their 3,000 sales reps that were

FAC Resp. Exhibit D -- 135

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          touching base with the doctors on

2          a daily basis.  And an interesting

3          factor is that in 2003,

4          pharmaceutical companies were

5          spending $9 billion on marketing

6          and promotion of their products,

7          and out of that 9 billion, 6

8          billion was being spent directly

9          on prescribers.

10              In the particular case of

11         Benjamin LoPresti, Dr. Sheldon

12         Solomon was his prescriber, and we

13         were able to get his 1099s, which

14         showed thousands of dollars, if

15         not hundreds of thousands of

16         dollars, from 1999 to 2005.  He

17         was a Merck thought leader.  The

18         common benefit impact of exposing

19         the financial ties was introduced

20         to Judge Higbee early on, and the

21         conflict of interest that the

22         doctors had in receiving all of

23         that money and yet being very much

24         influenced by this money, in my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      opinion, had a very negative

2      effect on a lot of our clients,

3      because they were taking money, it

4      was altering their prescribing

5      habits, and I think to the

6      detriment of a lot of our clients.

7           Soon after our work in the

8      LoPresti trial, Judge Higbee

9      ordered the production of 1099s

10     for all providers in the trial

11     cases moving forward.

12          MR. DASSOW:  I just want to

13     touch on a couple of other aspects

14     of the LoPresti trial and why it

15     is important.

16          First of all, at the

17     beginning, and this is early on in

18     the litigation, we've got Chris

19     Seeger's office, we've got Mark

20     Lanier's, we've got Perry's

21     office, and we've got Anapol

22     Schwartz and us, that's it, going

23     forward.  You are seeing a lot of

24     people, you guys, and they are all

Page 13

1      telling you, we did a lot of

2      common benefit, but I'm telling

3      you, we were involved right away

4      with Chris and Mark and Perry at

5      the beginning with a trial case

6      that we had five months to work

7      up.

8            Other than the Humeston

9      trial, nothing had been going on.

10     Mark is working on the Ernst

11     trial.  I mean, we're involved and

12     we're going.  That's how we are

13     different at the beginning from

14     all the other folks that are

15     coming in and talking to you guys

16     and telling you how they did

17     common benefit things.  Well, we

18     were at the ground floor, and we

19     went all the way up the elevator

20     with everybody in this room.

21            I've got a couple of points

22     here.  You can tell we did 12

23     depositions.  Obviously, we all in

24     this room did a number of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          depositions.  At the beginning, we

2          were the earliest firm to take

3          sales reps other than Jerry

4          Kristal.  I think that Moshe came

5          along to a couple of deps with us,

6          but Harley, O'Connor, Fagen,

7          what's important there is there

8          were six Merck lawyers at each of

9          those depositions defending them

10         against us.  Each deposition.

11              We did some physician

12         depositions of family members.  I

13         want to note one last thing on

14         this slide.  You see the

15         deposition of Dr. Lynch?  What is

16         important is, in Chris' trial, I

17         believe, and in the first trial,

18         they brought up the green monkey,

19         and they want to talk about venous

20         and arterial problems that the

21         green monkey showed that you can't

22         have plaque accumulation, blah,

23         blah, blah, I won't go into all

24         the fun medical terms and things

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          like that today, but what's

2          important is, through an expert of

3          ours, I was told that Dr. Lynch

4          would tell the truth.  I was told

5          that Dr. Lynch would come forward

6          and explain that the green monkey

7          study meant nothing.  And that's

8          exactly what he did.  I prepped,

9          took his deposition in Philly, and

10         that applied to everybody.  You

11         never heard that again, unless

12         Mark and Chris can tell me, you

13         never heard about the green monkey

14         study ever again.  He was done.

15         Never heard about it again.  I

16         don't think in the MDL trials,

17         they may have brought it up, I'm

18         not sure, but it was over.

19              What's the impact of

20         LoPresti?  We disseminated all the

21         sales rep documents, deposition,

22         video clips to anybody who wanted

23         it in New Jersey.  Frankly, I

24         didn't care if they went to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1           MDL.  I didn't care.

2                We disseminated all the

3           prescribers, all the cardiologist

4           depositions we did.  We gave our

5           outlines.  We didn't care, it was

6           for the common benefit after the

7           first four or five firms got it

8           going.  We were ready to go and

9           help anybody else.

10               Again, while Chris and the

11          folks in New Jersey are on trial,

12          and the best way I can explain is

13          they went on trial, and we are

14          right underneath them kicking

15          Merck's butt and keeping them as

16          busy as we possibly can at all

17          times.  That is true 'til November

18          of '07, until the settlement.

19               Susanne is going to just

20          touch on something of interest

21          that was about Rodney Jew, and you

22          know --

23               MS. SCOVERN:  As soon as

24          Judge Higbee gave us the green

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        light for our bellwether cases to

2        move forward, my firm set up a

3        number of trial strategies,

4        seminars presented by Rodney Jew.

5        He is the foremost trial

6        consultant and litigation

7        strategist in Palo Alto.

8                MR. DASSOW:  Other than Dr.

9        Bob.

10               MS. SCOVERN:  So, we

11       attended two week-long sessions in

12       Palo Alto.  And at that time, we

13       were land mining and doing case

14       mapping from our respective cases.

15               And the overall impact,

16       common benefit impact I think with

17       our three firms working together,

18       Chris', Anapol Schwartz and ours,

19       our group, was it developed a

20       strategy for a coherent and

21       effective trial theme for future

22       common benefit cases or the common

23       benefit of future cases in New

24       Jersey.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1           MR. DASSOW:  Richard Allen.
 2       After we were working on the
 3       Rodney Jew issue, Judge Higbee
 4       talked to us, and since we didn't
 5       get to go on that particular trial
 6       because of the other trials that
 7       were going, she chatted with us,
 8       along with Merck, and said we want
 9       you guys to put up some cases for
10       the next round.  So, what we did
11       in June was work on, go through
12       each one of our cases to figure
13       out, now that the judge has opened
14       up nonNew Jersey cases, she opened
15       up the entire United States, we
16       didn't have the conflict issue
17       anymore.  Judge Higbee opened it
18       up.  She wanted our cases in July
19       of '06.  As a result of what we
20       ponied up at that point, along
21       with other folks in this room,
22       Judge Higbee selected Richard
23       Allen as one of the main trial
24       cases of the 39.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1           Richard Allen made the cut

2      with Chris and Mark and Perry,

3      made that cut down to one of the

4      ten that was going to go in the

5      next batch.

6           What's important there is

7      that we flew out and met with

8      Mark, and we strategized about how

9      are we going to put the trials

10     together, what cases mesh, how are

11     we going to do that, and, frankly,

12     Mark said, here's what we're

13     looking for, we want you

14     tag-teaming it, how are you going

15     to do this?  So that's what we

16     did.  And I point out a couple

17     other issues here.

18           We have 24 sales reps.  We

19     had hundreds of thousands of

20     documents.  We had the most

21     voluminous production with regard

22     to Mr. Allen, I think, of any of

23     the cases at that time.  We went

24     through that thoroughly.  And I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          came up with a couple of sales

2          reps that we took.  In that case,

3          in a matter of two-and-a-half

4          months, we took nine discovery and

5          de bene esse depositions.  This

6          case was absolutely primed and

7          ready to go to trial.  Morricol

8          and Hillis, the cardiologist and

9          the prescribing doctor, were

10         absolutely totally on board.  Had

11         they known about the risks of

12         Vioxx, they never would have

13         prescribed it.  I had a

14         cardiologist, and we had the

15         prescriber both saying that, and

16         saying many, many better things

17         for us.  The case was great.

18         Every case had warts, let's not

19         kid each other, every case had

20         warts.

21              The other thing to note with

22         regard to Allen is that we were

23         one of the first firms to be

24         allowed by Judge Higbee to get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        regional business managers.  This

2        applied to all of the cases.  She

3        allowed us to get the regional

4        business manager.  Why is that

5        important?  That tied in Anstice

6        to the regional business manager

7        to the low level sales reps.  We

8        never got there, but we put

9        pressure on them, and we are the

10        only people to get that, and that

11        was for the common benefit of

12        everybody.

13            I also mentioned there the

14        whistle blower.  I can't tell you

15        with the gentlemen sitting here

16        how many whistle blowers you had

17        or if you had any.  I ponied up

18        and offered a whistle blower to

19        Moshe on an occasion, Mark had the

20        ability, talked to Jerry Kristal

21        about it.  I had a nurse sales rep

22        in Indiana that was willing to

23        testify with regard to Merck.  She

24        had a TIA while she was on Vioxx,

FAC Resp. Exhibit D -- 146

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          okay, while she was on Vioxx,

 2          confronted her people and her

 3          regional business manager and

 4          said, this stuff is killing

 5          people, it's causing heart attacks

 6          and strokes.  He said, if you say

 7          anything else, you are going to be

 8          fired.  So, that gives you a

 9          little background.

10               We never needed it.  We

11          couldn't really bring her in,

12          because the Indiana case never

13          went.  It was a decision made that

14          we never used it, but she was

15          available, and I made her

16          available for everyone in the

17          trial.

18               What's the quick common

19          benefit of that?  We continued to

20          put pressure on those nonstop with

21          regard to Allen.  First whistle

22          blower, as far as I know, and the

23          first regional business manager.

24               Susanne is now going to talk
```

FAC Resp. Exhibit D -- 147

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          to you about physician

2          compensation, kind of our pet

3          project that we had that was for

4          the common benefit of everybody

5          with regard to 1099s.

6               MS. SCOVERN:  It started off

7          with Ben LoPresti, as I mentioned,

8          and it carried through the entire

9          litigation.  What I was doing was

10         comparing the Merck profile form,

11         and for the MDL, it is called the

12         defense fact sheet, responses that

13         Merck provided for the payments to

14         doctors to their 1099s.

15              In the Merck profile form,

16         Merck is supposed to list all the

17         payments to doctors for their

18         presentations, their honorariums,

19         their clinical investigations of

20         any COX-2s, including Arcoxia, and

21         their expenses per calendar year

22         from 1999 to 2005.  If you looked

23         at what you were getting in the

24         Merck profile form for physician

Page 24

1          compensation and compared it

2          against their 1099s, there were

3          widespread discrepancies and

4          redactions.

5               Merck came up with a series

6          of explanations trying to explain

7          away the inconsistencies for a

8          period of three to four months.

9          Either they didn't have the 1099s

10         anymore or they were in storage or

11         they couldn't locate them or it

12         was an IRS reporting nuance or we

13         didn't know what the redactions

14         were on the Merck profile forms,

15         but we'll get back to you.

16               We were in Judge Higbee's

17         chambers at least six to eight

18         times between June and July on

19         this issue and multiple conference

20         calls with her.  In the end, what

21         we discovered was that they

22         redacted in the Merck profile form

23         all physician payments that went

24         to any clinical research,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          including Arcoxia, and any grants

2          that they gave to doctors.  And

3          when you compared that with the

4          1099s, in the end they told Judge

5          Higbee in chambers that they did

6          not issue 1099s to doctors for

7          clinical research work or grants

8          given to doctors.  And that's

9          millions of dollars.

10              MR. DASSOW:  Let me just say

11         this again.  They never issued

12         1099s to doctors ever.  Even in

13         clinicals, even in preceptorships,

14         even in tutorials, they never did

15         it, and they expensed it.

16              MS. SCOVERN:  So, that

17         opened up Merck to a very big

18         issue of liability with the IRS.

19              MR. DASSOW:  Hundreds of

20         millions of dollars we know.

21         That's what we were told by Merck.

22         That's what we were told by

23         Dechert.

24              MS. SCOVERN:  What Judge

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1        Higbee then ordered was the

2        depositions of the executives at

3        Merck who were responsible and

4        signed off on the defendant fact

5        sheets and Merck profile forms,

6        the people who had to compile the

7        physician data.  And we were able

8        to explore how they went about

9        trying to mine physician data, and

10       it was completely corrupt.

11            They were mining databases

12       based on the name of the

13       prescriber that a plaintiff would

14       provide in a plaintiff profile

15       form.  That's it.  If the

16       plaintiff misspelled the name, you

17       were not going to get physician

18       compensation.  If the plaintiff

19       did not list the address of the

20       professional corporation for the

21       prescriber, you are not going to

22       get their physician compensation.

23            They had this information

24       because they targeted doctors

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1          through their sales reps, yet they
 2          failed to provide it on thousands
 3          of Merck profile forms and
 4          defendant fact sheets.
 5              MR. DASSOW:  Tens of
 6          thousands.  It applied not only to
 7          the New Jersey folks, but to the
 8          MDL, because we worked on the
 9          defense fact sheet and the Merck
10          profile form and know how we were
11          all getting cheated consistently.
12          And it was follow the money, and
13          we were not getting the
14          information.  So, what the effect
15          of that is, is when we would go
16          take -- for any of you guys, we
17          would go take a prescriber's
18          deposition, and you didn't know if
19          they were in Merck's pocket or you
20          didn't know whether they weren't
21          in Merck's pocket.  You didn't
22          know whether you had all the
23          contracts.  You didn't know
24          anything about that prescriber.
```

FAC Resp. Exhibit D -- 152

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            You were going to get blind sided

2            big time.  That's why we were

3            working on this for everybody.

4                 MS. SCOVERN:  They did, they

5            withheld lots, I mean, thousands

6            of physician consulting

7            agreements.  They provided you

8            with the signature pages, but they

9            never provided you with the

10           payments to the doctors.  It is an

11           issue in this litigation, it is an

12           issue in all pharma litigation,

13           and it should be explored in all

14           of our mass torts.

15                MR. DASSOW:  And it was only

16           us, too, that were doing it.

17           Nobody else was doing it.  I don't

18           know about the MDL guys, I can't

19           tell you what you guys were doing,

20           but I can tell you that we're the

21           only two that Judge Higbee was

22           sending us out to do this and

23           taking the heads of Heins and

24           Scott, the head of people signing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          these things, so we got them at

2          the top, and we can go down below.

3               MS. SCOVERN:  We actually

4          had a second series of depositions

5          scheduled with that group in the

6          first week of November right up

7          until the time of settlement in

8          2007.

9               The common benefit impact of

10         our physician compensation and

11         1099 investigation, the

12         credibility of Merck in front of

13         Judge Higbee was seriously,

14         seriously undermined, and she, in

15         the July 2007 CMC, expressed her

16         extreme disappointment with them

17         and the fact that she was in the

18         process of considering that Merck

19         reissue all Merck profile forms.

20              MR. DASSOW:  For all of New

21         Jersey.  And I can't tell you,

22         again, with regard to the MDL, but

23         I can tell you that that was the

24         next -- I'm sure Chris would have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1        taken that up, we want to reissue

 2        50,000 Merck profile forms.  Can

 3        you imagine the cost to Merck to

 4        do that?  It would have been

 5        substantial.

 6             MS. SCOVERN:  The other

 7        thing that Judge Higbee did is she

 8        ordered production of 1099s for

 9        all prescribers in the expedited

10        discovery wave that was

11        established in 2007.  There were

12        two waves of 250 cases.  So, we

13        had 500 cases moving forward where

14        the exposure of the physician

15        payments was going to be made

16        readily available, and all firms

17        could have attacked Merck on that.

18             Merck had a serious issue

19        with the IRS as well.  And Judge

20        Higbee ordered that Merck send a

21        letter from the CFO to the IRS

22        explaining their 1099s and their

23        deficiencies in issuing 1099s from

24        1999 to 2005.
```

FAC Resp. Exhibit D -- 155

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1           MR. DASSOW:  We don't know

2      as we sit here today really what's

3      happened with it, but it's

4      certainly an issue that I have

5      already talked to the judge about

6      with regard to our TPP cases.

7           Also the AG issue, as you

8      know, the knees and hips folks and

9      everybody like that has paid

10      millions of dollars for the issue

11      that we're going after.  That's

12      why we pressured them with regard

13      to that.

14           The next slide is our

15      commitment to trials.  So, things

16      didn't go so well for some trials,

17      things went pretty well back and

18      forth.  Well, what happens now in

19      '07?  We never waned.  In fact, we

20      were picking up speed, the two of

21      us, our firms.  We are committed.

22      Now we're talking about trial pool

23      consideration.  The folks here,

24      some of them are on trial, so what

Page 32

1        are we requested to do?  We're

2        requested to go kick Merck's butt,

3        right, and support whoever is

4        going to trial.  So, what do we

5        do?  We pony up 17 cases in the

6        first wave.  17 cases.  We only

7        have 265 cases between us.  Okay?

8        I don't know if anybody in this

9        room ponied up 10 percent of their

10       cases for trial, but we did for

11       working on expedited discovery.

12       And I really truly believe that

13       that's significant.  I know that

14       most of you guys have more cases,

15       but if somebody has 1,000 cases,

16       nobody ponied up 100 cases, I

17       assure you.  This was a

18       tremendous, tremendous burden on

19       our firms to do this.  I mean,

20       tremendous burden.

21            I want to point out two

22       particular cases.  Tena and Fagel

23       were both going to be trial cases,

24       I assure you.  Both are death

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

 1          cases.  Tena has two kids,

 2          16-year-old honor student from New

 3          Mexico.  Susanne had traveled like

 4          crazy to New Mexico.

 5              Merck put six lawyers on the

 6          issue of whether we even get to

 7          depose Dr. Sokoloff in New Mexico.

 8          Six lawyers.

 9              Ms. SCOVERN:  He was a

10          doctor that had over $200,000 in

11          payments -- he was involved in the

12          Arcoxia trials and the Vioxx

13          trials.

14              MR. DASSOW:  They hired

15          every firm.  They had Fulbright &

16          Jaworski flying out to defend

17          them, they have got Dechert.  They

18          have got everybody defending them.

19          I only talk about that case, as

20          well, because Susanne meets with

21          the pathologist, who is a Merck

22          pathologist.

23              MS. SCOVERN:  It was a

24          pathologist that conducted the

Page 34

1    autopsy report on Mr. Tena, who

2    was 37 years old at the time of

3    his death.  And when I was meeting

4    with him, he said, let's go look

5    at the slides.  And we went down

6    to look at the pathology slides

7    together.  And he saw, you know, a

8    thrombus, and he just said, this

9    is one that you guys need to bring

10   further.

11        MR. DASSOW:  And he further

12   goes on and says, why didn't you

13   try this case?  But this was one

14   of those cases, as well as Fagel

15   was also a death case.  A

16   14-year-old little boy, son goes

17   up and finds him slumped over in

18   the basement.  That's in addition

19   to all the other cases we're

20   working up.  So, we've got those

21   issues.

22        Additional contribution --

23   we are almost done, fellows.  I

24   need your attention here for a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          little bit longer.  I know that

2          you guys are busy.

3               We participate in each and

4          every CMC from November of '04

5          until this case was settled.  We

6          were there.  Let me tell you this.

7          I looked at all the firms that

8          were presenting to you.  I want to

9          find somebody, other than the

10         folks that are here, that was at

11         each and every CMC, that was

12         flying out from Indianapolis, from

13         California, not driving in to New

14         Jersey, flying out consistently.

15         I was in attendance early on in

16         '05 at Anstice, Kim, Gilmartin and

17         Scolnick, all right?  I did not

18         put that time and expense down in

19         my submission to you guys.  Didn't

20         put it down, because I didn't take

21         the depositions.  Mark took the

22         depositions.  Chris took the

23         depositions.  I can't remember who

24         else took the depositions.  But I

FAC Resp. Exhibit D -- 160

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        was one of 15 lawyers learning the

2        case.  I didn't put that down as

3        time and expense.  Susanne goes to

4        Dr. Fries.  Mark, there's six

5        people there, Susanne is there

6        with you.

7              MS. SCOVERN:  I didn't have

8        to travel.

9              MR. DASSOW:  That was one

10       you didn't have to travel.

11             Graham's deposition.  We

12       went to every bellwether case

13       selection meeting in New York City

14       and Atlantic City.  We went to

15       discovery stuff at Battery Park

16       and Trump Plaza.  We filed

17       numerous motions that applied to

18       each and every case in New Jersey

19       and potentially applicable to the

20       MDL.

21             Sales reps redactions.

22             MS. SCOVERN:  Can I just add

23       that two weeks prior to the

24       settlement, the end of October,

Page 37

1          just days before the settlement,

2          I, along with Jeff Grand and Jerry

3          Kristal and Mike Wenkowitz,

4          representing New Jersey plaintiffs

5          in a special hearing called by

6          Judge Higbee, made the motion for

7          the 250 expedited cases in

8          discovery at that time to get

9          additional custodial and sales rep

10         files.  Each firm had issued their

11         own motion, and we were battling

12         it out trying to get sales rep

13         documents from Charlie Cohen and

14         Ben Barnett just two weeks prior

15         to the settlement.

16              I think overall, our common

17         benefit impact was tremendous.  We

18         worked with New Jersey liaison

19         counsel.  We are not at the same

20         tier as they are, but we worked

21         just as hard.  We put tremendous

22         pressure on Merck.

23              The intensity of our work

24         increased.  In 2007, as Robb said,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1       we had 10 percent of our cases up

2       for expedited discovery.  This is

3       after we had lost a few.  And

4       believe you me, there were a lot

5       more seats at the CMC in 2007 when

6       we got there, but we accelerated

7       the process and increased our

8       work, and we did whatever was

9       asked from our firms.

10              MR. DASSOW:  I've got a

11      couple more comments, and then

12      we'll let you get on with somebody

13      else.

14              We have separate fee apps,

15      again, like I told you earlier,

16      and we teamed up because as

17      everybody teamed up in these

18      cases, you needed the manpower to

19      take on Merck because of all the

20      lawyers, as you well know.

21              Again, at the beginning, we

22      were there fighting Merck.  In the

23      middle, we were fighting Merck.

24      And at the end, we were fighting

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1      Merck.

2           One last comment.  There are

3      people on this committee that

4      obviously did a tremendous amount

5      of work and more than Susanne did

6      and have spent more money.  But I

7      can tell you as the tiers go, and

8      when you go to the next level and

9      you guys decide on this, I'm sure

10     you can tell how passionate I was

11     about the Vioxx, how passionate I

12     am about this, and I was really

13     motivated, and we're in the guts

14     of this case.  While we're not up

15     there with a lot of you folks that

16     tried the cases, we were ready,

17     willing and able to try cases, and

18     we did everything that was asked

19     of us.  I really appreciate it,

20     guys, really appreciate it.  Thank

21     you.

22          MR. LEVIN:  How are you

23     making out with the accountants

24     with all of your rejected hours?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1           MR. DASSOW:  We haven't had

2      anything rejected.

3           MR. LEVIN:  Yes, you have.

4           MR. DASSOW:  Okay.

5           MR. LEVIN:  The accountant's

6      records shows Bill Audet's firm

7      submitted 7,722 hours and $258,000

8      in costs and they are rejected.

9      It could be something procedural.

10          MS. SCOVERN:  The one thing

11     that they asked us to do was break

12     that out by calendar year, and

13     we're in the process of doing that

14     for them.

15          MR. LEVIN:  Hovde, 8,442

16     hours and $270,000 in costs that

17     are rejected.

18          MR. DASSOW:  Okay.  I have

19     no idea why.  I have to split them

20     up.

21          MR. LEVIN:  You have to find

22     out so that we can handle it.

23          MR. DASSOW:  Okay.  Let me

24     tell you this.  This is the first

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1         I've heard about it being

 2         rejected.  They have called me six

 3         times, and I told them, listen, if

 4         you had told me from day one that

 5         I was going to be sitting in front

 6         of a committee, I would have had

 7         it on my --

 8              MR. LEVIN:  I'm sure you

 9         will straighten it out.

10              MR. SEEGER:  By the way, it

11         is not a factor for today.

12              MR. DASSOW:  Good.

13              MR. SEEGER:  We just need it

14         done.

15              MR. LEVIN:  I just want to

16         get it done.

17              MR. BIRCHFIELD:  If you are

18         communicating with them and you

19         are running into difficulties, let

20         us know, somebody, Chris.

21              MR. HERMAN:  You've got

22         15,000 hours reported between the

23         two firms, and obviously you've

24         worked together.  That's a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          significant number of hours.  You

2          don't have to do it yourself, but

3          I can tell you a number of firms

4          that are just making an

5          appointment, going in to sit with

6          the CPA and working it out, and it

7          can be worked out in maybe half a

8          day.  It is probably worth your

9          while to go ahead and do that.

10              I need to tell you that the

11         CPA firm does absolutely no work,

12         none, for any Vioxx entitled firm

13         or individual.  They are

14         completely independent, selected

15         by the judge.

16              MS. SCOVERN:  We've had a

17         great --

18              MR. DASSOW:  They've been

19         great.

20              MR. HERMAN:  They will work

21         with you, but given the Christmas

22         holidays coming up, et cetera, it

23         is probably worth somebody's while

24         to go make a trip and meet with

FAC Resp. Exhibit D -- 167

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1      them.

2            MR. DASSOW:  It is

3      significant enough for us, Russ,

4      that we will fly down and meet

5      with them for half a day.  I can

6      answer questions.

7            MR. HERMAN:  Give them a

8      call.  Get yourself a slot.

9            MR. DASSOW:  No problem.

10           MR. HERMAN:  I have a couple

11     of questions.  I will try to make

12     them quick.

13           The 3,000 detail persons,

14     I'll use the old marketing term,

15     were those New Jersey, New York,

16     Pennsylvania?

17           MS. SCOVERN:  Those were

18     countrywide, throughout the

19     country.

20           MR. HERMAN:  We've got

21     18,000 in our database.  It took

22     us a long time to get them there.

23           MS. SCOVERN:  I have 3,000

24     from the Henry Waxman

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1       investigation into the Vioxx

2       marketing, Congressman Henry

3       Waxman.

4               MR. HERMAN:  In your cost,

5       do you remember what you paid

6       Rodney Jew?

7               MR. DASSOW:  I know that

8       Bill picked up the major tab of

9       that, if I remember.

10              MR. SEEGER:  It was some

11      flat number, I think.

12              MR. DASSOW:  It was a flat

13      number.  I think our firm paid 10

14      or 15, I mean my firm alone.

15              MS. SCOVERN:  I think it was

16      35,000.

17              MR. HERMAN:  That's

18      reasonable.  I'm interested,

19      because I know a great deal about

20      Rodney Jew, and I've talked with

21      him on occasion, and that sounds

22      reasonable to me.

23              MS. SCOVERN:  I think it was

24      35,000 each week.  And if you are

Page 45

1          going to use them in the future,

2          he's now in Napa.

3               MR. HERMAN:  Well, he's

4          great on colors and charts and

5          that -- well, what he's good on,

6          he's good.

7               MS. SCOVERN:  That's our

8          colors right there.

9               MR. DASSOW:  There's red.

10         You can see that he's getting too

11         old.

12              MS. SCOVERN:  Do you see

13         that now, Chris?

14              MR. SEEGER:  I do now that

15         you mention it.

16              MR. HERMAN:  I don't have

17         any other questions.  Mainly my

18         questions had to do with sales

19         reps.  But I do want you to know,

20         because you are not familiar with

21         the work in the MDL, that we had

22         many hearings and a Court-approved

23         Merck profile form, substantial

24         work done with regard to detail

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1         persons, et cetera.

2              The shame of it, and I'm

3         going to put this in the record,

4         is that law firms still continued

5         either to go off on their own and

6         think, well, I'm not going to be

7         an MDL lawyer, and then their

8         lawyers will say I'm an MDL

9         lawyer, I'm not going to be an

10        independent lawyer, and sooner or

11        later, this plaintiff bar is going

12        to have to find a way where we all

13        work together, because there's too

14        much talent out there, and there

15        are too many evildoers on the

16        other side for us to be

17        duplicating work.  Even though we

18        try to cooperate with each other,

19        we've got to find a better way of

20        coordinating these major cases.

21              MS. SCOVERN:  This physician

22        relationship with payments from

23        big pharma to physicians is

24        something that permeates all

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1          pharmaceutical cases, and it needs

2          to be exploited and explored.

3               MR. HERMAN:  We're going to

4          find it in the chemical industry,

5          we're going to find it everywhere.

6               MR. RAFFERTY:  On the 17

7          cases, did you work up all 17 of

8          those cases?

9               MR. DASSOW:  No.  Because

10         you guys got the cases.

11              MR. RAFFERTY:  So, how many

12         of those got --

13              MR. DASSOW:  You guys

14         screwed up.  You got them settled.

15         What the heck.

16              I can't remember when the

17         tranche was, but I would say

18         several months for sure.

19              MS. SCOVERN:  I would say

20         half, Troy, half.

21              MR. SEEGER:  Thank you.

22              MR. BIRCHFIELD:  Thank you.

23                   -  -  -

24

FAC Resp. Exhibit D -- 172

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1               C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23          Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:           AUDET & PARTNERS, LLP
                William Audet, Esquire


BEFORE COMMITTEE MEMBERS:


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    - - -

2              MR. GIRARDI:  Obviously, you

3         can tell there's a court reporter

4         here, and so everything will be

5         taken down.  The primary purpose

6         of this is for Judge Fallon, who

7         clearly is the final say on all of

8         this.

9              Further, as you know, you

10        have given half the presentation

11        before us, but not the California.

12        So, we gave permission so that you

13        could fill up that time, which I

14        think is about 12 minutes, with

15        respect to the California cases.

16        We don't do this to be unfair to

17        you, but we want to make sure we

18        are fair to everybody so everybody

19        gets the same time.  So, you may

20        go forward.

21             MR. AUDET:  Thank you very

22        much.  Well, I appreciate the

23        committee's time in allowing me

24        the opportunity to finish up the

FAC Resp. Exhibit D -- 175

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1         presentation that we started in

2         New Jersey, and I appreciate the

3         fact that you have given me a

4         little extra time to finish up,

5         and I will do this in short order.

6              Essentially, the focus of

7         the presentation today by me will

8         be less than five minutes and just

9         discuss what I think was our

10        contribution to the California

11        cases.  I know there's a couple of

12        other firms in the same situation,

13        but my firm thought that it would

14        make sense to have basically cases

15        in New Jersey and in California.

16        We understood that at some point

17        in time there was a general

18        request that cases that could be

19        ready for trial in short order be

20        filed in California, and so my

21        firm filed just six cases in

22        California, all of which were

23        pretty good.  We then were given

24        the opportunity to present to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          Tom's office with the help of,

2          actually, Jim O'Callahan two cases

3          for selection.

4                One of them didn't get

5          selected.  It was an MI.  It was

6          Andreasen.  Our office had met

7          with him a number of times.  We

8          wanted to make sure that he was

9          ready to go to trial if need be.

10               If you look at our chart,

11         two of our cases were designated

12         out of the 18 in the January '06

13         selection process.  We were

14         selected by Judge Chaney in March

15         '06.  At that point we really got

16         heavily involved in the California

17         litigation overall.  Prior to

18         that, quite honestly, we had done

19         some work in California, but it

20         was at that point I assigned a

21         lawyer almost full time to work on

22         that case under my supervision.

23         We worked closely with Jim

24         O'Callahan, who I believe would

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          back up that we did bother him a

2          lot with questions to get up to

3          speed.

4               Our client had a very unique

5          issue which Jim thought was

6          important or at least I thought

7          was important, and that was

8          military marketing.  Up until

9          then, apparently there had been no

10         real pressing on the issue of

11         military marketing.  Our client

12         was in a VA hospital, was also in

13         a regular hospital, but was on VA

14         benefits.  We took a number of

15         depositions.

16              The common benefit impact of

17         the bellwether case was, we did at

18         least one deposition that Jim

19         thought was a good idea to do, and

20         that was a person most

21         knowledgeable regarding military

22         marketing.  We actually found some

23         information that was contrary to

24         their prior representations

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1         regarding the lack of military

2         marketing.  And that was one of

3         the issues that allowed us to

4         proceed and get an order from

5         Judge Chaney to open up more

6         military marketing issues.

7              Again, we looked, I think

8         the segment of the population was

9         eight to ten percent, but

10        nonetheless, we thought it might

11        be useful to others.  If our trial

12        didn't go forward, it was still

13        useful to press that issue.

14             We have a summary of

15        contributions, but I'll close on

16        my California contribution there

17        because, of course, I'm not here

18        to regurgitate what Suzanne

19        presented before to you.

20             MR. BLIZZARD:  One question

21        for you.  What happened to the

22        bellwether trial cases?

23             MR. AUDET:  Here's what

24        happened, unfortunately.  It was a

FAC Resp. Exhibit D -- 179

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          good idea.  The doctor had left

2          the United States.  We hired a

3          private investigator.  There was a

4          critical issue about he was on it

5          for six months.  We could show

6          through him and through -- we had

7          one of three, three of four, he

8          kept some of the bottles.  We were

9          able to show that there was six

10         months of usage, and that was

11         pretty critical.  Unfortunately,

12         we couldn't get the VA Hospital

13         records.  The Court declined an

14         issue ordering them to produce it.

15         We issued a subpoena.  They never

16         produced the records.  That's when

17         we hired, and Jim suggested --

18         actually, Mark Robinson suggested

19         with Jim on a call to me that I

20         hire a private investigator to

21         locate the doctor.  We located

22         him.  I hired someone to go see

23         him.  He's in Germany.  He

24         basically slammed the door on us.

FAC Resp. Exhibit D -- 180

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1         He wouldn't give us any

2         information, said it was

3         privileged, confidential.  He had

4         no obligation to come back to the

5         United States.

6              So, what happened was, we

7         had a face-to-face with the judge,

8         and it was myself, I think Jim was

9         in, it was back in chambers, in

10        which the judge said, am I going

11        to have usage issues?  And they

12        would not stipulate -- even though

13        I could show through my client

14        that we had six months' usage,

15        they would not agree to it.  I

16        agreed to waive punitives.  I did

17        everything I could, and the judge

18        said, I'm not doing a usage issue

19        case.  I'm not going to have a

20        case in which you guys are going

21        to fight over usage for a week.

22              She said, it is up to you.

23        I talked to Jim about it.  Jim

24        said, take it as far as you can,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        but you are going to have to

2        dismiss this case if you can't

3        prove usage.  We put almost a good

4        year into the case.  We knew there

5        was some usage proof issues.  We

6        didn't know that we would never

7        get the VA Hospital records that

8        would prove it.  Again, because he

9        went to the VA, he didn't pick

10       them up at Walgreen's, we just had

11       no choice.  We had his affidavit,

12       we had his wife's affidavit, who

13       went and picked it up for him, but

14       again, unfortunately, we had to

15       drop the trial.  We did not want

16       to drop the trial.  The plan was I

17       really wanted to take it to trial,

18       and I wanted to be one of the

19       California plaintiffs because it

20       was ready to go, but because of

21       the usage issue, that was it.

22            I think we had a great

23       plaintiff.  He was a former

24       military man.  He couldn't support

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          his family anymore.  I think he

2          was a really good client.  He had

3          some weight issues, but that

4          was -- I didn't think it was going

5          to be a problem.

6               MR. BLIZZARD:  So, when was

7          it dismissed?

8               MR. AUDET:  I have it

9          somewhere.  I know I have it

10          somewhere.  It was dismissed -- I

11          don't know if I have that with me.

12          Josh would have this.

13               MR. GIRARDI:  We have that.

14          Clearly the benefit and what you

15          did do was to show the marketing

16          to the government.  That was the

17          whole focus of this.

18               MR. AUDET:  Correct.

19               MR. GIRARDI:  Because that

20          was an area that Merck had denied,

21          and because of your work, you

22          opened that can of worms up and

23          then got very beneficial documents

24          and testimony to show they were

FAC Resp. Exhibit D -- 183

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          marketing to the government.

2          True?

3              MR. AUDET:  Yes, that's

4          correct.  And even June '07 I have

5          here, per the judge's request, we

6          did a telephonic deposition of a

7          military in charge of VA hospitals

8          in the western region with the

9          defendants.  They supposedly had

10          the primary prescriber, but we

11          could never get him to identify

12          himself.  That was the problem.

13          We had a court order that

14          basically he wasn't going to abide

15          by because he was in Germany.  So,

16          again, I did a lot of consulting

17          with Jim about this and what we

18          could do.  And again, his concern

19          was going forward.  But we were

20          committed to doing the trial, of

21          course, with Jim's help.  I don't

22          know if there's any other

23          questions.

24              MR. SEEGER:  Suzanne did a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          very thorough job about your

2          contributions.

3               MR. LEVIN:  And also

4          corrected the record with a letter

5          afterwards.

6               MR. AUDET:  I thank the

7          committee for pointing out the

8          deficiency.  We weren't aware of

9          that.  It's already been

10         corrected.  We've already given

11         them the zip file, I learned, last

12         night and this morning.

13              So, I do appreciate the

14         committee, actually, its time, its

15         efforts, and really that's my

16         presentation unless you have any

17         questions.

18              MR. GIRARDI:  Thank you.

19              MR. AUDET:  Thank you.

20                   -   -   -

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1            C E R T I F I C A T E

 2

 3            I, LINDA L. GOLKOW, a Notary

 4  Public and Certified Court Reporter of

 5  the State of New Jersey, Registered

 6  Diplomate Reporter, Federally-Approved by

 7  the United States District Court of

 8  Pennsylvania, do hereby certify that the

 9  foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22       Linda L. Golkow, RDR, CRR, CCR
         Notary Number:  1060147

23       Notary Expiration:  1.2.10
         CCR Number:  30X100176200

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  AYLSTOCK WITKIN KREIS &
       OVERHOLTZ, PLLC
       Justin Witkin, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
      877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 187

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2               MR. BIRCHFIELD:  Everything

3          is on the record, and so we'll

4          have a transcript in the event the

5          judge needs it.  So, the floor is

6          yours.

7               MR. WITKIN:  Thanks for

8          allowing me the opportunity to

9          speak.  I apologize ahead of time

10          if I'm a little horse or if I

11          sniffle.  I'm coming off a little

12          cold.

13               I think I know all of you,

14          but I'm Justin Witkin from

15          Aylstock Witkin Kreis & Overholtz.

16          As I understand it, you've asked

17          me to come here today and talk

18          about how my firm's contribution

19          to the litigation benefited the

20          litigation and the end result as a

21          whole.  I've obviously submitted

22          an affidavit, and I won't rehash

23          that here.  I've prepared just a

24          few remarks.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1              I think that, in essence,

2         the way I would answer the

3         question of how were the things

4         that we did beneficial to the MDL,

5         beneficial to the litigation, was

6         that we answered the call of the

7         PSC at the beginning of the

8         litigation.  Our role was largely

9         in response to requests for work

10        from the PSC, and those requests

11        came throughout the duration of

12        the litigation, at the beginning,

13        middle and end of the litigation.

14             A few examples of some of

15        the things that we were asked to

16        do and that we stepped up to do,

17        towards the sort of end of the

18        case, there was a desire to put

19        together a stroke package.  That

20        wasn't necessarily the most

21        desirable work, because the effort

22        had been on the MI cases.  The

23        request, I think, came through

24        your office, Russ, through Penny,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          and we stepped up and did that.

2          We sent multiple attorneys to

3          review stroke documents, to work

4          on the stroke package, when there

5          weren't really any other takers

6          for that job.

7              MR. SEEGER:  Justin, could

8          you identify the lawyers from your

9          office that worked on the case?

10             MR. WITKIN:  Sure.  We had

11         Bryan Aylstock, Ben Anderson,

12         Paula Bruner.  I'm not sure if Ken

13         Smith was over there at the time.

14         Ken Smith might have been over

15         there.

16             MR. LEVIN:  Ken Smith did

17         work.  He did work.

18             MR. WITKIN:  I'm trying to

19         remember whether he did the stroke

20         package work or not.

21             MR. LEVIN:  He had more

22         hours in discovery than anybody

23         else in your office.

24             MR. WITKIN:  Right.  I was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        going to address that next,

2        actually.

3            In 2005/2006, the dates all

4        blend together, when the documents

5        first started rolling in or

6        started rolling in in large

7        volume, as I'm sure you all

8        recall, the request every week

9        was, who can send people to review

10        documents?  Who can send people to

11        review documents?  We've got a

12        depository in New York, we've got

13        a depository in Louisiana.  And we

14        did.  And we didn't just send the

15        contract lawyer or the guy that

16        has been in the firm for a year.

17        We sent a 25-year lawyer, Ken

18        Smith, with our firm, and he

19        reviewed documents for weeks on

20        end.  We had other people at other

21        times that reviewed documents,

22        but, again, we were answering the

23        call when the PSC put the call

24        out.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1            At the outset of the case,

 2       when things first started going

 3       and we got into some of the sales

 4       rep discovery, it was my firm that

 5       drafted the sales rep database

 6       brief, in conjunction with Dawn

 7       and some others, and had some

 8       input on it.  We did that.  Mark

 9       Robinson approached us and asked

10       us to be involved in the sales rep

11       discovery.  We got involved in

12       doing the -- Neil Overholtz of my

13       firm got involved in drafting some

14       of the subpoenas, took some

15       depositions with Lenny from your

16       office, Russ.

17            Initially there was an

18       effort to identify sales reps in

19       the state of Florida who we could

20       contact because they were no

21       longer employees of Merck, and we

22       were trying to figure out could we

23       do that, so we were involved in

24       that project.  That was a request

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          that was made at the beginning.

2          We stepped up and we did that.

3              The Irvin trial came along,

4          and obviously Andy's firm was

5          responsible for that.  Because of

6          its connection to Florida or maybe

7          because of our proximity to Andy

8          or because I'm so good looking,

9          Andy asked us to get involved in

10         that, and we did.  We got involved

11         both in Irvin I and in Irvin II,

12         and Irvin I in a more limited

13         capacity, helping on some depo

14         cuts and were doing some jury

15         questionnaires, we were out of

16         Houston for that.

17             In Irvin II, when the crunch

18         came down on the motions in

19         limine, I'm not sure if it was

20         Andy or if it was Leigh, called us

21         and said, we've got these 10,000

22         motions in limine, can you do

23         these?  And I literally pulled

24         every attorney, or not every

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          attorney, I pulled six attorneys

2          from my firm, Joshua Jones, Ken

3          Smith, myself, Jason Richards,

4          Russell Rein, Bryan Aylstock, all

5          of us did nothing for a couple of

6          days but take care of those motion

7          in limine requests.  So, again,

8          the call went out, we answered the

9          call, and I assumed that, in the

10         scheme of things, Irvin was an

11         important part of the overall

12         effort to bring about the result

13         that we obtained here.

14               And then at the end of the

15         case, when the PSC was looking to

16         put a little more leverage, get a

17         little more leverage, try to bring

18         about a result, the request was

19         sent out, we're going to do this

20         rapid remand thing.  We want to

21         get some cases back into state

22         courts, we're going to file this

23         motion, put some cases back in

24         district courts so that we can get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          some pressure.  Let's identify

2          people who have cases who are up

3          to the task, and let's identify

4          the cases.  I did that, trying to

5          sort that out.  So, again,

6          answering the call, beginning,

7          middle and end.  I think that's

8          characteristic of all of our

9          efforts, which are more detailed,

10         obviously, in my affidavit.

11             I'll talk just real briefly

12         about my appointment to the State

13         Liaison Committee.  I was

14         appointed to the State Liaison

15         Committee.  The State Liaison

16         Committee, it seems to me, served

17         an important role in litigation

18         like this for this reason.  This

19         is obviously one of the bigger

20         litigations that's out there.

21         When you have a litigation this

22         size and this disparate, you have

23         to have cohesiveness if you want

24         to bring about the end result.

FAC Resp. Exhibit D -- 195

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          You know that.  You can't get a

2          global settlement unless you've

3          got most of the people on board.

4              So, the role of the State

5          Liaison Committee, it seems to me,

6          the important role in the state

7          liaison committee, is to

8          facilitate that cohesiveness, to

9          make sure that the people who are

10         not necessarily at that middle of

11         the MDL process are on board or at

12         least are aware of what's going

13         on, so that when something

14         happens, they don't throw up their

15         hands and go, oh, gosh, oh, no,

16         and start to become the objectors.

17         Well, that's what the state

18         liaison committee did, and that's

19         what I did a lot of.

20             We published a newsletter,

21         and our names are out there in

22         front of hundreds, if not

23         thousands of attorneys.  And so we

24         would get random calls from Tom,

FAC Resp. Exhibit D -- 196

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        Dick and Harry, hey, what's going

2        on, can you tell me how to fill

3        out the plaintiff profile form.

4        Well, read the order.  Well, tell

5        me how to do it.  So, I spent a

6        lot of time doing that, and, you

7        know, to my detriment, most of

8        which I didn't capture and submit

9        as time.  But that was an

10       important role, I think, that

11       benefited the litigation as a

12       whole, because it was necessary to

13       have that kind of cohesiveness.

14            Beyond that, I think that

15       anything, any of my time spent on

16       the SLC, discharging the orders of

17       the Court, is necessarily

18       important to the outcome of the

19       litigation.  The Court says do

20       something, you do it.  So, when

21       the Court said catalog all the

22       remand motions and tell me how

23       many remand motions and come

24       report to us every week or every

FAC Resp. Exhibit D -- 197

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1       status conference, I did that.

2       And when Dawn wasn't there, I

3       filled in and I made those reports

4       for the Court.

5            MR. SEEGER:  Did you attend

6       most of the status conferences?

7            MR. WITKIN:  You know, I

8       did, I would say up until end of

9       2006, and as things sort of

10      tapered down and we looked like we

11      were heading in towards the

12      settlement, I stopped coming, I

13      stopped getting as many questions,

14      to be honest.  Part of what I had

15      to do, or I appreciated that I had

16      to do in order to facilitate the

17      cohesiveness in the state liaison

18      committee was to stay abreast of

19      what was going on.  In the early

20      stages, obviously that's when all

21      of the pretrial orders were coming

22      out that were setting out

23      procedures, and it was important

24      for me, I felt, to be at each

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1           status conference, to read every

2           pretrial order, to try to stay

3           abreast of all the things that

4           were going on.

5                MR. HERMAN:  Let me ask you

6           a couple of questions.

7                Ben Anderson, is Ben

8           Anderson a partner?

9                MR. WITKIN:  Yes.  I wanted

10          to address both Ben Anderson and

11          Ken Smith.  When Wegmann sent out

12          the form that they wanted us to

13          fill out, they said identify

14          people as associate, partner or

15          contract attorney.  I identified

16          both of them as of counsel, even

17          though that wasn't a category, and

18          I'll tell you why.  Both of them

19          were, I think, functionally -- I

20          don't think, they were employees

21          of our firm.  I paid all of their

22          wages.  They could do no work

23          without my blessing.  Now, titles

24          matter to some people, and Ken

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1      Smith and Ben --

2            MR. LEVIN:  Let me tell you,

3      the title "of counsel" is not

4      necessarily a matter for us.  That

5      was sent out so that we could get

6      hourly rates and try to blend them

7      in categories.  So, don't feel

8      that you have hurt them or helped

9      them or anything by listing them

10     as of counsel.

11           MR. WITKIN:  I just wanted

12     to explain it.

13           MR. LEVIN:  It is not really

14     an issue from my perspective,

15     because I initiated that, and that

16     was just to get hourly rates.

17           MR. WITKIN:  I guess the

18     point I want to make is that Ken

19     Smith and Ben Anderson were not

20     contract attorneys.  They were

21     employees of my firm.

22           MR. HERMAN:  What about

23     Paula Bruner?

24           MR. WITKIN:  Paula Bruner is

FAC Resp. Exhibit D -- 200

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          the same situation.  The only
 2          distinction between Paula Bruner
 3          and what I would call my other
 4          associates is that she lived in
 5          New Orleans.  I conditioned her
 6          becoming a full associate on
 7          moving to Pensacola, but she spent
 8          three years in my employment
 9          living in New Orleans.
10               MR. HERMAN:  I don't see any
11          hours for Neil Overholtz.
12               MR. WITKIN:  Well, then,
13          that is a bad oversight on our
14          part.
15               MR. HERMAN:  You need to
16          contact the CPA.  I need to tell
17          you that they don't have any
18          personal business with any Vioxx
19          lawyer or firm.  They are
20          independent.  The judge has
21          selected them.  You should call
22          them.  If you need a number or
23          something, call Lenny Davis in my
24          office.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1            MR. LEVIN:  I seldom

 2       contradict Russ, but Overholtz has

 3       93 hours.

 4            MR. HERMAN:  That's not what

 5       I see here.

 6            MR. WEITZ:  You said that

 7       you had conducted some

 8       depositions.  What was the name of

 9       the deponent?

10            MR. WITKIN:  It was

11       Overholtz in my firm that

12       conducted the depositions.  He did

13       the 30(b)(6) of the MIS guy with

14       Lenny at the outset, and there was

15       one other one, and honestly I

16       don't recall the name.

17            MR. RAFFERTY:  Did he first

18       chair those, Justin?

19            MR. WITKIN:  I'm not sure

20       whether he did or not with Lenny.

21       I honestly don't know.  I know

22       that he did all the prep, but I

23       don't know whether he first

24       chaired it.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          MR. RAFFERTY:  Can you just

2     expand for me the work in the

3     stroke trial package, like what

4     y'all did and that kind of stuff?

5          MR. WITKIN:  I think that

6     the primary task, and my personal

7     involvement is less, so I can't

8     give you as detailed an answer as

9     I might like to, but we reviewed

10     the documents that were initially

11     coded as the stroke documents, to

12     try to identify those that would

13     be trial package documents.  And

14     from there, I think at the

15     direction of Russ' office, I'm not

16     sure what next steps we took or

17     whether we went so far as to

18     create depo cuts or what.

19          MR. HERMAN:  I just want to

20     say that Arnold has got an update

21     of the hours, so, you don't have

22     to worry about that.

23          MR. SEEGER:  Justin, on the

24     State Federal Liaison Committee

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          that you guys were involved with,

2          did you have calls and things like

3          that to update each other?  If so,

4          how often and how long did they

5          last?

6                MR. WITKIN:  We did.  And,

7          again, just like my attendance at

8          status conferences, they started

9          out a little more fast and furious

10         and tapered off at the end.  I

11         would say -- well, we met prior to

12         each status conference initially.

13         I had a lot of contact with Dawn,

14         so, I was talking to Dawn two or

15         three times a month.  We probably

16         had a formal call at least once a

17         month.

18                MR. HERMAN:  Dawn was here

19         earlier, and she described that

20         you were within a consortium of

21         attorney firms.  Who is in that

22         consortium?

23                MR. WITKIN:  The attorneys

24         that -- if you are referring to

Page 19

1          the attorneys that we have a loose

2          joint venture with --

3                    MR. SEEGER:  In your group.

4                    MR. WITKIN:  In my group,

5          yes, and not the referral

6          attorneys?

7                    MR. HERMAN:  No.

8                    MR. WITKIN:  It is Dawn,

9          Arsenault, Lundy and Andrus.

10                    MR. HERMAN:  It's Vance?

11                    MR. WITKIN:  Yes.

12                    MR. LEVIN:  When you say it

13          is a joint venture, do your pool

14          your fees and then split them in

15          different cases or you just sort

16          of support each other?

17                    MR. WITKIN:  It is one of

18          these things where we probably

19          would have been well served to

20          have a lot more definition up

21          front.  The answer is no, sort of.

22          On the MDL side, there's no

23          pooling of fees at all.

24                    MR. LEVIN:  Okay.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1              MR. SEEGER:  Dawn told us, I

2         don't remember, but your group has

3         how many cases that are going into

4         the deal, the settlement?

5              MR. WITKIN:  There's 600

6         cases approximately.

7              MR. WEITZ:  Those cases were

8         filed in the MDL?

9              MR. WITKIN:  Majority.  We

10        have a few that were filed in New

11        Jersey, but the vast majority were

12        filed in the MDL.

13             MR. WEITZ:  Were there any

14        cases that you had worked up in

15        New Jersey or in the MDL for trial

16        that were your cases?

17             MR. WITKIN:  Individual

18        cases?  No.

19             MR. HERMAN:  Didn't someone

20        else from your firm second chair

21        Lenny in some FDA depositions, if

22        you recall?

23             MR. WITKIN:  I don't believe

24        so, no.

FAC Resp. Exhibit D -- 206

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1                MR. HERMAN:  In terms of the

2          consortium, what other cases has

3          the consortium been involved with

4          or is involved with from 2005 to

5          today?

6                MR. WITKIN:  We did Bextra/

7          Celebrex together, and we did

8          Guidant and Medtronic together.

9                MR. HERMAN:  How many

10         Bextra/Celebrex cases?

11               MR. WITKIN:  How many paid?

12               MR. HERMAN:  How many did

13         you have?

14               MR. WITKIN:  80.

15               MR. HERMAN:  Guidant?

16               MR. WITKIN:  How many

17         claimants do we have?  About 160.

18               MR. HERMAN:  And in

19         Medtronic?

20               MR. WITKIN:  110 maybe.

21               MR. HERMAN:  Have you

22         applied or are you applying for

23         common benefit in any of those?

24               MR. WITKIN:  Yes.  In

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          Guidant and Medtronic, we served

2          significant roles and we did.  In

3          Bextra/Celebrex, we will not be.

4          In Ortho Evra, no, we are not.

5               MR. HERMAN:  Is Richard

6          Arsenault on the PSC in Guidant,

7          do you know?

8               MR. WITKIN:  Yes.

9               MR. HERMAN:  And in

10         Medtronic?

11              MR. WITKIN:  He is.

12              MR. HERMAN:  This is Chris'

13         favorite question, but I'm going

14         to borrow it --

15              MR. SEEGER:  It used to be

16         mine.

17              MR. HERMAN:  -- because I

18         think it is a significant

19         question.

20              What do you consider, if you

21         had to name the most significant

22         contribution that your firm made

23         to the litigation to move it along

24         towards resolution, what would it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          be?

2                  MR. WITKIN:  You know, I

3          don't know that I would pick one

4          thing.  I went through five or six

5          things where, you know, you guys

6          tell me, what was the most

7          important thing in getting this

8          case to where it was.  I think

9          that we answered --

10                 MR. SEEGER:  Trying cases.

11         Oh, I thought you were asking me a

12         question.  You asked.

13                 MR. WITKIN:  Russ, I don't

14         know that out of the things that

15         we did I would say that one thing

16         clearly stood out as being

17         advancing the ball more than the

18         others, because to do that is to

19         suggest that you knew at the time

20         you were doing the things that you

21         were doing that it was going to be

22         the thing that would bring about

23         the outcome, and you didn't.

24                 MR. LEVIN:  I guess what you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          would say is you did everything

2          you were asked to do.

3               MR. WITKIN:  I did, and I

4          guess I would make this further

5          point.  I think there's a

6          distinction between work that you

7          do when you know what the outcome

8          is and work that you do when you

9          don't know what the outcome is.

10         If you go back and you look at the

11         examples I gave, I mean, the

12         stroke package for one, that

13         wasn't something that anybody else

14         really wanted to do.  Why?

15         Because nobody was feeling so

16         great about the stroke cases.  And

17         we did that work because there was

18         a request to do it.

19               MR. SEEGER:  I would just

20         correct that.  I mean, I know that

21         in our office we felt pretty high

22         on the stroke cases.  I think Dave

23         Buchanan would argue with you on

24         that.  But you are right, it was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1              little bit of an offering for a

2              while.

3                   MR. HERMAN:  Let me say to

4              you that I think that's an

5              important thing, because without a

6              stroke package, again, trial

7              package, you can't then justify

8              people opting out who are going to

9              say, well, you didn't give me

10             anything, and stroke is an

11             important part of the resolution

12             of this case.  I know this is a

13             particular theme of mine, but it

14             is pretty difficult for lawyers to

15             go through a process, elect to

16             come into a settlement, and then

17             complain that they had no option

18             when the option was they had a

19             stroke package to try the case and

20             not come in, so...

21                   MR. BIRCHFIELD:  Justin, I

22             think you summed it up.  Answering

23             the call, that's critical, and I

24             appreciate it.  Because there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          wasn't a single time that we

2          called on you for help in a

3          specific role that you didn't step

4          up, and that's appreciated.

5               MR. SEEGER:  Anybody else?

6               (No response.)

7               MR. SEEGER:  Thank you, sir.

8               MR. HERMAN:  Thank you.

9                    -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23        Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  BARRIOS, KINGSDORF & CASTEIX, LLP
Dawn M. Barrios, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 214

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                          - - -

2                  MR. HERMAN:  Everything is

3           recorded.  You are going to get a

4           copy of what everybody else has

5           had to say.  Judge Fallon said if

6           there's no fee agreement at the

7           end of day, he's going to have a

8           Special Master go through the

9           Murphy Oil process.

10                  MS. BARRIOS:  And as a

11          victim of the Murphy Oil process,

12          I will personally state that

13          nobody wants to do that.

14                  I want to thank y'all for

15          allowing me to meet with you

16          today.  I told Ed in the hall I

17          kind of feel like I'm coming to a

18          firing squad.

19                  MR. SEEGER:  A tired firing

20          squad.

21                  MS. BARRIOS:  Seriously,

22          I've been in your position before,

23          so I'm only going to do the

24          highlights for you guys.  I want

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1         to give you a couple of broad

2         strokes.  I want you to know how

3         small my law firm is.  We're only

4         three lawyers, two who do

5         litigation, and we've devoted a

6         substantial amount of time for a

7         three-man law firm to this

8         litigation, and we have been in

9         the beginning of this MDL.  I was

10        not in it before the recall, but I

11        really got involved, of course,

12        after it came to Louisiana.

13             All of my work stems from

14        three orders of the Court.  The

15        first was when the judge appointed

16        me to the state liaison committee,

17        and I took that job very seriously

18        because, as Russ and Arnold and

19        Chris know, I have that same job

20        in Propulsid, and I knew what the

21        judge wanted me to do.  I knew of

22        the coordination that needed to be

23        accomplished.  In order to

24        coordinate and move the case

FAC Resp. Exhibit D -- 216

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          forward, you have to communicate.

2          So, one of the first things that I

3          did was started up with the

4          newsletters.  I would send them to

5          Russ and Lenny to review, and I

6          started sending out all the

7          orders, all the information that

8          the MDL wanted to give to the

9          regular attorneys.  Because of

10         that communication, I got

11         innumerable calls asking me

12         questions.  Obviously the

13         experienced, the MDL litigators

14         didn't call me, but I had to deal

15         with Joe six pack who didn't

16         understand what an MDL was.  So, I

17         took a lot of those calls.

18              One of the first things that

19         I did, and I'm not too sure if

20         Russ was very happy with me that

21         day, but I stood up and I asked

22         Judge Fallon if the state liaison

23         committee could do a separate memo

24         on the sales reps, getting the

FAC Resp. Exhibit D -- 217

Page 5

1        sales reps notes from Merck,

2        because I felt that the state

3        attorneys really needed that,

4        particularly if they were going to

5        have diversity.  So, while I

6        didn't author the memo, I edited

7        it and sort of nursed it through.

8            I kept a gigantic database

9        of all the plaintiffs' lawyers.

10       Dave Buchanan would come to me and

11       ask me to send out information to

12       the people in the database.

13           I was asked by Fred Longer

14       to find the head class sales rep.

15       When class actions were filed and

16       there were no class reps, Fred

17       said, hit your database, go

18       through it, find me some class

19       reps.

20           Similarly, I was asked to

21       help find trials to occur in the

22       MDL and people to put their trial

23       cases up.  I helped Lisa

24       Dagostino, obviously she did it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1         all, but I helped get her medical

2         records and assist her, and went

3         to a lot of friends I knew who

4         were good litigators to see if

5         they would bring their cases into

6         the MDL.  One of those is Ed

7         Blizzard, and luckily his Mason

8         case was selected to be tried

9         here.

10            I don't know, Ed, if I

11        should take some kind of credit

12        for bringing you in or not.  It

13        sort of depends on what these guys

14        feel about you.

15            MR. HERMAN:  We feel a lot

16        better about you than we do about

17        him.

18            MS. BARRIOS:  Okay.  So,

19        please be on your best behavior

20        from here on out.

21            Ed asked me to be his local

22        trial counsel in Mason.  I helped

23        mostly with the jury selection and

24        reporting to the jury consultant

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          every day after the class and did

2          a memo.

3               Lenny Davis asked me to get

4          together a whole list of cases for

5          case-specific discovery when the

6          MDL was not moving as quickly as

7          everybody wanted.  There was a

8          motion, and I believe the motion

9          was filed for case-specific

10         discovery, and it was to be tee'd

11         up, and I helped Lenny locate some

12         cases to put for the discovery

13         track.

14              I met with Judge Fallon

15         privately, Judge Higbee, Judge

16         Wilson in coordinating with the

17         various menus.

18              When Merck selected a case

19         called Diaz to be tried here,

20         Jerry Meunier reached out to me,

21         because the local counsel for Diaz

22         was a female attorney, and she

23         felt more comfortable talking to

24         me.  I helped prepare the witness

FAC Resp. Exhibit D -- 220

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1       for deposition and was going to

2       prepare the doctors, but she

3       ultimately dismissed the case.

4            With Ted Mayer and Doug

5       Marvin, I coordinated deposition

6       dates and worked with the

7       different attorneys in the various

8       jurisdictions to iron out how much

9       they could participate versus the

10      MDL participate.

11           I think that I was a go-to

12      person outside the PSC to get

13      things done because of my

14      relationships and my database.  My

15      goal was just to get critical mass

16      so that the MDL would be

17      successful.

18           My second bit of work comes

19      from the order that Judge Fallon

20      entered in July of 2005 in which

21      he ordered the SLC to keep track

22      of all the remands that came into

23      the MDL.  I really didn't know

24      what he was talking about when he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          first ordered that we do it, but

2          as chair of the SLC, I undertook

3          to figure out how to do it and

4          what to do.

5               We have kept track of over

6          955 cases with remand orders, with

7          remand motions.  We had to locate

8          them.  Remand motions do not come

9          with a record when it is

10         transferred over to the MDL.  So,

11         we worked with the clerk's office

12         and transferred reports to get all

13         of that information, put it

14         together.  We have a massive

15         database with hyperlinks for the

16         judge for every one of the motions

17         and orders.  Then he asked that we

18         break it down by state, so, we

19         went and did an entire

20         investigation broken down by

21         states, and then I didn't want him

22         to ask me to break them down even

23         further, and then I would have to

24         do it again, so I decided to break

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          it down by issue.  Because he did

2          say from the bench that he was

3          going to rule on remand motions,

4          he would look at one of each

5          category, and then people were to

6          take it from there and figure out

7          what he would do with remands.

8          So, I started to classify them.

9          The reason for the remand was

10         diversity, was it federal

11         jurisdiction, was it a federal

12         question, et cetera.

13              As I was doing this, it

14         became clear the value of this

15         remand motion for me was the fact

16         that it kept the heat on Merck.

17         When I got to stand up and say

18         that we have 955 remands, they

19         knew that that was going to come

20         some time down the pike.

21         Obviously I had to deal with all

22         the counsel and answering their

23         questions about remands and why

24         isn't Judge Fallon ruling on my

Page 11

1          remand, when can I get out, can I

2          mandamus him to the Fifth Circuit.

3          That was ongoing.

4                    MR. SEEGER:  Can I ask a

5          quick question while you're

6          presenting?

7                    MS. BARRIOS:  Sure.

8                    MR. SEEGER:  On the state

9          liaison committee, could you

10         identify for us who your most

11         active and useful members were?

12                   MR. LEVIN:  Yeah, that would

13         be helpful.

14                   MS. BARRIOS:  Actually, the

15         person who always -- two people

16         always came to the status

17         conference.  Willie Singleton

18         and --

19                   MR. LEVIN:  Len Fodera.

20                   MS. BARRIOS:  -- Len Fodera

21         are generally the only two who

22         routinely appear.  In terms of

23         work, when Judge Fallon allowed us

24         to do a secondary memo to yours in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          support of the motion to get class

2          representation, I turned to the

3          Aylstock Witkin firm out of

4          Florida, because I knew that they

5          had done a similar memo in a

6          different case, so that we didn't

7          have to reinvent the wheel.

8              Then when we were asked to

9          do the case-specific discovery and

10         this other project called the

11         rapid remand motion that the PSC

12         filed in order to try to get some

13         remands done, and Lenny asked me

14         to pick the cases that I thought

15         people would actually try in the

16         MDL, I turned to Justin Witkin and

17         to Matt Lundy and asked them to

18         help me on telephone calls and

19         getting that information.

20             MR. SEEGER:  Did you have

21         monthly calls, weekly calls?  Did

22         you have regular calls?

23             MS. BARRIOS:  No.

24             MR. SEEGER:  So, you

FAC Resp. Exhibit D -- 225

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1        convened the committee when you

 2        had an issue?

 3             MS. BARRIOS:  Exactly.  When

 4        we had an issue.  I'm trying to

 5        think.  The newsletter, I would

 6        send out to Russ and to everybody

 7        on the state liaison committee

 8        asking for comments, but other

 9        than that, I didn't have any

10        routine calls.

11             MR. HERMAN:  State liaison

12        committee was essentially Dawn,

13        and she's correct that the two

14        people that showed up every time

15        were Singleton and Fodera.

16             Basically on the remand

17        issue, I know she answered a lot

18        of questions, because they would

19        come into our office and we would

20        refer them over to Dawn.

21             I have some questions, Dawn.

22             What are your costs in the

23        case?

24             MS. BARRIOS:  They were in
```

FAC Resp. Exhibit D -- 226

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          my affidavit, $17,477.95.

2                    MR. HERMAN:  Have you had

3          any problem with your costs in

4          terms of getting them verified by

5          the CPA or any of that business?

6                    MS. BARRIOS:  Sometimes they

7          would ask my bookkeeper questions,

8          and we answered them.

9                    MR. HERMAN:  Okay.  So, you

10         don't have a problem.  If you do

11         have a problem, be sure you call

12         them, because they'll be available

13         to you.

14                   MS. BARRIOS:  They have been

15         very responsive, so...

16                   MR. HERMAN:  The number of

17         cases you have?

18                   MS. BARRIOS:  I would say my

19         office has in an interest in about

20         500 cases.

21                   MR. HERMAN:  When you say

22         "an interest," are there other

23         folks who have an interest in the

24         same cases you have?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1           MS. BARRIOS:  Yes.

2           MR. HERMAN:  Who are they?

3           MS. BARRIOS:  Richard

4      Arsenault, Matt Lundy, Justin

5      Witkin and Vance Andrus.

6           MR. WEITZ:  Did you submit

7      those cases to the settlement?

8           MS. BARRIOS:  Yes.

9           MR. WEITZ:  Your firm?

10          MS. BARRIOS:  No.  Because

11     Richard Arsenault was the primary,

12     I forget, Andy, what you call

13     them --

14          MR. BIRCHFIELD:  Primary

15     counsel.

16          MS. BARRIOS:  So, they all

17     had Richard's name on them.  I

18     mean, I prepared cases to

19     submit --

20          MR. SEEGER:  But he's listed

21     as primary counsel?

22          MR. LEVIN:  So, it is 500

23     cases that the group has?

24          MS. BARRIOS:  Correct.

Page 16

1              MR. HERMAN:  In terms of --

2        this is really a question Chris

3        asks everybody.  What do you

4        consider the most important things

5        that you did to move the case to

6        fruition?

7              MS. BARRIOS:  That's hard to

8        say.  I would say the work on the

9        remand stuff, just keeping it

10       moving.  I created a double remand

11       database that got Kathy Snapka's

12       Garza case remanded, and she got

13       to try that case.

14             I now work with BrownGreer

15       on a weekly basis to find out what

16       remands will be moot by the

17       factors in the settlement.  So, I

18       take it very personally since this

19       was sort of my baby, this project,

20       so, I would have to say the remand

21       stuff is probably the most

22       important.

23             MR. HERMAN:  Now, you

24       mentioned Diaz.  Jerry Meunier and

Page 17

1        I agreed to split costs to try

2        that case.  Were you involved in

3        the expert search?

4              MS. BARRIOS:  No.  My only

5        involvement was really talking to

6        counsel, preparing Mr. Diaz for

7        his depo, and then I talked with

8        Jerry about splitting up the

9        treaters to prepare them for

10       depositions.

11             MR. BLIZZARD:  Dawn, I know

12       you kind of skimmed over your work

13       on Mason, maybe because it's

14       painful to talk about it

15       sometimes.

16             MS. BARRIOS:  You know, I

17       started thinking about that today,

18       and I just remember my feeling

19       when Mr. Mason said, oh, I don't

20       think I took Vioxx before my heart

21       attack.

22             MR. SEEGER:  Even the great

23       Ed Blizzard couldn't save that.

24             MR. BLIZZARD:  Dawn was good

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        at talking to Mr. Mason every day
 2        and handling him when we were busy
 3        doing other stuff.  Dawn was
 4        really good help for our team.
 5             MR. HERMAN:  Are you
 6        involved in any way in Guidant and
 7        Medtronic ?
 8             MS. BARRIOS:  No.  When I
 9        say "no," my partner, Bruce
10        Kingsdorf, did a couple of the
11        individual cases.  I went to the
12        Medtronic first MDL meeting, the
13        Guidant first MDL meeting, talked
14        about the state liaison stuff and
15        they weren't --
16             MR. LEVIN:  Nothing
17        happened.
18             MS. BARRIOS:  Yes, nothing
19        happened.
20             MR. HERMAN:  What about
21        Celebrex or Bextra?
22             MS. BARRIOS:  Did the same
23        thing with Elizabeth.  Went out
24        there a couple of times to do the
```

FAC Resp. Exhibit D -- 231

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          state stuff.  She told me I could

2          do it, and there was no court

3          order.

4               MR. HERMAN:  Elizabeth

5          Cabraser?

6               MS. BARRIOS:  Right, in

7          Bextra Celebrex.  There was no

8          court order appointing the state

9          liaison committee, and at that

10         time, we talked about maybe doing

11         some sort of joint newsletter to

12         the COX-2 people, and I just said

13         I can't do this.

14              MR. HERMAN:  I do want to

15         tell you I was never angry with

16         you about anything you did in the

17         case.  You are a competent lawyer.

18         You knew what you were doing.  You

19         raised an issue that had to be

20         raised, so --

21              MS. BARRIOS:  Thank you.

22              MR. HERMAN:  -- I never had

23         a problem with that.

24              In Guidant, Medtronic,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Celebrex or Bextra, are you

2          involved in any way with the same

3          group of lawyers, Richard, Lundy,

4          Witkin, Vance, any of those?

5              MS. BARRIOS:  Yes.

6              MR. HERMAN:  Tell me about

7          that.

8              MS. BARRIOS:  We have a

9          consortium, and we do these kind

10         of cases together.

11             MR. HERMAN:  In Guidant,

12         Celebrex, Medtronic and Bextra,

13         the group is involved in those

14         cases?

15             MS. BARRIOS:  Yes.  But I

16         didn't, I, personally, didn't.

17             MR. HERMAN:  I understand.

18             How many hours do you have

19         in this case?

20             MR. RAFFERTY:  2,085.

21             MS. BARRIOS:  I just

22         resubmitted.  We have a new

23         submission.

24             MR. LEVIN:  As of May 31st,

FAC Resp. Exhibit D -- 233

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          I had 1,920.

2                  MS. BARRIOS:  I didn't know

3          that you had a cutoff date.

4                  MR. LEVIN:  I have the

5          accountants' report as of May, and

6          it says 1,922, so, you've got

7          hours after that, they are just

8          not here yet?

9                  MS. BARRIOS:  Exactly.

10                  MR. HERMAN:  So, you have

11          got 1,922 plus whatever since May?

12                  MS. BARRIOS:  Yes.

13                  MR. HERMAN:  You have an

14          estimate on that?

15                  MS. BARRIOS:  I would say

16          maybe 200, 250.

17                  MR. RAFFERTY:  Dawn, what

18          about the other hours?  I think in

19          your affidavit you said about

20          1,300 of them were yours?

21                  MS. BARRIOS:  Yes.

22                  MR. RAFFERTY:  What about

23          the other hours?  What were those

24          primarily involving?

FAC Resp. Exhibit D -- 234

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1              MS. BARRIOS:  The way our

 2         law firm works is that I usually

 3         do the rainmaker type of stuff,

 4         and my partner, Bruce, backs me up

 5         with all the law.  So, every time

 6         we needed to do law stuff and deal

 7         with that, he handled it.  I have

 8         heavy paralegal hours because of

 9         the remand project.  I mean, I

10         couldn't go through 174

11         conditional transfer orders.

12              MR. LEVIN:  The 1,922 was

13         the total hours for your firm.  Of

14         that, yours was 1,119.  This,

15         again, is as of May.  Bruce had

16         157.  And after that, all of the

17         hours are law clerks and

18         paralegals?

19              MS. BARRIOS:  Correct,

20         correct.

21              Since you are asking about

22         the volume of hours, after

23         Katrina, there was some time that

24         I lost without being able to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          report it, but I would hope y'all

2          would take that into

3          consideration.

4                    MR. HERMAN:  But I know you

5          were active, because when the case

6          moved to Houston, you were still

7          active in the case.

8                    MS. BARRIOS:  Right.

9                    Can I just continue or do

10         you have any more questions?

11                   MR. HERMAN:  No, no.  Go

12         ahead.

13                   MS. BARRIOS:  Just the last

14         bit of information, and this is

15         really a question, formed the

16         basis of a question that I have is

17         the third order that Judge Fallon

18         handed down in July of this year

19         regarding the Attorney General

20         cases.  I mean, I've been working

21         with Chris on that a lot, with

22         Lenny on that.  Does that get

23         compensated in this group?

24                   MR. SEEGER:  Good question.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1                    MR. HERMAN:  Well, at this

2          point, we have --

3                    MS. BARRIOS:  I don't need

4          an answer --

5                    MR. HERMAN:  No.  It is a

6          fair question.  Up to now, the

7          only hours we've been concerned

8          with are common benefit hours.

9                    MR. SEEGER:  That led to the

10         settlement, the PI stuff.

11                   MR. HERMAN:  Yes, that led

12         to the settlement in this case,

13         which would be New Jersey, Texas,

14         California and the MDL.  The AGs,

15         we have been trying to -- they

16         have indicated that they would

17         like MDL work product, but there

18         has not been an agreement reached

19         yet.

20                   MS. BARRIOS:  I'm working on

21         it.

22                   MR. BLIZZARD:  We haven't

23         discussed it.  Just from my

24         personal standpoint, I would just

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          suggest that you submit your

2          hours.  To the extent the hours

3          are necessary, by virtue of your

4          role in the MDL, I mean, I guess

5          we'll just consider them.

6                MR. SEEGER:  I think that's

7          good.

8                MR. HERMAN:  There's a

9          problem, okay, particularly in

10         Louisiana, and we have Louisiana

11         AG counsel.  Louisiana has special

12         rules as to who can do what.

13         Assume that some arrangement is

14         made with the AGs for MDL work

15         product, then any work that you've

16         done causing that to happen is

17         certainly going to be counted.  I

18         don't want to get into -- I don't

19         want you to get into a problem or

20         us to get into a problem saying

21         that we're doing work for the AGs.

22               MS. BARRIOS:  I understand.

23         I just wanted to raise the issue,

24         because --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1              MR. HERMAN:  It is a good

2         issue, and hopefully there will be

3         some arrangement with the AGs to

4         get MDL work product, and you need

5         to keep your hours.

6              MR. SEEGER:  Yes, you are

7         reporting your hours anyway?

8              MS. BARRIOS:  I am, I am.

9         But I just know that that is at

10        least an issue for me, and we've

11        been working along that goal and

12        stay lifted and --

13             MR. HERMAN:  Well, you have

14        been instrumental in that, you

15        have been instrumental in, I don't

16        want to use the word agitating,

17        but being tenacious on the AG

18        issue.  If we come to hopefully

19        some good result, you certainly

20        have a strong part in that, and I

21        think we recognize that.  I really

22        don't want to go into the

23        Louisiana issue.

24             MS. BARRIOS:  That's fine.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1                MR. SEEGER:  Anybody have

2        anything else?

3                (No response.)

4                MR. SEEGER:  Thank you so

5        much.

6                      -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147
23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -

FIRM:   BROWN & CROUPPEN
        Seth Webb, Esquire

        THE DRISCOLL FIRM, P.C.
        John Driscoll, Esquire
ON BEHALF OF BROWN & CROUPPEN:
        GOFFSTEIN, RASKAS, POMERANTZ,
        KRAUS & SHERMAN, L.L.C.
        Edward L. Adelman, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 242

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -
 2              MR. SEEGER:  This is part of
 3         the majority of the fee committee
 4         that's been appointed by Judge
 5         Fallon in the Vioxx litigation.
 6         We've been charged with the task
 7         of really kind of going through
 8         what everybody did and at some
 9         point, I guess, talk to the judge
10         about where people are.
11              He wants a record of
12         everything that goes on, so, we
13         have a court reporter here so
14         everything is taken down.  You can
15         make any presentation you want.
16         You have 30 minutes.
17              MR. DRISCOLL:  At the
18         outset --
19              MR. ADELMAN:  Before Mr.
20         Driscoll speaks, I know I sent
21         correspondence to the committee,
22         to Mr. Herman's office.  My name
23         is Edward Adelman, and I represent
24         Brown & Crouppen, the law firm
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        that prosecuted the Schwaller

2        case, which is before the

3        committee today.  It is our

4        position that Mr. Driscoll, who is

5        a former associate of Brown &

6        Crouppen, should not be making a

7        presentation to this committee.

8        He was an employee of Brown &

9        Crouppen at that time and an

10       associate.  All the work and

11       effort he did was on behalf of the

12       law firm.  Any dispute he might

13       have with Brown & Crouppen

14       regarding any fee he might be

15       entitled to as a result of any

16       common benefit allocation that's

17       given to Brown & Crouppen should

18       remain in-house, and we

19       respectfully ask the committee

20       that Mr. Driscoll not be allowed

21       to make a statement.  He was

22       involved in the Vioxx matter, and

23       his contributions were much

24       appreciated, but since he's no

Page 4

```
 1        longer employed at Brown &
 2        Crouppen, I don't believe it is
 3        proper for the committee to hear
 4        it.
 5            MR. SEEGER:  Why don't we
 6        make the record, and you guys have
 7        plenty of time to fight this out.
 8        The checks are not going out the
 9        door.
10            MR. LEVIN:  From my
11        perspective, we're going to hear
12        everybody that has something to
13        say.  If there's a partnership
14        dissolution, that's not within our
15        jurisdiction.  I'm not even sure
16        that's within Judge Fallon's
17        jurisdiction.  That you will
18        attend to on your own, as all of
19        us have attended to, that have
20        been fortunate or unfortunate
21        enough to be involved with
22        dissolved partnerships.
23            MR. SEEGER:  Seth, just so
24        I'm clear with the players.  I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          have you.  You're representing the

2          firm, correct?

3                  MR. WEBB:  I work for Brown

4          & Crouppen and I'm here.

5                  MR. SEEGER:  I just want to

6          know who is going to address us on

7          this issue.

8                  MR. WEBB:  Sure.  With

9          regard to the work on the

10         Schwaller matter --

11                 MR. LEVIN:  What we're

12         interested in is the work.  We're

13         not interested in how you

14         developed your --

15                 MR. SEEGER:  Exactly right.

16         Your information is helpful to us

17         no matter what --

18                 MR. ADELMAN:  I'm saying

19         that any statement from Mr.

20         Driscoll does not represent

21         anything of the law firm since

22         he's a former employee.

23                 MR. BLIZZARD:  Let me see if

24         I understand it.  Has Brown &

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        Crouppen made the application or

2        is it Mr. Driscoll that has made

3        the application?

4                MR. ADELMAN:  Brown &

5        Crouppen.  Mr. Driscoll was an

6        employee of Brown & Crouppen at

7        the time.

8                MR. BLIZZARD:  So, is Brown

9        & Crouppen saying that as the

10       applicant for common benefit fees

11       that they do not want a

12       presentation made today?

13               MR. ADELMAN:  No.  Mr. Webb

14       is going to make the presentation.

15               MR. SEEGER:  That wasn't

16       clear.  You are saying you do have

17       somebody from Brown & Crouppen to

18       make this presentation?

19               MR. ADELMAN:  Correct.

20       That's Mr. Webb.

21               MR. DRISCOLL:  Any time Mr.

22       Adelman is finished, I'll chime

23       in.

24               MR. SEEGER:  Go ahead, John.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1              MR. DRISCOLL:  My name is

2        John Driscoll.  I'm now with the

3        recently formed Driscoll Firm PC,

4        an Illinois law firm --

5              MR. SEEGER:  John, can I

6        just say one thing.

7              Just so you understand, I

8        don't think there's anybody being

9        prejudiced by allowing anybody to

10       speak.  We had a group yesterday

11       of about 15 people make

12       presentations for one group.  So,

13       this is really just information

14       gathering for us.  I think we

15       would like to hear Mr.  Driscoll

16       out, but you've got your comments

17       on the record.

18             MR. DRISCOLL:  Thank you for

19       that.

20             I was an associate of Brown

21       & Crouppen at the time that this

22       case was prosecuted.  Of course,

23       we're talking about the Schwaller

24       case.  It is the Illinois case

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          that was tried in Madison County

 2          State Court.  I, along with a

 3          number of other very fine lawyers,

 4          prosecuted this case.  I think by

 5          my last count, seven law firms

 6          were involved.  I believe other

 7          lawyers who were involved in that

 8          case have made presentations

 9          already.  The so-called Vioxx

10          Litigation Consortium was involved

11          in that case, Grant Kaiser, Mikal

12          Watts and others.  I'm

13          forgetting --

14                MR. WEITZ:  John, let me

15          say, the Schwaller case was a

16          Brown & Crouppen case?

17                MR. DRISCOLL:  Well, that's

18          not actually accurate, and quite

19          technically, and I'm sure we'll

20          fight this out in state court.  As

21          you see, breaking up is hard to

22          do.

23                MR. LEVIN:  Sometimes it is

24          very enjoyable.
```

FAC Resp. Exhibit D -- 249

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1            MR. DRISCOLL:  This case,

2        this client was actually referred

3        to me.  This is my case.  I

4        brought it in to Brown & Crouppen.

5        Brown & Crouppen has internally

6        what they call an associate's

7        agreement where you share in the

8        fees for any case that you

9        generate.  This is just one of

10       those cases.  In fact, there's

11       documents, some of which I have

12       with me today, and those that the

13       client signed off on.

14            MR. LEVIN:  We're not

15       interested in who represents the

16       client.  We're just interested

17       collectively in the work that was

18       done by you at the firm, other

19       members of the firm, you outside

20       of the firm, just that.

21            MR. DRISCOLL:  You've got

22       it.

23            MR. WEITZ:  I didn't know

24       who filed the Schwaller case, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1           that's what I was trying to find

2           out.

3                 MR. SEEGER:  Brown &

4           Crouppen is on the complaint.

5                 MR. DRISCOLL:  That's right.

6           I filed it while an associate at

7           Brown & Crouppen.  It was filed in

8           Madison County, Illinois.  It was

9           removed improperly and remanded.

10          In fact, Judge Murphy at the time,

11          our chief federal judge,

12          sanctioned Merck for the

13          improvident removal.

14          Unfortunately, those sanctions

15          were withdrawn in light of a

16          United States Supreme Court case

17          on 1447(C).  So, we didn't get our

18          money from Merck there.  The case

19          was remanded and tried for six

20          weeks.

21                MR. SEEGER:  Talk to us now

22          about what you specifically did

23          and your contribution on that

24          case, and then I'm going to allow

FAC Resp. Exhibit D -- 251

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Seth to speak for Brown &

2          Crouppen.

3              MR. DRISCOLL:  Absolutely.

4          Well, while I was an associate at

5          Brown & Crouppen, I was really the

6          singular attorney involved in the

7          case until a jury was actually

8          seated.  I did everything from

9          draft the complaint, filed the

10         complaint.  I was the singular

11         attorney involved in the

12         removal/remand process.  In fact,

13         I submitted my -- as I mentioned,

14         Judge Murphy granted sanctions

15         against Merck.  In that process, I

16         was required to submit the hours

17         and the work involved at least to

18         that point in the case so that

19         Judge Murphy could properly

20         calculate the sanctions involved.

21             I did everything from engage

22         in motion practice, drafted every

23         motion, every response.  I went to

24         nearly every deposition in the

FAC Resp. Exhibit D -- 252

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

    1        case of every expert.  As I
    2        said --
    3            MR. SEEGER:  Did you take
    4        first or second chair in any of
    5        these depositions?
    6            MR. DRISCOLL:  First chair.
    7        Nathan Rubin, he's a cardiologist
    8        from here in Beverly Hills.  We
    9        didn't end up using him at trial.
   10        He's a cardiologist.  Second
   11        chaired a lot of other depos.  I'm
   12        sorry.  I'm not completely
   13        prepared on each witness blow by
   14        blow right now.
   15            MR. WEITZ:  Is it in your
   16        affidavit?
   17            MR. DRISCOLL:  It is.
   18            MR. SEEGER:  What did you do
   19        with the trial team?  That was
   20        Mike Watts and Andy, right, Andy
   21        Birchfield?
   22            MR. DRISCOLL:  Yes.  I sat
   23        with them.  I did the plaintiff
   24        himself.  It was actually the

Page 13

1          widower of the decedent.

2                    MR. SEEGER:  You put him on

3          at trial?

4                    MR. DRISCOLL:  I put him on.

5                    MR. WEITZ:  Was the trial

6          while you were still an associate

7          Brown & Crouppen?

8                    MR. DRISCOLL:  Correct.

9                    MR. SEEGER:  Is it okay if

10         we hear from Seth?

11                   MR. DRISCOLL:  Absolutely.

12                   MR. SEEGER:  The floor is

13         yours.

14                   MR. WEBB:  Well, obviously,

15         not to get into the other

16         argument, but everything that John

17         just discussed I consider to be

18         what Brown & Crouppen did in this

19         case because that's what we did.

20         I also sat second chair at several

21         expert depositions, several sales

22         rep depositions, prepped

23         plaintiffs for multiple

24         depositions.  We did pretty much

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1       all the local work on this case

2       because it was in our backyard.

3               MR. WEITZ:  Can you state

4       your name again for the record?

5               MR. WEBB:  Seth Webb.

6               MR. BLIZZARD:  You said

7       plaintiffs.  Were there multiple

8       plaintiffs?

9               MR. WEBB:  Children,

10      decedent.

11              MR. LEVIN:  Collectively,

12      you have reported 780 hours, and

13      at one point they were rejected.

14      Now they are being reviewed by the

15      accountant.  Have you had dealings

16      with the accounting firm?

17              MR. WEBB:  Were they

18      rejected because of the format?

19              MR. LEVIN:  They may have

20      been.

21              MR. GIRARDI:  We don't know.

22              MR. WEBB:  Because we

23      submitted them originally not

24      monthly, and then we submitted

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

Page 15

1           them monthly.

2                MR. LEVIN:  That's right.

3           Now they are under review, so you

4           should know that.

5                MR. WEBB:  Okay.  As long as

6           they are being reviewed.

7                MR. SEEGER:  Of the 780

8           hours, do you guys know how it

9           breaks down, individual attorneys?

10                MR. DRISCOLL:  Off the top

11          of my head, I don't, but a lot of

12          that is paralegal time, and as

13          Seth mentioned, Seth performed

14          some work on the case as well as

15          I.  There's two lawyers.

16                MR. WEBB:  I have it broken

17          down between attorney and

18          paralegal.

19                MR. LEVIN:  I take it you

20          guys are not going to lunch today?

21                MR. DRISCOLL:  We had dinner

22          last night though.

23                MR. WEBB:  The attorney time

24          is 694 hours and one half,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

 1          actually.  And the paralegal time

 2          is 86 hours and a quarter.

 3                  MR. SEEGER:  Okay.

 4                  MR. WEBB:  I don't have it

 5          broken down by attorney either.

 6                  MR. SEEGER:  We're not here

 7          to resolve any issues between you

 8          guys.

 9                  MR. WEBB:  Obviously.

10                  MR. LEVIN: Although we

11          collectively have a lot of

12          experience.

13                  MR. SEEGER:  I don't have

14          any questions.

15                  MR. WEITZ:  I just have a

16          couple more questions.

17                  How many cases did Brown &

18          Crouppen file?

19                  MR. WEBB:  Approximately

20          450.

21                  MR. WEITZ:  Where did you

22          file those, all Madison County?

23                  MR. WEBB:  No.  Some were in

24          St. Louis City, some in Madison

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          County, some in St. Clair County.

2                    MR. SEEGER:  All in state

3          court or both?

4                    MR. WEBB:  I believe that

5          they were all filed in state

6          court.  Now, the majority of them

7          got removed --

8                    MR. WEITZ:  Did you have any

9          other cases in any of those

10         jurisdictions that were assigned

11         for trial?

12                   MR. WEBB:  I don't believe

13         so.  Not Vioxx cases.  I think

14         this was the only Vioxx case that

15         actually got assigned for trial in

16         maybe the Midwest, definitely

17         Madison County.

18                   MR. SEEGER:  As far as I

19         know.

20                   MR. WEITZ:  Did you have any

21         cases in any of those

22         jurisdictions that were being

23         worked up for trial and prepped

24         for trial by the judge on a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        specific docket in a specific

 2        group?

 3             MR. SEEGER:  Were you set

 4        for trial?  Did you have any trial

 5        settings anywhere else?

 6             MR. WEBB:  No.

 7             MR. SEEGER:  Thank you, and

 8        hope everything works out okay.

 9                  -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:  BURG SIMPSON ELDREDGE
       HERSH & JARDINE, PC
       Michael S. Burg, Esquire
       John M. Restaino, Jr., Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 261

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. SEEGER: We've been going
 3         around the country and having
 4         meetings giving everyone the
 5         opportunity not only to file an
 6         affidavit, but to make any
 7         statements they want about their
 8         common benefit contributions.  You
 9         should focus on common benefit,
10         obviously.
11              Everything that we discuss
12         is being taken down so there's a
13         record if Judge Fallon ever wants
14         to take a look at it, he will hear
15         what people have to say.
16              With that, there are no
17         other rules.  The floor is yours.
18              MR. BURG:  Let me just say,
19         we appreciate this.  Having been
20         involved in doing this for a long
21         time, to have this procedure where
22         we can actually come in and talk
23         to you, we really appreciate the
24         opportunity to be here.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           With that, John, why don't

2      you go ahead and start with the

3      PowerPoint.

4           MR. RESTAINO:  Sure.  First,

5      thank you for this opportunity.  I

6      think those of you that have

7      worked with me at least in the

8      last 16 years know that it is not

9      my nature to come and ask for

10     anything.  I usually show up and

11     try to give --

12          MR. LEVIN:  Change your ways

13     today.

14          MR. RESTAINO:  Today I have

15     to change my ways, correct.  I

16     think that I've been called humble

17     to a fault.  I have got to change

18     that way today also.

19          So, with that in mind, this

20     is a little awkward, in that I

21     need to come back here at noon as

22     a representative of the now

23     defunct Lopez Hodes Restaino

24     Milman & Skikos.

Page 4

1           MR. SEEGER:  May I interrupt

2       you?  I don't want to put you in a

3       bad position, Mike, because I know

4       there's two firms, but does it

5       make sense for you to do in the

6       next 30 minutes both so you don't

7       have to come back?  Because we're

8       focusing on your contribution.

9           MR. BURG:  The only problem

10      is, Steve Skikos is not here, and

11      he's flying in this morning.

12      Otherwise, it would have made

13      sense.

14          MR. SEEGER:  Sorry, John.

15          MR. RESTAINO:  It would

16      have.

17           As an introduction in that

18      regard, I was a named partner of

19      Lopez Hodes.  I do have to talk a

20      little bit about that for those of

21      you who may not be still familiar.

22      In January of '05 when we went to

23      New York City for the introductory

24      meeting that Chris and Dave and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1           others held and talked about the

2           Vioxx litigation, at that time

3           Chris and Dave Buchanan talked to

4           me about co-chairing the science

5           committee.  I have co-chaired the

6           science committee going back to

7           fen-phen, Propulsid, Rezulin,

8           Zyprexa, PPA, initially Ortho

9           Evra, co-chairing it now for NSF.

10          As a result of my medical

11          background, it is just a natural

12          role for me.  So I was asked if I

13          would work with a lady who I had

14          not met prior to that by the name

15          of Carlene Lewis.  I was told she

16          would be my co-chair, and shortly

17          thereafter, especially everyone

18          who has had a chance to know or

19          knew Carlene, you couldn't help

20          but fall in love with Carlene.

21          I'm assuming that there's

22          something being filed on her

23          behalf by somebody.

24                MR. SEEGER:  Her partner,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          Shelly, gave us a presentation.

2               MR. RESTAINO:  I just want

3          to let you know, I don't think I

4          have ever worked with a more

5          quality lawyer, smart, hard

6          working, than Carlene, and then,

7          quite honestly, Shelly.

8          Tremendous people.

9               She and I co-chaired it, and

10         then Shelly and I co-chaired it,

11         and I facetiously say, and today

12         is not the day for me to say this,

13         but I usually facetiously say that

14         the chair of the science committee

15         really doesn't do anything more

16         than shave his legs and set up the

17         conference calls.

18              Well, in reality, we do,

19         because especially with the

20         generic experts and with my

21         background with experts, I can't

22         do it all.  I just don't have the

23         time to work up an epidemiologist,

24         although I have a degree in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          epidemiology from Johns Hopkins, I

2          cannot work with the

3          pharmacoepidemiologist, the

4          radiologist.  So, part of my role

5          and Shelly's role and Carlene's

6          role was to triage, so to speak.

7               So, when I was asked and I

8          brought Jerry Avorn into the

9          litigation, I turned to Chris

10         Tisi, who worked with him in the

11         past, and said, Chris, I don't

12         have the time, you have worked

13         with Jerry, you are comfortable

14         with this.  And that's part of it.

15         Oversee it a little bit.  But

16         people like that, and I'm going to

17         give the accolades where

18         appropriate because, again, in my

19         role as the other co-chair of

20         science, I did get to see who did

21         some really quality work and who

22         did a lot of less than quality

23         work.

24               My work continued, to bring

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1           you up into Burg Simpson, 2005,

2           2006, but through 2007, I

3           continued.  I became a part of the

4           stroke subcommittee.  I had the

5           pleasure of working with a

6           goddess, Lisa Dagostino, quality

7           work, no wasted time, continued to

8           work with them and continued to

9           work with some of the key experts.

10                Throughout 2007, we

11          continued on the extensive medical

12          library that worked, reviewing the

13          articles.  Typically, truth be

14          told, because of my then student

15          role at Johns Hopkins, I had free

16          access to the Welch library.

17          During that time, I was able to

18          procure over $15,000 worth of

19          medical articles for free.  I was

20          able to do that until I graduated

21          this past May.  I may go back and

22          get my Ph.D. just to get access to

23          the library.  But I would take a

24          look at the article, review it and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          see, who is this germane for.

2          It's another epi article.

3              Don Arbitblit, fantastic job

4          with Dr. John Farquhar, would send

5          me the reports and send me things

6          going on, and I would review it

7          and say, Don, you are doing a

8          great job, keep going.  That was

9          part of what I had to do.

10             2007, I flew to New York

11         City for the stroke subcommittees.

12         I flew to Philadelphia in October

13         2007.  So, I continued to work on

14         this litigation actively

15         throughout the year.  One of the

16         things, and, again, you are going

17         to see this earlier, that we did

18         early was, there were, and maybe I

19         think on the next series of

20         PowerPoints, there were like 74

21         members initially of the science

22         committee.  Everybody wanted on

23         the science committee.

24             So, one of the things that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1      Carlene and then Shelly and I, one

2      of the things we had to do, we set

3      up subcommittees to try to control

4      all of these individuals.

5      Everybody did want to do the work,

6      but there's only so much real work

7      to be done, and you are not going

8      to send out a medical record or an

9      expert and have ten attorneys

10     reviewing it.  So, we set up

11     subcommittees such as benefits,

12     indications, labeling,

13     international issues, as chaired

14     by Roberta Walburn, Shelly Sanford

15     and Leila Watson.  They are the

16     other members.  We would do this

17     and have subcommittee phone calls

18     by the chairs to somehow keep

19     managed on this 70 plus science

20     committee.

21          MR. SEEGER:  How often would

22     you do those calls, John?

23          MR. RESTAINO:  Well, we had

24     a weekly call.  The way we worked

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        it was, it became so unmanageable

2        that we did it biweekly with the

3        whole science committee, but then

4        biweekly also, so there was a call

5        every Friday with the chairs of

6        the different committees.  Let

7        them have conference calls as

8        needed during the week with their

9        people.  If something new was to

10       report, then on the Friday

11       subcommittee chair calls, they

12       would report to the executive

13       committee, who -- there's a slide

14       for it later, but I think the

15       executive committee was Carlene

16       and myself and a few other people,

17       and I'm blanking on that right now

18       without the benefit of the slide.

19            Here's one, mechanism of

20       action, pharmacology defense

21       issues.  This was chaired by Paul

22       Sizemore, Mark Hoffman and Max

23       Yefimenko.  I don't think I have

24       to introduce any of these

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1          individuals to you.  Max I may
 2          have to.  Max is a
 3          pharmacologist/attorney in our
 4          firm, did a fabulous, fabulous job
 5          early on in the pharmacology,
 6          looking at the pharmacology
 7          experts and spent countless time
 8          in the depository reviewing those
 9          studies, especially those germane
10          to pharmacology.
11               MR. BLIZZARD:  John, I'm a
12          little lost.  What firm --
13               MR. BURG:  He's with Burg
14          Simpson, and he was with Burg
15          Simpson from the beginning of the
16          time before John came over.
17               MR. BLIZZARD:  It would help
18          me to understand when you left and
19          went to Burg Simpson so that we
20          have a time frame for this
21          presentation.  Because we're going
22          to hear from you when you were at
23          Lopez Hodes later, it would help
24          me to know when the split
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1         occurred.

2              MR. RESTAINO:  Sure.  I was

3         with Lopez Hodes officially until

4         December 31st, 2006, and January

5         1st of 2007, I became a partner,

6         shareholder with Burg Simpson.

7              MR. BLIZZARD:  So, with

8         respect to your work, we're

9         talking about from January of 2007

10        to the present in this

11        presentation?

12             MR. RESTAINO:  In this

13        presentation.  Again, I apologize.

14        I have to give a little background

15        just so that --

16             MR. BURG:  We broke down the

17        hours.  At the end, we'll give you

18        the amount of hours that were

19        worked from our time.

20             MR. WEITZ:  Let me just tell

21        you.  Burg's hours submitted so

22        far are 1,177 to the accountants.

23        Lopez hours submitted are 5,104 to

24        date.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1              MR. BURG:  We have the

2         hours, Perry, and I don't know if

3         that matches up.  I think we may

4         have --

5              MR. WEITZ:  This is why I

6         tell you.  These hours have to be

7         approved and accepted by the

8         accountants, third-party

9         accountants, and the expenses have

10        to.  Also, without them getting

11        and approving them, it is

12        meaningless what you have.

13             MR. BURG:  I understand.

14        But we tried to confirm, and I can

15        look, and at the end, we'll see if

16        they add up.

17             MR. LEVIN:  Let me help you.

18        With Burg Simpson, you submitted

19        1,177 hours.  318 and a quarter

20        have been accepted.  858.60 have

21        been rejected.  So, you are to

22        call Leonard Davis at Russ' office

23        and get him to get you in touch

24        with the accountant so that you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          could at least talk to him and

2          straighten that out.

3              You submitted $12,986.84 in

4          costs, of which $7,163.66 are

5          accepted, and $5,823.18 have been

6          rejected.

7              MR. BURG:  On the costs, our

8          numbers show, and we have the

9          submissions, that we submitted

10         $22,000, $22,439.68.  So, I'm

11         going to have to call and find out

12         why there's a discrepancy, because

13         I've got the submissions.

14             MR. LEVIN:  Time is of the

15         essence.

16             MR. BURG:  On the hours, I

17         don't know, I think we have more

18         than 1,100 hours.  Do you remember

19         the total?

20             MR. RESTAINO:  I thought it

21         was around 11.  I thought so.

22             MR. BURG:  Maybe it was.

23             MR. RESTAINO:  So, between

24         2005 and 2007, one of the key

FAC Resp. Exhibit D -- 275

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        aspects of the science committee,

 2        of course, as with the PSC, is the

 3        development of the generic

 4        experts.  These are the experts

 5        that we were involved in.  Those

 6        that are in yellow are experts

 7        that I either personally brought

 8        to the table or had a significant

 9        role in developing.  The first

10        one, Dr. Cecil Pace-Asciak, was a

11        background

12        consultant/pharmacologist who did

13        a lot of work with the Cox-2s out

14        of Toronto.  He was actually found

15        and developed by Max Yefimenko in

16        our office.

17             Egil Fosslien, who is the

18        cardiopathologist from Chicago

19        that I brought to the table, you

20        will hear more about him.

21             Les Cleland and Michael

22        James, Michael James was used by

23        Mark Robinson, and Les Cleland had

24        his preservation testimony taken.
```

FAC Resp. Exhibit D -- 276

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          I found and developed all of

2          those.

3               We used Preston Mason, who

4          was a background pharmacologist

5          from Harvard.

6               Dr. Colin Bloor,

7          cardiopathologist, actually

8          testified in the Irvin I trial.

9               Dr. Jerry Avorn is a

10         pharmacoepidemiologist from

11         Harvard.  I brought him in.

12              Dr. Mamdani, who is now at

13         Pfizer, is an epidemiologist.

14              Douglas Zipes, I didn't

15         develop.  Steve Skikos was more

16         involved with him, but I helped

17         with his Rule 26 report, reviewing

18         it for purposes of Daubert.

19              MR. BLIZZARD:  John, what

20         work was done for those witnesses

21         after January of 2007?

22              MR. RESTAINO:  Dr. Egil

23         Fosslien, he's the

24         cardiopathologist.  So, he was

FAC Resp. Exhibit D -- 277

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          asked to start talking about the

2          cardiovascular effects, especially

3          cerebral stroke by the stroke

4          committee.  And as you will see in

5          a moment, we spent a lot of time

6          in 2006 and 2007 developing

7          animation, which was then going

8          into the stroke, and you will see

9          what was done with him.  He was

10         actually at times present with the

11         animators, making sure they were

12         anatomically physiologically

13         correct.  So, he continued through

14         2007.

15              Les Cleland had his

16         preservation -- discovery

17         deposition taken in '06, but his

18         preservation testimony, he flew in

19         from Australia, and I came here in

20         '07 and took his preservation

21         testimony.

22              I think that's it.

23              Again, Fosslien was a

24         professor of pathology.  The

Page 19

1       reason we found him is because he

2       authored these key articles,

3       including the review article on

4       it.  We began with him in 2005,

5       assisted his report in 2006, met

6       with him in 2007, and he wrote his

7       supplementary report in

8       preparation for his preservation

9       testimony.  He met secretly, so to

10      speak, with Garret FitzGerald's

11      laboratory.  He spent four days in

12      New Orleans preparing for trial in

13      Barnett.

14           Cleland and James, as I

15      mentioned, were from Australia,

16      and James was used and wrote a

17      rebuttal report to one of the

18      defense biochemistry reports for

19      Mark Robinson.  Cleland did have

20      his preservation testimony done,

21      including writing a Rule 26

22      report.  The reason that we were

23      of interest with Cleland is in

24      1999 in the principal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          investigator's brochure, he was

2          sent by Merck, he was warned to

3          observe for increased

4          cardiovascular events with Vioxx.

5               I'm not going to go through

6          a whole lot of this, but I

7          defended his depo in '06 and I

8          continued in May '07, did his

9          preservation testimony.  Same

10         thing with James.  As I mentioned,

11         he did research in this area, and

12         he was named as an expert rebuttal

13         witness in the Barnett case by

14         Mark --

15               MR. BLIZZARD:  That's 2006,

16         though, right?

17               MR. RESTAINO:  That's 2006.

18         A lot of this is just background.

19         If you get the background, I can

20         skip over the earlier.

21               MR. WEITZ:  It's difficult

22         for us, and what we need to

23         clarify, John, is that Burg, now

24         Mike has told us, is submitting

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          22,000 hours.

2                    MR. BURG:  No.  I think it

3          is around 1,100.  $22,000 in

4          costs.

5                    MR. WEITZ:  Because I was

6          saying if you moved over to them

7          in '07, that's a lot of hours.

8                    MR. RESTAINO:  No, my total

9          hours that I think were submitted

10          on my behalf, it was a little over

11          500 for the entire year of '07.

12                    MR. WEITZ:  Lopez has

13          submitted over 5000 hours -- I'm

14          sorry, 5,104, and that's primarily

15          the work you are talking about?

16                    MR. RESTAINO:  A good

17          portion of this, yes.

18                    MR. BURG:  And with Max

19          Yefimenko in terms of this expert,

20          he was involved in developing this

21          expert, found this expert when he

22          was with our firm.

23                    MR. SEEGER:  That was before

24          John?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              MR. BURG:  Before John came

2        over.

3              MR. BLIZZARD:  I guess since

4        we're creating a record, it's

5        important from our perspective to

6        make sure we understand when you

7        are switching over from background

8        information to actual work that

9        was done by either Burg Simpson

10       employees or by you when you were

11       at Burg Simpson.

12             MR. RESTAINO:  Fair enough.

13             Again, it is even more

14       convoluted.  The reason I'm

15       putting up Cecil Pace-Asciak is

16       because, while I met with him and

17       these other individuals in Toronto

18       in '05/'06, I'm really putting it

19       up because Max Yefimenko has

20       submitted his time, and he was

21       there and he discovered him.

22       That's the reason for this slide.

23       So, I was a member of Lopez Hodes

24       at that time, but this is from Max

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          Yefimenko.

2                  This is just a small snippet

3          of the animation that Dr. Douglas

4          Zipes and Fosslien showed, worked

5          on.  It's playing on my computer,

6          and the red blood cells are in the

7          background.  This is called

8          platelet aggregation.  You can see

9          the platelets aggregating.  Now

10         they release their thromboxane and

11         prostacyclin, resulting in

12         vasodilatation and

13         vasoconstriction.  There's the

14         vasoconstriction as a result of

15         the thromboxane.  So, you can see

16         the quality of work that these

17         cardiopathologists and

18         cardiologists did.  We worked on

19         this extensively.  This was to be

20         shown for the first time in his

21         preservation testimony, and then

22         the case settled.

23                 MR. SEEGER:  John, was this

24         used anywhere, at any trials or

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          anything?  It was kind of at the
2          end.
3                MR. RESTAINO:  Right.  It
4          was now being developed for the
5          stroke committee if they needed it
6          there, and they started working
7          with us.
8                So, in summary, since '05,
9          Vioxx was the main thing I worked
10         on while I was with Lopez Hodes.
11         It continued to be a critical part
12         of what I was doing when I joined
13         Burg Simpson.  We had Max
14         Yefimenko working on it, as I
15         mentioned, and Mike will talk to
16         some of the others.  We were in
17         the final phases of the
18         preservation testimony of Egil
19         Fosslien when it settled.  The
20         animation project was to be
21         unveiled during that particular
22         time.  And so I'll let Mike talk a
23         little bit about --
24                MR. BURG:  Why don't we move

Page 25

1          on to what we show.  This is what

2          we show the total hours are.  So,

3          I'm going to have to call Lenny

4          and find out --

5              MR. LEVIN:  He will get you

6          to Phil Garrett, who is the

7          accountant.

8              MR. BURG:  -- what happened.

9          First of all, let me say, for

10         those of you that have worked with

11         Burg Simpson, when we work, we

12         work.  We don't send people who

13         don't know what they are doing and

14         sit around and play games on their

15         computers if they are going to

16         look at documents.  We understand

17         the priority that you and other

18         people who do common benefit look

19         at in terms of what moves the ball

20         down the field.  And while the

21         other things that are needed don't

22         necessarily get the same emphasis

23         or are not as important,

24         everything is done.

Page 26

```
 1              So, I really want to go

 2         through each of the people here.

 3         John, when he came over to our

 4         firm, obviously it was toward the

 5         end, we never knew it was the end,

 6         but near the end of at least the

 7         last part of the litigation was

 8         going on.  John continued to do

 9         his work --

10              MR. SEEGER:  By the way,

11         just so you know, I'm very

12         familiar with John's work because,

13         first of all, I was one of the

14         people that asked him to chair

15         that committee, but also Shelly

16         was on the PSC, and she would give

17         updates on the weekly PSC calls

18         about the science committee.  So

19         we don't have to spend any more

20         time talking about you, John, from

21         my perspective.  I get what you

22         do.  But I'm not as familiar with

23         what anybody else, Scott or Max --

24              MR. BURG:  Let me tell you
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          what I did.  My role was obviously

2          much more minor than it has been

3          in other litigations.  I was

4          appointed by Judge Fallon to be on

5          the state/federal liaison

6          committee.  I worked, attended

7          hearings.  Sometimes when I had a

8          conflict, either Seth Katz or

9          Peter Burg would attend those

10         hearings in my absence.

11              We were involved in tracking

12         the state cases for most of the

13         western United States, not

14         including California.  California

15         was being tracked separately.  We

16         were involved in looking at the

17         other states not really from the

18         East Coast, but in the Midwest,

19         tracking those cases, keeping

20         control over those, talking to

21         lawyers who had cases, trying to

22         really make sure that the PSC --

23         and I know Chris and I had

24         numerous conversations about what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1       was going on, really trying to

2       make sure that nobody was going to

3       screw up the litigation, to be

4       candid about it.  We all know that

5       that's one of the dangers in an

6       MDL, that somebody who really

7       doesn't know what they are doing

8       is out there, has a state case,

9       and ends up thinking they can go

10      forward and try it.  That's what I

11      did.  Really my work was really

12      limited to my role on the

13      federal/state liaison committee as

14      appointed by Judge Fallon.

15           Max Yefimenko is a

16      pharmacologist, was involved as a

17      subcommittee chair.  Those of you

18      who have worked with him, and I'm

19      not sure how many of you have,

20      he's a brilliant guy.  He's able

21      to read these articles that are

22      related to the litigation, and he

23      did that, and did summaries,

24      involved with experts.  He was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1        involved in finding some experts

2        in this particular case, was

3        involved in working up the

4        pharmacology, working with John

5        and the other -- at that time,

6        John was with Lopez Hodes.

7             MR. RESTAINO:  If I may

8        interject there, two years before

9        I had any idea that I would end up

10       with the firm, Shelly and I would

11       go through -- we had a coding

12       project, and we would assign 15,

13       20, 30 articles to an attorney.

14       We would code these with the

15       coding form.  And Max was assigned

16       that coding form, again, in an

17       unbiased manner and equal number

18       as other people.

19             MR. BURG:  Max, that's what

20       he did.  That's what his specialty

21       is.  He's not going to be a trial

22       lawyer.  He's not going to be a

23       guy who you are going to have

24       doing depositions.  But he's a guy

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        who is going to be in the back

2        room, who we believe had an effect

3        in moving this forward in terms of

4        making sure that the pharmacology

5        and all the articles, that nothing

6        was missed, and was also involved

7        in trying to get that.

8             Scott Eldredge, who was one

9        of our senior partners, he spent

10       most of his time at the

11       depository.  At that time, we

12       looked at this project as a

13       real -- we didn't send a

14       paralegal.  We didn't send

15       somebody who was -- and whether

16       that's a plus or a minus, we felt

17       we wanted to have somebody -- he

18       does mostly med-mal, does some

19       products cases in our office.  We

20       felt that we needed someone who,

21       because of the complexity of this

22       litigation, somebody who truly was

23       going to make a difference in

24       terms of knowing what they are

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          looking for, and not sitting at

2          the screen and just putting time

3          down.

4                  MR. LEVIN:  How long has

5          Eldredge been out of law school?

6                  MR. BURG:  25 years.

7                  MR. LEVIN:  And Katz?

8                  MR. BURG:  15 years.

9                  MR. LEVIN:  You have hourly

10         rates, not that that's very

11         relevant to how we're going to do

12         this, but have any of those hourly

13         rates that are posted there been

14         judicially approved by any court?

15                 MR. BURG:  Yes.

16                 MR. LEVIN:  Which ones?

17                 MR. BURG:  Some of the

18         rates, my rate, I believe, and

19         Seth's rate.  Seth's rate, which

20         was a little lower, was approved

21         in Zyprexa, I believe.  I also

22         know in class actions, we have had

23         federal judges in Colorado that

24         have approved my rate or $650.  In

Page 32

1          fact, the chief judge, Judge

2          Daniel, recently in a class action

3          this year approved that rate.

4               MR. LEVIN:  Fine.

5               MR. BURG:  The only other

6          thing I would say is this.  Just

7          so everybody knows, we had trial

8          teams, and we had trial teams that

9          are not included on this, but I

10         think it is important that the

11         record reflect that.  We spent --

12         and John can tell you.  We spent

13         Saturdays, Sundays and nights with

14         three trial teams, putting

15         together three trial teams,

16         learning this case, not putting

17         one moment of that into this

18         submission because we understand

19         that was for us.  We were ready,

20         willing and prepared, as things

21         moved forward, to try those cases,

22         and we wanted to make sure that we

23         were up to speed.

24               MR. WEITZ:  Can you talk to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          us about your cases?  Tell me how

2          many cases you guys had filed.

3                MR. BURG:  I think we had

4          157 cases was our total inventory.

5                MR. WEITZ:  Where were they

6          filed?

7                MR. BURG:  All over the

8          United States, but mostly in the

9          MDL.

10               MR. WEITZ:  So, you filed

11         them in Federal Court in the

12         United States?

13               MR. BURG:  I would say 98

14         percent or 95 percent of them were

15         in the MDL.  I think we had a few

16         in New Jersey, and we may have

17         had -- I'm trying to think if we

18         had any in California.

19               MR. GIRARDI:  Maybe one.

20               MR. BURG:  I think for the

21         most part, probably 95 to 98

22         percent were in the MDL.

23               MR. GIRARDI:  Tell me, I'm

24         sorry, how many cases all together

Page 34

1      again?

2              MR. WEITZ:  157.

3              MR. BURG:  I think it was

4      157, but I would have to go back

5      and check.

6              MR. WEITZ:  Tell me what

7      cases were on any trial dockets,

8      whether it was New Jersey, the

9      MDL?

10              MR. BURG:  As I sit here

11      today, we know that our cases were

12      potentially looked at for the MDL.

13      When I said we were getting

14      prepared, I don't think any of

15      them were really set for trial,

16      but our concern was, quite

17      frankly, having been at most of

18      the hearings, there was always

19      this question of whether or not

20      Judge Fallon was going to remand

21      these cases.  I know that was

22      something he talked about from the

23      bench at these hearings.  And we

24      in Colorado, as well as many other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1          states, the dockets are not as

 2          crowded as -- it's not unheard of

 3          in Colorado where you get a remand

 4          order and you get a trial within

 5          60 days unlike other federal

 6          courts.  So, we were very

 7          cognizant of the fact that there

 8          was the potential that a

 9          significant number of our cases

10          were going to be remanded and that

11          ultimately, because of that

12          remand, our trials were going to

13          come up very quickly.  That's why

14          we were working, and, in fact, we

15          had conversations with many people

16          who were on the PSC about the

17          potential, and we talked to Chris

18          about this.  The potential was

19          that if these remands happened,

20          getting him and Dave or other

21          people to come in so we make sure

22          that we're doing it at the highest

23          level.

24               MR. WEITZ:  So, it would be
```

FAC Resp. Exhibit D -- 295

Page 36

```
 1          fair to say that you were working

 2          up the individual cases in your

 3          office, but they weren't in any of

 4          the waves, the four waves that

 5          Judge Higbee had or they weren't

 6          being prepared for trial in the

 7          MDL?

 8               MR. BURG:  Correct.

 9               MR. LEVIN:  John, with

10          regard to the stroke package, Dr.

11          Levine, did you work with him?

12               MR. RESTAINO:  No.

13               MR. LEVIN:  Do you know who

14          worked with him, what was done

15          with him?

16               MR. RESTAINO:  There were

17          the two stroke --

18               MR. LEVIN:  Feldman and

19          Levine?

20               MR. RESTAINO:  They were

21          both being handled separately,

22          going through the committee, but

23          there had already been attorneys

24          that had worked up with them.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          MR. LEVIN:  So, you are not

2     involved with --

3          MR. RESTAINO:  That was one

4     of those delegated things.  I

5     would review the Rule 26 report if

6     it got to that level.  They had

7     access.

8          MR. LEVIN:  Did you ever see

9     a report from Steve Levine?

10          MR. RESTAINO:  No, I did

11     not.  And they had access to Egil

12     Fosslien as the cardiopathologist

13     so they could be on the same page

14     and the materials.  So, again, my

15     role there as the co-chair is

16     again to triage, and what's

17     everybody doing, let's make sure

18     we're on the same page.  People

19     throw up because I used the

20     metaphor of Venn diagram way too

21     frequently.  That's what my role

22     was, to have these different

23     circles and have them overlap as

24     much as possible and try to

Page 38

```
 1        coordinate and keep certain
 2        individuals from running off the
 3        reservation.
 4              MR. SEEGER:  Just to keep us
 5        on schedule, and we're going to
 6        see you later today, do you want
 7        to take a minute to sum up and if
 8        we have any questions?
 9              MR. BURG:  The only thing I
10        would sum up saying is everybody
11        knows John's talents and what he's
12        done.  John is not there playing
13        around.  He's doing a good job.  I
14        believe our firm has that same
15        reputation.  We're not going to
16        come here and pad our numbers, and
17        I'm obviously very concerned that
18        there's some difference in the
19        numbers that we showed that were
20        submitted and the numbers --
21              MR. SEEGER:  By the way,
22        just so you know and have some
23        peace of mind on this, the
24        questions about this, you don't
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          need to have it done today.  We

2          just need it done before the

3          motion can be made.  All of us in

4          some level are going through it,

5          so don't worry about it.

6               MR. BURG:  I appreciate

7          that.  All I can say is we

8          understood that we were not the

9          guys, other than what John was

10         doing when he joined the firm, who

11         were at the forefront of the

12         litigation.  At the same time, we

13         understood our role, which was to

14         support.  In other litigations, we

15         may be more at the forefront, and

16         other people may be supporting.

17         We felt that our support and the

18         kind of talent that we bring to

19         the table has value in moving the

20         litigation forward.  I'm not going

21         to say anything about any other

22         firms, but there are people who

23         send bodies and are not absolutely

24         dedicated to the success of the

FAC Resp. Exhibit D -- 299

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          project.

2                MR. GIRARDI:  Really?

3                MR. BURG:  It's a big

4          surprise, I know.  We come ready

5          to give you our best work product.

6          I think in this case we did.  We

7          appreciate the ability to come

8          here and talk to you and be able

9          to express what we felt we did

10         without trying to tell you guys we

11         did more than we did, but we also

12         feel we had a significant

13         contribution in the limited role

14         that we had.

15               MR. RESTAINO:  I'll just add

16         one thing because my time cards

17         are made contemporaneously with

18         what I do.  If I get a one and a

19         half hour phone call from Jerry

20         Avorn, when I hang up, I put it on

21         my time card.  My current time

22         card for the NSF litigation is as

23         current as of literally midnight

24         last night.  So, I don't go back

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          and reconstruct, I don't call my

2          partners and say, what did we do

3          in August on this stuff.  If at

4          any time anyone says, John, let me

5          see September '06 time card,

6          Vioxx --

7                    MR. SEEGER:  That's real

8          time.

9                    MR. RESTAINO:  There it is

10         right there.

11                   MR. BURG:  That is our firm.

12         That is our requirement in our

13         firm that we keep

14         contemporaneously daily time

15         records of what is done.  Not one

16         hour of this was recreated or gone

17         back by anybody.  We basically

18         just took the time slips of the

19         time that was kept on the daily

20         basis and submitted it.

21                   MR. SEEGER:  Thank you.

22                   MR. BLIZZARD:  We would

23         expect nothing less of somebody

24         whose favorite word is Venn

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          diagram.

2                    MR. SEEGER:  Thank you.

3                    MR. GIRARDI:  Thank you.

4                    MR. RESTAINO:  Thank you.

5                    MR. BURG:  Thank you.

6                         -  -  -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number: 1060147

23         Notary Expiration: 1.2.10
           CCR Number: 30X100176200

24

FAC Resp. Exhibit D -- 303

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM:  COHEN MILSTEIN
       Daniel W. Sigelman, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.

FAC Resp. Exhibit D -- 304

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2           MR. SIGELMAN:  Overall, I
 3      believe that Cohen Milstein
 4      contributed to the advancement of
 5      the scientific knowledge of the
 6      Vioxx case and that Cohen Milstein
 7      played a significant role in
 8      uncovering and developing critical
 9      liability and causation evidence
10      against Merck in the scientific
11      area.
12           Some highlights, and I just
13      picked a few of the major
14      highlights of our common benefit
15      contributions, are on the first --
16      the second page of the handout,
17      the PowerPoints that I handed out.
18      One is the deposition of a case
19      critical fact witness, Ned
20      Braunstein.
21           Another one is that our firm
22      was a member of a small team,
23      really an informal team,
24      furnishing important work product
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        and documents to trial counsel and

2        their experts, both testifying and

3        nontestifying, before and during

4        the Cona/McDarby and

5        Hermans/Humeston trials, and we

6        had a significant role, a very

7        significant role in developing and

8        preparing important liability, as

9        well as causation experts, Harlan

10       Krumholz, as well as Dr. David

11       Madigan.

12            On the next slide, I give

13       some evidence, really

14       testimonials, that highlight some

15       of these highlights.  One is with

16       respect to the deposition of Ned

17       Braunstein.  And here I'm quoting

18       Harlan Krumholz in an e-mail to me

19       on Christmas Day.  And I presume

20       that you know that both of us are

21       not Christian.

22            In any event, he wrote me

23       December 25, 2006 saying, "The

24       more I get into your deposition of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          Braunstein, the more I appreciate

2          what you did and how you did it.

3          It is actually a masterful and

4          scientifically strong piece of

5          work - that combination of

6          developing the case and being

7          right on all the science is rare."

8              In the Braunstein

9          deposition, I actually used it as

10         an opportunity to try to develop

11         what I thought would be our expert

12         case down the road in the Vioxx

13         litigation.  So, it was very heavy

14         on the clinical trials, and

15         particularly the

16         placebo-controlled clinical

17         trials, and Merck's handling of

18         the data from those trials and the

19         manner in which it did or didn't

20         report that data and the analyses

21         that were done or could have been

22         done to the FDA and to the FDA

23         Advisory Committee.

24              The next slide really is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        with reference to the team that

 2        was furnishing important work

 3        product and documents to trial

 4        counsel and their experts before

 5        and during the Cona/McDarby and

 6        Hermans/Humeston trials.  And here

 7        I'm quoting Mark Lanier, actually,

 8        in an e-mail he wrote me on

 9        February 5, 2007, which was the

10        day that Dr. Krumholz was

11        initially called to testify in the

12        Hermans/Humeston trial.  And he

13        wrote, "Just finished the final

14        prep with Krumholz.  He paused me

15        this morning and told me how

16        important your help has been, Dan.

17        Thank you."

18             And then Mark continued,

19        "Amen on Harlan," because I

20        praised Harlan as an amazing

21        expert, "[as a great expert]!!!

22        (And in no small part because of

23        your work...)"

24             So, I use this just to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1       illustrate that, in fact, it

2       really, I think, summarizes, it

3       culminates the work that I did

4       with Harlan Krumholz.  I spent

5       many, many hours with that man on

6       the phone and in long e-mails

7       analyzing data.  I remember, for

8       example, sending him a very

9       detailed analysis of how Merck

10      excluded important clinical trial

11      data in its three major

12      publications in the pooled

13      analyses of these trials:  The

14      Shapiro/Reicin paper, the Konstam

15      paper and the Weir paper.  He used

16      that, for example, in the

17      Hermans/Humeston trial.  He also

18      used other things that we

19      discussed.  I believe that Cohen

20      Milstein contributed to and

21      enhanced his knowledge and

22      understanding of the scientific

23      case.

24              Here I'm going to quote from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      him in an e-mail he wrote on

2      February 7, 2007, which was one

3      day after his first appearance in

4      the Hermans/Humeston trial.  He

5      appeared three times in that

6      trial.  He came back in rebuttal,

7      and then he was examined by Chris

8      Seeger in the specific causation

9      part of the case with the Humeston

10     case.  He said, "I feel privileged

11     and fortunate to have had the

12     opportunity to learn from you.

13     You made all the difference."

14          With respect to our common

15     benefit contributions, we did

16     common benefit work both in the

17     MDL and in the New Jersey

18     consolidated litigation.  I did

19     the primary work for the firm.  I

20     spent the most time on it.  Our of

21     counsel, Douglas McNamara, with

22     input from Richard Lewis, also

23     contributed to some of our common

24     benefit time.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          Our common benefit work
2     began in early 2005, and it ended
3     in early November of 2007 pretty
4     much when we heard about the
5     nationwide settlement.  Our work
6     greatly intensified in August of
7     2005, when I was provided remote
8     access to the entire Concordance
9     Vioxx production database, for
10    which I was very grateful.  And
11    that enabled me to do a lot of
12    things in my office from that
13    point forward.
14          From August of 2005 to
15    November of 2007, I consistently
16    devoted most, the overwhelming
17    majority of my professional time,
18    to Vioxx common benefit work to
19    the exclusion of other available
20    firm project opportunities.
21          The next slide is on the
22    scope of activities of our firm.
23    Obviously, first of all, in the
24    MDL, we were appointed to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      science committee, and we

2      primarily concentrated with

3      respect to work with -- our

4      assignment to the clinical trials

5      epidemiology and proof of

6      causation subcommittee.

7           We did a lot of extensive

8      focused reviews for projects.  We

9      searched for and reviewed hundreds

10     of thousands of Merck documents in

11     Concordance.  We reviewed

12     voluminous medical and scientific

13     literature and culled and shared

14     countless pertinent documents with

15     other counsel and with testifying

16     and nontestifying experts.

17          We furnished work product

18     and documents on scientific and

19     FDA regulatory issues to counsel

20     and their consultants for use in

21     discovery and in the New Jersey

22     trials.

23          And we helped prepare

24     testifying experts for deposition

FAC Resp. Exhibit D -- 312

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          and trial.

2                  Generally I saw our

3          objectives, at least within our

4          firm, to be to try to characterize

5          Merck's misconduct, particularly

6          in the scientific areas, destroy

7          its scientific defenses and

8          support the affirmative scientific

9          proofs required to win trials.

10                 The primary focus of our

11         common benefit work was, first of

12         all, conceptualizing and then

13         building plaintiffs' scientific

14         liability case and obliterating

15         Merck's scientific defenses that

16         we could through use of data from

17         Merck's own 'gold standard'

18         placebo-controlled Vioxx trials in

19         arthritis and Alzheimer's disease.

20                 We were also interested in

21         establishing general causation

22         based on Merck's

23         placebo-controlled study data,

24         with particular emphasis on data

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        generated before Vioxx was

2        withdrawn from the market.  It was

3        my feeling that with respect to

4        the 203 protocols, which consisted

5        of the APPROVe study, the VIP

6        study and VICTOR, that those had

7        been very comprehensively and well

8        dissected and dealt with by people

9        like Don Arbitblit, but I felt

10       that more work could be done in

11       areas of placebo-controlled trial

12       data that preceded the withdrawal

13       of Vioxx, although some very good

14       work had been done by other

15       lawyers, including Mr. Seeger's

16       firm and work that was done with

17       Dr. Kronmal, some very excellent

18       work.

19           On behalf of Cohen Milstein,

20       I developed a close and highly

21       productive working relationship

22       with some key firms, especially in

23       New Jersey.  I became one of a

24       handful of lawyers to whom other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1          lawyers in New Jersey would look

 2          for help on generic scientific

 3          liability questions.

 4               I ultimately worked with a

 5          group of lawyers such as, most

 6          notably, Eric Weinberg, whom I

 7          actually met for the first time in

 8          late 2005.  We shared a lot of the

 9          same ideas, and Eric had retained

10          an absolutely incredible

11          statistician, David Madigan at

12          Rutgers and now at Columbia

13          University.  I really wanted to

14          implement some ideas that I had

15          developed in the statistical area

16          that had not been developed by

17          others.  And my only avenue, I

18          thought at the time, was through

19          Dr. Madigan.  And so I started

20          working very hard with Eric and

21          Dr. Madigan.  And our group

22          expanded.  It really became a

23          rather informal group.  And to a

24          great extent, the group really
```

FAC Resp. Exhibit D -- 315

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          formed around Dr. David Egilman,

2          to be quite honest, because he was

3          hired by Mark Lanier's law firm as

4          a consultant, and he likes to

5          surround himself with people whom

6          who he thinks he can learn from

7          and get good information from.

8               MR. SEEGER:  Either that or

9          he likes to surround himself with

10         people he can abuse.

11              MR. LANIER:  He was the

12         personal physician to Daniel

13         Ortega.

14              MR. SIGELMAN:  But he

15         generated an incredible amount of

16         stuff, and he became a conduit for

17         people like me to submit all kinds

18         of analyses and documents, and he

19         was kind of the filter to send

20         them on to the trial team.  And so

21         that group was -- well, it was an

22         informal group.  We didn't really

23         meet except in cyberspace, but it

24         was Jeff Grand, it was Jerry

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          Kristal, it was Eric Weinberg, it

2          was Chris Placitella, it was David

3          Egilman, obviously, many members

4          of Mark Lanier's law firm.  And we

5          were sending things all the time,

6          and many of the things that Cohen

7          Milstein said to Dr. Egilman ended

8          up in the trials.  For example,

9          playing around with adjudications

10         in one of the Alzheimer patients

11         in 158 or protocol 906, which was

12         a study where some information

13         hadn't been conveyed to the FDA,

14         came from Cohen Milstein through

15         David Egilman.

16             This was a way that we all

17         shared information and benefited,

18         and it was an informal group that

19         I think it really advanced the

20         trial.  It was a real team effort.

21             MR. SEEGER:  Can I ask you a

22         question?  Don't you have both a

23         medical degree and a law degree?

24             MR. SIGELMAN:  Do I?  No, I

FAC Resp. Exhibit D -- 317

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        do not.

2              MR. SEEGER:  I thought you

3        had both degrees.

4              MR. LANIER:  He doesn't have

5        a law degree.

6              MR. SIGELMAN:  I don't have

7        a law degree.  I'm practicing

8        medicine and law without a

9        license.

10             No, I have a lot of

11       experience in pharmaceutical

12       things because in the 1980s, I was

13       the principal congressional

14       investigator of the FDA, and we

15       had a lot of hearings that led to

16       prosecutions of drug companies.

17       So, I've been doing analysis of

18       pharmaceutical data for over a

19       quarter of a century.  But I don't

20       have a medical degree.

21             Cohen Milstein was one of a

22       small team of firms who furnished

23       common benefits work product and

24       documents, as I said, and the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        slide also indicates the

2        assistance was provided directly

3        to trial counsel.  I remember some

4        occasions where Mark Lanier, for

5        example, asked me for some

6        documents.  I think one time I was

7        asked for documents on what the

8        Advisory Committee at FDA had said

9        about intention-to-treat analysis,

10       and so I sent them directly to

11       Mark.  Sometimes I would send it

12       to people at Mark's law firm and

13       often, obviously, through Dr.

14       Egilman, and Mark and his law firm

15       were on those e-mails.

16            I would like to give a case

17       in point of the kind of work that

18       I did.  And this is just one

19       illustration of something I

20       remember very distinctly.  From

21       April 8th through 9th of 2006,

22       there was feverish briefing going

23       on by Ellen Relkin of Weitz &

24       Luxenberg on the question of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1        Merck's noncompliance with FDA

 2        reporting requirements.  The issue

 3        was, could we get over the bar of

 4        punitive damages -- of course now

 5        punitive damages is history, at

 6        least for the time being in New

 7        Jersey -- but could we get over

 8        the bar with the evidence that

 9        Mark had brought up at the trial.

10        And so Ellen had come to me and

11        said, because of my FDA regulatory

12        background, could I help her.  And

13        I gave her a plethora of all the

14        FDA, NDA and IND regulations that

15        could conceivably apply, at least

16        to my knowledge, to the data at

17        issue.  And she incorporated all

18        of those in her briefing that

19        week, and, in fact, some of the

20        language that we had written were

21        incorporated wholesale in her

22        briefs.

23              And I remember her telling

24        me on that Sunday that Merck had
```

FAC Resp. Exhibit D -- 320

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          totally freaked out, because they

2          weren't expecting this plethora of

3          regulatory citations, and they had

4          come to Judge Higbee and asked her

5          for more time.  And that turned

6          out to be a real team effort,

7          because Ellen did an incredible

8          job, as she always does, on that

9          occasion, but it was a real team

10         effort, and it was very

11         successful, at least until the

12         appellate courts in New Jersey got

13         ahold of punitive damages.

14              And, obviously, as I've said

15         here before, I sent a lot of

16         documents to other people involved

17         in the trial.

18              Mark Lanier, for example,

19         acknowledged my contribution,

20         among others, in a very generous

21         e-mail to many people on April

22         12th of 2006 following the

23         Cona/McDarby trial.  And he said

24         something very nice about me that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1      I obviously knew my stuff, or at

2      least so he thought, I was able to

3      trick someone else once again, and

4      acknowledged that he was able to

5      do what he was able to do because

6      of the hard work of many people

7      around him.

8           With respect to the

9      deposition of Ned Braunstein, he

10     was a Merck regulatory official,

11     this was an MDL deposition that I

12     first chaired.  My preparation of

13     it involved -- I decided to really

14     go whole hog on the science, so, I

15     actually reviewed over 260,000

16     documents that were tied to

17     Braunstein for this deposition.

18     In addition to that, I had

19     reviewed the entire file of the

20     FDA custodial file in Concordance,

21     because I wanted to be totally

22     familiar with what had been sent

23     to the FDA by Merck, whether these

24     were letters signed by Dr.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        Braunstein or not.

2               I incorporated that into the

3        deposition.  And as I said before,

4        the deposition highlighted Merck's

5        knowledge and handling of damaging

6        evidence on the thrombotic

7        cardiovascular hazards of Vioxx

8        evidenced by its own

9        placebo-controlled arthritis and

10       Alzheimer's disease trials

11       completed long before market

12       withdrawal.

13              And to look at what impact

14       the Braunstein deposition had on

15       subsequent litigation, testimony

16       and documents from the Braunstein

17       deposition played key roles in

18       opinions presented during the

19       Hermans/Humeston trial of the

20       cardiology expert, Harlan

21       Krumholz.  And he acknowledged the

22       contribution of that deposition to

23       his understanding of the case.

24              And I remember some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1              documents were used, I even think

2              in the latter part of the trial, I

3              think when Chris Seeger was

4              working on the specific causation

5              part of the trial, I remember

6              there was a famous e-mail from

7              Bolognese that we dug up from --

8              for the Braunstein deposition that

9              was very significant in the trial.

10             It was used at the latter part of

11             the trial, as was table 13 from

12             the 2003 pooled analysis update

13             that showed some incredible data

14             that Merck had really hidden from

15             the world.

16                   Dr. Krumholz had told Mark

17             Lanier in a December 25, 2006

18             e-mail, "I do think that the work

19             Sigelman did in the Braunstein

20             deposition has merit...and we are

21             working to pull this together,"

22             and he was obviously referring for

23             use at trial.  He was trying to

24             come to an understanding of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        scientific issues, a fuller

2        understanding.

3            And Mark e-mailed me and

4        said, "Thanks much.  Now I'm going

5        to have to learn it."  The only

6        reason I put that in there was not

7        because Mark couldn't learn things

8        and didn't know things, because I

9        am awed by his ability to pick

10       things up, but I wanted to

11       emphasize that, obviously, Mark

12       had recognized that some part of

13       that Braunstein deposition,

14       whether specifically or

15       implicitly, was going to make its

16       way into that trial, and he was

17       going to learn some new material,

18       which he did do with his mutual

19       aplomb.

20           The technical and scientific

21       assistance that Cohen Milstein was

22       able to provide Dr. Krumholz and

23       Dr. Madigan marked the culmination

24       of much of the common benefit work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      that it had previously undertaken.

2           I worked very closely on

3      behalf of Cohen Milstein with

4      Harlan Krumholz to prepare him for

5      his testimony in Hermans/Humeston.

6      I sent him, I don't know, an

7      unbelievable number of documents,

8      a lot of data.  Some of the data,

9      in fact, was ongoing analysis from

10     Dr. Madigan, because there was

11     cross-pollination with these

12     experts.

13          MR. HERMAN:  Can I stop you

14     right there?  I'm sorry.  Dr.

15     Madigan's name has come up quite a

16     bit.  I believe Eric first spoke

17     about it.  Can you tell me a

18     little bit more about Dr. Madigan?

19          MR. SIGELMAN:  When you say

20     more?

21          MR. HERMAN:  Well, I would

22     like to know a little bit more

23     about his expertise and how he fit

24     into the entire litigation.

FAC Resp. Exhibit D -- 326

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          MR. LEVIN:  How he was

2     chosen?

3          MR. SIGELMAN:  How he was

4     chosen, he was chosen because he

5     was a world class statistician by

6     Eric Weinberg.  He is an actual

7     statistician, and we got him the

8     SAS data from the clinical trials.

9     Seeger Weiss had done a great job

10    of getting SAS data, and a lot of

11    it had been given to Dr. Kronmal.

12    And Dr. Kronmal had worked

13    previously with Dr. Madigan,

14    because Dr. Madigan at one time

15    was at the University of

16    Washington.  So, they did

17    communicate a little bit.

18         We were building on what

19    Kronmal had done and doing some

20    new things that Kronmal had not

21    done.  And so one of the big tasks

22    was to find out what SAS data were

23    available.  And what we found was

24    there was some SAS data that we

Page 25

1        needed that, for whatever reason,

2        had not been produced by Merck.

3        We went to David Buchanan and

4        worked with him to get that data.

5             For example, protocols 10

6        and 17 were early

7        placebo-controlled trials of four

8        weeks or greater duration.  We

9        didn't have the SAS data for that.

10       All the Celebrex studies,

11       comparing Celebrex with Vioxx and

12       placebo, that was

13       placebo-controlled data of four

14       weeks or longer.  We wanted all

15       studies of four weeks or longer in

16       placebo, because that's what Merck

17       looked at.  And we didn't have

18       those data.  We needed them,

19       because we wanted to do the entire

20       universe of placebo-controlled

21       studies of four weeks or longer.

22       And what we came up with --  this

23       is later in my PowerPoint, but I

24       can give it right now.  I think

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          this is a momentous finding that

2          we were prepared to go with in the

3          January 2008 trial.  That is, if

4          you followed Merck's approach in

5          the arthritis studies, in the

6          placebo-controlled trials, pooling

7          the data, and when I say Merck's

8          approach, you use adjudications

9          and confirmed events for the

10         studies that were adjudicated, and

11         you use investigator-reported

12         events for the studies that were

13         not, that was Merck's approach,

14         and instead of cherry picking like

15         Merck did, you use the entire

16         universe of studies four weeks or

17         longer, that includes 10 and 17

18         and the Celebrex studies which

19         were never included in any of the

20         pooled analyses of Merck, you have

21         a statistically significant

22         increase in thrombotic

23         cardiovascular events emerging in

24         arthritis, the primary indication

FAC Resp. Exhibit D -- 329

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1        for Vioxx in the year 2000.  That

2        is an unbelievably momentous

3        finding.

4             That is four years before

5        APPROVe, before they had the first

6        placebo data supposedly that led

7        to the market withdraw.  And think

8        about what happened in Hermans.

9        In Hermans, we had the misfortune

10       of the jury believing that the

11       VIGOR labeling was adequate.  So,

12       one of the things that we did with

13       Madigan is, we said we've got to

14       put our nose to the grindstone and

15       come up with some data that that

16       VIGOR labeling is grossly

17       inadequate.  That was one of the

18       findings.

19            MR. HERMAN:  Well, let me

20       stop you, because I think you've

21       been very thorough with that, and

22       I've got a better picture.  I've

23       got to ask you a couple of

24       questions that really are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          irrelevant to why you're here, but

2          I've got to know the answers to

3          them.

4               The first is, Madigan, his

5          field is statistics?

6               MR. SIGELMAN:  Right.

7               MR. HERMAN:  Not medical

8          causation; is that correct?

9               MR. SIGELMAN:  Correct.

10               MR. HERMAN:  What

11          information did you see about

12          skeletal or orthopedic problems or

13          failure in bone healing coming out

14          of Madigan?

15               MR. SIGELMAN:  There was a

16          little bit on that.  I mean, he

17          actually generated some data.  I

18          don't recall if he addressed those

19          data in his report, but he did

20          some runs on data like that,

21          because Eric Weinberg was pursuing

22          that.

23               MR. HERMAN:  Do you know why

24          Eric Weinberg was pursuing that?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

 1            MR. SIGELMAN:  Yes.  Because

 2       Eric was interested in the panoply

 3       of all of the things that Vioxx

 4       did.  And I think that we were

 5       thinking in a creative way of

 6       whether we could get into other

 7       things in terms of risk/benefit.

 8            MR. HERMAN:  That's fine.  I

 9       appreciate you helping me out with

10       that.  And I didn't mean to take

11       up your time.

12            MR. SIGELMAN:  Oh, no

13       problem.

14            MR. HERMAN:  So go ahead

15       with your --

16            MR. SIGELMAN:  Ask me

17       anything.  That's fine.

18            Another e-mail in January

19       28, 2007 where it said, "You have

20       helped me so much with the placebo

21       trials."  So, we were interested

22       in -- you know, obviously, some

23       incredible trial work was done in

24       both the MDL and the states, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          we were hoping that we could make

2          even better the win/loss record,

3          and we were hoping also to add

4          some new things to the offense,

5          because Merck had just heard all

6          this stuff about VIGOR.  And we

7          had these big debates.  I remember

8          Egilman and I and Krumholz had

9          these big debates about how we

10         should go and how Krumholz should

11         go in the Hermans/Humeston trial

12         depending, of course, on what Mark

13         wanted to do.  We wanted to throw

14         them some new curves at Merck, and

15         so we were really using Madigan

16         for that purpose.

17              And specifically after

18         VIGOR, Merck used gold standard

19         placebo-controlled trials as its

20         strength.  It said, you know, the

21         gold standard is placebo, and you

22         can talk about VIGOR until the

23         cows come home.  That's naproxen.

24         But placebo, man, placebo is our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          baby.  And what we wanted to do

2          was take what Merck thought was

3          its strength and make that the

4          plaintiffs' sword.  And that's

5          what I believe the Madigan report

6          is.  It is using placebo data as

7          the plaintiffs' sword.

8                MR. SEEGER:  And just

9          because we're on a tight schedule,

10         just another five minutes.  I just

11         want to give you a heads up.

12               MR. SIGELMAN:  Okay.

13               The next slide, I've already

14         told you about the 2000, the

15         statistically significant

16         increased risk.  Obviously, Merck

17         used its Alzheimer's trials as a

18         sword, and we thought that the

19         Alzheimer's trials, if you look at

20         the totality of the data and you

21         used them as prespecified analysis

22         of the intention to treat that was

23         in the Alzheimer's trials, you

24         would actually get statistically

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          significant increases not only in

 2          all-cause mortality, but in

 3          thrombotic cardiovascular events.

 4          And Madigan's report is replete

 5          with that.

 6               With respect to Madigan's

 7          report, what did we do?  First of

 8          all, we suggested many of the

 9          statistical analyses that Madigan

10          ran.  We actually said, we'd like

11          you to run this particular

12          analysis using ITT, look at this,

13          look at protocol 91, 78, do this,

14          do that.  We told him, we asked

15          him if he would use certain cutoff

16          dates for liability purposes.

17          Like September 15, 2000 was the

18          cutoff date for the data that was

19          used for the Advisory Committee

20          meeting in February of 2001.

21          March 16th, 2001 was the data

22          cutoff for the VIGOR labeling.  We

23          wanted all of these dates.  We

24          furnished him with countless,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1        hundreds of key documents.  We

2        determined what SAS data he

3        needed, and we obtained it, so we

4        would have a complete rendering of

5        their placebo-controlled trials.

6        And we consulted with him on

7        numerous technical issues such as

8        endpoint.

9            His expert report was served

10       in early October 2007, and his

11       report is replete with findings

12       from many of the statistical runs

13       and analyses earlier recommended

14       by Cohen Milstein.  For virtually

15       all of the drafting period, he

16       turned to Cohen Milstein for

17       review and input into the draft

18       report.  In fact, I was the only

19       person who saw that draft report

20       until the later drafts.  And Cohen

21       Milstein suggested many extensive

22       revisions.

23           MR. SEEGER:  In what case

24       was the report filed?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1           MR. SIGELMAN:  Pardon me?

2           MR. SEEGER:  Do you know

3       what cases that report was

4       ultimately filed in, the Madigan

5       report?  We've asked this of other

6       people.

7           MR. SIGELMAN:  Whatever

8       cases were up in January of 2008.

9       And he was to give a deposition in

10      December, which obviously never

11      occurred.

12          And we suggested many

13      extensive revisions and additions

14      that he generally accepted and

15      incorporated into his final

16      report.

17          And then a couple more

18      slides.  First of all, you have

19      Jerry Avorn's comments on Dr.

20      Madigan's report.  He said, "His

21      review is far more detailed, more

22      quantitatively sophisticated and

23      appears to be based on a more

24      complete collection of trial data

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1      than I have seen before.  It is a

2      most comprehensive depiction of

3      their," that's Merck's,

4      "misstatement and

5      misinterpretation of this data

6      that I have seen.  Even people who

7      think they know 'the whole Vioxx

8      story' will be astonished at some

9      of his analyses."  And Dr.

10     Krumholz said, "Great job!  Best

11     report yet by far."

12          And, by the way, as I said

13     before, it wasn't the first time

14     Krumholz had seen Dr. Madigan's

15     data.  We were constantly sharing

16     his data.  And Dr. Krumholz was

17     using his statisticians at Yale,

18     particularly a man by the name of

19     Yung Fay Wang, to try to replicate

20     what Madigan had done so that he

21     could testify on it at trial.

22          So, anyway, that's generally

23     what I have to say, other than my

24     firm also complied with PTO 6 in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1       terms of our time and expense

2       submissions.

3            MR. SEEGER:  Does anybody

4       have any questions?

5            MR. LEVIN:  Could you tell

6       me about that meeting in

7       Philadelphia when Mark Robinson

8       was there?

9            MR. SIGELMAN:  Yes.

10           MR. LEVIN:  How did it come

11      about?

12           MR. SIGELMAN:  That meeting

13      came about at the instance of Eric

14      Weinberg, and my recollection is

15      that Eric was interested in

16      sharing information with the MDL.

17      And I remember specifically that

18      Mark Robinson also had reached out

19      to Eric.  At some point, Don

20      Arbitblit then said he would like

21      to come to the meeting.  He hadn't

22      been invited, not that we didn't

23      want him, we thought Mark Robinson

24      just wanted to come for a meeting.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1       So, Don came and Jenny Gross from

2       Lieff Cabraser was there, and

3       Jerry Kristal was at that meeting,

4       Dr. Madigan was at that meeting,

5       Dr. Egilman was at that meeting,

6       and somebody from Sol Weiss' firm

7       I think was at that meeting, if

8       memory serves.

9            In any event, and I

10      remember, I gave a presentation of

11      some of the main data from

12      Madigan's report, and we were

13      willing to share the report.  In

14      fact, Don Arbitblit was sent in

15      the later stages a draft of the

16      Madigan report which he reviewed,

17      and, in fact, made one

18      contribution to the report.  He

19      came up with a very useful

20      document that was in the Madigan

21      report.  So, those data were fully

22      shared with the MDL, and I think

23      Eric Weinberg was specifically

24      interested in possibly an exchange

FAC Resp. Exhibit D -- 340

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1      of information.

2              MR. LEVIN:  Do you know

3      whether Russ Herman, Chris Seeger

4      or Andy Birchfield knew about that

5      meeting?

6              MR. SIGELMAN:  I don't know.

7      I wasn't convening the meeting.  I

8      presume that -- I know that -- you

9      know, I got a call about that

10     meeting from you.  So, I presume

11     that unless you were

12     uncharacteristically quiet about

13     the meeting, that you might have

14     conveyed it.

15             MR. LEVIN:  How do you do?

16             MR. SIGELMAN:  And I

17     remember you had concerns

18     specifically about what the MDL --

19             MR. LEVIN:  It was another

20     world then.

21             MR. SIGELMAN:  Pardon me?

22             MR. LEVIN:  It is not your

23     concern.  It was another world.

24             MR. SIGELMAN:  Right.  In

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1        any event, I remember specifically

2        that the information that we were

3        using with Dr. Madigan was stuff

4        that we developed since the MDL.

5        To be quite honest, what happened

6        in the MDL was, at some point, I

7        wanted to do some things with a

8        statistician, and I was informed

9        by John Restaino that for

10       budgetary reasons, they just

11       couldn't afford more statistical

12       work.  So, I ended up doing the

13       work through --  work that I

14       wanted to do through Dr. Madigan.

15       And that's kind of how I ended up

16       doing even more in New Jersey.

17            MR. LEVIN:  Don't take this

18       the wrong way.  This is for future

19       reference.

20            MR. SIGELMAN:  No, I

21       understand.

22            MR. LEVIN:  Were your hours

23       reported in the MDL or in the New

24       Jersey litigation for that?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          MR. SIGELMAN:  Both.  Well,

2      I reported them separately to Russ

3      Herman.  I reported our hours for

4      MDL, and then I reported our hours

5      for New Jersey.

6          MR. SEEGER:  Okay.  Anybody

7      have anything?

8          MR. LANIER:  Thanks again,

9      Dan.

10             -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1                 C E R T I F I C A T E

2

3                 I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                 I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23        Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: COHEN, PLACITELLA & ROTH
       Christopher M. Placitella, Esquire
       Harry M. Roth, Esquire


BEFORE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 345

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. SEEGER:  Chris, you sent
 3         in an affidavit, right?  I think
 4         we have something.
 5              MR. PLACITELLA:  It was a
 6         summary.
 7              MR. SEEGER:  So, this is the
 8         Court-appointed fee committee.  I
 9         think the idea here is to ensure
10         that we make sure everyone has had
11         an opportunity to express their
12         contributions to the case from the
13         common benefit standpoint.
14              Obviously we all know each
15         other.  I have a sense of what
16         went on in New Jersey and what
17         people did.  You've got 20
18         minutes, I believe, and we would
19         like to have 10 minutes at the end
20         for questions, if there are any.
21         You can use it any way you want.
22              MR. PLACITELLA:  I can
23         probably do this in five minutes.
24              MR. SEEGER:  It's up to you.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          Chris, just so you know, we've got

2          Linda here.  We're going to record

3          everything for Judge Fallon.

4                    MR. PLACITELLA:  Right.

5                    It is kind of a weird

6          position to be in with a bunch of

7          friends in a room talking about

8          money, but I guess there's worse

9          places to be in this world.

10                   When I got involved or we

11         got involved in this case, it was

12         post recall, and what I attempted

13         to do was to try to figure out

14         what was done and then figure out

15         where we could contribute,

16         basically.  Because there was a

17         lot of great work that was done

18         and a lot of people took a lot of

19         risks long before we got in the

20         cases.

21                   So, I spent a fair amount of

22         time in the beginning just

23         reviewing what had been done in

24         terms of depositions, documents,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        and things like that, and I

 2        determined that the place where I

 3        thought we could make the most

 4        contribution was in the public

 5        relations and marketing areas

 6        because there was still a lot of

 7        stuff to be developed.  So, that's

 8        really where I focused my efforts,

 9        not on who knew what and where in

10        terms of the science, but getting

11        and doing some unique things on

12        the PR side of things and on the

13        marketing side.

14             Just as an overview, it

15        looks like we spent, our firm,

16        about 5,000 hours, a little less,

17        slightly under that, which is

18        about two years' worth of full

19        time for a partner.  Now, I had

20        just left my old firm and joined

21        my new firm, and for the next two

22        years, I probably spent about 80

23        percent of my time doing Vioxx and

24        not generating many fees, and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1          these guys kind of took a flyer on

 2          our doing that.  So, there were

 3          some real opportunity costs in

 4          terms of what I did.  When I was

 5          at Wilentz, I generated a lot of

 6          work.  I was the number one

 7          business getter there for years.

 8          So, I really put that on hold in

 9          developing our practice to do

10          Vioxx even when things weren't

11          going too well.

12               So, I spent, I figured about

13          80 percent of my time for two

14          years doing that, and other people

15          spent less portions of their time.

16               On the public relations side

17          of things, I don't think that that

18          had ever really been looked at

19          hard in the context of an MDL or a

20          mass tort that I had been involved

21          in, but it looked like a

22          vulnerable area in this case.  So,

23          I was involved and took the lead

24          in taking the depositions of Jan

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          Weiner and Mary Blake, doing all

2          the document reviews.  There were

3          probably, between those two

4          deponents alone, 70,000 documents

5          that had to be gone through in one

6          way or another.

7                Now, that does not mean that

8          I looked at 70,000 documents, but

9          scanning through the databases and

10         pushing stuff out and looking at

11         things that made sense, and then

12         summarizing them, putting them in

13         databases, constructing

14         PowerPoints.

15               There were other depositions

16         I was involved with but did not

17         take the lead in, say, like

18         Westrick, where I identified

19         people had to be taken, but other

20         people helped.

21               It's interesting.  I guess

22         this is when I knew I was off the

23         wall.  When my son was in the

24         hospital with a collapsed lung and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           I was on the phone on a phone dep

2           in the Westrick deposition, Motley

3           Rice was taking the lead, that's

4           when I really knew I was off the

5           mark in terms of my priorities.

6                But in the public relations

7           stuff, in terms of depositions, I

8           think a lot of that stuff was

9           actually used in both the Federal

10          and State trials.  You know,

11          everybody in the world was told

12          that Vioxx didn't cause heart

13          attacks, and that message was

14          delivered ten times over to every

15          man, woman and child in the United

16          States in a single year.  I mean,

17          that was a significant piece of

18          evidence, I think.

19               We also spent a lot of time

20          battling over the video news

21          releases, you know, unearthing the

22          whole Loren Laine, Laura

23          Demopolous stuff.  We subpoenaed

24          the records, we litigated the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          right to have the videos.  Merck

2          wanted to keep them quiet.  We

3          unearthed them.

4               There were hundreds of hours

5          of videotape, most of which no one

6          ever had to look at.  I went

7          through them all, got the 15

8          minutes worth of gold, but there

9          was some pretty good stuff.

10               I think the Loren Laine

11          stuff was helpful in most cases.

12          We teamed up with Mark on the

13          Demopoulos depositions and those

14          videos.  We actually had to

15          litigate again the right to take

16          her deposition with conditions in

17          Philadelphia, and ultimately Judge

18          Higbee ruled that, as a result of

19          that battle, Merck could no longer

20          hire outside counsel for

21          independent witnesses and try to,

22          you know, keep secret what was

23          going on between Merck and outside

24          counsel's lawyers.  So, I thought

FAC Resp. Exhibit D -- 352

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          that was significant.

2               Some of the documents we

3          uncovered that I know were used as

4          significant documents were the

5          Westrick letter to the FDA where

6          they were complaining that Pfizer

7          was committing a violation by not

8          giving both explanations of the

9          VIGOR trial, an FDA violation; the

10         2001 profit plan, the strategic

11         plan for the public relations

12         which was do no harm to Vioxx; the

13         SWOT team memos; and there was

14         other stuff, but they were some of

15         the highlights.

16              On the marketing side, I

17         spent a lot of time identifying

18         who should be deposed.  I thought

19         some of the depositions were more

20         productive than others, but,

21         nevertheless, most of them took

22         the same amount of time.  I know

23         we tag-teamed with the MDL on the

24         Charlotte McKines depositions.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          She was the person who was the

2          ultimate supervisor for the "Be

3          the Power" and the development of

4          the CV card.  We took her for

5          multiple days.  Tens of thousands

6          of documents were reviewed.  We

7          met with experts to help us

8          prepare to do that right.

9              We took Wendy Dixon for

10         multiple days.  Interestingly

11         enough, I didn't really understand

12         the significance of Dixon's

13         depositions until much later,

14         because Dixon, the whole premise

15         of Merck's defense that they had

16         Dixon prepped for was the whole

17         Alzheimer's thing.  That was the

18         whole key that they had her

19         prepped on.  It wasn't until the

20         back end of the litigation when we

21         unraveled the Alzheimer's fraud

22         that if we ever had to go back to

23         Dixon again, I think we would

24         really kind of take her down.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1              Jo Jerman I did with

2         Papantonio.  Papantonio, I think,

3         did a great job.  I tag-teamed

4         with him, but he really took the

5         lead.  My role in the Jo Jerman

6         dep is I have a cue card, and

7         every time he asked a question, I

8         would give Papantonio the cue card

9         and say, didn't the lawyers ask

10        you to do this.  So, we spent a

11        lot of time doing that.

12             The CME training programs,

13        doing all of those documents.  The

14        ghostwriting stuff or the STI, I

15        spearheaded for New Jersey.  That

16        ended up to be about 60,000

17        related documents.  It could have

18        been better coordinated with the

19        MDL, frankly, because I thought we

20        were doing some parallel work.  I

21        think that that never really

22        developed to where it should have

23        been, to be honest.  I identified

24        it, litigated it, got the

FAC Resp. Exhibit D -- 355

Page 12

1          documents and then delegated to

2          have people finish it off.  And I

3          don't think it ever got finished

4          the way -- I mean, there was some

5          potential there that could have

6          been better, I thought.

7              I also was involved for New

8          Jersey in subpoenaing the Ogilvy

9          records.  We litigated the right

10         to get those records.  That review

11         was done in connection with the

12         Motley Rice firm.

13             I was originally the person,

14         I think, that got all the

15         advertising materials, integrated

16         them, all the commercials with the

17         print, and then distributed that

18         to all the lawyers around the

19         country who needed it.

20             All the information I did,

21         you know, the MDL coordination was

22         a little bit clumsy.  It got

23         better as it went along.  All the

24         stuff that we uncovered, we turned

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1          over.  I know that Mark Robinson

 2          actually took the stuff and used

 3          it in seminars, but I actually got

 4          on the phone and helped him prep

 5          the marketing expert and turned

 6          all those materials over.  I'm not

 7          sure what route it ultimately

 8          went, but I know that we spent

 9          some amount of time doing that.

10                We were involved in the

11          whole Joanne Lahner privilege

12          fight, which to this day, I don't

13          think is actually over.  It was my

14          view that that was really a very

15          soft spot on the underbelly of

16          Merck and their Achilles' heel to

17          show that the legal department at

18          Merck was really at the base of

19          the fraud.  We had our in-camera

20          hearings before the judge where I

21          cross-examined Lahner.  I had

22          never been -- I have never

23          conducted a cross-examination

24          where then the judge asked me to

Page 14

1        leave the room and then she

2        conducted her own

3        cross-examination.  Then during

4        the examination, the law clerk

5        would come out and ask me for

6        different things that the judge

7        could ask Lahner about.

8             MR. GIRARDI:  That's

9        happened to me.  They said to me,

10        get out of the room, Girardi, and

11        I'll do it myself.

12             MR. PLACITELLA:  Right.  So,

13        unfortunately, I think the Merck

14        lawyers stayed in there, so, they

15        had a lot of things to say that we

16        never really got to hear, and that

17        issue is still in flux, I guess,

18        although on the first round, she

19        wasn't going to give us all we

20        wanted, but there's still a lot of

21        privileged stuff under review.  I

22        think the settlement itself kind

23        of slowed that train down.  But I

24        still believe that that was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          significant effort that had

2          significant potential.

3              I did spend a fair amount of

4          time assisting Eric Weinberg, not

5          as the primary, but as the

6          secondary on experts.

7              I spent a lot of time, and I

8          don't know whether I drew the

9          short straw, but I spent a lot of

10         time with Dave Egilman in helping

11         with Mark's trials, doing his

12         depositions, Jay Geller, Sandra

13         Greenman, Michael Hoffman.  I

14         spent an awful lot of time with

15         Dr. Kostis, who gave us a lot of

16         guidance, and I think it actually

17         inured to the benefit of all for a

18         lot of reasons, but he gave us a

19         lot of guidance on even the

20         marketing end of things.

21             I spent a lot of time with

22         David Madigan, who I would submit,

23         although late in the game,

24         produced one of the best work

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 359

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          products in terms of an expert

2          that I had seen in the litigation

3          in terms of his stuff on the

4          Alzheimer's and the SAS data.  And

5          I spent, I guess I was the

6          exclusive person with Nesi for a

7          long time, who ended up writing

8          the book, and the only one that

9          ever got in the book was Lanier,

10         none of the rest of us.

11              MR. HERMAN:  He's good at

12         that.

13              MR. LANIER:  And I never

14         talked to him.

15              MR. PLACITELLA:  You never

16         talked to him.  He's very good.

17         Never talked to him.  So, that was

18         a lot of time.

19              We also spent a lot of time

20         with lawyer training, especially

21         in New Jersey, of having people

22         there assembling materials to give

23         to them so they could better

24         represent their clients.

FAC Resp. Exhibit D -- 360

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          We actually took a little

2          bit of everybody's work product.

3          We took some of the stuff that

4          Jerry Kristal did, we took some of

5          the stuff that Chris did, we took

6          some of the stuff that Andy did,

7          that Mark did, put it on a CD and

8          made it available to people so

9          they could actually go in and do a

10         decent job when it came time to do

11         a doctor's deposition and the

12         detail people's depositions.

13             MR. ROTH:  And having their

14         clients deposed.

15             MR. PLACITELLA:  And having

16         their clients deposed.

17             In terms of trial

18         assistance, I figure I spent

19         probably two full weeks in various

20         trials in New Jersey helping out,

21         whether it was prepping for an

22         expert, actually being the one who

23         did the depo cuts that no one

24         wanted to do, you know, the not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          fun stuff.  So, I spent some time

2          in Perry's trials and Mark's

3          trials.  Hopefully we gave some

4          significant assistance there that

5          was helpful.

6                  After the settlement, I was

7          put in charge of working out or

8          helping to work out the lien

9          issues with Garretson, although I

10         would have to say that Garretson

11         really carried that ball.  I

12         didn't have to do that much other

13         than calm the forces inside of New

14         Jersey.  We took a leading role

15         with Judge Higbee in confronting

16         some of the ethics issues that

17         were being raised as it related to

18         the settlement.  We had gotten

19         independent ethics counsel, worked

20         through some of that stuff with

21         Chris' help and Judge Higbee, and

22         I think, you know, we played a

23         real role in keeping people

24         focused on what the real issues

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          were.

2                  That's kind of an overview.

3          I'm assuming that almost everybody

4          here knew how hard we worked and

5          how much time we dedicated.  Some

6          efforts, frankly, when you are in

7          this kind of litigation, bear more

8          fruit than others, but I think we

9          produced some significant fruit,

10         and everybody here has made a

11         tremendous contribution, and I

12         think we helped fill in some of

13         the gaps, and saying more than

14         that is, frankly, a little

15         awkward.

16                 MR. SEEGER:  That was very

17         helpful, actually, from my

18         perspective to remind everybody of

19         the things that you worked on,

20         because we're sort of at the end

21         of the road now, so, I think those

22         things could be forgotten, so, it

23         was helpful for me.

24                 MR. HERMAN:  I just have a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          couple of questions, Chris.  The

2          ethics counsel you retained, who

3          was that?

4               MR. PLACITELLA:  Jeff

5          Pollack.

6               MR. HERMAN:  The reason I'm

7          asking is that I'm not sure that

8          that issue is over yet, so, we may

9          be calling on you.

10               MR. PLACITELLA:  Yeah.  He

11          helped us work through everything,

12          because one of our co-counsel from

13          Maryland had some major issues,

14          and they had a lawyer in their

15          office who was on the Maryland

16          ethics committee, and then we had

17          some kind of side shots from other

18          places, including the guys from

19          Connecticut.  And you know who all

20          those were.

21               MR. SEEGER:  I was on some

22          of those calls with you.

23               MR. PLACITELLA:  Right.  So,

24          we retained independent counsel

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          who was on the New Jersey ethics

2          committee really who was very,

3          very helpful, I thought.

4                  MR. SEEGER:  Dennehy, right?

5                  MR. PLACITELLA:  Dennehy

6          actually was the guy at Wilentz,

7          but Jeff Pollack.  He also had

8          some significant issues.  Jeff

9          Pollack, who was on the New Jersey

10         Supreme Court ethics committee.

11                 MR. SEEGER:  I spoke with

12         him.

13                 MR. PLACITELLA:  Yes.  We

14         retained him independently to help

15         us kind of get through some of

16         those moguls.  I thought he was

17         very helpful.  In fact, I think he

18         might have given us a written

19         opinion.

20                 MR. ROTH:  He did.

21                 MR. PLACITELLA:  He gave us

22         a written opinion.

23                 MR. HERMAN:  You said that

24         Motley at one point was taking a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          deposition and your son was ill

2          and you were on the phone?

3               MR. PLACITELLA:  Right.

4               MR. HERMAN:  What sort of

5          interaction did you have with

6          Motley Rice?

7               MR. PLACITELLA:  Yeah, we

8          had an ongoing relationship with

9          him.  We're close friends for a

10         long time.  They worked on the

11         Ogilvy.  They helped on the public

12         relations.  They helped on the

13         privilege log issues

14         significantly.  They took the lead

15         in the Westrick deposition.  I

16         think Fred Thompson might have

17         done that deposition.  I think

18         they might have done some of the

19         work on the STI.

20              So, they were an integral

21         part of -- you know, there was too

22         much, frankly, for me just to do,

23         and they carried a lot of the

24         water on that end of things.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1              MR. LANIER:  Based on the

2         way you perceive what Ness Motley

3         did, because I think you probably

4         worked closer with them than

5         anybody else, right?

6              MR. PLACITELLA:  Right.

7              MR. LANIER:  Based on the

8         way you perceive what they did and

9         what you perceived you did, if you

10        were called on to make the hard

11        decision, where do you

12        comparatively rank yourself with

13        Ness Motley?  Above, same level or

14        below in terms of contributions?

15             MR. PLACITELLA:  I think

16        that it was my job to steer the

17        ship, to figure out what had to be

18        done, try to figure out what the

19        soft spots were, and that was a

20        major contribution.

21             In terms of the number of

22        hours they put in, I don't even

23        know the number -- you know, I

24        don't know, I haven't seen their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          submission.  I'll say any time

2          they do things, they do it right

3          --

4                MR. WEITZ:  I think that

5          it's an important question,

6          because I'll tell you why, because

7          people like myself and Chris and

8          Mark know your contribution in

9          Jersey.  We worked with you, we

10         know what you guys did.  Ness

11         Motley was sort of out there in

12         the periphery.  They weren't in

13         the MDL, they weren't in New

14         Jersey, so we are trying to get a

15         feeling, and you really know

16         better than anybody, as to what

17         their contribution is.  So, try

18         to --

19               MR. PLACITELLA:  Well, I

20         know what they did in relation to

21         me, which was significant.  They

22         helped significantly on the Lahner

23         issue.  They spent a lot of time

24         going through the documents.  They

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          helped with the briefing on that

2          issue.  They showed up at the

3          hearing.

4               MR. SEEGER:  You and Fred

5          handled that, I remember that.

6               MR. PLACITELLA:  Correct.

7          So, they spent a lot of time on

8          that.  They spent a lot of time on

9          the Westrick PR issue.  They spent

10         a fair amount of time with

11         Hoffman, who was the ethics

12         expert.  That was the person that

13         they were in charge of taking.

14              They assisted with Kostis

15         and some others.  I mean, they did

16         a significant amount of work.

17              MR. WEITZ:  Were they doing

18         things in conjunction with you at

19         your direction or were they doing

20         it on their own?

21              MR. PLACITELLA:  No.  They

22         were really doing it in

23         coordination with what I was

24         doing.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1              MR. LEVIN:  Were you giving

2         them the assignment?

3              MR. PLACITELLA:  No.  We'd

4         split it up.

5              MR. LEVIN:  You were like

6         working together?

7              MR. PLACITELLA:  Right,

8         right.  Since I had reviewed

9         pretty much everything at one

10        point, I saw my role as trying to

11        figure out where the gaps were

12        and --

13             MR. LEVIN:  I guess what you

14        are saying is, they weren't

15        duplicating what you were doing --

16             MR. PLACITELLA:  No, they

17        were not.

18             MR. LEVIN:  -- they were

19        supplementing?

20             MR. LANIER:  Did you get

21        them involved in the litigation,

22        did they get you involved, or did

23        they get involved independently?

24             MR. PLACITELLA:  I think it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          was kind of independently, but,

2          actually, we had a work in

3          triumbrant with Sol Weiss where,

4          in the beginning, we had a --

5          because we don't really know how

6          the dynamics of things actually

7          unfold, but in the beginning, the

8          way we worked it out is Sol,

9          Motley Rice and our firm were

10         going to go in and do whatever we

11         thought needed to be done

12         together.  So, we kind of divided

13         up responsibilities.  So I wasn't

14         giving them direction.  We were in

15         it together.

16              Then, of course, as the

17         dynamics and all of these things

18         happened, directions change a

19         little bit because, well, you are

20         not going to duplicate what Seeger

21         is doing, and you are not going to

22         duplicate what Perry has done or

23         Mark has done.  You are just not

24         going to do that, so...

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1              MR. HERMAN:  What I'm really
 2         interested in is the fact that you
 3         primarily did the work for your
 4         firm, not someone else, not some
 5         paralegal, or anybody else, it was
 6         really you?
 7              MR. PLACITELLA:  It was
 8         primarily myself.  Harry helped,
 9         he did a lot of client stuff.
10         David Lenrow, who was a physician
11         in my office --
12              MR. HERMAN:  But these were
13         partner level folks?
14              MR. PLACITELLA:  Correct,
15         yeah.
16              MR. SEEGER:  Not low level
17         people?
18              MR. PLACITELLA:  Yes.
19              MR. HERMAN:  I think that's
20         important.
21              MR. WEITZ:  Chris did most
22         of the work.
23              MR. HERMAN:  With regard to
24         Motley Rice, Fred Thompson was the
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          main partner on that?

2               MR. PLACITELLA:  Actually,

3          they had -- Fred was the partner

4          most of the time that was doing

5          that.  But they had Carmen Scott,

6          who is a very competent lawyer,

7          Henry Leventis, Josh Littlejohn.

8          I mean, they had a number --

9               MR. WEITZ:  Wasn't Ann also

10         involved?

11              MR. PLACITELLA:  Ann Ritter

12         was for a while.  Jeff Thompson in

13         the beginning.  So, they had some

14         significant people.  I mean, they

15         weren't just throwing a bunch of

16         low level people out.  They had

17         some senior people.

18              MR. LEVIN:  Chris, was

19         somebody in your firm working with

20         the accountant to straighten out

21         your costs and hours?  Because you

22         have $41,000 in costs that you

23         want to recover and a significant

24         number of hours.  You say that's

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

 1      Harry?

 2              MR. ROTH:  Yes.  We're --

 3              MR. LEVIN:  Keep doing that

 4      so that we can get that plugged

 5      in.

 6              MR. ROTH:  We are hopeful

 7      that by the end of the week the

 8      accountant will have back the

 9      reformatted sheets.

10              MR. PLACITELLA:  By the way,

11      right before I left Wilentz, they

12      put in, I think, 50,000 for Nesi

13      as a contribution.  We never

14      claimed it.  I don't know if they

15      ever claimed it.  I don't know how

16      they would claim it, but that was

17      a clear common benefit.  It is not

18      my cost, but it is their cost.

19              MR. WEITZ:  Were you

20      handling Motley Rice's cases?

21              MR. PLACITELLA:  We were

22      local counsel.

23              MR. WEITZ:  And cases that

24      were in the Jersey court, had you

FAC Resp. Exhibit D -- 374

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          worked up cases on the discovery

2          docket?

3                    MR. PLACITELLA:  Yes.

4                    MR. WEITZ:  Tell us how

5          many.  Because I remember you

6          being actively involved as one of

7          the guys that were actually trying

8          to push some cases.

9                    MR. PLACITELLA:  Everybody

10         was -- you remember, it was who

11         can push their case out first.  We

12         were all trying to push out cases.

13         We were doing the docs.

14                   MR. SEEGER:  Actually, we

15         were --

16                   MR. WEITZ:  If you remember,

17         there were very few guys.

18                   MR. PLACITELLA:  I

19         remember --

20                   MR. ROTH:  You know, in

21         terms of the group that we were

22         working with, Motley Rice was also

23         one of the groups that was

24         interested in pushing their cases.

FAC Resp. Exhibit D -- 375

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          MR. PLACITELLA:  And

2      Simmons, they pushed pretty hard.

3          MR. ROTH:  These were not

4      guys that were taken aback.  We

5      had some guys who were sitting

6      around, hurry up, hurry up, get me

7      in, and Motley Rice was not one of

8      those guys.

9          MR. HERMAN:  How many cases

10     aggregate did you all have with

11     Motley Rice?

12         MR. PLACITELLA:  About 400?

13         MR. ROTH:  A little less.

14     360.

15         MR. WEITZ:  What was the

16     total number of cases that you

17     guys submitted to the settlement,

18     that Cohen Placitella submitted?

19         MR. PLACITELLA:  Or through

20     co-counsel?

21         MR. WEITZ:  Not through

22     co-counsel, but for your firm.

23         MR. PLACITELLA:  Oh,

24     probably not that many.  A few

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1        hundred.

2                MR. ROTH:  I think we were,

3        I want to say 250, and that may be

4        generous.

5                MR. BIRCHFIELD:  Is that

6        your cases and Motley Rice?

7                MR. PLACITELLA:  No, no,

8        just ours.

9                MR. BIRCHFIELD:  You talked

10       about the working relationship.

11       Was there a joint venture on these

12       cases with Sol?

13               MR. PLACITELLA:  It was a

14       loose arrangement that was never

15       totally formalized.  But, you

16       know, we've been in this business

17       for a long time, and probably

18       there's a lot of things that

19       should be.  You just trust people.

20               MR. LEVIN:  Was there a fee

21       sharing agreement?

22               MR. PLACITELLA:  We never

23       got that all the way 'til the end.

24               MR. LEVIN:  Is there a fee

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          sharing agreement?

2                  MR. PLACITELLA:  We never

3          got all the way to the end.

4                  MR. LEVIN:  Will there be a

5          fee sharing agreement?  That's for

6          you being local counsel?

7                  MR. PLACITELLA:  Right.

8                  MR. LEVIN:  Not in terms of

9          anything else?

10                 MR. PLACITELLA:  Correct.

11                 MR. HERMAN:  Just a couple

12         of things.

13                 MR. SEEGER:  We have about

14         two minutes, just to stay on time.

15                 MR. HERMAN:  Just a couple

16         of things.  In fairness, make sure

17         you read the Fifth Circuit

18         opinions in a couple of cases.  If

19         you are not familiar with the

20         cases that are governing fees in

21         quasi class actions and class

22         actions, we'll send out a memo

23         again, but you can access those

24         cases on the judge's website.  One

FAC Resp. Exhibit D -- 378

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1      is Murphy Oil, which is Judge

2      Fallon's latest, which gives you a

3      pretty good road map on the law

4      and where you need to go and where

5      we need to go.

6           Of course the Johnson

7      factors originated in the Fifth

8      Circuit, and those factors have

9      been reaffirmed in the Mobil Oil

10     case.  So, there are two or three

11     cases that you have to look at.

12          We hope that all the fee

13     issues are going to be resolved,

14     but Judge Fallon has advised us to

15     advise everyone seeking a fee that

16     in the event that things are not

17     resolved, he's going to do what

18     the Fifth Circuit requires him to

19     do.  He's going to have some

20     former Assistant U.S. Attorney put

21     people under oath, take

22     depositions, et cetera.

23          The two things that we're

24     responsible for are transparency

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          and consistency.  So, even though
2          you don't know, you are not
3          familiar with what Ness Motley,
4          for example, submitted or how many
5          hours, you will be privy to what
6          everybody else is privy to by the
7          time this process works its way
8          through.
9                MR. PLACITELLA:  I
10         appreciate it.  I know that this
11         is not an easy thing for you.  I
12         will say one thing about this
13         litigation.  In the end, it was
14         really a collaborative effort even
15         though it didn't start that way.
16         I mean, everybody -- it was always
17         like a substantial contributing
18         factor.  There were a lot of
19         really significant pieces, and
20         that's a tribute to everybody, I
21         think.
22                MR. LANIER:  You found the
23         Loren Laine piece that I used in
24         one of the trials.  I think you

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1              found it by the third trial.  I

2              don't know if you found it by my

3              second.

4                    MR. SEEGER:  Bogus quote.

5                    MR. LANIER:  The bogus

6              quote.  That was you, wasn't it?

7                    MR. PLACITELLA:  Right.

8                    MR. LANIER:  It was a good

9              clip.

10                   MR. PLACITELLA:  It was very

11             helpful.

12                   MR. SEEGER:  By the way, I

13             don't see Wilentz's stuff.

14                   MR. LEVIN:  No.

15                   MR. SEEGER:  I don't know if

16             they submitted it.  I don't know

17             if you want to put a call in to

18             them.

19                   MR. LEVIN:  If there's a

20             cost, you know, nobody wants to

21             see somebody not get reimbursed.

22                   MR. PLACITELLA:  Because

23             they didn't really do much, you

24             know --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

 1                MR. SEEGER:  Even their

 2         costs.

 3                MR. PLACITELLA:  But their

 4         costs, you know, that's a

 5         significant piece.

 6                MR. SEEGER:  That was

 7         helpful.  Thank you.

 8                MR. PLACITELLA:  Thank you.

 9                     -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1                C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM: CUNEO GILBERT & LADUCA
        Jonathan Cuneo, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 384

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2               MR. CUNEO:  For those of you

 3          who don't me, my name is Jonathan

 4          Cuneo, and I'm the senior partner

 5          in a Washington, D.C.-based firm

 6          called Cuneo Gilbert & LaDuca.

 7          I've got sort of what I believe is

 8          going to be an unusual story to

 9          tell you, and I thought I might

10          approach it by simply asking and

11          answering a few questions and then

12          taking yours.

13               The first question is, who

14          are we and what is it that is

15          unique that we bring to the table?

16          And the answer is essentially like

17          this.  We are a Washington,

18          D.C.-based plaintiffs' commercial

19          firm.  Every one of our partners,

20          at the same time, has a deep

21          background in government or public

22          relations or running political

23          kind of campaigns.  And, so, for

24          example, I started my career at
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        the Federal Trade Commission,

2        working in the office of the

3        general counsel, and then with

4        antitrust counsel to the House of

5        Representatives in the early

6        1980s.  That was my formal title,

7        but that was the sum and substance

8        of it when Peter Trevino was the

9        chairman.

10            I then formed my own

11        practice, and my choices at that

12        time were to go to a big law firm

13        and pretend that I graduated five

14        years before instead of nine years

15        before, or to start my own

16        practice, which I did.  I began a

17        dual practice of legislative work

18        and basically general commercial

19        litigation.  Through the years, I

20        have represented the securities

21        lawyers at an association called

22        NASCAT, the antitrust plaintiffs'

23        lawyers in a group called COSAL,

24        we continue to represent them, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        my law firm grew from just me and

2        a telephone to about 16 lawyers.

3            The principal lawyers who

4        were involved here were me and my

5        partner, Pamela Gilbert, who is a

6        recognized consumer advocate in

7        Washington.  She began her career

8        at US PIRG and then became

9        director of Congress Watch.  And

10       then during the Clinton

11       administration, she was the

12       executive director, which is the

13       top civilian job at the Consumer

14       Product Safety Commission.  She

15       has testified before Congress well

16       over 50 times.  She's done

17       literally hundreds of television

18       appearances, and she continues to

19       represent AAJ in a number of

20       capacities.  And I think she was

21       very honored that President Elect

22       Obama asked her to direct the

23       transition for the Consumer

24       Product Safety Commission.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          So, we have always had one

2          foot in the litigation door.  I

3          have a very active litigation

4          practice, not as active as any of

5          the lawyers in this room, but

6          we've done about 100 cases around

7          the country, antitrust, consumer,

8          derivative kind of cases, and at

9          the same time, we have a foot on

10         Capitol Hill, and we deal with the

11         media on a daily basis.

12              I used to work as a

13         reporter.  One of the people who

14         started with me on this case,

15         Michael Waldman, was director of

16         the office of speech writing for

17         President Bill Clinton.  If you

18         read his resume, he wrote four

19         State of the Union messages to

20         address us to the United Nations.

21              MR. LEVIN:  Now he runs the

22         Brennan Center.

23              MR. CUNEO:  Yes.  Now he is

24         the director of the Brennan Center

Page 6

1        in New York.

2              So, what is it that caused

3        us and the committee that was

4        running this case to have a need

5        for our services?  Well, in

6        general, Congress was interested

7        in the issue of regulation and

8        preemption and also specifically

9        in Vioxx.  So, even before the

10       committee was formed, we

11       interacted with the various

12       congressional committees, covered

13       the hearings, sent the materials

14       on, and my main points of contact

15       with the committee have been my

16       old friends, Chris Seeger and

17       Arnold Levin.

18              And second, after Mark

19       achieved such a terrific and

20       unexpected result in the Ernst

21       case in Texas, the committee that

22       was running this case I think

23       correctly perceived an increased

24       political risk coming from that

Page 7

1           verdict, because why is it?  Well,

2           Merck was and probably still

3           remains one of the most respected

4           names in corporate America, ran a

5           very successful public relations

6           campaign to make it sound as if

7           this was a Perry Mason result,

8           that it was something that was

9           against all the odds and the

10          evidence.  And really this goes to

11          show you the tremendous risks and

12          terrors that the jury system in

13          the United States imposed.

14                So, as a group, they, I

15          think, or people who were in this

16          case, were correctly concerned

17          about the possibility of an

18          Arizona/McDonald's coffee case

19          kind of a PR campaign by the

20          defendants.  I was asked to look

21          over the daily press, which I did

22          while I was on vacation, and we

23          held a number of conference calls,

24          and what we decided to do was to

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        assemble an evidence book to show

2        that this wasn't simply a matter

3        of snake charming and magical

4        tricks and Houdini, but actually

5        there was some evidence at least

6        to support them.

7            So, in September,

8        specifically September 21st, 2005,

9        I was having difficulty accessing

10       exactly what the evidence is.  I

11       came and visited Chris Seeger, and

12       he at that time effectively Tom

13       Sawyered me into staying in

14       Atlantic City for the next seven

15       weeks.  As I told you, I ran, and

16       during that period of time, on a

17       daily basis I managed the press

18       for the trial, conducted

19       background briefings, we faxed

20       things all over the country, we

21       dealt with members of Congress, in

22       addition to running my own law

23       practice.

24            Now, if inconvenience were

Page 9

 1         the test of what kind of a fee

 2         that we would be awarded, then we

 3         would be entitled to a very high

 4         fee, indeed, because like all of

 5         us, we work in a workday world

 6         where I have court hearings and

 7         things that are scheduled, and we

 8         basically dropped everything and

 9         came to Atlantic City.  We missed

10         one day of trial in the next seven

11         weeks.

12             I was here or Pam was here

13         every single day.  Some days we

14         went back to work at night and

15         conducted business.  Some days I

16         went to New York and conducted

17         business, but we were here during

18         the trial for all seven weeks.

19             Now, that was a situation in

20         which I've learned at that time

21         that there were really three or

22         four aspects to what the

23         defendants were doing.  One is, it

24         was clear to me that they had a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          courtroom presence where they were
 2          chastened, and they learned from
 3          their experience in Texas.  Every
 4          single thing, from the fact that
 5          Diane didn't wear any bling to the
 6          way they got out of their bus and
 7          marched in the courtroom and went
 8          out at night had been focus
 9          grouped and orchestrated.  It was
10          very, very careful.
11              In the room, in addition to
12          the lawyers who were actually
13          trying the case, was a partner
14          named Jim Fitzpatrick from the
15          Dewey firm in New York, who, in
16          turn, was being directed by a
17          partner whose name was Ted Mayer,
18          whose father, by the way, was a
19          great public health advocate,
20          ironically enough, as president of
21          Tufts University.
22              But in addition to helping
23          Jim, they had a professional,
24          former reporter, but a crisis
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          management professional whose name

 2          was Kent Jarrell.  So, Merck

 3          mounted a campaign that was meant

 4          to reflect their view of what was

 5          happening in the courtroom every

 6          day through the media, across the

 7          world, to the Congress, and

 8          basically an attempt to shape

 9          public opinion.

10               My role during that seven

11          weeks was to counter.  As I say,

12          we had a legitimate view, I think,

13          that if the Humeston case had gone

14          as I believe it should, and there

15          had been a significant -- in fact,

16          it did -- and there had been a

17          significant plaintiff's verdict,

18          we would have faced an onslaught

19          or the potential of an onslaught,

20          and my job was to start putting

21          down the sandbags in order to

22          prevent that from overwhelming our

23          position.

24               So, what results did we
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          achieve?  Well, I think that we

2          gave you increased connections on

3          Capitol Hill.  By the way, this is

4          something that we not only did for

5          you, but we did it in a very

6          formal role in the Enron case.  We

7          were officially designated

8          Washington counsel.  We had a

9          huge, huge, huge amount of work to

10         do in that case.  As you know,

11         there were a whole series of

12         congressional hearings.  We

13         interacted with every committee,

14         every member of the press who was

15         up there, and we did it in a way

16         that was completely anonymous, I

17         might say.  And that's our role.

18         We did it in the Worldcom case,

19         and to a much lesser extent, we

20         did it with you.

21              At the end of the trial, it

22         didn't go in a way that we had

23         wanted it to go, and it didn't go

24         the way Chris had expected it to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        go, I think.  Maybe I was more

2        optimistic about it than he was,

3        because I thought that he and

4        David Buchanan did a magnificent

5        job in presenting the case to the

6        jury, but at that time, our role

7        ceased.  It ceased.  You did not

8        need the insurance policy against

9        Congressional action at that

10       point.  It was, you know, they won

11       one, you won one.

12            After that, it was merely a

13       matter of, it was like a World

14       Series.  It didn't have the same

15       inherent danger.  After that, in

16       consultation with a group who was

17       running the case, we ceased our

18       activities and essentially, with

19       very minor exception, have done

20       nothing else since.

21            So, that is basically 80 or

22       so percent of our work.

23            In addition, we had 20

24       percent of work that was performed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1      by other members of our firm in

2      close consultation with Arnold

3      Levin, specifically.

4           MR. HERMAN:  I'm sorry, in

5      consultation with whom?

6           MR. CUNEO:  Arnold Levin,

7      specifically.

8           MR. HERMAN:  Okay.

9           MR. CUNEO:  At that time,

10     for example, we represented the

11     Massachusetts plaintiff in the

12     national class you were putting

13     together.  We did a lot of work on

14     the Massachusetts plaintiff, Iowa,

15     Indiana and others.  And so that

16     was a minor part of what we did,

17     but it was a part, nonetheless.

18     Again, those activities ceased a

19     long time ago.

20          I'm proud of the fact that

21     we were able to come here and

22     literally, at the drop of a hat,

23     help for a period of seven weeks

24     at the time.  I think that Chris

Page 15

 1       and others were very pleased with

 2       the job that we did.  And at the

 3       same time, like a member of the

 4       Cincinnatus, we went home.  I had

 5       many other cases to do, we got out

 6       of your hair, so much so that I

 7       didn't even follow it enough to

 8       understand that I might have

 9       presented an affidavit here.  We

10       did exactly as we were requested,

11       nothing more, nothing less,

12       nothing else.

13            MR. LANIER:  Can I ask a

14       question?  I don't mean to

15       interrupt.  Are you done?

16            MR. CUNEO:  No, I'm done.

17       I'm a little nervous that you are

18       asking.

19            MR. LANIER:  Were you paid

20       for any of that work that you did?

21       Did you bill for it?  What kind of

22       arrangement did you have?

23            MR. CUNEO:  It was purely

24       contingent.  We paid for our own

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        expenses.  We were not paid for
 2        it.  I think I legitimately could
 3        be an expense of the case, but
 4        that's not the way it was.  We
 5        billed our time, and we paid our
 6        own expenses.
 7             MR. LANIER:  Why wouldn't it
 8        be an expense in the case?
 9             MR. SEEGER:  Actually,
10        that's an interesting comment.  I
11        never even thought of it.
12             MR. LEVIN: It's something
13        that we have to discuss.
14             MR. SEEGER:  It was a very
15        busy time, obviously.  It was
16        right after Mark's Ernst verdict.
17        I had press all over the place.  I
18        actually got a call from you,
19        Arnie, saying if would be helpful
20        if you had somebody running to the
21        press.  And then, because it was
22        you, John, I knew you, I said yes,
23        that would be very helpful,
24        because we are getting swamped.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          It was the first two trials.  We

2          were literally being swamped, and

3          they were flooding our workroom,

4          they were finding where we were.

5          So, John came down and ran

6          interference and handled that

7          aspect of the case.

8              MR. CUNEO:  Just so you know

9          it, too, in order that I didn't

10         get in their hair, there were

11         documents that had to --

12             MR. SEEGER:  Oh, you were in

13         our hair.  You had more requests

14         for documents.  You were doing

15         your job.

16             MR. CUNEO:  But I brought my

17         own guy up to copy documents and

18         to do work.  And he also helped

19         out.  In the 12 hours of the day

20         he wasn't working for me, he

21         worked with Chris as a paralegal.

22             MR. SEEGER:  Actually, I

23         forgot that.

24             MR. LEVIN:  The other work

FAC Resp. Exhibit D -- 400

Page 18

1          that John said he did, and it was

2          minimum, because everybody had

3          minimal work, Judge Fallon wanted

4          a master complaint with a

5          plaintiff for each state in the

6          event that there had to be state

7          issues and what have you, and I

8          think he provided five or six.

9               MR. SEEGER:  For subclasses?

10               MR. LEVIN:  Well, standalone

11          and state classes because he was a

12          resource there.

13               MR. HERMAN:  His direction,

14          actually, was see if you can group

15          states according to issues.

16               MR. LEVIN:  Yes.  And that's

17          what John did.

18               MR. HERMAN:  That's why we

19          needed it.

20               MR. CUNEO:  We did some work

21          on that.

22               MR. LEVIN:  John, this has

23          nothing to do with whether you

24          become a lawyer or a consultant, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        guess, but you have 1,429 hours

2        that are still being rejected.

3        Are you perfecting them?

4              MR. CUNEO:  Yes.  We did

5        that last week.

6              MR. LEVIN:  As of November

7        24th --

8              MR. CUNEO:  No, we did that

9        last week.

10             MR. LANIER:  Off the record.

11                  -  -  -

12             (Whereupon, a discussion off

13        the record occurred.)

14                  -  -  -

15             MR. CUNEO:  I guess that if

16        you wanted to go that route, what

17        you would have to do, Mark, would

18        be to allocate.  That is easily,

19        easily doable.

20             MR. SEEGER:  We'll get back

21        to you.

22             MR. LEVIN:  Could you do us

23        a favor and send us each -- see,

24        we don't have the accountants --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          we don't have your hours, I don't,

2          anyway, I just have totals from

3          the accountant.  If you could send

4          us what you sent to the accountant

5          as the breakdown, we can get it

6          amongst ourselves.

7               MR. LANIER:  Great idea.

8               MR. CUNEO:  Okay.  In other

9          words, there are two --

10               MR. LEVIN:  I know you have

11          sent it around 20 different times.

12               MR. CUNEO:  Can we go off

13          the record?

14               MR. LEVIN: Yes.

15                  -  -  -

16               (Whereupon, an

17          off-the-record discussion was

18          held.)

19                  -  -  -

20               MR. SEEGER:  Thank you.

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary
        Public and Certified Court Reporter of
 4      the State of New Jersey, Registered
        Diplomate Reporter, Federally-Approved by
 5      the United States District Court of
        Pennsylvania, do hereby certify that the
 6      foregoing is a correct transcript of the
        testimony as taken stenographically by
 7      and before me at the time, place and on
        the date hereinbefore set forth.

 8

 9              I DO FURTHER CERTIFY that I
        am neither a relative nor employee nor
10      attorney nor counsel of any of the
        parties to this action, and that I am
11      neither a relative nor employee of such
        attorney or counsel, and that I am not
12      financially interested in the action.

13

14

        _____

15              Linda L. Golkow, RDR, CRR, CCR
                Notary Number:  1060147
16              Notary Expiration:  1.2.10
                CCR Number:  30X100176200

17

18

19

20

21

22

23

24
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:          ENGSTROM, LIPSCOMB & LACK
               Walter J. Lack, Esquire


BEFORE COMMITTEE MEMBERS:


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. GIRARDI:  Walter, here's
 3         the purpose for this, just so you
 4         know.  This is two-thirds of the
 5         fee allocation committee, and the
 6         transcript is being made for the
 7         purposes of Judge Fallon.  So, at
 8         the end of the day, obviously, it
 9         is Judge Fallon that's going to
10         make the call.  But about 50 firms
11         or so have requested to set forth
12         what they did, concerned primarily
13         with the group benefit, the
14         benefit to the overall Vioxx
15         litigation, as opposed to
16         individual situations.  So,
17         anyway, that's the format, and
18         then you can just say whatever you
19         want.
20              MR. LACK:  Like right now?
21              MR. GIRARDI:  Right now.
22              MR. LACK:  I haven't
23         prepared for this, but I've been
24         giving it some thought since I was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1            informed about the interview.

2                  I think I should go back to

3            how our firm got involved.  It is

4            kind of an interesting story.

5            We've done drug cases over the

6            years, but have never sat on an

7            MDL panel.  I personally have

8            historically taken a dim view of

9            that situation, but with modern

10           litigation being what it is, I had

11           better get with the program.

12                 We've always developed our

13           own work product in our own cases

14           based upon our own resources.

15           This case -- and I'll perhaps

16           refresh Tom's memory on this.

17           This case actually came to us from

18           a deep throat within Merck, who

19           made contact with a woman by the

20           name of Cheryl Blume, and all of

21           you probably have worked with her

22           over the years.  Her firm is

23           called Pharmaceutical Development

24           Group, Inc.  We had been working

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        with her on some other drug cases,

2        found her work product to be quite

3        impressive, and she was looking to

4        extend the number of cases she was

5        working on.  I recall getting a

6        call from her through our private

7        investigator, Arlene Friedman, who

8        does this work for her.  Arlene

9        Friedman is a lady in Beverly

10       Hills who works out of her home,

11       who provides what I consider to be

12       the highest level of competent

13       private investigation services.

14       We use her exclusively.  She did

15       all the investigation on the

16       Golden Buddha case for the

17       Cathcart firm, and it went for ten

18       years in the Philippines,

19       resulting in a $3 billion

20       judgment.  She did all the work on

21       that.

22            She called and she said that

23       she had been contacted by one of

24       the original epidemiologists that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          set up the VIGOR study for Merck,

 2          an inside guy.  He was appalled by

 3          the fact that, I think it was

 4          licensed in about April of 2002.

 5          She had called us at the end of

 6          2004 saying this guy would love to

 7          spill the beans, but he still

 8          works there, but he's prepared to

 9          establish to your satisfaction,

10          and certainly to mine already,

11          that all the cardiovascular

12          disease patients were taken out of

13          that study and that it was slanted

14          from the very outset.  He thinks

15          he can provide some excellent

16          background information to tell you

17          where the bodies are buried.  So,

18          this got us interested.

19              I said, well, we need to

20          know a lot more about COX-2

21          inhibitors before we go down this

22          path.  We know that some bad

23          things are going to come out of

24          this.  And so she agreed at my
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1           request and ultimately Tom's

2           request, because I immediately

3           conferred with him on this, to do

4           a definitive medical workup and to

5           locate experts that we could both

6           consult with and that would

7           ultimately be willing to testify.

8                 As a result of that, she had

9           prepared -- this work that I

10          brought -- I just brought a little

11          bit of the file here, as you can

12          imagine.

13                But in February of 2005, by

14          that time, after our original

15          call, she was able to put together

16          a most definitive work product

17          here consisting of three different

18          binders.  This is, first of all, a

19          review of all the Vioxx, all the

20          data that went into this.  This is

21          long before any discovery was done

22          in the case, before any litigation

23          was really ongoing.

24                MR. SEEGER:  What year?

FAC Resp. Exhibit D -- 410

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1              MR. LACK:  This is early

2         2005.  But all this work she's

3         doing is in 2004.  If you want to

4         page through, it is really very

5         good work that she did.  She went

6         all the way back to '94 to look at

7         all the literature on COX-2

8         inhibitors, the whole history of

9         this.  She then prepared a dossier

10        on the labeling chronology for

11        this particular medication, and

12        every change is tabbed here by the

13        date.  And all of the literature

14        that was generated in connection

15        with the labeling changes she

16        secured from the FDA at our

17        request.  Also, every epi study

18        you ever wanted is in here.

19             Then we had two separate

20        sessions in my office attended by

21        at least four lawyers from the

22        Girardi firm and four or five

23        lawyers in my firm.  The thing

24        went on for at least four hours.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          During the course of that, I call

 2          it a blackboard session, she

 3          brought in three experts.  She

 4          brought in a pharmacologist, she

 5          brought in a COX-2 inhibitor

 6          specialist, and then she brought

 7          in a general physician to talk

 8          about physiology or what happens

 9          when you take these things.  It

10          was a primer for us to be able to

11          go out and basically put on

12          seminars for lawyers to teach them

13          about what to look for in

14          screening these cases.

15               Then you'll recall most of

16          you people in this room were at

17          this conference in Miami.  I was

18          one of the speakers, and my topic

19          was giving an opening statement in

20          a pharmaceutical case.  Great fun.

21          You recall we had some lawyers

22          there from Merck in the audience,

23          and we were sort of off to the

24          races.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          After that, Tom thought it
2      would be better, because I love
3      financial scams, to get into what
4      we thought would be a very
5      relevant and ultimately admissible
6      issue relating to the sale of
7      options by all the senior
8      management at Merck.  I hired an
9      investment banker to do the
10     research to go on Bloomberg.  I
11     have a whole file on Gilmartin,
12     Reicin and the rest of that crowd
13     there.  We thought that if
14     Gilmartin had stayed, that would
15     be a very fruitful area for cross
16     examination.  She had her own
17     story of why she sold.  They all
18     sold at the all time high for
19     Merck stock.  There's quite a lot
20     of stuff in here.
21          Then we went to the State of
22     California.  Phil Angelides was
23     the state treasurer at the time.
24     We felt that the State of

FAC Resp. Exhibit D -- 413

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        California should investigate this

 2        and perhaps hire us to pursue

 3        their own MediCal reimbursement

 4        issues and on and on and on.  So,

 5        I have a whole line of

 6        correspondence with the state

 7        treasurer's office about what

 8        Merck has done and the fraud they

 9        perpetrated.

10             Now, the Gilmartin thing

11        ended up not being useful, I

12        suppose, because of some court

13        rulings.  But I would say that we

14        could have tried this case in the

15        fall of 2005 just on the basis of

16        the work that we did.  And all of

17        this, of course, was turned over

18        to Jim O'Callahan at the Girardi

19        firm, who then incorporated it

20        into a massive database that we

21        all contributed costs towards.  I

22        didn't bring that.  But one of the

23        first things in this box that I

24        found that was the first thing
```

FAC Resp. Exhibit D -- 414

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          that O'Callahan and our office

2          worked together on, one of my

3          partners Brian Depew actually

4          worked with him in his office, was

5          to put together a so-called

6          chronology of the story.  It

7          starts in this volume.  I didn't

8          bring all the volumes.  It starts

9          in 1996 with the first reference

10         to the Vioxx theory and goes on

11         from there.  Some of these

12         documents were used in the various

13         trials, some were not, but they

14         were all certainly relevant based

15         upon what we knew at the time.

16              MR. SEEGER:  Can I see it?

17              MR. LACK:  Yes.

18              (Handing over documents.)

19              MR. LACK:  Here's the hard

20         data from what we obtained from

21         our investment banker and what was

22         sold and disclosures made at the

23         SEC.  You will have a separate

24         binder just on SEC disclosures.

FAC Resp. Exhibit D -- 415

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1            I would say everything in

2       this room was paid for and

3       transferred over to the MDL

4       ultimately for use in whatever.

5            Then, of course, the

6       California cases went to trial.  I

7       was there.  I sat next to Tom

8       Brandi through a good deal of the

9       trial primarily because I wasn't

10      so interested in the facts of

11      those individual cases, but the

12      judge before whom all the

13      California cases was pending is a

14      very powerful and important judge

15      in California.

16           Judge Chaney has all my big

17      cases.  She sits in a courtroom

18      that's only -- it's got various

19      names, but Central Civil is one of

20      the names it goes by.  They have

21      six judges there that handle only

22      the most complex cases for the LA

23      region.  I think half my cases are

24      pending in front of her, and so

FAC Resp. Exhibit D -- 416

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          this is a very useful, show your

2          face down there.

3               MR. LEVIN:  I'm sure she

4          knows your face.

5               MR. LACK:  What was

6          bothering me most at the time was

7          getting muscled out not by anybody

8          in particular but, for instance,

9          Mark Robinson down there.  That

10         bothered me a lot.  So, I wanted

11         to be in the courtroom to make

12         sure she knew the next cases that

13         got picked, some of them were

14         going to be mine.

15              MR. SEEGER:  Walter, can I

16         ask you a question about that?

17         Did you get any support during

18         your trial from Robinson?

19              MR. LACK:  No.  And I wasn't

20         asked to.  I didn't ask him.  I

21         wasn't going to go seek his

22         support, because we had to put it

23         together, I thought.

24              MR. WEITZ:  Did he seek your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          support?

2                    MR. LACK:  No, no.  That

3          wouldn't be something that came to

4          pass.

5                    Then as the center of

6          gravity of the case went from our

7          little ten percent of all the

8          cases filed in California to the

9          MDL, it was very apparent that we

10          were just going to get swept along

11          with the tide.  So, when you are

12          in that situation, we are all

13          trying to conserve resources, I'm

14          not going to continue to labor --

15                    MR. SEEGER:  And duplicate.

16                    MR. LACK:  Right.  So, the

17          gravamen of my activities for,

18          let's say, the common good or

19          common issues would have ceased at

20          the end of the first trial in

21          California.

22                    MR. GIRARDI:  That isn't

23          true.  End of the second trial in

24          California.

Page 15

1           MR. LACK:  Second trial.

2      I'm sorry.

3           MR. GIRARDI:  Because all of

4      these documents were in.  We set

5      up our own database for the

6      California lawyers, and these

7      documents were the most important

8      part of that database.  Obviously,

9      it got improved as time went on,

10     as other testimony came in and

11     things like that.  But this was

12     the foundation of the case.

13          MR. LACK:  Right.  Of

14     course, we were always looking for

15     more experts.  As the tide against

16     Merck started to swing, more and

17     more people were willing to come

18     forward and say what they should

19     have said.  We continued,

20     obviously, to follow it on a daily

21     basis until well into 2006.

22          MR. SEEGER:  After the two

23     cases were tried, Walter, did you

24     guys have any cases in the queue

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          that would come back up for trial?

2                 MR. LACK:  Yes.  I felt one

3          of them was mine.  I had a very

4          good heart attack case.

5                 MR. SEEGER:  Do you know the

6          name?

7                 MR. LACK:  A guy named

8          Cooper.  Just so you know, this

9          guy named Cooper, the referring

10         lawyer filed suit against Merck

11         only, did not sue the dispensing

12         physician or anybody else in

13         California.  It got removed.  We

14         filed a motion in the MDL.  I went

15         down there twice to have it

16         remanded to California.  And even

17         today it still wasn't going to get

18         remanded.  He just said, I'll get

19         to that later and never got back

20         to it.  It was a pristine case.

21                I had another one where we

22         just got an award, it was a pretty

23         big award for a heart attack.

24                 MR. SEEGER:  As part of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        settlement?

2              MR. LACK:  Yes.  Over 100

3        clients.

4              MR. SEEGER:  How many cases

5        did you send into the settlement,

6        do you know?

7              MR. LACK:  I've sent in 53.

8              MR. WEITZ:  Walter, the case

9        you were talking about after

10       Robinson's case was in front of

11       Judge Chaney and it already had

12       been worked up, that was going to

13       be the next case that you thought

14       was going to go out for trial --

15             MR. LACK:  Yes.

16             MR. WEITZ:  We are also

17       trying to find the lawyers, and we

18       know you are one, that were moving

19       the dockets in the jurisdictions.

20       That's an important fact.  What

21       case was that?

22             MR. LACK:  I'm trying to

23       remember.  We had meetings in

24       O'Callahan's office.  I wasn't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          party to them.  Steve Terrell and

2          Brian Depew in my office were the

3          two advocating for -- we put three

4          cases up, and, of course, one was

5          a retired IBM executive who had

6          severe brain damage as a result of

7          a blood clot.  Everybody kind of

8          agreed, well, we're not trying

9          those yet, they are going to be

10         the hardest.  They are very

11         problematic by the law.  But it

12         was the biggest damage case.  The

13         guy had over a million and a half

14         in medicals, and he was only 52.

15              So, they shelved that, and

16         they agreed, okay, fine, you have

17         got a perfect heart attack case,

18         and we'll go with that, and only

19         O'Callahan can tell you the name,

20         because I've forgotten.

21              MR. SEEGER:  I know Depew.

22         I think I've seen him around Vioxx

23         circles.  When you mentioned his

24         name --

FAC Resp. Exhibit D -- 422

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              MR. LACK:  Depew spent a lot

2         of time with O'Callahan.

3              MR. SEEGER:  Tom's guy I saw

4         a lot.

5              MR. LEVIN:  I haven't seen

6         Brian here.  I've seen a lot of

7         Brian in Spokane.

8              MR. LACK:  We did turn in

9         some time records.

10             MR. SEEGER:  He was your

11        point guy for the case?

12             MR. LACK:  Hundreds of

13        hours.

14             MR. GIRARDI:  You may have

15        to look at those.  The form on

16        some of those maybe is not

17        appropriate, and we'll talk about

18        that and go through the

19        accountants.

20             MR. LEVIN:  Tom will work

21        with you getting that through the

22        accountant.  Right now they are in

23        a state that they haven't been

24        approved probably because of form,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          so, Tom will take care of it.

2              MR. LACK:  All right.

3              MR. WEITZ:  Go over expenses

4          with him also so we make sure

5          those are right.

6              MR. LACK:  We put in $20,000

7          for common costs, and I've got

8          like 800,000.  I didn't want to

9          hassle.  Because it took longer to

10         do the format for these

11         accountants than it was worth to

12         get the money back.

13             MR. SEEGER:  Walter, if you

14         have worked up an expert and you

15         have spent a couple hundred

16         thousand, you should send that to

17         us.

18             MR. LACK:  Everything is

19         through his office.  I'd rather do

20         it that way.

21             MR. LEVIN:  That's fine,

22         just as long as you don't get

23         shortchanged.

24             MR. LACK:  I'm not really

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          worried about that, but the actual

2          time to reconstruct this stuff --

3          being a contingent fee lawyer, my

4          time wasn't done contemporaneous

5          with my actual work, but every

6          other lawyer, we still do that in

7          our firm.  We keep track of our

8          time, quote, as a management tool,

9          so we track their time.  I know

10         all of that is very accurate.   I

11         had to reconstruct mine because

12         you go through every page.

13              MR. LEVIN:  Because you only

14         have to deal with yourself when

15         you shave in the morning.

16              MR. SEEGER:  Thank you.

17              MR. LEVIN:  Thank you.

18                   -  -  -

19

20

21

22

23

24

FAC Resp. Exhibit D -- 425

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1                C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 426

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM: ESCOBEDO, TIPPIT & CARDENAS, L.L.P.
        Joe Escobedo, Jr., Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 427

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    - - -

2              MR. ESCOBEDO:  Joe Escobedo.

3              MR. BIRCHFIELD:  We

4         appreciate you being here today.

5         We've got a court reporter here.

6         Everything is being transcribed.

7              Judge Fallon in the Murphy

8         Oil decision, if you followed

9         that, it would be helpful to be

10        familiar with that order from his

11        court.  Transparency is key.  So,

12        he'll have this transcript

13        available for his use for whatever

14        he determines is appropriate.  So,

15        just know everything is being

16        taken down, and the floor is

17        yours.  We appreciate it.

18             MR. ESCOBEDO:  I didn't know

19        how many people were going to be

20        here today.

21             MR. BLIZZARD:  We can share.

22             MR. ESCOBEDO:  I think we

23        have enough.

24             I know it's been a long day

FAC Resp. Exhibit D -- 428

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          for you guys, so I'll see if I can

2          give you some time back.

3               Really what I want to focus

4          my discussion on here today as far

5          as the Order Rule 6(D) is the

6          factors relating to whether

7          counsel was already involved in

8          the Vioxx litigation prior to the

9          withdrawal of the drug and the

10         participation in any non-MDL

11         trials.  I prepared a short little

12         presentation here for you, the

13         second page after the cover page,

14         trying to give you an

15         understanding of what we did prior

16         to Vioxx being removed from the

17         market.

18              The second page basically is

19         the entire thing, and then I'll go

20         through and touch on some of

21         these, and then if y'all have any

22         questions, I can answer them.  I

23         think as the timeline shows, we

24         were extensively involved in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          Vioxx litigation prior to the

2          withdrawal of the drug from the

3          market, and we did try a non-MDL

4          trial that we believe provided a

5          common benefit.

6                  We were hired by the Garza

7          family back on April 15, 2002.  I

8          know at that point there was a

9          handful of cases.  We started

10         doing our investigation, which

11         involved getting as many records

12         as we can on the drug from the

13         FDA.  We also met with David

14         Miceli, who I believe used to be

15         with your firm and at that time

16         was very active in the litigation.

17                 MR. BIRCHFIELD:  That's

18         right.

19                 MR. ESCOBEDO:  He was very

20         helpful and gave us a lot of

21         information.  I know some of my

22         partners and associates met with,

23         I guess, just a handful of people

24         who had cases back then, 2002 and

FAC Resp. Exhibit D -- 430

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        2003.  We retained experts.  Some
 2        of them are listed here and others
 3        as well.  Then we filed our
 4        lawsuit on March 10 of 2003 in
 5        Starr County, Texas.  Merck
 6        promptly removed the case to
 7        Federal Court, and it took us a
 8        while -- as you can see, it took
 9        us a while to get it back to state
10        court.
11              After that, once we got back
12        to state court, I'm sure as
13        everyone is familiar with, the
14        discovery wars with Merck started.
15        We literally had, I lost count of
16        how many motions to compel, and
17        motions for sanctions.  We also
18        had a mandamus proceeding with a
19        Court of Appeals involving the
20        drug Arcoxia, which,
21        unfortunately, we lost.
22              But once we got all of that,
23        then they inundated us with paper,
24        and also we made them produce --
```

Page 6

```
 1          the corporate rep depositions had

 2          been taken at the time by your

 3          firm, by Mr. Miceli.  I think Mr.

 4          Lanier had taken some as well.

 5          And what I did and what my firm

 6          did at that point was started

 7          reviewing the documents, reviewing

 8          the depositions.  A lot of the

 9          depositions, people that took

10          them, I'm sure are familiar with

11          them, that Merck at the time was

12          producing witnesses that at least

13          on some of the areas of

14          examination the particular

15          witnesses produced didn't have the

16          appropriate knowledge.

17              MR. GIRARDI:  They did that

18          with every one of them.  A guy

19          would come in, he wouldn't know

20          anything about Vioxx.

21              MR. ESCOBEDO:  So, what I

22          basically did, what my firm tried

23          to do was to build on the work

24          that had already been done.  We at
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1       one point, our notice -- in Texas,

2       they are called areas of

3       examination, the corporate rep

4       depos.  I think once it was all

5       done and -- I think we had over

6       almost 200 areas of examination in

7       the notice, and then they started

8       producing corporate reps, and

9       that's what we did after that.

10          We did get a trial setting

11      on April 23rd.  The judge gave us

12      a trial setting for November 8,

13      2004, and it was also around this

14      time that our involvement with

15      Kathy Snapka started as well.

16          We started taking corporate

17      rep depositions in New York.

18          MR. HERMAN:  Excuse me.  I

19      want to state for the record that

20      Kathy Snapka was relentless in

21      appearing in the MDL to get this

22      case remanded, which the MDL

23      supported, and it was one of the

24      few cases -- I don't know that the

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          judge remanded any more cases

 2          other than this, but it was

 3          important that you and Ms. Snapka

 4          were tenacious in getting this

 5          case sent back.

 6                  MR. ESCOBEDO:  Thank you,

 7          sir.  And I remember when we met

 8          with Judge Fallon, he basically

 9          asked me one question:  Why is

10          your case different from all the

11          others that have been removed?

12          And I said, because we're ready to

13          go to trial, because this is the

14          second removal, because the basis

15          of the removal was bogus.  What

16          happened was this.  They wanted to

17          go, and they deposed one of my

18          experts, Dr. Simonini, which I

19          believe you used in your trial --

20                  MR. GIRARDI:  Sure.

21                  MR. ESCOBEDO:  --  and they

22          asked him, do you have any

23          criticism of the doctors?  He said

24          no.  Well, he wasn't my expert
```

FAC Resp. Exhibit D -- 434

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          against the doctors.  And they

2          removed the case.  The real reason

3          why, I believe, is because we were

4          set to go to trial in February,

5          and the judge wasn't going to

6          continue the case.

7               The depositions that we

8          took, some of them had already

9          been taken in other cases, but

10         some of them, we were the first

11         ones to take them, I believe, and

12         those are listed.

13              Linda Hostelley on the AEs.

14              Leonard Tacconi, I believe

15         we were the first one to depose

16         him.  He was on consumer

17         advertising.  Texas is a learned

18         intermediary state, but we knew,

19         for example, New Jersey had an

20         opinion where they were maybe

21         opening the door a little bit to

22         that.

23              As everybody in this room

24         knows, Merck did a lot of

FAC Resp. Exhibit D -- 435

Page 10

1    direct-to-consumer advertising.

2    We took a corporate dep on that.

3    Deborah Shapiro on the DSMB

4    for the VIGOR trial, we deposed

5    her as well, as well as the peer

6    review of the Konstam article.

7    Everybody here knows there was an

8    issue about that.

9    James Dunn, one of the sales

10    reps, there was a lot of issues

11    relating to sales reps and this

12    drug.

13    On June 21st 2004, we took

14    our second round of corporate rep

15    depos.  Bernadette McKeon, I

16    believe we were the first ones to

17    depose her.  They produced her on

18    the PIRs, the physician

19    information requests.  We had them

20    produce a bunch of PIRs, and we

21    limited it to the CV risk, but

22    there were a lot of PIRs where the

23    doctors were asking -- they were

24    very interested and obviously

FAC Resp. Exhibit D -- 436

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1    concerned about the CV risk for

2    Vioxx.  So we took an extensive

3    deposition on the PIR process.

4        We took Ms. Reicin's depo.

5    I spent eight hours with her.  I

6    filed a motion to extend the six-

7    hour deadline.  Richard Josephson

8    calls me up, I'll give you eight.

9    I wanted ten, but I figured the

10   judge would give me eight anyway.

11   So, I agreed, and I took her

12   deposition for eight hours.

13   Anybody who has ever deposed her,

14   I know Mr. Lanier deposed her as

15   well, and everybody can tell you

16   that it is exhausting.

17       Mr. Casola on the FDA

18   warning letter --

19       MR. GIRARDI:  You should

20   have made a motion to have it be a

21   45-minute depo.

22       MR. ESCOBEDO:  I agree.  I

23   messed up on that one.  You are

24   absolutely right.

FAC Resp. Exhibit D -- 437

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          They did not bring her to

2          trial.  I believe that was the

3          first time they didn't.  I don't

4          know, obviously, why, but they

5          didn't bring her to trial.

6          We took Thomas Bold.  I

7          believe we were also the first one

8          to depose him.  He was safety

9          surveillance, trying to determine

10         trends.  He was one of the only

11         persons that I can say was very

12         nervous during the deposition

13         because he had never been deposed

14         before, and I don't think they

15         prepared him very well.

16         We also deposed the sales

17         reps that met with or called on

18         the two cardiologists.  I think

19         that was a big -- a unique facet

20         of our case.  We had sales reps

21         calling on cardiologists, which,

22         obviously, by the very nature of

23         their practice are going to have

24         patients with CV risk.  So, we did

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1         that as well.

2              We designated our experts,

3         some of whom I already talked

4         about before.  There was a third

5         round of corporate rep depos.  We

6         took Mr. Silverstein's depo

7         because McKeon didn't know some of

8         the aspects of the PIR process.

9         So we made them produce somebody

10        else.

11             And then we took Nancy

12        Santanello's deposition, really

13        only on the issue -- that was the

14        time when they required the

15        withdrawal of Ms. Cannuscio's name

16        from that article, and we were

17        interested about that.  At this

18        time, everything was going

19        downhill, and it was all headed, I

20        guess, toward the withdrawal of

21        the drug.  But she was the last

22        corporate rep depo that we

23        deposed.

24             They designated their

Page 14

1          experts, which I think is unusual,

2          because we had expert reports from

3          all their experts saying that

4          there's absolutely nothing wrong

5          with Vioxx, under no circumstances

6          could it be prothrombotic.  Then a

7          month later, they withdrew the

8          drug from the market.  They did

9          get a short continuance February

10         14.  That was the alternate trial

11         setting.  And then of course

12         September 30th, Vioxx was

13         withdrawn from the market, and

14         they filed another continuance,

15         the basis of which was --

16         actually, they were trying to help

17         me.  They kept saying it was for

18         my benefit, and I kept saying,

19         thank you, I don't want that

20         benefit.

21              Then in 2005, it really got

22         interesting, and they filed their

23         first motion for legislative

24         continuance.  For those of you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          that are not familiar with that,

2          in Texas, you can get a

3          continuance if the legislature

4          isn't in session, and you have a

5          legislator lawyer, you can get a

6          continuance.

7               They hired Chuy Hinojosa.

8          We basically had a reporter that

9          we knew from the local media, and

10         you would have thought it was Ed

11         Bradley or something.  They went

12         in to go talk to him, he

13         apparently freaked out, and the

14         next day, he withdrew -- on his

15         own, withdrew the motion for

16         legislative continuance.  As you

17         might imagine, there's other

18         legislator attorneys available.

19         And the next day they hired

20         another one, and they filed a

21         legislative continuance.  We moved

22         for an evidentiary hearing and a

23         move to strike the legislative

24         continuance.  And then just to

FAC Resp. Exhibit D -- 441

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          make things -- I guess they didn't

2          want to have that hearing, so they

3          removed us to Federal Court again.

4          Again, that was the basis that I

5          talked about earlier, they deposed

6          Dr. Simonini, but he wasn't my

7          expert against the doctors.  We

8          tried to get it back, but as you

9          might imagine, it is hard to get

10         it back.  The local federal judge

11         said, well, it is going to go to

12         the MDL, and that was that.  Then

13         after that, JPML issued the

14         conditional transfer order.

15              And we fought, as you can

16         tell.  It got removed in January,

17         and it didn't get remanded back

18         until November.  We fought very

19         hard to try to get it remanded

20         because we were ready for trial.

21         We were ready to get the case

22         tried, and we wanted to go to

23         trial.  And quite frankly, we

24         wanted to go to trial because we

FAC Resp. Exhibit D -- 442

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          wanted to hit them for a really,

 2          really big verdict along the lines

 3          of what Mr. Lanier was able to do,

 4          obviously.  It didn't work out

 5          that way, but --

 6                    MR. LANIER:  You had a good

 7          one.

 8                    MR. BIRCHFIELD:  You had a

 9          good result.

10                    MR. ESCOBEDO:  I appreciate

11          that.

12                    Then in 2006, it was a weird

13          trial setting scheduled because

14          the judge has three counties or

15          responsibilities, so we could only

16          try it one week a month.

17                    MR. HERMAN:  Say that again.

18                    MR. BIRCHFIELD:  That's a

19          challenging way to try a case.

20                    MR. ESCOBEDO:  It was a

21          four-and-a-half week trial, but we

22          could only try it one week per

23          month.  So, we started in January,

24          and we tried one week in January.
```

FAC Resp. Exhibit D -- 443

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1          MR. HERMAN:  Same jury?

 2          MR. ESCOBEDO:  Same jury.

 3     And we came back in February and

 4     March, and finally on April 21st,

 5     we got a $32 million verdict.  It

 6     has, I'm sure as everyone is

 7     aware, unfortunately, been

 8     reversed and irrendered by the San

 9     Antonio Court of Appeals in what I

10     believe to be one horribly written

11     opinion, and I believe that for

12     Mr. Lanier's case as well.  We

13     filed a motion for rehearing, and

14     there's been amicus briefs, and

15     I'm very happy that people have

16     done that.

17          That's the extent of what I

18     wanted to say.  We were, I think,

19     involved.  The evidence shows we

20     were involved in this litigation

21     way before the withdrawal of the

22     drug, and I believe we tried a

23     case that was significant in that

24     it was the first short term

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          case -- short term use case.

 2          Right after it, everyone is

 3          familiar, the studies came out

 4          where, I mean, sort of validating

 5          what we were saying, which is the

 6          danger, it can be almost

 7          instantaneous.  And he had risks.

 8          But the way we combatted that on

 9          specific causation was, and of

10          course you never heard about this

11          in the media because it is too

12          complicated, but Mr. Garza had a

13          thallium scan less than a month

14          before he died.  The thallium scan

15          showed normal blood flow.  Then

16          one month later, he dies.  There's

17          an autopsy.  And the autopsy finds

18          not one, but two fresh clots in

19          the exact parts of the heart where

20          the thallium scan less than a

21          month earlier had found normal

22          blood flow.

23               So, I think that's the

24          reason why the case was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1       significant.

2              MR. BIRCHFIELD:  Joe, we're

3       all very familiar with the Garza

4       case and your work in getting that

5       case remanded and pushed through

6       trial and the good verdict.

7              One of the things maybe you

8       can help us on, did you have other

9       cases that you were working up for

10      trial or trying to push to trial?

11             MR. ESCOBEDO:  We had other

12      cases, but none to the point that

13      were developed as the Garza case.

14             MR. BIRCHFIELD:  What about

15      cases that you have that are

16      submitted for the settlement

17      program?

18             MR. ESCOBEDO:  We didn't

19      have that many.  I mean, we looked

20      at a bunch of them.  I'll have to

21      be honest, and I will be honest, I

22      think between 10 and 20 were

23      actually submitted.

24             The firm broke up after the

Page 21

1      trial, and so the MDL part of it

2      stayed probably by mutual

3      agreement -- it was a very

4      amicable breakup.  So, the MDL's

5      part of it stayed with my former

6      partner, and so I'm a little --

7      I'm not that knowledgeable about

8      that.  I'm sorry.  But there

9      weren't that many.  I mean, like I

10     said, between 10 and 20.  We did

11     not have that many.  We're

12     geographically challenged.

13          MR. BLIZZARD:  Joe, the

14     expenses that y'all submitted for

15     that trial I think are around --

16     according to the accountant's

17     report, are $485,000.

18          MR. ESCOBEDO:  Right.

19          MR. BLIZZARD:  That

20     currently has been rejected, but

21     they have rejected a lot of

22     expenses because they didn't

23     really know exactly what the story

24     was.  And so whoever can -- we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          will help get that through the

 2          process and make sure you have

 3          whatever documentation you need to

 4          satisfy that.  If you will call

 5          Lenny Davis in Russ's office.

 6          It's probably better to do that in

 7          person rather than over the phone.

 8          So, you might want to consider

 9          making an appointment to go down

10          there and sit with them and

11          explain the situation.

12                MR. ESCOBEDO:  Glad to do

13          that.

14                MR. BLIZZARD:  Also, it

15          might help, I know Kathy is going

16          to present next, to kind of give

17          us a sort of the breakdown of the

18          responsibilities between the two

19          of you in the involvement on this

20          trial.

21                MR. LEVIN:  Also, your hours

22          have been rejected.

23                MR. ESCOBEDO:  Okay.

24                MR. LEVIN:  So, when you
```

FAC Resp. Exhibit D -- 448

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          talk about your costs, talk about

2          the hours.

3              MR. BIRCHFIELD:  That's not

4          unique to you.  That's happened.

5          We just need you to work with the

6          accountant and get that

7          straightened out.

8              MR. ESCOBEDO:  And I need to

9          talk to Mr. Davis.

10             MR. BIRCHFIELD:  Right.  And

11         he will put you in touch with Phil

12         Garrett at Wegmann-Dazet and set

13         up a meeting if that's necessary.

14             MR. HERMAN:  E-mail

15         ldavis@hhkc.com or call at (504)

16         581-4892 and tell Lenny Davis you

17         need to -- he needs to coordinate

18         for you either a meeting or a

19         conference call with Phil Garrett.

20         Now, most folks that have

21         substantial costs to date have

22         actually met with Phil Garrett and

23         his team.  He's an independent

24         appointed by the Court, a CPA, and

FAC Resp. Exhibit D -- 449

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1          he has a whole team.  They are

 2          there, actually, to assist and

 3          help, rather than to impede.

 4                  MR. ESCOBEDO:  I will do

 5          that.

 6                  MR. HERMAN:  I have a couple

 7          questions.  Your Garza case is

 8          still on appeal, right?

 9                  MR. ESCOBEDO:  Yes, sir.

10                  MR. HERMAN:  Excuse me.

11          Let's go off the record for a

12          minute, please.

13                    -  -  -

14                  (Whereupon, there was an

15          off-the-record discussion.)

16                    -  -  -

17                  MR. ESCOBEDO:  I believe the

18          question that you were asking

19          about is about the

20          responsibilities of Kathy.  We got

21          involved -- well, we are old

22          friends, I've known her for a long

23          time.  We just by coincidence

24          found out we had cases and she had
```

FAC Resp. Exhibit D -- 450

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          cases, we had the Garza case and

2          some others that we were looking

3          at.  I knew that she had

4          prosecuted drug pharmaceutical

5          cases before, and we at the time

6          were -- we did primarily auto

7          products, some other kind of

8          cases, but primarily we're an auto

9          products liability firm.  So we

10         felt we needed to associate with

11         her, and we did.

12              Then later we also

13         associated with Kevin Dubose's

14         firm.  He's an appellate lawyer

15         here in Houston, because we felt

16         we needed to have book lawyers to

17         counter their book lawyers.  They

18         had a lot of them.  I mean, every

19         day of trial in the afternoon,

20         they would have a delivery.  I'm

21         sure everybody that had a trial,

22         they had their little delivery of

23         motions, and I had two associates

24         there, and that's all their job

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          was, basically just to read them

2          and start churning out responses

3          every day.

4                MR. BIRCHFIELD:  Any other

5          questions?

6                (No response.)

7                MR. HERMAN:  Thank you.

8                MR. ESCOBEDO:  Thank you.

9                     -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:   FIBICH, HAMPTON & LEEBRON, L.L.P.
        Sara J. Fendia, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 454

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. BLIZZARD:  Sarah, we

 3         just want to let you know that

 4         obviously we have a court reporter

 5         here, and the court reporter is

 6         going that take everything down.

 7              The Judge in his order has

 8         indicated that he's approaching

 9         this in the same way he approached

10         the Murphy Oil case, and so you

11         need, obviously, to be familiar

12         with that case and those factors.

13         They were also in the original

14         order that has standards to look

15         to for common benefit work.  The

16         floor is going to be yours.  You

17         can say whatever you would like to

18         say, and then we may have some

19         questions at the end.  There may

20         be some people who will interrupt

21         with questions during your

22         presentation, and you can either

23         take them or push them to the end

24         if you want.
```

FAC Resp. Exhibit D -- 455

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          MR. BIRCHFIELD:  Thank you
2      for being here.  Thank you for
3      giving us a few minutes to eat our
4      lunch.
5          MS. FENDIA:  Thank you for
6      giving us the time.
7          I'm here for Tommy Fibich,
8      who was not able to be here.
9      There was some confusion, and the
10     confusion probably originated at
11     my office about this meeting.  So,
12     he didn't get on the schedule
13     until yesterday.  He had a
14     deposition today and tried to
15     rearrange that deposition to be
16     here.  He looked at the list of
17     people who might be here and said,
18     these are all friends of mine, I
19     would like to go over and talk to
20     them, but he was not able to
21     rearrange the deposition.  It's in
22     a pretty critical case that we're
23     involved in now that he's been
24     working pretty hard on.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          I'm here.  I am a 20-year

2     lawyer.  I've been with Tommy for

3     19 of those 20 years.  I know him

4     well.  I know his work ethic well.

5     I can address those issues, and I

6     can address for you what I believe

7     that he accomplished in Vioxx, and

8     I hope that gets us to where we

9     need to be.

10          Let me start out by saying

11     that we did submit time.  Our

12     time, I am confident, is grossly

13     understated.  The reason for that

14     is that our primary efforts were

15     in the Texas MDL.  Tommy was a

16     state liaison for the Federal MDL

17     and obviously had time and

18     involvement in the hearings and in

19     dealing with some of the issues

20     that were required by that

21     position, but our primary focus

22     was with the Texas MDL.  The Texas

23     lawyers know that there is no

24     mechanism under the Texas MDL

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          statute to authorize common

 2          benefit fees.  As a consequence of

 3          that, we, unfortunately, didn't

 4          keep time the way we should have

 5          kept it.  So, when it came time to

 6          submit time to the federal MDL, we

 7          went back and we didn't submit

 8          anything that we didn't have some

 9          kind of piece of paper or record

10          to rely on in coming up with the

11          time.

12              Tommy's philosophy is he's

13          not one to promote himself in

14          terms of how much time is spent

15          and how much money is spent.

16          Those of you in the room that know

17          him probably know that about him.

18          You probably also know you

19          wouldn't want to get between him

20          and a reporter, but in terms of

21          promoting his time, he's very,

22          very conservative in that regard,

23          and that's just our firm

24          philosophy.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1           I am the nuts and bolts

2      lawyer on a lot of his

3      pharmaceutical litigation, and I

4      am the one that took primary

5      responsibility for trying to

6      assemble the time records, but I

7      do believe they are grossly

8      understated.

9           When Tommy first got

10     involved in the Vioxx litigation,

11     he did as he has done in all

12     pharmaceutical litigation he's

13     been involved in.  He started

14     talking to experts and making

15     himself familiar with the issues

16     associated with Vioxx causation

17     issues, the epidemiology, where

18     the gaps were in the science and

19     what was going to have to happen

20     to develop this litigation.

21     Because of his stature in

22     pharmaceutical litigation -- I

23     look around this room, and you all

24     have a national stature in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           pharmaceutical litigation, and I

2           think you would agree with me that

3           Tommy is one of your peers.  He's

4           been at it for a long time.  He

5           served on the PSC for Zyprexa and

6           fen-phen, and, of course, I think

7           a lot of people cut their teeth on

8           fen-phen, and we certainly did

9           too.

10              Because of his stature,

11          obviously, other lawyers in Texas

12          kind of looked at Tommy on the

13          Vioxx issue.  For the Texas MDL,

14          we were in Judge Randy Wilson's

15          court.  I think it's fair to say

16          that Randy Wilson looked

17          consistently to Tommy to work with

18          him, and for guidance and for

19          assistance and input as to how the

20          Texas MDL should proceed.

21              As it relates to the Texas

22          MDL, our law firm, along with, to

23          a great extent, Dave Matthews' law

24          firm, really took the lead on

FAC Resp. Exhibit D -- 460

Page 8

```
 1          briefing, arguing, advancing the

 2          Texas MDL, assisting the Court in

 3          developing pretrial orders, CMOs

 4          and the like, and worked

 5          consistently with the Court in

 6          that regard.

 7               Tommy was also notice

 8          counsel for the State of Texas.

 9               MR. HERMAN:  I'm sorry.

10          What does that mean?

11               MS. FENDIA:  That meant that

12          all notices served by the

13          defendants came through our

14          office, and from our office we

15          disseminated them to all Vioxx

16          counsel.

17               MR. HERMAN:  Liaison.

18               MR. SEEGER:  Actually,

19          Sarah, he was the liaison for

20          Texas, wasn't he?

21               MS. FENDIA:  Right.  I think

22          along with Grant Kaiser in the

23          Federal MDL.  Is that what you

24          meant?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1           MR. SEEGER:  I thought Judge
 2      Wilson had appointed Tommy as the
 3      state court liaison.
 4           MR. BLIZZARD:  No.  That's
 5      what really this notice counsel
 6      serves, is the role of making sure
 7      all of the communications are
 8      facilitated in the state.  Then
 9      there was a separate appointment,
10      I think, to be liaison to the
11      federal MDL, and that was Grant
12      and Tommy.
13           MR. HERMAN:  What did you
14      understand Grant's role to be?
15           MS. FENDIA:  I understood
16      Grant and Tommy were both state
17      liaison counsel to the Federal
18      MDL.  That's what I understood.  I
19      may be mistaken about Grant.  I
20      know I'm not about Tommy.
21           MR. BLIZZARD:  It was Judge
22      Wilson's attempt to make sure
23      Texas lawyers were informed of
24      what was going on in the MDL, to

FAC Resp. Exhibit D -- 462

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          sort of appoint them as the people

2          to report back.

3               MS. FENDIA:  So, over the

4          course of the Texas MDL

5          particularly, that's where my

6          heaviest involvement was, and

7          that's what I know most about, we

8          served on a daily basis all kinds

9          of functions in that capacity for

10         the Texas lawyers.

11              There are a lot of small

12         Texas lawyers that had a few cases

13         and for one reason or another felt

14         they didn't have the ability to

15         fund some of the things that

16         needed to be -- you know, always

17         travel up to hearings, for

18         example, to participate in certain

19         aspects.  So they relied very

20         heavily on us.  I fielded calls

21         almost daily from Texas lawyers,

22         certainly none in this room, you

23         are certainly capable of dealing

24         with the issues themselves, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        from a lot of the smaller firms

2        and lawyers that didn't have the

3        pharmaceutical experience.  We

4        dealt with that.

5             We dealt with making sure

6        everyone had notice.  We had many

7        questions from Judge Wilson about

8        who are the Texas counsel, where

9        are these cases, trying to get the

10       Texas MDL properly positioned.  So

11       we handled a lot of that kind of

12       work in our office.

13            Tommy, of course, was always

14       engaged in all of that.  He was

15       also on the Texas PSC, which

16       consisted of probably about seven

17       or eight lawyers including Dave

18       Matthews and Gallagher.  Mark, I

19       think you were on the committee.

20            MR. LANIER:  Yes.

21            MS. FENDIA:  And several

22       others.  Tommy continuously was

23       involved in meetings with the

24       Texas PSC, developing --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        assisting, again, the Court in

2        developing this MDL and trying to

3        advance the cases.  A great deal

4        of time was spent in those kinds

5        of meetings.  Unfortunately, no

6        time records, so not all of that

7        appears on the time sheets, but a

8        great deal of time was spent in

9        that.

10             Again, I think, given

11       Tommy's stature generally in

12       Houston and Texas and I would say

13       beyond, I think that a lot of

14       lawyers did look to him for

15       leadership.  I know that Judge

16       Wilson did, and I think Mark and

17       Ed would concur with that.

18             As we came down in Texas to

19       a point that it was time to start

20       trying cases, Judge Wilson decided

21       he wanted to try a heart attack

22       case or a couple of heart attack

23       cases and a stroke case or a

24       couple of stroke cases and get a

FAC Resp. Exhibit D -- 465

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          sense of what the evidentiary

2          issues would be and try to make as

3          many rulings as we could so there

4          would be consistency around the

5          state.  To a large extent, he

6          visited with Tommy a lot on that

7          issue and conducted a number of

8          hearings on limine issues,

9          evidentiary issues, Daubert issues

10         and all of these types of things.

11         Tommy and, again, Dave Matthews,

12         to a large degree, took the lead

13         on all of that in assisting the

14         Court and getting ready to try

15         cases.

16              When it came down to

17         actually trying a case -- and I

18         know you had the same experience

19         in the Federal MDL, but when it

20         came down to actually trying a

21         case, every time a case came up to

22         go, someone nonsuited or there was

23         an issue associated, and we were

24         having trouble getting the case to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1          trial.

 2               So, Tommy finally stepped in

 3          and said we need to get a case to

 4          trial, and he agreed to be the one

 5          to take Ruby Ledbetter's case to

 6          trial.  That was our first case

 7          that was getting ready to go.  We

 8          were working that up for trial,

 9          all of the pretrial, and that's

10          our bellwether case.  Our time

11          will reflect the Ledbetter time,

12          because we believe it was the case

13          that was going to advance Texas

14          litigation for all Texas claims.

15               MR. BIRCHFIELD:  Sarah, was

16          that your case?

17               MS. FENDIA:  Yes.  Ruby

18          Ledbetter was our case.

19               MR. SEEGER:  You were

20          working that case up for trial?

21               MS. FENDIA:  Yes,

22          absolutely.  We were working that

23          up for trial.  It was in that case

24          that the defendants filed their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          preemption motions based on the

2          Texas statute, and, of course, we

3          all worked on that.  We did very

4          heavy briefing on that.  The

5          Matthews firm took a lot of the

6          briefing on and a lot of the

7          limine issues.  Mark's firm

8          participated in that as well.  We

9          took the initial briefing on the

10         preemption issues and the Texas

11         statute issues.  And then Collyn

12         Peddie from Williams and Bailey --

13         it is no longer Williams and

14         Bailey.

15              MR. BLIZZARD:  Williams

16         Kherkher.

17              MS. FENDIA:  -- jumped in.

18         She's a fine lawyer, and she was

19         involved with us on that as well.

20              Ultimately we lost that,

21         which the Texas lawyers know,

22         which kind of put all Texas

23         litigation on hold.

24              At that point, the decision

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          was made to appeal that case, and

2          the appeal was underway.  Collyn

3          Peddie took the lead on the

4          appeal, and then your settlement

5          came, and of course Ruby Ledbetter

6          was excluded from that settlement,

7          and that was unfortunate.

8                MR. BIRCHFIELD:  On

9          Ledbetter, just so you know, as we

10         were negotiating, you are right,

11         Ledbetter was excluded from the

12         settlement, but as we were

13         negotiating, we tried.  We tried

14         to get Ledbetter included in the

15         settlement, but Merck just

16         absolutely refused to include

17         Ledbetter, as well as several

18         other cases that were pending on

19         appeal at the time.

20               MS. FENDIA:  Right.  I think

21         we understood that.

22               MR. HERMAN:  Can you tell us

23         what depositions your firm took

24         and what experts you hired that

Page 17

1          the firm considers to be of common

2          benefit.

3              MS. FENDIA:  Unfortunately,

4          I wish I had looked back at that.

5          Unfortunately, I'm having a little

6          trouble recalling the names to

7          mind.  I believe Tommy did, was it

8          the Dolan deposition for the state

9          of Texas?

10             MR. BLIZZARD:  He actually

11         sat and took the deposition of

12         somebody who was high up in the

13         sales and marketing group with

14         Mark Robinson.  I know that

15         because he told me about that

16         deposition.

17             MR. HERMAN:  I know Tommy is

18         not here, and we need to be fair

19         to you folks.  Frankly, I don't

20         have an affidavit with me.

21             MR. BLIZZARD:  It is in the

22         affidavit, Russ.

23             MR. HERMAN:  Maybe the

24         question I'm asking is already

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          there.

2                  MR. BLIZZARD:  It is.

3                  MS. FENDIA:  There are no

4          names.  Can I supplement with

5          that?

6                  MR. HERMAN:  Yes.  That's

7          why I'm asking the question.

8                  MS. FENDIA:  So, depositions

9          and experts.

10                  MR. LEVIN:  Definitely the

11          experts, too, because it looks to

12          me like you submitted about

13          $80,000 in costs that were

14          rejected, but we'll tell you what

15          to do about that.  But you were

16          doing that in conjunction with

17          Matthews, who has $1,600,000 costs

18          that were rejected.  Some of that

19          must be expert fees.  So, Russ

20          will tell you how to call the

21          accountants and see whether you

22          can straighten that out.

23                  MR. HERMAN:  You can call

24          Leonard Davis at my office, (504)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1       581-4892 and ask him to set up a

2       conference call and an appointment

3       with Phil Garrett.  Phil Garrett

4       is a CPA appointed by the Court

5       who doesn't do any private work

6       for any lawyer in the litigation

7       or firm.  He'll sit with you or

8       have someone sit -- it might as

9       well be for both you and Fibich

10      and Matthews and work through the

11      costs.  We really need to get that

12      done.  The safest thing to protect

13      you is to make these contacts, and

14      if necessary, there's enough money

15      involved, to go sit with the CPA

16      firm.

17              MS. FENDIA:  Okay.  I'll do

18      that.

19              MR. LEVIN:  Your hours were

20      approved.  Matthews' hours have

21      not been approved.

22              MS. FENDIA:  Thank you.  I

23      felt they were reasonable.  As I

24      said, I felt they were

Page 20

1        understated.

2                MR. HERMAN:  One of the

3        questions I have is, after

4        preemption in Texas, Judge

5        Wilson's decision, what

6        materials -- you might want to

7        include this in a supplement.  I

8        read all the affidavits, and I

9        just don't remember seeing the

10       information I'm asking for.  If

11       you could list what materials were

12       sent to the MDL depository or New

13       Jersey depository and Chris'

14       office or Andy's office for common

15       benefit and when they were sent,

16       that also ought to be

17       supplemented.  I think it would be

18       unfair to ask you to do this off

19       the top of your head.

20               MS. FENDIA:  I can tell you

21       that I don't think that we

22       submitted materials.  I think we

23       have submitted our time based on

24       our activities in the Texas MDL.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1         So, I can tell you candidly that I

2         don't believe that we submitted

3         materials to the Federal MDL or to

4         New Jersey.  I will certainly

5         follow up.

6               MR. HERMAN:  Check to be

7         sure.

8               MS. FENDIA:  I will.

9               MR. HERMAN:  Judge Fallon

10        appointed Dawn Barrios as chair of

11        the MDL liaison committee with the

12        states.  If you recall, what

13        interaction did you have with Dawn

14        Barrios?

15              MS. FENDIA:  My interaction

16        with Dawn Barrios was relatively

17        limited.  We dealt primarily with

18        mechanics.

19              MR. HERMAN:  Generically.

20              MS. FENDIA:  But Tommy

21        participated fairly regularly, at

22        least by phone, if not in

23        hearings, in the Federal MDL up

24        until -- probably until the Texas

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          MDL.  Up to the point he had more

 2          difficulty making those trips to

 3          New Orleans.  He and Dawn Barrios,

 4          I believe, talked regularly about

 5          what the issues were, as I

 6          understand it.  Unfortunately, I

 7          wasn't a party to those

 8          conversations.  But as I

 9          understand it, he had regular

10          conversations with her and dealt

11          with the issues that were being

12          raised by Judge Wilson to the

13          extent -- very often at the

14          hearings, Judge Wilson was talking

15          to Tommy about what is Judge

16          Fallon doing about this issue or

17          that issue or the next issue, and

18          my understanding is Tommy was

19          dealing with Dawn on those issues.

20          I will clarify that understanding

21          for you, but that is my

22          understanding.

23              MR. BIRCHFIELD:  Besides the

24          Ledbetter case, were there any
```

FAC Resp. Exhibit D -- 475

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1           other cases that y'all worked up

2           for trial that you were pushing or

3           had trial ready?

4                MS. FENDIA:  No.

5                MR. BIRCHFIELD:  How many

6           cases did your firm submit to the

7           settlement, claims packages?

8                MS. FENDIA:  100.  I'm

9           sorry.  Between 90 and 100.

10          That's what our firm directly

11          submitted, and that's what we are

12          working on now.  We are secondary

13          counsel on another 250 that were

14          submitted out of Louisiana.

15               MR. HERMAN:  Who is primary

16          on those?

17               MS. FENDIA:  Robert Salin.

18               MR. HERMAN:  When you say

19          "primary," "secondary," I'm not

20          sure that I understand the

21          relationship.  Were these filed in

22          Texas where he was lead or filed

23          in Louisiana?

24               MS. FENDIA:  Many of them

FAC Resp. Exhibit D -- 476

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          were filed in Louisiana and are in

2          the MDL, I believe.  But his firm

3          took primary responsibility for

4          those files.  We were sharing the

5          fees.

6                    MR. BIRCHFIELD:  When you

7          say "primary," you are talking

8          about for the settlement program?

9                    MS. FENDIA:  Right.  For the

10         settlement program.

11                   MR. BIRCHFIELD:  Any other

12         questions?

13                   MR. WEITZ:  No.

14                   MR. BLIZZARD:  No.

15                   MR. HERMAN:  I think Ed has

16         asked some questions that are

17         important, and I know that the

18         Fibich firm has regularly

19         contributed to plaintiff bar

20         efforts, and I'm assuming that the

21         firm is still fighting the

22         preemption fight like the rest of

23         us.

24                   MS. FENDIA:  Yes,

FAC Resp. Exhibit D -- 477

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          absolutely, no question about it.

2          I think Ed knows Tommy's

3          involvement in that issue better

4          than I do.

5               MR. BLIZZARD:  Yes.  Let me

6          say from the outset that we all

7          worked closely on the Texas MDL,

8          even though many of us, including

9          Tommy, didn't have a lot of cases

10         filed in Texas.  Tommy clearly

11         took the lead in the motion

12         practice and also the interactions

13         with Judge Wilson.

14              When it came time for Judge

15         Fallon to appoint a committee to

16         help negotiate with Merck from the

17         plaintiffs' side, Judge Wilson

18         talked to Tommy, and Tommy said

19         that I would probably be the

20         person that should do that because

21         I had just tried a case in Judge

22         Fallon's court.  So Tommy was the

23         kind of --

24              MR. HERMAN:  He's the one we

FAC Resp. Exhibit D -- 478

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          have to blame for that?

2               MR. BLIZZARD:  Right.  He's

3          the kind of team player who was

4          not just looking out for his own

5          interest, but was looking to make

6          sure that the clients' interests

7          were advanced first and foremost,

8          and he thought that would be a

9          more effective way of doing it

10         since I had worked closely with

11         Judge Fallon on my trial case.

12         So, Tommy put the clients'

13         interest ahead of anything else

14         for him and --

15              MR. HERMAN:  I think that's

16         an important commentary, Ed, for

17         this record.

18              MS. FENDIA:  Thank you.

19              MR. SEEGER:  Thank you,

20         Sara.

21                   -  -  -

22

23

24

FAC Resp. Exhibit D -- 479

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  GAINSBURGH, BENJAMIN, DAVID,
       MEUNIER & WARSHAUER, LLC
       Gerald E. Meunier, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
    877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 481

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                - - -- - -
 2              MR. HERMAN:  Jerry,
 3         everything is on the record for
 4         Judge Fallon.  If you would like
 5         to add or subtract from your
 6         affidavit, let us know.
 7              We had a woman whose office
 8         had virtually been destroyed.  We
 9         had a client by the name of Diaz,
10         and the defendants picked Diaz.
11         Jerry stepped up with me, agreed
12         to share all the costs in that
13         case.  We went out looking for
14         experts.  I know that I believe
15         Jerry interviewed one at Tulane, I
16         had one at Hofstra, and we were
17         ready to prepare that case and try
18         that case when, in a conference,
19         the lawyer who had the client,
20         would not agree to let us call the
21         shots during trial.  It could have
22         been a disaster in pulling that
23         case following another case that
24         was pulled, but the fact that
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        Jerry stepped up and we were ready

2        to go, and it wasn't our decision

3        not to try it, really saved the

4        situation.

5             Secondly, Jerry, at the time

6        when we needed a trial package,

7        volunteered to chair, co-chair the

8        trial package committee and did a

9        heck of a job.  I know he made

10        other contributions, but I'm

11        particularly grateful in those two

12        circumstances that Jerry stepped

13        up.

14             MR. MEUNIER:  Thank you,

15        Russ.

16             Well, first thing I wanted

17        to just say was that I'm neither a

18        competent nor an aggressive

19        timekeeper, so, I think my job

20        today is to try to communicate

21        some of the more tangible aspects

22        of whatever time I have as a

23        weighing factor for common benefit

24        purposes.  I think essentially my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          affidavit covers all the key

2          points.  I'll just emphasize a few

3          things.

4               In the early going of the

5          case, I saw my job as being

6          focused on law issues, and then I

7          realized we have the master in law

8          among us, Arnie, and this is

9          hardly needed, but I did do some

10         work on the master complaint,

11         helped with some Louisiana law

12         research.  Then it was my

13         experience that it was helpful for

14         the group to have a local attorney

15         here in town on a continuous

16         basis, because there were some

17         case management issues that arose

18         and some needs on a short notice

19         basis to meet with Phil Wittmann

20         or meeting with the judge.  I know

21         there were a couple of times I

22         went over to see Judge Fallon with

23         Russ to talk about, for example,

24         that Miller study that was being

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        published.

2              I remember a meeting, too,

3        with Phil to talk about the

4        beginnings of a case management on

5        a class action.  So, I think a lot

6        of the work that I did in the

7        early going focused on the fact

8        that I was available and I was

9        here practicing in the state and

10       available to take those kinds of

11       things on.

12             When we were talking about

13       class certification, I also

14       arranged Dean Ed Sherman's

15       involvement as an expert, and we

16       had a lunch meeting with him.

17             Then as things evolved, I

18       became more involved with some of

19       the trials at least in an

20       ancillary way.  The Daubert

21       hearing, as I recall, was a group

22       effort, but I did take a role in

23       the presentation to Judge Fallon

24       on Daubert.  I had published on it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          and spoken on Daubert and spoke

2          about general standards, as I

3          recall, with the Court.

4                And then the first trial of

5          Irvin occurred in November of '05

6          when the Court was displaced to

7          Houston because of Katrina, and as

8          Russ knows and local attorneys

9          know, that hurricane also

10         displaced law firms, including

11         mine, but we gathered ourselves,

12         kept the firm together, and I

13         maintained my level of commitment

14         to this case.

15               I flew to Houston for that

16         trial, as others did, and

17         essentially stayed there during

18         the entire trial.  I think I was

19         one of the few, besides Andy's

20         trial team, who were actually

21         there every day right through to

22         the end and staying through the

23         final weekend, as I recall.

24               It was good for me.  I got

Page 7

1    to, obviously, learn more about

2    the case, but I got to know the

3    family.  I got to see firsthand

4    what the case was about from a

5    human standpoint, which was very

6    helpful.  During that trial, I did

7    handle the jury charge conference,

8    as I recall, that we had with

9    opposing counsel.  I also reported

10   to the PSC during that trial on a

11   key evidentiary ruling.  I found

12   myself in this case at various

13   times having to answer questions

14   about Judge Fallon's way of

15   thinking about certain things, and

16   I did --

17        MR. HERMAN:  I think it's

18   fair to say we were both shocked

19   at some of the rulings.

20        MR. MEUNIER:  We were

21   shocked at the decision he made

22   about the expert, the causation

23   expert in Irvin.

24        Now, when Irvin mistried,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          the Court decided, one, that the

2          retrial would occur here, we would

3          be back here in New Orleans, but

4          then, as Russ has already alluded

5          to, the next case up was going to

6          be Ellis Diaz.  And Bonnie

7          Zabotnick, who was the local

8          counsel, was just not equipped to

9          handle that trial.  As Russ said,

10         we agreed to team up on it.  I met

11         with Ellis Diaz.  I prepped him

12         for his deposition, I defended his

13         deposition, which was a lengthy

14         one in my office.

15              I had extensive meetings

16         with Bonnie Zabotnick about the

17         case.  We looked at the medical

18         records.  I did contact the local

19         cardiologist, Russ knows, we lined

20         him up, I met with him to talk

21         about causation issues.  There

22         were problems dealing with family

23         history in that case.  It was

24         going to be a challenging case.

FAC Resp. Exhibit D -- 488

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          As Russ says, ultimately it became

2          clear that there was no effective

3          way for the PSC to do what it

4          needed to do in that case.  I was,

5          I believe, instrumental in

6          convincing Zabotnick that the best

7          thing that should happen is an

8          agreement that the case be

9          withdrawn, because Judge Fallon

10         was not going to permit us to

11         simply pick another case.

12              In other words, Mr. Diaz had

13         to either drop his Vioxx case or

14         that was going to be the next case

15         after Irvin II.  And I think it

16         was helpful that the Ellis Diaz

17         case was not tried.

18              I remember during Irvin II,

19         and I was invited by Andy and with

20         Troy to join the trial team, sit

21         at counsel table for Irvin II.  We

22         actually suspended the trial of

23         Irvin II for a status conference

24         of Diaz.  I remember I had to put

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          on a second had during that,

2          actually sit in on the Diaz

3          conference as lead counsel at that

4          moment for him.

5               Irvin II, my job was not to

6          handle witnesses or have any

7          speaking role with the jury, but I

8          was asked to be responsible for

9          jury charges and then certain

10         evidentiary issues that came up.

11         Primarily, I think I was helpful

12         in giving input to that trial team

13         and to others that would follow

14         about just the Eastern District,

15         the trial of Eastern District jury

16         cases after Katrina.

17              I think at that point, I was

18         one of the few plaintiff lawyers

19         associated with this case who had

20         actually tried a case to verdict

21         after Katrina, it was a maritime

22         case, and we have a good verdict

23         in it, but I learned a lot about

24         the different demographics after

FAC Resp. Exhibit D -- 490

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Katrina of Eastern District

2          juries, and I think that helped me

3          give some input in a trial of

4          those cases.

5               After Irvin II, I was less

6          active, but still had input for

7          the Barnett case with Mark

8          Robinson and his team.  I remember

9          speaking with him about jury

10         themes and about presentation to

11         that jury.  I remember giving --

12         talking to Mark during the voir

13         dire, and I was present for and

14         attended that trial, as I did

15         Irvin I and II.

16              The next trial, and probably

17         the only other relative trial in

18         the federal MDL that I was

19         involved with was Dedrick, and

20         what I recall about that is Andy

21         asked me to come over to the hotel

22         where he and others were staying,

23         we had a meeting one evening about

24         certain issues that were

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          challenges in that case, certain

2          issues that needed to be addressed

3          and how the proof could better be

4          presented.

5               MR. BIRCHFIELD:  A few

6          challenges in that case.

7               MR. MEUNIER:  There were

8          challenges.

9               And so, in retrospect, I

10        believe I made helpful

11        contributions in Irvin I and II,

12        in Diaz, even though it wasn't

13        tried, in Barnett and Dedrick.

14        So, the trial activity for me in

15        the MDL was not insignificant, and

16        I think occupied most of my time

17        in the middle stage, the early

18        stage being more of the law and

19        case management and then the

20        middle stage trials.

21             And then the final stage was

22        the trial plan, as Russ mentioned.

23        I was asked to chair the trial

24        plan committee.  I want to make it

FAC Resp. Exhibit D -- 492

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       very clear that there was a lot of

2       heavy lifting done by that

3       committee which was not done by

4       me.  There were people on that

5       committee, including Leigh O'Dell

6       and a host of others who really

7       had such a good, strong working

8       knowledge of the case that I

9       thought my role was to look at it

10      from the standpoint of a user of

11      the package, a trial lawyer who

12      would take that package with

13      little foreknowledge about Vioxx

14      and how would the package actually

15      serve a lawyer to put the case on.

16          So, I tried to keep a

17      pragmatic focus for the group,

18      giving whatever input I can from a

19      user standpoint.  And other than

20      that, served as a sounding board

21      just to help with the organization

22      of it.  There were a lot of

23      meetings for the trial plan, a lot

24      of phone conferences and in-person

Page 14

1     meetings, and then ultimately the

2     MI trial package group presented

3     to Judge Fallon, and I was part of

4     that presentation.  We then merged

5     with the stroke package committee

6     and basically had a larger working

7     group to then do the stroke

8     adjunct to the trial package.  And

9     so I continued to work in a

10    chair --

11         MR. HERMAN:  Let me

12    interrupt you for a second.

13         Jerry is being really overly

14    modest in terms of trial package,

15    because we were negotiating at the

16    time, unknown to Jerry, and I kept

17    pushing the deadlines, because I

18    knew that if we ever came to

19    fruition to get a settlement, we

20    had to have a stroke package in

21    place, and it had to be reviewed

22    by the judge.  So, Jerry really

23    organized that, pushed it, made

24    sure the deadlines were met.  And

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          without his leadership and Pete's,

2          and I think at some point Pete was

3          trying a case with Troy, I don't

4          think the product would have been

5          as good, and I don't think we

6          would have had it as timely as we

7          did.  I don't think we can

8          undervalue Jerry's leadership in

9          terms of the trial package.

10              MR. SEEGER:  I agree with

11          that, by the way, but since names

12          are being mentioned, if I don't

13          mention that Jeff Grand and

14          Buchanan were involved, I'm going

15          to get yelled at when I get back.

16              MR. MEUNIER:  You can't

17          mention one without the others,

18          you're right.  Chris Tisi, I mean,

19          Shelly Sanford, there were many.

20              MR. SEEGER:  It was a great

21          team, but the team needed a lead,

22          and you were the lead.

23              MR. MEUNIER:  And Russ is

24          right.  We worked under pretty

FAC Resp. Exhibit D -- 495

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          strict deadlines, and it took some

 2          doing to get everybody on the same

 3          page and working and meeting

 4          deadlines.  I was pleased with the

 5          product.  I think it's a great

 6          trial package.

 7                So, I started as a law clerk

 8          in this Eastern District Court,

 9          and I've done a lot of work in

10          this court, and was president of

11          the Federal Bar Association of the

12          New Orleans chapter, which is the

13          second largest chapter in the

14          nation, and I feel like I've grown

15          up here.  I feel like I've really

16          spent a lot of my time in this

17          court.

18                MR. LEVIN:  I feel like I've

19          grown up here.

20                MR. MEUNIER:  So, my final

21          thought is what I began with, I

22          think it was helpful to the group

23          to have me join Russ as a local

24          attorney who kind of knew the
```

Page 17

```
 1        ropes here, who could give insight

 2        to different aspects of how you

 3        practice here and who this judge

 4        is and how you approach juries,

 5        and I was really pleased to serve

 6        as a New Orleans member of the

 7        committee itself, but I think in

 8        retrospect, that was a key part of

 9        my role in the case.

10             MR. HERMAN:  Off the record

11        for one second.

12                  -   -   -

13             (Whereupon, an

14        off-the-record discussion was

15        held.)

16                  -   -   -

17             MR. HERMAN:  How many hours

18        do you have in, Jerry?  Let me

19        preface this by saying your hour

20        of your work may be worth a great

21        deal more than somebody else's.

22        We're asking everybody how many

23        hours they had in.

24             MR. LEVIN:  I'll tell you --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           MR. MEUNIER:  You'd probably

2       know.

3           MR. LEVIN:  1,058, and the

4       firm has 1,123.25.

5           MR. BIRCHFIELD:  It is a

6       pleasure working with you on the

7       trial team.  The support role you

8       played, it was vital.  Everything

9       that you touched in this

10      litigation was done with

11      excellence and was much

12      appreciated.

13          MR. RAFFERTY:  I would echo

14      that.

15          MR. SEEGER:  This is the

16      first case we had ever worked on

17      together, and I don't want to be

18      negative about -- I don't have to

19      give a compliment by being

20      negative about others, but there

21      were some people who were not

22      really there for assignments.  You

23      were there for every single one,

24      and you helped us anywhere.  You

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          are a real team player.  I

2          definitely appreciate that.

3               MR. HERMAN:  Anybody have

4          any other questions?

5               MR. SEEGER:  Thank you for

6          everything.

7                    -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:        GANCEDO & NIEVES
             Hector G. Gancedo, Esquire
             Tina B. Nieves, Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 501

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. GIRARDI:  The reason the
 3       court reporter is here is for
 4       Judge Fallon actually.  Everything
 5       that we say, we'll have a record
 6       of for the purpose of getting this
 7       to Judge Fallon.
 8            With that, go ahead.
 9            MS. NIEVES:  I was going to
10       say that originally I prepared a
11       PowerPoint, but I've spoken to a
12       few of the people in New Orleans,
13       and they said oh, no, it is way
14       more informal.
15            MR. SEEGER:  If you printed
16       stuff, that's easier.
17            MS. NIEVES:  I'm going to
18       use it as bullet points basically
19       just for an outline.  Over the
20       course of six years, seven years,
21       there's been a lot done.
22            So, as Tom knows here, and I
23       think the rest of you, our firm
24       has been involved in the case from
```

Page 3

 1          the outset.

 2              I see that one of the items

 3          that you want to delve into is how

 4          long pre-Vioxx withdrawal has the

 5          firm been involved.  We started

 6          investing in this case with Tom's

 7          firm back in 2001.  At that time,

 8          my partner, Hector, went with

 9          members of Girardi Keese out to

10          Mark Lanier's office to meet with

11          Goforth Lewis and members of

12          Mark's firm, and we had done a lot

13          of prefiling research at that

14          time.  We went out there and met

15          with them and put our heads

16          together and looked at what they

17          have come up with and augmented

18          our research.  We filed our first

19          case in 2002.

20              At that time, we had several

21          cases filed in California.  It was

22          the very beginning of the

23          litigation in California.  Our

24          firm filed and prepared the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          initial coordination petition to

2          help get the cases coordinated in

3          CCW.

4                    MR. SEEGER:  That's for

5          California?

6                    MS. NIEVES:  This is all

7          California stuff.  So we did that,

8          and shortly thereafter, we were

9          before what became the first of

10         many judges, because as you've

11         probably heard with Walter, we

12         bounced around with a lot of

13         judges.  We were before the first

14         of the judges, and we were

15         appointed as one of the five

16         members of the Plaintiffs'

17         Executive Committee in California.

18         We regularly attended throughout

19         the litigation status conferences.

20         We attended the meetings with the

21         defendants early on regarding

22         coordination, how we're going to

23         strategize about that.

24                    We then undertook to look

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1           through the inventory of cases

2           that were filed at that point in

3           California.  At that point, we had

4           about 600 cases filed in

5           California, and we ended up with,

6           three of the five clients that

7           were going forward on bellwether

8           cases before Judge Lichtman were

9           our cases.  So we undertook a very

10          aggressive prelitigation schedule.

11              MR. BLIZZARD:  You may have

12          said this, Tina.  When was that

13          exactly, what was the time frame?

14              MS. NIEVES:  2002.  Well, I

15          don't know at that point.  It may

16          have been beginning of 2003, but

17          it was somewhere around then.

18          Basically at that point, the

19          pressure points for defendants was

20          what was going on in Houston and

21          what was going on in California at

22          that point.  Right, Chris?  Or in

23          New Jersey, too.

24              MR. BLIZZARD:  Coordination

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          started in California around 2003

 2          or late 2002.

 3               MS. NIEVES:  Late 2002,

 4          exactly.

 5               MR. SEEGER:  I remember, and

 6          I remember you having those issues

 7          and going through judges, and one

 8          case was set really fast, and then

 9          you lost that judge, and then the

10          case got pushed --

11               MS. NIEVES:  Defendants used

12          a preemptory challenge on the

13          first one.  We used a preemptory

14          challenge on the second one.  The

15          third one, Judge Lichtman, we were

16          with him for two years, and then

17          he was disqualified when the

18          defendants discovered he has used

19          Vioxx.  Then we went to Judge

20          Chaney.

21               When we were before Judge

22          Lichtman, he had it for two years,

23          we had three of the five cases

24          that were set.  We did the full
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          workup, actually, on those cases,

2          a lot of depositions and expert

3          work, et cetera.

4                And then in the interim, we

5          were sent over to Judge Chaney.

6          Then once we were with Judge

7          Chaney, at that point she dashed

8          what protocol Lichtman had in

9          place.  He had an all plaintiffs

10         pick slate, and Chaney said that

11         we're going to do a completely

12         different protocol.  So, we

13         started anew with members of the

14         executive committee to go through

15         and look at what was now a growing

16         number of cases in the California

17         inventory.

18                This is right around -- now

19         at this point we're around the

20         time when the MDL is about to

21         start.  Ultimately as we selected

22         the cases that were going to be

23         tried in this following group in

24         California, and right around then

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        is when, like I said, the MDL

 2        started to form and Hector and I

 3        went out and saw all of you and we

 4        went out to a lot of

 5        organizational meetings.  Houston,

 6        I can't remember where the others

 7        were, but we went a number of

 8        places.  We kind of shifted most

 9        of our resources because we didn't

10        have a dog in the fight at that

11        point.

12             MR. GANCEDO:  We didn't have

13        a trial case in California.

14             MS. NIEVES:  We didn't have

15        a trial case going on.  We shifted

16        a lot of our resources at that

17        point to the MDL.  We were

18        appointed to both the science and

19        expert committee and to the

20        discovery committee.

21             Let's see.  So, I think the

22        most unique, in terms of what we

23        did for the MDL, and we did quite

24        a lot, but I think the most unique
```

FAC Resp. Exhibit D -- 508

Page 9

1         contribution we did, and I don't

2         have it put on the screen at the

3         moment, but I have it right here,

4         was this interactive multimedia

5         trial package that we prepared.

6         Basically what this was, and some

7         of you, I think, have seen it, and

8         I've actually got copies for all

9         of you so you can run it on your

10        computers.  Chris, you already

11        have one of these probably because

12        I sent one to every member of the

13        executive committee.  It was made

14        part of the trial package.

15             MR. GIRARDI:  I have it.

16        Not only do I have it, but I

17        looked at it.

18             MS. NIEVES:  Okay.  The

19        purpose of this was based on our

20        experience with prior MDLs, we

21        have had situations where people

22        have complained that they received

23        a trial package and it seems

24        cumbersome for an individual trial

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          lawyer, let's say, in Nebraska,

2          who wasn't on the inside, didn't

3          have the inside knowledge and

4          didn't do any of the common

5          benefit work, and all of a sudden

6          has got this fast track case set

7          for trial and he needs to brush up

8          on it quickly.  And he's got a

9          huge amount of work product, but

10         it is difficult, it is cumbersome.

11              So, what we did was, we made

12         this interactive program, which is

13         essentially a very sophisticated

14         PowerPoint.  We tried a lot of

15         different programs, and this is

16         the best one.  We divided the case

17         into several different categories,

18         failure to warn and concealment,

19         scientific literature, FDA

20         overview, misleading marketing to

21         physicians and consumers and

22         profit over safety.

23              And then we further

24         divided -- so, we hyperlinked all

FAC Resp. Exhibit D -- 510

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           the key trial documents that were

2           being used in all the MDL and

3           state trials that we were

4           tracking.  We hyperlinked them to

5           the 375 events that we have in

6           this program.  So you can go and

7           say, here's a failure to warn

8           story, you can click on each one,

9           there's a summary of the event in

10          chronological order, and you can

11          then type the link into the

12          document, and we have it

13          highlighted for you.  We did this.

14          This evolved.  We worked on this

15          with the Robinson firm.  This

16          evolved --

17                MR. LEVIN:  Mark Robinson's

18          firm?

19                MS. NIEVES:  Yes.  Mark and

20          I actually went out and presented

21          it to Russ early on, Russ and Andy

22          early on, and it was approved to

23          be used as part of the trial

24          package.  And then it continued to

FAC Resp. Exhibit D -- 511

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      grow as the trials went on.

2              MR. BLIZZARD:  Was this part

3      of the work done in the MDL for

4      the discovery committee?

5              MS. NIEVES:  This had

6      started before the discovery

7      committee was formed, and so we

8      went and got authorization, and

9      then, yes, it was a continuation

10     of what was done in the discovery

11     committee.  As a matter of fact,

12     we worked very closely with the

13     theme grid committee to make sure

14     that these two things complemented

15     each other.  Basically, the theme

16     grid has a lot more issues, and it

17     has the entire universe of

18     documents that the parties are

19     using.  This has the key trial

20     documents that you are actually

21     walking into court with.  So, it

22     is the hottest of the hot

23     documents.

24              We further divided it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          into -- we put in these management

 2          organizations so that you could

 3          see who the players were.  There

 4          is a page where you can link on to

 5          each one and get the bio that's

 6          been marked in the deposition, and

 7          you can pull up the bios.  Then --

 8          don't worry, I'm not going through

 9          this whole thing, but I wanted to

10          show you a few of the things that

11          went into it.

12              We did a lot of the insider

13          trades.  We captured all of the

14          insider trades of the key

15          executives.  We have a section

16          that's profit over safety, and you

17          can look at that as it relates to

18          all the other issues and events

19          that are going on and you can see

20          how, for instance, Gilmartin or

21          Anstice or these guys were dumping

22          large amounts of stock just before

23          VIGOR was released, just before

24          Vioxx was withdrawn.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1              MR. LEVIN:  Did you work

2         with anybody else with regard to

3         the insider trading?

4              MS. NIEVES:  The SEC.

5              MR. LEVIN:  I don't mean the

6         SEC.  I mean nobody else on the

7         committees or anything like in

8         California?

9              MS. NIEVES:  No.  This was

10        all done through the MDL.

11             MR. LEVIN:  Yes, but you

12        didn't work with any other

13        California lawyers on that other

14        than Mark?

15             MS. NIEVES:  Mark's firm.

16        We worked with Ted Wacker on it.

17        Then as we were getting into

18        discovery, of course, we worked

19        with members of the discovery

20        committee.  We were on these calls

21        every single week, and so we were

22        working very closely with them.

23             I just want to give you a

24        couple -- show you a couple of

Page 15

```
 1          examples.  Like here is where the
 2          VIGOR results were released.  This
 3          is 2000, and all you do is go to
 4          2000 and you go to the date and
 5          you go to where the VIGOR results
 6          were released.  Then on the next
 7          page, you are able to see where
 8          the stock was dumped, right here.
 9          It is all color coded.  So this is
10          the green for the profits over
11          safety.  If you click on any one
12          of these tabs at the top, you can
13          get a chronology only relating to
14          that one issue.  So, for instance,
15          if you are looking for a key
16          label, you can go straight to the
17          FDA tab and you can go right
18          through the labels and see exactly
19          when it was and pull it up.
20               We also made it so you can
21          go and do a plaintiffs' chronology
22          so it can be customized for any
23          attorney that this is sent out to.
24          So, let's take the attorney in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1       Nebraska again.  He can input his

2       plaintiff's chronology, lay it

3       over the overall chronology and

4       see exactly when its usage was,

5       whether it was pre-VIGOR, post

6       VIGOR, et cetera.  We also made it

7       so it is enabled so you can import

8       all of your pharmacy records and

9       medical records straight from this

10      program.

11            You have the self-play

12      version, which runs a little bit

13      slower, but if you were actually

14      in a situation where you were

15      asking for the trial package from

16      the MDL, you would have one with

17      instructions that you load on your

18      computer, and it works very, very

19      quickly.  It is very user

20      friendly, and I think that it

21      creates a great benefit to the

22      persons actually using the MDL

23      trial package, as they can sit

24      down in the afternoon and learn

Page 17

1           the whole case.

2                   MR. BLIZZARD:  When was this

3           project started?

4                   MS. NIEVES:  When did the

5           MDL start?

6                   MR. GANCEDO:  2005 probably.

7                   MS. NIEVES:  When was the

8           beginning of the MDL?

9                   MR. SEEGER:  It was April of

10          2005.  That was the beginning of

11          the MDL.

12                  MS. NIEVES:  It was the

13          beginning of 2005.

14                  MR. BLIZZARD:  So, this was

15          from the start an MDL project?

16                  MS. NIEVES:  Yes.

17                  MR. BLIZZARD:  It was put

18          into the trial package?

19                  MS. NIEVES:  Yes.

20                  Anyway, this is a really

21          powerful tool.  It's got a lot,

22          lot of documents, a lot of good

23          information.

24                  Something I forgot to tell

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          you, if you have a marketing case,

2          we have imported all of the live

3          commercials in there.  You can

4          play them straight from the

5          program and all the print ads.  We

6          also have the media tracking.  We

7          went through media tracking

8          centers to get information about

9          the money that was spent, the

10         spots that were purchased, the

11         regions that they were played in

12         and how many spots per day.

13         There's a pretty full and

14         comprehensive marketing case

15         there.

16              MR. BLIZZARD:  So, was Troy

17         the person who ultimately had

18         responsibility for this project as

19         chair of the discovery committee?

20              MS. NIEVES:  I suppose so.

21         Mark and I were spearheading it,

22         but we were constantly speaking

23         with other members of the

24         discovery committee and making

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          sure we weren't eliminating things

2          that were going in the theme grid.

3          As I said, we worked very closely

4          with the theme grid and the

5          subcommittee.

6                MR. BLIZZARD:  Who was the

7          vendor?  Was there a vendor?

8                MS. NIEVES:  Yes.  Executive

9          Presentations.  And there were

10         instructions that went out with

11         all of the programs when they were

12         sent to the executive committee

13         and when they were sent for

14         inclusion in the trial package

15         that indicates that it can be

16         customized for you, for your own

17         trial, you're to contact Executive

18         Presentations, and they can put in

19         all your plaintiff's information.

20               So that's the trial package.

21               Then in addition to that,

22         let me move to the science

23         committee, science and expert

24         committee and what we did for

Page 20

1          Shelly there.  We worked very

2          closely with Shelly.  We were very

3          active members throughout the

4          litigation on the science

5          committee.  One of the biggest

6          projects that she asked us to

7          undertake was to create a database

8          that was a science theme grid.

9          She wanted basically a combination

10         of what we had done in this

11         project, the trial package, and

12         what the theme grid committee had

13         done, and she wanted it only for

14         science.  So, we created a

15         multi-faceted access database

16         basically with a lot of fields so

17         you can search to find, for

18         instance, all the studies that

19         related to selectivity or all of

20         the FitzGerald studies or all the

21         studies that came out in different

22         years so you can search them in

23         many different ways.  When you

24         reach that through the science

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          theme grid, you have -- I'm sorry,

2          I lost my train of thought.

3               When you go through all of

4          that, you can pull it up and you

5          can search it.  We've highlighted

6          some of the things, and we've

7          summarized each one.  Then we

8          summarized it, categorized it.  I

9          led a team, a subgroup -- I don't

10         think we had a formal name, but a

11         subgroup of the science committee,

12         because she kind of needed this

13         quickly.  I think it was around

14         the time of the Dedrick trial,

15         just before the Dedrick trial, and

16         she needed this quickly.  We spent

17         a couple of months, maybe two,

18         three months putting the whole

19         thing together.  At the request of

20         she and Andy and Leigh O'Dell, we

21         augmented it during the Dedrick

22         trial to incorporate, I think it

23         was, all the Pratt-authored

24         studies.

FAC Resp. Exhibit D -- 521

Page 22

1              I forgot to mention that the

2         trial package was definitely used

3         in one of Mark's trials, I think

4         it was the Barnett trial.

5              MR. SEEGER:  Tina, I'm sorry

6         to waste your time, because if you

7         addressed it, I apologize.  How

8         closely did you work with Mark on

9         some of these projects?  Was he

10         kind of your point person?

11              MS. NIEVES:  On that one, we

12         worked closely with him.  We

13         designed the program, and then he

14         was doing a lot of discovery for

15         the discovery committee.  And

16         since we're both here and we were

17         doing a lot of work at the time

18         for the science committee, we

19         started putting our resources

20         together.  So, we were getting

21         help from Ted Wacker at his office

22         with respect to importing all the

23         documents, and then we were

24         summarizing them internally, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          we were circulating it through the

2          discovery committee.

3                    MR. SEEGER:   Okay.

4                    MS. NIEVES:   So, we did the

5          science theme grid for Shelly.   We

6          also obviously attended all of the

7          science conference calls.   We were

8          the official gatekeeper for the

9          consulting group of Girkipal Singh

10         through whom we were able to

11         access a lot of Congressional

12         testimony and the Waxman documents

13         and some of the documents that

14         were under seal at the time in

15         connection with the Congressional

16         testimony.

17              We also attended the FDA

18         advisory COX-2 advisory meetings

19         that were out in Maryland and

20         D.C., and we attended one of those

21         with Dr. Singh when we were there.

22              We also assisted in

23         developing several of the experts.

24         I'll just kind of list them.   Dr.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           Sturkenboom, who had stroke data;

2           Dr. Pechmann, we were working with

3           Mark's firm on developing her in

4           the marketing area; Dr. Gislason;

5           Dr. La Puma; Dr. Edwards.  I went

6           up to Washington with Shelly to

7           meet Dr. Edwards and did followup

8           work with her.  And Dr. Farquhar

9           to an extent.  Mark and Dr. Singh

10          and I went up to Stanford and met

11          with Don Arbitblit and Dr.

12          Farquhar to kind of resolve or

13          reconcile some of the findings in

14          the Singh study as part of Dr.

15          Farquhar's analysis.

16               We were also asked to do an

17          analysis by the science and expert

18          committee.  We were asked to do an

19          analysis of the FitzGerald

20          hypothesis, because in several

21          joint meetings that we went to in

22          Vegas and elsewhere between the

23          discovery and the science and

24          expert committees, there was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1      questions as to whether or not we

2      really wanted to depose him.  It

3      was a two-edged sword, and we went

4      around and around on it.

5      Ultimately they asked us to do an

6      analysis.  We went through all of

7      his FDA hearings, all of his

8      testimony, his editorials,

9      studies, did a 28-page memo

10     analyzing it, and ultimately we

11     decided not to take his

12     deposition.

13         Document review.  I think

14     that we're probably a little bit

15     unique in that a lot of the firms,

16     I don't think, who have been

17     involved in this can say they made

18     a really consistent effort over

19     the long haul reviewing documents.

20     Partly the function of the fact

21     that we are working on all of

22     these other projects, we had

23     people either in Denver or in

24     Newport, or in some cases, with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          respect to the marketing

2          materials, the documents were sent

3          to us in our office, of having

4          people, partners and associates

5          reviewing documents on a

6          consistent basis over a very long

7          period of time.

8               We prepared materials for

9          several of the depositions in the

10         trials or in connection with the

11         trials including the Silver,

12         Farquhar, Krahe depositions.

13              We also served on the sales

14         and marketing subcommittee, which

15         was chaired I think -- yeah, it

16         was by Mark.  We attended the Las

17         Vegas subcommittee meeting, and we

18         took numerous sales representative

19         depositions.

20              In addition, I chaired the

21         science research, publications and

22         societies subcommittee, and this

23         was part of the discovery

24         committee.

FAC Resp. Exhibit D -- 526

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          MR. SEEGER:  Science

2     research, what was that?

3          MS. NIEVES:  Scientific

4     research, publications and

5     societies subcommittee.  It still

6     catches me.  Basically, the

7     purpose of this was for us to go

8     to all the scientific symposiums

9     that were being held in the

10    medical community that were

11    covering COX-2s.  As you all know,

12    we had a lot of emerging issues in

13    the medical field relating to

14    COX-2s and actually what the

15    mechanism of action was.  We were

16    going there to find out what the

17    defense experts were saying and

18    see if we could identify experts

19    out there that would be friendly

20    to the plaintiffs.

21          MR. SEEGER:  Tina, I'm

22    sorry, if you don't mind me

23    jumping in.

24          MS. NIEVES:  No.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

 1            MR. SEEGER:  Who was your

 2       contact person on that project?

 3       Who assigned it you and who did

 4       you report to?

 5            MS. NIEVES:  This was part

 6       of the discovery committee.  So,

 7       it was the chair of discovery.

 8            MR. SEEGER:  It would have

 9       been Troy or one of those guys?

10            MS. NIEVES:  Yes.

11       Absolutely.  It was on every

12       single agenda item, you'll see it.

13       It was one of the subcommittees of

14       the discovery committee.

15            So, I oversaw a small group

16       of firms that were going -- I was

17       identifying all these symposia

18       that were going on, and some of

19       them were over the pond, as they

20       say.  Some of them were in Europe.

21            MR. SEEGER:  I should have

22       gotten that assignment.

23            MS. NIEVES:  Some of the

24       firms were going and sitting in on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1          them.  The ones we personally
 2          attended, our firm attended, was
 3          the American Heart Association
 4          scientific conference, and that
 5          was in November of '05; the
 6          scientific meeting conference of
 7          the American College of
 8          Rheumatology and International
 9          Society of Pharmacoepidemiology in
10          Nashville, that was in August of
11          '05; the science subcommittee,
12          cardiology conference in Salt Lake
13          City; the rheumatology annual
14          scientific committee in San Diego
15          in '05.  These were all in '05.
16          We monitored by a live feed the
17          annual European Congress of
18          Rheumatology, which was held in
19          Amsterdam.  Then we had other
20          firms that were reporting on other
21          ones they had attended.
22                With respect to direct
23          contributions to the MDL trials,
24          our firm worked on the deposition
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1        trial cuts with Pete Kaufman and

 2        other people that he was

 3        overseeing in connection with that

 4        project.

 5             We reviewed documents

 6        specific to various witnesses for

 7        the Barnett trial.

 8             We compiled, I think I

 9        already mentioned this, the

10        Pratt-authored articles and other

11        scientific literature for the

12        Dedrick trial at the request of

13        Andy and Leigh and Shelly.

14             We analyzed sales and

15        marketing documents and Ogilvy and

16        Arcoxia documents also at the

17        Barnett trial.

18             MR. SEEGER:  The assignment

19        from the Barnett trial would have

20        come from Robinson, and Dedrick

21        would have come from Andy?

22             MS. NIEVES:  Yes.  I think

23        how it worked was, Andy and Leigh

24        asked Shelly, and Shelly was there
```

FAC Resp. Exhibit D -- 530

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          working on the trial, so she

2          called and asked me to do it from

3          my office.

4              And then finally it's just

5          speaking engagements which, you

6          know, we were all out and about

7          trying to inform the plaintiffs'

8          bar as best we could on progress

9          of the MDL and common benefit work

10          and what was being done.  I

11          attended and presented at a number

12          of those, including several

13          seminars, ATLA seminars, the West

14          Palm Beach conference.  I

15          moderated the ATLA Vioxx mock

16          trial in New Orleans.  That's the

17          one that, Mark, I think you were

18          there, and I know Mark Lanier

19          presented there.  I presented at

20          the Mealey's conference with Mark

21          Robinson on the Irvin trial

22          highlights in December of '05.  I

23          served as a panelist with Russ and

24          Arnold and you at the Mealey's

FAC Resp. Exhibit D -- 531

Page 32

1          Vioxx conference at Amelia Island

2          in Florida.

3               MR. LEVIN:  I was there.

4               MR. SEEGER:  I remember you

5          being there.

6               MS. NIEVES:  ATLA Vioxx

7          teleconference which was FDA and

8          painkillers, and I also reported

9          for Mealey's on the FDA Advisory

10         Committee hearings for COX-2s out

11         in D.C. at the request of the

12         science committee.

13              So, you know, I think that,

14         as they say in Vegas, we were all

15         in on this case.  We put a lot of

16         resources in over a long period of

17         time, and I think we produced a

18         very high caliber of work.

19              MR. SEEGER:  Just for the

20         purposes of when we start just

21         piecing all of this together, it

22         sounds like the greatest -- and

23         I'm giving you credit for what you

24         have done.  You have had the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          greatest contact with Mark,

2          probably Troy on the discovery

3          committee, Shelly on the science

4          committee.

5               MS. NIEVES:  John Restaino.

6               MR. SEEGER:  And John

7          Restaino.

8               MS. NIEVES:  I worked really

9          closely with Shelly and Mark's

10         firm.  Then a lot of the other --

11         definitely the other attorneys,

12         but a lot of that was through

13         teleconferences where they were

14         asking to report on what had been

15         done.  And while I'm sending it to

16         them, I wasn't doing a lot of that

17         in person though.

18              MR. SEEGER:  Is this part of

19         the trial package right here?

20         (Indicating.)

21              MS. NIEVES:  That is the

22         trial --

23              MR. LEVIN:  That's your

24         trial package that you prepared?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1              MR. NIEVES:  You have it on

2         disk.  I just handed it to you.

3              MR. SEEGER:  So, the people

4         who put together what we are

5         calling the MDL trial package have

6         incorporated this?

7              MR. GANCEDO:  Yes.

8              MS. NIEVES:  That's in

9         there.  To me, this should be the

10        first stop for someone looking at

11        it.  Because they can look at this

12        and learn the overall picture and

13        see the key documents, and they

14        can go into depth in the theme

15        grid and start looking at the

16        depositions.

17             MR. SEEGER:  Who worked on

18        that project with you, that one

19        there?

20             MS. NIEVES:  Well, the

21        members of my firm and the members

22        of Mark's firm.  And then it's

23        kind of a hard question because

24        there's so much incorporated in

Page 35

1          here.  Chris, you sent us a big

2          chronology, it was a compendium.

3          That was incorporated in here.  We

4          used things from Mark Lanier's

5          opening statements.  Mark Robinson

6          and I went out to the Ernst trial.

7          We used any exhibits that he used

8          that we haven't incorporated.  We

9          went to several states.  So, I

10         mean, it is everyone's work

11         product, but we designed this

12         program.

13              MR. SEEGER:  Have you gone

14         on line and seen the way the MDL

15         trial package is set up?  Have you

16         had a chance to see that?

17              MS. NIEVES:  I haven't

18         looked at that, no.

19              MR. SEEGER:  That's why I'm

20         asking.

21              MR. LEVIN:  We'll find it.

22              MS. NIEVES:  Russ had told

23         us at the beginning of the

24         litigation he definitely wanted

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          this in there.  I did call Leigh

2          at the end of the litigation to

3          make sure that it was

4          incorporated, and people were

5          checking in with me to make sure

6          we were working closely with the

7          theme grid people over the course

8          of the development to make sure we

9          were capturing all the best

10         documents that were in the theme

11         grid.  We were attending the

12         trials to make sure that we got

13         ahold of anything new that came up

14         for any of these subtimelines that

15         were being used as exhibits in the

16         various trials.

17              MR. SEEGER:  Okay.  Fine.

18              MS. NIEVES:  Questions?

19              MR. SEEGER:  Just to

20         summarize, I mean, what would you

21         pick as your top contribution to

22         the common benefit?  Would it be

23         the work on the trial package?

24              MS. NIEVES:  I think the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          work on the trial package and the

2          work on the science theme grid,

3          because I know that that was -- I

4          mean, people were calling me while

5          they were in trial and saying we

6          need this immediately.  So, I know

7          that was used, and that was

8          important, and it was very

9          important to Shelly as she did the

10         work.

11              MR. WEITZ:  How many cases

12         did the firm have filed?

13              MS. NIEVES:  About 120.  Is

14         that right?

15              MR. GANCEDO:  110.

16              MR. WEITZ:  And you

17         submitted those all to the

18         settlement?

19              MR. GANCEDO:  Yes.

20              MR. WEITZ:  They were filed

21         in LA?

22              MS. NIEVES:  A lot of them

23         were in the MDL.  They were in

24         both jurisdictions.

FAC Resp. Exhibit D -- 537

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

```
1                MR. WEITZ:  Other than those

2           three out of five cases that were

3           originally before Judge Lichtman,

4           did you guys have any other cases

5           that were --

6                MS. NIEVES:  Selected for

7           trial?

8                MR. WEITZ:  -- selected for

9           trial?

10               MS. NIEVES:  No.

11               MR. WEITZ:  Thank you.

12               MR. GIRARDI:  Judge Lichtman

13          was recused because he had taken

14          Vioxx, so the defendants recused

15          him.

16               MR. SEEGER:  That's

17          interesting, isn't it?

18               MS. NIEVES:  He did say it

19          wouldn't affect anything.

20          Remember?  He threw that out.

21          Remember that time he threw that

22          out and it went up on appeal.  I

23          was at the hearing.  I remember

24          him saying on the bench, saying I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          took it.

2                  MR. GIRARDI:  Thank you very

3          much.  Well done.

4                        -  -  -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number: 1060147

23        Notary Expiration: 1.2.10
          CCR Number: 30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -


FIRM:  IRPINO LAW FIRM
        Anthony Irpino, Esquire

BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 541

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -
 2            MR. HERMAN:  We have a court
 3        reporter here who will make a
 4        record of everything as part of
 5        the Court's direction on
 6        transparency so everybody knows
 7        what everybody is saying at the
 8        end of the day.
 9            Secondly, the affidavit, if
10        there's anything you want to add
11        or subtract from it, go ahead and
12        do it.
13            The judge has made it clear
14        that if the fee issues aren't
15        resolved a la Murphy Oil, then
16        what he's going to do is go
17        through virtually the same
18        process, folks are going to have
19        to be cross-examined, et cetera,
20        and basically that's it.
21            The committee is going to
22        publish whatever directive we get
23        from the judge when we get it.
24        So, that's about it.  The floor is
```

FAC Resp. Exhibit D -- 542

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1          yours.

 2                    MR. IRPINO:  Okay.

 3                    Well, number one, thank you,

 4          everybody, for allowing me to

 5          present as to what I contributed

 6          to the Vioxx litigation and the

 7          MDL.

 8                    My name is Anthony Irpino of

 9          the Irpino Law Firm.  My address

10          is 365 Canal Street, Suite 2290,

11          New Orleans, Louisiana 70130.

12                    I've never presented to

13          anybody about the work I've done

14          in a case in a manner such as

15          this, so, I'm a little bit in the

16          dark.  But with that said, I just

17          figured --

18                    MR. SEEGER:  Can we help you

19          with that?

20                    MR. IRPINO:  Yes.

21                    MR. SEEGER:  We are all

22          interested in the way you see your

23          common benefit contributions, and

24          some of us know you and some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          people don't, so, speak to the

 2          people that don't.

 3               MR. IRPINO:  Okay.

 4               I think that's a good point,

 5          that a lot of you do know me.  I

 6          worked very closely with a lot of

 7          y'all in connection with this

 8          case, and so in large part, for

 9          the people who have worked with

10          me, I rest on what I've done, the

11          way I've done it, the vigor with

12          which I did it and the quality in

13          which I did it.  But that said, I

14          didn't work with y'all closely in

15          the case, and I do want to go into

16          some of those things so you know

17          it.

18               I did try and squeeze into

19          the affidavit some of the things

20          that I did.  Candidly, in a

21          three-page affidavit, you can't do

22          it.  In a 30-minute presentation,

23          I can't do it.

24               To go into what we did in
```

Page 5

1          this case, what I did in this case

2          and what my teams did in this case

3          I think would take days,

4          literally.  I'll try and give as

5          good of a recitation as I can, but

6          it boils down into two primary

7          roles that I played.

8                Number one, first and

9          foremost, is chairman of the

10         privilege log team.

11               Second role, which is

12         somewhat of a forgotten role,

13         somewhat of a less glamorous role,

14         was chairman of the document

15         repository team.  That was

16         significant, and I'll get into

17         that later, but certainly chairman

18         of the privilege log team was my

19         primary role.  I believe that it

20         is not an inaccurate statement to

21         say that I led that charge.  So,

22         all the issues that dealt with the

23         privilege log, which in this case

24         I think it's a fair statement,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        became extensive.

2               With that said, I did want

3        to make everybody aware that this

4        was a team effort, the privilege

5        log team.  I did lead it, but

6        there were a lot of people

7        involved.  I wanted to go into the

8        names of who were involved,

9        because it was extensive.

10              First of all, I was kind of

11       appointed to it or put in that

12       position by Troy Rafferty and Russ

13       Herman.  They basically gave me

14       the power to do that, as well as

15       the other heads of the discovery

16       team, which included Dave

17       Buchanan, Richard Arsenault, Chris

18       Tisi.  It was critical that they

19       gave me the kind of power and the

20       time to say just to go do it, get

21       this done.  I mean, to have that

22       type of freedom in a case such as

23       this really allowed us to push

24       forward and do it.

FAC Resp. Exhibit D -- 546

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          The other members of the

2     team included Gary Wilson and Tara

3     Sutton, who were up in

4     Minneapolis, they worked very

5     hard, and I want that to be known

6     to everybody.

7          A woman by the name of Lynn

8     Swanson over at a firm called

9     Jones Swanson here in New Orleans

10    worked hard.

11         There were other people who

12    worked hard on that team.  Brian

13    Balser Andy Childers, Leslie

14    Bryan, Raul Bencomo each did some

15    good and helpful work.

16         Others included Mike Hugo

17    and Michael Stratton.  I wanted

18    y'all to know that.  I might have

19    left out a name or two, but I

20    wanted y'all to know that this was

21    a team effort, a lot of people

22    involved, a lot of coordination

23    involved.

24         I also wanted to speak real

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          briefly as to the --
 2                MR. SEEGER:  Anthony, is
 3          this a team that you assembled?
 4          I'm sorry.  Some of these names I
 5          recognize, some I don't.
 6                MR. IRPINO:  Well,
 7          essentially it was assembled -- I
 8          think it is fair to say that Troy,
 9          myself, Dave Buchanan, Chris Tisi
10          at the beginning, said, hey, who
11          wants to work on privilege log.
12          It was not a glamorous role.  They
13          said, who wants it?  Shoot, I'll
14          take it.  I'll take it and run
15          with it.
16                MR. LEVIN:  Well, the Robins
17          Kaplan group, how did they become
18          involved?
19                MR. IRPINO:  They also said
20          that they'll help.
21                MR. LEVIN:  In other words,
22          they hadn't been in the Army and
23          they volunteered?
24                MR. IRPINO:  Yes.  They put
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          their hand up.  I think the way

2          things kind of started out and

3          worked out is I kind of took the

4          reins and ran with it.  I said,

5          this is what we're going to do,

6          this is how we're going to do it.

7          Everybody followed, and everybody

8          helped participate.  People

9          worked.  And to give you a sense,

10         that team was being formulated in

11         June of '05, right after the MDL

12         was formed, very early on.  I'm

13         just going on memory.  There's so

14         much I'll leave out.  Troy was

15         saying, we need to get on this.

16         You know, we'll get on it.  We'll

17         do it.  We had some good

18         go-getting people.

19              Dave Buchanan said, look, we

20         have this privilege log they

21         produced in New Jersey, it is a

22         piece of crud, we need to get into

23         it.  So, we went through and

24         combed through that privilege log,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          and we're talking about 30,000
 2          privilege claims.  We're not
 3          talking in a sense of, oh, you
 4          know, let's take a look at it and
 5          let's do some, quote, review.
 6          Let's take a look at it.  I mean,
 7          this was combing through this
 8          thing, trying to find the best
 9          examples of how they were not
10          documenting their privilege claims
11          properly, how they were hiding
12          documents.  When you are going
13          through and you are seeing
14          requests for legal review of
15          APPROVe study materials, what the
16          heck is that?  So, you wanted to
17          find out things that were, A,
18          clearly bogus privilege claims,
19          clearly claims that we could win
20          on.
21              We didn't want to go to
22          Judge Fallon and just randomly
23          say, Judge, take some privilege
24          claims, and here's some bad ones.
```

Page 11

1        We wanted to go with the best of

2        the best.  So, we spent literally

3        a couple of months combing through

4        this privilege log.  And I'm not

5        talking about a little review.

6        This was combing through.

7            So, we got that process done

8        and presented it to Judge Fallon

9        on a plate that made him

10       understand that this was a serious

11       issue and that there were serious

12       violations here.  I think that

13       really, as much as anything in the

14       beginning, helped our cause along

15       those lines.

16           But getting back, we had

17       this committee, Troy formed it,

18       Dave formed it, Chris Tisi formed

19       it, and we were running through

20       and were just going and going.

21       And we organized it, we had weekly

22       calls.  And I'll tell you, these

23       weekly calls were not, hey, guys,

24       how are you doing.  I had an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           agenda each call.  This is what

2           we're going to discuss.  If you

3           want copies of them, I've got

4           copies of them, I promise you.

5           They are too voluminous to go

6           through, the agendas, the minutes,

7           but it was very well organized

8           from the beginning so that

9           everybody knew that this was a

10          team effort, that it was an

11          organized effort.

12              I think as much as anything

13          that I worry about in MDL work or

14          class action work is keeping

15          people engaged in the litigation,

16          keeping team members engaged,

17          because we know everybody has

18          another practice.  I mean,

19          oftentimes they are working on two

20          cases at once, three cases at once

21          or some other cases.  So, it is

22          very easy to lose sight of this

23          litigation, and one of my goals

24          was to keep people focused on this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          litigation, and the way I know how

2          to do that is keep engaged, keep

3          organized and keep assignments

4          running.  So, we did that

5          throughout this process.

6               So, those first several

7          months were very detailed, very

8          strenuous, very long hours

9          working, working, working on this

10         stuff and putting together the

11         package so that we can attack this

12         thing properly.  That's kind of

13         how it began.

14              Later on -- and I want to

15         say this.  I mean, there were

16         different stages of the privilege

17         log fight.  Later on, you know, we

18         were up at the Fifth Circuit, and

19         let me tell you something --

20         Arnold, you are going to like

21         this.  Fred Longer and Arnold

22         Levin personally got involved at

23         that stage.  Russ Herman

24         personally got involved at that

Page 14

1          stage where we were collaborating

2          and coordinating on writing the

3          appellate briefs and making the

4          appellate argument, which Russ

5          made.  I mean, I guess there's so

6          much to go through from beginning

7          to end --

8               MR. SEEGER:  Let me ask you

9          questions.  What role did you have

10         in the briefing with Arnold and

11         his firm and Russ?

12              MR. LEVIN:  He worked on

13         it -- I don't have to answer it.

14              MR. SEEGER:  It is his

15         record.  Thank you, Mr. Levin,

16         we'll swear you in.

17              Tell us about your role in

18         the briefing.

19              MR. IRPINO:  My role in the

20         briefing was that I was one of the

21         co-coordinators of it.  First of

22         all, I mean, the way this works,

23         it was again not just like, hey,

24         let's do a brief up.  I mean, I

Page 15

```
 1          would brief the background to
 2          Russ, to Arnold, to Fred in memos.
 3          This is where we've come from,
 4          this is where we've been in memos.
 5          This is not like, oh, get on the
 6          phone and say -- you know, I don't
 7          know how many memos I wrote.  I
 8          have hundreds of memos in the file
 9          about this is what this is about,
10          this is where we've been, this is
11          where we're going.
12               But even the Fifth Circuit
13          briefing, and as frustrating of a
14          situation as I've been in, it was
15          that Fifth Circuit.  But, you
16          know, this is where we've been,
17          this is where we're going, and
18          this is the law, and this is what
19          we have to argue.  These are
20          pressure points.
21               MR. HERMAN:  Let me ask some
22          questions.
23               Approximately how many pages
24          of documents, if you can recall or
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1           estimate, were reviewed?

2                 MR. IRPINO:  Were reviewed

3           in terms of the privilege log?

4                 MR. HERMAN:  Yes.

5                 MR. IRPINO:  Well, that's an

6           interesting question, because the

7           privilege log itself, you are

8           talking about thousands and

9           thousands of pages, okay?  We got

10          Judge Fallon to essentially order

11          Merck to do a revised privilege

12          log.  Then there are thousands of

13          pages you are talking about

14          reviewing, okay?  Then in

15          connection with this assignment,

16          Merck said, we see the writing on

17          the wall, we're going to

18          deprivilege a bunch.  So, we got

19          Merck to voluntarily deprivilege

20          hundreds of thousands of pages of

21          documents.  That's in 2005.

22                 There was a second

23          deprivileging of documents in

24          2006, and then a third

Page 17

1          deprivileging of documents.

2                    MR. HERMAN:  How many boxes

3          of documents did Merck send to the

4          Court in camera that Judge Fallon

5          reviewed?

6                    MR. IRPINO:  That's easy.

7          80, right around 80.

8                    MR. HERMAN:  Okay.

9                    Now, did there come a point

10         in time when the Court had to

11         appoint a Special Master to go

12         through and make a recommendation

13         on the documents that Merck

14         contended were privileged?

15                   MR. IRPINO:  Yes, there was.

16         Let me give you just a brief

17         history of that.  Judge Fallon

18         spent two weeks, two weeks

19         straight reviewing deprivileged

20         documents.  Number one, I want

21         everybody to know that we viewed

22         that, our team, everybody viewed

23         that as a significant victory.

24         We've got Judge Fallon looking at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          all of their privileged documents

2          and checking out and seeing where

3          the bones were buried and seeing

4          the dirt.  He saw it.  And I

5          thought we felt that there was

6          some sort of a change or some sort

7          of a victory of that in and of

8          itself, because Judge Fallon was

9          not happy with Merck through that

10         process.  When he got done after

11         two weeks of reviewing, quote,

12         privileged documents, something

13         changed in terms of the way he

14         viewed the parties even.  I think

15         I remember Russ saying something

16         about that at a PSC meeting where

17         I was called to discuss these

18         issues.

19              To give you an example,

20         there were 30,000 documents in

21         these 80 boxes.  Judge Fallon

22         found that 491 of them were

23         privileged.  The other 29,509

24         documents he found were not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1            privileged.  Now, if you are a

 2            Federal judge spending two weeks

 3            reviewing privileged documents,

 4            you expect a better number.  I

 5            think it is fair to say that that

 6            had a significant effect.  But

 7            with that said, Judge Fallon did

 8            it, the Fifth Circuit did what

 9            they did, there was a lot of

10            briefing going on throughout this

11            process, and then we got a Special

12            Master.  Judge Fallon said, look,

13            we need to have a Special Master

14            review this because we're talking

15            about now we rereviewed all of

16            these documents, and the Fifth

17            Circuit made a decision, oddest

18            decision I have ever seen, that

19            includes a per curium order that

20            said that Merck gets to select

21            2,000 documents randomly out of

22            all of those documents I told you

23            about that they want to be

24            rereviewed and then we'll revisit
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          this issue.  It is the damndest

2          thing you've ever seen.

3                So, Judge Fallon, and this

4          is no coincidence, Judge Fallon

5          selected Professor Paul Rice, who

6          we quoted extensively in all of

7          our briefing, to say this guy is

8          the man, this is how you do a

9          privilege log, these are how you

10         make privilege claims.  He took

11         that guy and appointed him.  So,

12         we saw that as a victory in and of

13         itself.  So, we got Professor

14         Rice, we met with Professor Rice,

15         this was back in, I think, April,

16         approximately April of '07, where

17         Professor Rice was appointed, went

18         to D.C., remember?

19                MR. SEEGER:  Yes.

20                MR. IRPINO:  I'm telling

21         you, throughout this process, I

22         mean, again, it is not just me, it

23         is a team.  We've got Fred Longer

24         involved, Troy Rafferty involved,

FAC Resp. Exhibit D -- 560

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1         Chris Seeger involved, we've got

2         Arnold Levin involved.  Look,

3         Russ' office became very involved.

4         Lenny Davis was very involved in a

5         lot of this stuff.  So, I just

6         want to let everybody know it is

7         not just Anthony Irpino alone.

8             MR. HERMAN:  Why don't you

9         move on to your other

10        contributions.

11            MR. SEEGER:  Can I ask a

12        quick question?  Anthony, prior to

13        the Vioxx MDL, had you been

14        involved in MDLs prior to that

15        where you held a leadership

16        position?

17            MR. IRPINO:  I was not

18        involved in an MDL where I held a

19        leadership position.  I was

20        involved in several class actions,

21        complex litigation, and that's

22        where a lot of my experience held

23        from.

24            MR. SEEGER:  I'm asking for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          a different reason, but go ahead,

 2          answer Russ' question.

 3              MR. IRPINO:  Let me just

 4          speak quickly as to the Special

 5          Master, because that process was

 6          very, very extensive.  The process

 7          lasted probably four months, four

 8          to six months, I would say,

 9          starting in April, ending in --

10          actually, the Special Master's

11          final report recommendation came

12          down November 1st of '07, okay?

13              That process was so

14          extensive, there were so many

15          briefs filed to the Special

16          Master, Merck went -- I mean,

17          first of all, Merck -- all you

18          have got to do is look at probably

19          Merck's billing to see how hard

20          this was fought.  They had, I

21          think, dozens of guys on this,

22          working a lot of hours on this

23          project.  I mean, that's what my

24          guess would be.  But we're talking
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          about literally dozens of briefs,

2          declarations.  They had Joanne

3          Lahner do a declaration.  They had

4          different employees doing

5          declarations to try and help prove

6          their privilege log claims.

7               Special Master's reports

8          came out, first report, second

9          report, third report, fourth

10         report.  We had a couple of

11         meetings with them, a couple

12         arguments with them, submitted

13         dozens of briefs from our

14         standpoint, which a lot was done,

15         myself, Fred Longer, Lenny worked

16         hard on that.

17              MR. SEEGER:  Anthony, did

18         you participate in the Joanne

19         Lahner issue?  Did you coordinate

20         with what was going on in New

21         Jersey, as well, because there

22         were challenges there?

23              MR. IRPINO:  There were

24         challenges with Joanne Lahner,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1       there was coordinations of those

2       efforts, and, in fact, we got

3       certain things from New Jersey

4       that were produced in there, and

5       there was coordination of that.

6              I just want to also say when

7       you see these reports and

8       recommendations, the first report

9       and recommendation, the PSC had de

10      bene esse depos going on.  We

11      wanted to get these documents for

12      these de bene esse depos.  So, in

13      addition to Merck selecting 2,000

14      documents for the Special Master

15      review, we got the Special Master

16      to agree to allow us to select 500

17      or 600 documents that were

18      critical to the de bene esse depos

19      that we were doing.  Silverman and

20      Barr, if I'm not mistaken, were a

21      couple of them.  So, the Special

22      Master reviewed those documents.

23             The decisions came out --

24      let me just tell you the amount of

Page 25

1          volume we're talking about and the

2          amount of work we're talking

3          about.  The report and

4          recommendation, I think the first

5          report was like 35 pages.  The

6          decisions took up 700 pages,

7          decisions, of individual document

8          claims, okay?  So, I'm in charge

9          of reviewing those, making sure

10         that we object to them properly,

11         because there were initial

12         determinations by the Special

13         Master.  We had a chance to

14         object, Merck had a chance to

15         object.  We had to respond, they

16         responded.  I'm telling you this

17         process was so in depth and so

18         detailed that it was very time

19         consuming, and it was very

20         thorough.

21              Couple other things about

22         the privilege log that sometimes

23         can get overlooked.  This wasn't

24         just Merck's privilege log, this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          was the FDA privilege log that we

2          dealt with, and these were

3          third-party privilege claims, all

4          right?  So, it wasn't just limited

5          to that.  So, at different times

6          we're dealing with different

7          issues.

8               But, again, it was a fairly

9          extensive battle, it was very time

10         consuming, and it was consistent.

11         As much as anything I would like

12         to say, we were consistent.  We

13         kept on this.  I'm telling you

14         right now, this was not an issue

15         that we couldn't just touch this

16         every once in a while.  You had to

17         stay on it, and you had to fight

18         it through.

19               MR. SEEGER:  How much of

20         your working time would you say,

21         from the time you were asked to be

22         involved in the project, did you

23         spend in terms of other

24         opportunities you might have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          gotten involved with or other

2          things you might have done with

3          your firm?  What percentage of

4          your time was involved?

5               MR. IRPINO:  Was involved in

6          Vioxx?

7               MR. SEEGER:  Yes.

8               MR. IRPINO:  Over 50

9          percent, but outside of that, I'm

10          not terribly comfortable.  I mean,

11          I basically worked on two main

12          cases.

13               MR. RAFFERTY:  And how many

14          lawyers are in the firm, Anthony,

15          during the time that you were

16          working on it?

17               MR. IRPINO:  During some of

18          the time, it was me.

19               MR. SEEGER:  You mean just

20          you and your firm?

21               MR. IRPINO:  Just me and my

22          firm.  During some of the time, I

23          had an associate, and even my

24          associate worked.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            MR. LEVIN:  Was that Amy

2       Dunn?

3            MR. IRPINO:  Yes.  Amy Dunn

4       was my associate.  Amy Dunn worked

5       at the U.S. Supreme Court.  I

6       mean, no dummy.  You are talking

7       about graduating from Georgetown,

8       very bright, worked at big, big

9       defense firms like 600-person

10      defense firms in Chicago and New

11      York, and she came in and helped

12      extensively with the Fifth Circuit

13      briefing.

14            MR. RAFFERTY:  I think we

15      only have a few minutes.

16            MR. SEEGER:  Actually, we're

17      out of time, but let's wrap up.

18            MR. LEVIN:  What else did

19      you do --

20            MR. HERMAN:  Talk about the

21      depository.

22            MR. IRPINO:  Okay.  The

23      depository is almost something

24      that's near and dear to me,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1    because we started out -- just so
2    you know, I started getting
3    involved, and there was a
4    requirement --  I think this is a
5    very good thing that should be
6    done in all cases.  There was a
7    requirement to say if you want to
8    do work in the discovery
9    committee, you need to go review
10   documents.  You need to get your
11   hands dirty, you need to go do
12   that.  So, I did that.  I went and
13   worked, and I did it where I could
14   and when I could, and there were
15   openings at the New York
16   depository, there were some
17   openings at the California
18   depository.  So, I went to each of
19   those.  As I said, I've never been
20   involved in a case where you had
21   four different document
22   depositories.  We were starting to
23   have some issues, and Penny Herman
24   was extensively involved, along

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        with Mike Wagner, with taking care

2        of a lot of depository issues.

3            In the beginning, it was

4        Seeger Weiss, Mike Wagner doing

5        everything.  I mean, doing

6        everything, and doing a phenomenal

7        job, by the way.  It was very

8        clear at some point to me that

9        that was going to be overwhelming

10       with everything that's coming up.

11       So, I suggested that we form a

12       document depository committee.  I

13       brought it --  I didn't just do

14       it, brought it to Troy, brought it

15       to Lenny, brought it to Russ.

16       They agreed.  They said, let's do

17       it, go do it, run with it, okay?

18           This wound up being a pretty

19       regularly scheduled meeting,

20       weekly meeting again.  We had

21       probably approximately 50

22       conference calls, 5-0, 50

23       conference calls to take care of

24       various issues that would arise at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          the depositories.  And let me tell

2          you right now, the people who were

3          critical with that, Penny Herman,

4          Mike Wagner, critical.  I mean,

5          the job these two did, worked so

6          hard on this litigation.  I don't

7          know, Chris, you had better give

8          Mike Wagner -- I mean, the guy's

9          amazing --

10               MR. SEEGER:  Off the record.

11                    -  -  -

12               (Whereupon, an

13          off-the-record discussion was

14          held.)

15                    -  -  -

16               MR. IRPINO:  With these

17          guys, I just want to say the

18          dedication involved was extensive,

19          and the issues that would come up

20          with the depository were many.

21          Troy knows.  He was one of the

22          heads of the discovery.  I mean,

23          it was so extensive, so we needed

24          coordination, we needed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          communication.  I mean, you had

2          four different depositories.

3          You've got somebody in LA doing

4          some of the same things that

5          somebody in New York is doing, and

6          we saw that.  We also needed to

7          make sure --

8                MR. SEEGER:  I want to be

9          clear that people understand what

10         you are talking about, because we

11         needed to have the depositories

12         talking to each other so that we

13         don't have people doing things,

14         repeating things and duplicating

15         efforts, and that was what you got

16         involved in.

17               MR. IRPINO:  Absolutely.

18         That's what I started.  I mean, to

19         be fair, I was proud of that as

20         anything, just coming up with the

21         idea, let's do this.

22               MR. SEEGER:  There were like

23         four satellites at one point doing

24         their own thing.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1           MR. IRPINO:  That was

2       exactly it.  So, we had to

3       coordinate that, we had to

4       communicate.  But also there was a

5       need for communication between the

6       depositories and the different

7       committees.  Science committee, we

8       needed to get materials to the

9       stroke expert.  Okay.  Well, who

10      is going to put that together?

11      How are we going to do it?  What

12      materials do we get?  When do you

13      need them?  What's the deadline?

14      We needed to know that.

15          We would identify these

16      issues and go over them.  There

17      were many other issues that came

18      up on a fairly regular basis.  One

19      was making sure that we made this

20      as efficient as possible.  We had

21      some worker bees, but sometimes

22      depositories would be overcrowded.

23      We didn't have enough stations,

24      particularly in New York at

Page 34

1          certain times, because a lot of

2          people would go to the New York

3          depository.  Lenny, we went to

4          Lenny and said, Lenny, we need

5          more computers in the New Orleans

6          depository.  Do you remember that?

7               MR. DAVIS:  Yes.

8               MR. IRPINO:  So, Lenny got

9          six computers.  We increased the

10         number of spaces in New Orleans.

11              Then it was a matter of too

12         many people coming on the same

13         week.  We had to schedule that

14         out, okay?  Penny Herman did that.

15         Then there were issues with

16         third-party document productions.

17         How would they get Bates stamped?

18         Where would they go?  Who would

19         get copies?  Who would pay for the

20         copies?  All right.  We worked out

21         deals where Merck and us, we would

22         split those costs and Merck would

23         get a CD, we would get a CD.

24              Then it is a question of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1        what depositions are we taking and

2        who needs what documents when?

3        And when do we prioritize that?

4        You don't want to be having

5        somebody reviewing Joanne Lahner

6        custodial files when you have got

7        a deposition of Marty Carroll

8        coming up in a week.  You want to

9        make sure that those assignments

10       get given out, and you need one

11       person to track the assignments.

12       So, we had Penny Herman in charge

13       of tracking those assignments.

14       Where does that start from, where

15       does it flow from?  Communication

16       amongst the depositories, making

17       sure that everybody knows what

18       everybody else is doing, what the

19       left hand is doing, what the right

20       hand is doing.

21            Let me just say another

22       thing.  There was a problem that

23       came up not only with

24       overcrowding, not only with

FAC Resp. Exhibit D -- 575

Page 36

1          working, but some workers in the

2          depositories, and you know this

3          happens, worker bees, they get

4          lazy, they go around.  So, we had

5          to track that.  We started

6          implementing different procedures

7          and time sheets and different

8          supervisory procedures.

9               I went to the depositories,

10         and at one point we did a

11         presentation.  There was one time

12         there was a problem where, at the

13         beginning, people were clearly

14         over -- being overinclusive with

15         their coding, particularly with

16         their hot doc coding.  So, Troy is

17         going to take a deposition and he

18         says, print me out our hot doc

19         custodial file for Marty Carroll.

20         We print it out, and it is 10,000

21         documents.  Well, what good is

22         that?  It did no good.  And we had

23         that problem at the beginning.

24         So, we had to change the mindset

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          of how people were coding.  So,

2          identify the problem, diagnose the

3          problem, and then solve the

4          problem.  We brainstormed it and

5          came up with, look, let's do an

6          educational session.  Troy

7          actually came in and did an

8          educational session in the New

9          Orleans depository for all of

10         those people.  I went to New York

11         and did an educational session

12         with them there.  We changed the

13         way people think.  Look, you don't

14         have to overcode.  Don't overcode.

15         That's a problem.  You are causing

16         more problems than good by

17         overcoding.  We had people hot

18         doc'ing articles.

19              MR. BIRCHFIELD:  Anthony,

20         with the limited time, one other

21         issue I would like for you to

22         address for me is, did you help

23         with any of the bellwether trials?

24         Talk about that.  Then any cases

1     that you had that were worked up

2     or advanced, just talk about any

3     cases in moving the docket, those

4     two issues.

5          MR. IRPINO:  I appreciate

6     you asking me that.  I did not

7     have extensive work on the trials,

8     but there was one trial that I

9     assisted with, and that was the

10    Dedrick trial, and that was the

11    one that Andy Birchfield, Leigh

12    O'dell tried.  And Russ Herman had

13    actually asked for volunteers for

14    people to assist Andy and Lee with

15    jury selection being from New

16    Orleans, knowing we are dealing

17    with a New Orleans jury pool.  So,

18    we assisted with that for about a

19    week.  It took about a week, and

20    it was extensive.  That Dedrick

21    trial I would wish on no one, but

22    we assisted with that process in

23    terms of the jury selection, and

24    we went -- you know, we go all in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1      and we do work, okay?  We got one

2      of our trial consultants to come

3      in, Victoria came in, Southern

4      Trial Consultants, assisted with

5      it.  We went to -- to tell you the

6      lengths we went to, she would

7      drive by houses just to see what

8      kind of information there would

9      be, bumper stickers or something

10      like that.  I mean, you know,

11      in-depth research so that we can

12      give -- you know, some of the

13      people were from Slidell.  What

14      does this mean?  What does this

15      person mean from Jefferson?

16      Giving Andy and Lee help with it.

17          And let me just talk about

18      that process for 30 seconds.

19      Camping out at the Lowe's Hotel I

20      think they were stationed in.  I

21      think they moved the entire

22      Beasley Allen office down here.  I

23      mean, that was an effort that you

24      want out of your trial teams.  I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          was very, very proud to be a part

2          of that effort.  It was extensive.

3          It was a, quote, loser case, and

4          it went full lore as if it was the

5          best case that you will ever have

6          a chance of winning.  That was a

7          pleasure to be a part of and a

8          great thing to see.

9                MR. BIRCHFIELD:  Y'all did

10         excellent work on the jury

11         selection.  I appreciate that.

12               MR. IRPINO:  Thank you.

13               MR. BIRCHFIELD:  What about

14         cases, did you have any cases that

15         were worked up to help move the

16         docket?

17               MR. IRPINO:  We had one case

18         that we helped -- that we had that

19         got us involved in the litigation,

20         and, unfortunately, that case did

21         not turn out to be a good case.

22         So, in terms of that aspect of it,

23         no.

24               MR. WEITZ:  How many cases

FAC Resp. Exhibit D -- 580

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          did you submit to the settlement?

2          Did you have cases you submitted

3          to the settlement?

4                  MR. IRPINO:  We actually

5          took it out, because we didn't --

6                  MR. SEEGER:  No, no.

7          Settlement.  How many cases did

8          you put into the settlement?

9                  MR. LEVIN:  He had one case.

10                 MR. IRPINO:  One case.  For

11         us, this was much more about

12         assisting with the MDL process and

13         effort and work product much more

14         so than focusing on any individual

15         cases or anything like that.  We

16         kind of went all in with that and

17         went about it that way.

18                 MR. WEITZ:  When did you

19         originally get involved in the

20         litigation?

21                 MR. LEVIN:  Through that one

22         case.

23                 MR. IRPINO:  Through that

24         one case, we said, look, we want

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          to be --

2                MR. WEITZ:  To get involved

3          in the MDL and do some work?

4                MR. IRPINO:  Yes.  We want

5          to assist with the work product,

6          we want to assist with the work

7          done in the case.

8                MR. SEEGER:  All right.

9          Anthony, thank you very, very much

10          for everything.

11                     -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -


FIRM: KASOWITZ BENSON TORRES & FRIEDMAN
     Daniel J. Fetterman, Esquire
     Christopher P. Johnson, Esquire


BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER: Linda L. Golkow, RDR
     GOLKOW TECHNOLOGIES, INC.
    877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 584

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2              MR. FETTERMAN:  For those
 3         who don't know me, my name is
 4         Daniel Fetterman, and along with
 5         my partner, Chris Johnson, we're
 6         here today to present the
 7         application of Kasowitz Benson
 8         Torres & Friedman for an
 9         allocation from the common benefit
10         fund.
11              Kasowitz, Benson is a
12         national firm with approximately
13         290 lawyers which had over 250
14         clients in the national Vioxx
15         litigation.
16              Chris Johnson and I have
17         been the two partners principally
18         responsible for day-to-day
19         oversight of the Vioxx matters.
20         We have participation of numerous
21         partners and associates, including
22         Mark Kasowitz and Dan Benson, two
23         of the founding partners of the
24         firm, along with David Rossner,
```

FAC Resp. Exhibit D -- 585

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1       one of our senior bankruptcy

2       partners.

3               I want to say at the outset

4       what a privilege it was to work

5       with many of the talented lawyers

6       in this matter, including many of

7       you here today, and what an

8       outstanding job was done in trying

9       and prosecuting these Vioxx cases.

10              In this litigation, Kasowitz

11      Benson played a valuable and

12      substantial supporting role.  So,

13      I don't want to take more credit

14      than we deserve, but at the same

15      time, I welcome the opportunity to

16      set forth what I think were

17      unique, important and

18      qualitatively valuable

19      contributions to the national

20      Vioxx effort.  I use the word

21      "unique," because I think it's

22      fair to say that Kasowitz Benson

23      was different from most of the

24      firms in the national litigation

FAC Resp. Exhibit D -- 586

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        because Kasowitz, Benson is a

2        large national firm that does both

3        plaintiffs and defense work, and

4        as such, we were able to bring and

5        to provide valuable support by

6        bringing defense insight into the

7        overall litigation strategy and

8        for particular trial teams as they

9        prepared for trial.

10               We also had resources in

11       terms of manpower and money, which

12       the firm willingly contributed

13       whenever asked.

14               Kasowitz Benson was

15       consistently and intensely

16       committed to the common Vioxx

17       effort from beginning to end.  Our

18       substantial commitment included

19       approximately 4,000 hours that had

20       been accepted by the Wegmann-Dazet

21       firm, along with another

22       approximately 450 preMDL hours

23       that were not accepted because

24       they were preMDL.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1            MR. HERMAN:  Wait one

 2       second.  You have 450 hours before

 3       the MDL, the Federal MDL was

 4       organized?

 5            MR. FETTERMAN:  Correct.

 6            MR. HERMAN:  You should

 7       submit those.

 8            MR. JOHNSON:  I think they

 9       are in.

10            MR. LEVIN:  They are under

11       review now.

12            MR. FETTERMAN:  We

13       contributed to the New Jersey

14       Vioxx effort from the outset with

15       the Seeger Weiss fund and

16       contributing to the public

17       relations fund, as well, when they

18       started.  And I think it is fair

19       to say that we remained committed

20       from the beginning to the very

21       end, by, among other things,

22       substantially contributing to the

23       document review, consulting on

24       strategy, assisting trial teams to

Page 6

1          prepare for trials through mock

2          trials, providing research and

3          editorial support, submitting

4          cases for trial in New Jersey,

5          although ours did not go, and

6          submitting our allocable share of

7          discovery cases in New Jersey in

8          the litigation, including late in

9          the game to put settlement

10         pressure on Merck, and also in

11         assisting with drafting of the

12         settlement agreement.

13              So, it's fair to say that

14         Kasowitz Benson was and remained

15         committed to the common Vioxx

16         effort from beginning to end.

17              And we had significant

18         partner participation.

19         Approximately eight partners

20         worked on the Vioxx matter,

21         including two of the named

22         partners, as I mentioned, two

23         senior trial counsel, which was

24         Chris Johnson and myself,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1    overseeing the day to day

 2    litigation, and other partners

 3    where appropriate.

 4         We also had participation

 5    from approximately 15 other

 6    lawyers at all levels, including

 7    special counsel, senior and junior

 8    associates and staff attorneys,

 9    and all 29 different legal

10    professionals from Kasowitz Benson

11    assisted in the common benefit

12    fund effort.

13         Addressing the quality of

14    our work, I'm happy to let members

15    of the panel who are here today

16    and are familiar with the quality

17    of the work that we produce speak

18    to that, but I think it's fair to

19    say that we expected and firmly

20    believe that we delivered the same

21    high quality for the national

22    Vioxx litigation projects as we do

23    for any of our defense clients.

24         With respect to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          litigation, our common benefit

2          efforts primarily centered in the

3          New Jersey litigation, because all

4          of our firms' cases were filed in

5          New Jersey.

6              I would like to now walk

7          through a little more specifically

8          the contributions that we made.

9              From the outset, Kasowitz

10         Benson's participation in the

11         litigation, which began in

12         February of 2005, shortly after

13         Merck's withdraw of Vioxx, we

14         supported the national litigation

15         effort.  And when we first became

16         involved, we talked to Chris

17         Seeger and Dave Buchanan, and we

18         asked them how we could help the

19         common effort.

20             And Seeger Weiss asked us to

21         do two things, both of which we

22         did.  One was to contribute to a

23         common fund.  They had a computer

24         system setup, and we made a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          contribution to that fund.  And

2          the second was to assist in the

3          review of millions of pages of

4          Merck documents.

5               According to our time

6          records, we devoted over 1,000

7          hours to the common discovery

8          effort, a substantial portion of

9          which involved reviewing Merck

10         documents at Seeger Weiss.

11         Indeed, we regularly sent one or

12         two associates at a time down to

13         Seeger Weiss' offices to review

14         those documents.

15              And among other things,

16         Kasowitz Benson lawyers reviewed

17         documents for Ray Gilmartin's

18         deposition and documents

19         concerning Alise Reicin.

20              MR. SEEGER:  Let me just

21         take one moment, because it is

22         important because we have a lot of

23         different types of people doing

24         different things in the case, but

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          they always sent very high quality

2          lawyers to the document review.

3          It was real document review by

4          people who were good at spotting

5          documents.  I just want to make a

6          note of that for the record.  As

7          opposed to somebody parking like

8          the contract lawyer in the

9          repository.  It was very different

10         for that.

11              For depositions, I know that

12         you guys would get a big dump of

13         documents, and your people would

14         go through them, and then we would

15         get back the best of.

16              MR. FETTERMAN:  Thank you.

17              I would like to address the

18         activities that Kasowitz Benson

19         participated in, including

20         bellwether trials and nonMDL

21         trials that impacted proceedings

22         on the common benefit level.

23              Kasowitz Benson also played

24         a substantial role in assisting

FAC Resp. Exhibit D -- 593

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1     specific trial teams in evaluating

2     and preparing their cases for

3     trial in four significant cases by

4     sharing our defense perspective

5     and anticipating Merck's defenses

6     as Merck adjusted and adapted

7     those defenses.

8          We also contributed to the

9     common benefit by participating in

10    the education of approximately 250

11    Vioxx lawyers from across the

12    country, and I'll describe those

13    efforts now in more detail.

14         We were initially asked by

15    Mark Lanier and Rick Meadow if we

16    would be willing to assist them in

17    preparing the Lanier trial team

18    for what turned out to be one of

19    the most significant bellwether

20    trials in the national litigation,

21    the Ernst trial.  We took that

22    role seriously and prepared for

23    that mock as if it were our own

24    case.  We retained a cardiologist

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      to advise us on specific

2      causation, focusing on where we

3      thought Merck would try to exploit

4      potential weaknesses in that case,

5      particularly with respect to

6      specific causation and the

7      coroner's observations that she

8      found no evidence of a heart

9      attack, that Ernst had died of

10     natural causes, specifically

11     arrhythmia, and that Ernst had

12     risk factors for arrhythmia and

13     the like.

14          Mark can speak to the value

15     that we added in his preparation

16     for that trial, but it's fair to

17     say that we had a spirited mock

18     trial, and I am still nursing the

19     battle scars from that.

20          As we all know, Mark did a

21     brilliant job in trying that case,

22     which resulted in an over $250

23     million jury verdict in a very

24     difficult case and set the tone

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          for the entire Vioxx litigation.

2              I believe as a result of

3          that work, I was also asked to

4          participate in a continuing legal

5          education mock trial put on by the

6          Association of Trial Lawyers of

7          America in New Orleans for

8          approximately 250 Vioxx lawyers

9          from around the country in May of

10         2005.  Specifically, I was asked

11         to give the closing argument for a

12         hypothetical Vioxx case, the Smith

13         case, to teach Vioxx lawyers how

14         to try these cases.  This time

15         Mark and I were on the same team,

16         Mark opened and I closed.

17              Again, Kasowitz, Benson took

18         its role seriously, prepared

19         approximately 100 PowerPoint

20         slides, which included

21         professional medical graphics and

22         which marshalled all the then

23         available evidence in support of a

24         Vioxx claim as a road map for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          other trial lawyers in the

2          national litigation.  And we

3          shared that at the mock.

4               That presentation was very

5          well received, and I'm happy to

6          report that Mark and I were

7          victorious in the Smith case.

8               Again, I had the privilege

9          of participating in a mock trial

10         for the second case that went to

11         trial in the New Jersey

12         litigation, the Cona/McDarby case,

13         with Mark Lanier, Perry Weitz and

14         Rob Gordon.

15              In that case, in that mock,

16         Perry and I defended Merck against

17         the formidable team of Mark Lanier

18         and Rob Gordon.  Again, we

19         prepared for that mock as if it

20         were our own case.  Kasowitz

21         Benson prepared approximately 90

22         slides for that, including

23         professional graphics.

24              The case was tried to the

Page 15

 1      first win in New Jersey, and I

 2      believe the second win in the

 3      overall litigation, with the trial

 4      team winning approximately $13

 5      million in damages and attorneys'

 6      fees.  And, again, another

 7      important bellwether case for the

 8      national litigation.

 9          Addressing the fourth mock

10      that I participated in, I was

11      asked by Chris Seeger and Sol

12      Weiss to assist them in vetting

13      the next group of cases that were

14      on the New Jersey trial calendar

15      for the estate of Steven Hatch and

16      Robert McFarland.  They were

17      concerned about how these

18      plaintiffs, how well these

19      plaintiffs would do at trial, and

20      asked if I would cross the actual

21      plaintiffs so they could test how

22      they would hold up in a courtroom

23      setting.  This case was

24      significant, because at the time

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        in the New Jersey litigation, the

2        win/loss record was 1 and 1.  At

3        the mock, Kasowitz Benson

4        presented Merck's arguments on

5        both general and specific

6        causation, and I prepared for and

7        cross-examined these plaintiffs

8        just like I would have had I been

9        defending Merck at trial.

10           Robert McFarland had a heart

11       attack, but during the

12       cross-examination, we showed a

13       video of him hiking with his

14       family and water skiing after his

15       heart attack, seemingly in perfect

16       health, and argued that his eating

17       habits, particularly the eggs,

18       sausage and butter that he had

19       regularly for breakfast and other

20       significant risk factors caused

21       his heart attack, and not the

22       Vioxx.

23           With respect to Mr. Hatch,

24       we argued that Hatch did not have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          a heart attack, but instead he

2          died from an arrhythmia, that the

3          evidence of his biofuse was

4          sketchy at best.  We also

5          cross-examined Mrs. Hatch on her

6          work for this prescribing doctor's

7          office, for taking Vioxx for her

8          husband without recording it in

9          his chart and other problems with

10         her testimony.

11             Neither plaintiff fared well

12         in that mock trial, and

13         plaintiff's counsel decided not to

14         move forward with the trial of

15         those cases.

16             Finally, we were asked to

17         participate in the mock for the

18         Humeston II trial, the retrial of

19         the Humeston case, where we

20         presented Merck's general

21         causation arguments at the mock

22         trial with the Lanier and Seeger

23         Weiss firms.  Humeston II, as you

24         all know, resulted in a total

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        damages award of over $47 million.

2        Again, a bellwether trial for the

3        national Vioxx litigation, and a

4        far better outcome for the New

5        Jersey litigation for the ultimate

6        settlement than if the

7        Hatch/McFarland trial had

8        proceeded.

9            In sum, Kasowitz Benson

10       assisted in preparing the trial

11       teams in three of the five winning

12       national Vioxx trials and helped

13       to vet a losing trial before it

14       occurred.  We also assisted in the

15       education of Vioxx lawyers

16       throughout the country through our

17       participation in the ATLA

18       continuing legal education program

19       in New Orleans.

20           We had other contributions.

21       In general, I would like to go

22       through some of those.  We

23       reviewed STI documents, prepared a

24       PowerPoint, and were in the

Page 19

1          process of preparing for STI

2          depositions when the settlement

3          occurred.  We assisted with

4          general strategy and settlement

5          issues.  We provided research and

6          editorial support for the forum

7          non conveniens brief filed in New

8          Jersey, and we provided assistance

9          in drafting the settlement

10         agreement, particularly with

11         respect to letter of credit

12         issues.

13              To wrap up, we submitted

14         approximately 4,395 hours in time,

15         and $47,471 in expenses.  Based on

16         our current hourly rates, the

17         value of our time and expenses is

18         approximately $2.1 million,

19         2,132,370 to be more specific.  We

20         respectfully ask that the fee

21         allocation committee recommend

22         that we receive that amount times

23         whatever multiplier deemed

24         appropriate to recognize Kasowitz

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        Benson's qualitative contributions

2        and commitment to the national

3        Vioxx litigation.

4             I also want to say, on

5        behalf of Kasowitz Benson, what a

6        privilege and how much fun it was

7        to participate in this important

8        national litigation with you and

9        other Vioxx counsel, and we look

10       forward to the next one.

11            Thank you.

12            MR. SEEGER:  Nicely done.

13       And I think from my perspective,

14       you did a very good and accurate

15       job in describing the work you did

16       in the litigation.

17            MR. LEVIN:  I'm from the

18       MDL, and I know not anything other

19       than what you did on the

20       settlement agreement, but it

21       confirms what others in New Jersey

22       said --

23            MR. SEEGER:  By the way, I

24       might have lost focus, but did you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1      have that in there?

2            MR. LEVIN:  Yes, he did,

3      because I said to Chris, you've

4      got to go to somebody that knows

5      what they are doing on a letter of

6      credit, and he mentioned your

7      firm.  And I said they do.

8            MR. WEITZ:  They are a

9      perfect example of a firm that, if

10     you were in New Jersey, you knew

11     was extraordinarily helpful in a

12     lot of ways, but probably did not

13     transcend to the MDL.  They were

14     there every time anybody asked to

15     help, and their work was

16     absolutely first class.

17            Arnie, do you have the right

18     expenses?

19            MR. LEVIN:  I don't have

20     them, but I'm sure they are okay.

21            MR. WEITZ:  What was your

22     number again?

23            MR. JOHNSON:  47,000.

24            MR. LEVIN:  I think 47 is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        exactly what I remember.

2              MR. SEEGER:  Dan, how many

3        individual cases do you have that

4        you are putting through the

5        settlement?

6              MR. FETTERMAN:  It is about

7        260.

8              MR. SEEGER:  Like I said,

9        that's a very accurate

10       presentation.  I know what you did

11       for us in the litigation.  It

12       really was a pleasure working with

13       you from my perspective.

14             MR. LEVIN:  It is a pleasure

15       not working with you and meeting

16       with you.

17             MR. SEEGER:  I don't have

18       any other questions.  Thank you.

19                  -  -  -

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 606

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM:  KLINE & SPECTER, P.C.
       Thomas R. Kline, Esquire
       Shanin Specter, Esquire
       Lisa Dagostino, M.D., J.D.
       Kathy Spurka
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 607

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -

 2            MR. KLINE:  For the record,

 3       I'm Tom Kline from the law firm of

 4       Kline & Specter.  I'm here with my

 5       partner, Shanin Specter, Lee

 6       Balefsky, my partner, recent

 7       partner, Lisa Dagostino, and legal

 8       assistant, Kathy Spurka.

 9            I want to start out with a

10       story, which those of us who

11       labored in the trenches I think

12       will appreciate, and some of you

13       will indulge me because you may

14       have heard it before.

15            It was the night before

16       Jerry Avorn's deposition, and I

17       was coming back from a good steak

18       with Buchanan and Tisi.  Actually,

19       I think Buchanan had two steaks

20       and a couple of drinks.  We were

21       staying at not the Four Seasons,

22       but the Sheraton in Boston where

23       the deposition was going to take

24       place.  There was a Lions
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1          Convention in town at the time.

 2          We got in the elevator with a

 3          fellow who, to use a word or a

 4          description that I've heard Mark

 5          Lanier use during the course of

 6          this litigation, he looked like he

 7          was a pork chop away.  He was a

 8          man who looked like he had every

 9          one of the comorbidities that any

10          of our Vioxx clients had.  He was

11          short, he was obese, he looked

12          like, if I were to make a

13          diagnosis on the spot, he had

14          hypertension.

15               MR. LEVIN:  Objection.

16               MR. KLINE:  He looked like

17          he had diabetes based on my

18          analysis of the man.  As we were

19          going up the elevator on the 7th

20          floor, I said, admittedly after a

21          couple drinks, let me ask you a

22          question, and pushing 60 at the

23          time, I could say this, "I said,

24          pop, have you ever been on the

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1      drug Vioxx?"  And he looked at me

 2      nonplused, like he had never heard

 3      of it before, and his wife looked

 4      at me and said, no, but if you

 5      have some, mistaking it for some

 6      other drug with the letter V, if

 7      you have some, I think we'd like

 8      to get it.

 9          There are two points that I

10      take from the story.  The first

11      is, that was the teamwork and

12      camaraderie of the Vioxx

13      litigation.  Any of us who stayed

14      up until the wee hours of the

15      morning, like I think everyone in

16      this room, everyone who labored in

17      the trenches of this litigation,

18      knows what it feels like to pull

19      together like we all did in a

20      remarkable effort.

21          And the second point that I

22      would make is, the story tells me,

23      as I reflected on it, just how

24      difficult we all knew the task was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        and how we understood the

 2        causation problems, the patient

 3        population and the convincing that

 4        it was going to take to win these

 5        cases.

 6            If I can start with the

 7        first slide, I would start my

 8        presentation with a quotation from

 9        C.S. Lewis, and I think it is

10        apropos to my endeavors here

11        today.  "We all wish to be judged

12        by our peers, by the men 'after

13        our own heart'.  Only they really

14        know our mind and only they judge

15        it by the standard we fully

16        acknowledge.  Theirs is the praise

17        we really covet and the blame we

18        really dread."

19            You will see where I'm

20        going.  My presentation today I

21        see as more creating a necessary

22        record than to convince this panel

23        of colleagues who appreciate our

24        firm's, among many other firm's,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        including those at this table,

2        contribution to the Vioxx

3        litigation.

4             Our firm has many

5        experienced trial lawyers, lawyers

6        experienced in mass tort and

7        catastrophic injury.  We brought a

8        team, and I calculated this

9        yesterday, to this litigation with

10       over 100 years of lawyering

11       experience and 40 years of medical

12       experience.  We were there at the

13       beginning, as those at the table

14       know.  We made a major

15       contribution, I believe, and that

16       contribution, as I said, was made

17       not only by our firm, but by many

18       other firms.

19             The litigation settled on

20       the strength of the collective

21       work that essentially is now

22       memorialized in something known as

23       the trial package.  It is heavy

24       with science and medicine and as

FAC Resp. Exhibit D -- 612

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1      technical and complex as I've seen

 2      in 30 years of litigating complex

 3      drug product cases, back to the

 4      first one which I tried, which was

 5      a Dalkon Shield case.

 6           On the day that this case

 7      settled, and I take us back to the

 8      words of praise by C.S. Lewis, and

 9      we were headed to New Orleans, I

10      received the kindest note, kindest

11      note from Russ Herman, inviting

12      our firm to a dinner in New

13      Orleans with the highest praise,

14      which was appreciated then and

15      appreciated now.  I return that

16      praise, Russ, I return that praise

17      by saying we appreciate your

18      leadership.

19           His e-mail in the invitation

20      said, "Your firm's team is and has

21      been integral to all efforts."  My

22      presentation today will describe

23      all of those efforts and how they

24      were, I believe, integral to a

FAC Resp. Exhibit D -- 613

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          collective effort that was made in

2          this room and throughout the

3          United States.

4                  An overview.  If you guys

5          can just wait for me on the

6          slides.  We're among friends.

7                  Here's how I see the

8          overview for what we've done in

9          showing how our role was integral.

10         We were involved since back in

11         2003.  No one at this table knows

12         better than Chris Seeger.  We, of

13         course, provided litigation

14         funding and took the risk with all

15         of those here.  We developed a

16         substantial portion of the

17         liability case principally through

18         depositions of Merck executives,

19         scientists, key third parties,

20         developed experts and did

21         extensive, I mean extensive

22         document review.

23                 Next we developed a

24         substantial portion of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1         causation case, including

2         depositions, expert development,

3         medical literature review, work on

4         mechanism of action and

5         pharmacology.  This was the

6         scientific puzzle that we all

7         struggled with in the beginning.

8              If I might complement her,

9         Lisa Dagostino did the work in the

10        trenches, along with many others

11        whose names are familiar, Dave

12        Buchanan, very notably, as well as

13        others.

14             We did expert development,

15        and I'm going to discuss that with

16        you, and extensive document

17        review.  Trial package development

18        included significant portions of

19        the trial package, which I'll

20        discuss.  We were involved in the

21        preemption briefing in which Arnie

22        took the lead.  We worked very

23        closely, as everyone knows.  Lisa

24        argued the factual portion, while

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          others argued the other portion.

2                We were intimately involved

3          in the trial, not only trial

4          selection, but trial strategy, in

5          many aspects of it, both formally

6          and informally, as this litigation

7          progressed.

8                I know it's important, so my

9          next slide deals with leadership

10         positions and committee

11         memberships.

12               The next slide on committee

13         memberships and leadership

14         positions, again, I believe most

15         people, if not everyone at the

16         table, knows our various roles.

17         Lee Balefsky and I were not only

18         at the status conferences, but we

19         were asked to be part of the

20         premeets with Judge Fallon and

21         were there, and I know viewed by

22         those in leadership in this

23         litigation as an important and

24         integral part of the think tank,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1          if I could call it that.

 2              Lee Balefsky was a member of

 3          the discovery committee, liaison

 4          counsel, and we were tasked with

 5          developing significant parts, as

 6          you know, of the stroke package.

 7              Lisa Dagostino, her

 8          membership on the science

 9          committee is well known to

10          everyone at this table and the

11          countless hours -- I guess they

12          are not countless, because they

13          are counted -- but the hours which

14          amount to literally two years of

15          full-time work.

16              Lisa, as everyone knows, is

17          a physician and an attorney and

18          among the most knowledgeable, by

19          anyone's account, in the

20          litigation of the science and

21          medicine of Vioxx.  It's probably

22          only a shame for the victims of

23          Vioxx that Lisa Dagostino wasn't

24          Alise Reicin, because there may

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          not have been that tragedy.

2               As part of the science

3          committee, Lisa undertook an

4          extensive review of the underlying

5          medical files for adverse events

6          in the Merck trials.  Those at

7          this table who were in the

8          litigation part of this know that

9          that was the, quote, adjudication

10         project.  That was some of the

11         most tedious work in dragging down

12         and undercutting the underbelly of

13         the various Merck studies,

14         especially the VIGOR trial, and

15         Lisa was involved.

16              Moving to depositions.

17         Depositions of key Merck

18         scientists and executives, I think

19         probably our firm made one of its

20         most significant contributions

21         here.  I can tick them off.

22         Shanin Specter was one of the

23         three who deposed Ray Gilmartin, I

24         remember those days well, as will

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          Chris Seeger and Mark Lanier.

2               Ed Scolnick, I, in

3          particular, did what was then

4          called the label module.  It took

5          us all collectively, until my

6          redirect-examination, to figure

7          out that Ed Scolnick never

8          finished his residency and was

9          never board certified, and that's

10         why he didn't practice medicine.

11         That is a little historical fact

12         for those in the room who would

13         appreciate it.

14               Shanin, on four different

15         days, relentlessly and doggedly

16         day after day went after Peter

17         Kim, one of the best witnesses

18         that Merck had.

19               I've always to this day

20         thought that Alise Reicin loathed

21         Lanier more than me, but I had

22         three different cracks at her and

23         probably the best day of the

24         litigation, and I mean this,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1         because we all know Mark Lanier's

2         contribution to this litigation.

3         I was only lucky enough to be

4         there when Chris Seeger ran into

5         the room on the record, Mrs.

6         Golkow will testify to this under

7         oath, and said, we got a verdict,

8         $250 million, and we were on the

9         record.  True, Linda?

10                THE COURT REPORTER:  Yes.

11                MR. KLINE:  I said to Alise

12        Reicin, so, what do you think

13        about that, Dr. Reicin?  I was

14        only there to ask her what she

15        thought about it, Lanier got the

16        verdict, and it was a turning

17        point.

18                I was talking to Rick Meadow

19        today out in the hall, because

20        this is a time, I guess, to

21        reminisce, too, about how the

22        State cases and the Federal cases

23        and the effort, as I'm going to

24        talk about in a moment at the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          Topol deposition, became a

2          collective one.  Everybody from

3          California to New Jersey, coast to

4          coast, banded together in this

5          litigation.  That's something I'm

6          proud of.

7               If I can have like one

8          little gem that I take credit for,

9          I want one little thing, defender

10         of the franchise.  Actually, Lisa

11         found it.  I only got, as Shanin

12         Specter would say, quoting Winston

13         Churchill, the roar.

14              Deborah Shapiro was taken by

15         Shanin Specter.  As you know, it

16         is the only evidence that Judge

17         Higbee found sufficient to present

18         to the jury on punitive damages in

19         Cona/McDarby, the Cona/McDarby

20         trial.  I have, and I know Mark

21         will indulge me with the e-mail

22         later in showing it, but I have

23         the nicest e-mail between Shanin

24         and Mark, which I would like to

FAC Resp. Exhibit D -- 621

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        share with this group, because I

2        think it shows, again, our

3        integral part.

4              Continuing along, these were

5        the key Merck scientists and

6        executives.  For two days, Shanin

7        went at Alan Nies on the early

8        development of the drug, the

9        pharmacology, backed up by Lisa.

10             We do not take credit for

11       the developing of the marketing

12       part of this case, it was ably

13       developed by other lawyers, but I

14       might add, we just wanted our toes

15       in the Anstice water, and so Lee

16       Balefsky got a small crack at him

17       that day.

18             Continuing along, Barry

19       Gertz, as you all know, he's a

20       pharmacologist, he was a key guy,

21       and it was a very technical

22       deposition taken by Mark Hoffman

23       with something near 30 years of

24       experience as a former transplant

FAC Resp. Exhibit D -- 622

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1      surgeon, and one of the early

2      developers and persons who figured

3      out the science of this

4      litigation.

5           Tom Simon, the GI doc who

6      designed the VIGOR trial, was

7      taken on two separate days by Mark

8      Hoffman.

9           Continuing along, Kathy

10     Metters, who was the head of basic

11     research of Merck, you will all

12     remember the so-called claw back

13     document, the patent document.

14     That's what this deposition was

15     all about.

16          On this page, I've lumped

17     her with Joe Lynch, who was taken

18     by Shanin, and Lisa questioned

19     him, and that was the infamous

20     green monkey study.  Here's a

21     point that may get lost in the sea

22     of work that was done by so many

23     lawyers.

24          The green monkey study was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        major defense, as was the defenses

2        presented by Metters.  It was

3        neutralizing those defenses, not

4        only presenting the evidence that

5        we developed, but neutralizing the

6        defenses, neutralizing the Peter

7        Kims, neutralizing the Metters,

8        neutralizing the Lynches of the

9        Merck stable that contributed

10       significantly.

11            There were many trials in

12       this litigation, as we all know,

13       and we provided direct support and

14       assistance, deposition cuts, all

15       kinds of assistance.  I know that

16       in your small group, Andy can

17       speak to that.  He knows that we

18       were there, as does Chris and

19       others at these trials, during

20       these trials, for these trials.

21            Speaking of trials, I want

22       to, in passing, mention one case

23       which never did try.  That was the

24       Abrams case.  It was listed as the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          second MDL trial.  It was listed
 2          in early 2006.  It was a
 3          disappointment to pull that case.
 4          After consulting with all of the
 5          PEC, including Andy and Chris and
 6          Russ and Arnie, I might add, as
 7          well, we unanimously agreed that a
 8          late discovered document made the
 9          case undesirable as a bellwether
10          case.  I know that was a
11          disappointment to all of us, and I
12          know it was a disappointment to
13          Judge Fallon, but for those of us
14          who were involved in the decision,
15          I still think that it was the
16          right decision.
17               Depositions in this
18          litigation of third parties were,
19          as everyone here knows, very
20          important.  I was given the
21          responsibility to be involved in
22          taking two of what we at the time
23          in the trenches called the
24          third-party trinity, Topol, Graham
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          and Nissen.

2                The deposition of Eric

3          Topol, which, of course, was

4          extremely critical of Merck's

5          conduct, was played at, I believe,

6          every trial, certainly every trial

7          which ended in a plaintiff's

8          verdict, but I believe every

9          trial.  He debunked many of the

10         theories.  It was our most solid

11         evidence on debunking Merck's

12         interpretation of the APPROVe data

13         that the increased risk of Vioxx

14         only happened at 18 months.

15               I could not have done that

16         deposition without Mark Lanier.

17         He and I know it.  He and I were

18         collaborators in a backstory that

19         probably will never be told on a

20         record.

21               MR. LANIER:  But it was a

22         darn good story.

23               MR. KLINE:  It was a hell of

24         a story, and it was one of the

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1      most fun things that I ever did as

2      a lawyer.

3           David Graham, his deposition

4      was taken by me, and we know the

5      story there.  He was the chief

6      critic.

7           Nissen was Topol's co-author

8      and FDA Advisory Committee member,

9      and Lisa worked extensively with

10      Chris Tisi on this litigation.  I

11      would be remiss, because I labored

12      so many hours, as did Lisa in

13      particular with Chris Tisi, and I

14      know it is my time to make a

15      pitch, but I can tell you that

16      Chris Tisi was the dogged pursuer

17      of the MDL third-party strategy.

18      He kept saying, let's take these

19      deps, let's take these deps, and

20      Topol was worth it, and we offer

21      congratulations to him.

22           I was responsible to go off

23      and take Curfman.  We all know how

24      the New England Journal was in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1      middle of the fray.  I went up and

2      took Curfman's deposition after

3      the Expression of Concern was

4      written.  It became a very

5      important corollary to what was

6      going on at that time.

7           Jerry Avorn, Chris Tisi ably

8      took it.  Mark Lanier at trial did

9      it live, and Lisa did much of a

10     background and prep work on that.

11     I went up there for the

12     deposition, because somehow my

13     being there was supposed to

14     neutralize Phil Beck or something

15     like that.  I don't take any

16     credit for it, other than Lisa did

17     all the background work on Avorn.

18           And then, finally, I was up

19     there when they sent the dogs out

20     after Eric Topol and they decided

21     that Mal Mixon, the chairman of

22     the board of trustees of the

23     Cleveland Clinic, was going to

24     trash the guy.  I was sent to do

Page 23

1          the cross-examination.  I don't

2          remember seeing that deposition

3          played during the course of the

4          Vioxx litigation, as I recall it.

5               Expert development.  A word

6          about it, if I may.  We were

7          involved in much of the major

8          expert development in this

9          litigation.  Jerry Avorn -- I'm

10         going to pass over a lot of this

11         quickly for the sake of time --

12         but they are names that are

13         familiar to everyone here.  Avorn

14         was clearly, in my view, was the

15         most distinguished expert.  Tisi,

16         Buchanan, Grand from Seeger Weiss,

17         the latter two did phenomenal

18         work, along with Lisa, in a key

19         deposition, as I believe we all

20         agree.

21               Ray, another highly

22         credentialed expert.  Lisa

23         Dagostino, Tisi and Buchanan

24         prepping him for a de bene esse

Page 24

1          deposition.  And then there were

2          other experts, as well, that we

3          spent much time working with in

4          expert development, and that

5          includes Pace-Asciak, Parisian,

6          Levine, who is the stroke

7          expert -- I'll speak to that in

8          just a moment, I'll speak to

9          Feldman in a moment, who, in the

10         stroke part of the trial package,

11         was a project among many people,

12         including Mike Wenkowitz of Arnold

13         Levin's office and Lisa Dagostino.

14              That takes us to the trial

15         package.  It's kind of like a tour

16         of the Vioxx litigation, by the

17         way.

18              The trial package, I would

19         make just a few points.  The trial

20         package has been described, I've

21         heard it described as probably the

22         best trial package ever put

23         together in mass tort litigation.

24         It was a comprehensive effort of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1        many people who put in countless

2        hours in the project.

3            I would say a couple of

4        things about our contribution.

5        The documents which are sitting

6        with Lisa to her right, if I can

7        just have them in my hand for a

8        moment, are really three.  They

9        became really the guide, if you

10       will, the way that someone would,

11       along with the updated --

12            MR. SEEGER:  Your time --

13            MR. KLINE:  I am going to

14       make it, and I appreciate the

15       indulgence.

16            -- along with the road map,

17       and what do you call the initial

18       --

19            MS. DAGOSTINO:  The theme

20       grid.

21            MR. KLINE:  The theme grid.

22       Along with the theme grid, which

23       the trial committee updated, which

24       was the original work of Buchanan,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          et al., Seeger, et al.  She

2          compiled the dictionary of terms,

3          the list of 3,200 articles in

4          Vioxx, which Lisa Dagostino

5          labored through and actually knows

6          and actually read.

7               This is essentially our data

8          bank, as is the cast of

9          characters, which essentially is a

10         road map of the who's who.  I know

11         this committee is familiar with

12         all of them.

13              In addition, we were

14         involved in doing all the things

15         that went into the package, which

16         is the deposition cuts, the

17         modules, et cetera.

18              I want to lead into my last

19         four minutes with "In the words of

20         our peers," this litigation was a

21         team effort.  I just want to show

22         a few things, and I know that

23         those who wrote them will be okay

24         with it, I guess is what I want to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1      say.

2              First of all, Lanier.  This

3       is on the Topol deposition, and I

4       like it and I saved it.

5              "Put down your

6       computer/Blackberry."  He was in

7       England.  "Go Outside...Listen.

8       ..can you hear that???  Can you

9       hear the applause?"  This is

10      classic Lanier, I might add.  "It

11      is coming from England...The

12      applause is so loud, it is

13      traveling the Atlantic.  I just

14      read the Topol depo.  If that is

15      not your best work, I would love

16      to see what is!  Fantastic!!!

17      Absolutely fantastic!!!  My

18      compliments and praise...Happy

19      Thanksgiving."

20              That was followed by a whole

21      bunch of e-mails about Bob Dylan,

22      which are not part of this

23      presentation.

24              From Mark, again, a very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          nice note saying, "Lisa/Shanin/

2          Tom's incredible depositions of

3          Shapiro/Topol."

4                  I would like to share with

5          this group a really nice e-mail

6          between Shanin and Mark.

7                  If we can skip this one and

8          go to the next one, which is, "We

9          got to punies because of you,"

10         said Lanier.  "Judge denied motion

11         to dismiss!!!

12                  Specter quoting Churchill.

13         "I 'had the luck to give the

14         roar.'  Lisa Dagostino deserves

15         the credit."

16                  And Lanier.  "You were

17         played in closing puni argument...

18         Great find and delivery from you

19         and Lisa both!!!"

20                  Next, speaking to the

21         trials, our involvement in the

22         various trials, Steve Knowlton of

23         the Locks firm saying, "Please

24         tell Tom thanks for me.  Your

FAC Resp. Exhibit D -- 634

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1        work, as a firm, has been an
 2        essential part of the case."
 3             Pete Kaufman writing from
 4        the Levin Papantonio firm.  "Lisa,
 5        your contributions to the trial
 6        package have been astonishing.  If
 7        I knew a word better than
 8        'astonishing,' I would use it."
 9             And Chris Tisi saying, "Wow!
10        Lisa and Kathy...this is great to
11        have.  You are fantastic."  This
12        is a kudos to the many hours of
13        work that was done by Kathy
14        Spurka.  No Arnie, you cannot have
15        her back.  "You guys are the best.
16        I particularly want to thank
17        Kathy."
18             And finally from Russ, very
19        kindly sending to Lisa and telling
20        here, "Excellent work as usual."
21             And finally another e-mail
22        again from Russ in his true
23        gentlemanly style.  We in the
24        north still have much to learn
```

FAC Resp. Exhibit D -- 635

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        from you, Russ.  It says here, "I

2        personally appreciate your

3        continuous work at a level of

4        excellence.  Trial package and

5        everything you have touched has

6        been top notch.  Take care and

7        thanks."

8             My very few concluding

9        thoughts.

10            MR. SEEGER:  Wait a second.

11       You don't have one nice e-mail

12       from me?

13            MR. KLINE:  You didn't send

14       me an e-mail or I would.

15            MS. DAGOSTINO:  We had to

16       redact certain words.

17            MR. HERMAN:  Mark recants,

18       but I don't.

19            MR. SEEGER:  I should have

20       written at least one nice e-mail.

21            MR. KLINE:  You didn't write

22       one to me, but you told me so.

23            MR. SEEGER:  Yes, I did.

24            MR. KLINE:  Here's the laugh

FAC Resp. Exhibit D -- 636

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1        line.  Here is my laugh line.

2             "I can live on a great

3        compliment for two months."  Mark

4        Twain.

5             Here's my last point.  This

6        was my official presentation, and

7        thank you for indulging me.  Thank

8        you again.  This was a successful

9        group effort.  Different people in

10       different firms did different

11       valuable things.  The

12       significantly contributing firms

13       of the PSC, of which ours is

14       clearly one, should be recognized

15       and recognized at the same

16       multiplier without

17       differentiation.  That's our view

18       of it.  Our work was undoubtedly

19       integral in the establishment of

20       the settlement and the success of

21       the litigation.

22             Thank you.

23             MR. HERMAN:  Let me say a

24       couple of things at this juncture.

FAC Resp. Exhibit D -- 637

Page 32

1             First of all, you made a

2       good move by making Lisa a

3       partner, because there are other

4       members of the PSC that if you

5       didn't, we would.  She would be

6       welcome at any time in any one of

7       the firms.

8             MR. LEVIN:  I have a

9       question, if I may interrupt you.

10            MR. HERMAN:  Wait a second,

11      it's my turn.

12            I want to thank Lisa

13      particularly.  The trial package

14      to me is one of the most important

15      single things that we can do,

16      because it justifies a common

17      benefit fee.  Individual trials,

18      those that won, some that didn't,

19      depositions, document review, we

20      all know what that is as lawyers.

21      But the ability to resolve the

22      case and at the same time produce

23      a trial package that no one can

24      deny cures a lot of issues in any

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

 1          view, and it's why I pushed so

 2          hard for it.  I think we had our

 3          best people on that committee in

 4          terms of knowing the case.  Or I

 5          should say representatives of the

 6          best firms who know the case on

 7          that committee.  Others were

 8          trying cases at the time.

 9              The reason for that is

10          everybody has got the opportunity

11          in this case to opt out.  You

12          don't have to opt in.  And in

13          order to justify the ethical

14          concerns, you have to have some

15          balance on the other side.  You

16          have to be able to say, hey, you

17          don't want in, you don't like the

18          deal, go try your case, here's a

19          package.  I think it's a

20          fundamental issue that's been lost

21          in all of this.  So, the work to

22          me on the trial package is a

23          fundamental situation absolutely

24          necessary in this case.  It is the

FAC Resp. Exhibit D -- 639

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1     only trial package I have ever

2     seen come out of an MDL that's

3     worth a damn.  Nobody else had a

4     trial package where you could go

5     try a case.  This one you could.

6          These trials were costing a

7     million-and-a-half, $1 million

8     apiece.  You can try a case maybe

9     for a couple hundred thousand with

10    this trial package.  I want to say

11    that because we're being recorded

12    on a record, and it's got to be

13    said at some point.

14          Secondly, you made the issue

15    about the Abrams trial.  I did not

16    know until y'all called that that

17    case was going to be pulled.  It

18    caused some difficulty.  However,

19    Tom's work on Topol, which was

20    used in numerous trials to a great

21    advantage, was before Judge Fallon

22    on several occasions, and I'm sure

23    demonstrated his extraordinary

24    ability as a trial lawyer.  We all

FAC Resp. Exhibit D -- 640

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1        get surprised sooner or later in

2        this practice, it just happens, no

3        matter how hard you work.

4              Again, I want to say that

5        when you take 17 key depositions

6        in the case, and they are taken by

7        partners, and you've got two

8        physician lawyers doing the

9        background work, it's significant.

10       That's my view of this.

11             What comes out of this, I

12       don't know, because the best

13       advice, and I'm directed to say

14       this, you've got to read the Fifth

15       Circuit cases, you've got to read

16       Murphy Oil, you've got to read

17       Mobil, and, of course, the

18       original case setting the Johnson

19       factors, because if this matter is

20       not resolved among counsel in

21       terms of fee, then it is all going

22       to the Fifth Circuit sooner or

23       later.  So, whatever happens.

24             In addition to that, Judge

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          Fallon has said that if the matter

2          is not resolved, he's got some

3          former assistant U.S. Attorneys on

4          hand, he's got the three judges or

5          special masters on hand, he's

6          going to put all of us under oath,

7          and we're all going to be required

8          to testify about what we did and

9          what we didn't do.

10               I say that to you not

11          because I see any fluff in what

12          you've done in your presentation,

13          but you've got to be aware of

14          that, and if there's some changes

15          you want to make to the affidavit,

16          and I'm not suggesting there are,

17          you really have to look at it

18          closely.

19               So, that's what I've got to

20          say.

21               MR. LEVIN:  Off the record.

22                    -  -  -

23               (Whereupon, an

24          off-the-record discussion was

FAC Resp. Exhibit D -- 642

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1      held.)

2                    -   -   -

3            MR. KLINE:  Lisa was, in a

4      way I've never seen, driven

5      compulsively to the point that I

6      didn't think it was healthy.  I'll

7      say that on the record.

8            MR. LANIER:  Her picture is

9      in the dictionary next to the word

10     indefatigable.

11           MR. LEVIN:  I went off the

12     record only because of the comment

13     on the hours, but I think

14     everything else is worthy of

15     putting on the record.

16           MR. SEEGER:  From my

17     perspective, your presentation

18     really speaks for itself, and it

19     is a real reminder about how many

20     pieces of the litigation you were

21     involved with.  Clearly, from the

22     day we got involved together in

23     Vioxx, we were in it a little

24     earlier, probably the earliest,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          you have been one of the go-to

2          people.  I think as Russ said,

3          which is key, it wasn't like you

4          sent -- I mean, you and Shanin

5          were taking the depositions and

6          Lisa, so --

7                MR. KLINE:  I appreciate

8          your saying it, and I appreciate

9          what Russ said.  We've all been

10         through a lot together, and I know

11         these proceedings are formal, and

12         I knew I had an obligation to the

13         law firm, the partners, to lay it

14         out.  It is a walk down memory

15         lane for a lot of us, and it is a

16         good walk.  There are a lot of

17         nice pieces to it.  It has been

18         very rewarding to work with the

19         folks in this room.  You know how

20         I feel personally about it.

21               I understand that there are

22         economic issues, and that's why

23         we're all going through the

24         process.  And to answer Russ'

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1              question, we're well familiar,

2              very familiar with the cases in

3              the Fifth Circuit.

4                    MR. LANIER:  Off the record

5              for a second.

6                          -   -   -

7                    (Whereupon, an

8              off-the-record discussion was

9              held.)

10                         -   -   -

11                   MR. BIRCHFIELD:  I got the

12             benefit of using the Topol

13             deposition first, and it was

14             remarkable work.  And you are

15             right, we were concerned about

16             Lisa's health, too, the hours that

17             she was putting in both on the

18             trial package, on the stroke

19             committee and helping us at

20             trials.  So, your work is really

21             phenomenal, and I appreciate that.

22             I told you before, but I want to

23             say it again.

24                   But one thing, and maybe it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          is not something that you can

2          address --

3                MR. HERMAN:  Andy, would you

4          raise your voice.

5                MR. BIRCHFIELD:  One of the

6          things I wanted you to help me a

7          little bit on, the Abrams case, I

8          was in trial when that decision

9          was made.  Can you share with us

10         what happened there?

11               MR. KLINE:  I sure can.

12         Lisa, do you have the slide?

13               MS. DAGOSTINO:  Yes.

14               MR. KLINE:  I'll show you

15         exactly what happened, and

16         everyone here will understand.

17               We were putting these cases

18         up, as everyone in this room

19         knows.  We were just trying to

20         find cases, our best cases.  We

21         didn't have all of the records.

22         None of us had all of the records.

23         What happened here was you had a

24         self-prescribing doctor, a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          dentist, he was a dentist, whose

2          blood pressure was increasing on

3          Vioxx.  His doctor told him to get

4          off the drug, he didn't, he died.

5               When we saw this document

6          that I brought with me, Andy,

7          which I reported, and I distinctly

8          remember it, and I know the others

9          here do, I reported it to Chris, I

10         talked to Arnie about it, I talked

11         to Russ about it, I talked to you

12         about it, I believe at the time,

13         but in any event, here were the

14         facts, and here was the reasoning.

15               We had a document here that

16         said "Vioxx increasing blood

17         pressure, edema."  The doctor knew

18         that he had the symptoms that, by

19         the way, while we criticized the

20         warning, the label does say

21         certain things about risks, and he

22         told Mr. Abrams or Dr. Abrams, the

23         dentist, who was self-prescribing,

24         in number 4, discontinue Vioxx."

FAC Resp. Exhibit D -- 647

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          I mean, it's in the "come on"

2          category.  He was told to get off

3          the Vioxx.  He wasn't prescribed

4          Vioxx by a doctor.  He was told by

5          a doctor get off of it.

6               I think that I can work with

7          some pretty bad facts, and I know,

8          Andy, you worked with some pretty

9          bad facts, I know that, but we

10         couldn't win this case.  And at

11         the time, we were all struggling,

12         all of us, with not losing cases,

13         with getting cases that we could

14         win.  We were jockeying with

15         Merck.  We all were involved in

16         this, the folks in the MDL, with

17         what cases to try, what cases not

18         to try.

19               Believe me, I know and I

20         regret that we pulled that case,

21         and I know through Russ and others

22         how Judge Fallon felt about it.

23         But if I can use a word, but damn

24         it, come on.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          MR. HERMAN:  Well, let me

2      just cut this short, because I

3      don't think you really have to

4      apologize.  I think we were all

5      rubbed raw at the time.

6          But my view has always been,

7      and if you look at the table and

8      I'll look at you guys, the one

9      thing about this litigation is we

10     had real lawyers involved that

11     tried real cases.  I've never been

12     in a position ever of

13     second-guessing a real trial

14     lawyer when he says, hey, I've got

15     to pull the case, I have to do

16     that.  I just think that when you

17     let your arrogance get involved in

18     your best judgment, you are headed

19     for trouble.  I think with really

20     fine trial lawyers, we all

21     sometimes go off base.  I don't

22     think you were off base.  I think

23     that your work was excellent in

24     the case.  It wasn't easy, I'll

FAC Resp. Exhibit D -- 649

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

```
 1      tell you -- well, it's not

 2      important.  But at any rate, I

 3      think we need to get past that.  I

 4      don't think that ought to be a key

 5      factor or a sine qua non in the

 6      judgment of your work.  We all

 7      have difficulties during trials,

 8      we have difficulties, et cetera,

 9      but the fact is, your firm made a

10      significant contribution and that

11      you are real lawyers.

12           MR. SEEGER:  From day one.

13           MR. HERMAN:  I want to get

14      past this.  The reason I do is I

15      got over it, and I think we all

16      ought to get over it.

17           MR. KLINE:  I appreciate

18      that, Russ.  We got over it, and

19      Lisa reminded me, what did we go

20      do the next week?  We took the

21      Topol deposition, I believe.

22           MS. DAGOSTINO:  It was the

23      day after.

24           MR. KLINE:  I think it was
```

FAC Resp. Exhibit D -- 650

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          the day after.  So, we were on to

2          doing the next thing.

3              Russ, I appreciate it.  I

4          felt obliged -- if I might have

5          just literally two seconds more.

6          I felt obliged to address it

7          because of Andy's question.

8              MR. HERMAN:  No, I'm glad

9          you did, and I think it needs to

10         be addressed, because in my own

11         mind --

12             MR. SEEGER:  It was good

13         that Andy asked the question.  It

14         needed to be addressed.

15             MR. KLINE:  It needed to be

16         addressed.  That's how I felt

17         about it.

18             MR. HERMAN:  I guess what I

19         want to say on the record is, in

20         our consideration, we really have

21         to get past it.  It provided a

22         very difficult time in the MDL.  I

23         think what really helps is the

24         fact that your performance and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          your partners' performance in all

2          the depositions, but particularly

3          in Topol, were very dramatic, and

4          they were going to have to eat

5          Topol in every single trial.  Very

6          important to this litigation.

7                    MR. BIRCHFIELD:  In raising

8          that issue, I was not diminishing

9          your work in any way.

10                   MR. KLINE:  No, I understand

11         that.  But you couldn't, sitting

12         in our shoes or in my shoes, not

13         go back and look at it

14         reflectively, and this is an

15         opportunity to do that in a

16         self-critical analysis and say

17         what happened, and I know what

18         happened.  I was prepared to say

19         so.

20                   MR. SEEGER:  You did.

21                   MR. HERMAN:  How many cases

22         have you submitted in the

23         settlement total, do you know?

24         What's the range?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1          MR. BALEFSKY:  600, a little

2     over 600.

3          MR. KLINE:  A little over

4     600 cases, Russ.

5          MR. SEEGER:  All right.

6     Thank you.

7          MR. HERMAN: Thank you.

8          MR. KLINE:  Thank you.

9          MR. BIRCHFIELD: Thank you.

10              -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -


FIRM:  LAW OFFICES OF BRIAN K. BALSER
       Brian K. Balser, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 655

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -
 2               MR. BIRCHFIELD:  As you see,
 3          we have a court reporter here.
 4          Linda is taking down everything.
 5          There will be a transcript that's
 6          available for Judge Fallon.  He'll
 7          have the transcript for his review
 8          and whatever use he deems is
 9          appropriate.
10               So, you've got the floor.
11               MR. BALSER:  I'm Brian
12          Balser.  I'm in solo practice.
13          Cleveland, Ohio is my main office,
14          and I also have a satellite office
15          in Clearwater, Florida, where
16          hopefully I'll practice more at,
17          but not until my girls grow up.
18               I've been in practice for
19          over 20 years, started off like
20          most do, doing defense work and
21          then I prosecuted for a while.
22          Then I came to the right side and
23          did plaintiffs' work, which I have
24          done since then, almost
```

FAC Resp. Exhibit D -- 656

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          exclusively personal injury, solo

 2          practice.  Background is medical

 3          malpractice work.  Did a little

 4          Sulzer Hip, did a lot of fen-phen.

 5          I watched you do a lot of work in

 6          the courtroom.

 7               Then I got on to the course

 8          with the Vioxx, and I was looking

 9          forward to getting involved more

10          with it because I was finally on

11          something at the very beginning in

12          terms of it.  I was asked and

13          appointed to the discovery

14          committee, and first I asked what

15          I needed to do, and I called

16          Chris' office, and they said, come

17          on up, and I do believe it was

18          Mike that ran the --

19               MR. SEEGER:  Mike Wagner.

20               MR. BALSER:  -- ran the

21          depository.  I spent time going

22          through records in that one room

23          there.  Then I was appointed to a

24          couple of committees.  The main
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          was the privilege log committee.

2          To be honest, I was really

3          fortunate to get put on the

4          committee with the type of

5          attorneys that we had on there

6          from Anthony Irpino to Mike Hugo,

7          Tara Sutton, Gary Wilson and

8          myself.  Because when I first

9          looked at what we had to do in

10         terms of the privilege log, I

11         said, there's no way it is going

12         to happen.  I didn't see it

13         happening.  But we did the

14         conference calls sometimes two or

15         three times a week.  The nice

16         thing was the other attorneys were

17         as dedicated to this as I was.  If

18         there was something that needed to

19         get done, we made sure it got done

20         in terms of document reviews.

21              One of the examples, when

22         they released more documents up in

23         New York, Mike Hugo and I flew up

24         there, met up there, started

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1           looking at the documents.  We

2           said, there was no way we could go

3           through all of these.  With the

4           approval of Anthony, we went and

5           bought an external hard drive.  We

6           downloaded some and shipped them

7           around to the other committee

8           members so that we could get

9           through the different documents we

10          had to get through.

11               The biggest thing, I guess,

12          that I liked is we succeeded in

13          terms of what we wanted to

14          accomplish in terms of getting

15          through the documents.  On the

16          conference calls, I have been on

17          other conference calls, I'm sure

18          you guys have been on a lot more

19          than I have, and you just sit

20          there and say, what the heck are

21          they doing.  Ours weren't like

22          that.  Ours were actually like

23          brain sessions where we actually

24          talked strategy, talked about what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          we wanted to accomplish, and then

2          the next call or even in between.

3          I could call Mike Hugo up and say,

4          I'm thinking about this, what do

5          you think, and vice versa.  Same

6          with Anthony Irpino, same thing

7          with Tara.

8               We finally came up with an

9          idea in terms of, let's set this

10         out so it's easy enough so they

11         can present it to the Court and

12         also so that Judge Fallon would be

13         able to look through the privilege

14         log and say, okay, I see.

15              So, what we did was, we set

16         it up in specific protocols in

17         terms of categories.  I'm sure you

18         are aware of the different

19         categories we came up with based

20         on APPROVe, VIGOR, ADVANTAGE study

21         down through the list, public

22         relations.

23              We spent a lot of time

24         discussing and saying, okay,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          what's the best way to set this

2          up.  We would highlight it and we

3          would put little notes in them,

4          and we would go through them.  We

5          would do memos back and forth with

6          each other, a quick e-mail, a

7          quick phone call.  That's the

8          reason I think we were successful

9          with this committee because it

10         didn't matter what time of day it

11         was or what time of night,

12         everybody was accessible, which

13         was really, really nice.  It was

14         something different for me with

15         being in solo practice to bounce

16         ideas off of somebody.  It went

17         back and forth.  I really, really

18         enjoyed that part.

19              I must be honest.  It was a

20         lot more work than I thought it

21         was going to be when I first got

22         involved.  But being in solo

23         practice, it is a situation where

24         you keep the lights on based on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          what you do.  There were periods

2          of time, about three months where

3          I was working over 30 hours a week

4          just on the Vioxx and the

5          privilege log, but I enjoyed it.

6          I really enjoyed it, and I enjoyed

7          working with who I was working

8          with.

9               I thought that the result we

10          got in terms of categorizing,

11          setting it up on a tee and letting

12          Russ and everybody else, when they

13          presented it to the judge, knock

14          it out of the park, made it even

15          more special to me in terms of

16          getting it done.

17               I also thought that the fact

18          that Judge Fallon was able to get

19          through those 80 boxes in two

20          weeks was really a compliment to

21          us in terms of the committee

22          because of the way we were able to

23          do it.

24               My work kind of stopped once

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        the judge made his ruling and they

2        did the writs in the Fifth

3        Circuit, there wasn't a lot more

4        to do.  However, Anthony, there

5        were times that he wanted a depo

6        summary done.  I think it was

7        Baumgartner's depo that I did a

8        depo summary on.

9            Also in terms of the request

10       for productions of documents, when

11       Merck wasn't giving us the

12       documents that we asked for, he

13       sent it out, and we broke it down

14       and sent back 20-page memos to him

15       saying, okay, here's the request,

16       these are the responses, and this

17       is where we go after them in terms

18       of that.

19            I enjoyed the work that I

20       did.  I enjoyed, like I said,

21       working with Anthony and everybody

22       who was in that group.  I would

23       have liked to have been more

24       involved, but I realize the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          privilege log only had so much

 2          work to do at that point in time.

 3          I thought Mike Wagner did a great

 4          job every time I was up at the

 5          depository.

 6                  MR. SEEGER:  That was an

 7          important project.

 8                  MR. BIRCHFIELD:  And a great

 9          result.  You are absolutely right.

10                  I'm showing that you have

11          submitted 680 something hours.

12                  MR. BALSER:  I didn't go

13          back through it and go over it.  I

14          thought it was about 600, maybe

15          680.

16                  MR. BIRCHFIELD:  Is the bulk

17          of that working on the privilege

18          log issue?

19                  MR. BALSER:  Almost all of

20          it -- not all it, almost all of

21          it, because originally I was doing

22          the document reviews.

23                  MR. BIRCHFIELD:  How many

24          cases did you submit for the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          settlement program?

2                    MR. BALSER:  I have 19.

3                    MR. BIRCHFIELD:  Were any of

4          those cases set for trial or on

5          the trial track?

6                    MR. BALSER:  No.  I

7          submitted the Sandra Nelson case,

8          and I think a couple of experts

9          looked at it through Chris and

10         said it looks good.  She actually

11         had two heart attacks.  But we

12         weren't able to submit that one

13         because it was actually filed in

14         Ohio, and they were looking for

15         cases that had been filed directly

16         to the MDL.

17                    MR. BIRCHFIELD:  Were all of

18         your cases in the MDL or do you

19         have some in New Jersey?

20                    MR. BALSER:  No.  They are

21         all in the MDL.

22                    MR. BIRCHFIELD:  Any

23         questions?

24                    MR. BLIZZARD:  No.

FAC Resp. Exhibit D -- 665

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1              MR. BIRCHFIELD:  Where is he

 2         with the accounting firm?

 3              MR. LEVIN:  Everything was

 4         accepted, and the costs have been

 5         accepted.

 6              MR. GIRARDI:  You are the

 7         first guy today that that's

 8         happened to.

 9              MR. HERMAN:  Brian, I want

10         to thank you.  The privilege log

11         was something very important to

12         the PSC and the Executive

13         Committee and to me because I

14         always feel that's where the bones

15         are buried.  If we could just get

16         the judge to look at it, maybe it

17         changes his view about the other

18         side.  Even if we don't get the

19         documents in, it causes a reaction

20         that's very favorable, because we

21         always believe that's where some

22         bad stuff is.

23              MR. BIRCHFIELD:  Not only is

24         it a very significant result in

FAC Resp. Exhibit D -- 666

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1              this litigation, but the

2              precedential value is significant,

3              and we appreciate your good and

4              hard work on that issue.

5                   MR. BALSER:  Thank you.

6                   MR. LEVIN:  Thank you.

7                        -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 667

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  LAW OFFICES OF DANIEL E. BECNEL,
       JR., ESQUIRE
       Daniel E. Becnel, Jr., Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
       GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 669

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. HERMAN:  Danny,
 3         everything is being recorded.  You
 4         will get a copy, not just of your
 5         transcript, but of everybody's.
 6              The judge, of course as you
 7         know, being very familiar with
 8         Mobil Oil, required transparency
 9         and consistency.
10              MR. BECNEL:  Murphy.
11              MR. HERMAN:  What did I say?
12              MR. BECNEL:  Mobil also.
13              MR. HERMAN:  Mobil and
14         Murphy.
15              In the event that there's a
16         fee dispute at the end, the judge
17         is going to appoint a Special
18         Master to take depositions, same
19         process, and at that time, if it
20         comes to that, if you want to
21         supplement or delete or add
22         something to your affidavit, it's
23         all right.
24              That's it.
```

FAC Resp. Exhibit D -- 670

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1            MR. BECNEL:  This case

2       caught my interest because of a

3       young lady who died, Carlene

4       Lewis, who brought Chris into the

5       case, brought Andy Birchfield into

6       the case, and I think probably the

7       greatest compliment you can get in

8       a case like this.  We started

9       looking at this case probably

10      about the same time as you did,

11      but we didn't have what you had, a

12      state action, and you doing an

13      individual.

14            Here's what she said.  "Dear

15      Danny, Thank you so much for your

16      kind introduction at the Windsor

17      Court meeting.  You have been very

18      generous to me.  I also want you

19      thank you for your support of

20      Houston and New Orleans before the

21      MDL panel.  You clearly have

22      extraordinary insight into the

23      process.  I'm anxious to work with

24      you and learn from you in this

FAC Resp. Exhibit D -- 671

Page 4

1          battle for our clients.

2                  "Sincerely, Carlene Lewis."

3                  MR. HERMAN:  What's the date

4          on that?

5                  MR. BECNEL:  She didn't send

6          a date.  This was after the

7          hearing on the MDL.

8                  MR. SEEGER:  After the MDL

9          hearing, it must have been.

10                 MR. BECNEL:  I had been

11         recruited --

12                 MR. HERMAN:  After the

13         meeting that we all had in Windsor

14         Court?

15                 MR. BECNEL:  Yes, right

16         after that hearing.

17                 MR. HERMAN:  Right.  So, it

18         was after the MDL hearing and

19         before Judge Fallon had made any

20         appointments?

21                 MR. BECNEL:  That's correct.

22                 Prior to that time, I had a

23         case which I thought was a case,

24         which was Sal Christina in my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          office.  He's a lawyer in my

2          office, his dad owned the biggest

3          seafood -- every restaurant in New

4          Orleans got seafood from him, and

5          he had a massive heart attack, was

6          on Vioxx, and then we just didn't

7          think --  we always worried about

8          12(b)(6) sanctions on it and not

9          investigating it enough.

10              MR. LEVIN:  Rule 11.

11              MR. BECNEL:  Rule 11.  I'm

12          sorry, what did I say, 12(b)(6)?

13          Rule 11 sanctions, so, we were

14          looking at stuff.

15              We weren't recording a lot

16          of the time in the beginning,

17          because we never thought it would

18          be an MDL, we didn't know if it

19          was really a case.  It was kind of

20          a personal project among the top

21          lawyers that I had.

22              Then we filed the first case

23          in New Orleans.  When I filed for

24          the MDL, if you look at the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
                                                Page 6

  1           pleadings, there were four cases

  2           in Federal Court.  This is my

  3           original complaint filed on

  4           October the 1st, my motion for MDL

  5           status was filed, and let me give

  6           you the four cases.

  7                MR. SEEGER:  In the Federal

  8           courts?

  9                MR. BECNEL:  In the Federal

 10           courts.  It was the Eastern

 11           District of New Orleans, which was

 12           mine, the Sal Christina case;

 13           Bucky Zimmerman, who I had worked

 14           with had filed a case called

 15           Grover in Minneapolis; there was

 16           one case called Bridget Elaine

 17           Michaud in South Carolina; one

 18           case in Missouri called Whitmore;

 19           and one case in Ohio called

 20           Dauterman.  That was it.

 21                MR. WEITZ:  When was this?

 22                MR. BECNEL:  I filed for the

 23           MDL in October of '05.  You are

 24           welcome to have this.  This is
```

FAC Resp. Exhibit D -- 674

Page 7

1          just an unstamped copy from my

2          file.

3               MR. BIRCHFIELD:  There was

4          one that was in Mobile District

5          Court that had been set for trial

6          in August, Danny, I'm not sure.

7               MR. BECNEL:  Well, that's

8          all I knew about at this time.

9          That's when I filed for the MDL.

10               We started trying to court

11          date things everywhere we could.

12          I mean, we had litigation groups.

13          Pap asked me to bring in some

14          experts because we were worried

15          about death cases.  How do you

16          prove a death case?  If you

17          remember, I brought two people, I

18          brought Cyril Wecht at my own

19          expense to Mass Torts Made

20          Perfect, and I brought Nachman

21          Brautbar, who was a toxicologist.

22          There's a famous book called --

23          and, I mean, I spent 10, $15,000

24          bringing them, because I paid for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          their hotel, I paid for their

2          airfare.

3               MR. LEVIN:  Cyril comes from

4          Pittsburgh?

5               MR. BECNEL:  I had used

6          Cyril for the first time 40 years

7          ago and won a big, big verdict on

8          a loss of chance of survival.  So,

9          I had used him over and over.

10              Nachman, I had used many,

11         many times in breast implant and

12         all kinds of cases.

13              Well, when we had the MDL, I

14         made one mistake in this

15         litigation, and it is his fault

16         for telling me that.  Russ told me

17         he wanted to retire.  And so Jerry

18         Meunier, who I had worked with for

19         13 years --

20              MR. SEEGER:  We're not

21         letting Russ retire.

22              MR. LEVIN:  Mea culpa, after

23         all of this.

24              MR. BECNEL:  He and Barbara

FAC Resp. Exhibit D -- 676

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          said -- I was on a plane, and he

 2          said, Danny, after tobacco, I'm

 3          retiring, and I'm going to hunt

 4          for dinosaur bones and I'm going

 5          to teach.

 6               I said okay.  So, I had been

 7          working with Jerry Meunier for 13

 8          years, and we just got our money

 9          in that, too, Russ got a little

10          bit of that, and he asked me,

11          Danny, I want to be liaison

12          counsel.  I said, well, is Russ

13          involved?  He says, I don't think

14          so.  I said, well, he told me he

15          was going to retire, so I'm fine

16          with that.  That's why I asked

17          some people to support Jerry,

18          because I thought he was out of

19          the picture.  It wasn't anything

20          personal.  I made a mistake.

21          Okay.

22               I knew Judge Fallon well.  I

23          had worked with him on numerous

24          cases in the past.  I had known
```

FAC Resp. Exhibit D -- 677

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          Judge Fallon and his ability from

2          the Ferry Froster case 30 years

3          ago, and I knew how meticulous he

4          was, I knew how hard he worked.

5               Although a lot of people

6          wanted other places, remember,

7          there were 56 jurisdictions being

8          sought.  We knocked it down at the

9          meeting, Chris, and those in

10         Houston, to 6.

11              MR. SEEGER:  Right.

12              MR. BECNEL:  There was 53, I

13         think it was, 53 jurisdictions

14         that people were asking for, and

15         we knocked it down to 6.  Well,

16         once the MDL was formed, I decided

17         to say, hey, look, let's all get

18         together and try to get some

19         leaders.

20              MR. WEITZ:  But you wouldn't

21         have known that Judge Fallon was

22         going to get the --

23              MR. BECNEL:  No, I said

24         after.  I promoted him.  That's

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1            the argument I made in the

2            Christina case, which he got.

3                 MR. SEEGER:  To the MDL

4            panel?

5                 MR. BECNEL:  To the MDL

6            panel.  I promoted him.  I had

7            previously promoted him in the

8            Propulsid case, which was my case

9            originally, and Russ was involved,

10           and Judge Fallon was involved in

11           that case.  I know how after our

12           office and Russ' office both lost

13           the case, he crafted us to get the

14           thing resolved.  Now, you can't

15           get any better track record than

16           that.

17                MR. WEITZ:  So, your

18           original Vioxx case, did you file

19           the MDL petition and Judge Fallon

20           was the judge assigned to it in

21           New Orleans?

22                MR. BECNEL:  That's correct.

23           I had just known of his ability in

24           Propulsid in his first MDL.  So, I

FAC Resp. Exhibit D -- 679

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          preached and preached for that

2          jurisdiction.

3                 After that occurred, I

4          called a meeting of everybody that

5          we knew, and prior to that time,

6          we had been disseminating -- Andy

7          Birchfield and his whole cadre of

8          lawyers was sending stuff out.

9                 MR. WEITZ:  What was the

10         name of your New Orleans case?

11                MR. BECNEL:  Christina.

12         This is it right here.  That's the

13         Christina case, and that's the MDL

14         filing.

15                So, we called a meeting of

16         everybody that we knew of at that

17         time to come to New Orleans to

18         Antoine's to have a meeting to try

19         to formulate some committee, some

20         structure, whatever we could.

21                At that meeting, which I

22         paid for -- Chris, I don't

23         remember the exact number, but I

24         know there must have been 70, 80

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          people there at least, I nominated

2          Chris and Andy.

3               MR. SEEGER:  Actually,

4          sadly, that was the last time I

5          saw Michael Nast.

6               MR. BECNEL:  Me too.  He

7          came down.

8               But I nominated both, and it

9          was unanimous among the 60, 70

10          lawyers, that they should be lead

11          counsel.  I made a full report to

12          Judge Fallon.  We had a meeting.

13               So, before the MDL, I might

14          say that we sent a bunch of

15          lawyers to Mr. Birchfield's office

16          in advance of the MDL to start

17          doing documents and to start page

18          and line summaries.  I think our

19          office did one-fifth of all of the

20          depositions that had been taken at

21          that time, the page and line

22          summary.  I think they were in New

23          York and in Mr. Birchfield's

24          office.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1              I would send lawyers every
 2         week, they would leave at 3:00 in
 3         the morning, they would drive 350
 4         hours to Montgomery.  We didn't
 5         bill time for the drive.  I gave
 6         them a vehicle to go in.  They
 7         would sleep two to a room, two
 8         guys to a room, two girls to a
 9         room, and they were doing
10         documents.  They worked over there
11         under his direction.
12              I sent Rebecca Todd from my
13         office to Chris's under his
14         direction. I had nothing to do
15         with it except paid for the hotel,
16         paid for the gas, paid for the
17         living --
18              MR. HERMAN:  How much in
19         costs do you have right now?
20              MR. BECNEL:  I spent in
21         costs, $149,316.08.
22              MR. LEVIN:  Has the
23         accountant approved all of that,
24         do you know?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1           MR. SEEGER:  You sent

2        everything to Wegmann?

3           MR. BECNEL:  I sent

4        everything I have.

5           MR. LEVIN:  You haven't

6        gotten any calls -- I don't have

7        it with me.

8           MR. BECNEL:  I have not.

9        But as you know, Mr. Levin, I

10       watch nickels.

11          MR. HERMAN:  Let me ask you

12       a question about the costs.

13          MR. LEVIN:  I do know.

14          MR. HERMAN:  The costs don't

15       include any salaries, draws of

16       that sort?

17          MR. BECNEL:  Nothing,

18       nothing.  That's just my

19       out-of-pocket stuff.

20          John Restaino and the

21       committee, he and I were involved

22       with the experts a lot.  In fact,

23       one time we were in, I think,

24       Miami, and we were looking for an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          FDA expert.  And Chris asked me if

2          I knew a good one, and I had Dr.

3          Suzanne Parisian from Tucson,

4          Arizona, and I said, yes, I do.

5               MR. SEEGER:  Actually, my

6          recollection of that is there was

7          a general meeting to educate

8          lawyers.  You were there.  We

9          discussed the need for it, and you

10         had actually come to me and said,

11         I have got the perfect person, and

12         I said, let's do it.

13              MR. BECNEL:  She got on a

14         plane that night, that night.  The

15         reason why is because she had

16         written this book called "Inside

17         and Out of the FDA," and this is

18         her thing to me.  It just says,

19         "To Danny from Suzanne Parisian,

20         my new best friend."  And this was

21         way, way in years, and I've used

22         it four or five times in various

23         cases.

24              ATLA then had a mock trial.

FAC Resp. Exhibit D -- 684

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          There were 25 lawyers that

2          participated in it.  They asked me

3          to be the judge, and they asked me

4          to help debrief after the three

5          juries that we had.  People were

6          given assignments of certain

7          witnesses, certain opening

8          statements and so on and so forth.

9              They asked me to try to rate

10         people from the 25.  Chris didn't

11         participate, but Paul Sizemore did

12         from your office, Mr.  Birchfield,

13         and Mark Lanier was with Carlene

14         and those.  So, I said, you know

15         what would be even better than

16         that, let me bring down a bunch of

17         experts at my cost and have them

18         critique this from both sides.

19         So, at that time, I brought down a

20         guy from the book Casarett and

21         Doull, "The Basic Science of

22         Poisons," Dr. Daniel Acosta, who

23         is the head of pharmacology at

24         Cincinnati, previously had been

FAC Resp. Exhibit D -- 685

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          from Texas.  I brought Dr. Daniel

2          Acosta.  He wrote the chapter on

3          the heart being affected by drugs

4          in that book.  That's known as the

5          Bible of toxicology.

6               I brought Dr. Daniel Aruna.

7          He's the head pharmacologist at

8          Xavier, he's an African American,

9          and Xavier has the best

10         pharmacology school in the

11         country.

12              I brought Dr. John Marcus

13         from Harvard.  Dr. Marcus had

14         worked with virtually a lot of

15         people --

16              MR. HERMAN:  Danny, let me

17         ask you this.

18              The people you are talking

19         about, who among them or how many

20         among them testified in bellwether

21         trials?

22              MR. BECNEL:  None of them

23         testified in bellwether trials.

24              MR. HERMAN:  Were they

Page 19

 1      deposed?

 2              MR. BECNEL:  Never were

 3      deposed.  These were the experts I

 4      was going to use.  I kept asking

 5      Judge Fallon, hey, let me try my

 6      case, let me try my case, and I

 7      did that until he -- I knew, once

 8      he appointed the PSC, I knew those

 9      cases would go first.  That's just

10      the way it is.  But I had to

11      prepare it, because my case --

12              MR. HERMAN:  No, I

13      understand.  I'm trying to get a

14      handle on this.

15              MR. BECNEL:  But what we did

16      with them, I had Dr. Wecht there,

17      I had Dr. Brautbar there, Dr.

18      Daniel Aruna, Dr. Acosta, Dr.

19      Marcus, and we brought them there.

20      After each of the presentations

21      were made, we would debrief them.

22              Carlene Lewis and myself and

23      Shelly Sanford then went to dinner

24      with them at night and were making

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          notes, what's good, what's bad,
 2          don't do this, do this and so on
 3          and so forth, because we knew
 4          Shelly's case and Carlene's case
 5          was going to probably go first.
 6          How much that helped or didn't
 7          help, I don't know.  But I paid
 8          for it.  And I didn't know where
 9          it was going, and I wasn't on the
10          PLC.
11               The one thing I think I do
12          more than almost anybody else, no
13          matter where the case goes,
14          whether I'm on a PLC or not on a
15          PLC, when they say do you need
16          people, do you need workers, do
17          you need this, do you need that, I
18          always step to the plate.  And I
19          do it without trying to control
20          anything.  I mean, we were told
21          initially if you do all of these
22          documents and stuff, you are going
23          to get to participate, you are
24          going to get to take depositions.
```

FAC Resp. Exhibit D -- 688

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          Well, that didn't occur because

2          the individual cases, people

3          wanted to do their own, and I can

4          understand that.

5               MR. SEEGER:  I think a

6          couple of things, Danny, that

7          would be helpful for the record is

8          that we need to understand and for

9          you to identify for us what you

10         really feel were the contributions

11         you made that sort of added to the

12         common benefit and advance the

13         ball, number one.  But number two,

14         I do have a comment, and I think

15         it is important I ask it to you so

16         you can address it.  I think it is

17         very obvious the way these

18         litigations have developed over

19         the many years is that these have

20         become partner intensive, you

21         know, senior-type people doing

22         them.  The days of kind of putting

23         contract people in depositories

24         and racking up document review

FAC Resp. Exhibit D -- 689

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          time, I'm not saying has no value,
 2          I'm just saying, these are cases
 3          that are really run by trial
 4          lawyers driven by trials.  So, if
 5          you can talk to us on both of
 6          those.
 7               MR. BECNEL:  For example, if
 8          you didn't know the documents --
 9          the two of you really knew the
10          documents, but you had been
11          working on it in your own offices.
12               MR. HERMAN:  You are
13          referring to Andy and Chris?
14               MR. BECNEL:  Andy and Chris.
15          They knew the documents.  The
16          state courts were so far ahead of
17          the MDL, because it wasn't even
18          formed.
19               In the MDL, people, as I'm
20          saying, there was four, and if
21          Andy is correct with that Alabama
22          case I wasn't aware of, there was
23          five cases.  So, there wasn't a
24          lot of people doing documents.
```

FAC Resp. Exhibit D -- 690

Page 23

1        You two had the only production of

2        documents there were.

3             When Mark Robinson tried his

4        case, the first thing he did, he

5        said, Danny, give me your best

6        lawyer to help me so I can help

7        prepare.

8             MR. SEEGER:  Who was that?

9             MR. BECNEL:  Same person

10       that had spent a year almost in

11       your office, Rebecca Todd.  So, I

12       said, Mark, what do you want her

13       to do?  Send her to California for

14       me.  I sent her to California.

15             MR. HERMAN:  Is she a

16       partner with you, Danny, or a

17       contract lawyer?

18             MR. BECNEL:  Well, she was,

19       but then when one of the court

20       reporting firms -- she fell in

21       love with Reserve and Laplace and

22       New York, and one of the court

23       reporting firms, they hired her

24       away at a ton of money, and she

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        worked for -- I forget the name of

2        court reporting firm.

3              MR. HERMAN:  At the time

4        that she went to Mark Robinson,

5        that was before the Barnett case

6        was tried?

7              MR. BECNEL:  Oh, yes, well

8        before that.

9              MR. HERMAN:  Was she a

10       partner at the time, an equity

11       partner or a contractor?

12             MR. BECNEL:  I have no

13       partners.  My sons, my

14       daughters-in-law -- I have three

15       sons that are lawyers.  None of

16       them are partners.  My brother,

17       his wife, they are not partners.

18             MR. SEEGER:  You are a tough

19       boss.

20             MR. BECNEL:  The only reason

21       I do it that way is because I just

22       didn't want to get into meetings

23       and have people leave and have all

24       of this commotion going on.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          Everybody is perfectly fine with

2          it and nobody has any problem.

3              MR. HERMAN:  How many hours

4          do you have in the case?

5              MR. BECNEL:  Personally?

6              MR. HERMAN:  Yes.

7              MR. BECNEL:  1,800 --

8              MR. LEVIN:  Don't you have

9          209 hours you yourself?

10             MR. BECNEL:  No, no.  This

11         is what I have.  They asked me --

12         I have 1,896.

13             MR. LEVIN:  For yourself?

14             MR. BECNEL:  For me.

15             MR. LEVIN:  How many total

16         hours does your firm have?

17             MR. BECNEL:  16,167.50.

18             MR. LEVIN:  I'm not

19         cross-examining you.  I know it

20         may sound that way.  Have any of

21         your hours been rejected by the

22         accountant?

23             MR. BECNEL:  Nobody said one

24         word to me about anything.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1              MR. LEVIN:  Well, according

2         to the accountant's report, and

3         this is something you have got to

4         look into, Daniel E. Becnel, Jr.

5         has 209 hours.  Your firm has

6         9,400 hours.  That includes

7         paralegals and attorneys -- well,

8         no paralegals.

9              MR. BECNEL:  There was no

10        paralegal.

11             MR. LEVIN:  Rebecca Todd has

12        an even 1,500 hours.  Percy

13        Williams has 1,874 hours.  Now,

14        let's see if you have some that

15        are still under submission that he

16        hasn't reviewed.

17             MR. RAFFERTY:  I'm sorry,

18        Danny, I missed it, how much did

19        you say you had?

20             MR. BECNEL:  I had 1,896.

21        And remember, a lot of that

22        occurred before the MDL.  I think

23        that's probably you are looking at

24        just MDL hours.

FAC Resp. Exhibit D -- 694

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1              MR. LEVIN:  I'm looking at
 2         what the court accountant has
 3         given us to work with.
 4              MR. BECNEL:  This is my
 5         sheet, and here's the difference.
 6         All I can tell you --
 7              MR. HERMAN:  Wait a minute.
 8         Other people have had concern.
 9         You've got to go make an
10         appointment, just call up, make an
11         appointment with the CPA or his
12         cohorts and sit down with him and
13         go over your hours.  Your reported
14         hours and what they are giving you
15         credit for are not the same.  This
16         is not something isolated to you.
17         We've had at least a dozen folks
18         that have.  I know Lanier came in,
19         for example, and spent a day.  I
20         think Ed has spent time.
21         Virtually everybody, maybe it's
22         not everybody, some people have
23         spent time directly with them and
24         gotten their time and their hours
```

FAC Resp. Exhibit D -- 695

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          and their costs straight.  I would

2          advise you to do that sometime in

3          the next two weeks.

4                  MR. BECNEL:  Well, when my

5          people, and I'll just show you how

6          I did it, when they were at Mr.

7          Birchfield's office, they would

8          leave, like I said, at 3:00 in the

9          morning to get there to be able to

10         work, that's a 350-mile drive, and

11         there were no planes to go there.

12         It was quicker to drive than to

13         fly.  And then they would stay

14         Monday night, Tuesday night,

15         Wednesday night, Thursday night,

16         and they would work nonstop until

17         their office closed on Friday.

18                 MR. HERMAN:  Danny, I don't

19         want to cut you short.  You have

20         said that.  That doesn't do us any

21         good, because we're not going to

22         review it.  The CPA is going to

23         review it.  You need to send

24         somebody that knows those records,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          if you are not going to go

2          yourself, and sit with the CPA and

3          get your hours straight.

4                  Now, here's my question.

5                  How many people, lawyers,

6          did you have work on the case?

7                  MR. BECNEL:  19.

8                  MR. HERMAN:  How many of

9          those were also involved in either

10         Bextra, Celebrex, Medtronic ,

11         Murphy Oil or the --

12                 MR. BECNEL:  None were

13         involved with Murphy Oil.

14                 Bextra, Celebrex, the only

15         hours anybody did was a few days

16         when Paul Sizemore asked them to

17         look at some documents.  But that

18         wasn't on the --

19                 MR. HERMAN:  Medtronic and

20         Guidant?

21                 MR. BECNEL:  I think Rebecca

22         Todd, for example, may have had

23         100 or so hours in Medtronic.

24                 MR. HERMAN:  What about the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        hurricane cases?

2               MR. BECNEL:  None of them

3        were for the hurricane cases.

4               MR. HERMAN:  So that you

5        were the only lawyer in those

6        cases where they didn't have

7        hours?

8               MR. BECNEL:  In the

9        hurricane cases?  Until you

10       release them from the

11       depository -- like Will.  Will was

12       released when there was no more

13       work for the depository, and then

14       I shifted him to the hurricane

15       cases.  Like Kevin Klibert, he

16       worked the hurricane cases

17       exclusively.  He had 14.50 hours

18       in Vioxx.  That's it.

19               But the rest, none of them

20       did, none of them did.

21               MR. LEVIN:  Dan, you have no

22       partners.  Are these all contract

23       employees?  Are them some of them

24       contract employees that you don't

FAC Resp. Exhibit D -- 698

Page 31

1          pay benefits for?

2                  MR. BECNEL:  No.  Here's

3          what I pay.  Everyone gets an

4          option to have health insurance or

5          extra money.  They all chose extra

6          money.  Every one of my main

7          lawyers, which includes about 16

8          of them, I give them a Mercedes, a

9          brand new Mercedes.  Every one of

10         them, I fund their homes, because

11         a lot of people can't fund their

12         homes at 5 percent interest.  So,

13         most of them have homes in the

14         $200,000 range.  It is not like

15         where you guys live.  So, I fund

16         that.

17                 At the end of the case, they

18         get a percentage of the money that

19         they have earned, depending on

20         what is given, whether it is a

21         multiplier or not.  People in my

22         office in the past, for example,

23         in fen-phen, have made bonuses at

24         the end of the case of $1 million,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          $800,000.  I wrote a check this

2          morning at 4:30 in the morning

3          with Kevin Klibert on a bunch of

4          insurance cases, you know, of

5          117,000 this morning on something

6          that he just settled.

7              That's how I pay.  I pay

8          different than everybody else.  I

9          make them feel that they shouldn't

10         leave the case because they are

11         not going to get the bonus until

12         the end of the case, and that

13         makes them stay when you are

14         giving them grunt work to do.

15         Now, we've all done it, but how

16         many of us would sit in a room and

17         do documents eight hours a day for

18         a year, you know, and pass up the

19         opportunity to make money?  That's

20         the way I did it, so, I didn't

21         have them coming in for a little

22         while and then leaving.

23             MR. WEITZ:  Do they get

24         salaries?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1           MR. BECNEL:  Yes.  They get

2      $50,000 base salary, plus I pay

3      for all of their ATLA dues, I pay

4      for two seminars a year, I give

5      them two weeks paid vacation at my

6      expense to places like Rome and

7      Greece and just all over the

8      world, wherever they want to go,

9      they get to pick for two weeks.

10          MR. WEITZ:  Can I come work

11     for you?

12          MR. BECNEL:  And they go.

13          MR. LEVIN:  Could I be his

14     valet?

15          MR. WEITZ:  Are these 19

16     listed --

17          MR. BECNEL:  All on the

18     letterhead, all on my letterhead

19     with malpractice insurance.

20          MR. SEEGER:  Can I just try

21     to refocus this?  For my benefit,

22     Danny, there's a couple of things.

23     You did organize an early meeting,

24     and it was very helpful for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          organizing the case.  The problem

2          is, it is hard to assess a value

3          for calling a meeting and throwing

4          your support behind it, because my

5          impression, and I have never

6          really spoken to Andy about it,

7          but my impression is that most of

8          the people who showed up to that

9          meeting had already pledged

10         support for the leadership of our

11         two firms because it made sense in

12         so many ways.  Everyone here is a

13         leader.  It makes sense under

14         certain circumstances --

15              MR. BECNEL:  I don't take

16         credit for that.

17              MR. SEEGER:  No.  Well, you

18         organized the meeting.  My point

19         is, to move beyond that, after the

20         happened and the case is being

21         litigated, if you could identify

22         for the committee in the last

23         couple of minutes like the major

24         common benefit contributions.  One

FAC Resp. Exhibit D -- 702

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

 1          of them was document review.  We

 2          got it.  Was there anything -- I

 3          want to make sure we haven't

 4          missed anything.

 5              MR. BECNEL:  For example,

 6          Rebecca Todd, after helping Mark

 7          with the documents, I gave her to

 8          him, as I gave her to your office.

 9              MR. SEEGER:  Well, she was

10          in the depository at my office.

11              MR. BECNEL:  Whatever you

12          needed her to do, she did.  And

13          she took his plaintiffs and went

14          over and actually lived up here at

15          some hotel where he was.

16              MR. SEEGER:  With Robinson's

17          team.

18              MR. BECNEL:  With Robinson

19          for three months and was in trial

20          with him every step of the way.

21          Mark asked her to babysit his

22          clients to help prepare for the

23          testimony.

24              MR. SEEGER:  Did Rebecca put

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          her own affidavit in?

2                    MR. BECNEL:  No.  I didn't

3          know you wanted that.

4                    MR. SEEGER:  No, no, no.  I

5          thought I saw something separate.

6          Is she still with your firm?

7                    MR. BECNEL:  No.  She went

8          to New York.

9                    MR. BIRCHFIELD:  I think it

10         is a different Rebecca.

11                   MR. SEEGER:  I'm confused.

12                   MR. BECNEL:  Who is that big

13         firm, that court reporting firm?

14                   THE COURT REPORTER.  Doerner

15         & Goldberg.

16                   MR. BECNEL:  Doerner &

17         Goldberg, because Rebecca was

18         doing a bunch of documents and

19         stuff --

20                   MR. HERMAN:  Look, we have

21         to get back.  Let me ask you this.

22                   Who in your firm served on

23         the science committee?

24                   MR. BECNEL:  Me.

FAC Resp. Exhibit D -- 704

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1           MR. HERMAN:  Who in your

2      firm served on the discovery

3      committee?

4           MR. BECNEL:  Nobody was per

5      se on the discovery committee.

6      What we were told, Mr. Herman, was

7      that the only way you were going

8      to be able to do depositions is if

9      you did the documents.  And we

10     were told that over and over and

11     over again.  And so I would send

12     these people to do them, they

13     would send me the hot documents, I

14     was putting them in the binders

15     and stuff trying --

16          MR. HERMAN:  Well, Danny,

17     you can call me, Russ.  I mean,

18     we've known each other a long

19     time, and I'm not going to call

20     you Mister, because we've known

21     each other too long.

22          I'm just trying to help you

23     explain the major contributions

24     that you made to the litigation.

FAC Resp. Exhibit D -- 705

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1      Okay?

2           MR. WEITZ:  Did you have a

3      case that you prepared for trial,

4      one of your cases?

5           MR. BECNEL:  The first one,

6      Christina.

7           MR. WEITZ:  Did that case

8      ever go to trial?

9           MR. BECNEL:  No, it didn't

10     go to trial, but I think everybody

11     on that committee would know that

12     every time I would stand up and

13     say --

14          MR. WEITZ:  It never got

15     designated.

16          MR. BECNEL:  It wasn't

17     designated.  I would say, Judge,

18     can I try my case?  You know, I'm

19     first in line in the Eastern

20     District, you see, and we thought

21     that he was going to try only

22     Eastern District cases first.  We

23     didn't know he was going to pull

24     cases.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          MR. HERMAN:  Danny

2     volunteered his case and to try

3     his case very early in the MDL at

4     whatever meetings he attended.

5     That's true.

6          MR. WEITZ:  How many cases

7     did you have that you submitted to

8     the settlement?

9          MR. BECNEL:  Well, I had

10    2,000 cases until I didn't get

11    appointed to the plaintiffs'

12    committee, and then I lost about

13    1,500.

14          MR. RAFFERTY:  So, how many?

15          MR. WEITZ:  So, the answer

16    is 500 cases you submitted to the

17    settlement?

18          MR. BECNEL:  No, I don't

19    think.  I think we submitted about

20    300, 400.  In fact, Paul Rhinegold

21    called me yesterday on some cases

22    he sent here that we did for him,

23    and I didn't even have a fee

24    agreement with him.  I said, Paul,

FAC Resp. Exhibit D -- 707

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          whatever you want to send is fine.

2          Send it to my son, because he

3          hadn't worked for, you know --

4          he's been on the campaign trail

5          for 14 straight months.

6              MR. WEITZ:  And all those

7          cases were filed in the MDL?

8              MR. BECNEL:  Every case I

9          have.  I have none in state court.

10         Every case I have.  But I started

11         losing them after -- I have a lot

12         of referral lawyers like most of

13         you do.  But after I didn't get

14         appointed to the committee --

15             MR. SEEGER:  Your referrals

16         are conditioned upon your

17         appointment to a leadership role?

18             MR. BECNEL:  No, Chris --

19             MR. SEEGER:  That sounds

20         harsh.

21             MR. BECNEL:  It happens,

22         though.

23             MR. HERMAN:  I know you

24         applied for a common benefit fee

FAC Resp. Exhibit D -- 708

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          in Murphy.  I'm familiar with your

2          affidavit or your representation

3          in Murphy.  If you applied or are

4          you applying for common benefit in

5          Guidant, Medtronic, Celebrex or

6          Bextra?

7                MR. BECNEL:  Well, we

8          haven't made any applications in

9          Bextra, Celebrex and Medtronic.  I

10         think I had a lot, lot of cases,

11         probably the top five to ten.  My

12         common benefit fee was less than

13         $250,000.

14               MR. HERMAN:  I'm not

15         disputing.  I'm just --

16               MR. BECNEL:  Compared to

17         most other people who got 2 and 3

18         and $4 million.

19               MR. BIRCHFIELD:  Let me ask

20         it in a little broader context.

21               During the period of time of

22         the Vioxx litigation, are there

23         any other MDLs where you are

24         making a petition for or you plan

FAC Resp. Exhibit D -- 709

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1           to make, you have made, a petition

2           for common benefit fees?

3                MR. BECNEL:  I think the two

4           are Guidant and Medtronic.  And I

5           think probably my fee in each is

6           below a quarter of a million

7           dollars common benefit.  And most

8           people that did a bunch of work in

9           those cases got 1 and 2 and $3

10          million each in common benefit.

11               MR. WEITZ:  What expenses

12          did you submit?  How much?

13               MR. BECNEL:  The only thing

14          I had was what I submitted.

15               MR. BLIZZARD:  149,000.

16               MR. LEVIN:  But I don't know

17          what the accountant has.

18               MR. RAFFERTY:  149,316.

19               MR. BECNEL:  For example, in

20          this 149, the only one I had in

21          here was Acosta and Wecht.  I

22          didn't submit those other people.

23               MR. WEITZ:  What do you

24          mean, what other people?

FAC Resp. Exhibit D -- 710

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1               MR. BECNEL:  The other

2          experts I had.  And Shelly and

3          Carlene, I mean, they spent most

4          of their time consulting with my

5          experts in preparation for their

6          case.

7               MR. SEEGER:  By the way,

8          Danny, did you include the expense

9          for the cost of that dinner?

10              MR. BECNEL:  Yes, I did.

11              MR. SEEGER:  Okay.

12              MR. BECNEL:  4,269.

13              MR. SEEGER:  Anybody have

14         any more questions?

15              MR. BECNEL:  The only other

16         thing is, as all of you know,

17         Carlis Griffen was my paralegal,

18         African American paralegal.  We

19         put her in Propulsid, and then

20         when Vioxx came up, they asked if

21         they could keep her in Vioxx, and

22         she was so familiar with Penny

23         Herman, who was kind of managing

24         Vioxx in the beginning and had

FAC Resp. Exhibit D -- 711

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

```
 1          managed Propulsid, and so I said

 2          certainly.  And the PLC picked up

 3          her expense, and she's still

 4          working.

 5               MR. SEEGER:  Is she still

 6          with your firm?

 7               MR. BECNEL:  Well, she's not

 8          now, because she's on loan to you

 9          guys.

10               MR. HERMAN:  The PSC has

11          paid her salary at the depository,

12          as well as whatever benefits are

13          offered through the PSC since her

14          retention.

15               MR. SEEGER:  Got it.

16               MR. BECNEL:  When this ends,

17          she's going to be back in my

18          office.  She just had the

19          experience, and after the

20          hurricane, it was really horrible,

21          because she had a place to live.

22          Most people in New Orleans didn't

23          have a place to live.

24               MR. LEVIN:  Dan, we talked
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          to you about your hours.  I don't

2          have with me what costs you

3          submitted, but I do know of

4          whatever costs they are, $15,814

5          has been rejected by the

6          accountants.  So, put that on your

7          list to do.

8               MR. SEEGER:  You just have

9          to call them, Danny.

10              MR. BECNEL:  Like I said,

11         nobody did it cheaper than I did

12         it.

13              MR. SEEGER:  That isn't even

14         the issue.  You could have

15         submitted something for $10.  If

16         it didn't fall into categories --

17              MR. WEITZ:  Everybody has

18         issues.

19              MR. LEVIN:  You're not

20         alone, Dan.

21              MR. WEITZ:  It is nothing

22         specific to you.

23              MR. LEVIN:  Nobody is

24         picking on you.

FAC Resp. Exhibit D -- 713

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1              MR. BECNEL:  I think Arnold

2         knows one thing about me.

3         Whenever you have a cash call, I

4         wasn't on his committee, and there

5         was three people that put up the

6         bulk of the money in that case, if

7         you remember.

8              MR. LEVIN:  Which case?

9              MR. BECNEL:  Pedicle screw.

10             MR. LEVIN:  Was I one?

11             MR. BECNEL:  You were one

12        and Cummings was one and I was the

13        third.

14             MR. LEVIN:  I just wanted to

15        make sure I was one.

16             MR. BECNEL:  And I wasn't on

17        that PLC either.

18             MR. SEEGER:  Just so we stay

19        on schedule, does anyone else have

20        anything else they want to ask

21        Danny?

22             (No response.)

23             MR. SEEGER:  Thank you.

24

FAC Resp. Exhibit D -- 714

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -


FIRM: LAW OFFICES OF ERIC H. WEINBERG
      Eric H. Weinberg, Esquire


BEFORE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 716

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2              MR. WEINBERG:  My firm got
 3         involved in the New Jersey
 4         litigation on September 30, 2006.
 5         We ended up filing about 300 cases
 6         in New Jersey.
 7              MR. LANIER:  How many?
 8              MR. WEINBERG:  About 300.
 9              MR. LANIER:  Okay.  Sorry.
10              MR. WEINBERG:  I immediately
11         got to work on Vioxx.  On October
12         1st, I retained Caesar Roy, who
13         was a former director of the New
14         York field office of the FDA who
15         assisted me in processing a FOIA
16         request for the summary approval
17         package and other documents from
18         the FDA, which we got in about a
19         week's time.
20              And from that time until the
21         case settled, I consistently went
22         back and reviewed those FDA
23         materials, created PowerPoints
24         which we shared with our
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          colleagues, to understand the

2          dynamic between Merck and the FDA.

3               Within a week of the drug

4          being pulled off the market, I

5          retained John Kostis, Chairman of

6          Medicine at Robert Wood Johnson.

7          Dr. Kostis was an invaluable

8          resource to us in this litigation,

9          consistently provided input,

10         advice, a man of great experience

11         that worked in the pharmaceutical

12         industry, clinical studies, world

13         renowned cardiologist, assisted on

14         trials.  I made Dr. Kostis

15         available to my colleagues who

16         needed input from a top shelf

17         cardiologist at trial.

18              Clearly I had the benefit of

19         the work product that existed at

20         the time I got into this case.

21         You guys were in this case for a

22         long time, and to a certain

23         extent, when you come into a case

24         and you are new and other people

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          had been working on it, you stand

2          on your shoulders.  And I did

3          that.

4               As the case developed, I was

5          able to see how it played out with

6          the weaknesses and what the

7          strengths of the case were and to

8          sort of develop my approach to

9          discovering the case and what kind

10         of projects I was going to work

11         on.

12              I spent pretty much the vast

13         majority of my time on Vioxx.  My

14         business model is I'm a solo

15         practitioner, I work on one mass

16         tort at a time.  From '92 through

17         the early part of 2000, it was on

18         hemophilia HIV.  From 2001 through

19         about 2004, it was on Baycol.  And

20         from 2004 until the case settled,

21         it was on Vioxx.

22              I'm a solo practitioner, so

23         there are some limitations in

24         terms of what I can do, but I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        spent a good amount of time on

 2        this case.

 3             I think that the work that

 4        we put together is of great

 5        quality.  I know that there's an

 6        MDL trial package, I haven't seen

 7        it, but it is my understanding

 8        that an MDL trial package is

 9        really a collection of the best

10        information in the case that's

11        given to lawyers that have to go

12        out and try cases in order to give

13        them the best chance of winning.

14             Although a lot of our work

15        was done in New Jersey and some

16        people on the committee were not

17        familiar with it, I think that if

18        you look closely at the work

19        product, the way we attacked the

20        placebo-controlled clinical

21        studies I think really undercut

22        Merck's position with David

23        Madigan's report and the analyses

24        that he did.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1                  Work that was done on the
2         Alzheimer's studies, which were a
3         key defense for Merck not only in
4         the FDA, but in the litigation in
5         the way that we went after the FDA
6         and the Alzheimer's studies and
7         developed the body of work that's
8         substantial, the marketing work
9         that Chris Placitella headed up --
10        and by the way, you know, I wasn't
11        alone in working on these issues
12        in the Madigan project.  Dan
13        Sigelman was a wonderful colleague
14        who developed a lot of ideas that
15        I adopted in terms of how to work
16        with Madigan.  I had recruited
17        Madigan in December of 2005.  I
18        had ideas about how we were going
19        to proceed with him.  Dan and I
20        started talking, and I liked his
21        approach, I liked some of the
22        things that he had to offer, and I
23        prioritized that.  I think that's
24        what you do when you're working

FAC Resp. Exhibit D -- 721

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          collaboratively.  You look at what

2          other people bring to the table.

3          And I did that.

4               So, this work, I think, is

5          clearly work that would and should

6          be in a trial package.  I have a

7          case to try.  I have one case that

8          opted out of the settlement.  I

9          don't know if other people do as

10         well.  But I would encourage you,

11         and at the end of this -- I'm

12         sorry that I'm giving you

13         something to take home and carry,

14         but it is hard to sort of capture

15         work in a brief presentation.

16               At the end of this document,

17         there's a bibliography of work.

18         All of that stuff is available.  I

19         would urge you to look at it,

20         because some of that should be in

21         the trial package for the lawyers

22         who are out there who are still

23         going to have to try cases.

24               One of the issues the Court

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        was concerned with was what did

 2        you do after the litigation

 3        started to go south and Merck

 4        started to win consistently.  I

 5        think it is fair to say, and I

 6        kind of framed this in the last

 7        year of the litigation, what work

 8        did I do, what project was I

 9        working on.  I put that into this

10        PowerPoint, and I'll just go

11        through it briefly.

12            The Alzheimer's discovery, I

13        noticed up the corporate rep

14        deposition, and Merck filed a

15        motion to quash that deposition,

16        we defeated that motion, and I

17        took the deposition of Gilbert

18        Block in two days.  The final day

19        was October 30, 2007.  So, that

20        was about a week before the

21        settlement.

22            Block had been deposed in

23        the MDL.  I spent time talking to

24        Chris Tisi about the deposition,
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1    he became very frustrated by

2    Block.  I think I took Block's

3    pants down and spanked him,

4    frankly.

5         The work that I did to

6    develop the Alzheimer's story is

7    captured in a paper that I wrote,

8    which ultimately I will probably

9    try and get published.  I think

10   Mark has seen it.  It is available

11   to you.  It lays out how Merck set

12   up the Alzheimer studies, and we

13   had the benefit of knowing the

14   analysis of the data from Madigan

15   that hadn't been out there before

16   that showed that there was

17   statistically significant

18   increased risk with cardiovascular

19   events and deaths by the year 2000

20   and 2001, so that what was in the

21   label was a lie.

22        Frankly, you know, part of

23   what inspired me to work on that

24   or to redouble my efforts was the

Page 10

1          Hermans verdict, because Mr.

2          Hermans got treated unfairly.  He

3          didn't get justice.  At the time

4          that that verdict came down, I had

5          already started working with David

6          Madigan to analyze the Alzheimer's

7          data, and I knew that what was in

8          the label was a lie, we just

9          didn't have the time to frame it

10         for that case.

11              So, that's sort of not only

12         standing on the shoulders of your

13         colleagues, but standing shoulder

14         to shoulder with them, and that's

15         what I tried to do.

16              In the last year, I also

17         worked on the placebo study

18         analysis done by David Madigan.  I

19         recruited Madigan.  I organized a

20         group of lawyers that funded

21         Madigan's work.  So, there was

22         actually a common benefit approach

23         to Madigan.

24              MR. SEEGER:  Can I stop you,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1      because I don't want to forget

2      these questions.  We're trying not

3      to interrupt people, but on that

4      point, I know Madigan's

5      involvement in Celebrex, Bextra,

6      and I'm not that aware of his

7      involvement really in Vioxx.  So,

8      if you can spend a little time

9      talking about the common benefit

10     contribution of Madigan.  What

11     work did he provide?  I'm not

12     aware of it.

13          MR. WEINBERG:  Absolutely.

14          Madigan wrote a report that

15     was served on October 8th, 2007.

16     It was served in all of the cases

17     that were pending for trial in New

18     Jersey in January of 2008.

19          MR. RAFFERTY:  It was served

20     when, Eric?  I'm sorry.

21          MR. WEINBERG:  Beginning of

22     October of 2007.

23          We obtained all of the SAS

24     data from Merck's

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1         placebo-controlled clinical
 2         studies, all of it, working with
 3         your folks, Chris.
 4              MR. SEEGER:  Yes.
 5              MR. WEINBERG:  We gave it to
 6         Madigan.  Madigan is a
 7         biostatistician.  He was at
 8         Rutgers when I contacted him.  He
 9         had been director of the Institute
10         of Biostatistics.  At the time
11         that I reached out to him, he was
12         dean of mathematics and physical
13         science.  He's now dean of
14         mathematics at Columbia.
15              Madigan is a highly
16         published young guy, Irish,
17         brilliant.  One of his particular
18         areas of expertise is data safety
19         mining.  So, he's a guy that
20         consults with the pharmaceutical
21         companies in looking at their data
22         and seeing what the risks are.  I
23         spent a lot of time, you know,
24         bringing him in.  You know how it
```

FAC Resp. Exhibit D -- 727

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        is when you are trying to recruit

2        a good expert.  And I had to have

3        a level of credibility with him in

4        order to convince him to work.  He

5        did agree to come and work.

6              He analyzed the SAS data,

7        and it is in the bibliography.  He

8        wrote a report which basically

9        determined when there was

10        statistically significant risk of

11        cardiovascular thrombotic events

12        and cardiovascular thrombotic

13        deaths and other things.  We

14        looked at other things in the

15        Alzheimer's studies like

16        osteoporosis, like pneumonia

17        deaths, things that were

18        statistically significant early

19        on, and he found that in the

20        intent to treat analysis of that

21        data, which were prespecified

22        endpoints in the data analysis

23        plan, there was statistically

24        significant risk of death by the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1      year 2000.  So that when Merck was

2      negotiating with the FDA on the

3      label and taking the position that

4      it was not significant, that the

5      difference in death was not

6      significant, that was not true.

7      The numbers that are in the label

8      are 8 to 3, but the numbers in the

9      ITT are something like 18 to 5,

10     which are statistically

11     significant.  So, the curve was

12     separating over time.  That was a

13     highly obviously important fact.

14          Also, the CVT events became

15     statistically significant by, I

16     think, 2001.  And I have a couple

17     of the tables, the KM tables that

18     Madigan prepared in his report.  I

19     have pasted them into this

20     PowerPoint for you.

21          Madigan did testify in

22     Celebrex and Bextra.  I was not

23     involved in that case.  I declined

24     to be involved in Celebrex and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1       Bextra, because I know my

2       limitations and I like to focus on

3       one case at a time and dig as

4       deeply into that case as I can.

5       However, because my colleagues had

6       those cases, Madigan testified in

7       those cases as an expert.

8             So, Madigan's report has

9       been commended by Dr. Avorn and

10      Dr. Krumholz as perhaps the best

11      scientific analysis that has been

12      done of the statistical evidence

13      related to Vioxx.  He is writing

14      the paper with Krumholz and

15      Egilman, or a series of papers, on

16      this issue.  I've been asked by

17      our colleagues in Australia,

18      Slatery Warden, if they can work

19      with Madigan, I will be working

20      with them and introduce evidence

21      in their cases I think in March in

22      Australia.

23            It's a beautiful piece of

24      work, and it's a unique piece of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        work, and it should clearly be a

 2        part of the trial package.  And

 3        Madigan, I'm told, did a good job

 4        in testifying, so, I think he will

 5        be a very powerful expert.

 6             MR. LEVIN:  In Bextra and

 7        Celebrex?

 8             MR. WEINBERG:  In Bextra and

 9        Celebrex, yes.  He was scheduled

10        to be deposed --

11             MR. LEVIN:  I understand.

12             MR. WEINBERG:  Other work in

13        the last year in the litigation,

14        FDA discovery.  I said that I

15        immediately got the FDA summary

16        approval packages.  I've developed

17        something of a track record in

18        terms of FDA issues.  I've taught

19        about it at Rutgers.

20             In this case, I served nine

21        FOIAs after the initial FOIAs,

22        which the FDA did not respond to,

23        so, I sued them personally in

24        District Court in New Jersey in
```

FAC Resp. Exhibit D -- 731

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        April of 2007.  FDA filed a motion

2        to quash my complaint, to stay my

3        complaint.  That was briefed

4        before Judge Hochberg.  I defeated

5        the FDA's motion.  We were ordered

6        to mediation.

7             We were in the process of

8        mediating this case and

9        approaching settlement when Merck

10       got wind for the fact that I had

11       had this discovery process outside

12       of the regular litigation where

13       the FDA was going to produce

14       documents to me personally and not

15       to Merck.  Merck made an

16       application to Judge Higbee to

17       compel me to turn over all of the

18       materials that I got from the FDA

19       to them.  This was, again, in

20       September, October of 2007.

21            We argued that before Judge

22       Higbee, and their application was

23       denied.  So, at the time of the

24       settlement, I was in a position of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1       having nine FOIA requests that the

2       FDA had to respond to to provide

3       documents to me related to Vioxx

4       which Merck had no stake in

5       whatsoever.  They would not know

6       what I was getting.  That was in

7       the last year of the litigation.

8            In late 2006, I drafted a

9       memorandum on public relations to

10      develop a public relations

11      strategy.  I felt that we needed

12      to have a cohesive strategy in

13      order to defeat the public

14      relations, Merck's public

15      relations agenda.  I tried to

16      think broadly and deeply about the

17      task that I take on when I'm

18      involved in a case, and I thought

19      the PR was important.  So, working

20      with Mike Ferrara and Mike

21      Grossman and Ben Morelli, we

22      retained a firm in New York called

23      Klore & Associates.  I wrote the

24      working memorandum that served as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          a basis for that project, and we

2          got about 100 firms in New Jersey

3          to all kick in money together to

4          work together to develop that

5          strategy.

6              I believe that that strategy

7          was beginning to become effective,

8          that we were beginning to see in

9          media stories even where Merck was

10         winning cases, there were things

11         in the stories about the drag of

12         the litigation and so forth,

13         points that we wanted to make

14         whether we won or lost the cases.

15             MR. SEEGER:  Eric, I'm

16         sorry, Mike Ferrara, because he

17         was involved with that, too, if

18         you had to -- first of all, we're

19         not really allowing people to

20         submit extra stuff.

21             MR. WEINBERG:  I didn't

22         know --

23             MR. SEEGER:  No, it's okay.

24         I mean, I'll look at it.  I don't

FAC Resp. Exhibit D -- 734

Page 20

1          know if other people will.  I

2          don't have a problem with it.  I'm

3          just saying, I'm going to look

4          this over, and I have a sense of

5          it.

6               If you wanted us to leave

7          here with us thinking of like two

8          or three big contributions you

9          think you made sort of to the

10         common benefit, what would you

11         want the committee to focus on?

12              MR. WEINBERG:  Well, I think

13         that in a trial package, you have

14         got to have three things that I

15         worked on.  One, the

16         placebo-controlled study.

17              MR. HERMAN:  Wait a minute.

18         You didn't submit any materials to

19         the current trial package; is that

20         right?

21              MR. WEINBERG:  That's

22         correct.

23              MR. HERMAN:  Why not?

24              MR. WEINBERG:  Because I was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        not involved in the MDL.
 2              MR. LEVIN:  I don't want to
 3        interrupt, and we're probably MDL
 4        oriented, and I'm going to look to
 5        Jersey counsel here as to what was
 6        going on in Jersey, but was the
 7        leadership in Jersey aware of
 8        everything you were doing and all
 9        the engagements of experts you did
10        and whether any of it was
11        duplicative of what they were
12        doing?
13              MR. WEINBERG:  I assume so.
14              MR. LEVIN:  Did you --
15              MR. WEINBERG:  Absolutely.
16              MR. LEVIN:  Did you report
17        to them, and did they approve,
18        disapprove, or were you basically
19        out there on your own doing a good
20        job?
21              MR. WEINBERG:  Well, you
22        know, there wasn't a defined
23        structure in New Jersey the way
24        there was in the MDL.  I did try.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          Madigan was clearly a good guy and

2          a good expert.

3               MR. LEVIN:  Was there some

4          procedure by which they said, go

5          get Madigan, we'll endorse him,

6          we'll use him, or was that your

7          expert that you went out and

8          cultivated yourself?

9               MR. WEINBERG:  Well, first

10         of all, he was my expert who I

11         cultivated myself, but he was

12         offered to and was going to

13         testify for my colleagues.  He was

14         in Perry's cases.  He was in Sol

15         Weiss' cases.  He was offered

16         to -- I forget the other firm that

17         had cases.  I was going to work

18         Madigan in that case.

19               But in terms of the MDL,

20         Russ, we had a meeting in June of

21         2007 in Philadelphia where I

22         brought Madigan, and Mark Robinson

23         was there and Don Arbitblit was

24         there, and my proposal was to work

FAC Resp. Exhibit D -- 737

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      together.  In terms of the workup

2      of Madigan, I was working

3      primarily with Dave Buchanan and

4      Jeff Grand at Chris' office,

5      because they had worked with

6      Kronmal.  Again, this is standing

7      on the shoulders.  Kronmal did

8      terrific work, but I saw some

9      things, some directions that I

10     wanted to go that were a little

11     bit different.  I wanted to have

12     my own guy.  The discussion was,

13     let them work together.  Let them

14     peer review each other's work.

15     Let's have two brainchilds.

16           MR. HERMAN:  Here's the

17     problem that I have, and I need

18     your help with it.

19           On the trial package

20     committee, we had representatives

21     from the New Jersey litigation

22     that were not, per se, MDL folks.

23     None of them ever suggested that

24     you had materials that could be

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          incorporated into a trial package,

2          which is now complete.  Why that

3          is, I don't know.  It may be that

4          they just weren't aware of what

5          you were doing.

6               I'm particularly concerned,

7          because we put on a massive effort

8          in the MDL to get FDA documents.

9          We had several Assistant US

10         Attorneys involved, we had five or

11         six hearings.  We may have even --

12         I'm not certain whether we went to

13         the Fifth Circuit, but we

14         certainly had posted on the

15         website the Court's decisions

16         requiring the FDA to produce, and,

17         in fact, they are still producing

18         documents even post trial.

19              So, we do have FDA documents

20         within the trial package.  My

21         concern really isn't with your

22         presentation, it is with the fact

23         that we still have possibly 100

24         folks, claimants, and I don't know

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          how many pro se that want to try

2          their cases, and we've got to -- I

3          mean, if you've got materials that

4          ought to be in the trial package,

5          that's got to be explored.

6                  MR. RAFFERTY:  In terms of

7          the FDA, Eric called me, I think

8          before he filed the lawsuit

9          against the FDA, and I provided

10         him with copies of what we had

11         done in the MDL to make sure that

12         you didn't duplicate.  I don't

13         know, are you still waiting on

14         those documents?

15                 MR. WEINBERG:  We mediated

16         them.  Once the case settled, the

17         need for them was obviated.  They

18         were quoting me hundreds of

19         thousands of dollars in costs to

20         produce those documents.

21                 MR. LEVIN:  Who would you

22         say you had the most contact with

23         in the leadership of the New

24         Jersey litigation?

FAC Resp. Exhibit D -- 740

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1            MR. WEINBERG:  Dave, Jeff.

2            MR. LEVIN:  At Chris' firm?

3            MR. WEINBERG:  Chris at a

4       higher level, I guess.  Sol,

5       obviously.

6            MR. HERMAN:  How many hours

7       did you have put into the case?

8            MR. WEINBERG:  I calculated

9       about 6,000.  Obviously I'm

10      recreating hours.

11           MR. LEVIN:  You submitted

12      10,000 hours and 235,000 in costs.

13      Are you working with the

14      accountants to get them approved?

15      Because so far they have been

16      rejected.

17           MR. WEINBERG:  They

18      contacted me.  I spoke to Cliff

19      Newlin, and then we've been

20      trading phone calls.  But 10,000

21      hours is basically, of that time,

22      6,000 and change is mine.  I

23      worked essentially full time on

24      Vioxx for three years, and I work

Page 27

1       hard.  So, I believe I probably

2       underestimated my hours.

3            MR. HERMAN:  The other

4       question I have, and I'm not

5       holding you to an exact number, of

6       the hours that you've

7       reconstructed, were they all yours

8       or did you have contract workers,

9       associates?

10           MR. WEINBERG:  All mine.

11           MR. HERMAN:  They were 100

12      percent yours?

13           MR. WEINBERG:  All mine.

14           Just to kind of finish the

15      point on the MDL issue.  I called

16      a meeting in Philadelphia in June

17      of 2007, because I was concerned

18      that we needed to have the best

19      evidence in those trials.  I was

20      very interested in working with --

21      we had some conversations with Don

22      Arbitblit.  Arbitblit became very

23      much interested in the Madigan

24      project and spent a lot of time

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          talking to him, and he came to the

2          meeting.  Mark Robinson came to

3          the meeting.  Chris Placitella was

4          there.  Chris was handling

5          marketing stuff, and that's the

6          other thing that needs to be in

7          the trial package, if it is not,

8          because it is brilliant, brilliant

9          lawyering.  I was his sounding

10          board on that stuff.  Kostis was

11          also very much involved in that.

12          So, we had Mark, Don Arbitblit

13          myself, Chris, Dan Sigelman.

14              MR. LEVIN:  Was this the

15          meeting that Dan Sigelman from

16          Cohen Milstein went to in

17          Philadelphia?

18              MR. WEINBERG:  Philadelphia,

19          yes.

20              The intent of that meeting

21          was basically to say, let's work

22          together.  Let's put Madigan in

23          the MDL cases.  We were interested

24          in Zipes, who was a very good

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1      witness, I understood, in the

2      trial that he testified in.

3          You know, for reasons that,

4      you know, I'm not -- there's not a

5      blame game here, but it didn't

6      work out.

7          MR. LEVIN:  I know.

8          MR. WEINBERG:  But I tried.

9      So, in terms me being able to

10     communicate the work that I was

11     doing, I did try.  I think in

12     terms of the leadership in New

13     Jersey, I would consider Perry and

14     Mark, you know, they were on the

15     front lines of the cases, and I

16     know I worked with their firms on

17     a variety of issues including

18     Kostis.  Kostis was on the phone

19     with Rick.

20         MR. WEITZ:  I have to tell

21     you that Eric, although he was

22     focused on working up his cases,

23     he did bring a lot to the

24     litigation as far as his

FAC Resp. Exhibit D -- 744

Page 30

 1        participation and expertise.  He

 2        did share it.  It is not that he

 3        probably didn't coordinate with

 4        the MDL as much as he possibly

 5        could have and contributed, but he

 6        was always available and always

 7        sharing his experts.  I met with

 8        Eric and Kostis.

 9             MR. HERMAN:  I need to

10        apologize.  Excuse me.  Off the

11        record.

12                  -  -  -

13             (Whereupon, an

14        off-the-record discussion was

15        held.)

16                  -  -  -

17             MR. WEINBERG:  Russ, in

18        terms of what should be in the

19        trial package, I'm willing to

20        share all of it.  I do think that

21        you should have Madigan in the

22        trial package.

23             MR. RAFFERTY:  I think you

24        started off saying there's three

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          things.  One was Madigan.

2               MR. WEINBERG:  Madigan, the

3          Alzheimer's analysis, and the

4          marketing stuff.  We can look at

5          the FDA stuff, because I did -- I

6          went through the summary approval

7          packages and other stuff.  I have

8          long detailed PowerPoints which I

9          did share with experts that

10         excerpted key portions of those

11         documents.

12              Just to kind of finish up on

13         this point, because I know you

14         guys have a full day.

15              Other stuff in the last

16         year, I took discovery on a

17         project called the NitroMed

18         project, which was a very

19         interesting project that Merck did

20         with a company called NitroMed out

21         of Boston.  When Merck got the

22         results of protocol 136 and knew

23         they could no longer say that

24         their drug could be combined with

Page 32

```
 1          aspirin truthfully, because there
 2          was no benefit from the data in
 3          that study, they had to find a way
 4          of improving the gastrointestinal
 5          profile where you were combining
 6          Vioxx with aspirin, otherwise,
 7          they were losing a big marketing
 8          benefit.  They thought that by
 9          combining Vioxx with nitric oxide
10          that it would reduce the
11          gastrointestinal side effects of
12          the drug, and they sought out
13          companies that own proprietary
14          patents on combining Vioxx with
15          COX-2 inhibitors, because that
16          work had been going on for some
17          time.  NitroMed was the company
18          that had the best patents.  So,
19          Merck cut a deal with them.  It
20          was actually Merck Frosst.  So, I
21          got into the Merck Frosst
22          discovery, and this was work that
23          was ongoing at the time of the
24          settlement, but what I found out
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          was that NitroMed, when Merck

2          approached them, said to Merck,

3          hey, we can not only fix your

4          gastrointestinal problems, we can

5          fix your cardiovascular risk.  And

6          this was in the middle of 2002.

7              I served a commission for a

8          subpoena in Boston and took the

9          deposition of Gordon Letts, who

10         was the chief medical officer of

11         NitroMed, who said that Merck

12         rejected that offer.  They were

13         not interested in ameliorating the

14         cardiovascular side effects of

15         Vioxx.

16             Now that we know from

17         Madigan's analysis there was

18         statistically significant risk, I

19         think that evidence would be

20         interesting evidence in terms of

21         punitive conduct.  Here you have a

22         company that's telling you we can

23         improve the cardiovascular profile

24         of your drug and they're refusing

FAC Resp. Exhibit D -- 748

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          it.  Not only that, there's

2          another company out there called

3          Nitrox, which today is working on

4          a nitric oxide enhanced COX-2 that

5          actually lowers blood pressure.

6          And they are in Phase III studies,

7          and that drug may be approved.

8               So, that was work that was

9          going on.  I took the deposition

10         of a Merck Frosst scientist named

11         Don Nicholson.  I had Ford

12         Hutchinson, another expert,

13         another Merck Frosst person named

14         Sophie Roy on my radar screen to

15         depose.  That was work going on in

16         the last year of the litigation.

17              I organized some working

18         meetings.  I tried to defer to the

19         people who were the leaders in

20         this litigation, because they had

21         been there before me, and at the

22         same time, fill in where I could

23         to work together.

24              I had a working meeting in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1      my office in November of 2006 with

 2      John Kostis and several of the

 3      attorneys from the MDL and State

 4      Court on a specific causation

 5      model.  I thought it was a good

 6      model for settlement.  It ended up

 7      not being used, but it was useful

 8      in understanding specific

 9      causation.  It became very

10      important in the McDarby case

11      where diabetes was the issue, and

12      the day before Dr. Krumholz'

13      deposition, Ellen reached out to

14      me and said, what do you know

15      about diabetes risk?  And I had

16      the information.  It was no

17      coincidence that I had it, because

18      I organized the meeting in June of

19      2007 in Philadelphia that Mark

20      Robinson and Don Arbitblit --

21          MR. SEEGER:  Take 60 seconds

22      and kind of sum up, because we've

23      got to stay on schedule.

24          MR. HERMAN:  I have one
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        other question, excuse me.

2             I noted in your PowerPoint

3        under number IX, Roman Numeral IX,

4        fracture and bone healing.  Have

5        you had any contact with any pro

6        se folks or other folks alleging

7        that bone healing was either

8        retarded or mal affected by Vioxx?

9             MR. WEINBERG:  Not with pro

10       se folks, but I have had

11       discussions with Madigan about

12       that.  In fact, we analyzed the

13       data.  It does retard fracture

14       healing, and there was a

15       statistically significant

16       increased risk of --

17             MR. HERMAN:  Do you have a

18       client that you analyzed that for?

19             MR. WEINBERG:  No.  One of

20       the things that I did was to look

21       at the overall risk/benefit of

22       Vioxx because I felt that --

23             MR. HERMAN:  Wait a minute.

24       Let me explain to you that there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1        are -- have you sent that material

2        in to the MDL or to New Jersey?

3                MR. WEINBERG:  It's in

4        Madigan's report.

5                MR. LANIER:  Is that a yes

6        or a no?

7                MR. WEINBERG:  Yes.  I don't

8        want to be cross-examined.

9                MR. HERMAN:  Would you

10       e-mail me a copy of that report or

11       fax it?

12               MR. LANIER:  You've got

13       information that may be helpful to

14       people with other cases right now

15       that we need to plug into.  So, we

16       need it not just lost in the

17       morass of 80 bazillion documents,

18       would you highlight it and send it

19       to Russ?

20               MR. WEINBERG:  Yes.

21               MR. LANIER:  Thank you.

22               MR. WEINBERG:  So, to sum

23       up, I did a lot of work on this

24       case.  I think a lot of it was of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          the highest quality.  I worked

2          diligently from beginning to end.

3          When the track record was bad, I

4          worked harder.  I tried to fill in

5          where I saw that there were gaps.

6               When I was called upon in

7          each of the trials in New Jersey,

8          except for the Locks folks really,

9          I offered help, but they didn't

10         want it, but in each of those

11         cases, I was asked for help.  Even

12         in Ernst, Mark, I didn't realize

13         this, but I spent some time

14         prepping Egilman.  My role was

15         minimal, but I sat through

16         Egilman's deposition.  I think his

17         son accused me of falling asleep

18         at one point.  But what I brought

19         to, for example, the Humeston

20         case, the first Humeston case,

21         when Dave and Jeff and Chris were

22         looking at FDA issues, I had spent

23         a lot of time, between September

24         30, 2004 and when that case was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          tried, studying the FDA issues.

2          So, the fact that I was asked for

3          help is not a coincidence.  It was

4          because I had gone to school on

5          this case.

6               I'd be happy to share any of

7          my work product.  I'll send you --

8          Russ, I'll send you the Madigan

9          report.  I also have an expert, if

10          somebody needs an expert, I have a

11          guy named Pat O'Connor who was at

12          UMD&J who approached Merck in 2000

13          and said I think you need to do

14          some studies.  And I have the

15          documents on that issue.  And they

16          blew him off.  So, if somebody has

17          got an osteoporosis case, I can

18          help them.

19               But I did that, just to

20          finish, I looked at the overall

21          risk/benefit of the drug because I

22          felt that it was possible that if

23          Merck was arguing that

24          risk/benefit, gastrointestinal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

```
 1          benefit and the issues were

 2          cardiovascular risk, that other

 3          benefits and risks should be fair

 4          game.  And so I looked at the

 5          universe of them as I could define

 6          it and shared my work product

 7          consistently and tried to be a

 8          leader, tried to be a team player,

 9          and just tried to represent my

10          clients the way that I was taught

11          when I took my first job out of

12          law school.

13               MR. SEEGER:  Thanks, Eric.

14               MR. LEVIN:  Thanks.

15               MR. WEINBERG:  Thank you.

16                    -  -  -

17

18

19

20

21

22

23

24
```

FAC Resp. Exhibit D -- 755

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1               C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23        Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 756

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:        LEWIS & ROBERTS
             Kimberly R. Wilson, Esquire
FIRM:        MARTIN & JONES
             H. Forest Horne, Jr., Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 757

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -
 2              MR. SEEGER:  We're most of
 3         the fee committee.  We're making a
 4         record because Judge Fallon would
 5         like to have a record of things
 6         that are discussed here, but the
 7         floor is yours, and you can
 8         present and say whatever you want
 9         in the time you have.
10              MS. WILSON:  Okay.  Some of
11         you know me, some of you don't.
12         Chris and I go way back.  I got
13         involved in Vioxx literally the
14         day it was withdrawn from the
15         market.  Between 1500 and 2200
16         cases came across my desk.  The
17         way I did it was, I educated
18         myself very, very early.
19         Fortunately, I come from a family
20         of physicians and just decided
21         from the get-go, I was only going
22         to take, my firm, Lewis & Roberts,
23         we were only going to take cases
24         that we felt could go to trial.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          We ended up taking a very small

2          select group of cases, I think it

3          was around 50.

4                We filed all of our cases.

5          We filed in New Jersey state court

6          with the exception of one case

7          that I filed in the MDL.  We just

8          made a huge commitment from the

9          get-go, as did my partners, a

10         small firm, a firm of 20

11         attorneys, 11 partners, to make a

12         financial commitment and work

13         these cases up.  I got in early

14         and filed early and made it very

15         clear from the outset that I

16         wanted to push my cases because I

17         felt like in a case like this

18         where there was not a signature

19         injury and causation was

20         particularly tough, and Chris and

21         Mark did a great job with their

22         trials in getting over those

23         hurdles, the only way to really

24         resolve this particular mass tort

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          in a favorable way for the

2          plaintiffs was to have high

3          quality cases that got worked up.

4          Unfortunately, causation was so

5          hard, I think there's only a small

6          number of law firms that made that

7          financial commitment and also put

8          forth the labor to do so.  My firm

9          clearly did that.

10              We did it without being

11         asked to do that and then, of

12         course, when Chris and Dave and

13         Mark asked me to do more, I

14         certainly did more.  My firm alone

15         from North Carolina trucked 28

16         folks up to New Jersey and/or

17         Philadelphia for depositions.  I

18         did, I don't know, I think my

19         affidavit says four sales reps,

20         but it was actually eight sales

21         reps.  I did the depositions of 18

22         physicians and miscellaneous other

23         people along the way.  So, I was

24         actively involved.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1            MR. WEITZ:  Was that for
 2       your individual cases where you
 3       did the four sales reps?
 4            MS. WILSON:  Yes.
 5            MR. WEITZ:  Judge Higbee had
 6       four different waves of cases.
 7       Could you tell us which of your 49
 8       cases were in which waves and if
 9       any of them were assigned a trial
10       date?
11            MS. WILSON:  The first wave,
12       Black and Smith got chosen, and it
13       went up to the very wire, got
14       worked up for trial, and then I
15       think the way -- and Chris can
16       correct me if I might be mistaken,
17       but there were 39 initially in
18       that first wave that got worked
19       up.  Black and Smith got chosen
20       for trial, and then for some
21       reason, collectively a small group
22       of us, probably me, Chris, Mark
23       Lanier, Dave Buchanan was in on
24       it, there was some reason those

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          two got bumped, and I think the

2          only reason was we ended up, that

3          first group, not trying as many as

4          what we thought.

5               MR. SEEGER:  I think we had

6          a striking procedure with them.

7          We selected, they selected, they

8          got strikes, we got strikes.  They

9          might have struck your two because

10         they were good cases.

11              MS. WILSON:  It went to the

12         bitter end.  We were working those

13         up and thinking those cases were

14         going to go to trial in January.

15         So, that was Black and Smith.

16         Then I kept putting cases up in

17         those trial waves.  And I think in

18         every wave, there was always a

19         chance my cases were going to go

20         to trial throughout the process.

21              MR. SEEGER:  Kim was always

22         one of those people that when we

23         would call for cases, she would

24         put cases in.

Page 7

1            MS. WILSON:  And actively

2       engaged in discovery in all of

3       them.  I mean, every single case

4       that ended up -- there were a

5       couple of cases that I filed that

6       I ended up dismissing because I

7       felt there were huge causation

8       issues.  So, I got rid, along the

9       way, of any case that I felt was

10      more of a threat than an advantage

11      to us as a group.

12           MR. LEVIN:  You have about

13      $159,000 in costs that has been

14      approved by the accountant.  You

15      are ahead of a lot of people that

16      have not had them approved.  What

17      was the bulk of those costs, the

18      transportation, the lodging and

19      everything of your clients?

20           MS. WILSON:  Yes.  The other

21      thing I did was, with all of my

22      depositions, I had everything

23      videotaped.  And as soon as I got

24      those DVDs back, I disseminated

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        them throughout the country to

 2        everyone.  So, I did a lot of

 3        digital stuff with my discovery

 4        just to help educate other

 5        attorneys, especially in regards

 6        to the sales reps, because early

 7        on, there was a group of us, and

 8        Forest was part of it, we had some

 9        excellent sales rep depos, I mean,

10        with incredible admissions.

11              MR. SEEGER:  Who from your

12        group was taking those for the

13        most part?

14              MS. WILSON:  Me.

15              MR. HORNE:  And I was.

16              MS. WILSON:  And Forest.  I

17        mean, I don't know any other

18        lawyers in North Carolina --

19              MR. HORNE:  That took any

20        sales reps.

21              MS. WILSON:  I don't think

22        so.

23              MR. WEITZ:  Did you

24        coordinate any of that with Jerry
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        Kristal with Weitz & Luxenberg?

2              MR. HORNE:  I did, and I

3        borrowed heavily from the fine

4        depositions that Jerry took, and

5        Dave also gave us some deposition

6        transcripts of sales reps.  So, I

7        borrowed heavily from those, but

8        we took -- I think Kim and I, I

9        think there was a different line

10       of thought on the sales reps.  All

11       the sales rep depositions that I

12       took were at least eight hours

13       long.  I mean, it was an all day

14       affair.

15             MR. LEVIN:  Forest, were you

16       assisting her in processing her

17       cases or just your own?

18             MR. HORNE:  Just my own.

19             MR. LEVIN:  Your firm's?

20             MR. HORNE:  Just my firm's.

21             MR. LEVIN:  How many cases

22       did your firm have?

23             MR. HORNE:  We filed 48

24       cases all in New Jersey.  We

FAC Resp. Exhibit D -- 765

Page 10

```
 1          screened probably -- I'm with a

 2          15-lawyer plaintiffs firm with our

 3          primary office in Raleigh, and so

 4          we get a lot of calls when there

 5          are these kind of drug cases.  We

 6          screened probably 2000 cases and

 7          narrowed that down to 48.  We only

 8          filed and put up for expedited

 9          discovery the ones where the Vioxx

10          usage was clear and where we

11          thought the causation was

12          relatively clear, at least early

13          on it seemed like it was clear.

14          It got hazier as you went along,

15          but we had 48 cases.  Every one of

16          them was filed in New Jersey.  We

17          filed the first case in January of

18          2005.  I think at the time there

19          were only about 300 filed in New

20          Jersey at that time, and then

21          within six months, we actually

22          screened -- we had an expert in

23          cardiology review every case that

24          we accepted before we filed it.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1     So, we had that.  Ira Gelb and

2     Steve Rich were the two physicians

3     that we had review all of our

4     cases.

5          Myself and my partner, Greg

6     Martin, who was heavily involved

7     in the fen-phen litigation -- I

8     headed up the project for our firm

9     and did most of the work, but my

10    partner, Greg Martin, worked on

11    the case.  And then we hired two

12    experienced associate lawyers to

13    come in to work on the cases.  We

14    devoted two paralegals exclusively

15    to Vioxx, and then we hired two

16    summer law clerks to come in and

17    go through the FACTS database.

18    That's all they did eight hours a

19    day for three months.

20         MR. LEVIN:  For your

21    individual cases?

22         MR. HORNE:  Kim and I, our

23    collaboration, a lot was on the

24    sales reps because we had mutual

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          sales reps, we had mutual

2          physicians and --

3               MR. LEVIN:   Same

4          jurisdiction.

5               MR. HORNE:   -- going through

6          those FACTS documents was

7          maddening.  Kim would call me

8          occasionally and say, did you see

9          this document on Dr. X, and then I

10         would find a document on Dr. Y.

11         We collaborated there, and we

12         collaborated on the sales rep

13         depositions, and I shared a lot

14         of -- Chris, I dealt with Dave and

15         Jeff Grand more than you.  Jerry

16         and I worked together a lot, but

17         we found a number of -- we had one

18         orthopedic physician, I didn't

19         write down his name, but he was an

20         orthopedic physician in

21         Fayetteville, North Carolina who

22         we found in the FACTS database had

23         been paid over $100,000 by Merck.

24         And in collaborating with Robb

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          Dassow and Dave, I think that's

2          kind of what led to, along with

3          some other folks, I'm sure, the

4          order by Judge Higbee to require

5          Merck to report the income that

6          Merck had paid all these

7          physicians.  And the one

8          physician, the orthopedic

9          physician that we found in

10         Fayetteville had been paid over

11         $100,000.  We found all of these

12         e-mails, including a PowerPoint

13         presentation where the Merck rep

14         had told the physician to take out

15         a slide that talked about an

16         increase in blood pressure, move

17         it to the end, and don't spend

18         much time on it.  We circulated

19         that with a number of folks in the

20         litigation.

21              MR. LEVIN:  How is

22         Fayetteville these days?

23              MR. SEEGER:  Still there.

24              MR. HORNE:  It is not very

Page 14

```
 1          friendly.
 2                  MR. LEVIN:  I used to be a
 3          policeman in Fayetteville.
 4                  MR. HORNE:  Is that right?
 5                  MR. LEVIN:  Military
 6          policeman.
 7                  MR. HORNE:  The doctor, his
 8          name is Brad Broussard -- these
 9          Fayetteville physicians are very
10          conservative, but this is a short
11          story.
12                  I had a 48-year-old client
13          who suffered a heart attack and
14          ended up having a
15          defibrillator/pacemaker installed.
16          He was in perfect health otherwise
17          and was on the heart transplant
18          list, and this physician that had
19          been paid over $100,000 by Merck
20          and was on the speakers bureau,
21          this was the very first case I
22          filed in New Jersey.  I
23          arranged -- one of the things that
24          I tried to do with all my clients
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          is arrange meetings with the

2          prescribing physicians.  I went

3          down and met with him, not knowing

4          that he had been paid $100,000,

5          and went into a conference -- paid

6          him $1,000 to meet with him for an

7          hour and went into a conference.

8          He just waylaid me.  He said, no,

9          I'm not going to say that I

10         wouldn't have prescribed it had I

11         known.  Little did I know that he

12         did know, and I found that out

13         later.  His deposition --

14              MR. GIRARDI:  Speaks for

15         it --

16              MR. HORNE:  He just clipped

17         me for $1000 and then was a jerk.

18         The only thing that saved the

19         meeting, the guy said if he was

20         deposed, and this case wasn't on

21         for trial, but he said if he was

22         deposed -- he finally came around,

23         I brought my client with me who

24         pleaded with the doctor, and he

Page 16

1          finally gave in.

2                  MR. SEEGER:  Did you guys

3          work closely with Robb Dassow and

4          Sue Scovern on these sales rep

5          things?

6                  MS. WILSON:  Forest did.

7                  MR. HORNE:  I worked with

8          Robb on that, and I also worked

9          with Robb on the Medco because we

10         had two cases where we sued Medco

11         because they were 50 milligram

12         cases where they had prescribed

13         for over 18 months of 50

14         milligrams.  So, we sued Merck-

15         Medco.  That was either two or

16         three cases.  I engaged in

17         discovery with Medco's lawyers on

18         those issues, trying to find a

19         connection between Medco and

20         Merck, and I worked closely with

21         Robb on that, and we shared a lot

22         of documents in that regard.

23                 Kim put up, I don't know,

24         what was your percentage of cases?

Page 17

1          I mean, you put up close to 50% of

2          your cases.

3               MS. WILSON:  It was over

4          50%.

5               MR. HORNE:  We filed 48

6          cases, and we had 12 in for the

7          expedited discovery.  And then

8          along with Steve Kherkher at

9          Williams Kherkher, I had two cases

10         from North Carolina in the four

11         trial groupings that were set for

12         trial originally in October, and

13         then were moved to January.  I

14         worked closely with Jerry on those

15         and attended all the meetings, and

16         also Dave and Jeff Grand were very

17         helpful.  Frankly, I knew the

18         settlement discussions were going

19         on, but I had no idea that y'all

20         had moved it along as far as it

21         was.  So, we were heavily

22         preparing for trial along with

23         Steve Kherkher.

24              Steve's firm had two North

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1          Carolina cases, and my firm had

 2          two North Carolina cases that I

 3          put up.  So, we were collaborating

 4          together.  And then Judge Higbee

 5          changed her mind early on and said

 6          I only want prelabel change cases

 7          in the mix.  So, one of my cases

 8          dropped out because it was post

 9          label change.  And then in

10          discovery, the two cases that

11          Steve had developed usage

12          problems, so both of his cases

13          dropped out.  So, we were down to

14          one case in North Carolina, and I

15          communicated with Dave, and we had

16          a hearing with Judge Higbee,

17          fought Hope Freiwald tooth and

18          nail, and added another case that

19          was not on the expedited list for

20          trial.

21               So, I brought another case

22          in for the January '08 trial mix

23          and got that case -- even though

24          it wasn't in my expedited group, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          got the client and his wife up to

2          Philadelphia, went to Dechert,

3          dealt with Hope on all of those

4          depositions, got that done, got

5          the physicians deposed.  So, we

6          had those two cases set for trial.

7              I worked closely with Sol

8          Weiss on developing Steve Rich.  I

9          had been using Steve from early

10         '05 on specific causation, and

11         then Sol had worked with him on

12         general causation.  And Steve was

13         going to be our general causation

14         expert for the January '08 trial

15         set cases along with Sol.  I went

16         up to Philadelphia to defend

17         Steve's general causation

18         deposition, coordinated our

19         cardiologists, who saw all the

20         clients whose cases were trial set

21         on specific causation.

22             The Williams Kherkher firm

23         developed Dr. Goldberg for the

24         marketing case.  I wasn't involved

FAC Resp. Exhibit D -- 775

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          in that, they were.

2                But we, like Kim, our firm

3          responded every time there was a

4          call to put more cases in the mix,

5          and I was pretty vocal about that

6          on the list serve, saying, guys,

7          we are all in this together.  So,

8          we volunteered over 25 percent of

9          our firm's caseload, and we worked

10         them up, and we brought quality

11         cases to the mix.

12               MR. GIRARDI:  Was it the

13         same 50 cases?

14               MR. HORNE:  No.

15               MS. WILSON:  No.

16               MR. GIRARDI:  How many cases

17         did you have?

18               MR. HORNE:  We filed 48.  We

19         screened 2000 to get 48, and we

20         only filed cases where -- we knew

21         from the fen-phen days that

22         causation was going to be an

23         issue, so we felt comfortable that

24         we either had affidavits from

Page 21

```
 1          doctors where there were sample
 2          cases, and then otherwise we had
 3          rock solid usage on our
 4          prescriptions.
 5              MR. LEVIN:  How many of your
 6          cases did you put in the same
 7          position that Kim's were where you
 8          worked them up to trial?
 9              MR. HORNE:  We had 11 cases
10          in the mix, but then we added the
11          additional ones, so, there were
12          12.  And we had a hearing with
13          Hope, and Dave was instrumental in
14          getting this other case added at
15          the last minute.  Otherwise, we
16          would have only had one case for
17          the North Carolina trial setting,
18          and we were able to get one of our
19          other cases in, so we had two.  I
20          attended all the meetings with
21          Jerry on that, we collaborated
22          closely on all of the preparations
23          for trial.
24              MR. BLIZZARD:  Forest, help
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        me understand the timing of this

2        because I think we heard some of

3        this the other day from Steve

4        Kherkher.

5               When were those four cases,

6        two of yours and two of Williams

7        Kherkher, scheduled to go to trial

8        originally?

9               MR. HORNE:  October of '07.

10              MR. BLIZZARD:  Then as I

11       understood, three of them dropped

12       out because of various reasons,

13       including two of them because they

14       didn't have proof of use.

15              MR. HORNE:  Right.

16              MR. BLIZZARD:  So, there was

17       one left, and then you added one?

18              MR. HORNE:  Right.

19              MR. BLIZZARD:  That case was

20       then put off until February of

21       2008?

22              MR. HORNE:  No.  We got that

23       case -- I was in Salt Lake City in

24       depositions in another case and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1        had a conference call with Dave

 2        Buchanan, Hope Freiwald and Judge

 3        Higbee, and Hope was screaming

 4        about adding one of our cases

 5        late.  It had been filed and had

 6        been there.

 7             MR. BLIZZARD:  I'm trying to

 8        find out, when were those two

 9        then, the one you added and the

10        one that still was there, when

11        were they set for trial?

12             MR. HORNE:  With the trial

13        grouping of four cases, and I

14        think the Weitz Luxenberg setting

15        had a problem with that expert,

16        and I think there was some talk at

17        the time of settlement of moving

18        it back, so there would only be

19        three cases.

20             MR. SEEGER:  Well, there was

21        actually, and then something

22        happened to that setting.  They

23        got moved to like September or

24        October.
```

Page 24

1              MR. HORNE:  It was October.

2              MR. SEEGER:  Then they got

3         bounced to January and then we

4         settled.

5              MR. BLIZZARD:  I'm confused,

6         because I thought I heard

7         yesterday Kherkher say the cases

8         were set in March of 2008, that

9         those were actually Martin & Jones

10        cases, but that they were working

11        on them.

12             MR. SEEGER:  They might have

13        been originally set for

14        March/April of '07, because that

15        was an original target date.  I

16        don't remember why we lost the

17        setting, there were so many facts.

18        Dave definitely will, because he

19        remembers everything.  But that

20        somehow wound up after the summer,

21        which was September/October, and

22        basically the settlement came

23        before you guys could try the

24        case.  But the cases were in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          queue, and they were going to go

2          at that point.

3               MR. HORNE:  Right.

4               MS. WILSON:  Black.  I

5          remember why we took Black off.

6          Black ended up, he was an MI and a

7          stroke, and Judge Higbee didn't

8          want to do that.

9               MR. SEEGER:  That's right.

10              MS. WILSON:  That's why

11         Black didn't go.

12              MR. SEEGER:  She tried to

13         keep the issues as close as she

14         could for trial groupings because

15         she was doing more than one case

16         at that point.

17              MS. WILSON:  Just my

18         affidavit --

19              MR. SEEGER:  Just so I'm

20         clear.  I'm sorry, Kim.  So

21         Kherkher was going to help you

22         guys try the case?

23              MR. HORNE:  No.

24              MR. SEEGER:  I'm not clear

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1          on that.

 2                MR. HORNE:  What happened

 3          was, Steve had two North Carolina

 4          cases, and I had two North

 5          Carolina cases.  We were at the

 6          hearing when the judge was asking

 7          for trial cases.  So, I offered

 8          both of mine up, and Steve offered

 9          both of his up.  We agreed to work

10          together, and I would work my

11          cases up, he would work his cases

12          up, and we would share the general

13          and specific causation experts for

14          trial.  At the beginning of that,

15          Judge Higbee at the last minute

16          changed her mind and said, I only

17          want three prelabel cases.  So,

18          one of mine dropped out, and it

19          was two of Steve's and one of

20          mine.  And then both of Steve's

21          dropped out, because in the

22          depositions they did, the

23          prescription usage and samples was

24          terrible, so, they voluntarily

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          dropped those.  That's when I

2          added another one of my cases.

3              MR. SEEGER:  You had two

4          cases?

5              MR. HORNE:  I had two cases.

6              MR. SEEGER:  At that point,

7          they didn't have a case in.

8              MR. HORNE:  They didn't have

9          a case in, but they had already

10         gone a long way down the road of

11         developing the experts.

12             MR. SEEGER:  Yes.  No

13         question.

14             MR. HORNE:  They continued

15         with that.  As far as my two

16         cases, I handled all the

17         depositions for my clients and

18         their spouses and the physicians

19         and the sales reps.  I did all of

20         that.

21             MR. SEEGER:  Okay.

22             MR. BLIZZARD:  Was there any

23         agreement that they would try your

24         two cases that remained?

Page 28

1            MR. HORNE:  We were going to

2        try it together.  And I told Steve

3        this, and we had early on -- we've

4        got an office in Atlanta as well.

5        So, we had some Georgia cases, and

6        we had some -- a couple of good

7        Georgia cases that we were going

8        to put up.  Someone else had some

9        Georgia cases, and we couldn't

10       come to an accommodation, because

11       I told Steve, I'm going to be

12       involved in my cases.  I'm not

13       going to delegate it to you and

14       you do everything, because that's

15       just not the way I work or my firm

16       works.  So, I worked up my cases,

17       Steve worked up his cases.  We

18       were sharing the general and

19       specific causation witnesses for

20       trial.  And then we were going to

21       divide up opening, closing, cross

22       examinations, witness examinations

23       and that sort of thing.

24            MR. SEEGER:  Once their

Page 29

```
 1          cases were out, how would the

 2          trial have gone?  Would you have

 3          taken the lead, would they have

 4          worked with you on the trial

 5          still?

 6               MR. HORNE:  Yes.  And when

 7          that happened, because --

 8               MR. SEEGER:  You were still

 9          dividing up.

10               MR. HORNE:  What happened

11          when Steve's cases dropped out, we

12          were down to one case.  They

13          didn't have any other North

14          Carolina cases.  And that's when

15          we had to get Dave involved.  And

16          I told Hope, look, I've got a case

17          that's been filed, fact sheets in,

18          you've got all the medical

19          records, basically everything is

20          there.  I'll get the client up to

21          Philadelphia next week with his

22          wife.  We'll make every

23          accommodation.  And I think the

24          one thing Judge Higbee did was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          gave 30 extra days to designate

2          the experts.  But I got that case

3          in with Dave's help.  But Steve

4          was so far down the road with the

5          marketing expert and a fine

6          cardiologist out of San Francisco

7          that came back to North Carolina

8          and saw both of these clients.  He

9          was so far down the road with

10         that, I said let's --

11              MR. SEEGER:  Keep it

12         together.

13              MR. HORNE:  -- keep it

14         together, and that's what we did.

15              MR. WEITZ:  Forest, clarify

16         some times with me and cases.

17         Because in January of '07, you had

18         Hermans and Humeston, and then you

19         had Keeley and Rossi, which

20         Humeston was Chris's case, Hermans

21         was Lanier's, and Keeley and Rossi

22         were Weitz & Luxenberg cases.  She

23         set those cases down for trial in

24         January '07, and then Hermans and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          Humeston were tried in February

2          '07.  Keeley and Rossi were then

3          postponed to be tried in September

4          of '07, and then the judge just

5          put it on hold because there were

6          negotiations going on.  Where were

7          your cases with respect to that?

8          Did you have an actual firm trial

9          date?

10               MR. HORNE:  Yes.

11               MR. WEITZ:  From when?

12          Because Keeley and Rossi were the

13          next ones she was trying.  I'm

14          trying to figure out when you and

15          Kherkher had trial dates.  Was it

16          after those two cases?

17               MR. HORNE:  Originally there

18          were four states set forth for

19          trial.  It was North Carolina,

20          Pennsylvania, New Jersey and New

21          York.  Jerry was heading up the

22          New York, and Sol had both New

23          Jersey and Pennsylvania, and I had

24          North Carolina.  Those four cases

FAC Resp. Exhibit D -- 787

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          were all set on the same track.

2          Then Jerry and I talked about the

3          fact that his -- the general

4          causation witness out of Canada

5          called Jerry the night before his

6          deposition and said, oops --

7               MR. WEITZ:  He had an

8          article --

9               MR. HORNE:  -- he signed an

10         affidavit I think.  He said, I

11         think I signed an affidavit.  But

12         North Carolina was in that

13         setting.  We were in that setting.

14         And then because of that snafu

15         with Jerry's expert, I think Judge

16         Higbee -- and this was all about

17         the time the settlement came down

18         -- was going to move the New York

19         setting out to February because we

20         were down the road as far as when

21         the jury was going to come in, and

22         we were talking about renting out

23         the convention center at the hotel

24         and having the voir dire there.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

 1            MR. WEITZ:  So, you were
 2       part of the final stage in those
 3       two cases?
 4            MR. SEEGER:  Yes.
 5            MR. HORNE:  Yes.  Jeff Grand
 6       and Dave Buchanan and I worked --
 7       Dave was very gracious --
 8            MR. SEEGER:  By the way,
 9       Jeff Grand just had a baby.  For
10       the record, let the record reflect
11       we're looking at Jeff's new baby.
12            MR. HORNE: My two cases were
13       Romans, Billy Ray Romans and Andy
14       Ray Sanderson.
15            MR. WEITZ:  The cases Forest
16       had ready for trial were Romans
17       and Sanderson.
18            MR. HORNE:  Yes.  Romans was
19       a prelabel change that was in the
20       mix originally.  Sanderson was the
21       case that was added after a motion
22       hearing with Dave and Judge Higbee
23       and Hope and myself, and Judge
24       Higbee agreed to add Sanderson.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          So, Sanderson and Romans were the

2          two North Carolina cases that were

3          set to go to trial originally in

4          that October setting with the New

5          Jersey, Pennsylvania and New York

6          cases that Judge Higbee then moved

7          into January.

8              I went to the status

9          conference in November and left

10         there, flew back to Raleigh, North

11         Carolina, jumped in my car and

12         drove four hours to Asheville and

13         got to the hotel at 4:00 a.m. and

14         deposed a Merck rep on a Friday

15         from 9:00 in the morning until

16         6:00 at night, and then the next

17         week is when the settlement

18         happened.

19             And I didn't -- and Steve, I

20         don't know what Steve knew.  He

21         may have known more than he told

22         me, but after the fact -- I mean,

23         I knew the negotiations were

24         going, and I think that's -- even

FAC Resp. Exhibit D -- 790

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1        Judge Higbee said in a conference

2        that that's one of the

3        considerations for moving the

4        setting from October of '07 to

5        January '08.  But I had no idea

6        that y'all were that close, and

7        obviously a great result.

8             MR. LEVIN:  Neither did we.

9             MS. WILSON:  My cases are

10       real simple.  I did not work with

11       Kherkher at all.  I worked with

12       two people.  That was Chris Seeger

13       and Mark Lanier.  So, mine is real

14       clear-cut.  That was kind of the

15       get go.  Forest and I collaborated

16       a lot.

17            Something I would like to

18       add is, after the settlement was

19       announced, it was either Chris or

20       Mark, one, who got interviewed by

21       the Wall Street Journal reporter.

22       I think it was you who told that

23       person to call me.  They asked me

24       to describe my role in Vioxx in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1            this litigation.

2                  MR. SEEGER:  Must have been

3            me.  Lanier would have never sent

4            a reporter to someone else.

5                  MS. WILSON:  I think we had

6            some five star generals, and I was

7            a front line soldier really every

8            step of the way, and there weren't

9            a lot of us out there.

10                 MR. SEEGER:  You also had a

11           case in Federal Court that you

12           were trying to get remanded to the

13           transfer court in North Carolina

14           that you wanted us to try

15           together.

16                 MS. WILSON:  That's right.

17           That's the Howard case, and I

18           think it is still probably right

19           now one of the best cases out

20           there.  I have no doubt it has

21           already been approved actually.

22           I'm just waiting on our points, I

23           guess I should say.  Great case,

24           and that was the plan.  We were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          going to tee that up.  So, I did

2          have one in the MDL.

3              It was a tough litigation,

4          as you guys know.  I thought it

5          was far harder than Baycol,

6          fen-phen, Rezulin.  I don't think

7          anything compares to Vioxx.  I

8          really don't.  It was very tough.

9              Anyway, after the settlement

10         was announced, I certainly did my

11         part to help bring everyone

12         together in newspapers, on TV,

13         talked about what a tremendous job

14         everyone did, how tough this

15         litigation was.  Hard, hard cases,

16         difficult causation, and I was a

17         big supporter of this resolution.

18             MR. HORNE:  One thing I

19         would like to say about the

20         submission.  I sent every member

21         of the committee a copy of our

22         submission with detailed expenses

23         and time sheets.  I will say we

24         had about 1000 attorney hours that

FAC Resp. Exhibit D -- 793

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1       we submitted for the committee's

2       consideration, and that is an

3       extremely conservative amount

4       because we don't keep hourly

5       bills.  I think Kim's firm, they

6       do keep track of their time.  We

7       don't.  I went back through, and

8       the only thing that I submitted

9       for this committee's consideration

10      are matters that were related to

11      the 12 cases and the trial and

12      those expenses.  There's nothing

13      in here for stuff that I didn't

14      truly think was for the common

15      benefit.

16           Going into this, Kim's firm

17      and my firm, we were really kind

18      of the only two firms in the

19      state.  So, in a way, we were

20      certainly competitors, but we also

21      collaborated from the very

22      beginning, and it was both of our

23      intentions to try these cases.  I

24      went to the first trial in

Page 39

```
 1          Brazoria.  I went for the full

 2          week, that first week there.  I

 3          saw Mark Robinson was there and

 4          had dinner.

 5               MR. LEVIN:  With Mark?

 6               MR. HORNE:  With Ben Morelli

 7          and some other folks during that

 8          trial.  I stayed there for the

 9          whole week and saw the openings.

10          Chris, I watched you on Court TV.

11          I spent about a week watching

12          that.  I came back for the

13          Hermans/Humeston openings.

14               MR. SEEGER:  I remember

15          that.

16               MR. HORNE:  Because Hope

17          came over to ask you to get Kim

18          and me --

19               MR. SEEGER:  They were

20          sitting on the defense side, and

21          Hope said, these guys are

22          plaintiffs lawyers, would you tell

23          them to go on to the other side.

24          There's no line in the middle.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          They can sit wherever they want.

2               MR. WEITZ:  Judge Fallon's

3          PTO Order 6, he laid out

4          guidelines.  You are worried about

5          the hours.  The hours are a factor

6          to consider, but the judge laid

7          out in his Murphy Oil decision

8          that there are a lot of other

9          factors, people that were actually

10         litigating the cases and moving

11         the dockets in jurisdictions and

12         were preparing to try the cases.

13         Those are factors.

14              MR. SEEGER:  This is helpful

15         to us.

16              MR. HORNE:  Kim and I, we

17         traveled to New Jersey for like

18         two of the trials, I believe.  But

19         I saw openings or closings in -- I

20         was there for Jim Pettit's

21         closing, I was there for your

22         opening in Hermans/Humeston.  I

23         was there for Mark's opening in

24         the first case in Texas.  I was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          there for one of the other ones.

2          And so it was --

3              MR. SEEGER:  I didn't get a

4          chance to talk to you much.  I

5          know that you worked a lot with

6          Dave and Jeff.

7              I spoke to you all the time.

8          Kim was always looking to get

9          something set for trial.  That's

10          the fairest way to reflect it.

11          How many times did we talk to each

12          other on the phone?  I've got this

13          case, this is a great case for

14          trial, I've got two cases coming

15          to New Jersey.  You are our kind

16          of people.  That's the way to move

17          a case.

18              MR. LEVIN:  Pleasure to have

19          met.  Up until now, I only knew

20          your hours.

21              MR. SEEGER:  Do you have the

22          hours?

23              MR. LEVIN:  He sent them to

24          everybody.  All of a sudden I got

FAC Resp. Exhibit D -- 797

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          binders.  Now I know.

2                    MS. WILSON:  I did the same

3          thing.

4                    MR. SEEGER:  Have they been

5          reviewed?

6                    MR. LEVIN:  Yes.  Your hours

7          have been reviewed.  They have

8          been approved.

9                    MR. SEEGER:  Which means you

10         have met all the guidelines.

11                   MR. LEVIN:  In fact, your

12         costs to the seven cents were

13         approved.

14                   MR. SEEGER:  What are they?

15                   MR. LEVIN:  159,045.07.

16                   MR. SEEGER:  Both firms?

17                   MR. LEVIN:  No.

18                   MR. WEITZ:  No.  Forest is

19         131 and change.

20                   MR. SEEGER:  That was a very

21         helpful presentation.  Thank you.

22                   MR. LEVIN:  It is a pleasure

23         to see professionals that are

24         truly professionals.

FAC Resp. Exhibit D -- 798

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1            MR. HORNE:  I want to thank

2        y'all for the work that went on

3        behind the scenes that we never

4        knew about.

5            MR. SEEGER:  Thank you.

6            MR. GIRARDI:  Thank you.

7            MR. BLIZZARD:  Thank you.

8                -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number: 1060147

23         Notary Expiration: 1.2.10
           CCR Number: 30X100176200

24

FAC Resp. Exhibit D -- 800

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:        LEWIS & ROBERTS
             Kimberly R. Wilson, Esquire
FIRM:        MARTIN & JONES
             H. Forest Horne, Jr., Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 801

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2                MR. SEEGER:  We're most of

3          the fee committee.  We're making a

4          record because Judge Fallon would

5          like to have a record of things

6          that are discussed here, but the

7          floor is yours, and you can

8          present and say whatever you want

9          in the time you have.

10               MS. WILSON:  Okay.  Some of

11         you know me, some of you don't.

12         Chris and I go way back.  I got

13         involved in Vioxx literally the

14         day it was withdrawn from the

15         market.  Between 1500 and 2200

16         cases came across my desk.  The

17         way I did it was, I educated

18         myself very, very early.

19         Fortunately, I come from a family

20         of physicians and just decided

21         from the get-go, I was only going

22         to take, my firm, Lewis & Roberts,

23         we were only going to take cases

24         that we felt could go to trial.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          We ended up taking a very small
 2          select group of cases, I think it
 3          was around 50.
 4               We filed all of our cases.
 5          We filed in New Jersey state court
 6          with the exception of one case
 7          that I filed in the MDL.  We just
 8          made a huge commitment from the
 9          get-go, as did my partners, a
10          small firm, a firm of 20
11          attorneys, 11 partners, to make a
12          financial commitment and work
13          these cases up.  I got in early
14          and filed early and made it very
15          clear from the outset that I
16          wanted to push my cases because I
17          felt like in a case like this
18          where there was not a signature
19          injury and causation was
20          particularly tough, and Chris and
21          Mark did a great job with their
22          trials in getting over those
23          hurdles, the only way to really
24          resolve this particular mass tort
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1       in a favorable way for the

2       plaintiffs was to have high

3       quality cases that got worked up.

4       Unfortunately, causation was so

5       hard, I think there's only a small

6       number of law firms that made that

7       financial commitment and also put

8       forth the labor to do so.  My firm

9       clearly did that.

10          We did it without being

11      asked to do that and then, of

12      course, when Chris and Dave and

13      Mark asked me to do more, I

14      certainly did more.  My firm alone

15      from North Carolina trucked 28

16      folks up to New Jersey and/or

17      Philadelphia for depositions.  I

18      did, I don't know, I think my

19      affidavit says four sales reps,

20      but it was actually eight sales

21      reps.  I did the depositions of 18

22      physicians and miscellaneous other

23      people along the way.  So, I was

24      actively involved.

FAC Resp. Exhibit D -- 804

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1            MR. WEITZ:  Was that for

2       your individual cases where you

3       did the four sales reps?

4            MS. WILSON:  Yes.

5            MR. WEITZ:  Judge Higbee had

6       four different waves of cases.

7       Could you tell us which of your 49

8       cases were in which waves and if

9       any of them were assigned a trial

10      date?

11           MS. WILSON:  The first wave,

12      Black and Smith got chosen, and it

13      went up to the very wire, got

14      worked up for trial, and then I

15      think the way -- and Chris can

16      correct me if I might be mistaken,

17      but there were 39 initially in

18      that first wave that got worked

19      up.  Black and Smith got chosen

20      for trial, and then for some

21      reason, collectively a small group

22      of us, probably me, Chris, Mark

23      Lanier, Dave Buchanan was in on

24      it, there was some reason those

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        two got bumped, and I think the

 2        only reason was we ended up, that

 3        first group, not trying as many as

 4        what we thought.

 5             MR. SEEGER:  I think we had

 6        a striking procedure with them.

 7        We selected, they selected, they

 8        got strikes, we got strikes.  They

 9        might have struck your two because

10        they were good cases.

11             MS. WILSON:  It went to the

12        bitter end.  We were working those

13        up and thinking those cases were

14        going to go to trial in January.

15        So, that was Black and Smith.

16        Then I kept putting cases up in

17        those trial waves.  And I think in

18        every wave, there was always a

19        chance my cases were going to go

20        to trial throughout the process.

21             MR. SEEGER:  Kim was always

22        one of those people that when we

23        would call for cases, she would

24        put cases in.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1            MS. WILSON:  And actively

2       engaged in discovery in all of

3       them.  I mean, every single case

4       that ended up -- there were a

5       couple of cases that I filed that

6       I ended up dismissing because I

7       felt there were huge causation

8       issues.  So, I got rid, along the

9       way, of any case that I felt was

10      more of a threat than an advantage

11      to us as a group.

12           MR. LEVIN:  You have about

13      $159,000 in costs that has been

14      approved by the accountant.  You

15      are ahead of a lot of people that

16      have not had them approved.  What

17      was the bulk of those costs, the

18      transportation, the lodging and

19      everything of your clients?

20           MS. WILSON:  Yes.  The other

21      thing I did was, with all of my

22      depositions, I had everything

23      videotaped.  And as soon as I got

24      those DVDs back, I disseminated

FAC Resp. Exhibit D -- 807

Page 8

1          them throughout the country to

2          everyone.  So, I did a lot of

3          digital stuff with my discovery

4          just to help educate other

5          attorneys, especially in regards

6          to the sales reps, because early

7          on, there was a group of us, and

8          Forest was part of it, we had some

9          excellent sales rep depos, I mean,

10         with incredible admissions.

11             MR. SEEGER:  Who from your

12         group was taking those for the

13         most part?

14             MS. WILSON:  Me.

15             MR. HORNE:  And I was.

16             MS. WILSON:  And Forest.  I

17         mean, I don't know any other

18         lawyers in North Carolina --

19             MR. HORNE:  That took any

20         sales reps.

21             MS. WILSON:  I don't think

22         so.

23             MR. WEITZ:  Did you

24         coordinate any of that with Jerry

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          Kristal with Weitz & Luxenberg?
 2               MR. HORNE:  I did, and I
 3          borrowed heavily from the fine
 4          depositions that Jerry took, and
 5          Dave also gave us some deposition
 6          transcripts of sales reps.  So, I
 7          borrowed heavily from those, but
 8          we took -- I think Kim and I, I
 9          think there was a different line
10          of thought on the sales reps.  All
11          the sales rep depositions that I
12          took were at least eight hours
13          long.  I mean, it was an all day
14          affair.
15               MR. LEVIN:  Forest, were you
16          assisting her in processing her
17          cases or just your own?
18               MR. HORNE:  Just my own.
19               MR. LEVIN:  Your firm's?
20               MR. HORNE:  Just my firm's.
21               MR. LEVIN:  How many cases
22          did your firm have?
23               MR. HORNE:  We filed 48
24          cases all in New Jersey.  We
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          screened probably -- I'm with a
 2          15-lawyer plaintiffs firm with our
 3          primary office in Raleigh, and so
 4          we get a lot of calls when there
 5          are these kind of drug cases.  We
 6          screened probably 2000 cases and
 7          narrowed that down to 48.  We only
 8          filed and put up for expedited
 9          discovery the ones where the Vioxx
10          usage was clear and where we
11          thought the causation was
12          relatively clear, at least early
13          on it seemed like it was clear.
14          It got hazier as you went along,
15          but we had 48 cases.  Every one of
16          them was filed in New Jersey.  We
17          filed the first case in January of
18          2005.  I think at the time there
19          were only about 300 filed in New
20          Jersey at that time, and then
21          within six months, we actually
22          screened -- we had an expert in
23          cardiology review every case that
24          we accepted before we filed it.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           So, we had that.  Ira Gelb and
2           Steve Rich were the two physicians
3           that we had review all of our
4           cases.
5               Myself and my partner, Greg
6           Martin, who was heavily involved
7           in the fen-phen litigation -- I
8           headed up the project for our firm
9           and did most of the work, but my
10          partner, Greg Martin, worked on
11          the case.  And then we hired two
12          experienced associate lawyers to
13          come in to work on the cases.  We
14          devoted two paralegals exclusively
15          to Vioxx, and then we hired two
16          summer law clerks to come in and
17          go through the FACTS database.
18          That's all they did eight hours a
19          day for three months.
20              MR. LEVIN:  For your
21          individual cases?
22              MR. HORNE:  Kim and I, our
23          collaboration, a lot was on the
24          sales reps because we had mutual

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1          sales reps, we had mutual
 2          physicians and --
 3               MR. LEVIN:  Same
 4          jurisdiction.
 5               MR. HORNE:  -- going through
 6          those FACTS documents was
 7          maddening.  Kim would call me
 8          occasionally and say, did you see
 9          this document on Dr. X, and then I
10          would find a document on Dr. Y.
11          We collaborated there, and we
12          collaborated on the sales rep
13          depositions, and I shared a lot
14          of -- Chris, I dealt with Dave and
15          Jeff Grand more than you.  Jerry
16          and I worked together a lot, but
17          we found a number of -- we had one
18          orthopedic physician, I didn't
19          write down his name, but he was an
20          orthopedic physician in
21          Fayetteville, North Carolina who
22          we found in the FACTS database had
23          been paid over $100,000 by Merck.
24          And in collaborating with Robb
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          Dassow and Dave, I think that's

2          kind of what led to, along with

3          some other folks, I'm sure, the

4          order by Judge Higbee to require

5          Merck to report the income that

6          Merck had paid all these

7          physicians.  And the one

8          physician, the orthopedic

9          physician that we found in

10         Fayetteville had been paid over

11         $100,000.  We found all of these

12         e-mails, including a PowerPoint

13         presentation where the Merck rep

14         had told the physician to take out

15         a slide that talked about an

16         increase in blood pressure, move

17         it to the end, and don't spend

18         much time on it.  We circulated

19         that with a number of folks in the

20         litigation.

21              MR. LEVIN:  How is

22         Fayetteville these days?

23              MR. SEEGER:  Still there.

24              MR. HORNE:  It is not very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1            friendly.

2                  MR. LEVIN:  I used to be a

3            policeman in Fayetteville.

4                  MR. HORNE:  Is that right?

5                  MR. LEVIN:  Military

6            policeman.

7                  MR. HORNE:  The doctor, his

8            name is Brad Broussard -- these

9            Fayetteville physicians are very

10           conservative, but this is a short

11           story.

12                 I had a 48-year-old client

13           who suffered a heart attack and

14           ended up having a

15           defibrillator/pacemaker installed.

16           He was in perfect health otherwise

17           and was on the heart transplant

18           list, and this physician that had

19           been paid over $100,000 by Merck

20           and was on the speakers bureau,

21           this was the very first case I

22           filed in New Jersey.  I

23           arranged -- one of the things that

24           I tried to do with all my clients

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          is arrange meetings with the

2          prescribing physicians.  I went

3          down and met with him, not knowing

4          that he had been paid $100,000,

5          and went into a conference -- paid

6          him $1,000 to meet with him for an

7          hour and went into a conference.

8          He just waylaid me.  He said, no,

9          I'm not going to say that I

10         wouldn't have prescribed it had I

11         known.  Little did I know that he

12         did know, and I found that out

13         later.  His deposition --

14              MR. GIRARDI:  Speaks for

15         it --

16              MR. HORNE:  He just clipped

17         me for $1000 and then was a jerk.

18         The only thing that saved the

19         meeting, the guy said if he was

20         deposed, and this case wasn't on

21         for trial, but he said if he was

22         deposed -- he finally came around,

23         I brought my client with me who

24         pleaded with the doctor, and he

FAC Resp. Exhibit D -- 815

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
1          finally gave in.
2              MR. SEEGER:  Did you guys
3          work closely with Robb Dassow and
4          Sue Scovern on these sales rep
5          things?
6              MS. WILSON:  Forest did.
7              MR. HORNE:  I worked with
8          Robb on that, and I also worked
9          with Robb on the Medco because we
10         had two cases where we sued Medco
11         because they were 50 milligram
12         cases where they had prescribed
13         for over 18 months of 50
14         milligrams.  So, we sued Merck-
15         Medco.  That was either two or
16         three cases.  I engaged in
17         discovery with Medco's lawyers on
18         those issues, trying to find a
19         connection between Medco and
20         Merck, and I worked closely with
21         Robb on that, and we shared a lot
22         of documents in that regard.
23             Kim put up, I don't know,
24         what was your percentage of cases?
```

FAC Resp. Exhibit D -- 816

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           I mean, you put up close to 50% of

2       your cases.

3           MS. WILSON:  It was over

4       50%.

5           MR. HORNE:  We filed 48

6       cases, and we had 12 in for the

7       expedited discovery.  And then

8       along with Steve Kherkher at

9       Williams Kherkher, I had two cases

10      from North Carolina in the four

11      trial groupings that were set for

12      trial originally in October, and

13      then were moved to January.  I

14      worked closely with Jerry on those

15      and attended all the meetings, and

16      also Dave and Jeff Grand were very

17      helpful.  Frankly, I knew the

18      settlement discussions were going

19      on, but I had no idea that y'all

20      had moved it along as far as it

21      was.  So, we were heavily

22      preparing for trial along with

23      Steve Kherkher.

24          Steve's firm had two North

FAC Resp. Exhibit D -- 817

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1      Carolina cases, and my firm had

2      two North Carolina cases that I

3      put up.  So, we were collaborating

4      together.  And then Judge Higbee

5      changed her mind early on and said

6      I only want prelabel change cases

7      in the mix.  So, one of my cases

8      dropped out because it was post

9      label change.  And then in

10     discovery, the two cases that

11     Steve had developed usage

12     problems, so both of his cases

13     dropped out.  So, we were down to

14     one case in North Carolina, and I

15     communicated with Dave, and we had

16     a hearing with Judge Higbee,

17     fought Hope Freiwald tooth and

18     nail, and added another case that

19     was not on the expedited list for

20     trial.

21          So, I brought another case

22     in for the January '08 trial mix

23     and got that case -- even though

24     it wasn't in my expedited group, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          got the client and his wife up to

2          Philadelphia, went to Dechert,

3          dealt with Hope on all of those

4          depositions, got that done, got

5          the physicians deposed.  So, we

6          had those two cases set for trial.

7               I worked closely with Sol

8          Weiss on developing Steve Rich.  I

9          had been using Steve from early

10         '05 on specific causation, and

11         then Sol had worked with him on

12         general causation.  And Steve was

13         going to be our general causation

14         expert for the January '08 trial

15         set cases along with Sol.  I went

16         up to Philadelphia to defend

17         Steve's general causation

18         deposition, coordinated our

19         cardiologists, who saw all the

20         clients whose cases were trial set

21         on specific causation.

22               The Williams Kherkher firm

23         developed Dr. Goldberg for the

24         marketing case.  I wasn't involved

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          in that, they were.

2               But we, like Kim, our firm

3          responded every time there was a

4          call to put more cases in the mix,

5          and I was pretty vocal about that

6          on the list serve, saying, guys,

7          we are all in this together.  So,

8          we volunteered over 25 percent of

9          our firm's caseload, and we worked

10         them up, and we brought quality

11         cases to the mix.

12              MR. GIRARDI:  Was it the

13         same 50 cases?

14              MR. HORNE:  No.

15              MS. WILSON:  No.

16              MR. GIRARDI:  How many cases

17         did you have?

18              MR. HORNE:  We filed 48.  We

19         screened 2000 to get 48, and we

20         only filed cases where -- we knew

21         from the fen-phen days that

22         causation was going to be an

23         issue, so we felt comfortable that

24         we either had affidavits from

Page 21

1      doctors where there were sample

2      cases, and then otherwise we had

3      rock solid usage on our

4      prescriptions.

5              MR. LEVIN:  How many of your

6      cases did you put in the same

7      position that Kim's were where you

8      worked them up to trial?

9              MR. HORNE:  We had 11 cases

10      in the mix, but then we added the

11      additional ones, so, there were

12      12.  And we had a hearing with

13      Hope, and Dave was instrumental in

14      getting this other case added at

15      the last minute.  Otherwise, we

16      would have only had one case for

17      the North Carolina trial setting,

18      and we were able to get one of our

19      other cases in, so we had two.  I

20      attended all the meetings with

21      Jerry on that, we collaborated

22      closely on all of the preparations

23      for trial.

24              MR. BLIZZARD:  Forest, help

Page 22

1          me understand the timing of this

2          because I think we heard some of

3          this the other day from Steve

4          Kherkher.

5               When were those four cases,

6          two of yours and two of Williams

7          Kherkher, scheduled to go to trial

8          originally?

9               MR. HORNE:  October of '07.

10               MR. BLIZZARD:  Then as I

11          understood, three of them dropped

12          out because of various reasons,

13          including two of them because they

14          didn't have proof of use.

15               MR. HORNE:  Right.

16               MR. BLIZZARD:  So, there was

17          one left, and then you added one?

18               MR. HORNE:  Right.

19               MR. BLIZZARD:  That case was

20          then put off until February of

21          2008?

22               MR. HORNE:  No.  We got that

23          case -- I was in Salt Lake City in

24          depositions in another case and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          had a conference call with Dave

 2          Buchanan, Hope Freiwald and Judge

 3          Higbee, and Hope was screaming

 4          about adding one of our cases

 5          late.  It had been filed and had

 6          been there.

 7               MR. BLIZZARD:  I'm trying to

 8          find out, when were those two

 9          then, the one you added and the

10          one that still was there, when

11          were they set for trial?

12               MR. HORNE:  With the trial

13          grouping of four cases, and I

14          think the Weitz Luxenberg setting

15          had a problem with that expert,

16          and I think there was some talk at

17          the time of settlement of moving

18          it back, so there would only be

19          three cases.

20               MR. SEEGER:  Well, there was

21          actually, and then something

22          happened to that setting.  They

23          got moved to like September or

24          October.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1              MR. HORNE:  It was October.

2              MR. SEEGER:  Then they got

3        bounced to January and then we

4        settled.

5              MR. BLIZZARD:  I'm confused,

6        because I thought I heard

7        yesterday Kherkher say the cases

8        were set in March of 2008, that

9        those were actually Martin & Jones

10        cases, but that they were working

11        on them.

12              MR. SEEGER:  They might have

13        been originally set for

14        March/April of '07, because that

15        was an original target date.  I

16        don't remember why we lost the

17        setting, there were so many facts.

18        Dave definitely will, because he

19        remembers everything.  But that

20        somehow wound up after the summer,

21        which was September/October, and

22        basically the settlement came

23        before you guys could try the

24        case.  But the cases were in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1        queue, and they were going to go

2        at that point.

3              MR. HORNE:  Right.

4              MS. WILSON:  Black.  I

5        remember why we took Black off.

6        Black ended up, he was an MI and a

7        stroke, and Judge Higbee didn't

8        want to do that.

9              MR. SEEGER:  That's right.

10              MS. WILSON:  That's why

11        Black didn't go.

12              MR. SEEGER:  She tried to

13        keep the issues as close as she

14        could for trial groupings because

15        she was doing more than one case

16        at that point.

17              MS. WILSON:  Just my

18        affidavit --

19              MR. SEEGER:  Just so I'm

20        clear.  I'm sorry, Kim.  So

21        Kherkher was going to help you

22        guys try the case?

23              MR. HORNE:  No.

24              MR. SEEGER:  I'm not clear

Page 26

1          on that.

2               MR. HORNE:  What happened

3          was, Steve had two North Carolina

4          cases, and I had two North

5          Carolina cases.  We were at the

6          hearing when the judge was asking

7          for trial cases.  So, I offered

8          both of mine up, and Steve offered

9          both of his up.  We agreed to work

10          together, and I would work my

11          cases up, he would work his cases

12          up, and we would share the general

13          and specific causation experts for

14          trial.  At the beginning of that,

15          Judge Higbee at the last minute

16          changed her mind and said, I only

17          want three prelabel cases.  So,

18          one of mine dropped out, and it

19          was two of Steve's and one of

20          mine.  And then both of Steve's

21          dropped out, because in the

22          depositions they did, the

23          prescription usage and samples was

24          terrible, so, they voluntarily

Page 27

1        dropped those.  That's when I

2        added another one of my cases.

3             MR. SEEGER:  You had two

4        cases?

5             MR. HORNE:  I had two cases.

6             MR. SEEGER:  At that point,

7        they didn't have a case in.

8             MR. HORNE:  They didn't have

9        a case in, but they had already

10       gone a long way down the road of

11       developing the experts.

12            MR. SEEGER:  Yes.  No

13       question.

14            MR. HORNE:  They continued

15       with that.  As far as my two

16       cases, I handled all the

17       depositions for my clients and

18       their spouses and the physicians

19       and the sales reps.  I did all of

20       that.

21            MR. SEEGER:  Okay.

22            MR. BLIZZARD:  Was there any

23       agreement that they would try your

24       two cases that remained?

Page 28

```
 1              MR. HORNE:  We were going to

 2          try it together.  And I told Steve

 3          this, and we had early on -- we've

 4          got an office in Atlanta as well.

 5          So, we had some Georgia cases, and

 6          we had some -- a couple of good

 7          Georgia cases that we were going

 8          to put up.  Someone else had some

 9          Georgia cases, and we couldn't

10          come to an accommodation, because

11          I told Steve, I'm going to be

12          involved in my cases.  I'm not

13          going to delegate it to you and

14          you do everything, because that's

15          just not the way I work or my firm

16          works.  So, I worked up my cases,

17          Steve worked up his cases.  We

18          were sharing the general and

19          specific causation witnesses for

20          trial.  And then we were going to

21          divide up opening, closing, cross

22          examinations, witness examinations

23          and that sort of thing.

24              MR. SEEGER:  Once their
```

Page 29

 1          cases were out, how would the

 2          trial have gone?  Would you have

 3          taken the lead, would they have

 4          worked with you on the trial

 5          still?

 6               MR. HORNE:  Yes.  And when

 7          that happened, because --

 8               MR. SEEGER:  You were still

 9          dividing up.

10               MR. HORNE:  What happened

11          when Steve's cases dropped out, we

12          were down to one case.  They

13          didn't have any other North

14          Carolina cases.  And that's when

15          we had to get Dave involved.  And

16          I told Hope, look, I've got a case

17          that's been filed, fact sheets in,

18          you've got all the medical

19          records, basically everything is

20          there.  I'll get the client up to

21          Philadelphia next week with his

22          wife.  We'll make every

23          accommodation.  And I think the

24          one thing Judge Higbee did was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1        gave 30 extra days to designate

 2        the experts.  But I got that case

 3        in with Dave's help.  But Steve

 4        was so far down the road with the

 5        marketing expert and a fine

 6        cardiologist out of San Francisco

 7        that came back to North Carolina

 8        and saw both of these clients.  He

 9        was so far down the road with

10        that, I said let's --

11             MR. SEEGER:  Keep it

12        together.

13             MR. HORNE:  -- keep it

14        together, and that's what we did.

15             MR. WEITZ:  Forest, clarify

16        some times with me and cases.

17        Because in January of '07, you had

18        Hermans and Humeston, and then you

19        had Keeley and Rossi, which

20        Humeston was Chris's case, Hermans

21        was Lanier's, and Keeley and Rossi

22        were Weitz & Luxenberg cases.  She

23        set those cases down for trial in

24        January '07, and then Hermans and
```

FAC Resp. Exhibit D -- 830

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1           Humeston were tried in February

2           '07.  Keeley and Rossi were then

3           postponed to be tried in September

4           of '07, and then the judge just

5           put it on hold because there were

6           negotiations going on.  Where were

7           your cases with respect to that?

8           Did you have an actual firm trial

9           date?

10               MR. HORNE:  Yes.

11               MR. WEITZ:  From when?

12          Because Keeley and Rossi were the

13          next ones she was trying.  I'm

14          trying to figure out when you and

15          Kherkher had trial dates.  Was it

16          after those two cases?

17               MR. HORNE:  Originally there

18          were four states set forth for

19          trial.  It was North Carolina,

20          Pennsylvania, New Jersey and New

21          York.  Jerry was heading up the

22          New York, and Sol had both New

23          Jersey and Pennsylvania, and I had

24          North Carolina.  Those four cases

FAC Resp. Exhibit D -- 831

Page 32

```
 1        were all set on the same track.

 2        Then Jerry and I talked about the

 3        fact that his -- the general

 4        causation witness out of Canada

 5        called Jerry the night before his

 6        deposition and said, oops --

 7             MR. WEITZ:  He had an

 8        article --

 9             MR. HORNE:  -- he signed an

10        affidavit I think.  He said, I

11        think I signed an affidavit.  But

12        North Carolina was in that

13        setting.  We were in that setting.

14        And then because of that snafu

15        with Jerry's expert, I think Judge

16        Higbee -- and this was all about

17        the time the settlement came down

18        -- was going to move the New York

19        setting out to February because we

20        were down the road as far as when

21        the jury was going to come in, and

22        we were talking about renting out

23        the convention center at the hotel

24        and having the voir dire there.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1              MR. WEITZ:  So, you were

2         part of the final stage in those

3         two cases?

4              MR. SEEGER:  Yes.

5              MR. HORNE:  Yes.  Jeff Grand

6         and Dave Buchanan and I worked --

7         Dave was very gracious --

8              MR. SEEGER:  By the way,

9         Jeff Grand just had a baby.  For

10        the record, let the record reflect

11        we're looking at Jeff's new baby.

12             MR. HORNE: My two cases were

13        Romans, Billy Ray Romans and Andy

14        Ray Sanderson.

15             MR. WEITZ:  The cases Forest

16        had ready for trial were Romans

17        and Sanderson.

18             MR. HORNE:  Yes.  Romans was

19        a prelabel change that was in the

20        mix originally.  Sanderson was the

21        case that was added after a motion

22        hearing with Dave and Judge Higbee

23        and Hope and myself, and Judge

24        Higbee agreed to add Sanderson.

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 833

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          So, Sanderson and Romans were the

2          two North Carolina cases that were

3          set to go to trial originally in

4          that October setting with the New

5          Jersey, Pennsylvania and New York

6          cases that Judge Higbee then moved

7          into January.

8              I went to the status

9          conference in November and left

10         there, flew back to Raleigh, North

11         Carolina, jumped in my car and

12         drove four hours to Asheville and

13         got to the hotel at 4:00 a.m. and

14         deposed a Merck rep on a Friday

15         from 9:00 in the morning until

16         6:00 at night, and then the next

17         week is when the settlement

18         happened.

19              And I didn't -- and Steve, I

20         don't know what Steve knew.  He

21         may have known more than he told

22         me, but after the fact -- I mean,

23         I knew the negotiations were

24         going, and I think that's -- even

Page 35

1         Judge Higbee said in a conference

2         that that's one of the

3         considerations for moving the

4         setting from October of '07 to

5         January '08.  But I had no idea

6         that y'all were that close, and

7         obviously a great result.

8              MR. LEVIN:  Neither did we.

9              MS. WILSON:  My cases are

10        real simple.  I did not work with

11        Kherkher at all.  I worked with

12        two people.  That was Chris Seeger

13        and Mark Lanier.  So, mine is real

14        clear-cut.  That was kind of the

15        get go.  Forest and I collaborated

16        a lot.

17             Something I would like to

18        add is, after the settlement was

19        announced, it was either Chris or

20        Mark, one, who got interviewed by

21        the Wall Street Journal reporter.

22        I think it was you who told that

23        person to call me.  They asked me

24        to describe my role in Vioxx in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          this litigation.

2                  MR. SEEGER:  Must have been

3          me.  Lanier would have never sent

4          a reporter to someone else.

5                  MS. WILSON:  I think we had

6          some five star generals, and I was

7          a front line soldier really every

8          step of the way, and there weren't

9          a lot of us out there.

10                 MR. SEEGER:  You also had a

11         case in Federal Court that you

12         were trying to get remanded to the

13         transfer court in North Carolina

14         that you wanted us to try

15         together.

16                 MS. WILSON:  That's right.

17         That's the Howard case, and I

18         think it is still probably right

19         now one of the best cases out

20         there.  I have no doubt it has

21         already been approved actually.

22         I'm just waiting on our points, I

23         guess I should say.  Great case,

24         and that was the plan.  We were

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

Page 37

1          going to tee that up.  So, I did

2          have one in the MDL.

3               It was a tough litigation,

4          as you guys know.  I thought it

5          was far harder than Baycol,

6          fen-phen, Rezulin.  I don't think

7          anything compares to Vioxx.  I

8          really don't.  It was very tough.

9               Anyway, after the settlement

10         was announced, I certainly did my

11         part to help bring everyone

12         together in newspapers, on TV,

13         talked about what a tremendous job

14         everyone did, how tough this

15         litigation was.  Hard, hard cases,

16         difficult causation, and I was a

17         big supporter of this resolution.

18              MR. HORNE:  One thing I

19         would like to say about the

20         submission.  I sent every member

21         of the committee a copy of our

22         submission with detailed expenses

23         and time sheets.  I will say we

24         had about 1000 attorney hours that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          we submitted for the committee's

2          consideration, and that is an

3          extremely conservative amount

4          because we don't keep hourly

5          bills.  I think Kim's firm, they

6          do keep track of their time.  We

7          don't.  I went back through, and

8          the only thing that I submitted

9          for this committee's consideration

10         are matters that were related to

11         the 12 cases and the trial and

12         those expenses.  There's nothing

13         in here for stuff that I didn't

14         truly think was for the common

15         benefit.

16              Going into this, Kim's firm

17         and my firm, we were really kind

18         of the only two firms in the

19         state.  So, in a way, we were

20         certainly competitors, but we also

21         collaborated from the very

22         beginning, and it was both of our

23         intentions to try these cases.  I

24         went to the first trial in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1          Brazoria.  I went for the full
 2          week, that first week there.  I
 3          saw Mark Robinson was there and
 4          had dinner.
 5               MR. LEVIN:  With Mark?
 6               MR. HORNE:  With Ben Morelli
 7          and some other folks during that
 8          trial.  I stayed there for the
 9          whole week and saw the openings.
10          Chris, I watched you on Court TV.
11          I spent about a week watching
12          that.  I came back for the
13          Hermans/Humeston openings.
14               MR. SEEGER:  I remember
15          that.
16               MR. HORNE:  Because Hope
17          came over to ask you to get Kim
18          and me --
19               MR. SEEGER:  They were
20          sitting on the defense side, and
21          Hope said, these guys are
22          plaintiffs lawyers, would you tell
23          them to go on to the other side.
24          There's no line in the middle.
```

Page 40

1              They can sit wherever they want.

2                    MR. WEITZ:  Judge Fallon's

3         PTO Order 6, he laid out

4         guidelines.  You are worried about

5         the hours.  The hours are a factor

6         to consider, but the judge laid

7         out in his Murphy Oil decision

8         that there are a lot of other

9         factors, people that were actually

10        litigating the cases and moving

11        the dockets in jurisdictions and

12        were preparing to try the cases.

13        Those are factors.

14                    MR. SEEGER:  This is helpful

15        to us.

16                    MR. HORNE:  Kim and I, we

17        traveled to New Jersey for like

18        two of the trials, I believe.  But

19        I saw openings or closings in -- I

20        was there for Jim Pettit's

21        closing, I was there for your

22        opening in Hermans/Humeston.  I

23        was there for Mark's opening in

24        the first case in Texas.  I was

Page 41

1           there for one of the other ones.

2           And so it was --

3               MR. SEEGER:  I didn't get a

4           chance to talk to you much.  I

5           know that you worked a lot with

6           Dave and Jeff.

7               I spoke to you all the time.

8           Kim was always looking to get

9           something set for trial.  That's

10          the fairest way to reflect it.

11          How many times did we talk to each

12          other on the phone?  I've got this

13          case, this is a great case for

14          trial, I've got two cases coming

15          to New Jersey.  You are our kind

16          of people.  That's the way to move

17          a case.

18              MR. LEVIN:  Pleasure to have

19          met.  Up until now, I only knew

20          your hours.

21              MR. SEEGER:  Do you have the

22          hours?

23              MR. LEVIN:  He sent them to

24          everybody.  All of a sudden I got

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          binders.  Now I know.

2                    MS. WILSON:  I did the same

3          thing.

4                    MR. SEEGER:  Have they been

5          reviewed?

6                    MR. LEVIN:  Yes.  Your hours

7          have been reviewed.  They have

8          been approved.

9                    MR. SEEGER:  Which means you

10         have met all the guidelines.

11                   MR. LEVIN:  In fact, your

12         costs to the seven cents were

13         approved.

14                   MR. SEEGER:  What are they?

15                   MR. LEVIN:  159,045.07.

16                   MR. SEEGER:  Both firms?

17                   MR. LEVIN:  No.

18                   MR. WEITZ:  No.  Forest is

19         131 and change.

20                   MR. SEEGER:  That was a very

21         helpful presentation.  Thank you.

22                   MR. LEVIN:  It is a pleasure

23         to see professionals that are

24         truly professionals.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1                MR. HORNE:  I want to thank

2         y'all for the work that went on

3         behind the scenes that we never

4         knew about.

5                MR. SEEGER:  Thank you.

6                MR. GIRARDI:  Thank you.

7                MR. BLIZZARD:  Thank you.

8                     -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1                C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 844

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:  LIEFF CABRASER HEIMANN &
       BERNSTEIN, LLP
       Elizabeth J. Cabraser, Esquire
       Donald C. Arbitblit, Esquire


BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 845

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                     -  -  -
 2              MS. CABRASER:  Good morning.
 3              MR. SEEGER:  Good morning.
 4              MS. CABRASER:  I think an
 5         appropriate way to start out our
 6         presentation, first thing is
 7         first, is to say thank you to
 8         everyone in this room for leading
 9         this case and for the
10         contributions to the common
11         benefit made by the leadership in
12         this case.
13              MR. SEEGER:  Thank you.
14              MS. CABRASER:  Every one of
15         us is probably the center of our
16         own universe, and our own clients
17         are closest to our hearts, but we
18         always like to feel that it is our
19         efforts that lead to their
20         success.  The definition of a mass
21         tort is that no one is alone, no
22         lawyer is alone, no client is
23         alone, and every client's success
24         comes from a collective effort,
```

FAC Resp. Exhibit D -- 846

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          not just efforts of the people who

2          are the obvious leaders, but of

3          the many firms whose efforts we

4          might not even be aware of.  I

5          want to thank those people today,

6          as well, and also to give an extra

7          thanks to this type of work that

8          this committee is doing, because

9          it is arduous, it is detailed, it

10          comes at a time of year when I

11          know everyone would rather be

12          doing other things, and it's

13          necessary.

14              I wanted to spend a little

15          bit of time talking about the work

16          that I personally did in the Vioxx

17          litigation, but it really is more

18          general and generic on the law

19          side of the case, purchase claims

20          committee work, working on

21          briefing, oral argument for the

22          purchase claims committee, motion

23          to dismiss, our writing victories

24          and then defeats in the New Jersey

FAC Resp. Exhibit D -- 847

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          state court, the system on medical

2          monitoring and providing a support

3          role, one of many, on the state

4          side of purchase claims.

5              This mass tort, both on the

6          MDL side and in New Jersey was

7          really, to probably a unique

8          degree, most about the trials, the

9          trial preparation, the bellwether

10         trials, and the medical and

11         scientific issues that arose in

12         the course of preparing for and

13         conducting those trials.

14             The person in my firm that

15         spent the largest amount of

16         personal hours on the Vioxx

17         litigation, over 5,000 hours,

18         essentially full-time work for two

19         or three years, is my partner, Don

20         Arbitblit, and he focused on those

21         all important medical and

22         scientific issues.  So, I thought

23         or we thought it was most

24         appropriate to have Don take the

FAC Resp. Exhibit D -- 848

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1         laboring oar in this presentation

2         to go through those efforts that

3         work, how it related to and how it

4         contributed to the sequence and

5         system of Daubert hearings,

6         depositions and bellwether trials

7         that, in turn, culminated in the

8         settlement of this case.

9              Don.

10              MR. ARBITBLIT:  Thank you,

11         Elizabeth, and thanks to everyone

12         in the room for all the work that

13         you have done to make this

14         possible.

15              I prepared a PowerPoint, but

16         we don't have computers.  I have

17         hard copies that, if you would

18         like to follow along on the

19         presentation, I have a couple of

20         extras.  How about if we pass one

21         to Chris and Perry and Ed, and,

22         I'm sorry, I'll just --

23              MS. CABRASER:  And it was a

24         true stroke of genius not to have

FAC Resp. Exhibit D -- 849

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          PowerPoint in this room.

2               MR. ARBITBLIT:  In any case,

3          the affidavit addressed the

4          criteria set forth in the order,

5          and I think we've ranked pretty

6          high on most all of those, so, I

7          won't go over those in all their

8          detail, but I do want to emphasize

9          certain aspects of the criteria,

10         in particular, the trial work,

11         depositions and discovery, some

12         significant motions and

13         recognition by co-counsel and even

14         one of the expert witnesses about

15         the quality and importance of the

16         work that we did during the Vioxx

17         case, which was full-time work for

18         me and done with a passion to get

19         the best result we could for

20         everyone.

21              Close to 19,000 hours, over

22         half of them by partners, and when

23         the partners weren't doing the

24         work, we were closely supervising

FAC Resp. Exhibit D -- 850

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          it to make sure that it was --

2                MR. LEVIN:  You said 19,000?

3                MR. ARBITBLIT:  19,000,

4          18,789 hours.

5                MR. LEVIN:  That's how many

6          hours you have?

7                MR. ARBITBLIT:  Yes.

8                MR. HERMAN:  Don, I'm

9          familiar with the work you did,

10         certainly, particularly in the

11         science area, but who were the

12         other partners that actually

13         worked in the science area?

14               MR. ARBITBLIT:  Well, I

15         would say that my most important

16         assistant on the science is Jenny

17         Gross, who is up for partnership

18         this year, we'll see how that

19         goes, but she has a lot of

20         experience in science.  She is a

21         scientist, and she has skills that

22         I find unique in the plaintiff's

23         bar.

24               MR. SEEGER:  When you say "a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1       scientist," she has formal
 2       training?
 3            MR. ARBITBLIT:  She is two
 4       courses away from being a Ph.D.,
 5       and her work on the statistics and
 6       the data analysis was very unique
 7       in my experience.  I've been a
 8       lawyer for 29 years.
 9            MR. HERMAN:  Excuse me.  Her
10       Ph.D. would be in statistics?
11            MR. ARBITBLIT:  Yes.  And
12       I've never seen anyone like her in
13       all the years I've been
14       practicing, which is 29.
15            So, she's not a partner, but
16       she was my most important asset in
17       terms of digging out the data,
18       analyzing it and figuring out
19       where we could nail Merck on what
20       they were saying, as opposed to
21       what the data said and how we
22       could feed our experts the right
23       information and get the right
24       analysis.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1              MR. LEVIN:  Help me out with

 2         the hours.  I'm absorbed in hours.

 3         You have 18,000 hours, and, you

 4         know, that may very well be.  The

 5         accountant has you at 710 hours,

 6         which is mind boggling.

 7              MR. ARBITBLIT:  That's not

 8         true, Arnold.

 9              MR. LEVIN:  I know it is not

10         true.  Have you been contacted by

11         the accountant?  Do you know what

12         the problem was and how it's being

13         resolved, because --

14              MR. SEEGER:  We have to

15         clean it up.

16              MR. LEVIN:  -- you also have

17         about $785,000 in costs, which I

18         would imagine can't be all

19         airplanes, so, it must be expert

20         fees and everything that you paid

21         for.  I would imagine those

22         experts were -- tell us who they

23         were and that they were approved

24         by the committee, because it's a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        substantial amount of money you

2        have invested in the case.

3               MR. ARBITBLIT:  Sure,

4        Arnold.

5               First of all, I have been in

6        contact with Marcy Roussel from

7        Wegmann-Dazet, and over the course

8        of the last month, I have, as far

9        as I know, cleared up every

10       question she had and submitted all

11       of our hours, which totalled to

12       the amount set forth in the

13       affidavit.  As far as I know,

14       there are no questions, and I was

15       in touch with her just before

16       Thanksgiving to verify that.  And

17       I hope that you will do the same

18       and let us know if there's any

19       questions.

20               MR. SEEGER:  This is really

21       just admin at this point.  We're

22       working off the hours in the

23       affidavit.

24               MR. ARBITBLIT:  Thank you,

Page 11

1        Chris.

2            On the experts, one of the

3        criteria was did you get involved

4        before there was an MDL.  The

5        answer is yes.  We did a

6        substantial amount of work before

7        the MDL.  I think in the

8        affidavit, it is listed as the

9        particular number of hours, but it

10       is in the thousands of hours, and

11       we also retained experts prior to

12       the MDL, one of whom was Dr.

13       Farquhar, who was the expert cited

14       by Judge Bechtle in the fen-phen

15       litigation upon whom he relied for

16       the medical monitoring decision.

17       Farquhar did quite a lot of work

18       before he was ever approved by the

19       MDL.  If fact, his 95-page report

20       was specifically cited by Judge

21       Fallon when I briefed and argued

22       the Daubert motion in November of

23       2005 as being a thorough and

24       explanatory 95-page report upon

Page 12

1          which he relied in finding that

2          the plaintiffs used proper

3          methodology and had a reliable

4          qualified expert when we surpassed

5          the initial and comprehensive

6          Daubert hurdle on short-term

7          duration on the naproxen defense

8          on the epidemiology evidence.  So,

9          a lot of that work was being done

10         before there was an MDL and before

11         there was an authorization

12         process.

13              Once the MDL was in place,

14         Dr. Farquhar was submitted to the

15         PSC and approved, as well as

16         Nicholas Jewell and Phillip

17         Lavori, who were assistants of his

18         at UC Berkeley School of Public

19         Health, and Stanford, who did the

20         statistical analyses upon which

21         Farquhar relied.  So, those were

22         the principal expert costs that

23         are in that mix.

24              So, I wanted to talk a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          little bit about early work that

2          we did, in particular,

3          communications that I had with

4          Carlene Lewis, who was a pioneer

5          and a beloved member of this

6          committee before her untimely

7          death.  Carlene was the initial

8          chair of the science committee and

9          also trial counsel on the Ernst

10         case.  At that point, I was

11         already the chair of the

12         epidemiology and causation

13         subcommittee, and I took it upon

14         myself to provide whatever

15         information I could to that trial

16         team as the trial was ongoing.

17         That included documents that were

18         being taken from the discovery

19         that was ongoing about the APPROVe

20         trial.  It included a document

21         that I used at a deposition during

22         the Ernst trial to show that Merck

23         had the authority to change the

24         label on its own without waiting

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          for the FDA, which was a subject

2          of great interest to them in the

3          trial.

4                This is at slide 9, there's

5          a summary of some of this, and

6          this was Dr. Bold, who was the

7          Merck witness who admitted that

8          they changed the label without

9          waiting for the FDA.  At the same

10         time, they were saying they

11         couldn't do that.

12               There's an e-mail, one of

13         many e-mails at slide 10 where

14         Carlene was asking initially for

15         my guidance on how to get through

16         the new drug application

17         submission.  I answered that

18         question, and then you can see at

19         the top what she said, which I

20         wouldn't say these things about

21         myself, but in this setting, it is

22         my job to tell you what others

23         have said.  She says, "Thanks so

24         much, Don.  You've been invaluable

FAC Resp. Exhibit D -- 858

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          this trial.  I owe you big time."

2          Coming from Carlene, that's a very

3          significant and meaningful message

4          for me to have obtained.

5                And the slide after that is

6          an e-mail from Chris Seeger, thank

7          you, Chris.

8                MR. SEEGER:  I remember

9          this.

10               MR. ARBITBLIT:  "Don, this

11         is a great find.  I'm using this

12         information about Merck's having

13         changed the label on a significant

14         adverse effect when they said that

15         that was not possible."

16               The next thing I wanted to

17         talk about briefly, I'm sure most

18         of you or probably all of you know

19         something about this New England

20         Journal of Medicine deposition and

21         Dr. Curfman.  This was something

22         that was my idea to take.  I

23         planned it, I implemented it, I

24         took the deposition.  I did it in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          a way that shows -- the only way

2          that I could show confidential

3          documents to someone at the New

4          England Journal to show that they

5          had been snookered was by having a

6          deposition because, otherwise, I

7          would have been violating

8          confidentiality orders.  So, I

9          went to the deposition with a set

10         of materials to show him chapter

11         and verse, day by day, what Merck

12         knew, when they knew it and how

13         they couldn't possibly have in

14         good faith and in good conscience

15         withheld it from the Journal, yet

16         they did.  The editor, Dr.

17         Curfman, was outraged by it, and

18         he published an Expression of

19         Concern, which is equivalent to a

20         correction, and then that was

21         confirmed.

22              The Expression of Concern or

23         EoC said that Merck withheld

24         critical data about cardiovascular

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           toxicity, you can see a summary of

2           this at slide 12, and then said

3           that the article was misleading

4           and did not accurately reflect the

5           potential for serious

6           cardiovascular toxicity with

7           rofecoxib.  That's pretty good

8           stuff from someone who is not

9           aligned with plaintiffs and had

10          never said anything that had

11          previously favored plaintiffs in

12          litigation.

13               What you can see at slide 13

14          is an actual document from Merck's

15          memo of July 2000 that was

16          reprinted by the New England

17          Journal.  What you see there is

18          exactly what the Journal was

19          concerned about that had been

20          withheld, that top line where

21          Vioxx had 47 versus 20 for

22          naproxen in the serious

23          thromboembolic events, which led

24          the Journal to conclude that for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           every serious gastrointestinal

2           event that was prevented by Vioxx,

3           there was an offset of at least

4           one serious heart attack, stroke

5           or serious event.

6                   MR. HERMAN:  Let me

7           interrupt you --

8                   MR. ARBITBLIT:  Yes, please.

9                   MR. HERMAN:  -- because

10          there's some points I think I

11          would like you to make, and I've

12          been through the PowerPoint, and

13          my questions, some come from

14          memory and many from the

15          PowerPoint.

16                  Tell me what your

17          involvement was in Humeston.

18                  MR. ARBITBLIT:  Right.  I

19          was just about to get there,

20          actually, Russ, in two ways.

21                  First of all, as I had with

22          Ernst, and even probably more so,

23          because I had started my

24          involvement in this litigation in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1           the fall of 2004, specifically

2           with Chris and Dave, and got my

3           initial assignments from Dave,

4           because he wanted lawyers with a

5           science aptitude.  So, I was

6           constantly in touch with Dave.

7           There are hundreds of e-mails back

8           and forth about every issue that

9           came to mind.  He asked me to help

10          prepare their expert, Dr. Kronmal.

11          I participated with him in

12          preparing his report, prepping him

13          for his trial testimony.  There

14          are many e-mails back and forth

15          about interpretation of APPROVe.

16               And then in Humeston, as it

17          was going on, he asked for my help

18          in preparing for cross-examination

19          of Dr. Reicin, and also I was

20          preparing him for Dr. Graziano,

21          their epidemiologist.

22               MR. HERMAN:  You were in New

23          York for that?

24               MR. ARBITBLIT:  No, I was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          not in New York for that, I was in
2          California, but I was responding
3          by e-mail on an urgent basis.
4          Whenever Dave wrote, I was right
5          there writing back, or Chris.
6              MR. HERMAN:  What about the
7          Ernst trial?
8              MR. ARBITBLIT:  Can I just
9          finish on Humeston?
10             Humeston I was a loss, but
11         Judge Higbee specifically relied
12         on the New England Journal as the
13         basis for the motion for a new
14         trial that allowed Chris, Dave and
15         the team to secure this $47
16         million verdict in Humeston.
17             MR. HERMAN:  In Humeston II?
18             MR. ARBITBLIT:  In Humeston
19         II.  So, without the New England
20         Journal article, there might not
21         have been a new trial.  So, I take
22         no credit for the great job they
23         did at trial, but I feel very
24         happy and proud to enable them

Page 21

```
 1          with that work.
 2                  MR. HERMAN:  What about the
 3          Ernst trial?
 4                  MR. ARBITBLIT:  The Ernst
 5          trial, as I mentioned, I was in
 6          touch with -- I was not in Texas,
 7          I was working with Carlene Lewis
 8          on a steady basis, providing her
 9          interpretations of documents and
10          studies, providing her with
11          documents that would show you
12          could have a Vioxx injury with
13          short duration, and as mentioned,
14          that Merck was able to change the
15          label regardless of whether the
16          FDA said that they could in
17          advance, which was a contested
18          issue.
19              The Barnett trial, which was
20          here in New Orleans, I was a
21          full-time member of that trial
22          team.  I was specifically invited
23          on to that team by Mark Robinson,
24          because he knew I was working both
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1         historically on other science

2         cases --

3              MR. HERMAN:  I note that in

4         your presentation, Mark had

5         requested various materials from

6         you even before that trial began.

7              MR. ARBITBLIT:  Yes.  Well,

8         I knew Mark all the way back to

9         fen-phen, and he knew that I dig

10        deep into the science issues, and

11        that's what he needed.  That's not

12        his strong suit.  He has many

13        strong suits, but he knows that he

14        needs help on that.  He gave me

15        the job of working with Dr. Zipes,

16        his key expert --

17             MR. HERMAN:  Did you go to

18        the Philadelphia meeting he

19        arranged?

20             MR. ARBITBLIT:  I went to

21        the Philadelphia meeting he

22        arranged.

23             MR. HERMAN:  Tell us about

24        that.

FAC Resp. Exhibit D -- 866

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1           MR. ARBITBLIT:  Well, my

2      understanding of it was that there

3      was an attempt to find a way to

4      reach common ground without

5      sharing work product, and so we

6      did not.  We talked about ideas,

7      but no MDL expert information was

8      provided to anyone outside the MDL

9      at that time or any other time

10     that I know of.

11          I had engaged in

12     discussions -- for example, I had

13     discussions with Jerry Kristal,

14     and I think there's some e-mails

15     in there where Jerry and I are

16     saying how much we like each

17     other's work.  One of them toward

18     the end says -- if you will look

19     at slides 25A and B, I did some

20     analysis of the VICTOR manuscript,

21     which went to Chris and --

22          MR. HERMAN:  I want to get

23     back -- I'm sorry.  I want to get

24     back to Philadelphia, this idea

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          that there was a meeting.  I still

2          don't understand that meeting.  I

3          have to tell you that.  Because,

4          frankly, at least in the MDL

5          executive committee and various

6          chairs, we had no idea the meeting

7          was going on.

8               MR. LEVIN:  How was it

9          called, and what was Dan

10         Sigelman's role?

11              MR. ARBITBLIT:  I don't know

12         how it was called.  I only know

13         that Mark asked me to come and so

14         I did.  I did learn at the time of

15         the meeting on the day of the

16         meeting that there was concern at

17         the MDL that something improper

18         might occur, and certainly from my

19         standpoint, and from what I

20         observed of Mark's standpoint,

21         nothing improper occurred.  We

22         listened, primarily we listened to

23         what their expert, Dr. Madigan,

24         had to say.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1           MR. HERMAN:  Whose expert

2      was Madigan?

3           MR. ARBITBLIT:  He was

4      the -- there was a New Jersey

5      team.  I don't know exactly --

6           MR. LEVIN:  Eric Weinberg?

7           MR. SEEGER:  Yes, it was

8      Weinberg.

9           MR. ARBITBLIT:  Weinberg was

10     one of the people working with

11     Madigan.  I don't know the extent

12     of who worked with Madigan, nor

13     who retained him.

14           MR. HERMAN:  Tell us about,

15     you were full time on the Barnett

16     trial team.  How long were you in

17     New Orleans?

18           MR. ARBITBLIT:  I was in New

19     Orleans for the entire trial,

20     which was approximately three

21     weeks and a couple of days ahead

22     of time.  And I had some pretty

23     significant tasks that are

24     described at slides 16 through 25.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1       I got involved full time in April

2       2006 when Mark asked me to do

3       that.

4           My initial job, based on

5       what I knew about the data, I

6       wanted to see how can we prove

7       this case.  The main thing to me

8       was what's the guy's blood

9       pressure history, because I knew

10      we had some good stuff on blood

11      pressure, a special high risk

12      category.  So, I went through the

13      guy's records, I found these

14      spikes where he had gone over 160

15      in his systolic blood pressure,

16      and I knew that put him in a high

17      risk category.  We developed

18      demonstratives to show exactly

19      what these were so that a jury

20      could understand.  I put a couple

21      of these in the PowerPoint at

22      slides 18 through 21.  These are

23      exhibits that we worked up for the

24      trial so that when Dr. Zipes got

FAC Resp. Exhibit D -- 870

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          on the stand, for example, at

2          slide 18, he could show the jury

3          when Merck said all these

4          painkillers are alike, that

5          actually Vioxx was twice as bad as

6          Celebrex.  So, we could use that

7          as the backup for the evidence

8          that Zipes talked about in slide

9          20, where if you are in that blood

10         pressure spike group that Vioxx

11         causes more of, you've got a three

12         out of four chance that Vioxx

13         causes a heart attack.  Dr. Zipes

14         testified to that.  I think it was

15         strong evidence for the jury.

16         That was information --

17              MR. HERMAN:  You helped

18         prepare Zipes, didn't you?

19              MR. ARBITBLIT:  I prepared

20         Zipes for several days, actually.

21              MR. SEEGER:  We had him for

22         a week.

23              MR. ARBITBLIT:  Well, he

24         needed it.  He's a very smart guy.

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1          He's at the top of his field, but
 2          he's also very demanding, and he
 3          was very nervous.  There's an
 4          e-mail that he sent that I wanted
 5          folks to see, because I thought --
 6                MR. SEEGER:  22.
 7                MR. ARBITBLIT:  Thank you.
 8          That's --
 9                MR. HERMAN:  August 11, '04,
10          '06 rather?
11                MR. ARBITBLIT:  Yes.  The
12          one where he says, "I have told my
13          wife all about you.  To me, you
14          epitomize what great lawyers are
15          like, and I can't express how much
16          I respect and admire you.  You
17          helped me tremendously and were so
18          patient and kind."
19                So, I mean, for someone --
20                MR. LEVIN:  What's this
21          "kind" stuff?
22                MS. CABRASER:  This is Don's
23          role in the firm.  I'm not kind.
24          Don is kind.
```

FAC Resp. Exhibit D -- 872

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1              MR. ARBITBLIT:  I protected

2          him from Mark.

3              MR. SEEGER:  Exactly.  We

4          all get that one.

5              MR. HERMAN:  Tell us your

6          involvement in Kozic.

7              MR. ARBITBLIT:  I was not

8          deeply involved, but at the time,

9          this was after some of the losses

10         and one of the criteria is did you

11         keep on working.  Yes, I was

12         working hard at new documents that

13         had been deprivileged for Dr.

14         Reicin.  I was involved -- I was

15         asked to participate in preparing

16         for her de bene esse deposition.

17              So, in the process of that,

18         I was preparing cross-examination

19         of Dr. Reicin about discrepancies

20         between the data on Vioxx risk

21         versus the --

22              MR. HERMAN:  Who did you

23         work closely with in terms of

24         trial team on that?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

 1            MR. ARBITBLIT:  On Kozic?

 2            MR. HERMAN:  Yes.

 3            MR. ARBITBLIT:  I spoke with

 4       Troy specifically and only Troy.

 5       I think I had sent out an e-mail

 6       to several people explaining some

 7       of the discrepancies between what

 8       Merck knew and what published

 9       articles said.  Troy responded to

10       that and said --

11            MR. HERMAN:  That was a

12       Florida case that Troy and Pete

13       were involved in?

14            MR. ARBITBLIT:  Yes.

15            MR. HERMAN:  Did you go to

16       Florida in that case?

17            MR. ARBITBLIT:  No.  It

18       involved --

19            MR. HERMAN:  I don't want

20       you to take from what I'm asking

21       that you had to be in Florida or

22       any other place.

23            MR. ARBITBLIT:  I appreciate

24       that.  But what I did was I

FAC Resp. Exhibit D -- 874

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          responded on an urgent basis,

2          since Troy was a week away from

3          trial, in giving him information

4          that would be potentially of use.

5               MR. HERMAN:  And you also

6          were involved in Berwick in some

7          way?

8               MR. ARBITBLIT:  Berwick was

9          Robinson's case in California.  He

10         asked me to take a deposition.

11              MR. HERMAN:  Is that the

12         case he withdrew?

13              MR. ARBITBLIT:  He did

14         withdraw it, yes.

15              MR. HERMAN:  Do you know

16         why?

17              MR. ARBITBLIT:  I don't know

18         specifically.  There were problems

19         with the plaintiff, but I don't

20         know what the specific problems

21         were.  That was after I had been

22         asked to and did take a deposition

23         of Dr. Pratt, who was one of

24         Merck's MDL experts that they were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          using in state cases as well, and

2          that deposition is part of the

3          trial package for MDL lawyers, and

4          I think I got some good things out

5          of it.

6                    MR. HERMAN:  What about

7          Irvin I and II?

8                    MR. ARBITBLIT:  I was

9          involved with Andy and with Paul

10         Sizemore quite a bit in Irvin I

11         and II over the course of the fall

12         of 2005, more so in Irvin I than

13         in Irvin II.  Dr. Farquhar -- Paul

14         Sizemore came out to meet with me

15         and with Dr. Farquhar.  He was

16         named as a witness, but they chose

17         not to call him, because there was

18         an inconsistency between his

19         approach and the approach of Dr.

20         Baldwin, whom they did call, as

21         far as what to do with high risk.

22                    Dr. Farquhar was very

23         insistent that high risk added to

24         the likelihood of a Vioxx event,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          whereas Dr. Baldwin took a

2          different approach.  There was an

3          inconsistency that would not have

4          been helpful at trial from the

5          people trying the case for the

6          plaintiff.  So, he was not called.

7          But I prepared him.  I met with

8          Paul Sizemore and with Dr.

9          Farquhar.  I provided earlier the

10         320 --

11              MR. HERMAN:  Let me

12         interrupt you, and I'm sorry to do

13         this, but you've got an awful lot

14         to say in a short period of time.

15              Was Paul Sizemore with

16         Andy's firm or Tom Girardi's at

17         the time?

18              MR. ARBITBLIT:  He was with

19         Andy's firm at the time.

20              MR. HERMAN:  That was a

21         California --

22              MR. ARBITBLIT:  Irving was

23         an MDL case.

24              MR. HERMAN:  No, no, I'm

FAC Resp. Exhibit D -- 877

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1           sorry.

2                   Irving was an MDL case in

3           New Orleans?

4                   MR. ARBITBLIT:  Correct.

5                   MR. SEEGER:  Actually, I

6           have a question, Russ, when you

7           are done.  Are you done?

8                   MR. HERMAN:  And you said

9           you did more in I than in II?

10                  MR. ARBITBLIT:  That's

11          right.  Because Farquhar was not

12          going to be called in II, and he

13          was the principal person I was

14          working with.

15                  MR. HERMAN:  Go ahead.

16                  MR. SEEGER:  Elizabeth is

17          right, because there have been so

18          many people collaborating on so

19          many projects, and we're really

20          trying to sort some things out.

21          So, you don't have a lot of time

22          remaining, but it would be very

23          helpful to me -- and, look, I

24          know, you are a lawyer's lawyer.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1          You are a good lawyer.  Everybody

 2      knows that.

 3          I would like to know what

 4      projects you would consider were

 5      the ones you owned.  Like I worked

 6      a little bit on the Daubert, I did

 7      this on that, but I kind of own

 8      these two or three projects, and

 9      this is what I did and provided

10      leadership on.

11          MR. ARBITBLIT:  Okay.  I

12      think that I marshalled the

13      evidence, to the extent there was

14      evidence, I marshalled all of it

15      for the short-term use issue on

16      Daubert and got us over that

17      hurdle.

18          I think I owned the New

19      England Journal Expression of

20      Concern that became a part of the

21      trials.

22          I owned the Watson issue and

23      the module that came of it that

24      showed there was a premarketing
```

FAC Resp. Exhibit D -- 879

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          signal of Vioxx toxicity that the

2          company never revealed to the FDA

3          and which became part of experts'

4          testimony after I circulated a

5          memo in June of 2005, including

6          Dr. Kronmal, Dr. Farquhar, Dr.

7          Moye, Dr. Gregory.

8               I own the osteoarthritis

9          initial analysis that was there a

10          three times greater risk for Vioxx

11          than placebo, which Merck had

12          denied, and that became a part of

13          some witness trial testimony or

14          expert testimony.

15               I owned the blood pressure

16          spike and the hypertension issue.

17          Shelly Sanford specifically

18          assigned me to write the

19          hypertension memo in October 2007

20          and to complete it after the

21          settlement because of the work I

22          had done previously.

23               MR. SEEGER:  That was for

24          the trial package, the memo?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1              MR. ARBITBLIT:  It was for
 2         the trial package, as well as the
 3         stroke issue that I worked up for
 4         the trial package to show that,
 5         yes, there was a significant
 6         excess of strokes, as well as
 7         heart attacks, even independently
 8         of each other.  So, that
 9         hypertension issue between showing
10         Vioxx was worse for hypertension
11         and that people that had those
12         spikes were more susceptible to
13         heart attacks I think was integral
14         to the success of the Barnett
15         case.
16              So, being able to turn
17         around Humeston, being able to
18         participate in getting the Barnett
19         case as the only MDL victory, I
20         would say that those are
21         significant contributions, and
22         they were ongoing at the time.
23         It's always a mixed feeling.  My
24         office desk was full of documents
```

FAC Resp. Exhibit D -- 881

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1         on November 9th when the call came

2         in for settlement, and I just

3         said, well, I guess I'll go home

4         for the day.

5             MS. CABRASER:  He was very

6         disappointed -- I mean, he was

7         distraught.

8             MR. WEITZ:  Don, how many

9         cases did you submit to the

10        settlement?

11            MR. ARBITBLIT:  160.  And

12        we've had 100 percent of them

13        approved so far, which is about 60

14        of them.

15            MR. RAFFERTY:  Don, did

16        Farquhar end up testifying in any

17        of the trials?

18            MR. ARBITBLIT:  No, he was

19        not called as a witness.

20            MR. WEITZ:  Where were your

21        cases filed, in the MDL or in

22        California?

23            MR. ARBITBLIT:  Very few in

24        California.  There were some in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1        New Jersey.  The majority in the
 2        MDL.
 3            MR. WEITZ:  Had you guys
 4        worked up any cases that were on
 5        the trial docket?
 6            MR. ARBITBLIT:  We had one
 7        at least.  There was another
 8        gentleman named Ralph Barnett, a
 9        different Barnett, who was on the
10        New Jersey docket.  We had
11        submitted several for additional
12        discovery in the fall of 2007
13        pursuant to Judge Higbee's request
14        for additional cases.
15            MR. WEITZ:  But the 39
16        cases, the cluster --
17            MR. SEEGER:  Excuse me for
18        interrupting, but I'm only making
19        this correction, and I hope you
20        don't find this as any statement
21        on the quality of the work you
22        did, it's just that because we
23        create this transcript and you go
24        around and you meet with people
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          and everybody says, you know, I

2          did this and that.

3              I just want to make it clear

4          that on the Humeston new motion

5          trial, we had many grounds that we

6          were seeking under.  Now, you

7          found this piece, what turned into

8          the EoC, which I just think gave

9          the judge sort of a roadway to

10         overturn that verdict, which was

11         faulty on so many levels.  But

12         there was a whole team effort on

13         that.  Dave Buchanan did the

14         briefing, and I was involved and

15         many people.  But you gave us a

16         very important piece of evidence

17         there.

18             MR. ARBITBLIT:  Well, I

19         agree, Chris, and I totally agree,

20         you guys did a very thorough job.

21         I've read all the papers, and when

22         I read the judge's decision and

23         the quote, she said that --

24             MR. SEEGER:  You gave her

FAC Resp. Exhibit D -- 884

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1           the roadway.  I'm saying that.

2                   MR. ARBITBLIT:  And I know.

3           You guys worked day and night on

4           many, many different grounds.  If

5           that hadn't been there, it is

6           possible she would have found

7           another reason to do it.

8                   MR. SEEGER:  Well, we don't

9           know.

10                  MR. ARBITBLIT:  We don't

11          know.  She cited this one.  I'm

12          proud of it.

13                  MR. WEITZ:  Don, let me just

14          get back to what I was asking.

15                  Were there any cases that

16          you guys had in either the MDL or

17          in New Jersey where you actually

18          had a trial date and were going to

19          trial?

20                  MR. ARBITBLIT:  No.

21                  MR. HERMAN:  On the science

22          -- I'm sorry, Perry, are you done?

23                  MR. WEITZ:  No, I'm done.

24                  MR. HERMAN:  On the science

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          committee that you were active in,

2          other than yourself, what can you

3          tell us about the members of the

4          committee?  You don't have to

5          highlight anybody if you don't

6          want to.  If there was somebody

7          that you thought was behind the

8          work, we'd like to know who that

9          is.

10              MR. ARBITBLIT:  Well, we had

11          weekly calls for a while.  I

12          stopped doing the weekly calls

13          when those calls just turned into

14          me lecturing, because I was

15          reading all the documents anyway,

16          and I wasn't getting any new

17          information from having those

18          calls.  I do recall that Tara

19          Sutton, who I see is up next, did

20          a good job on the project that I

21          asked her to do on analyzing some

22          of the epidemiology cases under

23          Daubert, and I used some of her

24          work when I wrote the brief.

FAC Resp. Exhibit D -- 886

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

 1              I don't get involved in what

 2         some of the controversies are, I

 3         try not to.  I understand that Dan

 4         Sigelman later was working with

 5         New Jersey people and that may be

 6         a source of consternation to some,

 7         but at the time that I knew him, I

 8         knew that he was involved in the

 9         MDL and he was on my committee and

10         he did work.  He was one of the

11         few who did work and had

12         experience to contribute and

13         he analyzed some of the --

14              MR. HERMAN:  Was Bert Black

15         on your committee?

16              MR. ARBITBLIT:  Bert Black

17         was on the committee.

18              MR. BLIZZARD:  I don't have

19         any questions, Don, but I do want

20         to say that this is not really

21         Vioxx related, but it comes out of

22         Vioxx.  I think that the New

23         England Journal of Medicine work

24         that you did, I don't have proof

FAC Resp. Exhibit D -- 887

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1    of this, but I believe it laid the

2    good groundwork for their help on

3    the preemption issue, which was

4    important to all of us, and I

5    appreciate your work with the New

6    England Journal of Medicine.  They

7    are not a bunch of wild eyed libs,

8    whatever Phil Beck wants to say,

9    and getting them on their side or

10   our side of these issues is very

11   important to us going forward, and

12   I appreciate it.

13        MR. ARBITBLIT:  Thank you,

14   Ed, and I appreciate your saying

15   that, and I did include that Dr.

16   Curfman went to Congress also and

17   testified to the committee on that

18   very subject.

19        MR. SEEGER:  Let's go off

20   the record.

21        (Whereupon, a discussion was

22   held off the record.)

23        MR. WEITZ:  Let's go back to

24   the hours, because there's a large

FAC Resp. Exhibit D -- 888

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

```
 1          number of hours, and I think you
 2          explained yourself and your
 3          substantive contribution well in
 4          this session.
 5              But I think Elizabeth has
 6          said that you did about 5,000
 7          hours of work yourself.  Explain
 8          to us the other 13,000 hours, and
 9          really because we're trying to
10          differentiate between people that
11          just reviewed documents and
12          substantive work that really made
13          a difference in the litigation.
14              MR. ARBITBLIT:  Most closely
15          connected to me, I believe Jenny
16          Gross was in the neighborhood of a
17          couple thousand hours.  It might
18          have been more than that, but she
19          was a constant presence.  She was
20          here full time for the Barnett
21          trial.  Whenever I needed
22          something, she was there.  I'd get
23          e-mails from her in the middle of
24          the night.  She's a very hard
```

FAC Resp. Exhibit D -- 889

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          worker, and digging into the

2          science was a lot of work for her,

3          not only the data, but the

4          documents.  She was a very good

5          detective.  So, there's a couple

6          thousand there.  I believe

7          Elizabeth's work is 1,900 to

8          2,000.

9               MS. CABRASER:  I'll talk

10         about that in a minute.

11              MR. LEVIN:  When you do

12         talk, differentiate between the

13         purchase claims.

14              MS. CABRASER:  Sure, I will.

15              MR. ARBITBLIT:  One of the

16         assignments that Paulina do Amaral

17         of our New York office received

18         was to head up the Arcoxia, which

19         was another COX-2 inhibitor,

20         discovery project, to see what

21         would be useful there.  So, a lot

22         of her time was spent on that,

23         which was also in the common

24         benefit bailiwick.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1           Wendy Fleishman's common

2      benefit work was probably on

3      medical monitoring.

4           MR. LEVIN:  That was in New

5      Jersey?

6           MR. ARBITBLIT:  In New

7      Jersey, yes.  Also the MDL had a

8      medical monitoring complaint,

9      didn't it?

10          MR. LEVIN:  Yes.

11          MR. ARBITBLIT:  So, it was

12     both.

13          Of course, the total time

14     includes paralegals and support

15     staff as well.  So, there was a

16     fair amount of, before I reviewed

17     documents, sometimes there would

18     be a paralegal -- often there

19     would be a paralegal who would

20     screen, and we had people working

21     on document reviews from the

22     get-go.

23          In December of 2004, Dave

24     Buchanan asked us to start

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1          reviewing part of a 500,000-page

2          custodial file for Tom Simon for

3          his deposition, and then there

4          were hundreds of thousands of

5          pages of adverse event reports

6          that we were asked to review.  I

7          didn't do all of that myself.  I

8          did a lot of that myself,

9          obviously, and I did the higher

10         end analysis and what to use for

11         exhibits and such.  But there was

12         help from associates on doing that

13         work.

14              But there was no work that

15         had no purpose.  There was never a

16         job where we just billed time.

17         Every job was done because it

18         needed to be done.  And that was

19         my job, to make sure nobody was

20         working on projects that I didn't

21         need to prove the case.

22              MR. WEITZ:  Were those jobs

23         that were given as a direction

24         from leadership on the MDL?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1            MR. ARBITBLIT:  Yes.  I

2       would say yes, because I was the

3       chair of the epidemiology and

4       causation committee, so, I had a

5       fairly broad charge.  I had to

6       write up what my mission statement

7       was.  My mission statement was

8       approved, and everything that was

9       assigned through me fell into that

10      mission statement that the PSC had

11      approved.

12           MR. BIRCHFIELD:  Those

13      assignments came through Shelly,

14      the charge?

15           MR. ARBITBLIT:  Well,

16      Carlene initially, sure, and

17      Shelly.  It was still Carlene at

18      the time that the mission

19      statement was approved.  That was

20      about June of 2005, right after

21      the MDL --

22           MR. SEEGER:  Just to get

23      back on schedule, I know

24      Elizabeth, you wanted to add some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 50

1          comments, but we should begin to

2          sum up.  We are starting to fall

3          behind.

4               MR. LEVIN:  We are running

5          late.

6               MS. CABRASER:  Got it.

7               Before Don sums up, let me

8          just give you a very quick run

9          through of my personal time, which

10          is approximately 1,700 hours, so,

11          less time than Don's, I think for

12          the very obvious reasons.

13               Some MDLs are all about the

14          law.  This MDL was really most

15          about the science, the evidence,

16          the medicine and the trials.  And,

17          in fact, one of the main missions

18          of the long briefing committee was

19          not to get legal rulings on issues

20          that might be issues of

21          vulnerabilities.  There's a

22          tremendous strategy, which I think

23          was primarily Arnold's strategy,

24          on briefing with respect to how to

FAC Resp. Exhibit D -- 894

Page 51

1          --

2                 MR. LEVIN:  Are you telling

3          me my strategy was to do nothing?

4                 MR. SEEGER:  Amazing how he

5          does that.

6                 MR. HERMAN:  You were

7          successful in that strategy.

8                 MS. CABRASER:  It was to

9          keep bad things from happening.

10                 MR. LEVIN:  A great

11          recovery.

12                 MS. CABRASER:  And it is a

13          very tough strategy.

14                 MR. WEITZ:  He's actually

15          very good at that.

16                 MS. CABRASER:  It was

17          maneuvering through a minefield.

18          Preemption was looming.  That was

19          a fabulous decision by Judge

20          Fallon on preemption, the best

21          decision, but that was due to a

22          strategy by law and briefing of

23          what to do, but more importantly,

24          what not to do.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

1              In that respect, that was

2         primarily Arnold and his office

3         doing that.  My role on law and

4         briefing, although it was

5         co-chair, was really a support.

6         We did some briefing, we did some

7         research.  If I get a call to do

8         overnight briefing on a particular

9         issue, like the day that Graham

10        motion to quash subpoena, I would

11        do that.  Because we were in

12        California, we could be the

13        overnight crew.  We did that a lot

14        on motions in limine for various

15        trials.  Happy to do it.  Was it

16        pivotal to the litigation?  No.  I

17        think the David Graham stuff was

18        neat, and I did that.

19              The other thing that I did,

20        and I spent about 220 hours on

21        this, is purchase claims.  Again,

22        at the outset of the case, at the

23        request of leadership, I chaired

24        that committee mainly to deal with

Page 53

1          political issues and keep it out

2          of the way, keep it alive, but

3          keep it out of the way so that

4          purchase claims could go ahead in

5          New Jersey, where things were more

6          favorable, so that Judge Fallon

7          could focus on trials and personal

8          injury claims.  I saw no conflict

9          with that.  I think it is a

10         contribution.  I think it is a

11         valuable contribution, but, again,

12         it is certainly less sexy and less

13         dramatic than many of the other

14         contributions.  I was happy to do

15         it.  Could someone else have done

16         it politically with the purchase

17         claims crew?  I like to think I

18         was able to do something.  But,

19         again, the value of that

20         contribution has yet to prove out.

21              So, more than 50 percent of

22         my time was spent on the personal

23         injury side of the case, primarily

24         legal briefing, legal research,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 54

1          legal issues, but, again, I didn't

2          argue most of the motions.  Russ

3          and Arnold argued most of the

4          motions.  I argued one major

5          motion, the purchase claims

6          committee motion to dismiss, and I

7          don't know whether that was a good

8          argument or not or whether it

9          would be successful or not, but

10          the claims are still alive.

11               Involuntarily in New Jersey,

12          we got tagged with medical

13          monitoring, to try and keep that

14          claim alive.  Worked for a while,

15          ultimately it did not.

16               MR. LEVIN:  When you have

17          1,700 hours in briefing, that

18          includes all the briefing in New

19          Jersey?

20               MS. CABRASER:  Yes.  That's

21          a total.

22               MR. LEVIN:  That was where

23          you took medical monitoring

24          through the appellate system?

Page 55

```
1              MS. CABRASER:  Yes.  I have

2        92 hours on Local 68 work in New

3        Jersey.  Medical monitoring I

4        tried to break out, it would be

5        about that amount or less, but

6        most of the briefing time was on

7        the MDL side.

8              MR. ARBITBLIT:  Can I have

9        two minutes?

10             MR. SEEGER:  Yes.

11             MR. ARBITBLIT:  For one

12       minute I wanted to just talk about

13       something early, the physician

14       contacts issue that I know Russ

15       argued with Judge Fallon.

16             When the MDL was threatened

17       by the ruling that said

18       plaintiffs' lawyers couldn't talk

19       to the doctors, Chris asked me to

20       take on briefing this issue,

21       because I thought I had an idea,

22       it turned out to be an idea that

23       Russ was able to get the judge to

24       sign off on, and since has become
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 56

1          adopted by other courts, that

2          unless there's a specific naming

3          of the doctor, which was only true

4          in about 7 percent of the cases,

5          that the plaintiffs' lawyers could

6          have continued to have their

7          contacts with the doctors.  I

8          thought that was important in

9          terms of helping the MDL get off

10         the ground without having this

11         unlevel playing field, where

12         plaintiffs' lawyers would choose

13         state venues.

14              So, I've been committed to

15         the MDL from the outset, and I

16         wanted folks to know that, and I

17         wanted to make it clear that I

18         have done what I could to make

19         that viable.

20              On the Barnett trial, one

21         thing I didn't mention that I

22         don't know if people are aware of

23         is that I was assigned to take the

24         deposition of the defense expert,

FAC Resp. Exhibit D -- 900

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 57

1           Dr. Kim, and their science expert

2           a month-and-a-half before the

3           trial.

4                MR. HERMAN:  And you did

5           that and they withdrew him.

6                MR. ARBITBLIT:  They

7           withdrew him, that's right.  They

8           withdrew him at trial in part

9           because of what's on Exhibit 24,

10          which is slide 24, in his own

11          handwriting, showing that using

12          the APPROVe study, there would

13          have been a 78 percent chance of

14          that heart attack suffered by Mr.

15          Barnett was due to Vioxx.

16                MR. SEEGER:  You made him do

17          this calculation at the dep?

18                MR. ARBITBLIT:  I did.

19                MR. BLIZZARD:  Attributable

20          risk.

21                MR. ARBITBLIT:  Attributable

22          risk.  And he wouldn't have been

23          able to dance out of it, and so

24          they had no expert at trial, which

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 58

1        is pretty unusual, and I own that,

2        too.

3              Thank you very much for all

4        the work you have done.  It was a

5        pleasure working with all of you.

6              MR. SEEGER: Thank you.

7              MR. HERMAN:  Thank you.

8              MR. BIRCHFIELD: Thank you.

9              MR. LEVIN: Thank you.

10             MS. CABRASER: Thank you.

11                    -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 902

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 59

1                 C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 903

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:   LOCKRIDGE GRINDAL NAUEN, PLLP
        Richard A. Lockridge, Esquire
        Yvonne Flaherty, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 904

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. LOCKRIDGE:  Well, thank
 3         you for having us here.  I'm Dick
 4         Lockridge, and with me is Yvonne
 5         Flaherty, and we're both from
 6         Minneapolis, the Minneapolis law
 7         firm of Lockridge Grindal Nauen.
 8         I'm here in a slightly awkward
 9         position in that I did not
10         personally do very much work on
11         Vioxx, although Yvonne did some.
12              Although I was at the
13         initial organization meeting, the
14         vast majority of the work was done
15         by Bert Black, who, as I'm sure
16         you all know, sent an
17         exceptionally unfortunate e-mail
18         in June or July '07, did not do
19         any more work in the case,
20         obviously, after that, and soon
21         thereafter left our firm and is no
22         longer with our firm.
23              But I think while he was
24         working on the case, he and a few
```

FAC Resp. Exhibit D -- 905

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1         other people in our firm did a lot

2         of very, very excellent work.

3             MR. WEITZ:  I'm sorry, I'm

4         not familiar with that situation.

5             MR. SEEGER:  Perry, you're

6         going to make him go there?

7             MR. WEITZ:  No, no.  I just

8         don't know what you are talking

9         about.  I never heard of it.

10            MR. LOCKRIDGE:  Bert Black

11        is kind of the science guru, and

12        he was with our firm during the

13        Vioxx case, and he sent out an

14        e-mail I believe in June or July

15        of '07, castigating certain

16        individuals in the MDL and the MDL

17        leadership, which was an entirely

18        inappropriate and wrong e-mail.

19        He did it on his own, totally

20        without anybody else in the firm

21        knowing about it, and it was

22        pretty obnoxious.  And,

23        understandably, Russ was not happy

24        about it and terminated him from

FAC Resp. Exhibit D -- 906

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          working any longer on the case,

 2          and then a couple of weeks

 3          thereafter, Bert left our firm.

 4               MR. WEITZ:  Did he have an

 5          official role in the MDL at that

 6          time?

 7               MR. LOCKRIDGE:  Bert?  Well,

 8          he was on the science committee,

 9          and I'll get to all the work that

10          he did do.

11               MR. SEEGER:  As soon as it

12          was brought to Dick's attention,

13          he took immediate action.

14               MR. LOCKRIDGE:  I was going

15          to address that at the end, but

16          that's fine.

17               But Bert, he was assisted by

18          Yvonne Flaherty and also Elizabeth

19          Odette of our firm.  Bert was on

20          the science committee, and he

21          worked extensively with Carlene

22          Lewis, John Restaino and Paul

23          Sizemore.  Most of his work was

24          through the science committee, and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1          he was also on the epidemiology

 2          proof of causation subcommittee

 3          with Don Arbitblit, who, of

 4          course, you just saw.

 5                He was on the subcommittee

 6          of mechanism of action

 7          pharmacology defense issues, and

 8          he was on the Daubert expert

 9          witness development committee and

10          worked also there with several

11          people, including Michelle Parfitt

12          and some others.

13                I'll go through some of the

14          specific projects just briefly and

15          then touch on some in more detail.

16          Some of the work that he did was

17          on the so-called Vioxx science

18          story, which was a project that

19          supported causation and debunked

20          Merck's junk science myths.  This

21          was assigned through the science

22          committee, and I know he

23          circulated this to the PSC and the

24          trial teams.  He worked

FAC Resp. Exhibit D -- 908

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          extensively on the label change

2          memorandum, which was assigned to

3          him through the science committee

4          and John Restaino and Mark

5          Robinson and Troy Rafferty.

6               I think some of you saw,

7          this was a 71-page, single-spaced

8          history of the April 11, 2002

9          label change relating to VIGOR.

10         It is more than probably you

11         wanted to know, but it certainly

12         told you everything you ever

13         wanted to know about that topic.

14              MR. BIRCHFIELD:  It was very

15         thorough.

16              MR. RAFFERTY:  Very

17         thorough.

18              MR. LOCKRIDGE:  Very

19         thorough.

20              Bert, of course, worked

21         extensively on Daubert and Daubert

22         issues.  I'll get to that in a

23         little more detail.  He at least

24         argued a couple of Daubert motions

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1          before Judge Fallon.  He retained

 2          Dr. Richard Kapit, who was an MDL

 3          expert, and he worked extensively

 4          with Paul Sizemore with Dr. Kapit.

 5          Bert and Paul Sizemore met with

 6          Dr. Kapit several times.

 7               He also worked with Ted

 8          Wacker in California with Dr.

 9          Kapit.  I know that Bert worked

10          with Dr. Kapit when he was a

11          witness, at least in the retrial

12          of the Irvin/Plunkett case.  He

13          prepared and worked with Dr. Kapit

14          in preparing his expert reports,

15          and obviously those were all

16          distributed to the trial teams.

17          He defended Dr. Kapit at two

18          different depositions, I think

19          September of '05 and then again in

20          June of '06.  Bert argued the

21          Daubert motion before Judge Fallon

22          in November of '05 where the

23          defendants wanted to exclude Dr.

24          Kapit.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          Bert and our associate

2     Elizabeth Odette prepared outlines

3     for direct examination and also

4     prepared outlines for expected

5     cross-examination for at least the

6     first Irvin/Plunkett trial for Dr.

7     Kapit, and I believe also for the

8     second Irvin trial.  So, he did a

9     lot of his work with Dr. Kapit.

10          Bert also retained Dr.

11     Robert Fletcher from Harvard.  He

12     met several times with Dr.

13     Fletcher.  He prepared the

14     response to the Daubert motion

15     regarding Dr. Fletcher.  Some of

16     you may recall Dr. Fletcher was

17     excluded by Judge Fallon, but

18     other experts were excluded, too.

19          Bert worked with Dr. Colin

20     Funk, who was an expert who was

21     actually proposed by Bert.  He met

22     several times with him, worked on

23     his expert report.  I don't

24     believe he was ever used, although

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          I know Mark Robinson, and maybe

2          you, Andy, were also at one time

3          at least considering using him.  I

4          know at least Mark ultimately did

5          not use him, although I think he

6          was down actually at the trial.

7               Bert worked with Dr.

8          Benedict Lucchesi, who was an MDL

9          expert.  I think he was the lead

10         off expert in Irvin I, maybe even

11         Irvin II, I'm not sure.

12              MR. BIRCHFIELD:  Irvin I.

13              MR. LOCKRIDGE: Irvin I?

14         Okay.

15              He worked on the response to

16         the Daubert motion, met with him

17         several times.  He and Paul

18         Sizemore worked on -- he and Paul

19         Sizemore worked on the preparation

20         for the Irvin trial and the second

21         Irvin trial in preparing Dr.

22         Lucchesi --

23              MS. FLAHERTY:  Lucchesi.

24              MR. LOCKRIDGE:  Lucchesi,

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 10

1          excuse me.  Thank you.

2                 He worked on an outline for

3          trial and expected cross.  Bert

4          also worked with Dr. Wayne Ray,

5          who was another MDL expert who I

6          believe testified at least at

7          Irvin II, maybe at Irvin I,

8          although I'm not sure.

9                 MR. BIRCHFIELD:  Irvin I.

10                MR. LOCKRIDGE:  I believe

11         that he at least worked in

12         preparation with Dr. Ray for those

13         trials.

14                I believe pursuant to Russ

15         Herman's request, Bert analyzed

16         Dr. Ray's statistics and causation

17         issues relating to Merck's

18         February 2006 motion.  I believe

19         it was for judgment of the

20         pleadings or summary judgment, I'm

21         not sure which.  This was all

22         circulated and prepared and sent

23         to the trial teams.

24                Then, finally, he worked on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Dr. Bruce Squires, who, as I

2          understand it, was not ever used,

3          but he worked under the direction

4          of Paul Sizemore and John Restaino

5          for this.  Dr. Squires was, of

6          course, the former editor of the

7          Canadian Medical Association

8          Journal.

9              He did a lot of work on the

10         defense experts, too, as some of

11         you may recall.  He worked

12         involving Dr. Janet

13         Arrowsmith-Lowe.  He prepared

14         outlines.  Bert took her

15         deposition twice, once in October

16         of '05 and another time in June of

17         '06.

18             He worked on a Daubert

19         motion to exclude Arrowsmith-Lowe.

20         He argued the motion to exclude

21         her.  They worked on preparation

22         for her cross-examination at least

23         at the first Irvin/Plunkett trial

24         down in Houston.

FAC Resp. Exhibit D -- 914

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          Yvonne worked on research,

2      on background research on her for

3      other cases.  She's certainly been

4      in a lot of cases, as you recall.

5          Bert worked pretty

6      extensively on matters involving

7      Dr. Alise Reicin; is that correct?

8          MR. SEEGER:  Yes.

9          MR. LOCKRIDGE:  I know you

10     guys know, obviously.

11         Bert, I believe, worked a

12     lot on the two Irvin trials

13     involving her, had a lot of

14     meetings involving her, and my

15     understanding was, he also

16     prepared the cross-examination for

17     the Barnett trial, too.

18         Bert did also some work

19     involving some of the other

20     defense experts like Dr. Roach,

21     Dr. Lisa Rarick, Dr. Frank Lanza

22     and a few others.  At the request

23     of Mark Robinson, he worked with

24     Dr. Suzanne Parisian.

FAC Resp. Exhibit D -- 915

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1             In the trial work, Bert was

2        at, I believe, the two Irvin

3        trials, and at least for part of

4        the Barnett trial.  He did work

5        extensively on motions in limine

6        in Irvin I, and I've indicated

7        much of what he's done there.

8             At the Irvin II trial, I

9        believe, Andy, he worked on that

10        case also again in the trenches.

11        I believe he worked some at least

12        on the outline of closing

13        arguments.

14             On the Barnett trial, I know

15        he worked extensively with Mark

16        Robinson and Ted Wacker there on

17        that trial, preparing direct and

18        cross-examinations, including,

19        obviously, mainly with the

20        experts.  These were some new

21        experts, it was Flavahan and

22        Morrison, and he worked on some

23        motions in limine.

24             The time records tell me he

FAC Resp. Exhibit D -- 916

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          did some things on the Berwick

2          trial, but, frankly, I don't know

3          what the heck he did.

4               He did do some FDA issues.

5          I've already mentioned the

6          labeling work that he did.  He

7          worked with Ted Wacker and Paul

8          Sizemore on some FDA issues.

9               He worked on AERs with Don

10         and the cerebrovascular event

11         research analysis.  This was not

12         with Don, but he did do a fair

13         amount of work on that.

14               Obviously our firm did some

15         other things, but this was

16         certainly the high points.  I

17         believe our MDL time is around 2.4

18         million.  We had most of our cases

19         in the MDL, although we had a few

20         cases in New Jersey.  I think we

21         had a total of 61 cases.

22               MR. HERMAN:  What was the

23         2.4 million?

24               MR. LEVIN:  That's the

Page 15

1          loadstar.

2                  MR. LOCKRIDGE:  I believe

3          that's the loadstar in the MDL for

4          common benefit time.  We obviously

5          had a lot more time.  There are

6          individual cases that we did not

7          submit and kept completely

8          separate.

9                  MR. WEITZ:  How many

10         individual cases did you submit to

11         the settlement?

12                 MS. FLAHERTY:  61.

13                 MR. LOCKRIDGE:  61.

14                 MR. WEITZ:  Where were those

15         cases filed?

16                 MR. LOCKRIDGE:  Most of them

17         were here, but there were a few

18         filed in New Jersey.

19                 MR. WEITZ:  Did you have any

20         of those cases prepared for trial?

21                 MS. FLAHERTY:  In New

22         Jersey.  Those cases were coming

23         up.  Actually, we did a lot of

24         work with Robb Dassow and Suzanne

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

 1          Scovern.  I recall before the

 2          settlement, before things started

 3          moving towards the settlement,

 4          there was a call made out for good

 5          cases in New Jersey, otherwise,

 6          Judge Higbee, I believe, was going

 7          to start selecting cases herself

 8          if we didn't put the cases

 9          forward.  So, our local counsel --

10               MR. WEITZ:  Who was Robb

11          Dassow?

12               MS. FLAHERTY:  No.  Robb

13          Dassow is actually licensed in

14          Indiana.  He did a lot of his work

15          in New Jersey, and then we worked

16          with him and Suzanne, who is from

17          California.

18               MR. WEITZ:  Scovern?

19               MS. FLAHERTY: Right.  Mike

20          Ferrara was our local counsel to

21          file cases in New Jersey.

22               MR. WEITZ:  So, when you say

23          you did a lot of work with Robb

24          Dassow and Suzanne, what kind of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          work are you talking about?

2                  MS. FLAHERTY:  That was not

3          common benefit work that we

4          submitted for purposes of this

5          presentation today.  That was work

6          more on our individual cases.  We

7          did help them a little bit --

8                  MR. SEEGER:  Did you put

9          cases in the pool that were being

10         worked in?

11                 MS. FLAHERTY:  Yes.

12                 MR. SEEGER:  Some of that

13         we're considering.

14                 MS. FLAHERTY:  Okay.  There

15         was a case, Donna Schwab was put

16         up toward the end, and I think

17         they sent out scheduling orders,

18         and I'm recalling it was going to

19         be, it was towards the end of the

20         year and maybe it was late, was it

21         '07 perhaps, maybe it was even

22         '06 --

23                 MR. WEITZ:  It was towards

24         the end of the litigation.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          MS. FLAHERTY:  Correct.  And

2     so I know they were scheduling,

3     there was a scheduling order that

4     came out, and things were kind of

5     put to a halt, and that was the

6     end of that.

7          MR. WEITZ:  So, you had

8     submitted a case, but you didn't

9     do any work on the case?

10          MS. FLAHERTY:  Not common

11     benefit work.

12          MR. WEITZ:  Okay.

13          MR. RAFFERTY:  Well, when

14     you say "not common benefit work,"

15     I mean, did y'all take

16     depositions?

17          MS. FLAHERTY:  No.  They

18     were being scheduled, it was on a

19     scheduling order, but everything

20     was put to a halt.

21          MR. LEVIN:  Just an

22     individual case.

23          MR. BLIZZARD:  Was Dr.

24     Parisian used in any of the cases?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              MR. SEEGER:  In Jersey?

2              MR. BLIZZARD:  No, I'm

3        sorry.  I'm back to, there was

4        discussion about Suzanne Parisian,

5        who I know to be an FDA expert

6        that Merck was working with.  Did

7        she get used in any of the cases?

8              MR. RAFFERTY:  Not in

9        Kosick, not in Irvin II.

10             MR. SEEGER:  Was she used in

11       Barnett, Parisian?

12             MR. BIRCHFIELD:  She was

13       being worked up for Barnett.

14             MR. SEEGER:  She was worked

15       up for a case or two, probably not

16       put on the stand though.

17             MR. BIRCHFIELD:  No, I don't

18       think she was.

19             MR. LOCKRIDGE:  I don't have

20       anything more, but if you have

21       other questions.

22             MR. BIRCHFIELD:  Just one

23       question.

24             You said that he worked

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          with, was it the Berwick trial,

2          was that the last one that you

3          mentioned?  Was that Mark's case

4          out in California?

5               MR. LOCKRIDGE:  It probably

6          was, yes, but I don't know very

7          much about it.  He didn't do much

8          on that.

9               MR. HERMAN:  You've got

10         about $70,000 in costs?

11              MR. LOCKRIDGE:  Yes.  I

12         guess we didn't get asked for an

13         assessment, but we don't have very

14         much in costs.  As you know, I'm

15         cheap, Arnie.

16              MR. HERMAN:  Let me say, and

17         I didn't say this at the

18         beginning, but I'm sure you'll

19         see.  Everything is being

20         recorded, and you are going to get

21         a copy.  The main thing the judge

22         is looking for is transparency and

23         consistency.

24              MR. LOCKRIDGE:  Certainly.

FAC Resp. Exhibit D -- 923

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1           MR. HERMAN:  Secondly, you

2       submitted an affidavit.  If we

3       don't resolve all the fee issues,

4       the judge is going to appoint a

5       Special Master and appoint people

6       to take lawyers' depositions, et

7       cetera.  Hopefully we can resolve

8       those issues.  If we can't, take a

9       look at your affidavit, and if

10      there's something you want to

11      supplement or delete, you may want

12      to consider that, but that's down

13      the line.

14          MR. LOCKRIDGE:  Okay.

15          MR. BIRCHFIELD:  I want to

16      say I appreciate your presentation

17      and your candor.

18          MR. LOCKRIDGE:  Thank you.

19      I really appreciate all of you

20      guys.  I know this is a big

21      effort.  I've been on the other

22      side of it.

23          MR. SEEGER:  Thank you.

24                      -  -  -

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 925

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: LOCKS LAW FIRM
        James Pettit, Esquire
        Steven P. Knowlton, Esquire
        Gene Locks, Esquire


BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
      877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 926

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                - - -

2          MR. PETTIT:  Good morning.

3      My name is Jim Pettit, Locks Law

4      Firm.  Steve Knowlton is to my

5      right.  Mr. Locks is here.

6          MR. KNOWLTON:  Good morning.

7          MR. PETTIT:  I've handed up

8      a submission which I will

9      supplement with an affidavit when

10     I get back to my office.  It's got

11     13 points.  The thrust of it

12     really is, I think, our

13     presentation of the Doherty jury

14     trial, which was back in July of

15     2006, and to address a couple of

16     other points as well.

17          I took a rough stab at what

18     I thought were the most important

19     issues.  Obviously in a

20     five-and-a-half week trial, there

21     were a lot of issues, a lot of

22     rulings, a lot of handling of

23     evidence.  I thought that these

24     were the issues that would inure

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1          to the common benefit of Vioxx

 2          plaintiffs across the country.

 3               So, the Doherty versus Merck

 4          verdict was a unanimous verdict on

 5          a very important issue despite

 6          being a defense verdict overall,

 7          and that is that the jury found

 8          seven to nothing that Merck failed

 9          to provide adequate warnings for

10          risk.  So, what that means, I

11          believe, is that the jury had to

12          have found that there were Vioxx

13          risks, that Vioxx risks existed.

14               Secondly, Merck either knew

15          the risks or should have known the

16          risks.

17               Third, Merck should have

18          adequately warned Doherty and did

19          not do so.

20               The jury was -- as you may

21          know, in New Jersey, we're not

22          allowed to talk to juries, but the

23          juries were interviewed

24          relentlessly by the press and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          actually was interviewed within an

 2          hour, I think, or less of the jury

 3          verdict.  And so in reading the

 4          press, as anyone could have, the

 5          jury said that there were

 6          overwhelming specific risk factors

 7          that they had found that Elaine

 8          Doherty had that caused her heart

 9          attack and not Vioxx.

10               So, the point that I guess

11          I'm making in issue number one is

12          that we had a unanimous liability

13          verdict and had the jury found,

14          which they could have in other

15          cases in the future after Doherty,

16          that, in fact, the case-specific

17          risk factors would have included

18          Vioxx as the substantial

19          contributing factor, that would

20          have been a plaintiff's verdict.

21          So, that's something I think that

22          Merck would have taken into

23          account, that there was one more

24          liability verdict in the country.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1            The Doherty case itself was

2       selected by our firm in

3       conjunction with a very elaborate

4       process which some of you know in

5       New Jersey as a bellwether case.

6       Elaine Doherty had many, many risk

7       factors and would not have been

8       ever probably a very, very high

9       potential verdict.  It had

10      potential to be a relatively high

11      verdict, but probably not millions

12      of dollars.

13           We picked that case so that

14      there would be, in fact, a

15      creation of a precedential value,

16      a verdict that had precedential

17      value, so that Merck could see a

18      New Jersey law firm trying a case

19      under New Jersey law with a

20      plaintiff that's had symptoms and

21      risk factors and a disease process

22      that was representative really, I

23      think, of the vast majority of

24      plaintiffs.

FAC Resp. Exhibit D -- 930

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          So, it wasn't just we picked

2      our best case, it was a case that

3      we thought, had we won the

4      complete verdict, would have been

5      valuable to plaintiffs in New

6      Jersey and across the country.

7          We spent a half a million

8      dollars trying the case.  The case

9      took five-and-a-half weeks.  There

10     were four partners that tried the

11     case, along with many associates

12     and paralegals and staff people.

13         The second issue which I

14     think is perhaps equally as

15     important, if not more important,

16     is the direct-to-consumer issue.

17     As you can see from our

18     submission, it was created by the

19     New Jersey Supreme Court years

20     ago, 1999.  There has never been a

21     charge ever in New Jersey that a

22     jury should consider the defendant

23     to be liable if they fail to warn

24     a plaintiff herself.  So, we

FAC Resp. Exhibit D -- 931

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          literally had the first

2          direct-to-consumer charge ever in

3          New Jersey, and we were not the

4          first Vioxx case.

5               Now, it is our

6          understanding, and plaintiffs'

7          lawyers are here, that the

8          direct-to-consumer ruling that

9          Judge Higbee made was an admixture

10         of law and very case-specific

11         facts.  So, what we did in the

12         Elaine Doherty case was hit that

13         very hard from day one.  Our

14         prescribing doctor, unlike perhaps

15         some of the prescribing doctors in

16         earlier trials, was very, very

17         unhealthy to us, and we presented

18         him by videotape so we knew going

19         in what we had to face.  So, we

20         really had to hit the

21         direct-to-consumer charge very

22         hard, and we did, and that was

23         what I think our major success was

24         with the unanimous verdict.

FAC Resp. Exhibit D -- 932

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          But for that, it would have
2      been a complete defense verdict.
3      What does that mean to the rest of
4      the bar?  I think that that really
5      created the law of the case for
6      New Jersey after the Doherty case.
7      So that all the -- not to minimize
8      it, but all that plaintiff lawyers
9      would have to do after that is
10     meet the factual predicate that
11     Judge Higbee saw that we had met
12     in Doherty.  Very difficult
13     deposition, very difficult motion
14     practice, and we spent a great
15     deal of time during the charging
16     conference just on the
17     direct-to-consumer.  Merck knew
18     what it meant and fought very
19     hard.
20          I'm going to let Steve
21     handle a couple of issues now and
22     then I'll come back.
23          MR. KNOWLTON:  Thanks, Jim.
24          First, number 3 is the trial

FAC Resp. Exhibit D -- 933

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        presentation of Merck, PR

2        liability deps.  We spent a lot of

3        time analyzing and getting these

4        transcripts ready for presentation

5        to the jury.  There is just one

6        clarification.  The Laine and the

7        Demopoulos testimony, while

8        litigated during trial, were not

9        actually presented to the jury.

10        It was the Blake deposition that

11        was presented to the jury.

12             And although this is our

13        application, I have to give credit

14        to Chris Placitella, because that

15        was probably the most powerful

16        seven-and-a-half minutes of

17        videotape that I have ever seen

18        based on the jury's reaction, as

19        Jim has just described to you, on

20        the DTC.  I think that had an

21        enormous impact on the jury and an

22        enormous impact on that verdict.

23             This was the first time that

24        that testimony had to be utilized,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        and it was the first time it had

2        been litigated for trial in front

3        of Judge Higbee.  That material

4        was made available and is still

5        available to plaintiffs' counsel

6        across the country.

7            The next is the APPROVe ITT

8        and extension data.

9            As Chris Seeger remembers,

10       this data was released just days

11       before our jury selection and

12       caused quite a bit of a ruckus

13       immediately before.  There was a

14       question about the manner of

15       production that we ended up

16       litigating in front of Judge

17       Higbee, and then eventually she

18       ruled that the data could be

19       considered by both experts, so,

20       there were the corresponding

21       reports and depositions, and then

22       there were the pretrial arguments

23       and rulings.  And although at

24       trial it wasn't utilized

Page 11

1    extensively, it was mentioned and

2    brought up in both Dr.

3    Traberg's -- in both Dr. Traberg's

4    testimony and cross-examination,

5    as well as Dr. John MacGregor's

6    deposition.

7         We extensively reviewed that

8    data on an obviously expedited

9    basis with our expert, Dr.

10   MacGregor, who concluded that the

11   extension data did not bear out

12   Merck's established trial position

13   that it required 18 months of

14   exposure.  That view was then, of

15   course, correlated by other

16   experts, both by independent

17   experts, and then FDA, and also by

18   the plaintiffs' firms.

19        That was the first time,

20   perhaps due to circumstances, but

21   certainly due to hard work by John

22   MacGregor and our lawyers, that

23   that data had been presented to a

24   jury and had been examined for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      trial.

2              Moving on to number 6.  In

3      the Doherty trial, prior to

4      presentation before the jury,

5      there was a Rule 104 hearing on

6      the admissibility of the 4/6/05

7      FDA document.  This document had

8      been the center piece of much

9      motion practice in New Jersey

10     prior to the Doherty trial, no

11     doubt, but this was first time

12     that we had presented and pushed

13     the issue both in correlation of

14     trying to get the entire document

15     admitted in front of the jury, and

16     also in advancing its COX-2 class

17     effect defense.

18              Judge Higbee ruled that

19     there would be a 104 hearing, and

20     the expert that Merck brought

21     forth was Dr. George Taylor, who

22     was noticed as an expert in our

23     trial as well.  Merck put Dr.

24     Taylor on, spent about 25 minutes

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        doing a direct.  He was

2        cross-examined.  At the end of the

3        hearing, from the bench, Judge

4        Higbee ruled that the 4/6/05

5        document was inadmissible in its

6        entirety and that there was no

7        basis, unless there was further

8        expert testimony, for bringing in

9        the COX-2 class effect defense in

10       front of the jury.  As an aside,

11       Dr. Taylor never appeared at

12       trial.

13            Moving on to number 8, this

14       is the preparation of the Topol

15       and Graham transcripts.  Again,

16       kudos for the effort to the

17       gentlemen who took those

18       depositions especially the folks

19       from Kline & Specter.  But these

20       deposition transcripts were

21       extensively litigated in a way

22       that was sensitive to other

23       plaintiffs' firms and their need

24       potentially to use it in future

FAC Resp. Exhibit D -- 938

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          litigation.

2                  As many of you will recall,

3          at the time, it was the Graham

4          transcript, I believe, that was

5          the subject of motion practice

6          before Judge Fallon, and it was

7          specifically the cross-examination

8          of Mr. Beck of that witness that

9          was at issue.

10                 We were very, very

11         sensitive, the Locks' lawyers were

12         sensitive not to litigate the

13         transcripts in such a way that

14         would require potentially

15         precedential rulings from Judge

16         Higbee, knowing that there were

17         trials in front of her and in the

18         MDL that were coming after us.

19                 So, we negotiated page and

20         line designations.  We also

21         negotiated exhibit presentations

22         during those depositions, and both

23         of those depositions were played,

24         we think, with good effect to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        jury.

2              Dr. MacGregor, number 9, was

3        our expert that we identified

4        early on in the litigation.  Dr.

5        MacGregor testified for us in

6        Doherty and acted as a consulting

7        expert.  We believe, and I

8        certainly believe as the lawyer

9        who put him on at trial, he was

10       probably one of the easiest

11       experts I've ever had to work

12       with.  He was motivated and was

13       extraordinarily well prepared both

14       by us and also by his own efforts.

15             Dr. MacGregor, we were free

16       with sharing his materials for the

17       plaintiffs' lawyers, and he's been

18       utilized, as you can see from our

19       submission, by other firms in

20       Vioxx and also in other

21       litigations to date.

22             My last item would be the

23       STI document review.  Scientific

24       Therapeutics, Inc. was a third

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          party that Merck utilized in

2          communicating with physicians

3          about Vioxx, and specifically in

4          blunting the impact of the VIGOR

5          study.  Unfortunately, the STI

6          initiative never reached the

7          deposition stage.  There were

8          hundreds of thousands of pages of

9          documents that were reviewed by my

10         firm, and also that effort was

11         spearheaded by Eric Weinberg and

12         his firm.  Also, videotapes and

13         audiotapes, presentations were

14         reviewed.  PowerPoint programs

15         were put together in an effort to

16         link and follow the money chain

17         from Merck from the third-party

18         vendor to physicians concerning

19         their speaker bureaus, which they

20         used to impact VIGOR, and also

21         publications in, quote,

22         peer-reviewed journals that Merck

23         authored and then substituted

24         other scientist names to.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           I'm sorry, back to you, Jim.

2           MR. PETTIT:  I'm going to go

3       back to number 5, which was use of

4       Dr. Susan Parisian.  She was an

5       FDA officer, and the strategy in

6       using her was two part.  One was

7       to rebut the defense of the FDA

8       approval, which is not only a very

9       strong factual argument that Merck

10      made over and over again during

11      five-and-a-half weeks to the jury,

12      but it's a statutory defense, as

13      I'm sure most, if not all of you

14      know in New Jersey, and in many

15      other states.  If there's an FDA

16      approved warning, it is presumed

17      to be an adequate warning and

18      there's rebuttal and presumption.

19          But sort of in the trenches,

20      we used Dr. Parisian to persuade

21      the jury that the FDA is not a

22      mission, and, in fact, are the

23      opposite, that they are

24      understaffed, that their

Page 18

1     procedures are not focused towards

2     this kind of drug and getting it

3     to the market safely.

4              We also were able to, sort

5     of as an aside, get a lot of the

6     state-of-the-art evidence through

7     Dr. Parisian rather than bringing

8     in another state of the art

9     witness.

10             So, the point of this for

11    common benefit is that Dr.

12    Parisian actually had been worked

13    up by other law firms, and we were

14    the first ones to use her in a

15    Vioxx trial.  I think we presented

16    her incredibly, and I think she

17    was very useful, and it was well

18    known to other plaintiff lawyers

19    had they, in fact, wanted to use

20    her.

21             The rulings that Judge

22    Higbee made, as you probably know,

23    were basically at the end of the

24    trial, that Judge Higbee would

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        present to the jury as a legal

2        charge what exactly the FDA

3        regulations meant.  So, she

4        presented factual testimony.

5            Number 7, the FDA preamble

6        that came out actually in January

7        of 2006, our trial, again, was

8        July of 2006, Merck argued that

9        extensively pretrial and trial,

10        probably argued it three different

11        times.  Judge Higbee finally made

12        an ultimate ruling during the

13        trial itself.  That really, I

14        think, was the centerpiece of the

15        preemption issue, obviously,

16        preemption being a tough legal

17        issue, but Merck was trying to get

18        that down on the ground to the

19        jury as a document, and Judge

20        Higbee very forcefully struck

21        that, and I think struck it and

22        made that for all Vioxx cases in

23        New Jersey.

24            I'm going to combine 11, 12

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      and 13.

2            We were the only firm in New

3      Jersey, and I think I may be

4      mistaken, the only firm in the

5      United States, that tried a Vioxx

6      jury trial by itself.  We relied

7      on the amazing incredible work

8      done by all the other plaintiffs'

9      attorneys for years up until July

10     of 2006, and we used their work

11     product and looked at their

12     trials.  I can't say enough about

13     that, obviously.  It almost goes

14     without saying that we were

15     talking about that that's an issue

16     that we tried the case by ourself,

17     I wanted to state that as clearly

18     and as gratefully as I can.

19            Having said that, I think

20     what Merck needed to see to come

21     to the table for global

22     negotiations is that a single law

23     firm is willing to try a case and

24     is able to try a case and is

Page 21

1        willing to put up $500,000 and

2        invest four partners and

3        associates and weeks and, of

4        course, months to get to trial.  I

5        think Merck needed to see that,

6        they needed to see that we could

7        do that successfully, and as I

8        said, we came close to having a

9        plaintiff's verdict and certainly

10       had a liability verdict.  I think

11       that is the kind of thing that

12       contributes to making Vioxx, in

13       short, a mass tort.  Not only the

14       large verdicts, it has gotten to

15       the point where one law firm can

16       try the case.  I think that's an

17       important factor.

18            One of the questions that

19       the committee sent in their e-mail

20       was consistency, quantity,

21       duration and intensity.  We

22       continued to litigate the Vioxx

23       cases long after Doherty.  We had

24       Klug, Ellis and Pritch were going

FAC Resp. Exhibit D -- 946

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          to be picked for bellwether

2          trials.  We did not give up.  We

3          continued to take depositions,

4          defend depositions, take sales rep

5          depositions, work up the cases.

6          We did not really have judicial

7          intervention in terms of discovery

8          motion practice.  So, we didn't

9          get that.  That was sort of an

10         answer to one of the issues raised

11         in your e-mail.

12                In addition to the funding,

13         extensive and large funding of the

14         Doherty trial and the rest of our

15         cases, we did contribute two

16         $7,500 submissions to the New

17         Jersey plaintiffs' funds for a

18         total of $15,000.  So, we did

19         contribute for funding.

20                Thank you.

21                MR. BIRCHFIELD:  Just a

22         note, before you submit this

23         affidavit, there was a single firm

24         trial in the MDL.

Page 23

1          MR. PETTIT:  I appreciate

2     you correcting me.

3          MR. HERMAN:  One question,

4     or more than one.

5          I have -- I see Mr. Locks,

6     and is it Pettit?

7          MR. SEEGER:  Knowlton and

8     Pettit.

9          MR. HERMAN:  I'm sorry.

10          MR. KNOWLTON:  I'm Mr.

11     Knowlton, this is Mr. Pettit, and

12     this is Mr. Locks.

13          MR. HERMAN:  Is it

14     K-N-O-W-L-T-O-N?

15          MR. KNOWLTON:  That's

16     correct, sir.

17          MR. HERMAN:  Since we've got

18     this on the record, I want to make

19     sure that the record notes that

20     all three of you are here.

21          I just have a couple of

22     other questions.

23          I apologize if our office,

24     because we were responsible for

Page 24

1        it, did not send out to you an

2        e-mail or communication to submit

3        a written material and affidavit

4        before this date.  I assume you

5        did get it.  If you didn't get it,

6        it is our fault.

7             MR. PETTIT:  We did not.

8             MR. HERMAN:  Well, I

9        apologize for that, and if you'd

10       get us an affidavit.

11            Now, did you submit your

12       time in hours?

13            MR. PETTIT:  Yes, we did.

14            MR. HERMAN:  In costs?

15            MR. PETTIT:  Yes, we did.

16            MR. HERMAN:  How much time

17       did you submit, do you recall?

18            MR. PETTIT:  Certainly

19       something I should have reviewed

20       before this morning.

21            MR. LEVIN:  I've reviewed

22       it.  7,505.  7,505 hours.

23            MR. HERMAN:  How much in

24       costs, Arnie?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          MR. LEVIN:  You are asking

2     me?  $433,301.77.

3          MR. HERMAN:  Excuse me.

4     $433 and how much?

5          MR. LEVIN:  301.77.

6          MR. HERMAN:  301.77 what?

7          MR. LEVIN:  Cents.

8     $433,301.77.

9          MR. HERMAN:  How much of

10    those costs were spent on your

11    trial, do you recall?

12         MR. PETTIT:  100 percent of

13    those costs, and by the way, I

14    think we did a slightly revised

15    cost.

16         MR. LEVIN:  I think your

17    original submission was rejected,

18    and I assume you are working with

19    the accountants to straighten it

20    out?

21         MR. PETTIT:  Right.  And as

22    far as I know, it has been

23    straightened out.

24         MR. LEVIN:  Good.

Page 26

1            MR. PETTIT:  The answer,

2        sir, to your question is that 100

3        percent of the costs were spent

4        either on Doherty or on very

5        specific review, as Mr. Knowlton

6        said, on the liability documents

7        and the page and line designations

8        that went on in 2005 and 2006

9        leading up.  But there was nothing

10       that was spent on another case --

11           MR. HERMAN:  No, no.  I'm

12       not suggesting that.  You rounded

13       off the cost of the trial to

14       $500,000.  I'm just trying to

15       determine whether there's another

16       $500,000 in costs or this is all

17       inclusive.

18           MR. PETTIT:  No.  That's

19       what our submission consists of.

20           MR. RAFFERTY:  Steve or

21       Jim --

22           MR. LOCKS:  There are

23       additional costs that we

24       submitted, a lot more.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

 1              MR. RAFFERTY:  Approximately

 2         out of the 7,500 hours or 7,000

 3         hours, approximately how many of

 4         those would be attributed to the

 5         Doherty case, the vast majority?

 6              MR. PETTIT:  Vast majority,

 7         just in 2006.

 8              MR. RAFFERTY:  You mentioned

 9         the Klug, Ellis and Pritch cases?

10              MR. PETTIT:  Right.

11              MR. RAFFERTY:  Were those

12         the other three cases that y'all

13         worked up or were there more?

14              MR. PETTIT:  Those were the

15         three.  We had reached a certain

16         point in the bellwether selection

17         with the plaintiffs' attorneys and

18         the judge, and the judge was

19         talking about stroke and heart

20         attack, and those were the ones we

21         had reached to the point where

22         Merck was taking a lot of

23         depositions.

24              MR. RAFFERTY:  So those --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          MR. PETTIT:  There were a

2     couple others that would have come

3     up on the stroke list and on the

4     heart attack list.  Those were the

5     three that we literally litigated

6     in 2006.

7          MR. RAFFERTY:  That's what I

8     want to know.

9          MR. KNOWLTON:  If I remember

10     properly, we had, at that point,

11     up until the time the settlement

12     was announced, we had either 16 or

13     21 cases where we had just begun

14     to start to litigate as far as

15     sales reps were concerned and

16     things like that, but these three

17     were the ones that were already on

18     point where there was discussion

19     as to whether or not there were

20     going to be trials set.

21          MR. LEVIN:  How many cases

22     did you submit to the settlement,

23     the Locks firm?  How many did you

24     submit to the settlement?

Page 29

1          MR. KNOWLTON:  An exact

2     number?

3          MR. LEVIN:  Approximately.

4          MR. SEEGER:  Approximately.

5          MR. BIRCHFIELD:  I'm showing

6     about 90.  Does that sound right?

7          MR. KNOWLTON:  90?  No.

8          MR. LOCKS:  No.  I thought

9     it was somewhere north of 200,

10    plus or minus 200.

11         MR. KNOWLTON:  That's about

12    right.  Around 200.

13         MR. LOCKS:  I think it was a

14    little more, but I don't know if

15    they would all pass the test.

16         MR. GIRARDI:  MacGregor is a

17    real good witness.

18         MR. WEITZ:  Great witness.

19         MR. KNOWLTON:  Thank you.

20         MR. SEEGER:  Thank you.

21         MR. BIRCHFIELD:  205.

22         MR. HERMAN:  Let me give you

23    a fax number.  (504) 561-6024.

24    The e-mail you should have on your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
1          notice about this meeting, you can

2          either e-mail or fax the affidavit

3          in.  I'm just going to attach it

4          to the submission.

5               MR. PETTIT:  We will get

6          right on it.  Thank you very much.

7               MR. SEEGER:  Thanks.

8                    -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 956

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  LOWE LAW FIRM
       Jeffrey Lowe, Esquire
       CAREY & DANIS, LLC
       Joseph P. Danis, Esquire

BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. BIRCHFIELD:  Everything
 3         is going to be on the record, so,
 4         we will have a transcript of
 5         everything that's said here in
 6         case it's necessary for the judge
 7         or for any proceedings later on.
 8              One of the things that Judge
 9         Fallon has asked us to do is to
10         let everybody know about the
11         process, we'll try to work out
12         having an agreement on the
13         allocation, but if there are
14         objections, he's going to follow
15         the same type of procedure similar
16         to what he did in the Murphy Oil
17         case.  It is important to be aware
18         of the Murphy Oil decision and the
19         process he followed there, where
20         he would appoint a special master,
21         depositions be taken and all of
22         that.
23              So, with that being said,
24         the floor is yours.
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1              MR. LOWE:  Nice to see you

2         guys.  Basically the question here

3         is, did we provide common benefit

4         work, and how much.  If you look

5         at section 9.2.4 of the settlement

6         agreement, and as it was

7         originally written, it provided

8         that common benefit work was

9         recoverable for attorneys doing

10        work in the MDL, in New Jersey,

11        California and Texas and in the

12        state court proceedings.

13             As you know, we filed an

14        objection to that, and we worked

15        it out, and you said that was

16        never the intent to include other

17        states.  So section 1.2.7 was

18        enacted on July 17th, '08 to

19        include common benefit work done

20        in any other state court.  What we

21        were seeking common benefit work

22        for is work that we did in

23        Illinois state court cases.

24             Before I go into that, I

Page 4

1          want to give you kind of an

2          overview of our involvement since

3          we were involved on the inside.

4          We filed a total of claims for

5          2,689 claimants.  In Missouri

6          alone, it was about 1,200, maybe a

7          little bit more, all of them were

8          filed in state court.  We joined

9          two local sales representatives

10         who lived in St. Louis city, and

11         we joined local pharmacies.  All

12         of them, we believe, are

13         nonremovable, but, of course, as

14         you know, Merck removed them, and

15         they never got remanded.  We filed

16         a motion to remand in every case.

17              In Illinois, we filed 172

18         cases, cases involving 172

19         claimants.  Of those, 11 cases

20         were remanded involving 65

21         plaintiffs by Judge Patrick

22         Murphy.  They were remanded to the

23         Circuit Courts of St. Clair County

24         and Madison County, Illinois.

FAC Resp. Exhibit D -- 960

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          Those are the cases that we're

2          seeking to recover for common

3          benefit work.

4                   California, we filed 29

5          cases.

6                   New Jersey, we filed 53

7          cases.  We were subject to

8          case-specific discovery.  In some

9          of those cases, I went out and

10         took doctor depositions, defendant

11         client depositions.  Again, we are

12         not seeking anything for those,

13         those were the case-specific work.

14                  And the rest of the cases,

15         the 2,689 were filed directly in

16         the MDL.

17                  MR. WEITZ:  How many was

18         that?

19                  MR. LOWE:  It was a good

20         number.  I mean, I don't know the

21         exact number.  I can probably get

22         that for you if you guys want it.

23         It was several hundred for sure.

24         You know, cases came up on the

Page 6

1       one-year statute or two-year

2       statute, and we filed them

3       directly in the MDL.

4              MR. LEVIN:  Did I hear you

5       say that what you are seeking

6       common benefit for are only the 11

7       cases that Judge Murphy remanded

8       to state court?

9              MR. LOWE:  Correct.  11

10      cases involving 65 plaintiffs.

11             MR. LEVIN:  And is that for

12      the remand itself or --

13             MR. LOWE:  Well, the remand

14      itself, plus all the work that we

15      did once it got remanded.

16             MR. BIRCHFIELD:  Jeff, if

17      you would, take us through the

18      timing of that, when you got the

19      remands and the work that was

20      done.

21             MR. LOWE:  A lot of the work

22      we are seeking for is the first

23      case, it's called Donahue versus

24      Merck.  It was filed February 23rd

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      of 2005.  I don't know the dates

2      of the remand, but it had to be

3      remanded quickly, because,

4      otherwise, it would get

5      transferred to the MDL, and

6      somehow it would always remand a

7      few days before the transfer date.

8      So, they really were remanded over

9      a period of about six months, I

10     would say beginning in April of

11     2005.  I can get the exact dates.

12            The first case we filed was

13     a single case, Donahue versus

14     Merck.  And Walgreen's is an

15     Illinois corporation, and there's

16     some case law in Illinois that we

17     looked at before we filed the

18     cases that said, under certain

19     circumstances, you can sue a

20     pharmacy in Illinois if they

21     prescribe -- if they fill a

22     prescription for a drug knowing

23     that there might be

24     contraindications for that drug

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          without telling the people.  It's

2          a case called Happel.  So, based

3          on the Happel case, we filed the

4          cases in Illinois and started

5          working them up.

6               MR. BLIZZARD:  How many of

7          the 65 cases were actually

8          scheduled for trial?

9               MR. LOWE:  The only case

10         that was scheduled for trial, I

11         think it would be two.  There was

12         a lot of procedural maneuvering

13         that went on -- the Donahue versus

14         Merck case was originally set for

15         trial as a case that we thought

16         was a real trial schedule, October

17         of 2007.  We were working that

18         case up, and in the summer of

19         2007, the VICTOR study was

20         published.  Based on that, I was

21         using Dr. Gary Sander here in New

22         Orleans as an expert, and I

23         developed a local -- you know, we

24         tried.  I mean, I talked to Zipes,

FAC Resp. Exhibit D -- 964

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          I talked to other cardiologists.
 2          We developed a local cardiologist,
 3          Dr. Alan Maniet, who was a
 4          fen-phen expert for us, and so he
 5          was giving us case-specific
 6          testimony, too.  Anyway, they both
 7          had to be redeposed.  I was going
 8          to put the trial off to March of
 9          '08.  There's a Fifth Amendment
10          scheduling order that was entered
11          regarding that.
12              So, I paid $10,000, and Joey
13          paid $10,000, and I hired Dr. Moye
14          to be our expert, so he was going
15          to come and testify live, Sander
16          was going to testify live, Maniet
17          was going to testify live.  We
18          deposed the treating doctors in
19          Illinois.  Actually, they were
20          deposed twice.  In Illinois,
21          there's a discovery deposition and
22          evidence deposition, so, some of
23          them were deposed twice.
24              MR. SEEGER:  These are
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          experts that you did designate in

2          the case that was headed toward

3          trial?

4                  MR. LOWE:  Yes.  In

5          Illinois, it is called a Rule 213

6          interrogatory.  Mark Robinson was

7          great.  We met with Mark and Ted

8          Wacker.  We were seeing if they

9          wanted to try the case, help us

10         try the case.  They wanted to get

11         Zipes on board, and we had already

12         contacted Zipes.  And then Zipes

13         decided he didn't want to do it,

14         because he testifies in cases

15         where there aren't many risk

16         factors, not when there are a lot

17         of risk factors.  And so based on

18         that, Zipes decided he didn't want

19         to do it, and based on that, Mark

20         decided he didn't want to do it.

21                 MR. WEITZ:  Where in

22         Illinois was it filed?

23                 MR. LOWE:  Madison County.

24         The client was a great client,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           older guy, truck driver.  He was a

2           lifelong resident of Madison

3           County.  His son was the recorder

4           of deeds in Madison County, so he

5           was politically connected.  We

6           were in front of the same judge

7           Andy was in front of, Judge Stack,

8           who was a good guy, he's a good

9           judge.

10               In the meantime, and we put

11          this in our affidavit, we were

12          trying to get the MDL trial

13          package, but it wasn't available,

14          and I understand that.  So, I

15          began getting information from --

16          I got a lot of information from

17          Penny Herman, I got a lot of

18          information from Mark Robinson.

19          And so based on that and the

20          Schwaller case, I got the trial

21          transcript, all the trial exhibits

22          were introduced in the record, so

23          I got all of those for the first

24          time, had all the exhibits.  So,

Page 12

1          we were in the process of creating

2          our own trial package because we

3          couldn't get it from the MDL, they

4          didn't have it yet.

5               So, then I deposed Dr.

6          Waymack, I deposed Dr. Marks, and

7          my deposition of Marks was after

8          the VICTOR data, and he has this

9          theory that in the VICTOR study,

10         they say that the data is not

11         completely balanced.  So, he

12         rebalanced it, and then, based on

13         that, said there's no statistical

14         significance.  So, there's one

15         depo out there regarding that

16         which I took.

17              I took their case-specific

18         guys, Dr. Cohen, Dr. Saltzman,

19         which I think Andy experienced at

20         trial.  They had a doctor at Johns

21         Hopkins, Dr. Hastasian, so I took

22         his depo.  After I got all those

23         depos done, including our experts,

24         I sent all of that stuff to the

Page 13

1          MDL, to Penny Herman, I .pdfed all

2          the exhibits, so all that was

3          there for everybody else to share.

4              As far as I'm concerned, as

5          plaintiffs' attorneys, whether

6          you're on the PSC or your own

7          case, we're all in this together

8          against Merck.  That's what we

9          were trying to do, was to proceed

10         and hopefully get a verdict

11         against Merck.  Even if I didn't

12         get a verdict, I learned a hell of

13         a lot more about Vioxx, and I had

14         65 more cases to go.

15             MR. SEEGER:  Jeff, how close

16         did you get to trial?

17             MR. LOWE:  The settlement

18         was in November of '07, and our

19         trial was put off in September of

20         '07 to April of '08.

21             MR. BIRCHFIELD:  So, you

22         were within like a month of trial?

23             MR. LOWE:  At one time we

24         were within two months of trial,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          and when the settlement came out,

2          there were deadlines of February

3          28th for fact witnesses and March

4          7 for experts.  But I had done

5          everything except for Vicki Starr.

6               MR. RAFFERTY:  Jeff, you

7          said the Donahue case and then

8          what other one?

9               MR. LOWE:  Well, there's

10         another cased called Auslander --

11              MR. RAFFERTY:  All of that

12         was Donahue?

13              MR. LOWE:  Yeah.  Basically

14         our lead case was Donahue.  We

15         were doing all of this in Donahue.

16         And once we got that created, we

17         could then proceed with the other

18         cases.

19              MR. RAFFERTY:  Was the other

20         case set yet?

21              MR. LOWE:  I know that

22         Auslander had a discovery schedule

23         and we were beginning fact

24         discovery in that.  It was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          stroke case.  It was in Cook

2          County.  It was originally in

3          Madison County, but it got

4          transferred to Cook.

5               MR. RAFFERTY:  Can you spell

6          that?

7               MR. LUNDY:

8          A-U-S-L-A-N-D-E-R.

9               MR. BLIZZARD:  Was that

10         actually scheduled for a trial

11         date?

12              MR. LOWE:  I don't remember.

13         I remember it had a discovery

14         schedule.  Discovery schedules

15         usually have a trial date.  In

16         Cook County, you are looking out

17         like three years on a trial date.

18              MR. HERMAN:  That's fast.

19              MR. SEEGER:  The stuff that

20         you did, the stuff you worked up,

21         the deps of the experts, you sent

22         that all on to Penny.  Do you

23         remember the time frame?

24              MR. LOWE:  I would say April

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          of '08 is probably when I got it

2          all together for her.

3                    MR. SEEGER:  Okay, thanks.

4                    MR. WEITZ:  Why did the case

5          get put off in October of '07?

6                    MR. LOWE:  That's when

7          VICTOR came out, and we said our

8          experts have new opinions

9          regarding VICTOR.  Sander was

10         redeposed in New Orleans, and

11         Maniet was redeposed in St. Louis

12         in the summer.  And so because of

13         that, we weren't going to be able

14         to meet the October date, because

15         they didn't want to produce their

16         experts until we had our experts

17         finalized.

18                   Also, meanwhile, in the

19         other cases, when we started

20         combining cases, we may only have

21         one plaintiff who bought from

22         Walgreen's, and we'd throw nine

23         other plaintiffs in there who were

24         Illinois residents.  And then

Page 17

1          Judge Murphy said, one plaintiff,

2          one defendant, it's not removable.

3          But then when we got down, got to

4          trial court, they filed motions to

5          sever, motions for forum non

6          conveniens.  And so we fought

7          those, we lost those in front of

8          Judge Stack, some of them.

9              We also had a new idea in

10         St. Clair County where what we did

11         or what Judge O'Malley did was

12         severed out the people who were

13         St. Clair County people, and then

14         he transferred all the other ones

15         up to Cook County.  Because Merck

16         had his registered agent in Cook

17         County, and he had just gotten

18         reversed for not transferring his

19         case to Cook County on a class

20         action to Merck.

21             MR. HERMAN:  The Donahue

22         case, was that an MI or a stroke?

23             MR. LOWE:  An MI case.

24             MR. HERMAN:  And the other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1         cause, Auslander?

2              MR. LOWE:  Auslander was a

3         stroke.

4              MR. BLIZZARD:  Do you know

5         what the expenses were that are

6         specific to the workup of Donahue

7         and Auslander, and have those been

8         submitted?

9              MR. LOWE:  Yes.  It was like

10        $160,000.

11             MR. LEVIN:  You submitted

12        160,688.39.  Your expenses and

13        your hours have been rejected by

14        the accountant.  Are you working

15        with them?

16             MR. LOWE:  We just found out

17        yesterday it was rejected by them,

18        because they sent a letter

19        addressed to Carey & Danis without

20        addressing it to anybody in

21        particular, and so they just

22        called me yesterday, and they just

23        e-mailed me the letter.  So, yes,

24        we will now be working --

FAC Resp. Exhibit D -- 974

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              MR. HERMAN:  That's okay.

2         As long as you work with them.

3              MR. LEVIN:  You have 6,285

4         hours, and I take it all of those

5         hours are related to the Donahue

6         case?

7              MR. LOWE:  Donahue case and

8         the other 64.

9              MR. BIRCHFIELD:  Jeff, can

10        you give us a sense of how many of

11        those hours would be your hours or

12        lawyer --

13             MR. LOWE:  My hours are

14        1,600 of those.

15             MR. BIRCHFIELD:  1,600.

16             MR. LOWE:  Yes.

17             MR. LEVIN:  Are there

18        paralegal hours in there?

19             MR. LOWE:  No.

20             MR. SEEGER:  You were going

21        to try the case, too, right?

22             MR. LOWE:  Yes.

23             MR. RAFFERTY:  On the other

24        64 cases, how far did those get?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Were there depos taken?

2               MR. LOWE:  There were depos

3          on probably about three of those

4          cases.  I know there's a depo in a

5          case called Brame, and there was a

6          depo in one other case, but what

7          happened is, after Judge O'Malley

8          transferred the rest of the cases

9          to Cook County, Merck appealed

10         three of the cases, it was Brame,

11         Riddle and Hardaway, and so we

12         went to the Court of Appeals, the

13         Fifth District, and we filed

14         briefs in that, and we ended up

15         winning all of those probably

16         pretty close to the time of the

17         settlement.  So all those cases

18         were then -- the transfer to Cook

19         County was --

20               MR. LEVIN:  Could you break

21         down the difference in the hours

22         between the Donahue case and the

23         other --

24               MR. LOWE:  On my time, if it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

    1          was Donahue, I put Donahue.

    2               MR. SEEGER:  You broke it

    3          down by case?

    4               MR. LOWE:  Yeah, I broke it

    5          down by case on my time.

    6               MR. LEVIN:  Give me a

    7          ballpark figure.  With the 6,000

    8          hours, how much of those 6,000

    9          were just earmarked for Donahue,

   10          the case going to trial?

   11               MR. LOWE:  I could go

   12          through it and recalculate it, but

   13          I don't want to ballpark it.  I

   14          don't really have any idea.  I

   15          know Evan Schaeffer -- again, I

   16          think everyone who was doing their

   17          time, we were trying to do it

   18          consistent with that strategy so

   19          you could tell what we were

   20          working on, which case.

   21               MR. SEEGER:  Other than

   22          Robinson, did you work with any

   23          other people from the MDL in

   24          working up the case or sharing?

FAC Resp. Exhibit D -- 977

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1              MR. LOWE:  No.  I mean, and
 2         I have the e-mails, because is it
 3         common benefit time?  And Mike
 4         Ferrara wrote to me or e-mailed
 5         everyone trying to get more money
 6         for the public relations campaign
 7         in New Jersey, and so I said,
 8         yeah, we forgot about it, we'll
 9         send you our two grand, by the
10         way, we've got this case set in
11         October, I'm trying to get the
12         trial package.  So, he writes me
13         back --
14              MR. HERMAN:  What's the date
15         of that?
16              MR. LOWE:  July of '07.  So,
17         July 26, '07, he writes me, "Hey,
18         Jeff, Thanks for the check.  We'll
19         advise the PR firm of your trial.
20         With regard to your October trial,
21         we want to win at all costs.  We
22         can't afford any more losses."
23         There was a bad streak there.
24         "There are four trials beginning
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

 1          in October here in New Jersey.

 2          Dave Buchanan is our liaison

 3          counsel, and he has a trial in a

 4          box."

 5               So I e-mailed Dave, Dave

 6          says, "Call me tomorrow."  I

 7          called Dave.  And he didn't have

 8          the trial in the box, but he

 9          talked to me and gave me some

10          hints and some tips.

11               I was in touch with Pete

12          Kaufman at Levin, and he was the

13          head of the trial package team,

14          and so he finally just said send

15          me -- and I talked to him, and he

16          was helpful.

17               Illinois has a rule where

18          you can make a request for them to

19          bring anyone who is a management

20          employee to trial.  And so I was

21          asking them, who should I do?  And

22          so he told me like Charlotte

23          McKines was a good one, because

24          she wasn't as experienced, had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

 1        some good depos.  So, I talked to

 2        him for half hour, an hour.  So,

 3        basically, I sent him the hard

 4        drive in August, and then October

 5        comes around, and I don't have the

 6        hard drive, so I finally asked him

 7        again.  He finally gives me the

 8        trial package.  I think I got it

 9        before anybody else.  So then I

10        started reviewing it and looking

11        at it.

12             MR. BLIZZARD:  In the

13        Donahue case, had you gotten to

14        the point where they had filed and

15        you had responded to Daubert

16        motions, motions in limine and

17        that sort of thing?

18             MR. LOWE:  No.  We had

19        gotten to the point where they

20        filed -- they filed a summary

21        judgment based on statute of

22        limitations claiming that anyone

23        would be put on notice within two

24        years -- within two years of --

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        before February 23rd of 2005 that

 2        Vioxx could cause heart attacks

 3        based on the VIGOR study and all

 4        the publicity.

 5             MR. LEVIN:  When was that

 6        motion filed?

 7             MR. LOWE:  It was filed -- I

 8        don't have the date of it.

 9             MR. LEVIN:  Was it filed

10        before the settlement here?

11             MR. LOWE:  Oh, yeah.  It was

12        in the summer.  It was filed

13        before it, and Judge Stack

14        overruled that pretty quickly, and

15        they had not filed any Daubert

16        motions.

17             MR. DANIS:  There were

18        negotiations where you would be

19        involved, kind of a period with

20        the CME evidence that was used in

21        Andy's case was going to be kind

22        of the agreement.

23             MR. HERMAN:  When did you

24        get the trial package?
```

FAC Resp. Exhibit D -- 981

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          MR. LOWE:  I can tell you

2     exactly.  It was either

3     September -- October 25, 2007.

4          I met with Ken Soh at one

5     time, too.

6          MR. BLIZZARD:  Had you

7     gotten to the point of a pretrial

8     order where you had to do

9     case-specific depo designations

10     and counters and objections?

11          MR. LOWE:  We had not done

12     that, but that's what I was

13     preparing.  That was my biggest

14     concern, to have a time to go

15     through all the depos and make

16     depo designations, and then we

17     were within a month or so of doing

18     that.  So, we were in the process

19     of gathering up the stuff to do

20     that.

21          MR. HERMAN:  Let me get back

22     to the trial package issue.  When

23     was your case continued?

24          MR. LOWE:  When was it

Page 27

1          continued?  September 5th, 2007.

2                    MR. RAFFERTY:  And it was

3          set for?

4                    MR. LOWE:  End of October of

5          2007.

6                    MR. HERMAN:  So, it was

7          continued in September --

8                    MR. LOWE:  Right.

9                    MR. HERMAN:  -- to April.

10         You got the trial package in

11         October.

12                   Let me ask you, before

13         November of 2007, did you send any

14         of your work product to the

15         depository?

16                   MR. LOWE:  No, I hadn't done

17         that yet.

18                   MR. HERMAN:  And just one

19         other question.

20                   When did you, if you recall,

21         sign an MDL participation

22         agreement?

23                   MR. LOWE:  Early on, right

24         away, because it was supposed to

Page 28

1          be the lower amount.  We signed it

2          quickly.  I would say in '05, late

3          '05.

4                    MR. WEITZ:  Were you guys

5          appointed to any of the committees

6          on the MDL or in state court?

7                    MR. LOWE:  No.  I mean, we

8          kind of considered we were State

9          Court of Illinois.  We had almost

10         all the cases.  So we kind of

11         think we ran that mini MDL.  We

12         thought about trying to

13         consolidate it at one time, but

14         then we were afraid of where they

15         would consolidate it.

16                    MR. HERMAN:  Wasn't there a

17         case tried in Illinois?

18                    MR. LOWE:  Andy's case, the

19         Schwaller case.  We were

20         originally set ahead of them, and

21         then we got ours continued behind

22         his.

23                    MR. WEITZ:  Was that tried

24         in Madison County?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          MR. LOWE:  Yes.

2          MR. WEITZ:  Judge Stack

3     tried that?

4          MR. LOWE:  Yes.

5          MR. WEITZ:  Were you given

6     any of your assignments for the

7     work that you did from any of the

8     leadership at the MDL?

9          MR. LOWE:  No.

10          MR. WEITZ:  So, you were

11     basically working up your case for

12     trial and then sharing that

13     information with the MDL?

14          MR. LOWE:  Yes.  I mean, I

15     say I talked to a lot of different

16     people within the MDL trying to

17     get more information.

18          MR. WEITZ:  But that was in

19     pursuit of working up your case?

20          MR. LOWE:  True.  Our cases,

21     and then the other 65 behind it,

22     and then possibly trying cases in

23     the MDL, or if we have a case in

24     New Jersey, it would be the Boaten

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
1          case, significant stroke case,

2          Alberta Boaten, that was in the

3          trial pool or the discovery,

4          case-specific discovery pool

5          there.  So, we had already done

6          the plaintiff's treating

7          neurologist, et cetera.  So, we

8          were trying to gather this

9          information so that we could try

10         Vioxx cases.

11              MR. HERMAN:  How many cases

12         have you enrolled in the

13         settlement?

14              MR. LOWE:  We enrolled all

15         of our cases.

16              MR. HERMAN:  I don't mean

17         enrolled.

18              MR. DANIS:  2,300.

19              MR. BIRCHFIELD:  Submitted.

20              MR. LOWE:  We enrolled all

21         2,689, to the best of my

22         knowledge.  And then any case

23         involving a blood clot, a DVT, a

24         pulmonary embolism, we disengaged
```

FAC Resp. Exhibit D -- 986

Page 31

1          those clients.  So, any MI or

2          stroke case we put in, which is, I

3          think in the 2,100 range, plus

4          200.

5               MR. BIRCHFIELD:  What did

6          you say?

7               MR. DANIS:  It is 2,300.

8               MR. LOWE:  Walther Glenn was

9          part of our group, and they had

10         200 separate cases that they

11         referred to us.  Part of our

12         agreement with him was that he

13         would work and do the plaintiff

14         fact sheets and all of that stuff.

15              MR. BIRCHFIELD:  He

16         submitted those as primary

17         counsel, is that what you are

18         saying?

19              MR. LOWE:  No.  We all

20         submitted it under our umbrella,

21         but he did the work.

22              MR. HERMAN:  Who else was in

23         your group?

24              MR. LOWE:  A guy named Evan

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          Schaeffer of a firm called

2          Schaeffer & Lamere.  He's a former

3          partner of Carey & Danis, and then

4          Carey & Danis, with their

5          associates and support staff, and

6          then me.  Basically that was it.

7          And Evan and I, we did a lot of

8          the work --

9               MR. HERMAN:  What's his

10         firm?

11              MR. LOWE:  Schaeffer &

12         Lamere.

13              MR. HERMAN:  Where is it

14         located?

15              MR. LOWE:  Godfrey,

16         Illinois.

17              MR. BIRCHFIELD:  Any other

18         questions?

19              MR. SEEGER:  No.  That was

20         very informative.  Thank you.

21              MR. WEITZ:  Thank you.

22              MR. HERMAN:  Thank you.

23                   -  -  -

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4  Public and Certified Court Reporter of

 5  the State of New Jersey, Registered

 6  Diplomate Reporter, Federally-Approved by

 7  the United States District Court of

 8  Pennsylvania, do hereby certify that the

 9  foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22       Linda L. Golkow, RDR, CRR, CCR
         Notary Number:  1060147

23       Notary Expiration:  1.2.10
         CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 989

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -


FIRM:  LUNDY & DAVIS, LLP
       Matthew E. Lundy, Esquire

BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 990

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                  -  -  -

2                  MR. HERMAN:  We're going to

3          have a transcript, and if matters

4          can't be resolved at the end of

5          the day, the judge is going to use

6          some sort of procedure akin to

7          Murphy Oil.

8                  MR. LUNDY:  Okay.

9                  We got involved in Vioxx and

10          wanted to be involved in the MDL,

11          I even applied for a position on

12          the PSC, so, we were dedicated

13          from the beginning to get involved

14          in this work and the work with the

15          PSC in the MDL, and we did.  We

16          did what the PSC wanted us to do.

17          We volunteered our services early

18          on, and whatever projects we were

19          asked to do, we worked on it and

20          gave it 100 percent effort.

21                  I worked on the discovery

22          committee and specifically on the

23          sales and marketing.

24                  We reviewed documents in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          repository, but we also reviewed

 2          sales and marketing documents to

 3          prepare for depositions that I was

 4          involved in in Texas.  One was Han

 5          Nguyen-Vo Mariacher,

 6          M-A-R-I-A-C-H-E-R, and Dr. Isaacs

 7          was a Merck consultant and

 8          mouthpiece for Merck and did a lot

 9          of presentations for doctors

10          around Texas, and I was in her

11          deposition.  So, I went through

12          documents and got prepared for

13          those.

14               I worked with Ted Wacker and

15          with Pete Kaufman on the case

16          chronology and the exhibit

17          authorization and exhibit

18          admissions in, I think it was Mark

19          Robinson's trial.  So, worked on

20          those.

21               Andy asked us early on to

22          help him in the trials that he

23          had.  We did depo cuts.  We did

24          motions in limine.  We worked on
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        jury questionnaires for Andy.  I

2        think we did that both in Irvin I

3        and II.

4              We sent lawyers to Chris

5        Seeger's office to review

6        documents early on, had people up

7        in New York doing that.

8              I was also appointed to the

9        state liaison committee where we

10       tried to keep lawyers around the

11       country, state lawyers, informed

12       of what was going on.  A lot of

13       that time I didn't even keep,

14       because it was just phone calls,

15       cell phone calls, and we did that.

16             As a part of that committee,

17       I worked on the rapid remand

18       project and case selection

19       project.  Those occurred at a

20       time, I think, when things were

21       moving more quickly in New Jersey

22       than they were in the MDL, and we

23       were strategizing and thinking of

24       ways to move the MDL further to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1              put pressure on Merck.  I talked

2              with Lenny, and Lenny called me

3              and asked us to help with this,

4              and I did.  He contacted lawyers

5              around the country to see who had

6              cases that could be remanded and

7              ready for trial, and we were

8              looking at cases and talking with

9              lawyers around the country to help

10             move the MDL along, and I think

11             that was successful.

12                  Those are the highlights of

13             the work that our firm was

14             involved in, and as I said, we

15             were willing to do the substantive

16             work and the hard work necessary

17             to help the MDL to make it

18             successful.  You won't see a lot

19             of receipt and review of

20             documents, none of that.

21                  MR. HERMAN:  Dawn has

22             already told us about your group

23             work together.  As we understand

24             it, you all together in your group

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1    had 500 to 600 cases for the

2    settlement?

3         MR. LUNDY:  That's probably

4    right.

5         MR. HERMAN:  Is that about

6    right?

7         MR. LUNDY:  Yes.

8         We're sharing the cases, but

9    there's no sharing in the --

10        MR. LEVIN:  MDL.

11        MR. LUNDY:  -- MDL.  That's

12   separate and apart.

13        MR. HERMAN:  When you say

14   you don't share in the MDL, you

15   mean in the common benefit?

16        MR. LUNDY:  The common

17   benefit.

18        MR. BIRCHFIELD:  What were

19   your total hours and expenses?

20        MR. LUNDY:  I think it's

21   about 18,000 in expenses, Andy.

22        MR. LEVIN:  You have got

23   about $900 in expenses that have

24   been rejected, so you may want to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        call the accountants to see what's

 2        doing with that.

 3             MR. LUNDY:  How do I find

 4        out what was --

 5             MR. HERMAN:  Touch base with

 6        Lenny.

 7             MR. LEVIN:  As far as the

 8        accounting form, you have no hours

 9        rejected, no hours under

10        submission.  You have 277 hours in

11        the whole case.

12             MR. RAFFERTY:  177?

13             MR. LEVIN:  277.

14             MR. LUNDY:  That's not what

15        I have.

16             MR. BIRCHFIELD:  That's why

17        I asked.

18             MR. LUNDY:  I've got about

19        608.

20             MR. LEVIN:  You not only

21        have 400 hours that are

22        unaccounted for, the accountant

23        doesn't know about them, because

24        they are neither under submission
```

FAC Resp. Exhibit D -- 996

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        nor rejected.

 2             MR. BLIZZARD:  Are these

 3        personal hours of Matt's or are

 4        you talking about his firm's?

 5             MR. LEVIN:  No.  I'm talking

 6        about the firm.

 7             MR. LUNDY:  Because we

 8        submitted them all to both,

 9        whatever that thing is, and to

10        Russ' office.

11             MR. RAFFERTY:  Who else in

12        your firm was doing work on it?

13             MR. HERMAN:  Matt, let me

14        just give you the procedure.  What

15        happens is, people submit their

16        hours and we send them directly to

17        the CPA, Wegmann-Dazet.  Phil

18        Garrett is the head of that team,

19        and he's court appointed.  What

20        happens is, when there's some

21        discrepancy in hours or costs,

22        lawyers call there, they work out

23        whatever the snafu is, so, you're

24        going to want to --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          MR. LUNDY:  I had been

2      e-mailing with whatever the guy's

3      name is.

4          MR. LEVIN:  Phil Garrett?

5          MR. LUNDY:  One of the guys

6      in their office.

7          MR. BIRCHFIELD:  Cliff

8      Newlin.

9          MR. LUNDY:  Cliff Newlin,

10      that's it.  And I sent you and he

11      the same thing a couple of times.

12          MR. HERMAN:  Give him a

13      call, and let's see if we can get

14      this updated.  Otherwise, you are

15      understated.

16          MR. BIRCHFIELD:  So, you

17      have got about 680?

18          MR. LUNDY:  680 I think is

19      what I've got.

20          MR. BIRCHFIELD:  Is that

21      your time, Matt, or lawyer time or

22      paralegal time?

23          MR. LUNDY:  I think it is

24      all lawyer time, between Lisa

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          Stewart, myself and three other

2          lawyers, a guy named Charles

3          Beckham, guy named Billy Quinn.

4               MR. LEVIN:  The problem may

5          be there's no Billy Quinn, and

6          there's no Charles here.  We have

7          you, Lisa, and Karen as a

8          paralegal.  She has one half hour.

9               MR. LUNDY:  I'll look into

10          that.  Thank you.

11               MR. SEEGER:  Thank you.

12               MR. HERMAN: Thank you.

13                    -   -   -

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1                    C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 1000

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:  MATTHEWS & ASSOCIATES
       David P. Matthews, Esquire
       Julie L. Rhoades, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
         GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1001

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1              -  -  -

 2              MR. BIRCHFIELD:  We've got

 3         Linda here.  She's taking

 4         everything down.  Judge Fallon

 5         wants everybody to be aware of his

 6         order in Murphy Oil, take a look

 7         at those criteria.  I'm sure you

 8         are already familiar with that.

 9              MR. MATTHEWS:  Yes.

10              MR. BIRCHFIELD:

11         Transparency is a big issue.  We

12         have a transcript, and it will be

13         available for him to review and

14         use in whatever way he sees fit.

15         So, with that, the floor is yours.

16              MR. MATTHEWS:  Well, I think

17         I know everybody in the room here,

18         but my name is David Matthews, and

19         I'm here with Julie Rhoades to

20         talk briefly about our position on

21         common benefit expenses and fees.

22              We have included quite a bit

23         of information in writing, so, I

24         would like to incorporate that.  I
```

FAC Resp. Exhibit D -- 1002

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1          don't want to repeat myself.  You

 2          guys have been here for a long

 3          time.

 4               I'll start just by saying

 5          that we were involved in Vioxx in

 6          the early, middle and late, and we

 7          were committed participants in the

 8          litigation early on.  I think that

 9          we had cases we were filing

10          several months prior to the drug

11          being withdrawn from the market.

12          I don't think we were in as early

13          as you and Chris and Mark, but we

14          were in earlier than most, I'll

15          say that.

16               I did participate and

17          actually talked at the Advisory

18          Committee hearing back in February

19          of '05 after the drug was

20          withdrawn --

21               MR. BIRCHFIELD:  The FDA

22          Advisory Committee?

23               MR. MATTHEWS:  The FDA

24          Advisory Committee, and it was

FAC Resp. Exhibit D -- 1003

Page 4

 1          discussing three drugs, three

 2          COX-2s and what they were going to

 3          do with them.  I had argued at

 4          that time that all three drugs

 5          need to be off the market, and

 6          there should be criminal penalties

 7          leveled against CEOs and suggested

 8          some type of criminal penalty with

 9          all the CEOs in the room, which

10          was met with a pretty stern lip

11          from the folks.  But Dr. Jeb Wait

12          and I were the only two plaintiffs

13          lawyers at the Advisory Committee

14          hearing.  So, I think that is some

15          evidence and example of our

16          commitment early on in the

17          litigation.

18              MR. BIRCHFIELD:  Jeb is your

19          partner?

20              MR. MATTHEWS:  Dr. Jeb Wait

21          has been with our firm as a

22          consultant.  He's still a

23          consultant at the firm.  He was

24          involved early, in the middle and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          late, as well.

2                So, that started, and our

3          involvement was the filing of

4          suits prior to the withdrawal,

5          continued filing.  We filed a

6          great number of suits, and I think

7          without looking at these

8          documents, approximately 430 cases

9          in Texas.  We filed another

10         several hundred in New Jersey, I

11         think, with Chris' firm, and then

12         several hundred in New Orleans in

13         the MDL.

14               So, we had a three-prong

15         attack.  It's my belief -- I've

16         been handling drug litigation for

17         about ten years now, and my

18         approach has always been multi-

19         litigation approaches, that is,

20         both State and Federal.  From

21         Vioxx -- I'm sorry, from Rezulin

22         days, Andy, when you and I were

23         working together where I had cases

24         in six or seven different states,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          state court litigation, it has

 2          always been my belief to have a

 3          multi-prong attack, and that's

 4          what we were doing and planning on

 5          doing in Vioxx, and that's what we

 6          did.

 7              MR. WEITZ:  Dave, how many

 8          total cases did you have?

 9              MR. MATTHEWS:  We looked at

10          over 6,000 or 7,000 cases, and we

11          had whittled it down to 1900.  So,

12          we were at about 1930, give or

13          take.

14              MR. WEITZ:  Did you submit

15          that for settlement, 1930?

16              MR. MATTHEWS:  1930 minus.

17          We're still in the process of

18          about, I want to say 200.  So, we

19          submitted approximately 1700.  And

20          like I say, when I say "in the

21          process," the last 200, they were

22          registered, of course, but we're

23          still working on medical records

24          and followup material.
```

FAC Resp. Exhibit D -- 1006

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1              MS. ROSE:  I think our final
 2         number will be about 1,823.
 3              MR. MATTHEWS:  So,
 4         continuing on with the litigation
 5         in Texas, without overspeaking, I
 6         think I was probably instrumental
 7         in the formation of the Texas MDL
 8         based on statutes in Texas that
 9         allow for an MDL because the
10         defendants wanted it.  We dealt,
11         and I was kind of the point person
12         with that.  I worked with Ed and
13         Tommy Fibich, Mike Gallagher, and
14         we spearheaded the Texas MDL.
15         Again, without overspeaking, I
16         would say that I probably did the
17         lion's share of the work in the
18         Texas MDL.
19              MR. SEEGER:  What are some
20         of the things, Dave, as we have
21         some people here that might not be
22         familiar, that you worked on as
23         point person in the Texas MDL?
24              MR. MATTHEWS:  Well, I
```

FAC Resp. Exhibit D -- 1007

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          started by offering my office as

2          the Texas depository.  That's

3          really where it started.  Chris,

4          you and your outfit in New Jersey

5          had your own depository, but we

6          had geographically a need in the

7          center of the country to have a

8          depository.  So, I offered and

9          paid for and continued to update

10         and maintain the Texas depository,

11         which I believe was thoroughly

12         complete.  Depositions, both

13         coasts, as well as the MDL, all

14         state and Texas depositions, both

15         specific and general deposition,

16         expert and fact deposition,

17         continuing to update on the

18         production of documents of which

19         we paid for.  A lot of this,

20         hopefully all of it was submitted.

21         But that was an expensive venture.

22         So, that was, I think, our initial

23         involvement.

24              Secondly, we worked with the

FAC Resp. Exhibit D -- 1008

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
1          defendants and tried to determine

2          which judge was going to be the

3          head of the MDL in Texas.

4                  MR. HERMAN:  Let me stop

5          you, David, for a minute.  I want

6          to try to understand better, and I

7          don't, how the various -- Texas

8          has got some of the best lawyers

9          in the country.  I'm not just

10         saying that.  I know that.  I

11         don't understand how the various

12         groups of lawyers work together.

13         I want to give you an example so

14         that you can see where I'm coming

15         from.

16                 We have a Texas Vioxx

17         litigation group, five firms,

18         Walter Umphrey, John Eddie's firm

19         and so on.  They had their own, as

20         I understand it, their own

21         building, their own case

22         depository for their own clients

23         and their own document

24         accumulation.  I won't call it a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1       depository, but accumulation.  How

2       did you all articulate with each

3       other?  Mark had his.  Ed was

4       involved with you and Tommy.  We

5       just heard from Kathy Snapka, who

6       was running her own accumulation

7       of experts and documents.  What

8       happened in the Texas MDL in terms

9       of the articulation of the Texas

10      groups with each other and then

11      with New Jersey and Andy, Tom in

12      California?

13          MR. MATTHEWS:  Well, we

14      worked with Merck in trying to

15      determine a fair judge, and we

16      arrived at Randy Wilson by process

17      of exclusion.  So, he was the MDL

18      judge pursuant to Texas state

19      statute.

20          At that point, we formed a

21      PSC, which included anybody that

22      really had a great deal of

23      involvement in the litigation.

24      Mark Lanier had kind of separated

FAC Resp. Exhibit D -- 1010

Page 11

1          and was really litigating on the

2          East Coast, really not much in

3          Texas.  So, this was folks that

4          had the majority of cases in

5          Texas.  Mr. Lanier had a good

6          number of cases in Texas, but was

7          really more concentrating, in my

8          opinion, in the East.

9               MR. LANIER:  I would send

10          Ken Soh to this stuff generally

11          more than myself.

12               MR. MATTHEWS:  Ken Soh from

13          Mark's firm was there always, so

14          we coordinated with him.  In terms

15          of the consortium with Watts, and

16          Umphrey and John Eddie and Grant

17          Kaiser and one other --

18               MR. BIRCHFIELD:  Drew, Drew

19          Ranier.

20               MR. MATTHEWS:  -- I would

21          regularly work with those guys in

22          terms of what we needed, and we

23          would share information.  It was

24          my opinion we had to have a Texas

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          depository, which was used by

2          many, many lawyers, not just

3          Texas.

4                MR. HERMAN:  But everybody

5          fed information into your

6          depository?

7                MR. MATTHEWS:  Yes.  I paid

8          for depositions with Linda

9          Golkow's company and others so we

10         could have direct access.

11               MR. BLIZZARD:  Russ, just to

12         supplement and clarify, I don't

13         think that the consortium had

14         their own document depository.  I

15         think at their Vioxx Center, their

16         individual case files were worked

17         up.  The depository was at David's

18         office.

19               MR. MATTHEWS:  I think

20         that's right, but I can't speak to

21         exactly what was in there.

22               MR. HERMAN:  I'm glad you

23         clarified that, because I thought

24         what I heard when I took notes

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1          earlier was that they had gathered

 2          expert material and depositions

 3          and transcripts from other cases

 4          and were maintaining their own --

 5               MR. BLIZZARD:  Russ, I think

 6          they may well have gathered

 7          transcripts --

 8               MR. HERMAN:  I'm not arguing

 9          the point, I'm --

10               MR. WEITZ:  Let's ask Dave.

11          Dave, what firms were substantial

12          contributors to your document

13          depository and the work that was

14          done in the Texas MDL?

15               MR. MATTHEWS:  Well, in

16          terms of creating, maintaining the

17          depository, that fell in my lap,

18          probably 95 percent of that.

19          There were some contributors, and

20          I can't tell you off the top of my

21          head exactly what they

22          contributed.  It was an expensive

23          venture, and I, again, included

24          all of these receipts and whatnot

FAC Resp. Exhibit D -- 1013

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1           in our submission.  The document

2           depository was used by many, many

3           firms.  We had people inside of

4           Texas and outside of Texas using

5           the depository.  So, we would

6           have, for instance, Ed, Scott

7           Nabers would come and they would

8           come and spend time looking

9           through documents.  I had an IT

10          guy that was full time working on

11          this thing.  It was a big deal,

12          and as everybody at this table

13          knows, to put together something

14          of 20 million documents,

15          searchable format, and then

16          include all depositions taken to

17          date from all jurisdictions, both

18          State and Federal, and then

19          continue updating with new

20          discovery that's coming in, while

21          my office continually did

22          discovery, written discovery, as

23          well as our own depositions.  So,

24          it was a very, very big project.

FAC Resp. Exhibit D -- 1014

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1                MR. WEITZ:  That you had
 2         taken upon yourself?
 3                MR. MATTHEWS:  Yes.  I
 4         offered to do it.  Somebody had to
 5         do it, and I said I would do it.
 6                MR. WEITZ:  Were you
 7         organizing information in the
 8         depository for other lawyers in
 9         Texas?
10                MR. MATTHEWS:  Yes.
11         Everybody could use it inside of
12         Texas and outside of Texas.  We
13         had people coming from New Mexico,
14         and there was nothing really, to
15         my knowledge, in Louisiana as far
16         as a depository goes.  So, if
17         people from Louisiana wanted it,
18         all they had to do was sign the
19         confidentiality order.  That's all
20         they did.
21                MR. WEITZ:  Was it being
22         used by a lot of lawyers
23         throughout Texas?
24                MR. MATTHEWS:  Throughout
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          Texas, yes.  Yes.  I don't have a
 2          log with me, but I would say many,
 3          many firms use that depository.  I
 4          offered my staff if they needed to
 5          figure out how to search it, use
 6          it, find a document.  We all know
 7          that the case was really about 50
 8          or maybe 100 documents.  How do we
 9          get that one document?  We would
10          always offer our help.
11               MR. BIRCHFIELD:  Dave, will
12          you talk to us for a few minutes
13          about the cases that you worked up
14          for trial and how you were moving
15          the Texas docket in the MDL.  Let
16          me say, and you also may want to
17          touch on this, but the first MDL
18          trial was moved to Houston after
19          Katrina, and you helped us try
20          that case, and we used your
21          office.
22               MR. MATTHEWS:  I forgot to
23          submit those hours, by the way,
24          which was silly, but I did prepare
```

FAC Resp. Exhibit D -- 1016

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        probably 40 hours before the trial

2        just on that trial.  Then I would

3        say we worked probably 60 hours a

4        week for two weeks or at least I

5        did.  I can't speak for anybody

6        else.

7            MR. SEEGER:  Did anybody

8        else from your office -- I know

9        you were there, I saw you.  But

10       anybody else from your office?

11           MR. MATTHEWS:  Well, I had a

12       lawyer there, but really we did

13       not really submit any other time

14       for any other lawyer.  It was more

15       of an education time for that

16       lawyer.  I was the one that did

17       the work.  I didn't submit

18       anything from the other lawyer.

19           We also did a couple of my

20       trials with you, Andy, as you

21       know, and I think we even split

22       the cost at one point of an expert

23       or two and possibly Robert

24       Hirschhorn, who was the trial

FAC Resp. Exhibit D -- 1017

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1          strategist.  We split the cost of
 2          Hirschhorn.
 3               We did offer Andy to use my
 4          office for the first trial in the
 5          MDL.  Not that that was a big
 6          expense, but I offered it to
 7          anyone that needed it.  You
 8          clearly had a big staff there, and
 9          I'm not saying we didn't want you
10          there, but we did offer that.
11               We also had a great deal of
12          involvement I think in the first
13          stroke case, and I think this is
14          very significant in my opinion.
15          We worked up from beginning to end
16          an entire stroke case with
17          epidemiology from Moye and
18          Plunkett, with a neurologist from
19          New York who I have used before by
20          the name is Steve Levine, who I
21          think is an excellent witness.  I
22          did work with Tom Kline's office a
23          bit, and we met there a couple of
24          times, because you were also going

FAC Resp. Exhibit D -- 1018

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          to use them in the MDL is my

 2          understanding, but we had a case

 3          ready for trial.

 4                MR. LEVIN:  Did you get a

 5          report from Steve Levine?

 6                MR. MATTHEWS:  Yes, we did.

 7          I can't remember if we deposed him

 8          now.  Jason Webster in my office

 9          was working with Dr. Levine on and

10          off for many, many months.  We had

11          been to New York twice to work

12          with him.  We had been to Philly

13          to Tom Kline's office to work with

14          him.  He was ready to go to trial.

15          We were two weeks short of trial.

16          Actually, I had put this

17          information here, but just an

18          example of how much work was done

19          in that particular case, I had

20          stated in here the experts, and

21          there were a lot of them.  Dr.

22          Moye, Dr. Ushchmann, Dr.

23          Glandville, Dr. Guevarra, Dr.

24          Joshi, Dr. Keith, Dr. Rock, Dr.
```

FAC Resp. Exhibit D -- 1019

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        Stephen Levine, and then a host of

2        other case specific depositions

3        that were taken in that case.  We

4        were ready to try the case.

5              MR. HERMAN:  What's the name

6        of that case?

7              MR. MATTHEWS:  Elvis

8        Anderson, Elvis Presley Anderson.

9        He's a Native American, and we

10       were in the Choctaw Nation Tribal

11       Court.  We were going to try a

12       case in Tribal Court, and Merck

13       was, in my opinion, scared

14       greatly.

15             MR. HERMAN:  What was your

16       trial date, Dave?

17             MR. MATTHEWS:  The trial

18       date was August 7, 2006.  I had

19       spent a lot of money and a great

20       deal of time on that case.  I was

21       pretty excited.  We were going to

22       try it with six Native American

23       jurors.  Elvis was a car dealer at

24       the Choctaw Nation casino and was

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1          well known in the community and a

 2          good plaintiff in my opinion, and

 3          we were going to rock the boat.

 4          Suddenly, two weeks prior to

 5          trial, there was a motion to

 6          abstain from finding jurisdiction

 7          in the case, and the Tribal Court

 8          abstained from jurisdiction,

 9          completely pulled the rug from

10          underneath us.  I still to this

11          day don't know exactly what

12          happened, but it happened.  I'll

13          leave it at that.

14               So, that was another case we

15          worked up.  The first case that

16          was going to be tried in Texas was

17          James Miller, Jay Miller or James

18          Miller.  Julie knows the case well

19          because, again, we worked this

20          thing up from beginning to end.

21          This thing was set, the first case

22          in Texas, and we used and deposed

23          Dr. Tom Mayor, Dr. Eric Price, Dr.

24          Thomas Baldwin, the cardiologist
```

FAC Resp. Exhibit D -- 1021

Page 22

1          from KC that you got us, Andy, Dr.

2          Plunkett, Dr. Moye, Dr. Frias and

3          Dr. Rosin, ready to try that case.

4          They filed a summary judgment

5          motion on a bankruptcy proceeding

6          because Miller had filed the

7          bankruptcy two years prior to our

8          filing suit, and the bankruptcy

9          was dismissed prior to filing

10         suit, but he had been injured in

11         the interim.  They said that he

12         did not list it in his -- this was

13         just two weeks again prior to

14         trial.  They said he didn't list

15         it.  Julie had argued a summary

16         judgment motion, and our judge,

17         Randy Wilson, found for the

18         defendants with that case.  We

19         appealed to the 14th Court of

20         Appeals, and it was on appeal at

21         the time the settlement was

22         announced.  Unbelievable to me.

23              MR. HERMAN:  When was the

24         Miller case set for trial?

Page 23

1              MR. MATTHEWS:  Elvis

2         Anderson was August 7, 2006.  This

3         would have been prior to that.

4         This would have been in early

5         2006.  I don't have a specific

6         date right in front of me here.

7         Is there a process that you would

8         like somebody to follow up on

9         that?

10             MR. HERMAN:  No.  I was just

11        trying to place it.

12             MR. MATTHEWS:  Early '06.

13             At that point, we moved on

14        to the next couple of cases, and

15        we fully worked up Eura Fowler,

16        Herlinda Melindez, Sharon Rigby,

17        Nancy Springfield and Ruby

18        Ledbetter, which was a Fibich case

19        that Fibich had asked that I get

20        involved in and try it either by

21        myself or with him.  We were kind

22        of in that mode.  During the last

23        case I just talked about, Ruby

24        Ledbetter, is when Wilson came

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          down with the preemption finding,

2          which put everything in

3          standstill.

4                    MR. BIRCHFIELD:  You named

5          several plaintiffs there together.

6          Were those going to be tried

7          together?

8                    MR. MATTHEWS:  They were all

9          going to be tried individually.

10         The Court wanted us to submit

11         cases so we had several cases

12         ready to try.  I kind of was the

13         point person for that.  We would

14         submit ten cases, and, again, this

15         is what Dr. Wait spent a great

16         deal of time with.  It is a

17         hundreds of hours project, in my

18         opinion, that is, going through

19         your cases, as we all know, and

20         finding cases that you think

21         should be tried or can be tried.

22         A great deal of time was spent on

23         that.

24                    This is the short story to

FAC Resp. Exhibit D -- 1024

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

 1          that long story.  After whittling

 2          it down to these cases, we worked

 3          all of these cases up.  Again, I

 4          put this in the written materials.

 5          All the experts were taken, all

 6          the fact witnesses, all the family

 7          members, all the treaters, all the

 8          detailers, all the prescribers,

 9          you know, the whole --

10              MR. SEEGER:  Can I ask you a

11          question, Dave?  I don't mean this

12          to be a provocative question, but

13          I have to ask it, and you are the

14          best guy to address it.  There

15          have been certain statements made

16          that cases were put up for trial,

17          were worked up and then were being

18          dismissed.  Some of this was

19          aggravating the judge, that people

20          either appeared to be trial ready

21          or they were getting cases set.

22              MR. MATTHEWS:  I appreciate

23          the question.

24              MR. SEEGER:  You are the

FAC Resp. Exhibit D -- 1025

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           best guy to address this.

2                   MR. MATTHEWS:  I think it's

3           me.  If you want to ask the

4           person, I think it's me.

5                   There was one case in

6           particular that was Sharon Rigby,

7           that was dismissed, the only case

8           that was dismissed prior to trial.

9           Sharon Rigby, I really don't think

10          I should talk about it because it

11          truly is attorney-client

12          information, and I'm not going to

13          talk about it, but Sharon Rigby

14          was dismissed for a variety of

15          reasons that needed to be

16          dismissed.  Other than that,

17          that's just simply not the case.

18                  MR. SEEGER:  By anybody

19          else, Dave?  Was anybody else --

20                  MR. MATTHEWS:  Not to my

21          recollection.  I think all the

22          cases that were up for trial were

23          mine, both stroke and heart

24          attack, I think.

FAC Resp. Exhibit D -- 1026

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          MR. SEEGER:  Do you know how
2     many that would have been?  I
3     think you told us, but how many
4     cases were in the queue?
5          MR. MATTHEWS:  I would say
6     we had about eight or nine cases.
7     I'm sorry.  Eight cases, and then
8     Elvis Anderson was in Tribal Court
9     in the city.
10         MR. HERMAN:  Was your stroke
11    expert and specific causation
12    reports and depositions shared
13    with the New Jersey depository or
14    the MDL depository?
15         MR. MATTHEWS:  I don't know
16    the answer to that, but I know
17    that Tom Kline --
18         MR. LEVIN:  Well, Steve
19    Levine was an expert for the MDL.
20    My question to you was, did you
21    get a report?  Because we never
22    got a report from him in the MDL,
23    and he went by the wayside for
24    whatever reason, and Feldman is

FAC Resp. Exhibit D -- 1027

Page 28

```
 1          our stroke expert.
 2              MR. MATTHEWS:  Steve
 3          Levine -- I have worked with Steve
 4          Levine --
 5              MR. LEVIN:  He's Selikoff's
 6          guy.
 7              MR. MATTHEWS:  I worked with
 8          Steve Levine several years prior
 9          to Vioxx.  That's how I knew Steve
10          Levine.  We worked on the PPA.  I
11          was real familiar with his work.
12          We had literally gotten, like I
13          said, two weeks, maybe two and
14          half weeks prior to trial, so I
15          have to believe a report was
16          furnished to the defendants, but
17          they didn't take his deposition,
18          to my memory right now.
19              MR. HERMAN:  The reason I
20          ask the question is, we were being
21          pushed for stroke cases not only
22          to try, but at the same time, we
23          were putting together a stroke
24          trial package.  There's a dearth
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

 1        of material that's provided to the

 2        MDL depository on stroke, and if,

 3        when you get back, you have a

 4        chance to look at it, if you can

 5        provide a list of what stroke

 6        materials were provided to either

 7        the New Jersey depository or the

 8        MDL, it would be helpful.

 9            MR. MATTHEWS:  I'll say

10        this.  I know, because I presented

11        both Plunkett and Moye, Plunkett,

12        a pharmacologist, and Moye, an

13        epidemiologist, for deposition in

14        the stroke case, Elvis Anderson.

15        So, there has been expert

16        testimony about epidemiology and

17        pharmacology.  I'll find that out

18        for you.

19            MR. BLIZZARD:  Dave, why

20        don't you explain Judge Wilson's

21        approach to the stroke cases, as

22        well as your development of the

23        Elvis Anderson case, because I

24        think some people may not

Page 30

1          understand that Wilson focused on

2          stroke because heart attack cases

3          had already been tried.  Why don't

4          you explain that.

5               MR. MATTHEWS:  Judge Wilson

6          believed we needed to get a stroke

7          case to trial, and he, being an

8          innovative judge, wanted to try

9          the first stroke case.  We, I

10         guess, were kind of elected,

11         again, by exclusion, to be the

12         firm that was going to go through

13         the cases.  So, I had contacted

14         all plaintiffs lawyers in Texas or

15         elsewhere, but had cases in Texas

16         that had strokes.  We were trying

17         to get through those cases because

18         Judge Wilson was really pushing us

19         to get these cases to get to

20         trial.  Not only did we get Dr.

21         Wait and his group to kind of

22         whittle away down to cases we

23         could try and my cases in Texas,

24         but we did the same thing with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          stroke.  This is an ongoing

2          battle, I'll say, with Merck as to

3          what case or what cases would be

4          tried.  So, that was another thing

5          that was going on at the time.

6               MR. LANIER:  Did we put

7          those stroke cases up?  Did we put

8          up two?

9               MR. MATTHEWS:  I think so.

10         Let me just say, there was not a

11         great deal of discovery done.

12         Other than Elvis Anderson in the

13         Texas MDL, there wasn't a great

14         deal of discovery done.  The

15         plaintiffs were always trying to

16         push it to the side, let's get a

17         heart attack case, because we all

18         know in this room that stroke

19         cases were harder.  We had less

20         clinical trial data.

21              Let's see.  I can go on and

22         answer questions.  I had filed

23         some time ago to be part of the

24         Plaintiffs' Steering Committee,

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          and, frankly, I have not always

2          been involved in MDLs.  I maybe

3          avoided them, and I guess I'm

4          doing that less so now, but I did

5          for several years.  But I did file

6          a motion to be in the Federal MDL,

7          and I have included that in the

8          materials.

9               Looking at the Court's

10         order, pretrial 6(D), just to

11         quickly go through what the Court

12         had asked, and that's the extent

13         each common benefit firm made a

14         substantial contribution to the

15         outcome of the litigation, I do

16         believe our biggest contribution

17         was the stroke arena, because I

18         think we pushed it because we

19         happened to have one in what I

20         think was a desirable venue and

21         jurisdiction to try it.  We were

22         also getting pushed in Texas.  So,

23         I think that was probably one of

24         our bigger contributions.

FAC Resp. Exhibit D -- 1032

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1                  I'll say that when Texas
 2           didn't go as we had hoped with the
 3           preemption ruling, I was ready to
 4           try the Ledbetter case.  We were
 5           going to try it.  It went south on
 6           us.  That didn't slow us down.  We
 7           continued to push litigation.
 8                  We again continued to work
 9           with Chris' firm, Seeger Weiss in
10           New York and New Jersey, to push
11           those cases.  We were presenting
12           plaintiffs for deposition, taking
13           prescribers and working with
14           Chris' group to push that
15           litigation because Texas had
16           slowed down.
17                  We also filed for the appeal
18           of Texas, and we worked prior to
19           that on all of the briefing.  I
20           hired an appellate lawyer and
21           spent $75,000, it is a typical
22           defense firm in Houston, and Ed is
23           familiar with them, with David
24           Gunn with Beck, Redden & Secrest,
```

Page 34

1          which is a very well known defense

2          group who I felt would help us on

3          the appellate and briefing points.

4          So, we spent 75, $85,000 in that

5          arena.

6               We continued to fight

7          through the preemption arguments.

8          I made all the arguments, which I

9          probably should not take credit

10         for.

11              MR. SEEGER:  Just as it's

12         coming down.

13              MR. MATTHEWS:  Let me back

14         up.  I only did about half of

15         them.

16              MR. BIRCHFIELD:  Did you

17         have cases in the trial pools that

18         were coming up?  What was the

19         status of the New Jersey cases?

20              MR. MATTHEWS:  Right at the

21         time the settlement was announced,

22         to my memory, we had several cases

23         in the trial pool.  Where they

24         were in the queue, I can't tell

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          you.

2                    MR. SEEGER:  I can tell you

3          sitting here right now, I can't

4          either.  I will tell you that

5          there was a big push to get 250

6          cases worked up so that Judge

7          Higbee would have a trial pool to

8          constantly dip into.  I do know

9          Dave had cases in that pool.  I

10         don't know where they were though.

11                   MR. HERMAN:  At that time,

12         there was a large pool of cases in

13         New Jersey, and I know Tom Girardi

14         was pushing a large pool in

15         California at the same time.

16                   MR. LANIER:  Thank you.

17                   MR. HERMAN:  I want to thank

18         you because you have very

19         concisely cleared up some

20         misinformation that I know I

21         received thirdhand, and I think it

22         was important for me personally to

23         hear.

24                   I also need to say that a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          lot of strange things happened in

2          this litigation.  If your tribal

3          case had gone to trial -- we

4          always deal with ifs, but there

5          are a lot of mysterious things

6          that Merck had happen in this

7          case, and it is real tough for a

8          front line trial lawyer to go

9          ahead and prepare a case, have it

10         set up, know where it is going to

11         trial, and all of a sudden the

12         case disappears and you can't even

13         explain it to the client.

14              More importantly, the

15         negotiating committee for eleven

16         months found it very difficult

17         going in terms of stroke cases in

18         negotiations.  I'm certain lawyers

19         that prepared stroke cases, Merck

20         knew about.  At some point we were

21         able to get stroke cases included.

22         For my own part, the work you did

23         in stroke cases is a common

24         benefit, and I appreciate it.

FAC Resp. Exhibit D -- 1036

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1              MR. MATTHEWS:  Some of it
 2        was unwitting.
 3              MR. HERMAN:  I'd rather have
 4        unwitting contributions than
 5        witless contributions.
 6              MR. MATTHEWS:  I'm going to
 7        finish this real quick.  I'm going
 8        to wrap it up in a minute because
 9        I don't want to take any other
10        time.
11              Just to follow up, we had
12        Julie, Jason, Jeb and I, we had
13        four lawyers working on this
14        litigation since its inception.  I
15        think we were committed from the
16        beginning to the end until the
17        announcement of the settlement.
18        Consistency, I don't think it ever
19        waned.  I think we were always
20        involved 100 percent.
21              In terms of the PSC, I think
22        I was on the science committee.  I
23        did not do work on the science
24        committee.  I was more doing work
```

FAC Resp. Exhibit D -- 1037

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          in individual cases, preparing my

2          own experts.  We had Dr.

3          Zabalgortia, we had Entman, we had

4          Plunkett, Moye and others that we

5          were preparing and presenting for

6          deposition and trial.

7               The trial I talked about

8          with Andy.

9               Not involved in the

10         allocation, fee committee.

11              We were involved prior to

12         its withdrawal.

13              After negative consequences

14         in Texas, we continued to stay

15         involved.

16              I think that's what the

17         Court had asked that we talk

18         about.

19              MR. HERMAN:  Arnie, what do

20         you have on costs and hours?

21              MR. LEVIN:  Ed will do it.

22              MR. BLIZZARD:  Dave and

23         Julie and I have had a meeting

24         previously and talked about the

Page 39

```
1        cost submissions and the time

2        submission.  I think they are

3        still showing at Wegmann-Dazet as

4        not being approved at this point.

5        So, whatever we can do to help.  I

6        think it is a good idea to maybe

7        set an appointment with them and

8        go down in person.  And if I can

9        go down and help in person with

10       you, I'll do that, to make sure

11       that you've got whatever they need

12       to get your expenses and time

13       approved.

14            MS. RHOADES:  I think I have

15       another --

16            MR. LEVIN:  You have

17       $1,660,000 in expenses, so, it is

18       worth the trip to New Orleans.

19            MR. MATTHEWS:  I think

20       that's probably worth a trip.  We

21       obviously spent more than that.

22       I've already seen some problems,

23       Ed, you and I talked about this.

24            MR. HERMAN:  Let me give you
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          the contact, my partner,

2          ldavis@hhkc.com, (504) 581-4892.

3          Lenny can set up or connect you in

4          with Phil Garrett, who is the

5          independent CPA appointed by the

6          Court.  I recommend with that much

7          in expenses that you send someone

8          knowledgeable.  They are helpful.

9          They are there to help and assist,

10         not impede, and they will be happy

11         to go over what the expenses are.

12              MR. BIRCHFIELD:  If you have

13         a report from Steve Levine, will

14         you get that to Lenny?

15              MR. MATTHEWS:  I will give

16         it to Russ.

17              MR. BIRCHFIELD:  Lenny in

18         Russ' office, just e-mail it.

19              MR. MATTHEWS:  Okay.

20              Julie, is there something

21         you want to add?

22              MS. RHOADES:  Sounds great

23         to me.

24                   -  -  -

FAC Resp. Exhibit D -- 1040

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 1041

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM:  MORELLI RATNER
       Benedict Morelli, Esquire
       David Ratner, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1042

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                 -  -  -
 2            MR. MORELLI:  Good morning,
 3       everyone.  I decided not to do a
 4       PowerPoint because Mark is here,
 5       and he's the best PowerPoint
 6       person I know.  I said I'm not to
 7       embarrass myself.  He's going to
 8       mark and critique me for the next
 9       year.
10            MR. SEEGER:  He's going to
11       do that anyway.
12            MR. MORELLI:  I want to say
13       that there are a couple of people
14       on the panel that don't really
15       know me that well, if at all.  I'm
16       in a very unique and unusual
17       situation in this litigation,
18       because I've been trying cases
19       since the '70s, and I've had a lot
20       of high profile cases, and at the
21       time when Mark asked me to assist
22       him on the Ernst trial, I had just
23       been elected the president of the
24       New York State Trial Lawyers
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1043

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1       Association.  At the same time

2       that I was elected, I left for

3       Houston and gave up my summer, two

4       months of it.  I don't know a

5       whole lot of people who decide

6       that they are going to spend their

7       summers in Houston.

8            When I spoke to Mark and he

9       asked me to help him on the Ernst

10      trial, we started out by taking

11      the depositions of the executives

12      of Merck, and I second seated him

13      with all of those depositions,

14      Scolnick, Reicin, Kim, Gilmartin,

15      I think six depositions in all.

16           And when he was off in

17      Houston finishing his preparation

18      of the trial, I took the national

19      sales manager's deposition, Mr.

20      Dunn, I did that myself.  When I

21      went to Houston and started

22      working with Mark, I got there at

23      the jury selection.  I was there

24      from jury selection through the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        verdict for two months.

2              As a trial lawyer, I think

3        that I was always in control.  I

4        decided which cases I was going to

5        try, how I was going to try them,

6        the order of the witnesses.  I've

7        tried every kind of civil case in

8        my career.  And for 25 straight

9        years, I never lost a case.  And

10       when I took the bullet in the Cona

11       case, because that was the second

12       trial I was on with Mark Lanier, I

13       knew I was taking it.

14             MR. WEITZ:  Explain that.

15       Explain what you mean by that.

16             MR. MORELLI:  Let me go back

17       and explain about the fact that I

18       was on two trials with Mark.  One

19       was approximately two months, and

20       the other one was maybe a

21       month-and-a-half, and that was

22       Cona/McDarby.

23             The Cona/McDarby case was a

24       unique situation where Judge

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1    Higbee asked us to try two cases

2    at the same time.  Mark took the

3    lead in trying the liability in

4    the case, and the damages were

5    tried separately by Mark's firm

6    and by Weitz & Luxenberg.  I was

7    part of that trial team for the

8    entire time, from jury selection

9    through verdict.

10        MR. WEITZ:  Also before

11   that, explain the prep that you

12   were involved with in the mock

13   trials.

14        MR. MORELLI:  We also had

15   mock trials, and I actually

16   allowed myself to be embarrassed

17   for the common good, of course, by

18   wearing the robes of the judge,

19   which were too long for me.  They

20   were all the way down to here.

21   (Indicating.)

22        MR. LEVIN:  I think you'll

23   grow into them.

24        MR. MORELLI:  My mother was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1      optimistic like you.

2            MR. LEVIN:  So was mine.

3            MR. MORELLI:  When I was 50,

4      she told me I'd still be growing.

5      If she was alive, she would still

6      be telling me that.

7            But I was involved in the

8      mock trials.

9            When Mark and I were taking

10     the depositions of the executives,

11     I sat next to him at every single

12     deposition.  I tried to give him

13     my experience, my advice, my

14     questions.  He would ask me, did I

15     leave out anything, or he would

16     take questions from me.  The two

17     of us actually gave up a lot of

18     our ego for this litigation,

19     because anybody who knows anything

20     about a trial lawyer knows that

21     they don't like to give up

22     control.  I never second seated

23     anyone in my entire career until

24     the Vioxx litigation.

FAC Resp. Exhibit D -- 1047

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1              This litigation has been

2         unique and unusual, and I find

3         myself again not in control.  Not

4         in control during the whole

5         litigation.  Second seating in the

6         Ernst trial for two months; second

7         seating in Cona/McDarby, where I

8         know that I brought a lot of

9         maturity to that trial.  I

10        prepared witnesses, I prepared

11        documents.  I argued every motion

12        in limine in the Ernst trial in

13        Houston.  The uniqueness of this

14        is that never did I have the

15        prospect of a fee.  Never did I

16        discuss with Mark, am I going to

17        get paid?  Never did I have any

18        kind of an arrangement.  No one

19        offered to pay me.  Every single

20        thing I did, I did for the good

21        and the common good of this

22        litigation.

23             The first trial was a

24        verdict of $253 million, and I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        have to say that I think I had a

 2        lot to do with that.  I wrote a

 3        summation over three or four

 4        weeks, and I presented it to Mark

 5        in the hotel, just not because I

 6        thought that he was incapable of

 7        doing it himself, because anyone

 8        who has ever seen him knows how

 9        capable he is, but because he had

10        asked me to join him, to give him

11        insight, to bring him experience.

12             I've been trying cases since

13        1977, from trip and fall cases to

14        DES.  There's nothing I haven't

15        tried.  There's no case that I

16        haven't tried.  I've tried more

17        cases than most lawyers who

18        practice law today, and when Mark

19        asked me to join him and to second

20        seat him, I took my ego and put it

21        aside and said okay.

22             When we were on the

23        Cona/McDarby trial in New Jersey,

24        we knew that the damages in that
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        case were in trouble because it

2        was all based on samples.  And the

3        treating doctor did not testify

4        that he gave the plaintiff

5        samples.  And I put the daughter

6        on the witness stand in that case,

7        and then I agreed to give the

8        summation in a case that I knew

9        was a loser.  Because as a trial

10       lawyer, and I've taught how to try

11       cases for a very, very long time,

12       I know you can't win a case in the

13       summation.  You can get money in

14       the summation, but you can't win

15       the case if it is a loser.

16             So, when I agreed to sum up

17       in that case, I did it for the

18       common good, because I wanted the

19       liability in the case to stay

20       pristine so that we would win.

21       And we did win the liability in

22       the case, and we won the liability

23       in the Cona/McDarby case.  The

24       Cona/McDarby verdict was a very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1      big verdict.

 2           Those two trials that I was

 3      on, Ernst and Cona/McDarby, had as

 4      much to do to shape the litigation

 5      here and to bring about a global

 6      settlement than anything.  I don't

 7      think that there's anybody in this

 8      litigation who has been on two

 9      trial teams who gave up almost

10      four months of their career and

11      didn't have a case, it wasn't

12      their case personally.

13           Now, when I was sworn in as

14      the president of the New York

15      State Trial Lawyers, and by the

16      way, the second largest trial

17      association, bar association in

18      the country other than AAJ, I gave

19      up a lot of my presidency to spend

20      two months in Houston.  I didn't

21      see my family for two months in

22      the summer when my kids are home

23      and my wife wants to go to the

24      beach.  I didn't do any of that.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1     I did it not because I thought

2     there was a pot of gold at the end

3     for me, but we had to win the

4     litigation.  I'm a trial lawyer.

5     We had to win the litigation.

6     That's all I cared about.

7         And please understand that

8     there was a lot of sacrifice made

9     because many of the perks of being

10    president of the New York State

11    Trial Lawyers I gave up to be on

12    this trial.  And, look, I believe

13    that I deserve a determination on

14    the merits.  There are a number of

15    people on this panel who I know

16    fairly well.  I'm not asking you

17    for any favors.  I don't deserve

18    any favors.  But I certainly

19    deserve full consideration being

20    in such a unique position.

21        Because when all of my cases

22    were brought in New Jersey, I

23    didn't warehouse cases, I didn't

24    toll any cases.  I filed them all.

FAC Resp. Exhibit D -- 1052

Page 12

1          I got medical records on every

2          case.  And when Judge Higbee asked

3          for people to put forth cases to

4          move this litigation toward a

5          global settlement, we stepped up

6          to the plate.

7               My firm, with fewer than 15

8          lawyers, put five lawyers,

9          including my partner, who is

10         sitting next to me, David Ratner,

11         and myself to prepare these cases.

12         And as a matter of fact, when

13         Judge Higbee called for what she

14         called the original 39 cases that

15         went to 10, because she said we

16         would try 10 cases at once, out of

17         those 10 cases, 4 were mine.  And

18         we prepared those cases.  I hired

19         a pathologist in Chicago, and

20         because I had a very unique death

21         case called Weiss, my client died

22         midair on his way to Hong Kong in

23         his wife's arms, and Merck was so

24         afraid of that case, they fought

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1        me tooth and nail to make sure
 2        that that case never went to
 3        trial.  I had to hire a lawyer in
 4        Hong Kong to be able to get the
 5        pathology slides, because they did
 6        an autopsy in Hong Kong.
 7             To this day, that case has
 8        never been tried, because as my
 9        four cases were part of the ten,
10        and that ten got reduced to eight,
11        then got reduced to four, and I
12        still had a case in there, then it
13        got reduced to two, and I was shut
14        out after I spent time, money and
15        effort, my personal time.  I
16        wasn't allowed to try any cases.
17             But it wasn't because -- and
18        by the way, my firm does
19        individual cases, personal injury,
20        medical malpractice and employment
21        discrimination.  That's the bread
22        and butter.  For three years, it
23        put such a strain on my firm
24        financially because I was in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          Vioxx business, and I was

2          hell-bent on making sure that we

3          won and that we got to the right

4          result.

5                    I've always been, you know,

6          tough in the courtroom, and it was

7          very, very difficult for me to

8          take a second seat and not, you

9          know, stand up in Houston at every

10         turn.  And I want you to know, the

11         economist was who I put on in

12         Ernst.  And anybody who has ever

13         put an economist on the stand

14         knows that it is like watching

15         grass grow, okay?  It is not

16         exactly what you would choose to

17         do.  Somebody would not be

18         fighting, let me put on the

19         economist.

20                   When I tell you that when we

21         did these trials, Ernst and

22         Cona/McDarby, it changed the

23         litigation.

24                   Now, look, I know that there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1         are people who dedicated

2         themselves to the litigation and

3         were certainly essential to the

4         common good, and I'm not saying

5         I'm number one on the list, no

6         way.  There's people in this room,

7         in my opinion, who should be in

8         the top tier of people who get

9         compensated because of what they

10        dedicated to this litigation.

11             But it's my opinion that my

12        firm, what I gave up in time and

13        money, and let me tell you, when I

14        took the bullet in Cona, okay, I

15        did it publicly, live stream.  All

16        right?  And it is interesting,

17        because there was an article

18        written about me in New York

19        Magazine in March of 2000, and as

20        a result of that article, I was on

21        a television show for two years

22        called Power of Attorney, where we

23        tried cases on television.  A

24        couple of members of the panel

FAC Resp. Exhibit D -- 1056

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
1        know this story.  And to show you

2        that my son, my youngest son, who

3        had come to watch me try cases and

4        knew that it was so important for

5        me to win, win, win, okay, he said

6        to me, dad, I saw you on

7        television today.  I said, yeah?

8        He said, yeah.  He said, you were

9        trying a case.  I said, yeah.  He

10       said, you lost.  He said, you lose

11       cases?  I said, only on

12       television.  Okay?

13            And on Vioxx, luckily it was

14       only on television in my head.

15       But we all know it wasn't just on

16       television.  And I tell you, in

17       those cases, not only did I bring

18       my experience as a trial lawyer --

19       and, by the way, you know, I could

20       have boards and PowerPoints and

21       everything, but I'm talking to you

22       the old-fashioned way, the way I

23       sum up.

24            I stand in front of a jury,
```

FAC Resp. Exhibit D -- 1057

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          I look them in the eye, and I
 2          don't ask them, could you be fair
 3          when I select the jury because I
 4          know I'm going to get the answer
 5          from them that they expect me to
 6          hear.  So, I'm not going to ask
 7          any of you could you be fair.  I'm
 8          going to say, please be fair with
 9          my firm.
10              And my partner will tell
11          you, because he -- I manage my own
12          office.  The finances, the
13          business, I interview clients, I
14          bring in business, all of that was
15          really hurt by my decision to
16          spend so much time in Vioxx.  Now,
17          I'm a big boy, and I'm going to
18          survive, but when you decide who
19          is in the most unique position of
20          anybody in this litigation, I hope
21          you think it's Benedict Morelli,
22          not the way it's spelled in the
23          e-mail, Bendict, it's Benedict
24          like the Pope.  Okay?  Benedict
```

FAC Resp. Exhibit D -- 1058

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1      Morelli had a lot to do with the

 2      Vioxx litigation.

 3           And a lot of my of counsel

 4      clients, who normally give us

 5      individual cases, were hard

 6      pressed to do so, because they

 7      would say to me on the phone and

 8      to my partner, you guys are in the

 9      Vioxx business.  Morelli is not

10      around to try these cases.  He's

11      not around to look and see how it

12      should be tried or what judge it

13      is going to be in front of.  So,

14      we lost a lot of money because of

15      the Vioxx litigation, and I'm so

16      happy we did what we did, because

17      I think without Ernst, without

18      Cona/McDarby, and without a number

19      of people on this panel who pushed

20      forward even when it felt

21      impossible, because let me tell

22      you, they kept saying, we're not

23      going to settle these cases.

24           So, I had no cases, zero

FAC Resp. Exhibit D -- 1059

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1          cases in the MDL.  I never

 2          expected to be assessed.  All my

 3          cases were in New Jersey.  So, I

 4          certainly wasn't thinking, oh, I'm

 5          going to get the common benefit

 6          fund one day.  But think about how

 7          strange it is that I would be in

 8          this position, because at the time

 9          I had 1,200 cases, I was on the

10          first trial and the third or

11          fourth trial, and I'm not even on

12          the panel making the decision of

13          how much money people get.  Once

14          again, not in control.

15              So, I have to leave it to

16          all of you and your good

17          conscience.  I just want my

18          partner to say one or two things

19          about the way it affected our

20          firm.

21              MR. RATNER:  When Ben was in

22          Houston and in New Jersey, he was

23          obviously not in the office.  When

24          he's not in the office, he's not

FAC Resp. Exhibit D -- 1060

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      there to interview clients, he's

2      not there to talk to prospective

3      referring attorneys, he's not

4      there to do things like that.  So,

5      that had one effect on the

6      business.

7          But there was a second and

8      greater effect, and that is when

9      we were preparing the four New

10     Jersey cases for trial, we took

11     the five most senior lawyers in

12     the office, me, Les Salmon, three

13     other people, who tried the bulk

14     of our personal injury cases, and

15     said, we're going to defer that

16     for a while and we're going to

17     prepare these four cases, the four

18     most important cases in the firm.

19         And I flew all around the

20     country preparing our prescribing

21     doctors, our treating doctors for

22     their depositions.  In every one

23     of the cases, the prescribing

24     doctor testified, had I known

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          now -- had I known then what I

2          know now, I would not have given

3          Vioxx to this patient.  And all

4          the treating doctors testified

5          that Vioxx was the cause of the

6          heart attack in that particular

7          case.

8               We had our senior trial

9          lawyer, Les Salmon, taking all the

10         sales reps depositions in all of

11         these four cases.  So, we put our

12         full court press to get these

13         cases ready.  But what did that

14         mean?  That meant that I wasn't

15         available to try any cases in New

16         York.  Les, who got a $70 million

17         verdict in a medical malpractice

18         case last year, wasn't available

19         to try any cases in New York.  He

20         wasn't available to take any

21         depositions in New York.  He

22         wasn't available to conference

23         cases in New York.  I wasn't

24         available and Ben wasn't available

FAC Resp. Exhibit D -- 1062

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          to be on the phone to settle cases

2          in New York.  So, as a result of

3          that, our income and cash flow

4          were severely affected.  And we

5          did that because we thought we

6          were going to get money on these

7          four cases?  No.  Because we

8          thought that getting cases ready

9          for trial and pressing Merck and

10         pressing Merck and getting ready

11         to take depositions and making

12         them take doctor depositions and

13         making them prepare sales rep

14         depositions would put pressure on

15         them to bring them to the table.

16         And we hoped that it did, and we

17         think that it did, and we think we

18         should be compensated for it.

19              MR. MORELLI:  Just two

20         things in closing.  The unique and

21         unusual, that's what I want you to

22         think about when you think about

23         me, because I think I am, and in

24         this litigation, I certainly was

FAC Resp. Exhibit D -- 1063

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      unique and unusual.  I think about

2      now being assessed and maybe at

3      the end being lucky enough to get

4      my own assessment back.  How fair

5      do you think that would look when

6      somebody like me gave up so much?

7           MR. WEITZ:  Ben, how many

8      cases did you submit to the

9      settlement?  How many cases did

10     your firm submit?

11          MR. MORELLI:  860.  We were

12     on board from the beginning with

13     the settlement.  We applauded

14     Chris and everyone else who put

15     the settlement together.

16          MR. WEITZ:  Tell us about

17     your expenses.

18          MR. MORELLI:  I don't

19     remember them offhand, but I did

20     give the spreadsheet.

21          MR. WEITZ:  They were pretty

22     significant.

23          MR. LEVIN:  They were

24     $166,000.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          MR. RATNER:  Sounds right.

2          MR. SEEGER:  Arnold

3     memorized all of them.

4          MR. MORELLI:  Let me just

5     answer that, because that's an

6     interesting thing that you would

7     know the exact amount.

8          MR. SEEGER:  Well, we have

9     it right here.

10          MR. LEVIN:  Ben, what do you

11     think this is?

12          MR. MORELLI:  No, no, no, I

13     appreciate that.  But let me

14     explain what they would have been

15     had we been able to try the four

16     cases that were part of the ten.

17     It would have been millions of

18     dollars.

19          MR. LEVIN:  Exactly.

20          MR. MORELLI:  Because in

21     this litigation, I don't think it

22     should be judged at how much your

23     expenses were, because we never

24     backed down, and we never backed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1      up in this litigation.  Every time

2      Judge Higbee asked for volunteers,

3      you can ask Buchanan, my firm was

4      right there ready to try cases.

5          As a matter of fact, after

6      Humeston got tried for the second

7      time with Mark, and I forget the

8      name of your case, Mark, in those

9      two cases, I had -- Judge Higbee

10     promised that our cases would be

11     tried next either with a trial

12     team or just with my office.  So,

13     I was willing to put up whatever

14     money it was for the common good.

15          MR. WEITZ:  Well, when I say

16     expenses also, I didn't mean just

17     your hard costs that you

18     submitted.  But you had a lot of

19     expenses on individual cases too,

20     right?

21          MR. MORELLI:  Absolutely.

22          MR. SEEGER:  I want to say,

23     none of us know where any of this

24     is heading, and we're just working

FAC Resp. Exhibit D -- 1066

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1      as hard as we can to put something

 2      together for the judge to

 3      consider.  I just want to

 4      personally say, I know what you

 5      did, I know how hard you guys

 6      worked, and you really were team

 7      players, from somebody who was

 8      involved both in the MDL and New

 9      Jersey.  So, I think I thanked you

10      privately, but I want to thank you

11      on the record.

12           MR. WEITZ:  Well, I also

13      know Ben for 30 years, and I know

14      the firm Dave and Ben have.

15      Although you take a look at my

16      firm, I have a lot of people and I

17      contributed a lot of people to

18      this, but when these guys really

19      say that it truly affected their

20      income stream and the kind of work

21      that it did and their opportunity,

22      this is a firm that it really did.

23      So, I don't want that to go

24      lightly.

FAC Resp. Exhibit D -- 1067

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1            MR. LEVIN:  Work with the

 2       accountants to straighten out

 3       those costs so that you can get

 4       approved.

 5            MR. MORELLI:  Okay.

 6            MR. SEEGER:  From my

 7       perspective, I think you've done a

 8       great job summing up your

 9       contributions, and it is a lot

10       harder to be number two on a trial

11       team than number one.

12            We have two minutes if there

13       are any questions.

14            MR. HERMAN:  First of all, I

15       do know you by reputation.  Your

16       reputation as a trial lawyer is

17       really important.  One of the

18       things that I think distinguished

19       this litigation is that, by and

20       large, these were not class action

21       lawyers handling the cases, they

22       were lawyers that know how to try

23       cases, that go in and try cases,

24       and that always has an effect.
```

FAC Resp. Exhibit D -- 1068

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1              We still believe people

 2         settle cases out of fear, and

 3         Merck had its own reasons, but I

 4         think that contributions made by a

 5         number of lawyers caused them to

 6         give second thought to the fact

 7         that they were spending over a

 8         billion dollars to defend cases,

 9         and there are a lot more coming

10         down the road.

11              Just a couple of things.

12              You've got to be aware of

13         the Fifth Circuit and look at the

14         Johnson factors, look at Judge

15         Fallon's decision in Murphy Oil.

16         Read it, because it is going to

17         affect common benefit in this

18         case.  There's no question about

19         it.  There's another case, Mobil

20         Oil, that came out last year in

21         the Fifth Circuit out of the

22         Eastern District.

23              Judge Fallon has indicated

24         that if there's no resolution, he
```

FAC Resp. Exhibit D -- 1069

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1      is going to put lawyers under oath

2      and have former assistant US

3      attorneys and maybe the special

4      masters question and make sure the

5      affidavit is in good shape.

6          I say those things to you

7      because I think you have to know

8      that.  You have to be aware of the

9      Fifth Circuit, which is very

10     different than the First, Second

11     or Eleventh.  So, I appreciate you

12     being here.

13         MR. MORELLI:  Thank you.

14     You didn't see anything in my

15     affidavit that gives you pause,

16     did you?

17         MR. HERMAN:  I saw a lot of

18     things that give me pause, but

19     none in your affidavit.

20         MR. BIRCHFIELD:  When did

21     you start with Vioxx?  When did

22     you first start?

23         MR. MORELLI:  Well, it is

24     interesting.  I started after it

FAC Resp. Exhibit D -- 1070

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          was withdrawn from the market, and

2          that also puts me in a unique

3          position, because even though that

4          was true, I didn't warehouse the

5          tolling cases, I went right on the

6          first trial and actually six

7          depositions in the first trial.

8               I was not one of the

9          pioneers who started in '01 like

10         some of y'all.  So, that is

11         absolutely true.

12              MR. SEEGER:  Thank you, Ben.

13              MR. WEITZ:  Thank you.

14              MR. MORELLI:  Thank you.

15                   -   -   -

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 1071

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR

          Notary Number:  1060147

23        Notary Expiration:  1.2.10

          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 1072

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: MOTLEY RICE, LLC
      Fred Thompson III, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1073

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. THOMPSON:  I appreciate

 3         you taking the time to listen to

 4         me.  I hope to go pretty quickly,

 5         because I understand that

 6         everybody is sort of a traveling

 7         show, and so if I say something

 8         that is boring or redundant, how

 9         about just pull your ear and I'll

10         move on to something else.

11              First of all, there's no

12         reason for me to come before you

13         and claim that I single-handedly

14         resolved the Vioxx litigation.

15         I'm actually looking at people who

16         did a tremendous job, and this is

17         the first opportunity that I've

18         actually had to congratulate you

19         and thank you on behalf of my

20         clients for getting a very solid

21         resolution to a case which had

22         tremendous issues of individual

23         causation, which it was a Joe-type

24         accomplishment for you, and I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1      appreciate that.

2             Having said that, I'm not

3      going to take undue credit.  I do

4      think that our firm did do

5      valuable constructive work that is

6      worthy of a common fund award, and

7      I do want to go down that list

8      very briefly for you just on some

9      individual items for your

10     consideration.

11            We submitted a time sheet.

12     That time sheet has actually been

13     bounced back to us for some

14     presentation faults, and we are

15     now in a 30-day cure period, but

16     substantially the hours will be

17     the same.  We did locate some

18     additional hours, but they don't

19     change the shape of the

20     submission.

21            We chose to participate in

22     the New Jersey state forum, and

23     all but very few hours are hours

24     that were expended in pursuing the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        New Jersey state consolidation.

2        We pressed our cases for trial,

3        and we, in fact, had an

4        opportunity and were on the list

5        to be on the next -- on a trial

6        cycle in the fall of 2007, at

7        which time Merck made due process

8        objections to the size of the

9        trial grouping, and we were, in

10       essence, asked to take a step back

11       and allow some other folks to go

12       forward.  And we, for the good of

13       the litigation, we, in fact,

14       agreed to do that.

15            We were on the list for

16       trial cases in the winter and

17       early spring of 2008, and, of

18       course, the settlement preempted

19       that.  But we were doing

20       preparation work for those cases

21       as well.

22            We did not in our fee

23       petition submit hours for

24       individual cases.  And that would

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1          include the cases that we were

 2          working up as members of Judge

 3          Higbee's trial group.  We did not

 4          submit those hours, but let me

 5          just suggest to you that given

 6          Judge Fallon's opinion that he

 7          views the majority of cases as

 8          somewhat free riding cases, that

 9          they were not worked up and that a

10          push down was somehow justified

11          for that, we in New Jersey

12          followed a procedure that Sol and

13          Chris and Dave Buchanan put out

14          that was designed to put

15          continuous pressure on Merck.  We

16          were actually nominating -- as a

17          group, we were nominating 250

18          cases per quarter, and we were

19          tendering those for depositions of

20          the plaintiffs, the family and

21          close friends, treater, prescriber

22          and two sales reps.  And so we

23          actually were working up a broad

24          number of cases in those pool

FAC Resp. Exhibit D -- 1077

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1         settings.  Sometimes it felt like

 2         Dechert was pinning us down rather

 3         than us pinning them down, but

 4         that was the strategy, and we were

 5         good soldiers.  None of those

 6         hours show up in our fee petition,

 7         but I do want to point out that we

 8         were very active in pursuing that.

 9             As far as traditional common

10         fund work, one of the things that

11         our co-liaison, Sol Weiss -- early

12         on, we looked at the marketing

13         side, and we took on a substantial

14         responsibility in reviewing tens

15         of thousands of marketing

16         documents.  We identified the head

17         of the medical/legal office, Ellen

18         Westrick, who was present during

19         the period of time that Merck was

20         filing the petitions and filing

21         the various forms that were

22         required regarding the naproxen

23         cardioprotective theory.  We

24         worked those documents up, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        worked up the deposition of Ms.

2        Westrick, and we were the lead

3        counsel on that.

4             We also did a substantial

5        document review and a subpoena

6        practice with several third-party

7        PR firms, Ogilvy and DDB, and we

8        did that over a period of time.

9        We were in the process of

10       scheduling depositions when this

11       case changed its nature into a

12       claims facility.  One of the key

13       things that we looked at --

14            MR. HERMAN:  Excuse me.

15       When you say third-party PR

16       firms --

17            MR. THOMPSON:  Yes, sir.

18            MR. HERMAN:  -- are you

19       talking about Merck's PR machine?

20            MR. THOMPSON:  Yes, Ogilvy,

21       DDB.

22            MR. HERMAN:  Okay.

23            MR. THOMPSON:  One of the

24       things that we had looked at early

FAC Resp. Exhibit D -- 1079

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        on was, if you look at the

2        privilege logs, particularly the

3        period around April of 2000, Merck

4        threw a blanket over that period

5        of time where they were

6        considering, first of all, the

7        VIGOR results, and then their

8        public response, which was the

9        VIGOR results were related to the

10       naproxen cardioprotective theory.

11           Many of those documents were

12       completely hidden away, because

13       their general counsel, a lady

14       named Joanne Lahner, was cc'd and

15       attended practically every meeting

16       for that period of time.  We set

17       out very strongly to try to get

18       those documents, and we briefed

19       it, we made motions to take her

20       deposition.  We had three hearings

21       with Judge Higbee, one of which

22       was an evidentiary hearing in

23       which Ms. Lahner took the stand.

24           And we were proceeding, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        thought we had -- we found,

 2        actually, some documents that the

 3        defendant tried to claw back,

 4        because they were very

 5        demonstrative of Ms. Lahner's

 6        editing and the way that she was

 7        trying to handle this.  We thought

 8        we were well on our way to getting

 9        Merck to make privilege releases

10        when all of a sudden Judge Higbee

11        went dark, and in retrospect, it

12        was clear that at that point in

13        time, there were some settlement

14        discussions going on.  But that

15        was an effort, and I'll just be

16        frank with you right now, I don't

17        think anybody has ever seen those

18        documents.  And if we ever do,

19        we're going to see a very clear

20        picture of some corporate venality

21        that Merck really doesn't want us

22        to ever see.

23             So, we participated in the

24        joint prosecution in New Jersey.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        We worked carefully with Jeff

2        Grand in providing order books,

3        motions in limine and various

4        things that would be a part of --

5        Judge Higbee's plan was to try to

6        routinize these cases so that she

7        could farm them out and have

8        trials by many state court judges.

9        And part of that was her making

10       preemptory rulings on many

11       evidentiary issues and many issues

12       of law.  And we were involved with

13       Jeff.  I don't want to claim much

14       credit beyond the fact that we

15       volunteered for that program,

16       Carmen Scott in our office drafted

17       it up, and we sent a series of

18       things that were included in that

19       effort.

20            I think we talked a little

21       bit about marketing already, but

22       we did review the marketing sales,

23       FDA DDMAC documents, and found a

24       series of hot documents, including

FAC Resp. Exhibit D -- 1082

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        some really great ones from Ms.

 2        Westrick.

 3            We participated early in

 4        developing a business ethics

 5        expert.  Chris probably remembers

 6        this.  Mr. Michael Hoffman.  He

 7        had a beautiful opinion that Judge

 8        Higbee decided that she didn't

 9        want to put in front of the jury.

10        So, if you are looking at it from

11        today back, maybe that was not a

12        big bearer of fruit, but looking

13        at it in a forward-looking aspect,

14        looking at it in terms of an

15        ongoing war in which there are

16        many battlefields in which there

17        are many things that need to be

18        addressed, we did expend the time

19        and the expense to develop that

20        expert.  And given another judge

21        who would accept that type of

22        business expert testimony, Dr.

23        Hoffman would be a good witness.

24            We worked also with Eric
```

FAC Resp. Exhibit D -- 1083

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1       Weinberg on a damage causation

2       expert, I think it is Dr. Kostis

3       and Madigan, who were working on

4       trying to use -- trying to apply

5       some Framingham data to try to

6       show or illustrate the causation

7       trying to show an enhanced risk of

8       some substantial contributing

9       factor on these individual

10      causation cases, which, of course,

11      is the real tough part of this

12      case.

13          We used some pretty senior

14      people.  Don Migliori was going to

15      be our partner, who was going to

16      actually be on the trial team of

17      the cases, myself, Ann Ritter, who

18      did a substantial amount of

19      background work on the experts and

20      on the third-party documents.  Two

21      associates, Carmen Scott and Henry

22      Leventis.  This case has gone on

23      long enough that the law clerk in

24      our papers has now become an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1      associate.  Josh is now an

 2      associate.  I guess I will next

 3      become of counsel before we're

 4      finally through.

 5           But that's sort of the quick

 6      run through.

 7           MR. LEVIN:  Don't become of

 8      counsel.  That's where elephants

 9      go to die.

10           MR. THOMPSON:  Well, I don't

11      want that.  I'll go senior, one of

12      the judges, the senior status.

13           That's just a very, very

14      quick overview.  Certainly I can

15      keep going on and on, but I think

16      that if you've heard from seven or

17      eight or nine people, you've

18      probably heard all of us claiming

19      credit for many of the same things

20      over and over again.

21           I do believe that we made an

22      effort in our submission not to

23      fluff it up, not to do a lot of

24      redundant time, not to do things

FAC Resp. Exhibit D -- 1085

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        beyond what the scope of our work

2        was.  I don't think we've

3        overstated anything, but we did do

4        productive work that was of

5        material benefit to the resolution

6        of this case.

7            I sometimes worry that the

8        folks in the MDL don't know what

9        exactly was going on in the state

10       court consolidation, just like I,

11       as a member of the state court

12       consolidation, don't know exactly

13       what was going on in the Federal

14       MDL.  Although I was lucky, I had

15       a good many friends who were

16       keeping me somewhat abreast of it.

17           But I don't want to give the

18       impression that the state court

19       litigation in New Jersey was a

20       side show.  It was well

21       coordinated between --

22           MR. SEEGER:  Nobody here

23       thinks that.

24           MR. LEVIN:  I'm in the MDL,

FAC Resp. Exhibit D -- 1086

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          and I can assure you that Perry,

2          Mark and Chris have made it clear

3          to all of us, not that we didn't

4          know it already, that New Jersey

5          was not a side show.

6               MR. THOMPSON:  Okay.  Well,

7          in that case, I will end my

8          remarks on that subject.

9               MR. LEVIN:  You have three

10         superb advocates at this table.

11              MR. SEEGER:  Well, but the

12         important point you made is the

13         reason for these meetings is this

14         cross mixture of lawyers in state

15         and Federal litigations, some

16         people did both, is to make sure

17         everybody at the end of this

18         process has talked everything out.

19              MR. HERMAN:  The original

20         lawyers, at least when I became

21         involved, that were primary in

22         this litigation, were Lanier,

23         Birchfield, Seeger and some

24         others.  They were not in the MDL.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          They were in New Jersey, New York.
 2          There was a group in Texas.
 3              To the credit of Chris and
 4          Andy, they both, for mutual
 5          benefit, participated in the MDL,
 6          and Perry and Mark and others were
 7          trying cases.  Tom was organizing
 8          California.  There were cases
 9          tried in California.  So, there
10          were no side shows.  For whatever
11          comfort I can give you, the main
12          thing that we're looking at is the
13          quality of the lawyering, wherever
14          it was.  We're fortunate that we
15          had a lot of quality lawyering.
16              I think also it's important
17          for lawyers to know that other
18          lawyers give them credit.  When
19          Chris Placitella was here earlier,
20          he talked about him being local
21          counsel for your firm and also,
22          though, for the contributions that
23          you made, Fred, with regards to
24          Ogilvy and other things.
```

FAC Resp. Exhibit D -- 1088

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1              So, I think we're getting

 2         enough information.  We've had 100

 3         lawyers, actually, 106, submit

 4         affidavits, and 60 or so have said

 5         that they want to make oral

 6         presentations.  So, I think we're

 7         getting a pretty good view of the

 8         landscape.

 9              MR. WEITZ:  When you were

10         doing your work with Westrick and

11         Lahner and Ogilvy, were you

12         getting your direction from Sol as

13         co-liaison counsel to do that

14         work?

15              MR. THOMPSON:  Here's how we

16         handled that with Sol.  We were

17         careful to make sure that we were

18         not going off on some rogue

19         tangent.  The last thing we wanted

20         to do is everybody is busy, nobody

21         wants to do something that's not

22         productive.  So, we would talk

23         carefully with Chris about where

24         the litigation was going.
```

FAC Resp. Exhibit D -- 1089

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1              There was a sense early on

 2          that we would win this case on the

 3          science itself.  And it became, I

 4          don't want to say clear, but it

 5          became more and more apparent that

 6          the marketing fraud, the marketing

 7          overstatement and the deception

 8          was very important to us.  So, we

 9          checked in and we made sure that

10          Sol approved any kind of activity

11          that we were going to go down.

12              MR. WEITZ:  You did a lot of

13          your discovery in coordination

14          with Placitella?

15              MR. THOMPSON:  Yes, sir.

16          Yes, sir.

17              Well, when they say the

18          Court has no questions, that means

19          you haven't laid a glove on them.

20          So, I apologize if I haven't.

21              MR. SEEGER:  No, no.  It was

22          great.

23              MR. GIRARDI:  Thank you,

24          Fred.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1                       -   -   -

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 1092

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:        PANISH SHEA & BOYLE
             Brian Panish, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2              MR. GIRARDI:  Mr. Panish,
 3          nice of you to accommodate us and
 4          get here early.  I know you ran
 5          down from San Francisco and got
 6          here as quickly as you could, and
 7          it is very helpful because some of
 8          these people are on their way back
 9          to New York.
10              As you can tell, Brian,
11          there's a court reporter here, and
12          the purpose of this really is for
13          Judge Fallon.  At the end of the
14          day, Judge Fallon is going to call
15          the shots, and he wanted to get
16          everybody's ideas and stories and
17          so forth.
18              The thing we're primarily
19          interested in is the work that you
20          performed for the overall good of
21          Vioxx, of the Vioxx litigation.
22          So, that's the focus of this.  We
23          have a pretty good idea, we have
24          seen your declaration, we've spent
```

FAC Resp. Exhibit D -- 1094

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1        time on that.  So, it's not quite
 2        a situation where you have to
 3        start from the beginning of the
 4        world, but nonetheless, primarily
 5        for Judge Fallon, we wanted to
 6        make sure we had everything in one
 7        place so that he could look at
 8        your efforts, look at your
 9        results, and then be able to
10        compare them to the efforts of
11        others and their results.  So,
12        with that, you may go forward.
13             MR. PANISH:  Thanks for
14        seeing me.  I'm proud to be here.
15        I want to thank everyone that
16        worked on the litigation.  I know
17        how hard it was.  I know all the
18        great work you did.  I read some
19        Ed Blizzard cross of Briggs
20        Morrison that I used in my trial,
21        and Chris and all of you and all
22        of your work.  I'm proud to have
23        been a part of it.  I'm not going
24        to take a ton of time.  I feel
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        like the guy that finally got in

2        the game and they go run the

3        clock.  It's 50 to nothing.

4             What I would just like to

5        talk about are the contributions

6        my firm and myself made that we

7        believe contributed to the

8        ultimate resolution of the Vioxx

9        litigation.  We filed many cases

10       in California.  We were a member

11       of the PSC.

12             I tried the appellate case,

13       which I believe at the time there

14       had been a lot of losses in the

15       trials and that it was important

16       that we do the best we could on

17       that trial in California to move

18       the litigation towards resolution.

19       So, myself, my firm, my partner,

20       Kevin Boyle, with Tom Girardi's

21       firm, worked day and night from

22       September through January on the

23       trial.  I drafted the state

24       questionnaire for the jury, which

FAC Resp. Exhibit D -- 1096

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      was gone into every single

2      question.  I don't have to tell

3      you what it is like to litigate.

4      I would say this.  I've tried

5      about 100 cases, and I have never

6      been in a trial that was as

7      contentious and as hard fought as

8      this case.  The lawyers were good

9      on the other side, and they had

10      many of them.  All of you know

11      that tried the cases how hard it

12      really was just compared to

13      regular cases, and most of my

14      cases are against large corporate

15      defendants that fight hard, but it

16      was especially hard, I thought, in

17      this case.

18          I thought that the

19      cooperation among the plaintiff

20      lawyers was excellent and

21      extraordinary, that much of the

22      work that we started with was

23      given to us by the lawyers, and we

24      were able to expand on that in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          terms of the jury questionnaire,

2          focus groups that we ran here and

3          jury consultants.  Part of it is

4          because some of the work that had

5          been done before we weren't

6          allowed to use, other focus groups

7          that had been done in the prior

8          trial from the MDL.  So we had to

9          do a lot of that ourselves.

10              Specifically in the

11         appellate case, the prescribing

12         physician was a Vietnam veteran

13         and flight surgeon, had been paid

14         $750,000 by Merck to run clinical

15         trials, had prescribed Vioxx and

16         was given 60,000 samples by Merck

17         and was an adverse witness to the

18         plaintiff.  I called him adversely

19         to cross-examine him.  He had been

20         paid 750 for clinical trials on

21         Vioxx himself.  So, I had to call

22         him as an adverse witness and did

23         get him to admit that if he had a

24         heart attack, he wouldn't have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        given it, although when Merck

2        examined him, he flip-flopped for

3        them.  But it was very difficult.

4            The California law is

5        different than a lot of states on

6        the learned intermediary and

7        failure to warn, and we had a

8        difficult time with our

9        prescribing physician and dealing

10       with the learned intermediary and

11       dealing with the judge and the

12       law.  We spent a lot of time on

13       briefing the law, arguing, working

14       on the verdict forms, not only for

15       this case, but for the next case.

16       This case ended up in a hung jury,

17       three final arguments made in the

18       trial.  Go back, jury questions

19       for three straight weeks.  Got

20       some good findings in the trial,

21       and we're prepared to retry the

22       case.  We changed experts, took

23       out Merck's -- after the trial,

24       Merck no longer was using the same

FAC Resp. Exhibit D -- 1099

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          cardiologist, Dr. Friedman, who

2          had had over 75 meetings with

3          Merck lawyers and prepared to

4          testify in all the California

5          cases.  So, he was no longer

6          designated after that case.  Ready

7          for the retrial.

8               We had other cases, had put

9          up many cases for trial.  I had

10         other cases, Schechter case, other

11         cases that were going to be in the

12         mix.  Mr. Girardi had set up a

13         plan, in addition to trying to

14         have four or five cases going

15         simultaneous with ten or more

16         plaintiffs in each case, and we

17         had signed on to be part of that,

18         to try whatever number of cases

19         were necessary to be tried.

20              We spent hundreds of

21         thousands of dollars.  We

22         submitted all the time sheets.

23              MR. LEVIN:  Your time sheets

24         and your costs, the 400 plus

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          thousand was approved by the

 2          accountant.

 3              MR. PANISH:  450 plus --

 4          plenty of costs, prepared to put

 5          in plenty more costs.  I think we

 6          were ready to try the case, and

 7          they knew they took their best

 8          shot, and they couldn't beat us.

 9          We were ready to continue on, and

10          I think they knew that.  Not that

11          they would ever admit it, but they

12          knew that we were ready to go and

13          continue forward, committed to

14          resolution of the litigation.  I

15          was fortunate to be there at court

16          when it was announced, and I was

17          proud to be a lawyer and to have

18          been part of that and to have

19          worked with Tom Girardi and Tom

20          directing us here and the great

21          leadership in California for all

22          of us.  In all cases, California

23          is important.  Los Angeles County

24          is the seventh largest state.
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1          California is an important player

 2          in overall global litigation.

 3                  I've submitted my stuff.  I

 4          can talk for a long time.

 5                  MR. SEEGER:  Who actually

 6          tried the case with you?  I knew

 7          about your role in the trial.

 8                  MR. PANISH:  My case for

 9          Mr. Appell, just me.  There was

10          another plaintiff.  Mr. Arrigale

11          was represented by Tom Brandi.

12                  MR. SEEGER:  You and Brandi

13          did it?

14                  MR. PANISH:  My whole case,

15          just me.  I picked the jury, did

16          the final arguments, everything.

17          Three final arguments.

18                  MR. SEEGER:  Why was that?

19                  MR. PANISH:  There's a new

20          law.  The jury would have

21          questions on issues, and she would

22          give an hour and a half more for

23          each side to argue.  So we would

24          have to reprepare for those final

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          arguments to deal with that issue.

2          Then we went over Christmas, we

3          came back January 3rd or after the

4          New Year, they would have

5          questions on another issue.  So

6          now we have to prepare another

7          final argument and give that final

8          argument.

9               MR. SEEGER:  That's the way

10         you do it?

11              MR. PANISH:  It's kind a new

12         law, and the judge wanted to try

13         to -- she wanted to get a

14         resolution.  She didn't want a

15         hung jury, obviously.  So, we did

16         it.  We didn't have any choice.

17         She said that's what we're doing,

18         so we did it.

19              MR. WEITZ:  How many cases

20         did you have filed?

21              MR. PANISH:  100 plus

22         probably.

23              MR. WEITZ:  All in LA?

24              MR. PANISH:  All in LA.

FAC Resp. Exhibit D -- 1103

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1        Some were moved to MDL, but all
 2        were filed in State Court, Los
 3        Angeles.
 4            MR. GIRARDI:  Brian, truly
 5        you did -- not only did you do a
 6        terrific job in that case, which I
 7        thought had some difficulties,
 8        because I think Sizemore and
 9        O'Callahan would report to me
10        nightly how difficult a case it
11        was.  So, not only did you do a
12        great job on that case, but when
13        we were told to get 60 more cases
14        ready, 20 for Judge Chaney, 20 for
15        Judge McLaughlin and 20 for Judge
16        Chavez, you came to the fore and
17        immediately started running
18        through all of your cases to give
19        us the best ones to put in that
20        group, which was a massive amount
21        of work.  Obviously those things
22        never went on due to the
23        resolution of the case, but you
24        did a terrific job.
```

FAC Resp. Exhibit D -- 1104

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1              Also, I think it's great

2         that last week in the Sunday

3         edition of the Los Angeles Times,

4         you were named the second best

5         trial lawyer in California.

6              MR. SEEGER:  Who was number

7         one?

8              MR. GIRARDI:  Oh, that was

9         me.

10             MR. PANISH:  I'm glad to be

11        there.

12             MR. GIRARDI:  I'm just

13        teasing, obviously.  In all

14        honesty, you did a terrific job,

15        no kidding.  I think as far as the

16        California efforts, our two firms

17        carried the ball, and there's no

18        question about it.  You are to be

19        commended for all of your good

20        hard work, and it was a hell of a

21        contribution to the overall

22        resolution of these cases.

23             MR. SEEGER:  I only got to

24        know you through the case

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          recently, but I really learned

2          about you, first, through your

3          trial work.  So, based on what I

4          have known what you have done, I

5          have to second that.  Thank you.

6               MR. PANISH:  I want to thank

7          all of you guys, and, Tom, the

8          extraordinary efforts Mr. Girardi

9          did in California.  It wasn't

10         easy.  Lawyers were not stepping

11         up to try the cases despite what

12         they might tell you now.

13              MR. WEITZ:  We know.

14              MR. SEEGER:  As soon as

15         there was a loss, guys were

16         running for the hills.

17              MR. PANISH:  People would

18         dismiss cases on the day of trial.

19         Tom had tried the first case, and

20         it didn't go so well, and he

21         didn't bat an eyelash.  He was

22         prepared to go forward.  We'd

23         still be trying Vioxx cases.  I

24         thank you for giving me an

FAC Resp. Exhibit D -- 1106

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          opportunity and for all the work.

2                    MR. GIRARDI:  Thank you.

3                    MR. SEEGER:  Thank you.

4                    MR. BLIZZARD:  Thank you.

5                         -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRMS:    RANIER GAYLE & ELLIOT, L.L.C.
          Drew Ranier, Esquire
          Sarah Ranier, Esquire
          Brett M. Powers, Esquire
          PROVOST UMPHREY LAW FIRM, LLP
          Walter Umphrey, Esquire
          Darren Brown, Esquire
          WILLIAMS KHERKHER
          Steven J. Kherkher, Esquire
          John T. Boundas, Esquire
          Amy Carter, Esquire
          Brandon Steffey, Esquire
          THE WATTS FIRM
          Mikal Watts, Esquire
          Larry Wright, Esquire
          THE KAISER FIRM
          Grant Kaiser, Esquire
          John Furnish, Esquire
          Gerilyn Gordon, Esquire


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1   BEFORE FEE COMMITTEE MEMBERS:
 2

     ANDY D. BIRCHFIELD, ESQUIRE
 3   Beasley Allen Crow Methvin
     Portis & Miles, PC
 4

     EDWARD F. BLIZZARD, ESQUIRE
 5   Blizzard, McCarthy & Nabers
 6   THOMAS V. GIRARDI, ESQUIRE
     Girardi & Keese
 7

     RUSS M. HERMAN, ESQUIRE
 8   Herman, Herman, Katz & Cotlar, LLP
 9   W. MARK LANIER, ESQUIRE
     The Lanier Law Firm
10

     ARNOLD LEVIN, ESQUIRE
11   Levin, Fishbein, Sedran & Berman
12   TROY RAFFERTY, ESQUIRE
     Levin, Papantonio, Thomas, Mitchell,
13   Echsner & Proctor, P.A.
14   CHRISTOPHER A. SEEGER, Esquire
     Seeger Weiss, LLP
15

     PERRY WEITZ, ESQUIRE
16   Weitz & Luxenberg, P.C.
17
18
19
20
21
22
23
24
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1                  -  -  -
 2              MR. BLIZZARD:  We've got a
 3          court reporter here today, and
 4          obviously we had individual time
 5          slots for everybody, but John
 6          called me earlier and said that
 7          you guys wanted to present as a
 8          group, and that's obviously fine
 9          with us.
10              The court reporter is going
11          to record everything because of
12          Judge Fallon's interest in
13          transparency.
14              Really the floor is yours.
15          However you want to organize it,
16          however you want to present, you
17          can start.
18              MR. RANIER:  Good.  Thank
19          you.  I would be shocked --
20              MR. HERMAN:  I'm sorry.
21          Just one other thing.  I know you
22          are familiar with the cases, but
23          Mobil out of the Fifth Circuit and
24          the Murphy Oil case has been
```

Page 4

```
 1        settled now.  So, the only opinion
 2        in Murphy Oil is the opinion that
 3        the Fifth Circuit more or less
 4        adopted or did not review
 5        actually.  So, it would be Judge
 6        Fallon's opinion in Murphy Oil
 7        that is probably the same process
 8        that's going to operate here, and
 9        that's what the Judge has
10        indicated to this committee.
11             MR. RANIER:  I'll be very
12        surprised if we would use all of
13        our time with the combined five
14        firms.  I think we'll do less than
15        that.  We have a bit to say, but I
16        think it will be beneficial to all
17        of y'all's time to do this at
18        once.
19             MR. BLIZZARD:  I said this
20        to John out in the hall.  He may
21        have communicated it to y'all too.
22        We had a very inspirational
23        presentation this morning from
24        Shelly Sanford, who spoke really
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1          only about Carlene and her work to

 2          start this litigation.  I wish

 3          that all of you could have heard

 4          it, because it was a wonderful

 5          presentation.  It really has

 6          inspired us all this morning to

 7          really try as best we can to do

 8          the right thing here.  So,

 9          whatever y'all want to say, go

10          ahead.

11               MR. HERMAN:  Drew, I'm sorry

12          to interrupt you again.  We need

13          everybody in this room to

14          introduce themselves.  We know a

15          number of you and some we don't.

16               MR. WRIGHT:  Larry Wright,

17          Watts Law Firm.

18               MR. WATTS:  Mikal Watts,

19          Watts Law Firm.

20               MR. FURNISH:  John Furnish

21          with the Kaiser Firm.

22               MR. STEFFEY:  Brandon

23          Steffey, Williams Kherkher.

24               MS. GORDON:  Gerilyn Gordon,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          The Kaiser Firm.

 2               MR. KAISER:  Grant Kaiser.

 3               MR. POWERS:  Brett Powers,

 4          Ranier, Gayle & Elliot.

 5               MR. RANIER:  Drew Ranier.

 6               MR. UMPHREY:  Walter

 7          Umphrey.

 8               MR. BROWN:  Darren Brown.

 9               MR. KHERKHER:  Steven

10          Kherkher.

11               MS. CARTER:  Amy Carter.

12               MR. BOUNDAS:  John Boundas

13          with Williams Kherkher.

14               MR. GIRARDI:  I'm Tom

15          Girardi.

16               MR. RANIER:  Well, I'll

17          start by saying good morning to

18          everybody and Seasons Greetings

19          with all the decorations coming

20          down the hall.  I'm Drew Ranier,

21          R-A-N-I-E-R, and I'm going to do

22          an overview of the efforts of the

23          Vioxx Litigation Consortium.  That

24          is what the five firms that are
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        here today call themselves and

2        have worked together on Vioxx

3        under that name.  Basically I will

4        do an overview, and then other

5        members of our group will address

6        several specific areas.

7             Mikal Watts will lead the

8        discussion on the trial work.

9        Grant Kaiser will do the

10       organization and function of the

11       Vioxx Litigation Consortium, how

12       it is organized.  Walter Umphrey

13       will talk about financial

14       commitment.  I'll talk some about

15       the PSC work that I did as a PSC

16       member.

17             So, there are a lot of

18       lawyers in this room who have done

19       exceptional work in this case and

20       have done top tier work in this

21       case, and we respect that, and we

22       know that.  We know how difficult

23       it was to do that and how much of

24       a commitment it required to do

FAC Resp. Exhibit D -- 1115

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          that.  So, we want to tip our hats
 2          to you all who have done so much,
 3          and we want to say that we have
 4          made a top tier commitment to this
 5          litigation also.  We are going to
 6          describe that here for you today,
 7          and that's what we're here to talk
 8          about.
 9               Let me just introduce the
10          firms briefly.  I know for some of
11          you this will be old hat, but just
12          for the record so we have it here,
13          John Eddie Williams could not be
14          here today because of family
15          commitments and a death in the
16          family --
17               MR. SEEGER:  By the way,
18          would you send him our regards.
19               MR. RANIER:  I will.  Thank
20          you.  I'm sure he'll be happy to
21          get them.
22               His reputation, first in his
23          class at Baylor Law School,
24          Fulbright & Jaworski, built one of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          the largest and most successful

2          plaintiffs' practices in the

3          United States.  Just an absolutely

4          brilliant lawyer, senior partner

5          of Williams Kherkher Hart &

6          Boundas, 30 years of practice,

7          John Eddie.

8                Walter Umphrey, who is

9          sitting on my left here, one of

10         the most successful litigators in

11         the United States, practiced for

12         43 years.  Walter was doing mass

13         torts before most of us in this

14         room even thought about going to

15         law school.  Baylor Law School is

16         named after him.  Words like

17         pioneer and legend and dean are

18         frequently used in referring to

19         Walter.  As I say, he's been doing

20         this for 43 years.

21               Mikal Watts, who I know many

22         of you know well, the word that

23         comes to mind when I think about

24         Mikal is prodigious.  He is an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1          incredible trial lawyer.  He just

 2          turned 40 years old.  At 60, I

 3          would be happy to have

 4          accomplished as much as he did in

 5          the courtroom.  His trial

 6          schedule, which he takes in

 7          stride, by anybody's imagination,

 8          even experienced trial lawyers, is

 9          incredible, is punishing.  It's

10          like every Monday or every other

11          Monday, he's there, and he's there

12          on big and important cases.  Mikal

13          has been practicing, even at the

14          age of 40, for 19 years.

15              Grant Kaiser on my right

16          supervised and directed some of

17          the most far reaching and biggest

18          litigation in United States

19          history.  Grant has been

20          practicing for 27 years, and I am

21          personally proud of every word

22          that has come out of the Vioxx

23          Litigation Consortium.  Every

24          piece of paper, nothing is not

FAC Resp. Exhibit D -- 1118

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1       screened, goes through Grant to

2       make sure it is appropriate, and

3       we all know about it.  So, we are

4       in this very much as a group, and

5       we formed this group to do that

6       and take on the challenge that we

7       thought Vioxx presented.

8            In my own case, I've been

9       practicing for 33 years.  I did

10      three years of insurance defense

11      work after I graduated from the

12      University of Texas Law School,

13      although I'm from Lake Charles and

14      practice in Lake Charles, which is

15      25 miles this side or the other

16      side of the Sabine River.

17           My first toxic tort case was

18      tried in 1978 with Fred Baron, who

19      came to Lake Charles to try a

20      phosgene case with me.  Our jury

21      consultant was a woman named Lisa

22      Blue, who, of course, later became

23      Mrs. Fred Baron.

24           So, with the senior partners

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          alone in these five firms, we have

2          got about 152 years of experience

3          that we bring to the table or

4          brought to the table in this

5          litigation.

6               I've got a chart of how we

7          set ourselves up and how we formed

8          this organization.  And just to

9          say it quickly once at the

10         beginning, the purpose of this

11         organization that we formed with

12         these five firms is that we,

13         because of our past experiences,

14         wanted to build a litigation

15         machine and a litigation pipeline

16         that would last indefinitely and

17         would relentlessly and

18         continuously produce triable

19         cases.  We're glad the case

20         settled, but we started this out

21         and we continued to the very end

22         like we might have a Vioxx docket

23         for ten years, and we wanted to be

24         viable, financially viable and be

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        able to do that.  So, the common

2        sense of it is that five firms

3        that put all those resources

4        together, you know, another five

5        firms in this room that did that,

6        would be able to sustain this

7        thing longer and in a bigger way

8        than any one firm can.  That's the

9        underlying common sense thing

10        about what we did here.  It's

11        really not a lot more complicated

12        than that, but that we didn't get

13        these cases to settle them, we're

14        glad we did, but we didn't know if

15        they'd do individual settlements.

16        We tried to apply the maximum

17        amount of pressure to Merck, and

18        we did that through this

19        organization.  So, let me start by

20        just quickly going over the

21        organization.

22             We will have copies of these

23        provided later if they are too

24        small for anybody to see.  I'll

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        bring it up here where I can show

2        everybody.

3            The Vioxx Litigation

4        Consortium basically consisted of

5        36 attorneys from these firms, two

6        physicians, one CPA manager, five

7        Registered Nurse paralegals and 69

8        paralegals and staff.  We've got

9        the five firms and their

10       commitments in terms of attorneys

11       who worked on Vioxx down below

12       here.

13           In addition to the five

14       firms, we've got the Vioxx Center.

15       That was an independent -- it was

16       not in anybody's office.  We had a

17       separate office, an office

18       building down here on the corner

19       of 16 and 59 and had a whole

20       floor, I think, almost a whole

21       floor of that office building, if

22       not more.  In that Vioxx Center,

23       we had totally dedicated to Vioxx

24       four attorneys, one CPA manager,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
1        two physicians, five RN paralegals

2        and 38 paralegals and staff.  So,

3        that was the core dedicated center

4        of the Vioxx operation.  Grant

5        Kaiser is going to talk about how

6        that functioned and how it was

7        organized.  But that was the

8        center of the operation, and these

9        are the supporting and the

10       cooperating firms.  That's the way

11       it worked, but this thing is

12       Vioxx, totally dedicated to Vioxx.

13       That's what enabled us in many

14       ways to produce this flow of

15       continuous trial cases that we'll

16       talk about in a minute.

17            MR. SEEGER:  Drew, are

18       questions okay along the way or

19       would you rather do the

20       presentation?

21            MR. RANIER:  They are.  Why

22       don't you let me finish the

23       overview, and then we're going to

24       have individual people talk a
```

FAC Resp. Exhibit D -- 1123

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          little more about the details of
 2          this.
 3               MR. SEEGER:  I'm sorry I
 4          interrupted.
 5               MR. RANIER:  Let me try and
 6          just do that.
 7               While I'm on the subject,
 8          here's a little more graphic form
 9          of how that worked.  These are
10          approximate numbers.  We had
11          approximately 30,000 client
12          contacts, and those client
13          contacts went through the Vioxx
14          Center, which of course required a
15          substantial financial commitment,
16          complete medical records,
17          dedicated doctors, nurses and
18          lawyers, and then the five firms
19          vetting those cases.  And from the
20          30,000, we reduced that to 2,000
21          triable cases.  From those, at the
22          time of settlement, we had about
23          50 triable cases ready to go.
24          That includes the 30 that was the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1        last tranche that we put up in New

 2        Jersey, and we were on schedule

 3        and organized so we could produce

 4        20 cases a month to try.  That was

 5        our schedule at the time of

 6        settlement.  So, with these 50, we

 7        actually had 20 waiting in the

 8        wings behind it, and we were going

 9        to have 20 new ones up every

10        month.  That's basically the way

11        the organization worked.  Grant

12        can talk a little bit more about

13        that in detail later.

14              We're five firms.  We

15        operated as one firm.  We took all

16        of our resources, we pooled them

17        together.  We are asking for one

18        fee from common benefit.

19              Our presenters today and

20        their areas that they will cover

21        will be Mikal Watts, who will take

22        the lead, along with John Boundas,

23        Steve Kherkher and Amy Carter on

24        describing our trial work.  Grant
```

FAC Resp. Exhibit D -- 1125

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        Kaiser is going to do the

 2        organization and function of our

 3        group.  I'll talk about our PSC

 4        work and our time.  Walter Umphrey

 5        is going to do financial

 6        commitment.

 7            I would like just to say a

 8        few words about each of those

 9        areas before I turn it over to

10        them from an overview standpoint.

11            In the trial area, a lot of

12        you know this, and I want to make

13        a general comment too about this

14        group.  While we did this sort of

15        standalone, not knowing where

16        things would go, I think it was

17        characterized from start to finish

18        by cooperation with our

19        colleagues.  A number of you

20        sitting at this table have been

21        co-counsel in cases that we have

22        had.  Andy Birchfield helped us

23        try a case.  He did a great job.

24        Chris Seeger is co-counsel in our
```

FAC Resp. Exhibit D -- 1126

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        cases in New Jersey and would have

2        been soon trying cases with us.

3            We tried two cases to

4        verdict.  We tried a Merck pick in

5        the MDL, a defense pick.  You

6        know, a lot of firms dismiss cases

7        rather than going to trial, but

8        that was our case, and we stepped

9        up and tried that case.  That was

10       the snow shovel case, where the

11       guy shoveled snow for quite a long

12       time before he had a heart attack.

13           MR. BLIZZARD:  Drew, that

14       had nothing to do with his heart

15       attack.

16           MR. RANIER:  Ed, I agree

17       with you.  I don't describe that

18       as a bad case.  We'll talk more

19       about that later, too, on some of

20       the work we did on epi.  I totally

21       agree with you.

22           MR. BLIZZARD:  Just to

23       interrupt for a moment.  You may

24       be going to get to this too, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Amy Carter was somebody who helped

2          on our trial on Mason.  John Eddie

3          graciously, when we needed help

4          getting ready for Mason, Amy had

5          just been in the Smith trial, and

6          so he said that Amy could come and

7          help us, and she did a great job

8          for us.

9               MS. CARTER:  Now you have

10          done about 50% of my entire

11          presentation.

12               MR. SEEGER:  You are off the

13          hook, Amy.

14               MR. RANIER:  I was just

15          about to mention that.  We tried

16          the two cases to verdict.  We

17          tried the Merck pick in the MDL,

18          one of those two cases.  We had

19          two cases fixed for trial in New

20          Jersey in November of 2007, and

21          for settlement related reasons,

22          that did not go to trial.  But the

23          judge continued it to January

24          pending settlement.  So, that was

Page 21

1           there and totally worked up and

2           ready for trial.

3                We submitted two other cases

4           to the PSC.  The PSC approved,

5           they went through the approval

6           process.  Lisa Dagostino, I know,

7           and others reviewed those cases.

8           Merck vetoed both of those cases,

9           28-year-old female heart attack,

10          and a mid-50s sudden death cardiac

11          man.

12               MR. KAISER:  We don't know

13          why they vetoed them.

14               MR. RANIER:  We had one case

15          set in California in 2007.  We had

16          three others for trial set in

17          2008.  And we had another 30 that

18          we had nominated or were about to

19          be nominated for the next tranche

20          in New Jersey and more in the

21          pipeline behind that.

22               So, I want to again say from

23          the outset that we went from

24          30,000 to 2,000, but we didn't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          inventory those cases.  They were

2          not parked.  We built a trial

3          machine, and we built a pipeline

4          that flowed continuously with

5          these cases.  They did not just

6          sit there.

7               Grant, I've said a lot

8          already about organization and

9          function.  I will let Grant do

10         that.

11              On the PSC, a general

12         comment I will make on that, I

13         will do some details later, is

14         that because I was on the PSC, I

15         was a direct pipeline to these

16         five firms into the PSC and back.

17         These five firms took that very

18         seriously.  They fully

19         participated, fully involved

20         themselves in the MDL and the PSC

21         process.  We did not always agree

22         with everybody there.  I did not

23         always agree.  But we fully

24         participated, and we were fully

FAC Resp. Exhibit D -- 1130

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          committed to it.  I was the chair

2          of the insurance committee and did

3          some other things that we'll talk

4          about later.

5               Walter is going to talk

6          about financials.  Let's do a

7          summary chart on it here, and he

8          can go into some more detail.

9          This sort of sums it up for our

10         group, 13.5 million at the time of

11         settlement and 200,000 hours of

12         work.

13              MR. HERMAN:  Have you got a

14         breakdown chart on the 13.5

15         million with you?

16              MR. RANIER:  Walter does,

17         and Walter will present that.

18         That's at the time of settlement.

19              Just to give you some idea

20         of the scope of that kind of

21         investment, the PSC, which I'm a

22         member of at the time of

23         settlement, Russ, correct me if

24         I'm wrong, but we were -- as a

Page 24

1          group, we were at about 3.65

2          million or something in that range

3          at the time of settlement that we

4          put up in cash.  So, these five

5          firms had committed three or four

6          times that amount of money to this

7          litigation at that point.

8                MR. HERMAN:  I'm not --

9                MR. RANIER:  I understand.

10               MR. HERMAN:  The actual

11         dollars that the firms put up of a

12         similar nature exceeded $50

13         million.  There were 3.5 million,

14         I believe, to 4.5 million

15         contributed to a common cost fund.

16         But the actual dollars spent by

17         the law firms participating in

18         Vioxx exceeded -- not counting

19         your 13.5, exceeded $50 million.

20         What the exact figure is, I can't

21         even estimate right now because

22         the CPAs are still working with

23         it.

24               MR. LEVIN:  That didn't

FAC Resp. Exhibit D -- 1132

Page 25

1          include individual case costs?

2                   MR. RANIER:  The 13.5

3          million?

4                   MR. LEVIN:  I don't know

5          what yours did.  The 50 million

6          that Russ says were common

7          expenses and that were held costs,

8          that didn't include individual

9          case costs for processing

10         individual cases?

11                  MR. RANIER:  I'm sorry.  I'm

12         getting my millions confused here.

13                  MR. LEVIN:  It is hard to

14         talk in millions.

15                  MR. RANIER:  The PSC, which

16         I was a member of, we had

17         contributed or raised about 3.65

18         at the time.

19                  MR. LEVIN:  That was the

20         assessment.  But then there were

21         common expenses in excess of $50

22         million for everybody.  And in

23         addition to that, the caseload

24         costs, the individual costs are

Page 26

1          not in that 50.

2                    MR. RANIER:  And the

3          common benefit -- you are talking

4          about expenses that people

5          submitted as common benefit

6          expenses on the forms from all PSC

7          firms or all firms?

8                    MR. LEVIN:  All firms.

9                    MR. RANIER:  All firms.

10                   MR. SEEGER:  I think the

11         point he's trying to make is it

12         doesn't include case specific

13         expenses, it was just common.

14                   MR. KAISER:  Gotcha.

15                   MR. RANIER:  Well, some

16         relatively small percentage of our

17         firm costs were carried in that

18         13.5.  That is not our firm

19         overhead.  The only thing that

20         that 13.5 applies to is the Vioxx

21         Center.  So, it's clearly not

22         nearly everything that we spent on

23         this litigation.

24                   MR. SEEGER:  That's where

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          the cases were processed?

2               MR. RANIER:  That's right.

3          That's right.  And I mean they are

4          back and forth to the firms, too,

5          Chris.  It is a constant vetting

6          process, vetting things with the

7          five firms.  But that was the

8          central coordination of that.

9               Before I turn it over to

10         Mikal about trial work, I would

11         like to suggest a few questions

12         for y'all to consider while you

13         are listening to the presentation

14         and while you're thinking about

15         fees in our case.

16              First of all, how many firms

17         seeking common benefit fees did

18         more trial work than these five

19         firms in the Vioxx Litigation

20         Consortium?

21              How many firms did more?

22              How many firms made greater

23         financial contributions to the

24         litigation than these five firms?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          How many firms contributed

2      more cases and more quality cases

3      to the litigation?

4          How many firms were active

5      in more venues?  Grant is going to

6      talk about Texas, California, New

7      Jersey, New Orleans and state

8      court, selected state courts.

9          How many firms contributed

10     more time to the litigation?

11         How many firms brought more

12     experience to the table than these

13     five firms?

14         We are seeking one fee.  We

15     believe the answer to each of

16     these questions is few or none.

17     That means that this group should

18     be in the top tier of common

19     benefit fee awards.

20         MR. HERMAN:  Let me ask some

21     questions about that.

22         Of the 13.5, you said that

23     relates to your center, correct?

24         MR. RANIER:  That relates to

Page 29

1          everything but firm overhead.

2                    MR. HERMAN:  I need to

3          understand that better, because

4          you have on other occasions said

5          to me that y'all spent a terrific

6          amount of money getting from

7          30,000 cases to 2,000 cases.

8                    MR. RANIER:  That's where

9          that money --

10                   MR. HERMAN:  Is that that

11         13.5?

12                   MR. RANIER:  I think Walter

13         will get into more detail --

14                   MR. HERMAN:  How does that

15         differ -- and I'm being perfectly

16         honest with you, and I've had this

17         disagreement from the beginning.

18         How does that differ from any law

19         firm's case selection where you

20         get -- I don't care whether you've

21         got a consortium, a single firm or

22         a 600 person firm, you get in

23         cases, you put doctors, nurses,

24         paralegals on them, and then you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1       determine which cases you are

2       going to jettison and which cases

3       you are going to keep.

4            Why is that 13.5 million to

5       be considered in any common

6       benefit?  Now, I'm not asking a

7       rhetorical question.  I'm asking a

8       question that really concerns me.

9       I don't think it just concerns me,

10      but that's something that you

11      really have to address and Walter

12      has to address, because right now,

13      in terms of the 13.5, I'm

14      completely unconvinced as to how

15      that differs from my individual

16      firm starting with 600 cases,

17      putting doctors and nurses on it

18      to get down to 120, which are my

19      firm's costs that I don't believe

20      I can recover not just in this

21      case, but in any case.

22           MR. RANIER:  Let me answer

23      in general terms first and then

24      talk about the details of the

Page 31

 1          money.

 2                  MR. HERMAN:  I don't think

 3          it would be fair to you, Drew, if

 4          I didn't raise the question.

 5                  MR. RANIER:  I understand.

 6          The way we have approached this is

 7          we have taken Judge Fallon's

 8          statements in Murphy Oil and have

 9          read those carefully, and in his

10          orders -- and 6(D) is even in

11          there.  It says that the important

12          thing in determining these fees is

13          the overarching contribution that

14          the firm made to the litigation.

15          You can start cutting it as fine

16          as you want down to hours and CPAs

17          and everything like that, but the

18          bottom line on this is the

19          overarching contribution that you

20          made to the litigation.  I'm happy

21          to cut it fine and talk about

22          that, but that's where we're

23          coming from on this.

24                  All of the other stuff in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1           this case, great legal work, great

2           things done, I'm not criticizing

3           anybody about that.  It has to

4           stem and flow from a continuous

5           and strong supply of trial cases

6           and the ability to try a lot of

7           cases for a long time.

8                   MR. HERMAN:  Let me --

9                   MR. RANIER:  That's what

10          this chart is talking about.

11                  MR. HERMAN:  Let me put it

12          in a different perspective.

13                  Your group not only tried a

14          case in the MDL that I monitored,

15          it was well tried --

16                  MR. RANIER:  Thank you.

17                  MR. HERMAN:  -- it was tried

18          to the highest level of trial

19          practice.  That's my view.  I

20          don't have a problem with anything

21          that went into that trial,

22          preparing it, who took the

23          depositions, what was done.  I

24          still do not see how I can recover

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

 1        for the 600 cases that I

 2        jettisoned after having physicians

 3        and nurses and paralegals and

 4        trial lawyers review and say, hey,

 5        these cases are not worthy of our

 6        representation in Vioxx.  That

 7        amount of money, let's take it out

 8        of your group, and why is my firm

 9        worthy of recovery and common

10        benefit?

11            MR. UMPHREY:  Russ, let me

12        answer that.  We're not asking for

13        that 5.7 million back.  That's

14        costs we absorbed.  We're not

15        asking for reimbursement of that.

16        We are talking about the screening

17        tests and to decide whether it is

18        a viable case or whether it is

19        not.

20            MR. KAISER:  Let me explain,

21        Russ.  I think we've gotten off on

22        the wrong track.  We're not

23        requesting reimbursement out of

24        the common benefit fee and expense

FAC Resp. Exhibit D -- 1141

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          fund of 13.6 million.  We're

2          telling you what we invested in

3          the case to push these cases

4          along.  What we submitted, we've

5          submitted.  It is a million and a

6          half, 2 million maybe as common

7          benefit.  So, we're not asking to

8          reimburse that amount.

9              MR. HERMAN:  Well, I think

10         that's really clear, Walter, and I

11         thank you for making it clear.

12             MR. LANIER:  So, what you

13         are saying is, what you spent for

14         common benefit is a million and a

15         half to 2 million, but you overall

16         committed that much money to try

17         to justify your involvement in the

18         litigation?

19             MR. HERMAN:  That makes a

20         lot of sense.

21             MR. LEVIN:  Which shows your

22         commitment to the case.

23             MR. KAISER:  Right.

24             MR. RANIER:  That's relevant

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1          to fee, independent of expenses.

 2                  MR. KAISER:  They understand

 3          that.  This is about fee.

 4                  MR. LEVIN:  It is part of

 5          the gestalt process here.

 6                  MR. WEITZ:  But, Drew, what

 7          you are saying is, the amount of

 8          money shows your commitment to the

 9          litigation, and you want us to

10          take that into consideration in

11          evaluating the fee?

12                  MR. RANIER:  Right.

13                  MR. WEITZ:  That's really

14          what's being said.

15                  MR. HERMAN:  I have a weak

16          spot for Drew because he brought

17          Sarah with him.

18                  MS. RANIER:  It always

19          works.

20                  MR. HERMAN:  I see you back

21          there, Sarah.

22                  MR. SEEGER:  I'm still

23          afraid of her from the first time

24          I met her.
```

FAC Resp. Exhibit D -- 1143

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1           MR. RANIER:  Just a quick

2      note on -- that's it.

3           I think it is time that we

4      move to Mikal Watts to talk about

5      trial work.  Mikal.

6           MR. WATTS:  Before I do

7      that, Drew asked me to spend just

8      a couple of minutes to talk about

9      pre-recall work.

10          Let me just give you

11     background.  I tried a case

12     against Firestone in 2001, and

13     some guy calls me out of the blue

14     and wants me to try a Rezulin

15     case.  In 2001, myself,

16     Papantonio, Troy over there and

17     some other guys, Roe Frazier,

18     tried a big Rezulin case, got a

19     huge verdict.  That led to

20     something else.  Before you know

21     it, I'm doing Sulzer work and

22     trying cases with Blizzard and

23     we're involved.

24          My entry into this

Page 37

1          litigation actually is Andy's

2          fault.  I was, I think, at Mass

3          Torts Made Perfect in September of

4          2002, and to be honest with you, I

5          had never heard of Vioxx at that

6          time, and I was giving some speech

7          about the Rezulin verdict or the

8          Sulzer verdict, I don't remember,

9          but I'm listening to this speech

10         about Vioxx, and it seems to not

11         be getting a whole lot of traction

12         in terms of people understanding

13         because nobody has heard of it.

14         But I remember I respected Andy a

15         lot because we worked together on

16         Baycol and a whole lot of stuff,

17         and so I said, huh, and gave it

18         some thought.

19              Then a guy that came to work

20         for me named Chris Pinedo was

21         getting more and more involved

22         with Shelly Sanford on some stuff,

23         and so he came to me and said,

24         well, Shelly has some cases, and I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

 1          think Mark is going to try them.

 2          I had already seen a speech and

 3          everything, and I decided

 4          basically on strength of

 5          association, this is before I was

 6          even involved, I think, that

 7          something has to be going on.

 8              So, in the spring of '03 I

 9          think it was, my firm

10          individually, this is before this

11          consortium came together, I made

12          the decision that we were going to

13          start getting involved.  I don't

14          want to be disingenuous, but based

15          on if Andy is in it and Lanier is

16          going to be in it, it is probably

17          going to be fun.  So, we got

18          involved, the Watts Law Firm got

19          involved at that time.

20              For about a year, we began

21          working on bringing cases.  I

22          think my affidavit said we took --

23          we pared it down to between three

24          and 4,000 cases to somewhere

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1         between 450 and 500 cases.

2         Unfortunately, a lot of the work

3         that I did was with a

4         cardiologist, a friend of mine, a

5         guy Allison put me in touch with

6         named Antonio Pacifico, who is a

7         very world renowned or was a very

8         world renowned cardiologist here

9         in Houston until he went down in a

10        Gulfstream right after the recall.

11            We also spent some time with

12        Joseph Burton, who I think was in

13        your original case, Andy, a guy I

14        use a lot in car cases working on

15        just grabbing all the COX-2 stuff

16        that, frankly, you guys had

17        developed, and spent a lot of time

18        working on that.  I think you and

19        I had some discussions about your

20        case before you tried it, and I

21        began working with Tommy Jacks,

22        who I think had cases in

23        Tennessee.  That's the way that

24        Larry, who now works with me, and

FAC Resp. Exhibit D -- 1147

Page 40

1          I got hooked up.

2               So, my firm individually was

3          kind of working on getting up to

4          speed, if you will, on Vioxx.  I

5          don't pretend to be as involved as

6          Andy was or as Chris was, and I

7          think Mark, obviously, did some

8          wonderful work in preparation for

9          his eventual trial in 2005.

10              What happened is, the recall

11         was announced, our four firms were

12         working on welding rods.  I had

13         this case because I knew enough

14         about the COX-2s, knew enough

15         about the science and the

16         literature and what was involved.

17         I think we were flying out to

18         Miami or something, and Walter and

19         I had a discussion about it.  And

20         he said, why don't we try to wrap

21         this up and really get in in a big

22         way, and we flew in, the four of

23         us, like we did in welding rods.

24         So, I took all of our firm's work

Page 41

1         product and all of our cases and

2         contributed them to this new

3         entity that led to that.

4              So, let me put that aside.

5         I'm not going to talk about money

6         or anything like.  The trial work,

7         it's probably no secret, maybe to

8         the chagrin of one or two of you

9         in some litigation, I like to go

10        out and try a bunch of cases.

11        Sometimes it works, Firestone,

12        Rezulin, Sulzer.  Sometimes it

13        doesn't, Baycol.  I felt like it

14        was important to catch up as fast

15        as we could to start assisting

16        with trying cases.

17              Obviously, Mark's verdict

18        blew the whole thing up and got

19        everybody really jacked up, but at

20        least from the standpoint of where

21        I was, we had been in the case for

22        over a year, had started this up

23        before everybody knew about Mark's

24        prodigious talent in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1          courtroom.  I mean, they knew
 2          about it, but the verdict.
 3              Anyway, where we found
 4          ourselves, or at least inside of
 5          ourselves or where I found myself
 6          is that when you looked at the
 7          Ernst case that Mark had success
 8          on versus the Irvin case that you
 9          guys had trouble on, when I read
10          the transcripts, what I saw was
11          that Mark seemed to win the fight
12          about this guy was a marathoner
13          who didn't have a whole bunch of
14          risk factors, and maybe you guys
15          were losing the fight about risk
16          factors.  I looked at my docket of
17          cases and saw 95 percent of the
18          people having a whole bunch of
19          risk factors, looking like me, you
20          are probably overweight, you don't
21          exercise a lot and whatever it is.
22          So, to me, in setting up the
23          trials that I wanted to be
24          involved in, I thought it was
```

FAC Resp. Exhibit D -- 1150

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1       important that we not just cherry

2       pick the very best cases, but we'd

3       be willing to show Merck that

4       we're going to try every one of

5       them since their attitude was,

6       we're going to make you try every

7       one of them.

8            I know that John is going to

9       talk about some stuff that I

10      pushed hard to start funding, and

11      that was to get some epi going

12      with respect to the presence of

13      risk factors, and I'm not going to

14      steal his thunder about that.  But

15      it was real clear to me that

16      somebody had to be willing to try

17      difficult cases, and to Andy's

18      credit, I thought he was already

19      doing that.

20           I volunteered, and Kherkher

21      over there and Boundas agreed.

22      There was no shortage of people

23      willing to do the plaintiffs'

24      picks, but we agreed to do the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          defense pick.  I also agreed to

2          get involved in some case up in

3          Illinois that I knew nothing about

4          that involved a 290 pound

5          plaintiff.

6                  MR. WRIGHT:  298.

7                  MR. WATTS:  298, depending

8          upon the state of her diet.

9                  So, in effect, when we were

10         assigned to try the defense pick

11         in Smith, there was an epi paper

12         out there about shoveling snow.  I

13         think the attributable risk was in

14         excess of 99 percent, the relative

15         risk was over 200.  We're not

16         really involved in shoveling snow

17         down here, but apparently somebody

18         writes about it up in the

19         Northeast.

20                 MR. LANIER:  That's how it

21         made it through that screening

22         process from 30,000 to 2,000.  It

23         should have been 1,999.

24                 MR. WATTS:  With my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          prodigious ability to pick cases,

2          I get to try the case with a

3          relative risk of 200 and some

4          percent and a 290-pound plaintiff.

5               But the bottom line is, what

6          we tried to do and what I tried to

7          personally do is, this committee

8          had done some work that I thought

9          was real good work, and the

10         documents that were in some of

11         Mark's depositions were just

12         outstanding, but it was pretty

13         clear to me that at the time of

14         the first document attack, if you

15         will, reading through all the

16         documents was done, the people

17         that did it didn't know as much

18         about the litigation as we knew

19         three years later.  I thought

20         there would be some benefit of

21         going through and doing them all

22         over again from the standpoint of

23         just the corporate

24         representatives.  So, what I did

FAC Resp. Exhibit D -- 1153

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          is, with respect to largely some

2          crosses that you had done, Nancy

3          Santanello, Alise Reicin, Briggs

4          Morrison, I worked with your firm,

5          and I forget the paralegal that

6          was so good.

7                    MR. SEEGER:  Mike Wagner.

8                    MR. WATTS:  Yes.  Somebody

9          worked with Russ Abney, and any

10         document with any one of those

11         people's name on it, and there

12         were, it seemed like hundreds of

13         thousands of them, I had them all

14         sent to me, any transcript, any

15         paper, and I just started anew as

16         if they had never been through the

17         process.  We found a bunch of very

18         interesting stuff that, frankly,

19         weren't in any of the previous

20         records.

21                   Steve focused on it.  I

22         agreed to try that case.  John

23         worked up the science, and Steve

24         was doing a lot of the jury work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1          and the plaintiff work, and my job

2          was to do the corporate

3          representatives.

4               In the Schwaller case, same

5          kind of thing, although in that

6          case, I did the voir dire.  Andy

7          and I have been good friends a

8          long time.  I think Russ and I

9          called him and said, hey, do you

10         want to go play together, let's

11         try this case together.  And he

12         very appropriately, I thought, and

13         I think it's a testament to -- one

14         of the factors when the litigation

15         isn't going that well, did you

16         quit or did you keep fighting.

17         Well, Andy Birchfield kept

18         fighting, and I think we did too.

19         Obviously, the guys to my right

20         over here were great.

21               So, that's primarily what my

22         focus was in trial.  I think I

23         crossed Briggs Morrison for a day

24         and a half, I crossed Alise Reicin

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1           for a day and a half.

2                MR. SEEGER:  Those are two

3           difficult crosses.

4                MR. WATTS:  Well, they were

5           fun crosses.  They were fun

6           crosses.  And I literally did

7           documents, annotations I sent to

8           Chris, sent to Mark, sent to Andy

9           to try to move things along, sent

10          to Ed, you know, just from the

11          standpoint of anything that

12          anybody had missed when those

13          original sweeps were done to try

14          to get those into the record.

15               MR. BIRCHFIELD:  I'm still

16          amazed at your ability to go

17          through documents.  It's

18          phenomenal.

19               MR. WATTS:  Well, it helps

20          when you've got Amy Carter

21          standing right behind you on that.

22               But that's primarily the

23          role that I did in terms of trial

24          preparation.

FAC Resp. Exhibit D -- 1156

Page 49

1            MR. SEEGER:  Amy, was that

2        the other half of your

3        presentation?

4            MR. WATTS:  Actually, I

5        moved to San Antonio for about

6        three months for the Smith trial.

7        I just didn't show up for work for

8        about three months, stayed at my

9        house and did nothing but read

10       this stuff.  It actually was a

11       good thing because there was a lot

12       of stuff done.  I'm not used to

13       bragging about defense verdicts,

14       and don't want to because I don't

15       believe in excuses, but they were

16       hard cases that needed to be

17       tried.

18            I think at the same time of

19       that, we had in place a second

20       strategy, and I know Chris and I

21       talked and Mark and I talked, I

22       wanted to go up to New Jersey and

23       help out where I could.  And I

24       know Steve was taking very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 50

1          significant steps to get us set as

2          fast as we could in New Jersey.

3          And then Walter's firm had another

4          effort going in California just to

5          apply as much trial pressure as we

6          could.  That continued up until

7          the time that you guys cut the

8          deal that you cut.  And so that

9          was kind of what we did with

10          respect to trials or what I did

11          with respect to trials.

12               If you have any questions,

13          I'll answer them.  Otherwise, I'll

14          pass it along.

15               MR. HERMAN:  I want to say I

16          frequented those trials.

17               MR. WATTS:  I know.

18               MR. HERMAN:  And I thought

19          they were extraordinarily well

20          tried.

21               MR. WATTS:  Thank you.

22               MR. HERMAN:  I have a

23          different view about trials than a

24          number of lawyers, and that is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

```
1        because everybody gets a dog filed

2        when you start off.  You get the

3        worst of the worst.  And sometimes

4        the defendants just have to know

5        that you may not win the case, but

6        you are going to bloody them in

7        the process.  So, I think it is

8        important -- lawyers that tell me

9        that they've never lost a case, I

10       have problems with that.  Like my

11       dad used to say, if you want to

12       get a $1 million verdict, just

13       mistry a $3 million case.

14              MR. WATTS:  I did that last

15       week.

16              MR. HERMAN:  I don't think

17       enough can be said about the

18       quality of the trial work.

19              MR. SEEGER:  I would like to

20       say something about that, too,

21       about Mike.  Because from the

22       minute we started working with

23       each other on Vioxx, he has really

24       been a team player.  In fact, I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

```
 1          think I probably know you at some
 2          level better than most people in
 3          the group other than Drew.  The
 4          first trial that I had, Humeston,
 5          which didn't go well, and luckily
 6          Mark helped us right that one, you
 7          were one of the first people to
 8          write a very encouraging and
 9          supportive e-mail to me which I
10          have saved.  I wanted to thank you
11          for that at the time.  You really
12          are a team player, and the work
13          you did was fantastic.
14               MR. WATTS:  Thank you.
15               MR. HERMAN:  There are a
16          couple of other things I think I
17          can safely say, which is that post
18          Katrina, the jury venire changed.
19          For those of us that have tried a
20          lot of cases in that particular
21          federal courthouse, some of the
22          rulings on evidentiary matters and
23          in limine made it difficult for
24          plaintiffs.  Sometimes it happens
```

FAC Resp. Exhibit D -- 1160

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 53

1       to us.

2            From the overall

3       perspective, when you've got 60 or

4       70 defense firms, each one of them

5       being paid by a corporate

6       defendant to go to a particular

7       venue and try 30 trials, they have

8       an advantage over a plaintiff.

9       So, I don't think there should be

10      any regrets.  I don't think there

11      should be any diminution in the

12      work that was done in the trials

13      that you folks conducted.  I have

14      no reservations about this, as I

15      said, and I want to make that

16      clear on the record.

17           MR. BOUNDAS:  If anyone has

18      any questions, feel free to cut me

19      off.

20           For the record, John Boundas

21      here from Williams Kherkher Hart

22      Boundas.

23           A lot of people in this

24      room, I think, know our law firm

FAC Resp. Exhibit D -- 1161

Page 54

1        and the commitment and

2        determination that we show.

3            MR. HERMAN:  I apologize.  I

4        have one continuing family

5        emergency.  Let me step out for

6        just one minute.

7                - - -

8            (Whereupon, a recess was

9        taken from 9:57 until 10:09 a.m.)

10               - - -

11           MR. BOUNDAS: Anyway, for the

12       record, John Boundas, Williams

13       Kherkher.

14           A lot of the people in this

15       room know our firm and the level

16       of commitment and determination

17       that we show when we get involved

18       in a litigation.  I'm proud to say

19       that John Eddie, our managing

20       partner, has built a firm that a

21       defendant knows when we get

22       involved in a case that we're

23       going to commit whatever time,

24       whatever resources, talent, money,

Page 55

1       whatever it takes to see it

2       through to the end.  Ed Blizzard

3       was there with us when we tried, I

4       think, 12 separate jury trials in

5       fen-phen all over the United

6       States.

7            When we got involved in the

8       Vioxx litigation, our partners in

9       the VLC and we saw that this

10      litigation might break much the

11      same way, in that we may have to

12      do the same thing, take the same

13      approach and get ready, if

14      necessary, to try case after case

15      after case.  Merck was saying they

16      were going to try every case,

17      Mikal mentioned that, and we felt

18      like that's what they're saying,

19      that's what we're going to say.

20      We sort of took that approach.

21           We tried cases, we conducted

22      jury research.  We worked cases up

23      for trial.  We worked with and

24      developed a whole host of expert

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 56

1          witnesses, some of which I will

2          talk to you about later.  We were

3          out there on the front lines.

4                 As far as the quality of our

5          work, Russ, I appreciate what

6          you've said about us.  I think a

7          lot of you know, the lawyers in

8          this room, haven't gotten a chance

9          to work with Mikal and Steve and

10         Walter Umphrey and Grant and Drew.

11         I would put the quality of lawyers

12         in our group up against anyone.

13         And there were a lot of great

14         lawyers in this litigation and a

15         lot of lawyers whose work that we

16         used.  We used Mark Lanier's

17         depositions, and Andy helped us

18         tremendously.  So, this whole

19         litigation is to the credit of an

20         enormous number of people.  We're

21         not here saying we did it all, but

22         we are saying that we feel like we

23         were right there with everybody.

24                 I want to talk a minute

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 57

1           about the MDL and some of the work

2           that we did.  When cases needed to

3           get put up for trial, we were

4           there.  We were asked to put up

5           some plaintiff pick cases, we did

6           it, we put up two cases, they were

7           good cases, and Merck struck them.

8           And I think that speaks to the

9           quality of the kind of cases that

10          we were able to bring to the

11          table.

12              When a defense pick case

13          needed to be tried, we were there.

14          And I kind of felt like Mikey and

15          those Life Cereal commercials.

16          Well, who wants to try the defense

17          pick?  And all of a sudden they

18          pointed at me and Kherkher and

19          Mikal.  We stepped up and tried

20          that case.  It's been talked about

21          a little bit, the snow shoveling

22          issue.  After we lost the case, my

23          mom sent me an e-mail.  She grew

24          up in Chicago.  What were you guys

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 58

1          doing trying that case?  Everybody

2          knows when an old guy goes out to

3          shovel snow, he's going to have a

4          heart attack.  That's great.

5               On the DecisionQuest issue,

6          the shadow jury did award us $5

7          million, so, we're going to try

8          and recover some of that, spread

9          it around.  But, you know, that

10         was a tough case.  And I think we

11         did a good job in the case.

12         Obviously we wanted to win.  Mr.

13         Smith was a great guy, and I think

14         he had a good case.  But what I

15         think it showed Merck was that

16         this is going to be a tough

17         litigation if they want to go try

18         every case when they pick one and

19         it is going to be contested all

20         the way down to the wire.  That's

21         what I think that showed.

22               New Jersey, again, when

23         cases needed to be submitted for

24         trial, and the PSC and Chris and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 59

1        Dave Buchanan did a heck of a job

2        up there, when they were asking,

3        you guys need to submit cases, we

4        were there.  We submitted, I

5        think, 45 cases in New Jersey as

6        wave I through III for trial.  At

7        one point I think they only gave

8        us 10 slots and we submitted 20.

9        And so we submitted those cases.

10       We had 30 more cases literally

11       ready to go out the door for wave

12       IV, if necessary.

13            The way those cases got

14       submitted, I think Grant will

15       cover this a little bit, but we

16       had a team of lawyers, myself,

17       Grant, Amy, Steve, a bunch of

18       lawyers from our firm, nurses, to

19       go through all of those files, vet

20       the cases.  We would have long

21       meetings where we would go through

22       them and really tried to pick

23       cases that if Judge Higbee said,

24       hey, you guys are going to trial

FAC Resp. Exhibit D -- 1167

Page 60

     1        five times in March, that we'd

     2        have five cases to bring to the

     3        table.  So, we really made some

     4        efforts there.

     5              MR. HERMAN:  I'm going to

     6        interrupt you for one minute.  Did

     7        you submit any stroke cases?

     8              MR. BOUNDAS:  I don't think

     9        Judge Higbee ever got --

    10              MR. HERMAN:  In the MDL?

    11              MR. BOUNDAS:  We did not.

    12        Is that right, Grant?

    13              MR. RANIER:  We were working

    14        on it, Russ, and that's actually a

    15        note I have.

    16              Brett might have been on

    17        that.

    18              MR. HERMAN:  I think you are

    19        correct, in fact, I know you are,

    20        that there were not a lot of firms

    21        submitting cases in the MDL in MI.

    22        We didn't have any on stroke.  But

    23        your firm did step up, and the

    24        cases were tried.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 61

1                With regard to

2          DecisionQuest, your mock jurors,

3          your shadow jurors were easy to

4          spot in the courtroom, including

5          the guy in the second to last row

6          reading the racing form.

7                MR. WATTS:  He was our

8          sinker.

9                MR. HERMAN:  I say that

10         because I want to emphasize again

11         that everyone around this table

12         has different views of different

13         things, but I think there's no

14         question about the willingness to

15         work up cases, to submit cases and

16         to try cases by the Vioxx

17         Litigation Consortium.

18                What I personally would like

19         to hear and what we're trying to

20         do is to make a record that's

21         fair, and particularly fair to

22         you, to give you the opportunity,

23         is to talk more about

24         contributions beyond the trial

FAC Resp. Exhibit D -- 1169

Page 62

1          work because we know that.

2          Anybody that disputes that is

3          going to get a big argument from

4          me.  The other contributions that

5          you made, I think, are significant

6          enough that you ought to talk

7          about them or someone ought to

8          talk about them.

9               MR. BOUNDAS:  I've got some

10         of that.  I'm only going to be a

11         few minutes, but I do have some

12         other issues to cover.

13              For example, on, not just

14         the trial work, but in New Jersey,

15         we were working those cases up, we

16         were getting experts, depositions

17         were being taken.  Those cases in

18         the pipeline were being worked.

19              MR. BLIZZARD:  John, let me

20         ask you.  How many of them were

21         being worked up for trial where

22         you actually presented people for

23         depo?

24              MR. BOUNDAS:  I think we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 63

1          presented at least four plaintiffs

2          for depo, maybe more.

3               MR. KHERKHER:  Two of them

4          got shut down for various reasons,

5          but we were always there.  I mean,

6          Dave Buchanan was my new best

7          friend, and he told me exactly

8          what to say.  I mean, I feel

9          awkward trying to build ourselves

10         up when I look across the table

11         and I did it because of you guys.

12         I mean, I wasn't able to get in

13         the door if it wasn't for Dave

14         Buchanan.  He whispered in my ear

15         and told us what to say.  The only

16         compliment I got -- I mean,

17         granted, here I am learning how to

18         try a Vioxx case, and I saw Mark

19         Lanier try it and Chris Seeger try

20         it, but Judge Higbee, the best

21         compliment she ever gave me was,

22         you are the first one to raise

23         your hand that you want to try a

24         case.  We were going to try the

Page 64

1        Georgia cases, and we were going

2        to try the New York cases, the

3        Pennsylvania cases, and Sol Weiss

4        got in, and we tried to work with

5        everybody.  But when Russ says,

6        what did y'all contribute, we were

7        part of the team.  I mean, we were

8        ready to push this entire

9        litigation with the help of you

10       guys and get to the end result.

11       So, that's what we were doing.

12            MR. SEEGER:  I have to tell

13       you, Steve, on the trial front, I

14       think we are all in agreement when

15       I look at you and John and Mike, I

16       mean, we know who were the guys,

17       the trial lawyers in the trenches

18       every single time saying, coach,

19       put me in the game, put me in the

20       game.  You guys were there.

21       Nobody can dispute that.

22            MR. KHERKHER:  But as far as

23       the intangible contributions,

24       that's part of it.  What more can

Page 65

```
 1          I say other than, what gets us to

 2          the end result is these trial

 3          settings, knowing that -- when I

 4          was at the University of Houston,

 5          I wasn't good enough to play

 6          football, but I was a ball boy.  I

 7          was a water boy.  My claim to fame

 8          is Lionel Wilson, the quarterback,

 9          busted his helmet, and I fixed his

10          helmet.  He only missed one play,

11          he got back in the game, and he

12          scored the touchdown.  Did I score

13          the touchdown?  No.  But I was

14          part of the team.

15               MR. LANIER:  I always

16          thought you scored that, Kherkher.

17          That's not the way Susan told us

18          the story.

19               MR. LEVIN:  You are lucky it

20          was his head and not your head.

21               MR. KHERKHER:  Now, granted,

22          I wish I was on your side of the

23          table, but we're all part of the

24          team.  You guys are the owner,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 66

1           general manager and quarterback,

2           and maybe we're not the water

3           boys, maybe we're just the

4           superstar running backs that

5           helped the whole team get to where

6           we needed to be.  I mean, whether

7           it is off in our building which

8           was in Houston, Texas when we had

9           meetings for the consortium and

10          other plaintiff lawyers, but I

11          still feel awkward because we

12          could not get here -- I mean, Andy

13          Birchfield, I didn't even know

14          him, he's giving me his cell

15          number so I can call him so he can

16          feed me information.

17               MR. BLIZZARD:  That was a

18          mistake.

19               MR. KHERKHER:  It helped me,

20          Russ, to provide you information

21          on -- other than trial settings,

22          what we helped this great team to

23          get to where you need to be

24          because I'm missing it other than

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 67

1          just --

2              MR. HERMAN:  Well, there's

3          no question that preparing for

4          trial, getting the experts, doing

5          the mock juries, putting the cases

6          up is extraordinarily significant.

7          But fortunately in this room,

8          there's not a lawyer here that

9          doesn't try cases and hasn't been

10         through the wars.  We understand

11         completely the significance of

12         that and the gravity of it.  I

13         think there are other

14         contributions that you made

15         outside of that, and that's what

16         I'm trying to get at.

17             MR. BOUNDAS:  I've got some

18         of that.  Let me give you an

19         example.  At our firm, we had 12

20         attorneys commit time to Vioxx.

21         Some of them took expert depos,

22         presented plaintiffs, worked cases

23         up.  But Collyn Peddie, she's got

24         25 years of experience as an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 68

```
 1          appellate lawyer.  Anybody --
 2               MR. HERMAN:  Let me try and
 3          help you out.  Y'all did send
 4          expert depositions and reports to
 5          the depository?
 6               MR. BOUNDAS:  Right.
 7               MR. HERMAN:  Now, that's a
 8          contribution, okay, of common
 9          benefit because other lawyers get
10          the advantage of that work
11          product.  That's the type of thing
12          that I'm asking you about and I'm
13          trying to --
14               MR. BOUNDAS:  I'm getting to
15          it.
16               MR. BIRCHFIELD:  Let me say
17          this to you because, please, don't
18          mishear what we're saying because
19          we know the tremendous value that
20          comes from trying cases, working
21          cases up and moving the docket.
22          So, we're not diminishing that at
23          all.  I think all Russ is saying
24          is that we've got that.  We've
```

FAC Resp. Exhibit D -- 1176

Page 69

1          heard you on that.  We've heard

2          you, but not only that, we knew.

3          I think Mikal's point is an

4          excellent one, and Mikal is

5          fearless, and he will try any

6          case, and they know it.

7               What John was saying on the

8          snow shoveling case, Merck

9          couldn't turn around -- they knew

10         there were some lawyers that could

11         set their case and they'd get a

12         dismissal and they could come to

13         the status conference and they

14         could report.  This is another

15         case that was set for trial and

16         dismissed by the plaintiff's

17         lawyer.  That did not happen.

18         That did not happen with you and

19         your group.

20               And so we know the value of

21         trying cases, the value of saying,

22         put me in, coach, we're here,

23         we've got cases ready to try,

24         working those up.  We're not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 70

1           diminishing that in any respect.

2           What we're saying is that we've

3           got that.

4                MR. HERMAN:  Let me put it a

5           different way.  There are

6           carnivorites and vegetarians.  And

7           the carnivorites like blood meat.

8           They want to try cases, and they

9           know how to do it.  We understand

10          how important that is.  You made

11          other contributions you should

12          talk about.  You've got a lot of

13          time to talk about it.

14               MR. WEITZ:  Let me highlight

15          a little bit about what Steve said

16          and what Andy said.  You have to

17          understand that a lot of us on the

18          committee went through what you

19          guys went through in the beginning

20          of your presentation, sifted

21          through thousands and thousands of

22          cases, put in an enormous

23          financial contribution into this,

24          had dozens of lawyers and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 71

1       paralegals working on this.  So,

2       we know not only the hard costs,

3       but the soft costs and the

4       dedication that the Texas group

5       put into it.  So, a lot of that or

6       all of that does not go on deaf

7       ears.  We get it, and we know the

8       contribution that makes towards

9       moving the litigation, and that's

10      what we're focused on.  It is not

11      just the hours, it is the quality

12      of work, it is a lot of the things

13      that Andy said about moving the

14      cases and having the ability and

15      the resources to do that.  So,

16      Andy is right.  We get that.

17          What we need a little bit

18      from you also is when you talk

19      about New Jersey and Judge Higbee

20      and the waves, I mean, Chris and I

21      were there, and we had most of the

22      cases on that docket.  We need to

23      know specifically cases that had

24      work done on them, not just put in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 72

1          a tranche, but actually tell us,

2          okay, this was done, there were

3          Daubert motions that were done,

4          the experts were proffered, there

5          were motions in limine.  What

6          stage did you get?  Because we

7          know that you guys were ready to

8          move cases, but did they actually

9          get to a certain stage?  So, see

10         if you can focus on that.

11              MR. BOUNDAS:  This is all on

12         the page here.

13              MR. SEEGER:  Just hand in

14         your paper.

15              MR. BOUNDAS:  I'll answer

16         your question.

17              MR. HERMAN:  You had better

18         do it before I get another call.

19              MR. BOUNDAS:  We had the

20         Romans and Sanderson cases in New

21         Jersey.  They were the next cases

22         up for trial, and they were set I

23         think originally October, then I

24         think it occurred to me that Judge

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 73

```
 1            Higbee must have known something.

 2            She moved them up.  We worked

 3            those cases up, we got experts.

 4            I'm going to tell you about a

 5            couple of the new experts that we

 6            were going to bring to New Jersey

 7            that we were going to offer and

 8            actually offered our marketing

 9            expert for common use.  But on

10            Romans and Sanderson, we worked

11            the cases up, we presented the

12            plaintiffs, we did the discovery.

13            We were literally spending months

14            getting ready for that trial.

15                 And to give you one example,

16            we got Dr. Martin Wells, who is a

17            biostatistician from Cornell.  We

18            got him all the raw data from

19            Merck's clinical trials, the raw

20            stuff, the SAS files, all of that

21            stuff, and he went through that

22            data and was able to show some

23            very interesting things.  One was

24            that the signal shows up far
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 74

```
 1          earlier in Merck's data than you
 2          can ever imagine when you actually
 3          analyze it the way they were
 4          supposed to do it at the outset.
 5               The second thing is what
 6          Mikal mentioned, was that we saw
 7          that risk factors were going to be
 8          the dominant defense here.  So,
 9          what Dr. Wells did was look at,
10          well, can we take Merck's data and
11          use it against them on the risk
12          factor issue.  And he came up with
13          a report showing that we can take
14          their own clinical trial data and
15          demonstrate that Vioxx is more
16          dangerous than all of these other
17          risk factors.  And so we were
18          going to present that in a graphic
19          way to show the jury that, look,
20          we're just using their data,
21          here's how the risk factors line
22          up and here's where Vioxx stacks
23          up.  We thought that was a big
24          piece.
```

FAC Resp. Exhibit D -- 1182

Page 75

1           MR. LANIER:  Can I interrupt

2      and ask a question, please?

3           MR. BOUNDAS:  Sure.

4           MR. LANIER:  Two questions

5      on that point.

6           First, do you know if your

7      materials and the experts and the

8      Cornell fellow, for example, have

9      y'all given that material to the

10     MDL to put into the trial package?

11          MR. BOUNDAS:  Grant, I think

12     that was turned in.

13          MR. KAISER:  I'll have to

14     check.

15          MR. BOUNDAS:  I've got a

16     copy of the report.  I assume it

17     was turned in.  The thing you need

18     to know is that that report was

19     completed and filed -- or not

20     filed, I don't remember, it was

21     like a week before the settlement

22     was announced, so, I'm not sure

23     how it fell into that mix.

24          MR. HERMAN:  Can you check

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 76

1      on that?

2           MR. RANIER:  Mark, you are

3      right.  It needs to be there.

4           MR. LANIER:  Right.  You

5      don't want on the record an

6      argument that that doesn't really

7      contribute to the common benefit

8      because it was done a week before

9      the settlement was announced, but

10     if you get it into the trial

11     package, then arguably it is

12     something that's out there now for

13     the people who maybe didn't take

14     the settlement.

15          MR. LEVIN: It's also our

16     obligation and --

17          MR. BOUNDAS:  You've got it,

18     and that's available.  So, I think

19     it has a double benefit.  One was

20     we were getting ready to try these

21     cases with some new stuff for

22     Merck, and we were working on

23     that.

24          MR. BIRCHFIELD:  John, on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 77

1          the trial package point, because

2          this is a significant fact, and

3          I'm almost certain that

4          Mikal's cross-examination of the

5          corporate rep, I'm sure that was

6          submitted for the trial package.

7          Mikal took advantage of some

8          favorable Illinois law on a

9          corporate rep there and laid the

10         foundation for a tremendous number

11         of documents.  That's part of the

12         trial package.  That's the kind of

13         thing we're talking about.

14               MR. HERMAN:  Because it's

15         important.  The way that we

16         justify in this case common

17         benefit, because it's not a class

18         action, it's not a class action

19         settlement, it's a contractual

20         thing, is by saying, okay, for you

21         folks that didn't want to put your

22         cases in, you can't complain about

23         this settlement.  And the reason

24         you can't complain is here's a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 78

1          trial package on MI, here's a

2          trial package on stroke, go try

3          your cases.

4               I know we've all been in

5          cases where people talk about

6          trial packages and you would take

7          that package and just throw it in

8          a trash can.  I know what folks

9          spent preparing and getting these

10         cases to trial.  Most of them cost

11         between a half a million and a

12         million and a half bucks.  The

13         trial package enables folks to try

14         cases for less than $200,000.

15              Getting that report into the

16         trial package now has value.  No

17         one can say it comes late because

18         there's still people out there

19         that say they are going to try

20         cases.  And we say, okay, here,

21         take it.  So, what you have to say

22         is very important, and it

23         shouldn't be --

24              MR. BOUNDAS:  I think also

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 79

1          as a side point, Grant Kaiser's

2          affidavit that we have submitted

3          has a large amount of materials

4          that we did submit to the trial

5          package.  I think Grant will cover

6          that.  I just can't tell you right

7          now if that report is in.

8               Another report that we did

9          is we spent a lot of time

10         realizing that putting together

11         the marketing case in a really

12         coherent way for a jury, Ed did

13         this in his trial with Dr.

14         Pechmann, struck us as a good

15         idea.  We went out and worked with

16         Dr. Marvin Goldberg at Penn State

17         who put together a really first

18         rate comprehensive report going

19         through Merck's entire marketing

20         plan and really explaining how

21         calculated, devious, the kind of

22         message they were trying to get

23         across.  So, that was something

24         else that we had brought to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 80

1      table.  And actually at one of the

2      hearings, I offered to the New

3      Jersey group that we would make

4      that available for common use.

5      Again, the case settles within a

6      week of that designation date.

7      So, the same issue, and I hear

8      you, that we may need to get that

9      out there.

10          So, on those cases, those

11     weren't just cases we threw in the

12     trial pool.  So, I also have to

13     add we were working with a lawyer

14     named Forest Horn at Martin &

15     Jones.  Forest was our co-counsel,

16     and I think you guys are meeting

17     with him.  He certainly

18     contributed.  So, not just putting

19     cases in the hopper, but we were

20     getting ready for the next trial.

21     Then there were trials after that

22     we were getting ready for.

23          Some other contributions.  I

24     mentioned our firm committed 12

FAC Resp. Exhibit D -- 1188

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 81

1        lawyers at various stages.  We

2        submitted affidavits.  I'm not

3        going to rehash all that.

4            But to give you one example,

5        Collyn Peddie is a very

6        experienced appellate attorney,

7        very well known across the country

8        at this point for her work on

9        preemption issues --

10           MR. LEVIN:  She's been

11       terrific.

12           MR. BOUNDAS:  She's an

13       excellent lawyer.  And the Texas

14       MDL, we didn't file a lot of cases

15       there, but we saw in the Ledbetter

16       case that things were going south,

17       and that could hurt everybody.

18       And John Eddie stepped up to the

19       plate with Collyn's agreement and

20       said, hey, Collyn, will you go in

21       there and take that case on.  And

22       she took it on kind of late in the

23       game, she filed a motion for a new

24       trial, handled the entire appeal,

Page 82

1          which, you know, fortunately now

2          is dismissed due to the settlement

3          presence.  That wasn't our case.

4          We don't have a fee interest in

5          that case and never did.  Collyn

6          spent, I think, over 1,200 hours

7          on that case, arguing it, briefing

8          it, fighting it, all for the

9          common good.  I think we had 14

10         cases in Texas.  So, it certainly

11         helped our clients, but helped a

12         lot of other people.

13              Collyn also came to the MDL,

14         filed motions and numerous

15         responses to Daubert motions that

16         I'm sure are in the trial package,

17         they are excellent work product,

18         and I'm happy to say in that case

19         I don't recall a significant

20         evidentiary ruling that we lost.

21         Actually, we got Judge Fallon to

22         turn around on a couple of

23         important issues, one of which was

24         Dr. Graham's analysis of how many

Page 83

1          people had been killed or had

2          heart attacks as a result of

3          taking Vioxx across the country.

4          As I understand, Judge Fallon had

5          not let that in before.  We got

6          that evidence in in that case.  I

7          think that was a benefit.  A lot

8          of people deserve the credit for

9          that.

10               Collyn did a lot of work

11          there.  I think in all, she spent

12          17, 1,800 hours on common benefit,

13          briefing, researching, doing a lot

14          of hard work with a person who's

15          extremely talented.  That's

16          another --

17               I'll leave it at this point

18          to let Amy cover her contribution.

19               MR. SEEGER:  John, if I can

20          ask you a question before you wrap

21          up.  If it's in there, it is easy,

22          but in your affidavit, actually,

23          it's the group because you have

24          multiple law firms, do they

Page 84

1          outline contributions in terms of

2          legal briefing, discovery

3          contributions, things you did sort

4          of that go, like I say, beyond the

5          obvious stuff that we know, the

6          background stuff.  Amy, are you

7          going to be getting into this?

8                    MR. BOUNDAS:  Yes.  For

9          example, we had two lawyers who

10         put on the mock trial.  That will

11         be in there.  We had a number

12         of -- like Jim Doyle and some

13         other lawyers took depos of Merck

14         expert witnesses, and that's going

15         to be in there.

16                   MR. SEEGER:  Other than Drew

17         and his position on the PSC, were

18         there any members that had liaison

19         or positions on any committees?

20                   MR. KAISER:  Yes.

21                   MR. SEEGER:  That's in

22         there?

23                   MR. KAISER:  My affidavit.

24                   MR. RANIER:  It is in

Page 85

1          Mikal's affidavit, and I know it
2          is in Grant's.
3               MR. LANIER:  When you talked
4          about the way y'all were
5          coordinating through Drew and the
6          MDL, I was not an MDL lawyer, I
7          did my work --
8               MR. WATTS:  Short lived
9          liaison counsel.
10              MR. LANIER:  But I don't
11         have an intimate familiarity with
12         a lot of the MDL stuff.  I do have
13         intimate familiarity with a number
14         of other jurisdictions though.
15         And having tried three of these
16         cases, I have a decent grasp of
17         who the witnesses are.  When you
18         talk about the efforts y'all did
19         with your Cornell statistician,
20         one of the thoughts that occurs to
21         me is, did y'all integrate with
22         Drew to see whether or not you
23         were running a duplicate tract of
24         what was being done, or was this

Page 86

```
 1        being done at the behest of the

 2        MDL, or was this being done

 3        independently and now looking to

 4        merge into it?  Can you give me a

 5        feel for how that was done?

 6             MR. BOUNDAS:  To give you an

 7        overall point, I flew around the

 8        country and met with experts in

 9        probably five or six different

10        states.  We had people -- we had

11        all kinds of expert work going on

12        that was not, hey, guys, go out

13        and get experts because we were

14        figuring we're going to have to

15        have to try cases.  We're going to

16        need five cardiologists and not

17        one.  We're going to need

18        epidemiologists.  A lot of that

19        was at the behest of the MDL.

20        I'll let Drew answer on Dr. Wells

21        specifically.  All I know is we

22        went out there and did it.

23             MR. BIRCHFIELD:  What about

24        in New Jersey?  I know you were
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 87

1          working with Dave.  Was Marty

2          Wells, was Dave aware --

3               MR. POWERS:  Dave got us the

4          data.

5               MR. RANIER:  The way that

6          started was I called Dave Buchanan

7          and said, Dave, we would like to

8          take a look at the raw data.

9          Because everybody had seen the

10         runs, everybody knew that they

11         diluted the Konstam -- they

12         diluted the Konstam meta-analysis

13         with Alzheimer studies, and they

14         would get crossed on that.  But

15         nobody had ever gotten the actual

16         data itself under the --

17              MR. LANIER:  Actually,

18         Madigan did --

19              MR. SEEGER:  That's not

20         true.  I have to correct you on

21         that one.  Because we got in

22         electronic native format all of

23         the SAS files and all of the

24         backup.  I have to check with

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

Page 88

1          Dave.  It could be that you may

2          not have had it in your hands and

3          you needed it for your guy.  But

4          you've got to remember that

5          Kronmal, who was a biostatistician

6          from University of Washington, had

7          gone through all of that, and then

8          Madigan came along --

9               MR. LANIER:  Madigan came in

10         and did the same thing.

11              MR. SEEGER:  -- and looked

12         at it in a little bit different

13         light.  Your guy was doing the

14         same thing.  I'm not diminishing

15         the idea, but I just want to be

16         clear on the record what was

17         available and what was not.

18              MR. WEITZ:  But it was done

19         in Jersey.

20              MR. BOUNDAS:  Some of it was

21         those experts weren't available

22         for that particular trial, and we

23         knew -- Kronmal is a good example.

24              MR. SEEGER:  We were trying

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 89

1          to build a bullpen.

2                    MR. LANIER:  I know a good

3          example is y'all had asked me

4          about using Krumholz, and Krumholz

5          would not agree to helping y'all

6          out, so y'all needed someone

7          extra.  Krumholz, for example, had

8          used that same data in our third

9          trial to say the signal was there

10         in 2000.

11                   MR. BOUNDAS:  I think I read

12         his transcript.

13                   MR. RANIER:  Did he do the

14         risk factor data?  Did he break

15         out diabetes, high blood pressure,

16         and all of that like Wells did?

17                   MR. SEEGER:  That was done.

18                   MR. LANIER:  Yes.

19                   MR. WEITZ:  Walter?

20                   MR. UMPHREY:  I think one of

21         the main issues on common benefit

22         that we contributed was the

23         ethical issue.  When you folks

24         negotiated a settlement, I know

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 90

1        that we were at a difference of

2        opinion, and we were not in a

3        position to recommend that to any

4        of our clients, and we wouldn't

5        have done it.  Mr. Williams took

6        the lead in this issue and Drew

7        and worked it out satisfactorily

8        where we felt under the Texas

9        ethical rules we were okay.  I

10       think by doing that, we saved a

11       lot of problems for a lot of other

12       lawyers.

13            MR. LANIER:  And probably

14       helped a lot of other Texas

15       lawyers sign on even that had

16       cases in New Jersey, because I

17       would be bound by Texas rules in

18       New Jersey.  That was a big help.

19            MR. UMPHREY:  They never

20       would have had the numbers for the

21       settlement if not for our efforts

22       in that regard.

23            MR. SEEGER:  I guess I want

24       to be clear because we're taking

FAC Resp. Exhibit D -- 1198

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 91

1          this down, and Walter, I have

2          nothing but the highest respect

3          for you, your firm, everybody.  I

4          think what we ultimately wound up

5          doing is getting a clarification

6          about what the language meant.

7          That was very helpful to you.  But

8          I can tell you from the very

9          moment it was negotiated and the

10         intention of the committee, we

11         very much had Texas as the big

12         concern because we know that

13         that's a very difficult state.  I

14         think that John Eddie was a little

15         uncomfortable with the way some of

16         the verbiage was, and we clarified

17         some things.  I want to just make

18         that clear for the record.

19              MR. UMPHREY:  I also think

20         this group contributed heavily by

21         cooperating with your group.  We

22         did that in the very beginning.

23         Nothing was ever withheld from you

24         or we didn't make full disclosure,

FAC Resp. Exhibit D -- 1199

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 92

1          full cooperation.  Whatever it may

2          be, we were there.  And I think we

3          should be given a plus mark for

4          that.

5               MR. BIRCHFIELD:  I agree 100

6          percent on that, Walter, and that

7          was really the purpose of this

8          series of questions about, was

9          this coordinated through New

10          Jersey.  I mean, we all know that

11          there are lawyers out there that

12          have basically taken their cases

13          and done their own thing and run

14          their own show and kept it all to

15          themselves.  That plays different

16          in a common benefit setting than

17          someone who is coordinating and

18          communicating with the other

19          jurisdictions.  That was the

20          purpose of those questions.

21               MR. BLIZZARD:  Let me say

22          something, too, because I think

23          this will be helpful.

24               MR. UMPHREY:  I have always

Page 93

1          found over the years that when you

2          take good lawyers like those that

3          surround us at this table, when it

4          comes to fee division, good

5          lawyers are fair.  They recognize

6          the work of other lawyers and what

7          it contributed, and they are

8          willing to reward their friends

9          and their associates in the

10         economic aspect of it.

11              MR. SEEGER:  I agree with

12         that personally.

13              MR. BLIZZARD:  I just want

14         to say when we were getting ready

15         for Mason, our trial, right after

16         you guys had tried Smith, not only

17         did Mikal send me everything that

18         he had, but Steve and John and Amy

19         came and sat down with our team

20         and debriefed us on what had

21         happened, what witnesses worked,

22         what didn't work, what might be

23         helpful in the next trial.  That's

24         the way that teams approach

Page 94

1          things.  You guys didn't have to

2          do that.  We had worked closely in

3          the past, obviously, on fen-phen.

4          We knew each other.  But it wasn't

5          just that.  I mean, it is the kind

6          of thing that John mentioned, John

7          Eddie threw Collyn into the mix on

8          preemption.  We know how important

9          that was in Texas, but not only in

10         Texas, but nationally that

11         preemption issue was hanging over

12         our heads even after we settled

13         this case.  There was a period of

14         time that we sometimes forget

15         about where they could walk away

16         from the deal and leave 4.8

17         billion dollars, 85, don't want to

18         forget that 5.

19              MR. HERMAN:  Please don't.

20              MR. BLIZZARD:  A lot of

21         people in this room stepped up and

22         made not only commitments of work

23         and effort to try to fight the

24         preemption issue, but put money on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 95

1          the table to help fight that

2          issue.  I think that the group

3          here, as well as people on the

4          committee itself, made, again, a

5          team response to that threat.  I

6          think that is a contribution that

7          was made throughout this.  All of

8          you guys said we're in this

9          together.

10              MR. BOUNDAS:  I think in the

11         New Jersey litigation, there was a

12         high level of coordination.  It

13         wasn't just our case.  We had

14         Romans and Sanderson set.  I know

15         that Sol had a case set.  There

16         were probably two or three others.

17         Mark Lanier had one.  The idea

18         was, we're going to try all of

19         these cases at the same time,

20         we're going to share resources if

21         we have to have experts shuttle

22         from one courtroom to the other,

23         work on depo cuts together.  Steve

24         did a lot to coordinate that.  The

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 96

         1        idea there was we're going to try

         2        these four cases, and then Judge

         3        Higbee said we're going to set

         4        some in March, April or June if

         5        this doesn't settle.  That was

         6        really, I think, a team effort.

         7             MR. KHERKHER:  We had three

         8        meetings at Sol Weiss'

         9        Philadelphia office that I

        10        coordinated with the help of Dave

        11        Buchanan, of course.  Again, I

        12        feel every time I say something

        13        great we did, I did it with the

        14        help of you guys also.  But we

        15        were a great team.  You are right,

        16        Ed.  We were a great team.

        17             MR. HERMAN:  I want to get

        18        back to the ethics thing that

        19        Walter mentioned.  This isn't our

        20        opportunity to pat ourselves on

        21        the back, but I think you should

        22        know that Ed Blizzard during the

        23        negotiation made everyone on the

        24        negotiating committee aware of the

FAC Resp. Exhibit D -- 1204

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 97

1        Texas rules, and I think we had

2        three ethics experts before

3        anything was put on paper.  Ed was

4        extraordinarily conscientious, and

5        it did help.  We had a meeting --

6        I don't even remember where we had

7        a meeting.  We had a meeting where

8        you brought in, I think, Harry

9        Potter.

10              MR. KAISER:  In Atlanta.

11              MR. LANIER:  You were

12       excited when you heard Harry

13       Potter was coming.

14              MR. HERMAN:  Yes, I was.  I

15       looked for the little mark on his

16       head.

17              But you brought in a couple

18       of folks and, Walt, I thought that

19       meeting was extremely productive.

20       I think it is important to know

21       that without resolving the special

22       ethics agitation that comes from

23       Texas rulings in light of trial

24       practice, it not only solved it

FAC Resp. Exhibit D -- 1205

1      for Texas, but it had an impact in

2      other jurisdictions as well.

3      Because there were lawyers that

4      really were looking to the Texas

5      lawyers who were tag-alongs.  They

6      don't do very much, but when they

7      see some group of excellent

8      lawyers come up with an issue,

9      they immediately want to jump on

10     it.  And the fact that it was

11     resolved to the satisfaction of

12     your group had an impact beyond

13     Texas.  So, I'm glad you brought

14     that up.  I don't think we would

15     have recalled that contribution,

16     actually, and I think it was

17     significant.

18          I have some other

19     questions -- go ahead.  It is your

20     turn.

21          MS. CARTER:  I think it is

22     my turn.

23          You asked earlier, Russ,

24     what we sent in as far as expert

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 99

1          reports and depositions and that

2          sort of thing to the MDL package.

3          Essentially John Eddie sent me in.

4          I was first involved in Smith, and

5          I did all of the deposition cuts

6          and all of that behind the scenes

7          stuff that everyone hates to do

8          but takes up a lot of time.  There

9          were many 4:00 morning meetings

10         with Carrie Jablonski where she

11         said, well, we have already done

12         this before and this is not how we

13         did it, and the Court has already

14         said off the record that this is

15         how he wants things done.  Sorting

16         all of that out during the Smith

17         trial took a lot of time and

18         aggravation.

19              And at the end of the trial

20         when the Court was looking toward

21         Mason, he said that he would like

22         to see some continuity in the

23         plaintiff's side of the process

24         because that was such a difficult

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 100

1        aspect of getting the depositions

2        and the exhibits and everything

3        else done.  So, John Eddie

4        essentially sent me into the MDL

5        trial package because I was the

6        person who had done all of that.

7        So, I volunteered my time for the

8        Mason case.  We did not have a fee

9        interest in that case.  And I

10       again did all of the deposition

11       cuts and the exhibits and all of

12       those negotiations with Carrie

13       Jablonski at 3:00 in the morning

14       for the Mason trial, which I think

15       added a lot of continuity to the

16       second trial and helped with a lot

17       of headaches.

18            My other contribution was a

19       lot of time spent in New Jersey

20       getting ready for those last

21       trials.

22            The North Carolina cases

23       were the cases we were going to

24       try a week before, and I spent

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 101

1        weeks in North Carolina

2        interviewing fact witnesses and

3        figuring out proof and all of

4        those details that go into making

5        a good case factually.  That's how

6        I ended my days on Vioxx,

7        basically in North Carolina.

8              MR. HERMAN:  Who was going

9        to try that case?

10             MR. KHERKHER:  I was.

11             MS. CARTER:  Steve and John.

12             MR. KHERKHER:  And Forest.

13       Those were actually Forest Horn's

14       cases, and he asked us to help him

15       try the cases.

16             MR. HERMAN:  MIs?

17             MR. KHERKHER:  Yes, both of

18       them.

19             We actually had some cases

20       in Georgia that we were going to

21       try, and then we had a telephone

22       conference, and Paul Hanley out of

23       New York wanted to try those

24       cases.  We were going to work with

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1209

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 102

1        Paul, but I forgot who his

2        colleague was, they didn't want

3        too many chefs, so we stepped

4        aside.  That's when Judge Higbee

5        said, Kherkher, you are the first

6        one to raise your hand.  So, we

7        were going to try any case,

8        whether it was New York.  We were

9        going to work together even if it

10       wasn't our plaintiff under our

11       contract, we were either going to

12       try the Pennsylvania cases, the

13       New York cases.  I think there

14       were New Jersey and then Georgia

15       and them North Carolina, and we

16       got the North Carolina cases.

17            MR. BIRCHFIELD:  Mikal, do

18       you have --

19            MR. WATTS:  I was going to

20       bring up something.  You asked

21       about the work that Wells did.  My

22       recollection of that in terms of

23       working with the MDL, and I think

24       Andy and I talked about this, I'm

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 103

1          a big fan of Moye.  I thought he

2          won our case on Rezulin.  But I

3          thought the cross about his report

4          that it screwed up and mentioning

5          the other drug was just

6          devastating.  And I told everybody

7          to listen.  I think that was kind

8          of the origin for -- and it is not

9          that we had contacted anybody in

10         terms of the necessity of getting

11         it done.  And that's when we

12         started contacting you about your

13         guy that wasn't available and

14         said, we've just got to do it.

15         So, I think it sprang from a

16         problem that came up, you know,

17         and I just thought that cross was

18         unsustainable to keep eating that

19         with your chief epi guy.

20              MR. UMPHREY:  Russ, let me

21         mention one other point that you

22         may want to consider for common

23         benefit.  It is not a subject that

24         I like to talk about, but it is

FAC Resp. Exhibit D -- 1211

Page 104

```
 1        advertising.

 2              That 4.7 million number, 3.7

 3        million of that was spent on

 4        advertising.  Now, you ask how

 5        could that be a common benefit?

 6        People have a right to know and be

 7        informed if they have been exposed

 8        to a certain product and they have

 9        certain problems.  The average

10        person is not aware of that unless

11        they are educated and they have

12        responsible lawyers that can tell

13        them whether they have a case of

14        whether they don't.

15              MR. HERMAN:  Walter, I lost

16        that fight years ago.

17              MR. UMPHREY:  Let me finish

18        what I'm saying.

19              MR. HERMAN:  Let me say

20        something to you.  Judge Fallon in

21        every case that I know of that

22        he's handled, as well as the other

23        judges in the Houston District,

24        consider the number of cases that
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 105

```
 1          you bring to the table as an
 2          important ingredient.  It really
 3          doesn't make any difference to me,
 4          frankly, whether you advertise
 5          them, whether you've got your
 6          referral sources sending you
 7          letters.  You are the lead lawyers
 8          in the case, you bring them to the
 9          table, that's got --
10               MR. UMPHREY:  You asked for
11          common benefit, and the common
12          benefit is we brought 1,000 cases
13          that are makeable, triable cases
14          to the table for consideration by
15          Merck on the settlement.  That's a
16          common benefit.  Those thousand
17          were screened very heavily, and
18          they were gotten through the
19          advertising process.  The other
20          thousand came from referrals from
21          other lawyers.  But for the
22          thousand people that will get a
23          benefit out of this, it certainly
24          is a benefit that should
```

FAC Resp. Exhibit D -- 1213

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 106

1          contribute to your consideration

2          on the common benefit fund.  We

3          don't expect to get our money

4          back.  We're not asking for that.

5          We just ask you that we be

6          considered for those thousand

7          meritorious cases that we did get

8          through the advertising.

9               MR. HERMAN:  There are very

10         few trial lawyers of your stature

11         in this country.  Unfortunately,

12         most of them have passed on.  I

13         have great respect for you.  I

14         don't believe that it makes -- in

15         my consideration, and I'm going to

16         level with you, I don't think the

17         fact that you advertise for cases

18         or you didn't means anything.

19         People that advertise for cases

20         have business plans.  They

21         consider how many cases they are

22         going to get in.  They vet them.

23         It all goes into the bottom line

24         of, are we going to be able to

FAC Resp. Exhibit D -- 1214

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 107

```
 1        handle these cases, how we're
 2        going the handle them.
 3             MR. BOUNDAS:  Well, Russ, I
 4        hope Judge Fallon would consider
 5        the fact that we spent a
 6        significant amount of money
 7        stirring up the pot, if you will,
 8        to help other folks, maybe even
 9        your clients, pick up the phone
10        and protect their legal rights.
11             MR. HERMAN:  I can assure
12        you he's going to read every word
13        of the transcript, and he
14        considers everything.  That's one
15        reason why it is transcribed and
16        we have affidavits.  But I always
17        like to be straight up so people
18        know where I'm coming from, and I
19        just consider advertising costs of
20        doing business whether you
21        advertise or not.  It's the same
22        cost that lawyers have when they
23        get themselves on seminar programs
24        that result in referrals.
```

FAC Resp. Exhibit D -- 1215

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 108

```
 1                    MR. UMPHREY:  I'm not
 2           concerned about how it affects
 3           lawyers.  My point is that it is a
 4           common benefit to those folks that
 5           receive compensation that wouldn't
 6           have had it otherwise.  That's
 7           what I'm asking you to consider.
 8                    MR. HERMAN:  I understand
 9           that, Walter, but I can't agree
10           with that, I'm just telling you
11           straight out.  Because you've got
12           those people that you are serving,
13           and this was really, with all due
14           respect, Ralph Nader when he
15           started this idea of lawyer
16           advertising, and I think that
17           Chief Justice Burger is the only
18           one at the Senate in those
19           original decisions, is that you
20           help those people, and that's what
21           we're supposed to do as plaintiff
22           lawyers.  And those people pay for
23           the help that you give them.  So,
24           you get good cases in whether they
```

FAC Resp. Exhibit D -- 1216

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 109

1          are through referrals or

2          advertising or reputation.

3          However you get those cases in,

4          from my perspective, is not a

5          factor I consider.

6               What I do consider is the

7          fact that you have 2,000 cases

8          that you bring to the table,

9          however you got them --

10              MR. KHERKHER:  Well, Russ,

11         that's where we respectfully

12         disagree.  One of the most sacred

13         things we have is due process, as

14         you know.  I remember on a

15         Saturday morning you and I argued

16         with Judge Fallon on the

17         advertising.  And so what Walter

18         is saying is, this money we spent

19         is allowing all these folks that

20         don't have Internet that just do

21         drywall, Bubba doesn't do

22         Internet, he does drywall, we help

23         them help you come to the table.

24         So, let's just agree to disagree.

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1217

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 110

1           I hear what you are saying.
2                MR. SEEGER:  You are not
3           totally disagreeing.  I think what
4           Russ is saying, you got the cases,
5           you brought them here --
6                MR. KHERKHER:  But there's
7           an intangible.  As you know, you
8           did your share of advertising, and
9           we all together woke up America to
10          protect their legal rights.
11               MR. HERMAN:  I understand
12          that, and I'm trying to say to you
13          that not only will the judge, but
14          we consider the number of cases
15          you bring to the table, no matter
16          how you got them, is very
17          important in determining a common
18          benefit.
19               MR. LANIER:  I think one of
20          the reasons this is getting a lot
21          of response maybe from the
22          committee is because there are a
23          lot of folks that did a whole lot
24          of advertising that no one has

FAC Resp. Exhibit D -- 1218

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 111

1        really been putting that into the

2        record until y'all.  I think that

3        just may be some of the reaction,

4        if that makes sense.

5              MR. BOUNDAS:  So, if anyone

6        has any more questions.

7              MR. GIRARDI:  How many cases

8        did you submit to the settlement,

9        the exact number?

10             MR. WEITZ:  How many cases

11       did you submit to the settlement?

12             MR. FURNISH:  We had 2,021.

13       We registered in all but 53.

14             MR. WEITZ:  Where were those

15       cases filed?  In what

16       jurisdiction?  What percentages?

17             MR. BOUNDAS:  We filed

18       around 800 cases in the MDL.  We

19       filed, I think, 763, I could be

20       wrong by a few, in New Jersey.

21       So, 1500 plus were filed, and I

22       think 600 cases were tolled.  And

23       then we also filed cases in Texas,

24       California, Illinois, I believe,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 112

1        Wisconsin.  We had cases all over

2        the country, again, as part of the

3        strategy to, if necessary, try

4        cases.

5             MR. WEITZ:  When you say

6        "all over the country," you mean

7        you filed them in district courts,

8        and then they got transferred to

9        state court?

10            MR. BOUNDAS:  No.  State

11       court.  For example, the Schwaller

12       case was actually tried in state

13       court in Illinois.

14            MR. KAISER:  And federal

15       district courts, too, so we could

16       make sure they would come back

17       there for trial so we wouldn't

18       clog up New Orleans.

19            MR. WEITZ:  Now, talk to us

20       about some of the cases that might

21       have been trial ready in any of

22       the other jurisdictions.

23            MR. BOUNDAS:  I think Darren

24       Brown from Provost Umphrey could

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 113

1          speak about our California cases.

2                  MR. BROWN:  Set for trial in

3          November, we had the Feldman case,

4          which we had submitted to the

5          trial docket as a plaintiff pick.

6          It was a 69-year-old, one of the

7          older plaintiffs that we had dealt

8          with, but very few risk factors.

9                  MR. LEVIN:  That's not old.

10                 MR. RAFFERTY:  That was set

11         for trial in November of '07?

12                 MR. BROWN:  November of '07.

13                 Along with four other

14         plaintiff picks.  Then Merck had

15         four defendant picks that were set

16         for trial, and we had one of

17         those.  Then we had three other

18         cases that were set for trial in

19         March and June of the following

20         year of '08, the Lativio case,

21         Espinoza case.  Of course, those

22         didn't go forward.  The settlement

23         was reached.

24                 MR. BOUNDAS:  Then another

Page 114

```
1          example, we had a case in Cook

2          County, Illinois, in Chicago,

3          called the Mitchell case.  That

4          case had a scheduling order.  Off

5          the top of my head, I don't

6          remember the trial date, but we

7          were working it up, getting

8          experts, and that was another case

9          we were going to try.  I know it

10         had a date, but I can't tell you

11         exactly --

12              MR. KHERKHER:  Russ, another

13         thing I just remembered when you

14         asked me is, Judge Higbee said,

15         will anyone try a stroke case.

16         And we agreed to try the first

17         stroke case, Dave Buchanan and I,

18         and I think we were in the process

19         -- before you guys settled, we

20         were going to submit nine -- we

21         had nine stroke cases.  So, for

22         whatever that is worth.

23              Another thing, this might be

24         corny, but --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 115

1            MR. SEEGER:  That's actually

2       worth a lot because there's an

3       impression by a very small group

4       of people that there were people

5       out there not willing to try them.

6       We were willing to try them, our

7       firm was willing to try them,

8       people at this table, all of us.

9            MR. KHERKHER:  We had nine

10      cases we were going to submit, and

11      then y'all settled.

12           MR. HERMAN:  I'm just going

13      to make a comment that in the MDL,

14      for about four months, the judge

15      pushed us to put stroke cases up.

16      And we could not find a stroke

17      case to put up.  We got absolutely

18      no responses.  So that the fact

19      that you were willing to put up

20      stroke cases in New Jersey was of

21      obvious benefit.

22           MR. KHERKHER:  After Judge

23      Higbee told Dave and I that, and

24      she was impressed that we

FAC Resp. Exhibit D -- 1223

Page 116

```
 1          volunteered, Grant Kaiser and his

 2          team, we spent that weekend -- I

 3          don't know if you all know Glenda

 4          Grainger, and you are right, there

 5          were some tough ones, but we found

 6          nine, and then the settlement

 7          occurred.

 8               Another thing that might be

 9          silly, Russ, that may factor in, I

10          coordinated -- because we had

11          these four trial settings up in

12          New Jersey, I coordinated --

13          because I watched when Mark picked

14          his jury, the judge was kind

15          enough to give him two or three

16          days to read the questionnaires.

17          She didn't want that.  We had to

18          do it overnight.  I had an 18

19          wheeler with three copy machines,

20          and we were going to copy all

21          questionnaires for all trial

22          teams.  So, we had that set up.

23          Maybe that's a factor for common

24          benefit.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 117

```
1            MR. BLIZZARD:  Did you
2       submit the cost of the 18 wheeler?
3            MR. KHERKHER:  I didn't have
4       to put down a retainer because we
5       all settled because everything
6       happened simultaneously, but we
7       were ready to go.
8            MR. BLIZZARD:  One of the
9       things that I want to make sure we
10      cover is that there's been a lot
11      of time that was submitted to the
12      accountant and a lot of expenses
13      that have been submitted to the
14      accountant that for whatever
15      reason have been rejected.  That
16      has happened to a lot of people on
17      this side of the table as well,
18      and so whatever we need to do to
19      help get whatever records in order
20      to make it work for the
21      accountant, we'll do.
22           MR. LEVIN:  If you call the
23      accountant.
24           MR. KHERKHER:  That's my
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 118

1          biggest fear.  I have never billed

2          for my time, so, I'm sure we left

3          a lot of time on the table.

4                  MR. LEVIN:  We'll straighten

5          it out.  Feel free to call me.

6                  MR. KHERKHER:  Yes, sir,

7          thank you.

8                  MR. HERMAN:  If you call

9          Lenny Davis in my office, he will

10         set up an appointment with Phil

11         Garrett and his team.  Phil

12         Garrett was chosen by the judge.

13         That firm and he, they do no

14         personal work for any lawyer

15         that's got a Vioxx claim, either

16         firm work or personal work.  So,

17         they are purely independent.  They

18         will drop what they are doing and

19         meet with you.  I really suggest

20         -- and I don't know what the

21         differences are as to what they've

22         accepted and what they haven't or

23         even the reason for it.  But we

24         have had lawyers continuously call

FAC Resp. Exhibit D -- 1226

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 119

1          up, get an appointment, go meet

2          with them for a couple of hours,

3          and those things are resolved in

4          just one sitting.  I don't think

5          they are well resolved over the

6          phone.  But somebody very

7          knowledgeable about what your

8          costs are and the hours you

9          submitted, one of two people ought

10         to get an appointment and sit with

11         Phil Garrett.

12              MR. BOUNDAS:  Unless anyone

13         has any other questions on trial,

14         I'm not going to belabor the

15         point.

16              MR. RANIER:  Thank you,

17         John.

18              Grant is next on the

19         organization and function and

20         having done this.

21              I have got a question for

22         y'all.  If this is not an

23         appropriate question, it's a

24         record issue, but can the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 120

1              committee consider how much common

2              benefit fee is going to be gotten

3              from us?

4                   MR. KAISER:  Generated by

5              our cases.

6                   MR. RANIER:  Generated by

7              our cases in deciding how much

8              common benefit fee we're entitled

9              to?  I mean, that may not be --

10                  MR. LEVIN:  Just leave that

11             hanging.

12                  MR. LANIER:  That's a dicey

13             thing that has to be parsed out,

14             because to an extent, there's the

15             issue if someone got 100 cases and

16             you did, Drew, common benefit work

17             for that person, then they need to

18             pay you for the 100.  If you did

19             common benefit, Drew, for someone

20             that has 5,000 cases, then they

21             benefited 50 times more from your

22             work than the person who had only

23             100 cases and arguably would be 50

24             times more.  By the same token,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 121

```
 1          there's the other side of the

 2          coin, too.  So, it is a two-edged

 3          sword, and I don't know where we

 4          land on it.

 5              MR. HERMAN:  Let me just say

 6          one other thing.  The judge

 7          specifically has directed us not

 8          to talk about allocating dollars

 9          until he has determined what the

10          percentage is.  Anything that we

11          talk about in allocation or

12          consider in terms of dollars to

13          specific firms is a fiction in the

14          judge's mind.  He has to

15          determine, first, what the

16          percentage is going to be, and

17          then we have to deal with that

18          pot, so to speak.  Also, he's made

19          it very clear that whatever he

20          considers the pot to be, costs are

21          to be in addition to that.  So,

22          common benefit costs are very

23          important here, and it is easier

24          to deal with the costs than it is
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 122

1          with an unknown amount of common

2          benefit dollars.  I think you are

3          going to find in the next two or

4          three weeks, I think we have

5          California folks appearing Friday,

6          I'll tell you for your own -- so

7          you know what we know, 106 people

8          or firms submitted requests for

9          common benefit.  Less than 50 have

10         decided to come make a

11         presentation.  But when all of

12         that information is gathered in

13         the next three weeks, you are

14         going to see a motion and brief

15         file with the Court to set common

16         benefit, a pot, and costs.

17              You've taken various

18         positions, we've taken various

19         positions, but you need to know

20         that's coming.  It's coming before

21         any allocation is made.  I would

22         think the amount of dollars that

23         the Court says are going to be in

24         the common benefit pot and in the

FAC Resp. Exhibit D -- 1230

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 123

1          cost pot are going to affect all

2          the considerations.

3               MR. KHERKHER:  Russ, Judge

4          Fallon is a tough grader.  I was

5          telling someone the other day that

6          -- I was practicing what I was

7          going to tell you guys and how I

8          did what Mark Lanier did, I knew

9          all 200 jurors by name, I read

10         those questionnaires, I knew them

11         backwards and forwards.  And when

12         we were going through the

13         preemptive strikes before, Judge

14         Fallon knew them all too.  So,

15         here I am doing a great job, and

16         he's saying, oh, yeah, Mr.

17         Kherkher, that guy, his favorite

18         show is CSI.  Here's the hardest

19         working judge, stays up all night

20         and reads 200 questionnaires, and

21         so I know he's going to be tough.

22              MR. HERMAN:  Let me give you

23         one experience.

24              The first meeting I had with

FAC Resp. Exhibit D -- 1231

Page 124

1          him, he said, I want all the

2          articles that have been published

3          dealing with Vioxx.

4               By the next meeting that

5          Chris and Andy and I had with him

6          before the PSC order came out, he

7          had read every one of the articles

8          and had about seven or eight

9          cross-examination questions for

10         us.  And I know that he did the

11         same thing with Merck.  So, the

12         important thing is, he will

13         remember, and this transcript will

14         remind him of the quality of the

15         work that you folks put forth.

16              Let me tell you, he was a

17         heck of a trial lawyer, I mean, a

18         very fine trial lawyer.  When he

19         was nominated for the presidency

20         of the state bar, he had universal

21         support by both the plaintiff bar

22         and the defense bar.  We all know

23         that doesn't happen very often.

24         So, not only are we trying to be

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 125

1          fair, if we're not fair, he's

2          going to make us fair.

3               MR. RANIER:  We know.

4               MR. WEITZ:  Drew, the short

5          answer is that the number of cases

6          that you have and the commitment

7          of everybody on those cases are

8          looked at, and the factors

9          involved surrounding the number of

10          cases will be weighed.

11               MR. RANIER:  I appreciate

12          that.  And the quality issue is

13          there, too.  If you produce

14          quality cases to drive the

15          litigation, you pay a bigger

16          common benefit tax than you would

17          if you --

18               MR. WEITZ:  Than if you are

19          just storing cases and warehousing

20          cases.  I think that all the

21          judges have made that point very

22          clear, and I think you guys have

23          distinguished yourself in that

24          category.

FAC Resp. Exhibit D -- 1233

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 126

1          MR. KAISER:  If I might just

2     have a few minutes, and I think

3     this point has been made.

4          I'm going to take a couple

5     of minutes.  These were the 28,000

6     plus contacts we had.  We have

7     them from every state.  And like

8     Perry discussed, we did have a

9     very sophisticated filing strategy

10    where we evaluated every specific

11    case, where the best venue for

12    that case was.  And if we were in

13    a good Federal Court venue, we

14    were going to come back, we would

15    file it in that court.  Otherwise,

16    we would file it in Judge Fallon's

17    direct file.  And you take a risk

18    then if you are going to come back

19    to your home district or not.

20          But in state cases, the

21    same issues.  We filed where each

22    case needed to be filed.

23          To answer your question

24    specifically, Perry, we ended up

Page 127

1          filing about half our cases in New

2          Jersey, about half of them in the

3          MDL, and I think there was 60 in

4          California and a handful in Texas

5          for obvious reasons.  I think this

6          has come across, but you know the

7          way Merck played this game, and

8          that is to throw everything at

9          you.  If you imagine a task force

10         set up with all the pieces, we

11         moved all the pieces all at once

12         back at Merck.  We did it with

13         trial settings, we did it with

14         experts, we did it with our

15         administration to be able to get

16         those cases in line for trials and

17         to be able to do that.  We all

18         know about what moves cases, and

19         that's verdicts and trial

20         settings.  That's the message that

21         we're trying to say, is that our

22         entire effort to put the pressure

23         on Merck was what our goal was.

24              You guys that negotiated the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 128

1    settlement know better than we do

2    what kind of pressure, having five

3    different trials going on in New

4    Jersey starting in October of

5    multiple plaintiffs each, had on

6    Merck.  We were told at the time

7    that it was extremely important to

8    put these cases up and got letters

9    and e-mails from Dave Buchanan

10   begging people to put cases up and

11   from Sol saying, this is enough, I

12   can't believe you aren't going to

13   do this, because then the Court is

14   going to pick them then.  So, you

15   are ruining the opportunity if you

16   don't do it.  So, we were there

17   for that.

18        That's really our point

19   here, is that our total effort was

20   to push all the pieces at once at

21   Merck, and I think we did that --

22   not every firm does that, and not

23   every group of firms did that.

24        To carry the analogy even

FAC Resp. Exhibit D -- 1236

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 129

1          further, Walter will appreciate

2          this, we were all into the case in

3          terms of poker, too.  We put

4          everything in that we had.

5                MR. HERMAN:  Let me ask you

6          a question.  In cases that were

7          filed wherever they were filed,

8          I'm assuming in most of those

9          cases that were actual filed

10         cases, you had a Merck defense

11         counsel enter an appearance?

12               MR. KAISER:  Absolutely.

13               MR. HERMAN:  If you could

14         get me a list of those cases and

15         the defense firm that entered an

16         appearance, it will be of some use

17         to us in illustrating why we think

18         lawyers that did substantial

19         common benefit work should receive

20         compensation.

21               MR. KAISER:  We'll certainly

22         do that.

23               MR. HERMAN:  After all,

24         everyone at this table takes a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 130

```
 1          risk that none of those firms
 2          take, and those firms can be
 3          cross-referenced through American
 4          Lawyer with their earnings, which
 5          is something we intend to do.
 6               MR. KAISER:  I was
 7          day-to-day responsible for all the
 8          activities, so, if y'all have any
 9          questions from start to finish,
10          ask me about them, and we'll tell
11          you what the deal is.  You can do
12          it now or after Walter speaks or
13          whichever.
14               Thank you.
15               MR. RANIER:  Walter, do you
16          want to talk about the financial
17          commitment.
18               MR. UMPHREY:  Just for a
19          minute.  I think everybody has
20          covered most of the topics.  But
21          our firm did the accounting on the
22          Texas tobacco litigation, and we
23          inherited it to do on this.  So,
24          that's why I was asked to talk
```

FAC Resp. Exhibit D -- 1238

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 131

1          about it.

2                But we have a total of 13.6.

3          This is not a recoverable expense

4          from the common fund or the

5          client.  This is our screening

6          costs.  These were cases that we

7          did develop for trial and the

8          expenses through the medical and

9          of what have you.  3.7 of this was

10         the advertising which we absorbed.

11         And the other million went towards

12         personal expenses of travel and

13         the firms.  We didn't reimburse

14         each firm as we went for

15         out-of-pocket expense on travel

16         and what have you, for a total of

17         13.6.

18               MR. HERMAN:  I'm sorry, I

19         can't read it.  Smith or

20         Schwaller?

21               MR. RAFFERTY:  Schwaller is

22         474.

23               MR. HERMAN:  Is that

24         500,000?

Page 132

```
 1              MR. KAISER:  527,000 for

 2         Smith, 474,000 for the Schwaller

 3         case, which adds up to basically a

 4         million.  Take the million out of

 5         the other 3 point million total

 6         that we spent on trial

 7         development.  You have another 2

 8         million that we spent beyond those

 9         two cases that went to trial --

10              MR. HERMAN:  That's what I

11         want to understand, and I'll make

12         sure this gets circulated to the

13         committee.

14              MR. POWERS:  I have copies

15         for you.

16              MR. HERMAN:  Good.

17              MR. UMPHREY:  We understood

18         early on from Merck that we were

19         going to have to try each

20         individual case.  We prepared

21         these cases for that purpose.  We

22         didn't drive a nail halfway.  I

23         think that our involvement, our

24         preparation of these cases went a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 133

1          long way, as well as knowing that

2          we had the financial resources to

3          back it up to be a common benefit

4          for the final settlement of this

5          matter.  I will answer any other

6          questions you have.

7                MR. HERMAN:  The 3.1, other

8          than Smith and Schwaller, I want

9          to make sure.  I understand those

10         are the workup of cases that John

11         spoke about in New Jersey, et

12         cetera?

13               MR. KAISER:  Yes.

14               MR. UMPHREY:  We had 50

15         cases for trial at the time you

16         settled.

17               MR. HERMAN:  Have you

18         submitted costs other than Smith

19         and Schwaller on the workup of

20         those cases?

21               MR. KAISER:  No.

22               MR. HERMAN:  You should.

23               MR. WATTS:  No.

24               MR. HERMAN:  You should

FAC Resp. Exhibit D -- 1241

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 134

1          itemize it, and you should submit

2          it.

3               MR. KAISER:  Okay.  We will.

4               MR. LEVIN:  Has Smith and

5          Schwaller been submitted?

6               MR. KAISER:  Yes.  The only

7          thing that hasn't been submitted

8          in the Smith case is the DQ

9          aspect.

10               MR. HERMAN:  You just take

11          care of that and then send us

12          whatever.

13               MR. BLIZZARD:  Grant, we're

14          going to need to see exactly what

15          the other 2 million is to

16          understand whether it should or

17          should not be submitted.

18               MR. HERMAN:  In fairness, we

19          have indicated to every lawyer and

20          every firm that actually worked up

21          cases for trial that the remainder

22          of that 3.1 beyond Smith and

23          Schwaller should be submitted as a

24          common benefit cost.

FAC Resp. Exhibit D -- 1242

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 135

 1                    MR. UMPHREY:  Right.

 2                    MR. KAISER:  We'll do that.

 3                    MR. HERMAN:  If we get that

 4          within a week, that would --

 5                    MR. UMPHREY:  Whatever you

 6          folks do for us, we appreciate.

 7          But primarily we appreciate being

 8          involved with good lawyers that

 9          are prepared and that have been to

10          the well before and litigation

11          that helps our individual clients.

12          We thank you for your time.

13                    MR. SEEGER:  Thank you.

14                    MR. HERMAN:  Well, I think

15          we're honored to have you here

16          today, and I don't say that in a

17          condescending matter or in a light

18          manner.  You have always brought

19          to the table something special.

20                    MR. UMPHREY:  I'm getting

21          older, and they don't let me out

22          very much.

23                    MR. RANIER:  This is the PSC

24          piece.  We did a lot on the PSC.

Page 136

1          I want to quickly go through some

2          of the things that we did on the

3          PSC that we haven't already

4          discussed.  Of course, I served on

5          the committee and meetings and the

6          status conference and everything

7          and went to almost every one of

8          those.

9              I chaired the insurance

10         committee, and I had the support

11         of these five firms, obviously,

12         but the work on that committee,

13         the discovery, the motions, I read

14         every policy, every insurance

15         policy.  We had a voluminous

16         amount of material on that.  One

17         of the interesting things on that

18         is that of course we established

19         that Merck had more insurance than

20         they said they did, but the big

21         thing here on liability is when

22         they got their extra insurance.

23         Basically they went from under 500

24         million to a billion dollars, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 137

1        the year on that is like 1998.  It

2        is just about the same time when

3        we coordinated that with all the

4        time things that everybody had

5        done with trials that it is about

6        the time that, I think, they

7        unblinded Vioxx, that they had

8        results from the 090 study and a

9        couple of other studies that were

10       strongly suggesting that they had

11       some liability problems here.

12            Of course, we found out we

13       weren't the only persons that had

14       recognized that, but the insurance

15       companies had figured that out

16       also.  They took Merck to

17       arbitration in London.  So, there

18       was a whole body of evidence out

19       there regarding the insurer's

20       allegations and what evidence they

21       used to show that Merck knew and

22       misrepresented and covered up.  We

23       tried to get that from Judge

24       Fallon.  That was in May of 2007.

FAC Resp. Exhibit D -- 1245

Page 138

 1              I don't know whether he had

 2          his eye on the settlement or not.

 3          He declined to produce that after

 4          our motions and lengthy briefs and

 5          whatever to order it produced.

 6          But our strategy at that point was

 7          to go through the Louisiana Direct

 8          Action Statute, and we were at the

 9          time of settlement working on

10          filing a direct action Vioxx case

11          that we could keep in Louisiana

12          court or to go get one -- either

13          to get removed and to go back to

14          Judge Fallon with arguments under

15          the Direct Action Statute, which

16          had been stronger for production

17          of that evidence.

18              But just for anybody who is

19          still doing this and general

20          information, there's a pot of

21          evidence out there.  We had an

22          insurance consultant that worked

23          with us on this and who

24          participates in a lot of these

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 139

1      arbitrations in London, and we've

2      confirmed that it's there.  It's

3      stuff that's probably not been

4      seen before.

5           MR. SEEGER:  Drew, can I ask

6      you a question?  I'm sorry to

7      interrupt.  I just want to make

8      sure I ask a couple of points.

9      The chart, I'm seeing this for the

10     first time, has this been provided

11     to the PSC, the chart that you are

12     working off of?

13          MR. RANIER:  It should be in

14     the depository because this is all

15     a matter of record.  We introduced

16     the chart with the motions.

17          MR. SEEGER:  That was

18     attached to the motions?

19          MR. RANIER:  Judge Fallon

20     has seen this.  This is our chart.

21     We did this.  Every policy.  Every

22     policy.  That's kind of a brief

23     summary of what was done on

24     insurance.  It is not only there

Page 140

```
 1          from the standpoint of financial

 2          liquidity of Merck, but also

 3          there's some important liability

 4          aspects to this that haven't been

 5          finished and are still out there.

 6               LECG -- there's a mistake in

 7          my affidavit.  I said in my

 8          affidavit that LECG was paid

 9          exclusively by the Vioxx

10          Litigation Consortium.  That's not

11          correct.  LECG is an econometrics

12          firm out of Boston, formerly the

13          Bridle Group, and we got engaged

14          with them early on various aspects

15          of Merck's business model and what

16          have you.  The PSC did share some

17          of the expense of the LECG group.

18          I can't remember exactly how much.

19          It is not a fantastically high

20          number, but it could be 10, 20,

21          $30,000.  And so my statement in

22          my affidavit that the Vioxx

23          Litigation Consortium paid for all

24          of that is not accurate.  We paid
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 141

 1        for some of it, but the PSC paid

 2        for some of it.

 3             MR. HERMAN:  Let me stop you

 4        so I can alert you to something.

 5        First of all, if you find

 6        something in your affidavit that

 7        you want to add, subtract, in the

 8        event that we do not resolve fee

 9        issues and the Judge has looked at

10        everything and he issues his

11        opinion and there's still fee

12        issues unresolved, he's going to

13        embark on a Murphy Oil process.

14        Before that happens, you will be

15        given an opportunity to give

16        another look at your affidavits.

17             MR. RANIER:  It is not a big

18        deal.

19             MR. HERMAN:  I hadn't said

20        that before, and I wanted to make

21        sure I did say it.

22             MR. RANIER:  It was very

23        early on.  It was 2000.  It was, I

24        think, before the first MDL trial.

FAC Resp. Exhibit D -- 1249

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 142

1          It might have been after Ernst.

2          But Kenneth Gartrell, our

3          econometrics expert that we worked

4          with, in addition to Gerald, Dr.

5          Gerald, who was the former SEC

6          Commissioner, and we have an

7          expert report from him too, but

8          analyzed Merck's financial

9          situation.  And basically, if

10         nothing else, this is, in

11         retrospect, due diligence from the

12         PSC about actually how much cash

13         Merck could come up with in any

14         given settlement aside from

15         preemption and causation issues

16         and all of that.  So, the PSC had

17         developed this early on, and I

18         basically took the lead on that

19         and did that.  So, there are two

20         draft expert reports.

21             The third step was supposed

22         to be that we would develop Ken

23         Gartrell as the witness to say

24         what most people in their trials

Page 143

 1          did on cross with regard to the

 2          economic reasons why Merck kept

 3          selling Vioxx, even though they

 4          knew they had problems with it

 5          from a scientific standpoint.

 6          While I heard a lot of that on

 7          cross, and I think there might

 8          have been a couple of witnesses,

 9          actually a California witness, I

10          remember one who actually

11          testified to this, this was all

12          part of that process.  The PSC

13          said, no, we're not going to spend

14          all of that money on that now.

15          We're going to let the individual

16          trials develop that.  That's where

17          that stayed, but that was part of

18          what was done for the PSC.

19              We've already talked a lot

20          about the Konstam coverup, and

21          that was not officially PSC.  We

22          developed Martin Wells on that,

23          but there was a lot of talk and

24          discussion about that especially

Page 144

```
 1          with Dave Buchanan and me on the

 2          raw data and how much we needed to

 3          plumb that.  And the basic focus

 4          there was to undermine that risk

 5          factor defense, because I still

 6          think that the snow shoveling guy

 7          is the last guy in the world who

 8          ought to be taking Vioxx and

 9          anybody that's doing any kind of

10          exertion or whatever.  So, we can

11          call those bad cases, but I've

12          never really believed they are.  I

13          know they are hard to win with

14          juries.  But the more evidence we

15          had, and I think, for instance, in

16          the chart that we've got on Dr.

17          Wells, once the data is actually

18          plumbed -- I mean, in diabetes, I

19          mean, you could see the risk

20          factor in diabetes is 10.33.  I

21          mean, that's like lung cancer and

22          smoking.  That's how much more

23          likely you are to have a heart

24          attack if you've got diabetes
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 145

```
 1          taking Vioxx than if not.
 2                    MR. WEITZ:  Drew, I don't
 3          know if you read the Cona/McDarby
 4          trial transcript.
 5                    MR. RANIER:  I attended a
 6          couple of days of it, but I didn't
 7          see that testimony.
 8                    MR. WEITZ:  In our mock
 9          trials, we found out from the jury
10          that you needed to embrace the
11          risk factors, and we actually
12          completely embraced that theory in
13          the case.
14                    MR. RANIER:  It was your
15          partner, Rob Gordon, who was
16          McDarby's lawyer?
17                    MR. WEITZ:  He had actual
18          diabetes, and he was 90% occluded,
19          it was a defense pick, and had all
20          those things.  We actually
21          embraced the risk factors.
22                    MR. WATTS:  I read that
23          transcript and used a lot of that.
24                    MR. RANIER:  Here's your epi
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 146

```
 1        number.
 2              MR. WEITZ:  It is
 3        staggering.
 4              MR. HERMAN:  We had a
 5        discussion early on, and Drew and
 6        I have been together in a lot of
 7        cases, and we always end up at the
 8        same place, but usually we don't
 9        agree as it goes along.  But I
10        agree with him, and I still do,
11        that it is the straw that broke
12        the camel's back and felt from the
13        beginning that somewhere along the
14        line some case was going to be
15        tried with a lot of risk factors,
16        and Vioxx was going to -- the jury
17        was going to accept that in a way
18        that it could be replicated.  And
19        I think, actually, the way Mark
20        tried his case, he was able to do
21        that.
22              MR. LANIER:  Yes.  I took
23        the edge of the desk, and I took a
24        cup, and I said, the edge of the
```

FAC Resp. Exhibit D -- 1254

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 147

```
 1          desk is a cliff.  The cliff is a
 2          heart attack.  And all of us are
 3          different distances from that
 4          cliff.  A 15-year-old kid may be
 5          way over here, and I put the cup
 6          over here.  And I said, you get
 7          diabetes, you are a little closer.
 8          You smoke, you are a little
 9          closer.  You are overweight, you
10          are a male, you are over 50.  And
11          what Vioxx is, it's a shove.  It
12          is a shove towards the cliff.  You
13          can give that 15-year-old kid
14          Vioxx all day long.  Who you are
15          putting at risk is the person who
16          is already close to the edge of
17          the cliff.  You give them Vioxx,
18          and they are gone, and I knocked
19          that cup over.  I knocked the cup
20          over, and the jury goes 'ahhh'.  I
21          think there's a lot of truth to
22          that.
23              Then we took Krumholz and
24          added him to that.  Krumholz took
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 148

```
 1        the Framingham risk factors for a

 2        heart attack and all the different

 3        breakout rates, and he showed that

 4        if you take the Vioxx data, every

 5        one of those risk factors, Vioxx

 6        is a greater risk factor for a

 7        heart attack than diabetes, than

 8        all of these different things

 9        except for smoking.  That's the

10        only thing that beats it.

11             MR. HERMAN:  On the other

12        hand, we know it made the cases

13        tougher to try.

14             MR. RANIER:  Talk about

15        knocking the glass off, Percy

16        Foreman came to Lake Charles when

17        I was just out of law school and

18        was defending union members on

19        some union violence.  He sat

20        smoking a cigar -- you could smoke

21        in the courtrooms in those days.

22        He sat smoking a cigar during the

23        closing argument of the state, and

24        he had something in the cigar, in
```

FAC Resp. Exhibit D -- 1256

Page 149

```
 1          the ash, so the ash never fell,

 2          and he's right next to the jury.

 3          True story.  And the ash kept

 4          getting longer and longer, and

 5          nobody was listening to the

 6          state's argument.

 7              MR. BIRCHFIELD:  He got that

 8          from Abraham Lincoln.

 9              MR. RANIER:  I saw him do

10          it.

11              MR. LANIER:  The only risk

12          factor that I deemed would damage

13          trial at one of these cases is

14          smoking, because people smoke in

15          spite of the fact that they have a

16          warning that it could cause a

17          heart attack.  Who is to say if

18          they had been warned about Vioxx,

19          they wouldn't have still taken it.

20          That was the one that was tough to

21          get over.  I mocked seven of

22          these, and that was the one that

23          was tough to get over.

24              MR. KHERKHER:  But, Mark,
```

Page 150

1          you also would have educated the

2          jury how smoking is a horrible

3          addiction.

4                    MR. LANIER:  If I had had

5          Russ' material maybe or Walter's,

6          I didn't know that stuff, or

7          Grant's.

8                    MR. KAISER:  Thank you,

9          gentlemen.

10                   MR. RANIER:  Thank you.

11                   MR. WATTS:  Thank you.

12                   MR. SEEGER:  Thank you.

13                   MR. BLIZZARD:  Thank you.

14                        -  -  -

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 151

```
 1             C E R T I F I C A T E

 2

 3             I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 1259

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  ROBINS, KAPLAN, MILLER &
       CIRESI, LLP
       Gary Wilson, Esquire
       Tara Sutton, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1260

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. HERMAN:  Everything is
 3         being taken down by Linda.  You
 4         are going to get a copy at the end
 5         of this.  The judge is very strong
 6         on transparency in the process,
 7         consistency.
 8              Secondly, if we don't
 9         resolve all the fee issues, he's
10         got a process where he's going to
11         come in and put all the lawyers
12         under oath and cross-examine them.
13         I hope we don't get that far, but
14         we appreciate you being here.
15              In addition to that, did you
16         all make a written submission?
17              MR. WILSON:  We did, yes.
18              MR. HERMAN:  Do me a favor.
19         When you get back, just fax me or
20         e-mail my office an affidavit
21         saying that this is yours, and
22         we'll put it in the file with
23         everybody else's.
24              I'm going to pass this down
```

FAC Resp. Exhibit D -- 1261

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          to this side of the table or the
2          other side of the table.
3              MS. SUTTON:  I wanted to
4          thank everybody for giving us this
5          opportunity.  It is especially
6          important to us because we weren't
7          on the PSC, and I think our work
8          may have been a little less
9          visible, and this gives us a
10         chance to talk about what we
11         thought our contributions to the
12         MDL were.  We, of course, realize
13         that our contributions don't even
14         begin to compare with what all of
15         you have put into this litigation
16         and bringing it to such a
17         successful conclusion.
18             We initially had applied to
19         be on the Plaintiffs' Steering
20         Committee, because we hoped to
21         bring our mass tort experience to
22         the litigation, our trial
23         experience, and, of course, our
24         financial resources.  But when

FAC Resp. Exhibit D -- 1262

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

 1          that didn't happen, we stepped

 2          back and we tried to look at how

 3          it was we thought we could bring

 4          our expertise and our experience

 5          and bring the highest value we

 6          could to the litigation.  So, we

 7          decided to focus on the science

 8          committee and the discovery

 9          committee.  I wanted to first

10          maybe touch on the work we did in

11          the science committee and then

12          move over to the discovery

13          committee work.

14               On the science committee,

15          our partner, Roberta Walburn, who

16          was one of the vice chairs of the

17          committee, and really kind of some

18          of the main work that we did on

19          the science committee early on,

20          there was a request by John

21          Restaino and Carlene Lewis that we

22          have a really comprehensive review

23          of the law on how we are going to

24          prove causation and get our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          experts qualified under Daubert.

2          We volunteered in the summer of

3          2005 to take on that project and

4          do a very complete survey of an

5          analysis of the law on how you

6          prove causation.  It resulted in

7          July of 2005 this legal research

8          memo that we provided to the

9          members of the science committee

10         to use kind of as a roadmap of how

11         we were going to qualify experts

12         at trial.

13              I took a lot of grief

14         because this was pretty big, but

15         we were trying to make sure that

16         we did a very comprehensive --

17              MR. HERMAN:  Excuse me, I

18         don't mean to interrupt, but it

19         would be helpful to us when you

20         get back if you would send us a

21         copy of that.  I want to review it

22         in connection with the trial

23         package that's out there and take

24         a look at the depository and

FAC Resp. Exhibit D -- 1264

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          whether it is in the depository.

2              MS. SUTTON:  Sure.  We can

3          get it back to you.

4              We did this fairly quickly.

5          We provided this to the science

6          committee in July of 2005, so, it

7          was just within a month or so

8          after the request was made, and we

9          know it was used and read very

10         closely by the folks --

11             MR. HERMAN:  Don't send it.

12         Troy and Andy indicate that they

13         believe that it was used in the

14         trial package.  It is in the

15         depository.

16             MS. SUTTON:  Okay.  And then

17         for that first trial, we worked

18         really closely with Andy's

19         partner, Paul Sizemore and Leigh

20         O'Dell, in helping write the legal

21         section of the main brief opposing

22         their Daubert motion on causation.

23         We wrote -- you folks wrote the

24         facts, but we provided the legal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        section.  I think a lot of that

2        was used.

3             During the first trial, we

4        were also asked to do a lot of

5        spot legal research on some very

6        difficult issues like the

7        admissibility of post hoc analyses

8        of epidemiological data.  We also

9        did legal research on how you can

10       use Daubert challenges to go after

11       defense experts.  There was

12       learned intermediary research, a

13       lot of different legal research

14       memos we provided to the science

15       team.

16            We also were asked to do a

17       comprehensive labeling history for

18       Vioxx.  That was some work product

19       that we provided to the science

20       committee.  We have copies of

21       that, we can provide that as well.

22            MR. HERMAN:  Did you work

23       with Bert Black on that?

24            MS. SUTTON:  We did the work

FAC Resp. Exhibit D -- 1266

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1         product at our office, but I know
 2         he reviewed it.
 3              MR. WILSON:  We were on the
 4         phone with Bert a lot.
 5              MS. SUTTON:  We talked to
 6         Bert a lot.
 7              We worked really closely
 8         with Don Arbitblit.  Don was a
 9         great help in helping us think
10         about the approach to causation
11         and epidemiology from a legal
12         standpoint and gave input into the
13         memo that we did.  We stayed very
14         involved in the science committee
15         through the billable time that --
16              MR. HERMAN:  Was your firm
17         involved in Celebrex or Bextra?
18              MS. SUTTON:  No, we aren't.
19              Did I miss anything about
20         the science committee?
21              MR. WILSON:  No.  I think
22         you covered it pretty well.  We
23         got a lot of feedback saying that
24         the work was good and it was
```

Page 9

1      useful.  So, we weren't just

2      writing stuff into the air.  I

3      think that was a major

4      contribution.

5           MR. WEITZ:  Did you have

6      weekly meetings or conference

7      calls or were they monthly or you

8      didn't have them?

9           MS. SUTTON:  The science

10     committee had a weekly conference

11     call.  Then there were

12     subcommittees, as well, that we

13     participated in that would meet

14     less frequently by phone.  But

15     there were a lot of calls.

16          Then the epidemiology group

17     that Don was part of, we would

18     meet as a smaller group on the

19     phone and talk about these

20     legal -- these are very difficult

21     legal issues, and we would talk

22     about how we were going to use the

23     science to prove causation and to

24     qualify the experts.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1              MR. WEITZ:  Did you have any

2         individual cases that you

3         submitted into the settlement?

4              MS. SUTTON:  Yes.

5              MR. WEITZ:  How many?

6              MS. SUTTON:  Close to 100.

7              MR. WEITZ:  Where did you

8         file those cases?

9              MS. SUTTON:  Minnesota.

10              MR. WEITZ:  Minnesota.  Had

11         you guys worked up any cases for

12         trial?

13              MS. SUTTON:  We're working

14         up one now.

15              MR. WILSON:  We may have one

16         case.

17              MS. SUTTON:  We have a

18         beautiful case we are going to

19         hopefully try next year.  It was

20         filed after the settlement.

21              MR. WEITZ:  After the

22         settlement.  It was an opt out

23         case?

24              MR. SEEGER:  It was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          excluded.

2                    MR. WILSON:  We applied for

3          the settlement, but it was

4          rejected because it was after the

5          settlement date.

6                    MR. SEEGER:  Right.

7                    MR. WILSON:  But it is a

8          Minnesota case, so the statute is

9          still good.  It is a great case.

10          It is a marathoner.  He had a

11          previous workup, no problems,

12          heart attack while running, and

13          he's got terrible mental sequelae.

14          He's basically in a nursing home,

15          46 years old.

16                    MS. SUTTON:  So, we're

17          really looking forward to getting

18          that case back and trying it.

19                    MR. LEVIN:  When you say

20          "Minnesota," you are filing it in

21          the Federal Court, you are coming

22          here and then they're going back?

23                    MS. SUTTON:  Yes.  Our cases

24          were filed in Federal Court in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1          Minnesota.

 2                  MR. WILSON:  We have a

 3          six-year statute of limitations.

 4                  MS. SUTTON:  Which is being

 5          challenged now.  The Supreme Court

 6          in Minnesota is going to look at

 7          it.  We hope to get involved in

 8          that, the briefing of that.

 9                  MR. LEVIN:  That happened in

10          Mississippi with the statute that

11          they had.  You will look at the

12          history.

13                  MR. HERMAN:  Went to 6 to 3

14          and also eliminated most

15          out-of-state filings.

16                  MR. LEVIN:  Right.

17                  MS. SUTTON:  Andy, is your

18          firm going to be involved in that

19          Minnesota statute of limitations

20          issue?

21                  MR. BIRCHFIELD:  Yes.

22                  MS. SUTTON:  I would like to

23          talk to you when you get a minute.

24                  MR. BIRCHFIELD:  Okay.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          MS. SUTTON:  What we can do

2     to help on that.

3          MR. BIRCHFIELD:  I think

4     there was a conference call

5     yesterday, I believe.

6          MS. SUTTON:  Good.

7          Then the second thing was

8     really our work on the discovery

9     committee, and I know you've heard

10    from Anthony Irpino, who we worked

11    extremely closely with on the

12    privilege saga.  We were on the --

13    we got involved in the discovery

14    committee at the first meeting

15    that I think Dave Buchanan had,

16    and the first conference call, and

17    we brought up, based on that first

18    conference call, the idea of

19    really going hard after privilege

20    claims, because we had a lot of

21    success in doing that in the

22    tobacco litigation in Minnesota.

23         Dave said it was a problem,

24    and you were having problems in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          New Jersey with the privilege

2          claims, so we asked to --

3          suggested maybe a committee, a

4          subcommittee be set up.  That

5          happened, and Anthony chaired it

6          and did just an incredible job.

7              We asked to see those New

8          Jersey logs, and Dave got them to

9          us, and we painstakingly went

10          through those logs.  Gary and I

11          both wrote a letter that I think

12          Russ sent out in the summer of

13          '05, July of '05, that went

14          through all the deficiencies in

15          the log and basically grouped the

16          types of documents we thought

17          weren't privileged.  There were

18          science documents on the logs,

19          there were marketing documents on

20          the logs, there were things that

21          clearly weren't privileged.  We

22          gave many examples and laid out

23          the law, and we did the research

24          at our firm on why these things

FAC Resp. Exhibit D -- 1273

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      weren't privileged, and we wrote

2      the letter, and I know Russ sent

3      out the letter.  We built a great

4      record, and we got the MDL log,

5      they did an MDL log, and we went

6      and looked at that closely and did

7      another letter that went to the

8      defendants.  Then eventually we

9      drafted the first draft of the

10     motion to compel that Richard

11     Arsenault argued, I think it was

12     in October perhaps of '05, and

13     going through and saying there's

14     huge categories of documents that

15     should not be on this privilege

16     log.  They are not privileged.  I

17     think the judge really seemed to

18     listen.  He told them that their

19     logs weren't good and they needed

20     to provide new logs, and when they

21     did provide new logs, they

22     deprivileged a quarter of their

23     privileged documents.  I think

24     they went from 40,000 to 30,000

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          privileged documents.  Our firm,

2          along with other members of the

3          committee, we went through all of

4          those privileged documents.

5               Then I think the judge had

6          all 30,000 documents brought to be

7          reviewed in camera, which is, I

8          think, an amazing feat for -- I

9          mean, Judge Fallon gets a lot of

10         credit.  To get a judge to take

11         and look at all the privilege

12         documents in camera, that doesn't

13         happen very often in litigation.

14         So, he did look at them, and I

15         think he was ready to deprivilege

16         most of them when they went up to

17         the Fifth Circuit.

18              MR. LEVIN:  The Fifth

19         Circuit wasn't as kind to Judge

20         Fallon as you are.

21              MS. SUTTON:  I think --

22              MR. WILSON:  He kept it

23         alive, Arnie.

24              MS. SUTTON:  But I think the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          Fifth Circuit recognized that the
 2          privileged documents had to be
 3          reviewed, and I think the thing
 4          that we'd advocated in our
 5          committee is that there were too
 6          many privileged documents.  He
 7          couldn't look at all of them.  So,
 8          he needed to sample them.  The
 9          Fifth Circuit wrote a decision
10          that will be something used in all
11          litigation from now on that it is
12          okay to sample privileged
13          documents and make a privilege
14          determination based on sampling
15          and not looking at all of them.
16              We have been working,
17          frankly, our butts off at our firm
18          trying to get an appellate court
19          to put that in writing, and that
20          happened in Vioxx.  There was
21          sampling done in the Minnesota
22          tobacco litigation, but we never
23          got an order in the Supreme Court
24          on that.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1              MR. SEEGER:  They didn't
 2         like the sampling, but it was okay
 3         to do it.
 4              MS. SUTTON:  Gary flew down
 5         and helped on the Fifth Circuit
 6         brief with Lenny, and everybody
 7         pitched in on that mandamus brief.
 8              MR. WILSON:  Irpino
 9         especially worked on that.
10              MS. SUTTON:  Yes.  I think
11         that it is hard for us to know how
12         much influence the privilege
13         documents had on Judge Fallon and
14         his thinking about Vioxx and
15         Merck.  I mean, because you guys
16         know better than us, I think, the
17         impact it may have had on him, but
18         I think it definitely, I would
19         hope, helped educate the judge
20         about the games that were being
21         played and gave him an impression
22         that we hope helped contribute to
23         the success of the litigation.
24              MR. HERMAN:  What privilege
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1          issue did Arsenault argue?

 2                MR. WILSON:  Actually, he

 3          didn't argue it.  He relied upon

 4          the brief.

 5                MR. HERMAN:  He didn't argue

 6          it.

 7                MR. WILSON:  He stood up and

 8          said, on this one, we're going to

 9          rely on the brief, Your Honor.

10                MS. SUTTON:  That was the

11          brief we wrote.

12                MR. LEVIN:  It was a good

13          argument.

14                MR. SEEGER:  The brief was

15          better than the argument.

16                MR. WILSON:  It's a good

17          brief.

18                MR. HERMAN:  Well, just one

19          other thing, and that is, the

20          Fifth Circuit actually departed

21          from the Federal rules, appellate

22          rules and also some internal rules

23          to snatch up that issue.  We're

24          not certain how that happened, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          certainly had they done what we

2          interpret the rules to be, let's

3          put it that way, as lawyers, then

4          Judge Fallon's initial opinion

5          would have held, and it would have

6          meant that the litigation had

7          really been spurred at that point.

8                    MR. LEVIN:  They never

9          granted a mandamus and wrote an

10         opinion.  They had no

11         jurisdiction.

12                   MS. SUTTON:  Exactly.

13                   MR. WILSON:  I was there for

14         that.  We were over in Irpino's

15         office, the emergency stay was

16         there, we replied to that, and

17         then the next day we had to file

18         the brief.

19                   MS. SUTTON:  Yes.  I mean,

20         Judge Fallon looked at all 30,000

21         documents.  He did what he needed

22         to do.  He should have been upheld

23         on that.

24                   So, we also relied heavily

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        on Paul Rice in presenting his

2        textbook to the judge.  I know he

3        eventually adopted or used him as

4        the Special Master.

5             MR. HERMAN:  What are your

6        costs in the case?

7             MR. WILSON:  Just under

8        50,000 or just over 50,000.

9             MS. SUTTON:  50,418.22.

10            MR. HERMAN:  Primarily, what

11       are those costs?

12            MS. SUTTON:  We did 11 full

13       weeks of document review at the

14       document depository.

15            MR. WILSON:  In New York and

16       in Alabama.

17            MR. LEVIN:  So,

18       transportation and hotel lodging?

19            MS. SUTTON:  Right.

20            MR. HERMAN:  And partner

21       hours in the case?

22            MR. LEVIN:  1,950.

23            MR. WILSON:  In our

24       three-page thing --

FAC Resp. Exhibit D -- 1280

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          MR. LEVIN:  Did you say

2     partner hours?

3          MR. HERMAN:  Yes.

4          MR. LEVIN:  Partner hours --

5          MS. SUTTON:  That might be

6     right.

7          MR. WILSON:  We have a total

8     of 2,400 hours, partners and

9     associates.

10          MR. LEVIN:  The accountant

11     says you have 1,950.  You ought to

12     look into that.  The hours

13     reported are Peter Sutton Toepfer,

14     Roberta's, yours, Gary and

15     Zimmerman's and Tara's.

16          MS. SUTTON:  There's some

17     associates in there.

18          MR. LEVIN:  Jaycox, Moccio

19     and Narotsky.

20          MR. WILSON:  Do we talk to

21     the accountant about that, Arnold?

22          MR. HERMAN:  Yes, please.

23          MR. LEVIN:  Yes.

24          MR. HERMAN:  The accountant

Page 23

1          has made himself available, and so

2          you know, that CPA and the people

3          working with him do not do any

4          work whatsoever for any of the law

5          firms involved in the case or any

6          of the lawyers involved in the

7          case on a personal basis.  It is

8          Judge Fallon's choice.  But they

9          are extremely approachable.  If

10          you have any questions about their

11          review of either hours or dollars,

12          costs, they will straighten it out

13          with you.

14               MS. SUTTON:  Okay.

15               MR. WILSON:  Then we were

16          also on other committees.  We were

17          on the science -- well, we talked

18          about the science committee, but

19          we were on the law committee, Tara

20          mentioned we did the document

21          review, and we actually did the

22          document review.  I know there are

23          some people who would fly in and

24          spend the day there and then go to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          the Yankees game.  We did five-day

2          weeks.

3              MR. SEEGER:  And you worked.

4              MR. WILSON:  We went through

5          them.

6              MS. SUTTON:  We listened on

7          those conference calls when we'd

8          get yelled at.  We made sure we

9          were there five days a week.

10             MR. SEEGER:  All right.

11             MR. HERMAN:  You said you

12         were both in Montgomery and New

13         York?

14             MS. SUTTON:  Correct.

15             MR. WILSON:  And also here.

16         I think Toepfer was here for a

17         week.

18             MR. HERMAN:  Anybody else

19         have any questions?

20             MR. SEEGER:  I think we're

21         done.

22                  -  -  -

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1                 C E R T I F I C A T E

2

3                 I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13                 I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22           Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23           Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 1284

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 3, 2008
- - -
HOUSTON, TEXAS
- - -


FIRM: Sanford Pinedo, LLP
PRESENTER:  Shelly A. Sanford, Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, P.C

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1            MR. BIRCHFIELD:  Shelly,

2       everything is being recorded for a

3       transcript and will be available

4       for future use if it's needed.

5       So, with that, the floor is yours.

6            Everybody here knows your

7       contribution and what you did in

8       starting this litigation, and it's

9       very much appreciated, but I want

10      you to take this time to say

11      whatever you want to say.

12           MS. SANFORD:  Thank you,

13      Andy.  There may be one point at

14      which I might have to go off the

15      record very briefly, and I hope

16      nobody minds.

17           MR. BIRCHFIELD:  Not at all.

18           MS. SANFORD:  I want to say

19      first what an honor it is for me

20      to have been a member of the PSC

21      and to have worked with each one

22      of you.  I will be brief on this

23      this morning.  Probably the

24      hardest thing I've had to do since

FAC Resp. Exhibit D -- 1286

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1    Carlene died is to write the

2    affidavit.  I'll try not to cry.

3         MR. SEEGER:  Don't worry

4    about it.

5         MR. HERMAN:  Shelly, it

6    might be easier if you consider

7    you are talking to family.

8         MR. LEVIN:  Because you are.

9         MR. LANIER:  If worst comes

10   to worst, there are about six of

11   us that would jump in and testify

12   on your behalf and give the same

13   speech you are going to give

14   anyway.

15        MS. SANFORD:  Thank you.  I

16   would really like for this not to

17   be about me but to be about

18   Carlene.  She was the most humble

19   person I have ever known and

20   trusted each one of you as well.

21        Perry, I'm sorry you didn't

22   really have a chance to get to

23   know her.

24        MR. WEITZ:  I am, too.

FAC Resp. Exhibit D -- 1287

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1              MS. SANFORD:  A truly humble
 2         and wonderful person.
 3              I tried to put all that I
 4         could in the affidavit.
 5              Carlene's obituary was in
 6         the New York Times, and part of
 7         that was that she was a pioneer in
 8         Vioxx.  So, I know that you get
 9         that she's a pioneer in this
10         litigation.  I thought about
11         bringing that, but I think that's
12         a good testament to who she was
13         and what she did in this
14         litigation, that even the New York
15         Times would pick up the story on
16         her death.
17              Not to minimize her degree
18         at Harvard and her University of
19         Virginia law degree and the other
20         incredible things that she's done
21         in her life, but this was
22         extremely important to her, and
23         she dedicated herself to this
24         litigation.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          It started for us in 2000,

2     eight years ago here at the St.

3     Regis, a little bit after that

4     with you, Chris, and Mark, of

5     course, with you and Tom and Andy,

6     your firm, everybody, but it's

7     been a little bit of a long road.

8     It was a five-and-a-half year road

9     for Carlene up until the time she

10    died.

11         She gave speeches in the

12    beginning of this litigation that

13    I would like to encourage you to

14    consider allowing her time for,

15    because for her it was not about

16    getting cases or gathering cases.

17    She believed that this was a bad

18    drug, wanted to encourage other

19    lawyers to come out and be

20    involved in this litigation.  So,

21    we went to a number of places that

22    were simply designed to encourage

23    people to file claims against

24    Merck and help this litigation

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1     move forward years before it ever

2     came off the market.  I don't know

3     how that is playing out in fee

4     allocation considerations.

5          MR. HERMAN:  Why don't you

6     tell us about some of the places.

7          MS. SANFORD:  I almost

8     brought one of those speeches

9     here, but it is a little bit too

10    hard.  I can supplement the file

11    with those if you guys would like

12    because many of those were

13    recorded.

14          MR. HERMAN:  I would like to

15    know the various places.

16          MS. SANFORD:  She went to

17    the Mass Torts Made Perfect in

18    2002.  We were there.  We started

19    the Vioxx litigation group at ATLA

20    with David Miceli, and Carlene

21    gave really a speech almost every

22    year at every convention, the

23    annual conventions we did, and

24    encouraged people to come up until

FAC Resp. Exhibit D -- 1290

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          we turned that over in 2006.

2                We went to Mealey's and did

3          a speech, and the actual

4          culmination of that was with

5          Mealey's right when Vioxx came off

6          the market and a number of you --

7                MR. BIRCHFIELD:  Pasadena.

8                MS. SANFORD:  --  gave

9          speeches there.  Yes, Pasadena.

10         But the thing that really spoke to

11         me about that particular speech,

12         people always complimented her and

13         said, we really think we want to

14         get in this litigation. Mark, you

15         know how effective Carlene was at

16         trying to persuade people to jump

17         in and encourage that.

18                But she was in the hospital

19         the second time, the last time she

20         was in the hospital, and she got

21         an e-mail from a lawyer in New

22         York who had watched the Mealey's

23         presentation and just e-mailed her

24         and said, I don't know you, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          you've restored my faith in
 2          lawyers, a defense lawyer wrote
 3          that, and Carlene showed that to
 4          me and was just so touched that
 5          somebody would do that.
 6               We wrote articles for
 7          various places, trial magazines,
 8          but mostly it was ATLA and Mass
 9          Torts Made Perfect and Mealey's.
10          We also did the Harris Martin and
11          those sorts of things.
12               So, there were really a
13          number of things.  They would
14          probably be reflected in the time.
15          I tried to capture those for her
16          in the pre-2005 formation of the
17          MDL time that we submitted, and I
18          would encourage you to look at
19          that because it did impact
20          lawyers.  I know that may not be a
21          common, common benefit time issue,
22          but it was important to Carlene,
23          and I think it was very effective
24          and helped the litigation move
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        forward.

2              Mark, I looked at your

3        eulogy of Carlene, I listened to

4        that yesterday, and what a tribute

5        it was to her.  The things you

6        said about her, about Vioxx,

7        really stood out to me.   I think

8        you know it is true, if you gave

9        something to Carlene, you could

10        take it off your list.  It was

11        done.   That was very true in this

12        litigation.  You called her a

13        leader in the Vioxx fight, and I

14        think that's accurate.

15        Importantly, you told her girls

16        that there are pharmaceutical

17        companies that will never do

18        business the same way because she

19        took justice by the hand until it

20        came to fruition.  I believe that

21        is true and accurate.

22              I remember, again, shortly

23        before Carlene passed away,

24        watching a commercial with her on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        TV of Tylenol.  The president of
 2        Tylenol got on the commercial and
 3        said, we have this problem with
 4        our drug and we don't want you to
 5        take it.  We would rather you not
 6        take Tylenol than have this
 7        problem.   Carlene looked at me
 8        and said, I think we helped to
 9        make a difference with that and
10        that kind of pride in what she
11        did.  It's remarkable, and I
12        believe it is true as well.  I'm
13        glad she had it.
14            It was easy to see that she
15        was a visionary about the Vioxx
16        litigation.  She walked into my
17        office in October of 2000 after
18        having visited with Ms. Bell and
19        said, this is a bad drug, and we
20        need to do something about it.
21        That's how she proceeded in this
22        litigation.  She looked at Vioxx
23        and said it is a bad drug, it is
24        hurting people, we've got to do
```

FAC Resp. Exhibit D -- 1294

Page 11

1          something to help.  That's how she

2          looked at the litigation all the

3          way through.

4               It was a very proud moment

5          for her when Vioxx came off the

6          market, an extremely proud moment

7          when she was appointed to this

8          PSC, and even prouder when she

9          chaired the science committee.

10         When you voted her in, the taxi

11         ride to the airport after that was

12         one of the happiest moments that I

13         remember from her, and she was

14         very appreciative of that, and I

15         think did a tremendous job.

16              Here's where I'll go off the

17         record for one second.

18                   -  -  -

19              (Whereupon, an

20         off-the-record discussion was

21         held.)

22                   -  -  -

23         MR. BIRCHFIELD:  Shelly,

24         appointing Carlene and then you as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        chair of the science committee,

2        that was probably one of the

3        easiest and most obvious decisions

4        that we made in this litigation.

5            MS. SANFORD:  Thank you for

6        that.  We didn't take it lightly,

7        and I don't intend to overstate

8        either one of our positions or

9        understate them, but I think you

10       all know where we were in it and

11       at least where our heart was, and

12       you got the best of both of us,

13       and in particular, the best of

14       Carlene.

15           I think in regard to being a

16       visionary, she was able to

17       recognize a bad drug.  She was

18       able to look at Mrs. Ernst when

19       she came in the door and say, this

20       is the case that needs to go to

21       trial, and it needs to be tried by

22       Mark.  She was committed to that,

23       Mark, in a way that it's just

24       amazing to me.  She loved that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          trial, loved how you tried it,

2          loved being a part of it, loved

3          the result.  Happy, happy day for

4          her.  And we'll just say thank you

5          to you for being part of that.

6               She recognized the need for

7          giant people to be involved in

8          this litigation and encouraged, I

9          think, all of you in ways that

10          were, I hope, memorable to you

11          because she loved each one of you.

12               MR. HERMAN:  I think you

13          ought to know that it was a big

14          blow to everyone, not just in a

15          professional sense, but in a

16          personal sense, and there never

17          was a question at all as to who

18          would be recommended to fill the

19          spot on the PSC.  You always give

20          more and take less credit yourself

21          for what you do.  I know this

22          isn't easy for you, and you don't

23          find it easy to talk about

24          yourself.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1              MS. SANFORD:  No.

2              MR. HERMAN:  So, I think

3         some of us are going to have to do

4         that for you.

5              MR. SEEGER:  I was just

6         about to say, true to character,

7         she's talking about what everybody

8         else did but her.  You were right

9         there with Carlene from the very

10        beginning.  The very first meeting

11        I had was with the two of you.

12             Shelly, Carlene was a very

13        special person.  We all miss her.

14        It was a huge blow, and it felt

15        like there was just a huge hole in

16        our committee and in our team when

17        she left, but you filled it.

18        Even before that, you were so

19        active and so involved.

20             I don't want to go into all

21        the details like what you did on

22        the science committee and how you

23        supported every trial effort,

24        Andy, mine, Mark's, everybody's,

FAC Resp. Exhibit D -- 1298

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          Perry's.  You were always there

2          moving us on, helping us,

3          providing us with valuable

4          information.  You have been steady

5          and constant from the very minute

6          I met you right here in this

7          hotel.  So, I thank you.

8               MR. LANIER:  I also want the

9          record to reflect, and I think

10         those of us on the committee know

11         this, but I'm not certain, and I

12         hope this isn't something that I

13         know from some other means that I

14         shouldn't say, but the monies you

15         get from this have already been

16         pre-divided in such a way that

17         Carlene's children and her ex-law

18         partner are going to get the

19         lion's share compared to what you

20         get.  If you add those two

21         together, it is two to one, what

22         you would take out of this.   I

23         think that needs to be on the

24         record as well.  It's another good

FAC Resp. Exhibit D -- 1299

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        reason for you to be talking not

 2        just about what you did, but about

 3        what Carlene did, because this is

 4        our chance for her offspring to

 5        get what's coming to them from her

 6        efforts.

 7              MR. LEVIN:  How are those

 8        pretty girls?

 9              MS. SANFORD:  They are good.

10        They are tremendous.  They are a

11        testament to their mom really.

12        Carla, the oldest, is at Harvard

13        and followed in her mom's

14        footsteps, and Christie is a

15        senior in high school.  They are

16        very good children.

17              MR. LEVIN:  It's good that

18        they have you.

19              MS. SANFORD:  Thank you.  It

20        is a joy for me to have them, and

21        thank you for the comments.  I'm

22        in awe of each one of you and the

23        things that you have done and have

24        been glad to be a part of it and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1          would give my all for you on any

 2          case that I was involved in with

 3          you, and I do believe that Merck

 4          is --

 5              MR. HERMAN:  It takes a lot

 6          of mules to pull one cart, and we

 7          wouldn't be where we are without

 8          your contribution and Carlene's.

 9              I just want to add a little,

10          because you are not making a

11          pretty good record for somebody

12          else to read even though we know

13          what you did.  I think your

14          participation on, for example, the

15          science committee, the trial

16          package committee, monitoring the

17          trials, giving the input, being

18          there from the beginning to the

19          end, the consistency with which

20          you and Carlene performed, and

21          even after Carlene was facing a

22          really untoward situation, there

23          wasn't any stop.  You guys just

24          kept plowing ahead.  You are still

FAC Resp. Exhibit D -- 1301

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        not making the case for yourself.
 2             MR. LANIER:  Let me add, in
 3        the Ernst case, we go to trial in
 4        Ernst, no one has tried any Vioxx
 5        cases yet.  We are going where no
 6        man has gone before.  Alan Nies
 7        gets put on the stand.  I don't
 8        have a deposition of Alan Nies to
 9        read.  I have absolutely nothing
10        from Alan Nies.  So, I'm going
11        through documents, and I'm putting
12        together a cross with some of the
13        best stuff I had on Alan Nies.
14        You and Carlene found, in terms of
15        Alan Nies' "oh, I moved down here
16        to be with my grandkids," blah,
17        blah, blah.  He did not.  He moved
18        down here for a consulting job
19        making a quarter million dollars a
20        year for a sugarland company down
21        the freeway there.  And y'all
22        found that, which allowed me to
23        absolutely totally destroy his
24        credibility in the first five
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1       minutes of my cross-examination.

2       And that was y'all.

3            MS. SANFORD:  You did

4       destroy his credibility.  That was

5       very pleasant.  Thank you for

6       that.

7            MR. GIRARDI:  Shelly, let me

8       say this.  We were in this case in

9       2001.  I know you were and Chris

10      was in 2001.  Nobody at this table

11      knew how to spell Vioxx.  The only

12      reason this came about is you two

13      guys, no question about it.  If

14      you look at all of the bad drug

15      cases, you never see this sort of

16      a lead time between what you guys

17      did back in 2000 versus then it

18      gets withdrawn several years later

19      and then the MDL is set up in

20      2005.  All of that was because of

21      you.  I mean, no question about

22      it.

23            MR. LANIER:  I still recall

24      you helping me get ready to take

FAC Resp. Exhibit D -- 1303

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Alise Reicin's deposition.  Before
2          they pulled the drug off the
3          market, we deposed Alise Reicin,
4          got her locked into some lies
5          before she ever knew this thing
6          was going to go forward, and y'all
7          helped prep me for that.
8               MR. BIRCHFIELD:  We all know
9          your role early on and your
10         commitment throughout it.  Chris
11         mentioned the support and the help
12         that you gave.  Mark has mentioned
13         the role that you and Carlene
14         played in Ernst.  But you were
15         there for our trial.  I mean,
16         every MDL trial, you were there to
17         help.  So, we know your role
18         there.  We know the contribution
19         that you made on the committees,
20         the science committee and the
21         trial package and the stroke
22         committee.  I mean, all of that is
23         well known to the folks on this
24         committee.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1              One of the things that may

 2         not be as well known that would be

 3         helpful, if you could spend a few

 4         minutes talking about how y'all

 5         really advanced the litigation

 6         with your own cases.  We know

 7         about Ernst, but you had other

 8         cases that y'all had worked up

 9         that were ready for trial that you

10         were pushing to get to trial.  Can

11         you talk to us a few minutes about

12         that?  That would be helpful.

13              MR. SEEGER:  Excellent

14         question.

15              MS. SANFORD:  Most

16         particularly the case that I think

17         was helpful in advancing the

18         litigation -- with the exception

19         of Ernst, which I think was an

20         amazing thing to be able to get to

21         trial within four months of the

22         MDL being formed.  Again, I will

23         say that Carlene was so

24         appreciative that the PSC
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

 1          supported that, allowed that case

 2          to go to trial, encouraged it and,

 3          Mark, your role in that, but that

 4          that was able to go to trial then

 5          was tremendous.   We spent a very

 6          big amount of time with Mark's

 7          firm on that.

 8               We also had the Pikul case,

 9          which I think made a significant

10          difference in this litigation as

11          well.  When I say the Pikul case,

12          it is a case that we had in 2003.

13          We filed that he was a person who

14          had 50 milligram usage for more

15          than 30 months and got all of his

16          drugs from Merck-Medco directly.

17          They sent him the last 90-day

18          supply that killed him.  He had a

19          blood clot.  The clot was found by

20          the medical examiner here who had

21          pictures of the clot, testified in

22          that actual pathology record that

23          it was Vioxx related prior to

24          Vioxx even being withdrawn from

FAC Resp. Exhibit D -- 1306

Page 23

1          the market.  The actual physician,

2          I took his deposition, and he said

3          Merck was in his office telling

4          him that Vioxx was safe, go ahead

5          and continue to prescribe it in 50

6          milligram doses on a chronic

7          basis, which was contrary to the

8          label.  We had that case wired up,

9          and Merck knew it, and so every

10         time it came to the table in the

11         MDL to be the trial case --

12              MR. SEEGER:  They ran away

13         from it.

14              MS. SANFORD:  -- they ran

15         away from it.  They said that it

16         is not representative because it

17         is too good and those sorts of

18         things.  And I think it had a lot

19         to do, in my opinion and Carlene's

20         opinion, with how the cases got

21         selected for trial and how

22         eventually they would have faced

23         that case.

24              MR. BIRCHFIELD:  That case

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          was trial ready?

2              MS. SANFORD:  It was trial

3          ready.  The doctors, the experts,

4          the plaintiff's depositions were

5          taken, the representatives.  It is

6          the only case that Carlene

7          considered, as she was in the

8          hospital the first time, possibly

9          filing mandamus for Judge Fallon

10         because he was not getting his day

11         in court, and it was ready at the

12         time the MDL was formed.  And of

13         course we didn't do that because

14         that's not really something we

15         would have done, but it was that

16         strongly felt in her that this was

17         a case that should be tried and

18         should have been the first trial

19         in the MDL.  And Merck's ability

20         to strike that was helpful to

21         other cases like Barnett and those

22         that got put on the table.  I

23         think that was significant.  Thank

24         you for asking that question.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

 1       When I think of one of the things
 2       I'm proud about, I'm proud for
 3       Carlene about, that's one of the
 4       things that comes up.
 5            There are a few other things
 6       I will go through very quickly,
 7       but just fun little facts that I'm
 8       proud of them.  The video news
 9       release that was played in every
10       trial which Merck never mentioned
11       in there that there was a five
12       times risk of heart attack with
13       their drug.  They touted the
14       naproxen effects, and they sent
15       that out right after VIGOR was
16       released.  It was the first video
17       marketing material that we got.
18       It was document 0001 in 2001, and
19       that was something that Mark used
20       at the first trial.  It was a very
21       good piece.
22            The second piece of
23       information that was very
24       beneficial I think to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1          litigation overall was the "Be the

 2          Power" presentation.

 3              Tom, I don't know if you

 4          remember this, but you had a black

 5          and white PowerPoint presentation

 6          that you gave Carlene and I when

 7          we came down the second time to

 8          see you, and it was almost

 9          illegible.  We took it and we were

10          able to file a 30(b)(6) motion.

11          Carlene and I took the deposition

12          and got documents, and among those

13          documents was the "Be the Power"

14          video.  It was James Dunn's

15          production as it came in, and we

16          looked at it and saw this cartoon

17          basically that they had put

18          together undermining and

19          minimizing the effects.

20              MR. SEEGER:  Shelly,

21          something else just really

22          occurred to me.  You are so quiet

23          and you are so understated, but

24          you were really the central

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          organizer of the West Coast, the

2          East Coast, all of us, before the

3          MDL, and you were still, even

4          after the MDL was created, very

5          much involved with lawyers all

6          over the country, Mark, Tom's

7          office, us.  So, you provided a

8          lot of leadership in that respect.

9               MS. SANFORD:  I appreciate

10         that.  Thank you.

11              We had meetings in Mark's

12         office with everybody in your new

13         office when it first came in, when

14         you first went there, Mark, after

15         we dogged you downtown for so many

16         years to get involved.

17              MR. SEEGER:  I know.  I

18         remember I couldn't find his

19         office the first time he invited

20         me down.

21              MS. SANFORD:  That "Be the

22         Power" presentation, I think, was

23         significant, and it was played in

24         -- every trial that had a verdict

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1    for plaintiffs included that

2    presentation, and that was as a

3    result of that, and that was when

4    Merck filed personal

5    Interrogatories against me and

6    Carlene and the request for

7    admission and tried to figure out

8    how we got that.  And then when we

9    were able to stop that from

10   happening, we got motions for

11   sanctions on that and those sorts

12   of things early on, because they

13   were just furious that we knew

14   about it.  But it was a very good

15   deal, and I was proud of that.

16        We had 10 million pages of

17   documents by the summer of 2002,

18   and that ultimately became part of

19   the repository, I think, in New

20   Jersey, and I thought that was a

21   very good factor.

22        MR. HERMAN:  Shelly,

23   everybody on this committee has

24   recognized that one hour of work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          by a lawyer of your caliber or

2          Carlene's may be worth 100 of

3          somebody else's.  So, hours aren't

4          the sine qua non, I think, for

5          this committee.

6              But I do want to get on the

7          record the last report that I

8          have, which is -- I rounded off

9          7,084 hours by the firm and your

10         own hours, close to 4,000.

11         That's significant because there

12         was a time when you weren't even

13         dealing with hours and Carlene

14         wasn't dealing with hours.  But in

15         an effort to be consistent, I want

16         to make sure your hours are stated

17         on the record.

18              What are your outstanding

19         costs at this point for you and

20         Carlene?

21              MS. SANFORD:  I did not

22         bring that with me.

23              MR. HERMAN:  Can you

24         ballpark it for us?

FAC Resp. Exhibit D -- 1313

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1              MR. LEVIN:  We have it here.

2              MS. SANFORD:  You do?  Maybe

3         300?

4              MR. HERMAN:  Arnie, do you

5         have it?

6              MR. LEVIN:  You have about

7         7,000 hours in the cases reported,

8         and for some reason, your costs --

9         take a look at this.

10             MR. BLIZZARD:  $79,000 in

11        costs.

12             MS. SANFORD:  In expenses in

13        addition -- I mean less the PSC

14        contribution --

15             MR. LEVIN:  That has nothing

16        to do with the assessments.

17             MR. HERMAN:  How much?

18             MR. LEVIN:  $79,000.

19             MR. HERMAN:  It sounds low

20        to me.

21             MS. SANFORD:  It is low in a

22        sense that very graciously Mark

23        and Carlene came to a deal on the

24        cases where Mark fronted.

FAC Resp. Exhibit D -- 1314

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1              MR. SEEGER:  That explains

2         how --

3              MR. LEVIN:  That explains

4         Mark's costs now.

5              MS. SANFORD:  We paid a

6         significant amount, but Mark very

7         graciously contributed --

8              MR. HERMAN:  Check what you

9         and Carlene were out of pocket,

10         notwithstanding what Mark did, and

11         if it is different than around

12         80,000.  You have got Mark's

13         number.  Just call it into us

14         while we're here, and we'll put it

15         on the record.

16              MS. SANFORD:  I will

17         actually do that.  There was time

18         submitted for pre-MDL formation,

19         and I don't know what you are

20         doing with that.

21              MR. LEVIN:  We want to know

22         that.

23              MR. HERMAN:  We want to know

24         that.

Page 32

1               MR. LEVIN:  Get that in.

2               MS. SANFORD:  I submitted it

3          a year ago probably to your

4          office, Russ.

5               MR. LEVIN:  Well, then, it

6          is in there.

7               MR. HERMAN:  Well, then, we

8          should have it.

9               MR. SEEGER:  Shelly, do you

10          have somebody who can make a call

11          to Wegmann to make sure the

12          accountants have your pre-MDL

13          hours?

14               MR. HERMAN:  And your costs.

15               MR. LEVIN:  Shelly, I can

16          say this, that you are one of the

17          few, that every hour that you have

18          put in has been accepted by the

19          accountants.  There's nothing

20          rejected.  There's nothing under

21          review.  It's current --

22               MR. SEEGER:  That makes

23          Arnold very happy.

24               MR. LANIER:  Which also

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          brings up another point that I

2          think is useful on the record that

3          ties all of this together.

4               You and Carlene and Danny,

5          as this thing started, really were

6          a defense firm, and you lost and

7          burned some defense bridges by

8          stepping out in a plaintiff's

9          cause of action.  It is why you

10         weren't in a position to fund this

11         litigation and why I stepped in to

12         do your funding.  It is also why

13         you keep really good hours.  You

14         know how to do it.  They are

15         legitimate hours, and they are

16         real.

17              MS. SANFORD:  Thank you.

18              MR. LANIER:  But I say that

19         to underscore that I know for a

20         fact that y'all burned some

21         bridges with some defense clients

22         by, quote, going to the

23         plaintiff's side, closed quote.

24              MS. SANFORD:  We absolutely

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          did, and Carlene gave up a major

2          defense client to do this

3          litigation that funded her and her

4          family very well.

5               MR. HERMAN:  The last thing

6          I want to say about you and

7          Carlene is Louie L'Amour wrote a

8          lot about Texas and a pioneer's

9          spirit.  In one of the books, one

10         of his novels, he talks about a

11         female pioneer.  And the phrase he

12         used was, "She was fit to ride the

13         river with," which in those days

14         meant they would stick to it and

15         be tough.  Everybody wants to be a

16         pioneer, but we're looking at one

17         right now.  It would be a

18         discredit to us if we discounted

19         the work that you and Carlene did

20         in the early stages of the

21         litigation.  I'm glad you started

22         with that.  I want you to know

23         that we recognize it, and it is

24         meaningful.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
1           MS. SANFORD:  Thank you for
2      that, Russ.  I have one request in
3      that regard.  If you decide that
4      it's time that's valuable and able
5      to be recompensed in this, I would
6      accept that.  If you decide that
7      it isn't, I would encourage you to
8      rethink that on Carlene's time, as
9      she couldn't continue because she
10     passed away.
11          MR. HERMAN:  We're not deep
12     thinkers, Carlene.
13          MS. SANFORD:  But I will
14     give you that.  This is what we
15     submitted to them.  It is roughly
16     the same amount of hours
17     previously, and that's what we put
18     in there.
19          Russ, the picture that
20     Carlene hung on her wall that I
21     now have, actually, is a quote
22     from Abraham Lincoln, and it says,
23     "A lawyer's time and advice are
24     her stock in trade."
```

FAC Resp. Exhibit D -- 1319

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

 1            MR. HERMAN:  I'm just going
 2       to read the front page for the
 3       record, and then I'll turn this in
 4       myself when I get back.
 5            From January 1st, 2000 to
 6       April 5th, 2005, Carlene Lewis had
 7       3,079 hours, and Shelly Sanford
 8       had 3,596 hours, and Jeff Larson,
 9       29 hours.  That's really a
10       significant amount of time when
11       you are talking about a five-year
12       stretch before the MDL really got
13       geared up.
14            MS. SANFORD:  Thank you for
15       that.
16            Couple of just final
17       comments, and I thank you very
18       much for listening to me on this.
19            MR. LEVIN:  Shelly, will you
20       call the accountants to make sure
21       that the time is straight?
22            MR. SEEGER:  We told her
23       that, Arnie.
24            MR. LEVIN:  This time

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1        appears to be not in there.

2              MR. SEEGER:  She just gave

3        it to us.

4              MR. HERMAN:  She just gave

5        it to me.

6              MR. LEVIN:  I know, but he

7        has to get it in there.

8              MR. HERMAN:  I'll take care

9        of it.

10             MR. SEEGER:  Go ahead.

11             MS. SANFORD:  I communicated

12       with Lenny on it probably a month

13       ago just to make sure that it was

14       included, and he was looking into

15       it with Regina on that issue.

16             I think that in regards to

17       myself and to Carlene, what I'm

18       most proud of in this litigation

19       is that I think we might be river

20       ready, but we have a dogged

21       persistence, and I think that's

22       tantamount to who she was, and I

23       hope that I was able to honor her

24       in that in following that same

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          persistence.  We just loved

2          working with you guys and

3          appreciate the opportunity to have

4          done it and thank you for that.

5              MR. BLIZZARD:  Shelly,

6          sometimes the most valuable

7          contribution somebody can make is

8          to inspire other people, and I

9          think Carlene did that, and I

10         really thank you for inspiring us

11         this morning.

12             MR. BIRCHFIELD:  Amen.

13             MR. SEEGER:  Well said, Ed.

14             MS. SANFORD:  Thank you.

15                  -   -   -

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1              C E R T I F I C A T E

 2

 3

 4         I, LINDA L. GOLKOW, a Notary
       Public and Certified Court Reporter of
 5     the State of New Jersey, Registered
       Diplomate Reporter, Federally-Approved by
 6     the United States District Court of
       Pennsylvania, do hereby certify that the
 7     foregoing is a correct transcript of the
       testimony as taken stenographically by
 8     and before me at the time, place and on
       the date hereinbefore set forth.

 9

10

11

          I DO FURTHER CERTIFY that I am
12     neither a relative nor employee nor
       attorney nor counsel of any of the
13     parties to this action, and that I am
       neither a relative nor employee of such
14     attorney or counsel, and that I am not
       financially interested in the action.

15

16

17

18     _____

       Linda L. Golkow, RDR, CRR, CCR
19     Notary Number:  1060147
       Notary Expiration:  1.2.10
20     CCR Number:  30X100176200

21

22

23

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM:   SHELLER, P.C.
        Brian J. McCormick, Jr., Esquire
        Claudine O. Homolash, Esquire


BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1324

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2            MR. SEEGER:  We do have a
 3       court reporter keeping track, so,
 4       if you could just put your names
 5       on the record when you start
 6       speaking.
 7            MR. MCCORMICK:  Brian
 8       McCormick, and with me is Claudine
 9       Homolash from the Sheller firm.
10            MR. HERMAN:  I'm sorry.  I'm
11       Russ Herman.  I don't think we've
12       met.  And would you give me your
13       partner's name, Sharon?
14            MR. MCCORMICK:  Claudine
15       Homolash.
16            MR. HERMAN:  Claudine?  How
17       does Claudine spell her name?
18            MS. HOMOLASH:
19       C-L-A-U-D-I-N-E.
20            MR. HERMAN: No, no, your
21       last name.
22            MS. HOMOLASH:
23       H-O-M-O-L-A-S-H.
24            MR. SEEGER:  Go ahead.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          MR. MCCORMICK:  I'm going to

2     be brief.  I'll get you guys get

3     back on schedule.

4          Thanks for giving us a

5     chance to make a brief

6     presentation.

7          The affidavit that Steve

8     Sheller from my firm presented

9     back on October 31st, 2008, that

10    affidavit was based on a number of

11    discussions and conferences with

12    several of the attorneys who

13    worked on the various Vioxx

14    matters at the time in our firm.

15    I'm going to concentrate primarily

16    on three attorneys who worked

17    primarily on Vioxx matters from

18    the Sheller firm over the course

19    of 2005 and 2006.

20          Haile DeBass was one of the

21    attorneys who began work in

22    February of 2005, several weeks

23    before the MDL began.  Jonathan

24    Shub, another one of our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        attorneys, Gregory Waks.  Jon Shub

 2        began work early in the case

 3        working on the assessment and view

 4        of the case.  He worked primarily

 5        on the third-party payor complaint

 6        in the beginning.  Mr.  DeBass'

 7        became one of the managers of the

 8        New York document depository at

 9        Seeger Weiss.  He assisted Michael

10        Wagner of Seeger Weiss very

11        carefully, very closely.  Some of

12        his primary responsibilities that

13        he was given over the course of

14        the time were he would train the

15        other attorneys and the

16        paralegals.  He was asked to

17        allocate assignments among the

18        attorneys and the paralegals.  He

19        organized and managed the

20        deposition packages.  He helped

21        Michael Wagner allocate the seats

22        at the depository, which I

23        understand were scarce at times,

24        and he worked with Penny Herman at
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1    the document depository in New

2    Orleans on a pretty regular,

3    almost daily basis.

4        Mr. DeBass responsibilities

5    were greatly increased in the fall

6    of 2005 after Hurricane Katrina

7    when he took over and the New York

8    depository became the primary

9    depository, and then again when

10   Mr. Wagner began to assist the

11   various attorneys at trial, was

12   traveling around the country. I

13   think that the people who worked

14   with them on a daily basis at the

15   depository would say that, for a

16   while, Mr. DeBass was the de

17   facto manager of the depository.

18       Mr. DeBass also helped work

19   on several of the bellwether cases

20   by preparing and organizing the

21   exhibits for use at trial and

22   preparing the trial exhibit

23   outlines. One of the projects he

24   was able to specifically describe

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1    was one with Dave Buchanan where

2    he worked for several days that

3    turned into several weeks on a

4    label project.  He also worked

5    extensively with the SAS database

6    and assisted the experts in

7    pulling documents and reviewing

8    that.

9         The way I understand it,

10   after Hurricane Katrina, Mr.

11   DeBass and several of the other

12   Sheller attorneys, including Mr.

13   Waks, became the primary attorneys

14   at the Seeger Weiss depository

15   working on the documents.

16        We also provided a paralegal

17   for the Humeston trial here in

18   Atlantic City in the fall of 2005,

19   who lived in Atlantic City.  His

20   name was Joseph Yanick.

21        Mr. Shub has made me aware

22   that he worked with several of the

23   other attorneys both in the

24   personal injury cases and the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        third-party payor cases and

 2        interviewing and working with some

 3        of the experts.

 4              When Mr. DeBass began to

 5        become more busy with the

 6        administrative-type tasks in New

 7        York at the depository, we moved

 8        another attorney from our office

 9        named Gregory Waks up to New York,

10        who was working 12 to 13-hour days

11        in the document depository.

12              And, basically, to go

13        through the factors that are set

14        forth in rule or PTO 6(D),

15        substantial contribution, I think

16        has been explained, but any

17        attorneys who worked with Mr.

18        Shub, Mr. DeBass and Mr. Waks, I

19        think, recognize their

20        contribution.

21              The quality of the work,

22        Mr. DeBass' work, I believe was

23        unquestioned as he took on and was

24        given many more responsibilities
```

FAC Resp. Exhibit D -- 1330

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          than simply a document reviewer.
 2                  Mr. Shub's work is known to
 3          many of you here, and I think is
 4          unquestionable.
 5                  The consistency and duration
 6          of the work that the Sheller firm
 7          did, the firm dedicated several
 8          attorneys to the litigation.  It
 9          began in the very beginning, our
10          first time entry was in February
11          of 2005, and then the last entry
12          was in October of 2006, when 5,000
13          hours was billed individually by
14          the different attorneys at
15          Sheller, to the litigation.
16                  The assistance of bellwether
17          cases, while we didn't try any of
18          the cases, Mr. DeBass was
19          apparently enormously helpful in
20          preparing for many of the trials,
21          and we dedicated a paralegal to
22          that trial team and offered help
23          wherever needed.
24                  On the leadership
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      committees, Mr. Shub served on the

2      leadership of the third-party

3      payor committee, and Mr. DeBass

4      was very active in the discovery

5      and trial preparation committees

6      and the conference calls and the

7      weekly meetings.

8           All time spent by Sheller

9      was specifically authorized or

10     requested by a member of the PSC

11     or one of the other committees.

12     It was never taken for granted

13     that their work was going to be

14     just done randomly.

15          I think it is important to

16     remember that the Sheller

17     attorneys did the unsung work, the

18     discovery work that, frankly, no

19     one really wants to do, but is

20     critical to a case like this.

21     After Mr. DeBass began to work

22     closely with Mr. Wagner and Ms.

23     Herman, then he took over more of

24     the responsibilities of the New

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1        York depository.  As I said, he
 2        was de facto manager.
 3             I think it's also important
 4        that Sheller, after we got into
 5        the litigation through Mr. Shub's
 6        different relationships, we
 7        staffed it with very experienced
 8        and able attorneys and really dug
 9        into the work.  Many of the
10        attorneys who worked on that
11        project are still working on some
12        of the related cases and we
13        supported the cases to the end.
14             That's all I have.  I don't
15        have a PowerPoint, but I'm willing
16        to take questions on the work.
17             MR. SEEGER:  I have to make
18        the committee aware of something,
19        because it might be strange to
20        you, because John Shub is a
21        partner of mine.  John Shub was at
22        Sheller's office, and I forget
23        exactly when, about a year or so
24        ago, maybe two years ago,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        transferred his practice to Seeger

 2        Weiss.  I am very familiar with

 3        what he did.  DeBass, he was a

 4        contract lawyer for Sheller,

 5        right?

 6             MR. MCCORMICK:  Yes, he was.

 7             MR. SEEGER:  We're talking

 8        about document review,

 9        essentially, right?  I want to

10        make sure I understand.

11             MR. MCCORMICK:  Right.  We

12        are.

13             MR. LEVIN:  Of your 1,800

14        hours that are recorded here by

15        the accountants, close to 1,400 of

16        it is from a contract employee.

17        Was he an attorney or a paralegal?

18             MR. MCCORMICK:  He was an

19        attorney.

20             MR. LEVIN:  How long was he

21        out of law school?

22             MR. MCCORMICK:  Mr.

23        DeBass had been -- I don't know

24        his exact resume, Arnie.  I would
```

FAC Resp. Exhibit D -- 1334

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1         have to look that up.

2               MR. LEVIN:  But he was just

3         picked up for this case?

4               MR. MCCORMICK:  I think he

5         had worked on several cases with

6         Sheller before and with Mr. Shub.

7         I don't think he was picked

8         specifically for the Vioxx case.

9               MR. LEVIN:  MR. Shub was the

10        most senior attorney that worked

11        on this case?

12              MR. MCCORMICK:  Yes, he was.

13              MR. LEVIN:  He had 162

14        hours, and DeBass had 1,388; is

15        that correct?

16              MR. MCCORMICK:  I believe it

17        is more hours than that, but I'll

18        have to check on that.

19              MR. LEVIN:  Was DeBass in

20        New York -- did I pronounce his

21        name right?

22              MR. MCCORMICK:  It's DeBass.

23              MR. LEVIN:  There's no E on

24        the end.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1           There were two depositories

2       in New York, as I understand it, a

3       third-party depository?

4           MR. SEEGER:  Yes.  I

5       actually know this.  The review

6       they did was really limited to the

7       third-party payors.  John Shub did

8       not have a leadership role in

9       those cases, but he --

10          MR. LEVIN:  He worked the

11      third-party cases.

12          MR. SEEGER:  Right.

13          MR. LEVIN:  And the

14      third-party cases was the Local 68

15      and others?

16          MR. SEEGER:  Correct.

17          MR. HERMAN:  Were the hours

18      kept contemporaneously or are

19      these reconstructed or do you

20      know?

21          MR. MCCORMICK:  They were

22      kept contemporaneously.

23          MR. HERMAN:  I'm sorry?

24          MR. MCCORMICK:  They were

FAC Resp. Exhibit D -- 1336

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          kept as they went.

2                MR. HERMAN:  Okay.  Just so

3          you will know and the record is

4          clear, in the fall, on August 29,

5          2005, Katrina hit New Orleans.

6          That depository was moved to

7          Houston and up and running in

8          October of 2005.

9                Penny Herman, I don't know

10         what Mr. DeBass did to work with

11         Penny Herman after 2005, but I'd

12         like to know more specifics on

13         that, because that depository

14         was -- the MDL depository was kept

15         in my office, and I'm not doubting

16         that he came and worked in that

17         office --

18                MR. MCCORMICK:  I don't

19         think he worked in that office.

20         I'm sorry if I've misled you.  I

21         meant he worked or was in contact

22         with Ms. Herman during the

23         turnover.

24                MR. HERMAN:  Okay.  I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      understand.

2              Because various requests

3      would be made of the MDL

4      depository.  She would relay those

5      requests, if the material wasn't

6      in the MDL depository, either

7      to -- or generally to the

8      depository in Chris Seeger's

9      office and to Andy Birchfield's

10     office.  I suppose he would be one

11     of the people in New York that

12     would respond to those requests.

13             MR. MCCORMICK:  I'll try

14     and find out more.

15             MR. HERMAN:  I think I have

16     it now.  In other words, he was

17     working in New York at a

18     depository, and a request would

19     come in from the MDL depository,

20     he would respond.

21             MR. MCCORMICK:  Right.

22             MR. WEITZ:  How many cases,

23     individual cases has your firm

24     submitted to the settlement?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        MR. MCCORMICK:  I believe

2    88 at this point.

3        MR. WEITZ:  Did your firm

4    work up any individual cases in

5    either the MDL or any of the other

6    state jurisdictions for trial?

7        MS. HOMOLASH:  We have just

8    plaintiff depositions.

9        MR. WEITZ:  Did you

10    participate in any of the trials

11    as a second chair or first chair?

12        MR. MCCORMICK:  No, none of

13    our attorneys did.

14        MR. WEITZ:  Thank you.

15        MR. SEEGER:  Thank you very

16    much.

17        MR. MCCORMICK:  Thank you.

18        MR. HERMAN:  Appreciate you

19    coming in.

20            -  -  -

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23         Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:          THE BRANCH LAW FIRM
               Turner W. Branch, Esquire
               Cindy Zedalis, Esquire
               Margaret Moses Branch, Esquire


BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1341

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. GIRARDI:  Thank you.
 3              MR. BRANCH:  Cindy Zedalis
 4         from our office is going to
 5         present a summary, and I felt it
 6         was important to come and answer
 7         any questions you might have and
 8         to tell you that I did do my very
 9         best to attend.  I didn't miss any
10         of Judge Higbee's meetings in New
11         Jersey.  I think that can all be
12         verified by the attendance roles.
13         We did participate actively, I
14         think -- well, I don't think, I
15         know that were actively involved.
16              We had cases that we were
17         getting ready for trial.  We had
18         11 cases that we were putting up
19         for trial.  A lot of this I'm just
20         summarizing because we did make a
21         submission.
22              Those of you who were in New
23         Jersey, I saw on a regular basis.
24         Arnold, you were there.  Perry, I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        saw your office and you many

 2        times.  Mr. Lanier, I saw there.

 3        And I certainly saw my good friend

 4        at the end of the table there.  We

 5        never got to try a case.  We

 6        tried.  We had two cases, Mary

 7        Velasquez and Senator Ben

 8        Altamirano from New Mexico up for

 9        trial.  I thought they were good

10        plaintiffs.

11             Senator Altamirano was

12        President Pro-Tem of the New

13        Mexico Senate, and he had a

14        myocardial infarction associated

15        with Vioxx, and, unfortunately, he

16        had another myocardial infarction

17        a year ago tomorrow and died.  We

18        think that was probably

19        associated.  But he was one of the

20        clients we were putting up, as was

21        Mary Velasquez.

22             We participated whenever

23        asked by Eric Weinberg or others

24        on any study.
```

FAC Resp. Exhibit D -- 1343

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1              We did, and I think you can
 2         verify this, maybe some of you
 3         don't know, but we did retain, and
 4         I think she would tell you, Lynn
 5         Baker early on before anyone here
 6         did about checking out some
 7         conflict problems that we thought
 8         might exist.  And I think Mr.
 9         Lanier, Mark, can tell you that.
10         Some of her work was merged into
11         what happened eventually in the
12         global settlement, but I don't
13         take credit for her answering
14         questions that existed in the
15         global, but we did retain her
16         early on, like 2004, to address
17         those matters.  And then some of
18         the questions she did address
19         eventually while the settlement
20         was going on which we didn't know
21         about.
22              Here's Margaret.
23              (Whereupon, there was a
24         brief recess.)
```

FAC Resp. Exhibit D -- 1344

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1           MR. BRANCH:  Do I take

2      credit for any new ideas or

3      creative ideas that hadn't been

4      developed by others?  No.  Do I

5      expect an extraordinary amount for

6      our effort?  No, we don't.  We

7      would just ask that we be treated

8      fairly, and I think our time

9      substantiates what we did.  I'll

10      be happy to answer questions.

11           I wanted to be here out of

12      respect for each of you, and I'm

13      honored to appear before you and

14      to thank you for what you guys did

15      for a lot of people that were

16      injured.  I know there's a lot of

17      complaints from time to time and

18      you are never given credit for

19      what you do, but I will say thank

20      you to all of you for what you

21      have done because I think you've

22      helped a lot of people that

23      otherwise would get no help.

24           I think with that, I will

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        let Cindy summarize.  Cindy
 2        Zedalis worked on this case for
 3        almost six years.  She's an
 4        attorney in our office, went to
 5        University of California Law
 6        School and works with our office.
 7        Her husband is a pediatric
 8        oncologist in Albuquerque, and he
 9        temporarily got transferred to
10        Tulane University Medical School,
11        and she attended the MDL, a lot of
12        those in New Orleans, but we were
13        mainly active in New Jersey with
14        Judge Carol Higbee.  I don't think
15        Cindy missed any hearings either.
16             We had three other people
17        working on this in our office.
18        Once the settlement was reached,
19        we had over, I think, about 28
20        people working on settlement
21        packages, contract folks.
22             MR. LEVIN:  How many cases
23        did you put in the settlement,
24        Turner?
```

FAC Resp. Exhibit D -- 1346

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           MR. BRANCH:  We're going to

2       tell you, but it is 1,919 cases --

3           MR. LEVIN:  It was a good

4       year.

5           MR. BRANCH:  -- we submitted

6       settlement packages on.

7           MS. ZEDALIS:  That's as of

8       Monday.

9           MR. BRANCH:  As of Monday.

10      I don't think it's growing much.

11      Cindy, you can address that.  I

12      think we're pretty much done.

13          MR. LEVIN:  Turner, that was

14      the year you and I were born.

15          MR. BRANCH:  That's right.

16      But we were fortunate enough to

17      work with other attorneys on

18      referrals, and we got a lot of

19      help from the New York attorneys,

20      and I certainly want to give

21      credit to that and to Mark Lanier

22      for helping us.  We were able to

23      -- most of our cases are

24      co-counsel cases, to submit that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          many claims packages.  I think the

2          staff did a really good job on

3          those.  I don't take any credit

4          for those.  I did learn how to do

5          a claims package, and I can do

6          one.  I didn't do a lot of them.

7          I mainly complained, let's see

8          what we had done.  They did a good

9          job.

10               Cindy, I'll let you kind of

11          summarize what you think some of

12          our contributions were.

13               I was at the Borgata enough

14          to get a black card for playing

15          blackjack.  I don't know how long

16          you have to be there to do that,

17          but I did get a black card.

18          That's kind of it.  It's been an

19          interesting experience.  It has

20          been some of the most challenging

21          litigation.  Again, I think the

22          credit goes to all of you for

23          getting the results you did, and

24          we contributed a little, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          that's about it.
 2                Cindy, do you want to kind
 3          of summarize?
 4                MS. ZEDALIS:  I had passed
 5          around kind of a highlight sheet,
 6          a cheat sheet, basically
 7          summarizing the work that our firm
 8          did for the common benefit of all
 9          the plaintiffs in the litigation.
10          And of the 7400 hours of legal
11          time that we incurred, none of
12          that was incurred for discovery of
13          our individual cases.  I was the
14          person responsible for going
15          through all the time sheets and
16          basically cutting out anything
17          spent on obtaining discovery from
18          clients, doing PPFs, which really
19          took up a large chunk of most
20          people's time, which I'm sure you
21          are all familiar from complaints
22          from your staff.  With the
23          exception of our trial cases, none
24          of that time is reflected in the
```

FAC Resp. Exhibit D -- 1349

Page 10

```
 1          74 hours.  This was all --
 2               MR. LEVIN:  7400.
 3               MS. ZEDALIS:  7400 hours.  I
 4          don't think we would be here if it
 5          was 74 hours.
 6               So, in preparation, we had
 7          filed almost 2,500 claims,
 8          individual claims.  The majority
 9          of them were in New Jersey, 780 in
10          the MDL, almost 200 in the Texas
11          MDL, 238 in New Mexico that were
12          ultimately transferred to the MDL,
13          and the remaining in Washington,
14          D.C.  As Turner told you, we had
15          filed a little over 1900 cases or
16          enrolled 1900 cases and are either
17          dismissed or in the process of
18          dismissing some of those that
19          don't quite meet the settlement
20          criteria.
21               MR. HERMAN:  The CPA that's
22          getting all the information, I
23          would call and check with them.
24          You can e-mail my office.  I'll
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          give you the e-mail of my partner,

2          ldavis@hhkc.com.  Ask him to put

3          you in touch with Phil Garrett so

4          you can check with them

5          particularly on the expenses you

6          submitted.  He's an independent

7          CPA appointed by the Court.  He

8          doesn't have any connection in

9          doing any personal work for any of

10          the lawyers or firms.  I would say

11          50% of all firms submitting time

12          costs, they are going through

13          these and checking, and a number

14          of us have had to go back and sit

15          with them and explain things,

16          particularly on the costs.  I

17          don't know how much of your costs

18          right now they have accepted and

19          how much they haven't.

20              MS. ZEDALIS:  Will they tell

21          us?

22              MR. HERMAN:  Absolutely.

23              MS. ZEDALIS:  Because this

24          has been vetted.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           MR. HERMAN:  Not only do

2       they tell you, they are there to

3       help, not to discourage.

4           MS. ZEDALIS:  I see.  That's

5       helpful.

6           MR. LEVIN:  Let me direct

7       myself to that.  We're in Houston

8       and we have a problem.

9           According to the accountant,

10      you have 323 hours approved.  That

11      means there's no hours under

12      submission, there's no hours that

13      are rejected.  Somehow they don't

14      have all of your hours.  According

15      to the accountant, you never

16      submitted any costs, and they

17      never approved any costs.  You

18      have to do what Russ says to

19      straighten that out.

20          MS. ZEDALIS:  I know we have

21      e-mail confirmations.

22          MR. LEVIN:  That's a big

23      difference, very big difference --

24          MR. HERMAN:  Fastest way to

Page 13

1    do this, I know you have a lot of

2    money at stake here, is call

3    Lenny, and he'll connect you with

4    Garrett.  Spend whatever time.  A

5    lot of the firms, I don't know how

6    many have gone to their office and

7    spent three or four hours and come

8    out of there with everything

9    reconciled.

10          MS. ZEDALIS:  I know our

11    package was about this thick, and

12    I thought we FedExed it also and

13    we e-mailed it because it was too

14    large for a single attachment, but

15    maybe something happened.

16          MR. BIRCHFIELD:  On the

17    expenses, and I know you will work

18    that out with the accountant, but

19    is this primarily -- what's

20    reflected in these expenses?  You

21    had mentioned --

22          MS. ZEDALIS:  Travel

23    expenses to and from Albuquerque

24    to New Jersey.  Travel expenses to

FAC Resp. Exhibit D -- 1353

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          and from Albuquerque and New

 2          Orleans.  It's CLE conferences.

 3          It reflects -- we had payments

 4          made to the law firms, the Legal

 5          Consortium.  I think there were

 6          two payments of $25,000 apiece.

 7              MR. LEVIN:  That was in New

 8          Jersey?

 9              MS. ZEDALIS:  That was for

10          the New Jersey litigation.

11              MR. LEVIN:  As we

12          anticipate, that cost will come

13          back out of that fund because the

14          New Jersey leadership are going to

15          file a separate affidavit for

16          those costs, and when they are

17          approved, you will get your

18          $50,000 back.  So, they shouldn't

19          be in here.

20              MS. ZEDALIS:  Okay.

21              MR. SEEGER:  Wait a second

22          though.

23              MR. LEVIN:  It is an

24          assessment.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1              MR. SEEGER:  No.  But the

 2        Jersey assessments weren't

 3        $50,000.  Was that for a specific

 4        project?

 5              MR. BRANCH:  I don't know.

 6        Why don't you check with the

 7        accountant.

 8              MR. LEVIN:  That's a

 9        different consortium.

10              MR. BRANCH:  That's probably

11        right.  We also had some things on

12        studies.

13              MS. ZEDALIS:  We had for Dr.

14        Kostis.

15              MR. WEITZ:  That was a

16        separate project.  That wasn't --

17        that was unrelated to --

18              MR. LEVIN:  Are you speaking

19        of the New Jersey consortium when

20        you say that, Eric Weinberg's

21        group?

22              MS. ZEDALIS:  That was for

23        Dr. Kostis.  The other larger sum,

24        I thought it was two payments of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          $25,000.

 2               MR. BRANCH:  It might have

 3          been 15.

 4               MS. ZEDALIS:  It wasn't to

 5          Weinberg.  I thought it was to --

 6               MR. WEITZ:  My firm, Weitz &

 7          Luxenberg.  We'll find out.

 8               MR. BRANCH:  It is what it

 9          is, and we'll submit it.

10               MR. WEITZ:  Working with the

11          accountant will actually figure

12          out exactly what the payments were

13          for, and then we'll figure out how

14          you get reimbursed.

15               MR. SEEGER:  By the way, if

16          you can go back and see what

17          portions are for Kostis because

18          there was a $15,000 assessment.

19               MR. BRANCH:  I know we paid

20          that, and the rest of them, we

21          will have cancelled checks and

22          itemizations on, and I appreciate

23          Russ' idea of calling the

24          accountants, because we didn't
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          know we had an incomplete

2          application.  For example, I

3          didn't know we didn't have

4          everything submitted.

5               MR. HERMAN:  Turner, there

6          are 106 firms, and among those

7          firms are consortiums of firms

8          that have submitted a packet.  It

9          could be a snafu on our end.

10              MR. BRANCH:  We didn't

11         submit it with anyone else.

12              MR. HERMAN:  What I'm saying

13         is, when you get all of that

14         material at one time, but I'm

15         certain that Garrett and Wegmann-

16         Dazet --

17              MS. ZEDALIS:  Is he in

18         Covington?

19              MR. HERMAN:  In Metairie.

20         Right across the City Line in

21         Metairie.

22              They are very accessible,

23         they'll be happy to help.  If you

24         have any problem, call Lenny or

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1          myself while you are meeting or

 2          after your meeting with them.

 3          We'll take a personal interest.

 4                MR. BRANCH:  We thank you

 5          for that, and we will do that.

 6          Like I said, it is what it is, and

 7          we will have the cancelled checks

 8          and the verifications.

 9                MR. HERMAN:  Can you

10          ballpark the dollars within any

11          range of what you think in these

12          costs are expert witness costs?

13                MR. BRANCH:  I thought we

14          had everything itemized as to

15          every single cost that we

16          submitted, Cindy.

17                MS. ZEDALIS:  We paid some

18          experts on our trial cases.

19                MR. BRANCH:  Of course, I

20          may be wrong, but I think we did.

21                MR. SEEGER:  We'll work it

22          out.  We'll help figure it out.

23                MR. BRANCH:  He's asking for

24          a ballpark.  Do you know what that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          would be?

2                MS. ZEDALIS:  I couldn't

3          come up with it.

4                MR. SEEGER:  We don't need

5          it for today.

6                MR. WEITZ:  Cynthia, Chris

7          and I know your involvement in New

8          Jersey.  Our firms worked with you

9          guys.  As Turner said, you

10         attended all the conferences, you

11         had cases that you were pushing

12         for trial.  Explain to everybody

13         else about your 11 cases and what

14         waves they were in within Higbee's

15         court, if you had any that were

16         fully prepared for trial.

17               MS. ZEDALIS:  They were

18         identified.  We had 11 cases on, I

19         think it was the first wave or

20         second wave trial calendar.  They

21         were supposed to go in March of

22         2008.  They were identified by

23         Judge Higbee as trial cases, I

24         believe, in December of 2006.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
1        we had 11 clients, New Mexico
2        residents with heart attacks, and
3        a lot of time was spent reviewing
4        all of the records produced by
5        Merck.
6            MR. BRANCH:  You might
7        address the depositions like
8        Senator Altamirano and Mary
9        Velasquez.  The 11 we had, you
10       might just talk about depositions,
11       and we were back for a couple of
12       months doing depos, and we can
13       tell you about that.
14           MS. ZEDALIS:  One of the
15       lawyers in our office, Frank
16       Baldaramo, he had packed a bag for
17       three days, he was supposed to
18       attend one deposition in Cherry
19       Hill, I think it was in your
20       office, and he started buying his
21       clothes at Wal-Mart.  He was
22       there, I think, for
23       four-and-a-half weeks defending
24       depositions for our clients.  So,
```

FAC Resp. Exhibit D -- 1360

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          a lot of time was spent on those

2          11 trial cases, and we were ready

3          to go on those, including meeting

4          with the clients, talking to the

5          doctors, getting the hospital

6          records, traveling to -- I believe

7          all the depositions were conducted

8          in either Philadelphia -- I think

9          Ben Altamirano, who was our state

10         Senator, who is deceased now, and

11         Senator Pro-Tem of the New Mexico

12         State Senate, had a heart attack

13         after taking Vioxx, and he and his

14         wife both went and spent a few

15         days.

16              MR. BRANCH:  And the same

17         with the Velasquez family and the

18         others.

19              MS. ZEDALIS:  I can't

20         remember all the names off the top

21         of my head, but there were 11

22         clients, and they were all deposed

23         either in New Jersey or

24         Philadelphia.

FAC Resp. Exhibit D -- 1361

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

 1            MR. BRANCH:  James Frazier
 2        from Roswell, and we had 11 that
 3        were put up for trial that were
 4        accepted.  We had more than that,
 5        but they were found for various
 6        reasons not to be representative
 7        clients that should be put up for
 8        trial at the time, and we ferreted
 9        those out.
10            Ben Altamirano, the Senator,
11        was going to be one of the first
12        cases.  He was an excellent
13        plaintiff.  As Cindy said and I
14        started to say earlier, he was the
15        President Pro-Tem of the State
16        Senate of New Mexico and had been
17        in the Senate for 47 years.  I
18        think he would have made an
19        excellent exemplar plaintiff.  He
20        was great, and his wife was
21        wonderful too.
22            Mary Velasquez -- well, all
23        of them we put up were acceptable
24        because they were ferreted by

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1362

Page 23

1           various and sundry people to be

2           acceptable because we had a lot of

3           rejects, too, of course that

4           weren't acceptable.

5                We did work those cases up,

6           and I think, as Cindy said, they

7           were going to be going.  Chris,

8           you and Perry can tell us more

9           exact, but I think they were going

10          to be in a wave that started

11          February or March.

12               MR. WEITZ:  That's right.

13               MR. SEEGER:  That's right.

14               MS. ZEDALIS:  Actually, the

15          11 cases that were selected, we

16          had the most of any firm with

17          representative clients in New

18          Jersey.  Our firm did.  That took

19          a large chunk of time.  I believe

20          we had cases set on the second

21          wave also, but thanks to you nice

22          people, the case settled.

23               MR. BRANCH:  We had a case

24          also set with judge -- is it Randy

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          Wilson in Texas?  Mr. Lanier knows

2          about this, because we were

3          getting help from them and Tommy

4          Fibich.  But that case, of course,

5          when the judge granted his order

6          to take everything north to Austin

7          because of preemption, that case

8          went with him.  I think we had 206

9          Texas cases with --

10              MS. ZEDALIS:  Almost 200,

11         197 in the Texas MDL.

12              MR. BRANCH:  Cindy, anything

13         else you want to highlight or any

14         questions we can answer?

15              MR. BLIZZARD:  Turner, you

16         said that you had co-counsel

17         cases?  I think you said most of

18         your cases --

19              MR. BRANCH:  Most all of our

20         cases were co-counsel with

21         referring attorneys.

22              MR. BLIZZARD:  So, you have

23         referring attorneys?

24              MR. BRANCH:  Yes, we do.  We

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          have to share on the fees.

2                  MR. BLIZZARD:  Isn't that a

3          terrible thing?

4                  MR. BRANCH:  It is not so

5          bad.

6                  MR. SEEGER:  Thank you.

7          Always great seeing you.

8                  MR. BRANCH:  Good to see

9          everyone.

10                        -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number: 1060147

23          Notary Expiration: 1.2.10
            CCR Number: 30X100176200

24

FAC Resp. Exhibit D -- 1366

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:         THE SNAPKA LAW FIRM
              Kathryn Snapka, Esquire
              Anita Shahani, Esquire

BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. BIRCHFIELD:  Kathy, we
 3      appreciate you being here.  As you
 4      know, everything is being
 5      transcribed.  Judge Fallon wanted
 6      to make sure that everybody is
 7      aware of the Murphy Oil decision
 8      and the criteria that he's set out
 9      in that order.  Transparency is
10      key, and so we have a transcript
11      that will be available for his use
12      for whatever he decides is
13      appropriate.
14            Know that everything is
15      being taken down, and the floor is
16      yours.
17            MS. SNAPKA:  Great.
18            As I hope y'all remember, I
19      was involved in Vioxx back -- I
20      started in 2003.  I was initially
21      contacted with regard to four
22      cases, Benavides, Eller, Zajicek
23      and -- three cases and Garza.  I
24      became involved in Garza in 2004,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          but I'll get to that in a second.

 2               Do I need to attach by

 3          reference my affidavit and the

 4          cover letter to the hours,

 5          incorporate this?

 6               MR. HERMAN:  No.

 7               MS. SNAPKA:  I didn't know

 8          how formal we were being about

 9          that sort of thing.

10               I started in 2003 to

11          investigate the medical causation

12          and had many conversations with

13          experts that I had used before,

14          people literally in the field with

15          their experiences with marketing,

16          the heavy-handed marketing that

17          was done.  Zajicek looked to be

18          the best case.  It was a good case

19          with no risk factors in a

20          favorable venue, and I began

21          preparing -- I filed my cases and

22          began preparing Zajicek for trial.

23               In the meantime, because

24          I've worked with them for years,
```

Page 4

1          the law firm of Hockema Tippit &

2          Escobedo, as they were known at

3          the time, I was talking to David

4          Hockema, and David said his

5          partner, Joe Escobedo, was working

6          on a Vioxx case in Starr County,

7          and they were further along than I

8          was.  He said, you've done

9          pharmaceutical litigation, because

10         I had done a fen-phen case, and he

11         said, why don't you try the case

12         with us.  So, I said, that was

13         fine, I would bring what I had,

14         they would bring what they had.

15             I talked to Joe about the

16         depositions, the corporate

17         depositions that he had done.  One

18         of the things that was happening

19         was, particularly when Shelly was

20         taking the depositions, they were

21         saying, I don't know, I'm not

22         sure, you would have to talk to

23         somebody else who would know that.

24         So, Joe was actually one of the --

Page 5

1          he was the first person to take

2          Bold, Tacconi, Silverstein and, of

3          course, Santanello.  He was the

4          first one to take the documents we

5          had distilled from the production

6          and take those depositions first.

7          I think they became obviously

8          critically important later.

9          Santanello was used in both Mark's

10         trial with the corporate rep and

11         in the Garza trial as the

12         corporate rep.

13              We prepared Garza and had a

14         trial setting, and we were getting

15         the case ready for trial.  It was

16         set for trial in November of 2004.

17         As you all know, it was removed,

18         remanded, and then I got the

19         Zajicek case -- as I said, I was

20         working both Zajicek, Eller, and

21         Benavides was not a strong case, I

22         did some research into it, but it

23         was not -- the plan was to try

24         Garza first and then to try

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          Zajicek.

2               MR. BIRCHFIELD:  Where was

3          Zajicek pending?

4               MS. SNAPKA:  It was in

5          Jackson County, Texas.  As you

6          know, Andy, it was the case where

7          we went and visited with the

8          medical examiner, and he actually

9          was able to -- kept the blood and

10         was able to run it some years

11         after her death and found

12         rofecoxib in the blood.  So, I

13         think that had an impact, I

14         understand later on, from what you

15         told me.

16              MR. BIRCHFIELD:  There's a

17         clause in the settlement agreement

18         just for that case.

19              MS. SNAPKA:  That's right.

20         I never understood why other

21         people didn't do the same test,

22         because I thought it would be very

23         instructive on cases where

24         autopsies were performed and blood

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        was retained, but anyway, they may

 2        have.

 3             So, we were prepared for

 4        trial, we were ready to go to

 5        trial, and Merck got a continuance

 6        granted in November of 2004.  We

 7        got a resetting for February of

 8        2005.  And after the withdrawal --

 9        I'm just going to go in sequential

10        order because it is more logical

11        for me to do that.

12             At the time of the

13        withdrawal, I knew that Vioxx was

14        going to be important litigation.

15        And so what I did was, I had

16        already been in contact with

17        Shelly, I knew that she was

18        working with you, Mark.

19             MR. BIRCHFIELD:  Shelly

20        Sanford?

21             MS. SNAPKA:  Yes.  And

22        actually had been out to visit

23        David.

24             MR. BIRCHFIELD:  David
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        Miceli?
 2              MS. SNAPKA:  That's right.
 3        David Miceli.  And so what I did
 4        was, as far as Texas was
 5        concerned, knowing from the
 6        fen-phen litigation that the Texas
 7        litigators would be and should be
 8        out front in this litigation, I
 9        set up a meeting at the Four
10        Seasons Hotel in October of 2004
11        and tried to get everybody I could
12        think of and encourage them to get
13        everybody they could think of so
14        that we could share the
15        depositions, the theories, what we
16        knew from preparing for the Garza
17        trial.
18              I remember I talked to Maura
19        from your office, Mark, and you
20        were in trial, and I think we
21        moved it, but y'all still weren't
22        able to make it, unfortunately,
23        for that meeting.
24              MR. LANIER:  Nine week
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          trial.

2              MS. SNAPKA:  We had probably

3          40 people, and I thought that was

4          important to get everybody

5          together and everybody connected,

6          show them what we had and make

7          available what we had learned

8          through the deposition process,

9          but most importantly, the

10         documents that we had gleaned from

11         going through the millions of

12         pages of production as y'all are

13         aware.

14             I organized another meeting

15         December 8th, and I was trying to

16         remember -- one of the things I

17         would like to point out is the

18         hours I reconstructed are only

19         attorney hours.  The legal

20         assistant, who was my prime legal

21         assistant during this time period,

22         left to go sell real estate.  I

23         did not feel competent that I

24         could accurately represent legal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        assistant time, so, for the time
 2        period that I've submitted, those
 3        are only attorney hours, period.
 4        Nothing else.
 5             In any event, I know that
 6        you and Paul, Andy, you and Paul
 7        Sizemore came to one of the
 8        meetings that we had in Houston
 9        because I was trying to get
10        everybody that I could think of
11        together so that we could share
12        and present a unified and united
13        front.
14             I was also desperately
15        trying to get the Garza case to
16        trial because I knew the case, I
17        knew the case well, I knew that it
18        was in a really great venue, and
19        even though there were a lot of
20        risk factors which I thought was
21        critical to push that case for
22        trial, because it would
23        demonstrate that the target group
24        for Vioxx was going to be the most
```

FAC Resp. Exhibit D -- 1376

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1         affected, and I knew that we could

2         make that case based upon the

3         distinct fact pattern of Garza.

4               As you know, the MDL was

5         created, Merck removed it again,

6         less than 30 days before trial,

7         and everything sort of ground to a

8         halt at that time.

9               MR. BIRCHFIELD:  Just so you

10        know, Kathy, we just met with Joe

11        Escobedo, and Russ outlined for

12        him your tremendous effort, the

13        effort that both of y'all made in

14        getting that case remanded.  Joe

15        took us through the timeline of

16        the incredible struggle, the

17        timeline of getting that case

18        remanded and getting it sent back.

19        Let me tell you what Russ said to

20        Joe.  I mean, your effort in

21        getting that case remanded was

22        spectacular.  You dogged it all

23        the way.

24              MR. HERMAN:  I thought you

FAC Resp. Exhibit D -- 1377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1        were tenacious, persistent, and
 2        without you pushing that at every
 3        PSC meeting and every status
 4        conference, that case might still
 5        be lingering now.
 6             MS. SNAPKA:  Thank you very
 7        much.  I appreciate that
 8        recognition.  It means a lot to
 9        me.
10             MR. BIRCHFIELD:  Joe
11        provided us with a detailed
12        timeline of the Garza case.
13             MS. SNAPKA:  I will say that
14        Joe is a tremendous lawyer, and he
15        is the one who literally looked at
16        every page of that production when
17        we were putting the case together.
18        I can't say enough about what he
19        personally did as far as getting
20        that prepared.  We were
21        prepared -- that was what was so
22        frustrating for me personally, is,
23        we were prepared to go to trial.
24        We were ready to go, and then we
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          did go.

2                  In the meantime, what I was

3          doing was continuing -- I was

4          named by the Texas Supreme Court

5          as the plaintiffs' liaison

6          counsel, and then I continued in

7          that role, and we had -- and I

8          don't want to misrepresent, but it

9          was the first or second hearing I

10         think I was replaced by Tommy

11         Fibich as liaison, which certainly

12         made sense, because Tommy is in

13         Houston.  But I continued on the

14         Texas MDL, flying back and forth

15         and trying to push four trials.

16                 In the meantime, I had

17         referred many other cases and

18         wanted to pick the best cases to

19         try.  In that mix was the Nettles

20         case, which was a young man who

21         suffered a catastrophic stroke.  I

22         was developing that case, meeting

23         with his neurologist, meeting with

24         his treating physicians,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          proceeding with what I could

2          there.

3              I was also working on

4          Zajicek, because it was not

5          constrained by any of the Texas

6          MDL.  After we got it back out of

7          the Texas MDL, both Eller and

8          Zajicek, since they were pre-MDL

9          cases, both of those cases were

10         not subject to the constrictions

11         of time on either of the Texas MDL

12         or the federal MDL.  So, we

13         continued to pursue discovery,

14         retention and consultation with

15         experts.  And while we sought

16         remand -- Russ, you were there at

17         the emergency motion for remand in

18         July of 2005.  And then, of

19         course, your unfortunate

20         experience with the hurricane sort

21         of brought that to a standstill.

22             But we continued on with

23         discovery in Nettles and Zajicek.

24         And then of course in November, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1          got the great news that Garza got

 2          the remand.

 3              And honestly from that point

 4          until we got the verdict, that was

 5          what we did.  We prepared for

 6          Garza, and I'm sure if -- I don't

 7          want to duplicate what you've

 8          heard, but we have an odd system

 9          in Starr County where you start

10          trial for a week --

11              MR. LEVIN:  We heard.

12              MS. SNAPKA:  It is not like

13          you can say, okay, I'm going to

14          take a break and go try another

15          case and then come back.  So, what

16          you do is you get your daily copy,

17          and you plan what you are going to

18          do next.  There was a week in

19          there that is not accounted for

20          when my son had a tonsillectomy in

21          Houston.  Other than that -- other

22          than the tonsillectomy, I was back

23          at it.  And we stayed with the

24          Garza trial, and I outlined what

FAC Resp. Exhibit D -- 1381

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          we did.  I selected the jury, I

2          put on our cardiologist, I

3          cross-examined Dr. Wheeler, I put

4          on a plaintiff or two, and I was

5          supposed to cross-examine Dr.

6          Reicin.  And I kept asking over

7          and over again, are you going to

8          bring her?  And that's the one

9          case they didn't bring her in.

10         So, I didn't get to cross-examine

11         her, which was a huge

12         disappointment to me.

13              After that, sometime during

14         that time period, they had

15         selected Arnold and Gomez for a

16         preemption motion, and I told

17         Anita to drop everything and begin

18         briefing.  We had briefed quite a

19         lot of it because she had filed

20         several responses in other cases,

21         and then we started to coordinate

22         with your office, Arnold.  I know

23         I was very protective because my

24         feelings always --

Page 17

        1           MR. LEVIN:  It was your
        2      client.
        3           MS. SNAPKA:  It is my client
        4      and my case, and I appreciate very
        5      much the assistance, but I also
        6      appreciate the fact that I was
        7      allowed to speak and certainly
        8      present the facts.
        9           MR. LEVIN:  Collectively, we
       10      did it.
       11           MS. SNAPKA:  Collectively,
       12      we did it.
       13           Then when Nettles was
       14      removed, again, I was there to try
       15      and pull Nettles back because it
       16      was the double remand case.  Andy,
       17      you had some double remand cases,
       18      and my goal was to get these cases
       19      back to demonstrate that Merck was
       20      simply trying to avoid going to
       21      trial and would do anything.  I
       22      have the transcripts where it was
       23      discussed.  Even though it never
       24      got remanded, I was there in my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          spot to try to get them remanded.

2              Zajicek proceeded, and we

3          actually -- the first trial

4          setting for Zajicek was actually

5          October of 2005.  Since the plan

6          was to try Garza first, we ended

7          up moving the Zajicek trial.  It

8          was set for trial in February of

9          2008.  It was set for trial at the

10          time that the settlement was

11          announced.

12              At the point at which

13          Zajicek -- where we were was, we

14          were going to do some genetic

15          testing on Vanessa Zajicek's blood

16          to eliminate the genetic tendency

17          toward arrhythmia because we

18          believed she didn't have it.  So

19          we were actually scheduled for a

20          hearing at the end of November on

21          the testing of the blood to again

22          eliminate that as a possibility

23          for her arrhythmia and sudden

24          cardiac death.

FAC Resp. Exhibit D -- 1384

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1                I was under the impression

2           that I was supposed to just stop

3           at November 9th, and I could be

4           wrong about that.

5                MR. HERMAN:  Well, why don't

6           you tell us since November 9 what

7           activities you've had.

8                MS. SNAPKA:  The primary

9           activity, honestly, I believed --

10          I was sitting in court when the

11          settlement was announced.  Of

12          course, I had no idea --

13          everybody was rumoring, and there

14          were people calling me saying send

15          us all of your cases, there's

16          going to be a settlement or

17          whatever.  So, as the settlement

18          was being explained, the one thing

19          that concerned me greatly was the

20          requirement that the attorney was

21          obligated to recommend the

22          settlement to all clients.  I

23          believed in my heart that that was

24          a violation of Texas ethics.  And

FAC Resp. Exhibit D -- 1385

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          although I was clearly not part of

2          the plaintiffs' negotiating

3          committee, I believed that I had a

4          duty and responsibility to say

5          something.  I understood that Lynn

6          Baker had been retained, and so I

7          was the one that called Charlie

8          Silver, the professor who hired

9          Lynn Baker, and I said, I need you

10          to review this.  I had a

11          conversation with Ed, and Ed kept

12          saying no, no, it is okay, we

13          talked to Lynn about it.  I

14          nonetheless wanted independent

15          confirmation that the settlement

16          was as good as it could be and

17          that everybody in the nation

18          could, without reservation,

19          participate in the settlement.

20                So, I personally retained

21          Charlie Silver, and then within a

22          day or two, Tommy Fibich joined me

23          in retaining Charlie Silver.  Then

24          there were several other people

FAC Resp. Exhibit D -- 1386

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          who also, we discussed it.  We

2          went to New Jersey and met with

3          Judge Higbee.  I believe that

4          there were some --

5              MR. SEEGER:  Which I

6          arranged for you.

7              MS. SNAPKA:  Absolutely,

8          Chris, thank you very much.  What

9          I appreciated from the committee

10         was that even though it was

11         difficult to discuss, that I think

12         everybody kept in mind that what

13         we were trying to do was to make

14         this settlement one that everyone

15         without reservation could enter

16         into and not feel that they had

17         any qualms whatsoever about it,

18         and I think we ended up

19         accomplishing that.

20             MR. BIRCHFIELD:  Your

21         initial reaction is certainly

22         understandable.  You got the

23         settlement agreement, and it had

24         to be for all clients.  But what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          you were not able to distill at

2          that moment is that we had been

3          working for 11 months to make sure

4          that it would be a settlement that

5          would work and would be in the

6          interest of every client

7          regardless of risk factors and all

8          of that.  And so that's why your

9          reaction was understandable.

10              MR. HERMAN:  Let me add what

11         I said earlier today in another

12         presentation.

13              First of all, throughout our

14         negotiations, Ed Blizzard was in

15         the forefront particularly in

16         terms of the Texas potential

17         ethics situation.  There wasn't

18         anything put on paper without the

19         retention of three ethics experts,

20         and Lynn Baker, actually, along

21         with two other ethics experts,

22         drafted the language of the

23         agreement.

24              Once the agreement went into

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          effect and Judge Higbee, Judge

2          Fallon and Judge Chaney looked at

3          it and it passed muster with them,

4          our collective feeling was not

5          that the lawyers in Texas were out

6          of line in getting the ethics

7          opinions that they needed to

8          satisfy themselves and their

9          clients.

10              MR. SEEGER:  I agree with

11         that, by the way.

12              MR. HERMAN:  We had a full

13         day meeting in Atlanta.  I believe

14         that Professor Silver was there.

15         I know that also they brought

16         Harry Potter in.  So, I want you

17         to know that we don't have an

18         adverse reaction at all to that

19         being done.  As a matter of fact,

20         once the Texas concern, legitimate

21         concern, was resolved --

22              MR. SEEGER:  I have to stop

23         you there, because there's

24         something very important, Kathy,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          I'm sorry, but just because we are

2          making a record.

3             The agreement had not been

4          changed.  There are people that

5          have this impression.  It says

6          exactly what it says.  It says

7          exactly what we intended it to

8          say.  I think at the end of the

9          day, what happened was, we had

10         some letters passed around, some

11         documents clarifying, saying this

12         is how we understand this.

13             MS. SNAPKA:  The

14         interpretation.

15             MR. SEEGER:  That was really

16         because you guys had a concern

17         with it.  But the document, we

18         were very comfortable in the

19         beginning and still are.  This

20         sounds like a technicality --

21             MR. HERMAN:  After the

22         various points were expressed, it

23         not only had a good effect and a

24         better understanding for Texas,

Page 25

1         but also for the country.  Because

2         there were other folks from other

3         states that were looking for a way

4         to criticize, and they had sort of

5         latched on to this issue.  When it

6         was resolved and the document was

7         fully understood, it went away for

8         everybody.

9              MS. SNAPKA:  And I know I

10        wasn't popular.  I understand

11        that.

12             MR. LEVIN:  You were never

13        not popular.

14             MR. SEEGER:  I hope we're

15        not leaving you with that

16        impression, but you were very

17        helpful.

18             MS. SNAPKA:  To the simple

19        extent that we are talking about

20        common benefit work done, I would

21        hope that my concerns and my

22        actions that I took in hiring

23        Charlie initially and then getting

24        everybody together to talk about

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          it were viewed as ultimately

2          beneficial.  That's my purpose in

3          discussing it.  That's all I'm

4          saying.  That's what I meant.

5                MR. LEVIN:  We understand.

6                MR. HERMAN:  I think you can

7          be assured of that.

8                MS. SNAPKA:  Because you

9          said, go ahead and talk about what

10         it was after that.  That's what I

11         would say, is whatever I did

12         initially and ultimately in

13         working with everybody to get it

14         to where it is right now.  That's

15         what I'm trying to say.

16               MR. BIRCHFIELD:  Kathy, how

17         many cases have you submitted to

18         the settlement program?

19               MS. SNAPKA:  All of my

20         clients elected to go into the

21         settlement program, which is 87.

22               MR. WEITZ:  Other than

23         Nettles and Zajicek, did you have

24         any other cases that were on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
1          trial --
2               MS. SNAPKA:  Yes.  Eller.
3          In fact, what's really funny is,
4          Eller is still set for trial.
5          That's a very interesting one.
6          And I talked to Phil Wittmann
7          after that to say, you reported no
8          trial settings, but we actually do
9          have a trial setting in Eller.
10         It's a quirk, but, yes.  Eller has
11         been and continues to be set for
12         trial.
13              MR. BIRCHFIELD:  Have you
14         submitted Eller in the settlement?
15              MS. SNAPKA:  Yes.  Eller is
16         submitted, but the judge refused
17         to dismiss it while the settlement
18         was pending because --
19              MR. BIRCHFIELD:  In case it
20         doesn't pass the gates?
21              MS. SNAPKA:  That's correct.
22              MR. BLIZZARD:  Where was
23         Nettles pending?
24              MS. SNAPKA:  It was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          originally filed in Beaumont, and

2          then it was removed to Federal

3          Court.  Judge Crone remanded it.

4          It went back to Beaumont, to

5          Jefferson County, and then it went

6          into the Texas MDL where it was

7          removed again, and then it was in

8          the Federal MDL.  But there was

9          extensive discovery done on the

10         case.  Nettles was one of the

11         cases that was a Texas pick for

12         stroke.

13              MR. BLIZZARD:  But it was in

14         the Federal MDL ultimately?  Where

15         was it in terms of discovery when

16         it was removed the last time to

17         the federal MDL?

18              MS. SNAPKA:  The treating

19         physician, we had retained the

20         experts and designated them, the

21         case specific experts.  I believe

22         the case was removed at that time.

23              MR. BLIZZARD:  Depo of the

24         plaintiff.  Were there depos of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          other experts?

2                   MS. SNAPKA:  Only of the

3          treating/prescribing physician,

4          who had given him the Vioxx.

5                   But to the extent that there

6          were double removal cases, and I

7          was, again, trying to demonstrate

8          a pattern with Merck trying to

9          avoid trials, I was up there every

10         time being annoying.

11                  MS. SHAHANI:  Or dispatching

12         me to do that.

13                  MS. SNAPKA:  If I couldn't

14         be there.

15                  I believe that anything post

16         November 9 is pretty much taken

17         up -- I've already discussed the

18         issues, and that would be the only

19         thing that I would be submitting

20         additionally.  I don't know if I

21         can or will and whatever.

22                  MR. BIRCHFIELD:  Any other

23         questions?

24                  MR. SEEGER:  No.

FAC Resp. Exhibit D -- 1395

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1              MR. BLIZZARD:  I was just

2         going to point out that currently

3         your hours are under review by the

4         accountant at least according to

5         this report that we have, and the

6         expenses are being shown as being

7         under review also.  Is there

8         anything we can do to help with

9         that?

10             MR. LEVIN:  He's probably

11        working on that because if you

12        were in trouble, they would be

13        rejected.

14             MS. SNAPKA:  That's good to

15        know.  Let me just say that --

16             MR. BIRCHFIELD:  Don't panic

17        if you get a rejection letter.

18        Just respond quickly and get us

19        involved.  It has happened quite

20        frequently.  You just need to work

21        at it.

22             MR. SEEGER:  We'll give you

23        Arnold's cell phone number.

24             MS. SNAPKA:  I think I have

Page 31

1      it, actually.

2              One of the things they did

3      do is they rejected all of my

4      hours prior to the MDL, and I went

5      nuts.

6              MR. SEEGER:  They did with

7      me too, though.  We all went

8      there.

9              MR. LEVIN:  They were

10     working under guidelines of the

11     MDL.  And then when all the state

12     litigants came in, it took them a

13     while to get oriented.

14             MS. SNAPKA:  I'll let y'all

15     know.

16             In 28 years of practicing

17     law, what I found with every type

18     of case is that corporations will

19     recognize, assess and contain

20     their risk only after trial or if

21     there's a threat of trial or

22     during trial.  I say that as a

23     perspective from a trial lawyer.

24     I was trained at Baylor like Ed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1           was, and they taught us to try

2           cases.  That's all I know how to

3           do.  I'm not good at the other

4           stuff.  That was the one thing

5           that I thought, as far as a common

6           benefit, was they had me sort of

7           as a loose cannon out there.

8           Every time I possibly could, I was

9           going to push for a trial.  That's

10          where I was headed.  My only

11          regret is I didn't get to try more

12          cases.

13                Do y'all have any questions?

14                MR. SEEGER:  I think we

15          asked them.

16                MS. SNAPKA:  Thank you.

17                MR. BIRCHFIELD:  Thank you,

18          Kathy.

19                      -   -   -

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 1399

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          WHITE & WETHERALL, LLP
               J. Stewart White, Esquire


BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2              MR. SEEGER:  As you know,

3          we're the Vioxx fee committee.

4          We've got a court reporter taking

5          everything down because Judge

6          Fallon at some point may want to

7          take a look at the transcript.

8          You can say and do anything you

9          want.  The floor is yours to

10         present any way you want.

11              You should probably state

12         your name for the record and tell

13         us your common benefit

14         contributions.

15              MR. WHITE:  I'm Stewart

16         White from the law firm of White &

17         Wetherall in Reno, Nevada.  It

18         used to be White Meany &

19         Wetherall, but we got rid of

20         Meany.

21              You will be happy to hear

22         that I had nothing whatsoever to

23         do with Barnett.

24              MR. SEEGER:  I'm very happy

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          to hear that.

 2                  MR. WHITE:  I've just got a

 3          ten-minute analysis of the factors

 4          of 6(D) that I think applied, and

 5          I'll be kind of businesslike and

 6          right to the point.  I want to

 7          thank you for your time in doing

 8          all of this.  I know it's got to

 9          be hard for you.

10                  But our case, as you

11          probably know, did not actually go

12          to trial.  It was scheduled very

13          close in October of '07 --

14                  MR. WEITZ:  What was the

15          name of that case?

16                  MR. WHITE:  Crandall versus

17          Merck.

18                  We weren't on any of these

19          plaintiff committees.  We are on

20          the HT governing committee, but

21          there's four of us attorneys, so

22          we can't be on every one of them.

23          Nevertheless, I feel that our

24          pending Crandall case was one of
```

FAC Resp. Exhibit D -- 1402

Case 2:05-md-01657-EEF-DEK   Document 62655-3   Filed 03/02/11   Page 1403 of 1432

Page 4

1       many factors that must have gone

2       into the decision of Merck to

3       settle all the cases.  We were

4       just working them and pounding

5       them on this Crandall case with

6       great vigor from January '07, when

7       we selected it, all the way up to,

8       even past October of '07, right up

9       until the time the settlement was

10      announced.

11              The Court authorized in 6(D)

12      some appropriate -- the applicable

13      state courts for common benefit,

14      and that's me.

15              MR. WEITZ:  Did you have a

16      trial date?

17              MR. WHITE:  Yes.  October 1,

18      '07.

19              MR. BLIZZARD:  What

20      happened?

21              MR. WHITE:  When that Oxford

22      study came out -- my co-counsel

23      was Mark Robinson and all of his

24      people.  When that Oxford study

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      came out, what was it, VICTOR or

2      something, there was a lot of

3      additional good information in

4      that that Mark -- and it came out

5      in July or something, and we

6      wanted to make this one perfect,

7      and we stipulated to a

8      continuance.  We reset it for June

9      of the following year.  But we

10     kept working and deciding motions

11     even after that.  We didn't just

12     drop it.  We kept going.

13          MR. BLIZZARD:  So, the

14     VICTOR study came out in June.

15          MR. WHITE:  I don't know,

16     wasn't it June or July or

17     something like that?

18          MR. BLIZZARD:  Did you seek

19     a continuance around that time?

20          MR. WHITE:  Right.  Right.

21          MR. BLIZZARD:  It was in

22     Reno?

23          MR. WHITE:  Reno, Nevada.

24          Anyway, the affidavit

FAC Resp. Exhibit D -- 1404

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1       factors.  One is -- the first one,

2       it says the extent to which my

3       firm made a substantial

4       contribution to the outcome.

5       Basically, that's so general, you

6       have to look at all of the other

7       factors.  It was selected in early

8       '07 by us for trial.  It was set

9       initially for June of '07 in a

10      prior case's spot, but we had a

11      lot of work done then basically on

12      Crandall, just concentrating on

13      that one case from January '07 --

14      December '06 on.  The defendant

15      got the trial moved back from June

16      '07 to October 1, '07, but we used

17      that additional time to prepare

18      even more.

19          The other factor, quality of

20      our firm's work.  Basically, they

21      did not win, Merck did not win one

22      motion of any substance whatsoever

23      during this entire litigation.

24      They only had two successes

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          really.  One is that they got that

2          trial moved back from June 20th of

3          '07 to October 1, a very short

4          period of time, not the several

5          many, many months they wanted

6          because of all of this pending

7          litigation.  The Court granted

8          their motion to stop my brother

9          from making so many speaking

10         objections at the doctors'

11         depositions.  That was it.  That

12         was the only two won.

13              This is the quality I want

14         to talk about.  We maneuvered

15         first to get all of the Reno Vioxx

16         cases before an experienced trial

17         judge.  Our firm was the only one

18         that was doing Vioxx in Nevada

19         basically.  We had some cases in

20         Reno or northern Nevada and some

21         cases in Las Vegas.

22              There was one other

23         attorney, Will Kemp, some of you

24         may know him, from Kemp &

FAC Resp. Exhibit D -- 1406

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          Harrison.  He had some Vioxx

2          cases, but he said they were

3          really bad cases, so you go first.

4          So, we were going first, and we

5          did.

6              We got in front of an

7          experienced Judge Brent Adams with

8          whom we had other successes.  He

9          knew we were competent in drug

10         litigation.  He trusted us.  The

11         local defense counsel from Merck

12         was from Las Vegas.  The judge

13         didn't really know them.  The

14         other defense counsel were

15         primarily guys like Andrew Rudge

16         and Paul Boehm and David Blatt

17         from Williams & Connolly.  At some

18         depositions they would send people

19         from Venable in D.C. and Fulbright

20         & Jaworksi, I don't remember who,

21         Cooley Godward Kronish, Sedgwick

22         Detert, Hughes Hubbard & Reed.

23         They were paying a lot of

24         attention to the case, I think.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1              So, from the very beginning,

 2         they wanted a role in selecting

 3         the bellwether cases.  We did not

 4         let them have a role.  The judge

 5         denied them.  We told the judge

 6         that we had a burden of proof, we

 7         get to pick the case that goes

 8         first, and we picked them.

 9              MR. WEITZ:  That's a good

10         way to approach it.  I wish more

11         judges would do that.

12              MR. WHITE:  There's a lot of

13         good reasons.  I read all those

14         bellwether arguments.  There's

15         lots of good reasons to do it the

16         other way besides the way we did

17         it.  So far we have been able to

18         keep that out of Nevada in our HT

19         litigations and fen-phen and

20         everything else.  We just show him

21         that's the way we've always done

22         these mass torts, and they keep

23         doing it every year from then on.

24         I'm certainly not criticizing the
```

FAC Resp. Exhibit D -- 1408

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          way it works in the other

 2          jurisdictions because there are

 3          just some things that have to

 4          happen like that.

 5                MR. WEITZ:  I think we wish

 6          that in all jurisdictions.

 7                MR. WHITE:  That's what we

 8          did.

 9                And then the Court didn't

10          set the case out for two years

11          like they wanted to set it out.

12          They set it real quickly.  Then we

13          won all the other arguments, from

14          the timing of the sales rep

15          deposition, to using expert

16          reports on general causation that

17          were in the other litigation in

18          Nevada, using already decided

19          expert depo designations and

20          exhibit foundations from -- like

21          Robinson's case in Berwick in

22          California and the MDL.

23                My impression, basically, we

24          kept them pretty much on their
```

FAC Resp. Exhibit D -- 1409

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        heels the whole time from January
 2        '07 until October of '07, November
 3        '07 when the settlement was
 4        announced.
 5              MR. WEITZ:  What was the
 6        division of work between your firm
 7        and Robinson's firm?
 8              MR. WHITE:  Basically, as
 9        you can see from the time, it
10        worked out 60 percent our work, 40
11        percent Mark's work.  They were
12        just invaluable along with Andrews
13        & Thornton in getting experts.
14        They had gone through the trial.
15        They knew the evidence.  They knew
16        all of those hundreds of thousands
17        of documents and which ones were
18        the best hot documents to use.
19        So, they were in charge basically
20        of getting our experts, of
21        handling all of our experts.  I
22        don't remember all their names.
23        Abramson and some of the others
24        that Mark Robinson's firm used and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           Andrews & Thornton's firm used.

2           They assisted in the treating

3           physicians' depositions even to

4           the point of coming over sometimes

5           and helping us prepare them for

6           the depositions, but not on all of

7           them.

8               And then at trial basically

9           I was going to be doing like a lot

10          of the local people, my clients,

11          some of the smaller doctors, the

12          local doctors.  If they were

13          experts, Mark's firm's people were

14          going to handle them.  We had just

15          innumerable people at our disposal

16          from Mark's firm, and they helped

17          quite a bit as well.

18               Anyway, there's another

19          three factors I'm going to put

20          together, that one about

21          consistency, amount, duration and

22          intensity to the litigation,

23          commitment, level of partner

24          participation, and activities

Page 13

1        surrounding the individual trials,

2        including non-MDL bellwether

3        trials that impacted proceedings.

4        The consistency, amount and

5        duration you can see from our time

6        sheets.  I've got like 1500 hours

7        in this from January until we

8        stopped.

9            My partner, Geoff, my

10       brother also, was involved in the

11       successful motion to remand the

12       Crandall case after Merck removed

13       it on the grounds of fraudulent

14       joinder.  We sued Merck and about

15       11 Merck sales reps that were from

16       Nevada in order to defeat federal

17       diversity jurisdiction.  We got

18       their names from a source that we

19       had that was a sales rep in the HT

20       litigation, and so we knew they

21       were Nevada people, and of course

22       they removed it on the grounds of

23       fraudulent joinder.  Geoff did all

24       of that work in June and August of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          '05 on this case, Crandall.

2              We filed 20 lawsuits with

3          about five or six plaintiffs plus

4          their spouses in each case and

5          tried them all together.

6              MR. WEITZ:  How many total

7          cases?

8              MR. WHITE:  We had about 106

9          cases after we carefully vetted

10         them all.  We still have about 93

11         or 94 in the settlement that are

12         going through the settlement.

13             MR. WEITZ:  Did you file

14         them all in Reno state court?

15             MR. WHITE:  We filed about

16         half in Reno and about half in

17         Vegas.  If they lived in the

18         southern Nevada area, that's where

19         they went.  If they lived in

20         Carson City, little towns around

21         Reno, they went to Reno.

22             But Geoff did all that work,

23         and he was specifically involved

24         in all the treating doctors'

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          depositions, preparing them for
 2          depositions, attending some of
 3          them in April and June of 2007,
 4          went to all the status conferences
 5          with the Court, attended the
 6          meetings, a lot of the meetings we
 7          had with defense counsel and
 8          co-counsel.  That's that partner.
 9               David Meany, my partner,
10          became more deeply involved in it
11          when fen-phen slowed down a little
12          bit in the treating doctor depos
13          and a lot of those sales rep
14          depositions.  But he's a very good
15          researcher and writer, and he
16          handled all of that motion
17          practice that Merck just throws at
18          you continually.
19               Partner, Peter Wetherall,
20          was in Vegas.  He had pretty
21          peripheral involvement because we
22          had that HT trial coming up also
23          in October '07 at the same time as
24          this trial, and he was doing that
```

FAC Resp. Exhibit D -- 1414

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

 1          with Zoe Littlepage and Rainey

 2          Booth, and he attended status

 3          conferences, but he mostly just

 4          kept them percolating down there.

 5          The judges down there thought it

 6          was okay if we went first.

 7                We kind of worked out a

 8          state coordination on our own.

 9          All of our 20 cases were filed in

10          random number with different

11          judges, but Judge Adams, we

12          convinced, was a good one to do

13          these cases.  And so we basically

14          had all the Reno cases in front of

15          Judge Adams, and I forgot the name

16          of the judge down in Vegas.  All

17          the Vegas cases were in front of

18          that judge.  Periodically those

19          two judges would talk, but not

20          much.  But we kind of did our own

21          coordination with the cooperation

22          of Merck's counsel.

23                Then myself, participating

24          as a partner, and then I had one

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          or two paralegals extensively

2          involved really throughout, we're

3          just concentrating on Crandall,

4          though, we did the initial vetting

5          of the case and getting all the

6          medical records and plaintiff fact

7          sheets and all of that.  That's

8          kind of normal stuff.  Then the

9          summer of 2005 remand stuff.

10              In late 2006, early 2007, we

11         decided that Crandall was a better

12         case than the case we had set for

13         June of '07, and convinced the

14         judge to let us switch cases in

15         January of '07.  There was -- the

16         ones we had set were a couple of

17         stroke cases and a heart attack,

18         and we thought there was much

19         better science for heart attack

20         cases.  So, we wanted to do a

21         heart attack like Crandall first.

22         So, we got the Court's permission

23         to move it in its place.  And

24         that's Jerry Crandall.  That's

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          eventually -- the judge moved it

 2          from June '07 back to October of

 3          '07.  Crandall was a white male,

 4          mid 40s, nonsmoker, no other real

 5          risk factors.  Good health,

 6          physically active, hiking, cross

 7          country skiing, all of that,

 8          taking 50 milligrams of Vioxx for

 9          a couple of months before his

10          heart attack from his general

11          practitioner for thumb arthritis

12          in one thumb.  Thought it was a

13          really good representative case.

14          September 4, 2004, he's hiking up

15          Mt. Talac overlooking Lake Tahoe,

16          and the top of the mountain is

17          10,000 feet.  He goes 4,500 to

18          10,000 feet with his adult

19          daughter.  He was taking Vioxx

20          daily.  He specifically remembers

21          taking it that morning because he

22          says, I know from my hiking

23          experience coming down the

24          mountain, there's such a pounding
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          on your joints, and my joints hurt

2          a lot, and so I took Vioxx, I'm

3          sure, that morning.  He had a

4          heart attack while he was sitting

5          there resting up at the top.  He

6          could feel it was a heart attack.

7          There was no phone service or

8          anything up there.  But he's an

9          experienced hiker, and altitude

10         sickness, you use aspirin, so, he

11         always had aspirin in his

12         backpack, and he took an aspirin

13         right after he started down.  And

14         it turned into kind of a mild

15         heart attack.  That was okay.  I

16         didn't care -- I mean, it would

17         have been nice if he had really

18         great injuries, but it was still a

19         really good case.

20              MR. WEITZ:  It saved his

21         life.

22              MR. WHITE:  I think so.  So,

23         we switched that in there.  And

24         insofar as activities in this

FAC Resp. Exhibit D -- 1418

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          trial that impacted the

2          proceedings on a common benefit

3          level, a lot of it had to do with

4          the jurisdiction in Nevada, which

5          I'll go into in a minute, and

6          probably a lot of it had to do

7          with having Robinson Calcagnie as

8          co-counsel, which helped a lot,

9          because they'd run that other

10          case.  I told you what their role

11          was.

12              One activity that I

13          mentioned already was suing the 11

14          sales reps.  That kept us out of

15          Federal Court, which we didn't

16          want to be there, and you'll see

17          why in a minute.  But we also

18          thought one of them might get us

19          some pretty good information about

20          the marketing of the drug.

21              An example of Merck not

22          winning any motion, the Court

23          denied Merck's telephonic motion

24          in May of '07 for a protective

Page 21

1       order to not let us take

2       depositions of sales reps unless

3       they had actually detailed one of

4       our doctors.  The Court denied

5       that motion, our argument being

6       that, well, no, this sales rep

7       detailed Dr. A, and Dr. A infected

8       our doctor.  We took everybody's

9       deposition we wanted to take.  It

10      turns out that Merck prepared

11      those -- during their depositions,

12      they all said they were prepared

13      for two days for their

14      depositions, which lasted about

15      for half a day.  It was like

16      talking to a bunch of robots, all

17      identical, good looking, and they

18      all had the same answers to

19      everything.  It was just amazing.

20      But I mean we did make them do a

21      lot of work on those sales rep

22      depositions in Vegas and Reno.

23              Another activity of common

24      benefit was successfully opposing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        their attempt to keep us from

2        talking ex parte to treating

3        physicians and prescribers before

4        their depositions, which I had

5        never heard of until this case.

6        But apparently Judge Fallon had

7        granted that, and I had read that

8        because I was on that list serve.

9              Nevertheless, we argued to

10       the Court that we should be able

11       to prepare properly a treating

12       doctor or prescriber.  We told the

13       Court that we would keep track of

14       the documents that we were giving

15       to them, medical journal articles

16       and things to read beforehand, and

17       brought them to the deposition,

18       and it went off just fine with not

19       any problem.  The doctors gave

20       good factual testimony that was

21       then able to be used by our

22       specific causation experts later

23       on.

24             Another thing is, despite it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          being a state court action, we got

2          a stipulation from Merck that we

3          could use the MDL produced

4          documents in this case, and we

5          could use the general causation

6          reports from the California cases

7          and MDLs.

8              But another really good

9          thing, I think, was that aspect

10         where we, over Merck's pretty

11         strong objections, got the Court

12         to grant our motion in August '07,

13         this was even after we got the

14         continuance, we were still working

15         on it, that we could use the depo

16         designations and the exhibit

17         foundations from Barnett and

18         Berwick and other trials in our

19         trial.  It saved everybody

20         hundreds and hundreds of hours,

21         because apparently that's quite a

22         grueling process.

23              One of the last two

24         things -- well, last thing really,

Page 24

1          we got them to deny Merck's motion

2          that we each would only get a

3          certain number of hours of trial

4          time, which we had not ever

5          confronted that either.  The judge

6          said, no, you have a specific

7          amount, four weeks for this trial,

8          and use it up.  I'm not going any

9          further, and you guys work it out.

10          We were going to have to work it

11          out.  It wasn't going to be 60/40

12          or anything like that, nothing

13          specific.

14               So, all those things, I

15          think, helped Merck see that a big

16          verdict might be coming their way

17          in their case because they weren't

18          winning anything.

19               The other aspect, one of the

20          factors is on jurisdiction in

21          which non-MDL common benefit work

22          occurred, and that's one of the

23          main issues, because Nevada really

24          is a good, good jurisdiction for

FAC Resp. Exhibit D -- 1423

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          drug litigation.  We have no

2          Daubert at all, and we take

3          special steps to file amicus

4          briefs for the Nevada justice

5          association when anybody tries it

6          to keep it out.  We give seminars

7          to plaintiff groups, and Geoff

8          does that mostly on Daubert.

9               Secondly, we have not only

10         the failure to warn cause of

11         action, but we have pretty much

12         pure strict products liability.

13         There's a 1994 Nevada Supreme

14         Court case, Allison versus Merck,

15         involving brain damage to a kid

16         from a measles/mumps rubella

17         vaccine, and it was held that if

18         the plaintiff can prove the

19         vaccine caused the brain damage,

20         then the vaccine failed to perform

21         in a manner reasonably to be

22         expected in light of its nature

23         and intended function.  While the

24         drug company is not an insurer of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          their product, if it causes

2          injury, the manufacturer and the

3          distributors are responsible.  The

4          Court rejected specifically

5          comment K, 402A of the restatement

6          and said we don't have to consider

7          factors like usefulness and

8          reasonable risks and marketing and

9          everything like that.

10              MR. LEVIN:  We're all coming

11          to Nevada.

12              MR. WHITE:  It is a fine

13          cause of action to keep out all

14          that warning stuff, which is so

15          hard all the time.  That's a

16          really hard burden to meet that

17          one.

18              Thirdly, it is a small

19          state, Nevada is.  That has

20          several impacts.  You can get into

21          court relatively fast, in about a

22          year from filing, especially in

23          northern Nevada.  We have good

24          State and Federal trial and

FAC Resp. Exhibit D -- 1425

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1        appellate judges experienced in

2        drug litigation because we bring

3        them drug litigation.  We are the

4        only ones there that do that.

5        They know us.  They know we know

6        our business.  They trust us.  We

7        see them at county and state bar

8        meetings and other functions.  But

9        it is not to say we have had

10        success in this and other cases

11        because of personal relationships.

12        It's just because they know that

13        typically we are right.  And

14        plaintiffs' attorneys usually are

15        right in these things, and we have

16        a history of being right with

17        these judges.

18            For example, I told you we

19        sued the sales reps on the

20        misrepresentation counts, and they

21        removed them, claiming fraudulent

22        joinder.  We made our motion to

23        remand.  You have to allege you

24        have a good claim against the

FAC Resp. Exhibit D -- 1426

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1          sales reps, and that should be all
 2          that you need.  But we've been
 3          doing this in Nevada with these
 4          same federal judges so long that
 5          we can attach to our motions to
 6          remand other orders on remand on
 7          the same cases with sales reps
 8          like from our fen-phen cases.  The
 9          same judge looking at his own
10          order where we sued sales reps in
11          fen-phen.  So, we didn't have to
12          reinvent the wheel and didn't
13          really have to spend a great
14          amount of time on motions to
15          remand.
16               It is a small state, quick
17          trial, good law, seasoned judges
18          who know our reputation, good
19          juries.  That's why we got a $16
20          million breast implant verdict
21          years ago not only against Dow
22          Corning, but Dow Chemical, I think
23          the only one in the nation.  In
24          that same month, in October of
```

FAC Resp. Exhibit D -- 1427

Page 29

1          '07, that HT did go to trial and

2          we got that 134 million verdict

3          for three women, all tried at once

4          with one jury and one judge.

5               So when you have that 13

6          factor, when the number of adverse

7          verdicts happened, did their

8          commitment to litigation ebb, our

9          commitment didn't waiver.  There

10         were other states supplying other

11         law -- or the Federal Court, and

12         it worried us.  I'm not saying

13         that it didn't worry us, but it

14         didn't affect our commitment to

15         this litigation, and we pressed

16         on.

17              One other factor was we were

18         involved in the litigation with

19         the JP MDL.  That was in April of

20         '05 because we started on this

21         right as soon as they took it off

22         the market.

23              We don't have any

24         involvement in any of those other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

 1          factors.  We weren't on any of

 2          these committees or funding the

 3          litigation.  But I think Nevada is

 4          a good jurisdiction and a scary

 5          place for drug manufacturers.  We

 6          just set in Las Vegas a multi

 7          plaintiff HT trial for August of

 8          '09 when a lot of other courts are

 9          just waiting for Wyeth versus

10          Levine.  They tried to get them

11          stayed, and our judges wouldn't

12          stay them, so we are moving

13          forward on those.

14               I think that Merck could see

15          attorneys that were prepared.  We

16          took every doctor's deposition,

17          every sales rep's deposition.  We

18          had our exhibits list because the

19          judge wanted it in by June, even

20          before the continuance kind of

21          stuff.  All those exhibits,

22          hundreds and hundreds of pages,

23          all those arguments over that.

24          All the deposition designations,

FAC Resp. Exhibit D -- 1429

Page 31

 1        case specific expert reports were

 2        in.

 3              MR. SEEGER:  Everybody here

 4        has tried a Vioxx case, so we have

 5        a sense.

 6              MR. WHITE:  All that was

 7        done, and we were ready to go, and

 8        they knew it.  I think that

 9        knowing that had an effect, as did

10        all the other attorneys that were

11        plugging away, pounding away at

12        Merck and not just sitting back

13        warehousing their cases, that's

14        what we were doing, and then

15        putting them through that.

16              Hourly rates in Reno, I

17        don't ever do an hourly rate, but

18        I checked with some other

19        plaintiff litigation guy, and they

20        are about $400, $450 an hour.  I

21        think costs are separate

22        proceedings, right.

23              So, I do hope that you can

24        see your way with these several

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1        factors that I've talked to you
 2        about that I think Crandall versus
 3        Merck had a substantial common
 4        benefit and that you can pay the
 5        hours that my firm has put out,
 6        about 14, 1500 hours, I forget
 7        what it was, and Robinson has had
 8        about 1000 hours on the same
 9        thing.  I think it went a long
10        way.
11             MR. SEEGER:  We were
12        definitely aware of the case and
13        appreciate you coming here.
14             MR. WEITZ:  Thank you.
15             MR. WHITE:  Appreciate you
16        assisting me as well.
17                   -   -   -
18
19
20
21
22
23
24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23          Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 1432