# DARLA J. SANDERSON
(760) 271-7370

725 Alix Street, New Orleans, LA  70114

djsanderson2001@hotmail.com

## R MEMBERSHIP
California State Bar No. 234502
Candidate for the July 2005 Louisiana State Bar Examination

## EDUCATION
**California Western School of Law,** San Diego, CA
Juris Doctor, *cum laude,* April 2004
- *California Western Law Review/International Law Journal* Associate Writer/Editor
- Class standing 26/216
- Kennedy Scholar (Highest scholarship awarded)
- Trial Practice Academic Achievement Award, Spring 2003
- Tutor/Teaching Assistant, Civil Procedure, Fall 2003
- Research Assistant, Corporations, Fall 2003
- Federalist Society, founding member of student chapter and Secretary, 2004
- Health Law Society, founding member and President, 2002 – 2003

**Central Michigan University,** Mt. Pleasant, MI
Master of Science in Administration, 4.0/4.0 cumulative GPA, 2001

**Wayne State University,** Detroit, MI
Bachelor of Science in Occupational Therapy, *cum laude,* 1997

## LEGAL EXPERIENCE
**Brooke Company,** New Orleans, LA
*Temporary Legal Assistant,* January 2005 – present
- I am currently working with the firm of Abbott, Simses, & Kuchler, in the area of asbestos defense.

**Sampson & Associates,** San Diego, CA
*Law Clerk,* August 2004 – December 2004
- I drafted demand letters, complaints, requests for default, applications for court judgment, discovery, settlement agreements, abstracts of judgment, and writs for matters in state and federal court for breach of contract actions and post-judgment collections; performed asset investigations; composed client and party correspondence.

**Law Office of Randal T. Mason,** San Diego, CA
*Law Clerk,* February 2002 – March 2003, January 2004 – August 2004
- This private practitioner specializes in personal injury, products liability, and workers' compensation. While working for Mr. Mason I interviewed clients and organized discovery responses; drafted complaints, demand letters, mediation briefs, and settlement agreements for personal injury/product liability matters; researched workers compensation issues and drafted memoranda; composed client and party communications.

**U.S. District Court for the Southern District of California**
*Judicial Extern to Magistrate Judge James F. Stiven,* January 2004 – April 2004
- As a Judicial Extern, I researched and drafted bench memoranda summarizing civil litigation issues; researched and drafted Report and Recommendations on habeas corpus writs and Social Security administration appeals; assisted counsel in reaching plea-bargains for misdemeanor sentencing; assumed responsibility for general case file management.

**Bonne, Bridges, Mueller, O'Keefe & Nichols,** Santa Ana, CA
*Summer Associate,* May 2003 – August 2003
- This firm specializes in medical malpractice. I drafted motions for summary judgment and points and authorities in support thereof; researched and drafted memoranda on various medical malpractice/civil litigation issues; attended and observed depositions; drafted deposition summaries; composed client communications; participated in twice-weekly seminars on legal procedure.

## CONTINUING EDUCATION
Lorman Education Services, *Collection Techniques and Law,* September 2004

## THER EMPLOYMENT
**William Beaumont Hospital,** Royal Oak, MI
*Occupational Therapist,* 1997 – 2001; *Pharmacy Technician,* 1991 – 1997

FAC Resp. Exhibit B -- 1515

# EXHIBIT C

| | |
|---|---|
| **From:** | Lillian Flemming [LFLEMMING@hhkc.com] |
| **Sent:** | Friday, November 18, 2005 4:37 PM |
| **To:** | Andy D. Birchfield Jr. (PSC) (E-mail); Arnold Levin (PSC) (E-mail); Carlene Rhodes Lewis (PSC) (E-mail); Christopher Seeger (PSC) (E-mail 2); Christopher Seeger (PSC) (E-mail 3); Christopher Seeger (PSC) (E-mail); Christopher Vincent Tisi (PSC) (E-mail); David R. Buchanan (E-mail); Drew Ranier (PSC) (E-mail); Elizabeth Cabraser (PSC) (E-mail); Frank Woodson (E-mail); Gerald E. Meunier (PSC) (E-mail 2); Mark Robinson (PSC) (E-mail 2); Mark Robinson (PSC) (E-mail); Michael Wagner @ Seeger Weiss; Michelle A. Parfitt (E-mail 2); Michelle A. Parfitt (E-mail); P. Leigh O'Dell (E-mail); Paulina do Amaral (E-mail); Richard J. Arsenault; Russ Herman; shellysanford@goforthlewis.com; Thomas Kline (PSC) (E-mail 2); Thomas Kline (PSC) (E-mail 3); Thomas Kline (PSC) (E-mail); Troy Rafferty (PSC) (E-mail); ZVioxx Archive |
| **Cc:** | Lenny Davis; Regina Westenfeld; Heather Laborde; Leigh O'Dell; dbuchanan@seegerweiss.com |
| **Subject:** | Vioxx MDL 1657 re Irvin Trial |

From: Leonard A. Davis

Russ has requested that Richard Arsenault and Gerald Meunier provide trial support to the Plaintiffs' Steering Committee for the upcoming Irvin trial. Richard and Jerry have advised that they will be in attendance for all or substantially all of the trial. Their willingness to assist is greatly appreciated and they will be coordinating attendance and providing support to the Beasley firm throughout the trial. Please communicate with Richard or Jerry for issues regarding trial attendance and other related matters.

Lillian M. Flemming
Legal Assistant to Leonard A. Davis and Stephen J. Herman
Herman, Herman, Katz & Cotlar, L.L.P.
820 O'Keefe Avenue, New Orleans, LA 70113
PH: (504) 581-4892
Fax: (504) 561-6024

Temporary Office:
3411 Richmond Avenue
Suite 460
Houston, TX 77046
PH: (713) 877-1843
Fax: (713) 871-9750
Toll Free: (866) 815-6728

E-Mail: lflemming@hhkc.com
URL: http://www.hhkc.com

# EXHIBIT D

## MDL 1657 Vioxx Products Liability Litigation
## Neblett, Beard & Arsenault

| Name of Individual | Title | Summary Total Hours of All Firm Personnel |
|---|---|---|
| Richard J. Arsenault | Sr. Partner (28-yr lawyer) | 2,529.85 |
| C. Michael Bollinger | Sr. Partner (26-yr lawyer) | 72.25 |
| J.R. Whaley | Jr. Partner (10-yr lawyer) | 57.25 |
| Steven M. Rachal | Associate (11-yr Lawyer) | 616.75 |
| Suzanne J. Wright | Associate (9-yr Lawyer) | 59.75 |
| Jean Paul Overton | Associate (16-yr Lawyer) | 699.50 |
| Margaret Parker | Contract Attorney (4-yr lawyer) | 322.75 |
| Mary Lorenz | Contract Attorney (4-yr lawyer) | 694.00 |
| Mike Breinin | Contract Attorney (12-yr lawyer) | 784.50 |
| Holly Lamarche | Contract Attorney (4-yr lawyer) | 702.00 |
| Will Percy | Contract Attorney (26-yr lawyer) | 425.75 |
| Darla Sanderson | Contract Attorney (4-yr lawyer) | 66.00 |
| **Attorney Total** | | **7,030.35** |
| | | |
| Rebecca L. Monk | 15-yr Paralegal | 56.00 |
| Barbara Mitchell | 9-yr Administrative Assistant | 1.00 |
| Jane Oxenhandler | 26-yr Paralegal | 126.25 |
| Janet Doyle | 28-yr Paralegal | 1.25 |
| **Paralegal Total** | | **184.50** |
| | | |
| **Computer Specialist Total** | | **13.00** |
| | | |
| Combined Total | | 7,227.85 |

| | |
|---|---|
| **PARTNER TIME** | **2,659.35** |
| **SR. ASSOCIATE TIME** | **1,376.00** |
| **CONTRACT LABOR TIME** | **2,995.00** |

1  PANISH, SHEA & BOYLE, LLP
   Brian Panish, SBN 116060
2  Kevin Boyle, SBN 192718
   11111 Santa Monica Blvd., Suite 700, Los Angeles, CA 90025
3  Tel: (310) 477-1700 Fax: (310) 477-1699

4  Attorneys for Plaintiff, Lawrence Appell

5

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10

11 Coordination Proceeding Special Title (Rule 1550(b))

12 **This Document Applies to All**          ) CASE NO. JCCP No. 4247
                                             ) Assigned to the Honorable Victoria Chaney,
13                                           ) Department 324
                                             )
14 **VIOXX ® CASES**                         )
   This document relates to:                 ) DECLARATION OF BRIAN J. PANISH
15 RUDOLPH ARRIGALE V. Merck & Co.,          ) PER PRE TRIAL ORDER No. 6 (D)
   Inc., et al. [Part of Andrew Nelson, et al. v. ) (FEE ALLOCATION GUIDELINES)
16 Merck & Co., Inc., et al., State Docket No. )
   05CC03136]                                )
17                                           )
                                             )
18 LAWRENCE APPELL v. Merck & Co.,           )
   Inc., et al., State Docket No. BC328858   )

19        I, BRIAN J. PANISH, declare and say that:

20        1.     I am an attorney at law licensed to practice before all of the courts of the State of California,

21 and am a partner in the law firm of Panish, Shea & Boyle, attorneys of record for Plaintiff, Lawrence

22 *Appell*.

23        2.     As such, I have personal knowledge of the facts surrounding the present action and all facts

24 herein stated. If called as a witness, I could testify competently to the following.

25        3.     Attached is a current and correct copy of my Curriculum Vitae.

26        4. This Declaration is being prepared for consideration in the allocation of common benefit award.

27 This will outline some of our firm's common benefit contributions and address the factors set forth in Pre

28 Trial Order No. 6 (D). I believe our firm's common benefit work made a substantial contribution to the

DECLARATION OF BRIAN J. PANISH PER PRE TRIAL ORDER No. 6 (D FEE ALLOCATION GUIDELINES)

FAC Resp. Exhibit B -- 1518

outcome of the Vioxx litigation. I tried one of the bell weather cases, entitled *Appell v. Merck*, Superior Court Case No. BC328858. That case was followed by all persons interested in the Vioxx litigation. Prior to that time, I served and continue to serve as a member of the California Plaintiffs Steering Committee. We participated in Vioxx hearings, pre-trial discovery and trial preparation. I participated in meetings where trial case selection was decided and submitted for trial.

5. In 2005, I started a new law firm, Panish, Shea and Boyle, LLP, and devoted a substantial amount of my time to the Vioxx litigation, including the trial of the *Appell* case. During this time, I had to continue many trials that were set for trial.

6. The *Appell* trial lasted from September through the end of January 2006. Prior to the trial, I was involved in depositions of expert witnesses and trial preparation. I spent substantial time conducting focus group work and preparing for trial and dealing with the generic and case specific issues.

APPELL TRIAL:

7. The *Appell* case was tried in the Los Angeles Superior Court before Judge Victoria Chaney, who was the presiding Judge for all the JCCP Vioxx cases in the State of California. The *Appell* case had numerous issues at trial. During discovery in the case, Mr. Appell's prescribing physician, Dr. McAdam testified, among other things, the warnings provided by Merck were adequate, that even if he had been given additional warnings by Merck, he would have still prescribed Vioxx for Mr. Appell and he did not believe Vioxx was dangerous or defective in any way. He also testified at trial that he continued to take Vioxx after it had been recalled from the market and was taking it during trial.

8. Obviously, this testimony created difficulties in dealing in the cases. It also created issues relating to the "learned intermediary doctrine", which was one of Merck's major defenses. A substantial amount of time was spent in in pre-trial preparation and Motions in Limine, substantial additional time was spent dealing with the jury instructions, specifically the "learned intermediary doctrine" instructions. Despite this evidence and the jury instructions given by the Court relating to "learned intermediary", the jury found:

(1)     Vioxx had potential risk that were known or knowable through the use of scientific knowledge;

(2)     The potential risk presented a substantial risk of harm.

DECLARATION OF BRIAN J. PANISH PER PRE TRIAL ORDER No. 6 (D (FEE ALLOCATION GUIDELINES))

2

9. During the course of jury deliberations, many questions were asked of the Court. The case was re-argued three separate times to the jury. In the end, the jury could not reach a verdict on all the questions, although juror discussions post trial indicated that the majority of the jurors were voting for the plaintiff. The case was reset for trial and additional experts were retained and trial preparation began again. I was prepared to try the case at the time the Vioxx global settlement was reached.

10. We incurred over $450,000 in out-of-pocket expenses for the *Appell* trial in addition to thousands of hours by paralegals, secretaries and attorneys.

11. I will supplement this Declaration at the hearing by the Committee on Fee Allocation.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.

Executed this 31st day of October 2008, at Los Angeles, California.

BRIAN J. PANISH
Declarant

DECLARATION OF BRIAN J. PANISH PER PRE TRIAL ORDER No. 6 (D (FEE ALLOCATION GUIDELINES))

3

FAC Resp. Exhibit B -- 1520

## BIOGRAPHY OF BRIAN J. PANISH

BRIAN J. PANISH, Los Angeles, California. Partner in the Law Firm of Panish, Shea & Boyle, LLP. In 2001, he was selected by The National Law Journal as one of Nation's Top Ten Litigators. Voted one of the best lawyers in America, and included in publication Best Lawyers in America. Named one of the 100 Most Influential Attorneys in the State of California. He was named Trial Attorney of the year in 1999, by the Consumer Attorneys Of Los Angeles. Named Attorney of the Year by O'Brien's Trial Evaluator. He has obtained more than 150 verdicts and settlements in excess of One Million Dollars ($1,000,000), including 12 jury verdicts in excess of Ten Million Dollars ($10,000,000). In *Anderson v. General Motors*, he obtained a jury verdict of Four Billion Nine-Hundred and Seven Million ($4,907,662,321), the largest personal injury and product liability verdict in history. There have been four (4) jury verdicts over $50,000 million for individuals in personal injury cases in California. Brian has obtained three of the four. In 2001, he obtained a jury verdict of $55,600,000 in *Lampe v. General Tire*, the largest jury verdict in a tread separation case. In 2004, he obtained a jury verdict of $58,137,361 in *Griggs v. West-Pak*, the largest compensatory damage jury verdict in California for a plaintiff in a personal injury case. In 2005, he obtained a verdict of $27,600,000 against the City and County of San Francisco, the largest ever against the City and County of San Francisco. In 2004, he also obtained a jury verdict of $15,000,000 in *Wu v. Singapore Airlines*, the largest jury verdict in California for the loss of two parents survived by adult children. In *Marx vs. Storage-Tek* he obtained a jury verdict of $12,000,000 on behalf of a salesman who was wrongfully terminated.

## EDUCATION

Legal Education: Southwestern University School of Law where he graduated with honors and awarded Juris Doctorate Degree in 1984. He received the American Jurisprudence Awards for the highest grade in Wills and Trusts, Legal Professions, Secured Transactions, Entertainment Law, and Product Liability.
Undergraduate: California State University, Fresno, where he graduated with honors and awarded Bachelors Degree in 1980. He was also named the Fresno State Scholar Athlete and received the Athletic Directors Award. Presently serves as member of Fresno State's National Board of Visitors.

## CAREER

Admitted to practice in December 1984, Mr. Panish began his legal career with the firm of Engstrom, Lipscomb and Lack where he specialized in Aviation litigation. Mr. Panish was involved in aviation and product liability litigation. He also represented plaintiffs and defendants in personal injury, insurance and business litigation. He tried many jury trials without a defeat.

In 1987 he joined the firm of Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler and Rosenberg, which later became Greene Broillet Panish & Wheeler. In April of 2005 he started the firm of Panish, Shea and Boyle. The firm is located in Los Angeles, California and specializes in matters involving aviation law, pharmaceutical litigation, mass torts, automotive and general product liability, professional negligence, business torts, toxic torts, class actions, wrongful termination, insurance bad faith, governmental liability, civil rights (including all types of police misconduct). He handles cases involving aircraft, automobiles, motorcycles, agricultural products, workplace injuries, marine products, wrongful death and all types of employment litigating including wrongful termination, discrimination and sexual harassment.

Mr. Panish has been lead counsel in many high profile cases. Since 1999. Some of Mr. Panish's verdicts include:

- $4.907 billion verdict in *Anderson v. GM.* (The largest personal injury/products liability verdict in history.)
- $55.6 million verdict in *Lampe/Cortez v. Continental General Tire.* (The largest jury verdict in a tread separation rollover case and the largest verdict in California for a quadriplegic.)
- $58 million verdict in *Griggs vs. West-Pac Industries, Inc..* (Largest burn verdict for an individual in a personal injury case)
- $25.2 million verdict in *Sherman v. Courrege*
- $22 million verdict in *Pogosyan vs. Metropolitan Transit Authority.*
- $27.5 million verdict in *Dominguez v. City & County of San Francisco.* (The largest ever against the City and County of San Francisco)
- $15.6 million verdict in *Ledesma vs. Patel.*
- $15.1 million verdict in *Tilton v. Southern California Gas Company.*
- $15 million verdict in *Wu vs. Singapore Airlines.* (Largest ever death verdict in U.S. District Court, Central District)
- $13 million verdict in *Fuller vs. Fairmont Tires.*
- $12 million verdict in *Marx vs. Storage Technology Corp.*
- $11.7 verdict/settlement in *Witham/Garcia vs. Avjet Corporation.*
- $5.6 million verdict in *Gonzalez v. Dresick Farms* (largest personal injury verdict in Imperial County)
- $2.8 million verdict in *Sorensen v. Burlington Northern Santa Fe Railroad.*

## *Mass Torts*

He has been appointed by the Court to serve on Plaintiffs' Steering Committee in many mass tort cases. He was named to the Plaintiffs' Steering Committee in the Fen-Phen Diet Drug Litigation, the L-Tryptophan Drug Litigation and Vioxx. Recently, he has been selected to the Plaintiffs' Steering Committee and Plaintiffs' Management Committee in the crash of Alaska Airlines Flight 261 and Singapore Airlines Flight 006.

## Professional Organizations

- American Board of Trial Advocates - Rank: Advocate (Los Angeles Chapter Executive Board)
- American Bar Association (Civil Justice Institute)
- International Society of Barristers.
- Consumer Attorneys of California
- Consumer Attorneys of Los Angeles. Named Trial Attorney of the Year in 1999 (finalist for the award in 1992, 1996, 1997, 1998, 2003, 2005)
- Inner Circle of Trial Advocates (limited to 100 of the best attorneys in America)
- Attorney Information Exchange Group (Board of Directors)
- Founding member of the Eighth Street Lawyers
- Trial Lawyers for Public Justice (Finalist Trial Lawyer of the Year 1990, 1994, 2000)

## Continuing Education

He has lectured and written about all aspects of trial practice to groups throughout the State of California, nationally and internationally. Groups addressed include: American Bar Association, Consumer Attorneys of Los Angeles, Consumer Attorneys of California, Association of Trial Lawyers of America, Attorneys' Information Exchange Group, Inner Circle of Advocates, Washington State Trial Lawyers' Association, Alabama Trial Lawyers' Association, Association of Southern California Defense Counsel, Southwestern University School of Law, and Hong University School of Law.

FAC Resp. Exhibit B -- 1522



801 Estelle Drive Lancaster, Pennsylvania 17601
Telephone (717) 892-3000 Facsimile (717) 892-1200 rodanast@rodanast.com

October 28, 2008

<u>VIA OVERNIGHT DELIVERY</u>

Russ M. Herman, Esquire
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113

Re:    <u><i>Vioxx Products Liability Litigation</i> (MDL 1657)</u>

Dear Russ:

In accordance with Pretrial Order No. 6(D), enclosed is my Declaration in Support of RodaNast, P.C.'s Application for Fees and Expenses.

Please do not hesitate to contact us with any questions.

With best wishes.

Sincerely,

DMN:kjm
Enclosure

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re: VIOXX | * MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * SECTION L |
|  | * JUDGE FALLON |
|  | * MAGISTRATE JUDGE KNOWLES |

## DECLARATION OF DIANNE M. NAST IN SUPPORT OF RODANAST, P.C.'S APPLICATION FOR FEES AND EXPENSES

I, Dianne M. Nast declare and state as follows:

1.    I am a Senior Shareholder of RodaNast, P.C.  I submit this declaration in support of this firm's application for fees and reimbursement of expenses in connection with services in connection with this litigation.

2.    While I did not apply to be appointed to the Plaintiffs' Steering Committee, this firm has actively participated in MDL 1657 whenever assigned to do so.  The attorneys and paralegals of the firm contributed a total of 1,295.75 hours from February 16, 2005, the date of JPMDL transfer, to October 23, 2008, with a lodestar at current hourly rates of $525,140.00.  From the inception of the case to February 16, 2005 (pre-MDL transfer), the firm contributed a total of 274.25 hours, with a lodestar at current hourly rates of $108,975.00.  The aggregate time for the firm from inception of the litigation through October 23, 2008 is 1,570.00 hours with a lodestar of $634,115.00. Expenses are billed separately and such charges are not duplicated in this firm's billing rates.

3.      The following summarizes this firm's contribution to the litigation. Detailed information is contained in the firm's daily time records, which were timely submitted to Plaintiffs' Liaison Counsel.

4.      Prior to MDL transfer, Attorneys Michael G. Nast and Erin C. Burns attended plaintiffs' organizational meetings. Ms. Burns also attended the MDL hearing on January 27, 2005 in Fort Myers, Florida. After transfer, Ms. Burns attended other meetings of counsel and a status conference in New Orleans before The Honorable Eldon E. Fallon on March 18, 2005.

5.      The firm served on the Law and Briefing Committee. Attorneys Daniel N. Gallucci, Jennifer S. Snyder, Ms. Burns and I participated in numerous conference calls and assisted with assigned briefing and research projects. Attorneys Snyder and Burns undertook an assigned survey of consumer protection laws in 51 jurisdictions and drafted a memorandum on federal preemption law, including *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). In addition, Ms. Snyder was assigned and completed a 50 state law survey on medical monitoring and future damages in preparation for responding to the motion to dismiss the medical monitoring complaint. Ms. Snyder completed assigned research in preparation for responding to Merck's Rule 12 motions, and assigned research in connection with Plaintiffs' motion to stay class certification briefing of the personal injury claims. Ms. Snyder also was assigned to draft the reply in support of Plaintiffs' motion to stay class certification briefing in personal injury actions.

6.      Ms. Burns spent substantial time completing the research and writing assignment concerning remanding cases to their respective transferor courts, with Judge Fallon sitting by designation at the trials of those remanded cases.

FAC Resp. Exhibit B -- 1525

7.     After the Eighth Circuit rendered its decision in *In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005), the firm's attorneys participated in conference calls regarding the application of state class certification procedural rules in lieu of Fed. R. Civ. P. 23 by a federal diversity court.  Ms. Snyder prepared a memorandum on this subject at the request of the Law and Briefing Committee.

8.     In early 2006, Ms. Snyder and Attorneys Steven L. O'Donnell and Shannon O. Young undertook assigned research concerning FDA preemption and prepared a memorandum on FDA rulemaking.

9.     The firm's attorneys also worked on assigned discovery projects.  Mr. Gallucci participated in developing the deposition protocol.  Ms. Snyder and Ms. Burns worked on an assigned memorandum regarding types of questions asked of class representatives.  Mr. Gallucci and Attorney Joanne E. Matusko attended a settlement conference in Philadelphia on November 19, 2007.

10.    This firm made a financial contribution, incurring $10,828.15 in unreimbursed expenses in connection with the prosecution of this litigation from February 16, 2005 (the date of MDL transfer) to October 23, 2008.  The firm incurred $5,721.91 in expenses from the inception of the case through February 16, 2005.  The aggregate total of all expenses is $16,550.06.  The expenses incurred are reflected on the firm's books and records that are prepared from expense vouchers, check records and other source materials and represent an accurate record of expenses incurred.

Executed on this 28th day of October 2008 at Lancaster, Pennsylvania.

Dianne M.  Nast

3

## SANFORD PINEDO LLP
### ATTORNEYS AT LAW
2016 BISSONNET STREET
### HOUSTON, TEXAS 77005-1647
www.SanfordPinedo.com

Shelly A. Sanford
T. Christopher Pinedo
Alex Barlow

**TOLL FREE** 877.441.6677
**PHONE** 713.524.6677
**FAX** 713.524.6611

Anthony C. Coveny

October 31, 2008

*Via Overnight Mail*

Russ Herman
Herman Herman Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA 70113-1125

>        Re:    MDL No. 1657 – Section L
>               *In Re:* Vioxx Products Liability Litigation

Dear Mr. Herman:

I am enclosing an Affidavit to Allocation Committee on Behalf of PSC Members Carlene Lewis and Shelly A. Sanford.

Please feel free to contact me if you require additional information.

Yours truly,

SANFORD PINEDO LLP

Shelly A. Sanford

SAS/ca
Enclosures: as stated.

FAC Resp. Exhibit B -- 1527

Before me the undersigned Notary personally appeared Shelly A. Sanford, who, on her Oath provided that the following facts are within her personal knowledge and are true and correct:

## AFFIDAVIT TO ALLOCATION COMMITTEE ON BEHALF OF PSC MEMBERS CARLENE RHODES LEWIS AND SHELLY A. SANFORD

1.      The Vioxx litigation began with an injury to Myrtle Louise Bell, a friend of Carlene Lewis's mother, in the summer of 2000. Carlene was a pioneer and visionary as to this then new, but emerging mass tort. It began with the workup of Ms. Bell's case and a November 2000 demand letter to Merck on Ms. Bell's behalf. This was less than six months after Vioxx went on-market in May of 1999. By September of 2001 we had several hundred claims, multiple individual claims on file, a national class action in the S.D. of Illinois, and the beginnings of the third party purchaser litigation in New Jersey. With persistence, we gathered, coordinated, encouraged, and otherwise worked alongside giants in the mass tort world (e.g. Tom Girardi, Chris Seeger, Andy Birchfield) and soon to be giant (Mark Lanier). Carlene and I pursued Lanier for months to convince him to join this battle. When he did he never looked back, which was to the great benefit of the plaintiff population. We met with Chris Seeger in 2001 on a Saturday morning in Houston for breakfast to encourage his involvement. We flew to Los Angeles to meet with Tom Girardi and he graciously accommodated two enthusiastic women who knew he would lend credence to litigation and help get a bad drug off the market. We met with Beasley Allen and their amazing lawyers who were already in the litigation. We held meetings in Houston, New York, Illinois and other places. In sum, we initiated and led a team of lawyers dedicated to justice in this litigation and all fought Merck when fighting Merck was not done. In fact, the litigation was considered by many who joined then abandoned it to be a losing battle because it involved an on-market drug.

2.      In the summer of 2001 we were retained by Carol Ernst, who had just lost her husband Robert Ernst from Sudden Cardiac Death while on Vioxx. We told Carol we would do everything possible to make sure her case was tried first and Lanier agreed.

3.      We met with many potential clients and physicians throughout 2001 and 2002. We gathered, cultivated and helped arm experts, such as Ben Lucchesi and Cheryl Blume (with Girardi and Birchfield), Wayne Ray (with Seeger), Joye Carter, Lige Rushing and David Egilman (with Lanier) and others. We carried the Illinois class action through dismissal motions, expert designations, depositions, discovery and class certification briefing. By the summer of 2002 we had many depositions in this case of Merck (e.g. Alise Reicin, Adam Schechter, Deborah Shapiro, James Dunn) and experts (e.g. Rushing, Blume, Lucchesi) and more than 10.5 million pages of documents that were produced by Merck in electronic form. We cooperated in the efforts of our dedicated colleagues to take depositions and we took and presented witnesses for deposition. We gave interviews to the press to spur knowledge of the risks of Vioxx. We were asked to meet with and met for hours in Houston with Korea's equivalent of our FDA commissioner to help him understand the problems with drugs in his own country. We gave speeches at national mass tort conventions (ATLA, Mass Torts Made Perfect), founded the ATLA litigation group (with David Miceli) in 2002 (and led it from 2002-2006), filed the original class action purchaser claim (with Seeger), filed the original securities action against Merck in New Orleans in 2003 (with Stull Stull & Brody of NYC), continued in the class action battle (with Girardi), filed multiple individual claims in State Court in Texas with Lanier and several hundred individual claims in state and federal courts. We helped our experts prepare full reports and added to this group of experts Wayne Ray, who filed a report and was deposed in Stubblefield and Ernst.

4.      In 2001, I spent a full week reviewing documents in Blue Bell, Pennsylvania, and was placed in a conference room with the NDA in its original boxes and found the hallway lined with stacks of hundreds of original boxes labeled with custodial files of Merck employees. Listing these names on a notepad is how we were able to ask for specific files in discovery, including Alise Reicin, Adam Schechter, and

**1 | P a g e**

Deborah Shapiro. In one of the NDA boxes I was able to find a document that was the basis for our venue and filing of the Ernst case in Brazoria County, Texas with Mark Lanier.

5.      By 2003 and early 2004 we had trial settings in test cases in Houston and in Brazoria County (with Lanier) and were preparing for trial in the Ernst case, Keith Stubblefield case (with Lanier) and the Paul Pikul case (solo).[1] In one of our federal cases Carlene spent an extra hour at a hearing in chambers just to convince this federal judge that Vioxx, 50 mg, posed a significant risk of heart attack. The judge told us at the next meeting he had thrown away his Vioxx prescription. We faced judges who were initially skeptical of the litigation against an on-market drug when Merck's counsel would argue there was no science. We fought confidentiality agreements and multiple motions to seal any pleading that suggested Vioxx caused heart attacks. We were threatened by Merck's counsel with motions for sanctions if we did not draw down pleadings in Illinois that included public testimony or references to Merck's corporate testimony, and actually had a motion filed against us by Bryan Cave in Illinois. We fought off multiple motions to transfer venue of the several hundred Texas federal cases to the distant forum of New Jersey. Our firm bypassed other litigation (e.g. Zyprexa, HRT, Devices, Paxil, individual product injuries) to continue to focus on Vioxx. Carlene and I were 2 of 3 partners in the firm and we focused our efforts on Vioxx.

6.      We expended a significant amount of revenue for our shop on the Vioxx litigation and by the withdrawal had accumulated almost $500,000 in expenses. The pressure on Merck was mounting and the imminent trial pressure in the Stubblefield and Pikul cases and other state court cases such as Ernst was significant. Within months one of these cases would have been tried either by Lanier or by us, or by both firms jointly.

7.      Then Vioxx was withdrawn from the market on September 30, 2004.

8.      Although we were tired and had both given up time with our families and easier cases that would have benefited us more  in time and money, we (and our families) made a decision to continue in the fray and embrace the hundreds of new lawyers stepping into the litigation. I watched Carlene do amazing and brilliant things both with and without reward, but remarkable to me was her deep satisfaction and appreciation when Vioxx was withdrawn from the market and she was appointed to the Plaintiffs Steering Committee for the Vioxx MDL. She was humbled, thankful, and stood in awe of her colleagues and fellow PSC members and those among the early participants who chose not to seek PSC membership at that time. A second significant moment of joy I observed and joined in with Carlene was when the Ernst verdict came in as a huge win. Perhaps the third time I watched that level of satisfaction in her profession was when she was hospitalized, knew she had ovarian cancer, and realized that every single PSC member and mass tort giant we had come to know and appreciate had reached out to her with flowers, love and compassion. It was a bittersweet joy to have had that same satisfaction when Chris Seeger and Andy Birchfield called and informed me of the impending settlement about 16 months after Carlene's death.

---

[1] The Pikul and Stubblefield cases were both repeatedly rejected by Merck for the MDL trial pool in part on the basis they were too good to be representative for the plaintiff group as a whole. In Pikul, I took the treating physician, Carlene the Merck witnesses, and we had experts lined up for specific and general causation as well as the pathologist who did the autopsy, took photographs of the clot in the artery, and was willing to testify that Vioxx ingestion for some 30 months was the cause of Mr. Pikul's death. The treating physician testified that he prescribed Vioxx 50 mg in 90 day supplies (through Merck Medco) because the Merck representatives were in his office telling him it was safe. In Stubblefield, Lanier had just received the Federal Judge's immanent trial setting. Judge Gilmore declined to stay the case for MDL transfer on the basis that discovery was done. These two cases were held in limbo in the MDL for the next several years and were subjected to Merck's unilateral rejection of them as trial cases.

FAC Resp. Exhibit B -- 1529

9.      One hardly needs to walk through the things that Carlene added to this litigation particularly since most on this Committee saw it first hand. Everything else pales in comparison; yet, I am thankful that we were a good team alongside a great team of lawyers who (1) joined the cause, or (2) took up the cause and carried it to its satisfying conclusion.  I cannot do justice to re-creating Carlene's hours prior to the MDL formation or mine given the length of time and the loss of information that occurs in that time frame. I trust that you will accept that the hours provided are a slim portion of that actually done in furtherance of this litigation as is the case with many others of the early team.

