entertainment club from communicating with club's former general manager. <u>Rules of Prof.Conduct, Rule 4.2.</u>

"We join with the majority of jurisdictions that have analyzed this issue and hold that Indiana's <u>Rule 4.2</u> does not prohibit an attorney from contacting the former employee of a party adverse to the attorney's client in litigation. In reaching this decision, we are guided primarily by the text of the Rule, which refers only to communication with "a party." Former employees such as Lobosco are clearly not "parties" to the litigation. The Comment then clarifies who qualifies as a "party" in the case of a corporate party. Like the Committee, we find it persuasive that the Comment delineates certain classes of employees to which the Rule applies. No language in the Comment suggests that the Rule should even be applied to all current employees--much less former employees. In so holding, we recognize the danger that allowing such contacts creates and are mindful of the limitations some courts have imposed to address these dangers. We are particularly troubled by the possibility that ex parte interviews could lead to the disclosure of information protected by the attorney-client privilege. While Rule 4.4 prohibits an attorney from inducing anyone to violate an attorney-client privilege, it does not reach the situation where the disclosure of such privileged communication was inadvertent and unsolicited. However, we find no language in <u>Rule 4.2</u> suggesting any limitations on contact with former employees. Recognizing the drawbacks of <u>Rule 4.2</u> as applied in this situation, our supreme court with its rule-making authority may wish to revisit this issue. Until then, we hold that <u>Rule 4.2</u> contains no limitations on the contacts an attorney may make with the former employee of an adverse party. Accordingly, the trial court did not err in denying the Club's motion to strike the Lobosco affidavit."
Id 737

----------

**<u>Brown v. St. Joseph County</u>,**
148 F.R.D. 246, N.D.Ind., Apr 12, 1993

Rule of Professional Conduct and corresponding disciplinary rule pursuant to which lawyer is not to communicate, without consent, about subject of representation with "party" lawyer knows to be represented by another lawyer have no application to former employees who no longer have any relationship with corporate party. ABA <u>Rules of Prof.Conduct, Rule 4.2</u>; ABA Code of Prof.Resp., DR 7-104(A)(1).

"Neither <u>Rule 4.2</u>, nor the official Comment, makes any reference to former employees. If the "party" referred to in <u>Rule 4.2</u> is a corporation, then a former employee who no longer has any relationship with that corporation cannot be equated with that "party." In this regard, the court in *Valassis* observed:
If one party is an organization, the first level of inquiry is whether the person in question is an agent of that organization. If he is not, then he cannot be a party because he lacks any relevant connection to the organization which could reasonably place him in the role of a party. Only if a person is an agent of the organization need a court advance to the next level to determine whether the agent fits within the specific category of organizational agents to which <u>Rule 4.2</u> is applicable." Id., at 252

"This court must agree with the majority of courts which have held that <u>Rule 4.2</u> and its analogue, DR 7-104(A)(1), have no application to former employees who no longer have any relationship with a corporation." Id. at 253

////////////////////////////

## Iowa

Iowa Rules of Professional Conduct, Rule 32:4.2: (Eff. 7/1/05)

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

     In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Comment

...

     [7] In the case of a represented organization, this rule prohibits communications with a constituent of the organization who supervises, directs, or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this rule. *Compare* rule 32:3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. *See* rule 32:4.4.
...

----------

**Terra Intern., Inc. v. Mississippi Chemical Corp.,**
913 F.Supp. 1306, N.D.Iowa, Jan 25, 1996

Counsel is not prohibited from communicating ex parte with former employees of opposing party, with exception of former employees who are in fact represented by former employer's counsel. Code of Prof.Resp., DR 7-104(A)(1), 40 I.C.A. Ch. 602 App.

"In *Cram,* after reviewing the case law that has grown up around both ethical rules, I concluded that neither DR 7-104(A)(1) nor Rule 4.2 entirely precludes *ex parte* communications with former employees of an opposing party, although there were some limitations on contact with former employees of managerial status and other limitations resulting from the attorney-client privilege. *Cram,* 148 F.R.D. at 265-66. In particular, I noted that a former employee no longer works on the organization's behalf, is unlikely to be represented by the organization's counsel, and unlikely to be a participant in the process leading to resolution of the dispute, *id.* at 260; requiring formal discovery methods rather than informal *ex parte* contacts as the only means of obtaining information would have a deleterious effect on the time and expense necessary to pursue litigation, or even to decide whether to pursue litigation, *id.* at 261; [FN8] and that former employees do not fit within the definition of a "party" with whom *ex parte* contacts are forbidden. *Id.* at 263. On this last point, I rejected the arguments that former employees are "persons having a managerial responsibility," *id.* at 263 (citing the

35

Comment to Rule 4.2, which identifies this category of persons as ones who must be treated as organizational "parties," and the rule of agency law that a statement of a former agent does not constitute an admission of or bind an organization); and that former employees, even former managerial employees, are not persons whose acts or omissions may be imputed to the organization for purposes of liability or whose statements constitute admissions by the organization. *Id.* at 263-65 (citing, *inter alia,* ABA Committee on Professional Ethics and Professional Responsibility, Formal Opinion 91-359 at 3 (1991), and subsequent cases adopting that opinion)." Id., at 1314

...

"Thus, the court concludes that the ethical canons must be read as permitting *ex parte* communications with former employees of an opposing party, with one limited exception. Former employees who are in fact represented by the former employer's counsel, or any counsel, are plainly off limits under the language of the rules. *See* CPR DR 7-104(A)(1) (prohibiting *ex parte* contact with "a party [an attorney] knows to be represented by a lawyer in that matter"); MRPC Rule 4.2 (prohibiting *ex parte* contact with "a party the lawyer knows to be represented by another lawyer in the matter")." Id., at 1315

"The attorney-client privilege cannot be used to justify an absolute proscription against *ex parte* communications with former employees. Significantly, the attorney-client privilege exists only to the extent attorney-client confidences are implicated. The attorney-client privilege "only protects disclosures of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." ... [The attorney-client privilege] should restrict only what may be asked during *ex parte* communications. *Hanntz,* 766 F.Supp. at 270-71. Thus, an attorney communicating with a former employee of the opposing party "may not inquire into privileged attorney-client communications because '[a]ny privilege existing between the former employee and the organization's counsel belongs to the organization, and can only be waived by the organization.' " *Cram,* 148 F.R.D. at 266 (quoting *Sequa Corp v. Lititech, Inc.,* 807 F.Supp. 653, 668 (D.Colo.1992)). However, Terra has not identified any attorney-client privileged information to which any former employee was privy, although it has asserted that an attorney-client privilege exists as to representation of Mr. Romig. Until and unless the attorney-client privilege is properly asserted, the court will not restrict *ex parte* communications by MCC with any *unrepresented* former employees of Terra." Id., at 1316

//////////////////////////////////

## Kansas

Kansas Judicial Branch Rules Adopted by the Supreme Court, Rule 4.2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Comment

This Rule does not prohibit communication with a party, or an employee or agent of a party, concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party, or between two organizations, does not

36

prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter. Also, parties to a matter may communicate directly with each other and a lawyer having independent justification for communicating with the other party is permitted to do so. Communications authorized by law include, for example, the right of a party to a controversy with a government agency to speak with government officials about the matter.

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter of representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). ...

----------

**Turnbull v. Topeka State Hosp.,**
185 F.R.D. 645, 79 Fair Empl.Prac.Cas. (BNA) 1384, D.Kan., May 11, 1999

Model rule of professional conduct precluding attorney from communicating with party known to be represented by another lawyer does not apply to ban ex parte contact with former employees of an organizational party to the litigation that is represented by counsel. Kan.Sup.Ct.Rules, Rule 226, Rules of Prof.Conduct, Rule 4.2.

"The court finds no occasion, moreover, to expand the application of M.R.P.C. 4.2 to prohibit *ex parte* communications with all former and present employees of a party. The rule does not create a blanket of immunities against interviews with knowledgeable employees, only an ethical mandate that the attorney not interview any employee whose position equates with the employer as a party litigant. Rule 4.2 "does not apply to ban ex parte contact with former employees of an organizational party to the litigation that is represented by counsel." *Aiken,* 885 F.Supp. at 1475. With respect to communications with former employees, *Aiken* provides the following instructive analysis:
The court recognizes that a former employee could possess and reveal information which could potentially result in liability being imposed on an organization. The purpose of Rule 4.2, however, is not to prevent the flow of information, even if damaging to a party to the suit. To enlarge the scope of the rule hampers the broad discovery purposes contained in Federal Rule of Civil Procedure 26. In an era when easing or eliminating the unnecessary burdens and expense of litigation is widely viewed as desirable, this court is loath to create limitations on attorney communications which make the litigation process more difficult while providing little in the way of a corresponding benefit. *Cf. Cram,* 148 F.R.D. at 265 (citing *Goff,* 145 F.R.D. at 356) ("[R]estricting an attorney's ability to communicate with former employees strikes an unreasonable balance between protecting a relationship that does not exist and unduly restricting the need for litigants to have access to all relevant information...."). 
885 F.Supp. at 1479.

Although distinguishable in several respects, *Chancellor v. Boeing Company,* 678 F.Supp. 250 (D.Kan.1988) provides guidance with respect to ethical restraints regarding communications with current employees of a party. It held that [a] corporate employee is a 'party' under DR 7-104(A)(1) [ (the predecessor of M.R.P.C. 4.2) ] if he or she has managerial responsibility, his or her acts or omissions in connection with th[e] matter may be imputed to the corporation for purposes of civil or criminal liability, or his or her statements may be an admission on part of the organization.

37

*Id.* at 253. That definition remains applicable despite the adoption of M.R.P.C. 4.2 as the governing guideline."  Id., at 652

----------

### Biocore Medical Technologies, Inc. v. Khosrowshahi,
181 F.R.D. 660, 42 Fed.R.Serv.3d 581, D.Kan., Sep 04, 1998

Under Kansas law, attorney for defendants did not violate rule of professional conduct regarding communication with another represented represented party without consent of counsel when he contacted former employees of plaintiff to set up deposition dates without consent of plaintiff's attorney, where former employees could not impute liability to plaintiff; moreover, although one former employee, the plaintiff's former counsel had attorney-client information, he asserted the attorney-client privilege and refused to provide privileged information. Kan.Sup.Ct.Rules, Rule 226, Rules of Prof.Conduct, Rule 4.2.

"Plaintiffs have not shown that any of the former employees who were contacted in this case meet the management-speaking test. There is no basis to finds that any of them, as former employees, have the ability to bind plaintiffs in a "legal evidentiary sense." *See Chancellor,* 678 F.Supp. at 253. To be a binding admission under Federal Rule of Evidence 801(d)(2)(D), the employee must make the admission during the employment relationship. Fed.R.Evid. 801(d)(2)(D); *Boren v. Sable,* 887 F.2d 1032, 1032 (10th Cir.1989). Former employees no longer have the authority to speak for the organization. *Miller v. Sirloin Stockade,* 224 Kan. 32, 35, 578 P.2d 247, 249 (1978). Because they are not agents of the employer, former employees cannot make a binding admission for the organization. *See Robinson v. Audi Nsu Auto Union,* 739 F.2d 1481, 1487 (10th Cir.1984) (statement not an admission when no agency relationship existed at time statement was made). Plaintiffs also fail to show that these former employees can impute liability to plaintiffs. While some of them may have been involved in the incidents which led to this litigation, plaintiffs have failed to provide evidence of any such involvement. The KBA approach also prohibits contact with former employees to obtain attorney-client information. Again plaintiffs provide no evidence that any of the contacted persons, with the exception of plaintiffs' former counsel, had attorney-client information. While defendants admit that Butler contacted plaintiffs' former counsel, the Court cannot find a violation of Rule 4.2 in this case, where the former employee, who is an attorney, asserted the attorney-client privilege and refused to provide privileged information. The Court therefore finds that Butler did not violate Rule 4.2 regardless of which approach Kansas would use."  Id., at 672

////////////////////////////

## Kentucky

Kentucky Rules of Professional Condtuct, Rule 3.130(4.2)

Communication with person represented by counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENTARY

38

...

[2] In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. Prior to communication with a nonmanagerial employee or agent of an organization, the lawyer should disclose the lawyer's identity and the fact that the lawyer represents a party with a claim against the organization. See Rule 4.3. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).

----------

Kentucky Bar Association Ethics Opinion KBA E-381 (7/95)

Question:      May a lawyer representing a client in a matter adverse to an organizational party that is represented by another lawyer, without violating Rule 4.2, communicate about the subject matter of the representation with an unrepresented former employee of the organizational party without the consent of or notification to the organization's lawyer?

Answer:        Yes.

...

OPINION

This question is coming up with increasing frequency.  The Committee is of the opinion that ABA Formal Op. 91-359 provides the correct answer.  That opinion collects and reviews the authorities and arguments, and we need not recite them at length.  It is sufficient to state that after recognizing that neither Rule 4.2 not [? "nor"] the Comments thereto deal with former employees, the Committee concluded that Rule 4.2 does not bar ex parte contacts with an organization's former employees.  We note that a former employee  is no longer subject to the control of the organization nor in a position to speak for the organization, and cannot make vicarious admissions under the state and federal evidence rules.

A lawyer seeking information from a former employee of an organizational party should disclose the lawyer's identity and the fact that the lawyer represents a party with a claim against the organizational party.  See Rule 4.3 and Comment (2) to Rule 4.2.  It is incumbent on the party who knows that its former employees possess privileged information to utilize confidentiality agreements and/or seek protective orders.  See e.g., Nalian Truck Lines at 472.

We also emphasize that if the former employee is personally represented by counsel in that matter, then counsel may not be bypassed.

-----------

**Humco, Inc. v. Noble,**
31 S.W.3d 916, Ky., Nov 22, 2000

39

Former employee with no present relationship with the organizational party is not a "party," for purposes of the rule against ex parte contact with represented adverse parties to an action, and thus the individual is not "adverse" in the sense that his interests are at stake in the litigation.

"The rule does not distinguish between current and former employees of the organization. As noted by the Court of Appeals, Formal Ethics Opinion KBA E-381 provides guidance in this area. In holding that *ex parte* contact with an organization's former employees is not prohibited, the ethics opinion reasoned, "a former employee is no longer subject to the control of the organization nor in a position to speak for the organization, and cannot make vicarious admissions under the state and federal evidence rules." The opinion refers to a formal opinion issued in 1991 by the American Bar Association Committee on Ethics and Professional Responsibility, which explicitly states that <u>Rule 4.2</u> does not extend to former employees, even if they are former managerial employees or those whose conduct might have been the basis for imputing liability to the employer or whose statements could be admitted in evidence as an admission by the employer. [FN6]
FN6. ABA Committee on Ethics and Professional Responsibility, Formal Op. 91-359, at 6 (March 22, 1991).

We believe this to be the sound approach and observe that it has been adopted by the majority of other jurisdictions. The majority rule is consistent with the purposes and policies of <u>Rule 4.2</u>. The purpose of <u>Rule 4.2</u> is not "to prevent the flow of information, even if damaging to a party in a suit." [FN7] Rather, it is to preserve the positions of the parties in an adversarial system and thereby to maintain the protections obtained by employing counsel and prevent disruption of the attorney-client relationship. A former employee with no present relationship with the organizational party is not a "party" under the rule, and thus the individual is not adverse in the sense that his interests are at stake in the litigation." Id., at 920

//////////////////////////////

## Louisiana

Lousiana Rules of Professional Conduct, Rule 4.2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with:

(a) a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

(b) a person the lawyer knows is presently a director, officer, employee, member, shareholder or other constituent of a represented organization and

(1) who supervises, directs or regularly consults with the organization's lawyer concerning the matter;
(2) who has the authority to obligate the organization with respect to the matter; or
(3) whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

40

----------

**Schmidt v. Gregorio,**
705 So.2d 742, 25,305 (La.App. 2 Cir. 10/27/93), La.App. 2 Cir., October 27, 1993

Rule of Profession Conduct concerning communication with party represented by attorney does not prohibit counsel from conducting informal ex parte interviews with former employees of adversary; former employees are not "parties" represented by attorney for purposes of rule. Schmidt v. Gregorio, App. 2 Cir.1993, 705 So.2d 742, 25,305 (La.App. 2 Cir. 10/27/93), rehearing denied. Attorney And Client ⊙⇒32(12)

"Although this rule is essentially the same as American Bar Association Model Rule of Professional Conduct 4.2, it lacks the following ABA clarifying comment:
In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person, whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability, or whose statement may constitute an admission on the part of an organization.
As there is no existing jurisprudence in Louisiana providing guidance on this issue, the trial court relied upon the ABA comment, and the federal jurisprudence interpreting it, as persuasive authority. In particular, the trial court found that the decision in _Public Serv. Elec. & Gas v. Associated Elec. & Gas_, 745 F.Supp. 1037 (D.N.J.1990) operated to bar such ex parte contact with former employees. However, a recent ABA opinion interpreting Rule 4.2 and subsequent decisions questioning and rejecting _Public Serv., supra,_ reach a different result. _Hanntz v. Shiley, Inc.,_ 766 F.Supp. 258 (D.N.J.1991) and _Curley v. Cumberland Farms, Inc.,_ 134 F.R.D. 77 (D.N.J.1991).
ABA formal ethical opinion 91-359 issued March 22, 1991, states that ABA Rule 4.2 does not, by its terms, apply to former employees. Although courts have used the rule in various ways, the opinion notes that the rule is **3** limited to present employees. The comment under Rule 4.2 limits even present employees with whom contact is prohibited: Ex parte contact should not be made with present corporate employees (1) who have managerial responsibility on behalf of the defendant corporation, (2) whose act or admission concerning the litigation subject matter may be imputed to the corporation, and (3) whose statement may constitute an admission by the corporation.
Since the ABA comment limits unrepresented corporate employees with whom ex parte communication is prohibited to the above three categories, the ABA 91-359 opinion finds the clear implication that communication with all other employees on the subject matter of the litigation is permissible without consent of the corporate attorney. After reviewing various authorities the opinion concludes that:
A lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4-2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer.

We find ABA Formal Op. 91-359 and the cited jurisprudence to be persuasive. Accordingly, we hold that the Schmidts' counsel may contact the unrepresented former employees of HCA about the subject of the representation without violating Louisiana State Bar Association Rule of Professional Conduct 4.2, and is not merely relegated to formal discovery." Id., at 743-744

41

----------

### In re Bank of Louisiana/Kenwin Shops Inc., Contract Litigation,
Not Reported in F.Supp.2d, 1998 WL 788776, E.D.La., Nov 10, 1998

"Most courts have found that Rule 4.2 does not generally bar *ex parte* contacts with former employees; however, it proscribes inquiry by opposing counsel into matters subject to the attorney-client privilege. *Torch*, page 3, citing *Action Air Freight, 769 F.Supp. 899, 903-04 (E.D.Pa.1991); Hantz v. Shiley, Inc., 766 F.Supp. 258, 265-69 (D.N.J.1991). See* Vernia, Benjamin *Right of Attorney to Conduct Ex Parte Interviews With Former Corporate Employees,* 57 A.L.R.5th 633 (1998) (most court have concluded ethical rules do not problem *ex parte* communication so long as interviewing attorney does not inquire into privileged matters). [FN2]

FN2. Other decisions following this approach rendered in Louisiana courts are *Jenkins v. Wal-Mart Stores, Inc., 956 F.Supp. 695 (W.D.La.1997); Lirette v. Delchamps Inc., 1996 WL 267991 (E.D.La.1996); Barron Builders & Management Co. v. J & A Conditioning & Refrigeration, Inc., 1997 WL 685352 (E.D.La.1997); Schmidt v. Gregorio, 25-305 La.App. 2 Cir. 10/27/93, 1993 WL 852155 (La. Ct. App 2d Cir.1993).*

Indeed, as noted in *Valassis v. Samelson, 143 F.R.D. 118 (E.D.Mich.1992),* the American Bar Association Committee held in its ABA Formal Opinion 91-359 issued in March 1991, that Rule 4.2 does not extend to former employees, including former managerial employees. It stated with respect to Rule 4.2:
While the Committee recognizes that persuasive policy arguments can be and have been made for extending the the ambit of Model Rule 4.2 to cover some former corporate employees, the fact remains that the text of the rule does not do so and the comment gives no basis for concluding that such coverage was intended. Especially where, as here, the effect of the rule is to inhibit the acquisition of information about one's case, the Committee is loath, given the text of the Model Rule 4.2 and its Comment, to expand its coverage to former employees by means of liberal interpretation.

*3* Accordingly, it is the opinion of the committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4 .2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporations's lawyer. *Valassis*, 143 F.R.D. at 121.
Nonetheless, former employees are "barred from discussing privileged information to which they are privy." *Orlowski v. Dominick's Finer Foods, Inc., 937 F.Supp. 723, 728 (N.D.Ill.1996).* Thus, as this Court has stated before, "an attorney can investigate the underlying facts leading up to the disputed matter, but he must forgo inquiry into attorney-client communication during the contact. *Torch*, p.3. Thus, no wrongdoing was committed by BOL's counsels in so far as its counsel having communications with former employees such as Evelyn Kelley, so long as such conversations did not concern attorney-client communications." Id., at *2-3

////////////////////////////

## Maine

Maine Code of Professional responsibility, Rule 3.6

Conduct During Representation

42

...

(f) Communicating With Adverse Party. During the course of representation of a client, a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by another lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so. An otherwise unrepresented party to whom limited representation is being provided or has been provided in accordance with Rule 3.4(i) is considered to be unrepresented for purposes of this rule, except to the extent the limited representation attorney provides other counsel written notice of a time period within which other counsel shall communicate only with the limited representation attorney.

----------

### Frank v. L.L. Bean, Inc.,
--- F.Supp.2d ----, --- F.Supp.2d ----, 2005 WL 1125653, D.Me., May 11, 2005

Ex parte contact by employment discrimination plaintiff's attorney with plaintiff's former supervisor did not warrant disqualification of or imposition of sanctions against counsel, absent showing that former supervisor was within scope of defense counsel's representation of its client.

"It is self-evident that a former employee is entirely outside the scope of representation suggested by the commission. A former employee cannot be characterized as "a member of management," and certainly has no responsibilities or duties to the corporation regarding the litigation. Nor can he or she be deemed in any way to represent the corporation or be capable of making any admissions or "major capitulations" on behalf of the corporation....

Finally, and perhaps most importantly, it is unclear how the rule adopted in *Kaiser* and *Armsey,* however wise, can be justified in the face of the plain text of the Maine Bar Rule 3.6(f), which prohibits ex parte communication only when the witness is represented by counsel. These cases do not explain how a former employee--who has presumably severed all other ties with his former employer--could nonetheless be considered to be represented by counsel for that employer."

----------

### Crowley v. L.L. Bean, Inc.,
143 F.Supp.2d 38, 85 Fair Empl.Prac.Cas. (BNA) 1193, D.Me., May 08, 2001

"L.L. Bean objects to Crowley's reliance on the affidavits of current and former L.L. Bean employees, arguing that Crowley's communications with them violated Maine Bar Rule 3.6(f). Defendant L.L. Bean's Reply Statement of Facts (Docket No. 46) at 2. Defendant specifically objects to the use of the affidavits of John Andretta, Tammy Bickford, James M. Campbell, Michael T. Crossman, Kenneth R. Libby, Steve McCourt, Keith Menard, Bennett Schlaack, and George F. Weekes. *Id.* Plaintiff strenuously disputes that she violated the Maine Bar Rules.

The United States District Court for the District of Maine has adopted the Code of Professional Responsibility of the Maine Supreme Judicial Court. *See* LOCAL RULE 83.3(d). Maine Bar Rule 3.6(f) prohibits communications between an attorney and an adverse party that is represented by counsel. Two of the affidavits at issue were given by individuals who were no longer employed by L.L. Bean at the time of their interview. *See* Affidavits of John Andretta and Keith Menard. There is certainly no violation of the rule with respect to Crowley securing the statement of those former L.L. Bean employees."

43

Id., at FN. 3

////////////////////////////

## Maryland

Maryland Rules of Professional Conduct, Rule 4.2

Communication With Person Represented by Counsel

(a) Except as provided in paragraph (b), in representing a client, a lawyer shall not communicate about the subject of the representation with a person who the lawyer knows is represented in the matter by another lawyer unless the lawyer has the consent of the other lawyer or is authorized by law or court order to do so. If the person represented by another lawyer is an organization, the prohibition extends to each of the organization's (1) current officers, directors, and managing agents and (2) current agents or employees who supervise, direct, or regularly communicate with the organization's lawyers concerning the matter or whose acts or omissions in the matter may bind the organization for civil or criminal liability. The lawyer may not communicate with a current agent or employee of the organization unless the lawyer first has made inquiry to ensure that the agent or employee is not an individual with whom communication is prohibited by this paragraph and has disclosed to the individual the lawyer's identity and the fact that the lawyer represents a client who has an interest adverse to the organization.

...

COMMENT

...

If an agent or employee of a represented person that is an organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4 (f). In communicating with a current agent or employee of an organization, a lawyer must not seek to obtain information that the lawyer knows or reasonably should know is subject to an evidentiary or other privilege of the organization. Regarding communications with former employees, see Rule 4.4 (b).

Rule 4.4 Respect for Rights of Third Persons

(a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.

(b) In communicating with third persons, a lawyer representing a client in a matter shall not seek information relating to the matter that the lawyer knows or reasonable should know is protected from disclosure by statute or by an established evidentiary privilege, unless the protection has been waived. The lawyer who recieves information that is protected from disclosure shall (1) terminate the communication immediately and (2) give notice of the disclosure to any tribunal in which the matter is pending and to the person entitled to enforce the protection against disclosure.

----------

44

FAC Resp. Exhibit B -- 1933

**Sharpe v. Leonard Stulman Enterprises Ltd. Partnership,**
12 F.Supp.2d 502, D.Md., July 21, 1998

Maryland Rule of Professional Conduct prohibiting attorney representing client from communicating about subject of representation with party attorney knows to be represented by another attorney in matter without consent did not prohibit attorneys, who represented former apartment tenants in Fair Housing Act (FHA) suit against landlord, from interviewing individuals formerly employed by landlord as rental agents; former employees did not play any role in alleged "steering" or hold type of position that would permit their acts to be imputed to landlord, and Rule does not prohibit investigation into unprivileged matters. Md.Rule 16-812, <u>Rules of Prof.Conduct, Rule 4.2</u>.

"Having reviewed these opinions, it is clear that the contact in this case has not, and will not, violate <u>Rule 4.2</u>. First, the language of the Rule on its face does not prohibit such contact. Even considering the Comment's extension of the Rule to "any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization," such a prohibition does not encompass the former employees in this case. None of the three former employees here played any role in the alleged "steering" of the plaintiffs in this case; nor did these employees hold the type of position that would otherwise permit their statements or actions to be imputed to the defendants. On its face, then, the scope of the Rule, even considering its Comment, does not extend to such former employees." Id., at 507

----------

**Camden v. State of Md.,**
910 F.Supp. 1115, 106 Ed. Law Rep. 571, D.Md., January 24, 1996

Lawyer representing client in matter generally may not have ex parte contact with former employee of another party interested in matter, including corporations and other organizations, when lawyer knows or should know that former employee has been extensively exposed to confidential client information of other interested party; so long as privileged matters are respected, all other former employees remain fair game. Md.Rules of <u>Prof.Conduct, Rule 4.2</u>.

"The rule of the draft Restatement is not merely the product of the draftsman's imagination nor does it require an interpretation of <u>Rule 4.2</u> that strains to find that a former employee is a represented "party." Ample case authority supports limitations on contact with former employees who have had extensive exposure to privileged information. *See, e.g., <u>Rentclub, Inc. v. Transamerica Rental Fin. Corp.,</u> 811 F.Supp. 651 (M.D.Fla.1992); <u>MMR/Wallace Power & Indus., Inc. v. Thames Assocs.,</u> 764 F.Supp. 712 (D.Conn.1991); <u>Chancellor v. Boeing Co.,</u> 678 F.Supp. 250 (D.Kan.1988); <u>Williams v. Trans World Airlines, Inc.,</u> 588 F.Supp. 1037 (W.D.Mo.1984);* Hazard & Hodes, *supra,* at § 4.2:107 (<u>Rule 4.2</u> violated where there is high risk former employee will disclose confidential information); *cf. <u>Lang v. Superior Court,</u> 170 Ariz. 602, 826 P.2d 1228 (App.1992).*
In addition, a separate source for the no-contact rule is the law of agency which prohibits an agent acquiring confidential information from a principal from sharing it with someone outside the principal-agent relationship when disclosure would impair substantial interests of the principal, a prohibition which holds both during employment, <u>Restatement (Second) of Agency § 395 (1958)</u>, and after, *id.* at § 396.
What the proposed Restatement does, however, is to extract the organizing principle from these various authorities. Only insofar as a former employee has been *extensively* exposed to confidential information and only insofar an adversary attorney knows (or,

45

it must be added, should reasonably know) of that fact, will *ex parte* contact be precluded. So long as privileged matters are respected, all other former employees remain fair game. This balancing of interests, in the Court's view, is both fair and reasonable." Id., at 1122

//////////////////////////////

## Massachusetts

Massachusetts Rules of Prof.Conduct and Comments, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

...

Comment

...

[4] In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation only with those agents or employees who exercise managerial responsibility in the matter, who are alleged to have committed the wrongful acts at issue in the litigation, or who have authority on behalf of the organization to make decisions about the course of the litigation. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).

----------

Massachusetts bar Association Ethics Opinion No. 82-7 (6/23/82)

Summary: A lawyer may not interview current employees of a corporate defendant without the consent of opposing counsel under DR 7-104(A)(1) when the proposed interview concerns matters within the scope of the employee's employment but may interview current employees about other matters.

....

Recently, however, the Committee on Professional Ethics of the Association of the Bar of the City of New York has canvassed the whole subject in an exhaustive opinion. See Inquiry Reference No. 80-46. Overruling a prior opinion, the opinion concluded that "the principal interest reflected in DR 7-104(A)(1) is the party's right to effective representation of counsel" and "that the corporation's right to effective representation can be guarded adequately only by viewing all present employees of a corporation as 'parties' for purposes of DR 7-104 where the proposed interview concerns matters within the scope of the employee's employment."

46

FAC Resp. Exhibit B -- 1935

...

Support for the notion that effective representation of counsel is the touchstone for interpreting DR 7-104(A)(1) is derived from the fact that all who have considered the matter appear to agree that the prohibition of the rule applies only to present, not former, employees of the corporation. The reason is that former employees enjoy no present agency relationship that is being served by the representation of corporate counsel. Even more important, the position we are adopting is also in accord with the law of evidence as exemplified in Federal Rule 801(d)(2)(D), which recognizes an exception to the hearsay rule as to "a statement by his agent or servant concerning the matter within the scope of his agency or employment, made during the existence of the relationship." This rule binds the corporation with respect to admissions by employees far beyond the "control group" of the corporation. Thus for example, in litigation arising out of motor vehicle accidents it is not uncommon that the corporate defendant has only one agent involved, the driver, who will usually not be a management employee. Rule 801(d)(2)(D) permits the driver's admissions about the accident to be introduced against the defendant corporation, and it seems quite in line with the consequences to the corporation to include the driver within the group to be covered by the prohibitions of DR 7-104(A)(1).

...

----------

### Clark v. Beverly Health and Rehabilitation Services, Inc.,
440 Mass. 270, 797 N.E.2d 905, Mass., Oct 29, 2003

Although "no-contact" rule of professional conduct does not prohibit a lawyer from making contact with former employees of a represented corporation, counsel must be assiduous in meeting other ethical and professional standards found outside rule. S.J.C.Rule 3:07, Rules of Prof.Conduct, Rule 4.2.

" While the rule prohibits a lawyer from making ex parte contact with a former employee whom counsel knows to be represented, see _Patriarca, supra_, at 136 n. 6, 778 N.E.2d 877, it neither prohibits, nor purports to regulate, private contacts between an adverse attorney and the organization's former employees as such.
Beverly Health's attempt to bring former employees within the ambit of the no-contact rule by way of comment [4] is unpersuasive. [FN6] If anything, comment [4] emphasizes that only current employees, and only certain kinds of current employees, properly fall within the prohibitions of the no-contact rule." Id., at274

" By definition, _former_ agents or employees at one time were, but no longer are, "agents or employees." To conclude otherwise would fold former constituents of the organization into its current composition; an illogical result. Second, the use of the past tense in category (2) merely reflects the common assumption that the current agent or employee's allegedly wrongful conduct will have occurred prior to the filing of the complaint ("alleged to have committed")." Id., at 275

"Without limitation, counsel conducting the ex parte interview must pay particular attention to avoid transgressing Mass. R. Prof. C. 4.1, 426 Mass. 1401 (1998), governing a lawyer's duty of truthfulness to a third party; Mass. R. Prof. C. 4.3, 426 Mass. 1404 (1998), governing a lawyer's dealings with unrepresented persons; and Mass. R. Prof. C. 4.4, 426 Mass. 1405 (1998), requiring the lawyer to refrain from using unfair *279 or illegal tactics to obtain evidence. See _Patriarca, supra_ at 139- 141 & nn. 9, 10, 778

47

N.E.2d 877. Further, counsel must also be careful to avoid violating applicable privileges or matters subject to appropriate confidences or protections. [FN10] Existing attorney disciplinary**912 procedures should adequately address any less than scrupulous professional conduct."  Id., at 278-279

----------

**Patriarca v. Center for Living & Working, Inc.,**
438 Mass. 132, 778 N.E.2d 877, 19 IER Cases 453, Mass., Nov 14, 2002
Employer corporation could not invoke rule of professional conduct prohibiting lawyer from communicating with represented party in absence of that party's counsel to claim that all current and former employees were represented, and thus could not be contacted by attorney for former employee who brought wrongful termination action, where there was no factual showing that former employees, who attorney for former employee sought to contact, were actually represented by employer's, or their own personal, counsel. S.J.C.Rule 3:07, Rules of Prof.Conduct, Rule 4.2.

"These four former employees of the center do not come within any category of employee covered by rule 4.2. See _Messing, supra_ at 357, 764 N.E.2d 825. None of them is alleged to have committed the wrongful acts at issue in the litigation. There is no evidence, under their job descriptions or otherwise, that any of them had authority on behalf of the corporation to make decisions about the course of the litigation. The question whether any of them exercised managerial responsibility in the matter, however, is less obvious. We said in _Messing_ that employees with managerial responsibility in the matter "include[ ] only those employees who have supervisory authority over the events at issue in the litigation." _Id._ at 361, 764 N.E.2d 825. Patriarca alleges that Bailey pressured her to evaluate individuals who were not eligible for personal care services, to falsify documents to make it appear that certain individuals were eligible for personal care services, and finally to present false information to the Department of Medical Assistance by recommending more services for clients than was required. Her surviving claims against the center allege breach of contract and wrongful termination in violation of public policy.

Thus, to find that the former employees in question exercised managerial responsibility in the matter, we must determine either that they were in a position to direct Bailey to conduct himself as alleged, or to cause the center to respond as alleged. The center makes no claim that the occupational therapists and the skills trainer had any such managerial responsibility.
The fourth employee, described by the center as "Director of PCA/Fiscal Intermediary Services and former Business *139 Manager," was allegedly "a 'management' witness to the [p]laintiff's separation which ultimately led to this [c]omplaint," and "was a central part of [the center's] management team." Being a "witness" to the plaintiff's separation does not establish that the fourth employee was involved in supervising, planning, or directing the events and practices that led to this litigation. Based on the record before the motion judge, there is no basis to conclude that the fourth employee "exercise [d] managerial responsibility _in the matter_""  Id., at 138-139

----------

**Amarin Plastics, Inc. v. Maryland Cup Corp.,**
116 F.R.D. 36, D.Mass., Apr 28, 1987

Attorney's ex parte contact with former corporate officer of corporation involved in litigation did not violate Disciplinary Rule prohibiting contact by attorney of opponent who is represented by attorney, where corporation failed to demonstrate that former officer had ongoing agency or fiduciary relationship with corporation, or that his acts or

48

omissions could be imputed to corporation for purposes of its civil liability; mere fact that former officer may be prospective witness did not trigger prohibitions of rule.

////////////////////////////////

## Michigan

Michigan Rules of Professional Conduct RULE 4.2

COMMUNICATION WITH A PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party whom the lawyer knows to be represented in the matter by another lawyer, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Comment

....

In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by separate counsel, the consent by that counsel to a communication will be sufficient for purposes of this rule. Compare Rule 3.4(f).

-----------

State Bar of Michigan Standing Committee On Professional and Judicial Ethics

Opinion Number R-2 (4/21/89)

Once suit has been filed, plaintiff's counsel may not communicate with nurses who cared for the client at the time the alleged malpractice occurred and who are currently employed by defendant corporation, unless hospital counsel consents.

Nurses who cared for the client at the time the alleged malpractice occurred and who are not currently employed by defendant hospital, who owe no continuing duty to the corporation, who are not privy to privileged information of the corporation, and who have no ongoing relationship to the corporation, are not "parties" within the provisions of MRPC 4.2 and may be contacted by plaintiff's counsel without the consent of hospital counsel.

...

2. MAY PLAINTIFF'S COUNSEL COMMUNICATE WITH PRESENT AND FORMER EMPLOYEES OF DEFENDANT CORPORATION?

..

49

The inquiry before us states that plaintiff's counsel wants to interview "nurses who cared for my client at the time the alleged malpractice occurred." All the nurses were employees of the hospital at the time of the incident, although some are no longer employees. Under the rationale of Upjohn and Wright, nurses currently employed at the hospital and who cared for the plaintiff at the time of the alleged malpractice are persons whose acts or omissions may be imputed to the organization, or whose statement may constitute an admission. Plaintiff's counsel should not communicate with those nurses without consent of hospital counsel.

With regard to former employees of an organization, in The Law of Lawyering, Prentice-Hall, 1988 Supplement, pp. 436-436.1, authors Hazard and Hodes state:

"[4.2 and Comment do] not address communications with former agents and employees, and technically these should be no bar, since former employees cannot bind the organization, and their statements cannot be introduced as admissions of the organization. Speaking with a former employee therefore does not do damage to the policy underlying Rule 4.2 -- undercutting or 'end-running' an on- going lawyer relationship. See Bar Association of the City of New York, Inquiry Ref. No. 80-46 (1980).

*5 "Yet it seems clear that some former employees continue to personify the organization even after they have terminated their employment relationship. . ."

Two jurisdictions which follow the ABA Model Code of Professional Responsibility, Colorado and California, appear to follow that rationale for former employees. The Colorado Ethics Committee determined that a lawyer may not interview a present or former employee of an adverse party organization without the prior consent of opposing counsel if the employee has or had the legal authority to commit the organization to a position regarding the subject matter of the litigation. Colorado Op 69. Where an employee still owes a duty to the organization, is privy to privileged information, entitled to attend meetings, or has an active ongoing relationship with the entity, it is improper for opposing counsel to contact the employee. Mills Land and Water Co. v. Golden West Refining Co., 186 Cal App 3d 116 (Cal App Ct 1986); Hewlett-Packard Co v. Superior Court, 252 Cal Rptr 14 (1988). See also, Florida Op 88- 14 (3/7/89), stating that a former employee who has not maintained ties to the corporation, is not subject to the control or authority of the corporate lawyer, and is no longer in a position to speak for the corporation, is not covered under Rule 4.2. None of these factors are present in this inquiry regarding contact with former employee nurses.

". . . lower level and uninvolved former employees are properly analyzed as free witnesses who may be interviewed by a lawyer opposing the organization. . . As for intermediate and higher level former employees, it would seem that they should be allowed to decide for themselves whether they are still so attached to the organization as to refuse to give statements except in the presence of the organization's lawyer." Hazard and Hodes, p 436.1

Although former employees who cared for plaintiff at the time of the alleged malpractice are not "uninvolved" in the matter, sufficient protection is provided under MRPC 4.3:

"Rule 4.3 Dealing With an Unrepresented Person

"In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding."

50

Thus, pursuant to MRPC 4.3 plaintiff's counsel may communicate with nurses who are former employees of the hospital corporation without consent from hospital counsel.

----------

### Smith v. Kalamazoo Ophthalmology,
322 F.Supp.2d 883, W.D.Mich., Apr 21, 2004

Plaintiff's counsel's ex parte contacts with unrepresented former employee of defendant did not violate Michigan's ethical proscription against communications with person represented by counsel, since former employee had no agency relationship with defendant at the time and her interests were even adverse to defendant's.

"Having considered the reasons advanced by the majority of courts, which conclude that Rule 4.2 does not apply to ex parte contacts with former employees, and the minority of courts, which hold that Rule 4.2 applies to former employees at least in some limited circumstances, this Court concludes that the majority view is more persuasive. Specifically, a situation involving a former employee does not implicate the underlying policies behind Rule 4.2, and neither Rule 4.2 nor the comment to the rule can be reasonably interpreted to refer to former employees, who cannot bind the employer by their statements. *Cram v. Lamson & Sessions Co., 148 F.R.D. 259, 265 (S.D.Iowa 1993).* As the court in *Valassis v. Samelson,* 143 F.R.D. 118 (E.D.Mich.1992), observed, under Rule 4.2 and the comment,
If one party is an organization, the first level of inquiry is whether the person in question is an agent of that organization. If he is not, then he cannot be a party because he lacks any relevant connection to the organization which could reasonably place him in the role of a party.
*Id.* at 123. Under this commonsense analysis of Rule 4.2, the Court concludes that Piper's contact with Salliotte was not improper because Defendant has not shown that Salliotte was in some type of an agency relationship with Defendant at the time she contacted Piper. At the time of the contact, Salliotte was not employed by Defendant and, in fact, her interests were even adverse to Defendant's interests. [FN1]

FN1. Defendant cites Formal Ethics Opinion R-2 (Apr. 21, 1989) by the professional and judicial ethics committee of the State Bar of Michigan which states that Rule 4.2 prohibits ex parte contact where the former employee "is privy to privileged information." Mich. Prof'l & Judicial Ethics Comm. Informal Op. R-2 (1989). As Defendant notes, such opinions are not binding upon this Court. *City of Kalamazoo,* 125 F.Supp.2d at 232 n. 4. The Court has reviewed that opinion and, in light of other authorities which the Court finds more persuasive in light of the plain language of Rule 4.2 and the comment, the Court declines to follow that opinion. Furthermore, the Michigan opinion is at odds with and pre-dates the ABA opinion, which presents a more thorough analysis of the issue.

The Court notes that although ex parte contact with former employees is not subject to Rule 4.2, former employees "are 'barred from discussing privileged information to which they are privy.' " *In re Bank of La./Kenwin Shops Inc., Contract Litig.,* No. CIV.A.97MDL No. 1193, 1998 WL 788776, at *3 (E.D.La. Nov. 10, 1998) (quoting *Orlowski v. Dominick's Finer Foods, Inc.,* 937 F.Supp. 723, 728 (N.D.Ill.1996)). Attorneys also have a responsibility to refrain from inquiring into areas that may be subject to the attorney-client privilege or the work product doctrine. *Cram,* 148 F.R.D. at 266. Therefore, an attorney may have ex parte contact with an unrepresented former employee of an organizational party, subject to the limitation that the attorney may not inquire into areas **\*891** subject to the attorney-client privilege or work product doctrine. *See Palmer v. Pioneer Hotel & Casino,* 19 F.Supp.2d 1157, 1167 (D.Nev.1998); *Breedlove v. Tele-Trip*

51

<u>Co.</u>, No. 91 C 5702, 1992 WL 202147, at *2 (N.D.Ill. Aug. 14, 1992)." Id., at 890-891

/////////////////////////////////

## Minnesota

Minnesota Rules of Professional Conduct, Rule 4.2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. A party who is a lawyer may communicate directly with another party unless expressly instructed to avoid communication by the lawyer for the other party, or unless the other party manifests a desire to communicate only through counsel.

COMMENT

...

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).

...

----------

**Olson v. Snap Products, Inc.,**
183 F.R.D. 539, D.Minn., Oct 19, 1998

Contacts by plaintiff's attorney with former managerial employees of corporate defendant did not violate rule prohibiting ex parte contacts, where attorney informed former employees of his representation of the plaintiff, did not ask either of them to discuss matters that would be privileged. <u>Olson v. Snap Products, Inc.</u>, D.Minn.1998, 183 F.R.D. 539. Attorney And Client ⟳32(12)

"Some Courts, however, have recognized circumstances in which the concerns reflected in the comment to <u>Rule 4.2</u> survive the termination of the employment relationship, and these Courts employ a flexible approach when applying the Rule to former employees, "calling for an assessment of the likelihood that the contact in question has actually impaired the policy underlying <u>Rule 4.2</u>, of protecting privileged information from being disclosed to an opponent in litigation." <u>Spencer v. Steinman, 179 F.R.D. 484, 491 (E.D.Pa.1998)</u>; see also, <u>Orlowski v. Dominick's Finer Foods, Inc.</u>, supra at 728 (although <u>Rule 4.2</u> does not apply to former **\*545** employees, former employees would be barred

52

from divulging any privileged information).

In our view, this latter, flexible approach stakes out a sensible and policy-oriented middle ground worthy of adherence. While matters of this sort may warrant "bright-line" rules, seldom do such categorical pronouncements survive variant factual applications. This pliant rule gives recognition to the underlying policy of <u>Rules 4.3</u> and <u>4.4 of the Minnesota Rules of Professional Conduct</u>, by prohibiting an attorney from unfairly taking advantage of unrepresented parties when acting on behalf of a client, while still allowing leeway for the proper search for the truth. Therefore, the pivotal question, in evaluating the propriety of Dolven's contacts with Snap's former employees, is the likelihood that any information gathered by Dolven actually intruded upon any legally privileged matters."   Id., at 544-545

----------

**Paulson v. Plainfield Trucking, Inc.,**
210 F.R.D. 654, D.Minn., Apr 29, 2002

In conducting proposed ex parte contacts with corporate defendant's current or former employees, plaintiff's attorney or investigator for plaintiff would be required on pain of sanctions to: fully disclose his or her representative capacity to the employee; state the reason for seeking the interview; and inform the employee or former employee of his or her right to refuse to be interviewed. 52 <u>M.S.A., Rules of Prof.Conduct, Rule 4.2</u>.

"<u>Rule 4.2</u> clearly does not limit Paulson's access to Plainfield's **former** employees. Unlike current employees, their statements cannot be construed as admissions, as the statements would not be made during the course and scope of their employment. See, <u>Rule 801, Federal Rules of Evidence</u>. Moreover, there is no indication that these individuals were officials of the organization, or were responsible for implementing the advice of the corporation, and there is no contention, other than as to Utley, that the acts or omissions could be imputed to the organization. We, therefore, conclude that Paulson can conduct ex parte interviews of those **former** employees, excluding Utley, assuming that those individuals are not represented by counsel. In order to ensure the dictates and purpose of the Rule are carried out, we will impose certain limitations on Paulson's contacts with Jankowski and Plainfield's current or former employees. Thus, in conducting the proposed ex parte contacts, we direct the attorney or the investigator for Paulson to fully disclose his or her representative capacity to the employee; state the reason for seeking the interview as it concerns Paulson and Plainfield; and inform the employee of his or her right to refuse to be interviewed, and his or her right to have their own counsel present. See, Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc., supra at 1157; Cole v. Appalachian Power Co., supra at 980. "The attorney or investigator shall not, under any circumstances, seek to obtain attorney-client or work product information from the employee." Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc., supra at 1157; see also, Cole v. Appalachian Power Co., supra at 980. Failure to abide by these directions will result in the imposition of appropriate sanctions." Id., at 659

//////////////////////////////

## Mississippi

Mississippi Rules of Prof.Conduct, Rule 4.2

FAC Resp. Exhibit B -- 1942

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Comment

...

In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). ....

----------

Mississippi Bar Ethics Opinion No. FIO #215 (3/4/94)

EX PARTE CONTACT WITH FORMER EMPLOYEES OF A REPRESENTED PARTY

IN REPRESENTING A CLIENT, A LAWYER MAY ETHICALLY COMMUNICATE, EX PARTE, WITH AN UNREPRESENTED INDIVIDUAL THAT WAS FORMERLY EMPLOYED BY A REPRESENTED PARTY. NEITHER THE TEXT NOR THE COMMENTS TO RULE 4.2 PROHIBITS SUCH CONTACTS; HOWEVER, OTHER PROFESSIONAL RULES OF CONDUCT PROSCRIBE THE ATTORNEY'S CONDUCT IN DEALING WITH UNREPRESENTED INDIVIDUALS.... 

PRIOR OPINIONS

...

In Opinion No. 192, rendered less than three months after Opinion No. 189, it was opined that it was improper, under Rule 4.2, for a lawyer to conduct an ex parte interview of a former employee of a represented party if the former employee's actions could be imputed to the corporation for the purposes of civil liability or whose statements might constitute an admission on the part of the corporation. This conclusion was reached, in part, because the former employee possessed testimony that could either exonerate or implicate his former employer.

Although not withdrawn and not addressed by the ad hoc committee, Ethics Opinion No. 141 allows a lawyer representing a personal injury claimant to communicate with an unrepresented party concerning the facts of the claim and the availability of liability coverage. The Opinion noted that Rule 4.2 was inapplicable to the situation presented because, at the time of the contact, the adverse party was not actually represented by a lawyer in the matter.

...

54

As stated above, Rule 4.2's proscription is clear in the context of private parties. The analysis becomes more complicated when one of the parties is a corporate enterprise or other organization. The identification of who is a "party" represented by counsel is less than clear. In this regard, the comment to Rule 4.2 states:

In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. (emphasis added)

The issue, then, is whether the above comments to Rule 4.2 could be interpreted broadly enough to include some, all, or none of the former employees of the represented organization.

The Committee finds it significant that the above comment is identical to the comment to ABA Model Rule 4.2 and that the ABA Professional Responsibility Committee, in Formal Opinion No. 91359, declined to expand the application of Rule 4.2 to prohibit ex parte contact with all former employees. The ABA Committee noted:

...the fact remains that the text of the rules does not do so and the comment gives no basis for concluding that such coverage was intended. Especially where, as here, the effect of the rule is to inhibit the acquisition of information about one's case, the committee is loathe, given the text of Model Rule 4.2 and its comments, to expand its coverage to former employees by means of liberal interpretation.

...

There is a valid concern in preventing former corporate employees from inadvertently disclosing to an interviewing attorney privileged material obtained or given by them during the course and scope of their employment. This interest does not, however, justify a blanket ban on communications and can be guarded by less stringent measures. See Polycast Technology Corp. v. Uniroyal Inc., 129 F.R.D. at 627-28; Alaska Ethics Opinion No. 91-1 (Jan. 1991). This approach is further supported by the fact that the attorney/client privilege only protects disclosure of communications not underlying facts. In other words, a former employee should not be asked what they said or communicated to the corporate attorney but, rather, inquiries should be limited to what the witness saw or knows about the matter being investigated. Any concern about the likelihood that some former employees will reveal privileged information can best be addressed on a case-by-case basis. It seems clear that counsel for the corporation would be aware of the former employees that possess such information and, in those circumstances, could seek court protection.

CONCLUSION

It is the Committee's opinion, after thorough review of the varying analysis and approaches, that no former employees are "off limits" under Rule 4.2, unless, of course, they are known to be represented by counsel concerning the matter at issue. As noted in Opinion No. 141, the lawyer, in conducting such an interview, must not knowingly make a false statement of material fact or law (Rule 4.1), must not state or imply that the lawyer is disinterested and must never give advice to the unrepresented person other than the advice to obtain counsel (Rule 4.3). Of course, the interviewing lawyer has an affirmative duty under Rule 4.3 to clear up any misunderstanding by the unrepresented

55

party about the lawyer's role. The lawyer must make clear that he is not disinterested and must stick to facts.

----------

**White v. Illinois Cent. R. Co.,**
162 F.R.D. 118, S.D.Miss., Jun 23, 1995

Railroad accident victim's attorney did not have to obtain permission from attorney for railroad prior to having his investigator interview a former railroad employee, particularly where ex-employee had shouldered no managerial responsibilities, and ex-employee's statements could not be imputed to railroad. Miss.Rules of Prof.Conduct, Rule 4.2.

"Ronald Long was the foreman of the crew on which the Plaintiff was working at the time he was injured. His act or omission, if any, might be imputed to the Defendant and his statement might constitute an admission on the part of the Defendant. Thus, it was improper under Rule 4.2 for the investigator hired by Plaintiff's attorney to have any communication with Long.

The other witness in question, Sammy Weaver, was a fellow employee of the Plaintiff at the time of the accident, but is no longer employed with Defendant. Since Mr. Weaver was not employed with the Defendant at the time of the interview, it was not improper to interview him. Even if Mr. Weaver had still been employed by Defendant at the time of the interview, it would not have been improper under Rule 4.2 for the *120 investigator to communicate with this witness unless Weaver had managerial responsibility (which he did not), unless his act or omission may be imputed to the Defendant (which under the circumstances it may not) or unless his statement would constitute an admission on the part of the Defendant (which it does not.)" Id., at 119-120

///////////////////////////

## Missouri

Missouri Rules of Prof.Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Comment

...

In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of

56

the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). ...

----------

Missouri Bar Informal Advisory Opinion Number: 20030098

QUESTION: Attorney is counsel for parties in several lawsuits and desires to contact former employees of adverse corporate defendants. Two cases are in federal court and one is in state court. The employees were mid-level managerial employees or territorial representatives, but Attorney does not believe any of them would be directly involved in the defense of any of the lawsuits. May Attorney contact these former employees?

ANSWER: For cases already filed in federal court, Attorney may follow the interpretations of Rule 4-4.2, officially expressed by that federal court or superior courts in that circuit. The Missouri federal courts have taken the position that it is permissible to contact former employees. If the case is not yet filed in federal court, but anticipated to be filed in federal court, the state court interpretation applies until it is actually filed in federal court. For a case in state court, Attorney may not contact former employees if they fall within the three categories listed in the second paragraph of the comment to Rule 4-4.2. The category most likely to apply to Attorney's case is "persons having managerial responsibility on behalf of the organization." If the employee had management responsibility, Attorney may not make direct contact.

----------

Missouri Bar Informal Advisory Opinion Number: 990129

QUESTION: Attorney's firm represents individuals who are suing a company as a result of an auto accident. Attorney has taken the deposition of the driver involved in the collision and learned that the company may have not always done all of the preventive maintenance required by law. This is an issue in the lawsuit. Attorney would like to speak with former employees. Attorney has the names of employees who were drivers and mechanics, not managerial employees. May Attorney contact the above described former employees without the knowledge or consent of the defendant's attorney?

ANSWER: Under the second paragraph of the comment to Rule 4-4.2, Attorney may not directly contact current or former employees if they fit within any of these categories: "persons having the managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization." It appears that some of the employees whom Attorney would like to contact may fall within one of these categories. However, it is possible that some of the employees described do not fall within any of these categories. If any of the three categories apply to an individual, Attorney may not contact that individual without going through the employer's counsel, unless the individual has his or her own counsel related to this matter.

----------

**Smith v. Kansas City Southern Ry. Co.,**
87 S.W.3d 266, Mo.App. W.D., Jun 28, 2002

57

Rule governing ex parte contacts with represented parties did not prohibit contact between counsel of employee, who was injured while working as trackman and who brought action against railroad for personal injuries under the Federal Employers Liability Act (FELA), and former field supervisor of railroad; rule and its respective counterparts did not apply to former employees who were not expressly represented by their own counsel or counsel for organization, and even if rule applied to former managerial employees, supervisor did not fit within classification.

"There is, again, nothing in the Rule or Comment suggesting, by the words chosen, any intent to cover former employees. There is substantial merit in reasonably consistent rules regulating professional conduct throughout the states. This is true particularly when lawyers, organizations and their employees (current and former) may operate or be located in various states. No persuasive argument is *275 made that Missouri should stand virtually alone in applying Rule 4-4.2 to former employees.
Even assuming that _Pitts_ indicates some intent to apply Rule 4-4.2 to former employees, the only basis for KCS' argument and the trial court's ruling was that House was a "managerial employee" under the Rule. Id., at 274-275

"The common thread of the majority of these cases is the view that managers are not protected by the anticontact rule merely because they have some supervisory responsibility in the organization. In particular, low level supervisors are not protected simply because they are managers unless their acts are imputable to the organization or they can make admissions that are binding on the organization. This approach is quite consistent with the Court's explanation in _Pitts_ that it did not wish to employ a strictly hierarchical test.
There is no indication in the record that House's position would satisfy any of these tests. He was not Smith's supervisor at the time of the accident nor was he responsible for the maintenance of the equipment that Smith contended to be unsafe. Nor did House have management control over any litigation, let alone the litigation at hand. Nor did he consult with the organization's attorney while in its employment about litigation matters or have any responsibility for creating company policy.
Finally, this limited approach to who constitutes a manager under Rule 4- 4.2 is consistent with the draft proposed revisions by the ABA to Model Rule 4.2. Acknowledging criticism of the phrase in the current comment to Rule 4.2 of "persons having a managerial responsibility on behalf of the organization" as vague and overly broad, the proposed new comment to Rule 4.2 states, in part: "[t]his Rule prohibits communications with a constituent of an organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter...." A restrictive view of the term "managerial responsibility" is consistent, as well, with the twin objectives of the ethics rule to protect the rights of a represented litigant from unfair dealing and, at the same time, not to unduly restrict informal fact investigation. Such a view also discourages improper use of the ethics rules by an organization in an attempt to hide or conceal information."
Id., at 276

----------

**Tipton v. Sonitrol Sec. Systems, Inc.,**
958 F.Supp. 447, 70 Empl. Prac. Dec. P 44,583, 83 Fair Empl.Prac.Cas. (BNA) 1811, E.D.Mo., November 27, 1996

Missouri Supreme Court rule governing attorney's communications with persons represented by counsel did not prohibit discrimination plaintiff's counsel from communicating about the subject of the representation with unrepresented former managerial employee of defendant corporation without consent of corporation's attorney. V.A.M.R. 4, Rules of Prof.Conduct, Rule 4.2.

58

"Risk Control argues that _State ex rel. Pitts v. Roberts,_ 857 S.W.2d 200 (Mo.1993), should be read to bar _ex parte_ contact with former managerial employees of a company when the company is represented by counsel. However, this Court finds that neither _Pitts_ nor any other case applying Missouri law has directly addressed this question. Further, the advisory committee rulings cited by Risk Control do not bind this Court because these informal opinions are expressly non-binding. _See_Missouri Supreme Court Rule 5.30(b). The language of Rule 4.2 does not on its face involve, or in any way prohibit, _ex parte_ contact with former managerial employees. _See_ _Aiken v. Bus. and Indus. Health Group, Inc.,_ 885 F.Supp. 1474, 1476 (D.Kan.1995) (interpreting Kansas Supreme Court Rule 4.2, which is identical to Missouri's Rule 4.2); _see also_ _Lirette v. Delchamps Inc.,_ 1996 WL 267991, at *1 (E.D.La. May 20, 1996). There is no indication in the text of Rule 4.2 or its **\*452** comment that the construction urged by Risk Control is warranted. Indeed, ABA Model Rule 4.2 and its comment are identical to Missouri Rule 4.2 and its comment, and the ABA Committee on Ethics and Professional Responsibility issued a formal opinion in 1991 which determined that "the text of the Rule does not [cover former employees] and the comment gives no basis for concluding that such coverage was intended." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 91-359 (1991). The opinion concludes that a lawyer may without violating Model Rule 4.2 communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer. _Id.; see also_ _Aiken,_ 885 F.Supp. at 1477 (providing comprehensive discussion of Rule 4.2 and noting that a "clear majority" of the courts interpreting Rule 4.2 concur with the conclusion reached in the ABA's formal opinion). This Court agrees with this reasoning, and declines Risk Control's invitation to extend Rule 4.2's meaning of "party" beyond its textual moorings. Risk Control's motion for a protective order will therefore be denied." Id., at 452-453

///////////////////////////////

## Montana

Rule Rule of Professional Conduct 4.2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

----------

**Porter v. Arco Metals Co., Div. of Atlantic Richfield Corp.,**
642 F.Supp. 1116, D.Mont., Sep 04, 1986

Employee's counsel in suit based on alleged wrongful demotion was not precluded from conducting ex parte interviews of employees present at time of events in question, so long as he did not attempt to interview present or former employees with managerial responsibilities concerning matter involved in litigation and did not inquire into privileged areas of communication. ABA Rules of Prof.Conduct, Rule 4.2; ABA Code of Prof.Resp., DR7-104(A)(1).

59

"It is apparent from the *Upjohn* decision that while the attorney-client privilege may extend to Arco's former employees, it applies only to communications between those employees and the company's counsel. Moreover, *Upjohn* must be considered in its context--as a case concerned with what information may be protected from disclosure under the attorney-client privilege.

This case presents a different issue. It does not involve a question of whether confidential communication have been made between counsel for Arco and its present or former employees. Plaintiff's counsel has interviewed former employees of defendant as prospective witnesses. This presents no question of privilege unless counsel asks the employees to divulge confidential communications. More importantly, Rule 4.2 does not prohibit this type of conduct by a party's attorney. The comment makes clear that even current employees may be contacted *ex parte* so long as they do not have significant managerial responsibility in the matter in question.

This conclusion finds support from other courts interpreting similar situations. Under the ABA's former Code of Professional Responsibility, [FN2] the Supreme Court of the State of Washington held that the plaintiff's counsel was entitled to initiate *ex parte* contacts with the defendant's employees. *Wright by Wright v. Group Health Hospital*, 103 Wash.2d 192, 691 P.2d 564 (1984). In a thorough and well-reasoned opinion, the court held that the term "party" as used in the Code of Professional Responsibility encompasses "only those employees who have the legal authority to 'bind' the corporation in a legal evidentiary sense, i.e., those employees who have 'speaking authority' for the corporation." *Id.*, 691 P.2d at 569. *See also Frey v. Dept. of Health and Human Services*, 106 F.R.D. 32 (E.D.N.Y.1985).

The Court agrees with the reasoning set forth in *Wright* and *Frey* and concludes that plaintiff's *ex parte* conduct is prohibited neither by Rule 4.2 nor by the attorney-client privilege, so long as plaintiff does not attempt to interview present or former employees with managerial responsibilities concerning the matter in litigation, and does not inquire into privileged areas of communication. This conclusion is consistent with the Model Rules, [FN3] with the *Upjohn* decision, and with the Federal Rules of Civil Procedure regarding discovery practices." Id., at 1118

//////////////////////////

## Nebraska

Nebraska Rules of Professional Conduct, Rule 4.2 (effective 9/1/05)

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

COMMENT

...

[7]  In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs, or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.  Consent of the organization's lawyer is not required for communication with a former constituent.  If a constituent of the organization is

60

represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule.  Compare Rule 3.4(f).  In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization.  See Rule 4.4.
…

----------

Nebraska State Bar Opinion 94-5

FORMER EMPLOYEES OF A CORPORATE PARTY MAY BE INTERVIEWED BY ADVERSE COUNSEL WITHOUT THE PERMISSION OF CORPORATE COUNSEL IF THE FORMER EMPLOYEES ARE NOT INDIVIDUALLY REPRESENTED. ANY SUCH INTERVIEWS SHOULD NOT INQUIRE AS TO PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS.

FACTS

In Opinion 91-3 the Committee addressed the issue of whether a plaintiffs attorney may ethically interview present or former employees of a defendant corporation. The Committee has been requested to clarify its position regarding interviews of former employees of a corporation by adverse counsel.

….

In recent years a number of advisory opinions have been rendered indicating that an attorney for a plaintiff may ethically interview former employees of a defendant corporation without the permission of the corporate counsel.

…

ABA Formal Opinion 91-359, 901:140 ABA/BNA Lawyers Manual on Professional Conduct also addressed this issue and concluded that the prohibition does not extend to former employees of an opposing corporate party. The opinion stated the following in regard to pertinent case law [Model Rule of Professional Conduct 4.2 is substantially identical to DR 7-104 (A)]:

Most recently, in an aside in a case dealing with current employees under DR 7-104 (A) (1), the New Yorke Court of Appeals noted its agreement with the Appellate Division that the rule applies "only to current employees, not to former employees." Niesig v. Team I et al, 76 N.Y.2d 363, 558 N.E.2d 1030 (1990). See also Wright by Wright v. Group Health Hosp. 103 Wash. 2d 192, 691 P.2d 564 (1984) (reasoning that former employees could not possibly speak for or bind the corporation, and therefore interpreting DR 7-104 (A) (1) as not applying to them); and Polycast Technology Corp. v. Uniroyal, Inc., 129 F.R.D. 621 (S.D.N.Y. 1990) (holding that DR 7-104 does not bar contacts with former corporate employees, at least in absence of a showing that the employees possessed privileged information).

On the other hand, other courts have held that former employees are covered (it is usually phrased that they will be considered "parties" for ex parte contact purposes) under certain circumstances. Thus, Rule 4.2 has been held to bar ex parte contacts with former employees who, while employed, had "managerial responsibilities concerning the matter in litigation." Porter v. Arco Metals, 642 F.Supp. 1116, 1118 (D.Mont. 1988). In Amarin Plastics v. Maryland Cup Corp., 116 F.R.D. 36 (D.Mass. 1987) the Court, while recognizing the possible applicability of Rule 4.2 to former employees, declined to apply it on the facts of that case. It noted, however, the additional possibility that communications between a former employee and his former corporate

61

employer's counsel may be privileged. Id., at 41. See also In re Coordinated Pre-Trial Proceedings in Petroleum Products Antitrust Litigation, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981), cert. denied, 455 U.S. 99 (1982) (noting that the rational of Upjohn v. United States, 449 U.S. 383 (1981), with respect to corporate attorney-client privileges applies to former as well as current corporate employees. In Public Service Electric and Gas Company v. Associated Electric and Gas Ins. Services, Ltd., 745 F.Supp. 1037 (D.N.J. 1990) the court interpreted Rule 4.2 to cover all former employees.

The ABA opinion concluded by stating:

Accordingly, it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2 communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer.

With respect to any unrepresented former employee, of course, the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the privilege attaching to attorney-client communications to the extent his or her communications as former employee with his or her former employees counsel are protected by the privilege (a privilege not belonging to or for the benefit of the former employee, by the former employer). Such an attempt could violate Rule 4.4 (requiring respect for the rights of third persons).

CONCLUSION

The Committee is in substantial agreement with ABA Formal Opinion 91-359 and is of the opinion that former employees of a corporate party may be interviewed by adverse counsel without the permission of the corporate counsel if the former employees are not individually represented in the same matter. Any such interviews should not inquire as to privileged attorney-client communications.

///////////////////////////

## Nevada

Nevada Supreme Court Rules, Rule 182

Communication with person represented by counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

----------

State Bar of Nevada Formal Opinion No. 27  (9/10/01; revised and reissued 5/25/05)

QUESTION

        May opposing counsel make ex parte contact with lower level employees of a corporate defendant where the corporation is represented by counsel?

ANSWER

62

Yes, within limits.  In Palmer v. Pioneer Inn Associates, Ltd., 59 P.3d 1237 (Nev. 2002), the Nevada Supreme Court engaged in an extensive interpretation of Nevada SCR 182 and determined to apply it to organizational entities according to a "managing-speaking agent" test, in which an attorney is precluded from ex parte contact with a person affiliated with the adverse entity only if the person qualifies as a managing-speaking agent (defined by the Court as someone with supervisory control or authorization to speak for the entity as to the matter that is the subject of the conflict). See 59 P.3d at 1238, 1244-45 and 1248 (test applies to "those representatives who are in a position to speak for and bind the organization during the course of litigation").

...

The federal trial court in Palmer v. Pioneer Hotel had adopted the party-opponent test, essentially holding that if a statement from a company employee would be admissible under Fed. R. Evid. 801(d)(2)(the party-opponent exception to the hearsay rule) and its state counterparts, opposing counsel should not have ex parte contact with the employee.  In addition to the federal court in Palmer, this test has support from some influential commentators.  See Vol. II Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering § 38:6 at p. 38-9 (3d ed. 2001).  But, as the Nevada Supreme Court observed in Palmer:

The drawback of this test is that it essentially covers all or almost all employees, since any employee could make statements concerning a matter within the scope of his or her employment, and thus could potentially be included within the rule.  Thus, the party-opponent admission test can effectively serve as a blanket test, thus frustrating the search for truth.  An attorney attempting to comply with Rule 11's requirements would be faced with two unenviable choices.  The first option would be not to contact a person who might be the best, if not the only, source of corroborating information.  This option would ensure that the attorney complies with SCR 182's prohibitions, but would result in the attorney's failure to comply with Rule 11.  The second option would be for the attorney to second-guess what an employee might say, in an attempt to determine whether contact might be permissible, which would result in the attorney risking an SCR 182 violation. See 59 P.3d at 1243-44 (footnotes omitted).

...

After the Palmer v. Pioneer Inn decision, it is now clear that Nevada SCR 182 utilizes a "managing-speaking agent" test for determining which adverse entity employees are off limits to counsel and that neither the Restatement-Niesig "ability to bind the company" test nor the "admission by a party-opponent" test applies to Nevada SCR 182.  Despite the pedigree supporting the party-opponent and New York-Niesig tests, the Nevada Supreme Court rejected them in favor of the managing-speaking agent test because it best balances the policies at stake when considering what contact with an organization's representatives is appropriate.  The test protects from overbearance by opposing counsel those representatives who are in a position to speak for and bind the organization during the course of litigation, while still providing ample opportunity for an adequate Rule 11 investigation.

In particular, the managing-speaking agent test best fulfills this purpose by not being over-inclusive.  In particular, the managing-speaking agent test adopted by this court does not protect the organization at the expense of the justice system's truth-finding function by including employees whose conduct could be imputed to the organization based simply on the doctrine of respondeat superior.  Finally, while any non-blanket rule has some uncertainty, we conclude that the test is sufficiently clear to provide significant guidance to counsel. See 59 P.3d at 1248 (footnotes omitted).  The Court also noted that

63

it was not adopting ABA Model Rule 4.2's comment and was not adopting the ABA's 2002 comment, "which essentially tracks the New York test. Rather, SCR 182 should be interpreted according to the managing-speaking agent test as set forth by the Washington Supreme Court in Wright by Wright v. Group Health Hospital." See 59 P.3d at 1248 (footnotes omitted). See also Wright v. Group Health Hosp., 691 P.2d at 569 (Wash. 1984):

[The function of anti-contact rule] is to preclude the interviewing of those corporate employees who have the authority to bind the corporation. [Employees should be viewed as within the anti-contact rule where they have] managing authority sufficient to give them the right to speak for, and bind, the corporation. . . . an employee does not "speak for" the organization simply because his or her statement may be admissible as a party-opponent admission. Rather, the inquiry is whether the employee can bind the organization with his or her statement.

...

## CONCLUSION

The approach of the Nevada Supreme Court in Palmer v. Pioneer Inn strikes a balance allowing informal and inexpensive discovery while providing a represented party with the advice and protection of counsel. An employee of an organization may be interviewed by counsel for an adverse party unless the employee is a managing-speaking agent of the organization.

This opinion is issued by the Standing Committee on Ethics and Professional Responsibility of the State Bar of Nevada, pursuant to SCR 225. It is advisory only. It is not binding upon the courts, the State Bar of Nevada, its Board of Governors, any person or tribunal charged with regulatory responsibilities, or any member of the State Bar.

[1] The Committee first considered this issue prior to the Nevada Supreme Court's decision in Palmer v. Pioneer Inn Assocs., 59 P.3d 1237 (Nev. 2002) and based much of the Committee's analysis on a federal trial court opinion in the matter, Palmer v. Pioneer Hotel & Casino, 19 F. Supp. 2d 1157 (D. Nev. 1998). The Nevada Supreme Court, the decisions of which clearly bind members of the State Bar of Nevada, took a significantly different approach to the application of Nevada SCR 182 than did the federal trial court. Consequently, the Committee has revised Opinion No. 27 significantly in light of the Nevada Supreme Court's Palmer v. Pioneer Inn analysis.

----------

### Palmer v. Pioneer Hotel & Casino,
19 F.Supp.2d 1157, 86 Fair Empl.Prac.Cas. (BNA) 897, D.Nev., Aug 28, 1998

Attorney may make ex parte contact with former employee of employer which was adverse party to attorney's client, provided communication does not cover areas subject to attorney-client and work product privileges. Nev.Sup.Ct.Rules, Rule 182; ABA Rules of Prof.Conduct, Rule 4.2; Fed.Rules Evid.Rule 801(d)(2)(D), 28 U.S.C.A.

"At the time Silverberg communicated with Lorentz, she was no longer employed by Pioneer. During her employment, however, she occupied a supervisory position and apparently witnessed discriminatory practices used by agents of Pioneer. Nevertheless, "the clear majority of courts interpreting Rule 4.2 have held, consistent with [American Bar Association Formal Opinion 91-359 (issued March 22, 1991) ], that Rule 4.2 does not

64

apply to communication[s] with former employees of an organizational party who no longer have any relationship with the organization." *Aiken v. Business & Indus. Health Group, Inc.*, 885 F.Supp. 1474, 1477 (D.Kan.1995) (collecting cases). The rationale underlying the inapplicability of Model Rule 4.2 to former employees was aptly summarized in *Terra Int'l, Inc.*:

a former employee no longer works on the organization's behalf, is unlikely to be represented by the organization's counsel, and unlikely to be a participant in the process leading to resolution of the dispute; ... [and] do [es] not fit within the definition of a 'party' with whom ex parte contacts are forbidden.

913 F.Supp. at 1314 (citations omitted). The Court finds this rationale persuasive and adopts it, as well as the majority rule, for application in this district. The Court will also adopt, however, a common-sense qualification on the application of the majority rule that has been advanced by courts and commentators alike: when communicating with a former employee of an organization, the adverse attorney may not inquire into areas subject to the attorney-client or work product privileges."  Id., at 1167


----------


### Palmer v. Pioneer Inn Associates, Ltd.,
118 Nev. 943, 59 P.3d 1237, 90 Fair Empl.Prac.Cas. (BNA) 1042, Nev., Dec 27, 2002

Managing-speaking agent test applies to rule providing that in representing a client, a lawyer shall not communicate about subject of representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has consent of other lawyer or is authorized by law to do so, and under that test, a party is an employee who has legal authority to bind the corporation in a legal evidentiary sense. Sup.Ct. Rules, Rule 182.


"FN5. Palmer's counsel also contacted one other current employee and two former employees. Jennifer Walker, the current employee, was a telephone operator, a non-supervisory position. The two former employees were Sarah Favero, an "on-call" banquet worker, and Donna Lorenz, who was Food and Beverage Director before Zamora. The federal district court found that counsel's contact with these individuals was not a violation of SCR 182, and so they are not discussed in the Ninth Circuit's order or this opinion."


"[E]mployees should be considered "parties" for the purposes of the disciplinary rule if, under applicable [state] law, they have managing authority sufficient to give them the right to speak for, and bind, the corporation.
In applying this test, we specifically note that an employee does not "speak for" the organization simply because his or her statement may be admissible as a party-opponent admission. Rather, the inquiry is whether the employee can bind the organization with his or her statement. Also, an employee for whom counsel has not been retained does not become a "represented party" simply because his or her conduct may be imputed to the organization; while any confidential communications between such an employee and the organization's counsel would be protected by the attorney-client privilege, the facts within that employee's knowledge are generally not protected from revelation through ex parte interviews by opposing counsel. [FN65]

FN65. See *Upjohn*, 449 U.S. at 395-96, 101 S.Ct. 677. We note that an attorney who abuses the interview process by inquiring into privileged matters, or even by permitting an employee to refer to confidential communications without immediately warning the

65

employee that such communications are protected and should not be disclosed, is subject to appropriate sanctions.

A lawyer must have a reasonable opportunity to conduct an investigation under Rule 11. This investigation would be unduly hampered by an over-inclusive test, such as the party-opponent admission test adopted by the federal district court in this case. Such a test essentially bars contact with all employees, because any employee could make a statement concerning a matter within the scope of his or her employment, which would then be admissible under FRE 801(d)(2)(D) **1249 or a state equivalent. A lawyer contacting the employee could not know in advance whether the employee might make such a statement, and so would be forced to choose between foregoing information that could be useful and even necessary to a proper investigation, or risking sanctions for an SCR 182 violation. Without doubt, an organization is entitled to the protections afforded by SCR 182, but just as for individuals, this protection is not unlimited. The managing-speaking agent test most appropriately balances these competing interests, and so it is the test we adopt.

*CONCLUSION*

Nevada does not follow the portion of the ABA Model Rule 4.2's former comment providing that contact is barred with an organization's employee whose admission may constitute an admission on the part of the organization, nor does it follow the 2002 version of the comment. Rather, in interpreting SCR 182 as *962 applied to employees of an organization, we adopt the managing-speaking agent test. This test preserves the protection afforded by SCR 182 to an organization, while permitting sufficient flexibility to conduct an adequate pre-litigation investigation." Id., at 1248-1249

//////////////////////////////

## New Hampshire

Rules of Prof.Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

...

New Hampshire Comments

The New Hampshire Committee has modified the official comment to Rule **4.2** by eliminating the following language from the comment thoughts by the ABA in August of 1983: "This Rule prohibits communications by a lawyer ... with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization." Instead the New Hampshire Committee decided to adopt the comments originally proposed by the Kutak Commission in May of 1981. Using the example of taking a statement from the driver of a Titanic Oil gasoline truck involved in an accident, the committee felt there was nothing improper or unethical for plaintiff's counsel to take a statement from the driver even though counsel knew that Titanic Oil was represented by retained counsel.

----------

66

New Hampshire Bar Ethics Committee Advisory Opinion #1984-85/4 (11/13/84)

Taking Statements From An Opposing Party

...

FACTS AND QUESTIONS:A lawyer representing one party in a lawsuit wishes to interview or take the statement of an opposing party. The lawyer has posed three queries: a) Whether it is proper to take the statement of the opposing party before suit is filed and that party has obtained counsel; and b) Whether it is proper to take the statement of a former agent or employee of the opposing party after suit has been filed and counsel has been retained (assuming that the former agent or employee whose statement is sought was an agent or employee of the opposing party at the time of the incident giving rise to the suit); and c) Whether it is proper to take the statement of a present agent or employee of the opposing party either (i) before suit has been filed, or (ii) after suit has been filed. For purposes of this question, the Committee is to assume that the agent or employee from whom a statement is sought, was an agent or employee of the opposing party at the time of the incident giving rise to the lawsuit, and continues in that relationship at the time the statement is sought, but the agent or employee is not the named defendant in the lawsuit.

RESPONSE: With regard to the first inquiry, DR 7-104(A)(1) directly addresses the subject of communications by an attorney with a party, whether or not that party's interests are adverse, instating that: "During the course of his representation of a client, a lawyer shall not:(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."  Accordingly, if the party is not represented "in that matter", there would be no ethical bar to either the taking of a statement or other communication by a lawyer with the adverse party, regardless of whether suit has or has not been filed, so long as the constraints set forth in DR 7-104(A) (2) are observed. A lawyer is duty bound to represent his or her clients zealously within the bounds of the law. EC 7-1; DR 7-101(A) (1). This duty includes a duty to investigate thoroughly facts related to the subject matter in litigation. In carrying out this duty, an attorney should avoid conduct that may tend to mislead a party not represented by counsel and should identify himself or herself and whom he or she represents. DR 1-102.With regard to the second and third inquiries, DR 7-104 prohibits a lawyer from communicating with a party, adverse or otherwise, whom he or she knows is represented by counsel in the matter, in the absence of that counsel's consent. Assuming proper resolution of the knowledge requirements of DR 7-104, the key question is whether the former or present agent or employee is to be considered the equivalent of a "party" for purposes of DR 7-104. Resolution of that question will be heavily dependent upon the facts and circumstances of each case. The Committee is unable to resolve it in this particular case, because the information provided is not sufficiently detailed.

SUMMARY: If a lawyer has knowledge that a party involved in the lawyer's subject of representation is represented by counsel, he/she may not communicate with or cause another to communicate with that party without the prior consent of that party's attorney, unless otherwise authorized bylaw to do so. Former or present agents or employees of a party may be the equivalent of a "party", for purposes of the Disciplinary Rules, depending on the facts and circumstances of each case.

/////////////////////////////

## New Jersey

New Jersey Rules of Professional Conduct, Rule 4.2

FAC Resp. Exhibit B -- 1956

## COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by another lawyer in the matter, including members of an organization's litigation control group as defined by RPC 1.13, unless the lawyer has the consent of the other lawyer, or is authorized by law or court order to do so, or unless the sole purpose of the communication is to ascertain whether the person is in fact represented. Reasonable diligence shall include, but not be limited to, a specific inquiry of the person as to whether that person is represented by counsel. Nothing in this rule shall, however, preclude a lawyer from counseling or representing a member or former member of an organization's litigation control group who seeks independent legal advice.

Official Comment by Supreme Court (November 17, 2003)

Concerning organizations, RPC 4.2 addresses the issue of who is represented under the rule by precluding a lawyer from communicating with members of the organization's litigation control group. The term "litigation control group" is not intended to limit application of the rule to matters in litigation. As the Report of the Special Committee on RPC 4.2 states, "... the 'matter' has been defined as a 'matter whether or not in litigation.'" The primary determinant of membership in the litigation control group is the person's role in determining the organization's legal position. See _Michaels v. Woodland, 988 F.Supp. 468, 472 (D.N.J. 1997)_.

...

----------

### Klier v. Sordoni Skanska Const. Co.,
337 N.J.Super. 76, 766 A.2d 761, N.J.Super.A.D., January 26, 2001

Nothing in the rules of professional conduct prohibits an attorney's ex parte communication with a former employee of an adversary who was not within that adversary's litigation control group and who was not otherwise represented by counsel. RPC 4.2.

"The current rules prohibit communication only with employees who are members of the organization's litigation control group, or are represented by another lawyer in the matter. _R.P.C. 4.2_. This is in accord with the Committee's recommendation that the prohibition against _ex parte_ communication should not extend to employees who were only fact witnesses or involved with the subject matter of the litigation. Committee Rep., _supra_, 139 _N.J.L.J._ at 1195-96. The Committee explained that extending the prohibition against _ex parte_ communication to employees who were only involved in the subject matter of the litigation would include too many people "whose interests are most likely not only not congruent with the organization's but also, in many cases, in conflict with it." _Ibid._ (quoted in _Michaels, supra, 988 F.Supp. at 471)._ The Committee determined that the bar against _ex parte_ communications should only apply in those situations where the employee is not only a fact witness, but also is significantly involved in determining the organization's legal position as opposed to merely supplying information. Committee Rep., _supra_, 139 _N.J.L.J._ at 1195-96. In its recommendation, the Committee specifically provided that "[s]ignificant involvement requires involvement greater than merely supplying factual information regarding *90 the matter in question." _Id._ at 1195. Moreover, in its comment on proposed _R.P.C._ 1:13, the Committee specifically noted that the bar "does not include persons whose actions bind the organization or are imputable to the organization or who are responsible for other aspects of organizational policy unless

68

they meet the 'legal position' test." Committee Rep., *supra*, 139 *N.J.L.J.* at 1196.

Thus, the first determination that must be made by a court in considering whether to allow *ex parte* interviews of current and former employees of an organization **769** is whether the witness is a current or former employee. *R.P.C.* 1:13(a); *Michaels, supra,* 988 *F.Supp.* at 472. If the witness is a current employee, the judge must determine whether the person is within the litigation control group as defined by *R.P.C.* 1:13(a), and, if not, whether the person has obtained other representation. *R.P.C.* 4.2; *Michaels, supra,* 988 *F.Supp.* at 472. *R.P.C.* 4.2 prohibits an adverse attorney from having *ex parte* contact with any current employee who is within the litigation control group. *Ibid.* On the other hand, if the current employee is not within the litigation control group and has not obtained other representation, *ex parte* contact is permitted consistent with *R.P.C.* 4.2 and *R.P.C.* 4.3. In addition, a former employee who was within the litigation control group is presumptively represented by the organization. *R.P.C.* 1:13(a); *Michaels, supra,* 988 *F.Supp.* at 472. However, pursuant to *R.P.C.* 1.13(a) and *R.P.C.* 4.2, the lawyer may interview a former employee who was within the litigation control group, if he or she disavows that representation. Hence, nothing in the Rules prohibits *ex parte* communication with a former employee who was not within the litigation control group and who was not otherwise represented by counsel. *Michaels, supra, 988 F.Supp.* at 472."
Id., at 89-90

----------

### Andrews v. Goodyear Tire & Rubber Co., Inc.,
191 F.R.D. 59, D.N.J., Feb 14, 2000

Pursuant to rules of professional conduct governing ex parte contacts, plaintiffs' attorney in employment discrimination suit was not obligated to determine if managerial employee was in employer's litigation control group or otherwise represented by counsel "before making contact" with employee; rather, attorney was only required to make such determination prior to engaging in any substantive ex parte communications.

"Upon publication of the initial report by the Special Committee on *RPC* 4.2, the Court received an abundance of comments. As a result of those comments, the Committee reconvened and filed a Supplemental Report on May 6, 1996. *See Notice to the Bar,* 145 N.J.L.J. 318 (July 15, 1996). Therein, the Committee noted that it was adhering to the **76** reasoning set forth in the initial report with the exception of minimal modifications to *RPCs* 4.2 and 1.13 as set forth in the supplemental report. *See id.*
The first modification to the original report involved "former" employees of a corporation and their recommended status as members of the litigation control group. *See id.* The Committee reaffirmed its initial position that former employees of a corporation presumptively should be deemed members of the litigation control group. The Committee added, however, that, because both current and former employees of a corporation do not lose their right to seek independent legal advice as a result of their current or former employment, *RPC* 4.2 should be amended to reflect that option.
The second modification to the initial report also involved former employees of a corporation. The Committee recognized that because the interests of a former employee may become adverse to the present interests of a corporation, an approaching attorney making communications pursuant to *RPC* 4.3 "may inquire as to whether the former employee disavows organizational representation or not." *Id.* Thus, the Committee recommended amending *RPC* 1.13 to reflect such "disavowing" language.
In conclusion, the Committee suggested that, if the recommended amendments to the

69

*RPCs* caused any confusion for an attorney seeking to inquire about representation pursuant to *RPC 4.2*, the attorney could consult the scripts set forth in *In re Prudential Insurance Company of America Sales Practices Litigation*, 911 F.Supp. 148, 152 n. 5 (D.N.J.1995) and *In re Environmental Insurance Declaratory Judgment Actions*, 252 N.J.Super. 510, 523, 600 A.2d 165 (1991).

...On June 28, 1996, the New Jersey Supreme Court adopted the amendment to *RPC 4.3* as proposed by the Committee in the initial report and also adopted those amendments to *RPCs* 4.2 and 1.13 as proposed in both the initial and supplemental reports. *See id.* The amendments to *RPCs* 4.2, 4.3 and 1.13 became effective on September 1, 1996." Id., at 75-76

"Finally, the Court amended *RPC 1.13*. The pertinent language is as follows:
(a) A lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents. For the purposes of RPC 4.2 or 4.3, however, the organization's lawyer shall be deemed to represent not only the organizational entity but also the members of its litigation control group. Members of the litigation control group shall be deemed to include current agents and employees responsible for, or significantly involved in, the determination of the organization's legal position in the matter whether or not in the litigation, provided, however, that "significant involvement" requires involvement greater, and other than, the supplying of factual information or data respecting the matter. Former agents and employees who were members of the litigation control group shall presumptively be deemed to be represented in the matter by the organization's lawyer but may at any time disavow said representation."   Id., at 77

////////////////////////////

**New Mexico**

New Mexico State Court Rules, Rule 16-402

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. Except for persons having a managerial responsibility on behalf of the organization, an attorney is not prohibited from communicating directly with employees of a corporation, partnership or other entity about the subject matter of the representation even though the corporation, partnership or entity itself is represented by counsel.

ABA COMMENT TO MODEL RULES

This Rule does not prohibit communication with a party, or an employee or agent of a party, concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party, or between two organizations, does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter. Also, parties to a matter may communicate directly with each other and a lawyer having independent justification for communicating with the other party is permitted to do so. Communications authorized by law include, for example, the right of a party to a controversy with a government agency to speak with government officials about the matter.

70

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).

This Rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question.

///////////////////////////

## New York

Code of Professional Responsibility DR 7-104 [22 NYCRR § 1200.35]

Communicating with Represented and Unrepresented Persons

A. During the course of the representation of a client a lawyer shall not:

1. Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.

2. Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client.

B. Notwithstanding the prohibitions of DR 7-101 [1200.35] (A), and unless prohibited by law, a lawyer may cause a client to communicate with a represented person, if that person is legally competent, and counsel the client with respect to those communications, provided the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place.

----------

New York County Lawyers' Association Committee on Professional Ethics
Amended Opinion No. 729 (3/1/00)
March 1, 2000

DIGEST: A LAWYER ETHICALLLY MAY ADVANCE COUNSEL FEES TO A THIRD PARTY WITNESS UNDER DR7-109

QUESTION:

A lawyer proposes to obtain testimony and/or evidence through an informal interview of a former employee of a corporate adversary. The former employee has agreed to the interview, but has requested that she be represented by counsel of her choice, and that the costs of counsel be advanced by the inquirer. Assuming the consent of inquirer's client (who will remain ultimately liable for such expenses), may the lawyer advance the costs of counsel to the witness? Alternatively, assuming that the witness has made no

71

such request, may the lawyer suggest to the witness that she be represented by counsel, and offer to advance the costs of such counsel?

OPINION

As a preliminary matter, we note that DR 7-104(A) prohibits communication by a lawyer with any person the lawyer knows to be represented by counsel in the matter. The rule applies to all parties represented by counsel in a matter, including witnesses. Assuming the witness here is not already represented by a lawyer, the contact by the inquirer with a former employee of a corporate adversary would not be prohibited. See Niesig v. Team I, 76 N.Y.2d 363, 558 N.E.2d 1030, 559 N.Y.S.2d 493 (1990) (DR 7-104(A)(1) applies only to current employees, not to former employees). The inquirer may not, however, seek to discover privileged communications of the corporate adversary to which the former employee was privy through the interview of the former employee. See N.Y. State 700 (1998) (attorney engaged in ex parte contacts with former employees of corporate adversary may not seek to obtain from former employees information that might be protected under the attorney-client privilege or the work product doctrine).

...

CONCLUSION:

*4 The fees of counsel to a witness -- both for preparation of and in attending testimony -- are "expenses reasonably incurred by a witness in attending or testifying" within the meaning of DR 7-109(C)(1). Accordingly, with client consent, a lawyer may ethically advance or acquiesce in the payment of such fees to a witness, whether at the request of the witness or at the suggestion of the lawyer.

----------

New York State Bar Association Ethics Opinion 700, (5/7/98)

Digest: Lawyer who receives unsolicited communication from former employee of adversary's law firm regarding alteration of documents may not communicate further with employee and should seek judicial guidance as to use of the unauthorized communication.

QUESTIONS

An attorney for a government agency responsible for prosecuting an administrative proceeding received an unsolicited telephone call from a person who identified himself as a former non-lawyer employee of a law firm that represents the respondent in the proceeding. In substance, the former employee told the attorney that certain key records submitted to the government agency in connection with its investigation of respondent had been materially altered prior to submission. Aware of the sensitive ethical issues raised by this communication, the attorney refrained from asking the former employee any questions, such as whether the law firm is aware of the alleged alteration of documents.

This opinion addresses three questions arising from this set of facts:

1. Whether the attorney may seek further information from the former employee regarding the allegedly altered documents;

2. Whether the attorney must inform the respondent's law firm of the communication from its former employee; and

3. Whether the attorney must inform the hearing officer presiding over the administrative proceeding of the communication and, if so, whether that may be done ex parte.

72

OPINION

...

 Just as a lawyer should never initiate contact with a former employee of an adversary's law firm for the purpose of obtaining confidential information of the adversary, neither may a lawyer take advantage of a former employee's willingness to violate the duty of confidentiality to the former employer's client.

The cases and ethics opinions permitting ex parte contacts with unrepresented former employees of a corporate adversary are not to the contrary. These opinions hold that the prohibition on such contact applies only to current employees, not to former employees. See, e.g., Dubois v. Gradco Sys., Inc., 136 F.R.D. 341 (D. Conn. 1991); Neisig v. Team I et al., 76 N.Y.2d 363, 558 N.E.2d 1030 (1990); ABA 359 (1991), but they are also uniform in holding that an attorney engaged in such ex parte contacts may not seek to obtain from former employees information that might be protected under the attorney-client privilege or the work product doctrine. As one court has observed:

"[I]t goes without saying that, with respect to any unrepresented former employee, plaintiff's counsel must take care not to seek to induce or listen to disclosures by the former employees of any privileged attorney-client communications to which the employee was privy. After all, the privilege does not belong to, and is not for the benefit of, the former employee; rather, it belongs to, and is for the benefit of, [the former employer]." Dubois, 136 F.R.D. at 347.

Similarly, the inquirer here may not seek to cause the former employee of his adversary's counsel to reveal the confidences or secrets of the former employer's client.

...

CONCLUSION

*5 A lawyer who receives an unsolicited and unauthorized communication from a former employee of an adversary's law firm may not seek information from that person if the communication would exploit the adversary's confidences or secrets. Where the information communicated involves alleged criminal or fraudulent conduct in which opposing counsel may be assisting, the receiving lawyer should communicate with a tribunal or other appropriate authority to get further direction as to the use of the information.

----------

**Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A.,**
Not Reported in F.Supp.2d, 2003 WL 22990099, S.D.N.Y., Dec 19, 2003

Oil supplier was not entitled to protective order in refiner's breach of contract action barring ex parte contact with its former employees, even if employees had been exposed to privileged or confidential information, or had been privy to business proprietary information and/or trade secrets, where refiner had stipulated that all interviews would be conducted by attorneys, and that questions would be targeted so as to avoid any discussion of privileged information.

"A party seeking a protective order precluding disclosure of certain communications with a former employee on grounds of attorney-client privilege has been found to have failed to carry its burden when it fails to identify any privileged information to which the former employee was privy. See Stratagem Dev. Corp. v. Heron Int'l N.V., 1992 WL 276844 at *9 (S.D.N.Y.1992); see also Polycast Tech. Corp. v. Uniroyal, Inc., 129 F.R.D. 621, 629 (S.D.N.Y.1990) (noting that if the party seeking a bar on ex parte communications with a former employee were to "come forward with evidence that privileged communications

73

might be in jeopardy, a narrowly-tailored order might be appropriate," but denying the motion for a protective order, since the party had "failed to identify any specific privileged information to which [the former employee] was privy").

Defendants seek this protective order on the grounds that the individuals in question are likely to have been exposed to privileged or confidential information, or to have been privy to business proprietary information and/or trade secrets. However, we find that the circumstances of this case do not warrant the imposition of a bar on *ex parte* communications. As regards privileged material, we find that defendants' interests will be sufficiently protected by two stipulations made by plaintiff, in its response to defendants' motion. First, plaintiff has stipulated that all interviews will be conducted by attorneys, thus avoiding the hazard noted in *G-I Holdings,* where "[t]he danger of inadvertent disclosure is compounded by the fact that the investigators are themselves lay persons and, thus, are in little better position than the interviewees to assess whether privileged material is being disclosed." *G-I Holdings, Inc. v. Baron & Budd,* 199 F.R.D. 529, 535 (S.D.N.Y.2001). Second, plaintiff has stipulated that the questions will be targeted so as to avoid any discussion of privileged information. As regards confidential material, proprietary information and trade secrets, we agree with plaintiff that defendants' interests will be sufficiently protected by the confidentiality agreement signed by the parties subsequent to this court's order of October 30, 2003, regarding *ex parte* contacts.

IV. CONCLUSION

For the reasons stated above, defendants' motion is denied, and plaintiff may proceed to contact the former employees at issue." Id., at *3

----------

### Niesig v. Team I,
76 N.Y.2d 363, 558 N.E.2d 1030, 559 N.Y.S.2d 493, 59 USLW 2041, N.Y., Jul 05, 1990

Disciplinary rule prohibiting lawyer from communicating directly with "party" known to have counsel did not preclude lawyer who represented injured employee from conducting ex parte interviews of employees of corporate employer who witnessed accident underlying employee's personal injury action against employer.

"The court further *369 noted that the information sought from employee witnesses could instead be obtained through their depositions.
In the main we disagree with the Appellate Division's conclusions. However, because we agree with the holding that DR 7-104(A)(1) applies only to current employees, not to former employees, we modify rather than reverse its order, and grant plaintiff's motion to allow the interviews." Id., at 368-369

----------

### Polycast Technology Corp. v. Uniroyal, Inc.,
129 F.R.D. 621, S.D.N.Y., Feb 13, 1990

In the absence of showing that former employee of corporate litigant was privy to any privileged information during his employment, ex parte contact with him by attorneys for the opposing party would not be barred in order to preserve the privilege.

"The expanded comments to Rule 4.2, then, were not designed to make former employees adjuncts of the corporate "party." Rather, they were intended to insure that current employees--whether participants or witnesses-- would not be subject to interrogation by an adversary's attorney except through formal discovery.
                    4. *The Definition of "Party"*

74

The traditional interpretation of DR 7-104(A)(1) did not include former employees within the definition of the corporate "party." The text of Model Rule 4.2 did not deviate in substance from the earlier rule, and the comments, while more expansively worded, do not clearly indicate a departure. We must return then, to the policies underlying the proscription against communication with a represented party to determine if those principles require that the rule apply to former employees.

The interest in preventing inadvertent disclosure of privileged material does not justify a blanket ban on communication *628 with the opposing party's former employees. In most situations a former employee will not be privy to the corporation's legal strategies after his employment has terminated. Similarly, many employees will have no access to privileged information even while employed. Accordingly, the problem of protecting privileged material is best dealt with on a case-by-case basis. Where there is a strong likelihood that a former employee does possess such information, an appropriately tailored order can be issued.

The corporation's interest in counseling a former employee whose acts may lead to imputed liability is likewise an insufficient basis for extending the definition of "party" to such persons. While such a participant's statements to opposing counsel may be damaging to the corporation, they are no more so than the statements of a former employee who merely witnessed the liability-creating acts but did not commit them. Yet there is no dispute that the opposing attorney may interview the latter witness freely. And, of course, counsel for the corporation may depose its own former employee to learn facts and to lock in his testimony." Id., at 627-628

"In this Court, then, the Code of Professional Responsibility currently prescribes the ethical conduct of attorneys, and the Code may be interpreted in light of judicial decisions and commentary from other sources. In this case, DR 7-104 does not require a ban on ex parte communications with a former employee, even if it is interpreted in light of the comments to Model Rule 4.2. Nor has there been a sufficient showing that contacts with the former employee would jeopardize privileged communications. Accordingly, Uniroyal's motion for a protective order is denied." Id., at 629

////////////////////////////

## North Carolina

North Carolina Revised Rules of Professional Conduct, Rule 4.2

Communication with Person Represented by Counsel

(a) During the representation of a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order. It is not a violation of this rule for a lawyer to encourage his or her client to discuss the subject of the representation with the opposing party in a good-faith attempt to resolve the controversy.

(b) Notwithstanding section (a) above, in representing a client who has a dispute with a government agency or body, a lawyer may communicate about the subject of the representation with the elected officials who have authority over such government agency or body even if the lawyer knows that the government agency or body is represented by another lawyer in the matter, but such communications may only occur under the following circumstances:

(1) in writing, if a copy of the writing is promptly delivered to opposing counsel;

75

(2) orally, upon adequate notice to opposing counsel; or

(3) in the course of official proceedings.

Comment

…

[9] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. It also prohibits communications with any constituent of the organization, regardless of position or level of authority, who is participating or participated substantially in the legal representation of the organization in a particular matter. Consent of the organization's lawyer is not required for communication with a former constituent unless the former constituent participated substantially in the legal representation of the organization in the matter. If an employee or agent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication would be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4, Comment [2]….

----------

North Carolina State Bar  97 Formal Ethics Opinion 2 (1/16/98)

Communications with Unrepresented Former Employees of Represented Organizations

Opinion rules that a lawyer may interview an unrepresented former employee of an adverse represented organization about the subject of the representation unless the former employee participated substantially in the legal representation of the organization in the matter.

…

Inquiry #3:

[The facts of this inquiry are unrelated to the preceding inquiries.]

Employee X is no longer employed by Corporation. While an employee of Corporation, however, Employee X may have engaged in activities that would constitute the sexual harassment of other employees of Corporation. An action alleging sexual harassment based on Employee X's conduct was brought against Corporation. Although he is not a named defendant in the action, Employee X's acts, while an employee, may be imputed to the organization. When he was employed, Employee X did not discuss the corporation's representation in this matter with Corporation's lawyer. Employee X is unrepresented. May the lawyer for the plaintiffs in the sexual harassment action interview Employee X without the consent of the lawyer for Corporation?

Opinion #3:

Yes. Unlike the adjuster in the two prior inquiries, Employee X was not an active participant in the legal representation of his former employer in the sexual harassment action. It does not appear that he was involved in any decision making relative to the representation of Corporation nor was

76

he privy to privileged client-lawyer communications relative to the representation. Rather, Employee X is a fact witness and a potential defendant in his own right. Permitting ex parte contact with Employee X by the plaintiff's counsel will not interfere with Corporation's relationship with its lawyer nor will it result in the disclosure of privileged client-lawyer communications regarding the representation. Comment [5] to Rule 4.2, which indicates that the rule prohibits communications with any employee "... whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization, " should be applicable only to current employees. The purpose of Rule 4.2 is not enhanced by extending the prohibition to former employees who, during the time of their employment, did not participate substantively in the representation of the organization.

Although the plaintiff's lawyer may communicate directly with the Employee X, the lawyer's communications are subject to the protections for unrepresented persons set fourth in Rule 4.3. Rule 4.3(a) prohibits a lawyer from giving advice to an unrepresented person, other than the advice to secure legal counsel, if the interests of the person are in conflict with the interests of the lawyer's client. Similarly, Rule 4.3(b) requires the lawyer to make known to the unrepresented person that the lawyer is not disinterested.

----------

## Houck v. Hardee's Food Systems, Inc.,
Not Reported in F.Supp.2d, 1999 WL 1939988, E.D.N.C., Mar 23, 1999

"In general, a lawyer may interview a former employee of a represented corporate party without the permission of the corporation's lawyer. *See* N.C. RPC 81 (Jan. 12, 1990). An exception exists, however, when "the former employee participated substantially in the legal representation of the organization in the matter." 97 N.C. Formal Ethics Op. 2 (Jan. 16, 1998). Therefore, although a lawyer may interview a former employee of a represented corporation regarding "factual information willingly shared by [the] former employee," he may not interview the former employee regarding matters that may be protected by the attorney-client privilege. N.C. RPC 81 (Jan. 12, 1990).
Rule 4.2 of the North Carolina Revised Rules of Professional Conduct prohibits a lawyer from communicating ex parte with a represented corporate party's employees who have "managerial responsibility." N.C. Revised Rules of Professional Conduct Rule 4.2 cmt. 5 (1998). Defendants contend that Rule 4.2 prohibits ex parte communication not only with current managerial employees, but also with *former* managerial employees. However, in a formal opinion, the American Bar Association Committee on Ethics and Professional Responsibility stated:
While the Committee recognizes that persuasive policy arguments can be and have been made for extending the ambit of Model Rule 4.2 to cover some former employees, the fact remains that the text of the Rule does not do so and the comment gives no basis for concluding that such coverage was intended.... Accordingly, it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer.
**\*2** ABA Comm. on Ethics and Professional Responsibility Formal Op. 95-396 (1991); *see also* ABA Comm. on Ethics and Professional Responsibility Formal Op. 95-396 n. 47 (1995) ("Rule 4.2 does not prohibit contacts with former officers or employees of a represented corporation, even if they were in one of the categories with which communication was prohibited while they were employed."). However, the committee cautioned that "the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the privilege attached to attorney-client communications." *Id.*

77

The undersigned concludes that Rule 4.2 does not prohibit ex parte contact with former managerial employees of a represented corporation. Therefore, Plaintiff's motion to compel is ALLOWED as to Interrogatory Number 2 and to the extent that they have not done so already, Defendants are ORDERED to provide the addresses and telephone numbers of all Hardee's employees who were terminated on July 15, 1997. However, counsel for Plaintiff are cautioned that they may not communicate ex parte with any employee regarding matters protected by the attorney-client privilege." Id., at *1-2

///////////////////////////

### North Dakota

North Dakota Rules of Professional Conduct, Rule 4.2

Communication with person represented by counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENT

...

In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statements may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). The prohibition of this Rule does not apply to contact with unrepresented former agents or employees of the represented organization (although Rule 4.3 does then apply); however, the lawyer making the contact must take care not to seek to induce the former agent/employee to reveal information that may be protected by the privilege attached to attorney/client communications to the extent of the person's contacts, while an agent or employee, with her or his former employer's counsel.
...

----------

State Bar of North Dakota Ethics Committee Opinion No. 92-12 (10/15/92)

        The Ethics Committee received a request for an opinion from Mr. _____, Attorney at Law, _____ North Dakota, regarding the following inquiry:

        Does the prohibition of Rule 4.2 with respect to contracts by a lawyer with employees of an opposing corporate party extend to former employees of that party?

        The analysis logically begins with the text of Rule 4.2, which provides that a lawyer shall not communicate about the subject matter of representation with a party he/she knows to be represented by another lawyer without the consent of the other

78

lawyer or authorization by law to do so.  North Dakota Rule of Professional Conduct 4.2. The comment to Rule 4.2 notes that the Rule applies to corporate parties and further clarifies the application of the Rule as to current employees or agents of the corporate party.  The comment explains the Rule as prohibiting communications with (1) persons having a managerial responsibility on behalf of the organization; (2) anyone whose acts or omissions could be imputed to the organization; and (3) anyone whose statements may constitute an admission on the part of the organization.

However, Rule 4.2 is silent as to former employees.

As noted in ABA Formal Opinion 91-359 dated 3/22/91 in dealing with the same issue, there are persuasive policy arguments for extending Rule 4.2 to cover certain classifications of former corporate employees.  However, neither Rule 4.2 nor its comment provide a basis for extending the coverage to such former employees.  Just as the ABA Committee was not willing to do, this Committee is not willing to issue an opinion expanding the literal scope of Rule 4.2 to include such former corporate employees.

Accordingly, the Committee's opinion is that the prohibition of Rule 4.2 with respect to contact by an attorney with employees of an opposing corporate party does not extend to former employees of such a party.

The Committee reiterates the cautions of the ABA Formal Opinion 91-359 pertaining to Rule 4.4. and 4.3.  Specifically, the Committee cautions that an attorney contacting any unrepresented former employee must take care not to seek to induce the former employee to violate the privilege attached to attorney/client communications to the extent of his or her communications as a former employee with his or her former employer's counsel in which the privilege would belong to the former employer.  In regard to Rule 4.3, the Committee would caution an attorney when contacting former employees to make clear the attorney's position in the action giving rise to the contact, including the identity of the lawyer's client and the fact that the person's former employer is the adverse party.

//////////////////////////////

## Ohio

Ohio Code of Professional Responsibility, DR 7-104

Communicating with one of adverse interest

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client.

----------

79

The Supreme Court of Ohio Board of Commissioners on Grievances and Discipline
Opinion Number 2005-3 (2/4/05)

SYLLABUS:  Counsel representing an interest adverse to a corporation may communicate without the consent of a corporation's lawyer with certain current employees and former employees of the corporation, even when corporate counsel asserts blanket representation of the corporation and all its current and former employees.

...

As to communication with former employees of a corporation, these guidelines apply. While representing a client in a matter adverse to a corporation, an attorney may communicate on the subject matter of the representation with former employees of the corporation without notification or consent of corporate counsel.  Such communication would not violate DR 7-104(A)(1) when conducted within the following boundaries.  An attorney may not communicate ex parte if a former employee is represented by his or her own counsel in the matter, unless that counsel consents.  An attorney may not communicate ex parte if a former employee has asked the corporation's counsel to provide representation in the matter, unless that counsel consents.  An attorney must obtain the consent of the former employee to the interview.  An attorney must inform the former employee not to divulge any communications that the former employee may have had with corporate or other counsel.  An attorney must fully explain to the former employee that he or she represents a client adverse to the corporation.  Under DR 7-104(A)(2), an attorney must not give advice to the unrepresented former employee other than advice to seek counsel in the matter.

OPINION:  This opinion addresses an attorney's communication, without the consent of a corporation's lawyer, with current and former employees of a corporation when opposing corporate counsel asserts blanket representation of the employees and the corporation.

Is it proper for counsel who represents an interest adverse to a corporation to communicate without consent of the corporation's counsel with certain current and former employees of the corporation, when the corporate counsel asserts blanket representation of the corporation and all current and former employees?

...

Blanket representation

Corporate counsel's assertion of blanket representation of the corporation and all its corporate employees is bluster.  It is inappropriate.  First, a unilateral declaration by a corporation's counsel that he or she represents all current and former employees does not make it so.  Second, such blanket representation of a corporation and all its current and former employees would in many instances be fraught with impermissible conflicts of interest for the corporate lawyer.

The Board's view is that a lawyer representing a corporation may not prohibit contact with all employees by asserting blanket representation of the corporation and all its current and former employees.  A similar view is expressed by the ABA, Committee on Ethics and Professional Responsibility:  "[A] lawyer representing the organization cannot insulate all employees from contacts with opposing lawyers by asserting a blanket representation of the organization."  ABA, Formal Op. 95-396 (1995).

...

80

Former employees

Former employees, who have not obtained counsel in a matter, may be interviewed without consent of the corporation's counsel.

In Opinion 96-1 (1996), this Board advised:

While representing a client in a matter adverse to a corporation, an attorney may communicate on the subject matter of the representation with former employees of the corporation without notification or consent of corporate counsel.  Such communication would not violate DR 7-104(A)(1) when conducted within the boundaries set forth.  An attorney may not communicate ex parte if a former employee is represented by his or her own counsel in the matter, unless that counsel consents.  An attorney may not communicate ex parte if a former employee has asked the corporation's counsel to provide representation in the matter, unless that counsel consents.  An attorney must obtain the consent of the former employee to the interview.  An attorney must inform the former employee not to divulge any communications that the former employee may have had with corporate or other counsel.  An attorney must fully explain to the former employee that he or she represents a client adverse to the corporation.  Under DR 7-104(A)(2), an attorney must not give advice to the unrepresented former employee other than advice to seek counsel in the matter.

...

Conclusion

Counsel representing an interest adverse to a corporation may communicate without the consent of a corporation's lawyer with certain current employees and former employees of the corporation, even when corporate counsel asserts blanket representation of the corporation and all its current and former employees.

...

As to communication with former employees of a corporation, these guidelines apply. While representing a client in a matter adverse to a corporation, an attorney may communicate on the subject matter of the representation with former employees of the corporation without notification or consent of corporate counsel.  Such communication would not violate DR 7-104(A)(1) when conducted within the following boundaries.  An attorney may not communicate ex parte if a former employee is represented by his or her own counsel in the matter, unless that counsel consents.  An attorney may not communicate ex parte if a former employee has asked the corporation's counsel to provide representation in the matter, unless that counsel consents.  An attorney must obtain the consent of the former employee to the interview.  An attorney must inform the former employee not to divulge any communications that the former employee may have had with corporate or other counsel.  An attorney must fully explain to the former employee that he or she represents a client adverse to the corporation.  Under DR 7-104(A)(2), an attorney must not give advice to the unrepresented former employee other than advice to seek counsel in the matter.

----------

The Supreme Court of Ohio Board of Commissioners on Grievances and Discipline

Opinion Number 96-1 (2/2/96)

This opinion addresses ex parte communications between attorneys and former employees of a corporation.

While representing a client in matters adverse to a corporation, is it proper for an attorney to communicate on the subject matter of representation with former employees of the corporation without notification or consent of corporate counsel?

...

In conclusion, this Board advises that while representing a client in a matter adverse to a corporation, an attorney may communicate on the subject matter of the representation with former employees of the corporation without notification or consent of corporate counsel. Such communication would not violate DR 7-104(A)(1) when conducted within the boundaries set forth. An attorney may not communicate ex parte if a former employee is represented by his or her own counsel in the matter, unless that counsel consents. An attorney may not communicate ex parte if a former employee has asked the corporation's counsel to provide representation in the matter, unless that counsel consents. An attorney must obtain the consent of the former employee to the interview. An attorney must inform the former employee not to divulge any communications that the former employee may have had with corporate or other counsel. An attorney must fully explain to the former employee that he or she represents a client adverse to the corporation. Under DR 7-104(A)(2), an attorney must not give advice to the unrepresented former employee other than advice to seek counsel in the matter.

Advisory Opinions of the Board of Commissioners on Grievances and Discipline are informal, nonbinding opinions in response to prospective or hypothetical questions regarding the application of the Supreme Court Rules for the Government of the Bar of Ohio, the Supreme Court Rules for the Government of the Judiciary, the Code of Professional Responsibility, the Code of Judicial Conduct, and the Attorney's Oath of Office.

----------

### Johnson v. Ohio Dept. of Youth Services,
231 F.Supp.2d 690, N.D.Ohio, Dec 03, 2002

Disciplinary rule under Ohio Code of Professional Responsibility barring communication with represented party does not prohibit ex parte contact with a former employee of represented government department. Code of Prof.Resp., DR 7-104(A)(1).

"Ex parte contact with a former employee is not, however, prohibited. *United States v. Beiersdorf-Jobst, Inc.,* 980 F.Supp. 257, 260- 61 (N.D.Ohio 1997). The issue raised by defendants' motion to strike is, accordingly, whether Mr. Parrish is affiliated with the Department and remains such that he should be deemed to be a "party ... represented by a lawyer in [this] matter," as those terms are used in D.R. 7-104(A)(1). I conclude that he is not; therefore, the motion to strike shall be overruled because it was not improper for plaintiff's attorney to have contacted Mr. Parrish or to have secured his affidavit.
Mr. Parrish is not on a leave of absence: he his retired due to disability. Though Ohio law may give him a right to return when and if his health is restored, there is nothing in the record that would indicate that either he or the Department has any present expectation, or is likely to develop a future expectation, that he will, in fact, someday be back at work. Even if Mr. Parrish's continuing relationship were such that he could be viewed as a current employee (i.e., his absence from the office was temporary, and he and the

82

Department expected that he would be returning in due course), <u>D.R. 7-104(A)(1)</u> does not prohibit plaintiff's counsel's contact with him. The Rule bars ex parte contact only with employees with "authority to bind the government [or] to settle a litigable matter" or whose "act or omission gave rise to the matter."
None of these circumstances exists. Nothing Mr. Parrish may say can bind the Department. He cannot settle this case. Nothing he did or failed to do is alleged to give rise to plaintiff's complaint. As in *Beiersdorf-Jobst,* "the underlying rationale behind the rule, *i.e.,* maintaining the integrity of the attorney-client relationship, is not undermined by allowing uncounseled interviews with former employees who have no existing relationship with, and therefore cannot bind, a represented corporation." <u>980 F.Supp. at 261</u>."   Id., at 692

----------

## U.S. v. Beiersdorf-Jobst, Inc.,
980 F.Supp. 257, N.D.Ohio, Sep 26, 1997

Proscription against communications with represented parties created by Ohio Code of Professional Responsibility does not extend to bar ex parte communications with former employees of represented corporation. <u>Ohio Code of Prof.Resp., DR 7-104(A)(1)</u>.

"My review of case law and opinions from both the state and national ethics committees convinces me that the proscription against communications with represented parties does not extend to former employees of a represented corporation. Nothing in the text of <u>DR 7-104(A)(1)</u> indicates that it was meant to forbid *ex parte* communications with ex-employees. Moreover, the underlying ***262** rationale behind the rule, *i.e.,* maintaining the integrity of the attorney-client relationship, is not undermined by allowing uncounseled interviews with former employees who have no existing relationship with, and therefore cannot bind, a represented corporation.
Furthermore, policy considerations militate against restricting communications with former employees. A basic cornerstone of our judicial system is the unimpeded flow of information between adversaries to encourage the early detection and elimination of both undisputed and meritless claims. Requiring the approval and the presence of corporate counsel would have the inevitable effect of chilling the exchange of information, because former employees would most likely be hesitant about speaking freely in the presence of their former employer's attorney. See <u>Polycast, 129 F.R.D. at 627</u> ("former employees often have emotional or economic ties to their former employer and would sometimes be reluctant to come forward with potentially damaging information if they could only do so in the presence of the corporation's attorney").

After considering the case law construing <u>DR 7-104(A)(1)</u> and its counterpart, Model Rules Rule 4.2, the purposes of these ethical standards, and the policies of modern-day adversarial litigation, I hold that attorneys practicing in the Northern District of Ohio are not barred from *ex parte* communications with former employees of adverse corporations. In so holding, I recognize that at the heart of Jobst's argument is its concern that statements made by former employees will be admissible against it as party admissions. I have already found that such statements cannot be party admissions if made by an employee who is no longer employed by and has no continuing relationship with Jobst. However, should the government attempt to admit such statements against Jobst as party admissions, Jobst can then move for exclusion of such statements."
Id., at 261-262

/////////////////////////////

## Oklahoma

Oklahoma Rules of Professional Conduct, Rule 4.2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMITTEE COMMENT

...

In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).

...

----------

Oklahoma Bar Association Articles by the Ethics Counsel
http://www.okbar.org/members/ethicscounsel/articles/051504.htm

Hendryx, G., (OBAEthics Counsel), Can I Communicate with Another Lawyer's Client? Compliance with Rule 4.2

Oklahoma Rules of Professional Conduct 4.2 (O.R.P.C. 4.2) prohibits a lawyer from communicating about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. By restricting lawyers from communicating directly with persons who are represented, Rule 4.2 preserves the attorney-client relationship, protects clients against overreaching by other lawyers, and reduces the likelihood that clients will disclose confidential or damaging information (ABA Formal Ethics Op. 95-396, 1995)

....

These are only but a few of the dilemmas faced by attorneys when complying with Rule 4.2 communications. Much more complex issues are raised when the represented party is an organization with current and former employees. Care should be taken to review the applicable case law before contacting persons who may be represented in a matter. Violation of the rule may result in suppression of the evidence, return of documents, monetary sanctions, disqualification and discipline.

----------

**Fulton v. Lane,**
829 P.2d 959, 1992 OK 25, Okla., Feb 14, 1992

84

After attorney for plaintiff whose husband allegedly received negligent care and maintenance at defendant corporation's nursing home conducted ex parte interviews with nursing home employees, nursing home obtained court order prohibiting all ex parte communications with any employee or former employee of nursing home, and plaintiff petitioned for writ of mandamus. The Supreme Court held that rule concerning ex parte communications with party represented by counsel barred plaintiff's attorney only from speaking with those employees with authority to bind the corporation.
Writ granted.

"Rule 4.2, 5 O.S.Supp.1988, Ch. 1, App. 3-A, prohibits ex parte communications about the subject of representation with a party the lawyer knows to be represented by counsel without the consent of the opposing attorney. However, the Committee Comments to Rule 4.2 indicate that not all communication with the employees of an organization represented by counsel are prohibited. The Committee Comment provides in pertinent part:
"... In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other persons whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization...."
4) Rule 4.2 does not prohibit communications with all of St. Simeon's employees and former employees. However, its application may extend beyond those employees controlling the corporation. _Upjohn Co. v. United States_, 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584, 591-92 (1981). In litigation involving corporations, Rule 4.2 applies to only those employees who have the legal authority to bind a corporation in a legal evidentiary sense, i.e., those employees who have "speaking authority" for the corporation. _Chancellor v. Boeing Co._, 678 F.Supp. 250, 252-53 (D.Kan.1988); _Wright_, supra; Annot., "Right of Attorney to Conduct Ex Parte Interviews with Corporate Party's Nonmanagement Employees," 50 A.L.R.4th 652, 657-58 (1986).
5) Fulton is prohibited from conducting ex parte interviews with St. Simeon employees if they have managing authority sufficient to give them the right to speak for, and bind, the corporation. Because former employees may not speak for or bind the corporation, ex parte communications with former employees are not prohibited."   Id., at 960

////////////////////////////////

## Oregon

Oregon Rules of Professional Conduct. Rule 4.2

Communication with Person Represented by Counsel

In representing a client or the lawyer's own interests, a lawyer shall not communicate or cause another to communicate on the subject of the representation with a person the lawyer knows to be represented by a lawyer on that subject unless:

(a) the lawyer has the prior consent of a lawyer representing such other person;

(b) the lawyer is authorized by law or by court order to do so; or

(c) a written agreement requires a written notice or demand to be sent to such other person, in which case a copy of such notice or demand shall also be sent to such other

85

person's lawyer.

----------

Oregon State Bar Formal Ethics Opinon No. 1991-80

Communicating with Represented Persons:

Current and Former Employees of Entities Represented by Counsel, Attorney-Client Privilege

Facts:

Plaintiff's Attorney represents Plaintiff in litigation against Corporate Defendant. Corporate Defendant is represented by Defense Attorney.  Current Employee is a current employee of Corporate Defendant.  Former Employee is a former employee of Corporate Defendant.  Current Employee and Former Employee are not separately represented by Defense Attorney or by other counsel.

Questions:

1.    May Plaintiff's Attorney talk to Current Employee about the facts of the underlying dispute without the permission of Defense Attorney?

2.    May Plaintiff's Attorney talk to Former Employee about the facts of the underlying dispute without the permission of Defense Attorney?

3.    May Plaintiff's Attorney discuss with Current Employee or Former Employee communications between Current Employee or Former Employee on the one hand and Defense Attorney on the other?

Conclusions:

1.    See discussion.

2.    Yes.

3.    No, qualified.

Discussion:

…

With respect to Former Employee, the simple answer is that former employees and former officers and directors who are not in fact represented by counsel are not represented parties within the meaning of DR 7-104(A)(1). See, e.g., Wright v. Group Health Hosp., supra; Triple A Machine Shop, Inc. v. State, 213 Cal.App3d 131, 261 Cal Rptr 493 (1989).  See also ABA Formal Ethics Op No 91-359.  Consequently, DR 7-104(A)(1) does not prevent Plaintiff's Attorney from contacting Former Employee without Defense Attorney's permission.

Plaintiff's Attorney may not, however, use any conversations with Current Employee or Former Employee to invade Corporate Defendant's attorney-client privilege.  Thus, Plaintiff's Attorney may not ask or permit Current Employee or Former Employee to disclose to Plaintiff's

86

Attorney any communications that Current Employee or Former Employee had with Defense Attorney pertaining to their employment.  Cf. ORS 9.460(3); DR 4-101; Amarin Plastics, Inc. v. Maryland Cup Corp., 116 FRD 36, 42 (D Mass 1987); Porter v. Arco Metals Div., supra, 642 F Supp at 1118.  See also OSB Legal Ethics Op Nos 1991-50, 1991-44.

This limitation applies to Plaintiff's Attorney's conversations with Current Employee even if Current Employee is not a represented party within the meaning of DR 7-104(A)(1).  This is due, inter alia, to the 1987 amendment to the definition of "representative of the client" in OEC 503(1)(d), which eliminated the control group test for attorney-client privilege and provided, in effect, that all employees could have conversations with corporate counsel that would be subject to the corporation's attorney-client privilege.  CF. Upjohn Co. v. United States, 449 US 383, 394, 101 S Ct 677, 66 L Ed2d 584 (1981).

This prohibition also applies to Plaintiff's Attorney's conversations with Former Employee about communications that Former Employee may have had with Corporate Counsel either before or after Former Employee left Corporate Defendant's employment.  Communications by Corporate Counsel with a former corporate employee about the subject of that former employee's employment are subject to attorney-client privilege.  See, e.g., Upjohn Co. v. United States, supra, 449 US at 402-403 (Burger, C.J., concurring); Admiral Ins. v. U.S. Dist. Court for Dist. of Ariz., 881 F2d 1486, 1493 (9th Cir 1989); Command Transp., Inc. v. Y.S. Line (USA) Corp., 116 FRD 94, 97 (D Mass 1987); Amarin Plastics, Inc. v. Maryland Cup Corp., supra, 116 FRD at 42.

It follows that unless Corporate Defendant has waived its attorney-client privilege or the conversations between Defense Attorney on the one hand and Current Employee or Former Employee on the other are not privileged for some other reason (because, for example, third parties unrelated to Corporate Defendant were present), Plaintiff's Attorney may not discuss with Current Employee or Former Employee any communications that they may have had with Defense Attorney.

Approved by Board of Governors, July 1991.

----------

**Brown v. State of Or., Dept. of Corrections,**
173 F.R.D. 265, 73 Fair Empl.Prac.Cas. (BNA) 1852, D.Or., May 02, 1997

Former public employee bringing race discrimination claim against his former employer could informally contact former employees of his former employer, even those whose conduct when employed at former employer is now at issue or those who were formerly in management positions, and employees who were transferred to another state agency were treated as former employees. Or.Code of Prof.Resp., DR 7-104.

"Relying again on Opinion No.1991-80, the court finds that all former employees, even those whose conduct when employed at the Department of Corrections is now at issue or those who were formerly in management positions, are not represented parties within the meaning of DR 7-104 and may be contacted *ex parte* by Brown's attorney.
3. *Employees Now Working at a Different State Agency*
Brown questions whether an employee who formerly worked at the Department of Corrections, but is now working for another agency of the State of Oregon, should be treated as a current employee or a former employee. The defendants contend that transferred employees should be classified as former employees when analyzing these issues because, although the Attorney General's office represents all agencies of the

87

State of Oregon, it does not do so until asked.

Agencies of the State of Oregon are treated as separate entities by the court. Conduct occurring in one agency is not imputed to another agency; knowledge of one agency is not imputed to another agency. An employee**269** who is transferred from the Department of Corrections to another agency of the State of Oregon shall be treated as a former employee of the Department of Corrections when analyzing these issues.

4. *Attorney-Client Privilege*

In Opinion No.1991-80, the Oregon State Bar states that an attorney making *ex parte* contacts with either current or former employees must be extremely cautious to avoid invading the attorney-client privilege claimed by the opposing party. Brown's attorney shall abide by this restriction. In particular, he may neither ask nor permit a current or former employee to disclose privileged communications. If counsel for Brown recognizes that an interviewee is disclosing privileged communications, he shall stop the interviewee from continuing to speak and explain the restriction to that person.

5. *Required Disclosures*

Counsel for Brown has offered to advise all current and former employees being interviewed *ex parte* of the following information:

(1) counsel's representative capacity;

(2) counsel's reason for seeking the interview;

(3) the right of the current or former employee to refuse to be interviewed; and

(4) the right of the current or former employee to have his or her own counsel present during the *ex parte* contact.

The defendants have also asked for these disclosures, along with the advance notice which the court determined above was unnecessary. In *Carter-Herman v. City of Philadelphia,* 897 F.Supp. 899, 904 (E.D.Pa.1995), the court required these four pieces of information to be disclosed prior to *ex parte* interviews concerning sex discrimination within a police department. This court believes that this limited disclosure is in the spirit of another ethical rule, DR 1- 102(A)(3), which considers it professional misconduct for a lawyer to "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." Accordingly, counsel for Brown, or counsel's agents, shall disclose these four pieces of information at the beginning of any *ex parte* contact so that the person will be fully informed before agreeing to talk. If the person declines to be interviewed, the contact shall end.   Id., at 268-269

//////////////////////////

## Pennsylvania

Pennsylvania Rules of Professional Conduct, Rule 4,2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

COMMENT

...

[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be

FAC Resp. Exhibit B -- 1977

imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4.

...

----------

Pennsylvania Ethics Opinion 90-142, 1990 WL 678969 (12/7/90)

Pennsylvania Bar Association Committee on Legal Ethics and Professional Responsibility

**\*1** COMMUNICATING WITH EMPLOYEES AND FORMER EMPLOYEES OF ADVERSE PARTY

The Legal Ethics and Professional Responsibility Committee of the Pennsylvania Bar Association has received numerous inquiries concerning the extent to which lawyers may contact existing and former employees of opposing corporate plaintiffs or defendants. The Committee has evaluated the applicable Rules of Professional Conduct, existing case law, and related ethics opinions in order to develop guidelines to govern attorney conduct. The conclusions and supporting rationale of the Committee appear as follows.

I. CONCLUSIONS OF THE COMMITTEE

The Committee concludes as follows:

1. Unless a lawyer has the consent of opposing counsel or is authorized by law to do so, in representing a client, a lawyer shall not conduct ex parte communications about the matter of the representation with:

a. present managerial employees of an opposing party, and with any other employee whose acts or omissions may be imputed to the corporation for purposes of civil or criminal liability;

b. present employees of an opposing party whose statements may constitute admissions on the part of the corporation; and

c. present or former employees of an opposing party when there is a substantial likelihood that the communication will cause or elicit the disclosure of confidential information subject to the attorney-client privilege.

2. A lawyer representing a client may conduct ex parte communications about the matter of the representation with:

a. present and former employees of an opposing party if such party's counsel consents;

b. present and former employees of an opposing corporation if ex parte communication is specially authorized by law;

c. present nonmanagerial employees of an opposing party who have not made acts or omissions in connection with the matter in issue that may be imputed to the party for purposes of its liability and whose statements will not constitute admissions on the part of the corporation; and

d. former employees of an opposing party under the conditions set forth in Part V of this Opinion.

3. A lawyer may not under any circumstances contact an existing or former employee of the opposing party that she knows to be represented by separate counsel without the consent of that counsel.

...

V. FORMER EMPLOYEES

89

We also are of the view that an organization's asserted proprietary interest in controlling the testimony of former employees is less significant and may be counterbalanced by the opposing party's discovery rights. [FN12] Cf. Amarin Plastics, Inc. v. Maryland Cup Corp., 116 F.R.D. 36, 41 (D.Mass.1987) (permitting informal contacts with company's ex-president only because he had left its employ before the contract dispute giving rise to suit); Neisig v. Team I, 76 N.Y.2d 363, 558 N.E.2d 1030, 1032 (1990) (holding that DR 7-104(A)(1) applies only to current employees, not to former employees); see also Law of Lawyering § 4.2:107, at 738-39 (Former intermediate and higher level employees "should be allowed to decide for themselves whether they are still so attached to the organization as to refuse to give statements except in the presence of the organization's lawyer.").

While the Committee believes that its approach to the former employee issue reflects the prevailing sentiment, attorneys should be cognizant of a recent federal court decision in New Jersey construing the Comment to preclude virtually any ex parte contact with former employees of an organization. In Public Service Electric and Gas Company v. AEGIS, 745 F.Supp. 1037 (D.N.J.1990) ("PSE & G"), [FN13] Judge Politan interpreted the "any other person" phrase in the Comment to Rule 4.2 to apply to former employees. He further concluded that, wherever there is the "possibility" that the statement of a witness will be imputed [FN14] to the organization, ex parte contact must be prohibited. [FN15] Id. at 1042. The PSE & G court's "understandable bright line test" admittedly "has the decided benefit of simplicity." At the same time, however, it forecloses certain avenues of informal discovery and virtually mandates the need for costly formal depositions of even tangential witnesses.

*10 The Committee concludes, contrary to the PSE & G ruling, that the theory that former employees are impliedly represented by their former employers is a fiction which operates to preclude legitimate fact gathering efforts by opposing counsel. With appropriate safeguards, the risk of overreaching by the investigating party should be minimized, while at the same time protecting an attorney's right to learn and assemble information off-the-record without fear of facing disciplinary action or disqualification. Therefore, the Committee concludes that Rules 4.2 and 4.3 permit an attorney to communicate with an organization's unrepresented former employees under the following conditions:

(1) the attorney (or anyone under her direction) is prohibited from eliciting or using information that may be protected by the attorney-client privilege;

(2) the attorney immediately must disclose her capacity to the former employee;

(3) if the person contacted requests that her personal attorney or the company's attorney be present for the interview, the request must be honored; and

(4) the attorney should advise such persons that they have the right to refuse to be interviewed or, if they wish, to be interviewed with the company's counsel present.

Where an attorney is in doubt about whether she is authorized to pursue informal discovery of current or former employees, it is sound practice to seek consent of opposing counsel or advance court approval to interview them. See University Patents. Inc. v. Kligman, C.A. No. 89-3525, slip op. at 4 (E.D.Pa. May 7, 1990); Cagguila v. Wyeth Laboratories Inc., 127 F.R.D. 653, 654 (E.D.Pa.1989); Neisig v. Team I, 149 A.D.2d 94, 545 N.Y.S.2d 153 (1989); Wyeth, "Talking to the Other Side's Employees and Ex-Employees," Litigation, Vol. 15, No. 4, at 59 (Summer 1989).

VI. SUMMARY

Under Rule 4.2, absent the consent of opposing counsel or authorization by law, an attorney is prohibited from interviewing a current managerial employee and any other employee whose actions or omissions in connection with the matter in issue may be imputed to the corporation for purposes of civil or criminal liability or when an employee's statement may constitute an admission on the part of the organization. However, the fact that a former employee had managerial authority while employed is not sufficient to prevent ex parte communication.

90

Moreover, even where ex parte communication with either a current or former employee of an organization is authorized, an attorney is precluded from eliciting the disclosure of information subject to the attorney-client privilege.

----------

**Pritts v. Wendy's of Greater Pittsburgh, Inc.,**
1998 WL 1004930, 37 Pa. D. & C.4th 158, Pa.Com.Pl., Jun 23, 1998

Defendant was not entitled to a protective order precluding plaintiffs' counsel from interviewing former employers of defendant who were not represented by counsel.


"Most of the persons whom plaintiffs' seeks to interview are former employees. Neither the text of Rule 4.2 nor its comments specifically refer to former employees. Rule 4.2 does not cover communications with unrepresented persons. While certain persons who are connected with an organization that is represented by counsel should be covered by the representation by virtue of their relationship with that organization, a person who no longer has any relationship with the organization cannot be considered a client. Rule 4.2 bars a lawyer from communicating with "a party the lawyer knows to be represented by another lawyer in the matter." A former employee who has no existing relationship with a corporate party is not a "party." Therefore, the language of Rule 4.2 does not reach communications with former employees who have not retained counsel.
This ruling that Rule 4.2 does not prohibit ex parte communications with any former employees of an opposing party is consistent with formal opinion 91- 359 issued by the American Bar Association Committee on Ethics and Professional Responsibility which considered the prohibitions of Rule 4.2 with respect to contacts with a former employee of an opposing party."   Id., at 164


"On December 7, 1990, the Pennsylvania Bar Association's Committee on Legal Ethics and Professional Responsibility issued formal opinion no. 90-142 which addressed the issue of the extent to which lawyers may contact existing and former employees of opposing corporate plaintiffs or defendants. With respect to former employees, the committee concluded that Disciplinary Rules 4.2 and 4.3 allow an attorney to communicate with an organization's unrepresented former employees under the following circumstances:
"(1) The attorney is prohibited from eliciting or using information that may be protected by the attorney-client privilege;
"(2) The attorney must immediately disclose his or her capacity to the former employee;
"(3) If the person contacted requests personal counsel or the company's counsel to be present for the interview, the request must be honored;
"(4) The attorney should advise former employees that they have the right to refuse to be interviewed **167** or, if they wish, to be interviewed with the company's counsel present;
"(5) The lawyer may not contact a former employee of the opposing party that the lawyer knows to be represented by separate counsel without the consent of that counsel."
In his brief, plaintiffs' counsel recognizes that any ex parte communications with former employees are subject to the constraints of the attorney-client privilege. Under Disciplinary Rule 4.3, plaintiffs' counsel is required to disclose his capacity to former employees; I have no reason to believe that plaintiffs' counsel does not intend to do so. Under Rule 4.2, plaintiffs' counsel cannot contact a former employee who has retained counsel; I have no reason to believe that plaintiffs' counsel intends to do so.
*7 As to the remaining two requirements, it appears from plaintiffs' brief that plaintiffs' counsel intends to follow ABA formal opinion 91-359 which does not impose requirements that the attorney advise former employees that they have the right to refuse to be

91

interviewed or, if they wish, to be interviewed with the company's counsel present. Obviously, an attorney violates Rule 4.3 if the attorney causes an unrepresented person to believe that he or she has an obligation to submit to an interview or if the attorney disregards the request of an unrepresented person that the interview be terminated. However, Rule 4.3 does not impose a "Miranda" requirement that unrepresented persons be advised that they have the right to refuse to be interviewed or to be interviewed only with the company's attorney present. Furthermore, since Rule 4.2 does not extend to former employees, this rule cannot be the source of any "Miranda" requirement. Consequently, there is no source for this "Miranda" requirement in the Rules of Professional Conduct."   Id., at 166-167

----------

### Spencer v. Steinman,
179 F.R.D. 484, 41 Fed.R.Serv.3d 398, E.D.Pa., Jun 01, 1998

Even assuming that "no contact" rule precluding contact between a lawyer and an opposing party was applicable to defendant's former counsel, rule did not prohibit contact with defendant's former counsel in which he was asked by counsel for plaintiff for his personal recollection about an event he allegedly witnessed; plaintiff's counsel was not seeking disclosure of information which would either bind defendant or constitute an admission by an agent of defendant, and inquiry did not tread upon communication protected by the attorney-client privilege. Rules of Prof.Conduct, Rule 4.2, 42 Pa.C.S.A.

"In general terms, Rule 4.2 prohibits contacts between a lawyer and a party who is represented by a lawyer concerning the matter in controversy. Pa. Rule of Professional Conduct 4.2 cmt. Even assuming that former counsel could be deemed a "former employee" for purposes of the reach of Rule 4.2, there is substantial controversy as to whether this "no contact" rule applies at all to contacts with former employees. See Action Air Freight, Inc. v. Pilot Air Freight Corp., 769 F.Supp. 899, 902 (E.D.Pa.1991) (collecting cases). In fact, neither the text nor the accompanying commentary to Rule 4.2 expressly refer to "former employees." Moreover, even assuming that Rule 4.2 applies to contacts between counsel and former employees, the courts are in disagreement as to the type and nature of the contacts prohibited by the Rule.
Some courts have agreed that permitting ex parte contacts by opposing counsel with former employees does not impinge upon the attorney-client relationship and, therefore, have concluded that there is no general bar against such contacts. .....Yet, at least one court has staked a middle ground, calling for an assessment of the likelihood that the contact in question has actually impaired the policy underlying Rule 4.2, of protecting privileged information from being disclosed to an opponent in litigation. Under this approach:
That assessment would depend upon weighing such factors as the positions of the former employees in relation to the issues in the suit; whether they were privy to communications between the former employer and its counsel concerning the subject matter of the litigation, or otherwise; the nature of the inquiry by opposing counsel; and how much time had elapsed between the end of the employment relationship and the questioning by opposing counsel. When such factors point to the conclusion that there is a substantial risk of disclosure of privileged matters, as opposed to the risk of the adverse party learning information which might be damaging to the former employer's litigation position, then appropriate notice should be given to the former employees concerning the prohibition against disclosing attorney-client confidences of the former employer and, perhaps, the former employer's counsel should be notified prior to any ex parte interview. Any question concerning the appropriateness of the adversary's decision to proceed with ex parte contact with specific former employees can be resolved by determining whether any information gathered by the opponent actually intrudes upon

92

privileged matters. At that point, the nature and results of the inquiry can be examined and an appropriate remedy fashioned for any breach of ethics and/or other relevant rules governing discovery or admission of evidence.
*Dillon Companies, Inc. v. Sico Co.*, No. 92-1512, 1993 WL 492746, at *5 (E.D.Pa. Nov. 24, 1993).
The Court is persuaded that the *Dillon* factors reflect a sensible and policy-oriented middle ground and, in the absence of a bright-line test adopted by either the Pennsylvania Supreme Court or the Third Circuit, will apply them to inform its judgment in this case."   Id., at 490-491

///////////////////////////////

## Rhode Island

Rhode Island Rules of Professional Conduct, Rule 4.2

Communication with person represented by counsel.

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENTARY

...

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f)....

----------

Ethics Advisory Panel of Rhode Island SupCt, Opinion 91-74 (10/30/91)

Digest of Ethics Advisory Panel

An attorney seeks Panel advice as to permissible conduct by attorneys when performing discovery involving former employees of parties in litigation.

The Panel takes the position that the Rhode Island Rules of Professional Conduct do not prohibit attorneys and their agents from conducting ex parte interviews of former employees of an adverse corporate party.  Also, the ABA Standing Committee on Ethics and Professional Responsibility issued Formal Opinion 91-359 entitled "Contact with Former Employee of Adverse Corporate Party" which concludes that Rule 4.2 does not prohibit ex parte interviews of former employees of an adverse corporate party.  Courts have recognized that Rule 4.2 was not meant to cover a corporate party's former employees, but is applicable only when a "party" witness is involved.  Polycast

93

Technology Corp. v. Uniroyal, Inc., 129 F.R.D. 621, 625 (S.D.N.Y.) 1990), Amland Properties v. Alcoa, et al., Civ. No. 86-1830 (D.N.J. January 28, 1991).

Rule 4.3, entitled "Dealing with Unrepresented Person" requires only that when dealing with a person who is not represented by counsel, the lawyer shall 1) make no misrepresentation of disinterest and 2) if the lawyer becomes aware that there is a misunderstanding, then the lawyer shall make reasonable efforts to correct the misunderstanding.

//////////////////////////////

## South Carolina

South Carolina Rules of Professional Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENT:

...

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).

...

----------

South Carolina Bar Ethics Advisory Opinion 01-01

Upon the request of a member of the South Carolina Bar, the Ethics Advisory Committee has rendered this opinion on the ethical propriety of the inquirer's contemplated conduct. This Committee has no disciplinary authority. Lawyer discipline is administered solely by the South Carolina Supreme Court through its Commission on Lawyer Conduct. ...

FACTS:

Attorney wishes to investigate a possible suit against Corporation X in a premises liability case. One theory of liability is that corporation's Former Employee was negligent in failing to adequately clean the floor. Another theory is that the corporation was negligent in failing to provide Former Employee with enough assistance or supplies to adequately clean the floor. Former Employee no longer works for Corporation X.

94

Prior to filing suit, Attorney would like to contact Former Employee of Corporation X to investigate the claim. No suit has been filed, and Corporation X has not been put on notice of the claim.

QUESTIONS:

1. May Attorney contact Corporation X's Former Employee to investigate the claim prior to filing suit?

2. Are there any limitations on Attorney's ability to interview Corporation X's Former Employee?

3. If an interview provides favorable information, may Attorney obtain an affidavit from Former Employee prior to filing suit?

SUMMARY:

Under the Rules of Professional Conduct, Attorney may contact Former Employee of Corporation X so long as Former Employee is not represented by counsel and Attorney fully discloses the nature of the matter and purpose of the contact. Attorney must be acutely aware of his obligations under rule 4.4, and be careful not to elicit the privileged or confidential information of Corporation X.

OPINION:

…

Although not expressly asked, it is important to address the question of whether Former Employee may be contacted when Attorney has knowledge that Corporation X is represented by counsel. Application of Rule 4.2 to these facts, again, allows contact with Former Employee. Former Employee is not a party in the matter because he or she no longer works for Corporation X. Former Employee may once have been a "party" under this Rule, but he or she no longer is when the employment ceases. Termination of the employment relationship precludes the ability of Corporation X to be bound by anything Former Employee says or does. See, South Carolina and Federal Rule of Evidence 801(d)(2)(D) (admission by Party-Opponent is "a statement made by the party's agent, or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." (emphasis added)). Former Employee is not represented by counsel for Corporation X for purposes of Rule 4.2. To the extent our Ethics Advisory Opinion 97-36 is inconsistent with this opinion, it is hereby expressly overruled. See generally, ABA Formal Opinions 91-359 (1991) ("prohibition of Rule 4.2 with respect to contacts by a lawyer with employees of an opposing corporate party does not extend to former employees of that party") and 95-396 (1995) ("It should be noted that Rule 4.2 does not prohibit contacts with former officers or employees of a represented corporation, even if they were in one of the categories with which communication was prohibited while they were employed.")

With respect to the second question posed regarding limitations on Attorney's ability to interview Former Employee, it is helpful to review the requirements of Rule 4.3. This rule states:

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

Attorney must inform Former Employee of his or her role, the identity of Attorney's client, the fact that former employer is an adverse party, and why Attorney seeks to interview Former Employee.

95

It is also extremely important to review Rule 4.4 which states:

In representing a client, a lawyer shall not use means that have no purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person. (emphasis added).

Attorney must be careful when delving into confidential or privileged areas in the interview with Former Employee. Attorney must be careful, however, not to seek to induce Former Employee to violate the privilege attaching to attorney-client communications to the extent his or her communications as a former employee with his or her former employer's counsel are protected by the privilege. Such an attempt would violate Rule 4.4. Likewise, it may be improper to induce a former employee to divulge other types of confidential or proprietary material under Rule 4.4. See Camden v. State of Maryland, 910 F.Supp. 1115, 1116 (D. Md. 1996) ("a lawyer representing a client in a matter may not, subject to a few exceptions, have ex parte contact with the former employee of another party interested in the matter when the lawyer knows or should know that the former employee has been extensively exposed to confidential client information of the other interested party.").

With respect to the last inquiry posed, Attorney may obtain an affidavit from Former Employee prior to filing suit, as long as none of the rules above are violated.

The Committee admonishes the Bar to be careful when contemplating contact with former employees. "The attorney who seeks [prior] court approval does not risk an ethical violation, but one who does not acts at his or her own peril." In re Aircrash Disaster, 909 F.Supp. 1116 (N. D. Ill. 1995). Such an interview is "a veritable minefield in which. . . . short and tentative steps are the most appropriate." Driggs Reorg. Corp. v. Driggs, 217 B.R. 67 (D. Md. 1988). Because the American Bar Association Standing Committee on Ethics and Professional Responsibility or the South Carolina Ethics Advisory Committee provides a particular analysis and interpretation of Rule of Professional Conduct 4.2, does not mean that a particular court in or outside the State of South Carolina will draw the same conclusions. Of particular note is that federal law governs the conduct of attorneys in federal courts. In re Snyder, 472 U.S. 634, 645 n.6 (1985).

...

In Florida, some courts draw the line not on the nature of the prior employment, but rather on the former employee's knowledge. Contact may be had with any ex-employee, but no confidential information may be elicited. Rent Club Inc. v. TransAmerica Rental Finance Corp., 811 F.Supp. 651 (M.D. Fla. 1992). In another case, however, a Florida court decided that ex-employees can be freely interviewed ex parte, but only subject to a series of guidelines that range from counsel identifying him or herself as adverse to the former employer to counsel delivering all of his or her work product to the other side, listing the employees contacted and all interview notes. Lang v. Reedy Creek Improvement District, 888 F.Supp. 1143 (M.D. Fla. 1995).

Without being mindful of the views of various courts and jurisdictions on this subject, attorneys may find their evidence excluded and themselves disqualified from further representation. See, Zachair Ltd. v. Driggs, 965 F.Supp. 741 (D. Md. 1997). It is the interpretation of this Committee, however, that Rule 4.2 does not, at present, preclude ex parte communications with former employees. Any other interpretation "should be made by a duly promulgated amendment to the rule itself, rather than by the gloss of caselaw." Davidson Supply Co., Inc. v. P.P.E., Inc., 986 F.Supp. 956, 958 (D. Md. 1997) (disagreeing with the Zachair opinion and relying upon the interpretation of Rule 4.2 given by the Maryland State Bar Association).

///////////////////////////

96

## South Dakota

South Dakota Codified Laws Rules of Professional Conduct, Rule 4.2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

COMMENT:

...

[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4.

**Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.,**
144 F.Supp.2d 1147, D.S.D., Apr 23, 2001

"The Court is not here concerned with the voluminous number of cases addressing whether former employees of an organization may be contacted, because the investigator here contacted one current employee of Elliott Power Sports and Jon Becker, current owner of A-Tech...."

"However, like the district court in *Terra Int'l, Inc.,* the Court rejects a total ban on *ex parte* contacts with current employees of an organization or corporation, and the Court rejects as well unrestricted *ex parte* contacts with current employees of an organization or corporation. *Terra Int'l, Inc.,* 913 F.Supp. at 1320. Any current corporate or organization employee who is represented by counsel may not be contacted *ex parte* by opposing counsel. *Hill v. St. Louis Univ.,* 123 F.3d 1114, 1117 (8th Cir.1997). Additionally, the Court adopts the *Cole* holding, 903 F.Supp. at 979, that counsel or counsel's agent may not conduct *ex parte* interviews with five classes of an adversary corporation's or organization's current employees under Rule 4.2, unless counsel has the consent of the opposing attorney or is otherwise authorized by law to make such *ex parte* contact:
1. Current officials of the corporation or organization who have managerial responsibility;
2. Other current corporate or organizational employees whose act or omission in connection with the matter may be imputed to the corporation or organization for

97

purposes of civil or criminal liability;
3. Those who are responsible for implementing the advice of the corporation's or organization's lawyers;
4. Any members of the corporation or organization whose own interests are directly at stake in a representation; and
5. An agent or servant of the corporation or organization whose statement **1157** concerns a matter within the scope of the agency or employment, which statement was made during the existence of the relationship and which is offered against the corporation or organization as an admission. However, *ex parte* interviews of employees who are "mere witnesses" to an event for which the corporation or organization is sued (i.e., holders of factual information), are permitted. Depending upon the information sought, *ex parte* questioning could be done under the fifth category."   Id., at 1156-1157

/////////////////////////////

## Tennessee

Tennesse Rules of Professional Conduct, Rule 4.2

Communication With a Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Comments

...

(4) If an agent or employee of an organization is represented in the matter by his or her own counsel, consent by that counsel will be sufficient for purposes of this Rule. Consent of the organization's lawyer is not required for communication with a former agent or employee. See Rule 4.4 regarding the lawyer's duty not to violate the organization's legal rights by inquiring about information protected by the organization's attorney-client privilege or as work-product of the organization's lawyer. In communicating with a current or former agent or employee of an organization, a lawyer shall not solicit or assist in the breach of any duty of confidentiality owed by the agent to the organization. See RPC 4.4.
...

----------

Board of Professional Responsibility of the Supreme Court of Tennessee, Formal Ethics Opinion 83-F-46

Inquiry is made by the plaintiff's attorney concerning the propriety of interviewing non-management or non-administrative level employees of a corporate defendant, to determine the facts of a disputed matter, without the knowledge or consent of the corporation or its attorney.

...

Generally, a lawyer may interview witnesses or prospective witnesses for opposing sides without the prior consent of opposing counsel.

98

Non-management and non-administrative level employees of an adverse party are to be considered as witnesses.  The provisions of DR 7-104(A)(1) do not apply to witnesses.  However, the management or administrative level employees of an adverse party are to be considered and treated as adverse parties.  The provisions of DR 7-104(A)(1) fully apply to management and administrative level employees.  See ABA Informal Opinion 1377.

There is no impropriety in the plaintiff's attorney interviewing non-management or non-administrative level employees of a corporate defendant without the knowledge or consent of the corporation or its attorney, provided the attorney identifies himself and informs the employee of the controversy and the reason for the inquiry prior to the interview.

----------

**Sherrod v. Furniture Center,**
769 F.Supp. 1021, 56 Fair Empl.Prac.Cas. (BNA) 1039, W.D.Tenn., Jan 10, 1991

Sexual harassment plaintiff's counsel's ex parte contact with former employee of corporate defendant did not violate rule prohibiting ex parte contacts with represented parties, in that defendant was not bound by former employee's statements. Tenn.Sup.Ct.Rules, Rule 8, Code of Prof.Resp., DR 7-104(A)(1).

"This court's local rules adopt the American Bar Association's Code of Professional Responsibility as its standards of professional conduct. That code provides at DR 7-104(A)(1):
(A) During the course of his representation of a client a lawyer shall not:
(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.
The purpose of this ethical restraint is "to prevent situations in which a represented party may be taken advantage of by adverse counsel; the presence of the party's attorney theoretically neutralizes the contact." *Wright v. Group Health Hospital,* 103 Wash.2d 192, 691 P.2d 564, 567 (1984). At the same time the rule should not be interpreted to preclude a lawyer from carrying on ex parte informal investigations with corporate employees if the goals of the rule are not at risk.
A corporation, acting through its individual employees, has some need for the protections of DR 7-104 as do individual clients. The question, of course, is which, if not all, corporate employees will adverse counsel be restricted from having ex parte contact. There are varying decisions but the rule that best supplies the intended protection of DR 7-104 without unnecessarily precluding the less expensive informal investigations and discovery of underlying facts from corporate witnesses is one that precludes contact only with corporate employees whose position gives them the legal authority to bind the employer in a legal evidentiary sense. By adopting this interpretation of the rule, the represented corporation cannot be bound by statements made in ex parte interviews and all parties are afforded broad latitude to otherwise investigate the case.
Former corporate employees have no authority under law to bind the corporation by their current deeds and statements. Only certain current employees can speak for the corporation. Therefore, DR 7-104(A)(1) does not apply to former employees and the plaintiff's counsel's ex parte contact with defendant's former employee is not in violation of DR 7-104(A)(1)."

99

////////////////////////////

**Texas**

Texas Disciplinary Rules of Professional Conduct, Rule 4.2

Communication with One Represented by Counsel

(a) In representing a client, a lawyer shall not communicate or cause or encourage another to communicate about the subject of the representation with a person, organization or entity of government the lawyer knows to be represented by another lawyer regarding that subject, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

(b) In representing a client a lawyer shall not communicate or cause another to communicate about the subject of representation with a person or organization a lawyer knows to be employed or retained for the purpose of conferring with or advising another lawyer about the subject of the representation, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

(c) For the purpose of this rule, "organization or entity of government" includes: (1) those persons presently having a managerial responsibility with an organization or entity of government that relates to the subject of the representation, or (2) those persons presently employed by such organization or entity and whose act or omission in connection with the subject of representation may make the organization or entity of government vicariously liable for such act or omission.

...

COMMENT:

...

4. In the case of an organization or entity of government, this Rule prohibits communications by a lawyer for one party concerning the subject of the representation with persons having a managerial responsibility on behalf of the organization that relates to the subject of the representation and with those persons presently employed by such organization or entity whose act or omission may make the organization or entity vicariously liable for the matter at issue, without the consent of the lawyer for the organization or entity of government involved. This Rule is based on the presumption that such persons are so closely identified with the interests of the organization or entity of government that its lawyers will represent them as well. If, however, such an agent or employee is represented in the matter by his or her own counsel that presumption is inapplicable. In such cases, the consent by that counsel to communicate will be sufficient for purposes of this Rule. Compare Rule 3.04(f). Moreover, this Rule does not prohibit a lawyer from contacting a former employee of a represented organization or entity of a government, nor from contacting a person presently employed by such an organization or entity whose conduct is not a matter at issue but who might possess knowledge concerning the matter at issue.

...

----------

Texas Professional Ethics Opinion No. 461 (10/88)

100

## QUESTION PRESENTED

Does the Texas Code of Professional Responsibility prohibit the plaintiff's attorney from questioning present employees of a corporate defendant concerning matters within the scope of their employment that are the subject of the pending litigation?

## FACTUAL BACKGROUND

The plaintiff brought suit in a state court in Texas against a defendant corporation, seeking damages for personal injury alleged to have been caused by negligent acts committed by employees of the defendant in the course and scope of their employment. No individual employee was named as a defendant.

After the defendant appeared and answered through its attorney, the plaintiff's attorney, personally or through his employees or agents, contacted present employees of the defendant to question them concerning matters within the course and scope of their employment which are the subject of the suit.

## DISCUSSION

Answer to the question presented is governed by DR 7104, the pertinent portion of which reads as follows: "DR 7104. Communicating With One of Adverse Interest. (A) During the course of his representation of a client a lawyer shall not: (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

Opinion 17 (December, 1948) held that Canon 9 then in effect did not preclude an attorney from interviewing a potential witness, other than a party to the suit, even though the witness may be an employee of a party to the suit, if the attorney makes a full disclosure of his connection with the litigation and explains the purpose of the interview. That opinion was qualified, however, by Opinion 342 (March, 1968) with the following modification: (1) If the employee being interviewed is the person for whose acts or omissions the defendant is sought to be held liable, such employee should be considered as a party and he should not be interviewed without the consent of the attorney for the corporate defendant by whom he was employed. (2) If the employee being interviewed is an officer or managing employee with authority to bind the corporate defendant, he should likewise be considered a party within the meaning of Canon 9.

We do not read prior Opinion 342 as prohibiting communication by a lawyer with the employee of a corporate defendant who is represented by an attorney if, and only if, both conditions set out in Opinion 342 are met. If either condition exists, the prohibition applies.

## CONCLUSION

During the course of his representation of a client, a lawyer shall not communicate or cause another to communicate on the subject of the representation with the employee of an adverse party without consent of opposing counsel if (1) the employee is an officer or managing employee or (2) the conduct (act or omission) of the employee is the basis of the litigation. If the employee with whom communication is made is not an officer or managing employee of the corporate defendant and the conduct by the employee is not the subject of the controversy, he may be interviewed by an attorney or a party opposing the corporation provided the attorney makes a full disclosure of his connection with the suit and explains the purpose of the interview.

101

----------

Texas Professional Ethics Opinion No.342 (3/68)

COMMUNICATIONS WITH ADVERSE PARTY - INTERVIEWING WITNESSES AND
OBTAINING STATEMENTS

It is not unethical for an attorney to interview and take statements from employees of an
adverse party without consent of opposing counsel provided a full disclosure is made and
provided further that the employee is not an officer or managing employee of the party
and is not the person whose conduct gives rise to the controversy.

QUESTION

Plaintiff files a damage suit against defendant corporation. Thereafter plaintiff's attorney,
or his investigator, interviews and obtains a statement from defendant's employee
without consent of defendant or defendant's counsel. Is such conduct a violation of Canon
9?

OPINION

...

These Canons, however, do not prohibit communications with employees of an adverse
party and this Committee held, in Opinion 17 (December, 1948), that an attorney may
interview an employee of a party provided the attorney makes a full disclosure of his
connection with the suit and explains the purpose of the interview. To the same effect is
ABA Opinion 117 (August, 1934). We approve those opinions with the following
modifications: (1) If the employee being interviewed is the person for whose acts or
omissions the defendant is sought of be held liable, such employee should be considered
as a party within the meaning of Canon 9. (2) If the employee being interviewed is an
officer or managing employee with authority to bind the corporate defendant he should
likewise be considered a party within the meaning of Canon 9. See Drinker, Legal Ethics,
pages 85 and 201.

...

//////////////////////////

## Utah

Utah Rules of Professional Conduct, Rule 4.2

COMMUNICATION WITH PERSONS REPRESENTED BY COUNSEL

(a) General Rule. A lawyer who is representing a client in a matter shall not communicate
about the subject of the representation with a person the lawyer knows to be represented
by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or
is authorized to do so by:

(1) constitutional law or statute;

102

(2) decision or a rule of a court of competent jurisdiction;

(3) a prior written authorization by a court of competent jurisdiction obtained by the lawyer in good faith; or

(4) paragraph (b) of this rule.

(b) Rules Relating to Government Lawyers Engaged in Civil or Criminal Law Enforcement. A government lawyer engaged in a criminal or civil law enforcement matter, or a person acting under the lawyer's direction in the matter, may communicate with a person known to be represented by a lawyer if:

(1) the communication is in the course of, and limited to, an investigation of a different matter unrelated to the representation or any ongoing, unlawful conduct; or

(2) the communication is made to protect against an imminent risk of death or serious bodily harm or substantial property damage that the government lawyer reasonably believes may occur and the communication is limited to those matters necessary to protect against the imminent risk; or

(3) the communication is made at the time of the arrest of the represented person and after he or she is advised of his or her rights to remain silent and to counsel and voluntarily and knowingly waives these rights; or

(4) the communication is initiated by the represented person, directly or through an intermediary, if prior to the communication the represented person has given a written or recorded voluntary and informed waiver of counsel, including the right to have substitute counsel, for that communication.

(c) Organizations as Represented Persons.

(1) When the represented "person" is an organization, an individual is "represented" by counsel for the organization if the individual is not separately represented with respect to the subject matter of the communication, and
(A) with respect to a communication by a government lawyer in a civil or criminal law enforcement matter, is known by the government lawyer to be a current member of the control group of the represented organization; or
(B) with respect to a communication by a lawyer in any other matter, is known by the lawyer to be
(i) a current member of the control group of the represented organization; or
(ii) a representative of the organization whose acts or omissions in the matter may be imputed to the organization under applicable law; or
(iii) a representative of the organization whose statements under applicable rules of evidence would have the effect of binding the organization with respect to proof of the matter.

(2) The term "control group" means the following persons: (A) the chief executive officer, chief operating officer, chief financial officer, and chief legal officer of the organization; and (B) to the extent not encompassed by the foregoing, the chair of the organization's governing body, president, treasurer, and secretary, and a vice-president or vice-chair who is in charge of a principal business unit, division, or function (such as sales, administration, or finance) or performs a major policy making function for the organization; and (C) any other current employee or official who is known to be participating as a principal decision maker in the determination of the organization's legal position in the matter.

103

(3) This rule does not apply to communications with government parties, employees, or officials unless litigation about the subject of the representation is pending or imminent. Communications with elected officials on policy matters are permissible when litigation is pending or imminent after disclosure of the representation to the official.

(d) Limitations on Communications. When communicating with a represented person pursuant to this Rule, no lawyer may

(1) inquire about privileged communications between the person and counsel or about information regarding litigation strategy or legal arguments of counsel, or seek to induce the person to forgo representation or disregard the advice of the person's counsel; or

(2) engage in negotiations of a plea agreement, settlement, statutory or non-statutory immunity agreement, or other disposition of actual or potential criminal charges or civil enforcement claims, or sentences or penalties with respect to the matter in which the person is represented by counsel unless such negotiations are permitted by paragraphs (a)(1), (2) or (3), or (b)(4).

COMMENT

...

Organizational clients are entitled to the protections of this Rule. Paragraph (c) specifies which individuals will be deemed for purposes of this Rule to be represented by the lawyer who is representing the organization in a matter. Included within the control group of an organizational client, for example, would be the designated high level officials identified in subparagraphs (2)(A) and (B). Whether an officer performs a major policy function is to be determined by reference to the organization's business as a whole. Therefore, a vice-president who has policy making functions in connection with only a unit or division would not be a major policy maker for that reason alone, unless that unit or division represents a substantial part of the organization's total business. A staff member who gives advice on policy but does not have authority, alone or in combination with others, to make policy does not perform a major policy making function.
Also included in the control group are other current employees known to be "participating as principal decision makers' in the determination of the organization's legal position in the proceeding or investigation of the matter. In this context, "employee" could also encompass former employees who return to the company's payroll or are specifically retained for compensation by the organization to participate as principal decisionmakers for a particular matter. In general, however, a lawyer may, consistent with this Rule, interview a former employee of an organization without consent of the organization's lawyer.
...

----------

Utah State Bar Ethics Advisory Opinion Committee Opinion No. 04-04 (8/25/04)

1 Issue: In litigation to enforce an oral contract allegedly made by a corporate defendant's former employee on behalf of the corporation, where the former employee was not a member of the control group, may the plaintiff's attorney contact the ex-employee without the consent of the corporate defendant's attorney?

¶ 2 Answer: The contact with the former employee is not unethical. Utah Rules of Professional Conduct 4.2 (2004) does not bar a lawyer's unauthorized contact with

104

former employees of a represented corporate defendant except in very limited circumstances not applicable to this opinion.

...

¶ 8 The language of Rule 4.2 (c)(1)(B)(i) specifically pertains only to a "current member of the control group" (emphasis added). While Rules 4.2 (c)(1)(B)(ii) and 4.2 (c)(1)(B)(iii) do not specifically reference a current" representative of the organization", the Committee concludes that this is the proper interpretation of Rule 4.2. The Comment to Rule 4.2 removes any doubt about the intent of the revision on this issue. The Comment provides:

"The purpose of this Rule is to foster and protect legitimate attorney-client relationships. It seeks to guard against inequities that exist when a lawyer speaks to an untrained lay person. The Rule should not, however, be used as a vehicle to thwart appropriate contact between lawyers and lay persons."

"In general, however, a lawyer may, consistent with this Rule, interview a former employee of an organization without consent of the organization." [FN2]

¶ 9 The Comments to the Rules of Professional Conduct carry considerable weight. The Utah Supreme Court adopted the Comment when it adopted Rule 4.2, most recently when Rule 4.2 was amended on September 3, 1999. Further, the Preamble to the Rules states: "The Comment accompanying each Rule explains and illustrates the meaning and purpose of the Rule.... The Comments are intended as guides to interpretation, but the text of the Rule is authoritative."

*3 ¶ 10 The "control group" for purposes of Rule 4.2.(c)(1)(B)(i) includes any "current employee or official who is known to be participating as a principal decision maker in the determination of the organization's legal position in the matter" (emphasis added). The Comment to Rule 4.2 explains that "current employee" in the context of Rule 4.2(c)(1)(B)(i) includes those "who return to the company's payroll or are specifically retained for compensation by the organization to participate as principal decisionmakers for a particular matter." [FN3] The Committee finds this Comment to be equally applicable to Rules 4.2(c)(1)(B)(ii) and 4.2(c)(1)(B)(iii). The former employee described in the request for opinion does not fall within this interpretative guide. Accordingly, we conclude that Rule 4.2 does not bar the unauthorized contact by plaintiff's counsel with the former employee. Of course, nothing in this opinion relieves an attorney of the duty to comply with other ethical rules governing contact with unrepresented persons and potential witnesses. See, e.g., Rules 3.4 (fairness to opposing party and counsel); 4.1 (truthfulness in statements to others); Rule 4.3 (dealing with unrepresented person); Rule 4.4 (respect for rights of third persons); Rule 8.4 (misconduct).

FN1. The "control group" is defined in Utah Rules of Professional Conduct 4.2 (c)(2), as follows:

The term "control group" means the following persons: (A) the chief executive officer, chief operating officer, chief financial officer, and chief legal officer of the organization; and (B) to the extent not encompassed by the following, the chair of the organization's governing body, president, treasurer, and secretary, and a vice-president or vice-chair who is in charge of a principle business unit, division, or function (such as sales administration, or finance) or performs a major policy-making function for the organization and (C) any other current employee or officer who is known to be participating as a principal decision maker in the determination of the organization's legal position in the matter.

----------

**Shearson Lehman Bros., Inc. v. Wasatch Bank,**
139 F.R.D. 412, D.Utah, Oct 25, 1991

105

Rules of Professional Conduct and ABA model rule does not prohibit counsel's ex parte contact with former employees of opposing organizational party, which is represented by counsel, although full spectrum of ethical requirements which bind attorney in any other situation are equally binding when attorney engages in ex parte contact with unrepresented former employee of opposing organizational party. ABA Rules of Prof.Conduct, Rules 4.2, 4.3; Utah Rules of Prof.Conduct, Rules 4.2, 4.3.

"Today this court joins the ranks of those which have construed Rule 4.2 consistently with the position taken by the ABA Committee on Ethics and Professional Responsibility. Under this court's rules of practice, Utah Rule of Professional Conduct 4.2 as well as ABA Model Rule 4.2 do not prohibit ex parte contact with the former employees of an organizational party that is represented by counsel. Consistent with the ABA position, however, the court recognizes that other rules govern and limit the scope and method of ex parte informal communication with such former employees. Specifically mentioned by the ABA Committee on Ethics and Professional Conduct were the ethical rules regarding the attorney-client privilege and Rule 4.3 which governs an attorney's dealings with an unrepresented party. It should be noted, however, that these two ethical restraints do not exhaust the list of potential rules which may apply to ex parte contact with former employees of a corporate party. Fortunately, the court is not called upon to compile such a list. Suffice it to say that the full spectrum of ethical requirements that bind the attorney in any other situation is equally binding when the attorney engages in ex parte contact with an unrepresented former employee of an opposing organizational party. Accordingly, Shearson's motion for authority to conduct ex parte interviews with persons formerly employed as tellers for Wasatch is granted. Shearson's counsel is once again cautioned that strict compliance with all applicable ethical guidelines will be required and any evidence obtained in violation thereof will be subject to suppression." Id., at 418

//////////////////////////////////

## Vermont

Vermont Rules of Professional Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Comment:

...

In the case of an organization, this rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this rule. Compare Rule 3.4(f).

106

...

----------

Vermont Bar Association Advisory Ethics Opinion 96-07

SYNOPSIS:

An attorney representing a client in a matter in which an adverse party is a corporation represented by counsel may communicate with a former employee of the corporation about the matter without the consent of the corporation's counsel.

FACTS:

The requesting attorney represents the plaintiff in a contract action against a corporation which is represented by counsel in the matter. The requesting attorney wishes to question a former employee of the corporation regarding the issues raised in the complaint without the consent of the corporation's counsel. The former employee is the individual who, during her employment with the corporation, signed the contract at issue on behalf of the corporation and managed the corporation's performance thereunder. The former employee is not represented by counsel with respect to the matter.

QUESTION:

The requesting attorney seeks the opinion of this Committee as to whether the proposed *ex parte* communication with the defendant corporation's former employee would violate DR 7-104(A)(1).

DISCUSSION:

...

As noted above, the clear text of our anti-contact rule extends only to those "parties" or "persons" who are adversely positioned in the matter. Where the one adverse is a business organization, we find nothing in our law or rules which creates a direct, current nexus between a business organization and its former employees. Such employees would, in our view, stand in the same shoes as a potential witness, or, at most a "party" in his or her own right. Current counsel in the matter for the organization would not, by virtue thereof, be counsel for the former employee. Therefore, in our opinion, our anti-contact rule, as currently framed, does not extend to former employees of an adverse business organization. This is so, whether or not the former employee was a manager of the organization. Like the ABA Committee, we decline to extend or modify the Rule through interpretation or analysis, no matter how persuasive or compelling. This is especially so where, as here, there is clear and unequivocal direction on the issue which has existed, unchanged, for five years. The answer to the question presented is, No.

Notwithstanding this Opinion, the Requesting Attorney is required to adhere to the proscriptions contained in DR 7-104(A)(2) relating to unrepresented persons.

In the State Bar of Wisconsin Ethics Opinion E-82-10 (1982), *supra*, a duty of the attorney contacting an unrepresented former employee of an adverse organization was stated as follows:

> [T]he attorney should first apprise the former employee that he or she may have a continuing duty to the corporation not to reveal any confidential information which he or she may have acquired during the course of his or her employment by the corporation.

In the ABA Committee Formal Opinion 91-359 (1991), *supra*, duties to the unrepresented former employee under the Model Rules include the following:

107

[The] attorney must be careful not to seek to induce the former employee to violate the privilege attaching to attorney-client communications to the extent his or her communications as a former employee with his or her former employer's counsel are protected by the privilege....

[The lawyer should] make clear the nature of the lawyer's role in the matter giving occasion for the contact, including the identity of the lawyer's client and the fact that the witness's former employer is an adverse party.

CONCLUSION:

These directions appear to come from Model Rules 4.4 ("burden a third person") and 4.3, respectively, which have no substantially equivalent counterpart under our Code.  However, this Committee views any compliance with these Rules to be well within the recognized qualifications upon a lawyer's duty to represent a client zealously, and therefore would be permissible.  DR 7-101(A)(1) (last sentence).

//////////////////////////////

## Virginia

Virginina Rules of Prof.Conduct, Rule 4.2

Communication With Persons Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENT

...

[4] In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons in the organization's "control group" as defined in Upjohn v. United States, 449 U.S. 383 (1981) or persons who may be regarded as the "alter ego" of the organization. The "control group" test prohibits ex parte communications with any employee of an organization who, because of their status or position, have the authority to bind the corporation. Such employees may only be contacted with the consent of the organization's counsel, through formal discovery or as authorized by law. An officer or director of an organization is likely a member of that organization's "control group." The prohibition does not apply to former employees or agents of the organization, and an attorney may communicate ex parte with such former employee or agent even if he or she was a member of the organization's "control group." If an agent or employee of the organization is represented in the matter by separate counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule.

----------

Virginia State Bar Committee on Legal Ethics Opinion No. 1670  (4/1/96)

CONTACT WITH FORMER EMPLOYEE OF ADVERSE PARTY

108

You have presented a hypothetical situation in which an attorney represents Defendant in a dispute concerning the right to goods. Defendant bought the disputed goods from Seller, who contends that Plaintiff released its lien prior to the sale to Defendant. Plaintiff says the lien was not released. Officer, an employee of Plaintiff, signed documents which Seller says were intended to release the lien. Seller says Officer's subsequent actions were consistent with a release of the lien, and Seller believes Officer's testimony would be favorable to Defendant. Officer no longer works for Plaintiff and is not represented by counsel.

Under the facts you have presented, you have asked the committee to opine as to the propriety of the Defendant's attorney communicating ex parte with Officer to determine Officer's recollections concerning matters at issue in a law suit pending in a Virginia Circuit Court.

...

The committee has previously opined that it is permissible to contact, ex parte, employees of an adverse corporation as long as the attorney first discloses their role as an adversary to the corporation in litigation and second the employee does not occupy a position within the corporation such that he or she could commit the corporation to specific courses of action that would lead one to believe the employee is the corporation's "alter ego", i.e., that said employees are members of the corporation's "control group" as defined in Upjohn Co. v. United States, 449 U.S. 383 (1981).  Under the alter ego test, any employee who because of their status or position might bind the corporation by their acts or admissions must be contacted only through formal discovery channels and not by ex parte methods. (See Legal Ethics Opinion Nos. 347, 530 and 801).

In prior opinions, this committee has adopted the "control group" test as a standard for defining a group of employees to be treated as a "party" for purposes of DR 7-103(A)(1) and whom opposing counsel may not interview without the consent of counsel for the corporate entity. Under the control group test it is not improper for an attorney to communicate directly with the employee of an adverse party if that employee is not a member of the control group and is not able to commit the organization to specific courses of action that would lead one to believe the employee is the corporation's alter ego. (See Legal Ethics Opinion No. 1504). Clearly, an officer of a corporation would be a likely member of the corporation's control group or alter ego under this definition. In the facts you present, the committee believes that the termination from employment by Officer in this hypothetical is a pivotal point which distinguishes the analysis of this hypothetical.  A corporation acts through its employees.  However, once an employee who is also a member of the control group separates from the corporate employer by voluntary or involuntary termination, the restrictions upon direct contact cease to exist because the former employee no longer speaks for the corporation or binds it by his or her acts or admissions.  In fact, this committee has previously held that it is ethically permissible for an attorney to communicate directly with the former officers, directors and employees of an adverse party unless the attorney is aware that the former employee is represented by counsel. (See Legal Ethics Opinion Nos. 533, 905 and 1589).  Counsel for the corporation represents the corporate entity and not individual corporate employees.  (See Ethical Consideration 5-18).  In the instance where it is necessary to contact unrepresented persons, a lawyer should not undertake to give advice to the person, except to advise them to obtain a lawyer.  (See Ethical Consideration 7-15).

The committee is mindful that some circuit courts and federal courts in Virginia have interpreted DR 7-103(A)(1) differently.  Some courts have applied a Model Rules approach and prohibited ex parte contacts not only where the control group or alter ego theory applies, but also where the activities or statements of an employee are part of the focus of litigation or would make the employer vicariously liable as a result of the employee's statements or activity.  Queensberry v. Norfolk & Western Ry., 157 F.R.D. 21 (E.D.Va. 1993); Nila Sue DuPont v. Winchester Medical Center, Inc. - Winchester Circuit Court Law No. 92-171.  The committee also recognizes that a different opinion might result if the facts of this hypothetical were analyzed under Rule 4.2 of the

109

Model Rules which adopts a broader prohibition of ex parte contacts than DR 7-103(A)(1). Nevertheless, the committee must apply the rules of conduct which Virginia has adopted to this hypothetical and leave specific legal rulings involving other rules of ethical conduct to the presiding trial judges of Virginia based upon the facts presented before them.

Virginia State Bar Committee on Legal Ethics Opinion No. 1749 (3/29/01)

PROPRIETY OF ATTORNEY ASKING QUESTIONS ABOUT ADVICE PROVIDED BY CORPORATE COUNSEL WHEN QUESTIONING FORMER EMPLOYEE OF OPPOSING PARTY

You have presented a hypothetical situation in which a plaintiff sues a corporation in a personal injury action. The counsel for the corporation, in the course of investigation, interviews an employee who has knowledge of matters relevant to the litigation. The employee is not within the corporate control group. The interviews all occur on the corporation's premises during the employee's normal work hours. The employee is acting within the course and scope of employment in participating in the interviews. The communications are confidential in nature and no factors exist which would constitute a waiver of the attorney-client privilege as to these communications.

Thereafter, and while the litigation remains pending, the employee terminates her employment with the corporation. Upon learning this, the plaintiff's counsel initiates ex parte contact with the employee and inquires not only regarding the facts known to the employee, but also regarding the substance of the communications with counsel.

Under the facts you have presented, you have asked the committee to opine as to whether it is a violation of the Rules of Professional Conduct for counsel to:

Inquire into matters known or reasonably apprehended to be confidential communications when interviewing, ex parte, a former employee of a corporate adversary in pending litigation.

Induce a former employee of a corporate adversary in pending litigation to disclose matters known or reasonably apprehended to be confidential communications in an ex parte interview where: a) such disclosure might subject the employee to civil liability; b) the employee is unrepresented by counsel; or c) the communications fall within the attorney-client privilege and pertain directly to the matters in litigation. …

With regard to the threshold question of whether an attorney may contact the former employee of an opposing party, this Committee previously opined that such contact is permissible so long as that former employee is not represented by his own counsel. See, LEOs 533, 905, 1589, 1670. Those opinions all interpret former DR 7-103(A)(1). Current Rule 4.2 is substantially the same as the previous rule; the only change is the replacement of "party" with "person" That change has no pertinent impact on the analysis in those prior opinions. Moreover, Comment 4 to Rule 4.2 expressly clarifies that the contact prohibition of that rule does not apply to contact with former employees. While the Committee is aware that some other states have found such contact generally impermissible under Rule 4.2, the Committee finds the conclusions of those states unpersuasive as only the Virginia rules contain the pertinent language found in Comment 4. Accordingly, the Committee opines that the lawyer in this scenario may contact the former employee of the opposing party regarding the litigation.

In allowing the contact generally, the Committee notes that under Rule 3.4 (f), the employer's counsel can request that the former employee not communicate with opposing counsel. To allow

110

contact from the opposing counsel would merely provide a level playing field where both attorneys in a dispute, neither of which represent the former employee, may contact that potential witness.

The question remains what restrictions, if any, apply to the content of the contact between the attorney and the former employee. …

The Committee believes that the only needed prohibition on contact with former employees is one of content restriction. The Rules of Professional Conduct already limit the content of an attorney's communication with unrepresented parties; Rule 4.3 requires that the attorney identify his role in the matter and that the attorney provide no legal advice other than to obtain independent counsel. Thus, attorneys are directed by Rule 4.3 to curb their contact with unrepresented parties to prevent overreaching. Similarly, confidentiality protection can survive contact with former employees with a prohibition on seeking any information that may reasonably be foreseen as stemming from attorney-client communications.

In determining the parameters of this content prohibition, consideration must be given to the complexity presented by an entity client. Virginia's Rules of Professional Conduct address that complexity in Rule 1.13(a), which notes that an attorney represents an entity client through its "constituents," defined as "officers, directors, employees, shareholders, and other constituents." See, Rule 1.13, Comment 1. Thus, the former employee in this inquiry was a constituent of the corporation at the time of his communications with the corporation's attorney. Comment 2 to Rule 1.13 establishes that the confidentiality protections afforded all clients under Rule 1.6 attach to constituent/attorney communications in order to preserve the client's (i.e., the entity's) right to confidentiality. Thus, under that provision, the communications between the former employee, during the tenure of his employment, with the corporation's attorney must receive the confidentiality protection of Rule 1.6.

In considering whether the attorney in the inquiry may ask this former employee about those confidential communications, Rule 4.4 is pertinent. Rule 4.4 prohibits an attorney from obtaining evidence in a manner that violates the rights of a third party. As established above, the corporation has a right to confidentiality for the constituent/attorney communications involving this former employee. The attorney would violate that right and, therefore, Rule 4.4 if he were to ask the former employee to disclose the content of those constituent/attorney discussions.

The committee opines that the attorney in this request's scenario may contact the former employee but that such contact must be limited as described in this opinion. As the answer to the first question of this request prohibits inquiry into confidential communications in all instances, the answer to the remaining three questions is, of course, that such inquiries are prohibited.

----------

**Armsey v. Medshares Management Services, Inc.,**
184 F.R.D. 569, 43 Fed.R.Serv.3d 223, W.D.Va., Nov 16, 1998

Under Virginia law, plaintiffs attorneys were precluded from communicating ex parte with former employees of represented corporation defendant, since plaintiffs' counsel indicated that they wanted to speak with former employees because they believed that they could bind corporation through statements, actions, or omissions of former employees, which could have affected corporation's potential liability. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.; Va.Code of Prof.Resp., DR 7-103(A)(1).

111

"Based upon my research and the representations of counsel in this case, it appears that this is an issue of first impression in Virginia. While state and federal courts in other jurisdictions have considered the issue, these courts have split on whether ex parte communications with the former employees of represented corporate parties is permissible. Some courts have held that, since a former employee can no longer speak for the corporation and, therefore, cannot make statements that could become vicarious admissions of the corporation, ex parte communication with former employees of a represented corporate party is permissible. ...

One of best discussions I found of the ethical considerations presented by such ex parte communications is contained in *Polycast Technology Corp. v. Uniroyal, Inc.,* 129 F.R.D. 621. In this opinion, the court addressed not only the applicable ethical guidelines, but also addressed the policies reasons behind the ethical rules. *Polycast Technology Corp.,* 129 F.R.D. at 623-28. The court recognized that the general prohibition against an attorney having ex parte contact with a represented party is based on several rationales. *Id.* at 625. These rationales include preventing an attorney from circumventing opposing counsel to obtain unwise statements from an adversary party. *Id.* The court recognized that, under this rationale, a represented corporate party retained an interest in preventing an opposing attorney from eliciting uncounselled statements from its former employees, since such statements could affect the corporation's potential liability. *Id.* at 626.

The court in *Polycast Technology Corp.* found that this rationale did not justify preventing ex parte contact with the former employee at issue in that case. Nonetheless, I find that this rationale provides a compelling basis for prohibiting ex parte communications by the Plaintiffs' counsel in this case with these former employees of Medshares. I base my decision in large part on the fact that Plaintiffs' counsel has informed the court that they believe that each of these witnesses has knowledge or has made statements or has taken actions which should be imputed to Medshares. *See* Letter from Gerald **574** L. Gray to the court dated October 21, 1998, (Docket Item No. 42). In such a case, I see no need to craft a distinction in the governing ethical rules between current and former corporate employees. *See Branham v. Norfolk & Western Ry. Co.,* 151 F.R.D. 67, 69-70 (S.D.W.V.1993).
I should note that in reaching this decision I have considered Virginia Legal Ethics Opinion No. 1670, VIRGINIA LAWYER REGISTER, May 1996, at 34-35. Based on the facts presented in the hypothetical before the committee in that case, the committee opinion stated: "A corporation acts through its employees. However, once an employee ... separates from the corporate employer ..., the restrictions upon direct contact cease to exist because the former employee no longer speaks for the corporation or binds it by his or her acts or admissions." Virginia Legal Ethics Opinion No. 1670, VIRGINIA LAWYER REGISTER, May 1996, at 35. The Committee, however, also recognized that specific courts might reach a different conclusion based on the facts before them in any given case. *Id.* I find that the facts of this case justify a different conclusion.
I agree with the committee that former employees may no longer bind their corporate employer by their *current* statements, acts or omissions. Yet, this does not prevent liability being imposed upon their former employer based on the statements, acts or omissions of these individuals which occurred during the course of their employment. *See Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co., et al.,* 951 F.2d 613, 619-20 (4th Cir.1991). In fact, Plaintiffs' counsel in this case has informed the court that it seeks to speak to each of these former employees because Plaintiffs believe that they can impute liability upon Medshares through the statements, actions or omissions of these former employees. Under these facts, I do not believe ex parte communications with these former employees is proper.
This opinion should not be interpreted as holding that any ex parte contact with any

112

former employee of a represented corporate party is prohibited. This opinion does not attempt to address those cases where counsel may be seeking information from a former employee whose actions or statements are not a subject of the litigation. *See Cole v. Appalachian Power Co., 903 F.Supp. 975, 979 (S.D.W.V.1995); Chancellor, 678 F.Supp. at 252; Amarin Plastics, 116 F.R.D. at 40.*

While ex parte interviews are not a method of discovery encompassed within Rule 26(c) of the Federal Rules of Civil Procedure, I hold that this court has authority to enter an order prohibiting such contact based on its inherent power to prohibit or remedy litigation practices which may raise or constitute ethical violations."   Id., at 573-574

///////////////////////////

# Washington

Washington Rules Of Professional Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

(a) In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

(b) An otherwise unrepresented person to whom limited representation is being provided or has been provided in accordance with rule 1.2 is considered to be unrepresented for purposes of this rule unless the opposing lawyer knows of, or has been provided with, a written notice of appearance under which, or a written notice of time period during which, he or she is to communicate only with the limited representation lawyer as to the subject matter within the limited scope of the representation.

----------

http://www.wsba.org/media/publications/barnews/archives/2000/feb-00-ethics.htm

Althoff, Barrie, Washington State Bar Chief Disciplinary Counsel, Ethics and the Law:Communicating with Represented Persons (7/1/03)

Opinions expressed herein are the author's and are not official or unofficial WSBA positions.

Where corporations or other multi-employee organizations are involved, the issue of who is considered off-limits to opposing counsel is complicated and involves conflicting policies of the right of an entity to defend itself and the right of opposing counsel to gather needed information. Washington's leading no-contact case provides some guidance as to whom is covered by the no-contact rule. Applying the predecessor to RPC 4.2, namely DR 7-104(A)(1) of the Code of Professional Responsibility, the Supreme Court held that the current employees of a hospital should be considered "parties" under that rule only if they had managing authority sufficient to give them the right to speak for and bind the corporation, and that non-managing/non-speaking employees and former employees of the corporation should not be considered parties. Wright v. Group Health Hospital, 103 Wn.2d 192, 201 (1984). Accordingly, a plaintiff's lawyer could ethically seek to communicate directly with such non-managing/non-speaking employees and former employees without the presence of the hospital's counsel. Although the Court was

113

concerned to protect a client from being bound by statements made by managing/speaking employees without the protection of counsel, it is unclear whether the same rule would apply to a former managing/speaking employee who could no longer bind the client, but who might have extensive confidential information which the employer might still have a legitimate interest in protecting. The Court also held that the hospital could not prohibit its non-managing/non-speaking employees or former employees from communicating with adverse counsel, but that nothing required such persons to meet ex parte with adverse counsel if they did not wish to do so. 103 Wn.2d 192, 203. This is consistent with other jurisdictions. For example, Polycast Technology Corp. v. Uniroyal Inc., 129 F.R.D. 621 (1990), held that lawyers were not barred from having ex parte contacts with a former employee of the opposing party and that there was no showing that that former employee had access to privileged information.

----------

**Wright by Wright v. Group Health Hosp.,**
103 Wash.2d 192, 691 P.2d 564, 53 USLW 2309, 50 A.L.R.4th 641, Wash., Dec 06, 1984

Current employees of health maintenance organization against which malpractice action was brought would be considered "parties" for purposes of disciplinary rule dealing with ex parte communications by attorney with parties if, under applicable law, they had managing authority sufficient to give them right to speak for, and bind, corporation; therefore, plaintiffs' attorney would not violate such rule by interviewing former employees of organization. CPR DR7-104(A), (A)(1).

"We hold the best interpretation of "party" in litigation involving corporations is only those employees who have the legal authority to "bind" the corporation in a legal evidentiary sense, *i.e.,* those employees who have "speaking authority" for the corporation. This interpretation is consistent with the declared purpose of the rule to protect represented parties from the dangers of dealing with adverse counsel. Leubsdorf, *supra* at 686- 88. A flexible interpretation of "parties", moreover, advances the policy of keeping the testimony of employee witnesses freely accessible to both parties. *See* ABA Comm. on Professional Ethics and Grievances, Formal Op. 117 (1934). We find no reason to distinguish between employees who in fact witnessed an event and those whose act or omission caused the event leading to the action. It is not the purpose of the rule to protect a corporate party from the revelation of prejudicial facts. *Accord, Coburn v. Seda,* 101 Wash.2d 270, 276-77, 677 P.2d 173 (1984) (discovery immunity statute will be strictly construed; it does not grant an immunity to information available from original sources). Rather, the rule's ***201** function is to preclude the interviewing of those corporate employees who have the authority to *bind* the corporation. H. Drinker, *Legal Ethics* 201 (1953).

We hold *current* Group Health employees should be considered "parties" for the purposes of the disciplinary rule if, under applicable Washington law, they have managing authority sufficient to give them the right to speak for, and bind, the corporation. Since former employees cannot possibly speak for the corporation, we hold that CPR DR 7-104(A)(1) does not apply to them." Id., at 569

///////////////////////////////

# West Virginia

West Virginia Rules of Professional Conduct, Rule 4.2

114

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENT

...

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).
This rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question.

----------

**State ex rel. Charleston Area Medical Center v. Zakaib,**
190 W.Va. 186, 437 S.E.2d 759, W.Va., Oct 29, 1993

Rule of Professional Conduct prohibiting lawyer from ex parte communications about subject of representation with party known to be represented by another lawyer absent consent of other lawyer or authorization by law is not designed to foreclose ex parte interviews of former employees of organization by attorney representing party adverse to organization unless former employees are represented by their own attorney.

"There is little question that a majority of jurisdictions that have had occasion to consider whether Rule 4.2 restrictions are applicable to former employees have concluded that they are not applicable. *See, e.g., Action Air Freight, Inc. v. Pilot Air Freight Corp.,* 769 F.Supp. 899 (E.D.Pa.1991), *appeal dismissed without opinion,* 961 F.2d 207 (3d Cir.1992); *Hanntz v. Shiley, Inc., supra; University Patents, Inc. v. Kligman,* 737 F.Supp. 325 (E.D.Pa.1990); *Valassis v. Samelson, supra; In re Domestic Air Transp. Antitrust Litig.,* 141 F.R.D. 556 (N.D.Ga.1992); *Shearson Lehman Bros., Inc. v. Wasatch Bank,* 139 F.R.D. 412 (D.Utah 1991); *Dubois v. Gradco Sys., Inc.,* 136 F.R.D. 341 (D.Conn.1991); *Polycast Technology Corp. v. Uniroyal, Inc.,* 129 F.R.D. 621 (S.D.N.Y.1990), *aff'd,* 1990 WL 180571 (No. 87 Civ. 3297 S.D.N.Y. Nov. 15, 1990). Some of these cases have relied on the ABA Committee on Ethics and Professional Responsibility Formal Opinion 359 issued in March, 1991 (ABA Formal Opinion 91-359), which determined that Rule 4.2 did not extend to former employees, including managerial employees. [FN6] *See, e.g., Action Air Freight, Inc. v. Pilot Air Freight Corp.,* 769 F.Supp. at 902- 04; *Hanntz v. Shiley, Inc.,* 766 F.Supp. at 266-67; *Valassis v. Samelson,* 143 F.R.D. at 122. In view of the lack of any precise language in Rule 4.2 and the specific interpretation in ABA Formal Opinion 91-359 that Rule 4.2 does not apply to former employees of an organization, we decline to **\*764 \*191** create a different standard under our Rule 4.2. As we stated earlier, the primary goal behind Rule 4.2 is to protect the attorney-client relationship. To enlarge its scope defeats the broad discovery purposes contained in Rule 26 of the West Virginia Rules of Civil Procedure.

115

Consequently, we conclude that <u>Rule 4.2 of the Rules of Professional Conduct</u> is not designed to foreclose *ex parte* interviews of former employees of an organization by an attorney representing a party adverse to the organization unless the former employees are represented by their own attorney. To the extent that the respondent judge's order may be interpreted to restrict *ex parte* interviews of former employees of CAMC, such an interpretation is erroneous."  Id., at 190-191

////////////////////////////////////

## Wisconsin

Wisconsin Supreme Court Rules, Rules of Professional Conduct SCR 20:4.2.

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENT

...

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). This Rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question.

----------

State bar of Wisconsin Formal Ethics Opinion E-82-10

Communications with a party's former employees

Question 1      In a pending action, may counsel for an adversary party contact a former managing agent of the corporation, who was an employee of that corporation at the time when certain material acts were taken which may form a partial basis for liability?

Opinion         Generally an attorney may communicate with one not represented by counsel and may properly interview witnesses or prospective witnesses for opposing sides in any civil or criminal action without prior consent of opposing counsel unless such person is a party.  (ABA Informal Opinion 1377.)

Since a corporation, although a party, acts only through its officers, directors, managers, employee and the like, it would, in the committee's opinion, be improper to interview any officer or employee who had the authority to commit the corporation, since, under such circumstances, those persons are alter egos of the corporation and are parties for the purposes of SCR 20.38(1).

116

ABA Informal Opinion 1410 states in part:

The right of the corporation to representation by counsel must prevail over opposing counsel's unrestricted access to officers and employees of the corporation.  Where an officer or an employee can commit the corporation, opposing counsel must view the officer or employee as an integral component of the corporation itself and therefore within the concept of a single "party" for the purposes of the Code.

However, if the former managing officer has severed all relationship with the corporation in question, and has no longer any capacity whatsoever to commit the corporation, so that such former employee would not be a party by implication, then contact may be made for the purpose of interviewing such person as a witness or prospective witness in the pending action.

In doing so, the attorney should first apprise the former employee that he or she may have a continuing duty to the corporation not to reveal any confidential information which he or she may have acquired during the course of his or her employment by the corporation.

Question 2

May the corporation's counsel properly inform the former employee that counsel represents that employee by virtue of his representation of the corporation and proceed to represent both the former employee and the corporation without the request of the employee but with the former employee's acquiescence?

Opinion

Section 757.295(1) states:  "Except as provided under Section 757.296, no person may solicit legal matters or a retainer, written or oral, or any agreement authorizing an attorney to perform or render legal services."

Section 757.296 authorizes advertisement of legal services therein provided.

SCR 20.06 states:  "A lawyer should assist the legal profession in fulfilling its duty to make legal counsel available."

SCR 20.06(2)(b) states in part:  "A lawyer should not contact a non-client directly or indirectly, for the purpose of being retained to represent the client for compensation."  However, SCR 20.06(2)(c) permits a lawyer to volunteer advice and render resulting legal services to close friends, relatives, former clients (in regard to matters germane to former employment) and regular clients.

A former employee of the corporation is not a former client of that corporation's counsel by virtue of the corporate employment, since corporate counsel represents the corporate entity, and not individual employees.  SCR 20.23(3)(e).  However, the same section states that if the lawyer for the entity is requested by an employee to represent him or her in an individual capacity, the lawyer may do so only if the lawyer is convinced that differing interests are not present.

Therefore, it is the committee's opinion that the corporation's counsel may not initiate contact with the former employee for the purpose of proceeding to represent both the corporate client and the former employee unless:  (1) the former employee requests such representation; (2) no conflict of interest arises between the duty to the corporation and the former employee; and (3) consent of the corporate client is obtained for such representation.

117

//////////////////////////////

## Wyoming

Wyoming Rules of Prof.Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENT

...

[2] In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).

----------

Burman, John, Wisonsin State Bar Bar Journal, April, 2005, Ethically Speaking

Committee Recommends Changes to the Wyoming Rules of Professional Conduct

By Order dated March 14, 2003 ("the Order"), the Wyoming Supreme Court created the Select Committee to Review the Rules of Professional Conduct ("the Committee"). The Committee was charged with examining the ABA Model Rules of Professional Conduct, the Wyoming Rules of Professional Conduct for Attorneys at Law ("the Wyoming Rules"), which were adopted nearly twenty years ago, and other related matters, to evaluate whether it would be appropriate to recommend changes in the Wyoming Rules.

The Order directed the Committee to deliver its final report to the Wyoming State Bar Board of Commissioners ("the Commissioners"), which will be presented to the Wyoming Supreme Court after review and comment by the Commissioners and the Board of Professional Responsibility. The Committee delivered its final report to the Bar Commissioners in early March.

The final report contains the Committee's proposed revisions to the Wyoming Rules. The Commissioners considered the Final Report at their regular meeting on April 8, 2005. The Commissioners plan to post the proposed changes on the State Bar's web-site and solicit comments from members of the Bar. The Commissioners will then consider the comments before submitting a recommendation to the Wyoming Supreme Court regarding changes to the Wyoming Rules.

Rule 4.2 Communication With Person Represented by Counsel

The rule remains largely unchanged. The significant additions are in the comments. Comments [4] through [9] are all new. Comment [5] addresses communications "authorized by law." Such

118

communications may include constitutional or other legal rights to contact the government (the First Amendment includes the right to petition the government for redress of grievances, and courts have consistently held that the right may be exercised through an attorney). Such communications also include investigative activities, during which an attorney or someone acting on behalf of an attorney, such as an investigator, may have contact with a person who has an attorney. Many courts, including the Tenth Circuit, have allowed such contacts, finding that to hold otherwise would unfairly hamper law-enforcement activities. Such opinions, and this Comment, have been very controversial. U.S. Attorney Matt Mead suggested significant additions to this comment, which the Committee rejected in favor of more general language, believing that too much detail could be counter-productive.

Comment [7] addresses communications with an organization that is represented by counsel. The Committee believed that the Comment reflects the holding of the Wyoming Supreme Court in Strawser v. Exon, both regarding current and former employees of the organization.

----------

**Strawser v. Exxon Co., U.S.A., a Div. of Exxon Corp.,**
843 P.2d 613, Wyo., Dec 14, 1992

Rule on communication with person represented by counsel permits ex parte contacts with former employees and managers, but proscribes inquiry into matters subject to attorney-client privilege. Rules of Prof.Conduct, Rules 4.2, 4.2 comment.

"Various courts have struggled with the question of whether Rule 4.2 applies to former corporate employees. See, e.g., Action Air Freight, Inc., 769 F.Supp. at 903; and Hanntz v. Shiley, Inc. A Div. of Pfizer, Inc., 766 F.Supp. 258, 265-69 (D.N.J.1991). It is clear, however, that the overwhelming recent trend has been for courts to find that Rule 4.2 does not generally bar ex parte contacts with former employees. As noted in Action Air Freight, Inc., 769 F.Supp. at 903:
[Rule 4.2] permits ex parte contacts but proscribes inquiry by opposing counsel into matters subject to the attorney-client privilege. The qualification on the "contact rule" allows opposing counsel to investigate the underlying facts leading up to the disputed matter. At the same time, counsel must for[e]go inquiry into attorney-client communications during the contact. Accordingly, Hanntz interprets Rule 4.2 to proscribe the type of questioning of former employees, not the contact itself.
See Valassis v. Samelson, 143 F.R.D. 118 (E.D.Mich.1992); Dubois v. Gradco Systems, Inc., 136 F.R.D. 341 (D.Conn.1991); In re Domestic Air Transp. Antitrust Litigation, 141 F.R.D. 556 (N.D.Ga.1992); Curley v. Cumberland Farms, Inc., 134 F.R.D. 77 (D.N.J.1991); Polycast Technology Corp. v. Uniroyal, Inc., 129 F.R.D. 621 (S.D.N.Y.1990); Shearson Lehman Bros., Inc. v. Wasatch Bank, 139 F.R.D. 412 (D.Utah 1991); Lang v. Superior Court, In and For County of Maricopa, 170 Ariz. 602, 826 P.2d 1228 (1992); Neil S. Sullivan Associates, Ltd. v. Medco Containment Services, Inc., 257 N.J.Super. 155, 607 A.2d 1386 (1992) (counsel must abide by Rule 4.3 guidelines--must disclose role in litigation and can not elicit any privileged information); and In re Environmental Ins. Declaratory Judgment Actions, 600 A.2d 165.
Although the exact status of any former Exxon employees who may have been interviewed by the Strawsers or their counsel is not particularly clear from the record, we remand to the district court to vacate that portion of the protective order prohibiting all ex parte interviews with former Exxon employees and managers." Id., at 622

**END OF DOCUMENT**

FAC Resp. Exhibit B -- 2008

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

---

# PLAINTIFF GERALD BARNETT'S MEMORANDUM IN OPPOSITION TO RENEWED MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

---

## **TABLE OF AUTHORITIES**

### **CASES**

*Abbot by Abbot v. American Cyanamid Co.,*
    844 F.2d 1108, 1112 (4th Cir. 1988) ..........................................................32

*Allen v. Pennsylvania Eng'g Corp.,*
    102 F.3d 194 (5th Cir. 1996) ......................................................................6

*Anderson v. Sandoz Pharmaceuticals Corp.,*
    77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D.Tex. 1999)...........................19, 29

*Black v. Food Lion, Inc.,*
    171 F.3d 308, 313 (5th Cir. 1999) ..............................................................4

*BMW of North America, Inc. v. Gore,*
    517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).............................36, 37

*Bonner v. ISP Tech., Inc.,*
    259 F.3d 924, 929 (8th Cir. 2001) ..............................................................7

*Bragg v. Hi-Ranger, Inc.,* 319 S.C. 531, 462 S.E.2d 321 (1995) .................................18

*Brasher v. Sandoz Pharm. Corp.,*
    160 F.Supp.2d 1291, 1296-98 (N.D. Ala. 2001)...........................................7

*Brock v. Merrell Dow Pharmaceuticals, Inc.,*
    874 F.2d 307, 313 (5th Cir. 1989) ..............................................................6

*Brooks v. Medtronic,*
    750 F.2d 1227, 1232 (4th Cir. 1984) ..........................................................16

*Brown v. Bryan County, Okla.,*
    219 F.3d 450 at 456 (5th Cir. 2000)............................................................1

*Bryant v. Waste Management, Inc.,*
    342 S.C. 159, 536 S.E.2d 380, 386 (S.C. App. 2000) ....................................37

*Carlin v. Superior Court,*
    13 C.4th 1104, 56 C.R.2d 162, 920 P.2d 1347 (1996) ...............................16, 17

*Caraker v. Sandoz Pharmaceuticals Corp.,*
    172 F.Supp.2d 1018, 1030 ( S.D.Ill. 2001).................................................26

ii

*Cartwright v. Pfizer, Inc.*,
369 F.Supp.2d 876, 885 (E.D. Tex. 2005) ........................................................32

*Clark v. Cantrell*,
339 S.C. 369, 378, 529 S.E.2d 528, 533 (2000) ...............................................39

*Coffel v. Stryker Corp.*,
284 F.3d 625, 630 (5th Cir. 2002) .......................................................................1

*Curtis v. M&S Petroleum, Inc.*,
174 F.3d 661, 670 (5th Cir. 1999) .....................................................................10

*Desiano v. Warner-Lambert & Co.*,
--- F.3d ----, 2006 WL 2846454, FN9, C.A.2 (N.Y.), (October 05, 2006) ........32

*Doe v. Miles Lab., Inc.*,
927 F.2d 187 (4th Cir. 1991) .......................................................................17, 18

*Ellis v. Weasler Eng'g Inc.*,
258 F.3d 326, 337 (5th Cir. 2001) .......................................................................1

*Feldman v. Lederle Laboratories*,
125 N.J. 117, 147, 592 A.2d 1176, 1192 (1991)................................................32

*Finn v. G. D. Searle & Co.*,
35 Cal. 3d 691, 701 (Cal. 1984) ........................................................................18

*Flowers v. S. Reg'l Physician Servs.*,
247 F.3d 229, 235 (5th Cir. 2001) .......................................................................1

*Gardner v. Q.H.S., Inc.*,
448 F.2d 238 (4th Cir. 1971) .............................................................................19

*Hackett v. G.D.Searle & Co.*,
246 F.Supp.2d 591, 595 (W.D. Tex. 2002) ..................................................15, 16

*Hermes v. Pfizer, Inc.*,
848 F.2d 66, 69-70 (5th Cir. 1988) ...............................................................28, 29

*Hopkins v. Dow Corning*,
33 F.3d 1116, 1124-25 (9th Cir. 1994).................................................................7

*In re: Propulsid Products Liability Litigation*,
261 F.Supp.2d 603, 618 (E.D. La. 2003) .............................................................4

iii

*In Re: Propulsid Products Liability Litigation,*
　　Not Reported in F.Supp.2d, 2003 WL 22023398, *4, E.D.La., (March 11, 2003)............17

*In re Rezulin Prods. Liab. Litig.,*
　　331 F. Supp. 2d 196, 200 (S.D.N.Y. (2004) ......................................................................18

*Incollingo v. Ewing,*
　　444 Pa. 263, 282 A.2d 206 (1971) ............................................................................26, 29

*Jackson v. Pfizer, Inc.,*
　　432 F.Supp.2d 964 (D. Neb. 2006) ..................................................................................32

*Krasnopolsky v. Warner-Lambert Co.,*
　　799 F.Supp. 1342, 1345-46 (E.D.N.Y. 1992) ..................................................................19

*Little v. Brown & Williamson Tobacco Corp.,*
　　243 F. Supp. 2d 480, 498 (M.S.C. 2001) .....................................................................2, 17

*Livingston v. Noland Corp.,*
　　293 S.C. 521, 525, 362 S.E.2d 16 (S.C. 1987) ...............................................................18

*Magistrini v. One Hour Martinizing Dry Cleaning,*
　　180 F.Supp.2d 584, 610 (D. N. J.2002) ..........................................................................20

*Martin v. Hacker,*
　　83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993)...........................................19

*Maurer v. Heyer-Schulte Corp.,*
　　2002 WL 31819160, E.D. La., (December 13, 2002) .........................................................6

*Mazur v. Merck & Co., Inc..*
　　742 F.Supp. 239, 247 (E.D. Pa. 1990) ............................................................................32

*McClain v. Metabolife Intern., Inc.,*
　　401 F.3d 1233,1242-1243 (11th Cir. 2005) ................................................................4, 10

*McNeil v. Wyeth,*
　　462 F.3d 364, 368-374 (5th Cir. 2006) ....................................................................20, 29

*McNellis ex rel DeAngelis v. Pfizer, Inc., Slip Copy,*
　　2006 WL 2819046, D.N.J., (September 29, 2006) ...........................................................32

*McDonnell v. Chelsea Mfrs., Inc.,*
　　259 A.D.2d 674, 676, 687 N.Y.S.2d 172, 1999 N.Y. Slip Op. 02491
　　(N.Y.A.D. 2 Dept. 1999).................................................................................................19

iv

*Medalen v. Tiger Drylac U.S.A., Inc.,*
   269 F.Supp.2d 1118, 1133 (D. Minn. 2003) ...................................................................11

*Metabolife Intern., Inc. v. Wornick,*
   264 F.3d 832 (9th Cir. 2001) .............................................................................................7

*Moore v. Ashland Chem. Ins.,*
   151 F.3d 269, 278 (5th Cir.1998) ...................................................................................10

*Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.,*
   22 F.Supp.2d 942, 952 (E.D. Ark. 1998) .......................................................................11

*Nobles v. Astrazeneca Pharmaceuticals,*
   48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003)..............................26

*Odom v. G.D. Searle & Co.,*
   979 F.2d 1001, 1003 (4th Cir. 1992) ..............................................................................24

*Ohio v. U.S. Dept. of Interior,*
   880 F.2d 432, 473 (D.C. Cir. 1989) ...............................................................................10

*Omnitech Int'l, Inc. v. Clorox Co.,*
   11 F.3d 1316, 1322 (5th Cir. 1994) ..................................................................................1

*Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ..........................................1

*Rife v. Hitachi Const. Machinery Co., Ltd.,*
   363 S.C. 209, 215, 609 S.E.2d 565, 569 (S.C. App. 2005) ............................................17

*Ruff v. Ensign-Bickford Indus., Inc.,*
   168 F.Supp.2d 1271, (D. Utah 2001) ...............................................................................7

*Salmon v. Parke Davis & Co.,*
   520 F.2d 1359, 1363 (4th Cir. 1975) .......................................................................26, 29

*Stahl v. Novartis Pharms. Corp.,*
   283 F.3d 254, 267 (5th Cir. 2002) ..................................................................................19

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
   538 U.S. 408, 123 S. Ct. 1513 (2003) ............................................................................36

*Stevens v. Parke, Davis & Company,*
   9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973) ..............................26, 29

v

*Talkington v. Atria Reclamelucifers Fabrieken BV,*
   152 F.3d 254, 261-262. (4th Cir. 1998) ............................................................18

*Tatum v. Schering Corp.,*
   795 F.2d 925, 928-929 (11th Cir. 1986) ..........................................................24

*Thomas v. Hoffman-LaRoche, Inc.,*
   949 F.2d 806, 812 (5th Cir. 1992) ...................................................................37

*Timm v. Upjohn Co.,*
   624 F.2d 536 (5th Cir. 1980)...................................................................... 24

*Turner v. Iowa Fire Equipment Co.,*
   229 F.3d 1202, 1208 (8th Cir.2000) ................................................................11

*WadeGreaux v. Whitehall Lab. Inc.,*
   874 F.Supp. 1441, 1480 (D.Vi. 1994)................................................................6

*Wheat v. Pfizer, Inc.,*
   31 F.3d 340, 342-43 (5th Cir. 1994) ...............................................................10

*White v. Ford,*
   312 F.3d 998, 1014 (9th Cir. 2002) .................................................................38

*Whitley v. Cubberly,*
   24 N.C.App. 204, 210 S.E.2d 289, 207-208 (1974) ........................................29

*Witczak v. Pfizer, Inc.,*
   377 F.Supp.2d 726, 728-30 (D. Minn. 2005)...................................................32

*Woodbury v. Janssen Pharmaceutica, Inc.,*
   1997 WL 201571*8 (N.D.Ill. 1997) ...............................................................19

vi

FAC Resp. Exhibit B -- 2014

## **STATUTES**

63 Fed.Reg. 66378, 66384 (Dec. 1, 1998) ...........................................................................32

65 Fed.Reg. 81082, 81103 (Dec. 22, 2000) .........................................................................32

71 Fed. Reg. at 3923-35 .......................................................................................................31

## **OTHER**

Reference Manual on Scientific Evidence 2nd Ed. (FJC 2000) .........................................7

Restatement (Second) of Torts § 431 (1965) ...............................................................2, 15

http://www.census.gov/population/cen2000/phc-t2/tab01.pdf ......................................38

vii

## **TABLE OF CONTENTS**

I.  THE LEGAL STANDARD FOR JUDGMENT AS A MATTER OF LAW
UNDER RULE 50(B)...............................................................................1

II.  THE JURY'S FINDINGS ON CAUSATION WERE REASONABLE, AND BASED
UPON MORE THAN LEGALLY SUFFICIENT EVIDENTIARY BASIS. ...............1

    A.  Plaintiff Introduced Significant and Scientifically Reliable Evidence of
    General Causation. ...................................................................................1

        1.  Plaintiff's Experts Offered More Than Sufficient Evidence to Show an
        Association Between Vioxx at the 25 mg Dose and an Increased Risk of
        Cardiovascular Events.........................................................................2

        2.  Plaintiff Affirmatively Demonstrated the Mechanism by which
        Vioxx Accelerates Atherosclerosis. ..........................................................4

            a.  Plaintiff Offered Significant and Substantial Evidence to Show that
            Vioxx Accelerates Atherosclerosis. .........................................5

            b.  The Articles Used by Dr. Zipes are Scientifically Reliable Evidence
            that Vioxx Accelerates Atherosclerosis. ...............................................8

            c.  Dr. Zipes Thoroughly Reviewed the Literature. ...................................9

    B.  Plaintiff Introduced Significant and Scientifically Reliable Evidence of
    Specific Causation. . .................................................................................10

        1.  Plaintiff's Experts Effectively Ruled Out Possible Risk Factors as a Cause
        of His Heart Attack and Subsequent Injuries. ...........................................11

        2.  Vioxx Was Shown to be the Most Probable Cause of the Plaintiff's
        Heart Attack and Subsequent Injuries.......................................................14

III. THE JURY'S FINDINGS ON THE NEGLIGENT FAILURE-TO-WARN AND
DECEIT-BY-CONCEALMENT CLAIMS WERE REASONABLE, AND BASED
UPON MORE THAN LEGALLY SUFFICIENT EVIDENTIARY BASIS. ............  15

    A.  Plaintiffs Negligence Claim, Which Is a Separate and Distinct Cause of
    Action From Strict Liability, Was Proven By a Preponderance
    of the Evidence. . ......................................................................................15

        1.  The Nature And Extent of the Risks of Vioxx Which Merck Should
        Have Conveyed to Plaintiff's Prescribing Physicians Were Known and
        Knowable to Merck, and Were Neither Uncertain Nor Unproven. ...........18

viii

2.   Knowledge of a Risk Associated with a Drug Does Not
     Absolve a Manufacturer of Liability, Where, As Here, the
     Warnings Are Inadequate. ........................................................................24

3.   The Evidence, Both Subjective and Objective, Establishes That Had
     Merck Provided an Adequate Warning, Dr. Mikola Would
     Not Have Prescribed Vioxx and Mr. Barnett Would Not Have
     Continued to Take Vioxx.........................................................................27

B.   Merck's Argument Regarding Plaintiff's Deceit Claim Fails for the
     Same Reasons. ......................................................................................31

C.   Plaintiff's Claims Are Not Preempted by Federal Law. ........................................31

D.   Plaintiff Presented More Than Sufficient Evidence of Causation. ........................32

E.   The Evidence Was More Than Sufficient To Support  Punitive Damages. ..........33

IV.   CONCLUSION ..................................................................................................40

ix

## INTRODUCTION

### I.    THE LEGAL STANDARD FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B)

"Although our review is de novo, ... our standard of review with respect to a jury verdict is especially deferential." *Flowers v. S. Reg'l Physicians Servs.*, 247 F.3d (5th Cir. 2001) at 235 (internal quotations omitted) (quoting *Brown v. Bryan County, Okla*, 219 F.3d 450 at 456 (5th Cir. 2000). Therefore, judgment as a matter of law should only be granted if "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.* (internal quotations omitted) (quoting *Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316, 1322 (5th Cir.1994).) *Coffel v. Stryker Corp.*, 284 F.3d 625, 630 (5th Cir. 2002)..."'"... Moreover, in entertaining a Rule 50 motion, the court "must review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence." *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).) "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." In reviewing the record as a whole, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 630-631.

### II.   THE JURY'S FINDINGS ON CAUSATION WERE REASONABLE, AND BASED UPON MORE THAN LEGALLY SUFFICIENT EVIDENTIARY BASIS.

#### A.    Plaintiff Introduced Significant and Scientifically Reliable Evidence of General Causation.

Merck contends that there is no legally sufficient evidence to show that Vioxx was the

1

proximate cause of Mr. Barnett's injuries.[1] Merck argues that the Plaintiff failed to satisfy his burden to prove general causation because he "introduced no relevant and reliable studies to show that use of Vioxx at the 25mg dose causes heart attacks," and that he did not prove a biologically plausible mechanism by which Vioxx caused his injuries.

However, the evidence in the record supports the jury's findings and demonstrates that Vioxx causes heart attacks and rapid progression of atherosclerosis. Plaintiff's experts cited to numerous studies, both human as well as animal, and data from clinical trials, yet Merck offered not a single retained expert witness in response. (Drs. Karavan and Bryan concededly were not knowledgeable about the Vioxx science.) In fact, Merck's witness, Dr. Reicin admitted that APPROVe showed an excess of thrombotic events at 18 months or longer, (8/14/06 Tr. at 2354:22-2355:1) and the Plaintiff used Vioxx for 31 months before his first heart attack, and another 24 months thereafter.

1.   **Plaintiff's Experts Offered More Than Sufficient Evidence to Show an Association Between Vioxx at the 25 mg Dose and an Increased Risk of Cardiovascular Events.**

Through the testimony of his causation experts, Dr. Zipes and Dr. Avorn, the Plaintiff proved that Vioxx causes an increased risk of heart attacks. Merck contends that Plaintiff's proof is scientifically unreliable because the experts could point to only one study (APPROVe) that shows an

---

[1] Merck is correct that under Restatement (Second) of Torts § 431 (1965), "[t]he actor's negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in bringing about the harm . . . ." However, the substantial factor test does not require absolute certainty nor proof beyond a reasonable doubt. 'The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, ..." Restatement 2d Torts 431, Comment a. As stated by Merck in its Memorandum Addressing Applicable South Carolina Law filed 5/17/06: "When there are several alleged - or possible - causes of an injury, a defendant is not relieved from liability because it is responsible for only one of those causes.) *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 498 (M.S.C. 2001)   Plaintiffs can recover if they show that the defendant's conduct was an "efficient cause" that contributed to the injury. Id. Thus, under South Carolina law, "the defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury." Small, 494 S.E.2d at 843."

2

increase in cardiovascular events. Merck concedes that APPROVe is a statistically significant, placebo controlled, clinical trial, yet discounts this evidence by saying Dr. Moye suggested "one study is not enough." Motion at 6. However, Merck ignores Dr. Moye's testimony that recently the FDA has decided that "if they have one good, large and well-designed, well-executed, well-analyzed confirmation study, that will be enough." (8/3/06 Tr. at 778:20-23.)

Standing alone, APPROVe is statistically significant, scientifically reliable evidence that Vioxx causes cardiovascular events at the 25 mg dose. Nevertheless, Dr. Zipes also relied upon statistically significant evidence from the Alzheimer's trials. He explained that often in people with Alzheimer's the first manifestation of heart attack is sudden death, so there is good reason to combine the two endpoints of sudden death and heart attack. Once combined, the relative risk becomes 1.89, which is statistically significant. (8/8/06 Tr. at 1713:23-1714:20.) In addition to epidemiological data from various clinical studies, Dr. Zipes relied upon the Plaintiff's medical records and the results of the 2005 FDA Advisory Committee, wherein 32 independent scientists reviewed clinical data and unanimously concluded that Vioxx causes an increase in cardiovascular events. (8/8/06 Tr. at 1666:11-1667:6.)

Dr. Avorn testified about how the results of VIGOR study showed a five-fold increased risk of heart attack with Vioxx versus naproxen, (8/1/06 Tr. at 295:23-297:14) and why Merck's theory that naproxen is cardioprotective does not explain a five-fold increase. (*Id.* at 323:22-324:18.) Dr. Avorn testified that in his own study he found an increased risk of MI in people taking regular doses of Vioxx, (*Id.* at 336:5-336:14) and that the FDA medical reviewer cited several studies that suggest trends toward higher rates of myocardial infarction with Vioxx, even with lower doses of Vioxx or shorter duration. (*Id.* at 373:10-374:6.) The ADVANTAGE trial showed an increased risk of heart attack on Vioxx, (*Id.* at 367:16-20) as did Study 090 (*Id.* at 367:23-368:9.)I n the Alzheimer's trials,

3

the number of cardiac deaths on Vioxx was "striking" (*Id.* at 378:25-379:5), and even Merck's own internal meta-analysis conducted by Dr. Shapiro showed an increased risk of heart attack on Vioxx. (*Id.* at 559:7-561:4.) From all of this evidence, it was more than reasonable for a jury to conclude that Vioxx causes an increase of cardiovascular events at the 25 mg dose.

### 2. Plaintiff Affirmatively Demonstrated the Mechanism by which Vioxx Accelerates Atherosclerosis.

Merck contends that Plaintiff presented no evidence of any biologically plausible mechanism by which Vioxx could accelerate atherosclerosis. First of all, the cases relied upon by Merck are readily distinguishable in that they all addressed obvious failures of proof. *Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999) (Expert's testimony that customer's fall caused hormonal damage leading to fibromyalgia was not sufficiently reliable where neither expert nor medical science knew exact process that resulted in fibromyalgia, and expert testified, "I didn't find the cause. I found an event that contributed to the development of the symptom. I did not find the cause."); *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1242-1243 (11th Cir. 2005)(Expert had no opinion as to dose that could would cause injury. "He only said that any amount of Metabolife is too much, which clearly contradicts the principles of reliable methodology...." "He offered no epidemiological data. He offered no clinical trials. He offered no animal studies to support his opinions." *Id.* at 1251.); *In re: Propulsid Products Liability Litigation*, 261 F.Supp.2d 603, 618 (E.D.La.2003)(Experts admitted they did not know how or why the drug allegedly caused the effect, and had no evidence that the plaintiff did not have the condition prior to taking the drug. *Id.* at 615-616.)

The experts here provided reliable and compelling explanations of how Mr. Barnett's use of Vioxx caused his extensive cardiac injuries. Dr. Zipes demonstrated - unrebutted by any defense expert opinion to the contrary - the mechanism by which Vioxx caused Mr. Barnett's rapid

4

progression of atherosclerosis.   Based upon vast clinical experience as well as hundreds of hours

reviewing materials regarding Vioxx and Cox-2 inhibition (8/8/06 Tr. at 1654:7-17), Dr. Zipes

explained that Vioxx prevents the development of prostacyclin, creating an imbalance favoring

thromboxane, leading to vasoconstriction, platelet clumping, narrowing of the artery and eventual

heart attack.  Because of the imbalance, cells will tend to adhere to an injury in the blood vessel,

causing an increase in platelet migration to that area, which in turn causes an acceleration of plaque

build-up.  (*Id.* at 1677:9-1679:2; 1679:10-1680:12.)   In his testimony regarding the APPROVe

follow-up data, Zipes described how the acceleration of atherosclerosis can affect a person even after

Vioxx use is discontinued.   In essence, the damage done to the artery, or the plaque that has

accumulated within the artery during the time that a person was on Vioxx remains, putting the person

at greater risk for a thrombotic event.  (*Id.* Tr. at 1700:21-1701:17.)

        **a.**     **Plaintiff Offered Significant and Substantial Evidence to Show that Vioxx Accelerates Atherosclerosis.**

Dr. Zipes explained the body of evidence which demonstrates that Vioxx accelerates

atherosclerosis. This includes human data from Merck's own clinical trials and the APPROVe

follow-up data, as well as the Alzheimer's data from study 078 described in the *Thal* article.

Both of these studies were in humans and showed that Vioxx continued to increase the risk of

cardiovascular events even after discontinuation of the drug, which is best explained by the

acceleration of atherosclerosis while the person was on the drug.  As discussed by Merck's own

consultant, Dr. FitzGerald, "Patients in the APPROVe study should continue to be followed.

This will allow some estimate of how quickly the developed risk may dissipate given the

relatively short-half lives of these compounds.  Such dissipation may occur rapidly.  On the other

hand, if treatment accelerates atherosclerosis, the offset of the risk may be more gradual."

5

Indeed, as described by Dr. Zipes, the APPROVe follow-up date proved exactly the prediction provided by Dr. FitzGerald, namely that the risk dissipates gradually after discontinuation of the drug.  (8/8/06 Tr. at 1700:18 – 1704:23; 1713:21 – 1714:20; 8/10/06 Tr. at 1857:1-8; 1861:1-12; 1863:7 – 1864:10; 1867:19-25.)  Protocol 112 also provides evidence that Vioxx increases cardiovascular risk by showing that in a comparison between Celebrex and other NSAIDs, Vioxx caused a greater increase in blood pressure than the other drugs. (8/8/06 Tr. at 1709:24-1710:24.)

In addition to data involving humans, Dr. Zipes also relied upon animal studies which provide "an understanding of mechanisms that help us interpret clinical information." (*Id.* at 1793:9-10.)  Ignoring all of the human data relied upon by Plaintiff's experts, Merck contends that "animal studies cannot establish causation in humans."  However, two of the cases cited by Merck involved animal studies which were themselves unreliable. See *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194 (5th Cir. 1996) (Affirming exclusion where the animal studies themselves were inconclusive and unreliable, (*Id.* at 195) and there were numerous contrary reputable epidemiological studies. (*Id* a t 197.); *Brock v. Merrell Dow Pharmaceuticals, Inc*., 874 F.2d 307, 313 (5th Cir. 1989)("We need not address at length the animal studies presented by plaintiffs below, except to note several of the more important studies and their methodological flaws." *Id.* at 313.) The other cases involved unique case-specific problems not present here. *Maurer v. Heyer-Schulte Corp.*, 2002 WL 31819160, E.D. La., December 13, 2002 (Summary judgment granted where the only scientific support was an FDA report regarding effect of chemical on rats.); (*Wade-Greaux v. Whitehall Lab. Inc.,* 874 F.Supp. 1441, 1480 (D.Vi. 1994), *aff'd* 46 F.3d 1120 (3d Cir.1994) (Summary judgment in action alleging birth defects where Plaintiff's expert had testified in other litigation that "because so many substances are teratogenic in animals, before you can make a conclusion that a substance is teratogenic in humans, you must

6

look to the human data." *Id.* at 1483.)

Despite these limited factual scenarios, use of animal studies is an accepted and reliable methodology. See *e.g.* Reference Manual on Scientific Evidence 2d Ed. FJC 2000, 345-346. Blanket arguments against animal studies like Merck is making here were rejected by the court in *Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 842 (9th Cir. 2001):

> "First, *Daubert II* itself recognized that animal studies are not per se inadmissible and should be subjected to substantive analysis, just like other scientific evidence. ... None of these cases holds that animal studies will always be too unreliable to provide admissible evidence about human health issues. Notwithstanding the moral and ethical problems often surrounding animal studies, in some circumstances they provide useful data about human health. The district court erred in rejecting the animal studies proffered by Metabolife merely because of the species gap." *Id.* at 842..

Large-scale epidemiological studies are not essential to the formation of an expert opinion as to causation. See *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929 (8th Cir. 2001); *Brasher v. Sandoz Pharm. Corp.,* 160 F.Supp.2d 1291, 1296-98 (N.D. Ala. 2001; *Ruff v. Ensign-Bickford Indus., Inc.,* 168 F.Supp.2d 1271 (D. Utah 2001). See also *Hopkins v. Dow Corning*, 33 F.3d 1116, 1124-25 (9th Cir.1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995).

Even ignoring the studies and data involving humans upon which Dr. Zipes relied, the animal studies show compelling proof that Vioxx accelerates atherosclerosis.  Genetic alteration allows scientists to closely mimic the conditions of a human heart under the influence of Cox-2s, thereby providing reliable predictors of the mechanism by which Vioxx accelerates atherosclerosis.  Dr. Epstein testified that animal studies are relevant to the human situation, (8/5/06 Tr. at 1176:13-16) and that his animal study raised a yellow flag for Merck that Vioxx causes accelerated atherosclerosis.  (*Id.* at 1201:19-25.)  Dr. Zipes opined that animal studies help to explain the mechanism by which Vioxx causes heart attacks.  (8/8/06 Tr. at 1686:21-1687:1.)  Dr. Epstein

explained that in his study he used an analog of Vioxx called MF-Tricyclic because it shares so much of the same structure, and has similar biologic activity. (8/5/06 Tr. at 1184:6-23.)

### b.   The Articles Used by Dr. Zipes are Scientifically Reliable Evidence that Vioxx Accelerates Atherosclerosis.

Merck refers to an Egan study (Circulation 2005) and argues that it does not show that Vioxx accelerates atherosclerosis.  Motion at 11-12.  Because this study is not in the record, Merck's argument is patently meritless. Zipes testified about another study conducted by Egan (Science 2004), in which the authors conclude that the synthesis of prostacyclin, along with estrogen, plays a role in protecting female mice from developing atherosclerosis. Therefore, by inhibiting prostacyclin, Vioxx contributes to the development of atherosclerosis.  (8/8/06 Tr. at 1695:19-1697:10.)

Merck objects to parts of the Rudic article.  Motion at 12.  However, the particulars of this second experiment were not specifically discussed in Dr. Zipes testimony and are not contained within the record. Dr. Zipes briefly explained the parameters and results of the Rudic study on direct examination, and on cross-examination was asked only about whether the study involved Vioxx and whether it examined acceleration of atherosclerosis.   (8/8/06 Tr. at 1690:23-1692:3; 1834:24-1835:15.) This article was not admitted into evidence, and Merck's arguments go beyond any testimony in the record.  Dr. Zipes explained that nimesulide, a Cox-2 inhibitor like Vioxx, diminished the prostacyclin within the arteries of mice and effected a change in the inner wall of the arteries by increasing the number of smooth muscle cells.  He explained that this increase is "part and parcel of the artery wall that can go on to the development of atherosclerosis." (*Id.* at 1691:8-1692:3.)  This article is further evidence that the inhibition of Cox-2 has a direct effect on the progression of atherosclerosis.  Next, Merck refers to an article by Cheng (Science 2002), which again was not discussed in Dr. Zipes testimony, and which is not within the trial record. Merck also

8

argues that the Antman article does not support Plaintiff's theory because it is a review article. Motion at 13. However, it is a peer-reviewed publication, was not prepared for litigation, (*Id.* at 1684:8-13), and is in accord with independent articles. (*Id.* at 1792:22-25.)

Contrary to Merck's assertion, the articles relied upon by Dr. Zipes provide substantial evidence that the damage caused by Vioxx can have lasting effects. Moreover, Merck did not offer a single expert witness to refute Dr. Zipes' conclusions and methodology, nor the studies and literature upon which they were based. Merck instead relied, as it does here, upon argument of counsel.

### c.   Dr. Zipes Thoroughly Reviewed the Literature.

Merck contends that Dr. Zipes "inexplicably dismissed" various studies that did not clearly show that Vioxx causes acceleration of atherosclerosis. Motion at 13. This is not the case. Dr. Zipes spent between 300 and 400 hours reviewing Vioxx related materials, including hundreds of published articles, and conducted extensive review of the basic and clinical literature. (8/8/06 Tr. at 1654:7-20.) In fact, as Merck points out in its brief, Dr. Zipes does not dismiss these articles, but readily acknowledged their existence. He discussed how Pratico disputed the concept of accelerated atherosclerosis in earlier literature, but that the author recently showed he is changing this opinion. (*Id.* Tr. at 1693:10-1694:4.) Further, he had read and was able to explain why the Burleigh articles were not relevant. (8/10/06 Tr. at 1838:9-19 and 1842:12.)

Dr. Zipes did not "dismiss" the studies such as Bogaty (Circulation 2004), as Merck suggests, because the findings were opposite to Plaintiff's theory of acceleration of atherosclerosis. Instead, he testified that the results of the studies are skewed because the patients enrolled were taking low-dose aspirin, thus masking the effects of unopposed thromboxane on the development of atherosclerosis, since aspirin acts in a manner similar to prostacyclin. (*Id.* at 1921:13-14 and 1923:11-16.) Despite the difference in some of the studies, accelerated atherosclerosis is proven by both the

9

clinical data as well as the animal studies Dr. Zipes reviewed.  (8/8/06 Tr. at 1692:25-1693:7.)

**B.      Plaintiff Introduced Significant and Scientifically Reliable Evidence of Specific Causation.**

Merck argues that "[t]he specific causation opinion Dr. Zipes offered amounts to nothing more than a temporal proximity argument."  Motion at 15.  The cases relied upon by Merck are either completely off point (*Ohio v. U.S. Dept. of Interior*, 880 F.2d 432, 473 (D.C. Cir. 1989) (criteria for determining whether oil spills and hazardous substance releases caused injury to natural resources), or involved obvious flaws in the experts' methodologies. *E.g. McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1242-1243 (11th Cir. 2005)(Plaintiffs' expert had no opinion about dose that could would cause injury.)("He only said that any amount of Metabolife is too much, which clearly contradicts the principles of reliable methodology...."); *Moore v. Ashland Chem. Ins.*, 151 F.3d 269, 278 (5th Cir. 1998)(Expert relied solely upon Material Safety Data Sheet from the manufacturer stating that  the contents of the drum in question were 'irritating to the lungs.') See also, *Curtis v. M&S Petroleum*, Inc., 174 F.3d 661, 670 (5th Cir. 1999), distinguishing *Moore*, supra. (Trial court abused its discretion in excluding the plaintiffs' expert's specific causation opinion.)("[A] temporal connection is entitled to greater weight when there is an established scientific connection between exposure and illness or other circumstantial evidence supporting the causal link.")

Moreover, the cases cited by Merck almost all involved situations where the experts could not even 'rule in' the defendant's product, let alone 'rule out' other more likely causes. *E.g. Wheat v. Pfizer, Inc.*, 31 F.3d 340, 342-43 (5th Cir. 1994) (Despite evidence that the decedent had been exposed to hepatitis, and testimony by her treating physicians that she had a viral hepatitis unrelated to medication, plaintiffs offered no evidence or expert testimony excluding it as a cause. *Id.* at 342-

10

343.); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F.Supp.2d 1118, 1133 (D. Minn.2003) (Expert conceded he was aware of no published literature supporting his opinion on causation and could not 'rule in' the defendant's products.); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*, 22 F.Supp.2d 942, 952 (E.D. Ark.1998)("[E]xperts must turn to epidemiological studies, in vitro studies, animal studies, and other indirect methods in an attempt to make the connection. FN5 Here, there are no such studies." *Id.* at 952.); *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000)(Physician "admitted that he made no attempt to consider all the possible causes, or to exclude each potential cause until only one remained, or to consider which of two or more non-excludable causes was the more likely to have caused the condition." *Id* at 1208.); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 610 (D. N.J. 2002)(Expert offered no reliable methodology for ruling out alternative causes, and defendant presented testimony of experts demonstrating that smoking was a greater risk factor for leukemia than PCE exposure.)

Unlike the cases cited by Merck, Plaintiff's experts provided substantial reliable scientific evidence of both general and specific causation. Plaintiff's experts were able not only to 'rule in' Vioxx as the most probable cause of Mr. Barnett's heart attack and increased atherosclerosis, but to rule out each of the other 'possible' causes which Merck has alleged.

1.   **Plaintiff's Experts Effectively Ruled Out Possible Risk Factors as a Cause of His Heart Attack and Subsequent Injuries.**

In January 2000, approximately two weeks after starting Vioxx, Mr. Barnett had a Cardiolite stress test showing mild lateral wall ischemia. The coronary artery disease from which he suffered was of a mild degree, and placed him at only a 1-2% risk of having a future heart attack. (8/8/06 Tr. at 1716:3-1717:1.) However, just 31 months later he suffered a heart attack and developed multi-vessel coronary disease. According to Dr. Zipes, this rapid progression of CAD and heart attack was

11

a very unusual occurrence for someone in Mr. Barnett's medical condition. (*Id.* at 1715:20-25.) Dr. Popma agreed. (8/7/06 Tr. at 1396:23.)

Plaintiffs' experts both took into account the Plaintiff's age, family history, high cholesterol, stress, gender and exposure to secondhand smoke. Dr. Popma explained that some risk factors are modifiable, such as high cholesterol, stress and exposure to secondhand smoke, while others, such as age, family history and gender are not modifiable risk factors. (*Id.* at 1329:19-1330:1.) Yet neither type of risk factor could have explained the type of injuries that the Plaintiff experienced. As to modifiable risk factors, Dr. Karavan testified that Mr. Barnett was in the top 1% of his patients in terms of his vigilance in modifying risk factors. According to Dr. Karavan, "Mr. Barnett's always been very aggressive with risk factor modification." (8/4/06 Tr. at 1028:5-6; 8/5/06 Tr. at 1153:7-10.) He had engaged in strict medical management of his cholesterol by taking Lipitor, and brought his LDL levels down to the range of 100 during the time frame of 2000 to 2002. (8/7/06 Tr. at 1495:5-9.) Dr. Popma explained that by bringing down his LDL levels he was lowering his risk of heart attack to the point where his cholesterol could not have caused the type of accelerated plaque progression seen in 2002. (*Id.* at 1360:11-17.) ("it should markedly slow the rate of progression by having this LDL cholesterol the way it was.")

Even after his heart attack and bypass surgery, Mr. Barnett continued to lower his LDL levels down to below the 100 range, the point at which Dr. Popma expected to see a freeze or regression in plaque build-up. Instead, the angiogram in July 2006 revealed further blockages of the arteries, causing vein graft occlusions. (*Id.* at 1387:9-11; 1389:7-9.) ("And this is at a time when, at least the amount of data we have available, the plaque should be getting – regressing, going away.")

The Plaintiff's experts were also able to rule out stress and exposure to secondhand smoke as contributors to Mr. Barnett's heart attack and subsequent injuries. Dr. Zipes testified that if stress

12

from being an FBI Agent for almost 30 years or from his wife's diagnosis of cancer was a possible source of his decline in cardiac health, then more plaque build-up would have been visible on Mr. Barnett's January 2000 Cardiolite test. (8/8/06 Tr. at 1735:1-6.) Dr. Karavan noted that stress is not a major risk factor. (8/4/06 Tr. at 1143:16-17.) Dr. Popma testified that it has not been proven that secondhand smoke has a negative effect. (8/7/06 Tr. at 1429:13-16.) Both Mr. Barnett and Mrs. Barnett testified that the Plaintiff did not like to be around the smoke, and required Mrs. Barnett to smoke outside of the house out of his presence. (*Id.* at 1534:3-1535:1; 1542:17-1543:2.) Stress and secondhand smoke were nominal, if not nonexistent risk factors, and could not have been the cause of the extreme amount of plaque build-up that Mr. Barnett experienced in such a short time.

While discussing age as a risk factor, Dr. Popma cited a study by Nissen, which showed that by age 50 men have an 85% chance of having atherosclerotic narrowings in their blood vessels. (*Id.* at 1339:4-10.) However, Dr. Popma distinguished this study, saying, "but many of these patients [in the study] didn't have Mr. Barnett's exercise test," referring to the results of mild ischemia on the Plaintiff's January 24, 2000 Cardiolite exam. (*Id.* at 1405:6-7.) Furthermore, while Mr. Barnett may have been at a greater risk for heart disease because he was over 50 at the time of his heart attack, Dr. Popma testified that the Plaintiff had only had a short six years for the risk factors that come along with age, such as cholesterol build-up, to take effect. (*Id.* at 1406:1-7.)

As with age, Dr. Popma discussed how Mr. Barnett's unclear family history does not sufficiently explain Mr. Barnett's injuries. Merck first cites to Mr. Barnett's father's cardiac history as having predisposed Mr. Barnett to the type of damage he experienced. However, Plaintiff's father did not modify his risk factors. He was overweight, did not watch his diet, exercise or take cholesterol lowering medications. (*Id.* at 1501:18-1502:11.) Furthermore, it is not clear how many heart attacks the Plaintiff's father had, or how old he was when he had them. (*Id.* at 1503:18-1504:2;

13

1407:1-2.)  The Plaintiff recalls that his father may have had two events.  (8/8/06 Tr. at 1596:3-5.)

However, even assuming that Mr. Barnett's father had two events, it is possible that the earlier heart

attack did not occur until age 62, which would not qualify as a risk factor according to the Adult

Treatment Panel Guideline, which sets less than age 55 as a criterion for this risk factor.  (8/7/06 Tr.

at 1407:1-7.)  Merck also contends that the Plaintiff's mother's and sister's history of TIAs is a

contributing factor to Plaintiff's injuries.  A TIA is a neurological, not a cardiac injury, which is

similar to stroke. According to Dr. Karavan, "I don't think stroke had anything to do with his heart

disease, so I don't see the connection with stroke." (8/4/06 Tr. at 1073:14-15.)

All of this evidence was uncontested proof that the alleged risk factors raised by Merck could

be ruled out as causes of Mr. Barnett's heart attack and subsequent injuries

### 2.     Vioxx Was Shown to be the Most Probable Cause of the Plaintiff's Heart Attack and Subsequent Injuries.

Dr. Zipes "ruled in" Vioxx as the cause of Mr. Barnett's injuries. (8/8/06 Tr. at 1666:11-

15;1679:11-17; 1716:3-12; 1716:19-1717:1), testifying that even in the presence of risk factors, Mr.

Barnett had only a 1-2% risk of having a heart attack in 2000, and yet once he began taking Vioxx,

his plaque progressed from a mild to severe state in just 31 months.  Contrary to what the defense

argued during the trial, the damages in this case are not limited to a "small heart attack." Mr.

Barnett's heart attack was just the first overt manifestation of the injuries caused by Vioxx that took

him from a favorable cardiac health status with prospects of a full life in 2000, to a dire situation in

2006, in which he now suffers from diffuse coronary disease throughout his heart.  Since his heart

attack in 2002 he has also suffered: a quintuple open-heart CABG surgery; continued rapid

development of plaque; a second heart attack resulting in vein occlusions; another angiogram and

placement of a stent; likelihood of further surgical intervention and a loss of nine to ten years of his

14

life. Plaintiff's doctors testified as to the difference in Mr. Barnett's present cardiac status and at the time of his heart attack in 2002. In each of Mr. Barnett's various coronary arteries, the plaque burden is worse (8/5/06 Tr. at 1162:23-1163:19), and has shortened his life by 10 years. (8/8/06 Tr. at 1733:24- 1735:16.)

Vioxx caused a disease process that aggressively occluded Mr. Barnett's arteries, not once, but twice, to the point where he is now at increased risk of future cardiac events requiring surgical intervention, and which can result in premature death. The 2002 heart attack, whether categorized as "small" or otherwise, was only the first conspicuous physical injury. Mr. Barnett then had to undergo a quintuple CABG surgery, which should have resolved his coronary artery disease in light of his continued lowering of his LDL levels. (8/7/06 Tr. at 1385:7-23.) Instead, even after CABG, Mr. Barnett suffered from rapid plaque development again, resulting in occlusion of two grafts as well as two other vessels and his second heart attack. (8/8/06 Tr. at 1723:5-18; 1724:14-1725:20.) Vioxx caused increased plaque burden and decreased exercise tolerance, (8/5/06 Tr. at 1162:23-1163:19; 8/8/06 Tr. at 1727:20-23; 8/7/06 Tr. at 1477:1-1478:6), and Mr. Barnett has had to undergo another angiogram and surgical stenting in one of his grafted vessels. (8/7/06 Tr. at 1481:8-13.)

III.   **THE JURY'S FINDINGS ON THE NEGLIGENT FAILURE-TO-WARN AND DECEIT-BY-CONCEALMENT CLAIMS WERE REASONABLE, AND BASED UPON MORE THAN LEGALLY SUFFICIENT EVIDENTIARY BASIS.**

   A.   **Plaintiffs Negligence Claim, Which Is a Separate and Distinct Cause of Action From Strict Liability, Was Proven By a Preponderance of the Evidence.**

Arguing that comment k, Restatement (Second) of Torts § 402A "defeats" plaintiff's negligence claim, Merck contends that because "this issue was already tendered" by a strict liability claim for failure to warn "in the circumstances of this case, an independent "negligence" claim was superfluous and should have been dismissed." Merck cites *Hackett v. G.D. Searle & Co.,* 246

15

F.Supp.2d 591, 595 (W.D. Tex. 2002) for this proposition, as "granting summary judgment on design defect claim in COX-2 prescription drug case involving Celebrex where application of comment k left only a duplicative warning claim." Merck's brief leaves the misimpression that the court in *Hackett* dismissed one failure to warn claim as 'duplicative' or 'superfluous.' In fact, the court in *Hackett* granted partial summary judgment on a 'design defect claim' under comment k. As to the negligence claim, the court granted judgment on the pleadings as to claims Searle "failed to warn *users and consumers of Celebrex and physicians other than Hackett's physician.*" *Id.* at 594.

As the court in *Hackett* correctly recognized, comment k precludes liability for design defects in prescription drug cases, (". . .Defendants can only be held strictly liable if the drug was *not properly prepared or marketed or accompanied by proper warnings,*" (*Id.* at 595. Emphasis added.) but it has no effect on other theories of liability. Comment k does not change the standard for determining whether warnings are adequate, nor does it eliminate the manufacturer's duty to exercise reasonable care, nor does it eliminate liability for negligence in *testing, inspection* and *marketing* its products. *Brooks v. Medtronic,* 750 F.2d 1227, 1232 (4th Cir. 1984) (under South Carolina law that pacemakers are unavoidably unsafe products within the scope of comment k) does not hold otherwise. In fact, the plaintiff in *Brooks* had dismissed his negligence claim during deliberations, which the Fourth Circuit noted by saying: "Undoubtedly Brooks and his counsel regretted the decision for it was a misreading of the probable outcome on strict liability." *Id.* at 1230. The court also commented on the distinction between negligence and strict liability for failure to warn. "[D]uty to warn under breach of warranty, the functional equivalent of strict liability, focuses upon whether the lack of warning rendered the *product* unreasonably dangerous; whereas a manufacturer may be liable in negligence for failure to warn if its *conduct* is unreasonable." *Id.* at FN13.

Merck also cites *Carlin v. Superior Court* (1996) 13 C.4th 1104, 56 C.R.2d 162, 920 P.2d

16

1347, a California Supreme Court case.  California has long followed comment k in prescription

drug cases and in fact the court in *Carlin* explained in detail that "[f]ailure to warn in strict liability

differs markedly from failure to warn in the negligence context." *Id.* at 1112.  This Court also noted

the distinction under Louisiana law in *In re Propulsid Products Liability Litigation,* Not Reported in

F.Supp.2d, 2003 WL 22023398, *4, E.D. La. March 11, 2003:

> "Thus, the design defects and inadequate warnings claims are separable. A finding of
> liability on one theory does not guarantee or preclude a finding of liability on the
> other. The required elements of proof are also different and distinct. A warnings
> claim in a prescription drug case such as this one focuses on whether the defendant
> adequately warned the plaintiff's doctor of the dangers of the product, while the
> defective design claim focuses on the actions of the defendant in manufacturing the
> drug despite alternative designs."

Comment k eliminates design defect claims which are based upon strict liability. It does not,

as Merck seems to suggest, merge strict liability for inadequate warnings with negligent failure to

warn, nor does it eliminate a negligence claim which includes conduct other than failure to warn.

See also *Doe v. Miles Lab Inc.,* 927 F.2d 187 (4th Cir. 1991), also relied upon by Merck. Although

the court held summary judgment was proper, and that comment k was applicable to the product (*Id.*

at 191), it applied different standards to both the negligence claim and the strict liability claims. *Id.* at

195.  Plaintiff's negligence claim is not superfluous, and failure to warn is not, and has never been,

'the only issue on the table.' This is consistent with South Carolina law, which provides that a

products liability action may be brought under several theories, including negligence, strict liability,

and warranty. *Rife v. Hitachi Const. Machinery Co., Ltd.* (S.C. App. 2005) 363 S.C. 209, 215, 609

S.E.2d 565, 569; *Little v. Brown & Williamson Tobacco Corp.*, 243  F.Supp.2d 480 (D. S.C. 2001).

Under South Carolina law, a jury finding for the manufacturer on a strict liability claim does not

exonerate the manufacturer for a claim based upon negligence. Moreover, negligence may be the

broader theory of recovery under the instructions given to the jury, thereby eliminating any claim of

17

inconsistency. *Talkington v. Atria Reclamelucifers Fabrieken BV,* 152 F.3d 254, 261-262 (4th Cir. 1998), citing and quoting from *Bragg v. Hi-Ranger, Inc.,* 319 S.C. 531, 462 S.E.2d 321 (1995).

> **1.    The Nature And Extent of the Risks of Vioxx Which Merck Should Have Conveyed to Plaintiff's Prescribing Physicians Were Known and Knowable to Merck, and Were Neither Uncertain Nor Unproven.**

Merck argues that "during the relevant period there was no medical consensus about the cardiovascular risks of Vioxx," and "thus Merck was not required to give warnings of these risks." Once again, the cases Merck cited are not even close to the facts here. *Doe v. Miles Lab., Inc.,* 927 F.2d 187, 195 n. 32 (4th Cir.1991) (Blood product administered in 1983, when there was no consensus that AIDS was even transmissible by blood and no way to detect contamination. *Id.* at 191, 194.); *In re Rezulin Prods. Liab. Litig.,* 331 F. Supp. 2d 196, 200 (S.D.N.Y. 2004) (Plaintiffs who suffered no liver injury alleged manufacturer failed to warn of the risk of liver damage.)

The dicta from *Finn v. G. D. Searle & Co.,* 35 Cal. 3d 691, 701 (Cal. 1984), which says that "[k]nowledge of a potential side effect which is based on a single isolated report of a possible link between a prescription drug and an injury *may* not require a warning," does not change the standard here. As correctly stated in the jury charge, Merck is liable under a theory of negligence for failure to "adequately warn the Plaintiff's treating physicians or the medical community of a known or reasonably scientifically or medically knowable risk of Vioxx." Jury Charge at 11. Or as Merck stated earlier in this case: "Under South Carolina law, a manufacturer has a duty to warn of only known or reasonably knowable risks." Motion at 21. A supplier and manufacturer of a product are liable for failing to warn if they know or have reason to know the product is or is likely to be dangerous for its intended use; they have no reason to believe the user will realize the potential danger; and, they fail to exercise reasonable care to inform of its dangerous condition or of the facts which make it likely to be dangerous. *Livingston v. Noland Corp.,* 293 S.C. 521, 525, 362 S.E.2d 16

FAC Resp. Exhibit B -- 2035

(S.C. 1987), citing *Gardner v. Q.H.S., Inc*., 448 F.2d 238 (4th Cir. 1971).

Although there is a paucity of South Carolina decisional authorities regarding prescription drugs, there is a large body of law from other jurisdictions regarding prescription drugs, the extent of manufacturers' duties, and what a manufacturer must disclose. A warning must be correct, complete, and fully descriptive, and it must convey updated information as to all of the drug's known side effects. *Martin v. Hacker*, 83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993); *Krasnopolsky v. Warner-Lambert Co*., 799 F.Supp. 1342, 1345-46 (E.D. N.Y. 1992) (Manufacturer's duty to warn of all potential dangers "is a continuous one, and requires that the manufacturer be aware of the current information concerning the safety of its product.") The warning must also have clarity so that the language of the warning is "direct, unequivocal and sufficiently forceful to convey the risk." *Martin* supra, 83 N.Y.2d, at 11. Merely mentioning a possible injury or adverse effect is not necessarily adequate. *Stahl v. Novartis Pharms. Corp*., 283 F.3d 254, 267 (5th Cir. 2002)) A manufacturer's disclosure of a particular risk of injury does not foreclose liability if the degree of risk is not sufficiently conveyed. *McDonnell v. Chelsea Mfrs., Inc*., 259 A.D.2d 674, 676, 687 N.Y.S.2d 172 (N.Y.A.D. 2 Dept. 1999); *Anderson v. Sandoz Pharmaceuticals Corp*., 77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D. Tex. 1999)(Summary judgment denied even though package insert and PDR entry disclosed risk of myocardial infarction injury suffered by the plaintiff.) Even where a 'dear doctor letter' discloses the risk, affirmatively misleading information may cause a warning to be inadequate. *Woodbury v. Janssen Pharmaceutica, Inc*., 1997 WL 201571*8 (N.D.Ill. 1997).

The evidence at trial established that the CV risks of Vioxx, which were not adequately conveyed by Merck, were not only reasonably scientifically and medically knowable, but known to Merck long before Mr. Barnett's heart attacks and surgical interventions, and before Mr. Barnett began taking Vioxx. Dr. Avorn's unrebutted testimony regarding the current state of knowledge

19

about Vioxx's CV risks was "that it is now universally agreed that Vioxx causes heart attacks..."
(8/1/06 Tr. at 428:18-429:2.) This fact was generally accepted within the medical community in
February 2005 when the FDA Advisory Committee met and unanimously voted that Vioxx causes
cardiovascular disease. (*Id.* at 353:13-23.) Dr. Reicin admitted that the APPROVe study showed
"an excess in thrombotic events of Vioxx over placebo..." (8/14/06 Tr. at 2354:22-2355:1.) [2]
Combining the VIGOR data with evidence from other clinical trials, by at least the Spring of 2000
there was enough evidence to suggest that Vioxx was associated with heart attack and other
cardiovascular disease. (8/1/06 Tr. at 365:18-366:10.) At least 11 months before Mr. Barnett's heart
attack, Merck was aware of a statistically significant doubling of the risk of heart attacks with Vioxx,
based upon a meta-analysis of all clinical trials . (8/2/06 Tr. at 558:12-561:4.) Merck implies that its
knowledge of an *association* does not trigger its duty to warn. However, Dr. Moye testified that
"when it comes to assessing risks, the FDA does not require the sponsor to wait until they have
fleshed out whether the relationship is a mere association or is causative. The very identity of the
association is sufficient for it to go in the label..." (8/3/06 Tr. at 836:1-5.) This was admitted by Dr.
Reicin: "...My understanding from my regulatory colleagues is that warnings are appropriate when
there's a known association. It had nothing to do with causation..." (8/14/06 Tr. at 2408:7-10.) *See
also McNeil v. Wyeth*, 462 F.3d 364, 370 (5th Cir. 2006)(Noting that FDA regulations require
warnings as soon as there is reasonable evidence of an association of a serious hazard.) Merck's
knowledge of Vioxx's CV risks goes back even earlier.

By March 2000, and within two months of Mr. Barnett starting Vioxx, Merck knew the
results of the VIGOR study, which showed a fivefold increase in heart attacks in those using Vioxx.

---

[2] According to Dr. Reicin (but refuted by the overwhelming weight of the evidence) this increase only
begins after 18 months. (*Ibid.*)

20

(8/1/06 Tr. at 295:23-297:14.) The immediate reaction of Dr. Edward Scolnick, Merck senior executive and the head of Merck Research Laboratories, was that he believed that the findings of increased heart attacks were valid and mechanism based. (8/2/06 Tr. at 617:20-618:5.) Dr. Reicin also thought one of the explanations for the VIGOR data was that Vioxx could be causing heart attacks. (8/14/06 at Tr. 2367:21-24.) Even before Mr. Barnett's first use of Vioxx, clinical trials submitted by Merck to the FDA in the late 1990's revealed an excess of CV disease. This red flag was noticed by the FDA (8/1/06 Tr. at 361:3-20) and was known and knowable by Merck.  In a memo dated May 3-6 of 1998, Merck was advised by its Scientific Advisors, a board of outside pharmacologists, that  the mechanism of Vioxx could result in potentially dangerous developments which would lead to heart disease and heart attacks.  (*Id.* at 363:2-15.)

Further, animal studies conducted before Vioxx ever went on the market showed that Vioxx's mechanism of action (*i.e.* selective inhibition of Cox-2) could be dangerous for the heart.  (*Id.* at 548:19-551:14.)  Finally, Merck knew well before Vioxx went to market of the significance of the relationship and balance between thromboxane and prostacyclin and their roles in vasoconstriction and platelet aggregation.  In fact, the Sixteenth Edition of the Merck Manual, which was published by Merck in 1992, contains a discussion of this balance.  (8/2/06 Tr. at 599:8-604:14.)

It was more than reasonable for the jury to determine that Merck knew of Vioxx's risks before Mr. Barnett's began taking Vioxx.  Further, to the extent the CV risks were "uncertain" or "unproven," as Merck argues, such uncertainty was the product of Merck's overpromotion and conscious efforts to confuse, conceal and suppress information about the true CV risks of Vioxx.  Spinning the results of the VIGOR study in a misleading manner, Merck "flipped" the data to suggest that Vioxx did not increase the risk of heart attacks (8/1/06 Tr. at 301:4-21 (Test. Dr. Avorn)) and framed the data in a manner that did not convey the true risk of the drug. (*Id.* at 299:15-

21

300:12; 301:22-302:15.) Merck claimed that the study's methods did not support an extension of the study results to broader population groups.[3] Even though Merck knew of three additional reported cases of heart attacks prior to the publication of the VIGOR study, Merck did not tell the New England Journal of Medicine, further creating uncertainty among the medical community and public. (8/14/06 Tr. at 2384:25-2391:17.)

Merck fostered uncertainty by claiming that the VIGOR results were explained by the fact that the comparator drug, naproxen, had cardioprotective properties (*i.e.* the "naproxen theory") even though Merck knew this to be untrue. (8/1/06 Tr. at 324:7-11.) Merck made this claim via a press release despite the fact that not one randomized clinical trial showed a cardioprotective effect of naproxen. (8/14/06 Tr. at 2370:11-2372:10, discussing P1.0581.) In fact, the FDA issued a warning letter to Merck in response to its integrated marketing campaign and took particular issue with Merck's use of the naproxen theory. (P1.0006) ("…you fail to disclose that your explanation is hypothetical and has not been demonstrated by substantial evidence and that there is another reasonable explanation, that Vioxx may have prothrombotic properties." at p.1); *See also* 8/14/06 Tr. at 2421:1-2424:1 (Test. Dr. Reicin).) One FDA official went so far as to describe Merck's use of the naproxen theory as "implausible." (8/1/06 Tr. at 371:13-372:11 (Test. Dr. Avorn).) Even Merck documents confirmed the naproxen theory did not satisfactorily explain the VIGOR data. (8/2/06 Tr. at 623:4-624:22 (Test. Dr. Scolnick).) Dr. Scolnick himself sent an email to his colleagues within Merck stating that there was no way to prove that the naproxen theory was valid, that "IT IS IMPOSSIBLE TO PROVE THIS." (*Id.* at 626:25-627:17.) Nevertheless, Merck continued to use the naproxen theory to create uncertainty about the risks of Vioxx.

---

[3] Contrary to Merck's claim, the FDA found that other Merck studies (*e.g.* 085, 090 and 102), with different methods, found similar increases in heart attacks. (*Id.* at 373:10-374:6.)

FAC Resp. Exhibit B -- 2039

In cross-examination of Dr. Alise Reicin, Plaintiff's Exhibit P1.004 was introduced which showed that Merck was aware of the cardiovascular risk in 1997 and Dr. Reicen talked of a study which would exclude high risk patients in an effort to "decrease the CV event rate so that a difference between the two groups would not be evident.   (8/14/06 Tr. at 2355:12-2356:16.) Although Merck knew of the CV risks and although Merck could have conducted a study specifically designed to ascertain the true risks, either before or after the drug went on market, Merck never conducted such a study.   (8/2/06 Tr. at 614:6-615:3; 615:9-616:14 (Test. Dr. Scolnick).)   As discussed herein at section III.A.2, Merck so manipulated the scientific literature related to Vioxx that Dr. Avorn characterized it as "skewed and distorted."   (*Id.* at 399:18.) Merck also created confusion by concealing information from the FDA.   Dr. Scolnick never told the FDA that his initial reaction to the VIGOR data was that the increased heart attacks with Vioxx were mechanism based and attributable to Vioxx.   (*Id.* at 644:8-12.)   Merck successfully stalled updating the Vioxx label with the VIGOR data for two years by protracted negotiations.   (*Id.* at 671:7-676:23; 685:4-687:12.) Merck never shared the death imbalance data from its Alzheimer's studies (*Id.* at 558:2-11), nor the Shapiro meta-analysis (*Id.* at 558:12-561:12), with the FDA Advisory Committee reviewing the label change.

Other tactics employed by Merck to conceal the truth and suppress free discussion included: persuading Wall Street analysts that Vioxx did not have a CV risk (8/14/06 Tr. at 2382:4 (Test. Dr. Reicin).); challenging and even intimidating those who tried to give an alternate explanation (*e.g.* that Vioxx causes heart attacks) for the VIGOR results (8/2/06 Tr. at 609:25-611:8 (Test. Dr. Scolnick) "if he says this I will boil him in oil at the meeting."); and never communicating Dr. Scolnick's initial conclusion to the public.( *Id.* at 641:18-642:9.)

Merck knew of the CV risks of Vioxx before Mr. Barnett's injuries and before he began

23

taking Vioxx.  Any uncertainty as to these risks on the part of the FDA, the medical community or the public was due to Merck's overpromotion and concealment of the risks.

### 2.    Knowledge of a Risk Associated with a Drug Does Not Absolve a Manufacturer of Liability, Where, As Here, the Warnings Are Inadequate.

Merck contends that the Mr. Barnett's doctors "had independent knowledge of the cardiovascular risks associated with Vioxx," [4] and therefore "an absent or allegedly inadequate warning is not the cause of the plaintiff's injury." This is factually incorrect and contrary to established law. Again, Merck relies upon a string of factually inapposite cases. E.g, *Odom v. G.D. Searle & Co.,* 979 F.2d 1001, 1003 (4th Cir. 1992)(Summary judgment granted where physician "stated that he had always believed and still believed that "the Cu-7 is the best IUD that's ever been on the market," and that he would still prescribe it today," (*Id.* at 1002), and physician's "own estimate of the risk actually exceeded" that of the plaintiff's expert.)

A prescribing physician's awareness of risks involved with a drug does not absolve a manufacturer of liability, where a jury could reasonably infer that additional and more complete disclosures should have been made and the physician was not sufficiently informed. See *Tatum v. Schering Corp.,* 795 F.2d 925, 928-929 (11th Cir. 1986)(Jury could infer from the evidence that prescriber "did not possess the knowledge that he described himself as having."); *Timm v. Upjohn Co.,* 624 F.2d 536 (5th Cir. 1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981)(Affirming verdict for the plaintiff, noting that although prescriber testified he was aware of the risks involved, he had responded to a hypothetical that had he known of the types and incidence of certain adverse reactions he probably would not have prescribed the drug. *Id.* at 538-539.)

---

[4]By claiming that Mr. Barnett's doctors had "independent knowledge of the cardiovascular risks associated with Vioxx," Merck is arguing against its earlier position (III.A.1) that the CV risks of Vioxx were unproven, uncertain and unknowable.

The weight of the evidence is that Mr. Barnett's prescribing doctors were not sufficiently aware of the risks associated with Vioxx.[5]  Dr. Mikola, who began prescribing Vioxx for Mr. Barnett at least as early as 12/28/2001 (8/4/06 Tr. at 925:6-11), was never told by Merck that the President of Merck Research Laboratories believed that the CV events associated with Vioxx in the VIGOR trial were mechanism-based. (*Id.* at 912:23-913:1.)  While he reviewed the VIGOR study, neither the title of the article nor the abstract stated that Vioxx significantly increases the risk of heart attack. (*Id.* at 973:20-974:15.) He further testified that if Merck had had information of a statistically significant increase in the risk of serious cardiovascular thrombotic events, that information was not shared with him. (*Id.* at 977:13-978:15.)

Dr. Mikola further testified that had he been aware of or seen the information in the FDA's proposed label change to the effect that Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events, such as those with a history of angina and in patients with preexisting hypertension and congestive heart failure, he would not have put Mr. Barnett on Vioxx. (*Id.* at 914:16-915:11.) Dr. Mikola's testimony establishes that Merck withheld information vital to his making a fully informed decision as to whether or not to prescribe Vioxx to Mr. Barnett. In failing to provide Mr. Barnett's prescribing physician with such information, Merck removed the possibility that he could act as a learned intermediary.

Dr. Avorn also explained how Merck's incomplete and misleading communications mislead physicians. (8/1/06 Tr. at 298:20-300:12.; 301:4-302:15)  According to Dr. Avorn "...Merck's conduct of ... communication ... was inadequate in that it failed to truthfully represent what was known to Merck at the time about the risks of its drug in relation to the cardiovascular symptoms."

---

[5] At page 26 of Merck's brief Merck discusses the independent knowledge of Dr. Karavan.  There is no evidence that Dr. Karavan ever prescribed Vioxx to Mr. Barnett or even treated Mr. Barnett before Barnett's September 6, 2002 heart attack.

FAC Resp. Exhibit B -- 2042

(*Id.* at 289:12-290:1.)  He also testified that "...Doctors did not have adequate information presented to them by Merck to make a fair and reasonable evidence-based decision about Vioxx." (*Id.* at 290:2-15.)

Furthermore, assuming *arguendo* that Mr. Barnett's physicians had in fact been fully apprised of all pertinent and necessary information in Merck's possession, Merck would still not be relieved of liability. This is because the evidence showed that Merck's overpromotion of the drug had the effect of nullifying the already inadequate warnings. *Caraker v. Sandoz Pharmaceuticals Corp.,* 172 F.Supp.2d 1018, 1030 ( S.D. Ill. 2001); *Salmon v. Parke Davis & Co.*, 520 F.2d 1359, 1363-1364 (4th Cir. 1975); *Stevens v. Parke, Davis & Company*, 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973); *Incollingo v. Ewing,* 444 Pa. 263, 288-289, 282 A.2d 206 (1971); *Nobles v. Astrazeneca Pharmaceuticals*, 48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003) Merck's integrated national marketing campaign downplayed, deemphasized and misrepresented the true risks of Vioxx to such a degree as to result in the overpromotion of Vioxx.   (8/1/06 Tr. at 325:21-326:16; 399:21-400:14.)  Merck instructed its sales representatives ("detailers") to treat negative findings about Vioxx's risks as "obstacles" and to suppress open discussion of such information within the medical community. (*Id.* at 342:1-343:22; 400:15-401:20.)  As Dr. Avorn testified, Merck's news releases were "an inadequate and a deceptive way of presenting this information to the press, to doctors, to patients, or to anyone." (*Id.* at 393:14-395:20.)

Merck's studies were published in such a way as to bury risk data (*Id.* at 368:10-20; 398:11-21), while other studies were never published at all by Merck (*Id.* at 368:21-369:1.)  Data from the APPROVe study was presented in an inaccurate and unfair manner, (*Id.* at 395:21-398:10), and even though Merck had data from Alzheimer's studies related to an increased mortality rate associated with Vioxx, Merck did not convey this data to physicians. (*Id.* at 398:22-399:2.)  Dr. Avorn summed

26

up all the major Vioxx publications by testifying,"...I have never known a collection of papers on any one topic in which there has been such a constellation of skewed and distorted presentation of data in any drug studies that I've ever looked at." (*Id.* at 399:3-20.)

Merck's overpromotion is also illustrated in an FDA Warning Letter that Merck received in September 2001. (P1.0006; *See* also 8/14/2006 Tr. at 2421:1-2424:1 (Test. of Alise Reicin).) That letter references three facets of Merck's Vioxx promotional campaign that minimized the cardiovascular findings of VIGOR and misrepresented Vioxx's safety profile. According to the FDA, these activities and materials were "...false, lacking fair balance, or otherwise misleading..." (*Id.* at p.1, para. 1 and 3.) In the year 2000 Merck generated "a billion" media impressions that carried Merck's message that Vioxx does not cause heart attacks. (8/5/06 Tr. at 1277:1-25.) Merck issued press releases and videos giving the impression that Vioxx was safe from a cardiovascular standpoint, and completely failed to mention that Vioxx could cause heart attacks and that one explanation for the VIGOR results was that Vioxx caused the heart attacks. (*Id.* at 1289:12-1295:22); (1296:23-1299:13.) Merck's integrated campaign amounted to overpromotion of the drug that minimized and deemphasized the true nature of the drug's risks. From this evidence the jury could reasonably have found that regardless of the knowledge of the prescribing physicians, and even if Merck had provided complete and thorough warnings and disclosures, Merck's overpromotion had the effect of nullifying the warnings, rendering them inadequate. Jury Charge at 10.

3.   **The Evidence, Both Subjective and Objective, Establishes That Had Merck Provided an Adequate Warning, Dr. Mikola Would Not Have Prescribed Vioxx and Mr. Barnett Would Not Have Continued to Take Vioxx.**

Merck next argues that there is no evidence that a different warning would have changed Mr. Barnett's doctors' decisions to prescribe Vioxx to him. Again, Merck is wrong. First, Dr. Mikola testified unequivocally that if Merck had fully disclosed what it knew regarding cardiovascular risks

27

he would not have prescribed Vioxx to Mr. Barnett.

> 915
> 3Q. OKAY. NOW, GIVEN THE INFORMATION THAT YOU'VE READ IN
> 4EXHI BITS I'VE JUST SHOWN YOU AND THIS PROPOSED LABEL, IF YOU
> 5HAD KNOWN THAT INFORMATION THAT I'VE SHOWN YOU AND YOU HAD
> SEEN
> 6A LABEL LIKE THIS, WOULD YOU HAVE PRESCRIBED VIOXX TO
> 7MR. BARNETT, GIVEN HIS HISTORY WITH POSSIBLE ANGINA, IN JANUARY
> 8OF 2000?
> 9A. I BELIEVE I WOULD HAVE LEFT HIM ON FELDENE.
> 10 Q. YOU WOULDN'T HAVE PUT HIM ON VIOXX?
> 11 A. I DON'T BELIEVE SO, NO, SIR.
> (8/4/06 Tr. at 915:3-11)

> 928
> 2Q. AND GIVEN WHAT YOU'VE READ TODAY, THAT COMBINED WITH HIS
> 3A NGINA, WOULD YOU SAY THAT FROM EVERYTHING YOU'VE READ ABOUT
> 4VI OXX TODAY, THAT YOU PROBABLY WOULD NOT HAVE PRESCRIBED
> VIOXX
> 5FOR, HIM IF YOU'D KNOWN ALL OF THIS INFORMATION, IN 2000?
> 6A. HAVING KNOWN TODAY WHAT I KNOW ABOUT VIOXX, I WOULD NOT
> 7HAV E PRESCRIBED IT. (*Id.* at 928:2-7)

Based on this uncontroverted testimony alone the jury could have reasonably found that

Merck's inadequate warning was a cause of Mr. Barnett's injuries.

Second, assuming *arguendo* that Dr. Mikola did not testify as he did that the inadequate

warning caused him to prescribe the drug, the jury could still have reasonably found that Merck's

inadequate warning was a cause of Mr. Barnett's injuries. Proof that the inadequacy of a warning

was a proximate cause of injury is not limited to, nor dependent solely upon, the testimony of the

prescribing physician. "To satisfy the burden of establishing warning causation, a plaintiff may

introduce either objective evidence of how a reasonable physician would have responded to an

adequate warning, or subjective evidence of how the treating physician would have responded."

*Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992); *Hermes v. Pfizer, Inc.*, 848

F.2d 66, 69-70 (5th Cir. 1988). Testimony from a prescribing physician that he or she appreciated

28

the risks does not preclude a finding that the warnings were inadequate, nor does it preclude a finding of causation. *Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804, 808-809 (S.D.Tex. 1999); *Whitley v. Cubberly,* 24 N.C.App. 204, 210 S.E.2d 289, 207-208 (1974); *Stevens v. Parke-Davis & Co.*, (1973) 9 Cal.3d 51, 54-56, 507 P.2d 653. See also, *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971), (cited by the court in *Salmon v. Parke Davis* & Co., 520 F.2d 1359, 1363 (4th Cir.1975)) ("Dr. Cucinotta stated, in effect, that he was adequately warned and understood the dangers and proper use of the drug. The jury was not obliged to believe the oral, uncorroborated testimony of either doctor. The evidence of Parke, Davis' efforts in promoting the drug would tend to refute Dr. Cucinotta's testimony in the sense that he may have been influenced by the efforts, perhaps even unconsciously, to prescribe the drug ...." *Id.* at 221-222.)

Merck's overpromotion and misleading statements about Vioxx, through its integrated marketing campaign, nullified the already insufficient warning.  Thus, even if Dr. Mikola had testified that he would still have prescribed Vioxx if he had received an adequate warning (as is not the case here), the jury could still have reasonably found that Dr. Mikola was not in a position to fully appreciate Vioxx's risks and that he would have taken Mr. Barnett off of Vioxx had he been provided with an adequate warning.

Moreover, even where a risk is disclosed, and even where the prescribing physician testifies he would have still prescribed the drug in light of the risk, liability is not foreclosed.  See *e.g., McNeil v. Wyeth,* 462 F.3d 364, 372-373 (5th Cir. 2006).  The court in *McNeil* also found it significant that the plaintiff testified she would not have taken the drug had she been made aware of the full extent of the risk. See also *Hermes v. Pfizer, Inc.*, 848 F.2d 66, 69-70 (5th Cir.1988) ("Furthermore, Hermes herself testified that she would not have taken the Sinequan had she known that it could cause the injury she experienced." *Id.* at FN.20) Similarly, Mr. Barnett testified that if

29

FAC Resp. Exhibit B -- 2046

he had been told of the risk of heart attack by Dr. Mikola or any doctor, he never would have taken it. During the entire time that he took Vioxx he was unaware that Vioxx could cause heart problems. (8/7/06 Tr. at 1565:11-13.)  During his use of Vioxx he was never told that the VIGOR results showed a 5-fold increase in heart attacks with Vioxx. (*Id.* at 1560:12-20.)  However, Mr. Barnett testified that if he had ever been told that Vioxx could cause heart attacks he never would have taken Vioxx, (*Id.* at 1554:5-7) and if asked to do so would have gone back on Feldene. (*Id.* at 1557:9-11.)

The jury could reasonably have found Mr. Barnett's testimony in this regard especially credible, because there was substantial evidence that he was concerned about and was an active participant in his health and health care.  (*Id.* at 1552:4-1553:10.)[6]  In fact, Mr. Barnett stopped taking Vioxx following one such discussion with his doctor after hearing that there may be safety concerns with Vioxx   (*Id.* at 1553:11-1554:4) and he stopped taking Mobic as soon as he learned that it could increase the risk of heart attacks (*Id.* at 1605:4-8; 1607:7-14.)

Merck's argument is based on the erroneous proposition that the 2002 label "contained all the information that [plaintiff's expert] Dr. Moye said was necessary." Motion at 29.  The testimony cited by Merck is limited to Dr. Moye's opinion of the accuracy of the VIGOR information that was included within the 2002 label. Merck ignores Dr. Moye's testimony that the label failed to properly disclose that the VIGOR results showed a 5-fold *increase* in heart attacks for Vioxx over Naproxen, and that the significance of these results was not made clear to prescribing physicians. (8/3/06 Tr. at 841:1-13.)  Dr. Moye was also of the opinion that data from studies other than VIGOR were not fully disclosed in the label.  (*Id.* at 877-881.)

---

[6]Dr. Mikola assured him that his medications were safe because at that time (due to Merck's inadequate warnings and overpromotion) Dr. Mikola believed that Vioxx did not significantly increase the risk of heart disease (8/4/06 Tr. at 926:13-21.)

FAC Resp. Exhibit B -- 2047

Additionally, Dr. Moye criticized the location of the VIGOR data within the label and opined that such data should have been in the "Warnings" section rather than the "Precautions" section. There is a significant difference in the level of warning between these sections. (8/3/06 Tr. at 838:13-839:15.) The "Warnings" section of the label has a specific meaning to physicians and should include the serious adverse events that have been associated with the drug, including heart attacks. (*Id.* at 833:11-25-834:3.) According to Merck's own internal forecast, the difference between placing the cardiovascular risks of Vioxx in the Warnings versus the Precautions section amounted to approximately $1 Billion in lost sales of the drug. (*Id.* at 872:25-875:13 referencing Trial Exhibit P1.1135.) As Dr. Moye testified, "Well, my sense about this is that doctors pay attention to labels and, as we said earlier, that they take warnings much more seriously than they take precautions and that this same concern is reflected by Merck." (8/3/06 Tr. at 875:10-13.)

**B.    Merck's Argument Regarding Plaintiff's Deceit Claim Fails for the Same Reasons.**

Although the jury was correctly instructed on the learned intermediary doctrine, again Merck argues that the learned intermediary doctrine applies to fraud and defeats the Plaintiff's deceit claim. However, Merck's only argument as to this cause of action is still the same premise asserted in section III.A.3 of its motion- that "There was no evidence that a different warning could have changed Mr. Barnett's doctors' decisions to prescribe Vioxx to him."

Merck's argument fails for the same reasons, authorities and evidence cited above.

**C.    Plaintiff's Claims Are Not Preempted by Federal Law.**

At the present time the preemptive effect of 71 Fed.Reg. 3923-35 (Jan. 24, 2006) is the subject of some controversy. Merck is correct that at least one trial court has found preemption. However, other more recent and more well-reasoned decisions are directly contrary to the holding in

31

*Colacicco.* See e.g. *McNellis ex rel DeAngelis v. Pfizer*, Inc., Slip Copy, 2006 WL 2819046, *10 D.N.J., (September 29, 2006); *Jackson v. Pfizer, Inc.*, 432 F.Supp.2d 964, 968 (D. Neb. 2006); *Desiano v. Warner-Lambert & Co.*, --- F.3d ----, 2006 WL 2846454, FN9, C.A.2 (N.Y.), October 05, 2006. In all likelihood when other appellate courts including the Fifth Circuit address this same claim by pharmaceutical manufacturers they will, as they have many times in the past, reject preemption of common law failure to warn claims. The statement regarding preemption is inconsistent with past statements made by the FDA. See 65 Fed.Reg. 81082, 81103 (Dec. 22, 2000) ("FDA's regulations establish the minimal standards necessary, but were not intended to preclude the states from imposing additional labeling requirements."); 63 Fed.Reg. 66378, 66384 (Dec. 1, 1998) ("[F]ederal preemption could unduly interfere with the goals and objectives of existing State programs ... This final rule is intended to complement these State efforts, not replace or hinder them.") and myriad decisions over several decades. See, e.g., *Feldman v. Lederle Laboratories* 125 N.J. 117, 147, 592 A.2d 1176, 1192 (1991); *Abbot by Abbot v. American Cyanamid Co.* (4th Cir.1988) 844 F.2d 1108, 1112; *Mazur v. Merck & Co., Inc.* (E.D. Pa. 1990) 742 F.Supp. 239, 247; *Cartwright v. Pfizer, Inc.*, 369 F.Supp.2d 876, 885 (E.D. Tex. 2005). Additionally, FDA regulations permit a manufacturer to strengthen its warnings any time without the approval of the FDA. *Witczak v. Pfizer, Inc.*, 377 F.Supp.2d 726, 728-30 (D. Minn. 2005).

### D. Plaintiff Presented More Than Sufficient Evidence of Causation.

Merck next argues that the Plaintiff failed to prove that his damages were caused by his use of Vioxx "because the undisputed evidence proves that Mr. Barnett had preexisting CAD." Motion at 32. This is essentially a repeat of its earlier arguments. First of all, to the extent Merck's argument is based upon the premise that if the Plaintiff had preexisting conditions which increased his risk of a heart attack or of requiring bypass surgery, it cannot be liable for either or for worsening his

32

condition, Merck is mistaken as to the fundamental law on causation. As this Court instructed the jury:

> "In order to be regarded as the proximate cause of the injury, however, the defect need not be the only cause. A defect may be a legal cause of an injury even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time the defect has its effect and if the defect contributes substantially to producing the alleged injury. Furthermore, a defendant may still be held liable when the defendant's fault operates upon a concealed physical condition, such as a latent disease, to produce consequences which the defendant could not reasonably anticipate."

Secondly, as set forth in detail above, Mr. Barnett was a man who in 2000 had only a 1-2% risk of having heart attack. However, just a short time later, he not only had a heart attack, but suffered from severe coronary artery disease, inexplicable by anything other than Vioxx. The evidence at trial demonstrated that the Plaintiff's heart attack was just the first injury of many resulting in diffuse coronary disease and multiple surgical interventions.

Merck argues that "plaintiff's counsel admitted in his opening statement that Mr. Barnett *would likely* have had a heart attack at some point, even if he had never taken Vioxx." (7/31/06 Tr. at 124:13-17.) (emphasis added). This is a mischaracterization. The point Plaintiff's counsel made was simply that Mr. Barnett "might have" had a heart attack but not until he was 75 or 80. The evidence at trial showed that in a little over 2 years while on Vioxx, Mr. Barnett went from a less than 2% chance of having a heart attack to a 100% chance. Merck submitted no medical evidence to support its contention that "he likely would at some point have had a heart attack and/or bypass surgery, and would have incurred certain medical bills relating to his heart disease."

**E.    The Evidence Was More Than Sufficient To Support Punitive Damages.**

Merck has pigeonholed the punitive damages claim into two main points regarding VIGOR and the post-VIGOR label. However, the evidence of willful, wanton misconduct and reckless

33

disregard of Plaintiff's rights was much broader. Evidence of Merck's misconduct came from the testimony of numerous witnesses and documents presented at trial, showing that even prior to VIGOR findings in March 2000 and well before the launch of the drug in 1999, Merck had knowledge of the potential cardiovascular risks of Vioxx. Prior to the launch of Vioxx in 1999, Merck was warned by its own scientific advisors to conduct further testing, including a cardiovascular outcome (CV outcome) study. Rather than test the drug or warn of the potential risk, Merck rushed to market in an effort to compete for pain reliever market share with its primary competitor, Celebrex. This evidence alone showed reckless disregard for the safety of patients.

It would be impractical to recite here each one of the over 200 documents and all of the testimony of the numerous witnesses supporting the jury's findings on the punitive liability issues. Briefly however, there was compelling evidence of the cardiovascular risks of Vioxx even before Merck placed the drug on the market (8/2/06 Tr. at 548:19-551:14; 361:11-363:15; 546:15-546:25; 8/11/06 Tr. at 2095:9-2099:23; 2100: 6-2102:7; 2108:6 - 2118:24.) Merck was aware of the cardiovascular risk in 1997 and discussed designing its study to exclude high risk patients in an effort to "decrease the CV event rate so that a difference between the two groups *would not be evident.*" (Exhibit P1.004; 8/14/06 Tr. at 2355:12-2356:16.)  Notwithstanding the early warning signs of the cardiovascular risk of Vioxx prior to marketing the drug, Merck then obtained the results of the VIGOR study in March of 2000 which showed a 500% increase in cardiovascular risk. (8/2/06 Tr. at 617:20-623:3.)  Merck disregarded this information and told doctors, the public and the FDA that the VIGOR results could be explained by Naproxen, knowing this was untrue. (*Id.* at 623:4-627:17; (8/5/06 Tr. at 1289:12-1290:23.)  Merck violated its own Code of Conduct in failing to communicate openly and honestly with physicians about the CV risks associated with Vioxx. The CV risk was seen as an "obstacle" to sales and was not included in the discussions representatives had with

34

physicians (8/5/06 Tr. at 1252:20-1259:2), and Merck continued to market Vioxx despite there being an increased risk of myocardial infarctions. (8/2/06 Tr. at 580:10-589:7.)

On top of this, rather than immediately advising physicians of the serious risks of Vioxx shown in the VIGOR study as well as other studies, including ADVANTAGE and Alzheimer's, through an appropriate warning label as suggested by the FDA, Merck chose instead to fight the FDA and request a watered down label with the VIGOR results in the "precaution" section. Merck's internal documents reflect that the reason Merck fought to place the cardiovascular risk information in the precaution section as opposed to the more prominent and heightened warning section was to generate an additional $1 Billion in sales. The financial reward from Vioxx sales provided Merck with the economic motive to carry out this fraud on the public. (8/1/06 Tr. at 196:14-208:12.)

Dr. Scolnick admitted that he never told the FDA about his concerns regarding the cardiovascular risk of Vioxx. (8/2/06 Tr. at 644:8-12.) He admitted that a CV outcome study was an appropriate study to properly address the CV concern Merck recognized internally, but it was never performed. (*Id.* Tr. at 652:2-23.) Following the VIGOR study, after the FDA issued a proposed label with the cardiovascular risks in the "warnings" section, he stated "we will fight back", "it is ugly cubed" and "they (referring to the FDA) are Bastards." (*Id.* Tr. at 685:4 to 687:12.) Scolnick felt that it would be a "miracle" if they were able to place the cardiovascular risk information in the "precaution" section (*Id.* Tr. at 677:6-18), and was adamant he would not "sign off any label that has a warning." (8/2/06 Tr. at 676:1-23.)

Merck attempted keep physicians and the public in the dark about the true nature of the cardiovascular risk. (See generally, the testimony of Anstice, Scolnick, Cannell, Weiner, Blake and Avorn.)Thr ough Thomas Cannell's testimony, the jury was shown how Merck taught its sales representatives to highlight the difference between the "precaution" and "warning" sections of the

35

label to doctors, thereby downplaying the risk. (8/5/06 Tr. at 1259:12-1261:10.) Merck employees made incomplete statements to the public, minimizing the risk (8/5/06 Tr. at 1277:1-25-1290:14-23.) When doctors asked questions about the VIGOR findings, Merck sales representatives were instructed to show the Cardiovascular Card, containing misleading data. (8/1/06 Tr. at 254:21-258:14.) Merck published incorrect data in the New England Journal of Medicine to indicate that there was only a risk from Vioxx after 18 months of use. (*Id.* at 356:2-357:21.) Merck distanced itself from Dr. Avorn's study by instructing him and his colleagues to remove the name of one of their epidemiologists as a co-author. (*Id.* at 340:12-340:18.) Merck instructed its sales representatives to view Dr. Avorn's study as an "obstacle" to prescriptions of Vioxx and that they should not initiate discussions with physicians about his study. (*Id.* at 342:1-343:22.) All of this affected the prescribing practices of doctors. (*Id.* at 346:25-347:14.)

Based upon Merck's conduct of intentionally failing to disclose a known and serious cardiovascular risk of the drug, downplaying the CV risk from VIGOR and delaying and then minimizing the warning label for VIGOR in order to reap $1 Billion in profits, the jury had clear and convincing evidence that Merck's conduct was fraudulent, as well as willful, wanton and in reckless disregard of Plaintiff's rights.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513 (2003) holds that a jury must be instructed "that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred." *Id.* at 1522-1523, quoting from *BMW of North America v. Gore*, 517 U.S. 559, 572-573 (1996) (noting that a State "does not have the power … to punish [a defendant] for conduct that was lawful where it occurred and that had no impact on [the State] or its residents".) Accordingly, this Court so admonished the jury. (8/17/06 Tr. at 2691:20-2692:3), and left no doubt on this point, mentioning that the specific documents to which

36

Merck refers here could not be considered in the amount of punitive damages. (*Id.* at 2693:10-25.)

State Farm did not, as Merck implies, proscribe the introduction of evidence of a party's wealth. It merely held that the wealth of a defendant cannot justify an otherwise unconstitutional award. "[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy. ...That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct." *Id.* at 427-428, quoting *BMW*, supra, at 591, 116 S.Ct. 1589. This Court appropriately instructed the jury that in determining the amount of punitive damages it should consider "the ability of the defendant to pay any punitive damage award." (8/17/06 Tr. at 2690:18-19.) This is consistent with South Carolina law. *Bryant v. Waste Management, Inc.*, 342 S.C. 159, 536 S.E.2d 380, 386 (S.C. App. 2000). Merck's argument also assumes that extraterritorial conduct evidence has no legitimate purpose. However, the Supreme Court has never held that extraterritorial conduct has no relevance to issues of punitive liability. In fact, the Court in *BMW of North America, Inc. v. Gore* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) stated just the opposite:

> "Of course, the fact that the Alabama Supreme Court correctly concluded that it was error for the jury to use the number of sales in other States as a multiplier in computing the amount of its punitive sanction does not mean that evidence describing out-of-state transactions is irrelevant in a case of this kind. To the contrary, as we stated in *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462, n. 28, 113 S.Ct. 2711, 2722, n. 28, 125 L.Ed.2d 366 (1993), such evidence may be relevant to the determination of the degree of reprehensibility of the defendant's conduct." *Id.* at FN21.

The fact that some of the documents included projected revenue from sales as opposed to actual sales is a distinction without a difference. The evidence of projected sales and revenues Merck expected as a result of its misconduct and concealment of the risks of Vioxx is all part and parcel of

37

the identical conduct which resulted in injury to Mr. Barnett. See *State Farm*, supra, at 409-410. ("Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff."); *White v. Ford*, 312 F.3d 998, 1014 (9th Cir. 2002)(" Evidence of extraterritorial conduct, such as sales in other states, "may be relevant to the determination of the degree of reprehensibility of the defendant's conduct…")

Merck argues that "Mr. Barnett introduced no evidence of the magnitude of any harm caused by Merck in South Carolina." Motion at 37. Plaintiff did in fact introduce evidence of the harm caused by Merck in South Carolina---Mr. Barnett's atherosclerosis, his heart attack, his bypass surgery and his diminished life expectancy. The injuries to Mr. Barnett, which occurred in South Carolina, are sufficient in and of themselves to justify the punitive damages award. If Merck is suggesting that the Plaintiff should have introduced evidence of the total sales of Vioxx in South Carolina and the total number of probable injuries from Vioxx there, there is no such requirement. (The fact that the Plaintiff did not introduce evidence of other Vioxx heart attack victims in South Carolina probably worked to Merck's benefit, as evidenced by the relatively miniscule punitive damages award. This is undoubtedly why, even though it was within Merck's exclusive power to introduce its South Carolina Vioxx sales figures to the jury, it chose not to do so.) Moreover, Merck's argument rests on the false assumption that the amount of the jury's award is somehow based upon the total amount of Vioxx sales nationwide, and that evidence of South Carolina's much lower sales figures would have resulted in a lower award. According to the 2000 Census, South Carolina had 4,012,012 residents and the U.S. had a total population of 281,421,906. (http://www.census.gov/population/cen2000/phc-t2/tab01.pdf) Assuming, arguendo, that South Carolina's Vioxx sales as a percentage of nationwide sales were similar to its share of the U.S.

38

population, accepting Merck's argument would mean the jury should have awarded $14,256.22 in punitive damages in order to set an example and deter this multi-billion dollar business from engaging in similar conduct in the future.

As to the brief argument of Plaintiff's counsel to which Merck objects, this was an appropriate response to what counsel for Merck had just told the jury. Immediately following Plaintiff's abbreviated argument on punitive damages (which was less than 4 pages of transcript), counsel for Merck told the jury that Merck had "already gotten" their message:

> "....I think you have sent you message loud and clear.' .... '[p]eople currently who run Merck have heard that message and are reflecting on it as we speak...' (8/17/06 Tr. at 2696) 'I believe in my heart that you determined that amount was what you needed to award in order to send a message....The message has been sent and received. (*Id.* at 2697)

> "If we made mistakes—and you have determined that we did. You have already delivered that message loud and clear. As I said, the people at Merck take it seriously and will take it seriously.' (*Id.* at 2698) 'So $50 million, as I said, it's a lot of money. I believe in my heart that you gentlemen have already awarded an amount intended to send a message and to deter and punish....As I said, the bottom line, I think everybody in the courtroom and everybody back in New Jersey ...everybody has already gotten the message. We certainly have, and as I said, we take it to heart.' (*Id.* at 2703)

This strategy worked well for Merck. By telling the jury that everybody back in New Jersey was reflecting on the award and that that they had already gotten the message and were taking it to heart, Merck dodged what should have been tens of millions of dollars in punitive damages. Mr. Robinson's minimal argument on this point was an entirely appropriate response. Punitive damages are intended not only to punish but "deter the wrongdoer and others from engaging in similar reckless, willful, wanton, or malicious conduct in the future." *Clark v. Cantrell,* 339 S.C. 369, 378, 529 S.E.2d 528, 533 (2000). Counsel for Plaintiff never suggested that Merck should be punished for defending itself. Rather, he focused on the deterrent purpose of punitive damages in his

39

response to Merck's argument. "The point of punitive damages is to deter others, to deter Merck from doing this in the future." (8/17/06 Tr. at 2505:5-6.)  In light of the statements by counsel for Merck on matters entirely outside the record (i.e. how the verdict on compensatory damages had already sent a message, how it had affected Merck and how is was then being 'reflected on' by Merck management), Plaintiff's counsel had every right to respond by arguing, based upon matters in the record, that Merck was not affected and had not been deterred, by results in the ongoing litigation.

Further, the Court admonished the jury to disregard the comment regarding defending cases. There is no reason to believe the jury ignored the Court's instruction. As set forth above, the evidence supports the jury's finding on liability, including liability for punitive damages. This Court concluded that the jury's findings on liability are reasonable, and commented that the Court "is not troubled by $1 Million punitive damage award."

Further evidence of the fact that the punitive damage award was not the result of passion, prejudice or any improper influence is its relatively exiguous amount. Although additur is not permitted in the federal courts, if it were the Plaintiff would be justified in seeking a larger award, for $1 million is patently insufficient to achieve the purposes of punishing Merck and deterring similar conduct in the future.

## IV.     CONCLUSION.

For the reasons stated above, the Court should deny Merck's motion for judgment as a matter of law.

Date: October 31, 2006                    Respectfully submitted,

                                          By:  __/s/  MARK P. ROBINSON, JR.
                                               Mark P. Robinson, Jr.
                                               Kevin F. Calcagnie

40

Ca   rlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California  92660
Telephone:  (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California   94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

41

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 31st day of October, 2006.

By: /s/ MARK P. ROBINSON, JR.
MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson

42

FAC Resp. Exhibit B -- 2059

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| **This document relates to** | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | **CASE NO. 02:06CV00485** |

## PLAINTIFF GERALD BARNETT'S MEMORANDUM IN OPPOSITION TO MOTION OF MERCK & CO., INC. ("MERCK") FOR A NEW TRIAL ON ALL ISSUES

i

FAC Resp. Exhibit B -- 2060

# TABLE OF AUTHORITIES

## CASES

*Alabama v. Blue Bird Body Co.,*
    573 F.2d 309, 318 (5th Cir. 1978) .................................................................20

*Allen v. Pennsylvania Eng'g Corp.,*
    102 F.3d 194 (5th Cir. 1996) .......................................................................24

*Anderson v. Sandoz Pharmaceuticals Corp.,*
    77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D.Tex. 1999)..............................39, 44

*Anderson v. Siemens Corp.,*
    335 F.3d 466, 471-72 (5th Cir. 2003) ...........................................................32

*Asad v. Continental Airlines, Inc.,*
    314 F.Supp.2d 726, 740 (N.D.Ohio 2004)......................................................49

*Atlantic & Gulf Stevedores v. Ellerman Lines,*
    369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ...........................33

*Atlas Food Systems and Services, Inc. v. Crane Nat. Vendors, Inc.,*
    99 F.3d 587, 599-600 (4th Cir. 1996) ...........................................................30

*Automotive Products v. Tilton Engineering, Inc.,*
    Not Reported in F.Supp., 1993 WL 661138,*1, C.D.Cal.,
    (November 18, 1993) ...................................................................................21

*Bianchi v. City of Philadelphia,*
    80 Fed.Appx. 232, 237, 2003 WL 22490388, (3rd Cir. 2003) .........................28

*Bigham v. J.C. Penney Co.,*
    268 N.W.2d 892, 898 (Minn. 1978)...............................................................34

*Bonner v. ISP Tech., Inc.,*
    259 F.3d 924, 929 (8th Cir. 2001) ................................................................25

*Bragg v. Hi-Ranger, Inc.,*
    319 S.C. 531, 540, 462 S.E.2d 321 (1995) .....................................................35

*Brasher v. Sandoz Pharm. Corp.,*
    160 F.Supp.2d 1291, 1296-98 (N.D. Ala. 2001)..............................................25

ii

*Bray v. Marathon Corp.,*
  356 S.C. 111, 116, 588 S.E.2d 93 (S.C. 2003) ................................................32

*Brock v. Merrell Dow Pharmaceuticals, Inc.,*
  874 F.2d 307 (5th Cir. 1989) ........................................................................25

*Brunnemann v. Terra Intern., Inc.,*
  975 F.2d 175,179 (5th Cir. 1992) .......................................................17, 19, 29

*Brunner v. Maritime Overseas Corp.,*
  779 F.2d 296, 299 (5th Cir. 1986) ................................................................31

*Caraker v. Sandoz Pharmaceuticals Corp.,*
  172 F.Supp.2d 1018, 1030 ( S.D.Ill. 2001)...................................................55

*Castano v. Am. Tobacco Co.,*
  84 F.3d 734, 744 (5th Cir. 1996) ..................................................................20

*Chemical Distributors, Inc. v. Exxon Corp.,*
  1 F.3d 1478 (5th Cir. 1993) ......................................................................3, 31

*Christopher v. Florida,*
  449 F.3d 1360, 1368 (11th Cir. 2006) ..........................................................27

*City of Phoenix v. Com/Systems, Inc.,*
  706 F.2d 1033, 1036 (9th Cir. 1983) .............................................................16

*Colonial Leasing v. Logistics Control Int'l,*
  770 F.2d 479, 481-82 (5th Cir. 1985) ...........................................................18

*Continental Cas. Co. v. Howard,*
  775 F.2d 876, 886 (7th Cir. 1985) ................................................................30

*Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194 (4th Cir. 2001)....................................49

*Curtis v. M&S Petroleum, Inc.,*
  174 F.3d 661, 670 (5th Cir. 1999) ................................................................46

*Curtis Publishing Co. v. Butts,*
  351 F.2d 702, 718 (5th Cir. 1965) ................................................................42

*Davis v. Safeway Stores, Inc.,*
  532 F.2d 489, 491 (5th Cir. 1976) ................................................................18

iii

*DIJO, Inc. v. Hilton Hotels Corp.*,
    351 F.3d 679, 687-688 (5th Cir. 2003) ............................................................17

*Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*,
    791 F.2d 1416, 1424-1425 (10th Cir.) ............................................................32

*Duk v. MGM Grand Hotel, Inc.*,
    320 F.3d 1052, 1056-1057 (9th Cir. 2003) ......................................................30

*Edwards v. Sears, Roebuck and Co.*,
    512 F.2d 276, 292 (5th Cir. 1975) ...................................................................27

*Eiland v. Westinghouse Elec. Corp.*,
    58 F.3d 176 (5th Cir. 1995) .............................................................................17

*Evans v. Port Authority of New York and New Jersey*,
    273 F.3d 346, 352 (3rd Cir. 2001) ...................................................................29

*Evers v. Equifax, Inc.*,
    650 F.2d 793, 798 (5th Cir. 1981) ...................................................................27

*Eximco, Inc. v. Trane Co.*,
    748 F.2d 287 (5th Cir. 1984) ...........................................................................18

*Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.*,
    419 F.Supp.2d 225, 235 (N.D.N.Y. 2005) ......................................................21

*Fox v. United States*,
    417 F.2d 84, 88 (5th Cir. 1969) .......................................................................30

*Gallick v. Baltimore & Ohio R. Co.*,
    372 U.S. 108, 119 (1963)................................................................................30

*Garrett v. Hamilton Standard Controls, Inc.*,
    850 F.2d 253 (5th Cir. 1988) ...........................................................................35

*Gasoline Products Co. v. Champlin Refining Co.*,
    283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931).........................................17

*Green v. American Tobacco Co.*,
    325 F.2d 673, 678 (5th Cir. 1963) ...................................................................21

*Griffin v. Matherne*,
    471 F.2d 911, 915 (5th Cir. 1973) ...................................................................31

iv

*Haynes v. Manning,*
    717 F.Supp. 730, 735-736 (D. Kan. 1989) ........................................................................32

*Heller v. Shaw Industries, Inc.*
    167 F.3d 146 (3d Cir. 1999) ...............................................................................48, 49

*Hermes v. Pfizer, Inc.,*
    848 F.2d 66, 69-70 (5th Cir. 1988) ......................................................................44, 45

*Hopkins v. Dow Corning,*
    33 F.3d 1116, 1124-25 (9th Cir. 1994) ...............................................................26

*Houseman v. U.S. Aviation Underwriters,*
    171 F.3d 1117, 1128 (7th Cir. 1999) ...................................................................20

*Hundley v. Rite Aid of South Carolina, Inc.,*
    529 S.E.2d 45 (S.C. App. 2000) ...........................................................................1

*Hurley v. Atlantic City Police Dept.,*
    174 F.3d 95, 114 (3rd Cir. 1999) .........................................................................28

*Hutson v. Continental Assurance Co.,*
    269 S.C. 322, 237 S.E.2d 375 (1977) ..................................................................17

*In re Chevron U.S.A., Inc.,*
    109 F.3d 1016, 1019 (5th Cir. 1997) ...................................................................14

*In re Innotron Diagnostics,*
    800 F.2d 1077, 1986 (Fed Cir. 1986)...................................................................20

*In re Paoli R.R. Yard PCB Litigation,*
    35 F.3d 717, 759 (3rd Cir. 1994) .........................................................................49

*In re Plywood Antitrust Litigation,*
    655 F.2d 627, 636 (5th Cir. 1981) .......................................................................20

*In re: Propulsid Products Liability Litigation,*
    Not Reported in F.Supp.2d, 2003 WL 22023398, *6, E.D. La., (March 11, 2003).....14, 35

*In re Rhone-Poulenc Rorer Inc.,*
    51 F.3d 1293, 1300-03 (7th Cir. 1995) ...............................................................20

*Incollingo v. Ewing,*
    444 Pa. 263, 282 A.2d 206 (1971) .......................................................................41, 44

FAC Resp. Exhibit B -- 2064

*J.T. Baggerly v. CSX Transp., Inc.,*
    --- S.E.2d ----, 2006 WL 2474203,*3, S.C., (August 28, 2006) ........................................18

*Jahn v. Equine Services, PSC,*
    233 F.3d 382, 390 (6th Cir. 2000) ...............................................................................49

*Johnson v. Ablt Trucking Co., Inc.,*
    412 F.3d 1138, 1144 (10th Cir. 2005) .........................................................................30

*Kellassy v. Cirrus Design Corp.,*
    No. 3:04-CV-0727-N, 2006 U.S. Dist. Lexis 34347, at *13-14
    (N.D. Tex. May 30, 2006).............................................................................................30

*Kiriakides v. Atlas Food Systems & Services, Inc.,*
    338 S.C. 572, 586, 527 S.E.2d 371 (S.C. App. 2000) ................................................33

*Krasnopolsky v. Warner-Lambert Co.,*
    799 F.Supp. 1342, 1345-46 (E.D. N.Y. 1992) ............................................................39

*Laxton v. Gap Inc.,*
    333 F.3d 572, 586 (5th Cir. 2003) ...............................................................................29

*LeBlanc-Sternberg v. Fletcher,*
    67 F.3d 412, 427 (2d Cir. 1995)...................................................................................21

*Lehrman v. Gulf Oil Corp.,*
    464 F.2d 26, 47 (5th Cir. 1972) ...................................................................................30

*Levesque v. Marine Drilling Co.,*
    783 F.Supp. 302, 306 (E.D.Tex. 1992) .......................................................................19

*Lifschultz Fast Freight, Inc. v. Haynsworth, Marion, McKay & Guerard,*
    324 S.C. 645, 653, 486 S.E.2d 14, S.C.App., (May 19, 1997) ...................................18

*Little v. Brown & Williamson Tobacco Corp.,*
    243  F.Supp.2d  480 (D. S.C. 2001)..............................................................................35

*Lowe v. General Motors Corp.,*
    624 F.2d 1373 (5th Cir. 1980) .....................................................................................42

*Mack Trucks, Inc. v. Arrow Aluminum Castings, Co.,*
    510 F.2d 1029, 1034 (5th Cir. 1975)...........................................................................18

vi

*Magistrini v. One Hour Martinizing Dry Cleaning,*
      180 F. Supp. 2d 584, 609 (D. N.J. 2002) ..................................................................50

*Martin v. Hacker,*
      83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993).........................................39

*Mason v. Texaco, Inc.,*
      948 F.2d 1546, 1561 (10th Cir. 1991) ..................................................................28

*Maurer v. Heyer-Schulte Corp.,*
      2002 WL 31819160, E.D. La. (December 13, 2002) ......................................................25

*Maxey v. Freightliner Corp.,*
      727 F.2d 350, 351-352 (5th Cir. 1984) ..................................................................16

*McClain v. Metabolife Intl Inc.,*
      401 F.3d 1233, 1243 (11th Cir. 2005) ..................................................................46

*McDonnell v. Chelsea Mfrs., Inc.,*
      259 A.D.2d 674, 676, 687 N.Y.S.2d 172,
      (N.Y.A.D. 2 Dept. 1999)..................................................................................39

*McNeil v. Wyeth,*
      464 F.3d 364 (5th Cir. 2006) ..........................................................................45

*Medalen v. Tiger Drylac U.S.A., Inc.,*
      269 F. Supp. 2d 1118, 1139 (D. Minn. 2003) ............................................................50

*Metabolife Intern., Inc. v. Wornick,*
      264 F.3d 832, 842 (9th Cir. 2001) ......................................................................25

*Miller v. Royal Netherlands Steamship Co.,*
      508 F.2d 1103, 1106 (5th Cir. 1975) ....................................................................37

*Moore v. Ashland Chem. Ins.,*
      151 F.3d 269, 278 (5th Cir. 1998) ......................................................................46

*Morales v. American Honda Motor Co., Inc.,*
      151 F.3d 500, 511 (6th Cir. 1998) ......................................................................34

*Mueller v. Hubbard Milling Co.,*
      573 F.2d 1029, 1038 (8th Cir.1978) ....................................................................27

vii

FAC Resp. Exhibit B -- 2066

*Murray v. Bank of America, N.A.,*
  354 S.C. 337,344, 580 S.E.2d 194 (S.C. App. 2003) ........................................................29

*Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.,*
  22 F. Supp. 2d 942, 963 (E.D. Ark. 1998) ........................................................................50

*National Hispanic Circus, Inc. v. Rex Trucking, Inc.,*
  414 F.3d 546, FN16 (5th Cir. 2005) ..................................................................................34

*Nissho-Iwai Co. v. Occidental Crude Sales, Inc.,*
  729 F.2d 1530, 1538-1539 (5th Cir. 1984) ........................................................................18

*Nobles v. Astrazeneca Pharmaceuticals,*
  48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003), ..............................41

*Odom v. G.D. Searle & Co.,*
  979 F.2d 1001, 1003 (4th Cir. 1992) ..................................................................................38

*Ohio v. Dept of the Interior,*
  880 F.2d 432, 437 (D.C. Cir. 1989) ....................................................................................46

*Paine, Webber, Jackson & Curtis, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,*
  587 F.Supp. 1112, 1117 (D. Del. 1984) ..............................................................................20

*Pryer v. C.O. 3 Slavic,*
  251 F.3d 448, 455 (3rd Cir. 2001) ......................................................................................20

*Poullard v. Turner,*
  298 F.3d 421, 423 (5th Cir. 2002) ......................................................................................17

*Raino v. Goodyear Tire & Rubber Co.,*
  309 S.C. 255, 259, 422 S.E.2d 98, 100 (1992) ..................................................................18

*Ramar Coal Co., Inc. v. International Union, United Mine Workers of America,*
  814 F.Supp. 502, 510 (W.D. Va. 1993) ..............................................................................16

*Resolution Trust Corp. v. Stone,*
  998 F.2d 1534, 1547 (10th Cir. 1993) ................................................................................32

*Richard v. Firestone Tire & Rubber Co.,*
  853 F.2d 1258, 1260 (5th Cir. 1988) ..................................................................................30

*Rife v. Hitachi Const. Machinery Co., Ltd.*
  363 S.C. 209, 215, 609 S.E.2d 565, 569 (S.C. App. 2005) ..............................................34

viii

*Ruff v. Ensign-Bickford Indus., Inc.*,
    168 F.Supp.2d 1271 (D. Utah 2001) ............................................................25

*Salmon v. Parke Davis & Co.*,
    520 F.2d 1359, 1363 (4th Cir. 1975) ...................................................41, 44

*Sheikh v. Lexington Medical Center*,
    Case No. 2003-CP-32-0675 (Lexington C.P. Sept. 18, 2006) ............................1

*Stahl v. Novartis Pharms. Corp.*,
    283 F.3d 254, 267 (5th Cir. 2002) ..............................................................39

*Stevens v. Parke, Davis & Company*,
    9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973) ...............41, 44

*Stockton v. Altman*,
    432 F.2d 946, 951 (5th Cir. 1970) ..............................................................34

*Talkington v. Atria Reclamelucifers Fabrieken BV*,
    152 F.3d 254, 261-262 (4th Cir. 1998) .........................................................35

*Tatum v. Schering Corp.*,
    795 F.2d 925, 928-929 (11th Cir. 1986) .......................................................40

*Thomas v. Hoffman-LaRoche, Inc.*,
    949 F.2d 806, 812 (5th Cir. 1992) ..............................................................44

*Timm v. Upjohn Co.*,
    624 F.2d 536 (5th Cir.1980) ......................................................................40

*Tipton v. Michelin Tire Co.*,
    101 F.3d 1145, 1151, 1152 (6th Cir. 1996) ...................................................31

*Turner v. Iowa Fire Equip. Co.*,
    229 F.3d 1202, 1209 (8th Cir. 2000) ...........................................................50

*University Computing Co. v. Lykes-Youngstown Corp.*,
    504 F.2d 518, 547 (5th Cir. 1974) ..............................................................10

*Valentine v. Baxter Healthcare Corp.*
    68 Cal.App.4th 1467, 1480, 1481 (1999) ......................................................30

ix

FAC Resp. Exhibit B -- 2068

*Wade-Greaux v. Whitehall Lab. Inc.,*
    874 F.Supp. 1441, 1480 (D.Vi. 1994).. ..............................................................................25

*Wagner v. Reading Co.,*
    428 F.2d 289 (3d Cir. 1970) ...............................................................................................16

*Walters v. Mintec/International,*
    758 F.2d 73, 82 (3rd Cir. 1985) . ......................................................................................15

*Waring v. Johnson,*
    341 S.C. 248, 260, 533 S.E.2d 906, 912-913 (S.C.App. 2000) .........................................18

*Watson v. Wilkinson Trucking Co.,*
    244 S.C. 217, 136 S.E.2d 286 (1964) ...............................................................................18

*Welch v. Epstein,*
    342 S.C. 279, 536 S.E.2d 408, 420 (Ct.App. 2000)............................................................1

*Westbrook v. General Tire and Rubber Co.,*
    754 F.2d 1233, 1242 (5th Cir. 1985) ...............................................................................16

*Westberry v. Gislaved Gummi AB,*
    178 F.3d 257, 265 (4th Cir. 1999) ....................................................................................49

*Wheat v. Pfizer, Inc.,*
    31 F.3d 340, 343 (5th Cir. 1994) ......................................................................................49

*White v. Grinfas,*
    809 F.2d 1157, 1161 (5th Cir. 1987) ..........................................................................21, 34

*Whitehead v. Food Max of Mississippi, Inc.,*
    163 F.3d 265 (5th Cir. 1998) ............................................................................................16

*Whitley v. Cubberly,*
    24 N.C.App. 204, 210 S.E.2d 289, 207-208 (1974) ..........................................................44

*Willard v. The John Hayward,*
    577 F.2d 1009, 1011 (5th Cir. 1978) ...............................................................................37

*Willett v. Western Oceanic, Inc.,*
    117 F.R.D. 379 (E.D. La. 1987)........................................................................................28

*Williams v. Slade,*
    431 F.2d 605, 609 (5th Cir. 1970) ..............................................................................18, 27

x

*Woodbury v. Janssen Pharmaceutica, Inc.,*
    1997 WL 201571*8 (N.D. Ill. 1997) ................................................................................39

xi

FAC Resp. Exhibit B -- 2070

**STATUTES**

S.C. CODE ANN. § 15-73-30 ........................................................................................32

**OTHER**

Anderson, S.C. Requests to Charge - Civil, § 32-2 (2002)............................................35

9A Wright & Miller, Federal Practice and Procedure § 2510 (2006) .............................32

Daniel J. Capra, The Daubert Puzzle, 32 Ga.L.Rev. 699, 728 (1998)............................49

Manual for Complex Litigation, Fourth §20.132, 22.315 (FJC 2004)...........................14

Reference Manual on Scientific Evidence 2nd Ed. 345-346 (FJC 2000) .......................25

xii

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

I.    PLAINTIFF'S DAMAGES AND THE EVIDENCE SUPPORTING THE
      JURY'S FINDING OF LIABILITY AND CAUSATION..................................................2

      A.    Vioxx Accelerated Mr. Barnett's Atherosclerosis. ...................................3

      B.    Mr. Barnett's Current Plaque Build-Up is Due to Vioxx. ........................5

      C.    Before He Began Taking Vioxx, Mr. Barnett Had 5 Non-Occluded Coronary
            Vessels; Only the Small Circumflex Had Greater Than 50% Stenosis. .................6

      D.    The State of the Record Shows That Because of Vioxx and Accelerated Plaque
            Build-Up, Mr. Barnett Suffered From the Following: ...............................6

            1.    Heart Attack on September 6, 2002 and a First Angiogram
                  Showing 6-Vessel Stenosis ...............................................6

            2.    CABG Surgery with 5 Grafts on September 10, 2002.....................7

            3.    More Likely Than Not a Second Heart Attack in July 2004 ...........7

            4.    A Second 2006 Angiogram Which Showed 2 Occluded Bypass
                  Grafts, and a Stent Placed in the Native Ramus Coronary Vessel to
                  Supply Replacement Perfusion For One of the Occluded Grafts,
                  and 2 New Fully Occluded Native Vessels – the RCA and the
                  PLSA………………………………………………………………8

      E.    Today, Mr. Barnett Has 2 Fully Occluded Native Vessels – the RCA and
            PLSA, 2 Occluded Bypass Grafts, and Some Blood Flow Vis a Vis Collaterals
            to the Very Bottom Part of the PDA.  He Does Not Have Proper Blood Flow to
            the Upper and Proximal Sections of the RCA. ........................................9

      F.    In Addition to These Injuries, the Posterolateral Part of Heart (Not Seen on the
            Ventriculogram) Has Some Level of Kinesis.  Also, He Has Inferior Wall
            Hypokinesis Which is Permanent. ........................................................10

      G.    Pain and Suffering.....................................................................12

      H.    Merck's National Litigation Posture. ..................................................13

II.   ANY NEW TRIAL SHOULD BE LIMITED TO DAMAGES.........................................15

      A.   The Court Should Order a Remittitur, With Any Conditional New Trial
           Limited to Damages Only. .......................................................................15

      B.   The Damages and Liability Issues are Not Inextricably Intertwined. ...................17

III.  THERE IS NO EVIDENCE, MUCH LESS A REASONABLE PROBABILITY, THAT
      THE VERDICT WAS THE RESULT OF PASSION OR PREJUDICE, OR OTHER
      IMPROPER MOTIVE, NOR THAT THE JURY'S FINDINGS ON LIABILITY WERE
      IMPROPERLY INFLUENCED. THE COURT SHOULD THEREFORE ISSUE A
      REMITTITUR. ..................................................................................................22

IV.   THE VERDICT CANNOT BE INCONSISTENT, AS IT INVOLVES
      SEPARATE AND DISTINCT CLAIMS AND STANDARDS OF PROOF. ...................29

      A.   The Verdict Is Not Inconsistent - Strict Liability And Deceit Are Separate and
           Distinct Causes of Action with Different Standards of Proof. ...............................31

      B.   Even if the Jury Had Not Found for the Plaintiff on the Deceit Cause of Action,
           the Jury Instructions Rendered Negligence the Broader Theory of Recovery Under
           South Carolina Law. ...............................................................................33

V.    THE GREAT WEIGHT OF THE EVIDENCE SUPPORTS THE JURY'S FINDINGS. 37

      A.   Knowledge of a Risk Associated with a Drug Does Not Absolve a Manufacturer
           of Liability. The Plaintiff's Physicians Were Not Provided Adequate Warnings
           Regarding Vioxx. ..................................................................................38

      B.   The Evidence, Both Subjective and Objective, Establishes That Had Merck
           Provided an Adequate Warning, Dr. Mikola Would Not Have Prescribed Vioxx,
           and Mr. Barnett Would Not Have Continued to Take the Drug. ............................43

      C.   The Weight of the Evidence is That in All Probability Vioxx Caused Mr.
           Barnett's Heart Attack and Accelerated His Atherosclerosis. ...............................46

VI.   CONCLUSION. ..................................................................................................52

xiv

**INTRODUCTION**

During the course of this trial, Plaintiff proved unequivocally that he will lose nine to ten years from his life due to his ingestion of Vioxx. The weight of the evidence – unchallenged by a single Merck retained expert -showe d that Vioxx caused plaque build-up in the Plaintiff's heart, causing him to suffer from a heart attack, multiple surgical interventions, a second heart attack, and the fear of early death. Juries in South Carolina have rendered similar verdicts in cases involving serious injuries. See *Sheikh v. Lexington Medical Center*, Case No. 2003-CP-32-0675 (Lexington C.P. 9/18/06)(Plaintiff claimed drug heart sudden death; defense claimed heart attack-$30 million verdict.) Additionally, South Carolina courts have upheld $35.4 million and $16 million verdicts in personal injury cases. See *Welch v. Epstein*, 536 S.E.2d 408 (S.C.App. 2000); *Hundley v. Rite Aid of South Carolina, Inc.*, 529 S.E.2d 45 (S.C. App. 2000) Much like these cases, the Plaintiff believes that $50 million in compensatory damages is justified for the loss of a decade of life expectancy, yet acknowledges that this Court believes the amount was excessive. Although Plaintiff agrees with the Court that any new trial should be limited to damages, Plaintiff requests the option to accept a remittitur of $10 million for the compensatory damages, all the while leaving the punitive damages at $1 million. Each year taken off Jerry Barnett's life has a high value, and is arguably worth up to $1 million per year during the golden years of his life.

The Seventh Amendment, the law of the Fifth Circuit, considerations of judicial economy, as well as basic principles of equity and fairness, require that Plaintiff be given the option of remittitur. The Court concluded "that the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable," and stated that "the Court is not troubled by the $1 million punitive damage award." Under these circumstances remittitur is appropriate.

Moreover, if, as Merck suggests, the issues of liability are so intertwined as to require a new

1

trial of all issues, why should the Plaintiff be forced to take such a risk, either in this courtroom, or in the court of appeals, when liability has already been determined in his favor? It is not fair to the Plaintiff or the Court, nor consistent with the premise of bellwether trials in multi-district litigation to unnecessarily conduct a second trial. This was not a hung jury like Irvin/Plunkett. The jury clearly found in favor of Gerald Barnett on liability for negligence, breach of duty, deceit and proximate cause, and found by clear and convincing evidence that Merck's conduct was willful, wanton or in reckless disregard of the Plaintiff's rights.

The Court should not feel that by setting a value for a reasonable compensatory award in this bellwether case it would be placing a value on settlement for future cases. In reality, the ad damnum is going to be several times what the cases will eventually settle for, because there will be multiple defense verdicts as well as some plaintiff verdicts. However, in order for a plaintiff who tries a bellwether case to receive a reasonable net from a remitted award, the extraordinary costs and expenses must be considered.

## I. PLAINTIFF'S DAMAGES AND THE EVIDENCE SUPPORTING THE JURY'S FINDING OF LIABILITY AND CAUSATION

Contrary to Merck's assertions at trial, this is not a case of a "small heart attack" with minimal medical billing. Jerry Barnett's heart attack was just the first manifestation of the multiple serious and ongoing injuries caused by Vioxx which took him from a favorable cardiac health status with prospects of a full life in 2000, to a dire situation in 2006, in which he now suffers from diffuse coronary disease throughout his heart and dismal prospects for the future. Since his heart attack in 2002 he has also suffered: a quintuple open-heart CABG surgery; continued rapid development of plaque; a second heart attack resulting in vein occlusions; another angiogram and placement of a stent; and the likelihood of further surgical intervention and a loss of nine to ten years of his life.

2

The evidence in this case showed, through the testimony of Dr. Zipes, that Mr. Barnett was a man who in 2000 had only a 1-2% risk of having a heart attack. However, just a short time later, he not only had a heart attack, but suffered from a severe amount of coronary artery disease, inexplicable by anything other than Vioxx. Dr. Karavan testified as to the difference in Mr. Barnett's cardiac status today as compared to the time of his heart attack in 2002. In each of Mr. Barnett's various coronary arteries, such as the LAD, the diagonals off the LAD, the Ramus Intermedius, the RCA and the posterolateral branch of the RCA, the plaque burden is worse today than it was at the time of the heart attack. Therefore, when evaluating the overall compensatory damages for this case, the focus should not be solely placed upon Mr. Barnett's heart attack and resulting CABG surgery. This is but one aspect of his overall damage from taking Vioxx. Instead the focus should be on the extensive coronary artery disease caused by Vioxx.

This trial was a story not just of a "small heart attack," but one of a disease process that aggressively occluded Mr. Barnett's arteries, not once, but twice to the point where he is now at increased risk of future cardiac events requiring surgical intervention, and the prospect of premature death. Mr. Barnett's damages are more than his lost years of life. The following is a brief summary of the ongoing damage that Jerry suffered as a result using Vioxx, starting with his overall health status in 2000, to the heart attack in 2002, to the CABG surgery in 2002, to his vein graft occlusions and second heart attack in 2004, to his decreased exercise tolerance and finally to his current status of occlusion. Included in the summary are excerpts from the trial transcript supporting showing what evidence the jury was able to consider when deciding to award damages to Mr. Barnett.

**A.    Vioxx Accelerated Mr. Barnett's Atherosclerosis.**

- Douglas Zipes, MD, 8/8/06 Tr. at 1677:13-1678:12

1677

13   A.   Sure. I do.  When Vioxx, as a Cox-2 inhibitor, works, it

3

14  will prevent the development of the prostacyclin part of the
15  whole balance that I told you.  So, then, that will lead to
16  thromboxane not being opposed, not being balanced, by the
17  prostacyclin.
18       And that, then, will lead to the steps that I talked
19  about before so that we're going to have constriction.  We call
20  that vasoconstriction.  That water pipe is going to get
21  narrower.  The blood pressure is going to go up.  The platelets
22  are going to get more sticky because they don't have the
23  prostacyclin to prevent them from sticking together.  And there
24  are other things that can happen that I didn't touch on.
25       But, if you remember, in the very beginning I said

                              1678
1   that, if there is an injury to the inner wall, there is a
2   signal that's sent out for cells to come and try to repair that
3   injury.  There is a balance between the thromboxane and
4   prostacyclin in terms of attracting those cells.  It's called a
5   chemoattractant mechanism.  And prostacyclin tends to prevent
6   the cells from adhering while thromboxane tends to encourage
7   the cells to adhere.
8        So if you get rid of the prostacyclin with Vioxx and
9   you get this little injury that we all have from age 10 or 20
10  years old, you're now going to have more of these cells migrate
11  into that area of the blood vessel, and this, then, can
12  accelerate the development of the plaque.

- Stephen Epstein, MD: Trial Transcript Volume 6, August 5, 2006, 1201:19-22;
  1203:2-7

                              1201

19  A.  **Well, our initial proposal to Merck had the hypotheses**
20  **that Vioxx would be protective against viral infection and**
21  **protective against the development of atherosclerosis, and we**
22  **found just the opposite.**

                              1203
2   Q.  Before we move on to this clinical study and away from
3   this e-mail, doctor, based on your experience in this area and
4   your study and your years of research in this area, **was Merck**
5   **given a yellow flag or a warning back in 2001 about the**
6   **potential harmful effects of Vioxx in humans?**
7   A.  **Yes.**

                              4

**B.    Mr. Barnett's Current Plaque Build-Up is Due to Vioxx.**

- Dr. Karavan, 8/5/06 Tr. at 1153:15-1154:11

1153

15  Q.  Given the amount of plaques that he's got, CAD, would you
16  be able to compare his prognosis versus a person who does not
17  have this level of plaque?
18  A.  I think he -- **clinically, the thing that would be the most**
19  **worrisome is that he has somewhat of a diffuse process and**
20  **progression of that process would be -- more progression of it**
21  **is the main concern to me.**
22        Again, given the fact that his heart pumps normally
23  and the overall blood flow is probably normal now -- it was
24  only mildly diminished -- that still would, overall, give him a
25  good prognosis, but I am concerned about his total plaque

1154

1  burden and that progression.
2  Q.  Do you have an opinion as to whether or not that total
3  plaque burden could shorten his life expectancy?
4  A.  **Well, one of the hardest things, in my mind, is to tell**
5  **someone how long they're going to live or have to live and**
6  **the -- but the amount of plaque burden would be one of the**
7  **things I'd be concerned about.  He certainly, from a cardiac**
8  **standpoint, would not have the same prognosis of someone that**
9  **had more simple, you know, less diffuse disease.  I think he**
10  **has a different prognosis than someone like that.**  I would not
11  put a number on it.

- Dr. Zipes, 8/8/06 Tr. at 1734:25-1735:14

1734

25  Q.  Why?

1735

1  A.  I can come up with no other answer.  As I expressed to
2  you, all of his risks were taken into consideration when he has
3  the first stress test January 24, 2000.  If being an FBI agent
4  and his wife's cancer, all of these things, family history had
5  played a role, whatever role it played, we should have seen it
6  on the stress test at January 24, 2000.  So we start basically
7  from that point.
8        Then he starts taking the Vioxx, and the one major
9  big risk that he had was the elevated LDL, the bad cholesterol.
10  that is brought under control by July of 2000 and comes down to
11  numbers that, as I cited from two trials, actually produced

5

12    reversal of coronary plaque. **So the only way I can account for**
13    **the progression of the plaque buildup that Jerry Barnett has**
14    **had is that it has to be the Vioxx.**

**C.**    **Before He Began Taking Vioxx, Mr. Barnett Had 5 Non-Occluded Coronary Vessels; Only the Small Circumflex Had Greater Than 50% Stenosis.**

- Jeffrey Popma, 8/7/06 Tr. at 1344:19-1345:5

1344

19    Q.  Now, can you tell from the results of this test whether
20    the blockage is confined to that one area?
21    A.  Again, I'm going to try to qualify the statement
22    "blockage." I think that there is blockages in the arteries.
23    but what I want to differentiate is: are there important
24    blockages, more than 50 percent narrowings, that with maximum
25    exercise -- and this isn't just maximum exercise; this is

1345

1    rather heroic exercise -- that with this maximum exercise, with
2    the heart pumping, getting to 92 percent of his maximum
3    predicted heart rate, that **only one area right over here had**
4    **any important reduction of the blood flow. The rest of the**
5    **heart was functioning normally.**

**D.**    **The State of the Record Shows That Because of Vioxx and Accelerated Plaque Build-Up, Mr. Barnett Suffered From the Following:**

    **1.**    **Heart Attack on September 6, 2002 and a First Angiogram Showing 6-Vessel Stenosis.**

- Dr. Jeffrey Popma, 8/7/06 Tr. at 1366:9-20

9    Q.  And what's that stump?
10    A.  That stump is a combination of the cholesterol buildup and
11    blood clot.
12         And the blood clot, which is dynamic, which just came
13    on and formed a blood clot, **stopped the flow, caused the chest**
14    **pain, caused part of his heart muscle tissue to die, and cut**
15    **off the circulation to the distal portion of this vessel.**
16    Q.  And what is that called?
17    A.  In this particular case, it was called a non q-wave
18    myocardial infarction.
19    **Q.  Is that another term for a heart attack?**
20    **A.  Yes, exactly.**

6

- Dr. Mark Karavan, 8/4/06 Tr. at 1001:118

1001

1  Q.  And tell the jury what a cardiac catheterization is.
2  A.  That's a test where we slide tubes from the groin up into
3  the heart and inject contrast dye into the blood vessels of the
4  heart and feed blood to the heart and assess for blockage.
5  Q.  And blockage is -- is -- you'll give a percentage of the
6  blockage; is that right?
7  A.  Yes, sir, we give --
8  Q.  We'll come to that.
9  A.  Yes, sir.
10  Q.  Could you read into the record what you say in your
11  handwriting on 9/9/02 on exhibit 12.
12  A.  Cath without complication.  LVEF approximately 50 percent.
13  LVEDP 16.  **Left main, 50 percent distal.  LAD, mild proximal**
14  **irregularities, mid vessel 80 percent.  D1 small 80 percent.**
15  **D2 moderate, mild irregularities.  Circumflex, small diffuse,**
16  **high-grade disease.  Ramus, large, proximal 80 percent lesion.**
17  **RCA hundred percent PDA with collaterals.  Posterolateral**
18  **branch 80 percent.  Recommendation, CABG.**

**2.      CABG Surgery with 5 Grafts on September 10, 2002.**

- Dr. Karavan, 8/4/06 Tr. at 1014:4-11

1014

4  Q.  Okay.  He described on page 2 details of the operation;
5  right?
6  A.  That's correct.
7  Q.  Just in laymen's terms, what did he do there?
8  A.  **He performed a five way coronary artery bypass grafting to**
9  **Mr. Barnett.**
10  **Q.  Five different vessels?**
11  **A.  Five, that's correct.**

**3.      More Likely Than Not a Second Heart Attack in July 2004.**

- Dr. Zipes, 8/6/06 Tr. at 1726:10-20

1726

10  Q.  So, in other words, you didn't do the test.  You had
11  somebody else doing the tests.
12  A.  Absolutely.  Now, I looked at the tests after they had
13  done them and after they had written their decisions.  I didn't

7

14  change anything.  I didn't influence them.  Those are the
15  decisions that they came up with.
16      **They said two occluded vein grafts, new wall motion**
17  **abnormality -- that is abnormal squeeze -- when it had been**
18  **normal July of '03.  And I said I don't know how else to**
19  **explain it except that the vein grafts have closed and he**
20  **probably had a heart attack at this point.**

- Dr. Karavan, 8/4/06 Tr. at1116:11-1117:3

### 1116

11  Q.  Let me ask you this.  Was the ramus saphenous vein graft
12  the graft that was occluded?
13  A.  Correct.
14  Q.  Remember in the echocardiogram there was some wall motion
15  abnormalities; is that right?
16  A.  What we call mid basal and lateral, uh-huh.
17  Q.  Would that be consistent with a possible occlusion to the
18  ramus?
19  A.  I felt that most likely that area was ischemic, giving
20  that wall motion abnormality.  The vessel was patent.  It
21  wasn't 100 percent closed.  It was said to be ischemic, not
22  scarred, on his perfusion study.  So I think the wall motion
23  could be attributed to that vessel.  **Did he have a heart attack**
24  **there?  If he did, it wasn't a big one.  I can tell you that.**
25  **Q.  Is it possible that he had a small one?**

### 1117

1  **A.  Given the fact that he has a small wall motion abnormality**
2  **there, it's consistent -- it's possible that he might have had**
3  **a small market in that area.**

[The last line of this above excerpt was incorrectly transcribed by the court reporter at
trial.  In the deposition it is recorded correctly (*See* July 17, 2006 trial deposition, 41:7-
10.) Instead of reading "small market" it should read "small heart attack."]

4.  **A Second 2006 Angiogram Which Showed 2 Occluded Bypass Grafts, and a**
    **Stent Placed in the Native Ramus Coronary Vessel to Supply Replacement**
    **Perfusion For One of the Occluded Grafts, and 2 New Fully Occluded Native**
    **Vessels – the RCA and the PLSA.**

- Dr. Popma, 8/7/06 Tr. at 1377: 6-14; 1481:8-16

### 1377

6  Q.  I'm going to lay a foundation before I ask you the opinion
7  question.  Would you tell us, at some time after the

8

8    September 9 cath and the September 10 bypass operation, do you
9    have an opinion as to whether or not his grafts occluded?
10   A.  Yes, I do.
11   Q.  And what is that opinion?
12   A.  **The saphenous vein graft that went to the ramus branch**
13   **occluded, and one of the sequential limbs of the graft that**
14   **went to the bottom portion of the heart also occluded.**

1481

8    Q.  He then had a stent inserted by Dr. Karavan while he was
9    in the hospital; right?
10   A.  That's one -- yes.
11   Q.  The stent was inserted into the artery called the ramus?
12   A.  That's correct, because the vein graft to that ramus
13   branch had closed.
14   Q.  We'll talk about that.  The ramus was one of the arteries
15   that had been bypassed in 2002; true?
16   A.  That's correct.

E.    **Today, Mr. Barnett Has 2 Fully Occluded Native Vessels – the RCA and**
      **PLSA, 2 Occluded Bypass Grafts, and Some Blood Flow Vis a Vis Collaterals**
      **to the Very Bottom Part of the PDA.  He Does Not Have Proper Blood Flow**
      **to the Upper and Proximal Sections of the RCA.**

   •  Dr. Popma, 8/7/06 Tr. at 1388:8-1389:3

1388

8    Q.  **So add it up.  Between September 9, '02, and July 10, '06,**
9    **did you list or calculate how many areas of actual occlusion or**
10   **total blockage?**
11   A.  **Total blockages, yes.**
12   Q.  **How many?**
13   A.  **Four.**
14   Q.  **Tell the jury where they were.**
15   A.  **Oh, so from that period of time, 2002 to 2006, there were**
16   **four areas that became totally blocked.**
17       And as I've intimated, different, I mean, different
18   cardiologists will convince about how narrow something is,
19   between 50 and 70, and 70 and 80.  But total is total.  We
20   can't argue with the fact that it's totally blocked.
21       **And so we have the vein graft that went to the ramus**
22   **branch totally blocked that was likely open in July of 2003.**
23       The sequential limb -- I think the sequential limb to
24   the posterolateral branch -- others would say it's to the PDA,
25   but **one of the sequential limbs -- 100 percent blocked; the**
1389
9

1    distal portion of the coronary artery, a big vessel, totally
2    blocked; and finally **this limb right here of this segment right**
3    **there, "patent and open now," September 9, now totally blocked**.

**F.    In Addition to These Injuries, the Posterolateral Part of Heart (Not Seen on
the Ventriculogram) Has Some Level of Kinesis.  Also, He Has Inferior Wall
Hypokinesis Which is Permanent.**

- Dr. Popma, 8/7/06 Tr. at 1379:20-1382:25

1379

20    By Mr. Robinson:
21    Q.  Tell us about those tests that you relied upon.
22    A.  So there were three tests -- which I'll just go through
23    very briefly because they are in the record and we can talk
24    about them -- there were three tests that Dr. Zipes performed?
25    Q.  What's the date of the tests, for the jury?

1380

1    A.  So the first test is an echocardiogram, and the
2    echocardiogram was performed on 5/2/06.  **Echocardiogram is a**
3    **soundwave test that allows us to look, without going into the**
4    **heart, through the procedures that I perform, how well the**
5    **heart contracts and are there any areas of scar and what's the**
6    **overall function.**
7            Now, although Mr. Barnett's overall function of his
8    heart was good, was normal, what was noted on that test was
9    that **there was incomplete contraction in the lateral and the**
10    **basal section of the heart down here.  It just didn't squeeze**
11    **normally.  And there was severely reduced wall motion that was**
12    **in the basal posterior and inferior portion.**
13            I'm just showing you on the heart where this is.  So
14    this is kind of this area, in this same zone that he had his
15    heart attack previously; but also, **as we'll see in just a**
16    **minute, in a zone where one of the vein grafts also occluded.**
17    **and importantly, it wasn't moving, which implies there is**
18    **actually a scar that is there.**
19            So the next test that he had was a ct angio.  Sorry.
20    Let me just say that -- a ct angiogram.
21    Q.  Quickly, what is a CT?
22    A.  A CT angiogram is another way we inject dye into the veins
23    and we can image, without our coronary angiography, what the
24    state of the vessels are.
25            On that, just very briefly, it appeared that one of

1381

1    the main grafts that went to the ramus branch had occluded.

10

2    and finally, he had an exercise stress test that was performed
3    on May 2, and he could no longer exercise with the same
4    capacity that he could do before.
5    Q.  How many minutes did he do in that exam?
6    A.  I think he got to nine minutes and 30 seconds.  So rather
7    than being 17.2 and 17.5 minutes, which is phenomenal
8    exercise --
9    Q.  The mets, you mean?
10    A.  The mets, yes, that he's actually down to 13.1 mets.
11    Q.  And how many minutes did he do before on the first
12    cardiolite?
13    A.  15 minutes and now we're down to 9 minutes.  So a marked
14    reduction in his exercise tolerance.
15    Q.  And what opinion do you have regarding the change?
16    A.  Well, we'll put this in aggregate, but I think that there
17    is evidence, which we'll see with the angiogram, that there was
18    more heart disease, either by occlusions of these grafts or by
19    progression of his native disease.
20        And interestingly, it's all in the setting when he
21    should be having additional plaque formation because his LDL
22    cholesterol has been so well controlled.
23        Now, just the final piece which I'll mention again.
24    it's a sestamibi scan.
25    Q.  What is a sestamibi scan?

1382

1    A.  Sorry.  Cardiolite.  A Cardiolite scan.  Thank you very
2    much.
3    Q.  Is the old name for it sestamibi?
4    A.  It is.  Thank you.  Yes.  And on that particular scan,
5    there was an area of reduced perfusion -- I'm reading from the
6    report -- in the inferior and infero -- and basal inferolateral
7    segments.
8    Q.  What does that mean?
9    A.  That area down here, that, with exercise, starts to fall
10    out.  But the important part of this is that, during rest, it
11    doesn't come back all in towards normal.  **There is still a**
12    **residual problem, and that implies that there has been some**
13    **heart muscle damage; a heart attack in that area.**
14    Q.  And can you tell me whether, in your opinion, was that the
15    same?  Was that the residue from the original heart attack, or
16    was that a residue from a new one?
17    A.  **I believe that it's new.**  And the reason I say that,
18    although it's impossible to predict these things, the reason I
19    say that is because his cardiolite test that he had back in
20    2003 --
21    Q.  July.

11

22    A.  -- didn't show this problem.  So if the old heart attack
23    healed up, had bypass surgery, everything got fixed, **there is**
24    **now a new abnormality, a new problem, to the back portion that**
25    **wasn't there in 2003.**

- Dr. Zipes, 8/8/06 Tr. at 1730:17-1731:18

17        Click again.  I measured the relaxed area that's red.
18    click again.  The squeezed area, healthy muscle, is yellow.
19    That gets thicker.  That's like squeezing your bicep.  Go
20    forward again.  This is the scarred area that's narrow.  Click
21    again.  This is the scarred area when the heart is contracting
22    staying narrow.  **This is absolute, unequivocable, unarguable**
23    **proof that he has damaged heart muscle; that he has scar in**
24    **that area; and that this changed from '03 to '06.  Something**
25    **happened, and my interpretation is that it's related to the**
            1731
1    **obstruction of the two vein grafts and he indeed had a heart**
2    **attack, and he now has to live with the scar.**
3    Q.  Go to the next slide, please.  You did a stress test;
4    right?
5    A.  I did.  Probably blow up, yeah --
6    Q.  What's the point of that?
7    A.  The point of that is this subtle basal inferior
8    hypokinesis.  This was read by our expert in this area, and he
9    confirms this is an abnormal area of contraction and that this
10    is the scar.  In addition, he says that "the mildly reduced
11    perfusion in the fifth inferobasal and inferolateral segments,
12    which is partially reversible, is suggestive of mild
13    stress-induced ischemia."
14        **"Partially reversible," what does that mean?  It**
15    **means that, at rest, the area that didn't take up the**
16    **cardiolite did not improve.  So it's scarred.  So even at rest,**
17    **it won't take up the cardiolite.  This is what we call a fixed**
18    **defect, and this is consistent with a heart attack.**

**G.      Pain and Suffering.**

In determining the appropriate amount for a remittitur the Court should take into account that

Mr. Barnett has suffered a great deal, both physically, as detailed above, and emotionally.

Physically, he has endured the pain of a heart attack and the burden of major medical procedures

such as catheterization, stent placement and bypass surgery.  As the Plaintiff's brother John testified,

12

he spent quality time with the Plaintiff before the heart attack, and together they engaged in many activities such as golf, shag dancing and walking on the beach. (8/7/06 Tr. at 1520:12-20.)  John notes that since Mr. Barnett's heart attack and subsequent episodes of chest pain, the Plaintiff's energy level has markedly decreased.  He states, "most definitely, as far as his energy level, he has never come back to the level that he had when he came down here to North Carolina." (*Id.* at 1514:6-9.)  Reiterating this point, John testified that "I remember that in my mind that he seemed to be recovering slower than what I thought he ought to." (*Id.* at 1512:13-14.) John further describes the Plaintiff as "not quite hitting on all cylinders." (*Id.* at 1520:4-5.) As the Plaintiff described in his testimony, "I know after the heart attack I've been doing things at a lower level . . ." (8/8/06 Tr. at 1594:5-6.)

Mr. Barnett has also suffered emotionally. When asked about his concerns for the future, he responded that his major concern is dying early and leaving his wife behind.  As he testified, "My biggest one would be my family, particularly my wife, because she really depends on me a lot.  And I can't imagine her – you know, really what life would be life for her, you know, if I wasn't here . . . It's my biggest worry is, you know, my mom, how is she going to handle it, the brothers?  But my wife, particularly, because she's more vulnerable." (*Id.* at 1594:11-17.) Each day, Mr. Barnett is fearful of another heart attack and premature death, which is a heavy burden for him to carry during his golden years. Nothing is more stressful in life than fear of death. This fear is a compensable damage everyday that he stays alive.  Plaintiff's first heart attack and loss of years off of his life, in and of themselves, would justify a remitted award of $10 million in compensatory damages.  When the overall permanent and life-threatening damage to Mr. Barnett's cardiac health caused by Vioxx is also considered, compensatory damages in that amount are clearly reasonable.

**H.     Merck's National Litigation Posture.**

13

The Court can and should also take into account Merck's national litigation posture and the effect the reduction of this verdict will have on other cases.[1] Despite Merck's argument that the Defendant and the people who currently run Merck had gotten the 'message' and taken it 'to heart,' it is ironic, though not surprising, that soon thereafter representatives of Merck were reiterating their scorched earth litigation strategy of trying every case. According to the Associated Press as reported in the Washington Post, in a news release a member of Merck's national defense team "said that the company intended to maintain its policy of trying every Vioxx case."

(http://www.washingtonpost.com/wp- dyn/content/article/2006/08/17/AR2006081701609.html)

This case and this verdict have national resonance.[2] Merck must accept the good and the bad which are inherent in its litigation strategy. It must live with the larger awards just as it has accepted the defense verdicts. Otherwise, if all large awards are artificially lowered Merck will only be encouraged to continue to try every case, requiring every plaintiff to spend millions of dollars to have their day in court.   It is essential that the bellwether cases in the mass tort context be truly representative. *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997.) Because the purpose of test cases is to produce a reliable range of potential values, (Manual for Complex Litigation,

---

[1] As this Court noted in *In Re: Propulsid Products Liability Litigation*, Not Reported in F.Supp.2d, 2003 WL 22023398, *6, E.D. La., March 11, 2003:

> "Finally, the Court is mindful that its primary duty in this case is owed to the litigants in this case, but the Court cannot ignore its responsibilities as an MDL transferee court. The Court must balance the two interests. In doing so, the Court reiterates its previous statements that trial of the issue of adequate warnings will be helpful to all litigants, including the [plaintiffs], in an attempt to move this litigation forward toward an ultimate conclusion."

[2] According to the Manual for Complex Litigation, Fourth:

> "One of the values of multidistrict proceedings is that they bring before a single judge all of the federal cases, parties, and counsel comprising the litigation. They therefore afford a unique opportunity for the negotiation of a global settlement. Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court. As a transferee judge, it is advisable to make the most of this opportunity and facilitate the settlement of the federal and any related state cases." Id at §20.132.

14

Fourth, § 22.315(FJC 2004), any significant reduction of the jury's verdict here would artificially skew the global liability picture.  It would render an unrealistic view of Merck's potential exposure in the Vioxx litigation, by narrowing and lowering the anticipated range of verdict amounts.

## II.       ANY NEW TRIAL SHOULD BE LIMITED TO DAMAGES.

### A.       The Court Should Order a Remittitur, With Any Conditional New Trial Limited to Damages Only.

Merck argues that Court has found the damages award was so excessive as to be the result of caprice, passion, or prejudice. Actually the court did not make such a finding, nor was it required to in order to find the verdict excessive. The Order states:  "The Court finds that the $50 million compensatory damages award is excessive under any conceivable substantive standard of excessiveness," and that "no reasonable jury could have found that the Plaintiffs losses totaled $50 million." This does not mean the jury acted out of passion or prejudice, in either its award or its liability findings.  To the contrary,  the Court, having heard all the evidence, concluded " the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable,"  and that it "is not troubled by the $1 million punitive damage award in this case."

There is nothing in the record and no reason to believe that the jury, which acted dispassionately in its findings on the liability issues as well as its award of punitive damages, somehow acted with caprice, passion, and prejudice. Where, as here, the jury's liability findings are reasonable and supported by the evidence, any new trial, with or without remittitur, must be limited to damages. Merck should not be allowed to take advantage of the jury's generosity to obtain another chance at a verdict on liability. Merck had its day in court on the liability issues. Where the excessiveness of a verdict does not implicate the jury's liability findings, a new trial, where required, may be limited to damages. *Walters v. Mintec/International*, 758 F.2d 73, 82 (3rd Cir. 1985) citing

15

*Wagner v. Reading Co.,* 428 F.2d 289 (3d Cir. 1970) (ordering partial retrial on damages in personal injury action.) Moreover, this Court is the best judge of the fact that the liability ruling was not in any way tainted. *City of Phoenix v. Com/Systems, Inc.*, 706 F.2d 1033, 1036 (9th Cir. 1983).

The excessive nature of an award does not impugn the reasonable liability findings. In fact, an excessive award may demonstrate that the jury had little doubt as to issues of liability. *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1242 (5th Cir. 1985). Even if a damages award is found to be the result of passion or prejudice, this does not mean the liability findings were improperly influenced or that liability must be retried. *Whitehead v. Food Max of Mississippi, Inc.*,163 F.3d 265, 278-279 (5th Cir. 1998)("Here, the new trial need be only on damages. ….[T]he damage awards were high; this also indicates the jury's strong belief that Kmart was liable.")

This Court should also examine the question of a new trial in terms of the fairness to the Plaintiff, who has already proven liability, being forced to retry the issue solely because it is this court's opinion the jury by its honest judgment placed a much higher value on the injuries than most juries would have awarded. See *Ramar Coal Co., Inc. v. International Union, United Mine Workers of America,* 814 F. Supp. 502, 510 (W.D. Va. 1993) ("Defendants assert that they are entitled to a new trial on all issues because the jury did not fairly consider the issue of damages. Although the Court is convinced that the jury was mistaken as to damages, the Court finds nothing to suggest that the jury's verdict was based on anything other than honest judgment.") "Considerations of economy, fairness, and repose may provide justification for preserving a jury's liability determination that has been fairly and fully made and ordering only a new trial on damages "where there is no substantial indication that the liability and damage issues are inextricably interwoven, or that the first jury verdict was the result of a compromise of the liability and damage questions.'" *Atlas Food Systems and Services, Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 599-600 (4th Cir. 1996). See also *Maxey*

16

*v. Freightliner Corp.*, 727 F.2d 350, 351-352 (5th Cir. 1984)(" To subject the plaintiffs to re-entering the judicial fray, should they reject remittitur, to re-prove liability either for purposes of compensatory or exemplary damages (both issues decided favorably in plaintiffs' favor after three appellate appearances) would be judicially wasteful, as well as unfair to the plaintiffs.")

Where a new trial is appropriate because of an excessive damage award the Fifth Circuit has not hesitated to remand for a new trial limited to the issue of damages. *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 687-688 (5th Cir. 2003); *Poullard v. Turner*, 298 F.3d 421, 423 (5th Cir. 2002)(New trial on compensatory and punitive damages.) This often occurs with the court offering the plaintiff a choice of accepting a remittitur or a new trial on damages only. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176 (5th Cir. 1995); *Chemical Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478 (5th Cir. 1993); *Brunnemann v. Terra Intern., Inc.*, 975 F.2d 175,179 (5th Cir. 1992).

## B.   The Damages and Liability Issues are Not Inextricably Intertwined.

Merck contends that the evidence of damages falls into three categories ((i) medical bills; (ii) non-economic damages and (iii) diminished life of nine to ten years), and argues that as to each of these injuries, there is conflicting evidence as to whether, and to what extent, it was caused by Vioxx, and that therefore "all of this requires specific causation evidence that is properly part of liability, not damages." In *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931), a breach of contract action, damages were entirely dependent upon very specific findings regarding the contracts and the contemplation of the parties. While damages for breach of contract are limited to the contemplation of the parties, tort actions are subject to an entirely different set of rules. Merck is responsible for all damages suffered regardless of the extent to which its conduct contributed, and regardless of whether such damages were within the contemplation of the parties. *Hutson v. Continental Assurance Co.*, 269 S.C. 322, 332, 237 S.E.2d

17

375 (1977); *Lifschultz Fast Freight, Inc. v. Haynsworth, Marion, McKay & Guerard*, 324 S.C. 645, 653, 486 S.E.2d 14, (S.C.App. 1997.) See also *J.T. Baggerly v. CSX Transp., Inc.*, --- S.E.2d ----, 2006 WL 2474203,*3, S.C., August 28, 2006. Additionally, damages here are not dependent upon the extent to which Merck's conduct contributed to Mr. Barnett's heart attacks nor to which they contributed to his loss of life expectancy. Under South Carolina law the defendant takes the plaintiff as he is found, and the plaintiff is entitled to recover damages resulting from the aggravation of pre-existing conditions. *Watson v. Wilkinson Trucking Co.*, 244 S.C. 217, 136 S.E.2d 286 (1964); *Raino v. Goodyear Tire & Rubber Co.,* 309 S.C. 255, 259, 422 S.E.2d 98, 100 (1992); See also, *Waring v. Johnson*, 341 S.C. 248, 260, 533 S.E.2d 906, 912-913 (S.C.App. 2000). Even if all issues of liability and damages were retried, the jury still would not be required to itemize each injury in special interrogatories, nor the extent to which Merck's conduct was a contributing factor to each injury.

The authorities cited by Merck are of no help. *Anderson v. Siemens Corp.*, 335 F.3d 466, 471-72 (5th Cir. 2003)(Liability finding based upon erroneous admission of evidence and the court found it could not separate two intertwined *liability* issues. *Id.* at 475-476.); *Mack Trucks, Inc. v. Arrow Aluminum Castings, Co.,* 510 F.2d 1029, 1034 (5th Cir. 1975) (rejecting separate trials on two different but related liability theories); *Eximco, Inc. v. Trane Co.*, 748 F.2d 287, 289 (5th Cir. 1984)(breach of contract and federal statutory violations.); *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1538-1539 (5th Cir.1984)(rejecting separate trials of fraud and breach of contract causes of action); *Davis v. Safeway Stores Inc.*, 532 F.2d 489, 491 (5th Cir. 1976)(default judgment in personal injury action reversed as to damages where affidavits insufficient); *Colonial Leasing v. Logistics Control Int'l*, 770 F.2d 479, 481-82 (5th Cir. 1985) (Plaintiff was entitled to new trial on all issues relevant to its right to recover under Texas Fraudulent Transfer Act, rather than solely to issue of creditor status.); *Williams v. Slade,* 431 F.2d 605, 609 (5th Cir. 1970))(Issue of

18

whether a retrial could be ordered only as to one defendant who had been erroneously granted a directed verdict, or whether case should be retried as to both.)

Unlike the cases cited by Merck, *Brunnemann v. Terra Int'l, Inc.,* 975 F.2d 175, 179 (5th Cir.1992), cited by this Court, actually involved a tort claim and actually addressed the issue of a possible new trial limited to damages. Although the appellate court found the verdict was excessive, because there was no evidence it was the result of passion or prejudice the court held that the appropriate remedy was remittitur, subject to a new trial on damages only if the plaintiff did not accept the reduced amount. *Id.* at 178-179. Like *Brunnemann*, there is no evidence that the jury's award was the result of passion or prejudice. As this Court noted, the jury's liability findings were reasonable. This combined with the relatively minimal award on punitive damages demonstrates this jury was attempting to be eminently fair. As is *Brunneman*, a new trial can be ordered on the issue of damages alone, conditioned upon the Plaintiff rejecting a remittitur.

Merck argues that the jury never decided which, if any, of Mr. Barnett's injuries resulted from his Vioxx use, and that a second jury would be required to reexamine all the issue of general and specific causation in order to do so. However, this same argument could be applied to almost any products liability case, and virtually every one of thousands of cases in the Vioxx litigation. Accepting Merck's argument would guarantee a retrial of all issues in every Vioxx case, every time a jury renders an excessive award.[3]  Merck would always argue that different aspects of damages and the absence of jury findings separating out medical bills and preexisting conditions, two factors

---

[3] Merck's position is not unlike the argument made by the defendant in *Levesque v. Marine Drilling Co.*, 783 F.Supp. 302, 306 (E.D.Tex. 1992), that the plaintiff's credibility on liability was 'intertwined' with his credibility on damages. ("Plaintiff's credibility has already been determined as to liability. A new jury can judge his credibility as to damages. The credibility of the plaintiff is present in every case. If the court follows the defendant's suggestion, no case could ever be tried on damages alone. Such a position is contrary to the law.")

19

present in most Vioxx cases, foreclose a trial on damages without retrying liability. The resulting waste of judicial resources, and the unfair burden to injured victims of Vioxx, would be monumental.

The requirement that issues retried be separate and distinct from those not retried is to ensure that improper influence that may have affected one did not affect the other, (*Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 455 (3rd Cir. 2001)) and  to avoid a risk of inconsistent verdicts. *In re Plywood Antitrust Litigation*, 655 F.2d 627, 636 (5th Cir. 1981).  However, there is no danger of inconsistency here, nor is there any evidence that the cause of the allegedly excessive award affected the jury's findings on liability. Merck asserts that it is a practical impossibility to try damages alone in that it would require presentation of most or all of the evidence from the first trial. The cases Merck cites for this proposition all concern bifurcation of trials in class actions. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 749-751 (5th Cir.1996); *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 318 (5th Cir. 1978); *In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293, 1303-1304 (7th Cir. 1995).

The fact that some of the evidence relevant to one claim may have to be presented again to the second jury does not implicate the constitutional concerns behind the rule. See *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1128 (7th Cir. 1999)("…Seventh Amendment argument boils down to an assertion that much of the evidence presented in the first trial would have been re-examined in the second. Yet, this alone does not raise constitutional concerns. The Seventh Amendment is concerned about factual conclusions, not evidence: "The prohibition is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues." (citing *Paine, Webber, Jackson & Curtis, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 587 F.Supp. 1112, 1117 (D. Del. 1984)) and *In re Innotron Diagnostics*, 800 F.2d 1077, 1986 (Fed Cir. 1986) (Bifurcation of anti-trust and patent claims upheld despite likelihood that "most of the facts and issues in the patent trial [were] overwhelmingly intertwined and overlapping with

20

those [in the anti-trust case].")

A new trial on the amount of punitive damages does not, as Merck contends, necessitate a retrial of liability issues. See *White v. Ford Motor Company*, 2003 WL 23353600 (D.Nev. Dec 30, 2003) (NO. CV-N-95-0279-DWH) Not Reported in F.Supp.2d, 2003 WL 23353600, *2 (Rejecting argument that retrial of amount of punitive damages must include retrial of liability issues.) Even if some evidence of the conduct for which Merck was found liable must be put before a second jury to determine the appropriate amount of the award of punitive damages, this does not require a new trial on liability issues. See *e.g. Automotive Products v. Tilton Engineering, Inc.*, Not Reported in F.Supp., 1993 WL 661138,*1, C.D.Cal., November 18, 1993.( "Although the Court agrees that AP and *Tilton* must present the evidence of liability to the new jury, the jury does not need to retry that issue…") Proper deference to the Seventh Amendment precludes entry of a judgment that disregards any material jury finding. *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427-428 (2d Cir. 1995). "Whether and to what extent issues should be separated out should be considered in light of the legal principles that, even when general verdicts are vacated, the parties are still bound by the jury's answers to the written interrogatories, *Green v. American Tobacco Co.*, 325 F.2d 673, 678 (5th Cir. 1963) ("the parties may not re-litigate the issues already decided under the guise of presenting evidence on the issue [that needs to be retried]"), and the Court may not enter a judgment that disregards any material jury finding." *Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.*, 419 F.Supp.2d 225, 234 (N.D.N.Y. 2005) citing *LeBlanc, supra, at* 427.) The Plaintiff's Seventh Amendment rights are at stake here as well, and Mr. Barnett is entitled to the benefit of the findings by the jury on the liability issues already tried.

FAC Resp. Exhibit B -- 2094

### III.   THERE IS NO EVIDENCE, MUCH LESS A REASONABLE PROBABILITY, THAT THE VERDICT WAS THE RESULT OF PASSION OR PREJUDICE, OR OTHER IMPROPER MOTIVE, NOR THAT THE JURY'S FINDINGS ON LIABILITY WERE IMPROPERLY INFLUENCED. THE COURT SHOULD THEREFORE ISSUE A REMITTITUR.

The jury's verdict in this case was based upon Plaintiff's presentation of a wealth of evidence showing that Vioxx caused acceleration of atherosclerosis and heart attacks. Plaintiff's experts relied upon numerous studies, in humans and animals, as well as data from clinical trials, to explain the mechanism by which Vioxx causes increased cardiovascular risk and accelerated atherosclerosis. Through the testimony of Drs. Zipes and Avorn, the Plaintiff proved that Vioxx causes an increased risk of heart attacks. This evidence went unrebutted, as Merck offered not a single retained expert witness in response. (Drs. Karavan and Bryan concededly were not knowledgeable about the Vioxx science.) Merck's witness, Dr. Reicin admitted APPROVe showed an increased cardiovascular risk at 18 months or longer, (8/14/06 Tr. at 2354:22-2355:1), and Mr. Barnett used Vioxx for 31 months. Merck concedes that APPROVe is a statistically significant, placebo controlled, clinical trial, yet argues that Dr. Moye suggested "one study is not enough." However, Merck ignores his testimony that the FDA has decided "if they have one good, large and well-designed, well-executed, well-analyzed confirmation study, that will be enough." (8/3/06 Tr. at 778:20-23.)

Standing alone, APPROVe is statistically significant, scientifically reliable evidence that Vioxx causes cardiovascular events at the 25 mg dose. Dr. Zipes also relied upon statistically significant evidence from the Alzheimer's trials. (8/8/06 Tr. at 1713:23-1714:20.) In addition to epidemiological data from various clinical studies, Zipes relied upon the Plaintiff's medical records and the results of the 2005 FDA Advisory Committee, wherein 32 independent scientists reviewed clinical data and concluded, 32 to zero, that Vioxx causes an increase in cardiovascular events. (*Id.* Tr. at 1666:11-1667:6.) Dr. Avorn testified how the VIGOR study results showed a 5-fold increased

22

risk of heart attack with Vioxx versus naproxen, (8/1/06 Tr. at 295:23-297:14) and why he dismissed Merck's theory that naproxen is cardioprotective. (*Id.* at 323:22-324:18.)I n his own study, he found an increased risk of MI in people taking regular doses of Vioxx, (*Id.* at 336:5-336:14) and the FDA medical reviewer cited several studies that suggest trends toward higher rates of myocardial infarction with Vioxx, even with lower doses of Vioxx or shorter duration. (*Id.* at 373:10-374:6.) The ADVANTAGE trial showed an increased risk of heart attack, (*Id.* at 367:16-20), as did Study 090. (*Id.* at 367:23-368:9.) In the Alzheimer's trials the number of cardiac deaths was "striking," (*Id.* at 378:25-379:5), and even Merck's own internal meta-analysis conducted by Dr. Shapiro showed an increased risk of heart attack. (*Id.* at 559:7-561:4; 8/1/06 Tr. at 365:24-366:10.)

From all of this evidence it was more than reasonable for a jury to conclude that Vioxx causes an increase of cardiovascular events at the 25 mg dose. The experts provided reliable and compelling explanations of how Mr. Barnett's use of Vioxx caused his extensive cardiac injuries. Dr. Zipes demonstrated - unrebutted by any defense expert opinion to the contrary - the mechanism by which Vioxx caused Mr. Barnett's rapid progression of atherosclerosis. Based upon clinical experience as well as hundreds of hours reviewing materials regarding Vioxx and Cox-2 inhibition (8/8/06 Tr. at 1654:7-20), Dr. Zipes explained that Vioxx prevents the development of prostacyclin, creating an imbalance favoring thromboxane, leading to vasoconstriction, platelet clumping, narrowing of the artery and eventual heart attack. Because of the imbalance, cells will tend to adhere to an injury in the blood vessel, causing an increase in platelet migration to that area, which in turn causes an acceleration of plaque build-up. (*Id.* at 1677:9-1679:2; 1679:10-1680:12.) In his testimony regarding the APPROVe follow-up data, Zipes described how the acceleration of atherosclerosis can affect a person even after Vioxx use is discontinued. In essence, the damage done to the artery, or the plaque that has accumulated within the artery during the time that a person

23

was on Vioxx remains, putting the individual at greater risk for a thrombotic event.  (8/8/06 Tr. at 1700:21-1701:17.)

Dr. Zipes explained the body of evidence which demonstrates that Vioxx accelerates atherosclerosis, including human data from Merck's own clinical trials, the APPROVe follow-up data as well as the Alzheimer's data from study 078 described in the *Thal* article. These studies were in humans and showed that Vioxx continued to increase the risk of cardiovascular events even after discontinuation of the drug, which is best explained by the acceleration of atherosclerosis while the person was on the drug.  As discussed by Merck's own consultant, Dr. FitzGerald, "Patients in the APPROVe study should continue to be followed.  This will allow some estimate of how quickly the developed risk may dissipate given the relatively short-half lives of these compounds.  Such dissipation may occur rapidly.  On the other hand, if treatment accelerates atherosclerosis, the offset of the risk may be more gradual."  Indeed, as described by Dr. Zipes, the APPROVe follow-up data proved exactly the prediction provided by Dr. FitzGerald, namely that the risk dissipates gradually after discontinuation of the drug.   (*See*, testimony of Dr. Zipes - 8/8/06 Tr. at 1700:18–1704:23; 1713:21–1714:20; 8/10/06 Tr. at 1857:1-8; 1861:1-12; 1863:7–1864:10; 1867:19-25.) Protocol 112 also provides evidence that Vioxx increases cardiovascular risk by showing that in a comparison between Celebrex and other NSAIDs, Vioxx caused a greater increase in blood pressure than any of the other drugs. (8/8/06 Tr. at 1709:25-1710:24.)

Dr. Zipes also relied upon animal studies which provide "an understanding of mechanisms that help us interpret clinical information." (*Id.* at 1793:9-10.)  Ignoring all of the human data relied upon by Plaintiff's experts, Merck cites several cases and argues that "animal studies cannot establish causation in humans." However, two of the cases involved animal studies which themselves were unreliable. See *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194 (5th Cir. 1996)

24

(Affirming exclusion where the animal studies themselves were inconclusive and unreliable, (*Id.* at 195) and there were numerous contrary reputable epidemiological studies. (*Id.* at 197); *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 313 (5th Cir.1989)("We need not address at length the animal studies presented by plaintiffs below, except to note several of the more important studies and their methodological flaws." *Id.* at 313.) The other cases involved unique case-specific problems not present here. *Maurer v. Heyer-Schulte Corp.*, 2002 WL 31819160, E.D.La., December 13, 2002 (Summary judgment granted where the only scientific support was an FDA report regarding effect of chemical on rats.); (*Wade-Greaux v. Whitehall Lab. Inc.,* 874 F.Supp. 1441, 1480 (D.Vi. 1994), *aff'd* 46 F.3d 1120 (3d Cir.1994) (Summary judgment in action alleging birth defects where expert testified in other litigation that "because so many substances are teratogenic in animals, before you can make a conclusion that a substance is teratogenic in humans, you must look to the human data." *Id.* at 1483.)

Despite these limited factual scenarios, the use of animal studies is an accepted and reliable methodology. See *e.g.* Reference Manual on Scientific Evidence 2d Ed. 345-346 (FJC 2000.) Blanket arguments against animal studies like Merck is making here, were rejected by the court in *Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 842 (9th Cir. 2001):

> "First, *Daubert II* itself recognized that animal studies are not per se inadmissible and should be subjected to substantive analysis, just like other scientific evidence. ... None of these cases holds that animal studies will always be too unreliable to provide admissible evidence about human health issues. Notwithstanding the moral and ethical problems often surrounding animal studies, in some circumstances they provide useful data about human health. The district court erred in rejecting the animal studies proffered by Metabolife merely because of the species gap." *Id.* at 842.

Large-scale epidemiological studies are not essential to the formation of an expert opinion as to causation. See *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929 (8th Cir. 2001); *Brasher v. Sandoz Pharm. Corp.,* 160 F.Supp.2d 1291, 1296-98 (N.D. Ala. 2001; *Ruff v. Ensign-Bickford Indus., Inc.,*

25

168 F.Supp.2d 1271, (D. Utah 2001). See also *Hopkins v. Dow Corning*, 33 F.3d 1116, 1124-25 (9th Cir. 1994), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995). Even ignoring the studies and data involving humans upon which Dr. Zipes relied, the animal studies provided compelling evidence about the mechanism by which Vioxx accelerates atherosclerosis. Genetic alteration allows scientists to closely mimic the conditions of a human heart under the influence of Cox-2s, thereby providing reliable predictors of the mechanism by which Vioxx accelerates atherosclerosis. Dr. Epstein testified that animal studies are relevant to the human situation, (8/5/06 Tr. at 1176:13-16) and that his animal study raised a yellow flag for Merck that Vioxx caused accelerated atherosclerosis. (*Id.* at 1201:19-25.) Dr. Zipes also testified how the animal studies help to explain the mechanism by which Vioxx causes heart attacks. (8/8/06 Tr. at 1686:21-1687:1.)

Based upon the totality of the evidence presented at trial, the jury's findings were reasonable and based on scientifically reliable evidence, including clinical data, medical literature, and studies involving both humans and animals.

Merck argues that the jury ignored the Court's instructions and awarded a verdict intended to punish Merck. Merck's basis for this assertion is defense counsel's unrecorded recollection of the jurors nodding in agreement with his argument to that effect, to wit: "My guess is that you have already awarded punitive damages and that you did not know that this stage was even a possibility." (8/17/06 Tr. at 2696:19-22.) If this is evidence, it opens up a whole new chapter in the FRE. But even assuming, *arguendo,* that this were actually part of the record, and admissible evidence of anything, the statement is ambiguous, as is the alleged 'response' of the jurors. If they in fact nodded, the jurors could just as easily have been agreeing that they did not know punitive damages were even a possibility in phase 1, and therefore they did not intend to punish Merck or make them part of the phase 1 award.

26

Regardless of Merck's rank speculation as to this undocumented communication from the jury, of actual significance is that this Court found that "the jury's findings on liability are reasonable in this case," and that "the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable." This contradicts Merck's empty assertions that the award was the result of improper jury conduct. The authorities cited by Merck all involved misconduct of counsel which the court found to have improperly influenced the jury, or circumstances where there was concrete evidence that the jury disregarded the court's instructions. *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 292 (5th Cir. 1975)(Jury failed to respond to instructions and court found "clear and prejudicial error in the closing arguments of plaintiff's counsel which unduly influenced the jury's sympathies." *Id.* at 283.); *Evers v. Equifax, Inc.,* 650 F.2d 793, 798 (5th Cir. 1981)(Verdict of liability itself was affected by improper considerations where counsel twice made improper argument to the jury to, in effect, award punitive damages despite admonition against and withdrawal of punitive damages issue.); *Mueller v. Hubbard Milling Co.,* 573 F.2d 1029, 1040 (8th Cir.1978)(Verdict was "tainted with the trial court's erroneous and prejudicial admission of parole evidence," and jury added punitive damages where the issue had not been submitted to them.); *Christopher v. Florida,* 449 F.3d 1360, 1368 (11th Cir. 2006)(Plaintiff's counsel made a series of statements which implied to the jury that the State of Florida was underwriting the costs of defense.); *Williams v. Slade*, 431 F.2d 605, 609 (5th Cir.1970)( Passion or prejudice was not in issue, but rather, whether a retrial could be ordered only as to one defendant who had been erroneously granted a directed verdict.)

Unlike the authorities it relies upon, Merck has nothing to point to here other than the size of the award to support its contention the verdict "was infected with passion and prejudice." Where a damages award is found to be excessive courts do not blindly assume that a liability finding has been

27

wrongfully decided. Even where a damages award is excessive or has been improperly influenced, if liability is "firmly and correctly established" the court should issue a remittitur. *Willett v. Western Oceanic, Inc.,* 117 F.R.D. 379, 382-383 (E.D. La. 1987)("A jury's finding as to liability can be binding even though its monetary award is found to be excessive or even improperly influenced-our deference to faith in the jury system demands at least this much.") Merck is unable to cite a single case where the size of the damages award alone was enough to support a finding of passion and prejudice, let alone one where it was found to have affected the finding of liability as well. This is why Merck has gone to great lengths to attempt to convince this Court that a finding that the award is excessive necessarily includes a finding that it was also the result of passion and prejudice, and "improper jury conduct." The Court made no such finding, nor was it required to in order to find the award excessive, or to issue a remittitur.

Just because a trial court believes an award is excessive, does not mean it was the result of passion or prejudice sufficient to require a new trial. *Curtis Publishing Co. v. Butts,* 351 F.2d 702, 718 (5th Cir. 1965)("Reviewing the amount of the verdict and reaching the conclusion that it is more than the law would permit is not, therefore, the equivalent of the judge's determination that excessiveness is due to a runaway jury, under the spell of passion or bias."); See also *Lowe v. General Motors Corp.,* 624 F.2d 1373, 1383-1384 (5th Cir. 1980)(Ordering remittitur or new trial on damages only, even though trial court had opined that the damages awarded were "excessive and demonstrate(d) prejudice, bias and passion.") Numerous courts have held that the size of an award does not by itself demonstrate that it resulted from prejudice and passion. *Bianchi v. City of Philadelphia,* 80 Fed.Appx. 232, 237, 2003 WL 22490388 (3rd Cir. 2003)("[T]he defendant's only evidence of jury prejudice and passion is the amount of the punitive damage award itself. This is insufficient..."); *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1561 (10th Cir. 1991); *Hurley v. Atlantic*

28

*City Police Dept.,* 174 F.3d 95, 114 (3rd Cir. 1999); *Evans v. Port Authority of New York and New Jersey,* 273 F.3d 346, 352 (3rd Cir. 2001).  See also *Murray v. Bank of America, N.A.,* 354 S.C. 337,344, 580 S.E.2d 194 (S.C. App. 2003)("Mere undue liberality on the part of the jury does not warrant an inference that the verdict resulted from caprice, passion, prejudice, or other improper motives.")

The rule in the 5th Circuit is that "when a jury verdict results from passion or prejudice, a new trial is the proper remedy, but when a damage award is merely excessive or so large as to appear contrary to right reason, remittitur is the appropriate remedy." *Laxton v. Gap Inc.,* 333 F.3d 572, 586 (5th Cir. 2003), citing *Brunnemann v. Terra Int'l., Inc.,* 975 F.2d 175, 178 (5th Cir.1992)("Damage awards which are merely excessive or so large as to appear contrary to right reason, however, are subject to remittitur, not a new trial. 'When a jury's award exceed[s] the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so.'…If the plaintiff refuses to remit, we order a new trial on damages only." *Id.* at 178-179.)

While the jury's award of $50 million in compensatory damages is admittedly high, and in this court's opinion excessive, there is no evidence that the jury's award was the result of passion or prejudice or improper motive, much less a 'reasonable probability.' There is certainly no evidence that there were any improper influences upon the findings of liability, which this Court has already found to be reasonable. Accordingly, the Court should give Plaintiff the option of either accepting the maximum amount the jury could properly have awarded, or submitting to a new trial limited to the issue of damages.

**IV.   THE VERDICT CANNOT BE INCONSISTENT, AS IT INVOLVES SEPARATE AND DISTINCT CLAIMS AND STANDARDS OF PROOF.**

When a party contends that a verdict is inconsistent, the remedy is to request that the court

29

order the jury to continue its deliberations. "[T]he proper procedure is for the attorney to request the verdict to be clarified before the jury was discharged." *Continental Cas. Co. v. Howard,* 775 F.2d 876, 886 (7th Cir. 1985) citing *Fox v. United States,* 417 F.2d 84, 88 (5th Cir. 1969.) See *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 547 (5th Cir. 1974). Counsel for Merck never requested that the verdict be clarified.

Moreover, there is in fact no inconsistency in the verdict. The cases cited by Merck involve unique unusual circumstances of actual and obvious inconsistency which are not present here.[4] *Kellassy v. Cirrus Design Corp.,* No. 3:04-CV-0727-N, 2006 U.S. Dist. Lexis 34347, at \*13-14 (N.D. Tex. May 30, 2006)(Plaintiff failed to designate experts on causation and could not under Texas law demonstrate a defect without expert testimony. *Id.* at \*5.); *Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1480, 1481 (Jury deadlock on negligent failure to warn "as well as whether any negligence in testing or inspection caused injury" foreclosed a finding of negligent failure to warn under California law.); *Richard v. Firestone Tire & Rubber Co.,* 853 F.2d 1258, 1260 (5th Cir.1988)(Jury answered interrogatory finding no causation between defect and injury, but assigned 10% of the fault for injury to manufacturer.); *Duk v. MGM Grand Hotel, Inc.,* 320 F.3d 1052, 1056-1057 (Even though Nevada's comparative negligence law allowed damages only if a plaintiff is 50% negligent or less, jury found 65%, ignored stop instruction in special verdict form and awarded damages.); *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26, 47 (5th Cir. 1972) (After jury in action for treble damages under Sherman Act determined that harm to plaintiff extended for ten

---

[4] Two of the cases cited by Merck support the Plaintiff's position here. *Gallick v. Balitmore & Ohio R. Co.,* 372 U.S. 108, 119(1963) ("But it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them: 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.' (citations omitted) We therefore must attempt to reconcile the jury's findings, by exegesis if necessary..."); *Johnson v. Ablt Trucking Co., Inc.,* 412 F.3d 1138, 1144 (10th Cir.2005)("If there is any plausible theory that supports the verdict, the reviewing court must affirm the judgment.")

30

years, court could not properly base remittitur on finding of lesser duration.); *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973) (Special verdict that third defendant was guilty of passive negligence and not proximate cause of injury, taken with colloquy between judge and jury in which jury indicated that plaintiff was to be awarded some damages, was inconsistent and did not support judgment as to third defendant.); *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1151, 1152 (6th Cir. 1996)( Strict liability and negligence instructions were directed toward the actions of an "ordinarily prudent" manufacturer "fully aware of the risk" of accidental injury. "From the manner in which the instructions were propounded to the jury, it is difficult for this court to determine the distinctions between the two different theories of recovery." *Id.* at 1150.)

None of the cases cited by Merck involved a situation where a separate claim was brought under a theory of fraudulent deceit,none  involved negligence allegations beyond failure to warn, and none involved instructions which would have allowed a broader theory of liability under negligence.

**A.    The Verdict Is Not Inconsistent - Strict Liability And Deceit Are Separate and Distinct Causes of Action with Different Standards of Proof.**

This Court need not even address whether the findings on Strict Liability and Negligence are inconsistent. As the court correctly observed in its Order of 8/30/06 "Regardless, the jury's finding for the Plaintiff on the deceit by concealment claim would be unaffected by either potential consequence, and thus he would still be entitled to damages." The jury found in favor of the Plaintiff on his cause of action for Deceit, a separate and entirely distinct claim which involves not only different elements, but a higher standard of proof.   Under  these  circumstances  there  is  no inconsistency which would affect the verdict on that independent cause of action. See *Brunner v. Maritime Overseas Corp.*, 779 F.2d 296, 299 (5th Cir. 1986) ("In the present case, the jury answers to the negligence and unseaworthiness interrogatories are not in irreconcilable conflict. Rather, they

31

represent differing answers to two separate theories of recovery. The judgment was properly based upon the jury verdict. It must be upheld.") (See 9A Wright & Miller, *Federal Practice and Procedure* § 2510 (2006), "[A]lthough both claims arose from the same alleged unsafe condition, negligence and unseaworthiness require different standards of proof for causation..." *Id.* at FN 8.); *Haynes v. Manning*, 717 F.Supp. 730, 735-736 (D. Kan. 1989)("Here, we have a verdict resolving separate and distinct causes of action (breach of warranty and fraud) in favor of both parties. Therefore, the verdicts are not inconsistent on their face."); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1547 (10th Cir. 1993) (No facial inconsistency between jury's general verdict finding liability under RICO fraud counts and general verdict finding no liability under Securities Act.); *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,* 791 F.2d 1416, 1424-1425 (10th Cir.), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

Strict liability and deceit are entirely separate and distinct causes of action under South Carolina law. The elements of a strict liability claim are established by statue. S.C.Code Ann. § 15-73-10 (1976) (the Defective Products Act), provides that "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if (a) The seller is engaged in the business of selling such a product, and (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold;  See also, *Bray v. Marathon Corp.*, 356 S.C. 111, 116, 588 S.E.2d 93 (S.C. 2003)( "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer....")  However, a cause of action for fraud is an entirely different theory of liability. "To establish fraud, the following nine elements must be shown: 1) a representation or nondisclosure of a material fact, 2) its falsity, 3) its materiality,

32

4) either knowledge of its falsity or a reckless disregard of its truth or falsity, 5) intent that the representation be acted upon, 6) the hearer's ignorance of its falsity, 7) the hearer's reliance on its truth, 8) the hearer's right to rely thereon, and 9) the hearer's consequent and proximate injury." *Kiriakides v. Atlas Food Systems & Services, Inc.,* 338 S.C. 572, 586, 527 S.E.2d 371 (S.C. App. 2000). In addition, a fraud claim must be proven by clear and convincing evidence.

Based upon the evidence the jury could have reasonably found that, regardless of the warnings issued with Vioxx, and regardless of whether or not Vioxx was defective and unreasonably dangerous, Merck in connection with the marketing and promotion of Vioxx "knowingly misrepresented or failed to disclose a material fact to Plaintiff's treating physicians in a circumstance where it was required to do so, that the Plaintiff's treating physicians were entitled to and did rely on that the misrepresentation or nondisclosure, and that the misrepresentation or nondisclosure was a legal cause" of Mr. Barnett's injuries. (Jury Charge, Page 12.) The strict liability and deceit claims have entirely different elements, are based upon entirely different evidence and allegations, and require different standards of proof. Because the jury found for the Plaintiff on the deceit claim, a separate and distinct cause of action from the strict liability claim, no inconsistency exists. The jury's verdict based upon the deceit cause of action stands. It is unaffected by the jury's findings on the strict liability claim, and provides an independent basis for upholding the verdict.

**B.      Even if the Jury Had Not Found for the Plaintiff on the Deceit Cause of Action, the Jury Instructions Rendered Negligence the Broader Theory of Recovery Under South Carolina Law.**

Even where there is an inconsistency in the jury's verdict, a court is obligated to attempt to reconcile and harmonize the jury's answers to validate the verdict. "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atlantic & Gulf Stevedores v. Ellerman Lines,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798

33

(1962); *Stockton v. Altman*, 432 F.2d 946, 951 (5th Cir. 1970) (A reviewing court "is duty bound to reconcile or harmonize answers to interrogatories if it can reasonably do so...Indeed, '* * * a search of one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment.')"A jury's answers "should be considered inconsistent ⋯ only if there is no way to reconcile them." *National Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, FN16 (5th Cir. 2005); As the court stated in *White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir. 1987):

> "When the jury's answers appear to conflict, we are obliged to reconcile the answers, if possible, in order to validate the jury's verdict. *See, e.g., Federal Deposit Ins. Corp. v. Munn*, 804 F.2d 860, 867 (5th Cir.1986); *Crossland v. Canteen Corp.*, 711 F.2d 714, 725 (5th Cir.1983). Indeed, this effort is required by the Seventh Amendment. *See, e.g., Crossland*, 711 F.2d at 725. The touchstone in reconciling apparent conflict is whether "the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted.""

In keeping with the court's obligation to 'attempt to harmonize the jury's answers' 'where there is a view of the case that makes the jury's answers to special interrogatories consistent,' verdicts in product liability actions which may seem inconsistent at first glance, are routinely upheld. See *e.g. Bigham v. J.C. Penney Co.*, 268 N.W.2d 892, 898 (Minn. 1978); *Morales v. American Honda Motor Co., Inc.*,151 F.3d 500, 511 (6th Cir. 1998) (Jury verdict finding that motorbike was defective, that manufacturer had failed to exercise ordinary care in design and sale of motorbike, and manufacturer had breached warranties, but that plaintiff had failed to show that directions and warnings of potential dangers were inadequate, was not legally inconsistent.)

When the alleged inconsistency here is examined according to these principles and South Carolina substantive law, as well as the instructions that were given to the jury, it becomes apparent that the verdict on the negligence claim must stand, regardless of the negative finding on the strict liability claim. A products liability case in South Carolina may be brought under several theories, including negligence, strict liability, and warranty. *Rife v. Hitachi Const. Machinery Co., Ltd.* (S.C.

34

App. 2005) 363 S.C. 209, 215, 609 S.E.2d 565, 569; *Little v. Brown & Williamson Tobacco Corp.*, 243 F.Supp.2d 480 (D.S.C. 2001). A finding in favor of the manufacturer on a strict liability claim does not preclude a verdict based upon a finding of negligence. Anderson, S.C. Requests to Charge - Civil, § 32-2 (2002)

The few cases cited by Merck which actually involved the circumstance of a verdict on strict liability for the manufacturer with a verdict for the plaintiff on failure to warn, are uniformly distinguishable. First of all, they were all decided upon state substantive laws which, as interpreted by their appellate courts, did not distinguish between strict liability and negligent failure to warn. *E.g. Garrett v. Hamilton Standard Controls, Inc.,* 850 F.2d 253 (5th Cir. 1988) ("In Texas, the standard of care is the same in failure to warn cases brought under negligence and strict liability theories." *Id.* a t FN4.) The is not the law in South Carolina.[5] *Talkington v. Atria Reclamelucifers Fabrieken BV,* 152 F.3d 254, 261-262 (4th Cir. 1998) citing *Bragg v. Hi-Ranger, Inc.,* 319 S.C. 531, 540, 462 S.E.2d 321 (1995). Under South Carolina law, a jury finding for the manufacturer on a strict liability claim does not exonerate the manufacturer for a claim based upon negligence. Moreover, negligence may be the broader theory of recovery under the instructions given to the jury, thereby eliminating any alleged inconsistency. In *Talkington,* the jury found for the manufacturer on the strict liability claim and against the manufacturer on the negligence cause of action. *Id.* at 258. The Court of Appeals held that under South Carolina law the two findings were not inconsistent:

---

[5]Nor is it the law in Louisiana. This Court addressed the distinction between strict liability and failure to warn under Louisiana Law in *In Re: Propulsid Products Liability Litigtion.*,Not Reported in F.Supp.2d, 2003 WL 22023398, *4, E.D. La., March 11, 2003:

> "Thus, the design defects and inadequate warnings claims are separable. A finding of liability on one theory does not guarantee or preclude a finding of liability on the other. The required elements of proof are also different and distinct. A warnings claim in a prescription drug case such as this one focuses on whether the defendant adequately warned the plaintiff's doctor of the dangers of the product, while the defective design claim focuses on the actions of the defendant in manufacturing the drug despite alternative designs."

35

"The distinction between strict liability and negligence in design-defect and failure-to-warn cases is that in strict liability, knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer, whereas in negligence these elements must be proven.

Whether strict liability or negligence affords a plaintiff the broader theory of recovery will depend largely on the scope of evidence admitted by the trial court and on the jury instructions given under each theory." *Id.* at 261-262.

Similarly, a reading of the jury instructions here shows that the negligence cause of action here afforded the broader theory of recovery. In the strict liability charge the jury was told: "you must determine whether Vioxx was defective and unreasonably dangerous by reason of an inadequate warning." Jury Charge at 8. As to the negligence claim, they were instructed that the Plaintiff must prove that "1. Merck negligently failed to adequately warn the Plaintiff's treating physicians or the medical community of a known or reasonably scientifically or medically knowable risk associated with Vioxx, 2. He suffered injuries as a result of Merck's alleged failure to warn, and 3. Merck's negligence was the proximate cause of his injuries." Jury Charge at 11.

Additionally, the negligence cause of action included instructions regarding the duty to conduct inspections and conduct adequate testing. As part of the negligence cause of action, jurors were instructed: "A manufacturer owes a duty to conduct adequate tests and inspections of its products such as will reveal latent defects or defects that are not apparent upon a reasonable inspection so that it can give adequate warnings. The failure to exercise reasonable care in fulfilling any of these duties constitutes negligence." Jury Charge at 12.

Looking at the jury charge in its entirety, the instructions rendered the negligence cause of action the broader theory of recovery. Substantial evidence was presented at trial regarding Merck's negligent conduct in connection with the testing of Vioxx, and showing that Merck had failed to conduct adequate testing of Vioxx prior to and after marketing the drug. The instructions on the strict

36

FAC Resp. Exhibit B -- 2109

liability theory did not encompass negligent testing and inspection, nor did they tell the jury to analyze the conduct of the manufacturer. The jury could have found that Merck was negligent in failing to conduct adequate testing, and that such negligence was a proximate cause of Plaintiff's injuries.

Moreover, the instructions on strict liability stated that 'a product is defective due to inadequate warning if the manufacturer fails to give a reasonably prudent physician adequate warning.' Jury Charge at 8-9. However, the instructions on negligence stated that the Plaintiff must prove that Merck 'negligently failed to adequately warn the Plaintiff's treating physicians *or the medical community.*' Jury Charge at 11.

Under these instructions negligence was again the broader theory. The jury could have found that Merck had failed to adequately warn the medical community, and that such negligence was a proximate cause of the Plaintiff's injuries. An alternative explanation for the different findings is that the jury simply wanted to leave no doubt that they believed Merck to be negligent, and that an affirmative answer to the first question, which made no reference to negligence, might be misinterpreted as implying that Merck was not negligent. "Even a jury verdict inconsistent on its face is not inconsistent if it can be explained by assuming the jury reasonably misunderstood the instructions." *Willard v. The John Hayward*, 577 F.2d 1009, 1011 (5th Cir. 1978), citing *Miller v. Royal Netherlands Steamship Co.*, 508 F.2d 1103, 1106 (5th Cir. 1975).

## V.   THE GREAT WEIGHT OF THE EVIDENCE SUPPORTS THE JURY'S FINDINGS.

The unrebutted evidence presented at trial demonstrates that the Plaintiff in fact suffered significant, serious, permanent and life-threatening damage and disability as a result of his use of Vioxx, which has substantially reduced his remaining life expectancy. The damages evidence

37

presented at trial showed even though he was personally modifying every modifiable coronary disease risk factor, Mr. Barnett was unknowingly subjected to 55 months of Vioxx-induced plaque build-up in his arteries. The jury had the benefit of Mr. Barnett's well-documented medical history, which includes objective serial diagnostic testing before, during and after Vioxx use.

On January 24, 2000, the same month he started Vioxx, he underwent a cardiolite test which showed mild lateral ischemia and one mild vessel greater than 50% blockage. At that time his LDL cholesterol was 174. Then on September 6, 2002 he had a heart attack. The testing three days later showed 6 vessel blockage of 50-80%, even though in 27 months his LDL had been reduced to 101. As of July 2006, Mr. Barnett's LDL was only 52, yet he has now suffered 2 heart attacks as a consequence of Vioxx use, and he has two occluded bypass graft occlusions which occurred while he was taking Vioxx.

The compensatory award undoubtedly reflects the unrebutted mountain of evidence of "plaque burden" which has taken 10 years off Mr. Barnett's life expectancy. The award demonstrates a realistic measure of what juries will award in long term exposure cases, because of the plaque build-up caused by Vioxx. It also shows that there is an upper range of reasonable jury awards in cases such as this, where the plaintiff suffers serious debilitating and life-threatening injuries.

### A. Knowledge of a Risk Associated with a Drug Does Not Absolve a Manufacturer of Liability. The Plaintiff's Physicians Were Not Provided Adequate Warnings Regarding Vioxx.

Merck asserts that "when a prescribing physician has independent knowledge of the risks associated with a drug from sources other than the manufacturer, an absent or allegedly inadequate warning is not the cause of the plaintiff's injury." This oversimplification and generalization of a complex issue is not only incorrect, but it is contrary to established law. Again, Merck relies upon a string of factually inapposite cases. *E.g. Odom v. G.D. Searle & Co.,* 979 F.2d 1001, 1003 (4th Cir.

FAC Resp. Exhibit B -- 2111

1992)(Summary judgment granted where physician "stated that he had always believed and still believed that "the Cu-7 is the best IUD that's ever been on the market," and that he would still prescribe it today," (*Id.* at 1002) and physician's "own estimate of the risk actually exceeded" that of the plaintiff's expert.)

Merck ignores a large body of law regarding prescription drugs and what a manufacturer is required to disclose. The manufacturer's duty is to warn of all potential dangers in its prescription drugs that it knew or should have known to exist, and a warning must be correct, complete, and fully descriptive, and must convey updated information as to all of the drug's known side effects. *Martin v. Hacker*, 83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993); *Krasnopolsky v. Warner-Lambert Co.*, 799 F.Supp. 1342, 1345-46 (E.D. N.Y. 1992) The warning must also have clarity so that the language of the warning is "direct, unequivocal and sufficiently forceful to convey the risk." *Martin* supra, 83 N.Y.2d, at 11.

Merely mentioning a possible injury or adverse effect is not necessarily adequate. *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 267 (5th Cir. 2002)) A manufacturer's disclosure of a particular risk of injury does not foreclose liability if the degree of risk is not sufficiently conveyed. *McDonnell v. Chelsea Mfrs., Inc.*, 259 A.D.2d 674, 676, 687 N.Y.S.2d 172, (N.Y.A.D. 2 Dept. 1999); *Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D. Tex. 1999)(Summary judgment denied even though package insert and PDR entry disclosed risk of myocardial infarction injury suffered by the plaintiff.) Even where a 'dear doctor letter' discloses the risk, affirmatively misleading information may cause a warning to be inadequate. *Woodbury v. Janssen Pharmaceutica, Inc.*, 1997 WL 201571*8 (N.D. Ill. 1997).

A prescribing physician's awareness of risks involved with a drug does not absolve a manufacturer of liability, where a jury could reasonably infer that additional and more complete

39

disclosures should have been made and the physician was not sufficiently informed. See *Tatum v. Schering Corp.,* 795 F.2d 925, 928-929 (11th Cir. 1986)(Jury could infer from the evidence that prescriber "did not possess the knowledge that he described himself as having."); *Timm v. Upjohn Co.,* 624 F.2d 536 (5th Cir.1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981)(Affirming verdict for the plaintiff, noting that although prescriber testified he was aware of the risks involved, he had responded to a hypothetical that had he known of the types and incidence of certain adverse reactions he probably would not have prescribed the drug. *Id.* at 538-539.)

Merck's argument is also unsupported by the record. The weight of the evidence is that Mr. Barnett's prescribing doctors were not sufficiently aware of the risks associated with Vioxx. Dr. Mikola, who began prescribing Vioxx for Mr. Barnett at least as early as 12/28/2001 (8/4/06 Tr. at 925:6-11), was never told by Merck that the President of Merck Research Laboratories believed that the CV events associated with Vioxx in the VIGOR trial were mechanism-based.(*Id.* at 912:23-913:1.) While he reviewed the VIGOR study, neither the title of the article nor the abstract stated that Vioxx significantly increases the risk of heart attack. (*Id.* at 973:20-974:15.) He further testified that if Merck had had information of a statistically-significant increase in the risk of serious cardiovascular thrombotic events, that information was not shared with him. (*Id.* at 977:13-978:15.)

Dr. Mikola further testified that had he been aware of or seen the information in the FDA's proposed label change to the effect that Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events, such as those with a history of myocardial infarction and angina and in patients with preexisting hypertension and congestive heart failure, he would not have put Mr. Barnett on Vioxx. (*Id.* at 914:16-915:11.) Dr. Mikola's testimony establishes that Merck withheld information vital to his making a fully informed decision as to whether or not to prescribe Vioxx to Mr. Barnett. In failing to provide Mr. Barnett's prescribing physician with such

40

information, Merck removed the possibility that he could act as a learned intermediary.

Dr. Avorn also explained how Merck's incomplete and misleading communications mislead physicians. (8/1/06 Tr. at 298:20-300:12; 301:4-302:15.)  According to Dr. Avorn "...Merck's conduct of ... communication ... was inadequate in that it failed to truthfully represent what was known to Merck at the time about the risks of its drug in relation to the cardiovascular symptoms." (*Id.* at 289:12-290:1.) He also testified that "...Doctors did not have adequate information presented to them by Merck to make a fair and reasonable evidence-based decision about Vioxx." (*Id.* at 290:2-15.) It is also important to note that Dr. Avorn's opinion testimony regarding the inadequacy and inaccuracy of Merck's communications with physicians was unopposed by any defense witness.

Furthermore, assuming *arguendo* that Mr. Barnett's physicians had in fact been fully apprised of all pertinent and necessary information in Merck's possession, Merck would still not be relieved of liability. This is because the evidence showed that Merck's overpromotion of the drug had the effect of nullifying the already inadequate warnings. *Caraker v. Sandoz Pharmaceuticals Corp.,* 172 F.Supp.2d 1018, 1030 ( S.D. Ill. 2001): *Salmon v. Parke Davis & Co.,* 520 F.2d 1359, 1363-1364 (4th Cir. 1975); *Stevens v. Parke, Davis & Company,* 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973); *Incollingo v. Ewing,* 444 Pa. 263, 288-289, 282 A.2d 206 (1971); *Nobles v. Astrazeneca Pharmaceuticals,* 48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003) Merck's integrated national marketing campaign downplayed, deemphasized and misrepresented the true risks of Vioxx to such a degree as to result in the overpromotion of Vioxx. (8/1/06 Tr. at 325:21-326:16; 399:21-400:14.)  Merck instructed its sales representatives ("detailers") to treat negative findings about Vioxx's risks as "obstacles" and to suppress open discussion of such information within the medical community. (*Id.* at 342:1-343:22; 400:15-401:20.) As Dr. Avorn testified, Merck's news releases were "an inadequate and a deceptive way of presenting this

41

information to the press, to doctors, to patients, or to anyone." (*Id.* at 393:14-395:20.)

Merck's studies were published in such a way as to bury risk data (*Id.* at 368:10-20; 398:11-21) while other studies were never published at all by Merck. (*Id.* at 368:21-369:1.) Data from the APPROVe study was presented in an inaccurate and unfair manner, (*Id.* at 395:21-398:10), and even though Merck had data from Alzheimer's studies related to an increased mortality rate associated with Vioxx, Merck did not convey this data to physicians. (*Id.* at 398:22-399:2.) Dr. Avorn summed up all the major Vioxx publications by testifying,…. "I have never known a collection of papers on any one topic in which there has been such a constellation of skewed and distorted presentation of data in any drug studies that I've ever looked at." (*Id.* at 399:3-20.)

Merck's overpromotion is also illustrated in a FDA Warning Letter that Merck received in September 2001. (P1.0006; *See also* 8/14/2006 Tr. at 2421:1-2424:1 (Test. of Alise Reicin).) That letter references three facets of Merck's Vioxx promotional campaign that minimized the cardiovascular findings of VIGOR and misrepresented Vioxx's safety profile. According to the FDA, these activities and materials were "…false, lacking fair balance, or otherwise misleading…" (*Id.* at p.1, para. 1 and 3.) In the year 2000 Merck generated "a billion" media impressions that carried Merck's message that Vioxx does not cause heart attacks. (8/5/06 Tr. at 1277:1-25.)Me rck issued press released and videos giving the impression that Vioxx was safe from a cardiovascular standpoint and completely failed to mention that Vioxx could cause heart attacks, and that one explanation for the VIGOR results was that Vioxx caused the heart attacks. (*Id.* at 1289:12-1295:22);(296:23-1299:13.) Merck's integrated campaign amounted to overpromotion of the drug that minimized and deemphasized the true nature of the drug's risks. From this evidence the jury could reasonably have found that regardless of the knowledge of the prescribing physicians, even if Merck had provided complete and thorough warnings and disclosures, Merck's overpromotion had

42

the effect of eroding the warnings, rendering them inadequate.  (Jury Charge at 10.)

**B.    The Evidence, Both Subjective and Objective, Establishes That Had Merck Provided an Adequate Warning, Dr. Mikola Would Not Have Prescribed Vioxx, and Mr. Barnett Would Not Have Continued to Take the Drug.**

Merck next argues that there is no evidence that a different warning would have changed Mr.

Barnett's doctors' decisions to prescribe Vioxx to him. Again, Merck is wrong. First, Dr. Mikola's

testimony unequivocally shows that had he been adequately informed as to the risks of Vioxx and

what Merck knew, he would not have prescribed Vioxx to Mr. Barnett:

915
3Q.   OKAY. NOW, GIVEN THE INFORMATION THAT YOU'VE READ IN
4EXHI BITS I'VE JUST SHOWN YOU AND THIS PROPOSED LABEL, IF YOU
5HAD  KNOWN THAT INFORMATION THAT I'VE SHOWN YOU AND YOU HAD SEEN
6A  LABEL LIKE THIS, WOULD YOU HAVE PRESCRIBED VIOXX TO
7MR.  BARNETT, GIVEN HIS HISTORY WITH POSSIBLE ANGINA, IN JANUARY
8OF  2000?
9A.   I BELIEVE I WOULD HAVE LEFT HIM ON FELDENE.
10 Q.  YOU WOULDN'T HAVE PUT HIM ON VIOXX?
11 A.  I DON'T BELIEVE SO, NO, SIR.

(8/14/06 Tr. at 915:3-11)

928
2Q.   AND GIVEN WHAT YOU'VE READ TODAY, THAT COMBINED WITH HIS
3ANG INA, WOULD YOU SAY THAT FROM EVERYTHING YOU'VE READ ABOUT
4VI OXX TODAY, THAT YOU PROBABLY WOULD NOT HAVE PRESCRIBED VIOXX
5FOR,  HIM IF YOU'D KNOWN ALL OF THIS INFORMATION, IN 2000?
6A.   HAVING KNOWN TODAY WHAT I KNOW ABOUT VIOXX, I WOULD NOT
7HAV E PRESCRIBED IT.
(*Id.* at 928:2-7)

Based on this uncontroverted testimony alone the jury could have reasonably found that

Merck's inadequate warning was a cause of Mr. Barnett's injuries.

Second, assuming *arguendo* that Dr. Mikola did not testify as he did that the inadequate

warning caused him to prescribe the drug, the jury could still have reasonably found that Merck's

inadequate warning was a cause of Mr. Barnett's injuries. Proof that the inadequacy of a warning is

43

a proximate cause of injury is not limited to, nor dependent solely upon, the testimony of the prescribing physician. "To satisfy the burden of establishing warning causation, a plaintiff may introduce either objective evidence of how a reasonable physician would have responded to an adequate warning, or subjective evidence of how the treating physician would have responded." *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992); *Hermes v. Pfizer, Inc.*, 848 F.2d 66, 69-70 (5th Cir. 1988). Testimony from a prescribing physician that he or she appreciated the risks does not preclude a finding that the warnings were inadequate, nor does it preclude a finding of causation. *Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804, 808-809 (S.D. Tex. 1999); *Whitley v. Cubberly*, 24 N.C.App. 204, 210 S.E.2d 289, 207-208 (1974); *Stevens v. Parke-Davis & Co.*, (1973) 9 Cal.3d 51, 54-56, 507 P.2d 653. See also, *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971), (cited by the court in *Salmon v. Parke Davis* & Co., 520 F.2d 1359, 1363 (4th Cir. 1975)) ("Dr. Cucinotta stated, in effect, that he was adequately warned and understood the dangers and proper use of the drug. The jury was not obliged to believe the oral, uncorroborated testimony of either doctor. The evidence of Parke, Davis' efforts in promoting the drug would tend to refute Dr. Cucinotta's testimony in the sense that he may have been influenced by the efforts, perhaps even unconsciously, to prescribe the drug ...." *Id.* at 221-222.)

Merck's overpromotion and misleading statements about Vioxx, through its integrated marketing campaign, nullified the already insufficient warning. Thus, even if Dr. Mikola had testified that he would still have prescribed Vioxx even if he had received an adequate warning (as is not the case here), the jury could still have reasonably found that Dr. Mikola was not in a position to fully appreciate Vioxx's risks and that he would have taken Mr. Barnett off of Vioxx had he been provided with an adequate warning.

Moreover, even where a risk is disclosed, and even where the prescribing physician testifies

44

he would have still prescribed the drug in light of the risk, liability is not foreclosed.  See *e.g.,*
*McNeil v. Wyeth,* 464 F.3d 364, 372-373 (5th Cir. 2006).  The court in *McNeil* also found it
significant that the plaintiff testified she would not have taken the drug had she been made aware of
the full extent of the risk.  See also *Hermes v. Pfizer, Inc.,* 848 F.2d 66, 69-70 (5th Cir.1988)
("Furthermore, Hermes herself testified that she would not have taken the Sinequan had she known
that it could cause the injury she experienced." *Id.* at FN.20.)

Similarly, the actions that Mr. Barnett took after his heart attack shed light upon what he
would have done if he had been adequately informed of the risks *before* his heart attack.  After his
heart attack, Mr. Barnett initiated a conversation with Dr. Mikola about the potential cardiac risk
from any of his medications he was taking (including Vioxx.) Dr. Mikola assured him that he had no
concerns.  In March 2003, three years after the VIGOR study was published, and approximately one
year after Merck changed the Precautions section of its label, Dr. Mikola informed Mr. Barnett that
Vioxx did not increase the risk of heart attacks. (8/4/06 (Mikola) Tr. at 926:3-21.) This is strong
evidence of Dr. Mikola's lack of awareness of the risks of Vioxx, and that the inadequacy of Merck's
warnings was a cause of Mr. Barnett's injuries.  The fact that Mr. Barnett would not have taken
Vioxx had he been warned of the cardiac risks is illustrated by the fact that once he learned about the
potential risks of Vioxx, he again initiated a conversation with Dr. Huberty, one of his physicians,
and stopped taking Vioxx at that point.  Further evidence that he would not have taken Vioxx if his
doctors had warned him of the heart attack risk is that he stopped taking Metabolife when he learned
that drug had the potential for adverse effects on the heart. (8/7/06 Tr. at 1552:4-1554:15.)

Mr. Barnett also testified that if Dr. Mikola had known of the risks of Vioxx and wanted to
put him back on Feldene, he would have been happy to revert to Feldene for his pain relief
medication. (8/7/06 Tr. at 1556:23-1557:11.)  Under cross-examination by Mr. Goldman, Mr.

45

Barnett was shown the label for another NSAID, Mobic, which contained a detailed black-box warning of cardiovascular risks. Mr. Barnett testified that upon learning of the information in that label, he immediately stopped taking Mobic. He also testified that if he had ever known of the risks he would not have taken the drug. (8/8/06 Tr. at 1603:21-1605:8; 1607:7-14.)

### C. The Weight of the Evidence is That in All Probability Vioxx Caused Mr. Barnett's Heart Attack and Accelerated His Atherosclerosis.

Merck argues that 'the weight of the evidence is that Mr. Barnett's use of Vioxx did not accelerate his atherosclerosis or cause his heart attack,' and 'the specific causation opinion of Dr. Zipes amounts to nothing more than a temporal proximity argument.' The cases relied upon by Merck are either completely off point (*Ohio v. U.S. Dept. of Interior*, 880 F.2d 432, 473 (D.C.Cir.1989) (criteria for determining whether oil spills and hazardous substance releases caused injury to natural resources ) or involved obvious flaws in the experts' methodologies. *E.g. McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1242-1243 (11th Cir. 2005)( Plaintiffs' expert had no opinion about dose that could would cause injury.)("He only said that any amount of *Metabolife* is too much, which clearly contradicts the principles of reliable methodology...."); *Moore v. Ashland Chem. Ins.,* 151 F.3d 269, 278 (5th Cir.1998)( Expert relied solely upon Material Safety Data Sheet from the manufacturer stating that  the contents of the drum in question were 'irritating to the lungs.') See also, *Curtis v. M&S Petroleum*, Inc., 174 F.3d 661, 670 (5th Cir. 1999), distinguishing *Moore*, supra. (Trial court abused its discretion in excluding the plaintiffs' expert's specific causation opinion.)("[A] temporal connection is entitled to greater weight when there is an established scientific connection between exposure and illness or other circumstantial evidence supporting the causal link.")

Unlike the expert in *Moore* and the other cases cited by Merck, the Plaintiffs' experts here

46

relied upon a broad spectrum of reliable scientific evidence demonstrating that Vioxx causes heart attacks as well as atherosclerosis, and that, in all likelihood Vioxx caused Mr. Barnett's heart attack and accelerated his atherosclerosis. Dr. Zipes described in detail the basis of his opinions and in order to provide the court with an outline the Plaintiff categorized the issues Dr. Zipes discussed:

1. Cause of Heart Attacks in General – (8/8/06 Tr. at 672: 2-17);
2. Pharmacology of Cox-2 Inhibitors – (8/8/06 Tr. at 672:9-25 to 1677:1-7);
3. Mechanism of Action for Vioxx – (8/8/06 Tr. at 1677:9-25 to 1679:1-9);
4. Vioxx accelerates Plaque Build-up – (8/8/06 Tr. at 1679:10-25 to 1683: 1-13);
5. Vioxx Inhibits Prostacyclin – (8/8/06 Tr. at 1683:14-25 to 1685:1-17);
6. Vioxx Accelerates Atherosclerosis – (8/8/06 Tr. at 685:18-23);
7. Basis of Opinion That Vioxx Accelerates Atherosclerosis – (8/8/06 Tr. at 1685:23-25 to1692:1-3);
8. Dr. FitzGerald and Others Support that Vioxx Accelerates Atherosclerosis – (8/8/06 Tr. at 1692:7-25 to 1697);
9. The Biologic Plausibility for Vioxx Accelerating Atherosclerosis –(8/8 /06 Tr. at 1697:11-25 to 1700:1-16);
10. APPROVe Follow-up Data Provide Evidentiary Support in Humans of Vioxx Accelerating Atherosclerosis – (8/8/06 Tr. at 1700:17-25 to 1704:1-23);
11. FDA Advisory Committee Votes 32-0 that Vioxx Significantly Increases the Risk of Heart Attack – (8/8/06 Tr. at 1704:24-25 to 1705:1-23);
12. VIGOR Data Provides Evidence of Vioxx Causing Heart Attacks – (8/8/06 Tr. at 1705:24-25 to 1710:1-10);
13. Protocol 112 – Shows Vioxx Significantly Increases Blood Pressure More Than Any Other NSAID – (8/8/06 Tr. at 1709:18-25 to 1711:1-6);
14. APPROVe Clinical Trial Shows Blood Pressure Spikes Which Increase the Relative Risk of Heart Attacks and Atherosclerosis Acceleration – (8/8/06 Tr. at 1711:1-7 to 1715:1-3.)

Merck chose not to offer any expert testimony to challenge Dr. Zipes' opinions. In response to the scientific evidence, including the opinions of two highly qualified experts, scientific literature, and clinical trial data as well as Merck internal documents, Merck did not offer any testimony from a qualified cardiologist in rebuttal. In fact, Merck never called its own designated expert cardiologist Paul Roach, M.D. The only reasonable explanation for the defense failing to call its own expert is that he could not rebut the opinions of Plaintiffs' experts.

As to specific causation, Plaintiff offered opinions from Dr. Zipes and Dr. Popma, and again,

FAC Resp. Exhibit B -- 2120

Merck offered no expert testimony in rebuttal. (8/8/06 Tr. at 1666:11-1667:6; *See also*, *Id.* Tr. at 1715:15-24; 1734:23-1735:15.) Prior to taking Vioxx for 31 months, Mr. Barnett's risk of a heart attack was no more than approximately 2%. (*Id.* Tr. at 1715:25-1717:1.) In January 2000, Mr. Barnett underwent a cardiolite stress test which showed nothing more than "mild ischemia" in one minor vessel in his heart. (*Id.* Tr. at 1718:22-1724:24.) Nevertheless, after taking Vioxx for 31 months during which time he had blood pressure spikes like the patients in the APPROVe study, he suffered a heart attack and underwent 5-way bypass surgery.

After his heart attack and bypass surgery in September 2002, Mr. Barnett continued taking Vioxx for another 24 months for a total of 55 months. While on Vioxx, he suffered a second heart attack. (*Id.* Tr. at 1726:10-1727:2.) As of May of 2006 Mr. Barnett had 2 occluded vein grafts from the underlying bypass surgery, which were likely closed due to the acceleration of his plaque caused by Vioxx. (*Id.* Tr. at 1722:25-1726:9.) Ultimately, the 2 occluded vein grafts required stents and additional cardiovascular surgery in July 2006. (8/8/06 Tr. at 1727:3-25 - 1729:2.) Contrary to Merck's assertions, Dr. Zipes described in detail Mr. Barnett's damages from Vioxx, as well as his current condition (*Id.* Tr. at 1728:21-1733:18), including the fact that Mr. Barnett in all likelihood has a reduced life expectancy of 9-10 years. (8/8/06 Tr. at 1733:19-1734:23.)

Offering no expert testimony in rebuttal, Merck was content to argue as it does now, that Mr. Barnett had other risk factors and coronary artery disease ("CAD") before he took Vioxx. Merck contends that to establish specific causation, plaintiff must "rule out" the possibility that his heart attack was caused by something other than Vioxx." This is a misstatement of the law. "Obvious alternative causes need to be ruled out. All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted." *Heller v. Shaw Industries, Inc.,* 167 F.3d 146 (3d Cir. 1999), citing Professor Capra, Reporter to the Advisory Committee on the Federal Rules

FAC Resp. Exhibit B -- 2121

of Evidence. ("[T]o require the experts to rule out categorically all other possible causes for an injury would mean that few experts would ever be able to testify…. Obvious alternative causes need to be ruled out. All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted." Daniel J. Capra, *The* Daubert *Puzzle,* 32 Ga.L.Rev. 699, 728 (1998).); See also *Asad v. Continental Airlines, Inc.*, 314 F.Supp.2d 726, 740 (N.D. Ohio 2004) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury. *Jahn v. Equine Services, PSC,* 233 F.3d 382, 390 (6th Cir. 2000). The fact that several possible causes might remain "uneliminated" goes to the accuracy of the conclusion and not to the soundness of the methodology. *Id")*

Federal circuit courts of appeal have found differential diagnosis to be a reliable scientific method of determining causation in an individual case, even when physicians do not rule out every potential cause of the patient's illness. *See e.g., In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 759 (3rd Cir. 1994)(finding "sometimes differential diagnosis can be reliable with less than full information and, to the extent that the district court concluded otherwise, we hold that it abused its discretion"); *Heller v. Shaw Industries, Inc.,* 167 F.3d 146 (3d Cir.1999)(not addressing every possible alternative cause in a differential diagnosis did not render expert's opinion inadmissible); *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194 (4th Cir. 2001) (recognizing that a medical expert opinion based upon differential diagnosis normally should not be excluded because "the opinion fails to rule out every possible alternative cause of a plaintiff's illness.")(citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir. 1999).)

The cases cited by Merck almost all involved situations where the experts could not even 'rule in' the defendant's product, let alone 'rule out' other more likely causes. *E.g. Wheat v. Pfizer, Inc.,* 31 F.3d 340, 342-43 (5th Cir.1994) (Despite evidence that the decedent had been exposed to

49

hepatitis, and testimony by her treating physicians that she had a viral hepatitis unrelated to medication, plaintiffs offered no evidence or expert testimony excluding it as a cause. *Id.* at 342-343); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F.Supp.2d 1118, 1133 (D. Minn.2003) (Expert conceded he was aware of no published literature supporting his opinion on causation and could not 'rule in' the defendant's products); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*, 22 F.Supp.2d 942, 952 (E.D. Ark. 1998)("[E]xperts must turn to epidemiological studies, in vitro studies, animal studies, and other indirect methods in an attempt to make the connection.FN5 Here, there are no such studies." *Id.* at 952.); *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202, 1208 (8th Cir.2000)(Physician "admitted that he made no attempt to consider all the possible causes, or to exclude each potential cause until only one remained, or to consider which of two or more non-excludable causes was the more likely to have caused the condition." *Id.* at 1208.); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 610 (D. N.J. 2002)(Expert offered no reliable methodology for ruling out alternative causes, and defendant presented testimony of experts demonstrating that smoking was a greater risk factor for leukemia than PCE exposure.)

Unlike the cases cited by Merck, Plaintiff's experts provided substantial reliable scientific evidence of both general and specific causation. Plaintiff's experts were able not only to 'rule in' Vioxx as the most probable cause of Mr. Barnett's heart attack and increased atherosclerosis, but to rule out each of the other 'possible' causes which Merck has alleged. In January 2000, Mr. Barnett's treating physician, Dr. Mikola, felt that Barnett was at low risk for a coronary event. (8/7/06 Tr. at 1493:6-1493:23.) The January 2000 Cardiolite established that Mr. Barnett had superb exercise tolerance, only mild disease located in only one small area of his heart, and that he had an excellent prognosis. (*Id.* at 1342:15-1343:16; 1344:7-1345:18; 1445:25-1446:10.) Contrary to Merck's assertions, as of January of 2000 Mr. Barnett had minimal coronary artery disease in his five major

50

vessels. (*Id.* at 1353:21-1355:15; 1447:15-1449:4.)   According to Dr. Zipes, when Mr. Barnett first started Vioxx he had a 2% or less chance or having a heart attack within the next three years. (*Id.* at 1349:20-1350:19; 1352:19-1353:20; 1445:25-1446:10; 1486:18-1486:22.)

Between January 2000 and Mr. Barnett's heart attack in September 2002, Mr. Barnett took steps to further decrease his risk such as reducing his LDL cholesterol levels, which dramatically slows the progression of plaque. (*Id.* at 1357:24-1361:8.) Nevertheless, in September 2002, at the time of his heart attack,which  was the result of plaque build-up and a blood clot, Mr. Barnett had multiple blockages that were not present when he began taking Vioxx in January of 2000. (*Id.* at 1364:2-1369:11.)

Dr. Popma testified that after Mr. Barnett's heart attack and bypass surgery in September 2002, as of his July 2003 Cardiolite exam his bypass grafts were working and Mr. Barnett was almost back to the cardiac level he was back in January 2000.  At that time the bypass grafts were still open and were not blocked or occluded. (*Id.* at 1372:18-1373:22.) From the time of Barnett's heart attack and bypass surgery in 2002 until July 2006, the trend of his LDL cholesterol was a progressive decline to such a degree that since October 2005 his LDL levels have been in the range where plaque begins to regress. (*Id.* at 1360:18-1361:8.) Mr. Barnett's LDL cholesterol levels were so low from 2002 to 2006 that a dramatic progression of blockages within the arteries would not be expected during that time frame. (*Id.* at 1362:3-1362:14.) This evidence supported Dr. Popma's conclusion that his cholesterol levels played little, if any, role in accelerating his plaque build-up.

Notwithstanding the decrease in his cholesterol levels, in July 2004 two of the Plaintiff's vein grafts occluded.  A May 2006 CT angiogram showed that Mr. Barnett's saphenous graft to the Ramus branch and one of the sequential limbs of a second graft had completely occluded. This rapid progression of plaque occurred at a time when Barnett's LDL was well controlled.  The May 2006

51

Cardiolite showed that Barnett had experienced new heart muscle damage since the original heart attack in September 2002 (*Id.* at 1377:6-1383:14) and that in comparison with the January 2000 and July 2003 examinations, Mr. Barnett had a marked reduction in exercise tolerance and a decreased heart rate. (*Id.* at 1477:1-1478:6.) Further, from September 2002 to July 2006 (a time period when Mr. Barnett had reduced his LDL levels to the point of significantly slowing and then reversing plaque development), he experienced unexpected, dramatic progression of plaque to the point of complete occlusion or blockage in four new vessels, including two of the grafted vessels. (*Id.* at 1383:17-1389:9; 1391:10-1394:25; 1494:9-1495:18.) Mr. Barnett's rapid plaque progression from 2002 to 2006 was very unusual and not explained by traditional risk factors, particularly since he was lowering his LDL levels to the point of reversing plaque development. (*Id.* at 1396:18-1397:8.) In summary, there was more than sufficient evidence to rule out the risk factors and rule in Vioxx as the cause of Mr. Barnett's heart attack and accelerated atherosclerosis.

## VI.    CONCLUSION.

This Court was entirely correct when it concluded that the jury's findings on liability are reasonable on the negligent failure-to-warn and deceit-by-concealment claims. Although the Plaintiff believes the jury's damages award in its entirety is appropriate, if the Court believes a new trial is appropriate, the Plaintiff should be permitted the option of either accepting a remittitur in an amount the Court deems reasonable, or a new trial limited to damages.

Date: October 31, 2006                     Respectfully submitted,


By:  __/s/  MARK P. ROBINSON, JR.__
          Mark P. Robinson, Jr.
          Kevin F. Calcagnie
          Carlos A. Prietto, III
          Ted B. Wacker
          Lexi W. Myer

FAC Resp. Exhibit B -- 2125

ROB    INSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Counsel for Plaintiff

FAC Resp. Exhibit B -- 2126

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants'

Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs'

Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No.

8A, and that the foregoing was electronically filed with the Clerk of the Court of the United

States District Court for the Eastern District of Louisiana by using the CM/ECF system which

will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657

on this 31st day of October, 2006.


By:   /s/ MARK P. ROBINSON, JR.
MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson


54

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO.  02:06CV00485 |

---

## PLAINTIFF GERALD BARNETT'S MEMORANDUM IN OPPOSITION TO MOTION OF MERCK & CO., INC. ("MERCK") FOR A NEW TRIAL

---

## TABLE OF CONTENTS

INTRODUCTION. ................................................................................................................ 1

1.    MERCK'S RENEWED MOTION FOR NEW TRIAL IS AN IMPROPER MOTION
      FOR RECONSIDERATION, AND IS BASED SOLELY UPON ARGUMENTS
      PREVIOUSLY RAISED IN THE BRIEFING AND ARGUMENT ON ITS
      PREVIOUS MOTION FOR NEW TRIAL. .................................................................... 2

2.    THERE WAS MORE THAN SUFFICIENT EVIDENCE IN THE RECORD
      FOR THE COURT TO INVOKE ITS DISCRETION IN GRANTING
      REMITTITUR. ............................................................................................................ 6

3.    THE COURT CORRECTLY EXERCISED ITS DISCRETION IN CALCULATING
      AN APPROPRIATE AMOUNT FOR A REMITTED AWARD. ................................... 10

CONCLUSION............................................................................................................... 17

ii

## TABLE OF AUTHORITIES

**CASES**

*Betancourt v. J.C. Penney Co.,*
   554 F.2d 1206, 1209 (1st Cir. 1977)..................................................................3, 13

*Boan v. Blackwell,*
   343 S.C. 498, 541 S.E. 2d 242 (S.C. 2001) ..................................................10

*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.,*
   312 F.3d 1292, 1296 n. 3 (10th Cir. 2002) ....................................................4

*Bonura v. Sea Land Service, Inc.,*
   505 F.2d 665, 669 (5th Cir.1974) ..................................................................11

*Daves v. Cleary,*
   355 S.C. 216, 584 S.E.2d 423, 430 (S.C. App. 2003) ....................................11

*De Centeno v. Gulf Fleet Crews, Inc.,*
   798 F.2d 138, 142-143 (5th Cir.1986)............................................................12

*Denton v. Morgan,*
   136 F.3d 1038, 1046 (5th Cir.1998) ..............................................................11

*Edwards v. Lawton,*
   244 S.C. 276, 136 S.E.2d 708, 710 (1964) ....................................................15

*Gautreaux v. Insurance Company of North America,*
   811 F.2d 908 (5th Cir.1987) ........................................................................3, 14

*Harris v. Gusman,*
   Slip Copy, 2007 WL 1812613, *1 E.D.La., June 18, 2007
   (Civil Action No. 05-4992) ............................................................................4

*In re Vioxx Products Liability Litigation,*
   230 F.R.D. 473, 474-475 E.D.La., July 22, 2005 (No. MDL 1657)................4

*Iwai Co. v. Occidental Crude Sales, Inc.,*
   729 F.2d 1530, 1547-48 (5th Cir. 1984)........................................................13

*King v. Ames,*
   179 F.3d 370 n. 8 (5th Cir. 1999) ..................................................................11

iii

FAC Resp. Exhibit B -- 2130

*Knight v. Texaco, Inc.,*
 786 F.2d 1296, 1299-1300 (5th Cir. 1986) ........................................................ 12

*LeClerc v. Webb,*
 419 F.3d 405 n. 13 (5th Cir. 2005) ..................................................................... 4

*Lowe v. General Motors Corp.,*
 624 F.2d 1373, 1383 (5th Cir. 1980) .................................................................. 10

*Maxey v. Freightliner Corp.,*
 722 F.2d 1238,1242 (5th Cir. 1984) ................................................................... 12

*Mims v. Florence Co. Ambulance Serv. Comm'n,*
 296 S.C. 4, 370 S.E.2d 96 (S.C. App. 1988) ..................................................... 15

*Murray v. Bank of America, N.A.,*
 354 S.C. 337, 345, 580 S.E.2d 194 (S.C.App. 2003) ........................................ 15

*Osburn v. Anchor Laboratories, Inc.,*
 825 F.2d 908, 919 (5th Cir. 1987) ................................................................. 14-15

*Shu-Tao Lin v. McDonnell Douglas Corp.,*
 742 F.2d 45, 49 (2d Cir. 1984) ..................................................................... 3, 12

*Templet v. HydroChem Inc.,*
 367 F.3d 473, 479 (5th Cir. 2004) ...................................................................... 4

*United States v. Flores,*
 981 F.2d 231, 237 (5th Cir. 1993) ..................................................................... 5

*Vogler v. Blackmore,*
 352 F.3d 150,156 (5th Cir. 2003) ...................................................................... 11

**STATUTES**

Federal Rule of Civil Procedure 59 ......................................................................... 2, 4

FAC Resp. Exhibit B -- 2131

## INTRODUCTION

For the second time Merck has filed a motion for new trial on all issues. Realizing that this recent motion is just a rehash of arguments previously made in briefing and oral argument on its first motion, Merck has attempted to rephrase its arguments regarding the propriety of remittitur to make it appear that this renewed motion is somehow based upon circumstances unforeseen prior to the Court's order of June 5, 2007, which denied Merck's motion in part and issued a remittitur.

However, on closer analysis the Defendant's argument is essentially that Merck did not anticipate the Court would not accept the arguments it made the first time around. Merck was well aware during briefing and argument on the first motion that Plaintiff has contended all along that a remittitur is appropriate, and that while the Court found the verdict to be excessive, it did not find it to be the result of passion or prejudice. Merck has been aware of those arguments since at least last October. That is why Merck chose to argue in the briefing on the first motion, and in oral argument, that the Court had insufficient facts upon which to base the amount of a remittitur- the same argument which forms the basis of the current motion. ("A court cannot remit an award when there is insufficient evidence on which to base the amount of remittitur. ... Thus, the Court has no basis upon which to decide what damages Mr. Barnett suffered, let alone what they are worth. (Reply of Merck in support of motion for new trial on all issues, 3/8/07, at 6-7))

There is nothing about the Court's order of June 5, 2007 which changes those arguments, nor which raises new issues. What Merck is left with is an improper motion for reconsideration of arguments which have already been briefed, argued and ruled upon. The Court's decision was entirely correct, and in view of the fact Merck was successful in reducing a $51 million verdict to

1

$1.6 million, the Court was more than fair to the Defendant.  Merck's motion should therefore be summarily denied.

1. **MERCK'S RENEWED MOTION FOR NEW TRIAL IS AN IMPROPER MOTION FOR RECONSIDERATION, AND IS BASED SOLELY UPON ARGUMENTS PREVIOUSLY RAISED IN THE BRIEFING AND ARGUMENT ON ITS PREVIOUS MOTION FOR NEW TRIAL.**

For the second time Merck moves for a new trial on all issues, pursuant to Federal Rule of Civil Procedure 59.  Although styled as a "Motion for New Trial," Merck's motion is clearly a motion for reconsideration, as it is simply repeating arguments made in its first motion for new trial on all issues.  Merck is forced to concede this fact in its brief when it says, "A new trial on all issues is warranted for the reasons articulated in Merck's September 5, 2006 motion for a new trial on all issues - and, in that sense, this motion seeks reconsideration of the Court's June 5, 2007 Order denying in part and deferring ruling in part on Merck's September 5, 2006 motion."  (Motion at 2.)

However, Merck attempts to skirt around the fact this is a motion for reconsideration and merely a rehash of prior arguments, by implying that the Court's recent order somehow raises new issues or changes the scope of the previous arguments.  It does neither.  Merck's brief has one heading and essentially makes one argument- an argument which it already made in the briefing and in oral argument on its first motion- "Because the jury's compensatory damages award cannot be separated into 'reasoned' and 'excessive' portions, the Court's remittitur was inappropriate."  (Motion at 3.)

Specifically, Merck contends that "there is insufficient evidence in the record on which to base a remitted compensatory damages award" and therefore it is impossible for the Court to remove the excess portion of the verdict.  (Motion at 7)

2

Merck also contends that "Because the jury's findings did not specify which injuries it intended to compensate, let alone the amount of compensation it awarded for each injury, the Court had no basis upon which to decide what damages Mr. Barnett suffered, or what they were worth," (Id.) and that "Because there is no way to determine what damages the jury concluded Mr. Barnett suffered, let alone what compensation it awarded for each component of his damages, there is no way to lop off - or even calculate - the "excessive" part of the jury's award. Nor is there any way to justify a reduction of the award to $600,000 by reference to the evidence in the record or the jury's findings." (Motion at 5)

Although it has rephrased them, Merck made these identical arguments before, citing the same cases, (e.g.. *Gautreaux v. Insurance Company of North America*, 811 F.2d 908 (5th Cir.1987); *Betancourt v. J. C. Penney Co.*, 554 F.2d 1206, 1209 n.5, 1210 (1st Cif. 1977); *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)) in its reply filed 3/8/07:

> "Even if remittitur were a proper remedy under these circumstances - which it is not - there is no principled basis upon which the award should be reduced to plaintiff's suggested figure of $10 million dollars, as opposed to any other number. A court cannot remit an award when there is insufficient evidence on which to base the amount of remittitur. ...
>
> Barnett made no effort to quantify his damages at trial, and the jury made no findings on either the extent or quantum of his damages, other than the excessive $50 million award. In particular, the jury did not specify which of Mr. Barnett's claimed damages (first heart attack, increased atherosclerosis, second alleged heart attack, alleged reduced life expectancy, etc.) it ascribed to Merck. Which, if any, of these damages is attributable to Merck was hotly contested. Thus, the Court has no basis upon which to decide what damages Mr. Barnett suffered, let alone what they are worth. Under the circumstances, remittitur is prohibited.."
> (Reply of Merck at 6-7)

As can be seen, these are issues which were thoroughly briefed and argued by counsel, and which Merck is now seeking to rehash and re-debate, after the Court has already rejected the

3

same arguments. Merck has advanced no reason why the Court should entertain this motion. The Federal Rules of Civil Procedure do not expressly recognize a motion for reconsideration. See *Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, 312 F.3d 1292, 1296 n. 3 (10th Cir. 2002). If the court has entered a final order or judgment, then a motion for reconsideration is considered a motion to alter or amend the judgment under rule 59(e). See *id.* at 1296.

"Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004); A motion for reconsideration may not be used to rehash rejected arguments or introduce new arguments.") *LeClerc v. Webb*, 419 F.3d 405, n.13 (5th Cir. 2005) "[R]econsideration … should not be used to relitigate old matters, raise new arguments, or present evidence that could have been raised prior to the entry of judgment." *Harris v. Gusman, Slip Copy*, 2007 WL 1812613, *1 E.D.La., June 18, 2007 (Civil Action No. 05-4992.) "[M]otions for reconsideration are not to be used "to re-debate the merits of a particular motion." *In re Vioxx Products Liability Litigation*, 230 F.R.D. 473, 474-475 E.D.La., July 22, 2005 (No. MDL 1657).

As the court stated in *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir.2004):

"A Rule 59(e) motion "calls into question the correctness of a judgment." In re Transtexas Gas Corp., 303 F.3d 571, 581 (5th Cir.2002). This Court has held *479 that such a motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment. Simon v. United States, 891 F.2d 1154, 1159 (5th Cir.1990). Rather, Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." Waltman v. Int'l Paper Co., 875 F.2d 468, 473 (5th Cir.1989) (internal quotations omitted). Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly. Clancy v. Employers Health Ins. Co., 101 F.Supp.2d 463, 465 (E.D.La.2000) (citing 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice & Procedure § 2810.1, at 124 (2d ed.1995))."

4

*United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993), cited by Merck, is inapposite, and in fact, supports denial of the present motion. (Affirming trial court's dismissal of second motion to vacate heroin distribution sentence as abusive, where motion "primarily rehashed" claims asserted in prior motion.)

Merck concedes that it "has addressed the propriety of remittitur before, in its reply brief in support of its September 5, 2006 motion for a new trial on all issues." However, Merck argues that it "did not make the precise argument presented in this brief - because, at the time, it understood the Court's August 30, 2006 ruling to be, in relevant part, that the jury's compensatory damages award was the result of passion or prejudice."

This is a distinction without a difference. First of all Merck has not explained, and cannot explain, how the Court's ruling of June 5, 2007 raises any new issues which were not already covered in the briefing and argument on Merck's motion for new trial. The parties addressed the issue of passion or prejudice at length, as well as the import of the Court's statements in its August 30, 2006 order. Plaintiff contended from the very outset of his opposition to the first motion for a new trial that the verdict was not the result of passion or prejudice, that the Court found the award to be merely excessive, and that remittitur was the appropriate remedy.

Merck acts as if it is surprised by the remittitur and the Court's finding that the award was excessive but not "passionate," when Plaintiff made it very clear that the Court was merely quoting a case in the August 2006 order and not actually making a finding of passion or prejudice. This was addressed not only in the briefing on original motion, but in oral argument as well. In short, Merck's motion is based upon nothing more than the patently meritless claim that it somehow could not have anticipated the Court would accept the Plaintiff's position.

5

The June 5 order merely confirms that Plaintiff was correct and that the Court rejected Merck's arguments on that issue.  Merck is simply reasserting arguments it has already made, and the Court's recent order clarifying its earlier ruling does not change Merck's argument, as is evident form the fact the Defendant continues to assert that "even with that clarification, remittitur is impermissible in this case."  (Motion at 20)  Merck has advanced no sound reason why it should be permitted to reassert arguments about issues which it has already briefed and argued, and which the Court has already ruled upon.

## 2.  THERE WAS MORE THAN SUFFICIENT EVIDENCE IN THE RECORD FOR THE COURT TO INVOKE ITS DISCRETION IN GRANTING REMITTITUR

Merck argues that "[t]here is scant evidence of damages in the record."  The record shows just the opposite.  There is in fact ample evidence to support a remitted award of $600,000 in compensatory damages.  Not only does the record provide proof that as a result of taking Vioxx Mr. Barnett suffered a heart attack in September 2002 requiring a 5-way open-heart CABG surgery, but it also provides evidence of the related sequelae, including an accelerated development of atherosclerosis, a second heart attack resulting in occluded veins, further angiogram and stent placement, decreased exercise tolerance, the possibility of future surgical intervention and a loss of life expectancy of nine to ten years.

Over and above the medical expenses incurred to undergo these surgical procedures, the pain and suffering the Plaintiff has endured from any one of these conditions, let alone a combination of them, alone justify an award of $600,000 in damages.   A brief review of the trial record indicates that before Mr. Barnett began taking Vioxx in January 2000, he had five non-occluded coronary vessels.  As Dr. Popma testified, a Cardiolite exam taken on January 24, 2000,

6

showed that Mr. Barnett had only one small area in his heart that had a reduction in blood flow – the rest of his heart was functioning normally. (8/7/06 Tr. at 1344:19-1345:5)  Dr. Zipes testified that in 2000, Mr. Barnett had only a 1-2% risk of having a heart attack over the following three years (8/8/06 Tr. at 1716:18-1717:1).  Yet despite his low risk in 2000, Mr. Barnett suffered a heart attack just a short time later on September 6, 2002, after taking Vioxx for 31 months.

Dr. Mark Karavan, Mr. Barnett's treating cardiologist, testified that the catheterization performed during the Plaintiff's hospitalization showed six-vessel stenosis and he therefore recommended a CABG surgery.  (8/4/06 Tr. at 1001:1-18)  Compared with his January 2000 Cardiolite exam, Mr. Barnett's rapid progression of atherosclerosis in such a short period of time was a phenomenon that Dr. Zipes stated he had never seen happen in his career.  (8/8/06 Tr. at 1715:10-24)  After considering all of Mr. Barnett's possible risk factors, Dr. Zipes concluded that this accelerated atherosclerosis could only have been caused by Vioxx.  (Id. at 1716:18-1717:1; 1734:25-1735:14)

Mr. Barnett's resulting open-heart CABG surgery was a painful, invasive procedure.  At trial, Mr. Barnett's cardiac surgeon, Dr. Bryan, described the surgery in detail:

> 2200
> 25  Doctor, if you could kindly for the jury explain
>
> 2201
> 1  what you did during the surgery?
> 2  A.  Well, basically what we do during the surgery is make an
> 3  incision down the middle of the chest, starts a little bit
> 4  below the notch in your neck and goes just to the end of your
> 5  chest where you feel the little bit of cartilage at the end of
> 6  your chest.  At the same time that is going on, typically, the
> 7  physician assistant is taking vein out of one of the legs.  And
> 8  back in 2002 that would have been done with an open incision
> 9  all the way up and down the leg.
>
> . . .

7

2201

15  A.  While he's doing that, I would take the mammary artery off
16  the chest wall.  We lifted the left side of the sternum up a
17  little bit with a retractor and then take down the artery off
18  the chest wall.
19      Then, typically, after I have all of the conduit vein
20  artery harvested, we will go on the heart/lung machine by
21  putting a canula in their aorta and a canula in their right
22  atrium so that we can stop their heart.  And we put a clamp on
23  their aorta, stop the heart, and then we're going to sew on
24  these grafts beyond the blockage.  We don't do anything to the
25  blockage.  We go beyond it.

2202

1  Q.  So you don't remove these vessels?
2  A.  No.  We don't remove any of the plaque.  Typically, we
3  don't do that.  Typically we don't do that.
4      Then after we finish making all of the connections to
5  restore blood flow.  We take the clamp off the aorta and the
6  heart starts beating, and we put some drains in, typically put
7  little some wires on the surface of the heart to keep the – if
8  their heart rate is a little slow, so we can keep them a little
9  faster and – and then close their chest up and take them back
10  to the ICU.
(8/11/06 Tr. at 2200:25-2201:9; 2201:15-2202:10)


Because of the serious nature of open-heart surgery and its effect on his body, it took Mr.

Barnett six weeks to sufficiently heal from the incisions in his chest and down the entire length of

his leg.  Once healed, he participated in a program of rehabilitation to build up the muscles in his

chest and legs, and his overall endurance.  (8/8/07 Tr. at 1582:22-1583:17)

Initially, the September 9, 2002 CABG surgery helped to re-open the vessels in Mr.

Barnett's heart.  However, in the months following and as Mr. Barnett continued to take Vioxx,

he experienced further injuries to his heart.  Both Dr. Popma and Dr. Zipes testified that two of

the Plaintiff's vein grafts which had been open in September 2002 after the CABG surgery, had

re-occluded.  (8/7/06 Tr. at 1377:7-14; 1388:8-1389:9 and 8/8/06 Tr. at 1726:10-20)  Dr.

8

Karavan performed a stent placement in one of the occluded vein grafts in 2006.  (8/7/06 Tr. 1481:8-16)  Dr. Popma testified that between 2002 and 2006, there were four areas of Mr. Barnett's heart that occluded.  (Id. at 1388:8-1389:6)  These blockages occurred even though Mr. Barnett had lowered his cholesterol to the point where, as Dr. Popma stated, "the plaque should be getting – regressing, going away." (Id. at 1389:7-9)

In addition to the occluded vein grafts, Dr. Zipes determined from a set of May 2006 physical examinations of Mr. Barnett's heart, that he more likely than not suffered a second heart attack between 2003 and 2006.  (8/8/06 Tr. at 1726:16-1727:1).  Dr. Popma and Dr. Zipes added that there was scarring and damage to the heart muscle, a new abnormality that was not present in 2003, and was consistent with a second heart attack.  (8/7/06 Tr. at 1379:20-1382:25 and 8/8/07 Tr. at 1730:17-1731:18)

The effect of these injuries on Mr. Barnett is an overall decrease in energy level.  (8/7/06 Tr. at 1519:23-1520:6; 1525:23-1526:10)  He also suffers from an increased plaque burden that is worrisome to Dr. Karavan, who stated that Mr. Barnett's prognosis is not the same as someone with less diffuse disease.  (8/5/06 Tr. at 1153:15-1154:11)  Even though Mr. Barnett was extremely diligent in modifying his risk factors – Dr. Karavan stated that Mr. Barnett did more than 99% of his patients in terms of modifying risk factors (Id. at 1153:6-10) – he still experienced multiple, ongoing, and severe injuries due to Vioxx.  Dr. Zipes testified that because of all of the damage to Mr. Barnett's heart, his life expectancy has been reduced by nine or ten years. (8/8/06 Tr. at 1733:24-1734:16; 1734:25-1735:14)

In sum, the record contains an abundance of evidence to justify a compensatory damage award of $600,000.  Neither side disputes that Mr. Barnett had the September 2002 heart attack.  The general damages from this injury alone justify the award.  In describing the heart attack, Dr.

9

Popma testified that a blood clot "stopped the flow, caused the chest pain, caused part of his heart muscle tissue to die, and cut off the circulation to the distal portion of this vessel." (Tr. 8/7/06 at 1366:13-15) Dr. Bryan confirmed that once heart muscle tissue has died, it cannot ever be healed (Tr. 8/11/06 at 2202:11-15)

Moreover, Mr. Barnett's damages are not confined to physical injuries. He understandably fears a future heart attack and premature death, and will always carry with him this significant emotional burden. *Boan v. Blackwell*, 343 S.C. 498, 541 S.E. 2d 242 (S.C. 2001) ("Loss of enjoyment of life" is a compensable element of damages.) At trial, Mr. Barnett testified that the fear of further injury and death causes him concern over leaving his wife and family behind were he to die prematurely. (Tr. 8/8/06 at 1594:11-17) Evidence of this apprehension and anxiety unquestionably supports the Court's remitted award.

**3.      THE COURT CORRECTLY EXERCISED ITS DISCRETION IN CALCULATING  AN APPROPRIATE AMOUNT FOR A REMITTED AWARD.**

Merck is correct that the 5th Circuit applies the maximum recovery rule.  The rule provides that the trial court fix the remitted amount based upon what the court feels is appropriate from the record.  *Lowe v. General Motors Corp.*, 624 F.2d 1373, 1383 (5th Cir. 1980):

> "In proceeding to fix the remittitur, then, the Court will be guided by the principle that the plaintiff who has been awarded an excessive amount by one jury should have the option of taking the maximum amount that the jury could properly have awarded or of taking a new trial before another one. In determining this, it appears proper first to fix the amount that (the District) Court thinks a properly functioning jury would have awarded, and this may be merely another way of saying that the starting point is the amount of damages the Court itself thinks proper on the record under the mandate of the Court of Appeals. After that, the maximum recovery rule requires the Court to determine the maximum amount of deviation from that verdict that could be allowed without requiring a new trial."

10

This is exactly what this Court has correctly and appropriately done. "In calculating the amount of remittitur and the maximum amount a reasonable jury could have awarded under the 'maximum recovery rule,' the court looks not only to actual awards, but may also apply a multiplier of fifty percent to past similar awards, so long as no multiplier was used in calculating those past awards." *Vogler v. Blackmore*, 352 F.3d 150,156 (5th Cir. 2003)  With that in mind, this Court's compensatory damages remittitur of $600,000 is not only consistent with other awards for similar injuries, but well within the ballpark and below the maximum recovery.  See e.g. *Daves v. Cleary*, 355 S.C. 216, 584 S.E.2d 423, 430 (S.C. App. 2003)(Affirming a $500,000 jury verdict in a medical malpractice action under South Carolina law, to a man who suffered a heart attack while in a hospital.)  The plaintiff in *Daves* (who had had a previous heart attack 10 years earlier), required two heart catheterizations, three thoracentesis procedures and a triple bypass operation, and incurred medical expenses totaling approximately $140,000. Id. at 221-222.

The decision to grant a remittitur is in the sound discretion of the trial judge and is reviewed for abuse of discretion. See *Denton v. Morgan*, 136 F.3d 1038, 1046 (5th Cir.1998). "Like the decision to alter or amend judgment, the trial court's decision to grant or deny a remittitur rests within the sound discretion of the trial judge." *King v. Ames*, 179 F.3d 370, n. 8 (5th Cir. 1999) "The standard for review, however, is strict; and the trial court will be reversed only if the party opposed to the remittitur shows an abuse of discretion on the part of the judge. (citations)  The reason for this strict standard is that the court's power to condition a denial of a new trial upon consent to a remittitur is founded upon its power to grant a new trial for excessiveness of verdict." *Bonura v. Sea Land Service, Inc.*, 505 F.2d 665, 669 (5th Cir.1974)  A

11

trial court "abuses its discretion if it requires remission of a sum that would reduce the verdict below the maximum award that is reasonably supported by the evidence." *Maxey v. Freightliner Corp.*,722 F.2d 1238, 1242 (5th Cir. 1984)

In the 5th Circuit significant deference is afforded to the trial court's decision  in granting remittitur.  As the Court stated in *Knight v. Texaco, Inc.*, 786 F.2d 1296, 1299-1300 (5th Cir. 1986)(affirming remittitur):

> "Finally, Texaco attacks the damage award as excessive by arguing that the
> district court erred in granting too small a remittitur. The rule is firmly established
> in this Circuit that this Court will not reverse a jury verdict for excessiveness
> except on the strongest of showings. Dixon, 754 F.2d at 590; Caldarera v. Eastern
> Airlines, Inc., 705 F.2d 778, 784 (5th Cir.1983); Shows, 671 F.2d at 934.  In
> addition, where, as here, "the trial court already has invoked its discretion in
> granting a remittitur, our scope of review is even narrower than usual." Stapleton
> v. Kawasaki Heavy Industries, Ltd., 608 F.2d 571, 574 n. 7 (5th Cir.1979),
> modified on other grounds, 612 F.2d 905 (5th Cir.1980);..."

Merck has completely misread *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984).  While the court there found that remittitur was inappropriate, it was not because of a lack of information to guide the court, but rather, because the "defendants did not have a fair trial. Numerous errors occurred in the course of the trial." Id. at 49. "We need not choose among these various rules, however, for these formulations are not appropriate for use in the instant case.  These formulations are designed for circumstances in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award.  They are not designed for a case such as the present one, in which prejudicial error has infected the jury's entire consideration of plaintiff's pecuniary loss." Id. at 50.

*De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 142-143 (5th Cir.1986) is similarly inapposite.  The Court there elected to remand for a new trial on damages only, because of

12

improper arguments by counsel in a Jones Act death claim that the jury should award damages for "loss of love and affection" which were not legally recoverable, and counsel's misstatements as to earnings loss which were contrary to uncontroverted evidence . ("In this circumstance where we cannot determine the reason the verdict is excessive-because it is unclear whether the jury improperly awarded sums for loss of love and affection or whether it simply awarded excessive sums for legally recoverable items of damage-we elect to remand this case for a new damage trial.")

        In the present case, there was no such improper argument by counsel as to earnings loss, nor as to any element of damages, nor was there argument for unrecoverable items of damages. The jury simply awarded what this Court believed were excessive sums for legally recoverable items of general damage.  The other cases relied upon by Merck are readily distinguishable, and involved clearly dissimilar circumstances. *Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1547-48 (5th Cir. 1984) (Action by oil purchaser against producer for breach of agreement to provide crude oil involved only economic losses.) *Betancourt v. J.C. Penney Co.*, 554 F.2d 1206, 1209 (1st Cir. 1977)(Estimation of proper awards for the plaintiffs would rest solely on speculation because there was no evidence of damages regarding four minor plaintiffs other than their mother's testimony.)

        Merck argues, as it did before, that "[b]ecause we cannot determine which injuries the jury ascribed to Merck, we also cannot know which if any of Mr. Barnett's medical expenses the jury intended to award as part of verdict, or whether it included general damages with respect to some or all of the alleged injuries." First of all, even assuming arguendo that the jury found Merck responsible only for Mr. Barnett's first heart attack, and not for reduced life expectancy, nor the second heart attack- in other words the smallest quantum of injury that is consistent with

13

the jury's findings on the special verdict- the Court's remitted amount is entirely reasonable.  The sequelae and medical bills from this heart attack alone support an award of at least $600,000.

More importantly, Merck ignores the fact that, as this Court pointed out, Mr. Barnett's damages were primarily noneconomic in nature.  The decision in *Gautreaux v. Insurance Company of North America*, 811 F.2d 908 (5th Cir.1987), cited by Merck now and in its first motion, hinged upon the court's inability to determine economic damages resulting from lost earning capacity.  However, Mr. Barnett had no lost wages or lost earning capacity.  Directly on point is *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 919 (5th Cir. 1987), cited by this Court, which distinguished *Gautreaux* for that very same reason and pointed out that general damages awards are "somewhat amalgamated by their very nature":

> "Where the district court used a general verdict interrogatory and instructed on several elements of damages, it is sometimes impossible to determine the reason the verdict was excessive.  In that event, an appellate court may elect to grant a new trial without providing the option of remittitur. ...
> In this case, however, we think a mandatory new trial on damages is unnecessary and that a remittitur is preferable.  The jury verdict separated Mr. and Mrs. Osburn's damages.  Although Mr. Osburn's award lumped together a number of elements, the amount the jury could properly have awarded--and very likely did award--for loss of earning capacity and past medical expenses can be easily calculated on the basis of the evidence in the record. [FN17] Under the facts of this case, the other damages items upon which the jury was instructed--pain and suffering, mental anguish, and loss of physical capacity-- are somewhat amalgamated by their very nature. For purposes of applying our maximum recovery rule, we are therefore able to consider them together. Since we can determine the proper amount for a remittitur in this case despite the district court's failure to submit special interrogatories to the jury on the individual items of damages, we elect not to require a new damages trial.
> FN17. We believe that this case is properly distinguished from Gautreaux, for there we noted that "on the record before us we cannot determine to what extent or in what amount Gautreaux's injury impairs his future earnings" and "we are completely unable to determine loss of future earnings." 811 F.2d at 915, 916."

14

Just like the plaintiffs in *Osburn*, the bulk of Mr. Barnett's damages were noneconomic in nature. There was no lost earning capacity, and medical expenses relating to the heart attack were easily calculated. Noneconomic damages by their very nature are incapable of precise calculation, and this is clear not only from 5th Circuit authority, but under South Carolina law as well. *Mims v. Florence Co. Ambulance Serv. Comm'n*, 296 S.C. 4, 370 S.E.2d 96 (S.C. App. 1988)("The amount of damages a jury may award for physical pain and suffering and for mental pain and suffering is incapable of exact measurement and is therefore left for determination by the jury.")

As with most states, South Carolina law recognizes this fact and does not require mathematical precision in calculation of damages. As the South Carolina Supreme Court stated in *Edwards v. Lawton*, 244 S.C. 276, 136 S.E.2d 708, 710 (1964):

> "Damages for pain and suffering are unliquidated and indeterminate in character and the assessment of unliquidated damages must rest in the sound discretion of the jury, controlled by the discretionary power of the trial Judge. Wright v. Gilbert et al., 227 S.C. 334, 88 S.E.2d 72. Pain and suffering have no market price. They are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured. Hence, the amount of damages to be awarded for pain and suffering must be left to the judgment of the jury, subject on to correction by the courts for abuse.' Harper v. Bolton, supra, 239 S.C. 541, 124 S.E.2d 54."

The same is true of future damages. See Haltiwanger v. Barr, 258 S.C. 27, 32-33, 186 S.E.2d 819 (1972) "The rule is not always easy to apply. Future damages in personal injury cases need not be proved to a mathematical certainty. Oftentimes a verdict involving future damages must be approximated. A wide latitude is allowed the jury."

In *Murray v. Bank of America, N.A.*, 354 S.C. 337, 345, 580 S.E.2d 194 (S.C.App. 2003) a woman brought an action for negligence against a bank for allowing an imposter to open an account in her name and write fraudulent checks. The plaintiff was arrested for 12 hours and

15

forced to attend 3 criminal court hearings, and although she was exonerated, she sought damages for embarrassment and discomfort, including numbness in her face "prompting a visit to the doctor," and because "due to her acute embarrassment of being arrested in front of her neighbors, she moved to a more expensive apartment, which strained her finances and caused more stress." Although the Plaintiff had no physical injury, the court affirmed a jury award of $300,000 in damages, stating:

> "Most of the damages Murray suffered were intangible. "One cannot easily or with any mathematical certainty place a value on the amount of a person's pain and suffering."  Smalls v. South Carolina Dep't of Educ., 339 S.C. 208, 218, 528 S.E.2d 682, 687 (Ct.App.2000). We find the jury's verdict of $300,000 is not so shocking to the conscience of the court that it clearly indicates the verdict was the result of improper motive. Thus, we hold the trial court did not err in denying the Bank's motion for a new trial absolute."

In light of the evidence in the record and the substantial injury suffered by Mr. Barnett, under these circumstances a reduction in the award of $50,000,000 to $600,000 in compensatory damages is more than fair to Merck, and is an appropriate exercise of this Court's discretion.

16

## CONCLUSION

For the reasons stated above, as well as the reasons previously set forth in response to Merck's first motion, Plaintiff respectfully requests that the Court deny Merck's motion in its entirety.

Date: August _10_, 2007                    Respectfully submitted,

                                        By: _Mark P. Robinson, Jr._
                                            Mark P. Robinson, Jr.
                                            Kevin F. Calcagnie
                                            Ted B. Wacker
                                            Lexi W. Myer
                                            ROBINSON, CALCAGNIE & ROBINSON
                                            620 Newport Center Dr., 7th Floor
                                            Newport Beach, California 92660
                                            Telephone: (949) 720-1288
                                            Facsimile: (949) 720-1292

                                            Andy D. Birchfield, Jr.
                                            P. Leigh O'Dell
                                            BEASLEY, ALLEN, CROW,
                                            METHVIN, PORTIS & MILES, P.C.
                                            P.O. Box 4160
                                            234 Commerce Street
                                            Montgomery, Alabama 36103-4160
                                            Telephone: (334) 269-2343
                                            Facsimile: (334) 954-7555

                                            Donald C. Arbitblit
                                            LIEFF, CABRASER, HEIMANN and
                                            BERNSTEIN, LLP
                                            275 Battery Street, 30th Floor
                                            San Francisco, California 94111
                                            Telephone: (415) 956-1000
                                            Facsimile: (415) 956-1008

                                            Counsel for Plaintiff

17

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants'

Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs'

Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No.

8B, and that the foregoing was electronically filed with the Clerk of the Court of the United

States District Court for the Eastern District of Louisiana by using the CM/ECF system which

will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657

on this _10_ day of August , 2007.

By:_____

MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson
620 Newport Center Drive, Suite 700
Newport Beach, California  92660
Telephone:  (949) 720-1288
Facsimile:  (949) 720-1292

18

1  Thomas V. Girardi, SBN 36603
2  James O'Callahan, SBN 126975
   GIRARDI KEESE
3  1126 Wilshire Blvd.
   Los Angeles, CA 90017
4
5  Mark P. Robinson, Jr., SBN 054426
   Kevin F. Calcagnie, SBN
6  ROBINSON, CALCAGNIE & ROBINSON
   620 Newport Center Drive, 7th Floor
7  Newport Beach, CA 92660
   949-720-1288; Fax 949-720-1292
8
9  **On behalf of the Plaintiffs' Executive Committee**

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12          FOR THE COUNTY OF LOS ANGELES–CENTRAL CIVIL WEST

13

14

15  **COORDINATION PROCEEDING**          )   **JCCP 4247**
    **SPECIAL TITLE [Rule 1550(b)]**     )
16                                       )   RESPONSE OF PLAINTIFFS' EXECUTIVE
    **IN RE VIOXX® CASES**               )   COMMITTEE TO DEFENDANT MERCK'S
17                                       )   STATEMENT REGARDING CASE
                                         )   MANAGEMENT AND TRIAL SELECTION
18                                       )   PROTOCOL
                                         )
19                                       )
                                         )   Honorable Peter D. Lichtman
20                                       )   Dept. 322
21                                       )
                                         )
22  ─────────────────────────────────   )

23

24  1.      **INTRODUCTION**

25

26          At the December 6, 2004 Status Conference, the Court directed the parties to submit

27  briefs regarding the Court's suggestion that the Plaintiffs Executive Committee submit a

28  proposal for five cases in the coordinated litigation to be set for the initial trials.  On December

FAC Resp. Exhibit B -- 2150

29, 2004, plaintiffs served Merck with a list of those five cases.  The Court indicated its belief that allowing the PEC to select the initial cases makes the most sense for quickly setting values on all cases.

However, Merck has objected to this method as counterproductive and unfair, arguing that a case selection protocol must allow for input from Merck. Merck proposes instead that both plaintiffs and Merck should nominate slates of cases against which the other side could exercise a limited number of peremptory challenges, and then the Court would then make a final selection of cases drawn equally from the two slates. Additionally, Merck argues that the Court should set cases for individual, not group, trials, contending that 'group trials of claims involving complex and individualized medical causation issues are inherently prejudicial, especially in the context of "immature" torts like this one.'

Merck is wrong on both counts. The PEC submits that the Court had it right the first time and that the procedure suggested by the Court is in fact the most efficient, economic and pragmatic way to establish a standard by which to evaluate the other cases and work toward an early resolution of all cases, without sacrificing fairness and due process.  This is a coordination court and a coordination issue involving matters of judicial resources, court personnel hours and litigation expenditures statewide.  If experience is any guide, by setting the best cases for early trial, following the same path as the Fen-Phen and Ford/Firestone coordinated cases, there is a good chance that the vast majority of the cases will settle sooner rather than later.

However, choosing the route suggested by Merck will result in a situation similar to the PPA and Rezulin cases, where many have settled but many are still dragging on years later.  A 'split the baby' approach will be hit or miss, will not move the litigation along, and will likely result in wasted time and years of litigation.  Likewise,  Merck's suggestion that cases must only be tried on an individual basis, would add insult to injury, and would result in an even greater waste of time and resources.

## II.     THE COORDINATION COURT HAS BROAD DISCRETION AND FLEXIBILITY IN THE SELECTION, SCHEDULING AND SEQUENCE OF

**CASES FOR TRIAL.**

A coordination judge is vested with significant discretion in fashioning suitable procedures it deems appropriate 'to ease the transition through the judicial system of the logjam of cases which gives rise to coordination.'   (*McGhan Med. Corp. v. Sup.Ct.* (Hogan) (1992) 11 Cal.App.4th  804, 812, 14 Cal.Rptr.2d 264, 269-270)   According to Weil and Brown:

> "[12:374]  On any question not covered by the coordination statute, or the Ca Rules of Court Rule Rules, the coordination judge will follow the provisions of the Code of Civil Procedure applicable to civil actions generally. If none are in point, the judge "may prescribe any suitable manner of proceeding." [Ca Rules of Court Rule  1504(b)]
>
> The intent is to vest in the coordination judge "whatever great breadth of discretion may be necessary and appropriate to ease the transition through the judicial system of the logjam of cases which gives rise to coordination." [ McGhan Med. Corp. v. Sup.Ct. (Hogan) (1992) 11 Cal.App.4th 804, 812, 14 Cal.Rptr.2d 264, 269-270]
>
> …
>
> d. [12:375.5]  Power to tailor cases for trial:  The coordination trial judge may remand any action, or any severable claim, may transfer claims, may add on other cases, or may terminate the action or actions. [See Ca Rules of Court Rule  1542- 1545]
>
> The trial court may order "any issue or defense to be tried separately and prior to the trial of the remaining issues." [Ca Rules of Court Rule  1541(b)(3)]"
>
> (Weil & Brown, CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL (The Rutter Group 2004))

According to the court in *McGhan, supra:*

> "A review of applicable rules adopted by the Judicial Council indicates that the procedures which may be utilized by the coordinating judge are flexible indeed.   Rule 1541 provides that

1
2
3
4
5
6
7
8
9

the court may order any issue or defense tried separately; hearings may be conducted at various sites in the state as may be selected to provide convenience to witnesses, parties, and counsel; the court can prescribe all manner of pretrial discovery devices designed to aid the litigation. Rule 1543 gives the coordinating judge the power to sever cases or claims from the coordination pool and transfer them back to their original venue. Rule 1528 gives the judge power to try specific issues separately. Generally, we are satisfied that it is the intent of the Judicial Council to vest in the coordinating judge whatever great breadth of discretion may be necessary and appropriate to ease the transition through the judicial system of the logjam of cases which gives rise to coordination."

(11 Cal.App. 4th at 812.)

10      Similarly, the court in Abelson v. National Union Fire Ins. Co. (1994) 28 Cal.App.4th

11   776, 786, 35 Cal.Rptr.2d 13, 18, stated:

12
13
14
15
16
17
18
19
20
21
22
23

"The purposes of coordination include promoting the efficient use of judicial resources. ( Code Civ.Proc., § 404.1;  Christensen v. Superior Court (1991) 54 Cal.3d 868, 877, fn. 6, 2 Cal.Rptr.2d 79, 820 P.2d 181.)  As a general matter the rules implementing our coordination statutes  (FN7) vest the coordinating judge with flexible procedures and "whatever great breadth of discretion may be necessary and appropriate to ease the transition through the judicial system of the logjam of cases which gives rise to coordination...."  (McGhan Medical Corp. v. Superior Court (1992) 11 Cal.App.4th 804, 812, 14 Cal.Rptr.2d 264.)  For example, rule 1541(b) mandates that the coordination trial judge "assume an active role in managing all steps of the pretrial, discovery and trial proceedings to expedite the just determination of the coordinated actions without delay...."  Consistent with this mandate, the coordination judge may "(3) order any issue or defense to be tried separately and prior to the trial of the remaining issues when it appears the disposition of any of the coordinated actions might thereby be expedited."

24   ///
25   ///
26   ///
27
28

STATEMENT OF PLAINTIFFS' EXECUTIVE COMMITTEE REGARDING CASE MANAGEMENT
AND TRIAL SELECTION PROTOCOL

4

**III.   THE COURT'S PROPOSAL WILL RESULT IN THE MOST EFFICIENT USE OF COURT RESOURCES, WHILE AT THE SAME TIME PROVIDE THE OPTIMAL METHOD FOR INCREASING THE PROBABILITY OF AN EARLY AND FAIR RESOLUTION OF THIS LITIGATION.**

The Court's proposal that the cases for initial trials be selected by the Plaintiffs' Executive Committee, is the most, and in fact the only, pragmatic approach. The ivory tower method suggested by Merck has historically led to years and years of protracted litigation and delay in other cases. For example, in the Rezulin coordinated litigation the (In re Rezulin Litigation, JCCP No. 4122) Judge West utilized an approach similar to what the Merck is requesting here. While many cases have settled, there are many others continuing forward today with no end in sight, because there is no defined settlement value that has been obtained from trials.

By contrast, both the Diet Drugs (Fen-Phen) and Ford/Firestone coordinations, whether by intent or original design, ended up with initial trials selected from among the plaintiffs' best cases. In both, the vast majority of other cases settled quickly and fairly within a very short period of time after the initial cases were scheduled for trial. As this Court has recognized, the goal of the initial trials is to determine reasonable case values, and using the best cases will establish an approximate ceiling by which to measure the value of lesser cases. This is the only practical means of identifying potential case value, as a defense verdict on a weak case says nothing about the value of other cases.

Despite differences among plaintiffs' counsel, as a practical matter, if the plaintiffs win the initial trials there will be a recognizable upper limit on the value of the best cases, and a basis for a sliding scale. Should the plaintiffs lose one of the best cases, it will necessarily cause others to lower their settlement expectations. As the Court pointed out, if initial verdicts are

lower than the the plaintiffs had hoped, they will be unable to claim or rationalize that they did not try their best case and that somehow later cases will fare better.

The same cannot be said if the worst are tried first.  If the plaintiffs lose a weak or slim liability case selected by the defense, plaintiff counsel will be correct in assuming they have better cases to try, and in seeking settlement amounts far in excess of the verdict. If the defense wins a "worst case" case, no value of any sort will be established.  Everyone will have a better case and will view the result as anomalous.

Merck has advanced several arguments against the Court's suggestion, but each is patently flawed or contradicted by Merck's own statements.  Merck complains that 'the Court has provided no guidance as to what constitutes a "best" case.'  No guideline is needed.  There is no reason for the PEC to select any cases which do not involve the most significant injuries and the best potential for a plaintiff's verdict.  The PEC has no incentive to choose anything less.   Merck's suggestion that the PEC may want to 'gamble' with a 'sympathetic plaintiff' with a 'weak medical causation case' defies logic, when the PEC could instead choose a 'sympathetic plaintiff' with a strong causation case.  The intent is to determine value, and a point below which other cases should settle.  A plaintiffs verdict on a better case will provide a standard by which to measure weaker cases and cases with less significant damages. There is no rational incentive to 'gamble' and obtain a defense verdict which tells us nothing, or to seek an unrealistic outcome which the defense will see as an aberration and refuse to acknowledge as a settlement guidepost.  As Merck has pointed out in another part of its brief,  "Both sides obviously would have incentive to select cases they believed they could win…"

Merck's fallback position, a request for a peremptory challenge to strike certain cases from the selection process, would adversely undermine the purpose of the initial trials.  Merck

1  could, and would, simply throw out the best cases, thereby artificially lowering the ceiling, and

2  reducing confidence in the verdict as a guidepost.

3

4      Merck's reliance upon the 'The Manual for Complex Litigation § 22.315 at p. 360 (4th ed.

5  2004) is misplaced.   That section and its discussion of 'representativeness' and 'resolution on a

6  group basis' are based entirely upon the federal case In re Chevron U.S.A., Inc., 109 F.. 3d 1016,

7  1019 (5th Cir. 1997).   Although *Chevron* mentions settlement valuation as one possible benefit

8  of a bellwether trial generally, it is clear from the opinion that the only real concern was one of

9  due process- the trial court there was attempting to conduct a unitary trial of *common liability*

10 *issues* for 3,000 cases and the trial plan was "clearly designed to resolve the issue of liability on

11 the part of Chevron to *all of the plaintiffs* by referring to a unitary trial on the issues of general

12 liability or causation..." (Id at 1018. Quoted italics in original text.)

13

14     The issue in *Chevron* was not the adequacy of the trial plan for moving the settlement

15 process along, but rather, the propriety of establishing a procedure whereby the trial of a few

16 cases would be binding on issues of liability as to several thousand others.  Clearly there were

17 due process problems. ("Our substantive due process concerns are based on the lack of

18

19 fundamental fairness contained in a system that permits the extinguishment of claims or the

20 imposition of liability in nearly 3,000 cases based upon results of a trial of a non-representative

21 sample of plaintiffs.  Such a procedure is inherently  unfair when the substantive rights of both

22 plaintiffs and the defendant are resolved in a manner that lacks the requisite level of confidence

23 in the reliability of its result." Id at 1020-21)

24

25     Merck goes on to argue that allowing both sides to participate in the selection process

26 will ensure fundamental fairness.  Interestingly, the *Chevron* court recommended against the

27 very procedure which Merck is suggesting- each side selecting their best cases, ("Whatever may

28

1   be said about the trial contemplated by the district court's December 19, 1996 order, one thing is

2   clear.   It is not a bellwether trial. It is simply a trial of fifteen (15) of the "best" and fifteen (15)

3   of the "worst" cases contained in the universe of claims involved in this litigation.   There is no

4   pretense that the thirty (30) cases selected are representative of the 3,000 member group of

5

6   plaintiffs.")  Again, the *Chevron* court was concerned about a trial of a handful of cases which

7   would have been binding on liability issues as to thousands of others.

8       *Chevron* and the section of the manual upon which Merck relies, are simply inapposite.

9

10  Likewise, so is is the other case cited, Liggett Group Inc. v. Engle, 853 So.2d 434, 455 (Fla.App.

11  2003)(Extrapolation of class representatives' damages to the rest of the class during the punitive

12  damages phase of class action trial was not permissible, where there was insufficient proof

13  concerning actual class size, class composition, and the amounts of compensatory damages

14  ultimately recoverable by class members, and the three class representatives were hand-picked

15  by counsel and could not be viewed as a statistically significant or representative sample of the

16  state-wide class of 700,000 cigarette smokers.)

17

18      Merck next points out that one case arises under Arizona law, and another under

19  Washington law and argues that this limits their utility as comparators for the other cases here

20  which arise under California law.   However, despite subtle nuances in substantive products

21  liability law between the states, the trial of these cases will still yield the most important

22  information- the probable jury verdict range for the most significant injuries in the best cases.

23

24      This is a coordinated proceeding and a coordination judge has to take into account not

25  only what is best for his or her courtroom, but the complex panel, and the courts and courtroom

26  staffs in other counties.   The approach suggested by the Court recognizes this, and is the optimal

27  path for resolution of this litigation in a timely fashion.

28

STATEMENT OF PLAINTIFFS' EXECUTIVE COMMITTEE REGARDING CASE MANAGEMENT
AND TRIAL SELECTION PROTOCOL

FAC Resp. Exhibit B -- 2157

## IV.   THE COURT SHOULD SET CASES FOR CONSOLIDATED TRIALS.

Merck argues that the Court should set the selected cases for individual and not group trials, and that 'grouping two or more plaintiffs in one initial trial would grossly prejudice Merck, provide yet another one-sided advantage to plaintiffs, and further undermine the utility of early trials of selected cases.'  While plaintiffs are not suggesting that the court try 10 to 14 cases simultaneously, (as in the Mississippi and Alabama decisions cited by Merck), Plaintiffs strongly disagree that the court should only try cases individually.  Under California law consolidated trials of smaller numbers of cases are in fact appropriate, and have been utilized in other mass tort cases.

Todd-Stenberg v. Dalkon Shield Claimants Trust (1996) 48 Cal.App.4th 976, 56 Cal.Rptr. 2d 16, is right on point.  Todd-Stenberg involved  an intrauterine device which caused pelvic inflammatory disease (PID).  Six personal injury cases were consolidated, and the three actions remaining by the time of trial were tried together.  Following a jury verdict which awarded varying amounts of damages to each plaintiff, the defendant appealed, making an argument similar to Merck's.  Pointing out the irrelevance of authorities involving class actions and trials of large numbers of claimants, the court stated:

> "The out-of-state cases cited by the Trust, while potentially persuasive in similar actions, provide no binding precedent for their position.  In addition, they are, for the most part, distinguishable from the present case.  Most involved a substantially greater number of plaintiffs than the three, or even the original six, plaintiffs in the present case. (E.g., *In re Agent Orange Prod. Liability Litigation* (2d Cir.1987) 818 F.2d 145: over 100,000 notified plaintiffs; *In re Fibreboard Corp.* (5th Cir.1990) 893 F.2d 706: 3,031 cases; *In re Northern Dist. of Cal., Dalkon Shield, etc.* (9th Cir.1982) 693 F.2d 847:166 northern California actions consolidated and nationwide class certified, noting that approximately 2.2 million Dalkon Shields had been

inserted in women and 1,573 claims were then pending.)  In such cases there is a far more significant possibility of confusing the jury than existed here.  Furthermore, the percentage of trial time devoted to individual issues increases with every additional plaintiff."
(48 Cal.App.4th at 981.)

In rejecting the defendant's arguments, the appellate court commented upon the sound practical reasons for trying the cases together:

"Six actions were consolidated.  By the time of trial, however, only three actions remained.  In each, the plaintiff claimed she had suffered pelvic inflammatory disease (PID) as a result of her use of a Dalkon Shield.  **The trial court correctly anticipated that a large portion of the trial would be devoted to issues common to the three cases:  how PID occurs, whether it can be caused by the use of Dalkon Shield, and what other factors might cause or contribute to the disease.**  In short, a large part of the trial was devoted to educating the jury about the female reproductive system, the Dalkon Shield and PID.  Some of this evidence was in the form of deposition testimony relating to the structure of the Dalkon Shield, and did not consider the plaintiffs' individual cases in any way.  Other evidence was adduced through expert witnesses called by the parties at trial.  Much of this evidence was relevant to the structure of the Dalkon Shield and its propensity to cause or contribute to PID, and did not consider the plaintiffs' individual cases.  In addition, **the parties were able to use the same witnesses not only to discuss these general issues, but to address the probable cause, extent and result of the PID in each of the plaintiffs.  Had there been three separate trials the same deposition testimony would have been introduced, many of the same expert witnesses called and much of the same evidence presented.  The record, therefore, discloses that consolidation was appropriate.**"
(48 Cal.App.4th at 979.  Emphasis added)

Similarly, in the present case, there will be substantial common issues and common evidence among the cases.  A large portion of any trial will be devoted to issues common to all cases, including how Vioxx acts in the body, how the heart and brain function, how Vioxx causes strokes and cardiac events, and what other factors might cause or contribute to strokes

FAC Resp. Exhibit B -- 2159

and heart attacks.  The parties will be able to use the same witnesses to discuss common issues as well as individual causation.  Most of the same expert witnesses will be called on issues common to all plaintiffs.  The same is true with respect to documentary evidence.

The overwhelming majority of the liability evidence will be essentially the same in each case.  That evidence will consume the bulk of the trial time and will involve numerous documents and exhibits, video deposition testimony and live testimony, both by percipient witnesses and experts regarding Merck's  duties and obligations with respect to the approval and marketing of Vioxx.  Similarly, the same general causation evidence will be relevant to each of the cases, i.e., how Vioxx causes injury, the rates of injury, the mechanism of injury,  whether the risk of injury is warranted in any case, and the like.   The only issues which are distinct as between the first 5 plaintiffs are specific causation – which will require minimal expert witness testimony with respect to each plaintiff – and individual damages, which again will require very little trial time relative to that which will be spent on liability and general causation issues.

Because the liability and general causation evidence will consume the vast majority of trial time, it is logical to try these first five cases as a unit.   That such "group trials" can be successfully accomplished without confusion to the jury and with an enormous savings in both time and resources has been demonstrated in the Lockheed litigation, tried by Girardi & Keese.  Attached as Exhibit ____ for the Court's reference is a true and correct copy of the scheduling order in the Lockheed litigation issued by Judge Kalin, in which the court made findings regarding the appropriateness and judicial efficiency of trying several of the personal injury cases together:

> "The court finds that these cases involve complex issues of
> medicine, toxicology, epidemiology, chemistry and industrial
> hygiene, among other disciplines, and absent careful judicial

STATEMENT OF PLAINTIFFS' EXECUTIVE COMMITTEE REGARDING CASE MANAGEMENT
AND TRIAL SELECTION PROTOCOL

11

1  management, will consume vast and unjustified amounts of public,
2  judicial and private resources, both in the pre-trial and trial phases.
   In fashioning this order, the court finds significant that: (1) the
3  defendants in each are substantially identical; and (2) each
   plaintiff's legal theories are substantially identical; and (3) there is
4  a substantial similarity in the facts underlying each plaintiff's
   causes of action (although the plaintiffs' alleged injuries and
5  damages vary).

6
   "Accordingly, the court believes that there is a substantial
7  likelihood that the parties will resolve, without a series of
   protracted and expensive trials, all or a substantial portion of
8  plaintiffs' claims following a plenary trial of a meaningful number
9  of plaintiff's cases."
   (Case Management Order, March 24, 1992, *Orozco v. Lockheed*
10 *Corporation*, Case No NCC 30559B, Exhibit ___, p. 3, line 23-page 4,     line
11 10.)

12      Based upon those findings, Judge Kalin ordered 15 plaintiffs' cases to be tried in a single

13 trial.  Similarly, Judge West entered an order in the Rezulin litigation which provided:

14      "Efficient Use of Judicial and Party Resources in Consolidated
15      Trial

16      The Court finds the interests of judicial economy weigh in favor of
        trying all six cases together. The consolidation of these six
17      plaintiffs' cases for trial is expressly authorized by CCP § 1048.
        Clearly, these cases present numerous common questions of law
18      and fact. **The very nature of these coordinated proceedings
19      demands that the Court consolidate matters for trial. Separate
        trials would unduly burden the Court, the parties, and
20      witnesses. The cost, the time involved, and the duplication of
        common evidence in separate trials is not warranted**. The Court
21      is confident that appropriate steps may be taken to eliminate the
22      risk of jury confusion or prejudice to the Defendants."
                ( Minute Order, May 28, 2002, In re
23              Rezulin Litigation, JCCP No. 4122,
24              Exhibit ___ attached)

25 / / /

26 / / /

27

28
                STATEMENT OF PLAINTIFFS' EXECUTIVE COMMITTEE REGARDING CASE MANAGEMENT
                                AND TRIAL SELECTION PROTOCOL

                                                                                    12

## V.   FACT DISCOVERY SHOULD BE STAYED OR LIMITED IN THE REMAINING CASES.

Merck has requested that the Court allow non expert discovery to continue in all cases not set for trial, and asserts that fact discovery should remain open in all cases during the work-up and trials of the test cases.

The Plaintiffs' Executive Committee submits that discovery should be stayed or limited as to the cases which are not scheduled for the initial trials. Experience with preparation for the Rezulin trials, the Fen-Phen trials, the Baycol trials and the PPA trials has demonstrated that the focus and the amount of work that will be involved in the trial cases, and the preparation of those five cases for trial, will be a massive undertaking in terms of time and resources for the Plaintiffs' counsel, as well as the defense firms preparing for this trial. That preparation should be the total focus. Once those verdicts are in, we will have a way to properly, effectively and quickly evaluate all of the other cases. Until that time, discovery should be stayed or limited in the cases not set for trial.

## VI.   CONCLUSION

Plaintiffs are not suggesting fairness should be sacrificed for efficiency.  There is nothing unfair about asking that certain cases be tried before others.  On the other hand, it is unfair to adopt procedures which have been proven to unduly protract similar litigation and to force large numbers of cases to go unresolved for several years. This Court is entirely correct in recognizing that the faster values are set on these cases, the sooner it will be to the benefit of everyone, including judges and litigants in other state and federal courts.

The method proposed by the Court will simply prioritize the better cases among hundreds

of others, while saving all parties the undue expense and burden of trying numerous cases that might not otherwise have to be tried.  The Court's proposal will avoid unnecessary delay, excessive litigation expenses and legal bills, and prevent this litigation from dragging on indefinitely.


DATED:        January 18, 2005                ROBINSON, CALCAGNIE & ROBINSON



                                                          _____
                                                          MARK P. ROBINSON, JR.
                                                          On behalf of the Plaintiffs' Executive Committee

Mark P. Robinson, Jr., SBN 054426
Kevin F. Calcagnie, SBN 08994
Carlos A. Prietto, III, SBN 166410
Ted B. Wacker, SBN 157416
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, Suite 700
Newport Beach, California   92660
Tele: 949-720-1288; Fax:  949-720-1292

Attorneys for Plaintiff
LOWELL BERWICK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST

| | |
|---|---|
| Coordination Proceedings<br>Special Title  (Rule 1550(b))<br>**VIOXX® CASES**<br><br>LOWELL BERWICK and CAROLE BERWICK<br><br>             Plaintiffs,<br><br>vs.<br><br>MERCK & COMPANY, INC., McKESSON<br>CORPORATION, and DOES 1 THROUGH 100,<br>inclusive,<br><br>             Defendants | Case No.: JCCP 4247<br><br>Assigned to Honorable Victoria Chaney,<br>Department 324<br><br>[LASC Case Number:  BC328855]<br><br>**PLAINTIFF'S BRIEF RE THE NOERR-<br>PENNINGTON DOCTRINE<br>AND ITS INAPPLICABILITY TO<br>PLAINTIFF'S CLAIMS AND EVIDENCE**<br><br>Trial Date:  April 9, 2007 |

i

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

    1. THE NOERR-PENNINGTON DOCTRINE IN CALIFORNIA  ........................ 2

    2. EVEN WHERE THE DOCTRINE IS APPLICABLE, EVIDENCE OF PETITIONING OR
       LOBBYING THE GOVERNMENT IS STILL ADMISSIBLE TO SHOW THE
       CHARACTER AND PURPOSE OF NONEXEMPT ACTIVITIES ........................... 2

    3. THE DOCTRINE DOES NOT APPLY WHERE A PARTY HAS MADE
       DELIBERATELY FALSE STATEMENTS TO A GOVERNMENT AGENCY ....................... 5

    4. THE DOCTRINE DOES NOT APPLY WHERE THE DEFENDANT IS SEEKING
       APPROVAL FROM A REGULATORY BODY, AND IS NOT REQUESTING A
       MODIFICATON OR CHANGE IN THE LAW .................................................... 6

    5. THE DOCTRINE DOES NOT APPLY WHERE THE ACTION IS BASED ON CONDUCT
       OTHER THAN PETITIONING OR LOBBYING THE GOVERNMENT ................................. 7

CONCLUSION .......................................................................................................... 8

ii

FAC Resp. Exhibit B -- 2165

# TABLE OF AUTHORITIES

**CASES**

*Buell-Wilson v. Ford Motor Co.,*
    141 Cal.App.4th 525, 561-562, 46 Cal.Rptr.3d 147 (2006) ............................................................ 1

*Cantor v. Detroit Edison Co.,*
    428 U.S. 579, 601-602, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1979) .................................................. 6, 7

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)................................................................passim

*Hi-Top Steel Corp. v. Lehrer,*
    24 Cal.App.4th 570, 29 Cal.Rptr.2d 646 (Cal.App. 2 Dist.1994) .................................................. 2

*Mason v. Texaco, Inc.,*
    741 F.Supp. 1472, 1499-1500, 31 Fed. R. Evid. Serv. 97 (D.Kan.1990)...................................... 3, 5

*MCI Communications Corp. v. American Tel. & Tel. Co.,*
    708 F.2d 1081, 1160 (7th Cir. 1983) .......................................................................................... 3, 4

*National Flood Services, Inc. v. Torrent Technologies, Inc.,*
    Slip Copy, 2006 WL 1518886, *8 (W.D.Wash. 2006) .................................................................... 5

*Premier Medical Management Systems, Inc. v. California Ins. Guarantee,*
    136 Cal.App.4th 464, 39 Cal.Rptr.3d 43 (Cal.App. 2 Dist. 2006) .................................................. 7

*Snyder v. American Ass'n of Blood Banks,*
    144 N.J. 269, 676 A.2d 1036 (N.J.1996)................................................................................... 1, 8

*United Mine Workers of America v. Pennington,*
    381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).............................................................. passim

*United States v. Title Ins. Rating Bureau of Arizona,*
    (D. Ariz. 1981) 517 F. Supp. 1053, 1060, aff'd, (9th Cir. 1983) 700 F.2d 1247,
    cert. denied, (1984) 467 U.S. 1240 .............................................................................................. 6

*Whelan v. Abell,*
    48 F.3d 1247, 1253-55 (D.C.Cir.1995) ........................................................................................ 5

iii

# INTRODUCTION

Merck's assertion of the *Noerr-Pennington* doctrine should be rejected in its entirety. A search of Westlaw demonstrates that although the doctrine has been around for over 40 years, its use under these circumstances would be unprecedented. Perhaps this is why Merck did not think to raise the doctrine in any of its 23 motions in the first instance, nor in the two previous trials in California, nor in the Barnett trial in the MDL.  An examination of the fundamentals of the doctrine, its limits and its exceptions, and how it has been interpreted by other courts including the Supreme Court itself, demonstrates that it is neither a bar to Plaintiff's claims and allegations here, nor to the admission of the evidence of Merck's interactions with the FDA.

One must ask why the doctrine has never arisen in any of the numerous reported California appellate decisions involving pharmaceuticals and products such as automobiles which are also subject to regulatory action and safety standards, (see e.g. *Buell-Wilson v. Ford Motor Co.* (2006)141 Cal.App.4th 525, 561-562, 46 Cal.Rptr.3d 147), and why does it not appear in any of the dozens of other reported pharmaceutical products liability decisions from federal and state courts around the country.[1] The answer is that from the beginning *Noerr-Pennington* decisions have made it clear that the doctrine does not apply in a case like this. There are several reasons why the doctrine is inapplicable here, each of which is sufficient in and of itself to reject Merck's assertion. Moreover, even if the doctrine could be invoked here, it would not bar admission of the evidence Merck wants to exclude. Merck is asking this Court to make new law and expand the *Noerr-Pennington* doctrine far beyond where any court in California or anywhere else has ever taken it.

---

[1] A search of the Weslaw.com database of all state and federal decisions up to and including 3/20/07 using the search terms: "Noerr & FDA or "Food and Drug Administration"" turned up 81 cases. Although counsel for Plaintiff does not claim to have read every decision, almost all of them appear to involve antitrust cases and business entities suing other business entities. Counsel was unable to locate a single reported decision involving an individual personal injury action against a pharmaceutical manufacturer within those cases. In fact, the only case involving an individual personal injury action involves a claim against a trade association, and actually supports the position of Plaintiff here.  See *Snyder v. American Ass'n of Blood Banks* 144 N.J. 269, 676 A.2d 1036 (N.J.,1996), discussed infra at 8.

1

### 1. THE NOERR-PENNINGTON DOCTRINE IN CALIFORNIA

The doctrine has been recognized and discussed by California courts and is described at length in *Hi-Top Steel Corp. v. Lehrer*, 24 Cal.App.4th 570, 574-575, 29 Cal.Rptr.2d 646 (Cal.App. 2 Dist.1994):

> "The *Noerr -Pennington* doctrine provides that there is no antitrust liability under the Sherman Act for efforts to influence government which are protected by the First Amendment right to petition for redress of grievances, even if the motive behind the efforts is anticompetitive. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1133, 270 Cal.Rptr. 1, 791 P.2d 587; *575 Blank v. Kirwan* (1985) 39 Cal.3d 311, 320, 216 Cal.Rptr. 718, 703 P.2d 58.) ...

> ... "The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." ( Id. at p. 139, 81 S.Ct. at p. 530.)"

> ...

> "In *Mine Workers v. Pennington* (1965) 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626, the court reiterated that Noerr "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.... Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." (At p. 670, 85 S.Ct. at p. 1593.)"

While the court noted that the *Noerr-Pennington* doctrine was formulated in the context of antitrust cases, and has been applied or discussed in cases involving other types of civil liability, no California case has ever applied it in a products liability action, despite the fact that manufacturers' communications and representations to regulatory agencies such as the FDA are frequently an issue.

### 2. EVEN WHERE THE DOCTRINE IS APPLICABLE, EVIDENCE OF PETITIONING OR LOBBYING THE GOVERNMENT IS STILL ADMISSIBLE TO SHOW THE CHARACTER AND PURPOSE OF NONEXEMPT ACTIVITIES.

Even assuming, *arguendo*, that *Noerr-Pennington* is applicable, (and as will be shown *infra*, it is not), the doctrine does not preclude the admission of evidence of protected petitioning or lobbying activity where such evidence is relevant to show the character or purpose of nonexempt activity. The Supreme Court in *Pennington* made this very clear:

> "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. The jury should have been so

2

instructed and, given the obviously telling nature of this evidence, we cannot hold this lapse to be harmless error.

**It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.'** *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 1593 n. 3, 14 L.Ed.2d 626 (1965) (Emphasis in bold added throughout this brief.)

*Pennington's* allowance for the admission of evidence of otherwise protected activity has been applied in a variety of circumstances. For example, in *Mason v. Texaco, Inc.,* 741 F.Supp. 1472, 1499-1500, 31 Fed. R. Evid. Serv. 97 (D.Kan.1990), aff'd (10th Cir. 1991), 948 F.2d 1546, a failure to warn action against a benzene manufacturer arising from the plaintiff's benzene-related leukemia, the court excluded evidence that an organization of which the defendant was a member had filed a lawsuit challenging OSHA's efforts to lower workplace exposure limits to benzene. However, quoting the identical passage above from *Pennington*, the court held that evidence of positions taken by the defendant as to the OSHA efforts to change the standard were nevertheless admissible:

> "Contrary to defendant's present assertion, the court never precluded introducing evidence of positions taken by Texaco *individually* with respect to OSHA's efforts to lower the workplace exposure limits to benzene. For several reasons, the court repeatedly rejected defendant's attempts to insulate Texaco's own private actions from scrutiny under the auspices of the *Noerr-Pennington* doctrine.[FN21] First and foremost, Texaco was not a party to the API lawsuit. Thus, defendant's First Amendment right to petition the courts is not implicated by evidence of its own private positions expressed on other persons' lawsuits. Further, even assuming an identity between Texaco and the API, the *Noerr-Pennington* doctrine would have no applicability to this case."

The Court also noted several reasons why the doctrine was inapplicable, and why evidence of the defendant's opposition to the standard was relevant to punitive damages on the failure to warn claim:

> "Accordingly, courts have invoked the doctrine only where the cause of action itself is based on the act of lobbying or filing a lawsuit. *Cf. MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1160 (7th Cir.) (defendant's actions before FCC admissible as evidence of the purpose and character of decisions that were relevant to charges not based on defendant's *1501 first amendment activities), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); Alexander v. National Farmers Org.,* 687 F.2d 1173, 1196 (8th Cir.1982) (exempt conduct may be considered to the extent it tends to show purpose or character of nonexempt activity); *Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530, 543 n. 7 (5th Cir.1978) (evidence of activity protected by Noerr doctrine admissible to show purpose and character of other non-protected activity if not unduly

3

prejudicial), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). **Because plaintiff's claim of failure to warn adequately is based on actions other than the API lawsuit, evidence of Texaco's own position regarding this lawsuit does not fall within the proscriptive sweep of *Noerr-Pennington.***

..... **As to Texaco's own individual actions, however, Texaco's express opposition to this standard, in light of its purported knowledge of the necessity of a 1 ppm limit, would indicate a conscious indifference for workplace safety relevant to the issue of punitive damages."** Id. at 1500-1501.

In *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1160 (7th Cir.), an antitrust action, the court cited the same quote from *Pennington* in holding that evidence of the defendant's actions before the FCC was admissible to show the purpose and character of its business decisions which were relevant to charges not based on protected activities:

> **"MCI referred to AT & T's actions before the FCC only as evidence of the purpose and character of business decisions which had already been made and which were relevant to charges other than the filings of state tariffs.** "Evidence of activity that is protected by the *Noerr* doctrine may be admitted to show the purpose and character of other activities if doing so is not overly prejudicial to the defendants." (citations) We find no error in the district court's refusal to give a general *Noerr-Pennington* instruction."

Similarly, in the present case, even if Merck could credibly argue that the documents it is asking the Court to exclude were in fact evidence of protected activity, (which they are not), the evidence would still be admissible to show the purpose and character of Merck's nonexempt conduct relating to its marketing of Vioxx, its failure to warn, the inadequacy of its warnings, and its intention and motives to conceal, downplay and minimize knowledge of the risks of Vioxx. The evidence which Merck seeks to exclude demonstrates that for purely financial reasons, Merck was working to keep the VIGOR language in the precautions section of its Vioxx labels instead of the warnings section, in order to bring in an additional $2.5 billion dollars over 5 years. That is why Dr. Scolnick referred to the label as "ugly cubed." (Exhibit 1002, attached.)[2]

The FDA had no knowledge of Merck's financial analysis, nor Merck's attitudes and motives. However, the documents, including those which Merck argues are protected, demonstrate why Merck

---

[2] On March 19, 2007 counsel for Merck e-mailed counsel for Plaintiff a list of five exhibits which it expects its motion on *Noerr-Pennington* to cover, indicating there may be more. Those exhibits, Nos. 1001, 1104, 1002, 1058 and 1128, are attached herewith. A cursory examination reveals that although they relate to and reference Merck's actions with respect to the FDA, none are actual communications with the FDA, but rather, internal Merck communications.

4

misled the February 2001 FDA Advisory Committee, and withheld the Shapiro meta-analysis which showed greater than a 2.0 risk for heart attacks. They demonstrate why, when the FDA recommended a warning label, Merck had already done a financial analysis and made a business decision to defeat it. This evidence is entirely relevant to and probative on the purpose and character of Merck's unprotected conduct, including its motives and its conscious disregard for safety. (*Mason*, supra.)

### 3. THE DOCTRINE DOES NOT APPLY WHERE A PARTY HAS MADE DELIBERATELY FALSE STATEMENTS TO A GOVERNMENT AGENCY

Where a party has made deliberately false statements to the government the doctrine does not apply. See e.g. *Whelan v. Abell*, 48 F.3d 1247, 1253-55 (D.C.Cir.1995)(*Noerr-Pennington* doctrine did not bar tort claims based on filing of lawsuit and submissions to state securities officials where it was alleged that the defendants had made deliberately false statements.)("However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods. "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport*, 404 U.S. at 513, 92 S.Ct. at 613; see also *PREI*, 508 U.S. at ---- n. 6, 113 S.Ct. at 1929 n. 6... ") As the court stated in *Whelan*:

> "In a decision four years after *Noerr* and months after *Pennington*, the Court said, without discussion of either case, that a firm could not invoke a patent as a defense to antitrust charges if it "obtained the patent by knowingly and willfully misrepresenting facts to the Patent Office." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). And we said in *Federal Prescription Serv., Inc. v. American Pharmaceutical Ass'n*, 663 F.2d 253, 263 (D.C.Cir.1981), "Attempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of *Noerr*."

See also *National Flood Services, Inc. v. Torrent Technologies, Inc.*, Slip Copy, 2006 WL 1518886, *8 (W.D.Wash. 2006)(On counterclaim alleging anticompetitive strategies to monopolize and restrain competition in the flood insurance market, doctrine did not apply to copyright registration which described business model and its planned technology, where counter-claimant alleged that copyright registration was obtained by making fraudulent representations to the U.S. Copyright Office):

5

"... ***Noerr*** *does not apply* **where a fraud has been alleged.** *See Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1261 (9th Cir.1982) (**"[T]he fraudulent furnishing of false information to an agency in connection with an adjudicatory proceeding can be the basis for antitrust liability,** if the requisite predatory intent is present and the other elements of an antitrust claim are proven."). For the purposes of this motion, the Court takes Defendants' allegations, as to the fraud committed upon the United States Copyright Office by Plaintiffs, as true. Thus, Plaintiffs' fraudulent registration of the copyright is not immune from antitrust liability under the *Noerr-Pennington* doctrine."

Here, in connection with its representations to the FDA, Merck made deliberately false statements in order to keep the risks of Vioxx minimized on the label and in the medical community. This is just one more reason why Merck's conduct in obtaining the approval of Vioxx and its activities in connection with the label, are not protected by the *Noerr-Pennington* doctrine.

### 4. THE DOCTRINE DOES NOT APPLY WHERE THE DEFENDANT IS SEEKING APPROVAL FROM A REGULATORY BODY, AND IS NOT REQUESTING A MODIFICATON OR CHANGE IN THE LAW.

The *Noerr-Pennington* doctrine protects petitioning or lobbying efforts seeking a modification or change in the law. However, it is limited in scope and does not extend to conduct which does neither, such as a business entity seeking approval of proposals it makes to a government regulatory agency. *United States v. Title Ins. Rating Bureau of Arizona* (D. Ariz. 1981) 517 F. Supp. 1053, 1060, aff'd, (9th Cir. 1983) 700 F.2d 1247, cert. denied, (1984) 467 U.S. 1240 (**"This Court views the Doctrine as one which protects activities undertaken to modify or change the laws, whether laws were promulgated by the legislature or a regulatory agency.** The defendants' attempt to shoehorn rate filings, which are required by law to be done, into a protected activity, misapprehends the caselaw and the underlying policy. The mere filing of something required by law does not in any way invoke the right to petition. The defendants' filing of its rates is not an attempt by an individual or entity to employ the democratic process in order to effectuate change; it is mere compliance with the law.")

The court in the *Title Insurance, supra,* relied on the Supreme Court's decision in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 601-602, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1979), an antitrust action brought by the owner of drugstore which sold electrical light bulbs, alleging that an electric utility had damaged him in his business by distributing free light bulbs to residential subscribers in exchange for burned-out bulbs. The defendant utility sought protection under the *Noerr-Pennington* doctrine, arguing

6

that the Commission's approval of its proposal relating to light-bulb marketing practices exempted it from

liability.  However, the Supreme Court rejected this argument:

> **"Moreover, nothing in the Noerr opinion implies that *602 the mere fact that a state regulatory agency may approve a proposal included in a tariff, and thereby require that the proposal be implemented until a revised tariff is filed and approved, is a sufficient reason for conferring antitrust immunity on the proposed conduct.** The passage quoted in the dissent, Post, at 3132, sets up an assumed dichotomy between a restraint imposed by governmental action, as contrasted with one imposed by private action, and then cites United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, and Parker for the conclusion that the former does not violate the Sherman Act.[FN44] That passing reference to Parker sheds no light on the significance of **state action which amounts to little more than approval of a private proposal.** It surely does not qualify the categorical statement in Parker that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S., at 351, 63 S.Ct., at 314. Yet **the dissent would allow every state agency to grant precisely that immunity by merely including a direction to engage in the proposed conduct in an approval order."**

Similarly, under *Cantor* Merck is not entitled to the protection of *Noerr-Pennington* here, when it

was seeking neither a change nor a modification of FDA regulations. Its filings were required by law and

the proposals it made to the FDA were part and parcel of its obligations.  Approval of Merck's proposals

regarding its labels is not the equivalent of petitioning the government "with respect to the passage or

enforcement of laws," and Merck is not entitled to the protections of the doctrine.


5.   **THE DOCTRINE DOES NOT APPLY WHERE THE ACTION IS BASED ON CONDUCT OTHER THAN PETITIONING OR LOBBYING THE GOVERNMENT**

Even in cases where protected petitioning activity is actually present, the *Noerr-Pennington* doctrine is

only applied to defeat a claim which is based solely upon the protected conduct. See e.g. *Premier Medical*

*Management Systems, Inc. v. California Ins. Guarantee* 136 Cal.App.4th 464, 479, 39 Cal.Rptr.3d 43

(Cal.App. 2 Dist.2006)(Action by management company against insurers and employers, was barred by the

*Noerr-Pennington* doctrine, where the gravamen of action arose from activity of defendants in petitioning

the Workers' Compensation Appeals Board (WCAB) to stay processing of workers' compensation bills and

lien claims by plaintiff, because "[a]ll of the actions which form the basis for the complaint took place in

anticipation of, or during, proceedings before the WCAB.")

7

1    While petitioning activities alone are not actionable, the doctrine does not apply when related

2  conduct is actionable. An example is found in *Snyder v. American Ass'n of Blood Banks* 144 N.J. 269, 676

3  A.2d 1036 (N.J. 1996). In *Snyder* a transfusion recipient who contracted AIDS after receiving blood

4  contaminated with HIV, brought a negligence action against the AABB, a trade association of voluntary

5  blood banks that set standards for blood banks and was "an active member of the FDA's influential Blood

6  Products Advisory Council and advised the FDA on issues concerning the blood industry." Id. at 279. The

7  plaintiff alleged that the association had negligently enhanced the recipient's risk of contracting AIDS by

8  failing to recommend surrogate testing of donors. Appealing from a judgment for the plaintiff, the

9  defendant asserted the *Noerr-Pennington* doctrine. However, the Court of appeal affirmed:

10

11    "We need not determine whether the *Noerr-Pennington* doctrine extends beyond antitrust
      law to tort liability. The AABB's liability does not rest on its right to petition government.

12    The jury found that the AABB was negligent for failing to recommend that its member banks
      adopt surrogate testing, and not for the AABB's lobbying efforts or its participation on the

13    FDA Blood Products Advisory Board. In brief, the *Noerr-Pennington* doctrine does not
      apply." (Id. at 1050.)

14

15    Similarly, the basis of Plaintiff's causes of action is not a failure to warn the FDA, nor a fraud-on-

16  the-FDA claim. Merck's contacts with the FDA are relevant to but not the basis for Plaintiff's claims.

17  Evidence of how Merck has interacted with the FDA and made representations and proposals to the FDA

18  in connection with its marketing and labeling is highly probative, and does not implicate Merck's right to

19  petition the government, nor does it give rise to *Noerr-Pennington* protection.

20                                      **CONCLUSION**

21    Based upon the foregoing, Merck's motion to preclude the admission of evidence under the Noerr-

22  Pennington doctrine should be denied, and any such objection should be overruled.

23  DATED: March 21, 2007                        ROBINSON, CALCAGNIE & ROBINSON

24

25                                      By: _____
                                            MARK P. ROBINSON, JR.
26                                          KEVIN F. CALCAGNIE
                                            CARLOS A. PRIETTO, III
27                                          Attorneys for Plaintiff
                                            LOWELL BERWICK
28

**Cannuscio, Carolyn C**

| | |
|---|---|
| **From:** | Guess, Harry A |
| **Sent:** | Tuesday, February 13, 2001 12:43 AM |
| **To:** | Watson, Douglas J.; Rhodes, Thomas; Cannuscio, Carolyn C; Holmes, Richard; Ramey, Dena Rosen; Cei, Bing |
| **Cc:** | Williams, George W (U.S.); Santanello, Nancy C. |
| **Subject:** | passing along a note of thanks from last week |

Hi Folks,

I wanted to thank all of you again for the tremendous effort all of you put into the VIOXX Adv Com Mtg. Our efforts were appreciated.

Harry


-----Original Message-----

| | |
|---|---|
| **From:** | Scolnick, Edward M. |
| **Sent:** | Thursday, February 08, 2001 9:10 PM |
| **To:** | Greene, Douglas Dr.; Reicin, Alise S.; Nies, Alan S.; Guess, Harry A; Shapiro, Deborah R.; Simon, Thomas |
| **Subject:** | Today |

To ALL: I bit my nails all day. You all were FANTASTIC. You made them look like grade d high school students and you won big huge and completely. You should be proud happy and .... exhausted. enjoy and bask in the warmth of having done an impossible job superbly/ Ed

P1.0001

EXHIBIT 1001

MRK-ACT0018064

FAC Resp. Exhibit B -- 2175

**Anstice, David W.**

| | |
|---|---|
| From: | Scolnick, Edward M. |
| Sent: | Tuesday, October 16, 2001 12:06 AM |
| To: | Anstice, David W. |
| Subject: | RE: vioxx label |

it is ugly cubed. thye are bastards

-----Original Message-----
From: Anstice, David W.
Sent: Monday, October 15, 2001 6:32 PM
To: Scolnick, Edward M.
Subject: RE: vioxx label

Ed, Thanks.I just received a copy 5 minutes ago and will digest tonight. We knew it would be UGLY and it is. We'll fight back and see where we get. I agree that we should ask for an advisory committee if necessary.  David

-----Original Message-----
From: Scolnick, Edward M.
Sent: Monday, October 15, 2001 6:02 PM
To: Anstice, David W.
Subject: vioxx label

*David  Be assured we will not accept this label. if we need to we will ask to go to an advisory committee meeting/Ed*

Wendy +

RECEIVED
OCT 17 2001
WENDY L. DIXON

Legal hold

P1.0002

1

EXHIBIT 1002

Confidential - Subject To Protective Order

MRK-ABW0004799

FAC Resp. Exhibit B -- 2176

To:        Goldmann, Bonnie J; Greene, Douglas Alan; Kim, Peter S
From:      Scolnick, Edward M.
Cc
Bcc:
Date:      2002-02-25 19:05:32
Subject:   Vioxx label

To ALL: If you get this label it will be an Al Michaels quote: " Do you believe in miracles?" But a 2002 version.Just plain terrific!/ Ed

EXHIBIT 1058

P1.0305

MRK-ACR0009297

FAC Resp. Exhibit B -- 2177

| | |
|---|---|
| **To:** | Greene, Douglas Alan; Goldmann, Bonnie J |
| **From:** | Scolnick, Edward M. |
| **Cc** | Kim, Peter S |
| **Bcc:** | |
| **Date:** | 2001-11-08 13:31:20 |
| **Subject:** | History lesson |

Doug and Bonnie   twice in my life I have had to say to the FDA" That label is unacceptable, we will not under any circumstances accept it." Once when they wanted a black box warning for angioedema in vasotec in 1985 and once in 1989 when Steve Fred wanted a warning about potential colon cancer in the prilosec label. You WILL have to do that on the cardiac warning for Vioxx. I assure you
that you will . And i assure you i will NOT sign off on any lable that had a cardiac warning. the data review yesterday convinces me that we do not have an unsafe drug and I am willing if needed to spend several hours one on one with anyone at the FDA going through the data until they in fact get it/ Ed Scolnick

**EXHIBIT 1104**

**P1.1098**

Confidential - Subject To Protective Order

MRK-AFJ0001537

FAC Resp. Exhibit B -- 2178

| To: | Greene, Douglas Dr.; Nies, Alan S.; Reicin, Alise S.; Goldmann, Bonnie J; Gertz, Barry J. |
|-----|---|
| From: | Scolnick, Edward M. |
| Cc | Slater, Eve; Blois, David W.; McGlynn, Margie G; Anstice, David W. |
| Bcc: | |
| Date: | 2001-01-21 13:59:47 |
| Subject: | Vigor Adv meeting |

To ALL;     I have been stewing about the FDA review of Vigor since reading the document Friday. Doug and I spoke briefly Sat. Morning about it. The more I think about it the more I think we need to change slightly the emphasis of the talks. Not the slides , obviously not the data but what we say.

Let me take you through the logic. (My office is undergoing asbestos repair and I am at home Monday morning before going to a MMD annual meeting in Arizona)

If you want to talk about what i am going to say please call me at home before 10 30 AM

I think it must be stated clearly that we know the dose for RA. 25mg. That at the time we did Vigor we did not know., That it is unfortunate that Vigor came to conclusion before the RA program but that they MUST know-explicitly and not waiting for a question- that the dose for RA is 25mg.Clearly have data ready to show and acknowledge that the fDA has not seen it although i think we should send them the essence of it. A couple of tables and graphs.

Then i think as you go through the prior ulcer data which compares to ibuprofen you emphasize the DOSE RESPONSE curve. WE NOW KNOW THE ANSWER THAT WAS NOT CLEAR WHEN VIGOR WAS DESIGNED. We know that 50mg og Vioxx in 2 ulcer studies is higher than placebo. We know Mk663 at 120 mg is higher than placebo.

Heads in the sand, or hoping for a miracle which will not happen in the fianl endoscopy study will not help.. Thus we point out that it is expected that 50mg will be lower than the SECOND NSAID we tested against in Vigor ie Naproxen since it was lower than ibuprofen for ulcers even at 50mg but it will not be placebo at 50mg. The need now that we have data is to tie the ulcer data to the outcome data. We NOW can do that. By doing that we can introduce the dose response concept. THIS IS ABSOLUTELT VITAL in presenting Vigor to the committee and in a public affairs way.

We gain the following : We emphasize the safety of 12.5mg and 25mg. The benefit risk is clear. we have no appreciable hypertension or edema at 25mg, we have ulcers comparable to placebo, and we have no CV events in the placebo controlled trials including the Alzheimer's trial.We isolate the 50mg data and say THAT WE HAVE PROVEN IF THERE IS DOSAGE CREEP THAT EVEN AT 50MG WE ARE LOWER FOR GI EVENTS THAN NAPROXEN . We point out that since the ulcer data is vs Ibuprofen , and the outcomes data is vs naproxen that we have in fact tested Vioxx vs  TWO NOT ONE NSAID.

This will allow us to argue that the label should reflect  a different statement using the lower doses for Gi safety. for example. Assuming the warning is retained we could get to lump the ulcer data in an intelligent way to the outcomes  which now should be doable. The logic is very tight that we should be able to say: the outcomes were less than naproxen at 50mg Vioxx, the ulcers which are a marker for the outcomes although not one for one, were much lower than another nsaid at 12.5 and 25 mg, Thus across the dosage range this class has  lower risk of GI safety problems than the prior class. getting that bland a statement even retaining the warning would be a big win. BIG. For managed care and the class of drugs, this would be an enormous help. The logic for this approach is sound. we can stand behind it scientifically with integrity. The agency can moan and groan as usual but we can win the argument for this type of statement. But we will not win by couching our statements  and not ebing explicit with the words that describe the data. The MK663 data and the table that shows ll the ulcer endo data is unambiguous.By looking at the data and not relying on our preconceived notions we can now formulate a correct strategy to the meeting and the upcoming round two battle with this group, and win the public affairs war.

As I have said if you want to talk i am at home Monday morning while an asbestos abatement is being finished in my office. I ahve asked Bob Bissett to set up a telecon wed or thur to discuss the Public Affairs handling of Vigor andwe can also talk then. But I plead and urge you to take this approach. I deeply believe we will end up in a horribel situation otherwise/ Ed

P1.1437

EXHIBIT 1128

*Reicin*
EXHIBIT NO. ___
*8. 19. 05*
L. GOLKOW

Confidential   Subject To Protective Order                MRK ABH0018058

03/23/2006 14:42 FAX 2134811554          GIRARDI & KEESE                          ☒002

1    GIRARDI | KEESE
     1126 Wilshire Boulevard
2    Los Angeles, California 90017
     213-977-0211
3    THOMAS V. GIRARDI - BAR NO. 36603
     JAMES O'CALLAHAN - BAR NO. 126975
4    VINCENT CARTER - BAR NO.

5    Plaintiffs' Liaison Counsel

6    ROBINSON, CALCAGNIE & ROBINSON
     620 Newport Center Drive, Suite 700
7    Newport Beach, California 92660
     (949) 720-1288
8    MARK P. ROBINSON, JR. - BAR NO. 054426
     KEVIN F. CALCAGNIE - BAR NO. 108994
9
     On behalf of the Plaintiffs' Executive Committee
10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                   FOR THE COUNTY OF LOS ANGELES

13

14   Coordination Proceeding          )   Case No. JCCP 4247
     Special Title (Rule 1550(b))     )
15                                     )   Assigned to Honorable Victoria Chaney,
     IN RE: VIOXX® CASES              )   Department 324
16   _____          )
                                       )   PLAINTIFFS' BRIEF RE STRICT LIABILITY
17   THIS DOCUMENT RELATES TO ALL      )   FAILURE TO WARN IN PRESCRIPTION
     CASES                             )   DRUG LITIGATION
18                                     )                     April 10, 2006
     Plaintiff,                        )   Date:    ~~March 20, 2006~~
19                                     )   Time:    ~~9:30 a.m.~~ 10:00 AM
     vs.                               )   Dept.:   324
20                                     )   Trial Date: None
     MERCK & COMPANY, INC., a corporation; )
21   McKESSON CORPORATION, a           )
     corporation; DOES 1 to 100,       )
22   PHARMACEUTICAL DISTRIBUTOR        )
     DOES 101 to 200, PHARMACY         )
23   DEFENDANT DOES 201 to 300, inclusive. )
                                       )
24        Defendants.                  )
                                       )
25   _____          )

26

27

28

                                      1

1                          **TABLE OF AUTHORITIES**

2     <u>CASES</u>

3     Brown v. Superior Court (1988) 44 Cal.3d 1049, 1061, 245 Cal.Rptr. 412,
      751 P.2d 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4     Carlin v. Superior Court (1996) 13 C.4th 1104, 1108-1110, 56 C.R.2d 162, 920 P.2d 1347 . . 1, 5, 6

5     Le Francois v. Goel (2005) 35 Cal.4th 1094, 1108, 29 Cal.Rptr.3d 249, 112 P.3d 636 . . . . . . . . . 3

6     Murphy v. E.R. Squibb & Sons, Inc. (1985) 40 Cal.3d 672, 221 Cal.Rptr. 447, 710 P.2d 247 . . 4, 5

7

8     <u>OTHER</u>

9     6 Witkin, Summary 10th (2005) Torts, § 1477, p. 913 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

10    CACI 1205, Judicial Council of California Civil Jury Instructions, Jan. 2006 . . . . . . . . . . . . . . 1, 7

11    Flahavan, Rea & Kelly, CAL. PRAC. GUIDE: PERSONAL INJURY
      (The Rutter Group 2005) 2:595-2:597; 2:687) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

FAC Resp. Exhibit B -- 2181

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        Plaintiffs submit the following brief in support of their request at the status conference of

3    March 20, 2006, that the Court reconsider its Ruling of March 3, 2006, which sustained without

4    leave to amend the Demurrer of the Distributor Defendants to the 1st Cause of Action for Strict

5    Liability - Failure to Warn.  Plaintiffs believe that the order is contrary to established California law,

6    including the California Supreme Court's decision in Carlin v. Superior Court (1996) 13 C.4th

7    1104, 1110, 56 C.R.2d 162, 920 P.2d 1347, in that the order is based upon the incorrect assumption

8    that pharmaceutical manufacturers cannot be held strictly liable for failure to warn.  The law is

9    clearly the opposite, according to authorities which unfortunately were not brought to the Court's

10    attention by either party in the briefing:

11    **"Prescription drug manufacturers are strictly liable for failure to warn."**
        6 Witkin, Summary 10th (2005) Torts, § 1477, p. 913

12

13    "In this case we address the question whether a plaintiff alleging injury from
        ingesting a **prescription drug** can state a claim against the manufacturer for **strict**

14    **liability** and breach of warranty **for failure to warn** about the known or reasonably
        scientifically knowable dangerous propensities of its product.  We conclude that she

15    can."
        Carlin v. Superior Court (1996) 13 C.4th 1104, 1108, 56 C.R.2d 162, 920 P.2d 1347
        (Emphasis in bold added throughout this brief.)

16    **"In prior cases, we have expressly and repeatedly applied a strict liability**

17    **standard to manufacturers of prescription drugs for failure to warn of known**
        **or reasonably scientifically knowable risks.  We merely reaffirm those**

18    **precedents here."**  Id. at 1110

19    **"Strict Liability-Failure to Warn**-Essential Factual Elements
        …To establish this claim, [name of plaintiff] must prove all of the following:

20    1. That [name of **defendant**] [**manufactured/distributed/sold**] the [product]; …[The
        warning must be given to the prescribing physician and must include the potential

21    risks, side effects, or allergic reactions that may follow the foreseeable use of the
        product….

22    …..The last bracketed paragraph should be read only **in prescription product**
        cases…"

23    CACI 1205, Judicial Council of California Civil Jury Instructions, Jan. 2006

24      "**Strict Liability** for Defective Products:  The "strict product liability" theory of
        recovery exposes a broad range of defendants to legal accountability for "defective"

25    products. …Broad range of potential defendants:  The theory permits the imposition
        of tort liability against all those directly in the marketing chain--e.g., **not only**

26    **manufacturers, but also wholesalers, distributors and retailers.**  "Regardless of
        the identity of a particular defendant or his position in the commercial chain, **the**

27    **basis for his liability remains that he has marketed or distributed** a defective
        product.'"

28    Flahavan, et al., CAL. PRAC. GUIDE: PERSONAL INJURY (TRG 2005) 2:595-2:597

1

1

2        **INTRODUCTION**

          The portion of the Court's ruling sustaining without leave to amend the Demurrer of the

3    Distributor Defendants to the cause of action for strict liability for failure to warn, reads as follows:

4        "B.       Strict Liability

5                  In their first cause of action plaintiffs allege strict liability–failure to
          warn–against "Pharmaceutical Distributor Does 101 to 200." (Compl., p. 13.)

6                  Pharmacists cannot be held strictly liable for defects in prescription
          pharmaceuticals or for failure to warn of such defects. (Murphy v. E.R. Squibb &

7        Son., Inc. (1985) 40 Cal.3d 672 [pharmacists not strictly liable because they have no
          discretion to depart from a valid prescription, and strict liability would raise the price

8        of prescription drugs, which is against public policy].)  Neither can manufacturers.
          (Brown v. Superior Court (1988) 44 Cal.3d 1049, 1060-1061 [no strict liability

9        against pharmaceutical manufacturers].)

10                 It would be an anomalous to hold a distributor, who stands between the
          manufacturer and pharmacist in the chain of distribution, to a different standard.

11                 Therefore, the distributor defendants' demurrer to the first cause of action is
          sustained without leave to amend."

12        While the ruling is correct that *Murphy* does not permit strict liability against pharmacists,

13   (who, in addition to being sellers, are service providers), the ruling as to manufacturers and

14   distributors is erroneous and based upon an incorrect statement of the law.  *Brown* precludes only

15   strict liability for *design* defects in prescription drug cases.  It does *not* preclude strict liability for

16   failure to warn against pharmaceutical manufacturers or distributors.  Strict liability for failure to

17   warn is clearly recognized in post-*Brown* decisions involving prescription drugs.  In fact, it is so

18   well-recognized that this same cause of action has been pursued for several years and is part of the

19   Master Complaints in both the Diet Drugs JCCP overseen by Judge Pratt, and the Rezulin JCCP

20   overseen by Judge West, both coordinated proceedings involving prescription drugs.

21        The *Brown* decision is not a model of clarity on the subject, and therefore the fault for the

22   Court's misunderstanding lies in part with counsel for Plaintiffs in failing to bring the authorities

23   cited above to the Court's attention, particularly the *Carlin* decision, which is crystal clear on this

24   issue.  Plaintiffs apologize to the Court for not adequately briefing this issue earlier.  However, if

25   this Court's ruling were to remain in effect, it would essentially eliminate what is the single most

26   important cause of action in this case.

27

28

                                                         2
FAC Resp. Exhibit B -- 2183

1. **UPON ITS OWN MOTION OR THE REQUEST OF ANY PARTY THE COURT MAY RECONSIDER ANY PRIOR ORDER WHICH IT BELIEVES TO BE ERRONEOUS**

Although CCP § 1008 has specific requirements relating to motions for reconsideration, it is not the exclusive method by which a party may seek reconsideration of an order. Even where a party does not seek reconsideration based upon "new or different facts, circumstances, or law," the court still has jurisdiction to reconsider an erroneous ruling, on its own motion or when an error is brought to its attention by a party. As stated by the California Supreme Court in Le Francois v. Goel (2005) 35 Cal.4th 1094, 29 Cal.Rptr.3d 249, 112 P.3d 636:

> "We cannot prevent a party from communicating the view to a court that it should reconsider a prior ruling (although any such communication should never be ex parte). We agree that it should not matter whether the "judge has an unprovoked flash of understanding in the middle of the night" (Remsen v. Lavacot, supra, 87 Cal.App.4th at p. 427, 104 Cal.Rptr.2d 612) or acts in response to a party's suggestion. **If a court believes one of its prior interim orders was erroneous, it should be able to correct that error no matter how it came to acquire that belief. For example, nothing would prevent the losing party from asking the court at a status conference to reconsider a ruling.** (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, supra, § 9:327.8, p. 9(1)-107.) But a party may not file a written *motion* to reconsider that has procedural significance if it does not satisfy the requirements of section 437c, subdivision (f)(2), or 1008. The [112 P.3d 646] court need not rule on any suggestion that it should reconsider a previous ruling and, without more, another party would not be expected to respond to such a suggestion. As one court explained, "were a party to suggest that the court reconsider a motion, the court would have every right to do so, even if that required the party to bring a new motion. In that circumstance, the responding party would not bear the burden of preparing opposition unless the court indicated an interest in reconsideration." (Schachter v. Citigroup, Inc., supra, 126 Cal.App.4th at p. 739, 23 Cal.Rptr.3d 920.)" Id. at 1108-1109.

2. **WITH THE EXCEPTION OF PHARMACISTS, WHO ARE A 'HYBRID' AND PRIMARILY SERVICE PROVIDERS, ALL THOSE DIRECTLY IN THE MARKETING CHAIN, INCLUDING 'NON-MANUFACTURING SELLERS', ARE SUBJECT TO STRICT LIABILITY**

In addition to product manufacturers, non-manufacturers such as sellers and distributors are subject to strict liability for defective products. According to Flahavan, Rea & Kelly, CAL. PRAC. GUIDE: PERSONAL INJURY (The Rutter Group 2005):

> [2:596] General considerations: **Strict product liability is an outgrowth of predominating public policy considerations. The concept is that all those involved in the marketing "enterprise," and who have reaped profits by placing a defective product in the stream of commerce, should bear the costs of injuries caused by that product.** [Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 262, 37 Cal.Rptr. 896, 899]

...

(1) [2:597]  Broad range of potential defendants:  The theory permits the imposition of tort liability against **all those directly in the marketing chain**--e.g., not only manufacturers, but also wholesalers, distributors and retailers. "**Regardless of the identity of a particular defendant or his position in the commercial chain**, the basis for his liability remains that he has marketed or distributed a defective product." [Daly v. General Motors Corp. (1978) 20 Cal.3d 725, 739, 144 Cal.Rptr. 380, 388; see  Peterson v. Super.Ct. (Banque Paribas) (1995) 10 Cal.4th 1185, 1199-1202, 43 Cal.Rptr.2d 836, 844-846; and more detailed discussion at ¶2:662 ff.]

(a) [2:597.1]  Rationale:  **All those involved in the distribution chain** play a part in stimulating consumer demand for the product through advertising and marketing techniques in order to enhance their own profits.  By so doing, they necessarily increase the number of persons exposed to risk of injury from the product.  Having increased the risk, they should bear the burden of resulting injuries. [Bay Summit Community Ass'n v. Shell Oil Co. (1996) 51 Cal.App.4th 762, 771-776, 59 Cal.Rptr.2d 322, 327-330;  LaRosa v. Super.Ct. (Joe Clar & Sons) (1981) 122 Cal.App.3d 741, 756-757, 176 Cal.Rptr. 224, 233]

[2:666] Wholesalers, **distributors**: Any person or entity involved in the **marketing chain between the original manufacturer and the ultimate retail seller is also exposed to strict product liability.** [Barth v. B.F. Goodrich Tire Co. (1968) 265 CA2d 228, 253, 71 CR 306, 321]

Murphy v. E.R. Squibb & Sons, Inc. (1985) 40 Cal.3d 672, 221 Cal.Rptr. 447, 710 P.2d 247, provides an exception to the general rule of strict liability on the part of anyone in the marketing chain.  This is because pharmacists, unlike defendants which only manufacture or only distribute prescription drugs, are primarily providers of a service.  As the court stated in Murphy:

"It seems clear to us that the pharmacist is engaged in a hybrid enterprise, combining the performance of services and the sale of prescription drugs.  It is pure hyperbole to suggest, as does plaintiff, that the role of the pharmacist is similar to that of a clerk in an ordinary retail store.  With a few exceptions, only a licensed pharmacist may dispense prescription drugs, and as indicated above there are stringent educational and professional requirements *679 for obtaining and retaining a license.  A pharmacist must not only use skill and care in accurately filling and labelling a prescribed drug, but he must be aware of problems regarding the medication, and on occasion he provides doctors as well as patients with advice regarding such problems." Id. at 678-679

"If pharmacies were held strictly liable for the drugs they dispense, some of them, to avoid liability, might restrict availability by refusing to dispense*681 drugs which pose even a potentially remote risk of harm, although such medications may be essential to the health or even the survival of patients.  Furthermore, in order to assure that a pharmacy receives the maximum protection in the event of suit for defects in a drug, the pharmacist may select the more expensive product made by an established manufacturer when he has a choice of several brands of the same drug." Id at 680-681

...

4

1     "The fact that a pharmacy may be owned by an enterprise which also deals in
2     ordinary merchandise does not justify the conclusion that it should be held strictly liable when it performs a service." Id at 681

3     Flahavan, et al. explain pharmacists' immunity from strict liability as being based upon the

4 fact that their dominant function is providing a service instead of selling a product:

6     [2:687] Hybrid cases--pharmacists: Pharmacists fall into a more problematic category. They obviously provide a 'service' in the dispensing of prescription drugs. But they are also providers (sellers, in fact) of consumer goods, arguably no different
7     from other retailers in a marketing enterprise; unlike doctors and hospitals (above), they are not 'essentially' service providers. Even so (absent relevant legislation),
8     **strict product liability in these 'hybrid' cases turns on a 'dominant role' test--i.e., whether defendant's dominant role in supplying the product should be
9     characterized as the performance of a service or the sale of a product.** [Murphy v. E.R. Squibb & Sons, Inc. (1985) 40 C3d 672, 221 CR 447]

11     **The 'dominant' function of pharmacists is deemed to be the performance of a service and, therefore, pharmacists are immune from strict product liability** for injuries caused by 'defective' drugs they dispense. [See Murphy v. E.R. Squibb &
12     Sons, Inc., supra (analogizing to blood product manufacturers and looking to legislation describing practice of pharmacy as a 'dynamic patient-oriented health
13     service')]"

15     *Murphy* on its face applies only to pharmacies and pharmacists.  Unlike pharmacies and

16 pharmacists, distributors and manufacturers of prescription drugs which are in the marketing chain

17 are not 'hybrid cases.' Their dominant role is the sale of a product, and they are still subject to the

18 same rules of strict liability.  As will be shown below, in the case of prescription drugs this includes

19 strict liability for failure to warn.

21 **3.  PHARMACEUTICAL MANUFACTURERS AND DISTRIBUTORS ARE NOT
22 SUBJECT TO STRICT LIABILITY FOR DESIGN DEFECTS, BUT THEY ARE SUBJECT
TO STRICT LIABILITY UNDER FAILURE TO WARN.**

23     In Brown v. Superior Court (1988) 44 Cal.3d 1049, 1061, 245 Cal.Rptr. 412, 751 P.2d 470,

24 the California Supreme Court held that strict liability for design defect is not available in a

25 prescription drug action.  However, the Court did not hold that strict liability for failure to warn was

26 unavailable in such a case.  Eight years after *Brown* the California Supreme Court left no doubt on

27 this issue in Carlin v. Superior Court (1996) 13 C.4th 1104, 56 C.R.2d 162, 920 P.2d 1347.  Perhaps

28 the clearest statement of the viability of a cause of action for strict liability for failure to warn in a

prescription drug case is found in 6 Witkin, Summary 10th (2005) Torts, § 1477, p. 913, which discusses *Carlin*:

> "The Anderson analysis was reaffirmed in Carlin v. Superior Court (1996) 13 C.4th 1104, 56 C.R.2d 162, 920 P.2d 1347. Plaintiff brought suit against defendant drug manufacturer for injuries allegedly sustained from side effects of the sleeping pill Halcion, which was prescribed by her physician for several years. Plaintiff claimed that defendant was strictly liable for failure to warn of these known side effects. The trial judge sustained defendant's demurrer without leave to amend, and plaintiff petitioned for mandamus. The Court of Appeal issued the writ, directing the trial judge to overrule the demurrer. Held, affirmed.
>
> **(a) Prescription drug manufacturers are strictly liable for failure to warn.**
> In Anderson, an asbestos case, the court held that manufacturers generally are strictly liable for injuries caused by their failure to warn of dangers known to the scientific community at the time they manufacture and distribute products. There is no sound reason to reject the Anderson strict liability standard in prescription drug cases. California courts have expressly and repeatedly applied a strict liability standard to prescription drug manufacturers for failure to warn of "known or reasonably scientifically knowable" risks. The court merely reaffirms these precedents here. (13 C.4th 1110.)
>
> (b) Knowledge or knowability requirement. Strict liability is not absolute liability; it is not intended to make the **manufacturer or distributor** of a product its insurer. **Actual or constructive knowledge of potential risk or danger is required before strict liability for failure to warn may be imposed. (13 C.4th 1110.) This requirement applies to all products, including prescription drugs. (13 C.4th 1111.)**"

The statements of the California Supreme Court in the *Carlin* decision are equally clear and leave no doubt about the viability of a cause of action based upon strict liability for failure to warn in a prescription drug action:

> "In this case we address the question whether a plaintiff alleging injury from ingesting a prescription drug can state a claim against the manufacturer for strict liability and breach of warranty for failure to warn about the known or reasonably scientifically knowable dangerous propensities of its product. We conclude that she can." Id. at 1108

> "Upjohn Company (hereafter Upjohn), a manufacturer of prescription drugs, urges us to now reject the strict liability standard under Anderson for cases involving failure to warn of known or reasonably scientifically knowable risks from prescription drugs, and adopt a new standard of simple negligence for that industry only. We discern no sound basis for doing so." Id. at 1109

> "Upjohn contends that the Court of Appeal erred in vacating the superior court's order sustaining a demurrer on Carlin's cause of action for strict liability for failure to warn. It argues that California courts have "long refused to expand the scope of

potential liability of prescription pharmaceutical manufacturers beyond traditional negligence principles." Not so. In prior cases, we have expressly and repeatedly applied a strict liability standard to manufacturers of prescription drugs for failure to warn of known or reasonably scientifically knowable risks. We merely reaffirm those precedents here." Id. at 1110

The law could not be any clearer. Strict liability for failure to warn applies in a prescription drug case. This is why manufacturers, distributors and sellers are all included in CACI 1205, the jury instruction on strict liability for failure to warn, which specifically references prescription products:

"1205. **Strict Liabilty-Failure to Warn-Essential Factual Elements**

[Name of plaintiff] claims that the [product] lacked sufficient [instructions] [or] [warning of potential [risks/side effects/allergic reactions]]. To establish this claim, [name of plaintiff]      must prove all of the following:
    1. That [name of **defendant] [manufactured/distributed/sold] the [product];**
    2. That the [product] had potential [risks/side effects/allergic reactions] that were [known] [or] [knowable by the use of scientific knowledge available] at the
        time of [manufacture/distribution/sale];
    3. That the potential [risks/side effects/allergic reactions] presented a substantial danger to users of the [product];
    4. That ordinary consumers would not have recognized the potential [risks/side effects/allergic reactions];
    5. That [name of defendant] failed to adequately warn [or instruct] of the potential [risks/side effects/allergic reactions];
    6. That the [product] was used [or misused] in a way that was reasonably foreseeable to [name of defendant];
    7. That [name of plaintiff] was harmed; and
    8. That lack of sufficient [instructions] [or] [warnings] was a substantial factor in causing [name of plaintiff]'s harm.
    [The warning must be given to the **prescribing physician** and must include the potential risks, side effects, or allergic reactions that may follow the foreseeable use of the product.  [Name of defendant] had a continuing duty to warn physicians as long as the product was in use.]"

The 'DIRECTIONS FOR USE' for 1205 make it clear that it is used in prescription drug cases, noting that "The last bracketed paragraph should be read only in prescription product cases: In the case of prescription drugs and implants, the physician stands in the shoes of the 'ordinary user' …"

//

//

//

7

1

2

3

**CONCLUSION**

Based upon the forgoing, Plaintiffs respectfully request that the Court reconsider its ruling on the Demurrer as to the 1ˢᵗ Cause of Action for Strict Liability-Failure to Warn.

4

5   Dated:_____3 - 17 - 06_____          ROBINSON, CALCAGNIE & ROBINSON

6

7                                        BY: _Mark P. Robinson, Jr._

8                                            MARK P. ROBINSON, JR.
                                             Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Brief re: Strict Liability for Failure to Warn in Prescription Drug Litigation

FAC Resp. Exhibit B -- 2189

1  GIRARDI | KEESE
   1126 Wilshire Blvd.
2  Los Angeles, CA 90017
   (213) 977-0211
3  FAX (213) 481-1554
4  THOMAS V. GIRARDI - BAR NO. 36603
   JAMES G. O'CALLAHAN, STATE BAR NO. 126975
5
6  Plaintiffs Liaison Counsel
7
8
9               SUPERIOR COURT OF THE STATE OF CALIFORNIA
10                         COUNTY OF LOS ANGELES
11  Coordination Proceeding Special Title (Rule 1550(b))
12
13  **This Document Applies to All**          )   CASE NO. JCCP No. 4247
                                              )
14  **VIOXX ® CASES**                         )   Assigned to the Honorable Victoria
                                              )   Chaney, Department 324
15                                            )
                                              )   NOTICE OF RULING
16                                            )
17
18  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:
19      Pursuant to the court's minute order, attached hereto is a copy of the court's revised ruling
20  pertaining to the distributor defendant's demurrer in the above-captioned matter.
    Dated: May 22, 2006
21
                                              GIRARDI AND KEESE
22
23                                  By:   _Jun  6 O'Callahan_
                                          James G. O'Callahan
24                                        Plaintiffs' Liaison Counsel
25
26
27
28

                                    -1-

05/23/2006 10:45 FAX 2134811554          GIRARDI & KEESE                    ☒003

*Vence ETI*

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| DATE: 05/16/06 | | **DEPT.** 324 |
| HONORABLE VICTORIA CHANEY | JUDGE   E. SABALBURO | DEPUTY CLERK |
| HONORABLE #7 | JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| F. ROJAS, C.A. | Deputy Sheriff   NONE | Reporter |

| | | |
|---|---|---|
| JCCP4247 | Plaintiff Counsel | |
| COORDINATION PROCEEDING SPECIAL TITLE RULE (1550 (b)) | Defendant Counsel | |
| VIOXX Cases | | |

RECEIVED
MAY 17 2006
GIRARDI & KEESE

NO APPEARANCES

**NATURE OF PROCEEDINGS:**

REVISED RULING ON SUBMITTED MATTER HEARD APRIL 10, 2006

The Court hereby makes its revised ruling pursuant to the "REVISED RULING ON REQUEST FOR RECONSIDERATION" as signed and filed this date.

On its own motion the court GRANTS reconsideration of its ruling of March 3, 2006 in which it sustained the distributor defendants' demurrer to plaintiffs' cause of action for strict liability--failure to warn. Upon reconsideration, the demurrer is OVERRULED.

Counsel James G. O'Callahan is ordered to serve a copy of the court's ruling on all parties.

CLERK'S CERTIFICATE OF MAILING/
NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served Notice of Entry of the above minute order of 5-16-2006 upon each party or counsel named below by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original entered herein in a separate sealed envelope for each, addressed as shown below with the postage thereon fully prepaid.

Page    1 of    2    DEPT. 324

MINUTES ENTERED
05/16/06
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 05/16/06 | **DEPT.** 324 |

| | | | |
|---|---|---|---|
| HONORABLE VICTORIA CHANEY | JUDGE | E. SABALBURO | DEPUTY CLERK |
| HONORABLE #7 | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| F. ROJAS, C.A. | Deputy Sheriff | NONE | Reporter |

| | | |
|---|---|---|
| JCCP4247 | Plaintiff Counsel | |
| COORDINATION PROCEEDING SPECIAL TITLE RULE (1550 (b)) | Defendant Counsel | |
| VIOXX Cases | | |
| | NO APPEARANCES | |

**NATURE OF PROCEEDINGS:**

Date: 5-16-2006

John A. Clarke, Executive Officer/Clerk

By: _____
             E. Sabalburo

James G. O'Callahan
GIRARDI KEESE
1126 Wilshire Blvd.
Los Angeles, CA 90017

Page    2 of    2    DEPT. 324

┌─────────────────────┐
│ **MINUTES ENTERED** │
│ 05/16/06            │
│ **COUNTY CLERK**    │
└─────────────────────┘

FAC Resp. Exhibit B -- 2192

05/23/2006 10:46 FAX 2134811554          GIRARDI & KEESE                    ☒005

RECEIVED
MAY 1 7 2006
GIRARDI & KEESE

**FILED**
LOS ANGELES SUPERIOR COURT

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

MAY 1 6 2006

JOHN A. CLARKE, CLERK

BY E. SABALBURO, DEPUTY

IN RE VIOXX CASES

CASE NO. JCCP 4247

REVISED RULING ON REQUEST FOR
RECONSIDERATION

Hearing date:        4/11/06

Ruling date:         5/16/06

After considering the moving, opposition and reply papers and the arguments of counsel at the hearing, the court now rules as follows:

**On its own motion the court GRANTS reconsideration of its ruling of March 3, 2006 in which it sustained the distributor defendants' demurrer to plaintiffs' cause of action for strict liability—failure to warn. Upon reconsideration, the demurrer is OVERRULED.**

**I.     INTRODUCTION**

In their first cause of action plaintiffs allege strict liability—failure to warn—against "Pharmaceutical Distributor Does 101 to 200." (Compl., p. 13.) In sustaining the distributor defendants' demurrer to this cause of action the court on March 3, 2006 ruled that

Pharmacists cannot be held strictly liable for defects in prescription pharmaceuticals or for failure to warn of such defects. (*Murphy v. E.R. Squibb &*

-1-

*Sons, Inc.* (1985) 40 Cal.3d 672 [pharmacists not strictly liable because they have no discretion to depart from a valid prescription, and strict liability would raise the price of prescription drugs, which is against public policy].) Neither can manufacturers. (*Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1060-1061 [no strict liability against pharmaceutical manufacturers].) [¶] It would be an anomalous to hold a distributor, who stands between the manufacturer and pharmacist in the chain of distribution, to a different standard.

At a status conference on April 11, 2006, plaintiffs requested that the court sua sponte reconsider the above in light of *Carlin v. Superior Court* (1996) 13 Cal. 4th 1104 (*Carlin*), a case they did not cite in their opposition to the demurrer. In opposition, the distributor defendants argued, as they argued in their demurrer, that exemption of distributors of prescription drugs from the doctrine of strict liability is supported by California case law, public policy, and the Restatement (Third) of Torts.

The court agreed to reconsider the matter, and now reverses its earlier ruling.

## II.    DISCUSSION

### A.    Reconsideration

A court may, on its own motion, reconsider its interim rulings. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094.) A court may also take under advisement a party's request that it reconsider a ruling. (*Id.* at p. 1108.)

### B.    Strict Liability

The parties well know the law of strict liability. A manufacturer may be held strictly liable for injuries caused by a defective product that it knew would not be inspected by the consumer for defects. (*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57.) This is so because a "manufacturer, unlike the public, can anticipate or guard against the recurrence of hazards, [] the cost of injury may be an overwhelming

-2-

1   misfortune to the person injured whereas the manufacturer can insure against the risk and
2   distribute the cost among the consuming public, and [] it is in the public interest to
3   discourage the marketing of defective products." (*Brown v. Superior Court, supra*, 44
4   Cal.3d at p. 1056 (*Brown*).)  Strict liability also applies to retailers (*Vandermark v. Ford
5   Motor Co.* (1964) 61 Cal.2d 256) but not to "'those who sell their services for the
6   guidance of others . . . .'" (*Murphy v. E.R. Squibb & Sons, Inc., supra*, 40 Cal.3d at p. 677
7   (*Murphy*), quoting *Gagne v. Bertran* (1954) 43 Cal.2d 481, 487).

8        There are three types of product defects for which a manufacturer and distributor
9   may be held liable:  Manufacturing defects, design defects, and deficient warnings or
10  instructions. (*Brown, supra*, at p. 1057.)  Though strong policy considerations—
11  protection of consumers and distribution of the cost of injury—support the doctrine of
12  strict liability generally, other policy considerations—including the "public interest in the
13  availability of drugs at an affordable price" (*Brown, supra*, at p. 1063)—militate against
14  applying the doctrine specifically to prescription drugs.

15       In its March 3 ruling the court identified two boundaries in the chain of
16  distribution—the drug manufacturer and the ultimate retailer—where, for policy reasons,
17  the courts have held strict liability not to apply.  The court then reasoned that if strict
18  liability does not apply at the book-ends of distribution, it doesn't apply in the middle.
19  As will be discussed below, the court misapprehended the case law's treatment of the
20  book-ends.

21
22  **C.    California Case Law**
23
24       In its March 3 ruling, *supra*, the court overstated the rule of *Brown* and failed to
25  limit *Murphy* to its rationale.
26       In *Brown*, the court considered whether a manufacturer of prescription drugs
27  could, like other manufacturers, be held strictly liable for injuries caused by its products.
28  After discussing various policy considerations the court held prescription drugs should be
    treated differently from other products.  However, *Brown* did not, as this court stated,

FAC Resp. Exhibit B -- 2195

1   hold that manufacturers of prescription drugs are exempt from strict liability altogether; it

2   held only that they may not be held strictly liable for injuries caused by design defects in

3   their products (*id.* at p. 1065) or by failure to warn of unknowable risks (*id.* at p. 1066.)

4   *Brown* held drug manufacturers *could* be held strictly liable for injuries caused by failure

5   to warn of known or reasonably scientifically knowable risks. (*Id.* at p. 1069.)

6       Thus falls one of the book-ends relied upon by this court in its March 3 ruling, for

7   plaintiff alleges the distributor defendants are subject to liability in the same wise as were

8   the manufacturer defendants in *Brown*—liability for failure to warn of risks about which

9   they knew or reasonably should have known.

10      The other book-end was *Murphy*. There, the court held pharmacists cannot be

11  held strictly liable for defects in prescription pharmaceuticals or for failure to warn of

12  such defects. (*Id.* at p. 681.) Defendants liken themselves to pharmacists and argue

13  *Murphy* exempts them, too, from strict liability.

14      In *Murphy*, the plaintiff asserted that a pharmacy that sells prescription drugs "is in

15  the same position as a retailer of any other consumer product, and that the reasons

16  advanced in *Greenman* and *Vandermark* for imposing strict liability necessarily apply to

17  a pharmacy." (*Murphy*, at p. 676.) The court disagreed, ultimately affirming the trial

18  court's granting of a pharmacy defendant's motion for judgment on the pleadings. (*Id.* at

19  p. 681.)

20      To understand why it did so requires close reading. First, the court noted "[i]t is

21  critical to the issue posed to determine if the dominant role of a pharmacist in supplying a

22  prescription drug should be characterized as the performance of a service or the sale of a

23  product." (*Id.* at p. 677.) "'[T]hose who sell their services for the guidance of others . . .

24  are not liable in the absence of negligence or intentional misconduct.'" (*Ibid.*, citation

25  omitted.) The court surveyed case law, amicus briefs, and the Business and Professions

26  and Health and Safety Codes, ultimately finding that while a "pharmacist is engaged in a

27  hybrid enterprise, combining the performance of services and the sale of prescription

28  drugs" (*id.* at p. 678), "[t]he Legislature must have intended . . . that even though a

-4-

1  pharmacist is paid for the medication he dispenses, his conduct in filling a prescription is

2  to be deemed a service, and . . . is immune from strict liability" (*id.* at p. 680).

3       Thus falls the second book-end relied upon by this court in its March 3 ruling, for

4  the distributor defendants cannot argue their business is, like a pharmacist, to provide a

5  service. They are thus in a position different from that of the pharmacy in *Murphy* and

6  cannot apply its holding to them.

7       The final case on point is *Carlin, supra.* There, after an extensive policy

8  discussion the supreme court affirmed its earlier ruling in *Brown*: A manufacturer of

9  prescription drugs "should bear the costs, in terms of preventable injury or death, of its

10  own failure to provide adequate warnings of known or reasonably scientifically knowable

11  risks." (*Id.* at p. 1117.)

12       No California case law supports defendants' argument that distributors of

13  prescription drugs should not be held strictly liable for injuries caused by their failure to

14  warn of known or reasonably scientifically knowable risks. The only law nearly on point

15  is to the contrary: In general, the strict liability doctrine applies to those in the chain of

16  distribution. (See *Vandermark v. Ford Motor Co., supra*, 61 Cal.2d at pp. 262-263

17  ["Retailers like manufacturers . . . . are an integral part of the overall producing and

18  marketing enterprise that should bear the cost of injuries resulting from defective

19  products."].)

20

21  **D.    Public Policy**

22

23       There being no California case law on point, the distributor defendants argue the

24  public policy considerations discussed and acknowledged in *Brown, Murphy* and *Carlin*

25  require that distributors of prescription drugs not be held strictly liable for injuries caused

26  by their failure to warn of known or reasonably scientifically knowable risks.

27       For the court's present purpose, the important point to take away from *Brown* and

28  *Carlin* is that while for policy reasons prescription drugs are treated differently from

other products, those reasons are not compelling enough to exempt drug manufacturers

-5-

1  from strict liability altogether.  And policy considerations were not the basis of *Murphy's*

2  holding at all.  (After holding that pharmacies provide a service when they dispense

3  prescription drugs, the court speculated as to why "[t]he Legislature may have

4  determined that it is not in the public interest to subject [pharmacies] to strict liability,"

5  (*Murphy*, at p. 680), discussing various possible policy considerations the Legislature

6  could have relied upon.  However, those policy considerations were discussed only

7  insofar as they supported the Legislature's action, not the court's holding, which merely

8  relied upon the Legislature's action.)  There is therefore no California authority for

9  defendants' proposition that public policy requires that distributors of prescription drugs

10  be treated differently from distributors of other products for purposes of strict liability.

11

12  **E.     Restatement**

13

14       Finally, defendants argue the Third Restatement of Torts holds distributors may be

15  held liable only for negligence.

16       At issue is section 6, subdivision (e), Products Liability:

17       A retail seller or other distributor of a prescription drug or medical device is
18       subject to liability for harm caused by the drug or device if:  [¶]  (1) at the time of
         sale or other distribution the drug or medical device contains a manufacturing
19       defect . . . ; or [¶] (2) at or before the time of sale or other distribution of the drug
         or medical device the retail seller or other distributor *fails to exercise reasonable*
20       *care* and such failure causes harm to persons.

21

22  (Rest.3d Torts, Products Liability, § 6, subd. (e), emphasis added.)

23       Missing from this description is the word "only"—though the rule states that a

24  distributor of as prescription drug may be held liable for injuries caused by its failure to

25  exercise reasonable care, it does not state that is the only circumstance in which a

26  distributor may be held liable.  But that is what it means, as evidenced by comment h:

27

28       The rule governing most products imposes liability on wholesalers and retailers
         for selling a defectively designed product, or one without adequate instructions or
         warnings, even though they have exercised reasonable care in marketing the

-6-

product. [Citations.]  Courts have refused to apply this general rule to nonmanufacturing retail sellers of prescription drugs and medical devices and, instead, have adopted the rule stated in Subsection (e).  That rule subjects retailers to liability *only* if the product contains a manufacturing defect or if the retailer fails to exercise reasonable care in connection with distribution of the drug or medical device.  In so limiting the liability of intermediary parties, courts have held that they should be permitted to rely on the special expertise of manufacturers, prescribing and treating health-care providers, and governmental regulatory agencies.  They have also emphasized the needs of medical patients to have ready access to prescription drugs at reasonable prices.

(Rest.3d Torts, Products Liability, § 6, subd. (e), com. h, emphasis added.)

As discussed above, though California cases discuss policy considerations attendant upon the manufacture and distribution of prescription drugs, none has found those considerations to require that actors in the chain of distribution be exempt from strict liability altogether.  (Though in *Murphy* a pharmacy was exempted from strict liability, it was because a pharmacy provides a service, not because public policy requires the exemption.)

The cases considered by The American Law Institute are no different.  The court will survey them:

*Elsroth v. Johnson & Johnson* (S.D.N.Y. 1988) 700 F.Supp. 151 held a manufacturer and retailer cannot be liable in damages for the criminal conduct of unknown third party who tampered with the manufacturer's product post-distribution.

*Jones v. Irvin* (S.D.Ill. 1985) 602 F.Supp. 399 held a pharmacist had no duty to warn a customer that a drug is being prescribed in dangerous amounts, that the customer is being over medicated, or that various drugs in their prescribed quantities could cause adverse reactions.

*Murphy, supra,* held a pharmacy cannot be held strictly liable because in dispensing prescription medications it predominantly provides a service, as opposed to effecting a sale.

*Leesley v. West* (Ill.App.Ct. 1988) 518 N.E.2d 758 held that under the learned intermediary doctrine a drug manufacturer has a duty to warn only prescribing doctors of

-7-

1  the inherent dangers of the drug, not consumers directly, and that a pharmacist should be
2  held to no greater duty than a manufacturer.

3      *Lemire v. Garrard Drugs* (Mich.Ct.App. 1980) 291 N.W.2d 103 held a successor
4  drug store could not be held liable for injuries caused by the predecessor drug store's
5  filling a doctor's prescription.

6      *Parker v. St. Vincent Hosp.* (N.M.App. 1996) 919 P.2d 1104 held public policy
7  favored not imposing strict liability on hospitals for supplying a *defectively designed*
8  implant selected by a physician.  The court reversed the grant of summary judgment on
9  plaintiff's negligence claim, holding the hospital may have a duty to investigate the safety
10 of the implants before supplying them.

11     *Batiste v. American Home Products Corp.* (N.C.Ct.App. 1977) 231 S.E.2d 269
12 noted that under North Carolina law the doctrine of strict liability does not apply to
13 retailers (*id.* at p. 275) and held a druggist is not strictly liable for providing a drug
14 ordered by a physician (*id.* at pp. 275-276).

15     *Coyle v. Richardson-Merrell, Inc.* (Pa. 1991) 584 A.2d 1383 held that public
16 policy requires that a pharmacist not be held strictly liable damages caused because by
17 the pharmacist's failure to provide warnings of the risks of a drug to a patient/consumer.
18 (This case goes one step beyond *Murphy, supra,* but still does not extend the rule to
19 defendant distributors.)

20     *Makripodis v. Merrell-Dow Pharmaceuticals., Inc.* (Pa.Super.Ct. 1987) 523 A.2d
21 374 is to the same effect as *Coyle v. Richardson-Merrell, supra.*

22     *Pittman v. Upjohn Co.* (Tenn. 1994) 890 S.W.2d 425 held a manufacturer and a
23 prescribing physician had only a duty to use reasonable care in giving warnings about an
24 unavoidably dangerous drug.

25     In sum, none of the cases relied upon by the American Law Institute in
26 formulating section 6, subdivision (3) of the Restatement supports the proposition that
27 distributors of prescription drugs (other than pharmacists) should be exempt from strict
28 liability for failure to warn of known or reasonably knowable risks.

-8-

FAC Resp. Exhibit B -- 2200

F.     **Question of First Impression**

Though no California case, no recitation of public policy found in California case law, and no case supporting the Third Restatement of Torts supports the proposition that an exception to the strict liability doctrine should be made for distributors of prescription drugs, no authority prohibits such an exception either, and the proposition that there should be one has its appeal.  Some of the policy considerations applicable to pharmacists may apply to distributors:

> [T]he wide availability of a full range of prescription drugs at economical cost [may] outweigh[] the advantage to the individual consumer of being able to recover for injuries on a strict liability basis rather than to be limited to claims arising from negligence.
>
> If [distributors] were held strictly liable for the drugs they [distribute], some of them, to avoid liability, might restrict availability by refusing to [distribute] drugs which pose even a potentially remote risk of harm, although such medications may be essential to the health or even the survival of patients.  Furthermore, in order to assure that a [distributor] receives the maximum protection in the event of suit for defects in a drug, the [distributor] may select the more expensive product made by an established manufacturer when he has a choice of several brands of the same drug. . . .  "Why choose a new company's inexpensive product, which has received excellent reviews in the literature for its quality, over the more expensive product of an established multinational corporation which will certainly have assets available for purpose of indemnification 10, 20, or 30 years down the line?" [Citation omitted.]
>
> [S]ince the doctor who ordered the drug provided by the [distributor] cannot be held strictly liable for its defects and in some circumstances the manufacturer who created the defect can also escape liability, it would be unfair and burdensome to expose the [distributor] alone to strict liability . . . .

(*Murphy*, *supra*, at pp. 680-681.)

But these considerations are speculative, and the court, being aware of no judicial conclusion on them, will leave their resolution to the Legislature.

Finally, the distributor defendants argue that a distributor who neither created nor tested a drug "has no connection with physicians, certainly knows far less about the drug than does the manufacturer, [] is in no position to independently test or analyze a drug

-9-

1   and/or its labeling," and is "not privy to proprietary and non-public information known to

2   the manufacturers", and therefore cannot reasonably be held strictly liable for failure to

3   warn. (Opp., p. 7.)

4         This argument, too, has its appeal.  But the same can be said of distributors of

5   many products, and with respect to them public policy is well established:

6         [T]the seller, by marketing his product for use and consumption, has undertaken
7         and assumed a special responsibility toward any member of the consuming public
          who may be injured by it; [] the public has the right to and does expect, in the case
8         of products which it needs and for which it is forced to rely upon the seller, that
          reputable sellers will stand behind their goods; [] public policy demands that the
9         burden of accidental injuries caused by products intended for consumption be
10       placed on those who market them, and be treated as a cost of production against
          which liability insurance can be obtained; and [] the consumer of such products is
11       entitled to the maximum of protection at the hands of someone, and the proper
12       persons to afford it are those who market the products.

13   (Rest.2d Torts, § 402A, com. c.)

14        Defendants point to no authority that makes an exception to the doctrine of strict

15   liability for distributors in an industry analogous to the prescription pharmaceutical

16   industry.  This court will not be the first to make such an exception at the pleading stage.

17

18   **In sum:**

19       **On its own motion the court GRANTS reconsideration of its ruling of March**

20   **3, 2006 in which it sustained the distributor defendants' demurrer to plaintiffs'**

21   **cause of action for strict liability—failure to warn.  Upon reconsideration, the**

22   **demurrer is OVERRULED.**

23

24   IT IS SO ORDERED.
      Dated: 5/16/06
25

26

27                           Victoria Gerrard Chaney

28                              Judge

## ELECTRONIC PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1126 Wilshire Boulevard, Los Angeles, California 90017.

On May 23, 2006, pursuant to the Court's Electronic Case Management Order (CMO No. 1),

[ ]     I submitted an electronic version of the following document via file transfer protocol to CaseHomePage.

[X]     I submitted a hard copy of the following document to CaseHomePage by facsimile.

[ ]     I submitted an electronic version of the document via file transfer protocol and a hard copy of the exhibits via facsimile to CaseHome Page.

Notice of Ruling

Executed on May 23, 2006, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Colleen Teeman

-1-

1  Mark P. Robinson, Jr., SBN 054426
    Kevin F. Calcagnie, SBN 08994
2  Ted B. Wacker, SBN 157416
    ROBINSON, CALCAGNIE & ROBINSON
3  620 Newport Center Drive, Suite 700
    Newport Beach, California   92660
4  Tele: 949-720-1288; Fax:  949-720-1292
5
6  Thomas V. Girardi, SBN 36603
    James G. O'Callahan, SBN 126975
7  Vincent J. Carter, SBN 208899
    GIRARDI | KEESE
8  1126 Wilshire Boulevard
    Los Angeles, California  90017
9  Tele: 213-977-0211; Fax:  213-481-1554
10
11  On Behalf of the Plaintiffs'
    Executive Committee
12

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST

| | |
|---|---|
| Coordination Proceedings | )   Case No.: JCCP 4247 |
| Special Title  (Rule 1550(b)) | ) |
| **VIOXX® CASES** | )   Assigned to Honorable Victoria Chaney |
| | )   Department 324 |
| This Document Applies To: | ) |
| | )   [LASC Case Number:  BC359006] |
| | ) |
| | )   **PLAINTIFFS' EXECUTIVE COMMITTEE'S** |
| ALL VIOXX CASES | )   **OPPOSITION TO MOTION OF MERCK FOR** |
| | )   **(1) RECONSIDERATION OF RULING** |
| | )   **REGARDING EX PARTE** |
| | )   **COMMUNICATIONS WITH PLAINTIFFS'** |
| and | )   **PHYSICIANS; AND (2) SANCTIONS** |
| | ) |
| | )   **Hearing Date: August 13, 2007** |
| REBECCA JUREWICZ Plaintiff, | )   **Time:  8:30 a.m.** |
| | )   **Dept:  324** |
| v. | ) |
| | ) |
| MERCK & CO., INC. Defendant. | ) |
| | ) |

i

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2204

1

**TABLE OF CONTENTS**

2    INTRODUCTION ...................................................................................................1

3
4    1.  DEFENSE COUNSEL ARE PROHIBITED FROM INFORMAL EX PARTE
         COMMUNICATIONS WITH A PLAINTIFF'S TREATING PHYSICIANS. ..........................5

5
6    2.  THERE IS NOTHING UNFAIR OR IMPROPER ABOUT ONE PARTY HAVING
         EXCLUSIVE EX PARTE ACCESS TO A PARTICULAR CATEGORY OF WITNESSES,
         INCLUDING A DEFENDANT'S EMPLOYEES AND A PLAINTIFF'S TREATING
7        DOCTORS.............................................................................................................9

8    3.  CALIFORNIA PRACTICE GUIDES GIVE DETAILED RECOMMENDATIONS FOR
         EXTENSIVE PREPARATION OF NON-PARTY WITNESSES PRIOR TO DEPOSITION
9        OR TRIAL TESTIMONY WHERE EX PARTE CONTACT IS NOT PROHIBITED BY
10       PRIVILEGE.........................................................................................................11

11

12   CONCLUSION .....................................................................................................15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

FAC Resp. Exhibit B -- 2205

1

**TABLE OF AUTHORITIES**

2

<u>CASES</u>

3

*Heller v. Norcal Mut. Ins. Co.*, 8 Cal. 4th 30, 41 (1994)...................................................................8

4

*Province v. Center for Women's Health & Family Birth*
     20 Cal.App.4th 1673, 1685, 25 Cal.Rptr.2d 667  (1993) .......................................5, 7

5

6

*Torres v. Super.Ct.* (Daily)
     221 Cal.App.3d 181, 188, 270 Cal.Rptr. 401  (1990) ........................................5, 7-8

7

8

<u>STATUTES</u>

9

Confidentiality of Medical Information Act (Civ.Code, §  56) .............................................8

10

11

<u>OTHER</u>

12

Haning, Flahavan & Kelly, CAL. PRAC. GUIDE: PERSONAL INJURY
     (The Rutter Group 2006) ...................................................................................5, 8

13

14

Jones, Rosen, Wegner & Jones, RUTTER GROUP PRACTICE GUIDE:
     FEDERAL CIVIL TRIALS & EVIDENCE (The Rutter Group 2006) .....................................14

15

16

Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS & EVIDENCE
     (The Rutter Group 2006) ...............................................................................7, 12

17

18

Weil & Brown, CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL (The Rutter Group 2006)..........11

19

20

21

22

23

24

25

26

27

28

FAC Resp. Exhibit B -- 2206

# INTRODUCTION

Merck is back again asking the Court to further alter for the Defendant's benefit what has been the law of discovery and the practice in this state for decades, and to change this Court's prior ruling in these coordinated cases. This time Merck is asking the Court to "reconsider and modify its prior ruling to either: (1) prohibit plaintiffs' counsel from having ex parte contact with treating physicians prior to their discovery depositions; or (2) allow Merck's counsel to have ex parte communications with treating physicians." In addition, Merck is asking the Court to sanction plaintiffs counsel in the *Jurewicz* case and to specially instruct the jury regarding their alleged contact with a treating physician.

It is the Plaintiffs' Executive Committee's understanding that Girardi & Keese will be filing an opposition addressing the specifics of Merck's allegations regarding *Jurewicz*. Therefore this brief, which is filed on behalf of the PEC, will address Merck's motion only to the extent it seeks a ruling which would affect all plaintiffs in the coordinated Vioxx litigation.

The last time it brought this motion, which was in connection with the *Berwick* case, Merck asked that "the Court prohibit both parties from engaging in substantive ex parte contact of any kind with Mr. Berwick's treating and prescribing physicians prior to their deposition." As a fallback position Merck also requested that "should the Court deem such ex parte communications proper," that the Court "allow Merck equal access to the physicians as that afforded plaintiff's counsel." For the Court's convenience, attached as exhibit 1 is a copy of the brief and exhibits filed by the plaintiff in *Berwick v. Merck* several months ago.

The matter was argued on February 14, 2007. Although the Court did place certain restrictions on ex parte contacts by plaintiffs' counsel with respect to the manner in which documents are supplied to physicians, the Court rejected the same arguments Merck is making for the second time here, and denied Merck's alternative requests to prohibit contact by plaintiffs' counsel or to permit contact by defense counsel:

                                    33
"10   All right.  Number one, Mr. Campillo, I
11   respectfully disagree with your motion to limit access
12   to treating physicians, and I believe that and I'm
13   ruling that plaintiff's counsel may have full access

                                    1

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2207

14  to plaintiff's treating physicians and ask them anything
15  regarding the treatment given to the plaintiff, show them
16  any documents, provided that those documents were or are,
17  number one, kept and given to plaintiff's physician at least
18  at the time of the deposition are unmarked, unabridged, in
19  other words, clean copies, unredacted, and as I said before
20  preserved so that there's no confusion later on.
21          Plaintiff does have the burden of proof, and
22  the Question No. 3 on the CACI verdict form where the jury
23  did hang is a good example of the need of plaintiff to
24  understand exactly what it is that the treating doctor
25  thought and knew and would or wouldn't have done.  This is
26  different than the treating doctor in a rear-end accident
27  case where the doctor had nothing to do or arguably had no
28  connection with the mechanism of injury, unless the doctor

                                34
1  happened to be the rear-ender there, but in the Vioxx Cases
2  it's a little different.
3          Defendant does not have an absolute right to
4  interview the doctor ahead of time, "ahead of time" being
5  ahead of the deposition, unless defendant had a demonstrated
6  prior relationship with the doctor, such as a thought
7  leader, somebody that did clinical trials, somebody that
8  they went to for advice, "they went to," that is, Merck went
9  to for advice at that time, and if that is the case then
10  Merck should have access to that doctor as they would any
11  other regular witness.
12          But absent that showing, I do not believe that
13  Merck has a right to discuss the plaintiff with the treating
14  physician prior to the deposition.
15          Mr. Campillo, I think any questions are fair
16  game, but I do agree with you that it would be inappropriate
17  to show the treating physician something that is either
18  abridged with circles all around it, and it would probably
19  be inappropriate to show the physician something like an
20  argument chart, for lack of a better word, like this is
21  what I want you to do, so an outline or something that is
22  lawyer-created, I really don't care if it's from some other
23  source, the New England Journal of Medicine, e-mails sent
24  by Dr. Scolnick, I don't really care what it is.
25          But I think the one thing I would put on
26  this, Mr. Robinson, is since this is not a yet-named --
27  the treating physician is not yet named as an expert, I
28  know that they might be, what is it, a nonretained expert,

                                2

FAC Resp. Exhibit B -- 2208

35

1 I think Mr. O'Callahan taught me that expression, but since
2 the person is not an expert, I think any argument charts,
3 any outlines that are created by the lawyer is probably not
4 appropriate, because I would like to preserve the accuracy
5 of the physician's memory and position as much as possible.
6 And my goal is getting the truth to the jury, Mr. Robinson.
7       So, the motion is denied. "

....

37

10     THE COURT: Mr. Robinson, I'm going to make this
11 quick and dirty.
12     MR. ROBINSON: Okay.
13     THE COURT: Anything that you show a treating
14 physician you need to keep, preserve, give to the defense
15 at least 48 hours ahead of time.
16     MR. ROBINSON: Yes.
17     THE COURT: It has to be unabridged; it cannot be
18 a plaintiff-produced argument chart, for lack of a better
19 wording. All right?
20       I don't know why you'd be giving something to
21 somebody that didn't prescribe Vioxx, though, all this other
22 information, because I think it would be kind of a waste of
23 time. But, you know, if you do it, it's going to come out
24 and I'll deal with it at the time.
25       But I'm not going to say you can't do that.
26 Whatever is necessary to prepare a case.
27       And no, Mr. Campillo, you don't get access
28 ahead of time. Defense does not get access ahead of time."
(Tr. 2/14/07, Exhibit 2 attached.)

The Court's ruling was more than fair to Merck, and in fact, gave the defense more than they are entitled under the law. The Court placed limits on ex parte contact by plaintiffs' counsel, without a quid pro quo granting plaintiffs' counsel similar rights with respect to Merck employees. Nevertheless, consistent with Merck's essential litigation tenet of perpetually revisiting issues and continually chipping away at existing law and procedure, the Defendant is now back for a second bite at this apple. However, since the first time the Court ruled on this issue, nothing has changed which would warrant a further departure from existing law.

3

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2209

1   Merck's argument about "a level playing field" ignores the fundamentals of litigation.   It is
2   important to remember, as this Court noted at the hearing the first time around, that the Plaintiffs have the
3   burden of proof on the issue of warnings causation. They must have ex parte access to discuss these
4   issues with their clients' treating physicians. There is nothing unfair or unduly prejudicial about one party
5   having exclusive informal access to a witness, just as Merck has access to its former and current sales
6   representatives and employees. Certain witnesses will not or cannot voluntarily speak informally with
7   counsel for one side, whether by choice or as a result of a privileged relationship. It is a fact of life in
8   litigation.

9   Merck has already had extensive and long term contact with plaintiffs' physicians in person
10  through its sales representatives, as well as through dear doctor letters, PIRs, conferences, press releases,
11  advertisements and its integrated marketing campaign.   Merck has had unfettered access to physicians
12  and was able to convey to physicians incomplete and biased information about Vioxx, and its
13  interpretation of Vioxx data and studies, exclusively from its perspective for several years without
14  anyone giving physicians a complete picture or the other side of the story.   It is only fair that plaintiffs
15  should and do have the right, under longstanding California law, to show their own doctors what Merck
16  did not, and to engage in discussions with their doctors on the important documents and the issues to
17  which they relate, so they can reflect both sides of these issues, and not just Merck's representations.

18  The Court was correct the first time in denying Merck's requests to prohibit contact by plaintiffs'
19  counsel, and in denying Merck's request to permit ex parte contact by defense counsel. The singular
20  alleged violation in *Jurewicz v. Merck* does not support a departure from the law.   Even assuming
21  arguendo that the Merck's allegations were true, it would not demonstrate that this Court's ruling of
22  February 14 will be violated in the future, nor that the Court's order is impractical or unworkable. Merck
23  has advanced no reason for altering existing law, nor for changing the procedures established by the
24  Court.   Merck is simply exploiting an isolated incident in an attempt to gain another unwarranted
25  advantage over thousands of other litigants.

26
27
28

4

FAC Resp. Exhibit B -- 2210

## 1. DEFENSE COUNSEL ARE PROHIBITED FROM INFORMAL EX PARTE COMMUNICATIONS WITH A PLAINTIFF'S TREATING PHYSICIANS.

California law is straightforward on the issue of defendants communicating with treating physicians outside the scope of discovery. It's prohibited. Merck's renewed requests are still contrary to well established law and practice. Recognized treatises on California personal injury practice and civil trials and evidence specifically caution against ex parte contacts by defense counsel with the plaintiff's treating physicians, as a potentially violative of both statutory privileges as well as rules of ethics.

Contact by defense attorneys with a plaintiff's treating physicians outside the ordinary discovery process is improper and prohibited, irrespective of whether or not the physician has been designated as retained or non-retained. See *Torres v. Super.Ct.* (Daily) (1990) 221 Cal.App.3d 181, 188, 270 Cal.Rptr. 401 (Pretrial communications between defendants and patient's former treating physician, prospective defense expert, must be restricted to formal discovery.) ("While the ex parte interview process may be time efficient and cost effective, we believe Torres's right to ensure no violation of his statutory privilege occurs in an ex parte interview dictates this discovery should be limited to the statutorily mandated manner.").

Moreover, despite Merck's arguments, such contact is prohibited even if the plaintiff has waived the physician-patient privilege by filing suit. *Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1685, 25 Cal.Rptr.2d 667. The subject is discussed at length in Haning, Flahavan & Kelly, CAL. PRAC. GUIDE: PERSONAL INJURY (The Rutter Group 2006):

> (d) [2:37] Caution physician against ex parte communications with defense:
>
> …
>
> But the **treating physicians should also be reminded in writing not to engage in ex parte communications about plaintiff's condition or the injury case with any representative of the defendant. Ex parte interviews outside the presence of the patient's attorney may result in the disclosure of privileged medical information (the physician-patient privilege in personal injury litigation is waived only as to the condition in controversy in the lawsuit; see ¶ 6:75) and could have a "chilling effect" on the physician-patient relationship, hindering further treatment.** [Cf. Cal. State Bar Form. Opn. No. 1975-33]
>
> …

5

FAC Resp. Exhibit B -- 2211

[2:1089] Special concerns re physicians: Additional guidelines apply regarding ex parte contacts with an opposing party's physician.

(a) [2:1090] Ethical ban re consulting physicians: A physician who has consulted with or obtained confidential information from one party in a legal matter ethically should not consult with the opposing party. [See Cal. State Bar Form. Opn., No. 1975-33 (adopting position taken by Inter-Professional Code of Professional Ethics, also approved by California Medical Association)]

(b) [2:1091] Treating physicians: **The physician-patient privilege severely restricts defendant's right to engage a personal injury plaintiff's treating physician in ex parte communications. Even assuming the defense may have a right to call the treating physician as an expert witness for its own case (see ¶ 9:405.2), pretrial communications between the physician and defense representatives must be limited to formal discovery so as to give plaintiff a reasonable opportunity to protect against improper invasion of his or her physician-patient privilege; ...**

Additionally, the defense's ex parte contacts with plaintiff's treating physician regarding the scope of the physician's care may violate the Health Insurance and Portability Accountability Act of 1996 (42 USC § 1320d et seq.), which regulates disclosures by a physician of a patient's health information and, in the litigation context, appears to allow disclosure only pursuant to formal discovery. [See Crenshaw v. Mony Life Ins. Co., supra, 318 F.Supp.2d at 1027-1029; Law v. Zuckerman (D MD 2004) 207 F.Supp.2d 705, 708-711]

...

[2:1093] PRACTICE POINTER: Absent a court order expressly allowing the ex parte communications (¶ 2:1091), any defense ex parte interview with plaintiff's treating physician (other than a physician who is an actual or potential malpractice defendant, above), should proceed only if defense counsel first obtains plaintiff's counsel's express permission. **(As a practical matter, plaintiff's attorney should never give such consent and, at the very least, should permit the informal interview only if he or she is also present.) Otherwise, the defense must utilize normal discovery procedures.** [See Torres v. Super.Ct. (Daily), supra; Cal. State Bar Form. Opn. No. 1975-33]

[6:76.10] Caveat--ethical concerns re ex parte contacts with physician despite privilege waiver/exceptions: Even where, because of a waiver or statutory exception, the physician-patient privilege does not protect otherwise confidential information from compelled disclosure, opposing counsel should avoid ex parte contacts with plaintiff's physician in an attempt to elicit the information.

6

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2212

1    Similarly, Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS &
2    EVIDENCE (The Rutter Group 2006), provides:

> [11:78.7] Limitation re pretrial discovery: To prevent any violation of the
> physician-patient privilege, there should be no ex parte interviews before
> trial between plaintiff's physician and the defendant. Defendant's access to
> the treating physician's opinions should be through deposition proceedings,
> at which plaintiff will have the opportunity to assert the physician-patient
> privilege. [Torres v. Sup.Ct. (Daily), supra, 221 CA3d at 188, 270 CR at
> 405]

8    Merck's arguments are nothing new, and in fact were made the last time it brought this motion.
9    The two cases Merck relies upon do not support its arguments. Merck argues that "California law
10   acknowledges that in personal injury cases such as these, defense counsel may be allowed to meet with
11   treating physicians because plaintiffs have waived the physician-patient privilege by filing their lawsuit,"
12   and cites *Torres v. Sup. Ct. (Daily)*, 221 Cal. App. 3d 181, 185, 188 (1990) However, a closer look at
13   what the court in *Torres* actually said shows that Merck has misread the opinion. The exception the court
14   mentioned was limited to circumstances where the defendant could show that the testimony would not
15   impinge upon the physician-patient privilege, and in any event, *only after formal discovery*:

> "While the ex parte interview process may be time efficient and cost
> effective, we believe Torres's right to ensure no violation of his statutory
> privilege occurs in an ex parte interview dictates this discovery should be
> limited to the statutorily mandated manner.
> ... The trial court is directed to restrict pretrial communications concerning
> this litigation between Goodman and defense representatives to formal
> discovery conducted pursuant to the Code of Civil Procedure in order that
> Torres will have a reasonable opportunity to preclude an improper violation
> of his privilege.   **After such discovery,** if Real Parties show that
> Goodman's expert testimony will not impinge on Torres's physician-patient
> privilege, the trial court may then permit ex parte communications between
> Goodman and Real Parties as may be necessary for trial preparation." Id at
> 188.

25   See also *Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673,
26   1685, 25 Cal.Rptr.2d 667 (Holding that although the plaintiff as in *Torres* had "generally waived the
27   privilege by tendering the very matter at issue," and although the treating doctor's expression of opinions

7

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS, AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2213

1  "do not appear to violate the physician-patient privilege," defense counsel should **avoid ex parte**

2  **communications with physicians before discovery is completed.")**

3      Similarly, Merck cites *Heller v. Norcal Mut. Ins. Co.*, 8 Cal. 4th 30, 41 (1994).  Yet *Heller* is

4  patently distinguishable. There the California Supreme Court found *Torres* inapposite because it did not

5  involve a suit under the Confidentiality of Medical Information Act (Civ.Code, § 56 et seq.), and the

6  physician never testified.  More importantly, the court noted that there is an express statutory exception

7  to the Act for medical malpractice actions:

8          "As we explain, we conclude that because the purpose of the ex parte
        discussions was to assist Norcal in defending the malpractice action against
9          Geis, Yamaguchi (and VPSMG) are exempt from liability under section
        56.10, subdivision (c)(4) (hereafter, section 56.10(c)(4)), which allows
10         health care providers and insurers to conduct ex parte discussions to
        facilitate preparation of a defense to a malpractice action." Id at 35.
11

12

13      Merck incredibly argues that "the evidence Merck's counsel is interested in addressing with the

14  physicians --e.g., information about the doctor's clinical experience with Vioxx, their knowledge of the

15  risks and benefits of Vioxx at a given point in time, and the sources through which they gained this

16  information -- is not subject to any privilege." Merck misses the point entirely. Regardless of the claims

17  of defense counsel as to their intentions to narrow the scope of their inquiry, there is too great a risk that

18  the privilege will be violated.

19      In Merck's "fox guarding the chicken coop" world, where defense counsel and the plaintiffs'

20  physicians will decide on their own where to draw the line, patients will be reluctant to confide in their

21  physicians out of fear that their confidences will be wrongfully disclosed.  This will hinder treatment and

22  have a chilling effect upon the physician-patient relationship.  (Haning, et al., supra at 2:37)  This is

23  precisely why these same arguments have been made and rejected by courts in pharmaceutical litigation

24  time and time again, including this Court.  This is also why the law in California requires that there be no

25  ex parte contact by defense counsel with a plaintiff's treating physicians until *after completion of*

26  *discovery*, and *after a showing that the privilege will not be violated.*

27      These are the Plaintiffs' treating physicians, not Merck's. California law is clear that in order to

28  protect the physician-patient relationship and confidentiality a defendant has no right to communicate

8

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2214

with them under informal or ex parte circumstances.  Merck has cited no evidence which would warrant such an extreme departure from what has been the practice and the law for decades.

### 2. THERE IS NOTHING UNFAIR OR IMPROPER ABOUT ONE PARTY HAVING EXCLUSIVE EX PARTE ACCESS TO A PARTICULAR CATEGORY OF WITNESSES, INCLUDING A DEFENDANT'S EMPLOYEES AND A PLAINTIFF'S TREATING DOCTORS.

Merck argues that "it is fundamentally unfair to permit plaintiffs' counsel to have unbridled ex parte communications with treating physicians while prohibiting Merck from having an equal right of access. "and that [a]t this point, the only fair and meaningful remedy is to stop plaintiffs' counsel from having ex parte communications altogether.  Only then can discovery proceed on a level playing field."

First of all, Merck's request to prohibit contact by plaintiffs' counsel would work an injustice upon thousands of litigants in this coordinated litigation. As the Court recognized last time Merck made these same arguments, the plaintiffs here have a unique burden of proof:

> "21     Plaintiff does have the burden of proof, and
> 22   the Question No. 3 on the CACI verdict form where the jury
> 23   did hang is a good example of the need of plaintiff to
> 24   understand exactly what it is that the treating doctor
> 25   thought and knew and would or wouldn't have done.  This is
> 26   different than the treating doctor in a rear-end accident
> 27   case where the doctor had nothing to do or arguably had no
> 28   connection with the mechanism of injury, unless the doctor
>
>                                    34
>
> 1   happened to be the rear-ender there, but in the Vioxx Cases
> 2   it's a little different." (TR. 2/14/07, Exhibit 2)

Moreover, Merck ignores the fact that the "playing field" has been tilted in its favor for years. Its representatives have had numerous contacts with these doctors.  It is the PEC's understanding that Merck's sales representatives had 275 visits to the physician in *Jerewicz* alone, and had given him over 32,000 samples. Merck has had significant and extensive contacts with this doctor already.

The rule in California, and the predominant rule in the United States for that matter, is that it is impermissible for defense counsel to have ex parte contact with a plaintiff's treating physicians. Likewise the law in California and the predominant law nationally allows ex parte contact by the plaintiffs attorney

9

FAC Resp. Exhibit B -- 2215

1 with the plaintiff's treating doctors. This rule is no more unfair than permitting a defendant's attorney
2 exclusive access to meet and thoroughly prepare a defendant's current employees for deposition. That is
3 likewise common practice, and has been for decades.

4     Merck's argument that there is something inherently unfair about one side having ex parte access
5 to witnesses, ignores a fundamental fact of life in any litigation. Certain categories of non-party
6 witnesses are more accessible to one side than others, or exclusively available to one party for informal
7 contact. Some refuse to meet informally because of an association with a party, others because of a
8 statutorily protected relationship. Either way, the party without access cannot cry foul.

9     Merck complains that "[a]ll of this conduct impedes the search for truth because it gives plaintiffs'
10 counsel the ability to influence a physician's independent recollection of what he or she knew about
11 Vioxx and when, which are crucial facts in these failure-to-warn actions." Merck's argument rests on the
12 erroneous premise that physicians cannot separate what new information they receive from what they
13 already know. It presumes they cannot distinguish documents which they could not possibly have been
14 shown before, and which clearly Merck would not have shown them, from those which they have seen.
15 Additionally, Merck's argument on this point is so generic in nature that it would apply to virtually any ex
16 parte contact with any witness, including contacts by defense counsel with Merck employees.

17     Merck sees nothing unfair about its exclusive access to its current employees, including those
18 unrepresented by counsel, such as lower level employees and detailmen whose testimony is equally
19 critical to the issues in this litigation. Merck, like other drug manufacturers in similar litigation, does and
20 will do everything it can to prevent these individuals from talking to plaintiffs' attorneys, and will
21 prepare them ex parte for their depositions, sometimes in multiple sessions, despite the fact some of these
22 individuals are neither parties, nor persons whose statements, acts or omissions may be binding on the
23 defendant in connection with the matter in dispute. In fact, the potential for influence, if it exists, is
24 certainly much greater where the witness is dependent upon his employer for his livelihood.

25     Ex parte preparation of a non-party witness who cannot or will not talk with an adversary's
26 counsel takes place in virtually any litigation where witnesses exist. It's entirely appropriate. That is why
27 Merck counsel felt comfortable meeting with a Merck employee on no less than nine occasions prior to
28 her deposition in the Vioxx litigation, and with other employees on several occasions prior to theirs.

1 0

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2216

1   Absent a privilege, such as that which prohibits plaintiffs' counsel from meeting with certain employees,

2   it is common practice in state and federal courts to meet with witnesses prior to their testimony, whether

3   preparing for deposition or trial.

**3. CALIFORNIA PRACTICE GUIDES GIVE DETAILED RECOMMENDATIONS FOR EXTENSIVE PREPARATION OF NON-PARTY WITNESSES PRIOR TO DEPOSITION OR TRIAL TESTIMONY WHERE EX PARTE CONTACT IS NOT PROHIBITED BY PRIVILEGE.**

7   Preparation of clients as well as third party witnesses for deposition is a fundamental part of

8   discovery.  It is common practice not only for plaintiff's counsel to meet with the plaintiff's physician to

9   prepare for deposition, but to discuss key documents with them at depositions.   Weil and Brown

10   emphasize preparation of third party deponents in one of their "practice pointers':

> [8:877.1]  PRACTICE POINTER:  This is the reason, of course, **it is so crucially important to spend the time and effort necessary to prepare your clients and witnesses thoroughly before they testify at their depositions!** (Weil & Brown, CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL (The Rutter Group 2006)[1]

15   The treatise gives "practice pointers' on preparing witnesses for deposition, including preparing

16   them for specific questions and discussing how to answer them:

> "=>  [8:705.1]   PRACTICE POINTER--Preparing deponent to testify: Some deponents assume that, because a question is asked, they must give an answer whether it is correct or not. Others react in the opposite manner; if a question makes them the least bit uncomfortable, they resort to "I don't know" or "I don't remember." (Id)

> "Either of these approaches may cause the deponent to be impeached or come across as less than credible at trial. Therefore, **be sure to discuss these matters with your witnesses when preparing them for deposition and caution them against both extremes."**

---

[1]  Weil and Brown even mention time consumption necessitated by preparation of witnesses for deposition as one of the 'disadvantages' of oral depositions. "Time-consuming: The lawyer who will do the questioning has to spend as much time preparing for a deposition as to prepare for examining an adverse witness at trial; e.g., reviewing investigators' reports, witness statements, the pleadings, earlier discovery, etc. **The lawyer whose client or witness is being deposed also has to spend considerable time; e.g., reviewing the same materials and meeting with the client or witness beforehand to prepare for the deposition."** Id at 8:418

---

1    Additionally, both state and federal practice guides in California contain detailed

2 recommendations as to how counsel should prepare witnesses for their trial testimony, including

3 familiarizing the witnesses with key evidence, **and covering themes and elements of the case**, as well

4 as anticipated questions from opposing counsel.  According to Wegner, Fairbank, Epstein & Chernow,

5 CAL. PRAC. GUIDE: CIVIL TRIALS & EVIDENCE (The Rutter Group 2006):

> "[1:265] **Meeting "friendly" witnesses** (including the client, of course)
> **for the purpose of preparing their testimony is an essential ingredient**
> **of trial preparation.**  Following are some of the considerations affecting
> such meetings:
> 1. [1:266] Timing of **Prep Sessions:** Witness preparation should be
> arranged well in advance of the witness' scheduled testimony (several
> weeks or a month is fine). This avoids last-minute pressures, gives the
> witness time to reflect upon the matters covered, and allows for further
> consultation if required.
> => [1:267] **PRACTICE POINTER:** One **meeting may not be enough for**
> **important witnesses!**  It is better to schedule several shorter meetings than
> to attempt to cover everything in a prolonged session. A "brush-up" session
> is also usually required immediately before the witness is called to testify.
> ...
> 3. [1:269] **Preparation vs. Instruction:** It is entirely proper for counsel to
> remind the witness of facts, point out discrepancies or weaknesses in the
> witness' story, and even advise how to answer a question.
> However, counsel must be careful to avoid telling a witness what to say. It
> is both unethical and illegal for an attorney to instruct a witness to give
> false testimony. [See Bus. & Prof.C. §§ 6068(d), 6128(a); CRPC 5-200(B)]
> => [1:270] **PRACTICE POINTER:** Conduct these interviews yourself
> rather than delegating them to an associate. **To assure thorough coverage,**
> **prepare an outline of:**
> --**the specific points the witness will be called upon to establish**
> **(elements of your claim or defense); and**
> --**potential pitfalls and likely cross-examination questions (e.g., prior**
> **inconsistent statements, etc.).**
> ...
> 5. [1:273] **Review Facts of Case: Make sure that percipient witnesses**
> **are familiar with the events they will be asked to testify about**. If
> necessary, take them back to the place where the event occurred and ask
> them to recreate exactly what they saw, heard, etc. Where appropriate, note
> the location of physical objects and approximate distances. Remember that
> their testimony must relate what they recall ... not what someone else told
> them (hearsay).

12

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2218

If you plan to ask the witness to draw a diagram or demonstrate how something happened, tell the witness beforehand and ask him or her to practice doing so.

6. [1:274] **Review Exhibits: The witness should be shown any document or exhibit that he or she may be shown while testifying. The witness must take the time to read and study documents carefully before trial so that he or she will know precisely what the records contain and can refer to them without hesitation at trial.** If the witness will be asked to authenticate records, he or she should be able to testify to how they were prepared and have been maintained.

**Caution:** Documents shown to the witness to refresh his or her recollection may have to be shown to opposing counsel; see discussion at ¶ 9:186.

...

9. [1:277] **How to Respond to Questions:** The client and witnesses should also be given some guidance about how to act on the witness stand...."

Practice guides such as these give detailed recommendations on preparing witnesses for their testimony, and as can be seen, they are not limited to preparing clients.  It is also important to remember that prescribing and treating physicians, in addition to being percipient witnesses, are also experts.  The practice guides also discuss how experts should be prepared for testimony, including review of litigation 'themes,' different opinions under varying facts, and documentary evidence:

[1:281] Additional Matters in Preparing Expert Witnesses: The above matters should be reviewed with expert as well as lay **witnesses. In addition, expert witness preparation should cover the following:**
a. [1:282] Review case theme: **Review your litigation "theme" with the expert so that he or she is aware of what you are trying to establish and where his or her testimony "fits in."**
...

[1:286] **Matters reviewed: Reexamine the documents and other source materials the expert used to arrive at his or her opinion.**
--Review each item of demonstrative evidence the expert will use at trial to educate the jury about the field involved and to better communicate his or her opinion.
. . .

(a) [1:287] **Review opposing experts' depositions and reports:** Ask for your expert's assistance in focusing on critical areas of difference, and in developing proper questions for cross-examination of the opposing expert.
(3) [1:288] **Eliciting expert opinion:**...
Keep in mind that an expert's opinion is only as valuable as the factual premises on which it is based. If the jury disbelieves certain facts, the expert's opinion will probably also be discredited.

13

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2219

**Thus, it is good practice to review alternative versions of the facts and determine what the expert's opinion would be under all the variables.** A decision can then be made as to which premises to stress, and which to drop, during in-court questioning.

11. [1:291] **Rehearse Questioning**: To avoid the witness being caught off guard or "freezing up" on the stand, it is a good idea to practice questioning in the same manner and form expected at trial. I.e., rather than simply ask for a narrative or discussion of the matter, pose the same types of questions you will ask on direct examination.
...
c. [1:295] **Simulated cross-examination:** Wherever possible, witnesses should be exposed to simulated crossexamination on the key points of their testimony: Concentrate particularly on weaknesses in the witness' testimony or on other possible bases for impeachment. Practice such questions until the witness responds readily with credible explanations for all potential areas of attack.[2]

As can be seen, familiarizing a cooperative witness with the issues of the case and documentary evidence is a necessary and fundamental part of preparation for the witness's deposition. Although these recommendations go far beyond what any plaintiff has done or will do in this litigation in terms of preparation, they illustrate the scope of witness preparation that is customary and proper. Despite repeated attempts by Merck in other jurisdictions, the PEC is unaware of any court which has gone along with Merck on its wish list to allow it to contact plaintiffs' physicians ex parte, or to prohibit such contact by plaintiffs' counsel.

---

[2]  The Rutter Group California federal practice guide has similar, and on some issues, identical, advice on preparing witnesses See Jones, Rosen, Wegner & Jones, RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL TRIALS & EVIDENCE (The Rutter Group 2006) 1:245 et seq.

14

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2220

## CONCLUSION

Merck is again pushing the envelope.  Merck has not cited a single California case where a court has limited the scope of pre-deposition communication between a plaintiff's attorney and non-party treating physicians. Yet it obtained such an order last time. Likewise, Merck cannot cite a single case where a California court has permitted pre-deposition ex parte contact by defense lawyers with treating doctors, or prohibited such contact by plaintiff counsel. Yet it what Merck is asking for again.

Despite occasional failed attempts by defendants to change the rules in coordinated pharmaceutical litigation, the law has remained unchanged for decades. Merck will have its opportunity to examine the physicians at each deposition and to present whatever it wants to them at that time. After years of one-sided communication with these physicians, Merck cannot claim it will be prejudiced by complying with longstanding California law and established discovery custom and practice.

Merck is simply repeating the same arguments it made last time and the Court should reject them for the same reasons it did before. This Court has already placed restrictions on plaintiffs counsel, with no reciprocal restrictions upon Merck with respect to its access to its employees. The procedures set by the Court were followed in *Berwick v. Merck*, and there is no reason to change them. *Jurewicz* is an individual case with individual issues which will be addressed by counsel in a separate brief. Regardless of how the Court resolves those issues, *Jurewicz* should not be used as a basis for changing the Court's prior ruling as to all Vioxx plaintiffs.

The Plaintiffs' Executive Committee will do everything necessary to assist the Court in preventing violations of its orders.  However, Merck should not be allowed to exploit a single alleged incident in a single case to the disadvantage of Vioxx plaintiffs throughout California.

DATED: August 7, 2007

ROBINSON, CALCAGNIE & ROBINSON

By:_____
MARK P. ROBINSON, JR.
KEVIN F. CALCAGNIE
TED B. WACKER
On Behalf of the Plaintiffs' Executive Committee

15

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2221

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Robinson, Calcagnie & Robinson, 620 Newport Center Drive, Suite 700, Newport Beach, California  92660.

On the date indicated below, I served the within document as follows:   **PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS**

  X   E-MAIL -  By e-mailing to the following addresses: Ralph Campillo at ralph.campillo@sdma.com; Wendy Tucker at wendy.tucker@sdma.com; Karen Woodward at karen.woodward@sdma.com; and Richard Goetz at RGoetz@OMM.com and James O'Callahan at jgocallahan@girardikeese.com

  X   CASE HOME PAGE – by submitting an electronic version of the above-referenced documents via file transfer protocol to CaseHomePage.  Pursuant to the Court's Electronic Case Managemetn Order (CMO No. 1), service upon all parties listed in the 31st Master Service List is deemed complete when the above-referenced documents have been posted on CaseHomePage.  The 33rd Master Service List is currently available for review on CaseHomePage under the folder Vioxx Service Lists entitled Thirty-Second Amended Master Service List.

  X   MAIL – by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Newport Beach, California, addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Newport Beach, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

     PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

     OVERNIGHT COURIER – by placing the document(s) listed above in a sealed envelope with shipping prepaid, and depositing in a collection box for next day delivery to the person(s) at the address(es) set forth below via Federal Express.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on _August 7, 2007_____, at Newport Beach, California.

_____
Darleen Perkins

16

FAC Resp. Exhibit B -- 2222

1   SERVICE LIST

2   Michael K Brown, Esq.                  Counsel for Defendant:

3   Thomas J. Yoo, Esq.                   MERCK & CO., INC.
REED SMITH LLP

4   355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071

5   Telephone: (213) 457-8000
Facsimile: (213) 457-8080

6

7   Ralph A. Campillo, Esq.

8   Wendy A. Tucker, Esq.
Karen Woodward, Esq.

9   SEDGWICK, DETERT, MORAN & ARNOLD, LLP
801 South Figueroa Street, 18th Floor

10   Los Angeles, CA 90017-5556
Telephone: (213) 426-6900

11   Facsimile: (213) 426-6921

12   Anthony G. Brazil, Esq.                Counsel for Defendant:

13   Megan S. Wynne, Esq.               McKESSON CORPORATION
MORRIS POLICH & PURDY, LLP

14   1055 West 17th Street, 24th Floor
Los Angeles, CA 90017

15   Telephone: (213) 891-9100
Facsimile: (213) 488-1178

16

17   Thomas V. Girardi, Esq.             Plaintiffs' Liaison Counsel

18   James O'Callahan, Esq.
David N. Bigelow, Esq.

19   Vincent Carter, Esq.
GIRARDI & KEESE

20   1126 Wilshire Boulevard
Los Angeles, CA 90017

21   Telephone: (213) 977-0211
Facsimile: (213) 481-1554

22

23

24

25

26

27

28

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2223

1   Mark P. Robinson, Jr., SBN 054426
2   Kevin F. Calcagnie, SBN 08994
    Carlos A. Prietto, III, SBN 166410
3   Ted B. Wacker, SBN 157416
    ROBINSON, CALCAGNIE & ROBINSON
4   620 Newport Center Drive, Suite 700
    Newport Beach, California   92660
5   Tele: 949-720-1288; Fax:  949-720-1292
6
    Attorneys for Plaintiff
7   LOWELL BERWICK
8
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
            FOR THE COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST
10
11
12  Coordination Proceedings          )   Case No.: JCCP 4247
    Special Title  (Rule 1550(b))     )
13  **VIOXX® CASES**                   )   Assigned to Honorable Victoria Chaney,
                                       )   Department 324
14                                     )
    LOWELL BERWICK and CAROLE BERWICK  )
15                                     )   [LASC Case Number:  BC328855]
               Plaintiffs,            )
16  vs.                                )   **PLAINTIFF'S BRIEF RE JURY**
                                       )   **INSTRUCTIONS ON STRICT LIABILITY**
17  MERCK & COMPANY, INC., McKESSON    )   **AND CONCEALMENT PROPOSED B Y**
18  CORPORATION, and DOES 1 THROUGH 100, )  **MERCK**
    inclusive,                         )
19                                     )
                                       )
20             Defendants              )   Trial Date:  April 9, 2007
                                       )
21                                     )
                                       )
22  _____)

23  **INTRODUCTION**

24      Merck's proposed instructions are a paradigm example of how not to prepare jury instructions. In

25  fact, they violate just about every basic rule regarding jury instructions. They are repetitive, they place

26  undue emphasis on Merck's defenses, they are argumentative, and they contain incorrect statements of

27  the law.

28

                                          1

For example, the most obvious problem is Merck's claim that as to the learned intermediary defense "the standard CACI instruction fails to incorporate this doctrine as is necessary for a prescription drug case and Merck's proposed instructions correct the deficiency." This is just wrong. CACI 1205 does in fact specifically provide for a paragraph to be read prescription drug cases to account for the learned intermediary doctrine:

> **"[The warning must be given to the prescribing physician and must include the potential risks, side effects, or allergic reactions that may follow the foreseeable use of the product. [Name of defendant] had a continuing duty to warn physicians as long as the product was in use.]"**

As can be seen, the standard CACI instruction incorporates the doctrine by providing a paragraph for that very reason. Referring to the *Carlin* case, the accompanying Directions for Use make it clear that this is designed specifically for the use which Merck is ostensibly adding in its own repetitive language:

> **"The last bracketed paragraph should be read only in prescription product cases:** "In the case of prescription drugs and implants, the physician stands in the shoes of the 'ordinary user' because it is through the physician that a patient learns of the properties and proper use of the drug or implant. Thus, the duty to warn in these cases runs to the physician, not the patient." (Valentine v. Baxter Healthcare Corp. (1999) 68 Cal.App.4th 1467, 1483 [81 Cal.Rptr.2d 252].)**"**

While the Directions also provide for a slight modification of the definition of "scientific knowledge" in certain cases, to "knowable in light of the generally recognized and prevailing best scientific and medical knowledge available," they do *not* recommend repeating that phrase *four* times in the seven sentences of the instruction, as Merck is attempting to do. Nor do they recommend chanting the phrase "known or reasonably knowable" *five* times in seven sentences, like some magical incantation, as Merck is suggesting the Court do. Apparently Merck is worried the jury might not remember it unless it is in just about every sentence.

Unfortunately for Merck, this is not permissible. According to Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS & EVIDENCE (The Rutter Group 2006):

> " [14:56] Not repetitive: Finally, jury instructions should provide the relevant rules of law generally and avoid singling out or stressing particular evidentiary items or legal theories; otherwise, the court's emphasis of certain facts or issues may cause jurors to attach undue

importance or credibility to the selected matters. [See > Powell v. Bartmess (1956) 139 Cal.App.2d 394, 404, 294 P.2d 150, 156;…"…

"[14:98] Instructions creating undue emphasis:  Instructions that place undue emphasis on particular evidence in the case are also improper since they suggest to the jury that special consideration should be given to those facts. [> Estate of Martin (1915) 170 Cal. 657, 672, 151 P 138, 144; and see > ¶[14:100 re argumentative instructions]"…

"[14:100]  Argumentative instructions:  "Argumentative" instructions are those that, instead of stating rules of law generally, go too elaborately into the facts relied on by one of the parties. Such instructions are improper because they put the court in the position of making an argument to the jury. Moreover, because the instructions emphasize certain facts or theories, the jury may be misled into thinking they are true or extremely important. [See > Fibreboard Paper Products Corp. v. East Bay Union of Machinists (1964) 227 Cal.App.2d 675, 718, 39 Cal.Rptr. 64, 91; > Slayton v. Wright (1969) 271 Cal.App.2d 219, 238, 76 Cal.Rptr. 494, 506]"…

"[14:118]  Repetitious instructions as reversible error:  The giving of repetitious instructions constitutes error when the effect is to unduly emphasize issues, theories or defenses. [> Fibreboard Paper Products Corp. v. East Bay Union of Machinists (1964) 227 Cal.App.2d 675, 718, 39 Cal.Rptr. 64, 91]"

Merck's instructions are contrary to each of these rules, and as will be shown herein, they contain incorrect statements of law as well.  Accordingly, they must be rejected.

## 1. The Proposed Instructions Contain Incorrect Statements of Applicable Law.

The instruction proposed by Merck regarding the essential elements of a strict liability claim (Exhibit "1") has several flaws. First of all, unlike CACI 1205 or even BAJI 9.00.7, it incorporates redundant and superfluous statements  The phrase 'known and knowable' risks is referred to no less than 5 times in 7 sentences, whereas CACI 1205 is designed such that 'known and knowable risks' are referred to only once in describing the elements of the strict liability claim:

PRODUCTS LIABILITY
1205
Strict Liability
Failure to Warn—Essential Factual Elements
[Name of plaintiff] claims that the [product] lacked sufficient [instructions] [or] [warning of potential [risks/side effects/allergic reactions]]. To establish this claim, [name of plaintiff] must prove all of the following:
1. That [name of defendant] [manufactured/distributed/sold] the [product];
2. That the [product] had potential [risks/side effects/allergic reactions] that were [known] [or] [knowable by the use of scientific knowledge available] at

3

the time of [manufacture/distribution/sale];
3. That the potential [risks/side effects/allergic reactions] presented a
substantial danger to users of the [product];
4. That ordinary consumers would not have recognized the potential [risks/side
effects/allergic reactions];
5. That [name of defendant] failed to adequately warn [or instruct] of the
potential [risks/side effects/allergic reactions];
6. That the [product] was used [or misused] in a way that was reasonably
foreseeable to [name of defendant];
7. That [name of plaintiff] was harmed; and
8. That lack of sufficient [instructions] [or] [warnings] was a substantial factor
in causing [name of plaintiff]'s harm.
[The warning must be given to the prescribing physician and must include the
potential risks, side effects, or allergic reactions that may follow the foreseeable use
of the product. [Name of defendant] had a continuing duty to warn physicians as long
as the product was in use.]

Just like CACI 1205, BAJI 9.00.7, the corresponding BAJI instruction on the elements of strict
liability for failure to warn, makes only a single reference to 'known and knowable' risks.

The second problem is that Merck's proposed instruction uses a redundant and erroneous 'cut-off'
date, which ends Merck's duty to warn as of May 8, 2003, the date of first prescription.  This is not the
law in this state.  The continuing duty to warn ran as long as the Plaintiff was using Vioxx.  (See CACI
1205, 8.: "[Name of defendant] had a continuing duty to warn physicians as long as the product was in
use.]")  (This makes sense for the simple reason many physicians took their patients off of Vioxx when
they became aware of its harmful effects which Merck had failed to disclose.)

Third, there is an additional error involved which will create problems similar to those caused by
the verdict form *Arrigale/ Appell*.  The error lies in the use of an incorrect statement of the law regarding
one of the elements. As the Court will recall, the *Arrigale/Appell* special verdict form as modified
contained a question (No. 3) which should not have been used, because it misstated the legal standard in
a case involving proof of a failure to warn claim. Specifically, the question was:

> "3. Would Mr. Appell's prescribing physician, Dr. McAdam, have
> recognized the potential risks or side effects?"

This is an incorrect standard. It erroneously limited the question to the subjective recognition of
the plaintiff's physician. The question, if it was even necessary, (and it was not for the verdict form)
should instead have asked what an *ordinary physician* would have recognized, and not what the

4

plaintiff's specific physicians would have recognized.  The question as unmodified came from question No. 4 in CACI VF-1203, which originally stated:

> "4. Would ordinary consumers have recognized the potential [risks/side effects/ allergic reactions]?"

This is an objective standard based not upon the plaintiff's subjective recognition, but that of the 'ordinary consumer.' (Or, as stated in BAJI 9.00.7, the 'ordinary user.' See also CACI 1205:"4.  That **ordinary consumers would not have recognized the potential [risks/**side effects/allergic reactions]")  This question, which became question No. 3 in the *Arrigale* and *Appell* special verdicts, and which was the subject of some confusion among the jurors, was probably modified with the thought that in a prescription drug action "warnings concerning the drug's properties are **properly directed to the physician rather than the patient.**"  *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1118, 920 P.2d 1347, 56 Cal.Rptr.2d 162.   In a prescription drug action the physician steps in the shoes of the patient and becomes the consumer. ("We are aware of no authority which requires a manufacturer to warn of a risk which is readily known and apparent to **the consumer, in this case the physician**." *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362 [13 Cal.Rptr.2d 811], quoted with approval in *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1354, 920 P.2d 1347, 56 Cal.Rptr.2d 162.)

The duty to warn is owed to the physician and not to the patient.  ("Moreover, in the case of prescription drugs, **the duty to warn runs to the physician, not to the patient.**..." "In the case of medical prescriptions, 'if adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed.'" *Carlin*, supra, at 1116, quoting *Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1062-1061, 245 Cal.Rptr. 412, 751 P.2d 470 and *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 507 P.2d 653.)

As with the objective standard of the 'ordinary consumer,' the adequacy for the physician is judged by the ordinary knowledge common to the medical community.  (See *Carmichael v. Reitz* (1971) 17 Cal.App.3d 958, 989, 95 Cal.Rptr. 381.  "[I]t is the prescribing doctor who in reality stands in the shoes of 'the ordinary consumer.'  Consequently in the situation presented here, it was not error to instruct the jury that Enovid had to be 'dangerous to an extent beyond that which would be contemplated by her

1   physician who purchases it, with the **ordinary knowledge common to the medical community** as to its

2   characteristics.'" See also *Carlin*, supra, at 1118. "Thus, a pharmaceutical manufacturer may not be

3   required to provide warning of a risk **known to the medical community**." Id at 1116.)

4   Therefore, assuming arguendo that it was even necessary to modify the question in the *Appell* and

5   *Arrigale* special verdicts, it should have been directed to whether ordinary physicians would have

6   recognized the potential risks or side effects.   Instead, the question was limited to the plaintiffs'

7   physicians' subjective knowledge, which not only was wrong, but confusing to jurors. While the

8   subjective knowledge of the physician, along with objective evidence of what a reasonable physician

9   would have done, is relevant to the issue of warnings causation, it is irrelevant to the element of proof

10  described in CACI 1205 as "4. That ***ordinary consumers*** would not have recognized the potential

11  [risks/side effects/allergic reactions]…"

12  With its latest instruction Merck has changed its tactics, but it is still misstating the law, in

13  addition to imposing a greater burden upon the Plaintiff than the law specifies. Merck has now added

14  language suggesting that Plaintiff must prove this element both as to ordinary physicians ***and*** Mr.

15  Berwick's prescribing physician so that Plaintiff must now prove: "3. That, as of May 8, 2003, **Mr.**

16  **Berwick's prescribing physician was not aware, nor would a reasonably well-informed physician**

17  **have been aware**, of the potential risks from Vioxx that were known or reasonably knowable in light of

18  the generally recognized and prevailing best scientific and medical knowledge available at the time;…"

19  This is not what the law requires and the instruction as proposed is patently defective.

20  The proposed instruction on concealment contains similar errors. It too is repetitive and uses the

21  initial prescription date of May 8, 2003 as the last date Merck had a duty to warn.  Additionally, the last

22  sentence of CACI 1901 provides: "That [name of defendant]'s concealment was a substantial factor in

23  causing [name of plaintiff]'s harm."  However, Merck instead wants the instruction to say that "Merck's

24  concealment was a substantial factor in Mr. Berwick's physician's decision to prescribe Vioxx to Mr.

25  Berwick on May 8, 2003."  In addition to misstating the law, this elaboration on the critical causation

26  portion of the instruction is both unnecessary and argumentative. No such elaboration was proposed for

27  CACI 1205 in a prescription drug case, and there is no reason to include one in the concealment

28  instruction either.

6

**2. Modification with Additional Redundant Reference to the Plaintiff's Treating Physician Is Unnecessary and Not Contemplated by the Drafters of the CACI Instructions.**

It is easy to see how the confusion came about in *Arrigale/Appell*, both with the proposed instruction as well as the deliberations.  BAJI 9.00.7, the instruction on strict liability failure to warn, which has worked fine for decades, is similar to CACA1205, but has always used the language "ordinary user" instead of "ordinary consumer":

BAJI 9.00.7

"FAILURE TO WARN--ESSENTIAL ELEMENTS

The essential elements of a claim based upon an alleged defect from failure to warn are:
1. The defendant was the [manufacturer] [_____] of a product, namely ___(identify the product)___;
2. The product was defective;
3. The product defect was a cause of injury to the plaintiffs; and
4. Plaintiff's injury resulted from a use of the product that was reasonably foreseeable to the defendant.

A product is defective if the [manufacturer] [_____] of a product of a product has a duty to warn of dangers, and fails to provide an adequate warning of that danger.

[A [manufacturer] [_____] has a duty to warn if 1) the use of the product in a manner that is reasonably foreseeable by the ___(manufacturer, etc.)___ **involves a substantial danger that would not be readily recognized by the ordinary user of the product**, and 2) this danger was known or knowable in light of the generally recognized and prevailing best scientific [and medical] knowledge available at the time of the manufacture and distribution.]

[A manufacturer has a duty to provide an adequate warning to the user on how to use the product if a reasonably foreseeable use of the product involves a substantial danger of which the manufacturer either is aware or should be aware, and that would not be readily recognized by the ordinary user.]

[A manufacturer has a duty to provide an adequate warning to the consumer of a product of potential risks or side effects which may follow the foreseeable use of the product, and which are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution.]

**[In the case of prescription drugs, the warning must be given to the physician.]...**"

7

1    The last sentence of BAJI 9.00.7 also provides a special addition for prescription drug cases,
2    stating, "In the case of prescription drugs, the warning must be given to the physician." However, that
3    addition did not change the objective standard of the 'ordinary user.' This is because the 'user' is the
4    physician, and the adequacy of the warning is tested by the 'ordinary' physician's knowledge.

5    In the analogous CACI instruction, 1205, the words 'ordinary consumers' were substituted for
6    'ordinary user.' Since the 'user' in a prescription drug case is the physician, likewise the 'consumers' are
7    physicians. The setting of a prescription drug case was specifically contemplated in CACI 1205 as well.
8    As with 9.00.7, in CACI 1205 the jury is told that "The warning must be given to the prescribing
9    physician."

10   The drafters of the CACI instructions never intended a modification of the instruction on the
11   elements of a claim to add in the treating physician for the "ordinary consumers." This is evident by the
12   fact that although they specifically inserted an additional provision in CACI 1205 for prescription drug
13   cases to note that the warning must be given to the physician, they made no suggestion for a change in
14   the portion of the instruction which refers to 'ordinary consumers.'

15   The last paragraph addition in the brackets was provided to tell jurors that the warning must be
16   given to the physician and that there is "a continuing duty was to warn physicians." However, CACI
17   does not suggest that as to the 'ordinary consumers' in prescription drug cases the language should be
18   altered, removed, or modified in any way. Nor does it suggest adding to the instruction to increase the
19   burden to the Plaintiff. Likewise, there is no suggestion that a similar addition or modification be made
20   to the CACI verdict form VF-1203 in a prescription drug case.

21
22                                    **CONCLUSION**

23   In addition to superfluous and redundant language highlighting its defenses and imposing an
24   excessive burden of proof, Merck's proposed jury instructions contain patently erroneous statements of
25   law. The extensive and unnecessary wholesale modifications Merck proposes would carry the same
26   potential confusion which hung up the jury in *Arrigale/Appell.*

27   To put it bluntly, Merck is just asking for trouble. Plaintiff suggests that the reasonable approach
28   would be to use CACI 1901 on the deceit cause of action, and either CACI 1205 or BAJI 9.00.7 on the

8

strict liability cause of action. This will avoid needless editorializing, undue repetition, errors of law and argumentative add-ons, and will reduce the risk of error and juror confusion.

DATED: March  28, 2007                           ROBINSON, CALCAGNIE & ROBINSON


By: _____
                    MARK P. ROBINSON, JR.
                    KEVIN F. CALCAGNIE
                    CARLOS A. PRIETTO, III
                    Attorneys for Plaintiff
                    LOWELL BERWICK

9

1  Mark P. Robinson, Jr., SBN 054426
   Kevin F. Calcagnie, SBN 08994
2  Carlos A. Prietto, III, SBN 166410
   Ted B. Wacker, SBN 157416
3  ROBINSON, CALCAGNIE & ROBINSON
   620 Newport Center Drive, Suite 700
4  Newport Beach, California  92660
   Tele: 949-720-1288; Fax:  949-720-1292
5
6
7  Attorneys for Plaintiff
   LOWELL BERWICK

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9        FOR THE COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST

10

11  Coordination Proceedings              )  Case No.: JCCP 4247
    Special Title  (Rule 1550(b))         )
12  **VIOXX® CASES**                      )  Assigned to Honorable Victoria Chaney,
                                          )  Department 324
13                                        )
    LOWELL BERWICK and CAROLE BERWICK     )
14                                        )  [LASC Case Number:  BC328855]
                Plaintiffs,               )
15                                        )  **PLAINTIFF'S BRIEF RE PROPOSED**
    vs.                                   )  **VERDICT FORM**
16                                        )
    MERCK & COMPANY, INC., McKESSON       )
17  CORPORATION, and DOES 1 THROUGH 100,  )
    inclusive,                            )
18                                        )  Trial Date:  April 9, 2007
                Defendants                )
19                                        )
                                          )
20                                        )
                                          )
21                                        )
                                          )
22                                        )
                                          )
23

24

25

26

27

28

PLAINTIFF'S BRIEF RE PROPOSED VERDICT FORM

FAC Resp. Exhibit B -- 2233

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

1.  THE COURT IS NOT REQUIRED TO USE THE CACI FORMS ...........................1

2.  THE PROBLEMS WITH CACI VF-1203 AND THE APPELL/ARRIGALE
    VERDICT FORM...................................................................................................2

    a.   The Verdict Forms in Appell and Arrigale Contained a Modification Based Upon an
         Incorrect Statement of Applicable Law ...........................................................2

    b.   The Modification Regarding the Plaintiff's Treating Physician Was Unnecessary and
         Not Contemplated by the Drafters of the CACI Instructions ...........................4

    c.   Even the Unmodified CACI Verdict Form Adds Undue Complexity and Confusion
         to the Jurors' Deliberations.............................................................................7

3.  THE SOLUTION:  VERDICT FORM BASED UPON BAJI ................................. 10

CONCLUSION ................................................................................................................13

ii

FAC Resp. Exhibit B -- 2234

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Brown v. Superior Court,*

4
    (1988) 44 Cal.3d 1049, 1062-1061, 245 Cal.Rptr. 412, 751 P.2d 470 ........................................4

5
*Carlin v. Superior Court,*

6
    (1996) 13 Cal.4th 1104, 1118, 920 P.2d 1347, 56 Cal.Rptr.2d 162. ......................................3, 4

7
*Carmichael v. Reitz,*
    (1971) 17 Cal.App.3d 958, 989, 95 Cal.Rptr. 381.........................................................................4

8

9
Plenger v. Alza Corp.,
    (1992) 11 Cal.App.4th 349, 362, 13 Cal.Rptr.2d 811 ...................................................................3

10

11
*Stevens v. Parke, Davis & Co.,*
    (1973) 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 507 P.2d 653 ............................................................4

12

13

14
**STATUTES**

15
Cal.Rules of Court, Rule 2.1050(e) ....................................................................................................1

16

17
**OTHER**

18
BAJI 9.00.7 .....................................................................................................................................3, 4, 5

19

20
BAJI 16.11    Form of Special Verdict—Negligence and Products Liability—
               Comparative Fault....................................................................................................8, 12

21
BAJI 16.13    Form of Special Verdict—Products Liability –Warranty ...............................................12

22
BAJI 16.50.1   Form of Special Verdict—Concealment ........................................................................12

23
BAJI 16.50.3   Form of Special Verdict—Negligent Misrepresentation.................................................12

24
BAJI 16.81    Punitive Damages– Bifurcated Trial--Phase I................................................................12

25
BAJI 16.82    Punitive Damages– Bifurcated Trial--Phase II...............................................................12

26

27

28

FAC Resp. Exhibit B -- 2235

CACI VF-1203.................................................................................................................2, 7

CACI 1205 ......................................................................................................................5, 6

Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS &
EVIDENCE (The Rutter Group 2006) ................................................................................2

iv

FAC Resp. Exhibit B -- 2236

### INTRODUCTION

Plaintiff Lowell Berwick respectfully requests that the Court utilize the Plaintiff's Proposed Special Verdict submitted with this brief, which is based upon a combination of several BAJI special verdict forms, rather than the CACI verdict forms. As this Court knows from the experience in the *Arrigale* and *Appell* cases with the verdict form CACI VF-1203, the CACI verdict forms are less than perfect and can lead to confusion. This brief will discuss why:

    a. The Verdict Forms in *Appell* and *Arrigale* Contained a Modification Based Upon an Incorrect Statement of Applicable Law.

    b. The Modification Was Unnecessary and Not Contemplated by the Drafters of the CACI Instructions.

    c. Even the Unmodified CACI Verdict Form Adds Undue Complexity and Confusion to the Jurors' Deliberations.

This brief will also show why the Court should instead utilize a verdict form based upon BAJI, similar to verdict forms used in other pharmaceutical mass torts such as the PPA JCCP and the Vioxx MDL. This approach is much less complex and reduces the risk of incorrect statements of the law, inconsistency between the verdict form and the jury instructions, and juror confusion.

### 1. THE COURT IS NOT REQUIRED TO USE THE CACI FORMS.

It is important to remember that the Court is not required to use the CACI instructions. While their use is 'strongly encouraged,' it is 'recommended' that the judge use applicable CACI instructions **"unless he or she finds that a different instruction would more accurately state the law and be understood by jurors."** See Cal.Rules of Court, Rule 2.1050(e), eff. Jan. 1, 2007. According to

FAC Resp. Exhibit B -- 2237

1  Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS & EVIDENCE (The

2  Rutter Group 2006):[1]

3

4          => [14:58.6]  PRACTICE POINTER:  The CACI instructions, while
           carefully crafted and reviewed by a select Judicial Council advisory
5          committee, are relatively new and there may be some errors. Keep in mind
           that the purpose of the instructions is to restate the law in terms
6          understandable by laypersons, not to make new law. If you have authority
           to demonstrate that a particular instruction is wrong in some respect, that
7          error may be pointed out in aid of a different instruction, which might be
           the BAJI version on the same subject.
8

9

10         It is also important to note that several CACI verdict forms, including VF-1203 state:

11         "DIRECTIONS FOR USE
           The special-verdict forms in this section are intended only as models. They
12         may need to be modified depending on the facts of the case. ...."

13

14  **2. THE PROBLEMS WITH CACI VF-1203 AND THE APPELL/ARRIGALE VERDICT FORM**

15         There are at least three problems with the verdict form used in *Arrigale* and *Appell*, a modified

16  version of VF-1203.  (Exhibit 1)  First of all, it contained a question which was based upon an incorrect

17  statement of the applicable law. Secondly, the modification was unnecessary and not contemplated by the

18  drafters of CACI, who apparently felt that the subject of the modification was already covered by an

19  addition to CACI 1205, the underlying instruction on strict liability failure to warn. Finally, even without

20  the modification, the CACI VF-1203 verdict form adds undue complexity to the jurors' deliberations.

21

22         **a.  The Verdict Forms in Appell and Arrigale Contained a Modification Based Upon an**

23             **Incorrect Statement of Applicable Law.**

24

25

26  _____

27  [1]  Emphasis throughout this brief added unless otherwise indicated.

28

1  The *Arrigale* and *Appell* special verdict form as modified contained a question (No. 3) which

2  should not have been used, because it misstated the legal standard in a case involving proof of a failure to

3  warn claim. Specifically, the question was:

4

5      "3. Would Mr. Appell's prescribing physician, Dr. McAdam, have
       recognized the potential risks or side effects?"(Exhibit 1)

6

7  This is an incorrect standard. It erroneously limits the question to the subjective recognition of the

8  plaintiff's physician. The question, if it was even necessary, (and it was not) should instead have asked

9  what an *ordinary physician* would have recognized, and not what the plaintiff's specific physicians

10  would have recognized.  The question as unmodified came from question No. 4 in CACI VF-1203, which

11  originally stated:

12      "4. Would ordinary consumers have recognized the potential [risks/side
       effects/ allergic reactions]?"

13

14  This is an objective standard based not upon the plaintiff's subjective recognition, but that of the

15  'ordinary consumer.' (Or, as stated in BAJI 9.00.7, the 'ordinary user.' See also CACI 1205:"4. That

16  **ordinary consumers would not have recognized the potential [risks/side effects/allergic reactions]"**)

17  This question, which became question No. 3 in the *Arrigale* and *Appell* special verdicts, and which was

18  the subject of some confusion among the jurors, was probably modified with the thought that in a

19  prescription drug action "warnings concerning the drug's properties are **properly directed to the**

20  **physician rather than the patient.**" *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1118, 920 P.2d

21  1347, 56 Cal.Rptr.2d 162.   In a prescription drug action the physician steps in the shoes of the patient

22  and becomes the consumer. ("We are aware of no authority which requires a manufacturer to warn of a

23  risk which is readily known and apparent to **the consumer, in this case the physician.**" *Plenger v. Alza*

24  *Corp.* (1992) 11 Cal.App.4th 349, 362 [13 Cal.Rptr.2d 811], quoted with approval in *Carlin v. Superior*

25  *Court* (1996) 13 Cal.4th 1104, 1354, 920 P.2d 1347, 56 Cal.Rptr.2d 162.)

26  The duty to warn is owed to the physician and not to the patient. ("Moreover, in the case of

27  prescription drugs, **the duty to warn runs to the physician, not to the patient**...." "In the case of

28  medical prescriptions, 'if adequate warning of potential dangers of a drug has been given to doctors, there

3

FAC Resp. Exhibit B -- 2239

1  is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the

2  drug is prescribed.'" *Carlin*, supra, at 1116, quoting *Brown v. Superior Court* (1988) 44 Cal.3d 1049,

3  1062-1061, 245 Cal.Rptr. 412, 751 P.2d 470 and *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65,

4  107 Cal.Rptr. 45, 507 P.2d 653.)

5      As with the objective standard of the 'ordinary consumer,' the adequacy for the physician is

6  judged by the ordinary knowledge common to the medical community.  (See *Carmichael v. Reitz* (1971)

7  17 Cal.App.3d 958, 989, 95 Cal.Rptr. 381.  "[I]t is the prescribing doctor who in reality stands in the

8  shoes of 'the ordinary consumer.'  Consequently in the situation presented here, it was not error to instruct

9  the jury that Enovid had to be 'dangerous to an extent beyond that which would be contemplated by her

10  physician who purchases it, with the **ordinary knowledge common to the medical community** as to its

11  characteristics.'" See also *Carlin*, supra, at 1118. "Thus, a pharmaceutical manufacturer may not be

12  required to provide warning of a risk **known to the medical community**." Id at 1116.)

13      Therefore, assuming arguendo that it was even necessary to modify the question in the *Appell* and

14  *Arrigale* special verdicts, it should have been directed to whether ordinary physicians would have

15  recognized the potential risks or side effects.   Instead, the question was limited to the plaintiffs'

16  physicians' subjective knowledge, which not only was wrong, but confusing to jurors.

17

18      **b.  The Modification Regarding the Plaintiff's Treating Physician Was Unnecessary and**

19          **Not Contemplated by the Drafters of the CACI Instructions.**

20

21      It is easy to see how the confusion came about, both with the proposed instruction as well as the

22  deliberations.  BAJI 9.00.7, the instruction on strict liability failure to warn, which has worked fine for

23  decades, is similar to CACA1205, but has always used the language "ordinary user" instead of "ordinary

24  consumer":

25

26          BAJI 9.00.7

27          "FAILURE TO WARN--ESSENTIAL ELEMENTS

28          The essential elements of a claim based upon an alleged defect from

4

failure to warn are:

    1. The defendant was the [manufacturer] [_____] of a product, namely ___(identify the product)___;

    2. The product was defective;

    3. The product defect was a cause of injury to the plaintiffs; and

    4. Plaintiff's injury resulted from a use of the product that was reasonably foreseeable to the defendant.

    A product is defective if the [manufacturer] [_____] of a product has a duty to warn of dangers, and fails to provide an adequate warning of that danger.

    [A [manufacturer] [_____] has a duty to warn if 1) the use of the product in a manner that is reasonably foreseeable by the ___(manufacturer, etc.)___ **involves a substantial danger that would not be readily recognized by the ordinary user of the product,** and 2) this danger was known or knowable in light of the generally recognized and prevailing best scientific [and medical] knowledge available at the time of the manufacture and distribution.]

    [A manufacturer has a duty to provide an adequate warning to the user on how to use the product if a reasonably foreseeable use of the product involves a substantial danger of which the manufacturer either is aware or should be aware, and that would not be readily recognized by the ordinary user.]

    [A manufacturer has a duty to provide an adequate warning to the consumer of a product of potential risks or side effects which may follow the foreseeable use of the product, and which are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution.]

    **[In the case of prescription drugs, the warning must be given to the physician.]…"**

The last sentence of BAJI 9.00.7 also provides a special addition for prescription drug cases, stating, "In the case of prescription drugs, the warning must be given to the physician." However, that addition did not change the objective standard of the 'ordinary user.' This is because the 'user' is the physician, and the adequacy of the warning is tested by the 'ordinary' physician's knowledge.

In the analogous CACI instruction, 1205, the words 'ordinary consumers' were substituted for 'ordinary user.' Since the 'user' in a prescription drug case is the physician, likewise the 'consumers' are physicians. The setting of a prescription drug case was specifically contemplated in CACI 1205 as well. As with 9.00.7, in CACI 1205 the jury is told that "The warning must be given to the prescribing physician."

FAC Resp. Exhibit B -- 2241

1  The drafters of the CACI instructions never intended a modification of the verdict form to
2  substitute the treating physician for the "ordinary consumers." This is evident by the fact that although
3  they specifically inserted an additional provision in CACI 1205, the underlying instruction, to note that
4  the warning must be given to the physician in prescription drug cases, they made no suggestion for a
5  change in the portion of the instruction which refers to ordinary consumers. CACI 1205, which sets out
6  the elements of a strict liability failure to warn claim, provides:

7  PRODUCTS LIABILITY
   1205
8  Strict Liability
9  Failure to Warn--- Essential Factual Elements
   [Name of plaintiff] claims that the [product] lacked sufficient [instructions]
10 [or] [warning of potential [risks/side effects/allergic reactions]]. To
   establish this claim, [name of plaintiff] must prove all of the following:
11 1. That [name of defendant] [manufactured/distributed/sold] the [product];
12 2. That the [product] had potential [risks/side effects/allergic reactions] that
   were [known] [or] [knowable by the use of scientific knowledge available]
13 at the time of [manufacture/distribution/sale];
   3. That the potential [risks/side effects/allergic reactions] presented a
14 substantial danger to users of the [product];
15 **4. That ordinary consumers would not have recognized the potential
   [risks/side effects/**allergic reactions];
16 5. That [name of defendant] failed to adequately warn [or instruct] of the
   potential [risks/side effects/allergic reactions];
17 6. That the [product] was used [or misused] in a way that was reasonably
18 foreseeable to [name of defendant];
   7. That [name of plaintiff] was harmed; and
19 8. That lack of sufficient [instructions] [or] [warnings] was a substantial
   factor in causing [name of plaintiff]'s harm.
20 **[The warning must be given to the prescribing physician and must
21 include the potential risks, side effects, or allergic reactions that may
   follow the foreseeable use of the product. [Name of defendant] had a
22 continuing duty to warn physicians as long as the product was in use.]"**

23

24  The last paragraph addition in the brackets was provided to tell jurors that the warning must be
25  given to the physician and that there is "a continuing duty was to warn physicians." However, CACI
26  1205 does not suggest altering or removing the subjective standard of the 'ordinary consumer,' who in
27  the situation here is the ordinary physician. Nor is there any suggestion that a similar provision, addition
28  or modification be made to the CACI verdict form VF-1203 in a prescription drug case.

6

FAC Resp. Exhibit B -- 2242

1    Significantly, even though the drafters inserted the addition in the last paragraph of CACI 1205

2  for prescription drug cases, they did not provide for or even suggest that a similar modification or

3  addition would be necessary for the verdict form, VF-1203.  This is undoubtedly because the subject is

4  covered in the underlying instruction, and no such modification is necessary on the verdict form. Thus,

5  the form used in *Appell* and *Arrigale* not only substituted a standard which was legally incorrect, it used

6  a modification which the drafters of CACI did not feel was even necessary.

7

8        **c.  Even the Unmodified CACI Verdict Form Adds Undue Complexity and Confusion to the**

9            **Jurors' Deliberations.**

10

11    Even in its unmodified form, the CACI VF-1203 is inherently problematic in that, simply stated,

12  it uses too many questions.  It breaks up a single cause of action, strict liability failure to warn, into seven

13  different questions on the issue of liability only:

14        **CACI**
           **VERDICT FORMS**
15        VF-1203
           Strict Products Liability
16        Failure to Warn
           We answer the questions submitted to us as follows:
17        1. Did [name of defendant] [manufacture/distribute/sell] the [product]?
18        ___Yes ___No
           If your answer to question 1 is yes, then answer question 2. If you
19        answered no, stop here, answer no further questions, and have the presiding
           juror sign and date this form.
20        2. Did the [product] have potential [risks/side effects/allergic reactions] that
           were [known] [or] [knowable through the use of scientific knowledge
21        available] at the time of [manufacture/distribution/sale]?
22        ___Yes ___No
           If your answer to question 2 is yes, then answer question 3. If you
23        answered no, stop here, answer no further questions, and have the presiding
           juror sign and date this form.
24        3. Did the potential [risks/side effects/allergic reactions] present a
25        substantial danger to users of the [product]?
           ___Yes ___No
26        If your answer to question 3 is yes, then answer question 4. If you
           answered no, stop here, answer no further questions, and have the presiding
27        juror sign and date this form.
28

7