HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM: ANAPOL SCHWARTZ WEISS & COHAN
      Sol Weiss, Esquire
      Gregory S. Spizer, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
     877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1                 -  -  -

2              MR. WEISS:  You've all seen

3         what I've submitted, and all I did

4         submit was common benefit.  By

5         that I mean, I did not submit,

6         except for the Hatch case, any

7         time on any individual case even

8         though some of them Chris used to

9         get ready for trial to drive the

10        litigation.

11             The second thing, none of

12        the 200-plus depositions we took,

13        either of the reps, the treaters,

14        are included in our submission to

15        common benefit.

16             MR. SEEGER:  Sol, did you

17        submit a three-page affidavit?  Is

18        that what you are talking about?

19             MR. WEISS:  No.  Benefit.

20             MR. LEVIN:  He's talking

21        about time submission.

22             MR. SEEGER:  Okay.

23             MR. WEISS:  So, the only

24        thing I did submit, again, is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1     liaison work of being the

2     architect, along with Dave, of

3     let's keep Merck busy by doing the

4     detail setup.  My office did

5     monitor I guess the 20 million

6     pages of detail documents that

7     came in.  We actually got copied,

8     and we checked to make sure, when

9     they started to get the same

10    detailer two or three times, and

11    they would go to Higbee and claim

12    they needed months and months and

13    months, we would go, oh, no, here

14    they are, here are the pages.

15         We also did a template for

16    New Jersey, and that's included,

17    all of the detail docs, that is,

18    all of the bulletins they got

19    every day, electric bulletins that

20    was actually embedded into, I

21    guess it was a Word monthly

22    calendar.  Our staff did that.

23    So, all you had to do was take a

24    look at the records you got from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1      Merck for your prescribing

2      physician, plug it into the chart,

3      and you could then overlay what

4      the reps knew, what they knew and

5      when they told their docs.  We

6      actually talked to Jerry about

7      some of that stuff.

8          We did take some of the

9      early depositions that we took,

10     and we gave them to people like

11     Jerry and a couple others, and we

12     actually came up with, it must

13     have been five or six-hour

14     questions that Merck was asking

15     all of the treating doctors, all

16     of the prescribing docs.  That's

17     in there.

18          But, essentially, it's my

19     work as liaison, Dave's work in

20     helping Chris, and I helped a

21     little bit in the first trial.

22          MR. SEEGER:  Dave Jacoby, so

23     they know when you say "Dave."

24          MR. WEISS:  My partner, Dave

FAC Resp. Exhibit D -- 4

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1      Jacoby.

 2              Greg was in charge of doing

 3      all of the individual case stuff.

 4      Greg also did work from LMI, and

 5      we did find them cheating.  LMI in

 6      New Jersey, I guess they used them

 7      in the MDL too, Merck used them to

 8      get records.  We found some LMI

 9      people actually writing letters to

10      the prescribers and treaters

11      saying that the Court ordered them

12      to relook through their documents

13      because not all the records were

14      there.  We caught them, and we had

15      a little brew ha-ha in front of

16      Higbee, very private, because they

17      were very embarrassed.

18              So, that's what we did.

19      Anything else, I'm here to answer

20      questions.

21              MR. SEEGER:  This is the

22      most refreshing presentation

23      that's over quickly.

24              MR. LANIER:  If you get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        credit for the presentation, Sol,

2        you are an all right guy.

3              MR. WEITZ:  Sol, how many

4        cases did you submit to the

5        settlement, approximately?

6              MR. WEISS:  Well, that's a

7        hard question to answer.  As

8        primary counsel?

9              MR. LEVIN:  As primary.

10              MR. WEISS:  About 800.  And

11        then we have cases where we are

12        not primary, we are local counsel

13        with Birchfield.  There are 90

14        cases that we have an arrangement

15        with Sheller.  We did a lot of his

16        work behind the scenes for

17        Sheller.  We get a piece of

18        Sheller's fees.

19              Whatever is left that you

20        don't have in diet drugs, I get.

21        There's other firms in

22        Philadelphia that we do their mass

23        tort work quietly, and we have a

24        piece of all of those cases.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          I'm going to say, Perry, when you

2          add it all up, we are over 1,000.

3               MR. WEITZ:  And as far as

4          individual workup of cases that

5          were on Judge Higbee's trial

6          docket, how many of those cases

7          would you say that your firm

8          worked up?

9               MR. SPIZER:  Trial or

10         discovery?

11              MR. WEITZ:  Trial or

12         discovery that you actually did

13         trial prep work?

14              MR. WEISS:  Abdul Malik and

15         Kimmelman were worked up the same

16         time we worked up Humeston.

17              MR. SEEGER:  And then Hatch.

18              MR. SPIZER:  Hatch.

19              MR. WEISS:  Hatch was a

20         standalone case.  We worked all

21         the way through until we got four

22         records they found that he was on

23         Celebrex and not Vioxx.

24              MR. WEITZ:  That was the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1      scuba diver.

2            MR. WEISS:  That was the

3      scuba diver.

4            Rodemoyer was worked up in a

5      group of 39, along with another

6      one, all the way through trial.

7            MR. SPIZER:  We were going

8      to trial January of '08 on

9      Rodemoyer, George Biehls and

10     Gisela Levinson -- wait, there

11     were six, actually.

12           MR. WEISS:  There were four

13     in Pennsylvania and four in New

14     Jersey.  So, we had eight of

15     the -- we had two of the four

16     trials going in January.  And they

17     were fully worked up.

18           MR. SPIZER:  We had two

19     states, Pennsylvania and New

20     Jersey.

21           MR. WEISS:  We also worked

22     up and vetted some experts that

23     were used in New Jersey.  I don't

24     know if you used them in the MDL

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          or not.  One guy, Stuart Rich.

2                  MR. SPIZER:  Steve Rich.

3                  MR. WEISS:  Steve Rich, who

4          we really controlled.  Some people

5          tried to burn him out, but we kept

6          him pretty well focused.  The guy

7          that you used in Humeston, and I

8          know that someone else used him.

9                  MR. SEEGER:  What was he?

10                 MR. WEISS:  Cardiologist.

11                 MR. SEEGER:  DePace.

12                 MR. WEISS:  We worked DePace

13         up.

14                 I helped Eric with Madigan

15         to some extent.  I helped Eric

16         with Kostis to a large extent.

17         Kostis did an analysis that he

18         superimposed Framingham over VIGOR

19         and APPROVe.

20                 MR. RAFFERTY:  Who did that?

21                 MR. WEISS:  John Kostis is

22         the head of cardiology at Robert

23         Wood Johnson Memorial Hospital,

24         which is the teaching hospital at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          Rutgers.

2                    MR. SEEGER:  How would you

3          say that Kostis' work, just focus

4          on him for a second, contributed

5          to the common benefit?

6                    MR. WEISS:  It helped us

7          understand if you are going to try

8          a case with a lot of risk factors,

9          how Vioxx was probably one of the

10         leading risks percentage wise, and

11         he could actually tell you why.

12                   He looked at, I think it was

13         1,000 clients, I think a third of

14         them were ours, or it turned out

15         to be that way.  We submitted all

16         the medical records.  They were

17         tabulated.  Kostis looked at them,

18         the risk factors and the length of

19         time you were on Vioxx, and then

20         looked at APPROVe, looked at

21         VIGOR, looked at ADVANTAGE, looked

22         at VICTOR, and was able to

23         identify the risks on the Vioxx

24         arm in those trials versus these

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1        people.  And it was pretty

 2        amazing.  It turned out that for

 3        about 85 percent of the population

 4        he looked at, of those who smoked,

 5        Vioxx was the larger risk for a

 6        heart attack than smoking.

 7             And as you know, Chris, the

 8        problem was twofold.  Initially

 9        Kostis wanted to be the settlement

10        recruiter and wanted Merck to

11        adopt his philosophy, and then he

12        finally agreed he was going to

13        testify at the latest trials.  But

14        they were obviously -- they were

15        settled.

16             MR. LEVIN:  I'm working on

17        the hours here.  Your hours are

18        under review.  They haven't been

19        rejected.  They are under review.

20        Have you been contacted by the

21        accountants with regard to

22        anything?  It could be because of

23        the time that they were submitted.

24             MR. WEISS:  The first thing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1      we were contacted about, Arnie,

 2      was that the sheets that I used

 3      were not the sheets that you used,

 4      and we redid them.

 5           MR. LEVIN:  That's probably

 6      the reason, because you have about

 7      6,900 hours and $561,000 in costs.

 8           MR. WEISS:  That's right.

 9      Let me tell you about the costs so

10      you know.  Costs were in the

11      Hatch.  Case, Chris and I went out

12      to Palo Alto and spent two weeks

13      with Rodney.  I had Rich and

14      another expert that we developed.

15      That's common benefit, because

16      other people used him.

17           MR. LEVIN:  These are expert

18      fees?

19           MR. WEISS:  Expert fees.  I

20      had a copy of every transcript in

21      New Jersey.  I also ordered

22      transcripts from Linda.  I wanted

23      every transcript.  Every

24      transcript we got electronically,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1      and Linda embedded and also tied

2      the transcript to the CD, which we

3      had.

4            MR. LEVIN:  When I look at

5      the submissions that are under

6      review, it says MDL time and Hatch

7      time.  Now, is the MDL time really

8      New Jersey litigation time?

9            MR. WEISS:  It is.  It is

10     7300 time.

11           MR. LEVIN:  Could you make

12     sure that the accountant corrects

13     that?  Not because it matters.

14     The reason I'm saying that is, I

15     want to draw and have two charts

16     showing state litigation on one

17     side and MDL litigation on the

18     other.  And you guys are the --

19           MR. WEISS:  You guys made me

20     resubmit the time sheets --

21           MR. LEVIN:  I didn't make

22     you.

23           MR. WEISS:  Let me finish --

24     -- MDL 1657.  So all of the New

FAC Resp. Exhibit D -- 13

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1         Jersey time had to be resubmitted.

2              MR. LEVIN:  Is that the way

3         we're doing it?

4              MR. SEEGER:  I think that's

5         the way it's been.

6              MR. WEISS:  So you'll know,

7         I also had to give him, because I

8         keep contemporaneous time records,

9         they are the designation for Vioxx

10        common benefit is 73 with four

11        zeros at the end.

12             MR. LEVIN:  And that is New

13        Jersey time, but --

14             MR. WEISS:  That's all New

15        Jersey.

16             MR. LEVIN:  This is for me.

17        I'm not being critical.

18             MR. WEISS:  I understand.

19        You are never critical with me.

20             MR. LEVIN:  Yes, I have

21        been.

22             I want to be able to get

23        those hours out to show how much

24        the state lawyers did so that it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          is not messed up in the MDL time.

2                MR. WEISS:  So you

3          understand, none of my time was in

4          the MDL.  I did this with Chris

5          and Andy going back to when it was

6          removed from the market, I said I

7          was staying out of the MDL.

8                MR. LEVIN:  You mentioned

9          Madigan.  Was that time included

10         in the MDL time for you, when you

11         were working with Eric?

12               MR. WEISS:  Any time I

13         worked on common benefit, it was

14         7300, yes.

15               MR. LEVIN:  But you

16         considered that common benefit,

17         working with Madigan?

18               MR. WEISS:  Absolutely.

19               MR. HERMAN:  Let me ask you

20         a question about Eric Weinberg.

21               You were co-lead in New

22         Jersey?

23               MR. WEISS:  Yes.

24               MR. HERMAN:  What

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        specifically did you assign him to

 2        do?

 3               MR. WEISS:  Eric was the guy

 4        who was working up experts and

 5        science.  For example --

 6               MR. HERMAN:  You assigned

 7        him to work up specific experts?

 8               MR. WEISS:  Absolutely.

 9               MR. HERMAN:  When he worked

10        them up, where did that work

11        product go?

12               MR. WEISS:  It went to me,

13        and it went to Dave Buchanan.

14               MR. HERMAN:  Okay.

15               MR. WEISS:  So you will

16        know, for example, Madigan was

17        used by the MDL people.  Elizabeth

18        Cabraser used Madigan's report in

19        the Sinclair class action.

20               MR. SEEGER:  Dave was

21        involved in this?

22               MR. WEISS:  Yes.

23               MR. LEVIN:  Sinclair was the

24        head of the monitoring of the New
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          Jersey state litigation?

2               MR. WEISS: Yes.

3               MR. HERMAN:  Liz Cabraser, I

4          want to make sure I understand,

5          used Madigan in what?

6               MR. WEISS:  In the medical

7          monitoring Vioxx class action in

8          New Jersey.  And I know Rich was

9          used by some people in the MDL, at

10         least they wanted to use him, and

11         I said okay.  I had to make sure

12         that they didn't make him go where

13         he wasn't qualified.  But there's

14         a couple of others.

15              DePace was used, I think by

16         some people in the MDL, but I know

17         he was also used by other people

18         in New Jersey.  I know he was used

19         in the MDL.  He's the

20         cardiologist.

21              MR. HERMAN:  Well, at this

22         point, I'm just trying to get a

23         handle on who was assigned to do

24         what.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1              MR. WEISS:  Eric's job was
 2         to work the science in New Jersey.
 3              MR. HERMAN:  Who else was
 4         assigned to do that?  Was he the
 5         only one?
 6              MR. WEISS:  It is hard to
 7         say, Russ, because we didn't do it
 8         the same way that you guys did it
 9         or I do it in MDLs.  Eric was one
10         of the lead people that worked the
11         science.  Dave Buchanan worked the
12         science.
13              MR. HERMAN:  Did your firm
14         have Bextra and Celebrex cases
15         also?
16              MR. WEISS:  Yes.
17              MR. HERMAN:  Was Madigan
18         used in those cases?
19              MR. WEISS:  Not by me, they
20         were used by Perry.
21              MR. HERMAN:  I'm sorry?
22              MR. WEISS:  He was used by
23         Perry, not us.  And all my Bextra
24         cases were with Mark.  I think
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        every one but two were in New York

2        State Court, right, Mark?

3              MR. LANIER:  Yes, sir.

4              MR. WEISS:  We did develop

5        some other cardiologists that were

6        very good like Altobelli, a young

7        well-qualified cardiologist who

8        actually reviewed cases for trial

9        and was going to testify at trial.

10       Eric was instrumental on doing

11       that.  I helped.  We took a whole

12       bunch, and I think they are in

13       this.  We took a bunch of Merck's

14       expert cardiologists in Kimmelman,

15       Humeston, the second round, in the

16       third round.  We gave you the

17       transcripts.  I know you guys had

18       them, with our pleasure.

19              I actually worked with

20       Hornbeck doing Flavahan.

21              MR. SEEGER:  Flavahan.

22              MR. WEISS:  What a favorite

23       he was.  Remember him, Mark?

24              MR. LANIER:  He was a joke.

FAC Resp. Exhibit D -- 19

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1        Put that on the record.  He was a

 2        joke, he was.  Had a really good

 3        accent.

 4              MR. WEISS:  That's the guy

 5        we caught with the article that

 6        was very critical on COX-2s in

 7        some offbeat publication.

 8              Any other questions for us

 9        or anybody else, guys?

10              MR. SEEGER:  No.  No, sir.

11        Thank you.

12              MR. WEISS:  Again, if you

13        are counting time for the detail

14        people, and if you are counting

15        time for all the trial cases that

16        we worked up, they are not here.

17        So, if that's part of the package,

18        I would like an opportunity to

19        submit the extra time.

20              MR. SEEGER:  Submit it.

21              MR. HERMAN:  Submit it.

22              MR. LEVIN:  I think you

23        ought to submit it.

24              MR. HERMAN:  Just identify
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          it when you do.

2                    MR. LEVIN:  Because it will

3          be helpful.

4                    MR. WEISS:  So, I'm going to

5          give you the time for those cases

6          we worked up for trial, and also

7          you want the detail time, too?

8                    MR. LEVIN:  It was part of

9          Judge Higbee's plan to work them

10         up.

11                   MR. WEISS:  Yes.  There was

12         12, then 29, then there was 39,

13         and, for example, Andy, do you

14         remember the first cases we worked

15         up way, way back when?

16                   MR. HERMAN:  Well, Sol, in

17         fairness to you, other people are

18         submitting those hours, and I

19         think you ought to do it also.

20                   MR. WEISS:  I understand,

21         but I was told they weren't

22         counting.  That's why I didn't do

23         them.

24                   MR. HERMAN:  Submit them.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

 1            MR. LEVIN:  They are

 2       counting them now.

 3            MR. HERMAN:  Those that were

 4       worked up for trial.

 5            MR. WEISS:  So, you want

 6       them on these forms?

 7            MR. LEVIN:  Yes.

 8            MR. WEISS:  It is going to

 9       say MDL 16 --

10            MR. LEVIN:  Just write a

11       cover letter to the accountant

12       saying this is a supplemental

13       submission dealing with such and

14       such.

15            MR. HERMAN:  It is not my

16       rule, but Arnold wants your blood

17       type, your thumbprint, your eye.

18       Send them as soon as you can get

19       them in, Sol.

20            MR. WEISS:  It will take a

21       couple of weeks.

22            MR. HERMAN:  Within a week?

23            MR. LEVIN:  Could you do it

24       faster?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1              MR. WEISS:  Those individual

 2         cases are not on time sheets.

 3              MR. LEVIN:  Okay.  Well, as

 4         fast as you can.

 5              MR. WEITZ:  But it is not

 6         your individual inventory of cases

 7         --

 8              MR. WEISS:  No, no.

 9              MR. LEVIN:  He just didn't

10         keep the time.

11              MR. WEISS:  In other words

12         if we had a case called for trial,

13         I don't have my people keep time

14         sheets.  I only keep time sheets

15         on stuff I think is the common

16         benefit.

17              MR. HERMAN:  You know what

18         you ought to do?

19              MR. WEISS:  What's that?

20              MR. HERMAN:  You ought to

21         say, estimate these hours the best

22         you can as an estimate and send

23         them in.

24              MR. WEISS:  Anything else?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1                  (No response.)

2                  MR. SEEGER:   Thank you.

3                  MR. HERMAN:   Thank you.

4                      -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR

23         Notary Number:  1060147 Exp. 1.2.10

24         CCR Number:  30X10017620
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 3, 2008
- - -
HOUSTON, TEXAS
- - -

FIRM:           ANASTOPOULO & CLORE, L.L.C.
                Samuel K. Allen, Esquire


BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 26

Page 2

```
 1                 -  -  -
 2              MR. BIRCHFIELD:  Sam, just
 3          so you know, we've got Linda here,
 4          and she's taking everything down.
 5              Judge Fallon has really
 6          stressed the transparency, but he
 7          will have a transcript available
 8          for his review and however he
 9          deems that the transcript should
10          be used.
11              With that being said, the
12          floor is yours.
13              MR. ALLEN:  Well, gentlemen,
14          I know most of you, and some of
15          you I have just met today.  My
16          name is Sam Allen, and I'm a
17          partner with Mark Clore and Bob
18          Berry with Anastopoulo & Clore.
19          We have a small practice that does
20          products liability, medical
21          malpractice, and other specialty
22          litigation, but exclusively
23          litigation work.  Mark and Bob
24          were partners here in Texas for
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1        about 30 years doing specialty

 2        work in medical malpractice.  We

 3        were involved in Baycol pretty

 4        extensively, had the Strong case

 5        in working with Andy and others

 6        and trying to get maximum value in

 7        Baycol.  Chris and the people that

 8        I'm familiar with on this panel,

 9        in trying to maximize the value of

10        that, we found out that sometimes

11        it helps to have people like Mark

12        and Bob's experience in context

13        with experts, obviously, in these

14        type of litigation cases to get

15        the premier experts for the

16        bellwether cases.

17             We did the same thing in the

18        Vioxx litigation from the point of

19        view of trying to go out and get

20        some exclusive experts for

21        specific reasons, particularly for

22        bellwether cases.  We were able

23        to, with the help of Joe

24        Alexander, retain a gentleman in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          cardiology by the name of Mark

2          Entman, one of the top

3          cardiologists at the Baylor

4          College of Medicine.  He sent a

5          pretty specific detailed report to

6          Mr. Gallagher in support of

7          allowing review of cases after we

8          met with him and talked with him,

9          probably a gentleman that would

10         not have come into the Vioxx

11         litigation had it not been for

12         Mark's experience and time with

13         Mr. Entman.

14              Because the focus in, I

15         believe --

16              MR. SEEGER:  I'm sorry.  It

17         is A-N --

18              MR. ALLEN:  Mark Entman,

19         E-N-T-M-A-N.

20              We then spoke with other

21         individuals about where we could

22         be of assistance with experts.  I

23         think everybody in this room is

24         familiar with the difficulty we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          were having with cardiovascular

2          cases, and as far as getting top

3          end cardiologists, but more

4          importantly, we were having a lot

5          more difficulty in the stroke

6          cases.  So --

7                MR. BIRCHFIELD:  Entman, was

8          he designated as the expert in the

9          Ledbetter case, do you know?

10               MR. ALLEN:  I can't tell you

11         today for sure which one that was.

12         I know he was designated in our

13         case, which was the top case to be

14         released on the Texas consolidated

15         litigation after, obviously, some

16         cases were tried outside of that.

17         Mark's case was tried outside of

18         that.  Kathy's case was tried

19         outside of that.

20               As of the e-mail that I

21         attached, we were the next case to

22         be released hopefully, called

23         Colleen Reck, death case of Fred

24         Reck.  That case was filed in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1           Tarrant County, but we believe

2           that that's going to be tried

3           either through some consolidated

4           issue where a judge would be

5           assigned to it or not.  We got

6           through discovery on that.  He was

7           designated in that.

8               To go back to discussing

9           experts, we were trying to help

10          regarding the stroke cases.  We

11          were able to get John Abrahamson

12          on board and retained to help

13          also.  This is pretty much where

14          our efforts were focused in the

15          case, was helping in getting those

16          experts lined up.

17              We then spoke, I believe,

18          with Beasley Allen and maybe you,

19          Chris, regarding how we could

20          potentially get one of our cases

21          lined up for a bellwether case, a

22          stroke case for the MDL.  That's

23          what we were discussing trying to

24          get done.  After review of our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          cases, we didn't have it.  We

2          didn't have one that we felt was

3          going to be one we would want to

4          put forward, although we did feel

5          the Reck case was one we could try

6          successfully.  It was a gentleman

7          who had no cardiac history

8          whatsoever, and upon autopsy had

9          no cardiovascular disease at all,

10         drew a large clot and died.  So,

11         we felt like that case would do

12         well.  That's how we promoted it

13         up.  It was already filed in the

14         Texas litigation and was working

15         from that point of view.

16             I'm simply here asking you

17         for reimbursement for costs of the

18         retainers of those experts, which

19         is actually -- and I think the

20         total amount we're seeking is less

21         than $100,000.

22             MR. SEEGER:  Were the

23         reports sent on either to my

24         office or somebody's office?

FAC Resp. Exhibit D -- 32

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1              MR. ALLEN:  I attached

2        Entman's letter to Mike Gallagher

3        as part of his efforts to support

4        and willingness to support the

5        Texas consolidated litigation

6        statements, but I don't know that

7        it went further from there.

8              MR. BIRCHFIELD:  Can you get

9        that in?  Send it to Lenny Davis

10       at Russ Herman's office.

11              You've submitted those costs

12       to Wegmann?

13            MR. LEVIN:  Costs have been

14       submitted, and you just made some

15       money today.

16            MR. SEEGER:  Arnold, do you

17       have the whole amount?

18            MR. LEVIN:  You submitted

19       $197,000 in costs.  It's okay.

20       Don't look surprised.  You are

21       okay.

22            MR. ALLEN:  I think it was

23       $97,000.

24            MR. LEVIN:  I had the wrong

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          guy.
 2                    MR. HERMAN:  Anything you
 3          want to send, you can e-mail it to
 4          ldavis@hhkc.com.  The phone number
 5          is (504) 581-4892.
 6                    MR. SEEGER:  We just need to
 7          make sure we have the expenses.
 8                    MR. ALLEN:  I don't want to
 9          misspeak, because one of the other
10          things that was submitted as part
11          of that cost was a database
12          contribution of $50,000.  That was
13          one part of that -- part of the
14          cost that was submitted.
15                    MR. LEVIN:  Ed will
16          straighten me out.
17                    MR. BLIZZARD:  You submitted
18          a total cost of $101,366.40, and
19          those costs to this point have
20          been rejected.  But as Russ points
21          out, we'll do what we can to put
22          you together with the accountant
23          to make sure that everything that
24          can be done is done to comply with
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1            their requirements.

2                 Also, is Abrahamson the

3            doctor from Massachusetts?

4                 MR. ALLEN:  No, different.

5                 MR. BIRCHFIELD:  John

6            Abrahamson not from Harvard?

7                 MR. ALLEN:  I'm not sure.

8                 MR. BIRCHFIELD:  You are

9            talking about a different John

10           Abrahamson.

11                MR. ALLEN:  I believe since

12           that rejection, I filed with the

13           accountant an amended petition and

14           withdrew -- I have it right here.

15                The main request was for

16           Abrahamson, and Richard Zane was

17           also retained.  Because 93 percent

18           of the total costs were in four

19           separate transactions, three

20           retention bills and a contribution

21           to the OCR documents and some

22           hours that were submitted on

23           behalf of preparing expert

24           packages by staff that we --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          specialized staff we hired to do

 2          that.  I think there's like 500

 3          hours or so submitted regarding

 4          those staff and individuals coming

 5          down and meeting with the experts

 6          and doing those type things to

 7          make sure we can get them on

 8          board.

 9               The other thing is, I'm here

10          really on behalf of my select

11          handful of clients because,

12          obviously, that $100,000 would

13          make a difference in their

14          recovery now that you take away

15          $100,000 from the case that you

16          really thought had more than $1

17          million value and under the new

18          structure, obviously, what's best

19          for our clients, but not

20          necessarily best for the

21          bellwether clients who would have

22          had a stronger case.

23               I want to answer any

24          questions that the board might
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          have.

2                    MR. GIRARDI:  No questions.

3                    MR. HERMAN:  Thank you.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 37

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 38

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          ANDREWS & THORNTON
               Anne Andrews, Esquire
               John Thornton, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                        -  -  -
 2                MR. GIRARDI:  As you can
 3           see, there's a court reporter in
 4           the room, and she's taking down
 5           these proceedings for Judge
 6           Fallon, because at the end of the
 7           day, he's the person that has to
 8           make the final evaluation of
 9           everything.
10                It is pretty much of a free
11           fashion sort of a situation.
12           Primarily, we're interested in
13           contributions to the Vioxx effort
14           as opposed to maybe individual
15           cases.  That's the format of this.
16           That's what we would like to get
17           your thoughts about with respect
18           to the record in the case.
19                MR. THORNTON:  You know you
20           are going to have Anne first.
21                MS. ANDREWS:  I'm first up
22           because I sort of started this
23           story.  I know all of you in the
24           room, some better than others.
```

FAC Resp. Exhibit D -- 40

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        But the story of why our role in

2        the Vioxx litigation became of

3        interest and we think we would

4        like to be compensated for it is

5        because for several years before

6        the Vioxx litigation started, this

7        firm had focused its efforts on a

8        drug case that -- a dietary

9        supplement case involving a drug

10       now outlawed by the name of

11       Ephedra, and it took us very

12       deeply into the world of

13       cardiology.  We had a real fight

14       on our hands in that case with

15       turning around an industry, a

16       government.  In fact, you know,

17       the story of that case is not just

18       that we were able to persuade the

19       top experts in cardiology in the

20       United States, if not the world,

21       to take our side against this

22       powerful industry, but they, in

23       fact, were the main course of our

24       Daubert proceedings in an MDL that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          Ed was -- I was lucky enough to

2          work with Ed Blizzard on, and

3          Chris Seeger was familiar with

4          that litigation and even Ellen

5          Relkin from Perry's firm, Weitz &

6          Luxenberg, was a colleague of ours

7          in that litigation and remains a

8          colleague and a friend of mine

9          today.

10              Your role --

11              MR. THORNTON:  My role was

12          my role.

13              MS. ANDREWS:  And you

14          certainly know the story.

15              That trial brought us into

16          the wheelhouse of some of the

17          great cardiology experts in the

18          world who had never testified in

19          the history of litigation against

20          big pharma.  As a matter of fact,

21          they had been only ever clinical

22          researcher and provided

23          Congressional testimony and, in

24          fact, court testimony for big

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      pharma.

2            As a matter of fact, kind of

3      a centerpiece expert of this case

4      who is familiar to all of you now

5      is Dr. Douglas Zipes, who had

6      actually been a Daubert qualified

7      witness for the defense in Judge

8      Fallon's courtroom.

9            So, there was a particularly

10     interesting moment during this

11     litigation in New York where Ed

12     and John and a number of other

13     people worked very hard for many

14     years to bring it to a successful

15     conclusion in a very lengthy

16     Daubert trial when y'all were

17     transferring cases to the Vioxx

18     MDL.  We knew because of our very,

19     very close encounters and length

20     of time that we worked with

21     Douglas Zipes that he was being

22     courted by industry to work on the

23     Vioxx litigation by Pfizer, Merck

24     and others.  We knew because he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        was sharing with us what they were

 2        asking of him at that time.

 3             So, there was a moment in

 4        time where the discussion about

 5        the drug and the events that were

 6        rapidly developing, he was often

 7        writing the Wall Street Journal

 8        about many breaking events at the

 9        time, he was a much quoted source

10        for the New York Times and the

11        Wall Street Journal, that I made

12        the bold move and retained him for

13        the Vioxx clients that we probably

14        didn't represent at that time.

15             MR. THORNTON:  For us all.

16        We didn't have any Vioxx clients.

17             MS. ANDREWS:  We didn't have

18        any Vioxx clients, but we knew

19        that this was going to be an

20        important time that Andrews &

21        Thornton was in a unique position

22        to have the access and the

23        credibility and the knowledge to

24        turn them into a very important
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          think tank.

2                  So, with that, Dr. Zipes

3          accepted.  I want it to be very

4          clear, and it's on the record, and

5          the methodology of what I did and

6          when I did it has been testified

7          to, I'm sure some of you were

8          present for it, I'm sure some of

9          you have read that testimony,

10         because he was certainly

11         cross-examined any number of times

12         about it, was that he was asked by

13         Andrews & Thornton and retained to

14         review all of the medical

15         literature pertaining to COX-2s

16         and to review all sides of the

17         issue.  Everything about a

18         comprehensive analysis would be

19         made by him of the drug, of the

20         data.  We knew from working with

21         Dr. Zipes how he worked and what

22         his requirements were and what it

23         would take for him to become

24         persuaded to a position.  So, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          embarked on that journey.

2                    MR. SEEGER:  Besides Mark

3          Robinson, who at the MDL did you

4          work with or coordinate with on

5          Zipes and science?

6                    MS. ANDREWS:  John Restaino

7          through Steve Skikos.

8                    MR. THORNTON:  And you met

9          with --

10                    MS. ANDREWS:  And later

11          meetings -- initially, it was

12          Steve through John, and then we

13          had a face-to-face meeting where

14          Dr. Zipes met with your firm, met

15          with Dave Buchanan.  We had a very

16          lengthy --

17                    MR. THORNTON:  That was in

18          May of 2005.

19                    MR. LEVIN:  Michelle

20          Parfitt, several, Chris Tisi.

21                    MS. ANDREWS:  But the

22          scientific presentation of the

23          plaintiffs' case had sufficient

24          enough -- had been sufficiently

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          developed enough that there was a

2          critical kind of exquisite moment

3          in Washington where Michelle and

4          Dave and Troy Rafferty were all in

5          the same room working on the case,

6          and I was able to bring all the

7          people into the same room and let

8          them sort of hear from Dave

9          principally, Chris, and Troy was

10         also very enthusiastic, the story

11         of the plaintiffs' case

12         essentially.  He was open to it at

13         that point because he had reviewed

14         a lot of the materials.

15              MR. WEITZ:  Did that become

16         part of the MDL trial package?

17              MS. ANDREWS:  It was an off

18         the record --

19              MR. THORNTON:  I don't think

20         so.

21              MR. WEITZ:  I mean the Zipes

22         --

23              MR. THORNTON:  The Rule 26

24         report?  We circulated it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1           MR. SEEGER:  I would imagine

2       it would be --

3           MR. LEVIN:  It was used in

4       Barnett, and Barnett was part of

5       the MDL product.

6           MR. THORNTON:  Can I explain

7       what we did.  I don't want to step

8       on your --

9           MS. ANDREWS:  I'll let John

10      address what became part of the

11      trial package.

12          MR. THORNTON:  Let me

13      explain briefly what we did.  I

14      think Chris knows the story.

15          Part of what we did had a

16      lot of sensitivity.  What Zipes

17      really had in mind to do, and we

18      worked through this with a

19      consultant we used named Mark

20      Haigney, who is a top doc in his

21      own right, but not quite a

22      national class doc.  He had this

23      concept that we're going to get

24      together a panel and we're going

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          to vet basically all the top

2          cardiologists in America.

3               If I may go off the record.

4                    -  -  -

5               (Whereupon, an

6          off-the-record discussion was

7          held.)

8                    -  -  -

9               MR. THORNTON:  The concept

10         was that we vetted through this

11         process most of the top

12         cardiologists in America to see

13         who they were working for.

14              MR. WEITZ:  When was this?

15         When was this process?

16              MR. THORNTON:  This all

17         occurred basically from March --

18         in March and April and probably

19         May as well.

20              MR. WEITZ:  Of what year?

21              MR. THORNTON:  Of '05, the

22         vetting process.

23              We came up with a concept,

24         because we knew Vioxx was going to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          be really big.  We're proud of our

2          victory in Ephedra, but we knew

3          the Ephedra industry wasn't Merck.

4          This was going to be big, and this

5          was going to be a full scale war.

6          We came up with this concept of,

7          instead of developing one expert,

8          developing a panel of experts in a

9          systematic way that would be very

10         difficult to impeach.

11              MS. ANDREWS:  They could

12         cover the disciplines that y'all

13         were advancing from

14         atherosclerosis to hypertension.

15         We knew this was going to be a

16         multidisciplinary MDL Daubert

17         hearing, and we were concerned

18         that no one expert could fill that

19         bill.  So, we wanted to really

20         push the data into a broad group

21         of people, from epidemiology,

22         through every -- these were all

23         superstars.

24              MR. THORNTON:  Sometimes we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1          didn't get exactly the person we

 2          were looking for, but --

 3              MR. WEITZ:  Was this an

 4          assignment from somebody, either

 5          from the MDL or from State Court?

 6              MR. THORNTON:  I would

 7          describe it as our idea.  We took

 8          it to Restaino and Skikos, who

 9          said, this is really a good idea,

10          and then we did it.

11              MR. WEITZ:  That's

12          important, because John was the

13          co-chair of the science committee

14          for the MDL.

15              MR. THORNTON:  I understand.

16          Restaino, we've been working

17          together on cases for over a

18          decade.  Restaino said it was

19          cool, and Skikos said it was cool.

20              So, we got these guys, and

21          I've got pictures of them.  These

22          were people not only that were

23          good researchers, but they weren't

24          people that couldn't talk.  They

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        were people who could command.

2        They were people of authority.

3        They were people not just with a

4        great CV, but they were opinion

5        leaders in the cardiology

6        community, because really what we

7        wanted to make sure of is that

8        Merck didn't manage to come up

9        with a whole group of opinion

10       leaders in the cardiology

11       community on the other side.

12       Believe me, the cardiologists at

13       the outset, they had read a little

14       bit from the New England Journal,

15       but they didn't understand Vioxx

16       from anything until we had this

17       panel.  So I got the people in

18       here.

19            Paul Ridker could have been

20       a tremendously dangerous guy on

21       the other side.  He is a

22       cardioepidemiologist of just

23       incredible renown.  Jeffrey Popma,

24       who did testify in the Barnett

FAC Resp. Exhibit D -- 52

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        trial, it turns out.  And Doug

 2        Zipes, who became the star of the

 3        litigation.

 4              MR. SEEGER:  He's cardio

 5        also, Popma?

 6              MR. THORNTON:  Yes.

 7              MS. ANDREWS:  Yes.

 8        Interventional.

 9              MR. THORNTON:  So we put

10        Haigney in and paid Haigney a lot

11        of money.  So, what we did is, we

12        came up with the most neutral

13        package of literature possible, we

14        arranged basically this panel.  We

15        paid everybody basically a

16        comparable amount to the amount

17        the pharmaceutical industry paid

18        them.  And the goal was to really

19        basically let them all meet

20        together.  Our real thought was to

21        try to put together a consensus of

22        these experts without attorneys

23        being around so we could mass

24        produce experts on the one hand,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          but organically through a process

2          that they couldn't be impeached

3          for.

4               I've included the panel, the

5          agenda of the first scientific

6          discussion that they had.  They

7          had this meeting without lawyers

8          present, and it achieved 100

9          percent consensus that Vioxx

10         causes heart attacks and Vioxx

11         causes death.  All these really

12         excellent, extraordinary

13         physicians, each and every one of

14         them was ready to go forward at

15         the next meeting, was interested

16         in the litigation.  Not one of

17         them said, no, it's too difficult

18         for my blood.

19              MS. ANDREWS:  Or it's not --

20         the evidence is close.  It was not

21         close.

22              MR. THORNTON:  Overwhelming.

23              MS. ANDREWS:  Overwhelming

24         evidence for us for the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1        plaintiff's position in which they

2        agreed to come to a second meeting

3        for a slightly more in tune

4        agenda.

5           By then, by the time of the

6        second meeting, the New England

7        Journal of Medicine scandal had

8        broken.

9           MR. THORNTON:  That was very

10       helpful, because it was exactly --

11          MR. SEEGER:  That made them

12       feel like they were on the right

13       team, right?

14          MR. THORNTON:  Right.  The

15       first panel meeting was science

16       kind of removed, the

17       unimpeachable.  The second panel

18       meeting was sort of the Dave

19       Buchanan meeting, we did it, but

20       where Skikos and Anne and I really

21       presented a very strong statement

22       of just -- I've got a great little

23       cartoon here that I really enjoy.

24       I'm going to have to buy this one,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          the ability to obscure truth.

2                    And so we told them about

3          the scientific advisors, and I'll

4          tell you, there are two slides

5          that they just obsessed on.  One

6          is, of course, the --

7                    MR. SEEGER:  The Scolnick

8          e-mail.

9                    MR. THORNTON:  The Scolnick

10         e-mail.

11                   MS. ANDREWS:  They were

12         shocked.

13                   MR. THORNTON: They know

14         Scolnick.  And I remember they

15         were looking, saying, yeah, he

16         knew.  He knew.

17                   MS. ANDREWS:  The second

18         meeting was the show us meeting.

19         It really proved to us bad things

20         happen because drugs get out and

21         hurt people and we don't know for

22         many, many years what happens, but

23         you show us bad conduct in this

24         second meeting, we're all in.

FAC Resp. Exhibit D -- 56

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1              MR. THORNTON:  They weren't
 2         buying the naproxen
 3         rationalization.  The other one
 4         was Konstam, because they think --
 5         it was kind of a view that
 6         Konstam's piece in defense of
 7         Vioxx early threw a lot of
 8         physicians off.  They had some
 9         fairly grave remarks about that as
10         well.
11              MR. SEEGER:  About his piece
12         on the APPROVe data?
13              MS. ANDREWS:  Exactly.
14              MR. THORNTON:  We spent
15         $194,749 on these experts, 200
16         grand out of our little firm, and
17         at this point we were creating
18         experts --
19              MR. LEVIN:  This may be a
20         good time to go over this.
21              MR. THORNTON:  -- for the
22         greater war.
23              MR. LEVIN:  John, we have
24         the hours that you reported to the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        accountant.  We also have your

2        costs here.

3              MR. THORNTON:  Okay.

4              MR. LEVIN:  But we also know

5        from their report that all your

6        hours are rejected.  Don't get

7        excited.  $166,000 worth of costs,

8        all of your costs were rejected.

9              MR. THORNTON:  Not

10        encouraging.

11              MR. LEVIN:  This may mean

12        you filled out the wrong forms.

13              MR. SEEGER:  It is probably

14        formatting.

15              MR. LEVIN:  Call Leonard

16        Davis at Russ Herman's office,

17        (504)581-4892, and have him put

18        you as soon as possible in touch

19        with a Phil Garrett at the

20        accounting firm so that they could

21        work it out with you.  If you are

22        having any problems, give me a

23        call.

24              MR. SEEGER:  For your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1    purposes, just so you know, we are

2    treating this as if every nickel

3    has been accepted.  We need the

4    accounting done.

5         MR. THORNTON:  Sure.

6         MS. ANDREWS:  And whatever,

7    wrong or right, we will fix it.

8         MR. LEVIN:  When we file it,

9    we want it to be right, but we're

10   assuming that it is right.

11        MR. WEITZ:  50 percent of --

12        MR. SEEGER:  You have a lot

13   of company in this respect.  A lot

14   of people have hours and money

15   rejected.  You are definitely not

16   the only one.

17        MR. THORNTON:  I set out

18   what the cost of these conferences

19   were just so you can understand

20   how much of this was really this

21   general expert development.

22   Because I know there's kind of the

23   sense that, well, aren't Anne and

24   John something to do with Barnett,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          and certainly Barnett was the

2          vehicle by which our project was

3          realized.

4               MS. ANDREWS:  The payload

5          was delivered.

6               MR. THORNTON:  But this was

7          not a joint venture with the

8          Robinson firm.  Robinson's claim

9          to fame or the thing that he did,

10         I should say from the standpoint

11         of this, was that Robinson sent us

12         a case that met the criteria that

13         the panel was really looking for.

14         What was the panel looking for?

15         It came from Jeffrey Popma's lips.

16         How would I feel if I had a

17         patient who had these risk

18         factors?  Because we obviously

19         knew that Vioxx cases weren't

20         going to be easy, even though we

21         knew there was a good science case

22         against it, because we had a lot

23         of people with risk factors.  How

24         would I feel as a physician if I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

 1          had a patient who was doing

 2          everything right, exercising, on

 3          medication, lowered lipids, all

 4          that, and I gave them Vioxx for

 5          symptoms and he had a heart

 6          attack.  I would know in my heart,

 7          now that I know this, now that

 8          I've seen this, that the Vioxx

 9          probably caused the heart attack.

10          That is the quintessential case

11          that we were looking for.  Mr.

12          Barnett was that case.  Mr.

13          Barnett was one of the most health

14          conscious people I've ever seen,

15          and he was the perfect -- he did

16          everything right, and Vioxx gave

17          him a heart attack, two heart

18          attacks, as a matter of fact.

19              We were not even retained by

20          Barnett until we had spent all of

21          this money and all of this time.

22          You will see a lot of our time --

23          most of Ann's time was before

24          Barnett at all.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1              I might mention who Dr.

2         Shlipak is.  There's a fairly

3         large expenditure for him.  He's a

4         professor of epidemiology in

5         biostatistics in San Francisco

6         State.  I used him as a consultant

7         in the epidemiologic issues

8         because Ridker is so busy that as

9         a practical matter -- the Rule 26

10        report is kind of two halves of

11        it.  There's the Barnett half,

12        which I had very little to do

13        with, and there's the generic

14        half, which I had a lot to do

15        with.

16              MR. SEEGER:  Did you guys

17        attend any or participate in any

18        of the science committee calls

19        that John Restaino would organize,

20        or were you communicating with

21        John, reporting to him and saying,

22        hey, we've got these experts,

23        John, I want you to know we've got

24        this guy warming up?  I just need

Page 25

1              to get a sense of the structure.

2                   MR. THORNTON:  I think there

3         were a number of calls we

4         participated in, but I don't think

5         that they were formal science

6         committee meetings.  Nobody said

7         this was a science committee

8         meeting.  But people were talking

9         about the issues.  I mean, Dave

10        was on a lot of these calls.  I

11        mean, just a handful of people

12        that really were in the know as

13        far as I was concerned about all

14        those issues.

15                   MS. ANDREWS:  By the time

16        these reports were being drafted,

17        y'all were in your own state court

18        trials, and California was heating

19        up, and you guys were certainly in

20        the trenches, and everybody was

21        warming up.  We were sort of just

22        waiting for what we knew these

23        experts wanted in terms of the

24        right plaintiff.  We knew that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          that person was going to arrive,

2          that case was going to arrive, and

3          we were looking for it and

4          interacting with a number of our

5          colleagues.

6               We had cases in Reno we were

7          reviewing, and we didn't even put

8          in time for the comprehensive

9          review we did of the entire Reno

10         practice.  You will see Stewart

11         White probably later this

12         afternoon.  We were called in to

13         do the same thing and open up

14         another state court front.

15              But we knew that the right

16         case was going to come.  By the

17         time it arrived, there were cases

18         that had been lost, there were

19         cases that had been won.

20              MR. THORNTON:  Predictable.

21         Vioxx was not going to be all

22         victories with the patient

23         population.

24              MS. ANDREWS:  Merck had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          announced the scorched earth

2          policy.  And it didn't look like

3          there was going to be any changing

4          from that policy until pretty late

5          in the game.  Ellen Relkin and I

6          were working on a collaboration of

7          some of these experts with your

8          next trial.  Next thing we knew,

9          the settlement was being

10         announced.

11              MR. SEEGER:  I want you to

12         know, the reason I'm asking, and

13         what you are saying is very

14         helpful, but we're trying to get

15         down to where people actually

16         provided a common benefit.  So,

17         working up one expert for one

18         case, your own case, would be one

19         thing, but providing an expert for

20         an MDL trial like you did in

21         Barnett and working up other

22         experts that other people are able

23         to use is another.  I'm just

24         trying to connect the dots.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1                MR. WEITZ:  I know from my

 2           office that Anne and Ellen work --

 3                MR. SEEGER:  Yes.  And you

 4           are telling me you were talking

 5           with Dave, too, so those are the

 6           kinds of people, if they are in

 7           the loop, yes.

 8                MR. WEITZ:  Talking about

 9           cases, how many cases did your

10           firm have?

11                MR. THORNTON:  22.

12                MR. WEITZ:  Were they all

13           put into the settlement?

14                MR. THORNTON:  Yes.

15                MR. WEITZ:  Where were they

16           filed?

17                MR. LEVIN:  In the MDL or

18           state?

19                MS. ANDREWS:  Los Angeles.

20           State Court, Los Angeles.  MDL and

21           a few in Los Angeles.

22                MR. WEITZ:  In any of those

23           cases, were they prepared for

24           trial?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1              MR. THORNTON:  No.  No.  We
 2         were never assigned a trial date,
 3         and we didn't think that our cases
 4         were necessarily trial worthy.
 5         You might have been able to win it
 6         but --
 7              We worked with and didn't
 8         put in the time -- we were
 9         developing Michael Shlipak for the
10         retrial of the Appell and Arrigale
11         trial with Tom Brandi, a lot of
12         stuff behind the scenes.  We were
13         trying to work things out to try
14         to help the general good.
15              MS. ANDREWS:  When we were
16         called, usually when something was
17         not coming together in a case and
18         it was in Tom Brandi's case, we
19         were close with his trial team,
20         and they would say, you know, we
21         really are in trouble on this
22         issue, can you help.  And John
23         would jump on a plane, run to
24         wherever they needed us, develop
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          an expert.

2                   MR. THORNTON:  There were so

3          many people that did that.  John

4          Hornbeck.

5                   MR. WEITZ:  You should

6          submit the hours for that work.

7                   MS. ANDREWS:  We're not the

8          only ones.

9                   MR. THORNTON:  I've been

10         really bad about submitting hours.

11         A lot of this time was

12         reconstructed.  I think it is very

13         accurate reconstruction because I

14         keep -- I know what I was doing on

15         that exact day.

16                  MS. ANDREWS:  I think the

17         thing that I would like this

18         committee to know the most about

19         what we feel we did was, we

20         devised a strategy that we

21         discussed with this committee's

22         leadership, the science

23         committee's leadership that was

24         extremely unique, was very risky.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1        We had no idea if all of these
 2        giants in cardiology were going to
 3        jump on our team and on our side,
 4        and we certainly -- when they all
 5        did with the force in which they
 6        did, to then go into the case
 7        specific work that it would take
 8        to get each one of them ready for
 9        a trial never occurred.  But Doug
10        Zipes and Jeff Popma did come to
11        the only MDL trial, and the
12        benefit of that testimony we
13        certainly think you all know the
14        full value of.
15             MR. THORNTON:  It is
16        important to see what experts of
17        this quality bring to something
18        like this.  So, they see Barnett.
19        They get Barnett's series of
20        medical records.  They say he
21        meets the profile.  They are the
22        ones that found the thrombus on
23        the angiogram, and I say "they"
24        meaning Zipes and Haigney, who was
```

FAC Resp. Exhibit D -- 69

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1           basically working as his

2           assistant.

3                Then we decided we should

4           bring Popma into the case because

5           it was the issue of whether there

6           really was a clot or whether there

7           wasn't a clot, but there were some

8           issues like that.

9                Zipes found the Q wave, that

10          it was a Q wave MI, which the

11          treaters hadn't found.  Nobody had

12          found it up until that time.

13          Zipes basically found the second

14          heart attack.  It became really a

15          big issue in the trial.  Beck in

16          his opening statement comes out

17          and calls Zipes out, I mean, Doug

18          Zipes is lying to you guys, and

19          he's made up this second heart

20          attack for litigation.  And

21          Haigney and I looked at each other

22          and said we're going to kill that.

23          And so we run down and work with

24          those DecisionQuest people, who

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1        were pretty remarkable of creating

 2        what we conceived, and I have one

 3        color version of the slide that we

 4        showed the difference in the

 5        perfusion between the two dates.

 6              MR. SEEGER:  John and Anne,

 7        could you take a minute to sum up.

 8        One thing you just did that was

 9        very helpful was saying this is

10        what I feel like our big benefit

11        was, and we get that.  It's just

12        so we can keep the schedule going.

13              MS. ANDREWS:  We provided

14        the linchpin expert for the only

15        MDL trial that we think caused a

16        general causation finding for

17        which every plaintiff was going to

18        be able to use the benefit on a

19        multi-disciplinary approach on two

20        theories.  The fact that we

21        started it way in the beginning

22        and pulled it through to this one

23        trial -- we're not going to take

24        credit for the results in Barnett.
```

FAC Resp. Exhibit D -- 71

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

```
 1          We're taking credit for the

 2          science that was pulled through

 3          the needle and all the work it

 4          took to build a fabric of that

 5          trial through these experts that

 6          turned the tide in this

 7          litigation.  We feel that that was

 8          a very important piece that only

 9          our firm with these experts could

10          provide and would dare take credit

11          for among all the contributions of

12          all of you.

13               MR. THORNTON:  So many

14          contributions helped.  I mentioned

15          in the PowerPoint of all the

16          people that helped us from Dave to

17          Hornbeck to Skikos to Restaino.

18          But I think we did a little bit

19          more than that really.  I think,

20          remember, Merck knew about this

21          panel.  They knew that there were

22          these top cardiologists out there,

23          they were very agitated about it.

24          They made an in limine motion to
```

FAC Resp. Exhibit D -- 72

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          keep the entire panel discussion

2          out.  So, at least we were

3          vindicated that we had not created

4          a problem with impeachment.  They

5          knew these other experts were

6          there.  We were actually trying to

7          encourage people to use other

8          experts.

9               The only unfortunate thing

10          that happened in my mind after

11          this was over, after Barnett, is

12          that everybody made Zipes the

13          superstar.  And Dr. Zipes is a

14          superstar, but there was a panel

15          of superstars.

16               MS. ANDREWS:  And Marty

17          LeWinter, terrific.

18               MR. THORNTON:  We were

19          really quite anxious that others

20          were used, because there was so

21          much talent here.

22               MR. SEEGER:  Did you work

23          with experts from any of the other

24          trials, winning or losing, other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1         than Barnett, just so we have a

2         picture?

3              MR. THORNTON:  I worked a

4         little bit with Kronmal --

5              MS. ANDREWS:  And with the

6         epis.

7              MR. THORNTON:  Nothing I

8         even submitted.  Shlipak, we had

9         him set aside for the retrial in

10        California.

11             MS. ANDREWS:  You know, Doug

12        Zipes because of the illness of

13        the epidemiologist, happened to

14        take on the third discipline of

15        epidemiology in Barnett.  He

16        carried three different

17        disciplines that, quite frankly,

18        we only ever targeted him for one.

19        So, it was a unique circumstance.

20             MR. GIRARDI:  Anne, to your

21        credit, with a small number of

22        cases, you put out $250,000

23        basically for the benefit of

24        experts to be used in other cases.

FAC Resp. Exhibit D -- 74

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          250, I'm just using that number,

2          plus or minus, but that's about

3          right.

4                  MR. SEEGER:  You submitted

5          all of that, right?

6                  MR. LEVIN:  It is here.  It

7          has to be moved from one column to

8          another.

9                  MR. THORNTON:  Just to give

10          you an idea of the fact that it

11          was the experts, the compact we

12          made with the experts, because

13          they were reluctant to get

14          involved in this wild litigation,

15          was I will protect you.  We will

16          protect you.  We are not the

17          agents of Mark Robinson in the

18          Barnett case.  We are actually

19          your agents in assuring you that

20          your professional standing and

21          reputation is held up.  I was in

22          Barnett until Dr. Zipes testified,

23          and I left -- and Dr. Popma

24          testified in that trial, too.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1        People don't talk about that.  He

2        was a tremendous --

3             MR. SEEGER:  Actually, Steve

4        Skikos told us that.

5             MR. THORNTON:  They were

6        really good.  And if the war had

7        continued, I think eventually they

8        would have all been used.  That

9        was fully my expectation, with the

10       possible exception of Ridker, who

11       was so darn busy that it may have

12       been another matter.

13            MR. SEEGER:  Thank you.

14       That was very helpful.

15            MR. THORNTON:  Thank you.

16            MR. GIRARDI:  Thank you.

17                 -   -   -

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 76

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147
23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 77

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  ASHCRAFT & GEREL, LLP
       Christopher V. Tisi, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 78

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2            MR. HERMAN:  As you can see,

 3       everything is recorded.  You are

 4       going to be getting a copy of what

 5       everybody has had to say at some

 6       point.

 7            If we can't resolve fees,

 8       the judge is going to go through

 9       some process similar to Murphy Oil

10       where he's going to have lawyers

11       come in, swear under oath, be

12       cross-examined.

13            If there's some addition or

14       subtraction you want to make to

15       your affidavit, at that point we

16       can't resolve all the fee issues,

17       I would go ahead and do that.

18       Basically that's it.

19            MR. TISI:  Okay.  Just for

20       the record, my name is Chris Tisi,

21       and I'm a senior partner at the

22       law firm of Ashcraft & Gerel.  I'm

23       going to try to be quick, as quick

24       as I can.
```

FAC Resp. Exhibit D -- 79

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1              Really, I do have to say
 2         this.  I've been involved in a
 3         couple of these things, and this
 4         is the first time I've had the
 5         opportunity to actually present.
 6         So, I really do appreciate the
 7         opportunity to do that.  Vioxx has
 8         been a labor of love for me and
 9         for people in my firm.
10              I've spent the better part
11         of four years, four-plus years,
12         almost five years, working on this
13         litigation, even though I think we
14         only had about 100 cases.  So, I
15         do appreciate the opportunity to
16         at least present myself and to be
17         cross-examined, if need be, not
18         only on my work, but on other
19         folks' work.  I'm happy do that.
20              I did prepare a little bit
21         of a presentation.  I'm going to
22         hand it out.  It is mostly for my
23         own guidance, so you can follow it
24         or not if you want to, but this is
```

FAC Resp. Exhibit D -- 80

Page 4

1          it.

2                  (Handing over document.)

3                  I know some of you real

4          well.  Some of you I don't know

5          very well, and so I think I'm kind

6          of in a unique position, because I

7          did a lot of MDL work, but I also

8          did a lot of work on the stateside

9          as well, and so some of the folks

10         who did MDL work may not be aware

11         of the work we did on the

12         stateside and vice versa.  So, I'm

13         going to try to take the

14         opportunity to do both.

15                 MR. HERMAN:  I want to state

16         one other thing on the record.

17         Excuse me.

18                 A number of you know that in

19         some cases we partner with

20         Ashcraft & Gerel.  We did not do

21         that in this case.  The work that

22         Chris and his firm did was work

23         they did independently of any

24         association.  We don't have any

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          fee sharing, cost sharing or

2          anything else in Vioxx.

3                MR. TISI:  Thank you.

4                This is what I'm going to

5          do.  I'm going to go over, I

6          think, generally speaking, what we

7          did both on the State and Federal

8          side, and then I want to focus

9          primarily on the factors that

10         Judge Fallon laid out in PTO 6.

11               On the second page of this,

12         on the PSC side, I think it is

13         fair to say that I was a very

14         active member of the Plaintiffs'

15         Steering Committee; an active

16         chair, vice chair of the discovery

17         committee with Troy and Dave

18         Buchanan; very active with the

19         science and expert committee,

20         working up, I think, several key

21         experts in the case with others;

22         an active member of the briefing

23         committee; an active member of the

24         privilege committee; and an active

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        member of the trial package

2        committee for both stroke and MI.

3            Now, I say "active," because

4        I think it's important to note

5        that when we did the work that we

6        did, it was not with the intent of

7        trying to have titles.  It was an

8        intent to try and actually do the

9        work, and I think we did do that.

10           I think we also contributed

11       to most of the trials -- a

12       majority of the trials that were

13       involved in both federal and state

14       court, and I think we actively

15       worked on Humeston I, on Humeston

16       II, we worked on Irvin I, Irvin

17       II, Barnett, I helped Mark and

18       others.

19           MR. HERMAN:  Let me stop

20       you.

21           Tell me what you did in

22       Barnett at Mark's request.

23           MR. TISI:  As I recall it, I

24       wasn't at the trial itself, but as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          I recall, his primary liability

2          witness was Jerry Avorn.  Apart

3          from actually having done that

4          deposition and prepared that

5          deposition, it was the first trial

6          in which that deposition was

7          actually used.  So, I prepared not

8          only for the Daubert hearing that

9          preceded that case, although the

10         judge ultimately decided that

11         there was nothing here, because he

12         was so well qualified, but I

13         prepared with Lisa Dagostino, we

14         prepared the direct examination,

15         the counters, the cross, the

16         objections, all of those things

17         were done in anticipation of the

18         Barnett case.  So, I know that he

19         called me to help him with

20         Pechmann, but that was more

21         tangential than anything else.

22         So, that was primarily my role in

23         that case.

24              MR. BLIZZARD:  Was there a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          better deposition taken in the

 2          case than Jerry Avorn?

 3               MR. TISI:  I tend to think

 4          he did pretty well.

 5               MR. BLIZZARD:  The lawyer

 6          did pretty well, I think.

 7               MR. SEEGER:  I agree with

 8          that.

 9               MR. TISI:  So, that's kind

10          of the overview.  But let me just

11          focus on some of the criteria that

12          I think at least I would like to

13          focus on.

14               When I was preparing to make

15          this presentation, I thought that

16          if you combined all the 14 factors

17          together, the question would be

18          whether or not, if you pulled the

19          lawyers or the firm out of a mix,

20          would the case have been

21          substantially different in the way

22          that it was rolled out.

23               MR. SEEGER:  That's a very

24          good test.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1              MR. LEVIN:  That's well put.

2              MR. TISI:  I really do think

3         that in several material ways, and

4         I'm going to just highlight the

5         ones that I really think that I'm

6         most proud of and that we

7         contributed to, the ways in which

8         the case changed over time because

9         of the work that we did.

10             I'm going to take these a

11        little bit out of order.  I'm

12        going to focus first on the preMDL

13        work and the preVioxx withdrawal

14        work.  I remember getting a call

15        from Dave Buchanan, we were

16        wrapping up the Rezulin work, and

17        Dave said, we're working on this

18        case, I would really like you to

19        work on it, it's a clinical trials

20        case.  You worked with a guy by

21        the name of Dick Kronmal, I have

22        him as an expert in this case, and

23        I would really like to get you

24        involved in the case.  That was in

FAC Resp. Exhibit D -- 86

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          the spring -- I keep getting the

2          years wrong.  That was in the

3          spring of 2004.

4               I went to New York, spent

5          some time with Dave, Tom Moore, a

6          couple other folks.  We went

7          through the VIGOR trial, went

8          through some of the data.  At that

9          point, he had an initial, if I

10         remember correctly, initial report

11         done for Dick Kronmal and for

12         Wayne Ray.  Over the next couple

13         of months, he spoke to me and

14         others about how to plod out the

15         discovery in the case.  We spent

16         some time, I remember during that

17         time frame, I think you were

18         taking Adam Schechter, we did some

19         work in reviewing the documents,

20         and there was a lot of preliminary

21         work being done at that period of

22         time before there any was real

23         MDL.

24               MR. SEEGER:  As you said, it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1      was prior to the withdrawal, and

2      there were very few firms.  I

3      remember Dave being in my office

4      and us discussing, hey, we've got

5      to call Tisi to see if he is

6      available to help us.

7           MR. TISI:  I appreciated the

8      call, and I also do now.

9           MR. LEVIN:  And you will.

10          MR. TISI:  And really, that

11     was at that time when we didn't

12     really have that many cases.  I

13     mean, we had just a handful of

14     cases, if I remember correctly,

15     and he said, you have to get

16     involved in this, and we did.  The

17     case was obviously transformed by

18     the withdrawal of the drug from

19     the market and the establishment

20     of the MDL.

21          I know I was privileged, I

22     think, to be appointed to the

23     steering committee, and I know

24     some of you supported that, and I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1         really appreciated that.  It was

2         an opportunity that I had not had

3         before.

4              We, Michelle Parfitt and I,

5         she worked more on the science

6         side, I worked more on the

7         liability side, but I really -- we

8         dove head -- I think it's fair to

9         say we dove head in.

10             Let me just back up for just

11        one second on the prespring

12        2004/2005 time.

13             Obviously there was no MDL

14        and there was no common benefit

15        work.  Now, I did have, obviously,

16        things that I did that I can

17        pinpoint by travel records and try

18        to reconstruct my time.  I did

19        pull together our time for that

20        time frame.

21             MR. LEVIN:  Did you put that

22        into the accountant?

23             MR. TISI:  We gave it to the

24        accountant.  But, quite frankly,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          for those of you that have worked

2          with us in the past, know that I'm

3          much better than I ever was,

4          Arnold, but, honestly, in the

5          preMDL time, there was just not --

6          we were all working on the

7          individual cases and for the

8          common good.  There was no real

9          reason to do that.  So, I

10         reconstructed what I could, and I

11         did what I did, and you have what

12         I have.

13              One thing I did not do.  If

14         I couldn't document my time in a

15         way that I felt comfortable with,

16         I didn't do it.  If I put an hour

17         of time, it is a real hour of

18         time.  I was better once the MDL

19         was put together, but in the

20         preMDL, there was just no need for

21         it.

22              The PSC work in the

23         committee and the leadership

24         factors, I think it is fair to say

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1           over the next three, four years,

2           there was almost not a day where

3           Troy or Dave or I or Lenny

4           actually didn't spend time talking

5           with each other.

6                MR. SEEGER:  I don't want to

7           interrupt your presentation, but

8           there's a couple of important

9           things.  One is really everybody

10          here is very familiar with how

11          important you are in this case.

12          Why don't you dive into the stuff,

13          the real projects that you owned,

14          that you were responsible for, the

15          prep work you did behind the

16          scenes, the trial support work you

17          did, let people know that.

18               MR. TISI:  I will, but I

19          think it's also important to know,

20          and I will do that right, but I

21          think it is really important to

22          know --

23               MR. SEEGER:  Now.

24               MR. TISI:  -- the grunt

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1       work, the grunt work that was

2       done, the running the

3       depositories, the scheduling, the

4       scheduling and coordination with

5       State and Federal Court.  Dealing

6       with Ted Mayer and having

7       everybody being jerked all around,

8       quite frankly, all over the

9       country on just the scheduling

10      issues.  Running discovery

11      meetings, reviewing the documents,

12      reporting to the PSC on the weekly

13      calls.  All that stuff was just

14      part of the grunt work that we

15      did.

16           But going to the next page,

17      I really want to focus on some of

18      these things, as you said, Chris,

19      that I think I'm most proud of.

20           Early on in the case, I

21      think I drafted with Richard

22      Arsenault the plaintiff profile

23      form that was used, and I think it

24      was much more streamlined than

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          some of the other work on some of

2          the other ones that we had had.

3          We negotiated it, we briefed it, I

4          think we submitted memos to you,

5          Russ, that you submitted to the

6          judge, and he ultimately decided.

7          I think this is the first case I

8          had the opportunity to develop a

9          corresponding reciprocal

10          case-specific requirement for the

11          defense.

12               MR. SEEGER:  Had that ever

13          been done prior?

14               MR. TISI:  I appreciate the

15          softball.  That's a good one.  But

16          that's the first time it ever has

17          been done.

18               MR. HERMAN:  I want to say

19          that you championed that issue.

20          That issue would not have been

21          brought to the floor without you

22          pushing it.

23               MR. TISI:  I appreciate

24          that.  It came as a result of in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1       fen-phen, going to the depositions

2       where the defense had more

3       information about the doctors than

4       I ever had, and it was a real

5       disadvantage.  I think it was

6       something that was taken and done

7       in New Jersey, I think you

8       transported a profile form into

9       New Jersey, so, it not only had a

10      benefit for the federal litigants,

11      but it also was used in the state

12      courts.

13          MR. SEEGER:  A lot of the

14      work that you did was both in the

15      MDL and in the state courts.

16          MR. TISI:  Yes.  Now, we

17      drafted the Interrogatories,

18      totally redrafted the

19      Interrogatories, and I venture to

20      say, in almost any case,

21      Interrogatories have not been

22      substantive.  The responses that

23      we got in this case were

24      substantive, because they were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        carefully drafted, they were

2        negotiated ahead of time, and we

3        got a lot of information about

4        trials, about sales, marketing, et

5        cetera, that were actually useful

6        in the litigation.

7             We worked with Jeff and Dave

8        on the master set of Requests for

9        Production of Documents.  We

10       negotiated with the Food & Drug

11       Administration, I know Troy and

12       Russ and Lenny and others.  We

13       worked to get those documents

14       produced in a timely manner and

15       developed a schedule to get those

16       documents done.

17            We had --

18            MR. HERMAN:  Excuse me.  Do

19       you recall being in Washington

20       with us when we met with the FDA?

21            MR. TISI:  Actually, I did

22       not go to that particular meeting,

23       Russ, because I couldn't make it,

24       but I was on the phone with them

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1            repeatedly over time.

 2                  MR. HERMAN:  I thought you

 3            had gone with us.

 4                  MR. TISI:  No.  I wanted to

 5            go, but I couldn't get out of town

 6            because I think we had a

 7            snowstorm.  It was in the

 8            wintertime.

 9                  MR. LEVIN:  That's why you

10            live there.

11                  MR. TISI:  That's in

12            addition to having several people

13            at the depository.  I think we had

14            somebody pretty much living up in

15            New York at the depository during

16            that time.

17                  I want to focus and turn to

18            what I think I'm most proud of of

19            all the things.  When we got the

20            case in, most of the work that was

21            being done was depositions of the

22            corporate witnesses.  I think we

23            really pushed, I know I did, the

24            idea of going around the Merck

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1    witnesses.  By that point, they

2    had pretty much gone to school on

3    just about everything we were

4    doing, and I felt that the best

5    thing that we could do was to try

6    and develop a third-party strategy

7    for getting key witnesses out in

8    front, people like Nissen, Topol,

9    Graham, Avorn and other people.

10   In retrospect, it seemed like it

11   was the right thing to do.  But at

12   the time, there was a lot of

13   controversy within the PSC and

14   elsewhere whether that was the

15   right thing to do, because a lot

16   of theses folks had had writings

17   out there, people wanted to rely

18   upon their writings, thought that

19   opening up to cross-examination

20   would not be the best thing to

21   do --

22        MR. SEEGER:  Everybody felt

23   it would be a mixed bag.

24        MR. TISI:  A mixed bag.  I

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1       think in retrospect, it seemed

2       like the right thing to do, but at

3       the time, I think I was a real

4       proponent of that, and we really

5       discussed witness by witness

6       whether that was the right thing

7       to do.  And I put a chart here of

8       just some of them.

9           David Graham, we got his

10      documents.  We filed a motion, I

11      think the ruling on David Graham

12      was one of the more important

13      discovery rulings that we got from

14      the judge.  Mike Wenkowitz and I

15      worked on the brief.  I argued it.

16      We prepped him.  Tom Kline took a

17      great deposition, but I was second

18      chair of that one and worked very

19      closely with him on that.

20          Eric Topol, I don't think

21      anybody would doubt that that was

22      a terrific deposition.  There was

23      a lot of controversy on whether

24      that was the right thing to do.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              Dr. Fries --

2              MR. SEEGER:  I need to make

3         this comment, because it is

4         important.  With Topol in

5         particular, you were very much

6         involved in that in every way,

7         getting our team ready, and it was

8         one that you really wanted to

9         take, and somebody else was

10        actually put up for it, and you

11        graciously stepped back and

12        allowed it.  But it was one that

13        you --

14             MR. TISI:  I wasn't so

15        gracious at the time.

16             MR. SEEGER:  You were pretty

17        gracious, and that's a very good

18        example of where you were very

19        much a team player.  So, I just

20        think that's important, because I

21        was involved in talking to you

22        about that.  I think it is

23        important that people know that.

24             MR. TISI:  I think the one

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          deposition came later on in the

2          process that we kind of decided

3          was Steve Nissen, and I take

4          particular pride in that.  When I

5          took that one, he was a

6          participant in both of the

7          Advisory Committees involving

8          Vioxx, and I think having him on

9          board saying that I was pretty

10         much duped by the company in the

11         original -- if it had the

12         opportunity to be played more, I

13         think it was played in the

14         Illinois case --

15              MR. BIRCHFIELD:  It was.

16              MR. TISI:  -- it would have

17         been used more as time went on.

18              There were some we didn't

19         decide to take.  We really spent a

20         lot of time talking about

21         FitzGerald, whether that was the

22         right thing to do.  We decided

23         against it.  But the fact that we

24         didn't take it didn't mean that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

 1          there was a lot of work that was

 2          not done to vet that issue.  So,

 3          we spent a lot of time on that.

 4                  Marvin Konstam, et cetera.

 5                  So, while there was a lot of

 6          questions about the wisdom of that

 7          strategy, I think these

 8          depositions really were the

 9          backbone or a backbone of trials,

10          and virtually all of these

11          depositions, to one extent or

12          another, played a role in the

13          trials that came after, I think.

14                  MR. SEEGER:  I don't think

15          we had these, but in Humeston II,

16          and you know the difference in

17          Humeston I and II, we did play

18          Graham, Topol, Fries, and Avorn

19          was live.

20                  MR. TISI:  Avorn was live.

21                  Let me talk about Avorn for

22          a second, since you raised it.

23                  MR. SEEGER:  Which, by the

24          way, you helped us obtain him for

FAC Resp. Exhibit D -- 101

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          that trial.
 2                MR. TISI:  Originally, I
 3          remember, Chris, you said to me,
 4          if you can get him, I'd be very
 5          happy.
 6                MR. SEEGER:  And I was
 7          happy.
 8                MR. TISI:  We got him, and
 9          we originally decided to develop
10          him as a hybrid witness, which was
11          really difficult to do.  We
12          originally were going to -- and
13          this is where we worked on
14          Humeston, as well, but we
15          originally were going to call him
16          in Humeston as a witness, and we
17          spent some time as a fact witness
18          bringing him out, because he
19          obviously had a role.
20                We decided in the end of the
21          game that it was probably a better
22          idea to kind of develop him into a
23          hybrid, and I think the result was
24          a really good, you know, saying,
```

FAC Resp. Exhibit D -- 102

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1          look, this is what you knew and
 2          this is what you thought, and then
 3          now let's show you what the
 4          company really had and now tell me
 5          what you really think.  And I
 6          think because of waiting and
 7          developing that strategy, I think,
 8          made that a much more effective
 9          deposition.  But it took a lot of
10          time to develop that.
11              MR. BIRCHFIELD:  Chris, on
12          Avorn, and I would have to agree
13          with Ed, I think it was probably
14          one of the best depositions taken
15          in the litigation.
16              MR. SEEGER:  I agree as
17          well.
18              MR. BIRCHFIELD:  But him
19          testifying live at Humeston,
20          that's the first time he's
21          testified live at trial?
22              MR. TISI:  Ever.
23              MR. BIRCHFIELD:  Ever, in
24          any litigation.  Can you tell us a

FAC Resp. Exhibit D -- 103

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          little bit about how you were

2          instrumental in getting him live?

3               MR. TISI:  We did.  I'll be

4          honest, I was very concerned about

5          the idea of exposing him live

6          because his deposition testimony

7          was so good, I didn't want to

8          undermine that in subsequent

9          hearings, but we talked about it.

10         The compromise, or what we came up

11         with was he was going to show up

12         at the trial, I was there to prep

13         him, we helped him out, we worked

14         with him, and I think his

15         testimony went across very well.

16              MR. SEEGER:  You are being

17         way too modest.  I mean, the truth

18         is, there was a lot of

19         apprehension on your part and on

20         his.  I was on the phone with

21         you -- I was in the middle of the

22         trial, and I was on the phone with

23         you constantly.  You were also

24         talking with Mark.  Mark, I don't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          think, had a lot of success

2          convincing you, and I remember

3          calling you and saying, Chris,

4          this is one for the team, just do

5          it, and he did it.

6                MR. TISI:  I'll just add,

7          because I want to add one point,

8          because everybody thinks of

9          Humeston/Hermans as a dual trial.

10         That case, up until the eve of

11         trial, was a four-plaintiff trial,

12         as you know, Perry.  It's

13         something I want to talk to the

14         committee about at the end of

15         this, because I didn't put in for

16         my time on that because I

17         didn't --

18                MR. BIRCHFIELD:  You should.

19                MR. RAFFERTY:  You should.

20                MR. HERMAN:  You obviously

21         didn't put in a lot of time that

22         you spent on the case.

23                MR. SEEGER:  Why did you do

24         that?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1              MR. TISI:  Well, because

2        Judge Fallon's order reads clearly

3        work for trials and verdicts.

4        That was a four-person --

5              MR. HERMAN:  Let me just

6        say, to the extent you can

7        supplement, because what his

8        intent is, is that if a trial was

9        set and it was worked up for

10       trial, even if it wasn't tried,

11       those hours count.

12             MR. TISI:  Okay.  Well, I

13       will recreate that and submit

14       that, but I appreciate that.

15             But it really was a

16       four-person trial.  We went

17       through focus groups, we did all

18       the discovery.  Now I'm going out

19       of order on where I wanted to go,

20       but --

21             MR. SEEGER:  You don't need

22       this anyway.

23             MR. TISI:  We did three or

24       four motions in limine, we worked

FAC Resp. Exhibit D -- 106

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1      up the case to get it ready.  I

2      remember arguing the Avorn issue

3      in front of Judge Higbee.  So, I

4      think it's --  I will submit with

5      that, but I read him literally to

6      say if it was a trial, if it was a

7      bellwether trial, and since my

8      case was pulled off the docket the

9      day or two days before, I think

10     two business days before the trial

11     began, I didn't submit that time.

12     But I will do that.

13          MR. WEITZ:  Chris, it is

14     important that you think about any

15     other cases that you did the same

16     thing in, because we think that it

17     is very important to be able to

18     demonstrate to the judge the

19     people that helped move the

20     dockets, that put pressure on

21     Merck and forced them to --

22          MR. SEEGER:  But you were

23     helping us all prepare for trial.

24          MR. TISI:  I stayed for an

FAC Resp. Exhibit D -- 107

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          extra week-and-a-half to work on

2          the case.

3                   MR. LEVIN:  Right.  Please

4          expedite that --

5                   MR. TISI:  I will get that

6          done.

7                   MR. LEVIN:  -- because the

8          fact that that's in for you helps

9          us with regard to the overall

10          picture of the whole case.

11                   MR. HERMAN:  I want to say

12          one thing from my point of view.

13          This was your first PSC

14          appointment by a federal judge.

15                   MR. TISI:  Yes.

16                   MR. HERMAN:  I don't know if

17          it was Troy's first, but you and

18          Troy did outstanding work, as far

19          as from my perspective, as

20          compared with some others that

21          were appointed to the PSC.  It

22          certainly --

23                   MR. SEEGER:  Who are

24          veterans of PSCs.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1               MR. HERMAN:  Yes.  Let me

2          tell you that it's certain from

3          just going through the MDL

4          process, it certainly made Chris

5          and Andy and myself a lot more

6          comfortable that you could be

7          called on, you weren't going to

8          give anybody back talk, you would

9          get the job done, and you did it

10         well.

11              MR. TISI:  So, the

12         third-party aspect is something I

13         take pretty carefully and I'm

14         particularly proud of.

15              I took a bunch of

16         depositions in the case.  I mean,

17         apart from Dr. Avorn, which we've

18         discussed, and apart from Steven

19         Nissen, which I've discussed, I

20         took the vice president of

21         scientific and medical affairs,

22         Peter Honig.  I took Gil Block,

23         who ran the Alzheimer's studies.

24         I had actually prepared to take

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1            Wayne Ray, and the interesting

2            thing about Wayne Ray, that kind

3            of developed over a year.  We had

4            learned during the course of

5            preparing him for his preservation

6            testimony that there was some

7            facts that he was aware of that

8            hadn't come out before, and that

9            was the extent to which Merck had

10           had backdoor conversations with

11           Peter Honig at the FDA prior to

12           the first Advisory Committee.  It

13           took us several months to develop

14           that.  And we did, Dave and I and

15           others, and really worked up that

16           issue, and we were about ready to

17           offer him up for a deposition when

18           the settlement was announced.

19               But I had actually prepared

20           for his testimony.  It was going

21           to be really good.  I'm still

22           regretting that we didn't get a

23           chance to take it.  We had to pull

24           it back because we wanted to

FAC Resp. Exhibit D -- 110

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          develop that fact portion of it.

2          So, I wanted to highlight that as

3          something that had been done, and

4          it obviously was interrupted by

5          the settlement.

6               David Graham, Eliav Barr,

7          other folks we worked on.

8               Science and expert

9          committee.  Michelle and I worked

10         up, I think sometimes it is very

11         interesting to look at the people

12         that were actually named, but a

13         lot of work gets done looking at

14         the people you vetted who you

15         didn't choose for generic experts.

16         I know Michelle traveled all over

17         the country, met with Dr. Singh,

18         Dr. Lipiky, Dr. -- the former FDA

19         person, a bunch of people who were

20         in our affidavits, went all over

21         the country to try and see who we

22         could name.  Some of theses folks

23         we decided in the end of the day

24         were probably not people we wanted

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1    to show.  But that took a lot of

2    time.

3        We worked on the expert

4    reports for Dr. Gueriguian, Dr.

5    Avorn, Dr. Kronmal.  Michelle and

6    I worked with Mike and Lisa

7    Dagostino on the stroke project

8    and Dr. Feldman.  So, we did a lot

9    of that stuff.

10        We were asked by the PSC to

11    work on the privilege committee

12    with Anthony and the other folks.

13    We met repeatedly with Special

14    Master Rice, did a lot of

15    briefing, did a lot of arguing.

16    It is the first case that I ever

17    remember where I ever got one

18    privileged document before the end

19    of the litigation, and I did

20    promise and I will put it on the

21    record, that if Anthony ever got a

22    document before the end of the

23    litigation, I owe him dinner, and

24    I still haven't dealt with that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          yet.  But we did get those

2          documents, and I think that was a

3          good thing.

4               Law and briefing, we did a

5          lot of briefing.  That's in the

6          affidavit.  I can tell it is

7          lunchtime, and I'm not going to

8          spend a lot of time on that.  But

9          we did do a lot on that.

10              I wanted to go to the

11         bellwether trial issue, because I

12         think that that's an important

13         point.  Some of you were fortunate

14         to try some of these cases, and I

15         always was very -- I know we were

16         very envious of the opportunity to

17         be able to do so.  But I was also

18         pleased that I was asked, and

19         Michelle, as well, were asked on

20         several occasions to lend whatever

21         support we could to preparing

22         witnesses, briefing, preparing

23         stuff that went into the trials of

24         these cases.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          As I said, in almost all of

2     these cases, I remember sitting in

3     the courtroom for Irvin I with

4     Lisa doing the trial cuts for

5     Topol and the objections of Topol,

6     doing the counters and working on

7     all of those issues.  We did the

8     same thing for Curfman, we worked

9     on the counters, the objections,

10     all of those things that went into

11     the trial package ultimately.

12          MR. SEEGER:  Were you

13     involved in the taking of Curfman?

14          MR. TISI:  Peripherally.  I

15     was involved in arranging it.  I

16     mean, that really was taken by

17     Don, and he ran with it.  But in

18     terms of cutting it and making it

19     trial ready, all of that stuff,

20     that was something that we worked

21     on.

22          One thing I didn't mention

23     on the PSC side I wanted to

24     mention, is the work done by the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          trial package committee.  We --

2                MR. SEEGER:  Have you seen

3          the trial package?

4                MR. TISI:  I have seen it.

5                MR. SEEGER:  That was a

6          joke, for the record.

7                MR. TISI:  It is a pretty

8          amazing trial package.  I mean, if

9          we had gone forward with this

10         litigation further, that trial

11         package would have been the core

12         of everything that had come on

13         following.  The case was pretty

14         much ready to be tried in a much

15         more --  the goal was really to

16         get cases that could be tried for

17         less money, that could be tried

18         with documents and that wouldn't

19         be as expensive as the first

20         couple trials were.

21                Trial involvement.  I'll

22         touch on that really briefly.  All

23         of these cases, Irvin I, Irvin II,

24         sat with Troy during Irvin II,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          working with Dr. Kapit, I think.

2                    MR. HERMAN:  Did you help

3          with Madigan?

4                    MR. TISI:  No, no.  There's

5          an inside joke there somewhere.

6                    MR. HERMAN:  Actually, it is

7          not.  Do you know anything about

8          him?

9                    MR. RAFFERTY:  Do you know

10         who Dr. Magidan is?

11                   MR. TISI:  It is a familiar

12         name, quite frankly.

13                   MR. SEEGER:  I think that

14         just spoke volumes.

15                   MR. TISI:  Oh, he was the

16         guy from Philadelphia.  I do

17         remember that.

18                   I actually remember, Andy,

19         we were getting ready to

20         cross-examine Alise Reicin, and

21         you asked me, could you go through

22         the Advisory Committee transcripts

23         and see if you can put together a

24         cross-examination that will help

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          me contribute to the results of

2          the Advisory Committee.  I think

3          we did a pretty good job in giving

4          you that.  I think that was that

5          big chart.

6                    MR. BIRCHFIELD:  It was the

7          highlight.

8                    MR. TISI:  It was a good

9          thing, and hopefully that was

10         helpful.  All of those things are

11         listed in my affidavit.  I don't

12         want to go through all of that

13         stuff.  But I think it's fair to

14         say that we spent a lot of time on

15         most of the trials that were out

16         there, and when asked, we always

17         put ourselves forward to assist if

18         we couldn't actually try the case.

19         We put ourselves in a position,

20         and it was constant.

21              I mean, I think that what's

22         key and one of the things that

23         Judge Fallon made clear is the

24         consistency of work throughout the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          time.  I can tell you from my own

2          perspective, we worked, I know I

3          did, Michelle to a lesser extent,

4          but --

5               MR. SEEGER:  Could you take

6          a few minutes to talk about

7          Michelle's contribution?  I think

8          we are very familiar with yours,

9          but maybe less so --

10              MR. TISI:  Well, like I

11         said, Michelle spent a lot of

12         time, particularly early on,

13         working and vetting the experts.

14         I think that that was her main

15         task.  I think she was appointed

16         to work by John and Carlene, and

17         ultimately Shelly, to work on the

18         Daubert committee.  So, we spent a

19         lot of time with the various

20         experts, vetting them, vetting

21         their reports, vetting their CVs,

22         working with them on their

23         opinions, helping draft their

24         reports and editing their reports

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1          that would be ready as the case

 2          got forwarded.  She spent a lot of

 3          time on that, particularly in the

 4          early days.

 5              MR. BIRCHFIELD:  She was

 6          very helpful in filtering out some

 7          that would not have been effective

 8          witnesses for us.

 9              MR. TISI:  Exactly.

10              MR. SEEGER:  Are there

11          certain experts that your firm

12          were the point person or

13          gatekeepers for?

14              MR. TISI:  Obviously I think

15          Avorn, I was.  I think that --

16              MR. SEEGER:  Or you brought

17          to the litigation?

18              MR. TISI:  Gueriguian was

19          another one that we worked on

20          developing the expert report and

21          getting him ready for the

22          deposition.

23              MR. BLIZZARD:  You can't get

24          him ready for a depo.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1              MR. TISI:  Not anymore.  But

2        actually, funny story about

3        Gueriguian.  When he left the FDA,

4        I think I was the guy that

5        actually found him.

6              MR. RAFFERTY:  That was for

7        fen-phen.

8              MR. TISI:  He was very good

9        early on, and then he became a

10        little more...

11              But in any event, a lot of

12        the experts, and lot of the

13        efforts to Daubertize a lot of the

14        experts was something that

15        Michelle had done.

16              MR. RAFFERTY:  One thing

17        that Chris did a lot of, too, that

18        doesn't get talked a lot about is

19        not only a lot of the substantive

20        work, but also a lot of the

21        organizational work and the

22        day-to-day dealings with a lot of

23        our discovery issues that we

24        encountered.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

           1              MR. TISI:  Remember, Troy,

           2         when the Farquhar issue came up or

           3         the document --

           4              MR. SEEGER:  I remember

           5         that.

           6              MR. TISI:  -- or the

           7         document that was --

           8              MR. SEEGER:  The memo.

           9              MR. TISI:  The memo that

          10         came up.  I mean, that was the

          11         kind of thing, and that took days

          12         of time before that ultimately got

          13         before the judge.  It was like one

          14         of those things that you wake up

          15         on a Monday morning and you get a

          16         phone call saying that you have to

          17         deal with that issue, and it was

          18         an issue that lasted a whole

          19         while.  Those are the kinds of

          20         things.

          21              It is impossible for me,

          22         quite frankly, to kind of

          23         illustrate all of those things

          24         that came up.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

 1              I remember there was an

 2         issue with Dr. Rarick and whether

 3         she had an expert report in the

 4         MDL, and we had a fight with Ted

 5         Mayer about whether it was even

 6         appropriate to name her and

 7         cross-notice her in the MDL.  We

 8         went back and forth on that issue.

 9         There were just so many instances

10         where you wake up one morning and

11         the date -- I mean, we all do

12         that.

13              MR. BIRCHFIELD:  Chris, we

14         all recognize that you did

15         excellent work and you've been

16         here throughout the course of the

17         litigation, so, your work is

18         recognized and appreciated, and

19         you are a team player.

20              MR. BLIZZARD:  Historically,

21         I have been a hypercritic,

22         sometimes excessively so, of the

23         kind of work product that MDLs

24         turn out in terms of its usability

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          in trial.  That was not the case

2          here.  The work product from the

3          witness standpoint, I thought, was

4          very useful in trials.  I think

5          you were a big part of that, and I

6          appreciate that.  So, to me, hours

7          says something, and I know from

8          what's been said that you are not

9          great about keeping them.

10              MR. TISI:  I'm much better.

11          For the record and for my senior

12          partners, I'm much better.

13              MR. BLIZZARD:  But

14          ultimately it is the work product

15          that counts, and you had a big

16          hand in making this a great work

17          product.

18              MR. SEEGER:  I can't think

19          of an important part of this

20          litigation that you were not

21          central to.

22              MR. TISI:  I appreciate it.

23              MR. SEEGER:  I would have to

24          stretch my imagination.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1              MR. TISI:  I appreciate

2         that, and it has been a pleasure

3         working with all of you as well.

4              MR. SEEGER:  Thank you.

5                   -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 125

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -


FIRM: AUDET & PARTNERS, LLP
      Susanne Scovern, Esquire
      HOVDE DASSOW & DEETS, LLC
      Robert Dassow, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
      GOLKOW TECHNOLOGIES, INC.
   877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 126

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
1                   -  -  -
2              MR. DASSOW:  I feel like I'm
3         coming to Congress and I'm looking
4         for a bailout.
5              Susanne and I decided to do
6         this together, and we'll explain
7         why in a few minutes.
8              What's important is, we were
9         fighting Merck at the beginning of
10        the litigation.  In the middle of
11        the litigation, we were fighting
12        Merck.  And at the end of the
13        litigation, we were fighting
14        Merck.  We worked out of New
15        Jersey, and we were always, always
16        fully engaged in this litigation
17        from the beginning.
18              I guess what I would like to
19        do first, fellows, is talk to you
20        a little bit about our firms.  The
21        partners are myself and Boyd
22        Hovde, Rick Hovde and Nick Deets.
23        Our partners, just by way of
24        background, two are in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          International Trial Academy.

2          Three of us are in the National

3          American Trial Academy.  As long

4          as I can remember, we've been

5          preeminent lawyers with regard to

6          Martindale-Hubbell.  We've got 100

7          years of combined experience with

8          regard to trial advocacy.  We have

9          tried over 300 cases between all

10         of us.  I think that what I can

11         say about our Indianapolis firm is

12         we're always ready to go and try

13         cases.

14              MR. HERMAN:  One thing I

15         would like to note, if you'll work

16         it in, is you either had a joint

17         venture, whether it is a business

18         joint venture, but apparently a

19         work effort joint venture of some

20         sort.  So, would you give us some

21         detail on that.

22              MR. DASSOW:  Sure.  I can

23         tell you about that, and at the

24         bottom of the slide, Russ, you can

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1         see it says separate fee

2         applications, but we've got a

3         common benefit.  Essentially what

4         happened was, early on, Susanne

5         and I got together, we knew each

6         other from prior litigation.  We

7         get along obviously very well.  We

8         work well together.  What we did

9         was, we essentially worked

10        together sort of like Chris and

11        Mark would work together with

12        regard to the trials, but

13        obviously they did different

14        things.  So, that's kind of what

15        we were doing.  Does that answer

16        your question, Russ?

17             MR. HERMAN:  Well, do you

18        have a cross fee participation at

19        all?

20             MR. DASSOW:  We do not.

21             MR. HERMAN:  And no joint

22        clients?

23             MR. DASSOW:  No joint

24        clients whatsoever.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1              Does that help?  Does that

2         demarcate what we're talking

3         about?

4              MS. SCOVERN:  Our clients

5         were better than his.

6              MR. DASSOW:  I'll let

7         Susanne tell you about her firm,

8         and then we'll keep moving on.

9              MS. SCOVERN:  My firm

10        consists of eight attorneys, and

11        our Vioxx team that was dedicated

12        during the course of the

13        litigation consisted of five

14        attorneys.  Bill Audet is the

15        principal owner of the firm.

16        Myself, I have 20 years of

17        litigation experience.  We had two

18        six-year associates who did most

19        of the law and motion work for

20        Robb and I, and Adel, a third year

21        associate.  We also had some

22        paralegals and legal assistants,

23        legal litigation assistants to

24        assist us.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1            Bill Audet was the person
 2       most responsible for organizing
 3       us.  He organized us, and he
 4       conducted mini-seminars of our
 5       counsel and about a dozen other
 6       firms both in the Midwest and on
 7       the West Coast.
 8            MR. DASSOW:  This is preMDL.
 9       This is early on in January of '05
10       that we started doing this.
11            MS. SCOVERN:  Right.  And we
12       got together with trial experts
13       and litigation strategy experts
14       early on, like Robb said, and
15       mapped out the cases and trial
16       strategy that we wanted to
17       endeavor in mostly in New Jersey.
18       We had a few cases that we also
19       filed in California in front of
20       Judge Chaney.  But the bulk of our
21       cases and the counsel that we
22       worked with were filed in New
23       Jersey.
24            At one time, our firm had
```

FAC Resp. Exhibit D -- 131

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1      two trial cases of the bellwether

 2      case of Benjamin LoPresti in New

 3      Jersey and the Anderson case in

 4      California, plus, as Robb will

 5      describe later, we had several New

 6      Jersey trial pool cases.

 7          Bill was also responsible

 8      for organizing the Merck profile

 9      form along with Dave Buchanan from

10      Chris Seeger's office.  They

11      worked in tandem with the MDL

12      attorneys with the defense profile

13      sheet and the Merck profile form

14      and got that adopted by Judge

15      Higbee early on.  I think it was

16      around March of 2006, she adopted

17      the New Jersey Merck profile form.

18          Our firms also, as I

19      mentioned before, were

20      instrumental in the initial

21      bellwether cases in New Jersey.

22      In October of 2005, Robb and I, at

23      Judge Higbee's request from the

24      CMC, went through all of our case

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1    inventory and came up with our

2    best New Jersey trial case.  At

3    that time, she was focused on

4    trying a few cases at the same

5    time, but she did not want to deal

6    with conflict of law issues, and

7    so she wanted to focus on New

8    Jersey cases.  Our New Jersey case

9    that we proposed was Benjamin

10   LoPresti.

11       In November of 2005, she

12   selected that as a bellwether case

13   to be tried with other New Jersey

14   liaison counsel.  At the time, it

15   was the Hatch case with Anapol

16   Schwartz and also the McFarland

17   case with Seeger Weiss.  She

18   scheduled us for an April 2006

19   trial date, and so we had five

20   months to prepare for that trial

21   date.  And essentially Robb and I

22   dropped everything we were doing

23   and concentrated on that.  We were

24   involved in multiple discovery

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1           meetings and teleconferences with

2           our New Jersey liaison counsel,

3           and we were one of the first firms

4           to review thousands of sales reps

5           documents that came through.

6                In looking at those sales

7           rep documents, we were the first

8           firm that went to Judge Higbee on

9           a series of redaction issues

10          involving prescribing depositions

11          that were redacted, Vioxx payments

12          to physicians that were redacted

13          and sales rep bonuses that were

14          redacted, and we had a couple of

15          in-camera motions with her

16          bringing forward those redacted

17          documents.

18                We also, in doing our

19          analysis of the sales reps

20          documents, discovered a window

21          into the widespread financial ties

22          between Merck and the doctors who

23          prescribed or recommended Vioxx.

24          Through the health education

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          learning programs that actually

2          Ken Soh from Mark Lanier's office

3          gave me the heads up on, those

4          programs -- after the Ernst trial,

5          he forwarded a lot of documents to

6          my office, and it kind of started

7          on looking at and tracking the

8          money that Merck was paying to

9          physicians.  This became something

10         of great interest to Judge Higbee

11         early on, and that permeated the

12         litigation all the way up into

13         settlement.  I will get into a

14         little bit more detail about that.

15              We also were the first firm

16         to give the American Express

17         reports of all the sales reps in

18         their custodial files.  We really

19         pressed Judge Higbee to open up

20         and to expose the amount of

21         payment that was going to the

22         Merck physicians through the

23         marketing department at Merck and

24         their 3,000 sales reps that were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        touching base with the doctors on

 2        a daily basis.  And an interesting

 3        factor is that in 2003,

 4        pharmaceutical companies were

 5        spending $9 billion on marketing

 6        and promotion of their products,

 7        and out of that 9 billion, 6

 8        billion was being spent directly

 9        on prescribers.

10             In the particular case of

11        Benjamin LoPresti, Dr. Sheldon

12        Solomon was his prescriber, and we

13        were able to get his 1099s, which

14        showed thousands of dollars, if

15        not hundreds of thousands of

16        dollars, from 1999 to 2005.  He

17        was a Merck thought leader.  The

18        common benefit impact of exposing

19        the financial ties was introduced

20        to Judge Higbee early on, and the

21        conflict of interest that the

22        doctors had in receiving all of

23        that money and yet being very much

24        influenced by this money, in my
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          opinion, had a very negative

2          effect on a lot of our clients,

3          because they were taking money, it

4          was altering their prescribing

5          habits, and I think to the

6          detriment of a lot of our clients.

7               Soon after our work in the

8          LoPresti trial, Judge Higbee

9          ordered the production of 1099s

10         for all providers in the trial

11         cases moving forward.

12              MR. DASSOW:  I just want to

13         touch on a couple of other aspects

14         of the LoPresti trial and why it

15         is important.

16              First of all, at the

17         beginning, and this is early on in

18         the litigation, we've got Chris

19         Seeger's office, we've got Mark

20         Lanier's, we've got Perry's

21         office, and we've got Anapol

22         Schwartz and us, that's it, going

23         forward.  You are seeing a lot of

24         people, you guys, and they are all

FAC Resp. Exhibit D -- 137

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       telling you, we did a lot of

2       common benefit, but I'm telling

3       you, we were involved right away

4       with Chris and Mark and Perry at

5       the beginning with a trial case

6       that we had five months to work

7       up.

8           Other than the Humeston

9       trial, nothing had been going on.

10      Mark is working on the Ernst

11      trial.  I mean, we're involved and

12      we're going.  That's how we are

13      different at the beginning from

14      all the other folks that are

15      coming in and talking to you guys

16      and telling you how they did

17      common benefit things.  Well, we

18      were at the ground floor, and we

19      went all the way up the elevator

20      with everybody in this room.

21          I've got a couple of points

22      here.  You can tell we did 12

23      depositions.  Obviously, we all in

24      this room did a number of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1      depositions.  At the beginning, we

 2      were the earliest firm to take

 3      sales reps other than Jerry

 4      Kristal.  I think that Moshe came

 5      along to a couple of deps with us,

 6      but Harley, O'Connor, Fagen,

 7      what's important there is there

 8      were six Merck lawyers at each of

 9      those depositions defending them

10      against us.  Each deposition.

11          We did some physician

12      depositions of family members.  I

13      want to note one last thing on

14      this slide.  You see the

15      deposition of Dr. Lynch?  What is

16      important is, in Chris' trial, I

17      believe, and in the first trial,

18      they brought up the green monkey,

19      and they want to talk about venous

20      and arterial problems that the

21      green monkey showed that you can't

22      have plaque accumulation, blah,

23      blah, blah, I won't go into all

24      the fun medical terms and things
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1       like that today, but what's

2       important is, through an expert of

3       ours, I was told that Dr. Lynch

4       would tell the truth.  I was told

5       that Dr. Lynch would come forward

6       and explain that the green monkey

7       study meant nothing.  And that's

8       exactly what he did.  I prepped,

9       took his deposition in Philly, and

10      that applied to everybody.  You

11      never heard that again, unless

12      Mark and Chris can tell me, you

13      never heard about the green monkey

14      study ever again.  He was done.

15      Never heard about it again.  I

16      don't think in the MDL trials,

17      they may have brought it up, I'm

18      not sure, but it was over.

19           What's the impact of

20      LoPresti?  We disseminated all the

21      sales rep documents, deposition,

22      video clips to anybody who wanted

23      it in New Jersey.  Frankly, I

24      didn't care if they went to the

FAC Resp. Exhibit D -- 140

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          MDL.  I didn't care.
 2               We disseminated all the
 3          prescribers, all the cardiologist
 4          depositions we did.  We gave our
 5          outlines.  We didn't care, it was
 6          for the common benefit after the
 7          first four or five firms got it
 8          going.  We were ready to go and
 9          help anybody else.
10               Again, while Chris and the
11          folks in New Jersey are on trial,
12          and the best way I can explain is
13          they went on trial, and we are
14          right underneath them kicking
15          Merck's butt and keeping them as
16          busy as we possibly can at all
17          times.  That is true 'til November
18          of '07, until the settlement.
19               Susanne is going to just
20          touch on something of interest
21          that was about Rodney Jew, and you
22          know --
23               MS. SCOVERN:  As soon as
24          Judge Higbee gave us the green
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1      light for our bellwether cases to

 2      move forward, my firm set up a

 3      number of trial strategies,

 4      seminars presented by Rodney Jew.

 5      He is the foremost trial

 6      consultant and litigation

 7      strategist in Palo Alto.

 8           MR. DASSOW:  Other than Dr.

 9      Bob.

10           MS. SCOVERN:  So, we

11      attended two week-long sessions in

12      Palo Alto.  And at that time, we

13      were land mining and doing case

14      mapping from our respective cases.

15           And the overall impact,

16      common benefit impact I think with

17      our three firms working together,

18      Chris', Anapol Schwartz and ours,

19      our group, was it developed a

20      strategy for a coherent and

21      effective trial theme for future

22      common benefit cases or the common

23      benefit of future cases in New

24      Jersey.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

          1          MR. DASSOW:  Richard Allen.

          2          After we were working on the

          3          Rodney Jew issue, Judge Higbee

          4          talked to us, and since we didn't

          5          get to go on that particular trial

          6          because of the other trials that

          7          were going, she chatted with us,

          8          along with Merck, and said we want

          9          you guys to put up some cases for

         10          the next round.  So, what we did

         11          in June was work on, go through

         12          each one of our cases to figure

         13          out, now that the judge has opened

         14          up nonNew Jersey cases, she opened

         15          up the entire United States, we

         16          didn't have the conflict issue

         17          anymore.  Judge Higbee opened it

         18          up.  She wanted our cases in July

         19          of '06.  As a result of what we

         20          ponied up at that point, along

         21          with other folks in this room,

         22          Judge Higbee selected Richard

         23          Allen as one of the main trial

         24          cases of the 39.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1          Richard Allen made the cut

 2      with Chris and Mark and Perry,

 3      made that cut down to one of the

 4      ten that was going to go in the

 5      next batch.

 6          What's important there is

 7      that we flew out and met with

 8      Mark, and we strategized about how

 9      are we going to put the trials

10      together, what cases mesh, how are

11      we going to do that, and, frankly,

12      Mark said, here's what we're

13      looking for, we want you

14      tag-teaming it, how are you going

15      to do this?  So that's what we

16      did.  And I point out a couple

17      other issues here.

18          We have 24 sales reps.  We

19      had hundreds of thousands of

20      documents.  We had the most

21      voluminous production with regard

22      to Mr. Allen, I think, of any of

23      the cases at that time.  We went

24      through that thoroughly.  And I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      came up with a couple of sales

2      reps that we took.  In that case,

3      in a matter of two-and-a-half

4      months, we took nine discovery and

5      de bene esse depositions.  This

6      case was absolutely primed and

7      ready to go to trial.  Morricol

8      and Hillis, the cardiologist and

9      the prescribing doctor, were

10     absolutely totally on board.  Had

11     they known about the risks of

12     Vioxx, they never would have

13     prescribed it.  I had a

14     cardiologist, and we had the

15     prescriber both saying that, and

16     saying many, many better things

17     for us.  The case was great.

18     Every case had warts, let's not

19     kid each other, every case had

20     warts.

21          The other thing to note with

22     regard to Allen is that we were

23     one of the first firms to be

24     allowed by Judge Higbee to get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
1        regional business managers.  This
2        applied to all of the cases.  She
3        allowed us to get the regional
4        business manager.  Why is that
5        important?  That tied in Anstice
6        to the regional business manager
7        to the low level sales reps.  We
8        never got there, but we put
9        pressure on them, and we are the
10       only people to get that, and that
11       was for the common benefit of
12       everybody.
13           I also mentioned there the
14       whistle blower.  I can't tell you
15       with the gentlemen sitting here
16       how many whistle blowers you had
17       or if you had any.  I ponied up
18       and offered a whistle blower to
19       Moshe on an occasion, Mark had the
20       ability, talked to Jerry Kristal
21       about it.  I had a nurse sales rep
22       in Indiana that was willing to
23       testify with regard to Merck.  She
24       had a TIA while she was on Vioxx,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1         okay, while she was on Vioxx,

 2         confronted her people and her

 3         regional business manager and

 4         said, this stuff is killing

 5         people, it's causing heart attacks

 6         and strokes.  He said, if you say

 7         anything else, you are going to be

 8         fired.  So, that gives you a

 9         little background.

10              We never needed it.  We

11         couldn't really bring her in,

12         because the Indiana case never

13         went.  It was a decision made that

14         we never used it, but she was

15         available, and I made her

16         available for everyone in the

17         trial.

18              What's the quick common

19         benefit of that?  We continued to

20         put pressure on those nonstop with

21         regard to Allen.  First whistle

22         blower, as far as I know, and the

23         first regional business manager.

24              Susanne is now going to talk
```

FAC Resp. Exhibit D -- 147

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

 1       to you about physician

 2       compensation, kind of our pet

 3       project that we had that was for

 4       the common benefit of everybody

 5       with regard to 1099s.

 6            MS. SCOVERN:  It started off

 7       with Ben LoPresti, as I mentioned,

 8       and it carried through the entire

 9       litigation.  What I was doing was

10       comparing the Merck profile form,

11       and for the MDL, it is called the

12       defense fact sheet, responses that

13       Merck provided for the payments to

14       doctors to their 1099s.

15            In the Merck profile form,

16       Merck is supposed to list all the

17       payments to doctors for their

18       presentations, their honorariums,

19       their clinical investigations of

20       any COX-2s, including Arcoxia, and

21       their expenses per calendar year

22       from 1999 to 2005.  If you looked

23       at what you were getting in the

24       Merck profile form for physician

FAC Resp. Exhibit D -- 148

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1    compensation and compared it

2    against their 1099s, there were

3    widespread discrepancies and

4    redactions.

5         Merck came up with a series

6    of explanations trying to explain

7    away the inconsistencies for a

8    period of three to four months.

9    Either they didn't have the 1099s

10   anymore or they were in storage or

11   they couldn't locate them or it

12   was an IRS reporting nuance or we

13   didn't know what the redactions

14   were on the Merck profile forms,

15   but we'll get back to you.

16        We were in Judge Higbee's

17   chambers at least six to eight

18   times between June and July on

19   this issue and multiple conference

20   calls with her.  In the end, what

21   we discovered was that they

22   redacted in the Merck profile form

23   all physician payments that went

24   to any clinical research,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          including Arcoxia, and any grants

2          that they gave to doctors.  And

3          when you compared that with the

4          1099s, in the end they told Judge

5          Higbee in chambers that they did

6          not issue 1099s to doctors for

7          clinical research work or grants

8          given to doctors.  And that's

9          millions of dollars.

10                MR. DASSOW:  Let me just say

11         this again.  They never issued

12         1099s to doctors ever.  Even in

13         clinicals, even in preceptorships,

14         even in tutorials, they never did

15         it, and they expensed it.

16                MS. SCOVERN:  So, that

17         opened up Merck to a very big

18         issue of liability with the IRS.

19                MR. DASSOW:  Hundreds of

20         millions of dollars we know.

21         That's what we were told by Merck.

22         That's what we were told by

23         Dechert.

24                MS. SCOVERN:  What Judge

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1     Higbee then ordered was the

2     depositions of the executives at

3     Merck who were responsible and

4     signed off on the defendant fact

5     sheets and Merck profile forms,

6     the people who had to compile the

7     physician data.  And we were able

8     to explore how they went about

9     trying to mine physician data, and

10    it was completely corrupt.

11         They were mining databases

12    based on the name of the

13    prescriber that a plaintiff would

14    provide in a plaintiff profile

15    form.  That's it.  If the

16    plaintiff misspelled the name, you

17    were not going to get physician

18    compensation.  If the plaintiff

19    did not list the address of the

20    professional corporation for the

21    prescriber, you are not going to

22    get their physician compensation.

23         They had this information

24    because they targeted doctors

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1        through their sales reps, yet they
 2        failed to provide it on thousands
 3        of Merck profile forms and
 4        defendant fact sheets.
 5             MR. DASSOW:  Tens of
 6        thousands.  It applied not only to
 7        the New Jersey folks, but to the
 8        MDL, because we worked on the
 9        defense fact sheet and the Merck
10        profile form and know how we were
11        all getting cheated consistently.
12        And it was follow the money, and
13        we were not getting the
14        information.  So, what the effect
15        of that is, is when we would go
16        take -- for any of you guys, we
17        would go take a prescriber's
18        deposition, and you didn't know if
19        they were in Merck's pocket or you
20        didn't know whether they weren't
21        in Merck's pocket.  You didn't
22        know whether you had all the
23        contracts.  You didn't know
24        anything about that prescriber.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1      You were going to get blind sided

2      big time.  That's why we were

3      working on this for everybody.

4           MS. SCOVERN:  They did, they

5      withheld lots, I mean, thousands

6      of physician consulting

7      agreements.  They provided you

8      with the signature pages, but they

9      never provided you with the

10     payments to the doctors.  It is an

11     issue in this litigation, it is an

12     issue in all pharma litigation,

13     and it should be explored in all

14     of our mass torts.

15          MR. DASSOW:  And it was only

16     us, too, that were doing it.

17     Nobody else was doing it.  I don't

18     know about the MDL guys, I can't

19     tell you what you guys were doing,

20     but I can tell you that we're the

21     only two that Judge Higbee was

22     sending us out to do this and

23     taking the heads of Heins and

24     Scott, the head of people signing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1     these things, so we got them at

2     the top, and we can go down below.

3          MS. SCOVERN:  We actually

4     had a second series of depositions

5     scheduled with that group in the

6     first week of November right up

7     until the time of settlement in

8     2007.

9          The common benefit impact of

10    our physician compensation and

11    1099 investigation, the

12    credibility of Merck in front of

13    Judge Higbee was seriously,

14    seriously undermined, and she, in

15    the July 2007 CMC, expressed her

16    extreme disappointment with them

17    and the fact that she was in the

18    process of considering that Merck

19    reissue all Merck profile forms.

20         MR. DASSOW:  For all of New

21    Jersey.  And I can't tell you,

22    again, with regard to the MDL, but

23    I can tell you that that was the

24    next -- I'm sure Chris would have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        taken that up, we want to reissue

2        50,000 Merck profile forms.  Can

3        you imagine the cost to Merck to

4        do that?  It would have been

5        substantial.

6              MS. SCOVERN:  The other

7        thing that Judge Higbee did is she

8        ordered production of 1099s for

9        all prescribers in the expedited

10       discovery wave that was

11       established in 2007.  There were

12       two waves of 250 cases.  So, we

13       had 500 cases moving forward where

14       the exposure of the physician

15       payments was going to be made

16       readily available, and all firms

17       could have attacked Merck on that.

18             Merck had a serious issue

19       with the IRS as well.  And Judge

20       Higbee ordered that Merck send a

21       letter from the CFO to the IRS

22       explaining their 1099s and their

23       deficiencies in issuing 1099s from

24       1999 to 2005.

Page 31

1              MR. DASSOW:  We don't know

2         as we sit here today really what's

3         happened with it, but it's

4         certainly an issue that I have

5         already talked to the judge about

6         with regard to our TPP cases.

7              Also the AG issue, as you

8         know, the knees and hips folks and

9         everybody like that has paid

10        millions of dollars for the issue

11        that we're going after.  That's

12        why we pressured them with regard

13        to that.

14             The next slide is our

15        commitment to trials.  So, things

16        didn't go so well for some trials,

17        things went pretty well back and

18        forth.  Well, what happens now in

19        '07?  We never waned.  In fact, we

20        were picking up speed, the two of

21        us, our firms.  We are committed.

22        Now we're talking about trial pool

23        consideration.  The folks here,

24        some of them are on trial, so what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1       are we requested to do?  We're

2       requested to go kick Merck's butt,

3       right, and support whoever is

4       going to trial.  So, what do we

5       do?  We pony up 17 cases in the

6       first wave.  17 cases.  We only

7       have 265 cases between us.  Okay?

8       I don't know if anybody in this

9       room ponied up 10 percent of their

10      cases for trial, but we did for

11      working on expedited discovery.

12      And I really truly believe that

13      that's significant.  I know that

14      most of you guys have more cases,

15      but if somebody has 1,000 cases,

16      nobody ponied up 100 cases, I

17      assure you.  This was a

18      tremendous, tremendous burden on

19      our firms to do this.  I mean,

20      tremendous burden.

21          I want to point out two

22      particular cases.  Tena and Fagel

23      were both going to be trial cases,

24      I assure you.  Both are death

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          cases.  Tena has two kids,

2          16-year-old honor student from New

3          Mexico.  Susanne had traveled like

4          crazy to New Mexico.

5               Merck put six lawyers on the

6          issue of whether we even get to

7          depose Dr. Sokoloff in New Mexico.

8          Six lawyers.

9               Ms. SCOVERN:  He was a

10         doctor that had over $200,000 in

11         payments -- he was involved in the

12         Arcoxia trials and the Vioxx

13         trials.

14              MR. DASSOW:  They hired

15         every firm.  They had Fulbright &

16         Jaworski flying out to defend

17         them, they have got Dechert.  They

18         have got everybody defending them.

19         I only talk about that case, as

20         well, because Susanne meets with

21         the pathologist, who is a Merck

22         pathologist.

23              MS. SCOVERN:  It was a

24         pathologist that conducted the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          autopsy report on Mr. Tena, who

2          was 37 years old at the time of

3          his death.  And when I was meeting

4          with him, he said, let's go look

5          at the slides.  And we went down

6          to look at the pathology slides

7          together.  And he saw, you know, a

8          thrombus, and he just said, this

9          is one that you guys need to bring

10         further.

11               MR. DASSOW:  And he further

12         goes on and says, why didn't you

13         try this case?  But this was one

14         of those cases, as well as Fagel

15         was also a death case.  A

16         14-year-old little boy, son goes

17         up and finds him slumped over in

18         the basement.  That's in addition

19         to all the other cases we're

20         working up.  So, we've got those

21         issues.

22               Additional contribution --

23         we are almost done, fellows.  I

24         need your attention here for a

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1      little bit longer.  I know that

2      you guys are busy.

3            We participate in each and

4      every CMC from November of '04

5      until this case was settled.  We

6      were there.  Let me tell you this.

7      I looked at all the firms that

8      were presenting to you.  I want to

9      find somebody, other than the

10     folks that are here, that was at

11     each and every CMC, that was

12     flying out from Indianapolis, from

13     California, not driving in to New

14     Jersey, flying out consistently.

15     I was in attendance early on in

16     '05 at Anstice, Kim, Gilmartin and

17     Scolnick, all right?  I did not

18     put that time and expense down in

19     my submission to you guys.  Didn't

20     put it down, because I didn't take

21     the depositions.  Mark took the

22     depositions.  Chris took the

23     depositions.  I can't remember who

24     else took the depositions.  But I

FAC Resp. Exhibit D -- 160

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        was one of 15 lawyers learning the

2        case.  I didn't put that down as

3        time and expense.  Susanne goes to

4        Dr. Fries.  Mark, there's six

5        people there, Susanne is there

6        with you.

7             MS. SCOVERN:  I didn't have

8        to travel.

9             MR. DASSOW:  That was one

10        you didn't have to travel.

11             Graham's deposition.  We

12        went to every bellwether case

13        selection meeting in New York City

14        and Atlantic City.  We went to

15        discovery stuff at Battery Park

16        and Trump Plaza.  We filed

17        numerous motions that applied to

18        each and every case in New Jersey

19        and potentially applicable to the

20        MDL.

21             Sales reps redactions.

22             MS. SCOVERN:  Can I just add

23        that two weeks prior to the

24        settlement, the end of October,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          just days before the settlement,

2          I, along with Jeff Grand and Jerry

3          Kristal and Mike Wenkowitz,

4          representing New Jersey plaintiffs

5          in a special hearing called by

6          Judge Higbee, made the motion for

7          the 250 expedited cases in

8          discovery at that time to get

9          additional custodial and sales rep

10         files.  Each firm had issued their

11         own motion, and we were battling

12         it out trying to get sales rep

13         documents from Charlie Cohen and

14         Ben Barnett just two weeks prior

15         to the settlement.

16              I think overall, our common

17         benefit impact was tremendous.  We

18         worked with New Jersey liaison

19         counsel.  We are not at the same

20         tier as they are, but we worked

21         just as hard.  We put tremendous

22         pressure on Merck.

23              The intensity of our work

24         increased.  In 2007, as Robb said,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          we had 10 percent of our cases up

2          for expedited discovery.  This is

3          after we had lost a few.  And

4          believe you me, there were a lot

5          more seats at the CMC in 2007 when

6          we got there, but we accelerated

7          the process and increased our

8          work, and we did whatever was

9          asked from our firms.

10              MR. DASSOW:  I've got a

11          couple more comments, and then

12          we'll let you get on with somebody

13          else.

14              We have separate fee apps,

15          again, like I told you earlier,

16          and we teamed up because as

17          everybody teamed up in these

18          cases, you needed the manpower to

19          take on Merck because of all the

20          lawyers, as you well know.

21              Again, at the beginning, we

22          were there fighting Merck.  In the

23          middle, we were fighting Merck.

24          And at the end, we were fighting

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1       Merck.
 2            One last comment.  There are
 3       people on this committee that
 4       obviously did a tremendous amount
 5       of work and more than Susanne did
 6       and have spent more money.  But I
 7       can tell you as the tiers go, and
 8       when you go to the next level and
 9       you guys decide on this, I'm sure
10       you can tell how passionate I was
11       about the Vioxx, how passionate I
12       am about this, and I was really
13       motivated, and we're in the guts
14       of this case.  While we're not up
15       there with a lot of you folks that
16       tried the cases, we were ready,
17       willing and able to try cases, and
18       we did everything that was asked
19       of us.  I really appreciate it,
20       guys, really appreciate it.  Thank
21       you.
22            MR. LEVIN:  How are you
23       making out with the accountants
24       with all of your rejected hours?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          MR. DASSOW:  We haven't had

2     anything rejected.

3          MR. LEVIN:  Yes, you have.

4          MR. DASSOW:  Okay.

5          MR. LEVIN:  The accountant's

6     records shows Bill Audet's firm

7     submitted 7,722 hours and $258,000

8     in costs and they are rejected.

9     It could be something procedural.

10         MS. SCOVERN:  The one thing

11    that they asked us to do was break

12    that out by calendar year, and

13    we're in the process of doing that

14    for them.

15         MR. LEVIN:  Hovde, 8,442

16    hours and $270,000 in costs that

17    are rejected.

18         MR. DASSOW:  Okay.  I have

19    no idea why.  I have to split them

20    up.

21         MR. LEVIN:  You have to find

22    out so that we can handle it.

23         MR. DASSOW:  Okay.  Let me

24    tell you this.  This is the first

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1          I've heard about it being

 2          rejected.  They have called me six

 3          times, and I told them, listen, if

 4          you had told me from day one that

 5          I was going to be sitting in front

 6          of a committee, I would have had

 7          it on my --

 8               MR. LEVIN:  I'm sure you

 9          will straighten it out.

10               MR. SEEGER:  By the way, it

11          is not a factor for today.

12               MR. DASSOW:  Good.

13               MR. SEEGER:  We just need it

14          done.

15               MR. LEVIN:  I just want to

16          get it done.

17               MR. BIRCHFIELD:  If you are

18          communicating with them and you

19          are running into difficulties, let

20          us know, somebody, Chris.

21               MR. HERMAN:  You've got

22          15,000 hours reported between the

23          two firms, and obviously you've

24          worked together.  That's a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1        significant number of hours.  You

2        don't have to do it yourself, but

3        I can tell you a number of firms

4        that are just making an

5        appointment, going in to sit with

6        the CPA and working it out, and it

7        can be worked out in maybe half a

8        day.  It is probably worth your

9        while to go ahead and do that.

10            I need to tell you that the

11       CPA firm does absolutely no work,

12       none, for any Vioxx entitled firm

13       or individual.  They are

14       completely independent, selected

15       by the judge.

16            MS. SCOVERN:  We've had a

17       great --

18            MR. DASSOW:  They've been

19       great.

20            MR. HERMAN:  They will work

21       with you, but given the Christmas

22       holidays coming up, et cetera, it

23       is probably worth somebody's while

24       to go make a trip and meet with

FAC Resp. Exhibit D -- 167

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1      them.

2           MR. DASSOW:  It is

3      significant enough for us, Russ,

4      that we will fly down and meet

5      with them for half a day.  I can

6      answer questions.

7           MR. HERMAN:  Give them a

8      call.  Get yourself a slot.

9           MR. DASSOW:  No problem.

10          MR. HERMAN:  I have a couple

11     of questions.  I will try to make

12     them quick.

13          The 3,000 detail persons,

14     I'll use the old marketing term,

15     were those New Jersey, New York,

16     Pennsylvania?

17          MS. SCOVERN:  Those were

18     countrywide, throughout the

19     country.

20          MR. HERMAN:  We've got

21     18,000 in our database.  It took

22     us a long time to get them there.

23          MS. SCOVERN:  I have 3,000

24     from the Henry Waxman

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

```
 1        investigation into the Vioxx

 2        marketing, Congressman Henry

 3        Waxman.

 4             MR. HERMAN:  In your cost,

 5        do you remember what you paid

 6        Rodney Jew?

 7             MR. DASSOW:  I know that

 8        Bill picked up the major tab of

 9        that, if I remember.

10             MR. SEEGER:  It was some

11        flat number, I think.

12             MR. DASSOW:  It was a flat

13        number.  I think our firm paid 10

14        or 15, I mean my firm alone.

15             MS. SCOVERN:  I think it was

16        35,000.

17             MR. HERMAN:  That's

18        reasonable.  I'm interested,

19        because I know a great deal about

20        Rodney Jew, and I've talked with

21        him on occasion, and that sounds

22        reasonable to me.

23             MS. SCOVERN:  I think it was

24        35,000 each week.  And if you are
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

```
 1         going to use them in the future,

 2         he's now in Napa.

 3              MR. HERMAN:  Well, he's

 4         great on colors and charts and

 5         that -- well, what he's good on,

 6         he's good.

 7              MS. SCOVERN:  That's our

 8         colors right there.

 9              MR. DASSOW:  There's red.

10         You can see that he's getting too

11         old.

12              MS. SCOVERN:  Do you see

13         that now, Chris?

14              MR. SEEGER:  I do now that

15         you mention it.

16              MR. HERMAN:  I don't have

17         any other questions.  Mainly my

18         questions had to do with sales

19         reps.  But I do want you to know,

20         because you are not familiar with

21         the work in the MDL, that we had

22         many hearings and a Court-approved

23         Merck profile form, substantial

24         work done with regard to detail
```

FAC Resp. Exhibit D -- 170

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          persons, et cetera.

2                  The shame of it, and I'm

3          going to put this in the record,

4          is that law firms still continued

5          either to go off on their own and

6          think, well, I'm not going to be

7          an MDL lawyer, and then their

8          lawyers will say I'm an MDL

9          lawyer, I'm not going to be an

10         independent lawyer, and sooner or

11         later, this plaintiff bar is going

12         to have to find a way where we all

13         work together, because there's too

14         much talent out there, and there

15         are too many evildoers on the

16         other side for us to be

17         duplicating work.  Even though we

18         try to cooperate with each other,

19         we've got to find a better way of

20         coordinating these major cases.

21                 MS. SCOVERN:  This physician

22         relationship with payments from

23         big pharma to physicians is

24         something that permeates all

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1          pharmaceutical cases, and it needs

2          to be exploited and explored.

3               MR. HERMAN:  We're going to

4          find it in the chemical industry,

5          we're going to find it everywhere.

6               MR. RAFFERTY:  On the 17

7          cases, did you work up all 17 of

8          those cases?

9               MR. DASSOW:  No.  Because

10         you guys got the cases.

11              MR. RAFFERTY:  So, how many

12         of those got --

13              MR. DASSOW:  You guys

14         screwed up.  You got them settled.

15         What the heck.

16              I can't remember when the

17         tranche was, but I would say

18         several months for sure.

19              MS. SCOVERN:  I would say

20         half, Troy, half.

21              MR. SEEGER:  Thank you.

22              MR. BIRCHFIELD:  Thank you.

23                   -   -   -

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          AUDET & PARTNERS, LLP
               William Audet, Esquire


BEFORE COMMITTEE MEMBERS:


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                         -   -   -

2               MR. GIRARDI:  Obviously, you

3          can tell there's a court reporter

4          here, and so everything will be

5          taken down.  The primary purpose

6          of this is for Judge Fallon, who

7          clearly is the final say on all of

8          this.

9               Further, as you know, you

10         have given half the presentation

11         before us, but not the California.

12         So, we gave permission so that you

13         could fill up that time, which I

14         think is about 12 minutes, with

15         respect to the California cases.

16         We don't do this to be unfair to

17         you, but we want to make sure we

18         are fair to everybody so everybody

19         gets the same time.  So, you may

20         go forward.

21              MR. AUDET:  Thank you very

22         much.  Well, I appreciate the

23         committee's time in allowing me

24         the opportunity to finish up the

FAC Resp. Exhibit D -- 175

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          presentation that we started in

2          New Jersey, and I appreciate the

3          fact that you have given me a

4          little extra time to finish up,

5          and I will do this in short order.

6                Essentially, the focus of

7          the presentation today by me will

8          be less than five minutes and just

9          discuss what I think was our

10         contribution to the California

11         cases.  I know there's a couple of

12         other firms in the same situation,

13         but my firm thought that it would

14         make sense to have basically cases

15         in New Jersey and in California.

16         We understood that at some point

17         in time there was a general

18         request that cases that could be

19         ready for trial in short order be

20         filed in California, and so my

21         firm filed just six cases in

22         California, all of which were

23         pretty good.  We then were given

24         the opportunity to present to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1           Tom's office with the help of,

2           actually, Jim O'Callahan two cases

3           for selection.

4                One of them didn't get

5           selected.  It was an MI.  It was

6           Andreasen.  Our office had met

7           with him a number of times.  We

8           wanted to make sure that he was

9           ready to go to trial if need be.

10               If you look at our chart,

11          two of our cases were designated

12          out of the 18 in the January '06

13          selection process.  We were

14          selected by Judge Chaney in March

15          '06.  At that point we really got

16          heavily involved in the California

17          litigation overall.  Prior to

18          that, quite honestly, we had done

19          some work in California, but it

20          was at that point I assigned a

21          lawyer almost full time to work on

22          that case under my supervision.

23          We worked closely with Jim

24          O'Callahan, who I believe would

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1    back up that we did bother him a

2    lot with questions to get up to

3    speed.

4         Our client had a very unique

5    issue which Jim thought was

6    important or at least I thought

7    was important, and that was

8    military marketing.  Up until

9    then, apparently there had been no

10   real pressing on the issue of

11   military marketing.  Our client

12   was in a VA hospital, was also in

13   a regular hospital, but was on VA

14   benefits.  We took a number of

15   depositions.

16        The common benefit impact of

17   the bellwether case was, we did at

18   least one deposition that Jim

19   thought was a good idea to do, and

20   that was a person most

21   knowledgeable regarding military

22   marketing.  We actually found some

23   information that was contrary to

24   their prior representations

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          regarding the lack of military
 2          marketing.  And that was one of
 3          the issues that allowed us to
 4          proceed and get an order from
 5          Judge Chaney to open up more
 6          military marketing issues.
 7               Again, we looked, I think
 8          the segment of the population was
 9          eight to ten percent, but
10          nonetheless, we thought it might
11          be useful to others.  If our trial
12          didn't go forward, it was still
13          useful to press that issue.
14               We have a summary of
15          contributions, but I'll close on
16          my California contribution there
17          because, of course, I'm not here
18          to regurgitate what Suzanne
19          presented before to you.
20               MR. BLIZZARD:  One question
21          for you.  What happened to the
22          bellwether trial cases?
23               MR. AUDET:  Here's what
24          happened, unfortunately.  It was a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          good idea.  The doctor had left

2          the United States.  We hired a

3          private investigator.  There was a

4          critical issue about he was on it

5          for six months.  We could show

6          through him and through -- we had

7          one of three, three of four, he

8          kept some of the bottles.  We were

9          able to show that there was six

10          months of usage, and that was

11          pretty critical.  Unfortunately,

12          we couldn't get the VA Hospital

13          records.  The Court declined an

14          issue ordering them to produce it.

15          We issued a subpoena.  They never

16          produced the records.  That's when

17          we hired, and Jim suggested --

18          actually, Mark Robinson suggested

19          with Jim on a call to me that I

20          hire a private investigator to

21          locate the doctor.  We located

22          him.  I hired someone to go see

23          him.  He's in Germany.  He

24          basically slammed the door on us.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          He wouldn't give us any

2          information, said it was

3          privileged, confidential.  He had

4          no obligation to come back to the

5          United States.

6              So, what happened was, we

7          had a face-to-face with the judge,

8          and it was myself, I think Jim was

9          in, it was back in chambers, in

10         which the judge said, am I going

11         to have usage issues?  And they

12         would not stipulate -- even though

13         I could show through my client

14         that we had six months' usage,

15         they would not agree to it.  I

16         agreed to waive punitives.  I did

17         everything I could, and the judge

18         said, I'm not doing a usage issue

19         case.  I'm not going to have a

20         case in which you guys are going

21         to fight over usage for a week.

22             She said, it is up to you.

23         I talked to Jim about it.  Jim

24         said, take it as far as you can,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          but you are going to have to

2          dismiss this case if you can't

3          prove usage.  We put almost a good

4          year into the case.  We knew there

5          was some usage proof issues.  We

6          didn't know that we would never

7          get the VA Hospital records that

8          would prove it.  Again, because he

9          went to the VA, he didn't pick

10         them up at Walgreen's, we just had

11         no choice.  We had his affidavit,

12         we had his wife's affidavit, who

13         went and picked it up for him, but

14         again, unfortunately, we had to

15         drop the trial.  We did not want

16         to drop the trial.  The plan was I

17         really wanted to take it to trial,

18         and I wanted to be one of the

19         California plaintiffs because it

20         was ready to go, but because of

21         the usage issue, that was it.

22             I think we had a great

23         plaintiff.  He was a former

24         military man.  He couldn't support

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1           his family anymore.  I think he

2           was a really good client.  He had

3           some weight issues, but that

4           was -- I didn't think it was going

5           to be a problem.

6                MR. BLIZZARD:  So, when was

7           it dismissed?

8                MR. AUDET:  I have it

9           somewhere.  I know I have it

10          somewhere.  It was dismissed -- I

11          don't know if I have that with me.

12          Josh would have this.

13               MR. GIRARDI:  We have that.

14          Clearly the benefit and what you

15          did do was to show the marketing

16          to the government.  That was the

17          whole focus of this.

18               MR. AUDET:  Correct.

19               MR. GIRARDI:  Because that

20          was an area that Merck had denied,

21          and because of your work, you

22          opened that can of worms up and

23          then got very beneficial documents

24          and testimony to show they were

FAC Resp. Exhibit D -- 183

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        marketing to the government.

2        True?

3            MR. AUDET:  Yes, that's

4        correct.  And even June '07 I have

5        here, per the judge's request, we

6        did a telephonic deposition of a

7        military in charge of VA hospitals

8        in the western region with the

9        defendants.  They supposedly had

10       the primary prescriber, but we

11       could never get him to identify

12       himself.  That was the problem.

13       We had a court order that

14       basically he wasn't going to abide

15       by because he was in Germany.  So,

16       again, I did a lot of consulting

17       with Jim about this and what we

18       could do.  And again, his concern

19       was going forward.  But we were

20       committed to doing the trial, of

21       course, with Jim's help.  I don't

22       know if there's any other

23       questions.

24            MR. SEEGER:  Suzanne did a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          very thorough job about your

2          contributions.

3                MR. LEVIN:  And also

4          corrected the record with a letter

5          afterwards.

6                MR. AUDET:  I thank the

7          committee for pointing out the

8          deficiency.  We weren't aware of

9          that.  It's already been

10         corrected.  We've already given

11         them the zip file, I learned, last

12         night and this morning.

13               So, I do appreciate the

14         committee, actually, its time, its

15         efforts, and really that's my

16         presentation unless you have any

17         questions.

18               MR. GIRARDI:  Thank you.

19               MR. AUDET:  Thank you.

20                     -   -   -

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1                 C E R T I F I C A T E

2

3                 I, LINDA L. GOLKOW, a Notary

4      Public and Certified Court Reporter of

5      the State of New Jersey, Registered

6      Diplomate Reporter, Federally-Approved by

7      the United States District Court of

8      Pennsylvania, do hereby certify that the

9      foregoing is a correct transcript of the

10     testimony as taken stenographically by

11     and before me at the time, place and on

12     the date hereinbefore set forth.

13                 I DO FURTHER CERTIFY that I

14     am neither a relative nor employee nor

15     attorney nor counsel of any of the

16     parties to this action, and that I am

17     neither a relative nor employee of such

18     attorney or counsel, and that I am not

19     financially interested in the action.

20

21     _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 186

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:  AYLSTOCK WITKIN KREIS &
       OVERHOLTZ, PLLC
       Justin Witkin, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
     877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 187

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2               MR. BIRCHFIELD:  Everything
 3          is on the record, and so we'll
 4          have a transcript in the event the
 5          judge needs it.  So, the floor is
 6          yours.
 7               MR. WITKIN:  Thanks for
 8          allowing me the opportunity to
 9          speak.  I apologize ahead of time
10          if I'm a little horse or if I
11          sniffle.  I'm coming off a little
12          cold.
13               I think I know all of you,
14          but I'm Justin Witkin from
15          Aylstock Witkin Kreis & Overholtz.
16          As I understand it, you've asked
17          me to come here today and talk
18          about how my firm's contribution
19          to the litigation benefited the
20          litigation and the end result as a
21          whole.  I've obviously submitted
22          an affidavit, and I won't rehash
23          that here.  I've prepared just a
24          few remarks.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1                I think that, in essence,

 2          the way I would answer the

 3          question of how were the things

 4          that we did beneficial to the MDL,

 5          beneficial to the litigation, was

 6          that we answered the call of the

 7          PSC at the beginning of the

 8          litigation.  Our role was largely

 9          in response to requests for work

10          from the PSC, and those requests

11          came throughout the duration of

12          the litigation, at the beginning,

13          middle and end of the litigation.

14                A few examples of some of

15          the things that we were asked to

16          do and that we stepped up to do,

17          towards the sort of end of the

18          case, there was a desire to put

19          together a stroke package.  That

20          wasn't necessarily the most

21          desirable work, because the effort

22          had been on the MI cases.  The

23          request, I think, came through

24          your office, Russ, through Penny,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          and we stepped up and did that.

2          We sent multiple attorneys to

3          review stroke documents, to work

4          on the stroke package, when there

5          weren't really any other takers

6          for that job.

7               MR. SEEGER:  Justin, could

8          you identify the lawyers from your

9          office that worked on the case?

10              MR. WITKIN:  Sure.  We had

11         Bryan Aylstock, Ben Anderson,

12         Paula Bruner.  I'm not sure if Ken

13         Smith was over there at the time.

14         Ken Smith might have been over

15         there.

16              MR. LEVIN:  Ken Smith did

17         work.  He did work.

18              MR. WITKIN:  I'm trying to

19         remember whether he did the stroke

20         package work or not.

21              MR. LEVIN:  He had more

22         hours in discovery than anybody

23         else in your office.

24              MR. WITKIN:  Right.  I was

FAC Resp. Exhibit D -- 190

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        going to address that next,

2        actually.

3             In 2005/2006, the dates all

4        blend together, when the documents

5        first started rolling in or

6        started rolling in in large

7        volume, as I'm sure you all

8        recall, the request every week

9        was, who can send people to review

10       documents?  Who can send people to

11       review documents?  We've got a

12       depository in New York, we've got

13       a depository in Louisiana.  And we

14       did.  And we didn't just send the

15       contract lawyer or the guy that

16       has been in the firm for a year.

17       We sent a 25-year lawyer, Ken

18       Smith, with our firm, and he

19       reviewed documents for weeks on

20       end.  We had other people at other

21       times that reviewed documents,

22       but, again, we were answering the

23       call when the PSC put the call

24       out.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1              At the outset of the case,
 2         when things first started going
 3         and we got into some of the sales
 4         rep discovery, it was my firm that
 5         drafted the sales rep database
 6         brief, in conjunction with Dawn
 7         and some others, and had some
 8         input on it.  We did that.  Mark
 9         Robinson approached us and asked
10         us to be involved in the sales rep
11         discovery.  We got involved in
12         doing the -- Neil Overholtz of my
13         firm got involved in drafting some
14         of the subpoenas, took some
15         depositions with Lenny from your
16         office, Russ.
17              Initially there was an
18         effort to identify sales reps in
19         the state of Florida who we could
20         contact because they were no
21         longer employees of Merck, and we
22         were trying to figure out could we
23         do that, so we were involved in
24         that project.  That was a request
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1         that was made at the beginning.

2         We stepped up and we did that.

3             The Irvin trial came along,

4         and obviously Andy's firm was

5         responsible for that.  Because of

6         its connection to Florida or maybe

7         because of our proximity to Andy

8         or because I'm so good looking,

9         Andy asked us to get involved in

10        that, and we did.  We got involved

11        both in Irvin I and in Irvin II,

12        and Irvin I in a more limited

13        capacity, helping on some depo

14        cuts and were doing some jury

15        questionnaires, we were out of

16        Houston for that.

17            In Irvin II, when the crunch

18        came down on the motions in

19        limine, I'm not sure if it was

20        Andy or if it was Leigh, called us

21        and said, we've got these 10,000

22        motions in limine, can you do

23        these?  And I literally pulled

24        every attorney, or not every

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          attorney, I pulled six attorneys

2          from my firm, Joshua Jones, Ken

3          Smith, myself, Jason Richards,

4          Russell Rein, Bryan Aylstock, all

5          of us did nothing for a couple of

6          days but take care of those motion

7          in limine requests.  So, again,

8          the call went out, we answered the

9          call, and I assumed that, in the

10         scheme of things, Irvin was an

11         important part of the overall

12         effort to bring about the result

13         that we obtained here.

14              And then at the end of the

15         case, when the PSC was looking to

16         put a little more leverage, get a

17         little more leverage, try to bring

18         about a result, the request was

19         sent out, we're going to do this

20         rapid remand thing.  We want to

21         get some cases back into state

22         courts, we're going to file this

23         motion, put some cases back in

24         district courts so that we can get

FAC Resp. Exhibit D -- 194

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1           some pressure.  Let's identify

2           people who have cases who are up

3           to the task, and let's identify

4           the cases.  I did that, trying to

5           sort that out.  So, again,

6           answering the call, beginning,

7           middle and end.  I think that's

8           characteristic of all of our

9           efforts, which are more detailed,

10          obviously, in my affidavit.

11              I'll talk just real briefly

12          about my appointment to the State

13          Liaison Committee.  I was

14          appointed to the State Liaison

15          Committee.  The State Liaison

16          Committee, it seems to me, served

17          an important role in litigation

18          like this for this reason.  This

19          is obviously one of the bigger

20          litigations that's out there.

21          When you have a litigation this

22          size and this disparate, you have

23          to have cohesiveness if you want

24          to bring about the end result.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          You know that.  You can't get a
 2          global settlement unless you've
 3          got most of the people on board.
 4              So, the role of the State
 5          Liaison Committee, it seems to me,
 6          the important role in the state
 7          liaison committee, is to
 8          facilitate that cohesiveness, to
 9          make sure that the people who are
10          not necessarily at that middle of
11          the MDL process are on board or at
12          least are aware of what's going
13          on, so that when something
14          happens, they don't throw up their
15          hands and go, oh, gosh, oh, no,
16          and start to become the objectors.
17          Well, that's what the state
18          liaison committee did, and that's
19          what I did a lot of.
20              We published a newsletter,
21          and our names are out there in
22          front of hundreds, if not
23          thousands of attorneys.  And so we
24          would get random calls from Tom,
```

FAC Resp. Exhibit D -- 196

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1          Dick and Harry, hey, what's going

 2          on, can you tell me how to fill

 3          out the plaintiff profile form.

 4          Well, read the order.  Well, tell

 5          me how to do it.  So, I spent a

 6          lot of time doing that, and, you

 7          know, to my detriment, most of

 8          which I didn't capture and submit

 9          as time.  But that was an

10          important role, I think, that

11          benefited the litigation as a

12          whole, because it was necessary to

13          have that kind of cohesiveness.

14              Beyond that, I think that

15          anything, any of my time spent on

16          the SLC, discharging the orders of

17          the Court, is necessarily

18          important to the outcome of the

19          litigation.  The Court says do

20          something, you do it.  So, when

21          the Court said catalog all the

22          remand motions and tell me how

23          many remand motions and come

24          report to us every week or every

FAC Resp. Exhibit D -- 197

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        status conference, I did that.

2        And when Dawn wasn't there, I

3        filled in and I made those reports

4        for the Court.

5              MR. SEEGER:  Did you attend

6        most of the status conferences?

7              MR. WITKIN:  You know, I

8        did, I would say up until end of

9        2006, and as things sort of

10       tapered down and we looked like we

11       were heading in towards the

12       settlement, I stopped coming, I

13       stopped getting as many questions,

14       to be honest.  Part of what I had

15       to do, or I appreciated that I had

16       to do in order to facilitate the

17       cohesiveness in the state liaison

18       committee was to stay abreast of

19       what was going on.  In the early

20       stages, obviously that's when all

21       of the pretrial orders were coming

22       out that were setting out

23       procedures, and it was important

24       for me, I felt, to be at each

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          status conference, to read every

2          pretrial order, to try to stay

3          abreast of all the things that

4          were going on.

5               MR. HERMAN:  Let me ask you

6          a couple of questions.

7               Ben Anderson, is Ben

8          Anderson a partner?

9               MR. WITKIN:  Yes.  I wanted

10         to address both Ben Anderson and

11         Ken Smith.  When Wegmann sent out

12         the form that they wanted us to

13         fill out, they said identify

14         people as associate, partner or

15         contract attorney.  I identified

16         both of them as of counsel, even

17         though that wasn't a category, and

18         I'll tell you why.  Both of them

19         were, I think, functionally -- I

20         don't think, they were employees

21         of our firm.  I paid all of their

22         wages.  They could do no work

23         without my blessing.  Now, titles

24         matter to some people, and Ken

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1       Smith and Ben --

2              MR. LEVIN:  Let me tell you,

3       the title "of counsel" is not

4       necessarily a matter for us.  That

5       was sent out so that we could get

6       hourly rates and try to blend them

7       in categories.  So, don't feel

8       that you have hurt them or helped

9       them or anything by listing them

10      as of counsel.

11             MR. WITKIN:  I just wanted

12      to explain it.

13             MR. LEVIN:  It is not really

14      an issue from my perspective,

15      because I initiated that, and that

16      was just to get hourly rates.

17             MR. WITKIN:  I guess the

18      point I want to make is that Ken

19      Smith and Ben Anderson were not

20      contract attorneys.  They were

21      employees of my firm.

22             MR. HERMAN:  What about

23      Paula Bruner?

24             MR. WITKIN:  Paula Bruner is

FAC Resp. Exhibit D -- 200

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1          the same situation.  The only

 2          distinction between Paula Bruner

 3          and what I would call my other

 4          associates is that she lived in

 5          New Orleans.  I conditioned her

 6          becoming a full associate on

 7          moving to Pensacola, but she spent

 8          three years in my employment

 9          living in New Orleans.

10               MR. HERMAN:  I don't see any

11          hours for Neil Overholtz.

12               MR. WITKIN:  Well, then,

13          that is a bad oversight on our

14          part.

15               MR. HERMAN:  You need to

16          contact the CPA.  I need to tell

17          you that they don't have any

18          personal business with any Vioxx

19          lawyer or firm.  They are

20          independent.  The judge has

21          selected them.  You should call

22          them.  If you need a number or

23          something, call Lenny Davis in my

24          office.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          MR. LEVIN:  I seldom

2     contradict Russ, but Overholtz has

3     93 hours.

4          MR. HERMAN:  That's not what

5     I see here.

6          MR. WEITZ:  You said that

7     you had conducted some

8     depositions.  What was the name of

9     the deponent?

10          MR. WITKIN:  It was

11     Overholtz in my firm that

12     conducted the depositions.  He did

13     the 30(b)(6) of the MIS guy with

14     Lenny at the outset, and there was

15     one other one, and honestly I

16     don't recall the name.

17          MR. RAFFERTY:  Did he first

18     chair those, Justin?

19          MR. WITKIN:  I'm not sure

20     whether he did or not with Lenny.

21     I honestly don't know.  I know

22     that he did all the prep, but I

23     don't know whether he first

24     chaired it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1            MR. RAFFERTY:  Can you just

2       expand for me the work in the

3       stroke trial package, like what

4       y'all did and that kind of stuff?

5            MR. WITKIN:  I think that

6       the primary task, and my personal

7       involvement is less, so I can't

8       give you as detailed an answer as

9       I might like to, but we reviewed

10      the documents that were initially

11      coded as the stroke documents, to

12      try to identify those that would

13      be trial package documents.  And

14      from there, I think at the

15      direction of Russ' office, I'm not

16      sure what next steps we took or

17      whether we went so far as to

18      create depo cuts or what.

19           MR. HERMAN:  I just want to

20      say that Arnold has got an update

21      of the hours, so, you don't have

22      to worry about that.

23           MR. SEEGER:  Justin, on the

24      State Federal Liaison Committee

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          that you guys were involved with,

 2          did you have calls and things like

 3          that to update each other?  If so,

 4          how often and how long did they

 5          last?

 6               MR. WITKIN:  We did.  And,

 7          again, just like my attendance at

 8          status conferences, they started

 9          out a little more fast and furious

10          and tapered off at the end.  I

11          would say -- well, we met prior to

12          each status conference initially.

13          I had a lot of contact with Dawn,

14          so, I was talking to Dawn two or

15          three times a month.  We probably

16          had a formal call at least once a

17          month.

18               MR. HERMAN:  Dawn was here

19          earlier, and she described that

20          you were within a consortium of

21          attorney firms.  Who is in that

22          consortium?

23               MR. WITKIN:  The attorneys

24          that -- if you are referring to
```

FAC Resp. Exhibit D -- 204

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          the attorneys that we have a loose

2          joint venture with --

3               MR. SEEGER:  In your group.

4               MR. WITKIN:  In my group,

5          yes, and not the referral

6          attorneys?

7               MR. HERMAN:  No.

8               MR. WITKIN:  It is Dawn,

9          Arsenault, Lundy and Andrus.

10               MR. HERMAN:  It's Vance?

11               MR. WITKIN:  Yes.

12               MR. LEVIN:  When you say it

13          is a joint venture, do your pool

14          your fees and then split them in

15          different cases or you just sort

16          of support each other?

17               MR. WITKIN:  It is one of

18          these things where we probably

19          would have been well served to

20          have a lot more definition up

21          front.  The answer is no, sort of.

22          On the MDL side, there's no

23          pooling of fees at all.

24               MR. LEVIN:  Okay.

FAC Resp. Exhibit D -- 205

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1           MR. SEEGER:  Dawn told us, I

2       don't remember, but your group has

3       how many cases that are going into

4       the deal, the settlement?

5           MR. WITKIN:  There's 600

6       cases approximately.

7           MR. WEITZ:  Those cases were

8       filed in the MDL?

9           MR. WITKIN:  Majority.  We

10      have a few that were filed in New

11      Jersey, but the vast majority were

12      filed in the MDL.

13          MR. WEITZ:  Were there any

14      cases that you had worked up in

15      New Jersey or in the MDL for trial

16      that were your cases?

17          MR. WITKIN:  Individual

18      cases?  No.

19          MR. HERMAN:  Didn't someone

20      else from your firm second chair

21      Lenny in some FDA depositions, if

22      you recall?

23          MR. WITKIN:  I don't believe

24      so, no.

FAC Resp. Exhibit D -- 206

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          MR. HERMAN:  In terms of the

2     consortium, what other cases has

3     the consortium been involved with

4     or is involved with from 2005 to

5     today?

6          MR. WITKIN:  We did Bextra/

7     Celebrex together, and we did

8     Guidant and Medtronic together.

9          MR. HERMAN:  How many

10    Bextra/Celebrex cases?

11         MR. WITKIN:  How many paid?

12         MR. HERMAN:  How many did

13    you have?

14         MR. WITKIN:  80.

15         MR. HERMAN:  Guidant?

16         MR. WITKIN:  How many

17    claimants do we have?  About 160.

18         MR. HERMAN:  And in

19    Medtronic?

20         MR. WITKIN:  110 maybe.

21         MR. HERMAN:  Have you

22    applied or are you applying for

23    common benefit in any of those?

24         MR. WITKIN:  Yes.  In

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          Guidant and Medtronic, we served

2          significant roles and we did.  In

3          Bextra/Celebrex, we will not be.

4          In Ortho Evra, no, we are not.

5               MR. HERMAN:  Is Richard

6          Arsenault on the PSC in Guidant,

7          do you know?

8               MR. WITKIN:  Yes.

9               MR. HERMAN:  And in

10         Medtronic?

11              MR. WITKIN:  He is.

12              MR. HERMAN:  This is Chris'

13         favorite question, but I'm going

14         to borrow it --

15              MR. SEEGER:  It used to be

16         mine.

17              MR. HERMAN:  -- because I

18         think it is a significant

19         question.

20              What do you consider, if you

21         had to name the most significant

22         contribution that your firm made

23         to the litigation to move it along

24         towards resolution, what would it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      be?

2              MR. WITKIN:  You know, I

3      don't know that I would pick one

4      thing.  I went through five or six

5      things where, you know, you guys

6      tell me, what was the most

7      important thing in getting this

8      case to where it was.  I think

9      that we answered --

10             MR. SEEGER:  Trying cases.

11     Oh, I thought you were asking me a

12     question.  You asked.

13             MR. WITKIN:  Russ, I don't

14     know that out of the things that

15     we did I would say that one thing

16     clearly stood out as being

17     advancing the ball more than the

18     others, because to do that is to

19     suggest that you knew at the time

20     you were doing the things that you

21     were doing that it was going to be

22     the thing that would bring about

23     the outcome, and you didn't.

24             MR. LEVIN:  I guess what you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1          would say is you did everything
 2          you were asked to do.
 3              MR. WITKIN:  I did, and I
 4          guess I would make this further
 5          point.  I think there's a
 6          distinction between work that you
 7          do when you know what the outcome
 8          is and work that you do when you
 9          don't know what the outcome is.
10          If you go back and you look at the
11          examples I gave, I mean, the
12          stroke package for one, that
13          wasn't something that anybody else
14          really wanted to do.  Why?
15          Because nobody was feeling so
16          great about the stroke cases.  And
17          we did that work because there was
18          a request to do it.
19              MR. SEEGER:  I would just
20          correct that.  I mean, I know that
21          in our office we felt pretty high
22          on the stroke cases.  I think Dave
23          Buchanan would argue with you on
24          that.  But you are right, it was a
```

FAC Resp. Exhibit D -- 210

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          little bit of an offering for a

2          while.

3                MR. HERMAN:  Let me say to

4          you that I think that's an

5          important thing, because without a

6          stroke package, again, trial

7          package, you can't then justify

8          people opting out who are going to

9          say, well, you didn't give me

10         anything, and stroke is an

11         important part of the resolution

12         of this case.  I know this is a

13         particular theme of mine, but it

14         is pretty difficult for lawyers to

15         go through a process, elect to

16         come into a settlement, and then

17         complain that they had no option

18         when the option was they had a

19         stroke package to try the case and

20         not come in, so...

21                MR. BIRCHFIELD:  Justin, I

22         think you summed it up.  Answering

23         the call, that's critical, and I

24         appreciate it.  Because there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1            wasn't a single time that we

2            called on you for help in a

3            specific role that you didn't step

4            up, and that's appreciated.

5                    MR. SEEGER:  Anybody else?

6                    (No response.)

7                    MR. SEEGER:  Thank you, sir.

8                    MR. HERMAN:  Thank you.

9                         -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1            C E R T I F I C A T E

 2

 3            I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23            Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 213

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  BARRIOS, KINGSDORF & CASTEIX, LLP
       Dawn M. Barrios, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 214

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. HERMAN:  Everything is
 3         recorded.  You are going to get a
 4         copy of what everybody else has
 5         had to say.  Judge Fallon said if
 6         there's no fee agreement at the
 7         end of day, he's going to have a
 8         Special Master go through the
 9         Murphy Oil process.
10              MS. BARRIOS:  And as a
11         victim of the Murphy Oil process,
12         I will personally state that
13         nobody wants to do that.
14              I want to thank y'all for
15         allowing me to meet with you
16         today.  I told Ed in the hall I
17         kind of feel like I'm coming to a
18         firing squad.
19              MR. SEEGER:  A tired firing
20         squad.
21              MS. BARRIOS:  Seriously,
22         I've been in your position before,
23         so I'm only going to do the
24         highlights for you guys.  I want
```

FAC Resp. Exhibit D -- 215

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        to give you a couple of broad

2        strokes.  I want you to know how

3        small my law firm is.  We're only

4        three lawyers, two who do

5        litigation, and we've devoted a

6        substantial amount of time for a

7        three-man law firm to this

8        litigation, and we have been in

9        the beginning of this MDL.  I was

10       not in it before the recall, but I

11       really got involved, of course,

12       after it came to Louisiana.

13            All of my work stems from

14       three orders of the Court.  The

15       first was when the judge appointed

16       me to the state liaison committee,

17       and I took that job very seriously

18       because, as Russ and Arnold and

19       Chris know, I have that same job

20       in Propulsid, and I knew what the

21       judge wanted me to do.  I knew of

22       the coordination that needed to be

23       accomplished.  In order to

24       coordinate and move the case

FAC Resp. Exhibit D -- 216

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          forward, you have to communicate.

2          So, one of the first things that I

3          did was started up with the

4          newsletters.  I would send them to

5          Russ and Lenny to review, and I

6          started sending out all the

7          orders, all the information that

8          the MDL wanted to give to the

9          regular attorneys.  Because of

10         that communication, I got

11         innumerable calls asking me

12         questions.  Obviously the

13         experienced, the MDL litigators

14         didn't call me, but I had to deal

15         with Joe six pack who didn't

16         understand what an MDL was.  So, I

17         took a lot of those calls.

18              One of the first things that

19         I did, and I'm not too sure if

20         Russ was very happy with me that

21         day, but I stood up and I asked

22         Judge Fallon if the state liaison

23         committee could do a separate memo

24         on the sales reps, getting the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        sales reps notes from Merck,

 2        because I felt that the state

 3        attorneys really needed that,

 4        particularly if they were going to

 5        have diversity.  So, while I

 6        didn't author the memo, I edited

 7        it and sort of nursed it through.

 8             I kept a gigantic database

 9        of all the plaintiffs' lawyers.

10        Dave Buchanan would come to me and

11        ask me to send out information to

12        the people in the database.

13             I was asked by Fred Longer

14        to find the head class sales rep.

15        When class actions were filed and

16        there were no class reps, Fred

17        said, hit your database, go

18        through it, find me some class

19        reps.

20             Similarly, I was asked to

21        help find trials to occur in the

22        MDL and people to put their trial

23        cases up.  I helped Lisa

24        Dagostino, obviously she did it
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          all, but I helped get her medical

 2          records and assist her, and went

 3          to a lot of friends I knew who

 4          were good litigators to see if

 5          they would bring their cases into

 6          the MDL.  One of those is Ed

 7          Blizzard, and luckily his Mason

 8          case was selected to be tried

 9          here.

10               I don't know, Ed, if I

11          should take some kind of credit

12          for bringing you in or not.  It

13          sort of depends on what these guys

14          feel about you.

15               MR. HERMAN:  We feel a lot

16          better about you than we do about

17          him.

18               MS. BARRIOS:  Okay.  So,

19          please be on your best behavior

20          from here on out.

21               Ed asked me to be his local

22          trial counsel in Mason.  I helped

23          mostly with the jury selection and

24          reporting to the jury consultant
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          every day after the class and did

2          a memo.

3              Lenny Davis asked me to get

4          together a whole list of cases for

5          case-specific discovery when the

6          MDL was not moving as quickly as

7          everybody wanted.  There was a

8          motion, and I believe the motion

9          was filed for case-specific

10         discovery, and it was to be tee'd

11         up, and I helped Lenny locate some

12         cases to put for the discovery

13         track.

14             I met with Judge Fallon

15         privately, Judge Higbee, Judge

16         Wilson in coordinating with the

17         various menus.

18             When Merck selected a case

19         called Diaz to be tried here,

20         Jerry Meunier reached out to me,

21         because the local counsel for Diaz

22         was a female attorney, and she

23         felt more comfortable talking to

24         me.  I helped prepare the witness

FAC Resp. Exhibit D -- 220

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          for deposition and was going to

 2          prepare the doctors, but she

 3          ultimately dismissed the case.

 4               With Ted Mayer and Doug

 5          Marvin, I coordinated deposition

 6          dates and worked with the

 7          different attorneys in the various

 8          jurisdictions to iron out how much

 9          they could participate versus the

10          MDL participate.

11               I think that I was a go-to

12          person outside the PSC to get

13          things done because of my

14          relationships and my database.  My

15          goal was just to get critical mass

16          so that the MDL would be

17          successful.

18               My second bit of work comes

19          from the order that Judge Fallon

20          entered in July of 2005 in which

21          he ordered the SLC to keep track

22          of all the remands that came into

23          the MDL.  I really didn't know

24          what he was talking about when he
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1           first ordered that we do it, but

2           as chair of the SLC, I undertook

3           to figure out how to do it and

4           what to do.

5                We have kept track of over

6           955 cases with remand orders, with

7           remand motions.  We had to locate

8           them.  Remand motions do not come

9           with a record when it is

10          transferred over to the MDL.  So,

11          we worked with the clerk's office

12          and transferred reports to get all

13          of that information, put it

14          together.  We have a massive

15          database with hyperlinks for the

16          judge for every one of the motions

17          and orders.  Then he asked that we

18          break it down by state, so, we

19          went and did an entire

20          investigation broken down by

21          states, and then I didn't want him

22          to ask me to break them down even

23          further, and then I would have to

24          do it again, so I decided to break

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1           it down by issue.  Because he did

2           say from the bench that he was

3           going to rule on remand motions,

4           he would look at one of each

5           category, and then people were to

6           take it from there and figure out

7           what he would do with remands.

8           So, I started to classify them.

9           The reason for the remand was

10          diversity, was it federal

11          jurisdiction, was it a federal

12          question, et cetera.

13              As I was doing this, it

14          became clear the value of this

15          remand motion for me was the fact

16          that it kept the heat on Merck.

17          When I got to stand up and say

18          that we have 955 remands, they

19          knew that that was going to come

20          some time down the pike.

21          Obviously I had to deal with all

22          the counsel and answering their

23          questions about remands and why

24          isn't Judge Fallon ruling on my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          remand, when can I get out, can I

2          mandamus him to the Fifth Circuit.

3          That was ongoing.

4                    MR. SEEGER:  Can I ask a

5          quick question while you're

6          presenting?

7                    MS. BARRIOS:  Sure.

8                    MR. SEEGER:  On the state

9          liaison committee, could you

10          identify for us who your most

11          active and useful members were?

12                    MR. LEVIN:  Yeah, that would

13          be helpful.

14                    MS. BARRIOS:  Actually, the

15          person who always -- two people

16          always came to the status

17          conference.  Willie Singleton

18          and --

19                    MR. LEVIN:  Len Fodera.

20                    MS. BARRIOS:  -- Len Fodera

21          are generally the only two who

22          routinely appear.  In terms of

23          work, when Judge Fallon allowed us

24          to do a secondary memo to yours in

FAC Resp. Exhibit D -- 224

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          support of the motion to get class

2          representation, I turned to the

3          Aylstock Witkin firm out of

4          Florida, because I knew that they

5          had done a similar memo in a

6          different case, so that we didn't

7          have to reinvent the wheel.

8              Then when we were asked to

9          do the case-specific discovery and

10         this other project called the

11         rapid remand motion that the PSC

12         filed in order to try to get some

13         remands done, and Lenny asked me

14         to pick the cases that I thought

15         people would actually try in the

16         MDL, I turned to Justin Witkin and

17         to Matt Lundy and asked them to

18         help me on telephone calls and

19         getting that information.

20             MR. SEEGER:  Did you have

21         monthly calls, weekly calls?  Did

22         you have regular calls?

23             MS. BARRIOS:  No.

24             MR. SEEGER:  So, you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1          convened the committee when you

 2          had an issue?

 3               MS. BARRIOS:  Exactly.  When

 4          we had an issue.  I'm trying to

 5          think.  The newsletter, I would

 6          send out to Russ and to everybody

 7          on the state liaison committee

 8          asking for comments, but other

 9          than that, I didn't have any

10          routine calls.

11               MR. HERMAN:  State liaison

12          committee was essentially Dawn,

13          and she's correct that the two

14          people that showed up every time

15          were Singleton and Fodera.

16               Basically on the remand

17          issue, I know she answered a lot

18          of questions, because they would

19          come into our office and we would

20          refer them over to Dawn.

21               I have some questions, Dawn.

22               What are your costs in the

23          case?

24               MS. BARRIOS:  They were in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          my affidavit, $17,477.95.

 2               MR. HERMAN:  Have you had

 3          any problem with your costs in

 4          terms of getting them verified by

 5          the CPA or any of that business?

 6               MS. BARRIOS:  Sometimes they

 7          would ask my bookkeeper questions,

 8          and we answered them.

 9               MR. HERMAN:  Okay.  So, you

10          don't have a problem.  If you do

11          have a problem, be sure you call

12          them, because they'll be available

13          to you.

14               MS. BARRIOS:  They have been

15          very responsive, so...

16               MR. HERMAN:  The number of

17          cases you have?

18               MS. BARRIOS:  I would say my

19          office has in an interest in about

20          500 cases.

21               MR. HERMAN:  When you say

22          "an interest," are there other

23          folks who have an interest in the

24          same cases you have?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          MS. BARRIOS:  Yes.

2          MR. HERMAN:  Who are they?

3          MS. BARRIOS:  Richard

4     Arsenault, Matt Lundy, Justin

5     Witkin and Vance Andrus.

6          MR. WEITZ:  Did you submit

7     those cases to the settlement?

8          MS. BARRIOS:  Yes.

9          MR. WEITZ:  Your firm?

10          MS. BARRIOS:  No.  Because

11     Richard Arsenault was the primary,

12     I forget, Andy, what you call

13     them --

14          MR. BIRCHFIELD:  Primary

15     counsel.

16          MS. BARRIOS:  So, they all

17     had Richard's name on them.  I

18     mean, I prepared cases to

19     submit --

20          MR. SEEGER:  But he's listed

21     as primary counsel?

22          MR. LEVIN:  So, it is 500

23     cases that the group has?

24          MS. BARRIOS:  Correct.

Page 16

```
 1              MR. HERMAN:  In terms of --
 2         this is really a question Chris
 3         asks everybody.  What do you
 4         consider the most important things
 5         that you did to move the case to
 6         fruition?
 7              MS. BARRIOS:  That's hard to
 8         say.  I would say the work on the
 9         remand stuff, just keeping it
10         moving.  I created a double remand
11         database that got Kathy Snapka's
12         Garza case remanded, and she got
13         to try that case.
14              I now work with BrownGreer
15         on a weekly basis to find out what
16         remands will be moot by the
17         factors in the settlement.  So, I
18         take it very personally since this
19         was sort of my baby, this project,
20         so, I would have to say the remand
21         stuff is probably the most
22         important.
23              MR. HERMAN:  Now, you
24         mentioned Diaz.  Jerry Meunier and
```

Page 17

1          I agreed to split costs to try

2          that case.  Were you involved in

3          the expert search?

4                  MS. BARRIOS:  No.  My only

5          involvement was really talking to

6          counsel, preparing Mr. Diaz for

7          his depo, and then I talked with

8          Jerry about splitting up the

9          treaters to prepare them for

10         depositions.

11                 MR. BLIZZARD:  Dawn, I know

12         you kind of skimmed over your work

13         on Mason, maybe because it's

14         painful to talk about it

15         sometimes.

16                 MS. BARRIOS:  You know, I

17         started thinking about that today,

18         and I just remember my feeling

19         when Mr. Mason said, oh, I don't

20         think I took Vioxx before my heart

21         attack.

22                 MR. SEEGER:  Even the great

23         Ed Blizzard couldn't save that.

24                 MR. BLIZZARD:  Dawn was good

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        at talking to Mr. Mason every day
 2        and handling him when we were busy
 3        doing other stuff.  Dawn was
 4        really good help for our team.
 5             MR. HERMAN:  Are you
 6        involved in any way in Guidant and
 7        Medtronic ?
 8             MS. BARRIOS:  No.  When I
 9        say "no," my partner, Bruce
10        Kingsdorf, did a couple of the
11        individual cases.  I went to the
12        Medtronic first MDL meeting, the
13        Guidant first MDL meeting, talked
14        about the state liaison stuff and
15        they weren't --
16             MR. LEVIN:  Nothing
17        happened.
18             MS. BARRIOS:  Yes, nothing
19        happened.
20             MR. HERMAN:  What about
21        Celebrex or Bextra?
22             MS. BARRIOS:  Did the same
23        thing with Elizabeth.  Went out
24        there a couple of times to do the
```

FAC Resp. Exhibit D -- 231

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        state stuff.  She told me I could

2        do it, and there was no court

3        order.

4              MR. HERMAN:  Elizabeth

5        Cabraser?

6              MS. BARRIOS:  Right, in

7        Bextra Celebrex.  There was no

8        court order appointing the state

9        liaison committee, and at that

10       time, we talked about maybe doing

11       some sort of joint newsletter to

12       the COX-2 people, and I just said

13       I can't do this.

14             MR. HERMAN:  I do want to

15       tell you I was never angry with

16       you about anything you did in the

17       case.  You are a competent lawyer.

18       You knew what you were doing.  You

19       raised an issue that had to be

20       raised, so --

21             MS. BARRIOS:  Thank you.

22             MR. HERMAN:  -- I never had

23       a problem with that.

24             In Guidant, Medtronic,

FAC Resp. Exhibit D -- 232

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Celebrex or Bextra, are you

2          involved in any way with the same

3          group of lawyers, Richard, Lundy,

4          Witkin, Vance, any of those?

5                    MS. BARRIOS:  Yes.

6                    MR. HERMAN:  Tell me about

7          that.

8                    MS. BARRIOS:  We have a

9          consortium, and we do these kind

10         of cases together.

11                   MR. HERMAN:  In Guidant,

12         Celebrex, Medtronic and Bextra,

13         the group is involved in those

14         cases?

15                   MS. BARRIOS:  Yes.  But I

16         didn't, I, personally, didn't.

17                   MR. HERMAN:  I understand.

18                   How many hours do you have

19         in this case?

20                   MR. RAFFERTY:  2,085.

21                   MS. BARRIOS:  I just

22         resubmitted.  We have a new

23         submission.

24                   MR. LEVIN:  As of May 31st,

FAC Resp. Exhibit D -- 233

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          I had 1,920.

2                    MS. BARRIOS:  I didn't know

3          that you had a cutoff date.

4                    MR. LEVIN:  I have the

5          accountants' report as of May, and

6          it says 1,922, so, you've got

7          hours after that, they are just

8          not here yet?

9                    MS. BARRIOS:  Exactly.

10                   MR. HERMAN:  So, you have

11         got 1,922 plus whatever since May?

12                   MS. BARRIOS:  Yes.

13                   MR. HERMAN:  You have an

14         estimate on that?

15                   MS. BARRIOS:  I would say

16         maybe 200, 250.

17                   MR. RAFFERTY:  Dawn, what

18         about the other hours?  I think in

19         your affidavit you said about

20         1,300 of them were yours?

21                   MS. BARRIOS:  Yes.

22                   MR. RAFFERTY:  What about

23         the other hours?  What were those

24         primarily involving?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          MS. BARRIOS:  The way our

2          law firm works is that I usually

3          do the rainmaker type of stuff,

4          and my partner, Bruce, backs me up

5          with all the law.  So, every time

6          we needed to do law stuff and deal

7          with that, he handled it.  I have

8          heavy paralegal hours because of

9          the remand project.  I mean, I

10         couldn't go through 174

11         conditional transfer orders.

12         MR. LEVIN:  The 1,922 was

13         the total hours for your firm.  Of

14         that, yours was 1,119.  This,

15         again, is as of May.  Bruce had

16         157.  And after that, all of the

17         hours are law clerks and

18         paralegals?

19         MS. BARRIOS:  Correct,

20         correct.

21         Since you are asking about

22         the volume of hours, after

23         Katrina, there was some time that

24         I lost without being able to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          report it, but I would hope y'all

 2          would take that into

 3          consideration.

 4              MR. HERMAN:  But I know you

 5          were active, because when the case

 6          moved to Houston, you were still

 7          active in the case.

 8              MS. BARRIOS:  Right.

 9              Can I just continue or do

10          you have any more questions?

11              MR. HERMAN:  No, no.  Go

12          ahead.

13              MS. BARRIOS:  Just the last

14          bit of information, and this is

15          really a question, formed the

16          basis of a question that I have is

17          the third order that Judge Fallon

18          handed down in July of this year

19          regarding the Attorney General

20          cases.  I mean, I've been working

21          with Chris on that a lot, with

22          Lenny on that.  Does that get

23          compensated in this group?

24              MR. SEEGER:  Good question.
```

FAC Resp. Exhibit D -- 236

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1                 MR. HERMAN:  Well, at this

2           point, we have --

3                 MS. BARRIOS:  I don't need

4           an answer --

5                 MR. HERMAN:  No.  It is a

6           fair question.  Up to now, the

7           only hours we've been concerned

8           with are common benefit hours.

9                 MR. SEEGER:  That led to the

10          settlement, the PI stuff.

11                MR. HERMAN:  Yes, that led

12          to the settlement in this case,

13          which would be New Jersey, Texas,

14          California and the MDL.  The AGs,

15          we have been trying to -- they

16          have indicated that they would

17          like MDL work product, but there

18          has not been an agreement reached

19          yet.

20                MS. BARRIOS:  I'm working on

21          it.

22                MR. BLIZZARD:  We haven't

23          discussed it.  Just from my

24          personal standpoint, I would just

FAC Resp. Exhibit D -- 237

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1            suggest that you submit your

2            hours.  To the extent the hours

3            are necessary, by virtue of your

4            role in the MDL, I mean, I guess

5            we'll just consider them.

6                    MR. SEEGER:  I think that's

7            good.

8                    MR. HERMAN:  There's a

9            problem, okay, particularly in

10           Louisiana, and we have Louisiana

11           AG counsel.  Louisiana has special

12           rules as to who can do what.

13           Assume that some arrangement is

14           made with the AGs for MDL work

15           product, then any work that you've

16           done causing that to happen is

17           certainly going to be counted.  I

18           don't want to get into -- I don't

19           want you to get into a problem or

20           us to get into a problem saying

21           that we're doing work for the AGs.

22                   MS. BARRIOS:  I understand.

23           I just wanted to raise the issue,

24           because --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1             MR. HERMAN:  It is a good

2        issue, and hopefully there will be

3        some arrangement with the AGs to

4        get MDL work product, and you need

5        to keep your hours.

6             MR. SEEGER:  Yes, you are

7        reporting your hours anyway?

8             MS. BARRIOS:  I am, I am.

9        But I just know that that is at

10       least an issue for me, and we've

11       been working along that goal and

12       stay lifted and --

13            MR. HERMAN:  Well, you have

14       been instrumental in that, you

15       have been instrumental in, I don't

16       want to use the word agitating,

17       but being tenacious on the AG

18       issue.  If we come to hopefully

19       some good result, you certainly

20       have a strong part in that, and I

21       think we recognize that.  I really

22       don't want to go into the

23       Louisiana issue.

24            MS. BARRIOS:  That's fine.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1            MR. SEEGER:  Anybody have

2        anything else?

3            (No response.)

4            MR. SEEGER:  Thank you so

5        much.

6                  -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:  BROWN & CROUPPEN
       Seth Webb, Esquire

       THE DRISCOLL FIRM, P.C.
       John Driscoll, Esquire
ON BEHALF OF BROWN & CROUPPEN:
       GOFFSTEIN, RASKAS, POMERANTZ,
       KRAUS & SHERMAN, L.L.C.
       Edward L. Adelman, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 242

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. SEEGER:  This is part of
 3       the majority of the fee committee
 4       that's been appointed by Judge
 5       Fallon in the Vioxx litigation.
 6       We've been charged with the task
 7       of really kind of going through
 8       what everybody did and at some
 9       point, I guess, talk to the judge
10       about where people are.
11            He wants a record of
12       everything that goes on, so, we
13       have a court reporter here so
14       everything is taken down.  You can
15       make any presentation you want.
16       You have 30 minutes.
17            MR. DRISCOLL:  At the
18       outset --
19            MR. ADELMAN:  Before Mr.
20       Driscoll speaks, I know I sent
21       correspondence to the committee,
22       to Mr. Herman's office.  My name
23       is Edward Adelman, and I represent
24       Brown & Crouppen, the law firm
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        that prosecuted the Schwaller

2        case, which is before the

3        committee today.  It is our

4        position that Mr. Driscoll, who is

5        a former associate of Brown &

6        Crouppen, should not be making a

7        presentation to this committee.

8        He was an employee of Brown &

9        Crouppen at that time and an

10       associate.  All the work and

11       effort he did was on behalf of the

12       law firm.  Any dispute he might

13       have with Brown & Crouppen

14       regarding any fee he might be

15       entitled to as a result of any

16       common benefit allocation that's

17       given to Brown & Crouppen should

18       remain in-house, and we

19       respectfully ask the committee

20       that Mr. Driscoll not be allowed

21       to make a statement.  He was

22       involved in the Vioxx matter, and

23       his contributions were much

24       appreciated, but since he's no

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

 1          longer employed at Brown &

 2          Crouppen, I don't believe it is

 3          proper for the committee to hear

 4          it.

 5              MR. SEEGER:  Why don't we

 6          make the record, and you guys have

 7          plenty of time to fight this out.

 8          The checks are not going out the

 9          door.

10              MR. LEVIN:  From my

11          perspective, we're going to hear

12          everybody that has something to

13          say.  If there's a partnership

14          dissolution, that's not within our

15          jurisdiction.  I'm not even sure

16          that's within Judge Fallon's

17          jurisdiction.  That you will

18          attend to on your own, as all of

19          us have attended to, that have

20          been fortunate or unfortunate

21          enough to be involved with

22          dissolved partnerships.

23              MR. SEEGER:  Seth, just so

24          I'm clear with the players.  I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        have you.  You're representing the

2        firm, correct?

3               MR. WEBB:  I work for Brown

4        & Crouppen and I'm here.

5               MR. SEEGER:  I just want to

6        know who is going to address us on

7        this issue.

8               MR. WEBB:  Sure.  With

9        regard to the work on the

10       Schwaller matter --

11              MR. LEVIN:  What we're

12       interested in is the work.  We're

13       not interested in how you

14       developed your --

15              MR. SEEGER:  Exactly right.

16       Your information is helpful to us

17       no matter what --

18              MR. ADELMAN:  I'm saying

19       that any statement from Mr.

20       Driscoll does not represent

21       anything of the law firm since

22       he's a former employee.

23              MR. BLIZZARD:  Let me see if

24       I understand it.  Has Brown &

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          Crouppen made the application or

 2          is it Mr. Driscoll that has made

 3          the application?

 4               MR. ADELMAN:  Brown &

 5          Crouppen.  Mr. Driscoll was an

 6          employee of Brown & Crouppen at

 7          the time.

 8               MR. BLIZZARD:  So, is Brown

 9          & Crouppen saying that as the

10          applicant for common benefit fees

11          that they do not want a

12          presentation made today?

13               MR. ADELMAN:  No.  Mr. Webb

14          is going to make the presentation.

15               MR. SEEGER:  That wasn't

16          clear.  You are saying you do have

17          somebody from Brown & Crouppen to

18          make this presentation?

19               MR. ADELMAN:  Correct.

20          That's Mr. Webb.

21               MR. DRISCOLL:  Any time Mr.

22          Adelman is finished, I'll chime

23          in.

24               MR. SEEGER:  Go ahead, John.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          MR. DRISCOLL:  My name is

2     John Driscoll.  I'm now with the

3     recently formed Driscoll Firm PC,

4     an Illinois law firm --

5          MR. SEEGER:  John, can I

6     just say one thing.

7          Just so you understand, I

8     don't think there's anybody being

9     prejudiced by allowing anybody to

10    speak.  We had a group yesterday

11    of about 15 people make

12    presentations for one group.  So,

13    this is really just information

14    gathering for us.  I think we

15    would like to hear Mr. Driscoll

16    out, but you've got your comments

17    on the record.

18          MR. DRISCOLL:  Thank you for

19    that.

20          I was an associate of Brown

21    & Crouppen at the time that this

22    case was prosecuted.  Of course,

23    we're talking about the Schwaller

24    case.  It is the Illinois case

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          that was tried in Madison County
 2          State Court.  I, along with a
 3          number of other very fine lawyers,
 4          prosecuted this case.  I think by
 5          my last count, seven law firms
 6          were involved.  I believe other
 7          lawyers who were involved in that
 8          case have made presentations
 9          already.  The so-called Vioxx
10          Litigation Consortium was involved
11          in that case, Grant Kaiser, Mikal
12          Watts and others.  I'm
13          forgetting --
14               MR. WEITZ:  John, let me
15          say, the Schwaller case was a
16          Brown & Crouppen case?
17               MR. DRISCOLL:  Well, that's
18          not actually accurate, and quite
19          technically, and I'm sure we'll
20          fight this out in state court.  As
21          you see, breaking up is hard to
22          do.
23               MR. LEVIN:  Sometimes it is
24          very enjoyable.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1              MR. DRISCOLL:  This case,
 2         this client was actually referred
 3         to me.  This is my case.  I
 4         brought it in to Brown & Crouppen.
 5         Brown & Crouppen has internally
 6         what they call an associate's
 7         agreement where you share in the
 8         fees for any case that you
 9         generate.  This is just one of
10         those cases.  In fact, there's
11         documents, some of which I have
12         with me today, and those that the
13         client signed off on.
14              MR. LEVIN:  We're not
15         interested in who represents the
16         client.  We're just interested
17         collectively in the work that was
18         done by you at the firm, other
19         members of the firm, you outside
20         of the firm, just that.
21              MR. DRISCOLL:  You've got
22         it.
23              MR. WEITZ:  I didn't know
24         who filed the Schwaller case, and
```

FAC Resp. Exhibit D -- 250

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1         that's what I was trying to find
2         out.
3              MR. SEEGER:  Brown &
4         Crouppen is on the complaint.
5              MR. DRISCOLL:  That's right.
6         I filed it while an associate at
7         Brown & Crouppen.  It was filed in
8         Madison County, Illinois.  It was
9         removed improperly and remanded.
10        In fact, Judge Murphy at the time,
11        our chief federal judge,
12        sanctioned Merck for the
13        improvident removal.
14        Unfortunately, those sanctions
15        were withdrawn in light of a
16        United States Supreme Court case
17        on 1447(C).  So, we didn't get our
18        money from Merck there.  The case
19        was remanded and tried for six
20        weeks.
21             MR. SEEGER:  Talk to us now
22        about what you specifically did
23        and your contribution on that
24        case, and then I'm going to allow

FAC Resp. Exhibit D -- 251

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Seth to speak for Brown &

2          Crouppen.

3               MR. DRISCOLL:  Absolutely.

4          Well, while I was an associate at

5          Brown & Crouppen, I was really the

6          singular attorney involved in the

7          case until a jury was actually

8          seated.  I did everything from

9          draft the complaint, filed the

10         complaint.  I was the singular

11         attorney involved in the

12         removal/remand process.  In fact,

13         I submitted my -- as I mentioned,

14         Judge Murphy granted sanctions

15         against Merck.  In that process, I

16         was required to submit the hours

17         and the work involved at least to

18         that point in the case so that

19         Judge Murphy could properly

20         calculate the sanctions involved.

21              I did everything from engage

22         in motion practice, drafted every

23         motion, every response.  I went to

24         nearly every deposition in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          case of every expert.  As I

2          said --

3               MR. SEEGER:  Did you take

4          first or second chair in any of

5          these depositions?

6               MR. DRISCOLL:  First chair.

7          Nathan Rubin, he's a cardiologist

8          from here in Beverly Hills.  We

9          didn't end up using him at trial.

10         He's a cardiologist.  Second

11         chaired a lot of other depos.  I'm

12         sorry.  I'm not completely

13         prepared on each witness blow by

14         blow right now.

15              MR. WEITZ:  Is it in your

16         affidavit?

17              MR. DRISCOLL:  It is.

18              MR. SEEGER:  What did you do

19         with the trial team?  That was

20         Mike Watts and Andy, right, Andy

21         Birchfield?

22              MR. DRISCOLL:  Yes.  I sat

23         with them.  I did the plaintiff

24         himself.  It was actually the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          widower of the decedent.

2                  MR. SEEGER:  You put him on

3          at trial?

4                  MR. DRISCOLL:  I put him on.

5                  MR. WEITZ:  Was the trial

6          while you were still an associate

7          Brown & Crouppen?

8                  MR. DRISCOLL:  Correct.

9                  MR. SEEGER:  Is it okay if

10         we hear from Seth?

11                 MR. DRISCOLL:  Absolutely.

12                 MR. SEEGER:  The floor is

13         yours.

14                 MR. WEBB:  Well, obviously,

15         not to get into the other

16         argument, but everything that John

17         just discussed I consider to be

18         what Brown & Crouppen did in this

19         case because that's what we did.

20         I also sat second chair at several

21         expert depositions, several sales

22         rep depositions, prepped

23         plaintiffs for multiple

24         depositions.  We did pretty much

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          all the local work on this case

2          because it was in our backyard.

3               MR. WEITZ:  Can you state

4          your name again for the record?

5               MR. WEBB:  Seth Webb.

6               MR. BLIZZARD:  You said

7          plaintiffs.  Were there multiple

8          plaintiffs?

9               MR. WEBB:  Children,

10          decedent.

11               MR. LEVIN:  Collectively,

12          you have reported 780 hours, and

13          at one point they were rejected.

14          Now they are being reviewed by the

15          accountant.  Have you had dealings

16          with the accounting firm?

17               MR. WEBB:  Were they

18          rejected because of the format?

19               MR. LEVIN:  They may have

20          been.

21               MR. GIRARDI:  We don't know.

22               MR. WEBB:  Because we

23          submitted them originally not

24          monthly, and then we submitted

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          them monthly.

2                  MR. LEVIN:  That's right.

3          Now they are under review, so you

4          should know that.

5                  MR. WEBB:  Okay.  As long as

6          they are being reviewed.

7                  MR. SEEGER:  Of the 780

8          hours, do you guys know how it

9          breaks down, individual attorneys?

10                 MR. DRISCOLL:  Off the top

11         of my head, I don't, but a lot of

12         that is paralegal time, and as

13         Seth mentioned, Seth performed

14         some work on the case as well as

15         I.  There's two lawyers.

16                 MR. WEBB:  I have it broken

17         down between attorney and

18         paralegal.

19                 MR. LEVIN:  I take it you

20         guys are not going to lunch today?

21                 MR. DRISCOLL:  We had dinner

22         last night though.

23                 MR. WEBB:  The attorney time

24         is 694 hours and one half,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          actually.  And the paralegal time

2          is 86 hours and a quarter.

3               MR. SEEGER:  Okay.

4               MR. WEBB:  I don't have it

5          broken down by attorney either.

6               MR. SEEGER:  We're not here

7          to resolve any issues between you

8          guys.

9               MR. WEBB:  Obviously.

10               MR. LEVIN: Although we

11          collectively have a lot of

12          experience.

13               MR. SEEGER:  I don't have

14          any questions.

15               MR. WEITZ:  I just have a

16          couple more questions.

17               How many cases did Brown &

18          Crouppen file?

19               MR. WEBB:  Approximately

20          450.

21               MR. WEITZ:  Where did you

22          file those, all Madison County?

23               MR. WEBB:  No.  Some were in

24          St. Louis City, some in Madison

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          County, some in St. Clair County.

2               MR. SEEGER:  All in state

3          court or both?

4               MR. WEBB:  I believe that

5          they were all filed in state

6          court.  Now, the majority of them

7          got removed --

8               MR. WEITZ:  Did you have any

9          other cases in any of those

10         jurisdictions that were assigned

11         for trial?

12              MR. WEBB:  I don't believe

13         so.  Not Vioxx cases.  I think

14         this was the only Vioxx case that

15         actually got assigned for trial in

16         maybe the Midwest, definitely

17         Madison County.

18              MR. SEEGER:  As far as I

19         know.

20              MR. WEITZ:  Did you have any

21         cases in any of those

22         jurisdictions that were being

23         worked up for trial and prepped

24         for trial by the judge on a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          specific docket in a specific

2          group?

3               MR. SEEGER:  Were you set

4          for trial?  Did you have any trial

5          settings anywhere else?

6               MR. WEBB:  No.

7               MR. SEEGER:  Thank you, and

8          hope everything works out okay.

9                    -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 260

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:  BURG SIMPSON ELDREDGE
       HERSH & JARDINE, PC
       Michael S. Burg, Esquire
       John M. Restaino, Jr., Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. SEEGER: We've been going
 3         around the country and having
 4         meetings giving everyone the
 5         opportunity not only to file an
 6         affidavit, but to make any
 7         statements they want about their
 8         common benefit contributions.  You
 9         should focus on common benefit,
10         obviously.
11              Everything that we discuss
12         is being taken down so there's a
13         record if Judge Fallon ever wants
14         to take a look at it, he will hear
15         what people have to say.
16              With that, there are no
17         other rules.  The floor is yours.
18              MR. BURG:  Let me just say,
19         we appreciate this.  Having been
20         involved in doing this for a long
21         time, to have this procedure where
22         we can actually come in and talk
23         to you, we really appreciate the
24         opportunity to be here.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1              With that, John, why don't
 2         you go ahead and start with the
 3         PowerPoint.
 4              MR. RESTAINO:  Sure.  First,
 5         thank you for this opportunity.  I
 6         think those of you that have
 7         worked with me at least in the
 8         last 16 years know that it is not
 9         my nature to come and ask for
10         anything.  I usually show up and
11         try to give --
12              MR. LEVIN:  Change your ways
13         today.
14              MR. RESTAINO:  Today I have
15         to change my ways, correct.  I
16         think that I've been called humble
17         to a fault.  I have got to change
18         that way today also.
19              So, with that in mind, this
20         is a little awkward, in that I
21         need to come back here at noon as
22         a representative of the now
23         defunct Lopez Hodes Restaino
24         Milman & Skikos.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1           MR. SEEGER:  May I interrupt

2      you?  I don't want to put you in a

3      bad position, Mike, because I know

4      there's two firms, but does it

5      make sense for you to do in the

6      next 30 minutes both so you don't

7      have to come back?  Because we're

8      focusing on your contribution.

9           MR. BURG:  The only problem

10     is, Steve Skikos is not here, and

11     he's flying in this morning.

12     Otherwise, it would have made

13     sense.

14          MR. SEEGER:  Sorry, John.

15          MR. RESTAINO:  It would

16     have.

17          As an introduction in that

18     regard, I was a named partner of

19     Lopez Hodes.  I do have to talk a

20     little bit about that for those of

21     you who may not be still familiar.

22     In January of '05 when we went to

23     New York City for the introductory

24     meeting that Chris and Dave and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          others held and talked about the

 2          Vioxx litigation, at that time

 3          Chris and Dave Buchanan talked to

 4          me about co-chairing the science

 5          committee.  I have co-chaired the

 6          science committee going back to

 7          fen-phen, Propulsid, Rezulin,

 8          Zyprexa, PPA, initially Ortho

 9          Evra, co-chairing it now for NSF.

10          As a result of my medical

11          background, it is just a natural

12          role for me.  So I was asked if I

13          would work with a lady who I had

14          not met prior to that by the name

15          of Carlene Lewis.  I was told she

16          would be my co-chair, and shortly

17          thereafter, especially everyone

18          who has had a chance to know or

19          knew Carlene, you couldn't help

20          but fall in love with Carlene.

21          I'm assuming that there's

22          something being filed on her

23          behalf by somebody.

24                MR. SEEGER:  Her partner,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          Shelly, gave us a presentation.

2               MR. RESTAINO:  I just want

3          to let you know, I don't think I

4          have ever worked with a more

5          quality lawyer, smart, hard

6          working, than Carlene, and then,

7          quite honestly, Shelly.

8          Tremendous people.

9               She and I co-chaired it, and

10          then Shelly and I co-chaired it,

11          and I facetiously say, and today

12          is not the day for me to say this,

13          but I usually facetiously say that

14          the chair of the science committee

15          really doesn't do anything more

16          than shave his legs and set up the

17          conference calls.

18               Well, in reality, we do,

19          because especially with the

20          generic experts and with my

21          background with experts, I can't

22          do it all.  I just don't have the

23          time to work up an epidemiologist,

24          although I have a degree in

FAC Resp. Exhibit D -- 266

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          epidemiology from Johns Hopkins, I

2          cannot work with the

3          pharmacoepidemiologist, the

4          radiologist.  So, part of my role

5          and Shelly's role and Carlene's

6          role was to triage, so to speak.

7              So, when I was asked and I

8          brought Jerry Avorn into the

9          litigation, I turned to Chris

10         Tisi, who worked with him in the

11         past, and said, Chris, I don't

12         have the time, you have worked

13         with Jerry, you are comfortable

14         with this.  And that's part of it.

15         Oversee it a little bit.  But

16         people like that, and I'm going to

17         give the accolades where

18         appropriate because, again, in my

19         role as the other co-chair of

20         science, I did get to see who did

21         some really quality work and who

22         did a lot of less than quality

23         work.

24             My work continued, to bring

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          you up into Burg Simpson, 2005,

2          2006, but through 2007, I

3          continued.  I became a part of the

4          stroke subcommittee.  I had the

5          pleasure of working with a

6          goddess, Lisa Dagostino, quality

7          work, no wasted time, continued to

8          work with them and continued to

9          work with some of the key experts.

10              Throughout 2007, we

11          continued on the extensive medical

12          library that worked, reviewing the

13          articles.  Typically, truth be

14          told, because of my then student

15          role at Johns Hopkins, I had free

16          access to the Welch library.

17          During that time, I was able to

18          procure over $15,000 worth of

19          medical articles for free.  I was

20          able to do that until I graduated

21          this past May.  I may go back and

22          get my Ph.D. just to get access to

23          the library.  But I would take a

24          look at the article, review it and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          see, who is this germane for.

2          It's another epi article.

3              Don Arbitblit, fantastic job

4          with Dr. John Farquhar, would send

5          me the reports and send me things

6          going on, and I would review it

7          and say, Don, you are doing a

8          great job, keep going.  That was

9          part of what I had to do.

10             2007, I flew to New York

11         City for the stroke subcommittees.

12         I flew to Philadelphia in October

13         2007.  So, I continued to work on

14         this litigation actively

15         throughout the year.  One of the

16         things, and, again, you are going

17         to see this earlier, that we did

18         early was, there were, and maybe I

19         think on the next series of

20         PowerPoints, there were like 74

21         members initially of the science

22         committee.  Everybody wanted on

23         the science committee.

24             So, one of the things that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1         Carlene and then Shelly and I, one

2         of the things we had to do, we set

3         up subcommittees to try to control

4         all of these individuals.

5         Everybody did want to do the work,

6         but there's only so much real work

7         to be done, and you are not going

8         to send out a medical record or an

9         expert and have ten attorneys

10        reviewing it.  So, we set up

11        subcommittees such as benefits,

12        indications, labeling,

13        international issues, as chaired

14        by Roberta Walburn, Shelly Sanford

15        and Leila Watson.  They are the

16        other members.  We would do this

17        and have subcommittee phone calls

18        by the chairs to somehow keep

19        managed on this 70 plus science

20        committee.

21              MR. SEEGER:  How often would

22        you do those calls, John?

23              MR. RESTAINO:  Well, we had

24        a weekly call.  The way we worked

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           it was, it became so unmanageable

2           that we did it biweekly with the

3           whole science committee, but then

4           biweekly also, so there was a call

5           every Friday with the chairs of

6           the different committees.  Let

7           them have conference calls as

8           needed during the week with their

9           people.  If something new was to

10          report, then on the Friday

11          subcommittee chair calls, they

12          would report to the executive

13          committee, who -- there's a slide

14          for it later, but I think the

15          executive committee was Carlene

16          and myself and a few other people,

17          and I'm blanking on that right now

18          without the benefit of the slide.

19               Here's one, mechanism of

20          action, pharmacology defense

21          issues.  This was chaired by Paul

22          Sizemore, Mark Hoffman and Max

23          Yefimenko.  I don't think I have

24          to introduce any of these

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          individuals to you.  Max I may

2          have to.  Max is a

3          pharmacologist/attorney in our

4          firm, did a fabulous, fabulous job

5          early on in the pharmacology,

6          looking at the pharmacology

7          experts and spent countless time

8          in the depository reviewing those

9          studies, especially those germane

10         to pharmacology.

11              MR. BLIZZARD:  John, I'm a

12         little lost.  What firm --

13              MR. BURG:  He's with Burg

14         Simpson, and he was with Burg

15         Simpson from the beginning of the

16         time before John came over.

17              MR. BLIZZARD:  It would help

18         me to understand when you left and

19         went to Burg Simpson so that we

20         have a time frame for this

21         presentation.  Because we're going

22         to hear from you when you were at

23         Lopez Hodes later, it would help

24         me to know when the split

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          occurred.

2                    MR. RESTAINO:  Sure.  I was

3          with Lopez Hodes officially until

4          December 31st, 2006, and January

5          1st of 2007, I became a partner,

6          shareholder with Burg Simpson.

7                    MR. BLIZZARD:  So, with

8          respect to your work, we're

9          talking about from January of 2007

10         to the present in this

11         presentation?

12                   MR. RESTAINO:  In this

13         presentation.  Again, I apologize.

14         I have to give a little background

15         just so that --

16                   MR. BURG:  We broke down the

17         hours.  At the end, we'll give you

18         the amount of hours that were

19         worked from our time.

20                   MR. WEITZ:  Let me just tell

21         you.  Burg's hours submitted so

22         far are 1,177 to the accountants.

23         Lopez hours submitted are 5,104 to

24         date.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1                MR. BURG:  We have the

2         hours, Perry, and I don't know if

3         that matches up.  I think we may

4         have --

5                MR. WEITZ:  This is why I

6         tell you.  These hours have to be

7         approved and accepted by the

8         accountants, third-party

9         accountants, and the expenses have

10        to.  Also, without them getting

11        and approving them, it is

12        meaningless what you have.

13               MR. BURG:  I understand.

14        But we tried to confirm, and I can

15        look, and at the end, we'll see if

16        they add up.

17               MR. LEVIN:  Let me help you.

18        With Burg Simpson, you submitted

19        1,177 hours.  318 and a quarter

20        have been accepted.  858.60 have

21        been rejected.  So, you are to

22        call Leonard Davis at Russ' office

23        and get him to get you in touch

24        with the accountant so that you

Page 15

1          could at least talk to him and

2          straighten that out.

3               You submitted $12,986.84 in

4          costs, of which $7,163.66 are

5          accepted, and $5,823.18 have been

6          rejected.

7               MR. BURG:  On the costs, our

8          numbers show, and we have the

9          submissions, that we submitted

10         $22,000, $22,439.68.  So, I'm

11         going to have to call and find out

12         why there's a discrepancy, because

13         I've got the submissions.

14              MR. LEVIN:  Time is of the

15         essence.

16              MR. BURG:  On the hours, I

17         don't know, I think we have more

18         than 1,100 hours.  Do you remember

19         the total?

20              MR. RESTAINO:  I thought it

21         was around 11.  I thought so.

22              MR. BURG:  Maybe it was.

23              MR. RESTAINO:  So, between

24         2005 and 2007, one of the key

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          aspects of the science committee,

2          of course, as with the PSC, is the

3          development of the generic

4          experts.  These are the experts

5          that we were involved in.  Those

6          that are in yellow are experts

7          that I either personally brought

8          to the table or had a significant

9          role in developing.  The first

10         one, Dr. Cecil Pace-Asciak, was a

11         background

12         consultant/pharmacologist who did

13         a lot of work with the Cox-2s out

14         of Toronto.  He was actually found

15         and developed by Max Yefimenko in

16         our office.

17             Egil Fosslien, who is the

18         cardiopathologist from Chicago

19         that I brought to the table, you

20         will hear more about him.

21             Les Cleland and Michael

22         James, Michael James was used by

23         Mark Robinson, and Les Cleland had

24         his preservation testimony taken.

FAC Resp. Exhibit D -- 276

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          I found and developed all of

2          those.

3               We used Preston Mason, who

4          was a background pharmacologist

5          from Harvard.

6               Dr. Colin Bloor,

7          cardiopathologist, actually

8          testified in the Irvin I trial.

9               Dr. Jerry Avorn is a

10         pharmacoepidemiologist from

11         Harvard.  I brought him in.

12              Dr. Mamdani, who is now at

13         Pfizer, is an epidemiologist.

14              Douglas Zipes, I didn't

15         develop.  Steve Skikos was more

16         involved with him, but I helped

17         with his Rule 26 report, reviewing

18         it for purposes of Daubert.

19              MR. BLIZZARD:  John, what

20         work was done for those witnesses

21         after January of 2007?

22              MR. RESTAINO:  Dr. Egil

23         Fosslien, he's the

24         cardiopathologist.  So, he was

FAC Resp. Exhibit D -- 277

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          asked to start talking about the

2          cardiovascular effects, especially

3          cerebral stroke by the stroke

4          committee.  And as you will see in

5          a moment, we spent a lot of time

6          in 2006 and 2007 developing

7          animation, which was then going

8          into the stroke, and you will see

9          what was done with him.  He was

10         actually at times present with the

11         animators, making sure they were

12         anatomically physiologically

13         correct.  So, he continued through

14         2007.

15              Les Cleland had his

16         preservation -- discovery

17         deposition taken in '06, but his

18         preservation testimony, he flew in

19         from Australia, and I came here in

20         '07 and took his preservation

21         testimony.

22              I think that's it.

23              Again, Fosslien was a

24         professor of pathology.  The

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1       reason we found him is because he

2       authored these key articles,

3       including the review article on

4       it.  We began with him in 2005,

5       assisted his report in 2006, met

6       with him in 2007, and he wrote his

7       supplementary report in

8       preparation for his preservation

9       testimony.  He met secretly, so to

10      speak, with Garret FitzGerald's

11      laboratory.  He spent four days in

12      New Orleans preparing for trial in

13      Barnett.

14          Cleland and James, as I

15      mentioned, were from Australia,

16      and James was used and wrote a

17      rebuttal report to one of the

18      defense biochemistry reports for

19      Mark Robinson.  Cleland did have

20      his preservation testimony done,

21      including writing a Rule 26

22      report.  The reason that we were

23      of interest with Cleland is in

24      1999 in the principal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1         investigator's brochure, he was

 2         sent by Merck, he was warned to

 3         observe for increased

 4         cardiovascular events with Vioxx.

 5              I'm not going to go through

 6         a whole lot of this, but I

 7         defended his depo in '06 and I

 8         continued in May '07, did his

 9         preservation testimony.  Same

10         thing with James.  As I mentioned,

11         he did research in this area, and

12         he was named as an expert rebuttal

13         witness in the Barnett case by

14         Mark --

15              MR. BLIZZARD:  That's 2006,

16         though, right?

17              MR. RESTAINO:  That's 2006.

18         A lot of this is just background.

19         If you get the background, I can

20         skip over the earlier.

21              MR. WEITZ:  It's difficult

22         for us, and what we need to

23         clarify, John, is that Burg, now

24         Mike has told us, is submitting
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1       22,000 hours.
 2            MR. BURG:  No.  I think it
 3       is around 1,100.  $22,000 in
 4       costs.
 5            MR. WEITZ:  Because I was
 6       saying if you moved over to them
 7       in '07, that's a lot of hours.
 8            MR. RESTAINO:  No, my total
 9       hours that I think were submitted
10       on my behalf, it was a little over
11       500 for the entire year of '07.
12            MR. WEITZ:  Lopez has
13       submitted over 5000 hours -- I'm
14       sorry, 5,104, and that's primarily
15       the work you are talking about?
16            MR. RESTAINO:  A good
17       portion of this, yes.
18            MR. BURG:  And with Max
19       Yefimenko in terms of this expert,
20       he was involved in developing this
21       expert, found this expert when he
22       was with our firm.
23            MR. SEEGER:  That was before
24       John?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1           MR. BURG:  Before John came

2      over.

3           MR. BLIZZARD:  I guess since

4      we're creating a record, it's

5      important from our perspective to

6      make sure we understand when you

7      are switching over from background

8      information to actual work that

9      was done by either Burg Simpson

10      employees or by you when you were

11      at Burg Simpson.

12           MR. RESTAINO:  Fair enough.

13           Again, it is even more

14      convoluted.  The reason I'm

15      putting up Cecil Pace-Asciak is

16      because, while I met with him and

17      these other individuals in Toronto

18      in '05/'06, I'm really putting it

19      up because Max Yefimenko has

20      submitted his time, and he was

21      there and he discovered him.

22      That's the reason for this slide.

23      So, I was a member of Lopez Hodes

24      at that time, but this is from Max

FAC Resp. Exhibit D -- 282

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          Yefimenko.

 2               This is just a small snippet

 3          of the animation that Dr. Douglas

 4          Zipes and Fosslien showed, worked

 5          on.  It's playing on my computer,

 6          and the red blood cells are in the

 7          background.  This is called

 8          platelet aggregation.  You can see

 9          the platelets aggregating.  Now

10          they release their thromboxane and

11          prostacyclin, resulting in

12          vasodilatation and

13          vasoconstriction.  There's the

14          vasoconstriction as a result of

15          the thromboxane.  So, you can see

16          the quality of work that these

17          cardiopathologists and

18          cardiologists did.  We worked on

19          this extensively.  This was to be

20          shown for the first time in his

21          preservation testimony, and then

22          the case settled.

23               MR. SEEGER:  John, was this

24          used anywhere, at any trials or
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        anything?  It was kind of at the

2        end.

3             MR. RESTAINO:  Right.  It

4        was now being developed for the

5        stroke committee if they needed it

6        there, and they started working

7        with us.

8             So, in summary, since '05,

9        Vioxx was the main thing I worked

10       on while I was with Lopez Hodes.

11       It continued to be a critical part

12       of what I was doing when I joined

13       Burg Simpson.  We had Max

14       Yefimenko working on it, as I

15       mentioned, and Mike will talk to

16       some of the others.  We were in

17       the final phases of the

18       preservation testimony of Egil

19       Fosslien when it settled.  The

20       animation project was to be

21       unveiled during that particular

22       time.  And so I'll let Mike talk a

23       little bit about --

24             MR. BURG:  Why don't we move

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1            on to what we show.  This is what

2            we show the total hours are.  So,

3            I'm going to have to call Lenny

4            and find out --

5                MR. LEVIN:  He will get you

6            to Phil Garrett, who is the

7            accountant.

8                MR. BURG:  -- what happened.

9            First of all, let me say, for

10           those of you that have worked with

11           Burg Simpson, when we work, we

12           work.  We don't send people who

13           don't know what they are doing and

14           sit around and play games on their

15           computers if they are going to

16           look at documents.  We understand

17           the priority that you and other

18           people who do common benefit look

19           at in terms of what moves the ball

20           down the field.  And while the

21           other things that are needed don't

22           necessarily get the same emphasis

23           or are not as important,

24           everything is done.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1              So, I really want to go

 2         through each of the people here.

 3         John, when he came over to our

 4         firm, obviously it was toward the

 5         end, we never knew it was the end,

 6         but near the end of at least the

 7         last part of the litigation was

 8         going on.  John continued to do

 9         his work --

10              MR. SEEGER:  By the way,

11         just so you know, I'm very

12         familiar with John's work because,

13         first of all, I was one of the

14         people that asked him to chair

15         that committee, but also Shelly

16         was on the PSC, and she would give

17         updates on the weekly PSC calls

18         about the science committee.  So

19         we don't have to spend any more

20         time talking about you, John, from

21         my perspective.  I get what you

22         do.  But I'm not as familiar with

23         what anybody else, Scott or Max --

24              MR. BURG:  Let me tell you

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1          what I did.  My role was obviously
 2          much more minor than it has been
 3          in other litigations.  I was
 4          appointed by Judge Fallon to be on
 5          the state/federal liaison
 6          committee.  I worked, attended
 7          hearings.  Sometimes when I had a
 8          conflict, either Seth Katz or
 9          Peter Burg would attend those
10          hearings in my absence.
11               We were involved in tracking
12          the state cases for most of the
13          western United States, not
14          including California.  California
15          was being tracked separately.  We
16          were involved in looking at the
17          other states not really from the
18          East Coast, but in the Midwest,
19          tracking those cases, keeping
20          control over those, talking to
21          lawyers who had cases, trying to
22          really make sure that the PSC --
23          and I know Chris and I had
24          numerous conversations about what
```

FAC Resp. Exhibit D -- 287

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          was going on, really trying to

2          make sure that nobody was going to

3          screw up the litigation, to be

4          candid about it.  We all know that

5          that's one of the dangers in an

6          MDL, that somebody who really

7          doesn't know what they are doing

8          is out there, has a state case,

9          and ends up thinking they can go

10         forward and try it.  That's what I

11         did.  Really my work was really

12         limited to my role on the

13         federal/state liaison committee as

14         appointed by Judge Fallon.

15              Max Yefimenko is a

16         pharmacologist, was involved as a

17         subcommittee chair.  Those of you

18         who have worked with him, and I'm

19         not sure how many of you have,

20         he's a brilliant guy.  He's able

21         to read these articles that are

22         related to the litigation, and he

23         did that, and did summaries,

24         involved with experts.  He was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1          involved in finding some experts
 2          in this particular case, was
 3          involved in working up the
 4          pharmacology, working with John
 5          and the other -- at that time,
 6          John was with Lopez Hodes.
 7               MR. RESTAINO:  If I may
 8          interject there, two years before
 9          I had any idea that I would end up
10          with the firm, Shelly and I would
11          go through -- we had a coding
12          project, and we would assign 15,
13          20, 30 articles to an attorney.
14          We would code these with the
15          coding form.  And Max was assigned
16          that coding form, again, in an
17          unbiased manner and equal number
18          as other people.
19               MR. BURG:  Max, that's what
20          he did.  That's what his specialty
21          is.  He's not going to be a trial
22          lawyer.  He's not going to be a
23          guy who you are going to have
24          doing depositions.  But he's a guy
```

FAC Resp. Exhibit D -- 289

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          who is going to be in the back

2          room, who we believe had an effect

3          in moving this forward in terms of

4          making sure that the pharmacology

5          and all the articles, that nothing

6          was missed, and was also involved

7          in trying to get that.

8              Scott Eldredge, who was one

9          of our senior partners, he spent

10         most of his time at the

11         depository.  At that time, we

12         looked at this project as a

13         real -- we didn't send a

14         paralegal.  We didn't send

15         somebody who was -- and whether

16         that's a plus or a minus, we felt

17         we wanted to have somebody -- he

18         does mostly med-mal, does some

19         products cases in our office.  We

20         felt that we needed someone who,

21         because of the complexity of this

22         litigation, somebody who truly was

23         going to make a difference in

24         terms of knowing what they are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          looking for, and not sitting at

2          the screen and just putting time

3          down.

4               MR. LEVIN:  How long has

5          Eldredge been out of law school?

6               MR. BURG:  25 years.

7               MR. LEVIN:  And Katz?

8               MR. BURG:  15 years.

9               MR. LEVIN:  You have hourly

10         rates, not that that's very

11         relevant to how we're going to do

12         this, but have any of those hourly

13         rates that are posted there been

14         judicially approved by any court?

15              MR. BURG:  Yes.

16              MR. LEVIN:  Which ones?

17              MR. BURG:  Some of the

18         rates, my rate, I believe, and

19         Seth's rate.  Seth's rate, which

20         was a little lower, was approved

21         in Zyprexa, I believe.  I also

22         know in class actions, we have had

23         federal judges in Colorado that

24         have approved my rate or $650.  In

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          fact, the chief judge, Judge

 2          Daniel, recently in a class action

 3          this year approved that rate.

 4                MR. LEVIN:  Fine.

 5                MR. BURG:  The only other

 6          thing I would say is this.  Just

 7          so everybody knows, we had trial

 8          teams, and we had trial teams that

 9          are not included on this, but I

10          think it is important that the

11          record reflect that.  We spent --

12          and John can tell you.  We spent

13          Saturdays, Sundays and nights with

14          three trial teams, putting

15          together three trial teams,

16          learning this case, not putting

17          one moment of that into this

18          submission because we understand

19          that was for us.  We were ready,

20          willing and prepared, as things

21          moved forward, to try those cases,

22          and we wanted to make sure that we

23          were up to speed.

24                MR. WEITZ:  Can you talk to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          us about your cases?  Tell me how

2          many cases you guys had filed.

3               MR. BURG:  I think we had

4          157 cases was our total inventory.

5               MR. WEITZ:  Where were they

6          filed?

7               MR. BURG:  All over the

8          United States, but mostly in the

9          MDL.

10               MR. WEITZ:  So, you filed

11          them in Federal Court in the

12          United States?

13               MR. BURG:  I would say 98

14          percent or 95 percent of them were

15          in the MDL.  I think we had a few

16          in New Jersey, and we may have

17          had -- I'm trying to think if we

18          had any in California.

19               MR. GIRARDI:  Maybe one.

20               MR. BURG:  I think for the

21          most part, probably 95 to 98

22          percent were in the MDL.

23               MR. GIRARDI:  Tell me, I'm

24          sorry, how many cases all together

FAC Resp. Exhibit D -- 293

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1      again?

2             MR. WEITZ:  157.

3             MR. BURG:  I think it was

4      157, but I would have to go back

5      and check.

6             MR. WEITZ:  Tell me what

7      cases were on any trial dockets,

8      whether it was New Jersey, the

9      MDL?

10            MR. BURG:  As I sit here

11      today, we know that our cases were

12      potentially looked at for the MDL.

13      When I said we were getting

14      prepared, I don't think any of

15      them were really set for trial,

16      but our concern was, quite

17      frankly, having been at most of

18      the hearings, there was always

19      this question of whether or not

20      Judge Fallon was going to remand

21      these cases.  I know that was

22      something he talked about from the

23      bench at these hearings.  And we

24      in Colorado, as well as many other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1          states, the dockets are not as

 2          crowded as -- it's not unheard of

 3          in Colorado where you get a remand

 4          order and you get a trial within

 5          60 days unlike other federal

 6          courts.  So, we were very

 7          cognizant of the fact that there

 8          was the potential that a

 9          significant number of our cases

10          were going to be remanded and that

11          ultimately, because of that

12          remand, our trials were going to

13          come up very quickly.  That's why

14          we were working, and, in fact, we

15          had conversations with many people

16          who were on the PSC about the

17          potential, and we talked to Chris

18          about this.  The potential was

19          that if these remands happened,

20          getting him and Dave or other

21          people to come in so we make sure

22          that we're doing it at the highest

23          level.

24               MR. WEITZ:  So, it would be
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          fair to say that you were working

2          up the individual cases in your

3          office, but they weren't in any of

4          the waves, the four waves that

5          Judge Higbee had or they weren't

6          being prepared for trial in the

7          MDL?

8                 MR. BURG:  Correct.

9                 MR. LEVIN:  John, with

10         regard to the stroke package, Dr.

11         Levine, did you work with him?

12                MR. RESTAINO:  No.

13                MR. LEVIN:  Do you know who

14         worked with him, what was done

15         with him?

16                MR. RESTAINO:  There were

17         the two stroke --

18                MR. LEVIN:  Feldman and

19         Levine?

20                MR. RESTAINO:  They were

21         both being handled separately,

22         going through the committee, but

23         there had already been attorneys

24         that had worked up with them.

Page 37

1          MR. LEVIN:  So, you are not

2     involved with --

3          MR. RESTAINO:  That was one

4     of those delegated things.  I

5     would review the Rule 26 report if

6     it got to that level.  They had

7     access.

8          MR. LEVIN:  Did you ever see

9     a report from Steve Levine?

10          MR. RESTAINO:  No, I did

11     not.  And they had access to Egil

12     Fosslien as the cardiopathologist

13     so they could be on the same page

14     and the materials.  So, again, my

15     role there as the co-chair is

16     again to triage, and what's

17     everybody doing, let's make sure

18     we're on the same page.  People

19     throw up because I used the

20     metaphor of Venn diagram way too

21     frequently.  That's what my role

22     was, to have these different

23     circles and have them overlap as

24     much as possible and try to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

 1          coordinate and keep certain

 2          individuals from running off the

 3          reservation.

 4                  MR. SEEGER:  Just to keep us

 5          on schedule, and we're going to

 6          see you later today, do you want

 7          to take a minute to sum up and if

 8          we have any questions?

 9                  MR. BURG:  The only thing I

10          would sum up saying is everybody

11          knows John's talents and what he's

12          done.  John is not there playing

13          around.  He's doing a good job.  I

14          believe our firm has that same

15          reputation.  We're not going to

16          come here and pad our numbers, and

17          I'm obviously very concerned that

18          there's some difference in the

19          numbers that we showed that were

20          submitted and the numbers --

21                  MR. SEEGER:  By the way,

22          just so you know and have some

23          peace of mind on this, the

24          questions about this, you don't

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 298

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1         need to have it done today.  We

2         just need it done before the

3         motion can be made.  All of us in

4         some level are going through it,

5         so don't worry about it.

6             MR. BURG:  I appreciate

7         that.  All I can say is we

8         understood that we were not the

9         guys, other than what John was

10        doing when he joined the firm, who

11        were at the forefront of the

12        litigation.  At the same time, we

13        understood our role, which was to

14        support.  In other litigations, we

15        may be more at the forefront, and

16        other people may be supporting.

17        We felt that our support and the

18        kind of talent that we bring to

19        the table has value in moving the

20        litigation forward.  I'm not going

21        to say anything about any other

22        firms, but there are people who

23        send bodies and are not absolutely

24        dedicated to the success of the

FAC Resp. Exhibit D -- 299

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

 1          project.

 2              MR. GIRARDI:  Really?

 3              MR. BURG:  It's a big

 4          surprise, I know.  We come ready

 5          to give you our best work product.

 6          I think in this case we did.  We

 7          appreciate the ability to come

 8          here and talk to you and be able

 9          to express what we felt we did

10          without trying to tell you guys we

11          did more than we did, but we also

12          feel we had a significant

13          contribution in the limited role

14          that we had.

15              MR. RESTAINO:  I'll just add

16          one thing because my time cards

17          are made contemporaneously with

18          what I do.  If I get a one and a

19          half hour phone call from Jerry

20          Avorn, when I hang up, I put it on

21          my time card.  My current time

22          card for the NSF litigation is as

23          current as of literally midnight

24          last night.  So, I don't go back

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          and reconstruct, I don't call my

2          partners and say, what did we do

3          in August on this stuff.  If at

4          any time anyone says, John, let me

5          see September '06 time card,

6          Vioxx --

7               MR. SEEGER:  That's real

8          time.

9               MR. RESTAINO:  There it is

10          right there.

11               MR. BURG:  That is our firm.

12          That is our requirement in our

13          firm that we keep

14          contemporaneously daily time

15          records of what is done.  Not one

16          hour of this was recreated or gone

17          back by anybody.  We basically

18          just took the time slips of the

19          time that was kept on the daily

20          basis and submitted it.

21               MR. SEEGER:  Thank you.

22               MR. BLIZZARD:  We would

23          expect nothing less of somebody

24          whose favorite word is Venn

FAC Resp. Exhibit D -- 301

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1        diagram.

2                MR. SEEGER:   Thank you.

3                MR. GIRARDI:   Thank you.

4                MR. RESTAINO:   Thank you.

5                MR. BURG:   Thank you.

6                     -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 303

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -


FIRM:  COHEN MILSTEIN
       Daniel W. Sigelman, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.

FAC Resp. Exhibit D -- 304

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2              MR. SIGELMAN:  Overall, I

3        believe that Cohen Milstein

4        contributed to the advancement of

5        the scientific knowledge of the

6        Vioxx case and that Cohen Milstein

7        played a significant role in

8        uncovering and developing critical

9        liability and causation evidence

10       against Merck in the scientific

11       area.

12             Some highlights, and I just

13       picked a few of the major

14       highlights of our common benefit

15       contributions, are on the first --

16       the second page of the handout,

17       the PowerPoints that I handed out.

18       One is the deposition of a case

19       critical fact witness, Ned

20       Braunstein.

21             Another one is that our firm

22       was a member of a small team,

23       really an informal team,

24       furnishing important work product

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          and documents to trial counsel and

2          their experts, both testifying and

3          nontestifying, before and during

4          the Cona/McDarby and

5          Hermans/Humeston trials, and we

6          had a significant role, a very

7          significant role in developing and

8          preparing important liability, as

9          well as causation experts, Harlan

10         Krumholz, as well as Dr. David

11         Madigan.

12              On the next slide, I give

13         some evidence, really

14         testimonials, that highlight some

15         of these highlights.  One is with

16         respect to the deposition of Ned

17         Braunstein.  And here I'm quoting

18         Harlan Krumholz in an e-mail to me

19         on Christmas Day.  And I presume

20         that you know that both of us are

21         not Christian.

22              In any event, he wrote me

23         December 25, 2006 saying, "The

24         more I get into your deposition of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          Braunstein, the more I appreciate

2          what you did and how you did it.

3          It is actually a masterful and

4          scientifically strong piece of

5          work - that combination of

6          developing the case and being

7          right on all the science is rare."

8               In the Braunstein

9          deposition, I actually used it as

10         an opportunity to try to develop

11         what I thought would be our expert

12         case down the road in the Vioxx

13         litigation.  So, it was very heavy

14         on the clinical trials, and

15         particularly the

16         placebo-controlled clinical

17         trials, and Merck's handling of

18         the data from those trials and the

19         manner in which it did or didn't

20         report that data and the analyses

21         that were done or could have been

22         done to the FDA and to the FDA

23         Advisory Committee.

24               The next slide really is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        with reference to the team that

2        was furnishing important work

3        product and documents to trial

4        counsel and their experts before

5        and during the Cona/McDarby and

6        Hermans/Humeston trials.  And here

7        I'm quoting Mark Lanier, actually,

8        in an e-mail he wrote me on

9        February 5, 2007, which was the

10       day that Dr. Krumholz was

11       initially called to testify in the

12       Hermans/Humeston trial.  And he

13       wrote, "Just finished the final

14       prep with Krumholz.  He paused me

15       this morning and told me how

16       important your help has been, Dan.

17       Thank you."

18              And then Mark continued,

19       "Amen on Harlan," because I

20       praised Harlan as an amazing

21       expert, "[as a great expert]!!!

22       (And in no small part because of

23       your work...)"

24              So, I use this just to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1       illustrate that, in fact, it

2       really, I think, summarizes, it

3       culminates the work that I did

4       with Harlan Krumholz.  I spent

5       many, many hours with that man on

6       the phone and in long e-mails

7       analyzing data.  I remember, for

8       example, sending him a very

9       detailed analysis of how Merck

10      excluded important clinical trial

11      data in its three major

12      publications in the pooled

13      analyses of these trials:  The

14      Shapiro/Reicin paper, the Konstam

15      paper and the Weir paper.  He used

16      that, for example, in the

17      Hermans/Humeston trial.  He also

18      used other things that we

19      discussed.  I believe that Cohen

20      Milstein contributed to and

21      enhanced his knowledge and

22      understanding of the scientific

23      case.

24          Here I'm going to quote from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        him in an e-mail he wrote on
 2        February 7, 2007, which was one
 3        day after his first appearance in
 4        the Hermans/Humeston trial.  He
 5        appeared three times in that
 6        trial.  He came back in rebuttal,
 7        and then he was examined by Chris
 8        Seeger in the specific causation
 9        part of the case with the Humeston
10        case.  He said, "I feel privileged
11        and fortunate to have had the
12        opportunity to learn from you.
13        You made all the difference."
14             With respect to our common
15        benefit contributions, we did
16        common benefit work both in the
17        MDL and in the New Jersey
18        consolidated litigation.  I did
19        the primary work for the firm.  I
20        spent the most time on it.  Our of
21        counsel, Douglas McNamara, with
22        input from Richard Lewis, also
23        contributed to some of our common
24        benefit time.
```

FAC Resp. Exhibit D -- 310

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1            Our common benefit work
 2       began in early 2005, and it ended
 3       in early November of 2007 pretty
 4       much when we heard about the
 5       nationwide settlement.  Our work
 6       greatly intensified in August of
 7       2005, when I was provided remote
 8       access to the entire Concordance
 9       Vioxx production database, for
10       which I was very grateful.  And
11       that enabled me to do a lot of
12       things in my office from that
13       point forward.
14            From August of 2005 to
15       November of 2007, I consistently
16       devoted most, the overwhelming
17       majority of my professional time,
18       to Vioxx common benefit work to
19       the exclusion of other available
20       firm project opportunities.
21            The next slide is on the
22       scope of activities of our firm.
23       Obviously, first of all, in the
24       MDL, we were appointed to the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        science committee, and we

 2        primarily concentrated with

 3        respect to work with -- our

 4        assignment to the clinical trials

 5        epidemiology and proof of

 6        causation subcommittee.

 7             We did a lot of extensive

 8        focused reviews for projects.  We

 9        searched for and reviewed hundreds

10        of thousands of Merck documents in

11        Concordance.  We reviewed

12        voluminous medical and scientific

13        literature and culled and shared

14        countless pertinent documents with

15        other counsel and with testifying

16        and nontestifying experts.

17             We furnished work product

18        and documents on scientific and

19        FDA regulatory issues to counsel

20        and their consultants for use in

21        discovery and in the New Jersey

22        trials.

23             And we helped prepare

24        testifying experts for deposition
```

FAC Resp. Exhibit D -- 312

Page 10

 1      and trial.

 2           Generally I saw our

 3      objectives, at least within our

 4      firm, to be to try to characterize

 5      Merck's misconduct, particularly

 6      in the scientific areas, destroy

 7      its scientific defenses and

 8      support the affirmative scientific

 9      proofs required to win trials.

10           The primary focus of our

11      common benefit work was, first of

12      all, conceptualizing and then

13      building plaintiffs' scientific

14      liability case and obliterating

15      Merck's scientific defenses that

16      we could through use of data from

17      Merck's own 'gold standard'

18      placebo-controlled Vioxx trials in

19      arthritis and Alzheimer's disease.

20           We were also interested in

21      establishing general causation

22      based on Merck's

23      placebo-controlled study data,

24      with particular emphasis on data

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1    generated before Vioxx was

2    withdrawn from the market.  It was

3    my feeling that with respect to

4    the 203 protocols, which consisted

5    of the APPROVe study, the VIP

6    study and VICTOR, that those had

7    been very comprehensively and well

8    dissected and dealt with by people

9    like Don Arbitblit, but I felt

10   that more work could be done in

11   areas of placebo-controlled trial

12   data that preceded the withdrawal

13   of Vioxx, although some very good

14   work had been done by other

15   lawyers, including Mr. Seeger's

16   firm and work that was done with

17   Dr. Kronmal, some very excellent

18   work.

19        On behalf of Cohen Milstein,

20   I developed a close and highly

21   productive working relationship

22   with some key firms, especially in

23   New Jersey.  I became one of a

24   handful of lawyers to whom other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          lawyers in New Jersey would look

2          for help on generic scientific

3          liability questions.

4               I ultimately worked with a

5          group of lawyers such as, most

6          notably, Eric Weinberg, whom I

7          actually met for the first time in

8          late 2005.  We shared a lot of the

9          same ideas, and Eric had retained

10         an absolutely incredible

11         statistician, David Madigan at

12         Rutgers and now at Columbia

13         University.  I really wanted to

14         implement some ideas that I had

15         developed in the statistical area

16         that had not been developed by

17         others.  And my only avenue, I

18         thought at the time, was through

19         Dr. Madigan.  And so I started

20         working very hard with Eric and

21         Dr. Madigan.  And our group

22         expanded.  It really became a

23         rather informal group.  And to a

24         great extent, the group really

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1          formed around Dr. David Egilman,

 2          to be quite honest, because he was

 3          hired by Mark Lanier's law firm as

 4          a consultant, and he likes to

 5          surround himself with people whom

 6          who he thinks he can learn from

 7          and get good information from.

 8                MR. SEEGER:  Either that or

 9          he likes to surround himself with

10          people he can abuse.

11                MR. LANIER:  He was the

12          personal physician to Daniel

13          Ortega.

14                MR. SIGELMAN:  But he

15          generated an incredible amount of

16          stuff, and he became a conduit for

17          people like me to submit all kinds

18          of analyses and documents, and he

19          was kind of the filter to send

20          them on to the trial team.  And so

21          that group was -- well, it was an

22          informal group.  We didn't really

23          meet except in cyberspace, but it

24          was Jeff Grand, it was Jerry

FAC Resp. Exhibit D -- 316

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          Kristal, it was Eric Weinberg, it

2          was Chris Placitella, it was David

3          Egilman, obviously, many members

4          of Mark Lanier's law firm.  And we

5          were sending things all the time,

6          and many of the things that Cohen

7          Milstein said to Dr. Egilman ended

8          up in the trials.  For example,

9          playing around with adjudications

10         in one of the Alzheimer patients

11         in 158 or protocol 906, which was

12         a study where some information

13         hadn't been conveyed to the FDA,

14         came from Cohen Milstein through

15         David Egilman.

16              This was a way that we all

17         shared information and benefited,

18         and it was an informal group that

19         I think it really advanced the

20         trial.  It was a real team effort.

21              MR. SEEGER:  Can I ask you a

22         question?  Don't you have both a

23         medical degree and a law degree?

24              MR. SIGELMAN:  Do I?  No, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      do not.

2              MR. SEEGER:  I thought you

3      had both degrees.

4              MR. LANIER:  He doesn't have

5      a law degree.

6              MR. SIGELMAN:  I don't have

7      a law degree.  I'm practicing

8      medicine and law without a

9      license.

10             No, I have a lot of

11     experience in pharmaceutical

12     things because in the 1980s, I was

13     the principal congressional

14     investigator of the FDA, and we

15     had a lot of hearings that led to

16     prosecutions of drug companies.

17     So, I've been doing analysis of

18     pharmaceutical data for over a

19     quarter of a century.  But I don't

20     have a medical degree.

21             Cohen Milstein was one of a

22     small team of firms who furnished

23     common benefits work product and

24     documents, as I said, and the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1     slide also indicates the

2     assistance was provided directly

3     to trial counsel.  I remember some

4     occasions where Mark Lanier, for

5     example, asked me for some

6     documents.  I think one time I was

7     asked for documents on what the

8     Advisory Committee at FDA had said

9     about intention-to-treat analysis,

10    and so I sent them directly to

11    Mark.  Sometimes I would send it

12    to people at Mark's law firm and

13    often, obviously, through Dr.

14    Egilman, and Mark and his law firm

15    were on those e-mails.

16         I would like to give a case

17    in point of the kind of work that

18    I did.  And this is just one

19    illustration of something I

20    remember very distinctly.  From

21    April 8th through 9th of 2006,

22    there was feverish briefing going

23    on by Ellen Relkin of Weitz &

24    Luxenberg on the question of

FAC Resp. Exhibit D -- 319

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1        Merck's noncompliance with FDA

 2        reporting requirements.  The issue

 3        was, could we get over the bar of

 4        punitive damages -- of course now

 5        punitive damages is history, at

 6        least for the time being in New

 7        Jersey -- but could we get over

 8        the bar with the evidence that

 9        Mark had brought up at the trial.

10        And so Ellen had come to me and

11        said, because of my FDA regulatory

12        background, could I help her.  And

13        I gave her a plethora of all the

14        FDA, NDA and IND regulations that

15        could conceivably apply, at least

16        to my knowledge, to the data at

17        issue.  And she incorporated all

18        of those in her briefing that

19        week, and, in fact, some of the

20        language that we had written were

21        incorporated wholesale in her

22        briefs.

23             And I remember her telling

24        me on that Sunday that Merck had
```

FAC Resp. Exhibit D -- 320

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          totally freaked out, because they

 2          weren't expecting this plethora of

 3          regulatory citations, and they had

 4          come to Judge Higbee and asked her

 5          for more time.  And that turned

 6          out to be a real team effort,

 7          because Ellen did an incredible

 8          job, as she always does, on that

 9          occasion, but it was a real team

10          effort, and it was very

11          successful, at least until the

12          appellate courts in New Jersey got

13          ahold of punitive damages.

14               And, obviously, as I've said

15          here before, I sent a lot of

16          documents to other people involved

17          in the trial.

18               Mark Lanier, for example,

19          acknowledged my contribution,

20          among others, in a very generous

21          e-mail to many people on April

22          12th of 2006 following the

23          Cona/McDarby trial.  And he said

24          something very nice about me that
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          I obviously knew my stuff, or at

 2       least so he thought, I was able to

 3       trick someone else once again, and

 4       acknowledged that he was able to

 5       do what he was able to do because

 6       of the hard work of many people

 7       around him.

 8              With respect to the

 9       deposition of Ned Braunstein, he

10       was a Merck regulatory official,

11       this was an MDL deposition that I

12       first chaired.  My preparation of

13       it involved -- I decided to really

14       go whole hog on the science, so, I

15       actually reviewed over 260,000

16       documents that were tied to

17       Braunstein for this deposition.

18       In addition to that, I had

19       reviewed the entire file of the

20       FDA custodial file in Concordance,

21       because I wanted to be totally

22       familiar with what had been sent

23       to the FDA by Merck, whether these

24       were letters signed by Dr.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        Braunstein or not.

2              I incorporated that into the

3        deposition.  And as I said before,

4        the deposition highlighted Merck's

5        knowledge and handling of damaging

6        evidence on the thrombotic

7        cardiovascular hazards of Vioxx

8        evidenced by its own

9        placebo-controlled arthritis and

10       Alzheimer's disease trials

11       completed long before market

12       withdrawal.

13             And to look at what impact

14       the Braunstein deposition had on

15       subsequent litigation, testimony

16       and documents from the Braunstein

17       deposition played key roles in

18       opinions presented during the

19       Hermans/Humeston trial of the

20       cardiology expert, Harlan

21       Krumholz.  And he acknowledged the

22       contribution of that deposition to

23       his understanding of the case.

24             And I remember some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        documents were used, I even think
 2        in the latter part of the trial, I
 3        think when Chris Seeger was
 4        working on the specific causation
 5        part of the trial, I remember
 6        there was a famous e-mail from
 7        Bolognese that we dug up from --
 8        for the Braunstein deposition that
 9        was very significant in the trial.
10        It was used at the latter part of
11        the trial, as was table 13 from
12        the 2003 pooled analysis update
13        that showed some incredible data
14        that Merck had really hidden from
15        the world.
16             Dr. Krumholz had told Mark
17        Lanier in a December 25, 2006
18        e-mail, "I do think that the work
19        Sigelman did in the Braunstein
20        deposition has merit...and we are
21        working to pull this together,"
22        and he was obviously referring for
23        use at trial.  He was trying to
24        come to an understanding of the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1       scientific issues, a fuller

2       understanding.

3              And Mark e-mailed me and

4       said, "Thanks much.  Now I'm going

5       to have to learn it."  The only

6       reason I put that in there was not

7       because Mark couldn't learn things

8       and didn't know things, because I

9       am awed by his ability to pick

10      things up, but I wanted to

11      emphasize that, obviously, Mark

12      had recognized that some part of

13      that Braunstein deposition,

14      whether specifically or

15      implicitly, was going to make its

16      way into that trial, and he was

17      going to learn some new material,

18      which he did do with his mutual

19      aplomb.

20             The technical and scientific

21      assistance that Cohen Milstein was

22      able to provide Dr. Krumholz and

23      Dr. Madigan marked the culmination

24      of much of the common benefit work

FAC Resp. Exhibit D -- 325

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1        that it had previously undertaken.

2            I worked very closely on

3        behalf of Cohen Milstein with

4        Harlan Krumholz to prepare him for

5        his testimony in Hermans/Humeston.

6        I sent him, I don't know, an

7        unbelievable number of documents,

8        a lot of data.  Some of the data,

9        in fact, was ongoing analysis from

10       Dr. Madigan, because there was

11       cross-pollination with these

12       experts.

13            MR. HERMAN:  Can I stop you

14       right there?  I'm sorry.  Dr.

15       Madigan's name has come up quite a

16       bit.  I believe Eric first spoke

17       about it.  Can you tell me a

18       little bit more about Dr. Madigan?

19            MR. SIGELMAN:  When you say

20       more?

21            MR. HERMAN:  Well, I would

22       like to know a little bit more

23       about his expertise and how he fit

24       into the entire litigation.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          MR. LEVIN:  How he was

2     chosen?

3          MR. SIGELMAN:  How he was

4     chosen, he was chosen because he

5     was a world class statistician by

6     Eric Weinberg.  He is an actual

7     statistician, and we got him the

8     SAS data from the clinical trials.

9     Seeger Weiss had done a great job

10    of getting SAS data, and a lot of

11    it had been given to Dr. Kronmal.

12    And Dr. Kronmal had worked

13    previously with Dr. Madigan,

14    because Dr. Madigan at one time

15    was at the University of

16    Washington.  So, they did

17    communicate a little bit.

18          We were building on what

19    Kronmal had done and doing some

20    new things that Kronmal had not

21    done.  And so one of the big tasks

22    was to find out what SAS data were

23    available.  And what we found was

24    there was some SAS data that we

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1        needed that, for whatever reason,

2        had not been produced by Merck.

3        We went to David Buchanan and

4        worked with him to get that data.

5             For example, protocols 10

6        and 17 were early

7        placebo-controlled trials of four

8        weeks or greater duration.  We

9        didn't have the SAS data for that.

10       All the Celebrex studies,

11       comparing Celebrex with Vioxx and

12       placebo, that was

13       placebo-controlled data of four

14       weeks or longer.  We wanted all

15       studies of four weeks or longer in

16       placebo, because that's what Merck

17       looked at.  And we didn't have

18       those data.  We needed them,

19       because we wanted to do the entire

20       universe of placebo-controlled

21       studies of four weeks or longer.

22       And what we came up with --  this

23       is later in my PowerPoint, but I

24       can give it right now.  I think

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1        this is a momentous finding that

2        we were prepared to go with in the

3        January 2008 trial.  That is, if

4        you followed Merck's approach in

5        the arthritis studies, in the

6        placebo-controlled trials, pooling

7        the data, and when I say Merck's

8        approach, you use adjudications

9        and confirmed events for the

10       studies that were adjudicated, and

11       you use investigator-reported

12       events for the studies that were

13       not, that was Merck's approach,

14       and instead of cherry picking like

15       Merck did, you use the entire

16       universe of studies four weeks or

17       longer, that includes 10 and 17

18       and the Celebrex studies which

19       were never included in any of the

20       pooled analyses of Merck, you have

21       a statistically significant

22       increase in thrombotic

23       cardiovascular events emerging in

24       arthritis, the primary indication

FAC Resp. Exhibit D -- 329

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1        for Vioxx in the year 2000.  That

2        is an unbelievably momentous

3        finding.

4             That is four years before

5        APPROVe, before they had the first

6        placebo data supposedly that led

7        to the market withdraw.  And think

8        about what happened in Hermans.

9        In Hermans, we had the misfortune

10       of the jury believing that the

11       VIGOR labeling was adequate.  So,

12       one of the things that we did with

13       Madigan is, we said we've got to

14       put our nose to the grindstone and

15       come up with some data that that

16       VIGOR labeling is grossly

17       inadequate.  That was one of the

18       findings.

19            MR. HERMAN:  Well, let me

20       stop you, because I think you've

21       been very thorough with that, and

22       I've got a better picture.  I've

23       got to ask you a couple of

24       questions that really are

FAC Resp. Exhibit D -- 330

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1          irrelevant to why you're here, but

 2          I've got to know the answers to

 3          them.

 4               The first is, Madigan, his

 5          field is statistics?

 6               MR. SIGELMAN:  Right.

 7               MR. HERMAN:  Not medical

 8          causation; is that correct?

 9               MR. SIGELMAN:  Correct.

10               MR. HERMAN:  What

11          information did you see about

12          skeletal or orthopedic problems or

13          failure in bone healing coming out

14          of Madigan?

15               MR. SIGELMAN:  There was a

16          little bit on that.  I mean, he

17          actually generated some data.  I

18          don't recall if he addressed those

19          data in his report, but he did

20          some runs on data like that,

21          because Eric Weinberg was pursuing

22          that.

23               MR. HERMAN:  Do you know why

24          Eric Weinberg was pursuing that?
```

FAC Resp. Exhibit D -- 331

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1              MR. SIGELMAN:  Yes.  Because

2       Eric was interested in the panoply

3       of all of the things that Vioxx

4       did.  And I think that we were

5       thinking in a creative way of

6       whether we could get into other

7       things in terms of risk/benefit.

8              MR. HERMAN:  That's fine.  I

9       appreciate you helping me out with

10      that.  And I didn't mean to take

11      up your time.

12             MR. SIGELMAN:  Oh, no

13      problem.

14             MR. HERMAN:  So go ahead

15      with your --

16             MR. SIGELMAN:  Ask me

17      anything.  That's fine.

18             Another e-mail in January

19      28, 2007 where it said, "You have

20      helped me so much with the placebo

21      trials."  So, we were interested

22      in -- you know, obviously, some

23      incredible trial work was done in

24      both the MDL and the states, but

Page 30

1    we were hoping that we could make

2    even better the win/loss record,

3    and we were hoping also to add

4    some new things to the offense,

5    because Merck had just heard all

6    this stuff about VIGOR.  And we

7    had these big debates.  I remember

8    Egilman and I and Krumholz had

9    these big debates about how we

10    should go and how Krumholz should

11    go in the Hermans/Humeston trial

12    depending, of course, on what Mark

13    wanted to do.  We wanted to throw

14    them some new curves at Merck, and

15    so we were really using Madigan

16    for that purpose.

17         And specifically after

18    VIGOR, Merck used gold standard

19    placebo-controlled trials as its

20    strength.  It said, you know, the

21    gold standard is placebo, and you

22    can talk about VIGOR until the

23    cows come home.  That's naproxen.

24    But placebo, man, placebo is our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1          baby.  And what we wanted to do

 2          was take what Merck thought was

 3          its strength and make that the

 4          plaintiffs' sword.  And that's

 5          what I believe the Madigan report

 6          is.  It is using placebo data as

 7          the plaintiffs' sword.

 8               MR. SEEGER:  And just

 9          because we're on a tight schedule,

10          just another five minutes.  I just

11          want to give you a heads up.

12               MR. SIGELMAN:  Okay.

13               The next slide, I've already

14          told you about the 2000, the

15          statistically significant

16          increased risk.  Obviously, Merck

17          used its Alzheimer's trials as a

18          sword, and we thought that the

19          Alzheimer's trials, if you look at

20          the totality of the data and you

21          used them as prespecified analysis

22          of the intention to treat that was

23          in the Alzheimer's trials, you

24          would actually get statistically
```

FAC Resp. Exhibit D -- 334

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1        significant increases not only in

 2        all-cause mortality, but in

 3        thrombotic cardiovascular events.

 4        And Madigan's report is replete

 5        with that.

 6             With respect to Madigan's

 7        report, what did we do?  First of

 8        all, we suggested many of the

 9        statistical analyses that Madigan

10        ran.  We actually said, we'd like

11        you to run this particular

12        analysis using ITT, look at this,

13        look at protocol 91, 78, do this,

14        do that.  We told him, we asked

15        him if he would use certain cutoff

16        dates for liability purposes.

17        Like September 15, 2000 was the

18        cutoff date for the data that was

19        used for the Advisory Committee

20        meeting in February of 2001.

21        March 16th, 2001 was the data

22        cutoff for the VIGOR labeling.  We

23        wanted all of these dates.  We

24        furnished him with countless,
```

FAC Resp. Exhibit D -- 335

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          hundreds of key documents.  We

2          determined what SAS data he

3          needed, and we obtained it, so we

4          would have a complete rendering of

5          their placebo-controlled trials.

6          And we consulted with him on

7          numerous technical issues such as

8          endpoint.

9               His expert report was served

10         in early October 2007, and his

11         report is replete with findings

12         from many of the statistical runs

13         and analyses earlier recommended

14         by Cohen Milstein.  For virtually

15         all of the drafting period, he

16         turned to Cohen Milstein for

17         review and input into the draft

18         report.  In fact, I was the only

19         person who saw that draft report

20         until the later drafts.  And Cohen

21         Milstein suggested many extensive

22         revisions.

23               MR. SEEGER:  In what case

24         was the report filed?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

```
 1              MR. SIGELMAN:  Pardon me?
 2              MR. SEEGER:  Do you know
 3         what cases that report was
 4         ultimately filed in, the Madigan
 5         report?  We've asked this of other
 6         people.
 7              MR. SIGELMAN:  Whatever
 8         cases were up in January of 2008.
 9         And he was to give a deposition in
10         December, which obviously never
11         occurred.
12              And we suggested many
13         extensive revisions and additions
14         that he generally accepted and
15         incorporated into his final
16         report.
17              And then a couple more
18         slides.  First of all, you have
19         Jerry Avorn's comments on Dr.
20         Madigan's report.  He said, "His
21         review is far more detailed, more
22         quantitatively sophisticated and
23         appears to be based on a more
24         complete collection of trial data
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1        than I have seen before.  It is a

2        most comprehensive depiction of

3        their," that's Merck's,

4        "misstatement and

5        misinterpretation of this data

6        that I have seen.  Even people who

7        think they know 'the whole Vioxx

8        story' will be astonished at some

9        of his analyses."  And Dr.

10       Krumholz said, "Great job!  Best

11       report yet by far."

12            And, by the way, as I said

13       before, it wasn't the first time

14       Krumholz had seen Dr. Madigan's

15       data.  We were constantly sharing

16       his data.  And Dr. Krumholz was

17       using his statisticians at Yale,

18       particularly a man by the name of

19       Yung Fay Wang, to try to replicate

20       what Madigan had done so that he

21       could testify on it at trial.

22            So, anyway, that's generally

23       what I have to say, other than my

24       firm also complied with PTO 6 in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

 1          terms of our time and expense

 2          submissions.

 3               MR. SEEGER:  Does anybody

 4          have any questions?

 5               MR. LEVIN:  Could you tell

 6          me about that meeting in

 7          Philadelphia when Mark Robinson

 8          was there?

 9               MR. SIGELMAN:  Yes.

10               MR. LEVIN:  How did it come

11          about?

12               MR. SIGELMAN:  That meeting

13          came about at the instance of Eric

14          Weinberg, and my recollection is

15          that Eric was interested in

16          sharing information with the MDL.

17          And I remember specifically that

18          Mark Robinson also had reached out

19          to Eric.  At some point, Don

20          Arbitblit then said he would like

21          to come to the meeting.  He hadn't

22          been invited, not that we didn't

23          want him, we thought Mark Robinson

24          just wanted to come for a meeting.

FAC Resp. Exhibit D -- 339

Page 37

1        So, Don came and Jenny Gross from

2        Lieff Cabraser was there, and

3        Jerry Kristal was at that meeting,

4        Dr. Madigan was at that meeting,

5        Dr. Egilman was at that meeting,

6        and somebody from Sol Weiss' firm

7        I think was at that meeting, if

8        memory serves.

9             In any event, and I

10       remember, I gave a presentation of

11       some of the main data from

12       Madigan's report, and we were

13       willing to share the report.  In

14       fact, Don Arbitblit was sent in

15       the later stages a draft of the

16       Madigan report which he reviewed,

17       and, in fact, made one

18       contribution to the report.  He

19       came up with a very useful

20       document that was in the Madigan

21       report.  So, those data were fully

22       shared with the MDL, and I think

23       Eric Weinberg was specifically

24       interested in possibly an exchange

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

 1      of information.

 2              MR. LEVIN:  Do you know

 3      whether Russ Herman, Chris Seeger

 4      or Andy Birchfield knew about that

 5      meeting?

 6              MR. SIGELMAN:  I don't know.

 7      I wasn't convening the meeting.  I

 8      presume that -- I know that -- you

 9      know, I got a call about that

10      meeting from you.  So, I presume

11      that unless you were

12      uncharacteristically quiet about

13      the meeting, that you might have

14      conveyed it.

15              MR. LEVIN:  How do you do?

16              MR. SIGELMAN:  And I

17      remember you had concerns

18      specifically about what the MDL --

19              MR. LEVIN:  It was another

20      world then.

21              MR. SIGELMAN:  Pardon me?

22              MR. LEVIN:  It is not your

23      concern.  It was another world.

24              MR. SIGELMAN:  Right.  In

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 341

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          any event, I remember specifically

2          that the information that we were

3          using with Dr. Madigan was stuff

4          that we developed since the MDL.

5          To be quite honest, what happened

6          in the MDL was, at some point, I

7          wanted to do some things with a

8          statistician, and I was informed

9          by John Restaino that for

10         budgetary reasons, they just

11         couldn't afford more statistical

12         work.  So, I ended up doing the

13         work through --  work that I

14         wanted to do through Dr. Madigan.

15         And that's kind of how I ended up

16         doing even more in New Jersey.

17              MR. LEVIN:  Don't take this

18         the wrong way.  This is for future

19         reference.

20              MR. SIGELMAN:  No, I

21         understand.

22              MR. LEVIN:  Were your hours

23         reported in the MDL or in the New

24         Jersey litigation for that?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1               MR. SIGELMAN:  Both.  Well,

2        I reported them separately to Russ

3        Herman.  I reported our hours for

4        MDL, and then I reported our hours

5        for New Jersey.

6               MR. SEEGER:  Okay.  Anybody

7        have anything?

8               MR. LANIER:  Thanks again,

9        Dan.

10                   -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 343

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4  Public and Certified Court Reporter of

 5  the State of New Jersey, Registered

 6  Diplomate Reporter, Federally-Approved by

 7  the United States District Court of

 8  Pennsylvania, do hereby certify that the

 9  foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22       Linda L. Golkow, RDR, CRR, CCR
         Notary Number:  1060147

23       Notary Expiration:  1.2.10
         CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 344

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM: COHEN, PLACITELLA & ROTH
        Christopher M. Placitella, Esquire
        Harry M. Roth, Esquire


BEFORE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 345

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                     -  -  -
 2            MR. SEEGER:  Chris, you sent
 3       in an affidavit, right?  I think
 4       we have something.
 5            MR. PLACITELLA:  It was a
 6       summary.
 7            MR. SEEGER:  So, this is the
 8       Court-appointed fee committee.  I
 9       think the idea here is to ensure
10       that we make sure everyone has had
11       an opportunity to express their
12       contributions to the case from the
13       common benefit standpoint.
14            Obviously we all know each
15       other.  I have a sense of what
16       went on in New Jersey and what
17       people did.  You've got 20
18       minutes, I believe, and we would
19       like to have 10 minutes at the end
20       for questions, if there are any.
21       You can use it any way you want.
22            MR. PLACITELLA:  I can
23       probably do this in five minutes.
24            MR. SEEGER:  It's up to you.
```

FAC Resp. Exhibit D -- 346

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          Chris, just so you know, we've got

2          Linda here.  We're going to record

3          everything for Judge Fallon.

4                  MR. PLACITELLA:  Right.

5                  It is kind of a weird

6          position to be in with a bunch of

7          friends in a room talking about

8          money, but I guess there's worse

9          places to be in this world.

10                 When I got involved or we

11         got involved in this case, it was

12         post recall, and what I attempted

13         to do was to try to figure out

14         what was done and then figure out

15         where we could contribute,

16         basically.  Because there was a

17         lot of great work that was done

18         and a lot of people took a lot of

19         risks long before we got in the

20         cases.

21                 So, I spent a fair amount of

22         time in the beginning just

23         reviewing what had been done in

24         terms of depositions, documents,

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          and things like that, and I
 2          determined that the place where I
 3          thought we could make the most
 4          contribution was in the public
 5          relations and marketing areas
 6          because there was still a lot of
 7          stuff to be developed.  So, that's
 8          really where I focused my efforts,
 9          not on who knew what and where in
10          terms of the science, but getting
11          and doing some unique things on
12          the PR side of things and on the
13          marketing side.
14                Just as an overview, it
15          looks like we spent, our firm,
16          about 5,000 hours, a little less,
17          slightly under that, which is
18          about two years' worth of full
19          time for a partner.  Now, I had
20          just left my old firm and joined
21          my new firm, and for the next two
22          years, I probably spent about 80
23          percent of my time doing Vioxx and
24          not generating many fees, and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1           these guys kind of took a flyer on

2           our doing that.  So, there were

3           some real opportunity costs in

4           terms of what I did.  When I was

5           at Wilentz, I generated a lot of

6           work.  I was the number one

7           business getter there for years.

8           So, I really put that on hold in

9           developing our practice to do

10          Vioxx even when things weren't

11          going too well.

12                So, I spent, I figured about

13          80 percent of my time for two

14          years doing that, and other people

15          spent less portions of their time.

16                On the public relations side

17          of things, I don't think that that

18          had ever really been looked at

19          hard in the context of an MDL or a

20          mass tort that I had been involved

21          in, but it looked like a

22          vulnerable area in this case.  So,

23          I was involved and took the lead

24          in taking the depositions of Jan

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          Weiner and Mary Blake, doing all

2          the document reviews.  There were

3          probably, between those two

4          deponents alone, 70,000 documents

5          that had to be gone through in one

6          way or another.

7               Now, that does not mean that

8          I looked at 70,000 documents, but

9          scanning through the databases and

10         pushing stuff out and looking at

11         things that made sense, and then

12         summarizing them, putting them in

13         databases, constructing

14         PowerPoints.

15              There were other depositions

16         I was involved with but did not

17         take the lead in, say, like

18         Westrick, where I identified

19         people had to be taken, but other

20         people helped.

21              It's interesting.  I guess

22         this is when I knew I was off the

23         wall.  When my son was in the

24         hospital with a collapsed lung and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        I was on the phone on a phone dep

2        in the Westrick deposition, Motley

3        Rice was taking the lead, that's

4        when I really knew I was off the

5        mark in terms of my priorities.

6              But in the public relations

7        stuff, in terms of depositions, I

8        think a lot of that stuff was

9        actually used in both the Federal

10       and State trials.  You know,

11       everybody in the world was told

12       that Vioxx didn't cause heart

13       attacks, and that message was

14       delivered ten times over to every

15       man, woman and child in the United

16       States in a single year.  I mean,

17       that was a significant piece of

18       evidence, I think.

19             We also spent a lot of time

20       battling over the video news

21       releases, you know, unearthing the

22       whole Loren Laine, Laura

23       Demopolous stuff.  We subpoenaed

24       the records, we litigated the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        right to have the videos.  Merck

 2        wanted to keep them quiet.  We

 3        unearthed them.

 4             There were hundreds of hours

 5        of videotape, most of which no one

 6        ever had to look at.  I went

 7        through them all, got the 15

 8        minutes worth of gold, but there

 9        was some pretty good stuff.

10             I think the Loren Laine

11        stuff was helpful in most cases.

12        We teamed up with Mark on the

13        Demopoulos depositions and those

14        videos.  We actually had to

15        litigate again the right to take

16        her deposition with conditions in

17        Philadelphia, and ultimately Judge

18        Higbee ruled that, as a result of

19        that battle, Merck could no longer

20        hire outside counsel for

21        independent witnesses and try to,

22        you know, keep secret what was

23        going on between Merck and outside

24        counsel's lawyers.  So, I thought
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1         that was significant.

2              Some of the documents we

3         uncovered that I know were used as

4         significant documents were the

5         Westrick letter to the FDA where

6         they were complaining that Pfizer

7         was committing a violation by not

8         giving both explanations of the

9         VIGOR trial, an FDA violation; the

10        2001 profit plan, the strategic

11        plan for the public relations

12        which was do no harm to Vioxx; the

13        SWOT team memos; and there was

14        other stuff, but they were some of

15        the highlights.

16              On the marketing side, I

17        spent a lot of time identifying

18        who should be deposed.  I thought

19        some of the depositions were more

20        productive than others, but,

21        nevertheless, most of them took

22        the same amount of time.  I know

23        we tag-teamed with the MDL on the

24        Charlotte McKines depositions.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          She was the person who was the

2          ultimate supervisor for the "Be

3          the Power" and the development of

4          the CV card.  We took her for

5          multiple days.  Tens of thousands

6          of documents were reviewed.  We

7          met with experts to help us

8          prepare to do that right.

9              We took Wendy Dixon for

10         multiple days.  Interestingly

11         enough, I didn't really understand

12         the significance of Dixon's

13         depositions until much later,

14         because Dixon, the whole premise

15         of Merck's defense that they had

16         Dixon prepped for was the whole

17         Alzheimer's thing.  That was the

18         whole key that they had her

19         prepped on.  It wasn't until the

20         back end of the litigation when we

21         unraveled the Alzheimer's fraud

22         that if we ever had to go back to

23         Dixon again, I think we would

24         really kind of take her down.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Jo Jerman I did with

2     Papantonio.  Papantonio, I think,

3     did a great job.  I tag-teamed

4     with him, but he really took the

5     lead.  My role in the Jo Jerman

6     dep is I have a cue card, and

7     every time he asked a question, I

8     would give Papantonio the cue card

9     and say, didn't the lawyers ask

10    you to do this.  So, we spent a

11    lot of time doing that.

12          The CME training programs,

13    doing all of those documents.  The

14    ghostwriting stuff or the STI, I

15    spearheaded for New Jersey.  That

16    ended up to be about 60,000

17    related documents.  It could have

18    been better coordinated with the

19    MDL, frankly, because I thought we

20    were doing some parallel work.  I

21    think that that never really

22    developed to where it should have

23    been, to be honest.  I identified

24    it, litigated it, got the

FAC Resp. Exhibit D -- 355

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        documents and then delegated to

2        have people finish it off.  And I

3        don't think it ever got finished

4        the way -- I mean, there was some

5        potential there that could have

6        been better, I thought.

7            I also was involved for New

8        Jersey in subpoenaing the Ogilvy

9        records.  We litigated the right

10       to get those records.  That review

11       was done in connection with the

12       Motley Rice firm.

13           I was originally the person,

14       I think, that got all the

15       advertising materials, integrated

16       them, all the commercials with the

17       print, and then distributed that

18       to all the lawyers around the

19       country who needed it.

20           All the information I did,

21       you know, the MDL coordination was

22       a little bit clumsy.  It got

23       better as it went along.  All the

24       stuff that we uncovered, we turned

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
1        over.  I know that Mark Robinson

2        actually took the stuff and used

3        it in seminars, but I actually got

4        on the phone and helped him prep

5        the marketing expert and turned

6        all those materials over.  I'm not

7        sure what route it ultimately

8        went, but I know that we spent

9        some amount of time doing that.

10            We were involved in the

11       whole Joanne Lahner privilege

12       fight, which to this day, I don't

13       think is actually over.  It was my

14       view that that was really a very

15       soft spot on the underbelly of

16       Merck and their Achilles' heel to

17       show that the legal department at

18       Merck was really at the base of

19       the fraud.  We had our in-camera

20       hearings before the judge where I

21       cross-examined Lahner.  I had

22       never been -- I have never

23       conducted a cross-examination

24       where then the judge asked me to
```

FAC Resp. Exhibit D -- 357

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          leave the room and then she

 2          conducted her own

 3          cross-examination.  Then during

 4          the examination, the law clerk

 5          would come out and ask me for

 6          different things that the judge

 7          could ask Lahner about.

 8              MR. GIRARDI:  That's

 9          happened to me.  They said to me,

10          get out of the room, Girardi, and

11          I'll do it myself.

12              MR. PLACITELLA:  Right.  So,

13          unfortunately, I think the Merck

14          lawyers stayed in there, so, they

15          had a lot of things to say that we

16          never really got to hear, and that

17          issue is still in flux, I guess,

18          although on the first round, she

19          wasn't going to give us all we

20          wanted, but there's still a lot of

21          privileged stuff under review.  I

22          think the settlement itself kind

23          of slowed that train down.  But I

24          still believe that that was a
```

FAC Resp. Exhibit D -- 358

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      significant effort that had

2      significant potential.

3          I did spend a fair amount of

4      time assisting Eric Weinberg, not

5      as the primary, but as the

6      secondary on experts.

7          I spent a lot of time, and I

8      don't know whether I drew the

9      short straw, but I spent a lot of

10     time with Dave Egilman in helping

11     with Mark's trials, doing his

12     depositions, Jay Geller, Sandra

13     Greenman, Michael Hoffman.  I

14     spent an awful lot of time with

15     Dr. Kostis, who gave us a lot of

16     guidance, and I think it actually

17     inured to the benefit of all for a

18     lot of reasons, but he gave us a

19     lot of guidance on even the

20     marketing end of things.

21         I spent a lot of time with

22     David Madigan, who I would submit,

23     although late in the game,

24     produced one of the best work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1           products in terms of an expert

2           that I had seen in the litigation

3           in terms of his stuff on the

4           Alzheimer's and the SAS data.  And

5           I spent, I guess I was the

6           exclusive person with Nesi for a

7           long time, who ended up writing

8           the book, and the only one that

9           ever got in the book was Lanier,

10          none of the rest of us.

11                MR. HERMAN:  He's good at

12          that.

13                MR. LANIER:  And I never

14          talked to him.

15                MR. PLACITELLA:  You never

16          talked to him.  He's very good.

17          Never talked to him.  So, that was

18          a lot of time.

19                We also spent a lot of time

20          with lawyer training, especially

21          in New Jersey, of having people

22          there assembling materials to give

23          to them so they could better

24          represent their clients.

FAC Resp. Exhibit D -- 360

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1            We actually took a little

2        bit of everybody's work product.

3        We took some of the stuff that

4        Jerry Kristal did, we took some of

5        the stuff that Chris did, we took

6        some of the stuff that Andy did,

7        that Mark did, put it on a CD and

8        made it available to people so

9        they could actually go in and do a

10       decent job when it came time to do

11       a doctor's deposition and the

12       detail people's depositions.

13            MR. ROTH:  And having their

14       clients deposed.

15            MR. PLACITELLA:  And having

16       their clients deposed.

17            In terms of trial

18       assistance, I figure I spent

19       probably two full weeks in various

20       trials in New Jersey helping out,

21       whether it was prepping for an

22       expert, actually being the one who

23       did the depo cuts that no one

24       wanted to do, you know, the not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          fun stuff.  So, I spent some time

2          in Perry's trials and Mark's

3          trials.  Hopefully we gave some

4          significant assistance there that

5          was helpful.

6              After the settlement, I was

7          put in charge of working out or

8          helping to work out the lien

9          issues with Garretson, although I

10         would have to say that Garretson

11         really carried that ball.  I

12         didn't have to do that much other

13         than calm the forces inside of New

14         Jersey.  We took a leading role

15         with Judge Higbee in confronting

16         some of the ethics issues that

17         were being raised as it related to

18         the settlement.  We had gotten

19         independent ethics counsel, worked

20         through some of that stuff with

21         Chris' help and Judge Higbee, and

22         I think, you know, we played a

23         real role in keeping people

24         focused on what the real issues

Page 19

```
1              were.
2                     That's kind of an overview.
3              I'm assuming that almost everybody
4              here knew how hard we worked and
5              how much time we dedicated.  Some
6              efforts, frankly, when you are in
7              this kind of litigation, bear more
8              fruit than others, but I think we
9              produced some significant fruit,
10             and everybody here has made a
11             tremendous contribution, and I
12             think we helped fill in some of
13             the gaps, and saying more than
14             that is, frankly, a little
15             awkward.
16                    MR. SEEGER:  That was very
17             helpful, actually, from my
18             perspective to remind everybody of
19             the things that you worked on,
20             because we're sort of at the end
21             of the road now, so, I think those
22             things could be forgotten, so, it
23             was helpful for me.
24                    MR. HERMAN:  I just have a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      couple of questions, Chris.  The

2      ethics counsel you retained, who

3      was that?

4           MR. PLACITELLA:  Jeff

5      Pollack.

6           MR. HERMAN:  The reason I'm

7      asking is that I'm not sure that

8      that issue is over yet, so, we may

9      be calling on you.

10          MR. PLACITELLA:  Yeah.  He

11     helped us work through everything,

12     because one of our co-counsel from

13     Maryland had some major issues,

14     and they had a lawyer in their

15     office who was on the Maryland

16     ethics committee, and then we had

17     some kind of side shots from other

18     places, including the guys from

19     Connecticut.  And you know who all

20     those were.

21          MR. SEEGER:  I was on some

22     of those calls with you.

23          MR. PLACITELLA:  Right.  So,

24     we retained independent counsel

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1    who was on the New Jersey ethics

2    committee really who was very,

3    very helpful, I thought.

4         MR. SEEGER:  Dennehy, right?

5         MR. PLACITELLA:  Dennehy

6    actually was the guy at Wilentz,

7    but Jeff Pollack.  He also had

8    some significant issues.  Jeff

9    Pollack, who was on the New Jersey

10   Supreme Court ethics committee.

11        MR. SEEGER:  I spoke with

12   him.

13        MR. PLACITELLA:  Yes.  We

14   retained him independently to help

15   us kind of get through some of

16   those moguls.  I thought he was

17   very helpful.  In fact, I think he

18   might have given us a written

19   opinion.

20        MR. ROTH:  He did.

21        MR. PLACITELLA:  He gave us

22   a written opinion.

23        MR. HERMAN:  You said that

24   Motley at one point was taking a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          deposition and your son was ill

 2          and you were on the phone?

 3                  MR. PLACITELLA:  Right.

 4                  MR. HERMAN:  What sort of

 5          interaction did you have with

 6          Motley Rice?

 7                  MR. PLACITELLA:  Yeah, we

 8          had an ongoing relationship with

 9          him.  We're close friends for a

10          long time.  They worked on the

11          Ogilvy.  They helped on the public

12          relations.  They helped on the

13          privilege log issues

14          significantly.  They took the lead

15          in the Westrick deposition.  I

16          think Fred Thompson might have

17          done that deposition.  I think

18          they might have done some of the

19          work on the STI.

20                  So, they were an integral

21          part of -- you know, there was too

22          much, frankly, for me just to do,

23          and they carried a lot of the

24          water on that end of things.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1              MR. LANIER:  Based on the

 2         way you perceive what Ness Motley

 3         did, because I think you probably

 4         worked closer with them than

 5         anybody else, right?

 6              MR. PLACITELLA:  Right.

 7              MR. LANIER:  Based on the

 8         way you perceive what they did and

 9         what you perceived you did, if you

10         were called on to make the hard

11         decision, where do you

12         comparatively rank yourself with

13         Ness Motley?  Above, same level or

14         below in terms of contributions?

15              MR. PLACITELLA:  I think

16         that it was my job to steer the

17         ship, to figure out what had to be

18         done, try to figure out what the

19         soft spots were, and that was a

20         major contribution.

21              In terms of the number of

22         hours they put in, I don't even

23         know the number -- you know, I

24         don't know, I haven't seen their
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           submission.  I'll say any time

2           they do things, they do it right

3           --

4                MR. WEITZ:  I think that

5           it's an important question,

6           because I'll tell you why, because

7           people like myself and Chris and

8           Mark know your contribution in

9           Jersey.  We worked with you, we

10          know what you guys did.  Ness

11          Motley was sort of out there in

12          the periphery.  They weren't in

13          the MDL, they weren't in New

14          Jersey, so we are trying to get a

15          feeling, and you really know

16          better than anybody, as to what

17          their contribution is.  So, try

18          to --

19               MR. PLACITELLA:  Well, I

20          know what they did in relation to

21          me, which was significant.  They

22          helped significantly on the Lahner

23          issue.  They spent a lot of time

24          going through the documents.  They

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          helped with the briefing on that

2          issue.  They showed up at the

3          hearing.

4                MR. SEEGER:  You and Fred

5          handled that, I remember that.

6                MR. PLACITELLA:  Correct.

7          So, they spent a lot of time on

8          that.  They spent a lot of time on

9          the Westrick PR issue.  They spent

10         a fair amount of time with

11         Hoffman, who was the ethics

12         expert.  That was the person that

13         they were in charge of taking.

14               They assisted with Kostis

15         and some others.  I mean, they did

16         a significant amount of work.

17               MR. WEITZ:  Were they doing

18         things in conjunction with you at

19         your direction or were they doing

20         it on their own?

21               MR. PLACITELLA:  No.  They

22         were really doing it in

23         coordination with what I was

24         doing.

Page 26

 1              MR. LEVIN:  Were you giving

 2        them the assignment?

 3              MR. PLACITELLA:  No.  We'd

 4        split it up.

 5              MR. LEVIN:  You were like

 6        working together?

 7              MR. PLACITELLA:  Right,

 8        right.  Since I had reviewed

 9        pretty much everything at one

10        point, I saw my role as trying to

11        figure out where the gaps were

12        and --

13              MR. LEVIN:  I guess what you

14        are saying is, they weren't

15        duplicating what you were doing --

16              MR. PLACITELLA:  No, they

17        were not.

18              MR. LEVIN:  -- they were

19        supplementing?

20              MR. LANIER:  Did you get

21        them involved in the litigation,

22        did they get you involved, or did

23        they get involved independently?

24              MR. PLACITELLA:  I think it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1        was kind of independently, but,

 2        actually, we had a work in

 3        triumbrant with Sol Weiss where,

 4        in the beginning, we had a --

 5        because we don't really know how

 6        the dynamics of things actually

 7        unfold, but in the beginning, the

 8        way we worked it out is Sol,

 9        Motley Rice and our firm were

10        going to go in and do whatever we

11        thought needed to be done

12        together.  So, we kind of divided

13        up responsibilities.  So I wasn't

14        giving them direction.  We were in

15        it together.

16             Then, of course, as the

17        dynamics and all of these things

18        happened, directions change a

19        little bit because, well, you are

20        not going to duplicate what Seeger

21        is doing, and you are not going to

22        duplicate what Perry has done or

23        Mark has done.  You are just not

24        going to do that, so...
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            MR. HERMAN:  What I'm really

2        interested in is the fact that you

3        primarily did the work for your

4        firm, not someone else, not some

5        paralegal, or anybody else, it was

6        really you?

7            MR. PLACITELLA:  It was

8        primarily myself.  Harry helped,

9        he did a lot of client stuff.

10       David Lenrow, who was a physician

11       in my office --

12           MR. HERMAN:  But these were

13       partner level folks?

14           MR. PLACITELLA:  Correct,

15       yeah.

16           MR. SEEGER:  Not low level

17       people?

18           MR. PLACITELLA:  Yes.

19           MR. HERMAN:  I think that's

20       important.

21           MR. WEITZ:  Chris did most

22       of the work.

23           MR. HERMAN:  With regard to

24       Motley Rice, Fred Thompson was the

FAC Resp. Exhibit D -- 372

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1          main partner on that?
 2               MR. PLACITELLA:  Actually,
 3          they had -- Fred was the partner
 4          most of the time that was doing
 5          that.  But they had Carmen Scott,
 6          who is a very competent lawyer,
 7          Henry Leventis, Josh Littlejohn.
 8          I mean, they had a number --
 9               MR. WEITZ:  Wasn't Ann also
10          involved?
11               MR. PLACITELLA:  Ann Ritter
12          was for a while.  Jeff Thompson in
13          the beginning.  So, they had some
14          significant people.  I mean, they
15          weren't just throwing a bunch of
16          low level people out.  They had
17          some senior people.
18               MR. LEVIN:  Chris, was
19          somebody in your firm working with
20          the accountant to straighten out
21          your costs and hours?  Because you
22          have $41,000 in costs that you
23          want to recover and a significant
24          number of hours.  You say that's
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1        Harry?
 2              MR. ROTH:  Yes.  We're --
 3              MR. LEVIN:  Keep doing that
 4        so that we can get that plugged
 5        in.
 6              MR. ROTH:  We are hopeful
 7        that by the end of the week the
 8        accountant will have back the
 9        reformatted sheets.
10              MR. PLACITELLA:  By the way,
11        right before I left Wilentz, they
12        put in, I think, 50,000 for Nesi
13        as a contribution.  We never
14        claimed it.  I don't know if they
15        ever claimed it.  I don't know how
16        they would claim it, but that was
17        a clear common benefit.  It is not
18        my cost, but it is their cost.
19              MR. WEITZ:  Were you
20        handling Motley Rice's cases?
21              MR. PLACITELLA:  We were
22        local counsel.
23              MR. WEITZ:  And cases that
24        were in the Jersey court, had you
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1          worked up cases on the discovery

 2          docket?

 3               MR. PLACITELLA:  Yes.

 4               MR. WEITZ:  Tell us how

 5          many.  Because I remember you

 6          being actively involved as one of

 7          the guys that were actually trying

 8          to push some cases.

 9               MR. PLACITELLA:  Everybody

10          was -- you remember, it was who

11          can push their case out first.  We

12          were all trying to push out cases.

13          We were doing the docs.

14               MR. SEEGER:  Actually, we

15          were --

16               MR. WEITZ:  If you remember,

17          there were very few guys.

18               MR. PLACITELLA:  I

19          remember --

20               MR. ROTH:  You know, in

21          terms of the group that we were

22          working with, Motley Rice was also

23          one of the groups that was

24          interested in pushing their cases.
```

FAC Resp. Exhibit D -- 375

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1            MR. PLACITELLA:  And

2       Simmons, they pushed pretty hard.

3            MR. ROTH:  These were not

4       guys that were taken aback.  We

5       had some guys who were sitting

6       around, hurry up, hurry up, get me

7       in, and Motley Rice was not one of

8       those guys.

9            MR. HERMAN:  How many cases

10      aggregate did you all have with

11      Motley Rice?

12           MR. PLACITELLA:  About 400?

13           MR. ROTH:  A little less.

14      360.

15           MR. WEITZ:  What was the

16      total number of cases that you

17      guys submitted to the settlement,

18      that Cohen Placitella submitted?

19           MR. PLACITELLA:  Or through

20      co-counsel?

21           MR. WEITZ:  Not through

22      co-counsel, but for your firm.

23           MR. PLACITELLA:  Oh,

24      probably not that many.  A few

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1           hundred.

2                   MR. ROTH:  I think we were,

3           I want to say 250, and that may be

4           generous.

5                   MR. BIRCHFIELD:  Is that

6           your cases and Motley Rice?

7                   MR. PLACITELLA:  No, no,

8           just ours.

9                   MR. BIRCHFIELD:  You talked

10          about the working relationship.

11          Was there a joint venture on these

12          cases with Sol?

13                  MR. PLACITELLA:  It was a

14          loose arrangement that was never

15          totally formalized.  But, you

16          know, we've been in this business

17          for a long time, and probably

18          there's a lot of things that

19          should be.  You just trust people.

20                  MR. LEVIN:  Was there a fee

21          sharing agreement?

22                  MR. PLACITELLA:  We never

23          got that all the way 'til the end.

24                  MR. LEVIN:  Is there a fee

FAC Resp. Exhibit D -- 377

Page 34

1       sharing agreement?

2              MR. PLACITELLA:  We never

3       got all the way to the end.

4              MR. LEVIN:  Will there be a

5       fee sharing agreement?  That's for

6       you being local counsel?

7              MR. PLACITELLA:  Right.

8              MR. LEVIN:  Not in terms of

9       anything else?

10             MR. PLACITELLA:  Correct.

11             MR. HERMAN:  Just a couple

12      of things.

13             MR. SEEGER:  We have about

14      two minutes, just to stay on time.

15             MR. HERMAN:  Just a couple

16      of things.  In fairness, make sure

17      you read the Fifth Circuit

18      opinions in a couple of cases.  If

19      you are not familiar with the

20      cases that are governing fees in

21      quasi class actions and class

22      actions, we'll send out a memo

23      again, but you can access those

24      cases on the judge's website.  One

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          is Murphy Oil, which is Judge

2          Fallon's latest, which gives you a

3          pretty good road map on the law

4          and where you need to go and where

5          we need to go.

6               Of course the Johnson

7          factors originated in the Fifth

8          Circuit, and those factors have

9          been reaffirmed in the Mobil Oil

10         case.  So, there are two or three

11         cases that you have to look at.

12              We hope that all the fee

13         issues are going to be resolved,

14         but Judge Fallon has advised us to

15         advise everyone seeking a fee that

16         in the event that things are not

17         resolved, he's going to do what

18         the Fifth Circuit requires him to

19         do.  He's going to have some

20         former Assistant U.S. Attorney put

21         people under oath, take

22         depositions, et cetera.

23              The two things that we're

24         responsible for are transparency

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        and consistency.  So, even though

2        you don't know, you are not

3        familiar with what Ness Motley,

4        for example, submitted or how many

5        hours, you will be privy to what

6        everybody else is privy to by the

7        time this process works its way

8        through.

9             MR. PLACITELLA:  I

10       appreciate it.  I know that this

11       is not an easy thing for you.  I

12       will say one thing about this

13       litigation.  In the end, it was

14       really a collaborative effort even

15       though it didn't start that way.

16       I mean, everybody -- it was always

17       like a substantial contributing

18       factor.  There were a lot of

19       really significant pieces, and

20       that's a tribute to everybody, I

21       think.

22             MR. LANIER:  You found the

23       Loren Laine piece that I used in

24       one of the trials.  I think you

FAC Resp. Exhibit D -- 380

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
1        found it by the third trial.  I

2        don't know if you found it by my

3        second.

4              MR. SEEGER:  Bogus quote.

5              MR. LANIER:  The bogus

6        quote.  That was you, wasn't it?

7              MR. PLACITELLA:  Right.

8              MR. LANIER:  It was a good

9        clip.

10             MR. PLACITELLA:  It was very

11       helpful.

12             MR. SEEGER:  By the way, I

13       don't see Wilentz's stuff.

14             MR. LEVIN:  No.

15             MR. SEEGER:  I don't know if

16       they submitted it.  I don't know

17       if you want to put a call in to

18       them.

19             MR. LEVIN:  If there's a

20       cost, you know, nobody wants to

21       see somebody not get reimbursed.

22             MR. PLACITELLA:  Because

23       they didn't really do much, you

24       know --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1             MR. SEEGER:  Even their

2        costs.

3             MR. PLACITELLA:  But their

4        costs, you know, that's a

5        significant piece.

6             MR. SEEGER:  That was

7        helpful.  Thank you.

8             MR. PLACITELLA:  Thank you.

9                  -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1                C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: CUNEO GILBERT & LADUCA
Jonathan Cuneo, Esquire


BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 384

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. CUNEO:  For those of you
 3       who don't me, my name is Jonathan
 4       Cuneo, and I'm the senior partner
 5       in a Washington, D.C.-based firm
 6       called Cuneo Gilbert & LaDuca.
 7       I've got sort of what I believe is
 8       going to be an unusual story to
 9       tell you, and I thought I might
10       approach it by simply asking and
11       answering a few questions and then
12       taking yours.
13            The first question is, who
14       are we and what is it that is
15       unique that we bring to the table?
16       And the answer is essentially like
17       this.  We are a Washington,
18       D.C.-based plaintiffs' commercial
19       firm.  Every one of our partners,
20       at the same time, has a deep
21       background in government or public
22       relations or running political
23       kind of campaigns.  And, so, for
24       example, I started my career at
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1      the Federal Trade Commission,

2      working in the office of the

3      general counsel, and then with

4      antitrust counsel to the House of

5      Representatives in the early

6      1980s.  That was my formal title,

7      but that was the sum and substance

8      of it when Peter Trevino was the

9      chairman.

10          I then formed my own

11     practice, and my choices at that

12     time were to go to a big law firm

13     and pretend that I graduated five

14     years before instead of nine years

15     before, or to start my own

16     practice, which I did.  I began a

17     dual practice of legislative work

18     and basically general commercial

19     litigation.  Through the years, I

20     have represented the securities

21     lawyers at an association called

22     NASCAT, the antitrust plaintiffs'

23     lawyers in a group called COSAL,

24     we continue to represent them, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          my law firm grew from just me and

 2          a telephone to about 16 lawyers.

 3              The principal lawyers who

 4          were involved here were me and my

 5          partner, Pamela Gilbert, who is a

 6          recognized consumer advocate in

 7          Washington.  She began her career

 8          at US PIRG and then became

 9          director of Congress Watch.  And

10          then during the Clinton

11          administration, she was the

12          executive director, which is the

13          top civilian job at the Consumer

14          Product Safety Commission.  She

15          has testified before Congress well

16          over 50 times.  She's done

17          literally hundreds of television

18          appearances, and she continues to

19          represent AAJ in a number of

20          capacities.  And I think she was

21          very honored that President Elect

22          Obama asked her to direct the

23          transition for the Consumer

24          Product Safety Commission.
```

FAC Resp. Exhibit D -- 387

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
1              So, we have always had one
2         foot in the litigation door.  I
3         have a very active litigation
4         practice, not as active as any of
5         the lawyers in this room, but
6         we've done about 100 cases around
7         the country, antitrust, consumer,
8         derivative kind of cases, and at
9         the same time, we have a foot on
10        Capitol Hill, and we deal with the
11        media on a daily basis.
12              I used to work as a
13        reporter.  One of the people who
14        started with me on this case,
15        Michael Waldman, was director of
16        the office of speech writing for
17        President Bill Clinton.  If you
18        read his resume, he wrote four
19        State of the Union messages to
20        address us to the United Nations.
21              MR. LEVIN:  Now he runs the
22        Brennan Center.
23              MR. CUNEO:  Yes.  Now he is
24        the director of the Brennan Center
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        in New York.

2               So, what is it that caused

3        us and the committee that was

4        running this case to have a need

5        for our services?  Well, in

6        general, Congress was interested

7        in the issue of regulation and

8        preemption and also specifically

9        in Vioxx.  So, even before the

10       committee was formed, we

11       interacted with the various

12       congressional committees, covered

13       the hearings, sent the materials

14       on, and my main points of contact

15       with the committee have been my

16       old friends, Chris Seeger and

17       Arnold Levin.

18              And second, after Mark

19       achieved such a terrific and

20       unexpected result in the Ernst

21       case in Texas, the committee that

22       was running this case I think

23       correctly perceived an increased

24       political risk coming from that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          verdict, because why is it?  Well,

2          Merck was and probably still

3          remains one of the most respected

4          names in corporate America, ran a

5          very successful public relations

6          campaign to make it sound as if

7          this was a Perry Mason result,

8          that it was something that was

9          against all the odds and the

10         evidence.  And really this goes to

11         show you the tremendous risks and

12         terrors that the jury system in

13         the United States imposed.

14              So, as a group, they, I

15         think, or people who were in this

16         case, were correctly concerned

17         about the possibility of an

18         Arizona/McDonald's coffee case

19         kind of a PR campaign by the

20         defendants.  I was asked to look

21         over the daily press, which I did

22         while I was on vacation, and we

23         held a number of conference calls,

24         and what we decided to do was to

FAC Resp. Exhibit D -- 390

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        assemble an evidence book to show
 2        that this wasn't simply a matter
 3        of snake charming and magical
 4        tricks and Houdini, but actually
 5        there was some evidence at least
 6        to support them.
 7             So, in September,
 8        specifically September 21st, 2005,
 9        I was having difficulty accessing
10        exactly what the evidence is.  I
11        came and visited Chris Seeger, and
12        he at that time effectively Tom
13        Sawyered me into staying in
14        Atlantic City for the next seven
15        weeks.  As I told you, I ran, and
16        during that period of time, on a
17        daily basis I managed the press
18        for the trial, conducted
19        background briefings, we faxed
20        things all over the country, we
21        dealt with members of Congress, in
22        addition to running my own law
23        practice.
24             Now, if inconvenience were
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      the test of what kind of a fee

2      that we would be awarded, then we

3      would be entitled to a very high

4      fee, indeed, because like all of

5      us, we work in a workday world

6      where I have court hearings and

7      things that are scheduled, and we

8      basically dropped everything and

9      came to Atlantic City.  We missed

10     one day of trial in the next seven

11     weeks.

12          I was here or Pam was here

13     every single day.  Some days we

14     went back to work at night and

15     conducted business.  Some days I

16     went to New York and conducted

17     business, but we were here during

18     the trial for all seven weeks.

19          Now, that was a situation in

20     which I've learned at that time

21     that there were really three or

22     four aspects to what the

23     defendants were doing.  One is, it

24     was clear to me that they had a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1      courtroom presence where they were

2      chastened, and they learned from

3      their experience in Texas.  Every

4      single thing, from the fact that

5      Diane didn't wear any bling to the

6      way they got out of their bus and

7      marched in the courtroom and went

8      out at night had been focus

9      grouped and orchestrated.  It was

10     very, very careful.

11          In the room, in addition to

12     the lawyers who were actually

13     trying the case, was a partner

14     named Jim Fitzpatrick from the

15     Dewey firm in New York, who, in

16     turn, was being directed by a

17     partner whose name was Ted Mayer,

18     whose father, by the way, was a

19     great public health advocate,

20     ironically enough, as president of

21     Tufts University.

22          But in addition to helping

23     Jim, they had a professional,

24     former reporter, but a crisis

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1     management professional whose name

2     was Kent Jarrell.  So, Merck

3     mounted a campaign that was meant

4     to reflect their view of what was

5     happening in the courtroom every

6     day through the media, across the

7     world, to the Congress, and

8     basically an attempt to shape

9     public opinion.

10         My role during that seven

11     weeks was to counter.  As I say,

12     we had a legitimate view, I think,

13     that if the Humeston case had gone

14     as I believe it should, and there

15     had been a significant -- in fact,

16     it did -- and there had been a

17     significant plaintiff's verdict,

18     we would have faced an onslaught

19     or the potential of an onslaught,

20     and my job was to start putting

21     down the sandbags in order to

22     prevent that from overwhelming our

23     position.

24         So, what results did we

FAC Resp. Exhibit D -- 394

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1    achieve?  Well, I think that we

2    gave you increased connections on

3    Capitol Hill.  By the way, this is

4    something that we not only did for

5    you, but we did it in a very

6    formal role in the Enron case.  We

7    were officially designated

8    Washington counsel.  We had a

9    huge, huge, huge amount of work to

10   do in that case.  As you know,

11   there were a whole series of

12   congressional hearings.  We

13   interacted with every committee,

14   every member of the press who was

15   up there, and we did it in a way

16   that was completely anonymous, I

17   might say.  And that's our role.

18   We did it in the Worldcom case,

19   and to a much lesser extent, we

20   did it with you.

21        At the end of the trial, it

22   didn't go in a way that we had

23   wanted it to go, and it didn't go

24   the way Chris had expected it to

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 395

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       go, I think.  Maybe I was more

2       optimistic about it than he was,

3       because I thought that he and

4       David Buchanan did a magnificent

5       job in presenting the case to the

6       jury, but at that time, our role

7       ceased.  It ceased.  You did not

8       need the insurance policy against

9       Congressional action at that

10      point.  It was, you know, they won

11      one, you won one.

12          After that, it was merely a

13      matter of, it was like a World

14      Series.  It didn't have the same

15      inherent danger.  After that, in

16      consultation with a group who was

17      running the case, we ceased our

18      activities and essentially, with

19      very minor exception, have done

20      nothing else since.

21          So, that is basically 80 or

22      so percent of our work.

23          In addition, we had 20

24      percent of work that was performed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          by other members of our firm in

2          close consultation with Arnold

3          Levin, specifically.

4                  MR. HERMAN:  I'm sorry, in

5          consultation with whom?

6                  MR. CUNEO:  Arnold Levin,

7          specifically.

8                  MR. HERMAN:  Okay.

9                  MR. CUNEO:  At that time,

10         for example, we represented the

11         Massachusetts plaintiff in the

12         national class you were putting

13         together.  We did a lot of work on

14         the Massachusetts plaintiff, Iowa,

15         Indiana and others.  And so that

16         was a minor part of what we did,

17         but it was a part, nonetheless.

18         Again, those activities ceased a

19         long time ago.

20                 I'm proud of the fact that

21         we were able to come here and

22         literally, at the drop of a hat,

23         help for a period of seven weeks

24         at the time.  I think that Chris

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          and others were very pleased with

2          the job that we did.  And at the

3          same time, like a member of the

4          Cincinnatus, we went home.  I had

5          many other cases to do, we got out

6          of your hair, so much so that I

7          didn't even follow it enough to

8          understand that I might have

9          presented an affidavit here.  We

10         did exactly as we were requested,

11         nothing more, nothing less,

12         nothing else.

13              MR. LANIER:  Can I ask a

14         question?  I don't mean to

15         interrupt.  Are you done?

16              MR. CUNEO:  No, I'm done.

17         I'm a little nervous that you are

18         asking.

19              MR. LANIER:  Were you paid

20         for any of that work that you did?

21         Did you bill for it?  What kind of

22         arrangement did you have?

23              MR. CUNEO:  It was purely

24         contingent.  We paid for our own

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        expenses.  We were not paid for

 2        it.  I think I legitimately could

 3        be an expense of the case, but

 4        that's not the way it was.  We

 5        billed our time, and we paid our

 6        own expenses.

 7              MR. LANIER:  Why wouldn't it

 8        be an expense in the case?

 9              MR. SEEGER:  Actually,

10        that's an interesting comment.  I

11        never even thought of it.

12              MR. LEVIN: It's something

13        that we have to discuss.

14              MR. SEEGER:  It was a very

15        busy time, obviously.  It was

16        right after Mark's Ernst verdict.

17        I had press all over the place.  I

18        actually got a call from you,

19        Arnie, saying if would be helpful

20        if you had somebody running to the

21        press.  And then, because it was

22        you, John, I knew you, I said yes,

23        that would be very helpful,

24        because we are getting swamped.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          It was the first two trials.  We

2          were literally being swamped, and

3          they were flooding our workroom,

4          they were finding where we were.

5          So, John came down and ran

6          interference and handled that

7          aspect of the case.

8               MR. CUNEO:  Just so you know

9          it, too, in order that I didn't

10         get in their hair, there were

11         documents that had to --

12              MR. SEEGER:  Oh, you were in

13         our hair.  You had more requests

14         for documents.  You were doing

15         your job.

16              MR. CUNEO:  But I brought my

17         own guy up to copy documents and

18         to do work.  And he also helped

19         out.  In the 12 hours of the day

20         he wasn't working for me, he

21         worked with Chris as a paralegal.

22              MR. SEEGER:  Actually, I

23         forgot that.

24              MR. LEVIN:  The other work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          that John said he did, and it was

2          minimum, because everybody had

3          minimal work, Judge Fallon wanted

4          a master complaint with a

5          plaintiff for each state in the

6          event that there had to be state

7          issues and what have you, and I

8          think he provided five or six.

9                    MR. SEEGER:  For subclasses?

10                   MR. LEVIN:  Well, standalone

11         and state classes because he was a

12         resource there.

13                   MR. HERMAN:  His direction,

14         actually, was see if you can group

15         states according to issues.

16                   MR. LEVIN:  Yes.  And that's

17         what John did.

18                   MR. HERMAN:  That's why we

19         needed it.

20                   MR. CUNEO:  We did some work

21         on that.

22                   MR. LEVIN:  John, this has

23         nothing to do with whether you

24         become a lawyer or a consultant, I

FAC Resp. Exhibit D -- 401

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1       guess, but you have 1,429 hours

2       that are still being rejected.

3       Are you perfecting them?

4              MR. CUNEO:  Yes.  We did

5       that last week.

6              MR. LEVIN:  As of November

7       24th --

8              MR. CUNEO:  No, we did that

9       last week.

10             MR. LANIER:  Off the record.

11                 -  -  -

12             (Whereupon, a discussion off

13      the record occurred.)

14                 -  -  -

15             MR. CUNEO:  I guess that if

16      you wanted to go that route, what

17      you would have to do, Mark, would

18      be to allocate.  That is easily,

19      easily doable.

20             MR. SEEGER:  We'll get back

21      to you.

22             MR. LEVIN:  Could you do us

23      a favor and send us each -- see,

24      we don't have the accountants --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        we don't have your hours, I don't,

2        anyway, I just have totals from

3        the accountant.  If you could send

4        us what you sent to the accountant

5        as the breakdown, we can get it

6        amongst ourselves.

7             MR. LANIER:  Great idea.

8             MR. CUNEO:  Okay.  In other

9        words, there are two --

10             MR. LEVIN:  I know you have

11        sent it around 20 different times.

12             MR. CUNEO:  Can we go off

13        the record?

14             MR. LEVIN: Yes.

15               -   -   -

16             (Whereupon, an

17        off-the-record discussion was

18        held.)

19               -   -   -

20             MR. SEEGER:  Thank you.

21

22

23

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary
   Public and Certified Court Reporter of
4  the State of New Jersey, Registered
   Diplomate Reporter, Federally-Approved by
5  the United States District Court of
   Pennsylvania, do hereby certify that the
6  foregoing is a correct transcript of the
   testimony as taken stenographically by
7  and before me at the time, place and on
   the date hereinbefore set forth.

8

9              I DO FURTHER CERTIFY that I
   am neither a relative nor employee nor
10 attorney nor counsel of any of the
   parties to this action, and that I am
11 neither a relative nor employee of such
   attorney or counsel, and that I am not
12 financially interested in the action.

13

14

   _____
15          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147
16          Notary Expiration:  1.2.10
            CCR Number:  30X100176200
17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          ENGSTROM, LIPSCOMB & LACK
               Walter J. Lack, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 405

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -

 2              MR. GIRARDI:  Walter, here's

 3          the purpose for this, just so you

 4          know.  This is two-thirds of the

 5          fee allocation committee, and the

 6          transcript is being made for the

 7          purposes of Judge Fallon.  So, at

 8          the end of the day, obviously, it

 9          is Judge Fallon that's going to

10          make the call.  But about 50 firms

11          or so have requested to set forth

12          what they did, concerned primarily

13          with the group benefit, the

14          benefit to the overall Vioxx

15          litigation, as opposed to

16          individual situations.  So,

17          anyway, that's the format, and

18          then you can just say whatever you

19          want.

20              MR. LACK:  Like right now?

21              MR. GIRARDI:  Right now.

22              MR. LACK:  I haven't

23          prepared for this, but I've been

24          giving it some thought since I was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          informed about the interview.

2                I think I should go back to

3          how our firm got involved.  It is

4          kind of an interesting story.

5          We've done drug cases over the

6          years, but have never sat on an

7          MDL panel.  I personally have

8          historically taken a dim view of

9          that situation, but with modern

10         litigation being what it is, I had

11         better get with the program.

12               We've always developed our

13         own work product in our own cases

14         based upon our own resources.

15         This case -- and I'll perhaps

16         refresh Tom's memory on this.

17         This case actually came to us from

18         a deep throat within Merck, who

19         made contact with a woman by the

20         name of Cheryl Blume, and all of

21         you probably have worked with her

22         over the years.  Her firm is

23         called Pharmaceutical Development

24         Group, Inc.  We had been working

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        with her on some other drug cases,

2        found her work product to be quite

3        impressive, and she was looking to

4        extend the number of cases she was

5        working on.  I recall getting a

6        call from her through our private

7        investigator, Arlene Friedman, who

8        does this work for her.  Arlene

9        Friedman is a lady in Beverly

10       Hills who works out of her home,

11       who provides what I consider to be

12       the highest level of competent

13       private investigation services.

14       We use her exclusively.  She did

15       all the investigation on the

16       Golden Buddha case for the

17       Cathcart firm, and it went for ten

18       years in the Philippines,

19       resulting in a $3 billion

20       judgment.  She did all the work on

21       that.

22            She called and she said that

23       she had been contacted by one of

24       the original epidemiologists that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          set up the VIGOR study for Merck,

2          an inside guy.  He was appalled by

3          the fact that, I think it was

4          licensed in about April of 2002.

5          She had called us at the end of

6          2004 saying this guy would love to

7          spill the beans, but he still

8          works there, but he's prepared to

9          establish to your satisfaction,

10         and certainly to mine already,

11         that all the cardiovascular

12         disease patients were taken out of

13         that study and that it was slanted

14         from the very outset.  He thinks

15         he can provide some excellent

16         background information to tell you

17         where the bodies are buried.  So,

18         this got us interested.

19             I said, well, we need to

20         know a lot more about COX-2

21         inhibitors before we go down this

22         path.  We know that some bad

23         things are going to come out of

24         this.  And so she agreed at my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1           request and ultimately Tom's

2           request, because I immediately

3           conferred with him on this, to do

4           a definitive medical workup and to

5           locate experts that we could both

6           consult with and that would

7           ultimately be willing to testify.

8                As a result of that, she had

9           prepared -- this work that I

10          brought -- I just brought a little

11          bit of the file here, as you can

12          imagine.

13               But in February of 2005, by

14          that time, after our original

15          call, she was able to put together

16          a most definitive work product

17          here consisting of three different

18          binders.  This is, first of all, a

19          review of all the Vioxx, all the

20          data that went into this.  This is

21          long before any discovery was done

22          in the case, before any litigation

23          was really ongoing.

24               MR. SEEGER:  What year?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1              MR. LACK:  This is early

 2         2005.  But all this work she's

 3         doing is in 2004.  If you want to

 4         page through, it is really very

 5         good work that she did.  She went

 6         all the way back to '94 to look at

 7         all the literature on COX-2

 8         inhibitors, the whole history of

 9         this.  She then prepared a dossier

10         on the labeling chronology for

11         this particular medication, and

12         every change is tabbed here by the

13         date.  And all of the literature

14         that was generated in connection

15         with the labeling changes she

16         secured from the FDA at our

17         request.  Also, every epi study

18         you ever wanted is in here.

19              Then we had two separate

20         sessions in my office attended by

21         at least four lawyers from the

22         Girardi firm and four or five

23         lawyers in my firm.  The thing

24         went on for at least four hours.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        During the course of that, I call

 2        it a blackboard session, she

 3        brought in three experts.  She

 4        brought in a pharmacologist, she

 5        brought in a COX-2 inhibitor

 6        specialist, and then she brought

 7        in a general physician to talk

 8        about physiology or what happens

 9        when you take these things.  It

10        was a primer for us to be able to

11        go out and basically put on

12        seminars for lawyers to teach them

13        about what to look for in

14        screening these cases.

15             Then you'll recall most of

16        you people in this room were at

17        this conference in Miami.  I was

18        one of the speakers, and my topic

19        was giving an opening statement in

20        a pharmaceutical case.  Great fun.

21        You recall we had some lawyers

22        there from Merck in the audience,

23        and we were sort of off to the

24        races.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          After that, Tom thought it

2      would be better, because I love

3      financial scams, to get into what

4      we thought would be a very

5      relevant and ultimately admissible

6      issue relating to the sale of

7      options by all the senior

8      management at Merck.  I hired an

9      investment banker to do the

10     research to go on Bloomberg.  I

11     have a whole file on Gilmartin,

12     Reicin and the rest of that crowd

13     there.  We thought that if

14     Gilmartin had stayed, that would

15     be a very fruitful area for cross

16     examination.  She had her own

17     story of why she sold.  They all

18     sold at the all time high for

19     Merck stock.  There's quite a lot

20     of stuff in here.

21          Then we went to the State of

22     California.  Phil Angelides was

23     the state treasurer at the time.

24     We felt that the State of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1           California should investigate this

2           and perhaps hire us to pursue

3           their own MediCal reimbursement

4           issues and on and on and on.  So,

5           I have a whole line of

6           correspondence with the state

7           treasurer's office about what

8           Merck has done and the fraud they

9           perpetrated.

10               Now, the Gilmartin thing

11          ended up not being useful, I

12          suppose, because of some court

13          rulings.  But I would say that we

14          could have tried this case in the

15          fall of 2005 just on the basis of

16          the work that we did.  And all of

17          this, of course, was turned over

18          to Jim O'Callahan at the Girardi

19          firm, who then incorporated it

20          into a massive database that we

21          all contributed costs towards.  I

22          didn't bring that.  But one of the

23          first things in this box that I

24          found that was the first thing

FAC Resp. Exhibit D -- 414

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        that O'Callahan and our office

 2        worked together on, one of my

 3        partners Brian Depew actually

 4        worked with him in his office, was

 5        to put together a so-called

 6        chronology of the story.  It

 7        starts in this volume.  I didn't

 8        bring all the volumes.  It starts

 9        in 1996 with the first reference

10        to the Vioxx theory and goes on

11        from there.  Some of these

12        documents were used in the various

13        trials, some were not, but they

14        were all certainly relevant based

15        upon what we knew at the time.

16             MR. SEEGER:  Can I see it?

17             MR. LACK:  Yes.

18             (Handing over documents.)

19             MR. LACK:  Here's the hard

20        data from what we obtained from

21        our investment banker and what was

22        sold and disclosures made at the

23        SEC.  You will have a separate

24        binder just on SEC disclosures.
```

FAC Resp. Exhibit D -- 415

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          I would say everything in

2      this room was paid for and

3      transferred over to the MDL

4      ultimately for use in whatever.

5          Then, of course, the

6      California cases went to trial.  I

7      was there.  I sat next to Tom

8      Brandi through a good deal of the

9      trial primarily because I wasn't

10     so interested in the facts of

11     those individual cases, but the

12     judge before whom all the

13     California cases was pending is a

14     very powerful and important judge

15     in California.

16         Judge Chaney has all my big

17     cases.  She sits in a courtroom

18     that's only -- it's got various

19     names, but Central Civil is one of

20     the names it goes by.  They have

21     six judges there that handle only

22     the most complex cases for the LA

23     region.  I think half my cases are

24     pending in front of her, and so

FAC Resp. Exhibit D -- 416

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          this is a very useful, show your

 2          face down there.

 3                MR. LEVIN:  I'm sure she

 4          knows your face.

 5                MR. LACK:  What was

 6          bothering me most at the time was

 7          getting muscled out not by anybody

 8          in particular but, for instance,

 9          Mark Robinson down there.  That

10          bothered me a lot.  So, I wanted

11          to be in the courtroom to make

12          sure she knew the next cases that

13          got picked, some of them were

14          going to be mine.

15                MR. SEEGER:  Walter, can I

16          ask you a question about that?

17          Did you get any support during

18          your trial from Robinson?

19                MR. LACK:  No.  And I wasn't

20          asked to.  I didn't ask him.  I

21          wasn't going to go seek his

22          support, because we had to put it

23          together, I thought.

24                MR. WEITZ:  Did he seek your
```

FAC Resp. Exhibit D -- 417

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1           support?

2                 MR. LACK:  No, no.  That

3           wouldn't be something that came to

4           pass.

5                 Then as the center of

6           gravity of the case went from our

7           little ten percent of all the

8           cases filed in California to the

9           MDL, it was very apparent that we

10          were just going to get swept along

11          with the tide.  So, when you are

12          in that situation, we are all

13          trying to conserve resources, I'm

14          not going to continue to labor --

15                MR. SEEGER:  And duplicate.

16                MR. LACK:  Right.  So, the

17          gravamen of my activities for,

18          let's say, the common good or

19          common issues would have ceased at

20          the end of the first trial in

21          California.

22                MR. GIRARDI:  That isn't

23          true.  End of the second trial in

24          California.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1           MR. LACK:  Second trial.

2      I'm sorry.

3           MR. GIRARDI:  Because all of

4      these documents were in.  We set

5      up our own database for the

6      California lawyers, and these

7      documents were the most important

8      part of that database.  Obviously,

9      it got improved as time went on,

10      as other testimony came in and

11      things like that.  But this was

12      the foundation of the case.

13           MR. LACK:  Right.  Of

14      course, we were always looking for

15      more experts.  As the tide against

16      Merck started to swing, more and

17      more people were willing to come

18      forward and say what they should

19      have said.  We continued,

20      obviously, to follow it on a daily

21      basis until well into 2006.

22           MR. SEEGER:  After the two

23      cases were tried, Walter, did you

24      guys have any cases in the queue

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          that would come back up for trial?

2                MR. LACK:  Yes.  I felt one

3          of them was mine.  I had a very

4          good heart attack case.

5                MR. SEEGER:  Do you know the

6          name?

7                MR. LACK:  A guy named

8          Cooper.  Just so you know, this

9          guy named Cooper, the referring

10         lawyer filed suit against Merck

11         only, did not sue the dispensing

12         physician or anybody else in

13         California.  It got removed.  We

14         filed a motion in the MDL.  I went

15         down there twice to have it

16         remanded to California.  And even

17         today it still wasn't going to get

18         remanded.  He just said, I'll get

19         to that later and never got back

20         to it.  It was a pristine case.

21              I had another one where we

22         just got an award, it was a pretty

23         big award for a heart attack.

24                MR. SEEGER:  As part of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          settlement?

2                  MR. LACK:  Yes.  Over 100

3          clients.

4                  MR. SEEGER:  How many cases

5          did you send into the settlement,

6          do you know?

7                  MR. LACK:  I've sent in 53.

8                  MR. WEITZ:  Walter, the case

9          you were talking about after

10         Robinson's case was in front of

11         Judge Chaney and it already had

12         been worked up, that was going to

13         be the next case that you thought

14         was going to go out for trial --

15                 MR. LACK:  Yes.

16                 MR. WEITZ:  We are also

17         trying to find the lawyers, and we

18         know you are one, that were moving

19         the dockets in the jurisdictions.

20         That's an important fact.  What

21         case was that?

22                 MR. LACK:  I'm trying to

23         remember.  We had meetings in

24         O'Callahan's office.  I wasn't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          party to them.  Steve Terrell and

2          Brian Depew in my office were the

3          two advocating for -- we put three

4          cases up, and, of course, one was

5          a retired IBM executive who had

6          severe brain damage as a result of

7          a blood clot.  Everybody kind of

8          agreed, well, we're not trying

9          those yet, they are going to be

10         the hardest.  They are very

11         problematic by the law.  But it

12         was the biggest damage case.  The

13         guy had over a million and a half

14         in medicals, and he was only 52.

15              So, they shelved that, and

16         they agreed, okay, fine, you have

17         got a perfect heart attack case,

18         and we'll go with that, and only

19         O'Callahan can tell you the name,

20         because I've forgotten.

21              MR. SEEGER:  I know Depew.

22         I think I've seen him around Vioxx

23         circles.  When you mentioned his

24         name --

FAC Resp. Exhibit D -- 422

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              MR. LACK:  Depew spent a lot
2         of time with O'Callahan.
3              MR. SEEGER:  Tom's guy I saw
4         a lot.
5              MR. LEVIN:  I haven't seen
6         Brian here.  I've seen a lot of
7         Brian in Spokane.
8              MR. LACK:  We did turn in
9         some time records.
10             MR. SEEGER:  He was your
11        point guy for the case?
12             MR. LACK:  Hundreds of
13        hours.
14             MR. GIRARDI:  You may have
15        to look at those.  The form on
16        some of those maybe is not
17        appropriate, and we'll talk about
18        that and go through the
19        accountants.
20             MR. LEVIN:  Tom will work
21        with you getting that through the
22        accountant.  Right now they are in
23        a state that they haven't been
24        approved probably because of form,

FAC Resp. Exhibit D -- 423

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          so, Tom will take care of it.

2               MR. LACK:  All right.

3               MR. WEITZ:  Go over expenses

4          with him also so we make sure

5          those are right.

6               MR. LACK:  We put in $20,000

7          for common costs, and I've got

8          like 800,000.  I didn't want to

9          hassle.  Because it took longer to

10         do the format for these

11         accountants than it was worth to

12         get the money back.

13              MR. SEEGER:  Walter, if you

14         have worked up an expert and you

15         have spent a couple hundred

16         thousand, you should send that to

17         us.

18              MR. LACK:  Everything is

19         through his office.  I'd rather do

20         it that way.

21              MR. LEVIN:  That's fine,

22         just as long as you don't get

23         shortchanged.

24              MR. LACK:  I'm not really

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        worried about that, but the actual

 2        time to reconstruct this stuff --

 3        being a contingent fee lawyer, my

 4        time wasn't done contemporaneous

 5        with my actual work, but every

 6        other lawyer, we still do that in

 7        our firm.  We keep track of our

 8        time, quote, as a management tool,

 9        so we track their time.  I know

10        all of that is very accurate.  I

11        had to reconstruct mine because

12        you go through every page.

13             MR. LEVIN:  Because you only

14        have to deal with yourself when

15        you shave in the morning.

16             MR. SEEGER:  Thank you.

17             MR. LEVIN:  Thank you.

18                  -  -  -

19

20

21

22

23

24
```

FAC Resp. Exhibit D -- 425

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

 1             C E R T I F I C A T E

 2

 3             I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM: ESCOBEDO, TIPPIT & CARDENAS, L.L.P.
      Joe Escobedo, Jr., Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
         GOLKOW TECHNOLOGIES, INC.
      877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 427

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

                                                    Page 2

     1                        -  -  -

     2              MR. ESCOBEDO:  Joe Escobedo.

     3              MR. BIRCHFIELD:  We

     4         appreciate you being here today.

     5         We've got a court reporter here.

     6         Everything is being transcribed.

     7              Judge Fallon in the Murphy

     8         Oil decision, if you followed

     9         that, it would be helpful to be

    10         familiar with that order from his

    11         court.  Transparency is key.  So,

    12         he'll have this transcript

    13         available for his use for whatever

    14         he determines is appropriate.  So,

    15         just know everything is being

    16         taken down, and the floor is

    17         yours.  We appreciate it.

    18              MR. ESCOBEDO:  I didn't know

    19         how many people were going to be

    20         here today.

    21              MR. BLIZZARD:  We can share.

    22              MR. ESCOBEDO:  I think we

    23         have enough.

    24              I know it's been a long day

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          for you guys, so I'll see if I can

2          give you some time back.

3               Really what I want to focus

4          my discussion on here today as far

5          as the Order Rule 6(D) is the

6          factors relating to whether

7          counsel was already involved in

8          the Vioxx litigation prior to the

9          withdrawal of the drug and the

10         participation in any non-MDL

11         trials.  I prepared a short little

12         presentation here for you, the

13         second page after the cover page,

14         trying to give you an

15         understanding of what we did prior

16         to Vioxx being removed from the

17         market.

18              The second page basically is

19         the entire thing, and then I'll go

20         through and touch on some of

21         these, and then if y'all have any

22         questions, I can answer them.  I

23         think as the timeline shows, we

24         were extensively involved in the

FAC Resp. Exhibit D -- 429

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          Vioxx litigation prior to the

2          withdrawal of the drug from the

3          market, and we did try a non-MDL

4          trial that we believe provided a

5          common benefit.

6               We were hired by the Garza

7          family back on April 15, 2002.  I

8          know at that point there was a

9          handful of cases.  We started

10          doing our investigation, which

11          involved getting as many records

12          as we can on the drug from the

13          FDA.  We also met with David

14          Miceli, who I believe used to be

15          with your firm and at that time

16          was very active in the litigation.

17               MR. BIRCHFIELD:  That's

18          right.

19               MR. ESCOBEDO:  He was very

20          helpful and gave us a lot of

21          information.  I know some of my

22          partners and associates met with,

23          I guess, just a handful of people

24          who had cases back then, 2002 and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1              2003.  We retained experts.  Some

2              of them are listed here and others

3              as well.  Then we filed our

4              lawsuit on March 10 of 2003 in

5              Starr County, Texas.  Merck

6              promptly removed the case to

7              Federal Court, and it took us a

8              while -- as you can see, it took

9              us a while to get it back to state

10             court.

11                   After that, once we got back

12             to state court, I'm sure as

13             everyone is familiar with, the

14             discovery wars with Merck started.

15             We literally had, I lost count of

16             how many motions to compel, and

17             motions for sanctions.  We also

18             had a mandamus proceeding with a

19             Court of Appeals involving the

20             drug Arcoxia, which,

21             unfortunately, we lost.

22                   But once we got all of that,

23             then they inundated us with paper,

24             and also we made them produce --

FAC Resp. Exhibit D -- 431

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1          the corporate rep depositions had

 2          been taken at the time by your

 3          firm, by Mr. Miceli.  I think Mr.

 4          Lanier had taken some as well.

 5          And what I did and what my firm

 6          did at that point was started

 7          reviewing the documents, reviewing

 8          the depositions.  A lot of the

 9          depositions, people that took

10          them, I'm sure are familiar with

11          them, that Merck at the time was

12          producing witnesses that at least

13          on some of the areas of

14          examination the particular

15          witnesses produced didn't have the

16          appropriate knowledge.

17              MR. GIRARDI:  They did that

18          with every one of them.  A guy

19          would come in, he wouldn't know

20          anything about Vioxx.

21              MR. ESCOBEDO:  So, what I

22          basically did, what my firm tried

23          to do was to build on the work

24          that had already been done.  We at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1        one point, our notice -- in Texas,

 2        they are called areas of

 3        examination, the corporate rep

 4        depos.  I think once it was all

 5        done and -- I think we had over

 6        almost 200 areas of examination in

 7        the notice, and then they started

 8        producing corporate reps, and

 9        that's what we did after that.

10            We did get a trial setting

11        on April 23rd.  The judge gave us

12        a trial setting for November 8,

13        2004, and it was also around this

14        time that our involvement with

15        Kathy Snapka started as well.

16            We started taking corporate

17        rep depositions in New York.

18            MR. HERMAN:  Excuse me.  I

19        want to state for the record that

20        Kathy Snapka was relentless in

21        appearing in the MDL to get this

22        case remanded, which the MDL

23        supported, and it was one of the

24        few cases -- I don't know that the

FAC Resp. Exhibit D -- 433

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          judge remanded any more cases

2          other than this, but it was

3          important that you and Ms. Snapka

4          were tenacious in getting this

5          case sent back.

6                    MR. ESCOBEDO:  Thank you,

7          sir.  And I remember when we met

8          with Judge Fallon, he basically

9          asked me one question:  Why is

10         your case different from all the

11         others that have been removed?

12         And I said, because we're ready to

13         go to trial, because this is the

14         second removal, because the basis

15         of the removal was bogus.  What

16         happened was this.  They wanted to

17         go, and they deposed one of my

18         experts, Dr. Simonini, which I

19         believe you used in your trial --

20                   MR. GIRARDI:  Sure.

21                   MR. ESCOBEDO:  --  and they

22         asked him, do you have any

23         criticism of the doctors?  He said

24         no.  Well, he wasn't my expert

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        against the doctors.  And they

 2        removed the case.  The real reason

 3        why, I believe, is because we were

 4        set to go to trial in February,

 5        and the judge wasn't going to

 6        continue the case.

 7             The depositions that we

 8        took, some of them had already

 9        been taken in other cases, but

10        some of them, we were the first

11        ones to take them, I believe, and

12        those are listed.

13             Linda Hostelley on the AEs.

14             Leonard Tacconi, I believe

15        we were the first one to depose

16        him.  He was on consumer

17        advertising.  Texas is a learned

18        intermediary state, but we knew,

19        for example, New Jersey had an

20        opinion where they were maybe

21        opening the door a little bit to

22        that.

23             As everybody in this room

24        knows, Merck did a lot of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          direct-to-consumer advertising.

2          We took a corporate dep on that.

3              Deborah Shapiro on the DSMB

4          for the VIGOR trial, we deposed

5          her as well, as well as the peer

6          review of the Konstam article.

7          Everybody here knows there was an

8          issue about that.

9              James Dunn, one of the sales

10         reps, there was a lot of issues

11         relating to sales reps and this

12         drug.

13             On June 21st 2004, we took

14         our second round of corporate rep

15         depos.  Bernadette McKeon, I

16         believe we were the first ones to

17         depose her.  They produced her on

18         the PIRs, the physician

19         information requests.  We had them

20         produce a bunch of PIRs, and we

21         limited it to the CV risk, but

22         there were a lot of PIRs where the

23         doctors were asking -- they were

24         very interested and obviously

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1          concerned about the CV risk for

 2          Vioxx.  So we took an extensive

 3          deposition on the PIR process.

 4              We took Ms. Reicin's depo.

 5          I spent eight hours with her.  I

 6          filed a motion to extend the six-

 7          hour deadline.  Richard Josephson

 8          calls me up, I'll give you eight.

 9          I wanted ten, but I figured the

10          judge would give me eight anyway.

11          So, I agreed, and I took her

12          deposition for eight hours.

13          Anybody who has ever deposed her,

14          I know Mr. Lanier deposed her as

15          well, and everybody can tell you

16          that it is exhausting.

17              Mr. Casola on the FDA

18          warning letter --

19              MR. GIRARDI:  You should

20          have made a motion to have it be a

21          45-minute depo.

22              MR. ESCOBEDO:  I agree.  I

23          messed up on that one.  You are

24          absolutely right.

FAC Resp. Exhibit D -- 437

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1              They did not bring her to

2        trial.  I believe that was the

3        first time they didn't.  I don't

4        know, obviously, why, but they

5        didn't bring her to trial.

6              We took Thomas Bold.  I

7        believe we were also the first one

8        to depose him.  He was safety

9        surveillance, trying to determine

10       trends.  He was one of the only

11       persons that I can say was very

12       nervous during the deposition

13       because he had never been deposed

14       before, and I don't think they

15       prepared him very well.

16             We also deposed the sales

17       reps that met with or called on

18       the two cardiologists.  I think

19       that was a big -- a unique facet

20       of our case.  We had sales reps

21       calling on cardiologists, which,

22       obviously, by the very nature of

23       their practice are going to have

24       patients with CV risk.  So, we did

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          that as well.

2                We designated our experts,

3          some of whom I already talked

4          about before.  There was a third

5          round of corporate rep depos.  We

6          took Mr. Silverstein's depo

7          because McKeon didn't know some of

8          the aspects of the PIR process.

9          So we made them produce somebody

10         else.

11               And then we took Nancy

12         Santanello's deposition, really

13         only on the issue -- that was the

14         time when they required the

15         withdrawal of Ms. Cannuscio's name

16         from that article, and we were

17         interested about that.  At this

18         time, everything was going

19         downhill, and it was all headed, I

20         guess, toward the withdrawal of

21         the drug.  But she was the last

22         corporate rep depo that we

23         deposed.

24               They designated their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          experts, which I think is unusual,

2          because we had expert reports from

3          all their experts saying that

4          there's absolutely nothing wrong

5          with Vioxx, under no circumstances

6          could it be prothrombotic.  Then a

7          month later, they withdrew the

8          drug from the market.  They did

9          get a short continuance February

10         14.  That was the alternate trial

11         setting.  And then of course

12         September 30th, Vioxx was

13         withdrawn from the market, and

14         they filed another continuance,

15         the basis of which was --

16         actually, they were trying to help

17         me.  They kept saying it was for

18         my benefit, and I kept saying,

19         thank you, I don't want that

20         benefit.

21              Then in 2005, it really got

22         interesting, and they filed their

23         first motion for legislative

24         continuance.  For those of you

FAC Resp. Exhibit D -- 440

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        that are not familiar with that,

 2        in Texas, you can get a

 3        continuance if the legislature

 4        isn't in session, and you have a

 5        legislator lawyer, you can get a

 6        continuance.

 7              They hired Chuy Hinojosa.

 8        We basically had a reporter that

 9        we knew from the local media, and

10        you would have thought it was Ed

11        Bradley or something.  They went

12        in to go talk to him, he

13        apparently freaked out, and the

14        next day, he withdrew -- on his

15        own, withdrew the motion for

16        legislative continuance.  As you

17        might imagine, there's other

18        legislator attorneys available.

19        And the next day they hired

20        another one, and they filed a

21        legislative continuance.  We moved

22        for an evidentiary hearing and a

23        move to strike the legislative

24        continuance.  And then just to
```

FAC Resp. Exhibit D -- 441

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1 make things -- I guess they didn't

2 want to have that hearing, so they

3 removed us to Federal Court again.

4 Again, that was the basis that I

5 talked about earlier, they deposed

6 Dr. Simonini, but he wasn't my

7 expert against the doctors.  We

8 tried to get it back, but as you

9 might imagine, it is hard to get

10 it back.  The local federal judge

11 said, well, it is going to go to

12 the MDL, and that was that.  Then

13 after that, JPML issued the

14 conditional transfer order.

15   And we fought, as you can

16 tell.  It got removed in January,

17 and it didn't get remanded back

18 until November.  We fought very

19 hard to try to get it remanded

20 because we were ready for trial.

21 We were ready to get the case

22 tried, and we wanted to go to

23 trial.  And quite frankly, we

24 wanted to go to trial because we

FAC Resp. Exhibit D -- 442

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          wanted to hit them for a really,

 2          really big verdict along the lines

 3          of what Mr. Lanier was able to do,

 4          obviously.  It didn't work out

 5          that way, but --

 6                  MR. LANIER:  You had a good

 7          one.

 8                  MR. BIRCHFIELD:  You had a

 9          good result.

10                  MR. ESCOBEDO:  I appreciate

11          that.

12                  Then in 2006, it was a weird

13          trial setting scheduled because

14          the judge has three counties or

15          responsibilities, so we could only

16          try it one week a month.

17                  MR. HERMAN:  Say that again.

18                  MR. BIRCHFIELD:  That's a

19          challenging way to try a case.

20                  MR. ESCOBEDO:  It was a

21          four-and-a-half week trial, but we

22          could only try it one week per

23          month.  So, we started in January,

24          and we tried one week in January.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1              MR. HERMAN:  Same jury?

 2              MR. ESCOBEDO:  Same jury.

 3         And we came back in February and

 4         March, and finally on April 21st,

 5         we got a $32 million verdict.  It

 6         has, I'm sure as everyone is

 7         aware, unfortunately, been

 8         reversed and irrendered by the San

 9         Antonio Court of Appeals in what I

10         believe to be one horribly written

11         opinion, and I believe that for

12         Mr. Lanier's case as well.  We

13         filed a motion for rehearing, and

14         there's been amicus briefs, and

15         I'm very happy that people have

16         done that.

17              That's the extent of what I

18         wanted to say.  We were, I think,

19         involved.  The evidence shows we

20         were involved in this litigation

21         way before the withdrawal of the

22         drug, and I believe we tried a

23         case that was significant in that

24         it was the first short term
```

FAC Resp. Exhibit D -- 444

Page 19

1          case -- short term use case.

2          Right after it, everyone is

3          familiar, the studies came out

4          where, I mean, sort of validating

5          what we were saying, which is the

6          danger, it can be almost

7          instantaneous.  And he had risks.

8          But the way we combatted that on

9          specific causation was, and of

10         course you never heard about this

11         in the media because it is too

12         complicated, but Mr. Garza had a

13         thallium scan less than a month

14         before he died.  The thallium scan

15         showed normal blood flow.  Then

16         one month later, he dies.  There's

17         an autopsy.  And the autopsy finds

18         not one, but two fresh clots in

19         the exact parts of the heart where

20         the thallium scan less than a

21         month earlier had found normal

22         blood flow.

23              So, I think that's the

24         reason why the case was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      significant.

2            MR. BIRCHFIELD:  Joe, we're

3      all very familiar with the Garza

4      case and your work in getting that

5      case remanded and pushed through

6      trial and the good verdict.

7            One of the things maybe you

8      can help us on, did you have other

9      cases that you were working up for

10     trial or trying to push to trial?

11           MR. ESCOBEDO:  We had other

12     cases, but none to the point that

13     were developed as the Garza case.

14           MR. BIRCHFIELD:  What about

15     cases that you have that are

16     submitted for the settlement

17     program?

18           MR. ESCOBEDO:  We didn't

19     have that many.  I mean, we looked

20     at a bunch of them.  I'll have to

21     be honest, and I will be honest, I

22     think between 10 and 20 were

23     actually submitted.

24           The firm broke up after the

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          trial, and so the MDL part of it

2          stayed probably by mutual

3          agreement -- it was a very

4          amicable breakup.  So, the MDL's

5          part of it stayed with my former

6          partner, and so I'm a little --

7          I'm not that knowledgeable about

8          that.  I'm sorry.  But there

9          weren't that many.  I mean, like I

10         said, between 10 and 20.  We did

11         not have that many.  We're

12         geographically challenged.

13              MR. BLIZZARD:  Joe, the

14         expenses that y'all submitted for

15         that trial I think are around --

16         according to the accountant's

17         report, are $485,000.

18              MR. ESCOBEDO:  Right.

19              MR. BLIZZARD:  That

20         currently has been rejected, but

21         they have rejected a lot of

22         expenses because they didn't

23         really know exactly what the story

24         was.  And so whoever can -- we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        will help get that through the

2        process and make sure you have

3        whatever documentation you need to

4        satisfy that.  If you will call

5        Lenny Davis in Russ's office.

6        It's probably better to do that in

7        person rather than over the phone.

8        So, you might want to consider

9        making an appointment to go down

10        there and sit with them and

11        explain the situation.

12               MR. ESCOBEDO:  Glad to do

13        that.

14               MR. BLIZZARD:  Also, it

15        might help, I know Kathy is going

16        to present next, to kind of give

17        us a sort of the breakdown of the

18        responsibilities between the two

19        of you in the involvement on this

20        trial.

21               MR. LEVIN:  Also, your hours

22        have been rejected.

23               MR. ESCOBEDO:  Okay.

24               MR. LEVIN:  So, when you

FAC Resp. Exhibit D -- 448

Page 23

1       talk about your costs, talk about

2       the hours.

3             MR. BIRCHFIELD:  That's not

4       unique to you.  That's happened.

5       We just need you to work with the

6       accountant and get that

7       straightened out.

8             MR. ESCOBEDO:  And I need to

9       talk to Mr. Davis.

10            MR. BIRCHFIELD:  Right.  And

11      he will put you in touch with Phil

12      Garrett at Wegmann-Dazet and set

13      up a meeting if that's necessary.

14            MR. HERMAN:  E-mail

15      ldavis@hhkc.com or call at (504)

16      581-4892 and tell Lenny Davis you

17      need to -- he needs to coordinate

18      for you either a meeting or a

19      conference call with Phil Garrett.

20      Now, most folks that have

21      substantial costs to date have

22      actually met with Phil Garrett and

23      his team.  He's an independent

24      appointed by the Court, a CPA, and

FAC Resp. Exhibit D -- 449

Page 24

1            he has a whole team.  They are

2            there, actually, to assist and

3            help, rather than to impede.

4                    MR. ESCOBEDO:  I will do

5            that.

6                    MR. HERMAN:  I have a couple

7            questions.  Your Garza case is

8            still on appeal, right?

9                    MR. ESCOBEDO:  Yes, sir.

10                    MR. HERMAN:  Excuse me.

11            Let's go off the record for a

12            minute, please.

13                        -  -  -

14                    (Whereupon, there was an

15            off-the-record discussion.)

16                        -  -  -

17                    MR. ESCOBEDO:  I believe the

18            question that you were asking

19            about is about the

20            responsibilities of Kathy.  We got

21            involved -- well, we are old

22            friends, I've known her for a long

23            time.  We just by coincidence

24            found out we had cases and she had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          cases, we had the Garza case and

2          some others that we were looking

3          at.  I knew that she had

4          prosecuted drug pharmaceutical

5          cases before, and we at the time

6          were -- we did primarily auto

7          products, some other kind of

8          cases, but primarily we're an auto

9          products liability firm.  So we

10         felt we needed to associate with

11         her, and we did.

12              Then later we also

13         associated with Kevin Dubose's

14         firm.  He's an appellate lawyer

15         here in Houston, because we felt

16         we needed to have book lawyers to

17         counter their book lawyers.  They

18         had a lot of them.  I mean, every

19         day of trial in the afternoon,

20         they would have a delivery.  I'm

21         sure everybody that had a trial,

22         they had their little delivery of

23         motions, and I had two associates

24         there, and that's all their job

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          was, basically just to read them

2          and start churning out responses

3          every day.

4                  MR. BIRCHFIELD:  Any other

5          questions?

6                  (No response.)

7                  MR. HERMAN:  Thank you.

8                  MR. ESCOBEDO:  Thank you.

9                      -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23         Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 453

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 3, 2008
- - -
HOUSTON, TEXAS
- - -

FIRM:   FIBICH, HAMPTON & LEEBRON, L.L.P.
        Sara J. Fendia, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
            GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 454

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -
 2              MR. BLIZZARD:  Sarah, we
 3         just want to let you know that
 4         obviously we have a court reporter
 5         here, and the court reporter is
 6         going that take everything down.
 7              The Judge in his order has
 8         indicated that he's approaching
 9         this in the same way he approached
10         the Murphy Oil case, and so you
11         need, obviously, to be familiar
12         with that case and those factors.
13         They were also in the original
14         order that has standards to look
15         to for common benefit work.  The
16         floor is going to be yours.  You
17         can say whatever you would like to
18         say, and then we may have some
19         questions at the end.  There may
20         be some people who will interrupt
21         with questions during your
22         presentation, and you can either
23         take them or push them to the end
24         if you want.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          MR. BIRCHFIELD:  Thank you
2      for being here.  Thank you for
3      giving us a few minutes to eat our
4      lunch.
5          MS. FENDIA:  Thank you for
6      giving us the time.
7          I'm here for Tommy Fibich,
8      who was not able to be here.
9      There was some confusion, and the
10     confusion probably originated at
11     my office about this meeting.  So,
12     he didn't get on the schedule
13     until yesterday.  He had a
14     deposition today and tried to
15     rearrange that deposition to be
16     here.  He looked at the list of
17     people who might be here and said,
18     these are all friends of mine, I
19     would like to go over and talk to
20     them, but he was not able to
21     rearrange the deposition.  It's in
22     a pretty critical case that we're
23     involved in now that he's been
24     working pretty hard on.

FAC Resp. Exhibit D -- 456

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1              I'm here.  I am a 20-year
 2         lawyer.  I've been with Tommy for
 3         19 of those 20 years.  I know him
 4         well.  I know his work ethic well.
 5         I can address those issues, and I
 6         can address for you what I believe
 7         that he accomplished in Vioxx, and
 8         I hope that gets us to where we
 9         need to be.
10              Let me start out by saying
11         that we did submit time.  Our
12         time, I am confident, is grossly
13         understated.  The reason for that
14         is that our primary efforts were
15         in the Texas MDL.  Tommy was a
16         state liaison for the Federal MDL
17         and obviously had time and
18         involvement in the hearings and in
19         dealing with some of the issues
20         that were required by that
21         position, but our primary focus
22         was with the Texas MDL.  The Texas
23         lawyers know that there is no
24         mechanism under the Texas MDL
```

FAC Resp. Exhibit D -- 457

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          statute to authorize common

2          benefit fees.  As a consequence of

3          that, we, unfortunately, didn't

4          keep time the way we should have

5          kept it.  So, when it came time to

6          submit time to the federal MDL, we

7          went back and we didn't submit

8          anything that we didn't have some

9          kind of piece of paper or record

10         to rely on in coming up with the

11         time.

12              Tommy's philosophy is he's

13         not one to promote himself in

14         terms of how much time is spent

15         and how much money is spent.

16         Those of you in the room that know

17         him probably know that about him.

18         You probably also know you

19         wouldn't want to get between him

20         and a reporter, but in terms of

21         promoting his time, he's very,

22         very conservative in that regard,

23         and that's just our firm

24         philosophy.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1            I am the nuts and bolts

 2       lawyer on a lot of his

 3       pharmaceutical litigation, and I

 4       am the one that took primary

 5       responsibility for trying to

 6       assemble the time records, but I

 7       do believe they are grossly

 8       understated.

 9            When Tommy first got

10       involved in the Vioxx litigation,

11       he did as he has done in all

12       pharmaceutical litigation he's

13       been involved in.  He started

14       talking to experts and making

15       himself familiar with the issues

16       associated with Vioxx causation

17       issues, the epidemiology, where

18       the gaps were in the science and

19       what was going to have to happen

20       to develop this litigation.

21       Because of his stature in

22       pharmaceutical litigation -- I

23       look around this room, and you all

24       have a national stature in
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      pharmaceutical litigation, and I

2      think you would agree with me that

3      Tommy is one of your peers.  He's

4      been at it for a long time.  He

5      served on the PSC for Zyprexa and

6      fen-phen, and, of course, I think

7      a lot of people cut their teeth on

8      fen-phen, and we certainly did

9      too.

10          Because of his stature,

11     obviously, other lawyers in Texas

12     kind of looked at Tommy on the

13     Vioxx issue.  For the Texas MDL,

14     we were in Judge Randy Wilson's

15     court.  I think it's fair to say

16     that Randy Wilson looked

17     consistently to Tommy to work with

18     him, and for guidance and for

19     assistance and input as to how the

20     Texas MDL should proceed.

21          As it relates to the Texas

22     MDL, our law firm, along with, to

23     a great extent, Dave Matthews' law

24     firm, really took the lead on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          briefing, arguing, advancing the

2          Texas MDL, assisting the Court in

3          developing pretrial orders, CMOs

4          and the like, and worked

5          consistently with the Court in

6          that regard.

7               Tommy was also notice

8          counsel for the State of Texas.

9               MR. HERMAN:  I'm sorry.

10         What does that mean?

11              MS. FENDIA:  That meant that

12         all notices served by the

13         defendants came through our

14         office, and from our office we

15         disseminated them to all Vioxx

16         counsel.

17              MR. HERMAN:  Liaison.

18              MR. SEEGER:  Actually,

19         Sarah, he was the liaison for

20         Texas, wasn't he?

21              MS. FENDIA:  Right.  I think

22         along with Grant Kaiser in the

23         Federal MDL.  Is that what you

24         meant?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1           MR. SEEGER:  I thought Judge
2       Wilson had appointed Tommy as the
3       state court liaison.
4           MR. BLIZZARD:  No.  That's
5       what really this notice counsel
6       serves, is the role of making sure
7       all of the communications are
8       facilitated in the state.  Then
9       there was a separate appointment,
10      I think, to be liaison to the
11      federal MDL, and that was Grant
12      and Tommy.
13          MR. HERMAN:  What did you
14      understand Grant's role to be?
15          MS. FENDIA:  I understood
16      Grant and Tommy were both state
17      liaison counsel to the Federal
18      MDL.  That's what I understood.  I
19      may be mistaken about Grant.  I
20      know I'm not about Tommy.
21          MR. BLIZZARD:  It was Judge
22      Wilson's attempt to make sure
23      Texas lawyers were informed of
24      what was going on in the MDL, to

FAC Resp. Exhibit D -- 462

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1         sort of appoint them as the people

 2         to report back.

 3              MS. FENDIA:  So, over the

 4         course of the Texas MDL

 5         particularly, that's where my

 6         heaviest involvement was, and

 7         that's what I know most about, we

 8         served on a daily basis all kinds

 9         of functions in that capacity for

10         the Texas lawyers.

11              There are a lot of small

12         Texas lawyers that had a few cases

13         and for one reason or another felt

14         they didn't have the ability to

15         fund some of the things that

16         needed to be -- you know, always

17         travel up to hearings, for

18         example, to participate in certain

19         aspects.  So they relied very

20         heavily on us.  I fielded calls

21         almost daily from Texas lawyers,

22         certainly none in this room, you

23         are certainly capable of dealing

24         with the issues themselves, but
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1        from a lot of the smaller firms

 2        and lawyers that didn't have the

 3        pharmaceutical experience.  We

 4        dealt with that.

 5             We dealt with making sure

 6        everyone had notice.  We had many

 7        questions from Judge Wilson about

 8        who are the Texas counsel, where

 9        are these cases, trying to get the

10        Texas MDL properly positioned.  So

11        we handled a lot of that kind of

12        work in our office.

13             Tommy, of course, was always

14        engaged in all of that.  He was

15        also on the Texas PSC, which

16        consisted of probably about seven

17        or eight lawyers including Dave

18        Matthews and Gallagher.  Mark, I

19        think you were on the committee.

20             MR. LANIER:  Yes.

21             MS. FENDIA:  And several

22        others.  Tommy continuously was

23        involved in meetings with the

24        Texas PSC, developing --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      assisting, again, the Court in

2      developing this MDL and trying to

3      advance the cases.  A great deal

4      of time was spent in those kinds

5      of meetings.  Unfortunately, no

6      time records, so not all of that

7      appears on the time sheets, but a

8      great deal of time was spent in

9      that.

10          Again, I think, given

11      Tommy's stature generally in

12      Houston and Texas and I would say

13      beyond, I think that a lot of

14      lawyers did look to him for

15      leadership.  I know that Judge

16      Wilson did, and I think Mark and

17      Ed would concur with that.

18          As we came down in Texas to

19      a point that it was time to start

20      trying cases, Judge Wilson decided

21      he wanted to try a heart attack

22      case or a couple of heart attack

23      cases and a stroke case or a

24      couple of stroke cases and get a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          sense of what the evidentiary

2          issues would be and try to make as

3          many rulings as we could so there

4          would be consistency around the

5          state.  To a large extent, he

6          visited with Tommy a lot on that

7          issue and conducted a number of

8          hearings on limine issues,

9          evidentiary issues, Daubert issues

10         and all of these types of things.

11         Tommy and, again, Dave Matthews,

12         to a large degree, took the lead

13         on all of that in assisting the

14         Court and getting ready to try

15         cases.

16              When it came down to

17         actually trying a case -- and I

18         know you had the same experience

19         in the Federal MDL, but when it

20         came down to actually trying a

21         case, every time a case came up to

22         go, someone nonsuited or there was

23         an issue associated, and we were

24         having trouble getting the case to

FAC Resp. Exhibit D -- 466

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          trial.

2               So, Tommy finally stepped in

3          and said we need to get a case to

4          trial, and he agreed to be the one

5          to take Ruby Ledbetter's case to

6          trial.  That was our first case

7          that was getting ready to go.  We

8          were working that up for trial,

9          all of the pretrial, and that's

10         our bellwether case.  Our time

11         will reflect the Ledbetter time,

12         because we believe it was the case

13         that was going to advance Texas

14         litigation for all Texas claims.

15              MR. BIRCHFIELD:  Sarah, was

16         that your case?

17              MS. FENDIA:  Yes.  Ruby

18         Ledbetter was our case.

19              MR. SEEGER:  You were

20         working that case up for trial?

21              MS. FENDIA:  Yes,

22         absolutely.  We were working that

23         up for trial.  It was in that case

24         that the defendants filed their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          preemption motions based on the

2          Texas statute, and, of course, we

3          all worked on that.  We did very

4          heavy briefing on that.  The

5          Matthews firm took a lot of the

6          briefing on and a lot of the

7          limine issues.  Mark's firm

8          participated in that as well.  We

9          took the initial briefing on the

10         preemption issues and the Texas

11         statute issues.  And then Collyn

12         Peddie from Williams and Bailey --

13         it is no longer Williams and

14         Bailey.

15              MR. BLIZZARD:  Williams

16         Kherkher.

17              MS. FENDIA:  -- jumped in.

18         She's a fine lawyer, and she was

19         involved with us on that as well.

20              Ultimately we lost that,

21         which the Texas lawyers know,

22         which kind of put all Texas

23         litigation on hold.

24              At that point, the decision

FAC Resp. Exhibit D -- 468

was made to appeal that case, and the appeal was underway. Collyn Peddie took the lead on the appeal, and then your settlement came, and of course Ruby Ledbetter was excluded from that settlement, and that was unfortunate.

MR. BIRCHFIELD: On Ledbetter, just so you know, as we were negotiating, you are right, Ledbetter was excluded from the settlement, but as we were negotiating, we tried. We tried to get Ledbetter included in the settlement, but Merck just absolutely refused to include Ledbetter, as well as several other cases that were pending on appeal at the time.

MS. FENDIA: Right. I think we understood that.

MR. HERMAN: Can you tell us what depositions your firm took and what experts you hired that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           the firm considers to be of common

2           benefit.

3                MS. FENDIA:  Unfortunately,

4           I wish I had looked back at that.

5           Unfortunately, I'm having a little

6           trouble recalling the names to

7           mind.  I believe Tommy did, was it

8           the Dolan deposition for the state

9           of Texas?

10               MR. BLIZZARD:  He actually

11          sat and took the deposition of

12          somebody who was high up in the

13          sales and marketing group with

14          Mark Robinson.  I know that

15          because he told me about that

16          deposition.

17               MR. HERMAN:  I know Tommy is

18          not here, and we need to be fair

19          to you folks.  Frankly, I don't

20          have an affidavit with me.

21               MR. BLIZZARD:  It is in the

22          affidavit, Russ.

23               MR. HERMAN:  Maybe the

24          question I'm asking is already

FAC Resp. Exhibit D -- 470

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          there.

2                   MR. BLIZZARD:  It is.

3                   MS. FENDIA:  There are no

4          names.  Can I supplement with

5          that?

6                   MR. HERMAN:  Yes.  That's

7          why I'm asking the question.

8                   MS. FENDIA:  So, depositions

9          and experts.

10                  MR. LEVIN:  Definitely the

11         experts, too, because it looks to

12         me like you submitted about

13         $80,000 in costs that were

14         rejected, but we'll tell you what

15         to do about that.  But you were

16         doing that in conjunction with

17         Matthews, who has $1,600,000 costs

18         that were rejected.  Some of that

19         must be expert fees.  So, Russ

20         will tell you how to call the

21         accountants and see whether you

22         can straighten that out.

23                  MR. HERMAN:  You can call

24         Leonard Davis at my office, (504)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        581-4892 and ask him to set up a

2        conference call and an appointment

3        with Phil Garrett.  Phil Garrett

4        is a CPA appointed by the Court

5        who doesn't do any private work

6        for any lawyer in the litigation

7        or firm.  He'll sit with you or

8        have someone sit -- it might as

9        well be for both you and Fibich

10       and Matthews and work through the

11       costs.  We really need to get that

12       done.  The safest thing to protect

13       you is to make these contacts, and

14       if necessary, there's enough money

15       involved, to go sit with the CPA

16       firm.

17             MS. FENDIA:  Okay.  I'll do

18       that.

19             MR. LEVIN:  Your hours were

20       approved.  Matthews' hours have

21       not been approved.

22             MS. FENDIA:  Thank you.  I

23       felt they were reasonable.  As I

24       said, I felt they were

FAC Resp. Exhibit D -- 472

Page 20

```
 1          understated.
 2                 MR. HERMAN:  One of the
 3          questions I have is, after
 4          preemption in Texas, Judge
 5          Wilson's decision, what
 6          materials -- you might want to
 7          include this in a supplement.  I
 8          read all the affidavits, and I
 9          just don't remember seeing the
10          information I'm asking for.  If
11          you could list what materials were
12          sent to the MDL depository or New
13          Jersey depository and Chris'
14          office or Andy's office for common
15          benefit and when they were sent,
16          that also ought to be
17          supplemented.  I think it would be
18          unfair to ask you to do this off
19          the top of your head.
20                 MS. FENDIA:  I can tell you
21          that I don't think that we
22          submitted materials.  I think we
23          have submitted our time based on
24          our activities in the Texas MDL.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        So, I can tell you candidly that I

2        don't believe that we submitted

3        materials to the Federal MDL or to

4        New Jersey.  I will certainly

5        follow up.

6             MR. HERMAN:  Check to be

7        sure.

8             MS. FENDIA:  I will.

9             MR. HERMAN:  Judge Fallon

10       appointed Dawn Barrios as chair of

11       the MDL liaison committee with the

12       states.  If you recall, what

13       interaction did you have with Dawn

14       Barrios?

15            MS. FENDIA:  My interaction

16       with Dawn Barrios was relatively

17       limited.  We dealt primarily with

18       mechanics.

19            MR. HERMAN:  Generically.

20            MS. FENDIA:  But Tommy

21       participated fairly regularly, at

22       least by phone, if not in

23       hearings, in the Federal MDL up

24       until -- probably until the Texas

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          MDL.  Up to the point he had more
 2          difficulty making those trips to
 3          New Orleans.  He and Dawn Barrios,
 4          I believe, talked regularly about
 5          what the issues were, as I
 6          understand it.  Unfortunately, I
 7          wasn't a party to those
 8          conversations.  But as I
 9          understand it, he had regular
10          conversations with her and dealt
11          with the issues that were being
12          raised by Judge Wilson to the
13          extent -- very often at the
14          hearings, Judge Wilson was talking
15          to Tommy about what is Judge
16          Fallon doing about this issue or
17          that issue or the next issue, and
18          my understanding is Tommy was
19          dealing with Dawn on those issues.
20          I will clarify that understanding
21          for you, but that is my
22          understanding.
23               MR. BIRCHFIELD:  Besides the
24          Ledbetter case, were there any
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          other cases that y'all worked up

2          for trial that you were pushing or

3          had trial ready?

4               MS. FENDIA:  No.

5               MR. BIRCHFIELD:  How many

6          cases did your firm submit to the

7          settlement, claims packages?

8               MS. FENDIA:  100.  I'm

9          sorry.  Between 90 and 100.

10         That's what our firm directly

11         submitted, and that's what we are

12         working on now.  We are secondary

13         counsel on another 250 that were

14         submitted out of Louisiana.

15              MR. HERMAN:  Who is primary

16         on those?

17              MS. FENDIA:  Robert Salin.

18              MR. HERMAN:  When you say

19         "primary," "secondary," I'm not

20         sure that I understand the

21         relationship.  Were these filed in

22         Texas where he was lead or filed

23         in Louisiana?

24              MS. FENDIA:  Many of them

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

 1          were filed in Louisiana and are in

 2          the MDL, I believe.  But his firm

 3          took primary responsibility for

 4          those files.  We were sharing the

 5          fees.

 6                  MR. BIRCHFIELD:  When you

 7          say "primary," you are talking

 8          about for the settlement program?

 9                  MS. FENDIA:  Right.  For the

10          settlement program.

11                  MR. BIRCHFIELD:  Any other

12          questions?

13                  MR. WEITZ:  No.

14                  MR. BLIZZARD:  No.

15                  MR. HERMAN:  I think Ed has

16          asked some questions that are

17          important, and I know that the

18          Fibich firm has regularly

19          contributed to plaintiff bar

20          efforts, and I'm assuming that the

21          firm is still fighting the

22          preemption fight like the rest of

23          us.

24                  MS. FENDIA:  Yes,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

 1         absolutely, no question about it.

 2         I think Ed knows Tommy's

 3         involvement in that issue better

 4         than I do.

 5             MR. BLIZZARD:  Yes.  Let me

 6         say from the outset that we all

 7         worked closely on the Texas MDL,

 8         even though many of us, including

 9         Tommy, didn't have a lot of cases

10         filed in Texas.  Tommy clearly

11         took the lead in the motion

12         practice and also the interactions

13         with Judge Wilson.

14             When it came time for Judge

15         Fallon to appoint a committee to

16         help negotiate with Merck from the

17         plaintiffs' side, Judge Wilson

18         talked to Tommy, and Tommy said

19         that I would probably be the

20         person that should do that because

21         I had just tried a case in Judge

22         Fallon's court.  So Tommy was the

23         kind of --

24             MR. HERMAN:  He's the one we

FAC Resp. Exhibit D -- 478

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          have to blame for that?

2              MR. BLIZZARD:  Right.  He's

3          the kind of team player who was

4          not just looking out for his own

5          interest, but was looking to make

6          sure that the clients' interests

7          were advanced first and foremost,

8          and he thought that would be a

9          more effective way of doing it

10         since I had worked closely with

11         Judge Fallon on my trial case.

12         So, Tommy put the clients'

13         interest ahead of anything else

14         for him and --

15             MR. HERMAN:  I think that's

16         an important commentary, Ed, for

17         this record.

18             MS. FENDIA:  Thank you.

19             MR. SEEGER:  Thank you,

20         Sara.

21                  -  -  -

22

23

24

FAC Resp. Exhibit D -- 479

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

 1            C E R T I F I C A T E

 2

 3            I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22       Linda L. Golkow, RDR, CRR, CCR
         Notary Number:  1060147

23       Notary Expiration:  1.2.10
         CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 480

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  GAINSBURGH, BENJAMIN, DAVID,
       MEUNIER & WARSHAUER, LLC
       Gerald E. Meunier, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
     877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                - - -- - -

2            MR. HERMAN:  Jerry,

3       everything is on the record for

4       Judge Fallon.  If you would like

5       to add or subtract from your

6       affidavit, let us know.

7            We had a woman whose office

8       had virtually been destroyed.  We

9       had a client by the name of Diaz,

10      and the defendants picked Diaz.

11      Jerry stepped up with me, agreed

12      to share all the costs in that

13      case.  We went out looking for

14      experts.  I know that I believe

15      Jerry interviewed one at Tulane, I

16      had one at Hofstra, and we were

17      ready to prepare that case and try

18      that case when, in a conference,

19      the lawyer who had the client,

20      would not agree to let us call the

21      shots during trial.  It could have

22      been a disaster in pulling that

23      case following another case that

24      was pulled, but the fact that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          Jerry stepped up and we were ready

 2          to go, and it wasn't our decision

 3          not to try it, really saved the

 4          situation.

 5               Secondly, Jerry, at the time

 6          when we needed a trial package,

 7          volunteered to chair, co-chair the

 8          trial package committee and did a

 9          heck of a job.  I know he made

10          other contributions, but I'm

11          particularly grateful in those two

12          circumstances that Jerry stepped

13          up.

14               MR. MEUNIER:  Thank you,

15          Russ.

16               Well, first thing I wanted

17          to just say was that I'm neither a

18          competent nor an aggressive

19          timekeeper, so, I think my job

20          today is to try to communicate

21          some of the more tangible aspects

22          of whatever time I have as a

23          weighing factor for common benefit

24          purposes.  I think essentially my
```

FAC Resp. Exhibit D -- 483

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          affidavit covers all the key

2          points.  I'll just emphasize a few

3          things.

4               In the early going of the

5          case, I saw my job as being

6          focused on law issues, and then I

7          realized we have the master in law

8          among us, Arnie, and this is

9          hardly needed, but I did do some

10         work on the master complaint,

11         helped with some Louisiana law

12         research.  Then it was my

13         experience that it was helpful for

14         the group to have a local attorney

15         here in town on a continuous

16         basis, because there were some

17         case management issues that arose

18         and some needs on a short notice

19         basis to meet with Phil Wittmann

20         or meeting with the judge.  I know

21         there were a couple of times I

22         went over to see Judge Fallon with

23         Russ to talk about, for example,

24         that Miller study that was being

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        published.

2              I remember a meeting, too,

3        with Phil to talk about the

4        beginnings of a case management on

5        a class action.  So, I think a lot

6        of the work that I did in the

7        early going focused on the fact

8        that I was available and I was

9        here practicing in the state and

10       available to take those kinds of

11       things on.

12             When we were talking about

13       class certification, I also

14       arranged Dean Ed Sherman's

15       involvement as an expert, and we

16       had a lunch meeting with him.

17             Then as things evolved, I

18       became more involved with some of

19       the trials at least in an

20       ancillary way.  The Daubert

21       hearing, as I recall, was a group

22       effort, but I did take a role in

23       the presentation to Judge Fallon

24       on Daubert.  I had published on it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1           and spoken on Daubert and spoke

2           about general standards, as I

3           recall, with the Court.

4                And then the first trial of

5           Irvin occurred in November of '05

6           when the Court was displaced to

7           Houston because of Katrina, and as

8           Russ knows and local attorneys

9           know, that hurricane also

10          displaced law firms, including

11          mine, but we gathered ourselves,

12          kept the firm together, and I

13          maintained my level of commitment

14          to this case.

15               I flew to Houston for that

16          trial, as others did, and

17          essentially stayed there during

18          the entire trial.  I think I was

19          one of the few, besides Andy's

20          trial team, who were actually

21          there every day right through to

22          the end and staying through the

23          final weekend, as I recall.

24               It was good for me.  I got

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          to, obviously, learn more about

 2          the case, but I got to know the

 3          family.  I got to see firsthand

 4          what the case was about from a

 5          human standpoint, which was very

 6          helpful.  During that trial, I did

 7          handle the jury charge conference,

 8          as I recall, that we had with

 9          opposing counsel.  I also reported

10          to the PSC during that trial on a

11          key evidentiary ruling.  I found

12          myself in this case at various

13          times having to answer questions

14          about Judge Fallon's way of

15          thinking about certain things, and

16          I did --

17               MR. HERMAN:  I think it's

18          fair to say we were both shocked

19          at some of the rulings.

20               MR. MEUNIER:  We were

21          shocked at the decision he made

22          about the expert, the causation

23          expert in Irvin.

24               Now, when Irvin mistried,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1         the Court decided, one, that the

2         retrial would occur here, we would

3         be back here in New Orleans, but

4         then, as Russ has already alluded

5         to, the next case up was going to

6         be Ellis Diaz.  And Bonnie

7         Zabotnick, who was the local

8         counsel, was just not equipped to

9         handle that trial.  As Russ said,

10        we agreed to team up on it.  I met

11        with Ellis Diaz.  I prepped him

12        for his deposition, I defended his

13        deposition, which was a lengthy

14        one in my office.

15             I had extensive meetings

16        with Bonnie Zabotnick about the

17        case.  We looked at the medical

18        records.  I did contact the local

19        cardiologist, Russ knows, we lined

20        him up, I met with him to talk

21        about causation issues.  There

22        were problems dealing with family

23        history in that case.  It was

24        going to be a challenging case.

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          As Russ says, ultimately it became
2          clear that there was no effective
3          way for the PSC to do what it
4          needed to do in that case.  I was,
5          I believe, instrumental in
6          convincing Zabotnick that the best
7          thing that should happen is an
8          agreement that the case be
9          withdrawn, because Judge Fallon
10         was not going to permit us to
11         simply pick another case.
12              In other words, Mr. Diaz had
13         to either drop his Vioxx case or
14         that was going to be the next case
15         after Irvin II.  And I think it
16         was helpful that the Ellis Diaz
17         case was not tried.
18              I remember during Irvin II,
19         and I was invited by Andy and with
20         Troy to join the trial team, sit
21         at counsel table for Irvin II.  We
22         actually suspended the trial of
23         Irvin II for a status conference
24         of Diaz.  I remember I had to put

FAC Resp. Exhibit D -- 489

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          on a second had during that,

2          actually sit in on the Diaz

3          conference as lead counsel at that

4          moment for him.

5               Irvin II, my job was not to

6          handle witnesses or have any

7          speaking role with the jury, but I

8          was asked to be responsible for

9          jury charges and then certain

10         evidentiary issues that came up.

11         Primarily, I think I was helpful

12         in giving input to that trial team

13         and to others that would follow

14         about just the Eastern District,

15         the trial of Eastern District jury

16         cases after Katrina.

17               I think at that point, I was

18         one of the few plaintiff lawyers

19         associated with this case who had

20         actually tried a case to verdict

21         after Katrina, it was a maritime

22         case, and we have a good verdict

23         in it, but I learned a lot about

24         the different demographics after

FAC Resp. Exhibit D -- 490

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Katrina of Eastern District

2          juries, and I think that helped me

3          give some input in a trial of

4          those cases.

5                After Irvin II, I was less

6          active, but still had input for

7          the Barnett case with Mark

8          Robinson and his team.  I remember

9          speaking with him about jury

10         themes and about presentation to

11         that jury.  I remember giving --

12         talking to Mark during the voir

13         dire, and I was present for and

14         attended that trial, as I did

15         Irvin I and II.

16                The next trial, and probably

17         the only other relative trial in

18         the federal MDL that I was

19         involved with was Dedrick, and

20         what I recall about that is Andy

21         asked me to come over to the hotel

22         where he and others were staying,

23         we had a meeting one evening about

24         certain issues that were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          challenges in that case, certain

2          issues that needed to be addressed

3          and how the proof could better be

4          presented.

5               MR. BIRCHFIELD:  A few

6          challenges in that case.

7               MR. MEUNIER:  There were

8          challenges.

9               And so, in retrospect, I

10         believe I made helpful

11         contributions in Irvin I and II,

12         in Diaz, even though it wasn't

13         tried, in Barnett and Dedrick.

14         So, the trial activity for me in

15         the MDL was not insignificant, and

16         I think occupied most of my time

17         in the middle stage, the early

18         stage being more of the law and

19         case management and then the

20         middle stage trials.

21              And then the final stage was

22         the trial plan, as Russ mentioned.

23         I was asked to chair the trial

24         plan committee.  I want to make it

FAC Resp. Exhibit D -- 492

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        very clear that there was a lot of

2        heavy lifting done by that

3        committee which was not done by

4        me.  There were people on that

5        committee, including Leigh O'Dell

6        and a host of others who really

7        had such a good, strong working

8        knowledge of the case that I

9        thought my role was to look at it

10       from the standpoint of a user of

11       the package, a trial lawyer who

12       would take that package with

13       little foreknowledge about Vioxx

14       and how would the package actually

15       serve a lawyer to put the case on.

16            So, I tried to keep a

17       pragmatic focus for the group,

18       giving whatever input I can from a

19       user standpoint.  And other than

20       that, served as a sounding board

21       just to help with the organization

22       of it.  There were a lot of

23       meetings for the trial plan, a lot

24       of phone conferences and in-person

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          meetings, and then ultimately the

2          MI trial package group presented

3          to Judge Fallon, and I was part of

4          that presentation.  We then merged

5          with the stroke package committee

6          and basically had a larger working

7          group to then do the stroke

8          adjunct to the trial package.  And

9          so I continued to work in a

10          chair --

11               MR. HERMAN:  Let me

12          interrupt you for a second.

13               Jerry is being really overly

14          modest in terms of trial package,

15          because we were negotiating at the

16          time, unknown to Jerry, and I kept

17          pushing the deadlines, because I

18          knew that if we ever came to

19          fruition to get a settlement, we

20          had to have a stroke package in

21          place, and it had to be reviewed

22          by the judge.  So, Jerry really

23          organized that, pushed it, made

24          sure the deadlines were met.  And

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1          without his leadership and Pete's,

 2          and I think at some point Pete was

 3          trying a case with Troy, I don't

 4          think the product would have been

 5          as good, and I don't think we

 6          would have had it as timely as we

 7          did.  I don't think we can

 8          undervalue Jerry's leadership in

 9          terms of the trial package.

10               MR. SEEGER:  I agree with

11          that, by the way, but since names

12          are being mentioned, if I don't

13          mention that Jeff Grand and

14          Buchanan were involved, I'm going

15          to get yelled at when I get back.

16               MR. MEUNIER:  You can't

17          mention one without the others,

18          you're right.  Chris Tisi, I mean,

19          Shelly Sanford, there were many.

20               MR. SEEGER:  It was a great

21          team, but the team needed a lead,

22          and you were the lead.

23               MR. MEUNIER:  And Russ is

24          right.  We worked under pretty

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        strict deadlines, and it took some

2        doing to get everybody on the same

3        page and working and meeting

4        deadlines.  I was pleased with the

5        product.  I think it's a great

6        trial package.

7             So, I started as a law clerk

8        in this Eastern District Court,

9        and I've done a lot of work in

10       this court, and was president of

11       the Federal Bar Association of the

12       New Orleans chapter, which is the

13       second largest chapter in the

14       nation, and I feel like I've grown

15       up here.  I feel like I've really

16       spent a lot of my time in this

17       court.

18            MR. LEVIN:  I feel like I've

19       grown up here.

20            MR. MEUNIER:  So, my final

21       thought is what I began with, I

22       think it was helpful to the group

23       to have me join Russ as a local

24       attorney who kind of knew the

FAC Resp. Exhibit D -- 496

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          ropes here, who could give insight

2          to different aspects of how you

3          practice here and who this judge

4          is and how you approach juries,

5          and I was really pleased to serve

6          as a New Orleans member of the

7          committee itself, but I think in

8          retrospect, that was a key part of

9          my role in the case.

10              MR. HERMAN:  Off the record

11          for one second.

12                  -   -   -

13              (Whereupon, an

14          off-the-record discussion was

15          held.)

16                  -   -   -

17              MR. HERMAN:  How many hours

18          do you have in, Jerry?  Let me

19          preface this by saying your hour

20          of your work may be worth a great

21          deal more than somebody else's.

22          We're asking everybody how many

23          hours they had in.

24              MR. LEVIN:  I'll tell you --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1              MR. MEUNIER:  You'd probably

2         know.

3              MR. LEVIN:  1,058, and the

4         firm has 1,123.25.

5              MR. BIRCHFIELD:  It is a

6         pleasure working with you on the

7         trial team.  The support role you

8         played, it was vital.  Everything

9         that you touched in this

10        litigation was done with

11        excellence and was much

12        appreciated.

13             MR. RAFFERTY:  I would echo

14        that.

15             MR. SEEGER:  This is the

16        first case we had ever worked on

17        together, and I don't want to be

18        negative about -- I don't have to

19        give a compliment by being

20        negative about others, but there

21        were some people who were not

22        really there for assignments.  You

23        were there for every single one,

24        and you helped us anywhere.  You

FAC Resp. Exhibit D -- 498

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          are a real team player.  I

2          definitely appreciate that.

3              MR. HERMAN:  Anybody have

4          any other questions?

5              MR. SEEGER:  Thank you for

6          everything.

7                  -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:          GANCEDO & NIEVES
               Hector G. Gancedo, Esquire
               Tina B. Nieves, Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
1                         -  -  -
2              MR. GIRARDI:  The reason the
3         court reporter is here is for
4         Judge Fallon actually.  Everything
5         that we say, we'll have a record
6         of for the purpose of getting this
7         to Judge Fallon.
8              With that, go ahead.
9              MS. NIEVES:  I was going to
10        say that originally I prepared a
11        PowerPoint, but I've spoken to a
12        few of the people in New Orleans,
13        and they said oh, no, it is way
14        more informal.
15             MR. SEEGER:  If you printed
16        stuff, that's easier.
17             MS. NIEVES:  I'm going to
18        use it as bullet points basically
19        just for an outline.  Over the
20        course of six years, seven years,
21        there's been a lot done.
22             So, as Tom knows here, and I
23        think the rest of you, our firm
24        has been involved in the case from
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        the outset.
2             I see that one of the items
3        that you want to delve into is how
4        long pre-Vioxx withdrawal has the
5        firm been involved.  We started
6        investing in this case with Tom's
7        firm back in 2001.  At that time,
8        my partner, Hector, went with
9        members of Girardi Keese out to
10       Mark Lanier's office to meet with
11       Goforth Lewis and members of
12       Mark's firm, and we had done a lot
13       of prefiling research at that
14       time.  We went out there and met
15       with them and put our heads
16       together and looked at what they
17       have come up with and augmented
18       our research.  We filed our first
19       case in 2002.
20            At that time, we had several
21       cases filed in California.  It was
22       the very beginning of the
23       litigation in California.  Our
24       firm filed and prepared the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

 1          initial coordination petition to

 2          help get the cases coordinated in

 3          CCW.

 4                    MR. SEEGER:  That's for

 5          California?

 6                    MS. NIEVES:  This is all

 7          California stuff.  So we did that,

 8          and shortly thereafter, we were

 9          before what became the first of

10          many judges, because as you've

11          probably heard with Walter, we

12          bounced around with a lot of

13          judges.  We were before the first

14          of the judges, and we were

15          appointed as one of the five

16          members of the Plaintiffs'

17          Executive Committee in California.

18          We regularly attended throughout

19          the litigation status conferences.

20          We attended the meetings with the

21          defendants early on regarding

22          coordination, how we're going to

23          strategize about that.

24                    We then undertook to look

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          through the inventory of cases

2          that were filed at that point in

3          California.  At that point, we had

4          about 600 cases filed in

5          California, and we ended up with,

6          three of the five clients that

7          were going forward on bellwether

8          cases before Judge Lichtman were

9          our cases.  So we undertook a very

10         aggressive prelitigation schedule.

11              MR. BLIZZARD:  You may have

12         said this, Tina.  When was that

13         exactly, what was the time frame?

14              MS. NIEVES:  2002.  Well, I

15         don't know at that point.  It may

16         have been beginning of 2003, but

17         it was somewhere around then.

18         Basically at that point, the

19         pressure points for defendants was

20         what was going on in Houston and

21         what was going on in California at

22         that point.  Right, Chris?  Or in

23         New Jersey, too.

24              MR. BLIZZARD:  Coordination

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          started in California around 2003

2          or late 2002.

3               MS. NIEVES:  Late 2002,

4          exactly.

5               MR. SEEGER:  I remember, and

6          I remember you having those issues

7          and going through judges, and one

8          case was set really fast, and then

9          you lost that judge, and then the

10         case got pushed --

11              MS. NIEVES:  Defendants used

12         a preemptory challenge on the

13         first one.  We used a preemptory

14         challenge on the second one.  The

15         third one, Judge Lichtman, we were

16         with him for two years, and then

17         he was disqualified when the

18         defendants discovered he has used

19         Vioxx.  Then we went to Judge

20         Chaney.

21              When we were before Judge

22         Lichtman, he had it for two years,

23         we had three of the five cases

24         that were set.  We did the full

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          workup, actually, on those cases,

2          a lot of depositions and expert

3          work, et cetera.

4                And then in the interim, we

5          were sent over to Judge Chaney.

6          Then once we were with Judge

7          Chaney, at that point she dashed

8          what protocol Lichtman had in

9          place.  He had an all plaintiffs

10         pick slate, and Chaney said that

11         we're going to do a completely

12         different protocol.  So, we

13         started anew with members of the

14         executive committee to go through

15         and look at what was now a growing

16         number of cases in the California

17         inventory.

18                This is right around -- now

19         at this point we're around the

20         time when the MDL is about to

21         start.  Ultimately as we selected

22         the cases that were going to be

23         tried in this following group in

24         California, and right around then

FAC Resp. Exhibit D -- 507

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          is when, like I said, the MDL

2          started to form and Hector and I

3          went out and saw all of you and we

4          went out to a lot of

5          organizational meetings.  Houston,

6          I can't remember where the others

7          were, but we went a number of

8          places.  We kind of shifted most

9          of our resources because we didn't

10          have a dog in the fight at that

11          point.

12                  MR. GANCEDO:  We didn't have

13          a trial case in California.

14                  MS. NIEVES:  We didn't have

15          a trial case going on.  We shifted

16          a lot of our resources at that

17          point to the MDL.  We were

18          appointed to both the science and

19          expert committee and to the

20          discovery committee.

21                  Let's see.  So, I think the

22          most unique, in terms of what we

23          did for the MDL, and we did quite

24          a lot, but I think the most unique

Page 9

```
 1          contribution we did, and I don't

 2          have it put on the screen at the

 3          moment, but I have it right here,

 4          was this interactive multimedia

 5          trial package that we prepared.

 6          Basically what this was, and some

 7          of you, I think, have seen it, and

 8          I've actually got copies for all

 9          of you so you can run it on your

10          computers.  Chris, you already

11          have one of these probably because

12          I sent one to every member of the

13          executive committee.  It was made

14          part of the trial package.

15               MR. GIRARDI:  I have it.

16          Not only do I have it, but I

17          looked at it.

18               MS. NIEVES:  Okay.  The

19          purpose of this was based on our

20          experience with prior MDLs, we

21          have had situations where people

22          have complained that they received

23          a trial package and it seems

24          cumbersome for an individual trial
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        lawyer, let's say, in Nebraska,

2        who wasn't on the inside, didn't

3        have the inside knowledge and

4        didn't do any of the common

5        benefit work, and all of a sudden

6        has got this fast track case set

7        for trial and he needs to brush up

8        on it quickly.  And he's got a

9        huge amount of work product, but

10       it is difficult, it is cumbersome.

11            So, what we did was, we made

12       this interactive program, which is

13       essentially a very sophisticated

14       PowerPoint.  We tried a lot of

15       different programs, and this is

16       the best one.  We divided the case

17       into several different categories,

18       failure to warn and concealment,

19       scientific literature, FDA

20       overview, misleading marketing to

21       physicians and consumers and

22       profit over safety.

23            And then we further

24       divided -- so, we hyperlinked all

FAC Resp. Exhibit D -- 510

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          the key trial documents that were

2          being used in all the MDL and

3          state trials that we were

4          tracking.  We hyperlinked them to

5          the 375 events that we have in

6          this program.  So you can go and

7          say, here's a failure to warn

8          story, you can click on each one,

9          there's a summary of the event in

10         chronological order, and you can

11         then type the link into the

12         document, and we have it

13         highlighted for you.  We did this.

14         This evolved.  We worked on this

15         with the Robinson firm.  This

16         evolved --

17                MR. LEVIN:  Mark Robinson's

18         firm?

19                MS. NIEVES:  Yes.  Mark and

20         I actually went out and presented

21         it to Russ early on, Russ and Andy

22         early on, and it was approved to

23         be used as part of the trial

24         package.  And then it continued to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          grow as the trials went on.

2               MR. BLIZZARD:  Was this part

3          of the work done in the MDL for

4          the discovery committee?

5               MS. NIEVES:  This had

6          started before the discovery

7          committee was formed, and so we

8          went and got authorization, and

9          then, yes, it was a continuation

10          of what was done in the discovery

11          committee.  As a matter of fact,

12          we worked very closely with the

13          theme grid committee to make sure

14          that these two things complemented

15          each other.  Basically, the theme

16          grid has a lot more issues, and it

17          has the entire universe of

18          documents that the parties are

19          using.  This has the key trial

20          documents that you are actually

21          walking into court with.  So, it

22          is the hottest of the hot

23          documents.

24               We further divided it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          into -- we put in these management

 2          organizations so that you could

 3          see who the players were.  There

 4          is a page where you can link on to

 5          each one and get the bio that's

 6          been marked in the deposition, and

 7          you can pull up the bios.  Then --

 8          don't worry, I'm not going through

 9          this whole thing, but I wanted to

10          show you a few of the things that

11          went into it.

12              We did a lot of the insider

13          trades.  We captured all of the

14          insider trades of the key

15          executives.  We have a section

16          that's profit over safety, and you

17          can look at that as it relates to

18          all the other issues and events

19          that are going on and you can see

20          how, for instance, Gilmartin or

21          Anstice or these guys were dumping

22          large amounts of stock just before

23          VIGOR was released, just before

24          Vioxx was withdrawn.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1              MR. LEVIN:  Did you work

 2          with anybody else with regard to

 3          the insider trading?

 4              MS. NIEVES:  The SEC.

 5              MR. LEVIN:  I don't mean the

 6          SEC.  I mean nobody else on the

 7          committees or anything like in

 8          California?

 9              MS. NIEVES:  No.  This was

10          all done through the MDL.

11              MR. LEVIN:  Yes, but you

12          didn't work with any other

13          California lawyers on that other

14          than Mark?

15              MS. NIEVES:  Mark's firm.

16          We worked with Ted Wacker on it.

17          Then as we were getting into

18          discovery, of course, we worked

19          with members of the discovery

20          committee.  We were on these calls

21          every single week, and so we were

22          working very closely with them.

23              I just want to give you a

24          couple -- show you a couple of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          examples.  Like here is where the

2          VIGOR results were released.  This

3          is 2000, and all you do is go to

4          2000 and you go to the date and

5          you go to where the VIGOR results

6          were released.  Then on the next

7          page, you are able to see where

8          the stock was dumped, right here.

9          It is all color coded.  So this is

10         the green for the profits over

11         safety.  If you click on any one

12         of these tabs at the top, you can

13         get a chronology only relating to

14         that one issue.  So, for instance,

15         if you are looking for a key

16         label, you can go straight to the

17         FDA tab and you can go right

18         through the labels and see exactly

19         when it was and pull it up.

20              We also made it so you can

21         go and do a plaintiffs' chronology

22         so it can be customized for any

23         attorney that this is sent out to.

24         So, let's take the attorney in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          Nebraska again.  He can input his

2          plaintiff's chronology, lay it

3          over the overall chronology and

4          see exactly when its usage was,

5          whether it was pre-VIGOR, post

6          VIGOR, et cetera.  We also made it

7          so it is enabled so you can import

8          all of your pharmacy records and

9          medical records straight from this

10         program.

11              You have the self-play

12         version, which runs a little bit

13         slower, but if you were actually

14         in a situation where you were

15         asking for the trial package from

16         the MDL, you would have one with

17         instructions that you load on your

18         computer, and it works very, very

19         quickly.  It is very user

20         friendly, and I think that it

21         creates a great benefit to the

22         persons actually using the MDL

23         trial package, as they can sit

24         down in the afternoon and learn

FAC Resp. Exhibit D -- 516

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          the whole case.

2                    MR. BLIZZARD:  When was this

3          project started?

4                    MS. NIEVES:  When did the

5          MDL start?

6                    MR. GANCEDO:  2005 probably.

7                    MS. NIEVES:  When was the

8          beginning of the MDL?

9                    MR. SEEGER:  It was April of

10         2005.  That was the beginning of

11         the MDL.

12                   MS. NIEVES:  It was the

13         beginning of 2005.

14                   MR. BLIZZARD:  So, this was

15         from the start an MDL project?

16                   MS. NIEVES:  Yes.

17                   MR. BLIZZARD:  It was put

18         into the trial package?

19                   MS. NIEVES:  Yes.

20                   Anyway, this is a really

21         powerful tool.  It's got a lot,

22         lot of documents, a lot of good

23         information.

24                   Something I forgot to tell

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          you, if you have a marketing case,

 2          we have imported all of the live

 3          commercials in there.  You can

 4          play them straight from the

 5          program and all the print ads.  We

 6          also have the media tracking.  We

 7          went through media tracking

 8          centers to get information about

 9          the money that was spent, the

10          spots that were purchased, the

11          regions that they were played in

12          and how many spots per day.

13          There's a pretty full and

14          comprehensive marketing case

15          there.

16                MR. BLIZZARD:  So, was Troy

17          the person who ultimately had

18          responsibility for this project as

19          chair of the discovery committee?

20                MS. NIEVES:  I suppose so.

21          Mark and I were spearheading it,

22          but we were constantly speaking

23          with other members of the

24          discovery committee and making
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          sure we weren't eliminating things

2          that were going in the theme grid.

3          As I said, we worked very closely

4          with the theme grid and the

5          subcommittee.

6                    MR. BLIZZARD:  Who was the

7          vendor?  Was there a vendor?

8                    MS. NIEVES:  Yes.  Executive

9          Presentations.  And there were

10         instructions that went out with

11         all of the programs when they were

12         sent to the executive committee

13         and when they were sent for

14         inclusion in the trial package

15         that indicates that it can be

16         customized for you, for your own

17         trial, you're to contact Executive

18         Presentations, and they can put in

19         all your plaintiff's information.

20                   So that's the trial package.

21                   Then in addition to that,

22         let me move to the science

23         committee, science and expert

24         committee and what we did for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Shelly there.  We worked very
2          closely with Shelly.  We were very
3          active members throughout the
4          litigation on the science
5          committee.  One of the biggest
6          projects that she asked us to
7          undertake was to create a database
8          that was a science theme grid.
9          She wanted basically a combination
10         of what we had done in this
11         project, the trial package, and
12         what the theme grid committee had
13         done, and she wanted it only for
14         science.  So, we created a
15         multi-faceted access database
16         basically with a lot of fields so
17         you can search to find, for
18         instance, all the studies that
19         related to selectivity or all of
20         the FitzGerald studies or all the
21         studies that came out in different
22         years so you can search them in
23         many different ways.  When you
24         reach that through the science

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          theme grid, you have -- I'm sorry,

2          I lost my train of thought.

3               When you go through all of

4          that, you can pull it up and you

5          can search it.  We've highlighted

6          some of the things, and we've

7          summarized each one.  Then we

8          summarized it, categorized it.  I

9          led a team, a subgroup -- I don't

10         think we had a formal name, but a

11         subgroup of the science committee,

12         because she kind of needed this

13         quickly.  I think it was around

14         the time of the Dedrick trial,

15         just before the Dedrick trial, and

16         she needed this quickly.  We spent

17         a couple of months, maybe two,

18         three months putting the whole

19         thing together.  At the request of

20         she and Andy and Leigh O'Dell, we

21         augmented it during the Dedrick

22         trial to incorporate, I think it

23         was, all the Pratt-authored

24         studies.

FAC Resp. Exhibit D -- 521

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1              I forgot to mention that the

 2         trial package was definitely used

 3         in one of Mark's trials, I think

 4         it was the Barnett trial.

 5              MR. SEEGER:  Tina, I'm sorry

 6         to waste your time, because if you

 7         addressed it, I apologize.  How

 8         closely did you work with Mark on

 9         some of these projects?  Was he

10         kind of your point person?

11              MS. NIEVES:  On that one, we

12         worked closely with him.  We

13         designed the program, and then he

14         was doing a lot of discovery for

15         the discovery committee.  And

16         since we're both here and we were

17         doing a lot of work at the time

18         for the science committee, we

19         started putting our resources

20         together.  So, we were getting

21         help from Ted Wacker at his office

22         with respect to importing all the

23         documents, and then we were

24         summarizing them internally, and
```

FAC Resp. Exhibit D -- 522

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          we were circulating it through the

2          discovery committee.

3                    MR. SEEGER:  Okay.

4                    MS. NIEVES:  So, we did the

5          science theme grid for Shelly.  We

6          also obviously attended all of the

7          science conference calls.  We were

8          the official gatekeeper for the

9          consulting group of Girkipal Singh

10         through whom we were able to

11         access a lot of Congressional

12         testimony and the Waxman documents

13         and some of the documents that

14         were under seal at the time in

15         connection with the Congressional

16         testimony.

17                 We also attended the FDA

18         advisory COX-2 advisory meetings

19         that were out in Maryland and

20         D.C., and we attended one of those

21         with Dr. Singh when we were there.

22                 We also assisted in

23         developing several of the experts.

24         I'll just kind of list them.  Dr.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        Sturkenboom, who had stroke data;

2        Dr. Pechmann, we were working with

3        Mark's firm on developing her in

4        the marketing area; Dr. Gislason;

5        Dr. La Puma; Dr. Edwards.  I went

6        up to Washington with Shelly to

7        meet Dr. Edwards and did followup

8        work with her.  And Dr. Farquhar

9        to an extent.  Mark and Dr. Singh

10       and I went up to Stanford and met

11       with Don Arbitblit and Dr.

12       Farquhar to kind of resolve or

13       reconcile some of the findings in

14       the Singh study as part of Dr.

15       Farquhar's analysis.

16            We were also asked to do an

17       analysis by the science and expert

18       committee.  We were asked to do an

19       analysis of the FitzGerald

20       hypothesis, because in several

21       joint meetings that we went to in

22       Vegas and elsewhere between the

23       discovery and the science and

24       expert committees, there was

FAC Resp. Exhibit D -- 524

Page 25

1          questions as to whether or not we

2          really wanted to depose him.  It

3          was a two-edged sword, and we went

4          around and around on it.

5          Ultimately they asked us to do an

6          analysis.  We went through all of

7          his FDA hearings, all of his

8          testimony, his editorials,

9          studies, did a 28-page memo

10         analyzing it, and ultimately we

11         decided not to take his

12         deposition.

13              Document review.  I think

14         that we're probably a little bit

15         unique in that a lot of the firms,

16         I don't think, who have been

17         involved in this can say they made

18         a really consistent effort over

19         the long haul reviewing documents.

20         Partly the function of the fact

21         that we are working on all of

22         these other projects, we had

23         people either in Denver or in

24         Newport, or in some cases, with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          respect to the marketing

2          materials, the documents were sent

3          to us in our office, of having

4          people, partners and associates

5          reviewing documents on a

6          consistent basis over a very long

7          period of time.

8               We prepared materials for

9          several of the depositions in the

10         trials or in connection with the

11         trials including the Silver,

12         Farquhar, Krahe depositions.

13              We also served on the sales

14         and marketing subcommittee, which

15         was chaired I think -- yeah, it

16         was by Mark.  We attended the Las

17         Vegas subcommittee meeting, and we

18         took numerous sales representative

19         depositions.

20              In addition, I chaired the

21         science research, publications and

22         societies subcommittee, and this

23         was part of the discovery

24         committee.

FAC Resp. Exhibit D -- 526

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1            MR. SEEGER:  Science

2       research, what was that?

3            MS. NIEVES:  Scientific

4       research, publications and

5       societies subcommittee.  It still

6       catches me.  Basically, the

7       purpose of this was for us to go

8       to all the scientific symposiums

9       that were being held in the

10      medical community that were

11      covering COX-2s.  As you all know,

12      we had a lot of emerging issues in

13      the medical field relating to

14      COX-2s and actually what the

15      mechanism of action was.  We were

16      going there to find out what the

17      defense experts were saying and

18      see if we could identify experts

19      out there that would be friendly

20      to the plaintiffs.

21           MR. SEEGER:  Tina, I'm

22      sorry, if you don't mind me

23      jumping in.

24           MS. NIEVES:  No.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1            MR. SEEGER:  Who was your
 2       contact person on that project?
 3       Who assigned it you and who did
 4       you report to?
 5            MS. NIEVES:  This was part
 6       of the discovery committee.  So,
 7       it was the chair of discovery.
 8            MR. SEEGER:  It would have
 9       been Troy or one of those guys?
10            MS. NIEVES:  Yes.
11       Absolutely.  It was on every
12       single agenda item, you'll see it.
13       It was one of the subcommittees of
14       the discovery committee.
15            So, I oversaw a small group
16       of firms that were going -- I was
17       identifying all these symposia
18       that were going on, and some of
19       them were over the pond, as they
20       say.  Some of them were in Europe.
21            MR. SEEGER:  I should have
22       gotten that assignment.
23            MS. NIEVES:  Some of the
24       firms were going and sitting in on
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          them.  The ones we personally
2          attended, our firm attended, was
3          the American Heart Association
4          scientific conference, and that
5          was in November of '05; the
6          scientific meeting conference of
7          the American College of
8          Rheumatology and International
9          Society of Pharmacoepidemiology in
10         Nashville, that was in August of
11         '05; the science subcommittee,
12         cardiology conference in Salt Lake
13         City; the rheumatology annual
14         scientific committee in San Diego
15         in '05.  These were all in '05.
16         We monitored by a live feed the
17         annual European Congress of
18         Rheumatology, which was held in
19         Amsterdam.  Then we had other
20         firms that were reporting on other
21         ones they had attended.
22              With respect to direct
23         contributions to the MDL trials,
24         our firm worked on the deposition

FAC Resp. Exhibit D -- 529

Page 30

```
 1        trial cuts with Pete Kaufman and
 2        other people that he was
 3        overseeing in connection with that
 4        project.
 5             We reviewed documents
 6        specific to various witnesses for
 7        the Barnett trial.
 8             We compiled, I think I
 9        already mentioned this, the
10        Pratt-authored articles and other
11        scientific literature for the
12        Dedrick trial at the request of
13        Andy and Leigh and Shelly.
14             We analyzed sales and
15        marketing documents and Ogilvy and
16        Arcoxia documents also at the
17        Barnett trial.
18             MR. SEEGER:  The assignment
19        from the Barnett trial would have
20        come from Robinson, and Dedrick
21        would have come from Andy?
22             MS. NIEVES:  Yes.  I think
23        how it worked was, Andy and Leigh
24        asked Shelly, and Shelly was there
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1          working on the trial, so she
 2          called and asked me to do it from
 3          my office.
 4                And then finally it's just
 5          speaking engagements which, you
 6          know, we were all out and about
 7          trying to inform the plaintiffs'
 8          bar as best we could on progress
 9          of the MDL and common benefit work
10          and what was being done.  I
11          attended and presented at a number
12          of those, including several
13          seminars, ATLA seminars, the West
14          Palm Beach conference.  I
15          moderated the ATLA Vioxx mock
16          trial in New Orleans.  That's the
17          one that, Mark, I think you were
18          there, and I know Mark Lanier
19          presented there.  I presented at
20          the Mealey's conference with Mark
21          Robinson on the Irvin trial
22          highlights in December of '05.  I
23          served as a panelist with Russ and
24          Arnold and you at the Mealey's
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          Vioxx conference at Amelia Island

 2          in Florida.

 3               MR. LEVIN:  I was there.

 4               MR. SEEGER:  I remember you

 5          being there.

 6               MS. NIEVES:  ATLA Vioxx

 7          teleconference which was FDA and

 8          painkillers, and I also reported

 9          for Mealey's on the FDA Advisory

10          Committee hearings for COX-2s out

11          in D.C. at the request of the

12          science committee.

13               So, you know, I think that,

14          as they say in Vegas, we were all

15          in on this case.  We put a lot of

16          resources in over a long period of

17          time, and I think we produced a

18          very high caliber of work.

19               MR. SEEGER:  Just for the

20          purposes of when we start just

21          piecing all of this together, it

22          sounds like the greatest -- and

23          I'm giving you credit for what you

24          have done.  You have had the
```

FAC Resp. Exhibit D -- 532

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          greatest contact with Mark,

2          probably Troy on the discovery

3          committee, Shelly on the science

4          committee.

5               MS. NIEVES:  John Restaino.

6               MR. SEEGER:  And John

7          Restaino.

8               MS. NIEVES:  I worked really

9          closely with Shelly and Mark's

10         firm.  Then a lot of the other --

11         definitely the other attorneys,

12         but a lot of that was through

13         teleconferences where they were

14         asking to report on what had been

15         done.  And while I'm sending it to

16         them, I wasn't doing a lot of that

17         in person though.

18              MR. SEEGER:  Is this part of

19         the trial package right here?

20         (Indicating.)

21              MS. NIEVES:  That is the

22         trial --

23              MR. LEVIN:  That's your

24         trial package that you prepared?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1           MR. NIEVES:  You have it on

2      disk.  I just handed it to you.

3           MR. SEEGER:  So, the people

4      who put together what we are

5      calling the MDL trial package have

6      incorporated this?

7           MR. GANCEDO:  Yes.

8           MS. NIEVES:  That's in

9      there.  To me, this should be the

10     first stop for someone looking at

11     it.  Because they can look at this

12     and learn the overall picture and

13     see the key documents, and they

14     can go into depth in the theme

15     grid and start looking at the

16     depositions.

17          MR. SEEGER:  Who worked on

18     that project with you, that one

19     there?

20          MS. NIEVES:  Well, the

21     members of my firm and the members

22     of Mark's firm.  And then it's

23     kind of a hard question because

24     there's so much incorporated in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          here.  Chris, you sent us a big

2          chronology, it was a compendium.

3          That was incorporated in here.  We

4          used things from Mark Lanier's

5          opening statements.  Mark Robinson

6          and I went out to the Ernst trial.

7          We used any exhibits that he used

8          that we haven't incorporated.  We

9          went to several states.  So, I

10         mean, it is everyone's work

11         product, but we designed this

12         program.

13              MR. SEEGER:  Have you gone

14         on line and seen the way the MDL

15         trial package is set up?  Have you

16         had a chance to see that?

17              MS. NIEVES:  I haven't

18         looked at that, no.

19              MR. SEEGER:  That's why I'm

20         asking.

21              MR. LEVIN:  We'll find it.

22              MS. NIEVES:  Russ had told

23         us at the beginning of the

24         litigation he definitely wanted

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          this in there.  I did call Leigh

2          at the end of the litigation to

3          make sure that it was

4          incorporated, and people were

5          checking in with me to make sure

6          we were working closely with the

7          theme grid people over the course

8          of the development to make sure we

9          were capturing all the best

10         documents that were in the theme

11         grid.  We were attending the

12         trials to make sure that we got

13         ahold of anything new that came up

14         for any of these subtimelines that

15         were being used as exhibits in the

16         various trials.

17              MR. SEEGER:  Okay.  Fine.

18              MS. NIEVES:  Questions?

19              MR. SEEGER:  Just to

20         summarize, I mean, what would you

21         pick as your top contribution to

22         the common benefit?  Would it be

23         the work on the trial package?

24              MS. NIEVES:  I think the

FAC Resp. Exhibit D -- 536

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1           work on the trial package and the

2           work on the science theme grid,

3           because I know that that was -- I

4           mean, people were calling me while

5           they were in trial and saying we

6           need this immediately.  So, I know

7           that was used, and that was

8           important, and it was very

9           important to Shelly as she did the

10          work.

11               MR. WEITZ:  How many cases

12          did the firm have filed?

13               MS. NIEVES:  About 120.  Is

14          that right?

15               MR. GANCEDO:  110.

16               MR. WEITZ:  And you

17          submitted those all to the

18          settlement?

19               MR. GANCEDO:  Yes.

20               MR. WEITZ:  They were filed

21          in LA?

22               MS. NIEVES:  A lot of them

23          were in the MDL.  They were in

24          both jurisdictions.

FAC Resp. Exhibit D -- 537

Page 38

1           MR. WEITZ:  Other than those

2       three out of five cases that were

3       originally before Judge Lichtman,

4       did you guys have any other cases

5       that were --

6           MS. NIEVES:  Selected for

7       trial?

8           MR. WEITZ:  -- selected for

9       trial?

10          MS. NIEVES:  No.

11          MR. WEITZ:  Thank you.

12          MR. GIRARDI:  Judge Lichtman

13      was recused because he had taken

14      Vioxx, so the defendants recused

15      him.

16          MR. SEEGER:  That's

17      interesting, isn't it?

18          MS. NIEVES:  He did say it

19      wouldn't affect anything.

20      Remember?  He threw that out.

21      Remember that time he threw that

22      out and it went up on appeal.  I

23      was at the hearing.  I remember

24      him saying on the bench, saying I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1        took it.

2              MR. GIRARDI:  Thank you very

3        much.  Well done.

4                    -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4   Public and Certified Court Reporter of

5   the State of New Jersey, Registered

6   Diplomate Reporter, Federally-Approved by

7   the United States District Court of

8   Pennsylvania, do hereby certify that the

9   foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 540

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -

FIRM:  IRPINO LAW FIRM
       Anthony Irpino, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 541

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2             MR. HERMAN:  We have a court
 3        reporter here who will make a
 4        record of everything as part of
 5        the Court's direction on
 6        transparency so everybody knows
 7        what everybody is saying at the
 8        end of the day.
 9             Secondly, the affidavit, if
10        there's anything you want to add
11        or subtract from it, go ahead and
12        do it.
13             The judge has made it clear
14        that if the fee issues aren't
15        resolved a la Murphy Oil, then
16        what he's going to do is go
17        through virtually the same
18        process, folks are going to have
19        to be cross-examined, et cetera,
20        and basically that's it.
21             The committee is going to
22        publish whatever directive we get
23        from the judge when we get it.
24        So, that's about it.  The floor is
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          yours.

2                     MR. IRPINO:  Okay.

3                     Well, number one, thank you,

4          everybody, for allowing me to

5          present as to what I contributed

6          to the Vioxx litigation and the

7          MDL.

8                     My name is Anthony Irpino of

9          the Irpino Law Firm.  My address

10         is 365 Canal Street, Suite 2290,

11         New Orleans, Louisiana 70130.

12                    I've never presented to

13         anybody about the work I've done

14         in a case in a manner such as

15         this, so, I'm a little bit in the

16         dark.  But with that said, I just

17         figured --

18                    MR. SEEGER:  Can we help you

19         with that?

20                    MR. IRPINO:  Yes.

21                    MR. SEEGER:  We are all

22         interested in the way you see your

23         common benefit contributions, and

24         some of us know you and some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          people don't, so, speak to the

2          people that don't.

3               MR. IRPINO:  Okay.

4               I think that's a good point,

5          that a lot of you do know me.  I

6          worked very closely with a lot of

7          y'all in connection with this

8          case, and so in large part, for

9          the people who have worked with

10          me, I rest on what I've done, the

11          way I've done it, the vigor with

12          which I did it and the quality in

13          which I did it.  But that said, I

14          didn't work with y'all closely in

15          the case, and I do want to go into

16          some of those things so you know

17          it.

18               I did try and squeeze into

19          the affidavit some of the things

20          that I did.  Candidly, in a

21          three-page affidavit, you can't do

22          it.  In a 30-minute presentation,

23          I can't do it.

24               To go into what we did in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          this case, what I did in this case

2          and what my teams did in this case

3          I think would take days,

4          literally.  I'll try and give as

5          good of a recitation as I can, but

6          it boils down into two primary

7          roles that I played.

8                Number one, first and

9          foremost, is chairman of the

10         privilege log team.

11               Second role, which is

12         somewhat of a forgotten role,

13         somewhat of a less glamorous role,

14         was chairman of the document

15         repository team.  That was

16         significant, and I'll get into

17         that later, but certainly chairman

18         of the privilege log team was my

19         primary role.  I believe that it

20         is not an inaccurate statement to

21         say that I led that charge.  So,

22         all the issues that dealt with the

23         privilege log, which in this case

24         I think it's a fair statement,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          became extensive.

2                 With that said, I did want

3          to make everybody aware that this

4          was a team effort, the privilege

5          log team.  I did lead it, but

6          there were a lot of people

7          involved.  I wanted to go into the

8          names of who were involved,

9          because it was extensive.

10                First of all, I was kind of

11         appointed to it or put in that

12         position by Troy Rafferty and Russ

13         Herman.  They basically gave me

14         the power to do that, as well as

15         the other heads of the discovery

16         team, which included Dave

17         Buchanan, Richard Arsenault, Chris

18         Tisi.  It was critical that they

19         gave me the kind of power and the

20         time to say just to go do it, get

21         this done.  I mean, to have that

22         type of freedom in a case such as

23         this really allowed us to push

24         forward and do it.

FAC Resp. Exhibit D -- 546

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           The other members of the

2      team included Gary Wilson and Tara

3      Sutton, who were up in

4      Minneapolis, they worked very

5      hard, and I want that to be known

6      to everybody.

7           A woman by the name of Lynn

8      Swanson over at a firm called

9      Jones Swanson here in New Orleans

10     worked hard.

11          There were other people who

12     worked hard on that team.  Brian

13     Balser Andy Childers, Leslie

14     Bryan, Raul Bencomo each did some

15     good and helpful work.

16          Others included Mike Hugo

17     and Michael Stratton.  I wanted

18     y'all to know that.  I might have

19     left out a name or two, but I

20     wanted y'all to know that this was

21     a team effort, a lot of people

22     involved, a lot of coordination

23     involved.

24          I also wanted to speak real

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          briefly as to the --

2               MR. SEEGER:  Anthony, is

3          this a team that you assembled?

4          I'm sorry.  Some of these names I

5          recognize, some I don't.

6               MR. IRPINO:  Well,

7          essentially it was assembled -- I

8          think it is fair to say that Troy,

9          myself, Dave Buchanan, Chris Tisi

10         at the beginning, said, hey, who

11         wants to work on privilege log.

12         It was not a glamorous role.  They

13         said, who wants it?  Shoot, I'll

14         take it.  I'll take it and run

15         with it.

16              MR. LEVIN:  Well, the Robins

17         Kaplan group, how did they become

18         involved?

19              MR. IRPINO:  They also said

20         that they'll help.

21              MR. LEVIN:  In other words,

22         they hadn't been in the Army and

23         they volunteered?

24              MR. IRPINO:  Yes.  They put

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          their hand up.  I think the way

2          things kind of started out and

3          worked out is I kind of took the

4          reins and ran with it.  I said,

5          this is what we're going to do,

6          this is how we're going to do it.

7          Everybody followed, and everybody

8          helped participate.  People

9          worked.  And to give you a sense,

10          that team was being formulated in

11          June of '05, right after the MDL

12          was formed, very early on.  I'm

13          just going on memory.  There's so

14          much I'll leave out.  Troy was

15          saying, we need to get on this.

16          You know, we'll get on it.  We'll

17          do it.  We had some good

18          go-getting people.

19              Dave Buchanan said, look, we

20          have this privilege log they

21          produced in New Jersey, it is a

22          piece of crud, we need to get into

23          it.  So, we went through and

24          combed through that privilege log,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          and we're talking about 30,000
 2          privilege claims.  We're not
 3          talking in a sense of, oh, you
 4          know, let's take a look at it and
 5          let's do some, quote, review.
 6          Let's take a look at it.  I mean,
 7          this was combing through this
 8          thing, trying to find the best
 9          examples of how they were not
10          documenting their privilege claims
11          properly, how they were hiding
12          documents.  When you are going
13          through and you are seeing
14          requests for legal review of
15          APPROVe study materials, what the
16          heck is that?  So, you wanted to
17          find out things that were, A,
18          clearly bogus privilege claims,
19          clearly claims that we could win
20          on.
21               We didn't want to go to
22          Judge Fallon and just randomly
23          say, Judge, take some privilege
24          claims, and here's some bad ones.
```

FAC Resp. Exhibit D -- 550

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          We wanted to go with the best of

2          the best.  So, we spent literally

3          a couple of months combing through

4          this privilege log.  And I'm not

5          talking about a little review.

6          This was combing through.

7              So, we got that process done

8          and presented it to Judge Fallon

9          on a plate that made him

10         understand that this was a serious

11         issue and that there were serious

12         violations here.  I think that

13         really, as much as anything in the

14         beginning, helped our cause along

15         those lines.

16             But getting back, we had

17         this committee, Troy formed it,

18         Dave formed it, Chris Tisi formed

19         it, and we were running through

20         and were just going and going.

21         And we organized it, we had weekly

22         calls.  And I'll tell you, these

23         weekly calls were not, hey, guys,

24         how are you doing.  I had an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          agenda each call.  This is what

2          we're going to discuss.  If you

3          want copies of them, I've got

4          copies of them, I promise you.

5          They are too voluminous to go

6          through, the agendas, the minutes,

7          but it was very well organized

8          from the beginning so that

9          everybody knew that this was a

10         team effort, that it was an

11         organized effort.

12              I think as much as anything

13         that I worry about in MDL work or

14         class action work is keeping

15         people engaged in the litigation,

16         keeping team members engaged,

17         because we know everybody has

18         another practice.  I mean,

19         oftentimes they are working on two

20         cases at once, three cases at once

21         or some other cases.  So, it is

22         very easy to lose sight of this

23         litigation, and one of my goals

24         was to keep people focused on this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          litigation, and the way I know how

2          to do that is keep engaged, keep

3          organized and keep assignments

4          running.  So, we did that

5          throughout this process.

6               So, those first several

7          months were very detailed, very

8          strenuous, very long hours

9          working, working, working on this

10          stuff and putting together the

11          package so that we can attack this

12          thing properly.  That's kind of

13          how it began.

14               Later on -- and I want to

15          say this.  I mean, there were

16          different stages of the privilege

17          log fight.  Later on, you know, we

18          were up at the Fifth Circuit, and

19          let me tell you something --

20          Arnold, you are going to like

21          this.  Fred Longer and Arnold

22          Levin personally got involved at

23          that stage.  Russ Herman

24          personally got involved at that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        stage where we were collaborating

2        and coordinating on writing the

3        appellate briefs and making the

4        appellate argument, which Russ

5        made.  I mean, I guess there's so

6        much to go through from beginning

7        to end --

8             MR. SEEGER:  Let me ask you

9        questions.  What role did you have

10        in the briefing with Arnold and

11        his firm and Russ?

12             MR. LEVIN:  He worked on

13        it -- I don't have to answer it.

14             MR. SEEGER:  It is his

15        record.  Thank you, Mr. Levin,

16        we'll swear you in.

17             Tell us about your role in

18        the briefing.

19             MR. IRPINO:  My role in the

20        briefing was that I was one of the

21        co-coordinators of it.  First of

22        all, I mean, the way this works,

23        it was again not just like, hey,

24        let's do a brief up.  I mean, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          would brief the background to

 2          Russ, to Arnold, to Fred in memos.

 3          This is where we've come from,

 4          this is where we've been in memos.

 5          This is not like, oh, get on the

 6          phone and say -- you know, I don't

 7          know how many memos I wrote.  I

 8          have hundreds of memos in the file

 9          about this is what this is about,

10          this is where we've been, this is

11          where we're going.

12               But even the Fifth Circuit

13          briefing, and as frustrating of a

14          situation as I've been in, it was

15          that Fifth Circuit.  But, you

16          know, this is where we've been,

17          this is where we're going, and

18          this is the law, and this is what

19          we have to argue.  These are

20          pressure points.

21               MR. HERMAN:  Let me ask some

22          questions.

23               Approximately how many pages

24          of documents, if you can recall or
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1              estimate, were reviewed?

2                   MR. IRPINO:  Were reviewed

3              in terms of the privilege log?

4                   MR. HERMAN:  Yes.

5                   MR. IRPINO:  Well, that's an

6              interesting question, because the

7              privilege log itself, you are

8              talking about thousands and

9              thousands of pages, okay?  We got

10             Judge Fallon to essentially order

11             Merck to do a revised privilege

12             log.  Then there are thousands of

13             pages you are talking about

14             reviewing, okay?  Then in

15             connection with this assignment,

16             Merck said, we see the writing on

17             the wall, we're going to

18             deprivilege a bunch.  So, we got

19             Merck to voluntarily deprivilege

20             hundreds of thousands of pages of

21             documents.  That's in 2005.

22                   There was a second

23             deprivileging of documents in

24             2006, and then a third

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          depriviliging of documents.

2                  MR. HERMAN:  How many boxes

3          of documents did Merck send to the

4          Court in camera that Judge Fallon

5          reviewed?

6                  MR. IRPINO:  That's easy.

7          80, right around 80.

8                  MR. HERMAN:  Okay.

9                  Now, did there come a point

10         in time when the Court had to

11         appoint a Special Master to go

12         through and make a recommendation

13         on the documents that Merck

14         contended were privileged?

15                 MR. IRPINO:  Yes, there was.

16         Let me give you just a brief

17         history of that.  Judge Fallon

18         spent two weeks, two weeks

19         straight reviewing deprivileged

20         documents.  Number one, I want

21         everybody to know that we viewed

22         that, our team, everybody viewed

23         that as a significant victory.

24         We've got Judge Fallon looking at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           all of their privileged documents

2           and checking out and seeing where

3           the bones were buried and seeing

4           the dirt.  He saw it.  And I

5           thought we felt that there was

6           some sort of a change or some sort

7           of a victory of that in and of

8           itself, because Judge Fallon was

9           not happy with Merck through that

10          process.  When he got done after

11          two weeks of reviewing, quote,

12          privileged documents, something

13          changed in terms of the way he

14          viewed the parties even.  I think

15          I remember Russ saying something

16          about that at a PSC meeting where

17          I was called to discuss these

18          issues.

19                To give you an example,

20          there were 30,000 documents in

21          these 80 boxes.  Judge Fallon

22          found that 491 of them were

23          privileged.  The other 29,509

24          documents he found were not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          privileged.  Now, if you are a

2          Federal judge spending two weeks

3          reviewing privileged documents,

4          you expect a better number.  I

5          think it is fair to say that that

6          had a significant effect.  But

7          with that said, Judge Fallon did

8          it, the Fifth Circuit did what

9          they did, there was a lot of

10         briefing going on throughout this

11         process, and then we got a Special

12         Master.  Judge Fallon said, look,

13         we need to have a Special Master

14         review this because we're talking

15         about now we rereviewed all of

16         these documents, and the Fifth

17         Circuit made a decision, oddest

18         decision I have ever seen, that

19         includes a per curium order that

20         said that Merck gets to select

21         2,000 documents randomly out of

22         all of those documents I told you

23         about that they want to be

24         rereviewed and then we'll revisit

Page 20

```
 1          this issue.  It is the damndest
 2          thing you've ever seen.
 3               So, Judge Fallon, and this
 4          is no coincidence, Judge Fallon
 5          selected Professor Paul Rice, who
 6          we quoted extensively in all of
 7          our briefing, to say this guy is
 8          the man, this is how you do a
 9          privilege log, these are how you
10          make privilege claims.  He took
11          that guy and appointed him.  So,
12          we saw that as a victory in and of
13          itself.  So, we got Professor
14          Rice, we met with Professor Rice,
15          this was back in, I think, April,
16          approximately April of '07, where
17          Professor Rice was appointed, went
18          to D.C., remember?
19               MR. SEEGER:  Yes.
20               MR. IRPINO:  I'm telling
21          you, throughout this process, I
22          mean, again, it is not just me, it
23          is a team.  We've got Fred Longer
24          involved, Troy Rafferty involved,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          Chris Seeger involved, we've got

2          Arnold Levin involved.  Look,

3          Russ' office became very involved.

4          Lenny Davis was very involved in a

5          lot of this stuff.  So, I just

6          want to let everybody know it is

7          not just Anthony Irpino alone.

8               MR. HERMAN:  Why don't you

9          move on to your other

10          contributions.

11               MR. SEEGER:  Can I ask a

12          quick question?  Anthony, prior to

13          the Vioxx MDL, had you been

14          involved in MDLs prior to that

15          where you held a leadership

16          position?

17               MR. IRPINO:  I was not

18          involved in an MDL where I held a

19          leadership position.  I was

20          involved in several class actions,

21          complex litigation, and that's

22          where a lot of my experience held

23          from.

24               MR. SEEGER:  I'm asking for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          a different reason, but go ahead,

 2          answer Russ' question.

 3               MR. IRPINO:  Let me just

 4          speak quickly as to the Special

 5          Master, because that process was

 6          very, very extensive.  The process

 7          lasted probably four months, four

 8          to six months, I would say,

 9          starting in April, ending in --

10          actually, the Special Master's

11          final report recommendation came

12          down November 1st of '07, okay?

13               That process was so

14          extensive, there were so many

15          briefs filed to the Special

16          Master, Merck went -- I mean,

17          first of all, Merck -- all you

18          have got to do is look at probably

19          Merck's billing to see how hard

20          this was fought.  They had, I

21          think, dozens of guys on this,

22          working a lot of hours on this

23          project.  I mean, that's what my

24          guess would be.  But we're talking
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          about literally dozens of briefs,

2          declarations.  They had Joanne

3          Lahner do a declaration.  They had

4          different employees doing

5          declarations to try and help prove

6          their privilege log claims.

7              Special Master's reports

8          came out, first report, second

9          report, third report, fourth

10         report.  We had a couple of

11         meetings with them, a couple

12         arguments with them, submitted

13         dozens of briefs from our

14         standpoint, which a lot was done,

15         myself, Fred Longer, Lenny worked

16         hard on that.

17             MR. SEEGER:  Anthony, did

18         you participate in the Joanne

19         Lahner issue?  Did you coordinate

20         with what was going on in New

21         Jersey, as well, because there

22         were challenges there?

23             MR. IRPINO:  There were

24         challenges with Joanne Lahner,

FAC Resp. Exhibit D -- 563

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          there was coordinations of those

2          efforts, and, in fact, we got

3          certain things from New Jersey

4          that were produced in there, and

5          there was coordination of that.

6               I just want to also say when

7          you see these reports and

8          recommendations, the first report

9          and recommendation, the PSC had de

10         bene esse depos going on.  We

11         wanted to get these documents for

12         these de bene esse depos.  So, in

13         addition to Merck selecting 2,000

14         documents for the Special Master

15         review, we got the Special Master

16         to agree to allow us to select 500

17         or 600 documents that were

18         critical to the de bene esse depos

19         that we were doing.  Silverman and

20         Barr, if I'm not mistaken, were a

21         couple of them.  So, the Special

22         Master reviewed those documents.

23              The decisions came out --

24         let me just tell you the amount of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          volume we're talking about and the

2          amount of work we're talking

3          about.  The report and

4          recommendation, I think the first

5          report was like 35 pages.  The

6          decisions took up 700 pages,

7          decisions, of individual document

8          claims, okay?  So, I'm in charge

9          of reviewing those, making sure

10         that we object to them properly,

11         because there were initial

12         determinations by the Special

13         Master.  We had a chance to

14         object, Merck had a chance to

15         object.  We had to respond, they

16         responded.  I'm telling you this

17         process was so in depth and so

18         detailed that it was very time

19         consuming, and it was very

20         thorough.

21              Couple other things about

22         the privilege log that sometimes

23         can get overlooked.  This wasn't

24         just Merck's privilege log, this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1      was the FDA privilege log that we

2      dealt with, and these were

3      third-party privilege claims, all

4      right?  So, it wasn't just limited

5      to that.  So, at different times

6      we're dealing with different

7      issues.

8           But, again, it was a fairly

9      extensive battle, it was very time

10     consuming, and it was consistent.

11     As much as anything I would like

12     to say, we were consistent.  We

13     kept on this.  I'm telling you

14     right now, this was not an issue

15     that we couldn't just touch this

16     every once in a while.  You had to

17     stay on it, and you had to fight

18     it through.

19          MR. SEEGER:  How much of

20     your working time would you say,

21     from the time you were asked to be

22     involved in the project, did you

23     spend in terms of other

24     opportunities you might have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          gotten involved with or other

2          things you might have done with

3          your firm?  What percentage of

4          your time was involved?

5               MR. IRPINO:  Was involved in

6          Vioxx?

7               MR. SEEGER:  Yes.

8               MR. IRPINO:  Over 50

9          percent, but outside of that, I'm

10         not terribly comfortable.  I mean,

11         I basically worked on two main

12         cases.

13              MR. RAFFERTY:  And how many

14         lawyers are in the firm, Anthony,

15         during the time that you were

16         working on it?

17              MR. IRPINO:  During some of

18         the time, it was me.

19              MR. SEEGER:  You mean just

20         you and your firm?

21              MR. IRPINO:  Just me and my

22         firm.  During some of the time, I

23         had an associate, and even my

24         associate worked.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            MR. LEVIN:  Was that Amy

2       Dunn?

3            MR. IRPINO:  Yes.  Amy Dunn

4       was my associate.  Amy Dunn worked

5       at the U.S. Supreme Court.  I

6       mean, no dummy.  You are talking

7       about graduating from Georgetown,

8       very bright, worked at big, big

9       defense firms like 600-person

10      defense firms in Chicago and New

11      York, and she came in and helped

12      extensively with the Fifth Circuit

13      briefing.

14           MR. RAFFERTY:  I think we

15      only have a few minutes.

16           MR. SEEGER:  Actually, we're

17      out of time, but let's wrap up.

18           MR. LEVIN:  What else did

19      you do --

20           MR. HERMAN:  Talk about the

21      depository.

22           MR. IRPINO:  Okay.  The

23      depository is almost something

24      that's near and dear to me,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1          because we started out -- just so
 2          you know, I started getting
 3          involved, and there was a
 4          requirement --  I think this is a
 5          very good thing that should be
 6          done in all cases.  There was a
 7          requirement to say if you want to
 8          do work in the discovery
 9          committee, you need to go review
10          documents.  You need to get your
11          hands dirty, you need to go do
12          that.  So, I did that.  I went and
13          worked, and I did it where I could
14          and when I could, and there were
15          openings at the New York
16          depository, there were some
17          openings at the California
18          depository.  So, I went to each of
19          those.  As I said, I've never been
20          involved in a case where you had
21          four different document
22          depositories.  We were starting to
23          have some issues, and Penny Herman
24          was extensively involved, along
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          with Mike Wagner, with taking care

2          of a lot of depository issues.

3              In the beginning, it was

4          Seeger Weiss, Mike Wagner doing

5          everything.  I mean, doing

6          everything, and doing a phenomenal

7          job, by the way.  It was very

8          clear at some point to me that

9          that was going to be overwhelming

10         with everything that's coming up.

11         So, I suggested that we form a

12         document depository committee.  I

13         brought it --  I didn't just do

14         it, brought it to Troy, brought it

15         to Lenny, brought it to Russ.

16         They agreed.  They said, let's do

17         it, go do it, run with it, okay?

18             This wound up being a pretty

19         regularly scheduled meeting,

20         weekly meeting again.  We had

21         probably approximately 50

22         conference calls, 5-0, 50

23         conference calls to take care of

24         various issues that would arise at

FAC Resp. Exhibit D -- 570

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          the depositories.  And let me tell

2          you right now, the people who were

3          critical with that, Penny Herman,

4          Mike Wagner, critical.  I mean,

5          the job these two did, worked so

6          hard on this litigation.  I don't

7          know, Chris, you had better give

8          Mike Wagner -- I mean, the guy's

9          amazing --

10              MR. SEEGER:  Off the record.

11                  -  -  -

12              (Whereupon, an

13          off-the-record discussion was

14          held.)

15                  -  -  -

16              MR. IRPINO:  With these

17          guys, I just want to say the

18          dedication involved was extensive,

19          and the issues that would come up

20          with the depository were many.

21          Troy knows.  He was one of the

22          heads of the discovery.  I mean,

23          it was so extensive, so we needed

24          coordination, we needed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          communication.  I mean, you had

 2          four different depositories.

 3          You've got somebody in LA doing

 4          some of the same things that

 5          somebody in New York is doing, and

 6          we saw that.  We also needed to

 7          make sure --

 8               MR. SEEGER:  I want to be

 9          clear that people understand what

10          you are talking about, because we

11          needed to have the depositories

12          talking to each other so that we

13          don't have people doing things,

14          repeating things and duplicating

15          efforts, and that was what you got

16          involved in.

17               MR. IRPINO:  Absolutely.

18          That's what I started.  I mean, to

19          be fair, I was proud of that as

20          anything, just coming up with the

21          idea, let's do this.

22               MR. SEEGER:  There were like

23          four satellites at one point doing

24          their own thing.
```

Page 33

1             MR. IRPINO:  That was

2        exactly it.  So, we had to

3        coordinate that, we had to

4        communicate.  But also there was a

5        need for communication between the

6        depositories and the different

7        committees.  Science committee, we

8        needed to get materials to the

9        stroke expert.  Okay.  Well, who

10       is going to put that together?

11       How are we going to do it?  What

12       materials do we get?  When do you

13       need them?  What's the deadline?

14       We needed to know that.

15             We would identify these

16       issues and go over them.  There

17       were many other issues that came

18       up on a fairly regular basis.  One

19       was making sure that we made this

20       as efficient as possible.  We had

21       some worker bees, but sometimes

22       depositories would be overcrowded.

23       We didn't have enough stations,

24       particularly in New York at

FAC Resp. Exhibit D -- 573

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          certain times, because a lot of

2          people would go to the New York

3          depository.  Lenny, we went to

4          Lenny and said, Lenny, we need

5          more computers in the New Orleans

6          depository.  Do you remember that?

7               MR. DAVIS:  Yes.

8               MR. IRPINO:  So, Lenny got

9          six computers.  We increased the

10         number of spaces in New Orleans.

11              Then it was a matter of too

12         many people coming on the same

13         week.  We had to schedule that

14         out, okay?  Penny Herman did that.

15         Then there were issues with

16         third-party document productions.

17         How would they get Bates stamped?

18         Where would they go?  Who would

19         get copies?  Who would pay for the

20         copies?  All right.  We worked out

21         deals where Merck and us, we would

22         split those costs and Merck would

23         get a CD, we would get a CD.

24              Then it is a question of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          what depositions are we taking and

2          who needs what documents when?

3          And when do we prioritize that?

4          You don't want to be having

5          somebody reviewing Joanne Lahner

6          custodial files when you have got

7          a deposition of Marty Carroll

8          coming up in a week.  You want to

9          make sure that those assignments

10         get given out, and you need one

11         person to track the assignments.

12         So, we had Penny Herman in charge

13         of tracking those assignments.

14         Where does that start from, where

15         does it flow from?  Communication

16         amongst the depositories, making

17         sure that everybody knows what

18         everybody else is doing, what the

19         left hand is doing, what the right

20         hand is doing.

21              Let me just say another

22         thing.  There was a problem that

23         came up not only with

24         overcrowding, not only with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          working, but some workers in the

2          depositories, and you know this

3          happens, worker bees, they get

4          lazy, they go around.  So, we had

5          to track that.  We started

6          implementing different procedures

7          and time sheets and different

8          supervisory procedures.

9              I went to the depositories,

10          and at one point we did a

11          presentation.  There was one time

12          there was a problem where, at the

13          beginning, people were clearly

14          over -- being overinclusive with

15          their coding, particularly with

16          their hot doc coding.  So, Troy is

17          going to take a deposition and he

18          says, print me out our hot doc

19          custodial file for Marty Carroll.

20          We print it out, and it is 10,000

21          documents.  Well, what good is

22          that?  It did no good.  And we had

23          that problem at the beginning.

24          So, we had to change the mindset

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          of how people were coding.  So,

2          identify the problem, diagnose the

3          problem, and then solve the

4          problem.  We brainstormed it and

5          came up with, look, let's do an

6          educational session.  Troy

7          actually came in and did an

8          educational session in the New

9          Orleans depository for all of

10         those people.  I went to New York

11         and did an educational session

12         with them there.  We changed the

13         way people think.  Look, you don't

14         have to overcode.  Don't overcode.

15         That's a problem.  You are causing

16         more problems than good by

17         overcoding.  We had people hot

18         doc'ing articles.

19              MR. BIRCHFIELD:  Anthony,

20         with the limited time, one other

21         issue I would like for you to

22         address for me is, did you help

23         with any of the bellwether trials?

24         Talk about that.  Then any cases

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          that you had that were worked up

2          or advanced, just talk about any

3          cases in moving the docket, those

4          two issues.

5               MR. IRPINO:  I appreciate

6          you asking me that.  I did not

7          have extensive work on the trials,

8          but there was one trial that I

9          assisted with, and that was the

10         Dedrick trial, and that was the

11         one that Andy Birchfield, Leigh

12         O'dell tried.  And Russ Herman had

13         actually asked for volunteers for

14         people to assist Andy and Lee with

15         jury selection being from New

16         Orleans, knowing we are dealing

17         with a New Orleans jury pool.  So,

18         we assisted with that for about a

19         week.  It took about a week, and

20         it was extensive.  That Dedrick

21         trial I would wish on no one, but

22         we assisted with that process in

23         terms of the jury selection, and

24         we went -- you know, we go all in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1         and we do work, okay?  We got one

2         of our trial consultants to come

3         in, Victoria came in, Southern

4         Trial Consultants, assisted with

5         it.  We went to -- to tell you the

6         lengths we went to, she would

7         drive by houses just to see what

8         kind of information there would

9         be, bumper stickers or something

10        like that.  I mean, you know,

11        in-depth research so that we can

12        give -- you know, some of the

13        people were from Slidell.  What

14        does this mean?  What does this

15        person mean from Jefferson?

16        Giving Andy and Lee help with it.

17             And let me just talk about

18        that process for 30 seconds.

19        Camping out at the Lowe's Hotel I

20        think they were stationed in.  I

21        think they moved the entire

22        Beasley Allen office down here.  I

23        mean, that was an effort that you

24        want out of your trial teams.  I

Page 40

1          was very, very proud to be a part

2          of that effort.  It was extensive.

3          It was a, quote, loser case, and

4          it went full lore as if it was the

5          best case that you will ever have

6          a chance of winning.  That was a

7          pleasure to be a part of and a

8          great thing to see.

9               MR. BIRCHFIELD:  Y'all did

10          excellent work on the jury

11          selection.  I appreciate that.

12               MR. IRPINO:  Thank you.

13               MR. BIRCHFIELD:  What about

14          cases, did you have any cases that

15          were worked up to help move the

16          docket?

17               MR. IRPINO:  We had one case

18          that we helped -- that we had that

19          got us involved in the litigation,

20          and, unfortunately, that case did

21          not turn out to be a good case.

22          So, in terms of that aspect of it,

23          no.

24               MR. WEITZ:  How many cases

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          did you submit to the settlement?

2          Did you have cases you submitted

3          to the settlement?

4                MR. IRPINO:  We actually

5          took it out, because we didn't --

6                MR. SEEGER:  No, no.

7          Settlement.  How many cases did

8          you put into the settlement?

9                MR. LEVIN:  He had one case.

10               MR. IRPINO:  One case.  For

11         us, this was much more about

12         assisting with the MDL process and

13         effort and work product much more

14         so than focusing on any individual

15         cases or anything like that.  We

16         kind of went all in with that and

17         went about it that way.

18               MR. WEITZ:  When did you

19         originally get involved in the

20         litigation?

21               MR. LEVIN:  Through that one

22         case.

23               MR. IRPINO:  Through that

24         one case, we said, look, we want

FAC Resp. Exhibit D -- 581

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          to be --

2               MR. WEITZ:  To get involved

3          in the MDL and do some work?

4               MR. IRPINO:  Yes.  We want

5          to assist with the work product,

6          we want to assist with the work

7          done in the case.

8               MR. SEEGER:  All right.

9          Anthony, thank you very, very much

10         for everything.

11                    -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4  Public and Certified Court Reporter of

5  the State of New Jersey, Registered

6  Diplomate Reporter, Federally-Approved by

7  the United States District Court of

8  Pennsylvania, do hereby certify that the

9  foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22      Linda L. Golkow, RDR, CRR, CCR
        Notary Number:  1060147

23      Notary Expiration:  1.2.10
        CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 583

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -


FIRM: KASOWITZ BENSON TORRES & FRIEDMAN
      Daniel J. Fetterman, Esquire
      Christopher P. Johnson, Esquire


BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
      877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 584

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. FETTERMAN:  For those
 3         who don't know me, my name is
 4         Daniel Fetterman, and along with
 5         my partner, Chris Johnson, we're
 6         here today to present the
 7         application of Kasowitz Benson
 8         Torres & Friedman for an
 9         allocation from the common benefit
10         fund.
11              Kasowitz, Benson is a
12         national firm with approximately
13         290 lawyers which had over 250
14         clients in the national Vioxx
15         litigation.
16              Chris Johnson and I have
17         been the two partners principally
18         responsible for day-to-day
19         oversight of the Vioxx matters.
20         We have participation of numerous
21         partners and associates, including
22         Mark Kasowitz and Dan Benson, two
23         of the founding partners of the
24         firm, along with David Rossner,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        one of our senior bankruptcy

 2        partners.

 3             I want to say at the outset

 4        what a privilege it was to work

 5        with many of the talented lawyers

 6        in this matter, including many of

 7        you here today, and what an

 8        outstanding job was done in trying

 9        and prosecuting these Vioxx cases.

10             In this litigation, Kasowitz

11        Benson played a valuable and

12        substantial supporting role.  So,

13        I don't want to take more credit

14        than we deserve, but at the same

15        time, I welcome the opportunity to

16        set forth what I think were

17        unique, important and

18        qualitatively valuable

19        contributions to the national

20        Vioxx effort.  I use the word

21        "unique," because I think it's

22        fair to say that Kasowitz Benson

23        was different from most of the

24        firms in the national litigation
```

FAC Resp. Exhibit D -- 586

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          because Kasowitz, Benson is a

2          large national firm that does both

3          plaintiffs and defense work, and

4          as such, we were able to bring and

5          to provide valuable support by

6          bringing defense insight into the

7          overall litigation strategy and

8          for particular trial teams as they

9          prepared for trial.

10              We also had resources in

11         terms of manpower and money, which

12         the firm willingly contributed

13         whenever asked.

14              Kasowitz Benson was

15         consistently and intensely

16         committed to the common Vioxx

17         effort from beginning to end.  Our

18         substantial commitment included

19         approximately 4,000 hours that had

20         been accepted by the Wegmann-Dazet

21         firm, along with another

22         approximately 450 preMDL hours

23         that were not accepted because

24         they were preMDL.

FAC Resp. Exhibit D -- 587

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1            MR. HERMAN:  Wait one

 2       second.  You have 450 hours before

 3       the MDL, the Federal MDL was

 4       organized?

 5            MR. FETTERMAN:  Correct.

 6            MR. HERMAN:  You should

 7       submit those.

 8            MR. JOHNSON:  I think they

 9       are in.

10            MR. LEVIN:  They are under

11       review now.

12            MR. FETTERMAN:  We

13       contributed to the New Jersey

14       Vioxx effort from the outset with

15       the Seeger Weiss fund and

16       contributing to the public

17       relations fund, as well, when they

18       started.  And I think it is fair

19       to say that we remained committed

20       from the beginning to the very

21       end, by, among other things,

22       substantially contributing to the

23       document review, consulting on

24       strategy, assisting trial teams to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        prepare for trials through mock

2        trials, providing research and

3        editorial support, submitting

4        cases for trial in New Jersey,

5        although ours did not go, and

6        submitting our allocable share of

7        discovery cases in New Jersey in

8        the litigation, including late in

9        the game to put settlement

10        pressure on Merck, and also in

11        assisting with drafting of the

12        settlement agreement.

13            So, it's fair to say that

14        Kasowitz Benson was and remained

15        committed to the common Vioxx

16        effort from beginning to end.

17            And we had significant

18        partner participation.

19        Approximately eight partners

20        worked on the Vioxx matter,

21        including two of the named

22        partners, as I mentioned, two

23        senior trial counsel, which was

24        Chris Johnson and myself,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1       overseeing the day to day

2       litigation, and other partners

3       where appropriate.

4            We also had participation

5       from approximately 15 other

6       lawyers at all levels, including

7       special counsel, senior and junior

8       associates and staff attorneys,

9       and all 29 different legal

10      professionals from Kasowitz Benson

11      assisted in the common benefit

12      fund effort.

13           Addressing the quality of

14      our work, I'm happy to let members

15      of the panel who are here today

16      and are familiar with the quality

17      of the work that we produce speak

18      to that, but I think it's fair to

19      say that we expected and firmly

20      believe that we delivered the same

21      high quality for the national

22      Vioxx litigation projects as we do

23      for any of our defense clients.

24           With respect to the

FAC Resp. Exhibit D -- 590

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1    litigation, our common benefit

2    efforts primarily centered in the

3    New Jersey litigation, because all

4    of our firms' cases were filed in

5    New Jersey.

6         I would like to now walk

7    through a little more specifically

8    the contributions that we made.

9         From the outset, Kasowitz

10   Benson's participation in the

11   litigation, which began in

12   February of 2005, shortly after

13   Merck's withdraw of Vioxx, we

14   supported the national litigation

15   effort.  And when we first became

16   involved, we talked to Chris

17   Seeger and Dave Buchanan, and we

18   asked them how we could help the

19   common effort.

20        And Seeger Weiss asked us to

21   do two things, both of which we

22   did.  One was to contribute to a

23   common fund.  They had a computer

24   system setup, and we made a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          contribution to that fund.  And

2          the second was to assist in the

3          review of millions of pages of

4          Merck documents.

5               According to our time

6          records, we devoted over 1,000

7          hours to the common discovery

8          effort, a substantial portion of

9          which involved reviewing Merck

10         documents at Seeger Weiss.

11         Indeed, we regularly sent one or

12         two associates at a time down to

13         Seeger Weiss' offices to review

14         those documents.

15              And among other things,

16         Kasowitz Benson lawyers reviewed

17         documents for Ray Gilmartin's

18         deposition and documents

19         concerning Alise Reicin.

20              MR. SEEGER:  Let me just

21         take one moment, because it is

22         important because we have a lot of

23         different types of people doing

24         different things in the case, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        they always sent very high quality

2        lawyers to the document review.

3        It was real document review by

4        people who were good at spotting

5        documents.  I just want to make a

6        note of that for the record.  As

7        opposed to somebody parking like

8        the contract lawyer in the

9        repository.  It was very different

10       for that.

11              For depositions, I know that

12       you guys would get a big dump of

13       documents, and your people would

14       go through them, and then we would

15       get back the best of.

16              MR. FETTERMAN:  Thank you.

17              I would like to address the

18       activities that Kasowitz Benson

19       participated in, including

20       bellwether trials and nonMDL

21       trials that impacted proceedings

22       on the common benefit level.

23              Kasowitz Benson also played

24       a substantial role in assisting

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1       specific trial teams in evaluating

2       and preparing their cases for

3       trial in four significant cases by

4       sharing our defense perspective

5       and anticipating Merck's defenses

6       as Merck adjusted and adapted

7       those defenses.

8              We also contributed to the

9       common benefit by participating in

10      the education of approximately 250

11      Vioxx lawyers from across the

12      country, and I'll describe those

13      efforts now in more detail.

14             We were initially asked by

15      Mark Lanier and Rick Meadow if we

16      would be willing to assist them in

17      preparing the Lanier trial team

18      for what turned out to be one of

19      the most significant bellwether

20      trials in the national litigation,

21      the Ernst trial.  We took that

22      role seriously and prepared for

23      that mock as if it were our own

24      case.  We retained a cardiologist

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 594

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        to advise us on specific

2        causation, focusing on where we

3        thought Merck would try to exploit

4        potential weaknesses in that case,

5        particularly with respect to

6        specific causation and the

7        coroner's observations that she

8        found no evidence of a heart

9        attack, that Ernst had died of

10        natural causes, specifically

11        arrhythmia, and that Ernst had

12        risk factors for arrhythmia and

13        the like.

14            Mark can speak to the value

15        that we added in his preparation

16        for that trial, but it's fair to

17        say that we had a spirited mock

18        trial, and I am still nursing the

19        battle scars from that.

20            As we all know, Mark did a

21        brilliant job in trying that case,

22        which resulted in an over $250

23        million jury verdict in a very

24        difficult case and set the tone

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          for the entire Vioxx litigation.

2               I believe as a result of

3          that work, I was also asked to

4          participate in a continuing legal

5          education mock trial put on by the

6          Association of Trial Lawyers of

7          America in New Orleans for

8          approximately 250 Vioxx lawyers

9          from around the country in May of

10          2005.  Specifically, I was asked

11          to give the closing argument for a

12          hypothetical Vioxx case, the Smith

13          case, to teach Vioxx lawyers how

14          to try these cases.  This time

15          Mark and I were on the same team,

16          Mark opened and I closed.

17               Again, Kasowitz, Benson took

18          its role seriously, prepared

19          approximately 100 PowerPoint

20          slides, which included

21          professional medical graphics and

22          which marshalled all the then

23          available evidence in support of a

24          Vioxx claim as a road map for

FAC Resp. Exhibit D -- 596

Page 14

1    other trial lawyers in the

2    national litigation.  And we

3    shared that at the mock.

4         That presentation was very

5    well received, and I'm happy to

6    report that Mark and I were

7    victorious in the Smith case.

8         Again, I had the privilege

9    of participating in a mock trial

10   for the second case that went to

11   trial in the New Jersey

12   litigation, the Cona/McDarby case,

13   with Mark Lanier, Perry Weitz and

14   Rob Gordon.

15        In that case, in that mock,

16   Perry and I defended Merck against

17   the formidable team of Mark Lanier

18   and Rob Gordon.  Again, we

19   prepared for that mock as if it

20   were our own case.  Kasowitz

21   Benson prepared approximately 90

22   slides for that, including

23   professional graphics.

24        The case was tried to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      first win in New Jersey, and I

2      believe the second win in the

3      overall litigation, with the trial

4      team winning approximately $13

5      million in damages and attorneys'

6      fees.  And, again, another

7      important bellwether case for the

8      national litigation.

9           Addressing the fourth mock

10     that I participated in, I was

11     asked by Chris Seeger and Sol

12     Weiss to assist them in vetting

13     the next group of cases that were

14     on the New Jersey trial calendar

15     for the estate of Steven Hatch and

16     Robert McFarland.  They were

17     concerned about how these

18     plaintiffs, how well these

19     plaintiffs would do at trial, and

20     asked if I would cross the actual

21     plaintiffs so they could test how

22     they would hold up in a courtroom

23     setting.  This case was

24     significant, because at the time

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        in the New Jersey litigation, the

 2        win/loss record was 1 and 1.  At

 3        the mock, Kasowitz Benson

 4        presented Merck's arguments on

 5        both general and specific

 6        causation, and I prepared for and

 7        cross-examined these plaintiffs

 8        just like I would have had I been

 9        defending Merck at trial.

10             Robert McFarland had a heart

11        attack, but during the

12        cross-examination, we showed a

13        video of him hiking with his

14        family and water skiing after his

15        heart attack, seemingly in perfect

16        health, and argued that his eating

17        habits, particularly the eggs,

18        sausage and butter that he had

19        regularly for breakfast and other

20        significant risk factors caused

21        his heart attack, and not the

22        Vioxx.

23             With respect to Mr. Hatch,

24        we argued that Hatch did not have
```

FAC Resp. Exhibit D -- 599

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          a heart attack, but instead he

2          died from an arrhythmia, that the

3          evidence of his biofuse was

4          sketchy at best.  We also

5          cross-examined Mrs. Hatch on her

6          work for this prescribing doctor's

7          office, for taking Vioxx for her

8          husband without recording it in

9          his chart and other problems with

10         her testimony.

11              Neither plaintiff fared well

12         in that mock trial, and

13         plaintiff's counsel decided not to

14         move forward with the trial of

15         those cases.

16              Finally, we were asked to

17         participate in the mock for the

18         Humeston II trial, the retrial of

19         the Humeston case, where we

20         presented Merck's general

21         causation arguments at the mock

22         trial with the Lanier and Seeger

23         Weiss firms.  Humeston II, as you

24         all know, resulted in a total

FAC Resp. Exhibit D -- 600

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1          damages award of over $47 million.

 2          Again, a bellwether trial for the

 3          national Vioxx litigation, and a

 4          far better outcome for the New

 5          Jersey litigation for the ultimate

 6          settlement than if the

 7          Hatch/McFarland trial had

 8          proceeded.

 9               In sum, Kasowitz Benson

10          assisted in preparing the trial

11          teams in three of the five winning

12          national Vioxx trials and helped

13          to vet a losing trial before it

14          occurred.  We also assisted in the

15          education of Vioxx lawyers

16          throughout the country through our

17          participation in the ATLA

18          continuing legal education program

19          in New Orleans.

20               We had other contributions.

21          In general, I would like to go

22          through some of those.  We

23          reviewed STI documents, prepared a

24          PowerPoint, and were in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          process of preparing for STI

2          depositions when the settlement

3          occurred.  We assisted with

4          general strategy and settlement

5          issues.  We provided research and

6          editorial support for the forum

7          non conveniens brief filed in New

8          Jersey, and we provided assistance

9          in drafting the settlement

10         agreement, particularly with

11         respect to letter of credit

12         issues.

13              To wrap up, we submitted

14         approximately 4,395 hours in time,

15         and $47,471 in expenses.  Based on

16         our current hourly rates, the

17         value of our time and expenses is

18         approximately $2.1 million,

19         2,132,370 to be more specific.  We

20         respectfully ask that the fee

21         allocation committee recommend

22         that we receive that amount times

23         whatever multiplier deemed

24         appropriate to recognize Kasowitz

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      Benson's qualitative contributions

2      and commitment to the national

3      Vioxx litigation.

4           I also want to say, on

5      behalf of Kasowitz Benson, what a

6      privilege and how much fun it was

7      to participate in this important

8      national litigation with you and

9      other Vioxx counsel, and we look

10     forward to the next one.

11          Thank you.

12          MR. SEEGER:  Nicely done.

13     And I think from my perspective,

14     you did a very good and accurate

15     job in describing the work you did

16     in the litigation.

17          MR. LEVIN:  I'm from the

18     MDL, and I know not anything other

19     than what you did on the

20     settlement agreement, but it

21     confirms what others in New Jersey

22     said --

23          MR. SEEGER:  By the way, I

24     might have lost focus, but did you

FAC Resp. Exhibit D -- 603

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        have that in there?
 2             MR. LEVIN:  Yes, he did,
 3        because I said to Chris, you've
 4        got to go to somebody that knows
 5        what they are doing on a letter of
 6        credit, and he mentioned your
 7        firm.  And I said they do.
 8             MR. WEITZ:  They are a
 9        perfect example of a firm that, if
10        you were in New Jersey, you knew
11        was extraordinarily helpful in a
12        lot of ways, but probably did not
13        transcend to the MDL.  They were
14        there every time anybody asked to
15        help, and their work was
16        absolutely first class.
17             Arnie, do you have the right
18        expenses?
19             MR. LEVIN:  I don't have
20        them, but I'm sure they are okay.
21             MR. WEITZ:  What was your
22        number again?
23             MR. JOHNSON:  47,000.
24             MR. LEVIN:  I think 47 is
```

FAC Resp. Exhibit D -- 604

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          exactly what I remember.

2                MR. SEEGER:  Dan, how many

3          individual cases do you have that

4          you are putting through the

5          settlement?

6                MR. FETTERMAN:  It is about

7          260.

8                MR. SEEGER:  Like I said,

9          that's a very accurate

10         presentation.  I know what you did

11         for us in the litigation.  It

12         really was a pleasure working with

13         you from my perspective.

14               MR. LEVIN:  It is a pleasure

15         not working with you and meeting

16         with you.

17               MR. SEEGER:  I don't have

18         any other questions.  Thank you.

19                     -   -   -

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1           C E R T I F I C A T E

2

3           I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13           I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 606

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM:  KLINE & SPECTER, P.C.
       Thomas R. Kline, Esquire
       Shanin Specter, Esquire
       Lisa Dagostino, M.D., J.D.
       Kathy Spurka
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

                                                    Page 2

1                    -  -  -

2                MR. KLINE:  For the record,

3           I'm Tom Kline from the law firm of

4           Kline & Specter.  I'm here with my

5           partner, Shanin Specter, Lee

6           Balefsky, my partner, recent

7           partner, Lisa Dagostino, and legal

8           assistant, Kathy Spurka.

9                I want to start out with a

10          story, which those of us who

11          labored in the trenches I think

12          will appreciate, and some of you

13          will indulge me because you may

14          have heard it before.

15               It was the night before

16          Jerry Avorn's deposition, and I

17          was coming back from a good steak

18          with Buchanan and Tisi.  Actually,

19          I think Buchanan had two steaks

20          and a couple of drinks.  We were

21          staying at not the Four Seasons,

22          but the Sheraton in Boston where

23          the deposition was going to take

24          place.  There was a Lions

Page 3

1    Convention in town at the time.

2    We got in the elevator with a

3    fellow who, to use a word or a

4    description that I've heard Mark

5    Lanier use during the course of

6    this litigation, he looked like he

7    was a pork chop away.  He was a

8    man who looked like he had every

9    one of the comorbidities that any

10   of our Vioxx clients had.  He was

11   short, he was obese, he looked

12   like, if I were to make a

13   diagnosis on the spot, he had

14   hypertension.

15        MR. LEVIN:  Objection.

16        MR. KLINE:  He looked like

17   he had diabetes based on my

18   analysis of the man.  As we were

19   going up the elevator on the 7th

20   floor, I said, admittedly after a

21   couple drinks, let me ask you a

22   question, and pushing 60 at the

23   time, I could say this, "I said,

24   pop, have you ever been on the

Page 4

1          drug Vioxx?"  And he looked at me

2          nonplused, like he had never heard

3          of it before, and his wife looked

4          at me and said, no, but if you

5          have some, mistaking it for some

6          other drug with the letter V, if

7          you have some, I think we'd like

8          to get it.

9               There are two points that I

10         take from the story.  The first

11         is, that was the teamwork and

12         camaraderie of the Vioxx

13         litigation.  Any of us who stayed

14         up until the wee hours of the

15         morning, like I think everyone in

16         this room, everyone who labored in

17         the trenches of this litigation,

18         knows what it feels like to pull

19         together like we all did in a

20         remarkable effort.

21               And the second point that I

22         would make is, the story tells me,

23         as I reflected on it, just how

24         difficult we all knew the task was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1     and how we understood the

2     causation problems, the patient

3     population and the convincing that

4     it was going to take to win these

5     cases.

6          If I can start with the

7     first slide, I would start my

8     presentation with a quotation from

9     C.S. Lewis, and I think it is

10    apropos to my endeavors here

11    today.  "We all wish to be judged

12    by our peers, by the men 'after

13    our own heart'.  Only they really

14    know our mind and only they judge

15    it by the standard we fully

16    acknowledge.  Theirs is the praise

17    we really covet and the blame we

18    really dread."

19          You will see where I'm

20    going.  My presentation today I

21    see as more creating a necessary

22    record than to convince this panel

23    of colleagues who appreciate our

24    firm's, among many other firm's,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1          including those at this table,

 2          contribution to the Vioxx

 3          litigation.

 4              Our firm has many

 5          experienced trial lawyers, lawyers

 6          experienced in mass tort and

 7          catastrophic injury.  We brought a

 8          team, and I calculated this

 9          yesterday, to this litigation with

10          over 100 years of lawyering

11          experience and 40 years of medical

12          experience.  We were there at the

13          beginning, as those at the table

14          know.  We made a major

15          contribution, I believe, and that

16          contribution, as I said, was made

17          not only by our firm, but by many

18          other firms.

19              The litigation settled on

20          the strength of the collective

21          work that essentially is now

22          memorialized in something known as

23          the trial package.  It is heavy

24          with science and medicine and as

FAC Resp. Exhibit D -- 612

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
1        technical and complex as I've seen
2        in 30 years of litigating complex
3        drug product cases, back to the
4        first one which I tried, which was
5        a Dalkon Shield case.
6             On the day that this case
7        settled, and I take us back to the
8        words of praise by C.S. Lewis, and
9        we were headed to New Orleans, I
10       received the kindest note, kindest
11       note from Russ Herman, inviting
12       our firm to a dinner in New
13       Orleans with the highest praise,
14       which was appreciated then and
15       appreciated now.  I return that
16       praise, Russ, I return that praise
17       by saying we appreciate your
18       leadership.
19            His e-mail in the invitation
20       said, "Your firm's team is and has
21       been integral to all efforts."  My
22       presentation today will describe
23       all of those efforts and how they
24       were, I believe, integral to a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1      collective effort that was made in

2      this room and throughout the

3      United States.

4           An overview.  If you guys

5      can just wait for me on the

6      slides.  We're among friends.

7           Here's how I see the

8      overview for what we've done in

9      showing how our role was integral.

10     We were involved since back in

11     2003.  No one at this table knows

12     better than Chris Seeger.  We, of

13     course, provided litigation

14     funding and took the risk with all

15     of those here.  We developed a

16     substantial portion of the

17     liability case principally through

18     depositions of Merck executives,

19     scientists, key third parties,

20     developed experts and did

21     extensive, I mean extensive

22     document review.

23           Next we developed a

24     substantial portion of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      causation case, including

2      depositions, expert development,

3      medical literature review, work on

4      mechanism of action and

5      pharmacology.  This was the

6      scientific puzzle that we all

7      struggled with in the beginning.

8           If I might complement her,

9      Lisa Dagostino did the work in the

10     trenches, along with many others

11     whose names are familiar, Dave

12     Buchanan, very notably, as well as

13     others.

14          We did expert development,

15     and I'm going to discuss that with

16     you, and extensive document

17     review.  Trial package development

18     included significant portions of

19     the trial package, which I'll

20     discuss.  We were involved in the

21     preemption briefing in which Arnie

22     took the lead.  We worked very

23     closely, as everyone knows.  Lisa

24     argued the factual portion, while

FAC Resp. Exhibit D -- 615

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          others argued the other portion.
 2                  We were intimately involved
 3          in the trial, not only trial
 4          selection, but trial strategy, in
 5          many aspects of it, both formally
 6          and informally, as this litigation
 7          progressed.
 8                  I know it's important, so my
 9          next slide deals with leadership
10          positions and committee
11          memberships.
12                  The next slide on committee
13          memberships and leadership
14          positions, again, I believe most
15          people, if not everyone at the
16          table, knows our various roles.
17          Lee Balefsky and I were not only
18          at the status conferences, but we
19          were asked to be part of the
20          premeets with Judge Fallon and
21          were there, and I know viewed by
22          those in leadership in this
23          litigation as an important and
24          integral part of the think tank,
```

FAC Resp. Exhibit D -- 616

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           if I could call it that.

2                Lee Balefsky was a member of

3           the discovery committee, liaison

4           counsel, and we were tasked with

5           developing significant parts, as

6           you know, of the stroke package.

7                Lisa Dagostino, her

8           membership on the science

9           committee is well known to

10          everyone at this table and the

11          countless hours -- I guess they

12          are not countless, because they

13          are counted -- but the hours which

14          amount to literally two years of

15          full-time work.

16                Lisa, as everyone knows, is

17          a physician and an attorney and

18          among the most knowledgeable, by

19          anyone's account, in the

20          litigation of the science and

21          medicine of Vioxx.  It's probably

22          only a shame for the victims of

23          Vioxx that Lisa Dagostino wasn't

24          Alise Reicin, because there may

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1          not have been that tragedy.

 2                  As part of the science

 3          committee, Lisa undertook an

 4          extensive review of the underlying

 5          medical files for adverse events

 6          in the Merck trials.  Those at

 7          this table who were in the

 8          litigation part of this know that

 9          that was the, quote, adjudication

10          project.  That was some of the

11          most tedious work in dragging down

12          and undercutting the underbelly of

13          the various Merck studies,

14          especially the VIGOR trial, and

15          Lisa was involved.

16                  Moving to depositions.

17          Depositions of key Merck

18          scientists and executives, I think

19          probably our firm made one of its

20          most significant contributions

21          here.  I can tick them off.

22          Shanin Specter was one of the

23          three who deposed Ray Gilmartin, I

24          remember those days well, as will

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        Chris Seeger and Mark Lanier.

2              Ed Scolnick, I, in

3        particular, did what was then

4        called the label module.  It took

5        us all collectively, until my

6        redirect-examination, to figure

7        out that Ed Scolnick never

8        finished his residency and was

9        never board certified, and that's

10       why he didn't practice medicine.

11       That is a little historical fact

12       for those in the room who would

13       appreciate it.

14              Shanin, on four different

15       days, relentlessly and doggedly

16       day after day went after Peter

17       Kim, one of the best witnesses

18       that Merck had.

19              I've always to this day

20       thought that Alise Reicin loathed

21       Lanier more than me, but I had

22       three different cracks at her and

23       probably the best day of the

24       litigation, and I mean this,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1        because we all know Mark Lanier's

 2        contribution to this litigation.

 3        I was only lucky enough to be

 4        there when Chris Seeger ran into

 5        the room on the record, Mrs.

 6        Golkow will testify to this under

 7        oath, and said, we got a verdict,

 8        $250 million, and we were on the

 9        record.  True, Linda?

10             THE COURT REPORTER:  Yes.

11             MR. KLINE:  I said to Alise

12        Reicin, so, what do you think

13        about that, Dr. Reicin?  I was

14        only there to ask her what she

15        thought about it, Lanier got the

16        verdict, and it was a turning

17        point.

18             I was talking to Rick Meadow

19        today out in the hall, because

20        this is a time, I guess, to

21        reminisce, too, about how the

22        State cases and the Federal cases

23        and the effort, as I'm going to

24        talk about in a moment at the
```

FAC Resp. Exhibit D -- 620

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          Topol deposition, became a

2          collective one.  Everybody from

3          California to New Jersey, coast to

4          coast, banded together in this

5          litigation.  That's something I'm

6          proud of.

7               If I can have like one

8          little gem that I take credit for,

9          I want one little thing, defender

10         of the franchise.  Actually, Lisa

11         found it.  I only got, as Shanin

12         Specter would say, quoting Winston

13         Churchill, the roar.

14              Deborah Shapiro was taken by

15         Shanin Specter.  As you know, it

16         is the only evidence that Judge

17         Higbee found sufficient to present

18         to the jury on punitive damages in

19         Cona/McDarby, the Cona/McDarby

20         trial.  I have, and I know Mark

21         will indulge me with the e-mail

22         later in showing it, but I have

23         the nicest e-mail between Shanin

24         and Mark, which I would like to

Page 16

```
 1          share with this group, because I

 2          think it shows, again, our

 3          integral part.

 4               Continuing along, these were

 5          the key Merck scientists and

 6          executives.  For two days, Shanin

 7          went at Alan Nies on the early

 8          development of the drug, the

 9          pharmacology, backed up by Lisa.

10               We do not take credit for

11          the developing of the marketing

12          part of this case, it was ably

13          developed by other lawyers, but I

14          might add, we just wanted our toes

15          in the Anstice water, and so Lee

16          Balefsky got a small crack at him

17          that day.

18               Continuing along, Barry

19          Gertz, as you all know, he's a

20          pharmacologist, he was a key guy,

21          and it was a very technical

22          deposition taken by Mark Hoffman

23          with something near 30 years of

24          experience as a former transplant
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1      surgeon, and one of the early

2      developers and persons who figured

3      out the science of this

4      litigation.

5            Tom Simon, the GI doc who

6      designed the VIGOR trial, was

7      taken on two separate days by Mark

8      Hoffman.

9            Continuing along, Kathy

10     Metters, who was the head of basic

11     research of Merck, you will all

12     remember the so-called claw back

13     document, the patent document.

14     That's what this deposition was

15     all about.

16            On this page, I've lumped

17     her with Joe Lynch, who was taken

18     by Shanin, and Lisa questioned

19     him, and that was the infamous

20     green monkey study.  Here's a

21     point that may get lost in the sea

22     of work that was done by so many

23     lawyers.

24            The green monkey study was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        major defense, as was the defenses

 2        presented by Metters.  It was

 3        neutralizing those defenses, not

 4        only presenting the evidence that

 5        we developed, but neutralizing the

 6        defenses, neutralizing the Peter

 7        Kims, neutralizing the Metters,

 8        neutralizing the Lynches of the

 9        Merck stable that contributed

10        significantly.

11            There were many trials in

12        this litigation, as we all know,

13        and we provided direct support and

14        assistance, deposition cuts, all

15        kinds of assistance.  I know that

16        in your small group, Andy can

17        speak to that.  He knows that we

18        were there, as does Chris and

19        others at these trials, during

20        these trials, for these trials.

21            Speaking of trials, I want

22        to, in passing, mention one case

23        which never did try.  That was the

24        Abrams case.  It was listed as the
```

FAC Resp. Exhibit D -- 624

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        second MDL trial.  It was listed

2        in early 2006.  It was a

3        disappointment to pull that case.

4        After consulting with all of the

5        PEC, including Andy and Chris and

6        Russ and Arnie, I might add, as

7        well, we unanimously agreed that a

8        late discovered document made the

9        case undesirable as a bellwether

10       case.  I know that was a

11       disappointment to all of us, and I

12       know it was a disappointment to

13       Judge Fallon, but for those of us

14       who were involved in the decision,

15       I still think that it was the

16       right decision.

17            Depositions in this

18       litigation of third parties were,

19       as everyone here knows, very

20       important.  I was given the

21       responsibility to be involved in

22       taking two of what we at the time

23       in the trenches called the

24       third-party trinity, Topol, Graham

FAC Resp. Exhibit D -- 625

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1      and Nissen.

 2           The deposition of Eric

 3      Topol, which, of course, was

 4      extremely critical of Merck's

 5      conduct, was played at, I believe,

 6      every trial, certainly every trial

 7      which ended in a plaintiff's

 8      verdict, but I believe every

 9      trial.  He debunked many of the

10      theories.  It was our most solid

11      evidence on debunking Merck's

12      interpretation of the APPROVe data

13      that the increased risk of Vioxx

14      only happened at 18 months.

15           I could not have done that

16      deposition without Mark Lanier.

17      He and I know it.  He and I were

18      collaborators in a backstory that

19      probably will never be told on a

20      record.

21           MR. LANIER:  But it was a

22      darn good story.

23           MR. KLINE:  It was a hell of

24      a story, and it was one of the

Page 21

```
 1        most fun things that I ever did as
 2        a lawyer.
 3             David Graham, his deposition
 4        was taken by me, and we know the
 5        story there.  He was the chief
 6        critic.
 7             Nissen was Topol's co-author
 8        and FDA Advisory Committee member,
 9        and Lisa worked extensively with
10        Chris Tisi on this litigation.  I
11        would be remiss, because I labored
12        so many hours, as did Lisa in
13        particular with Chris Tisi, and I
14        know it is my time to make a
15        pitch, but I can tell you that
16        Chris Tisi was the dogged pursuer
17        of the MDL third-party strategy.
18        He kept saying, let's take these
19        deps, let's take these deps, and
20        Topol was worth it, and we offer
21        congratulations to him.
22             I was responsible to go off
23        and take Curfman.  We all know how
24        the New England Journal was in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

 1        middle of the fray.  I went up and

 2        took Curfman's deposition after

 3        the Expression of Concern was

 4        written.  It became a very

 5        important corollary to what was

 6        going on at that time.

 7             Jerry Avorn, Chris Tisi ably

 8        took it.  Mark Lanier at trial did

 9        it live, and Lisa did much of a

10        background and prep work on that.

11        I went up there for the

12        deposition, because somehow my

13        being there was supposed to

14        neutralize Phil Beck or something

15        like that.  I don't take any

16        credit for it, other than Lisa did

17        all the background work on Avorn.

18             And then, finally, I was up

19        there when they sent the dogs out

20        after Eric Topol and they decided

21        that Mal Mixon, the chairman of

22        the board of trustees of the

23        Cleveland Clinic, was going to

24        trash the guy.  I was sent to do

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1        the cross-examination.  I don't
 2        remember seeing that deposition
 3        played during the course of the
 4        Vioxx litigation, as I recall it.
 5             Expert development.  A word
 6        about it, if I may.  We were
 7        involved in much of the major
 8        expert development in this
 9        litigation.  Jerry Avorn -- I'm
10        going to pass over a lot of this
11        quickly for the sake of time --
12        but they are names that are
13        familiar to everyone here.  Avorn
14        was clearly, in my view, was the
15        most distinguished expert.  Tisi,
16        Buchanan, Grand from Seeger Weiss,
17        the latter two did phenomenal
18        work, along with Lisa, in a key
19        deposition, as I believe we all
20        agree.
21             Ray, another highly
22        credentialed expert.  Lisa
23        Dagostino, Tisi and Buchanan
24        prepping him for a de bene esse
```

FAC Resp. Exhibit D -- 629

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1      deposition.  And then there were

2      other experts, as well, that we

3      spent much time working with in

4      expert development, and that

5      includes Pace-Asciak, Parisian,

6      Levine, who is the stroke

7      expert -- I'll speak to that in

8      just a moment, I'll speak to

9      Feldman in a moment, who, in the

10     stroke part of the trial package,

11     was a project among many people,

12     including Mike Wenkowitz of Arnold

13     Levin's office and Lisa Dagostino.

14          That takes us to the trial

15     package.  It's kind of like a tour

16     of the Vioxx litigation, by the

17     way.

18          The trial package, I would

19     make just a few points.  The trial

20     package has been described, I've

21     heard it described as probably the

22     best trial package ever put

23     together in mass tort litigation.

24     It was a comprehensive effort of

FAC Resp. Exhibit D -- 630

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          many people who put in countless

 2          hours in the project.

 3               I would say a couple of

 4          things about our contribution.

 5          The documents which are sitting

 6          with Lisa to her right, if I can

 7          just have them in my hand for a

 8          moment, are really three.  They

 9          became really the guide, if you

10          will, the way that someone would,

11          along with the updated --

12               MR. SEEGER:  Your time --

13               MR. KLINE:  I am going to

14          make it, and I appreciate the

15          indulgence.

16               -- along with the road map,

17          and what do you call the initial

18          --

19               MS. DAGOSTINO:  The theme

20          grid.

21               MR. KLINE:  The theme grid.

22          Along with the theme grid, which

23          the trial committee updated, which

24          was the original work of Buchanan,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1        et al., Seeger, et al.  She

2        compiled the dictionary of terms,

3        the list of 3,200 articles in

4        Vioxx, which Lisa Dagostino

5        labored through and actually knows

6        and actually read.

7            This is essentially our data

8        bank, as is the cast of

9        characters, which essentially is a

10       road map of the who's who.  I know

11       this committee is familiar with

12       all of them.

13           In addition, we were

14       involved in doing all the things

15       that went into the package, which

16       is the deposition cuts, the

17       modules, et cetera.

18           I want to lead into my last

19       four minutes with "In the words of

20       our peers," this litigation was a

21       team effort.  I just want to show

22       a few things, and I know that

23       those who wrote them will be okay

24       with it, I guess is what I want to

Page 27

1      say.
2              First of all, Lanier.  This
3      is on the Topol deposition, and I
4      like it and I saved it.
5              "Put down your
6      computer/Blackberry."  He was in
7      England.  "Go Outside...Listen.
8      ..can you hear that???  Can you
9      hear the applause?"  This is
10     classic Lanier, I might add.  "It
11     is coming from England...The
12     applause is so loud, it is
13     traveling the Atlantic.  I just
14     read the Topol depo.  If that is
15     not your best work, I would love
16     to see what is!  Fantastic!!!
17     Absolutely fantastic!!!  My
18     compliments and praise...Happy
19     Thanksgiving."
20             That was followed by a whole
21     bunch of e-mails about Bob Dylan,
22     which are not part of this
23     presentation.
24             From Mark, again, a very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          nice note saying, "Lisa/Shanin/

2          Tom's incredible depositions of

3          Shapiro/Topol."

4                I would like to share with

5          this group a really nice e-mail

6          between Shanin and Mark.

7                If we can skip this one and

8          go to the next one, which is, "We

9          got to punies because of you,"

10         said Lanier.  "Judge denied motion

11         to dismiss!!!

12               Specter quoting Churchill.

13         "I 'had the luck to give the

14         roar.'  Lisa Dagostino deserves

15         the credit."

16               And Lanier.  "You were

17         played in closing puni argument...

18         Great find and delivery from you

19         and Lisa both!!!"

20               Next, speaking to the

21         trials, our involvement in the

22         various trials, Steve Knowlton of

23         the Locks firm saying, "Please

24         tell Tom thanks for me.  Your

FAC Resp. Exhibit D -- 634

Page 29

1        work, as a firm, has been an

2        essential part of the case."

3            Pete Kaufman writing from

4        the Levin Papantonio firm.  "Lisa,

5        your contributions to the trial

6        package have been astonishing.  If

7        I knew a word better than

8        'astonishing,' I would use it."

9            And Chris Tisi saying, "Wow!

10       Lisa and Kathy...this is great to

11       have.  You are fantastic."  This

12       is a kudos to the many hours of

13       work that was done by Kathy

14       Spurka.  No Arnie, you cannot have

15       her back.  "You guys are the best.

16       I particularly want to thank

17       Kathy."

18           And finally from Russ, very

19       kindly sending to Lisa and telling

20       here, "Excellent work as usual."

21           And finally another e-mail

22       again from Russ in his true

23       gentlemanly style.  We in the

24       north still have much to learn

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        from you, Russ.  It says here, "I

2        personally appreciate your

3        continuous work at a level of

4        excellence.  Trial package and

5        everything you have touched has

6        been top notch.  Take care and

7        thanks."

8              My very few concluding

9        thoughts.

10             MR. SEEGER:  Wait a second.

11        You don't have one nice e-mail

12        from me?

13             MR. KLINE:  You didn't send

14        me an e-mail or I would.

15             MS. DAGOSTINO:  We had to

16        redact certain words.

17             MR. HERMAN:  Mark recants,

18        but I don't.

19             MR. SEEGER:  I should have

20        written at least one nice e-mail.

21             MR. KLINE:  You didn't write

22        one to me, but you told me so.

23             MR. SEEGER:  Yes, I did.

24             MR. KLINE:  Here's the laugh

Page 31

1        line.  Here is my laugh line.

2             "I can live on a great

3        compliment for two months."  Mark

4        Twain.

5             Here's my last point.  This

6        was my official presentation, and

7        thank you for indulging me.  Thank

8        you again.  This was a successful

9        group effort.  Different people in

10       different firms did different

11       valuable things.  The

12       significantly contributing firms

13       of the PSC, of which ours is

14       clearly one, should be recognized

15       and recognized at the same

16       multiplier without

17       differentiation.  That's our view

18       of it.  Our work was undoubtedly

19       integral in the establishment of

20       the settlement and the success of

21       the litigation.

22             Thank you.

23             MR. HERMAN:  Let me say a

24       couple of things at this juncture.

Page 32

1            First of all, you made a

2       good move by making Lisa a

3       partner, because there are other

4       members of the PSC that if you

5       didn't, we would.  She would be

6       welcome at any time in any one of

7       the firms.

8            MR. LEVIN:  I have a

9       question, if I may interrupt you.

10           MR. HERMAN:  Wait a second,

11      it's my turn.

12           I want to thank Lisa

13      particularly.  The trial package

14      to me is one of the most important

15      single things that we can do,

16      because it justifies a common

17      benefit fee.  Individual trials,

18      those that won, some that didn't,

19      depositions, document review, we

20      all know what that is as lawyers.

21      But the ability to resolve the

22      case and at the same time produce

23      a trial package that no one can

24      deny cures a lot of issues in any

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          view, and it's why I pushed so

2          hard for it.  I think we had our

3          best people on that committee in

4          terms of knowing the case.  Or I

5          should say representatives of the

6          best firms who know the case on

7          that committee.  Others were

8          trying cases at the time.

9               The reason for that is

10         everybody has got the opportunity

11         in this case to opt out.  You

12         don't have to opt in.  And in

13         order to justify the ethical

14         concerns, you have to have some

15         balance on the other side.  You

16         have to be able to say, hey, you

17         don't want in, you don't like the

18         deal, go try your case, here's a

19         package.  I think it's a

20         fundamental issue that's been lost

21         in all of this.  So, the work to

22         me on the trial package is a

23         fundamental situation absolutely

24         necessary in this case.  It is the

FAC Resp. Exhibit D -- 639

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          only trial package I have ever

2          seen come out of an MDL that's

3          worth a damn.  Nobody else had a

4          trial package where you could go

5          try a case.  This one you could.

6                These trials were costing a

7          million-and-a-half, $1 million

8          apiece.  You can try a case maybe

9          for a couple hundred thousand with

10         this trial package.  I want to say

11         that because we're being recorded

12         on a record, and it's got to be

13         said at some point.

14                Secondly, you made the issue

15         about the Abrams trial.  I did not

16         know until y'all called that that

17         case was going to be pulled.  It

18         caused some difficulty.  However,

19         Tom's work on Topol, which was

20         used in numerous trials to a great

21         advantage, was before Judge Fallon

22         on several occasions, and I'm sure

23         demonstrated his extraordinary

24         ability as a trial lawyer.  We all

FAC Resp. Exhibit D -- 640

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          get surprised sooner or later in

2          this practice, it just happens, no

3          matter how hard you work.

4                   Again, I want to say that

5          when you take 17 key depositions

6          in the case, and they are taken by

7          partners, and you've got two

8          physician lawyers doing the

9          background work, it's significant.

10         That's my view of this.

11                  What comes out of this, I

12         don't know, because the best

13         advice, and I'm directed to say

14         this, you've got to read the Fifth

15         Circuit cases, you've got to read

16         Murphy Oil, you've got to read

17         Mobil, and, of course, the

18         original case setting the Johnson

19         factors, because if this matter is

20         not resolved among counsel in

21         terms of fee, then it is all going

22         to the Fifth Circuit sooner or

23         later.  So, whatever happens.

24                  In addition to that, Judge

Page 36

```
 1          Fallon has said that if the matter

 2          is not resolved, he's got some

 3          former assistant U.S. Attorneys on

 4          hand, he's got the three judges or

 5          special masters on hand, he's

 6          going to put all of us under oath,

 7          and we're all going to be required

 8          to testify about what we did and

 9          what we didn't do.

10               I say that to you not

11          because I see any fluff in what

12          you've done in your presentation,

13          but you've got to be aware of

14          that, and if there's some changes

15          you want to make to the affidavit,

16          and I'm not suggesting there are,

17          you really have to look at it

18          closely.

19               So, that's what I've got to

20          say.

21               MR. LEVIN:  Off the record.

22                    -  -  -

23               (Whereupon, an

24          off-the-record discussion was
```

Page 37

1      held.)

2                    -   -   -

3           MR. KLINE:  Lisa was, in a

4      way I've never seen, driven

5      compulsively to the point that I

6      didn't think it was healthy.  I'll

7      say that on the record.

8           MR. LANIER:  Her picture is

9      in the dictionary next to the word

10     indefatigable.

11          MR. LEVIN:  I went off the

12     record only because of the comment

13     on the hours, but I think

14     everything else is worthy of

15     putting on the record.

16          MR. SEEGER:  From my

17     perspective, your presentation

18     really speaks for itself, and it

19     is a real reminder about how many

20     pieces of the litigation you were

21     involved with.  Clearly, from the

22     day we got involved together in

23     Vioxx, we were in it a little

24     earlier, probably the earliest,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

```
 1        you have been one of the go-to
 2        people.  I think as Russ said,
 3        which is key, it wasn't like you
 4        sent -- I mean, you and Shanin
 5        were taking the depositions and
 6        Lisa, so --
 7             MR. KLINE:  I appreciate
 8        your saying it, and I appreciate
 9        what Russ said.  We've all been
10        through a lot together, and I know
11        these proceedings are formal, and
12        I knew I had an obligation to the
13        law firm, the partners, to lay it
14        out.  It is a walk down memory
15        lane for a lot of us, and it is a
16        good walk.  There are a lot of
17        nice pieces to it.  It has been
18        very rewarding to work with the
19        folks in this room.  You know how
20        I feel personally about it.
21             I understand that there are
22        economic issues, and that's why
23        we're all going through the
24        process.  And to answer Russ'
```

FAC Resp. Exhibit D -- 644

Page 39

1       question, we're well familiar,

2       very familiar with the cases in

3       the Fifth Circuit.

4                   MR. LANIER:  Off the record

5       for a second.

6                       -  -  -

7                   (Whereupon, an

8       off-the-record discussion was

9       held.)

10                      -  -  -

11                  MR. BIRCHFIELD:  I got the

12      benefit of using the Topol

13      deposition first, and it was

14      remarkable work.  And you are

15      right, we were concerned about

16      Lisa's health, too, the hours that

17      she was putting in both on the

18      trial package, on the stroke

19      committee and helping us at

20      trials.  So, your work is really

21      phenomenal, and I appreciate that.

22      I told you before, but I want to

23      say it again.

24                  But one thing, and maybe it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1      is not something that you can

2      address --

3           MR. HERMAN:  Andy, would you

4      raise your voice.

5           MR. BIRCHFIELD:  One of the

6      things I wanted you to help me a

7      little bit on, the Abrams case, I

8      was in trial when that decision

9      was made.  Can you share with us

10      what happened there?

11           MR. KLINE:  I sure can.

12      Lisa, do you have the slide?

13           MS. DAGOSTINO:  Yes.

14           MR. KLINE:  I'll show you

15      exactly what happened, and

16      everyone here will understand.

17           We were putting these cases

18      up, as everyone in this room

19      knows.  We were just trying to

20      find cases, our best cases.  We

21      didn't have all of the records.

22      None of us had all of the records.

23      What happened here was you had a

24      self-prescribing doctor, a

FAC Resp. Exhibit D -- 646

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          dentist, he was a dentist, whose

2          blood pressure was increasing on

3          Vioxx.  His doctor told him to get

4          off the drug, he didn't, he died.

5              When we saw this document

6          that I brought with me, Andy,

7          which I reported, and I distinctly

8          remember it, and I know the others

9          here do, I reported it to Chris, I

10          talked to Arnie about it, I talked

11          to Russ about it, I talked to you

12          about it, I believe at the time,

13          but in any event, here were the

14          facts, and here was the reasoning.

15              We had a document here that

16          said "Vioxx increasing blood

17          pressure, edema."  The doctor knew

18          that he had the symptoms that, by

19          the way, while we criticized the

20          warning, the label does say

21          certain things about risks, and he

22          told Mr. Abrams or Dr. Abrams, the

23          dentist, who was self-prescribing,

24          in number 4, discontinue Vioxx."

FAC Resp. Exhibit D -- 647

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1        I mean, it's in the "come on"

2        category.  He was told to get off

3        the Vioxx.  He wasn't prescribed

4        Vioxx by a doctor.  He was told by

5        a doctor get off of it.

6            I think that I can work with

7        some pretty bad facts, and I know,

8        Andy, you worked with some pretty

9        bad facts, I know that, but we

10       couldn't win this case.  And at

11       the time, we were all struggling,

12       all of us, with not losing cases,

13       with getting cases that we could

14       win.  We were jockeying with

15       Merck.  We all were involved in

16       this, the folks in the MDL, with

17       what cases to try, what cases not

18       to try.

19           Believe me, I know and I

20       regret that we pulled that case,

21       and I know through Russ and others

22       how Judge Fallon felt about it.

23       But if I can use a word, but damn

24       it, come on.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1              MR. HERMAN:  Well, let me

2         just cut this short, because I

3         don't think you really have to

4         apologize.  I think we were all

5         rubbed raw at the time.

6              But my view has always been,

7         and if you look at the table and

8         I'll look at you guys, the one

9         thing about this litigation is we

10        had real lawyers involved that

11        tried real cases.  I've never been

12        in a position ever of

13        second-guessing a real trial

14        lawyer when he says, hey, I've got

15        to pull the case, I have to do

16        that.  I just think that when you

17        let your arrogance get involved in

18        your best judgment, you are headed

19        for trouble.  I think with really

20        fine trial lawyers, we all

21        sometimes go off base.  I don't

22        think you were off base.  I think

23        that your work was excellent in

24        the case.  It wasn't easy, I'll

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

```
 1        tell you -- well, it's not

 2        important.  But at any rate, I

 3        think we need to get past that.  I

 4        don't think that ought to be a key

 5        factor or a sine qua non in the

 6        judgment of your work.  We all

 7        have difficulties during trials,

 8        we have difficulties, et cetera,

 9        but the fact is, your firm made a

10        significant contribution and that

11        you are real lawyers.

12             MR. SEEGER:  From day one.

13             MR. HERMAN:  I want to get

14        past this.  The reason I do is I

15        got over it, and I think we all

16        ought to get over it.

17             MR. KLINE:  I appreciate

18        that, Russ.  We got over it, and

19        Lisa reminded me, what did we go

20        do the next week?  We took the

21        Topol deposition, I believe.

22             MS. DAGOSTINO:  It was the

23        day after.

24             MR. KLINE:  I think it was
```

Page 45

1          the day after.  So, we were on to

2          doing the next thing.

3               Russ, I appreciate it.  I

4          felt obliged -- if I might have

5          just literally two seconds more.

6          I felt obliged to address it

7          because of Andy's question.

8               MR. HERMAN:  No, I'm glad

9          you did, and I think it needs to

10         be addressed, because in my own

11         mind --

12              MR. SEEGER:  It was good

13         that Andy asked the question.  It

14         needed to be addressed.

15              MR. KLINE:  It needed to be

16         addressed.  That's how I felt

17         about it.

18              MR. HERMAN:  I guess what I

19         want to say on the record is, in

20         our consideration, we really have

21         to get past it.  It provided a

22         very difficult time in the MDL.  I

23         think what really helps is the

24         fact that your performance and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1        your partners' performance in all

2        the depositions, but particularly

3        in Topol, were very dramatic, and

4        they were going to have to eat

5        Topol in every single trial.  Very

6        important to this litigation.

7            MR. BIRCHFIELD:  In raising

8        that issue, I was not diminishing

9        your work in any way.

10            MR. KLINE:  No, I understand

11        that.  But you couldn't, sitting

12        in our shoes or in my shoes, not

13        go back and look at it

14        reflectively, and this is an

15        opportunity to do that in a

16        self-critical analysis and say

17        what happened, and I know what

18        happened.  I was prepared to say

19        so.

20            MR. SEEGER:  You did.

21            MR. HERMAN:  How many cases

22        have you submitted in the

23        settlement total, do you know?

24        What's the range?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1            MR. BALEFSKY:  600, a little

2       over 600.

3            MR. KLINE:  A little over

4       600 cases, Russ.

5            MR. SEEGER:  All right.

6       Thank you.

7            MR. HERMAN: Thank you.

8            MR. KLINE:  Thank you.

9            MR. BIRCHFIELD: Thank you.

10               -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 654

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:   LAW OFFICES OF BRIAN K. BALSER
        Brian K. Balser, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 655

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -
 2              MR. BIRCHFIELD:  As you see,
 3         we have a court reporter here.
 4         Linda is taking down everything.
 5         There will be a transcript that's
 6         available for Judge Fallon.  He'll
 7         have the transcript for his review
 8         and whatever use he deems is
 9         appropriate.
10              So, you've got the floor.
11              MR. BALSER:  I'm Brian
12         Balser.  I'm in solo practice.
13         Cleveland, Ohio is my main office,
14         and I also have a satellite office
15         in Clearwater, Florida, where
16         hopefully I'll practice more at,
17         but not until my girls grow up.
18              I've been in practice for
19         over 20 years, started off like
20         most do, doing defense work and
21         then I prosecuted for a while.
22         Then I came to the right side and
23         did plaintiffs' work, which I have
24         done since then, almost
```

FAC Resp. Exhibit D -- 656

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          exclusively personal injury, solo

2          practice.  Background is medical

3          malpractice work.  Did a little

4          Sulzer Hip, did a lot of fen-phen.

5          I watched you do a lot of work in

6          the courtroom.

7              Then I got on to the course

8          with the Vioxx, and I was looking

9          forward to getting involved more

10         with it because I was finally on

11         something at the very beginning in

12         terms of it.  I was asked and

13         appointed to the discovery

14         committee, and first I asked what

15         I needed to do, and I called

16         Chris' office, and they said, come

17         on up, and I do believe it was

18         Mike that ran the --

19             MR. SEEGER:  Mike Wagner.

20             MR. BALSER:  -- ran the

21         depository.  I spent time going

22         through records in that one room

23         there.  Then I was appointed to a

24         couple of committees.  The main

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          was the privilege log committee.

2          To be honest, I was really

3          fortunate to get put on the

4          committee with the type of

5          attorneys that we had on there

6          from Anthony Irpino to Mike Hugo,

7          Tara Sutton, Gary Wilson and

8          myself.  Because when I first

9          looked at what we had to do in

10         terms of the privilege log, I

11         said, there's no way it is going

12         to happen.  I didn't see it

13         happening.  But we did the

14         conference calls sometimes two or

15         three times a week.  The nice

16         thing was the other attorneys were

17         as dedicated to this as I was.  If

18         there was something that needed to

19         get done, we made sure it got done

20         in terms of document reviews.

21              One of the examples, when

22         they released more documents up in

23         New York, Mike Hugo and I flew up

24         there, met up there, started

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1          looking at the documents.  We

 2          said, there was no way we could go

 3          through all of these.  With the

 4          approval of Anthony, we went and

 5          bought an external hard drive.  We

 6          downloaded some and shipped them

 7          around to the other committee

 8          members so that we could get

 9          through the different documents we

10          had to get through.

11               The biggest thing, I guess,

12          that I liked is we succeeded in

13          terms of what we wanted to

14          accomplish in terms of getting

15          through the documents.  On the

16          conference calls, I have been on

17          other conference calls, I'm sure

18          you guys have been on a lot more

19          than I have, and you just sit

20          there and say, what the heck are

21          they doing.  Ours weren't like

22          that.  Ours were actually like

23          brain sessions where we actually

24          talked strategy, talked about what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1         we wanted to accomplish, and then

2         the next call or even in between.

3         I could call Mike Hugo up and say,

4         I'm thinking about this, what do

5         you think, and vice versa.  Same

6         with Anthony Irpino, same thing

7         with Tara.

8             We finally came up with an

9         idea in terms of, let's set this

10        out so it's easy enough so they

11        can present it to the Court and

12        also so that Judge Fallon would be

13        able to look through the privilege

14        log and say, okay, I see.

15            So, what we did was, we set

16        it up in specific protocols in

17        terms of categories.  I'm sure you

18        are aware of the different

19        categories we came up with based

20        on APPROVe, VIGOR, ADVANTAGE study

21        down through the list, public

22        relations.

23            We spent a lot of time

24        discussing and saying, okay,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          what's the best way to set this

 2          up.  We would highlight it and we

 3          would put little notes in them,

 4          and we would go through them.  We

 5          would do memos back and forth with

 6          each other, a quick e-mail, a

 7          quick phone call.  That's the

 8          reason I think we were successful

 9          with this committee because it

10          didn't matter what time of day it

11          was or what time of night,

12          everybody was accessible, which

13          was really, really nice.  It was

14          something different for me with

15          being in solo practice to bounce

16          ideas off of somebody.  It went

17          back and forth.  I really, really

18          enjoyed that part.

19              I must be honest.  It was a

20          lot more work than I thought it

21          was going to be when I first got

22          involved.  But being in solo

23          practice, it is a situation where

24          you keep the lights on based on
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          what you do.  There were periods

2          of time, about three months where

3          I was working over 30 hours a week

4          just on the Vioxx and the

5          privilege log, but I enjoyed it.

6          I really enjoyed it, and I enjoyed

7          working with who I was working

8          with.

9              I thought that the result we

10         got in terms of categorizing,

11         setting it up on a tee and letting

12         Russ and everybody else, when they

13         presented it to the judge, knock

14         it out of the park, made it even

15         more special to me in terms of

16         getting it done.

17             I also thought that the fact

18         that Judge Fallon was able to get

19         through those 80 boxes in two

20         weeks was really a compliment to

21         us in terms of the committee

22         because of the way we were able to

23         do it.

24             My work kind of stopped once

FAC Resp. Exhibit D -- 662

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          the judge made his ruling and they

2          did the writs in the Fifth

3          Circuit, there wasn't a lot more

4          to do.  However, Anthony, there

5          were times that he wanted a depo

6          summary done.  I think it was

7          Baumgartner's depo that I did a

8          depo summary on.

9              Also in terms of the request

10          for productions of documents, when

11          Merck wasn't giving us the

12          documents that we asked for, he

13          sent it out, and we broke it down

14          and sent back 20-page memos to him

15          saying, okay, here's the request,

16          these are the responses, and this

17          is where we go after them in terms

18          of that.

19              I enjoyed the work that I

20          did.  I enjoyed, like I said,

21          working with Anthony and everybody

22          who was in that group.  I would

23          have liked to have been more

24          involved, but I realize the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        privilege log only had so much
 2        work to do at that point in time.
 3        I thought Mike Wagner did a great
 4        job every time I was up at the
 5        depository.
 6              MR. SEEGER:  That was an
 7        important project.
 8              MR. BIRCHFIELD:  And a great
 9        result.  You are absolutely right.
10              I'm showing that you have
11        submitted 680 something hours.
12              MR. BALSER:  I didn't go
13        back through it and go over it.  I
14        thought it was about 600, maybe
15        680.
16              MR. BIRCHFIELD:  Is the bulk
17        of that working on the privilege
18        log issue?
19              MR. BALSER:  Almost all of
20        it -- not all it, almost all of
21        it, because originally I was doing
22        the document reviews.
23              MR. BIRCHFIELD:  How many
24        cases did you submit for the
```

FAC Resp. Exhibit D -- 664

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          settlement program?

2                    MR. BALSER:  I have 19.

3                    MR. BIRCHFIELD:  Were any of

4          those cases set for trial or on

5          the trial track?

6                    MR. BALSER:  No.  I

7          submitted the Sandra Nelson case,

8          and I think a couple of experts

9          looked at it through Chris and

10         said it looks good.  She actually

11         had two heart attacks.  But we

12         weren't able to submit that one

13         because it was actually filed in

14         Ohio, and they were looking for

15         cases that had been filed directly

16         to the MDL.

17                   MR. BIRCHFIELD:  Were all of

18         your cases in the MDL or do you

19         have some in New Jersey?

20                   MR. BALSER:  No.  They are

21         all in the MDL.

22                   MR. BIRCHFIELD:  Any

23         questions?

24                   MR. BLIZZARD:  No.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1              MR. BIRCHFIELD:  Where is he

2        with the accounting firm?

3              MR. LEVIN:  Everything was

4        accepted, and the costs have been

5        accepted.

6              MR. GIRARDI:  You are the

7        first guy today that that's

8        happened to.

9              MR. HERMAN:  Brian, I want

10       to thank you.  The privilege log

11       was something very important to

12       the PSC and the Executive

13       Committee and to me because I

14       always feel that's where the bones

15       are buried.  If we could just get

16       the judge to look at it, maybe it

17       changes his view about the other

18       side.  Even if we don't get the

19       documents in, it causes a reaction

20       that's very favorable, because we

21       always believe that's where some

22       bad stuff is.

23             MR. BIRCHFIELD:  Not only is

24       it a very significant result in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          this litigation, but the

2          precedential value is significant,

3          and we appreciate your good and

4          hard work on that issue.

5               MR. BALSER:  Thank you.

6               MR. LEVIN:  Thank you.

7                    -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 667

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1            C E R T I F I C A T E

 2

 3            I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  LAW OFFICES OF DANIEL E. BECNEL,
       JR., ESQUIRE
       Daniel E. Becnel, Jr., Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
     877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 669

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -

 2            MR. HERMAN:  Danny,

 3       everything is being recorded.  You

 4       will get a copy, not just of your

 5       transcript, but of everybody's.

 6            The judge, of course as you

 7       know, being very familiar with

 8       Mobil Oil, required transparency

 9       and consistency.

10            MR. BECNEL:  Murphy.

11            MR. HERMAN:  What did I say?

12            MR. BECNEL:  Mobil also.

13            MR. HERMAN:  Mobil and

14       Murphy.

15            In the event that there's a

16       fee dispute at the end, the judge

17       is going to appoint a Special

18       Master to take depositions, same

19       process, and at that time, if it

20       comes to that, if you want to

21       supplement or delete or add

22       something to your affidavit, it's

23       all right.

24            That's it.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1              MR. BECNEL:  This case
 2         caught my interest because of a
 3         young lady who died, Carlene
 4         Lewis, who brought Chris into the
 5         case, brought Andy Birchfield into
 6         the case, and I think probably the
 7         greatest compliment you can get in
 8         a case like this.  We started
 9         looking at this case probably
10         about the same time as you did,
11         but we didn't have what you had, a
12         state action, and you doing an
13         individual.
14              Here's what she said.  "Dear
15         Danny, Thank you so much for your
16         kind introduction at the Windsor
17         Court meeting.  You have been very
18         generous to me.  I also want you
19         thank you for your support of
20         Houston and New Orleans before the
21         MDL panel.  You clearly have
22         extraordinary insight into the
23         process.  I'm anxious to work with
24         you and learn from you in this
```

FAC Resp. Exhibit D -- 671

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          battle for our clients.

2                  "Sincerely, Carlene Lewis."

3                  MR. HERMAN:  What's the date

4          on that?

5                  MR. BECNEL:  She didn't send

6          a date.  This was after the

7          hearing on the MDL.

8                  MR. SEEGER:  After the MDL

9          hearing, it must have been.

10                  MR. BECNEL:  I had been

11          recruited --

12                  MR. HERMAN:  After the

13          meeting that we all had in Windsor

14          Court?

15                  MR. BECNEL:  Yes, right

16          after that hearing.

17                  MR. HERMAN:  Right.  So, it

18          was after the MDL hearing and

19          before Judge Fallon had made any

20          appointments?

21                  MR. BECNEL:  That's correct.

22                  Prior to that time, I had a

23          case which I thought was a case,

24          which was Sal Christina in my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          office.  He's a lawyer in my

2          office, his dad owned the biggest

3          seafood -- every restaurant in New

4          Orleans got seafood from him, and

5          he had a massive heart attack, was

6          on Vioxx, and then we just didn't

7          think --  we always worried about

8          12(b)(6) sanctions on it and not

9          investigating it enough.

10              MR. LEVIN:  Rule 11.

11              MR. BECNEL:  Rule 11.  I'm

12          sorry, what did I say, 12(b)(6)?

13          Rule 11 sanctions, so, we were

14          looking at stuff.

15              We weren't recording a lot

16          of the time in the beginning,

17          because we never thought it would

18          be an MDL, we didn't know if it

19          was really a case.  It was kind of

20          a personal project among the top

21          lawyers that I had.

22              Then we filed the first case

23          in New Orleans.  When I filed for

24          the MDL, if you look at the

FAC Resp. Exhibit D -- 673

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
1          pleadings, there were four cases

2          in Federal Court.  This is my

3          original complaint filed on

4          October the 1st, my motion for MDL

5          status was filed, and let me give

6          you the four cases.

7               MR. SEEGER:  In the Federal

8          courts?

9               MR. BECNEL:  In the Federal

10         courts.  It was the Eastern

11         District of New Orleans, which was

12         mine, the Sal Christina case;

13         Bucky Zimmerman, who I had worked

14         with had filed a case called

15         Grover in Minneapolis; there was

16         one case called Bridget Elaine

17         Michaud in South Carolina; one

18         case in Missouri called Whitmore;

19         and one case in Ohio called

20         Dauterman.  That was it.

21              MR. WEITZ:  When was this?

22              MR. BECNEL:  I filed for the

23         MDL in October of '05.  You are

24         welcome to have this.  This is
```

FAC Resp. Exhibit D -- 674

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1           just an unstamped copy from my

 2           file.

 3               MR. BIRCHFIELD:  There was

 4           one that was in Mobile District

 5           Court that had been set for trial

 6           in August, Danny, I'm not sure.

 7               MR. BECNEL:  Well, that's

 8           all I knew about at this time.

 9           That's when I filed for the MDL.

10               We started trying to court

11           date things everywhere we could.

12           I mean, we had litigation groups.

13           Pap asked me to bring in some

14           experts because we were worried

15           about death cases.  How do you

16           prove a death case?  If you

17           remember, I brought two people, I

18           brought Cyril Wecht at my own

19           expense to Mass Torts Made

20           Perfect, and I brought Nachman

21           Brautbar, who was a toxicologist.

22           There's a famous book called --

23           and, I mean, I spent 10, $15,000

24           bringing them, because I paid for
```

FAC Resp. Exhibit D -- 675

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          their hotel, I paid for their

 2          airfare.

 3               MR. LEVIN:  Cyril comes from

 4          Pittsburgh?

 5               MR. BECNEL:  I had used

 6          Cyril for the first time 40 years

 7          ago and won a big, big verdict on

 8          a loss of chance of survival.  So,

 9          I had used him over and over.

10               Nachman, I had used many,

11          many times in breast implant and

12          all kinds of cases.

13               Well, when we had the MDL, I

14          made one mistake in this

15          litigation, and it is his fault

16          for telling me that.  Russ told me

17          he wanted to retire.  And so Jerry

18          Meunier, who I had worked with for

19          13 years --

20               MR. SEEGER:  We're not

21          letting Russ retire.

22               MR. LEVIN:  Mea culpa, after

23          all of this.

24               MR. BECNEL:  He and Barbara
```

FAC Resp. Exhibit D -- 676

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        said -- I was on a plane, and he
 2        said, Danny, after tobacco, I'm
 3        retiring, and I'm going to hunt
 4        for dinosaur bones and I'm going
 5        to teach.
 6            I said okay.  So, I had been
 7        working with Jerry Meunier for 13
 8        years, and we just got our money
 9        in that, too, Russ got a little
10        bit of that, and he asked me,
11        Danny, I want to be liaison
12        counsel.  I said, well, is Russ
13        involved?  He says, I don't think
14        so.  I said, well, he told me he
15        was going to retire, so I'm fine
16        with that.  That's why I asked
17        some people to support Jerry,
18        because I thought he was out of
19        the picture.  It wasn't anything
20        personal.  I made a mistake.
21        Okay.
22            I knew Judge Fallon well.  I
23        had worked with him on numerous
24        cases in the past.  I had known
```

FAC Resp. Exhibit D -- 677

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1          Judge Fallon and his ability from

 2          the Ferry Froster case 30 years

 3          ago, and I knew how meticulous he

 4          was, I knew how hard he worked.

 5               Although a lot of people

 6          wanted other places, remember,

 7          there were 56 jurisdictions being

 8          sought.  We knocked it down at the

 9          meeting, Chris, and those in

10          Houston, to 6.

11               MR. SEEGER:  Right.

12               MR. BECNEL:  There was 53, I

13          think it was, 53 jurisdictions

14          that people were asking for, and

15          we knocked it down to 6.  Well,

16          once the MDL was formed, I decided

17          to say, hey, look, let's all get

18          together and try to get some

19          leaders.

20               MR. WEITZ:  But you wouldn't

21          have known that Judge Fallon was

22          going to get the --

23               MR. BECNEL:  No, I said

24          after.  I promoted him.  That's
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1          the argument I made in the

 2          Christina case, which he got.

 3              MR. SEEGER:  To the MDL

 4          panel?

 5              MR. BECNEL:  To the MDL

 6          panel.  I promoted him.  I had

 7          previously promoted him in the

 8          Propulsid case, which was my case

 9          originally, and Russ was involved,

10          and Judge Fallon was involved in

11          that case.  I know how after our

12          office and Russ' office both lost

13          the case, he crafted us to get the

14          thing resolved.  Now, you can't

15          get any better track record than

16          that.

17              MR. WEITZ:  So, your

18          original Vioxx case, did you file

19          the MDL petition and Judge Fallon

20          was the judge assigned to it in

21          New Orleans?

22              MR. BECNEL:  That's correct.

23          I had just known of his ability in

24          Propulsid in his first MDL.  So, I

FAC Resp. Exhibit D -- 679

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1        preached and preached for that

 2        jurisdiction.

 3             After that occurred, I

 4        called a meeting of everybody that

 5        we knew, and prior to that time,

 6        we had been disseminating -- Andy

 7        Birchfield and his whole cadre of

 8        lawyers was sending stuff out.

 9             MR. WEITZ:  What was the

10        name of your New Orleans case?

11             MR. BECNEL:  Christina.

12        This is it right here.  That's the

13        Christina case, and that's the MDL

14        filing.

15             So, we called a meeting of

16        everybody that we knew of at that

17        time to come to New Orleans to

18        Antoine's to have a meeting to try

19        to formulate some committee, some

20        structure, whatever we could.

21             At that meeting, which I

22        paid for -- Chris, I don't

23        remember the exact number, but I

24        know there must have been 70, 80
```

FAC Resp. Exhibit D -- 680

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          people there at least, I nominated

2          Chris and Andy.

3               MR. SEEGER:  Actually,

4          sadly, that was the last time I

5          saw Michael Nast.

6               MR. BECNEL:  Me too.  He

7          came down.

8               But I nominated both, and it

9          was unanimous among the 60, 70

10          lawyers, that they should be lead

11          counsel.  I made a full report to

12          Judge Fallon.  We had a meeting.

13               So, before the MDL, I might

14          say that we sent a bunch of

15          lawyers to Mr. Birchfield's office

16          in advance of the MDL to start

17          doing documents and to start page

18          and line summaries.  I think our

19          office did one-fifth of all of the

20          depositions that had been taken at

21          that time, the page and line

22          summary.  I think they were in New

23          York and in Mr. Birchfield's

24          office.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
1              I would send lawyers every

2         week, they would leave at 3:00 in

3         the morning, they would drive 350

4         hours to Montgomery.  We didn't

5         bill time for the drive.  I gave

6         them a vehicle to go in.  They

7         would sleep two to a room, two

8         guys to a room, two girls to a

9         room, and they were doing

10        documents.  They worked over there

11        under his direction.

12             I sent Rebecca Todd from my

13        office to Chris's under his

14        direction. I had nothing to do

15        with it except paid for the hotel,

16        paid for the gas, paid for the

17        living --

18             MR. HERMAN:  How much in

19        costs do you have right now?

20             MR. BECNEL:  I spent in

21        costs, $149,316.08.

22             MR. LEVIN:  Has the

23        accountant approved all of that,

24        do you know?
```

FAC Resp. Exhibit D -- 682

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1           MR. SEEGER:  You sent

2       everything to Wegmann?

3           MR. BECNEL:  I sent

4       everything I have.

5           MR. LEVIN:  You haven't

6       gotten any calls -- I don't have

7       it with me.

8           MR. BECNEL:  I have not.

9       But as you know, Mr. Levin, I

10      watch nickels.

11          MR. HERMAN:  Let me ask you

12      a question about the costs.

13          MR. LEVIN:  I do know.

14          MR. HERMAN:  The costs don't

15      include any salaries, draws of

16      that sort?

17          MR. BECNEL:  Nothing,

18      nothing.  That's just my

19      out-of-pocket stuff.

20          John Restaino and the

21      committee, he and I were involved

22      with the experts a lot.  In fact,

23      one time we were in, I think,

24      Miami, and we were looking for an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        FDA expert.  And Chris asked me if

2        I knew a good one, and I had Dr.

3        Suzanne Parisian from Tucson,

4        Arizona, and I said, yes, I do.

5             MR. SEEGER:  Actually, my

6        recollection of that is there was

7        a general meeting to educate

8        lawyers.  You were there.  We

9        discussed the need for it, and you

10       had actually come to me and said,

11       I have got the perfect person, and

12       I said, let's do it.

13            MR. BECNEL:  She got on a

14       plane that night, that night.  The

15       reason why is because she had

16       written this book called "Inside

17       and Out of the FDA," and this is

18       her thing to me.  It just says,

19       "To Danny from Suzanne Parisian,

20       my new best friend."  And this was

21       way, way in years, and I've used

22       it four or five times in various

23       cases.

24            ATLA then had a mock trial.

FAC Resp. Exhibit D -- 684

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        There were 25 lawyers that

2        participated in it.  They asked me

3        to be the judge, and they asked me

4        to help debrief after the three

5        juries that we had.  People were

6        given assignments of certain

7        witnesses, certain opening

8        statements and so on and so forth.

9            They asked me to try to rate

10       people from the 25.  Chris didn't

11       participate, but Paul Sizemore did

12       from your office, Mr.  Birchfield,

13       and Mark Lanier was with Carlene

14       and those.  So, I said, you know

15       what would be even better than

16       that, let me bring down a bunch of

17       experts at my cost and have them

18       critique this from both sides.

19       So, at that time, I brought down a

20       guy from the book Casarett and

21       Doull, "The Basic Science of

22       Poisons," Dr. Daniel Acosta, who

23       is the head of pharmacology at

24       Cincinnati, previously had been

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1         from Texas.  I brought Dr. Daniel

2         Acosta.  He wrote the chapter on

3         the heart being affected by drugs

4         in that book.  That's known as the

5         Bible of toxicology.

6              I brought Dr. Daniel Aruna.

7         He's the head pharmacologist at

8         Xavier, he's an African American,

9         and Xavier has the best

10        pharmacology school in the

11        country.

12             I brought Dr. John Marcus

13        from Harvard.  Dr. Marcus had

14        worked with virtually a lot of

15        people --

16             MR. HERMAN:  Danny, let me

17        ask you this.

18             The people you are talking

19        about, who among them or how many

20        among them testified in bellwether

21        trials?

22             MR. BECNEL:  None of them

23        testified in bellwether trials.

24             MR. HERMAN:  Were they

FAC Resp. Exhibit D -- 686

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          deposed?

2                  MR. BECNEL:  Never were

3          deposed.  These were the experts I

4          was going to use.  I kept asking

5          Judge Fallon, hey, let me try my

6          case, let me try my case, and I

7          did that until he -- I knew, once

8          he appointed the PSC, I knew those

9          cases would go first.  That's just

10         the way it is.  But I had to

11         prepare it, because my case --

12                 MR. HERMAN:  No, I

13         understand.  I'm trying to get a

14         handle on this.

15                 MR. BECNEL:  But what we did

16         with them, I had Dr. Wecht there,

17         I had Dr. Brautbar there, Dr.

18         Daniel Aruna, Dr. Acosta, Dr.

19         Marcus, and we brought them there.

20         After each of the presentations

21         were made, we would debrief them.

22                 Carlene Lewis and myself and

23         Shelly Sanford then went to dinner

24         with them at night and were making

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          notes, what's good, what's bad,

 2          don't do this, do this and so on

 3          and so forth, because we knew

 4          Shelly's case and Carlene's case

 5          was going to probably go first.

 6          How much that helped or didn't

 7          help, I don't know.  But I paid

 8          for it.  And I didn't know where

 9          it was going, and I wasn't on the

10          PLC.

11               The one thing I think I do

12          more than almost anybody else, no

13          matter where the case goes,

14          whether I'm on a PLC or not on a

15          PLC, when they say do you need

16          people, do you need workers, do

17          you need this, do you need that, I

18          always step to the plate.  And I

19          do it without trying to control

20          anything.  I mean, we were told

21          initially if you do all of these

22          documents and stuff, you are going

23          to get to participate, you are

24          going to get to take depositions.
```

FAC Resp. Exhibit D -- 688

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          Well, that didn't occur because

2          the individual cases, people

3          wanted to do their own, and I can

4          understand that.

5                MR. SEEGER:  I think a

6          couple of things, Danny, that

7          would be helpful for the record is

8          that we need to understand and for

9          you to identify for us what you

10         really feel were the contributions

11         you made that sort of added to the

12         common benefit and advance the

13         ball, number one.  But number two,

14         I do have a comment, and I think

15         it is important I ask it to you so

16         you can address it.  I think it is

17         very obvious the way these

18         litigations have developed over

19         the many years is that these have

20         become partner intensive, you

21         know, senior-type people doing

22         them.  The days of kind of putting

23         contract people in depositories

24         and racking up document review

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1         time, I'm not saying has no value,

2         I'm just saying, these are cases

3         that are really run by trial

4         lawyers driven by trials.  So, if

5         you can talk to us on both of

6         those.

7              MR. BECNEL:  For example, if

8         you didn't know the documents --

9         the two of you really knew the

10        documents, but you had been

11        working on it in your own offices.

12             MR. HERMAN:  You are

13        referring to Andy and Chris?

14             MR. BECNEL:  Andy and Chris.

15        They knew the documents.  The

16        state courts were so far ahead of

17        the MDL, because it wasn't even

18        formed.

19             In the MDL, people, as I'm

20        saying, there was four, and if

21        Andy is correct with that Alabama

22        case I wasn't aware of, there was

23        five cases.  So, there wasn't a

24        lot of people doing documents.

FAC Resp. Exhibit D -- 690

Page 23

1          You two had the only production of

2          documents there were.

3              When Mark Robinson tried his

4          case, the first thing he did, he

5          said, Danny, give me your best

6          lawyer to help me so I can help

7          prepare.

8              MR. SEEGER:  Who was that?

9              MR. BECNEL:  Same person

10          that had spent a year almost in

11          your office, Rebecca Todd.  So, I

12          said, Mark, what do you want her

13          to do?  Send her to California for

14          me.  I sent her to California.

15              MR. HERMAN:  Is she a

16          partner with you, Danny, or a

17          contract lawyer?

18              MR. BECNEL:  Well, she was,

19          but then when one of the court

20          reporting firms -- she fell in

21          love with Reserve and Laplace and

22          New York, and one of the court

23          reporting firms, they hired her

24          away at a ton of money, and she

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          worked for -- I forget the name of

2          court reporting firm.

3               MR. HERMAN:  At the time

4          that she went to Mark Robinson,

5          that was before the Barnett case

6          was tried?

7               MR. BECNEL:  Oh, yes, well

8          before that.

9               MR. HERMAN:  Was she a

10         partner at the time, an equity

11         partner or a contractor?

12              MR. BECNEL:  I have no

13         partners.  My sons, my

14         daughters-in-law -- I have three

15         sons that are lawyers.  None of

16         them are partners.  My brother,

17         his wife, they are not partners.

18              MR. SEEGER:  You are a tough

19         boss.

20              MR. BECNEL:  The only reason

21         I do it that way is because I just

22         didn't want to get into meetings

23         and have people leave and have all

24         of this commotion going on.

FAC Resp. Exhibit D -- 692

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

 1          Everybody is perfectly fine with

 2          it and nobody has any problem.

 3               MR. HERMAN:  How many hours

 4          do you have in the case?

 5               MR. BECNEL:  Personally?

 6               MR. HERMAN:  Yes.

 7               MR. BECNEL:  1,800 --

 8               MR. LEVIN:  Don't you have

 9          209 hours you yourself?

10               MR. BECNEL:  No, no.  This

11          is what I have.  They asked me --

12          I have 1,896.

13               MR. LEVIN:  For yourself?

14               MR. BECNEL:  For me.

15               MR. LEVIN:  How many total

16          hours does your firm have?

17               MR. BECNEL:  16,167.50.

18               MR. LEVIN:  I'm not

19          cross-examining you.  I know it

20          may sound that way.  Have any of

21          your hours been rejected by the

22          accountant?

23               MR. BECNEL:  Nobody said one

24          word to me about anything.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          MR. LEVIN:  Well, according

2      to the accountant's report, and

3      this is something you have got to

4      look into, Daniel E. Becnel, Jr.

5      has 209 hours.  Your firm has

6      9,400 hours.  That includes

7      paralegals and attorneys -- well,

8      no paralegals.

9          MR. BECNEL:  There was no

10     paralegal.

11         MR. LEVIN:  Rebecca Todd has

12     an even 1,500 hours.  Percy

13     Williams has 1,874 hours.  Now,

14     let's see if you have some that

15     are still under submission that he

16     hasn't reviewed.

17         MR. RAFFERTY:  I'm sorry,

18     Danny, I missed it, how much did

19     you say you had?

20         MR. BECNEL:  I had 1,896.

21     And remember, a lot of that

22     occurred before the MDL.  I think

23     that's probably you are looking at

24     just MDL hours.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1           MR. LEVIN:  I'm looking at

2      what the court accountant has

3      given us to work with.

4           MR. BECNEL:  This is my

5      sheet, and here's the difference.

6      All I can tell you --

7           MR. HERMAN:  Wait a minute.

8      Other people have had concern.

9      You've got to go make an

10     appointment, just call up, make an

11     appointment with the CPA or his

12     cohorts and sit down with him and

13     go over your hours.  Your reported

14     hours and what they are giving you

15     credit for are not the same.  This

16     is not something isolated to you.

17     We've had at least a dozen folks

18     that have.  I know Lanier came in,

19     for example, and spent a day.  I

20     think Ed has spent time.

21     Virtually everybody, maybe it's

22     not everybody, some people have

23     spent time directly with them and

24     gotten their time and their hours

FAC Resp. Exhibit D -- 695

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
1        and their costs straight.  I would
2        advise you to do that sometime in
3        the next two weeks.
4              MR. BECNEL:  Well, when my
5        people, and I'll just show you how
6        I did it, when they were at Mr.
7        Birchfield's office, they would
8        leave, like I said, at 3:00 in the
9        morning to get there to be able to
10       work, that's a 350-mile drive, and
11       there were no planes to go there.
12       It was quicker to drive than to
13       fly.  And then they would stay
14       Monday night, Tuesday night,
15       Wednesday night, Thursday night,
16       and they would work nonstop until
17       their office closed on Friday.
18             MR. HERMAN:  Danny, I don't
19       want to cut you short.  You have
20       said that.  That doesn't do us any
21       good, because we're not going to
22       review it.  The CPA is going to
23       review it.  You need to send
24       somebody that knows those records,
```

FAC Resp. Exhibit D -- 696

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1           if you are not going to go

2           yourself, and sit with the CPA and

3           get your hours straight.

4                Now, here's my question.

5                How many people, lawyers,

6           did you have work on the case?

7                MR. BECNEL:  19.

8                MR. HERMAN:  How many of

9           those were also involved in either

10          Bextra, Celebrex, Medtronic ,

11          Murphy Oil or the --

12               MR. BECNEL:  None were

13          involved with Murphy Oil.

14               Bextra, Celebrex, the only

15          hours anybody did was a few days

16          when Paul Sizemore asked them to

17          look at some documents.  But that

18          wasn't on the --

19               MR. HERMAN:  Medtronic and

20          Guidant?

21               MR. BECNEL:  I think Rebecca

22          Todd, for example, may have had

23          100 or so hours in Medtronic.

24               MR. HERMAN:  What about the

FAC Resp. Exhibit D -- 697

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          hurricane cases?

2                    MR. BECNEL:  None of them

3          were for the hurricane cases.

4                    MR. HERMAN:  So that you

5          were the only lawyer in those

6          cases where they didn't have

7          hours?

8                    MR. BECNEL:  In the

9          hurricane cases?  Until you

10         release them from the

11         depository -- like Will.  Will was

12         released when there was no more

13         work for the depository, and then

14         I shifted him to the hurricane

15         cases.  Like Kevin Klibert, he

16         worked the hurricane cases

17         exclusively.  He had 14.50 hours

18         in Vioxx.  That's it.

19                   But the rest, none of them

20         did, none of them did.

21                   MR. LEVIN:  Dan, you have no

22         partners.  Are these all contract

23         employees?  Are them some of them

24         contract employees that you don't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          pay benefits for?

2                MR. BECNEL:  No.  Here's

3          what I pay.  Everyone gets an

4          option to have health insurance or

5          extra money.  They all chose extra

6          money.  Every one of my main

7          lawyers, which includes about 16

8          of them, I give them a Mercedes, a

9          brand new Mercedes.  Every one of

10         them, I fund their homes, because

11         a lot of people can't fund their

12         homes at 5 percent interest.  So,

13         most of them have homes in the

14         $200,000 range.  It is not like

15         where you guys live.  So, I fund

16         that.

17               At the end of the case, they

18         get a percentage of the money that

19         they have earned, depending on

20         what is given, whether it is a

21         multiplier or not.  People in my

22         office in the past, for example,

23         in fen-phen, have made bonuses at

24         the end of the case of $1 million,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1           $800,000.  I wrote a check this

2           morning at 4:30 in the morning

3           with Kevin Klibert on a bunch of

4           insurance cases, you know, of

5           117,000 this morning on something

6           that he just settled.

7                That's how I pay.  I pay

8           different than everybody else.  I

9           make them feel that they shouldn't

10          leave the case because they are

11          not going to get the bonus until

12          the end of the case, and that

13          makes them stay when you are

14          giving them grunt work to do.

15          Now, we've all done it, but how

16          many of us would sit in a room and

17          do documents eight hours a day for

18          a year, you know, and pass up the

19          opportunity to make money?  That's

20          the way I did it, so, I didn't

21          have them coming in for a little

22          while and then leaving.

23               MR. WEITZ:  Do they get

24          salaries?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1               MR. BECNEL:  Yes.  They get

2          $50,000 base salary, plus I pay

3          for all of their ATLA dues, I pay

4          for two seminars a year, I give

5          them two weeks paid vacation at my

6          expense to places like Rome and

7          Greece and just all over the

8          world, wherever they want to go,

9          they get to pick for two weeks.

10              MR. WEITZ:  Can I come work

11         for you?

12              MR. BECNEL:  And they go.

13              MR. LEVIN:  Could I be his

14         valet?

15              MR. WEITZ:  Are these 19

16         listed --

17              MR. BECNEL:  All on the

18         letterhead, all on my letterhead

19         with malpractice insurance.

20              MR. SEEGER:  Can I just try

21         to refocus this?  For my benefit,

22         Danny, there's a couple of things.

23         You did organize an early meeting,

24         and it was very helpful for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          organizing the case.  The problem

2          is, it is hard to assess a value

3          for calling a meeting and throwing

4          your support behind it, because my

5          impression, and I have never

6          really spoken to Andy about it,

7          but my impression is that most of

8          the people who showed up to that

9          meeting had already pledged

10         support for the leadership of our

11         two firms because it made sense in

12         so many ways.  Everyone here is a

13         leader.  It makes sense under

14         certain circumstances --

15              MR. BECNEL:  I don't take

16         credit for that.

17              MR. SEEGER:  No.  Well, you

18         organized the meeting.  My point

19         is, to move beyond that, after the

20         happened and the case is being

21         litigated, if you could identify

22         for the committee in the last

23         couple of minutes like the major

24         common benefit contributions.  One

FAC Resp. Exhibit D -- 702

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1        of them was document review.  We

2        got it.  Was there anything -- I

3        want to make sure we haven't

4        missed anything.

5             MR. BECNEL:  For example,

6        Rebecca Todd, after helping Mark

7        with the documents, I gave her to

8        him, as I gave her to your office.

9             MR. SEEGER:  Well, she was

10        in the depository at my office.

11             MR. BECNEL:  Whatever you

12        needed her to do, she did.  And

13        she took his plaintiffs and went

14        over and actually lived up here at

15        some hotel where he was.

16             MR. SEEGER:  With Robinson's

17        team.

18             MR. BECNEL:  With Robinson

19        for three months and was in trial

20        with him every step of the way.

21        Mark asked her to babysit his

22        clients to help prepare for the

23        testimony.

24             MR. SEEGER:  Did Rebecca put

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

 1          her own affidavit in?

 2                  MR. BECNEL:  No.  I didn't

 3          know you wanted that.

 4                  MR. SEEGER:  No, no, no.  I

 5          thought I saw something separate.

 6          Is she still with your firm?

 7                  MR. BECNEL:  No.  She went

 8          to New York.

 9                  MR. BIRCHFIELD:  I think it

10          is a different Rebecca.

11                  MR. SEEGER:  I'm confused.

12                  MR. BECNEL:  Who is that big

13          firm, that court reporting firm?

14                  THE COURT REPORTER.  Doerner

15          & Goldberg.

16                  MR. BECNEL:  Doerner &

17          Goldberg, because Rebecca was

18          doing a bunch of documents and

19          stuff --

20                  MR. HERMAN:  Look, we have

21          to get back.  Let me ask you this.

22          Who in your firm served on

23          the science committee?

24                  MR. BECNEL:  Me.

FAC Resp. Exhibit D -- 704

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1                 MR. HERMAN:  Who in your
 2          firm served on the discovery
 3          committee?
 4                 MR. BECNEL:  Nobody was per
 5          se on the discovery committee.
 6          What we were told, Mr. Herman, was
 7          that the only way you were going
 8          to be able to do depositions is if
 9          you did the documents.  And we
10          were told that over and over and
11          over again.  And so I would send
12          these people to do them, they
13          would send me the hot documents, I
14          was putting them in the binders
15          and stuff trying --
16                 MR. HERMAN:  Well, Danny,
17          you can call me, Russ.  I mean,
18          we've known each other a long
19          time, and I'm not going to call
20          you Mister, because we've known
21          each other too long.
22                 I'm just trying to help you
23          explain the major contributions
24          that you made to the litigation.
```

FAC Resp. Exhibit D -- 705

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1       Okay?

2               MR. WEITZ:  Did you have a

3       case that you prepared for trial,

4       one of your cases?

5               MR. BECNEL:  The first one,

6       Christina.

7               MR. WEITZ:  Did that case

8       ever go to trial?

9               MR. BECNEL:  No, it didn't

10      go to trial, but I think everybody

11      on that committee would know that

12      every time I would stand up and

13      say --

14              MR. WEITZ:  It never got

15      designated.

16              MR. BECNEL:  It wasn't

17      designated.  I would say, Judge,

18      can I try my case?  You know, I'm

19      first in line in the Eastern

20      District, you see, and we thought

21      that he was going to try only

22      Eastern District cases first.  We

23      didn't know he was going to pull

24      cases.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1               MR. HERMAN:  Danny

2          volunteered his case and to try

3          his case very early in the MDL at

4          whatever meetings he attended.

5          That's true.

6               MR. WEITZ:  How many cases

7          did you have that you submitted to

8          the settlement?

9               MR. BECNEL:  Well, I had

10         2,000 cases until I didn't get

11         appointed to the plaintiffs'

12         committee, and then I lost about

13         1,500.

14              MR. RAFFERTY:  So, how many?

15              MR. WEITZ:  So, the answer

16         is 500 cases you submitted to the

17         settlement?

18              MR. BECNEL:  No, I don't

19         think.  I think we submitted about

20         300, 400.  In fact, Paul Rhinegold

21         called me yesterday on some cases

22         he sent here that we did for him,

23         and I didn't even have a fee

24         agreement with him.  I said, Paul,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

 1          whatever you want to send is fine.

 2          Send it to my son, because he

 3          hadn't worked for, you know --

 4          he's been on the campaign trail

 5          for 14 straight months.

 6                  MR. WEITZ:  And all those

 7          cases were filed in the MDL?

 8                  MR. BECNEL:  Every case I

 9          have.  I have none in state court.

10          Every case I have.  But I started

11          losing them after -- I have a lot

12          of referral lawyers like most of

13          you do.  But after I didn't get

14          appointed to the committee --

15                  MR. SEEGER:  Your referrals

16          are conditioned upon your

17          appointment to a leadership role?

18                  MR. BECNEL:  No, Chris --

19                  MR. SEEGER:  That sounds

20          harsh.

21                  MR. BECNEL:  It happens,

22          though.

23                  MR. HERMAN:  I know you

24          applied for a common benefit fee

FAC Resp. Exhibit D -- 708

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1           in Murphy.  I'm familiar with your

2           affidavit or your representation

3           in Murphy.  If you applied or are

4           you applying for common benefit in

5           Guidant, Medtronic, Celebrex or

6           Bextra?

7                 MR. BECNEL:  Well, we

8           haven't made any applications in

9           Bextra, Celebrex and Medtronic.  I

10          think I had a lot, lot of cases,

11          probably the top five to ten.  My

12          common benefit fee was less than

13          $250,000.

14                MR. HERMAN:  I'm not

15          disputing.  I'm just --

16                MR. BECNEL:  Compared to

17          most other people who got 2 and 3

18          and $4 million.

19                MR. BIRCHFIELD:  Let me ask

20          it in a little broader context.

21                During the period of time of

22          the Vioxx litigation, are there

23          any other MDLs where you are

24          making a petition for or you plan

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 709

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1          to make, you have made, a petition

 2          for common benefit fees?

 3              MR. BECNEL:  I think the two

 4          are Guidant and Medtronic.  And I

 5          think probably my fee in each is

 6          below a quarter of a million

 7          dollars common benefit.  And most

 8          people that did a bunch of work in

 9          those cases got 1 and 2 and $3

10          million each in common benefit.

11              MR. WEITZ:  What expenses

12          did you submit?  How much?

13              MR. BECNEL:  The only thing

14          I had was what I submitted.

15              MR. BLIZZARD:  149,000.

16              MR. LEVIN:  But I don't know

17          what the accountant has.

18              MR. RAFFERTY:  149,316.

19              MR. BECNEL:  For example, in

20          this 149, the only one I had in

21          here was Acosta and Wecht.  I

22          didn't submit those other people.

23              MR. WEITZ:  What do you

24          mean, what other people?
```

FAC Resp. Exhibit D -- 710

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1            MR. BECNEL:  The other

2      experts I had.  And Shelly and

3      Carlene, I mean, they spent most

4      of their time consulting with my

5      experts in preparation for their

6      case.

7            MR. SEEGER:  By the way,

8      Danny, did you include the expense

9      for the cost of that dinner?

10           MR. BECNEL:  Yes, I did.

11           MR. SEEGER:  Okay.

12           MR. BECNEL:  4,269.

13           MR. SEEGER:  Anybody have

14     any more questions?

15           MR. BECNEL:  The only other

16     thing is, as all of you know,

17     Carlis Griffen was my paralegal,

18     African American paralegal.  We

19     put her in Propulsid, and then

20     when Vioxx came up, they asked if

21     they could keep her in Vioxx, and

22     she was so familiar with Penny

23     Herman, who was kind of managing

24     Vioxx in the beginning and had

FAC Resp. Exhibit D -- 711

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

 1          managed Propulsid, and so I said

 2          certainly.  And the PLC picked up

 3          her expense, and she's still

 4          working.

 5                MR. SEEGER:  Is she still

 6          with your firm?

 7                MR. BECNEL:  Well, she's not

 8          now, because she's on loan to you

 9          guys.

10                MR. HERMAN:  The PSC has

11          paid her salary at the depository,

12          as well as whatever benefits are

13          offered through the PSC since her

14          retention.

15                MR. SEEGER:  Got it.

16                MR. BECNEL:  When this ends,

17          she's going to be back in my

18          office.  She just had the

19          experience, and after the

20          hurricane, it was really horrible,

21          because she had a place to live.

22          Most people in New Orleans didn't

23          have a place to live.

24                MR. LEVIN:  Dan, we talked

FAC Resp. Exhibit D -- 712

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          to you about your hours.  I don't

2          have with me what costs you

3          submitted, but I do know of

4          whatever costs they are, $15,814

5          has been rejected by the

6          accountants.  So, put that on your

7          list to do.

8               MR. SEEGER:  You just have

9          to call them, Danny.

10               MR. BECNEL:  Like I said,

11          nobody did it cheaper than I did

12          it.

13               MR. SEEGER:  That isn't even

14          the issue.  You could have

15          submitted something for $10.  If

16          it didn't fall into categories --

17               MR. WEITZ:  Everybody has

18          issues.

19               MR. LEVIN:  You're not

20          alone, Dan.

21               MR. WEITZ:  It is nothing

22          specific to you.

23               MR. LEVIN:  Nobody is

24          picking on you.

FAC Resp. Exhibit D -- 713

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1             MR. BECNEL:  I think Arnold

2         knows one thing about me.

3         Whenever you have a cash call, I

4         wasn't on his committee, and there

5         was three people that put up the

6         bulk of the money in that case, if

7         you remember.

8             MR. LEVIN:  Which case?

9             MR. BECNEL:  Pedicle screw.

10            MR. LEVIN:  Was I one?

11            MR. BECNEL:  You were one

12        and Cummings was one and I was the

13        third.

14            MR. LEVIN:  I just wanted to

15        make sure I was one.

16            MR. BECNEL:  And I wasn't on

17        that PLC either.

18            MR. SEEGER:  Just so we stay

19        on schedule, does anyone else have

20        anything else they want to ask

21        Danny?

22        (No response.)

23            MR. SEEGER:  Thank you.

24

FAC Resp. Exhibit D -- 714

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: LAW OFFICES OF ERIC H. WEINBERG
        Eric H. Weinberg, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 716

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. WEINBERG:  My firm got

 3         involved in the New Jersey

 4         litigation on September 30, 2006.

 5         We ended up filing about 300 cases

 6         in New Jersey.

 7              MR. LANIER:  How many?

 8              MR. WEINBERG:  About 300.

 9              MR. LANIER:  Okay.  Sorry.

10              MR. WEINBERG:  I immediately

11         got to work on Vioxx.  On October

12         1st, I retained Caesar Roy, who

13         was a former director of the New

14         York field office of the FDA who

15         assisted me in processing a FOIA

16         request for the summary approval

17         package and other documents from

18         the FDA, which we got in about a

19         week's time.

20              And from that time until the

21         case settled, I consistently went

22         back and reviewed those FDA

23         materials, created PowerPoints

24         which we shared with our
```

FAC Resp. Exhibit D -- 717

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          colleagues, to understand the

2          dynamic between Merck and the FDA.

3                Within a week of the drug

4          being pulled off the market, I

5          retained John Kostis, Chairman of

6          Medicine at Robert Wood Johnson.

7          Dr. Kostis was an invaluable

8          resource to us in this litigation,

9          consistently provided input,

10         advice, a man of great experience

11         that worked in the pharmaceutical

12         industry, clinical studies, world

13         renowned cardiologist, assisted on

14         trials.  I made Dr. Kostis

15         available to my colleagues who

16         needed input from a top shelf

17         cardiologist at trial.

18               Clearly I had the benefit of

19         the work product that existed at

20         the time I got into this case.

21         You guys were in this case for a

22         long time, and to a certain

23         extent, when you come into a case

24         and you are new and other people

Page 4

1    had been working on it, you stand

2    on your shoulders.  And I did

3    that.

4         As the case developed, I was

5    able to see how it played out with

6    the weaknesses and what the

7    strengths of the case were and to

8    sort of develop my approach to

9    discovering the case and what kind

10   of projects I was going to work

11   on.

12        I spent pretty much the vast

13   majority of my time on Vioxx.  My

14   business model is I'm a solo

15   practitioner, I work on one mass

16   tort at a time.  From '92 through

17   the early part of 2000, it was on

18   hemophilia HIV.  From 2001 through

19   about 2004, it was on Baycol.  And

20   from 2004 until the case settled,

21   it was on Vioxx.

22        I'm a solo practitioner, so

23   there are some limitations in

24   terms of what I can do, but I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        spent a good amount of time on

 2        this case.

 3             I think that the work that

 4        we put together is of great

 5        quality.  I know that there's an

 6        MDL trial package, I haven't seen

 7        it, but it is my understanding

 8        that an MDL trial package is

 9        really a collection of the best

10        information in the case that's

11        given to lawyers that have to go

12        out and try cases in order to give

13        them the best chance of winning.

14             Although a lot of our work

15        was done in New Jersey and some

16        people on the committee were not

17        familiar with it, I think that if

18        you look closely at the work

19        product, the way we attacked the

20        placebo-controlled clinical

21        studies I think really undercut

22        Merck's position with David

23        Madigan's report and the analyses

24        that he did.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1            Work that was done on the
 2       Alzheimer's studies, which were a
 3       key defense for Merck not only in
 4       the FDA, but in the litigation in
 5       the way that we went after the FDA
 6       and the Alzheimer's studies and
 7       developed the body of work that's
 8       substantial, the marketing work
 9       that Chris Placitella headed up --
10       and by the way, you know, I wasn't
11       alone in working on these issues
12       in the Madigan project.  Dan
13       Sigelman was a wonderful colleague
14       who developed a lot of ideas that
15       I adopted in terms of how to work
16       with Madigan.  I had recruited
17       Madigan in December of 2005.  I
18       had ideas about how we were going
19       to proceed with him.  Dan and I
20       started talking, and I liked his
21       approach, I liked some of the
22       things that he had to offer, and I
23       prioritized that.  I think that's
24       what you do when you're working
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      collaboratively.  You look at what

2      other people bring to the table.

3      And I did that.

4             So, this work, I think, is

5      clearly work that would and should

6      be in a trial package.  I have a

7      case to try.  I have one case that

8      opted out of the settlement.  I

9      don't know if other people do as

10      well.  But I would encourage you,

11      and at the end of this -- I'm

12      sorry that I'm giving you

13      something to take home and carry,

14      but it is hard to sort of capture

15      work in a brief presentation.

16             At the end of this document,

17      there's a bibliography of work.

18      All of that stuff is available.  I

19      would urge you to look at it,

20      because some of that should be in

21      the trial package for the lawyers

22      who are out there who are still

23      going to have to try cases.

24             One of the issues the Court

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1         was concerned with was what did

2         you do after the litigation

3         started to go south and Merck

4         started to win consistently.  I

5         think it is fair to say, and I

6         kind of framed this in the last

7         year of the litigation, what work

8         did I do, what project was I

9         working on.  I put that into this

10        PowerPoint, and I'll just go

11        through it briefly.

12             The Alzheimer's discovery, I

13        noticed up the corporate rep

14        deposition, and Merck filed a

15        motion to quash that deposition,

16        we defeated that motion, and I

17        took the deposition of Gilbert

18        Block in two days.  The final day

19        was October 30, 2007.  So, that

20        was about a week before the

21        settlement.

22             Block had been deposed in

23        the MDL.  I spent time talking to

24        Chris Tisi about the deposition,

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1       he became very frustrated by

2       Block.  I think I took Block's

3       pants down and spanked him,

4       frankly.

5           The work that I did to

6       develop the Alzheimer's story is

7       captured in a paper that I wrote,

8       which ultimately I will probably

9       try and get published.  I think

10      Mark has seen it.  It is available

11      to you.  It lays out how Merck set

12      up the Alzheimer studies, and we

13      had the benefit of knowing the

14      analysis of the data from Madigan

15      that hadn't been out there before

16      that showed that there was

17      statistically significant

18      increased risk with cardiovascular

19      events and deaths by the year 2000

20      and 2001, so that what was in the

21      label was a lie.

22          Frankly, you know, part of

23      what inspired me to work on that

24      or to redouble my efforts was the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          Hermans verdict, because Mr.

2          Hermans got treated unfairly.  He

3          didn't get justice.  At the time

4          that that verdict came down, I had

5          already started working with David

6          Madigan to analyze the Alzheimer's

7          data, and I knew that what was in

8          the label was a lie, we just

9          didn't have the time to frame it

10         for that case.

11              So, that's sort of not only

12         standing on the shoulders of your

13         colleagues, but standing shoulder

14         to shoulder with them, and that's

15         what I tried to do.

16              In the last year, I also

17         worked on the placebo study

18         analysis done by David Madigan.  I

19         recruited Madigan.  I organized a

20         group of lawyers that funded

21         Madigan's work.  So, there was

22         actually a common benefit approach

23         to Madigan.

24              MR. SEEGER:  Can I stop you,

FAC Resp. Exhibit D -- 725

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        because I don't want to forget

 2        these questions.  We're trying not

 3        to interrupt people, but on that

 4        point, I know Madigan's

 5        involvement in Celebrex, Bextra,

 6        and I'm not that aware of his

 7        involvement really in Vioxx.  So,

 8        if you can spend a little time

 9        talking about the common benefit

10        contribution of Madigan.  What

11        work did he provide?  I'm not

12        aware of it.

13             MR. WEINBERG:  Absolutely.

14             Madigan wrote a report that

15        was served on October 8th, 2007.

16        It was served in all of the cases

17        that were pending for trial in New

18        Jersey in January of 2008.

19             MR. RAFFERTY:  It was served

20        when, Eric?  I'm sorry.

21             MR. WEINBERG:  Beginning of

22        October of 2007.

23             We obtained all of the SAS

24        data from Merck's
```

FAC Resp. Exhibit D -- 726

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1         placebo-controlled clinical

2         studies, all of it, working with

3         your folks, Chris.

4               MR. SEEGER:  Yes.

5               MR. WEINBERG:  We gave it to

6         Madigan.  Madigan is a

7         biostatistician.  He was at

8         Rutgers when I contacted him.  He

9         had been director of the Institute

10        of Biostatistics.  At the time

11        that I reached out to him, he was

12        dean of mathematics and physical

13        science.  He's now dean of

14        mathematics at Columbia.

15              Madigan is a highly

16        published young guy, Irish,

17        brilliant.  One of his particular

18        areas of expertise is data safety

19        mining.  So, he's a guy that

20        consults with the pharmaceutical

21        companies in looking at their data

22        and seeing what the risks are.  I

23        spent a lot of time, you know,

24        bringing him in.  You know how it

FAC Resp. Exhibit D -- 727

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1    is when you are trying to recruit

2    a good expert.  And I had to have

3    a level of credibility with him in

4    order to convince him to work.  He

5    did agree to come and work.

6        He analyzed the SAS data,

7    and it is in the bibliography.  He

8    wrote a report which basically

9    determined when there was

10   statistically significant risk of

11   cardiovascular thrombotic events

12   and cardiovascular thrombotic

13   deaths and other things.  We

14   looked at other things in the

15   Alzheimer's studies like

16   osteoporosis, like pneumonia

17   deaths, things that were

18   statistically significant early

19   on, and he found that in the

20   intent to treat analysis of that

21   data, which were prespecified

22   endpoints in the data analysis

23   plan, there was statistically

24   significant risk of death by the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1      year 2000.  So that when Merck was
 2      negotiating with the FDA on the
 3      label and taking the position that
 4      it was not significant, that the
 5      difference in death was not
 6      significant, that was not true.
 7      The numbers that are in the label
 8      are 8 to 3, but the numbers in the
 9      ITT are something like 18 to 5,
10      which are statistically
11      significant.  So, the curve was
12      separating over time.  That was a
13      highly obviously important fact.
14           Also, the CVT events became
15      statistically significant by, I
16      think, 2001.  And I have a couple
17      of the tables, the KM tables that
18      Madigan prepared in his report.  I
19      have pasted them into this
20      PowerPoint for you.
21           Madigan did testify in
22      Celebrex and Bextra.  I was not
23      involved in that case.  I declined
24      to be involved in Celebrex and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          Bextra, because I know my

2          limitations and I like to focus on

3          one case at a time and dig as

4          deeply into that case as I can.

5          However, because my colleagues had

6          those cases, Madigan testified in

7          those cases as an expert.

8               So, Madigan's report has

9          been commended by Dr. Avorn and

10         Dr. Krumholz as perhaps the best

11         scientific analysis that has been

12         done of the statistical evidence

13         related to Vioxx.  He is writing

14         the paper with Krumholz and

15         Egilman, or a series of papers, on

16         this issue.  I've been asked by

17         our colleagues in Australia,

18         Slatery Warden, if they can work

19         with Madigan, I will be working

20         with them and introduce evidence

21         in their cases I think in March in

22         Australia.

23               It's a beautiful piece of

24         work, and it's a unique piece of

FAC Resp. Exhibit D -- 730

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        work, and it should clearly be a

2        part of the trial package.  And

3        Madigan, I'm told, did a good job

4        in testifying, so, I think he will

5        be a very powerful expert.

6              MR. LEVIN:  In Bextra and

7        Celebrex?

8              MR. WEINBERG:  In Bextra and

9        Celebrex, yes.  He was scheduled

10        to be deposed --

11              MR. LEVIN:  I understand.

12              MR. WEINBERG:  Other work in

13        the last year in the litigation,

14        FDA discovery.  I said that I

15        immediately got the FDA summary

16        approval packages.  I've developed

17        something of a track record in

18        terms of FDA issues.  I've taught

19        about it at Rutgers.

20              In this case, I served nine

21        FOIAs after the initial FOIAs,

22        which the FDA did not respond to,

23        so, I sued them personally in

24        District Court in New Jersey in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        April of 2007.  FDA filed a motion

2        to quash my complaint, to stay my

3        complaint.  That was briefed

4        before Judge Hochberg.  I defeated

5        the FDA's motion.  We were ordered

6        to mediation.

7             We were in the process of

8        mediating this case and

9        approaching settlement when Merck

10       got wind for the fact that I had

11       had this discovery process outside

12       of the regular litigation where

13       the FDA was going to produce

14       documents to me personally and not

15       to Merck.  Merck made an

16       application to Judge Higbee to

17       compel me to turn over all of the

18       materials that I got from the FDA

19       to them.  This was, again, in

20       September, October of 2007.

21            We argued that before Judge

22       Higbee, and their application was

23       denied.  So, at the time of the

24       settlement, I was in a position of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
1        having nine FOIA requests that the

2        FDA had to respond to to provide

3        documents to me related to Vioxx

4        which Merck had no stake in

5        whatsoever.  They would not know

6        what I was getting.  That was in

7        the last year of the litigation.

8             In late 2006, I drafted a

9        memorandum on public relations to

10       develop a public relations

11       strategy.  I felt that we needed

12       to have a cohesive strategy in

13       order to defeat the public

14       relations, Merck's public

15       relations agenda.  I tried to

16       think broadly and deeply about the

17       task that I take on when I'm

18       involved in a case, and I thought

19       the PR was important.  So, working

20       with Mike Ferrara and Mike

21       Grossman and Ben Morelli, we

22       retained a firm in New York called

23       Klore & Associates.  I wrote the

24       working memorandum that served as
```

FAC Resp. Exhibit D -- 733

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
1        a basis for that project, and we

2        got about 100 firms in New Jersey

3        to all kick in money together to

4        work together to develop that

5        strategy.

6             I believe that that strategy

7        was beginning to become effective,

8        that we were beginning to see in

9        media stories even where Merck was

10       winning cases, there were things

11       in the stories about the drag of

12       the litigation and so forth,

13       points that we wanted to make

14       whether we won or lost the cases.

15            MR. SEEGER:  Eric, I'm

16       sorry, Mike Ferrara, because he

17       was involved with that, too, if

18       you had to -- first of all, we're

19       not really allowing people to

20       submit extra stuff.

21            MR. WEINBERG:  I didn't

22       know --

23            MR. SEEGER:  No, it's okay.

24       I mean, I'll look at it.  I don't
```

Page 20

1       know if other people will.  I

2       don't have a problem with it.  I'm

3       just saying, I'm going to look

4       this over, and I have a sense of

5       it.

6            If you wanted us to leave

7       here with us thinking of like two

8       or three big contributions you

9       think you made sort of to the

10      common benefit, what would you

11      want the committee to focus on?

12           MR. WEINBERG:  Well, I think

13      that in a trial package, you have

14      got to have three things that I

15      worked on.  One, the

16      placebo-controlled study.

17           MR. HERMAN:  Wait a minute.

18      You didn't submit any materials to

19      the current trial package; is that

20      right?

21           MR. WEINBERG:  That's

22      correct.

23           MR. HERMAN:  Why not?

24           MR. WEINBERG:  Because I was

FAC Resp. Exhibit D -- 735

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1       not involved in the MDL.

2              MR. LEVIN:  I don't want to

3       interrupt, and we're probably MDL

4       oriented, and I'm going to look to

5       Jersey counsel here as to what was

6       going on in Jersey, but was the

7       leadership in Jersey aware of

8       everything you were doing and all

9       the engagements of experts you did

10      and whether any of it was

11      duplicative of what they were

12      doing?

13             MR. WEINBERG:  I assume so.

14             MR. LEVIN:  Did you --

15             MR. WEINBERG:  Absolutely.

16             MR. LEVIN:  Did you report

17      to them, and did they approve,

18      disapprove, or were you basically

19      out there on your own doing a good

20      job?

21             MR. WEINBERG:  Well, you

22      know, there wasn't a defined

23      structure in New Jersey the way

24      there was in the MDL.  I did try.

FAC Resp. Exhibit D -- 736

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

 1        Madigan was clearly a good guy and

 2        a good expert.

 3            MR. LEVIN:  Was there some

 4        procedure by which they said, go

 5        get Madigan, we'll endorse him,

 6        we'll use him, or was that your

 7        expert that you went out and

 8        cultivated yourself?

 9            MR. WEINBERG:  Well, first

10        of all, he was my expert who I

11        cultivated myself, but he was

12        offered to and was going to

13        testify for my colleagues.  He was

14        in Perry's cases.  He was in Sol

15        Weiss' cases.  He was offered

16        to -- I forget the other firm that

17        had cases.  I was going to work

18        Madigan in that case.

19            But in terms of the MDL,

20        Russ, we had a meeting in June of

21        2007 in Philadelphia where I

22        brought Madigan, and Mark Robinson

23        was there and Don Arbitblit was

24        there, and my proposal was to work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      together.  In terms of the workup

2      of Madigan, I was working

3      primarily with Dave Buchanan and

4      Jeff Grand at Chris' office,

5      because they had worked with

6      Kronmal.  Again, this is standing

7      on the shoulders.  Kronmal did

8      terrific work, but I saw some

9      things, some directions that I

10     wanted to go that were a little

11     bit different.  I wanted to have

12     my own guy.  The discussion was,

13     let them work together.  Let them

14     peer review each other's work.

15     Let's have two brainchilds.

16          MR. HERMAN:  Here's the

17     problem that I have, and I need

18     your help with it.

19          On the trial package

20     committee, we had representatives

21     from the New Jersey litigation

22     that were not, per se, MDL folks.

23     None of them ever suggested that

24     you had materials that could be

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          incorporated into a trial package,

2          which is now complete.  Why that

3          is, I don't know.  It may be that

4          they just weren't aware of what

5          you were doing.

6               I'm particularly concerned,

7          because we put on a massive effort

8          in the MDL to get FDA documents.

9          We had several Assistant US

10         Attorneys involved, we had five or

11         six hearings.  We may have even --

12         I'm not certain whether we went to

13         the Fifth Circuit, but we

14         certainly had posted on the

15         website the Court's decisions

16         requiring the FDA to produce, and,

17         in fact, they are still producing

18         documents even post trial.

19               So, we do have FDA documents

20         within the trial package.  My

21         concern really isn't with your

22         presentation, it is with the fact

23         that we still have possibly 100

24         folks, claimants, and I don't know

FAC Resp. Exhibit D -- 739

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        how many pro se that want to try

 2        their cases, and we've got to -- I

 3        mean, if you've got materials that

 4        ought to be in the trial package,

 5        that's got to be explored.

 6              MR. RAFFERTY:  In terms of

 7        the FDA, Eric called me, I think

 8        before he filed the lawsuit

 9        against the FDA, and I provided

10        him with copies of what we had

11        done in the MDL to make sure that

12        you didn't duplicate.  I don't

13        know, are you still waiting on

14        those documents?

15              MR. WEINBERG:  We mediated

16        them.  Once the case settled, the

17        need for them was obviated.  They

18        were quoting me hundreds of

19        thousands of dollars in costs to

20        produce those documents.

21              MR. LEVIN:  Who would you

22        say you had the most contact with

23        in the leadership of the New

24        Jersey litigation?
```

Page 26

1              MR. WEINBERG:  Dave, Jeff.

2              MR. LEVIN:  At Chris' firm?

3              MR. WEINBERG:  Chris at a

4      higher level, I guess.  Sol,

5      obviously.

6              MR. HERMAN:  How many hours

7      did you have put into the case?

8              MR. WEINBERG:  I calculated

9      about 6,000.  Obviously I'm

10     recreating hours.

11             MR. LEVIN:  You submitted

12     10,000 hours and 235,000 in costs.

13     Are you working with the

14     accountants to get them approved?

15     Because so far they have been

16     rejected.

17             MR. WEINBERG:  They

18     contacted me.  I spoke to Cliff

19     Newlin, and then we've been

20     trading phone calls.  But 10,000

21     hours is basically, of that time,

22     6,000 and change is mine.  I

23     worked essentially full time on

24     Vioxx for three years, and I work

Page 27

```
 1      hard.  So, I believe I probably

 2      underestimated my hours.

 3           MR. HERMAN:  The other

 4      question I have, and I'm not

 5      holding you to an exact number, of

 6      the hours that you've

 7      reconstructed, were they all yours

 8      or did you have contract workers,

 9      associates?

10           MR. WEINBERG:  All mine.

11           MR. HERMAN:  They were 100

12      percent yours?

13           MR. WEINBERG:  All mine.

14           Just to kind of finish the

15      point on the MDL issue.  I called

16      a meeting in Philadelphia in June

17      of 2007, because I was concerned

18      that we needed to have the best

19      evidence in those trials.  I was

20      very interested in working with --

21      we had some conversations with Don

22      Arbitblit.  Arbitblit became very

23      much interested in the Madigan

24      project and spent a lot of time
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1              talking to him, and he came to the

2              meeting.  Mark Robinson came to

3              the meeting.  Chris Placitella was

4              there.  Chris was handling

5              marketing stuff, and that's the

6              other thing that needs to be in

7              the trial package, if it is not,

8              because it is brilliant, brilliant

9              lawyering.  I was his sounding

10             board on that stuff.  Kostis was

11             also very much involved in that.

12             So, we had Mark, Don Arbitblit

13             myself, Chris, Dan Sigelman.

14                  MR. LEVIN:  Was this the

15             meeting that Dan Sigelman from

16             Cohen Milstein went to in

17             Philadelphia?

18                  MR. WEINBERG:  Philadelphia,

19             yes.

20                  The intent of that meeting

21             was basically to say, let's work

22             together.  Let's put Madigan in

23             the MDL cases.  We were interested

24             in Zipes, who was a very good

Page 29

```
 1        witness, I understood, in the

 2        trial that he testified in.

 3             You know, for reasons that,

 4        you know, I'm not -- there's not a

 5        blame game here, but it didn't

 6        work out.

 7             MR. LEVIN:  I know.

 8             MR. WEINBERG:  But I tried.

 9        So, in terms me being able to

10        communicate the work that I was

11        doing, I did try.  I think in

12        terms of the leadership in New

13        Jersey, I would consider Perry and

14        Mark, you know, they were on the

15        front lines of the cases, and I

16        know I worked with their firms on

17        a variety of issues including

18        Kostis.  Kostis was on the phone

19        with Rick.

20             MR. WEITZ:  I have to tell

21        you that Eric, although he was

22        focused on working up his cases,

23        he did bring a lot to the

24        litigation as far as his
```

Page 30

```
 1        participation and expertise.  He

 2        did share it.  It is not that he

 3        probably didn't coordinate with

 4        the MDL as much as he possibly

 5        could have and contributed, but he

 6        was always available and always

 7        sharing his experts.  I met with

 8        Eric and Kostis.

 9             MR. HERMAN:  I need to

10        apologize.  Excuse me.  Off the

11        record.

12                  -  -  -

13             (Whereupon, an

14        off-the-record discussion was

15        held.)

16                  -  -  -

17             MR. WEINBERG:  Russ, in

18        terms of what should be in the

19        trial package, I'm willing to

20        share all of it.  I do think that

21        you should have Madigan in the

22        trial package.

23             MR. RAFFERTY:  I think you

24        started off saying there's three
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          things.  One was Madigan.

2               MR. WEINBERG:  Madigan, the

3          Alzheimer's analysis, and the

4          marketing stuff.  We can look at

5          the FDA stuff, because I did -- I

6          went through the summary approval

7          packages and other stuff.  I have

8          long detailed PowerPoints which I

9          did share with experts that

10         excerpted key portions of those

11         documents.

12              Just to kind of finish up on

13         this point, because I know you

14         guys have a full day.

15              Other stuff in the last

16         year, I took discovery on a

17         project called the NitroMed

18         project, which was a very

19         interesting project that Merck did

20         with a company called NitroMed out

21         of Boston.  When Merck got the

22         results of protocol 136 and knew

23         they could no longer say that

24         their drug could be combined with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1        aspirin truthfully, because there

2        was no benefit from the data in

3        that study, they had to find a way

4        of improving the gastrointestinal

5        profile where you were combining

6        Vioxx with aspirin, otherwise,

7        they were losing a big marketing

8        benefit.  They thought that by

9        combining Vioxx with nitric oxide

10       that it would reduce the

11       gastrointestinal side effects of

12       the drug, and they sought out

13       companies that own proprietary

14       patents on combining Vioxx with

15       COX-2 inhibitors, because that

16       work had been going on for some

17       time.  NitroMed was the company

18       that had the best patents.  So,

19       Merck cut a deal with them.  It

20       was actually Merck Frosst.  So, I

21       got into the Merck Frosst

22       discovery, and this was work that

23       was ongoing at the time of the

24       settlement, but what I found out

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1       was that NitroMed, when Merck

2       approached them, said to Merck,

3       hey, we can not only fix your

4       gastrointestinal problems, we can

5       fix your cardiovascular risk.  And

6       this was in the middle of 2002.

7           I served a commission for a

8       subpoena in Boston and took the

9       deposition of Gordon Letts, who

10      was the chief medical officer of

11      NitroMed, who said that Merck

12      rejected that offer.  They were

13      not interested in ameliorating the

14      cardiovascular side effects of

15      Vioxx.

16          Now that we know from

17      Madigan's analysis there was

18      statistically significant risk, I

19      think that evidence would be

20      interesting evidence in terms of

21      punitive conduct.  Here you have a

22      company that's telling you we can

23      improve the cardiovascular profile

24      of your drug and they're refusing

FAC Resp. Exhibit D -- 748

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

```
 1          it.  Not only that, there's

 2          another company out there called

 3          Nitrox, which today is working on

 4          a nitric oxide enhanced COX-2 that

 5          actually lowers blood pressure.

 6          And they are in Phase III studies,

 7          and that drug may be approved.

 8               So, that was work that was

 9          going on.  I took the deposition

10          of a Merck Frosst scientist named

11          Don Nicholson.  I had Ford

12          Hutchinson, another expert,

13          another Merck Frosst person named

14          Sophie Roy on my radar screen to

15          depose.  That was work going on in

16          the last year of the litigation.

17               I organized some working

18          meetings.  I tried to defer to the

19          people who were the leaders in

20          this litigation, because they had

21          been there before me, and at the

22          same time, fill in where I could

23          to work together.

24               I had a working meeting in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          my office in November of 2006 with

2          John Kostis and several of the

3          attorneys from the MDL and State

4          Court on a specific causation

5          model.  I thought it was a good

6          model for settlement.  It ended up

7          not being used, but it was useful

8          in understanding specific

9          causation.  It became very

10         important in the McDarby case

11         where diabetes was the issue, and

12         the day before Dr. Krumholz'

13         deposition, Ellen reached out to

14         me and said, what do you know

15         about diabetes risk?  And I had

16         the information.  It was no

17         coincidence that I had it, because

18         I organized the meeting in June of

19         2007 in Philadelphia that Mark

20         Robinson and Don Arbitblit --

21              MR. SEEGER:  Take 60 seconds

22         and kind of sum up, because we've

23         got to stay on schedule.

24              MR. HERMAN:  I have one

FAC Resp. Exhibit D -- 750

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          other question, excuse me.

2                  I noted in your PowerPoint

3          under number IX, Roman Numeral IX,

4          fracture and bone healing.  Have

5          you had any contact with any pro

6          se folks or other folks alleging

7          that bone healing was either

8          retarded or mal affected by Vioxx?

9                  MR. WEINBERG:  Not with pro

10         se folks, but I have had

11         discussions with Madigan about

12         that.  In fact, we analyzed the

13         data.  It does retard fracture

14         healing, and there was a

15         statistically significant

16         increased risk of --

17                 MR. HERMAN:  Do you have a

18         client that you analyzed that for?

19                 MR. WEINBERG:  No.  One of

20         the things that I did was to look

21         at the overall risk/benefit of

22         Vioxx because I felt that --

23                 MR. HERMAN:  Wait a minute.

24         Let me explain to you that there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          are -- have you sent that material

2          in to the MDL or to New Jersey?

3               MR. WEINBERG:  It's in

4          Madigan's report.

5               MR. LANIER:  Is that a yes

6          or a no?

7               MR. WEINBERG:  Yes.  I don't

8          want to be cross-examined.

9               MR. HERMAN:  Would you

10         e-mail me a copy of that report or

11         fax it?

12              MR. LANIER:  You've got

13         information that may be helpful to

14         people with other cases right now

15         that we need to plug into.  So, we

16         need it not just lost in the

17         morass of 80 bazillion documents,

18         would you highlight it and send it

19         to Russ?

20              MR. WEINBERG:  Yes.

21              MR. LANIER:  Thank you.

22              MR. WEINBERG:  So, to sum

23         up, I did a lot of work on this

24         case.  I think a lot of it was of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1        the highest quality.  I worked

2        diligently from beginning to end.

3        When the track record was bad, I

4        worked harder.  I tried to fill in

5        where I saw that there were gaps.

6              When I was called upon in

7        each of the trials in New Jersey,

8        except for the Locks folks really,

9        I offered help, but they didn't

10       want it, but in each of those

11       cases, I was asked for help.  Even

12       in Ernst, Mark, I didn't realize

13       this, but I spent some time

14       prepping Egilman.  My role was

15       minimal, but I sat through

16       Egilman's deposition.  I think his

17       son accused me of falling asleep

18       at one point.  But what I brought

19       to, for example, the Humeston

20       case, the first Humeston case,

21       when Dave and Jeff and Chris were

22       looking at FDA issues, I had spent

23       a lot of time, between September

24       30, 2004 and when that case was

FAC Resp. Exhibit D -- 753

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1        tried, studying the FDA issues.

2        So, the fact that I was asked for

3        help is not a coincidence.  It was

4        because I had gone to school on

5        this case.

6            I'd be happy to share any of

7        my work product.  I'll send you --

8        Russ, I'll send you the Madigan

9        report.  I also have an expert, if

10       somebody needs an expert, I have a

11       guy named Pat O'Connor who was at

12       UMD&J who approached Merck in 2000

13       and said I think you need to do

14       some studies.  And I have the

15       documents on that issue.  And they

16       blew him off.  So, if somebody has

17       got an osteoporosis case, I can

18       help them.

19           But I did that, just to

20       finish, I looked at the overall

21       risk/benefit of the drug because I

22       felt that it was possible that if

23       Merck was arguing that

24       risk/benefit, gastrointestinal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          benefit and the issues were

2          cardiovascular risk, that other

3          benefits and risks should be fair

4          game.  And so I looked at the

5          universe of them as I could define

6          it and shared my work product

7          consistently and tried to be a

8          leader, tried to be a team player,

9          and just tried to represent my

10         clients the way that I was taught

11         when I took my first job out of

12         law school.

13                MR. SEEGER:  Thanks, Eric.

14                MR. LEVIN:  Thanks.

15                MR. WEINBERG:  Thank you.

16                      -  -  -

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1                  C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 756

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -

FIRM:          LEWIS & ROBERTS
               Kimberly R. Wilson, Esquire
FIRM:          MARTIN & JONES
               H. Forest Horne, Jr., Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 757

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -
 2              MR. SEEGER:  We're most of
 3         the fee committee.  We're making a
 4         record because Judge Fallon would
 5         like to have a record of things
 6         that are discussed here, but the
 7         floor is yours, and you can
 8         present and say whatever you want
 9         in the time you have.
10              MS. WILSON:  Okay.  Some of
11         you know me, some of you don't.
12         Chris and I go way back.  I got
13         involved in Vioxx literally the
14         day it was withdrawn from the
15         market.  Between 1500 and 2200
16         cases came across my desk.  The
17         way I did it was, I educated
18         myself very, very early.
19         Fortunately, I come from a family
20         of physicians and just decided
21         from the get-go, I was only going
22         to take, my firm, Lewis & Roberts,
23         we were only going to take cases
24         that we felt could go to trial.
```

FAC Resp. Exhibit D -- 758

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        We ended up taking a very small

2        select group of cases, I think it

3        was around 50.

4              We filed all of our cases.

5        We filed in New Jersey state court

6        with the exception of one case

7        that I filed in the MDL.  We just

8        made a huge commitment from the

9        get-go, as did my partners, a

10       small firm, a firm of 20

11       attorneys, 11 partners, to make a

12       financial commitment and work

13       these cases up.  I got in early

14       and filed early and made it very

15       clear from the outset that I

16       wanted to push my cases because I

17       felt like in a case like this

18       where there was not a signature

19       injury and causation was

20       particularly tough, and Chris and

21       Mark did a great job with their

22       trials in getting over those

23       hurdles, the only way to really

24       resolve this particular mass tort

FAC Resp. Exhibit D -- 759

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        in a favorable way for the
 2        plaintiffs was to have high
 3        quality cases that got worked up.
 4        Unfortunately, causation was so
 5        hard, I think there's only a small
 6        number of law firms that made that
 7        financial commitment and also put
 8        forth the labor to do so.  My firm
 9        clearly did that.
10             We did it without being
11        asked to do that and then, of
12        course, when Chris and Dave and
13        Mark asked me to do more, I
14        certainly did more.  My firm alone
15        from North Carolina trucked 28
16        folks up to New Jersey and/or
17        Philadelphia for depositions.  I
18        did, I don't know, I think my
19        affidavit says four sales reps,
20        but it was actually eight sales
21        reps.  I did the depositions of 18
22        physicians and miscellaneous other
23        people along the way.  So, I was
24        actively involved.
```

FAC Resp. Exhibit D -- 760

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1              MR. WEITZ:  Was that for
 2         your individual cases where you
 3         did the four sales reps?
 4              MS. WILSON:  Yes.
 5              MR. WEITZ:  Judge Higbee had
 6         four different waves of cases.
 7         Could you tell us which of your 49
 8         cases were in which waves and if
 9         any of them were assigned a trial
10         date?
11              MS. WILSON:  The first wave,
12         Black and Smith got chosen, and it
13         went up to the very wire, got
14         worked up for trial, and then I
15         think the way -- and Chris can
16         correct me if I might be mistaken,
17         but there were 39 initially in
18         that first wave that got worked
19         up.  Black and Smith got chosen
20         for trial, and then for some
21         reason, collectively a small group
22         of us, probably me, Chris, Mark
23         Lanier, Dave Buchanan was in on
24         it, there was some reason those
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1      two got bumped, and I think the

2      only reason was we ended up, that

3      first group, not trying as many as

4      what we thought.

5          MR. SEEGER:  I think we had

6      a striking procedure with them.

7      We selected, they selected, they

8      got strikes, we got strikes.  They

9      might have struck your two because

10     they were good cases.

11         MS. WILSON:  It went to the

12     bitter end.  We were working those

13     up and thinking those cases were

14     going to go to trial in January.

15     So, that was Black and Smith.

16     Then I kept putting cases up in

17     those trial waves.  And I think in

18     every wave, there was always a

19     chance my cases were going to go

20     to trial throughout the process.

21         MR. SEEGER:  Kim was always

22     one of those people that when we

23     would call for cases, she would

24     put cases in.

FAC Resp. Exhibit D -- 762

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          MS. WILSON:  And actively

2      engaged in discovery in all of

3      them.  I mean, every single case

4      that ended up -- there were a

5      couple of cases that I filed that

6      I ended up dismissing because I

7      felt there were huge causation

8      issues.  So, I got rid, along the

9      way, of any case that I felt was

10     more of a threat than an advantage

11     to us as a group.

12          MR. LEVIN:  You have about

13     $159,000 in costs that has been

14     approved by the accountant.  You

15     are ahead of a lot of people that

16     have not had them approved.  What

17     was the bulk of those costs, the

18     transportation, the lodging and

19     everything of your clients?

20          MS. WILSON:  Yes.  The other

21     thing I did was, with all of my

22     depositions, I had everything

23     videotaped.  And as soon as I got

24     those DVDs back, I disseminated

Page 8

```
 1        them throughout the country to
 2        everyone.  So, I did a lot of
 3        digital stuff with my discovery
 4        just to help educate other
 5        attorneys, especially in regards
 6        to the sales reps, because early
 7        on, there was a group of us, and
 8        Forest was part of it, we had some
 9        excellent sales rep depos, I mean,
10        with incredible admissions.
11             MR. SEEGER:  Who from your
12        group was taking those for the
13        most part?
14             MS. WILSON:  Me.
15             MR. HORNE:  And I was.
16             MS. WILSON:  And Forest.  I
17        mean, I don't know any other
18        lawyers in North Carolina --
19             MR. HORNE:  That took any
20        sales reps.
21             MS. WILSON:  I don't think
22        so.
23             MR. WEITZ:  Did you
24        coordinate any of that with Jerry
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          Kristal with Weitz & Luxenberg?

2                MR. HORNE:  I did, and I

3          borrowed heavily from the fine

4          depositions that Jerry took, and

5          Dave also gave us some deposition

6          transcripts of sales reps.  So, I

7          borrowed heavily from those, but

8          we took -- I think Kim and I, I

9          think there was a different line

10         of thought on the sales reps.  All

11         the sales rep depositions that I

12         took were at least eight hours

13         long.  I mean, it was an all day

14         affair.

15               MR. LEVIN:  Forest, were you

16         assisting her in processing her

17         cases or just your own?

18               MR. HORNE:  Just my own.

19               MR. LEVIN:  Your firm's?

20               MR. HORNE:  Just my firm's.

21               MR. LEVIN:  How many cases

22         did your firm have?

23               MR. HORNE:  We filed 48

24         cases all in New Jersey.  We

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        screened probably -- I'm with a

2        15-lawyer plaintiffs firm with our

3        primary office in Raleigh, and so

4        we get a lot of calls when there

5        are these kind of drug cases.  We

6        screened probably 2000 cases and

7        narrowed that down to 48.  We only

8        filed and put up for expedited

9        discovery the ones where the Vioxx

10       usage was clear and where we

11       thought the causation was

12       relatively clear, at least early

13       on it seemed like it was clear.

14       It got hazier as you went along,

15       but we had 48 cases.  Every one of

16       them was filed in New Jersey.  We

17       filed the first case in January of

18       2005.  I think at the time there

19       were only about 300 filed in New

20       Jersey at that time, and then

21       within six months, we actually

22       screened -- we had an expert in

23       cardiology review every case that

24       we accepted before we filed it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1         So, we had that.  Ira Gelb and

2         Steve Rich were the two physicians

3         that we had review all of our

4         cases.

5              Myself and my partner, Greg

6         Martin, who was heavily involved

7         in the fen-phen litigation -- I

8         headed up the project for our firm

9         and did most of the work, but my

10        partner, Greg Martin, worked on

11        the case.  And then we hired two

12        experienced associate lawyers to

13        come in to work on the cases.  We

14        devoted two paralegals exclusively

15        to Vioxx, and then we hired two

16        summer law clerks to come in and

17        go through the FACTS database.

18        That's all they did eight hours a

19        day for three months.

20             MR. LEVIN:  For your

21        individual cases?

22             MR. HORNE:  Kim and I, our

23        collaboration, a lot was on the

24        sales reps because we had mutual

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          sales reps, we had mutual

2          physicians and --

3              MR. LEVIN:  Same

4          jurisdiction.

5              MR. HORNE:  -- going through

6          those FACTS documents was

7          maddening.  Kim would call me

8          occasionally and say, did you see

9          this document on Dr. X, and then I

10         would find a document on Dr. Y.

11         We collaborated there, and we

12         collaborated on the sales rep

13         depositions, and I shared a lot

14         of -- Chris, I dealt with Dave and

15         Jeff Grand more than you.  Jerry

16         and I worked together a lot, but

17         we found a number of -- we had one

18         orthopedic physician, I didn't

19         write down his name, but he was an

20         orthopedic physician in

21         Fayetteville, North Carolina who

22         we found in the FACTS database had

23         been paid over $100,000 by Merck.

24         And in collaborating with Robb

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          Dassow and Dave, I think that's

 2          kind of what led to, along with

 3          some other folks, I'm sure, the

 4          order by Judge Higbee to require

 5          Merck to report the income that

 6          Merck had paid all these

 7          physicians.  And the one

 8          physician, the orthopedic

 9          physician that we found in

10          Fayetteville had been paid over

11          $100,000.  We found all of these

12          e-mails, including a PowerPoint

13          presentation where the Merck rep

14          had told the physician to take out

15          a slide that talked about an

16          increase in blood pressure, move

17          it to the end, and don't spend

18          much time on it.  We circulated

19          that with a number of folks in the

20          litigation.

21               MR. LEVIN:  How is

22          Fayetteville these days?

23               MR. SEEGER:  Still there.

24               MR. HORNE:  It is not very
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
1        friendly.
2              MR. LEVIN:  I used to be a
3        policeman in Fayetteville.
4              MR. HORNE:  Is that right?
5              MR. LEVIN:  Military
6        policeman.
7              MR. HORNE:  The doctor, his
8        name is Brad Broussard -- these
9        Fayetteville physicians are very
10       conservative, but this is a short
11       story.
12             I had a 48-year-old client
13       who suffered a heart attack and
14       ended up having a
15       defibrillator/pacemaker installed.
16       He was in perfect health otherwise
17       and was on the heart transplant
18       list, and this physician that had
19       been paid over $100,000 by Merck
20       and was on the speakers bureau,
21       this was the very first case I
22       filed in New Jersey.  I
23       arranged -- one of the things that
24       I tried to do with all my clients
```

FAC Resp. Exhibit D -- 770

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        is arrange meetings with the

 2        prescribing physicians.  I went

 3        down and met with him, not knowing

 4        that he had been paid $100,000,

 5        and went into a conference -- paid

 6        him $1,000 to meet with him for an

 7        hour and went into a conference.

 8        He just waylaid me.  He said, no,

 9        I'm not going to say that I

10        wouldn't have prescribed it had I

11        known.  Little did I know that he

12        did know, and I found that out

13        later.  His deposition --

14             MR. GIRARDI:  Speaks for

15        it --

16             MR. HORNE:  He just clipped

17        me for $1000 and then was a jerk.

18        The only thing that saved the

19        meeting, the guy said if he was

20        deposed, and this case wasn't on

21        for trial, but he said if he was

22        deposed -- he finally came around,

23        I brought my client with me who

24        pleaded with the doctor, and he
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          finally gave in.

2                MR. SEEGER:  Did you guys

3          work closely with Robb Dassow and

4          Sue Scovern on these sales rep

5          things?

6                MS. WILSON:  Forest did.

7                MR. HORNE:  I worked with

8          Robb on that, and I also worked

9          with Robb on the Medco because we

10         had two cases where we sued Medco

11         because they were 50 milligram

12         cases where they had prescribed

13         for over 18 months of 50

14         milligrams.  So, we sued Merck-

15         Medco.  That was either two or

16         three cases.  I engaged in

17         discovery with Medco's lawyers on

18         those issues, trying to find a

19         connection between Medco and

20         Merck, and I worked closely with

21         Robb on that, and we shared a lot

22         of documents in that regard.

23                Kim put up, I don't know,

24         what was your percentage of cases?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          I mean, you put up close to 50% of

2          your cases.

3               MS. WILSON:  It was over

4          50%.

5               MR. HORNE:  We filed 48

6          cases, and we had 12 in for the

7          expedited discovery.  And then

8          along with Steve Kherkher at

9          Williams Kherkher, I had two cases

10         from North Carolina in the four

11         trial groupings that were set for

12         trial originally in October, and

13         then were moved to January.  I

14         worked closely with Jerry on those

15         and attended all the meetings, and

16         also Dave and Jeff Grand were very

17         helpful.  Frankly, I knew the

18         settlement discussions were going

19         on, but I had no idea that y'all

20         had moved it along as far as it

21         was.  So, we were heavily

22         preparing for trial along with

23         Steve Kherkher.

24               Steve's firm had two North

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1         Carolina cases, and my firm had

2         two North Carolina cases that I

3         put up.  So, we were collaborating

4         together.  And then Judge Higbee

5         changed her mind early on and said

6         I only want prelabel change cases

7         in the mix.  So, one of my cases

8         dropped out because it was post

9         label change.  And then in

10        discovery, the two cases that

11        Steve had developed usage

12        problems, so both of his cases

13        dropped out.  So, we were down to

14        one case in North Carolina, and I

15        communicated with Dave, and we had

16        a hearing with Judge Higbee,

17        fought Hope Freiwald tooth and

18        nail, and added another case that

19        was not on the expedited list for

20        trial.

21             So, I brought another case

22        in for the January '08 trial mix

23        and got that case -- even though

24        it wasn't in my expedited group, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1          got the client and his wife up to

 2          Philadelphia, went to Dechert,

 3          dealt with Hope on all of those

 4          depositions, got that done, got

 5          the physicians deposed.  So, we

 6          had those two cases set for trial.

 7              I worked closely with Sol

 8          Weiss on developing Steve Rich.  I

 9          had been using Steve from early

10          '05 on specific causation, and

11          then Sol had worked with him on

12          general causation.  And Steve was

13          going to be our general causation

14          expert for the January '08 trial

15          set cases along with Sol.  I went

16          up to Philadelphia to defend

17          Steve's general causation

18          deposition, coordinated our

19          cardiologists, who saw all the

20          clients whose cases were trial set

21          on specific causation.

22              The Williams Kherkher firm

23          developed Dr. Goldberg for the

24          marketing case.  I wasn't involved

Page 20

1          in that, they were.

2               But we, like Kim, our firm

3          responded every time there was a

4          call to put more cases in the mix,

5          and I was pretty vocal about that

6          on the list serve, saying, guys,

7          we are all in this together.  So,

8          we volunteered over 25 percent of

9          our firm's caseload, and we worked

10         them up, and we brought quality

11         cases to the mix.

12              MR. GIRARDI:  Was it the

13         same 50 cases?

14              MR. HORNE:  No.

15              MS. WILSON:  No.

16              MR. GIRARDI:  How many cases

17         did you have?

18              MR. HORNE:  We filed 48.  We

19         screened 2000 to get 48, and we

20         only filed cases where -- we knew

21         from the fen-phen days that

22         causation was going to be an

23         issue, so we felt comfortable that

24         we either had affidavits from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          doctors where there were sample

2          cases, and then otherwise we had

3          rock solid usage on our

4          prescriptions.

5              MR. LEVIN:  How many of your

6          cases did you put in the same

7          position that Kim's were where you

8          worked them up to trial?

9              MR. HORNE:  We had 11 cases

10         in the mix, but then we added the

11         additional ones, so, there were

12         12.  And we had a hearing with

13         Hope, and Dave was instrumental in

14         getting this other case added at

15         the last minute.  Otherwise, we

16         would have only had one case for

17         the North Carolina trial setting,

18         and we were able to get one of our

19         other cases in, so we had two.  I

20         attended all the meetings with

21         Jerry on that, we collaborated

22         closely on all of the preparations

23         for trial.

24             MR. BLIZZARD:  Forest, help

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          me understand the timing of this

2          because I think we heard some of

3          this the other day from Steve

4          Kherkher.

5               When were those four cases,

6          two of yours and two of Williams

7          Kherkher, scheduled to go to trial

8          originally?

9               MR. HORNE:  October of '07.

10              MR. BLIZZARD:  Then as I

11         understood, three of them dropped

12         out because of various reasons,

13         including two of them because they

14         didn't have proof of use.

15              MR. HORNE:  Right.

16              MR. BLIZZARD:  So, there was

17         one left, and then you added one?

18              MR. HORNE:  Right.

19              MR. BLIZZARD:  That case was

20         then put off until February of

21         2008?

22              MR. HORNE:  No.  We got that

23         case -- I was in Salt Lake City in

24         depositions in another case and

Page 23

```
 1          had a conference call with Dave

 2          Buchanan, Hope Freiwald and Judge

 3          Higbee, and Hope was screaming

 4          about adding one of our cases

 5          late.  It had been filed and had

 6          been there.

 7              MR. BLIZZARD:  I'm trying to

 8          find out, when were those two

 9          then, the one you added and the

10          one that still was there, when

11          were they set for trial?

12              MR. HORNE:  With the trial

13          grouping of four cases, and I

14          think the Weitz Luxenberg setting

15          had a problem with that expert,

16          and I think there was some talk at

17          the time of settlement of moving

18          it back, so there would only be

19          three cases.

20              MR. SEEGER:  Well, there was

21          actually, and then something

22          happened to that setting.  They

23          got moved to like September or

24          October.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

     1              MR. HORNE:  It was October.

     2              MR. SEEGER:  Then they got

     3         bounced to January and then we

     4         settled.

     5              MR. BLIZZARD:  I'm confused,

     6         because I thought I heard

     7         yesterday Kherkher say the cases

     8         were set in March of 2008, that

     9         those were actually Martin & Jones

    10         cases, but that they were working

    11         on them.

    12              MR. SEEGER:  They might have

    13         been originally set for

    14         March/April of '07, because that

    15         was an original target date.  I

    16         don't remember why we lost the

    17         setting, there were so many facts.

    18         Dave definitely will, because he

    19         remembers everything.  But that

    20         somehow wound up after the summer,

    21         which was September/October, and

    22         basically the settlement came

    23         before you guys could try the

    24         case.  But the cases were in the

FAC Resp. Exhibit D -- 780

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        queue, and they were going to go

 2        at that point.

 3             MR. HORNE:  Right.

 4             MS. WILSON:  Black.  I

 5        remember why we took Black off.

 6        Black ended up, he was an MI and a

 7        stroke, and Judge Higbee didn't

 8        want to do that.

 9             MR. SEEGER:  That's right.

10             MS. WILSON:  That's why

11        Black didn't go.

12             MR. SEEGER:  She tried to

13        keep the issues as close as she

14        could for trial groupings because

15        she was doing more than one case

16        at that point.

17             MS. WILSON:  Just my

18        affidavit --

19             MR. SEEGER:  Just so I'm

20        clear.  I'm sorry, Kim.  So

21        Kherkher was going to help you

22        guys try the case?

23             MR. HORNE:  No.

24             MR. SEEGER:  I'm not clear
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           on that.

2                MR. HORNE:  What happened

3           was, Steve had two North Carolina

4           cases, and I had two North

5           Carolina cases.  We were at the

6           hearing when the judge was asking

7           for trial cases.  So, I offered

8           both of mine up, and Steve offered

9           both of his up.  We agreed to work

10          together, and I would work my

11          cases up, he would work his cases

12          up, and we would share the general

13          and specific causation experts for

14          trial.  At the beginning of that,

15          Judge Higbee at the last minute

16          changed her mind and said, I only

17          want three prelabel cases.  So,

18          one of mine dropped out, and it

19          was two of Steve's and one of

20          mine.  And then both of Steve's

21          dropped out, because in the

22          depositions they did, the

23          prescription usage and samples was

24          terrible, so, they voluntarily

Page 27

1          dropped those.  That's when I

2          added another one of my cases.

3               MR. SEEGER:  You had two

4          cases?

5               MR. HORNE:  I had two cases.

6               MR. SEEGER:  At that point,

7          they didn't have a case in.

8               MR. HORNE:  They didn't have

9          a case in, but they had already

10          gone a long way down the road of

11          developing the experts.

12               MR. SEEGER:  Yes.  No

13          question.

14               MR. HORNE:  They continued

15          with that.  As far as my two

16          cases, I handled all the

17          depositions for my clients and

18          their spouses and the physicians

19          and the sales reps.  I did all of

20          that.

21               MR. SEEGER:  Okay.

22               MR. BLIZZARD:  Was there any

23          agreement that they would try your

24          two cases that remained?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          MR. HORNE:  We were going to

2      try it together.  And I told Steve

3      this, and we had early on -- we've

4      got an office in Atlanta as well.

5      So, we had some Georgia cases, and

6      we had some -- a couple of good

7      Georgia cases that we were going

8      to put up.  Someone else had some

9      Georgia cases, and we couldn't

10     come to an accommodation, because

11     I told Steve, I'm going to be

12     involved in my cases.  I'm not

13     going to delegate it to you and

14     you do everything, because that's

15     just not the way I work or my firm

16     works.  So, I worked up my cases,

17     Steve worked up his cases.  We

18     were sharing the general and

19     specific causation witnesses for

20     trial.  And then we were going to

21     divide up opening, closing, cross

22     examinations, witness examinations

23     and that sort of thing.

24          MR. SEEGER:  Once their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          cases were out, how would the

2          trial have gone?  Would you have

3          taken the lead, would they have

4          worked with you on the trial

5          still?

6                  MR. HORNE:  Yes.  And when

7          that happened, because --

8                  MR. SEEGER:  You were still

9          dividing up.

10                 MR. HORNE:  What happened

11         when Steve's cases dropped out, we

12         were down to one case.  They

13         didn't have any other North

14         Carolina cases.  And that's when

15         we had to get Dave involved.  And

16         I told Hope, look, I've got a case

17         that's been filed, fact sheets in,

18         you've got all the medical

19         records, basically everything is

20         there.  I'll get the client up to

21         Philadelphia next week with his

22         wife.  We'll make every

23         accommodation.  And I think the

24         one thing Judge Higbee did was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1        gave 30 extra days to designate

 2        the experts.  But I got that case

 3        in with Dave's help.  But Steve

 4        was so far down the road with the

 5        marketing expert and a fine

 6        cardiologist out of San Francisco

 7        that came back to North Carolina

 8        and saw both of these clients.  He

 9        was so far down the road with

10        that, I said let's --

11            MR. SEEGER:  Keep it

12        together.

13            MR. HORNE:  -- keep it

14        together, and that's what we did.

15            MR. WEITZ:  Forest, clarify

16        some times with me and cases.

17        Because in January of '07, you had

18        Hermans and Humeston, and then you

19        had Keeley and Rossi, which

20        Humeston was Chris's case, Hermans

21        was Lanier's, and Keeley and Rossi

22        were Weitz & Luxenberg cases.  She

23        set those cases down for trial in

24        January '07, and then Hermans and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          Humeston were tried in February

2          '07.  Keeley and Rossi were then

3          postponed to be tried in September

4          of '07, and then the judge just

5          put it on hold because there were

6          negotiations going on.  Where were

7          your cases with respect to that?

8          Did you have an actual firm trial

9          date?

10               MR. HORNE:  Yes.

11               MR. WEITZ:  From when?

12          Because Keeley and Rossi were the

13          next ones she was trying.  I'm

14          trying to figure out when you and

15          Kherkher had trial dates.  Was it

16          after those two cases?

17               MR. HORNE:  Originally there

18          were four states set forth for

19          trial.  It was North Carolina,

20          Pennsylvania, New Jersey and New

21          York.  Jerry was heading up the

22          New York, and Sol had both New

23          Jersey and Pennsylvania, and I had

24          North Carolina.  Those four cases

FAC Resp. Exhibit D -- 787

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          were all set on the same track.

2          Then Jerry and I talked about the

3          fact that his -- the general

4          causation witness out of Canada

5          called Jerry the night before his

6          deposition and said, oops --

7               MR. WEITZ:  He had an

8          article --

9               MR. HORNE:  -- he signed an

10         affidavit I think.  He said, I

11         think I signed an affidavit.  But

12         North Carolina was in that

13         setting.  We were in that setting.

14         And then because of that snafu

15         with Jerry's expert, I think Judge

16         Higbee -- and this was all about

17         the time the settlement came down

18         -- was going to move the New York

19         setting out to February because we

20         were down the road as far as when

21         the jury was going to come in, and

22         we were talking about renting out

23         the convention center at the hotel

24         and having the voir dire there.

FAC Resp. Exhibit D -- 788

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

 1                    MR. WEITZ:  So, you were

 2           part of the final stage in those

 3           two cases?

 4                    MR. SEEGER:  Yes.

 5                    MR. HORNE:  Yes.  Jeff Grand

 6           and Dave Buchanan and I worked --

 7           Dave was very gracious --

 8                    MR. SEEGER:  By the way,

 9           Jeff Grand just had a baby.  For

10           the record, let the record reflect

11           we're looking at Jeff's new baby.

12                    MR. HORNE: My two cases were

13           Romans, Billy Ray Romans and Andy

14           Ray Sanderson.

15                    MR. WEITZ:  The cases Forest

16           had ready for trial were Romans

17           and Sanderson.

18                    MR. HORNE:  Yes.  Romans was

19           a prelabel change that was in the

20           mix originally.  Sanderson was the

21           case that was added after a motion

22           hearing with Dave and Judge Higbee

23           and Hope and myself, and Judge

24           Higbee agreed to add Sanderson.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          So, Sanderson and Romans were the

2          two North Carolina cases that were

3          set to go to trial originally in

4          that October setting with the New

5          Jersey, Pennsylvania and New York

6          cases that Judge Higbee then moved

7          into January.

8              I went to the status

9          conference in November and left

10         there, flew back to Raleigh, North

11         Carolina, jumped in my car and

12         drove four hours to Asheville and

13         got to the hotel at 4:00 a.m. and

14         deposed a Merck rep on a Friday

15         from 9:00 in the morning until

16         6:00 at night, and then the next

17         week is when the settlement

18         happened.

19             And I didn't -- and Steve, I

20         don't know what Steve knew.  He

21         may have known more than he told

22         me, but after the fact -- I mean,

23         I knew the negotiations were

24         going, and I think that's -- even

FAC Resp. Exhibit D -- 790

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          Judge Higbee said in a conference

2          that that's one of the

3          considerations for moving the

4          setting from October of '07 to

5          January '08.  But I had no idea

6          that y'all were that close, and

7          obviously a great result.

8                  MR. LEVIN:  Neither did we.

9                  MS. WILSON:  My cases are

10         real simple.  I did not work with

11         Kherkher at all.  I worked with

12         two people.  That was Chris Seeger

13         and Mark Lanier.  So, mine is real

14         clear-cut.  That was kind of the

15         get go.  Forest and I collaborated

16         a lot.

17                 Something I would like to

18         add is, after the settlement was

19         announced, it was either Chris or

20         Mark, one, who got interviewed by

21         the Wall Street Journal reporter.

22         I think it was you who told that

23         person to call me.  They asked me

24         to describe my role in Vioxx in

FAC Resp. Exhibit D -- 791

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          this litigation.

2                  MR. SEEGER:  Must have been

3          me.  Lanier would have never sent

4          a reporter to someone else.

5                  MS. WILSON:  I think we had

6          some five star generals, and I was

7          a front line soldier really every

8          step of the way, and there weren't

9          a lot of us out there.

10                 MR. SEEGER:  You also had a

11         case in Federal Court that you

12         were trying to get remanded to the

13         transfer court in North Carolina

14         that you wanted us to try

15         together.

16                 MS. WILSON:  That's right.

17         That's the Howard case, and I

18         think it is still probably right

19         now one of the best cases out

20         there.  I have no doubt it has

21         already been approved actually.

22         I'm just waiting on our points, I

23         guess I should say.  Great case,

24         and that was the plan.  We were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1              going to tee that up.  So, I did

2              have one in the MDL.

3                   It was a tough litigation,

4              as you guys know.  I thought it

5              was far harder than Baycol,

6              fen-phen, Rezulin.  I don't think

7              anything compares to Vioxx.  I

8              really don't.  It was very tough.

9                   Anyway, after the settlement

10             was announced, I certainly did my

11             part to help bring everyone

12             together in newspapers, on TV,

13             talked about what a tremendous job

14             everyone did, how tough this

15             litigation was.  Hard, hard cases,

16             difficult causation, and I was a

17             big supporter of this resolution.

18                  MR. HORNE:  One thing I

19             would like to say about the

20             submission.  I sent every member

21             of the committee a copy of our

22             submission with detailed expenses

23             and time sheets.  I will say we

24             had about 1000 attorney hours that

FAC Resp. Exhibit D -- 793

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1      we submitted for the committee's

2      consideration, and that is an

3      extremely conservative amount

4      because we don't keep hourly

5      bills.  I think Kim's firm, they

6      do keep track of their time.  We

7      don't.  I went back through, and

8      the only thing that I submitted

9      for this committee's consideration

10     are matters that were related to

11     the 12 cases and the trial and

12     those expenses.  There's nothing

13     in here for stuff that I didn't

14     truly think was for the common

15     benefit.

16         Going into this, Kim's firm

17     and my firm, we were really kind

18     of the only two firms in the

19     state.  So, in a way, we were

20     certainly competitors, but we also

21     collaborated from the very

22     beginning, and it was both of our

23     intentions to try these cases.  I

24     went to the first trial in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1          Brazoria.  I went for the full
 2          week, that first week there.  I
 3          saw Mark Robinson was there and
 4          had dinner.
 5               MR. LEVIN:  With Mark?
 6               MR. HORNE:  With Ben Morelli
 7          and some other folks during that
 8          trial.  I stayed there for the
 9          whole week and saw the openings.
10          Chris, I watched you on Court TV.
11          I spent about a week watching
12          that.  I came back for the
13          Hermans/Humeston openings.
14               MR. SEEGER:  I remember
15          that.
16               MR. HORNE:  Because Hope
17          came over to ask you to get Kim
18          and me --
19               MR. SEEGER:  They were
20          sitting on the defense side, and
21          Hope said, these guys are
22          plaintiffs lawyers, would you tell
23          them to go on to the other side.
24          There's no line in the middle.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          They can sit wherever they want.

2               MR. WEITZ:  Judge Fallon's

3          PTO Order 6, he laid out

4          guidelines.  You are worried about

5          the hours.  The hours are a factor

6          to consider, but the judge laid

7          out in his Murphy Oil decision

8          that there are a lot of other

9          factors, people that were actually

10         litigating the cases and moving

11         the dockets in jurisdictions and

12         were preparing to try the cases.

13         Those are factors.

14               MR. SEEGER:  This is helpful

15         to us.

16               MR. HORNE:  Kim and I, we

17         traveled to New Jersey for like

18         two of the trials, I believe.  But

19         I saw openings or closings in -- I

20         was there for Jim Pettit's

21         closing, I was there for your

22         opening in Hermans/Humeston.  I

23         was there for Mark's opening in

24         the first case in Texas.  I was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          there for one of the other ones.

2          And so it was --

3               MR. SEEGER:  I didn't get a

4          chance to talk to you much.  I

5          know that you worked a lot with

6          Dave and Jeff.

7               I spoke to you all the time.

8          Kim was always looking to get

9          something set for trial.  That's

10         the fairest way to reflect it.

11         How many times did we talk to each

12         other on the phone?  I've got this

13         case, this is a great case for

14         trial, I've got two cases coming

15         to New Jersey.  You are our kind

16         of people.  That's the way to move

17         a case.

18              MR. LEVIN:  Pleasure to have

19         met.  Up until now, I only knew

20         your hours.

21              MR. SEEGER:  Do you have the

22         hours?

23              MR. LEVIN:  He sent them to

24         everybody.  All of a sudden I got

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1        binders.  Now I know.

2                MS. WILSON:  I did the same

3        thing.

4                MR. SEEGER:  Have they been

5        reviewed?

6                MR. LEVIN:  Yes.  Your hours

7        have been reviewed.  They have

8        been approved.

9                MR. SEEGER:  Which means you

10        have met all the guidelines.

11                MR. LEVIN:  In fact, your

12        costs to the seven cents were

13        approved.

14                MR. SEEGER:  What are they?

15                MR. LEVIN:  159,045.07.

16                MR. SEEGER:  Both firms?

17                MR. LEVIN:  No.

18                MR. WEITZ:  No.  Forest is

19        131 and change.

20                MR. SEEGER:  That was a very

21        helpful presentation.  Thank you.

22                MR. LEVIN:  It is a pleasure

23        to see professionals that are

24        truly professionals.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1                MR. HORNE:  I want to thank

2         y'all for the work that went on

3         behind the scenes that we never

4         knew about.

5                MR. SEEGER:  Thank you.

6                MR. GIRARDI:  Thank you.

7                MR. BLIZZARD:  Thank you.

8                     -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 799

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 800

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:        LEWIS & ROBERTS
             Kimberly R. Wilson, Esquire
FIRM:        MARTIN & JONES
             H. Forest Horne, Jr., Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 801

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2            MR. SEEGER:  We're most of

3        the fee committee.  We're making a

4        record because Judge Fallon would

5        like to have a record of things

6        that are discussed here, but the

7        floor is yours, and you can

8        present and say whatever you want

9        in the time you have.

10            MS. WILSON:  Okay.  Some of

11        you know me, some of you don't.

12        Chris and I go way back.  I got

13        involved in Vioxx literally the

14        day it was withdrawn from the

15        market.  Between 1500 and 2200

16        cases came across my desk.  The

17        way I did it was, I educated

18        myself very, very early.

19        Fortunately, I come from a family

20        of physicians and just decided

21        from the get-go, I was only going

22        to take, my firm, Lewis & Roberts,

23        we were only going to take cases

24        that we felt could go to trial.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          We ended up taking a very small

2          select group of cases, I think it

3          was around 50.

4               We filed all of our cases.

5          We filed in New Jersey state court

6          with the exception of one case

7          that I filed in the MDL.  We just

8          made a huge commitment from the

9          get-go, as did my partners, a

10         small firm, a firm of 20

11         attorneys, 11 partners, to make a

12         financial commitment and work

13         these cases up.  I got in early

14         and filed early and made it very

15         clear from the outset that I

16         wanted to push my cases because I

17         felt like in a case like this

18         where there was not a signature

19         injury and causation was

20         particularly tough, and Chris and

21         Mark did a great job with their

22         trials in getting over those

23         hurdles, the only way to really

24         resolve this particular mass tort

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          in a favorable way for the

2          plaintiffs was to have high

3          quality cases that got worked up.

4          Unfortunately, causation was so

5          hard, I think there's only a small

6          number of law firms that made that

7          financial commitment and also put

8          forth the labor to do so.  My firm

9          clearly did that.

10              We did it without being

11          asked to do that and then, of

12          course, when Chris and Dave and

13          Mark asked me to do more, I

14          certainly did more.  My firm alone

15          from North Carolina trucked 28

16          folks up to New Jersey and/or

17          Philadelphia for depositions.  I

18          did, I don't know, I think my

19          affidavit says four sales reps,

20          but it was actually eight sales

21          reps.  I did the depositions of 18

22          physicians and miscellaneous other

23          people along the way.  So, I was

24          actively involved.

Page 5

1              MR. WEITZ:  Was that for

2         your individual cases where you

3         did the four sales reps?

4              MS. WILSON:  Yes.

5              MR. WEITZ:  Judge Higbee had

6         four different waves of cases.

7         Could you tell us which of your 49

8         cases were in which waves and if

9         any of them were assigned a trial

10        date?

11             MS. WILSON:  The first wave,

12        Black and Smith got chosen, and it

13        went up to the very wire, got

14        worked up for trial, and then I

15        think the way -- and Chris can

16        correct me if I might be mistaken,

17        but there were 39 initially in

18        that first wave that got worked

19        up.  Black and Smith got chosen

20        for trial, and then for some

21        reason, collectively a small group

22        of us, probably me, Chris, Mark

23        Lanier, Dave Buchanan was in on

24        it, there was some reason those

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          two got bumped, and I think the

2          only reason was we ended up, that

3          first group, not trying as many as

4          what we thought.

5               MR. SEEGER:  I think we had

6          a striking procedure with them.

7          We selected, they selected, they

8          got strikes, we got strikes.  They

9          might have struck your two because

10         they were good cases.

11              MS. WILSON:  It went to the

12         bitter end.  We were working those

13         up and thinking those cases were

14         going to go to trial in January.

15         So, that was Black and Smith.

16         Then I kept putting cases up in

17         those trial waves.  And I think in

18         every wave, there was always a

19         chance my cases were going to go

20         to trial throughout the process.

21              MR. SEEGER:  Kim was always

22         one of those people that when we

23         would call for cases, she would

24         put cases in.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           MS. WILSON:  And actively

2      engaged in discovery in all of

3      them.  I mean, every single case

4      that ended up -- there were a

5      couple of cases that I filed that

6      I ended up dismissing because I

7      felt there were huge causation

8      issues.  So, I got rid, along the

9      way, of any case that I felt was

10     more of a threat than an advantage

11     to us as a group.

12          MR. LEVIN:  You have about

13     $159,000 in costs that has been

14     approved by the accountant.  You

15     are ahead of a lot of people that

16     have not had them approved.  What

17     was the bulk of those costs, the

18     transportation, the lodging and

19     everything of your clients?

20          MS. WILSON:  Yes.  The other

21     thing I did was, with all of my

22     depositions, I had everything

23     videotaped.  And as soon as I got

24     those DVDs back, I disseminated

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          them throughout the country to
 2          everyone.  So, I did a lot of
 3          digital stuff with my discovery
 4          just to help educate other
 5          attorneys, especially in regards
 6          to the sales reps, because early
 7          on, there was a group of us, and
 8          Forest was part of it, we had some
 9          excellent sales rep depos, I mean,
10          with incredible admissions.
11              MR. SEEGER:  Who from your
12          group was taking those for the
13          most part?
14              MS. WILSON:  Me.
15              MR. HORNE:  And I was.
16              MS. WILSON:  And Forest.  I
17          mean, I don't know any other
18          lawyers in North Carolina --
19              MR. HORNE:  That took any
20          sales reps.
21              MS. WILSON:  I don't think
22          so.
23              MR. WEITZ:  Did you
24          coordinate any of that with Jerry
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          Kristal with Weitz & Luxenberg?

2               MR. HORNE:  I did, and I

3          borrowed heavily from the fine

4          depositions that Jerry took, and

5          Dave also gave us some deposition

6          transcripts of sales reps.  So, I

7          borrowed heavily from those, but

8          we took -- I think Kim and I, I

9          think there was a different line

10         of thought on the sales reps.  All

11         the sales rep depositions that I

12         took were at least eight hours

13         long.  I mean, it was an all day

14         affair.

15              MR. LEVIN:  Forest, were you

16         assisting her in processing her

17         cases or just your own?

18              MR. HORNE:  Just my own.

19              MR. LEVIN:  Your firm's?

20              MR. HORNE:  Just my firm's.

21              MR. LEVIN:  How many cases

22         did your firm have?

23              MR. HORNE:  We filed 48

24         cases all in New Jersey.  We

Page 10

1        screened probably -- I'm with a

2        15-lawyer plaintiffs firm with our

3        primary office in Raleigh, and so

4        we get a lot of calls when there

5        are these kind of drug cases.  We

6        screened probably 2000 cases and

7        narrowed that down to 48.  We only

8        filed and put up for expedited

9        discovery the ones where the Vioxx

10       usage was clear and where we

11       thought the causation was

12       relatively clear, at least early

13       on it seemed like it was clear.

14       It got hazier as you went along,

15       but we had 48 cases.  Every one of

16       them was filed in New Jersey.  We

17       filed the first case in January of

18       2005.  I think at the time there

19       were only about 300 filed in New

20       Jersey at that time, and then

21       within six months, we actually

22       screened -- we had an expert in

23       cardiology review every case that

24       we accepted before we filed it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        So, we had that.  Ira Gelb and

2        Steve Rich were the two physicians

3        that we had review all of our

4        cases.

5            Myself and my partner, Greg

6        Martin, who was heavily involved

7        in the fen-phen litigation -- I

8        headed up the project for our firm

9        and did most of the work, but my

10       partner, Greg Martin, worked on

11       the case.  And then we hired two

12       experienced associate lawyers to

13       come in to work on the cases.  We

14       devoted two paralegals exclusively

15       to Vioxx, and then we hired two

16       summer law clerks to come in and

17       go through the FACTS database.

18       That's all they did eight hours a

19       day for three months.

20            MR. LEVIN:  For your

21       individual cases?

22            MR. HORNE:  Kim and I, our

23       collaboration, a lot was on the

24       sales reps because we had mutual

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      sales reps, we had mutual

2      physicians and --

3           MR. LEVIN:  Same

4      jurisdiction.

5           MR. HORNE:  -- going through

6      those FACTS documents was

7      maddening.  Kim would call me

8      occasionally and say, did you see

9      this document on Dr. X, and then I

10     would find a document on Dr. Y.

11     We collaborated there, and we

12     collaborated on the sales rep

13     depositions, and I shared a lot

14     of -- Chris, I dealt with Dave and

15     Jeff Grand more than you.  Jerry

16     and I worked together a lot, but

17     we found a number of -- we had one

18     orthopedic physician, I didn't

19     write down his name, but he was an

20     orthopedic physician in

21     Fayetteville, North Carolina who

22     we found in the FACTS database had

23     been paid over $100,000 by Merck.

24     And in collaborating with Robb

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          Dassow and Dave, I think that's
 2          kind of what led to, along with
 3          some other folks, I'm sure, the
 4          order by Judge Higbee to require
 5          Merck to report the income that
 6          Merck had paid all these
 7          physicians.  And the one
 8          physician, the orthopedic
 9          physician that we found in
10          Fayetteville had been paid over
11          $100,000.  We found all of these
12          e-mails, including a PowerPoint
13          presentation where the Merck rep
14          had told the physician to take out
15          a slide that talked about an
16          increase in blood pressure, move
17          it to the end, and don't spend
18          much time on it.  We circulated
19          that with a number of folks in the
20          litigation.
21               MR. LEVIN:  How is
22          Fayetteville these days?
23               MR. SEEGER:  Still there.
24               MR. HORNE:  It is not very
```

FAC Resp. Exhibit D -- 813

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1        friendly.
 2              MR. LEVIN:  I used to be a
 3        policeman in Fayetteville.
 4              MR. HORNE:  Is that right?
 5              MR. LEVIN:  Military
 6        policeman.
 7              MR. HORNE:  The doctor, his
 8        name is Brad Broussard -- these
 9        Fayetteville physicians are very
10        conservative, but this is a short
11        story.
12              I had a 48-year-old client
13        who suffered a heart attack and
14        ended up having a
15        defibrillator/pacemaker installed.
16        He was in perfect health otherwise
17        and was on the heart transplant
18        list, and this physician that had
19        been paid over $100,000 by Merck
20        and was on the speakers bureau,
21        this was the very first case I
22        filed in New Jersey.  I
23        arranged -- one of the things that
24        I tried to do with all my clients
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        is arrange meetings with the

 2        prescribing physicians.  I went

 3        down and met with him, not knowing

 4        that he had been paid $100,000,

 5        and went into a conference -- paid

 6        him $1,000 to meet with him for an

 7        hour and went into a conference.

 8        He just waylaid me.  He said, no,

 9        I'm not going to say that I

10        wouldn't have prescribed it had I

11        known.  Little did I know that he

12        did know, and I found that out

13        later.  His deposition --

14             MR. GIRARDI:  Speaks for

15        it --

16             MR. HORNE:  He just clipped

17        me for $1000 and then was a jerk.

18        The only thing that saved the

19        meeting, the guy said if he was

20        deposed, and this case wasn't on

21        for trial, but he said if he was

22        deposed -- he finally came around,

23        I brought my client with me who

24        pleaded with the doctor, and he
```

FAC Resp. Exhibit D -- 815

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1         finally gave in.

2              MR. SEEGER:  Did you guys

3         work closely with Robb Dassow and

4         Sue Scovern on these sales rep

5         things?

6              MS. WILSON:  Forest did.

7              MR. HORNE:  I worked with

8         Robb on that, and I also worked

9         with Robb on the Medco because we

10        had two cases where we sued Medco

11        because they were 50 milligram

12        cases where they had prescribed

13        for over 18 months of 50

14        milligrams.  So, we sued Merck-

15        Medco.  That was either two or

16        three cases.  I engaged in

17        discovery with Medco's lawyers on

18        those issues, trying to find a

19        connection between Medco and

20        Merck, and I worked closely with

21        Robb on that, and we shared a lot

22        of documents in that regard.

23             Kim put up, I don't know,

24        what was your percentage of cases?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          I mean, you put up close to 50% of

2          your cases.

3               MS. WILSON:  It was over

4          50%.

5               MR. HORNE:  We filed 48

6          cases, and we had 12 in for the

7          expedited discovery.  And then

8          along with Steve Kherkher at

9          Williams Kherkher, I had two cases

10         from North Carolina in the four

11         trial groupings that were set for

12         trial originally in October, and

13         then were moved to January.  I

14         worked closely with Jerry on those

15         and attended all the meetings, and

16         also Dave and Jeff Grand were very

17         helpful.  Frankly, I knew the

18         settlement discussions were going

19         on, but I had no idea that y'all

20         had moved it along as far as it

21         was.  So, we were heavily

22         preparing for trial along with

23         Steve Kherkher.

24              Steve's firm had two North

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
1       Carolina cases, and my firm had

2       two North Carolina cases that I

3       put up.  So, we were collaborating

4       together.  And then Judge Higbee

5       changed her mind early on and said

6       I only want prelabel change cases

7       in the mix.  So, one of my cases

8       dropped out because it was post

9       label change.  And then in

10      discovery, the two cases that

11      Steve had developed usage

12      problems, so both of his cases

13      dropped out.  So, we were down to

14      one case in North Carolina, and I

15      communicated with Dave, and we had

16      a hearing with Judge Higbee,

17      fought Hope Freiwald tooth and

18      nail, and added another case that

19      was not on the expedited list for

20      trial.

21           So, I brought another case

22      in for the January '08 trial mix

23      and got that case -- even though

24      it wasn't in my expedited group, I
```

FAC Resp. Exhibit D -- 818

Page 19

1        got the client and his wife up to

2        Philadelphia, went to Dechert,

3        dealt with Hope on all of those

4        depositions, got that done, got

5        the physicians deposed.  So, we

6        had those two cases set for trial.

7            I worked closely with Sol

8        Weiss on developing Steve Rich.  I

9        had been using Steve from early

10       '05 on specific causation, and

11       then Sol had worked with him on

12       general causation.  And Steve was

13       going to be our general causation

14       expert for the January '08 trial

15       set cases along with Sol.  I went

16       up to Philadelphia to defend

17       Steve's general causation

18       deposition, coordinated our

19       cardiologists, who saw all the

20       clients whose cases were trial set

21       on specific causation.

22           The Williams Kherkher firm

23       developed Dr. Goldberg for the

24       marketing case.  I wasn't involved

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          in that, they were.

2              But we, like Kim, our firm

3          responded every time there was a

4          call to put more cases in the mix,

5          and I was pretty vocal about that

6          on the list serve, saying, guys,

7          we are all in this together.  So,

8          we volunteered over 25 percent of

9          our firm's caseload, and we worked

10          them up, and we brought quality

11          cases to the mix.

12              MR. GIRARDI:  Was it the

13          same 50 cases?

14              MR. HORNE:  No.

15              MS. WILSON:  No.

16              MR. GIRARDI:  How many cases

17          did you have?

18              MR. HORNE:  We filed 48.  We

19          screened 2000 to get 48, and we

20          only filed cases where -- we knew

21          from the fen-phen days that

22          causation was going to be an

23          issue, so we felt comfortable that

24          we either had affidavits from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        doctors where there were sample

2        cases, and then otherwise we had

3        rock solid usage on our

4        prescriptions.

5            MR. LEVIN:  How many of your

6        cases did you put in the same

7        position that Kim's were where you

8        worked them up to trial?

9            MR. HORNE:  We had 11 cases

10       in the mix, but then we added the

11       additional ones, so, there were

12       12.  And we had a hearing with

13       Hope, and Dave was instrumental in

14       getting this other case added at

15       the last minute.  Otherwise, we

16       would have only had one case for

17       the North Carolina trial setting,

18       and we were able to get one of our

19       other cases in, so we had two.  I

20       attended all the meetings with

21       Jerry on that, we collaborated

22       closely on all of the preparations

23       for trial.

24           MR. BLIZZARD:  Forest, help

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1    me understand the timing of this

2    because I think we heard some of

3    this the other day from Steve

4    Kherkher.

5         When were those four cases,

6    two of yours and two of Williams

7    Kherkher, scheduled to go to trial

8    originally?

9         MR. HORNE:  October of '07.

10        MR. BLIZZARD:  Then as I

11   understood, three of them dropped

12   out because of various reasons,

13   including two of them because they

14   didn't have proof of use.

15        MR. HORNE:  Right.

16        MR. BLIZZARD:  So, there was

17   one left, and then you added one?

18        MR. HORNE:  Right.

19        MR. BLIZZARD:  That case was

20   then put off until February of

21   2008?

22        MR. HORNE:  No.  We got that

23   case -- I was in Salt Lake City in

24   depositions in another case and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          had a conference call with Dave
 2          Buchanan, Hope Freiwald and Judge
 3          Higbee, and Hope was screaming
 4          about adding one of our cases
 5          late.  It had been filed and had
 6          been there.
 7               MR. BLIZZARD:  I'm trying to
 8          find out, when were those two
 9          then, the one you added and the
10          one that still was there, when
11          were they set for trial?
12               MR. HORNE:  With the trial
13          grouping of four cases, and I
14          think the Weitz Luxenberg setting
15          had a problem with that expert,
16          and I think there was some talk at
17          the time of settlement of moving
18          it back, so there would only be
19          three cases.
20               MR. SEEGER:  Well, there was
21          actually, and then something
22          happened to that setting.  They
23          got moved to like September or
24          October.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1              MR. HORNE:  It was October.

2              MR. SEEGER:  Then they got

3       bounced to January and then we

4       settled.

5              MR. BLIZZARD:  I'm confused,

6       because I thought I heard

7       yesterday Kherkher say the cases

8       were set in March of 2008, that

9       those were actually Martin & Jones

10      cases, but that they were working

11      on them.

12             MR. SEEGER:  They might have

13      been originally set for

14      March/April of '07, because that

15      was an original target date.  I

16      don't remember why we lost the

17      setting, there were so many facts.

18      Dave definitely will, because he

19      remembers everything.  But that

20      somehow wound up after the summer,

21      which was September/October, and

22      basically the settlement came

23      before you guys could try the

24      case.  But the cases were in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          queue, and they were going to go

2          at that point.

3               MR. HORNE:  Right.

4               MS. WILSON:  Black.  I

5          remember why we took Black off.

6          Black ended up, he was an MI and a

7          stroke, and Judge Higbee didn't

8          want to do that.

9               MR. SEEGER:  That's right.

10              MS. WILSON:  That's why

11         Black didn't go.

12              MR. SEEGER:  She tried to

13         keep the issues as close as she

14         could for trial groupings because

15         she was doing more than one case

16         at that point.

17              MS. WILSON:  Just my

18         affidavit --

19              MR. SEEGER:  Just so I'm

20         clear.  I'm sorry, Kim.  So

21         Kherkher was going to help you

22         guys try the case?

23              MR. HORNE:  No.

24              MR. SEEGER:  I'm not clear

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           on that.

2               MR. HORNE:  What happened

3           was, Steve had two North Carolina

4           cases, and I had two North

5           Carolina cases.  We were at the

6           hearing when the judge was asking

7           for trial cases.  So, I offered

8           both of mine up, and Steve offered

9           both of his up.  We agreed to work

10          together, and I would work my

11          cases up, he would work his cases

12          up, and we would share the general

13          and specific causation experts for

14          trial.  At the beginning of that,

15          Judge Higbee at the last minute

16          changed her mind and said, I only

17          want three prelabel cases.  So,

18          one of mine dropped out, and it

19          was two of Steve's and one of

20          mine.  And then both of Steve's

21          dropped out, because in the

22          depositions they did, the

23          prescription usage and samples was

24          terrible, so, they voluntarily

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1           dropped those.  That's when I

2           added another one of my cases.

3               MR. SEEGER:  You had two

4           cases?

5               MR. HORNE:  I had two cases.

6               MR. SEEGER:  At that point,

7           they didn't have a case in.

8               MR. HORNE:  They didn't have

9           a case in, but they had already

10          gone a long way down the road of

11          developing the experts.

12              MR. SEEGER:  Yes.  No

13          question.

14              MR. HORNE:  They continued

15          with that.  As far as my two

16          cases, I handled all the

17          depositions for my clients and

18          their spouses and the physicians

19          and the sales reps.  I did all of

20          that.

21              MR. SEEGER:  Okay.

22              MR. BLIZZARD:  Was there any

23          agreement that they would try your

24          two cases that remained?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1           MR. HORNE:  We were going to

2       try it together.  And I told Steve

3       this, and we had early on -- we've

4       got an office in Atlanta as well.

5       So, we had some Georgia cases, and

6       we had some -- a couple of good

7       Georgia cases that we were going

8       to put up.  Someone else had some

9       Georgia cases, and we couldn't

10      come to an accommodation, because

11      I told Steve, I'm going to be

12      involved in my cases.  I'm not

13      going to delegate it to you and

14      you do everything, because that's

15      just not the way I work or my firm

16      works.  So, I worked up my cases,

17      Steve worked up his cases.  We

18      were sharing the general and

19      specific causation witnesses for

20      trial.  And then we were going to

21      divide up opening, closing, cross

22      examinations, witness examinations

23      and that sort of thing.

24           MR. SEEGER:  Once their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
1        cases were out, how would the

2        trial have gone?  Would you have

3        taken the lead, would they have

4        worked with you on the trial

5        still?

6              MR. HORNE:  Yes.  And when

7        that happened, because --

8              MR. SEEGER:  You were still

9        dividing up.

10             MR. HORNE:  What happened

11       when Steve's cases dropped out, we

12       were down to one case.  They

13       didn't have any other North

14       Carolina cases.  And that's when

15       we had to get Dave involved.  And

16       I told Hope, look, I've got a case

17       that's been filed, fact sheets in,

18       you've got all the medical

19       records, basically everything is

20       there.  I'll get the client up to

21       Philadelphia next week with his

22       wife.  We'll make every

23       accommodation.  And I think the

24       one thing Judge Higbee did was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

 1          gave 30 extra days to designate

 2          the experts.  But I got that case

 3          in with Dave's help.  But Steve

 4          was so far down the road with the

 5          marketing expert and a fine

 6          cardiologist out of San Francisco

 7          that came back to North Carolina

 8          and saw both of these clients.  He

 9          was so far down the road with

10          that, I said let's --

11               MR. SEEGER:  Keep it

12          together.

13               MR. HORNE:  -- keep it

14          together, and that's what we did.

15               MR. WEITZ:  Forest, clarify

16          some times with me and cases.

17          Because in January of '07, you had

18          Hermans and Humeston, and then you

19          had Keeley and Rossi, which

20          Humeston was Chris's case, Hermans

21          was Lanier's, and Keeley and Rossi

22          were Weitz & Luxenberg cases.  She

23          set those cases down for trial in

24          January '07, and then Hermans and

FAC Resp. Exhibit D -- 830

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1        Humeston were tried in February

2        '07.  Keeley and Rossi were then

3        postponed to be tried in September

4        of '07, and then the judge just

5        put it on hold because there were

6        negotiations going on.  Where were

7        your cases with respect to that?

8        Did you have an actual firm trial

9        date?

10           MR. HORNE:  Yes.

11           MR. WEITZ:  From when?

12      Because Keeley and Rossi were the

13      next ones she was trying.  I'm

14      trying to figure out when you and

15      Kherkher had trial dates.  Was it

16      after those two cases?

17           MR. HORNE:  Originally there

18      were four states set forth for

19      trial.  It was North Carolina,

20      Pennsylvania, New Jersey and New

21      York.  Jerry was heading up the

22      New York, and Sol had both New

23      Jersey and Pennsylvania, and I had

24      North Carolina.  Those four cases

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          were all set on the same track.

 2          Then Jerry and I talked about the

 3          fact that his -- the general

 4          causation witness out of Canada

 5          called Jerry the night before his

 6          deposition and said, oops --

 7               MR. WEITZ:  He had an

 8          article --

 9               MR. HORNE:  -- he signed an

10          affidavit I think.  He said, I

11          think I signed an affidavit.  But

12          North Carolina was in that

13          setting.  We were in that setting.

14          And then because of that snafu

15          with Jerry's expert, I think Judge

16          Higbee -- and this was all about

17          the time the settlement came down

18          -- was going to move the New York

19          setting out to February because we

20          were down the road as far as when

21          the jury was going to come in, and

22          we were talking about renting out

23          the convention center at the hotel

24          and having the voir dire there.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          MR. WEITZ:  So, you were

2      part of the final stage in those

3      two cases?

4          MR. SEEGER:  Yes.

5          MR. HORNE:  Yes.  Jeff Grand

6      and Dave Buchanan and I worked --

7      Dave was very gracious --

8          MR. SEEGER:  By the way,

9      Jeff Grand just had a baby.  For

10     the record, let the record reflect

11     we're looking at Jeff's new baby.

12         MR. HORNE: My two cases were

13     Romans, Billy Ray Romans and Andy

14     Ray Sanderson.

15         MR. WEITZ:  The cases Forest

16     had ready for trial were Romans

17     and Sanderson.

18         MR. HORNE:  Yes.  Romans was

19     a prelabel change that was in the

20     mix originally.  Sanderson was the

21     case that was added after a motion

22     hearing with Dave and Judge Higbee

23     and Hope and myself, and Judge

24     Higbee agreed to add Sanderson.

FAC Resp. Exhibit D -- 833

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1       So, Sanderson and Romans were the

2       two North Carolina cases that were

3       set to go to trial originally in

4       that October setting with the New

5       Jersey, Pennsylvania and New York

6       cases that Judge Higbee then moved

7       into January.

8              I went to the status

9       conference in November and left

10      there, flew back to Raleigh, North

11      Carolina, jumped in my car and

12      drove four hours to Asheville and

13      got to the hotel at 4:00 a.m. and

14      deposed a Merck rep on a Friday

15      from 9:00 in the morning until

16      6:00 at night, and then the next

17      week is when the settlement

18      happened.

19             And I didn't -- and Steve, I

20      don't know what Steve knew.  He

21      may have known more than he told

22      me, but after the fact -- I mean,

23      I knew the negotiations were

24      going, and I think that's -- even

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1          Judge Higbee said in a conference
 2          that that's one of the
 3          considerations for moving the
 4          setting from October of '07 to
 5          January '08.  But I had no idea
 6          that y'all were that close, and
 7          obviously a great result.
 8                  MR. LEVIN:  Neither did we.
 9                  MS. WILSON:  My cases are
10          real simple.  I did not work with
11          Kherkher at all.  I worked with
12          two people.  That was Chris Seeger
13          and Mark Lanier.  So, mine is real
14          clear-cut.  That was kind of the
15          get go.  Forest and I collaborated
16          a lot.
17                  Something I would like to
18          add is, after the settlement was
19          announced, it was either Chris or
20          Mark, one, who got interviewed by
21          the Wall Street Journal reporter.
22          I think it was you who told that
23          person to call me.  They asked me
24          to describe my role in Vioxx in
```

FAC Resp. Exhibit D -- 835

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          this litigation.

2                  MR. SEEGER:  Must have been

3          me.  Lanier would have never sent

4          a reporter to someone else.

5                  MS. WILSON:  I think we had

6          some five star generals, and I was

7          a front line soldier really every

8          step of the way, and there weren't

9          a lot of us out there.

10                 MR. SEEGER:  You also had a

11         case in Federal Court that you

12         were trying to get remanded to the

13         transfer court in North Carolina

14         that you wanted us to try

15         together.

16                 MS. WILSON:  That's right.

17         That's the Howard case, and I

18         think it is still probably right

19         now one of the best cases out

20         there.  I have no doubt it has

21         already been approved actually.

22         I'm just waiting on our points, I

23         guess I should say.  Great case,

24         and that was the plan.  We were

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1        going to tee that up.  So, I did

2        have one in the MDL.

3            It was a tough litigation,

4        as you guys know.  I thought it

5        was far harder than Baycol,

6        fen-phen, Rezulin.  I don't think

7        anything compares to Vioxx.  I

8        really don't.  It was very tough.

9            Anyway, after the settlement

10       was announced, I certainly did my

11       part to help bring everyone

12       together in newspapers, on TV,

13       talked about what a tremendous job

14       everyone did, how tough this

15       litigation was.  Hard, hard cases,

16       difficult causation, and I was a

17       big supporter of this resolution.

18           MR. HORNE:  One thing I

19       would like to say about the

20       submission.  I sent every member

21       of the committee a copy of our

22       submission with detailed expenses

23       and time sheets.  I will say we

24       had about 1000 attorney hours that

FAC Resp. Exhibit D -- 837

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1       we submitted for the committee's

2       consideration, and that is an

3       extremely conservative amount

4       because we don't keep hourly

5       bills.  I think Kim's firm, they

6       do keep track of their time.  We

7       don't.  I went back through, and

8       the only thing that I submitted

9       for this committee's consideration

10      are matters that were related to

11      the 12 cases and the trial and

12      those expenses.  There's nothing

13      in here for stuff that I didn't

14      truly think was for the common

15      benefit.

16           Going into this, Kim's firm

17      and my firm, we were really kind

18      of the only two firms in the

19      state.  So, in a way, we were

20      certainly competitors, but we also

21      collaborated from the very

22      beginning, and it was both of our

23      intentions to try these cases.  I

24      went to the first trial in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          Brazoria.  I went for the full

2          week, that first week there.  I

3          saw Mark Robinson was there and

4          had dinner.

5               MR. LEVIN:  With Mark?

6               MR. HORNE:  With Ben Morelli

7          and some other folks during that

8          trial.  I stayed there for the

9          whole week and saw the openings.

10         Chris, I watched you on Court TV.

11         I spent about a week watching

12         that.  I came back for the

13         Hermans/Humeston openings.

14              MR. SEEGER:  I remember

15         that.

16              MR. HORNE:  Because Hope

17         came over to ask you to get Kim

18         and me --

19              MR. SEEGER:  They were

20         sitting on the defense side, and

21         Hope said, these guys are

22         plaintiffs lawyers, would you tell

23         them to go on to the other side.

24         There's no line in the middle.

FAC Resp. Exhibit D -- 839

Page 40

1          They can sit wherever they want.

2               MR. WEITZ:  Judge Fallon's

3          PTO Order 6, he laid out

4          guidelines.  You are worried about

5          the hours.  The hours are a factor

6          to consider, but the judge laid

7          out in his Murphy Oil decision

8          that there are a lot of other

9          factors, people that were actually

10         litigating the cases and moving

11         the dockets in jurisdictions and

12         were preparing to try the cases.

13         Those are factors.

14              MR. SEEGER:  This is helpful

15         to us.

16              MR. HORNE:  Kim and I, we

17         traveled to New Jersey for like

18         two of the trials, I believe.  But

19         I saw openings or closings in -- I

20         was there for Jim Pettit's

21         closing, I was there for your

22         opening in Hermans/Humeston.  I

23         was there for Mark's opening in

24         the first case in Texas.  I was

Page 41

```
 1         there for one of the other ones.
 2         And so it was --
 3              MR. SEEGER:  I didn't get a
 4         chance to talk to you much.  I
 5         know that you worked a lot with
 6         Dave and Jeff.
 7              I spoke to you all the time.
 8         Kim was always looking to get
 9         something set for trial.  That's
10         the fairest way to reflect it.
11         How many times did we talk to each
12         other on the phone?  I've got this
13         case, this is a great case for
14         trial, I've got two cases coming
15         to New Jersey.  You are our kind
16         of people.  That's the way to move
17         a case.
18              MR. LEVIN:  Pleasure to have
19         met.  Up until now, I only knew
20         your hours.
21              MR. SEEGER:  Do you have the
22         hours?
23              MR. LEVIN:  He sent them to
24         everybody.  All of a sudden I got
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          binders.  Now I know.

2                    MS. WILSON:  I did the same

3          thing.

4                    MR. SEEGER:  Have they been

5          reviewed?

6                    MR. LEVIN:  Yes.  Your hours

7          have been reviewed.  They have

8          been approved.

9                    MR. SEEGER:  Which means you

10         have met all the guidelines.

11                   MR. LEVIN:  In fact, your

12         costs to the seven cents were

13         approved.

14                   MR. SEEGER:  What are they?

15                   MR. LEVIN:  159,045.07.

16                   MR. SEEGER:  Both firms?

17                   MR. LEVIN:  No.

18                   MR. WEITZ:  No.  Forest is

19         131 and change.

20                   MR. SEEGER:  That was a very

21         helpful presentation.  Thank you.

22                   MR. LEVIN:  It is a pleasure

23         to see professionals that are

24         truly professionals.

Page 43

1              MR. HORNE:  I want to thank

2         y'all for the work that went on

3         behind the scenes that we never

4         knew about.

5              MR. SEEGER:  Thank you.

6              MR. GIRARDI:  Thank you.

7              MR. BLIZZARD:  Thank you.

8                   -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 844

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:   LIEFF CABRASER HEIMANN &
        BERNSTEIN, LLP
        Elizabeth J. Cabraser, Esquire
        Donald C. Arbitblit, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 845

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2              MS. CABRASER:  Good morning.

3              MR. SEEGER:  Good morning.

4              MS. CABRASER:  I think an

5         appropriate way to start out our

6         presentation, first thing is

7         first, is to say thank you to

8         everyone in this room for leading

9         this case and for the

10         contributions to the common

11         benefit made by the leadership in

12         this case.

13              MR. SEEGER:  Thank you.

14              MS. CABRASER:  Every one of

15         us is probably the center of our

16         own universe, and our own clients

17         are closest to our hearts, but we

18         always like to feel that it is our

19         efforts that lead to their

20         success.  The definition of a mass

21         tort is that no one is alone, no

22         lawyer is alone, no client is

23         alone, and every client's success

24         comes from a collective effort,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          not just efforts of the people who

2          are the obvious leaders, but of

3          the many firms whose efforts we

4          might not even be aware of.  I

5          want to thank those people today,

6          as well, and also to give an extra

7          thanks to this type of work that

8          this committee is doing, because

9          it is arduous, it is detailed, it

10         comes at a time of year when I

11         know everyone would rather be

12         doing other things, and it's

13         necessary.

14              I wanted to spend a little

15         bit of time talking about the work

16         that I personally did in the Vioxx

17         litigation, but it really is more

18         general and generic on the law

19         side of the case, purchase claims

20         committee work, working on

21         briefing, oral argument for the

22         purchase claims committee, motion

23         to dismiss, our writing victories

24         and then defeats in the New Jersey

FAC Resp. Exhibit D -- 847

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        state court, the system on medical

 2        monitoring and providing a support

 3        role, one of many, on the state

 4        side of purchase claims.

 5             This mass tort, both on the

 6        MDL side and in New Jersey was

 7        really, to probably a unique

 8        degree, most about the trials, the

 9        trial preparation, the bellwether

10        trials, and the medical and

11        scientific issues that arose in

12        the course of preparing for and

13        conducting those trials.

14             The person in my firm that

15        spent the largest amount of

16        personal hours on the Vioxx

17        litigation, over 5,000 hours,

18        essentially full-time work for two

19        or three years, is my partner, Don

20        Arbitblit, and he focused on those

21        all important medical and

22        scientific issues.  So, I thought

23        or we thought it was most

24        appropriate to have Don take the
```

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      laboring oar in this presentation

2      to go through those efforts that

3      work, how it related to and how it

4      contributed to the sequence and

5      system of Daubert hearings,

6      depositions and bellwether trials

7      that, in turn, culminated in the

8      settlement of this case.

9          Don.

10         MR. ARBITBLIT:  Thank you,

11     Elizabeth, and thanks to everyone

12     in the room for all the work that

13     you have done to make this

14     possible.

15         I prepared a PowerPoint, but

16     we don't have computers.  I have

17     hard copies that, if you would

18     like to follow along on the

19     presentation, I have a couple of

20     extras.  How about if we pass one

21     to Chris and Perry and Ed, and,

22     I'm sorry, I'll just --

23         MS. CABRASER:  And it was a

24     true stroke of genius not to have

FAC Resp. Exhibit D -- 849

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          PowerPoint in this room.

2                MR. ARBITBLIT:  In any case,

3          the affidavit addressed the

4          criteria set forth in the order,

5          and I think we've ranked pretty

6          high on most all of those, so, I

7          won't go over those in all their

8          detail, but I do want to emphasize

9          certain aspects of the criteria,

10          in particular, the trial work,

11          depositions and discovery, some

12          significant motions and

13          recognition by co-counsel and even

14          one of the expert witnesses about

15          the quality and importance of the

16          work that we did during the Vioxx

17          case, which was full-time work for

18          me and done with a passion to get

19          the best result we could for

20          everyone.

21                Close to 19,000 hours, over

22          half of them by partners, and when

23          the partners weren't doing the

24          work, we were closely supervising

FAC Resp. Exhibit D -- 850

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          it to make sure that it was --

2                    MR. LEVIN:  You said 19,000?

3                    MR. ARBITBLIT:  19,000,

4          18,789 hours.

5                    MR. LEVIN:  That's how many

6          hours you have?

7                    MR. ARBITBLIT:  Yes.

8                    MR. HERMAN:  Don, I'm

9          familiar with the work you did,

10         certainly, particularly in the

11         science area, but who were the

12         other partners that actually

13         worked in the science area?

14                   MR. ARBITBLIT:  Well, I

15         would say that my most important

16         assistant on the science is Jenny

17         Gross, who is up for partnership

18         this year, we'll see how that

19         goes, but she has a lot of

20         experience in science.  She is a

21         scientist, and she has skills that

22         I find unique in the plaintiff's

23         bar.

24                   MR. SEEGER:  When you say "a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        scientist," she has formal

2        training?

3             MR. ARBITBLIT:  She is two

4        courses away from being a Ph.D.,

5        and her work on the statistics and

6        the data analysis was very unique

7        in my experience.  I've been a

8        lawyer for 29 years.

9             MR. HERMAN:  Excuse me.  Her

10       Ph.D. would be in statistics?

11            MR. ARBITBLIT:  Yes.  And

12       I've never seen anyone like her in

13       all the years I've been

14       practicing, which is 29.

15            So, she's not a partner, but

16       she was my most important asset in

17       terms of digging out the data,

18       analyzing it and figuring out

19       where we could nail Merck on what

20       they were saying, as opposed to

21       what the data said and how we

22       could feed our experts the right

23       information and get the right

24       analysis.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1              MR. LEVIN:  Help me out with

2         the hours.  I'm absorbed in hours.

3         You have 18,000 hours, and, you

4         know, that may very well be.  The

5         accountant has you at 710 hours,

6         which is mind boggling.

7              MR. ARBITBLIT:  That's not

8         true, Arnold.

9              MR. LEVIN:  I know it is not

10        true.  Have you been contacted by

11        the accountant?  Do you know what

12        the problem was and how it's being

13        resolved, because --

14              MR. SEEGER:  We have to

15        clean it up.

16              MR. LEVIN:  -- you also have

17        about $785,000 in costs, which I

18        would imagine can't be all

19        airplanes, so, it must be expert

20        fees and everything that you paid

21        for.  I would imagine those

22        experts were -- tell us who they

23        were and that they were approved

24        by the committee, because it's a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1        substantial amount of money you

 2        have invested in the case.

 3             MR. ARBITBLIT:  Sure,

 4        Arnold.

 5             First of all, I have been in

 6        contact with Marcy Roussel from

 7        Wegmann-Dazet, and over the course

 8        of the last month, I have, as far

 9        as I know, cleared up every

10        question she had and submitted all

11        of our hours, which totalled to

12        the amount set forth in the

13        affidavit.  As far as I know,

14        there are no questions, and I was

15        in touch with her just before

16        Thanksgiving to verify that.  And

17        I hope that you will do the same

18        and let us know if there's any

19        questions.

20             MR. SEEGER:  This is really

21        just admin at this point.  We're

22        working off the hours in the

23        affidavit.

24             MR. ARBITBLIT:  Thank you,

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 854

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1        Chris.

 2             On the experts, one of the

 3        criteria was did you get involved

 4        before there was an MDL.  The

 5        answer is yes.  We did a

 6        substantial amount of work before

 7        the MDL.  I think in the

 8        affidavit, it is listed as the

 9        particular number of hours, but it

10        is in the thousands of hours, and

11        we also retained experts prior to

12        the MDL, one of whom was Dr.

13        Farquhar, who was the expert cited

14        by Judge Bechtle in the fen-phen

15        litigation upon whom he relied for

16        the medical monitoring decision.

17        Farquhar did quite a lot of work

18        before he was ever approved by the

19        MDL.  If fact, his 95-page report

20        was specifically cited by Judge

21        Fallon when I briefed and argued

22        the Daubert motion in November of

23        2005 as being a thorough and

24        explanatory 95-page report upon

FAC Resp. Exhibit D -- 855

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          which he relied in finding that

2          the plaintiffs used proper

3          methodology and had a reliable

4          qualified expert when we surpassed

5          the initial and comprehensive

6          Daubert hurdle on short-term

7          duration on the naproxen defense

8          on the epidemiology evidence.  So,

9          a lot of that work was being done

10         before there was an MDL and before

11         there was an authorization

12         process.

13              Once the MDL was in place,

14         Dr. Farquhar was submitted to the

15         PSC and approved, as well as

16         Nicholas Jewell and Phillip

17         Lavori, who were assistants of his

18         at UC Berkeley School of Public

19         Health, and Stanford, who did the

20         statistical analyses upon which

21         Farquhar relied.  So, those were

22         the principal expert costs that

23         are in that mix.

24              So, I wanted to talk a

Page 13

 1          little bit about early work that

 2          we did, in particular,

 3          communications that I had with

 4          Carlene Lewis, who was a pioneer

 5          and a beloved member of this

 6          committee before her untimely

 7          death.  Carlene was the initial

 8          chair of the science committee and

 9          also trial counsel on the Ernst

10          case.  At that point, I was

11          already the chair of the

12          epidemiology and causation

13          subcommittee, and I took it upon

14          myself to provide whatever

15          information I could to that trial

16          team as the trial was ongoing.

17          That included documents that were

18          being taken from the discovery

19          that was ongoing about the APPROVe

20          trial.  It included a document

21          that I used at a deposition during

22          the Ernst trial to show that Merck

23          had the authority to change the

24          label on its own without waiting

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          for the FDA, which was a subject

2          of great interest to them in the

3          trial.

4               This is at slide 9, there's

5          a summary of some of this, and

6          this was Dr. Bold, who was the

7          Merck witness who admitted that

8          they changed the label without

9          waiting for the FDA.  At the same

10         time, they were saying they

11         couldn't do that.

12              There's an e-mail, one of

13         many e-mails at slide 10 where

14         Carlene was asking initially for

15         my guidance on how to get through

16         the new drug application

17         submission.  I answered that

18         question, and then you can see at

19         the top what she said, which I

20         wouldn't say these things about

21         myself, but in this setting, it is

22         my job to tell you what others

23         have said.  She says, "Thanks so

24         much, Don.  You've been invaluable

Page 15

1          this trial.  I owe you big time."

2          Coming from Carlene, that's a very

3          significant and meaningful message

4          for me to have obtained.

5               And the slide after that is

6          an e-mail from Chris Seeger, thank

7          you, Chris.

8               MR. SEEGER:  I remember

9          this.

10              MR. ARBITBLIT:  "Don, this

11         is a great find.  I'm using this

12         information about Merck's having

13         changed the label on a significant

14         adverse effect when they said that

15         that was not possible."

16              The next thing I wanted to

17         talk about briefly, I'm sure most

18         of you or probably all of you know

19         something about this New England

20         Journal of Medicine deposition and

21         Dr. Curfman.  This was something

22         that was my idea to take.  I

23         planned it, I implemented it, I

24         took the deposition.  I did it in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1      a way that shows -- the only way

2      that I could show confidential

3      documents to someone at the New

4      England Journal to show that they

5      had been snookered was by having a

6      deposition because, otherwise, I

7      would have been violating

8      confidentiality orders.  So, I

9      went to the deposition with a set

10     of materials to show him chapter

11     and verse, day by day, what Merck

12     knew, when they knew it and how

13     they couldn't possibly have in

14     good faith and in good conscience

15     withheld it from the Journal, yet

16     they did.  The editor, Dr.

17     Curfman, was outraged by it, and

18     he published an Expression of

19     Concern, which is equivalent to a

20     correction, and then that was

21     confirmed.

22          The Expression of Concern or

23     EoC said that Merck withheld

24     critical data about cardiovascular

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          toxicity, you can see a summary of

2          this at slide 12, and then said

3          that the article was misleading

4          and did not accurately reflect the

5          potential for serious

6          cardiovascular toxicity with

7          rofecoxib.  That's pretty good

8          stuff from someone who is not

9          aligned with plaintiffs and had

10         never said anything that had

11         previously favored plaintiffs in

12         litigation.

13              What you can see at slide 13

14         is an actual document from Merck's

15         memo of July 2000 that was

16         reprinted by the New England

17         Journal.  What you see there is

18         exactly what the Journal was

19         concerned about that had been

20         withheld, that top line where

21         Vioxx had 47 versus 20 for

22         naproxen in the serious

23         thromboembolic events, which led

24         the Journal to conclude that for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          every serious gastrointestinal

 2          event that was prevented by Vioxx,

 3          there was an offset of at least

 4          one serious heart attack, stroke

 5          or serious event.

 6                    MR. HERMAN:  Let me

 7          interrupt you --

 8                    MR. ARBITBLIT:  Yes, please.

 9                    MR. HERMAN:  -- because

10          there's some points I think I

11          would like you to make, and I've

12          been through the PowerPoint, and

13          my questions, some come from

14          memory and many from the

15          PowerPoint.

16                    Tell me what your

17          involvement was in Humeston.

18                    MR. ARBITBLIT:  Right.  I

19          was just about to get there,

20          actually, Russ, in two ways.

21                    First of all, as I had with

22          Ernst, and even probably more so,

23          because I had started my

24          involvement in this litigation in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          the fall of 2004, specifically

2          with Chris and Dave, and got my

3          initial assignments from Dave,

4          because he wanted lawyers with a

5          science aptitude.  So, I was

6          constantly in touch with Dave.

7          There are hundreds of e-mails back

8          and forth about every issue that

9          came to mind.  He asked me to help

10          prepare their expert, Dr. Kronmal.

11          I participated with him in

12          preparing his report, prepping him

13          for his trial testimony.  There

14          are many e-mails back and forth

15          about interpretation of APPROVe.

16                And then in Humeston, as it

17          was going on, he asked for my help

18          in preparing for cross-examination

19          of Dr. Reicin, and also I was

20          preparing him for Dr. Graziano,

21          their epidemiologist.

22                MR. HERMAN:  You were in New

23          York for that?

24                MR. ARBITBLIT:  No, I was

FAC Resp. Exhibit D -- 863

Page 20

```
 1          not in New York for that, I was in

 2          California, but I was responding

 3          by e-mail on an urgent basis.

 4          Whenever Dave wrote, I was right

 5          there writing back, or Chris.

 6               MR. HERMAN:  What about the

 7          Ernst trial?

 8               MR. ARBITBLIT:  Can I just

 9          finish on Humeston?

10               Humeston I was a loss, but

11          Judge Higbee specifically relied

12          on the New England Journal as the

13          basis for the motion for a new

14          trial that allowed Chris, Dave and

15          the team to secure this $47

16          million verdict in Humeston.

17               MR. HERMAN:  In Humeston II?

18               MR. ARBITBLIT:  In Humeston

19          II.  So, without the New England

20          Journal article, there might not

21          have been a new trial.  So, I take

22          no credit for the great job they

23          did at trial, but I feel very

24          happy and proud to enable them
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          with that work.

2                    MR. HERMAN:  What about the

3          Ernst trial?

4                    MR. ARBITBLIT:  The Ernst

5          trial, as I mentioned, I was in

6          touch with -- I was not in Texas,

7          I was working with Carlene Lewis

8          on a steady basis, providing her

9          interpretations of documents and

10         studies, providing her with

11         documents that would show you

12         could have a Vioxx injury with

13         short duration, and as mentioned,

14         that Merck was able to change the

15         label regardless of whether the

16         FDA said that they could in

17         advance, which was a contested

18         issue.

19              The Barnett trial, which was

20         here in New Orleans, I was a

21         full-time member of that trial

22         team.  I was specifically invited

23         on to that team by Mark Robinson,

24         because he knew I was working both

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1      historically on other science

2      cases --

3           MR. HERMAN:  I note that in

4      your presentation, Mark had

5      requested various materials from

6      you even before that trial began.

7           MR. ARBITBLIT:  Yes.  Well,

8      I knew Mark all the way back to

9      fen-phen, and he knew that I dig

10     deep into the science issues, and

11     that's what he needed.  That's not

12     his strong suit.  He has many

13     strong suits, but he knows that he

14     needs help on that.  He gave me

15     the job of working with Dr. Zipes,

16     his key expert --

17          MR. HERMAN:  Did you go to

18     the Philadelphia meeting he

19     arranged?

20          MR. ARBITBLIT:  I went to

21     the Philadelphia meeting he

22     arranged.

23          MR. HERMAN:  Tell us about

24     that.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1           MR. ARBITBLIT:  Well, my

2      understanding of it was that there

3      was an attempt to find a way to

4      reach common ground without

5      sharing work product, and so we

6      did not.  We talked about ideas,

7      but no MDL expert information was

8      provided to anyone outside the MDL

9      at that time or any other time

10     that I know of.

11          I had engaged in

12     discussions -- for example, I had

13     discussions with Jerry Kristal,

14     and I think there's some e-mails

15     in there where Jerry and I are

16     saying how much we like each

17     other's work.  One of them toward

18     the end says -- if you will look

19     at slides 25A and B, I did some

20     analysis of the VICTOR manuscript,

21     which went to Chris and --

22          MR. HERMAN:  I want to get

23     back -- I'm sorry.  I want to get

24     back to Philadelphia, this idea

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          that there was a meeting.  I still

2          don't understand that meeting.  I

3          have to tell you that.  Because,

4          frankly, at least in the MDL

5          executive committee and various

6          chairs, we had no idea the meeting

7          was going on.

8               MR. LEVIN:  How was it

9          called, and what was Dan

10         Sigelman's role?

11              MR. ARBITBLIT:  I don't know

12         how it was called.  I only know

13         that Mark asked me to come and so

14         I did.  I did learn at the time of

15         the meeting on the day of the

16         meeting that there was concern at

17         the MDL that something improper

18         might occur, and certainly from my

19         standpoint, and from what I

20         observed of Mark's standpoint,

21         nothing improper occurred.  We

22         listened, primarily we listened to

23         what their expert, Dr. Madigan,

24         had to say.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1            MR. HERMAN:  Whose expert

2        was Madigan?

3            MR. ARBITBLIT:  He was

4        the -- there was a New Jersey

5        team.  I don't know exactly --

6            MR. LEVIN:  Eric Weinberg?

7            MR. SEEGER:  Yes, it was

8        Weinberg.

9            MR. ARBITBLIT:  Weinberg was

10       one of the people working with

11       Madigan.  I don't know the extent

12       of who worked with Madigan, nor

13       who retained him.

14            MR. HERMAN:  Tell us about,

15       you were full time on the Barnett

16       trial team.  How long were you in

17       New Orleans?

18            MR. ARBITBLIT:  I was in New

19       Orleans for the entire trial,

20       which was approximately three

21       weeks and a couple of days ahead

22       of time.  And I had some pretty

23       significant tasks that are

24       described at slides 16 through 25.

FAC Resp. Exhibit D -- 869

Page 26

1          I got involved full time in April

2          2006 when Mark asked me to do

3          that.

4              My initial job, based on

5          what I knew about the data, I

6          wanted to see how can we prove

7          this case.  The main thing to me

8          was what's the guy's blood

9          pressure history, because I knew

10         we had some good stuff on blood

11         pressure, a special high risk

12         category.  So, I went through the

13         guy's records, I found these

14         spikes where he had gone over 160

15         in his systolic blood pressure,

16         and I knew that put him in a high

17         risk category.  We developed

18         demonstratives to show exactly

19         what these were so that a jury

20         could understand.  I put a couple

21         of these in the PowerPoint at

22         slides 18 through 21.  These are

23         exhibits that we worked up for the

24         trial so that when Dr. Zipes got

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          on the stand, for example, at

2          slide 18, he could show the jury

3          when Merck said all these

4          painkillers are alike, that

5          actually Vioxx was twice as bad as

6          Celebrex.  So, we could use that

7          as the backup for the evidence

8          that Zipes talked about in slide

9          20, where if you are in that blood

10         pressure spike group that Vioxx

11         causes more of, you've got a three

12         out of four chance that Vioxx

13         causes a heart attack.  Dr. Zipes

14         testified to that.  I think it was

15         strong evidence for the jury.

16         That was information --

17              MR. HERMAN:  You helped

18         prepare Zipes, didn't you?

19              MR. ARBITBLIT:  I prepared

20         Zipes for several days, actually.

21              MR. SEEGER:  We had him for

22         a week.

23              MR. ARBITBLIT:  Well, he

24         needed it.  He's a very smart guy.

FAC Resp. Exhibit D -- 871

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          He's at the top of his field, but

2          he's also very demanding, and he

3          was very nervous.  There's an

4          e-mail that he sent that I wanted

5          folks to see, because I thought --

6                MR. SEEGER:  22.

7                MR. ARBITBLIT:  Thank you.

8          That's --

9                MR. HERMAN:  August 11, '04,

10         '06 rather?

11               MR. ARBITBLIT:  Yes.  The

12         one where he says, "I have told my

13         wife all about you.  To me, you

14         epitomize what great lawyers are

15         like, and I can't express how much

16         I respect and admire you.  You

17         helped me tremendously and were so

18         patient and kind."

19               So, I mean, for someone --

20               MR. LEVIN:  What's this

21         "kind" stuff?

22               MS. CABRASER:  This is Don's

23         role in the firm.  I'm not kind.

24         Don is kind.

FAC Resp. Exhibit D -- 872

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1            MR. ARBITBLIT:  I protected

2        him from Mark.

3            MR. SEEGER:  Exactly.  We

4        all get that one.

5            MR. HERMAN:  Tell us your

6        involvement in Kozic.

7            MR. ARBITBLIT:  I was not

8        deeply involved, but at the time,

9        this was after some of the losses

10        and one of the criteria is did you

11        keep on working.  Yes, I was

12        working hard at new documents that

13        had been deprivileged for Dr.

14        Reicin.  I was involved -- I was

15        asked to participate in preparing

16        for her de bene esse deposition.

17            So, in the process of that,

18        I was preparing cross-examination

19        of Dr. Reicin about discrepancies

20        between the data on Vioxx risk

21        versus the --

22            MR. HERMAN:  Who did you

23        work closely with in terms of

24        trial team on that?

FAC Resp. Exhibit D -- 873

Page 30

1              MR. ARBITBLIT:  On Kozic?

2              MR. HERMAN:  Yes.

3              MR. ARBITBLIT:  I spoke with

4       Troy specifically and only Troy.

5       I think I had sent out an e-mail

6       to several people explaining some

7       of the discrepancies between what

8       Merck knew and what published

9       articles said.  Troy responded to

10      that and said --

11             MR. HERMAN:  That was a

12      Florida case that Troy and Pete

13      were involved in?

14             MR. ARBITBLIT:  Yes.

15             MR. HERMAN:  Did you go to

16      Florida in that case?

17             MR. ARBITBLIT:  No.  It

18      involved --

19             MR. HERMAN:  I don't want

20      you to take from what I'm asking

21      that you had to be in Florida or

22      any other place.

23             MR. ARBITBLIT:  I appreciate

24      that.  But what I did was I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1           responded on an urgent basis,

2           since Troy was a week away from

3           trial, in giving him information

4           that would be potentially of use.

5                   MR. HERMAN:  And you also

6           were involved in Berwick in some

7           way?

8                   MR. ARBITBLIT:  Berwick was

9           Robinson's case in California.  He

10          asked me to take a deposition.

11                  MR. HERMAN:  Is that the

12          case he withdrew?

13                  MR. ARBITBLIT:  He did

14          withdraw it, yes.

15                  MR. HERMAN:  Do you know

16          why?

17                  MR. ARBITBLIT:  I don't know

18          specifically.  There were problems

19          with the plaintiff, but I don't

20          know what the specific problems

21          were.  That was after I had been

22          asked to and did take a deposition

23          of Dr. Pratt, who was one of

24          Merck's MDL experts that they were

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 875

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          using in state cases as well, and

2          that deposition is part of the

3          trial package for MDL lawyers, and

4          I think I got some good things out

5          of it.

6                    MR. HERMAN:  What about

7          Irvin I and II?

8                    MR. ARBITBLIT:  I was

9          involved with Andy and with Paul

10         Sizemore quite a bit in Irvin I

11         and II over the course of the fall

12         of 2005, more so in Irvin I than

13         in Irvin II.  Dr. Farquhar -- Paul

14         Sizemore came out to meet with me

15         and with Dr. Farquhar.  He was

16         named as a witness, but they chose

17         not to call him, because there was

18         an inconsistency between his

19         approach and the approach of Dr.

20         Baldwin, whom they did call, as

21         far as what to do with high risk.

22                    Dr. Farquhar was very

23         insistent that high risk added to

24         the likelihood of a Vioxx event,

FAC Resp. Exhibit D -- 876

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1       whereas Dr. Baldwin took a

2       different approach.  There was an

3       inconsistency that would not have

4       been helpful at trial from the

5       people trying the case for the

6       plaintiff.  So, he was not called.

7       But I prepared him.  I met with

8       Paul Sizemore and with Dr.

9       Farquhar.  I provided earlier the

10      320 --

11           MR. HERMAN:  Let me

12      interrupt you, and I'm sorry to do

13      this, but you've got an awful lot

14      to say in a short period of time.

15           Was Paul Sizemore with

16      Andy's firm or Tom Girardi's at

17      the time?

18           MR. ARBITBLIT:  He was with

19      Andy's firm at the time.

20           MR. HERMAN:  That was a

21      California --

22           MR. ARBITBLIT:  Irving was

23      an MDL case.

24           MR. HERMAN:  No, no, I'm

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

```
 1          sorry.

 2                  Irving was an MDL case in

 3          New Orleans?

 4                  MR. ARBITBLIT:  Correct.

 5                  MR. SEEGER:  Actually, I

 6          have a question, Russ, when you

 7          are done.  Are you done?

 8                  MR. HERMAN:  And you said

 9          you did more in I than in II?

10                  MR. ARBITBLIT:  That's

11          right.  Because Farquhar was not

12          going to be called in II, and he

13          was the principal person I was

14          working with.

15                  MR. HERMAN:  Go ahead.

16                  MR. SEEGER:  Elizabeth is

17          right, because there have been so

18          many people collaborating on so

19          many projects, and we're really

20          trying to sort some things out.

21          So, you don't have a lot of time

22          remaining, but it would be very

23          helpful to me -- and, look, I

24          know, you are a lawyer's lawyer.
```

FAC Resp. Exhibit D -- 878

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1          You are a good lawyer.  Everybody
 2      knows that.
 3          I would like to know what
 4      projects you would consider were
 5      the ones you owned.  Like I worked
 6      a little bit on the Daubert, I did
 7      this on that, but I kind of own
 8      these two or three projects, and
 9      this is what I did and provided
10      leadership on.
11          MR. ARBITBLIT:  Okay.  I
12      think that I marshalled the
13      evidence, to the extent there was
14      evidence, I marshalled all of it
15      for the short-term use issue on
16      Daubert and got us over that
17      hurdle.
18          I think I owned the New
19      England Journal Expression of
20      Concern that became a part of the
21      trials.
22          I owned the Watson issue and
23      the module that came of it that
24      showed there was a premarketing
```

FAC Resp. Exhibit D -- 879

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          signal of Vioxx toxicity that the

2          company never revealed to the FDA

3          and which became part of experts'

4          testimony after I circulated a

5          memo in June of 2005, including

6          Dr. Kronmal, Dr. Farquhar, Dr.

7          Moye, Dr. Gregory.

8               I own the osteoarthritis

9          initial analysis that was there a

10         three times greater risk for Vioxx

11         than placebo, which Merck had

12         denied, and that became a part of

13         some witness trial testimony or

14         expert testimony.

15              I owned the blood pressure

16         spike and the hypertension issue.

17         Shelly Sanford specifically

18         assigned me to write the

19         hypertension memo in October 2007

20         and to complete it after the

21         settlement because of the work I

22         had done previously.

23              MR. SEEGER:  That was for

24         the trial package, the memo?

FAC Resp. Exhibit D -- 880

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1            MR. ARBITBLIT:  It was for

2        the trial package, as well as the

3        stroke issue that I worked up for

4        the trial package to show that,

5        yes, there was a significant

6        excess of strokes, as well as

7        heart attacks, even independently

8        of each other.  So, that

9        hypertension issue between showing

10        Vioxx was worse for hypertension

11        and that people that had those

12        spikes were more susceptible to

13        heart attacks I think was integral

14        to the success of the Barnett

15        case.

16            So, being able to turn

17        around Humeston, being able to

18        participate in getting the Barnett

19        case as the only MDL victory, I

20        would say that those are

21        significant contributions, and

22        they were ongoing at the time.

23        It's always a mixed feeling.  My

24        office desk was full of documents

FAC Resp. Exhibit D -- 881

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          on November 9th when the call came

2          in for settlement, and I just

3          said, well, I guess I'll go home

4          for the day.

5               MS. CABRASER:  He was very

6          disappointed -- I mean, he was

7          distraught.

8               MR. WEITZ:  Don, how many

9          cases did you submit to the

10         settlement?

11              MR. ARBITBLIT:  160.  And

12         we've had 100 percent of them

13         approved so far, which is about 60

14         of them.

15              MR. RAFFERTY:  Don, did

16         Farquhar end up testifying in any

17         of the trials?

18              MR. ARBITBLIT:  No, he was

19         not called as a witness.

20              MR. WEITZ:  Where were your

21         cases filed, in the MDL or in

22         California?

23              MR. ARBITBLIT:  Very few in

24         California.  There were some in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          New Jersey.  The majority in the

2          MDL.

3                    MR. WEITZ:  Had you guys

4          worked up any cases that were on

5          the trial docket?

6                    MR. ARBITBLIT:  We had one

7          at least.  There was another

8          gentleman named Ralph Barnett, a

9          different Barnett, who was on the

10         New Jersey docket.  We had

11         submitted several for additional

12         discovery in the fall of 2007

13         pursuant to Judge Higbee's request

14         for additional cases.

15                    MR. WEITZ:  But the 39

16         cases, the cluster --

17                    MR. SEEGER:  Excuse me for

18         interrupting, but I'm only making

19         this correction, and I hope you

20         don't find this as any statement

21         on the quality of the work you

22         did, it's just that because we

23         create this transcript and you go

24         around and you meet with people

Page 40

 1          and everybody says, you know, I

 2          did this and that.

 3               I just want to make it clear

 4          that on the Humeston new motion

 5          trial, we had many grounds that we

 6          were seeking under.  Now, you

 7          found this piece, what turned into

 8          the EoC, which I just think gave

 9          the judge sort of a roadway to

10          overturn that verdict, which was

11          faulty on so many levels.  But

12          there was a whole team effort on

13          that.  Dave Buchanan did the

14          briefing, and I was involved and

15          many people.  But you gave us a

16          very important piece of evidence

17          there.

18               MR. ARBITBLIT:  Well, I

19          agree, Chris, and I totally agree,

20          you guys did a very thorough job.

21          I've read all the papers, and when

22          I read the judge's decision and

23          the quote, she said that --

24               MR. SEEGER:  You gave her

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

     1          the roadway.  I'm saying that.

     2                  MR. ARBITBLIT:  And I know.

     3          You guys worked day and night on

     4          many, many different grounds.  If

     5          that hadn't been there, it is

     6          possible she would have found

     7          another reason to do it.

     8                  MR. SEEGER:  Well, we don't

     9          know.

    10                  MR. ARBITBLIT:  We don't

    11          know.  She cited this one.  I'm

    12          proud of it.

    13                  MR. WEITZ:  Don, let me just

    14          get back to what I was asking.

    15                  Were there any cases that

    16          you guys had in either the MDL or

    17          in New Jersey where you actually

    18          had a trial date and were going to

    19          trial?

    20                  MR. ARBITBLIT:  No.

    21                  MR. HERMAN:  On the science

    22          -- I'm sorry, Perry, are you done?

    23                  MR. WEITZ:  No, I'm done.

    24                  MR. HERMAN:  On the science

FAC Resp. Exhibit D -- 885

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          committee that you were active in,

2          other than yourself, what can you

3          tell us about the members of the

4          committee?  You don't have to

5          highlight anybody if you don't

6          want to.  If there was somebody

7          that you thought was behind the

8          work, we'd like to know who that

9          is.

10              MR. ARBITBLIT:  Well, we had

11          weekly calls for a while.  I

12          stopped doing the weekly calls

13          when those calls just turned into

14          me lecturing, because I was

15          reading all the documents anyway,

16          and I wasn't getting any new

17          information from having those

18          calls.  I do recall that Tara

19          Sutton, who I see is up next, did

20          a good job on the project that I

21          asked her to do on analyzing some

22          of the epidemiology cases under

23          Daubert, and I used some of her

24          work when I wrote the brief.

Page 43

1              I don't get involved in what

2          some of the controversies are, I

3          try not to.  I understand that Dan

4          Sigelman later was working with

5          New Jersey people and that may be

6          a source of consternation to some,

7          but at the time that I knew him, I

8          knew that he was involved in the

9          MDL and he was on my committee and

10          he did work.  He was one of the

11          few who did work and had

12          experience to contribute and

13          he analyzed some of the --

14              MR. HERMAN:  Was Bert Black

15          on your committee?

16              MR. ARBITBLIT:  Bert Black

17          was on the committee.

18              MR. BLIZZARD:  I don't have

19          any questions, Don, but I do want

20          to say that this is not really

21          Vioxx related, but it comes out of

22          Vioxx.  I think that the New

23          England Journal of Medicine work

24          that you did, I don't have proof

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          of this, but I believe it laid the

2          good groundwork for their help on

3          the preemption issue, which was

4          important to all of us, and I

5          appreciate your work with the New

6          England Journal of Medicine.  They

7          are not a bunch of wild eyed libs,

8          whatever Phil Beck wants to say,

9          and getting them on their side or

10         our side of these issues is very

11         important to us going forward, and

12         I appreciate it.

13              MR. ARBITBLIT:  Thank you,

14         Ed, and I appreciate your saying

15         that, and I did include that Dr.

16         Curfman went to Congress also and

17         testified to the committee on that

18         very subject.

19              MR. SEEGER:  Let's go off

20         the record.

21              (Whereupon, a discussion was

22         held off the record.)

23              MR. WEITZ:  Let's go back to

24         the hours, because there's a large

FAC Resp. Exhibit D -- 888

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1        number of hours, and I think you

2        explained yourself and your

3        substantive contribution well in

4        this session.

5             But I think Elizabeth has

6        said that you did about 5,000

7        hours of work yourself.  Explain

8        to us the other 13,000 hours, and

9        really because we're trying to

10       differentiate between people that

11       just reviewed documents and

12       substantive work that really made

13       a difference in the litigation.

14            MR. ARBITBLIT:  Most closely

15       connected to me, I believe Jenny

16       Gross was in the neighborhood of a

17       couple thousand hours.  It might

18       have been more than that, but she

19       was a constant presence.  She was

20       here full time for the Barnett

21       trial.  Whenever I needed

22       something, she was there.  I'd get

23       e-mails from her in the middle of

24       the night.  She's a very hard

FAC Resp. Exhibit D -- 889

Page 46

1          worker, and digging into the

2          science was a lot of work for her,

3          not only the data, but the

4          documents.  She was a very good

5          detective.  So, there's a couple

6          thousand there.  I believe

7          Elizabeth's work is 1,900 to

8          2,000.

9               MS. CABRASER:  I'll talk

10         about that in a minute.

11              MR. LEVIN:  When you do

12         talk, differentiate between the

13         purchase claims.

14              MS. CABRASER:  Sure, I will.

15              MR. ARBITBLIT:  One of the

16         assignments that Paulina do Amaral

17         of our New York office received

18         was to head up the Arcoxia, which

19         was another COX-2 inhibitor,

20         discovery project, to see what

21         would be useful there.  So, a lot

22         of her time was spent on that,

23         which was also in the common

24         benefit bailiwick.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1          Wendy Fleishman's common

2     benefit work was probably on

3     medical monitoring.

4          MR. LEVIN:  That was in New

5     Jersey?

6          MR. ARBITBLIT:  In New

7     Jersey, yes.  Also the MDL had a

8     medical monitoring complaint,

9     didn't it?

10         MR. LEVIN:  Yes.

11         MR. ARBITBLIT:  So, it was

12    both.

13         Of course, the total time

14    includes paralegals and support

15    staff as well.  So, there was a

16    fair amount of, before I reviewed

17    documents, sometimes there would

18    be a paralegal -- often there

19    would be a paralegal who would

20    screen, and we had people working

21    on document reviews from the

22    get-go.

23         In December of 2004, Dave

24    Buchanan asked us to start

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1          reviewing part of a 500,000-page

2          custodial file for Tom Simon for

3          his deposition, and then there

4          were hundreds of thousands of

5          pages of adverse event reports

6          that we were asked to review.  I

7          didn't do all of that myself.  I

8          did a lot of that myself,

9          obviously, and I did the higher

10         end analysis and what to use for

11         exhibits and such.  But there was

12         help from associates on doing that

13         work.

14              But there was no work that

15         had no purpose.  There was never a

16         job where we just billed time.

17         Every job was done because it

18         needed to be done.  And that was

19         my job, to make sure nobody was

20         working on projects that I didn't

21         need to prove the case.

22              MR. WEITZ:  Were those jobs

23         that were given as a direction

24         from leadership on the MDL?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1                   MR. ARBITBLIT:  Yes.  I

2          would say yes, because I was the

3          chair of the epidemiology and

4          causation committee, so, I had a

5          fairly broad charge.  I had to

6          write up what my mission statement

7          was.  My mission statement was

8          approved, and everything that was

9          assigned through me fell into that

10         mission statement that the PSC had

11         approved.

12                  MR. BIRCHFIELD:  Those

13         assignments came through Shelly,

14         the charge?

15                  MR. ARBITBLIT:  Well,

16         Carlene initially, sure, and

17         Shelly.  It was still Carlene at

18         the time that the mission

19         statement was approved.  That was

20         about June of 2005, right after

21         the MDL --

22                  MR. SEEGER:  Just to get

23         back on schedule, I know

24         Elizabeth, you wanted to add some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 50

```
 1          comments, but we should begin to

 2          sum up.  We are starting to fall

 3          behind.

 4              MR. LEVIN:  We are running

 5          late.

 6              MS. CABRASER:  Got it.

 7              Before Don sums up, let me

 8          just give you a very quick run

 9          through of my personal time, which

10          is approximately 1,700 hours, so,

11          less time than Don's, I think for

12          the very obvious reasons.

13              Some MDLs are all about the

14          law.  This MDL was really most

15          about the science, the evidence,

16          the medicine and the trials.  And,

17          in fact, one of the main missions

18          of the long briefing committee was

19          not to get legal rulings on issues

20          that might be issues of

21          vulnerabilities.  There's a

22          tremendous strategy, which I think

23          was primarily Arnold's strategy,

24          on briefing with respect to how to
```

FAC Resp. Exhibit D -- 894

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

```
 1              --
 2              MR. LEVIN:  Are you telling
 3     me my strategy was to do nothing?
 4              MR. SEEGER:  Amazing how he
 5     does that.
 6              MR. HERMAN:  You were
 7     successful in that strategy.
 8              MS. CABRASER:  It was to
 9     keep bad things from happening.
10              MR. LEVIN:  A great
11     recovery.
12              MS. CABRASER:  And it is a
13     very tough strategy.
14              MR. WEITZ:  He's actually
15     very good at that.
16              MS. CABRASER:  It was
17     maneuvering through a minefield.
18     Preemption was looming.  That was
19     a fabulous decision by Judge
20     Fallon on preemption, the best
21     decision, but that was due to a
22     strategy by law and briefing of
23     what to do, but more importantly,
24     what not to do.
```

FAC Resp. Exhibit D -- 895

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

1          In that respect, that was

2     primarily Arnold and his office

3     doing that.  My role on law and

4     briefing, although it was

5     co-chair, was really a support.

6     We did some briefing, we did some

7     research.  If I get a call to do

8     overnight briefing on a particular

9     issue, like the day that Graham

10     motion to quash subpoena, I would

11     do that.  Because we were in

12     California, we could be the

13     overnight crew.  We did that a lot

14     on motions in limine for various

15     trials.  Happy to do it.  Was it

16     pivotal to the litigation?  No.  I

17     think the David Graham stuff was

18     neat, and I did that.

19          The other thing that I did,

20     and I spent about 220 hours on

21     this, is purchase claims.  Again,

22     at the outset of the case, at the

23     request of leadership, I chaired

24     that committee mainly to deal with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 53

1           political issues and keep it out

2           of the way, keep it alive, but

3           keep it out of the way so that

4           purchase claims could go ahead in

5           New Jersey, where things were more

6           favorable, so that Judge Fallon

7           could focus on trials and personal

8           injury claims.  I saw no conflict

9           with that.  I think it is a

10          contribution.  I think it is a

11          valuable contribution, but, again,

12          it is certainly less sexy and less

13          dramatic than many of the other

14          contributions.  I was happy to do

15          it.  Could someone else have done

16          it politically with the purchase

17          claims crew?  I like to think I

18          was able to do something.  But,

19          again, the value of that

20          contribution has yet to prove out.

21               So, more than 50 percent of

22          my time was spent on the personal

23          injury side of the case, primarily

24          legal briefing, legal research,

FAC Resp. Exhibit D -- 897

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 54

1         legal issues, but, again, I didn't

2         argue most of the motions.  Russ

3         and Arnold argued most of the

4         motions.  I argued one major

5         motion, the purchase claims

6         committee motion to dismiss, and I

7         don't know whether that was a good

8         argument or not or whether it

9         would be successful or not, but

10        the claims are still alive.

11              Involuntarily in New Jersey,

12        we got tagged with medical

13        monitoring, to try and keep that

14        claim alive.  Worked for a while,

15        ultimately it did not.

16              MR. LEVIN:  When you have

17        1,700 hours in briefing, that

18        includes all the briefing in New

19        Jersey?

20              MS. CABRASER:  Yes.  That's

21        a total.

22              MR. LEVIN:  That was where

23        you took medical monitoring

24        through the appellate system?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 55

```
 1              MS. CABRASER:  Yes.  I have
 2         92 hours on Local 68 work in New
 3         Jersey.  Medical monitoring I
 4         tried to break out, it would be
 5         about that amount or less, but
 6         most of the briefing time was on
 7         the MDL side.
 8              MR. ARBITBLIT:  Can I have
 9         two minutes?
10              MR. SEEGER:  Yes.
11              MR. ARBITBLIT:  For one
12         minute I wanted to just talk about
13         something early, the physician
14         contacts issue that I know Russ
15         argued with Judge Fallon.
16              When the MDL was threatened
17         by the ruling that said
18         plaintiffs' lawyers couldn't talk
19         to the doctors, Chris asked me to
20         take on briefing this issue,
21         because I thought I had an idea,
22         it turned out to be an idea that
23         Russ was able to get the judge to
24         sign off on, and since has become
```

FAC Resp. Exhibit D -- 899

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 56

1          adopted by other courts, that

2          unless there's a specific naming

3          of the doctor, which was only true

4          in about 7 percent of the cases,

5          that the plaintiffs' lawyers could

6          have continued to have their

7          contacts with the doctors.  I

8          thought that was important in

9          terms of helping the MDL get off

10         the ground without having this

11         unlevel playing field, where

12         plaintiffs' lawyers would choose

13         state venues.

14              So, I've been committed to

15         the MDL from the outset, and I

16         wanted folks to know that, and I

17         wanted to make it clear that I

18         have done what I could to make

19         that viable.

20              On the Barnett trial, one

21         thing I didn't mention that I

22         don't know if people are aware of

23         is that I was assigned to take the

24         deposition of the defense expert,

FAC Resp. Exhibit D -- 900

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 57

1        Dr. Kim, and their science expert

2        a month-and-a-half before the

3        trial.

4             MR. HERMAN:  And you did

5        that and they withdrew him.

6             MR. ARBITBLIT:  They

7        withdrew him, that's right.  They

8        withdrew him at trial in part

9        because of what's on Exhibit 24,

10       which is slide 24, in his own

11       handwriting, showing that using

12       the APPROVe study, there would

13       have been a 78 percent chance of

14       that heart attack suffered by Mr.

15       Barnett was due to Vioxx.

16             MR. SEEGER:  You made him do

17       this calculation at the dep?

18             MR. ARBITBLIT:  I did.

19             MR. BLIZZARD:  Attributable

20       risk.

21             MR. ARBITBLIT:  Attributable

22       risk.  And he wouldn't have been

23       able to dance out of it, and so

24       they had no expert at trial, which

FAC Resp. Exhibit D -- 901

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 58

1          is pretty unusual, and I own that,

2          too.

3                Thank you very much for all

4          the work you have done.  It was a

5          pleasure working with all of you.

6                MR. SEEGER: Thank you.

7                MR. HERMAN:  Thank you.

8                MR. BIRCHFIELD: Thank you.

9                MR. LEVIN: Thank you.

10               MS. CABRASER: Thank you.

11                    -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 59

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147
23            Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 903

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:  LOCKRIDGE GRINDAL NAUEN, PLLP
       Richard A. Lockridge, Esquire
       Yvonne Flaherty, Esquire


BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 904

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. LOCKRIDGE:  Well, thank
 3         you for having us here.  I'm Dick
 4         Lockridge, and with me is Yvonne
 5         Flaherty, and we're both from
 6         Minneapolis, the Minneapolis law
 7         firm of Lockridge Grindal Nauen.
 8         I'm here in a slightly awkward
 9         position in that I did not
10         personally do very much work on
11         Vioxx, although Yvonne did some.
12              Although I was at the
13         initial organization meeting, the
14         vast majority of the work was done
15         by Bert Black, who, as I'm sure
16         you all know, sent an
17         exceptionally unfortunate e-mail
18         in June or July '07, did not do
19         any more work in the case,
20         obviously, after that, and soon
21         thereafter left our firm and is no
22         longer with our firm.
23              But I think while he was
24         working on the case, he and a few
```

FAC Resp. Exhibit D -- 905

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1    other people in our firm did a lot

2    of very, very excellent work.

3         MR. WEITZ:  I'm sorry, I'm

4    not familiar with that situation.

5         MR. SEEGER:  Perry, you're

6    going to make him go there?

7         MR. WEITZ:  No, no.  I just

8    don't know what you are talking

9    about.  I never heard of it.

10        MR. LOCKRIDGE:  Bert Black

11   is kind of the science guru, and

12   he was with our firm during the

13   Vioxx case, and he sent out an

14   e-mail I believe in June or July

15   of '07, castigating certain

16   individuals in the MDL and the MDL

17   leadership, which was an entirely

18   inappropriate and wrong e-mail.

19   He did it on his own, totally

20   without anybody else in the firm

21   knowing about it, and it was

22   pretty obnoxious.  And,

23   understandably, Russ was not happy

24   about it and terminated him from

FAC Resp. Exhibit D -- 906

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          working any longer on the case,

2          and then a couple of weeks

3          thereafter, Bert left our firm.

4                    MR. WEITZ:  Did he have an

5          official role in the MDL at that

6          time?

7                    MR. LOCKRIDGE:  Bert?  Well,

8          he was on the science committee,

9          and I'll get to all the work that

10         he did do.

11                   MR. SEEGER:  As soon as it

12         was brought to Dick's attention,

13         he took immediate action.

14                   MR. LOCKRIDGE:  I was going

15         to address that at the end, but

16         that's fine.

17                   But Bert, he was assisted by

18         Yvonne Flaherty and also Elizabeth

19         Odette of our firm.  Bert was on

20         the science committee, and he

21         worked extensively with Carlene

22         Lewis, John Restaino and Paul

23         Sizemore.  Most of his work was

24         through the science committee, and

FAC Resp. Exhibit D -- 907

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          he was also on the epidemiology

2          proof of causation subcommittee

3          with Don Arbitblit, who, of

4          course, you just saw.

5               He was on the subcommittee

6          of mechanism of action

7          pharmacology defense issues, and

8          he was on the Daubert expert

9          witness development committee and

10         worked also there with several

11         people, including Michelle Parfitt

12         and some others.

13              I'll go through some of the

14         specific projects just briefly and

15         then touch on some in more detail.

16         Some of the work that he did was

17         on the so-called Vioxx science

18         story, which was a project that

19         supported causation and debunked

20         Merck's junk science myths.  This

21         was assigned through the science

22         committee, and I know he

23         circulated this to the PSC and the

24         trial teams.  He worked

FAC Resp. Exhibit D -- 908

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          extensively on the label change

2          memorandum, which was assigned to

3          him through the science committee

4          and John Restaino and Mark

5          Robinson and Troy Rafferty.

6                  I think some of you saw,

7          this was a 71-page, single-spaced

8          history of the April 11, 2002

9          label change relating to VIGOR.

10         It is more than probably you

11         wanted to know, but it certainly

12         told you everything you ever

13         wanted to know about that topic.

14                 MR. BIRCHFIELD:  It was very

15         thorough.

16                 MR. RAFFERTY:  Very

17         thorough.

18                 MR. LOCKRIDGE:  Very

19         thorough.

20                 Bert, of course, worked

21         extensively on Daubert and Daubert

22         issues.  I'll get to that in a

23         little more detail.  He at least

24         argued a couple of Daubert motions

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        before Judge Fallon.  He retained

2        Dr. Richard Kapit, who was an MDL

3        expert, and he worked extensively

4        with Paul Sizemore with Dr. Kapit.

5        Bert and Paul Sizemore met with

6        Dr. Kapit several times.

7             He also worked with Ted

8        Wacker in California with Dr.

9        Kapit.  I know that Bert worked

10       with Dr. Kapit when he was a

11       witness, at least in the retrial

12       of the Irvin/Plunkett case.  He

13       prepared and worked with Dr. Kapit

14       in preparing his expert reports,

15       and obviously those were all

16       distributed to the trial teams.

17       He defended Dr. Kapit at two

18       different depositions, I think

19       September of '05 and then again in

20       June of '06.  Bert argued the

21       Daubert motion before Judge Fallon

22       in November of '05 where the

23       defendants wanted to exclude Dr.

24       Kapit.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1           Bert and our associate

2      Elizabeth Odette prepared outlines

3      for direct examination and also

4      prepared outlines for expected

5      cross-examination for at least the

6      first Irvin/Plunkett trial for Dr.

7      Kapit, and I believe also for the

8      second Irvin trial.  So, he did a

9      lot of his work with Dr. Kapit.

10          Bert also retained Dr.

11     Robert Fletcher from Harvard.  He

12     met several times with Dr.

13     Fletcher.  He prepared the

14     response to the Daubert motion

15     regarding Dr. Fletcher.  Some of

16     you may recall Dr. Fletcher was

17     excluded by Judge Fallon, but

18     other experts were excluded, too.

19          Bert worked with Dr. Colin

20     Funk, who was an expert who was

21     actually proposed by Bert.  He met

22     several times with him, worked on

23     his expert report.  I don't

24     believe he was ever used, although

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          I know Mark Robinson, and maybe

 2          you, Andy, were also at one time

 3          at least considering using him.  I

 4          know at least Mark ultimately did

 5          not use him, although I think he

 6          was down actually at the trial.

 7               Bert worked with Dr.

 8          Benedict Lucchesi, who was an MDL

 9          expert.  I think he was the lead

10          off expert in Irvin I, maybe even

11          Irvin II, I'm not sure.

12               MR. BIRCHFIELD:  Irvin I.

13               MR. LOCKRIDGE: Irvin I?

14          Okay.

15               He worked on the response to

16          the Daubert motion, met with him

17          several times.  He and Paul

18          Sizemore worked on -- he and Paul

19          Sizemore worked on the preparation

20          for the Irvin trial and the second

21          Irvin trial in preparing Dr.

22          Lucchesi --

23               MS. FLAHERTY:  Lucchesi.

24               MR. LOCKRIDGE:  Lucchesi,
```

FAC Resp. Exhibit D -- 912

Page 10

1           excuse me.  Thank you.

2                   He worked on an outline for

3           trial and expected cross.  Bert

4           also worked with Dr. Wayne Ray,

5           who was another MDL expert who I

6           believe testified at least at

7           Irvin II, maybe at Irvin I,

8           although I'm not sure.

9                   MR. BIRCHFIELD:  Irvin I.

10                  MR. LOCKRIDGE:  I believe

11          that he at least worked in

12          preparation with Dr. Ray for those

13          trials.

14                  I believe pursuant to Russ

15          Herman's request, Bert analyzed

16          Dr. Ray's statistics and causation

17          issues relating to Merck's

18          February 2006 motion.  I believe

19          it was for judgment of the

20          pleadings or summary judgment, I'm

21          not sure which.  This was all

22          circulated and prepared and sent

23          to the trial teams.

24                  Then, finally, he worked on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1          Dr. Bruce Squires, who, as I

 2      understand it, was not ever used,

 3      but he worked under the direction

 4      of Paul Sizemore and John Restaino

 5      for this.  Dr. Squires was, of

 6      course, the former editor of the

 7      Canadian Medical Association

 8      Journal.

 9          He did a lot of work on the

10      defense experts, too, as some of

11      you may recall.  He worked

12      involving Dr. Janet

13      Arrowsmith-Lowe.  He prepared

14      outlines.  Bert took her

15      deposition twice, once in October

16      of '05 and another time in June of

17      '06.

18          He worked on a Daubert

19      motion to exclude Arrowsmith-Lowe.

20      He argued the motion to exclude

21      her.  They worked on preparation

22      for her cross-examination at least

23      at the first Irvin/Plunkett trial

24      down in Houston.

FAC Resp. Exhibit D -- 914

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          Yvonne worked on research,

2     on background research on her for

3     other cases.  She's certainly been

4     in a lot of cases, as you recall.

5          Bert worked pretty

6     extensively on matters involving

7     Dr. Alise Reicin; is that correct?

8          MR. SEEGER:  Yes.

9          MR. LOCKRIDGE:  I know you

10    guys know, obviously.

11          Bert, I believe, worked a

12    lot on the two Irvin trials

13    involving her, had a lot of

14    meetings involving her, and my

15    understanding was, he also

16    prepared the cross-examination for

17    the Barnett trial, too.

18          Bert did also some work

19    involving some of the other

20    defense experts like Dr. Roach,

21    Dr. Lisa Rarick, Dr. Frank Lanza

22    and a few others.  At the request

23    of Mark Robinson, he worked with

24    Dr. Suzanne Parisian.

FAC Resp. Exhibit D -- 915

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1              In the trial work, Bert was
 2        at, I believe, the two Irvin
 3        trials, and at least for part of
 4        the Barnett trial.  He did work
 5        extensively on motions in limine
 6        in Irvin I, and I've indicated
 7        much of what he's done there.
 8              At the Irvin II trial, I
 9        believe, Andy, he worked on that
10        case also again in the trenches.
11        I believe he worked some at least
12        on the outline of closing
13        arguments.
14              On the Barnett trial, I know
15        he worked extensively with Mark
16        Robinson and Ted Wacker there on
17        that trial, preparing direct and
18        cross-examinations, including,
19        obviously, mainly with the
20        experts.  These were some new
21        experts, it was Flavahan and
22        Morrison, and he worked on some
23        motions in limine.
24              The time records tell me he
```

FAC Resp. Exhibit D -- 916

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          did some things on the Berwick

2          trial, but, frankly, I don't know

3          what the heck he did.

4               He did do some FDA issues.

5          I've already mentioned the

6          labeling work that he did.  He

7          worked with Ted Wacker and Paul

8          Sizemore on some FDA issues.

9               He worked on AERs with Don

10         and the cerebrovascular event

11         research analysis.  This was not

12         with Don, but he did do a fair

13         amount of work on that.

14               Obviously our firm did some

15         other things, but this was

16         certainly the high points.  I

17         believe our MDL time is around 2.4

18         million.  We had most of our cases

19         in the MDL, although we had a few

20         cases in New Jersey.  I think we

21         had a total of 61 cases.

22               MR. HERMAN:  What was the

23         2.4 million?

24               MR. LEVIN:  That's the

FAC Resp. Exhibit D -- 917

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        loadstar.

2                MR. LOCKRIDGE:  I believe

3        that's the loadstar in the MDL for

4        common benefit time.  We obviously

5        had a lot more time.  There are

6        individual cases that we did not

7        submit and kept completely

8        separate.

9                MR. WEITZ:  How many

10       individual cases did you submit to

11       the settlement?

12               MS. FLAHERTY:  61.

13               MR. LOCKRIDGE:  61.

14               MR. WEITZ:  Where were those

15       cases filed?

16               MR. LOCKRIDGE:  Most of them

17       were here, but there were a few

18       filed in New Jersey.

19               MR. WEITZ:  Did you have any

20       of those cases prepared for trial?

21               MS. FLAHERTY:  In New

22       Jersey.  Those cases were coming

23       up.  Actually, we did a lot of

24       work with Robb Dassow and Suzanne

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1            Scovern.  I recall before the

2            settlement, before things started

3            moving towards the settlement,

4            there was a call made out for good

5            cases in New Jersey, otherwise,

6            Judge Higbee, I believe, was going

7            to start selecting cases herself

8            if we didn't put the cases

9            forward.  So, our local counsel --

10                MR. WEITZ:  Who was Robb

11           Dassow?

12                MS. FLAHERTY:  No.  Robb

13           Dassow is actually licensed in

14           Indiana.  He did a lot of his work

15           in New Jersey, and then we worked

16           with him and Suzanne, who is from

17           California.

18                MR. WEITZ:  Scovern?

19                MS. FLAHERTY: Right.  Mike

20           Ferrara was our local counsel to

21           file cases in New Jersey.

22                MR. WEITZ:  So, when you say

23           you did a lot of work with Robb

24           Dassow and Suzanne, what kind of

FAC Resp. Exhibit D -- 919

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          work are you talking about?

2                    MS. FLAHERTY:  That was not

3          common benefit work that we

4          submitted for purposes of this

5          presentation today.  That was work

6          more on our individual cases.  We

7          did help them a little bit --

8                    MR. SEEGER:  Did you put

9          cases in the pool that were being

10         worked in?

11                   MS. FLAHERTY:  Yes.

12                   MR. SEEGER:  Some of that

13         we're considering.

14                   MS. FLAHERTY:  Okay.  There

15         was a case, Donna Schwab was put

16         up toward the end, and I think

17         they sent out scheduling orders,

18         and I'm recalling it was going to

19         be, it was towards the end of the

20         year and maybe it was late, was it

21         '07 perhaps, maybe it was even

22         '06 --

23                   MR. WEITZ:  It was towards

24         the end of the litigation.

FAC Resp. Exhibit D -- 920

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1             MS. FLAHERTY:  Correct.  And

2        so I know they were scheduling,

3        there was a scheduling order that

4        came out, and things were kind of

5        put to a halt, and that was the

6        end of that.

7             MR. WEITZ:  So, you had

8        submitted a case, but you didn't

9        do any work on the case?

10             MS. FLAHERTY:  Not common

11        benefit work.

12             MR. WEITZ:  Okay.

13             MR. RAFFERTY:  Well, when

14        you say "not common benefit work,"

15        I mean, did y'all take

16        depositions?

17             MS. FLAHERTY:  No.  They

18        were being scheduled, it was on a

19        scheduling order, but everything

20        was put to a halt.

21             MR. LEVIN:  Just an

22        individual case.

23             MR. BLIZZARD:  Was Dr.

24        Parisian used in any of the cases?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1                    MR. SEEGER:  In Jersey?

 2                    MR. BLIZZARD:  No, I'm

 3          sorry.  I'm back to, there was

 4          discussion about Suzanne Parisian,

 5          who I know to be an FDA expert

 6          that Merck was working with.  Did

 7          she get used in any of the cases?

 8                    MR. RAFFERTY:  Not in

 9          Kosick, not in Irvin II.

10                    MR. SEEGER:  Was she used in

11          Barnett, Parisian?

12                    MR. BIRCHFIELD:  She was

13          being worked up for Barnett.

14                    MR. SEEGER:  She was worked

15          up for a case or two, probably not

16          put on the stand though.

17                    MR. BIRCHFIELD:  No, I don't

18          think she was.

19                    MR. LOCKRIDGE:  I don't have

20          anything more, but if you have

21          other questions.

22                    MR. BIRCHFIELD:  Just one

23          question.

24                    You said that he worked

FAC Resp. Exhibit D -- 922

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          with, was it the Berwick trial,

2          was that the last one that you

3          mentioned?  Was that Mark's case

4          out in California?

5               MR. LOCKRIDGE:  It probably

6          was, yes, but I don't know very

7          much about it.  He didn't do much

8          on that.

9               MR. HERMAN:  You've got

10         about $70,000 in costs?

11              MR. LOCKRIDGE:  Yes.  I

12         guess we didn't get asked for an

13         assessment, but we don't have very

14         much in costs.  As you know, I'm

15         cheap, Arnie.

16              MR. HERMAN:  Let me say, and

17         I didn't say this at the

18         beginning, but I'm sure you'll

19         see.  Everything is being

20         recorded, and you are going to get

21         a copy.  The main thing the judge

22         is looking for is transparency and

23         consistency.

24              MR. LOCKRIDGE:  Certainly.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          MR. HERMAN:  Secondly, you

2     submitted an affidavit.  If we

3     don't resolve all the fee issues,

4     the judge is going to appoint a

5     Special Master and appoint people

6     to take lawyers' depositions, et

7     cetera.  Hopefully we can resolve

8     those issues.  If we can't, take a

9     look at your affidavit, and if

10     there's something you want to

11     supplement or delete, you may want

12     to consider that, but that's down

13     the line.

14          MR. LOCKRIDGE:  Okay.

15          MR. BIRCHFIELD:  I want to

16     say I appreciate your presentation

17     and your candor.

18          MR. LOCKRIDGE:  Thank you.

19     I really appreciate all of you

20     guys.  I know this is a big

21     effort.  I've been on the other

22     side of it.

23          MR. SEEGER:  Thank you.

24               -  -  -

FAC Resp. Exhibit D -- 924

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4   Public and Certified Court Reporter of

5   the State of New Jersey, Registered

6   Diplomate Reporter, Federally-Approved by

7   the United States District Court of

8   Pennsylvania, do hereby certify that the

9   foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 925

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: LOCKS LAW FIRM
        James Pettit, Esquire
        Steven P. Knowlton, Esquire
        Gene Locks, Esquire


BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 926

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. PETTIT:  Good morning.
 3         My name is Jim Pettit, Locks Law
 4         Firm.  Steve Knowlton is to my
 5         right.  Mr. Locks is here.
 6              MR. KNOWLTON:  Good morning.
 7              MR. PETTIT:  I've handed up
 8         a submission which I will
 9         supplement with an affidavit when
10         I get back to my office.  It's got
11         13 points.  The thrust of it
12         really is, I think, our
13         presentation of the Doherty jury
14         trial, which was back in July of
15         2006, and to address a couple of
16         other points as well.
17              I took a rough stab at what
18         I thought were the most important
19         issues.  Obviously in a
20         five-and-a-half week trial, there
21         were a lot of issues, a lot of
22         rulings, a lot of handling of
23         evidence.  I thought that these
24         were the issues that would inure
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        to the common benefit of Vioxx
 2        plaintiffs across the country.
 3            So, the Doherty versus Merck
 4        verdict was a unanimous verdict on
 5        a very important issue despite
 6        being a defense verdict overall,
 7        and that is that the jury found
 8        seven to nothing that Merck failed
 9        to provide adequate warnings for
10        risk.  So, what that means, I
11        believe, is that the jury had to
12        have found that there were Vioxx
13        risks, that Vioxx risks existed.
14            Secondly, Merck either knew
15        the risks or should have known the
16        risks.
17            Third, Merck should have
18        adequately warned Doherty and did
19        not do so.
20            The jury was -- as you may
21        know, in New Jersey, we're not
22        allowed to talk to juries, but the
23        juries were interviewed
24        relentlessly by the press and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          actually was interviewed within an

2          hour, I think, or less of the jury

3          verdict.  And so in reading the

4          press, as anyone could have, the

5          jury said that there were

6          overwhelming specific risk factors

7          that they had found that Elaine

8          Doherty had that caused her heart

9          attack and not Vioxx.

10               So, the point that I guess

11          I'm making in issue number one is

12          that we had a unanimous liability

13          verdict and had the jury found,

14          which they could have in other

15          cases in the future after Doherty,

16          that, in fact, the case-specific

17          risk factors would have included

18          Vioxx as the substantial

19          contributing factor, that would

20          have been a plaintiff's verdict.

21          So, that's something I think that

22          Merck would have taken into

23          account, that there was one more

24          liability verdict in the country.

FAC Resp. Exhibit D -- 929

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1           The Doherty case itself was

2      selected by our firm in

3      conjunction with a very elaborate

4      process which some of you know in

5      New Jersey as a bellwether case.

6      Elaine Doherty had many, many risk

7      factors and would not have been

8      ever probably a very, very high

9      potential verdict.  It had

10     potential to be a relatively high

11     verdict, but probably not millions

12     of dollars.

13          We picked that case so that

14     there would be, in fact, a

15     creation of a precedential value,

16     a verdict that had precedential

17     value, so that Merck could see a

18     New Jersey law firm trying a case

19     under New Jersey law with a

20     plaintiff that's had symptoms and

21     risk factors and a disease process

22     that was representative really, I

23     think, of the vast majority of

24     plaintiffs.

FAC Resp. Exhibit D -- 930

Page 6

1          So, it wasn't just we picked

2      our best case, it was a case that

3      we thought, had we won the

4      complete verdict, would have been

5      valuable to plaintiffs in New

6      Jersey and across the country.

7          We spent a half a million

8      dollars trying the case.  The case

9      took five-and-a-half weeks.  There

10     were four partners that tried the

11     case, along with many associates

12     and paralegals and staff people.

13         The second issue which I

14     think is perhaps equally as

15     important, if not more important,

16     is the direct-to-consumer issue.

17     As you can see from our

18     submission, it was created by the

19     New Jersey Supreme Court years

20     ago, 1999.  There has never been a

21     charge ever in New Jersey that a

22     jury should consider the defendant

23     to be liable if they fail to warn

24     a plaintiff herself.  So, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1       literally had the first

2       direct-to-consumer charge ever in

3       New Jersey, and we were not the

4       first Vioxx case.

5            Now, it is our

6       understanding, and plaintiffs'

7       lawyers are here, that the

8       direct-to-consumer ruling that

9       Judge Higbee made was an admixture

10      of law and very case-specific

11      facts.  So, what we did in the

12      Elaine Doherty case was hit that

13      very hard from day one.  Our

14      prescribing doctor, unlike perhaps

15      some of the prescribing doctors in

16      earlier trials, was very, very

17      unhealthy to us, and we presented

18      him by videotape so we knew going

19      in what we had to face.  So, we

20      really had to hit the

21      direct-to-consumer charge very

22      hard, and we did, and that was

23      what I think our major success was

24      with the unanimous verdict.

FAC Resp. Exhibit D -- 932

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1              But for that, it would have
2         been a complete defense verdict.
3         What does that mean to the rest of
4         the bar?  I think that that really
5         created the law of the case for
6         New Jersey after the Doherty case.
7         So that all the -- not to minimize
8         it, but all that plaintiff lawyers
9         would have to do after that is
10        meet the factual predicate that
11        Judge Higbee saw that we had met
12        in Doherty.  Very difficult
13        deposition, very difficult motion
14        practice, and we spent a great
15        deal of time during the charging
16        conference just on the
17        direct-to-consumer.  Merck knew
18        what it meant and fought very
19        hard.
20             I'm going to let Steve
21        handle a couple of issues now and
22        then I'll come back.
23             MR. KNOWLTON:  Thanks, Jim.
24             First, number 3 is the trial

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          presentation of Merck, PR

2          liability deps.  We spent a lot of

3          time analyzing and getting these

4          transcripts ready for presentation

5          to the jury.  There is just one

6          clarification.  The Laine and the

7          Demopoulos testimony, while

8          litigated during trial, were not

9          actually presented to the jury.

10         It was the Blake deposition that

11         was presented to the jury.

12              And although this is our

13         application, I have to give credit

14         to Chris Placitella, because that

15         was probably the most powerful

16         seven-and-a-half minutes of

17         videotape that I have ever seen

18         based on the jury's reaction, as

19         Jim has just described to you, on

20         the DTC.  I think that had an

21         enormous impact on the jury and an

22         enormous impact on that verdict.

23              This was the first time that

24         that testimony had to be utilized,

FAC Resp. Exhibit D -- 934

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          and it was the first time it had

2          been litigated for trial in front

3          of Judge Higbee.  That material

4          was made available and is still

5          available to plaintiffs' counsel

6          across the country.

7               The next is the APPROVe ITT

8          and extension data.

9               As Chris Seeger remembers,

10         this data was released just days

11         before our jury selection and

12         caused quite a bit of a ruckus

13         immediately before.  There was a

14         question about the manner of

15         production that we ended up

16         litigating in front of Judge

17         Higbee, and then eventually she

18         ruled that the data could be

19         considered by both experts, so,

20         there were the corresponding

21         reports and depositions, and then

22         there were the pretrial arguments

23         and rulings.  And although at

24         trial it wasn't utilized

Page 11

1     extensively, it was mentioned and

2     brought up in both Dr.

3     Traberg's -- in both Dr. Traberg's

4     testimony and cross-examination,

5     as well as Dr. John MacGregor's

6     deposition.

7          We extensively reviewed that

8     data on an obviously expedited

9     basis with our expert, Dr.

10    MacGregor, who concluded that the

11    extension data did not bear out

12    Merck's established trial position

13    that it required 18 months of

14    exposure.  That view was then, of

15    course, correlated by other

16    experts, both by independent

17    experts, and then FDA, and also by

18    the plaintiffs' firms.

19         That was the first time,

20    perhaps due to circumstances, but

21    certainly due to hard work by John

22    MacGregor and our lawyers, that

23    that data had been presented to a

24    jury and had been examined for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1        trial.

 2               Moving on to number 6.   In

 3        the Doherty trial, prior to

 4        presentation before the jury,

 5        there was a Rule 104 hearing on

 6        the admissibility of the 4/6/05

 7        FDA document.   This document had

 8        been the center piece of much

 9        motion practice in New Jersey

10        prior to the Doherty trial, no

11        doubt, but this was first time

12        that we had presented and pushed

13        the issue both in correlation of

14        trying to get the entire document

15        admitted in front of the jury, and

16        also in advancing its COX-2 class

17        effect defense.

18               Judge Higbee ruled that

19        there would be a 104 hearing, and

20        the expert that Merck brought

21        forth was Dr. George Taylor, who

22        was noticed as an expert in our

23        trial as well.   Merck put Dr.

24        Taylor on, spent about 25 minutes
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       doing a direct.  He was

2       cross-examined.  At the end of the

3       hearing, from the bench, Judge

4       Higbee ruled that the 4/6/05

5       document was inadmissible in its

6       entirety and that there was no

7       basis, unless there was further

8       expert testimony, for bringing in

9       the COX-2 class effect defense in

10      front of the jury.  As an aside,

11      Dr. Taylor never appeared at

12      trial.

13          Moving on to number 8, this

14      is the preparation of the Topol

15      and Graham transcripts.  Again,

16      kudos for the effort to the

17      gentlemen who took those

18      depositions especially the folks

19      from Kline & Specter.  But these

20      deposition transcripts were

21      extensively litigated in a way

22      that was sensitive to other

23      plaintiffs' firms and their need

24      potentially to use it in future

Page 14

 1          litigation.

 2                  As many of you will recall,

 3          at the time, it was the Graham

 4          transcript, I believe, that was

 5          the subject of motion practice

 6          before Judge Fallon, and it was

 7          specifically the cross-examination

 8          of Mr. Beck of that witness that

 9          was at issue.

10                  We were very, very

11          sensitive, the Locks' lawyers were

12          sensitive not to litigate the

13          transcripts in such a way that

14          would require potentially

15          precedential rulings from Judge

16          Higbee, knowing that there were

17          trials in front of her and in the

18          MDL that were coming after us.

19                  So, we negotiated page and

20          line designations.  We also

21          negotiated exhibit presentations

22          during those depositions, and both

23          of those depositions were played,

24          we think, with good effect to the

Page 15

1        jury.

2              Dr. MacGregor, number 9, was

3        our expert that we identified

4        early on in the litigation.  Dr.

5        MacGregor testified for us in

6        Doherty and acted as a consulting

7        expert.  We believe, and I

8        certainly believe as the lawyer

9        who put him on at trial, he was

10       probably one of the easiest

11       experts I've ever had to work

12       with.  He was motivated and was

13       extraordinarily well prepared both

14       by us and also by his own efforts.

15             Dr. MacGregor, we were free

16       with sharing his materials for the

17       plaintiffs' lawyers, and he's been

18       utilized, as you can see from our

19       submission, by other firms in

20       Vioxx and also in other

21       litigations to date.

22             My last item would be the

23       STI document review.  Scientific

24       Therapeutics, Inc. was a third

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1       party that Merck utilized in

2       communicating with physicians

3       about Vioxx, and specifically in

4       blunting the impact of the VIGOR

5       study.  Unfortunately, the STI

6       initiative never reached the

7       deposition stage.  There were

8       hundreds of thousands of pages of

9       documents that were reviewed by my

10      firm, and also that effort was

11      spearheaded by Eric Weinberg and

12      his firm.  Also, videotapes and

13      audiotapes, presentations were

14      reviewed.  PowerPoint programs

15      were put together in an effort to

16      link and follow the money chain

17      from Merck from the third-party

18      vendor to physicians concerning

19      their speaker bureaus, which they

20      used to impact VIGOR, and also

21      publications in, quote,

22      peer-reviewed journals that Merck

23      authored and then substituted

24      other scientist names to.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1                 I'm sorry, back to you, Jim.

 2                 MR. PETTIT:  I'm going to go

 3         back to number 5, which was use of

 4         Dr. Susan Parisian.  She was an

 5         FDA officer, and the strategy in

 6         using her was two part.  One was

 7         to rebut the defense of the FDA

 8         approval, which is not only a very

 9         strong factual argument that Merck

10         made over and over again during

11         five-and-a-half weeks to the jury,

12         but it's a statutory defense, as

13         I'm sure most, if not all of you

14         know in New Jersey, and in many

15         other states.  If there's an FDA

16         approved warning, it is presumed

17         to be an adequate warning and

18         there's rebuttal and presumption.

19                 But sort of in the trenches,

20         we used Dr. Parisian to persuade

21         the jury that the FDA is not a

22         mission, and, in fact, are the

23         opposite, that they are

24         understaffed, that their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1          procedures are not focused towards

 2          this kind of drug and getting it

 3          to the market safely.

 4               We also were able to, sort

 5          of as an aside, get a lot of the

 6          state-of-the-art evidence through

 7          Dr. Parisian rather than bringing

 8          in another state of the art

 9          witness.

10               So, the point of this for

11          common benefit is that Dr.

12          Parisian actually had been worked

13          up by other law firms, and we were

14          the first ones to use her in a

15          Vioxx trial.  I think we presented

16          her incredibly, and I think she

17          was very useful, and it was well

18          known to other plaintiff lawyers

19          had they, in fact, wanted to use

20          her.

21               The rulings that Judge

22          Higbee made, as you probably know,

23          were basically at the end of the

24          trial, that Judge Higbee would

Page 19

1        present to the jury as a legal

2        charge what exactly the FDA

3        regulations meant.  So, she

4        presented factual testimony.

5              Number 7, the FDA preamble

6        that came out actually in January

7        of 2006, our trial, again, was

8        July of 2006, Merck argued that

9        extensively pretrial and trial,

10       probably argued it three different

11       times.  Judge Higbee finally made

12       an ultimate ruling during the

13       trial itself.  That really, I

14       think, was the centerpiece of the

15       preemption issue, obviously,

16       preemption being a tough legal

17       issue, but Merck was trying to get

18       that down on the ground to the

19       jury as a document, and Judge

20       Higbee very forcefully struck

21       that, and I think struck it and

22       made that for all Vioxx cases in

23       New Jersey.

24             I'm going to combine 11, 12

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          and 13.

2                We were the only firm in New

3          Jersey, and I think I may be

4          mistaken, the only firm in the

5          United States, that tried a Vioxx

6          jury trial by itself.  We relied

7          on the amazing incredible work

8          done by all the other plaintiffs'

9          attorneys for years up until July

10         of 2006, and we used their work

11         product and looked at their

12         trials.  I can't say enough about

13         that, obviously.  It almost goes

14         without saying that we were

15         talking about that that's an issue

16         that we tried the case by ourself,

17         I wanted to state that as clearly

18         and as gratefully as I can.

19                Having said that, I think

20         what Merck needed to see to come

21         to the table for global

22         negotiations is that a single law

23         firm is willing to try a case and

24         is able to try a case and is

FAC Resp. Exhibit D -- 945

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        willing to put up $500,000 and

2        invest four partners and

3        associates and weeks and, of

4        course, months to get to trial.  I

5        think Merck needed to see that,

6        they needed to see that we could

7        do that successfully, and as I

8        said, we came close to having a

9        plaintiff's verdict and certainly

10       had a liability verdict.  I think

11       that is the kind of thing that

12       contributes to making Vioxx, in

13       short, a mass tort.  Not only the

14       large verdicts, it has gotten to

15       the point where one law firm can

16       try the case.  I think that's an

17       important factor.

18            One of the questions that

19       the committee sent in their e-mail

20       was consistency, quantity,

21       duration and intensity.  We

22       continued to litigate the Vioxx

23       cases long after Doherty.  We had

24       Klug, Ellis and Pritch were going

FAC Resp. Exhibit D -- 946

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1        to be picked for bellwether
 2        trials.  We did not give up.  We
 3        continued to take depositions,
 4        defend depositions, take sales rep
 5        depositions, work up the cases.
 6        We did not really have judicial
 7        intervention in terms of discovery
 8        motion practice.  So, we didn't
 9        get that.  That was sort of an
10        answer to one of the issues raised
11        in your e-mail.
12              In addition to the funding,
13        extensive and large funding of the
14        Doherty trial and the rest of our
15        cases, we did contribute two
16        $7,500 submissions to the New
17        Jersey plaintiffs' funds for a
18        total of $15,000.  So, we did
19        contribute for funding.
20              Thank you.
21              MR. BIRCHFIELD:  Just a
22        note, before you submit this
23        affidavit, there was a single firm
24        trial in the MDL.
```

Page 23

1          MR. PETTIT:  I appreciate

2     you correcting me.

3          MR. HERMAN:  One question,

4     or more than one.

5          I have -- I see Mr. Locks,

6     and is it Pettit?

7          MR. SEEGER:  Knowlton and

8     Pettit.

9          MR. HERMAN:  I'm sorry.

10          MR. KNOWLTON:  I'm Mr.

11     Knowlton, this is Mr. Pettit, and

12     this is Mr. Locks.

13          MR. HERMAN:  Is it

14     K-N-O-W-L-T-O-N?

15          MR. KNOWLTON:  That's

16     correct, sir.

17          MR. HERMAN:  Since we've got

18     this on the record, I want to make

19     sure that the record notes that

20     all three of you are here.

21          I just have a couple of

22     other questions.

23          I apologize if our office,

24     because we were responsible for

Page 24

1        it, did not send out to you an

2        e-mail or communication to submit

3        a written material and affidavit

4        before this date.  I assume you

5        did get it.  If you didn't get it,

6        it is our fault.

7              MR. PETTIT:  We did not.

8              MR. HERMAN:  Well, I

9        apologize for that, and if you'd

10       get us an affidavit.

11             Now, did you submit your

12       time in hours?

13             MR. PETTIT:  Yes, we did.

14             MR. HERMAN:  In costs?

15             MR. PETTIT:  Yes, we did.

16             MR. HERMAN:  How much time

17       did you submit, do you recall?

18             MR. PETTIT:  Certainly

19       something I should have reviewed

20       before this morning.

21             MR. LEVIN:  I've reviewed

22       it.  7,505.  7,505 hours.

23             MR. HERMAN:  How much in

24       costs, Arnie?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1              MR. LEVIN:  You are asking

2       me?  $433,301.77.

3              MR. HERMAN:  Excuse me.

4       $433 and how much?

5              MR. LEVIN:  301.77.

6              MR. HERMAN:  301.77 what?

7              MR. LEVIN:  Cents.

8       $433,301.77.

9              MR. HERMAN:  How much of

10      those costs were spent on your

11      trial, do you recall?

12             MR. PETTIT:  100 percent of

13      those costs, and by the way, I

14      think we did a slightly revised

15      cost.

16             MR. LEVIN:  I think your

17      original submission was rejected,

18      and I assume you are working with

19      the accountants to straighten it

20      out?

21             MR. PETTIT:  Right.  And as

22      far as I know, it has been

23      straightened out.

24             MR. LEVIN:  Good.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1              MR. PETTIT:  The answer,

2        sir, to your question is that 100

3        percent of the costs were spent

4        either on Doherty or on very

5        specific review, as Mr. Knowlton

6        said, on the liability documents

7        and the page and line designations

8        that went on in 2005 and 2006

9        leading up.  But there was nothing

10       that was spent on another case --

11             MR. HERMAN:  No, no.  I'm

12       not suggesting that.  You rounded

13       off the cost of the trial to

14       $500,000.  I'm just trying to

15       determine whether there's another

16       $500,000 in costs or this is all

17       inclusive.

18             MR. PETTIT:  No.  That's

19       what our submission consists of.

20             MR. RAFFERTY:  Steve or

21       Jim --

22             MR. LOCKS:  There are

23       additional costs that we

24       submitted, a lot more.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1            MR. RAFFERTY:  Approximately

2       out of the 7,500 hours or 7,000

3       hours, approximately how many of

4       those would be attributed to the

5       Doherty case, the vast majority?

6            MR. PETTIT:  Vast majority,

7       just in 2006.

8            MR. RAFFERTY:  You mentioned

9       the Klug, Ellis and Pritch cases?

10            MR. PETTIT:  Right.

11            MR. RAFFERTY:  Were those

12       the other three cases that y'all

13       worked up or were there more?

14            MR. PETTIT:  Those were the

15       three.  We had reached a certain

16       point in the bellwether selection

17       with the plaintiffs' attorneys and

18       the judge, and the judge was

19       talking about stroke and heart

20       attack, and those were the ones we

21       had reached to the point where

22       Merck was taking a lot of

23       depositions.

24            MR. RAFFERTY:  So those --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          MR. PETTIT:  There were a

2     couple others that would have come

3     up on the stroke list and on the

4     heart attack list.  Those were the

5     three that we literally litigated

6     in 2006.

7          MR. RAFFERTY:  That's what I

8     want to know.

9          MR. KNOWLTON:  If I remember

10    properly, we had, at that point,

11    up until the time the settlement

12    was announced, we had either 16 or

13    21 cases where we had just begun

14    to start to litigate as far as

15    sales reps were concerned and

16    things like that, but these three

17    were the ones that were already on

18    point where there was discussion

19    as to whether or not there were

20    going to be trials set.

21         MR. LEVIN:  How many cases

22    did you submit to the settlement,

23    the Locks firm?  How many did you

24    submit to the settlement?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          MR. KNOWLTON:  An exact

2     number?

3          MR. LEVIN:  Approximately.

4          MR. SEEGER:  Approximately.

5          MR. BIRCHFIELD:  I'm showing

6     about 90.  Does that sound right?

7          MR. KNOWLTON:  90?  No.

8          MR. LOCKS:  No.  I thought

9     it was somewhere north of 200,

10     plus or minus 200.

11          MR. KNOWLTON:  That's about

12     right.  Around 200.

13          MR. LOCKS:  I think it was a

14     little more, but I don't know if

15     they would all pass the test.

16          MR. GIRARDI:  MacGregor is a

17     real good witness.

18          MR. WEITZ:  Great witness.

19          MR. KNOWLTON:  Thank you.

20          MR. SEEGER:  Thank you.

21          MR. BIRCHFIELD:  205.

22          MR. HERMAN:  Let me give you

23     a fax number.  (504) 561-6024.

24     The e-mail you should have on your

FAC Resp. Exhibit D -- 954

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          notice about this meeting, you can

2          either e-mail or fax the affidavit

3          in.  I'm just going to attach it

4          to the submission.

5              MR. PETTIT:  We will get

6          right on it.  Thank you very much.

7              MR. SEEGER:  Thanks.

8                  -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 956

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  LOWE LAW FIRM
       Jeffrey Lowe, Esquire
       CAREY & DANIS, LLC
       Joseph P. Danis, Esquire

BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 957

Page 2

```
 1                      -  -  -

 2            MR. BIRCHFIELD:  Everything

 3       is going to be on the record, so,

 4       we will have a transcript of

 5       everything that's said here in

 6       case it's necessary for the judge

 7       or for any proceedings later on.

 8            One of the things that Judge

 9       Fallon has asked us to do is to

10       let everybody know about the

11       process, we'll try to work out

12       having an agreement on the

13       allocation, but if there are

14       objections, he's going to follow

15       the same type of procedure similar

16       to what he did in the Murphy Oil

17       case.  It is important to be aware

18       of the Murphy Oil decision and the

19       process he followed there, where

20       he would appoint a special master,

21       depositions be taken and all of

22       that.

23            So, with that being said,

24       the floor is yours.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1              MR. LOWE:  Nice to see you

2        guys.  Basically the question here

3        is, did we provide common benefit

4        work, and how much.  If you look

5        at section 9.2.4 of the settlement

6        agreement, and as it was

7        originally written, it provided

8        that common benefit work was

9        recoverable for attorneys doing

10        work in the MDL, in New Jersey,

11        California and Texas and in the

12        state court proceedings.

13              As you know, we filed an

14        objection to that, and we worked

15        it out, and you said that was

16        never the intent to include other

17        states.  So section 1.2.7 was

18        enacted on July 17th, '08 to

19        include common benefit work done

20        in any other state court.  What we

21        were seeking common benefit work

22        for is work that we did in

23        Illinois state court cases.

24              Before I go into that, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1      want to give you kind of an

2      overview of our involvement since

3      we were involved on the inside.

4      We filed a total of claims for

5      2,689 claimants.  In Missouri

6      alone, it was about 1,200, maybe a

7      little bit more, all of them were

8      filed in state court.  We joined

9      two local sales representatives

10     who lived in St. Louis city, and

11     we joined local pharmacies.  All

12     of them, we believe, are

13     nonremovable, but, of course, as

14     you know, Merck removed them, and

15     they never got remanded.  We filed

16     a motion to remand in every case.

17          In Illinois, we filed 172

18     cases, cases involving 172

19     claimants.  Of those, 11 cases

20     were remanded involving 65

21     plaintiffs by Judge Patrick

22     Murphy.  They were remanded to the

23     Circuit Courts of St. Clair County

24     and Madison County, Illinois.

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 960

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          Those are the cases that we're

2          seeking to recover for common

3          benefit work.

4                California, we filed 29

5          cases.

6                New Jersey, we filed 53

7          cases.  We were subject to

8          case-specific discovery.  In some

9          of those cases, I went out and

10         took doctor depositions, defendant

11         client depositions.  Again, we are

12         not seeking anything for those,

13         those were the case-specific work.

14               And the rest of the cases,

15         the 2,689 were filed directly in

16         the MDL.

17               MR. WEITZ:  How many was

18         that?

19               MR. LOWE:  It was a good

20         number.  I mean, I don't know the

21         exact number.  I can probably get

22         that for you if you guys want it.

23         It was several hundred for sure.

24         You know, cases came up on the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1      one-year statute or two-year

2      statute, and we filed them

3      directly in the MDL.

4           MR. LEVIN:  Did I hear you

5      say that what you are seeking

6      common benefit for are only the 11

7      cases that Judge Murphy remanded

8      to state court?

9           MR. LOWE:  Correct.  11

10     cases involving 65 plaintiffs.

11          MR. LEVIN:  And is that for

12     the remand itself or --

13          MR. LOWE:  Well, the remand

14     itself, plus all the work that we

15     did once it got remanded.

16          MR. BIRCHFIELD:  Jeff, if

17     you would, take us through the

18     timing of that, when you got the

19     remands and the work that was

20     done.

21          MR. LOWE:  A lot of the work

22     we are seeking for is the first

23     case, it's called Donahue versus

24     Merck.  It was filed February 23rd

Page 7

```
1        of 2005.  I don't know the dates
2        of the remand, but it had to be
3        remanded quickly, because,
4        otherwise, it would get
5        transferred to the MDL, and
6        somehow it would always remand a
7        few days before the transfer date.
8        So, they really were remanded over
9        a period of about six months, I
10       would say beginning in April of
11       2005.  I can get the exact dates.
12            The first case we filed was
13       a single case, Donahue versus
14       Merck.  And Walgreen's is an
15       Illinois corporation, and there's
16       some case law in Illinois that we
17       looked at before we filed the
18       cases that said, under certain
19       circumstances, you can sue a
20       pharmacy in Illinois if they
21       prescribe -- if they fill a
22       prescription for a drug knowing
23       that there might be
24       contraindications for that drug
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        without telling the people.  It's
 2        a case called Happel.  So, based
 3        on the Happel case, we filed the
 4        cases in Illinois and started
 5        working them up.
 6             MR. BLIZZARD:  How many of
 7        the 65 cases were actually
 8        scheduled for trial?
 9             MR. LOWE:  The only case
10        that was scheduled for trial, I
11        think it would be two.  There was
12        a lot of procedural maneuvering
13        that went on -- the Donahue versus
14        Merck case was originally set for
15        trial as a case that we thought
16        was a real trial schedule, October
17        of 2007.  We were working that
18        case up, and in the summer of
19        2007, the VICTOR study was
20        published.  Based on that, I was
21        using Dr. Gary Sander here in New
22        Orleans as an expert, and I
23        developed a local -- you know, we
24        tried.  I mean, I talked to Zipes,
```

FAC Resp. Exhibit D -- 964

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        I talked to other cardiologists.

2        We developed a local cardiologist,

3        Dr. Alan Maniet, who was a

4        fen-phen expert for us, and so he

5        was giving us case-specific

6        testimony, too.  Anyway, they both

7        had to be redeposed.  I was going

8        to put the trial off to March of

9        '08.  There's a Fifth Amendment

10       scheduling order that was entered

11       regarding that.

12            So, I paid $10,000, and Joey

13       paid $10,000, and I hired Dr. Moye

14       to be our expert, so he was going

15       to come and testify live, Sander

16       was going to testify live, Maniet

17       was going to testify live.  We

18       deposed the treating doctors in

19       Illinois.  Actually, they were

20       deposed twice.  In Illinois,

21       there's a discovery deposition and

22       evidence deposition, so, some of

23       them were deposed twice.

24            MR. SEEGER:  These are

Page 10

1           experts that you did designate in

2           the case that was headed toward

3           trial?

4                MR. LOWE:  Yes.  In

5           Illinois, it is called a Rule 213

6           interrogatory.  Mark Robinson was

7           great.  We met with Mark and Ted

8           Wacker.  We were seeing if they

9           wanted to try the case, help us

10          try the case.  They wanted to get

11          Zipes on board, and we had already

12          contacted Zipes.  And then Zipes

13          decided he didn't want to do it,

14          because he testifies in cases

15          where there aren't many risk

16          factors, not when there are a lot

17          of risk factors.  And so based on

18          that, Zipes decided he didn't want

19          to do it, and based on that, Mark

20          decided he didn't want to do it.

21                MR. WEITZ:  Where in

22          Illinois was it filed?

23                MR. LOWE:  Madison County.

24          The client was a great client,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        older guy, truck driver.  He was a
 2        lifelong resident of Madison
 3        County.  His son was the recorder
 4        of deeds in Madison County, so he
 5        was politically connected.  We
 6        were in front of the same judge
 7        Andy was in front of, Judge Stack,
 8        who was a good guy, he's a good
 9        judge.
10             In the meantime, and we put
11        this in our affidavit, we were
12        trying to get the MDL trial
13        package, but it wasn't available,
14        and I understand that.  So, I
15        began getting information from --
16        I got a lot of information from
17        Penny Herman, I got a lot of
18        information from Mark Robinson.
19        And so based on that and the
20        Schwaller case, I got the trial
21        transcript, all the trial exhibits
22        were introduced in the record, so
23        I got all of those for the first
24        time, had all the exhibits.  So,
```

FAC Resp. Exhibit D -- 967

Page 12

1          we were in the process of creating

2          our own trial package because we

3          couldn't get it from the MDL, they

4          didn't have it yet.

5               So, then I deposed Dr.

6          Waymack, I deposed Dr. Marks, and

7          my deposition of Marks was after

8          the VICTOR data, and he has this

9          theory that in the VICTOR study,

10         they say that the data is not

11         completely balanced.  So, he

12         rebalanced it, and then, based on

13         that, said there's no statistical

14         significance.  So, there's one

15         depo out there regarding that

16         which I took.

17              I took their case-specific

18         guys, Dr. Cohen, Dr. Saltzman,

19         which I think Andy experienced at

20         trial.  They had a doctor at Johns

21         Hopkins, Dr. Hastasian, so I took

22         his depo.  After I got all those

23         depos done, including our experts,

24         I sent all of that stuff to the

Page 13

```
 1          MDL, to Penny Herman, I .pdfed all
 2          the exhibits, so all that was
 3          there for everybody else to share.
 4               As far as I'm concerned, as
 5          plaintiffs' attorneys, whether
 6          you're on the PSC or your own
 7          case, we're all in this together
 8          against Merck.  That's what we
 9          were trying to do, was to proceed
10          and hopefully get a verdict
11          against Merck.  Even if I didn't
12          get a verdict, I learned a hell of
13          a lot more about Vioxx, and I had
14          65 more cases to go.
15               MR. SEEGER:  Jeff, how close
16          did you get to trial?
17               MR. LOWE:  The settlement
18          was in November of '07, and our
19          trial was put off in September of
20          '07 to April of '08.
21               MR. BIRCHFIELD:  So, you
22          were within like a month of trial?
23               MR. LOWE:  At one time we
24          were within two months of trial,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          and when the settlement came out,

2          there were deadlines of February

3          28th for fact witnesses and March

4          7 for experts.  But I had done

5          everything except for Vicki Starr.

6                   MR. RAFFERTY:  Jeff, you

7          said the Donahue case and then

8          what other one?

9                   MR. LOWE:  Well, there's

10         another cased called Auslander --

11                  MR. RAFFERTY:  All of that

12         was Donahue?

13                  MR. LOWE:  Yeah.  Basically

14         our lead case was Donahue.  We

15         were doing all of this in Donahue.

16         And once we got that created, we

17         could then proceed with the other

18         cases.

19                  MR. RAFFERTY:  Was the other

20         case set yet?

21                  MR. LOWE:  I know that

22         Auslander had a discovery schedule

23         and we were beginning fact

24         discovery in that.  It was a

FAC Resp. Exhibit D -- 970

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        stroke case.  It was in Cook

2        County.  It was originally in

3        Madison County, but it got

4        transferred to Cook.

5            MR. RAFFERTY:  Can you spell

6        that?

7            MR. LUNDY:

8        A-U-S-L-A-N-D-E-R.

9            MR. BLIZZARD:  Was that

10       actually scheduled for a trial

11       date?

12           MR. LOWE:  I don't remember.

13       I remember it had a discovery

14       schedule.  Discovery schedules

15       usually have a trial date.  In

16       Cook County, you are looking out

17       like three years on a trial date.

18           MR. HERMAN:  That's fast.

19           MR. SEEGER:  The stuff that

20       you did, the stuff you worked up,

21       the deps of the experts, you sent

22       that all on to Penny.  Do you

23       remember the time frame?

24           MR. LOWE:  I would say April

Page 16

1            of '08 is probably when I got it

2            all together for her.

3                  MR. SEEGER:   Okay, thanks.

4                  MR. WEITZ:   Why did the case

5            get put off in October of '07?

6                  MR. LOWE:   That's when

7            VICTOR came out, and we said our

8            experts have new opinions

9            regarding VICTOR.   Sander was

10           redeposed in New Orleans, and

11           Maniet was redeposed in St. Louis

12           in the summer.   And so because of

13           that, we weren't going to be able

14           to meet the October date, because

15           they didn't want to produce their

16           experts until we had our experts

17           finalized.

18                  Also, meanwhile, in the

19           other cases, when we started

20           combining cases, we may only have

21           one plaintiff who bought from

22           Walgreen's, and we'd throw nine

23           other plaintiffs in there who were

24           Illinois residents.   And then

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          Judge Murphy said, one plaintiff,

2          one defendant, it's not removable.

3          But then when we got down, got to

4          trial court, they filed motions to

5          sever, motions for forum non

6          conveniens.  And so we fought

7          those, we lost those in front of

8          Judge Stack, some of them.

9               We also had a new idea in

10         St. Clair County where what we did

11         or what Judge O'Malley did was

12         severed out the people who were

13         St. Clair County people, and then

14         he transferred all the other ones

15         up to Cook County.  Because Merck

16         had his registered agent in Cook

17         County, and he had just gotten

18         reversed for not transferring his

19         case to Cook County on a class

20         action to Merck.

21               MR. HERMAN:  The Donahue

22         case, was that an MI or a stroke?

23               MR. LOWE:  An MI case.

24               MR. HERMAN:  And the other

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

Page 18

1          cause, Auslander?

2                  MR. LOWE:  Auslander was a

3          stroke.

4                  MR. BLIZZARD:  Do you know

5          what the expenses were that are

6          specific to the workup of Donahue

7          and Auslander, and have those been

8          submitted?

9                  MR. LOWE:  Yes.  It was like

10         $160,000.

11                 MR. LEVIN:  You submitted

12         160,688.39.  Your expenses and

13         your hours have been rejected by

14         the accountant.  Are you working

15         with them?

16                 MR. LOWE:  We just found out

17         yesterday it was rejected by them,

18         because they sent a letter

19         addressed to Carey & Danis without

20         addressing it to anybody in

21         particular, and so they just

22         called me yesterday, and they just

23         e-mailed me the letter.  So, yes,

24         we will now be working --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1             MR. HERMAN:  That's okay.

2        As long as you work with them.

3             MR. LEVIN:  You have 6,285

4        hours, and I take it all of those

5        hours are related to the Donahue

6        case?

7             MR. LOWE:  Donahue case and

8        the other 64.

9             MR. BIRCHFIELD:  Jeff, can

10        you give us a sense of how many of

11        those hours would be your hours or

12        lawyer --

13             MR. LOWE:  My hours are

14        1,600 of those.

15             MR. BIRCHFIELD:  1,600.

16             MR. LOWE:  Yes.

17             MR. LEVIN:  Are there

18        paralegal hours in there?

19             MR. LOWE:  No.

20             MR. SEEGER:  You were going

21        to try the case, too, right?

22             MR. LOWE:  Yes.

23             MR. RAFFERTY:  On the other

24        64 cases, how far did those get?

FAC Resp. Exhibit D -- 975

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Were there depos taken?

2               MR. LOWE:  There were depos

3          on probably about three of those

4          cases.  I know there's a depo in a

5          case called Brame, and there was a

6          depo in one other case, but what

7          happened is, after Judge O'Malley

8          transferred the rest of the cases

9          to Cook County, Merck appealed

10         three of the cases, it was Brame,

11         Riddle and Hardaway, and so we

12         went to the Court of Appeals, the

13         Fifth District, and we filed

14         briefs in that, and we ended up

15         winning all of those probably

16         pretty close to the time of the

17         settlement.  So all those cases

18         were then -- the transfer to Cook

19         County was --

20              MR. LEVIN:  Could you break

21         down the difference in the hours

22         between the Donahue case and the

23         other --

24              MR. LOWE:  On my time, if it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
1          was Donahue, I put Donahue.

2                MR. SEEGER:  You broke it

3          down by case?

4                MR. LOWE:  Yeah, I broke it

5          down by case on my time.

6                MR. LEVIN:  Give me a

7          ballpark figure.  With the 6,000

8          hours, how much of those 6,000

9          were just earmarked for Donahue,

10         the case going to trial?

11               MR. LOWE:  I could go

12         through it and recalculate it, but

13         I don't want to ballpark it.  I

14         don't really have any idea.  I

15         know Evan Schaeffer -- again, I

16         think everyone who was doing their

17         time, we were trying to do it

18         consistent with that strategy so

19         you could tell what we were

20         working on, which case.

21               MR. SEEGER:  Other than

22         Robinson, did you work with any

23         other people from the MDL in

24         working up the case or sharing?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1           MR. LOWE:  No.  I mean, and

2       I have the e-mails, because is it

3       common benefit time?  And Mike

4       Ferrara wrote to me or e-mailed

5       everyone trying to get more money

6       for the public relations campaign

7       in New Jersey, and so I said,

8       yeah, we forgot about it, we'll

9       send you our two grand, by the

10      way, we've got this case set in

11      October, I'm trying to get the

12      trial package.  So, he writes me

13      back --

14          MR. HERMAN:  What's the date

15      of that?

16          MR. LOWE:  July of '07.  So,

17      July 26, '07, he writes me, "Hey,

18      Jeff, Thanks for the check.  We'll

19      advise the PR firm of your trial.

20      With regard to your October trial,

21      we want to win at all costs.  We

22      can't afford any more losses."

23      There was a bad streak there.

24      "There are four trials beginning

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          in October here in New Jersey.

2          Dave Buchanan is our liaison

3          counsel, and he has a trial in a

4          box."

5               So I e-mailed Dave, Dave

6          says, "Call me tomorrow."  I

7          called Dave.  And he didn't have

8          the trial in the box, but he

9          talked to me and gave me some

10         hints and some tips.

11              I was in touch with Pete

12         Kaufman at Levin, and he was the

13         head of the trial package team,

14         and so he finally just said send

15         me -- and I talked to him, and he

16         was helpful.

17              Illinois has a rule where

18         you can make a request for them to

19         bring anyone who is a management

20         employee to trial.  And so I was

21         asking them, who should I do?  And

22         so he told me like Charlotte

23         McKines was a good one, because

24         she wasn't as experienced, had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          some good depos.  So, I talked to

2          him for half hour, an hour.  So,

3          basically, I sent him the hard

4          drive in August, and then October

5          comes around, and I don't have the

6          hard drive, so I finally asked him

7          again.  He finally gives me the

8          trial package.  I think I got it

9          before anybody else.  So then I

10         started reviewing it and looking

11         at it.

12              MR. BLIZZARD:  In the

13         Donahue case, had you gotten to

14         the point where they had filed and

15         you had responded to Daubert

16         motions, motions in limine and

17         that sort of thing?

18              MR. LOWE:  No.  We had

19         gotten to the point where they

20         filed -- they filed a summary

21         judgment based on statute of

22         limitations claiming that anyone

23         would be put on notice within two

24         years -- within two years of --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        before February 23rd of 2005 that

 2        Vioxx could cause heart attacks

 3        based on the VIGOR study and all

 4        the publicity.

 5             MR. LEVIN:  When was that

 6        motion filed?

 7             MR. LOWE:  It was filed -- I

 8        don't have the date of it.

 9             MR. LEVIN:  Was it filed

10        before the settlement here?

11             MR. LOWE:  Oh, yeah.  It was

12        in the summer.  It was filed

13        before it, and Judge Stack

14        overruled that pretty quickly, and

15        they had not filed any Daubert

16        motions.

17             MR. DANIS:  There were

18        negotiations where you would be

19        involved, kind of a period with

20        the CME evidence that was used in

21        Andy's case was going to be kind

22        of the agreement.

23             MR. HERMAN:  When did you

24        get the trial package?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1            MR. LOWE:  I can tell you

2       exactly.  It was either

3       September -- October 25, 2007.

4            I met with Ken Soh at one

5       time, too.

6            MR. BLIZZARD:  Had you

7       gotten to the point of a pretrial

8       order where you had to do

9       case-specific depo designations

10      and counters and objections?

11           MR. LOWE:  We had not done

12      that, but that's what I was

13      preparing.  That was my biggest

14      concern, to have a time to go

15      through all the depos and make

16      depo designations, and then we

17      were within a month or so of doing

18      that.  So, we were in the process

19      of gathering up the stuff to do

20      that.

21           MR. HERMAN:  Let me get back

22      to the trial package issue.  When

23      was your case continued?

24           MR. LOWE:  When was it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          continued?  September 5th, 2007.

2                    MR. RAFFERTY:  And it was

3          set for?

4                    MR. LOWE:  End of October of

5          2007.

6                    MR. HERMAN:  So, it was

7          continued in September --

8                    MR. LOWE:  Right.

9                    MR. HERMAN:  -- to April.

10         You got the trial package in

11         October.

12                   Let me ask you, before

13         November of 2007, did you send any

14         of your work product to the

15         depository?

16                   MR. LOWE:  No, I hadn't done

17         that yet.

18                   MR. HERMAN:  And just one

19         other question.

20                   When did you, if you recall,

21         sign an MDL participation

22         agreement?

23                   MR. LOWE:  Early on, right

24         away, because it was supposed to

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1       be the lower amount.  We signed it

2       quickly.  I would say in '05, late

3       '05.

4               MR. WEITZ:  Were you guys

5       appointed to any of the committees

6       on the MDL or in state court?

7               MR. LOWE:  No.  I mean, we

8       kind of considered we were State

9       Court of Illinois.  We had almost

10      all the cases.  So we kind of

11      think we ran that mini MDL.  We

12      thought about trying to

13      consolidate it at one time, but

14      then we were afraid of where they

15      would consolidate it.

16              MR. HERMAN:  Wasn't there a

17      case tried in Illinois?

18              MR. LOWE:  Andy's case, the

19      Schwaller case.  We were

20      originally set ahead of them, and

21      then we got ours continued behind

22      his.

23              MR. WEITZ:  Was that tried

24      in Madison County?

FAC Resp. Exhibit D -- 984

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          MR. LOWE:  Yes.

2          MR. WEITZ:  Judge Stack

3     tried that?

4          MR. LOWE:  Yes.

5          MR. WEITZ:  Were you given

6     any of your assignments for the

7     work that you did from any of the

8     leadership at the MDL?

9          MR. LOWE:  No.

10          MR. WEITZ:  So, you were

11     basically working up your case for

12     trial and then sharing that

13     information with the MDL?

14          MR. LOWE:  Yes.  I mean, I

15     say I talked to a lot of different

16     people within the MDL trying to

17     get more information.

18          MR. WEITZ:  But that was in

19     pursuit of working up your case?

20          MR. LOWE:  True.  Our cases,

21     and then the other 65 behind it,

22     and then possibly trying cases in

23     the MDL, or if we have a case in

24     New Jersey, it would be the Boaten

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        case, significant stroke case,

2        Alberta Boaten, that was in the

3        trial pool or the discovery,

4        case-specific discovery pool

5        there.  So, we had already done

6        the plaintiff's treating

7        neurologist, et cetera.  So, we

8        were trying to gather this

9        information so that we could try

10       Vioxx cases.

11              MR. HERMAN:  How many cases

12       have you enrolled in the

13       settlement?

14              MR. LOWE:  We enrolled all

15       of our cases.

16              MR. HERMAN:  I don't mean

17       enrolled.

18              MR. DANIS:  2,300.

19              MR. BIRCHFIELD:  Submitted.

20              MR. LOWE:  We enrolled all

21       2,689, to the best of my

22       knowledge.  And then any case

23       involving a blood clot, a DVT, a

24       pulmonary embolism, we disengaged

FAC Resp. Exhibit D -- 986

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          those clients.  So, any MI or

2          stroke case we put in, which is, I

3          think in the 2,100 range, plus

4          200.

5               MR. BIRCHFIELD:  What did

6          you say?

7               MR. DANIS:  It is 2,300.

8               MR. LOWE:  Walther Glenn was

9          part of our group, and they had

10         200 separate cases that they

11         referred to us.  Part of our

12         agreement with him was that he

13         would work and do the plaintiff

14         fact sheets and all of that stuff.

15              MR. BIRCHFIELD:  He

16         submitted those as primary

17         counsel, is that what you are

18         saying?

19              MR. LOWE:  No.  We all

20         submitted it under our umbrella,

21         but he did the work.

22              MR. HERMAN:  Who else was in

23         your group?

24              MR. LOWE:  A guy named Evan

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          Schaeffer of a firm called

2          Schaeffer & Lamere.  He's a former

3          partner of Carey & Danis, and then

4          Carey & Danis, with their

5          associates and support staff, and

6          then me.  Basically that was it.

7          And Evan and I, we did a lot of

8          the work --

9               MR. HERMAN:  What's his

10         firm?

11              MR. LOWE:  Schaeffer &

12         Lamere.

13              MR. HERMAN:  Where is it

14         located?

15              MR. LOWE:  Godfrey,

16         Illinois.

17              MR. BIRCHFIELD:  Any other

18         questions?

19              MR. SEEGER:  No.  That was

20         very informative.  Thank you.

21              MR. WEITZ:  Thank you.

22              MR. HERMAN:  Thank you.

23                   -  -  -

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147
23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 989

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  LUNDY & DAVIS, LLP
       Matthew E. Lundy, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 990

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2            MR. HERMAN:  We're going to

 3       have a transcript, and if matters

 4       can't be resolved at the end of

 5       the day, the judge is going to use

 6       some sort of procedure akin to

 7       Murphy Oil.

 8            MR. LUNDY:  Okay.

 9            We got involved in Vioxx and

10       wanted to be involved in the MDL,

11       I even applied for a position on

12       the PSC, so, we were dedicated

13       from the beginning to get involved

14       in this work and the work with the

15       PSC in the MDL, and we did.  We

16       did what the PSC wanted us to do.

17       We volunteered our services early

18       on, and whatever projects we were

19       asked to do, we worked on it and

20       gave it 100 percent effort.

21            I worked on the discovery

22       committee and specifically on the

23       sales and marketing.

24            We reviewed documents in the
```

FAC Resp. Exhibit D -- 991

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        repository, but we also reviewed

 2        sales and marketing documents to

 3        prepare for depositions that I was

 4        involved in in Texas.  One was Han

 5        Nguyen-Vo Mariacher,

 6        M-A-R-I-A-C-H-E-R, and Dr. Isaacs

 7        was a Merck consultant and

 8        mouthpiece for Merck and did a lot

 9        of presentations for doctors

10        around Texas, and I was in her

11        deposition.  So, I went through

12        documents and got prepared for

13        those.

14             I worked with Ted Wacker and

15        with Pete Kaufman on the case

16        chronology and the exhibit

17        authorization and exhibit

18        admissions in, I think it was Mark

19        Robinson's trial.  So, worked on

20        those.

21             Andy asked us early on to

22        help him in the trials that he

23        had.  We did depo cuts.  We did

24        motions in limine.  We worked on
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          jury questionnaires for Andy.  I

2          think we did that both in Irvin I

3          and II.

4               We sent lawyers to Chris

5          Seeger's office to review

6          documents early on, had people up

7          in New York doing that.

8               I was also appointed to the

9          state liaison committee where we

10         tried to keep lawyers around the

11         country, state lawyers, informed

12         of what was going on.  A lot of

13         that time I didn't even keep,

14         because it was just phone calls,

15         cell phone calls, and we did that.

16              As a part of that committee,

17         I worked on the rapid remand

18         project and case selection

19         project.  Those occurred at a

20         time, I think, when things were

21         moving more quickly in New Jersey

22         than they were in the MDL, and we

23         were strategizing and thinking of

24         ways to move the MDL further to

FAC Resp. Exhibit D -- 993

Page 5

1          put pressure on Merck.  I talked

2          with Lenny, and Lenny called me

3          and asked us to help with this,

4          and I did.  He contacted lawyers

5          around the country to see who had

6          cases that could be remanded and

7          ready for trial, and we were

8          looking at cases and talking with

9          lawyers around the country to help

10         move the MDL along, and I think

11         that was successful.

12              Those are the highlights of

13         the work that our firm was

14         involved in, and as I said, we

15         were willing to do the substantive

16         work and the hard work necessary

17         to help the MDL to make it

18         successful.  You won't see a lot

19         of receipt and review of

20         documents, none of that.

21              MR. HERMAN:  Dawn has

22         already told us about your group

23         work together.  As we understand

24         it, you all together in your group

Page 6

```
 1        had 500 to 600 cases for the

 2        settlement?

 3             MR. LUNDY:  That's probably

 4        right.

 5             MR. HERMAN:  Is that about

 6        right?

 7             MR. LUNDY:  Yes.

 8             We're sharing the cases, but

 9        there's no sharing in the --

10             MR. LEVIN:  MDL.

11             MR. LUNDY:  -- MDL.  That's

12        separate and apart.

13             MR. HERMAN:  When you say

14        you don't share in the MDL, you

15        mean in the common benefit?

16             MR. LUNDY:  The common

17        benefit.

18             MR. BIRCHFIELD:  What were

19        your total hours and expenses?

20             MR. LUNDY:  I think it's

21        about 18,000 in expenses, Andy.

22             MR. LEVIN:  You have got

23        about $900 in expenses that have

24        been rejected, so you may want to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          call the accountants to see what's

2          doing with that.

3               MR. LUNDY:  How do I find

4          out what was --

5               MR. HERMAN:  Touch base with

6          Lenny.

7               MR. LEVIN:  As far as the

8          accounting form, you have no hours

9          rejected, no hours under

10          submission.  You have 277 hours in

11          the whole case.

12               MR. RAFFERTY:  177?

13               MR. LEVIN:  277.

14               MR. LUNDY:  That's not what

15          I have.

16               MR. BIRCHFIELD:  That's why

17          I asked.

18               MR. LUNDY:  I've got about

19          608.

20               MR. LEVIN:  You not only

21          have 400 hours that are

22          unaccounted for, the accountant

23          doesn't know about them, because

24          they are neither under submission

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          nor rejected.
 2               MR. BLIZZARD:  Are these
 3          personal hours of Matt's or are
 4          you talking about his firm's?
 5               MR. LEVIN:  No.  I'm talking
 6          about the firm.
 7               MR. LUNDY:  Because we
 8          submitted them all to both,
 9          whatever that thing is, and to
10          Russ' office.
11               MR. RAFFERTY:  Who else in
12          your firm was doing work on it?
13               MR. HERMAN:  Matt, let me
14          just give you the procedure.  What
15          happens is, people submit their
16          hours and we send them directly to
17          the CPA, Wegmann-Dazet.  Phil
18          Garrett is the head of that team,
19          and he's court appointed.  What
20          happens is, when there's some
21          discrepancy in hours or costs,
22          lawyers call there, they work out
23          whatever the snafu is, so, you're
24          going to want to --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1              MR. LUNDY:  I had been

2         e-mailing with whatever the guy's

3         name is.

4              MR. LEVIN:  Phil Garrett?

5              MR. LUNDY:  One of the guys

6         in their office.

7              MR. BIRCHFIELD:  Cliff

8         Newlin.

9              MR. LUNDY:  Cliff Newlin,

10        that's it.  And I sent you and he

11        the same thing a couple of times.

12             MR. HERMAN:  Give him a

13        call, and let's see if we can get

14        this updated.  Otherwise, you are

15        understated.

16             MR. BIRCHFIELD:  So, you

17        have got about 680?

18             MR. LUNDY:  680 I think is

19        what I've got.

20             MR. BIRCHFIELD:  Is that

21        your time, Matt, or lawyer time or

22        paralegal time?

23             MR. LUNDY:  I think it is

24        all lawyer time, between Lisa

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          Stewart, myself and three other

2          lawyers, a guy named Charles

3          Beckham, guy named Billy Quinn.

4               MR. LEVIN:  The problem may

5          be there's no Billy Quinn, and

6          there's no Charles here.  We have

7          you, Lisa, and Karen as a

8          paralegal.  She has one half hour.

9               MR. LUNDY:  I'll look into

10          that.  Thank you.

11               MR. SEEGER:  Thank you.

12               MR. HERMAN: Thank you.

13                    -   -   -

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1          C E R T I F I C A T E

 2

 3          I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13          I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23          Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:  MATTHEWS & ASSOCIATES
       David P. Matthews, Esquire
       Julie L. Rhoades, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1001

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                 -  -  -
 2              MR. BIRCHFIELD:  We've got
 3        Linda here.  She's taking
 4        everything down.  Judge Fallon
 5        wants everybody to be aware of his
 6        order in Murphy Oil, take a look
 7        at those criteria.  I'm sure you
 8        are already familiar with that.
 9              MR. MATTHEWS:  Yes.
10              MR. BIRCHFIELD:
11        Transparency is a big issue.  We
12        have a transcript, and it will be
13        available for him to review and
14        use in whatever way he sees fit.
15        So, with that, the floor is yours.
16              MR. MATTHEWS:  Well, I think
17        I know everybody in the room here,
18        but my name is David Matthews, and
19        I'm here with Julie Rhoades to
20        talk briefly about our position on
21        common benefit expenses and fees.
22              We have included quite a bit
23        of information in writing, so, I
24        would like to incorporate that.  I
```

FAC Resp. Exhibit D -- 1002

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        don't want to repeat myself.  You

2        guys have been here for a long

3        time.

4             I'll start just by saying

5        that we were involved in Vioxx in

6        the early, middle and late, and we

7        were committed participants in the

8        litigation early on.  I think that

9        we had cases we were filing

10       several months prior to the drug

11       being withdrawn from the market.

12       I don't think we were in as early

13       as you and Chris and Mark, but we

14       were in earlier than most, I'll

15       say that.

16            I did participate and

17       actually talked at the Advisory

18       Committee hearing back in February

19       of '05 after the drug was

20       withdrawn --

21            MR. BIRCHFIELD:  The FDA

22       Advisory Committee?

23            MR. MATTHEWS:  The FDA

24       Advisory Committee, and it was

FAC Resp. Exhibit D -- 1003

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          discussing three drugs, three
 2          COX-2s and what they were going to
 3          do with them.  I had argued at
 4          that time that all three drugs
 5          need to be off the market, and
 6          there should be criminal penalties
 7          leveled against CEOs and suggested
 8          some type of criminal penalty with
 9          all the CEOs in the room, which
10          was met with a pretty stern lip
11          from the folks.  But Dr. Jeb Wait
12          and I were the only two plaintiffs
13          lawyers at the Advisory Committee
14          hearing.  So, I think that is some
15          evidence and example of our
16          commitment early on in the
17          litigation.
18               MR. BIRCHFIELD:  Jeb is your
19          partner?
20               MR. MATTHEWS:  Dr. Jeb Wait
21          has been with our firm as a
22          consultant.  He's still a
23          consultant at the firm.  He was
24          involved early, in the middle and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          late, as well.

2                  So, that started, and our

3          involvement was the filing of

4          suits prior to the withdrawal,

5          continued filing.  We filed a

6          great number of suits, and I think

7          without looking at these

8          documents, approximately 430 cases

9          in Texas.  We filed another

10         several hundred in New Jersey, I

11         think, with Chris' firm, and then

12         several hundred in New Orleans in

13         the MDL.

14                 So, we had a three-prong

15         attack.  It's my belief -- I've

16         been handling drug litigation for

17         about ten years now, and my

18         approach has always been multi-

19         litigation approaches, that is,

20         both State and Federal.  From

21         Vioxx -- I'm sorry, from Rezulin

22         days, Andy, when you and I were

23         working together where I had cases

24         in six or seven different states,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1          state court litigation, it has

 2          always been my belief to have a

 3          multi-prong attack, and that's

 4          what we were doing and planning on

 5          doing in Vioxx, and that's what we

 6          did.

 7               MR. WEITZ:  Dave, how many

 8          total cases did you have?

 9               MR. MATTHEWS:  We looked at

10          over 6,000 or 7,000 cases, and we

11          had whittled it down to 1900.  So,

12          we were at about 1930, give or

13          take.

14               MR. WEITZ:  Did you submit

15          that for settlement, 1930?

16               MR. MATTHEWS:  1930 minus.

17          We're still in the process of

18          about, I want to say 200.  So, we

19          submitted approximately 1700.  And

20          like I say, when I say "in the

21          process," the last 200, they were

22          registered, of course, but we're

23          still working on medical records

24          and followup material.

FAC Resp. Exhibit D -- 1006

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           MS. ROSE:  I think our final

2      number will be about 1,823.

3           MR. MATTHEWS:  So,

4      continuing on with the litigation

5      in Texas, without overspeaking, I

6      think I was probably instrumental

7      in the formation of the Texas MDL

8      based on statutes in Texas that

9      allow for an MDL because the

10     defendants wanted it.  We dealt,

11     and I was kind of the point person

12     with that.  I worked with Ed and

13     Tommy Fibich, Mike Gallagher, and

14     we spearheaded the Texas MDL.

15     Again, without overspeaking, I

16     would say that I probably did the

17     lion's share of the work in the

18     Texas MDL.

19           MR. SEEGER:  What are some

20     of the things, Dave, as we have

21     some people here that might not be

22     familiar, that you worked on as

23     point person in the Texas MDL?

24           MR. MATTHEWS:  Well, I

FAC Resp. Exhibit D -- 1007

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          started by offering my office as

2          the Texas depository.  That's

3          really where it started.  Chris,

4          you and your outfit in New Jersey

5          had your own depository, but we

6          had geographically a need in the

7          center of the country to have a

8          depository.  So, I offered and

9          paid for and continued to update

10          and maintain the Texas depository,

11          which I believe was thoroughly

12          complete.  Depositions, both

13          coasts, as well as the MDL, all

14          state and Texas depositions, both

15          specific and general deposition,

16          expert and fact deposition,

17          continuing to update on the

18          production of documents of which

19          we paid for.  A lot of this,

20          hopefully all of it was submitted.

21          But that was an expensive venture.

22          So, that was, I think, our initial

23          involvement.

24              Secondly, we worked with the

FAC Resp. Exhibit D -- 1008

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1          defendants and tried to determine

 2          which judge was going to be the

 3          head of the MDL in Texas.

 4                MR. HERMAN:  Let me stop

 5          you, David, for a minute.  I want

 6          to try to understand better, and I

 7          don't, how the various -- Texas

 8          has got some of the best lawyers

 9          in the country.  I'm not just

10          saying that.  I know that.  I

11          don't understand how the various

12          groups of lawyers work together.

13          I want to give you an example so

14          that you can see where I'm coming

15          from.

16                We have a Texas Vioxx

17          litigation group, five firms,

18          Walter Umphrey, John Eddie's firm

19          and so on.  They had their own, as

20          I understand it, their own

21          building, their own case

22          depository for their own clients

23          and their own document

24          accumulation.  I won't call it a

FAC Resp. Exhibit D -- 1009

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        depository, but accumulation.  How

2        did you all articulate with each

3        other?  Mark had his.  Ed was

4        involved with you and Tommy.  We

5        just heard from Kathy Snapka, who

6        was running her own accumulation

7        of experts and documents.  What

8        happened in the Texas MDL in terms

9        of the articulation of the Texas

10       groups with each other and then

11       with New Jersey and Andy, Tom in

12       California?

13            MR. MATTHEWS:  Well, we

14       worked with Merck in trying to

15       determine a fair judge, and we

16       arrived at Randy Wilson by process

17       of exclusion.  So, he was the MDL

18       judge pursuant to Texas state

19       statute.

20            At that point, we formed a

21       PSC, which included anybody that

22       really had a great deal of

23       involvement in the litigation.

24       Mark Lanier had kind of separated

FAC Resp. Exhibit D -- 1010

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        and was really litigating on the

 2        East Coast, really not much in

 3        Texas.  So, this was folks that

 4        had the majority of cases in

 5        Texas.  Mr. Lanier had a good

 6        number of cases in Texas, but was

 7        really more concentrating, in my

 8        opinion, in the East.

 9             MR. LANIER:  I would send

10        Ken Soh to this stuff generally

11        more than myself.

12             MR. MATTHEWS:  Ken Soh from

13        Mark's firm was there always, so

14        we coordinated with him.  In terms

15        of the consortium with Watts, and

16        Umphrey and John Eddie and Grant

17        Kaiser and one other --

18             MR. BIRCHFIELD:  Drew, Drew

19        Ranier.

20             MR. MATTHEWS:  -- I would

21        regularly work with those guys in

22        terms of what we needed, and we

23        would share information.  It was

24        my opinion we had to have a Texas
```

FAC Resp. Exhibit D -- 1011

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          depository, which was used by

2          many, many lawyers, not just

3          Texas.

4                    MR. HERMAN:  But everybody

5          fed information into your

6          depository?

7                    MR. MATTHEWS:  Yes.  I paid

8          for depositions with Linda

9          Golkow's company and others so we

10         could have direct access.

11                   MR. BLIZZARD:  Russ, just to

12         supplement and clarify, I don't

13         think that the consortium had

14         their own document depository.  I

15         think at their Vioxx Center, their

16         individual case files were worked

17         up.  The depository was at David's

18         office.

19                   MR. MATTHEWS:  I think

20         that's right, but I can't speak to

21         exactly what was in there.

22                   MR. HERMAN:  I'm glad you

23         clarified that, because I thought

24         what I heard when I took notes

FAC Resp. Exhibit D -- 1012

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          earlier was that they had gathered

2          expert material and depositions

3          and transcripts from other cases

4          and were maintaining their own --

5               MR. BLIZZARD:  Russ, I think

6          they may well have gathered

7          transcripts --

8               MR. HERMAN:  I'm not arguing

9          the point, I'm --

10              MR. WEITZ:  Let's ask Dave.

11         Dave, what firms were substantial

12         contributors to your document

13         depository and the work that was

14         done in the Texas MDL?

15              MR. MATTHEWS:  Well, in

16         terms of creating, maintaining the

17         depository, that fell in my lap,

18         probably 95 percent of that.

19         There were some contributors, and

20         I can't tell you off the top of my

21         head exactly what they

22         contributed.  It was an expensive

23         venture, and I, again, included

24         all of these receipts and whatnot

FAC Resp. Exhibit D -- 1013

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          in our submission.  The document

2          depository was used by many, many

3          firms.  We had people inside of

4          Texas and outside of Texas using

5          the depository.  So, we would

6          have, for instance, Ed, Scott

7          Nabers would come and they would

8          come and spend time looking

9          through documents.  I had an IT

10         guy that was full time working on

11         this thing.  It was a big deal,

12         and as everybody at this table

13         knows, to put together something

14         of 20 million documents,

15         searchable format, and then

16         include all depositions taken to

17         date from all jurisdictions, both

18         State and Federal, and then

19         continue updating with new

20         discovery that's coming in, while

21         my office continually did

22         discovery, written discovery, as

23         well as our own depositions.  So,

24         it was a very, very big project.

FAC Resp. Exhibit D -- 1014

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1           MR. WEITZ:  That you had

2       taken upon yourself?

3           MR. MATTHEWS:  Yes.  I

4       offered to do it.  Somebody had to

5       do it, and I said I would do it.

6           MR. WEITZ:  Were you

7       organizing information in the

8       depository for other lawyers in

9       Texas?

10           MR. MATTHEWS:  Yes.

11       Everybody could use it inside of

12       Texas and outside of Texas.  We

13       had people coming from New Mexico,

14       and there was nothing really, to

15       my knowledge, in Louisiana as far

16       as a depository goes.  So, if

17       people from Louisiana wanted it,

18       all they had to do was sign the

19       confidentiality order.  That's all

20       they did.

21           MR. WEITZ:  Was it being

22       used by a lot of lawyers

23       throughout Texas?

24           MR. MATTHEWS:  Throughout

FAC Resp. Exhibit D -- 1015

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          Texas, yes.  Yes.  I don't have a

 2          log with me, but I would say many,

 3          many firms use that depository.  I

 4          offered my staff if they needed to

 5          figure out how to search it, use

 6          it, find a document.  We all know

 7          that the case was really about 50

 8          or maybe 100 documents.  How do we

 9          get that one document?  We would

10          always offer our help.

11               MR. BIRCHFIELD:  Dave, will

12          you talk to us for a few minutes

13          about the cases that you worked up

14          for trial and how you were moving

15          the Texas docket in the MDL.  Let

16          me say, and you also may want to

17          touch on this, but the first MDL

18          trial was moved to Houston after

19          Katrina, and you helped us try

20          that case, and we used your

21          office.

22               MR. MATTHEWS:  I forgot to

23          submit those hours, by the way,

24          which was silly, but I did prepare
```

FAC Resp. Exhibit D -- 1016

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1        probably 40 hours before the trial

 2        just on that trial.  Then I would

 3        say we worked probably 60 hours a

 4        week for two weeks or at least I

 5        did.  I can't speak for anybody

 6        else.

 7             MR. SEEGER:  Did anybody

 8        else from your office -- I know

 9        you were there, I saw you.  But

10        anybody else from your office?

11             MR. MATTHEWS:  Well, I had a

12        lawyer there, but really we did

13        not really submit any other time

14        for any other lawyer.  It was more

15        of an education time for that

16        lawyer.  I was the one that did

17        the work.  I didn't submit

18        anything from the other lawyer.

19             We also did a couple of my

20        trials with you, Andy, as you

21        know, and I think we even split

22        the cost at one point of an expert

23        or two and possibly Robert

24        Hirschhorn, who was the trial
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1       strategist.  We split the cost of
2       Hirschhorn.
3             We did offer Andy to use my
4       office for the first trial in the
5       MDL.  Not that that was a big
6       expense, but I offered it to
7       anyone that needed it.  You
8       clearly had a big staff there, and
9       I'm not saying we didn't want you
10      there, but we did offer that.
11            We also had a great deal of
12      involvement I think in the first
13      stroke case, and I think this is
14      very significant in my opinion.
15      We worked up from beginning to end
16      an entire stroke case with
17      epidemiology from Moye and
18      Plunkett, with a neurologist from
19      New York who I have used before by
20      the name is Steve Levine, who I
21      think is an excellent witness.  I
22      did work with Tom Kline's office a
23      bit, and we met there a couple of
24      times, because you were also going

FAC Resp. Exhibit D -- 1018

Page 19

1        to use them in the MDL is my

2        understanding, but we had a case

3        ready for trial.

4             MR. LEVIN:  Did you get a

5        report from Steve Levine?

6             MR. MATTHEWS:  Yes, we did.

7        I can't remember if we deposed him

8        now.  Jason Webster in my office

9        was working with Dr. Levine on and

10       off for many, many months.  We had

11       been to New York twice to work

12       with him.  We had been to Philly

13       to Tom Kline's office to work with

14       him.  He was ready to go to trial.

15       We were two weeks short of trial.

16       Actually, I had put this

17       information here, but just an

18       example of how much work was done

19       in that particular case, I had

20       stated in here the experts, and

21       there were a lot of them.  Dr.

22       Moye, Dr. Ushchmann, Dr.

23       Glandville, Dr. Guevarra, Dr.

24       Joshi, Dr. Keith, Dr. Rock, Dr.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1        Stephen Levine, and then a host of
 2        other case specific depositions
 3        that were taken in that case.  We
 4        were ready to try the case.
 5             MR. HERMAN:  What's the name
 6        of that case?
 7             MR. MATTHEWS:  Elvis
 8        Anderson, Elvis Presley Anderson.
 9        He's a Native American, and we
10        were in the Choctaw Nation Tribal
11        Court.  We were going to try a
12        case in Tribal Court, and Merck
13        was, in my opinion, scared
14        greatly.
15             MR. HERMAN:  What was your
16        trial date, Dave?
17             MR. MATTHEWS:  The trial
18        date was August 7, 2006.  I had
19        spent a lot of money and a great
20        deal of time on that case.  I was
21        pretty excited.  We were going to
22        try it with six Native American
23        jurors.  Elvis was a car dealer at
24        the Choctaw Nation casino and was
```

FAC Resp. Exhibit D -- 1020

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

 1        well known in the community and a
 2        good plaintiff in my opinion, and
 3        we were going to rock the boat.
 4        Suddenly, two weeks prior to
 5        trial, there was a motion to
 6        abstain from finding jurisdiction
 7        in the case, and the Tribal Court
 8        abstained from jurisdiction,
 9        completely pulled the rug from
10        underneath us.  I still to this
11        day don't know exactly what
12        happened, but it happened.  I'll
13        leave it at that.
14             So, that was another case we
15        worked up.  The first case that
16        was going to be tried in Texas was
17        James Miller, Jay Miller or James
18        Miller.  Julie knows the case well
19        because, again, we worked this
20        thing up from beginning to end.
21        This thing was set, the first case
22        in Texas, and we used and deposed
23        Dr. Tom Mayor, Dr. Eric Price, Dr.
24        Thomas Baldwin, the cardiologist

FAC Resp. Exhibit D -- 1021

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          from KC that you got us, Andy, Dr.

 2          Plunkett, Dr. Moye, Dr. Frias and

 3          Dr. Rosin, ready to try that case.

 4          They filed a summary judgment

 5          motion on a bankruptcy proceeding

 6          because Miller had filed the

 7          bankruptcy two years prior to our

 8          filing suit, and the bankruptcy

 9          was dismissed prior to filing

10          suit, but he had been injured in

11          the interim.  They said that he

12          did not list it in his -- this was

13          just two weeks again prior to

14          trial.  They said he didn't list

15          it.  Julie had argued a summary

16          judgment motion, and our judge,

17          Randy Wilson, found for the

18          defendants with that case.  We

19          appealed to the 14th Court of

20          Appeals, and it was on appeal at

21          the time the settlement was

22          announced.  Unbelievable to me.

23               MR. HERMAN:  When was the

24          Miller case set for trial?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1            MR. MATTHEWS:  Elvis
 2       Anderson was August 7, 2006.  This
 3       would have been prior to that.
 4       This would have been in early
 5       2006.  I don't have a specific
 6       date right in front of me here.
 7       Is there a process that you would
 8       like somebody to follow up on
 9       that?
10            MR. HERMAN:  No.  I was just
11       trying to place it.
12            MR. MATTHEWS:  Early '06.
13            At that point, we moved on
14       to the next couple of cases, and
15       we fully worked up Eura Fowler,
16       Herlinda Melindez, Sharon Rigby,
17       Nancy Springfield and Ruby
18       Ledbetter, which was a Fibich case
19       that Fibich had asked that I get
20       involved in and try it either by
21       myself or with him.  We were kind
22       of in that mode.  During the last
23       case I just talked about, Ruby
24       Ledbetter, is when Wilson came
```

FAC Resp. Exhibit D -- 1023

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1          down with the preemption finding,

 2          which put everything in

 3          standstill.

 4               MR. BIRCHFIELD:  You named

 5          several plaintiffs there together.

 6          Were those going to be tried

 7          together?

 8               MR. MATTHEWS:  They were all

 9          going to be tried individually.

10          The Court wanted us to submit

11          cases so we had several cases

12          ready to try.  I kind of was the

13          point person for that.  We would

14          submit ten cases, and, again, this

15          is what Dr. Wait spent a great

16          deal of time with.  It is a

17          hundreds of hours project, in my

18          opinion, that is, going through

19          your cases, as we all know, and

20          finding cases that you think

21          should be tried or can be tried.

22          A great deal of time was spent on

23          that.

24               This is the short story to
```

FAC Resp. Exhibit D -- 1024

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        that long story.  After whittling

 2        it down to these cases, we worked

 3        all of these cases up.  Again, I

 4        put this in the written materials.

 5        All the experts were taken, all

 6        the fact witnesses, all the family

 7        members, all the treaters, all the

 8        detailers, all the prescribers,

 9        you know, the whole --

10             MR. SEEGER:  Can I ask you a

11        question, Dave?  I don't mean this

12        to be a provocative question, but

13        I have to ask it, and you are the

14        best guy to address it.  There

15        have been certain statements made

16        that cases were put up for trial,

17        were worked up and then were being

18        dismissed.  Some of this was

19        aggravating the judge, that people

20        either appeared to be trial ready

21        or they were getting cases set.

22             MR. MATTHEWS:  I appreciate

23        the question.

24             MR. SEEGER:  You are the
```

FAC Resp. Exhibit D -- 1025

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1          best guy to address this.
 2                  MR. MATTHEWS:  I think it's
 3          me.  If you want to ask the
 4          person, I think it's me.
 5                  There was one case in
 6          particular that was Sharon Rigby,
 7          that was dismissed, the only case
 8          that was dismissed prior to trial.
 9          Sharon Rigby, I really don't think
10          I should talk about it because it
11          truly is attorney-client
12          information, and I'm not going to
13          talk about it, but Sharon Rigby
14          was dismissed for a variety of
15          reasons that needed to be
16          dismissed.  Other than that,
17          that's just simply not the case.
18                  MR. SEEGER:  By anybody
19          else, Dave?  Was anybody else --
20                  MR. MATTHEWS:  Not to my
21          recollection.  I think all the
22          cases that were up for trial were
23          mine, both stroke and heart
24          attack, I think.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          MR. SEEGER:  Do you know how

2     many that would have been?  I

3     think you told us, but how many

4     cases were in the queue?

5          MR. MATTHEWS:  I would say

6     we had about eight or nine cases.

7     I'm sorry.  Eight cases, and then

8     Elvis Anderson was in Tribal Court

9     in the city.

10         MR. HERMAN:  Was your stroke

11    expert and specific causation

12    reports and depositions shared

13    with the New Jersey depository or

14    the MDL depository?

15         MR. MATTHEWS:  I don't know

16    the answer to that, but I know

17    that Tom Kline --

18         MR. LEVIN:  Well, Steve

19    Levine was an expert for the MDL.

20    My question to you was, did you

21    get a report?  Because we never

22    got a report from him in the MDL,

23    and he went by the wayside for

24    whatever reason, and Feldman is

FAC Resp. Exhibit D -- 1027

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          our stroke expert.

2                MR. MATTHEWS:  Steve

3          Levine -- I have worked with Steve

4          Levine --

5                MR. LEVIN:  He's Selikoff's

6          guy.

7                MR. MATTHEWS:  I worked with

8          Steve Levine several years prior

9          to Vioxx.  That's how I knew Steve

10         Levine.  We worked on the PPA.  I

11         was real familiar with his work.

12         We had literally gotten, like I

13         said, two weeks, maybe two and

14         half weeks prior to trial, so I

15         have to believe a report was

16         furnished to the defendants, but

17         they didn't take his deposition,

18         to my memory right now.

19               MR. HERMAN:  The reason I

20         ask the question is, we were being

21         pushed for stroke cases not only

22         to try, but at the same time, we

23         were putting together a stroke

24         trial package.  There's a dearth

FAC Resp. Exhibit D -- 1028

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          of material that's provided to the

2          MDL depository on stroke, and if,

3          when you get back, you have a

4          chance to look at it, if you can

5          provide a list of what stroke

6          materials were provided to either

7          the New Jersey depository or the

8          MDL, it would be helpful.

9               MR. MATTHEWS:  I'll say

10          this.  I know, because I presented

11          both Plunkett and Moye, Plunkett,

12          a pharmacologist, and Moye, an

13          epidemiologist, for deposition in

14          the stroke case, Elvis Anderson.

15          So, there has been expert

16          testimony about epidemiology and

17          pharmacology.  I'll find that out

18          for you.

19               MR. BLIZZARD:  Dave, why

20          don't you explain Judge Wilson's

21          approach to the stroke cases, as

22          well as your development of the

23          Elvis Anderson case, because I

24          think some people may not

FAC Resp. Exhibit D -- 1029

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          understand that Wilson focused on

2          stroke because heart attack cases

3          had already been tried.  Why don't

4          you explain that.

5               MR. MATTHEWS:  Judge Wilson

6          believed we needed to get a stroke

7          case to trial, and he, being an

8          innovative judge, wanted to try

9          the first stroke case.  We, I

10         guess, were kind of elected,

11         again, by exclusion, to be the

12         firm that was going to go through

13         the cases.  So, I had contacted

14         all plaintiffs lawyers in Texas or

15         elsewhere, but had cases in Texas

16         that had strokes.  We were trying

17         to get through those cases because

18         Judge Wilson was really pushing us

19         to get these cases to get to

20         trial.  Not only did we get Dr.

21         Wait and his group to kind of

22         whittle away down to cases we

23         could try and my cases in Texas,

24         but we did the same thing with

FAC Resp. Exhibit D -- 1030

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1        stroke.  This is an ongoing

2        battle, I'll say, with Merck as to

3        what case or what cases would be

4        tried.  So, that was another thing

5        that was going on at the time.

6             MR. LANIER:  Did we put

7        those stroke cases up?  Did we put

8        up two?

9             MR. MATTHEWS:  I think so.

10       Let me just say, there was not a

11       great deal of discovery done.

12       Other than Elvis Anderson in the

13       Texas MDL, there wasn't a great

14       deal of discovery done.  The

15       plaintiffs were always trying to

16       push it to the side, let's get a

17       heart attack case, because we all

18       know in this room that stroke

19       cases were harder.  We had less

20       clinical trial data.

21            Let's see.  I can go on and

22       answer questions.  I had filed

23       some time ago to be part of the

24       Plaintiffs' Steering Committee,

FAC Resp. Exhibit D -- 1031

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          and, frankly, I have not always

2          been involved in MDLs.  I maybe

3          avoided them, and I guess I'm

4          doing that less so now, but I did

5          for several years.  But I did file

6          a motion to be in the Federal MDL,

7          and I have included that in the

8          materials.

9                  Looking at the Court's

10         order, pretrial 6(D), just to

11         quickly go through what the Court

12         had asked, and that's the extent

13         each common benefit firm made a

14         substantial contribution to the

15         outcome of the litigation, I do

16         believe our biggest contribution

17         was the stroke arena, because I

18         think we pushed it because we

19         happened to have one in what I

20         think was a desirable venue and

21         jurisdiction to try it.  We were

22         also getting pushed in Texas.  So,

23         I think that was probably one of

24         our bigger contributions.

FAC Resp. Exhibit D -- 1032

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1              I'll say that when Texas

2         didn't go as we had hoped with the

3         preemption ruling, I was ready to

4         try the Ledbetter case.  We were

5         going to try it.  It went south on

6         us.  That didn't slow us down.  We

7         continued to push litigation.

8              We again continued to work

9         with Chris' firm, Seeger Weiss in

10        New York and New Jersey, to push

11        those cases.  We were presenting

12        plaintiffs for deposition, taking

13        prescribers and working with

14        Chris' group to push that

15        litigation because Texas had

16        slowed down.

17             We also filed for the appeal

18        of Texas, and we worked prior to

19        that on all of the briefing.  I

20        hired an appellate lawyer and

21        spent $75,000, it is a typical

22        defense firm in Houston, and Ed is

23        familiar with them, with David

24        Gunn with Beck, Redden & Secrest,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          which is a very well known defense

2          group who I felt would help us on

3          the appellate and briefing points.

4          So, we spent 75, $85,000 in that

5          arena.

6               We continued to fight

7          through the preemption arguments.

8          I made all the arguments, which I

9          probably should not take credit

10         for.

11              MR. SEEGER:  Just as it's

12         coming down.

13              MR. MATTHEWS:  Let me back

14         up.  I only did about half of

15         them.

16              MR. BIRCHFIELD:  Did you

17         have cases in the trial pools that

18         were coming up?  What was the

19         status of the New Jersey cases?

20              MR. MATTHEWS:  Right at the

21         time the settlement was announced,

22         to my memory, we had several cases

23         in the trial pool.  Where they

24         were in the queue, I can't tell

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1         you.
 2              MR. SEEGER:  I can tell you
 3         sitting here right now, I can't
 4         either.  I will tell you that
 5         there was a big push to get 250
 6         cases worked up so that Judge
 7         Higbee would have a trial pool to
 8         constantly dip into.  I do know
 9         Dave had cases in that pool.  I
10         don't know where they were though.
11              MR. HERMAN:  At that time,
12         there was a large pool of cases in
13         New Jersey, and I know Tom Girardi
14         was pushing a large pool in
15         California at the same time.
16              MR. LANIER:  Thank you.
17              MR. HERMAN:  I want to thank
18         you because you have very
19         concisely cleared up some
20         misinformation that I know I
21         received thirdhand, and I think it
22         was important for me personally to
23         hear.
24              I also need to say that a
```

FAC Resp. Exhibit D -- 1035

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

```
 1          lot of strange things happened in

 2          this litigation.  If your tribal

 3          case had gone to trial -- we

 4          always deal with ifs, but there

 5          are a lot of mysterious things

 6          that Merck had happen in this

 7          case, and it is real tough for a

 8          front line trial lawyer to go

 9          ahead and prepare a case, have it

10          set up, know where it is going to

11          trial, and all of a sudden the

12          case disappears and you can't even

13          explain it to the client.

14              More importantly, the

15          negotiating committee for eleven

16          months found it very difficult

17          going in terms of stroke cases in

18          negotiations.  I'm certain lawyers

19          that prepared stroke cases, Merck

20          knew about.  At some point we were

21          able to get stroke cases included.

22          For my own part, the work you did

23          in stroke cases is a common

24          benefit, and I appreciate it.
```

FAC Resp. Exhibit D -- 1036

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

 1            MR. MATTHEWS:  Some of it

 2       was unwitting.

 3            MR. HERMAN:  I'd rather have

 4       unwitting contributions than

 5       witless contributions.

 6            MR. MATTHEWS:  I'm going to

 7       finish this real quick.  I'm going

 8       to wrap it up in a minute because

 9       I don't want to take any other

10       time.

11            Just to follow up, we had

12       Julie, Jason, Jeb and I, we had

13       four lawyers working on this

14       litigation since its inception.  I

15       think we were committed from the

16       beginning to the end until the

17       announcement of the settlement.

18       Consistency, I don't think it ever

19       waned.  I think we were always

20       involved 100 percent.

21            In terms of the PSC, I think

22       I was on the science committee.  I

23       did not do work on the science

24       committee.  I was more doing work

FAC Resp. Exhibit D -- 1037

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          in individual cases, preparing my

2          own experts.  We had Dr.

3          Zabalgortia, we had Entman, we had

4          Plunkett, Moye and others that we

5          were preparing and presenting for

6          deposition and trial.

7               The trial I talked about

8          with Andy.

9               Not involved in the

10         allocation, fee committee.

11              We were involved prior to

12         its withdrawal.

13              After negative consequences

14         in Texas, we continued to stay

15         involved.

16              I think that's what the

17         Court had asked that we talk

18         about.

19              MR. HERMAN:  Arnie, what do

20         you have on costs and hours?

21              MR. LEVIN:  Ed will do it.

22              MR. BLIZZARD:  Dave and

23         Julie and I have had a meeting

24         previously and talked about the

FAC Resp. Exhibit D -- 1038

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1        cost submissions and the time
 2        submission.  I think they are
 3        still showing at Wegmann-Dazet as
 4        not being approved at this point.
 5        So, whatever we can do to help.  I
 6        think it is a good idea to maybe
 7        set an appointment with them and
 8        go down in person.  And if I can
 9        go down and help in person with
10        you, I'll do that, to make sure
11        that you've got whatever they need
12        to get your expenses and time
13        approved.
14              MS. RHOADES:  I think I have
15        another --
16              MR. LEVIN:  You have
17        $1,660,000 in expenses, so, it is
18        worth the trip to New Orleans.
19              MR. MATTHEWS:  I think
20        that's probably worth a trip.  We
21        obviously spent more than that.
22        I've already seen some problems,
23        Ed, you and I talked about this.
24              MR. HERMAN:  Let me give you
```

FAC Resp. Exhibit D -- 1039

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1           the contact, my partner,

2           ldavis@hhkc.com, (504) 581-4892.

3           Lenny can set up or connect you in

4           with Phil Garrett, who is the

5           independent CPA appointed by the

6           Court.  I recommend with that much

7           in expenses that you send someone

8           knowledgeable.  They are helpful.

9           They are there to help and assist,

10          not impede, and they will be happy

11          to go over what the expenses are.

12               MR. BIRCHFIELD:  If you have

13          a report from Steve Levine, will

14          you get that to Lenny?

15               MR. MATTHEWS:  I will give

16          it to Russ.

17               MR. BIRCHFIELD:  Lenny in

18          Russ' office, just e-mail it.

19               MR. MATTHEWS:  Okay.

20               Julie, is there something

21          you want to add?

22               MS. RHOADES:  Sounds great

23          to me.

24                    -  -  -

FAC Resp. Exhibit D -- 1040

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

 1             C E R T I F I C A T E

 2

 3             I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23         Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM: MORELLI RATNER
Benedict Morelli, Esquire
David Ratner, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER: Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1042

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. MORELLI:  Good morning,
 3        everyone.  I decided not to do a
 4        PowerPoint because Mark is here,
 5        and he's the best PowerPoint
 6        person I know.  I said I'm not to
 7        embarrass myself.  He's going to
 8        mark and critique me for the next
 9        year.
10            MR. SEEGER:  He's going to
11        do that anyway.
12            MR. MORELLI:  I want to say
13        that there are a couple of people
14        on the panel that don't really
15        know me that well, if at all.  I'm
16        in a very unique and unusual
17        situation in this litigation,
18        because I've been trying cases
19        since the '70s, and I've had a lot
20        of high profile cases, and at the
21        time when Mark asked me to assist
22        him on the Ernst trial, I had just
23        been elected the president of the
24        New York State Trial Lawyers
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1          Association.  At the same time

 2          that I was elected, I left for

 3          Houston and gave up my summer, two

 4          months of it.  I don't know a

 5          whole lot of people who decide

 6          that they are going to spend their

 7          summers in Houston.

 8               When I spoke to Mark and he

 9          asked me to help him on the Ernst

10          trial, we started out by taking

11          the depositions of the executives

12          of Merck, and I second seated him

13          with all of those depositions,

14          Scolnick, Reicin, Kim, Gilmartin,

15          I think six depositions in all.

16               And when he was off in

17          Houston finishing his preparation

18          of the trial, I took the national

19          sales manager's deposition, Mr.

20          Dunn, I did that myself.  When I

21          went to Houston and started

22          working with Mark, I got there at

23          the jury selection.  I was there

24          from jury selection through the

FAC Resp. Exhibit D -- 1044

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        verdict for two months.

2              As a trial lawyer, I think

3        that I was always in control.  I

4        decided which cases I was going to

5        try, how I was going to try them,

6        the order of the witnesses.  I've

7        tried every kind of civil case in

8        my career.  And for 25 straight

9        years, I never lost a case.  And

10       when I took the bullet in the Cona

11       case, because that was the second

12       trial I was on with Mark Lanier, I

13       knew I was taking it.

14             MR. WEITZ:  Explain that.

15       Explain what you mean by that.

16             MR. MORELLI:  Let me go back

17       and explain about the fact that I

18       was on two trials with Mark.  One

19       was approximately two months, and

20       the other one was maybe a

21       month-and-a-half, and that was

22       Cona/McDarby.

23             The Cona/McDarby case was a

24       unique situation where Judge

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          Higbee asked us to try two cases

 2          at the same time.  Mark took the

 3          lead in trying the liability in

 4          the case, and the damages were

 5          tried separately by Mark's firm

 6          and by Weitz & Luxenberg.  I was

 7          part of that trial team for the

 8          entire time, from jury selection

 9          through verdict.

10               MR. WEITZ:  Also before

11          that, explain the prep that you

12          were involved with in the mock

13          trials.

14               MR. MORELLI:  We also had

15          mock trials, and I actually

16          allowed myself to be embarrassed

17          for the common good, of course, by

18          wearing the robes of the judge,

19          which were too long for me.  They

20          were all the way down to here.

21          (Indicating.)

22               MR. LEVIN:  I think you'll

23          grow into them.

24               MR. MORELLI:  My mother was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1    optimistic like you.

2              MR. LEVIN:  So was mine.

3              MR. MORELLI:  When I was 50,

4    she told me I'd still be growing.

5    If she was alive, she would still

6    be telling me that.

7              But I was involved in the

8    mock trials.

9              When Mark and I were taking

10   the depositions of the executives,

11   I sat next to him at every single

12   deposition.  I tried to give him

13   my experience, my advice, my

14   questions.  He would ask me, did I

15   leave out anything, or he would

16   take questions from me.  The two

17   of us actually gave up a lot of

18   our ego for this litigation,

19   because anybody who knows anything

20   about a trial lawyer knows that

21   they don't like to give up

22   control.  I never second seated

23   anyone in my entire career until

24   the Vioxx litigation.

FAC Resp. Exhibit D -- 1047

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           This litigation has been

2      unique and unusual, and I find

3      myself again not in control.  Not

4      in control during the whole

5      litigation.  Second seating in the

6      Ernst trial for two months; second

7      seating in Cona/McDarby, where I

8      know that I brought a lot of

9      maturity to that trial.  I

10     prepared witnesses, I prepared

11     documents.  I argued every motion

12     in limine in the Ernst trial in

13     Houston.  The uniqueness of this

14     is that never did I have the

15     prospect of a fee.  Never did I

16     discuss with Mark, am I going to

17     get paid?  Never did I have any

18     kind of an arrangement.  No one

19     offered to pay me.  Every single

20     thing I did, I did for the good

21     and the common good of this

22     litigation.

23           The first trial was a

24     verdict of $253 million, and I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        have to say that I think I had a

 2        lot to do with that.  I wrote a

 3        summation over three or four

 4        weeks, and I presented it to Mark

 5        in the hotel, just not because I

 6        thought that he was incapable of

 7        doing it himself, because anyone

 8        who has ever seen him knows how

 9        capable he is, but because he had

10        asked me to join him, to give him

11        insight, to bring him experience.

12              I've been trying cases since

13        1977, from trip and fall cases to

14        DES.  There's nothing I haven't

15        tried.  There's no case that I

16        haven't tried.  I've tried more

17        cases than most lawyers who

18        practice law today, and when Mark

19        asked me to join him and to second

20        seat him, I took my ego and put it

21        aside and said okay.

22              When we were on the

23        Cona/McDarby trial in New Jersey,

24        we knew that the damages in that
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1    case were in trouble because it

2    was all based on samples.  And the

3    treating doctor did not testify

4    that he gave the plaintiff

5    samples.  And I put the daughter

6    on the witness stand in that case,

7    and then I agreed to give the

8    summation in a case that I knew

9    was a loser.  Because as a trial

10   lawyer, and I've taught how to try

11   cases for a very, very long time,

12   I know you can't win a case in the

13   summation.  You can get money in

14   the summation, but you can't win

15   the case if it is a loser.

16          So, when I agreed to sum up

17   in that case, I did it for the

18   common good, because I wanted the

19   liability in the case to stay

20   pristine so that we would win.

21   And we did win the liability in

22   the case, and we won the liability

23   in the Cona/McDarby case.  The

24   Cona/McDarby verdict was a very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        big verdict.
 2             Those two trials that I was
 3        on, Ernst and Cona/McDarby, had as
 4        much to do to shape the litigation
 5        here and to bring about a global
 6        settlement than anything.  I don't
 7        think that there's anybody in this
 8        litigation who has been on two
 9        trial teams who gave up almost
10        four months of their career and
11        didn't have a case, it wasn't
12        their case personally.
13             Now, when I was sworn in as
14        the president of the New York
15        State Trial Lawyers, and by the
16        way, the second largest trial
17        association, bar association in
18        the country other than AAJ, I gave
19        up a lot of my presidency to spend
20        two months in Houston.  I didn't
21        see my family for two months in
22        the summer when my kids are home
23        and my wife wants to go to the
24        beach.  I didn't do any of that.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        I did it not because I thought

 2        there was a pot of gold at the end

 3        for me, but we had to win the

 4        litigation.  I'm a trial lawyer.

 5        We had to win the litigation.

 6        That's all I cared about.

 7             And please understand that

 8        there was a lot of sacrifice made

 9        because many of the perks of being

10        president of the New York State

11        Trial Lawyers I gave up to be on

12        this trial.  And, look, I believe

13        that I deserve a determination on

14        the merits.  There are a number of

15        people on this panel who I know

16        fairly well.  I'm not asking you

17        for any favors.  I don't deserve

18        any favors.  But I certainly

19        deserve full consideration being

20        in such a unique position.

21             Because when all of my cases

22        were brought in New Jersey, I

23        didn't warehouse cases, I didn't

24        toll any cases.  I filed them all.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1        I got medical records on every
 2        case.  And when Judge Higbee asked
 3        for people to put forth cases to
 4        move this litigation toward a
 5        global settlement, we stepped up
 6        to the plate.
 7            My firm, with fewer than 15
 8        lawyers, put five lawyers,
 9        including my partner, who is
10        sitting next to me, David Ratner,
11        and myself to prepare these cases.
12        And as a matter of fact, when
13        Judge Higbee called for what she
14        called the original 39 cases that
15        went to 10, because she said we
16        would try 10 cases at once, out of
17        those 10 cases, 4 were mine.  And
18        we prepared those cases.  I hired
19        a pathologist in Chicago, and
20        because I had a very unique death
21        case called Weiss, my client died
22        midair on his way to Hong Kong in
23        his wife's arms, and Merck was so
24        afraid of that case, they fought
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        me tooth and nail to make sure

2        that that case never went to

3        trial.  I had to hire a lawyer in

4        Hong Kong to be able to get the

5        pathology slides, because they did

6        an autopsy in Hong Kong.

7            To this day, that case has

8        never been tried, because as my

9        four cases were part of the ten,

10       and that ten got reduced to eight,

11       then got reduced to four, and I

12       still had a case in there, then it

13       got reduced to two, and I was shut

14       out after I spent time, money and

15       effort, my personal time.  I

16       wasn't allowed to try any cases.

17           But it wasn't because -- and

18       by the way, my firm does

19       individual cases, personal injury,

20       medical malpractice and employment

21       discrimination.  That's the bread

22       and butter.  For three years, it

23       put such a strain on my firm

24       financially because I was in the

FAC Resp. Exhibit D -- 1054

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1        Vioxx business, and I was

 2        hell-bent on making sure that we

 3        won and that we got to the right

 4        result.

 5             I've always been, you know,

 6        tough in the courtroom, and it was

 7        very, very difficult for me to

 8        take a second seat and not, you

 9        know, stand up in Houston at every

10        turn.  And I want you to know, the

11        economist was who I put on in

12        Ernst.  And anybody who has ever

13        put an economist on the stand

14        knows that it is like watching

15        grass grow, okay?  It is not

16        exactly what you would choose to

17        do.  Somebody would not be

18        fighting, let me put on the

19        economist.

20             When I tell you that when we

21        did these trials, Ernst and

22        Cona/McDarby, it changed the

23        litigation.

24             Now, look, I know that there
```

FAC Resp. Exhibit D -- 1055

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1    are people who dedicated

2    themselves to the litigation and

3    were certainly essential to the

4    common good, and I'm not saying

5    I'm number one on the list, no

6    way.  There's people in this room,

7    in my opinion, who should be in

8    the top tier of people who get

9    compensated because of what they

10   dedicated to this litigation.

11       But it's my opinion that my

12   firm, what I gave up in time and

13   money, and let me tell you, when I

14   took the bullet in Cona, okay, I

15   did it publicly, live stream.  All

16   right?  And it is interesting,

17   because there was an article

18   written about me in New York

19   Magazine in March of 2000, and as

20   a result of that article, I was on

21   a television show for two years

22   called Power of Attorney, where we

23   tried cases on television.  A

24   couple of members of the panel

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

     1          know this story.  And to show you

     2          that my son, my youngest son, who

     3          had come to watch me try cases and

     4          knew that it was so important for

     5          me to win, win, win, okay, he said

     6          to me, dad, I saw you on

     7          television today.  I said, yeah?

     8          He said, yeah.  He said, you were

     9          trying a case.  I said, yeah.  He

    10          said, you lost.  He said, you lose

    11          cases?  I said, only on

    12          television.  Okay?

    13              And on Vioxx, luckily it was

    14          only on television in my head.

    15          But we all know it wasn't just on

    16          television.  And I tell you, in

    17          those cases, not only did I bring

    18          my experience as a trial lawyer --

    19          and, by the way, you know, I could

    20          have boards and PowerPoints and

    21          everything, but I'm talking to you

    22          the old-fashioned way, the way I

    23          sum up.

    24              I stand in front of a jury,

Page 17

```
 1        I look them in the eye, and I
 2        don't ask them, could you be fair
 3        when I select the jury because I
 4        know I'm going to get the answer
 5        from them that they expect me to
 6        hear.  So, I'm not going to ask
 7        any of you could you be fair.  I'm
 8        going to say, please be fair with
 9        my firm.
10            And my partner will tell
11        you, because he -- I manage my own
12        office.  The finances, the
13        business, I interview clients, I
14        bring in business, all of that was
15        really hurt by my decision to
16        spend so much time in Vioxx.  Now,
17        I'm a big boy, and I'm going to
18        survive, but when you decide who
19        is in the most unique position of
20        anybody in this litigation, I hope
21        you think it's Benedict Morelli,
22        not the way it's spelled in the
23        e-mail, Bendict, it's Benedict
24        like the Pope.  Okay?  Benedict
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          Morelli had a lot to do with the
 2          Vioxx litigation.
 3              And a lot of my of counsel
 4          clients, who normally give us
 5          individual cases, were hard
 6          pressed to do so, because they
 7          would say to me on the phone and
 8          to my partner, you guys are in the
 9          Vioxx business.  Morelli is not
10          around to try these cases.  He's
11          not around to look and see how it
12          should be tried or what judge it
13          is going to be in front of.  So,
14          we lost a lot of money because of
15          the Vioxx litigation, and I'm so
16          happy we did what we did, because
17          I think without Ernst, without
18          Cona/McDarby, and without a number
19          of people on this panel who pushed
20          forward even when it felt
21          impossible, because let me tell
22          you, they kept saying, we're not
23          going to settle these cases.
24              So, I had no cases, zero
```

FAC Resp. Exhibit D -- 1059

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1    cases in the MDL.  I never

2    expected to be assessed.  All my

3    cases were in New Jersey.  So, I

4    certainly wasn't thinking, oh, I'm

5    going to get the common benefit

6    fund one day.  But think about how

7    strange it is that I would be in

8    this position, because at the time

9    I had 1,200 cases, I was on the

10   first trial and the third or

11   fourth trial, and I'm not even on

12   the panel making the decision of

13   how much money people get.  Once

14   again, not in control.

15        So, I have to leave it to

16   all of you and your good

17   conscience.  I just want my

18   partner to say one or two things

19   about the way it affected our

20   firm.

21        MR. RATNER:  When Ben was in

22   Houston and in New Jersey, he was

23   obviously not in the office.  When

24   he's not in the office, he's not

FAC Resp. Exhibit D -- 1060

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1    there to interview clients, he's

2    not there to talk to prospective

3    referring attorneys, he's not

4    there to do things like that.  So,

5    that had one effect on the

6    business.

7         But there was a second and

8    greater effect, and that is when

9    we were preparing the four New

10   Jersey cases for trial, we took

11   the five most senior lawyers in

12   the office, me, Les Salmon, three

13   other people, who tried the bulk

14   of our personal injury cases, and

15   said, we're going to defer that

16   for a while and we're going to

17   prepare these four cases, the four

18   most important cases in the firm.

19        And I flew all around the

20   country preparing our prescribing

21   doctors, our treating doctors for

22   their depositions.  In every one

23   of the cases, the prescribing

24   doctor testified, had I known

FAC Resp. Exhibit D -- 1061

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        now -- had I known then what I
 2        know now, I would not have given
 3        Vioxx to this patient.  And all
 4        the treating doctors testified
 5        that Vioxx was the cause of the
 6        heart attack in that particular
 7        case.
 8             We had our senior trial
 9        lawyer, Les Salmon, taking all the
10        sales reps depositions in all of
11        these four cases.  So, we put our
12        full court press to get these
13        cases ready.  But what did that
14        mean?  That meant that I wasn't
15        available to try any cases in New
16        York.  Les, who got a $70 million
17        verdict in a medical malpractice
18        case last year, wasn't available
19        to try any cases in New York.  He
20        wasn't available to take any
21        depositions in New York.  He
22        wasn't available to conference
23        cases in New York.  I wasn't
24        available and Ben wasn't available
```

FAC Resp. Exhibit D -- 1062

Page 22

```
 1          to be on the phone to settle cases

 2          in New York.  So, as a result of

 3          that, our income and cash flow

 4          were severely affected.  And we

 5          did that because we thought we

 6          were going to get money on these

 7          four cases?  No.  Because we

 8          thought that getting cases ready

 9          for trial and pressing Merck and

10          pressing Merck and getting ready

11          to take depositions and making

12          them take doctor depositions and

13          making them prepare sales rep

14          depositions would put pressure on

15          them to bring them to the table.

16          And we hoped that it did, and we

17          think that it did, and we think we

18          should be compensated for it.

19               MR. MORELLI:  Just two

20          things in closing.  The unique and

21          unusual, that's what I want you to

22          think about when you think about

23          me, because I think I am, and in

24          this litigation, I certainly was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
1      unique and unusual.  I think about

2      now being assessed and maybe at

3      the end being lucky enough to get

4      my own assessment back.  How fair

5      do you think that would look when

6      somebody like me gave up so much?

7           MR. WEITZ:  Ben, how many

8      cases did you submit to the

9      settlement?  How many cases did

10     your firm submit?

11          MR. MORELLI:  860.  We were

12     on board from the beginning with

13     the settlement.  We applauded

14     Chris and everyone else who put

15     the settlement together.

16          MR. WEITZ:  Tell us about

17     your expenses.

18          MR. MORELLI:  I don't

19     remember them offhand, but I did

20     give the spreadsheet.

21          MR. WEITZ:  They were pretty

22     significant.

23          MR. LEVIN:  They were

24     $166,000.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           MR. RATNER:  Sounds right.

2           MR. SEEGER:  Arnold

3      memorized all of them.

4           MR. MORELLI:  Let me just

5      answer that, because that's an

6      interesting thing that you would

7      know the exact amount.

8           MR. SEEGER:  Well, we have

9      it right here.

10          MR. LEVIN:  Ben, what do you

11     think this is?

12          MR. MORELLI:  No, no, no, I

13     appreciate that.  But let me

14     explain what they would have been

15     had we been able to try the four

16     cases that were part of the ten.

17     It would have been millions of

18     dollars.

19          MR. LEVIN:  Exactly.

20          MR. MORELLI:  Because in

21     this litigation, I don't think it

22     should be judged at how much your

23     expenses were, because we never

24     backed down, and we never backed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          up in this litigation.  Every time

2          Judge Higbee asked for volunteers,

3          you can ask Buchanan, my firm was

4          right there ready to try cases.

5               As a matter of fact, after

6          Humeston got tried for the second

7          time with Mark, and I forget the

8          name of your case, Mark, in those

9          two cases, I had -- Judge Higbee

10         promised that our cases would be

11         tried next either with a trial

12         team or just with my office.  So,

13         I was willing to put up whatever

14         money it was for the common good.

15              MR. WEITZ:  Well, when I say

16         expenses also, I didn't mean just

17         your hard costs that you

18         submitted.  But you had a lot of

19         expenses on individual cases too,

20         right?

21              MR. MORELLI:  Absolutely.

22              MR. SEEGER:  I want to say,

23         none of us know where any of this

24         is heading, and we're just working

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1      as hard as we can to put something

 2      together for the judge to

 3      consider.  I just want to

 4      personally say, I know what you

 5      did, I know how hard you guys

 6      worked, and you really were team

 7      players, from somebody who was

 8      involved both in the MDL and New

 9      Jersey.  So, I think I thanked you

10      privately, but I want to thank you

11      on the record.

12          MR. WEITZ:  Well, I also

13      know Ben for 30 years, and I know

14      the firm Dave and Ben have.

15      Although you take a look at my

16      firm, I have a lot of people and I

17      contributed a lot of people to

18      this, but when these guys really

19      say that it truly affected their

20      income stream and the kind of work

21      that it did and their opportunity,

22      this is a firm that it really did.

23      So, I don't want that to go

24      lightly.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1              MR. LEVIN:  Work with the
 2         accountants to straighten out
 3         those costs so that you can get
 4         approved.
 5              MR. MORELLI:  Okay.
 6              MR. SEEGER:  From my
 7         perspective, I think you've done a
 8         great job summing up your
 9         contributions, and it is a lot
10         harder to be number two on a trial
11         team than number one.
12              We have two minutes if there
13         are any questions.
14              MR. HERMAN:  First of all, I
15         do know you by reputation.  Your
16         reputation as a trial lawyer is
17         really important.  One of the
18         things that I think distinguished
19         this litigation is that, by and
20         large, these were not class action
21         lawyers handling the cases, they
22         were lawyers that know how to try
23         cases, that go in and try cases,
24         and that always has an effect.
```

FAC Resp. Exhibit D -- 1068

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1           We still believe people

2       settle cases out of fear, and

3       Merck had its own reasons, but I

4       think that contributions made by a

5       number of lawyers caused them to

6       give second thought to the fact

7       that they were spending over a

8       billion dollars to defend cases,

9       and there are a lot more coming

10      down the road.

11          Just a couple of things.

12          You've got to be aware of

13      the Fifth Circuit and look at the

14      Johnson factors, look at Judge

15      Fallon's decision in Murphy Oil.

16      Read it, because it is going to

17      affect common benefit in this

18      case.  There's no question about

19      it.  There's another case, Mobil

20      Oil, that came out last year in

21      the Fifth Circuit out of the

22      Eastern District.

23          Judge Fallon has indicated

24      that if there's no resolution, he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1    is going to put lawyers under oath

2    and have former assistant US

3    attorneys and maybe the special

4    masters question and make sure the

5    affidavit is in good shape.

6        I say those things to you

7    because I think you have to know

8    that.  You have to be aware of the

9    Fifth Circuit, which is very

10   different than the First, Second

11   or Eleventh.  So, I appreciate you

12   being here.

13       MR. MORELLI:  Thank you.

14   You didn't see anything in my

15   affidavit that gives you pause,

16   did you?

17       MR. HERMAN:  I saw a lot of

18   things that give me pause, but

19   none in your affidavit.

20       MR. BIRCHFIELD:  When did

21   you start with Vioxx?  When did

22   you first start?

23       MR. MORELLI:  Well, it is

24   interesting.  I started after it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        was withdrawn from the market, and

2        that also puts me in a unique

3        position, because even though that

4        was true, I didn't warehouse the

5        tolling cases, I went right on the

6        first trial and actually six

7        depositions in the first trial.

8              I was not one of the

9        pioneers who started in '01 like

10        some of y'all.  So, that is

11        absolutely true.

12              MR. SEEGER:  Thank you, Ben.

13              MR. WEITZ:  Thank you.

14              MR. MORELLI:  Thank you.

15                  -  -  -

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 1071

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147
23            Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 1072

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: MOTLEY RICE, LLC
        Fred Thompson III, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -
 2               MR. THOMPSON:  I appreciate
 3         you taking the time to listen to
 4         me.  I hope to go pretty quickly,
 5         because I understand that
 6         everybody is sort of a traveling
 7         show, and so if I say something
 8         that is boring or redundant, how
 9         about just pull your ear and I'll
10         move on to something else.
11               First of all, there's no
12         reason for me to come before you
13         and claim that I single-handedly
14         resolved the Vioxx litigation.
15         I'm actually looking at people who
16         did a tremendous job, and this is
17         the first opportunity that I've
18         actually had to congratulate you
19         and thank you on behalf of my
20         clients for getting a very solid
21         resolution to a case which had
22         tremendous issues of individual
23         causation, which it was a Joe-type
24         accomplishment for you, and I
```

FAC Resp. Exhibit D -- 1074

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          appreciate that.
 2                  Having said that, I'm not
 3          going to take undue credit.  I do
 4          think that our firm did do
 5          valuable constructive work that is
 6          worthy of a common fund award, and
 7          I do want to go down that list
 8          very briefly for you just on some
 9          individual items for your
10          consideration.
11                  We submitted a time sheet.
12          That time sheet has actually been
13          bounced back to us for some
14          presentation faults, and we are
15          now in a 30-day cure period, but
16          substantially the hours will be
17          the same.  We did locate some
18          additional hours, but they don't
19          change the shape of the
20          submission.
21                  We chose to participate in
22          the New Jersey state forum, and
23          all but very few hours are hours
24          that were expended in pursuing the
```

FAC Resp. Exhibit D -- 1075

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          New Jersey state consolidation.

 2          We pressed our cases for trial,

 3          and we, in fact, had an

 4          opportunity and were on the list

 5          to be on the next -- on a trial

 6          cycle in the fall of 2007, at

 7          which time Merck made due process

 8          objections to the size of the

 9          trial grouping, and we were, in

10          essence, asked to take a step back

11          and allow some other folks to go

12          forward.  And we, for the good of

13          the litigation, we, in fact,

14          agreed to do that.

15              We were on the list for

16          trial cases in the winter and

17          early spring of 2008, and, of

18          course, the settlement preempted

19          that.  But we were doing

20          preparation work for those cases

21          as well.

22              We did not in our fee

23          petition submit hours for

24          individual cases.  And that would
```

Page 5

```
 1          include the cases that we were

 2          working up as members of Judge

 3          Higbee's trial group.  We did not

 4          submit those hours, but let me

 5          just suggest to you that given

 6          Judge Fallon's opinion that he

 7          views the majority of cases as

 8          somewhat free riding cases, that

 9          they were not worked up and that a

10          push down was somehow justified

11          for that, we in New Jersey

12          followed a procedure that Sol and

13          Chris and Dave Buchanan put out

14          that was designed to put

15          continuous pressure on Merck.  We

16          were actually nominating -- as a

17          group, we were nominating 250

18          cases per quarter, and we were

19          tendering those for depositions of

20          the plaintiffs, the family and

21          close friends, treater, prescriber

22          and two sales reps.  And so we

23          actually were working up a broad

24          number of cases in those pool
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1    settings.  Sometimes it felt like

2    Dechert was pinning us down rather

3    than us pinning them down, but

4    that was the strategy, and we were

5    good soldiers.  None of those

6    hours show up in our fee petition,

7    but I do want to point out that we

8    were very active in pursuing that.

9         As far as traditional common

10   fund work, one of the things that

11   our co-liaison, Sol Weiss -- early

12   on, we looked at the marketing

13   side, and we took on a substantial

14   responsibility in reviewing tens

15   of thousands of marketing

16   documents.  We identified the head

17   of the medical/legal office, Ellen

18   Westrick, who was present during

19   the period of time that Merck was

20   filing the petitions and filing

21   the various forms that were

22   required regarding the naproxen

23   cardioprotective theory.  We

24   worked those documents up, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          worked up the deposition of Ms.

2          Westrick, and we were the lead

3          counsel on that.

4                We also did a substantial

5          document review and a subpoena

6          practice with several third-party

7          PR firms, Ogilvy and DDB, and we

8          did that over a period of time.

9          We were in the process of

10         scheduling depositions when this

11         case changed its nature into a

12         claims facility.  One of the key

13         things that we looked at --

14                MR. HERMAN:  Excuse me.

15         When you say third-party PR

16         firms --

17                MR. THOMPSON:  Yes, sir.

18                MR. HERMAN:  -- are you

19         talking about Merck's PR machine?

20                MR. THOMPSON:  Yes, Ogilvy,

21         DDB.

22                MR. HERMAN:  Okay.

23                MR. THOMPSON:  One of the

24         things that we had looked at early

FAC Resp. Exhibit D -- 1079

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1        on was, if you look at the

 2        privilege logs, particularly the

 3        period around April of 2000, Merck

 4        threw a blanket over that period

 5        of time where they were

 6        considering, first of all, the

 7        VIGOR results, and then their

 8        public response, which was the

 9        VIGOR results were related to the

10        naproxen cardioprotective theory.

11            Many of those documents were

12        completely hidden away, because

13        their general counsel, a lady

14        named Joanne Lahner, was cc'd and

15        attended practically every meeting

16        for that period of time.  We set

17        out very strongly to try to get

18        those documents, and we briefed

19        it, we made motions to take her

20        deposition.  We had three hearings

21        with Judge Higbee, one of which

22        was an evidentiary hearing in

23        which Ms. Lahner took the stand.

24            And we were proceeding, we

FAC Resp. Exhibit D -- 1080

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        thought we had -- we found,

2        actually, some documents that the

3        defendant tried to claw back,

4        because they were very

5        demonstrative of Ms. Lahner's

6        editing and the way that she was

7        trying to handle this.  We thought

8        we were well on our way to getting

9        Merck to make privilege releases

10       when all of a sudden Judge Higbee

11       went dark, and in retrospect, it

12       was clear that at that point in

13       time, there were some settlement

14       discussions going on.  But that

15       was an effort, and I'll just be

16       frank with you right now, I don't

17       think anybody has ever seen those

18       documents.  And if we ever do,

19       we're going to see a very clear

20       picture of some corporate venality

21       that Merck really doesn't want us

22       to ever see.

23            So, we participated in the

24       joint prosecution in New Jersey.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        We worked carefully with Jeff
 2        Grand in providing order books,
 3        motions in limine and various
 4        things that would be a part of --
 5        Judge Higbee's plan was to try to
 6        routinize these cases so that she
 7        could farm them out and have
 8        trials by many state court judges.
 9        And part of that was her making
10        preemptory rulings on many
11        evidentiary issues and many issues
12        of law.  And we were involved with
13        Jeff.  I don't want to claim much
14        credit beyond the fact that we
15        volunteered for that program,
16        Carmen Scott in our office drafted
17        it up, and we sent a series of
18        things that were included in that
19        effort.
20            I think we talked a little
21        bit about marketing already, but
22        we did review the marketing sales,
23        FDA DDMAC documents, and found a
24        series of hot documents, including
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        some really great ones from Ms.

2        Westrick.

3             We participated early in

4        developing a business ethics

5        expert.  Chris probably remembers

6        this.  Mr. Michael Hoffman.  He

7        had a beautiful opinion that Judge

8        Higbee decided that she didn't

9        want to put in front of the jury.

10        So, if you are looking at it from

11        today back, maybe that was not a

12        big bearer of fruit, but looking

13        at it in a forward-looking aspect,

14        looking at it in terms of an

15        ongoing war in which there are

16        many battlefields in which there

17        are many things that need to be

18        addressed, we did expend the time

19        and the expense to develop that

20        expert.  And given another judge

21        who would accept that type of

22        business expert testimony, Dr.

23        Hoffman would be a good witness.

24             We worked also with Eric

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1          Weinberg on a damage causation

 2          expert, I think it is Dr. Kostis

 3          and Madigan, who were working on

 4          trying to use -- trying to apply

 5          some Framingham data to try to

 6          show or illustrate the causation

 7          trying to show an enhanced risk of

 8          some substantial contributing

 9          factor on these individual

10          causation cases, which, of course,

11          is the real tough part of this

12          case.

13               We used some pretty senior

14          people.  Don Migliori was going to

15          be our partner, who was going to

16          actually be on the trial team of

17          the cases, myself, Ann Ritter, who

18          did a substantial amount of

19          background work on the experts and

20          on the third-party documents.  Two

21          associates, Carmen Scott and Henry

22          Leventis.  This case has gone on

23          long enough that the law clerk in

24          our papers has now become an

FAC Resp. Exhibit D -- 1084

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1          associate.  Josh is now an

 2          associate.  I guess I will next

 3          become of counsel before we're

 4          finally through.

 5               But that's sort of the quick

 6          run through.

 7               MR. LEVIN:  Don't become of

 8          counsel.  That's where elephants

 9          go to die.

10               MR. THOMPSON:  Well, I don't

11          want that.  I'll go senior, one of

12          the judges, the senior status.

13               That's just a very, very

14          quick overview.  Certainly I can

15          keep going on and on, but I think

16          that if you've heard from seven or

17          eight or nine people, you've

18          probably heard all of us claiming

19          credit for many of the same things

20          over and over again.

21               I do believe that we made an

22          effort in our submission not to

23          fluff it up, not to do a lot of

24          redundant time, not to do things

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1     beyond what the scope of our work

2     was.  I don't think we've

3     overstated anything, but we did do

4     productive work that was of

5     material benefit to the resolution

6     of this case.

7          I sometimes worry that the

8     folks in the MDL don't know what

9     exactly was going on in the state

10    court consolidation, just like I,

11    as a member of the state court

12    consolidation, don't know exactly

13    what was going on in the Federal

14    MDL.  Although I was lucky, I had

15    a good many friends who were

16    keeping me somewhat abreast of it.

17          But I don't want to give the

18    impression that the state court

19    litigation in New Jersey was a

20    side show.  It was well

21    coordinated between --

22          MR. SEEGER:  Nobody here

23    thinks that.

24          MR. LEVIN:  I'm in the MDL,

FAC Resp. Exhibit D -- 1086

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        and I can assure you that Perry,

 2        Mark and Chris have made it clear

 3        to all of us, not that we didn't

 4        know it already, that New Jersey

 5        was not a side show.

 6              MR. THOMPSON:  Okay.  Well,

 7        in that case, I will end my

 8        remarks on that subject.

 9              MR. LEVIN:  You have three

10        superb advocates at this table.

11              MR. SEEGER:  Well, but the

12        important point you made is the

13        reason for these meetings is this

14        cross mixture of lawyers in state

15        and Federal litigations, some

16        people did both, is to make sure

17        everybody at the end of this

18        process has talked everything out.

19              MR. HERMAN:  The original

20        lawyers, at least when I became

21        involved, that were primary in

22        this litigation, were Lanier,

23        Birchfield, Seeger and some

24        others.  They were not in the MDL.
```

FAC Resp. Exhibit D -- 1087

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1       They were in New Jersey, New York.

2       There was a group in Texas.

3           To the credit of Chris and

4       Andy, they both, for mutual

5       benefit, participated in the MDL,

6       and Perry and Mark and others were

7       trying cases.  Tom was organizing

8       California.  There were cases

9       tried in California.  So, there

10      were no side shows.  For whatever

11      comfort I can give you, the main

12      thing that we're looking at is the

13      quality of the lawyering, wherever

14      it was.  We're fortunate that we

15      had a lot of quality lawyering.

16          I think also it's important

17      for lawyers to know that other

18      lawyers give them credit.  When

19      Chris Placitella was here earlier,

20      he talked about him being local

21      counsel for your firm and also,

22      though, for the contributions that

23      you made, Fred, with regards to

24      Ogilvy and other things.

FAC Resp. Exhibit D -- 1088

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          So, I think we're getting

2      enough information.  We've had 100

3      lawyers, actually, 106, submit

4      affidavits, and 60 or so have said

5      that they want to make oral

6      presentations.  So, I think we're

7      getting a pretty good view of the

8      landscape.

9          MR. WEITZ:  When you were

10     doing your work with Westrick and

11     Lahner and Ogilvy, were you

12     getting your direction from Sol as

13     co-liaison counsel to do that

14     work?

15         MR. THOMPSON:  Here's how we

16     handled that with Sol.  We were

17     careful to make sure that we were

18     not going off on some rogue

19     tangent.  The last thing we wanted

20     to do is everybody is busy, nobody

21     wants to do something that's not

22     productive.  So, we would talk

23     carefully with Chris about where

24     the litigation was going.

FAC Resp. Exhibit D -- 1089

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1              There was a sense early on

 2         that we would win this case on the

 3         science itself.  And it became, I

 4         don't want to say clear, but it

 5         became more and more apparent that

 6         the marketing fraud, the marketing

 7         overstatement and the deception

 8         was very important to us.  So, we

 9         checked in and we made sure that

10         Sol approved any kind of activity

11         that we were going to go down.

12              MR. WEITZ:  You did a lot of

13         your discovery in coordination

14         with Placitella?

15              MR. THOMPSON:  Yes, sir.

16         Yes, sir.

17              Well, when they say the

18         Court has no questions, that means

19         you haven't laid a glove on them.

20         So, I apologize if I haven't.

21              MR. SEEGER:  No, no.  It was

22         great.

23              MR. GIRARDI:  Thank you,

24         Fred.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1                    -   -   -

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1           C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4   Public and Certified Court Reporter of

5   the State of New Jersey, Registered

6   Diplomate Reporter, Federally-Approved by

7   the United States District Court of

8   Pennsylvania, do hereby certify that the

9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22           Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -


FIRM:         PANISH SHEA & BOYLE
              Brian Panish, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. GIRARDI:  Mr. Panish,
 3         nice of you to accommodate us and
 4         get here early.  I know you ran
 5         down from San Francisco and got
 6         here as quickly as you could, and
 7         it is very helpful because some of
 8         these people are on their way back
 9         to New York.
10              As you can tell, Brian,
11         there's a court reporter here, and
12         the purpose of this really is for
13         Judge Fallon.  At the end of the
14         day, Judge Fallon is going to call
15         the shots, and he wanted to get
16         everybody's ideas and stories and
17         so forth.
18              The thing we're primarily
19         interested in is the work that you
20         performed for the overall good of
21         Vioxx, of the Vioxx litigation.
22         So, that's the focus of this.  We
23         have a pretty good idea, we have
24         seen your declaration, we've spent
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          time on that.  So, it's not quite

2          a situation where you have to

3          start from the beginning of the

4          world, but nonetheless, primarily

5          for Judge Fallon, we wanted to

6          make sure we had everything in one

7          place so that he could look at

8          your efforts, look at your

9          results, and then be able to

10         compare them to the efforts of

11         others and their results.  So,

12         with that, you may go forward.

13              MR. PANISH:  Thanks for

14         seeing me.  I'm proud to be here.

15         I want to thank everyone that

16         worked on the litigation.  I know

17         how hard it was.  I know all the

18         great work you did.  I read some

19         Ed Blizzard cross of Briggs

20         Morrison that I used in my trial,

21         and Chris and all of you and all

22         of your work.  I'm proud to have

23         been a part of it.  I'm not going

24         to take a ton of time.  I feel

FAC Resp. Exhibit D -- 1095

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        like the guy that finally got in
 2        the game and they go run the
 3        clock.  It's 50 to nothing.
 4             What I would just like to
 5        talk about are the contributions
 6        my firm and myself made that we
 7        believe contributed to the
 8        ultimate resolution of the Vioxx
 9        litigation.  We filed many cases
10        in California.  We were a member
11        of the PSC.
12             I tried the appellate case,
13        which I believe at the time there
14        had been a lot of losses in the
15        trials and that it was important
16        that we do the best we could on
17        that trial in California to move
18        the litigation towards resolution.
19        So, myself, my firm, my partner,
20        Kevin Boyle, with Tom Girardi's
21        firm, worked day and night from
22        September through January on the
23        trial.  I drafted the state
24        questionnaire for the jury, which
```

FAC Resp. Exhibit D -- 1096

Page 5

1      was gone into every single

2      question.  I don't have to tell

3      you what it is like to litigate.

4      I would say this.  I've tried

5      about 100 cases, and I have never

6      been in a trial that was as

7      contentious and as hard fought as

8      this case.  The lawyers were good

9      on the other side, and they had

10     many of them.  All of you know

11     that tried the cases how hard it

12     really was just compared to

13     regular cases, and most of my

14     cases are against large corporate

15     defendants that fight hard, but it

16     was especially hard, I thought, in

17     this case.

18          I thought that the

19     cooperation among the plaintiff

20     lawyers was excellent and

21     extraordinary, that much of the

22     work that we started with was

23     given to us by the lawyers, and we

24     were able to expand on that in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          terms of the jury questionnaire,

2          focus groups that we ran here and

3          jury consultants.  Part of it is

4          because some of the work that had

5          been done before we weren't

6          allowed to use, other focus groups

7          that had been done in the prior

8          trial from the MDL.  So we had to

9          do a lot of that ourselves.

10               Specifically in the

11          appellate case, the prescribing

12          physician was a Vietnam veteran

13          and flight surgeon, had been paid

14          $750,000 by Merck to run clinical

15          trials, had prescribed Vioxx and

16          was given 60,000 samples by Merck

17          and was an adverse witness to the

18          plaintiff.  I called him adversely

19          to cross-examine him.  He had been

20          paid 750 for clinical trials on

21          Vioxx himself.  So, I had to call

22          him as an adverse witness and did

23          get him to admit that if he had a

24          heart attack, he wouldn't have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          given it, although when Merck

2          examined him, he flip-flopped for

3          them.  But it was very difficult.

4               The California law is

5          different than a lot of states on

6          the learned intermediary and

7          failure to warn, and we had a

8          difficult time with our

9          prescribing physician and dealing

10          with the learned intermediary and

11          dealing with the judge and the

12          law.  We spent a lot of time on

13          briefing the law, arguing, working

14          on the verdict forms, not only for

15          this case, but for the next case.

16          This case ended up in a hung jury,

17          three final arguments made in the

18          trial.  Go back, jury questions

19          for three straight weeks.  Got

20          some good findings in the trial,

21          and we're prepared to retry the

22          case.  We changed experts, took

23          out Merck's -- after the trial,

24          Merck no longer was using the same

FAC Resp. Exhibit D -- 1099

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        cardiologist, Dr. Friedman, who

2        had had over 75 meetings with

3        Merck lawyers and prepared to

4        testify in all the California

5        cases.  So, he was no longer

6        designated after that case.  Ready

7        for the retrial.

8            We had other cases, had put

9        up many cases for trial.  I had

10       other cases, Schechter case, other

11       cases that were going to be in the

12       mix.  Mr. Girardi had set up a

13       plan, in addition to trying to

14       have four or five cases going

15       simultaneous with ten or more

16       plaintiffs in each case, and we

17       had signed on to be part of that,

18       to try whatever number of cases

19       were necessary to be tried.

20           We spent hundreds of

21       thousands of dollars.  We

22       submitted all the time sheets.

23           MR. LEVIN:  Your time sheets

24       and your costs, the 400 plus

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          thousand was approved by the
 2          accountant.
 3              MR. PANISH:  450 plus --
 4          plenty of costs, prepared to put
 5          in plenty more costs.  I think we
 6          were ready to try the case, and
 7          they knew they took their best
 8          shot, and they couldn't beat us.
 9          We were ready to continue on, and
10          I think they knew that.  Not that
11          they would ever admit it, but they
12          knew that we were ready to go and
13          continue forward, committed to
14          resolution of the litigation.  I
15          was fortunate to be there at court
16          when it was announced, and I was
17          proud to be a lawyer and to have
18          been part of that and to have
19          worked with Tom Girardi and Tom
20          directing us here and the great
21          leadership in California for all
22          of us.  In all cases, California
23          is important.  Los Angeles County
24          is the seventh largest state.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          California is an important player

2          in overall global litigation.

3               I've submitted my stuff.  I

4          can talk for a long time.

5               MR. SEEGER:  Who actually

6          tried the case with you?  I knew

7          about your role in the trial.

8               MR. PANISH:  My case for

9          Mr. Appell, just me.  There was

10          another plaintiff.  Mr. Arrigale

11          was represented by Tom Brandi.

12               MR. SEEGER:  You and Brandi

13          did it?

14               MR. PANISH:  My whole case,

15          just me.  I picked the jury, did

16          the final arguments, everything.

17          Three final arguments.

18               MR. SEEGER:  Why was that?

19               MR. PANISH:  There's a new

20          law.  The jury would have

21          questions on issues, and she would

22          give an hour and a half more for

23          each side to argue.  So we would

24          have to reprepare for those final

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        arguments to deal with that issue.

2        Then we went over Christmas, we

3        came back January 3rd or after the

4        New Year, they would have

5        questions on another issue.  So

6        now we have to prepare another

7        final argument and give that final

8        argument.

9            MR. SEEGER:  That's the way

10       you do it?

11           MR. PANISH:  It's kind a new

12       law, and the judge wanted to try

13       to -- she wanted to get a

14       resolution.  She didn't want a

15       hung jury, obviously.  So, we did

16       it.  We didn't have any choice.

17       She said that's what we're doing,

18       so we did it.

19           MR. WEITZ:  How many cases

20       did you have filed?

21           MR. PANISH:  100 plus

22       probably.

23           MR. WEITZ:  All in LA?

24           MR. PANISH:  All in LA.

FAC Resp. Exhibit D -- 1103

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      Some were moved to MDL, but all

2      were filed in State Court, Los

3      Angeles.

4              MR. GIRARDI:  Brian, truly

5      you did -- not only did you do a

6      terrific job in that case, which I

7      thought had some difficulties,

8      because I think Sizemore and

9      O'Callahan would report to me

10     nightly how difficult a case it

11     was.  So, not only did you do a

12     great job on that case, but when

13     we were told to get 60 more cases

14     ready, 20 for Judge Chaney, 20 for

15     Judge McLaughlin and 20 for Judge

16     Chavez, you came to the fore and

17     immediately started running

18     through all of your cases to give

19     us the best ones to put in that

20     group, which was a massive amount

21     of work.  Obviously those things

22     never went on due to the

23     resolution of the case, but you

24     did a terrific job.

FAC Resp. Exhibit D -- 1104

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1              Also, I think it's great

 2         that last week in the Sunday

 3         edition of the Los Angeles Times,

 4         you were named the second best

 5         trial lawyer in California.

 6              MR. SEEGER:  Who was number

 7         one?

 8              MR. GIRARDI:  Oh, that was

 9         me.

10              MR. PANISH:  I'm glad to be

11         there.

12              MR. GIRARDI:  I'm just

13         teasing, obviously.  In all

14         honesty, you did a terrific job,

15         no kidding.  I think as far as the

16         California efforts, our two firms

17         carried the ball, and there's no

18         question about it.  You are to be

19         commended for all of your good

20         hard work, and it was a hell of a

21         contribution to the overall

22         resolution of these cases.

23              MR. SEEGER:  I only got to

24         know you through the case
```

FAC Resp. Exhibit D -- 1105

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          recently, but I really learned

 2          about you, first, through your

 3          trial work.  So, based on what I

 4          have known what you have done, I

 5          have to second that.  Thank you.

 6               MR. PANISH:  I want to thank

 7          all of you guys, and, Tom, the

 8          extraordinary efforts Mr. Girardi

 9          did in California.  It wasn't

10          easy.  Lawyers were not stepping

11          up to try the cases despite what

12          they might tell you now.

13               MR. WEITZ:  We know.

14               MR. SEEGER:  As soon as

15          there was a loss, guys were

16          running for the hills.

17               MR. PANISH:  People would

18          dismiss cases on the day of trial.

19          Tom had tried the first case, and

20          it didn't go so well, and he

21          didn't bat an eyelash.  He was

22          prepared to go forward.  We'd

23          still be trying Vioxx cases.  I

24          thank you for giving me an
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          opportunity and for all the work.

2                    MR. GIRARDI:  Thank you.

3                    MR. SEEGER:  Thank you.

4                    MR. BLIZZARD:  Thank you.

5                         -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1            C E R T I F I C A T E

 2

 3            I, LINDA L. GOLKOW, a Notary

 4  Public and Certified Court Reporter of

 5  the State of New Jersey, Registered

 6  Diplomate Reporter, Federally-Approved by

 7  the United States District Court of

 8  Pennsylvania, do hereby certify that the

 9  foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22      Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23      Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRMS:    RANIER GAYLE & ELLIOT, L.L.C.
          Drew Ranier, Esquire
          Sarah Ranier, Esquire
          Brett M. Powers, Esquire
          PROVOST UMPHREY LAW FIRM, LLP
          Walter Umphrey, Esquire
          Darren Brown, Esquire
          WILLIAMS KHERKHER
          Steven J. Kherkher, Esquire
          John T. Boundas, Esquire
          Amy Carter, Esquire
          Brandon Steffey, Esquire
          THE WATTS FIRM
          Mikal Watts, Esquire
          Larry Wright, Esquire
          THE KAISER FIRM
          Grant Kaiser, Esquire
          John Furnish, Esquire
          Gerilyn Gordon, Esquire


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1109

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1   BEFORE FEE COMMITTEE MEMBERS:
 2
     ANDY D. BIRCHFIELD, ESQUIRE
 3   Beasley Allen Crow Methvin
     Portis & Miles, PC
 4
     EDWARD F. BLIZZARD, ESQUIRE
 5   Blizzard, McCarthy & Nabers
 6   THOMAS V. GIRARDI, ESQUIRE
     Girardi & Keese
 7
     RUSS M. HERMAN, ESQUIRE
 8   Herman, Herman, Katz & Cotlar, LLP
 9   W. MARK LANIER, ESQUIRE
     The Lanier Law Firm
10
     ARNOLD LEVIN, ESQUIRE
11   Levin, Fishbein, Sedran & Berman
12   TROY RAFFERTY, ESQUIRE
     Levin, Papantonio, Thomas, Mitchell,
13   Echsner & Proctor, P.A.
14   CHRISTOPHER A. SEEGER, Esquire
     Seeger Weiss, LLP
15
     PERRY WEITZ, ESQUIRE
16   Weitz & Luxenberg, P.C.
17
18
19
20
21
22
23
24
```

FAC Resp. Exhibit D -- 1110

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1                    -  -  -
 2              MR. BLIZZARD:  We've got a
 3         court reporter here today, and
 4         obviously we had individual time
 5         slots for everybody, but John
 6         called me earlier and said that
 7         you guys wanted to present as a
 8         group, and that's obviously fine
 9         with us.
10              The court reporter is going
11         to record everything because of
12         Judge Fallon's interest in
13         transparency.
14              Really the floor is yours.
15         However you want to organize it,
16         however you want to present, you
17         can start.
18              MR. RANIER:  Good.  Thank
19         you.  I would be shocked --
20              MR. HERMAN:  I'm sorry.
21         Just one other thing.  I know you
22         are familiar with the cases, but
23         Mobil out of the Fifth Circuit and
24         the Murphy Oil case has been
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        settled now.  So, the only opinion
 2        in Murphy Oil is the opinion that
 3        the Fifth Circuit more or less
 4        adopted or did not review
 5        actually.  So, it would be Judge
 6        Fallon's opinion in Murphy Oil
 7        that is probably the same process
 8        that's going to operate here, and
 9        that's what the Judge has
10        indicated to this committee.
11             MR. RANIER:  I'll be very
12        surprised if we would use all of
13        our time with the combined five
14        firms.  I think we'll do less than
15        that.  We have a bit to say, but I
16        think it will be beneficial to all
17        of y'all's time to do this at
18        once.
19             MR. BLIZZARD:  I said this
20        to John out in the hall.  He may
21        have communicated it to y'all too.
22        We had a very inspirational
23        presentation this morning from
24        Shelly Sanford, who spoke really
```

FAC Resp. Exhibit D -- 1112

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      only about Carlene and her work to

2      start this litigation.  I wish

3      that all of you could have heard

4      it, because it was a wonderful

5      presentation.  It really has

6      inspired us all this morning to

7      really try as best we can to do

8      the right thing here.  So,

9      whatever y'all want to say, go

10     ahead.

11         MR. HERMAN:  Drew, I'm sorry

12     to interrupt you again.  We need

13     everybody in this room to

14     introduce themselves.  We know a

15     number of you and some we don't.

16         MR. WRIGHT:  Larry Wright,

17     Watts Law Firm.

18         MR. WATTS:  Mikal Watts,

19     Watts Law Firm.

20         MR. FURNISH:  John Furnish

21     with the Kaiser Firm.

22         MR. STEFFEY:  Brandon

23     Steffey, Williams Kherkher.

24         MS. GORDON:  Gerilyn Gordon,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          The Kaiser Firm.

 2               MR. KAISER:  Grant Kaiser.

 3               MR. POWERS:  Brett Powers,

 4          Ranier, Gayle & Elliot.

 5               MR. RANIER:  Drew Ranier.

 6               MR. UMPHREY:  Walter

 7          Umphrey.

 8               MR. BROWN:  Darren Brown.

 9               MR. KHERKHER:  Steven

10          Kherkher.

11               MS. CARTER:  Amy Carter.

12               MR. BOUNDAS:  John Boundas

13          with Williams Kherkher.

14               MR. GIRARDI:  I'm Tom

15          Girardi.

16               MR. RANIER:  Well, I'll

17          start by saying good morning to

18          everybody and Seasons Greetings

19          with all the decorations coming

20          down the hall.  I'm Drew Ranier,

21          R-A-N-I-E-R, and I'm going to do

22          an overview of the efforts of the

23          Vioxx Litigation Consortium.  That

24          is what the five firms that are
```

FAC Resp. Exhibit D -- 1114

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1          here today call themselves and

 2          have worked together on Vioxx

 3          under that name.  Basically I will

 4          do an overview, and then other

 5          members of our group will address

 6          several specific areas.

 7              Mikal Watts will lead the

 8          discussion on the trial work.

 9          Grant Kaiser will do the

10          organization and function of the

11          Vioxx Litigation Consortium, how

12          it is organized.  Walter Umphrey

13          will talk about financial

14          commitment.  I'll talk some about

15          the PSC work that I did as a PSC

16          member.

17              So, there are a lot of

18          lawyers in this room who have done

19          exceptional work in this case and

20          have done top tier work in this

21          case, and we respect that, and we

22          know that.  We know how difficult

23          it was to do that and how much of

24          a commitment it required to do

FAC Resp. Exhibit D -- 1115

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1           that.  So, we want to tip our hats

2           to you all who have done so much,

3           and we want to say that we have

4           made a top tier commitment to this

5           litigation also.  We are going to

6           describe that here for you today,

7           and that's what we're here to talk

8           about.

9                Let me just introduce the

10          firms briefly.  I know for some of

11          you this will be old hat, but just

12          for the record so we have it here,

13          John Eddie Williams could not be

14          here today because of family

15          commitments and a death in the

16          family --

17               MR. SEEGER:  By the way,

18          would you send him our regards.

19               MR. RANIER:  I will.  Thank

20          you.  I'm sure he'll be happy to

21          get them.

22               His reputation, first in his

23          class at Baylor Law School,

24          Fulbright & Jaworski, built one of

FAC Resp. Exhibit D -- 1116

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          the largest and most successful

2          plaintiffs' practices in the

3          United States.  Just an absolutely

4          brilliant lawyer, senior partner

5          of Williams Kherkher Hart &

6          Boundas, 30 years of practice,

7          John Eddie.

8                Walter Umphrey, who is

9          sitting on my left here, one of

10         the most successful litigators in

11         the United States, practiced for

12         43 years.  Walter was doing mass

13         torts before most of us in this

14         room even thought about going to

15         law school.  Baylor Law School is

16         named after him.  Words like

17         pioneer and legend and dean are

18         frequently used in referring to

19         Walter.  As I say, he's been doing

20         this for 43 years.

21               Mikal Watts, who I know many

22         of you know well, the word that

23         comes to mind when I think about

24         Mikal is prodigious.  He is an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1 incredible trial lawyer.  He just

2 turned 40 years old.  At 60, I

3 would be happy to have

4 accomplished as much as he did in

5 the courtroom.  His trial

6 schedule, which he takes in

7 stride, by anybody's imagination,

8 even experienced trial lawyers, is

9 incredible, is punishing.  It's

10 like every Monday or every other

11 Monday, he's there, and he's there

12 on big and important cases.  Mikal

13 has been practicing, even at the

14 age of 40, for 19 years.

15  Grant Kaiser on my right

16 supervised and directed some of

17 the most far reaching and biggest

18 litigation in United States

19 history.  Grant has been

20 practicing for 27 years, and I am

21 personally proud of every word

22 that has come out of the Vioxx

23 Litigation Consortium.  Every

24 piece of paper, nothing is not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1       screened, goes through Grant to

2       make sure it is appropriate, and

3       we all know about it.  So, we are

4       in this very much as a group, and

5       we formed this group to do that

6       and take on the challenge that we

7       thought Vioxx presented.

8           In my own case, I've been

9       practicing for 33 years.  I did

10      three years of insurance defense

11      work after I graduated from the

12      University of Texas Law School,

13      although I'm from Lake Charles and

14      practice in Lake Charles, which is

15      25 miles this side or the other

16      side of the Sabine River.

17          My first toxic tort case was

18      tried in 1978 with Fred Baron, who

19      came to Lake Charles to try a

20      phosgene case with me.  Our jury

21      consultant was a woman named Lisa

22      Blue, who, of course, later became

23      Mrs. Fred Baron.

24          So, with the senior partners

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          alone in these five firms, we have

2          got about 152 years of experience

3          that we bring to the table or

4          brought to the table in this

5          litigation.

6               I've got a chart of how we

7          set ourselves up and how we formed

8          this organization.  And just to

9          say it quickly once at the

10         beginning, the purpose of this

11         organization that we formed with

12         these five firms is that we,

13         because of our past experiences,

14         wanted to build a litigation

15         machine and a litigation pipeline

16         that would last indefinitely and

17         would relentlessly and

18         continuously produce triable

19         cases.  We're glad the case

20         settled, but we started this out

21         and we continued to the very end

22         like we might have a Vioxx docket

23         for ten years, and we wanted to be

24         viable, financially viable and be

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        able to do that.  So, the common
2        sense of it is that five firms
3        that put all those resources
4        together, you know, another five
5        firms in this room that did that,
6        would be able to sustain this
7        thing longer and in a bigger way
8        than any one firm can.  That's the
9        underlying common sense thing
10       about what we did here.  It's
11       really not a lot more complicated
12       than that, but that we didn't get
13       these cases to settle them, we're
14       glad we did, but we didn't know if
15       they'd do individual settlements.
16       We tried to apply the maximum
17       amount of pressure to Merck, and
18       we did that through this
19       organization.  So, let me start by
20       just quickly going over the
21       organization.
22            We will have copies of these
23       provided later if they are too
24       small for anybody to see.  I'll

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        bring it up here where I can show

2        everybody.

3            The Vioxx Litigation

4        Consortium basically consisted of

5        36 attorneys from these firms, two

6        physicians, one CPA manager, five

7        Registered Nurse paralegals and 69

8        paralegals and staff.  We've got

9        the five firms and their

10       commitments in terms of attorneys

11       who worked on Vioxx down below

12       here.

13           In addition to the five

14       firms, we've got the Vioxx Center.

15       That was an independent -- it was

16       not in anybody's office.  We had a

17       separate office, an office

18       building down here on the corner

19       of 16 and 59 and had a whole

20       floor, I think, almost a whole

21       floor of that office building, if

22       not more.  In that Vioxx Center,

23       we had totally dedicated to Vioxx

24       four attorneys, one CPA manager,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        two physicians, five RN paralegals

2        and 38 paralegals and staff.  So,

3        that was the core dedicated center

4        of the Vioxx operation.  Grant

5        Kaiser is going to talk about how

6        that functioned and how it was

7        organized.  But that was the

8        center of the operation, and these

9        are the supporting and the

10       cooperating firms.  That's the way

11       it worked, but this thing is

12       Vioxx, totally dedicated to Vioxx.

13       That's what enabled us in many

14       ways to produce this flow of

15       continuous trial cases that we'll

16       talk about in a minute.

17            MR. SEEGER:  Drew, are

18       questions okay along the way or

19       would you rather do the

20       presentation?

21            MR. RANIER:  They are.  Why

22       don't you let me finish the

23       overview, and then we're going to

24       have individual people talk a

FAC Resp. Exhibit D -- 1123

Page 16

 1          little more about the details of

 2          this.

 3                MR. SEEGER:  I'm sorry I

 4          interrupted.

 5                MR. RANIER:  Let me try and

 6          just do that.

 7                While I'm on the subject,

 8          here's a little more graphic form

 9          of how that worked.  These are

10          approximate numbers.  We had

11          approximately 30,000 client

12          contacts, and those client

13          contacts went through the Vioxx

14          Center, which of course required a

15          substantial financial commitment,

16          complete medical records,

17          dedicated doctors, nurses and

18          lawyers, and then the five firms

19          vetting those cases.  And from the

20          30,000, we reduced that to 2,000

21          triable cases.  From those, at the

22          time of settlement, we had about

23          50 triable cases ready to go.

24          That includes the 30 that was the

FAC Resp. Exhibit D -- 1124

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1       last tranche that we put up in New

2       Jersey, and we were on schedule

3       and organized so we could produce

4       20 cases a month to try.  That was

5       our schedule at the time of

6       settlement.  So, with these 50, we

7       actually had 20 waiting in the

8       wings behind it, and we were going

9       to have 20 new ones up every

10      month.  That's basically the way

11      the organization worked.  Grant

12      can talk a little bit more about

13      that in detail later.

14           We're five firms.  We

15      operated as one firm.  We took all

16      of our resources, we pooled them

17      together.  We are asking for one

18      fee from common benefit.

19           Our presenters today and

20      their areas that they will cover

21      will be Mikal Watts, who will take

22      the lead, along with John Boundas,

23      Steve Kherkher and Amy Carter on

24      describing our trial work.  Grant

FAC Resp. Exhibit D -- 1125

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        Kaiser is going to do the

 2        organization and function of our

 3        group.  I'll talk about our PSC

 4        work and our time.  Walter Umphrey

 5        is going to do financial

 6        commitment.

 7             I would like just to say a

 8        few words about each of those

 9        areas before I turn it over to

10        them from an overview standpoint.

11             In the trial area, a lot of

12        you know this, and I want to make

13        a general comment too about this

14        group.  While we did this sort of

15        standalone, not knowing where

16        things would go, I think it was

17        characterized from start to finish

18        by cooperation with our

19        colleagues.  A number of you

20        sitting at this table have been

21        co-counsel in cases that we have

22        had.  Andy Birchfield helped us

23        try a case.  He did a great job.

24        Chris Seeger is co-counsel in our
```

FAC Resp. Exhibit D -- 1126

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1        cases in New Jersey and would have

 2        been soon trying cases with us.

 3             We tried two cases to

 4        verdict.  We tried a Merck pick in

 5        the MDL, a defense pick.  You

 6        know, a lot of firms dismiss cases

 7        rather than going to trial, but

 8        that was our case, and we stepped

 9        up and tried that case.  That was

10        the snow shovel case, where the

11        guy shoveled snow for quite a long

12        time before he had a heart attack.

13             MR. BLIZZARD:  Drew, that

14        had nothing to do with his heart

15        attack.

16             MR. RANIER:  Ed, I agree

17        with you.  I don't describe that

18        as a bad case.  We'll talk more

19        about that later, too, on some of

20        the work we did on epi.  I totally

21        agree with you.

22             MR. BLIZZARD:  Just to

23        interrupt for a moment.  You may

24        be going to get to this too, but
```

FAC Resp. Exhibit D -- 1127

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1        Amy Carter was somebody who helped
 2        on our trial on Mason.  John Eddie
 3        graciously, when we needed help
 4        getting ready for Mason, Amy had
 5        just been in the Smith trial, and
 6        so he said that Amy could come and
 7        help us, and she did a great job
 8        for us.
 9             MS. CARTER:  Now you have
10        done about 50% of my entire
11        presentation.
12             MR. SEEGER:  You are off the
13        hook, Amy.
14             MR. RANIER:  I was just
15        about to mention that.  We tried
16        the two cases to verdict.  We
17        tried the Merck pick in the MDL,
18        one of those two cases.  We had
19        two cases fixed for trial in New
20        Jersey in November of 2007, and
21        for settlement related reasons,
22        that did not go to trial.  But the
23        judge continued it to January
24        pending settlement.  So, that was
```

FAC Resp. Exhibit D -- 1128

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        there and totally worked up and

2        ready for trial.

3             We submitted two other cases

4        to the PSC.  The PSC approved,

5        they went through the approval

6        process.  Lisa Dagostino, I know,

7        and others reviewed those cases.

8        Merck vetoed both of those cases,

9        28-year-old female heart attack,

10       and a mid-50s sudden death cardiac

11       man.

12            MR. KAISER:  We don't know

13       why they vetoed them.

14            MR. RANIER:  We had one case

15       set in California in 2007.  We had

16       three others for trial set in

17       2008.  And we had another 30 that

18       we had nominated or were about to

19       be nominated for the next tranche

20       in New Jersey and more in the

21       pipeline behind that.

22            So, I want to again say from

23       the outset that we went from

24       30,000 to 2,000, but we didn't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          inventory those cases.  They were

2          not parked.  We built a trial

3          machine, and we built a pipeline

4          that flowed continuously with

5          these cases.  They did not just

6          sit there.

7               Grant, I've said a lot

8          already about organization and

9          function.  I will let Grant do

10         that.

11              On the PSC, a general

12         comment I will make on that, I

13         will do some details later, is

14         that because I was on the PSC, I

15         was a direct pipeline to these

16         five firms into the PSC and back.

17         These five firms took that very

18         seriously.  They fully

19         participated, fully involved

20         themselves in the MDL and the PSC

21         process.  We did not always agree

22         with everybody there.  I did not

23         always agree.  But we fully

24         participated, and we were fully

FAC Resp. Exhibit D -- 1130

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          committed to it.  I was the chair

2          of the insurance committee and did

3          some other things that we'll talk

4          about later.

5                Walter is going to talk

6          about financials.  Let's do a

7          summary chart on it here, and he

8          can go into some more detail.

9          This sort of sums it up for our

10         group, 13.5 million at the time of

11         settlement and 200,000 hours of

12         work.

13               MR. HERMAN:  Have you got a

14         breakdown chart on the 13.5

15         million with you?

16               MR. RANIER:  Walter does,

17         and Walter will present that.

18         That's at the time of settlement.

19               Just to give you some idea

20         of the scope of that kind of

21         investment, the PSC, which I'm a

22         member of at the time of

23         settlement, Russ, correct me if

24         I'm wrong, but we were -- as a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1        group, we were at about 3.65

 2        million or something in that range

 3        at the time of settlement that we

 4        put up in cash.  So, these five

 5        firms had committed three or four

 6        times that amount of money to this

 7        litigation at that point.

 8             MR. HERMAN:  I'm not --

 9             MR. RANIER:  I understand.

10             MR. HERMAN:  The actual

11        dollars that the firms put up of a

12        similar nature exceeded $50

13        million.  There were 3.5 million,

14        I believe, to 4.5 million

15        contributed to a common cost fund.

16        But the actual dollars spent by

17        the law firms participating in

18        Vioxx exceeded -- not counting

19        your 13.5, exceeded $50 million.

20        What the exact figure is, I can't

21        even estimate right now because

22        the CPAs are still working with

23        it.

24             MR. LEVIN:  That didn't
```

FAC Resp. Exhibit D -- 1132

Page 25

1          include individual case costs?

2                  MR. RANIER:  The 13.5

3          million?

4                  MR. LEVIN:  I don't know

5          what yours did.  The 50 million

6          that Russ says were common

7          expenses and that were held costs,

8          that didn't include individual

9          case costs for processing

10         individual cases?

11                 MR. RANIER:  I'm sorry.  I'm

12         getting my millions confused here.

13                 MR. LEVIN:  It is hard to

14         talk in millions.

15                 MR. RANIER:  The PSC, which

16         I was a member of, we had

17         contributed or raised about 3.65

18         at the time.

19                 MR. LEVIN:  That was the

20         assessment.  But then there were

21         common expenses in excess of $50

22         million for everybody.  And in

23         addition to that, the caseload

24         costs, the individual costs are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          not in that 50.

2               MR. RANIER:  And the

3          common benefit -- you are talking

4          about expenses that people

5          submitted as common benefit

6          expenses on the forms from all PSC

7          firms or all firms?

8               MR. LEVIN:  All firms.

9               MR. RANIER:  All firms.

10               MR. SEEGER:  I think the

11          point he's trying to make is it

12          doesn't include case specific

13          expenses, it was just common.

14               MR. KAISER:  Gotcha.

15               MR. RANIER:  Well, some

16          relatively small percentage of our

17          firm costs were carried in that

18          13.5.  That is not our firm

19          overhead.  The only thing that

20          that 13.5 applies to is the Vioxx

21          Center.  So, it's clearly not

22          nearly everything that we spent on

23          this litigation.

24               MR. SEEGER:  That's where

FAC Resp. Exhibit D -- 1134

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          the cases were processed?

2                    MR. RANIER:  That's right.

3          That's right.  And I mean they are

4          back and forth to the firms, too,

5          Chris.  It is a constant vetting

6          process, vetting things with the

7          five firms.  But that was the

8          central coordination of that.

9                    Before I turn it over to

10         Mikal about trial work, I would

11         like to suggest a few questions

12         for y'all to consider while you

13         are listening to the presentation

14         and while you're thinking about

15         fees in our case.

16                    First of all, how many firms

17         seeking common benefit fees did

18         more trial work than these five

19         firms in the Vioxx Litigation

20         Consortium?

21                    How many firms did more?

22                    How many firms made greater

23         financial contributions to the

24         litigation than these five firms?

FAC Resp. Exhibit D -- 1135

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            How many firms contributed

2       more cases and more quality cases

3       to the litigation?

4            How many firms were active

5       in more venues?  Grant is going to

6       talk about Texas, California, New

7       Jersey, New Orleans and state

8       court, selected state courts.

9            How many firms contributed

10      more time to the litigation?

11           How many firms brought more

12      experience to the table than these

13      five firms?

14           We are seeking one fee.  We

15      believe the answer to each of

16      these questions is few or none.

17      That means that this group should

18      be in the top tier of common

19      benefit fee awards.

20           MR. HERMAN:  Let me ask some

21      questions about that.

22           Of the 13.5, you said that

23      relates to your center, correct?

24           MR. RANIER:  That relates to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1          everything but firm overhead.
 2               MR. HERMAN:  I need to
 3          understand that better, because
 4          you have on other occasions said
 5          to me that y'all spent a terrific
 6          amount of money getting from
 7          30,000 cases to 2,000 cases.
 8               MR. RANIER:  That's where
 9          that money --
10               MR. HERMAN:  Is that that
11          13.5?
12               MR. RANIER:  I think Walter
13          will get into more detail --
14               MR. HERMAN:  How does that
15          differ -- and I'm being perfectly
16          honest with you, and I've had this
17          disagreement from the beginning.
18          How does that differ from any law
19          firm's case selection where you
20          get -- I don't care whether you've
21          got a consortium, a single firm or
22          a 600 person firm, you get in
23          cases, you put doctors, nurses,
24          paralegals on them, and then you
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        determine which cases you are

2        going to jettison and which cases

3        you are going to keep.

4             Why is that 13.5 million to

5        be considered in any common

6        benefit?  Now, I'm not asking a

7        rhetorical question.  I'm asking a

8        question that really concerns me.

9        I don't think it just concerns me,

10       but that's something that you

11       really have to address and Walter

12       has to address, because right now,

13       in terms of the 13.5, I'm

14       completely unconvinced as to how

15       that differs from my individual

16       firm starting with 600 cases,

17       putting doctors and nurses on it

18       to get down to 120, which are my

19       firm's costs that I don't believe

20       I can recover not just in this

21       case, but in any case.

22            MR. RANIER:  Let me answer

23       in general terms first and then

24       talk about the details of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          money.

2              MR. HERMAN:  I don't think

3          it would be fair to you, Drew, if

4          I didn't raise the question.

5              MR. RANIER:  I understand.

6          The way we have approached this is

7          we have taken Judge Fallon's

8          statements in Murphy Oil and have

9          read those carefully, and in his

10         orders -- and 6(D) is even in

11         there.  It says that the important

12         thing in determining these fees is

13         the overarching contribution that

14         the firm made to the litigation.

15         You can start cutting it as fine

16         as you want down to hours and CPAs

17         and everything like that, but the

18         bottom line on this is the

19         overarching contribution that you

20         made to the litigation.  I'm happy

21         to cut it fine and talk about

22         that, but that's where we're

23         coming from on this.

24              All of the other stuff in

Page 32

```
 1          this case, great legal work, great

 2          things done, I'm not criticizing

 3          anybody about that.  It has to

 4          stem and flow from a continuous

 5          and strong supply of trial cases

 6          and the ability to try a lot of

 7          cases for a long time.

 8                  MR. HERMAN:  Let me --

 9                  MR. RANIER:  That's what

10          this chart is talking about.

11                  MR. HERMAN:  Let me put it

12          in a different perspective.

13                  Your group not only tried a

14          case in the MDL that I monitored,

15          it was well tried --

16                  MR. RANIER:  Thank you.

17                  MR. HERMAN:  -- it was tried

18          to the highest level of trial

19          practice.  That's my view.  I

20          don't have a problem with anything

21          that went into that trial,

22          preparing it, who took the

23          depositions, what was done.  I

24          still do not see how I can recover
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
1          for the 600 cases that I
2          jettisoned after having physicians
3          and nurses and paralegals and
4          trial lawyers review and say, hey,
5          these cases are not worthy of our
6          representation in Vioxx.  That
7          amount of money, let's take it out
8          of your group, and why is my firm
9          worthy of recovery and common
10         benefit?
11              MR. UMPHREY:  Russ, let me
12         answer that.  We're not asking for
13         that 5.7 million back.  That's
14         costs we absorbed.  We're not
15         asking for reimbursement of that.
16         We are talking about the screening
17         tests and to decide whether it is
18         a viable case or whether it is
19         not.
20              MR. KAISER:  Let me explain,
21         Russ.  I think we've gotten off on
22         the wrong track.  We're not
23         requesting reimbursement out of
24         the common benefit fee and expense
```

FAC Resp. Exhibit D -- 1141

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1      fund of 13.6 million.  We're

2      telling you what we invested in

3      the case to push these cases

4      along.  What we submitted, we've

5      submitted.  It is a million and a

6      half, 2 million maybe as common

7      benefit.  So, we're not asking to

8      reimburse that amount.

9          MR. HERMAN:  Well, I think

10     that's really clear, Walter, and I

11     thank you for making it clear.

12         MR. LANIER:  So, what you

13     are saying is, what you spent for

14     common benefit is a million and a

15     half to 2 million, but you overall

16     committed that much money to try

17     to justify your involvement in the

18     litigation?

19         MR. HERMAN:  That makes a

20     lot of sense.

21         MR. LEVIN:  Which shows your

22     commitment to the case.

23         MR. KAISER:  Right.

24         MR. RANIER:  That's relevant

FAC Resp. Exhibit D -- 1142

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1           to fee, independent of expenses.

2                     MR. KAISER:  They understand

3           that.  This is about fee.

4                     MR. LEVIN:  It is part of

5           the gestalt process here.

6                     MR. WEITZ:  But, Drew, what

7           you are saying is, the amount of

8           money shows your commitment to the

9           litigation, and you want us to

10          take that into consideration in

11          evaluating the fee?

12                    MR. RANIER:  Right.

13                    MR. WEITZ:  That's really

14          what's being said.

15                    MR. HERMAN:  I have a weak

16          spot for Drew because he brought

17          Sarah with him.

18                    MS. RANIER:  It always

19          works.

20                    MR. HERMAN:  I see you back

21          there, Sarah.

22                    MR. SEEGER:  I'm still

23          afraid of her from the first time

24          I met her.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          MR. RANIER:  Just a quick

2      note on -- that's it.

3          I think it is time that we

4      move to Mikal Watts to talk about

5      trial work.  Mikal.

6          MR. WATTS:  Before I do

7      that, Drew asked me to spend just

8      a couple of minutes to talk about

9      pre-recall work.

10          Let me just give you

11      background.  I tried a case

12      against Firestone in 2001, and

13      some guy calls me out of the blue

14      and wants me to try a Rezulin

15      case.  In 2001, myself,

16      Papantonio, Troy over there and

17      some other guys, Roe Frazier,

18      tried a big Rezulin case, got a

19      huge verdict.  That led to

20      something else.  Before you know

21      it, I'm doing Sulzer work and

22      trying cases with Blizzard and

23      we're involved.

24          My entry into this

FAC Resp. Exhibit D -- 1144

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1          litigation actually is Andy's
 2          fault.  I was, I think, at Mass
 3          Torts Made Perfect in September of
 4          2002, and to be honest with you, I
 5          had never heard of Vioxx at that
 6          time, and I was giving some speech
 7          about the Rezulin verdict or the
 8          Sulzer verdict, I don't remember,
 9          but I'm listening to this speech
10          about Vioxx, and it seems to not
11          be getting a whole lot of traction
12          in terms of people understanding
13          because nobody has heard of it.
14          But I remember I respected Andy a
15          lot because we worked together on
16          Baycol and a whole lot of stuff,
17          and so I said, huh, and gave it
18          some thought.
19               Then a guy that came to work
20          for me named Chris Pinedo was
21          getting more and more involved
22          with Shelly Sanford on some stuff,
23          and so he came to me and said,
24          well, Shelly has some cases, and I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          think Mark is going to try them.

2          I had already seen a speech and

3          everything, and I decided

4          basically on strength of

5          association, this is before I was

6          even involved, I think, that

7          something has to be going on.

8               So, in the spring of '03 I

9          think it was, my firm

10         individually, this is before this

11         consortium came together, I made

12         the decision that we were going to

13         start getting involved.  I don't

14         want to be disingenuous, but based

15         on if Andy is in it and Lanier is

16         going to be in it, it is probably

17         going to be fun.  So, we got

18         involved, the Watts Law Firm got

19         involved at that time.

20              For about a year, we began

21         working on bringing cases.  I

22         think my affidavit said we took --

23         we pared it down to between three

24         and 4,000 cases to somewhere

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1          between 450 and 500 cases.

 2          Unfortunately, a lot of the work

 3          that I did was with a

 4          cardiologist, a friend of mine, a

 5          guy Allison put me in touch with

 6          named Antonio Pacifico, who is a

 7          very world renowned or was a very

 8          world renowned cardiologist here

 9          in Houston until he went down in a

10          Gulfstream right after the recall.

11               We also spent some time with

12          Joseph Burton, who I think was in

13          your original case, Andy, a guy I

14          use a lot in car cases working on

15          just grabbing all the COX-2 stuff

16          that, frankly, you guys had

17          developed, and spent a lot of time

18          working on that.  I think you and

19          I had some discussions about your

20          case before you tried it, and I

21          began working with Tommy Jacks,

22          who I think had cases in

23          Tennessee.  That's the way that

24          Larry, who now works with me, and
```

FAC Resp. Exhibit D -- 1147

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

```
1           I got hooked up.
2               So, my firm individually was
3           kind of working on getting up to
4           speed, if you will, on Vioxx.  I
5           don't pretend to be as involved as
6           Andy was or as Chris was, and I
7           think Mark, obviously, did some
8           wonderful work in preparation for
9           his eventual trial in 2005.
10              What happened is, the recall
11          was announced, our four firms were
12          working on welding rods.  I had
13          this case because I knew enough
14          about the COX-2s, knew enough
15          about the science and the
16          literature and what was involved.
17          I think we were flying out to
18          Miami or something, and Walter and
19          I had a discussion about it.  And
20          he said, why don't we try to wrap
21          this up and really get in in a big
22          way, and we flew in, the four of
23          us, like we did in welding rods.
24          So, I took all of our firm's work
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          product and all of our cases and

2          contributed them to this new

3          entity that led to that.

4               So, let me put that aside.

5          I'm not going to talk about money

6          or anything like.  The trial work,

7          it's probably no secret, maybe to

8          the chagrin of one or two of you

9          in some litigation, I like to go

10         out and try a bunch of cases.

11         Sometimes it works, Firestone,

12         Rezulin, Sulzer.  Sometimes it

13         doesn't, Baycol.  I felt like it

14         was important to catch up as fast

15         as we could to start assisting

16         with trying cases.

17              Obviously, Mark's verdict

18         blew the whole thing up and got

19         everybody really jacked up, but at

20         least from the standpoint of where

21         I was, we had been in the case for

22         over a year, had started this up

23         before everybody knew about Mark's

24         prodigious talent in the

FAC Resp. Exhibit D -- 1149

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1          courtroom.  I mean, they knew

 2          about it, but the verdict.

 3               Anyway, where we found

 4          ourselves, or at least inside of

 5          ourselves or where I found myself

 6          is that when you looked at the

 7          Ernst case that Mark had success

 8          on versus the Irvin case that you

 9          guys had trouble on, when I read

10          the transcripts, what I saw was

11          that Mark seemed to win the fight

12          about this guy was a marathoner

13          who didn't have a whole bunch of

14          risk factors, and maybe you guys

15          were losing the fight about risk

16          factors.  I looked at my docket of

17          cases and saw 95 percent of the

18          people having a whole bunch of

19          risk factors, looking like me, you

20          are probably overweight, you don't

21          exercise a lot and whatever it is.

22          So, to me, in setting up the

23          trials that I wanted to be

24          involved in, I thought it was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          important that we not just cherry

2          pick the very best cases, but we'd

3          be willing to show Merck that

4          we're going to try every one of

5          them since their attitude was,

6          we're going to make you try every

7          one of them.

8              I know that John is going to

9          talk about some stuff that I

10         pushed hard to start funding, and

11         that was to get some epi going

12         with respect to the presence of

13         risk factors, and I'm not going to

14         steal his thunder about that.  But

15         it was real clear to me that

16         somebody had to be willing to try

17         difficult cases, and to Andy's

18         credit, I thought he was already

19         doing that.

20             I volunteered, and Kherkher

21         over there and Boundas agreed.

22         There was no shortage of people

23         willing to do the plaintiffs'

24         picks, but we agreed to do the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          defense pick.  I also agreed to

2          get involved in some case up in

3          Illinois that I knew nothing about

4          that involved a 290 pound

5          plaintiff.

6                    MR. WRIGHT:  298.

7                    MR. WATTS:  298, depending

8          upon the state of her diet.

9                    So, in effect, when we were

10         assigned to try the defense pick

11         in Smith, there was an epi paper

12         out there about shoveling snow.  I

13         think the attributable risk was in

14         excess of 99 percent, the relative

15         risk was over 200.  We're not

16         really involved in shoveling snow

17         down here, but apparently somebody

18         writes about it up in the

19         Northeast.

20                   MR. LANIER:  That's how it

21         made it through that screening

22         process from 30,000 to 2,000.  It

23         should have been 1,999.

24                   MR. WATTS:  With my

Page 45

1          prodigious ability to pick cases,

2          I get to try the case with a

3          relative risk of 200 and some

4          percent and a 290-pound plaintiff.

5               But the bottom line is, what

6          we tried to do and what I tried to

7          personally do is, this committee

8          had done some work that I thought

9          was real good work, and the

10         documents that were in some of

11         Mark's depositions were just

12         outstanding, but it was pretty

13         clear to me that at the time of

14         the first document attack, if you

15         will, reading through all the

16         documents was done, the people

17         that did it didn't know as much

18         about the litigation as we knew

19         three years later.  I thought

20         there would be some benefit of

21         going through and doing them all

22         over again from the standpoint of

23         just the corporate

24         representatives.  So, what I did

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

```
 1        is, with respect to largely some

 2        crosses that you had done, Nancy

 3        Santanello, Alise Reicin, Briggs

 4        Morrison, I worked with your firm,

 5        and I forget the paralegal that

 6        was so good.

 7             MR. SEEGER:  Mike Wagner.

 8             MR. WATTS:  Yes.  Somebody

 9        worked with Russ Abney, and any

10        document with any one of those

11        people's name on it, and there

12        were, it seemed like hundreds of

13        thousands of them, I had them all

14        sent to me, any transcript, any

15        paper, and I just started anew as

16        if they had never been through the

17        process.  We found a bunch of very

18        interesting stuff that, frankly,

19        weren't in any of the previous

20        records.

21             Steve focused on it.  I

22        agreed to try that case.  John

23        worked up the science, and Steve

24        was doing a lot of the jury work
```

Page 47

1          and the plaintiff work, and my job

2          was to do the corporate

3          representatives.

4               In the Schwaller case, same

5          kind of thing, although in that

6          case, I did the voir dire.  Andy

7          and I have been good friends a

8          long time.  I think Russ and I

9          called him and said, hey, do you

10         want to go play together, let's

11         try this case together.  And he

12         very appropriately, I thought, and

13         I think it's a testament to -- one

14         of the factors when the litigation

15         isn't going that well, did you

16         quit or did you keep fighting.

17         Well, Andy Birchfield kept

18         fighting, and I think we did too.

19         Obviously, the guys to my right

20         over here were great.

21              So, that's primarily what my

22         focus was in trial.  I think I

23         crossed Briggs Morrison for a day

24         and a half, I crossed Alise Reicin

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

```
1              for a day and a half.
2                      MR. SEEGER:  Those are two
3              difficult crosses.
4                      MR. WATTS:  Well, they were
5              fun crosses.  They were fun
6              crosses.  And I literally did
7              documents, annotations I sent to
8              Chris, sent to Mark, sent to Andy
9              to try to move things along, sent
10             to Ed, you know, just from the
11             standpoint of anything that
12             anybody had missed when those
13             original sweeps were done to try
14             to get those into the record.
15                     MR. BIRCHFIELD:  I'm still
16             amazed at your ability to go
17             through documents.  It's
18             phenomenal.
19                     MR. WATTS:  Well, it helps
20             when you've got Amy Carter
21             standing right behind you on that.
22                     But that's primarily the
23             role that I did in terms of trial
24             preparation.
```

FAC Resp. Exhibit D -- 1156

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1              MR. SEEGER:  Amy, was that

2         the other half of your

3         presentation?

4              MR. WATTS:  Actually, I

5         moved to San Antonio for about

6         three months for the Smith trial.

7         I just didn't show up for work for

8         about three months, stayed at my

9         house and did nothing but read

10        this stuff.  It actually was a

11        good thing because there was a lot

12        of stuff done.  I'm not used to

13        bragging about defense verdicts,

14        and don't want to because I don't

15        believe in excuses, but they were

16        hard cases that needed to be

17        tried.

18             I think at the same time of

19        that, we had in place a second

20        strategy, and I know Chris and I

21        talked and Mark and I talked, I

22        wanted to go up to New Jersey and

23        help out where I could.  And I

24        know Steve was taking very

Page 50

1          significant steps to get us set as

2          fast as we could in New Jersey.

3          And then Walter's firm had another

4          effort going in California just to

5          apply as much trial pressure as we

6          could.  That continued up until

7          the time that you guys cut the

8          deal that you cut.  And so that

9          was kind of what we did with

10         respect to trials or what I did

11         with respect to trials.

12              If you have any questions,

13         I'll answer them.  Otherwise, I'll

14         pass it along.

15              MR. HERMAN:  I want to say I

16         frequented those trials.

17              MR. WATTS:  I know.

18              MR. HERMAN:  And I thought

19         they were extraordinarily well

20         tried.

21              MR. WATTS:  Thank you.

22              MR. HERMAN:  I have a

23         different view about trials than a

24         number of lawyers, and that is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

1          because everybody gets a dog filed

2          when you start off.  You get the

3          worst of the worst.  And sometimes

4          the defendants just have to know

5          that you may not win the case, but

6          you are going to bloody them in

7          the process.  So, I think it is

8          important -- lawyers that tell me

9          that they've never lost a case, I

10         have problems with that.  Like my

11         dad used to say, if you want to

12         get a $1 million verdict, just

13         mistry a $3 million case.

14              MR. WATTS:  I did that last

15         week.

16              MR. HERMAN:  I don't think

17         enough can be said about the

18         quality of the trial work.

19              MR. SEEGER:  I would like to

20         say something about that, too,

21         about Mike.  Because from the

22         minute we started working with

23         each other on Vioxx, he has really

24         been a team player.  In fact, I

Page 52

1          think I probably know you at some

2          level better than most people in

3          the group other than Drew.  The

4          first trial that I had, Humeston,

5          which didn't go well, and luckily

6          Mark helped us right that one, you

7          were one of the first people to

8          write a very encouraging and

9          supportive e-mail to me which I

10         have saved.  I wanted to thank you

11         for that at the time.  You really

12         are a team player, and the work

13         you did was fantastic.

14              MR. WATTS:  Thank you.

15              MR. HERMAN:  There are a

16         couple of other things I think I

17         can safely say, which is that post

18         Katrina, the jury venire changed.

19         For those of us that have tried a

20         lot of cases in that particular

21         federal courthouse, some of the

22         rulings on evidentiary matters and

23         in limine made it difficult for

24         plaintiffs.  Sometimes it happens

FAC Resp. Exhibit D -- 1160

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 53

1          to us.

2               From the overall

3          perspective, when you've got 60 or

4          70 defense firms, each one of them

5          being paid by a corporate

6          defendant to go to a particular

7          venue and try 30 trials, they have

8          an advantage over a plaintiff.

9          So, I don't think there should be

10         any regrets.  I don't think there

11         should be any diminution in the

12         work that was done in the trials

13         that you folks conducted.  I have

14         no reservations about this, as I

15         said, and I want to make that

16         clear on the record.

17              MR. BOUNDAS:  If anyone has

18         any questions, feel free to cut me

19         off.

20              For the record, John Boundas

21         here from Williams Kherkher Hart

22         Boundas.

23              A lot of people in this

24         room, I think, know our law firm

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 54

1       and the commitment and

2       determination that we show.

3           MR. HERMAN:  I apologize.  I

4       have one continuing family

5       emergency.  Let me step out for

6       just one minute.

7               -  -  -

8           (Whereupon, a recess was

9       taken from 9:57 until 10:09 a.m.)

10              -  -  -

11          MR. BOUNDAS: Anyway, for the

12      record, John Boundas, Williams

13      Kherkher.

14          A lot of the people in this

15      room know our firm and the level

16      of commitment and determination

17      that we show when we get involved

18      in a litigation.  I'm proud to say

19      that John Eddie, our managing

20      partner, has built a firm that a

21      defendant knows when we get

22      involved in a case that we're

23      going to commit whatever time,

24      whatever resources, talent, money,

FAC Resp. Exhibit D -- 1162

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 55

1          whatever it takes to see it

2          through to the end.  Ed Blizzard

3          was there with us when we tried, I

4          think, 12 separate jury trials in

5          fen-phen all over the United

6          States.

7               When we got involved in the

8          Vioxx litigation, our partners in

9          the VLC and we saw that this

10          litigation might break much the

11          same way, in that we may have to

12          do the same thing, take the same

13          approach and get ready, if

14          necessary, to try case after case

15          after case.  Merck was saying they

16          were going to try every case,

17          Mikal mentioned that, and we felt

18          like that's what they're saying,

19          that's what we're going to say.

20          We sort of took that approach.

21               We tried cases, we conducted

22          jury research.  We worked cases up

23          for trial.  We worked with and

24          developed a whole host of expert

FAC Resp. Exhibit D -- 1163

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 56

1          witnesses, some of which I will

2          talk to you about later.  We were

3          out there on the front lines.

4                As far as the quality of our

5          work, Russ, I appreciate what

6          you've said about us.  I think a

7          lot of you know, the lawyers in

8          this room, haven't gotten a chance

9          to work with Mikal and Steve and

10          Walter Umphrey and Grant and Drew.

11          I would put the quality of lawyers

12          in our group up against anyone.

13          And there were a lot of great

14          lawyers in this litigation and a

15          lot of lawyers whose work that we

16          used.  We used Mark Lanier's

17          depositions, and Andy helped us

18          tremendously.  So, this whole

19          litigation is to the credit of an

20          enormous number of people.  We're

21          not here saying we did it all, but

22          we are saying that we feel like we

23          were right there with everybody.

24                I want to talk a minute

FAC Resp. Exhibit D -- 1164

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 57

```
 1          about the MDL and some of the work
 2          that we did.  When cases needed to
 3          get put up for trial, we were
 4          there.  We were asked to put up
 5          some plaintiff pick cases, we did
 6          it, we put up two cases, they were
 7          good cases, and Merck struck them.
 8          And I think that speaks to the
 9          quality of the kind of cases that
10          we were able to bring to the
11          table.
12              When a defense pick case
13          needed to be tried, we were there.
14          And I kind of felt like Mikey and
15          those Life Cereal commercials.
16          Well, who wants to try the defense
17          pick?  And all of a sudden they
18          pointed at me and Kherkher and
19          Mikal.  We stepped up and tried
20          that case.  It's been talked about
21          a little bit, the snow shoveling
22          issue.  After we lost the case, my
23          mom sent me an e-mail.  She grew
24          up in Chicago.  What were you guys
```

FAC Resp. Exhibit D -- 1165

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 58

1          doing trying that case?  Everybody

2          knows when an old guy goes out to

3          shovel snow, he's going to have a

4          heart attack.  That's great.

5               On the DecisionQuest issue,

6          the shadow jury did award us $5

7          million, so, we're going to try

8          and recover some of that, spread

9          it around.  But, you know, that

10         was a tough case.  And I think we

11         did a good job in the case.

12         Obviously we wanted to win.  Mr.

13         Smith was a great guy, and I think

14         he had a good case.  But what I

15         think it showed Merck was that

16         this is going to be a tough

17         litigation if they want to go try

18         every case when they pick one and

19         it is going to be contested all

20         the way down to the wire.  That's

21         what I think that showed.

22               New Jersey, again, when

23         cases needed to be submitted for

24         trial, and the PSC and Chris and

FAC Resp. Exhibit D -- 1166

Page 59

```
 1        Dave Buchanan did a heck of a job

 2        up there, when they were asking,

 3        you guys need to submit cases, we

 4        were there.  We submitted, I

 5        think, 45 cases in New Jersey as

 6        wave I through III for trial.  At

 7        one point I think they only gave

 8        us 10 slots and we submitted 20.

 9        And so we submitted those cases.

10        We had 30 more cases literally

11        ready to go out the door for wave

12        IV, if necessary.

13            The way those cases got

14        submitted, I think Grant will

15        cover this a little bit, but we

16        had a team of lawyers, myself,

17        Grant, Amy, Steve, a bunch of

18        lawyers from our firm, nurses, to

19        go through all of those files, vet

20        the cases.  We would have long

21        meetings where we would go through

22        them and really tried to pick

23        cases that if Judge Higbee said,

24        hey, you guys are going to trial
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 60

```
 1        five times in March, that we'd

 2        have five cases to bring to the

 3        table.  So, we really made some

 4        efforts there.

 5            MR. HERMAN:  I'm going to

 6        interrupt you for one minute.  Did

 7        you submit any stroke cases?

 8            MR. BOUNDAS:  I don't think

 9        Judge Higbee ever got --

10            MR. HERMAN:  In the MDL?

11            MR. BOUNDAS:  We did not.

12        Is that right, Grant?

13            MR. RANIER:  We were working

14        on it, Russ, and that's actually a

15        note I have.

16            Brett might have been on

17        that.

18            MR. HERMAN:  I think you are

19        correct, in fact, I know you are,

20        that there were not a lot of firms

21        submitting cases in the MDL in MI.

22        We didn't have any on stroke.  But

23        your firm did step up, and the

24        cases were tried.
```

Page 61

 1          With regard to

 2     DecisionQuest, your mock jurors,

 3     your shadow jurors were easy to

 4     spot in the courtroom, including

 5     the guy in the second to last row

 6     reading the racing form.

 7          MR. WATTS:  He was our

 8     sinker.

 9          MR. HERMAN:  I say that

10     because I want to emphasize again

11     that everyone around this table

12     has different views of different

13     things, but I think there's no

14     question about the willingness to

15     work up cases, to submit cases and

16     to try cases by the Vioxx

17     Litigation Consortium.

18          What I personally would like

19     to hear and what we're trying to

20     do is to make a record that's

21     fair, and particularly fair to

22     you, to give you the opportunity,

23     is to talk more about

24     contributions beyond the trial

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 62

1          work because we know that.

2          Anybody that disputes that is

3          going to get a big argument from

4          me.  The other contributions that

5          you made, I think, are significant

6          enough that you ought to talk

7          about them or someone ought to

8          talk about them.

9               MR. BOUNDAS:  I've got some

10         of that.  I'm only going to be a

11         few minutes, but I do have some

12         other issues to cover.

13              For example, on, not just

14         the trial work, but in New Jersey,

15         we were working those cases up, we

16         were getting experts, depositions

17         were being taken.  Those cases in

18         the pipeline were being worked.

19              MR. BLIZZARD:  John, let me

20         ask you.  How many of them were

21         being worked up for trial where

22         you actually presented people for

23         depo?

24              MR. BOUNDAS:  I think we

FAC Resp. Exhibit D -- 1170

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 63

1          presented at least four plaintiffs

2          for depo, maybe more.

3              MR. KHERKHER:  Two of them

4          got shut down for various reasons,

5          but we were always there.  I mean,

6          Dave Buchanan was my new best

7          friend, and he told me exactly

8          what to say.  I mean, I feel

9          awkward trying to build ourselves

10         up when I look across the table

11         and I did it because of you guys.

12         I mean, I wasn't able to get in

13         the door if it wasn't for Dave

14         Buchanan.  He whispered in my ear

15         and told us what to say.  The only

16         compliment I got -- I mean,

17         granted, here I am learning how to

18         try a Vioxx case, and I saw Mark

19         Lanier try it and Chris Seeger try

20         it, but Judge Higbee, the best

21         compliment she ever gave me was,

22         you are the first one to raise

23         your hand that you want to try a

24         case.  We were going to try the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 64

```
 1          Georgia cases, and we were going
 2          to try the New York cases, the
 3          Pennsylvania cases, and Sol Weiss
 4          got in, and we tried to work with
 5          everybody.  But when Russ says,
 6          what did y'all contribute, we were
 7          part of the team.  I mean, we were
 8          ready to push this entire
 9          litigation with the help of you
10          guys and get to the end result.
11          So, that's what we were doing.
12               MR. SEEGER:  I have to tell
13          you, Steve, on the trial front, I
14          think we are all in agreement when
15          I look at you and John and Mike, I
16          mean, we know who were the guys,
17          the trial lawyers in the trenches
18          every single time saying, coach,
19          put me in the game, put me in the
20          game.  You guys were there.
21          Nobody can dispute that.
22               MR. KHERKHER:  But as far as
23          the intangible contributions,
24          that's part of it.  What more can
```

Page 65

1          I say other than, what gets us to

2          the end result is these trial

3          settings, knowing that -- when I

4          was at the University of Houston,

5          I wasn't good enough to play

6          football, but I was a ball boy.  I

7          was a water boy.  My claim to fame

8          is Lionel Wilson, the quarterback,

9          busted his helmet, and I fixed his

10          helmet.  He only missed one play,

11          he got back in the game, and he

12          scored the touchdown.  Did I score

13          the touchdown?  No.  But I was

14          part of the team.

15               MR. LANIER:  I always

16          thought you scored that, Kherkher.

17          That's not the way Susan told us

18          the story.

19               MR. LEVIN:  You are lucky it

20          was his head and not your head.

21               MR. KHERKHER:  Now, granted,

22          I wish I was on your side of the

23          table, but we're all part of the

24          team.  You guys are the owner,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 66

```
 1          general manager and quarterback,

 2          and maybe we're not the water

 3          boys, maybe we're just the

 4          superstar running backs that

 5          helped the whole team get to where

 6          we needed to be.  I mean, whether

 7          it is off in our building which

 8          was in Houston, Texas when we had

 9          meetings for the consortium and

10          other plaintiff lawyers, but I

11          still feel awkward because we

12          could not get here -- I mean, Andy

13          Birchfield, I didn't even know

14          him, he's giving me his cell

15          number so I can call him so he can

16          feed me information.

17               MR. BLIZZARD:  That was a

18          mistake.

19               MR. KHERKHER:  It helped me,

20          Russ, to provide you information

21          on -- other than trial settings,

22          what we helped this great team to

23          get to where you need to be

24          because I'm missing it other than
```

FAC Resp. Exhibit D -- 1174

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 67

1           just --

2                MR. HERMAN:  Well, there's

3           no question that preparing for

4           trial, getting the experts, doing

5           the mock juries, putting the cases

6           up is extraordinarily significant.

7           But fortunately in this room,

8           there's not a lawyer here that

9           doesn't try cases and hasn't been

10          through the wars.  We understand

11          completely the significance of

12          that and the gravity of it.  I

13          think there are other

14          contributions that you made

15          outside of that, and that's what

16          I'm trying to get at.

17               MR. BOUNDAS:  I've got some

18          of that.  Let me give you an

19          example.  At our firm, we had 12

20          attorneys commit time to Vioxx.

21          Some of them took expert depos,

22          presented plaintiffs, worked cases

23          up.  But Collyn Peddie, she's got

24          25 years of experience as an

FAC Resp. Exhibit D -- 1175

Page 68

1          appellate lawyer.  Anybody --

2                    MR. HERMAN:  Let me try and

3          help you out.  Y'all did send

4          expert depositions and reports to

5          the depository?

6                    MR. BOUNDAS:  Right.

7                    MR. HERMAN:  Now, that's a

8          contribution, okay, of common

9          benefit because other lawyers get

10         the advantage of that work

11         product.  That's the type of thing

12         that I'm asking you about and I'm

13         trying to --

14                    MR. BOUNDAS:  I'm getting to

15         it.

16                    MR. BIRCHFIELD:  Let me say

17         this to you because, please, don't

18         mishear what we're saying because

19         we know the tremendous value that

20         comes from trying cases, working

21         cases up and moving the docket.

22         So, we're not diminishing that at

23         all.  I think all Russ is saying

24         is that we've got that.  We've

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 69

1          heard you on that.  We've heard

2          you, but not only that, we knew.

3          I think Mikal's point is an

4          excellent one, and Mikal is

5          fearless, and he will try any

6          case, and they know it.

7               What John was saying on the

8          snow shoveling case, Merck

9          couldn't turn around -- they knew

10         there were some lawyers that could

11         set their case and they'd get a

12         dismissal and they could come to

13         the status conference and they

14         could report.  This is another

15         case that was set for trial and

16         dismissed by the plaintiff's

17         lawyer.  That did not happen.

18         That did not happen with you and

19         your group.

20              And so we know the value of

21         trying cases, the value of saying,

22         put me in, coach, we're here,

23         we've got cases ready to try,

24         working those up.  We're not

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 70

 1          diminishing that in any respect.

 2          What we're saying is that we've

 3          got that.

 4              MR. HERMAN:  Let me put it a

 5          different way.  There are

 6          carnivorites and vegetarians.  And

 7          the carnivorites like blood meat.

 8          They want to try cases, and they

 9          know how to do it.  We understand

10          how important that is.  You made

11          other contributions you should

12          talk about.  You've got a lot of

13          time to talk about it.

14              MR. WEITZ:  Let me highlight

15          a little bit about what Steve said

16          and what Andy said.  You have to

17          understand that a lot of us on the

18          committee went through what you

19          guys went through in the beginning

20          of your presentation, sifted

21          through thousands and thousands of

22          cases, put in an enormous

23          financial contribution into this,

24          had dozens of lawyers and

FAC Resp. Exhibit D -- 1178

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 71

```
 1          paralegals working on this.  So,

 2          we know not only the hard costs,

 3          but the soft costs and the

 4          dedication that the Texas group

 5          put into it.  So, a lot of that or

 6          all of that does not go on deaf

 7          ears.  We get it, and we know the

 8          contribution that makes towards

 9          moving the litigation, and that's

10          what we're focused on.  It is not

11          just the hours, it is the quality

12          of work, it is a lot of the things

13          that Andy said about moving the

14          cases and having the ability and

15          the resources to do that.  So,

16          Andy is right.  We get that.

17              What we need a little bit

18          from you also is when you talk

19          about New Jersey and Judge Higbee

20          and the waves, I mean, Chris and I

21          were there, and we had most of the

22          cases on that docket.  We need to

23          know specifically cases that had

24          work done on them, not just put in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 72

1          a tranche, but actually tell us,

2          okay, this was done, there were

3          Daubert motions that were done,

4          the experts were proffered, there

5          were motions in limine.  What

6          stage did you get?  Because we

7          know that you guys were ready to

8          move cases, but did they actually

9          get to a certain stage?  So, see

10         if you can focus on that.

11             MR. BOUNDAS:  This is all on

12         the page here.

13             MR. SEEGER:  Just hand in

14         your paper.

15             MR. BOUNDAS:  I'll answer

16         your question.

17             MR. HERMAN:  You had better

18         do it before I get another call.

19             MR. BOUNDAS:  We had the

20         Romans and Sanderson cases in New

21         Jersey.  They were the next cases

22         up for trial, and they were set I

23         think originally October, then I

24         think it occurred to me that Judge

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 73

1          Higbee must have known something.

2          She moved them up.  We worked

3          those cases up, we got experts.

4          I'm going to tell you about a

5          couple of the new experts that we

6          were going to bring to New Jersey

7          that we were going to offer and

8          actually offered our marketing

9          expert for common use.  But on

10         Romans and Sanderson, we worked

11         the cases up, we presented the

12         plaintiffs, we did the discovery.

13         We were literally spending months

14         getting ready for that trial.

15              And to give you one example,

16         we got Dr. Martin Wells, who is a

17         biostatistician from Cornell.  We

18         got him all the raw data from

19         Merck's clinical trials, the raw

20         stuff, the SAS files, all of that

21         stuff, and he went through that

22         data and was able to show some

23         very interesting things.  One was

24         that the signal shows up far

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 74

1           earlier in Merck's data than you

2           can ever imagine when you actually

3           analyze it the way they were

4           supposed to do it at the outset.

5                The second thing is what

6           Mikal mentioned, was that we saw

7           that risk factors were going to be

8           the dominant defense here.  So,

9           what Dr. Wells did was look at,

10          well, can we take Merck's data and

11          use it against them on the risk

12          factor issue.  And he came up with

13          a report showing that we can take

14          their own clinical trial data and

15          demonstrate that Vioxx is more

16          dangerous than all of these other

17          risk factors.  And so we were

18          going to present that in a graphic

19          way to show the jury that, look,

20          we're just using their data,

21          here's how the risk factors line

22          up and here's where Vioxx stacks

23          up.  We thought that was a big

24          piece.

FAC Resp. Exhibit D -- 1182

Page 75

1            MR. LANIER:  Can I interrupt

2        and ask a question, please?

3            MR. BOUNDAS:  Sure.

4            MR. LANIER:  Two questions

5        on that point.

6            First, do you know if your

7        materials and the experts and the

8        Cornell fellow, for example, have

9        y'all given that material to the

10       MDL to put into the trial package?

11           MR. BOUNDAS:  Grant, I think

12       that was turned in.

13           MR. KAISER:  I'll have to

14       check.

15           MR. BOUNDAS:  I've got a

16       copy of the report.  I assume it

17       was turned in.  The thing you need

18       to know is that that report was

19       completed and filed -- or not

20       filed, I don't remember, it was

21       like a week before the settlement

22       was announced, so, I'm not sure

23       how it fell into that mix.

24           MR. HERMAN:  Can you check

Page 76

1        on that?

2               MR. RANIER:  Mark, you are

3        right.  It needs to be there.

4               MR. LANIER:  Right.  You

5        don't want on the record an

6        argument that that doesn't really

7        contribute to the common benefit

8        because it was done a week before

9        the settlement was announced, but

10       if you get it into the trial

11       package, then arguably it is

12       something that's out there now for

13       the people who maybe didn't take

14       the settlement.

15               MR. LEVIN: It's also our

16       obligation and --

17               MR. BOUNDAS:  You've got it,

18       and that's available.  So, I think

19       it has a double benefit.  One was

20       we were getting ready to try these

21       cases with some new stuff for

22       Merck, and we were working on

23       that.

24               MR. BIRCHFIELD:  John, on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 77

```
 1          the trial package point, because

 2          this is a significant fact, and

 3          I'm almost certain that

 4          Mikal's cross-examination of the

 5          corporate rep, I'm sure that was

 6          submitted for the trial package.

 7          Mikal took advantage of some

 8          favorable Illinois law on a

 9          corporate rep there and laid the

10          foundation for a tremendous number

11          of documents.  That's part of the

12          trial package.  That's the kind of

13          thing we're talking about.

14               MR. HERMAN:  Because it's

15          important.  The way that we

16          justify in this case common

17          benefit, because it's not a class

18          action, it's not a class action

19          settlement, it's a contractual

20          thing, is by saying, okay, for you

21          folks that didn't want to put your

22          cases in, you can't complain about

23          this settlement.  And the reason

24          you can't complain is here's a
```

FAC Resp. Exhibit D -- 1185

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 78

1          trial package on MI, here's a

2          trial package on stroke, go try

3          your cases.

4               I know we've all been in

5          cases where people talk about

6          trial packages and you would take

7          that package and just throw it in

8          a trash can.  I know what folks

9          spent preparing and getting these

10         cases to trial.  Most of them cost

11         between a half a million and a

12         million and a half bucks.  The

13         trial package enables folks to try

14         cases for less than $200,000.

15              Getting that report into the

16         trial package now has value.  No

17         one can say it comes late because

18         there's still people out there

19         that say they are going to try

20         cases.  And we say, okay, here,

21         take it.  So, what you have to say

22         is very important, and it

23         shouldn't be --

24              MR. BOUNDAS:  I think also

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 79

1        as a side point, Grant Kaiser's

2        affidavit that we have submitted

3        has a large amount of materials

4        that we did submit to the trial

5        package.  I think Grant will cover

6        that.  I just can't tell you right

7        now if that report is in.

8             Another report that we did

9        is we spent a lot of time

10       realizing that putting together

11       the marketing case in a really

12       coherent way for a jury, Ed did

13       this in his trial with Dr.

14       Pechmann, struck us as a good

15       idea.  We went out and worked with

16       Dr. Marvin Goldberg at Penn State

17       who put together a really first

18       rate comprehensive report going

19       through Merck's entire marketing

20       plan and really explaining how

21       calculated, devious, the kind of

22       message they were trying to get

23       across.  So, that was something

24       else that we had brought to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 80

```
 1        table.  And actually at one of the

 2        hearings, I offered to the New

 3        Jersey group that we would make

 4        that available for common use.

 5        Again, the case settles within a

 6        week of that designation date.

 7        So, the same issue, and I hear

 8        you, that we may need to get that

 9        out there.

10             So, on those cases, those

11        weren't just cases we threw in the

12        trial pool.  So, I also have to

13        add we were working with a lawyer

14        named Forest Horn at Martin &

15        Jones.  Forest was our co-counsel,

16        and I think you guys are meeting

17        with him.  He certainly

18        contributed.  So, not just putting

19        cases in the hopper, but we were

20        getting ready for the next trial.

21        Then there were trials after that

22        we were getting ready for.

23             Some other contributions.  I

24        mentioned our firm committed 12
```

Page 81

1          lawyers at various stages.  We

2          submitted affidavits.  I'm not

3          going to rehash all that.

4               But to give you one example,

5          Collyn Peddie is a very

6          experienced appellate attorney,

7          very well known across the country

8          at this point for her work on

9          preemption issues --

10               MR. LEVIN:  She's been

11          terrific.

12               MR. BOUNDAS:  She's an

13          excellent lawyer.  And the Texas

14          MDL, we didn't file a lot of cases

15          there, but we saw in the Ledbetter

16          case that things were going south,

17          and that could hurt everybody.

18          And John Eddie stepped up to the

19          plate with Collyn's agreement and

20          said, hey, Collyn, will you go in

21          there and take that case on.  And

22          she took it on kind of late in the

23          game, she filed a motion for a new

24          trial, handled the entire appeal,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 82

1        which, you know, fortunately now

2        is dismissed due to the settlement

3        presence.  That wasn't our case.

4        We don't have a fee interest in

5        that case and never did.  Collyn

6        spent, I think, over 1,200 hours

7        on that case, arguing it, briefing

8        it, fighting it, all for the

9        common good.  I think we had 14

10       cases in Texas.  So, it certainly

11       helped our clients, but helped a

12       lot of other people.

13            Collyn also came to the MDL,

14       filed motions and numerous

15       responses to Daubert motions that

16       I'm sure are in the trial package,

17       they are excellent work product,

18       and I'm happy to say in that case

19       I don't recall a significant

20       evidentiary ruling that we lost.

21       Actually, we got Judge Fallon to

22       turn around on a couple of

23       important issues, one of which was

24       Dr. Graham's analysis of how many

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 83

1          people had been killed or had

2          heart attacks as a result of

3          taking Vioxx across the country.

4          As I understand, Judge Fallon had

5          not let that in before.  We got

6          that evidence in in that case.  I

7          think that was a benefit.  A lot

8          of people deserve the credit for

9          that.

10              Collyn did a lot of work

11          there.  I think in all, she spent

12          17, 1,800 hours on common benefit,

13          briefing, researching, doing a lot

14          of hard work with a person who's

15          extremely talented.  That's

16          another --

17              I'll leave it at this point

18          to let Amy cover her contribution.

19              MR. SEEGER:  John, if I can

20          ask you a question before you wrap

21          up.  If it's in there, it is easy,

22          but in your affidavit, actually,

23          it's the group because you have

24          multiple law firms, do they

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 84

1          outline contributions in terms of

2          legal briefing, discovery

3          contributions, things you did sort

4          of that go, like I say, beyond the

5          obvious stuff that we know, the

6          background stuff.  Amy, are you

7          going to be getting into this?

8               MR. BOUNDAS:  Yes.  For

9          example, we had two lawyers who

10         put on the mock trial.  That will

11         be in there.  We had a number

12         of -- like Jim Doyle and some

13         other lawyers took depos of Merck

14         expert witnesses, and that's going

15         to be in there.

16               MR. SEEGER:  Other than Drew

17         and his position on the PSC, were

18         there any members that had liaison

19         or positions on any committees?

20               MR. KAISER:  Yes.

21               MR. SEEGER:  That's in

22         there?

23               MR. KAISER:  My affidavit.

24               MR. RANIER:  It is in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 85

1           Mikal's affidavit, and I know it

2           is in Grant's.

3                MR. LANIER:  When you talked

4           about the way y'all were

5           coordinating through Drew and the

6           MDL, I was not an MDL lawyer, I

7           did my work --

8                MR. WATTS:  Short lived

9           liaison counsel.

10               MR. LANIER:  But I don't

11          have an intimate familiarity with

12          a lot of the MDL stuff.  I do have

13          intimate familiarity with a number

14          of other jurisdictions though.

15          And having tried three of these

16          cases, I have a decent grasp of

17          who the witnesses are.  When you

18          talk about the efforts y'all did

19          with your Cornell statistician,

20          one of the thoughts that occurs to

21          me is, did y'all integrate with

22          Drew to see whether or not you

23          were running a duplicate tract of

24          what was being done, or was this

FAC Resp. Exhibit D -- 1193

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 86

```
 1          being done at the behest of the

 2          MDL, or was this being done

 3          independently and now looking to

 4          merge into it?  Can you give me a

 5          feel for how that was done?

 6               MR. BOUNDAS:  To give you an

 7          overall point, I flew around the

 8          country and met with experts in

 9          probably five or six different

10          states.  We had people -- we had

11          all kinds of expert work going on

12          that was not, hey, guys, go out

13          and get experts because we were

14          figuring we're going to have to

15          have to try cases.  We're going to

16          need five cardiologists and not

17          one.  We're going to need

18          epidemiologists.  A lot of that

19          was at the behest of the MDL.

20          I'll let Drew answer on Dr. Wells

21          specifically.  All I know is we

22          went out there and did it.

23               MR. BIRCHFIELD:  What about

24          in New Jersey?  I know you were
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 87

1          working with Dave.  Was Marty

2          Wells, was Dave aware --

3               MR. POWERS:  Dave got us the

4          data.

5               MR. RANIER:  The way that

6          started was I called Dave Buchanan

7          and said, Dave, we would like to

8          take a look at the raw data.

9          Because everybody had seen the

10          runs, everybody knew that they

11          diluted the Konstam -- they

12          diluted the Konstam meta-analysis

13          with Alzheimer studies, and they

14          would get crossed on that.  But

15          nobody had ever gotten the actual

16          data itself under the --

17               MR. LANIER:  Actually,

18          Madigan did --

19               MR. SEEGER:  That's not

20          true.  I have to correct you on

21          that one.  Because we got in

22          electronic native format all of

23          the SAS files and all of the

24          backup.  I have to check with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 88

1          Dave.  It could be that you may

2          not have had it in your hands and

3          you needed it for your guy.  But

4          you've got to remember that

5          Kronmal, who was a biostatistician

6          from University of Washington, had

7          gone through all of that, and then

8          Madigan came along --

9               MR. LANIER:  Madigan came in

10          and did the same thing.

11               MR. SEEGER:  -- and looked

12          at it in a little bit different

13          light.  Your guy was doing the

14          same thing.  I'm not diminishing

15          the idea, but I just want to be

16          clear on the record what was

17          available and what was not.

18               MR. WEITZ:  But it was done

19          in Jersey.

20               MR. BOUNDAS:  Some of it was

21          those experts weren't available

22          for that particular trial, and we

23          knew -- Kronmal is a good example.

24               MR. SEEGER:  We were trying

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 89

1              to build a bullpen.

2                    MR. LANIER:  I know a good

3              example is y'all had asked me

4              about using Krumholz, and Krumholz

5              would not agree to helping y'all

6              out, so y'all needed someone

7              extra.  Krumholz, for example, had

8              used that same data in our third

9              trial to say the signal was there

10             in 2000.

11                   MR. BOUNDAS:  I think I read

12             his transcript.

13                   MR. RANIER:  Did he do the

14             risk factor data?  Did he break

15             out diabetes, high blood pressure,

16             and all of that like Wells did?

17                   MR. SEEGER:  That was done.

18                   MR. LANIER:  Yes.

19                   MR. WEITZ:  Walter?

20                   MR. UMPHREY:  I think one of

21             the main issues on common benefit

22             that we contributed was the

23             ethical issue.  When you folks

24             negotiated a settlement, I know

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 90

```
 1          that we were at a difference of
 2          opinion, and we were not in a
 3          position to recommend that to any
 4          of our clients, and we wouldn't
 5          have done it.  Mr. Williams took
 6          the lead in this issue and Drew
 7          and worked it out satisfactorily
 8          where we felt under the Texas
 9          ethical rules we were okay.  I
10          think by doing that, we saved a
11          lot of problems for a lot of other
12          lawyers.
13               MR. LANIER:  And probably
14          helped a lot of other Texas
15          lawyers sign on even that had
16          cases in New Jersey, because I
17          would be bound by Texas rules in
18          New Jersey.  That was a big help.
19               MR. UMPHREY:  They never
20          would have had the numbers for the
21          settlement if not for our efforts
22          in that regard.
23               MR. SEEGER:  I guess I want
24          to be clear because we're taking
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 91

1        this down, and Walter, I have

2        nothing but the highest respect

3        for you, your firm, everybody.  I

4        think what we ultimately wound up

5        doing is getting a clarification

6        about what the language meant.

7        That was very helpful to you.  But

8        I can tell you from the very

9        moment it was negotiated and the

10       intention of the committee, we

11       very much had Texas as the big

12       concern because we know that

13       that's a very difficult state.  I

14       think that John Eddie was a little

15       uncomfortable with the way some of

16       the verbiage was, and we clarified

17       some things.  I want to just make

18       that clear for the record.

19            MR. UMPHREY:  I also think

20       this group contributed heavily by

21       cooperating with your group.  We

22       did that in the very beginning.

23       Nothing was ever withheld from you

24       or we didn't make full disclosure,

FAC Resp. Exhibit D -- 1199

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 92

1          full cooperation.  Whatever it may

2          be, we were there.  And I think we

3          should be given a plus mark for

4          that.

5                MR. BIRCHFIELD:  I agree 100

6          percent on that, Walter, and that

7          was really the purpose of this

8          series of questions about, was

9          this coordinated through New

10         Jersey.  I mean, we all know that

11         there are lawyers out there that

12         have basically taken their cases

13         and done their own thing and run

14         their own show and kept it all to

15         themselves.  That plays different

16         in a common benefit setting than

17         someone who is coordinating and

18         communicating with the other

19         jurisdictions.  That was the

20         purpose of those questions.

21               MR. BLIZZARD:  Let me say

22         something, too, because I think

23         this will be helpful.

24               MR. UMPHREY:  I have always

FAC Resp. Exhibit D -- 1200

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 93

1          found over the years that when you

2          take good lawyers like those that

3          surround us at this table, when it

4          comes to fee division, good

5          lawyers are fair.  They recognize

6          the work of other lawyers and what

7          it contributed, and they are

8          willing to reward their friends

9          and their associates in the

10         economic aspect of it.

11              MR. SEEGER:  I agree with

12         that personally.

13              MR. BLIZZARD:  I just want

14         to say when we were getting ready

15         for Mason, our trial, right after

16         you guys had tried Smith, not only

17         did Mikal send me everything that

18         he had, but Steve and John and Amy

19         came and sat down with our team

20         and debriefed us on what had

21         happened, what witnesses worked,

22         what didn't work, what might be

23         helpful in the next trial.  That's

24         the way that teams approach

FAC Resp. Exhibit D -- 1201

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 94

1          things.  You guys didn't have to

2          do that.  We had worked closely in

3          the past, obviously, on fen-phen.

4          We knew each other.  But it wasn't

5          just that.  I mean, it is the kind

6          of thing that John mentioned, John

7          Eddie threw Collyn into the mix on

8          preemption.  We know how important

9          that was in Texas, but not only in

10          Texas, but nationally that

11          preemption issue was hanging over

12          our heads even after we settled

13          this case.  There was a period of

14          time that we sometimes forget

15          about where they could walk away

16          from the deal and leave 4.8

17          billion dollars, 85, don't want to

18          forget that 5.

19               MR. HERMAN:  Please don't.

20               MR. BLIZZARD:  A lot of

21          people in this room stepped up and

22          made not only commitments of work

23          and effort to try to fight the

24          preemption issue, but put money on

FAC Resp. Exhibit D -- 1202

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 95

 1          the table to help fight that

 2          issue.  I think that the group

 3          here, as well as people on the

 4          committee itself, made, again, a

 5          team response to that threat.  I

 6          think that is a contribution that

 7          was made throughout this.  All of

 8          you guys said we're in this

 9          together.

10              MR. BOUNDAS:  I think in the

11          New Jersey litigation, there was a

12          high level of coordination.  It

13          wasn't just our case.  We had

14          Romans and Sanderson set.  I know

15          that Sol had a case set.  There

16          were probably two or three others.

17          Mark Lanier had one.  The idea

18          was, we're going to try all of

19          these cases at the same time,

20          we're going to share resources if

21          we have to have experts shuttle

22          from one courtroom to the other,

23          work on depo cuts together.  Steve

24          did a lot to coordinate that.  The

Page 96

```
 1        idea there was we're going to try

 2        these four cases, and then Judge

 3        Higbee said we're going to set

 4        some in March, April or June if

 5        this doesn't settle.  That was

 6        really, I think, a team effort.

 7             MR. KHERKHER:  We had three

 8        meetings at Sol Weiss'

 9        Philadelphia office that I

10        coordinated with the help of Dave

11        Buchanan, of course.  Again, I

12        feel every time I say something

13        great we did, I did it with the

14        help of you guys also.  But we

15        were a great team.  You are right,

16        Ed.  We were a great team.

17             MR. HERMAN:  I want to get

18        back to the ethics thing that

19        Walter mentioned.  This isn't our

20        opportunity to pat ourselves on

21        the back, but I think you should

22        know that Ed Blizzard during the

23        negotiation made everyone on the

24        negotiating committee aware of the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 97

1          Texas rules, and I think we had

2          three ethics experts before

3          anything was put on paper.  Ed was

4          extraordinarily conscientious, and

5          it did help.  We had a meeting --

6          I don't even remember where we had

7          a meeting.  We had a meeting where

8          you brought in, I think, Harry

9          Potter.

10              MR. KAISER:  In Atlanta.

11              MR. LANIER:  You were

12          excited when you heard Harry

13          Potter was coming.

14              MR. HERMAN:  Yes, I was.  I

15          looked for the little mark on his

16          head.

17              But you brought in a couple

18          of folks and, Walt, I thought that

19          meeting was extremely productive.

20          I think it is important to know

21          that without resolving the special

22          ethics agitation that comes from

23          Texas rulings in light of trial

24          practice, it not only solved it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 98

```
 1          for Texas, but it had an impact in

 2          other jurisdictions as well.

 3          Because there were lawyers that

 4          really were looking to the Texas

 5          lawyers who were tag-alongs.  They

 6          don't do very much, but when they

 7          see some group of excellent

 8          lawyers come up with an issue,

 9          they immediately want to jump on

10          it.  And the fact that it was

11          resolved to the satisfaction of

12          your group had an impact beyond

13          Texas.  So, I'm glad you brought

14          that up.  I don't think we would

15          have recalled that contribution,

16          actually, and I think it was

17          significant.

18               I have some other

19          questions -- go ahead.  It is your

20          turn.

21               MS. CARTER:  I think it is

22          my turn.

23               You asked earlier, Russ,

24          what we sent in as far as expert
```

FAC Resp. Exhibit D -- 1206

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 99

1          reports and depositions and that

2          sort of thing to the MDL package.

3          Essentially John Eddie sent me in.

4          I was first involved in Smith, and

5          I did all of the deposition cuts

6          and all of that behind the scenes

7          stuff that everyone hates to do

8          but takes up a lot of time.  There

9          were many 4:00 morning meetings

10         with Carrie Jablonski where she

11         said, well, we have already done

12         this before and this is not how we

13         did it, and the Court has already

14         said off the record that this is

15         how he wants things done.  Sorting

16         all of that out during the Smith

17         trial took a lot of time and

18         aggravation.

19              And at the end of the trial

20         when the Court was looking toward

21         Mason, he said that he would like

22         to see some continuity in the

23         plaintiff's side of the process

24         because that was such a difficult

Page 100

1          aspect of getting the depositions

2          and the exhibits and everything

3          else done.  So, John Eddie

4          essentially sent me into the MDL

5          trial package because I was the

6          person who had done all of that.

7          So, I volunteered my time for the

8          Mason case.  We did not have a fee

9          interest in that case.  And I

10         again did all of the deposition

11         cuts and the exhibits and all of

12         those negotiations with Carrie

13         Jablonski at 3:00 in the morning

14         for the Mason trial, which I think

15         added a lot of continuity to the

16         second trial and helped with a lot

17         of headaches.

18              My other contribution was a

19         lot of time spent in New Jersey

20         getting ready for those last

21         trials.

22              The North Carolina cases

23         were the cases we were going to

24         try a week before, and I spent

FAC Resp. Exhibit D -- 1208

Page 101

```
 1          weeks in North Carolina

 2          interviewing fact witnesses and

 3          figuring out proof and all of

 4          those details that go into making

 5          a good case factually.  That's how

 6          I ended my days on Vioxx,

 7          basically in North Carolina.

 8               MR. HERMAN:  Who was going

 9          to try that case?

10               MR. KHERKHER:  I was.

11               MS. CARTER:  Steve and John.

12               MR. KHERKHER:  And Forest.

13          Those were actually Forest Horn's

14          cases, and he asked us to help him

15          try the cases.

16               MR. HERMAN:  MIs?

17               MR. KHERKHER:  Yes, both of

18          them.

19               We actually had some cases

20          in Georgia that we were going to

21          try, and then we had a telephone

22          conference, and Paul Hanley out of

23          New York wanted to try those

24          cases.  We were going to work with
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 102

```
 1          Paul, but I forgot who his
 2          colleague was, they didn't want
 3          too many chefs, so we stepped
 4          aside.  That's when Judge Higbee
 5          said, Kherkher, you are the first
 6          one to raise your hand.  So, we
 7          were going to try any case,
 8          whether it was New York.  We were
 9          going to work together even if it
10          wasn't our plaintiff under our
11          contract, we were either going to
12          try the Pennsylvania cases, the
13          New York cases.  I think there
14          were New Jersey and then Georgia
15          and them North Carolina, and we
16          got the North Carolina cases.
17               MR. BIRCHFIELD:  Mikal, do
18          you have --
19               MR. WATTS:  I was going to
20          bring up something.  You asked
21          about the work that Wells did.  My
22          recollection of that in terms of
23          working with the MDL, and I think
24          Andy and I talked about this, I'm
```

FAC Resp. Exhibit D -- 1210

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 103

1          a big fan of Moye.  I thought he

2          won our case on Rezulin.  But I

3          thought the cross about his report

4          that it screwed up and mentioning

5          the other drug was just

6          devastating.  And I told everybody

7          to listen.  I think that was kind

8          of the origin for -- and it is not

9          that we had contacted anybody in

10          terms of the necessity of getting

11          it done.  And that's when we

12          started contacting you about your

13          guy that wasn't available and

14          said, we've just got to do it.

15          So, I think it sprang from a

16          problem that came up, you know,

17          and I just thought that cross was

18          unsustainable to keep eating that

19          with your chief epi guy.

20               MR. UMPHREY:  Russ, let me

21          mention one other point that you

22          may want to consider for common

23          benefit.  It is not a subject that

24          I like to talk about, but it is

FAC Resp. Exhibit D -- 1211

Page 104

1      advertising.

2            That 4.7 million number, 3.7

3      million of that was spent on

4      advertising.  Now, you ask how

5      could that be a common benefit?

6      People have a right to know and be

7      informed if they have been exposed

8      to a certain product and they have

9      certain problems.  The average

10     person is not aware of that unless

11     they are educated and they have

12     responsible lawyers that can tell

13     them whether they have a case of

14     whether they don't.

15            MR. HERMAN:  Walter, I lost

16     that fight years ago.

17            MR. UMPHREY:  Let me finish

18     what I'm saying.

19            MR. HERMAN:  Let me say

20     something to you.  Judge Fallon in

21     every case that I know of that

22     he's handled, as well as the other

23     judges in the Houston District,

24     consider the number of cases that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 105

```
 1          you bring to the table as an

 2          important ingredient.  It really

 3          doesn't make any difference to me,

 4          frankly, whether you advertise

 5          them, whether you've got your

 6          referral sources sending you

 7          letters.  You are the lead lawyers

 8          in the case, you bring them to the

 9          table, that's got --

10                  MR. UMPHREY:  You asked for

11          common benefit, and the common

12          benefit is we brought 1,000 cases

13          that are makeable, triable cases

14          to the table for consideration by

15          Merck on the settlement.  That's a

16          common benefit.  Those thousand

17          were screened very heavily, and

18          they were gotten through the

19          advertising process.  The other

20          thousand came from referrals from

21          other lawyers.  But for the

22          thousand people that will get a

23          benefit out of this, it certainly

24          is a benefit that should
```

FAC Resp. Exhibit D -- 1213

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 106

 1          contribute to your consideration

 2          on the common benefit fund.  We

 3          don't expect to get our money

 4          back.  We're not asking for that.

 5          We just ask you that we be

 6          considered for those thousand

 7          meritorious cases that we did get

 8          through the advertising.

 9              MR. HERMAN:  There are very

10          few trial lawyers of your stature

11          in this country.  Unfortunately,

12          most of them have passed on.  I

13          have great respect for you.  I

14          don't believe that it makes -- in

15          my consideration, and I'm going to

16          level with you, I don't think the

17          fact that you advertise for cases

18          or you didn't means anything.

19          People that advertise for cases

20          have business plans.  They

21          consider how many cases they are

22          going to get in.  They vet them.

23          It all goes into the bottom line

24          of, are we going to be able to

FAC Resp. Exhibit D -- 1214

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 107

```
 1          handle these cases, how we're
 2          going the handle them.
 3              MR. BOUNDAS:  Well, Russ, I
 4          hope Judge Fallon would consider
 5          the fact that we spent a
 6          significant amount of money
 7          stirring up the pot, if you will,
 8          to help other folks, maybe even
 9          your clients, pick up the phone
10          and protect their legal rights.
11              MR. HERMAN:  I can assure
12          you he's going to read every word
13          of the transcript, and he
14          considers everything.  That's one
15          reason why it is transcribed and
16          we have affidavits.  But I always
17          like to be straight up so people
18          know where I'm coming from, and I
19          just consider advertising costs of
20          doing business whether you
21          advertise or not.  It's the same
22          cost that lawyers have when they
23          get themselves on seminar programs
24          that result in referrals.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 108

    1            MR. UMPHREY:  I'm not

    2       concerned about how it affects

    3       lawyers.  My point is that it is a

    4       common benefit to those folks that

    5       receive compensation that wouldn't

    6       have had it otherwise.  That's

    7       what I'm asking you to consider.

    8            MR. HERMAN:  I understand

    9       that, Walter, but I can't agree

   10       with that, I'm just telling you

   11       straight out.  Because you've got

   12       those people that you are serving,

   13       and this was really, with all due

   14       respect, Ralph Nader when he

   15       started this idea of lawyer

   16       advertising, and I think that

   17       Chief Justice Burger is the only

   18       one at the Senate in those

   19       original decisions, is that you

   20       help those people, and that's what

   21       we're supposed to do as plaintiff

   22       lawyers.  And those people pay for

   23       the help that you give them.  So,

   24       you get good cases in whether they

FAC Resp. Exhibit D -- 1216

Page 109

 1          are through referrals or

 2          advertising or reputation.

 3          However you get those cases in,

 4          from my perspective, is not a

 5          factor I consider.

 6               What I do consider is the

 7          fact that you have 2,000 cases

 8          that you bring to the table,

 9          however you got them --

10               MR. KHERKHER:  Well, Russ,

11          that's where we respectfully

12          disagree.  One of the most sacred

13          things we have is due process, as

14          you know.  I remember on a

15          Saturday morning you and I argued

16          with Judge Fallon on the

17          advertising.  And so what Walter

18          is saying is, this money we spent

19          is allowing all these folks that

20          don't have Internet that just do

21          drywall, Bubba doesn't do

22          Internet, he does drywall, we help

23          them help you come to the table.

24          So, let's just agree to disagree.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 110

1          I hear what you are saying.

2                    MR. SEEGER:  You are not

3          totally disagreeing.  I think what

4          Russ is saying, you got the cases,

5          you brought them here --

6                    MR. KHERKHER:  But there's

7          an intangible.  As you know, you

8          did your share of advertising, and

9          we all together woke up America to

10         protect their legal rights.

11                   MR. HERMAN:  I understand

12         that, and I'm trying to say to you

13         that not only will the judge, but

14         we consider the number of cases

15         you bring to the table, no matter

16         how you got them, is very

17         important in determining a common

18         benefit.

19                   MR. LANIER:  I think one of

20         the reasons this is getting a lot

21         of response maybe from the

22         committee is because there are a

23         lot of folks that did a whole lot

24         of advertising that no one has

FAC Resp. Exhibit D -- 1218

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 111

1          really been putting that into the

2          record until y'all.  I think that

3          just may be some of the reaction,

4          if that makes sense.

5               MR. BOUNDAS:  So, if anyone

6          has any more questions.

7               MR. GIRARDI:  How many cases

8          did you submit to the settlement,

9          the exact number?

10              MR. WEITZ:  How many cases

11         did you submit to the settlement?

12              MR. FURNISH:  We had 2,021.

13         We registered in all but 53.

14              MR. WEITZ:  Where were those

15         cases filed?  In what

16         jurisdiction?  What percentages?

17              MR. BOUNDAS:  We filed

18         around 800 cases in the MDL.  We

19         filed, I think, 763, I could be

20         wrong by a few, in New Jersey.

21         So, 1500 plus were filed, and I

22         think 600 cases were tolled.  And

23         then we also filed cases in Texas,

24         California, Illinois, I believe,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 112

1        Wisconsin.  We had cases all over

2        the country, again, as part of the

3        strategy to, if necessary, try

4        cases.

5              MR. WEITZ:  When you say

6        "all over the country," you mean

7        you filed them in district courts,

8        and then they got transferred to

9        state court?

10             MR. BOUNDAS:  No.  State

11       court.  For example, the Schwaller

12       case was actually tried in state

13       court in Illinois.

14             MR. KAISER:  And federal

15       district courts, too, so we could

16       make sure they would come back

17       there for trial so we wouldn't

18       clog up New Orleans.

19             MR. WEITZ:  Now, talk to us

20       about some of the cases that might

21       have been trial ready in any of

22       the other jurisdictions.

23             MR. BOUNDAS:  I think Darren

24       Brown from Provost Umphrey could

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 113

1          speak about our California cases.

2                 MR. BROWN:  Set for trial in

3          November, we had the Feldman case,

4          which we had submitted to the

5          trial docket as a plaintiff pick.

6          It was a 69-year-old, one of the

7          older plaintiffs that we had dealt

8          with, but very few risk factors.

9                 MR. LEVIN:  That's not old.

10                MR. RAFFERTY:  That was set

11         for trial in November of '07?

12                MR. BROWN:  November of '07.

13                Along with four other

14         plaintiff picks.  Then Merck had

15         four defendant picks that were set

16         for trial, and we had one of

17         those.  Then we had three other

18         cases that were set for trial in

19         March and June of the following

20         year of '08, the Lativio case,

21         Espinoza case.  Of course, those

22         didn't go forward.  The settlement

23         was reached.

24                MR. BOUNDAS:  Then another

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 114

```
 1          example, we had a case in Cook

 2          County, Illinois, in Chicago,

 3          called the Mitchell case.  That

 4          case had a scheduling order.  Off

 5          the top of my head, I don't

 6          remember the trial date, but we

 7          were working it up, getting

 8          experts, and that was another case

 9          we were going to try.  I know it

10          had a date, but I can't tell you

11          exactly --

12               MR. KHERKHER:  Russ, another

13          thing I just remembered when you

14          asked me is, Judge Higbee said,

15          will anyone try a stroke case.

16          And we agreed to try the first

17          stroke case, Dave Buchanan and I,

18          and I think we were in the process

19          -- before you guys settled, we

20          were going to submit nine -- we

21          had nine stroke cases.  So, for

22          whatever that is worth.

23               Another thing, this might be

24          corny, but --
```

Page 115

```
 1            MR. SEEGER:  That's actually
 2       worth a lot because there's an
 3       impression by a very small group
 4       of people that there were people
 5       out there not willing to try them.
 6       We were willing to try them, our
 7       firm was willing to try them,
 8       people at this table, all of us.
 9            MR. KHERKHER:  We had nine
10       cases we were going to submit, and
11       then y'all settled.
12            MR. HERMAN:  I'm just going
13       to make a comment that in the MDL,
14       for about four months, the judge
15       pushed us to put stroke cases up.
16       And we could not find a stroke
17       case to put up.  We got absolutely
18       no responses.  So that the fact
19       that you were willing to put up
20       stroke cases in New Jersey was of
21       obvious benefit.
22            MR. KHERKHER:  After Judge
23       Higbee told Dave and I that, and
24       she was impressed that we
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 116

```
 1         volunteered, Grant Kaiser and his

 2         team, we spent that weekend -- I

 3         don't know if you all know Glenda

 4         Grainger, and you are right, there

 5         were some tough ones, but we found

 6         nine, and then the settlement

 7         occurred.

 8              Another thing that might be

 9         silly, Russ, that may factor in, I

10         coordinated -- because we had

11         these four trial settings up in

12         New Jersey, I coordinated --

13         because I watched when Mark picked

14         his jury, the judge was kind

15         enough to give him two or three

16         days to read the questionnaires.

17         She didn't want that.  We had to

18         do it overnight.  I had an 18

19         wheeler with three copy machines,

20         and we were going to copy all

21         questionnaires for all trial

22         teams.  So, we had that set up.

23         Maybe that's a factor for common

24         benefit.
```

FAC Resp. Exhibit D -- 1224

Page 117

```
 1             MR. BLIZZARD:  Did you
 2        submit the cost of the 18 wheeler?
 3             MR. KHERKHER:  I didn't have
 4        to put down a retainer because we
 5        all settled because everything
 6        happened simultaneously, but we
 7        were ready to go.
 8             MR. BLIZZARD:  One of the
 9        things that I want to make sure we
10        cover is that there's been a lot
11        of time that was submitted to the
12        accountant and a lot of expenses
13        that have been submitted to the
14        accountant that for whatever
15        reason have been rejected.  That
16        has happened to a lot of people on
17        this side of the table as well,
18        and so whatever we need to do to
19        help get whatever records in order
20        to make it work for the
21        accountant, we'll do.
22             MR. LEVIN:  If you call the
23        accountant.
24             MR. KHERKHER:  That's my
```

FAC Resp. Exhibit D -- 1225

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 118

1          biggest fear.  I have never billed

2          for my time, so, I'm sure we left

3          a lot of time on the table.

4                MR. LEVIN:  We'll straighten

5          it out.  Feel free to call me.

6                MR. KHERKHER:  Yes, sir,

7          thank you.

8                MR. HERMAN:  If you call

9          Lenny Davis in my office, he will

10         set up an appointment with Phil

11         Garrett and his team.  Phil

12         Garrett was chosen by the judge.

13         That firm and he, they do no

14         personal work for any lawyer

15         that's got a Vioxx claim, either

16         firm work or personal work.  So,

17         they are purely independent.  They

18         will drop what they are doing and

19         meet with you.  I really suggest

20         -- and I don't know what the

21         differences are as to what they've

22         accepted and what they haven't or

23         even the reason for it.  But we

24         have had lawyers continuously call

FAC Resp. Exhibit D -- 1226

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 119

 1        up, get an appointment, go meet

 2        with them for a couple of hours,

 3        and those things are resolved in

 4        just one sitting.  I don't think

 5        they are well resolved over the

 6        phone.  But somebody very

 7        knowledgeable about what your

 8        costs are and the hours you

 9        submitted, one of two people ought

10        to get an appointment and sit with

11        Phil Garrett.

12              MR. BOUNDAS:  Unless anyone

13        has any other questions on trial,

14        I'm not going to belabor the

15        point.

16              MR. RANIER:  Thank you,

17        John.

18              Grant is next on the

19        organization and function and

20        having done this.

21              I have got a question for

22        y'all.  If this is not an

23        appropriate question, it's a

24        record issue, but can the

FAC Resp. Exhibit D -- 1227

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 120

```
1         committee consider how much common
2         benefit fee is going to be gotten
3         from us?
4              MR. KAISER:  Generated by
5         our cases.
6              MR. RANIER:  Generated by
7         our cases in deciding how much
8         common benefit fee we're entitled
9         to?  I mean, that may not be --
10             MR. LEVIN:  Just leave that
11        hanging.
12             MR. LANIER:  That's a dicey
13        thing that has to be parsed out,
14        because to an extent, there's the
15        issue if someone got 100 cases and
16        you did, Drew, common benefit work
17        for that person, then they need to
18        pay you for the 100.  If you did
19        common benefit, Drew, for someone
20        that has 5,000 cases, then they
21        benefited 50 times more from your
22        work than the person who had only
23        100 cases and arguably would be 50
24        times more.  By the same token,
```

FAC Resp. Exhibit D -- 1228

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 121

1           there's the other side of the

2           coin, too.  So, it is a two-edged

3           sword, and I don't know where we

4           land on it.

5               MR. HERMAN:  Let me just say

6           one other thing.  The judge

7           specifically has directed us not

8           to talk about allocating dollars

9           until he has determined what the

10          percentage is.  Anything that we

11          talk about in allocation or

12          consider in terms of dollars to

13          specific firms is a fiction in the

14          judge's mind.  He has to

15          determine, first, what the

16          percentage is going to be, and

17          then we have to deal with that

18          pot, so to speak.  Also, he's made

19          it very clear that whatever he

20          considers the pot to be, costs are

21          to be in addition to that.  So,

22          common benefit costs are very

23          important here, and it is easier

24          to deal with the costs than it is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 122

```
 1          with an unknown amount of common

 2          benefit dollars.  I think you are

 3          going to find in the next two or

 4          three weeks, I think we have

 5          California folks appearing Friday,

 6          I'll tell you for your own -- so

 7          you know what we know, 106 people

 8          or firms submitted requests for

 9          common benefit.  Less than 50 have

10          decided to come make a

11          presentation.  But when all of

12          that information is gathered in

13          the next three weeks, you are

14          going to see a motion and brief

15          file with the Court to set common

16          benefit, a pot, and costs.

17               You've taken various

18          positions, we've taken various

19          positions, but you need to know

20          that's coming.  It's coming before

21          any allocation is made.  I would

22          think the amount of dollars that

23          the Court says are going to be in

24          the common benefit pot and in the
```

FAC Resp. Exhibit D -- 1230

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 123

```
 1          cost pot are going to affect all
 2          the considerations.
 3               MR. KHERKHER:  Russ, Judge
 4          Fallon is a tough grader.  I was
 5          telling someone the other day that
 6          -- I was practicing what I was
 7          going to tell you guys and how I
 8          did what Mark Lanier did, I knew
 9          all 200 jurors by name, I read
10          those questionnaires, I knew them
11          backwards and forwards.  And when
12          we were going through the
13          preemptive strikes before, Judge
14          Fallon knew them all too.  So,
15          here I am doing a great job, and
16          he's saying, oh, yeah, Mr.
17          Kherkher, that guy, his favorite
18          show is CSI.  Here's the hardest
19          working judge, stays up all night
20          and reads 200 questionnaires, and
21          so I know he's going to be tough.
22               MR. HERMAN:  Let me give you
23          one experience.
24               The first meeting I had with
```

FAC Resp. Exhibit D -- 1231

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 124

1       him, he said, I want all the

2       articles that have been published

3       dealing with Vioxx.

4               By the next meeting that

5       Chris and Andy and I had with him

6       before the PSC order came out, he

7       had read every one of the articles

8       and had about seven or eight

9       cross-examination questions for

10      us.  And I know that he did the

11      same thing with Merck.  So, the

12      important thing is, he will

13      remember, and this transcript will

14      remind him of the quality of the

15      work that you folks put forth.

16              Let me tell you, he was a

17      heck of a trial lawyer, I mean, a

18      very fine trial lawyer.  When he

19      was nominated for the presidency

20      of the state bar, he had universal

21      support by both the plaintiff bar

22      and the defense bar.  We all know

23      that doesn't happen very often.

24      So, not only are we trying to be

FAC Resp. Exhibit D -- 1232

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 125

 1          fair, if we're not fair, he's

 2          going to make us fair.

 3               MR. RANIER:  We know.

 4               MR. WEITZ:  Drew, the short

 5          answer is that the number of cases

 6          that you have and the commitment

 7          of everybody on those cases are

 8          looked at, and the factors

 9          involved surrounding the number of

10          cases will be weighed.

11               MR. RANIER:  I appreciate

12          that.  And the quality issue is

13          there, too.  If you produce

14          quality cases to drive the

15          litigation, you pay a bigger

16          common benefit tax than you would

17          if you --

18               MR. WEITZ:  Than if you are

19          just storing cases and warehousing

20          cases.  I think that all the

21          judges have made that point very

22          clear, and I think you guys have

23          distinguished yourself in that

24          category.

FAC Resp. Exhibit D -- 1233

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 126

1            MR. KAISER:  If I might just

2       have a few minutes, and I think

3       this point has been made.

4            I'm going to take a couple

5       of minutes.  These were the 28,000

6       plus contacts we had.  We have

7       them from every state.  And like

8       Perry discussed, we did have a

9       very sophisticated filing strategy

10      where we evaluated every specific

11      case, where the best venue for

12      that case was.  And if we were in

13      a good Federal Court venue, we

14      were going to come back, we would

15      file it in that court.  Otherwise,

16      we would file it in Judge Fallon's

17      direct file.  And you take a risk

18      then if you are going to come back

19      to your home district or not.

20           But in state cases, the

21      same issues.  We filed where each

22      case needed to be filed.

23           To answer your question

24      specifically, Perry, we ended up

FAC Resp. Exhibit D -- 1234

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 127

```
 1          filing about half our cases in New
 2          Jersey, about half of them in the
 3          MDL, and I think there was 60 in
 4          California and a handful in Texas
 5          for obvious reasons.  I think this
 6          has come across, but you know the
 7          way Merck played this game, and
 8          that is to throw everything at
 9          you.  If you imagine a task force
10          set up with all the pieces, we
11          moved all the pieces all at once
12          back at Merck.  We did it with
13          trial settings, we did it with
14          experts, we did it with our
15          administration to be able to get
16          those cases in line for trials and
17          to be able to do that.  We all
18          know about what moves cases, and
19          that's verdicts and trial
20          settings.  That's the message that
21          we're trying to say, is that our
22          entire effort to put the pressure
23          on Merck was what our goal was.
24               You guys that negotiated the
```

FAC Resp. Exhibit D -- 1235

Page 128

1          settlement know better than we do

2          what kind of pressure, having five

3          different trials going on in New

4          Jersey starting in October of

5          multiple plaintiffs each, had on

6          Merck.  We were told at the time

7          that it was extremely important to

8          put these cases up and got letters

9          and e-mails from Dave Buchanan

10         begging people to put cases up and

11         from Sol saying, this is enough, I

12         can't believe you aren't going to

13         do this, because then the Court is

14         going to pick them then.  So, you

15         are ruining the opportunity if you

16         don't do it.  So, we were there

17         for that.

18              That's really our point

19         here, is that our total effort was

20         to push all the pieces at once at

21         Merck, and I think we did that --

22         not every firm does that, and not

23         every group of firms did that.

24              To carry the analogy even

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 129

1          further, Walter will appreciate

2          this, we were all into the case in

3          terms of poker, too.  We put

4          everything in that we had.

5                    MR. HERMAN:  Let me ask you

6          a question.  In cases that were

7          filed wherever they were filed,

8          I'm assuming in most of those

9          cases that were actual filed

10          cases, you had a Merck defense

11          counsel enter an appearance?

12                    MR. KAISER:  Absolutely.

13                    MR. HERMAN:  If you could

14          get me a list of those cases and

15          the defense firm that entered an

16          appearance, it will be of some use

17          to us in illustrating why we think

18          lawyers that did substantial

19          common benefit work should receive

20          compensation.

21                    MR. KAISER:  We'll certainly

22          do that.

23                    MR. HERMAN:  After all,

24          everyone at this table takes a

FAC Resp. Exhibit D -- 1237

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 130

```
 1          risk that none of those firms

 2          take, and those firms can be

 3          cross-referenced through American

 4          Lawyer with their earnings, which

 5          is something we intend to do.

 6               MR. KAISER:  I was

 7          day-to-day responsible for all the

 8          activities, so, if y'all have any

 9          questions from start to finish,

10          ask me about them, and we'll tell

11          you what the deal is.  You can do

12          it now or after Walter speaks or

13          whichever.

14               Thank you.

15               MR. RANIER:  Walter, do you

16          want to talk about the financial

17          commitment.

18               MR. UMPHREY:  Just for a

19          minute.  I think everybody has

20          covered most of the topics.  But

21          our firm did the accounting on the

22          Texas tobacco litigation, and we

23          inherited it to do on this.  So,

24          that's why I was asked to talk
```

Page 131

```
 1          about it.
 2                  But we have a total of 13.6.
 3          This is not a recoverable expense
 4          from the common fund or the
 5          client.  This is our screening
 6          costs.  These were cases that we
 7          did develop for trial and the
 8          expenses through the medical and
 9          of what have you.  3.7 of this was
10          the advertising which we absorbed.
11          And the other million went towards
12          personal expenses of travel and
13          the firms.  We didn't reimburse
14          each firm as we went for
15          out-of-pocket expense on travel
16          and what have you, for a total of
17          13.6.
18                  MR. HERMAN:  I'm sorry, I
19          can't read it.  Smith or
20          Schwaller?
21                  MR. RAFFERTY:  Schwaller is
22          474.
23                  MR. HERMAN:  Is that
24          500,000?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 132

1          MR. KAISER:  527,000 for

2     Smith, 474,000 for the Schwaller

3     case, which adds up to basically a

4     million.  Take the million out of

5     the other 3 point million total

6     that we spent on trial

7     development.  You have another 2

8     million that we spent beyond those

9     two cases that went to trial --

10          MR. HERMAN:  That's what I

11     want to understand, and I'll make

12     sure this gets circulated to the

13     committee.

14          MR. POWERS:  I have copies

15     for you.

16          MR. HERMAN:  Good.

17          MR. UMPHREY:  We understood

18     early on from Merck that we were

19     going to have to try each

20     individual case.  We prepared

21     these cases for that purpose.  We

22     didn't drive a nail halfway.  I

23     think that our involvement, our

24     preparation of these cases went a

FAC Resp. Exhibit D -- 1240

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 133

```
 1        long way, as well as knowing that

 2        we had the financial resources to

 3        back it up to be a common benefit

 4        for the final settlement of this

 5        matter.  I will answer any other

 6        questions you have.

 7             MR. HERMAN:  The 3.1, other

 8        than Smith and Schwaller, I want

 9        to make sure.  I understand those

10        are the workup of cases that John

11        spoke about in New Jersey, et

12        cetera?

13             MR. KAISER:  Yes.

14             MR. UMPHREY:  We had 50

15        cases for trial at the time you

16        settled.

17             MR. HERMAN:  Have you

18        submitted costs other than Smith

19        and Schwaller on the workup of

20        those cases?

21             MR. KAISER:  No.

22             MR. HERMAN:  You should.

23             MR. WATTS:  No.

24             MR. HERMAN:  You should
```

FAC Resp. Exhibit D -- 1241

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 134

1         itemize it, and you should submit

2         it.

3              MR. KAISER:  Okay.  We will.

4              MR. LEVIN:  Has Smith and

5         Schwaller been submitted?

6              MR. KAISER:  Yes.  The only

7         thing that hasn't been submitted

8         in the Smith case is the DQ

9         aspect.

10              MR. HERMAN:  You just take

11         care of that and then send us

12         whatever.

13              MR. BLIZZARD:  Grant, we're

14         going to need to see exactly what

15         the other 2 million is to

16         understand whether it should or

17         should not be submitted.

18              MR. HERMAN:  In fairness, we

19         have indicated to every lawyer and

20         every firm that actually worked up

21         cases for trial that the remainder

22         of that 3.1 beyond Smith and

23         Schwaller should be submitted as a

24         common benefit cost.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 135

```
 1              MR. UMPHREY:  Right.

 2              MR. KAISER:  We'll do that.

 3              MR. HERMAN:  If we get that

 4         within a week, that would --

 5              MR. UMPHREY:  Whatever you

 6         folks do for us, we appreciate.

 7         But primarily we appreciate being

 8         involved with good lawyers that

 9         are prepared and that have been to

10         the well before and litigation

11         that helps our individual clients.

12         We thank you for your time.

13              MR. SEEGER:  Thank you.

14              MR. HERMAN:  Well, I think

15         we're honored to have you here

16         today, and I don't say that in a

17         condescending matter or in a light

18         manner.  You have always brought

19         to the table something special.

20              MR. UMPHREY:  I'm getting

21         older, and they don't let me out

22         very much.

23              MR. RANIER:  This is the PSC

24         piece.  We did a lot on the PSC.
```

FAC Resp. Exhibit D -- 1243

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 136

1          I want to quickly go through some
2          of the things that we did on the
3          PSC that we haven't already
4          discussed.  Of course, I served on
5          the committee and meetings and the
6          status conference and everything
7          and went to almost every one of
8          those.
9              I chaired the insurance
10          committee, and I had the support
11          of these five firms, obviously,
12          but the work on that committee,
13          the discovery, the motions, I read
14          every policy, every insurance
15          policy.  We had a voluminous
16          amount of material on that.  One
17          of the interesting things on that
18          is that of course we established
19          that Merck had more insurance than
20          they said they did, but the big
21          thing here on liability is when
22          they got their extra insurance.
23          Basically they went from under 500
24          million to a billion dollars, and

FAC Resp. Exhibit D -- 1244

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 137

1          the year on that is like 1998.  It

2          is just about the same time when

3          we coordinated that with all the

4          time things that everybody had

5          done with trials that it is about

6          the time that, I think, they

7          unblinded Vioxx, that they had

8          results from the 090 study and a

9          couple of other studies that were

10         strongly suggesting that they had

11         some liability problems here.

12              Of course, we found out we

13         weren't the only persons that had

14         recognized that, but the insurance

15         companies had figured that out

16         also.  They took Merck to

17         arbitration in London.  So, there

18         was a whole body of evidence out

19         there regarding the insurer's

20         allegations and what evidence they

21         used to show that Merck knew and

22         misrepresented and covered up.  We

23         tried to get that from Judge

24         Fallon.  That was in May of 2007.

FAC Resp. Exhibit D -- 1245

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 138

1           I don't know whether he had

2       his eye on the settlement or not.

3       He declined to produce that after

4       our motions and lengthy briefs and

5       whatever to order it produced.

6       But our strategy at that point was

7       to go through the Louisiana Direct

8       Action Statute, and we were at the

9       time of settlement working on

10      filing a direct action Vioxx case

11      that we could keep in Louisiana

12      court or to go get one -- either

13      to get removed and to go back to

14      Judge Fallon with arguments under

15      the Direct Action Statute, which

16      had been stronger for production

17      of that evidence.

18           But just for anybody who is

19      still doing this and general

20      information, there's a pot of

21      evidence out there.  We had an

22      insurance consultant that worked

23      with us on this and who

24      participates in a lot of these

FAC Resp. Exhibit D -- 1246

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 139

1          arbitrations in London, and we've

2          confirmed that it's there.  It's

3          stuff that's probably not been

4          seen before.

5              MR. SEEGER:  Drew, can I ask

6          you a question?  I'm sorry to

7          interrupt.  I just want to make

8          sure I ask a couple of points.

9          The chart, I'm seeing this for the

10         first time, has this been provided

11         to the PSC, the chart that you are

12         working off of?

13             MR. RANIER:  It should be in

14         the depository because this is all

15         a matter of record.  We introduced

16         the chart with the motions.

17             MR. SEEGER:  That was

18         attached to the motions?

19             MR. RANIER:  Judge Fallon

20         has seen this.  This is our chart.

21         We did this.  Every policy.  Every

22         policy.  That's kind of a brief

23         summary of what was done on

24         insurance.  It is not only there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 140

1          from the standpoint of financial

2          liquidity of Merck, but also

3          there's some important liability

4          aspects to this that haven't been

5          finished and are still out there.

6               LECG -- there's a mistake in

7          my affidavit.  I said in my

8          affidavit that LECG was paid

9          exclusively by the Vioxx

10         Litigation Consortium.  That's not

11         correct.  LECG is an econometrics

12         firm out of Boston, formerly the

13         Bridle Group, and we got engaged

14         with them early on various aspects

15         of Merck's business model and what

16         have you.  The PSC did share some

17         of the expense of the LECG group.

18         I can't remember exactly how much.

19         It is not a fantastically high

20         number, but it could be 10, 20,

21         $30,000.  And so my statement in

22         my affidavit that the Vioxx

23         Litigation Consortium paid for all

24         of that is not accurate.  We paid

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 141

1     for some of it, but the PSC paid

2     for some of it.

3          MR. HERMAN:  Let me stop you

4     so I can alert you to something.

5     First of all, if you find

6     something in your affidavit that

7     you want to add, subtract, in the

8     event that we do not resolve fee

9     issues and the Judge has looked at

10    everything and he issues his

11    opinion and there's still fee

12    issues unresolved, he's going to

13    embark on a Murphy Oil process.

14    Before that happens, you will be

15    given an opportunity to give

16    another look at your affidavits.

17         MR. RANIER:  It is not a big

18    deal.

19         MR. HERMAN:  I hadn't said

20    that before, and I wanted to make

21    sure I did say it.

22         MR. RANIER:  It was very

23    early on.  It was 2000.  It was, I

24    think, before the first MDL trial.

FAC Resp. Exhibit D -- 1249

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 142

1        It might have been after Ernst.

2        But Kenneth Gartrell, our

3        econometrics expert that we worked

4        with, in addition to Gerald, Dr.

5        Gerald, who was the former SEC

6        Commissioner, and we have an

7        expert report from him too, but

8        analyzed Merck's financial

9        situation.  And basically, if

10       nothing else, this is, in

11       retrospect, due diligence from the

12       PSC about actually how much cash

13       Merck could come up with in any

14       given settlement aside from

15       preemption and causation issues

16       and all of that.  So, the PSC had

17       developed this early on, and I

18       basically took the lead on that

19       and did that.  So, there are two

20       draft expert reports.

21            The third step was supposed

22       to be that we would develop Ken

23       Gartrell as the witness to say

24       what most people in their trials

FAC Resp. Exhibit D -- 1250

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 143

1          did on cross with regard to the

2          economic reasons why Merck kept

3          selling Vioxx, even though they

4          knew they had problems with it

5          from a scientific standpoint.

6          While I heard a lot of that on

7          cross, and I think there might

8          have been a couple of witnesses,

9          actually a California witness, I

10         remember one who actually

11         testified to this, this was all

12         part of that process.  The PSC

13         said, no, we're not going to spend

14         all of that money on that now.

15         We're going to let the individual

16         trials develop that.  That's where

17         that stayed, but that was part of

18         what was done for the PSC.

19              We've already talked a lot

20         about the Konstam coverup, and

21         that was not officially PSC.  We

22         developed Martin Wells on that,

23         but there was a lot of talk and

24         discussion about that especially

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 144

1          with Dave Buchanan and me on the

2          raw data and how much we needed to

3          plumb that.  And the basic focus

4          there was to undermine that risk

5          factor defense, because I still

6          think that the snow shoveling guy

7          is the last guy in the world who

8          ought to be taking Vioxx and

9          anybody that's doing any kind of

10         exertion or whatever.  So, we can

11         call those bad cases, but I've

12         never really believed they are.  I

13         know they are hard to win with

14         juries.  But the more evidence we

15         had, and I think, for instance, in

16         the chart that we've got on Dr.

17         Wells, once the data is actually

18         plumbed -- I mean, in diabetes, I

19         mean, you could see the risk

20         factor in diabetes is 10.33.  I

21         mean, that's like lung cancer and

22         smoking.  That's how much more

23         likely you are to have a heart

24         attack if you've got diabetes

FAC Resp. Exhibit D -- 1252

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 145

```
 1          taking Vioxx than if not.
 2               MR. WEITZ:  Drew, I don't
 3          know if you read the Cona/McDarby
 4          trial transcript.
 5               MR. RANIER:  I attended a
 6          couple of days of it, but I didn't
 7          see that testimony.
 8               MR. WEITZ:  In our mock
 9          trials, we found out from the jury
10          that you needed to embrace the
11          risk factors, and we actually
12          completely embraced that theory in
13          the case.
14               MR. RANIER:  It was your
15          partner, Rob Gordon, who was
16          McDarby's lawyer?
17               MR. WEITZ:  He had actual
18          diabetes, and he was 90% occluded,
19          it was a defense pick, and had all
20          those things.  We actually
21          embraced the risk factors.
22               MR. WATTS:  I read that
23          transcript and used a lot of that.
24               MR. RANIER:  Here's your epi
```

FAC Resp. Exhibit D -- 1253

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 146

1          number.

2                    MR. WEITZ:  It is

3          staggering.

4                    MR. HERMAN:  We had a

5          discussion early on, and Drew and

6          I have been together in a lot of

7          cases, and we always end up at the

8          same place, but usually we don't

9          agree as it goes along.  But I

10         agree with him, and I still do,

11         that it is the straw that broke

12         the camel's back and felt from the

13         beginning that somewhere along the

14         line some case was going to be

15         tried with a lot of risk factors,

16         and Vioxx was going to -- the jury

17         was going to accept that in a way

18         that it could be replicated.  And

19         I think, actually, the way Mark

20         tried his case, he was able to do

21         that.

22                   MR. LANIER:  Yes.  I took

23         the edge of the desk, and I took a

24         cup, and I said, the edge of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 147

```
 1          desk is a cliff.  The cliff is a
 2          heart attack.  And all of us are
 3          different distances from that
 4          cliff.  A 15-year-old kid may be
 5          way over here, and I put the cup
 6          over here.  And I said, you get
 7          diabetes, you are a little closer.
 8          You smoke, you are a little
 9          closer.  You are overweight, you
10          are a male, you are over 50.  And
11          what Vioxx is, it's a shove.  It
12          is a shove towards the cliff.  You
13          can give that 15-year-old kid
14          Vioxx all day long.  Who you are
15          putting at risk is the person who
16          is already close to the edge of
17          the cliff.  You give them Vioxx,
18          and they are gone, and I knocked
19          that cup over.  I knocked the cup
20          over, and the jury goes 'ahhh'.  I
21          think there's a lot of truth to
22          that.
23              Then we took Krumholz and
24          added him to that.  Krumholz took
```

FAC Resp. Exhibit D -- 1255

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 148

1       the Framingham risk factors for a

2       heart attack and all the different

3       breakout rates, and he showed that

4       if you take the Vioxx data, every

5       one of those risk factors, Vioxx

6       is a greater risk factor for a

7       heart attack than diabetes, than

8       all of these different things

9       except for smoking.  That's the

10      only thing that beats it.

11          MR. HERMAN:  On the other

12      hand, we know it made the cases

13      tougher to try.

14          MR. RANIER:  Talk about

15      knocking the glass off, Percy

16      Foreman came to Lake Charles when

17      I was just out of law school and

18      was defending union members on

19      some union violence.  He sat

20      smoking a cigar -- you could smoke

21      in the courtrooms in those days.

22      He sat smoking a cigar during the

23      closing argument of the state, and

24      he had something in the cigar, in

FAC Resp. Exhibit D -- 1256

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 149

1          the ash, so the ash never fell,

2          and he's right next to the jury.

3          True story.  And the ash kept

4          getting longer and longer, and

5          nobody was listening to the

6          state's argument.

7               MR. BIRCHFIELD:  He got that

8          from Abraham Lincoln.

9               MR. RANIER:  I saw him do

10         it.

11              MR. LANIER:  The only risk

12         factor that I deemed would damage

13         trial at one of these cases is

14         smoking, because people smoke in

15         spite of the fact that they have a

16         warning that it could cause a

17         heart attack.  Who is to say if

18         they had been warned about Vioxx,

19         they wouldn't have still taken it.

20         That was the one that was tough to

21         get over.  I mocked seven of

22         these, and that was the one that

23         was tough to get over.

24              MR. KHERKHER:  But, Mark,

FAC Resp. Exhibit D -- 1257

Page 150

1          you also would have educated the

2          jury how smoking is a horrible

3          addiction.

4                MR. LANIER:  If I had had

5          Russ' material maybe or Walter's,

6          I didn't know that stuff, or

7          Grant's.

8                MR. KAISER:  Thank you,

9          gentlemen.

10               MR. RANIER:  Thank you.

11               MR. WATTS:  Thank you.

12               MR. SEEGER:  Thank you.

13               MR. BLIZZARD:  Thank you.

14                    -   -   -

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 151

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:   ROBINS, KAPLAN, MILLER &
        CIRESI, LLP
        Gary Wilson, Esquire
        Tara Sutton, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1260

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. HERMAN:  Everything is
 3         being taken down by Linda.  You
 4         are going to get a copy at the end
 5         of this.  The judge is very strong
 6         on transparency in the process,
 7         consistency.
 8              Secondly, if we don't
 9         resolve all the fee issues, he's
10         got a process where he's going to
11         come in and put all the lawyers
12         under oath and cross-examine them.
13         I hope we don't get that far, but
14         we appreciate you being here.
15              In addition to that, did you
16         all make a written submission?
17              MR. WILSON:  We did, yes.
18              MR. HERMAN:  Do me a favor.
19         When you get back, just fax me or
20         e-mail my office an affidavit
21         saying that this is yours, and
22         we'll put it in the file with
23         everybody else's.
24              I'm going to pass this down
```

FAC Resp. Exhibit D -- 1261

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        to this side of the table or the
 2        other side of the table.
 3             MS. SUTTON:  I wanted to
 4        thank everybody for giving us this
 5        opportunity.  It is especially
 6        important to us because we weren't
 7        on the PSC, and I think our work
 8        may have been a little less
 9        visible, and this gives us a
10        chance to talk about what we
11        thought our contributions to the
12        MDL were.  We, of course, realize
13        that our contributions don't even
14        begin to compare with what all of
15        you have put into this litigation
16        and bringing it to such a
17        successful conclusion.
18             We initially had applied to
19        be on the Plaintiffs' Steering
20        Committee, because we hoped to
21        bring our mass tort experience to
22        the litigation, our trial
23        experience, and, of course, our
24        financial resources.  But when
```

FAC Resp. Exhibit D -- 1262

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        that didn't happen, we stepped

 2        back and we tried to look at how

 3        it was we thought we could bring

 4        our expertise and our experience

 5        and bring the highest value we

 6        could to the litigation.  So, we

 7        decided to focus on the science

 8        committee and the discovery

 9        committee.  I wanted to first

10        maybe touch on the work we did in

11        the science committee and then

12        move over to the discovery

13        committee work.

14             On the science committee,

15        our partner, Roberta Walburn, who

16        was one of the vice chairs of the

17        committee, and really kind of some

18        of the main work that we did on

19        the science committee early on,

20        there was a request by John

21        Restaino and Carlene Lewis that we

22        have a really comprehensive review

23        of the law on how we are going to

24        prove causation and get our
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
1          experts qualified under Daubert.

2          We volunteered in the summer of

3          2005 to take on that project and

4          do a very complete survey of an

5          analysis of the law on how you

6          prove causation.  It resulted in

7          July of 2005 this legal research

8          memo that we provided to the

9          members of the science committee

10         to use kind of as a roadmap of how

11         we were going to qualify experts

12         at trial.

13              I took a lot of grief

14         because this was pretty big, but

15         we were trying to make sure that

16         we did a very comprehensive --

17              MR. HERMAN:  Excuse me, I

18         don't mean to interrupt, but it

19         would be helpful to us when you

20         get back if you would send us a

21         copy of that.  I want to review it

22         in connection with the trial

23         package that's out there and take

24         a look at the depository and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          whether it is in the depository.

2                    MS. SUTTON:  Sure.  We can

3          get it back to you.

4                    We did this fairly quickly.

5          We provided this to the science

6          committee in July of 2005, so, it

7          was just within a month or so

8          after the request was made, and we

9          know it was used and read very

10         closely by the folks --

11                   MR. HERMAN:  Don't send it.

12         Troy and Andy indicate that they

13         believe that it was used in the

14         trial package.  It is in the

15         depository.

16                   MS. SUTTON:  Okay.  And then

17         for that first trial, we worked

18         really closely with Andy's

19         partner, Paul Sizemore and Leigh

20         O'Dell, in helping write the legal

21         section of the main brief opposing

22         their Daubert motion on causation.

23         We wrote -- you folks wrote the

24         facts, but we provided the legal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          section.  I think a lot of that

2          was used.

3              During the first trial, we

4          were also asked to do a lot of

5          spot legal research on some very

6          difficult issues like the

7          admissibility of post hoc analyses

8          of epidemiological data.  We also

9          did legal research on how you can

10         use Daubert challenges to go after

11         defense experts.  There was

12         learned intermediary research, a

13         lot of different legal research

14         memos we provided to the science

15         team.

16             We also were asked to do a

17         comprehensive labeling history for

18         Vioxx.  That was some work product

19         that we provided to the science

20         committee.  We have copies of

21         that, we can provide that as well.

22             MR. HERMAN:  Did you work

23         with Bert Black on that?

24             MS. SUTTON:  We did the work

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

Page 8

```
 1          product at our office, but I know

 2          he reviewed it.

 3               MR. WILSON:  We were on the

 4          phone with Bert a lot.

 5               MS. SUTTON:  We talked to

 6          Bert a lot.

 7               We worked really closely

 8          with Don Arbitblit.  Don was a

 9          great help in helping us think

10          about the approach to causation

11          and epidemiology from a legal

12          standpoint and gave input into the

13          memo that we did.  We stayed very

14          involved in the science committee

15          through the billable time that --

16               MR. HERMAN:  Was your firm

17          involved in Celebrex or Bextra?

18               MS. SUTTON:  No, we aren't.

19               Did I miss anything about

20          the science committee?

21               MR. WILSON:  No.  I think

22          you covered it pretty well.  We

23          got a lot of feedback saying that

24          the work was good and it was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      useful.  So, we weren't just

2      writing stuff into the air.  I

3      think that was a major

4      contribution.

5          MR. WEITZ:  Did you have

6      weekly meetings or conference

7      calls or were they monthly or you

8      didn't have them?

9          MS. SUTTON:  The science

10     committee had a weekly conference

11     call.  Then there were

12     subcommittees, as well, that we

13     participated in that would meet

14     less frequently by phone.  But

15     there were a lot of calls.

16         Then the epidemiology group

17     that Don was part of, we would

18     meet as a smaller group on the

19     phone and talk about these

20     legal -- these are very difficult

21     legal issues, and we would talk

22     about how we were going to use the

23     science to prove causation and to

24     qualify the experts.

FAC Resp. Exhibit D -- 1268

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1            MR. WEITZ:  Did you have any

2       individual cases that you

3       submitted into the settlement?

4            MS. SUTTON:  Yes.

5            MR. WEITZ:  How many?

6            MS. SUTTON:  Close to 100.

7            MR. WEITZ:  Where did you

8       file those cases?

9            MS. SUTTON:  Minnesota.

10            MR. WEITZ:  Minnesota.  Had

11       you guys worked up any cases for

12       trial?

13            MS. SUTTON:  We're working

14       up one now.

15            MR. WILSON:  We may have one

16       case.

17            MS. SUTTON:  We have a

18       beautiful case we are going to

19       hopefully try next year.  It was

20       filed after the settlement.

21            MR. WEITZ:  After the

22       settlement.  It was an opt out

23       case?

24            MR. SEEGER:  It was

FAC Resp. Exhibit D -- 1269

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        excluded.

2                MR. WILSON:  We applied for

3        the settlement, but it was

4        rejected because it was after the

5        settlement date.

6                MR. SEEGER:  Right.

7                MR. WILSON:  But it is a

8        Minnesota case, so the statute is

9        still good.  It is a great case.

10       It is a marathoner.  He had a

11       previous workup, no problems,

12       heart attack while running, and

13       he's got terrible mental sequelae.

14       He's basically in a nursing home,

15       46 years old.

16               MS. SUTTON:  So, we're

17       really looking forward to getting

18       that case back and trying it.

19               MR. LEVIN:  When you say

20       "Minnesota," you are filing it in

21       the Federal Court, you are coming

22       here and then they're going back?

23               MS. SUTTON:  Yes.  Our cases

24       were filed in Federal Court in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

          1          Minnesota.

          2                 MR. WILSON:  We have a

          3          six-year statute of limitations.

          4                 MS. SUTTON:  Which is being

          5          challenged now.  The Supreme Court

          6          in Minnesota is going to look at

          7          it.  We hope to get involved in

          8          that, the briefing of that.

          9                 MR. LEVIN:  That happened in

         10          Mississippi with the statute that

         11          they had.  You will look at the

         12          history.

         13                 MR. HERMAN:  Went to 6 to 3

         14          and also eliminated most

         15          out-of-state filings.

         16                 MR. LEVIN:  Right.

         17                 MS. SUTTON:  Andy, is your

         18          firm going to be involved in that

         19          Minnesota statute of limitations

         20          issue?

         21                 MR. BIRCHFIELD:  Yes.

         22                 MS. SUTTON:  I would like to

         23          talk to you when you get a minute.

         24                 MR. BIRCHFIELD:  Okay.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1           MS. SUTTON:  What we can do

2       to help on that.

3           MR. BIRCHFIELD:  I think

4       there was a conference call

5       yesterday, I believe.

6           MS. SUTTON:  Good.

7           Then the second thing was

8       really our work on the discovery

9       committee, and I know you've heard

10      from Anthony Irpino, who we worked

11      extremely closely with on the

12      privilege saga.  We were on the --

13      we got involved in the discovery

14      committee at the first meeting

15      that I think Dave Buchanan had,

16      and the first conference call, and

17      we brought up, based on that first

18      conference call, the idea of

19      really going hard after privilege

20      claims, because we had a lot of

21      success in doing that in the

22      tobacco litigation in Minnesota.

23           Dave said it was a problem,

24      and you were having problems in

FAC Resp. Exhibit D -- 1272

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1       New Jersey with the privilege

2       claims, so we asked to --

3       suggested maybe a committee, a

4       subcommittee be set up.  That

5       happened, and Anthony chaired it

6       and did just an incredible job.

7            We asked to see those New

8       Jersey logs, and Dave got them to

9       us, and we painstakingly went

10      through those logs.  Gary and I

11      both wrote a letter that I think

12      Russ sent out in the summer of

13      '05, July of '05, that went

14      through all the deficiencies in

15      the log and basically grouped the

16      types of documents we thought

17      weren't privileged.  There were

18      science documents on the logs,

19      there were marketing documents on

20      the logs, there were things that

21      clearly weren't privileged.  We

22      gave many examples and laid out

23      the law, and we did the research

24      at our firm on why these things

FAC Resp. Exhibit D -- 1273

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          weren't privileged, and we wrote

 2          the letter, and I know Russ sent

 3          out the letter.  We built a great

 4          record, and we got the MDL log,

 5          they did an MDL log, and we went

 6          and looked at that closely and did

 7          another letter that went to the

 8          defendants.  Then eventually we

 9          drafted the first draft of the

10          motion to compel that Richard

11          Arsenault argued, I think it was

12          in October perhaps of '05, and

13          going through and saying there's

14          huge categories of documents that

15          should not be on this privilege

16          log.  They are not privileged.  I

17          think the judge really seemed to

18          listen.  He told them that their

19          logs weren't good and they needed

20          to provide new logs, and when they

21          did provide new logs, they

22          deprivileged a quarter of their

23          privileged documents.  I think

24          they went from 40,000 to 30,000
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          privileged documents.  Our firm,

2          along with other members of the

3          committee, we went through all of

4          those privileged documents.

5               Then I think the judge had

6          all 30,000 documents brought to be

7          reviewed in camera, which is, I

8          think, an amazing feat for -- I

9          mean, Judge Fallon gets a lot of

10         credit.  To get a judge to take

11         and look at all the privilege

12         documents in camera, that doesn't

13         happen very often in litigation.

14         So, he did look at them, and I

15         think he was ready to deprivilege

16         most of them when they went up to

17         the Fifth Circuit.

18               MR. LEVIN:  The Fifth

19         Circuit wasn't as kind to Judge

20         Fallon as you are.

21               MS. SUTTON:  I think --

22               MR. WILSON:  He kept it

23         alive, Arnie.

24               MS. SUTTON:  But I think the

FAC Resp. Exhibit D -- 1275

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          Fifth Circuit recognized that the
 2          privileged documents had to be
 3          reviewed, and I think the thing
 4          that we'd advocated in our
 5          committee is that there were too
 6          many privileged documents.  He
 7          couldn't look at all of them.  So,
 8          he needed to sample them.  The
 9          Fifth Circuit wrote a decision
10          that will be something used in all
11          litigation from now on that it is
12          okay to sample privileged
13          documents and make a privilege
14          determination based on sampling
15          and not looking at all of them.
16              We have been working,
17          frankly, our butts off at our firm
18          trying to get an appellate court
19          to put that in writing, and that
20          happened in Vioxx.  There was
21          sampling done in the Minnesota
22          tobacco litigation, but we never
23          got an order in the Supreme Court
24          on that.
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1              MR. SEEGER:  They didn't
 2         like the sampling, but it was okay
 3         to do it.
 4              MS. SUTTON:  Gary flew down
 5         and helped on the Fifth Circuit
 6         brief with Lenny, and everybody
 7         pitched in on that mandamus brief.
 8              MR. WILSON:  Irpino
 9         especially worked on that.
10              MS. SUTTON:  Yes.  I think
11         that it is hard for us to know how
12         much influence the privilege
13         documents had on Judge Fallon and
14         his thinking about Vioxx and
15         Merck.  I mean, because you guys
16         know better than us, I think, the
17         impact it may have had on him, but
18         I think it definitely, I would
19         hope, helped educate the judge
20         about the games that were being
21         played and gave him an impression
22         that we hope helped contribute to
23         the success of the litigation.
24              MR. HERMAN:  What privilege
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          issue did Arsenault argue?

2                  MR. WILSON:  Actually, he

3          didn't argue it.  He relied upon

4          the brief.

5                  MR. HERMAN:  He didn't argue

6          it.

7                  MR. WILSON:  He stood up and

8          said, on this one, we're going to

9          rely on the brief, Your Honor.

10                 MS. SUTTON:  That was the

11         brief we wrote.

12                 MR. LEVIN:  It was a good

13         argument.

14                 MR. SEEGER:  The brief was

15         better than the argument.

16                 MR. WILSON:  It's a good

17         brief.

18                 MR. HERMAN:  Well, just one

19         other thing, and that is, the

20         Fifth Circuit actually departed

21         from the Federal rules, appellate

22         rules and also some internal rules

23         to snatch up that issue.  We're

24         not certain how that happened, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          certainly had they done what we

2          interpret the rules to be, let's

3          put it that way, as lawyers, then

4          Judge Fallon's initial opinion

5          would have held, and it would have

6          meant that the litigation had

7          really been spurred at that point.

8                    MR. LEVIN:  They never

9          granted a mandamus and wrote an

10         opinion.  They had no

11         jurisdiction.

12                   MS. SUTTON:  Exactly.

13                   MR. WILSON:  I was there for

14         that.  We were over in Irpino's

15         office, the emergency stay was

16         there, we replied to that, and

17         then the next day we had to file

18         the brief.

19                   MS. SUTTON:  Yes.  I mean,

20         Judge Fallon looked at all 30,000

21         documents.  He did what he needed

22         to do.  He should have been upheld

23         on that.

24                   So, we also relied heavily

FAC Resp. Exhibit D -- 1279

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        on Paul Rice in presenting his

 2        textbook to the judge.  I know he

 3        eventually adopted or used him as

 4        the Special Master.

 5              MR. HERMAN:  What are your

 6        costs in the case?

 7              MR. WILSON:  Just under

 8        50,000 or just over 50,000.

 9              MS. SUTTON:  50,418.22.

10              MR. HERMAN:  Primarily, what

11        are those costs?

12              MS. SUTTON:  We did 11 full

13        weeks of document review at the

14        document depository.

15              MR. WILSON:  In New York and

16        in Alabama.

17              MR. LEVIN:  So,

18        transportation and hotel lodging?

19              MS. SUTTON:  Right.

20              MR. HERMAN:  And partner

21        hours in the case?

22              MR. LEVIN:  1,950.

23              MR. WILSON:  In our

24        three-page thing --
```

FAC Resp. Exhibit D -- 1280

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1              MR. LEVIN:  Did you say
 2      partner hours?
 3              MR. HERMAN:  Yes.
 4              MR. LEVIN:  Partner hours --
 5              MS. SUTTON:  That might be
 6      right.
 7              MR. WILSON:  We have a total
 8      of 2,400 hours, partners and
 9      associates.
10              MR. LEVIN:  The accountant
11      says you have 1,950.  You ought to
12      look into that.  The hours
13      reported are Peter Sutton Toepfer,
14      Roberta's, yours, Gary and
15      Zimmerman's and Tara's.
16              MS. SUTTON:  There's some
17      associates in there.
18              MR. LEVIN:  Jaycox, Moccio
19      and Narotsky.
20              MR. WILSON:  Do we talk to
21      the accountant about that, Arnold?
22              MR. HERMAN:  Yes, please.
23              MR. LEVIN:  Yes.
24              MR. HERMAN:  The accountant
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          has made himself available, and so

2          you know, that CPA and the people

3          working with him do not do any

4          work whatsoever for any of the law

5          firms involved in the case or any

6          of the lawyers involved in the

7          case on a personal basis.  It is

8          Judge Fallon's choice.  But they

9          are extremely approachable.  If

10         you have any questions about their

11         review of either hours or dollars,

12         costs, they will straighten it out

13         with you.

14              MS. SUTTON:  Okay.

15              MR. WILSON:  Then we were

16         also on other committees.  We were

17         on the science -- well, we talked

18         about the science committee, but

19         we were on the law committee, Tara

20         mentioned we did the document

21         review, and we actually did the

22         document review.  I know there are

23         some people who would fly in and

24         spend the day there and then go to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1          the Yankees game.  We did five-day

 2          weeks.

 3               MR. SEEGER:  And you worked.

 4               MR. WILSON:  We went through

 5          them.

 6               MS. SUTTON:  We listened on

 7          those conference calls when we'd

 8          get yelled at.  We made sure we

 9          were there five days a week.

10               MR. SEEGER:  All right.

11               MR. HERMAN:  You said you

12          were both in Montgomery and New

13          York?

14               MS. SUTTON:  Correct.

15               MR. WILSON:  And also here.

16          I think Toepfer was here for a

17          week.

18               MR. HERMAN:  Anybody else

19          have any questions?

20               MR. SEEGER:  I think we're

21          done.

22                    -   -   -

23

24
```

FAC Resp. Exhibit D -- 1283

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23          Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM: Sanford Pinedo, LLP
PRESENTER:  Shelly A. Sanford, Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, P.C

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.

FAC Resp. Exhibit D -- 1285

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1          MR. BIRCHFIELD:  Shelly,

2     everything is being recorded for a

3     transcript and will be available

4     for future use if it's needed.

5     So, with that, the floor is yours.

6          Everybody here knows your

7     contribution and what you did in

8     starting this litigation, and it's

9     very much appreciated, but I want

10    you to take this time to say

11    whatever you want to say.

12         MS. SANFORD:  Thank you,

13    Andy.  There may be one point at

14    which I might have to go off the

15    record very briefly, and I hope

16    nobody minds.

17         MR. BIRCHFIELD:  Not at all.

18         MS. SANFORD:  I want to say

19    first what an honor it is for me

20    to have been a member of the PSC

21    and to have worked with each one

22    of you.  I will be brief on this

23    this morning.  Probably the

24    hardest thing I've had to do since

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1       Carlene died is to write the

2       affidavit.  I'll try not to cry.

3           MR. SEEGER:  Don't worry

4       about it.

5           MR. HERMAN:  Shelly, it

6       might be easier if you consider

7       you are talking to family.

8           MR. LEVIN:  Because you are.

9           MR. LANIER:  If worst comes

10      to worst, there are about six of

11      us that would jump in and testify

12      on your behalf and give the same

13      speech you are going to give

14      anyway.

15          MS. SANFORD:  Thank you.  I

16      would really like for this not to

17      be about me but to be about

18      Carlene.  She was the most humble

19      person I have ever known and

20      trusted each one of you as well.

21          Perry, I'm sorry you didn't

22      really have a chance to get to

23      know her.

24          MR. WEITZ:  I am, too.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          MS. SANFORD:  A truly humble
 2      and wonderful person.
 3          I tried to put all that I
 4      could in the affidavit.
 5          Carlene's obituary was in
 6      the New York Times, and part of
 7      that was that she was a pioneer in
 8      Vioxx.  So, I know that you get
 9      that she's a pioneer in this
10      litigation.  I thought about
11      bringing that, but I think that's
12      a good testament to who she was
13      and what she did in this
14      litigation, that even the New York
15      Times would pick up the story on
16      her death.
17          Not to minimize her degree
18      at Harvard and her University of
19      Virginia law degree and the other
20      incredible things that she's done
21      in her life, but this was
22      extremely important to her, and
23      she dedicated herself to this
24      litigation.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1              It started for us in 2000,
 2         eight years ago here at the St.
 3         Regis, a little bit after that
 4         with you, Chris, and Mark, of
 5         course, with you and Tom and Andy,
 6         your firm, everybody, but it's
 7         been a little bit of a long road.
 8         It was a five-and-a-half year road
 9         for Carlene up until the time she
10         died.
11              She gave speeches in the
12         beginning of this litigation that
13         I would like to encourage you to
14         consider allowing her time for,
15         because for her it was not about
16         getting cases or gathering cases.
17         She believed that this was a bad
18         drug, wanted to encourage other
19         lawyers to come out and be
20         involved in this litigation.  So,
21         we went to a number of places that
22         were simply designed to encourage
23         people to file claims against
24         Merck and help this litigation
```

Page 6

```
 1      move forward years before it ever
 2      came off the market.  I don't know
 3      how that is playing out in fee
 4      allocation considerations.
 5           MR. HERMAN:  Why don't you
 6      tell us about some of the places.
 7           MS. SANFORD:  I almost
 8      brought one of those speeches
 9      here, but it is a little bit too
10      hard.   I can supplement the file
11      with those if you guys would like
12      because many of those were
13      recorded.
14           MR. HERMAN:  I would like to
15      know the various places.
16           MS. SANFORD:  She went to
17      the Mass Torts Made Perfect in
18      2002.  We were there.  We started
19      the Vioxx litigation group at ATLA
20      with David Miceli, and Carlene
21      gave really a speech almost every
22      year at every convention, the
23      annual conventions we did, and
24      encouraged people to come up until
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1       we turned that over in 2006.

2             We went to Mealey's and did

3       a speech, and the actual

4       culmination of that was with

5       Mealey's right when Vioxx came off

6       the market and a number of you --

7           MR. BIRCHFIELD: Pasadena.

8           MS. SANFORD: -- gave

9       speeches there. Yes, Pasadena.

10      But the thing that really spoke to

11      me about that particular speech,

12      people always complimented her and

13      said, we really think we want to

14      get in this litigation. Mark, you

15      know how effective Carlene was at

16      trying to persuade people to jump

17      in and encourage that.

18           But she was in the hospital

19      the second time, the last time she

20      was in the hospital, and she got

21      an e-mail from a lawyer in New

22      York who had watched the Mealey's

23      presentation and just e-mailed her

24      and said, I don't know you, but

FAC Resp. Exhibit D -- 1291

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          you've restored my faith in

2          lawyers, a defense lawyer wrote

3          that, and Carlene showed that to

4          me and was just so touched that

5          somebody would do that.

6               We wrote articles for

7          various places, trial magazines,

8          but mostly it was ATLA and Mass

9          Torts Made Perfect and Mealey's.

10         We also did the Harris Martin and

11         those sorts of things.

12              So, there were really a

13         number of things.  They would

14         probably be reflected in the time.

15         I tried to capture those for her

16         in the pre-2005 formation of the

17         MDL time that we submitted, and I

18         would encourage you to look at

19         that because it did impact

20         lawyers.  I know that may not be a

21         common, common benefit time issue,

22         but it was important to Carlene,

23         and I think it was very effective

24         and helped the litigation move

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      forward.

2            Mark, I looked at your

3      eulogy of Carlene, I listened to

4      that yesterday, and what a tribute

5      it was to her.  The things you

6      said about her, about Vioxx,

7      really stood out to me.   I think

8      you know it is true, if you gave

9      something to Carlene, you could

10     take it off your list.  It was

11     done.   That was very true in this

12     litigation.  You called her a

13     leader in the Vioxx fight, and I

14     think that's accurate.

15     Importantly, you told her girls

16     that there are pharmaceutical

17     companies that will never do

18     business the same way because she

19     took justice by the hand until it

20     came to fruition.  I believe that

21     is true and accurate.

22            I remember, again, shortly

23     before Carlene passed away,

24     watching a commercial with her on

FAC Resp. Exhibit D -- 1293

Page 10

```
 1          TV of Tylenol.  The president of
 2          Tylenol got on the commercial and
 3          said, we have this problem with
 4          our drug and we don't want you to
 5          take it.  We would rather you not
 6          take Tylenol than have this
 7          problem.   Carlene looked at me
 8          and said, I think we helped to
 9          make a difference with that and
10          that kind of pride in what she
11          did.  It's remarkable, and I
12          believe it is true as well.  I'm
13          glad she had it.
14              It was easy to see that she
15          was a visionary about the Vioxx
16          litigation.  She walked into my
17          office in October of 2000 after
18          having visited with Ms. Bell and
19          said, this is a bad drug, and we
20          need to do something about it.
21          That's how she proceeded in this
22          litigation.  She looked at Vioxx
23          and said it is a bad drug, it is
24          hurting people, we've got to do
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1     something to help.  That's how she

2     looked at the litigation all the

3     way through.

4          It was a very proud moment

5     for her when Vioxx came off the

6     market, an extremely proud moment

7     when she was appointed to this

8     PSC, and even prouder when she

9     chaired the science committee.

10    When you voted her in, the taxi

11    ride to the airport after that was

12    one of the happiest moments that I

13    remember from her, and she was

14    very appreciative of that, and I

15    think did a tremendous job.

16          Here's where I'll go off the

17    record for one second.

18              -  -  -

19          (Whereupon, an

20    off-the-record discussion was

21    held.)

22              -  -  -

23       MR. BIRCHFIELD:  Shelly,

24    appointing Carlene and then you as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1         chair of the science committee,

2         that was probably one of the

3         easiest and most obvious decisions

4         that we made in this litigation.

5              MS. SANFORD:  Thank you for

6         that.  We didn't take it lightly,

7         and I don't intend to overstate

8         either one of our positions or

9         understate them, but I think you

10        all know where we were in it and

11        at least where our heart was, and

12        you got the best of both of us,

13        and in particular, the best of

14        Carlene.

15             I think in regard to being a

16        visionary, she was able to

17        recognize a bad drug.  She was

18        able to look at Mrs. Ernst when

19        she came in the door and say, this

20        is the case that needs to go to

21        trial, and it needs to be tried by

22        Mark.  She was committed to that,

23        Mark, in a way that it's just

24        amazing to me.  She loved that

FAC Resp. Exhibit D -- 1296

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          trial, loved how you tried it,

2          loved being a part of it, loved

3          the result.  Happy, happy day for

4          her.  And we'll just say thank you

5          to you for being part of that.

6               She recognized the need for

7          giant people to be involved in

8          this litigation and encouraged, I

9          think, all of you in ways that

10         were, I hope, memorable to you

11         because she loved each one of you.

12              MR. HERMAN:  I think you

13         ought to know that it was a big

14         blow to everyone, not just in a

15         professional sense, but in a

16         personal sense, and there never

17         was a question at all as to who

18         would be recommended to fill the

19         spot on the PSC.  You always give

20         more and take less credit yourself

21         for what you do.  I know this

22         isn't easy for you, and you don't

23         find it easy to talk about

24         yourself.

Page 14

```
 1              MS. SANFORD:  No.
 2              MR. HERMAN:  So, I think
 3         some of us are going to have to do
 4         that for you.
 5              MR. SEEGER:  I was just
 6         about to say, true to character,
 7         she's talking about what everybody
 8         else did but her.  You were right
 9         there with Carlene from the very
10         beginning.  The very first meeting
11         I had was with the two of you.
12              Shelly, Carlene was a very
13         special person.  We all miss her.
14         It was a huge blow, and it felt
15         like there was just a huge hole in
16         our committee and in our team when
17         she left, but you filled it.
18         Even before that, you were so
19         active and so involved.
20              I don't want to go into all
21         the details like what you did on
22         the science committee and how you
23         supported every trial effort,
24         Andy, mine, Mark's, everybody's,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          Perry's.  You were always there

 2          moving us on, helping us,

 3          providing us with valuable

 4          information.  You have been steady

 5          and constant from the very minute

 6          I met you right here in this

 7          hotel.  So, I thank you.

 8               MR. LANIER:  I also want the

 9          record to reflect, and I think

10          those of us on the committee know

11          this, but I'm not certain, and I

12          hope this isn't something that I

13          know from some other means that I

14          shouldn't say, but the monies you

15          get from this have already been

16          pre-divided in such a way that

17          Carlene's children and her ex-law

18          partner are going to get the

19          lion's share compared to what you

20          get.  If you add those two

21          together, it is two to one, what

22          you would take out of this.   I

23          think that needs to be on the

24          record as well.  It's another good
```

Page 16

```
 1        reason for you to be talking not

 2        just about what you did, but about

 3        what Carlene did, because this is

 4        our chance for her offspring to

 5        get what's coming to them from her

 6        efforts.

 7             MR. LEVIN:  How are those

 8        pretty girls?

 9             MS. SANFORD:  They are good.

10        They are tremendous.  They are a

11        testament to their mom really.

12        Carla, the oldest, is at Harvard

13        and followed in her mom's

14        footsteps, and Christie is a

15        senior in high school.  They are

16        very good children.

17             MR. LEVIN:  It's good that

18        they have you.

19             MS. SANFORD:  Thank you.  It

20        is a joy for me to have them, and

21        thank you for the comments.  I'm

22        in awe of each one of you and the

23        things that you have done and have

24        been glad to be a part of it and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1        would give my all for you on any

 2        case that I was involved in with

 3        you, and I do believe that Merck

 4        is --

 5            MR. HERMAN:  It takes a lot

 6        of mules to pull one cart, and we

 7        wouldn't be where we are without

 8        your contribution and Carlene's.

 9            I just want to add a little,

10        because you are not making a

11        pretty good record for somebody

12        else to read even though we know

13        what you did.  I think your

14        participation on, for example, the

15        science committee, the trial

16        package committee, monitoring the

17        trials, giving the input, being

18        there from the beginning to the

19        end, the consistency with which

20        you and Carlene performed, and

21        even after Carlene was facing a

22        really untoward situation, there

23        wasn't any stop.  You guys just

24        kept plowing ahead.  You are still

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
1          not making the case for yourself.
2               MR. LANIER:  Let me add, in
3          the Ernst case, we go to trial in
4          Ernst, no one has tried any Vioxx
5          cases yet.  We are going where no
6          man has gone before.  Alan Nies
7          gets put on the stand.  I don't
8          have a deposition of Alan Nies to
9          read.  I have absolutely nothing
10         from Alan Nies.  So, I'm going
11         through documents, and I'm putting
12         together a cross with some of the
13         best stuff I had on Alan Nies.
14         You and Carlene found, in terms of
15         Alan Nies' "oh, I moved down here
16         to be with my grandkids," blah,
17         blah, blah.  He did not.  He moved
18         down here for a consulting job
19         making a quarter million dollars a
20         year for a sugarland company down
21         the freeway there.  And y'all
22         found that, which allowed me to
23         absolutely totally destroy his
24         credibility in the first five
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1       minutes of my cross-examination.

 2       And that was y'all.

 3            MS. SANFORD:  You did

 4       destroy his credibility.  That was

 5       very pleasant.  Thank you for

 6       that.

 7            MR. GIRARDI:  Shelly, let me

 8       say this.  We were in this case in

 9       2001.  I know you were and Chris

10       was in 2001.  Nobody at this table

11       knew how to spell Vioxx.  The only

12       reason this came about is you two

13       guys, no question about it.  If

14       you look at all of the bad drug

15       cases, you never see this sort of

16       a lead time between what you guys

17       did back in 2000 versus then it

18       gets withdrawn several years later

19       and then the MDL is set up in

20       2005.  All of that was because of

21       you.  I mean, no question about

22       it.

23            MR. LANIER:  I still recall

24       you helping me get ready to take

FAC Resp. Exhibit D -- 1303

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1        Alise Reicin's deposition.  Before
 2        they pulled the drug off the
 3        market, we deposed Alise Reicin,
 4        got her locked into some lies
 5        before she ever knew this thing
 6        was going to go forward, and y'all
 7        helped prep me for that.
 8             MR. BIRCHFIELD:  We all know
 9        your role early on and your
10        commitment throughout it.  Chris
11        mentioned the support and the help
12        that you gave.  Mark has mentioned
13        the role that you and Carlene
14        played in Ernst.  But you were
15        there for our trial.  I mean,
16        every MDL trial, you were there to
17        help.  So, we know your role
18        there.  We know the contribution
19        that you made on the committees,
20        the science committee and the
21        trial package and the stroke
22        committee.  I mean, all of that is
23        well known to the folks on this
24        committee.
```

Page 21

    1              One of the things that may

    2         not be as well known that would be

    3         helpful, if you could spend a few

    4         minutes talking about how y'all

    5         really advanced the litigation

    6         with your own cases.  We know

    7         about Ernst, but you had other

    8         cases that y'all had worked up

    9         that were ready for trial that you

   10         were pushing to get to trial.  Can

   11         you talk to us a few minutes about

   12         that?  That would be helpful.

   13              MR. SEEGER:  Excellent

   14         question.

   15              MS. SANFORD:  Most

   16         particularly the case that I think

   17         was helpful in advancing the

   18         litigation -- with the exception

   19         of Ernst, which I think was an

   20         amazing thing to be able to get to

   21         trial within four months of the

   22         MDL being formed.  Again, I will

   23         say that Carlene was so

   24         appreciative that the PSC

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          supported that, allowed that case

2          to go to trial, encouraged it and,

3          Mark, your role in that, but that

4          that was able to go to trial then

5          was tremendous.   We spent a very

6          big amount of time with Mark's

7          firm on that.

8               We also had the Pikul case,

9          which I think made a significant

10         difference in this litigation as

11         well.  When I say the Pikul case,

12         it is a case that we had in 2003.

13         We filed that he was a person who

14         had 50 milligram usage for more

15         than 30 months and got all of his

16         drugs from Merck-Medco directly.

17         They sent him the last 90-day

18         supply that killed him.  He had a

19         blood clot.  The clot was found by

20         the medical examiner here who had

21         pictures of the clot, testified in

22         that actual pathology record that

23         it was Vioxx related prior to

24         Vioxx even being withdrawn from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          the market.  The actual physician,

2          I took his deposition, and he said

3          Merck was in his office telling

4          him that Vioxx was safe, go ahead

5          and continue to prescribe it in 50

6          milligram doses on a chronic

7          basis, which was contrary to the

8          label.  We had that case wired up,

9          and Merck knew it, and so every

10         time it came to the table in the

11         MDL to be the trial case --

12              MR. SEEGER:  They ran away

13         from it.

14              MS. SANFORD:  -- they ran

15         away from it.  They said that it

16         is not representative because it

17         is too good and those sorts of

18         things.  And I think it had a lot

19         to do, in my opinion and Carlene's

20         opinion, with how the cases got

21         selected for trial and how

22         eventually they would have faced

23         that case.

24              MR. BIRCHFIELD:  That case

FAC Resp. Exhibit D -- 1307

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1       was trial ready?

2            MS. SANFORD:  It was trial

3       ready.  The doctors, the experts,

4       the plaintiff's depositions were

5       taken, the representatives.  It is

6       the only case that Carlene

7       considered, as she was in the

8       hospital the first time, possibly

9       filing mandamus for Judge Fallon

10      because he was not getting his day

11      in court, and it was ready at the

12      time the MDL was formed.  And of

13      course we didn't do that because

14      that's not really something we

15      would have done, but it was that

16      strongly felt in her that this was

17      a case that should be tried and

18      should have been the first trial

19      in the MDL.  And Merck's ability

20      to strike that was helpful to

21      other cases like Barnett and those

22      that got put on the table.  I

23      think that was significant.  Thank

24      you for asking that question.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          When I think of one of the things

2          I'm proud about, I'm proud for

3          Carlene about, that's one of the

4          things that comes up.

5               There are a few other things

6          I will go through very quickly,

7          but just fun little facts that I'm

8          proud of them.  The video news

9          release that was played in every

10         trial which Merck never mentioned

11         in there that there was a five

12         times risk of heart attack with

13         their drug.  They touted the

14         naproxen effects, and they sent

15         that out right after VIGOR was

16         released.  It was the first video

17         marketing material that we got.

18         It was document 0001 in 2001, and

19         that was something that Mark used

20         at the first trial.  It was a very

21         good piece.

22              The second piece of

23         information that was very

24         beneficial I think to the

Page 26

```
 1          litigation overall was the "Be the
 2          Power" presentation.
 3              Tom, I don't know if you
 4          remember this, but you had a black
 5          and white PowerPoint presentation
 6          that you gave Carlene and I when
 7          we came down the second time to
 8          see you, and it was almost
 9          illegible.  We took it and we were
10          able to file a 30(b)(6) motion.
11          Carlene and I took the deposition
12          and got documents, and among those
13          documents was the "Be the Power"
14          video.  It was James Dunn's
15          production as it came in, and we
16          looked at it and saw this cartoon
17          basically that they had put
18          together undermining and
19          minimizing the effects.
20              MR. SEEGER:  Shelly,
21          something else just really
22          occurred to me.  You are so quiet
23          and you are so understated, but
24          you were really the central
```

Page 27

```
 1          organizer of the West Coast, the

 2          East Coast, all of us, before the

 3          MDL, and you were still, even

 4          after the MDL was created, very

 5          much involved with lawyers all

 6          over the country, Mark, Tom's

 7          office, us.  So, you provided a

 8          lot of leadership in that respect.

 9               MS. SANFORD:  I appreciate

10          that.  Thank you.

11               We had meetings in Mark's

12          office with everybody in your new

13          office when it first came in, when

14          you first went there, Mark, after

15          we dogged you downtown for so many

16          years to get involved.

17               MR. SEEGER:  I know.  I

18          remember I couldn't find his

19          office the first time he invited

20          me down.

21               MS. SANFORD:  That "Be the

22          Power" presentation, I think, was

23          significant, and it was played in

24          -- every trial that had a verdict
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1    for plaintiffs included that

2    presentation, and that was as a

3    result of that, and that was when

4    Merck filed personal

5    Interrogatories against me and

6    Carlene and the request for

7    admission and tried to figure out

8    how we got that.  And then when we

9    were able to stop that from

10   happening, we got motions for

11   sanctions on that and those sorts

12   of things early on, because they

13   were just furious that we knew

14   about it.  But it was a very good

15   deal, and I was proud of that.

16        We had 10 million pages of

17   documents by the summer of 2002,

18   and that ultimately became part of

19   the repository, I think, in New

20   Jersey, and I thought that was a

21   very good factor.

22        MR. HERMAN:  Shelly,

23   everybody on this committee has

24   recognized that one hour of work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1        by a lawyer of your caliber or

 2        Carlene's may be worth 100 of

 3        somebody else's.  So, hours aren't

 4        the sine qua non, I think, for

 5        this committee.

 6             But I do want to get on the

 7        record the last report that I

 8        have, which is -- I rounded off

 9        7,084 hours by the firm and your

10        own hours, close to 4,000.

11        That's significant because there

12        was a time when you weren't even

13        dealing with hours and Carlene

14        wasn't dealing with hours.  But in

15        an effort to be consistent, I want

16        to make sure your hours are stated

17        on the record.

18             What are your outstanding

19        costs at this point for you and

20        Carlene?

21             MS. SANFORD:  I did not

22        bring that with me.

23             MR. HERMAN:  Can you

24        ballpark it for us?
```

FAC Resp. Exhibit D -- 1313

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1            MR. LEVIN:  We have it here.
 2            MS. SANFORD:  You do?  Maybe
 3       300?
 4            MR. HERMAN:  Arnie, do you
 5       have it?
 6            MR. LEVIN:  You have about
 7       7,000 hours in the cases reported,
 8       and for some reason, your costs --
 9       take a look at this.
10            MR. BLIZZARD:  $79,000 in
11       costs.
12            MS. SANFORD:  In expenses in
13       addition -- I mean less the PSC
14       contribution --
15            MR. LEVIN:  That has nothing
16       to do with the assessments.
17            MR. HERMAN:  How much?
18            MR. LEVIN:  $79,000.
19            MR. HERMAN:  It sounds low
20       to me.
21            MS. SANFORD:  It is low in a
22       sense that very graciously Mark
23       and Carlene came to a deal on the
24       cases where Mark fronted.
```

FAC Resp. Exhibit D -- 1314

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1              MR. SEEGER:  That explains

2       how --

3              MR. LEVIN:  That explains

4       Mark's costs now.

5              MS. SANFORD:  We paid a

6       significant amount, but Mark very

7       graciously contributed --

8              MR. HERMAN:  Check what you

9       and Carlene were out of pocket,

10      notwithstanding what Mark did, and

11      if it is different than around

12      80,000.  You have got Mark's

13      number.  Just call it into us

14      while we're here, and we'll put it

15      on the record.

16             MS. SANFORD:  I will

17      actually do that.  There was time

18      submitted for pre-MDL formation,

19      and I don't know what you are

20      doing with that.

21             MR. LEVIN:  We want to know

22      that.

23             MR. HERMAN:  We want to know

24      that.

FAC Resp. Exhibit D -- 1315

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

    1            MR. LEVIN:  Get that in.

    2            MS. SANFORD:  I submitted it

    3       a year ago probably to your

    4       office, Russ.

    5            MR. LEVIN:  Well, then, it

    6       is in there.

    7            MR. HERMAN:  Well, then, we

    8       should have it.

    9            MR. SEEGER:  Shelly, do you

   10       have somebody who can make a call

   11       to Wegmann to make sure the

   12       accountants have your pre-MDL

   13       hours?

   14            MR. HERMAN:  And your costs.

   15            MR. LEVIN:  Shelly, I can

   16       say this, that you are one of the

   17       few, that every hour that you have

   18       put in has been accepted by the

   19       accountants.  There's nothing

   20       rejected.  There's nothing under

   21       review.  It's current --

   22            MR. SEEGER:  That makes

   23       Arnold very happy.

   24            MR. LANIER:  Which also

FAC Resp. Exhibit D -- 1316

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1          brings up another point that I

 2          think is useful on the record that

 3          ties all of this together.

 4               You and Carlene and Danny,

 5          as this thing started, really were

 6          a defense firm, and you lost and

 7          burned some defense bridges by

 8          stepping out in a plaintiff's

 9          cause of action.  It is why you

10          weren't in a position to fund this

11          litigation and why I stepped in to

12          do your funding.  It is also why

13          you keep really good hours.  You

14          know how to do it.  They are

15          legitimate hours, and they are

16          real.

17               MS. SANFORD:  Thank you.

18               MR. LANIER:  But I say that

19          to underscore that I know for a

20          fact that y'all burned some

21          bridges with some defense clients

22          by, quote, going to the

23          plaintiff's side, closed quote.

24               MS. SANFORD:  We absolutely
```

FAC Resp. Exhibit D -- 1317

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

```
 1        did, and Carlene gave up a major

 2        defense client to do this

 3        litigation that funded her and her

 4        family very well.

 5             MR. HERMAN:  The last thing

 6        I want to say about you and

 7        Carlene is Louie L'Amour wrote a

 8        lot about Texas and a pioneer's

 9        spirit.  In one of the books, one

10        of his novels, he talks about a

11        female pioneer.  And the phrase he

12        used was, "She was fit to ride the

13        river with," which in those days

14        meant they would stick to it and

15        be tough.  Everybody wants to be a

16        pioneer, but we're looking at one

17        right now.  It would be a

18        discredit to us if we discounted

19        the work that you and Carlene did

20        in the early stages of the

21        litigation.  I'm glad you started

22        with that.  I want you to know

23        that we recognize it, and it is

24        meaningful.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1              MS. SANFORD:  Thank you for
 2         that, Russ.  I have one request in
 3         that regard.  If you decide that
 4         it's time that's valuable and able
 5         to be recompensed in this, I would
 6         accept that.  If you decide that
 7         it isn't, I would encourage you to
 8         rethink that on Carlene's time, as
 9         she couldn't continue because she
10         passed away.
11              MR. HERMAN:  We're not deep
12         thinkers, Carlene.
13              MS. SANFORD:  But I will
14         give you that.  This is what we
15         submitted to them.  It is roughly
16         the same amount of hours
17         previously, and that's what we put
18         in there.
19              Russ, the picture that
20         Carlene hung on her wall that I
21         now have, actually, is a quote
22         from Abraham Lincoln, and it says,
23         "A lawyer's time and advice are
24         her stock in trade."
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

 1            MR. HERMAN:  I'm just going

 2       to read the front page for the

 3       record, and then I'll turn this in

 4       myself when I get back.

 5            From January 1st, 2000 to

 6       April 5th, 2005, Carlene Lewis had

 7       3,079 hours, and Shelly Sanford

 8       had 3,596 hours, and Jeff Larson,

 9       29 hours.  That's really a

10       significant amount of time when

11       you are talking about a five-year

12       stretch before the MDL really got

13       geared up.

14            MS. SANFORD:  Thank you for

15       that.

16            Couple of just final

17       comments, and I thank you very

18       much for listening to me on this.

19            MR. LEVIN:  Shelly, will you

20       call the accountants to make sure

21       that the time is straight?

22            MR. SEEGER:  We told her

23       that, Arnie.

24            MR. LEVIN:  This time

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1          appears to be not in there.
 2                  MR. SEEGER:  She just gave
 3          it to us.
 4                  MR. HERMAN:  She just gave
 5          it to me.
 6                  MR. LEVIN:  I know, but he
 7          has to get it in there.
 8                  MR. HERMAN:  I'll take care
 9          of it.
10                  MR. SEEGER:  Go ahead.
11                  MS. SANFORD:  I communicated
12          with Lenny on it probably a month
13          ago just to make sure that it was
14          included, and he was looking into
15          it with Regina on that issue.
16                  I think that in regards to
17          myself and to Carlene, what I'm
18          most proud of in this litigation
19          is that I think we might be river
20          ready, but we have a dogged
21          persistence, and I think that's
22          tantamount to who she was, and I
23          hope that I was able to honor her
24          in that in following that same
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          persistence.  We just loved

2          working with you guys and

3          appreciate the opportunity to have

4          done it and thank you for that.

5                MR. BLIZZARD:  Shelly,

6          sometimes the most valuable

7          contribution somebody can make is

8          to inspire other people, and I

9          think Carlene did that, and I

10         really thank you for inspiring us

11         this morning.

12               MR. BIRCHFIELD:  Amen.

13               MR. SEEGER:  Well said, Ed.

14               MS. SANFORD:  Thank you.

15                     -   -   -

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1           C E R T I F I C A T E

2

3

4        I, LINDA L. GOLKOW, a Notary
     Public and Certified Court Reporter of
5     the State of New Jersey, Registered
     Diplomate Reporter, Federally-Approved by
6     the United States District Court of
     Pennsylvania, do hereby certify that the
7     foregoing is a correct transcript of the
     testimony as taken stenographically by
8     and before me at the time, place and on
     the date hereinbefore set forth.

9

10

11

         I DO FURTHER CERTIFY that I am
12    neither a relative nor employee nor
     attorney nor counsel of any of the
13    parties to this action, and that I am
     neither a relative nor employee of such
14    attorney or counsel, and that I am not
     financially interested in the action.

15

16

17

18    _____

     Linda L. Golkow, RDR, CRR, CCR
19    Notary Number:  1060147
     Notary Expiration:  1.2.10
20    CCR Number:  30X100176200

21

22

23

24

FAC Resp. Exhibit D -- 1323

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM:  SHELLER, P.C.
       Brian J. McCormick, Jr., Esquire
       Claudine O. Homolash, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1324

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2            MR. SEEGER:  We do have a
 3       court reporter keeping track, so,
 4       if you could just put your names
 5       on the record when you start
 6       speaking.
 7            MR. MCCORMICK:  Brian
 8       McCormick, and with me is Claudine
 9       Homolash from the Sheller firm.
10            MR. HERMAN:  I'm sorry.  I'm
11       Russ Herman.  I don't think we've
12       met.  And would you give me your
13       partner's name, Sharon?
14            MR. MCCORMICK:  Claudine
15       Homolash.
16            MR. HERMAN:  Claudine?  How
17       does Claudine spell her name?
18            MS. HOMOLASH:
19       C-L-A-U-D-I-N-E.
20            MR. HERMAN: No, no, your
21       last name.
22            MS. HOMOLASH:
23       H-O-M-O-L-A-S-H.
24            MR. SEEGER:  Go ahead.
```

FAC Resp. Exhibit D -- 1325

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          MR. MCCORMICK:  I'm going to

2     be brief.  I'll get you guys get

3     back on schedule.

4          Thanks for giving us a

5     chance to make a brief

6     presentation.

7          The affidavit that Steve

8     Sheller from my firm presented

9     back on October 31st, 2008, that

10    affidavit was based on a number of

11    discussions and conferences with

12    several of the attorneys who

13    worked on the various Vioxx

14    matters at the time in our firm.

15    I'm going to concentrate primarily

16    on three attorneys who worked

17    primarily on Vioxx matters from

18    the Sheller firm over the course

19    of 2005 and 2006.

20          Haile DeBass was one of the

21    attorneys who began work in

22    February of 2005, several weeks

23    before the MDL began.  Jonathan

24    Shub, another one of our

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        attorneys, Gregory Waks.  Jon Shub
 2        began work early in the case
 3        working on the assessment and view
 4        of the case.  He worked primarily
 5        on the third-party payor complaint
 6        in the beginning.  Mr.  DeBass'
 7        became one of the managers of the
 8        New York document depository at
 9        Seeger Weiss.  He assisted Michael
10        Wagner of Seeger Weiss very
11        carefully, very closely.  Some of
12        his primary responsibilities that
13        he was given over the course of
14        the time were he would train the
15        other attorneys and the
16        paralegals.  He was asked to
17        allocate assignments among the
18        attorneys and the paralegals.  He
19        organized and managed the
20        deposition packages.  He helped
21        Michael Wagner allocate the seats
22        at the depository, which I
23        understand were scarce at times,
24        and he worked with Penny Herman at
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        the document depository in New

 2        Orleans on a pretty regular,

 3        almost daily basis.

 4             Mr.  DeBass responsibilities

 5        were greatly increased in the fall

 6        of 2005 after Hurricane Katrina

 7        when he took over and the New York

 8        depository became the primary

 9        depository, and then again when

10        Mr. Wagner began to assist the

11        various attorneys at trial, was

12        traveling around the country.  I

13        think that the people who worked

14        with them on a daily basis at the

15        depository would say that, for a

16        while, Mr.  DeBass was the de

17        facto manager of the depository.

18             Mr. DeBass also helped work

19        on several of the bellwether cases

20        by preparing and organizing the

21        exhibits for use at trial and

22        preparing the trial exhibit

23        outlines.  One of the projects he

24        was able to specifically describe
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1    was one with Dave Buchanan where

2    he worked for several days that

3    turned into several weeks on a

4    label project.  He also worked

5    extensively with the SAS database

6    and assisted the experts in

7    pulling documents and reviewing

8    that.

9         The way I understand it,

10   after Hurricane Katrina, Mr.

11   DeBass and several of the other

12   Sheller attorneys, including Mr.

13   Waks, became the primary attorneys

14   at the Seeger Weiss depository

15   working on the documents.

16        We also provided a paralegal

17   for the Humeston trial here in

18   Atlantic City in the fall of 2005,

19   who lived in Atlantic City.  His

20   name was Joseph Yanick.

21        Mr. Shub has made me aware

22   that he worked with several of the

23   other attorneys both in the

24   personal injury cases and the

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      third-party payor cases and

2      interviewing and working with some

3      of the experts.

4           When Mr. DeBass began to

5      become more busy with the

6      administrative-type tasks in New

7      York at the depository, we moved

8      another attorney from our office

9      named Gregory Waks up to New York,

10     who was working 12 to 13-hour days

11     in the document depository.

12          And, basically, to go

13     through the factors that are set

14     forth in rule or PTO 6(D),

15     substantial contribution, I think

16     has been explained, but any

17     attorneys who worked with Mr.

18     Shub, Mr. DeBass and Mr. Waks, I

19     think, recognize their

20     contribution.

21          The quality of the work,

22     Mr. DeBass' work, I believe was

23     unquestioned as he took on and was

24     given many more responsibilities

FAC Resp. Exhibit D -- 1330

Page 8

1          than simply a document reviewer.

2                Mr. Shub's work is known to

3          many of you here, and I think is

4          unquestionable.

5                The consistency and duration

6          of the work that the Sheller firm

7          did, the firm dedicated several

8          attorneys to the litigation.  It

9          began in the very beginning, our

10         first time entry was in February

11         of 2005, and then the last entry

12         was in October of 2006, when 5,000

13         hours was billed individually by

14         the different attorneys at

15         Sheller, to the litigation.

16                The assistance of bellwether

17         cases, while we didn't try any of

18         the cases, Mr. DeBass was

19         apparently enormously helpful in

20         preparing for many of the trials,

21         and we dedicated a paralegal to

22         that trial team and offered help

23         wherever needed.

24                On the leadership

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          committees, Mr. Shub served on the

2          leadership of the third-party

3          payor committee, and Mr. DeBass

4          was very active in the discovery

5          and trial preparation committees

6          and the conference calls and the

7          weekly meetings.

8               All time spent by Sheller

9          was specifically authorized or

10         requested by a member of the PSC

11         or one of the other committees.

12         It was never taken for granted

13         that their work was going to be

14         just done randomly.

15              I think it is important to

16         remember that the Sheller

17         attorneys did the unsung work, the

18         discovery work that, frankly, no

19         one really wants to do, but is

20         critical to a case like this.

21         After Mr. DeBass began to work

22         closely with Mr. Wagner and Ms.

23         Herman, then he took over more of

24         the responsibilities of the New

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1          York depository.  As I said, he

 2          was de facto manager.

 3               I think it's also important

 4          that Sheller, after we got into

 5          the litigation through Mr. Shub's

 6          different relationships, we

 7          staffed it with very experienced

 8          and able attorneys and really dug

 9          into the work.  Many of the

10          attorneys who worked on that

11          project are still working on some

12          of the related cases and we

13          supported the cases to the end.

14               That's all I have.  I don't

15          have a PowerPoint, but I'm willing

16          to take questions on the work.

17               MR. SEEGER:  I have to make

18          the committee aware of something,

19          because it might be strange to

20          you, because John Shub is a

21          partner of mine.  John Shub was at

22          Sheller's office, and I forget

23          exactly when, about a year or so

24          ago, maybe two years ago,

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1333

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        transferred his practice to Seeger
 2        Weiss.  I am very familiar with
 3        what he did.  DeBass, he was a
 4        contract lawyer for Sheller,
 5        right?
 6              MR. MCCORMICK:  Yes, he was.
 7              MR. SEEGER:  We're talking
 8        about document review,
 9        essentially, right?  I want to
10        make sure I understand.
11              MR. MCCORMICK:  Right.  We
12        are.
13              MR. LEVIN:  Of your 1,800
14        hours that are recorded here by
15        the accountants, close to 1,400 of
16        it is from a contract employee.
17        Was he an attorney or a paralegal?
18              MR. MCCORMICK:  He was an
19        attorney.
20              MR. LEVIN:  How long was he
21        out of law school?
22              MR. MCCORMICK:  Mr.
23        DeBass had been -- I don't know
24        his exact resume, Arnie.  I would
```

FAC Resp. Exhibit D -- 1334

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1        have to look that up.

 2                MR. LEVIN:  But he was just

 3        picked up for this case?

 4                MR. MCCORMICK:  I think he

 5        had worked on several cases with

 6        Sheller before and with Mr. Shub.

 7        I don't think he was picked

 8        specifically for the Vioxx case.

 9                MR. LEVIN:  MR. Shub was the

10        most senior attorney that worked

11        on this case?

12                MR. MCCORMICK:  Yes, he was.

13                MR. LEVIN:  He had 162

14        hours, and DeBass had 1,388; is

15        that correct?

16                MR. MCCORMICK:  I believe it

17        is more hours than that, but I'll

18        have to check on that.

19                MR. LEVIN:  Was DeBass in

20        New York -- did I pronounce his

21        name right?

22                MR. MCCORMICK:  It's DeBass.

23                MR. LEVIN:  There's no E on

24        the end.
```

FAC Resp. Exhibit D -- 1335

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1           There were two depositories

2       in New York, as I understand it, a

3       third-party depository?

4           MR. SEEGER:  Yes.  I

5       actually know this.  The review

6       they did was really limited to the

7       third-party payors.  John Shub did

8       not have a leadership role in

9       those cases, but he --

10          MR. LEVIN:  He worked the

11      third-party cases.

12          MR. SEEGER:  Right.

13          MR. LEVIN:  And the

14      third-party cases was the Local 68

15      and others?

16          MR. SEEGER:  Correct.

17          MR. HERMAN:  Were the hours

18      kept contemporaneously or are

19      these reconstructed or do you

20      know?

21          MR. MCCORMICK:  They were

22      kept contemporaneously.

23          MR. HERMAN:  I'm sorry?

24          MR. MCCORMICK:  They were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          kept as they went.

2                    MR. HERMAN:  Okay.  Just so

3          you will know and the record is

4          clear, in the fall, on August 29,

5          2005, Katrina hit New Orleans.

6          That depository was moved to

7          Houston and up and running in

8          October of 2005.

9                    Penny Herman, I don't know

10         what Mr. DeBass did to work with

11         Penny Herman after 2005, but I'd

12         like to know more specifics on

13         that, because that depository

14         was -- the MDL depository was kept

15         in my office, and I'm not doubting

16         that he came and worked in that

17         office --

18                   MR. MCCORMICK:  I don't

19         think he worked in that office.

20         I'm sorry if I've misled you.  I

21         meant he worked or was in contact

22         with Ms. Herman during the

23         turnover.

24                   MR. HERMAN:  Okay.  I

FAC Resp. Exhibit D -- 1337

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1       understand.

 2               Because various requests

 3       would be made of the MDL

 4       depository.  She would relay those

 5       requests, if the material wasn't

 6       in the MDL depository, either

 7       to -- or generally to the

 8       depository in Chris Seeger's

 9       office and to Andy Birchfield's

10       office.  I suppose he would be one

11       of the people in New York that

12       would respond to those requests.

13               MR. MCCORMICK:  I'll try

14       and find out more.

15               MR. HERMAN:  I think I have

16       it now.  In other words, he was

17       working in New York at a

18       depository, and a request would

19       come in from the MDL depository,

20       he would respond.

21               MR. MCCORMICK:  Right.

22               MR. WEITZ:  How many cases,

23       individual cases has your firm

24       submitted to the settlement?

Page 16

1            MR. MCCORMICK:  I believe

2      88 at this point.

3            MR. WEITZ:  Did your firm

4      work up any individual cases in

5      either the MDL or any of the other

6      state jurisdictions for trial?

7            MS. HOMOLASH:  We have just

8      plaintiff depositions.

9            MR. WEITZ:  Did you

10     participate in any of the trials

11     as a second chair or first chair?

12           MR. MCCORMICK:  No, none of

13     our attorneys did.

14           MR. WEITZ:  Thank you.

15           MR. SEEGER:  Thank you very

16     much.

17           MR. MCCORMICK:  Thank you.

18           MR. HERMAN:  Appreciate you

19     coming in.

20               -  -  -

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1                 C E R T I F I C A T E

2

3                 I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13                 I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1340

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 3, 2008
- - -
HOUSTON, TEXAS
- - -

FIRM:         THE BRANCH LAW FIRM
              Turner W. Branch, Esquire
              Cindy Zedalis, Esquire
              Margaret Moses Branch, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
         GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1341

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1               - - -

 2               MR. GIRARDI:  Thank you.

 3               MR. BRANCH:  Cindy Zedalis

 4          from our office is going to

 5          present a summary, and I felt it

 6          was important to come and answer

 7          any questions you might have and

 8          to tell you that I did do my very

 9          best to attend.  I didn't miss any

10          of Judge Higbee's meetings in New

11          Jersey.  I think that can all be

12          verified by the attendance roles.

13          We did participate actively, I

14          think -- well, I don't think, I

15          know that were actively involved.

16               We had cases that we were

17          getting ready for trial.  We had

18          11 cases that we were putting up

19          for trial.  A lot of this I'm just

20          summarizing because we did make a

21          submission.

22               Those of you who were in New

23          Jersey, I saw on a regular basis.

24          Arnold, you were there.  Perry, I
```

FAC Resp. Exhibit D -- 1342

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        saw your office and you many

2        times.  Mr. Lanier, I saw there.

3        And I certainly saw my good friend

4        at the end of the table there.  We

5        never got to try a case.  We

6        tried.  We had two cases, Mary

7        Velasquez and Senator Ben

8        Altamirano from New Mexico up for

9        trial.  I thought they were good

10       plaintiffs.

11            Senator Altamirano was

12       President Pro-Tem of the New

13       Mexico Senate, and he had a

14       myocardial infarction associated

15       with Vioxx, and, unfortunately, he

16       had another myocardial infarction

17       a year ago tomorrow and died.  We

18       think that was probably

19       associated.  But he was one of the

20       clients we were putting up, as was

21       Mary Velasquez.

22            We participated whenever

23       asked by Eric Weinberg or others

24       on any study.

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1            We did, and I think you can
 2       verify this, maybe some of you
 3       don't know, but we did retain, and
 4       I think she would tell you, Lynn
 5       Baker early on before anyone here
 6       did about checking out some
 7       conflict problems that we thought
 8       might exist.  And I think Mr.
 9       Lanier, Mark, can tell you that.
10       Some of her work was merged into
11       what happened eventually in the
12       global settlement, but I don't
13       take credit for her answering
14       questions that existed in the
15       global, but we did retain her
16       early on, like 2004, to address
17       those matters.  And then some of
18       the questions she did address
19       eventually while the settlement
20       was going on which we didn't know
21       about.
22            Here's Margaret.
23            (Whereupon, there was a
24       brief recess.)
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1            MR. BRANCH:  Do I take

 2       credit for any new ideas or

 3       creative ideas that hadn't been

 4       developed by others?  No.  Do I

 5       expect an extraordinary amount for

 6       our effort?  No, we don't.  We

 7       would just ask that we be treated

 8       fairly, and I think our time

 9       substantiates what we did.  I'll

10       be happy to answer questions.

11            I wanted to be here out of

12       respect for each of you, and I'm

13       honored to appear before you and

14       to thank you for what you guys did

15       for a lot of people that were

16       injured.  I know there's a lot of

17       complaints from time to time and

18       you are never given credit for

19       what you do, but I will say thank

20       you to all of you for what you

21       have done because I think you've

22       helped a lot of people that

23       otherwise would get no help.

24            I think with that, I will

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        let Cindy summarize.  Cindy

 2        Zedalis worked on this case for

 3        almost six years.  She's an

 4        attorney in our office, went to

 5        University of California Law

 6        School and works with our office.

 7        Her husband is a pediatric

 8        oncologist in Albuquerque, and he

 9        temporarily got transferred to

10        Tulane University Medical School,

11        and she attended the MDL, a lot of

12        those in New Orleans, but we were

13        mainly active in New Jersey with

14        Judge Carol Higbee.  I don't think

15        Cindy missed any hearings either.

16             We had three other people

17        working on this in our office.

18        Once the settlement was reached,

19        we had over, I think, about 28

20        people working on settlement

21        packages, contract folks.

22             MR. LEVIN:  How many cases

23        did you put in the settlement,

24        Turner?
```

FAC Resp. Exhibit D -- 1346

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1               MR. BRANCH:  We're going to

 2          tell you, but it is 1,919 cases --

 3               MR. LEVIN:  It was a good

 4          year.

 5               MR. BRANCH:  -- we submitted

 6          settlement packages on.

 7               MS. ZEDALIS:  That's as of

 8          Monday.

 9               MR. BRANCH:  As of Monday.

10          I don't think it's growing much.

11          Cindy, you can address that.  I

12          think we're pretty much done.

13               MR. LEVIN:  Turner, that was

14          the year you and I were born.

15               MR. BRANCH:  That's right.

16          But we were fortunate enough to

17          work with other attorneys on

18          referrals, and we got a lot of

19          help from the New York attorneys,

20          and I certainly want to give

21          credit to that and to Mark Lanier

22          for helping us.  We were able to

23          -- most of our cases are

24          co-counsel cases, to submit that

FAC Resp. Exhibit D -- 1347

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          many claims packages.  I think the
 2          staff did a really good job on
 3          those.  I don't take any credit
 4          for those.  I did learn how to do
 5          a claims package, and I can do
 6          one.  I didn't do a lot of them.
 7          I mainly complained, let's see
 8          what we had done.  They did a good
 9          job.
10               Cindy, I'll let you kind of
11          summarize what you think some of
12          our contributions were.
13               I was at the Borgata enough
14          to get a black card for playing
15          blackjack.  I don't know how long
16          you have to be there to do that,
17          but I did get a black card.
18          That's kind of it.  It's been an
19          interesting experience.  It has
20          been some of the most challenging
21          litigation.  Again, I think the
22          credit goes to all of you for
23          getting the results you did, and
24          we contributed a little, and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          that's about it.

2                 Cindy, do you want to kind

3          of summarize?

4                 MS. ZEDALIS:  I had passed

5          around kind of a highlight sheet,

6          a cheat sheet, basically

7          summarizing the work that our firm

8          did for the common benefit of all

9          the plaintiffs in the litigation.

10         And of the 7400 hours of legal

11         time that we incurred, none of

12         that was incurred for discovery of

13         our individual cases.  I was the

14         person responsible for going

15         through all the time sheets and

16         basically cutting out anything

17         spent on obtaining discovery from

18         clients, doing PPFs, which really

19         took up a large chunk of most

20         people's time, which I'm sure you

21         are all familiar from complaints

22         from your staff.  With the

23         exception of our trial cases, none

24         of that time is reflected in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          74 hours.  This was all --

2              MR. LEVIN:  7400.

3              MS. ZEDALIS:  7400 hours.  I

4          don't think we would be here if it

5          was 74 hours.

6              So, in preparation, we had

7          filed almost 2,500 claims,

8          individual claims.  The majority

9          of them were in New Jersey, 780 in

10         the MDL, almost 200 in the Texas

11         MDL, 238 in New Mexico that were

12         ultimately transferred to the MDL,

13         and the remaining in Washington,

14         D.C.  As Turner told you, we had

15         filed a little over 1900 cases or

16         enrolled 1900 cases and are either

17         dismissed or in the process of

18         dismissing some of those that

19         don't quite meet the settlement

20         criteria.

21             MR. HERMAN:  The CPA that's

22         getting all the information, I

23         would call and check with them.

24         You can e-mail my office.  I'll

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          give you the e-mail of my partner,

 2          ldavis@hhkc.com.  Ask him to put

 3          you in touch with Phil Garrett so

 4          you can check with them

 5          particularly on the expenses you

 6          submitted.  He's an independent

 7          CPA appointed by the Court.  He

 8          doesn't have any connection in

 9          doing any personal work for any of

10          the lawyers or firms.  I would say

11          50% of all firms submitting time

12          costs, they are going through

13          these and checking, and a number

14          of us have had to go back and sit

15          with them and explain things,

16          particularly on the costs.  I

17          don't know how much of your costs

18          right now they have accepted and

19          how much they haven't.

20               MS. ZEDALIS:  Will they tell

21          us?

22               MR. HERMAN:  Absolutely.

23               MS. ZEDALIS:  Because this

24          has been vetted.
```

FAC Resp. Exhibit D -- 1351

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           MR. HERMAN:  Not only do
2       they tell you, they are there to
3       help, not to discourage.
4           MS. ZEDALIS:  I see.  That's
5       helpful.
6           MR. LEVIN:  Let me direct
7       myself to that.  We're in Houston
8       and we have a problem.
9           According to the accountant,
10      you have 323 hours approved.  That
11      means there's no hours under
12      submission, there's no hours that
13      are rejected.  Somehow they don't
14      have all of your hours.  According
15      to the accountant, you never
16      submitted any costs, and they
17      never approved any costs.  You
18      have to do what Russ says to
19      straighten that out.
20          MS. ZEDALIS:  I know we have
21      e-mail confirmations.
22          MR. LEVIN:  That's a big
23      difference, very big difference --
24          MR. HERMAN:  Fastest way to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          do this, I know you have a lot of
 2          money at stake here, is call
 3          Lenny, and he'll connect you with
 4          Garrett.  Spend whatever time.  A
 5          lot of the firms, I don't know how
 6          many have gone to their office and
 7          spent three or four hours and come
 8          out of there with everything
 9          reconciled.
10               MS. ZEDALIS:  I know our
11          package was about this thick, and
12          I thought we FedExed it also and
13          we e-mailed it because it was too
14          large for a single attachment, but
15          maybe something happened.
16               MR. BIRCHFIELD:  On the
17          expenses, and I know you will work
18          that out with the accountant, but
19          is this primarily -- what's
20          reflected in these expenses?  You
21          had mentioned --
22               MS. ZEDALIS:  Travel
23          expenses to and from Albuquerque
24          to New Jersey.  Travel expenses to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          and from Albuquerque and New

 2          Orleans.  It's CLE conferences.

 3          It reflects -- we had payments

 4          made to the law firms, the Legal

 5          Consortium.  I think there were

 6          two payments of $25,000 apiece.

 7               MR. LEVIN:  That was in New

 8          Jersey?

 9               MS. ZEDALIS:  That was for

10          the New Jersey litigation.

11               MR. LEVIN:  As we

12          anticipate, that cost will come

13          back out of that fund because the

14          New Jersey leadership are going to

15          file a separate affidavit for

16          those costs, and when they are

17          approved, you will get your

18          $50,000 back.  So, they shouldn't

19          be in here.

20               MS. ZEDALIS:  Okay.

21               MR. SEEGER:  Wait a second

22          though.

23               MR. LEVIN:  It is an

24          assessment.
```

Page 15

 1            MR. SEEGER:  No.  But the

 2       Jersey assessments weren't

 3       $50,000.  Was that for a specific

 4       project?

 5            MR. BRANCH:  I don't know.

 6       Why don't you check with the

 7       accountant.

 8            MR. LEVIN:  That's a

 9       different consortium.

10            MR. BRANCH:  That's probably

11       right.  We also had some things on

12       studies.

13            MS. ZEDALIS:  We had for Dr.

14       Kostis.

15            MR. WEITZ:  That was a

16       separate project.  That wasn't --

17       that was unrelated to --

18            MR. LEVIN:  Are you speaking

19       of the New Jersey consortium when

20       you say that, Eric Weinberg's

21       group?

22            MS. ZEDALIS:  That was for

23       Dr. Kostis.  The other larger sum,

24       I thought it was two payments of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          $25,000.

2                    MR. BRANCH:  It might have

3          been 15.

4                    MS. ZEDALIS:  It wasn't to

5          Weinberg.  I thought it was to --

6                    MR. WEITZ:  My firm, Weitz &

7          Luxenberg.  We'll find out.

8                    MR. BRANCH:  It is what it

9          is, and we'll submit it.

10                   MR. WEITZ:  Working with the

11         accountant will actually figure

12         out exactly what the payments were

13         for, and then we'll figure out how

14         you get reimbursed.

15                   MR. SEEGER:  By the way, if

16         you can go back and see what

17         portions are for Kostis because

18         there was a $15,000 assessment.

19                   MR. BRANCH:  I know we paid

20         that, and the rest of them, we

21         will have cancelled checks and

22         itemizations on, and I appreciate

23         Russ' idea of calling the

24         accountants, because we didn't

FAC Resp. Exhibit D -- 1356

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          know we had an incomplete

2          application.  For example, I

3          didn't know we didn't have

4          everything submitted.

5                MR. HERMAN:  Turner, there

6          are 106 firms, and among those

7          firms are consortiums of firms

8          that have submitted a packet.  It

9          could be a snafu on our end.

10                MR. BRANCH:  We didn't

11          submit it with anyone else.

12                MR. HERMAN:  What I'm saying

13          is, when you get all of that

14          material at one time, but I'm

15          certain that Garrett and Wegmann-

16          Dazet --

17                MS. ZEDALIS:  Is he in

18          Covington?

19                MR. HERMAN:  In Metairie.

20          Right across the City Line in

21          Metairie.

22                They are very accessible,

23          they'll be happy to help.  If you

24          have any problem, call Lenny or

Page 18

1        myself while you are meeting or

2        after your meeting with them.

3        We'll take a personal interest.

4               MR. BRANCH:  We thank you

5        for that, and we will do that.

6        Like I said, it is what it is, and

7        we will have the cancelled checks

8        and the verifications.

9               MR. HERMAN:  Can you

10       ballpark the dollars within any

11       range of what you think in these

12       costs are expert witness costs?

13              MR. BRANCH:  I thought we

14       had everything itemized as to

15       every single cost that we

16       submitted, Cindy.

17              MS. ZEDALIS:  We paid some

18       experts on our trial cases.

19              MR. BRANCH:  Of course, I

20       may be wrong, but I think we did.

21              MR. SEEGER:  We'll work it

22       out.  We'll help figure it out.

23              MR. BRANCH:  He's asking for

24       a ballpark.  Do you know what that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1    would be?

2          MS. ZEDALIS:  I couldn't

3    come up with it.

4          MR. SEEGER:  We don't need

5    it for today.

6          MR. WEITZ:  Cynthia, Chris

7    and I know your involvement in New

8    Jersey.  Our firms worked with you

9    guys.  As Turner said, you

10   attended all the conferences, you

11   had cases that you were pushing

12   for trial.  Explain to everybody

13   else about your 11 cases and what

14   waves they were in within Higbee's

15   court, if you had any that were

16   fully prepared for trial.

17         MS. ZEDALIS:  They were

18   identified.  We had 11 cases on, I

19   think it was the first wave or

20   second wave trial calendar.  They

21   were supposed to go in March of

22   2008.  They were identified by

23   Judge Higbee as trial cases, I

24   believe, in December of 2006.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1        we had 11 clients, New Mexico

 2        residents with heart attacks, and

 3        a lot of time was spent reviewing

 4        all of the records produced by

 5        Merck.

 6              MR. BRANCH:  You might

 7        address the depositions like

 8        Senator Altamirano and Mary

 9        Velasquez.  The 11 we had, you

10        might just talk about depositions,

11        and we were back for a couple of

12        months doing depos, and we can

13        tell you about that.

14              MS. ZEDALIS:  One of the

15        lawyers in our office, Frank

16        Baldaramo, he had packed a bag for

17        three days, he was supposed to

18        attend one deposition in Cherry

19        Hill, I think it was in your

20        office, and he started buying his

21        clothes at Wal-Mart.  He was

22        there, I think, for

23        four-and-a-half weeks defending

24        depositions for our clients.  So,
```

FAC Resp. Exhibit D -- 1360

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1            a lot of time was spent on those
 2            11 trial cases, and we were ready
 3            to go on those, including meeting
 4            with the clients, talking to the
 5            doctors, getting the hospital
 6            records, traveling to -- I believe
 7            all the depositions were conducted
 8            in either Philadelphia -- I think
 9            Ben Altamirano, who was our state
10            Senator, who is deceased now, and
11            Senator Pro-Tem of the New Mexico
12            State Senate, had a heart attack
13            after taking Vioxx, and he and his
14            wife both went and spent a few
15            days.
16                 MR. BRANCH:  And the same
17            with the Velasquez family and the
18            others.
19                 MS. ZEDALIS:  I can't
20            remember all the names off the top
21            of my head, but there were 11
22            clients, and they were all deposed
23            either in New Jersey or
24            Philadelphia.
```

FAC Resp. Exhibit D -- 1361

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          MR. BRANCH:  James Frazier

2     from Roswell, and we had 11 that

3     were put up for trial that were

4     accepted.  We had more than that,

5     but they were found for various

6     reasons not to be representative

7     clients that should be put up for

8     trial at the time, and we ferreted

9     those out.

10          Ben Altamirano, the Senator,

11     was going to be one of the first

12     cases.  He was an excellent

13     plaintiff.  As Cindy said and I

14     started to say earlier, he was the

15     President Pro-Tem of the State

16     Senate of New Mexico and had been

17     in the Senate for 47 years.  I

18     think he would have made an

19     excellent exemplar plaintiff.  He

20     was great, and his wife was

21     wonderful too.

22          Mary Velasquez -- well, all

23     of them we put up were acceptable

24     because they were ferreted by

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

 1          various and sundry people to be

 2          acceptable because we had a lot of

 3          rejects, too, of course that

 4          weren't acceptable.

 5               We did work those cases up,

 6          and I think, as Cindy said, they

 7          were going to be going.  Chris,

 8          you and Perry can tell us more

 9          exact, but I think they were going

10          to be in a wave that started

11          February or March.

12               MR. WEITZ:  That's right.

13               MR. SEEGER:  That's right.

14               MS. ZEDALIS:  Actually, the

15          11 cases that were selected, we

16          had the most of any firm with

17          representative clients in New

18          Jersey.  Our firm did.  That took

19          a large chunk of time.  I believe

20          we had cases set on the second

21          wave also, but thanks to you nice

22          people, the case settled.

23               MR. BRANCH:  We had a case

24          also set with judge -- is it Randy

FAC Resp. Exhibit D -- 1363

Page 24

1          Wilson in Texas?  Mr. Lanier knows

2          about this, because we were

3          getting help from them and Tommy

4          Fibich.  But that case, of course,

5          when the judge granted his order

6          to take everything north to Austin

7          because of preemption, that case

8          went with him.  I think we had 206

9          Texas cases with --

10               MS. ZEDALIS:  Almost 200,

11          197 in the Texas MDL.

12               MR. BRANCH:  Cindy, anything

13          else you want to highlight or any

14          questions we can answer?

15               MR. BLIZZARD:  Turner, you

16          said that you had co-counsel

17          cases?  I think you said most of

18          your cases --

19               MR. BRANCH:  Most all of our

20          cases were co-counsel with

21          referring attorneys.

22               MR. BLIZZARD:  So, you have

23          referring attorneys?

24               MR. BRANCH:  Yes, we do.  We

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1         have to share on the fees.

2                 MR. BLIZZARD:  Isn't that a

3         terrible thing?

4                 MR. BRANCH:  It is not so

5         bad.

6                 MR. SEEGER:  Thank you.

7         Always great seeing you.

8                 MR. BRANCH:  Good to see

9         everyone.

10                      -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23          Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 1366

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:        THE SNAPKA LAW FIRM
             Kathryn Snapka, Esquire
             Anita Shahani, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1367

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                      - - -

2              MR. BIRCHFIELD:  Kathy, we

3        appreciate you being here.  As you

4        know, everything is being

5        transcribed.  Judge Fallon wanted

6        to make sure that everybody is

7        aware of the Murphy Oil decision

8        and the criteria that he's set out

9        in that order.  Transparency is

10       key, and so we have a transcript

11       that will be available for his use

12       for whatever he decides is

13       appropriate.

14            Know that everything is

15       being taken down, and the floor is

16       yours.

17              MS. SNAPKA:  Great.

18            As I hope y'all remember, I

19       was involved in Vioxx back -- I

20       started in 2003.  I was initially

21       contacted with regard to four

22       cases, Benavides, Eller, Zajicek

23       and -- three cases and Garza.  I

24       became involved in Garza in 2004,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          but I'll get to that in a second.

2               Do I need to attach by

3          reference my affidavit and the

4          cover letter to the hours,

5          incorporate this?

6               MR. HERMAN:  No.

7               MS. SNAPKA:  I didn't know

8          how formal we were being about

9          that sort of thing.

10               I started in 2003 to

11          investigate the medical causation

12          and had many conversations with

13          experts that I had used before,

14          people literally in the field with

15          their experiences with marketing,

16          the heavy-handed marketing that

17          was done.  Zajicek looked to be

18          the best case.  It was a good case

19          with no risk factors in a

20          favorable venue, and I began

21          preparing -- I filed my cases and

22          began preparing Zajicek for trial.

23               In the meantime, because

24          I've worked with them for years,

FAC Resp. Exhibit D -- 1369

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        the law firm of Hockema Tippit &
 2        Escobedo, as they were known at
 3        the time, I was talking to David
 4        Hockema, and David said his
 5        partner, Joe Escobedo, was working
 6        on a Vioxx case in Starr County,
 7        and they were further along than I
 8        was.  He said, you've done
 9        pharmaceutical litigation, because
10        I had done a fen-phen case, and he
11        said, why don't you try the case
12        with us.  So, I said, that was
13        fine, I would bring what I had,
14        they would bring what they had.
15            I talked to Joe about the
16        depositions, the corporate
17        depositions that he had done.  One
18        of the things that was happening
19        was, particularly when Shelly was
20        taking the depositions, they were
21        saying, I don't know, I'm not
22        sure, you would have to talk to
23        somebody else who would know that.
24        So, Joe was actually one of the --
```

FAC Resp. Exhibit D -- 1370

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        he was the first person to take

2        Bold, Tacconi, Silverstein and, of

3        course, Santanello.  He was the

4        first one to take the documents we

5        had distilled from the production

6        and take those depositions first.

7        I think they became obviously

8        critically important later.

9        Santanello was used in both Mark's

10       trial with the corporate rep and

11       in the Garza trial as the

12       corporate rep.

13            We prepared Garza and had a

14       trial setting, and we were getting

15       the case ready for trial.  It was

16       set for trial in November of 2004.

17       As you all know, it was removed,

18       remanded, and then I got the

19       Zajicek case -- as I said, I was

20       working both Zajicek, Eller, and

21       Benavides was not a strong case, I

22       did some research into it, but it

23       was not -- the plan was to try

24       Garza first and then to try

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          Zajicek.

2                    MR. BIRCHFIELD:  Where was

3          Zajicek pending?

4                    MS. SNAPKA:  It was in

5          Jackson County, Texas.  As you

6          know, Andy, it was the case where

7          we went and visited with the

8          medical examiner, and he actually

9          was able to -- kept the blood and

10         was able to run it some years

11         after her death and found

12         rofecoxib in the blood.  So, I

13         think that had an impact, I

14         understand later on, from what you

15         told me.

16                   MR. BIRCHFIELD:  There's a

17         clause in the settlement agreement

18         just for that case.

19                   MS. SNAPKA:  That's right.

20         I never understood why other

21         people didn't do the same test,

22         because I thought it would be very

23         instructive on cases where

24         autopsies were performed and blood

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1       was retained, but anyway, they may

2       have.

3            So, we were prepared for

4       trial, we were ready to go to

5       trial, and Merck got a continuance

6       granted in November of 2004.  We

7       got a resetting for February of

8       2005.  And after the withdrawal --

9       I'm just going to go in sequential

10      order because it is more logical

11      for me to do that.

12           At the time of the

13      withdrawal, I knew that Vioxx was

14      going to be important litigation.

15      And so what I did was, I had

16      already been in contact with

17      Shelly, I knew that she was

18      working with you, Mark.

19           MR. BIRCHFIELD:  Shelly

20      Sanford?

21           MS. SNAPKA:  Yes.  And

22      actually had been out to visit

23      David.

24           MR. BIRCHFIELD:  David

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1      Miceli?
 2             MS. SNAPKA:  That's right.
 3      David Miceli.  And so what I did
 4      was, as far as Texas was
 5      concerned, knowing from the
 6      fen-phen litigation that the Texas
 7      litigators would be and should be
 8      out front in this litigation, I
 9      set up a meeting at the Four
10      Seasons Hotel in October of 2004
11      and tried to get everybody I could
12      think of and encourage them to get
13      everybody they could think of so
14      that we could share the
15      depositions, the theories, what we
16      knew from preparing for the Garza
17      trial.
18             I remember I talked to Maura
19      from your office, Mark, and you
20      were in trial, and I think we
21      moved it, but y'all still weren't
22      able to make it, unfortunately,
23      for that meeting.
24             MR. LANIER:  Nine week
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          trial.

2               MS. SNAPKA:  We had probably

3          40 people, and I thought that was

4          important to get everybody

5          together and everybody connected,

6          show them what we had and make

7          available what we had learned

8          through the deposition process,

9          but most importantly, the

10         documents that we had gleaned from

11         going through the millions of

12         pages of production as y'all are

13         aware.

14              I organized another meeting

15         December 8th, and I was trying to

16         remember -- one of the things I

17         would like to point out is the

18         hours I reconstructed are only

19         attorney hours.  The legal

20         assistant, who was my prime legal

21         assistant during this time period,

22         left to go sell real estate.  I

23         did not feel competent that I

24         could accurately represent legal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          assistant time, so, for the time

2          period that I've submitted, those

3          are only attorney hours, period.

4          Nothing else.

5               In any event, I know that

6          you and Paul, Andy, you and Paul

7          Sizemore came to one of the

8          meetings that we had in Houston

9          because I was trying to get

10          everybody that I could think of

11          together so that we could share

12          and present a unified and united

13          front.

14               I was also desperately

15          trying to get the Garza case to

16          trial because I knew the case, I

17          knew the case well, I knew that it

18          was in a really great venue, and

19          even though there were a lot of

20          risk factors which I thought was

21          critical to push that case for

22          trial, because it would

23          demonstrate that the target group

24          for Vioxx was going to be the most

FAC Resp. Exhibit D -- 1376

Page 11

1      affected, and I knew that we could

2      make that case based upon the

3      distinct fact pattern of Garza.

4           As you know, the MDL was

5      created, Merck removed it again,

6      less than 30 days before trial,

7      and everything sort of ground to a

8      halt at that time.

9           MR. BIRCHFIELD:  Just so you

10     know, Kathy, we just met with Joe

11     Escobedo, and Russ outlined for

12     him your tremendous effort, the

13     effort that both of y'all made in

14     getting that case remanded.  Joe

15     took us through the timeline of

16     the incredible struggle, the

17     timeline of getting that case

18     remanded and getting it sent back.

19     Let me tell you what Russ said to

20     Joe.  I mean, your effort in

21     getting that case remanded was

22     spectacular.  You dogged it all

23     the way.

24           MR. HERMAN:  I thought you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1        were tenacious, persistent, and

 2        without you pushing that at every

 3        PSC meeting and every status

 4        conference, that case might still

 5        be lingering now.

 6             MS. SNAPKA:  Thank you very

 7        much.  I appreciate that

 8        recognition.  It means a lot to

 9        me.

10             MR. BIRCHFIELD:  Joe

11        provided us with a detailed

12        timeline of the Garza case.

13             MS. SNAPKA:  I will say that

14        Joe is a tremendous lawyer, and he

15        is the one who literally looked at

16        every page of that production when

17        we were putting the case together.

18        I can't say enough about what he

19        personally did as far as getting

20        that prepared.  We were

21        prepared -- that was what was so

22        frustrating for me personally, is,

23        we were prepared to go to trial.

24        We were ready to go, and then we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       did go.

2              In the meantime, what I was

3       doing was continuing -- I was

4       named by the Texas Supreme Court

5       as the plaintiffs' liaison

6       counsel, and then I continued in

7       that role, and we had -- and I

8       don't want to misrepresent, but it

9       was the first or second hearing I

10      think I was replaced by Tommy

11      Fibich as liaison, which certainly

12      made sense, because Tommy is in

13      Houston.  But I continued on the

14      Texas MDL, flying back and forth

15      and trying to push four trials.

16             In the meantime, I had

17      referred many other cases and

18      wanted to pick the best cases to

19      try.  In that mix was the Nettles

20      case, which was a young man who

21      suffered a catastrophic stroke.  I

22      was developing that case, meeting

23      with his neurologist, meeting with

24      his treating physicians,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          proceeding with what I could

2          there.

3               I was also working on

4          Zajicek, because it was not

5          constrained by any of the Texas

6          MDL.  After we got it back out of

7          the Texas MDL, both Eller and

8          Zajicek, since they were pre-MDL

9          cases, both of those cases were

10         not subject to the constrictions

11         of time on either of the Texas MDL

12         or the federal MDL.  So, we

13         continued to pursue discovery,

14         retention and consultation with

15         experts.  And while we sought

16         remand -- Russ, you were there at

17         the emergency motion for remand in

18         July of 2005.  And then, of

19         course, your unfortunate

20         experience with the hurricane sort

21         of brought that to a standstill.

22              But we continued on with

23         discovery in Nettles and Zajicek.

24         And then of course in November, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          got the great news that Garza got

 2          the remand.

 3              And honestly from that point

 4          until we got the verdict, that was

 5          what we did.  We prepared for

 6          Garza, and I'm sure if -- I don't

 7          want to duplicate what you've

 8          heard, but we have an odd system

 9          in Starr County where you start

10          trial for a week --

11              MR. LEVIN:  We heard.

12              MS. SNAPKA:  It is not like

13          you can say, okay, I'm going to

14          take a break and go try another

15          case and then come back.  So, what

16          you do is you get your daily copy,

17          and you plan what you are going to

18          do next.  There was a week in

19          there that is not accounted for

20          when my son had a tonsillectomy in

21          Houston.  Other than that -- other

22          than the tonsillectomy, I was back

23          at it.  And we stayed with the

24          Garza trial, and I outlined what
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        we did.  I selected the jury, I

2        put on our cardiologist, I

3        cross-examined Dr. Wheeler, I put

4        on a plaintiff or two, and I was

5        supposed to cross-examine Dr.

6        Reicin.  And I kept asking over

7        and over again, are you going to

8        bring her?  And that's the one

9        case they didn't bring her in.

10       So, I didn't get to cross-examine

11       her, which was a huge

12       disappointment to me.

13            After that, sometime during

14       that time period, they had

15       selected Arnold and Gomez for a

16       preemption motion, and I told

17       Anita to drop everything and begin

18       briefing.  We had briefed quite a

19       lot of it because she had filed

20       several responses in other cases,

21       and then we started to coordinate

22       with your office, Arnold.  I know

23       I was very protective because my

24       feelings always --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1              MR. LEVIN:  It was your

2        client.

3              MS. SNAPKA:  It is my client

4        and my case, and I appreciate very

5        much the assistance, but I also

6        appreciate the fact that I was

7        allowed to speak and certainly

8        present the facts.

9              MR. LEVIN:  Collectively, we

10        did it.

11              MS. SNAPKA:  Collectively,

12        we did it.

13              Then when Nettles was

14        removed, again, I was there to try

15        and pull Nettles back because it

16        was the double remand case.  Andy,

17        you had some double remand cases,

18        and my goal was to get these cases

19        back to demonstrate that Merck was

20        simply trying to avoid going to

21        trial and would do anything.  I

22        have the transcripts where it was

23        discussed.  Even though it never

24        got remanded, I was there in my

FAC Resp. Exhibit D -- 1383

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          spot to try to get them remanded.

2                Zajicek proceeded, and we

3          actually -- the first trial

4          setting for Zajicek was actually

5          October of 2005.  Since the plan

6          was to try Garza first, we ended

7          up moving the Zajicek trial.  It

8          was set for trial in February of

9          2008.  It was set for trial at the

10         time that the settlement was

11         announced.

12               At the point at which

13         Zajicek -- where we were was, we

14         were going to do some genetic

15         testing on Vanessa Zajicek's blood

16         to eliminate the genetic tendency

17         toward arrhythmia because we

18         believed she didn't have it.  So

19         we were actually scheduled for a

20         hearing at the end of November on

21         the testing of the blood to again

22         eliminate that as a possibility

23         for her arrhythmia and sudden

24         cardiac death.

FAC Resp. Exhibit D -- 1384

Page 19

```
 1              I was under the impression
 2         that I was supposed to just stop
 3         at November 9th, and I could be
 4         wrong about that.
 5              MR. HERMAN:  Well, why don't
 6         you tell us since November 9 what
 7         activities you've had.
 8              MS. SNAPKA:  The primary
 9         activity, honestly, I believed --
10         I was sitting in court when the
11         settlement was announced.  Of
12         course, I had no idea --
13         everybody was rumoring, and there
14         were people calling me saying send
15         us all of your cases, there's
16         going to be a settlement or
17         whatever.  So, as the settlement
18         was being explained, the one thing
19         that concerned me greatly was the
20         requirement that the attorney was
21         obligated to recommend the
22         settlement to all clients.  I
23         believed in my heart that that was
24         a violation of Texas ethics.  And
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          although I was clearly not part of

2          the plaintiffs' negotiating

3          committee, I believed that I had a

4          duty and responsibility to say

5          something.  I understood that Lynn

6          Baker had been retained, and so I

7          was the one that called Charlie

8          Silver, the professor who hired

9          Lynn Baker, and I said, I need you

10         to review this.  I had a

11         conversation with Ed, and Ed kept

12         saying no, no, it is okay, we

13         talked to Lynn about it.  I

14         nonetheless wanted independent

15         confirmation that the settlement

16         was as good as it could be and

17         that everybody in the nation

18         could, without reservation,

19         participate in the settlement.

20              So, I personally retained

21         Charlie Silver, and then within a

22         day or two, Tommy Fibich joined me

23         in retaining Charlie Silver.  Then

24         there were several other people

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1      who also, we discussed it.  We

2      went to New Jersey and met with

3      Judge Higbee.  I believe that

4      there were some --

5           MR. SEEGER:  Which I

6      arranged for you.

7           MS. SNAPKA:  Absolutely,

8      Chris, thank you very much.  What

9      I appreciated from the committee

10     was that even though it was

11     difficult to discuss, that I think

12     everybody kept in mind that what

13     we were trying to do was to make

14     this settlement one that everyone

15     without reservation could enter

16     into and not feel that they had

17     any qualms whatsoever about it,

18     and I think we ended up

19     accomplishing that.

20          MR. BIRCHFIELD:  Your

21     initial reaction is certainly

22     understandable.  You got the

23     settlement agreement, and it had

24     to be for all clients.  But what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1       you were not able to distill at

2       that moment is that we had been

3       working for 11 months to make sure

4       that it would be a settlement that

5       would work and would be in the

6       interest of every client

7       regardless of risk factors and all

8       of that.  And so that's why your

9       reaction was understandable.

10          MR. HERMAN:  Let me add what

11      I said earlier today in another

12      presentation.

13          First of all, throughout our

14      negotiations, Ed Blizzard was in

15      the forefront particularly in

16      terms of the Texas potential

17      ethics situation.  There wasn't

18      anything put on paper without the

19      retention of three ethics experts,

20      and Lynn Baker, actually, along

21      with two other ethics experts,

22      drafted the language of the

23      agreement.

24          Once the agreement went into

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          effect and Judge Higbee, Judge

2          Fallon and Judge Chaney looked at

3          it and it passed muster with them,

4          our collective feeling was not

5          that the lawyers in Texas were out

6          of line in getting the ethics

7          opinions that they needed to

8          satisfy themselves and their

9          clients.

10              MR. SEEGER:  I agree with

11         that, by the way.

12              MR. HERMAN:  We had a full

13         day meeting in Atlanta.  I believe

14         that Professor Silver was there.

15         I know that also they brought

16         Harry Potter in.  So, I want you

17         to know that we don't have an

18         adverse reaction at all to that

19         being done.  As a matter of fact,

20         once the Texas concern, legitimate

21         concern, was resolved --

22              MR. SEEGER:  I have to stop

23         you there, because there's

24         something very important, Kathy,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1      I'm sorry, but just because we are

2      making a record.

3          The agreement had not been

4      changed.  There are people that

5      have this impression.  It says

6      exactly what it says.  It says

7      exactly what we intended it to

8      say.  I think at the end of the

9      day, what happened was, we had

10     some letters passed around, some

11     documents clarifying, saying this

12     is how we understand this.

13         MS. SNAPKA:  The

14     interpretation.

15         MR. SEEGER:  That was really

16     because you guys had a concern

17     with it.  But the document, we

18     were very comfortable in the

19     beginning and still are.  This

20     sounds like a technicality --

21         MR. HERMAN:  After the

22     various points were expressed, it

23     not only had a good effect and a

24     better understanding for Texas,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        but also for the country.  Because

 2        there were other folks from other

 3        states that were looking for a way

 4        to criticize, and they had sort of

 5        latched on to this issue.  When it

 6        was resolved and the document was

 7        fully understood, it went away for

 8        everybody.

 9             MS. SNAPKA:  And I know I

10        wasn't popular.  I understand

11        that.

12             MR. LEVIN:  You were never

13        not popular.

14             MR. SEEGER:  I hope we're

15        not leaving you with that

16        impression, but you were very

17        helpful.

18             MS. SNAPKA:  To the simple

19        extent that we are talking about

20        common benefit work done, I would

21        hope that my concerns and my

22        actions that I took in hiring

23        Charlie initially and then getting

24        everybody together to talk about
```

FAC Resp. Exhibit D -- 1391

Page 26

1            it were viewed as ultimately

2            beneficial.  That's my purpose in

3            discussing it.  That's all I'm

4            saying.  That's what I meant.

5                  MR. LEVIN:  We understand.

6                  MR. HERMAN:  I think you can

7            be assured of that.

8                  MS. SNAPKA:  Because you

9            said, go ahead and talk about what

10           it was after that.  That's what I

11           would say, is whatever I did

12           initially and ultimately in

13           working with everybody to get it

14           to where it is right now.  That's

15           what I'm trying to say.

16                 MR. BIRCHFIELD:  Kathy, how

17           many cases have you submitted to

18           the settlement program?

19                 MS. SNAPKA:  All of my

20           clients elected to go into the

21           settlement program, which is 87.

22                 MR. WEITZ:  Other than

23           Nettles and Zajicek, did you have

24           any other cases that were on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1          trial --
 2               MS. SNAPKA:  Yes.  Eller.
 3          In fact, what's really funny is,
 4          Eller is still set for trial.
 5          That's a very interesting one.
 6          And I talked to Phil Wittmann
 7          after that to say, you reported no
 8          trial settings, but we actually do
 9          have a trial setting in Eller.
10          It's a quirk, but, yes.  Eller has
11          been and continues to be set for
12          trial.
13               MR. BIRCHFIELD:  Have you
14          submitted Eller in the settlement?
15               MS. SNAPKA:  Yes.  Eller is
16          submitted, but the judge refused
17          to dismiss it while the settlement
18          was pending because --
19               MR. BIRCHFIELD:  In case it
20          doesn't pass the gates?
21               MS. SNAPKA:  That's correct.
22               MR. BLIZZARD:  Where was
23          Nettles pending?
24               MS. SNAPKA:  It was
```

FAC Resp. Exhibit D -- 1393

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          originally filed in Beaumont, and

2          then it was removed to Federal

3          Court.  Judge Crone remanded it.

4          It went back to Beaumont, to

5          Jefferson County, and then it went

6          into the Texas MDL where it was

7          removed again, and then it was in

8          the Federal MDL.  But there was

9          extensive discovery done on the

10         case.  Nettles was one of the

11         cases that was a Texas pick for

12         stroke.

13              MR. BLIZZARD:  But it was in

14         the Federal MDL ultimately?  Where

15         was it in terms of discovery when

16         it was removed the last time to

17         the federal MDL?

18              MS. SNAPKA:  The treating

19         physician, we had retained the

20         experts and designated them, the

21         case specific experts.  I believe

22         the case was removed at that time.

23              MR. BLIZZARD:  Depo of the

24         plaintiff.  Were there depos of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          other experts?

2                    MS. SNAPKA:  Only of the

3          treating/prescribing physician,

4          who had given him the Vioxx.

5                    But to the extent that there

6          were double removal cases, and I

7          was, again, trying to demonstrate

8          a pattern with Merck trying to

9          avoid trials, I was up there every

10         time being annoying.

11                   MS. SHAHANI:  Or dispatching

12         me to do that.

13                   MS. SNAPKA:  If I couldn't

14         be there.

15                   I believe that anything post

16         November 9 is pretty much taken

17         up -- I've already discussed the

18         issues, and that would be the only

19         thing that I would be submitting

20         additionally.  I don't know if I

21         can or will and whatever.

22                   MR. BIRCHFIELD:  Any other

23         questions?

24                   MR. SEEGER:  No.

Page 30

1           MR. BLIZZARD:  I was just

2      going to point out that currently

3      your hours are under review by the

4      accountant at least according to

5      this report that we have, and the

6      expenses are being shown as being

7      under review also.  Is there

8      anything we can do to help with

9      that?

10          MR. LEVIN:  He's probably

11     working on that because if you

12     were in trouble, they would be

13     rejected.

14          MS. SNAPKA:  That's good to

15     know.  Let me just say that --

16          MR. BIRCHFIELD:  Don't panic

17     if you get a rejection letter.

18     Just respond quickly and get us

19     involved.  It has happened quite

20     frequently.  You just need to work

21     at it.

22          MR. SEEGER:  We'll give you

23     Arnold's cell phone number.

24          MS. SNAPKA:  I think I have

Page 31

```
 1        it, actually.

 2              One of the things they did

 3        do is they rejected all of my

 4        hours prior to the MDL, and I went

 5        nuts.

 6              MR. SEEGER:  They did with

 7        me too, though.  We all went

 8        there.

 9              MR. LEVIN:  They were

10        working under guidelines of the

11        MDL.  And then when all the state

12        litigants came in, it took them a

13        while to get oriented.

14              MS. SNAPKA:  I'll let y'all

15        know.

16              In 28 years of practicing

17        law, what I found with every type

18        of case is that corporations will

19        recognize, assess and contain

20        their risk only after trial or if

21        there's a threat of trial or

22        during trial.  I say that as a

23        perspective from a trial lawyer.

24        I was trained at Baylor like Ed
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          was, and they taught us to try

2          cases.  That's all I know how to

3          do.  I'm not good at the other

4          stuff.  That was the one thing

5          that I thought, as far as a common

6          benefit, was they had me sort of

7          as a loose cannon out there.

8          Every time I possibly could, I was

9          going to push for a trial.  That's

10         where I was headed.  My only

11         regret is I didn't get to try more

12         cases.

13              Do y'all have any questions?

14              MR. SEEGER:  I think we

15         asked them.

16              MS. SNAPKA:  Thank you.

17              MR. BIRCHFIELD:  Thank you,

18         Kathy.

19                   -   -   -

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1                 C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          WHITE & WETHERALL, LLP
               J. Stewart White, Esquire


BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1400

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. SEEGER:  As you know,
 3         we're the Vioxx fee committee.
 4         We've got a court reporter taking
 5         everything down because Judge
 6         Fallon at some point may want to
 7         take a look at the transcript.
 8         You can say and do anything you
 9         want.  The floor is yours to
10         present any way you want.
11              You should probably state
12         your name for the record and tell
13         us your common benefit
14         contributions.
15              MR. WHITE:  I'm Stewart
16         White from the law firm of White &
17         Wetherall in Reno, Nevada.  It
18         used to be White Meany &
19         Wetherall, but we got rid of
20         Meany.
21              You will be happy to hear
22         that I had nothing whatsoever to
23         do with Barnett.
24              MR. SEEGER:  I'm very happy
```

FAC Resp. Exhibit D -- 1401

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          to hear that.
 2                MR. WHITE:  I've just got a
 3          ten-minute analysis of the factors
 4          of 6(D) that I think applied, and
 5          I'll be kind of businesslike and
 6          right to the point.  I want to
 7          thank you for your time in doing
 8          all of this.  I know it's got to
 9          be hard for you.
10                But our case, as you
11          probably know, did not actually go
12          to trial.  It was scheduled very
13          close in October of '07 --
14                MR. WEITZ:  What was the
15          name of that case?
16                MR. WHITE:  Crandall versus
17          Merck.
18                We weren't on any of these
19          plaintiff committees.  We are on
20          the HT governing committee, but
21          there's four of us attorneys, so
22          we can't be on every one of them.
23          Nevertheless, I feel that our
24          pending Crandall case was one of
```

FAC Resp. Exhibit D -- 1402

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          many factors that must have gone

2          into the decision of Merck to

3          settle all the cases.  We were

4          just working them and pounding

5          them on this Crandall case with

6          great vigor from January '07, when

7          we selected it, all the way up to,

8          even past October of '07, right up

9          until the time the settlement was

10         announced.

11              The Court authorized in 6(D)

12         some appropriate -- the applicable

13         state courts for common benefit,

14         and that's me.

15              MR. WEITZ:  Did you have a

16         trial date?

17              MR. WHITE:  Yes.  October 1,

18         '07.

19              MR. BLIZZARD:  What

20         happened?

21              MR. WHITE:  When that Oxford

22         study came out -- my co-counsel

23         was Mark Robinson and all of his

24         people.  When that Oxford study

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1       came out, what was it, VICTOR or

2       something, there was a lot of

3       additional good information in

4       that that Mark -- and it came out

5       in July or something, and we

6       wanted to make this one perfect,

7       and we stipulated to a

8       continuance.  We reset it for June

9       of the following year.  But we

10      kept working and deciding motions

11      even after that.  We didn't just

12      drop it.  We kept going.

13              MR. BLIZZARD:  So, the

14      VICTOR study came out in June.

15              MR. WHITE:  I don't know,

16      wasn't it June or July or

17      something like that?

18              MR. BLIZZARD:  Did you seek

19      a continuance around that time?

20              MR. WHITE:  Right.  Right.

21              MR. BLIZZARD:  It was in

22      Reno?

23              MR. WHITE:  Reno, Nevada.

24              Anyway, the affidavit

FAC Resp. Exhibit D -- 1404

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        factors.  One is -- the first one,

 2        it says the extent to which my

 3        firm made a substantial

 4        contribution to the outcome.

 5        Basically, that's so general, you

 6        have to look at all of the other

 7        factors.  It was selected in early

 8        '07 by us for trial.  It was set

 9        initially for June of '07 in a

10        prior case's spot, but we had a

11        lot of work done then basically on

12        Crandall, just concentrating on

13        that one case from January '07 --

14        December '06 on.  The defendant

15        got the trial moved back from June

16        '07 to October 1, '07, but we used

17        that additional time to prepare

18        even more.

19             The other factor, quality of

20        our firm's work.  Basically, they

21        did not win, Merck did not win one

22        motion of any substance whatsoever

23        during this entire litigation.

24        They only had two successes
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          really.  One is that they got that

2          trial moved back from June 20th of

3          '07 to October 1, a very short

4          period of time, not the several

5          many, many months they wanted

6          because of all of this pending

7          litigation.  The Court granted

8          their motion to stop my brother

9          from making so many speaking

10          objections at the doctors'

11          depositions.  That was it.  That

12          was the only two won.

13              This is the quality I want

14          to talk about.  We maneuvered

15          first to get all of the Reno Vioxx

16          cases before an experienced trial

17          judge.  Our firm was the only one

18          that was doing Vioxx in Nevada

19          basically.  We had some cases in

20          Reno or northern Nevada and some

21          cases in Las Vegas.

22              There was one other

23          attorney, Will Kemp, some of you

24          may know him, from Kemp &

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          Harrison.  He had some Vioxx

2          cases, but he said they were

3          really bad cases, so you go first.

4          So, we were going first, and we

5          did.

6               We got in front of an

7          experienced Judge Brent Adams with

8          whom we had other successes.  He

9          knew we were competent in drug

10         litigation.  He trusted us.  The

11         local defense counsel from Merck

12         was from Las Vegas.  The judge

13         didn't really know them.  The

14         other defense counsel were

15         primarily guys like Andrew Rudge

16         and Paul Boehm and David Blatt

17         from Williams & Connolly.  At some

18         depositions they would send people

19         from Venable in D.C. and Fulbright

20         & Jaworksi, I don't remember who,

21         Cooley Godward Kronish, Sedgwick

22         Detert, Hughes Hubbard & Reed.

23         They were paying a lot of

24         attention to the case, I think.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1              So, from the very beginning,

 2         they wanted a role in selecting

 3         the bellwether cases.  We did not

 4         let them have a role.  The judge

 5         denied them.  We told the judge

 6         that we had a burden of proof, we

 7         get to pick the case that goes

 8         first, and we picked them.

 9              MR. WEITZ:  That's a good

10         way to approach it.  I wish more

11         judges would do that.

12              MR. WHITE:  There's a lot of

13         good reasons.  I read all those

14         bellwether arguments.  There's

15         lots of good reasons to do it the

16         other way besides the way we did

17         it.  So far we have been able to

18         keep that out of Nevada in our HT

19         litigations and fen-phen and

20         everything else.  We just show him

21         that's the way we've always done

22         these mass torts, and they keep

23         doing it every year from then on.

24         I'm certainly not criticizing the

FAC Resp. Exhibit D -- 1408

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1          way it works in the other

 2          jurisdictions because there are

 3          just some things that have to

 4          happen like that.

 5               MR. WEITZ:  I think we wish

 6          that in all jurisdictions.

 7               MR. WHITE:  That's what we

 8          did.

 9               And then the Court didn't

10          set the case out for two years

11          like they wanted to set it out.

12          They set it real quickly.  Then we

13          won all the other arguments, from

14          the timing of the sales rep

15          deposition, to using expert

16          reports on general causation that

17          were in the other litigation in

18          Nevada, using already decided

19          expert depo designations and

20          exhibit foundations from -- like

21          Robinson's case in Berwick in

22          California and the MDL.

23               My impression, basically, we

24          kept them pretty much on their

FAC Resp. Exhibit D -- 1409

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          heels the whole time from January

2          '07 until October of '07, November

3          '07 when the settlement was

4          announced.

5               MR. WEITZ:  What was the

6          division of work between your firm

7          and Robinson's firm?

8               MR. WHITE:  Basically, as

9          you can see from the time, it

10         worked out 60 percent our work, 40

11         percent Mark's work.  They were

12         just invaluable along with Andrews

13         & Thornton in getting experts.

14         They had gone through the trial.

15         They knew the evidence.  They knew

16         all of those hundreds of thousands

17         of documents and which ones were

18         the best hot documents to use.

19         So, they were in charge basically

20         of getting our experts, of

21         handling all of our experts.  I

22         don't remember all their names.

23         Abramson and some of the others

24         that Mark Robinson's firm used and

FAC Resp. Exhibit D -- 1410

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          Andrews & Thornton's firm used.

2          They assisted in the treating

3          physicians' depositions even to

4          the point of coming over sometimes

5          and helping us prepare them for

6          the depositions, but not on all of

7          them.

8                And then at trial basically

9          I was going to be doing like a lot

10         of the local people, my clients,

11         some of the smaller doctors, the

12         local doctors.  If they were

13         experts, Mark's firm's people were

14         going to handle them.  We had just

15         innumerable people at our disposal

16         from Mark's firm, and they helped

17         quite a bit as well.

18                Anyway, there's another

19         three factors I'm going to put

20         together, that one about

21         consistency, amount, duration and

22         intensity to the litigation,

23         commitment, level of partner

24         participation, and activities

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1        surrounding the individual trials,

 2        including non-MDL bellwether

 3        trials that impacted proceedings.

 4        The consistency, amount and

 5        duration you can see from our time

 6        sheets.  I've got like 1500 hours

 7        in this from January until we

 8        stopped.

 9             My partner, Geoff, my

10        brother also, was involved in the

11        successful motion to remand the

12        Crandall case after Merck removed

13        it on the grounds of fraudulent

14        joinder.  We sued Merck and about

15        11 Merck sales reps that were from

16        Nevada in order to defeat federal

17        diversity jurisdiction.  We got

18        their names from a source that we

19        had that was a sales rep in the HT

20        litigation, and so we knew they

21        were Nevada people, and of course

22        they removed it on the grounds of

23        fraudulent joinder.  Geoff did all

24        of that work in June and August of
```

FAC Resp. Exhibit D -- 1412

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1            '05 on this case, Crandall.

 2                  We filed 20 lawsuits with

 3            about five or six plaintiffs plus

 4            their spouses in each case and

 5            tried them all together.

 6                  MR. WEITZ:  How many total

 7            cases?

 8                  MR. WHITE:  We had about 106

 9            cases after we carefully vetted

10            them all.  We still have about 93

11            or 94 in the settlement that are

12            going through the settlement.

13                  MR. WEITZ:  Did you file

14            them all in Reno state court?

15                  MR. WHITE:  We filed about

16            half in Reno and about half in

17            Vegas.  If they lived in the

18            southern Nevada area, that's where

19            they went.  If they lived in

20            Carson City, little towns around

21            Reno, they went to Reno.

22                  But Geoff did all that work,

23            and he was specifically involved

24            in all the treating doctors'
```

FAC Resp. Exhibit D -- 1413

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          depositions, preparing them for
 2          depositions, attending some of
 3          them in April and June of 2007,
 4          went to all the status conferences
 5          with the Court, attended the
 6          meetings, a lot of the meetings we
 7          had with defense counsel and
 8          co-counsel.  That's that partner.
 9               David Meany, my partner,
10          became more deeply involved in it
11          when fen-phen slowed down a little
12          bit in the treating doctor depos
13          and a lot of those sales rep
14          depositions.  But he's a very good
15          researcher and writer, and he
16          handled all of that motion
17          practice that Merck just throws at
18          you continually.
19               Partner, Peter Wetherall,
20          was in Vegas.  He had pretty
21          peripheral involvement because we
22          had that HT trial coming up also
23          in October '07 at the same time as
24          this trial, and he was doing that
```

FAC Resp. Exhibit D -- 1414

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          with Zoe Littlepage and Rainey

2          Booth, and he attended status

3          conferences, but he mostly just

4          kept them percolating down there.

5          The judges down there thought it

6          was okay if we went first.

7               We kind of worked out a

8          state coordination on our own.

9          All of our 20 cases were filed in

10         random number with different

11         judges, but Judge Adams, we

12         convinced, was a good one to do

13         these cases.  And so we basically

14         had all the Reno cases in front of

15         Judge Adams, and I forgot the name

16         of the judge down in Vegas.  All

17         the Vegas cases were in front of

18         that judge.  Periodically those

19         two judges would talk, but not

20         much.  But we kind of did our own

21         coordination with the cooperation

22         of Merck's counsel.

23               Then myself, participating

24         as a partner, and then I had one

FAC Resp. Exhibit D -- 1415

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          or two paralegals extensively
 2          involved really throughout, we're
 3          just concentrating on Crandall,
 4          though, we did the initial vetting
 5          of the case and getting all the
 6          medical records and plaintiff fact
 7          sheets and all of that.  That's
 8          kind of normal stuff.  Then the
 9          summer of 2005 remand stuff.
10              In late 2006, early 2007, we
11          decided that Crandall was a better
12          case than the case we had set for
13          June of '07, and convinced the
14          judge to let us switch cases in
15          January of '07.  There was -- the
16          ones we had set were a couple of
17          stroke cases and a heart attack,
18          and we thought there was much
19          better science for heart attack
20          cases.  So, we wanted to do a
21          heart attack like Crandall first.
22          So, we got the Court's permission
23          to move it in its place.  And
24          that's Jerry Crandall.  That's
```

FAC Resp. Exhibit D -- 1416

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          eventually -- the judge moved it
 2          from June '07 back to October of
 3          '07.  Crandall was a white male,
 4          mid 40s, nonsmoker, no other real
 5          risk factors.  Good health,
 6          physically active, hiking, cross
 7          country skiing, all of that,
 8          taking 50 milligrams of Vioxx for
 9          a couple of months before his
10          heart attack from his general
11          practitioner for thumb arthritis
12          in one thumb.  Thought it was a
13          really good representative case.
14          September 4, 2004, he's hiking up
15          Mt. Talac overlooking Lake Tahoe,
16          and the top of the mountain is
17          10,000 feet.  He goes 4,500 to
18          10,000 feet with his adult
19          daughter.  He was taking Vioxx
20          daily.  He specifically remembers
21          taking it that morning because he
22          says, I know from my hiking
23          experience coming down the
24          mountain, there's such a pounding
```

FAC Resp. Exhibit D -- 1417

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        on your joints, and my joints hurt

2        a lot, and so I took Vioxx, I'm

3        sure, that morning.  He had a

4        heart attack while he was sitting

5        there resting up at the top.  He

6        could feel it was a heart attack.

7        There was no phone service or

8        anything up there.  But he's an

9        experienced hiker, and altitude

10       sickness, you use aspirin, so, he

11       always had aspirin in his

12       backpack, and he took an aspirin

13       right after he started down.  And

14       it turned into kind of a mild

15       heart attack.  That was okay.  I

16       didn't care -- I mean, it would

17       have been nice if he had really

18       great injuries, but it was still a

19       really good case.

20            MR. WEITZ:  It saved his

21       life.

22            MR. WHITE:  I think so.  So,

23       we switched that in there.  And

24       insofar as activities in this

FAC Resp. Exhibit D -- 1418

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          trial that impacted the

 2          proceedings on a common benefit

 3          level, a lot of it had to do with

 4          the jurisdiction in Nevada, which

 5          I'll go into in a minute, and

 6          probably a lot of it had to do

 7          with having Robinson Calcagnie as

 8          co-counsel, which helped a lot,

 9          because they'd run that other

10          case.  I told you what their role

11          was.

12               One activity that I

13          mentioned already was suing the 11

14          sales reps.  That kept us out of

15          Federal Court, which we didn't

16          want to be there, and you'll see

17          why in a minute.  But we also

18          thought one of them might get us

19          some pretty good information about

20          the marketing of the drug.

21               An example of Merck not

22          winning any motion, the Court

23          denied Merck's telephonic motion

24          in May of '07 for a protective
```

FAC Resp. Exhibit D -- 1419

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1          order to not let us take
 2          depositions of sales reps unless
 3          they had actually detailed one of
 4          our doctors.  The Court denied
 5          that motion, our argument being
 6          that, well, no, this sales rep
 7          detailed Dr. A, and Dr. A infected
 8          our doctor.  We took everybody's
 9          deposition we wanted to take.  It
10          turns out that Merck prepared
11          those -- during their depositions,
12          they all said they were prepared
13          for two days for their
14          depositions, which lasted about
15          for half a day.  It was like
16          talking to a bunch of robots, all
17          identical, good looking, and they
18          all had the same answers to
19          everything.  It was just amazing.
20          But I mean we did make them do a
21          lot of work on those sales rep
22          depositions in Vegas and Reno.
23               Another activity of common
24          benefit was successfully opposing
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1       their attempt to keep us from

2       talking ex parte to treating

3       physicians and prescribers before

4       their depositions, which I had

5       never heard of until this case.

6       But apparently Judge Fallon had

7       granted that, and I had read that

8       because I was on that list serve.

9           Nevertheless, we argued to

10      the Court that we should be able

11      to prepare properly a treating

12      doctor or prescriber.  We told the

13      Court that we would keep track of

14      the documents that we were giving

15      to them, medical journal articles

16      and things to read beforehand, and

17      brought them to the deposition,

18      and it went off just fine with not

19      any problem.  The doctors gave

20      good factual testimony that was

21      then able to be used by our

22      specific causation experts later

23      on.

24          Another thing is, despite it

FAC Resp. Exhibit D -- 1421

Page 23

1        being a state court action, we got

2        a stipulation from Merck that we

3        could use the MDL produced

4        documents in this case, and we

5        could use the general causation

6        reports from the California cases

7        and MDLs.

8            But another really good

9        thing, I think, was that aspect

10       where we, over Merck's pretty

11       strong objections, got the Court

12       to grant our motion in August '07,

13       this was even after we got the

14       continuance, we were still working

15       on it, that we could use the depo

16       designations and the exhibit

17       foundations from Barnett and

18       Berwick and other trials in our

19       trial.  It saved everybody

20       hundreds and hundreds of hours,

21       because apparently that's quite a

22       grueling process.

23           One of the last two

24       things -- well, last thing really,

Page 24

1      we got them to deny Merck's motion

2      that we each would only get a

3      certain number of hours of trial

4      time, which we had not ever

5      confronted that either.  The judge

6      said, no, you have a specific

7      amount, four weeks for this trial,

8      and use it up.  I'm not going any

9      further, and you guys work it out.

10     We were going to have to work it

11     out.  It wasn't going to be 60/40

12     or anything like that, nothing

13     specific.

14           So, all those things, I

15     think, helped Merck see that a big

16     verdict might be coming their way

17     in their case because they weren't

18     winning anything.

19           The other aspect, one of the

20     factors is on jurisdiction in

21     which non-MDL common benefit work

22     occurred, and that's one of the

23     main issues, because Nevada really

24     is a good, good jurisdiction for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1    drug litigation.  We have no

2    Daubert at all, and we take

3    special steps to file amicus

4    briefs for the Nevada justice

5    association when anybody tries it

6    to keep it out.  We give seminars

7    to plaintiff groups, and Geoff

8    does that mostly on Daubert.

9         Secondly, we have not only

10   the failure to warn cause of

11   action, but we have pretty much

12   pure strict products liability.

13   There's a 1994 Nevada Supreme

14   Court case, Allison versus Merck,

15   involving brain damage to a kid

16   from a measles/mumps rubella

17   vaccine, and it was held that if

18   the plaintiff can prove the

19   vaccine caused the brain damage,

20   then the vaccine failed to perform

21   in a manner reasonably to be

22   expected in light of its nature

23   and intended function.  While the

24   drug company is not an insurer of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
1          their product, if it causes

2          injury, the manufacturer and the

3          distributors are responsible.  The

4          Court rejected specifically

5          comment K, 402A of the restatement

6          and said we don't have to consider

7          factors like usefulness and

8          reasonable risks and marketing and

9          everything like that.

10              MR. LEVIN:  We're all coming

11         to Nevada.

12              MR. WHITE:  It is a fine

13         cause of action to keep out all

14         that warning stuff, which is so

15         hard all the time.  That's a

16         really hard burden to meet that

17         one.

18              Thirdly, it is a small

19         state, Nevada is.  That has

20         several impacts.  You can get into

21         court relatively fast, in about a

22         year from filing, especially in

23         northern Nevada.  We have good

24         State and Federal trial and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          appellate judges experienced in

2          drug litigation because we bring

3          them drug litigation.  We are the

4          only ones there that do that.

5          They know us.  They know we know

6          our business.  They trust us.  We

7          see them at county and state bar

8          meetings and other functions.  But

9          it is not to say we have had

10         success in this and other cases

11         because of personal relationships.

12         It's just because they know that

13         typically we are right.  And

14         plaintiffs' attorneys usually are

15         right in these things, and we have

16         a history of being right with

17         these judges.

18              For example, I told you we

19         sued the sales reps on the

20         misrepresentation counts, and they

21         removed them, claiming fraudulent

22         joinder.  We made our motion to

23         remand.  You have to allege you

24         have a good claim against the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          sales reps, and that should be all

2          that you need.  But we've been

3          doing this in Nevada with these

4          same federal judges so long that

5          we can attach to our motions to

6          remand other orders on remand on

7          the same cases with sales reps

8          like from our fen-phen cases.  The

9          same judge looking at his own

10          order where we sued sales reps in

11          fen-phen.  So, we didn't have to

12          reinvent the wheel and didn't

13          really have to spend a great

14          amount of time on motions to

15          remand.

16              It is a small state, quick

17          trial, good law, seasoned judges

18          who know our reputation, good

19          juries.  That's why we got a $16

20          million breast implant verdict

21          years ago not only against Dow

22          Corning, but Dow Chemical, I think

23          the only one in the nation.  In

24          that same month, in October of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1    '07, that HT did go to trial and

2    we got that 134 million verdict

3    for three women, all tried at once

4    with one jury and one judge.

5         So when you have that 13

6    factor, when the number of adverse

7    verdicts happened, did their

8    commitment to litigation ebb, our

9    commitment didn't waiver.  There

10   were other states supplying other

11   law -- or the Federal Court, and

12   it worried us.  I'm not saying

13   that it didn't worry us, but it

14   didn't affect our commitment to

15   this litigation, and we pressed

16   on.

17        One other factor was we were

18   involved in the litigation with

19   the JP MDL.  That was in April of

20   '05 because we started on this

21   right as soon as they took it off

22   the market.

23        We don't have any

24   involvement in any of those other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          factors.  We weren't on any of

2          these committees or funding the

3          litigation.  But I think Nevada is

4          a good jurisdiction and a scary

5          place for drug manufacturers.  We

6          just set in Las Vegas a multi

7          plaintiff HT trial for August of

8          '09 when a lot of other courts are

9          just waiting for Wyeth versus

10          Levine.  They tried to get them

11          stayed, and our judges wouldn't

12          stay them, so we are moving

13          forward on those.

14              I think that Merck could see

15          attorneys that were prepared.  We

16          took every doctor's deposition,

17          every sales rep's deposition.  We

18          had our exhibits list because the

19          judge wanted it in by June, even

20          before the continuance kind of

21          stuff.  All those exhibits,

22          hundreds and hundreds of pages,

23          all those arguments over that.

24          All the deposition designations,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

 1          case specific expert reports were

 2          in.

 3               MR. SEEGER:  Everybody here

 4          has tried a Vioxx case, so we have

 5          a sense.

 6               MR. WHITE:  All that was

 7          done, and we were ready to go, and

 8          they knew it.  I think that

 9          knowing that had an effect, as did

10          all the other attorneys that were

11          plugging away, pounding away at

12          Merck and not just sitting back

13          warehousing their cases, that's

14          what we were doing, and then

15          putting them through that.

16               Hourly rates in Reno, I

17          don't ever do an hourly rate, but

18          I checked with some other

19          plaintiff litigation guy, and they

20          are about $400, $450 an hour.  I

21          think costs are separate

22          proceedings, right.

23               So, I do hope that you can

24          see your way with these several

FAC Resp. Exhibit D -- 1430

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          factors that I've talked to you

2          about that I think Crandall versus

3          Merck had a substantial common

4          benefit and that you can pay the

5          hours that my firm has put out,

6          about 14, 1500 hours, I forget

7          what it was, and Robinson has had

8          about 1000 hours on the same

9          thing.  I think it went a long

10         way.

11              MR. SEEGER:  We were

12         definitely aware of the case and

13         appreciate you coming here.

14              MR. WEITZ:  Thank you.

15              MR. WHITE:  Appreciate you

16         assisting me as well.

17                   -  -  -

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 1431

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1                C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4      Public and Certified Court Reporter of

5      the State of New Jersey, Registered

6      Diplomate Reporter, Federally-Approved by

7      the United States District Court of

8      Pennsylvania, do hereby certify that the

9      foregoing is a correct transcript of the

10     testimony as taken stenographically by

11     and before me at the time, place and on

12     the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14     am neither a relative nor employee nor

15     attorney nor counsel of any of the

16     parties to this action, and that I am

17     neither a relative nor employee of such

18     attorney or counsel, and that I am not

19     financially interested in the action.

20

21     _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 1432