```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2
      ********************************************************************
 3

 4    IN RE:  VIOXX PRODUCTS                MDL No. 1657
      LIABILITY LITIGATION                  Section: "L"
 5                                          New Orleans, Louisiana
                                            Thursday, January 6, 2011
 6
      ********************************************************************
 7

 8       TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS AND MOTIONS
                HEARD BEFORE THE HONORABLE ELDON E. FALLON
 9                      UNITED STATES DISTRICT JUDGE

10

11    APPEARANCES:

12    FOR THE PLAINTIFFS
      LIAISON COMMITTEE:                    HERMAN, HERMAN, KATZ & COTLAR
13                                          BY:  RUSS HERMAN, ESQ.
                                                 LEONARD A. DAVIS, ESQ.
14                                          820 O'Keefe Avenue
                                            New Orleans, LA 70113
15

16                                          BEASLEY, ALLEN, CROW,
                                            METHVIN, PORTIS & MILES
17                                          BY:  ANDY D. BIRCHFIELD, JR., ESQ.
                                            218 Commerce St.
18                                          Montgomery, AL 36104

19    FOR THE STATE LIAISON
      COMMITTEE:                            BARRIOS, KINGSDORF & CASTEIX
20                                          BY:  DAWN M. BARRIOS, ESQ.
                                            701 Poydras Street, Suite 3650
21                                          One Shell Square
                                            New Orleans, LA 70139
22

23    FOR THE DEFENDANTS
      LIAISON COMMITTEE:                    WILLIAMS & CONNOLLY
24                                          BY:  DOUGLAS R. MARVIN, ESQ.
                                            725 12th Street, N.W.
25                                          Washington, D.C. 20005
```

```
 1                                    SKADDEN
                                     BY:   JOHN H. BEISNER, ESQ.
 2                                         GEOFFREY M. WYATT, ESQ.
                                     1440 New York Avenue, N.W.
 3                                   Washington, D.C. 20005

 4
        CURATOR FOR PRO SE
 5      PLAINTIFFS:                   LAW OFFICE OF ROBERT M. JOHNSTON
                                     BY:   ROBERT M. JOHNSTON, ESQ.
 6                                   400 Poydras Street, Suite 2450
                                     New Orleans, LA 70130
 7

 8      SPECIAL MASTER:              PATRICK A. JUNEAU, ESQ.
                                     1018 Harding St., Suite 202
 9                                   Lafayette, LA 70503

10
        FOR VARIOUS PLAINTIFFS:      OLDFATHER LAW FIRM
11                                   BY:   ANN B. OLDFATHER, ESQ.
                                     1330 South Third Street
12                                   Louisville, Kentucky 40208

13

14                                   LEIFF CABRASER HEIMANN & BERNSTEIN
                                     BY:   ELIZABETH CABRASER, ESQ.
15                                   Embarcadero Center West
                                     275 Battery Street, Suite 3000
16                                   San Francisco, CA 94111-3339

17

18

19      Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR
                                     500 Poydras Street, Room HB-406
20                                   New Orleans, Louisiana 70130
                                     (504) 589-7776
21

22
             Proceedings recorded by mechanical stenography, transcript
23      produced by computer.

24

25
```

<u>P R O C E E D I N G S</u>

(THURSDAY, JANUARY 6, 2011)

(MONTHLY STATUS CONFERENCE AND MOTIONS)


    (OPEN COURT.)

        THE COURT:  Good morning, ladies and gentlemen.  Call the

case, please.

        THE DEPUTY CLERK:  MDL-1657, *in re:  Vioxx*.

        THE COURT:  Counsel, make your appearance for the record,

please.

        MR. MARVIN:  Your Honor, Douglas Marvin for Merck.

        MR. HERMAN:  May it please the court, good morning, Judge

Fallon, Russ Herman for plaintiffs.  And take the opportunity to

wish your staff a happy and a healthy new year.

        THE COURT:  Okay.  We're here today for our monthly

status conference.  As you know, we set these matters in advance

and I meet with liaison and lead counsel for the parties and the

committees prior to the meeting to discuss the agenda with them.

I've received an agenda, I've added some matters to it, I'll take

the agenda in the order.

        First the Settlement Program, anything on that?

        MR. BIRCHFIELD:  Nothing, your Honor, except for the fact

that all of the claimants have been paid out, all of those awards

have been determined.  There are just a handful of cases where

there are state issues involved before they can receive their final

1    payment, and Mr. Marvin and I hope to have all of those finalized

2    within the next 60 days.

3              THE COURT:  I think that's important.  I would like to

4    see all of the claimants paid.  We've gotten 30 or 40,000 people

5    who have been paid, let's get everybody paid, and then we'll focus

6    on some of the matters that have not resolved.

7              The Lien Administrator, anything from the lien

8    administrator?

9              MR. HERMAN:  Nothing new, your Honor.

10             THE COURT:  Special Master, any report from the special

11   master?

12             MR. JUNEAU:  Nothing new, your Honor, other than to tell

13   you there are just a few very small items pending that I am working

14   with Mr. Garretson on that has to do with a few disputes and very,

15   very limited in that regard, but we've already established a

16   process and that will be rapidly handled.

17             Other than that, your Honor, as the court is aware, my

18   activities really shifted into the, involved with the pending

19   attorney general matters, which is on really a separate track from

20   what we're dealing with here today.  Thank you.

21             THE COURT:  Right.  I'll discuss those in another part of

22   the agenda.

23             Any Class Actions?

24             MR. HERMAN:  Your Honor, there's nothing new.

25             THE COURT:  State and Federal Coordination, Dawn.

1        MS. BARRIOS:  Thank you, your Honor.  Good morning, Dawn

2  Barrios for the State Liaison Committee.  We are current now

3  through the December 9th, 2010, transfer order.  We continue to

4  update the database and clean it up.  We're very happy to have

5  Dorothy Wimberly's cooperation, because 244 cases with pending

6  remands -- I'm sorry, 220 cases with pending remands have been

7  dismissed since our last status conference, so it brings us down to

8  only 425 plaintiffs with open remands.  And there is one case on

9  the docket where all of the plaintiffs have been terminated but

10  it's still open on PACER, and as I usually do, I would like to

11  present that to your law clerk so that can be terminated as well.

12  Thank you, your Honor.

13        THE COURT:  All right.  Thank you.

14        Pro se, Bob, anything from that?

15        MR. HERMAN:  Mr. Johnston is here.

16        MR. JOHNSTON:  Yes, I am.

17        MR. HERMAN:  And I should say, gentleman Bob Johnston in

18  *True Grit* fashion is here.

19        MR. JOHNSTON:  Your Honor, Bob Johnston, curator.  I

20  really have nothing to report other than the fact that we are down

21  to fumes, meaning that we have extremely limited calls.  A few of

22  the individuals that continue have very, very little business, and

23  I think it's consistent with where the whole process is and we feel

24  very good about where it is.

25        THE COURT:  Well, fine.  I appreciate your work on this

```
 1   matter.

 2            In matters of this sort, as I mentioned several times, we

 3   have individuals who need the services that they need to talk with

 4   somebody to understand the program and they don't have lawyers, and

 5   so in that situation I've appointed a pro se lawyer to be of

 6   assistance to those individuals.  And they have been calling him

 7   over the years and he's been giving assistance to them, and I think

 8   that that's a part of the program that we try to accommodate to

 9   people who do not want lawyers, do not have lawyers, maybe do not

10   need lawyers but they need someone to talk to to understand the

11   full import of the program.

12            And, Bob, you've done a great service and I appreciate

13   your work.

14            MR. JOHNSTON:  Thank you, your Honor, thank you.

15            THE COURT:  Governmental Actions, anything on that?

16            MR. HERMAN:  Please the court, I believe that John

17   Beisner will report for Merck and Dawn Barrios, who is coordinating

18   for the MDL with the AG's.

19            MS. BARRIOS:  Thank you, Mr. Herman.  Your Honor, if you

20   don't mind if we could put this off to ten o'clock because the

21   attorney generals, we're going to have a call in conference at ten

22   o'clock.

23            THE COURT:  I have a special conference, we have a number

24   of people on the phone, but at 10:30 we are going to meet with all

25   of the attorney generals.  We have about 15 or 16 states
```

1    represented by the attorney generals who have claims and we've been

2    dealing with those separately.  We've put those off for a part, for

3    a time until we dealt with some of the other claims, but now we're

4    focussing on these actions and there is some interest and also some

5    activity, so I'll be interested in hearing from them.

