**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

———————————————————
In Re:  VIOXX                                  :
                                                        :          **MDL Docket NO. 1657**
**PRODUCTS LIABILITY LITIGATION**  :
                                                        :          **SECTION L**
                                                        :
**This document relates to ALL ACTIONS** :    **JUDGE FALLON**
                                                        :          **MAG. JUDGE KNOWLES**
———————————————————:

**FEE ALLOCATION COMMITTEE'S**
**RESPONSE TO OBJECTIONS TO RECOMMENDED**
**COMMON BENEFIT FEE ALLOCATION**

The Fee Allocation Committee's recommended allocation of common benefit fees was published and all applicants were afforded an opportunity to object.  Seventeen of the 105 applicants filed objections which are addressed here.  In stark contrast to many cases, the fee allocation process established by the Court and followed by the Fee Allocation Committee in this litigation is one of openness and objectivity.   The objections, as would be expected, reflect a desire for a different process, one that would be more favorable to the objectors.  However, the process and system established by the Court and implemented by the Fee Allocation Committee is a system that rewards key contributions, provides fair compensation for necessary but less demanding work, and accounts for activities that are harmful to the common cause.  At its core, the Court's system incentivizes team effort, a key ingredient to a successful MDL action.

### I.   Description of Fee Allocation Process

Within three years of the formation of the Vioxx MDL and after 6 MDL bellwether trials and 13 trials in state courts, Merck & Co. ("Merck") and the Negotiating Plaintiffs' Committee ("NPC") reached a global settlement for $4.85 billion.  This settlement was executed and

1

publicly announced on November 9, 2007.[1]  The Agreement is a private agreement.  In essence, the private settlement program served as a settlement offer to counsel and all claimants who suffered sudden cardiac death, heart attack or stroke, an offer that they were free to accept or reject.  On November 20, 2007, the Court appointed the Fee Allocation Committee for the purpose of providing a common benefit fee allocation recommendation, in accordance with Article 9 of the Master Settlement Agreement ("MSA").  The Court entered Pretrial Order 6D on September 8, 2008.  This Order imposed a deadline of October 31, 2008, for the submission of an affidavit by any attorney seeking a common benefit fee.  In Pretrial Order 6D, the Court set forth procedures to be followed by the Fee Allocation Committee to ensure that applicants were provided ample opportunity to be heard.  Moreover, Pretrial Order 6D provided guidelines and criteria to be considered by the Fee Allocation Committee in evaluating applicants' submissions.

Following the Court's directives, the Fee Allocation Committee received and reviewed the affidavits from a majority of common benefit fee applicants.[2]  The Fee Allocation Committee also reviewed the time submissions of applicant firms and reports prepared by Philip Garrett, the Court-appointed CPA.[3]  Additionally, the Fee Allocation Committee conducted hearings in Atlantic City, New Jersey; New Orleans, Louisiana; Houston, Texas; and Los Angeles, California where common benefit fee applicants were given the opportunity to present additional testimony in support of their common benefit fee application.  Members of the Fee Allocation Committee likewise made presentations.[4]  As directed by the Court and pursuant to the terms of the MSA, the Fee Allocation Committee rigorously applied the *Johnson* factors in its evaluation of each applicant.

---

[1] See Master Settlement Agreement ("MSA") attached as Exhibit A.
[2] Exhibit B is a composite of these affidavits.
[3] Exhibit C is a composite of reports prepared by the Court-appointed CPA, Philip Garrett, of Wegmann Dazet & Co.
[4] Transcripts of all presentations are attached as Exhibit D.

In arriving at a recommended amount for each applicant, the Fee Allocation Committee considered the type of work that was performed as well as the value that such work contributed to the litigation.  While reviewing the time submissions of each applicant, the Fee Allocation Committee recognized that, for many applicants, time records were not contemporaneously maintained but rather were reconstructed years later.  Also, the Fee Allocation Commitee recognized the lack of consistency in the manner and method of applicants' time keeping. Furthermore, the time submissions of applicants covered a wide array of activities and personnel with varying skill levels and expertise.  In addressing the issue of time submissions, the Fee Allocation Committee found particularly helpful the views expressed by the Court in *Turner v. Murphy Oil*, 582 F. Supp.2d 797 (E.D. La. 2008), when it noted that:

> Hours spent taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of the case are some of the more significant types of work that a case of this sort requires and deserves the most recognition.  This, of course, is not the only type of work that such a case requires.  Documents must be reviewed, categorized, and analyzed:  emails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the litigation must be monitored.   This work while necessary and often time consuming, does not deserve equal treatment when allotting fees.

*Id.* at 810-811.

For these reasons, the Fee Allocation Committee gave due consideration to the time submitted by each common benefit applicant, but did not treat the number of hours as the prevailing factor in arriving at the recommended allocation for each firm.

To properly evaluate and sift the time submissions and the testimony of the applicants required an in-depth and broad understanding of the litigation. The members of the Fee Allocation Committee were well situated for this task.  The Fee Allocation Committee is

3

comprised of members who:

- Pioneered the Vioxx litigation, having filed and litigated Vioxx cases for more than three years before the formation of the MDL;
- Served as Plaintiffs Liaison Counsel, Co-Lead Counsel, and the Executive Committee of the MDL, and in leadership in the coordinated litigations in California, Texas and New Jersey;
- Served as Lead or Co-Lead Counsel in five of the six MDL bellwether trials;
- Served as Lead or Co-Lead Counsel in 13 of the 19 total jury trials (state and federal);
- Served as Chairs or Co-Chairs of the Law and Briefing Committee, Trial Committee, Discovery Committee and Administrative Committee in the MDL;
- Comprised the entire Negotiating Committee that negotiated the Master Settlement Agreement over a period of eleven months; and
- Provided leadership in every aspect of the Vioxx litigation.

The high level involvement of the Fee Allocation Committee members in every phase of the litigation and in every key venue ensured that each applicant's submission could be analyzed and measured against Fee Allocation Committee members' personal knowledge regarding the role of the applicant, thus facilitating a meaningful analysis utilizing *Johnson* factors and the criteria prescribed by the Court in Pretrial Order 6D.

At the Court's instruction, the Fee Allocation Committee developed a point system to assist in objectively evaluating each applicant's submission in a manner that utilizes a *Johnson* factor analysis and weighs the applicant's contributions to the overall success of the litigation.[5] The Fee Allocation Committee developed a point system that gave greater weight to certain categories of work such as trials and settlement while giving credit for necessary but less demanding categories. The details of the point system were developed through considerable discussion and careful deliberations by members of the Fee Allocation Committee.[6] The Fee Allocation Committee then utilized the point system to evaluate each applicant's contribution in each category. This process produced a preliminary allocation recommendation which was

---

5 See Exhibit E (Transcript of January 6, 2011 Status Conference).
6 See Exhibit F (Point System Guide).

presented to Judge Fallon for his review.[7]  Consistent with the terms of Article 9 of the MSA, the Fee Allocation Committee consulted with Judge Higbee, Judge Chaney, and Judge Wilson regarding the preliminary allocation recommendation.

The Fee Allocation Committee communicated the amount of its preliminary recommendation to each firm on an individual basis.  In keeping with Pretrial Order 6D and to ensure due process, each applicant was afforded 14 days to object to the preliminary recommendation and to set forth the basis for the objection in writing. The Fee Allocation Committee considered each objection.  Each applicant was afforded an opportunity to be heard by members of the Fee Allocation Committee.  Many applicants met with members of the Fee Allocation Committee and asked questions, expressed views and voiced objections.  Through this phase of the process prescribed by the Court, the Fee Allocation Committee determined that some adjustments should be made.  One such adjustment involved giving greater weight to a rough lodestar cross-check.  That adjustment, in some cases, necessitated a change from the amount of the preliminary recommendation that was derived from the point system calculation.  The rough lodestar cross-check yielded, in some cases, relatively minor adjustments.  Nonetheless, lodestar was not the predominant factor in determining an applicant's recommended allocation. After considering the applicants' objections to the preliminary allocation, the Fee Allocation Committee also made adjustments to some applicants' point system evaluation.[8] Then, the Fee Allocation Committee presented its final recommendation to the Court.[9]  The Court posted the recommendation on its website on January 20, 2011, for all to see.  The Court also ordered that any objections to the recommendation should be filed on or before February 4, 2011, and that such objections should state the reasons for the objection, the

---

[7] See Exhibit G (Preliminary Grid – December 2010).
[8] See Exhibit H (Final Grid – January 2011).
[9] See Exhibit I (Fee Allocation's Final Recommendation).

amount sought, and the basis for such an award.  Seventeen firms objected and filed briefs and materials in support of their objection.[10]

Each objector, of course, contends that their firm is entitled to a greater award based upon the objector's work. The Fee Allocation Committee's assessment of each objector's claim for common benefit fees is covered below, but first the Fee Allocation Committee addresses several arguments that are common among several of the objectors.

## II.  Common Arguments Among Various Objectors

### A.  Objectors Assert Lack of Jurisdiction

The following objectors contend that the Court lacks jurisdiction to address fee allocation: The Branch Law Firm; Kline & Specter; The Locks Law Firm; Chris Placitella; Cohen Placitella & Roth; and Eric H. Weinberg.  These objectors argue that this Court lacks jurisdiction over the common benefit fee allocation process to the extent it involves the allocation of fees earned in relation to state court cases.  More specifically, they insist that the Honorable Carol Higbee is the rightful judge to oversee the allocation of common benefit fees generated by cases which were filed in the New Jersey Coordinated Litigation.

Objectors concede that the Master Settlement Agreement is binding on counsel who enrolled claimants in the settlement program.[11]  Each of these objectors accepted the terms of the Master Settlement Agreement and received payments on behalf of their clients pursuant to the terms of the Master Settlement Agreement.[12]  In addition, these objectors suggest that the Court

---

[10] Exhibit J is a list of common benefit applicant firms who agreed to the Fee Allocation Committee's recommended allocation.  Exhibit K is a composite exhibit of the executed acceptance forms.

[11] See Jt. Obj. Weinberg, Placitella, and Cohen, Placitella & Cohen, at 41.

[12] The Branch Law Firm enrolled over 950 claimants and received over $115 million on behalf of their clients pursuant to the terms of the MSA.  Cohen Placitella & Roth enrolled 210 claimants and received over $32 million on behalf of their clients pursuant to the terms of the MSA.  Kline & Specter enrolled over 600 claimants and received over $115 million on behalf of their clients pursuant to the terms of the MSA.  The Locks Law Firm enrolled over

has within its "reservoir of 'inherent' authority" the power to order that an assessment of 6.5% for common benefit fees be withheld from settlement proceeds from all cases regardless of the jurisdiction in which the case is pending, yet lacks the jurisdiction to allocate these same funds. According to their objections, the Master Settlement Agreement is a valid, private agreement, controlling in all aspects that inure to their benefit, but neither controlling nor valid in only one regard: the allocation of common benefit fees.

