# DARLA J. SANDERSON
(760) 271-7370

725 Alix Street, New Orleans, LA  70114

djsanderson2001@hotmail.com

## R MEMBERSHIP
California State Bar No. 234502
Candidate for the July 2005 Louisiana State Bar Examination

## EDUCATION
**California Western School of Law,** San Diego, CA
Juris Doctor, *cum laude,* April 2004
- *California Western Law Review/International Law Journal* Associate Writer/Editor
- Class standing 26/216
- Kennedy Scholar (Highest scholarship awarded)
- Trial Practice Academic Achievement Award, Spring 2003
- Tutor/Teaching Assistant, Civil Procedure, Fall 2003
- Research Assistant, Corporations, Fall 2003
- Federalist Society, founding member of student chapter and Secretary, 2004
- Health Law Society, founding member and President, 2002 – 2003

**Central Michigan University,** Mt. Pleasant, MI
Master of Science in Administration, 4.0/4.0 cumulative GPA, 2001

**Wayne State University,** Detroit, MI
Bachelor of Science in Occupational Therapy, *cum laude,* 1997

## LEGAL EXPERIENCE
**Brooke Company,** New Orleans, LA
*Temporary Legal Assistant,* January 2005 – present
- I am currently working with the firm of Abbott, Simses, & Kuchler, in the area of asbestos defense.

**Sampson & Associates,** San Diego, CA
*Law Clerk,* August 2004 – December 2004
- I drafted demand letters, complaints, requests for default, applications for court judgment, discovery, settlement agreements, abstracts of judgment, and writs for matters in state and federal court for breach of contract actions and post-judgment collections; performed asset investigations; composed client and party correspondence.

**Law Office of Randal T. Mason,** San Diego, CA
*Law Clerk,* February 2002 – March 2003, January 2004 – August 2004
- This private practitioner specializes in personal injury, products liability, and workers' compensation. While working for Mr. Mason I interviewed clients and organized discovery responses; drafted complaints, demand letters, mediation briefs, and settlement agreements for personal injury/product liability matters; researched workers compensation issues and drafted memoranda; composed client and party communications.

**U.S. District Court for the Southern District of California**
*Judicial Extern to Magistrate Judge James F. Stiven,* January 2004 – April 2004
- As a Judicial Extern, I researched and drafted bench memoranda summarizing civil litigation issues; researched and drafted Report and Recommendations on habeas corpus writs and Social Security administration appeals; assisted counsel in reaching plea-bargains for misdemeanor sentencing; assumed responsibility for general case file management.

**Bonne, Bridges, Mueller, O'Keefe & Nichols,** Santa Ana, CA
*Summer Associate,* May 2003 – August 2003
- This firm specializes in medical malpractice. I drafted motions for summary judgment and points and authorities in support thereof; researched and drafted memoranda on various medical malpractice/civil litigation issues; attended and observed depositions; drafted deposition summaries; composed client communications; participated in twice-weekly seminars on legal procedure.

## CONTINUING EDUCATION
Lorman Education Services, *Collection Techniques and Law,* September 2004

## THER EMPLOYMENT
**William Beaumont Hospital,** Royal Oak, MI
*Occupational Therapist,* 1997 – 2001; *Pharmacy Technician,* 1991 – 1997

FAC Resp. Exhibit B -- 1515

# EXHIBIT C

| | |
|---|---|
| **From:** | Lillian Flemming [LFLEMMING@hhkc.com] |
| **Sent:** | Friday, November 18, 2005 4:37 PM |
| **To:** | Andy D. Birchfield Jr. (PSC) (E-mail); Arnold Levin (PSC) (E-mail); Carlene Rhodes Lewis (PSC) (E-mail); Christopher Seeger (PSC) (E-mail 2); Christopher Seeger (PSC) (E-mail 3); Christopher Seeger (PSC) (E-mail); Christopher Vincent Tisi (PSC) (E-mail); David R. Buchanan (E-mail); Drew Ranier (PSC) (E-mail); Elizabeth Cabraser (PSC) (E-mail); Frank Woodson (E-mail); Gerald E. Meunier (PSC) (E-mail 2); Mark Robinson (PSC) (E-mail 2); Mark Robinson (PSC) (E-mail); Michael Wagner @ Seeger Weiss; Michelle A. Parfitt (E-mail 2); Michelle A. Parfitt (E-mail); P. Leigh O'Dell (E-mail); Paulina do Amaral (E-mail); Richard J. Arsenault; Russ Herman; shellysanford@goforthlewis.com; Thomas Kline (PSC) (E-mail 2); Thomas Kline (PSC) (E-mail 3); Thomas Kline (PSC) (E-mail); Troy Rafferty (PSC) (E-mail); ZVioxx Archive |
| **Cc:** | Lenny Davis; Regina Westenfeld; Heather Laborde; Leigh O'Dell; dbuchanan@seegerweiss.com |
| **Subject:** | Vioxx MDL 1657 re Irvin Trial |

From: Leonard A. Davis

Russ has requested that Richard Arsenault and Gerald Meunier provide trial support to the Plaintiffs' Steering Committee for the upcoming Irvin trial. Richard and Jerry have advised that they will be in attendance for all or substantially all of the trial. Their willingness to assist is greatly appreciated and they will be coordinating attendance and providing support to the Beasley firm throughout the trial. Please communicate with Richard or Jerry for issues regarding trial attendance and other related matters.

Lillian M. Flemming
Legal Assistant to Leonard A. Davis and Stephen J. Herman
Herman, Herman, Katz & Cotlar, L.L.P.
820 O'Keefe Avenue, New Orleans, LA 70113
PH: (504) 581-4892
Fax: (504) 561-6024

Temporary Office:
3411 Richmond Avenue
Suite 460
Houston, TX 77046
PH: (713) 877-1843
Fax: (713) 871-9750
Toll Free: (866) 815-6728

E-Mail: lflemming@hhkc.com
URL: http://www.hhkc.com

# EXHIBIT D

**MDL 1657 Vioxx Products Liability Litigation**
**Neblett, Beard & Arsenault**

| Name of Individual | Title | Summary Total Hours of All Firm Personnel |
|---|---|---|
| Richard J. Arsenault | Sr. Partner (28-yr lawyer) | 2,529.85 |
| C. Michael Bollinger | Sr. Partner (26-yr lawyer) | 72.25 |
| J.R. Whaley | Jr. Partner (10-yr lawyer) | 57.25 |
| Steven M. Rachal | Associate (11-yr Lawyer) | 616.75 |
| Suzanne J. Wright | Associate (9-yr Lawyer) | 59.75 |
| Jean Paul Overton | Associate (16-yr Lawyer) | 699.50 |
| Margaret Parker | Contract Attorney (4-yr lawyer) | 322.75 |
| Mary Lorenz | Contract Attorney (4-yr lawyer) | 694.00 |
| Mike Breinin | Contract Attorney (12-yr lawyer) | 784.50 |
| Holly Lamarche | Contract Attorney (4-yr lawyer) | 702.00 |
| Will Percy | Contract Attorney (26-yr lawyer) | 425.75 |
| Darla Sanderson | Contract Attorney (4-yr lawyer) | 66.00 |
| **Attorney Total** | | **7,030.35** |
| | | |
| Rebecca L. Monk | 15-yr Paralegal | 56.00 |
| Barbara Mitchell | 9-yr Administrative Assistant | 1.00 |
| Jane Oxenhandler | 26-yr Paralegal | 126.25 |
| Janet Doyle | 28-yr Paralegal | 1.25 |
| **Paralegal Total** | | **184.50** |
| | | |
| **Computer Specialist Total** | | **13.00** |
| | | |
| **Combined Total** | | **7,227.85** |

| | |
|---|---|
| **PARTNER TIME** | **2,659.35** |
| **SR. ASSOCIATE TIME** | **1,376.00** |
| **CONTRACT LABOR TIME** | **2,995.00** |

1    PANISH, SHEA & BOYLE, LLP
2    Brian Panish, SBN 116060
    Kevin Boyle, SBN 192718
3    11111 Santa Monica Blvd., Suite 700, Los Angeles, CA 90025
    Tel: (310) 477-1700 Fax: (310) 477-1699

4    Attorneys for Plaintiff, Lawrence Appell

5

6

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                COUNTY OF LOS ANGELES

10

11    Coordination Proceeding Special Title (Rule 1550(b))

| | |
|---|---|
| **This Document Applies to All**     ) | CASE NO. JCCP No. 4247 |
| ) | Assigned to the Honorable Victoria Chaney, |
| ) | Department 324 |
| **VIOXX ® CASES**     ) | |
| This document relates to:     ) | DECLARATION OF BRIAN J. PANISH |
| RUDOLPH ARRIGALE V. Merck & Co.,     ) | PER PRE TRIAL ORDER No. 6 (D) |
| Inc., et al. [Part of Andrew Nelson, et al. v.     ) | (FEE ALLOCATION GUIDELINES) |
| Merck & Co., Inc., et al., State Docket No.     ) | |
| 05CC03136]     ) | |
| ) | |
| LAWRENCE APPELL v. Merck & Co.,     ) | |
| Inc., et al., State Docket No. BC328858     ) | |

      I, BRIAN J. PANISH, declare and say that:

      1.     I am an attorney at law licensed to practice before all of the courts of the State of California, and am a partner in the law firm of Panish, Shea & Boyle, attorneys of record for Plaintiff, Lawrence *Appell*.

      2.     As such, I have personal knowledge of the facts surrounding the present action and all facts herein stated. If called as a witness, I could testify competently to the following.

      3.     Attached is a current and correct copy of my Curriculum Vitae.

      4. This Declaration is being prepared for consideration in the allocation of common benefit award. This will outline some of our firm's common benefit contributions and address the factors set forth in Pre Trial Order No. 6 (D). I believe our firm's common benefit work made a substantial contribution to the

outcome of the Vioxx litigation. I tried one of the bell weather cases, entitled *Appell v. Merck*, Superior Court Case No. BC328858. That case was followed by all persons interested in the Vioxx litigation. Prior to that time, I served and continue to serve as a member of the California Plaintiffs Steering Committee. We participated in Vioxx hearings, pre-trial discovery and trial preparation. I participated in meetings where trial case selection was decided and submitted for trial.

5. In 2005, I started a new law firm, Panish, Shea and Boyle, LLP, and devoted a substantial amount of my time to the Vioxx litigation, including the trial of the *Appell* case. During this time, I had to continue many trials that were set for trial.

6. The *Appell* trial lasted from September through the end of January 2006. Prior to the trial, I was involved in depositions of expert witnesses and trial preparation. I spent substantial time conducting focus group work and preparing for trial and dealing with the generic and case specific issues.

APPELL TRIAL:

7. The *Appell* case was tried in the Los Angeles Superior Court before Judge Victoria Chaney, who was the presiding Judge for all the JCCP Vioxx cases in the State of California. The *Appell* case had numerous issues at trial. During discovery in the case, Mr. Appell's prescribing physician, Dr. McAdam testified, among other things, the warnings provided by Merck were adequate, that even if he had been given additional warnings by Merck, he would have still prescribed Vioxx for Mr. Appell and he did not believe Vioxx was dangerous or defective in any way. He also testified at trial that he continued to take Vioxx after it had been recalled from the market and was taking it during trial.

8. Obviously, this testimony created difficulties in dealing in the cases. It also created issues relating to the "learned intermediary doctrine", which was one of Merck's major defenses. A substantial amount of time was spent in in pre-trial preparation and Motions in Limine, substantial additional time was spent dealing with the jury instructions, specifically the "learned intermediary doctrine" instructions. Despite this evidence and the jury instructions given by the Court relating to "learned intermediary", the jury found:

     (1)       Vioxx had potential risk that were known or knowable through the use of scientific knowledge;

     (2)       The potential risk presented a substantial risk of harm.

DECLARATION OF BRIAN J. PANISH PER PRE TRIAL ORDER No. 6 (D (FEE ALLOCATION GUIDELINES))

FAC Resp. Exhibit B -- 1519

9. During the course of jury deliberations, many questions were asked of the Court. The case was re-argued three separate times to the jury. In the end, the jury could not reach a verdict on all the questions, although juror discussions post trial indicated that the majority of the jurors were voting for the plaintiff. The case was reset for trial and additional experts were retained and trial preparation began again. I was prepared to try the case at the time the Vioxx global settlement was reached.

10. We incurred over $450,000 in out-of-pocket expenses for the *Appell* trial in addition to thousands of hours by paralegals, secretaries and attorneys.

11. I will supplement this Declaration at the hearing by the Committee on Fee Allocation.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.

Executed this 31st day of October 2008, at Los Angeles, California.

BRIAN J. PANISH
Declarant

# BIOGRAPHY OF BRIAN J. PANISH

BRIAN J. PANISH, Los Angeles, California. Partner in the Law Firm of Panish, Shea & Boyle, LLP. In 2001, he was selected by The National Law Journal as one of Nation's Top Ten Litigators. Voted one of the best lawyers in America, and included in publication Best Lawyers in America. Named one of the 100 Most Influential Attorneys in the State of California. He was named Trial Attorney of the year in 1999, by the Consumer Attorneys Of Los Angeles. Named Attorney of the Year by O'Brien's Trial Evaluator. He has obtained more than 150 verdicts and settlements in excess of One Million Dollars ($1,000,000), including 12 jury verdicts in excess of Ten Million Dollars ($10,000,000). In *Anderson v. General Motors*, he obtained a jury verdict of Four Billion Nine-Hundred and Seven Million ($4,907,662,321), the largest personal injury and product liability verdict in history. There have been four (4) jury verdicts over $50,000 million for individuals in personal injury cases in California. Brian has obtained three of the four. In 2001, he obtained a jury verdict of $55,600,000 in *Lampe v. General Tire*, the largest jury verdict in a tread separation case. In 2004, he obtained a jury verdict of $58,137,361 in *Griggs v. West-Pak*, the largest compensatory damage jury verdict in California for a plaintiff in a personal injury case. In 2005, he obtained a verdict of $27,600,000 against the City and County of San Francisco, the largest ever against the City and County of San Francisco. In 2004, he also obtained a jury verdict of $15,000,000 in *Wu v. Singapore Airlines*, the largest jury verdict in California for the loss of two parents survived by adult children. In *Marx vs. Storage-Tek* he obtained a jury verdict of $12,000,000 on behalf of a salesman who was wrongfully terminated.

## EDUCATION

Legal Education: Southwestern University School of Law where he graduated with honors and awarded Juris Doctorate Degree in 1984. He received the American Jurisprudence Awards for the highest grade in Wills and Trusts, Legal Professions, Secured Transactions, Entertainment Law, and Product Liability.
Undergraduate: California State University, Fresno, where he graduated with honors and awarded Bachelors Degree in 1980. He was also named the Fresno State Scholar Athlete and received the Athletic Directors Award. Presently serves as member of Fresno State's National Board of Visitors.

## CAREER

Admitted to practice in December 1984, Mr. Panish began his legal career with the firm of Engstrom, Lipscomb and Lack where he specialized in Aviation litigation. Mr. Panish was involved in aviation and product liability litigation. He also represented plaintiffs and defendants in personal injury, insurance and business litigation. He tried many jury trials without a defeat.

In 1987 he joined the firm of Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler and Rosenberg, which later became Greene Broillet Panish & Wheeler. In April of 2005 he started the firm of Panish, Shea and Boyle. The firm is located in Los Angeles, California and specializes in matters involving aviation law, pharmaceutical litigation, mass torts, automotive and general product liability, professional negligence, business torts, toxic torts, class actions, wrongful termination, insurance bad faith, governmental liability, civil rights (including all types of police misconduct). He handles cases involving aircraft, automobiles, motorcycles, agricultural products, workplace injuries, marine products, wrongful death and all types of employment litigating including wrongful termination, discrimination and sexual harassment.

FAC Resp. Exhibit B -- 1521

Mr. Panish has been lead counsel in many high profile cases. Since 1999. Some of Mr. Panish's verdicts include:

- $4.907 billion verdict in *Anderson v. GM.* (The largest personal injury/products liability verdict in history.)
- $55.6 million verdict in *Lampe/Cortez v. Continental General Tire.* (The largest jury verdict in a tread separation rollover case and the largest verdict in California for a quadriplegic.)
- $58 million verdict in *Griggs vs. West-Pac Industries, Inc..* (Largest burn verdict for an individual in a personal injury case)
- $25.2 million verdict in *Sherman v. Courrege*
- $22 million verdict in *Pogosyan vs. Metropolitan Transit Authority.*
- $27.5 million verdict in *Dominguez v. City & County of San Francisco.* (The largest ever against the City and County of San Francisco)
- $15.6 million verdict in *Ledesma vs. Patel.*
- $15.1 million verdict in *Tilton v. Southern California Gas Company.*
- $15 million verdict in *Wu vs. Singapore Airlines.* (Largest ever death verdict in U.S. District Court, Central District)
- $13 million verdict in *Fuller vs. Fairmont Tires.*
- $12 million verdict in *Marx vs. Storage Technology Corp.*
- $11.7 verdict/settlement in *Witham/Garcia vs. Avjet Corporation.*
- $5.6 million verdict in *Gonzalez v. Dresick Farms* (largest personal injury verdict in Imperial County)
- $2.8 million verdict in *Sorensen v. Burlington Northern Santa Fe Railroad.*

### *Mass Torts*

He has been appointed by the Court to serve on Plaintiffs' Steering Committee in many mass tort cases. He was named to the Plaintiffs' Steering Committee in the Fen-Phen Diet Drug Litigation, the L-Tryptophan Drug Litigation and Vioxx. Recently, he has been selected to the Plaintiffs' Steering Committee and Plaintiffs' Management Committee in the crash of Alaska Airlines Flight 261 and Singapore Airlines Flight 006.

### Professional Organizations

- American Board of Trial Advocates - Rank: Advocate (Los Angeles Chapter Executive Board)
- American Bar Association (Civil Justice Institute)
- International Society of Barristers.
- Consumer Attorneys of California
- Consumer Attorneys of Los Angeles. Named Trial Attorney of the Year in 1999 (finalist for the award in 1992, 1996, 1997, 1998, 2003, 2005)
- Inner Circle of Trial Advocates (limited to 100 of the best attorneys in America)
- Attorney Information Exchange Group (Board of Directors)
- Founding member of the Eighth Street Lawyers
- Trial Lawyers for Public Justice (Finalist Trial Lawyer of the Year 1990, 1994, 2000)

### Continuing Education

He has lectured and written about all aspects of trial practice to groups throughout the State of California, nationally and internationally. Groups addressed include: American Bar Association, Consumer Attorneys of Los Angeles, Consumer Attorneys of California, Association of Trial Lawyers of America, Attorneys' Information Exchange Group, Inner Circle of Advocates, Washington State Trial Lawyers' Association, Alabama Trial Lawyers' Association, Association of Southern California Defense Counsel, Southwestern University School of Law, and Hong University School of Law.