10.     In addition to the overall personal commitment to the litigation, the things that appear important to consider include that (1) we substantially helped prepare the Ernst case for trial, did the briefing on the science, worked up the experts, assisted and promoted Lanier in his tremendous effort, and have continued to assist in the appeals process. I wrote all of the science briefing and Carlene brilliantly argued the motions to disqualify experts and for summary judgment on the basis that Robert Ernst's death did not qualify as an adverse event caused by Vioxx. The failure of those arguments, and Lanier's verdict, helped create the SCD portion of the settlement and gave the plaintiff population much needed momentum; (2) we had the Pikul case ready for trial and so well-prepared (30 months Vioxx use; depositions all taken; experts lined up and an autopsy with photos of the clot) that Merck was able to get it stricken every time as a trial case on that basis alone; (3) We sequentially co-chaired the Science and Expert Committee for the PSC; (4) we were sequential PSC members; (5) We (myself after Carlene's death) assisted either in person or remotely in a majority of the Vioxx trials and trial preparation; (6) We committed our firm's time and resources (including 2/3 of the partners) to the litigation from 2000 onward; (7) I helped run the expert and science committee with Carlene and after her death gratefully accepted the PSC support, nomination in Carlene's stead, and continuing role as co-chair; was part of the trial package committee and helped with its many component parts; am on the administrative committee; and have assisted people post settlement where possible on science questions, expert issues, and Brown Greer filings; (8) I worked with other PSC members and people outside the PSC to try to encourage various regulatory or State agencies to bring criminal charges against Merck (specifically Alise Reicin) for its intentional conduct; (9) we have made significant contributions toward funding of the litigation in our individual cases, in general prior to the withdrawal, and as PSC members; (10) Carlene and I both steered certain MDL common benefit attorneys in the right direction on our committees to ensure that the work was approved by the PSC and being done for the benefit of the MDL and not just to build hours; (11) Carlene and her clients Louise Bell and Carol Ernst received the Stephen Sharp Award by ATLA in 2006 for their commitment and contributions to the Vioxx litigation, and we received the Clarence Darrow Award in 2008 for the same; and (12) we worked to do all we could throughout this 8 year process to help and encourage our fellow lawyers and friends to remain committed to the litigation; take and prepare for depositions, gather and cultivate experts and exhibits; continue to fight in trials and ancillary cases (class actions, purchaser claims, state actions, and the securities litigation) despite the odds and the adverse trial court or appellate rulings;  through the entirety we gave it our best efforts to honor each other's work and contributions.

11.     I am available for any questions or additional information that may be of import to this Committee. On behalf of myself, Carlene and her family, please accept our gratitude to have been included in this MDL. Our CVs have been provided to Wegmann Dazet & Company. I believe we are seasoned and dedicated enough lawyers to have offered significant benefit to the overall scope and outcome of this litigation and MDL.

FURTHER AFFIANT SAYETH NOT.                SIGNED this 31st day of October, 2008.

Shelly A. Sanford                          Notary Public – State of Texas

CAT ALVEAR
Notary Public, State of Texas
My Commission Expires
September 22, 2010

**3 | P a g e**

FAC Resp. Exhibit B -- 1530

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | MDL Docket No. 1657 |
| **PRODUCTS LIABILITY LITIGATION** | SECTION L |
| | JUDGE FALLON |
| | MAGISTRATE JUDGE KNOWLES |

## AFFIDAVIT OF CHISTOPHER A. SEEGER IN SUPPORT OF THE SEEGER WEISS LLP FEE ALLOCATION SUBMISSION

I, Christopher A Seeger, make the following sworn statement based on personal knowledge:

1.      I am the founding Partner of the law firm, Seeger Weiss LLP.  During the course of the Vioxx litigation, Seeger Weiss dedicated a large number of senior partners, associates, and paralegals to actively participate in both the federal multi-district litigation and the mass tort litigation centralized in Atlantic County, New Jersey.  The attorneys involved not only made significant contributions to the litigation, but assumed key leadership roles as well.  *See* annexed Appendix, at ¶ 1.  This contribution was made in several areas and on multiple fronts, including but not limited to: case administration and discovery; trial prosecution and trial package development; and settlement negotiations and administration.  As detailed in its time and expense submissions, Seeger Weiss attorneys and paralegals spent more than 57,000 hours litigating these actions, and expended in excess of $3.9 million.  Indeed, for some of our attorneys, the Vioxx litigation was the primary focus of their practice.

## Case Administration & Discovery

2.      Early on Seeger Weiss took on a leadership role with its appointment as liaison counsel for the coordinated New Jersey VIOXX litigation in the summer of 2003.  Seeger Weiss litigated the case aggressively in New Jersey, through tough negotiations, extensive motion practice, and coordinated discovery efforts with plaintiffs' counsel in New Jersey and elsewhere.  These efforts resulted in large-scale and unprecedented discovery for plaintiffs across the country.  *See* Appendix at ¶ 2.  Prior to the formation of the MDL, Seeger Weiss made significant discovery advances, including but not limited to:

- Built and maintained the infrastructure for a large, multi-user electronic document depository at its offices in New York.  This depository also made available numerous databases and raw clinical data produced by Merck, as well as deposition transcripts and exhibits.  Additionally, created document review and coding protocols, and custodial file review assignments for a database that would ultimately exceed 30 million pages;

- Reviewed countless pages of documents and identified some of the most significant "hot docs" in the litigation.  Seeger Weiss organized such documents by theme, facilitating their use at deposition, in motion practice, and at trial.  ***Ultimately, this document collection was the genesis of the MDL Exhibit Database and Theme Grid***; and

- Conducted, assisted in, or coordinated numerous depositions of important corporate witnesses, including but not limited to Beth Seidenberg, Brian Daniels, Thomas Bold, Louis Sherwood, Doug Watson, Adam Schechter, Jennifer Ng, David Anstice, Briggs Morrison, Alise Reicin, and Alan Nies.

3.      The Vioxx MDL, which was not formed until early 2005, directly benefited from the efforts described above and in the annexed Appendix, as Seeger Weiss' accomplishments in New Jersey resulted in identical, and in some cases, broader, productions and/or more favorable

1

rulings in the MDL. Indeed, much of the work-product created by Seeger Weiss, including but not limited to motions, discovery materials, and document summaries and compilations, were provided to the MDL and/or served as templates for subsequent MDL work product.

4.      After the MDL was formed, Seeger Weiss continued in its leadership role through significant participation in both the coordinated New Jersey proceedings and the MDL. Further, Seeger Weiss fostered unprecedented cooperation among state and MDL plaintiffs' counsel, resulting in coordinated discovery, litigation, and trial strategies. While serving as both co-chair of the MDL and co-liaison counsel in New Jersey, Seeger Weiss advised and consulted with counsel from around the country, litigating in both state courts and in the MDL, in advance of their depositions, court hearings, and trials.

5.      Further, Seeger Weiss continued to make significant contributions to discovery efforts after the Vioxx MDL was formed, both in New Jersey and MDL litigation. *See* Appendix at ¶ 3. Specifically, Seeger Weiss was primarily responsible for, or made significant contributions to:

- Significant participation and/or leadership on MDL committees, including but not limited to the: Plaintiffs' Steering Committee; Trial Committee; Discovery Committee; Science Committee; and Trial Package Committee, and

- Critical depositions of Merck corporate representatives and third-party witnesses, including but not limited to: Ray Gilmartin, Alise Reicin, Edward Scolnick, Dr. Eric Topol, Dr. Jerry Avorn, and Dr. David Graham. Where a Seeger Weiss attorney was not the lead examiner, he either participated in the depositions or played a significant role in the preparation for such depositions.

6.      In 2006 and 2007, Seeger Weiss organized co-plaintiffs' counsel and secured large-scale discovery and scheduling orders in New Jersey that required Merck to: (a) work up large numbers of cases for potential trial, and (b) collect and produce nearly 1,000 custodial files of Merck sales representatives. These orders placed a significant burden on Merck and Plaintiffs estimate that Merck spent several hundred million dollars in legal fees as a result of these discovery orders. It cannot be disputed that such an outcome had a significant benefit to plaintiffs in all jurisdictions, including the MDL.

**Trial Prosecution and Trial Package Development**

7.      Seeger Weiss served as lead and co-lead counsel in the cases of *Humeston v. Merck* and *Hermans/Humeston v. Merck* in 2005 and 2007, respectively. The 2007 *Humeston* trial resulted in a plaintiffs' verdict for $47.5 million. Additionally, Seeger Weiss attorneys provided valuable assistance and support to other trials throughout the country by providing exhibits, deposition cuts, motion support and templates, examination kits, appearance at oral argument and assistance with pre-trial proceedings, or simply advice regarding specific witnesses and trial themes. Seeger Weiss provided such assistance in *Ernst v. Merck, Plunkett v. Merck, Cona/McDarby v. Merck, Barnett v. Merck*, as well as trials in California and Florida. The *Ernst, McDarby*, and *Barnett*

2

trials all resulted in plaintiffs' verdicts.

8.      Seeger Weiss was also involved in the development of numerous experts with varying specialties—regardless of whether that witness was to appear in the MDL or in another jurisdiction.   Seeger Weiss attorneys were primarily responsible or played a significant role in the development and preparation of the following experts:  Wayne Ray, Dr. Richard Kronmal, Dr. David Egilman, Dr. Jerry Avorn, Cheryl Blume, John Guerigian, and Dr. Harlan Krumholz.

9.      Similarly, as detailed in the Appendix at ¶ 4, Seeger Weiss played a significant role in the development of the MDL trial package, including the Exhibit Database and Theme Grid.

## Settlement Negotiations and Administration

10.     In the Fall of 2006, Merck and plaintiff representatives from the MDL and various coordinated state court litigations, entered into a dialogue regarding potential settlement of certain VIOXX personal injury claims.  I took a leading role in these negotiations, which ultimately resulted in agreement to the $4.85 billion settlement program announced in November 2007.  These negotiations spanned nearly a year and involved multiple conference calls and face-to-face meetings.  Further, when it came time to draft the agreement and finalize its terms, Seeger Weiss attorneys again took on a significant role.  Even while I was negotiating a potential settlement agreement, Seeger Weiss attorneys began to litigate the Vioxx case more aggressively in New Jersey.  These efforts resulted in court-ordered trial settings and burdensome discovery orders on Merck that placed tremendous pressure on the Defendant to settle the litigation on a global scale.

11.     Following announcement of the Settlement Program, Seeger Weiss attorneys have participated in numerous meetings, conferences, and telephone calls with counsel from around the country, to facilitate a speedy and successful resolution to those claims subject to the settlement program.   Additionally, Seeger Weiss attorneys have appeared at numerous hearings to resolve disputes relating to the settlement.   Further, to help insure the success of the settlement program, Seeger Weiss continues to review claim packages and participate in Gates Committee meetings and teleconferences.

12.     Seeger Weiss's leadership, tenacity, and superior work product have been acknowledged by co-counsel, defense counsel, and the courts presiding over these actions.  Our significant contributions to virtually every aspect of the Vioxx litigation placed tremendous pressure on Merck and ultimately led to the successful resolution of the majority of Vioxx personal injury claims in federal and state courts.

Christopher A. Seeger, Founding Partner
Seeger Weiss, LLP

3

## **APPENDIX**

1.  Partial list of Seeger Weiss Attorneys Involved in the Vioxx Litigation

    a.  Christopher A. Seeger, Founding Partner: Vioxx MDL Co-Lead Counsel; Plaintiffs' Steering Committee, Co-Chair; Trial Committee, Co-Chair; and Plaintiffs' Negotiating Committee, Member.

    b.  David R. Buchanan, Partner: Plaintiffs' Co-Liaison Counsel, New Jersey; Vioxx MDL Discovery Committee, Co-Chair; and Science Committee, Member.

    c.  Jeffrey S. Grand: Vioxx MDL Trial Package Committee, Member; Privilege Committee, Member; and Stroke Committee, Member.

    d.  Moshe Horn:  Trial counsel, *Humeston v. Merck* (2005) and *Humeston/Hermans v. Merck* (2007).

    e.  Laurence V. Nassif: Trial counsel, *Humeston v. Merck* (2005) and *Humeston/Hermans v. Merck* (2007).

    f.  Dion Kekatos:  Third Party Payor Litigation counsel.

2.  Early on Seeger Weiss took on a leadership role with its appointment as liaison counsel for the coordinated New Jersey VIOXX litigation in the summer of 2003.  Seeger Weiss litigated the case aggressively in New Jersey, through tough negotiations, extensive motion practice, and coordinated discovery efforts with plaintiffs' counsel in New Jersey and elsewhere. *Prior to the MDL's formation*, Seeger Weiss had:

    *   Developed comprehensive master discovery requests and engaged in successful motion practice that resulted in large-scale, rolling document and database productions.  This production resulted in defense and third-party productions exceeding 30 million pages of documents and an unprecedented production of Merck databases, including its clinical trial database and adverse events reporting system.  Additionally, Seeger Weiss attorneys negotiated confidentiality and discovery orders with terms very favorable to plaintiffs;

    *   Authored, argued, and prevailed on numerous motions to compel and confidentiality challenges that ultimately resulted in a significant number of "hot documents" being available for public use, publication in scientific journals, and other sources, thereby increasing public pressure on Merck;

i

- Coordinated discovery efforts and depositions through conference calls and meetings with New Jersey counsel. Organized large educational conferences with New Jersey and other state counsel to coordinate litigation efforts and to provide instruction concerning the critical liability and science issues in the case against Merck. Indeed, at such meetings in November and December 2004, and January 2005, Seeger Weiss distributed binders of "hot documents" and other background information to participating attorneys, many of which were used in subsequent trials;

- Built and maintained the infrastructure for a large, multi-user electronic document depository at its offices in New York. This depository also made available numerous databases and raw clinical data produced by Merck, as well as deposition transcripts and exhibits. Additionally, created document review and coding protocols, and custodial file review assignments for a database that would ultimately exceed 30 million pages;

- Created the first Vioxx Backgrounder, which detailed the case against Merck and provided critical information relating to the science and marketing issues and which identified the key players in the case;

- Reviewed countless pages of documents and identified some of the most significant "hot docs" in the litigation. Further, Seeger Weiss organized such documents by theme, facilitating their use at deposition, in motion practice, and at trial. Ultimately, this document collection was the genesis of the MDL Exhibit Database and Theme Grid;

- Conducted, assisted in, or coordinated numerous depositions of important corporate witnesses, including but not limited to Beth Seidenberg, Brian Daniels, Thomas Bold, Louis Sherwood, Doug Watson, Adam Schechter, Jennifer Ng, David Anstice, Briggs Morrison, Alise Reicin, and Alan Nies.

- Developed experts and other consultants that made significant contributions to the litigation in both NJ and the MDL, ultimately being designated as generic experts in the MDL (*e.g.*, Wayne Ray, Dr. Richard Kronmal); and

- Continued to place pressure on Merck by advancing the third-party payor litigation and through cooperation with plaintiffs and public officials, pursuing other VIOXX-related claims.

3. *After the MDL was formed*, Seeger Weiss attorneys continued in their leadership role and significantly advanced the discovery and the development of the Vioxx litigation:

- Significant participation and/or leadership on MDL committees, including but not limited to the: Plaintiffs' Steering Committee; Trial Committee; Discovery Committee; Science Committee; and Trial Package Committee.

- Obtaining significant third-party and foreign discovery materials and depositions;

FAC Resp. Exhibit B -- 1536

- De-privileging thousands of documents previously withheld by Merck; and

- Critical depositions of Merck corporate representatives and third-party witnesses, including but not limited to:  Ray Gilmartin, Alise Reicin, Edward Scolnick, Dr. Eric Topol, Dr. Jerry Avorn, and Dr. David Graham.  Where a Seeger Weiss attorney was not the lead examiner, he either participated in the depositions or played a significant role in the preparation for such depositions.

4.     Seeger Weiss played a significant role in the development of the MDL trial package, including but not limited to:

- Development of cross-examination kits;

- Development and testimony preservation of key expert and fact witnesses, including but not limited to: Wayne Ray, Dr. Jerome Avorn, Dr. Eric Topol, and Edward Scolnick;

- Creation of the MDL Exhibit Database and Theme Grid, first created by Seeger Weiss in connection with the Humeston v. Merck trial then shared with the MDL for its trial package;

- Development of deposition cuts, powerpoint presentations, timelines, and trial graphics; and

- Development of a catalogue of various discovery, MIL, and Rule 702 motions, many of which were authored by Seeger Weiss attorneys or were drawn from the more than 20 substantive motions drafted and filed by Seeger Weiss in the New Jersey litigation.



NEW JERSEY OFFICE
74 SOUTH MAIN STREET
MEDFORD, NJ 08055
(609) 941-2596
(215) 546-0942 FAX

1528 WALNUT STREET, 3RD FLOOR
PHILADELPHIA, PA 19102

(215) 790-7300 • (800) 883-2299
FAX (215) 546-0942
WEBSITE: WWW.SHELLER.COM

OF COUNSEL

PALKOWITZ LAW OFFICE
PITTSBURGH, PA 15132
(412) 678-9000

L. VINCENT RAMUNNO
WILMINGTON, DE 19801

CAROLINE REEVES

Brian J. McCormick, Jr.
215-790-7325
bjmccormick@sheller.com

October 31, 2008

**VIA ELECTRONIC MAIL AND FEDERAL EXPRESS**
Russ M. Herman, Esquire
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA  70113

**Re:**   **Vioxx MDL NO. 1657; Submission for Pre-Trial Order No. 6(D)**

Dear Mr. Herman:

     In your role as Liaison Counsel in the above-referenced litigation, enclosed please find an Affidavit summarizing the work performed by Sheller, P.C. (f/k/a Sheller, Ludwig & Badey, P.C.) during the Vioxx litigation, as required by Pre-Trial Order No. 6(D).

     In addition, Sheller, P.C. request permission to speak about its entitlement to common benefit fees and reimbursement of expenses pursuant to paragraph 2 of Pre-Trial Order No. 6(D).  Sheller would prefer to make such a presentation at the Allocation Committee's meeting in Atlantic, New Jersey.

     Please feel free to contact me with any questions or concerns.

Very truly yours,

Brian J. McCormick, Jr.

BJM/jc
cc:   Stephen A. Sheller, Esquire

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| | * |
| **In re: VIOXX** | *     **MDL Docket No. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | *     **Section L** |
| | * |
| | *     **JUDGE FALLON** |
| | * |
| | * |

## AFFIDAVIT OF STEPHEN A. SHELLER, ESQ. IN SUPPORT OF SHELLER, P.C.'S REQUEST FOR AN AWARD OF ATTORNEYS' FEES FROM THE SETTLEMENT AND COST ACCOUNT

I, Stephen A. Sheller, Esquire, state as follows:

1.      I am the Founder and Managing Partner of the law firm of Sheller, P.C., formerly known as Sheller, Ludwig & Badey, P.C. ("Sheller"). I am a member of good standing of the Bars of the Commonwealth of Pennsylvania and the State of New York.

2.      Sheller's attorneys are recognized members of the mass tort bar and have had significant involvement in large, complex actions.

3.      Pursuant to Pre-Trial Order No. 6(D) (Fee Allocation Guidelines), I submit this Affidavit in support of Sheller's request for a common benefit award in the above-referenced litigation.

4.      Sheller provided enormous support for the Vioxx Litigation.

5.      For example, Haile DeBass, Esquire ("DeBass"), was one of the first attorneys to assist the Seeger Weiss law firm with the document review in the New York depository. He began working on the document review in February 2005, several weeks before the Judicial Panel on Multidistrict Litigation consolidated the cases in the U.S.D.C. for the Eastern District of Louisiana.

6.      Attorney DeBass provided the following assistance, *inter alia*, with the document depository:

- Assisted Michael Wagner, the supervising Seeger Weiss paralegal, in managing the depository;
- Given the critical responsibility of training attorneys and paralegals new to the litigation on Concordance;
- Participated in weekly telephone calls related to the document depository;
- Asked to allocate assignments for document review; and
- Organized and managed deposition packages for counsel conducting depositions.

7.      Attorney DeBass' responsibilities were greatly increased in two instances: (1) after Hurricane Katrina affected the ability of the New Orleans depository to function as a fully-operating unit; and (2) after Mr. Wagner began to assist at trial around the country and frequently had to be absent from the New York depository.

8.      Attorney DeBass commonly worked 12 hour days in the New York depository. For example in September 2005 and October 2005, Attorney DeBass worked 253 and 278 hours, respectively.

9.      Attorney DeBass also worked on several of the bellwether cases by preparing and organizing the exhibits for trial and working with the trial attorneys on witness and exhibit outlines.

10.     After Hurricane Katrina (August 2005), the Sheller firm became one of the leading firms, if not the leading firm, in managing the document review and depository.

11.     In addition, after several setbacks in various Vioxx trials, the Sheller personnel were not pulled from the Vioxx effort and continued to work diligently on the litigation until the final settlement.

2

12.     Another Sheller attorney, Gregory Waks, Esquire, also did considerable document review.  Attorney Waks was one of the first trial attorneys to work in the New York depository.

13.     Additionally, Sheller provided a paralegal, Joseph Yanick, to assist the trial team with the Humelston trial in Atlantic City, New Jersey.  Mr. Yanick spent approximately six (6) weeks in Atlantic City in the Fall of 2005 assisting with the trial.

14.     Finally, all of the work performed by any Sheller attorney or paralegal was specifically authorized by members of the PEC.

15.     Sheller attorneys participated in the discovery committee and the trial preparation committee.

16.     Sheller submits that various Seeger Weiss attorneys, including David Buchanan, Esquire, would support Attorney DeBass' performance, and the Sheller Firm's commitment to the Vioxx Litigation.  Sheller submits that two other prominent attorneys involved in the Vioxx Litigation -- Anthony Irpino, Esquire from the Irpino Law Frim, and Troy Rafferty, Esquire from Levin Papantonio – would also support this proposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

**EXECUTED this 31st day of October 2008.**

**STEPHEN A. SHELLER**

3

STATE OF TEXAS

COUNTY OF NUECES

## AFFIDAVIT TO THE ALLOCATION COMMITTEE
## PURSUANT TO PRE-TRIAL ORDER NO. 6(D)

BEFORE ME, the undersigned authority, on this day personally appeared Kathryn Snapka, after being first duly sworn upon oath, deposed and stated as follows:

"My name is Kathryn Snapka. I am competent to make this affidavit. The facts stated in this Affidavit are within my personal knowledge and are true and correct.

"I, Kathryn Snapka, of The Snapka Law Firm (formerly Snapka, Turman & Waterhouse, L.L.P.) have been involved in the representation of clients and prosecution of cases involving ingestion of Vioxx since early 2003. At that time, there were less than a handful of firms conducting any significant discovery involving Vioxx cases. Because of my experience and success in previous pharmaceutical trials, I was contacted during this time period and began my Vioxx litigation with representation of Charles Zajicek on behalf of his deceased wife, Vanessa Zajicek; Carolyn Eller on behalf of her deceased husband, Dale Eller; and Patricia Benavides, on behalf of her deceased husband, Juan Benavides. I began my research into the effects of Vioxx from an academic standpoint, as well as speaking with cardiologists and gerontologists regarding their empirical experience with the prescription of Vioxx, as well as the heavy-handed marketing conducted by Merck.

In addition, I traveled to Montgomery, Alabama, to meet with David Miceli, to discuss the cases and experts who had already expressed an opinion and who could be developed.

I learned from David Hockema, whom I have known and worked with for more than 20 years, that he and his firm were representing Felicia Garza for damages resulting from the death of her husband who died after taking Vioxx. They had obtained extensive document discovery which they had reviewed and summarized, and had deposed a large number of corporate witnesses. After I indicated to them that I, too, was involved in Vioxx litigation, I was asked to join the trial team and assist in preparing the case for trial. The Garza case was originally set for trial on November 8, 2004 (after having been removed to federal court and remanded). The case was later set for February 14, 2005. But for Merck's removal of the Garza lawsuit for a second time within thirty days of the trial, the Garza case would have been the first Vioxx case to be tried in the country.

Shortly after Vioxx was removed from the market, I realized that this was going to evolve into litigation on a national scale and decided at that time that I would devote all of my efforts primarily toward Vioxx litigation. As a result, and because of the relatively small size of my firm, I did not believe that we could take on additional mass torts. As a result, I was offered, and declined; cases involving Zyprexa, Oxycontin, Prempro and Trasylol, as well as other matters which would have required an intense involvement of my personal time.

On September 30, 2004, Merck announced the removal of Vioxx from the market. Shortly thereafter, I contacted by e-mail all of the Texas pharmaceutical lawyers that I could think of and invited them to a meeting at the Four Seasons Hotel in Houston to organize, discuss ideas, share discovery gained (primarily from the Garza case), and establish a network so that Texas litigators could provide a unified front in the ensuing battle against Merck. This was followed-up by an additional meeting in December of 2004, which was attended by Andy Birchfield and Paul Sizemore. I began speaking to groups about Vioxx and

FAC Resp. Exhibit B -- 1542

sharing what we knew. Those presentations include the November 4, 2005 Advanced Personal Injury Seminar in Corpus Christi; December 3, 2004 Scientific Evidence Workshop in Houston; May 8 & 9, 2006 Mealey's Vioxx Litigation Conference in Florida; December 10 - 12, 2006 Mealey's Vioxx Litigation Conference in Florida (co-chair); December 10 & 11, 2007 Mealey's Vioxx National Settlement Conference Roundtable; and February 15 & 16, 2008, AAJ Pharmaceutical Seminar, *David v. Goliath - How Plaintiffs are Holding Big Pharmaceutical Companies Accountable*.

I attended the meetings of the Joint Panel and Multidistrict Litigation in Florida and Dallas and I submitted my application for appointment to the Plaintiffs' Steering Committee. Even though I was not appointed to the Plaintiffs' Steering Committee, I have attended almost all of the Monthly Status Conferences, and continue to do so.

In Texas, Merck made a motion for consolidation of the cases on June 3, 2005. On June 7, 2005, the Texas Supreme Court appointed me as Plaintiffs' Liaison Counsel[1].

After Garza was removed and the case transferred to the Federal MDL, I, along with co-counsel, Joe Escobedo, vigorously pursued remand of the Garza case, filing an Emergency Motion for Remand and attending hearings related to the Garza remand. On November 23, 2005, Judge Fallon remanded this case for trial. I believe that it was one of the only, if not the only, case remanded from the Federal MDL back to the state court for trial. From the date of the remand until the trial started, the entire office was involved in trial preparations. This case was called to trial on January 24, 2006. I was involved in the trial from January 2006 through the return of verdict on April 21, 2006. As one of three lead counsel, I performed jury selection, presented Plaintiffs' expert cardiologist witness, presented the son of Mr. Garza and cross-examined Dr. Wheeler. Further, I was the team member designated to cross-examine Alise Reicin, however, the Garza case is the only case in which Merck did not present Dr. Reicin. The jury returned a verdict in Garza of thirty-two million dollars ($32,000,000.00).

On July 6, 2006, Merck filed Motions for Summary Judgment based upon preemption in two cases in the Federal MDL, *Gomez vs. Merck* and *Arnold vs. Merck*. I was counsel for Alicia Gomez and I was involved in preparing a response to the Motion for Summary Judgment and arguing at the hearing. The Motion for Summary Judgment based on preemption was ultimately denied by Judge Fallon on July 3, 2007.

With the crush of the Garza trial over, I was able to fully concentrate on the remaining Vioxx cases that were not part of the MDL and which had a good chance of succeeding and, therefore, improving the Plaintiffs' win-loss record. Lead among those cases was the Zajicek case. It involved the tragic sudden death of a young wife and mother with no risk factors in a favorable venue (South Texas) and had the added unique characteristic of being (as far as I know) the only case where autopsy testing revealed the presence of Rofecoxib in the blood. Additionally, since it was not part of the Federal MDL, nor of the State MDL, this was a matter which could be tried without regard for the State or Federal MDL timelines and the rulings could be beneficial to those proceedings as more cases were developed. Numerous depositions were taken, as well as other discovery in preparation for the trial. At virtually every MDL Status Conference, the matter of the Zajicek trial was noted and discussed and, indeed, was set for trial in February of 2008 at the time of the global settlement on November 9, 2007.

---

[1]I served in that capacity until Judge Randy Wilson appointed Tommy Fibich as Liaison Counsel for the Texas Plaintiffs. I continued to serve on the Texas Steering Committee and made several trips to Houston to attend hearings and other matters related to the Texas Consolidated Litigation.

FAC Resp. Exhibit B -- 1543

The Nettles case was another case which was removed, remanded and then sent to the Texas MDL. However, it was removed again and occupied a small category which came to be representative of the "double removal" cases; that is, cases which have been removed, remanded and removed again by Merck to avoid further proceedings on those matters. Nettles was, again, a unique case because it involved a catastrophic stroke in an otherwise healthy teenager. Once again, I vigorously appealed to the Court for the remand of the Nettles case so that this case could be returned to the Texas MDL where it had been selected to be one of the top "Plaintiffs' picks" for stroke cases to try.

Of course, I have always funded my own cases, from the retention of experts through discovery and trial.

Vioxx litigation has been, without a doubt, my number one priority as a category of litigation since 2003 and certainly after the withdrawal in September of 2004, and even after the announcement of the settlement. While I was not named to the MDL Negotiating Committee, I, nonetheless, wanted to make sure that the settlement which was announced on November 9, 2007, was something in which I could ethically, and without reservation, participate. To that end, I contacted Charles Silver at the University of Texas and asked for his review of the settlement document. I then contacted other members of the Texas Plaintiffs' Steering Committee and discussed with them my concerns and Professor Silver's opinions. At that point, we took the steps that we thought were necessary that would ensure that the clients' interests, first and foremost, would be protected, while conforming to the spirit of the agreement.

I am a board certified personal injury trial attorney and have dedicated my career to litigation. While my trials have encompassed every conceivable tort, from railroad crossing cases to crashworthiness issues, I have concentrated on pharmaceuticals and medical devices, both in and out of the mass tort context. While I am not particularly comfortable shining a spot light on myself or my involvement in the Vioxx litigation, I believe I have demonstrated a commitment to this litigation since two years before the MDL was created and which continues to the present. While I was not on the Plaintiffs' Steering Committee, I was engaged in relentlessly pressuring for trials in the cases of Zajicek and Nettles, who had no risk factors, in extremely Plaintiff-oriented jurisdictions. In my 28 years of experience, trials have been the single most driving force in ultimately motivating Defendants to settle.

I remain available for any questions from the Committee."

Further, Affiant sayeth not.

Respectfully submitted,

Kathryn Snapka

SUBSCRIBED AND SWORN TO before me the undersigned authority, on this _3/ st_ day of October, 2008, to certify which witness my hand and seal of office.

DIANA MORENO
Notary Public
STATE OF TEXAS
My Comm. Exp. 11-30-2010

NOTARY PUBLIC, STATE OF TEXAS

My Commission Expires: _11-30-2010_

3



# Vioxx Litigation Consortium

MERCK & Co. (MRK)

1999    2000    2001    2002    2003    2004

# Common Benefit Fee Affidavits

# WILLIAMS ◆ KHERKHER

**JOHN E. WILLIAMS, JR.**
MANAGING PARTNER
Attorney at Law
Board Certified Personal Injury Trial Law
Texas Board of Legal Specialization

jwilliams@williamskherkher.com

OF COUNSEL
Ned Barnett
Robert C. Kuehm

## October 31, 2008

**Vioxx Fee Allocation Committee**
**c/o Russ Herman**
**Herman, Herman Katz & Cotlar**
**820 O'Keefe Avenue**
**New Orleans, Louisiana 70013-**
**11116**

*Via Email*
*And Hand Delivery*

**Re:** *In re Vioxx Products Liability Litigation*, MDL-1657

**Dear Members of the Fee Allocation Committee:**

Enclosed are the fee affidavits contemplated by PTO 6(D) from the attorneys of the member firms of our Vioxx Litigation Consortium, Provost Umphrey Law Firm LLP, Williams Kherkher Hart & Boundas LLP, Ranier, Gayle & Elliot LLC, Watts Law Firm, LLP, and The Kaiser Firm LLP.

We ask that all of our fee affidavits be considered as one submission and that the common benefit fee award be issued jointly to our group.

---

FAC Resp. Exhibit B -- 1546

Mr. Russ Herman
Page 2
October 31, 2008

Thanks.

Yours very truly,

John Eddie Williams

cc:   Andy Birchfield
      Chris Seeger
      Arnold Levin
      Edward Blizzard
      Thomas Girardi
      Mark Lanier
      Troy Rafferty
      Perry Weitz
      Walter Umphrey
      Drew Ranier
      Mikal Watts
      Grant Kaiser

## AFFIDAVIT OF WALTER UMPHREY

BEFORE ME, the undersigned authority, on this day personally appeared WALTER UMPHREY, and after having first been duly sworn upon oath, states as follows:

1.     My name is Walter Umphrey. I am over eighteen years of age, of sound mind, and in all respects legally competent and duly authorized to make this affidavit. I have personal knowledge of the statements made herein. I am an attorney duly licensed in, and in good standing with, the State of Texas. I am doubly board-certified by the Texas Board of Legal Specialization[1] in Personal Injury Trial Law and in Labor & Employment Law. I am the Senior Managing Partner in the Provost ★ Umphrey Law Firm. The Provost ★ Umphrey Law Firm was established in 1969 and has earned a reputation over the last 39 years as one of the leading trial law firms in this country representing plaintiffs in personal injury cases, toxic torts, pharmaceutical litigation, commercial torts, and other areas of the law. I continue to be personally involved in the day-to-day operations of the firm. I attach my resume as Exhibit 1.

2.     I submit this affidavit pursuant to PTO 6(D), in support of allocation of common benefit fees in the Vioxx Litigation. In submitting this affidavit, I expressly reserve all, and do not waive any, rights relating to common benefit fees and/or their allocation.

3.     **Contribution to Outcome.** In October 2004, the Provost ★ Umphrey Law Firm joined with Williams Kherkher in Houston, Texas, led by John Eddie Williams; the Watts Law Firm in Corpus Christi, Texas, led by Mikal Watts; Ranier Gayle & Elliot in Lake Charles, Louisiana, led by Drew Ranier, and Grant Kaiser of The Kaiser Firm to form the Vioxx Litigation Consortium ("VLC"). From day one, our team committed itself to investing whatever time, talent and resources that it took to represent persons injured by Vioxx in their fight against the pharmaceutical giant, Merck & Co., in this novel and complex litigation.