6            Pending Personal Injury Cases.

7            MR. HERMAN:  Mr. Marvin is here to address for Merck and

8    I believe Ms. Oldfather is here with regard to her activities.

9            MR. MARVIN:  Your Honor, we have 185 cases that still

10   remain in the MDL that are personal injury cases.  Those are

11   divided between the PTO 28 cases, the cases that were either

12   eligible and chose not to enroll or were ineligible; PTO 29 cases

13   that were filed after the settlement; and third are the cases that

14   went through the program and failed the gates, we refer to those as

15   the PTO 43 or the FES cases.

16           Your Honor, each of these cases, the injuries occurred a

17   number of years ago and we would like to begin moving on those

18   cases so that evidence is not lost and in fairness to the parties

19   as well to have the cases move along.  There are a number of issues

20   that we are going to be talking to both the PSC as well as to

21   Ms. Oldfather so that this can proceed.  Those issues include a

22   schedule for case specific discovery and expert schedule, at least

23   for categories of cases, and lifting the stay on discovery in the

24   FES cases and the PTO 43 cases and the PTO 29 cases.

25           So we are going to be having those discussions, and we

1   would like to be able to report back to the court where we are on

2   those in the next 10 to 14 days.

3            THE COURT:  Okay.  Ann, do you have any input?

4            MS. OLDFATHER:  Yes, your Honor, just for the benefit for

5   anyone who is listening on the phone who is interested in this

6   group of cases.  Mr. Marvin is correct, the number of remaining

7   cases is comprised between those three PTO's, 28, 29 and 43.  There

8   is some confusion because those group of cases are divided

9   currently under PTO 56 between myself as liaison and lead for some,

10  and Mr. Birchfield and the PSC as liaison and lead for others.  So

11  we receive a number of calls of people that don't know who they

12  should be talking to, I'm sure Mr. Birchfield does, too, but we

13  will help anyone that calls us.

14           So let me just say that we are going to be working with

15  Merck to try to figure out how to get these cases concluded.  There

16  are a number of attorneys who are anxious to have their cases

17  remanded to their home court.  I would encourage anyone listening

18  who has a concern about remand to contact me so I can gather all of

19  that information.

20           And, your Honor, I don't you really know how Ms. Barrios

21  has 425 current remands and we only have 185 PI cases, but there

22  must be an answer in there some place; and I am going to work with

23  her and ask -- she is very helpful and always giving me data I ask

24  for -- and try to get this altogether in one package for your Honor

25  so that we can present you with the issues about moving these to

1    conclusion.

2              THE COURT:  Right.  From the big picture standpoint,

3    we've started out with about 50,000 claims and we got the case on

4    February 16th, 2005, and started trying the cases in 2006.  We've

5    tried six of them in federal courts and about 15 or so in state

6    courts, and thereafter the parties were able to get a view of the

7    big picture and to try to look at the matter and see whether or not

8    it could be globally resolved.

9              A global settlement program was instituted and a

10   settlement reached about three years after the case was MDL'd, and

11   then the settlement program has now resolved all but maybe seven

12   cases.  The people of the 50,000 have gotten their funds with the

13   exception of seven or eight.  As I say, about 200 cases either

14   didn't fall into the settlement program or chose not to partake of

15   the settlement program, and so we now have to focus on those cases,

16   those several hundred cases.

17             My thinking on that is that, and I've asked the parties

18   to look at them, see what common discovery is still necessary while

19   the MDL has it; and if we can do any common discovery, now is the

20   time to move on them.  When we finish with some common discovery,

21   then we ought to figure out how we go about trying the cases.  If

22   we can group them and take one case from each group, that might be

23   helpful; or perhaps because of the age of the case, we might have

24   to go in the first case filed type of priority, if that case falls

25   in a group maybe that case ought to go to the front of the group so

1    we can try that case.

2           With regard to trials, I'd be interested in input from

3    counsel as to where we try the cases, whether we try them in New

4    Orleans or other places.  If we remand them or send them back to

5    their federal courts in other states, I'd be interested in

6    counsel's input as to whether or not this court ought to go to

7    those other states and try the cases.

8           I can do that, I've checked with the Administrative

9    Office and the committees of the federal judiciary that make inter

10   circuit assignments and it's doable, I will need about two or three

11   weeks to get the paperwork taken care of, but I can go back to

12   those states and try the case if necessary.  I sort of hesitate to

13   send them to a judge who has not had any interest in this case or

14   experience in the case up until now, and it may not be fair to that

15   judge.  But I would be interested in input from counsel on that to

16   make that determination.  But those are some of the issues that we

17   need to focus on.

18          MS. OLDFATHER:  It certainly gives us a lot to focus on

19   between now and the next status conference, your Honor, and we will

20   be working on those points.

21          THE COURT:  Okay.  Thank you, ma'am, appreciate your

22   work.

23          MR. HERMAN:  May it please the court, with regard to

24   future trials, the depository stays open, supplemented from time to

25   time, the trial package was recently supplemented by Mr. Arbitblit

1    of Elizabeth Cabraser's firm and Jim Dugan and others with

2    materials from the Louisiana trial.

3            In the event that there are trials here, Mr. Meunier and

4    myself will be available to any out-of-state lawyers who are trying

5    plaintiff cases in the event that they want information about jury

6    venire, et cetera.

7            For the benefit of both, of all potential litigants,

8    Chief Judge Sarah Vance has published in the last two weeks some

9    amendments to the local rules.  Particularly you need to look at

10   the discovery amendments and also those amendments dealing with

11   jury selection and jury contact.

12           Those are the only comments that I have to make regarding

13   the trial issues, your Honor.

14           THE COURT:  Fine.  The trial package in this case has

15   been very helpful.  One of the things that an MDL can do, and we've

16   tried to do in this particular case, is not only to try the case

17   but also to try to prepare a package, so to speak, for lawyers who

18   are interested in trying their cases in another jurisdiction or

19   even in this jurisdiction but not have to pull in all of the

20   witnesses.

21           As I mentioned, we tried six cases here, they were

22   bellwether cases but they were very expensive cases to try.  Each

23   case the plaintiffs spent between a million and $2 million.  The

24   defendants spent between two and $3 million in each case.  Not

25   lawyer fees, just court costs.  Now, obviously if somebody wants to

 1  try to a case, they don't want to try a case and put it on for $1

 2  million; particularly if the case is worth 400,000 or 500,000, it

 3  doesn't make sense.  And so what we've tried to do is to have a

 4  package prepared so that that lawyer would be able to put the

 5  package, which is a video presentation of a lot of the general

 6  witnesses, instead of calling these high powered witnesses on their

 7  own ticket, so to speak.

 8          So they have a large portion of the case already

 9  prepared, already in the can, and they put that on and then garnish

10  it with some of the witnesses that are germane and significant for

11  their particular case.  Hopefully in that way they can try a case

12  for less amount and get the same benefit that was achieved.

13          The next item on the agenda is the Fee Allocation

14  Committee.

15          MR. HERMAN:  Your Honor, you may want to address for the

16  court and those on the phone the directives that you gave the

17  committee, and then Mr. Birchfield will speak as secretary of the

18  committee.

19          THE COURT:  In this matter I've tried to encourage anyone

20  who was interested in working on the case whether or not they were

21  on the committee that I established.  I picked 12 people on the

22  committee, Steering Committee, Plaintiff Steering Committee, and

23  empowered them with the responsibility of organizing this case.

24  They've done a great job on it, but I wanted anybody who was

25  interested in participating, in working on the case outside of the

1   committee, if they were interested they could participate.  If they
2   were interested, they could work on the case.

3          And I instructed the committee to make that available to
4   them, create subcommittees, give everybody who was interested in
5   working an opportunity to work on the case.

6          Now, you need direction.  I can't have 1,000 lawyers --
7   and that's what we had in this case, 1,000 plaintiff lawyers -- I
8   couldn't have 1,000 plaintiff lawyers going off on their own and
9   doing work that was not coordinated.  So I expected anyone who was
10  interested in working on the case to be able to do so, but I
11  expected that person to coordinate their work effort through the
12  committee.