Section 9.2.4 of the Agreement clearly states that common benefit fees would be allocated subject to the approval of Judge Eldon E. Fallon, in consultation with Judges Higbee, Chaney, and Wilson. The provision is not ambiguous. It is unmistakable in its meaning – the allocation of common benefit fees shall be determined by the Honorable Eldon E. Fallon. Now, having clearly profited from the Agreement, these objectors cannot rightly or with clean hands object to the proper application of Sections 9.2.3 and 9.2.4. If this term was not acceptable, they should have attempted to reach their own agreement with Merck apart from the settlement program in which they enrolled their clients. Based on the papers submitted by objectors and arguments advanced therein, reaching a settlement agreement with Merck was a simple and risk-free endeavor of little import.[13]

## B. Objectors Contend that Lodestar Must Control

Objectors have argued that the lodestar method for determining common benefit fees is controlling in regard to the calculation of common benefit fees. Kline and Specter[14] states that

---

180 claimants and received over $32 million on behalf of their clients pursuant to the terms of the MSA. Eric Weinberg enrolled over 230 claimants and received over $42 million on behalf of his clients pursuant to the terms of the MSA.

[13] See Jt. Obj. Weinberg, Placitella, and Cohen, Placitella & Cohen, at 29-30 ("By the time the PSC undertook settlement negotiations, a settlement was a foregone conclusion."); see also Objectors' Mot. Partial Sum. J., at 36 ("time spent settling the case, an endeavor that was virtually risk-free").

[14] Similar statements were made by Cohen, Placitella & Roth and Eric Weinberg in their joint objection. See Jt. Obj. Weinberg, Placitella, and Cohen, Placitella & Cohen, at 6.

"district courts are required to use the 'lodestar' method for assessment of common benefit fees."[15]

The Court has addressed in depth the issue of the proper application of the lodestar method. Most notably, the Court pointed out the method's flaws, listing the drawbacks as reported by the Third Circuit Task Force, which include: increased workload on the judiciary; inconsistent application of the approach and widely varied fee awards; illusory mathematically precision unwarranted by the realities of the practice of law; potential for manipulation; and, reward of wasteful and excessive attorney effort.[16] In addition to explaining the inherent difficulties and inequities caused by the use of the lodestar method exclusively, the Court further explained its reasoning as to why a blended percentage method was more appropriate in the present case and why lodestar analysis should be used as a rough cross-check:

> While the United States Supreme Court has approved the percentage method in common fund cases, it has never formally adopted the lodestar method in common fund cases. *See Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 773-74 (11th Cir. 1991) (reading *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984), as the Supreme Court's "acknowledgment" of the percentage method in common fund cases); *In re Prudential-Bache Energy Income P'ships Sec. Litig.*, MDL No. 888, 1994 WL 150742, (E.D. La. Apr. 13, 1994) (tracing the history of the various methods). Conversely, the Fifth Circuit appears to be the only Court of Appeals that has not explicitly endorsed the percentage method. Manual for Complex Litigation (Fourth) §14.121 (2004). However, neither has the Fifth Circuit "explicitly *disapproved* of the percentage method of calculating fees in common fund cases." *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 WL 512081, at *18 (E.D. La. Mar. 2, 2009) (emphasis added). Therefore, the Fifth Circuit appears to tolerate the percentage method, so long as the *Johnson* framework is utilized to ensure that the fee awarded is reasonable. *See id.*; *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 851-52 & n.5 (5th Cir. 1998); *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823-25 (5th Cir. 1996).

> Accordingly, numerous district courts in this Circuit have applied a "blended"

---

[15] See Kline & Specter Obj. 30 (citing *In re High Sulfur Content Gasoline Prods. Liab.*, 517 F.3d 220, 22 (5th Cir. 2008)).

[16] See *In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, Order of Oct. 19, 2010, at 16 (E.D. La. Oct. 19, 2010) (quoting *Vaughn R. Walker & Ben Horwich, The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases,* 19 Geo. J. Lethal Ethics 1453, 1456 (2005) (summarizing *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985))).

percentage method to determine a reasonable fee award, while staying within the *Johnson* framework. *See, e.g., In re OCA*, 2009 WL 512081, at *19; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 766, 778 (S.D. Tex. 2008); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 859-61 (E.D. La. 2007); *In re Bayou Sorrel Class Action*, No. 04-1101, 2006 WL 3230771, at *3 (W.D. La. Oct. 31, 2006); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 628-29 (E.D. La. 2006); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 531 (N.D. Miss. 2003); *In re Combustion, Inc.*, 968 F. Supp. at 1135-36; *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 499-501 (N.D. Miss. 1996).

Keeping in line with Fifth Circuit precedent and this Court's prior experience, the Court finds that the blended percentage approach is an appropriate method for calculating reasonable common benefit attorneys' fees in this case. Accordingly, the Court will first determine the valuation of the benefit received by the claimants and then select an initial benchmark percentage. The Court will then determine whether the benchmark should be adjusted based on the application of the *Johnson* factors to the particular circumstances of this case. Finally, the Court will conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award. The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method.

*In re Vioxx Prod. Liab. Litig.,* No. MDL 1657, Order of Oct. 19, 2010, at 18-19 (E.D. La. Oct. 19, 2010).

A few examples from this litigation demonstrate the disparity of a lodestar-controlled allocation:

- Example No. 1: Escobedo, Tippit & Cardenas ("Escobedo") and Blizzard McCarthy & Nabors ("Blizzard"). Escobedo tried the *Garza* case in state court in south Texas. Blizzard tried a MDL bellwether case. Escobedo did no other work for which he or his firm claims any common benefit fee consideration. Blizzard, on the other hand, played a key role in negotiating the global settlement over the course of eleven months; did substantial work ensuring the success of the settlement program; worked on the Gates Committee and served on the Liaison Committee with BrownGreer; served on the Common Benefit Cost Committee; and continues to serve on the Fee Allocation Committee. Any reasonably informed, objective observer would conclude that Blizzard is entitled to a substantially greater common benefit fee than Escobedo. Yet, Escobedo submitted 14,886 hours compared to Blizzard's 9,173 hours. Strict lodestar application would result in a grossly inequitable result.

9

- **Example No. 2**: The Motley Rice firm submitted nearly 1,000 hours for the preparation and taking of one two-day deposition. Strict adherence to the lodestar method would result in a fee of more than $400,000 for the taking a single deposition that was neither used at trial nor critical to any key aspect of litigation.

- **Example No. 3**: Danny Becnel supplied lawyers to perform document review work. Otherwise, the Becnel firm made no appreciable common benefit contribution. Jerry Meunier, on the other hand, served on the PSC, helped try a bellwether case in the MDL, and served as Co-Chair of the Trial Package Committee. Meunier's common benefit contribution towers above Becnel's common benefit contribution. Meunier's credentials and integrity are impeccable, but his timekeeping is poor. Thus, strict adherence to the lodestar method would result in a gross injustice compared to a more value-driven system of common benefit compensation.

- **Example No. 4**: RodaNast performed nine non-critical legal research tasks. Given the scope of the Vioxx litigation, these assignments were hardly noticeable in view of the body of law and briefing work required. Yet, based purely on lodestar, RodaNast claims the firm is entitled to over $500,000.

These examples make patently clear that the lodestar approach rewards time-keeping not advancing the litigation, form over substance. The Court has directed the Fee Allocation Committee to pursue a value-driven approach, and the Committee has endeavored to do so.

### C. Objectors Contend Entitlement to Common Benefit Fees for Case Specific Work

Several objecting firms argue that they are entitled to common benefit fees for hours expended on individual cases that did not proceed to trial. The Fee Allocation Committee acknowledges that preparing cases for trial or, in other words, advancing the docket, contributes to the advancement of the overall litigation. However, the Fee Allocation Committee also recognizes that case specific matters such as answering interrogatories, producing client medical records, preparing for and defending clients depositions, and taking the depositions of the prescribing and treating doctors and perhaps deposing relevant sales representatives are tasks that are to be reasonably expected to take place in every pharmaceutical case where a firm undertakes

to represent a client.   In its preliminary recommendation, the Fee Allocation Committee attempted to give partial common benefit credit for discovery performed in individual cases.

However, as objections to the Fee Allocation Committee's preliminary recommended allocation were received, it became clear that firms were not amenable to partial credit for such work.   Instead, the firms demanded full value for such time with no offset for the fact that the firms were receiving compensation for such work by way of contingency agreements with their clients.   Therefore, the Fee Allocation Committee reevaluated its approach.   As a result of this analysis, the Fee Allocation Committee reached the following conclusion.

In this litigation, the total fee for plaintiffs' lawyers has been established by Judge Fallon. By virtue of the Court's order of August 27, 2008 capping the contingency fees at 32%, the Court established the total aggregate attorneys' fee for all Vioxx cases resolved in the settlement program.   The Court further determined that this fee should be divided as follows:   20% for common benefit work and the remaining 80% for work on individual cases.[17]   Given this fee division and the strident objections to giving partial credit for advancing the docket in its preliminary recommendation, the Fee Allocation Committee decided that the better approach would be to draw a more definitive line between common benefit tasks and case specific tasks. Activities such as client communication, completion of fact sheets, case-specific depositions (such as plaintiff depositions, family member depositions, prescribing doctor depositions, treating physician depositions, and sales representative depositions) were determined to be case specific work.   Common benefit work, on the other hand, was considered to include all tasks necessary for developing and advancing the general liability case and other non-case specific

---

[17] Order and Reasons entered by the Court on October 19, 2010, established 6.5% or $315,250,000 as the appropriate amount for common benefit fees. Thus, the common benefit portion of the total attorneys' fee is 20.3125% ($315,250,000 / $1,552,000,000). The remaining portion of the fee, or 79.6875%, is for case individual case work as opposed to common benefit work.

work that inured to the common good.  Because general liability is a substantial part of trials, trials were deemed to be common benefit work.  However, work done on individual cases which were not tried was considered by the Fee Allocation Committee to be compensated by the case-specific 80% established by the Court.

### D.  Objectors Contend that Common Benefit Expense Reimbursement Entitles Them to Fees for Case Specific Work

Reimbursement for discovery costs on individual cases was for the benefit of clients, not to create an entitlement for lawyers.  This fact is made clear from the Court's Pretrial Order 51.[18] Case specific discovery was stayed in all but a small portion of Vioxx cases.  In cases where discovery was ordered, substantial costs were incurred in comparison to cases which were stayed and no discovery was conducted, absent the preparation of a plaintiff fact sheet.  Since costs are deducted from a client's portion of a recovery, if the costs related to discovery were not reimbursed from the Common Benefit Cost Fund, claimants whose cases were selected for discovery would pay a disproportionate amount of the costs associated with the litigation. Therefore, the Fee Allocation Committee determined that costs associated with discovery should be reimbursed for all cases which were worked up for trial and for which common benefit expenses were submitted.  However, the reimbursement of costs associated with ordered discovery did not render the hours expended on such work appropriate for common benefit fees. Again, fees for that work were covered by individual contingency fee contracts.