FAC Resp. Exhibit B -- 1522



**RodaNast, P.C.**
Attorneys at Law

801 ESTELLE DRIVE LANCASTER, PENNSYLVANIA 17601
TELEPHONE (717) 892-3000 FACSIMILE (717) 892-1200 rodanast@rodanast.com

October 28, 2008

<u>VIA OVERNIGHT DELIVERY</u>

Russ M. Herman, Esquire
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113

       Re:    *Vioxx Products Liability Litigation* (MDL 1657)

Dear Russ:

In accordance with Pretrial Order No. 6(D), enclosed is my Declaration in Support of RodaNast, P.C.'s Application for Fees and Expenses.

Please do not hesitate to contact us with any questions.

With best wishes.

Sincerely,

DMN:kjm
Enclosure

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| | * |
| | * |
| In re: VIOXX | * MDL Docket No. 1657 |
| | * |
| PRODUCTS LIABILITY | * SECTION L |
| LITIGATION | * |
| | * |
| | * JUDGE FALLON |
| | * |
| | * MAGISTRATE JUDGE KNOWLES |
| | * |

## DECLARATION OF DIANNE M. NAST IN SUPPORT OF RODANAST, P.C.'S APPLICATION FOR FEES AND EXPENSES

I, Dianne M. Nast declare and state as follows:

1.     I am a Senior Shareholder of RodaNast, P.C.  I submit this declaration in support of this firm's application for fees and reimbursement of expenses in connection with services in connection with this litigation.

2.     While I did not apply to be appointed to the Plaintiffs' Steering Committee, this firm has actively participated in MDL 1657 whenever assigned to do so.  The attorneys and paralegals of the firm contributed a total of 1,295.75 hours from February 16, 2005, the date of JPMDL transfer, to October 23, 2008, with a lodestar at current hourly rates of $525,140.00.  From the inception of the case to February 16, 2005 (pre-MDL transfer), the firm contributed a total of 274.25 hours, with a lodestar at current hourly rates of $108,975.00.  The aggregate time for the firm from inception of the litigation through October 23, 2008 is 1,570.00 hours with a lodestar of $634,115.00.  Expenses are billed separately and such charges are not duplicated in this firm's billing rates.

3.     The following summarizes this firm's contribution to the litigation. Detailed information is contained in the firm's daily time records, which were timely submitted to Plaintiffs' Liaison Counsel.

4.     Prior to MDL transfer, Attorneys Michael G. Nast and Erin C. Burns attended plaintiffs' organizational meetings. Ms. Burns also attended the MDL hearing on January 27, 2005 in Fort Myers, Florida. After transfer, Ms. Burns attended other meetings of counsel and a status conference in New Orleans before The Honorable Eldon E. Fallon on March 18, 2005.

5.     The firm served on the Law and Briefing Committee. Attorneys Daniel N. Gallucci, Jennifer S. Snyder, Ms. Burns and I participated in numerous conference calls and assisted with assigned briefing and research projects. Attorneys Snyder and Burns undertook an assigned survey of consumer protection laws in 51 jurisdictions and drafted a memorandum on federal preemption law, including *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). In addition, Ms. Snyder was assigned and completed a 50 state law survey on medical monitoring and future damages in preparation for responding to the motion to dismiss the medical monitoring complaint. Ms. Snyder completed assigned research in preparation for responding to Merck's Rule 12 motions, and assigned research in connection with Plaintiffs' motion to stay class certification briefing of the personal injury claims. Ms. Snyder also was assigned to draft the reply in support of Plaintiffs' motion to stay class certification briefing in personal injury actions.

6.     Ms. Burns spent substantial time completing the research and writing assignment concerning remanding cases to their respective transferor courts, with Judge Fallon sitting by designation at the trials of those remanded cases.

FAC Resp. Exhibit B -- 1525

7.     After the Eighth Circuit rendered its decision in *In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005), the firm's attorneys participated in conference calls regarding the application of state class certification procedural rules in lieu of Fed. R. Civ. P. 23 by a federal diversity court.  Ms. Snyder prepared a memorandum on this subject at the request of the Law and Briefing Committee.

8.     In early 2006, Ms. Snyder and Attorneys Steven L. O'Donnell and Shannon O. Young undertook assigned research concerning FDA preemption and prepared a memorandum on FDA rulemaking.

9.     The firm's attorneys also worked on assigned discovery projects.  Mr. Gallucci participated in developing the deposition protocol.  Ms. Snyder and Ms. Burns worked on an assigned memorandum regarding types of questions asked of class representatives.  Mr. Gallucci and Attorney Joanne E. Matusko attended a settlement conference in Philadelphia on November 19, 2007.

10.    This firm made a financial contribution, incurring $10,828.15 in unreimbursed expenses in connection with the prosecution of this litigation from February 16, 2005 (the date of MDL transfer) to October 23, 2008.  The firm incurred $5,721.91 in expenses from the inception of the case through February 16, 2005.  The aggregate total of all expenses is $16,550.06.  The expenses incurred are reflected on the firm's books and records that are prepared from expense vouchers, check records and other source materials and represent an accurate record of expenses incurred.

Executed on this 28th day of October 2008 at Lancaster, Pennsylvania.

Dianne M.  Nast

3

## SANFORD PINEDO LLP
### ATTORNEYS AT LAW
2016 BISSONNET STREET
#### HOUSTON, TEXAS 77005-1647
www.SanfordPinedo.com

Shelly A. Sanford
T. Christopher Pinedo
Alex Barlow

TOLL FREE 877.441.6677
PHONE 713.524.6677
FAX 713.524.6611

Anthony C. Coveny

October 31, 2008

*Via Overnight Mail*
Russ Herman
Herman Herman Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA 70113-1125

Re:     MDL No. 1657 – Section L
        *In Re:* Vioxx Products Liability Litigation

Dear Mr. Herman:

        I am enclosing an Affidavit to Allocation Committee on Behalf of PSC Members
Carlene Lewis and Shelly A. Sanford.

        Please feel free to contact me if you require additional information.

                        Yours truly,

                        SANFORD PINEDO LLP

                        Shelly A. Sanford

SAS/ca
Enclosures: as stated.

FAC Resp. Exhibit B -- 1527

Before me the undersigned Notary personally appeared Shelly A. Sanford, who, on her Oath provided that the following facts are within her personal knowledge and are true and correct:

## AFFIDAVIT TO ALLOCATION COMMITTEE ON BEHALF OF PSC MEMBERS CARLENE RHODES LEWIS AND SHELLY A. SANFORD

1.      The Vioxx litigation began with an injury to Myrtle Louise Bell, a friend of Carlene Lewis's mother, in the summer of 2000. Carlene was a pioneer and visionary as to this then new, but emerging mass tort. It began with the workup of Ms. Bell's case and a November 2000 demand letter to Merck on Ms. Bell's behalf. This was less than six months after Vioxx went on-market in May of 1999. By September of 2001 we had several hundred claims, multiple individual claims on file, a national class action in the S.D. of Illinois, and the beginnings of the third party purchaser litigation in New Jersey. With persistence, we gathered, coordinated, encouraged, and otherwise worked alongside giants in the mass tort world (e.g. Tom Girardi, Chris Seeger, Andy Birchfield) and soon to be giant (Mark Lanier). Carlene and I pursued Lanier for months to convince him to join this battle. When he did he never looked back, which was to the great benefit of the plaintiff population. We met with Chris Seeger in 2001 on a Saturday morning in Houston for breakfast to encourage his involvement. We flew to Los Angeles to meet with Tom Girardi and he graciously accommodated two enthusiastic women who knew he would lend credence to litigation and help get a bad drug off the market. We met with Beasley Allen and their amazing lawyers who were already in the litigation. We held meetings in Houston, New York, Illinois and other places. In sum, we initiated and joined the team of lawyers dedicated to justice in this litigation and all fought Merck when fighting Merck was not done. In fact, the litigation was considered by many who joined then abandoned it to be a losing battle because it involved an on-market drug.

2.      In the summer of 2001 we were retained by Carol Ernst, who had just lost her husband Robert Ernst from Sudden Cardiac Death while on Vioxx. We told Carol we would do everything possible to make sure her case was tried first and Lanier agreed.

3.      We met with many potential clients and physicians throughout 2001 and 2002. We gathered, cultivated and helped arm experts, such as Ben Lucchesi and Cheryl Blume (with Girardi and Birchfield), Wayne Ray (with Seeger), Joye Carter, Lige Rushing and David Egilman (with Lanier) and others. We carried the Illinois class action through dismissal motions, expert designations, depositions, discovery and class certification briefing. By the summer of 2002 we had many depositions in this case of Merck (e.g. Alise Reicin, Adam Schechter, Deborah Shapiro, James Dunn) and experts (e.g. Rushing, Blume, Lucchesi) and more than 10.5 million pages of documents that were produced by Merck in electronic form. We cooperated in the efforts of our dedicated colleagues to take depositions and we took and presented witnesses for deposition. We gave interviews to the press to spur knowledge of the risks of Vioxx. We were asked to meet with and met for hours in Houston with Korea's equivalent of our FDA commissioner to help him understand the problems with drugs in his own country. We gave speeches at national mass tort conventions (ATLA, Mass Torts Made Perfect), founded the ATLA litigation group (with David Miceli) in 2002 (and led it from 2002-2006), filed the original class action purchaser claim (with Seeger), filed the original securities action against Merck in New Orleans in 2003 (with Stull Stull & Brody of NYC), continued in the class action battle (with Girardi), filed multiple individual claims in State Court in Texas with Lanier and several hundred individual claims in state and federal courts. We helped our experts prepare full reports and added to this group of experts Wayne Ray, who filed a report and was deposed in Stubblefield and Ernst.

4.      In 2001, I spent a full week reviewing documents in Blue Bell, Pennsylvania, and was placed in a conference room with the NDA in its original boxes and found the hallway lined with stacks of hundreds of original boxes labeled with custodial files of Merck employees. Listing these names on a notepad is how we were able to ask for specific files in discovery, including Alise Reicin, Adam Schechter, and

FAC Resp. Exhibit B -- 1528

Deborah Shapiro. In one of the NDA boxes I was able to find a document that was the basis for our venue and filing of the Ernst case in Brazoria County, Texas with Mark Lanier.

5.    By 2003 and early 2004 we had trial settings in test cases in Houston and in Brazoria County (with Lanier) and were preparing for trial in the Ernst case, Keith Stubblefield case (with Lanier) and the Paul Pikul case (solo).[1] In one of our federal cases Carlene spent an extra hour at a hearing in chambers just to convince this federal judge that Vioxx, 50 mg, posed a significant risk of heart attack. The judge told us at the next meeting he had thrown away his Vioxx prescription. We faced judges who were initially skeptical of the litigation against an on-market drug when Merck's counsel would argue there was no science. We fought confidentiality agreements and multiple motions to seal any pleading that suggested Vioxx caused heart attacks. We were threatened by Merck's counsel with motions for sanctions if we did not draw down pleadings in Illinois that included public testimony or references to Merck's corporate testimony, and actually had a motion filed against us by Bryan Cave in Illinois. We fought off multiple motions to transfer venue of the several hundred Texas federal cases to the distant forum of New Jersey. Our firm bypassed other litigation (e.g. Zyprexa, HRT, Devices, Paxil, individual product injuries) to continue to focus on Vioxx. Carlene and I were 2 of 3 partners in the firm and we focused our efforts on Vioxx.

6.    We expended a significant amount of revenue for our shop on the Vioxx litigation and by the withdrawal had accumulated almost $500,000 in expenses. The pressure on Merck was mounting and the imminent trial pressure in the Stubblefield and Pikul cases and other state court cases such as Ernst was significant. Within months one of these cases would have been tried either by Lanier or by us, or by both firms jointly.

7.    Then Vioxx was withdrawn from the market on September 30, 2004.

8.    Although we were tired and had both given up time with our families and easier cases that would have benefited us more in time and money, we (and our families) made a decision to continue in the fray and embrace the hundreds of new lawyers stepping into the litigation. I watched Carlene do amazing and brilliant things both with and without reward, but remarkable to me was her deep satisfaction and appreciation when Vioxx was withdrawn from the market and she was appointed to the Plaintiffs Steering Committee for the Vioxx MDL. She was humbled, thankful, and stood in awe of her colleagues and fellow PSC members and those among the early participants who chose not to seek PSC membership at that time. A second significant moment of joy I observed and joined in with Carlene was when the Ernst verdict came in as a huge win. Perhaps the third time I watched that level of satisfaction in her profession was when she was hospitalized, knew she had ovarian cancer, and realized that every single PSC member and mass tort giant we had come to know and appreciate had reached out to her with flowers, love and compassion. It was a bittersweet joy to have had that same satisfaction when Chris Seeger and Andy Birchfield called and informed me of the impending settlement about 16 months after Carlene's death.

---

[1] The Pikul and Stubblefield cases were both repeatedly rejected by Merck for the MDL trial pool in part on the basis they were too good to be representative for the plaintiff group as a whole. In Pikul, I took the treating physician, Carlene the Merck witnesses, and we had experts lined up for specific and general causation as well as the pathologist who did the autopsy, took photographs of the clot in the artery, and was willing to testify that Vioxx ingestion for some 30 months was the cause of Mr. Pikul's death. The treating physician testified that he prescribed Vioxx 50 mg in 90 day supplies (through Merck Medco) because the Merck representatives were in his office telling him it was safe. In Stubblefield, Lanier had just received the Federal Judge's immanent trial setting. Judge Gilmore declined to stay the case for MDL transfer on the basis that discovery was done. These two cases were held in limbo in the MDL for the next several years and were subjected to Merck's unilateral rejection of them as trial cases.

FAC Resp. Exhibit B -- 1529

9.      One hardly needs to walk through the things that Carlene added to this litigation particularly since most on this Committee saw it first hand. Everything else pales in comparison; yet, I am thankful that we were a good team alongside a great team of lawyers who (1) joined the cause, or (2) took up the cause and carried it to its satisfying conclusion.  I cannot do justice to re-creating Carlene's hours prior to the MDL formation or mine given the length of time and the loss of information that occurs in that time frame. I trust that you will accept that the hours provided are a slim portion of that actually done in furtherance of this litigation as is the case with many others of the early team.

10.     In addition to the overall personal commitment to the litigation, the things that appear important to consider include that (1) we substantially helped prepare the Ernst case for trial, did the briefing on the science, worked up the experts, assisted and promoted Lanier in his tremendous effort, and have continued to assist in the appeals process. I wrote all of the science briefing and Carlene brilliantly argued the motions to disqualify experts and for summary judgment on the basis that Robert Ernst's death did not qualify as an adverse event caused by Vioxx. The failure of those arguments, and Lanier's verdict, helped create the SCD portion of the settlement and gave the plaintiff population much needed momentum; (2) we had the Pikul case ready for trial and so well-prepared (30 months Vioxx use; depositions all taken; experts lined up and an autopsy with photos of the clot) that Merck was able to get it stricken every time as a trial case on that basis alone; (3) We sequentially co-chaired the Science and Expert Committee for the PSC; (4) we were sequential PSC members; (5)  We (myself after Carlene's death) assisted either in person or remotely in a majority of the Vioxx trials and trial preparation; (6) We committed our firm's time and resources (including 2/3 of the partners) to the litigation from 2000 onward; (7) I helped run the expert and science committee with Carlene and after her death gratefully accepted the PSC support, nomination in Carlene's stead, and continuing role as co-chair; was part of the trial package committee and helped with its many component parts; am on the administrative committee; and have assisted people post settlement where possible on science questions, expert issues, and Brown Greer filings; (8) I worked with other PSC members and people outside the PSC to try to encourage various regulatory or State agencies to bring criminal charges against Merck (specifically Alise Reicin) for its intentional conduct; (9) we have made significant contributions toward funding of the litigation in our individual cases, in general prior to the withdrawal, and as PSC members; (10) Carlene and I both steered certain MDL common benefit attorneys in the right direction on our committees to ensure that the work was approved by the PSC and being done for the benefit of the MDL and not just to build hours; (11) Carlene and her clients Louise Bell and Carol Ernst received the Stephen Sharp Award by ATLA in 2006 for their commitment and contributions to the Vioxx litigation, and we received the Clarence Darrow Award in 2008 for the same; and (12) we worked to do all we could throughout this 8 year process to help and encourage our fellow lawyers and friends to remain committed to the litigation; take and prepare for depositions, gather and cultivate experts and exhibits; continue to fight in trials and ancillary cases (class actions, purchaser claims, state actions, and the securities litigation) despite the odds and the adverse trial court or appellate rulings;  through the entirety we gave it our best efforts to honor each other's work and contributions.

11.     I am available for any questions or additional information that may be of import to this Committee. On behalf of myself, Carlene and her family, please accept our gratitude to have been included in this MDL. Our CVs have been provided to Wegmann Dazet & Company. I believe we are seasoned and dedicated enough lawyers to have offered significant benefit to the overall scope and outcome of this litigation and MDL.

FURTHER AFFIANT SAYETH NOT.                    SIGNED this 31st day of October, 2008.

Shelly A. Sanford                    Notary Public – State of Texas

CAT ALVEAR
Notary Public, State of Texas
My Commission Expires
September 22, 2010

**3 | P a g e**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| | JUDGE FALLON |
| | MAGISTRATE JUDGE KNOWLES |

## AFFIDAVIT OF CHISTOPHER A. SEEGER IN SUPPORT OF THE SEEGER WEISS LLP FEE ALLOCATION SUBMISSION

FAC Resp. Exhibit B -- 1531

I, Christopher A Seeger, make the following sworn statement based on personal knowledge:

1.     I am the founding Partner of the law firm, Seeger Weiss LLP. During the course of the Vioxx litigation, Seeger Weiss dedicated a large number of senior partners, associates, and paralegals to actively participate in both the federal multi-district litigation and the mass tort litigation centralized in Atlantic County, New Jersey. The attorneys involved not only made significant contributions to the litigation, but assumed key leadership roles as well. *See* annexed Appendix, at ¶ 1. This contribution was made in several areas and on multiple fronts, including but not limited to: case administration and discovery; trial prosecution and trial package development; and settlement negotiations and administration. As detailed in its time and expense submissions, Seeger Weiss attorneys and paralegals spent more than 57,000 hours litigating these actions, and expended in excess of $3.9 million. Indeed, for some of our attorneys, the Vioxx litigation was the primary focus of their practice.