4.     The efforts and resources invested by our team contributed substantially to the resolution of the litigation. As a united Consortium, Merck was fully aware that our team had the quality, talent and funds to try our cases against it, despite the substantial costs and time involved in each trial. I personally invested at least 650 hours managing the day-to-day decisions relating to VLC's litigation efforts prior to the November 9, 2007 settlement. The time I committed to this litigation has no doubt caused me to take time away from other litigation and litigation potential.

5.     **Quality of Work.** Among those in the legal profession, the Provost ★ Umphrey Law Firm is held in high esteem for its reputation and ability for quality work and for investing the time and resources necessary to win cases. One example is that I, as lead counsel, along with VLC members John Eddie Williams and Grant Kaiser, represented the State of Texas in its historic tobacco litigation. The case settled in January 1998, two days before jury selection; we achieved one of the largest legal recoveries in history, despite the tobacco industry's 40 year his-

---

[1] This is the official organization for specialization authorized by the Supreme Court of Texas.

tory of no litigation losses. It is this reputation for commitment to success that made the VLC a credible threat to Merck and along with a large, high quality case load, was in my opinion a substantial factor in bringing about the settlement with Merck.

6. **Litigation Commitment.** Our Consortium committed thousands of hours of common benefit time, as detailed in our time record submissions. Our team's commitment of time and money to this cause never waned as we fought Merck in New Orleans, New Jersey, California, Texas, and in various other state jurisdictions. We pressed forward even though Merck continued to gain trial victories and this litigation became less attractive to other plaintiff's lawyers.

7. **Partnership Participation.** I am the Senior Managing Partner of the Provost ★ Umphrey Law Firm, LLP. I am involved in running the firm on a daily basis. I was personally involved in management decisions of our Vioxx docket and as part of this responsibility, met regularly with the other Vioxx Consortium Principals regarding Vioxx issues including trial strategy, expenses and management decisions. Attorneys from my firm that worked on Vioxx included Jim Morris, Matt Willis and Darren Brown. I directly supervised the work of these attorneys, including Darren Brown, who worked daily on Vioxx cases at our firm.

8. **Non MDL Jurisdictions.** Our Consortium participated in common benefit work outside of the federal MDL including New Jersey, California, Illinois and Texas. This effort is detailed in the affidavit of other Consortium attorneys and will not be repeated here. In addition, we spent time and money to develop cases for trial in other states including Wisconsin, Maryland, Florida, and Illinois when the cases were remanded.

9. **Trials.** The VLC firms tried, as lead counsel, two of the 15 Vioxx trials that reached verdict: *Smith* in the MDL and *Schwaller* in Illinois. In addition, we provided trial assistance and support in the trials of other bellwether Vioxx cases including *Irvin, Barnett* and *Mason*. Our efforts in the trials are detailed in the affidavits of other Consortium attorneys. Overall, the VLC was involved some to a greater, and some to a lesser, extent in four of the five bellwether cases tried in the MDL.

10. **Funding.** Our Consortium contributed significant amounts to fund this litigation. Our ability and willingness to fund the litigation to the extent it required benefited all Vioxx plaintiffs and their counsel. In all, we invested more than $13.5 million in out-of-pocket expenses— all *before* settlement. Very few Plaintiffs' counsel, if any, made this level of financial commitment to Vioxx litigation. Without this level of commitment, large corporate defendants generally, and Merck particularly, have little incentive to resolve litigation.

11. Regarding specific trials, our Consortium spent more than $527,000.00 out-of-pocket in the MDL bellwether trial of *Smith*. Adding the amount of DecisionQuest's invoices, the total expenses incurred exceed $1.2 million. Few firms nationwide would make that level of commitment to try a bellwether case hand-selected by Merck, presumably because it thought it

FAC Resp. Exhibit B -- 1549

had a substantial chance of prevailing.  Those that are capable and willing to do so should be compensated accordingly.

12.   In the *Schwaller* trial in Illinois, our Consortium spent more than $460,000.00 out-of-pocket to try the case.  In addition to those trials, we spent hundreds of thousands of dollars in selecting good quality trial cases in New Jersey, California, and other state venues and began preparing them for trial.  While these cases did not ultimately proceed to trial, the efforts and funds invested no doubt contributed substantially to Merck's desire and decision to negotiate and settle this litigation.

13.   **Other.**  After the November 9, 2007 Settlement Agreement was announced, serious ethical issues arose that threatened the success of a global resolution of Vioxx.  At that time, I and other members of our team personally met with experts on legal ethics and others to try to resolve the ethical problems with the settlement.  These issues caused many plaintiffs' attorneys in Texas and elsewhere concerns of such a magnitude that the failure to solve them would likely have caused the Vioxx settlement program to fail.  As part of this effort, I, along with John Eddie Williams, Drew Ranier, Grant Kaiser and others, personally traveled to New Orleans to discuss solutions to these issues with the PNC, counsel for Merck and the Honorable Eldon E. Fallon.  We also traveled to New Jersey and attended hearings before, and in-chambers conferences with, the Honorable Carol E. Higbee and counsel for Merck and NPC to raise the importance of the ethical issues.  We are proud to say that as a result of these efforts, the ethical issues were resolved by amending the Settlement Agreement.  That allowed a great number of plaintiffs' attorneys who could not have otherwise agreed to participate to register and enroll their clients in the settlement.  In all, I spent a minimum of 55 hours attending the hearings mentioned above, as well as numerous meetings and telephone conferences with our VLC team and ethics advisors to resolve these issues.  But, the number of hours, although not insubstantial, is relatively insignificant when compared to the result achieved by those hours: resolution of the ethical issues with the settlement so that it could be a success.  In my opinion, these were some of the very most critical hours worked on the Vioxx litigation.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

/
/
/
/
/
/
/
/
/
/
/
/

FAC Resp. Exhibit B -- 1550

WALTER UMPHREY

SBUSCRIBED AND SWORN TO BEFORE ME on the 30th day of October, 2008.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

1

# WALTER UMPHREY

490 Park Street
P. O. Box 4905
Beaumont, Texas 77704
Telephone – 409-835-6000
Facsimile – 409-838-8888

## PROFESSIONAL EXPERIENCE

PROVOST UMPHREY LAW FIRM, L.L.P. 1969 - present

Founding and Managing Partner.  The Provost Umphrey Law Firm began building its reputation for excellence in Jefferson County, Texas.  Over the years it has grown to the State of Texas, the Southeast U.S. and nationwide. This law firm represents clients anywhere in America from offices in Beaumont, Tyler, and Friendswood, Texas; Memphis and Nashville, Tennessee; and Little Rock, Arkansas.

The heart and soul of Provost & Umphrey Law Firm remains Walter Umphrey. Born in Port Arthur, Texas, Walter received a football scholarship to Southern Methodist University then completed undergraduate studies at Baylor University. In 1965, Walter received his *Juris Doctorate* degree from Baylor Law School.  He then joined the Jefferson County District Attorney's Office as a prosecuting attorney and ultimately Chief Felony Prosecutor.

Beyond the practice of law, Walter has provided unwavering support to important civic and community causes. He serves as Director of the National Wildlife Association, Director of the Lady Bird Johnson Wildflower Center, Director of both Texas Regional Bancshares, Inc., and Texas State Bank. Just recently, the newest cancer institute in Southeast Texas was named the Walter Umphrey Cancer Center.

He is former vice-chairman of the Texas State Parks and Wildlife Commission (1991-1997).  His life has been one of great success and selfless giving. Walter's numerous contributions to important causes range from lighting a ballpark for physically challenged kids, to donating land for a state park on Pleasure Island. Walter helped build the new law center at Baylor University on the banks of the Brazos River.  Named the Sheila and Walter Umphrey Law Center, it is hailed as a state of the art educational facility.

## BOARD CERTIFICATIONS

Personal Injury Trial Law, Texas Board of Legal Specialization

Labor & Employment Law, Texas Board of Legal Specialization

## BAR ADMISSIONS

United States Supreme Court
United States Court of Appeals for the Fifth Circuit
United States District Court, Eastern District of Texas
United States District Court, Southern District of Texas
Supreme Court of the State of Texas

## HONORS & AWARDS

Fellow, International society of Barristers
The Best Lawyers in America
Texas Super Lawyer, 2003-2008
One of the Top Texas Lawyers of the 20th Century, Texas Lawyer Publication "Legal Legends: A Century of Texas Law and Lawyering," 2000

## EDUCATION

BAYLOR UNIVERSITY
  *Juris Doctor*, 1965
  *BBA*, 1963

FAC Resp. Exhibit B -- 1553

## AFFIDAVIT OF JOHN EDDIE WILLIAMS, JR.

1.      My name is JOHN EDDIE WILLIAMS, JR.  I am over the age of 18 years, of sound mind, and in all respects legally competent to make this affidavit.  I have personal knowledge of the factual statements made herein.  I am an attorney duly licensed in, and in good standing with, the State of Texas.

2.      I submit this affidavit pursuant to PTO 6(D), in support of the allocation of common benefit fees in the Vioxx litigation.  In submitting this affidavit, I expressly reserve all, and do not waive any, rights relating to common benefit fees and/or their allocation.

3.      I am the founding and managing partner of the law firm of Williams, Kherkher, Hart and Boundas, LLP, based in Houston, Texas. To briefly summarize my professional experience and qualifications:  I graduated first in my class from the Baylor School of Law, where I served as Editor in Chief of the *Baylor Law Review*.  I started my career at the law firm of Fulbright & Jaworski, and left the firm in 1983 to start my own law firm to focus on representing plaintiffs in personal injury litigation, which I have done for the past 25 years.  I am board-certified in Personal Injury Trial Law by the Texas Board of Legal Specialization and am a past President of both the Houston Trial Lawyers Association and the Texas Trial Lawyers Association.

4.      Since 1983, our firm has represented tens of thousands of clients in a wide variety of cases against many of the biggest names in corporate America (Phillip Morris, BP, Wyeth, Merck, Phillips Petroleum, to name just a few).  For example, our firm, with others, represented the State of Texas in its lawsuit against the tobacco industry.  We accepted this case at great risk, at a time when most considered such litigation unwinnable and, after extremely difficult litigation, just days before jury selection, we achieved the largest settlement in U.S. history for our home state.  For over 25 years, we consistently have shown our willingness to take on and try tough cases and to stand up for the rights of our clients.

5.      We have been a leader in the fight to make prescription drugs safer and in holding pharmaceutical companies accountable when they injure consumers.  We have handled thousands of cases against drug companies.  We actively litigate and try these cases.  For example, our attorneys have tried over a dozen pharmaceutical cases in the past several years.  I believe our firm's track record of success and our reputation as a leading plaintiffs' trial law firm have been hard earned and are well known.

6.      We have a reputation for taking cases to trial and for having the resources, trial skills and determination to pursue litigation against the most formidable defendants.  We demonstrated this again in the Vioxx litigation; I believe our active involvement was a major contribution to the litigation.  My partners, Steve Kherkher and John Boundas, tried the third MDL bellwether case, *Smith v. Merck* and, along with many other attorneys at our firm, were

1

otherwise highly engaged in the litigation.  Our attorneys collectively spent thousands of hours on the Vioxx litigation.  Affidavits from my partners and our firm's attorneys have been submitted that detail these efforts, which include participating in Vioxx trials, taking and defending depositions, developing expert witnesses, attending hearings, preparing cases for trial, and many other tasks that contributed to the litigation as a whole.  This obviously precluded us from employing these significant efforts in other litigation

7.      In addition, our firm was involved in the Vioxx litigation in a team effort with several other law firms, the Vioxx Litigation Consortium ("VLC").  The VLC members, including me personally, took on enormous risk in pursuing this litigation.  We collectively invested over $13.5 million before the settlement was announced, well over $1 million of which was devoted to trial, pretrial discovery and expert witness expenses incurred in actively pursuing cases.  We committed the work of over twenty lawyers from my firm alone and many thousands of hours of attorney time.  Our VLC team tried two Vioxx cases to verdict and assisted on several others.  In addition, we were actively pushing the litigation in jurisdictions across the country (in the MDL, Texas, New Jersey, California, and elsewhere).  For example, we tried one case in the MDL and volunteered two others (which were struck by Merck), we tried a case in Illinois, we submitted 75 cases for pretrial discovery in New Jersey so that more cases could be set for trial, and we were preparing for another upcoming trial on behalf of two Vioxx plaintiffs when the settlement was announced.  The VLC got into this litigation prepared and able to try case after case.  As such, I believe that we represented a real litigation threat to Merck and that our efforts contributed in a major way to the resolution of the litigation.

8.      I actively directed the efforts of the VLC and the efforts of our firm's attorneys, and spent hundreds of hours on the Vioxx litigation.  I oversaw and made key decisions relating to our cases.  For example, all major strategy decisions of the VLC were discussed and approved at meetings in which I personally participated.  I also routinely met with our attorneys and with VLC staff members to ensure that we were doing all that we could to advance the litigation for our clients.  The contributions of the VLC are further detailed in the affidavits of Grant Kaiser, Walter Umphrey, Mikal Watts and Drew Ranier.

9.      We also showed leadership in connection with the settlement and in amending the settlement so that attorneys in Texas and around the country were ethically able to participate. While jury verdicts and settlements obviously are important, giving our clients the best legal representation also means adhering to the highest ethical standards.  When the Vioxx settlement was announced, we were encouraged that it had the promise to afford our clients a fair resolution to their cases in the context of a very hard fought litigation.  However, once we reviewed the Settlement Agreement, significant ethical issues became apparent, ones that would render the Vioxx settlement impossible to accept. These issues included a problem in the registration affidavit requiring a lawyer to recommend the settlement to all or none of his or her clients, an issue under Model Rule 2.1 on independent and professional judgment, and an issue under Model Rule 5.6, which prohibits restrictions on the right to practice law.

2

10.     These concerns were voiced by attorneys around the country and this criticism also received substantial media attention. I personally assumed a leadership role to try to resolve these issues so that we would have a settlement that works practically for the parties yet also meets the letter and the spirit of the ethics rules of our profession. I organized a group of VLC attorneys as well as attorneys from other firms to address the issue. My role also included hiring legal ethics expert Professor Charles Silver of the University of Texas School of Law, a nationally recognized expert in the area of mass tort settlements. Professor Silver worked with our firm's General Counsel, Harry G. Potter, on the ethics issues raised by the settlement agreement. Mr. Potter currently serves on the Texas Professional Ethics Committee, is former Chairman of the State Bar Grievance Committee in Austin, Texas and has taught legal ethics at the University of Texas School of Law. Together, they assisted in drafting the motion filed with the MDL Court and attended Court hearings and negotiation sessions relating to amendments to the settlement agreement eventually approved by the Court.

11.     I attended and spoke on these ethics issues at Court conferences in New Orleans and New Jersey and had numerous meetings and conference calls with attorneys in our group, legal ethics experts, and members of the NPC and PSC. The result of our efforts were amendments and actions that rendered the settlement in compliance with the ethics rules referenced above, which ultimately made it possible for the VLC as well as many other attorneys in the country to enroll and register their clients.

JOHN EDDIE WILLIAMS, JR

SUBSCRIBED AND SWORN TO BEFORE ME on the 31ST day of October 2008.

GERILYN GORDON
Notary Public, State of Texas
My Commission Expires
March 14, 2010

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |

## AFFIDAVIT OF DREW RANIER

BEFORE ME, the undersigned authority, on this day personally appeared DREW RANIER, and after having first been duly sworn upon oath, states as follows:

1. I, *Drew Ranier*, a member of the Louisiana and Texas Bars, have practiced law for over 30 years and served as lead counsel and on PSCs in several nationally important cases. I am a member of the International Society of Barristers, a past President of the Louisiana Association for Justice, and I have served on the AAJ Board for many years. My Bar activities include President-elect of the Louisiana Bar Foundation, Trustee of the Client Assistance Foundation, and Chair of the Bench-Bar Committee. I am the senior partner of Ranier, Gayle and Elliot, LLC (RGE). **(See c.v. Exh. A)**. I have extensive complex litigation experience and special expertise in insurance coverage. I was the national insurance counsel for all Attorneys General in the Tobacco litigation and lead counsel for the State of Louisiana. I also represented the State of Louisiana in thousands of asbestos abatement claims. I am admitted to practice in the United States Supreme Court, the U.S. Fifth Circuit Court of Appeals, all the U.S. District Courts of Louisiana, the Louisiana Supreme Court and the Texas Supreme Court.

2. *PSC Administrative & Financial Contributions*. The Court appointed me to the PSC when the MDL began. I attended nearly all of the 40 Vioxx Status Conferences and participated in hundreds of PSC meetings and conference calls. I recorded 2,569.5 hours of MDL PSC work through August 2008. My firm contributed 4,419 hours through August 2008 in PSC work. My large financial commitment to the Vioxx Litigation included $300,000 to the MDL PSC capital fund, over $100,000 in submitted expenses, and another $100,000 on lawyer travel and trial expenses.   With four other leading plaintiff firms (Williams Kherkher, Provost Umphrey, Mikal Watts Law Firm, The Kaiser Firm), I formed the Vioxx Center (with its own office building, lawyers, and staff), solely dedicated to representing people injured by Vioxx.   I contributed over $3.1 million to the Vioxx Center.  My professional and financial commitment to the Vioxx MDL precluded my work and my firm's work on other cases as a leading national trial lawyer with over 30 years of experience. As a PSC member I closely coordinated all MDL activities with the Vioxx Center and my co-counsel John Eddie Williams, Walter Umphrey, Mikal Watts and Grant Kaiser, to present a united front against Merck and to get cases to trial. All five firms and the Vioxx Center worked as one with the MDL.

3. *Contributions through the PSC, RGE and the Vioxx Center*. Qualitative and quantitative evidence establishes my substantial contributions to achieving the Master Settlement Agreement ("MSA"). The Vioxx Center firms, including my firm, combined the manpower, resources, and experience necessary to reduce 30,000 potential Vioxx claimants to 2,000 high quality cases for trial. This commitment created a credible threat to pressure Merck to settle. The Vioxx Center spent thousands of hours selecting, preparing, and trying cases that benefitted every Vioxx plaintiff. I worked on MDL trials and expert preparation, important insurance discovery, and ethics issues necessary to achieve an ethically acceptable

1

settlement. My firm and the four other firms  bore the costs of trying one MDL bellwether trial, Smith, and one state trial in Illinois, Schwaller, and were on the eve of trial in the Sanderson and Romans cases in New Jersey at the time of settlement. We also prepared for the Jones and Cooper bellwether trials, which were approved by the PSC and the Court but rejected by Merck.

4. *Case Identification & Screening Program.* At a cost of approximately $12 million and over 160,000 hours, all prior to settlement, the Vioxx Center implemented a comprehensive program to medically and legally evaluate approximately 30,000 prospective clients. The Vioxx Center obtained pharmacy records to confirm Vioxx use at or around the time of the heart attack or stroke. Once use was established, treating facilities' medical records were obtained and reviewed by medical experts to confirm the diagnoses. Individuals who did not meet the Vioxx Center's strict requirements were notified and released as clients. This entire process entailed 126,000 hours of staff/paralegals, 10,000 hours of nurse paralegals, 850 hours of expert/MD review, and 23,300 hours of attorney screening. The Vioxx Center used the same criteria to screen its clients four years ago that Brown Greer is now using. These activities were thus central to assembling one of the largest groups of high quality cases to empower the MDL.

5. *The Screening Process Benefitted All Claimants.* The Vioxx Center created one of the country's most advanced and thorough client databases, as described in other affidavits. [See Affidavit of Grant Kaiser]. Although I was unaware of the settlement negotiations, during 2007, PNC firms repeatedly requested on behalf of the Court information regarding Vioxx Center clients, e.g. the percentage of clients who were heavy smokers, had high blood pressure, etc. After the MSA, it was apparent that the Vioxx Center client database had been used in the settlement negotiations and in designing the MSA matrix, thereby contributing to the common benefit.

6. *Substantial Trial Work.* Our group tried two cases to verdict, Smith (MDL bellwether) and Schwaller. Two MDL bellwether cases, Jones and Cooper, were prepared for trial by my firm and the Vioxx Center firms, approved by the PSC screening process, but ultimately rejected by Merck's lawyers. Two more cases were set for trial in New Jersey within weeks of the MSA, Sanderson and Romans. The Vioxx Center firms tried a difficult bellwether case (Smith) selected by Merck's lawyers. It dedicated all of its resources to this costly trial. In contrast, several other firms dismissed plaintiff and defense MDL bellwether selection cases, rather than try them.

I fully participated in the fifteen day Smith trial as a senior attorney. My duties included jury venire investigation and analysis, witness selection, order of proof, focus group work, shadow juror work, meeting with Merck lawyers on discovery issues, work with the Court, a variety of strategic and tactical work with trial attorneys, and work with the principals and supporting counsel from all Vioxx Center firms. The Smith and Schwaller trials entailed approximately 30 days of trial, approximately 20 live witnesses, 25 video witnesses, 40 depositions, 400 exhibits, and the customary voluminous pleadings, motions, etc. My firm alone contributed over 1,400 hours to the Smith trial. Moreover, Vioxx Center members assisted in supporting roles in the Irwin, Barnett, and Mason MDL bellwether trials.

Ranier, Gayle and Elliot and Vioxx Center members were leaders in developing MDL trials. We worked with DecisionQuest and participated in over a dozen EDLA/MDL focus groups and mock trials involving over a 100 jurors which resulted in witnesses, evidence, themes, and profiles likely to succeed in MDL jury trials. This was central in the Barnett $51 million verdict, in the other bellwether trials, and for the thousands of MDL cases which would have been tried in New Orleans. We developed the only New Orleans area expert cardiologist to testify in the MDL bellwether trials.

2

Many other Vioxx Center cases were being actively prepared for trial when the settlement was announced.  Since I was only told about a possible settlement two weeks before settlement, most of my efforts were high risk pre-settlement work.  Only a few firms in the country did this much trial work, and one Vioxx Center  firm did substantial work on the case *before* Vioxx was withdrawn from the market.  [See Affidavit of Mikal Watts].

*7. Expert Witness Development and Attacking Merck's Key Defense.*  The Vioxx Center  also retained and paid for a  leading econometric firm, LECG of Cambridge, Mass., which, under my direction, analyzed Merck's financial actions with respect to liability and its ability to pay thousands of Vioxx victims.  This involved working closely with former high level SEC personnel.  The purpose of this analysis was to establish Merck's financial reasons for rushing Vioxx to market and keeping it there.

In preparation for upcoming trials, the Vioxx Center obtained an unprecedented expert report that undermined Merck's principal defense strategy of emphasizing cardiac risk factors to compete with Vioxx as a cause of heart attacks.  Cornell University statistician Dr. Martin Wells **(Exh. B)** provided evidence that Vioxx was at its worst for high-risk patients.  The Vioxx Center's effort to understand the thousands of clinical trial computer files received in discovery made the report possible. Professor Wells "reverse engineered" the Konstam et al. meta-analysis that Merck relied on to defend Vioxx and isolated the effect of Vioxx on high-risk groups.  For example, para. 10 and Table 2 of the Wells Report show an incidence rate ratio of 10.33 for diabetics in Merck's clinical trials.  This analysis also established the inappropriateness of Konstam's grouping of Alzheimer's trials with other clinical trials (see para. 9).  The expert report, signed on Oct. 29, 2007, was about to be filed when activity ceased due to settlement developments.  In our commitment to expertly try cases with excellent evidence, we mounted a  major attack on Merck's epidemiological position with leading experts.

*8. MDL Insurance and Merits Based Discovery Work.*  I chaired the PSC Insurance Committee,  and personally prepared the written discovery, deposed the Merck Insurance Vice President, and argued the Motion to Compel one of the largest bodies of yet undiscovered liability evidence in the case, the London Insurance Arbitration evidence.  This evidence showed that Merck knew of Vioxx's dangers in 2000-01, did not disclose those dangers to its insurers,  and increased its insurance accordingly.  I  prepared and supervised the brief  supporting the Motion to Compel and in opposition to Merck's Motion for a Protective Order.  This brief is submitted as an example of the level of work performed. **(Exh. C)**.  I personally analyzed Merck's insurance policies, supervised and helped prepare the Coverage Chart which shows Merck's complex insurance plan consisting of approximately 100 policies.  The policies proved Merck's ability to pay as well as what Merck knew and when it knew it. **(Exh. D)**.  I spent hundreds of hours on this issue alone.  Moreover, our group retained one of the country's leading insurance experts to consult on insurance issues,  John Ellison of Anderson Kill in Philadelphia.

*9. Contribution to MDL Participation.*  In addition to supplying strong MDL cases and trying MDL bellwether cases, my endeavors included leading the successful fight in the PSC to establish the Court-approved 2% common benefit agreement, which provided significant incentive to join the MDL.  Much of the PSC leadership opposed the 2% common benefit level. The MDL filing pattern over time supports the common sense point that the low common benefit amount that I fought for was instrumental in achieving a sufficient quantity of MDL cases.  The 2% rate was announced in Pre-Trial Order No. 19 on 8/4/05.  Before then, approximately 1,208 cases were in the MDL.  On and after that date, 9,046 additional cases flowed into the MDL.  While other factors contributed to the growth, the MDL case

3

growth pattern shortly before and after the August 4th Order supports that Order's pivotal role in achieving a mass of cases. In the three months preceding the August 4th Order, 658 cases joined the MDL. In the three months after the Order, 908 cases joined the MDL. MDL participation thus increased about 42% around the time of PTO 19.

10. *Keeping the Settlement Viable*. The initially published settlement contained provisions requiring total participation that raised serious ethical issues. I and the other principals of my group under the leadership of John Eddie Williams, were instrumental in calling the PNC's and the New Orleans and New Jersey Courts' attention to these issues in motions, meetings and Court appearances. This led to significant modifications to the settlement allowing for full participation of clients and attorneys who would not otherwise have been able to participate. I have continued to work diligently with the PSC to resolve complications of the settlement, including changes to the matrix and large numbers of questionable deficiencies received from Merck. I have been asked by Liaison Counsel to advise lawyers throughout the country on various aspects of claims submissions.

In submitting this affidavit, I expressly reserve all, and do not waive any, rights relating to common benefit fees and/or their allocation.

I swear that the foregoing is true and correct.

**DREW RANIER**

SUBSCRIBED AND SWORN TO BEFORE ME in the City of Lake Charles, Calcasieu Parish, State of Louisiana on the 28 day of October , 2008.

NOTARY PUBLIC

**Clara M. Miller**
Notary Public ID# 78227
CALCASIEU PARISH
State of Louisiana
My Commission Expires At Death

4

**DREW RANIER**
**Ranier, Gayle & Elliot LLC**
**1419 Ryan Street**
**Lake Charles, LA 70601**
**(337) 494-7171**
**dranier@rgelaw.com**

October, 2008

**Education:**
B.A. Tulane University 1968
J.D. University of Texas 1975

**Military Service:**
United States Navy 1969-1972

**Firm Affiliation:**
Ranier, Gayle & Elliot, L.L.C.
    Mr. Ranier is the senior partner in the firm with offices in Lake Charles and New Orleans, Louisiana. The firm has a broad litigation practice involving complex class-action, mass tort, business, pension, contract, insurance, property damage and personal injury litigation including tobacco, asbestos, silicosis, admiralty and maritime, defective products, and other litigation.

**States of Admission:**
Louisiana 1975
Texas 1975

**Courts of Admission:**
United States Supreme Court
United States Court of Appeals, Fifth Circuit
United States District Courts, Eastern, Western, and Middle Districts of Louisiana
United States District Courts, Southern and Eastern Districts of Texas
Louisiana Supreme Court
Texas Supreme Court

**Professional Organizations:**
American Bar Association
Louisiana State Bar Association
        Bench Bar Committee
        Civil Procedure Bar Examiner 1980-1991
        Louisiana Client Assistance Foundation 2002-present
        Rules of Professional Conduct Committee 2005-
        Professional Assessment Committee 2005-
Louisiana Bar Foundation
        Board of Directors 2003-present
        Secretary/Treasurer 2007-



EXHIBIT
A

Curriculum Vitae
Page 2

State Bar of Texas
Louisiana Association for Justice
        President 1996-1997
American Association for Justice
        Board of Governors 1999-2005
International Society of Barristers
Calcasieu-Cameron Indigent Defender Board 1986-1990
Southwest Louisiana Trial Lawyers Association
        President 1980-1981
National Board of Civil Trial Advocacy
        Certified Civil Trial Advocate 1983
American Inns of Court Judge Albert Tate Chapter
Maritime Law Association
Phi Delta Phi Legal Fraternity

**Non-Profit Organizations:**
Louisiana Endowment for the Humanities
The Nature Conservancy

**Book Chapter:**
*Louisiana Civil Trial Procedure*, Lawyers Cooperative Practice Guide (1997), Chapter 12,
    *Closing Argument*

**Articles:**
*The Proposed Statute for a European Company*, 10 Texas International Law Journal 90
    (Winter 1975)
*Exemplary Damages: Checks and Balances on Corporate America*, 3 Louisiana Bar Journal 256
    (1996).

**Representative Seminar Presentations:**
*"Pre-Complaint Discovery in Federal Court"*, Association of Trial Lawyers of America, 1990
        Annual Convention.
*"Handling the Uninsured Motorist Claim from A to Z"*, Louisiana Trial Lawyers Association, 1991
        Winter Seminar.
*"Maritime Damages"*, Louisiana Trial Lawyers Association, 1991 Winter Seminar.
*"Punitive Damages in Driving While Intoxicated Cases"*, Louisiana Trial Lawyers Association,
        1991 Damages Seminar.
*"Burns"*, Southwest Louisiana Bar  Association, August 1995, Lake Charles, LA.
*"Exemplary Damages"*, Louisiana Trial Lawyers Association, December 1995, New Orleans, LA.
*"Recent Developments in Admiralty and Maritime Law"*, 5th Tulane University Law School Fall
        Maritime Law Seminar, September 1996, New Orleans, LA.

Curriculum Vitae
Page 3

*"Tort Reform from the Plaintiff's Perspective"*, Louisiana State Bar Association, November 1996,
   Baton Rouge, LA.
*"Tort Reform from the Plaintiff's Perspective"*, Louisiana Trial Lawyers Association, December
   1996, New Orleans, LA.
*"Insurance Coverage for Tobacco Claims"*, Andrews Tobacco Litigation Conference, April 1997,
   New Orleans, LA.
*"Emerging Issues in Tort Litigation"*, Louisiana State Bar Association, November 1997, Baton
   Rouge, LA.
*"Cross Examination"*, Louisiana Trial Lawyers Association, October 1998, New Orleans, LA.
*"Make your Case with the Jury"*, Louisiana State Bar Association, June 1999, Destin, FL.
*"The Essential Requisites of a Class Action; The Propriety of Class Actions in Mass Tort, Contract,
   Environmental and Securities Claims"*, Louisiana Judicial College, December 2001, New
   Orleans, LA.
*"Management of Complex Litigation: Role of the Attorneys"*, Louisiana State University, Paul M.
   Hebert Law Center, October 2002, New Orleans, LA.
*"Welding Rods"*, Mass Torts Made Perfect, September 2002, Paradise Island, Bahamas.
*"Welding Rod Disease/The MDL"*, Mass Torts Made Perfect, November 2003, New Orleans, LA
*"Expert Admissibility Standards: How Daubert and Frye Have Been Used in this Litigation"*,
   Mealey's Welding Rod Litigation Conference, October 2004, West Palm Beach FL.

**Expert Witness Testimony:**
*Powers v. Vista Chemical Company*, CV 93-2104 (W. D. La.) 1995
*Bryant v. Fontenot, et al*, CV 93-1800 (W. D. La) 1997
*In re: Arcadian Disaster*, CV 95-6171 (14th JDC La.) 1997
*Dix vs. Mancuso*, CV 97-0761 (W. D. La.) 1998

**Legislative Testimony:**
U. S. House of Representatives Oversight Committee on Toxic Waste, 1985
Louisiana Senate Judiciary Committee, 1996, 1997
Louisiana House of Representatives Civil Law Committee, 1996, 1997

**Litigation:**
   Counsel in hundreds of cases spanning thirty years of practice. Many of these cases involved
legally significant or novel issues, and resulted in significant verdicts, opinions or settlements. Major
cases include:

*Arthur v. Zapata Haynie Corp.,* No. 10-12001, Cameron Parish, State of Louisiana, 38th JDC.
   Lead counsel in this major maritime explosion case involving a collision between a
commercial fishing vessel and an offshore natural gas pipeline, resulting in multiple loss of life,
injury and loss of property.

Curriculum Vitae
Page 4

*Auster Oil & Gas, Inc. V. Stream,* 835 F.2d 597 (5th Cir. 1988)

Lead counsel in this complex oilfield and civil rights litigation. Obtained a new trial after being retained as lead defense counsel. A multi-million dollar compensatory and punitive damages verdict against landowner client was set aside. This case has been used in teaching federal practice and procedure.

*Boudreaux v. Pritchard Corporation,* et al, No. 95-6442, Calcasieu Parish, State of Louisiana, 14th JDC.

Lead counsel in this brain injury case resulting from an injury in the Middle East to an American resident of the United Kingdom. The case involved conflicts and choice of law issues of state, federal, United Kingdom and Middle East (Shariah/Islamic) law, and international insurance issues.

*Buckbee v. Aweco, Inc.,* 418 So.2d 698 (La. App. 3rd Cir. 1982), 542 So.2d 81 (La. App. 3rd. Cir. 1989), 561 So. 2d 76 (La. 1990), 587 So.2d 79 (La. App. 3rd Cir. 1991), 590 So.2d 580 (La. 1992), 614 So.2d 1233 (La. 1993), 626 So.2d 1191 (La. App. 3rd Cir. 1993), writ denied 631 So.2d 1162 (La. 1994).

Lead counsel in this explosion and burn damages case, involving complex issues of evidence, law and damages. The case has been cited as authority by other state and federal courts.