13         I also expected that individual, as well as the committee
14  members, to report to the CPA all of the expenses that they
15  incurred in their work and all of the time and effort that they put
16  in in their work, and I appointed this CPA to be the CPA for the
17  court for this litigation.  One of my first appointments was this
18  CPA.  I received throughout the period of time a monthly report
19  from that individual, which I put in camera because it was the work
20  effort of one side of the case.  I didn't want to expose that work
21  effort to the world at that time.

22         But monthly I received from that individual a report of
23  who was doing the work, what type of work they were doing, how many
24  hours they were working and so forth.  So I have all of that
25  information.

1          And then I asked anyone who was interested in making a

2     fee application to make a fee application.  I received over 100 fee

3     applications from individuals who indicated that they had worked on

4     the case.

5          I focused on the case first from the "big pie" as to how

6     much ought to be established for a fee, and I set the fee at 32

7     percent.  That was the fee regardless of the contracts because I

8     had cases from 50 states and some states had restrictions, other

9     states didn't have restrictions; the fees for contracts ranged from

10    50 percent down to about 25 percent.  It seemed to me that it ought

11    to be uniform.  One purpose of the MDL is to have some uniformity.

12    It's helpful to the litigants, it's helpful to the lawyers, but

13    there ought to be some uniformity I felt in the fee also.  So I

14    established a uniform fee of 32 percent.

15         From that 32 percent, I then tried to determine how much

16    was for common benefit and it would come out of that 32 percent.  I

17    heard from the parties on that, they briefed it, they argued it,

18    there was evidence put forth and I established a common benefit

19    fee.  Once the common benefit fee is established, that's the slice

20    of that pie, so to speak.  The question at present is how it's

21    divided up.

22         I established a Fee Allocation Committee comprised of

23    people who are on the Steering Committee and not on the Steering

24    Committee.  And I asked them to interview on a transcript form all

25    of the applicants who wished to present their explanation of their

1    work.  They met throughout the country with people, I didn't have

2    them come here, I asked the committee to form subcommittees and to

3    go to the various states and talk with these individuals and make a

4    transcript of their conversations.  These individuals had an

5    opportunity on the transcript to say what they did, why they did

6    it, how it helped, what their view of it was and how much they

7    expended and so forth.

8           I met again with the Fee Allocation Committee after they

9    finished that part of the program, and I suggested to them that in

10   looking at a fee allocation that they try to come up with some

11   categories so that it could be more objectively formulated so that

12   the Fee Allocation Committee wouldn't just say A deserves such and

13   such, B deserves such and such.  It has some reason behind their

14   report or suggestion.  I suggested to them that they look at this

15   case and come up with categories of work that advanced this case to

16   completion.

17          All of us in this room have done trial work before and we

18   all know that a key part, the most significant is trials.  If you

19   participated in a trial, that is a big item; settlement is a big

20   item; organization perhaps is an item; depositions is important;

21   motions are important; briefing is important; client contact is

22   important; all of those things are important, but there are

23   priorities.

24          And so once you get four or five or six of these

25   categories, then you try to prioritize them and you assign numbers

1   for them; for example, trials, in my opinion, are probably the most

2   significant, trials and settlement, that brings a case to

3   conclusion.

4           So let's say 200 points are set for those categories.

5   Those individuals who participated in two or three trials, maybe

6   they got the whole 200 points.  Somebody who didn't participate in

7   a trial didn't get any amount or somebody who participated in one

8   trial may have got 100 points, those who participated in settlement

9   and so forth.  Then you simply added the points and it was a

10  category that you always need in these types of matters is how

11  significant it was or whether it was on the minus side or on the

12  plus side.  So there's some weighing factor that comes in.

13          The point is hopefully the Fee Allocation Committee then

14  will give to me a penciled in suggested fee allocation.  Then I

15  want them to go to the individuals, and they have done so or are in

16  the process of doing so, to tell each individual, "this is how much

17  we have assigned to you or we're going to suggest to the court.

18  What's your input?"  And listen to the input.  Maybe they have to

19  tweak it because it's in pencil, they can erase it and put a

20  different figure up or down.  Then they come to see me and say,

21  Judge, this is our final recommendation from the Fee Allocation

22  Committee and give to me their fee allocation recommendation.

23          At that point I am going to publish it, I am going to put

24  it on the web, I am going to let everybody in the world look at it,

25  they will know what everybody gets.  Everyone will have an

1   opportunity to know what everyone else gets.  I will give them an

2   opportunity, everybody an opportunity to object at that point.

3   They will not only have known what they have gotten, but they will

4   now know what everybody has gotten, and they can object.

5          When I get the objectors, if I get objectors, I will then

6   meet with the objectors and I'll organize the objectors so I have a

7   liaison or lead counsel for objectors.

8          I'll expect the allocation committee to give me a lead

9   and a liaison counsel.  I'll meet with those counsel and I'll work

10  out a scheduling order.  Whatever they need, I'll listen to them.

11  And we'll do a scheduling order if they need any additional

12  discovery, interrogatories or depositions or motions, whatever it

13  is, it would have to be in an expedited fashion but we'll deal with

14  it.

15         I'll appoint Pat Juneau, a special master, to preside

16  over these discovery matters.  He will then have all of the

17  depositions, the transcripts that have been prepared, all of the

18  depositions, if there be any taken since that, the objectors, the

19  opportunity for the objectors to express themselves, any briefs

20  that they have submitted, and he will give me a recommendation as

21  to the fee allocation.

22         I will then have the insiders recommendation, meaning the

23  Fee Allocation Committee, the people who know who did what and what

24  the significance is, and their suggestion based on objective

25  criteria, I will then also have a special master who has no dog in

1    that hunt to give me his recommendation, and I will look at that

2    material and I'll make my own judgment and I'll express myself.

3    Everybody will have a paragraph or two paragraphs as to why they

4    are getting X amount, but that will be my decision.

5        I will use the material that's given to me, I'll look at

6    the objector's comments, I'll look at the transcripts, but I'll

7    make the cut and then I'll put it out and that will be the final

8    amount.  I'll post that on the internet so that everybody can see

9    what the court feels on it.  Anybody who wishes to appeal, will

10   appeal.  The Fifth Circuit will have all of the material and the

11   Fifth Circuit then can go up or down.  They can change it and say I

12   gave too much to the person who appeals, or they can say I didn't

13   give enough.

14       And that's the method that I plan to utilize on this

15   particular case.  It gives everybody an opportunity to express

16   themselves, everybody an opportunity to present whatever evidence

17   they have, and input from the various players, both individuals who

18   have an interest and those who do not.

19       And I have been with this case since 2005, and I've been

20   meeting with counsel in open court, anybody who wished to

21   participate or say anything has had a chance to do so.  I've also

22   had hundreds of people at each meeting on the phone, which I've

23   made available, and I'll use all of that experience and information

24   in coming up with a decision in the case.

25       And that's really the best that I can do from the

1    standpoint of transparency of giving everybody an opportunity to

2    express themselves and taking all of that into consideration.

3                Anything from the Fee Allocation Committee?

4                MR. HERMAN:  Yes, your Honor.  Andy Birchfield, who you

5    appointed as secretary, will make a report on our activities.

6                MR. BIRCHFIELD:  Just a brief update, your Honor.  We

7    completed that first step of the process.  The fee committee met,

8    we came up with a penciled in version, and presented that to the

9    court.  Then we did provide that to each of the individual

10   applicants, and they were under Pretrial Order 6D were provided an

11   opportunity of 14 days to indicate whether they accepted the

12   recommended amount; or if they objected, and if they did object, to

13   state the basis of their objection and how much they're entitled

14   to.

15               Following that 14-day period, we had an opportunity for

16   those who either actually in advance of the expiration of that

17   period, we had an opportunity for firms if they objected and they

18   wanted to meet with us and express their objections, they could do

19   that.  If they had questions before they made their decision, they

20   could meet with us, voice those concerns.