### E.  Objectors Claim CPA Audit Alone Renders Time Compensable

The Objectors in an attempt to make lodestar the only and final word on common benefit awards have claimed that the hours submitted by them are sacrosanct because they were audited

---

[18] *In re Vioxx Prod. Liab. Litig.*, Pretrial Order 51, at 1 (E.D. La. Sept. 23, 2009).

by Wegmann Dazet & Co.  But the Wegmann Dazet audit of the common benefit hours was not an audit designed to determine that the hours were actually worked, or the quality of the work product attached to those hours. The fact is that many of the firms who applied for a common benefit award, including virtually all of the Objectors, did their work in jurisdictions where keeping contemporaneous time records was not required, so the submissions of hours worked on a project are actually estimates constructed years after the actual work was done.

What the Fee Allocation Committee found when it examined those records is that some firms were more conservative in estimating or reconstructing their time and that some were more liberal, and that there were wide variances in the time submitted for similar work. For example, the Motley Rice firm took a two-day deposition in 2005 of a Merck employee named Ellen Westrick, who worked on the marketing side of the company, but was not a key decision maker. The deposition was not played or otherwise used in any of the Vioxx trials, yet Motley Rice submitted nearly one thousand hours on this one deposition. An examination of the time records submitted shows that Motley Rice claims several junior associates worked 8 hour days preparing for this deposition for months at a time.  The Fee Allocation Committee is familiar with the Motley Rice firm, the quality of their work and the efficiency of their lawyers. Therefore, the Committee concluded that these time records were likely reconstructed and reflected an overestimate of the time actually worked.  In addition, the Committee was aware that the Westrick deposition was not a significant common benefit.

Because the Fee Allocation Committee is composed of lawyers who tried cases, prepared briefs, and argued motions in all of the major jurisdictions, they are familiar with who did what and the quality of the effort. They also are familiar with the firms that have made common benefit submissions and believe that any over estimate of time is a problem inherent in the

reconstruction of time records rather than an overt attempt to pad time records or deceive the Court. This is the principal reason why the Committee chose to use hours submitted as a crosscheck rather than the gold standard that the Objectors would have the Court adopt.

Philip Garrett, CPA, of Wegmann Dazet & Company was appointed by the Court to receive, compile, and report the common benefit time and expense submissions of counsel. Mr. Garrett reviewed the submissions for purposes of determining if the submissions complied with Pretrial Order 6 as well as other orders of the Court. Mr. Garrett's process was limited to a determination as to whether submissions complied with the Court's orders. Mr. Garrett made no findings as to whether the hours submitted were expended on efforts that benefitted all claimants nor did Mr. Garrett perform a *Johnson* factor analysis regarding the time submissions, responsibility for that analysis was assigned to the Fee Allocation Committee.

### III. Responses to Individual Objectors

#### A. Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.

As indicated in the Point System analysis below, the Fee Allocation Committee recognizes the Anapol firm's contributions to the Vioxx Litigation.[19] Anapol attended organizational meetings as early as 2001 and Sol Weiss as Co-Liaison Counsel for the New Jersey coordinated action assisted in the negotiation of draft complaints and initial orders, and participated in document review and certain depositions. However, as a general matter, Anapol has grossly overstated its contributions to the Vioxx litigation as a whole.

For example, Anapol seeks enhancement of its lodestar because it attended a 2001 organizational and strategy meeting and because it filed one of the first Vioxx cases in New

---

[19] Based on the firms' submissions, it is evident that Anapol, along with Cohen, Placitella, & Roth, Weinberg, and Motley Rice, worked outside the New Jersey Coordinated Litigation and the MDL to devise their own settlement protocol for their own inventory, and now seek common benefit compensation for that effort. Such work was contrary to and detracted from the common good and is not appropriate for common benefit consideration.

Jersey.[20]   Mere attendance at a meeting is not a measure of an attorney's contribution to a litigation.   Rather, that contribution should be evaluated according to the nature and level of work performed, and how that work furthered resolution of the matter.   Further, while Anapol may have filed one of the first cases in New Jersey, it never tried that case.  Indeed, at the time the Master Settlement Agreement was announced, there were nearly 50,000 Vioxx cases filed in jurisdictions all over the country.

Additionally, Anapol claims to have "negotiated or argued many of the issues, motions, orders, findings, and rulings that were handed down in the New Jersey Consolidated Litigation." *Id.*  A review of the motion papers and transcripts filed in New Jersey reveal that while Anapol had involvement in some of the first orders that were negotiated and entered in New Jersey, the work at issue was primarily performed by attorneys at Seeger Weiss.  Anapol also purports to have been "instrumental in developing generic and case specific experts in support of plaintiffs' positions."  *Id.*  While the Fee Allocation Committee does not doubt that Anapol developed case-specific experts for its individual cases, it is not aware of any generic experts developed by Anapol that participated in any case that was tried in New Jersey or any other jurisdiction. Finally, while Anapol claims to have "worked on numerous bellwether trial cases," Anapol never tried a single Vioxx case in any jurisdiction.

While the Anapol firm served as Co-Liaison Counsel in the New Jersey Coordinated Litigation, its role was limited in this regard, primarily providing administrative services, such as circulating correspondence among counsel and maintaining production logs.  Although Anapol attorneys did participate in a few depositions, none of the depositions taken by Anapol were used in a Vioxx trial.

---

[20] See Anapol's Objections to the Fee Allocation Committee's Common Benefit Fee Recommendations, at 2-3.

Anapol's objections and arguments in favor of an increased common benefit fee allocation rely on two factors.  First, Anapol argues that its common-benefit allocation should be driven primarily by lodestar.  Second, Anapol argues that the work it conducted in connection with individual cases should be deemed as having benefited the litigation as a whole.  For the period of December 2001-May 2008, Anapol submitted 8,430 hours and claimed a lodestar of $3,306,026.20.  That submission included hours expended working up the *Hatch* matter, a potential trial case in the New Jersey.[21]  Additionally, in January 2009, Anapol submitted 4,617.50 hours, seeking lodestar fees of $1,373,875.  As acknowledged by Anapol, the latter submission was for hours spent developing eight of the nine individual cases that Anapol worked up for potential trial in New Jersey.[22]

The time submitted in January 2009 was not included in the Fee Allocation Committee's common benefit fee allocation for Anapol nor should it have been.  For the reasons explained *supra* section II.C., the Committee concluded that work conducted in furtherance of individual cases that were not tried would not be deemed to be common benefit work.  Indeed, the Anapol firm has already recovered for such work from the attorney fees awarded to its individual cases. Further, as explained in section II.B., the Committee strongly disagrees with Anapol's contention that lodestar must control common benefit allocations.   Rather, as demonstrated below, the Fee Allocation Committee followed the blended percentage approach and adopted a Point System analysis that incorporated *Johnson* factors and the criteria prescribed by the Court in Pretrial Order 6D.

In sum, the Fee Allocation Committee has reviewed Anapol's submissions and the relevant records and maintains that its common benefit fee recommendation is fair and

---

[21] Ultimately, this case was not selected as a trial candidate because it was determined that the plaintiff was not prescribed Vioxx.
[22] *Id.* at 2.

reasonable.

**Point System.** The Fee Allocation Committee evaluated Anapol Schwartz's contributions using the Point System. This analysis yielded the following results:

- Key Leadership: 25 points. Sol Weiss served as Co-Lead Counsel in the New Jersey Coordinated Litigation.
- Trials: 0 points. Anapol Schwartz did not try a case in this litigation.
- Settlement: 0 points. Anapol Schwartz did not participate in negotiations.
- Law & Briefing: 20 points. Anapol Schwartz assisted with the some legal research and briefing, but the firm's role in this area was limited.
- Settlement Implementation/ Post Settlement Matters: 0 points. Anapol Schwartz did not assist in any post-settlement matters.
- Discovery/Science: 10 points. In light of the work described, the Fee Allocation Committee determined that the firm was entitled to 10 points.
- Committee Leadership and Participation: 10 points. In light of Sol Weiss' role as described above, the Fee Allocation Committee determined that the firm was entitled to 10 points.
- Funding: 25 points. Because the firm did significant common benefit work and contributed a significant number of cases, Anapol Schwartz was awarded 25 points.
- Case Management: 25 points. Due to the firm's role in the New Jersey Consolidated Litigation, Anapol Schwartz was given the maximum 25 points in this category.

**Johnson Factor and Pretrial Order 6D Criteria.** Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for Anapol Schwartz is .60.

**Lodestar Cross-Check.** Anapol Schwartz submitted over 12,000 hours of which 8,430 hours did not relate to work on individual, non-trial cases. Based on their submitted hourly rates, the lodestar is $3,309,025. Considering the close alignment of the value yielded by the Point System and the lodestar cross-check, the Fee Allocation Committee determined that a recommendation of $3,400,000 is appropriate.

**B. Becnel Law Firm**

The Becnel Law Firm ("Becnel") seeks common benefit compensation for a variety of

contributions.   Becnel seemingly takes credit for the Judicial Panel on Multidistrict Litigation's decision to appoint Judge Fallon as the MDL judge and the Eastern District of Louisiana as the venue for *In re Vioxx Product Liability*.   No credit was given to Becnel's "voice in the wilderness" claim.   Becnel participated in a mock trial, and due accord was given for this assignment.   Becnel attended MDL status conferences.   Becnel also claims to have hired numerous experts but there is no evidence that they were used in the Vioxx litigation or even provided an expert report.   Becnel attempts to take some credit for the plaintiff's verdict in *Barnett v. Merck & Co.*   Becnel participated neither in the preparation nor the trial of the case. The Committee gave due consideration to the role of Becnel's associate, Ms. Rebecca Todd, in the *Barnett* case.   Becnel provided lawyers for document review. In fact, nearly all of the hours submitted by the Becnel Law Firm, 13,038.25 hours, were devoted to document review.   The Committee carefully considered the number of reviewers, the hours expended, and their relative expertise.   Based upon the submissions of the Becnel Law Firm, the Fee Allocation Committee found that the Becnel Law Firm's only substantive contribution to the litigation was supplying non-employee attorneys to perform document review work.[23]

Furthermore, the Fee Allocation Committee determined the following under the Point System:   5 points was appropriate for Case Management due to Becnel's attendance at some monthly status conferences; and, 20 points was appropriate for Discovery/Science in light of the document review work performed.   However, considering the *Johnson* factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for the Becnel Law Firm is .35.   The Fee Allocation Committee also noted that while all other applicants, except the Snapka Law Firm, contributed to the common benefit fund

---

[23] See Affidavit of Richard A. Arsenault outlining the joint arrangement to hire contract lawyers for document review at a rate of $25/hour. See Ex. L, at 3.

at a rate of 6.5%, Becnel contributed at only 4%.