**Case Administration & Discovery**

2.     Early on Seeger Weiss took on a leadership role with its appointment as liaison counsel for the coordinated New Jersey VIOXX litigation in the summer of 2003. Seeger Weiss litigated the case aggressively in New Jersey, through tough negotiations, extensive motion practice, and coordinated discovery efforts with plaintiffs' counsel in New Jersey and elsewhere. These efforts resulted in large-scale and unprecedented discovery for plaintiffs across the country. *See* Appendix at ¶ 2. Prior to the formation of the MDL, Seeger Weiss made significant discovery advances, including but not limited to:

- Built and maintained the infrastructure for a large, multi-user electronic document depository at its offices in New York. This depository also made available numerous databases and raw clinical data produced by Merck, as well as deposition transcripts and exhibits. Additionally, created document review and coding protocols, and custodial file review assignments for a database that would ultimately exceed 30 million pages;

- Reviewed countless pages of documents and identified some of the most significant "hot docs" in the litigation. Seeger Weiss organized such documents by theme, facilitating their use at deposition, in motion practice, and at trial. ***Ultimately, this document collection was the genesis of the MDL Exhibit Database and Theme Grid***; and

- Conducted, assisted in, or coordinated numerous depositions of important corporate witnesses, including but not limited to Beth Seidenberg, Brian Daniels, Thomas Bold, Louis Sherwood, Doug Watson, Adam Schechter, Jennifer Ng, David Anstice, Briggs Morrison, Alise Reicin, and Alan Nies.

3.     The Vioxx MDL, which was not formed until early 2005, directly benefited from the efforts described above and in the annexed Appendix, as Seeger Weiss' accomplishments in New Jersey resulted in identical, and in some cases, broader, productions and/or more favorable

1

rulings in the MDL. Indeed, much of the work-product created by Seeger Weiss, including but not limited to motions, discovery materials, and document summaries and compilations, were provided to the MDL and/or served as templates for subsequent MDL work product.

4.      After the MDL was formed, Seeger Weiss continued in its leadership role through significant participation in both the coordinated New Jersey proceedings and the MDL. Further, Seeger Weiss fostered unprecedented cooperation among state and MDL plaintiffs' counsel, resulting in coordinated discovery, litigation, and trial strategies. While serving as both co-chair of the MDL and co-liaison counsel in New Jersey, Seeger Weiss advised and consulted with counsel from around the country, litigating in both state courts and in the MDL, in advance of their depositions, court hearings, and trials.

5.      Further, Seeger Weiss continued to make significant contributions to discovery efforts after the Vioxx MDL was formed, both in New Jersey and MDL litigation. *See* Appendix at ¶ 3. Specifically, Seeger Weiss was primarily responsible for, or made significant contributions to:

- Significant participation and/or leadership on MDL committees, including but not limited to the: Plaintiffs' Steering Committee; Trial Committee; Discovery Committee; Science Committee; and Trial Package Committee, and

- Critical depositions of Merck corporate representatives and third-party witnesses, including but not limited to: Ray Gilmartin, Alise Reicin, Edward Scolnick, Dr. Eric Topol, Dr. Jerry Avorn, and Dr. David Graham. Where a Seeger Weiss attorney was not the lead examiner, he either participated in the depositions or played a significant role in the preparation for such depositions.

6.      In 2006 and 2007, Seeger Weiss organized co-plaintiffs' counsel and secured large-scale discovery and scheduling orders in New Jersey that required Merck to: (a) work up large numbers of cases for potential trial, and (b) collect and produce nearly 1,000 custodial files of Merck sales representatives. These orders placed a significant burden on Merck and Plaintiffs estimate that Merck spent several hundred million dollars in legal fees as a result of these discovery orders. It cannot be disputed that such an outcome had a significant benefit to plaintiffs in all jurisdictions, including the MDL.

**Trial Prosecution and Trial Package Development**

7.      Seeger Weiss served as lead and co-lead counsel in the cases of *Humeston v. Merck* and *Hermans/Humeston v. Merck* in 2005 and 2007, respectively. The 2007 *Humeston* trial resulted in a plaintiffs' verdict for $47.5 million. Additionally, Seeger Weiss attorneys provided valuable assistance and support to other trials throughout the country by providing exhibits, deposition cuts, motion support and templates, examination kits, appearance at oral argument and assistance with pre-trial proceedings, or simply advice regarding specific witnesses and trial themes. Seeger Weiss provided such assistance in *Ernst v. Merck, Plunkett v. Merck, Cona/McDarby v. Merck, Barnett v. Merck,* as well as trials in California and Florida. The *Ernst, McDarby,* and *Barnett*

2

FAC Resp. Exhibit B -- 1533

trials all resulted in plaintiffs' verdicts.

8.      Seeger Weiss was also involved in the development of numerous experts with varying specialties—regardless of whether that witness was to appear in the MDL or in another jurisdiction.   Seeger Weiss attorneys were primarily responsible or played a significant role in the development and preparation of the following experts:  Wayne Ray, Dr. Richard Kronmal, Dr. David Egilman, Dr. Jerry Avorn, Cheryl Blume, John Guerigian, and Dr. Harlan Krumholz.

9.      Similarly, as detailed in the Appendix at ¶ 4, Seeger Weiss played a significant role in the development of the MDL trial package, including the Exhibit Database and Theme Grid.

**Settlement Negotiations and Administration**

10.     In the Fall of 2006, Merck and plaintiff representatives from the MDL and various coordinated state court litigations, entered into a dialogue regarding potential settlement of certain VIOXX personal injury claims.  I took a leading role in these negotiations, which ultimately resulted in agreement to the $4.85 billion settlement program announced in November 2007.  These negotiations spanned nearly a year and involved multiple conference calls and face-to-face meetings.  Further, when it came time to draft the agreement and finalize its terms, Seeger Weiss attorneys again took on a significant role.  Even while I was negotiating a potential settlement agreement, Seeger Weiss attorneys began to litigate the Vioxx case more aggressively in New Jersey.  These efforts resulted in court-ordered trial settings and burdensome discovery orders on Merck that placed tremendous pressure on the Defendant to settle the litigation on a global scale.

11.     Following announcement of the Settlement Program, Seeger Weiss attorneys have participated in numerous meetings, conferences, and telephone calls with counsel from around the country, to facilitate a speedy and successful resolution to those claims subject to the settlement program.   Additionally, Seeger Weiss attorneys have appeared at numerous hearings to resolve disputes relating to the settlement.   Further, to help insure the success of the settlement program, Seeger Weiss continues to review claim packages and participate in Gates Committee meetings and teleconferences.

12.     Seeger Weiss's leadership, tenacity, and superior work product have been acknowledged by co-counsel, defense counsel, and the courts presiding over these actions.  Our significant contributions to virtually every aspect of the Vioxx litigation placed tremendous pressure on Merck and ultimately led to the successful resolution of the majority of Vioxx personal injury claims in federal and state courts.

Christopher A. Seeger, Founding Partner
Seeger Weiss, LLP

3

**APPENDIX**

1.   Partial list of Seeger Weiss Attorneys Involved in the Vioxx Litigation

      a.   Christopher A. Seeger, Founding Partner: Vioxx MDL Co-Lead Counsel;
          Plaintiffs' Steering Committee, Co-Chair; Trial Committee, Co-Chair; and
          Plaintiffs' Negotiating Committee, Member.

      b.   David R. Buchanan, Partner: Plaintiffs' Co-Liaison Counsel, New Jersey; Vioxx
          MDL Discovery Committee, Co-Chair; and Science Committee, Member.

      c.   Jeffrey S. Grand: Vioxx MDL Trial Package Committee, Member; Privilege
          Committee, Member; and Stroke Committee, Member.

      d.   Moshe Horn:  Trial counsel, *Humeston v. Merck* (2005) and *Humeston/Hermans
          v. Merck* (2007).

      e.   Laurence V. Nassif: Trial counsel, *Humeston v. Merck* (2005) and
          *Humeston/Hermans v. Merck* (2007).

      f.   Dion Kekatos:  Third Party Payor Litigation counsel.


2.    Early on Seeger Weiss took on a leadership role with its appointment as liaison counsel
for the coordinated New Jersey VIOXX litigation in the summer of 2003.  Seeger Weiss litigated
the case aggressively in New Jersey, through tough negotiations, extensive motion practice, and
coordinated discovery efforts with plaintiffs' counsel in New Jersey and elsewhere.  *Prior to the
MDL's formation*, Seeger Weiss had:

- Developed comprehensive master discovery requests and engaged in successful motion
  practice that resulted in large-scale, rolling document and database productions.  This
  production resulted in defense and third-party productions exceeding 30 million pages of
  documents and an unprecedented production of Merck databases, including its clinical
  trial database and adverse events reporting system.  Additionally, Seeger Weiss attorneys
  negotiated confidentiality and discovery orders with terms very favorable to plaintiffs;

- Authored, argued, and prevailed on numerous motions to compel and confidentiality
  challenges that ultimately resulted in a significant number of "hot documents" being
  available for public use, publication in scientific journals, and other sources, thereby
  increasing public pressure on Merck;

i

- Coordinated discovery efforts and depositions through conference calls and meetings with New Jersey counsel. Organized large educational conferences with New Jersey and other state counsel to coordinate litigation efforts and to provide instruction concerning the critical liability and science issues in the case against Merck. Indeed, at such meetings in November and December 2004, and January 2005, Seeger Weiss distributed binders of "hot documents" and other background information to participating attorneys, many of which were used in subsequent trials;

- Built and maintained the infrastructure for a large, multi-user electronic document depository at its offices in New York. This depository also made available numerous databases and raw clinical data produced by Merck, as well as deposition transcripts and exhibits. Additionally, created document review and coding protocols, and custodial file review assignments for a database that would ultimately exceed 30 million pages;

- Created the first Vioxx Backgrounder, which detailed the case against Merck and provided critical information relating to the science and marketing issues and which identified the key players in the case;

- Reviewed countless pages of documents and identified some of the most significant "hot docs" in the litigation. Further, Seeger Weiss organized such documents by theme, facilitating their use at deposition, in motion practice, and at trial. Ultimately, this document collection was the genesis of the MDL Exhibit Database and Theme Grid;

- Conducted, assisted in, or coordinated numerous depositions of important corporate witnesses, including but not limited to Beth Seidenberg, Brian Daniels, Thomas Bold, Louis Sherwood, Doug Watson, Adam Schechter, Jennifer Ng, David Anstice, Briggs Morrison, Alise Reicin, and Alan Nies.

- Developed experts and other consultants that made significant contributions to the litigation in both NJ and the MDL, ultimately being designated as generic experts in the MDL (*e.g.*, Wayne Ray, Dr. Richard Kronmal); and

- Continued to place pressure on Merck by advancing the third-party payor litigation and through cooperation with plaintiffs and public officials, pursuing other VIOXX-related claims.

3. *After the MDL was formed,* Seeger Weiss attorneys continued in their leadership role and significantly advanced the discovery and the development of the Vioxx litigation:

- Significant participation and/or leadership on MDL committees, including but not limited to the: Plaintiffs' Steering Committee; Trial Committee; Discovery Committee; Science Committee; and Trial Package Committee.

- Obtaining significant third-party and foreign discovery materials and depositions;

ii

- De-privileging thousands of documents previously withheld by Merck; and

- Critical depositions of Merck corporate representatives and third-party witnesses, including but not limited to: Ray Gilmartin, Alise Reicin, Edward Scolnick, Dr. Eric Topol, Dr. Jerry Avorn, and Dr. David Graham. Where a Seeger Weiss attorney was not the lead examiner, he either participated in the depositions or played a significant role in the preparation for such depositions.

4.  Seeger Weiss played a significant role in the development of the MDL trial package, including but not limited to:

- Development of cross-examination kits;

- Development and testimony preservation of key expert and fact witnesses, including but not limited to: Wayne Ray, Dr. Jerome Avorn, Dr. Eric Topol, and Edward Scolnick;

- Creation of the MDL Exhibit Database and Theme Grid, first created by Seeger Weiss in connection with the Humeston v. Merck trial then shared with the MDL for its trial package;

- Development of deposition cuts, powerpoint presentations, timelines, and trial graphics; and

- Development of a catalogue of various discovery, MIL, and Rule 702 motions, many of which were authored by Seeger Weiss attorneys or were drawn from the more than 20 substantive motions drafted and filed by Seeger Weiss in the New Jersey litigation.

FAC Resp. Exhibit B -- 1537



**Sheller** P.C.
L A W   O F F I C E S

| | | |
|---|---|---|
| NEW JERSEY OFFICE<br>74 SOUTH MAIN STREET<br>MEDFORD, NJ 08055<br>(609) 941-2596<br>(215) 546-0942 FAX | 1528 WALNUT STREET, 3RD FLOOR<br>PHILADELPHIA, PA 19102<br>———<br>(215) 790-7300 • (800) 883-2299<br>FAX (215) 546-0942<br>WEBSITE: WWW.SHELLER.COM | OF COUNSEL<br>———<br>PALKOWITZ LAW OFFICE<br>PITTSBURGH, PA 15132<br>(412) 678-9000<br>———<br>L. VINCENT RAMUNNO<br>WILMINGTON, DE 19801<br>———<br>CAROLINE REEVES |

**Brian J. McCormick, Jr.**
215-790-7325
bjmccormick@sheller.com

October 31, 2008

**VIA ELECTRONIC MAIL AND FEDERAL EXPRESS**
Russ M. Herman, Esquire
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA  70113

 **Re:** **Vioxx MDL NO. 1657; Submission for Pre-Trial Order No. 6(D)**

Dear Mr. Herman:

  In your role as Liaison Counsel in the above-referenced litigation, enclosed please find an Affidavit summarizing the work performed by Sheller, P.C. (f/k/a Sheller, Ludwig & Badey, P.C.) during the Vioxx litigation, as required by Pre-Trial Order No. 6(D).

  In addition, Sheller, P.C. request permission to speak about its entitlement to common benefit fees and reimbursement of expenses pursuant to paragraph 2 of Pre-Trial Order No. 6(D).  Sheller would prefer to make such a presentation at the Allocation Committee's meeting in Atlantic, New Jersey.

  Please feel free to contact me with any questions or concerns.

      Very truly yours,

      Brian J. McCormick, Jr.

BJM/jc
cc: Stephen A. Sheller, Esquire

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | * | **Section L** |
|  | * | **JUDGE FALLON** |

## AFFIDAVIT OF STEPHEN A. SHELLER, ESQ. IN SUPPORT OF SHELLER, P.C.'S REQUEST FOR AN AWARD OF ATTORNEYS' FEES FROM THE SETTLEMENT AND COST ACCOUNT

I, Stephen A. Sheller, Esquire, state as follows:

1.      I am the Founder and Managing Partner of the law firm of Sheller, P.C., formerly known as Sheller, Ludwig & Badey, P.C. ("Sheller"). I am a member of good standing of the Bars of the Commonwealth of Pennsylvania and the State of New York.

2.      Sheller's attorneys are recognized members of the mass tort bar and have had significant involvement in large, complex actions.

3.      Pursuant to Pre-Trial Order No. 6(D) (Fee Allocation Guidelines), I submit this Affidavit in support of Sheller's request for a common benefit award in the above-referenced litigation.

4.      Sheller provided enormous support for the Vioxx Litigation.

5.      For example, Haile DeBass, Esquire ("DeBass"), was one of the first attorneys to assist the Seeger Weiss law firm with the document review in the New York depository. He began working on the document review in February 2005, several weeks before the Judicial Panel on Multidistrict Litigation consolidated the cases in the U.S.D.C. for the Eastern District of Louisiana.

6.      Attorney DeBass provided the following assistance, *inter alia*, with the document depository:

- Assisted Michael Wagner, the supervising Seeger Weiss paralegal, in managing the depository;
- Given the critical responsibility of training attorneys and paralegals new to the litigation on Concordance;
- Participated in weekly telephone calls related to the document depository;
- Asked to allocate assignments for document review; and
- Organized and managed deposition packages for counsel conducting depositions.

7.      Attorney DeBass' responsibilities were greatly increased in two instances: (1) after Hurricane Katrina affected the ability of the New Orleans depository to function as a fully-operating unit; and (2) after Mr. Wagner began to assist at trial around the country and frequently had to be absent from the New York depository.

8.      Attorney DeBass commonly worked 12 hour days in the New York depository. For example in September 2005 and October 2005, Attorney DeBass worked 253 and 278 hours, respectively.

9.      Attorney DeBass also worked on several of the bellwether cases by preparing and organizing the exhibits for trial and working with the trial attorneys on witness and exhibit outlines.

10.     After Hurricane Katrina (August 2005), the Sheller firm became one of the leading firms, if not the leading firm, in managing the document review and depository.

11.     In addition, after several setbacks in various Vioxx trials, the Sheller personnel were not pulled from the Vioxx effort and continued to work diligently on the litigation until the final settlement.

2

12.     Another Sheller attorney, Gregory Waks, Esquire, also did considerable document review.  Attorney Waks was one of the first trial attorneys to work in the New York depository.

13.     Additionally, Sheller provided a paralegal, Joseph Yanick, to assist the trial team with the Humelston trial in Atlantic City, New Jersey.  Mr. Yanick spent approximately six (6) weeks in Atlantic City in the Fall of 2005 assisting with the trial.

14.     Finally, all of the work performed by any Sheller attorney or paralegal was specifically authorized by members of the PEC.

15.     Sheller attorneys participated in the discovery committee and the trial preparation committee.

16.     Sheller submits that various Seeger Weiss attorneys, including David Buchanan, Esquire, would support Attorney DeBass' performance, and the Sheller Firm's commitment to the Vioxx Litigation.  Sheller submits that two other prominent attorneys involved in the Vioxx Litigation -- Anthony Irpino, Esquire from the Irpino Law Frim, and Troy Rafferty, Esquire from Levin Papantonio – would also support this proposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

**EXECUTED this 31st day of October 2008.**

STEPHEN A. SHELLER

3

STATE OF TEXAS    '   &#42;

                            &#42;

COUNT Y OF NUECES    &#42;

## AFFIDAVIT TO THE ALLOCATION COMMITTEE
## PURSUANT TO PRE-TRIAL ORDER NO. 6(D)

           BEFORE ME, the undersigned authority, on this day personally appeared Kathryn Snapka, after being first duly sworn upon oath, deposed and stated as follows:

           "My name is Kathryn Snapka. I am competent to make this affidavit. The facts stated in this Affidavit are within my personal knowledge and are true and correct.