*Cameron Parish School Board, et al v. Texaco, Inc., et al,* CA No. 96-1222, U.S. District Court, Western District of Louisiana; and Lease Oil Anti-Trust Litigation (No. II) MDL No. 1206.

Co-counsel for Louisiana royalty owners in this nationwide class action case to recover under-payment of oil royalties for landowners and oil lessors against the world's major oil companies, which involves state and federal laws relating to mineral rights, property, contract and antitrust law.

*Daniel v. Gulf States Utilities Co.,* No. A-140,953, 58th Judicial District Court of Jefferson County, State of Texas.

Lead counsel in this complex electrical distribution design, construction and maintenance case, spanning over half a century of design. The case involved extensive electrical burns and multiple amputations.

*Johnson, et al v. Georgia-Pacific Corporation, et al.,* No. 2003-5863, Lafayette Parish, State of Louisiana, 15th JDC.

Co-lead counsel for surface and groundwater contamination from railyard operations.

*In Re: Katrina Canal Breaches Consolidated Litigation (Pertains to All Cases),* No. 05-4182K(2), Eastern District of Louisiana.

Serves as a member of the Insurance Plaintiff Steering Committee for the class arising out of Hurricanes Katrina and Rita.

Curriculum Vitae
Page 5

*LaFleur v. National Union Fire Insurance*, No. 95-3755, Calcasieu Parish, State of Louisiana, 14th JDC.

Lead counsel in this case which resulted in one of the nation's most significant reported trial judgments for damages from thoracic outlet syndrome.

*Lougon v. Era Aviation, Inc.*, No. 10-11645, Cameron Parish, State of Louisiana, 38th JDC.

Lead counsel in this complex product liability, aviation, maritime and international law case involving the design, manufacture and maintenance of an aircraft which caused multiple offshore deaths and personal injuries.

*Meredith v. Ieyoub*, No. 96-C-1110 (La. 9/9/97); 700 So. 2d 478, *rehearing denied.*

Co-lead counsel in this constitutional law case which resulted in numerous appellate arguments, including two arguments before the Louisiana Supreme Court, over the Attorney General's power and authority to act on behalf of the State in litigation matters, the Legislature's plenary powers and the separation of powers between the branches of State government.

*Myer v. U.S. Trust Company of California, N.A.*, No. CV-00-147-B-M3, U.S. District Court, Middle District of Louisiana.

Lead counsel in this pending ERISA class action case seeking recovery of damages for the mismanagement of a major employee stock ownership plan (ESOP) with over a thousand participants.

*Poe v. PPG Industries, Inc.*, No. 10-11774, Cameron Parish, State of Louisiana, 38th JDC.

Co-lead counsel in this toxic tort and maritime case in which he represented 200 commercial fisherman in their claims against a major chemical company for pollution of a river estuary system and marine life.

*Pugh Hart v. Exxon Mobil et al*, No. 2001-2629, Calcasieu Parish, State of Louisiana, 14th JDC.

Lead counsel for landowners in groundbreaking case caused by surface and groundwater contamination from oil well drilling and production.

*Richard Ieyoub, Attorney General, ex rel State of Louisiana v. The American Tobacco Company, et al*, CA No. 96-1209, Calcasieu Parish, State of Louisiana, 14th JDC.

Lead counsel in the case which recovered $4.6 billion for the State of Louisiana, and was lead national counsel for all states on issues of insurance coverage. The Louisiana case involved the law of four countries and international law, and was prosecuted in five different venues against 200 defendants.

Curriculum Vitae
Page 6

*Richard Ieyoub, Attorney General, ex rel State of Louisiana v. W. R. Grace & Co.-Conn, et al*,
95-3722 and 95-3722(A), Calcasieu Parish, State of Louisiana, 14th JDC.
    Lead counsel for the State of Louisiana in this case which recovered damages caused by the manufacture, sale and installation of asbestos-containing materials in over 160 state buildings, including hospitals and universities. This case was brought against more than 50 defendants.

*Thibodeaux v. Conoco, Inc., et al.,* No. 2003-481, Calcasieu Parish, State of Louisiana, 14th JDC.
    Co-lead class counsel to approximately 20,000 claimants for injury and exposure resulting from the release of sulfur dioxide and other toxic chemicals from a major refinery failure.

*Thomas v. Conoco, Inc.*, et al, No. 99-5078, Calcasieu Parish, State of Louisiana, 14th JDC.
    Co-lead counsel representing over 250 plaintiffs in a toxic tort case arising out of an ethylene dichloride spill from a chemical plant pipeline.

*In Re: Vioxx Products Litigation,* MDL No. 1657, Eastern District of Louisiana.
    One of twelve members of the Court appointed national Plaintiffs' Steering Committee for injuries caused by the Merck medication and counsel for several thousand injured clients.

*Walker v. The City Club of Lake Charles, Inc., et al*, No. 93-2349, Calcasieu Parish, State of Louisiana, 14th JDC.
    Lead counsel in this child brain damage case which resulted in significant settlements and plaintiff's jury verdict based on state of the art neuro-imaging and demonstrative evidence, and involved premises liability legal issues arising from architectural and construction defects in a modern commercial highrise building.

*In Re: Welding Fume Products Liability Litigation*, MDL No. 1535, Northern District of Ohio.
    One of the leaders of nationwide litigation for brain injuries to welders from toxic fume inhalation, and a member of the nine-member national MDL Plaintiffs' Executive Committee.

*Woods v. Arcadian Corp.*, No. 93-3677, Calcasieu Parish, State of Louisiana, 14th JDC.
    Lead counsel in this catastrophic chemical plant explosion case. Punitive damages were a central issue in this case, in addition to complex, international issues of design and maintenance of a chemical facility.

## DECLARATION OF MARTIN T. WELLS PH.D

1.     I, Martin T. Wells PhD, have been asked to review statistical aspects of relevant epidemiological and scientific literature and data relating to the association between rofecoxib and excess cardiovascular events.

## BACKGROUND EDUCATION AND TRAINING

2.     I am the Charles A. Alexander Professor of Statistical Sciences, Chair of the Department of Statistical Science at Cornell University, and served for six years as founding Chair and Chair of the Department of Biological Statistics and Computational Biology at Cornell University. I am also Professor of Social Statistics, Professor of Clinical Epidemiology and Health Services Research at Cornell Weill Medical School, and the Director of Research in the School of Industrial and Labor Relations at Cornell University. I am also an Elected Member of the Cornell Law School Faculty. I teach undergraduate and graduate students in statistical methodology. My students are in fields such as agriculture, biology, epidemiology, finance, law, medicine, nutrition, social science, and veterinary medicine. I have served on high-level national statistical committees, and have published many articles in leading statistical journals. I am the Editor in Chief, *ASA-SIAM Series on Statistics and Applied Probability*; Co-Editor of *The Journal of Empirical Legal Studies*; and served as an Editor of *The Journal of the American Statistical Association*. I am a Fellow of the American Statistical Association, the Royal Statistical Society, Institute of Mathematical Statistics and an elected member of the International Statistics Institute. My qualifications are further summarized on my curriculum vitae, appended hereto as Exhibit A. I have also relied on standard statistical and epidemiological publications and may rely on additional material as discovery in this case progresses.

## CONCLUSION

3.     Rofecoxib is significantly associated with excess serious adverse cardiovascular events as compared with a placebo comparator. The finding of excess risk is based on data available not later than when data were available for the analysis in Konstam et al. discussed in paragraphs 11 to 13 below.
       Rofecoxib is also associated with significant excess cardiovascular events as compared with naproxen. The finding of excess risk compared to naproxen is based on data available not later than when data were available for the analysis in Bombardier et al., discussed in paragraph 14 below.
       In statistical models that control for the presence of known cardiovascular risks, rofecoxib is associated with a significant increase of serious cardiovascular adverse events. The increase in risk associated with rofecoxib thus persists in statistical models that include known cardiovascular risk factors. The magnitude of the rofecoxib effect in models that account for known cardiovascular risk factors is similar to the magnitude of other known risk factors for adverse cardiovascular events, such as smoking and

1

FAC Resp. Exhibit B -- 1567

**EXHIBIT**
B

hypertension. In samples limited to subjects with known cardiovascular risk factors, the incidence rate ratio for rofecoxib is significantly elevated. Rofecoxib therefore is associated with elevated rates of serious adverse cardiovascular events in subjects already at increased risk of adverse events.

These conclusions are based on my own analyses and on published studies. The studies are included in the list of articles attached to this report.

## PREVIOUS ANALYSES

4.      Merck initiated a Cardiovascular Adjudication Standard Operating Procedure (SOP) in 1998 to collect potential cardiovascular serious adverse experiences from studies with its selective COX-2 agents.[1]  The basis of the SOP was a blinded systematic review by an expert panel of serious adverse experiences reported by site investigators. These adverse experiences were prespecified in the SOP as cardiovascular events. The primary endpoint outlined in the original SOP was the confirmed cardiovascular serious adverse events endpoint.

5.      VIGOR was the first trial with rofecoxib to utilize the SOP. In March of 2000, the preliminary results of VIGOR became available and an increase in the number cardiovascular adverse experiences was observed. A relative risk (95% CI) for confirmed thrombotic events for rofecoxib compared to naproxen was 2.38 (1.39, 4.00).  Due the possibility that there might be an increased risk of cardiovascular adverse experiences associated with the use of rofecoxib, a pooled cardiovascular safety analysis was conducted using all relevant data as of September 2000.  Prior to publishing a pooled analysis of the data, the decision was made to prespecify the Antiplatelet Trialists' Collaboration (APTC) combined endpoint, for all pooled analyses which included studies which were not part of the original SOP.

6.      The pooled analysis with all data available from across the rofecoxib development program was performed in September 2000, including the two ongoing trials on Alzheimer's disease. The data for this pooled analysis were derived from all rofecoxib Phase IIb through V trials conducted by Merck that lasted at least 4 weeks. Studies performed in healthy volunteers or in which rofecoxib was compared with celecoxib were excluded. Data from treatment periods using doses of rofecoxib < 12.5 mg were excluded from analysis; doses $\geq$ 12.5 mg were combined for analysis. The studies included in this pooled analysis were all trials completed and unblinded in early September 2000, as well as two ongoing trials in Alzheimer's patients. Interim data from the two Alzheimer's studies were included using a cutoff of September 15, 2000.

7.      At this point in time the primary endpoint for the pooled analysis was now the APTC endpoint. For the rofecoxib comparison to placebo the results are given in Table 3

---

[1] FDA Advisory Committee Briefing Document.  Rofecoxib FDA Advisory Committee Background Information  NDA 21-042, s007 VIOXX Gastrointestinal Safety, February 8, 2001.
http://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4090B1_02_MERCK-Vioxx.pdf.

FAC Resp. Exhibit B -- 1568

of Konstram et al. (2001).[2] Among other results, Konstram et al. (2001) report that there was no evidence that rofecoxib was associated with excess cardiovascular events compared with placebo or non-naproxen NSAIDs.  Specifically, the crude (unadjusted) pooled relative risk for the APTC endpoint was 0.84 (95% CI: 0.51, 1.38) when comparing rofecoxib relative to placebo. No significant heterogeneity was seen across indications (p=0.381). The placebo was given for a limited duration in osteoarthritis, rheumatoid arthritis, and chronic low back pain studies, so the majority of the patient years at risk were attributable to Alzheimer's patients. The Alzheimer's patients were older and the majority of patients were male.[3] Although Cox proportional hazards models were discussed in Konstam et al. to evaluate the effect of rofecoxib relative to the various comparators for the APTC endpoint, no Cox regression analysis results were in the published article.

8.      Recently Kerr et al.[4] published an analysis of the VICTOR (Vioxx in Colorectal Cancer Therapy: Definition of Optimal Regime) Trial using the Thrombotic Cardiovascular Serious Adverse Event (TCVSAE) end point as well as the APTC criteria. Of the 23 confirmed cardiovascular thrombotic events, 16 occurred in the rofecoxib group during or within 14 days after the treatment period, with an estimated relative risk of 2.66 from the Cox proportional-hazards model; (95% CI,1.03 to 6.86; p = 0.04). Analysis of the APTC end point gave an unadjusted relative risk of 1.60 (95% CI, 0.57 to 4.51; p = 0.37).

## NEW ANALYSES

9.      Merck rofecoxib clinical trial data, from the discovery process, was furnished to me by the plaintiff's attorneys.   To assess whether rofecoxib is a risk factor in the presence of other risk factors, I merged the major studies with a placebo comparator (APPROVe[5], VICTOR[6], and the placebo comparator subset of the Konstam et al. studies) and analyzed this pooled sample.  I also merged two major studies with a naproxen comparator (ADVANTAGE[7] and VIGOR[8]) and analyzed this pooled sample.  I then used

---

[2] Konstam,  MA, Weir MR,  Reicin A, Shapiro D, Sperling RS, Barr E, et al. Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib. *Circulation* 2001;104:2280-8.

[3] In the Alzheimer's/lower back pain protocols (combined in Konstam et al.) significantly more females than males were in the rofecoxib group compared to the placebo group (p=.016 chi-squared) and the females were significantly younger in the rofecoxib group as compared to the placebo group (p=.0001, Kruskal-Wallis). Since age and gender are cardiovascular risk factors, this raises concerns about combining the Alzheimer's and lower back pain studies as a block.

[4] Kerr DJ, Dunn JA, Langman MJ, et al. Rofecoxib and cardiovascular adverse events in adjuvant treatment of colorectal cancer. N Engl J Med 2007;357:360-9.

[5] Bresalier RS, Sandler RS, Quan H, Bolognese JA, Oxenius B, Horgan K, Lines C, Riddell R, Morton D, Lanas A, Konstam MA, Baron JA (2005) Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 352:1092–1102.

[6] Kerr DJ, et al Rofecoxib and Cardiovascular Adverse Events in Adjuvant Treatment of Colorectal Cancer *N Engl J Med* 2007;357:360-369.

[7] Lisse JR,Perlman M, Gunnar Johansson G, Shoemaker JR, Schechtman J, Skalky CS, Dixon ME, Polis AB, Mollen AJ, Geba GP for the ADVANTAGE Study Group* Gastrointestinal Tolerability and

3

Cox proportional hazards models to evaluate the magnitude of rofecoxib as a risk factor in the presence of traditional cardiac risk factors (that were available in the data), age, smoking, high cholesterol, hypertension, gender, and diabetes.[9]   Table 1 gives three columns of hazard ratios and 95% confidence intervals: (1) for placebo comparator studies with the Alzheimer's protocols, (2) for placebo comparator studies without the Alzheimer protocols (protocol numbers 78 and 91), and (3) for naproxen comparator studies. The column (2) model is preferable to the column (1) model because a test of homogeneity using an incidence rate ratio analysis shows that when the Alzheimer protocols are included homogeneity is rejected (p=.01 and see footnote 3). Excluding the Alzheimer protocols, as in column (2), yields homogeneity (p=.51). In each of the three columns it can be seen that rofecoxib is a significant risk factor and consistently has a magnitude not significantly different from some well established risk factors such as hypertension and smoking.

10.    As an additional assessment of the risk of rofecoxib I computed the incidence rate ratio for rofecoxib to placebo for various cardiovascular high risk subgroups (diabetes, high cholesterol, hypertension, male, and smoking) using the furnished data from the placebo comparator studies, and omitting the Alzheimer protocols because of the lack of homogeneity discussed in paragraph 9. The results in Table 2 show that in the presence of high cardiovascular risk factors the incidence rate ratios for rofecoxib to placebo are elevated and significantly larger than one.

11.    In the original data sets of the various protocols, included in the Konstam et al. study, there were variables that indicated whether an individual subject experienced a serious cardiovascular adverse event. I have analyzed the Konstam et al. (2001) rofecoxib comparison to placebo data using this cardiovascular adverse event indicator as the study end point. The data on the serious cardiovascular adverse event was then merged with the SAS data files supplied by Merck that appear to have served as the basis for the Konstam et al. study[10]. As in Konstam et al. (2001), my pooled analysis used individual patient data. Table 3 shows the complete list of studies included in my pooled analysis of the rofecoxib comparison to placebo.

---

Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis: A Randomized, Controlled Trial. Ann Intern Med 2003; 139: 539-546.

[8] Bombardier C, Laine L, Reicin A, Shapiro D, Burgos-Vargas R, Davis B, Day R, Ferraz MB, Hawkey CJ, Hochberg MC, Kvien TK, Schnitzer TJ (2000) Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. VIGOR Study Group. N Engl J Med 343:1520–1528..

[9] For the risk factor analysis I use the vascular event end point variable in the Konstam SAS data files rather than the serious cardiovascular adverse event end point in order to achieve compatibility with the end points in APPROVe and VICTOR. I was unable to locate smoker information in the ADVANTAGE data. Cholesterol information in the VICTOR data appear to be coded in a "hyperlipidaemia" variable, which was coded as 'yes," "no," and "?." The Cox regression models included indicator variables to account for the missing smoker and cholesterol information.

[10] I also attempted to reconstruct the Konstam et al. placebo analysis from the underlying SAS data files furnished for each study included in the Konstam analysis as a check of my newly constructed data set. The new patient years at risk did not materially differ from the patient years reported in Konstam et al. and the event counts for the ATPC end point matched. I did notice that the upper 95% confidence bound in Table 3 of Konstam for the rheumatoid arthritis relative risk should be 93.7 rather than the published 9.37.

4

12.     As explained in paragraph 9, the Alzheimer's studies display heterogeneity relative to other studies. Additional evidence of heterogeneity exists within the studies analyzed in Konstam et al. A Cox proportional hazard model limited to the Konstam studies confirms heterogeneity in the Alzheimer's studies relative to the other studies. Additional evidence supported reporting analyses limited to non-Alzheimer's studies at the time of the Konstam study. Subjects' ages, dropout rates, assignment of adverse events to different body systems within the Alzheimer studies, and unbalanced samples resulting from combining Alzheimer's and lower back pain studies supported reporting the additional analyses. Using the serious cardiovascular adverse event end point there was evidence that rofecoxib was associated with excess cardiovascular events compared with placebo. Table 4 outlines the results.

13.     I also used a Cox proportional hazards model to evaluate the effect of rofecoxib relative to the placebo comparators for the serious cardiovascular adverse event end point. I controlled for both age and gender as covariates. The hazard ratio for rofecoxib relative to the placebo comparator, controlling for age and gender, was 2.02 (95% CI, 0.99 to 4.12, p=0.05, N= 7681; 90% CI, 1.11 to 3.68). [11] In a Cox model that included the Alzheimer's studies, the hazard ratio for rofecoxib relative to the placebo comparator, controlling for age and gender, was 1.28  90% CI, 1.00 to 1.64; p=0.10, N=9772). The global proportional hazards assumptions for these comparisons were tested[12]; the non-significance of these tests implies proportionality.

14.     Rofecoxib is also associated with significant excess cardiovascular events as compared with naproxen as reported in Konstam et al. This finding of excess risk compared to naproxen is based on data available not later than when data were available for the analysis in Bombardier et al. article. [13] The number of serious adverse cardiovascular events in the VIGOR study can be derived from the furnished SAS data files. A Cox proportional hazards model[14] yields the results in Table 5 that there are significant excess cardiovascular events for both the aspirin use and non-aspirin use subgroups of the VIGOR study. This result is consistent with the expression of concern

---

[11] One often uses .05 as the significance level, although other levels can and have been used. As pointed out the *Reference Manual on Scientific Evidence* pg 358 "significance test can be either one-tailed or two-tailed, depending on the null hypothesis selected by the researcher. Since most investigators of toxic substances are only interested in whether the agent increases the incidence of disease (as distinguished from providing protection from the disease), a one-tailed test is often viewed as appropriate." The *Reference Manual on Scientific Evidence* pg 359-359 goes on to note that " Confidence levels are frequently set at 95%, though 90% (which corresponds to an alpha of .10) is also used; selection of the value is "somewhat arbitrary." An alpha of .10 for a two tailed test corresponds to an alpha of .05 for a one tailed test. Using the Alzheimer studies' original assignment of serious cardiovascular adverse events to body systems (as reflected in the files furnished to me), an analysis, controlling for age and gender, gives a hazard ratio for rofecoxib relative to the placebo comparison of 1.46 (95% CI, 1.06 to 2.00, p=0.02, N= 9772).

[12] Grambsch, P. M., and T. M. Therneau. 1994. Proportional hazards test and diagnostics based on weighted residuals. *Biometrika*. 81: 515–526.

[13] Kerr DJ, et al Rofecoxib and Cardiovascular Adverse Events in Adjuvant Treatment of Colorectal Cancer" *N Engl J Med* 2007;357:360-369.

[14] I used robust standard errors (Lin, D. Y. and L. J. Wei. The robust inference for the Cox proportional hazards model. *Journal of the American Statistical Association* 1989 84: 1074–1078).

FAC Resp. Exhibit B -- 1571

with respect to myocardial infarctions in VIGOR outlined in Curfman et al.[15] Table 1's results are also consistent with rofecoxib's elevated hazard rate in naproxen comparisons not being attributable to a naproxen protective effect.

I reserve the right to supplement or modify this declaration in the light of any new information, including more detailed information about the analyses conducted by others using the data furnished to me. In light of the voluminous literature on rofecoxib, the attached table of authorities is subject to revision.

SIGNED:

*Martin T. Wells*

DATE:          October 29, 2007

---

[15] Curfman et al. Expression of concern: Bombardier et al., "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis," N Engl J Med 2000;343:1520-8., N Engl J Med. 2005 Dec 29;353(26):2813-4.

6

**TABLE 1. Pooled Analysis of Rofecoxib as a Comparative Risk Factor**

|  | (1)<br>Placebo comparator | (2)<br>Placebo comparator-Alzheimer's excluded | (3)<br>Naproxen comparator |
|---|---|---|---|
| Rofecoxib | 1.692 | 2.559 | 1.858 |
|  | (1.276 - 2.244)** | (1.745 - 3.752)** | (1.298 - 2.658)** |
| Age | 1.063 | 1.066 | 1.072 |
|  | (1.046 - 1.081)** | (1.046 - 1.087)** | (1.053 - 1.092)** |
| Cholesterol | 1.072 | 0.797 | 1.516 |
|  | (0.783 - 1.469) | (0.531 - 1.196) | (0.958 - 2.400) |
| Diabetes | 1.873 | 2.381 | 1.660 |
|  | (1.316 - 2.664)** | (1.574 - 3.600)** | (1.022 - 2.698)* |
| Hypertension | 1.836 | 2.430 | 1.698 |
|  | (1.390 - 2.426)** | (1.714 - 3.445)** | (1.185 - 2.433)** |
| Male | 1.712 | 1.957 | 1.744 |
|  | (1.249 - 2.347)** | (1.308 - 2.930)** | (1.220 - 2.494)** |
| Smoker | 2.636 | 2.864 | 2.519 |
|  | (1.865 - 3.726)** | (1.936 - 4.237)** | (1.614 - 3.933)** |
| Observations | 16107 | 14017 | 13642 |

95% confidence intervals in parentheses, shared gamma frailties
* significant at 5%; ** significant at 1%

**TABLE 2. Rofecoxib Incidence Rate Ratio for Samples Limited to Specified Risk Factor, Placebo Comparator**

| Sample limited to subjects<br>with risk factor | Rofecoxib<br>incidence rate ratio | Lower<br>95% CI | Upper<br>95% CI | N |
|---|---|---|---|---|
| Cholesterol | 3.03 | 1.33 | 6.92 | 2421 |
| Diabetes | 10.33 | 2.68 | 39.87 | 1073 |
| Hypertension | 1.66 | 1.03 | 2.7 | 4604 |
| Male | 2.43 | 1.59 | 3.72 | 6316 |
| Smoker | 3.25 | 1.43 | 7.39 | 2067 |

FAC Resp. Exhibit B -- 1573

**TABLE 3.**   **Studies Included in Cardiovascular Events Pooled Analysis of the Placebo Comparators**

| Indication for Therapy | Protocol # | Abbreviated Study Description |
|---|---|---|
| Rheumatoid arthritis | 068 | Phase IIb dose finding |
| | 096 | Phase III: domestic US |
| | 097 | Phase III: international |
| | 098+103 | Phase III: endoscopy |
| Osteoarthritis | 069 | Phase IIb/III OA studies† |
| | 083 | Bone metabolism study |
| | 085 | Nabumetone study 1 |
| | 090 | Nabumetone study 2 |
| Alzheimer/ Lower Back Pain | 078 | Alzheimer's prevention |
| | 091 | Alzheimer's treatment |
| | 120 | Phase III chronic low back pain |
| | 121 | Phase III chronic low back pain |

**TABLE 4. Pooled Analysis of Rofecoxib as a Comparative Risk Factor**

| Indication for treatment | Adverse Events/Patient-Years at Risk (Rofecoxib; Placebo) | Incidence Rate Ratio (95% CI) | Incidence Rate Ratio (95% CI) (Alzheimer's excluded) |
|---|---|---|---|
| Rheumatoid Arthritis | 11/337; 2/201 | 3.274 (0.856 -20.621) | 3.274 (0.856 -20.621) |
| Osteoarthritis | 33/654; 7/232 | 1.669 (0.811 - 3.804) | 1.669 (0.811 - 3.804) |
| Alzheimer's | 64/1138; 64/1209 | 1.062 (0.782 - 1.443) | - - |
| Low Back Pain | 1/51; 0/25 | - (0.025 - ∞) | - (0.025 - ∞) |
| Crude | | 1.140 (0.881 -1.482) | 2.191 (1.058 – 5.098)* |
| M-H[16] Adjusted | | 1.228 (0.947 – 1.593) | 2.032 (1.000 – 4.113)* |

Cox model hazard ratios for rofecoxib, adjusted for age and sex:
including Alzheimer's studies=1.28, 90% CI, 1.00 to 1.64
excluding Alzheimer's studies=2.02, 95% CI, 0.99 to 4.12; 90% CI, 1.11 to 3.68
*significant at 5%

---

[16] Mantel, N., & Haenszel, W. (1959) Statistical aspects of the analysis of data from retrospective studies of disease. Journal of the National Cancer Institute, 22, 719-748.

8

FAC Resp. Exhibit B -- 1574

**TABLE 5. Hazard Ratios for Serious Adverse Cardiovascular Events in VIGOR**

|  | (1) No aspirin therapy | (2) Aspirin therapy |
|---|---|---|
| Vioxx | 1.763 | 5.324 |
|  | (1.087 - 2.859)* | (1.545 - 18.340)** |
| Male | 2.138 | 1.530 |
|  | (1.319 - 3.466)** | (0.637 - 3.675) |
| Age | 1.085 | 1.045 |
|  | (1.061 - 1.110)** | (0.982 - 1.113) |
| Observations | 7755 | 321 |

Robust 95% confidence intervals in parentheses
* significant at 5%; ** significant at 1%

9

FAC Resp. Exhibit B -- 1575



Jan 22 2007
4:56PM

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  VIOXX                        )      **MDL NO. 1657**
**PRODUCTS LIABILITY LITIGATION**   )
                                     )      **SECTION: L**
**THIS DOCUMENT RELATES TO ALL**  )
**CASES**                                 )      **JUDGE FALLON**
                                     )      **MAG. JUDGE KNOWLES**

---

### PSC'S RESPONSE TO THE JOINT MOTION OF MERCK & CO, INC.  AND INSURERS TO QUASH AND/OR FOR PROTECTIVE ORDER PREVENTING IRRELEVANT AND INAPPROPRIATE INSURANCE RELATED DISCOVERY

**EXHIBIT**

FAC Resp. Exhibit B -- 1676

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION AND BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   MERCK AND THE INSURERS BEAR THE BURDEN OF PROOF, MERCK'S
      BOILERPLATE OBJECTIONS ARE INADEQUATE . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  INSURANCE-RELATED DISCOVERY IS REASONABLY EXPECTED TO PROVIDE
      INFORMATION NECESSARY TO UNDERSTAND MERCK'S KNOWLEDGE OF THE
      RISKS ASSOCIATED WITH VIOXX AND MERCK'S INSURANCE SYSTEM. . . . . 8

      A.    Insurance-Related Discovery Is Reasonably Likely to Provide Relevant Evidence 8

      B.    Case Law Supports Discovery About Prior Claims Brought Against Merck and
            Insurance Experience with Such Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      C.    Insurance-Related Matters Receive No Special Discovery Protection. . . . . . . . 14

            1.    Normal Rules of Discovery Apply to Insurance Policies. . . . . . . . . . . . 14
            2.    Insurance-Related Discovery Will Enable Plaintiffs to Understand Merck's
                  Insurance System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      D.    Merck Has Violated Rule 26(a)(1)(D) Insurance Policy Discovery
            Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      E.    Merck's and the Insurers' Precedents Do Not Support Their Position . . . . . . . 23

IV.   CONFIDENTIALITY DOES NOT PRECLUDE DISCOVERY OF RELEVANT
      INFORMATION FROM THE INSURANCE ARBITRATIONS. . . . . . . . . . . . . . . . . 25

      A.    Neither the Confidentiality Orders Nor UK Law Prohibit Disclosure in this Case 26

      B.    Federal Decisions Support Disclosure in this Case. . . . . . . . . . . . . . . . . . . . . . 29

            1.    Arbitration Cases Support Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . 29
            2.    Cases Allowing Discovery Despite Pre-Existing Protective Orders Support
                  Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
            3.    U.S. and UK Case Law Balance Interests in Assessing Pre-Existing
                  Confidentiality Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
            4.    Merck's and the Insurers' Precedents Do Not Support Their Position. . 36

i

FAC Resp. Exhibit B -- 1577

V.    DISCOVERY FROM THE INSURERS IS APPROPRIATE AND DIRECT ACTIONS
      AGAINST INSURERS MAKE INSURANCE-RELATED DISCOVERY CRITICAL TO
      FULFILLING THIS MDL'S MISSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      A.    Discovery From the Insurers is Appropriate and Not Overly Burdensome  . . . . 38

      B.    Discovery From the Insurers is Critical to Fulfilling This MDL's Mission  . . . . 40

            1.    Authority for Direct Actions Against the Insurers . . . . . . . . . . . . . . . . . . 40
            2.    Precluding Insurer Discovery Is Inconsistent with This MDL's Purpose  44

VI.   REQUIRING MERCK TO PRODUCE RELEVANT INFORMATION FROM DOJ AND
      SEC INVESTIGATIONS WOULD NOT IMPLICATE ATTORNEY-CLIENT PRIVILEGE
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

VII.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*Ali Shipping Corp. v. Shipyard Trogir*
    [1998] 1 Lloyd's Rep. 643, 650-651 (Ct. App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*All AT&T Corp. Fiber Optic Plaintiffs v. All AT&T Corp. Fiber Optic Defendants*
    MDL Docket No. 1313, 2002 U.S. Dist. LEXIS 11219 (S.D. Ind. June 5, 2002) . . . 23, 24

*Associated Elec. & Gas Ins. Servs. Ltd. [AEGIS] v. European Reinsurance Co. of Zurich*
    [2003] 1 All.E.R. (Comm.) 253, 1 W.L.R. 1041 (Privacy Counsel) . . . . . . . . . . . . . . . 37

*Ballard v. Allegheny Airlines, Inc.*
    54 F.R.D. 67 (E.D. Pa. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Bennett v. Krupkin*
    1999-2702 (La.App. 1st Cir. 12/22/00), 779 So.2d 923,
    *writ denied*, 2001-0193 (La.3/30/01), 788 So.2d 1190 . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Blockbuster Entertainment Corp. v. McComb Video, Inc.*
    145 F.R.D. 402 (M.D. La 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*Boyer v. Riverhead Central School Dist.*
    No. CV 05-4955, 2006 WL 3833040, at *2 (E.D.N.Y. Dec. 29, 2006) . . . . . . . . . . . . . 21

*Burns v. CLD, Inc.*
    886 So.2d 607, 614 (La. App. 2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Calabro v. Stone*
    224 F.R.D. 532, 533-34 (E.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Caringal v. Karteria Shipping, Ltd.*
    No. Civ. A 99-3159, 2001 WL 874705,
    2001 A.M.C.1236 (E.D. La. Jan. 24, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Contship ContainerLines Ltd., v. P.P.G. Industries, Inc.*
    No. 00 Civ 0194 RCCHBP, 2003 WL 1948807 (S.D.N.Y. Apr. 23, 2003) . . . . . . . . . . 30

*Covey v. Simonton*
    No. 04CV3273NG, 2005 WL 483439 at *1 (E.D.N.Y. Feb. 23, 2005) . . . . . . . . . . . . . 21

iii

**TABLE OF AUTHORITIES**
(cont'd)

Page

*Dollar v. Long Mfg., N.C., Inc.*
    561 F.2d 613, (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978) . . . . . . . . . . . . . . . . . 12

*Dolling-Baker v. Merrett*
    [1991] 2 All E.R. 890, 899 (Ct. App) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 34

*Dushkin Pub. Group, Inc. v. Kinko's Serv. Corp.*
    136 F.R.D. 334, 335-36 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Edwards v. Royal Indem. Co.*
    182 La. 171, 161 So. 191 (La. 1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Excelsior College v. Frye*
    223 F.R.D. 583 (S.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Florida ex rel. Butterworth v. Jones Chemicals, Inc.*
    148 F.R.D. 282 (M.D. Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Grubbs v. Gulf Int'l Marine, Inc.*
    625 So.2d 495 (La. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Hassneh Insurance Co. of Israel and Others v. Steuart J. Mew*
    [1993] 2 Lloyd's Rep. 243 (Q.B.), 1993 (W.L. 963287) . . . . . . . . . . . . . . . . . . . . . 29, 37