21               So we set aside a significant amount of time, we met with

22   over 30 firms through that process, so now we are in the process,

23   the Fee Allocation Committee is in the process of weighing those

24   objections, the information that we have heard.  We're in the

25   process of making adjustments - some up, some down.  And we

1    anticipate that probably within the next two weeks we will be in a

2    position to present our final or inked in recommendation to the

3    court at that time.

4         THE COURT:  And as I say, once I get that I will then

5    post that on the internet and give everybody an opportunity to

6    object, whether or not they've objected before I'll give them an

7    opportunity to object.

8         MR. HERMAN:  Your Honor, your Honor has advised everyone

9    in open court numerous times that your Honor prefers transparency.

10   In that regard, every individual or firm that submitted a fee

11   application was given an opportunity for CDs, DVDs that included

12   the trial package, the grid that we had developed that your Honor

13   described, all of the accountings by the CPA firm, which your Honor

14   appointed, written presentations from each fee applicant that

15   submitted a written application, the oral transcripts where they

16   appeared at various locations in the country, the state

17   depositions, the case law, particularly your Honor's opinion in

18   *Murphy Oil* and the Fifth Circuit and *High Sulphur I* and *High*

19   *Sulphur II*, PTO 6, 6D, and the agenda materials that were

20   distributed to the fee committee on November 20th, 2010, so that in

21   regards to transparency they not only have their own presentations,

22   but presentations that were made by everyone else, as well as

23   materials which the Fee Allocation Committee focused on.

24        THE COURT:  All right.  Thank you.

25        The next item is Merck's motions, but we will get to

1  those later, Dorothy.

2       MR. MARVIN:  Yes, your Honor, it's Items 10 and 11.  We

3  do have four motions and we'll take those up later as customary.

4       THE COURT:  Okay.  Anything on Appeals?  There was one

5  appeal to the --

6       MR. HERMAN:  Fifth Circuit, the *Wheel* case, and you were

7  affirmed on that appeal recently, your Honor, in the month of

8  December.

9       THE COURT:  Okay.  Anything from Consumer Class,

10  Elizabeth?

11       MS. CABRASER:  Your Honor, we are under submission to

12  your Honor on the motion to strike class allegation that Merck

13  filed.  We haven't filed class certification motions, we are happy

14  to await the court's ruling, and we're also happy to discuss with

15  Merck and present some case management ideas when your Honor feels

16  it's appropriate to either go forward on the bellwether state ideas

17  that we have discussed in the past and/or some other way to present

18  at least an exemplar consumer case for trial here or elsewhere with

19  your Honor or on remand.

20       THE COURT:  Yes.  I think with the consumers keep in mind

21  that maybe a way of handling that is to see whether or not there

22  are issues that we can deal with instead of trying a particular

23  case, if we can try issues, grouping issues, that might be helpful.

24       MS. CABRASER:  We'll explore that, your Honor.  And we're

25  also discussing with Kentucky an adjacent claim, which is a

1    consumer statute claim like our class action claims but brought on

2    behalf of the state itself.

3         THE COURT:  Right, Bill, are you still around?

4         MR. GARMER:  Yes, your Honor.

5         THE COURT:  Do you want to talk on that?

6         MR GARMER:  If your Honor, please, Bill Garmer from

7    Lexington, Kentucky.  Kentucky has an attorney generals action

8    which involves our Consumer Protection Act.  It is not actually a

9    claim that goes back to the consumer, but it is in the form of a

10   penalty to the company that is paid to the commonwealth of

11   Kentucky.  So to that extent it is different from the consumer

12   action claims that Ms. Cabraser represents the people on.

13        THE COURT:  Right.

14        MR. GARMER:  And we believe we're kind of sui generis in

15   this whole thing because we do not have a Medicare, Medicaid claim

16   per se but we do have this claim which we would like to proceed

17   with.

18        THE COURT:  Right.  And the difference is primarily in

19   the quantum aspect of it, the liability aspect or some of the

20   issues of liability are the same as Elizabeth's group, so you all

21   are coordinating that?

22        MR. GARMER:  Yes, sir.  The statute deals with

23   misrepresentations and to that extent they are similar and we will

24   coordinate on that.

25        THE COURT:  Okay.  Thank you.

1          MR. GARMER:  Thank you, your Honor.

2          MR. BEISNER:  Your Honor, if I may before you go on just

3    to respond briefly to the points that Ms. Cabraser noted.  I do

4    think that in terms of looking at the class cases getting the

5    court's conclusions on the pending motions, it would be helpful

6    because we do have a motion to dismiss there in terms of the claims

7    that are at issue.

8          And then with respect to the class issues, I think our

9    fundamental argument we've made there is that the prior findings in

10   the court would preclude class treatment under Fifth Circuit

11   precedent, the issues piece works only if all of the issues

12   predominate.  And so I think the conclusions on that will probably

13   guide us as to what, if anything, we need to proceed with there.

14         MR. HERMAN:  Your Honor, I do want to supplement my

15   response with regard to appeals.  The Fifth Circuit upheld your

16   Honor's dismissal of the *Weeks* case on December 17th, 2010.  And as

17   far as we can tell, that was the last remaining appeal to the Fifth

18   Circuit regarding PTO's 28 and 29.

19         THE COURT:  I think there's a writ of cert on that.

20         MR. BEISNER:  Your Honor, I believe there are several pro

21   se cases that are there.  I don't recall exactly the names of those

22   cases, but I know there's an appearance -- there's a Homer Jones

23   case, they're pro se cases that we are still dealing with there.

24         THE COURT:  Okay.

25         MR. MARVIN:  Right.  Ms. Wimberly is reminding me we also

```
 1    have the -- there is a petition to the U.S. Supreme Court for cert

 2    in the Nobile case.

 3               THE COURT:  Right.

 4               MR. HERMAN:  Your Honor, may I approach with Mr. Marvin

 5    one moment?

 6               THE COURT:  Sure.  The next status conference is when,

 7    Joe?

 8               THE LAW CLERK:  February 24th.

 9               THE COURT:  February 24th at nine o'clock, and I'll meet

10    again with the liaison and lead counsel at 8:30.

11         (WHEREUPON, A BENCH CONFERENCE WAS HELD OFF THE RECORD.)

12         (OPEN COURT.)

13               THE COURT:  As I said, the next status conference is

14    February 24th at nine o'clock.

15               I am advised that we have a claimant with us, Ms. Hart.

16    Ms. Hart, would you like to say anything to the court, ma'am?  I'll

17    entertain anything you have to say.

18               First, I appreciate you being here.  We have these

19    matters in open court so that anybody who wishes to participate,

20    either lawyers or claimants, may do so.  You're here, so I want you

21    to feel free to speak.  This is your court, you're a citizen of

22    this country and you can speak.

23               Why don't you come to the microphone, ma'am.  Would you

24    give us your name.

25               MS. HART:  My name is Pamela Vendetta Hart, I am the
```

1   oldest daughter of the deceased Rebecca Hart Sherman.

2           THE COURT:  Yes, ma'am.

3           MS. HART:  As I have pursued the case, I had filed a

4   claim and referenced as representing my family, my other siblings.

5   It was to my understanding that I had gave the names when I had

6   first filed all my, the siblings -- I am kind of nervous.

7           THE COURT:  Take your time.

8           MS. HART:  -- the siblings of the deceased.  It was to my

9   understanding that I did that.  As the case had progresses and went

10  on and on I had spoke with the attorney, I was speaking with the

11  paralegals, checking on the case to see the status of the case.  I

12  was told in form that the case was, came to a conclusion, and the

13  amount that was stated to us, the family members had disagreed and

14  disapproved.  So we had addressed the matters to the attorney who

15  is representing us.  I also had a meeting with the attorney, me and

16  my baby sister at the time.  And we stressed the fact that we

17  disapprove of the amount to be divided against all five children.

18          We also note that our mother, we are not going to see our

19  mother anymore, and we sorry that it had to be such a mishap that

20  my mother is not no longer with us anymore and we didn't feel that

21  the amount was just jest for the fact that my mother is deceased.

22          THE COURT:  Okay.  Ms. Hart, I am somewhat familiar with

23  the matter.  The issue really is how to divide up the funds among

24  and between the five children, and so you couldn't agree on it and

25  there's some dispute as to who gets what.  So what I have

 1    instructed the attorneys to do is to deposit it in the registry of

 2    the court that amount so that anyone who claims it has an

 3    opportunity to express themselves and to say how much they feel

 4    they should get from those funds.  I'll give everybody an

 5    opportunity to either with an attorney or without an attorney, and

 6    then I'll decide how to divide up the funds.