Following the issuance of the Fee Allocation Committee's initial recommendation of $97,076.50, members of the Fee Allocation Committee met with Mr. Becnel.   Mr. Becnel aggressively argued that he was due extra credit because he was "responsible for having the MDL panel bring" the Vioxx matter to New Orleans.  He further explained that he had been in the case before the MDL and tasked contract lawyers early on to work in preliminary depositories in Alabama and New York.  Considering early involvement and the amount of time expended for document review, the Fee Allocation Committee increased the recommendation to $455,000, as a fee reasonable for contribution to common benefit.

### C.  Branch Law Firm

In support of their application for a Common Benefit Award, the Branch Law Firm ("Branch") submitted 7,087.5 hours.   Branch claims common benefit credit for having eleven cases on the trial calendar in New Jersey and one in Texas.  In addition, Branch served as state liaison for New Mexico on the State Liaison Committee from April 2005 until October 2005 at which time he resigned to pursue his firm's interests outside the MDL.  The firm also held an appointment to the MDL Discovery and Science Committee though it appears that no substantive work was performed.  Branch argues that because the hours submitted by the firm (7,087.5 hours) is 1.25% of the total approved hours submitted on behalf of all common benefit lawyers that the Branch Law Firm is entitled to 1.25% of the total Common Benefit Fund or $3,947,875.75.

The Branch Law Firm did not hold key leadership positions in the MDL or in any of the coordinated state litigations.  The firm did not participate in trials, conduct depositions of any critical witnesses to build the liability case against Merck, or have any involvement with the

19

preparation of significant motions or legal briefing.  Branch was not involved in any aspect of settlement negotiations, the creation of the settlement agreement or its implementation.  Branch did not identify or specify any significant contribution related to its position as New Mexico's Liaison to the MDL.  Similarly, Branch did not identify any specific contribution it made as a member of the Discovery and Science committee other than sitting on the committee and funding one statistical study.

In large measure, the time submitted by the Branch Law Firm is time connected with discovery performed in several individual cases in preparation for potential trials.  None of the cases in question advanced to trial.  For the reasons described in detail above, the Fee Allocation Committee concluded that the work done on individual cases that did not proceed to trial was compensated by the individual fee contract with the client and was not appropriate for common benefit consideration.

**Point System.**  Because the work performed by the Branch Law Firm was performed on individual, non-trial cases, the Fee Allocation Committee determined that the firm was entitled to 0 points.

**Lodestar Cross-Check**.  Because the work performed by the Branch Law Firm was case specific in nature, the Fee Allocation Committee determined that a common benefit fee award was not appropriate.

### D.  Bruno & Bruno

On April 8, 2005, Judge Eldon Fallon issued Pretrial Order 6 outlining the procedures for submission of common benefit time and expenses.  The Court appointed Wegmann Dazet & Co. to review submissions and ensure that they complied with Pretrial Order 6 as well as other relevant orders of the Court.  On October 31, 2008, an affidavit of Joseph M. Bruno was filed

with the Court on behalf of Bruno & Bruno, purporting to submit hours and expenses for purposes of common benefit consideration.  Thereafter, on July 1, 2009, Clifton W. Newlin, CPA, of Wegmann-Dazet & Company issues a final notice to Bruno & Bruno rejecting all time and expense submissions made by the firm for failure to comply with the Court-ordered procedures.[24]    Bruno & Bruno failed to respond to the final notice.  The failure to respond was deemed by the Fee Allocation Committee to be an abandonment of any claim to either common benefit fees or reimbursement of common benefit expenses.  Therefore, an analysis under the points system was not conducted.

On January 24, 2011, the Fee Allocation Committee received an email from David S. Scalia, formerly with Bruno & Bruno, inquiring as to the reasons Bruno & Bruno was omitted from the Fee Allocation Committee's recommendation.  In addition to Bruno & Bruno's failure to reply to Wegmann-Dazet & Company's final deficiency notice, a review of the time records submitted by Bruno & Bruno demonstrated that the work reflected in the time records did not benefit all claimants in the litigation.  All three lawyers for which time was submitted billed for reviewing the same PSC applications, tagalong notices, correspondence from Vioxx referral counsel, and for reviewing pleadings for which they had no responsibility.  The time period for which hours were submitted ended in October 2005, even before the first MDL bellwether trial. For these reasons, the Fee Allocation Committee determined that a common benefit fee award was not appropriate.

### E.  Cohen, Placitella & Roth and the Law Firm of Eric Weinberg

#### a.  Cohen, Placitella & Roth

In their Joint Objection to the Fee Allocation Committee's Common Benefit

---

[24] A copy of this letter is attached as Exhibit M.

Recommendations, Cohen, Placitella, and Roth ("Cohen Placitella") devotes little time to demonstrating the common benefit provided by Cohen Placitella attorneys.[25]   Rather, its objections are primarily focused on the blended percentage methodology employed by the Fee Allocation Committee in reaching its determinations and Cohen Placitella's specious argument that this Court lacks jurisdiction to determine common benefit fees for cases originated or litigated in state court.[26]   Notably, despite its fierce opposition to this Court's authority, Cohen Placitella would seemingly abandon its objections should this Court order a common benefit allocation for Cohen Placitella of nearly $11 million dollars.[27]  With respect to Cohen Placitella's assertions concerning its contributions to the Vioxx litigation, the FAC has found little evidence to support Cohen Placitella's claims or in some instances, concluded that its claims are significantly exaggerated.

In Appendix 1 to its Objection papers, Cohen Placitella lists its "key contributions" to the common benefit.  For example, Cohen Placitella seeks credit for:  "Developing evidence of marketing fraud by Merck, through intensive investigation, depositions of senior Merck marketing executives, expert analysis, and creative production of exhibits, which were nationally recognized as essential to the plaintiffs' successes."  See Cohen Placitella Obj., App. 1, at 3.  However, the record suggests that much of the discovery undertaken by Cohen Placitella was largely inconsequential or duplicative of discovery already completed by other attorneys participating in the Vioxx litigation.  Further, while brief excerpts of two Cohen Placitella

---

[25] Notably, in neither its initial application nor in its objection papers, does Cohen Placitella provide documentation of its alleged common benefit contributions.  Rather, it simply states it will be prepared to provide such evidence at a future time.  See Cohen Placitella Obj., App. 1, n.2.  Thus, the Fee Allocation Committee has seen little evidence to support the claims of common benefit set forth by Cohen Placitella.

[26] See Id. at 38.  As discussed supra at 4-5, Cohen Placitella takes this position despite the fact that it entered into a private settlement agreement with Merck that explicitly concedes such authority to this Court.

[27] Such an allocation would place Cohen Placitella at the same level of compensation as Blizzard, McCarthy & Nabers, LLP, which unlike Cohen Placitella attorneys, actually tried a Vioxx case and was a key member of several committees, including the Negotiating Plaintiffs Committee.

depositions were played in several trials, this evidence was hardly "recognized as essential to the plaintiffs' successes."

Similarly, Cohen Placitella makes unsubstantiated claims relating to its participation in the development of the scientific case against Merck.  Specifically, Cohen Placitella purports to have: created "what has been described as the *best scientific analysis of Merck's liability*," which allegedly refuted Merck's "misleading and misconceived studies"; created "a scientifically-based model to measure specific causation, which *served as the template for the Vioxx settlement model*"; and developed and educated experts for trials in Texas. See *id.* (emphasis added). Notably, Cohen Placitella has not provided any evidence that an expert it developed was used at any Vioxx trial prior to announcement of the settlement agreement.  Further, Cohen Placitella's claim that its work-product "served as a template for the Vioxx settlement model" is wholly unsupported.

While Cohen Placitella touts its contributions as "paradigm-shifting," the 'firm's submissions make clear that the only shifting that has occurred is Cohen Placitella's blatant attempts to take credit for work performed by other attorneys involved in the Vioxx litigation. For example, Cohen Placitella claims it took the lead in organizing "all New Jersey counsel on discovery, expert witness development, trial, case analysis, and case management issues from 2005 through 2007."  While Cohen Placitella occasionally organized some meetings in New Jersey (at a time when liaison counsel, Seeger Weiss, was actually trying Vioxx cases), Cohen Placitella cannot reasonably assert that it organized or coordinated discovery efforts by New Jersey counsel.   Indeed, such meetings were duplicative of organizational efforts already undertaken by liaison counsel and were conducted without authorization from or consultation with New Jersey liaison counsel or the MDL.  A simple review of the transcripts from the  New

Jersey case management conferences and of the Fee Allocation Committee hearings with those firms active in the New Jersey litigation confirms that it was Seeger Weiss—not Cohen Placitella—that coordinated the efforts of New Jersey counsel.

Cohen Placitella also claims to have participated in "multiple trials in New Jersey, providing experts and other witnesses, exhibits, analysis, and consultation." *Id.* The Fee Allocation Committee is not aware of any evidence that Cohen Placitella attorneys were part of any trial team or that experts developed by Cohen Placitella testified at any Vioxx trial prior to announcement of the Settlement Agreement. Similarly, Cohen Placitella purports to have overcome plaintiffs' defeat in *Humeston* "with a new jury charge and evidence of consumer fraud." Cohen Placitella had no involvement in the retrial of the *Humeston* case and certainly did not draft the jury instructions issued by the Court.

The Fee Allocation Committee does not dispute that Cohen Placitella participated in document review and in certain depositions. Rather, the Committee takes issue with Cohen Placitella's unsubstantiated claims that its work was "critical" to plaintiffs' trial successes or to the final resolution of this action, and the extent to which Cohen Placitella purports to have conferred a common benefit to the Vioxx litigation.

**Point System.** The Fee Allocation Committee evaluated Cohen Placitella & Roth contributions using the Point System. This analysis yielded the following results:

- Key Leadership: 0 points. Cohen Placitella held no leadership positions.
- Trials: 0 points. Cohen Placitella did not try any cases in this litigation.
- Settlement: 0 points. Cohen Placitella did not participate in settlement negotiation or administration.
- Law & Briefing: 0 points. Cohen Placitella did not assist with legal research and briefing.
- Settlement Implementation/ Post Settlement Matters: 0 points. Cohen Placitella did not assist in any post-settlement matters.
- Discovery/Science: 20 points. In light of the work described, the Fee Allocation Committee determined that the firm was entitled to 20 points.

- ▪ <u>Committee Leadership and Participation</u>:  0 points.  Cohen Placitella made no common benefit contribution through committee participation.
- ▪ <u>Funding</u>:  0 points.
- ▪ <u>Case Management</u>:  2 points.  Due to the firm's role in the New Jersey Consolidated Litigation, Cohen Placitella was given 2 points in this category.

**Johnson Factor and Pretrial Order 6D Criteria.**  Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for Cohen Placitella is .50.

**Lodestar Cross-Check.**  Based on the above and the lodestar cross-check, the Fee Allocation Committee determined that a slight downward adjustment was warranted.

Therefore, based upon the common benefit contributions of Cohen, Placitella & Roth, the Fee Allocation Committee recommended a common benefit fee award in the amount of $500,000.