           "I, Kathryn Snapka, of The Snapka Law Firm (formerly Snapka, Turman & Waterhouse, L.L.P.) have been involved in the representation of clients and prosecution of cases involving ingestion of Vioxx since early 2003. At that time, there were less than a handful of firms conducting any significant discovery involving Vioxx cases. Because of my experience and success in previous pharmaceutical trials, I was contacted during this time period and began my Vioxx litigation with representation of Charles Zajicek on behalf of his deceased wife, Vanessa Zajicek; Carolyn Eller on behalf of her deceased husband, Dale Eller; and Patricia Benavides, on behalf of her deceased husband, Juan Benavides. I began my research into the effects of Vioxx from an academic standpoint, as well as speaking with cardiologists and gerontologists regarding their empirical experience with the prescription of Vioxx, as well as the heavy-handed marketing conducted by Merck.

           In addition, I traveled to Montgomery, Alabama, to meet with David Miceli, to discuss the cases and experts who had already expressed an opinion and who could be developed.

           I learned from David Hockema, whom I have known and worked with for more than 20 years, that he and his firm were representing Felicia Garza for damages resulting from the death of her husband who died after taking Vioxx. They had obtained extensive document discovery which they had reviewed and summarized, and had deposed a large number of corporate witnesses. After I indicated to them that I, too, was involved in Vioxx litigation, I was asked to join the trial team and assist in preparing the case for trial. The Garza case was originally set for trial on November 8, 2004 (after having been removed to federal court and remanded). The case was later set for February 14, 2005. But for Merck's removal of the Garza lawsuit for a second time within thirty days of the trial, the Garza case would have been the first Vioxx case to be tried in the country.

           Shortly after Vioxx was removed from the market, I realized that this was going to evolve into litigation on a national scale and decided at that time that I would devote all of my efforts primarily toward Vioxx litigation. As a result, and because of the relatively small size of my firm, I did not believe that we could take on additional mass torts. As a result, I was offered, and declined, cases involving Zyprexa, Oxycontin, Prempro and Trasylol, as well as other matters which would have required an intense involvement of my personal time.

           On September 30, 2004, Merck announced the removal of Vioxx from the market. Shortly thereafter, I contacted by e-mail all of the Texas pharmaceutical lawyers that I could think of and invited them to a meeting at the Four Seasons Hotel in Houston to organize, discuss ideas, share discovery gained (primarily from the Garza case), and establish a network so that Texas litigators could provide a unified front in the ensuing battle against Merck. This was followed-up by an additional meeting in December of 2004, which was attended by Andy Birchfield and Paul Sizemore. I began speaking to groups about Vioxx and

1

sharing what we knew. Those presentations include the November 4, 2005 Advanced Personal Injury Seminar in Corpus Christi; December 3, 2004 Scientific Evidence Workshop in Houston; May 8 & 9, 2006 Mealey's Vioxx Litigation Conference in Florida; December 10 - 12, 2006 Mealey's Vioxx Litigation Conference in Florida (co-chair); December 10 & 11, 2007 Mealey's Vioxx National Settlement Conference Roundtable; and February 15 & 16, 2008, AAJ Pharmaceutical Seminar, *David v. Goliath - How Plaintiffs are Holding Big Pharmaceutical Companies Accountable.*

I attended the meetings of the Joint Panel and Multidistrict Litigation in Florida and Dallas and I submitted my application for appointment to the Plaintiffs' Steering Committee. Even though I was not appointed to the Plaintiffs' Steering Committee, I have attended almost all of the Monthly Status Conferences, and continue to do so.

In Texas, Merck made a motion for consolidation of the cases on June 3, 2005. On June 7, 2005, the Texas Supreme Court appointed me as Plaintiffs' Liaison Counsel[1].

After Garza was removed and the case transferred to the Federal MDL, I, along with co-counsel, Joe Escobedo, vigorously pursued remand of the Garza case, filing an Emergency Motion for Remand and attending hearings related to the Garza remand. On November 23, 2005, Judge Fallon remanded this case for trial. I believe that it was one of the only, if not the only, case remanded from the Federal MDL back to the state court for trial. From the date of the remand until the trial started, the entire office was involved in trial preparations. This case was called to trial on January 24, 2006. I was involved in the trial from January 2006 through the return of verdict on April 21, 2006. As one of three lead counsel, I performed jury selection, presented Plaintiffs' expert cardiologist witness, presented the son of Mr. Garza and cross-examined Dr. Wheeler. Further, I was the team member designated to cross-examine Alise Reicin, however, the Garza case is the only case in which Merck did not present Dr. Reicin. The jury returned a verdict in Garza of thirty-two million dollars ($32,000,000.00).

On July 6, 2006, Merck filed Motions for Summary Judgment based upon preemption in two cases in the Federal MDL, *Gomez vs. Merck* and *Arnold vs. Merck.* I was counsel for Alicia Gomez and I was involved in preparing a response to the Motion for Summary Judgment and arguing at the hearing. The Motion for Summary Judgment based on preemption was ultimately denied by Judge Fallon on July 3, 2007.

With the crush of the Garza trial over, I was able to fully concentrate on the remaining Vioxx cases that were not part of the MDL and which had a good chance of succeeding and, therefore, improving the Plaintiffs' win-loss record. Lead among those cases was the Zajicek case. It involved the tragic sudden death of a young wife and mother with no risk factors in a favorable venue (South Texas) and had the added unique characteristic of being (as far as I know) the only case where autopsy testing revealed the presence of Rofecoxib in the blood. Additionally, since it was not part of the Federal MDL, nor of the State MDL, this was a matter which could be tried without regard for the State or Federal MDL timelines and the rulings could be beneficial to those proceedings as more cases were developed. Numerous depositions were taken, as well as other discovery in preparation for the trial. At virtually every MDL Status Conference, the matter of the Zajicek trial was noted and discussed and, indeed, was set for trial in February of 2008 at the time of the global settlement on November 9, 2007.

---

[1] I served in that capacity until Judge Randy Wilson appointed Tommy Fibich as Liaison Counsel for the Texas Plaintiffs. I continued to serve on the Texas Steering Committee and made several trips to Houston to attend hearings and other matters related to the Texas Consolidated Litigation.

FAC Resp. Exhibit B -- 1543

The Nettles case was another case which was removed, remanded and then sent to the Texas MDL. However, it was removed again and occupied a small category which came to be representative of the "double removal" cases; that is, cases which have been removed, remanded and removed again by Merck to avoid further proceedings on those matters. Nettles was, again, a unique case because it involved a catastrophic stroke in an otherwise healthy teenager. Once again, I vigorously appealed to the Court for the remand of the Nettles case so that this case could be returned to the Texas MDL where it had been selected to be one of the top "Plaintiffs' picks" for stroke cases to try.

Of course, I have always funded my own cases, from the retention of experts through discovery and trial.

Vioxx litigation has been, without a doubt, my number one priority as a category of litigation since 2003 and certainly after the withdrawal in September of 2004, and even after the announcement of the settlement. While I was not named to the MDL Negotiating Committee, I, nonetheless, wanted to make sure that the settlement which was announced on November 9, 2007, was something in which I could ethically, and without reservation, participate. To that end, I contacted Charles Silver at the University of Texas and asked for his review of the settlement document. I then contacted other members of the Texas Plaintiffs' Steering Committee and discussed with them my concerns and Professor Silver's opinions. At that point, we took the steps that we thought were necessary that would ensure that the clients' interests, first and foremost, would be protected, while conforming to the spirit of the agreement.

I am a board certified personal injury trial attorney and have dedicated my career to litigation. While my trials have encompassed every conceivable tort, from railroad crossing cases to crashworthiness issues, I have concentrated on pharmaceuticals and medical devices, both in and out of the mass tort context. While I am not particularly comfortable shining a spot light on myself or my involvement in the Vioxx litigation, I believe I have demonstrated a commitment to this litigation since two years before the MDL was created and which continues to the present. While I was not on the Plaintiffs' Steering Committee, I was engaged in relentlessly pressuring for trials in the cases of Zajicek and Nettles, who had no risk factors, in extremely Plaintiff-oriented jurisdictions. In my 28 years of experience, trials have been the single most driving force in ultimately motivating Defendants to settle.

I remain available for any questions from the Committee."

Further, Affiant sayeth not.

Respectfully submitted,

Kathryn Snapka

SUBSCRIBED AND SWORN TO before me the undersigned authority, on this 3/st day of October, 2008, to certify which witness my hand and seal of office.

DIANA MORENO
Notary Public
STATE OF TEXAS
My Comm. Exp. 11-30-2010

NOTARY PUBLIC, STATE OF TEXAS

My Commission Expires:   11-30-2010

3



# Vioxx Litigation Consortium

## Common Benefit Fee Affidavits

# WILLIAMS ◆ KHERKHER

JOHN E. WILLIAMS, JR.
MANAGING PARTNER
Attorney at Law
Board Certified Personal Injury Trial Law
Texas Board of Legal Specialization

jwilliams@williamskherkher.com

OF COUNSEL
Ned Barnett
Robert C. Kuehm

October 31, 2008

**Vioxx Fee Allocation Committee**
**c/o Russ Herman**
**Herman, Herman Katz & Cotlar**
**820 O'Keefe Avenue**
**New Orleans, Louisiana 70013-**
**11116**

*Via Email*
*And Hand Delivery*

Re:  *In re Vioxx Products Liability Litigation*, MDL-1657

**Dear Members of the Fee Allocation Committee:**

Enclosed are the fee affidavits contemplated by PTO 6(D) from the attorneys of the member firms of our Vioxx Litigation Consortium, Provost Umphrey Law Firm LLP, Williams Kherkher Hart & Boundas LLP, Ranier, Gayle & Elliot LLC, Watts Law Firm, LLP, and The Kaiser Firm LLP.

We ask that all of our fee affidavits be considered as one submission and that the common benefit fee award be issued jointly to our group.

---

FAC Resp. Exhibit B -- 1546

Mr. Russ Herman
Page 2
October 31, 2008

     Thanks.

                         Yours very truly,

                         John Eddie Williams

cc:   Andy Birchfield
      Chris Seeger
      Arnold Levin
      Edward Blizzard
      Thomas Girardi
      Mark Lanier
      Troy Rafferty
      Perry Weitz
      Walter Umphrey
      Drew Ranier
      Mikal Watts
      Grant Kaiser

## AFFIDAVIT OF WALTER UMPHREY

BEFORE ME, the undersigned authority, on this day personally appeared WALTER UMPHREY, and after having first been duly sworn upon oath, states as follows:

1.     My name is Walter Umphrey. I am over eighteen years of age, of sound mind, and in all respects legally competent and duly authorized to make this affidavit. I have personal knowledge of the statements made herein. I am an attorney duly licensed in, and in good standing with, the State of Texas. I am doubly board-certified by the Texas Board of Legal Specialization[1] in Personal Injury Trial Law and in Labor & Employment Law. I am the Senior Managing Partner in the Provost ★ Umphrey Law Firm. The Provost ★ Umphrey Law Firm was established in 1969 and has earned a reputation over the last 39 years as one of the leading trial law firms in this country representing plaintiffs in personal injury cases, toxic torts, pharmaceutical litigation, commercial torts, and other areas of the law. I continue to be personally involved in the day-to-day operations of the firm. I attach my resume as Exhibit 1.

2.     I submit this affidavit pursuant to PTO 6(D), in support of allocation of common benefit fees in the Vioxx Litigation. In submitting this affidavit, I expressly reserve all, and do not waive any, rights relating to common benefit fees and/or their allocation.

3.     **Contribution to Outcome.** In October 2004, the Provost ★ Umphrey Law Firm joined with Williams Kherkher in Houston, Texas, led by John Eddie Williams; the Watts Law Firm in Corpus Christi, Texas, led by Mikal Watts; Ranier Gayle & Elliot in Lake Charles, Louisiana, led by Drew Ranier, and Grant Kaiser of The Kaiser Firm to form the Vioxx Litigation Consortium ("VLC"). From day one, our team committed itself to investing whatever time, talent and resources that it took to represent persons injured by Vioxx in their fight against the pharmaceutical giant, Merck & Co., in this novel and complex litigation.

4.     The efforts and resources invested by our team contributed substantially to the resolution of the litigation. As a united Consortium, Merck was fully aware that our team had the quality, talent and funds to try our cases against it, despite the substantial costs and time involved in each trial. I personally invested at least 650 hours managing the day-to-day decisions relating to VLC's litigation efforts prior to the November 9, 2007 settlement. The time I committed to this litigation has no doubt caused me to take time away from other litigation and litigation potential.

5.     **Quality of Work.** Among those in the legal profession, the Provost ★ Umphrey Law Firm is held in high esteem for its reputation and ability for quality work and for investing the time and resources necessary to win cases. One example is that I, as lead counsel, along with VLC members John Eddie Williams and Grant Kaiser, represented the State of Texas in its historic tobacco litigation. The case settled in January 1998, two days before jury selection; we achieved one of the largest legal recoveries in history, despite the tobacco industry's 40 year his-

---

[1] This is the official organization for specialization authorized by the Supreme Court of Texas.

FAC Resp. Exhibit B -- 1548

tory of no litigation losses. It is this reputation for commitment to success that made the VLC a credible threat to Merck and along with a large, high quality case load, was in my opinion a substantial factor in bringing about the settlement with Merck.

6.     **Litigation Commitment.**  Our Consortium committed thousands of hours of common benefit time, as detailed in our time record submissions. Our team's commitment of time and money to this cause never waned as we fought Merck in New Orleans, New Jersey, California, Texas, and in various other state jurisdictions. We pressed forward even though Merck continued to gain trial victories and this litigation became less attractive to other plaintiff's lawyers.

7.     **Partnership Participation.**  I am the Senior Managing Partner of the Provost ★ Umphrey Law Firm, LLP. I am involved in running the firm on a daily basis. I was personally involved in management decisions of our Vioxx docket and as part of this responsibility, met regularly with the other Vioxx Consortium Principals regarding Vioxx issues including trial strategy, expenses and management decisions. Attorneys from my firm that worked on Vioxx included Jim Morris, Matt Willis and Darren Brown. I directly supervised the work of these attorneys, including Darren Brown, who worked daily on Vioxx cases at our firm.

8.     **Non MDL Jurisdictions.**  Our Consortium participated in common benefit work outside of the federal MDL including New Jersey, California, Illinois and Texas. This effort is detailed in the affidavit of other Consortium attorneys and will not be repeated here. In addition, we spent time and money to develop cases for trial in other states including Wisconsin, Maryland, Florida, and Illinois when the cases were remanded.

9.     **Trials.**  The VLC firms tried, as lead counsel, two of the 15 Vioxx trials that reached verdict: *Smith* in the MDL and *Schwaller* in Illinois. In addition, we provided trial assistance and support in the trials of other bellwether Vioxx cases including *Irvin*, *Barnett* and *Mason*. Our efforts in the trials are detailed in the affidavits of other Consortium attorneys. Overall, the VLC was involved some to a greater, and some to a lesser, extent in four of the five bellwether cases tried in the MDL.

10.    **Funding.**  Our Consortium contributed significant amounts to fund this litigation. Our ability and willingness to fund the litigation to the extent it required benefited all Vioxx plaintiffs and their counsel. In all, we invested more than $13.5 million in out-of-pocket expenses— all *before* settlement. Very few Plaintiffs' counsel, if any, made this level of financial commitment to Vioxx litigation. Without this level of commitment, large corporate defendants generally, and Merck particularly, have little incentive to resolve litigation.

11.    Regarding specific trials, our Consortium spent more than $527,000.00 out-of-pocket in the MDL bellwether trial of *Smith*. Adding the amount of DecisionQuest's invoices, the total expenses incurred exceed $1.2 million. Few firms nationwide would make that level of commitment to try a bellwether case hand-selected by Merck, presumably because it thought it

2

had a substantial chance of prevailing. Those that are capable and willing to do so should be compensated accordingly.

12.     In the *Schwaller* trial in Illinois, our Consortium spent more than $460,000.00 out-of-pocket to try the case. In addition to those trials, we spent hundreds of thousands of dollars in selecting good quality trial cases in New Jersey, California, and other state venues and began preparing them for trial. While these cases did not ultimately proceed to trial, the efforts and funds invested no doubt contributed substantially to Merck's desire and decision to negotiate and settle this litigation.

13.     **Other.** After the November 9, 2007 Settlement Agreement was announced, serious ethical issues arose that threatened the success of a global resolution of Vioxx. At that time, I and other members of our team personally met with experts on legal ethics and others to try to resolve the ethical problems with the settlement. These issues caused many plaintiffs' attorneys in Texas and elsewhere concerns of such a magnitude that the failure to solve them would likely have caused the Vioxx settlement program to fail. As part of this effort, I, along with John Eddie Williams, Drew Ranier, Grant Kaiser and others, personally traveled to New Orleans to discuss solutions to these issues with the PNC, counsel for Merck and the Honorable Eldon E. Fallon. We also traveled to New Jersey and attended hearings before, and in-chambers conferences with, the Honorable Carol E. Higbee and counsel for Merck and NPC to raise the importance of the ethical issues. We are proud to say that as a result of these efforts, the ethical issues were resolved by amending the Settlement Agreement. That allowed a great number of plaintiffs' attorneys who could not have otherwise agreed to participate to register and enroll their clients in the settlement. In all, I spent a minimum of 55 hours attending the hearings mentioned above, as well as numerous meetings and telephone conferences with our VLC team and ethics advisors to resolve these issues. But, the number of hours, although not insubstantial, is relatively insignificant when compared to the result achieved by those hours: resolution of the ethical issues with the settlement so that it could be a success. In my opinion, these were some of the very most critical hours worked on the Vioxx litigation.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

/
/
/
/
/
/
/
/
/
/
/

3

WALTER UMPHREY

SBUSCRIBED AND SWORN TO BEFORE ME on the 30th day of October, 2008.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

BETTY GAYLE BOUILLION
Notary Public, State Of Texas
My Commission Expires
09-12-2010

1

# WALTER UMPHREY

490 Park Street
P. O. Box 4905
Beaumont, Texas 77704
Telephone – 409-835-6000
Facsimile – 409-838-8888

## PROFESSIONAL EXPERIENCE

PROVOST UMPHREY LAW FIRM, L.L.P. 1969 - present

Founding and Managing Partner.  The Provost Umphrey Law Firm began building its reputation for excellence in Jefferson County, Texas.  Over the years it has grown to the State of Texas, the Southeast U.S. and nationwide. This law firm represents clients anywhere in America from offices in Beaumont, Tyler, and Friendswood, Texas; Memphis and Nashville, Tennessee; and Little Rock, Arkansas.