*Hedgepeth v. Guerin*
    96-1044 (La.App. 1st Cir. 3/27/97), 691 So.2d 1355, *writ denied*, 97-1377 (La. 9/26/97), 701
    So.2d 983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Hickman v. Taylor*
    450 F.3d at 1196 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re AirCrash Disaster Near Roselawn, Ind. Oct. 31, 1994*
    172 F.R.D. 295 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*
    293 F.3d 289, 291 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Enercons Virginia, Inc.*
    812 F. 2d 1469 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

iv

**TABLE OF AUTHORITIES**
(cont'd)

Page

*In re Martin Marietta Corp.*
  856 F.2d 619, 622-24 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Qwest Commc'n Int'l, Inc.*
  450 F.3d 1179, 1186-96 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Terra International, Inc.*
  134 F.3d 302, 306 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In the Matter of Talbott Bigfoot, Inc.*
  887 F.2d 611 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Jackson v. Firestone Tire & Rubber Co.*
  788 F.2d 1070, 1083 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jones & Laughlin Steel Corp. v. Matherne*
  348 F.2d 394, 401 (5th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Josephs v. Harris Corp.*
  677 F.2d 985, 991-992 (3rd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lawrence E. Jaffe Pension Plan v. Household International, Inc.*
  No. Civ.A 04-N-1228 (CBS, 04X-0057),
  2004 WL 1821968 (D. Colo. Aug.13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*LeBlanc v. Broyhill*
  123 F.R.D. 527 (W.D.N.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Lewis v. Allstate Ins. Co.*
  730 So. 2d 65, 71 (Miss. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*London & Leeds Estates Ltd. v. Parabas Ltd.*
  [1995] 02 EG 134, [1995] 1 EGLR 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*
  894 F.2d 1482, 1485 (5th Cir. 1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Missouri Pacific R. Co. v. Aetna Cas. & Sur. Co.*
  No. 3-93-CV-1898-D, 1995 WL 861146 (N.D. Tex. May 17, 1995) . . . . . . . . . . . . . . . 24

v

## TABLE OF AUTHORITIES
### (cont'd)

Page

*Mitchell v. Fruehauf Corp.*
    568 F.2d 1139, 1147 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Morales-Melendez v. S.S. Mut. Underwriting Ass'n.*
    763 F. Supp. 1174, 1179 (D.P.R. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Native American Arts, Inc. v. Bundy-Howard, Inc.*
    No. 01 C 1618, 2003 WL 1524649,
    2003 U.S. Dist. LEXIS 4393 (N.D. Ill. March 20, 2003) . . . . . . . . . . . . . . . . . . . . . . . . 23

*Nguyen v. Excel Corp.*
    197 F.3d 200 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Odfjell Asa v. Celanese AG*S
    F. Supp. 2d 283 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Oklahoma Pub. Co. v. Continental  Ins. Co.*
    No. CIV-90-1251-A, 1991 WL 323804 (W.D. Okla. Nov. 5, 1991) . . . . . . . . . . . . . . . 24

*Panola Land Buyers Ass'n v. Shuman*
    762 F.2d 1550, 1559 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Quinlan v. Liberty Bank and Trust Co.*
    575 So.2d 336, 352 (La. 1991) (on rehearing) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Ramos v. Liberty Mut. Ins. Co.*
    615 F.2d 334, *decision clarified*, 620 F.2d 464
    (5th Cir. 1980), *cert. denied sub nom.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Roesberg v. Johns-Manville Corp.*
    85 F.R.D. 292, 296-97 (E.D.Pa.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Rucker Co. v. Shell*
    449 U.S. 1112 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*S.E.C. v. Brady*
    No. 3:05CV-1416-M, 2006 WL 3301865, at *9 (N.D. Tex. Oct. 16, 2006) . . . . . . . . . . 48

*Simon v. G.D. Searle & Co.*
    816 F.2d 397, 404 (8th Cir.)., *cert. denied* 484 U.S. 917 (1987) . . . . . . . . . . . . . . . . . . 15

vi

## TABLE OF AUTHORITIES
### (cont'd)

Page

*Sun Life Assurance Co. Of Canada v. Lincoln National Life Ins. Co.*
 [2004] EWCA Civ. 1660, [2006] 1 All E.R.
 (Comm) 675, [2005] 1 Lloyd's Rep 606 (Ct. App.), at ¶ 67 . . . . . . . . . . . . . . . . . . . . . . 34

*Tajik Aluminum Plant v. Ermatov*
 [2006] All E.R. (D) 448, at ¶ 83 (Q.B.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Tucker v. Ohtsu Tire & Rubber Co., Ltd.*
 191 F.R.D. 495, 497-98 (Md. 2000) . . . . . . . . . . . . . . . . . . . . . . . 13, 30, 31, 32, 33, 34, 35

*United Oil Co., Inc. v. Parts Associates, Inc.*
 227 F.R.D. 404, 411 (D. Md. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Garrett*
 571 F.2d 1323, 1326 n.3 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. King*
 536 F.Supp. 253 (C.D. Cal. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Mass Inst. Of Tech*
 129 F.3d 681, 686 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Vertex Data Science Ltd. v. Powergen Retail Ltd.*
 2006 WL 2629805 (Q.B.), [2006] 2 Lloyd's Rep. 591 . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Westinghouse Elec. Corp. v. Republic of Philippines*
 951 F.2d 1414, 1424 (3rd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Zimmerman v. Intl. Companies & Consulting, Inc.*
 107 F.3d 344, 346 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

**Statutes**

22 Guam Code Ann., § 18305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

La. Rev. Stat. Ann., § 22:55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

La. Rev. Stat. 22:655 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

FAC Resp. Exhibit B -- 1583

**TABLE OF AUTHORITIES**
(cont'd)

Page

26 P.R. Laws Ann., tit. 26, § 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

R.I. Gen. Laws § 27-7-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

11 U.S.C. § 548 (a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

UFTA § 4(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

UFTA § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Wis. Stat., § 632.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Regulations**

Fed. R. Civ. P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 9, 21

Fed. R. Civ. P. 26(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 26(a)(1)(D)                                                        *passim*

Fed. R. Civ. P. 26(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14, 15

Fed. R. Civ. P. 26(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13, 14, 15, 30

Fed. R. Civ. P. 26(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18, 21

Fed. R. Civ. P. 26(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Fed. R. Civ. P. 26© . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 36

Fed. R. Civ. P. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 5, 25

Fed. R. Civ. P. 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

viii

FAC Resp. Exhibit B -- 1584

**TABLE OF AUTHORITIES**
(cont'd)

Page

Fed. R. Civ. P. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 40, 45

Fed. R. Evid. 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**Other Authorities**

Laurie Kratky Doré
   *Public Courts Versus Private Justice: It's Time to Let Some Sun Shine In on Alternative
   Dispute Resolution*, 81 CHI-KENT.L.Rev. 463, 510 n.252 (2006) . . . . . . . . . . . . . . . 37

Olivier Oakley-White, *Confidentiality Revisited: Is International Arbitration Losing One of its
   Major Benefits*, 6 INTERNAT'L ARB. L.Rev. 29, 31 (2003) . . . . . . . . . . . . . . . . . 27, 28

FAC Resp. Exhibit B -- 1585

The Plaintiffs' Steering Committee (PSC) files this brief in opposition to the Joint Motion of Merck & Co., Inc. And Insurers to Quash and/or for Protective Order Preventing Irrelevant and Inappropriate Insurance-Related Discovery. The PSC seeks to compel production of discovery it issued to Merck related to insurance matters of Merck and its Insurers and further seeks to compel Merck and its Insurers to designate corporate representatives to testify regarding the insurance-related issues identified in Plaintiffs' Notices of Rule 30(b)(6) Deposition, and compelling Merck and its Insurers to respond to Plaintiffs' associated Requests for Production of Documents. This Memorandum is filed in support of this Motion, in opposition to the *Joint Motion of Merck & Co., Inc. and Insurers to Quash and/or for Protective Order Preventing Irrelevant and Inappropriate Insurance-Related Discovery*, and in Reply to (1) the *Memorandum in Support of Joint Motion of Merck & Co., Inc. and Insurers to Quash and/or for Protective Order Preventing Irrelevant and Inappropriate Insurance-related Discovery* ("Joint Mem."), filed Jan. 16, 2007, and (2) *Merck & Co., Inc.'s Motion and Incorporated Memorandum for A Protective Order Preventing Corporate Deposition on Duplicative, Irrelevant and Privileged Topics* ("Merck Mem."), filed Nov. 16, 2006.

## I.    Introduction and Background.

Information about insurance-related issues in this case is vital because the disputes between Merck and its Insurers relate to liability issues and to Merck's financial condition and insurance status. Key elements of both Plaintiffs' claims and the Insurers' coverage denials are what Merck knew about the health risks of Vioxx and when the company knew it. Consequently, information about Merck's insurance coverage, Merck's communications about risk to its Insurers, and claims experience are reasonably expected to lead to admissible evidence. Plaintiffs' discovery requests

1

therefore cannot be dismissed, as Merck and its Insurers do, with boilerplate claims and objections of irrelevance.

Merck has violated FRCP 26(a)(1)(D)'s basic requirement that all possibly relevant insurance polices be produced. Despite admitting that Vioxx was in development and/or clinical trials since at least 1991, Merck has refused to provide insurance policies prior to 1996. The insurance policies that Merck has provided contain insufficient information to understand Merck's complex insurance system and its volatile changes during the Vioxx era. The discovery to date has been only policies with allegedly unknown numbers and there has not been a full explanation of how Merck or its Insurers interpret the policies' relations to each other. Testimony from knowledgeable insurance representatives of Merck and its Insurers are needed to provide Plaintiffs a reasonable understanding of Merck's insurance coverage.

Merck's and the Insurers' irrelevancy claim is inconsistent with their assertion of confidentiality. The premise of the confidentiality order they invoke is that information in the arbitration would be valuable to Plaintiffs. The confidentiality order thus shows the relevance of arbitration documents and testimony to this MDL. Such information is therefore presumptively discoverable. Merck's fabricated conflict between the confidentiality order and discovery in this case does not exist. The order expressly waives confidentiality to comply with court orders. Merck and the Insurers also misrepresent the legal rules governing UK arbitration confidentiality. Neither UK law nor U.S. law precludes reasonable discovery of testimony and documents presented in the arbitration proceedings. Both legal systems reject the ironclad confidentiality principle that Merck and the Insurers misleadingly claim to be governing law. Both legal systems balance the interest

2

in confidentiality against the need for fair adjudication.  That balancing clearly supports Plaintiffs on the facts of this case.

Merck's Insurers claim that responding to straightforward inquiries about Vioxx-related information is unduly burdensome on them as non-parties.  Discovery principles entitle Plaintiffs to discovery from non-parties with information as directly and obviously relevant as that possessed by the Insurers.  What Merck was telling all stakeholders about Vioxx risks is critical evidence in this MDL.  And while Merck's Insurers are formally non-parties, discovery from them is critical to successfully conducting this MDL.  Thousands of Plaintiffs have the right to bring direct actions against the Insurers.  Discovery from the Insurers will occur against them either now in a unified fashion or piecemeal in dozens of scattered forums.  Unified discovery from the Insurers is necessary for this MDL to fulfill its mission of efficiently processing Vioxx-related pretrial discovery.

*Plaintiffs' Diligent Pursuit of Insurance-Related Discovery.*  In an effort to understand insurance-related issues, the PSC issued discovery to Merck, consisting of a Notice of 30(b)(6) deposition and related Requests for Production of Documents, and similar discovery to the Insurers.  Merck initially identified a number of insurance policies in its Rule 26(a)(1)(D) production.  This production was limited to policies dating back to 1996 and did not include policies covering the full period of Merck's involvement with Vioxx.  Nor was the Rule 26(a)(1)(D) production accompanied by any meaningful explanation of how the various policies fit together.  Thus, some of the deposition topics and requests sought the basic information necessary to explain the complicated relationship between Merck and its Insurers.

Additional discovery was directed specifically at obtaining information relevant to the coverage issues that have taken center stage in this litigation.  The PSC asked for testimony and

3

documents relating to coverage investigations, coverage defenses, and coverage determinations made by Merck or any of its insurers. The PSC also requested information on the representations that Merck made regarding its coverage to regulatory agencies such as the SEC during the investigations that ensued after Merck withdrew Vioxx. The PSC also sought information relating to the insurance coverage arbitrations underway in London.

*Merck's and the Insurers' Responses.* Merck and the Insurers responded to the discovery requests with boilerplate objections and filed for a protective order rather than designate corporate representatives to appear at the Rule 30(b)(6) depositions.[1] After receiving Merck's responses and motion, the PSC requested a conference with Merck's lawyers in the hope of resolving at least some of these issues. That meeting took place on December 22, 2006, in Washington, D.C. Although Merck's lawyers finally provided the PSC with an insurance coverage chart at that meeting, the vast majority of discovery issues remain unresolved and, as shown below in Part III, raised as many questions as it answered.

At the discovery conference, Merck explained how Merck's various insurance policies fit together to create layers of insurance–totaling $1billion in coverage--above Merck's $25 million self-insured-retention level. But Merck refused to provide the PSC with any additional insurance-related information. Merck argued, incredibly, that none of the discovery that the PSC requested would be relevant or lead to the discovery of admissible evidence. Merck also relied on the alleged confidentiality of its London arbitrations, as well as the confidentiality of U.S. government investigations, as excuses to refuse further production. At the conclusion of the meeting, Merck's

---

[1] See Merck's discovery responses, attached as Exhibit "B" to Merck's Motion and Memorandum For Protective Order filed November 16, 2006; see Insurer's Discovery Responses, attached to the Omnibus filing as Exhibits "L" parts 1 and 2.

4

lawyers made it clear that they would not voluntarily comply with any of the PSC's remaining discovery requests.  Subsequently, the Insurers' filed responses to discovery issued by the PSC on January 10, 2007 and these responses also consist of little more than boilerplate objections.

## II.    Merck and the Insurers Bear the Burden of Proof; Merck's Boilerplate Objections Are Inadequate.

The Federal Rules of Civil Procedure support liberal discovery and allow parties to obtain discovery regarding any matter, not privileged, as long as it is relevant to either the claim or defense of any party. FRCP 26(b)(1).   The Rules state that "relevant" information does not have to be admissible at trial as long as it is reasonably calculated to lead to the discovery of admissible evidence. *Id.*

As the party resisting discovery, Merck and the Insurers must show specifically how the PSC's Notice of 30(b)(6) Deposition and Requests for Production are not relevant, or how each question is vague, overly broad, unduly burdensome, or otherwise improper. *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,* 894 F.2d 1482, 1485 (5th Cir. 1990) ("party resisting discovery 'must show specifically how . . . each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive,'" *quoting Josephs v. Harris Corp.,* 677 F.2d 985, 991-992 (3rd Cir. 1982) (in turn *quoting Roesberg v. Johns-Manville Corp.,* 85 F.R.D. 292, 296-97 (E.D.Pa.1980)). Similarly the Joint Motion for Protective Order must meet Rule 26(c)'s requirement of showing "good cause." The burden is therefore on Merck and the Insurers to show the necessity of its issuance, which again, "contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra International, Inc.,* 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett,* 571 F.2d 1323, 1326 n. 3 (5th Cir.1978)).

5

Contrary to Rule 26's requirements and interpretive case law, Merck's and the Insurers' response contained little more than the repetitive, conclusory statements and objections that federal courts have consistently rejected as grounds for opposing discovery.  For example, seventeen of Merck's twenty-two responses read essentially as follows:

> Merck objects to this Request on the grounds that is vague and ambiguous, overly broad and unduly burdensome, ans seeks information or documents that are not relevant to the claims or defenses of any party or to the subject matter involved in this action nor reasonably calculated to lead to the discovery beyond that contemplated by Federal Rule of Civil Procedure 26 regarding insurance coverage in so far as it seeks documents or information beyond the existence and contents of policies that may be applied to satisfy a judgement in this matter.  Subject to and without waiving its objections, Merck respectfully refers the PSC to its response to Request Nos. 1 and 2, *supra*.[2]

Merck's and the Insurers' remaining responses were similarly conclusory and demonstrated no good-faith effort to comply with the PSC's requests for information.

The Eleventh Circuit considered similar responses as the basis of a motion for protective order in *Panola Land Buyers Ass'n v. Shuman,*762 F.2d 1550, 1559 (11th Cir. 1985).  There a party objected to production requests and interrogatories by stating that they were "unnecessary, too long, too broad, require too much time, are expensive to complete, are irrelevant, are improperly timed, and entail unreasonable geographic compliance." *Id.* After considering the objections, the court held that "No mention of the Rule 26(b) factors is made in sufficient specificity to allow the magistrate and the district court, absent an abuse of discretion, to grant the motion for a protective order. The recitation of expense and burdensomeness are merely conclusory." *Id.*

---

[2] *See* Merck's responses to request for production numbers 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 19, 20, 21, 22 in Exhibit "B" to Merck's Motion and Memorandum for Protective Order filed November 16, 2006.

6

The pat objections that Merck and the Insurers repeatedly invoked in response to the PSC's discovery requests do not satisfy the burden in opposing the PSC's discovery requests or the burden of supporting the Joint Motion for Protective Order.   Merck's and the Insurers' inadequate objections, standing alone, support an order compelling Merck and the Insurers to designate corporate representatives for deposition and to respond fully to the Requests for Production.

Merck's and the Insurers' boilerplate objections of undue burden and repetitive discovery are an excuse to not provide plainly discoverable information.   They have chosen to interpret discovery requests in the most extreme and unfavorable fashion, and then used the extreme interpretation to refuse to supply plainly discoverable information.   For example, Merck and the Insurers claim that a request for "any and all" insurance policies includes "workers' compensation, automobile, employee benefits and travel insurance . . .." Joint Mem. at 13.   Plaintiffs' request, even if overbroadly phrased, was not meant to include such irrelevant insurance policies.   Merck and the Insurers have used their caricature interpretation to avoid disclosing liability policies in effect during the Vioxx era and to avoid any explanation of Merck's complex insurance system. *See* Part III *infra*. If Merck had furnished the appropriate information relative to Vioxx product liability policies, one cannot seriously believe that Plaintiffs would contest not disclosing the irrelevant insurance policies.

Merck's and the Insurers' claim of repetitious discovery is a similar subterfuge.   Plaintiffs are of course uninterested in receiving and wading through the same information twice.   But Merck and its Insurers would have the Court believe that no document or testimony in the London arbitrations disputing coverage, and no document in Merck's or its Insurers' insurance files have any relevance to these proceedings.   That is not credible.

7

III.    **Insurance-Related Discovery Is Reasonably Expected to Provide Information
Necessary to Understand Merck's Knowledge of the Risks Associated With Vioxx and
Merck's Insurance System.**

Merck and the Insurers claim that economic and legal reasons establish the irrelevance of

insurance-related discovery. Their economic argument is not rational. Merck and the Insurers claim

that Merck is pursuing the full limits of coverage under all policies and that "Merck's payments and

reserves for Vioxx-related defense costs to date already exceed the full limits of Merck's liability

insurance program." Joint Mem. at 3. Merck concludes from these assertions that "whether every

insurance dollar within the limits of Merck's liability policies will be obtained by Merck is a matter

that will have no foreseeable, practical impact on any MDL plaintiff's potential recovery . . .." *Id.*

With one billion dollars of insurance claimed by Merck on its General Liability Coverage insurance

coverage chart, Exh. "A"(the "Chart"), this position is unfathomable. It defies economic logic to

claim that the availability of one billion dollars is utterly irrelevant to every MDL claimant. With

tens of thousands of known Vioxx claimants, and a total possible liability exposure of many billions

of dollars, the claim that the availability of a billion dollars is irrelevant to this MDL is not worth

serious consideration.

**A. Insurance-Related Discovery Is Reasonably Likely to Provide Relevant Evidence.**

As a legal matter, Merck and the Insurers claim that "information regarding the nature or

extent of Merck's insurance coverage and claims is wholly irrelevant to the issue of Merck's liability

for Vioxx-related personal injury claims," Merck Mem. at 6, and that many insurance-related

matters are "inappropriate subjects for discovery because these issues are irrelevant . . .." Joint

Mem. at 11. This is incorrect. Insurance-related discovery is directly relevant to the underlying

8

merits of Vioxx cases. This is because Plaintiffs' claims against Merck and the Insurers' efforts to cancel Merck's policies likely turn on some of the same information.

Plaintiffs' claims against Merck include failure to warn, negligent concealment, misrepresentation, and fraud. Merck has acknowledged that its insurers have denied all coverage for Vioxx-related losses and sought to void their obligations to indemnify Merck against Plaintiffs' claims.[3] It is inconceivable that the basis for the insurers' denials of coverage are completely unrelated to the Plaintiffs' claims. Coverage is not being denied, for example, because Merck failed to pay its premiums. Rather, claims against Merck in both this MDL and in the arbitration proceedings hinge on related issues such as what Merck knew about the health risks associated with Vioxx and when the company knew it. The coverage issues and liability issues are not merely related; they likely are inseparable. Absent proof to the contrary, common sense dictates that information in Merck's insurance files, in its Insurers' files, and in the arbitration proceedings satisfies the Rule 26 discoverability standard.

Merck and the Insurers may be correct that, "the dealings between Merck and its Insurers do not concern whether Merck "failed to warn" or engaged in consumer protection violations . . .." Joint Mem. at 12. But those dealings indisputably concern what Merck knew about Vioxx's risks and when Merck knew it, and not merely, as the Joint Mem. sanitizes, "whether specific insurance claims submitted by Merck to its Insurers are covered by the specific terms of the contracts between them." *Id.* Furthermore, what Merck told its Insurers is directly relevant. If Merck conveyed information to Insurers about Vioxx risks that differed from the information it conveyed to doctors, patients, the FDA, or the public, such inconsistent statements would be admissible evidence.

---

[3]Merck & Co. 2006 10-Q SEC Filing attached as Exhibit "B".

9

Without knowing what Merck told its Insurers and when these Insurers were told, Plaintiffs cannot assess the consistency of Merck's Vioxx communications.

Even a cursory review of the PSC's discovery requests shows that they were designed to elicit information relating to Merck's current coverage disputes with its insurers. For example, in Request No. 4, the PSC asked for, inter alia, information regarding Merck's notifications of claims to its insurers. Merck itself admitted the relevancy of this request during the recent discovery conference when its lawyers advised the PSC that the company had provided notice of "integrated loss" to its insurers as much as three years before it actually removed Vioxx from the marketplace. The timing of this notice corresponds with a marked increase in Merck's responsibility for losses under its insurance system. *See* Part III.C.2 *infra*. Some communications transpired between Merck and its insurers during this notification period are relevant to Merck's knowledge of risk, and thus relevant to Plaintiffs' allegations against Merck.

As another example, Request No. 7 sought information regarding any coverage determinations made with respect to claims for Vioxx. This request and others like it could provide admissible evidence of negligence or other fault of Merck. Any denial of coverage would be accompanied by an explanation of the denial that would reflect the insurer's investigation of the timeliness of Merck's notice of loss. Again, any such evidence would be relevant to Plaintiffs to establish the level of Vioxx-associated risk appreciated by Merck at the time of coverage determinations.

A final example is Request No. 12, which asked for information relating to the Vioxx insurance claims files that Merck maintained. This production would establish when Merck began receiving claims for personal injuries relating to Vioxx, how the seriously the company treated those

10

claims, and what corrective actions, if any, it took as a result of the claims.  Once again, this evidence would be directly relevant to establishing negligence or some other level of fault of Merck.

Merck and the Insurers, when not arguing against insurance-related discovery, candidly admit that insurance matters, expressly including the London arbitrations, are relevant to Plaintiffs' claims.  The Confidentiality Order in the London arbitrations states:

> WHEREAS, Merck and the Insurers have a common interest in preventing the disclosure of information and documents that could jeopardize the defense and resolution of underlying claims against Merck;

Confidentiality Order at 2.[4]  This passage speaks volumes.  It establishes that Merck and its Insurers acknowledge that "information and documents" "could jeopardize" Merck's defense against Plaintiffs' claims.  Since utterly irrelevant information could not jeopardize that defense, Merck and its Insurers recognize the relevance of at least some arbitration information and documents to Plaintiffs' claims.  The Joint Mem. confirms that this MDL and other tort proceedings are the target of the Confidentiality Order.  It "is plainly intended to insulate the insurance matters from the underlying tort litigation . . .." Joint Mem. at 19.

Discovery with respect to the insurance-related information is not a "fishing expedition," Joint Mem. at 6, 15,  in which the likelihood of discovering relevant evidence is small or uncertain.  Merck's Insurers have triggered arbitration proceedings in which they deny coverage for Vioxx claims.  Merck's insurance coverage patterns have shown wild fluctuations during the Vioxx era.  Part III.C.2. *infra*.  Information in the arbitration proceedings, including documents and witness testimony, and information about Merck's insurance coverage patterns, cannot help but address what

---

[4]  See SRI Confidentiality Order attached to Defendant's Omnibus Motion as Exhibit "P"

FAC Resp. Exhibit B -- 1596

Merck knew about Vioxx and when Merck knew it. The likelihood of discovering relevant evidence is substantial.

**B.    Case Law Supports Discovery About Prior Claims Brought Against Merck and Insurance Experience with Such Claims.**

This Circuit's settled case law establishes the relevance of prior Vioxx claims brought against Merck, and the PSC's right to information about both insurance experience with respect to such claims and Insurers' efforts to deny coverage for such claims. Vioxx-related incidents brought to Merck's attention and insurer's efforts to void Merck policies based on misrepresentations or other information communicated by Merck plainly may lead to relevant evidence.

It is axiomatic in the Fifth Circuit that evidence of incidents similar to those at issue in an action are capable of constituting relevant evidence. For example, *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613 (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978), involved a backhoe accident. In discussing a discovery dispute over whether similar incidents could be discovered, the Fifth Circuit stated:

> The information sought by the plaintiff as to the existence and details of other injuries and deaths resulting from the use of Long backhoes of the 1200 model and other similar models clearly was "reasonably calculated to lead to the discovery of admissible evidence."

561 F.2d at 617. The Fifth Circuit therefore stated that, "the trial court should have compelled the defendant to answer that part of the interrogatory evaded." *Id.* The failure to require the defendant to respond to discovery requests constituted an abuse of discretion that warranted a new trial. *Id.* at 618.

Similarly, in *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, *decision clarified*, 620 F.2d 464 (5th Cir. 1980), *cert. denied sub nom. Rucker Co. v. Shell*, 449 U.S. 1112 (1981), the Fifth Circuit

12

held that a trial court erroneously excluded evidence of similar incidents. The accident in *Ramos* involved an allegedly defectively designed mast and plaintiff sought to introduce evidence of the collapse of a similar mast. The Fifth Circuit listed the ways in which evidence of similar incidents could be relevant.

> Evidence of similar accidents might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation.

615 F.2d at 338-39. The Fifth Circuit cited more than half a dozen cases in support of its position. *Id.* at 339.

It is self-evident that evidence of prior Vioxx-related insurance claims, and information about Vioxx exchanged between Merck and its Insurers, may lead to relevant evidence on one or more of the grounds recognized by the Fifth Circuit. *See also Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394, 401 (5th Cir. 1965) (evidence of prior similar incident "cannot be held inadmissible under either the federal or the state [Louisiana] rule"); *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1083 (5th Cir. 1986) (evidence of other accidents involving similar wheel rims was admissible for "purposes of proving other accidents in order to show defendants' awareness of a dangerous condition"; exclusion of evidence required reversal and new trial); *Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 1147 (5th Cir. 1978) ("evidence of other accidents involving the same product" can be admissible). Other courts concur.[5]

---

[5] E.g., *United Oil Co., Inc. v. Parts Associates, Inc.*, 227 F.R.D. 404, 411 (D. Md. 2005) ("Rule 26 and the core principles of relevancy and discovery and existing case law suggest that discovery of [defendant's] knowledge of the dangers of exposure to xylene and ethyl benzene to the liver through claims, complaints, and lawsuits regarding other products containing these chemical compounds is probative of what R & H knew or should have known about the liver toxicity of the dyes at issue here and may also provide admissible evidence on causation."); *Tucker v. Ohtsu Tire & Rubber Co., Ltd.*, 191 F.R.D. 495, 497-98 (Md. 2000) ("the plaintiffs in the Hernandez case [a case with an order protecting confidentiality and based on which defendants opposed discovery] alleged the same defect as is alleged in this case . . . . Accordingly, I am convinced that the Hernandez documents, if otherwise discoverable, are relevant to this case and may lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1).").

FAC Resp. Exhibit B -- 1598

### C.    Insurance-Related Matters Receive No Special Discovery Protection.

Merck and the Insurers thus cannot seriously contest that the PSC's discovery requests can lead to admissible evidence. They instead rely on a misstatement of the scope of discovery with respect to insurance and an unsupportable claim of arbitration-based confidentiality. In fact: (1) discovery is not constrained with respect to insurance policies, (2) the limited disclosure of policies that Plaintiffs have received already establishes the relevance of Merck's policies, and (3) the case law Merck relies on does not support limiting policy disclosure.

### 1.    Normal Rules of Discovery Apply to Insurance Policies.

Contrary to the insinuations in Merck's Mem. and the Joint Mem., insurance-related matters are not afforded special protection from discovery by the Federal Rules of Civil Procedure. Rule 26 does not limit insurance discovery to the policies. In *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 404 (8th Cir.), cert. denied, 484 U.S. 917 (1987), a case Merck cites in its Memorandum, the Eighth Circuit rejected Merck's argument in reference to Rule 26(a)(1)(D)'s precursor.[6] Searle, a drug manufacturer, sought to protect certain insurance-related documents from discovery by arguing that the former Rule 26(b)(2) contained an implicit limitation on the discovery of insurance information beyond the insurance agreement itself. 816 F.2d at 404. Like Merck, Searle argued that it had produced all of its insurance policies and that any additional insurance information was non-discoverable. *Id.* The Court disagreed, holding that any relevant insurance information must be produced:

> We cannot agree with Searle that Rule 26(b)(2) forecloses discovery of any insurance document beyond the agreement. First, the language of the rule itself

---

[6] In 1993, the FRCP shifted insurance agreements from discovery under Rule 26(b) to disclosure under Rule 26(a), but no change to the scope of discovery was intended.

14

plainly is not preclusive. Second, the advisory committee expressed concern, at least as to indemnity agreements that Rule 26(b)(2) not be interpreted to protect insurance information from discovery when that information is relevant under Rule 26(b)(1). . . . We hold, therefore, that insurance documents that are not discoverable under 26(b)(2) remain discoverable in accordance with the provisions of Rule 26(b)(1).

*Id.*

Rule 26(b) treats insurance matters the same as other matters for purposes of general discovery. Consequently, information about insurance coverage beyond the policies themselves is discoverable whenever "relevant to the claim or defense of any party." FRCP 26(b)(1). Relevance for discovery purposes is broadly construed and encompasses any material that bears on, or that reasonably could lead to any other matter that could bear on, any issue that is or may be in the case and is not limited to the issues raised by the pleadings. *E.g., In re AirCrash Disaster Near Roselawn, Ind. Oct. 31, 1994,* 172 F.R.D. 295 (N.D. Ill. 1997).

### 2. Insurance-Related Discovery Will Enable Plaintiffs to Understand Merck's Insurance System.

The Rule 26(a)(1)(D) insurance policy disclosure requirement and other insurance discovery principles serve at least one common purpose: to allow a plaintiff to understand a defendant's insurance status. In most ordinary litigation, supplying the plaintiff with a single insurance policy serves that purpose. Further explanation is not needed. In this MDL, however, disclosure of Merck's insurance policy establishes that Plaintiffs are not confronted with a single policy or even a handful of comprehensible policies. Merck is covered not so much by a policy as by an insurance system in which Merck itself serves as a key insurer. *E.g.,* Multiline Multiyear Catastrophe Excess Line Insurance Agreement, executed in 2002, at v, MRK-ANJ0000581, ANJ0000588 (listing Merck as a co-insurer with a 50.82% share). The skeletal structure of that system appears to be outlined,

15

for some years, in the General Liability Coverage chart that Merck has supplied. *See* Chart, Exh. "A".

The Chart contains entries for more than 50 items, each with its own set of per occurrence losses payable, excess amounts, and other information. For some years over 20 insurance entries on the Chart are at issue. One can assume that Merck's attorneys made a good faith effort to explain the relations among the dozens of Chart entries, including when one policy would "kick in" and other matters.

But good-faith attorney explanation is not a substitute for information that can be legally binding evidence of information that allows the PSC to explain to thousands of Plaintiffs Merck's actual insurance status. Since the purpose of insurance discovery is not merely to turn over pieces of paper, but to communicate a defendant's insurance status, Plaintiffs are entitled to ask a competent corporate representative to obtain an understanding of Merck's complex insurance system. That system is sufficiently complex, *see* Chart, that one reasonably expects only senior insurance personnel can reliably explain Merck's understanding of the policies in the system and their relation to one another. Merck's attorneys are neither authorized nor qualified to do so. Indeed, the insurance Chart provided so far has unacceptable gaps. Several of the entries in the chart, rather than including relevant data, simply state "unknown." Unknown information appears to include policy numbers. These examples and other gaps in Merck's production raise serious questions about the sufficiency of Merck's disclosures related to its insurance status.[7]

---

[7] Indeed, it would appear that Merck has simply failed to produce a large number of the policies shown by its own coverage chart to be relevant. The PSC has prepared its own coverage chart, which is attached as Exhibit "C", and it shows the policies that Merck has not yet produced.