 7         But I didn't want the attorneys to have the funds in

 8    their registry, I wanted it in the registry of the court so, No. 1,

 9    it would be safe; No. 2, it would earn interest; and No. 3, the

10    interest would be for the litigants themselves.

11         And so that's where it is now, it's in the registry of

12    the court.  And we're going to have to have an opportunity to have

13    each of you all tell me how you feel the funds ought to be divided

14    and then I'll hear all of that and then I'll make the decision.

15         MS. HART:  Your Honor, may I address?

16         THE COURT:  Yes, ma'am.

17         MS. HART:  Again, I think that was a mishap with that.

18    We totally disagree with the amount that was awarded to us.  It

19    wasn't the division, divided because it was to my understanding as

20    the oldest that I was going to disburse it.  But the discrepancy

21    came in with the amount that we was awarded to be awarded among,

22    divided among five of us the amount.  That was the discrepancy.

23    And I thought I had made that perfectly clear with my attorney when

24    I spoke with him and about when he told us the amount, what the

25    amount was.  The discrepancy was totally the amount, not the

1    division among the siblings.  It was the amount period.

2              THE COURT:  All right.  Let me hear from the attorney.

3              MR. DAVIS:  Your Honor, Leonard Davis from the law firm

4    of Herman, Herman, Katz and Cotlar.  Your Honor, pursuant to the

5    directives of the court, we did, in fact, file within the registry

6    of the court all of the settlement proceeds, that has been done.  I

7    don't know whether or not the final amount of the eight to seven

8    and a half percent has been done, but that will be done if it

9    hasn't been done yet.

10              In any event, with respect to this claimant as set forth

11    in the motion to deposit the funds into the registry of the court,

12    this matter went through the claims process.  They were in the

13    program, and, in fact, went through the appellate process in the

14    program.  So this is a claim that had a full review by the program

15    and went up the ladder quite frankly.  The amount of settlement

16    funds were determined through the program and that determination

17    was conveyed to the client.  The client expressed disapproval, and

18    as a result pursuant to your Honor's directives, we put the money

19    in the registry of the court.

20              We will do whatever is required or is necessary to

21    assistance in any way to resolve the matter.

22              THE COURT:  Okay.  All right.  Anybody else have any

23    input on that from the defendants?

24              MR. HERMAN:  May it please the court.  Russ Herman, I

25    just have one other statement.  In order to avoid any conflict or

1  appearance of conflict, I am going to introduce Ms. Hart to

2  Mr. Johnston who may be able to manage this matter on Ms. Hart's

3  behalf.

4          THE COURT:  Okay.  Ms. Hart, you should meet with

5  Mr. Johnston, he is the court designated attorney to assist

6  litigants.  At least talk with him, explain the situation to him,

7  you can ask him any question, he will hold it in confidence, and

8  then I'll be hearing from you, I'll give you an opportunity to

9  express yourself.

10         MS. HART:  And also, your Honor, I might add, I have my

11  siblings here, we are waiting for my brother.  It's five of us, and

12  all of us, they came from out of town to be here and I have them

13  here, too, and I take it that they want to express themselves as

14  well.

15         THE COURT:  Sure, okay.

16         MR. HERMAN:  Thank you, your Honor.

17         THE COURT:  Thank you.  Ma'am, do you want to speak?

18         MS. SHERMAN:  Good morning, your Honor.

19         THE COURT:  Good morning.

20         MS. SHERMAN:  All I have to say is that --

21         COURT REPORTER:  State your name for the record, please.

22         MS. SHERMAN:  Oh, my name is Gaylyn Sherman, I am Rebecca

23  Hart Sherman's third daughter.

24         All I want to say is that it has been six years, almost

25  six years since I've been without my mother, and I do share my

1   sister's feelings that the amount that was awarded to us I don't

2   think that it is just, nor do I think that it's fair.

3          I do appreciate the court's time in this matter, but

4   we're at a point now we want it resolved so that we can get on and

5   just put it behind us, because it's beginning to be a long, drawn

6   out painful process for us.

7          THE COURT:  Right.  Yes, ma'am.  And the difficulty is

8   that there's no question, I mean, it's a painful situation when

9   lose your mom and I understand that.  The issue sometimes is

10  whether or not there is liability.  It has nothing to do with the

11  value of your mom's life or has nothing to do with how much you

12  love her.

13         MS. SHERMAN:  I had an opportunity to review some of the

14  material that was sent to me, and I understood that Merck valued

15  her life with points and I was -- I'm confused because how do you

16  place points on a person's life.

17         THE COURT:  Well, that's what I am saying, in a case of

18  this sort it's not a question of a relationship between the money

19  and the value of a person's life, what has to be factored into it

20  is the liability aspect and the law aspect of the case.  And the

21  parties agreed, meaning all of the claimants agreed to a settlement

22  program and they had an opportunity to either agree or disagree

23  with the settlement program, and once they agree with the

24  settlement program, then the factors play out in trying to

25  determine the amount of the case.

```
1              But there's no relationship between the amount of the

2     case and the value of a person's life, you can't do that in money.

3     I mean, we can't deal with that.

4              MS. SHERMAN:  I would also like to state, your Honor,

5     there is no amount of money that can replace my mother's life.

6              THE COURT:  That's exactly right.

7              MS. SHERMAN:  It doesn't matter what is awarded to me,

8     but it won't give me my mother back.

9              THE COURT:  Oh, I understand.

10             MS. SHERMAN:  It won't give me my mother back.  All we're

11    asking at this point, your Honor, is that we want the matter -- we

12    want to try to resolve the matter.

13             THE COURT:  Right.  That's why I appointed the attorney

14    and your sister is talking with him now.

15             MS. SHERMAN:  I appreciate your time and thank you so

16    much, your Honor.

17             THE COURT:  Not at all.  And thank you from coming from

18    out of town.

19             Anything else?  We'll stop here and I'll return and we'll

20    deal with either the attorney generals or the motions.  The court

21    will stand in recess.

22        (WHEREUPON, A RECESS WAS TAKEN.)

23        (OPEN COURT.)

24             THE COURT:  We have a couple of motions, Dorothy.

25             MS. WIMBERLY:  Yes, your Honor, before we proceed with
```

1   the new motions on the docket there was one carryover matter from

2   the November 18th hearing regarding plaintiff Dariel Stephens in

3   case No. 09-7475.  Mr. Stephens was subject to Merck's ninth PTO 29

4   motion.  Mr. Stephens had contacted our office the day of the

5   hearing indicating that he was sending materials and asking that we

6   hold off.

7        Mr. Stephens failed to follow-up on that.  It's been more

8   than six weeks, we've had no further word from him, and we would

9   ask that the court grant the motion and dismiss his claims with

10  prejudice for failure to comply with Pretrial Order 29.

11       THE COURT:  Okay.  And I understand the plaintiffs take

12  the position that it shouldn't be dismissed; that if it is

13  dismissed, that it should only be dismissed without prejudice.  I

14  understand, I've listened to them, I understand their argument,

15  notwithstanding their enthusiasm and forceful way in which they

16  present it, I will overrule it.