### b.   The Law Firm of Eric H. Weinberg

The Law Firm of Eric H. Weinberg and Cohen, Placitella, and Roth submitted a Joint Objection to the Fee Application Committee's Common Benefit Fee Recommendation.  As noted in their submission, the two firms worked closely together and have raised identical legal and factual arguments in support of their shared claims of common benefit.  Eric Weinberg was involved in the New Jersey Consolidated Litigation.  Mr. Weinberg worked with experts Dr. John Kostis and Dr. David Madigan, among others.  In conjunction with the Alzheimer's studies, Mr. Weinberg deposed Merck employee, Dr. Gilbert Block, and he also deposed Merck Frosst scientists Dr. Don Nicholson and Dr. Ford Hutchinson. For his work, the Fee Allocation Committee recommended a common benefit award of $220,000.  However, based on his calculated lodestar, Mr. Weinberg seeks a common benefit fee of approximately $23 million.[28]

---

[28] While the Fee Allocation Committee has noted that the Cohen Placitella firm provided deposition excerpts that

**Point System.**  The Fee Allocation Committee evaluated Eric Weinberg's contributions using the Point System.  This analysis yielded the following results:

- Key Leadership:  0 points.  Eric Weinberg held no leadership positions.
- Trials:  0 points.  Eric Weinberg did not try any cases in this litigation.
- Settlement:  0 points. Eric Weinberg did not participate in settlement negotiation or administration.
- Law & Briefing:  0 points.  Eric Weinberg did not contribute to the common benefit in the area of law and briefing.
- Settlement Implementation/Post Settlement Matters:  0 points.  Eric Weinberg did not assist in any post-settlement matters.
- Discovery/Science:  7 points.  Considering the nature of the work, it was determined that Eric Weinberg was entitled to 7 points for the Discovery/Science category.
- Committee Leadership and Participation:  0 points. Eric Weinberg made no common benefit contribution through committee participation.
- Funding:  0 points.
- Case Management:  0 points.  Eric Weinberg did not participate in the case management process.

**Johnson Factors & Pretrial Order 6D Criteria.**  Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for Eric Weinberg is .65.

**Lodestar Cross-Check.**  Applying the lodestar cross-check, the Fee Allocation Committee determined that no adjustment to the Point System value was warranted.

Therefore, based upon the common benefit contributions of Eric Weinberg, the Fee Allocation Committee recommended a common benefit fee award in the amount of $220,000.

### F.  Rebecca A. Cunard

The Cunard Law Firm submitted a total of approximately 2,800 hours.  Rebecca A. Cunard personally submitted a total of 560 hours.  The remaining hours submitted were on behalf of lawyers who performed generic document review.  While many of the hours submitted

---

were played in at least two of the Vioxx trials, Mr. Weinberg's fee request is not supported by any work product used for common benefit, given that none of the experts he developed or depositions he participated in were used in any Vioxx trial prior to announcement of the Settlement Agreement.

were for case assessment, reviewing emails, pleadings and other tasks that would not rise to the level of a common benefit effort, a portion of the hours submitted were for document review, which is appropriate for common benefit consideration.[29]   The Fee Allocation Committee's inquiry revealed that the document review done by Rebecca A. Cunard and the non-employee lawyers on whose behalf she is submitting hours was rather low-level and nonproductive.  An analysis of Ms. Cunard's submissions reveals substantial busy work, but little common benefit productivity.

Under the point system, it was determined that the Cunard Law Firm should be awarded 5 points in the Discovery/Science category for document review, but the firm was not entitled to points under any other category.  Considering the *Johnson* factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for the Cunard Law Firm is .30.  As to the lodestar cross-check, the Fee Allocation Committee ascertained that the number of hours submitted by the firm warranted an upward adjustment from the value yielded by the points system, but that adjustment should be modest given the fact that the majority of the hours were for non-demanding tasks.   In sum, the Fee Allocation Committee considers the recommended allocation of $100,000 for the Cunard Law Firm to be a generous recommendation.

### G.    Escobedo, Tippit & Cardenas

It is undisputed that all claimed common work performed by Escobedo, Tippit & Cardenas, LLC ("Escobedo") was done in conjunction with *Garza v. Merck & Co.*  Escobedo submitted 14,866.75 hours in support of their common benefit fee application.  The *Garza* case

---

[29] Rebecca Cunard's time submissions include 58.75 hours reviewing emails; 38.25 hours reviewing minute entries and orders not relevant to any MDL assignment; and 10.25 hours reviewing pleadings not related to any MDL responsibility or assignment.  In addition, numerous entries are for such matters as reviewing "common benefit memo" from Seeger and Birchfield, reviewing Vioxx State Liaison newsletters, and calendaring conference calls.

was tried in state court in Texas.  A jury returned a verdict in favor of plaintiffs.  While the decision was on appeal,[30] plaintiff's counsel requested that the *Garza* case not be included in the Vioxx Settlement Program.  Presumably, Escobedo and Snapka decided they and their client could get a "better deal" outside the settlement program because it had a judgment against Merck.  Plus, opting out of the settlement program would mean that their fees would not be subject to the imposition of a common benefit assessment according to Article 9 of the MSA.  Consistent with their wishes, the case was explicitly excluded from participation in the Settlement Program.[31]  The *Garza* case, therefore, made no contribution to the Common Benefit Fund.

While there is plenty of evidence that Escobedo utilized common benefit work to progress the *Garza* trial, there is no evidence Escobedo provided any assistance to the common benefit of the litigation.  A careful review of the *Garza* trial record reveals that the opening statement largely quoted the opening statement in *Ernst v. Merck & Co.*  During the trial, Escobedo utilized depositions of key Merck witnesses that were taken by lawyers integral to the federal MDL and New Jersey Vioxx proceedings.  While Escobedo identifies 10 depositions of Vioxx employees (including 2 South Texas sales representatives), these depositions were not used by any non-Escobedo lawyer.

Escobedo had no role in any other trials in New Orleans, New Jersey or California.  Escobedo had absolutely no role in the Texas Vioxx MDL.  Escobedo did not take any MDL depositions; researched no non-Garza legal issues; wrote no non-Garza briefs; did not serve on any committee or have leadership in any jurisdiction including his home state of Texas; assumed very little risk; did not work up or try any cases in the federal MDL, New Jersey, California or

---

[30] The judgment in *Garza* remains on appeal to the Texas Supreme Court.
[31] See Exhibit T (MSA Ex. 17.1.23).

Texas subsequent to *Garza*; offered no novel contribution; and did not participate in settlement negotiations or implementation.

The Fee Allocation Committee initially recommended an award of $1,164,918 to Escobedo.  Escobedo objected to the common benefit allocation following receipt of its common benefit award notification in December 2010 and demanded a common benefit award of $31 million for his firm and the Snapka Law Firm.  The Committee engaged in further review of Escobedo's submissions and objection.  Following the post-objection review, the Fee Allocation Committee reduced Escobedo's fee award from $1,164,918 to $0.  Escobedo now challenges the Committee's second review, and in doing so, Escobedo requests a $19 million common benefit award for his firm alone.

The decision to award Escobedo $0 after his objection to the initial award of $1,164,917.97 was not punitive or groundless as he alleges, but rather the direct consequences of counsel's choice to not participate in the settlement program.  The entire common benefit fund established by the Court and to be allocated by the Court is derived from the Master Settlement Agreement, the very agreement that expressly excludes the *Garza* case as plaintiff's counsel requested.  In other words, plaintiff's counsel shunned the agreement at the beginning when it would have meant making a contribution to the common benefit fund, but now when there is no risk of having to pay any amount into the fund, the firm claims $19 million under the agreement he had earlier rejected.

Escobedo claims no other common benefit contribution apart from the work in *Garza*. Therefore, based upon the absence of common benefit contributions, the Fee Allocation Committee determined that a common benefit fee award was not appropriate.

### H.  Jones Swanson

In support of their application for a Common Benefit Award, Jones Swanson submitted 841.5 hours with a lodestar of $389,850.  Members of the firm served on the MDL Discovery and Science Committees.  Though many of the hours submitted involved conference calls and reviewing articles and emails, a majority of the hours submitted by the firm were devoted to the work of the Privilege Log Committee, a discovery subcommittee.  Jones Swanson did not hold any key leadership positions, did not participate in any trials, and did not conduct any depositions.  Moreover, the firm was not involved in the preparation of significant legal briefing or in any aspect of settlement creation or implementation.

Jones Swanson is requesting a straight lodestar application of its approved hours multiplied by its regular hourly billing rate without an analysis of the relative value of the work it performed.   This request is inconsistent with the blended percentage approach applied by Judge Fallon and is contrary to the role of the Allocation Committee to examine the relative value of the work performed.

**Point System.**  Jones Swanson did not make contributions to the common benefit of all plaintiffs in most key categories examined by the Fee Allocation Committee and outlined in Pretrial Order 6D, but made minor contributions in Discovery/Science by reviewing documents in conjunction with the privilege log project.  For these efforts, the Fee Allocation Committee determined that 2 points for Discovery/Science were appropriate.

**Johnson Factor and Pretrial Order 6D Criteria.**  Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for Jones Swanson is .30.

**Lodestar Cross-Check.**  While Jones Swanson's 841.5 hours were approved, the value

of those hours in comparison to the other applicants justified the recommendation given by the Fee Allocation Committee.  No adjustment to the Points System analysis was warranted.

Therefore, based upon the common benefit contributions, the Fee Allocation Committee recommended a common benefit fee award in the amount of $30,000.

### I.   Kline & Specter

Tom Kline was selected to serve as a member of the Plaintiffs' Steering Committee and as co-chair of the Trial Committee.  Other members of the firm served on the Science Committee, the Discovery Committee, the Trial Package Committee and the Trial Selection Committee.  Members of the firm engaged in factual discovery including the review of documents and the taking of depositions.

Lisa Dagostino committed extensive time to the litigation.  Dagostino made exceptional contributions to the Plaintiffs' Steering Committee trial package and was a valuable member of the Science Committee.

As is pointed out in Kline & Specter's objection, Tom Kline is one of the premier trial lawyers in the country. This point is not disputed by the Fee Allocation Committee.  And, as described in the firm's submissions, Tom Kline and other members of his firm took several key depositions in the litigation. However, other members of PSC did extraordinary work in preparation for these depositions.  These key depositions were a team effort.  And while Kline & Specter is entitled to credit for these depositions, the firm is not entitled to sole credit.

Equally important, Tom Kline, a premier trial lawyer who was appointed to the PSC and given key assignments based on the strength of his reputation as a trial lawyer, refused to follow through on his commitment to try a bellwether case.  At a critical juncture in the litigation, Tom Kline dismissed a bellwether trial case.  Tom Kline had agreed to try the second MDL case if

Merck and the Court would agree that the trial would take place in Philadelphia.  Merck agreed and the Court made all the necessary arrangements to conduct the trial in Philadelphia. Then, Tom Kline dismissed the case. This was a significant setback to the plaintiffs' cause.  Likewise, Kline & Specter dismissed the leading case in Pennsylvania state court to avoid trial.  Kline's disengagement and deleterious dismissal of trial set cases in the MDL and state court are major negative factors in evaluating his firm's contributions.  While Dagostino continued to provide valuable assistance, the Court's appointment of Kline to the PSC was personal in nature and her performance does not excuse or offset his desertion.