The heart and soul of Provost & Umphrey Law Firm remains Walter Umphrey. Born in Port Arthur, Texas, Walter received a football scholarship to Southern Methodist University then completed undergraduate studies at Baylor University. In 1965, Walter received his *Juris Doctorate* degree from Baylor Law School.  He then joined the Jefferson County District Attorney's Office as a prosecuting attorney and ultimately Chief Felony Prosecutor.

Beyond the practice of law, Walter has provided unwavering support to important civic and community causes. He serves as Director of the National Wildlife Association, Director of the Lady Bird Johnson Wildflower Center, Director of both Texas Regional Bancshares, Inc., and Texas State Bank. Just recently, the newest cancer institute in Southeast Texas was named the Walter Umphrey Cancer Center.

He is former vice-chairman of the Texas State Parks and Wildlife Commission (1991-1997).  His life has been one of great success and selfless giving. Walter's numerous contributions to important causes range from lighting a ballpark for physically challenged kids, to donating land for a state park on Pleasure Island. Walter helped build the new law center at Baylor University on the banks of the Brazos River.  Named the Sheila and Walter Umphrey Law Center, it is hailed as a state of the art educational facility.

## BOARD CERTIFICATIONS

Personal Injury Trial Law, Texas Board of Legal Specialization

Labor & Employment Law, Texas Board of Legal Specialization

## BAR ADMISSIONS

United States Supreme Court
United States Court of Appeals for the Fifth Circuit
United States District Court, Eastern District of Texas
United States District Court, Southern District of Texas
Supreme Court of the State of Texas

## HONORS & AWARDS

Fellow, International society of Barristers
The Best Lawyers in America
Texas Super Lawyer, 2003-2008
One of the Top Texas Lawyers of the 20th Century, Texas Lawyer Publication "Legal
Legends: A Century of Texas Law and Lawyering," 2000

## EDUCATION

BAYLOR UNIVERSITY
 *Juris Doctor*, 1965
 *BBA*, 1963

## AFFIDAVIT OF JOHN EDDIE WILLIAMS, JR.

1.      My name is JOHN EDDIE WILLIAMS, JR.  I am over the age of 18 years, of sound mind, and in all respects legally competent to make this affidavit.  I have personal knowledge of the factual statements made herein.  I am an attorney duly licensed in, and in good standing with, the State of Texas.

2.      I submit this affidavit pursuant to PTO 6(D), in support of the allocation of common benefit fees in the Vioxx litigation.  In submitting this affidavit, I expressly reserve all, and do not waive any, rights relating to common benefit fees and/or their allocation.

3.      I am the founding and managing partner of the law firm of Williams, Kherkher, Hart and Boundas, LLP, based in Houston, Texas. To briefly summarize my professional experience and qualifications:  I graduated first in my class from the Baylor School of Law, where I served as Editor in Chief of the *Baylor Law Review*.  I started my career at the law firm of Fulbright & Jaworski, and left the firm in 1983 to start my own law firm to focus on representing plaintiffs in personal injury litigation, which I have done for the past 25 years.  I am board-certified in Personal Injury Trial Law by the Texas Board of Legal Specialization and am a past President of both the Houston Trial Lawyers Association and the Texas Trial Lawyers Association.

4.      Since 1983, our firm has represented tens of thousands of clients in a wide variety of cases against many of the biggest names in corporate America (Phillip Morris, BP, Wyeth, Merck, Phillips Petroleum, to name just a few).  For example, our firm, with others, represented the State of Texas in its lawsuit against the tobacco industry.  We accepted this case at great risk, at a time when most considered such litigation unwinnable and, after extremely difficult litigation, just days before jury selection, we achieved the largest settlement in U.S. history for our home state.  For over 25 years, we consistently have shown our willingness to take on and try tough cases and to stand up for the rights of our clients.

5.      We have been a leader in the fight to make prescription drugs safer and in holding pharmaceutical companies accountable when they injure consumers.  We have handled thousands of cases against drug companies.  We actively litigate and try these cases.  For example, our attorneys have tried over a dozen pharmaceutical cases in the past several years.  I believe our firm's track record of success and our reputation as a leading plaintiffs' trial law firm have been hard earned and are well known.

6.      We have a reputation for taking cases to trial and for having the resources, trial skills and determination to pursue litigation against the most formidable defendants.  We demonstrated this again in the Vioxx litigation; I believe our active involvement was a major contribution to the litigation.  My partners, Steve Kherkher and John Boundas, tried the third MDL bellwether case, *Smith v. Merck* and, along with many other attorneys at our firm, were

1

otherwise highly engaged in the litigation. Our attorneys collectively spent thousands of hours on the Vioxx litigation. Affidavits from my partners and our firm's attorneys have been submitted that detail these efforts, which include participating in Vioxx trials, taking and defending depositions, developing expert witnesses, attending hearings, preparing cases for trial, and many other tasks that contributed to the litigation as a whole. This obviously precluded us from employing these significant efforts in other litigation

7.      In addition, our firm was involved in the Vioxx litigation in a team effort with several other law firms, the Vioxx Litigation Consortium ("VLC"). The VLC members, including me personally, took on enormous risk in pursuing this litigation. We collectively invested over $13.5 million before the settlement was announced, well over $1 million of which was devoted to trial, pretrial discovery and expert witness expenses incurred in actively pursuing cases. We committed the work of over twenty lawyers from my firm alone and many thousands of hours of attorney time. Our VLC team tried two Vioxx cases to verdict and assisted on several others. In addition, we were actively pushing the litigation in jurisdictions across the country (in the MDL, Texas, New Jersey, California, and elsewhere). For example, we tried one case in the MDL and volunteered two others (which were struck by Merck), we tried a case in Illinois, we submitted 75 cases for pretrial discovery in New Jersey so that more cases could be set for trial, and we were preparing for another upcoming trial on behalf of two Vioxx plaintiffs when the settlement was announced. The VLC got into this litigation prepared and able to try case after case. As such, I believe that we represented a real litigation threat to Merck and that our efforts contributed in a major way to the resolution of the litigation.

8.      I actively directed the efforts of the VLC and the efforts of our firm's attorneys, and spent hundreds of hours on the Vioxx litigation. I oversaw and made key decisions relating to our cases. For example, all major strategy decisions of the VLC were discussed and approved at meetings in which I personally participated. I also routinely met with our attorneys and with VLC staff members to ensure that we were doing all that we could to advance the litigation for our clients. The contributions of the VLC are further detailed in the affidavits of Grant Kaiser, Walter Umphrey, Mikal Watts and Drew Ranier.

9.      We also showed leadership in connection with the settlement and in amending the settlement so that attorneys in Texas and around the country were ethically able to participate. While jury verdicts and settlements obviously are important, giving our clients the best legal representation also means adhering to the highest ethical standards. When the Vioxx settlement was announced, we were encouraged that it had the promise to afford our clients a fair resolution to their cases in the context of a very hard fought litigation. However, once we reviewed the Settlement Agreement, significant ethical issues became apparent, ones that would render the Vioxx settlement impossible to accept. These issues included a problem in the registration affidavit requiring a lawyer to recommend the settlement to all or none of his or her clients, an issue under Model Rule 2.1 on independent and professional judgment, and an issue under Model Rule 5.6, which prohibits restrictions on the right to practice law.

2

10.     These concerns were voiced by attorneys around the country and this criticism also received substantial media attention. I personally assumed a leadership role to try to resolve these issues so that we would have a settlement that works practically for the parties yet also meets the letter and the spirit of the ethics rules of our profession. I organized a group of VLC attorneys as well as attorneys from other firms to address the issue. My role also included hiring legal ethics expert Professor Charles Silver of the University of Texas School of Law, a nationally recognized expert in the area of mass tort settlements. Professor Silver worked with our firm's General Counsel, Harry G. Potter, on the ethics issues raised by the settlement agreement. Mr. Potter currently serves on the Texas Professional Ethics Committee, is former Chairman of the State Bar Grievance Committee in Austin, Texas and has taught legal ethics at the University of Texas School of Law. Together, they assisted in drafting the motion filed with the MDL Court and attended Court hearings and negotiation sessions relating to amendments to the settlement agreement eventually approved by the Court.

11.     I attended and spoke on these ethics issues at Court conferences in New Orleans and New Jersey and had numerous meetings and conference calls with attorneys in our group, legal ethics experts, and members of the NPC and PSC. The result of our efforts were amendments and actions that rendered the settlement in compliance with the ethics rules referenced above, which ultimately made it possible for the VLC as well as many other attorneys in the country to enroll and register their clients.

_____

JOHN EDDIE WILLIAMS, JR

SUBSCRIBED AND SWORN TO BEFORE ME on the 31ST day of October 2008.

GERILYN GORDON
Notary Public, State of Texas
My Commission Expires
March 14, 2010

_____

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |

## AFFIDAVIT OF DREW RANIER

BEFORE ME, the undersigned authority, on this day personally appeared DREW RANIER, and after having first been duly sworn upon oath, states as follows:

1. I, *Drew Ranier*, a member of the Louisiana and Texas Bars, have practiced law for over 30 years and served as lead counsel and on PSCs in several nationally important cases. I am a member of the International Society of Barristers, a past President of the Louisiana Association for Justice, and I have served on the AAJ Board for many years. My Bar activities include President-elect of the Louisiana Bar Foundation, Trustee of the Client Assistance Foundation, and Chair of the Bench-Bar Committee. I am the senior partner of Ranier, Gayle and Elliot, LLC (RGE). (**See c.v. Exh. A**). I have extensive complex litigation experience and special expertise in insurance coverage. I was the national insurance counsel for all Attorneys General in the Tobacco litigation and lead counsel for the State of Louisiana. I also represented the State of Louisiana in thousands of asbestos abatement claims. I am admitted to practice in the United States Supreme Court, the U.S. Fifth Circuit Court of Appeals, all the U.S. District Courts of Louisiana, the Louisiana Supreme Court and the Texas Supreme Court.

2. *PSC Administrative & Financial Contributions.* The Court appointed me to the PSC when the MDL began. I attended nearly all of the 40 Vioxx Status Conferences and participated in hundreds of PSC meetings and conference calls. I recorded 2,569.5 hours of MDL PSC work through August 2008. My firm contributed 4,419 hours through August 2008 in PSC work. My large financial commitment to the Vioxx Litigation included $300,000 to the MDL PSC capital fund, over $100,000 in submitted expenses, and another $100,000 on lawyer travel and trial expenses. With four other leading plaintiff firms (Williams Kherkher, Provost Umphrey, Mikal Watts Law Firm, The Kaiser Firm), I formed the Vioxx Center (with its own office building, lawyers, and staff), solely dedicated to representing people injured by Vioxx. I contributed over $3.1 million to the Vioxx Center. My professional and financial commitment to the Vioxx MDL precluded my work and my firm's work on other cases as a leading national trial lawyer with over 30 years of experience. As a PSC member I closely coordinated all MDL activities with the Vioxx Center and my co-counsel John Eddie Williams, Walter Umphrey, Mikal Watts and Grant Kaiser, to present a united front against Merck and to get cases to trial. All five firms and the Vioxx Center worked as one with the MDL.

3. *Contributions through the PSC, RGE and the Vioxx Center.* Qualitative and quantitative evidence establishes my substantial contributions to achieving the Master Settlement Agreement ("MSA"). The Vioxx Center firms, including my firm, combined the manpower, resources, and experience necessary to reduce 30,000 potential Vioxx claimants to 2,000 high quality cases for trial. This commitment created a credible threat to pressure Merck to settle. The Vioxx Center spent thousands of hours selecting, preparing, and trying cases that benefitted every Vioxx plaintiff. I worked on MDL trials and expert preparation, important insurance discovery, and ethics issues necessary to achieve an ethically acceptable

1

settlement. My firm and the four other firms bore the costs of trying one MDL bellwether trial, Smith, and one state trial in Illinois, Schwaller, and were on the eve of trial in the Sanderson and Romans cases in New Jersey at the time of settlement. We also prepared for the Jones and Cooper bellwether trials, which were approved by the PSC and the Court but rejected by Merck.

4. *Case Identification & Screening Program.* At a cost of approximately $12 million and over 160,000 hours, all prior to settlement, the Vioxx Center implemented a comprehensive program to medically and legally evaluate approximately 30,000 prospective clients. The Vioxx Center obtained pharmacy records to confirm Vioxx use at or around the time of the heart attack or stroke. Once use was established, treating facilities' medical records were obtained and reviewed by medical experts to confirm the diagnoses. Individuals who did not meet the Vioxx Center's strict requirements were notified and released as clients. This entire process entailed 126,000 hours of staff/paralegals, 10,000 hours of nurse paralegals, 850 hours of expert/MD review, and 23,300 hours of attorney screening. The Vioxx Center used the same criteria to screen its clients four years ago that Brown Greer is now using. These activities were thus central to assembling one of the largest groups of high quality cases to empower the MDL.

5. *The Screening Process Benefitted All Claimants.* The Vioxx Center created one of the country's most advanced and thorough client databases, as described in other affidavits. [See Affidavit of Grant Kaiser]. Although I was unaware of the settlement negotiations, during 2007, PNC firms repeatedly requested on behalf of the Court information regarding Vioxx Center clients, e.g. the percentage of clients who were heavy smokers, had high blood pressure, etc. After the MSA, it was apparent that the Vioxx Center client database had been used in the settlement negotiations and in designing the MSA matrix, thereby contributing to the common benefit.

6. *Substantial Trial Work.* Our group tried two cases to verdict, Smith (MDL bellwether) and Schwaller. Two MDL bellwether cases, Jones and Cooper, were prepared for trial by my firm and the Vioxx Center firms, approved by the PSC screening process, but ultimately rejected by Merck's lawyers. Two more cases were set for trial in New Jersey within weeks of the MSA, Sanderson and Romans. The Vioxx Center firms tried a difficult bellwether case (Smith) selected by Merck's lawyers. It dedicated all of its resources to this costly trial. In contrast, several other firms dismissed plaintiff and defense MDL bellwether selection cases, rather than try them.

I fully participated in the fifteen day Smith trial as a senior attorney. My duties included jury venire investigation and analysis, witness selection, order of proof, focus group work, shadow juror work, meeting with Merck lawyers on discovery issues, work with the Court, a variety of strategic and tactical work with trial attorneys, and work with the principals and supporting counsel from all Vioxx Center firms. The Smith and Schwaller trials entailed approximately 30 days of trial, approximately 20 live witnesses, 25 video witnesses, 40 depositions, 400 exhibits, and the customary voluminous pleadings, motions, etc. My firm alone contributed over 1,400 hours to the Smith trial. Moreover, Vioxx Center members assisted in supporting roles in the Irwin, Barnett, and Mason MDL bellwether trials.

Ranier, Gayle and Elliot and Vioxx Center members were leaders in developing MDL trials. We worked with DecisionQuest and participated in over a dozen EDLA/MDL focus groups and mock trials involving over a 100 jurors which resulted in witnesses, evidence, themes, and profiles likely to succeed in MDL jury trials. This was central in the Barnett $51 million verdict, in the other bellwether trials, and for the thousands of MDL cases which would have been tried in New Orleans. We developed the only New Orleans area expert cardiologist to testify in the MDL bellwether trials.

2

Many other Vioxx Center cases were being actively prepared for trial when the settlement was announced. Since I was only told about a possible settlement two weeks before settlement, most of my efforts were high risk pre-settlement work. Only a few firms in the country did this much trial work, and one Vioxx Center firm did substantial work on the case *before* Vioxx was withdrawn from the market. [See Affidavit of Mikal Watts].

7. *Expert Witness Development and Attacking Merck's Key Defense*. The Vioxx Center also retained and paid for a leading econometric firm, LECG of Cambridge, Mass., which, under my direction, analyzed Merck's financial actions with respect to liability and its ability to pay thousands of Vioxx victims. This involved working closely with former high level SEC personnel. The purpose of this analysis was to establish Merck's financial reasons for rushing Vioxx to market and keeping it there.

In preparation for upcoming trials, the Vioxx Center obtained an unprecedented expert report that undermined Merck's principal defense strategy of emphasizing cardiac risk factors to compete with Vioxx as a cause of heart attacks. Cornell University statistician Dr. Martin Wells (**Exh. B**) provided evidence that Vioxx was at its worst for high-risk patients. The Vioxx Center's effort to understand the thousands of clinical trial computer files received in discovery made the report possible. Professor Wells "reverse engineered" the Konstam et al. meta-analysis that Merck relied on to defend Vioxx and isolated the effect of Vioxx on high-risk groups. For example, para. 10 and Table 2 of the Wells Report show an incidence rate ratio of 10.33 for diabetics in Merck's clinical trials. This analysis also established the inappropriateness of Konstam's grouping of Alzheimer's trials with other clinical trials (see para. 9). The expert report, signed on Oct. 29, 2007, was about to be filed when activity ceased due to settlement developments. In our commitment to expertly try cases with excellent evidence, we mounted a major attack on Merck's epidemiological position with leading experts.

8. *MDL Insurance and Merits Based Discovery Work*. I chaired the PSC Insurance Committee, and personally prepared the written discovery, deposed the Merck Insurance Vice President, and argued the Motion to Compel one of the largest bodies of yet undiscovered liability evidence in the case, the London Insurance Arbitration evidence. This evidence showed that Merck knew of Vioxx's dangers in 2000-01, did not disclose those dangers to its insurers, and increased its insurance accordingly. I prepared and supervised the brief supporting the Motion to Compel and in opposition to Merck's Motion for a Protective Order. This brief is submitted as an example of the level of work performed. (**Exh. C**). I personally analyzed Merck's insurance policies, supervised and helped prepare the Coverage Chart which shows Merck's complex insurance plan consisting of approximately 100 policies. The policies proved Merck's ability to pay as well as what Merck knew and when it knew it. (**Exh. D**). I spent hundreds of hours on this issue alone. Moreover, our group retained one of the country's leading insurance experts to consult on insurance issues, John Ellison of Anderson Kill in Philadelphia.

9. *Contribution to MDL Participation*. In addition to supplying strong MDL cases and trying MDL bellwether cases, my endeavors included leading the successful fight in the PSC to establish the Court-approved 2% common benefit agreement, which provided significant incentive to join the MDL. Much of the PSC leadership opposed the 2% common benefit level. The MDL filing pattern over time supports the common sense point that the low common benefit amount that I fought for was instrumental in achieving a sufficient quantity of MDL cases. The 2% rate was announced in Pre-Trial Order No. 19 on 8/4/05. Before then, approximately 1,208 cases were in the MDL. On and after that date, 9,046 additional cases flowed into the MDL. While other factors contributed to the growth, the MDL case

3

growth pattern shortly before and after the August 4th Order supports that Order's pivotal role in achieving a mass of cases. In the three months preceding the August 4th Order, 658 cases joined the MDL. In the three months after the Order, 908 cases joined the MDL. MDL participation thus increased about 42% around the time of PTO 19.