16

The Chart also suggests a dramatic change in Merck's insurance system when awareness of Vioxx's risks was growing. At least three dramatic changes appear on the face of the Chart. First, the Chart appears to indicate that, prior to 2001, Merck's own share of its liability coverage for claims in excess of $150 million never exceeded more than $150 million. In fact, from 1998 to 2000 Merck's share of its high-end excess liability coverage decreased from $150 million to $77.875 million. Sometime in 2001, however, Merck's share exploded to over $300 million, an increase of about 300% over the prior period. That is about the time when Merck provided a notice of "integrated loss" to its Insurers. Second, the Chart shows that, prior to some time in 1998, Merck's general liability coverage terminated at $75 million. In 1998, the Chart shows general liability coverage soaring to $1 billion. Third, the Chart shows "Monoline Policy" providing about $200 million in coverage from 1998 to 2001. In 2001, "Monoline Policy" coverage plummets to $20 million, ten percent of its prior level. In light of Merck's disputes with its insurers, these wild insurance coverage fluctuations may not be routine policy changes. This Vioxx era insurance volatility,[8] combined with the Insurers' actions against Merck, require the PSC to explore the reasons for the changes with those responsible for Merck's insurance decisions and those supplying Merck insurance.

Of course, Merck's understanding of its insurance system may differ from that of its Insurers. The existence of the London arbitrations establishes that Merck and its Insurers do not agree on an

---

[8] While Merck's insurance coverage pattern was wildly fluctuating, Merck took of the extraordinary step of seeking to frustrate any New York State public policy that might limit insuring against punitive damages. E.g., Multiline Multiyear Catastrophe Excess Line Insurance Agreement, executed in 2002, at 17 ¶ 22, MRK-ANJ0000581, ANJ0000606 (providing for New York law to govern "except insofar as such law (1) may prohibit payment in respect of punitive damages hereunder . . .."); Policy XLRKS-00298-98, dated July 30, 1998, at 16, MRK-ANJ0000538, ANJ0000569.

17

important feature of Merck's insurance system, coverage for Vioxx claims. An insured-insurer dispute is not a feature of everyday litigation and discovery from insurers is therefore not at issue in routine litigation. This clearly is not routine litigation and it equally clearly does not involve routine insurance.

The PSC cannot hope to communicate to Vioxx Plaintiffs a useful portrait of Merck's insurance status, and the uncertainties relating to it, without obtaining Merck's official corporate position about its insurance system, reasons for changes in that system that are about the time of key Vioxx developments, and Merck's Insurers' interpretation of that system. Merck and its Insurers are entitled to disagree with one another; but the PSC cannot fulfill its duties without sufficient information to allow it to understand both their positions. On the complex insurance matters attending this case, barebones disclosure of Merck's complex, disputed insurance policies, without access to knowledgeable insurance personnel, does not "enable counsel . . . to make [a] realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation." Advisory Committee's Note to FRCP 26(b)(2) (1970).

**D.      Merck Has Violated Rule 26(a)(1)(D) Insurance Policy Discovery Requirements.**

FRCP 26(a)(1)(D) requires, as an initial disclosure prior to discovery, the production of "any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment." Merck produced several insurance policies in accord with this Rule. Merck has not, however, complied with the initial insurance disclosure requirement because it did not produce all potentially relevant policies for the time period during which it developed, manufactured, and marketed Vioxx.

18

The Joint Mem. asserts that there "is no basis for plaintiffs' requests for insurance materials that date back to 1990, many years before Vioxx was even in development, let alone on the market." Joint Mem. at 13 n.9. The claim that 1990 is "many years before Vioxx was even in development" is untrue. The Vioxx timeline that Merck has furnished shows that Merck invented Vioxx in 1992 based on basic science that occurred in 1991 and 1992. Merck Timeline, Exh. "D". In fact, 1991-1995 are years when Merck conducted Vioxx-related research, conducted animal and test tube studies of Vioxx, and conducted Phase I and Phase II clinical trials of Vioxx. Plaintiffs are entitled to the requested policies since the insurers "*may* be liable to satisfy part or all of a judgment which may be entered . . .." FRCP 26(a)(1)(D) (emphasis added).

As more fully discussed in Part 4 *infra*, Merck has put at issue questions of confidentiality. The issue of confidentiality makes it even more important that Merck fully disclose all possibly relevant insurance policies under Rule 26(a)(1)(D). Merck's and the Insurers' discovery resistance on the issue of confidentiality has made requested policies relevant to pretrial discovery. The policies that Merck has disclosed contain relevant information about Merck's opposition to disclosing insurance coverage, and it is almost certain that the policies which have not been disclosed will contain equally relevant information. Merck and the Insurers claim that arbitration, and the confidentiality of arbitration, are of critical concern to Merck. But Merck's insurance policies show that Merck and the Insurers often regard neither arbitration, nor the confidentiality of arbitration, as essential to protect insurance information. For example, in SRI Policy 901/LK9601639, dated May 5, 1998, beginning at MRK-ANJ0000048, between Merck and SR International Business Insurance Company Limited (SRI, referred to in the policy as "Underwriters"), Merck and its Insurers forego arbitration completely. They agree to submit to U.S.

19

court jurisdiction. "It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States" *Id.* at 27, MRK-ANJ0000077. SRI also preserved its right to commence actions in U.S. courts. "Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States . . .." *Id.* This pattern of clauses preserving access to courts appears in several policies disclosed so far.[9]

Merck policies that do contain arbitration clauses impose no confidentiality requirement. For example, Policy XLRKS-00298-98, dated July 30, 1998, at 15-16, MRK-ANJ0000538, ANJ0000568-569, provides for arbitration but makes no provision for confidentiality. Other policies contain the same features.[10] Merck's and its Insurers' failure to provide expressly for arbitration confidentiality is noteworthy because many contracts requiring arbitration in London contain detailed information about confidentiality. *E.g., Vertex Data Science Ltd. v. Powergen Retail Ltd.*, 2006 WL 2629805 (Q.B.), [2006] 2 Lloyd's Rep. 591, at ¶ 26 (clause 19.4.5, requiring confidentiality). Plaintiffs' prosecution of pretrial discovery is assisted by knowledge that Merck and its Insurers have only selectively sought to cloak their relations in confidentiality. Merck's pre-1996 pattern of dispute resolution clauses in its insurance agreements are plainly relevant to Merck's and its Insurers' motivation in seeking to invoke confidentiality.

---

[9] Lexington Ins. Co. Policy 901/LK9601639, dated Feb. 26, 1998, at 27, MRK-ANJ0000149, ANJ0000178; SRI Policy 901/LK9802419, at 28, MRK-ANJ0000257, ANJ0000286.   Policy 901/LK9802419, at 28, MRK-ANJ0000351, ANJ0000379.

[10] Multiline Multiyear Catastrophe Excess Lines Insurance Agreement, executed Feb. 2, 2002, at 16, MRK-ANJ0000451, ANJ0000469; AAIC Multiline Multiyear Catastrophe Excess Lines Insurance Agreement, Policy 01-A2-FF-0000005-00, issued Apr. 11, 2001, at 15, MRK-ANJ0000334, ANJ0000335.

The post-1995 policy production was also apparently incomplete as Merck did not even produce all of the policies since 1996 that it later identified in the discovery conference. After the recent discovery conference, however, Merck has continued to refuse to provide any additional policies, claiming that none would be "relevant" to Plaintiffs' claims. Merck's conclusion is not binding on the PSC, which must determine what insurance coverage may be available in order to properly discharge its duties. The plain language of FRCP 26 provides that all policies that "may" provide coverage must be turned over without awaiting a discovery request. Thus, as part of its initial disclosures, Merck should have provided the PSC with all general liability policies, regardless of type, dating back to the time at which the company began its first research and development of Vioxx.

Merck's unilateral decision to impose a temporal limitation on its initial insurance disclosures contravenes Rule 26(a)(1)(D), which does not support such limitations. Courts look with disfavor on attempts to limit discovery of agreements to a time period. *Calabro v. Stone,* 224 F.R.D. 532, 533-34 (E.D.N.Y. 2004). Merck's temporal limitation is based on Merck's unilateral interpretation of undisclosed insurance contracts. Courts do not require parties entitled to disclosure of insurance policies to accept interested parties' summaries of those policies in lieu of full disclosure of the policies. *Boyer v. Riverhead Central School Dist.,* No. CV 05-4955, 2006 WL 3833040, at *2 (E.D.N.Y. Dec. 29, 2006) ("The summaries [of insurance policies] provided to Plaintiff's counsel fall short of the requirements under Fed.R.Civ.P. 26(a)(1)(D)."); *Calabro v. Stone, supra,* 224 F.R.D. at 533 ("while counsel may be correct that the policies sought contain enforceable provisions excluding from their coverage the accident at issue here, plaintiff is not limited to counsel's say-so in making this determination"); *Covey v. Simonton,* No. 04CV3273NG,

FAC Resp. Exhibit B -- 1606

2005 WL 483439, at *1 (E.D.N.Y. Feb. 23, 2005) (objection to disclosure on the assumption that an insurance policy offered no coverage did not excuse failure to produce the policy).   Merck's effort to impose its interpretation of the relevant policies on Plaintiffs also directly conflicts with the avowed purpose of Rule 26(a)(1)(D), which is to "enable counsel for both sides to make the same realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation."[11]   Speculating as to the existence of additional insurance coverage is all the PSC will be able to do without the best evidence of that coverage–the policies themselves.

Merck has thus unilaterally concluded that no conceivable theory could lead to insurance coverage under any policy prior to 1996.  Merck has unilaterally concluded that no general liability or other policy could conceivably support a claim relating to any Plaintiff's cause of action. Whether to pursue claims against insurance companies is one of the important matters with respect to which the PSC is charged with gathering information.

Given the critical nature of the coverage issue to all claims in the MDL, the PSC cannot accept Merck's take-our-word-for-it approach to discovery.  The PSC would be in derogation of its duties if it did not insist on (1) concrete evidence of any and all potential funds available to pay Vioxx claims, and (2) the actual policies covering the entire Vioxx-related time period. The PSC therefore respectfully requests that the Court order Merck to produce all general liability policies dating back to 1990, as Plaintiffs have requested.

**E.    Merck's and the Insurers' Precedents Do Not Support Their Position.**

Since discovery relating to Merck's insurance policies, relating to Merck's experience under those policies, and relating to information developed in the London arbitrations disputing the

---

[11]Advisory Committee Notes to the former FRCP 26(b)(2).

FAC Resp. Exhibit B -- 1607

enforceability of those policies may lead to admissible evidence, the case law Merck relies on to limit insurance-related disclosure is inapplicable to this case. Merck and the Insurers first rely on *Excelsior College v. Frye*, 233 F.R.D. 583 (S.D. Cal. 2006). Merck Mem. at 4; Joint Mem. at 8. But that case merely holds that some non-policy insurance information is not covered by Rule 26(a)(1)(D). The court expressly recognized that discovery methods other than Rule 26(a)(1)(D) could be used to obtain additional insurance information. "The Court recognizes there may be other procedural mechanisms for obtaining information or documentation from a party regarding its insurance. *See e.g.* Fed.R.Civ.P. Rule 30, 31, 33 and 34." 233 F.R.D. at 585 n.1. The plaintiff's discovery effort in *Excelsior College* did not include requests for insurance information through these other discovery means. The court stated, "Plaintiff, however, has not requested the information through one of these means, so the question as to whether the information Plaintiff seeks is discoverable is beyond the purview of this order." *Id.* In this case, the PSC has invoked other procedural mechanisms for insurance information discovery and *Excelsior College* therefore does not support Merck's discovery stonewalling.

Similarly, Merck's and the Insurers' reliance on *Native American Arts, Inc. v. Bundy-Howard, Inc.* No. 01 C 1618, 2003 WL 1524649, 2003 U.S. Dist. LEXIS 4393 (N.D. Ill. March 20, 2003) (cited at Merck Mem. at 4; Joint Mem. at 9), is misplaced. That case held that an insurer's reservation of rights was not required to be disclosed under Rule 26(a)(1)(D). The court expressly distinguished other, more material insurance events by stating that "an actual denial of coverage . . . would surely have to be disclosed . . ." 2003 U.S. Dist. LEXIS 4393, at *6. And, like *Excelsior*

23

*College*, the court did not address the discoverability of insurance-related information pursuant to discovery routes other than Rule 26(a)(1)(D).[12]

The Joint Mem.'s reliance on *Oklahoma Pub. Co. v. Continental Ins. Co.,* No. CIV-90-1251-A, 1991 WL 323804 (W.D. Okla. Nov. 5, 1991), Joint Mem. at 9, is erroneous because the case denied discovery of drafting history, claims manuals, underwriting materials, reserves, and reinsurance agreements on the ground that there had not yet been a finding of ambiguity in the insurance policy. Given the Insurers' refusal to acknowledge coverage in this case, Merck and the Insurers cannot seriously contend that no insurance policy ambiguity exists in this case. Merck's and the Insurers' own description of *Missouri Pacific R. Co. v. Aetna Cas. & Sur. Co.*, No. 3-93-CV-1898-D, 1995 WL 861146 (N.D. Tex. May 17, 1995) shows that it too turns on the absence of a showing of ambiguity in the policy. Joint Mem. at 9.[13]

Merck has offered no coherent argument or precedent against the relevance of the insurance-related deposition testimony or requests for production. For each of the PSC requests, Merck used the same boilerplate response filled with the same conclusory objections. And Merck's arguments in its Memorandum were no more persuasive. Merck simply repeated, without explanation or justification, that the PSC's discovery requests were irrelevant and outside the scope of permissible

---

[12] Merck's and the Insurers' reliance on *All AT&T Corp. Fiber Optic Plaintiffs v. All AT&T Corp. Fiber Optic Defendants*, MDL Docket No. 1313, 2002 U.S. Dist. LEXIS 11219 (S.D. Ind. June 5, 2002), Merck Mem. at 4; Joint Mem. at 9, is also unpersuasive. That case is solely a ruling on the scope of initial disclosure under Rule 26(a)(1)(D) and provides no support for refusing disclosure sought pursuant to the other mechanisms properly invoked by the PSC. Furthermore, the court in *All AT&T* had satisfied itself through personal inspection of the document sought to be discovered that the insurance companies had "no potential liability that is contingent upon the outcome of these cases." 2002 U.S. Dist. LEXIS 11219, at *5. The court did not accept the discovery opponents bare assertion that the document sought was irrelevant.

[13] *Ballard v. Allegheny Airlines, Inc.*, 54 F.R.D. 67 (E.D. Pa. 1972), Joint Mem. at 10-11, contains no evidence that the terms of insurance coverage were in dispute. It, too, therefore does not apply to the facts of this case, in which insurance is disputed.

24

discovery. Merck stated, "Merck's insurance coverage . . . has absolutely nothing to do with the claims or defenses of any party in this case." Merck Mem. at 6; *see also* Joint Mem. at 11 (insurance-related matters are "inappropriate subjects for discovery because these issues are irrelevant . . ."). There may be grounds on which the insurers sought to void Merck's coverage that do not relate to Plaintiffs' claims. But it was incumbent on Merck and the Insurers to articulate those grounds to support their Motion. Silence about the grounds asserted by the Insurers is telling. The deposition and production requests are likely to provide Plaintiffs with previously withheld details relevant to the merits of Plaintiffs' claims.

IV.    **Confidentiality Does Not Preclude Discovery of Relevant Information from the Insurance Arbitrations.**

Merck reports that two insurance coverage arbitrations are pending in London, England, *SR International Business Insurance, Ltd. v. Merck & Co., Inc.* and *Merck &Co., Inc. v. XL Insurance (Bermuda) Ltd.* In both proceedings, Merck's Insurers seek to void policies that they sold to Merck. Evidence in the arbitration proceedings is reasonably likely to be relevant to issues in this case. Part III *supra*. The PSC therefore requested production with respect to those proceedings and served FRCP 30(b)(6) notices relating to those proceedings. During the December discovery conference, Merck's lawyers refused to discuss any aspect of the arbitration proceedings, including those as fundamental as the grounds on which the Insurers challenge coverage. Merck and the Insurers continue to assert that the arbitration proceedings are completely beyond discovery and discussion. "Merck and the Insurers are not permitted to answer questions relating to the details of the arbitration, or to produce arbitration materials, in this product liability litigation." Joint Mem. at 19.

The confidentiality claim is inconsistent with the London confidentiality orders on which Merck and the Insurers rely. Merck and the Insurers also misstate the relevant doctrines. Neither

25

UK law, nor U.S. law, nor principles of comity preclude reasonable discovery of evidence presented in the arbitration proceedings. Neither legal system endorses the draconian confidentiality principle Merck and the Insurers proffer. Both legal system adopt a balanced view, under which the interests in confidentiality are weighed against the need for fair adjudication. That balanced approach supports discovery of arbitration proceeding testimony and documentary evidence.

**A.      Neither the Confidentiality Orders Nor UK Law Prohibit Disclosure in this Case.**

Merck and the Insurers claim that Confidentiality Orders issued by the London Arbitration Tribunal[14] prevent discovery of information relating to the arbitrations. Joint Mem. at 17-23. Both the plain wording of the Confidentiality Orders, however, and UK law contradict this claim. The Orders expressly authorize disclosing arbitration-related information. Paragraph four of both Confidentiality Orders acknowledges a court's authority to order discovery:

> Nothing in this Order shall prohibit a Party from disclosing Confidential Information to the extent that such disclosure is required by court order or other applicable law.

Thus, contrary to Merck's suggestion, this is not an issue that requires the Court to assess principles of international comity. The arbitration tribunal expressly recognized that information in the arbitrations could be disclosed in court proceedings. And the language of the Orders leaves no doubt that in such a circumstance the tribunal does not regard its purportedly private proceedings as sheltering information otherwise discoverable in duly constituted court proceedings. The claim to be "expressly prohibited from revealing [arbitration-related] information under the terms of the

---

[14]See SRI Confidentiality Order and XL Confidentiality Order attached to Defendant's Omnibus Motion as Exhibits "P" and "Q" respectively.

26

confidentiality orders," Merck Mem. at 7; *see* Joint Mem. at 19, is thus incorrect except to the extent Merck and the Insurers may need a court order to validate disclosure.[15]

UK law provides Merck and the Insurers no greater shelter than do the Confidentiality Orders. As shown in Part III *supra*, the insurance policies given to Plaintiffs that contain arbitration clauses do not contain confidentiality clauses. The English Arbitration Act of 1996, under which Merck and its Insurers are arbitrating,[16] also contains no provision for confidentiality.[17] The confidentiality of the arbitrations is thus an implied and limited requirement, *see Dolling-Baker v. Merrett*, [1991] 2 All E.R. 890, 899 (Ct. App.) ("some implied obligation on both parties not to disclose"), not one that Merck and its Insurers felt necessary even to state until Merck was threatened with Vioxx-based liability.

The implied confidentiality of materials in UK arbitration proceedings is far from absolute. It is expressly subject "to an order or leave of the court." *Id.* at 899.[18] The UK approach leaves substantial discretion in a subsequent court proceeding to order disclosure notwithstanding the implied confidentiality. Documents achieve no special status by virtue of their use in an arbitration:

---

[15] Paragraph four may suggest why Merck felt a duty to resist discovery in order to generate a court order to protect it from any adverse consequences before the arbitration tribunal. But once a court discovery order issues, the tribunal's own order precludes the imposition of adverse consequences on Merck based on disclosure pursuant to the court order.

[16] E.g., Multiline Multiyear Catastrophe Excess Line Insurance Agreement, executed in 2002, at 16, MRK-ANJ0000581, ANJ0000605 (disputes shall be determined "under the provisions of the Arbitration Act of 1966").

[17] Olivier Oakley-White, *Confidentiality Revisited: Is International Arbitration Losing One of its Major Benefits*, 6 Internat'l Arb. L.Rev. 29, 31 (2003) ("it is noteworthy that the English Arbitration Act 1996 contains no provision for confidentiality").

[18]       As between the parties to an arbitration . . ., their very nature is such that there must, in my judgment, be some implied obligation on both parties not to disclose . . . save with the consent of the other party, or pursuant to an order or leave of the court.

2 All E.R. at 899.

27

> It must be perfectly apparent that, for example, the fact that a document is used in an arbitration does not *confer* on it any confidentiality or privilege which can be availed of in subsequent proceedings. If it is a relevant document, its relevance remains . . . .

*Id.* If a document has a "sufficient likelihood" of being relevant to the fair disposal of a case, UK courts do not regard implied arbitration confidentiality as precluding discovery. "If [the court] is satisfied that, despite the implied obligation, disclosure and inspection is necessary for the fair disposal of the action, that consideration *must* prevail." *Id.* at 899 (emphasis added). If necessary, disclosure can be initially limited to supplying the information to the court–sufficient likelihood of relevance may "warrant the document being produced to the court . . . so that the learned judge may make his own assessment whether its production is necessary for the fair disposal of the action." *Id.* at 900.[19]

In addition to the general exception when disclosure promotes fair disposal of a subsequent case, UK law recognizes exceptions to confidentiality to assure the consistency of evidence in proceedings subsequent to the arbitration. *Tajik Aluminum Plant v. Ermatov*, [2006] All E.R. (D) 448, at ¶ 83 (Q.B.) ("Hydro won [a previous arbitration] and . . . TadAZ was ordered to pay Hydro more than US$125 million. TadAZ and Rusal . . . have steadfastly refused to make available a copy of the award. Its relevance to the present proceedings is obvious. Previously Blackburne J had ordered TadAZ to produce parts of the evidence. There are very many discrepancies between what TadAZ's employees told the arbitrators and what TadAZ had told the court in the freezing order application."); *London & Leeds Estates Ltd. v. Parabas Ltd.*, [1995] 02 EG 134, [1995] 1 EGLR 102 (confidentiality not required where inconsistent views were expressed). Thus, UK law

---

[19] Commentators recognize that the UK principle of implied confidentiality is not absolute and can be overridden by court order or other exceptions. Oakley-White, supra note 15, at 30. Interestingly, Merck and the Insurers did not see fit to refer the Court to the well-established exceptions to UK arbitration confidentiality. Joint Mem. at 20-21.

28

precludes Merck or its Insurers from using confidentiality to shelter taking positions in court that are inconsistent with their positions in the arbitrations. Such inconsistency could be in the Insurers' interests because they could seek to deny Merck coverage on grounds of misbehavior and then come to court and seek to deny payments to Plaintiffs on the ground that Merck did nothing wrong. Like the general fairness exception to confidentiality, the inconsistency exception prevents parties from using confidentiality to promote unfairness.

### B.      Federal Decisions Support Disclosure in this Case.

On analogous facts, federal courts, including those of this Circuit, consistently uphold disclosure of arbitration-related materials. More broadly, federal courts consistently hold on facts similar to these that the confidentiality or protective order agreed to in one proceeding does not preclude discovery of otherwise discoverable information in another proceeding.

### 1.      Arbitration Cases Support Disclosure.

In *Caringal v. Karteria Shipping, Ltd.*, No. Civ.A. 99-3159, 2001 WL 874705, 2001 A.M.C. 1236 (E.D. La. Jan. 24, 2001), the U.S. District Court for the Eastern District of Louisiana specifically addressed whether documents produced in connection with a London arbitration proceeding were subject to production in a U.S. civil proceeding. Karteria Shipping contended that no documents pertaining to a London arbitration could be produced without breaching the duty of confidentiality which attaches to an arbitration. In support, Karteria Shipping cited the decision of the Queen's Bench Division of Commercial Court in *Hassneh Insurance Co. of Israel and Others v. Steuart J. Mew*.[20] Upon review of *Hassneh* and its progeny, the court stated, "nothing in this line of cases from Great Britain undermines the principle that the Court may order disclosure when

---

[20] 2 Lloyd's Rep. 243 (1993), 1993 WL 963287.

29

appropriate. Even if documents are confidential, a Court may order disclosure if (1) the documents are relevant and (2) 'disclosure is necessary for disposing fairly of the cause or matter or for saving costs.'" 2001 WL 874705, at *1. The Court upheld the magistrate judge's ruling ordering production of the documents. *Id.* at *2.[21]

A similar issue arose in *Contship ContainerLines Ltd., v. P.P.G. Industries, Inc.,* No. 00 Civ. 0194 RCCHBP, 2003 WL 1948807 (S.D.N.Y. Apr. 23, 2003), a case involving a lawsuit over a fire aboard a charter vessel. The plaintiffs had previously been involved in a British arbitration dealing with the same accident. *Id.* at *1. The defendant sought detailed documentation from the arbitration proceeding. Plaintiffs objected on the ground that English law imposed a confidentiality obligation as part of the agreement to arbitrate. *Id.* at *1. The origin of the alleged confidentiality duty was unclear but the court assumed that a confidentiality requirement existed. *Id.* The court nevertheless ordered the plaintiff to produce the requested arbitration proceeding documents. *Id.* at *2. Citing *Caringal,* the court reasoned that the arbitration documents were relevant in that they related to the incident that was at issue in the case. In this case, the information from the arbitration proceedings would clearly be relevant to the substance of Plaintiffs' tort claims.

---

[21] Merck's and the Insurers' effort to distinguish *Caringal* is unpersuasive. They acknowledge, as they must, that the federal court ordered disclosure despite a London arbitration confidentiality order. Joint Mem. at 22-23. This establishes that Merck's and the Insurers' overreaching argument that comity commands nondisclosure without any balancing of interests is incorrect. While Plaintiffs do not argue that Caringal always mandates disclosure, *Caringal* is fully consistent with Plaintiffs' view of UK and U.S. case law—that both require a balancing of interests rather than unquestioning adherence to a confidentiality order. Merck's claim that *Caringal* is distinguishable because the arbitration at issue here cannot contain any relevant information is not credible. The Confidentiality Order that Merck and the Insurers rely on acknowledges that the arbitration proceeding includes information that "could jeopardize" Merck's litigation defense. Part III *supra*.

FAC Resp. Exhibit B -- 1615

2.   **Cases Allowing Discovery Despite Pre-Existing Protective Orders Support Disclosure.**

Even antecedent *judicial* protective orders do not bar discovery of otherwise discoverable evidence. In *Tucker v. Ohtsu Tire & Rubber Co., Ltd.*, 191 F.R.D. 495, 497-98 (Md. 2000), plaintiffs in a subsequent case sought relief from a protective order in a prior case in which the same defect had been alleged. Notwithstanding the protective order, the court, after carefully balancing the interests, ordered disclosure because the "documents, if otherwise discoverable, are relevant to this case and may lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1)."

Similarly, in *LeBlanc v. Broyhill*, 123 F.R.D. 527 (W.D.N.C. 1988), a state civil case, since dismissed, shared common questions of law and fact with a subsequent federal case. Defendants in the federal case invoked a state court protective order to oppose disclosure of discovery materials "generated in connection with" the state court case. 123 F.R.D. at 531. The court, "while sensitive to the values of Federalism and judicial comity," *Id.*, nevertheless ordered disclosure. Plaintiffs had tried to intervene in the state court action.

3.   **U.S. and UK Case Law Balance Interests in Assessing Pre-Existing Confidentiality Orders.**

The UK arbitration cases, U.S. arbitration cases, and U.S. protective order cases share a common, sensible approach when disclosure is sought of information characterized as confidential in another proceeding. While the other proceeding is always entitled to comity, courtesy, and respect, *Tucker*, *supra*, at 499, these "principles, while unquestionably important, are not absolute, and courts asked to issue discovery orders in litigation pending before them" do so when the circumstances so justify. *Id.* at 499-500. This is so even when important principles of federalism are called into play by the protective order having been entered by a state court. *Id.*

31

Neither UK cases in which a party seeks related arbitration-proceeding information, nor U.S. cases seeking such information, nor U.S. cases in which a party seeks related litigation-proceeding information, endorse Merck's and the Insurers' blanket assertion of privilege. Instead, as suggested by the above case law, UK and U.S. law in all three classes of cases carefully balance the interests at stake. That balancing process in this case supports Plaintiffs' discovery requests.

*Tucker, supra,* presents a helpful set of factors to consider in that balancing process. First, the implied confidentiality of the UK arbitration proceedings is analogous to U.S. protective orders "frequently issued in products liability and commercial cases." 191 F.R.D. at 498. "It is more in the nature of an agreement between the parties as to how discovery . . . will be handled without court intervention." *Id.* Confidentiality is routinely granted "without any hearing on the merits of the assertion of confidentiality . . . or the appropriateness of the restrictions on use of the documents covered by the order." *Id.* at 498-99. As such, the implied confidentiality does not reflect "any conclusion" by an adjudicative body "regarding the appropriateness of designating particular documents as confidential . . .." *Id.* at 499. In this case, as in the situation of U.S. cases granting relief from party-generated protective orders, no considered deliberation by the UK arbitration tribunal has occurred. The information sought in this case has not actually been reviewed by the tribunal. The tribunal merely and mechanically implemented a private agreement. This absence of actual consideration of the requested information surely affects the degree of comity, domestic or international, that this Court should adopt with respect to the Confidentiality Order.

> Thus, the [protective order] court's role was after the fact, as an instrument to implement what the parties already had agreed to. This is quite a different situation than that presented when a discovery dispute is raised before a court and, after a full hearing, it issues an order reflecting its deliberative process and decision. There is less need for deference and comity when the order involved is really an agreement

32

by counsel approved, almost as a ministerial act, by the court, than an action directed by the court after a full consideration of the merits of a fully briefed dispute.

*Id.* at 501.

Another characteristic of this case complements the absence of detailed tribunal deliberation. Merck and its Insurers did not agree to confidentiality as a matter of normal business practice. The Confidentiality Order on which they rely provides one, and only one, reason for their desired confidentiality—an intentional effort to deny Plaintiffs' what the Order concedes to be relevant information. As noted above, the Confidentiality Order acknowledges that "information and documents" in the arbitration "could jeopardize the defense . . . of underlying claims against Merck . . .." Confidentiality Order at 2. The passage unambiguously shows the actual motivation for obtaining the Confidentiality Order—to keep material information from Plaintiffs' lest it "jeopardize [Merck's] defense." The arbitration's confidentiality has not been triggered to protect trade secrets or commercial information from competitors, interests that could lead to protective orders under the Federal Rules. Confidentiality was invoked solely "to insulate the insurance matters from the underlying tort litigation." Joint Mem. at 19. That is not an interest that supports denying access to otherwise discoverable information and may in fact violate U.S. law.[22]

Second, the Merck-Insurer approach leads to an extreme result. Information that common sense and the Confidentiality Order suggest must be relevant to questions of Merck's knowledge of

---

[22] The Confidentiality Order obligation incurred by Merck and the Insurers to maintain confidentiality was incurred after the fact of their contracting, solely in the face of lawsuits, and expressly to keep information from creditors. It thus appears to be an intentional act to hinder or delay bona fide creditors, tort victims. As such, the confidentiality obligation is akin to a secret lien, also designed to hinder creditors by keeping information from them. Incurring obligations to hinder or delay creditors constitutes a fraudulent conveyance under U.S. state and federal law, Uniform Fraudulent Transfer Act (UFTA) § 4(a)(1) ("obligation incurred" is fraudulent "if the debtor . . . incurred the obligation . . . with actual intent to hinder, delay . . . any creditor"); 11 U.S.C. § 548(a)(1)(A) (similar language in Bankruptcy Code). Fraudulent conveyances entitle creditors to appropriate relief. UFTA § 7 (action against an obligation incurred may include "any . . . relief the circumstances may require . . .").

33

Vioxx's risks will be "forever . . . insulated from production] . . . by virtue of having once [been] produced . . . in a protected fashion . . .." *Id.* at 501. Only Merck's unsupported assertion that no additional relevant information is at issue in the arbitrations provides assurance that discoverable information is not being shielded by the Confidentiality Order. With all due respect to Merck, this Court has been down a similar road before. Merck made massive assertions of privilege that, when purportedly privileged information was reviewed by this Court, turned out to be largely unfounded.

Third, it is reasonable under U.S. and UK law to consider whether alternative means exist to obtain the requested information. *Id.* at 501; *see also Dolling-Baker v. Merrett, supra,* [1991] 2 All E.R. at 899 ("the Court [in assessing an arbitration-based confidentiality claim] should consider . . . whether there are other and possibly less costly ways of obtaining the information which is sought"). In the case of a prior state, federal, or foreign court protective order, an alternative route might exist. The plaintiff in the subsequent proceeding can seek to intervene in the proceeding affording protection and/or can request the protective-order court to modify its order. *Id.* These alternatives are not realistically available to Plaintiffs. Requiring Plaintiffs to try to intervene in a London arbitration proceeding "imposes a substantial hardship on the plaintiffs forced to seek such relief." *Id.* And, under UK law, it would be a fruitless effort because the arbitration is intended to preclude third-party participation.

> Arbitration is in contrast a consensual, private affair between the particular parties
> to a particular arbitration agreement. The resulting inability to enforce the solutions
> of joinder of parties or proceedings in arbitration . . . is well-recognized . . . .

*Sun Life Assurance Co. of Canada v. Lincoln National Life Ins. Co.,* [2004] EWCA Civ. 1660, [2006] 1 All E.R. (Comm) 675, [2005] 1 Lloyd's Rep. 606 (Ct. App.), at ¶ 67; *Ali Shipping Corp. v. Shipyard Trogir* [1998] 1 Lloyd's Rep. 643, 650-51 (Ct. App.) ("strangers shall be excluded from

34

the hearing and conduct of the arbitration"). Thus, joinder or intervention are not available to Plaintiffs.[23]

Fourth, the Court should assess the degree to which it can preserve the confidentiality sought in the arbitration proceeding. *See Tucker, supra,* 191 F.R.D. at 501 ("court should consider whether it is possible to incorporate terms in its own order which will further the protections originally ordered by the Texas court"). In this case, the Court can limit the degree to which arbitration confidentiality is qualified by imposing on the Plaintiffs "the same obligations and restrictions that were originally imposed on the" parties to the arbitration. *Id.* Plaintiffs do not wish to unnecessarily compromise the confidentiality of information and can be given access to discoverable information without it necessarily being made public. If the Court deems it advisable, it can review any information before disclosing it to Plaintiffs.