17       MS. WIMBERLY:  Next, your Honor, we have three motions

18  brought by Merck, a motion and Rule to Show Cause why the claim of

19  plaintiff Catherine Holt should not be dismissed with prejudice

20  under Rule 25(1), and a motion for summary judgment as to plaintiff

21  James Nelson, and a motion to dismiss for failure to prosecute and

22  a renewed motion pursuant to Pretrial Order 28 as to plaintiff John

23  Carroll.  Those motions are going to be argued on behalf of Merck

24  by Emily Pistilli from Williams and Connolly.  And Ms. Pistilli

25  will also argue in opposition to the motion of plaintiff Maureen

```
 1   Welch, who has filed a motion to reinstate her claim and/or relief
 2   from deadlines of the settlement program due to excusable neglect
 3   and no fault of claimant or her current attorney.
 4          I am not certain if the attorney who filed that motion
 5   and noticed it for hearing today is in the courtroom.  That was I
 6   believe Ginger DeForest.
 7          THE COURT:  Okay.
 8          MS. WIMBERLY:  I'll let Ms. Pistilli address those with
 9   you.
10          THE COURT:  All right.
11          THE DEPUTY CLERK:  Will she refer to record document
12   numbers?
13          MS. PISTILLI:  Yes, I do have those.
14          THE DEPUTY CLERK:  Thank you.
15          MS. PISTILLI:  Good morning, your Honor, Emily Pistilli
16   from Williams and Connolly here on behalf of Merck.
17          Do you have a particular order that you would like me to
18   address the motions in?
19          THE COURT:  John Carroll, that's record document 55558.
20          MS. PISTILLI:  Yes, your Honor.  Your Honor, this
21   plaintiff's claims are the subject of pending motion to dismiss for
22   material non-compliance with the discovery requirements of PTO 28,
23   and Merck has renewed that motion as to Mr. Carroll.  That docket
24   number, the renewed motion is the number that you just referred to.
25          As you know, your Honor, PTO 28 requires plaintiffs to
```

1    produce several basic categories of materials to provide prime

2    facia evidence of usage and causation in these cases, and although

3    Mr. Carroll has produced the required Lone Pine expert report, he

4    produced only a small handful of medical records; and more

5    importantly, he failed to produce any of the required generic

6    medical records authorizations, so Merck has no ability to collect

7    any medical records relating to Mr. Carroll's claims.

8            Mr. Carroll originally appeared on a PTO 28 motion in

9    September of 2009, which is more than 15 months ago at this point,

10   and that motion was deferred several times; but during its

11   referral, Merck continued to seek compliance with PTO 28 and

12   continued specifically to request the medical records

13   authorizations.  And as detailed in our motions paper during that

14   time Merck's counsel was also informed that Mr. Carroll's then

15   attorneys were unable to make contact with him.

16           So his former counsel then filed a motion to withdraw in

17   April 2010 and that motion was granted in October 2010.  And so

18   Mr. Carroll was served in his pro se capacity with this renewed

19   motion at his address in Brooklyn, New York, and he hasn't

20   responded to that motion as far as we're aware.  Therefore, we ask

21   that this case be dismissed at this time based on the PTO 28

22   non-compliance issues that were identified originally in our

23   initial motion and additionally because plaintiff has ceased to

24   participate in this litigation.

25           THE COURT:  Okay.  Anything?

1          MS. OLDFATHER:  Yes, your Honor.  PTO 28 and also in 29

2    and 43 requirements for medical authorizations and medical records

3    are the court's way of protecting against complete staleness in

4    this case, and they do provide a way for the court -- for Merck to

5    keep up the plaintiff's condition.  Ms. Pistilli's statements as

6    best I know are accurate.  As liaison counsel for this case, I can

7    say that we've been unable to reach Mr. Carroll also.

8          THE COURT:  The best I can do is give a person an

9    opportunity to respond to the court.  I don't, as you know, do this

10   willy-nilly.  I give them, one, two, three, sometimes four

11   opportunities, and Mr. Carroll has been afforded a number of

12   opportunities.  He hasn't responded.  I can only assume that he has

13   abandoned his case, so I will grant the motion and I'll grant it

14   with prejudice.

15         MS. PISTILLI:  Thank you, your Honor.

16         Do you have a preference on the next motion that we

17   address?

18         THE COURT:  The Catherine Holt, record document 54997.

19         MS. PISTILLI:  Yes, your Honor.  In this case we're here

20   on Merck's motion to dismiss Ms. Holt's claims under Rule 25(a) for

21   failure to substitute a proper plaintiff.  Ms. Holt passed away in

22   2006 and a suggestion of her death has now been on the record since

23   January 2010.  And in that time there's been no substitution of a

24   proper plaintiff and no indication that any proper party intends to

25   pursue these claims on her behalf.

1          Rule 25(a) is clear, your Honor, that if a motion for

2   substitution is not made within 90 days after the suggestion of

3   death, the action must be dismissed, and, Merck's, therefore,

4   moving for the dismissal of Ms. Holt's claims under Rule 25(a).

5          I'd also note that plaintiff's counsel has filed an

6   opposition response to this motion, although they do not oppose a

7   dismissal of plaintiff's claims, they ask for the dismissal to be

8   without prejudice.  And our reply memorandum, your Honor, has cited

9   a few cases to demonstrate that courts do routinely dismiss cases

10  with prejudice under Rule 25, and we submit that in this case a

11  dismissal of prejudice is appropriate.  Ms. Holt's been deceased

12  for almost five years and given the advanced stage of this

13  litigation, if any proper party intends to pursue these claims, the

14  time for them to enter this case is now.

15         So we ask, therefore, your Honor, that this plaintiff's

16  claims be dismissed with prejudice pursuant to Rule 25(a).

17         THE COURT:  Any response?

18         MS. OLDFATHER:  Your Honor, as liaison counsel, I have

19  nothing to add to Ms. Holt's counsel request.

20         THE COURT:  Five years is a really long time and I'll

21  dismiss it with prejudice.

22         MS. PISTILLI:  Thank you, your Honor.

23         THE COURT:  James Nelson, record document 56064.

24         MS. PISTILLI:  Yes, your Honor.  In this case Merck seeks

25  summary judgment under Rule 56 as to all of Mr. Nelson's claims.

1   Here, your Honor, this plaintiff's own expert has filed a report

2   and stated that he cannot conclude that Vioxx caused or contributed

3   to any injury to the plaintiff.  And in light of this statement by

4   plaintiff's own expert, no reasonable juror could return a verdict

5   in favor of the plaintiff; and Merck is, therefore, moving for

6   summary judgment on that basis.

7            Just to summarize the relevant events that are set forth

8   in more detail in our motion papers:  This plaintiff was included

9   in Merck's seventh Lone Pine motion, which was filed in April 2009,

10   because he had failed to submit any of the materials required by

11   PTO 28 at that time.  After that motion was filed, Mr. Nelson did

12   submit his expert report and as a result Merck withdrew that Lone

13   Pine motion as to this plaintiff in June of 2009.

14            And the expert report, which was attached to Merck's

15   papers, along with this motion, highlights the fact that

16   plaintiff's last Vioxx use would have been at least nine months

17   prior to his claimed injury, which was the heart attack that took

18   place in August 2005, which was about 11 months as the court is

19   aware after the withdrawal of Vioxx from the marketplace.  And

20   ultimately the expert concludes in that report that he cannot

21   conclude that Mr. Nelson's use of Vioxx caused or contributed to

22   any injury that he sustained.

23            And beyond the expert report, the only other materials

24   that were submitted by this plaintiff were just two pages of

25   prescription records, and there's nothing else that we're aware of

1  that's been submitted by this plaintiff.  And the court had

2  previously determined in a similar case to this one that where an

3  expert report has been submitted but it's one that refutes an

4  inference of causation, a motion for summary judgment is

5  appropriate rather than a motion under PTO 28.

6        So, therefore, given this plaintiff's own expert's

7  ability to conclude that Vioxx caused or contributed to any injury,

8  Merck's asking for summary judgment on all of Mr. Nelson's claims.

9        THE COURT:  Okay.

10       MS. OLDFATHER:  Your Honor, I believe Mr. Nelson is pro

11 se.

12       MS. PISTILLI:  Excuse me, I have that information.  He is

13 pro se at this point in time, your Honor, but he was represented --

14       MS. OLDFATHER:  That's fine, Ms. Pistilli, thank you.

15 This is a case-specific issue that the claimant or had he had

16 counsel, his counsel would be required to defend; so as liaison

17 counsel, I have no position to express, your Honor.

18       THE COURT:  It's not a motion to dismiss because he did

19 comply and presented a report, but the report that he provides says

20 that he can't, the expert says he can't conclude that it was caused

21 by Vioxx.  So this is a motion for summary judgment, I grant the

22 motion for summary judgment.

23       MS. PISTILLI:  Thank you, your Honor.

24       THE COURT:  The last one is a motion to reopen Maureen

25 Welch's case, this is record document 55992.

1          MS. PISTILLI:  Yes, your Honor, Merck is opposing that

2     motion, and I am prepared to argue it if there's no one else here

3     for plaintiff.