   **Point System.**  The Fee Allocation Committee evaluated Kline & Specter's contributions using the Point System.  This analysis yielded the following results:

- <u>Key Leadership</u>:  25 points.  Kline & Specter were given full credit for PSC participation despite the fact that Tom Kline disengaged and for the most part, stopped regularly attending the monthly status conferences after the second MDL trial.
- <u>Trials</u>:  0 points.  Kline & Specter did not try a case in this litigation.
- <u>Settlement</u>:  0 points.  Kline & Specter did not participate in negotiations.
- <u>Law & Briefing</u>:  20 points.  Kline & Specter assisted with some legal research and briefing, including the PSC's response to the motion for summary judgment regarding preemption, but in general, the firm's role in this area was limited.
- <u>Settlement Implementation/ Post Settlement Matters</u>:  0. Kline & Specter did not assist in any post-settlement matters.
- <u>Discovery/Science</u>:  40 points.  As described above, the firm took several key depositions and Lisa Dagostino did extraordinary work in helping to put together the trial package. Kline & Specter's work in this area is considered by the Fee Allocation Committee to be at a very high level of contribution (substantial and significant work relating to discovery, scientific issues and/or experts).
- <u>Committee Leadership and Participation</u>:  20 points. Kline & Specter's leadership and committee participation was modest.  Tom Kline served as co-chair of the Trial Committee but disengaged early in the litigation.
- <u>Funding</u>:  35 points. Kline & Specter made full payment on PSC assessments for which they were credited with 25 points.  Because the firm did significant common benefit work and contributed a significant number of cases, the firm was awarded an additional 10 points.
- <u>Case Management</u>:  15 points. Kline & Specter was not given the maximum 25 points in this category due to the fact that Tom Kline disengaged and stopped regularly attending the monthly status conferences following the second MDL

trial.

**Johnson Factors & Pretrial Order 6D Criteria.**  Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for the Kline & Specter Firm is .50.  Following the initial objection period, the Fee Allocation Committee re-reviewed Kline & Specter's full contribution and decided that the original .60 factor did not adequately reflect the harm caused to the litigation by the withdrawal of the second MDL bellwether case, dismissal of a case set for trial in state court, and Tom Kline's disengagement from the litigation.

**Lodestar Cross-Check.**  In reviewing Kline & Specter's hours, due consideration was given to Lisa Dagostino's time.  However, the accuracy of other time submissions is suspect, and the hours submitted appear to be inflated.  On balance, however, the lodestar cross-check resulted in the Fee Allocation Committee increasing the value yielded by the Point System to $4,000,000.

Therefore, based upon the common benefit contributions, and considering the significant detrimental effect of Tom Kline's disengagement from the litigation, the Fee Allocation Committee recommended a common benefit fee award in the amount of $4,000,000.00.

## J.     Lockridge, Grindal & Nauen

The vast majority of common benefit work submitted by Lockridge, Grindal & Nauen ("Lockridge") is comprised of time submitted by one particular attorney, Bert Black: 3,690.25 hours of a total of 4,712.5 hours submitted.  Mr. Black was a member of the Science Committee, Epidemiology Subcommittee, and the *Daubert* Subcommittee.  Mr. Black reviewed scientific literature, reviewed documents relevant to expert reports, participated in the development of expert reports, identified and retained experts, and assisted in efforts to defend *Daubert* motions

33

in the MDL.  For this work the Fee Allocation Committee recommends a common benefit award of $350,000.

However, there is one key issue omitted from Lockridge's objection – the detrimental impact Mr. Black had on the plaintiffs' cause.  While he does claim a number of hours on various projects, the hours spent by Mr. Black were largely ineffective and counterproductive.  Black would attend trials uninvited, requiring trial teams to assign a person with the responsibility of keeping Mr. Black from interfering with necessary work.  Moreover, some of his actions more directly undermined the plaintiffs' cause.  Without setting forth more detail than necessary, Black's conduct which was hurtful to plaintiffs' efforts resulted in his termination from any further work on behalf of the MDL and as well as his termination from the Lockridge firm.[32]  Lockridge now seeks credit for Mr. Black having done vast amounts of work for expert witnesses and FDA-related projects, but much of the actual preparation for these witnesses was done by other common benefit attorneys and many of the hours spent on projects produced work product that was not of a quality and nature that made it usable in any trial.

**Point System.**  The Fee Allocation Committee evaluated Lockridge, Grindal & Nauen's contributions using the Point System.  This analysis yielded the following results:

- Key Leadership:  0 points.  Lockridge held no leadership positions.
- Trials:  0 points.  Lockridge did not try any cases in this litigation.
- Settlement:  0 points. Lockridge did not participate in settlement negotiation or administration.
- Law & Briefing:  0 points.  Lockridge did not contribute to the common benefit in the area of law and briefing.
- Settlement Implementation/Post Settlement Matters:  0 points.  Lockridge did not assist in any post-settlement matters.

---

[32] See Exhibit N (July 10, 2007 Letter to Bert Black from Russ Herman); Exhibit O (July 12, 2007 Letter from Richard Lockridge to Russ Herman); and Exhibit P (July 16, 2007 Letter from Bert Black to Russ Herman).

- ▪ <u>Discovery/Science</u>: 15 points. Considering the nature of the work, it was determined that Lockridge was entitled to 15 points for the Discovery/Science category.
- ▪ <u>Committee Leadership and Participation</u>: 0 points. Lockridge made no common benefit contribution through committee participation. Although assigned to several committees, Mr. Black worked more on his own as opposed to cooperatively with a committee.
- ▪ <u>Funding</u>: 0 points.
- ▪ <u>Case Management</u>: 0 points. Lockridge did not participate in the case management process.

**Johnson Factors & Pretrial Order 6D Criteria.** Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for Lockridge is .50.

**Lodestar Cross-Check.** Applying the lodestar cross-check, the Fee Allocation Committee determined that no adjustment to the Point System value was warranted.

Therefore, based upon the common benefit contributions, the Fee Allocation Committee recommended a common benefit fee award in the amount of $350,000.

### K.    Locks Law Firm

The Locks Law Firm LLC ("Locks") amassed a lodestar of $4,345,483.75 based upon 7,678 attorney hours and 1,059 paralegal hours in the Vioxx litigation.  But the record proves that Locks' efforts were expended more so for the benefit of the Locks Law Firm than for the common weal.  Indeed, Locks' legacy in the Vioxx litigation reflects an obstinate history and practice of going it alone.   And while individuality is ordinarily to be appreciated, in the context of this litigation it was counter-productive and at times destructive.  From Locks' insistence that it develop its own experts, *e.g.,* Suzanne Parisian and John MacGregor, to trying the *Doherty* case by its lonesome self, the firm repeatedly demonstrated an insular, selfish purpose that held no regard for the common benefit of other litigants in the remaining cases.  As an island

35

among common benefit counsel, Locks shunned the advice and contributions of others.  And the result of this stubbornness was a jury verdict for the defense at a time when the momentum had been favoring plaintiffs and another plaintiffs' verdict would have been ideal.  Further proof of Locks' "one-way street" behavior is evidenced by their use of MDL work-product at their trial, but their failure to provide the *Doherty* trial record to the MDL for use in the MDL trial package.  Locks' inability to be a "team player," unwillingness to share its work-product, or use the work-product of others resulted in duplicative efforts at odds with the discipline lead counsel intended.  The friction that ensued was frequently counter-productive and distracting.  Nevertheless, the Fee Allocation Committee objectively weighed the contributions of Locks' trial effort but had to take into account the harmful effect of its uncommon behavior to reach the award recommended.

**Point  System.**  By virtue of the fact that the Locks Law Firm tried one case, the firm was entitled to 40 points under the point system.

**Johnson Factor and Pretrial Order 6D Criteria.**   Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for the Locks Law Firm is .25.

**Lodestar  Cross-Check.**   Based  the  analysis  above,  the  Fee  Allocation  Committee determined that a modest upward was warranted based on the lodestar cross-check.

Therefore, based upon the common benefit contributions, the Fee Allocation Committee recommended a common benefit fee award in the amount of $585,000.

### L.  Morelli Ratner

After  receiving  it's  the  common  benefit  award  notification  on  or  about  December  2, 2010, Benedict Morelli participated in a telephone conference on December 13, 2010, with Russ Herman  and  Andy  Birchfield  to  discuss  Mr.  Morelli's  objection  to  the  fee  allocation.   On

December 15, 2010, the Morelli Ratner firm ("Morelli") submitted a letter to the Fee Allocation Committee formally objecting to its common benefit allocation. Following both the teleconference with Mr. Morelli, and the receipt of Morelli Ratner's letter setting forth its objections, the Fee Allocation Committee engaged in further review of Mr. Morelli's submissions and objections. At the conclusion of the Committee's post-objection review, the Fee Allocation Committee found itself in the unfortunate position of having to conclude that the initial allocation was not justified and to significantly reduce Morelli's fee award from $1,274,129.03 to $750,000. Morelli has now challenged the Committee's second review, and in doing so, Morelli has requested a $12 million common benefit award, while contending that the reduction was unwarranted, punitive and arbitrary. These accusations as well as the distorted and rather bizarre claims advanced by Morelli, regrettably, forced the Fee Allocation Committee to expose the baseless nature of Morelli's assertions.

The Fee Allocation Committee's review of Morelli's claims unearthed a host of contradictions each of which underscore the inescapable determination that Morelli's involvement in the Vioxx litigation was not nearly as substantial and dramatic as Mr. Morelli and his partner, David Ratner, proclaimed on the record before the Fee Allocation Committee on December 1, 2008. Due to the nature of Morelli's claims and the necessity of a proper record regarding these claims, the Fee Allocation Committee requested that W. Mark Lanier provide a response to Mr. Morelli's specific claims regarding his involvement at the *Ernst* and *Cona/McDarby* trials. In response, Mr. Lanier submitted a detailed affidavit that documents the bases for Fee Allocation Committee's actions.[33]

Morelli has submitted approved common benefit time of 1,833.5 hours from the inception

---

[33] See Exhibit Q (Affidavit of W. Mark Lanier, Esq.).

of the Vioxx litigation through the settlement date.  A majority of these hours are associated with Mr. Morelli's involvement in the *Ernst* and *Cona/McDarby* trials.  Morelli makes assertions in its objections about the positive nature of Mr. Morelli's contributions to the *Ernst* and *Cona/McDarby* trials.  By and large, these statements are contradicted.[34]  In addition to his limited role in these trials, Mr. Morelli took the deposition of Merck sales manager, James Dunn, and Morelli worked up four cases in the pre-trial discovery pool in New Jersey.  Those cases were worked up during an extremely narrow window of time between August 2006 and December 2006.  The cases were not set for trial.