10. *Keeping the Settlement Viable.* The initially published settlement contained provisions requiring total participation that raised serious ethical issues. I and the other principals of my group under the leadership of John Eddie Williams, were instrumental in calling the PNC's and the New Orleans and New Jersey Courts' attention to these issues in motions, meetings and Court appearances. This led to significant modifications to the settlement allowing for full participation of clients and attorneys who would not otherwise have been able to participate. I have continued to work diligently with the PSC to resolve complications of the settlement, including changes to the matrix and large numbers of questionable deficiencies received from Merck. I have been asked by Liaison Counsel to advise lawyers throughout the country on various aspects of claims submissions.

In submitting this affidavit, I expressly reserve all, and do not waive any, rights relating to common benefit fees and/or their allocation.

I swear that the foregoing is true and correct.

**DREW RANIER**

SUBSCRIBED AND SWORN TO BEFORE ME in the City of Lake Charles, Calcasieu Parish, State of Louisiana on the 28 day of October , 2008.

NOTARY PUBLIC

**Clara M. Miller**
Notary Public ID# 78227
CALCASIEU PARISH
State of Louisiana
My Commission Expires At Death

4

**DREW RANIER**                                     October, 2008
**Ranier, Gayle & Elliot LLC**
**1419 Ryan Street**
**Lake Charles, LA 70601**
**(337) 494-7171**
**dranier@rgelaw.com**

**Education:**
B.A. Tulane University 1968
J.D. University of Texas 1975

**Military Service:**
United States Navy 1969-1972

**Firm Affiliation:**
Ranier, Gayle & Elliot, L.L.C.
        Mr. Ranier is the senior partner in the firm with offices in Lake Charles and New Orleans,
Louisiana. The firm has a broad litigation practice involving complex class-action, mass tort,
business, pension, contract, insurance, property damage and personal injury litigation including
tobacco, asbestos, silicosis, admiralty and maritime, defective products, and other litigation.

**States of Admission:**
Louisiana 1975
Texas 1975

**Courts of Admission:**
United States Supreme Court
United States Court of Appeals, Fifth Circuit
United States District Courts, Eastern, Western, and Middle Districts of Louisiana
United States District Courts, Southern and Eastern Districts of Texas
Louisiana Supreme Court
Texas Supreme Court

**Professional Organizations:**
American Bar Association
Louisiana State Bar Association
        Bench Bar Committee
        Civil Procedure Bar Examiner 1980-1991
        Louisiana Client Assistance Foundation 2002-present
        Rules of Professional Conduct Committee 2005-
        Professional Assessment Committee 2005-
Louisiana Bar Foundation
        Board of Directors 2003-present
        Secretary/Treasurer 2007-



EXHIBIT
A

Curriculum Vitae
Page 2

State Bar of Texas
Louisiana Association for Justice
        President 1996-1997
American Association for Justice
        Board of Governors 1999-2005
International Society of Barristers
Calcasieu-Cameron Indigent Defender Board 1986-1990
Southwest Louisiana Trial Lawyers Association
        President 1980-1981
National Board of Civil Trial Advocacy
        Certified Civil Trial Advocate 1983
American Inns of Court Judge Albert Tate Chapter
Maritime Law Association
Phi Delta Phi Legal Fraternity

**Non-Profit Organizations:**
Louisiana Endowment for the Humanities
The Nature Conservancy

**Book Chapter:**
*Louisiana Civil Trial Procedure*, Lawyers Cooperative Practice Guide (1997), Chapter 12,
    *Closing Argument*

**Articles:**
*The Proposed Statute for a European Company*, 10 Texas International Law Journal 90
    (Winter 1975)
*Exemplary Damages: Checks and Balances on Corporate America*, 3 Louisiana Bar Journal 256
    (1996).

**Representative Seminar Presentations:**
*"Pre-Complaint Discovery in Federal Court"*, Association of Trial Lawyers of America, 1990
        Annual Convention.
*"Handling the Uninsured Motorist Claim from A to Z"*, Louisiana Trial Lawyers Association, 1991
        Winter Seminar.
*"Maritime Damages"*, Louisiana Trial Lawyers Association, 1991 Winter Seminar.
*"Punitive Damages in Driving While Intoxicated Cases"*, Louisiana Trial Lawyers Association,
        1991 Damages Seminar.
*"Burns"*, Southwest Louisiana Bar  Association, August 1995, Lake Charles, LA.
*"Exemplary Damages"*, Louisiana Trial Lawyers Association, December 1995, New Orleans, LA.
*"Recent Developments in Admiralty and Maritime Law"*, 5th Tulane University Law School Fall
        Maritime Law Seminar, September 1996, New Orleans, LA.

Curriculum Vitae
Page 3

*"Tort Reform from the Plaintiff's Perspective"*, Louisiana State Bar Association, November 1996,
Baton Rouge, LA.
*"Tort Reform from the Plaintiff's Perspective"*, Louisiana Trial Lawyers Association, December
1996, New Orleans, LA.
*"Insurance Coverage for Tobacco Claims"*, Andrews Tobacco Litigation Conference, April 1997,
New Orleans, LA.
*"Emerging Issues in Tort Litigation"*, Louisiana State Bar Association, November 1997, Baton
Rouge, LA.
*"Cross Examination"*, Louisiana Trial Lawyers Association, October 1998, New Orleans, LA.
*"Make your Case with the Jury"*, Louisiana State Bar Association, June 1999, Destin, FL.
*"The Essential Requisites of a Class Action; The Propriety of Class Actions in Mass Tort, Contract,
Environmental and Securities Claims"*, Louisiana Judicial College, December 2001, New
Orleans, LA.
*"Management of Complex Litigation: Role of the Attorneys"*, Louisiana State University, Paul M.
Hebert Law Center, October 2002, New Orleans, LA.
*"Welding Rods"*, Mass Torts Made Perfect, September 2002, Paradise Island, Bahamas.
*"Welding Rod Disease/The MDL"*, Mass Torts Made Perfect, November 2003, New Orleans, LA
*"Expert Admissibility Standards: How Daubert and Frye Have Been Used in this Litigation"*,
Mealey's Welding Rod Litigation Conference, October 2004, West Palm Beach FL.

**Expert Witness Testimony:**
*Powers v. Vista Chemical Company*, CV 93-2104 (W. D. La.) 1995
*Bryant v. Fontenot, et al*, CV 93-1800 (W. D. La) 1997
*In re: Arcadian Disaster*, CV 95-6171 (14th JDC La.) 1997
*Dix vs. Mancuso*, CV 97-0761 (W. D. La.) 1998

**Legislative Testimony:**
U. S. House of Representatives Oversight Committee on Toxic Waste, 1985
Louisiana Senate Judiciary Committee, 1996, 1997
Louisiana House of Representatives Civil Law Committee, 1996, 1997

**Litigation:**
Counsel in hundreds of cases spanning thirty years of practice. Many of these cases involved
legally significant or novel issues, and resulted in significant verdicts, opinions or settlements. Major
cases include:

*Arthur v. Zapata Haynie Corp.*, No. 10-12001, Cameron Parish, State of Louisiana, 38th JDC.
Lead counsel in this major maritime explosion case involving a collision between a
commercial fishing vessel and an offshore natural gas pipeline, resulting in multiple loss of life,
injury and loss of property.

Curriculum Vitae
Page 4

*Auster Oil & Gas, Inc. V. Stream,* 835 F.2d 597 (5th Cir. 1988)

Lead counsel in this complex oilfield and civil rights litigation. Obtained a new trial after being retained as lead defense counsel. A multi-million dollar compensatory and punitive damages verdict against landowner client was set aside. This case has been used in teaching federal practice and procedure.

*Boudreaux v. Pritchard Corporation,* et al, No. 95-6442, Calcasieu Parish, State of Louisiana, 14th JDC.

Lead counsel in this brain injury case resulting from an injury in the Middle East to an American resident of the United Kingdom. The case involved conflicts and choice of law issues of state, federal, United Kingdom and Middle East (Shariah/Islamic) law, and international insurance issues.

*Buckbee v. Aweco, Inc.,* 418 So.2d 698 (La. App. 3rd Cir. 1982), 542 So.2d 81 (La. App. 3rd. Cir. 1989), 561 So. 2d 76 (La. 1990), 587 So.2d 79 (La. App. 3rd Cir. 1991), 590 So.2d 580 (La. 1992), 614 So.2d 1233 (La. 1993), 626 So.2d 1191 (La. App. 3rd Cir. 1993), writ denied 631 So.2d 1162 (La. 1994).

Lead counsel in this explosion and burn damages case, involving complex issues of evidence, law and damages. The case has been cited as authority by other state and federal courts.

*Cameron Parish School Board, et al v. Texaco, Inc., et al,* CA No. 96-1222, U.S. District Court, Western District of Louisiana; and Lease Oil Anti-Trust Litigation (No. II) MDL No. 1206.

Co-counsel for Louisiana royalty owners in this nationwide class action case to recover under-payment of oil royalties for landowners and oil lessors against the world's major oil companies, which involves state and federal laws relating to mineral rights, property, contract and antitrust law.

*Daniel v. Gulf States Utilities Co.,* No. A-140,953, 58th Judicial District Court of Jefferson County, State of Texas.

Lead counsel in this complex electrical distribution design, construction and maintenance case, spanning over half a century of design. The case involved extensive electrical burns and multiple amputations.

*Johnson, et al v. Georgia-Pacific Corporation, et al.,* No. 2003-5863, Lafayette Parish, State of Louisiana, 15th JDC.

Co-lead counsel for surface and groundwater contamination from railyard operations.

*In Re: Katrina Canal Breaches Consolidated Litigation (Pertains to All Cases),* No. 05-4182K(2), Eastern District of Louisiana.

Serves as a member of the Insurance Plaintiff Steering Committee for the class arising out of Hurricanes Katrina and Rita.

Curriculum Vitae
Page 5

*LaFleur v. National Union Fire Insurance*, No. 95-3755, Calcasieu Parish, State of Louisiana, 14th JDC.
    Lead counsel in this case which resulted in one of the nation's most significant reported trial judgments for damages from thoracic outlet syndrome.

*Lougon v. Era Aviation, Inc.*, No. 10-11645, Cameron Parish, State of Louisiana, 38th JDC.
    Lead counsel in this complex product liability, aviation, maritime and international law case involving the design, manufacture and maintenance of an aircraft which caused multiple offshore deaths and personal injuries.

*Meredith v. Ieyoub*, No. 96-C-1110 (La. 9/9/97); 700 So. 2d 478, *rehearing denied*.
    Co-lead counsel in this constitutional law case which resulted in numerous appellate arguments, including two arguments before the Louisiana Supreme Court, over the Attorney General's power and authority to act on behalf of the State in litigation matters, the Legislature's plenary powers and the separation of powers between the branches of State government.

*Myer v. U.S. Trust Company of California, N.A.,* No. CV-00-147-B-M3, U.S. District Court, Middle District of Louisiana.
    Lead counsel in this pending ERISA class action case seeking recovery of damages for the mismanagement of a major employee stock ownership plan (ESOP) with over a thousand participants.

*Poe v. PPG Industries, Inc.*, No. 10-11774, Cameron Parish, State of Louisiana, 38th JDC.
    Co-lead counsel in this toxic tort and maritime case in which he represented 200 commercial fisherman in their claims against a major chemical company for pollution of a river estuary system and marine life.

*Pugh Hart v. Exxon Mobil et al*, No. 2001-2629, Calcasieu Parish, State of Louisiana, 14th JDC.
    Lead counsel for landowners in groundbreaking case caused by surface and groundwater contamination from oil well drilling and production.

*Richard Ieyoub, Attorney General, ex rel State of Louisiana v. The American Tobacco Company, et al*, CA No. 96-1209, Calcasieu Parish, State of Louisiana, 14th JDC.
    Lead counsel in the case which recovered $4.6 billion for the State of Louisiana, and was lead national counsel for all states on issues of insurance coverage. The Louisiana case involved the law of four countries and international law, and was prosecuted in five different venues against 200 defendants.

Curriculum Vitae
Page 6

*Richard Ieyoub, Attorney General, ex rel State of Louisiana v. W. R. Grace & Co.-Conn, et al*,
95-3722 and 95-3722(A), Calcasieu Parish, State of Louisiana, 14th JDC.
      Lead counsel for the State of Louisiana in this case which recovered damages caused by the
manufacture, sale and installation of asbestos-containing materials in over 160 state buildings,
including hospitals and universities.  This case was brought against more than 50 defendants.

*Thibodeaux v. Conoco, Inc., et al.,* No. 2003-481, Calcasieu Parish, State of Louisiana, 14th JDC.
      Co-lead class counsel to approximately 20,000 claimants for injury and exposure resulting
from the release of sulfur dioxide and other toxic chemicals from a major refinery failure.

*Thomas v. Conoco, Inc.*, et al, No. 99-5078, Calcasieu Parish, State of Louisiana, 14th JDC.
      Co-lead counsel representing over 250 plaintiffs in a toxic tort case arising out of an ethylene
dichloride spill from a chemical plant pipeline.

*In Re: Vioxx Products Litigation,* MDL No. 1657, Eastern District of Louisiana.
      One of twelve members of the Court appointed national Plaintiffs' Steering Committee for
injuries caused by the Merck medication and counsel for several thousand injured clients.

*Walker v. The City Club of Lake Charles, Inc., et al*, No. 93-2349, Calcasieu Parish, State of
Louisiana, 14th JDC.
      Lead counsel in this child brain damage case which resulted in significant settlements and
plaintiff's jury verdict based on state of the art neuro-imaging and demonstrative evidence, and
involved premises liability legal issues arising from architectural and construction defects in a
modern commercial highrise building.

*In Re: Welding Fume Products Liability Litigation*, MDL No. 1535, Northern District of Ohio.
      One of the leaders of nationwide litigation for brain injuries to welders from toxic fume
inhalation, and a member of the nine-member national MDL Plaintiffs' Executive Committee.

*Woods v. Arcadian Corp.*, No. 93-3677, Calcasieu Parish, State of Louisiana, 14th JDC.
      Lead counsel in this catastrophic chemical plant explosion case. Punitive damages were a
central issue in this case, in addition to complex, international issues of design and maintenance of
a chemical facility.

## DECLARATION OF MARTIN T. WELLS PH.D

1.      I, Martin T. Wells PhD, have been asked to review statistical aspects of relevant epidemiological and scientific literature and data relating to the association between rofecoxib and excess cardiovascular events.

## BACKGROUND EDUCATION AND TRAINING

2.      I am the Charles A. Alexander Professor of Statistical Sciences, Chair of the Department of Statistical Science at Cornell University, and served for six years as founding Chair and Chair of the Department of Biological Statistics and Computational Biology at Cornell University. I am also Professor of Social Statistics, Professor of Clinical Epidemiology and Health Services Research at Cornell Weill Medical School, and the Director of Research in the School of Industrial and Labor Relations at Cornell University. I am also an Elected Member of the Cornell Law School Faculty. I teach undergraduate and graduate students in statistical methodology. My students are in fields such as agriculture, biology, epidemiology, finance, law, medicine, nutrition, social science, and veterinary medicine. I have served on high-level national statistical committees, and have published many articles in leading statistical journals. I am the Editor in Chief, *ASA-SIAM Series on Statistics and Applied Probability*; Co-Editor of *The Journal of Empirical Legal Studies*; and served as an Editor of *The Journal of the American Statistical Association*. I am a Fellow of the American Statistical Association, the Royal Statistical Society, Institute of Mathematical Statistics and an elected member of the International Statistics Institute. My qualifications are further summarized on my curriculum vitae, appended hereto as Exhibit A. I have also relied on standard statistical and epidemiological publications and may rely on additional material as discovery in this case progresses.

## CONCLUSION

3.      Rofecoxib is significantly associated with excess serious adverse cardiovascular events as compared with a placebo comparator. The finding of excess risk is based on data available not later than when data were available for the analysis in Konstam et al. discussed in paragraphs 11 to 13 below.

Rofecoxib is also associated with significant excess cardiovascular events as compared with naproxen. The finding of excess risk compared to naproxen is based on data available not later than when data were available for the analysis in Bombardier et al., discussed in paragraph 14 below.

In statistical models that control for the presence of known cardiovascular risks, rofecoxib is associated with a significant increase of serious cardiovascular adverse events. The increase in risk associated with rofecoxib thus persists in statistical models that include known cardiovascular risk factors. The magnitude of the rofecoxib effect in models that account for known cardiovascular risk factors is similar to the magnitude of other known risk factors for adverse cardiovascular events, such as smoking and

1

FAC Resp. Exhibit B -- 1567

EXHIBIT
B

hypertension. In samples limited to subjects with known cardiovascular risk factors, the incidence rate ratio for rofecoxib is significantly elevated. Rofecoxib therefore is associated with elevated rates of serious adverse cardiovascular events in subjects already at increased risk of adverse events.

These conclusions are based on my own analyses and on published studies. The studies are included in the list of articles attached to this report.

## PREVIOUS ANALYSES

4.      Merck initiated a Cardiovascular Adjudication Standard Operating Procedure (SOP) in 1998 to collect potential cardiovascular serious adverse experiences from studies with its selective COX-2 agents.[1]  The basis of the SOP was a blinded systematic review by an expert panel of serious adverse experiences reported by site investigators. These adverse experiences were prespecified in the SOP as cardiovascular events. The primary endpoint outlined in the original SOP was the confirmed cardiovascular serious adverse events endpoint.

5.      VIGOR was the first trial with rofecoxib to utilize the SOP. In March of 2000, the preliminary results of VIGOR became available and an increase in the number cardiovascular adverse experiences was observed. A relative risk (95% CI) for confirmed thrombotic events for rofecoxib compared to naproxen was 2.38 (1.39, 4.00).  Due the possibility that there might be an increased risk of cardiovascular adverse experiences associated with the use of rofecoxib, a pooled cardiovascular safety analysis was conducted using all relevant data as of September 2000.  Prior to publishing a pooled analysis of the data, the decision was made to prespecify the Antiplatelet Trialists' Collaboration (APTC) combined endpoint, for all pooled analyses which included studies which were not part of the original SOP.

6.      The pooled analysis with all data available from across the rofecoxib development program was performed in September 2000, including the two ongoing trials on Alzheimer's disease. The data for this pooled analysis were derived from all rofecoxib Phase IIb through V trials conducted by Merck that lasted at least 4 weeks. Studies performed in healthy volunteers or in which rofecoxib was compared with celecoxib were excluded. Data from treatment periods using doses of rofecoxib < 12.5 mg were excluded from analysis; doses ≥ 12.5 mg were combined for analysis. The studies included in this pooled analysis were all trials completed and unblinded in early September 2000, as well as two ongoing trials in Alzheimer's patients. Interim data from the two Alzheimer's studies were included using a cutoff of September 15, 2000.