A reasoned balancing process, with due comity and respect, thus strongly supports the requested discovery. While Plaintiffs offer precedents that allow disclosure despite arbitration confidentiality orders, Merck and the Insurers offer no case in which London arbitration confidentiality orders precluded U.S. discovery. Aside from their utter lack of precedent, Merck and its Insurers did not secure confidentiality after due tribunal deliberation or to preserve trade secrets. They did so to keep relevant information from Plaintiffs. Merck and its Insurers offer Plaintiffs no other realistic route to the information sought, except the unverifiable bare assertion that Plaintiffs already have what they are entitled to. And sustaining Merck's and its Insurers' position means that

---

[23] The ability of a party in a subsequent case who sought information subject to an earlier case's protective order to seek relief from the court issuing the order distinguishes this case from *Dushkin Pub. Group, Inc. v. Kinko's Serv. Corp.,* 136 F.R.D. 334, 335-36 (D.D.C. 1991) ("To the extent that the plaintiff should desire to obtain those additional documents, that request should be addressed to the issuing court in the Southern District of New York"), relied on by Merck and the Insurers. Joint Mem. at 21-22.

35

information they submit in the arbitrations is forever inaccessible to thousands of seriously injured

Plaintiffs. Comity and respect require reasoned deference, not naive, unbalanced acceptance.

### 4.    Merck's and the Insurers' Precedents Do Not Support Their Position.

Merck offers no relevant authority to support its confidentiality theory or to balance the

relevant factors in favor of its position. Merck and the Insurers first cite *Odfjell Asa v. Celanese*

*AG*S, 348 F.Supp.2d 283 (S.D.N.Y. 2004), in support of their position. Joint Mem. at 19; Merck

Mem. at 9. But that case involved a federal court's authority to enforce subpoenas issued by an

arbitration panel requiring appearances before the panel. The federal court held that claims of

privilege and confidentiality could be presented to the arbitration panel. It nowhere held that

arbitration proceeding confidentiality orders precluded federal court discovery. Federal court

discovery was not even at issue in the case. And Merck and its Insurers are not seriously contending

that the arbitration panel even has authority to consider a third party request, much less grant it.

Merck's and the Insurers' reliance on *Lawrence E. Jaffe Pension Plan v. Household*

*International, Inc.*, No. Civ.A 04-N-1228 (CBS, 04-X-0057), 2004 WL 1821968 (D. Colo. Aug. 13,

2004), Joint Mem. at 19, is remarkable. The *Jaffe* court expressly states that an arbitration

confidentiality order would *not* support issuance of a protective order.

> It bears noting that such a blanket protective [confidentiality] order would not be
> controlling in the context of a civil lawsuit and would not relieve the court of its
> obligation to find "good cause" for a protective order under Fed.R.Civ.P. 26©.

*Id.* at *1. The case further states that protection of allegedly confidential information produced in

an arbitration was accomplished by a litigation stipulation, similar to this Court's Pretrial Order #13,

limiting the dissemination of purportedly confidential information. *Id.* at *3 (confidentiality was

adequately protected by court order stating that, "all Discovery Material will be deemed confidential

36

and may be disclosed only to counsel to the parties in the litigation . . . and to their employees and contractors").[24] A published analysis of *Jaffe* suggests that it supports Plaintiffs, not Merck and the Insurers. *See* Laurie Kratky Doré, *Public Courts Versus Private Justice: It's Time to Let Some Sun Shine In on Alternative Dispute Resolution*, 81 Chi.-Kent. L.Rev. 463, 510 n.252 (2006) (summarizing *Jaffe* as follows: "relying on court's authority to modify protective orders to permit disclosure of documents produced in arbitration").

Merck's and the Insurers' summary of *Associated Elec. & Gas Ins. Servs. Ltd. [AEGIS] v. European Reinsurance Co. of Zurich*, [2003] 1 All E.R. (Comm.) 253, 1 W.L.R. 1041 (Privy Council), Joint Mem. at 21, fails to report that the case in fact *granted* relief from an arbitration confidentiality order to allow the prevailing party to use the arbitration award to stop its opponent from re-adjudicating an issue in a subsequent arbitration. Consistent with Plaintiffs' view of UK and U.S. law, AEGIS effectively balanced the need to respect confidentiality with the unfairness resulting from mechanical adherence to confidentiality.[25]

---

[24] Merck's reliance on *Florida ex rel. Butterworth v. Jones Chemicals, Inc.*, 148 F.R.D. 282 (M.D. Fla. 1993), Merck's Incorporated Memorandum at 9, is also misplaced. In that case, the court granted a motion to intervene in the proceeding issuing the protective order, an option not available to Plaintiffs here, but refused to modify the protective order because the "Court must presume its Order [ordering return or destruction of confidential information] has been complied with fully . . . ." *Id.* at 288. The court also noted that alternative ways of obtaining the confidential information were available. *Id.*

[25] Merck's and the Insurer's reliance on the UK case of *Hassneh Ins. v. Steuart J. Mew* [1993] 2 Lloyd's Rep. 243 (Q.B.), Joint Mem. at 21, is clearly misplaced because in that case none of the parties to the confidential arbitration sought to disclose information. No third party interests were at stake. Reliance on Hassneh was rejected in Caringal.

Merck's and the Insurers' reliance on *In re Enercons Virginia, Inc.*, 812 F.2d 1469 (4th Cir. 1987), Joint Mem. at 22, is near-frivolous. That case recognized an Italian court's appointment of a bankruptcy trustee on the ground that Italy had a basically fair legal system. No evidence existed that recognizing the foreign decision would materially or unfairly prejudice any party's substantive interests, that the foreign proceeding was designed to preclude an injured party's access to relevant information, that the foreign proceeding would deprive a litigant of access to relevant evidence, or otherwise affect case outcomes.

37

Merck's claims of confidentiality ring hollow in light of the plain wording of the London tribunal orders on which it has relied and the federal jurisprudence that has considered similar issues of confidentiality.

## V.   Discovery From the Insurers Is Appropriate and Direct Actions Against Insurers Make Insurance-Related Discovery Critical to Fulfilling This MDL's Mission.

Two separate bases support discovery against Merck's Insurers despite their abbreviated FRCP 45 objection. Joint Mem. at 23-25. First, normal principles of discovery entitle Plaintiffs to information from non-parties with information as directly and obviously relevant as that possessed by the Insurers. Second, in light of the thousands of Plaintiffs who have the right to bring direct actions against the Insurers, discovery from the Insurers is necessary for this MDL to fulfill its mission of efficiently processing national Vioxx-related pretrial discovery.

### A.   Discovery From the Insurers is Appropriate and Not Overly Burdensome.

Part III establishes that Plaintiffs' requests for insurance-related information satisfy the normal liberal discovery standard. As discussed there, insurance-related information is reasonably likely to lead to obtaining admissible evidence, especially information about what Merck knew about Vioxx and when Merck knew it. Plaintiffs are entitled to learn about what Merck knew and when Merck knew it from those reasonably expected to have information about those topics. Plaintiffs are not limited to accepting Merck's version of all material events.

The Insurers are key actors who likely have material information not only about what Merck claimed to know, but also about other topics central to this MDL. Part III establishes that Merck's system of insurance is sufficiently complex that the PSC can only reliably assess Merck's insurance situation with the assistance of both Merck and its Insurers. The Federal Rules unequivocally entitle Plaintiffs to information enabling the PSC to reasonably assess Merck's insurance status. Plaintiffs

38

are not required to assess insurance coverage on the basis of the partially "unknown" policy information Merck has furnished and in the absence of the many policies Merck has wrongfully failed to disclose. Part III *supra*. Plaintiffs are entitled to information related to why, in the Vioxx era, Merck and its Insurers negotiated coverage that varied from Merck having minimal high-end exposure to Merck being deemed an insurer of over 50% of the high-end exposure and Merck moved from $75 million in coverage to $1 billion in coverage. Part III *supra*.

Plaintiffs thus have made more than a *prima facie* showing of a legitimate need for information from the Insurers, information that is not merely duplicative of information available from Merck. So the Insurers' FRCP 45 objection can only be sustained if the burden of discovery on the Insurers outweighs Plaintiffs' legitimate needs. The Insurers object to breadth of discovery against them. Joint Mem. at 24. But the requests they quote— "all documents relating to Vioxx," "all claim files related to Vioxx," and "all documents reviewed in making coverage determinations"— plainly target Plaintiffs' legitimate informational needs. The Insurers invoke no general, inappropriate requests that might support a finding of undue burden.

The burden of Vioxx-related information-gathering by the Insurers is further reduced by the Insurers' themselves having commenced adversary proceedings against Merck in London. Presumably, before commencing those proceedings, the Insurers duly considered and investigated the bases for their action. The Insurers thus likely already have assembled files containing substantial amount of Vioxx-related information that include most of what Plaintiffs request. The actual additional burden cannot be presumed to be other than minimal.

39

The reasonable probability that insurance-related discovery, together with the Insurers already active engagement in adjudication with Merck, suggests that the Insurers' claim to undue burden under FRCP 45 should be rejected.

**B.      Discovery From the Insurers is Critical to Fulfilling This MDL's Mission.**

An additional aspect of this case further supports discovery from the Insurers. Statutes and case law in several states establish that thousands of Vioxx victims may bring actions against the Insurers as parties. Discovery of Insurer information relevant to cases in this MDL is fully authorized in such actions. The Insurers will be parties and cannot plausibly claim non-party intrusiveness of discovery. Given the thousands of pending cases in which full Insurer discovery is appropriate, the Insurers' resistance to insurance-arbitration discovery threatens to undermine this MDL's achievements. A core purpose of an MDL is to conclude non-case-specific pretrial discovery to allow cases to proceed efficiently in their scattered venues. Avoiding duplicative discovery and coordinating with other state and federal proceedings have been hallmarks of this MDL. That the Insurers are not parties to this MDL provides no persuasive reason to excuse them from complying with proper discovery requests seeking relevant information.

**1.      Authority for Direct Actions Against the Insurers.**

Direct action statutes in some states give Vioxx Plaintiffs the right to recover from insurers even under circumstances that would preclude an insured from recovering against an insurer. This is one of the core results of having a direct action statute. For example, in *Edwards v. Royal Indem. Co.*, 182 La. 171, 161 So. 191 (La. 1935), the defendant failed to give timely notice to the insurer and that failure would have precluded recovery by the defendant against the insurer. In the plaintiff's direct action against the insurer, however, the insurer's defense against the defendant did

40

not preclude recovery. The Louisiana Supreme Court stated, "the policy of public liability not only

protects the insured from loss caused by his negligence, but is also in favor of the party who sustains

damages through the insured's fault." 161 So. at 195.[26] Direct actions against the Insurers may be

brought by hundreds or thousands of victims. Wisconsin, Louisiana, Puerto Rico, and the territory

of Guam have direct action statutes that make insurers directly liable to Plaintiffs.[27]

Other states without traditional direct action statutes expressly contemplate insurers as

parties to actions by injured plaintiffs.[28] Still other states allow direct actions against insurers when

a plaintiff has died,[29] a circumstance present in many Vioxx cases.

Detailed considered of Louisiana law, standing alone, establishes the additional direct

relevance of Insurer discovery to this MDL. Approximately one thousand of the claims pending in

this MDL originated either in state or federal court in Louisiana. All of the insurance issues in those

_____

[26] See also *Hedgepeth v. Guerin*, 96-1044 (La.App. 1st Cir.3/27/97) (policy "limiting the liability of [insurer] to those claims which occurred and were reported while the policy was in force, are unenforceable and without effect . . . ."), 691 So.2d 1355, *writ denied*, 97-1377 (La.9/26/97), 701 So.2d 983; *Bennett v. Krupkin*, 1999-2702 (La.App. 1st Cir.12/22/00), 779 So.2d 923, *writ denied*, 2001-0193 (La.3/30/01), 788 So.2d 1190. But see *Burns v. CLD, Inc.*, 886 So.2d 607, 614 (La. App. 2d Cir. 2004) (rejecting *Hedgepeth and Bennett*).

[27] Wis. Stat., § 632.24 ("Any . . . policy of insurance covering liability to others for negligence makes the insurer liable . . . to the persons entitled to recover against the insured for the death of any person or for injury to persons or property, irrespective of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured."); La. Rev. Stat. Ann., § 22:55; 26 P.R. Laws Ann., tit. 26, § 2003; 22 Guam Code Ann. § 18305. See *Morales-Melendez v. S.S. Mut. Underwriting Ass'n*, 763 F. Supp. 1174, 1179 (D.P.R. 1991) (Puerto Rico direct action statute authorizes action).

[28] *E.g., Lewis v. Allstate Ins. Co.*, 730 So.2d 65, 71 (Miss. 1998) ("if an insurance company can conduct a declaratory action regarding coverage prior to resolution of an underlying wrongful death trial, then the insureds and third party beneficiaries should be able to raise the coverage question in the underlying lawsuit as well. Pursuant to our rules of civil procedure, a hearing to determine coverage may be conducted if necessary. . . . Accordingly, if a question of insurance coverage exists, a party should be able to bring the insurer into a lawsuit and have the coverage question resolved by the judge.").

[29] R.I. Gen. Laws § 27-7-2 ("where before suit has been brought and probate proceedings have not been initiated the insured has died . . . the injured party, and, in the event of that party's death, the party entitled to sue for that death, may proceed directly against the insurer.").

41

claims would be affected by the provisions of the Louisiana Direct Action Statute.[30] By law, the statute is read into and becomes a part of the every policy of insurance, even though the policy may not contain the language required by the statute, or contains language prohibited by the statute.[31]

Actions against the Insurers will proceed under discovery rules favoring insurance-related production. For example, in *Blockbuster Entertainment Corp. v. McComb Video, Inc.,* 145 F.R.D. 402 (M.D. La 1992), the court considered the scope of discovery in a direct action claim in which the insurer denied coverage. Plaintiff sought to depose the insurer on several topics including insurance claims and coverage, processing of insurance claims, interpretation of policy language, and approving a reservation of rights. 145 F.R.D. at 403. Plaintiff also sought production of documents including correspondence, claim forms, manuals, and other materials related to coverage, claims, processing of claims and the claims made in that particular case. *Id.* The defendant insurer asserted that the requests were overbroad, the information sought was irrelevant, and that it was protected by the attorney-client and work-product privileges. *Id.* In ruling that the requested discovery was permissible, the Court stated:

> Unless American wishes to stipulate that coverage exists, i.e., it will not claim that any conditions or exclusions in the policy are applicable to defeat coverage, the plaintiffs are entitled to know the basis for any denial of coverage. . . Thus, any denial of coverage entitles the plaintiffs to explore during discovery the basis for denying coverage. If the denial is based on interpretation of policy language, the plaintiffs are entitled to learn whether that policy interpretation derives from some manual, internal memoranda, report, or other source, and whether the interpretation has been consistently applied.

145 F.R.D. at 404-05.

---

[30] La. Rev. Stat. 22:655.

[31] *Zimmerman v. Intl. Companies & Consulting, Inc.,* 107 F.3d 344, 346 (5th Cir. 1997), citing, *Grubbs v. Gulf Int'l Marine, Inc.* 625 So.2d 495 (La. 1993); *Quinlan v. Liberty Bank and Trust Co.,* 575 So.2d 336, 352 (La. 1991) (on rehearing).

42

FAC Resp. Exhibit B -- 1627

Actions against Insurers clearly expand insurance discovery beyond that which would ordinarily be allowed in some jurisdictions. But the effect of direct Insurer actions on this case is even broader than that. It renders the ongoing insurance arbitrations meaningless in any respect that would limit the rights of direct action plaintiffs. *In the Matter of Talbott Bigfoot, Inc.,* 887 F.2d 611 (5th Cir. 1989); *Zimmerman v. Intl. Companies & Consulting, Inc.,* 107 F.3d 344, 346 (5th Cir. 1997). These two Fifth Circuit cases have considered the effect that an insurance arbitration could have on a direct action plaintiff's rights against the insurer while the arbitration was pending. Both cases held that the arbitration could not limit the plaintiffs rights vis-a-vis the insurer.

The specific issue in both *Talbott* and *Zimmerman* was whether an insurer was entitled to a stay of an injured plaintiff's suit against the insurer under the Louisiana Direct Action Statute during the pendency of arbitration. The answer was "no" in both cases. This is because any condition of a policy that has the effect of defeating the purpose of the Direct Action Statute, such as the "no-action" clauses at issue in *Talbott* and *Zimmerman* are annulled and superseded by the statute. *See Zimmerman,* 107 F.3d at 346. If the arbitration clause in a policy could not limit the plaintiff's rights against the insurer, then it stands to reason that a confidentiality order executed as part of that arbitration likewise could not limit the plaintiff's right to discovery. Consequently, even if the confidentiality order is determined to limit the rights of other plaintiffs around the country, the same cannot be true for those Plaintiffs from Louisiana or from other states in which the Insurers can be named as defendants.

## 2.    Precluding Insurer Discovery Is Inconsistent with This MDL's Purpose.

Since several states' laws permit insurers to be party defendants, with all the discovery scope that formal party status entails, dozens of state and federal courts will have to address pretrial

FAC Resp. Exhibit B -- 1628

discovery issues that precisely parallel those before this Court, and that can be resolved by this Court. Thousands of Plaintiffs, as well as Merck and the Insurers, will then bear the time and cost of additional discovery that this Court could have overseen. Discovery is destined to proceed on insurance in some forum; it will proceed, inefficiently, in many fora unless this MDL addresses the topic.

Thus, independent of the obvious relevance of the Merck-Insurer arbitration and other documents, see Part III, discovery of the Insurers is necessary for this MDL to fulfill its core mission— concluding pretrial discovery on issues common to thousands of Vioxx cases. Merck and its Insurers are prime beneficiaries of this core MDL efficiency function. They should not be permitted to derail the MDL with respect to particular issues about which they fear complete discovery.

Unless insurance-related discovery can proceed against Merck and its Insurers, pretrial discovery likely will have to be repeated in hundreds or thousands of individual Vioxx cases. Pretrial discovery will be continuously repeated because the question is not whether detailed, relevant insurance discovery will occur. Rather, it is where and when it will occur. Too many states' laws allow making insurers parties to Vioxx actions to realistically believe that the Insurers can forever avoid providing reasonable discovery about information relevant to this litigation. Thus, at a minimum the Court should allow the PSC's discovery to go forward with respect to Plaintiffs with claims governed by the law of states allowing direct actions against the Insurers, including Louisiana.

44

Merck's statement that it would "strongly oppose" any actions brought directly against insurers, Joint Mem. at 17 n.12, simply overlooks the goals of an MDL.[32] Whether or not Merck and the Insurers would oppose direct actions, discovery in this MDL is needed now to assess the larger Vioxx litigation picture. The PSC must seek pretrial discovery information from the Insurers or the efficiency goal of this MDL will be compromised. In the FRCP 45 balancing calculus, the MDL's existence and direct action opportunities weigh heavily in favor of supporting discovery.

## VI.   Requiring Merck to Produce Relevant Information From DOJ and SEC Investigations Would Not Implicate Attorney-Client Privilege.

The PSC's discovery initiative also covered materials relating to the investigations that the Department of Justice (DOJ) and the SEC commenced after Merck withdrew Vioxx from the market.[33] Merck claimed that it had already provided the PSC with all non-privileged information relating to these investigations. Incorporated Memorandum at 12. It appears that Merck's primary objection to producing any further information and/or testimony in response to the PSC requests is based on attorney-client privilege. "Further discovery related to the investigation would necessarily involve information that is protected by attorney-client privilege." *Id.* The gist of Merck's argument seems to be that it cannot designate a representative to testify about these investigations because its only representatives with sufficient knowledge of the facts are attorneys and any

---

[32] Although Merck and the Insurers claim to have "numerous grounds of both law and practicality" on which to oppose actions against the Insurers, Joint Mem. at 17 n.12, they cite no authority. In fact, as Plaintiffs demonstrate, there are no direct barriers to naming insurers under the laws of several states.

[33] Merck claims to have been under the impression that DOJ/SEC issues were "off the table" for purposes of the upcoming hearing. Joint Mem. at 4 n.5. Mr. Ranier made clear that any offer to separately treat the DOJ/SEC issues had expired with the failed effort to settle insurance discovery issues. [see Defendants' brief as Exhibit O]. Mr. Ranier offered Merck a deadline of Jan. 19, 2007 so that Merck could respond on DOJ/SEC issues. Merck rejected the offer and has declined to brief DOJ/SEC issues.

FAC Resp. Exhibit B -- 1630

statements that they made would necessarily violate the attorney-client privilege. Apparently, Merck also claims that all relevant documents would be covered by the attorney-client privilege.

Merck's reliance on the privilege is misplaced because the PSC does not seek privileged information and because materials provided by or on behalf of Merck to the DOJ or SEC are not protected by the attorney-client privilege.

The PSC did not request any attorney's deposition and it is not seeking any privileged attorney-client communications. But even if Merck felt that it was necessary to designate one of its lawyers for the deposition, the attorney-client privilege would not come into play. The PSC is not asking for testimony about the advice that Merck's lawyers gave to the company during the governmental investigations. It is only seeking testimony regarding the communications made on behalf of the company to the regulatory agencies. Similarly, the PSC only wants those documents that Merck exchanged with the agencies and those in-house documents that do no reflect the advice of counsel.

One of the logical confines of the privilege has long been that when communications and information are relayed to a third party that is not rendering legal services on the client's behalf, they cannot be considered confidential.[34] All of the information that the PSC is seeking from Merck was already provided to a third party regulatory agency, or never fell under the aegis of the attorney-client privilege in the first place. Under the circumstances no privilege can attach to the testimony or document production whether or not Merck chooses to designate one of its attorneys as its corporate representative to explain these matters. And to the extent that any of the requested

---

[34] *Nguyen v. Excel Corp.*, 197 F.3d 200 (5th Cir. 1999); *United States v. King*, 536 F.Supp. 253 (C.D. Cal. 1982).

46

discovery may run afoul of the privilege, Merck's proper course of action would be to file a detailed privilege log and allow the Court to conduct an in camera inspection of the materials so that it could determine the validity of the privilege claims.

Case law overwhelmingly supports the PSC's access to the materials and information communicated to the DOJ and SEC. When a party discloses information to a government agency conducting an investigation, the majority view is that the privilege is waived. *See, e.g., In re Qwest Commc'n Int'l, Inc.,* 450 F.3d 1179, 1186-96 (10th Cir.2006) (disclosure of information to SEC and DOJ waived attorney-client privilege). Merck seems to seek to avail itself of a principle of selective waiver whereby it can choose to disclose information to some parties such as the SEC and DOJ but not to others, such as the PSC. That claim of privilege has been widely rejected. "The only conclusion from the federal case law is that the federal circuits have not expanded wither the attorney-client privilege under Federal Rule of Evidence 501 or the non-opinion work-product doctrine under Fed.R.Civ.P. 26(b)(3) or *Hickman v. Taylor* by applying selective waiver." 450 F.3d at 1196. *See also In re Columbia/HCA Healthcare Corp. Billing Practices Litigation,* 293 F.3d 289, 291 (6th Cir.2002) (producing otherwise privileged documents to the DOJ and other government agencies "waived any privilege associated with the documents"); *Westinghouse Elec. Corp. v. Republic of Philippines,* 951 F.2d 1414, 1424 (3rd Cir.1991) ("numerous cases have applied the traditional waiver doctrine to communications disclosed to government agencies"); *United States v. Mass. Inst. of Tech.,* 129 F.3d 681, 686 (1st Cir.1997) (disclosure of documents to one government agency waived privilege with respect to another government agency); *In re Martin Marietta Corp.,* 856 F.2d 619, 622-24 (4th Cir.1988) (other privileged materials disclosed to the U.S. Attorney and the Department of Defense waived attorney-client privilege).

47

In line with the vast bulk of authority, selective waiver of the privilege in connection with disclosure to government agencies has been rejected in this Circuit. *See S.E.C. v. Brady*, No. 3:05-CV-1416-M, 2006 WL 3301865, at *9 (N.D. Tex. Oct. 16, 2006) (materials provided to the SEC waived attorney-client privilege; "an overwhelming amount of authority has . . . rejected the selective waiver doctrine").

To the extent that any documents requested would be subject to the attorney client privilege, or any other evidentiary privilege, there is still no excuse for Merck to refuse production. Merck's proper course of action for any documents that it considers to be privileged would be to prepare and file a detailed privilege log identifying each such documents and the perceived grounds for privilege. The Court could then conduct an *in camera* inspection of these documents to determine whether any such privilege exists.

Once again, Merck has no valid excuse for its refusal to respond.

## VII.   Conclusion.

Merck's and the Insurers' boilerplate opposition to discovery is insufficient as a matter of law. Substantively, the connection between the issues in Merck's insurance coverage disputes and Plaintiffs' claims against the manufacturer supports the requested discovery. Discovery relating to insurance information and the London arbitration proceedings is reasonably likely to produce admissible evidence. Merck's and the Insurers' claims of ironclad, draconian confidentiality are inconsistent with the Confidentiality Order on which they rely, as well as with UK and U.S. law. The requested discovery to understand Merck's insurance system and to obtain all insurance policies relevant to the Vioxx era are necessary to allow the PSC to understand Merck's insurance situation.

48

Given thousands of Plaintiffs' standing to directly sue the Insurers, the PSC's request for insurance-related information is all the more compelling and necessary to successfully prosecute this MDL. Merck's claim of attorney-client privilege with respect to material supplied to the SEC and DOJ rests on a selective waiver theory rejected by virtually every court that has considered it.

The PSC therefore respectfully requests that this Honorable Court deny Merck and its Insurers' Joint Motion to Quash and/or for Protective Order. The Court should order the production of the discovery and depositions sought by the PSC relating to Merck insurance matters.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

Date: January 22, 2007

By:/s/ Leonard A. Davis
**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, L.L.P.*
Place St. Charles
201 St. Charles Avenue, Suite 4310
New Orleans, Louisiana 70170
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

**PLAINTIFFS' LIAISON COUNSEL**

Andy D. Birchfield, Jr., Esquire
Leigh O'Dell, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

FAC Resp. Exhibit B -- 1634

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
 MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
 BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
Shanin Specter, Esquire
David J. Caputo, Esquire
Lisa S. Dagostino, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
Fred S. Longer, Esquire
Daniel Levin, Esquire
Matthew C. Gaughan, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W., Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

Shelly A. Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

50

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 22nd day of January, 2007.

/s/ Leonard A. Davis
Leonard A. Davis (Bar No. 14190)
*Herman, Herman, Katz & Cotlar, LLP*
201 St. Charles Ave., Suite 4310
New Orleans, LA  70170
PH:    (504) 581-4892
FAX:  (504) 561-6024
ldavis@hhkc.com

51

## AFFIDAVIT OF MIKAL C. WATTS

Before me, a Notary Public, on this day personally appeared Mikal C. Watts, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he has executed this Affidavit for the purposes expressed therein.

Mikal C. Watts, having been first duly sworn under oath, deposes and states as follows:

1.     My name is Mikal C Watts. I am over 18 years of age, and I am of sound mind and capable of making this affidavit. The information and facts stated herein are within my personal knowledge. The facts herein are true and correct. The opinions stated herein are set forth within my personal knowledge.

2.     I am a name partner and attorney with the Watts Law Firm, L.L.P. Previously, I had been a founding partner of Watts & Heard, L.L.P., and Harris & Watts, P.C. My principal work address is 300 Convent, Suite 100, San Antonio, Texas 78205. My firm has five offices located in Houston, Texas, Corpus Christi, Texas, San Antonio, Texas, Edinburg, Texas and Austin, Texas.

3.     I submit this affidavit pursuant to Pretrial Order No. 6(D) in support of my application for a fee award recommendation from the Allocation Committee. In submitting this affidavit, I expressly reserve all, and do not waive any, rights related to common benefit fees and/or their allocation.

4.     **Contribution to Outcome.**

I personally spent over 1,000 hours working on the Vioxx litigation. I worked diligently to assist in vetting more than 29,000 leads into approximately 2,000 high quality Vioxx cases, which are being pursued in litigation. In addition, I personally participated in the trial efforts of the plaintiff's side of the docket. When Judge Fallon decided that the Plaintiffs would select two cases to try, and the Defendants would select two cases to try, no one stepped up offering to try the defense pick cases. I spoke with my friend Andy Birchfield, and discussed the fact that we needed to put forth a good effort in the bad cases as well as the good cases. I then volunteered to try a "defense pick" on behalf of the plaintiff, as did Andy. In agreeing to try a defense pick, it was obvious to me that a defense verdict was probable, but viewed it as a way to contribute to the work product of the plaintiffs' side of this litigation. In preparing for this trial, I did a complete re-analysis of all of the database documents relating to Dr. Briggs Morrison and Dr. Alise Reicin. I personally read every transcript of any testimony either had ever given, read every paper ever written by either of them, and read every document produced by Merck with either of their names present. With all of this research, I organized and wrote a cross-examination outline for both Dr. Briggs Morrison and Dr. Alise Reicin. I conducted the cross examinations of both of these witnesses during the *Smith v. Merck* "defense pick" trial in the MDL.

After the *Smith* verdict, I offered to try another difficult case, involving a 290-lb Plaintiff named Schwaller. My thinking was that Merck needed to understand that some plaintiffs' lawyers were willing to try all the cases – good and bad, and thereby, create litigation pressure contributing to an outcome. I invited Andy Birchfield to try this case with me, and he agreed with the strategy. During the *Schwaller* trial, I cross-examined Dr. Nancy Santanello for several days. In preparation for the same, I personally read every transcript of any

testimony she had ever given, read every paper ever written by her, and read every document produced by Merck with her name present. In addition, I cross examined other witnesses, and gave the Closing Argument.

**5.     Quality of Work**

After each of these trials, I provided the transcript of the cross examinations I had performed to all other lawyers I knew preparing for subsequent trials. I provided these cross-examination outlines to Mark Lanier in preparation for his next New Jersey trial, and to members of the Plaintiffs' Steering Committee including Chris Seeger, who were preparing for trials.

**6.     Litigation Commitment**

I tried two different cases and was preparing to try others in New Jersey when the case settled. I called attorneys in New Jersey and offered to assist in subsequent trials of cases that were not mine. I did so in full commitment to this litigation. In addition to three years of work, allocating almost $5,000,000 in cash, and investing in excess of a thousand hours of time, I advised everyone on the plaintiffs' team that I was prepared to continue the effort to force Merck to trial over and over again.

**7.     Partnership Participation**

I lead a firm with 25 lawyers and a staff of 150 people. Several of my attorneys, and a large group of my staff, became involved in the Vioxx litigation from time to time. In addition, I funded the hiring of 25 individuals to staff our consortium's Vioxx Litigation Center. However, I did not merely employ persons to perform the work. As the name partner in my law firm, I expended more time working on Vioxx than any employee working for me. In addition to assisting in the vetting of 29,000 leads, and the filing of 2,000 cases, I personally participated in the formulation of trial strategy, and personally organized, wrote and conducted the cross examination of Merck's trial witnesses.

**8.     Committee Membership**

Upon the assignment of the MDL to Judge Fallon, I applied for a position of the Plaintiffs' Steering Committee (PSC). In addition, I was involved in several meetings in New Jersey involving PSC members, concerning the prosecution of cases. I had numerous meetings with Drew Ranier, an attorney who is on the PSC and a member of our firm's consortium involving Vioxx.

**9.     Non-MDL Jurisdictions**

Our firm initially coordinated with other Texas firms in preparing Texas state court cases for trial. However, it became obvious that the Texas coordinated proceedings judge viewed the cases as preempted, so we focused our efforts on filing our non-MDL cases in other jurisdictions, primarily in California and New Jersey. Together with Steve Kherkher at Williams/Kherkher, we began work to prepare cases for trial in the New Jersey state court proceedings.

**10.    Trials**

My direct involvement in trials included the roles described above in the MDL "defense pick" trial – *Smith v. Merck*, and the trial of *Schwaller v. Merck* in Illinois. I was preparing to try cases in New Jersey with Steve Kherkher when the settlement was announced.

**11.    Committee Leadership**

I did not participate on any MDL committees, but coordinated with the MDL through the efforts of Drew Ranier.

12. **Ongoing Activities**

Since the settlement agreement was announced, I have continued to participate in systematic meetings to meet the settlement agreement's deadlines, to ensure that our cases were included in the agreement, and that we met all the deadlines contained in the agreement.

13. **Involvement Pre-Withdrawal**

I caused my firm to begin accepting cases <u>before</u> the announcement of the recall of the product. Prior to the announcement of the recall, we had sifted through in excess of 5,000 phone calls and leads to generate in excess of 400 cases. We ordered medical records, and began extensive medical research on Vioxx and other drugs in its class, including Celebrex and Bextra. We contacted cardiologists to begin formulating our theory of the case, a theory which changed substantially upon the announcement of the recall.

14. **Involvement Pre-JPMDL**

Upon the announcement of the recall, I caused my firm to partner with four other firms to prosecute a larger Vioxx effort as part of a consortium. These firms are: (1) Provost/Umphrey; (2) Williams/Bailey (now Williams/Kherker); (3) Ranier, Gayle & Elliott; and (4) the Kaiser Law Firm. We immediately employed in excess of ten (10) people to handle our Vioxx litigation. By my count, we analyzed more than 29,000 leads, ordered records, hired doctors, and vetted these potential cases down to 3,000-4,000 cases we would pursue. In addition, our consortium hired expert witnesses, and enlarged our staff to more than 25 individuals to pursue the litigation.

15. **Funding**

By latest count, our consortium has expended more than $14,000,000 in prosecuting our Vioxx cases. I have personally funded ¼ of that amount.