4          THE COURT:  Okay.  What's the situation with Ms. Welch?

5          MS. PISTILLI:  Yes, this plaintiff Maureen Welch has

6     brought this motion requesting that her case be reinstated into

7     the, specifically into the Vioxx resolution program.  And her case

8     before this court was dismissed with prejudice in February 2, 2009,

9     for failure to comply with PTO 28.

10         As far as the settlement program, Ms. Welch was initially

11    registered for the program by her original counsel, but the claims

12    administrator for the program never received any enrollment

13    materials or any claims materials for her.  The enrollment deadline

14    passed on October 30th, 2008, and Ms. Welch's claim was ultimately

15    closed by the claims administrator because they had not received

16    any of the materials.

17         Plaintiff's current counsel has been in contact with the

18    claims administrator and was given the opportunity to submit a

19    request for relief from the deadlines in the program, and the

20    claims administrator never received any request for relief for this

21    plaintiff.

22         So now almost two years after her case before this court

23    was dismissed and over two years past the enrollment deadline for

24    the settlement program, she is asking the court to order her to be

25    included into the resolution program.  Your Honor, her motion

1   states no legal basis for the relief she is requesting and there is

2   no legal basis.  The terms of the master settlement agreement are

3   very clear that claimants who do not submit enrollment materials by

4   the deadline will not be eligible to participate except with

5   Merck's consent.

6         And at this point, as the court knows, all of the money

7   in the program, the resolution program has been allocated to

8   specific claimants and the vast majority of it has already been

9   disbursed to claimants.  And so at this point even if there were

10  some conceivable basis for her to be inserted into the program, her

11  request is coming far too late.

12        On those grounds we would ask that the plaintiff's motion

13  be denied.

14        THE COURT:  How do you see this, Ann?

15        MS. OLDFATHER:  Thank you, your Honor.  I see this just

16  as I did the prior one, I think this is a very case-specific

17  request that Ms. DeForest needs to advance on behalf of her client

18  orally in addition to her written motion if she chooses.

19        So as liaison counsel, I don't believe it's within my

20  purview to do anything except to observe to the court that it's not

21  within my duties to address this further.

22        THE COURT:  Okay.  She was represented at the time that

23  this happened, that's the problem, and if she has a problem she

24  really has a problem with the attorney and not with the court and

25  not with Merck.  So I'll grant the relief and instruct her to, if

```
 1    she wants to proceed, the proceeding has to be against the

 2    attorney, not in this litigation.

 3              MS. PISTILLI:  Thank you.  Your Honor, that's all I have.

 4              MS. OLDFATHER:  Your Honor, if I may, with leave of

 5    court.

 6              THE COURT:  Yes.

 7              MS. OLDFATHER:  Merck filed a suggestion of death several

 8    weeks ago with regard to one of my particular clients, and just

 9    within the last week we filed a similar suggestion of death and a

10    motion for substitution.  And I don't know if that's ready to be

11    ruled on or if this is something that I should bring up now.  The

12    anniversary is coming up on March 4th, which gives us some time,

13    but I would feel better if we get this resolved.

14              THE COURT:  What is this about?

15              MS. OLDFATHER:  Just a motion to substitute the

16    administrator.

17              THE COURT:  Dorothy, do you have any problem with that?

18              MS. WIMBERLY:  Your Honor, no, I don't believe we have

19    any problem whatsoever.  She's followed the requirements under Rule

20    25 and has moved to substitute the proper party.

21              THE COURT:  It's just a question of substitution, I'll

22    grant the motion.

23              MS. OLDFATHER:  Thank you, your Honor.

24              THE COURT:  Sure.

25              MS. PISTILLI:  Your Honor, I have just one more thing.
```

1  On the last motion for Ms. Welch I believe that you stated at the

2  end that you would grant the relief, and actually wanted to point

3  out that the motion was brought by the plaintiff to reinstate her

4  claims, so we would ask that the motion be denied.

5  THE COURT:  Right, so I'll deny it, right.  Thank you.

6  Denied.  Thank you.

7  Anything else, Bob?

8  MR. JOHNSTON:  May I approach the bench, your Honor?

9  THE COURT:  Sure.

10  (WHEREUPON, A BENCH CONFERENCE WAS HELD OFF THE RECORD.)

11  (OPEN COURT.)

12  THE COURT:  Okay.  The next matter on the agenda is the

13  attorney generals.  Who is going to represent the attorney

14  generals?

15  Okay.  We have to get a call.  Okay.  Let me take five

16  minutes then.  All right.  Then that ends the matter for open

17  court, we will do the rest in chambers.  The court will stand in

18  recess.  Thank you.

19  THE DEPUTY CLERK:  Everyone rise.

20  (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE CONDUCTED IN

21  CHAMBERS CONCERNING THE ATTORNEY GENERALS MATTER.)

22  (OPEN COURT.)

23  THE COURT:  Hello, this is Judge Fallon, who is on the

24  line?  Hello?  Hello.

25  MR. ROTH:  Harry Roth and Mike Coren for the Commonwealth

1   of Pennsylvania.

2           MR. COLLINS:  Chris Collins for Santa Clara County, your

3   Honor.

4           MS. BERKMAN:  Marcy (unintelligible), Santa Clara County.

5           THE COURT:  Wait, wait.  Marcy --

6           MS. BERKMAN:  B-E-R-K-M-A-N.

7           MR. LESSER:  And Seth Lesser for Santa Clara County.

8           MR. YOUNG:  Good morning, your Honor, James Young for the

9   state of Florida, and Elizabeth Arthurs for the state of Florida.

10          MR. ROSSBACH:  Bill Rossbach from the state of Montana.

11          MR. SCHULTZ:  Mark Schultz Pennsylvania and South

12  Carolina.

13          MR. FOX:  Good morning, your Honor, Randy Fox for New

14  York.

15          MR. SPIEGEL:  Good morning, your Honor, Craig Spiegel for

16  New York.

17          MR. HORAN:  Good morning, your Honor, Brian Horan for the

18  city of New York.

19          THE COURT:  Anyone else?

20          MR. STALLARD:  David Stallard from Utah.

21          MS. WINKLER:  Susan Winkler from the U.S. Attorney's

22  Office in Boston.

23          THE COURT:  Anyone else?

24          MR. PETTIT:  James Pettit from Santa Clara County.

25          THE COURT:  Anyone else?  Okay.  I have everybody in the

1    office here representing Merck and liaison, I have Dawn Barrios who

2    is also here, and Elizabeth Cabraser and our special master and

3    other representatives of the PSC.

4            Elizabeth, do you want to begin, or, Dawn, do you want to

5    begin?

6            MS. BARRIOS:  Yes, your Honor.  Since we last met on the

7    AG matter, I have received word from every AG, with the exception

8    of the County of Santa Clara and the District of Columbia, that

9    they have received notification from NAMFCU on the number to be

10   paid their state for Medicaid reimbursement.

11           I understand that that number is confidential, but I

12   further understand that Mr. Juneau has had conversations on that

13   point with NAMFCU.  And so I would like to ask Mr. Juneau to

14   follow-up with your conversations.

15           MR. JUNEAU:  I talked to Bob Patton about that, and he

16   said that it was his opinion that the state, individual state could

17   release that to me if they so authorized that, but it was in the

18   context of a settlement discussions and was to be treated

19   accordingly.  But I would have to get the permission from each

20   state to do that.

21           THE COURT:  Just for everybody's benefit, as you know

22   I've designated Mr. Pat Juneau to be the special master in this

23   matter and instructed him to get involved with the parties to see

24   whether or not some global resolution could be accomplished in this

25   matter.  So when he talks with individual states, he'll do so on an

1  individual basis and be apprised and conscious of any

2  confidentiality that you're concerned about.  When you talk to him

3  you will be like talking to the court.  You can assume that it's

4  going to be confidential with his remarks and comments to you.

5       But he's instructed to see whether or not he can deal

6  with this matter to see whether it can be resolved to the

7  satisfaction of all parties, or the dissatisfaction of all parties,

8  whichever works.