Mr. Morelli also contends that he assisted in "conducting" five depositions of senior Merck executives.  A review of Morelli's original submission for common benefit, including the post-submission correspondence with the Court-appointed CPA reflects that Mr. Morelli credited himself with having personally "taken" a number of depositions, when in fact Mr. Morelli's involvement amounted to little more than traveling and attending the actual depositions.

Morelli did not take any MDL depositions, researched no legal issues for common benefit, wrote no briefs for common benefit, did not serve on any committee or have leadership in any jurisdiction, invested little money when the firm entered the litigation, assumed very little risk, did not try any of the firm's own cases, offered no novel contribution, and did not participate in settlement negotiations or implementation.

Morelli's justification for its audacious common benefit request is grounded in an argument that Morelli had to devote substantial resources to the Vioxx litigation, and that because of its devotion of substantial resources Morelli suffered financially during a *three-year* period.   Indeed, at his oral presentation before the Fee Allocation Committee on December 1,

---
[34] *Id.*

2008, Mr. Morelli claimed that his firm put five lawyers on its Vioxx cases to prepare four discovery pool cases for trial.[35]   Thereafter, Mr. Morelli proclaimed to the Fee Allocation Committee that his firm was adversely impacted by its "three year" commitment to the Vioxx litigation.[36]  Mr. Morelli later turned the floor over to his partner, David Ratner, to speak about the financial impact that the Vioxx litigation purportedly had on Morelli.  Mr. Ratner stated that they deferred work on personal injury cases to focus on preparation for Vioxx cases.[37]  Similar statements were made in Mr. Morelli's affidavit, dated October 29, 2008.[38]

However, a review *of Morelli's own actual time submissions* for common benefit compensation underscores the disturbingly unsupportable statements made by Mr. Morelli and Mr. Ratner before the Fee Allocation Committee.  Mr. Ratner stated on the record that "a second and greater [adverse] effect" on Morelli as a result of Morelli's work in the Vioxx litigation was the deferral of other personal injury business so that Morelli could prepare the four most important cases in the firm concerning Vioxx.[39]  Yet, contrary to Mr. Morelli's and Mr. Ratner's recorded protestations, at best, Morelli could have only dedicated "the five most senior lawyers in the office" to  "defer" other personal injury work in favor of the Vioxx litigation <u>during a few months in 2006</u> in which all of Morelli's work was performed on behalf of Morelli's own cases.  This is so because outside of Mr. Morelli's 11 weeks of trial participation for *Ernst* and *Cona/McDarby*, Morelli's approved common benefit work submitted for reimbursement was <u>primarily limited to work performed between August 2006 and December 2006</u>.  Morelli's own fee application demonstrates that Morelli did not devote a substantial commitment to common

---

[35] <u>See</u> Exhibit D, at 1053 (transcript of statements made by Messrs. Morelli and Ratner before the Fee Allocation Committee in support of Morelli's common benefit fee application) (p. 12:7-11).
[36] <u>See</u> Exhibit D, at 1054-1055 (Morelli Ratner transcript) (p.13:22-14:4).
[37] <u>See</u> Exhibit D, at 1061 (Morelli Ratner transcript) (p. 20:7-18).
[38] <u>See</u> Exhibit B, at 1435 (Affidavit of Benedict P. Morelli submitted to Fee Allocation Committee on October 29, 2008) (emphasis added).
[39] <u>See</u> Exhibit D, at 1061.

benefit work in the Vioxx litigation during a three-year period.[40]

Given Morelli's narrow window of limited common benefit hours, the Fee Allocation Committee finds as unfounded Morelli's statements that its common benefit work in the Vioxx litigation "put such a strain on [Morelli] financially" during a "three year" period, if at all. Morelli's own submission for common benefit reimbursement demonstrates that the statements made by Mr. Morelli and Mr. Ratner before the Committee concerning the financial strain suffered by Morelli as a result of its common benefit work in Vioxx were implausible at best, and patently erroneous at worst.

As described above, the process set forth by the Court afforded applicants an opportunity to object and be heard regarding any issues they had with the Fee Allocation Committee's preliminary recommended award.  In some instances, this further review resulted in an increase in the firm's recommended award.   In other instances, further review of an applicant's submission was followed by the lowering of the recommended award. The Fee Allocation Committee was faced with this regrettable situation when reviewing the objections lodged by Morelli following the Fee Allocation Committee's notification of Benedict Morelli that the Fee Allocation was making a preliminary recommendation that Morelli be awarded a common benefit allocation of $1,274,129.03.  As a result of findings as stated above regarding Morelli's claim, the Fee Allocation Committee reduced Morelli's fee to $750,000.

**Point System.**  The Fee Allocation Committee evaluated Morelli Ratner's contributions using the Point System.  This analysis yielded the following results:

- ▪ <u>Key Leadership</u>:  0 points.  Morelli held no leadership positions.
- ▪ <u>Trials</u>: 25 points.  Morelli had limited roles in two trials as described above.
- ▪ <u>Settlement</u>:   0 points. Morelli did not participate in settlement negotiation or

---

[40] In this regard, the Fee Allocation Committee can only presume that Morelli is likely skewing the fact that it worked for three years on Vioxx performing client intake and review of medical records for its benefit with common benefit work.

administration.
- ▪ <u>Law & Briefing</u>:  0 points.  Morelli did not contribute to the common benefit in the area of law and briefing.
- ▪ <u>Settlement Implementation/Post Settlement Matters</u>:  0 points. Morelli did not assist in any post-settlement matters.
- ▪ <u>Discovery/Science</u>:  10 points.  Morelli participated in depositions as described above.
- ▪ <u>Committee Leadership and Participation</u>:  0 points. Morelli made no common benefit contribution through committee participation.
- ▪ <u>Funding</u>:  0 points.
- ▪ <u>Case Management</u>:  0 points.  Morelli Ratner did not participate in the case management process.

**Johnson Factors & Pretrial Order 6D Criteria.**  Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for Morelli Ratner is .40.

**Lodestar Cross-Check.**  Applying the lodestar cross-check, the Fee Allocation Committee determined that no adjustment to the Point System value was warranted.

Therefore, based upon the common benefit contributions, the Fee Allocation Committee recommended a common benefit fee award in the amount of $750,000.00.

### M. Motley Rice

Motley Rice submitted 3,289.5 hours for common benefit consideration.  Motley Rice did not try a single case or have any leadership role in the litigation.  Nearly 1,000 hours were devoted to the deposition of one Merck employee, Ellen Westrick, Executive Director, Office of Medical/Legal, U.S. Human Health.  The Westrick deposition was not played or used in any of the Vioxx trials.  A large portion of the preparation time for the deposition was recorded by three associate attorneys charging 8-hour days to "prep for Westrick," without recording any detail as to the specific tasks undertaken.  Fred Thompson, the partner who took the Westrick deposition, recorded only 52 hours in relation to the deposition, out of the nearly 1,000 hours charged.  More

than 1,000 hours were submitted in relation to a privilege log project for the Lahner matter. Almost all of the hours are recorded by associates charging 8 hours per day with no specific description of the work being done.   Furthermore, Motley Rice claims that they only submitted time for work authorized by New Jersey leadership, but there are a number of trips and hours charged to meetings with Placitella, Weinberg, and Kostis for work on a matrix for a private inventory settlement.

**Point System**.  In light of the above, the Fee Allocation Committee determined that no points are warranted in any category other than Discovery/Science.  In that category, the firm's work warranted 10 points.

**Johnson Factors & Pretrial Order 6D Criteria.**  Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for Motley Rice is .40

**Lodestar Cross-Check**. Based on the above discussion, the Fee Allocation Committee determined that it would be inappropriate to make any adjustment from the Point System value for lodestar.

Therefore, based upon the common benefit contributions, the Fee Allocation Committee recommended a common benefit fee award in the amount of $195,000.

### N.  Murray Law Firm

The Murray Law Firm ("Murray") contends that it contributed 2,897.25 hours towards the common benefit of Vioxx litigation, when, in fact, Mr. Garrett reports only 2,203.50 hours being submitted by Murray.  Of either amount, Murray recognizes the vast majority of its attorney time, some 2,000 hours, was devoted to routine work reviewing documents.  Of the remaining time, Murray attributes it primarily to the efforts of its senior partner, Mr. Murray, and

42

his son, towards work for the Law & Briefing Committee, of which Mr. Murray enjoyed the title of co-chair.  A review of the time records submitted by Murray, however, reveals that combined these counsel amassed only 56.50 and 22.25 hours (respectively) for work attributed to the classification of "pretrial pleadings and motions."  Although hundreds, if not thousands of motions were filed in the MDL litigation, the titular co-chair of the committee responsible for motions practice can only lay claim to about one week of solid work devoted to motions practice, and his son had half that amount.  The fact is that the Co-Chair of Law and Briefing abandoned the litigation very early on in these proceedings.  Murray merely provided litigation support in the form of document reviewers whose contribution to the litigation, like that of the firm as a whole, was *de minimus*.  The Murray Law Firm's recommended allocation was properly calibrated to match the firm's negligible level of contribution.

**Point System**.  In light of the above, the Fee Allocation Committee determined that 1 point was warranted for participation in Law & Briefing, 3 points were warranted for participation in Discovery/Science, and 1 point was warranted for Case Management for a total of 5 points.

**Johnson Factors & Pretrial Order 6D Criteria.**  Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for the Murray Law Firm is .60.

**Lodestar Cross-Check**. Based on the above discussion and the lodestar cross-check, the Fee Allocation Committee determined that a modest upward adjustment was warranted.

Therefore, based upon the Murray Law Firm's common benefit contributions, the Fee Allocation Committee recommended a common benefit fee award in the amount of $162,000.

### O. RodaNast

RodaNast objects to the fee award recommendation afforded to the firm based upon the lodestar the firm accumulated performing legal research.  RodaNast highlights only nine (9) distinct assignments that it performed.  They were:  research related to two 50-state surveys of the law of medical monitoring and consumer protection laws; background research on implied preemption, the FDA's new regulation addressing drug warning labels, and headless classes; briefing on medical monitoring; assistance with preparation of the deposition protocol; drafting of a memo regarding §1407 remands; and research on other class issues.  Although the firm's contributions were miniscule to the overall litigation, it nevertheless tallied 1,295.75 hours, which, based upon firm rates resulted in a lodestar of $525,140.  Absent paralegal time, which the firm was willing to waive, it clocked 1,124 hours with a $503,783.75 lodestar.