7.      At this point in time the primary endpoint for the pooled analysis was now the APTC endpoint. For the rofecoxib comparison to placebo the results are given in Table 3

---

[1] FDA Advisory Committee Briefing Document.  Rofecoxib FDA Advisory Committee Background Information  NDA 21-042, s007 VIOXX Gastrointestinal Safety, February 8, 2001.
http://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4090B1_02_MERCK-Vioxx.pdf.

2

of Konstram et al. (2001).[2]  Among other results, Konstram et al. (2001) report that there was no evidence that rofecoxib was associated with excess cardiovascular events compared with placebo or non-naproxen NSAIDs.   Specifically, the crude (unadjusted) pooled relative risk for the APTC endpoint was 0.84 (95% CI: 0.51, 1.38) when comparing rofecoxib relative to placebo. No significant heterogeneity was seen across indications (p=0.381). The placebo was given for a limited duration in osteoarthritis, rheumatoid arthritis, and chronic low back pain studies, so the majority of the patient years at risk were attributable to Alzheimer's patients. The Alzheimer's patients were older and the majority of patients were male.[3]  Although Cox proportional hazards models were discussed in Konstam et al. to evaluate the effect of rofecoxib relative to the various comparators for the APTC endpoint, no Cox regression analysis results were in the published article.

8.      Recently Kerr et al.[4] published an analysis of the VICTOR (Vioxx in Colorectal Cancer Therapy: Definition of Optimal Regime) Trial using the Thrombotic Cardiovascular Serious Adverse Event (TCVSAE) end point as well as the APTC criteria. Of the 23 confirmed cardiovascular thrombotic events, 16 occurred in the rofecoxib group during or within 14 days after the treatment period, with an estimated relative risk of 2.66 from the Cox proportional-hazards model; (95% CI,1.03 to 6.86; p = 0.04). Analysis of the APTC end point gave an unadjusted relative risk of 1.60 (95% CI, 0.57 to 4.51; p = 0.37).


## NEW ANALYSES

9.      Merck rofecoxib clinical trial data, from the discovery process, was furnished to me by the plaintiff's attorneys.   To assess whether rofecoxib is a risk factor in the presence of other risk factors, I merged the major studies with a placebo comparator (APPROVe[5], VICTOR[6], and the placebo comparator subset of the Konstam et al. studies) and analyzed this pooled sample.  I also merged two major studies with a naproxen comparator (ADVANTAGE[7] and VIGOR[8]) and analyzed this pooled sample.  I then used

[2] Konstam,  MA, Weir MR,  Reicin A, Shapiro D, Sperling RS, Barr E, et al. Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib. *Circulation* 2001;104:2280-8.

[3] In the Alzheimer's/lower back pain protocols (combined in Konstam et al.) significantly more females than males were in the rofecoxib group compared to the placebo group (p=.016 chi-squared) and the females were significantly younger in the rofecoxib group as compared to the placebo group (p=.0001, Kruskal-Wallis). Since age and gender are cardiovascular risk factors, this raises concerns about combining the Alzheimer's and lower back pain studies as a block.

[4] Kerr DJ, Dunn JA, Langman MJ, et al. Rofecoxib and cardiovascular adverse events in adjuvant treatment of colorectal cancer. N Engl J Med 2007;357:360-9.

[5] Bresalier RS, Sandler RS, Quan H, Bolognese JA, Oxenius B, Horgan K, Lines C, Riddell R, Morton D, Lanas A, Konstam MA, Baron JA (2005) Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 352:1092–1102.

[6] Kerr DJ, et al Rofecoxib and Cardiovascular Adverse Events in Adjuvant Treatment of Colorectal Cancer *N Engl J Med* 2007;357:360-369.

[7] Lisse JR,Perlman M, Gunnar Johansson G, Shoemaker JR, Schechtman J, Skalky CS, Dixon ME, Polis AB, Mollen AJ, Geba GP for the ADVANTAGE Study Group* Gastrointestinal Tolerability and

3

Cox proportional hazards models to evaluate the magnitude of rofecoxib as a risk factor in the presence of traditional cardiac risk factors (that were available in the data), age, smoking, high cholesterol, hypertension, gender, and diabetes.[9] Table 1 gives three columns of hazard ratios and 95% confidence intervals: (1) for placebo comparator studies with the Alzheimer's protocols, (2) for placebo comparator studies without the Alzheimer protocols (protocol numbers 78 and 91), and (3) for naproxen comparator studies. The column (2) model is preferable to the column (1) model because a test of homogeneity using an incidence rate ratio analysis shows that when the Alzheimer protocols are included homogeneity is rejected (p=.01 and see footnote 3). Excluding the Alzheimer protocols, as in column (2), yields homogeneity (p=.51). In each of the three columns it can be seen that rofecoxib is a significant risk factor and consistently has a magnitude not significantly different from some well established risk factors such as hypertension and smoking.

10.     As an additional assessment of the risk of rofecoxib I computed the incidence rate ratio for rofecoxib to placebo for various cardiovascular high risk subgroups (diabetes, high cholesterol, hypertension, male, and smoking) using the furnished data from the placebo comparator studies, and omitting the Alzheimer protocols because of the lack of homogeneity discussed in paragraph 9. The results in Table 2 show that in the presence of high cardiovascular risk factors the incidence rate ratios for rofecoxib to placebo are elevated and significantly larger than one.

11.     In the original data sets of the various protocols, included in the Konstam et al. study, there were variables that indicated whether an individual subject experienced a serious cardiovascular adverse event. I have analyzed the Konstam et al. (2001) rofecoxib comparison to placebo data using this cardiovascular adverse event indicator as the study end point. The data on the serious cardiovascular adverse event was then merged with the SAS data files supplied by Merck that appear to have served as the basis for the Konstam et al. study[10]. As in Konstam et al. (2001), my pooled analysis used individual patient data. Table 3 shows the complete list of studies included in my pooled analysis of the rofecoxib comparison to placebo.

---

Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis: A Randomized, Controlled Trial. Ann Intern Med 2003; 139: 539-546.

[8] Bombardier C, Laine L, Reicin A, Shapiro D, Burgos-Vargas R, Davis B, Day R, Ferraz MB, Hawkey CJ, Hochberg MC, Kvien TK, Schnitzer TJ (2000) Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. VIGOR Study Group. N Engl J Med 343:1520–1528..

[9] For the risk factor analysis I use the vascular event end point variable in the Konstam SAS data files rather than the serious cardiovascular adverse event end point in order to achieve compatibility with the end points in APPROVe and VICTOR. I was unable to locate smoker information in the ADVANTAGE data. Cholesterol information in the VICTOR data appear to be coded in a "hyperlipidaemia" variable, which was coded as 'yes," "no," and "?." The Cox regression models included indicator variables to account for the missing smoker and cholesterol information.

[10] I also attempted to reconstruct the Konstam et al. placebo analysis from the underlying SAS data files furnished for each study included in the Konstam analysis as a check of my newly constructed data set. The new patient years at risk did not materially differ from the patient years reported in Konstam et al. and the event counts for the ATPC end point matched. I did notice that the upper 95% confidence bound in Table 3 of Konstam for the rheumatoid arthritis relative risk should be 93.7 rather than the published 9.37.

4

12.     As explained in paragraph 9, the Alzheimer's studies display heterogeneity relative to other studies. Additional evidence of heterogeneity exists within the studies analyzed in Konstam et al. A Cox proportional hazard model limited to the Konstam studies confirms heterogeneity in the Alzheimer's studies relative to the other studies. Additional evidence supported reporting analyses limited to non-Alzheimer's studies at the time of the Konstam study. Subjects' ages, dropout rates, assignment of adverse events to different body systems within the Alzheimer studies, and unbalanced samples resulting from combining Alzheimer's and lower back pain studies supported reporting the additional analyses. Using the serious cardiovascular adverse event end point there was evidence that rofecoxib was associated with excess cardiovascular events compared with placebo. Table 4 outlines the results.

13.     I also used a Cox proportional hazards model to evaluate the effect of rofecoxib relative to the placebo comparators for the serious cardiovascular adverse event end point. I controlled for both age and gender as covariates. The hazard ratio for rofecoxib relative to the placebo comparator, controlling for age and gender, was 2.02 (95% CI, 0.99 to 4.12, p=0.05, N= 7681; 90% CI, 1.11 to 3.68). [11] In a Cox model that included the Alzheimer's studies, the hazard ratio for rofecoxib relative to the placebo comparator, controlling for age and gender, was 1.28  90% CI, 1.00 to 1.64; p=0.10, N=9772). The global proportional hazards assumptions for these comparisons were tested[12]; the non-significance of these tests implies proportionality.

14.     Rofecoxib is also associated with significant excess cardiovascular events as compared with naproxen as reported in Konstam et al. This finding of excess risk compared to naproxen is based on data available not later than when data were available for the analysis in Bombardier et al. article. [13] The number of serious adverse cardiovascular events in the VIGOR study can be derived from the furnished SAS data files. A Cox proportional hazards model[14] yields the results in Table 5 that there are significant excess cardiovascular events for both the aspirin use and non-aspirin use subgroups of the VIGOR study. This result is consistent with the expression of concern

---

[11] One often uses .05 as the significance level, although other levels can and have been used. As pointed out the *Reference Manual on Scientific Evidence* pg 358 "significance test can be either one-tailed or two-tailed, depending on the null hypothesis selected by the researcher. Since most investigators of toxic substances are only interested in whether the agent increases the incidence of disease (as distinguished from providing protection from the disease), a one-tailed test is often viewed as appropriate." The *Reference Manual on Scientific Evidence* pg 359-359 goes on to note that " Confidence levels are frequently set at 95%, though 90% (which corresponds to an alpha of .10) is also used; selection of the value is "somewhat arbitrary." An alpha of .10 for a two tailed test corresponds to an alpha of .05 for a one tailed test. Using the Alzheimer studies' original assignment of serious cardiovascular adverse events to body systems (as reflected in the files furnished to me), an analysis, controlling for age and gender, gives a hazard ratio for rofecoxib relative to the placebo comparison of 1.46 (95% CI, 1.06 to 2.00, p=0.02, N= 9772).

[12] Grambsch, P. M., and T. M. Therneau. 1994. Proportional hazards test and diagnostics based on weighted residuals. *Biometrika.* 81: 515–526.

[13] Kerr DJ, et al Rofecoxib and Cardiovascular Adverse Events in Adjuvant Treatment of Colorectal Cancer" *N Engl J Med* 2007;357:360-369.

[14] I used robust standard errors (Lin, D. Y. and L. J. Wei. The robust inference for the Cox proportional hazards model. *Journal of the American Statistical Association* 1989 84: 1074–1078).

FAC Resp. Exhibit B -- 1571

with respect to myocardial infarctions in VIGOR outlined in Curfman et al.[15] Table 1's results are also consistent with rofecoxib's elevated hazard rate in naproxen comparisons not being attributable to a naproxen protective effect.

I reserve the right to supplement or modify this declaration in the light of any new information, including more detailed information about the analyses conducted by others using the data furnished to me. In light of the voluminous literature on rofecoxib, the attached table of authorities is subject to revision.

SIGNED:

*Martin T. Wells*

DATE:        October 29, 2007

---

[15] Curfman et al. Expression of concern: Bombardier et al., "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis," N Engl J Med 2000;343:1520-8., N Engl J Med. 2005 Dec 29;353(26):2813-4.

6

**TABLE 1. Pooled Analysis of Rofecoxib as a Comparative Risk Factor**

| | (1) Placebo comparator | (2) Placebo comparator-Alzheimer's excluded | (3) Naproxen comparator |
|---|---|---|---|
| Rofecoxib | 1.692 | 2.559 | 1.858 |
| | (1.276 - 2.244)** | (1.745 - 3.752)** | (1.298 - 2.658)** |
| Age | 1.063 | 1.066 | 1.072 |
| | (1.046 - 1.081)** | (1.046 - 1.087)** | (1.053 - 1.092)** |
| Cholesterol | 1.072 | 0.797 | 1.516 |
| | (0.783 - 1.469) | (0.531 - 1.196) | (0.958 - 2.400) |
| Diabetes | 1.873 | 2.381 | 1.660 |
| | (1.316 - 2.664)** | (1.574 - 3.600)** | (1.022 - 2.698)* |
| Hypertension | 1.836 | 2.430 | 1.698 |
| | (1.390 - 2.426)** | (1.714 - 3.445)** | (1.185 - 2.433)** |
| Male | 1.712 | 1.957 | 1.744 |
| | (1.249 - 2.347)** | (1.308 - 2.930)** | (1.220 - 2.494)** |
| Smoker | 2.636 | 2.864 | 2.519 |
| | (1.865 - 3.726)** | (1.936 - 4.237)** | (1.614 - 3.933)** |
| Observations | 16107 | 14017 | 13642 |

95% confidence intervals in parentheses, shared gamma frailties
* significant at 5%; ** significant at 1%

**TABLE 2. Rofecoxib Incidence Rate Ratio for Samples Limited to Specified Risk Factor, Placebo Comparator**

| Sample limited to subjects with risk factor | Rofecoxib incidence rate ratio | Lower 95% CI | Upper 95% CI | N |
|---|---|---|---|---|
| Cholesterol | 3.03 | 1.33 | 6.92 | 2421 |
| Diabetes | 10.33 | 2.68 | 39.87 | 1073 |
| Hypertension | 1.66 | 1.03 | 2.7 | 4604 |
| Male | 2.43 | 1.59 | 3.72 | 6316 |
| Smoker | 3.25 | 1.43 | 7.39 | 2067 |

FAC Resp. Exhibit B -- 1573

**TABLE 3.**  **Studies Included in Cardiovascular Events Pooled Analysis of the Placebo Comparators**

| Indication for Therapy | Protocol # | Abbreviated Study Description |
|---|---|---|
| Rheumatoid arthritis | 068 | Phase IIb dose finding |
| | 096 | Phase III: domestic US |
| | 097 | Phase III: international |
| | 098+103 | Phase III: endoscopy |
| Osteoarthritis | 069 | Phase IIb/III OA studies† |
| | 083 | Bone metabolism study |
| | 085 | Nabumetone study 1 |
| | 090 | Nabumetone study 2 |
| Alzheimer/ Lower Back Pain | 078 | Alzheimer's prevention |
| | 091 | Alzheimer's treatment |
| | 120 | Phase III chronic low back pain |
| | 121 | Phase III chronic low back pain |

**TABLE 4. Pooled Analysis of Rofecoxib as a Comparative Risk Factor**

| Indication for treatment | Adverse Events/Patient-Years at Risk (Rofecoxib; Placebo) | Incidence Rate Ratio (95% CI) | Incidence Rate Ratio (95% CI) (Alzheimer's excluded) |
|---|---|---|---|
| Rheumatoid Arthritis | 11/337; 2/201 | 3.274 (0.856 -20.621) | 3.274 (0.856 -20.621) |
| Osteoarthritis | 33/654; 7/232 | 1.669 (0.811 - 3.804) | 1.669 (0.811 - 3.804) |
| Alzheimer's | 64/1138; 64/1209 | 1.062 (0.782 - 1.443) | - - |
| Low Back Pain | 1/51; 0/25 | - (0.025 - ∞) | - (0.025 - ∞) |
| Crude | | 1.140 (0.881 -1.482) | 2.191 (1.058 – 5.098)* |
| M-H[16] Adjusted | | 1.228 (0.947 – 1.593) | 2.032 (1.000 – 4.113)* |

Cox model hazard ratios for rofecoxib, adjusted for age and sex:
including Alzheimer's studies=1.28, 90% CI, 1.00 to 1.64
excluding Alzheimer's studies=2.02, 95% CI, 0.99 to 4.12; 90% CI, 1.11 to 3.68
*significant at 5%

[16] Mantel, N., & Haenszel, W. (1959) Statistical aspects of the analysis of data from retrospective studies of disease. Journal of the National Cancer Institute, 22, 719-748.