16. **Commitment**

Numerous other lawyers nonsuited or dismissed difficult cases, rather than try them. I tried to take the opposite approach, and to try cases that everyone knew would be difficult.

17. **Other**

In terms of any other factors relevant to my efforts for the common benefit, I would rely upon Andy Birchfield, Mark Lanier and Chris Seeger, each of who received my work product at the time it was created.

18. I certify and declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NOT.

Mikal C. Watts

SUBSCRIBED AND SWORN TO before me this 15th day of October, 2008.



PAMELA M. FLORES
MY COMMISSION EXPIRES
June 22, 2011

Notary Public in and for the
State of Texas
Notary's Printed Name: Pamela M. Flores
My commission expires: June 22, 2011

## AFFIDAVIT OF GRANT KAISER

BEFORE ME, the undersigned authority, on this day personally appeared GRANT KAISER, and after having first been duly sworn upon oath, states as follows:

1.     My name is Grant Kaiser. I am over the age of eighteen years, of sound mind, and in all respects legally competent and duly authorized to make this affidavit. I have personal knowledge of the factual statements made herein. I am an attorney duly licensed in, and in good standing with, the State of Texas. After a one-year appellate court judicial clerkship, I have practiced plaintiffs' personal injury trial law for more than 26 years. I am doubly board-certified by the Texas Board of Legal Specialization in Personal Injury Trial Law and in Civil Appellate Law. My resume is attached as Exhibit 1.

2.     I submit this affidavit pursuant to PTO 6(D), in support of allocation of common benefit fees in the Vioxx Litigation. In submitting this affidavit, I expressly reserve all, and do not waive any, rights relating to common benefit fees and/or their allocation.

3.     **Contribution to Outcome; Litigation Commitment.** I contributed significantly to the overall success of the Vioxx litigation. I began working on Vioxx on October 7, 2004, just days after Vioxx's withdrawal on September 30, 2004. I have continued to work on Vioxx through today. Since October 2004, I devoted 80% of my professional efforts to the prosecution of Vioxx cases. Based on a conservative 50-hour work week, that equals 6,240 hours I personally worked on the Vioxx litigation -- *before* settlement.

4.     My Vioxx work began as the firms, Provost ★ Umphrey Law Firm LLP, Williams Kherkher Hart & Boundas LLP, Ranier, Gayle & Elliot LLC, Watts Law Firm LLP and my firm combined resources to form the Vioxx Litigation Consortium ("VLC"). The VLC's objective was to prosecute Vioxx cases -- and *only* Vioxx cases. The VLC opened new, stand-alone offices, hired the necessary personnel (from file room clerks to registered nurses to attorneys experienced in mass torts), bought furniture and equipment, created and implemented a robust, networked custom database to manage extensive data on our clients, implemented appropriate accounting and financial controls, and performed all other activities associated with running such an organization. Even before the settlement, our database captured more than 100 medical data points for each of our clients including height, weight, pack years smoking history, every blood pressure measurement, all cholesterol levels, and every Vioxx prescription (dose, quantity, date, etc.). The complete VLC Data Collection Matrix is attached as Exhibit 2. At its zenith, the VLC engaged 47 personnel including 5 nurse paralegals and 4 attorneys – all in addition to the combined resources of the five Consortium firms. While I had tremendously talented assistance, I had overall responsibility for these efforts.

5.     The main purpose of the VLC was to find the best-qualified cases for trial. The steps to do this were to intake cases, gather the pharmacy and medical proof necessary for a valid Vioxx case, screen and vet valid cases to find the best, deliver complete, verified files to trial teams, and assist the trial teams in their preparations. I was ultimately responsible for coordinating and managing *all* day-to-day activities in handling the VLC's docket. The tasks

included (a) developing case screening criteria, (b) liaising and negotiating with 217 referring attorney firms from 20 different states, (c) developing strategies where to file the cases and whom to sue, and (d) managing statutes of limitations for clients from *all* 50 states for multiple causes of action. See map of clients attached as Exhibit 3.

6.      The VLC performed intake for and processed 28,815 contacts from all 50 states. After staff paralegals worked 126,000 hours, nurse paralegals worked 10,000 hours, expert/MDs worked 850 hours, and attorneys engaged by the VLC worked 23,300 hours, we had one of the largest dockets of well-screened and trial-ready Vioxx cases in the nation. Thus, we were prepared to identify and try even more cases than we actually tried and nominated for trial. After our intense screening, we filed or tolled 2,249 Vioxx cases, or 7.8% of the cases reviewed. The VLC's criteria were remarkably effective when later compared against the settlement criteria; our analysis showed that the VLC did not release any case that would have met the settlement criteria and kept all that would.

7.      Our strategy was to have a litigation presence in three primary jurisdictions. Thus, we filed 805 cases in the Eastern District of Louisiana, Honorable Eldon E. Fallon presiding, 738 cases in the Superior Court of New Jersey, Atlantic County Division, Honorable Carol E. Higbee presiding, 80 cases in the Superior Court of California, Los Angeles Division, Honorable Victoria D. Chaney presiding, and tolled 600. Beginning in November 2006, the VLC had officially nominated in "Waves 1-3" 45 cases (and committed the time and money) to try before Judge Higbee or her designee; we were working up another 30 cases for "Wave 4," for a total of 75 cases to try in New Jersey. At the time the settlement was announced, our consortium was set to try two cases before Judge Higbee in the fall of 2007. The trial was continued to January 2008, we now know, because of undisclosed settlement negotiations. We believe that the threat of multiple trials of multi-plaintiff cases in New Jersey was a critical step towards resolution. Regarding the MDL, the Court ordered that Merck and the PSC nominate cases for trial. The VLC did not shrink from this obligation; our prior efforts allowed us to offer two of four cases the PSC nominated for trial: Cooper and Jones. Merck struck both of the VLC's cases from the list, testimony to the quality of our vetting. The VLC's nomination of quality, triable cases, when other firms refused or were unable to, provided a strong, credible threat from a deep bench of attorneys that were ready, willing and able to try them.[1]

8.      The second outcome I contributed to was making the Vioxx Settlement Agreement one that could be successful. I personally worked to do this by amending the Settlement Agreement so that it was consistent with attorneys' ethical responsibilities and, therefore, attorneys could then recommend the settlement to their clients. I personally worked with various authorities on legal ethics, researched and drafted the VLC's motions regarding the ethical aspects of the Agreement, personally negotiated with counsel for Merck and the PNC, and drafted amendments to the Agreement. Without the VLC's and my work to amend

---

[1] In addition, I requested that Judge Higbee allow us to try the first "co-ingestion" case (injured party took Bextra and Vioxx), against Pfizer and Merck simultaneously. Our group had the largest filing of co-ingestion cases at 359.

the Settlement Agreement and the "all or none" aspect of the Registration Affidavit, the VLC's firms, and I suspect many others, could not have joined the settlement. If as few as 15% of the clients did not join the settlement, it could not have been a success; Merck had its walk away rights. We believe that a much higher percentage could not and would not have joined the settlement but for the amendments we urged.

9.      **Committee Membership.** I was appointed to the State Liaison Committee by Judge Fallon, to the Science Committee by the PSC, and was allowed to attend and participate in the majority of PSC meetings.

10.     **Non-MDL Jurisdictions.** See ¶¶ 3-8, supra. In addition, I did significant work in the Texas Vioxx litigation. I personally drafted the master petition for the Texas Vioxx MDL and the first comprehensive case management order the PSC presented to Judge Wilson. I attended all Texas Vioxx meetings and the vast majority of hearings before Judge Wilson. I was personally involved in arguing matters before the court, researching and preparing a defense to Texas's preemption statute, and virtually all other matters that arose during the litigation.

11.     **Trials. Irvin I.** My involvement in Vioxx trials began with the first MDL bellwether trial, the December 2005 Houston trial of *Irvin I.* In *Irvin*, in addition to attending each day of trial, I researched and presented to the Court plaintiffs' objections to the jury instructions and questions. **Barnett.** My next involvement was in the second MDL bellwether trial, the July 2006 trial of *Barnett*. For *Barnett*, I personally oversaw the pretrial work of DecisionQuest ("DQ"), one of the premier trial, research, and communication consultants, from the first meeting with DQ in Mark Robinson's Newport Beach offices on March 17, 2006, and throughout each day of trial. I personally participated in all *Barnett* jury studies including personally preparing and presenting Merck's defense in the first jury study for *Barnett*. **Smith.** I was also personally involved in the VLC's trial of *Smith*, Merck's selection for bellwether trial. In *Smith*, I personally worked on the jury questionnaire, liaised with defense counsel on various pretrial matters, conducted pretrial discovery, prepared motions to compel discovery, consulted on jury selection, prepared experts for trial, ordered proof, consulted on graphics, debriefed the shadow jury, and attended trial on most, but not all, days. (At the PSC's request, we delivered all *Smith* trial materials to it for work on the Trial Package. See attached Exhibit 4.) **Schwaller.** Lastly, I was personally involved in the VLC's trial of the Schwaller case in Illinois. I personally negotiated the agreement with local/co-counsel to secure the case and oversaw the necessary pretrial preparation of the case.

12.     **Ongoing Activities.** As the Court may recall, I have personally been active in enhancing and streamlining the processing of Vioxx claims. My efforts are designed to improve the claims process for all. I have sought clarification from Orran Brown and Doug Marvin on exact deficiencies, sought to eliminate multiple deficiencies for the same issue, worked to eliminate wasteful and useless processing steps, and so forth. Space limitations preclude further statement.

GRANT KAISER

3

SUBSCRIBED AND SWORN TO BEFORE ME on the 31ST day of October 2008.

**GERILYN GORDON**
Notary Public, State of Texas
My Commission Expires
March 14, 2010

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

4

# EXHIBIT 1

FAC Resp. Exhibit B -- 1644

# GRANT KAISER

8441 Gulf Freeway, Suite 600
Houston, Texas 77017
Telephone – 713-223-0000
Facsimile – 713-223-0440
Email – gkaiser@thekaiserfirm.com

## PROFESSIONAL EXPERIENCE

THE KAISER FIRM, L.L.P.  2003 – Present

> Founding partner.  Engaged with two civil litigation consortia as Coordinating Attorney. The first is the Vioxx Litigation Consortium, which represents several thousands of citizens injured by VIOXX.  The second is the Welding Fume Consortium, which represents numerous welders for permanent neurological injuries caused by exposure to manganese in welding fumes.  Responsible for all aspects of the day-to-day handling of the litigation – from intake to trials to final judgment on appeal.

KAISER & MORRISON 1996 – 2003

> Founding member, engaged in civil litigation and civil appellate practice.  Represented, along with five other Texas firms, the State of Texas in its historic case against the tobacco industry which resulted in a settlement estimated to be worth $24 billion.  Plaintiff's Liaison Counsel for the State of Texas and as Coordinating Attorney of the plaintiff's team of attorneys.  Responsible for all day-to-day responsibilities in the case.

ONSTAD, KAISER & FONTAINE, L.L.P.  1993 – 1996

> Founding partner, engaged in civil litigation and appellate practice representing cases in state and federal court

KRONZER, ABRAHAM & WATKINS  1982 – 1993

> Partner/Associate.  Engaged in civil litigation and appellate practice as an associate, then as partner, successfully handling litigation in both state and federal, trial and appellate courts

STATE OF TEXAS COURT OF APPEALS, 3RD DISTRICT  1981 – 1982
Briefing Attorney for Judge John Powers.  Reviewed appellate briefing, appellate records, wrote legal memoranda and draft opinions for civil cases of all types.

## EDUCATION

SOUTH TEXAS COLLEGE OF LAW, Houston, Texas
*Juris Doctor*, 1981
Assistant Editor-in-Chief of the South Texas Law Journal

UNIVERSITY OF TEXAS, Austin Texas
*Bachelor of Business Administration*, 1978

# EXHIBIT 2

**VIOXX LITIGATION CONSORTIUM**

Data Collection Matrix

Data to be collected by Nurse Paralegal Team

| Description | Field Type | Additional Information | Comment Field |
|---|---|---|---|
| **INJURED PARTY INFORMATION** | | | |
| Full Name (Last, First) | Pull from Database | | No |
| SS# | Pull from Database | | No |
| Gender | Pull from Database | | No |
| DOB and Age | Pull from Database | | No |
| Age at time of injury/injuries | Pull from Database | | No |
| Date of Death - if applicable | Pull from Database | | No |
| Age at time of death - if applicable | Pull from Database | | No |
| Flash Category | Include Confirmation Box - Nurse to check if injury in system is confirmed by | Confirmation box | X |
| Defined Injuries - Date Information | medical records (each defined injury) | | No |
| LMI Records Rcvd (Display based upon Records in Screen) | Pull from Database | | |
| | | | |
| **PATIENT INFORMATION** | | | |
| Weight | lbs - ability to enter multiple entries, each associated with a specific date (enter format similar to fact sheet) | | |
| Height | in feet and inches - 2 boxes for entry | | |
| Body Mass Index (BMI) | Calculate | | |
| Smoker? | Yes/No | | |
| Smoker at the time of injury? | Yes/No | | |
| Number of packs of cigarettes smoked daily (estimated) | Options (.25, .5, .75, 1, 1.5, 2, 2.5, 3, 3.5, 4, 4.5, 5) | | |
| Number of years patients smoked | Numeric Field | | |
| If stopped smoking, when? | MM,YYYY | | |
| Display Family Cardiovascular History from Fact Sheet Section C | Include Confirmation Box - Nurse to check if information in system is confirmed by medical records (each defined injury) | | |
| Also need ability for nurse to add additional cardiovascular family history in this section - but it would not auto-populate the fact sheet data | | | |
| Blood Pressure (Systolic/Diastolic) | 2 fields - one for each number, with the ability to entry multiple entries with each specific reading (Enter format similar to fact sheet). Also have a box for each to check if the reading is taken at a distressed point - simply label "Distressed Reading" | Ability to enter multiple entries, each associated with a specific date (enter format similar to fact sheet) | |
| Cholesterol - Total | Numeric Field | Ability to enter multiple entries, each associated with a specific date (enter format similar to fact sheet) | |
| Cholesterol - LDL | Numeric Field | Ability to enter multiple entries, each associated with a specific date (enter format similar to fact sheet) | |
| Cholesterol - HDL | Numeric Field | Ability to enter multiple entries, each associated with a specific date (enter format similar to fact sheet) | |
| Evidence of alcohol abuse? | Yes/No/Unknown | | X |
| Evidence of prescribed drug misuse/abuse? | Yes/No/Unknown | | X |
| Evidence of illicit drug use? | Yes/No/Unknown | | X |
| | | | |
| **MEDICATION** | | | |
| Why was Vioxx prescribed? | Options (Acute pain management, Arthritis, Dysmenorrhea, Migraine Attacks, Osteoarthritis, Rheumatoid Arthritis, Other) | Each should have a numeric value for evaluation | |
| Include the entire Fact Sheet Tab IV - Prescription Information items (A, F, G, H) As currently operating | | | |
| NEW DATA ENTRY SCREEN FOR ENTRY BY NON-NURSE TEAM - BUT NURSE TEAM CAN UPDATE AS NECESSARY | | | |
| Prescription # | Free Field/20 characters | | |
| Prescription Date | MM/DD/YYYY | | |
| Prescription Dosage | Options - same as those included in Fact Sheet - Section IV, Part G | | |

| Description | Field Type | Additional Information | Comment Field |
|---|---|---|---|
| Prescription Quantity | Numeric Field - not more than 200 | | |
| Days Supply | Numeric Field | | |
| Pharmacy/Source | Alpha Field - Can we have some pre-populated - let's discuss (Medco, Walmart, K-Mart, Walgreens, CVS, Rite-Aid, Caremark, Eckerd, H-E-B, Long's, Advance Rx, Aetna, Brooks, Express Scripts, Safeway, Kroger) | | |
| The information in orange below would be provided as group of data (or each date of injury | | | |
| Date of First Vioxx Fill Prior to Injury | Search for first date from above group before DOI as defined in NJSF | | |
| Duration of Use (Total Number of Days between first fill and date of injury) | Calculate the number of days/months based upon the information entered in the green group - Display example -45 days/ 1.5 months | | |
| Continuous Use? (Regular and Systematic Use of Vioxx without significant cessation (i.e. 30+ days) | Calculate if there are any blocks in span | | X |
| If not continuous, what was the last continuous span leading up to the injury? | Calculate | | X |
| Total Pills prescribed up to date of event | Calculate the number of pills from the date of first fill through the date of injury | | |
| Total Pills Prescribed vs. Duration Days | Display Number list above] over] [Duration of Use]  Example -45 pills over 65 days | | |
| Was Vioxx taken post-injury? | Yes/No/Unknown | | |
| If Yes, duration of use post event | Calculated based upon information obtained from medication log | | |
| Was Vioxx prescribed for than than 5 days at 50mg/day or more (continuous use)? | Calculate based upon information entered in green group - Answer: Yes/No | | |
| Did the client tell us that they asked the doctor or clinic to provide Vioxx by name? | Display information from Fact Sheet, Tab IV, Part I (DO NOT GAIN ACCESS TO MODIFY - FOR DISPLAY PURPOSES ONLY) | | |
| Do the medical records (doctor, hospital, etc) show Vioxx as a medication taken by the injured party? | Yes/No | | |
| Do the hospital admission records for the injury at issue show Vioxx as a current medication? | Yes/No | | |
| Do the medical records indicate that the injured party requested Vioxx by name? | Yes/No | | |
| Was aspirin taken on a regular basis at the time of the injury? | Yes/No | | |
| Was aspirin taken on a regular basis at any time before the injury? | Yes/No | | |
| Was Celebrex prescribed or taken? | Yes/No | | |
| If so, when | Before Injury/After Injury/Congestion at time of Injury | | |
| If so, for how long? | Options pick number of months, allow 0 -55 months | | |
| Was Bextra prescribed or taken? | Yes/No | | |
| If so, when | Before Injury/After Injury/Congestion at time of Injury | | |
| If so, for how long? | Options pick number of months, allow 0 - 65 months | | |
| Prior history of adverse reaction to NSAID? | Yes/No | | |
| Oral contraceptives within 2 years of injury? | Yes/No | | |
| **MEDICAL HISTORY** | | | |
| Diabetes? | Yes/No | | |
| Previously diagnosed and uncontrolled | Yes/No/Unknown | | |
| Previously diagnosed and controlled | Yes/No/Unknown | | |
| Previously undiagnosed but diagnosed at time of injury | Yes/No/Unknown | | |
| Is the diabetes controlled with medication? | Yes/No/Unknown | | |
| Is the diabetes controlled by the patients diet? | Yes/No/Unknown | | |
| Chronic hypertension? | Yes/No/Unknown | | |
| Previously diagnosed and uncontrolled | Yes/No/Unknown | | |
| Previously diagnosed and controlled | Yes/No/Unknown | | |
| Previously undiagnosed but diagnosed at time of injury | Yes/No/Unknown | | |
| Dyslipidemia? | Yes/No/Unknown | | |
| Previously diagnosed and uncontrolled | Yes/No/Unknown | | |
| Previously diagnosed and controlled | Yes/No/Unknown | | |
| Previously undiagnosed but diagnosed at time of injury | Yes/No/Unknown | | |
| Has the patient been diagnosed with Coronary Artery Disease/Coronary Heart Disease? | Yes/No/Unknown | | |
| If yes, when | MM/YYYY | | |

| Description | Field Type | Additional Information | Comment Field |
|---|---|---|---|
| Diagnosed with Carotid Artery Disease? | Yes/No/Unknown | | |
| If yes, when | MM/YYYY | | |
| Diagnosed with CHF? | Yes/No/Unknown | | |
| If yes, when | MM/YYYY | | |
| Diagnosed with COPD? | Yes/No/Unknown | | |
| If yes, when | MM/YYYY | | |
| Past medical history of cerebrovascular accidents? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of transient ischemic attacks? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of myocardial infarction? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of unstable angina? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of stable angina? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of coronary artery bypass graft surgery? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of pulmonary embolus? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of DVT? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of angioplasty? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of arteriosclerosis? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of carotid endarterectomy? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of congestive heart failure? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Past medical history of stent implant? | Yes/No/Unknown | Ability to insert date information similar to NJSF (multiple events) | |
| Severity of blockage | Numeric % (less than 100) | Ability to include data for multiple blockages | |
| Diagnosed with cancer at any time? | Yes/No/Unknown | | |
| History of gastrointestinal event(s) prior to Vioxx use (perforation, ulcer or a "bleed") | Yes/No/Unknown | | |
| Diagnosed with atrial fibrillation? | Yes/No/Unknown | | |
| If yes, when | MM/YYYY | | |
| Undergone major surgery or trauma within 14 days of the date of qualifying injury? | Yes/No/Unknown | | |
| If yes, Surgery type | Open Field | | |
| Diagnosed with injury? | Yes/No/Unknown | | |
| Undergone gastric bypass surgery? | Yes/No/Unknown | | |
| If yes, when? | MM/YYYY | | |
| | | | |
| **DEATH CASES** | | | |
| Was an autopsy performed? | Yes/No/Unknown | | |
| If Yes: Stated causes of death in order of primacy | Alpha field | | |

| | Trigger from NJSF Injury Definition Field | |
|---|---|---|
| **DAMAGES** | | |
| **ALL IN THIS ARE FOR STROKE PATIENTS ONLY** | | |
| **Domains Impaired** | | |
| Motor | No or minimal deficit/Able to maintain deficit/Severe deficit | MM information to include more detailed description from attachment | X |
| Sensory | No or minimal deficit/Able to maintain deficit/Severe deficit | MM information to include more detailed description from attachment | X |
| Vision | No or minimal deficit/Able to moderate deficit/Severe deficit | MM information to include more detailed description from attachment | X |
| Language | No or minimal deficit/Able to moderate deficit/Severe deficit | MM information to include more detailed description from attachment | X |
| Cognition | No or minimal deficit/Able to moderate deficit/Severe deficit | MM information to include more detailed description from attachment | X |
| Affect | No or minimal deficit/Able to moderate deficit/Severe deficit | MM information to include more detailed description from attachment | X |
| | | |
| **Basic Activities of Daily Living (BADL)** | | |
| Feeding | Unable/Needs help eating, spoonfeeding butter etc or requires modified diet/Independent | We should use numeric values for each category for later use | X |
| Bathing | Dependent/Independent | We should use numeric values for each category for later use | X |
| Grooming | Needs help with personal care/Independent | We should use numeric values for each category for later use | X |
| Dressing | Dependent/Needs help but can do about half unaided/Independent | We should use numeric values for each category for later use | X |
| Bowels | Incontinent/Occasional Accident/Continent | We should use numeric values for each category for later use | X |
| Bladder | Incontinent/Occasional Accident/Continent | We should use numeric values for each category for later use | X |
| Toilet Use | Dependent/Needs help but can do something independent | We should use numeric values for each category for later use | X |
| Transfers | Unable - no sitting balance/Major help, but can sit/Minor help | We should use numeric values for each category for later use | X |
| Mobility | Immobile or <50 yards/Wheelchair Independent including corners >50 yards/Walks with help of one person >50 yards/Independent > 50 yards | We should use numeric values for each category for later use | X |

| Description | Field Type | Additional Information | Comment Field |
|---|---|---|---|
| | Limits/Needs help/Independent | | X |
| **Instrumental Activities of Daily Living (IADL's)** | | | |
| Ability to Use a Telephone | Operates telephone on own initiative/Dials a few well known numbers/Answers telephone but does not dial/Does not use the telephone at all | We should use numeric values for each category for later use | X |
| Shopping | Takes care of all shopping needs independently/Shops independently for small purchases/Needs to be accompanied on any shopping trip/Completely unable to shop | We should use numeric values for each category for later use | X |
| Food Preparation | Plans, prepares and serves adequate meals independently/Prepares adequate meals if supplied with ingredients/Prepares meals but does not maintain adequate diet/Needs to have meals prepared and served | We should use numeric values for each category for later use | X |
| Housekeeping | Maintains house alone or with occasional assistance/Performs light daily tasks such as dish washing, bed making/Performs light tasks but cannot maintain acceptable level of cleanliness/Needs help with all home maintenance tasks/Does not participate in any housekeeping tasks | We should use numeric values for each category for later use | X |
| Laundry | Does personal laundry completely/Launders small items/Will have all laundry must be done by others | We should use numeric values for each category for later use | X |
| Mode of Transportation | Travels independently on public transportation or drives own car/Arranges own travel via taxi, but does not otherwise use public transportation/Travels on public transportation when accompanied by another/Travel limited to taxi or vehicle with assistance of another/Does not travel at all | We should use numeric values for each category for later use | X |
| Responsibility for Own Medication | Is responsible for taking medication in correct dosage at correct time/Takes responsibility if medication is prepared in advance in separate dosage/Is not capable of dispensing own medication | We should use numeric values for each category for later use | X |
| Ability to Handle Finances | Manages financial matters independently/Manages day-to-day purchases, but needs help with banking, major transactions/Incapable of making financial decisions or handling money | We should use numeric values for each category for later use | X |

| ALL IN PINK ARE FOR HEART ATTACK CASES ONLY | Trigger from NJSF Injury Definition Field | | |
|---|---|---|---|
| Extent of Coronary Artery Disease | Single Vessel Disease/Two Vessel Disease/Three Vessel Disease | | |
| Ejection Fracture | Numeric Value no higher than 90 - displays as a % | Need to include a date with each test with the ability to include multiple readings at different dates - similar to ability to enter multiple injuries | |

| TREATMENT | | | No |
|---|---|---|---|
| Inpatient? | Yes/No/Unknown | | No |
| Duration | Days | | No |
| Outpatient? | Yes/No/Unknown | | No |
| Duration | Days | | No |
| Rehabilitation? | Yes/No/Unknown | | No |
| Duration | Days | | No |

# EXHIBIT 3



FAC Resp. Exhibit B -- 1652

# EXHIBIT 4

# THE KAISER FIRM L.L.P.

**GRANT KAISER**
CERTIFIED CIVIL APPELLATE LAW
PERSONAL INJURY TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

April 6, 2007

Penny Herman                                    *Via Federal Express*
New Orleans
820 O'Keefe Avenue
New Orleans, LA 70113

Re:     Vioxx MDL 1657; *Smith v. Merck*

Dear Penny:

In response to Lenny's April 2, 2007, letter requesting production of material from the *Smith* trial for the MDL depository, I enclose two CDs. In addition to the trial transcripts and deposition designations previously delivered to the depository, these CDs contain the following:

(1) **CD – SMITH DEPOSITIONS & EXHIBITS**
        **Admitted Exhibits Folder**
                Plaintiff's Admitted Exhibits
                Plaintiff's-Defendants Admitted Exhibits

        **Deposition Folder**
                Subpoena List Update
                Deposition Notice – Marks
                Deposition Transcript – Scolnick
                Deposition Transcript – Kronmal (Humeston)
                Deposition Notice – Pratt (August, 2006)
                Deposition Notice – Cohen (August, 2006)
                Deposition Notice – Roach (August, 2006)
                Deposition Notice - Marks
                Abramson Folder
                    Deposition Transcript
                Cohen Folder
                    Deposition Transcript
                Courtade Folder
                    8 Courtade documents
                    Deposition transcript
                Grefer Folder
                    Plaintiff's Exhibits 1-6
                    Defendant's Exhibits 1-9
                    Grefer Document
                    Grefer Deposition Transcript
                    Grefer Trial Deposition

FAC Resp. Exhibit B -- 1654

Page 2

Heis Folder
Marks Folder
    Deposition transcript
Notices Folder
    Kaiser-Jablonski correspondence re doc depos
    Merck's amended notice to Dr. Grefer
    Additional Kaiser-Jablonski correspondence re depos
    Amended notice to Dr. Courtade
    Notice to David Smith
    Amended Notice to Dr. Heis
    Notice to Jack Lemming
    Correspondence to Russ Herman re Forest Heis notice
    Notice to Melissa Lemming
    Merck's Amended Cross Notice of Dr. Grefer
    Merck's Amended Notice of Dr. Courtade
    Merck's Amended Notice of Ravencraft
    Merck's Amended Notice of Dr. Sommerkamp
    Merck's Amended Notice of Dr. Sander
    Merck's Notice of Continuation of Dr. Grefer
    Merck's Deposition Notice – Allen
    Merck's Deposition Notice – Dr. Courtade
    Merck's Deposition Notice – David Smith
    Merck's Deposition Notice – Jack Lemming
    Merck's Deposition Notice – James Ravencraft
    Merck's Deposition Notice – Dr. Sander
    Merck's Deposition Notice – Dr. Grefer
    Merck's Deposition Notice – Melissa Lemming
    Merck's Deposition Notice – Robin Burger
    Merck's Deposition Notice – Sheila Adkins
    Merck's Deposition Notice – Dr. Sommerkamp
    Merck's Notice of Cancellation – Dr. Allen
    Merck's Notice of Cancellation – Burger, Lester
    Amended Notice – Gary Sander
    Cancellation Notice – Mark Furman
    Cancellation Notice – Smith & Lemmings
    Deposition Notice – Dr. Sander (July, 2006)
    Deposition Notice – Ravencraft (June, 2006)
    Deposition Notice – Abramson (July, 2006)
    Deposition Notice – Mark Sander (June, 2006)
    Deposition Notice – Robert Smith
    Deposition Notice Draft – Robert Smith
    Deposition Notice – Sommerkamp (June 20060)
    Plaintiff's Notice – Mark Sander (July, 2006)
    Plaintiff's Cross Notice – Zipes
    Plaintiff's Cross Notice – Farquhar
    Plaintiff's Notice – Dr. Grefer
    Plaintiff's Notice – Adkins, Burger, Smith, Lemmings & Lester

Page 3

            Plaintiff's Notice – Mark Furman
            Robin Burger
            Sheila Adkins
     Pechmann Folder
            Deposition Transcript
     Plaintiff Depo Folder
            Smith Deposition Transcript
            Smith Deposition Exhibits 1-32
     Pratt Folder
            Deposition Transcript (Rough draft)
     Pratt Depo Folder
            Deposition Transcript
            Top Ten List
     Roach Folder
            Deposition Transcript
     Sander Folder
            Deposition Transcript

**Defendant's BP Charts Folder**
     1978-2005 Chart
     February 17, 2003 – NLY BP Chart
     October 30, 2002 – NLY BP Chart

**Final (Deposition) Play List Folder**
     Ned Braunstein – Amended
     Tom Cannell, Final
     Daniel Courtade – Amended
     Michael Grefer – Amended
     David Graham
     Ronald Marks
     Eric Topol
     Jan Weiner – Final
     David Graham Folder
            Order re designation of Graham
            Defense Counter – Plaintiff's Objections (Parts 1-7)
            Plaintiff's Designation – Defense Objection – Plaintiff
             Response (Parts 1-7)

**Opening Slides**
     Defendant
     Plaintiff

(2) CD – *SMITH* EXPERTS & DEPO DESIGNATIONS
     **Depo Designations Folder**
         Avorn  (Parts 1-3)
         Courtade
         Demopolous

Page 4

Graham
Grefer
Topol
Cannell
Scolnik (Parts 1-2)
Avorn Revised
Anstice Final Revised
Avorn Revised Final
Baumgartner Final Revised
Blake Final
Braunstein Final
Cannell Revised Final
Cannuscio Final
Carroll Revised Final
Courtade Revised Final
Curfman Final
Demopolous Revised Final
Dixon Revised Final
Gilmartin Final
Graham Revised Final
Grefer Revised Final
Mixon Final
Nies Revised Final
Scolnick Revised Final
Topol Final
Weiner Final
Fries document & cover memo
Grefer Revised
Letter sending depo notebooks
Notice of Filing Transcripts
Ronald Marks Depo Designation
Topol Revised

**Defense Experts Folder**

Cohen Expert Report
Letter to Russ Herman sending Smith expert list
Marks Expert Report
Merck Witness List
Merck Designation of Experts
Merck Filing Letter
Pratt Expert Report
Roach Expert Report
Smith Expert List

**Plaintiff's Experts Folder**

Final Designation of Experts & Lay Witnesses
Amended Designation of Experts

FAC Resp. Exhibit B -- 1657

Page 5

             Designation of Experts (July 7, 2006)
             Draft – Final Designation of Experts & Lay Witnesses
             Supplemental Designation of Experts
             Third Amended Designation of Experts & Lay Witnesses
             Abramson Folder
                   Amended Reference List
                   CV
                   Report
                   Document List GK Final
                   Document List
             Corove Folder
                   Smith Report
             Furman Folder
                   Bibliography
                   CV
                   Report
                   Supplemental Report
             Moye Folder (generic)
                   Depo Notice Barnett
                   Previous Testimony
                   Deposition in Barnett
                   CV
                   Report (Revised 8/9/06)
                   Report
                   Deposition Transcript
                   Vioxx Affidavit
                   Working Index of Vioxx Documents
             Sander Folder
                   Compensation
                   References
                   CV
                   Report
             Zipes (generic)
                   Deposition in Barnett
                   Barnett Report
                   CV
                   Report

      This completes production from the *Smith* trial team of all materials it has related to *Smith*. If you have any questions, please call me.

Yours truly,

Grant Kaiser
The Kaiser Firm LLP

Page 6

cc:    Plaintiffs' PSC, Vioxx MDL 1657

Enclosures

gg





Admitted Exhibits Folder



Abramson Folder



Cohen Folder





Courtade Folder



Grefer Depo



Marks Folder



Notices Folder



Pechman Folder



*Plaintiff Depo Folder*





*Pratt Folder*



*Pratt depo Folder*



*Roach depo Folder*



Sander depo folder



Depositions Folder



D's BP Charts Folder



*Final Play List Folder*



*Graham, David*
*W/in  Final Play List folder*







Folder Depo Designations





*Folder - Defense Experts*



Folder - P' experts

Folder - Abramson



Corove Folder