9       Dawn, anything more?

10      MS. BARRIOS:  Yes, your Honor.  As I understand both from

11 Merck and from Mr. Juneau's conversation with Mr. Patton, that at

12 present time there's negotiations that have either started or

13 shortly will start about the scope of the release that each state

14 would have to sign.  It's my understanding that Merck will take the

15 position, and please correct me if I'm wrong, that they want a very

16 broad release such that if a state accepts the Medicaid money from

17 NAMFCU, the release would operate to release all claims against

18 Merck.

19      It's my understanding that when Mr. Juneau spoke with

20 Mr. Patton about that he said that he felt that the release would

21 be for Medicaid claims only because it was Medicaid money to be

22 paid only.  But that, your Honor, is between Merck and NAMFCU.

23      I suggested to the court, with all due respect, that you

24 include a NAMFCU representative, perhaps Mr. Patton, in on the

25 discussions with the special master.  I think it was very wise to

1    bring in the Department of Justice, and I hear that Susan Winkler

2    is on the line now and she was very helpful to us in explaining the

3    process.

4           So with regard to the release, it is being negotiated, I

5    ask that you bring a NAMFCU representative into the fray with us.

6           I further understand that in most part due to your

7    Honor's encouragement that the releases should be expeditiously

8    negotiated and that we should expect some word on the scope of the

9    release within 30 days.  Is that correct?

10          MR. BEISNER:  Well, this is John Beisner.  We will need

11   to see the draft, which we've not received yet, and then we'll get

12   into negotiations.  But I think our impression is that process

13   should commence soon and we hope will move along pretty quickly.

14          MS. BARRIOS:  Your Honor, another issue that we have on

15   the table is the stay that your Honor imposed.  It expires today.

16   I believe that with the representation that Mr. Patton made to

17   Mr. Juneau, as well as Mr. Beisner's representation that they're

18   going to try to negotiate the release quickly, I would recommend

19   that the stay be in place for another 30 days, subject to the

20   following:  Many states have claims outside the Medicaid arena.

21   Those claims revolve around the number of misrepresentations that

22   Merck has or alleged to have made to doctors, physicians,

23   hospitals, et cetera.

24          In order for those states that have the non-Medicaid

25   claim to understand the worth of that claim, those states need

 1    information from Merck.  We're not asking for documents, we're

 2    asking for numbers of times.  We've put together a top ten list,

 3    given it to Mr. Juneau, I understand that he's given it to Merck.

 4    And from my early conversations with Mr. Beisner, he's indicated

 5    that he will work with me on that list, that he believes some of

 6    the materials may have already been disseminated, he will help me

 7    locate them.

 8              But with the exception of getting the information on that

 9    list, we ask that the stay or we agree that the stay should be in

10    place for another 30 days to allow us to negotiate.

11              THE COURT:  Okay.  Any problem with anybody on the phone

12    with that suggestion?

13              Okay.  I'll do that then.  But we've got to move this

14    case.  I don't want it to just languish and that's why I am just

15    doing it 30 days as opposed to just keeping it open.  Within that

16    period -- I do agree that for the states that are involved to

17    really understand what they're giving up, if they are giving up

18    anything, they ought to know what they're giving up and the extent

19    of what they're giving up or potentially giving up.  It may not be

20    an issue, but they ought to at least know whether or not it's an

21    issue, and it may be an issue for some and not an issue for others.

22    So I do think there's some wisdom in doing that.

23              Okay.  Anything else, Dawn?

24              MS. BARRIOS:  No, your Honor.

25              THE COURT:  John?

 1              MR. BEISNER:  No, your Honor.

 2              THE COURT:  Yes, Russ.

 3              MR. HERMAN:  May it please the court, your Honor, Russ

 4   Herman for the Plaintiff Steering Committee in the MDL.  And I

 5   wanted to bring up on the record the issue of common benefit.

 6              For over a year members of the PSC and others in the MDL,

 7   Ms. Barrios, Mr. Dugan, Mr. Murray, Mr. Arbitblit, Mr. Seeger, et

 8   cetera, have been providing assistance in connection with the AG

 9   matters.  Not necessary to go into that, except that the trial

10   package has been made available, as well as the depository.

11              I got a third-party indication that if the funds were

12   paid directly to NAMFCU and NAMFCU distributes those funds to the

13   states that perhaps some attorney generals felt they could avoid

14   common benefit for the contributions made in the MDL to those

15   efforts.  I just wanted to alert the court and to all participating

16   counsel and entities on the record that the PSC on behalf of the

17   MDL will be filing some motion and perhaps a brief within the next

18   two weeks dealing with the common benefit issue.

19              THE COURT:  All right.  And we'll deal with it at that

20   time.  Basically it seems to me that if there is any common benefit

21   due that it's due from the fund before it's distributed, because it

22   would seem to me that the states who did not participate in this

23   process got some benefit from the process.  The reason we're here

24   now is because there have been six trials and 18 other trials in

25   other states and a lot of discovery and the package and so forth.

1          Whether or not and the extent of that is an issue, but I

2    do think that not just the states who participated and are on the

3    line owe or may owe, if any common benefit is due, it's due from

4    the fund in general as opposed to only those who participated.

5    It's not fair to those who participate, who have participated in

6    this matter to have people who have not participated not have to

7    recognize any common benefit, if any is allowed.

8          But I'll deal with that, give everybody an opportunity to

9    express themselves if that comes up at another time.

10         MR. GARMER:  Your Honor, Bill Garmer from Kentucky.  And

11   I want to express what I expressed to your Honor earlier this

12   morning, and that is that there is a good likelihood that if

13   Kentucky is required by the release to participate in the NAMFCU

14   that they will not do that and continue with their CPA claim, and

15   for that reason we have some concern about the stay.  And we

16   understand your Honor's going to grant the stay for the next 30

17   days, but we from Kentucky we would like to get the case moving as

18   quickly as possible on our Consumer Protection Act claim, and I

19   think I've expressed that to the court before and would like to

20   express it again.

21         THE COURT:  Right.  The consumer protection claim in

22   Kentucky is somewhat different in the sense of quantum requested,

23   they are looking for some penalties as opposed to compensation.

24   But other than the type of payment, they're in the same factual

25   scope and arena and environment as the other claims that Elizabeth

1    Cabraser's representing or the spokesperson for.  So I would

2    suggest to Kentucky that they coordinate with those cases, too, so

3    that we can deal with them at the same time.

4         MR. GARMER:  I will and we will do that, your Honor, and

5    we've already talked.

6         MS. CABRASER:  We've talked and are moving ahead.

7         THE COURT:  I set a status conference on February 24th,

8    which is about 30 days so that we can -- if it comes up sooner than

9    that we ought to get together.

10        MS. BARRIOS:  It's going to come up sooner than that,

11   today is January 6th, so if we could do something in February for

12   us.

13        THE COURT:  Yes, I'll do that.  Dawn, keep me posted on

14   this so that we can set up a status conference.  I would like even

15   before that maybe in a couple of weeks hear from you and John on

16   what's happening and I'll set up a telephone status conference so

17   that you can tell me what's happening and what needs to be done and

18   so forth.

19        I'll also make a call to Mr. Patton and get him involved

20   in the next open conference, I'll have him in the line or either in

21   court so that he can give us his input, I think he is an important

22   player in this.

23        And one other thing that, as I mentioned Pat Juneau is

24   going to be the special master.  I would like, Dawn, you and John

25   to meet with Pat and work out some kind of method of compensation,

1    method of his billing and so forth.

2            Some of the billing is going to have general to you, I'll

3    ask him to be more specific to me.  But if he talks to separate

4    states in a negotiating posture, it's not going to be helpful for

5    him to put on an open billing who he talked to and to whom and what

6    they said and so forth because that would defeat the opportunities

7    that he will have.

8            All right.  Anything else from anyone?  All right, folks,

9    thank you very much.  I appreciate you participating.

10           (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

11

12                          *  *  *  *  *  *

13

14                          REPORTER'S CERTIFICATE

15

16     I, Karen A. Ibos, CCR, Official Court Reporter, United States

17   District Court, Eastern District of Louisiana, do hereby certify

18   that the foregoing is a true and correct transcript, to the best of

19   my ability and understanding, from the record of the proceedings in

20   the above-entitled and numbered matter.

21

22

23                          _____

24                          Karen A. Ibos, CCR, RPR, CRR

25                          Official Court Reporter