If averaged over the nine tasks, it took the RodaNast firm approximately 140 hours per task.  And some of these tasks involved preparation of minor memoranda.  Thus, the inflation of Roda Nast's reported time is patent.  In contrast, the gist of RodaNast's objection is that the firm's lodestar was legitimately based, that the firm applied reasonable hourly rates without enhancement of a multiplier, and that an award of $45,000 is not adequate.  The tasks assigned to RodaNast, however, were not mission-critical to the litigation.  Many of the assignments were based on updating previous work and not groundbreaking endeavors.  Medical monitoring was never the focus of the Vioxx litigation because persons suffered acute injuries.  Although the PSC pursued class action status, it was well recognized, given established jurisprudence and by the sizeable docket of the court, that the individual personal injuries cases were driving the litigation.  And while RodaNast assisted in the effort to address preemption, the firm only researched a discrete issue involving the *Buckman* case, which issue had been addressed in

44

countless other cases and should have been routinely handled.  That work was not the sustaining nor broad analysis that contributed to the major work done by the PSC to confront Merck's preemption defense.  Nor was RodaNast's contribution well sustained.  After its limited initial participation in the litigation, the firm simply fell away and went on to other projects.  Thus, the efforts of RodaNast were not essential to the litigation, inflated and justifiably subject to a lesser fee than the one sought by the firm.

**Point System.**  The Fee Allocation Committee evaluated RodaNast's contributions using the Point System.  This evaluation demonstrated that the only category for which RodaNast made a common benefit contribution was Law and Briefing.  Considering the nature of the work, it was determined that the firm was entitled to 3 points for the Law and Briefing category.

**Johnson Factor and Pretrial Order 6D Criteria.**  Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for RodaNast is .30.

**Lodestar Cross-Check.**  Based on the analysis above, no adjustment for lodestar was warranted.

Therefore, based upon the common benefit contributions, the Fee Allocation Committee recommended a common benefit fee award in the amount of $45,000.

**P.  Snapka Law Firm**

The Snapka Law Firm claims common benefit fees for work performed in relation to the Texas MDL and *Garza v. Merck & Co.*  As noted above, the Snapka Law Firm and Escobedo Tippit requested that the *Garza* case not be included in the Vioxx Settlement Program.  Because the *Garza* case resulted in neither contribution to the common benefit fund nor to the body of work product available for use by common benefit counsel, the Fee Allocation Committee

45

concluded that common benefit fees are not warranted for the work performed in relation to the case.  The Snapka Law Firm performed work in relation to Ms. Snapka's limited role as liaison in the Texas MDL.  This work is appropriate for common benefit compensation.

The Snapka firm became involved in the Vioxx litigation in 2003.  Snapka submitted in support of her common benefit petition approximately 3,000 hours.  Approximately 1,273 of these hours were expended on the *Garza* case.  Approximately 1,144_hours were devoted to other individual, non-trial cases which did not benefit the overall litigation.  And, lastly, approximately 300 hours were associated with her role as liaison in the Texas MDL.  Time submitted for individual non-trial cases is not considered appropriate for common benefit compensation.  Therefore, the only basis of Snapka's award is the work done in association with the Texas MDL, for which Snapka claims 300 hours.

Since the inception of the MDL when she was denied a position on the Plaintiffs' Steering Committee, Ms. Snapka's mode of operation has been to work against the common effort, not for it.  At a time when the Court was seeking cases to be tried as bellwether cases in the MDL and seeking lawyers willing to try them, Ms. Snapka persistently sought remand of the *Garza* case.  The Court did in fact remand the *Garza* case to Texas state court where it was tried to verdict and currently remains on appeal.  Ms. Snapka then successfully sought to have the *Garza* case excluded from the global settlement agreement.

Throughout the course of the litigation, Ms. Snapka repeatedly advised the Plaintiffs' Liaison Counsel that she did not want to work cooperatively with the PSC.  When Merck selected Ms. Snapka's case as one of two cases in which to seek to obtain a statute of limitations ruling with broad application, Ms. Snapka refused to cooperate with the PSC, but rather insisted on presenting the matter herself and in her own way.

46

Once the global settlement was reached, Ms. Snapka sought to sabotage the entire effort by spearheading an empty ethics challenge.  She helped create a significant stir, despite the fact that the agreement had been approved by not one but three prominent experts who focus on ethical matters related to settlements in complex, mass tort litigation; three distinguished state court judges; and this Court.  However, Ms. Snapka did not allow the facts to stand in the way of her protestations.

Likewise, when the PLC filed its motion seeking an 8% common benefit assessment, Ms. Snapka led the way for objectors claiming that the fund from which she now seeks $12 million dollars should be less than one-third its current size.  Her objection combined with others led to a resolution prompting the return of one-half the holdback amount for cases where an objector was primary counsel.

At every step of this litigation, Ms. Snapka has objected vociferously in an effort to improve her own lot.  Such efforts should not be rewarded, particularly at the expense of firms who strove mightily to work cooperatively for the common good.

Perhaps the clearest demonstration of Ms. Snapka's mode of operation is on display now as part of the common benefit fee objection process.  Feigning confusion and alarm, Ms. Snapka has accused the Fee Allocation Committee of malfeasance.  Again, Ms. Snapka is not allowing the facts, or her lack of knowledge, to temper her accusations or criticisms.  A close look at her allegations is illuminating.

Ms. Snapka filed an Objection to the Plaintiff Liaison Counsel's motion for an 8% common benefit assessment on May 7, 2009.  Michael Stratton was appointed to serve as Liaison Counsel on behalf of all objectors, including Ms. Snapka.  After discovery and extensive negotiations, an agreement was reached to resolve all objections.  Stratton represented on the

record that he had authority from all objectors to enter into the agreement.[41] Part of the agreement called for each objector to be refunded any holdback from their firm's cases in excess of 4%. On July 28, 2010, Stratton submitted a letter to Judge Eldon E. Fallon withdrawing all objections with prejudice, including Ms. Snapka's.[42]

Ms. Snapka has stated that on September 2, 2010, she received a letter from Stratton along with a check in the amount of $336,492.14, representing the return of funds previously withheld from her firm's Vioxx cases in excess of 4%.

For nearly six months, Ms. Snapka raised no concern nor posed any questions to the NPC regarding the agreement. Nor did Snapka attempt to reassert her objection to Plaintiffs' Liaison Counsel's motion. Rather, on February 17, 2011, after the Fee Allocation Committee had published its Final Recommendation with which Ms. Snapka is dissatisfied, Ms. Snapka presents the matter for the first time and does so in open court. Tellingly, Ms. Snapka has made no charge that Mr. Stratton was acting without her authority when he entered into the agreement that resulted in a return of 4% of the attorney's fees previously withheld from her cases and in her objection to the PLC's motion for 8% assessment being withdrawn with prejudice.

The Fee Allocation Committee originally recommended an award to Snapka of $582,458.99. She objected and, in conjunction with Escobedo Tippit, claimed entitlement to $31 million in common benefit fees. Subsequent review of the Snapka submissions resulted in the reduction of the Fee Allocation Committee's recommended award to $75,000.00. The Fee Allocation Committee's decision was based upon the fact that the *Garza* case did not contribute to the Common Benefit Fund and that the only common benefit performed by Snapka was associated with the Texas MDL. The Fee Allocation Committee also noted that while all other

---

[41] See Ex. R, at 5 (July 27, 2010 transcript).
[42] See Ex. S (Letter of M. Stratton to Judge Eldon E. Fallon, July 28, 2010).

applicants, except Becnel, contributed to the common benefit fund at a rate of 6.5%, Snapka contributed at only 4%.

Following receipt of the Fee Allocation Committee's recommendation Snapka submitted her objection to the Court on February 4, 2011.  In her objection, Snapka seeks an award of $12 million.

**Point System.**   The Fee Allocation Committee evaluated the Snapka Law Firm's contributions using the Point System.  This evaluation demonstrated that 5 points were warranted for Discovery/Science and 1 point for Case Management for attendance at Texas MDL hearings and conferences.

**Johnson Factor and Pretrial Order 6D Criteria.**  Considering the Johnson factors and the criteria set forth by the Court in Pretrial Order 6D, the Fee Allocation Committee determined that the appropriate factor for the Snapka Law Firm is .25.

**Lodestar Cross-Check.**  Based on the analysis above, no adjustment for lodestar was warranted.

Therefore, based upon the common benefit contributions, the Fee Allocation Committee recommended a common benefit fee award in the amount of $75,000.

## IV.    Conclusion

The Fee Allocation Committee diligently followed the Court's directives in evaluating the claims of all common benefit fee applicants, including the claims of the Objectors.  In this endeavor, the Committee sought to thoughtfully, fairly and objectively examine each application in light of the applicant's contribution to the successful outcome of the litigation.  Based on its review and analysis, the Committee believes that the recommended allocation for each Objector is appropriate.  For this reason and those outlined above, the Fee Allocation Committee urges to

49

the Court to overrule each objection in its entirety.

Respectfully submitted,

Date:   March 1, 2011          By: _____/s/ Russ M. Herman_____

          **Russ M. Herman (Bar No. 6819)**
          Leonard A. Davis (Bar No. 14190)
          Stephen J. Herman (Bar No. 23129)
          ***Herman, Herman, Katz & Cotlar, L.L.P.***
          820 O'Keefe Avenue
          New Orleans, Louisiana 70113
          Telephone: (504) 581-4892
          Facsimile: (504) 561-6024

          **PLAINTIFFS' LIAISON COUNSEL
          AND CHAIR OF THE FEE
          ALLOCATION COMMITTEE**

By: _____/s/ Andy D. Birchfield, Jr.,_____

          **Andy D. Birchfield, Jr**.
          ***Beasley, Allen, Crow, Methvin,
          Portis & Miles, P.C.***
          P. O. Box 4160
          Montgomery, AL  36103-4160
          Telephone: (334) 369-2343
          Facsimile: (334) 954-7555

          **PLAINTIFFS' CO-LEAD COUNSEL
          AND SECRETARY OF THE FEE
          ALLOCATION COMMITTEE**

Russ M. Herman, Esq.
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, LA 70113
(504) 581-4892 (telephone)
(504) 561-6024 (telecopier)

Andy D. Birchfield, Jr., Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Thomas V. Girardi, Esq.
GIRARDI & KEESE
1126 Wilshire Blvd.
Los Angeles, CA 90017-1904
(213) 977-0211 (telephone)

Mark Lanier, Esq.
LANIER LAW FIRM, PC
6810 FM 1960 West
Houston, TX 77069
(713) 659-5200 (telephone)
(713) 659-2204 (telecopier)

Edward F. Blizzard, Esq.
BLIZZARD, MCCARTHY & NABERS, LLP
Lyric Centre, 440 Louisiana
Suite 1710
Houston, TX 77002-1689
(713) 844-3750 (telephone)
(713) 844-3755 (telecopier)

Perry Weitz, Esq.
WEITZ & LUXENBERG
180 Maiden Lane
New York, NY 10038
(212) 558-5500 (telephone)
(212) 344-5461 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

**FEE ALLOCATION COMMITTEE**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Motion has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and email, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 1st day of March, 2011.

                /s/ Andy D. Birchfield, Jr.,

                **Andy D. Birchfield, Jr**.
                ***Beasley, Allen, Crow, Methvin,***
                ***Portis & Miles, P.C.***
                P. O. Box 4160
                Montgomery, AL  36103-4160
                Telephone: (334) 369-2343
                Facsimile: (334) 954-7555