8

**TABLE 5. Hazard Ratios for Serious Adverse Cardiovascular Events in VIGOR**

| | (1) No aspirin therapy | (2) Aspirin therapy |
|---|---|---|
| Vioxx | 1.763 | 5.324 |
| | (1.087 - 2.859)* | (1.545 - 18.340)** |
| Male | 2.138 | 1.530 |
| | (1.319 - 3.466)** | (0.637 - 3.675) |
| Age | 1.085 | 1.045 |
| | (1.061 - 1.110)** | (0.982 - 1.113) |
| Observations | 7755 | 321 |

Robust 95% confidence intervals in parentheses
* significant at 5%; ** significant at 1%

9

FAC Resp. Exhibit B -- 1575

LEXISNEXIS® FILE & SERVE
13545942
E-SERVICE
Jan 22 2007
4:56PM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  VIOXX                                )        MDL NO. 1657
PRODUCTS LIABILITY LITIGATION   )
                                             )        SECTION: L
THIS DOCUMENT RELATES TO ALL  )
CASES                                        )        JUDGE FALLON
                                             )        MAG. JUDGE KNOWLES

### PSC'S RESPONSE TO THE JOINT MOTION OF MERCK & CO, INC.  AND INSURERS TO QUASH AND/OR FOR PROTECTIVE ORDER PREVENTING IRRELEVANT AND INAPPROPRIATE INSURANCE RELATED DISCOVERY

**EXHIBIT**

FAC Resp. Exhibit B -- 1676

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  MERCK AND THE INSURERS BEAR THE BURDEN OF PROOF, MERCK'S BOILERPLATE OBJECTIONS ARE INADEQUATE . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  INSURANCE-RELATED DISCOVERY IS REASONABLY EXPECTED TO PROVIDE INFORMATION NECESSARY TO UNDERSTAND MERCK'S KNOWLEDGE OF THE RISKS ASSOCIATED WITH VIOXX AND MERCK'S INSURANCE SYSTEM. . . . . 8

    A.  Insurance-Related Discovery Is Reasonably Likely to Provide Relevant Evidence 8

    B.  Case Law Supports Discovery About Prior Claims Brought Against Merck and Insurance Experience with Such Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    C.  Insurance-Related Matters Receive No Special Discovery Protection. . . . . . . . . 14

        1.  Normal Rules of Discovery Apply to Insurance Policies. . . . . . . . . . . . . 14
        2.  Insurance-Related Discovery Will Enable Plaintiffs to Understand Merck's Insurance System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    D.  Merck Has Violated Rule 26(a)(1)(D) Insurance Policy Discovery Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    E.  Merck's and the Insurers' Precedents Do Not Support Their Position . . . . . . . . 23

IV.  CONFIDENTIALITY DOES NOT PRECLUDE DISCOVERY OF RELEVANT INFORMATION FROM THE INSURANCE ARBITRATIONS. . . . . . . . . . . . . . . . . 25

    A.  Neither the Confidentiality Orders Nor UK Law Prohibit Disclosure in this Case 26

    B.  Federal Decisions Support Disclosure in this Case. . . . . . . . . . . . . . . . . . . . . . . 29

        1.  Arbitration Cases Support Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        2.  Cases Allowing Discovery Despite Pre-Existing Protective Orders Support Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        3.  U.S. and UK Case Law Balance Interests in Assessing Pre-Existing Confidentiality Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        4.  Merck's and the Insurers' Precedents Do Not Support Their Position. . 36

i

V.    DISCOVERY FROM THE INSURERS IS APPROPRIATE AND DIRECT ACTIONS
      AGAINST INSURERS MAKE INSURANCE-RELATED DISCOVERY CRITICAL TO
      FULFILLING THIS MDL'S MISSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      A.    Discovery From the Insurers is Appropriate and Not Overly Burdensome  . . . . 38

      B.    Discovery From the Insurers is Critical to Fulfilling This MDL's Mission  . . . . 40

            1.    Authority for Direct Actions Against the Insurers . . . . . . . . . . . . . . . . . . 40
            2.    Precluding Insurer Discovery Is Inconsistent with This MDL's Purpose  44

VI.   REQUIRING MERCK TO PRODUCE RELEVANT INFORMATION FROM DOJ AND
      SEC INVESTIGATIONS WOULD NOT IMPLICATE ATTORNEY-CLIENT PRIVILEGE
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

VII.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

ii

FAC Resp. Exhibit B -- 1578

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*Ali Shipping Corp. v. Shipyard Trogir*
 [1998] 1 Lloyd's Rep. 643, 650-651 (Ct. App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*All AT&T Corp. Fiber Optic Plaintiffs v. All AT&T Corp. Fiber Optic Defendants*
 MDL Docket No. 1313, 2002 U.S. Dist. LEXIS 11219 (S.D. Ind. June 5, 2002) . . . 23, 24

*Associated Elec. & Gas Ins. Servs. Ltd. [AEGIS] v. European Reinsurance Co. of Zurich*
 [2003] 1 All.E.R. (Comm.) 253, 1 W.L.R. 1041 (Privacy Counsel) . . . . . . . . . . . . . . . 37

*Ballard v. Allegheny Airlines, Inc.*
 54 F.R.D. 67 (E.D. Pa. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Bennett v. Krupkin*
 1999-2702 (La.App. 1st Cir. 12/22/00), 779 So.2d 923,
 *writ denied*, 2001-0193 (La.3/30/01), 788 So.2d 1190 . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Blockbuster Entertainment Corp. v. McComb Video, Inc.*
 145 F.R.D. 402 (M.D. La 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*Boyer v. Riverhead Central School Dist.*
 No. CV 05-4955, 2006 WL 3833040, at *2 (E.D.N.Y. Dec. 29, 2006) . . . . . . . . . . . . 21

*Burns v. CLD, Inc.*
 886 So.2d 607, 614 (La. App. 2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Calabro v. Stone*
 224 F.R.D. 532, 533-34 (E.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Caringal v. Karteria Shipping, Ltd.*
 No. Civ. A 99-3159, 2001 WL 874705,
 2001 A.M.C.1236 (E.D. La. Jan. 24, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Contship ContainerLines Ltd., v. P.P.G. Industries, Inc.*
 No. 00 Civ 0194 RCCHBP, 2003 WL 1948807 (S.D.N.Y. Apr. 23, 2003) . . . . . . . . . . 30

*Covey v. Simonton*
 No. 04CV3273NG, 2005 WL 483439 at *1 (E.D.N.Y. Feb. 23, 2005) . . . . . . . . . . . . . 21

iii

**TABLE OF AUTHORITIES**
(cont'd)

Page

*Dollar v. Long Mfg., N.C., Inc.*
    561 F.2d 613, (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978) . . . . . . . . . . . . . . . . . 12

*Dolling-Baker v. Merrett*
    [1991] 2 All E.R. 890, 899 (Ct. App) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 34

*Dushkin Pub. Group, Inc. v. Kinko's Serv. Corp.*
    136 F.R.D. 334, 335-36 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Edwards v. Royal Indem. Co.*
    182 La. 171, 161 So. 191 (La. 1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Excelsior College v. Frye*
    223 F.R.D. 583 (S.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Florida ex rel. Butterworth v. Jones Chemicals, Inc.*
    148 F.R.D. 282 (M.D. Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Grubbs v. Gulf Int'l Marine, Inc.*
    625 So.2d 495 (La. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Hassneh Insurance Co. of Israel and Others v. Steuart J. Mew*
    [1993] 2 Lloyd's Rep. 243 (Q.B.), 1993 (W.L. 963287) . . . . . . . . . . . . . . . . . . . . . 29, 37

*Hedgepeth v. Guerin*
    96-1044 (La.App. 1st Cir. 3/27/97), 691 So.2d 1355, *writ denied*, 97-1377 (La. 9/26/97), 701
    So.2d 983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Hickman v. Taylor*
    450 F.3d at 1196 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re AirCrash Disaster Near Roselawn, Ind. Oct. 31, 1994*
    172 F.R.D. 295 (N.D. III. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*
    293 F.3d 289, 291 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Enercons Virginia, Inc.*
    812 F. 2d 1469 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

iv

**TABLE OF AUTHORITIES**
(cont'd)

Page

*In re Martin Marietta Corp.*
856 F.2d 619, 622-24 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Qwest Commc'n Int'l, Inc.*
450 F.3d 1179, 1186-96 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Terra International, Inc.*
134 F.3d 302, 306 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In the Matter of Talbott Bigfoot, Inc.*
887 F.2d 611 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Jackson v. Firestone Tire & Rubber Co.*
788 F.2d 1070, 1083 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jones & Laughlin Steel Corp. v. Matherne*
348 F.2d 394, 401 (5th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Josephs v. Harris Corp.*
677 F.2d 985, 991-992 (3rd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lawrence E. Jaffe Pension Plan v. Household International, Inc.*
No. Civ.A 04-N-1228 (CBS, 04X-0057),
2004 WL 1821968 (D. Colo. Aug.13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*LeBlanc v. Broyhill*
123 F.R.D. 527 (W.D.N.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Lewis v. Allstate Ins. Co.*
730 So. 2d 65, 71 (Miss. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*London & Leeds Estates Ltd. v. Parabas Ltd.*
[1995] 02 EG 134, [1995] 1 EGLR 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*
894 F.2d 1482, 1485 (5th Cir. 1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Missouri Pacific R. Co. v. Aetna Cas. & Sur. Co.*
No. 3-93-CV-1898-D, 1995 WL 861146 (N.D. Tex. May 17, 1995) . . . . . . . . . . . . . . 24

v

## TABLE OF AUTHORITIES
### (cont'd)

Page

*Mitchell v. Fruehauf Corp.*
    568 F.2d 1139, 1147 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Morales-Melendez v. S.S. Mut. Underwriting Ass'n.*
    763 F. Supp. 1174, 1179 (D.P.R. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Native American Arts, Inc. v. Bundy-Howard, Inc.*
    No. 01 C 1618, 2003 WL 1524649,
    2003 U.S. Dist. LEXIS 4393 (N.D. Ill. March 20, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Nguyen v. Excel Corp.*
    197 F.3d 200 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Odfjell Asa v. Celanese AGS*
    F. Supp. 2d 283 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Oklahoma Pub. Co. v. Continental Ins. Co.*
    No. CIV-90-1251-A, 1991 WL 323804 (W.D. Okla. Nov. 5, 1991) . . . . . . . . . . . . . . . 24

*Panola Land Buyers Ass'n v. Shuman*
    762 F.2d 1550, 1559 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Quinlan v. Liberty Bank and Trust Co.*
    575 So.2d 336, 352 (La. 1991) (on rehearing) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Ramos v. Liberty Mut. Ins. Co.*
    615 F.2d 334, *decision clarified*, 620 F.2d 464
    (5th Cir. 1980), *cert. denied sub nom.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Roesberg v. Johns-Manville Corp.*
    85 F.R.D. 292, 296-97 (E.D.Pa.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Rucker Co. v. Shell*
    449 U.S. 1112 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*S.E.C. v. Brady*
    No. 3:05CV-1416-M, 2006 WL 3301865, at *9 (N.D. Tex. Oct. 16, 2006) . . . . . . . . . . 48

*Simon v. G.D. Searle & Co.*
    816 F.2d 397, 404 (8th Cir.), *cert. denied* 484 U.S. 917 (1987) . . . . . . . . . . . . . . . . . . 15

vi

# TABLE OF AUTHORITIES
## (cont'd)

Page

*Sun Life Assurance Co. Of Canada v. Lincoln National Life Ins. Co.*
    [2004] EWCA Civ. 1660, [2006] 1 All E.R.
    (Comm) 675, [2005] 1 Lloyd's Rep 606 (Ct. App.), at ¶ 67 . . . . . . . . . . . . . . . . . . . . . . 34

*Tajik Aluminum Plant v. Ermatov*
    [2006] All E.R. (D) 448, at ¶ 83 (Q.B.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Tucker v. Ohtsu Tire & Rubber Co., Ltd.*
    191 F.R.D. 495, 497-98 (Md. 2000) . . . . . . . . . . . . . . . . . . . . . . 13, 30, 31, 32, 33, 34, 35

*United Oil Co., Inc. v. Parts Associates, Inc.*
    227 F.R.D. 404, 411 (D. Md. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Garrett*
    571 F.2d 1323, 1326 n.3 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. King*
    536 F.Supp. 253 (C.D. Cal. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Mass Inst. Of Tech*
    129 F.3d 681, 686 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Vertex Data Science Ltd. v. Powergen Retail Ltd.*
    2006 WL 2629805 (Q.B.), [2006] 2 Lloyd's Rep. 591 . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Westinghouse Elec. Corp. v. Republic of Philippines*
    951 F.2d 1414, 1424 (3rd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Zimmerman v. Intl. Companies & Consulting, Inc.*
    107 F.3d 344, 346 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

**Statutes**

22 Guam Code Ann., § 18305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

La. Rev. Stat. Ann., § 22:55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

La. Rev. Stat. 22:655 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

FAC Resp. Exhibit B -- 1583

## TABLE OF AUTHORITIES
### (cont'd)

Page

26 P.R. Laws Ann., tit. 26, § 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

R.I. Gen. Laws § 27-7-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

11 U.S.C. § 548 (a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

UFTA § 4(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

UFTA § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Wis. Stat., § 632.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Regulations**

Fed. R. Civ. P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 9, 21

Fed. R. Civ. P. 26(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 26(a)(1)(D)                                                             *passim*

Fed. R. Civ. P. 26(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14, 15

Fed. R. Civ. P. 26(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13, 14, 15, 30

Fed. R. Civ. P. 26(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18, 21

Fed. R. Civ. P. 26(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Fed. R. Civ. P. 26© . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 36

Fed. R. Civ. P. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 5, 25

Fed. R. Civ. P. 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FAC Resp. Exhibit B -- 1584

**TABLE OF AUTHORITIES**
(cont'd)

Page

Fed. R. Civ. P. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 40, 45

Fed. R. Evid. 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**Other Authorities**

Laurie Kratky Doré
   *Public Courts Versus Private Justice: It's Time to Let Some Sun Shine In on Alternative
   Dispute Resolution*, 81 CHI-KENT.L.Rev. 463, 510 n.252 (2006)  . . . . . . . . . . . . . . . 37

Olivier Oakley-White, *Confidentiality Revisited: Is International Arbitration Losing One of its
   Major Benefits*, 6 INTERNAT'L ARB. L.Rev. 29, 31 (2003)  . . . . . . . . . . . . . . . . . 27, 28

FAC Resp. Exhibit B -- 1585

The Plaintiffs' Steering Committee (PSC) files this brief in opposition to the Joint Motion of Merck & Co., Inc. And Insurers to Quash and/or for Protective Order Preventing Irrelevant and Inappropriate Insurance-Related Discovery.  The PSC seeks to compel production of discovery it issued to Merck related to insurance matters of Merck and its Insurers and further seeks to compel Merck and its Insurers to designate corporate representatives to testify regarding the insurance-related issues identified in Plaintiffs' Notices of Rule 30(b)(6) Deposition, and compelling Merck and its Insurers to respond to Plaintiffs' associated Requests for Production of Documents.  This Memorandum is filed in support of this Motion, in opposition to the *Joint Motion of Merck & Co., Inc. and Insurers to Quash and/or for Protective Order Preventing Irrelevant and Inappropriate Insurance-Related Discovery*, and in Reply to (1) the *Memorandum in Support of Joint Motion of Merck & Co., Inc. and Insurers to Quash and/or for Protective Order Preventing Irrelevant and Inappropriate Insurance-related Discovery* ("Joint Mem."), filed Jan. 16, 2007, and (2) *Merck & Co., Inc.'s Motion and Incorporated Memorandum for A Protective Order Preventing Corporate Deposition on Duplicative, Irrelevant and Privileged Topics* ("Merck Mem."), filed Nov. 16, 2006.

## I.      Introduction and Background.

Information about insurance-related issues in this case is vital because the disputes between Merck and its Insurers relate to liability issues and to Merck's financial condition and insurance status.  Key elements of both Plaintiffs' claims and the Insurers' coverage denials are what Merck knew about the health risks of Vioxx and when the company knew it.  Consequently, information about Merck's insurance coverage, Merck's communications about risk to its Insurers, and claims experience are reasonably expected to lead to admissible evidence.  Plaintiffs' discovery requests

1

therefore cannot be dismissed, as Merck and its Insurers do, with boilerplate claims and objections of irrelevance.

Merck has violated FRCP 26(a)(1)(D)'s basic requirement that all possibly relevant insurance polices be produced. Despite admitting that Vioxx was in development and/or clinical trials since at least 1991, Merck has refused to provide insurance policies prior to 1996. The insurance policies that Merck has provided contain insufficient information to understand Merck's complex insurance system and its volatile changes during the Vioxx era. The discovery to date has been only policies with allegedly unknown numbers and there has not been a full explanation of how Merck or its Insurers interpret the policies' relations to each other. Testimony from knowledgeable insurance representatives of Merck and its Insurers are needed to provide Plaintiffs a reasonable understanding of Merck's insurance coverage.

Merck's and the Insurers' irrelevancy claim is inconsistent with their assertion of confidentiality. The premise of the confidentiality order they invoke is that information in the arbitration would be valuable to Plaintiffs. The confidentiality order thus shows the relevance of arbitration documents and testimony to this MDL. Such information is therefore presumptively discoverable. Merck's fabricated conflict between the confidentiality order and discovery in this case does not exist. The order expressly waives confidentiality to comply with court orders. Merck and the Insurers also misrepresent the legal rules governing UK arbitration confidentiality. Neither UK law nor U.S. law precludes reasonable discovery of testimony and documents presented in the arbitration proceedings. Both legal systems reject the ironclad confidentiality principle that Merck and the Insurers misleadingly claim to be governing law. Both legal systems balance the interest

2

in confidentiality against the need for fair adjudication.  That balancing clearly supports Plaintiffs on the facts of this case.

Merck's Insurers claim that responding to straightforward inquiries about Vioxx-related information is unduly burdensome on them as non-parties.  Discovery principles entitle Plaintiffs to discovery from non-parties with information as directly and obviously relevant as that possessed by the Insurers.  What Merck was telling all stakeholders about Vioxx risks is critical evidence in this MDL.  And while Merck's Insurers are formally non-parties, discovery from them is critical to successfully conducting this MDL.  Thousands of Plaintiffs have the right to bring direct actions against the Insurers.  Discovery from the Insurers will occur against them either now in a unified fashion or piecemeal in dozens of scattered forums.  Unified discovery from the Insurers is necessary for this MDL to fulfill its mission of efficiently processing Vioxx-related pretrial discovery.

*Plaintiffs' Diligent Pursuit of Insurance-Related Discovery.*  In an effort to understand insurance-related issues, the PSC issued discovery to Merck, consisting of a Notice of 30(b)(6) deposition and related Requests for Production of Documents, and similar discovery to the Insurers. Merck initially identified a number of insurance policies in its Rule 26(a)(1)(D) production. This production was limited to policies dating back to 1996 and did not include policies covering the full period of Merck's involvement with Vioxx.  Nor was the Rule 26(a)(1)(D) production accompanied by any meaningful explanation of how the various policies fit together.  Thus, some of the deposition topics and requests sought the basic information necessary to explain the complicated relationship between Merck and its Insurers.

Additional discovery was directed specifically at obtaining information relevant to the coverage issues that have taken center stage in this litigation.  The PSC asked for testimony and

3

documents relating to coverage investigations, coverage defenses, and coverage determinations made by Merck or any of its insurers. The PSC also requested information on the representations that Merck made regarding its coverage to regulatory agencies such as the SEC during the investigations that ensued after Merck withdrew Vioxx. The PSC also sought information relating to the insurance coverage arbitrations underway in London.

*Merck's and the Insurers' Responses.* Merck and the Insurers responded to the discovery requests with boilerplate objections and filed for a protective order rather than designate corporate representatives to appear at the Rule 30(b)(6) depositions.[1] After receiving Merck's responses and motion, the PSC requested a conference with Merck's lawyers in the hope of resolving at least some of these issues. That meeting took place on December 22, 2006, in Washington, D.C. Although Merck's lawyers finally provided the PSC with an insurance coverage chart at that meeting, the vast majority of discovery issues remain unresolved and, as shown below in Part III, raised as many questions as it answered.

At the discovery conference, Merck explained how Merck's various insurance policies fit together to create layers of insurance--totaling $1billion in coverage--above Merck's $25 million self-insured-retention level. But Merck refused to provide the PSC with any additional insurance-related information. Merck argued, incredibly, that none of the discovery that the PSC requested would be relevant or lead to the discovery of admissible evidence. Merck also relied on the alleged confidentiality of its London arbitrations, as well as the confidentiality of U.S. government investigations, as excuses to refuse further production. At the conclusion of the meeting, Merck's

---

[1] See Merck's discovery responses, attached as Exhibit "B" to Merck's Motion and Memorandum For Protective Order filed November 16, 2006; see Insurer's Discovery Responses, attached to the Omnibus filing as Exhibits "L" parts 1 and 2.

4