# Report of Vioxx Hours

Individual Name: __G. Erick Rosemond__

For the Month of: _____     September 2006

THIS SPREADSHEET IS FOR TRIAL SPECIFIC WORK ONLY. PLEASE USE THE CORRECT SPREADSHEET FOR PSC WORK, NPC WORK, NPO WORK, STATE WORK, OR COMMON FEE APPLICATION WORK.

SPECIFIC TRIAL: __Smith Trial__

| Date (MM/DD/YY) | Hours (0.00) | Location | Description of Work | Deposition Preparation (Percent) | Deposition Taking (Percent) | Legal Research (Percent) | Meetings (Percent) | Pleadings/ Briefs Preparation (Percent) | Trial Preparation (Percent) | Trial Time (Percent) | Travel Time (Percent) | Other (Specify) (Percent) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/13/06 | 5.00 | Houston, Texas | Review of Depositions of plaintiff's cardiologist's deposition | | | | 5.00 | | | | | 5.00 |
| 09/14/06 | 6.00 | Houston, Texas | Discussion with plaintiff's cardiologist/discussion with co-counsel about bringing the cardiologist to trial. | | | | 6.00 | | | | | 6.00 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Total Hours** | **11.00** | | | | | | 11.00 | | | | | 11.00 |

Verification: By signing this document, I hereby verify that the information contained in this document is true and correct.

Signed: _____

Date: _____

**G. ERICK ROSEMOND**
2414 Hanston Court
Houston, Texas 77584
(713) 412-8744

## EXPERIENCE

*Trial and Managing Attorney*, **July 2008 – Present, Hissey Kientz, L.L.P.,** Austin, Texas
- Managing attorney for large mass-tort pharmaceutical docket.
- Firm's lead trial counsel.
- Management of 4 attorneys and 5 staff.

*Trial Attorney,* **July 2002-July 2008, Williams Kherkher, L.L.P.,** Houston, Texas
- Complex litigation practice with a leading mass-tort firm.
- Extensive trial (including first-chair) and arbitration experience nationwide.
- Extensive motion and large-scale discovery practice in state and federal courts.
- Extensive deposition experience.

*Attorney,* **June 2000-July 2002, Milberg Weiss Bershad Hynes & Lerach, L.L.P.,** San Diego, California
- Complex antitrust and consumer class action practice.
- On lead Plaintiffs' counsel team for the largest antitrust class action in California history involving the California electricity market.
- Member of trial team that won a $700 million bench trial in Oakland, California.
- Extensive motion and large-scale discovery practice in state and federal courts.

*Attorney,* **September 1998-June 2000, Jenkens & Gilchrist, P.C.,** San Antonio, Texas
- Commercial and international litigation practice with large Dallas-based firm.
- Experience included substantial unsupervised case responsibility.
- Extensive discovery and motion practice primarily in federal court.

*Judicial Intern,* **September 1997-January 1998, Texas Supreme Court, the Honorable James Baker, Justice,** Austin, Texas
- Student clerk for Texas Supreme Court Justice and his staff attorney.
- Responsibilities included appeal brief analyses, preparing recommendations for granting or denying appeals, some oral briefing of full Court.

*Judicial Intern,* **June 1997-August 1997, United States District Court for the Western District of Texas, the Honorable Orlando M. Garcia, Judge,** San Antonio, Texas.
- Student clerk for United States federal trial judge.
- Responsibilities included researching various issues per the judge's and/or his staff attorney's request. Also drafted trial memoranda and orders.

## EDUCATION

*Juris Doctorate,* **May 1998, St. Mary's University School of Law,** San Antonio, Texas
- Top 15%
- Member *Phi Delta Phi*
- Teaching Assistant – Constitutional Law (Spring 1997)

***Bachelor of Arts, with Special Honors,*** **and** ***Bachelor of Business Administration,*** **May 1995, the University of Texas at Austin,** Austin, Texas
- Liberal Arts double Major in Economics and Government
- Business degree majoring in Finance, with a concentration in Accounting.

## REPRESENTATIVE VERDICTS

***Margie Paul, et al., v. Wyeth,*** **C.P. No. 003723, In the Court of Common Pleas of Philadelphia, Philadelphia,** Pennsylvania.
- On trial team that won a $200,000,000 cumulative Plaintiff's verdict for two women injured by fen-phen.
- Largest compensatory verdict in Pennsylvania history.

***Mildred H. Hill, et al., v. Wyeth,*** **C.P. No. 001207, In the Court of Common Pleas of Philadelphia,** Philadelphia, Pennsylvania.
- On trial team that won a $3,200,000 cumulative Plaintiff's verdict for four women injured by fen-phen.

***In re Visa Currency Conversion Fee Litigation,*** **Case No., 2000-054RG, In the Superior Court of Alameda County,** Oakland, California.
- On trial team that recorded a $700,000,000 bench trial verdict to recover undisclosed credit card fees.

## PUBLISHED OPINIONS

***Ruth Hendricks, et. al, v. Dynegy Power Mktg., et al.,*** 160 F.Supp. 1155 (S.D Cal. 2001)
- Lead author of plaintiff class' remand briefing.
- Obtained order remanding large antitrust class action to California state court. The Court rejected large power supplier defendants' arguments that the Federal Power Act preempted California state antitrust law thereby rendering federal jurisdiction.

***Rooster Products, Inc. v. United States,*** 24 C.I.T. 357 (U.S.C.I.T. 2000)
- Lead author of brief regarding proper interpretation of United States tariff regulations.

## PUBLISHED ARTICLES

**"Texas Pharmaceutical Failure to Warn Claims: *Alive and Well*," Texas Bar Journal, September 2006,**

## LICENSES

- Texas (November 1998)
- California (May 2001)

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

In re: VIOXX                  MDL Docket No. 1657

**PRODUCTS LIABILITY LITIGATION**      SECTION L

                                              JUDGE FALLON

PERRY WEITZ, being duly sworn deposes and says as follows:

I am the Senior Partner at Weitz & Luxenberg, P.C., located at 180 Maiden Lane, New York, New York and I am fully familiar with the details of my firm's extensive involvement in the Vioxx litigation since 2004. W&L investigated the potential Vioxx claims of over 15,000 individuals and after careful examination we currently represent over 3,000 individual plaintiffs whose cases were filed primarily in New Jersey State Court. Our Pharmaceutical Drug Unit consists of 12 attorneys including some of the most experienced and well respected attorneys in the mass tort field. Each of these attorneys played a critical role in the advancement of the Vioxx litigation for the common benefit of all plaintiffs nationwide. As further outlined below, as well as in the affidavit of my associate Glenn Zuckerman, Esq. attached to our Common Benefit submission, our firm played a central role in the New Jersey State Court coordination, in Advanced Discovery of 33 NJ filed cases, in creation of the strategy of attack on the Merck Sales Representatives, and of course in preparation for and ultimately success at trial and appeal. Our efforts have continued beyond the announcement of the settlement as I have devoted a significant amount of time in my ongoing role on the Allocation Committee in addition to my firm's assistance in promoting the settlement. W&L has also made a multi-million dollar financial commitment to the Vioxx litigation including but not limited to the costs associated with the McDarby trial, the Advanced Discovery costs in thirty three cases including the full discovery of the Rossi case, the complete trial preparation of the Kieley case, as well as our contributions to the assorted NJ Vioxx Plaintiff Litigation/Expert funds.

### A. **McDarby Trial - Plaintiff Verdict**

There can be no argument that the McDarby plaintiff verdict and, at the time, its prospect for success on appeal was one of the most significant contributing factors towards the creation of the National Settlement Program. As a defense pick for trial with multiple risk factors such as diabetes and advanced age, McDarby's victory demonstrated that any case with proof of Vioxx use and injury can be won by a plaintiff. Our trial team's strategy of "embracing the risk factors as opposed to running from them" proved to be very effective and countered Merck's long standing position that specific causation cannot be proven. Our pre-trial preparation and briefing proved to be critical elements of the plaintiffs' attack nationwide. Despite Merck's strong opposition, we zealously briefed and won the right to a joint trial of two Vioxx plaintiffs. This victory struck a blow to Merck's defense strategy to try each Vioxx case individually. Our trial team was essentially split into sub-groups where Jerry Kristal focused on the Merck sales representatives, Rob Gordon handled the case specifics, Ellen Relkin focused on the pre-trial motions and briefing and Rob Gordon and I worked extensively with Mark Lanier on the mock trial before a focus group. The work product from each sub-group was instrumental not only in the McDarby trial but in the preparations of all subsequent trials across the country. Jerry Kristal essentially created the "trial package" on handling the testimony of the Merck sales representatives including identifying all of the explosive Merck internal documents and videos in that area. Ellen Relkin's briefing of literally hundreds of novel issues was so instrumental in the McDarby outcome that she was called upon to assist in subsequent trials for other firms. Rob Gordon and I gained immeasurable knowledge after speaking to the "jurors" in our mock trial to help formulate the "embrace the risk factors" strategy that worked so well in McDarby. Prior to McDarby, plaintiffs' counsel from across the country were overlooking strong damages cases with risk factors in their mistaken and nearly impossible effort to find "the perfect plaintiff who has no risk factors". Perhaps most importantly, the McDarby compensatory verdict has essentially held up on appeal where many of the other plaintiff verdicts have been dismissed.

**B: Advanced Discovery and Kieley/Rossi Trial Prep:**

W&L worked up 33 NJ filed cases through Advanced Discovery in Waves I and II and had dozens more on the list for Waves III and IV. Even after several defense verdicts in other firm's cases, Weitz & Luxenberg's commitment to the Vioxx litigation only strengthened. W&L repeatedly offered to work up as many cases as necessary in order to fill the case lists for each wave of Advanced Discovery even though this extensive commitment of manpower and resources forced us to forgo other lucrative business opportunities. Our focus then turned to the full discovery and NJ trial settings of two strong cases Kieley and Rossi. In fact, Kieley was worked up completely for trial twice by our highly experienced trial team of Rob Gordon, Jerry Kristal and Paul Pennock. The first trial, originally scheduled for January 2007, was put off on the eve of jury selection and it was later firmly set for August 2007. Based on Merck's actions at the time, I am convinced that the pressure of this trial setting against a firm that had already beaten them at trial was a contributing factor in Merck's decision to settle.

**C: Conclusion:**

Weitz & Luxenberg's large caseload, litigation pressure and trial leverage in NJ were instrumental factors in pushing Merck towards settlement. I am confident that without W&L's participation the national settlement would never have materialized. Our common benefit contribution should be measured by our results. W&L defeated Merck repeatedly in motion practice, at trial and on appeal. Our vigorous attack continued up to the day the settlement was announced as we had two additional cases completely ready to be tried jointly in New Jersey. Our commitment and efforts for the common benefit have continued past the settlement announcement and will continue through 2009 and beyond until the settlement program is ultimately concluded. On behalf of W&L, I respectfully request a sizable common benefit award in proportion to the amount, quality and importance of our work-product, our commitment to the litigation and the results that we achieved for the benefit of all plaintiffs.

Sworn to before me this 29th
Day of October, 2008

Notary Public

Perry Weitz, Esq.

DEBORAH A. SAVOURS
Notary Public, State of New York
No. 01SA4944330
Qualified in Nassau County
Commission Expires Dec. 27, 2010

FAC Resp. Exhibit B -- 1765



**WILLIAMSON & WILLIAMS**
L A W Y E R S

187 PARFITT WAY SW
SUITE 250
BAINBRIDGE ISLAND, WA 98110
(206) 780-4447
(206) 780-5557 (FAX)
www.williamslaw.com

1708 BELLEVUE AVENUE
SEATTLE, WA 98104

KIM WILLIAMS*
(206) 780-4456
kim@williamslaw.com

ROB WILLIAMSON**
(206) 780-4457
roblin@williamslaw.com

* ALSO ADMITTED IN OREGON
** ALSO ADMITTED IN CALIFORNIA

Please reply to the
Bainbridge Island Address

October 30, 2008

RECEIVED NOV 0 3 2008

**_VIA FACSIMILE AND MAIL_**
**_(504)561-6024_**

Russ M. Herman
Chairman- Vioxx Common Benefit Time Allocation Committee
Herman, Herman, Katz and Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA 70113

    Re:    *MDL No. 1657- Section L; In Re: Vioxx Products Liability Litigation*
             *Williamson & Williams Common Benefit Time*

Dear Mr. Herman:

    I write in follow up to my letter of yesterday in which I indicated that Williamson & Williams would like the Allocation Committee to consider our previously submitted time, and pre-April 8, 2005 expenses in deciding our common benefit allocations. Enclosed with this letter, in further support of our firm's application to the Common Benefit Time Allocation Committee, is an Affidavit describing our contribution to common benefit work. Thanks to you and the Committee for your consideration.

    Sincerely,

    WILLIAMSON & WILLIAMS

    Kathryn (Kim) Williams

KW/ljh
Enclosure

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX ) MDL Docket No. 1657
)
PRODUCTS LIABILITY LITIGATION ) SECTION L
)
) JUDGE FALLON
)
) MAGISTRATE JUDGE KNOWLES
)

**AFFIDAVIT OF KATHRYN (KIM) WILLILAMS
IN SUPPORT OF WILLIAMSON & WILLIAMS' COMMON BENEFIT AWARD**

Kathryn (Kim) Williams, being first duly sworn on oath deposes and says:

    1.    I am a partner in the law firm of Williamson & Williams. This affidavit is based on personal knowledge in support of the common benefit time and expense reports submitted for Williamson & Williams.

    2.    Williamson & Williams submitted its common benefit time and expense reports in this action initially in response to a letter our firm received from Fred S. Longer of Levin, Fishbein, Sedran & Berman, which encouraged our firm to make this submission due to our firm's assistance in common benefit work in connection with our representation of clients on the Master Class Action Complaint involving medical monitoring.

    3.    Williamson & Williams' involvement, along with co-counsel firm Keller Rohrback, in the medical monitoring portion of this litigation began immediately after Vioxx was withdrawn from the market in September 2004. We received calls from Washington residents who wished to pursue a class action. We immediately engaged in legal, medical, and factual research and investigation that ultimately resulted in our two firms filing a medical monitoring class action case in the Superior Court of Washington in and for King County, which Merck removed to the Western District of Washington. Our research included issues such as

**WILLIAMSON
& WILLIAMS**  187 PARFITT WAY SW
SUITE 250
BAINBRIDGE ISLAND, WA 98110
(206) 780-4447
(206) 780-5557 (FAX)
www.williamslaw.com

FAC Resp. Exhibit B-66

AFFIDAVIT OF KATHRYN (KIM) WILLIAMS - 1

1   potential causes of action under the Washington Product Liability Act, the validity of a medical

2   monitoring cause of action under Washington law, and the forms of relief available to

3   Washington residents. Upon receipt of the defendants' answers, additional research was done

4   pertaining to issues such as the federal preemption defenses and the learned intermediary

5   doctrine.

6        4.     Upon filing the medical monitoring class action, our office, along with that of

7   Keller Rohrback, was inundated with telephone calls from potential class members. Our firms

8   assembled a team of paralegals and set up a toll-free number at Keller Rohrback for prospective

9   class members. We also prepared information packets and questionnaires to send to prospective

10  class members to give them information about the case and to obtain information from the

11  prospective class members to determine whether they might be entitled to relief. Through today,

12  we have been contacted by over 900 potential class members. Williamson & Williams fielded

13  several hundred of these calls. To this day, Keller Rohrback has maintained its 1-800 number

14  and has somebody available to take any calls from class members, as does our firm, but the

15  number of callers has dramatically declined. We anticipate, however, that additional work will

16  be required once Judge Fallon rules on Defendants' motions to strike the class action allegations

17  and to dismiss the Master Class Action Complaint involving medical monitoring.

18       5.     We also set about to review and analyze the various scientific and medical studies

19  and retain expert witnesses such as cardiologists.

20       6.     Meetings and telephone calls with other counsel around the country occurred to

21  assess the likelihood of whether the litigation was destined for MDL proceedings. Once the

22  MDL was established in this Court and assigned to Judge Fallon, we followed the minutes of the

23  status conferences and attended a number of seminars, by telephone and/or in person, some

24  sponsored by the PSC.

25

26

WILLIAMSON & WILLIAMS

187 PARFITT WAY SW
SUITE 250
BAINBRIDGE ISLAND, WA 98110
(206) 780-4447
(206) 780-5557 (FAX)
kim@williamslaw.com

AFFIDAVIT OF KATHRYN (KIM) WILLIAMS - 2

FAC Resp. Exhibit P

7.     We also investigated and eventually filed, with local co-counsel, additional medical monitoring class actions cases in Tennessee, Idaho, and Arizona. Those cases, along with the case we filed in Washington were ultimately transferred to the MDL and consolidated into the Master Class Action Complaint involving medical monitoring.

DATED this 30th day of October, 2008.

WILLIAMSON & WILLIAMS

By _____
Kathryn (Kim) Williams
187 Parfitt Way SW, Suite 250
Bainbridge Island, WA 98110
Attorneys for Plaintiffs Ken Yohe,
Calvin Kinghorn, Wayne Young, and
Barbara Cathey on the MDL Master
Class Action Complaint

SUBSCRIBED AND SWORN TO before me this 30th day of October, 2008.



_____
Print Name: Lisa Hanlon
NOTARY PUBLIC in and for the State of
Washington; residing at: King County
My commission expires: 02/09/12

AFFIDAVIT OF KATHRYN (KIM) WILLIAMS - 3

WILLIAMSON & WILLIAMS | 187 PARFITT WAY SW
SUITE 250
BAINBRIDGE ISLAND, WA 98110
(206) 780-4447
(206) 780-5557 (FAX)
FAC Resp. Exhibit williams769.com

## **AFFIDAVIT**

STATE OF NEVADA              )
                                          ) ss:
COUNTY OF WASHOE      )

J. STEWART WHITE, being first duly sworn, and under the penalties of perjury, states:

1.  White Meany & Wetherall (now "White & Wetherall) was lead counsel on the case of

Crandall v. Merck. The action involved a white male in his mid-40's, in good health, who was taking

50mg. Vioxx for several months for arthritis in his thumb. On September 4, 2004, while hiking in a

remote location near Lake Tahoe with his adult daughter, he suffered a mild heart attack.

2.  Suit was filed in Reno, Washoe County, NV on February 16, 2005, combining that Vioxx

suit with several other plaintiffs suffering similar injuries. I was in charge of the firm's Vioxx

litigation and spent the majority of my time for many, many months (though as you know it had its

ups and downs) on the firm's Vioxx litigation. Where conflicts arose ( i.e., depositions of several

sales reps in different cities on the same day), partners Geoff White (who also did the majority of the

Remand work) and David Meany provided assistance. Almost all my time was spent on preparing

this case from March, 2007 into August, 2007.

3.  Our firm filed 20 suits for approximately 105 plaintiffs injured by Vioxx in state court in

Nevada, with 5 or 6 plaintiffs per suit. We managed to get them placed all with one Judge in Reno

and one Judge in Las Vegas, essentially coordinating all cases statewide[1].

4.  The suits each named Merck and numerous Nevada-resident sales representatives for

Merck (whose names we obtained from a source involved in our Hormone Therapy litigation).

Merck immediately filed its Notice of Removal on all of our lawsuits to Federal Court on the

---

[1]There was one other firm in Nevada handling Vioxx cases, but they had few cases, felt they were bad cases, and let us take the lead on all Vioxx litigation matters. They did not press their suits forward at all.

1

grounds of fraudulent joinder. Seventeen of twenty Motions for Remand, were granted[2]

5. This Crandall litigation was essentially going to be the Nevada bellwether case. It was selected by my firm and by co-counsel Mark Robinson of Robinson Calcagnie and Robinson. Also assisting in the selection of this case with the Robinson firm, and experts for it, were Anne Andrews and John Thornton of Andrews Thornton. We had associated with both firms on earlier drug litigation. Though it tried, neither Merck's local counsel nor any of its national counsel (who appeared at all hearings and took all depositions) had any impact on our selection of the case, nor when it would be set for trial. Crandall was selected in early 2007, with trial to be October 1, 2007.

6. In preparation for trial in state court, practically everything listed below was the subject of dispute with Merck, many Motions and frequent court hearings. In addition to normal production of documents and interrogatories, we undertook to prepare and/or modify various CMO's for the trial courts regarding the discovery process, received thousands of pages of sales call notes from the named sales reps, and reviewed them prior to the sales reps' depositions with Robinson's help (comparing to the national FACTS or California database on same), and received court permission to use all national discovery in our state litigation in Crandall. We sent all medical records on Crandall to experts Haigney and others for review and expert reports. With Mark Robinson's personal assistance, we met with treating doctors to get them on board with the "Vioxx caused the heart attack" approach. We defeated Merck's motion not to allow us to speak with treating doctors before their depositions. This firm defended Merck's depositions of all treating physicians (7 doctors, a few twice), the client and his wife and daughter (over several days) after preparing all extensively for same and attended hearings on disputes arising with Merck during such depositions; we took the

---

[2]except for three that we could not obtain action on before they were swept into the MDL and a couple of individuals in another that had taken the Vioxx and had heart attacks outside of Nevada and then moved to Las Vegas where we sued– so not having any possible connection to the sales representatives.

2

FAC Resp. Exhibit B -- 1771

depositions of several (9?) "robotic" sales reps in Reno and Las Vegas; had numerous disagreements with Merck regarding our case specific reports of experts like Abramson, McGregor, Pechmann, etc. and their experts. We also worked extensively on preparing exhibits for the trial, which had to be produced mid-summer, and had daily conferences with co-counsel. We had much argument and hearings re expert's deposition designations and exhibit foundations; worked on jury instructions, a jury questionnaire and Motions in Limine. We worked very, very hard on this case.

7. I firmly believe that the pendency of this action on October 1, 2007 went a large way toward pushing Merck into the settlement. They were presented with a good case in <u>Crandall</u>, a younger man on 50 mg. Vioxx with a heart attack and no risk factors almost dying on a hike. They had my firm with its experience in numerous other drug litigation in state court. They had my co-counsel's firm, which had won the only MDL case, participating in this case. Nevada has very good law, no <u>Daubert</u>, law that provides that if a drug does something unexpected and harms the client, it is a dangerous drug, along with the standard law regarding insufficient warning labels. My firm had received the only verdict in the Breast Implant litigation against Dow Chemical ($16M), was a participant in the Fen-Phen litigation, and in October, 2007 received a $136M verdict in a three-plaintiff Hormone Therapy case. We had won practically every Motion Merck tried in this case. Our case was supported by strong experts, testifying consistently with all opinions in the MDL. Merck knew that they were not going to win this case.

_____

SUBSCRIBED and SWORN TO before me
this 31st day of October, 2008

_____
Notary Public

3

 **ZIMMERMAN REED**
ATTORNEYS AT LAW

## FAX TRANSMISSION COVER SHEET

| | |
|---|---|
| **Date:** | October 30, 2008 |
| **To:** | Russ Herman |
| **Fax:** | 504.561.6024 |
| **Re:** | Vioxx MDL #1657 Pre-Trial Order No. 6 (D) |
| **Sender:** | Angie Thomas for Ron Goldser |

**Important:** The document(s) accompanying this fax contain confidential information which is legally privileged. The information is intended only for the use of the intended recipient named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of the telecopies information except its direct delivery to the intended recipient named above is strictly prohibited. If you have received this fax in error, please notify us immediately by telephone to arrange for return of the original documents to us. Thank you.

YOU SHOULD RECEIVE __3__ PAGE(S), INCLUDING THIS COVER SHEET.  IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE CALL 612.341.0400.

## COMMENTS:

Mr. Herman,

Attached, you will find the affidavit explaining Zimmerman Reed's contribution to the Vioxx MDL common benefit.  I will send the original affidavit via Federal Express.

Thank you,
Angie Thomas

FAC Resp. Exhibit B -- 1773

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: VIOXX
PRODUCTS LIABILITY LITIGATION

MDL Docket No. 1657

SECTION L

JUDGE FALLON
MAGISTRATE JUDGE KNOWLES

SUBMISSION OF ZIMMERMAN REED FOR COMMON BENEFIT FEES AND
COSTS PURSUANT TO PRE-TRIAL ORDER NO. 6(D)
(FEE ALLOCATION GUIDELINES)

Zimmerman Reed respectfully submits this Affidavit in support of its time submissions for Common Benefit Fees in this MDL, pursuant to Pre-Trial Order 6(D).

Through April, 2008 Zimmerman Reed has submitted a total of 204.50 hours for consideration as common benefit time. The majority of that time (113.75 hours) was for attorney Ronald S. Goldser. The balance of time submitted is withdrawn as a claim for common benefit time.

Attorney Goldser participated on the Purchase Claims Committee. His work focused on the following relevant subject matter:

1.      Reviewing and drafting portions of the Third Party Payer Master Complaint

2.      Reviewing individual cases as potential bellwether trial cases

3.      Drafting sections of the response to the defense motion to dismiss the Third Party Payer Master Complaint

4.      Document review for personal injury and Third Party Payer claims

Pursuant to the request of Accountant Clifton Newlin, Zimmerman Reed has submitted its regular hourly rates and firm resume. Suffice to say that Zimmerman Reed is well

experienced in mass tort and pharmaceutical litigation and contributed worthwhile efforts

to this litigation, as described above.

_____

Ronald S. Goldser

Subscribed and sworn to before me
this 30th day of October, 2008

_____

NOTARY PUBLIC

Ann R. Hansen
Notary Public
Minnesota
My Commission Expires January 31, 2012

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
|     PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : | MAG. JUDGE KNOWLES |
|  | : |  |
|  | : |  |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. | : |  |

# VIOXX COMMON BENEFIT FEE ALLOCATION AFFIDAVITS - VOLUME 4

# **CONFIDENTIAL**

# VIOXX COMMON BENEFIT
# FEE ALLOCATION AFFIDAVITS

## Table of Contents

| | | | | |
|---|---|---|---|---|
| 1. | Alley Clark Greiwe & Fulmer | | 18. | Fibich Hampton & Leebron |
| 2. | Anastopoulo & Clore | | 19. | Gainsburgh Benjamin |
| 3. | Ashcraft & Gerel | | 20. | Gancedo & Nieves |
| 4. | Audet & Partners | | 21. | Gianni Petoyan |
| 5. | Aylstock Witkin Kreis & Overholtz | | 22. | Heins Mills & Olson |
| 6. | Barrios Kingsdorf & Casteix | | 23. | Herman Herman Katz & Cotlar |
| 7. | Beasley Allen Crow Methvin Portis & Miles | | 24. | Hovde Dassow & Deets |
| 8. | Becnel Law Firm | | 25. | Irpino Law Firm |
| 9. | Robert M. Becnel | | 26. | Khorrami Pollard & Abir |
| 10. | Bencomo & Associates | | 27. | Kline & Specter |
| 11. | Blizzard McCarthy & Nabers | | 28. | Lanier Law Firm |
| 12. | Brown & Crouppen | | 29. | Lieff Cabraser Heimann & Bernstein |
| 13. | Law Office of Joseph M. Bruno | | 30. | Levin Fishbein Sedran & Berman |
| 14. | Burg Simpson Eldredge Hersh & Jardine | | 31. | Levin Papantonio Thomas Mitchell Echsner & Proctor |
| 15. | Rebecca Ann Cunard | | 32. | Lewis & Roberts |
| 16. | Douglas & London | | 33. | Lockridge Grindal Nauen |
| 17. | Escobedo Tippit & Cardenas | | 34. | Lopez Hodes Restaino Milman & Skikos |

1

| | | | | |
|---|---|---|---|---|
| 35. | Lowe Law Firm | | 45. | Shelly A. Sanford / Carlene Lewis |
| 36. | Lundy & Davis | | 46. | Seeger Weiss |
| 37. | Martin & Jones | | 47. | Sheller Law Offices |
| 38. | Matthews & Associates | | 48. | Snapka Law Firm |
| 39. | Morelli Ratner | | 49. | Vioxx Litigation Consortium |
| 40. | Motley Rice | | 50. | Weitz & Luxemberg |
| 41. | Murray Lw Firm | | 51. | Williamson & Williams |
| 42. | Neblett Beard & Arsenault | | 52. | White Meany & Wetherall |
| 43. | Panish Shea & Boyle | | 53. | Zimmerman & Reed |
| 44. | Roda Nast | | 54. | Robinson Calcagnie & Robinson |

2

LAW OFFICES OF

# ROBINSON, CALCAGNIE & ROBINSON, INC.

**SAN DIEGO OFFICE**
110 LAUREL STREET
SAN DIEGO, CALIFORNIA 92101
(619) 338-4060 • (858) 456-0900

NEWPORT BEACH OFFICE
620 NEWPORT CENTER DRIVE
SEVENTH FLOOR
NEWPORT BEACH, CALIFORNIA 92660
(949) 720-1288
Facsimile (949) 720-1292
rcr@rcrlaw.net

Reply to: Newport Beach Office

October 29, 2008

Russ M. Herman
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, LA 70113

> Re:   Robinson, Calcagnie & Robinson
>        Vioxx Common Benefit Submission

Dear Russ:

Enclosed, please find my firm's Vioxx common benefit application, submitted pursuant to PTO 6(D). I have enclosed a declaration which details Robinson, Calcagnie & Robinson's contributions to the Vioxx litigation generally. I have also submitted a supporting declaration specifically regarding the *Barnett* trial, as well as declarations from other lawyers in my firm. The exhibits referenced within these declarations have been included under separate cover.

If you have any questions, please do not hesitate to contact me.

Sincerely,

ROBINSON, CALCAGNIE & ROBINSON

MARK P. ROBINSON, JR.

Encl.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: VIOXX                              :        MDL Docket No. 1657
    PRODUCTS LIABILITY LITIGATION   :
                                      :        SECTION:  L
                                        :
                                        :        JUDGE FALLON
                                        :        MAG. JUDGE KNOWLES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**THIS DOCUMENT RELATES TO:  ALL CASES**

### DECLARATION OF MARK P. ROBINSON, JR.

    I, Mark P. Robinson Jr., declare and state as follows:

    I am the senior partner in the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

    For me (and my firm), the Vioxx litigation was grueling.  During the five months before the *Barnett* trial, I worked seventy hour to one hundred hour weeks on a constant basis.  I spent another fifteen week stretch of seventy to one hundred hour weeks before the *Berwick* trial date.  I also spent difficult time helping to prepare *Manzo* and *Crandall* for trial.  Even while settlement negotiations took place, I was involved in intense pretrial work.  The same can be said for many in my firm.

    Our firm was also a contributor to the litigation in several respects which are outlined below.  Our firm's initial involvement in the Vioxx litigation began immediately following the withdrawal of Vioxx in September of 2004, and prior to the formation of the MDL. Ever since October 2004, I and my firm have been actively involved in the Vioxx litigation in both MDL No.1657 and the coordinated California VIOXX Cases, (California Judicial Council Coordination Proceeding ("JCCP") No. 4247). I am a member of the PEC in California and the PSC in the MDL.

    RC&R was an active member of both the MDL PSC, as well as the Plaintiffs' Executive Committee in the California Coordinated Vioxx litigation. The firm had substantial partner participation, with 3 of its 5 partners contributing significantly to the litigation, including myself, Kevin Calcagnie and Carlos Prietto, as well as eight of the firm's ten to twelve regular associates. I was Chair of the Sales and Marketing Committee, a sub-committee of the Discovery Committee in the MDL. My partner, Kevin Calcagnie, was on the Administrative Committee, and Ted Wacker and Carlos Prietto of my office were also on the Discovery Committee and the Sales and Marketing Committee. Ted was also on the Theme Grid Committee, the Timeline Committee, and the Science and Expert Committee. Anita Sherbanee of our office was also on the Science and Expert Committee.

    When a number of verdicts were adverse to plaintiffs, RC&R's commitment to the litigation did not ebb. To the contrary, even as adverse verdicts continued, our firm's commitment and efforts directed to the Vioxx litigation only increased. In addition to its MDL work throughout the country, RC&R performed non-MDL common benefit work in California and Nevada, and some in New Jersey.

    In California, the firm was involved in preparing other bellwether cases for trial including *Manzo v. Merck*, one of the first cases scheduled for trial in California. Although the trial was eventually continued due in part to our involvement with the upcoming trial of *Barnett* in the MDL, we devoted time to the case including retaining experts and taking the plaintiff's deposition.

    Another case scheduled for trial on April 9th, 2007, *Berwick v. Merck*, was a California action chosen by Merck as a trial pick, which was dismissed on the first day of trial after months of extensive and significant pre-trial work-up, and numerous pre-trial hearings relating to motions in limine, expert witnesses, and other generic evidentiary issues, including jury instructions. Eighteen

depositions were taken, including plaintiff depositions, depositions of treating physicians Dr. Van Den Noort, Dr. Detwiler, Dr. Matthews, Dr. Leahy and Dr. Reichmann, depositions of Merck sales representatives Heidi Dimond, Suzanne Ouimet, Craig Knapp, and Shelley Padgham, depositions of plaintiff experts Dr. MacGregor, Dr. Schim and Dr. Pechmann, and depositions of defense experts including Dr. Pratt, Dr. Dorfman and Dr. Wohlgelernter.  In addition, we conducted extensive law and motion, including briefing and argument, on a variety of issues, including motions in limine and motions re expert witnesses.  The *Berwick* work set up the project for Merck foundation cuts for document pre-admission and authentication in California trials which would save a lot of lawyer and court time in the future.

Even after the dismissal of the *Berwick* case, there were several generic matters which arose in connection with the case, and which our firm continued to work on for the benefit of all California plaintiffs, some of which were still in progress and pending at about the time of the MSA. These included video deposition cuts, evidentiary foundation, and arguments and briefing about issues relating to pre-instructions, jury instructions and special verdict forms, which were intended to standardize the evidence, instructions and procedures for use in later California Vioxx trials.

The firm was also trial counsel in *Crandall v. Merck*, a bellwether Nevada case involving a plaintiff who had taken 50mg Vioxx for less than one month. We developed the short term use case as well as experts for similar cases. The trial date, which had been continued, was pending at the time of the global settlement. Prior to that time we had engaged in several discovery disputes as well as briefing regarding evidentiary issues and deposition designations.  We obtained a ruling allowing us to use depo cut rulings by Judge Fallon in other cases, which would permit plaintiffs to avoid the burden of repeating this process in Nevada state court cases.  Additionally, in New Jersey we put up cases for the trial pool, including *Halpin v. Merck* and *Ramsey v. Merck*, and had begun to engage in work-up and discovery in those cases.

RC&R made significant contributions to the funding of the Vioxx litigation and the bellwether trials in the MDL, California and Nevada.  In addition to funding the PSC with regular assessment payments totaling $300,000.00 alone, the firm also spent over $462,583.00 in MDL related expenses, and an additional $831,000.00 in Vioxx common benefit expenses, including work for the California JCCP. The costs of the trial of the *Barnett* case incurred by the firm totaled $2,122,127.00. Additionally, the firm incurred costs of $757,090.00 in the *Berwick* case, $98,330 in the *Manzo* case, and $133,860 in the *Crandall* case.

Aside from the foregoing, my work included personal participation in a broad range of other significant activities and contributions to the litigation:

- Participating in weekly PSC conference calls and status conferences.
- Participating as a speaker on the Vioxx litigation at various conferences.
- Chairing the MDL Sales & Marketing sub-committee, responsible for, inter alia, sales and marketing discovery, document review, and development of a marketing timeline.
- Hosting a conference in Las Vegas for the Sales and Marketing sub-committee which went over strategies, development of marketing experts, and depositions of Merck marketing and corporate witnesses.
- Overseeing the timeline project, which utilized graphics firm Executive Presentations to show all of the important dates and events from the launch of Vioxx through withdrawal form the market.
- Overseeing the assembly, organization and ongoing work of the California depository at RC&R, which allowed attorneys from the western United Sates to access important documents for MDL document review.
- Overseeing the Western depository review projects assigned by MDL, including those conducted by our firm's fulltime document reviewer.
- Taking corporate witness depositions such as Susan Baumgartner, Marilyn Krahe, Thomas Cannell – sales and marketing witnesses – for use in the MDL.

2

- Developing marketing expert Dr. Connie Pechmann (who testified in *Mason* and *Diedrich* in the MDL and in the *Grossberg* trial in California) as a witness for trial, assisting her in developing the Merck integrated marketing theory, and taking her preservation depo for later trials in the MDL and in California.
- Initiating and pressing discovery from Merck's public relations firms, DDB, Ogilvy and Millward Brown, to determine whether they had any documents relevant to Merck's marketing campaign, including meet and confer phone calls and negotiations with counsel for these firms, which led to a process whereby the documents were produced electronically.
- Assisting with MDL trials, such as Irvin I in Houston, including creating and negotiating deposition cuts with Merck for Anstice.
- Obtaining a ruling in *Barnett* over the objection of Merck to have the option of having Mr. Anstice testify in person or playing a modified version of his original deposition.
- Participating in a number of focus groups in New Orleans for Barnett as well as other MDL trials.
- Overseeing briefing on a variety of generic and case specific motions and trial briefs relating to evidentiary issues, expert testimony and motions in limine.
- Conducting and overseeing document reviews, preparation of exhibits, and development of testimony cuts for a variety of generic witnesses, and to lay foundational testimony for documents and other evidence.
- Laying foundation for key documents so that they would not be challenged in each individual trial.
- Obtaining favorable rulings in California on a variety of issues relating to experts, evidence, claims, procedures and jury instructions, for use by plaintiffs in future trials.
- Assembling exhibit lists, pre-admission lists, objections and replies to defense deposition designations in Nevada.
- Speaking at a conference regarding the global settlement guidelines, in order to assist help lawyers understand and navigate through the settlement terms.

The foregoing list is not all-inclusive, but is meant to provide insight as to the breadth and depth of my involvement and the involvement of my firm.

For months at a time I was working almost exclusively on and was completely absorbed in the Vioxx litigation, as were several of our attorneys. Our firm has built a reputation for its leadership roles in mass torts, but also in handling individual products liability cases, particularly in the area of automotive crashworthiness. Because of our time commitment to the Vioxx litigation, my partners and I reduced our case-load in other areas.

I have attached in support of this declaration, my separate declaration regarding the *Barnett* trial, as well as the declarations of Attorneys Calcagnie, Wacker, Prietto, Garber, Myer, Westad, O'Brien, Karavatos, Sherbanee, Lukei, and law school graduate Christopher Spiro.

I declare under penalty of perjury that the foregoing is true and correct. Executed this *29th* day of *October*, 2008, at Newport Beach, California.

Mark P. Robinson, Jr.

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION: L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:  ALL CASES

### DECLARATION OF MARK P. ROBINSON, JR.

I, Mark P. Robinson Jr., declare and state as follows:

I am the senior partner in the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

I want to start out by giving credit to Andy Birchfield, Leigh O'Dell and Kelli Griffin for their hard work and invaluable assistance in the *Barnett* trial.  Robinson, Calcagnie & Robinson made several noteworthy and substantial contributions to the outcome of the Vioxx litigation, but the most significant was the *Barnett* trial, which resulted in the first and only verdict for a plaintiff in the MDL, and an award of punitive damages against Merck. To put the significance of the *Barnett* verdict in proper perspective it must be remembered what the landscape was like at the time the case was tried, as well as the difficulty of the case itself in terms of its facts and the available evidence. First of all, there were legitimate concerns among the plaintiffs' bar about New Orleans federal court jurors and the very real prospect of trying, and losing, another case there. Initially there were several potential cases in the mix for the next trial which were withdrawn for various reasons. Nevertheless, for purposes of being a team player, our firm hastily put in the *Barnett* case as a potential trial- a decision which drew a fair amount of criticism from elsewhere.

From the perspective of the plaintiffs' bar in the Vioxx litigation, there were very few in the legal community who would have predicted a verdict for Mr. Barnett. The prevailing viewpoint was that the timing and the location of the trial greatly favored the defense. Attorneys familiar with the litigation, and with trying a Vioxx case, did not give the case much hope, even after the trial was underway. For example, in the article in the Chicago Tribune entitled "Merck's Vioxx lawyer looks for another win," published in the middle of the *Barnett* trial on August 8th, 2006, (Exhibit 1), it was reported:

> Houston lawyer Mark Lanier, who scored the first victory for plaintiffs in a Texas case against Merck a year ago, said Beck and Merck have more of an advantage in federal court . . .

> "Most good plaintiffs' jurors are still gone from New Orleans," Lanier said. "Those people that are left have all gone through extreme tragedy lately with none of them able to sue and recover for that tragedy.  I expect him to win again.  I believe he is swimming with a very strong current this time."

After negative results in our focus groups, and watching Mr. Beck in *Irvin*, I actually agreed with Mr. Lanier.  In addition to these location and timing concerns and issues, the *Barnett* case did not have a favorable fact pattern relative to other Vioxx cases.  One physician/lawyer with a firm associated with the PSC advised that the case involved a very small non-Q wave heart attack.  She pointed out that if we tried to go forward on the small heart attack alone, then Merck would defend itself by saying that the plaintiff suffered no great damage, and that in fact, the heart attack was an important warning sign that saved Mr. Barnett's life.

Our experience with focus groups proved her analysis to be correct. In one focus group, we asked for a small award of $250,000 in damages based upon the heart attack alone. Mock jurors did not want to render such an award, and we soon realized that in order to prove damages, the key would be to show that Vioxx caused years of plaque build-up which ultimately led to serious heart problems. We would need to show that Mr. Barnett had no atherosclerosis before he began taking Vioxx, but that by the time he had taken Vioxx for 31 months, he had 80% and 90% blockages in his arteries, which caused the heart attack, the need for bypass surgery and a greater possibility of future heart attacks, re-stenosis, repeat grafting and the prospect of an early death.

However, as the physician/lawyer and others on the PSC opined, the theory that Vioxx caused plaque build-up would be too difficult to prove due to a lack of scientific evidence. One MDL lawyer emailed me the following:

> "The problem we're going to have damages wise is linking those--the argument they'll make is that the CABG was performed because of his underlying athero (not because of the MI), and the MI at issue was actually a fortuitous circumstance (watch--that's how they'll spin it) because it led to the discovery of this severe athero before he had an MI that actually damaged ventricular function, and allowed him to have the CABG for revascularization. The only way I see linking the CABG is to bring in the accelerated athero theory--which is controversial, as you know, and needs some more discussion among the science committee to see if it can fly." (Exhibit 2)

Another MDL lawyer emailed me this:

> "You've outlined maybe the best atherogenesis argument we could make, though I note the first document you cite suggests either a pro-atherosclerotic or anti-atherosclerotic effect of COX-2 inhibition would be possible. Also, FitzGerald and others suggest atherogenesis, but it's mostly at the 'mere' hypothesis stage. So if we have to do Barnett, I think you're by and large right, but I'd much prefer not to be looking for our first MDL win with this case. I suspect I'm preaching to the choir on all this." (Exhibit 3)

Suddenly, the case we hastily put up for trial thinking it was a clean and straightforward MI situation, turned out to in fact be an enormous challenge. It became clear we had to overcome a large obstacle and develop an untested, new mechanism of action - the atherogenesis theory.

The plaintiff, Mr. Barnett, had a potential problem with his deposition as well as with his treating physicians. We took his deposition and quickly realized that he had areas of vulnerability as a witness. When we showed the video in a focus group, the mock jurors did not react well to parts of his deposition. At trial, we constructed our direct exam in such a way as to obviate the defense placing him in a bad light.

After learning that we needed to develop a new theory, we understood it was very important to obtain favorable depositions of Mr. Barnett's treating physicians to make our case stronger. Here we faced yet another obstacle. His cardiologist refused to speak with us and the first deposition was very negative for Mr. Barnett. The cardiologist emphasized the fact that the heart attack was small and did little damage, that Mr. Barnett was in good health, and that he saw no evidence to conclude that Vioxx could have contributed to his atherosclerosis.

The deposition of Mr. Barnett's cardiac surgeon, Dr. Bryan, did not fare well either. Dr. Bryan stated that the heart attack was small and was not transmural, so there was no significant damage. Dr. Mikola, the prescribing physician, was just barely a favorable witness. To make matters worse, while we were attempting to engage in pre-deposition meetings with these doctors, Merck was actively trying to block our attempts to do so by raising the issue with Judge Fallon. We were not only fighting with Merck for the right to see our client's doctors, but at the same time we were facing an uphill battle with the doctors in our attempt to prove the atherogenesis theory.

We decided to take a second deposition of the treating cardiologist. Over defense objection, Judge Fallon granted us the permission to meet with this doctor before the deposition. We were able to have a

2

brief meeting with the cardiologist and give him some of the literature regarding the atherogenesis theory. His second deposition was more favorable to us, but still only 50-50. Though we do not know how the actual jury reacted to the two depositions of the treating cardiologist, shadow jurors sitting in the courtroom reacted more positively after seeing the second deposition. Yet, in the end, the depositions of Mr. Barnett's treating physicians were at best neutral to unhelpful.

With this type of environment, our trial team had to carefully craft the presentation of the evidence. The order of the witnesses, the timing of the deposition testimony, the type of testimony we chose to emphasize – all were of prime importance. We were very grateful to the PSC and Andy Birchfield for creating the first deposition designations used in the Irvin trials, but we were aware that with this new theory we would have to use new witnesses and make new designations. In *Barnett*, we also introduced into evidence many new documents that had not been admitted in the previous trials. We used Dr. Stephen Epstein, a non-retained expert, who did a study for Merck which showed that the development of plaque was possible with a Cox-2 agent. We used short, but very impactful videos of marketing witnesses, and sandwiched the depositions of the negative physicians between those videos so they were not as memorable. We minimized any flaws our plaintiff had by having his testimony come after our first cardiologist, Dr. Popma, but before our second cardiologist, Dr. Zipes, so as to take the focus off of him. We cut out certain witnesses that did not play well to focus groups, including Dr. Graham and Dr. Topol. All of these decisions helped us to take an obstacle-filled case and make it a winning case.

But we still had a battle of experts ahead of us. We needed Drs. Popma and Zipes in order to develop the atherogenesis theory and make it viable. However, Dr. Popma backpedaled off the atherogenesis causation theory in the middle of his deposition, so I had to make an agreement in the middle of the deposition with defense counsel that Popma would not be called as a witness on Vioxx causation. Instead, I limited Dr. Popma's testimony to ruling out all other causes of Mr. Barnett's heart attack or atherogenesis without mentioning Vioxx. This left me Dr. Zipes exclusively giving Vioxx causation and atherogenesis causation testimony. Dr. Zipes came to New Orleans well before he actually testified, and I kept moving his testimony back so he could be our last witness. He was frustrated but used the 12-day interval to follow the trial transcript feed in the hotel. We were fortunate that he had read all of the preceding transcript to ready himself for Phil Beck's attempt at a two-day blistering cross-examination. Though Phil's cross-examination was very strong, I feel Dr. Zipes effectively stood his ground.

Merck tried to block our experts at every turn, and challenged the atherogenesis theory through Daubert motions and in deposition. We had to rely on the APPROVe follow-up data, the Alzheimer's studies, a 1997 Fitzgerald memo and animal studies. Unfortunately, the excellent scientific work product that had been developed in the *Irvin* trials was not enough for this case because it only dealt with clotting. We needed to go beyond clotting, and we relied heavily on the above studies, our expert Dr. Zipes, and his interpretation of the studies.

Merck's cardiologist was Dr. Roach. In his deposition, I was fortunate to get Dr. Roach to admit that Mr. Barnett had only a 1% chance of having a heart attack before he started Vioxx. Merck never called Dr. Roach at trial, possibly because of this admission.

However, even our verdict presented yet another hurdle. Because the jury split the verdict and voted no on the strict liability claim, but yes to negligence, Merck believed it had grounds for a retrial. That, coupled with the fact that the jury awarded $50 million in compensatory damages, an amount that Judge Fallon felt was excessive under the circumstances, meant we had yet another fight ahead with Merck. Merck filed two post-trial briefs – a motion for judgment as a matter of law, claiming that the award was excessive, and a motion for a new trial, alleging that there were inconsistent verdicts.

We researched extensively, wrote our briefs (assisted by the PSC amicus briefs) and argued them in front of Judge Fallon. Because it was a close issue, we suggested a remittitur as an alternative to a new trial. Despite Merck's strenuous objection to any sort of remittitur, Judge Fallon granted our request. He not only upheld our verdict by permitting $600,000 in compensatory damages, but he also upheld a

3

punitive damages award of $1,000,000.  In his order, Judge Fallon stated, "the Court is not troubled by the $1 million punitive damage award in this case." (See Exhibit 4 p. 7-8)

The significance of the *Barnett* verdict, and the benefit to Vioxx plaintiffs from Judge Fallon's ruling upholding the verdict and the punitive damages, was addressed in emails from members of the PSC I received when the order was published:

> "Accd [sic] to Bloomberg, Mark is recommending that his client take the remittitur . . . I not only think that's the right decision, but also Fallon's upholding a one million dollar punitive award in the face of what he believes to be fair value for Barnett, namely $600k compensatory damages, arguably makes every case worth 2 to 3 times compensatory value, and is a major step forward in the litigation. . . It's our best value argument to date . . .Nice work indeed . . ." (Exhibit 5)

Another email:

> "And I cannot recall a single Pham [sic] case where a Federal Judge upheld an award of punitive damages.  This is a great result.  Good work to Mark, Arnold and everyone on this effort." (Exhibit 6)

Our client did ultimately accept the remittitur, and Merck filed a motion for reconsideration, which encompassed essentially the same motions as before and required another lengthy response from us.  Judge Fallon denied the motion without argument (Exhibit 7), but Merck, undeterred, filed an appeal with the 5th Circuit.  Merck tried to incorporate preemption briefing into the Barnett record, aiming for another fight.  However, the appeal was eventually dismissed by stipulation and a settlement in the case was reached.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of _October_ , 2008, at Newport Beach, California.

Mark P. Robinson, Jr.

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION:  L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**THIS DOCUMENT RELATES TO:  ALL CASES**

## DECLARATION OF KEVIN F. CALCAGNIE

I, Kevin F. Calcagnie, declare and state as follows:

I am a member of the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

Ever since October 2004 when I travelled to Atlanta to meet with attorneys from around the country who were contemplating or had begun actions against Merck, I have been actively involved in the Vioxx litigation in both MDL No.1657 and the coordinated California VIOXX Cases, (California Judicial Council Coordination Proceeding ("JCCP") No. 4247). I have attended various status conferences and PSC or PEC meetings and participated in conference calls in both the MDL and the JCCP, and I have attended meetings on issues concerning the Vioxx litigation around the country, including meetings in Miami, Houston, Los Angeles and New Orleans regarding discovery and trial preparation.

Because our firm is on the PEC in California and the PSC in the MDL, and my partner Mark Robinson Jr. was Chair of the MDL Sales and Marketing Sub-Committee, I have been involved in a number of projects at his request which required legal research, preparing memoranda, and briefing. For example, I was responsible for the research and preparation of the PSC's Position Paper Re Compulsion of Production of Merck's Sale Representative Databases, relating to discovery of sales call notes.  (Exhibit 1) Also, in May of 2005 I conducted legal research on the subject of ex parte interviews with physicians and provided research to the PSC for use in connection with the dispute relating to the communications with physicians.

Another project I worked on for the PSC was a 50 state study regarding the ethical considerations involved in communications with former employees of a corporate defendant, for use in evaluating the propriety and boundaries of contacting potential witnesses. I researched ethics rules, opinions of bar associations and federal and state case law where available, for all 50 states, and prepared a detailed compendium of key excerpts from each for the PSC. (Exhibit 2) Soon after I was also involved in researching and drafting a protocol for the PSC regarding contacts with Merck employees, which was a detailed guideline based upon the work on the compendium, and certain proscriptions and disclosures common to almost every state. (Exhibit 3)

At Mr. Robinson's request I also conducted research on a variety of issues for purposes of discovery and motions and limine, including FDA regulations and case law

relating to label changes to prescription pharmaceuticals and admissibility of foreign labels and standards. In addition, I was involved in locating marketing experts and I had in person and telephonic discussions with Dr. Pechmann, the marketing expert, relating to her retention and marketing issues.

As part of my work for the Sales and Marketing sub-committee I was involved in discussions and calls with third party attorneys, and in conducting legal research, relating to privilege issues with respect to subpoenas which were issued to Ogilvy, DDB Millward and others. I was also a member of the administrative committee in the MDL.

I provided assistance with the *Irvin* case at the request of counsel for the plaintiff, including conducting research relating to the relevance and admissibility of post-accident evidence. I assisted attorney Leigh O'Dell with Mr. Birchfield's office, and provided her with a memorandum regarding the relevance and admissibility of marketing evidence. I also conducted legal research and prepared memos and participated in conference calls regarding the proposed instructions and the jury charge in *Irvin*.

For a period of over a year I was extensively involved in the *Barnett* case, the only MDL trial which resulted in a verdict for a plaintiff. I assisted in the retention, designation and preparation of expert witnesses and participated in the preparation and selection of materials to be reviewed by our experts. However, most of my work was in law and motion, as I was primarily responsible for legal research and drafting memoranda and briefing on a variety of subjects, covering such issues as admissibility of marketing evidence and revenue documents, products liability law, causation, the learned intermediary doctrine and over-promotion. I was involved in preliminary and case specific motions in limine, coordinating Daubert-related motions, trial briefs, and the jury charge and instructions, as well as in post-trial motions. This involved not only researching and drafting briefs, but preparing memoranda and preparing PowerPoint presentations for Mark Robinson Jr. Although I remained in California during the *Barnett* trial, I was actively involved in the case and frequently working all night researching and drafting briefs and/or memoranda at the request of Mr. Robinson in order to assist in responding to or addressing legal issues which were arising during the course of the trial each day. I also was primarily responsible for research and preparation of the post-trial briefs. (Exhibit 4)

My work in the MDL paralleled my work in the California coordinated litigation. In December of 2004 I began attending meetings with attorneys in California on the Plaintiffs' Executive Committee in the California JCCP. I attended numerous status conferences and in chambers conferences, taking part in discussions with the Court, other plaintiffs counsel and defense counsel regarding pleadings, discovery procedures and disputes, evidentiary issues, jury instructions and procedures for scheduling trials. I also participated in drafting and negotiating general orders regarding procedures for case management, pleadings and discovery applicable to all cases.

In the JCCP I was also responsible for assisting Liaison Counsel James O'Callahan of the Girardi firm with legal research, including preparing memoranda for PEC members as well as briefing, on a variety of issues relating to including but not limited to the learned intermediary doctrine, protocol for bellwether trials, and the Noerr-Pennington doctrine. (Exhibit 5) I was involved in drafting amendments to pleadings applicable to all California Vioxx cases, including the master complaint and notice of adoption. My work also included preparing and opposing generic motions in limine, and motions relating to expert testimony, and resulted in a number of favorable rulings for the plaintiffs in the California

2

litigation on issues relating to the admissibility of evidence and expert testimony. I prepared and argued a motion for reconsideration in the JCCP in early 2006, which resulted in an order from Judge Chaney permitting California plaintiffs to proceed against Merck in a strict liability failure to warn claim. (Exhibits 6 and 7)The Court had previously disallowed that cause of action as to all California plaintiffs.

In December of 2006 I assisted trial counsel in *Arrigale v. Merck* with research on post-trial issues relating to the jury instructions and the special verdict form. In 2007 I assisted with briefing and trial preparation in connection with *Berwick v. Merck*. Although the case was ultimately voluntarily dismissed just prior to trial, the work we performed in connection with *Berwick* resulted in rulings favorable to plaintiffs and applicable to all California cases.

Judge Chaney had made it clear she was going to start with a clean slate and that she was not interested in hearing how other courts had ruled on the same issues. I worked on a number of briefs generic to all California cases including ex parte contact with physicians (Exhibit 8), motions in limine, and motions re expert witnesses. In addition to briefing I participated in oral arguments on generic motions and issues which had not been resolved in earlier trials. There were several matters relating to generic jury instructions which were still in progress and pending at about the time of the MSA. These included disputes over pre-instructions, jury instructions and special verdict forms, which were intended to standardize the instructions for later Vioxx trials. (Exhibit 9)

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28 day of OCT, , 2008, at Newport Beach, California.

Kevin F. Calcagnie

FAC Resp. Exhibit B -- 1789

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION: L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:  ALL CASES

<u>DECLARATION OF CARLOS A. PRIETTO, III</u>

I, Carlos A. Prietto III, declare and state as follows:

I am former member of the law firm of Robinson, Calcagnie & Robinson ("RCR"). From 1997 until 2007 I was a member of RCR. During the time I worked on the Vioxx litigation for RCR, as described below, I was a partner of RCR. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

I began working on the Vioxx litigation in 2005 and during 2006 and 2007 (until I left the firm) I spent a great deal of time on Vioxx. From early 2005, I participated in the MDL Plaintiffs' Steering Committee's ("PSC") weekly conference calls focusing on both litigation-wide administrative issues as well as individual case handling and trial issues. In coordination with the PSC, I assisted my senior partner Mark P. Robinson, Jr., who was appointed as a member of the Plaintiffs' Executive Committee in the California Coordinated Litigation, in fielding numerous phone calls from California plaintiffs' attorneys who had questions and sought information about the Vioxx MDL. Also in 2005, I assisted in the creation of the west coast document depository and I supervised RCR's administration of that depository which included various coding and reviewing assignments.

I participated in projects of the Sales and Marketing Sub-Committee and the Chronology/Timeline Sub-Committee. One such Sales and Marketing project, which began in 2005 and carried into 2006 and in which RCR took the lead, was discovery related to Merck's PR firms. I conducted research into Merck's direct-to-consumer marketing and advertising and prepared subpoenas duces tecum directed to Merck's PR firms and related entities: Ogilvy, DDB Needham, Mindshare and Millward Brown. I participated in several conference calls and telephonic meet and confers with counsel for these third party entities and assisted in Plaintiffs' efforts to compel production of documents in response to the subject subpoenas duces tecum. I also assisted in the Chronology/Timeline Sub-Committee's project to create a timeline of pertinent events.

In the Spring of 2006, RCR's case of *Barnett v. Merck* was selected as a MDL early trial. Immediately I became involved in trial-related tasks in preparation for our July trial date. I assisted in our firm's preparation of epidemiology and warnings expert Dr. Lemuel Moye.

In preparation for the *Barnett* trial, I also became involved in and supervised (along with Lexi Myer) RCR's extensive efforts related to deposition designations and video

deposition cuts. This grueling process included: reviewing deposition testimony designated and/or played in previous MDL trials and editing or revising that testimony to newly designate for our *Barnett* trial; reviewing and affirmatively designating deposition testimony that was not ruled on or played in prior MDL trials; objecting to Merck's affirmative designations; providing responses to Merck's objections to our affirmative designations; counter-designating to Merck's affirmative designations; objecting to Merck's counter-designations;  the preparation of a preliminary witness notebook; and the preparation of video deposition cuts. This process was required for each of the many witnesses listed for trial by both parties.

In preparation for the *Barnett* trial, I also reviewed and analyzed the deposition and trial testimony of David Anstice in preparation for his potential live cross-examination at trial and as part of our decision whether or not to call him live at trial. Due to its strong impact, Merck objected to our use of the designated deposition testimony of Anstice that had been played at the prior *Irvin I* MDL trial. Mr. Robinson requested that the Court either allow us to play the same video deposition testimony or to play the same video with Mr. Robinson's own voice dubbed over the voice of the questioning attorney's. Over Merck's objection, the Court granted Mr. Robinson's request and we eventually decided to play the original video deposition testimony that had been played in *Irvin I*.

In late July I traveled to New Orleans for the *Barnett* trial. Once in New Orleans, I spent numerous hours each day participating directly in and supervising many aspects of RCR's trial preparation and trial work. I conducted research into or prepared law and motion briefs related to such issues as: the admissibility of Mr. Barnett's Patient Information Sheet; the new FDA federal regulations regarding warnings and precautions; the preclusion of evidence related to the provision of Dr. Zipes' tests to Dr. Karavan; and the admissibility of the Court TV video of Alise Reicin's testimony in the New Jersey *Cona/McDarby* trial. I assisted in the creation and presentation of graphics for the trial. I assisted in the preparation of the direct examination of Mr. Barnett and Plaintiff's experts Dr. Zipes and Dr. Popma as well as the cross-examination of Defendant's expert Dr. Roach. I spent a number of hours preparing for the cross-examination of Alise Reicin, including: reviewing her prior deposition and trial testimony and exhibits; issue coding her prior testimony; and preparing an outline for her cross-examination. In preparation for our punitive damages claim I: reviewed Merck's 10k statements and other financial documents; reviewed Merck's executives' compensation; reviewed and prepared video deposition cuts of Anstice, Gilmartin, Scolnick, Fries, Topol and Graham; and reviewed and revised the jury charge and jury instructions.

After our successful verdict, Merck filed motions for remittitur, new trial and judgment as a matter of law. I assisted in the preparation of Plaintiff's oppositions to these motions which included reviewing many pages of trial testimony of multiple witnesses.

In the Fall of 2006, I traveled once again to New Orleans for several days to assist Leigh O'Dell and Andy Birchfield in the *Diedrick* MDL trial. I assisted in the preparation for the cross-examinations of Anstice and Reicin.

In December 2006, our case, *Berwick v. Merck*, was selected as an early California Coordinated Litigation trial and was set for April of that year. As designated second chair for this trial I was involved in every aspect of our trial preparation and was particularly involved in the arduous process of video deposition designations and video cuts. The law and motion hearings and deposition designations carried additional weight as the

2

California coordination judge indicated that she wanted to try and use our *Berwick* trial as the starting point for a coordination-wide trial package that included legal rulings on exhibits and deposition/trial testimony that could be used by all Vioxx plaintiffs in California in trials throughout the state.

Even after *Berwick* was eventually dismissed, the California coordination judge required the respective plaintiff and defense steering committees to continue the process that had begun in *Berwick* regarding the deposition designations and video cuts. I continued to work on a consolidated set of video deposition cuts. Concurrently, I continued, at the request of the judge, another *Berwick* project we termed "Foundation Cuts." In order to lay sufficient foundation for the admission of certain core exhibits, RCR prepared the pertinent testimony from witnesses to lay foundation for the exhibit. The Court then held a series of hearings to argue these Foundation Cuts. It was during the course of these hearings and the initial work on the California trial package that I left RCR and ended my involvement in the Vioxx litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of October, 2008, at Santa Ana, California.

_____
Carlos A. Prietto III

3

California coordination judge indicated that she wanted to try and use our *Berwick* trial as the starting point for a coordination-wide trial package that included legal rulings on exhibits and deposition/trial testimony that could be used by all Vioxx plaintiffs in California in trials throughout the state.

Even after *Berwick* was eventually dismissed, the California coordination judge required the respective plaintiff and defense steering committees to continue the process that had begun in *Berwick* regarding the deposition designations and video cuts. I continued to work on a consolidated set of video deposition cuts. Concurrently, I continued, at the request of the judge, another *Berwick* project we termed "Foundation Cuts." In order to lay sufficient foundation for the admission of certain core exhibits, RCR prepared the pertinent testimony from witnesses to lay foundation for the exhibit. The Court then held a series of hearings to argue these Foundation Cuts. It was during the course of these hearings and the initial work on the California trial package that I left RCR and ended my involvement in the Vioxx litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of _____, 2008, at Santa Ana, California.


_____
**Carlos A. Prietto III**

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                                      :        MDL Docket No. 1657
    PRODUCTS LIABILITY LITIGATION   :
                                        :        SECTION:  L
                                        :
                                        :        JUDGE FALLON
                                        :        MAG. JUDGE KNOWLES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:  ALL CASES

<u>DECLARATION OF ALEXIS W. MYER</u>

      I, Alexis W. Myer, declare and state as follows:

      I am an associate in the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

      My work on the Vioxx litigation began in earnest in early 2005, when I was asked to participate in Vioxx document review. At the time, the only depository was in New York at the law firm of Seeger Weiss, so I traveled there, and reviewed documents from the custodial file of Jennifer Ng for several days. Soon thereafter, I returned to my office in California, and our firm became the west coast depository location. As a separate depository, we were given several coding and reviewing assignments. I, along with Carlos Prietto, was initially responsible for the administration of our depository (subsequently I worked with Christopher Spiro on same), which included helping to complete our review assignments, forwarding any hot documents to lawyers participating in the depositions, helping lawyers visiting our depository to use the program to find documents and participating in weekly conference calls regarding depository and discovery issues.

      In late 2005, the senior partner of my firm, Mark P. Robinson, Jr., was asked to take the deposition of Thomas Cannell, a Merck corporate witness. I helped to prepare for the deposition by reviewing documents and creating deposition outlines. During this time, I was also helping to prepare summaries of potential trial cases that we could submit to the MDL for trial. In addition, Mr. Robinson and I attended the Irvin I trial in Houston, and helped the trial team along with Mr. Robinson by creating a deposition designation of the marketing corporate witness, David Anstice, taken by Mark Lanier. In early 2006, Mr. Robinson was asked to take the deposition of Marilyn Krahe, another Merck corporate witness. I again helped to prepare for the deposition by reviewing documents and creating outlines. At this time, Mr. Robinson and I also became involved in discovery related to Merck's PR firms, Ogilvy and DDB. We participated in calls with attorneys from these firms in an effort to obtain third party discovery, and began the process of procuring documents for review.

      In March 2006, our case, *Barnett v. Merck*, was picked for trial in the MDL. I quickly became involved in many aspects of this trial, including meeting with witnesses, meeting with graphic designers and video editors, helping to research and find documents pertaining to the "atherogenesis" theory, deposition scheduling, drafting of subpoenas, helping to find and create various exhibits, prepping witnesses, attending depositions, and interacting with experts. One of the most critical contributions I made during the trial was to create the deposition designations to be played by video. Due to jurisdictional issues, most of the evidence we presented at trial of corporate witnesses was by video, rather than live testimony. Though we used the designations that had been made in the preceding *Irvin* trials, we further built upon them and added new witnesses that had not yet been played. In addition to creating our designations and responding to defense objections, I also prepared objections to designations by Merck where called for. In all, we prepared twenty-nine Plaintiff designations and objected to defense counters to the designations.

We reviewed seven affirmative designations by the defense, and in addition to numerous phone conferences, we sent well over one hundred emails to defense counsel in negotiations over these designations.

This new and modified designation work was all-consuming and required spending hundreds of hours by our trial team both before and during trial reviewing transcripts carefully to make sure we had laid the foundation for the evidence we hoped to include at trial. It also required ensuring that none of Merck's material was objectionable. The designations had to be submitted to the Court in a specified format, with both plaintiff and defense designations in one document, color coded with all of the objections, replies and counter designations included. This format was very time consuming to prepare and review for inadvertent typographical errors or deletions, and required that we negotiate very closely and intensely with defense counsel. In addition, the court required that the videos be reviewed by each side before they were played at trial, so in addition to responding to and objecting on the paper transcripts, we had to check each video the night before it was to be played, and make adjustments to them if necessary. In all, we played fifteen videos during our trial, and therefore, there were many nights during *Barnett* that I and my colleagues worked all night without sleep, in order to ensure that we would have evidence to play each day. At times, we were handed rulings from the Court the night before a video, and had to make significant adjustments to the video well into the morning hours. Because Mr. Robinson had carefully crafted the order of the evidence, it was imperative to have this material ready to go at a moment's notice. The order of the evidence was so important due to the weakness of certain witnesses, that there was no room for substitutions – each video had to be completed at the perfect time.

In the summer of 2006, I prepared for and attended many depositions in South Carolina, Boston, Indiana, New Orleans and Washington DC, including the depositions of Dr. Mikola, Dr. McCaffrey, two depositions of Dr. Karavan, Dr. Bryan, Dr. Epstein, two depositions of Jerry Barnett, two depositions of Corinne Barnett, John Barnett, two depositions of Dr. Zipes, and Dr. Popma. In preparation for these depositions, I was responsible for compiling all of the exhibits and outlines. After the depositions, I reviewed each transcript and made notes for Mr. Robinson regarding the testimony I believed should be highlighted in our deposition designations. I reviewed all of the plaintiff's medical records with our legal nurse assistants in order to assist with choosing exhibits for deposition and trial. I reviewed the MPF and related documents produced by Merck to determine which call notes to use at deposition and trial. I met and conferred with defense counsel regarding a stipulation to allow Merck sales call note documents to be admitted into evidence at trial. I also helped to prepare for and attended all of the pretrial motions for *Barnett*, including Daubert motions. We had one hearing regarding our original Anstice deposition cut taken by Mark Lanier that was played in the *Irvin I* trial. The designation had such an impact that the defense did not want to play it at our trial. Mr. Robinson requested that we be permitted to either play it, have Anstice appear live, or use an alternative version of the video with his voice dubbed in as the questioner. The court allowed us to choose, and over Merck's objection, we played the original Anstice designation, which I still believe to be one of the more powerful deposition cuts we created.

Our trial was originally to commence on July 24, 2006 but was continued toon July 31, 2006. Therefore, our trial team spent two weeks before trial preparing night and day. We spent countless hours working on trial, both during the day and at night. I would attend proceedings during the day, and then work on deposition designations or other preparation projects well into the night, usually getting only 4-5 hours of sleep, and sometimes less. I assisted Mr. Robinson with preparation for the cross-examination of Merck corporate witness Alise Reicin. I organized and compiled all of the exhibits for the Reicin cross-examination. After trial, Merck brought several post-trial motions and I worked with Mr. Calcagnie on drafting part of our response to the JMOL, motion for new trial and the motion for reconsideration. I also assisted with preparation of the presentation for the hearing on the post-trial motions and attended the hearing in New Orleans. In

2

total, I spent over seventy hours reviewing transcripts, drafting selections of those motions and preparing for the hearing.

In November 2006, I attended the *Diedrick* trial for several days and assisted Leigh O'Dell's preparation for Dr. Pechmann's testimony. In January 2007, I assisted Mr. Robinson with the MDL preservation deposition of Dr. Pechmann, a marketing expert. Our firm had developed Dr. Pechmann as an expert and had been working with her while preparing for the *Barnett* trial.

In 2006, our firm began to prepare for the *Berwick* trial in California. From January 2007 until the trial date April 9, 2007, I worked exclusively on this trial. I compared deposition designations from various trials in order to create designations that best suited our case. I assisted with other trial work, including deposition preparation, preparation of exhibits for pre-trial hearings, attending depositions and witness meetings, reviewing deposition and trial transcripts for good direct examination and cross examination questions, as well as assisting with preparation of opening statement. I also assisted with creating a notebook of key documents regarding the misinformation in the Vioxx label. I created video designations that were played for our focus group to test the viability of the various witnesses. I also compiled documents regarding Merck expert Lisa Rarick and the IOM Report. I assisted with the compilation of the supplemental witness list and engaged in negotiations with defense over the content of the deposition designations up until the case was dismissed on the first day of trial.

In June 2007, our firm began work on the *Crandall* trial in Nevada state court. We resumed work on full-time trial preparation very shortly after *Berwick* was dismissed. In addition to helping to prepare expert reports, I again began to create deposition designations. However, for this trial, I drafted a motion requesting that we use ruled upon designations from previous trials, rather than repeating the designation process. That motion was granted and represented a step forward for the litigation. (See Ex 1) As previously stated, the deposition designation process is time consuming, and we were seeking to avoid having other litigants recreate the work again and again. We prepared for this trial as we had for the others, and again spent countless hours working with experts, reviewing medical records, and preparing for depositions. We were granted a continuance, and trial never proceeded due to settlement discussions.

In October 2007, I began to prepare for the *Barnett* appeal. I worked with Merck's attorneys for over forty hours to create a joint designation of exhibits, which resulted in many drafts and negotiations over what would be properly included in our record for appeal. The appeal was eventually dismissed by stipulation. From November 9, 2007 on, I have worked exclusively on settlement administration for our firm's clients. I was primarily responsible for registration of our clients, for enrolling almost 500 clients, and for preparing claims package submissions. Fully 100% of our clients are currently enrolled in the settlement program.

In all, I have contributed over 3,000 hours over the course of three years on trial and general MDL work. Between the *Barnett*, *Berwick* and *Crandall* trials, I have spent approximately eleven and a half months engaged in trial preparation.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of 2 8th , 2008, at Newport Beach, California.

Alexis W. Myer

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                                      :        MDL Docket No. 1657
    PRODUCTS LIABILITY LITIGATION        :
                                                     :        SECTION: L
                                                     :
                                                     :        JUDGE FALLON
                                                     :        MAG. JUDGE KNOWLES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:  ALL CASES

## DECLARATION OF CHRISTOPHER SPIRO

I, Christopher Spiro, declare and state as follows:

I am an information technology specialist and law school graduate with the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

I had daily responsibilities for the West Coast MDL Document Depository. During the course of the litigation I personally reviewed tens of thousands of pages of documents and directed and supervised other reviewers. I reviewed custodial files assigned by the MDL Discovery Committee, including those of Ned Braunstein, Thomas Cannell, Tracy Ogden, Leonard Tacconi, Tamara Hayden, Robert Young, Mark Williams, Donna Walters, Eric Maller, Donald Nicholson, Serge Leger, and Xuelei Pan.

In addition, I reviewed custodial files of numerous Merck sales representatives who targeted plaintiffs' prescribing physicians in the *Barnett*, *Crandall*, and *Berwick* cases. I identified and introduced documents showing that Merck Sales representatives aggressively promoted Vioxx to these physicians and detailed or distributed materials which minimized the cardiovascular risks of Vioxx. Furthermore, using the MDL electronic document database, I performed numerous targeted keyword searches and provided documents to various attorneys nationwide to assist with their specific cases or MDL related projects.

During the course of my document review I found numerous "hot" documents, many of which were added to the MDL master exhibit list, relied upon by experts, and/or used by attorneys in connection with depositions or trial. Among the types of documents that our firm discovered and made available to the MDL were: 1) studies and internal Merck documents which demonstrated that Merck was aware that COX-2 inhibition could accelerate the rate of atherogenesis and thereby increase the risk of heart attack; 2) documents supporting the view that Merck purposely delayed, avoided, or abandoned cardiovascular safety studies due to commercial concerns, including the VALOR study and several atherogenesis/plaque studies proposed through Merck's Medical School Grant Program; 3) documents showing that Vioxx "analog" formulations (drugs virtually identical to Vioxx) were used by Merck in commercially risky studies so that negative results would not be attributed to Vioxx; 4) marketing documents, including physician tracking and messaging documents, which showed that Merck sales representatives underplayed the cardiovascular risks of Vioxx; 5) documents supporting the view that Merck promoted long term 50mg usage, and was aware of and did nothing to prevent or

warn against "dosage creep," and that cardiovascular risks were dose dependent; and 6) various documents relating to the APPROVe and VICTOR studies, including early interim results that showed Merck was aware of the cardiovascular risks of Vioxx well before the study publication dates.

In addition to document review, I helped select documents for a generic exhibit list of "core documents" for use in all cases, and I assisted in preparing responses to defense objections to exhibits. I also worked on the review of deposition and trial transcripts in order to lay foundation for the admission of key documents in California and other jurisdictions.

During the course of the Vioxx litigation, I worked on other special projects. For example, I assisted in the development of the "accelerated atherogenesis theory." Our firm was the first to propound and develop the theory that Vioxx accelerated arterial plaque build-up, thereby increasing the risk of heart attack and stroke. The theory was based partly on our firm's discovery of an early Merck animal study by Dr. Stephen Epstein, former head of the NIH cardiology department, which concluded that COX-2 inhibition accelerated atherogenesis. Dr. Epstein was deposed in *Barnett* and his testimony was introduced at the *Barnett* trial. I also compiled a collection of internal Merck documents and published scientific articles, which was used by our retained experts to further develop this theory. The testimony of Dr. Epstein and our experts was used to rebut arguments by the defense that the plaintiff's heart attacks were caused by the natural progression of atherosclerosis.

I attended the *Barnett* trial, and pre-trial hearings on evidentiary matters in *Berwick v. Merck* and my primary responsibility at trial was to search the MDL's massive electronic document depository and provide attorneys with the documents they needed in support of or opposing motions, and for witness examinations and rebuttal of defense witness testimony. Another role I played was searching through deposition and trial transcripts in order to lay a foundation for key documents we were seeking to introduce into evidence.

In *Crandall v. Merck*, I performed various document searches relating to 50mg usage and created a compilation of documents showing the problem of "dosage creep," knowledge and promotion by Merck of long term 50mg usage, and dose dependent cardiovascular risks of Vioxx.

I worked with others in creating a timeline, history, and analysis of the protracted Merck-FDA label negotiations, which included searching, compiling and reviewing thousands of pages of Drug Applications, FDA minutes, FDA teleconferences, and Merck-FDA correspondence. The label history timeline and compendium of documents demonstrated that Merck fought extremely hard to obtain labeling language which minimized cardiovascular risks demonstrated by VIGOR and other studies. The label history project also strongly supported the Plaintiffs' position that Merck unnecessarily prolonged the negotiations in order to maintain Vioxx's record high sales and profits as long as possible.

I assisted attorney Don Arbiblit in his analysis of Alzheimer studies. Specifically, I searched, reviewed, and provided numerous documents which showed that the Alzheimer studies performed by Merck had high noncompliance and dropout rates and thus skewed Merck meta-analyses results in a way that subtly and falsely suggested that Vioxx was safe from a cardiovascular standpoint. Discrediting the validity of Merck's Alzheimer studies was especially important to the Plaintiffs' cases because the Alzheimer study results were

FAC Resp. Exhibit B -- 1798

used to support Merck Vioxx safety claims and in the April 2002 Vioxx label to minimize the significance of the VIGOR results which showed high rates of heart attack.

In addition, I performed numerous document searches and retrievals related to APPROVe and VICTOR studies. This included reviewing numerous drafts and preliminary data, and identifying ways in which Merck manipulated the data in a manner that underplayed cardiovascular risks.

I assisted Mr. Robinson and Ms. Lukei in the development of MDL and California JCCP marketing expert Connie Pechmann, Ph.D., which included numerous meetings and discussions regarding key marketing, promotional, physician detailing, and sales representative training materials. I also provided Dr. Pechmann with thousands of pages of internal Merck consumer and physician messaging and tracking data and statistics, and reviewed and provided Dr. Pechmann key documents obtained from third-party public relations firms employed by Merck, including Ogilvy Public Relations, Millard Brown, and DDB. Additionally, I provided Dr. Pechmann with regulatory materials and correspondence from the FDA Division of Drug Marketing, Advertising, and Communications (DDMAC). I also compiled and provided Dr. Pechmann with a complete list of DDMAC 2253 reports showing which Vioxx promotional materials were reviewed by DDMAC, assisting her in determining which promotional materials escaped FDA scrutiny.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _28_ day of _October_, 2008, at Newport Beach, California.

Christopher Spiro

FAC Resp. Exhibit B -- 1799

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                          :        MDL Docket No. 1657
        PRODUCTS LIABILITY LITIGATION :
                                      :        SECTION:  L
                                      :
                                      :        JUDGE FALLON
                                      :        MAG. JUDGE KNOWLES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:  ALL CASES

## DECLARATION OF CHRISTY L. WESTAD

I, Christy L. Westad, declare and state as follows:

I am an associate in the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

Our firm was involved in the work-up and litigation of bellwether trials in several jurisdictions, including *Barnett v. Merck* in MDL No. 1657, *Berwick v. Merck* and *Manzo v. Merck* in the coordinated California Vioxx Cases, (California Judicial Council Coordination Proceeding ("JCCP") No. 4247) and *Crandall v. Merck* a Nevada State Court Vioxx case and I was a member of each of those trial teams.

As part of my participation in the Vioxx litigation, in the *Barnett* and *Berwick* cases I made objections to documents proposed by Merck and helped keep objectionable documents from being admitted and used against plaintiffs.  In *Barnett v. Merck* I made objections to Merck's "conditional pre-admission exhibit list" and in *Barnett, Berwick,* and *Crandall* I reviewed and made objections to Merck's exhibit lists and to documents contained within Merck's deposition designations. In *Barnett, Berwick,* and *Crandall* I also helped prepare the exhibit lists for the plaintiffs and responded to objections to documents made by Merck.

In addition, I participated in the "foundation cut project" in the JCCP, which entailed reviewing all of the depositions conducted in every jurisdiction and all trial transcripts from the MDL and state court trials in order to lay foundation for key documents to be admissible in California and other jurisdictions.  I also prepared arguments and responded to objections by Merck regarding admissibility of these documents.  I helped prepare a "generic exhibit list of core documents" for use in all cases in the JCCP.

For the trial cases, I prepared deposition cuts and deposition designations for the plaintiff's case-in-chief and rebuttal, and I read and watched entire depositions to find the most useful elements.  I responded to objections by Merck so that useful testimony would be admitted. I objected to deposition designations by Merck and prepared counter-designations for the sake of completeness and to rebut testimony designated by Merck. During the *Barnett* trial, I reviewed clips of deposition testimony to be played by Merck to ensure that the testimony was consistent with all court rulings regarding admissible testimony, and not in violation of any rulings on any motions in limine.

I met and conferred with counsel from Merck regarding deposition designations in

*Barnett, Crandall*, and *Berwick*.  The deposition cuts that I helped prepare for these three cases focused on three different types of claims (i.e. a case with long-term use of 25 mg of Vioxx; a case with short-term use of 50 mg of Vioxx; and a case selected by Merck for trial in which there were several risk factors for heart attack).  Because of the different issues presented with these different types of cases, the generic deposition designations had to be re-cut in order to emphasize the different fact patterns presented in each.

In *Barnett v. Merck* I also worked on generic expert reports and helped gather documents for the reports.  I prepared notebooks for Judge Fallon to use in ruling on deposition testimony, which contained the deposition designations and every document referenced in the designation.  I reviewed trial transcripts and prior testimony of witnesses such as Reicin and Morrison, to prepare for cross-examination.

Additional work I did included preparing witness video cuts for focus groups to help test and refine plaintiff themes for trial.  The focus groups were conducted primarily in connection with the *Barnett* case in the MDL and the *Berwick* case in the JCCP.  I also worked on post-trial motions by culling trial testimony in support of the oppositions to the post-trial motions by the defense, in order to the Barnett verdict.  I helped draft Case Management Orders for use in the California JCCP and Nevada state courts, and I worked on the jury questionnaire for the California JCCP.

In early 2006 Merck began producing Merck Profile Forms ("MPF") in response to case specific discovery in the MDL. After discussion with members of the PSC we were advised that there had not yet been a PSC response or objections on behalf of the MDL to the MPFs that had been produced.  I assisted with generic discovery issues by reviewing the early MPFs produced to our firm and drafting form objections to the Merck Profile Forms.  At the request of Lenny Davis, Plaintiff's Liaison Counsel, and Dawn Barrios, Plaintiff's state court liaison coordinator, I circulated the MPF deficiency responses to the MDL PSC for use in all MDL and state court cases where an MPF was required.

Robinson, Calcagnie & Robinson maintained and operated a West Coast document depository in Newport Beach, California for the Vioxx MDL. I participated in generic document review in the Newport Beach office on behalf of the MDL, which was used in all jurisdictions.

Following the settlement I was involved in preparing a notebook and chart of common "deficiencies" alleged by Merck with respect to settlement enrollment documents for use in conferring with counsel from Williams, Connolly as part of efforts to resolve these issues.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28 day of October, 2008, at Newport Beach, California.

Christy L. Westad

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                               :        MDL Docket No. 1657
    PRODUCTS LIABILITY LITIGATION          :
                                           :        SECTION: L
                                           :
                                           :        JUDGE FALLON
                                           :        MAG. JUDGE KNOWLES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:  ALL CASES

## DECLARATION OF CYNTHIA L. GARBER

    I, Cynthia L. Garber, declare and state as follows:

    I am an associate in the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

    I joined the law firm of Robinson, Calcagnie & Robinson in December 2006 and became a member of the trial teams for the bellwether cases *Berwick v. Merck* in California and *Crandall v. Merck* in Nevada. In addition to my skills as an attorney, I also applied to these cases my previous background, knowledge, skills and understanding as a Registered Nurse and health care professional. My experience working in the cardiac catheterization lab at Hoag Hospital gave me a unique perspective on the Vioxx heart attack cases.

    As part of my work on Vioxx, I reviewed cases for possible trial selection in both the California and Nevada litigations. I looked at medical records and catheterization films and analyzed which cases would be potential plaintiff trial picks. In *Crandall v. Merck*, I worked on the early trial preparation phases, including reviewing Merck documents, negotiating a discovery plan, drafting the expert disclosure statement, meeting with experts, assisting with drafts of expert reports, engaging in meet and confer telephone calls with defense counsel, scheduling and preparing for depositions, meeting with treating physicians,  attending treating physicians depositions, meeting with the plaintiffs, briefing and attending court hearings.

    In working with experts, I assisted with the development of the 50mg-high dose and short term use theories by providing them with relevant internal Merck documents, medical research and literature. I also assisted in compiling the medical literature data and medical evidence for our experts to support Mr. Crandall's AMI diagnosis which we anticipated would be disputed by Merck. Additionally, I helped prepare deposition designations for trial, and in an effort to obtain information about the VICTOR study, I reviewed internal Merck documents and medical literature, and propounded discovery to Merck seeking this information. The *Crandall* trial was continued and was pending at the time of the announcement of the settlement.

    In *Berwick v. Merck*, I was a member of the trial team. I met with the Plaintiffs' treating physicians, located and compiled exhibits for their depositions, created outlines for and attended the depositions. I met with experts, assisted in preparing them, and with drafting their reports, and attended their depositions. I assisted with cardiac medical review and analyzed the scientific issues regarding the case, and I assisted Attorney Don

Arbitblit with compilation of exhibits and documents relating to the short term use theory and concerning warning and causation issues.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28 day of *October*, 2008, at Newport Beach, California.

Cynthia L. Garber

2

FAC Resp. Exhibit B -- 1803

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION: L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:  ALL CASES

## DECLARATION OF TED B. WACKER

I, Ted B. Wacker, declare and state as follows:

During the Vioxx litigation I was an associate in the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

I spent much of my time from 2005 through 2007 working for the Vioxx MDL, the JCCP California Coordinated cases, as well as in trial prep on the *Manzo, Barnett, Berwick* and *Crandall* trials.

One of my first roles in the Vioxx MDL was as Co-Chair of the Timeline Committee. As Co-Chair, I took responsibility with Matt Lundy, and with the help of the Gancedo Nieves firm, in creating a detailed timeline of Vioxx-related events.  This work included reviewing thousands of documents and articles and working with a graphics firm to prepare seven different power points which were linked to various documents and video testimony.  The timeline was created for use by the entire MDL.

In addition, I worked as a member of the Vioxx Theme Grid Committee, which was led by Pete Kaufman.  I met with this committee in Houston and Alabama in order develop both the Timeline and the Theme Grid projects in a cohesive manner.  As part of this team, I also assisted in reviewing "hot documents" for use at trials and depositions, and I helped to authenticate the documents in the depositions.

I spent time at the Seeger Weiss depository in New York and subsequently at the RCR depository in California reviewing Merck internal documents.  I reviewed documents in order to prepare for, assist and attend the depositions of a number of Merck employee witnesses.  These depositions included David Anstice (head of Merck marketing), Susan Baumgartner (National Director for sales of Vioxx to physicians), Deborah Shapiro (Merck statistician involved in the VIGOR trial), and Douglas Watson (Merck statistician involved in pre-marketing studies of Vioxx).

Throughout my work on the Vioxx litigation, I was involved in helping to work with a number of key plaintiffs' experts, including John Abramson, M.D. (Harvard Clinical Instructor regarding doctor prescribers and initial researcher regarding the VIGOR publication in the NEJM), Lemuel Moye, M.D. (FDA regulatory and statistical expert), Richard Kapit, M.D. (former FDA regulator) and Susan Parisian, M.D. (former FDA regulator).   The development of Dr. Abramson for the *Berwick* trial was important on the failure to warn issues.  In addition to working with Dr. Abramson, I also attended the deposition of Dr. Moye.

In *Barnett* I took the depositions of Merck's designated cardiology experts, including the first Dr. Roach deposition and the only Dr. DeBauche deposition.   I also helped to prepare for the deposition of Stephen Epstein, M.D. in Washington, D.C.

During the *Barnett* trial I reviewed documents and met with Merck sales representatives who had detailed Mr. Barnett's treating physicians in South Carolina, and I attended the second deposition of Dr. Popma, which took place during the trial.  I also assisted in the deposition of the plaintiff's prescribing physician, Dr. Mikola, and in preparing video deposition cuts for use at trial, and  I attended mock trials in both New Orleans and Los Angeles to evaluate the strengths and weaknesses of the *Barnett* case.

For the *Berwick* trial in California, I helped attorney Carlos Prietto prepare clients for depositions, and I attended the client's IME.  I took the deposition of Merck sales representatives, and I assisted attorney Carlos Prietto with the preparation and authentication of documents for the *Berwick* trial.  The rulings from hearings with Judge Chaney on these documents were hopefully to apply to all California cases and become part of the California trial package.

In *Crandall v. Merck*, I took a leadership role in the preparation for trial.  The case was venued in Reno, Nevada and trial was set for the Fall of 2007.  The trial date was continued just prior to the announcement of the global settlement.  I attended all pre-trial hearings regarding motions to authenticate documents, as well as motions in limine.  I also conducted numerous meet and confer in-person meetings and conference calls with defense counsel in Nevada and California.

I monitored the *Irvin II* trial, providing daily updates to Mark Robinson which were helpful in the *Barnett* trial.  In addition, I participated in mock trials for the *Manzo* and *Berwick* cases, which were set as bellwether trials in the California coordinated litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29 day of October , 2008, at Newport Beach, California.

Ted B. Wacker

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                           :        MDL Docket No. 1657
    PRODUCTS LIABILITY LITIGATION   :
                                    :        SECTION:  L
                                      :
                                      :        JUDGE FALLON
                                      :        MAG. JUDGE KNOWLES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:  ALL CASES

<u>DECLARATION OF MOLLY K. O'BRIEN</u>

    I, Molly K. O'Brien, declare and state as follows:

    I am an associate with the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

    My work on the Vioxx litigation began in May 2005, when I was asked to summarize depositions. Beginning in November 2005 I began working with the Vioxx depository, including participating in weekly conference calls regarding depository and discovery issues. My work on the Vioxx Depository entailed corresponding with members of the MDL Depository Committee, a sub-committee of the Discovery Committee. Together, we kept track of "hot documents" and ensured that all depository projects were completed. I participated in work for the Vioxx depository from November 2005 until approximately September 2006.

    In April 2006, *Barnett v. Merck* was picked for trial in the MDL, and I became involved in several aspects of the case, including summarizing depositions of sales and marketing executives and representatives. In July and August 2006, I spent a month in New Orleans in helping to prepare for the *Barnett* trial. I assisted in preparing the video deposition designations of various witnesses, including treating physicians and Merck employees. This required spending many hours both before and during trial reviewing transcripts carefully to make sure we had laid the foundation for the evidence we hoped to include at trial. It also required ensuring that none of Merck's proposed testimony was objectionable, and that it corresponded with Judge Fallon's rulings.

    The court required that the videos be reviewed by each side before they were played at trial, so in addition to responding to and objecting on the paper transcripts, we had to check each video the night before it was to be played, and make adjustments to them if necessary. There were many nights during the *Barnett* trial that I and my colleagues worked all night without sleep, in order to ensure that we would have evidence to play each day.

    Our trial commenced on July 31, 2006, and we spent countless hours working during the day and at night. I would attend court proceedings during the day, and then work on deposition designations or other preparation projects well into the night, usually getting only 4-5 hours of sleep, and sometimes less. I also assisted in preparing for cross-examination of a key Merck employee, Alise Reicin. After trial, Merck brought several post-trial motions and I reviewed transcripts for our response to the JMOL and the motion for reconsideration.

In February 2007, our firm began to prepare for the *Berwick* trial in California, and I began to work on deposition designations and other trial work, including attending depositions and witness meetings, as well as assisting with review of juror questionnaires. I spent many hours reviewing and summarizing thousands of documents from Merck sales representatives' custodial files and also preparing for their depositions. I also assisted with preparing for experts' testimony in connection with the APPROVe, VICTOR and ADVANTAGE studies.

After the *Berwick* case was dismissed on the first day of trial, my colleagues and I continued to work with defense counsel in California to create a "master" deposition designation list for various expert and Merck corporate witnesses, so that each new trial would not have to "reinvent the wheel," and instead could rely on agreed-upon portions of testimony to be played at trial. This necessarily included review of deposition and trial testimony of many witnesses to ensure that all proposed testimony and exhibits were authenticated. I prepared for and attended several lengthy hearings and participated in many discussions, teleconferences and email exchanges with defense counsel in an effort to create this master list, right up until the global settlement in November of 2007.

In June 2007, our firm began work on the *Crandall* trial in Nevada state court, including trial preparation and deposition designations. I spent many hours reviewing and summarizing thousands of documents from Merck sales representatives' custodial files, including review of Merck's FACTS and INSIGHT databases. We prepared for this trial as we had for the others, and again spent countless hours working with experts, reviewing medical records, and preparing for depositions. We were granted a continuance, and trial never proceeded due to settlement discussions.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of October 2008, at Newport Beach, California.

Molly K. O'Brien

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                                       :        MDL Docket No. 1657
    PRODUCTS LIABILITY LITIGATION        :
                                           :        SECTION:  L
                                           :
                                           :        JUDGE FALLON
                                           :        MAG. JUDGE KNOWLES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**THIS DOCUMENT RELATES TO:  ALL CASES**

### DECLARATION OF KAREN L. KARAVATOS

    I, Karen L. Karavatos, declare and state as follows:

    I am an associate in the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

    To help Mr. Robinson prepare for the deposition of Merck corporate witness Marilyn Krahe, I reviewed and analyzed documents produced for the deposition and located key documents.

    In addition to the foregoing, I performed extensive document reviews for the MDL, and I reviewed thousands of pages of Arcoxia documents for possible use in Vioxx cases.  I also analyzed and summarized documents from the custodial files of Ogden, Young and Williams for possible percipient witness depositions, and I also reviewed, analyzed and summarized the Vioxx Business Plan 2001-2005 for possible use as evidence in the general liability case.

    I reviewed and analyzed lengthy government reports regarding DTC advertising and also assisted Dr. Pechmann in locating copies of Vioxx television commercials from the VMS database.

    I declare under penalty of perjury that the foregoing is true and correct. Executed this 2*8* day of *October*, 2008, at Newport Beach, California.

                                  Karen L. Karavatos

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION: L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**THIS DOCUMENT RELATES TO:  ALL CASES**

### DECLARATION OF ANITA S. SHERBANEE

I, Anita S. Sherbanee, declare and state as follows:

I am an attorney, a registered nurse, and former associate with the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

My primary responsibilities in the Vioxx litigation included helping with pre-trial discovery and expert witness development, evaluating, assessing, conducting epidemiological research regarding Cox-2 inhibitors, identifying standards of care of medical professionals and prescribing physicians, and performing pre-trial preparation for *Barnett v. Merck.*

The conduct and completion of discovery and expert development in this matter required extensive cooperation amongst all counsel involved and a great amount of team work. I reviewed many of the corporate documents produced by the defense and assimilated a certain amount of these corporate documents into the ultimate trial package, organizing them in a fashion that I believe was useful and helpful to the MDL.  I believe that my background as a nurse facilitated in the understanding of many of these medically related documents, and I participated in the development of strategies that dealt with how these documents could potentially be used as evidence in the prosecution of the Vioxx case.

I also took the pre-trial deposition of Dr. Bryan in the *Barnett* case and assisted in the preparation of chronologies and timelines of the medical events in the *Barnett* matter.

Along with others, I assisted in the research and compilation of the vast amount of epidemiological literature that pertained to Cox-2 inhibitors and the science pertaining to their effect on the body and at the cellular level.  I also assisted in the integration of these results so that they would be beneficial for use at trial or other court proceedings.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28 day of _October_, 2008, at Newport Beach, California.

_____
Anita S. Sherbanee

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                          :        MDL Docket No. 1657
     PRODUCTS LIABILITY LITIGATION    :
                                      :        SECTION: L
                                      :
                                      :        JUDGE FALLON
                                      :        MAG. JUDGE KNOWLES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:  ALL CASES

<u>DECLARATION OF SHANNON LUKEI</u>

I, Shannon Lukei, declare and state as follows:

I am an associate in the law firm of Robinson, Calcagnie & Robinson. This declaration is made in support of the Submission of Robinson, Calcagnie & Robinson for an Allocation of the Common Benefit Fee Award pursuant to PTO 60(D). The facts contained herein are within my personal knowledge and if called upon as a witness I could and would competently testify to the following.

My initial work on the Vioxx litigation consisted of several Sales and Marketing discovery projects at the request of Mark P. Robinson, Jr., the chair of the Sales and Marketing committee for the MDL.  I assisted with various projects including developing a preliminary outline regarding Merck's marketing strategy, drafting deposition outlines for treating physicians, compiling, reviewing, summarizing and analyzing Merck marketing documents for Mr. Robinson's marketing presentation, researching sales figures for each year that Vioxx was on the market, and creating a chart of that information.

I participated in several conference calls relating to sales and marketing issues, and I compiled, reviewed and highlighted documents for the marketing hot document chronology, and revised the marketing and trial themes chronology.  I reviewed Merck corporate witness depositions, such as the Scolnick deposition, to incorporate relevant marketing documents into the chronology. I then met with Executive Presentations, a graphics company, to develop the final sales and marketing chronology product.
I also participated in deposition preparation for Merck corporate witness Thomas Cannell by reviewing hot documents and creating an outline.

I was also involved in work for the various MDL trials.  I revised the deposition cuts of Susan Baumgartner for Mr. Seeger's *Humeston* trial, I drafted a brief requesting an additional day of deposition for Susan Baumgartner, and I reviewed her depositions to provide questions for Mr. Birchfield for a corporate representative cross-examination.

I attended several meetings regarding the protocol for developing sales representative witnesses, and I drafted the protocol for obtaining witness statements from ex-sales employees and for taking detail representative depositions.  I reviewed sales representative depositions, and compiled and studied potential exhibits in order to draft the sales representative deposition outline.  I also prepared a binder for the Sales and Marketing sub-committee with ethics considerations for ex parte witnesses.

I reviewed the Delk deposition and exhibits and incorporated those into the sales representative deposition outline, and coordinated the organization and copying of the sales representative deposition notebook.  Finally, I reviewed the sales representative witness statements and summarized them in an email to MDL members taking their first

statements, and I created spreadsheets of California and New Jersey sales representatives.

I also participated in work for the MDL relating to expert witnesses. I attended several expert conference calls and epidemiology and science committee conference calls. I helped to compile materials to be sent to experts, and I attended meetings with marketing experts and assisted with the preparation of the expert report of Dr. Pechmann. I also assisted with the deposition preparation and deposition of Dr. Pechmann's trial preservation deposition.

My work for the MDL also included trial preparation as well. I assisted mainly with deposition designations. I reviewed the Baumgartner defense designations, drafted objections and counter designations, and created new deposition cuts for Anstice, Krahe and Topol. I reviewed the Anstice deposition designations by Merck, I created a deposition cut for Scolnick for the *Barnett* trial, I reviewed the Bold deposition, made objections and reviewed defense objections, and I re-edited and shortened the Shapiro and the Avorn deposition designations. In addition, I reviewed the *Irvin I* trial deposition designations for objections, and created several deposition designations for focus groups, including one for the Plaintiff Gerald Barnett, and one for his treating physician, Dr. Mikola.

For the focus groups, I also assisted with the creation of Mr. Robinson's opening statement and reviewed and summarized the focus group results. In addition, I worked on spreadsheets our firm created to lay foundation for documents to be used in opening statement.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28 day of ___October___, 2008, at Newport Beach, California.

_____
Shannon Lukei

FAC Resp. Exhibit B -- 1811

# Exhibits
# to
# Vioxx Common Benefit
# Submission

Case 2:05-md-01657-EEF-DEK   Document 62659-23   Filed 03/04/11   Page 54 of 163

Merck's Vioxx lawyer looks for another win. (08-AUG-06) Chicago Tribune (Chicago, IL)                    Page 1 of 2

**Merck's Vioxx lawyer looks for another win.**

Source: ☛ Chicago Tribune (Chicago, IL)
Publication Date: 08-AUG-06

Byline: Bruce Japsen

NEW ORLEANS _ If Merck & Co. is ever going to have to pay tens of billions of dollars in damages over its painkiller Vioxx, plaintiffs' attorneys are first going to have to get past Phil Beck.

Merck tapped the Chicago trial lawyer to steer it through nearly 6,000 federal lawsuits consolidated in U.S. District Court in New Orleans. So far Beck has won one key federal trial and, last week, delivered gracious but pointed opening remarks in another.

As Merck's lead outside counsel, the co-founder of Chicago's Bartlit Beck Herman Palenchar & Scott is trying to score a second win here in a series of federal trials brought by plaintiffs who say Vioxx caused heart attacks in themselves or a loved one.

The case now under way is the second of five trials from which the parties will try to estimate the direction of future litigation _ making their outcome particularly important.

U.S. District Judge Eldon Fallon said he would meet with Beck, Merck lawyers and plaintiffs' attorneys after the fifth trial to see if a resolution can be reached in the massive federal litigation, which accounts for 5,700 cases filed on behalf of 16,100 plaintiffs.

Concurrently the New Jersey-based drug giant is battling 8,500 state cases representing 11,000 plaintiffs.

In all, that's 14,200 cases. To date Merck has won five and lost three. Merck has been ordered to pay $298 million in damages, which will drop to $48 million because of state caps on punitive damages. It plans to appeal all three.

Merck's recent victories have pushed its stock up 27 percent in the last two months. It closed Friday at $41.21, not far from where it traded before Merck stopped selling Vioxx.

When Merck pulled the controversial painkiller from the market in 2004 analysts projected that the company's exposure from Vioxx could hit $30 billion, a staggering sum for a company that pulled in $22 billion in revenues last year.

But if Beck wins in the second federal trial, now under way in New Orleans, that would bode well for the federal side of Merck's liability, where the company has yet to lose.

"If Merck manages to win a series of cases, there is a good chance plaintiff lawyers will begin to become disinterested in pursuing further cases," Morgan Stanley research analyst Jami Rubin said in a recent report.

In Beck Merck has a lawyer who has helped secure victories in other important cases, some of them extremely high-profile.

Beck worked on the legal team that helped President Bush win the contested 2000 election. He also scored a victory on behalf of Bayer AG in 2003 in the first trial over its controversial Baycol cholesterol drug. Many analysts say that win limited the size of settlements that followed. Bayer, like Merck, originally faced tens of billions in potential liability.

"Not many people get to do what I do because I get a lot of very challenging cases where much is at stake," Beck said. "I have been fortunate."

Beck's trial work started not long after he graduated in 1976 from Boston University Law School, where he was editor of the law review. After clerking for a federal judge, his first job came at the giant Chicago law firm Kirkland & Ellis, where he worked for 17 years. He and fellow Kirkland attorney Fred Bartlit left in 1993 to start their own firm. Today Bartlit Beck is still considered small at 57 lawyers.

Though representing a corporation in one of America's most vilified industries, Beck, the 55-year-old son of a Chicago bookstore owner, comes across as a laid-back guy.

He grew up in south suburban Homewood where he worked in a steel mill as a teenager and rooted for the Cubs, a North Side allegiance that grew partly out of the location of many of his father Robert's business locations, the still-popular Beck's bookstores.

He became interested in law while sitting beside his dad watching courtroom TV dramas of the 1950s and '60s like ``Perry Mason'' and ``The Defenders.''

. By 2000 Beck was on television himself, cross-examining witnesses for the Bush legal team in the court battle over the Florida presidential vote.

"If you had to pick a star out of the roster of lawyers down there in Florida, and there were many of them, it might have been Phil Beck," NBC anchor Brian Williams reported after Beck's cross-examinations of witnesses were deemed key in a Florida judge's decision against allowing a recount of more than 12,000 disputed votes. The verdict from that Tallahassee courtroom was eventually overturned by the Florida Supreme Court, but the U.S. Supreme Court later ruled in favor of Bush.

In 2003 Beck led Bayer to a high-profile win in a Texas state court in the first Baycol cholesterol drug litigation.

Before the win, plaintiffs' attorneys and some Wall Street analysts were forecasting a Bayer collapse and awards to Baycol users totaling as high as $50 billion because plaintiffs were balking at company-offered settlement packages.

"They weren't getting any takers," Beck said of Bayer's settlement offer made before the trial. "After we won that first case, it opened the floodgates for people settling."

As of March 31, Bayer had paid about $1.1 billion in settlements. And although about 5,000 cases remain pending worldwide, the sum paid is a fraction of what plaintiffs' attorneys and some analysts predicted for a drug that had been linked to deaths.

The Merck litigation is different in that the company has vowed to challenge plaintiff allegations on a case-by-case basis.

FAC Resp. Exhibit B -- 1813

Case 2:05-md-01657-EEF-DEK   Document 62659-23   Filed 03/04/11   Page 55 of 163

Merck's Vioxx lawyer looks for another win. (08-AUG-06) Chicago Tribune (Chicago, IL)                    Page 2 of 2

Their tab includes lodging and a multiroom "war room" a few steps from the pool and spa at the Windsor Court Hotel in New Orleans.

Although Beck is the primary courtroom face, he has support from Bartlit Beck's Andrew Goldman in the courtroom and a team of attorneys, most from Bartlit. It is common, Beck says, for Merck's defense lawyers to share depositions and documents between his federal cases and state cases.

Beck believes Merck has a strong defense in each of the cases coming up because the patients suing Merck had other health risks.

In court last week, for example, Beck began countering claims brought by attorneys for retired FBI agent Gerald Barnett, who blames Vioxx for the heart attack he suffered in 2002. He said he took the drug daily for almost three years before the heart attack.

The task may be tougher this time around because the plaintiff in his first victory had taken Vioxx for less than a month before he died. There were few studies linking Vioxx to heart attacks for such a short time.

Merck pulled Vioxx from the market after a study showed it increased the risk of heart attack or stroke for those who took the drug for 18 months or longer.

Although Beck won the case in February, it followed a mistrial last December. Some legal observers, even among the plaintiffs' bar, thought he should have easily won the first time around given the fact that the plaintiff, Richard Irvin, took Vioxx for such a short time. In the mistrial a lone juror sided against Merck and eight others voted in the company's favor.

Beck's strategy on Merck's behalf in the Irvin case focused on many potential risk factors facing the plaintiff. Last week he began using the same strategy in the Barnett case.

"(Barnett attorney Mark) Robinson talked to you for about 90 minutes and during that 90 minutes 200 people in the United States had heart attacks ... most of them had heart attacks that were much more serious than the one that Mr. Barnett had," Beck said in his opening remarks last week. "Over 1.2 million people a year have heart attacks in America and that was true before Vioxx ever came on the market and it's true now that Vioxx has not been on the market for a couple of years."

Beck comes across in the courtroom as careful and calming in his approach, giving explanations of complex drug industry research in words a sixth grade science class would understand. He also played to the all-male eight-member jury, countering the plaintiff counsel's depiction of Barnett as a physically fit 62-year-old who worked out regularly. Beck said all men have higher risks for heart attacks. And although he talked about what a nice couple Barnett and his wife were for being married for more than three decades, he pointed to Barnett's wife's smoking habit as a risk factor for her husband.

Although some are predicting a Beck win this time around, at least one legal observer says the prediction may have more to do with a hurricane-ravaged New Orleans venue than Beck's legal talents.

Houston lawyer Mark Lanier, who scored the first victory for plaintiffs in a Texas case against Merck a year ago, said Beck and Merck have more of an advantage in federal court, citing Judge Fallon's ability to restrict what comes into evidence. And because the federal trials are in New Orleans, Lanier says, a smaller jury pool to pick from favors Merck.

"Most good plaintiffs' jurors are still gone from New Orleans," Lanier said. "Those people that are left have all gone through extreme tragedy lately with none of them able to sue and recover for that tragedy. I expect him to win again. I believe he is swimming with a very strong current this time."

(c) 2006, Chicago Tribune.

Visit the Chicago Tribune on the Internet at http://www.chicagotribune.com/

Distributed by McClatchy-Tribune Information Services.

ARCHIVE PHOTO on MCT Direct (from MCT Photo Service, 202-383-6099): Phil Beck

For reprints, email tmsreprints@permissionsgroup.com, call 800-374-7985 or 847-635-6550, send a fax to 847-635-6968, or write to The Permissions Group Inc., 1247 Milwaukee Ave., Suite 303, Glenview, IL 60025, USA.

FAC Resp. Exhibit B - 1874

>time, and that what differentiates the timing of the cardiovascular
>event in different patients and patient group is the underlying status
>of the patient.  The demographics in many of these studies is very disparate.
>Atherosclerosis is both a progressive and dynamic disease, and what I
>believe happens is that there is a certain threshold of atherosclerotic
>disease which patients catch up to a differential rates and which, when
>reached, combines with the Vioxx to cause a thrombotic occlusive event.
>This easily explains why you can have an MI after 1 day of usage or 30
>months of usage.
>
>-----Original Message-----
>From: Dagostino, Lisa S.
>Sent: Friday, March 17, 2006 10:46 AM
>To: John Restaino; Ted Wacker; Bert Black; Mark Robinson; Alexis Myer;
>Anita Sherbanee; Carlos Prietto; gmeunier@gainsben.com; John Restaino;
>Lin Moen; Shannon Lukei; Steven Skikos; Vioxx Small Group
>Subject: RE: RE: Gerald Barnett: brief summary re meetings in SC
>
>He had a cath two-three days post-MI (not a 'rescue cath') which
>disclosed severe athero in pretty much every vessel.   Then had a
>quintuple CABG.
>
>The problem we're going to have damages wise is linking those--the
>argument they'll make is that the CABG was performed because of his
>underlying athero (not because of the MI), and the MI at issue was
>actually a fortuitous circumstance (watch--that's how they'll spin it)
>because it led to the discovery of this severe athero before he had an
>MI that actually damaged ventricular function, and allowed him to have
>the CABG for revascularization.  The only way I see linking the CABG is
>to bring in the accelerated athero theory--which is controversial, as
>you know, and needs some more discussion among the science committee to
>see if it can fly.
>
>PS--My sleep patterns were permanently destroyed after residency....
>
>-----Original Message-----
>From: John Restaino [mailto:JRestaino@nextel.blackberry.net]
>Sent: Friday, March 17, 2006 10:27 AM
>To: Dagostino, Lisa S.; Ted Wacker; Bert Black; Mark Robinson; Alexis
>Myer; Anita Sherbanee; Carlos Prietto; gmeunier@gainsben.com; John
>Restaino; Lin Moen; Shannon Lukei; Steven Skikos; Vioxx Small Group
>Subject: Re: RE: Gerald Barnett: brief summary re meetings in SC
>
>I agree Lisa......what treatment, post event, was prescribed?
>
>BTW....interesting time of day, on your part, to be thinking/typing
>this.
>
>Remember 'sleep'???
>
>
>-----Original Message-----
>From: "Dagostino, Lisa S." <Lisa.Dagostino@KlineSpecter.com>
>Date: Fri, 17 Mar 2006 04:26:11
>To:"Ted Wacker" <Twacker@rcrlaw.net>, "Black, Bert
><bblack@locklaw.net>,        "Beach Lawyer" <beachlawyer51@hotmail.com>,
>,"Alexis Myer" <amyer@rcrlaw.net>,        "Anita Sherbanee"
><asherbanee@rcrlaw.net>,        "Carlos Prietto" <Cprietto@rcrlaw.net>,
><gmeunier@gainsben.com>,        <jrestaino@lopez-hodes.com>, "Lin Moen"
><Lmoen@rcrlaw.net>,        "Shannon Lukei" <slukei@rcrlaw.net>,
><SSkikos@Lopez-Hodes.com>, "Vioxx Small Group"
><VioxxSmallGroup@KlineSpecter.com>
>Subject: RE: RE: Gerald Barnett: brief summary re meetings in SC
>
>Agree---this was a non-q wave MI--dx was based on either the second or
>third set of enzymes (the first were negative)...the EKG was
>unrevealing.   The problem with it being an eeney-weenie MI is that

-3-

**Alexis Myer**

| | |
|---|---|
| **From:** | Alexis Myer |
| **Sent:** | Monday, October 06, 2008 5:01 PM |
| **To:** | beachlawyer51@hotmail.com |
| **Subject:** | FW: RE: Gerald Barnett: brief summary re meetings in SC |

```
-----Original Message-----
From: Black, Bert [mailto:bblack@locklaw.com]
Sent: Friday, March 17, 2006 1:45 PM
To: Beach Lawyer; Mark.Hoffman@KlineSpecter.com; Lisa.Dagostino@KlineSpecter.com;
JRestaino@nextel.blackberry.net; Ted Wacker; Alexis Myer; Anita Sherbanee; Carlos Prietto;
gmeunier@gainsben.com; jrestaino@lopez-hodes.com; Lin Moen; Shannon Lukei; SSkikos@Lopez-
Hodes.com; VioxxSmallGroup@KlineSpecter.com; darbitblit@lchb.com
Subject: RE: RE: Gerald Barnett: brief summary re meetings in SC
```

Mark --

You've outlined maybe the best atherogenesis argument we could make, though I note the
first document you cite suggests either a pro-atherosclerotic or anti-atherosclerotic
effect of COX-2 inhibition would be possible.

Also, FitzGerald and others suggest atherogenesis, but it's mostly at the "mere"
hypothesis stage.

So if we have to do Barnett, I think you're by and large right, but I'd much prefer not to
be looking for our first MDL win with this case.  I suspect I'm preaching to the choir on
all this.

Bert Black
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
(612) 339-6900
Fax:  (612) 339-0981
BBLACK@locklaw.com


```
-----Original Message-----
From: Beach Lawyer [mailto:beachlawyer51@hotmail.com]
Sent: Friday, March 17, 2006 2:27 PM
To: Mark.Hoffman@KlineSpecter.com; Lisa.Dagostino@KlineSpecter.com;
JRestaino@nextel.blackberry.net; Twacker@rcrlaw.net; Black, Bert; Amyer@rcrlaw.net;
asherbanee@rcrlaw.net; Cprietto@rcrlaw.net; gmeunier@gainsben.com; jrestaino@lopez-
hodes.com; Lmoen@rcrlaw.net; slukei@rcrlaw.net; SSkikos@Lopez-Hodes.com;
VioxxSmallGroup@KlineSpecter.com; darbitblit@lchb.com
Subject: RE: RE: Gerald Barnett: brief summary re meetings in SC
```

The insight on the Barnett case is terrific and very helpful.  We have
delineated the defense approach to a case like Barnett.  However, the
reason
Lisa gets THE BIG BUCKS$$ is because from the very beginning, she said
we
have to tie in the accelerated atherogenesis position so that we can
claim
Vioxx contributed to the plaque build-up and therefore contributed to
the
CABG surgery.  At least we have a 33 month use platform from which to
develop this theory.  When I started on this expedition, I did not know
very

FAC Resp. Exhibit B -- 1816

much about this acceleration of atherogenesis concept.  It seems that in

Merck's own documents, it began on May 3, 1998 with Fitzgerald and Oates in
the Scientific Advisor's Report:

"The formation of foam cells is central to the process of atherogenesis . .
. This process involves an inflammatory cell type that is the prototype for
regulation of Cox-2.  There is a growing body of evdience indicating that
inflammatory disease is a risk factor for myocardial infarction, and such
inflammatory processes almost certainly are accompanied by the release of
cytokines that affect cells in the monocytic series in general, and Cox-2
expression in particular.  Accordingly, it is appropriate to ask whether

Cox-2 expression in monocyte-macrophage-foam cell development regulates the
progression of the atherosclerosis that accompanies dyslipidemias, either
positively or negatively.  If this were the case, then inhibition of Cox-2
might be expected to alter the process of plaque formation." [Scientific

Advisors' Meeting 5/3/98, MRK-AEI0002736]

More recently, Fitzgerald (who is Merck's consultant and not our friend)
continues to advocate that for the vessels that are already sick and
predisposed to atherogenesis that Cox-2s like Vioxx work to accelerate the
atherogenesis process.  He postulates that the reduction in PGI2 (which can
inherently retard or slow down in some way the atherogenesis process) leads
to the build-up of plaque in an accelerated manner:

"Thus a single mechanism, depression of prostaglandin I2 formation, might be
expected to elevate blood pressure, accelerate atherogenesis, and predispose
patients receiving coxibs to an exaggerated thrombotic response to the
rupture of an atherosclerotic plaque.  The higher a patient's intrinsic risk
of cardiovascular disease, the more likely it would be that such a hazard
would manifest itself rapidly in the form of a clinical event." This is
Barnett.  (Fitzgerald, Garret A, Coxibs and Cardiovascular Disease, 351 N.
Engl. J. Med. (2004) pp. 1709-1710)

Both COX isoforms contribute to prostacyclin generation.  "There is
experimental evidence that the increased activity of COX-2 contributes to
the pathogenesis of atherosclerosis." (Belton, Orina A.; Duffy, A; Toomey,
S.; Fitzgerald, D.J., Cyclogenase Isoforms and Platelet Vessel Wall
Interactions in the Apolipoprotein E Knockout Mouse Model of
atherosclerosis, 108 Circulation 3017 (2003) p. 3022)

"COX-2 inhibition has several effects that could increase the risk of
cardiovascular disease, including reducing prostacyclin levels, increasing

2

FAC Resp. Exhibit B -- 1817

blood pressure, decreasing angiogenesis, and destabilizing plaque."
(Bresalier, Robert S.; et al., "Cardiovascular Events Associated With
Rofecoxib in a Colorectal Adenoma Chemoprevention Trial, 352 N. Engl. J.
Med. (2005) p.1093)

Suppression of PGI2 "would afford a mechanism by which the hazard of
drug-induced thrombosis would relate to the patient's underlying risk of

cardiovascular risk" (p. 1) . . . Result is that reducing (eliminating) PGI2
induces vascular hyperlasia even though geometry stays the same.  "Such
perturbation of the relationship between vascular hemodynamics and structure
may interact with hypertension and atherogenesis to contribute to an
emerging cardiovascular hazard in patients initially at low cardiovascular
risk during extended therapy with selective inhibitors of Cox-2."
(Rudic,
Fitzgerald et al, "Cox-2 Derived Prostacyclin Modulates Vascular
Remodeling," 96 Circulation Research 1240 (2005) p. 1-2)

I know there are contrary animal studies that are inopposite and tend to

show inhibition of Cox 2 reduces build-up of plaque.  However, the
Fitzgerald name seems to carry more weight in this litigation right now.

Question - it seems to me that Merck has claimed that Vioxx only causes CV
events in cases of long-term use.  In addition, Merck fails to attribute

this long-term use increased CV risk to no specific mechanism.  Merck's own
consultant, Fitzgerald, has published this atherogenesis acceleration
hypothesis in sick vessels in the prestigious NEJM.  Even if the defense

wants to debate this Fitzgerald/Fosslein hypothesis, there appears to be

published literature that gets us over the Daubert hurdle.  Especially since
there is no defined explanation for the APPROVe increased Vioxx
cardiovascular risk for use over 30 months assertion.

Our own expert, Dr. Fosslein, in his publication in 2005, opines: "Selective
inhibition of Cox-2 limits endothelial cell synthesis of prostacyclin
(PGI2), an arachidonic acid product that opposes the effects of thromboxane.
   In apoE-/- mice, interruption of TXA2 signaling by deletion of its
receptor (TP) limits atherogenesis, whereas interruption of PGI2 signaling
by deletion of its receptor (IP) accelerates atherogenesis.  This suggests
that selective inhibition of Cox-2 can disrupt the physiological balance

between thromboxane and prostacyclin and thus increase atherosclerosis,
thrombogenesis, and the risk of cardiovascular complications.  Second, Cox
inhibition can raise levels of arachidonic acid, which can inhibit
mitochondrial oxidative phosphorylation (OXPHOS) and increas OXPHOS
generation of reactive oxygen studies.  Several NSAIDs, including coxibs and
meloxicam, directly uncouple or inhibit OXPHOS.  Studies of apoE-/- mice
indicate that mitochondrial dysfunction plays an early role in
atherogenesis." (Fosslien, Egil, Review: Cardiovascular Complications of

3

Non-Steroidal Anti-Inflammatory Drugs, Annals of Clinical & Laboratory
Science, vol. 35, no. 4 (2005) p. 347)

If Barnett is selected for trial, we can make all these arguments to
support
the position that Vioxx made a substantial contribution to the 5 vessel
atherosclerotic build-up which ultimately led to the CABG surgery.   If
Barnett is not selected, then we can wait for another case.


>From: "Hoffman, Mark A." <Mark.Hoffman@KlineSpecter.com>
>To: "Dagostino, Lisa S." <Lisa.Dagostino@KlineSpecter.com>,"John
>Restaino"
><JRestaino@nextel.blackberry.net>,"Ted Wacker"
><Twacker@rcrlaw.net>,"Bert
>Black" <bblack@locklaw.com>,"Mark Robinson"
><beachlawyer51@hotmail.com>,"Alexis Myer" <Amyer@rcrlaw.net>,"Anita
>Sherbanee" <asherbanee@rcrlaw.net>,"Carlos Prietto"
><Cprietto@rcrlaw.net>,<gmeunier@gainsben.com>,"John Restaino"
><jrestaino@lopez-hodes.com>,"Lin Moen" <Lmoen@rcrlaw.net>,"Shannon
>Lukei"
><slukei@rcrlaw.net>,"Steven Skikos" <SSkikos@Lopez-Hodes.com>,"Vioxx
>Small
>Group" <VioxxSmallGroup@KlineSpecter.com>
>Subject: RE: RE: Gerald Barnett: brief summary re meetings in SC
>Date: Fri, 17 Mar 2006 10:56:32 -0500
>
>The MI in this patient was a gentle marker for more serious underlying
>cardiovascular pathology.  The accelerated atherosclerosis theory is
>far too controversial to jump over the Daubert hurdle.  I still would
>like to know what Merck believes is the mechanism of the increased risk
>of cardiovascular events as seen in the APPROVe trial.  I believe that
>that the risk for a cardiovascular event is actually constant over
>time, and that what differentiates the timing of the cardiovascular
>event in different patients and patient group is the underlying status
>of the patient.  The demographics in many of these studies is very
>disparate. Atherosclerosis is both a progressive and dynamic disease,
>and what I believe happens is that there is a certain threshold of
>atherosclerotic disease which patients catch up to a differential rates
>and which, when reached, combines with the Vioxx to cause a thrombotic
>occlusive event. This easily explains why you can have an MI after 1
>day of usage or 30 months of usage.
>
>-----Original Message-----
>From: Dagostino, Lisa S.
>Sent: Friday, March 17, 2006 10:46 AM
>To: John Restaino; Ted Wacker; Bert Black; Mark Robinson; Alexis Myer;
>Anita Sherbanee; Carlos Prietto; gmeunier@gainsben.com; John Restaino;
>Lin Moen; Shannon Lukei; Steven Skikos; Vioxx Small Group
>Subject: RE: RE: Gerald Barnett: brief summary re meetings in SC
>
>He had a cath two-three days post-MI (not a 'rescue cath') which
>disclosed severe athero in pretty much every vessel.   Then had a
>quintuple CABG.
>
>The problem we're going to have damages wise is linking those--the
>argument they'll make is that the CABG was performed because of his
>underlying athero (not because of the MI), and the MI at issue was
>actually a fortuitous circumstance (watch--that's how they'll spin it)
>because it led to the discovery of this severe athero before he had an
>MI that actually damaged ventricular function, and allowed him to have
>the CABG for revascularization.  The only way I see linking the CABG is
>to bring in the accelerated athero theory--which is controversial, as
>you know, and needs some more discussion among the science committee to

4

>see if it can fly.
>
>PS--My sleep patterns were permanently destroyed after residency....
>
>-----Original Message-----
>From: John Restaino [mailto:JRestaino@nextel.blackberry.net]
>Sent: Friday, March 17, 2006 10:27 AM
>To: Dagostino, Lisa S.; Ted Wacker; Bert Black; Mark Robinson; Alexis
>Myer; Anita Sherbanee; Carlos Prietto; gmeunier@gainsben.com; John
>Restaino; Lin Moen; Shannon Lukei; Steven Skikos; Vioxx Small Group
>Subject: Re: RE: Gerald Barnett: brief summary re meetings in SC
>
>I agree Lisa......what treatment, post event, was prescribed?
>
>BTW....interesting time of day, on your part, to be thinking/typing
>this.
>
>Remember 'sleep'???
>
>
>-----Original Message-----
>From: "Dagostino, Lisa S." <Lisa.Dagostino@KlineSpecter.com>
>Date: Fri, 17 Mar 2006 04:26:11
>To:"Ted Wacker" <Twacker@rcrlaw.net>, "Black, Bert"
><bblack@locklaw.com>,        "Beach Lawyer" <beachlawyer51@hotmail.com>,
>"Alexis Myer" <amyer@rcrlaw.net>,        "Anita Sherbanee"
><asherbanee@rcrlaw.net>,        "Carlos Prietto" <Cprietto@rcrlaw.net>,
><gmeunier@gainsben.com>,        <jrestaino@lopez-hodes.com>, "Lin Moen"
><Lmoen@rcrlaw.net>,        "Shannon Lukei" <slukei@rcrlaw.net>,
><SSkikos@Lopez-Hodes.com>,        "Vioxx Small Group"
><VioxxSmallGroup@KlineSpecter.com>
>Subject: RE: RE: Gerald Barnett: brief summary re meetings in SC
>
>Agree---this was a non-q wave MI--dx was based on either the second or
>third set of enzymes (the first were negative)...the EKG was
>unrevealing.   The problem with it being an eeney-weenie MI is that
>there was no myocardial wall damage....no hypokinetic areas on echo and

>no loss of function.
>
>-----Original Message-----
>From: Ted Wacker [mailto:Twacker@rcrlaw.net]
>Sent: Friday, March 17, 2006 1:18 AM
>To: Black, Bert; Beach Lawyer; Alexis Myer; Anita Sherbanee; Carlos
>Prietto; gmeunier@gainsben.com; jrestaino@lopez-hodes.com; Dagostino,
>Lisa S.; Lin Moen; Shannon Lukei; SSkikos@Lopez-Hodes.com
>Subject: RE: RE: Gerald Barnett: brief summary re meetings in SC
>
>My understanding from Anita is that the heat attack was diagnosed based

>in part on the chest pain and also the troponin level (see description
>below) and so there is a formal diagnosis of MI albeit the heart attack

>was tiny....
>
>
>in the news
>
>
>understanding
>your tests
>
>inside the lab
>
>about this site
>

FAC Resp. Exhibit B -- 1820

>site map
>
>send us your
>comments
>
>home
>
>
>_____
>
>Evidence-based Medicine
>Genetic Tests
>Home Testing
>Reference Ranges
>Screening
>Test Reliability
>Testing Tips
>Tests to Market
>Your Role
>_____
>
>          Troponin
>
>Also known as: TnI, TnT
>Formal name: Cardiac-specific Troponin I and T Related tests: CK,
>CK-MB, Myoglobin, Cardiac Biomarkers email this page
><mailto:?subject=Troponin: The
>Test&body=http://labtestsonline.org/understanding/analytes/troponin/tes
>t
>.html>   <mailto:?subject=Troponin: The
>Test&body=http://labtestsonline.org/understanding/analytes/troponin/tes
>t
>.html>
>
>print this article <javascript:void(0);>    <javascript:void(0);>
>
>
><http://www.labtestsonline.org/understanding/analytes/images/alltabs_of
>f
>_02.gif>
>          The Test
>_____
>
>       How is it used?
>When is it ordered?
>What does the test result mean?
>Is there anything else I should know?
>
>
>How is it used?
>Troponin tests are primarily ordered for people who have chest pain to
>see if they have had a heart attack or other damage to their heart.
>Either a troponin I or a troponin T can be performed; usually a
>laboratory will offer one test or the other. The troponin test may be
>ordered by itself or along with other cardiac biomarkers, tests for
>substances such as CK, CK-MB, and myoglobin. Troponin I and troponin T
>tests have begun to replace CK and CK-MB tests because they are more
>specific for heart injury (versus skeletal muscle injury) and are
>elevated for a longer period of time, but many doctors still prefer to
>have the additional information they get by ordering more than one
>cardiac biomarker.
>
>The troponin test will usually be ordered when a patient first comes
>into the emergency room and then may be ordered again at 6 and 12
>hours. The troponin test is used to help diagnose a heart attack, to
>detect and evaluate mild to severe heart injury, and to separate it
>from chest pain that may be due to other causes. In patients who have

6

>delayed getting treatment and have been having heart-related chest
>pain, discomfort, or other symptoms such as sweating, radiating pain in

>the arms, shoulders, jaw, neck, nausea, and/or lightheadedness for more
>than a day, the troponin test is the test of choice. This is because it

>will still be elevated in the blood if the symptoms were/are due to
>heart damage.
>
>
>[Back to top]
>
>
>When is it ordered?
>Troponin tests are usually ordered, often along with other heart tests
>such as CK, CK-MB, or myoglobin, when a patient has prolonged chest
>pain or other symptoms that could be related to heart injury.
>Typically, troponin is done 2 or 3 times during a 12- to 16-hour
>period. In patients with stable angina (predictable episodes of chest
>pain related to an inadequate flow of blood to the heart that resolve
>with rest and/or medication), the troponin test may be ordered when the

>patient's symptoms escalate, occur when the patient is at rest, and/or
>no longer ease with treatment, sings that the angina is becoming
>unstable, putting the patient at a much higher risk of having a heart
>attack or other serious heart problem in the near future.
>
>[Back to top]
>
>
>What does the test result mean?
>NOTE: A standard reference range is not available for this test.
>Because reference values are dependent on many factors, including
>patient age, gender, sample population, and test method, numeric test
>results have different meanings in different labs. Your lab report
>should include the specific reference range for your test. Lab Tests
>Online strongly recommends that you discuss your test results with your

>doctor. For more information on reference ranges, please read Reference

>Ranges and What They Mean.
>
>
>Normally, troponin levels are very low; even slight elevations can
>indicate some degree of damage to the heart. When the patient has
>significantly elevated troponin concentrations and other clinical
>signs, such as an abnormal ECG (electrocardiogram - an evaluation of
>the rhythm of the heart), then it is likely the patient has had a heart

>attack. If CK, CK-MB, and myoglobin concentrations are normal but
>troponin levels are increased, then it is likely that either a lesser
>degree of heart injury is present or that the injury took place more
>than 24 hours in the past. If the first troponin performed is normal
>but subsequent (6 hour and 12 hour samples) troponin tests are
>increased, then the heart injury likely occurred within a couple of
>hours prior to the first test and had not had time to increase. When a
>CK test is elevated but a CK-MB (which is more heart-specific than CK)
>and troponin test are normal, then it is likely that whatever symptoms
>are present are due to another cause, such as skeletal muscle injury.
>When a patient with chest pain and/or known stable angina has normal
>troponin, CK, and CK-MB concentrations, then it is likely that their
>heart has not been injured.

>Troponin will remain high for 1-2 weeks after a heart attack. Troponin
>is not generally affected by damage to other muscles so that muscle

7

>injections, accidents, strenuous exercise, and drugs that can damage
>muscle do not affect troponin levels.
>
>[Back to top]
>
>Is there anything else I should know?
>Increased troponin concentrations should not be used by themselves to
>diagnose or rule out a heart attack. A physical exam, clinical history,

>and ECG are also important. Some people who are having a heart attack
>will have normal troponin concentrations, and some people with
>increased troponin concentrations have no apparent heart injury.
>Troponin levels may also be elevated with acute or chronic conditions
>such as myocarditis (heart inflammation), congestive heart failure,
>severe infections, kidney disease, dermatomyositis, and polymyositis.
>
>_____
>
>From: Black, Bert [mailto:bblack@locklaw.com]
>Sent: Thu 3/16/2006 9:07 PM
>To: Beach Lawyer; Alexis Myer; Anita Sherbanee; Carlos Prietto;
>gmeunier@gainsben.com; jrestaino@lopez-hodes.com;
>Lisa.Dagostino@KlineSpecter.com; Lin Moen; Shannon Lukei;
>SSkikos@Lopez-Hodes.com; Ted Wacker
>Subject: RE: RE: Gerald Barnett: brief summary re meetings in SC
>
>Given the questions about whether there was an MI at all, I have to ask

>just what Don means by "marker for susceptibility to Vioxx-induced
>MI/CV events." In particular, what kind of non-MI CV events fall
>within this category?  Would BP spikes be a marker for making angina
>more severe, for example.

>_____
>
>From: Beach Lawyer [mailto:beachlawyer51@hotmail.com]
>Sent: Thu 3/16/2006 9:27 PM
>To: amyer@rcrlaw.net; asherbanee@rcrlaw.net; Black, Bert;
>Cprietto@rcrlaw.net; gmeunier@gainsben.com; jrestaino@lopez-hodes.com;
>Lisa.Dagostino@KlineSpecter.com; Lmoen@rcrlaw.net; slukei@rcrlaw.net;
>SSkikos@Lopez-Hodes.com; twacker@rcrlaw.net
>Subject: FW: RE: Gerald Barnett: brief summary re meetings in SC
>
>
>
>
>
> >From: "Arbitblit, Donald C." <DARBITBLIT@lchb.com>
> >To: "Beach Lawyer" <beachlawyer51@hotmail.com>
> >Subject: RE: Gerald Barnett: brief summary re meetings in SC
> >Date: Tue, 14 Mar 2006 22:52:55 -0800
> >
> >
> >Interesting. Please ask your folks to develop the longterm pre-Vioxx
> >blood pressure history-- going back a few years if possible. It would
>be
> >helpful to show that he only had the high spikes (> 160 systolic
> >and/or
> > >100 diastolic) after he started Vioxx. This would tend to support
>Vioxx
> >as the caus eof the spikes. Also, the picture is developing to
> >support even more strongly the view that such BP spikes on Vioxx are
> >a marker for susceptibility to Vioxx-induced MI/ CV events. The
> >APPROVe ESMB

8

>even
> >said so in 2/04, and a Merck statistician said there was a "striking
> >relationship" between the spikes and subsequent events in 11/04. So
> >it may be a low damages case, but could be a strong causation case if

>the BP history pre-Vioxx shows no spikes as high as those after Vioxx

> >started. Barnett was > 160 systolic BP on 1/20/00, 10/24/00, 2/24/02,

> >and 9/6/02, so this is more than a one-time deal.
> >
> >-----Original Message-----
> >From: Beach Lawyer [mailto:beachlawyer51@hotmail.com]
> >Sent: Tuesday, March 14, 2006 10:33 PM
> >To: Arbitblit, Donald C.
> >Subject: FW: Gerald Barnett: brief summary re meetings in SC
> >
> >
> >
> >
> >
> > >From: "Anita Sherbanee" <asherbanee@rcrlaw.net>
> > >To: "Mark Robinson" <beachlawyer51@hotmail.com>,"Mark Robinson"
> > ><Mrobinson@rcrlaw.net>,"Alexis Myer" <amyer@rcrlaw.net>,"Ted
> > >Wacker" <Twacker@rcrlaw.net>,"Carlos Prietto <Cprietto@rcrlaw.net>
> > >Subject: Gerald Barnett:  brief summary re meetings in SC
> > >Date: Tue, 14 Mar 2006 16:56:12 -0800
> > >
> > >Mark,
> > >Here are some additional thoughts on the Barnett case that we
>discussed
> > >last week after our meeting with Dr. Bryant, the cardiovascular
>surgeon
> > >who performed Mr. Barnett's bypass.  We also just received some
> > >additional records which provide us with additional information to
> > >evaluate this case.
> > >
> > >Issue of hypertension while on Vioxx:  (It appears his BP
> > >fluctuated while on Vioxx) We just received vital signs flow charts
> > >from Dr. Mikolaczyks (PCP & prescriber office).  On 10-22-99, which
> > >is before he started Vioxx,
>his
> > >BP is recorded as 136/84.  Subsequently that year in 2000 while on
> > >Vioxx, his BP drops to 128/68, 120/68, 116/68.  Then on 10/24/00
> > >his
>BP
> > >jumps up to  a one time value of 164/100  (there is nothing in his
> > >medical chart to suggest the cause of this sudden rise).   Two
>months
> > >later in December his BP is  back down to 138/62.    The doctor
>states
> > >in his record that   "  ...he has had a couple of episodes of chest
>pain
> > >but they do not sound cardiac....they seem to be reflux related..."
> > >[Note:  Dr. Guru, our inhouse reviewer has commented that this CP
>could
> > >very well be cardiac in nature; given the fact that this type of
> > >pain
> >is
> > >often referred pain and confused with reflux associated pain...]
> >Also,
> > >Dr. M writes as to the hypertension:  "  Hypertension:  his blood
> > >pressure is acceptable although a little elevated today at 138.  He
> > >states in the community it is under better control."   From what we
> > >know, Mr. Barnett monitored his BP at home.  He was the type of guy

9

```
>who
> > >was medically sophisticated and would have contacted his doctor if
>the
> > >BPs went up, so I am not sure how much we can make of hypertension
> > >issues.  If we argue that he did have hypertension, then arguably
> > >he
>or
> > >his doctor could have some degree of fault.  Note that Dr. M is
> > >also
>
> > >fully aware of the situation and does not treat the hypertension or
>his
> > >arguably high lipids (which I am sure defense will latch on to in
>some
> > >way) which they are trying to control with diet and exercise.  In a

> > >round about way, we are going to have to defend some of the care
>Dr.
> > >M
> > >rendered.
> > >
> > >In July 2001 his BP is recorded as 102/76.  In Feb 2002 it is
>recorded
> > >as 170/92, and then shortly before his HA, on 8/20/02, his BP is
> > >recorded on the graphic as 152/90, although the doctors note states
> > >120/80.  At the time of admission to the ER on 9/6/02, his BP was
> > >166/92.
> > >
> > >I do not know what to make of this labile hypertension except that
> > >I think we have a decent argument that Vioxx may have played a
> > >factor
>in
> > >it (but it was not treated..... or even relatively addressed by his
> > >doctors).
> > >
> > >Cardiolyte Stress Test of 1/24/00 & Hospital Admission of 1/20/00:
> > >Mr. Barnett was admitted to the ER on 1/19/00 for chest pain.  BP
> > >on admission was 162/95.  12 lead EKG was read as normal.  Was
> > >treated
>with
> > >SL Nitroglycerin.  Was on Vioxx and Seldane at the time.
>Pre-existing
> > >diagnosis of hyperlipidemia.  MD concerned about unstable angina
>given
> > >family history and personal diagnosis of hyperlipidemia.  He was
> >started
> > >on low dose betablocker, Metoprolol, and daily aspirin. (It is
>unclear
> > >why he did not stay on baby ASA) after discharge.  He was seen in
>the
> > >hospital by Dr. V. Swami (cardiologist) who stated that his cardiac
> >risk
> > >factors for CAD indicated a need for an exercise stress test.
> > >During
>
> > >this admission he had one episode of bradycardia.  He was
> > >discharged
>w/
> > >SL Nitro.  [Client has told us he was given the option of
> > >undergoing
>a
> > >heart cath or stress test by Dr. Swami.  Because the stress test
> > >was less invasive, he chose to undergo that test.]
> > >
> > >He underwent the stress test on 1/24/00.  The report stated: "mild
```

10

> > >decreased perfusion in the lateral wall.  LV EF was 56% [note:
> > >after
>
> > >his MI in 9/02 his EF was also 56%],  as to wall motion analysis,
> > >it
> >was
> > >normal but there was mild lateral ischemia."
> > >
> > >After this event, in March 2000, he is started on Lipitor.  [Per
> > >our internal reviewer, and Dr. Bryant, comment is made on why he
> > >was not started on Lipitor earlier, given his abnormal LDL and HDL,
> > >as well
>as
> > >being put on low dose aspirin given the diagnosis of ischemia).
> > >Dr. Bryant told us personally, that it may have been a judgment
> > >call as
>to
> > >what the standards for treatment of hyperlipidemia were in 2002.
> > >(He
>
> > >was probably protecting Dr. M.).  We are much more aggressive today
> >than
> > >we were a few years ago.  Nevertheless, the defense may make the
> > >argument that with his high lipids (as we know it today) his
> > >atherosclerosis was allowed to progress, eventually causing the
> > >small
>
> > >HA.
> > >
> > >Damages:
> > >According to Dr. Bryant, Mr. Barnett had a "very small heart attack
> > >(non
> > >Q-wave) on 9-6-02."  He feels that it probably came from a high
> > >grade
>
> > >vessel, and the HA did not damage the entire ventricular wall.  He
> >could
> > >not tell us where the heart damage was, albeit it was minimal.
> > >This
>is
> > >because it was not significant enough to produce EKG changes, and
> > >Mr. Barnett had relatively little chest pain at the time of
> > >admission.
>His
> > >enzymes were also not particularly high.  He stated that the
> > >picture
> > >was
> > >not of a classical total occlusion by a thrombus because of the
>minimal
> > >enzymes, quickly resolved chest pain, and lack of EKG findings.
> > >Had there been a clot, or typical scenario involving plaque
> > >rupture, his
>HA
> > >would have been more severe.  His thought was that this bordered on
>
> > >a
>
> > >"unstable angina" picture.  He also commented on the fact that the
> > >ejection fraction was normal and unchanged from 2000.
> > >
> > >He further stated  that a the time of the CABG/angio Mr. Barnett
> > >had collateral vessels.  When we asked him how long it takes to
>develop
> > >collaterals, he stated several years.   Thus the vessel had to
>have

11

> > >been occluded for quite some time.  If you look at the angiogram,
> > >you
>
> > >can see that the posterior descending was completed occluded and
> > >the presence of collateral vessels are clearly there.  Because of
> > >this he
>
> > >felt that this was not the vessel responsible for the heart attack.
> > >Because there is no heart damage in the areas proximal to the other

> > >significantly occluded vessels (i.e. the LAD, etc.) he thinks that
> > >probably one of the smaller vessels was the culprit vessel.  But we
> >just
> > >have no diagnostic way of telling.
> > >
> > >Dr. Bryant was interested about the theory of Vioxx potentially
>causing
> > >a progression of atherosclerosis.  However, we must be reminded of
>the
> > >events in 2000 and how they play into this scenario.  It seems that
>the
> > >majority of Mr. Barnetts present damages stem from his CABG.
> > >
> > >This doctor may make a very good witness and would probably be well

> > >liked by a jury.  We left him with the Ray and Farquar report as
> > >well
> >as
> > >some medical articles and internal documents for review.  We were
>able
> > >to make some headway with him, but in the grand scheme of things I
> > >am
> > >not sure how much given the actual facts of the case.
> > >
> > >Dr. Bryant also commented on the fact that Mr. Barnett stopped
>Lipitor
> > >one week prior to his event.  He believes there are studies out
> > >there
> >to
> > >support the premise that abrupt cessation of Lipitor can cause
> > >plaque
>
> > >disruption, and that the statin is a plaque stabilizing drug.
> >Therefore
> > >abrupt cessation could likely trigger plaque rupture (or so the
> > >manufacturer says...).  He said that the defense may pull that out
> > >of
>
> > >their bag of tricks also.
> > >
> > >Issue:  what are our damages if he had pre-existing CAD?
> > >(?therefore
>we
> > >must prove that Vioxx caused an acceleration of atherosclerosis).
> > >We
>
> > >are also unable to quantify amount of damage to heart (EF were same

> > >pre-and post event). As to economics, he was already retired.
> > >
> > >Meeting w/Pamela Pyle, M.D.
> > >We also met with this female physician who was the hospitalist who
> > >treated Mr. Barnett at the time of the 2002 admission.  She is
> > >rather attractive women who now runs a derma-spa.  She minimized
> > >his heart attack, and really was not persuaded about Vioxx as a

12

> > >causative
>factor
> > >in the MI.   The best she would give us is "its possible."   She
>felt
> > >that Mr. Barnett had diffuse disease to begin with and that
> >probably
>the
> > >MI was in some small vessel.   In the ER she treated him with
> > >Lovenox
> >and
> > >aspirin, (blood thinners), which prevent further clot from forming.

> > >This may be a very plausible explantation why no clot was seen at
> > >the
>
> > >time of the angio which was approximately 3 days later.
> > >
> > >She would not make a very good witness and Lexi and I got the
> >impression
> > >she really doesn't want to be involved in this litigation.   My
> > >impression is that she would do poorly under vigourous cross
> > >examination.   If at all possible, we should probably bury her.
> > >
> > >Client--Mr. Barnett and his wife:
> > >The plus side is that he probably will make a very likeable
> > >witness.
> >He
> > >is articulate and has a good memory.   He has testified in trials
>while
> > >with the FBI, so I would imagine someone like Phil Beck would not
> > >fluster him too much--given the fact he has worked with federal
> > >prosecutors and defense attorneys.   It appears that he was a very
> >active
> >person, but also very much in tune with the side effects of the
> >meds
>he
> > >was on.   He routinely researched them. He had researched Vioxx,
> > >and even discussed his concerns with Dr. M and Dr. Karavan (current
> > >cardiologist), but apparently Dr. Karavan told him that the data
> > >was "not conclusive" and he was also reassured by Dr. M. about the
> > >safety
> >of
> > >Vioxx.
> > >
> > >Mr. Barnett had been on Feldene for quite some time, however when
>Vioxx
> > >came on the market he recalls that Dr. McCaffrey (to whom we are
> >setting
> > >up a conference call) told him that Vioxx was "easier on the
>stomach."
> > >So he switched to Vioxx.   Mr. Barnett did say that Vioxx eased his
>pain
> > >and worked for him.
> > >
> > >Mrs. Barnett is a rather quiet woman, petite, wears large
> > >sunglasses
> >and
> > >loves her dogs.   When we told her that she would have to be in New
> > >Orleans for a significant length of time, she was concerned about
> > >boarding her dogs.   They are like her children apparantly.   She and
>Mr.
> > >Barnett obviously love each other very much; and she is accepting
> >of
>his
> > >ED resulting from his present use of beta-blockers.   (Note that he
>was

13

```
> > >also having some sexual difficulties pre-HA due to his bad back).
> > >
> > >
> > >
> > >
> > >
> > >
> > >
> >
> >
> >
> >This email message is for the sole use of the intended recipient(s)
> >and
>may
> >contain confidential and privileged information.
> >If you are not the intended recipient, please contact the sender by
>reply
> >email and destroy all copies of the original message.
> >To reply to our email administrator directly, send an email to
> >postmaster@lchb.com
>
>
>
>
>
>**********
>This e-mail may contain information that is privileged, confidential or

>otherwise protected from disclosure. If you are not the intended
>recipient or otherwise have received this message in error, you are not

>authorized to read, print, retain, copy or disseminate this message or
>any part of it. If you are not the intended recipient or otherwise have

>received this message in error, please notify us immediately by e-mail,

>discard any paper copies and delete all electronic files of the
>message.
>
>**********
```

```
**********
This e-mail may contain information that is privileged, confidential or
otherwise protected from disclosure.  If you are not the intended
recipient or otherwise have received this message in error, you are not
authorized to read, print, retain, copy or disseminate this message or
any part of it.  If you are not the intended recipient or otherwise
have received this message in error, please notify us immediately
by e-mail, discard any paper copies and delete all electronic files
of the message.
**********
```

FAC Resp. Exhibit B -- 1829



## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : |  |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
|  | : |  |
|  | : | **JUDGE FALLON** |
|  | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO**
*Barnett v. Merck & Co., Inc.*, 06-485

### ORDER & REASONS

Following a $51 million jury verdict for the Plaintiff in this bellwether case, $50 million

of which was awarded as compensatory damages, the Court ordered a new trial on the issue of

damages. *See In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 737 (E.D. La. Aug. 30, 2006).

Before the Court are Merck's Renewed Motion for Judgment as a Matter of Law (Rec. Doc.

7054) and alternative Motion for a New Trial on All Issues (Rec. Doc. 6739).  In opposing these

motions, the Plaintiff also asks the Court to reconsider its decision to order a new trial and argues

that a remission of the jury's verdict is appropriate in this case.  The Plaintiffs' Steering

Committee has filed an amicus curiae brief supporting the Plaintiff's request for a remittitur.

The Court heard oral argument on this matter and took Merck's motions under

submission.  For the following reasons, Merck's renewed motion for judgment as a matter of law

1

FAC Resp. Exhibit B -- 1830

is now DENIED, Merck's motion for a new trial on all issues is DENIED IN PART, and the

Court's Order and Reasons of August 30, 2006 is MODIFIED in several respects, including to

provide that there shall only be a new trial if the Plaintiff refuses to accept a remittitur of

$1,600,000.00, consisting of $600,000.00 in compensatory damages and $1,000,000.00 in

punitive damages. The Court will defer reconsidering the scope of the new trial at this time.

## I.   BACKGROUND

This is one of thousands of products liability cases currently pending in this multidistrict

litigation involving the prescription drug Vioxx, which was manufactured by Merck & Co., Inc.

("Merck").[1] The Plaintiff in this case, Mr. Gerald Barnett, is a former FBI agent and a citizen of

South Carolina. He was first prescribed Vioxx in 1999 to relieve chronic neck and back pain.

Mr. Barnett suffered a heart attack in September 2002 at the age of fifty-eight, and has endured

subsequent complications, all allegedly as a result of his use of Vioxx.

On January 31, 2006, the Plaintiff filed suit against Merck in this Court pursuant to

Pretrial Order No. 11.[2] With the consent of the parties, Mr. Barnett's case was selected to be the

second bellwether trial in this multidistrict litigation. Accordingly, on July 31, 2006, a jury trial

in this matter commenced in New Orleans. On August 17, 2006, the jury returned a verdict in

favor of the Plaintiff, finding by a preponderance of the evidence that Merck negligently failed to

---

[1] The Court will assume familiarity with the underlying facts and progress of the litigation, which have been discussed in previous orders. *See, e.g., In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450 (E.D. La. 2006) (denying certification of a nationwide personal injury class action); *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

[2] For a discussion of Pretrial Order No. 11 and the use of direct filing in this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897 (E.D. La. 2007).

FAC Resp. Exhibit B -- 1831

warn Mr. Barnett's treating physicians of the risks associated with taking Vioxx and that the drug was a contributing cause of the Plaintiff's injuries. The jury also found by clear and convincing evidence that Merck concealed information about Vioxx's risks from Mr. Barnett's physicians. However, the jury rejected the Plaintiff's strict liability claim. Based on these findings of liability, the jury awarded the Plaintiff $50 million in compensatory damages.[3] Following the announcement of the verdict, and outside of the jury's presence, Merck orally moved for judgment notwithstanding the verdict, or alternatively, for a new trial. The Court took this motion under submission and noted that Merck could supplement its arguments in writing. After brief presentations on the issue of punitive damages, the jury then found by clear and convincing evidence that Merck's conduct was willful, wanton, and/or in reckless disregard of the Plaintiff's rights and awarded him an additional $1 million. Following the punitive damages phase, Merck made several additional oral motions which were also taken under submission.

Troubled by the excessiveness of the jury's compensatory damage award, the Court withheld entry of judgment for several weeks. On August 30, 2006, the Court then entered the $51 million judgment and, on its own initiative, immediately ordered a new trial on the issue of damages pursuant to Rule 59(d) and denied Merck's post-trial oral motions as moot. *See In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 737 (E.D. La. 2006). The instant motions followed.

## II.    PRESENT MOTIONS

In its renewed motion for judgment as a matter of law, Merck again argues that the Plaintiff did not introduce sufficient evidence to prove his case. In its alternative motion for a

---

[3] It should be noted that neither the parties, in their closing arguments, nor the Court, in its instructions, explicitly informed the jury that a second phase on punitive damages would be held should the jury return an initial verdict in the Plaintiff's favor.

3

FAC Resp. Exhibit B -- 1832

new trial on all issues, Merck argues that the Seventh Amendment to the United States

Constitution prohibits a re-trial limited to the issue of damages, under the rule announced in

*Gasoline Products Co., Inc. v. Champlin Refining Co.*, 283 U.S. 494, 500-01 (1931) ("Where the

practice permits a partial new trial, it may not properly be resorted to unless it clearly appears

that the issue to be retried is so distinct and separable from the others that a trial of it alone may

be had without injustice."). Merck also argues that a new trial on all issues is required because

the jury's findings on strict liability, negligence, and deceit by concealment are fatally

inconsistent. Lastly, Merck contends that the entire verdict is infected with passion and

prejudice.

The Plaintiff opposes both motions and argues that the jury's findings of liability and

causation are supported by the weight of the evidence, and are not inconsistent. But the Plaintiff

also asks the Court to reconsider or modify its decision to order a new trial on the issue of

damages, and to instead offer him an opportunity to accept a remitted award. The Plaintiffs'

Steering Committee joins in this request, encouraging the Court to preserve the integrity of the

jury's findings, eliminate the prospective burden on the litigants from retrying some or all of this

bellwether case, and accelerate a final judgment that will assuredly be appealed.

## III.   LAW & ANALYSIS

### A.   Merck's Renewed Motion for Judgment as a Matter of Law

As the Court has noted on many occasions, the plaintiffs' claims in this litigation

"revolve around the safety risks of Vioxx, what Merck knew about any such risks, when Merck

knew this information, and what Merck should have done about it." *In re Vioxx Prods. Liab.*

*Litig.*, 448 F. Supp. 2d 737, 739-40 (E.D. La. 2006). With respect to this issue, the Court stands

4

by the conclusion it reached in its August 30, 2006 Order and Reasons:

> Considering all of the evidence in the light most favorable to the Plaintiff, the Court concludes that the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable.

*Id.* at 740. Accordingly, Merck's renewed motion for judgment as a matter of law will be denied.

### B.   Merck's Motion for a New Trial on All Issues

With the benefit of comprehensive briefing by the parties, the Court now clarifies its Order and Reasons of August 30, 2006 by (1) replacing the third paragraph of the "Law & Analysis" section of that decision, 448 F. Supp. 2d at 740, with the following discussion on the consistency of the verdict issue; (2) explaining the unintended implication that the jury's compensatory damage award was the result of passion or prejudice; and (3) conditioning the order mandating a new trial upon the Plaintiff's rejection of a remitted award of $1,600,000.00, consisting of $600,000.00 in compensatory damages and $1,000,000.00 in punitive damages.

#### 1.   *Liability Verdict Not Inconsistent*

Federal jurisdiction in this case is founded upon diversity of citizenship and the parties stipulated that South Carolina law would apply. Under the law of South Carolina, the jury's findings of liability on the Plaintiff's negligence and deceit claims are not fatally inconsistent with its finding of no liability on the Plaintiff's strict liability claim. *See Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 258 (4th Cir. 1998) ("In this diversity action, we follow the South Carolina appellate courts' consistent holdings that the doctrines of strict liability and negligence are distinct theories of recovery in a products liability case, and that the denial of liability under one of these doctrines does not automatically preclude the imposition of

5

liability under the other."); *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 325-26 (S.C. Ct. App. 1995) ("Although substantial similarities in analysis exist between strict liability for the sale of defective products and negligence principles of liability, especially in design and inadequate warning cases, differences do exist.  Strict liability and negligence are not mutually exclusive theories of recovery; that is, an injury may give rise to claims that can be established either under principles of strict liability or negligence, and failure to prove one theory does not preclude proving the other.") (citations omitted).

### 2.    *Compensatory Damages Award Excessive, Not Passionate*

Although never explicitly stated, the Court's Order and Reasons of August 30, 2006 could be read to imply that the jury's compensatory damage award was the result of passion or prejudice.  This was an unintended consequence, as the Court has not made such a finding.  Instead, without discussion from the parties, the Court merely felt at that time that a new trial on damages was an appropriate remedy for the excessive compensatory damages award.  Accordingly, the Court takes this opportunity to find specifically that the jury's award was not the result of passion nor prejudice, although it was excessive.

### 3.    *Remission of the Award*

To remedy the excessiveness of the jury's compensatory damages award, the Court now concludes that a new trial shall only be held if the Plaintiff rejects a remittitur.

The Court has previously noted that "the Plaintiff is retired, and therefore he cannot recover for lost wages or lost earning capacity." 448 F. Supp. 2d at 740.  Although the Plaintiff

6

did introduce evidence of some out-of-pocket medical expenses at trial,[4] his losses in this case are primarily noneconomic.  However, considering the entire record, the Court finds that the evidence does not justify a $50 million award for Mr. Barnett's medical expenses and noneconomic damages.

As the United States Court of Appeals for the Fifth Circuit has explained, determining the maximum amount the jury properly could have awarded for noneconomic damages is not an easy task:

> In a very real sense, there is no way to place a monetary value on a person's pain and suffering, especially where the agony is spread over an indefinite period of time. Most of us would not trade two or three million dollars for [Mr. Barnett's] situation. That cannot be the measure, however, because few indeed would take any sum of money in exchange for severe terminal illness or impending death.  Yet the very purpose of such damage awards is to affix dollar amounts for losses that cannot be measured in money.  We must therefore exercise our best judgment and place some restraint on awards, for as Judge Rubin has said, 'the sky is simply not the limit for jury verdicts.'

*Osburn v. Anchor Labs., Inc.*, 825 F.2d 908, 920 (5th Cir. 1987).

Considering the specific testimony and evidence introduced at trial, the Court believes in its best judgment that $600,000.00 is the most the jury "could properly have awarded" the Plaintiff as compensatory damages. *Zeno v. Great Atl. & Pac. Tea Co.*, 803 F.2d 178, 181 (5th Cir. 1986).[5]  And as previously noted, "the Court is not troubled by the $1 million punitive

---

[4] *See* "Exhibit 1," admitted during the Plaintiff's testimony.  (Trial Transcript dated Aug. 8, 2006, at 1575-1576.)

[5] While the Plaintiff's injuries and intangible feelings of insecurity undoubtedly affect the normal pursuits and pleasures of his life, he has been able to undergo preventative medical treatment as a result of this experience and has even returned to certain of his beloved recreations, including golf and Carolina shag dancing, apparently with the same gusto and commitment that he previously displayed.

7

damage award in this case." 448 F. Supp. 2d at 741.  Therefore, the Court will modify its Order and Reasons of August 30, 2006 to provide that there shall be a new trial unless Mr. Barnett will agree to a remittitur of $1,600,000.00, consisting of $600,000.00 in compensatory damages and $1,000,000.00 in punitive damages.[6]

**III.    CONCLUSION**

For the foregoing reasons, IT IS ORDERED that Merck's Renewed Motion for Judgment as a Matter of Law (Rec. Doc. 7054) is DENIED and Merck's Motion for a New Trial on All Issues (Rec. Doc. 6739) is DENIED IN PART.  The Court will defer reconsidering the scope of the new trial at this time.

IT IS FURTHER ORDERED that the Judgment of August 30, 2006 (Rec. Doc. 6576) is hereby VACATED and the Court's Order and Reasons of August 30, 2006 (Rec. Doc. 6577) is MODIFIED as provided for in this decision.

IT IS FURTHER ORDERED that there shall be a new trial, unless Mr. Barnett notifies the Court in writing within thirty days of the entry of this Order and Reasons that he will agree to a remittitur of $1,600,000.00, consisting of $600,000.00 in compensatory damages and $1,000,000.00 in punitive damages.

New Orleans, Louisiana, this 5th day of June, 2007.

_____
UNITED STATES DISTRICT JUDGE

---

[6]  In its Order and Reasons of August 30, 2006, the Court determined that the new trial would be limited to the issue of damages.  If the Plaintiff refuses to accept the remitted award, the Court will need to address Merck's argument that a new trial limited to the issue of damages runs afoul of the Seventh Amendment.  At this time, however, such an analysis is unnecessary.

8

Re: vioxx/barnett order

**Lin Moen**

**From:** Kline, Thomas R. [Tom.Kline@KlineSpecter.com]
**Sent:** Wednesday, June 06, 2007 6:31 AM
**To:** LDavis@hhkc.com; andy.birchfield@beasleyallen.com; Levin, A; bp@brettpowers.com; morellana@seegerweiss.com; SKibria@seegerweiss.com; cseeger@seegerweiss.com; cvtisi@aol.com; Dbuchanan@seegerweiss.com; dranier@rgelaw.com; ecabraser@lchb.com; FLonger@lfsblaw.com; frank.woodson@beasleyallen.com; dmartin@gainsben.com; Balefsky, Lee; beachlawyer51@hotmail.com; Mark Robinson; mwagner@seegerweiss.com; nparfitt@dc.ashcraftlaw.com; mparf@aol.com; MWeinkowitz@lfsblaw.com; leigh.odell@beasleyallen.com; pdoamaral@lchb.com; rarsenault@nbalawfirm.com; IMCEAEX-_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com; shellysanford@goforthlewis.com; sherman@hhkc.com; Jimenez, Margarita; trafferty@levinlaw.com; zvioxxarchive@hhkc.com
**Cc:** regina@hhkc.com; Specter, Shanin; Dagostino, Lisa S.; Balefsky, Lee; Hoffman, Mark A.; Tiger, Michelle
**Subject:** Re: vioxx/barnett order

Accd to Bloomberg, Mark is recommending that his client take the remittitur....I not only think that's the right decision, but also Fallon's upholding a one million dollar punitive award in the face of what he believes to be fair value for Barnett, namely $600K compensatory damages, arguably makes every case worth 2 to 3 times compensatory value, and is a major step forward in the litigation..Its our best value argument, to date..Nice work, indeed...
See below...

------

Merck Judge Who Voided $51 Mln Vioxx Verdict, Reverses Himself

By Jef Feeley

June 5 (Bloomberg) -- A judge who threw out a $51 million damage award against Merck & Co. last year over its Vioxx painkiller reversed himself and awarded $1.6 million to a former FBI agent who blamed his heart attack on the drug.

U.S. District Court Judge Eldon Fallon in New Orleans, who oversees all Vioxx litigation in federal courts, said today that the retired agent, Gerald Barnett, could accept a $1.6 million award or have a new trial on his claims that Vioxx caused his 2002 heart attack. The award includes $600,000 in compensatory and $1 million in punitive damages.

``I'm going to recommend that my client accept'' the award, said Mark Robinson, a Los Angeles-based lawyer who represented Barnett at trial. ``No appeals court is going to be able to say that amounts to an excessive verdict.''

Whitehouse Station, New Jersey-based Merck faces more than 27,000 lawsuits over Vioxx, which researchers have linked to increase risks of heart attack and strokes. Merck, the U.S.'s third-largest drugmaker, pulled the drug off the market in 2005. Kent Jarrell, a Merck spokesman, wasn't immediately available for comment on Fallon's ruling.

Merck had sought to have Barnett's verdict thrown out entirely. Fallon denied that request, ruling in August 2006 that the company was only entitled to a new trial on damages in the case.

-----Original Message-----
From: Lenny Davis <LDAVIS@hhkc.com>
To: Birchfield, Andy; Levin, A; bp@brettpowers.com <bp@brettpowers.com>; Christopher Seeger (PSC) (E-mail 2) <morellana@seegerweiss.com>; Christopher Seeger (PSC) (E-mail 3) <SKibria@seegerweiss.com>; Christopher Seeger (PSC) (E-mail) <cseeger@seegerweiss.com>; Christopher Vincent Tisi (PSC) (E-mail) <cvtisi@aol.com>; David R. Buchanan (E-mail) <dbuchanan@seegerweiss.com>; Drew Ranier (PSC) (E-mail) <dranier@rgelaw.com>; Elizabeth Cabraser (PSC) (E-mail) <ecabraser@lchb.com>; flonger@lfsblaw.com <flonger@lfsblaw.com>; Frank Woodson (E-mail) <frank.woodson@beasleyallen.com>; Gerald E. Meunier (PSC) (E-mail 2) <dmartin@gainsben.com>; Balefsky, Lee; Mark Robinson (PSC) (E-mail 2) <beachlawyer51@hotmail.com>; Mark Robinson (PSC) (E-mail) <mrobinson@rcrlaw.net>; Michael Wagner @ Seeger Weiss <mwagner@seegerweiss.com>; Michelle A. Parfitt (E-mail 2) <nparfitt@dc.ashcraftlaw.com>; Michelle A. Parfitt (E-mail) <mparf@aol.com>; mweinkowitz@lfsblaw.com <mweinkowitz@lfsblaw.com>; P. Leigh O'Dell (E-mail) <leigh.odell@beasleyallen.com>; Paulina do Amaral (E-mail) <pdoamaral@lchb.com>; Richard J. Arsenault (PSC) (E-mail) <rarsenault@nbalawfirm.com>; Russ Herman <IMCEAEX-_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com>; shellysanford@goforthlewis.com <shellysanford@goforthlewis.com>; Steve Herman <SHERMAN@hhkc.com>; Jimenez, Margarita; Kline, Thomas R.; Troy Rafferty (PSC) (E-mail) <trafferty@levinlaw.com>; ZVioxx Archive <zvioxxarchive@hhkc.com>
CC: dbuchanan@seegerweiss.com <dbuchanan@seegerweiss.com>; Regina Valenti <regina@hhkc.com>
Sent: Wed Jun 06 09:02:04 2007

10/6/2008

Re: vioxx/barnett order

Subject: vioxx/barnett order

Please see the order issued in the Barnett case. I have been told by Arnold that Mark has the order and is considering the remittitur

PLEASE NOTE THAT WE HAVE MOVED BACK TO OUR OFFICES AT 820 O'KEEFE AVENUE.  PLEASE DISCONTINUE ANY COMMUNICATION TO OUR PRIOR TEMPORARY OFFICE

Leonard A. Davis
Attorney at Law
Herman, Herman, Katz & Cotlar LLP
Herman, Mathis, Casey, Kitchens & Gerel LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
504-581-4892
504-561-6024(fax)

This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) immediately at (504) 581-4892 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

CONFIDENTIAL ATTORNEY WORK PRODUCT

10/6/2008

**Lin Moen**

| | |
|---|---|
| **From:** | Cvtisi@aol.com |
| **Sent:** | Wednesday, June 06, 2007 7:28 AM |
| **To:** | cseeger@seegerweiss.com; Tom.Kline@KlineSpecter.com; ldavis@hhkc.com; andy.birchfield@beasleyallen.com; alevin@lfsblaw.com; bp@brettpowers.com; morellana@seegerweiss.com; SKibria@seegerweiss.com; dbuchanan@seegerweiss.com; dranier@rgelaw.com; ECabraser@lchb.com; FLonger@lfsblaw.com; frank.woodson@beasleyallen.com; dmartin@gainsben.com; lee.balefsky@klinespecter.com; beachlawyer51@hotmail.com; Mark Robinson; MWagner@seegerweiss.com; nparfitt@dc.ashcraftlaw.com; MParf@aol.com; MWeinkowitz@lfsblaw.com; leigh.odell@beasleyallen.com; pdoamaral@lchb.com; rarsenault@nbalawfirm.com; IMCEAEX-_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com; shellysanford@goforthlewis.com; sherman@hhkc.com; Margarita.Jimenez@KlineSpecter.com; trafferty@levinlaw.com; zvioxxarchive@hhkc.com |
| **Cc:** | regina@hhkc.com; shanin.specter@klinespecter.com; Lisa.Dagostino@KlineSpecter.com; mark.hoffman@klinespecter.com; Michelle.Tiger@KlineSpecter.com |
| **Subject:** | Re: vioxx/barnett order |

And I cannot recall a single Pham case where a Federal Judge upheld an award of punitive damages.  This is a great result.

Good work to Mark, Arnold and everyone on this effort.

In a message dated 6/6/2007 9:37:12 A.M. Eastern Daylight Time, cseeger@seegerweiss.com writes:

> I totally agree with you analysis.
> -------------------------
> Sent from my BlackBerry Wireless Handheld
>
> -----Original Message-----
> From: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>
> To: LDavis@hhkc.com <LDavis@hhkc.com>; andy.birchfield@beasleyallen.com <andy.birchfield@beasleyallen.com>;
> Levin, A <alevin@lfsblaw.com>; bp@brettpowers.com <bp@brettpowers.com>; Orellana, Mirna;
> SKibria@seegerweiss.com <SKibria@seegerweiss.com>; Seeger, Chris; cvtisi@aol.com <cvtisi@aol.com>; Buchanan,
> David; dranier@rgelaw.com <dranier@rgelaw.com>; ecabraser@lchb.com <ecabraser@lchb.com>; FLonger@lfsblaw.com
> <FLonger@lfsblaw.com>; frank.woodson@beasleyallen.com <frank.woodson@beasleyallen.com>;
> dmartin@gainsben.com <dmartin@gainsben.com>; Balefsky, Lee <Lee.Balefsky@KlineSpecter.com>;
> beachlawyer51@hotmail.com <beachlawyer51@hotmail.com>; NJRT - mrobinson@rcrlaw.net; Wagner, Michael;
> nparfitt@dc.ashcraftlaw.com <nparfitt@dc.ashcraftlaw.com>; mparf@aol.com <mparf@aol.com>;
> MWeinkowitz@lfsblaw.com <MWeinkowitz@lfsblaw.com>; leigh.odell@beasleyallen.com <leigh.odell@beasleyallen.com>;
> pdoamaral@lchb.com <pdoamaral@lchb.com>; rarsenault@nbalawfirm.com <rarsenault@nbalawfirm.com>; IMCEAEX-
> _O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com
> <IMCEAEX-
> _O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com>;
> shellysanford@goforthlewis.com <shellysanford@goforthlewis.com>; sherman@hhkc.com <sherman@hhkc.com>;
> Jimenez, Margarita <Margarita.Jimenez@KlineSpecter.com>; NJRT - trafferty@levinlaw.com; zvioxxarchive@hhkc.com
> <zvioxxarchive@hhkc.com>
> CC: regina@hhkc.com <regina@hhkc.com>; Specter, Shanin <Shanin.Specter@KlineSpecter.com>; Dagostino, Lisa S.
> <Lisa.Dagostino@KlineSpecter.com>; Balefsky, Lee <Lee.Balefsky@KlineSpecter.com>; Hoffman, Mark A.
> <Mark.Hoffman@KlineSpecter.com>; Tiger, Michelle <Michelle.Tiger@KlineSpecter.com>
> Sent: Wed Jun 06 09:30:36 2007
> Subject: Re: vioxx/barnett order
>
>
> Accd to Bloomberg, Mark is recommending that his client take the remittitur....I not only think that's the right decision, but
> also Fallon's upholding a one million dollar punitive award in the face of what he believes to be fair value for Barnett,
> namely $600K compensatory damages,  arguably makes every case worth 2 to 3  times compensatory value, and is a
> major step forward in the litigation..Its our best value  argument, to date..Nice work, indeed...
> See below...
>
> ------
> Merck Judge Who Voided $51 Mln Vioxx Verdict, Reverses Himself

FAC Resp. Exhibit B -- 1840

By Jef Feeley

June 5 (Bloomberg) -- A judge who threw out a $51 million damage award against Merck & Co. last year over its Vioxx painkiller reversed himself and awarded $1.6 million to a former FBI agent who blamed his heart attack on the drug.

U.S. District Judge Eldon Fallon in New Orleans, who oversees all Vioxx litigation in federal courts, said today that the retired agent, Gerald Barnett, could accept a $1.6 million award or have a new trial on his claims that Vioxx caused his 2002 heart attack. The award includes $600,000 in compensatory and $1 million in punitive damages.

``I'm going to recommend that my client accept'' the award, said Mark Robinson, a Los Angeles-based lawyer who represented Barnett at trial. ``No appeals court is going to be able to say that amounts to an excessive verdict.''

Whitehouse Station, New Jersey-based Merck faces more than 27,000 lawsuits over Vioxx, which researchers have linked to increase risks of heart attack and strokes. Merck, the U.S.'s third-largest drugmaker, pulled the drug off the market in 2005. Kent Jarrell, a Merck spokesman, wasn't immediately available for comment on Fallon's ruling.

Merck had sought to have Barnett's verdict thrown out entirely. Fallon denied that request, ruling in August 2006 that the company was only entitled to a new trial on damages in the case.

-----Original Message-----
From: Lenny Davis <LDAVIS@hhkc.com>
To: Birchfield, Andy; Levin, A; bp@brettpowers.com <bp@brettpowers.com>; Christopher Seeger (PSC) (E-mail 2) <morellana@seegerweiss.com>; Christopher Seeger (PSC) (E-mail 3) <SKibria@seegerweiss.com>; Christopher Seeger (PSC) (E-mail) <cseeger@seegerweiss.com>; Christopher Vincent Tisi (PSC) (E-mail) <cvtisi@aol.com>; David R. Buchanan (E-mail) <dbuchanan@seegerweiss.com>; Drew Ranier (PSC) (E-mail) <dranier@rgelaw.com>; Elizabeth Cabraser (PSC) (E-mail) <ecabraser@lchb.com>; flonger@lfsblaw.com <flonger@lfsblaw.com>; Frank Woodson (E-mail) <frank.woodson@beasleyallen.com>; Gerald E. Meunier (PSC) (E-mail 2) <dmartin@gainsben.com>; Balefsky, Lee; Mark Robinson (PSC) (E-mail 2) <beachlawyer51@hotmail.com>; Mark Robinson (PSC) (E-mail) <mrobinson@rcrlaw.net>; Michael Wagner @ Seeger Weiss <mwagner@seegerweiss.com>; Michelle A. Parfitt (E-mail 2) <nparfitt@dc.ashcraftlaw.com>; Michelle A. Parfitt (E-mail) <mparf@aol.com>; mweinkowitz@lfsblaw.com <mweinkowitz@lfsblaw.com>; P. Leigh O'Dell (E-mail) <leigh.odell@beasleyallen.com>; Paulina do Amaral (E-mail) <pdoamaral@lchb.com>; Richard J. Arsenault (PSC) (E-mail) <rarsenault@nbalawfirm.com>; Russ Herman <IMCEAEX-_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com>; shellysanford@goforthlewis.com <shellysanford@goforthlewis.com>; Steve Herman <SHERMAN@hhkc.com>; Jimenez, Margarita; Kline, Thomas R.; Troy Rafferty (PSC) (E-mail) <trafferty@levinlaw.com>; ZVioxx. Archive <zvioxxarchive@hhkc.com>
CC: dbuchanan@seegerweiss.com <dbuchanan@seegerweiss.com>; Regina Valenti <regina@hhkc.com>
Sent: Wed Jun 06 09:02:04 2007
Subject: vioxx/barnett order

Please see the order issued in the Barnett case. I have been told by Arnold that Mark has the order and is considering the remittitur

PLEASE NOTE THAT WE HAVE MOVED BACK TO OUR OFFICES AT 820 O'KEEFE AVENUE.  PLEASE DISCONTINUE ANY COMMUNICATION TO OUR PRIOR TEMPORARY OFFICE

Leonard A. Davis

---

See what's free at AOL.com.

10/6/2008

Re: vioxx/barnett order

**Lin Moen**

**From:** Kline, Thomas R. [Tom.Kline@KlineSpecter.com]
**Sent:** Wednesday, June 06, 2007 7:40 AM
**To:** cvtisi@aol.com; cseeger@seegerweiss.com; LDavis@hhkc.com; andy.birchfield@beasleyallen.com; Levin, A; bp@brettpowers.com; morellana@seegerweiss.com; SKibria@seegerweiss.com; Dbuchanan@seegerweiss.com; dranier@rgelaw.com; ecabraser@lchb.com; FLonger@lfsblaw.com; frank.woodson@beasleyallen.com; dmartin@gainsben.com; Balefsky, Lee; beachlawyer51@hotmail.com; Mark Robinson; mwagner@seegerweiss.com; nparfitt@dc.ashcraftlaw.com; mparf@aol.com; MWeinkowitz@lfsblaw.com; leigh.odell@beasleyallen.com; pdoamaral@lchb.com; rarsenault@nbalawfirm.com; IMCEAEX-_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com; shellysanford@goforthlewis.com; sherman@hhkc.com; Jimenez, Margarita; trafferty@levinlaw.com; zvioxxarchive@hhkc.com
**Cc:** regina@hhkc.com; Specter, Shanin; Dagostino, Lisa S.; Hoffman, Mark A.; Tiger, Michelle
**Subject:** Re: vioxx/barnett order

And, it speaks volumes that the federal judge who has heard this evidence five times believes punitives are warranted and to the tune of a million dollars a plantiff... That should be the message here..its a BIG win..

-----Original Message-----
From: Cvtisi@aol.com <Cvtisi@aol.com>
To: cseeger@seegerweiss.com <cseeger@seegerweiss.com>; Kline, Thomas R.; ldavis@hhkc.com <ldavis@hhkc.com>; Birchfield, Andy; Levin, A; bp@brettpowers.com <bp@brettpowers.com>; morellana@seegerweiss.com <morellana@seegerweiss.com>; SKibria@seegerweiss.com <SKibria@seegerweiss.com>; dbuchanan@seegerweiss.com <dbuchanan@seegerweiss.com>; dranier@rgelaw.com <dranier@rgelaw.com>; ECabraser@lchb.com <ECabraser@lchb.com>; FLonger@lfsblaw.com <FLonger@lfsblaw.com>; frank.woodson@beasleyallen.com <frank.woodson@beasleyallen.com>; dmartin@gainsben.com <dmartin@gainsben.com>; Balefsky, Lee; beachlawyer51@hotmail.com <beachlawyer51@hotmail.com>; mrobinson@rcrlaw.net <mrobinson@rcrlaw.net>; MWagner@seegerweiss.com <MWagner@seegerweiss.com>; nparfitt@dc.ashcraftlaw.com <nparfitt@dc.ashcraftlaw.com>; MParf@aol.com <MParf@aol.com>; MWeinkowitz@lfsblaw.com <MWeinkowitz@lfsblaw.com>; leigh.odell@beasleyallen.com <leigh.odell@beasleyallen.com>; pdoamaral@lchb.com <pdoamaral@lchb.com>; rarsenault@nbalawfirm.com <rarsenault@nbalawfirm.com>; IMCEAEX-_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com <IMCEAEX-_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com>; shellysanford@goforthlewis.com <shellysanford@goforthlewis.com>; sherman@hhkc.com <sherman@hhkc.com>; Jimenez, Margarita; trafferty@levinlaw.com <trafferty@levinlaw.com>; zvioxxarchive@hhkc.com <zvioxxarchive@hhkc.com>
CC: regina@hhkc.com <regina@hhkc.com>; Specter, Shanin; Dagostino, Lisa S.; Hoffman, Mark A.; Tiger, Michelle
Sent: Wed Jun 06 10:28:18 2007
Subject: Re: vioxx/barnett order

And I cannot recall a single Pham case where a Federal Judge upheld an award of punitive damages. This is a great result.

Good work to Mark, Arnold and everyone on this effort.

In a message dated 6/6/2007 9:37:12 A.M. Eastern Daylight Time, cseeger@seegerweiss.com writes:

I totally agree with you analysis.
---------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>
To: LDavis@hhkc.com <LDavis@hhkc.com>; andy.birchfield@beasleyallen.com <andy.birchfield@beasleyallen.com>; Levin, A <alevin@lfsblaw.com>; bp@brettpowers.com <bp@brettpowers.com>; Orellana, Mirna; SKibria@seegerweiss.com <SKibria@seegerweiss.com>; Seeger, Chris; cvtisi@aol.com <cvtisi@aol.com>; Buchanan, David; dranier@rgelaw.com <dranier@rgelaw.com>; ecabraser@lchb.com <ecabraser@lchb.com>; FLonger@lfsblaw.com <FLonger@lfsblaw.com>; frank.woodson@beasleyallen.com <frank.woodson@beasleyallen.com>; dmartin@gainsben.com <dmartin@gainsben.com>; Balefsky, Lee <Lee.Balefsky@KlineSpecter.com>; beachlawyer51@hotmail.com <beachlawyer51@hotmail.com>; NJRT - mrobinson@rcrlaw.net; Wagner, Michael; nparfitt@dc.ashcraftlaw.com <nparfitt@dc.ashcraftlaw.com>; mparf@aol.com <mparf@aol.com>; MWeinkowitz@lfsblaw.com <MWeinkowitz@lfsblaw.com>; leigh.odell@beasleyallen.com <leigh.odell@beasleyallen.com>; pdoamaral@lchb.com <pdoamaral@lchb.com>; rarsenault@nbalawfirm.com <rarsenault@nbalawfirm.com>; IMCEAEX-_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com <IMCEAEX-_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com>; shellysanford@goforthlewis.com <shellysanford@goforthlewis.com>; sherman@hhkc.com <sherman@hhkc.com>; Jimenez, Margarita

10/6/2008

Re: vioxx/barnett order

<Margarita.Jimenez@KlineSpecter.com>; NJRT - trafferty@levinlaw.com; zviooxarchive@hhkc.com <zvioxxarchive@hhkc.com>
     CC: regina@hhkc.com <regina@hhkc.com>; Specter, Shanin <Shanin.Specter@KlineSpecter.com>; Dagostino, Lisa S.
<Lisa.Dagostino@KlineSpecter.com>; Balefsky, Lee <Lee.Balefsky@KlineSpecter.com>; Hoffman, Mark A.
<Mark.Hoffman@KlineSpecter.com>; Tiger, Michelle <Michelle.Tiger@KlineSpecter.com>
     Sent: Wed Jun 06 09:30:36 2007
     Subject: Re: vioxx/barnett order


     Acced to Bloomberg, Mark is recommending that his client take the remittitur....I not only think that's the right decision, but also Fallon's
upholding a one million dollar punitive award in the face of what he believes to be fair value for Barnett, namely $600K compensatory damages,
arguably makes every case worth 2 to 3 times compensatory value, and is a major step forward in the litigation..Its our best value  argument, to
date..Nice work, indeed...
     See below...

     ------
     Merck Judge Who Voided $51 Mln Vioxx Verdict, Reverses Himself


     By Jef Feeley

     June 5 (Bloomberg) -- A judge who threw out a $51 million damage award against Merck & Co. last year over its Vioxx painkiller reversed
himself and awarded $1.6 million to a former FBI agent who blamed his heart attack on the drug.

     U.S. District Judge Eldon Fallon in New Orleans, who oversees all Vioxx litigation in federal courts, said today that the retired agent, Gerald
Barnett, could accept a $1.6 million award or have a new trial on his claims that Vioxx caused his 2002 heart attack. The award includes $600,000
in compensatory and $1 million in punitive damages.

     ``I'm going to recommend that my client accept'' the award, said Mark Robinson, a Los Angeles-based lawyer who represented Barnett at trial.
``No appeals court is going to be able to say that amounts to an excessive verdict.''

     Whitehouse Station, New Jersey-based Merck faces more than 27,000 lawsuits over Vioxx, which researchers have linked to increase risks of
heart attack and strokes. Merck, the U.S.'s third-largest drugmaker, pulled the drug off the market in 2005. Kent Jarrell, a Merck spokesman, wasn't
immediately available for comment on Fallon's ruling.

     Merck had sought to have Barnett's verdict thrown out entirely. Fallon denied that request, ruling in August 2006 that the company was only
entitled to a new trial on damages in the case.

     -----Original Message-----
     From: Lenny Davis <LDAVIS@hhkc.com>
     To: Birchfield, Andy; Levin, A; bp@brettpowers.com <bp@brettpowers.com>; Christopher Seeger (PSC) (E-mail 2)
<morellana@seegerweiss.com>; Christopher Seeger (PSC) (E-mail 3) <SKibria@seegerweiss.com>; Christopher Seeger (PSC) (E-mail)
<cseeger@seegerweiss.com>; Christopher Vincent Tisi (PSC) (E-mail) <cvtisi@aol.com>; David R. Buchanan (E-mail)
<dbuchanan@seegerweiss.com>; Drew Ranier (PSC) (E-mail) <dranier@rgelaw.com>; Elizabeth Cabraser (PSC) (E-mail)
<ecabraser@lchb.com>; flonger@lfsblaw.com <flonger@lfsblaw.com>; Frank Woodson (E-mail) <frank.woodson@beasleyallen.com>; Gerald E.
Meunier (PSC) (E-mail 2) <dmartin@gainsben.com>; Balefsky, Lee; Mark Robinson (PSC) (E-mail 2) <beachlawyer51@hotmail.com>; Mark
Robinson (PSC) (E-mail) <mrobinson@rcrlaw.net>; Michael Wagner @ Seeger Weiss <mwagner@seegerweiss.com>; Michelle A. Parfitt (E-mail
2) <nparfitt@dc.ashcraftlaw.com>; Michelle A. Parfitt (E-mail) <mparf@aol.com>; mweinkowitz@lfsblaw.com <mweinkowitz@lfsblaw.com>; P.
Leigh O'Dell (E-mail) <leigh.odell@beasleyallen.com>; Paulina do Amaral (E-mail) <pdoamaral@lchb.com>; Richard J. Arsenault (PSC) (E-mail)
<rarsenault@nbalawfirm.com>; Russ Herman <IMCEAEX-
_O=HERMAN+20HERMAN+20KATZ+20+26+20COTLAR_ou=WORKGROUP_cn=Recipients_cn=rherman@hhkc.com>;
shellysanford@goforthlewis.com <shellysanford@goforthlewis.com>; Steve Herman <SHERMAN@hhkc.com>; Jimenez, Margarita; Kline,
Thomas R.; Troy Rafferty (PSC) (E-mail) <trafferty@levinlaw.com>; ZVioxx Archive <zvioxxarchive@hhkc.com>
     CC: dbuchanan@seegerweiss.com <dbuchanan@seegerweiss.com>; Regina Valenti <regina@hhkc.com>
     Sent: Wed Jun 06 09:02:04 2007
     Subject: vioxx/barnett order

     Please see the order issued in the Barnett case. I have been told by Arnold that Mark has the order and is considering the remittitur


     PLEASE NOTE THAT WE HAVE MOVED BACK TO OUR OFFICES AT 820 O'KEEFE AVENUE.  PLEASE DISCONTINUE ANY
COMMUNICATION TO OUR PRIOR TEMPORARY OFFICE

     Leonard A. Davis


10/6/2008

FAC Resp. Exhibit B -- 1843

ee what's free at AOL.com <http://www.aol.com?ncid=AOLAOF00020000000503> .

Aug 21 2007
2:05PM

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | **MDL NO. 1657** |
| IN RE: VIOXX | : |  |
| PRODUCTS LIABILITY LITIGATION | : | **SECTION: L** |
|  | : |  |
|  | : | **JUDGE FALLON** |
|  | : |  |
|  | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. : ..

**THIS DOCUMENT RELATES TO:**
*Barnett v. Merck & Co., Inc.*, 06-485

## ORDER

Before the Court is Merck's Motion for New Trial (Rec. Doc. 11661). On June 5, 2007,

the Court denied in part a previous, and almost identical, motion for a new trial on all issues filed

by Merck. *See* Rec. Doc. 11258. Indeed, Merck recognizes that in the instant motion, it is

asking the Court to reconsider its June 5, 2007 decision to offer the Plaintiff a remittitur in the

above-captioned case. Since the *Federal Rules of Civil Procedure* do not specifically recognize

a motion for reconsideration, such motions are treated as either a motion to alter or amend

judgment under Rule 59(e) of the *Federal Rules of Civil Procedure* or a motion for relief from

judgment or order under Rule 60(b) of the *Federal Rules of Civil Procedure*. *See Ford v.*

*Elsbury*, 32 F.3d 931, 937 (5th Cir. 1994); *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910

F.2d 167, 173 (5th Cir. 1990). Because Merck's motion was filed within ten days of the

-1-

rendition of final judgment, it shall be governed by Rule 59(e). *Lavespere*, 910 F.2d at 173.[1]

"Courts in this district hold that a moving party must satisfy at least one of the following criteria to prevail on a Rule 59(e) motion:  (1) the motion is necessary to correct a manifest error of fact or law; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is necessary in order to prevent manifest injustice; [or] (4) the motion is justified by an intervening change in the controlling law." *Motiva Enters. LLC v. Wegmann*, No. 00-3096, 2001 WL 246414 (E.D. La. Mar. 12, 2001).  In the instant motion, Merck re-urges its arguments in support of a new trial on all issues and contends that the Court made an error of law in remitting the jury's award.  For the reasons stated in the Court's June 5, 2007 Order & Reasons, IT IS ORDERED that Merck's Motion for New Trial (Rec. Doc. 11661) is DENIED.

New Orleans, Louisiana, this 20th day of August, 2007.

_____
UNITED STATES DISTRICT JUDGE

---

[1] Merck filed the instant motion on July 13, 2007.  While Merck's motion was filed within ten days of rendition of final judgment (which was entered on June 28, 2007), it was filed more than ten days after the Court's June 5, 2007 decision to remit the jury's award.  Regardless, the Court finds that Merck's motion lacks merit under both Rule 59 and Rule 60 standards.

-2-

FAC Resp. Exhibit B -- 1846



**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

2005 JUN -7 PM 4:36

# FILED UNDER SEAL

CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                                    :        MDL NO. 1657
      PRODUCTS LIABILITY LITIGATION  :
                                    :        SECTION: L
                                      :
                                      :        JUDGE FALLON
                                      :        MAG. JUDGE KNOWLES
                                      :
... .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

THIS DOCUMENT RELATES TO ALL CASES

## PSC'S POSITION PAPER REGARDING COMPULSION OF PRODUCTION OF MERCK'S SALES REPRESENTATIVE DATABASE AND CERTAIN DETAILER INFORMATION

FAC Resp. Exhibit B -- 1847

"[T]he documents suggest that Merck's sales representatives did not appropriately educate physicians about the research showing Vioxx's cardiovascular risks. To the contrary, it appears that **Merck's highly trained sales force was instructed not to address the new research findings, but to emphasize outdated and misleading data that indicated Vioxx was safer than alternatives. The documents thus raise serious questions about the role played by Merck's representatives in physician prescribing of a risky drug.**"
--May 5, 2005 memorandum from Rep. Henry A. Waxman to Democratic Members of the Government Reform Committee, Exhibit 1, page 7

"**'Obstacle Handling Exercises'; 'How did some of you convince your parents to get a pet, car, late curfew or anything like that?'"; "OBSTACLE 4 -" I am concerned about the cardiovascular effects of Vioxx."; "Dodge Ball - VIOXX (rofecoxib)- DODGE!"**"
--Selected quotes from undated Merck Vioxx sales training materials, Exhibit 2

## I. INTRODUCTION

This position paper has a limited focus. Plaintiffs have requested that Merck produce the Vioxx sales call note database (FACTS) in its entirety. (Exhibit 7, Request for Production #111a) In addition, Plaintiffs have requested Merck provide the names, last known addresses and current employment of all Vioxx sales and detail representatives. (Ex. 7, Interrogatory #24 a, b and h.) Merck does not dispute that it keeps very comprehensive records of this information in its computer databases. However, in this litigation which is expected to eventually involve over 100,000 plaintiffs, Merck at the last status conference took the extreme position that it will not produce any records of detailmen or their sales calls beyond those records which relate to communications with prescribing physicians of plaintiffs within this MDL.

Merck's stance is completely unreasonable, not to mention impractical and contrary to established discovery law. Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. "Relevant information

need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Federal Rule of Civil Procedure 26(b)(1)

This litigation involves thousands of individual cases and spans the entire country. The discovery conducted here is for the benefit of not only present but prospective litigants, and the databases requested are likely to lead to the discovery of relevant evidence. Limiting discovery to records of only a fraction of Merck's sales force- those sales representatives who had called on the plaintiffs' prescribing physicians- would allow Merck to effectively conceal what is some of the most important, relevant and probative evidence on the claims and defenses in this case.

The records requested reflect directly on each of the key elements of the Plaintiffs' claims, including notice, defect, causation, failure to warn, deceit and misrepresentation, not to mention fraud and punitive damages issues. They are also highly probative on issues relating to the primary defenses asserted by Merck, including the learned intermediary doctrine, adequacy of warnings, statute of limitations and lack of causation. It is therefore imperative that the Plaintiffs be provided with all evidence regarding all communications between Merck employees and the medical community, regardless of whether the physicians contacted prescribed Vioxx to a plaintiff.

## II. FACTUAL BACKGROUND

According to the testimony of Dr. David J. Graham of the FDA on November 18, 2004 before the Senate Finance Committee, the number of deaths, heart attacks and strokes in the United States caused by Vioxx is estimated to be between 88,000 and 138,000, and these may have led to as many as 28,000 to 55,000 deaths. While Vioxx was on the market, Merck racked up over $10 Billion in sales. However, $9.5 Billion of

that came after the results of the VIGOR study in 2000 showed Vioxx had a nearly five-fold increase in risk of heart attacks relative to a comparator drug.

A Congressional committee attempting to determine why this occurred has been reviewing thousands of Merck documents relating to the marketing of Vioxx, including presentations, training sessions and materials given to Merck agents, as well as records of communications to healthcare providers. In a memorandum dated May 5, 2005 from Rep. Henry A. Waxman to Democratic Members of the Government Reform Committee Re: The Marketing of Vioxx to Physicians, Congressman Waxman stated: "[T]he vast majority of these prescriptions were written by physicians after evidence of Vioxx's risks had already surfaced. Even as evidence mounted that use of Vioxx was associated with heart attacks and strokes, physicians continued to prescribe Vioxx to millions of patients. How could this have happened?" (Exhibit 1, page 3)

The answer is found in Merck's records:

> "...Based on a review of the Merck documents, it appears that **Merck sent over 3,000 highly trained representatives into doctor's offices and hospitals armed with misleading information about Vioxx's health risks.** The documents indicate that Merck ... **prohibited the representatives from discussing contrary studies (including those financed by Merck) that showed increased risks from Vioxx...**"(Exhibit 1 , page 3)

The memorandum goes on to say:

> "These documents provide an extraordinary window into how Merck trained its sales representatives and used them to communicate to physicians about Vioxx and its health risks. In fact, **the documents may offer the most extensive account ever provided to Congress of a drug company's efforts to use its sales force to market to physicians and overcome health concerns.**" His report goes on to detail how Merck's sales force was used "**to counter growing evidence of concern over the safety of Vioxx.**" and how "**[t]hese efforts involved providing highly questionable information to physicians and pursuing aggressive marketing strategies. Merck's promotional activities appear to help explain robust sales of Vioxx despite mounting evidence of risk.**" (Exhibit 1, page 1)

The review of the records shows that Merck detailmen were instructed and trained to play 'Dodge Ball' with 'Obstacles' raised in the medical community such as questions and concerns about the drug's safety, and studies which pointed to increased risks of serious of cardiovascular events. (Exhibits 2 and 3) They were told to "STOP defending Vioxx" and "START offensively selling the core benefit of this product..." (Exhibit 4) Merck even specifically instructed them not to initiate discussions with physicians regarding the VIGOR study, an FDA advisory committee's review of Vioxx, or articles in the press regarding Vioxx. (Exhibits 5 and 6)  According to the memorandum:

> "After Merck's VIGOR study reported increased heart attack risks, Merck directed its sales force to show physicians a "Cardiovascular Card" that made it appear that Vioxx could be 8 to 11 times safer than other anti-inflammatory drugs. **This card omitted any reference to the VIGOR findings and was based on data FDA considered to be inappropriate for a safety analysis.**" (Exhibit 1, page 4, and Exhibit 11)

> "**After the FDA advisory committee voted that physicians should be informed about the risks found in the VIGOR study, Merck sent a bulletin to its sales force** that advised: "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS COMMITTEE ... OR THE RESULTS OF THE ... VIGOR STUDY." If physicians asked about the VIGOR study, Merck representatives were directed to respond, **"I cannot discuss the study with you"**"(Exhibit 1, page 4)

The memorandum concluded by stating:

> "A review of over 20,000 pages of Merck documents suggests that **the company used its sales force of thousands to counter growing evidence of concern over the safety of Vioxx. These efforts involved providing highly questionable information to physicians and pursuing aggressive marketing strategies.** Merck's promotional activities appear to help explain robust sales of Vioxx despite mounting evidence of risk." (Exhibit 1, page 29)

As can be seen, the significance to this MDL of the sales and marketing story, and all of the available evidence, cannot be understated.  Merck's nation-wide

pattern and practice of deception is at the core of the fundamental issues of these cases. In view of the foregoing, Plaintiffs are making a limited request that Merck produce the entire FACTS database as it relates to Rofecoxib and/or Vioxx. (Request for Production #111a. (Exhibit 7) In addition, Plaintiffs request Merck provide a full response to Interrogatory #24 a, b and h (Exhibit 7) regarding the names, addresses and current employment of all the Vioxx sales representatives or detailers. Plaintiffs reserve the right to brief production of the other databases requested in Request for Production #111 depending on Merck's responses. Specifically, Request #111 asks for:

> 111.   All documents concerning interviews, contacts, detailing, training activities, educational activities, prescribing practices, promotional activities, communications, or other interactions about any Relevant Product, whether directly or though detailers, contractors, or HSAs, with any actual or potential thought leader, advocate, managed care entity, prescription benefit manager, academic institution, and prescribing physician, including all:
>
> (a)   Sales call records and notes, including records from Insight and FACTS;
> (b)   National Service Center ("NSC") records, including Cornerstone;
> (c)   National Business Group ("NBG") records, including Cornerstone;
> (d)   Interactive VIOXX Responses ("IVRs");
> (e)   FSNet records;
> (f)   Professional Information Requests ("PIRs");
> (g)   Merck Medical Services records or communications; and
> (h)   Medical education records, including records from iMed and MESA.

Interrogatory #24 (Exhibit 7) requests:

> Please identify, by Region, all sales representatives or other employees who were responsible for detailing Vioxx. In your answer, identify:
>
> (a)   Name (including maiden - married name)
> (b)   Last known address
> ...
> (h)   The current employment status of each such detailer or sales representative.

Merck sales representatives received laptop computers from Merck, and utilized various software packages.   The detailmen routinely reported electronically contacts with individual physicians regarding Vioxx on a daily basis. FACTS is the primary sales call note database used by Merck sales reps. (Ex.12, Terry Jacklin Depo, 4/4/04, pp. 44-48) (Ex. 8, James Dunn Depo, 4/16/03, pp.85-90) In New Jersey Merck has limited its FACTS production to sales call notes relating to filed cases only. Plaintiffs are seeking production of the entire FACTS database, including all sales call notes by all detailmen.

## III. ARGUMENT

### A.  SALES AND MARKETING EVIDENCE RELATING TO THE ACTIVITIES OF SALES REPRESENTATIVES IS RELEVANT AND HIGHLY PROBATIVE IN PHARMACEUTICAL PRODUCTS LIABILITY LITIGATION.

Merck's position ignores a substantial body of products liability discovery law recognizing not only the discoverability but the admissibility of evidence relating to other consumers of the product, regardless of whether they were injured, and regardless of whether they also filed suit.  A similar argument failed in the *Prempro Products Liability Litigation* (MDL No. 1507, Eastern District of Arkansas), a pharmaceutical products liability proceeding, where the plaintiffs sought production of a database which tracked sales representative visits to physicians and recorded what questions were asked or concerns expressed by the physician and what response was provided by the sales representative.  In opposing a motion to compel, the defendant argued that "plaintiffs number in the hundreds. Present and former users of Prempro products number in the tens of millions. The question raised by the motion to compel the specified databases is

FAC Resp. Exhibit B -- 1853

whether discovery is about the plaintiffs or about everyone who ever used the drugs." "The only information in the databases that is relevant to these plaintiffs' claims, however, is data that pertains to Wyeth☐s communications with them or their prescribing physicians during or a reasonable time before the time they were being prescribed Prempro products." (Exhibit 9, pages 1 and 2) Nevertheless, the Hon. William R. Wilson, Jr., who presides over the Prempro MDL, correctly rejected the defendants' arguments and ordered Wyeth to produce all sales call information for Prempro, Premarin, Premphase and Cycrin, which included 12 million call notes spanning about five decades. (Order of 9/9/04, Exhibit 10, [referring to a confidential report])

Sales and marketing evidence relating to detailmen and a manufacturer's promotion of the subject product is unavoidably part of, and figures prominently in, any action involving prescription drugs or medical devices. A manufacturer's nation-wide marketing program and it sales practices and policies carried out through its detailmen are relevant regardless of the extent to which a specific plaintiff or plaintiff's physician relied upon them. For example, the court in *Hawkinson v. A.H. Robins Co., Inc.*, 595 F.Supp. 1290 (D.C.Colo.1984), held that the plaintiff was not required to produce evidence of reliance on any specific particular product information, such as physician file cards, package inserts or patient sheets, citing an aggressive nationwide promotional campaign carried out through detailmen:

> "These items do not constitute the extent of Robins' misrepresentation in the promotion of the Shield, and a particular plaintiff's failure to produce evidence of the exact representation or method of presentation does not defeat her claim for product misrepresentation. Robins launched a massive promotional campaign in 1970 to achieve wide acceptance of the Dalkon Shield as the preferred IUD. Through presentations at medical meetings, distribution through planned

FAC Resp. Exhibit B -- 1854

parenthood groups, newspaper reports, articles in women's magazines, and advertising in medical journals, the Robins message reached a large audience. In addition, **its detailmen aggressively promoted the product to many physicians who had little knowledge of gynecology. The result can be considered a tribute to the effectiveness of the marketing strategy. The Dalkon Shield did become the best known and most widely used IUD. The unexpected consequence was to place many women at an unknown risk of injury.** This "carefree" contraceptive was made and marketed by a careless company."
Id. at 1311

Moreover, the promotional efforts of detailmen are directed to the medical profession as a whole, and not just to individual physicians. *See Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206, 220 (1971), where the Supreme Court of Pennsylvania held that evidence of the custom and practice of a drug manufacturer in "overpromoting" its product, primarily through use of "detailmen" who minimized the dangers of the drug while emphasizing its effectiveness, wide acceptance and use and lack of objectionable side effects associated with other drugs, was properly admitted to corroborate one physician's testimony that he was influenced by "detailmen" and to refute another physician's testimony that he was not influenced:

> **"As a practical matter, it would have been difficult, if not impossible, to show how the promotional efforts of the manufacturer bore on the judgments of these co-defendants without demonstrating that the efforts were directed to the entire class or group of which they were members..."**
> Id. at 221-222.

Similarly, in *Toole v. Richardson-Merrell Inc.*, 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (Cal. App. 1967) the court of appeal affirmed an award of punitive damages, citing evidence of misstatements directed at the medical community in general:

> **"Our record is replete with evidence showing that the statements recited were widely made to the medical profession generally, were orally made by appellant's detailmen in soliciting use of the drug by the profession, and were made by means of advertisements in medical journals and periodicals, and also by written material supplied generally to doctors....The fact, which appellant stresses, that the label contained a warning that '*** the long-term or**

FAC Resp. Exhibit B -- 1855

lifetime effects (of the drug) are unknown' offers appellant little comfort. The jury was not bound to find that the warning on the label cancelled out all the other representations made by it concerning the drug." Id. at 706.

Another example of the relevance of a prescription drug manufacturer's nationwide marketing practices is found in *Love v. Wolf*, 226 Cal.App. 3d 378, 38 Cal.Rptr.183 (Cal. App. 1964). Although the court reversed a verdict for the plaintiff based upon misconduct of counsel, the court commented on the effect of the activities of detailmen as a group and how they affected the warnings:

> "Parke-Davis, like other pharmaceutical manufacturers, sends salesmen throughout the United States known as 'detail' men. There are 600 or 700 such representatives. Several doctors testified that these men extolled the virtues of chloromycetin, and minimized its dangers. It appears in evidence that the company knew that many physicians in the United States had been prescribing chloromycetin for conditions less than serious. It does not appear that the detail men were told to attempt to do anything to curtail this. ... These statements may have expressed literal truth. They did not, however, express 'the whole truth, and nothing but the truth' as a fair warning which, according to plaintiff's experts, Parke-Davis should have been giving the medical profession. 226 Cal.App.2d at 399

> "...we must accept the evidence leading to justifiable inferences that Parke-Davis, believing otherwise, had **watered down its regulations-required warnings and had caused its detail men to promote a wider use of the drug by physicians than proper medical practice justified.** Id. at 402.

## B. MARKETING AND SALES EVIDENCE RELATING TO ALL MERCK DETAILMEN IS ESSENTIAL TO PROVE THE ELEMENTS OF PLAINTIFFS' CLAIMS, AS WELL AS TO RESPOND TO MERCK"S DEFENSES.

If discovery of communications to and from a manufacturer regarding a product were limited to just those relating to individuals who have filed suit, defendant manufacturers would have an incredible advantage. They could withhold much of the most damaging, yet relevant and probative evidence on issues such as notice, defect, causation, adequacy of warnings, reasonableness and due care, not to mention fraud and

FAC Resp. Exhibit B -- 1856

punitive damages issues such as conscious disregard for safety and malice. If evidence of other incidents, problems, complaints and misrepresentations and misconduct were confined solely to consumers who were also plaintiffs, most product liability claims would never be proven, let alone claims seeking punitive damages or alleging conduct affecting an entire class of persons.

The vast majority of the information in Merck's possession regarding what Merck's detailmen were telling physicians, and what they were being told, will undoubtedly involve patients who are not plaintiffs and who will never be plaintiffs in this litigation. However, this evidence is entirely relevant to every major issue here.

## 1. NOTICE, DEFECT AND INJURY CAUSATION

When any physician told a detailman about a Vioxx related heart attack or stroke, that evidence may be probative as to notice, defect and/or causation. Plaintiffs intend to review sales call notes for evidence that Merck was notified by physicians in the field regarding incidents of heart attacks, strokes or other serious incidents. In products liability actions evidence is not limited to individuals who have filed suit or been injured. Other accidents, injuries or complaints arising from the use of a product is relevant to fundamental questions such as notice, the existence of a defect and causation. "[I]n products liability actions, "[e]vidence of similar incidents may be relevant to prove the defendant's notice of defects, the defendant's ability to correct known defects, the magnitude of the danger, the product's lack of safety for intended uses, or causation."" *Arabian Agriculture Services Co. v. Chief Industries, Inc.*, 309 F.3d 479, 485 (8th Cir.2002); "Under Fed.R.Evid. 401, evidence of similar occurrences "might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to

FAC Resp. Exhibit B -- 1857

correct a known defect, the lack of safety for intended uses, * * * the standard of care, and causation." *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 625 (8th Cir.1983)

The requirement of similarity is less strict when the evidence is sought to be admitted to show notice. "For purposes of proving other accidents in order to show defendants' awareness of a dangerous condition, the rule requiring substantial similarity of those accidents to the accident at issue should be relaxed." *Jackson v. Firestone Tire & Rubber Co.,* 788 F.2d 1070, 1083 (5th Cir.1986); White v. Ford Motor Co. (9th Cir. 2002) 312 F3d 998, 1009-1010 (In action alleging parking brake failure, evidence that truck manufacturer had received a number of customer complaints of 'rollaways' due to parking brake failures was admissible to show manufacturer had notice.) Evidence of other complaints is relevant and discoverable, even where information regarding the subject incident may be too limited to determine substantial similarity. *Scaturro v. Warren & Sweat Manuf. Co.*, 160 F.R.D. 44, 45-46 (D.C.Pa.1995) (In suit alleging injury due to defect in ladder, plaintiff would be allowed discovery regarding reports of other incidents and/or lawsuits with ladder, despite defendant's claim that plaintiff's description of accident was not adequate to permit it to determine whether other incidents were "substantially similar.")

## 2. DUE CARE AND BREACH OF DUTIES

The information in the sales call notes is also probative on the fundamental issues relating to negligence. Did Merck act as a reasonably prudent manufacturer in responding to the information it received from physicians concerning problems and adverse events? Did it act as a reasonably prudent manufacturer in providing the information its representatives were instructed to communicate to physicians regarding the risks of

FAC Resp. Exhibit B -- 1858

Vioxx, and in responding to physicians' queries regarding the safety of Vioxx? Were the practices and procedures of the sales force in explaining the risks to the medical community as a whole reasonable under the circumstances? Did Merck exercise due care and provide correct and scientifically valid information to physicians? Did Merck conduct a timely and appropriate investigation of concerns and complaints, and warn physicians regarding the true risks of Vioxx? In light of the information available to Merck from the entire sales force, should Merck have changed the warning labels?

On issues relating to negligence, reasonableness and due care, discovery is not limited to information regarding other plaintiffs. A manufacturer's actions are judged upon its acts and failures to act in light of its knowledge obtained from all available sources, and therefore records of other incidents are relevant to the issue of due care. *Stagl v. Delta Airlines Inc.*, 52 F.3d 463, 474 (2d Cir.1995) (District court abused its discretion in declining to allow discovery regarding similar accidents at or near airline's baggage carousels. "To begin with, an accident record of this sort would be directly germane to establishing the degree of risk generated by Delta's method of luggage retrieval and hence whether its failure to institute some other means was, in fact, negligent."); *Hicks v. Long Island R.R. Co.*, 165 F.R.D. 377 (D.C.N.Y.1996) (In action involving injuries sustained during fall when chair employee was sitting on broke, documents in employer's possession regarding prior accidents involving same brand of chair were relevant as to degree of risk, whether the employer had notice of the risk and what actions, if any, it took to deal with the problem.); *Fann v. Giant Food, Inc.*, 115 F.R.D. 593, 595 (D.C.D.C.1987) (Plaintiff was entitled to discover if similar accidents

FAC Resp. Exhibit B -- 1859

had occurred at defendant's other stores and if there was a company-wide policy with respect to protective measures.)

Additionally, in many states there is a post sale duty to warn. In New Jersey, where Merck is located, a manufacturer is required to "warn of dangers it discovers or reasonably should discover after the product leaves its control." *Densberger v. United Technologies Corp.*, 297 F.3d 66,71 (2nd Cir.2002), citing *Feldman v. Lederle Labs.*, 97 N.J. 429, 479 A.2d 374, 388-89 (N.J.1984) ("[S]ubsequently acquired knowledge, both actual and constructive, also may obligate the manufacturer to take reasonable steps to notify purchasers and consumers of the newly-discovered danger."); Similarly, in California a manufacturer can be liable in negligence for post-sale failure to warn of a product hazard. *Torres v. Xomox Corp*, 49 Cal.App.4th 1, 16, 56 Cal.Rptr.2d 455 (Cal. App. 1996)

Merck's actions and it decisions regarding when, what and how to warn regarding Vioxx, were all based upon the totality of information it acquired during the entire period it marketed Vioxx. The reasonableness of Merck's conduct, and a determination of whether Merck should have issued greater or different warnings based upon its knowledge, can only be made by taking into consideration all information it possessed at various points in time, including information relayed to detailmen by physicians whose patients are not plaintiffs in this litigation.

Also, Merck is required to report all information it received regarding adverse events to the FDA. Only by reference to the entire database of Vioxx sales call notes, can it be determined whether or not Merck was complying with its obligations and accurately reporting this information. A failure to do so would be evidence of lack of due care, and

demonstrate that the risk of harm from Vioxx was known by Merck to be greater than Merck represented to the medical community. It would also demonstrate that the labels and warnings accompanying Vioxx were inadequate. The records also identify how many samples were being given out and to which physicians. Just like reports of adverse events, such information will be relevant to the calculation of the risk of harm.

### 3. FRAUD AND MISREPRESENTATION

The sales call notes are direct evidence of what the medical community was being told about Vioxx, what questions and concerns the medical community had about Vioxx, and what Merck was saying in response. Merck's policies and practices in relaying information about Vioxx to physicians are probative on the key issues in Plaintiffs' fraud causes of action, including those based upon individual claims of intentional misrepresentation, as well as consumer class actions under state unfair competition and false advertising laws. Misstatements by detailmen regarding a product can amount to actual fraud. *See e.g. Kociemba v. G.D. Searle & Co.,*707 F.Supp. 1517 (D.Minn.1989) (Evidence supported finding of fraud where detailmen misrepresented to prescribing physician that product was 'excellent for use' by women who had never had children, and 'safe and effective.' **"Pharmaceutical salesmen should not have as much leeway in "puffing" their wares as would a used car salesman."**)

Where, as here, detailmen give doctors unreliable, misleading or invalid information about a product, such conduct is evidence supporting a fraud cause of action. In *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 738 P.2d 1210 (Kan. 1987) the court affirmed an award of punitive damages against the manufacturer of an intrauterine device based upon evidence that the defendant engaged in a national promotion which

FAC Resp. Exhibit B -- 1861

misrepresented both the efficacy and the safety of the product, through misleading product cards and other invalid data given by detailmen to physicians:

> "The core of Robins' promotion for the Dalkon Shield was that its product was "safe and superior" to other forms of birth control. Robins obtained hundreds of thousands of reprints of Davis' 1970 article and gave them to its detailmen to give to physicians. The reprint given to physicians, however, did not include the label of "Current Investigation" which had originally appeared on the Davis article. Dr. Emanuel Friedman, an expert witness for plaintiff, testified that "Current Investigation" would indicate a preliminary report, **something not yet established as scientifically valid.** Product cards prepared in September 1970 to be given by Robins detailmen to physicians lauded the overall superiority of the Shield's pregnancy rate to the pill's and other IUDs', and claimed it was safe and produced no side effects on the body. Other cards prepared in November 1971 also stressed the 1.1% rate." Id. at 1218.
>
> "In the present case, the jury made a specific finding of fraud. A review of the record indicates that there was substantial evidence tending to show ... that Robins **misled doctors through claims of safety and efficacy while it knew there was no basis for a claim of safety,** and all responsible tests for the Dalkon Shield's effectiveness showed a much higher pregnancy rate than Dr. Davis' "1.1%" figure; ..." Id. at 1240.

The records of Merck's detailmen regarding communications with all physicians will demonstrate a pattern and practice of deception, which is directly probative on the elements of the fraud and intentional misrepresentation causes of action asserted by Plaintiffs. *U.S. v. Daniels*, 117 F.Supp.2d 1040, 1041 (D.Kan.2000) (Evidence of defendant's practice of luring patients into unwarranted surgery several years earlier was relevant to prove intent and context of current fraud charges, which were based on same type of conduct. "Thus, the evidence is highly relevant to proving defendant's intent, as it shows **deliberate and repeated patterns and practices over time, a hallmark of fraud.**"); See also FRE Rule 404(b) (Evidence of other crimes, wrongs, or acts may be admissible as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.)

FAC Resp. Exhibit B -- 1862

## 4. ADEQUACY OF WARNINGS AND FAILURE TO WARN CAUSATION

A manufacturer has a continuing duty is to warn of all potential dangers in its prescription drugs that it knew or should have known to exist. The warnings must be correct, complete, and fully descriptive, and must convey updated information as to all of the drug's known side effects. *Martin v. Hacker*, 83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993); *Krasnopolsky v. Warner-Lambert Co.*, 799 F.Supp. 1342, 1345-46 (E.D.N.Y.1992) (manufacturer's duty to warn of all potential dangers "is a continuous one, and requires that the manufacturer be aware of the current information concerning the safety of its product.") In determining the adequacy and accuracy of the warnings, the activities of all detailmen are relevant to Merck's knowledge regarding the risks of Vioxx. The communications with all physicians demonstrate what Merck knew and when, and are relevant to the question of whether and when Merck should have modified its warning or provided additional information regarding the risks associated with Vioxx.

Moreover, the adequacy of the written warnings must be examined in terms of how Merck's marketing practices as to all of its detailmen may have reduced their effectiveness. When detailmen minimized the cardiovascular risks to physicians, either in conversations or by providing misleading data such as the 'cardiovascular card,' they were in effect neutralizing or watering down the precautions stated in the Vioxx label, thereby rendering them ineffective. See *Love v. Wolf*, 226 Cal.App. 3d 378, 399-402, 38 Cal.Rptr. 183 (Cal. App. 1964) ("**Several doctors testified that these men extolled the virtues of chloromycetin, and minimized its dangers.  It appears in evidence that the company knew that many physicians in the United States had been prescribing chloromycetin for conditions less than serious.  It does not appear that the detail**

FAC Resp. Exhibit B -- 1863

**men were told to attempt to do anything to curtail this. ...")** The adequacy of the warnings cannot be resolved without reference to what Merck was telling the medical community as a whole. Even a patently sufficient warning may be cancelled out by the statements of detailmen, and therefore company-wide policies and practices of detailmen extolling a product's virtues and minimizing its dangers are relevant to the adequacy of the warnings. As the court stated in *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971):

> "We think that whether or not the warnings on the cartons, labels and literature of Parke, Davis in use in the relevant years were adequate, and **whether or not the printed words of warning were in effect cancelled out and rendered meaningless in the light of the sales effort made by the detail men, were questions properly for the jury. Action designed to stimulate the use of a potentially dangerous product must be considered in testing the adequacy of a warning as to when and how the product should not be used; if detail men are an effective means of selling a product and explaining its nature, a jury could find that they also afforded an effective medium of conveying a warning."** 282 A.2d at 220

## 5. PUNITIVE DAMAGES ISSUES

The nation-wide activities of Merck's sales and marketing are also essential proof on punitive damages issues such as intent, willfulness, reckless disregard, state of mind, and malice. The sales call records in their entirety chronicle Merck's actions, through all of its detailmen, and demonstrate a pattern and practice of fraud, deception and misconduct, as well as a repeated willful and reckless disregard for safety. The Supreme Court has noted that evidence of repeated misconduct is relevant in determining an appropriate punitive damage award:

> "Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law .... **Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more**

FAC Resp. Exhibit B -- 1864

reprehensible than an individual instance of malfeasance." *BMW of North America Inc. v. Gore*, 517 U.S. 559, 576-77, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)

"A pattern or practice of wrongful conduct is often introduced as evidence of malice or oppression to justify a punitive damage award." *George F. Hillenbrand, Inc. v. Ins. Co. of North America*, 104 Cal.App.4th 784, 820-821, 128 Cal.Rptr.2d 586 (Cal. App. 2002); *Smith v. Allstate Ins. Co.*, 52 Fed.Appx. 349, Slip Copy, 2002 WL 31689047 (9th Cir.2002) ("... Allstate's response to the revelation that settlement of hundreds of its claims was based on fraudulent engineering reports could well represent "a consistent and unremedied pattern of egregious" behavior warranting the imposition of punitive damages." 52 Fed.Appx. at 352

Evidence used to show a manufacturers' state of mind with respect to punitive damages issues is not limited to information actually received or relied upon by the plaintiff's physician. *Kociemba v. G.D. Searle & Co.*, 707 F.Supp. 1517, 1524-1525 (D.Minn.1989) (References to advertisements which manufacturer had placed in national medical journals but which patient's physician had never read were **admissible to establish its state of mind** for purposes of punitive damages and for purposes of the false advertising claim.) Nor is relevance confined to information regarding individuals who have filed suit. *Marks v. Global Mortg. Group, Inc.*, 218 F.R.D. 492, 497 (D.C.W.Va. 2003) (Information about lender's other customers with balloon notes was relevant to borrowers' claim that lender participated in a pattern and practice of fraud in connection with refinancing second mortgages, and therefore discoverable.; *Hilliard v. A.H. Robins Co.*, 148 Cal. App. 3d 374, 400-401(Cal. App.1983) ("In proving that defendant Robins acted in conscious disregard of the safety of others, plaintiff Hilliard was not limited to

Robins' conduct and activities that directly caused her injuries.  The conscious disregard concept of **malice does not limit an inquiry into the effect of the conduct and activities of the defendant on the plaintiff, the inquiry is directed at and is concerned with defendant's conduct affecting the safety of others.**")

Aside from its relevance to the core elements of proof in a punitive damages claim, the nation-wide conduct of the defendant is relevant to core issues in evaluating the propriety of punitive damages. In BMW, supra, the Supreme Court established three factors that must be used when determining whether an award of punitive damages is excessive. Of these factors, the degree of reprehensibility is "the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575, 116 S.Ct. 1589 Evidence regarding a manufacturer's conduct affecting others besides the plaintiffs is relevant to the issue of reprehensibility. *Smith v. Ingersoll-Rand Co.* 214 F.3d 1235, 1253 (10th Cir.2000) (Accidents involving manufacturer's machines that occurred outside the state illustrated reprehensibility of manufacturer's conduct).; *Watkins v. Lundell*, 169 F.3d 540, 546 (8th Cir.), cert. denied, 528 U.S. 928 (1999) (Evidence of a **"pattern, practice or scheme characterized by fraud or deceit,"** "is certainly more reprehensible than mere negligence," for purposes of evaluating a punitive damages award.)

An example of how reckless marketing practices like Merck's can demonstrate a state of mind sufficient to justify and award of punitive damages is found in *Toole v. Richardson-Merrell, Inc.*, supra:

> "….[A]ppellant continued to represent to the medical profession that MER/29 was a proven drug, remarkably free from side effects, virtually non-toxic having a specific and completely safe action. **In light of appellant's knowledge, the jury could infer that these statements were recklessly made, with wanton disregard for the safety of all who might use the drug. ….When respectable medical publications began to challenge the toxicity and efficacy of MER/29,**

FAC Resp. Exhibit B -- 1866

appellant's salesmen were instructed to blame side effects on other drugs, or at least to suggest that as a good possibility. Even after a number of cases of cataracts in humans from use of MER/29 had been reported to appellant, and when its own tests had established blindness in its test animals, appellant continued to defend sale of its drug." Id. at 715.

## 6. THE LEARNED INTERMEDIARY DEFENSE AND CAUSATION

The complete sales call note database is also critical to resolution of the issues raised by the learned intermediary defense asserted by Merck. The learned intermediary doctrine provides that a drug manufacturer is excused from warning a patient who receives the product when the manufacturer properly warns the prescribing physician of the product's dangers. Defendants asserting the learned intermediary doctrine also raise the issue of causation as it concerns warnings, by contending that a better or different warning would not have affected the physician's decision to prescribe the drug, and that if the physician was aware of the possible risks involved in the use of the product but decided to use it anyway, the adequacy of the warning is not a producing cause of the injury. *Porterfield v. Ethicon, Inc.*, 183 F.3d 464, 467-468 (5th Cir.1999)

However, courts have recognized that over-promotion of a drug by the manufacturer may nullify the warnings, rendering the warnings inadequate and defeating the learned intermediary defense. According to the court in *Caraker v. Sandoz Pharmaceuticals Corp.*, 172 F.Supp.2d 1018, 1029 (S.D.Ill. 2001):

"...[T]he overpromotion theory is simply that, by over-promoting a product, the over-promoter has de-emphasized or diluted the full effect of the warnings. See Hill v. Searle Laboratories, a Div. of Searle Pharmaceuticals, Inc., 884 F.2d 1064, 1071 n. 3 (8th Cir.1989) (noting that overpromotion by a drug manufacturer may cause the prescribing physician not to rely on the warnings and package inserts associated with a particular drug product); Plummer v. Lederle Laboratories, Div. of American Cyanamid Co., 819 F.2d 349, 358 (2d Cir.1987) (distinguishing Stevens v. Parke, Davis & Co., 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (1973), which imposed liability on a drug manufacturer because its overpromotion of a dangerous drug to the medical profession was coupled with a

FAC Resp. Exhibit B -- 1867

gross minimization of the risk of prescribing the drug in the product warnings); Salmon v. Parke Davis & Co., 520 F.2d 1359, 1363 (4th Cir.1975) (noting that overpromotion nullifies effect of valid warnings); Baldino v. Castagna, 505 Pa. 239, 478 A.2d 807, 810 (1984); Mahr v. G.D. Searle & Co., 72 Ill.App.3d 540, 28 Ill.Dec. 624, 390 N.E.2d 1214, 1238 (1979) (noting that overpromotion evidence is evidence showing that, in marketing the drug in question, the drug manufacturer tried to "play down" the warnings making them ineffective)."

Moreover, physicians prescribing decisions are not based merely upon what they read in the PDR. They make determinations utilizing knowledge acquired independent of the materials accompanying a product, from sources such as colleagues, other medical professionals and medical journals and publications. Even where a doctor testifies he or she appreciated the risks, this does not preclude a finding that the warnings were inadequate, nor does it preclude a finding of causation. In *Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804, 808-809 (S.D.Tex. 1999), the court denied summary judgment, even though the prescribing physician testified that he was aware of the risks and continued to prescribe the drug:

> "Despite the wealth of evidence provided by Defendants on this issue, the fact remains that Dr. Holt **may not have been fully apprised of all the attendant risks** ...Dr. Holt admits having **no knowledge of a variety of studies concerning Parlodel and stroke and myocardial infarction. And, because some of these studies may have been sponsored by Defendant, the Court finds it possible to conclude that Dr. Holt was not in a position to fully appreciate Parlodel's risks--even through independent knowledge--at the time he prescribed the drug ...**"

Manufacturers' efforts directed to the medical community as whole, through studies in medical literature, as well as through communications from detailmen, can influence the physicians' choices, by contributing to and controlling the information available to the medical community:

> "The **"independent knowledge" category of the learned intermediary doctrine is necessarily premised on the ability of the physician to move beyond the educative deficiencies of the product warning in forming a**

FAC Resp. Exhibit B -- 1868

> realistic opinion of the product's risks through an independent research of **professional journals.... .. When, however, the universe of information from which the physician must piece together a conception of the totality of the risks involved with a product includes misstatements by the product manufacturer, the physician's task becomes Herculean, for he or she must not only supplement the warning, but actually refute the errors communicated by the manufacturer."** *Zanzuri v. G.D. Searle & Co.*, 748 F.Supp. 1511, 1518 (S.D.Fla.1990))

A manufacturer's failure to make information about a product's risks available to the medical community in a timely manner may also defeat the learned intermediary doctrine, even though the prescriber has not read the PDR or the package insert. *Linnen v. A.H. Robins Co., Inc.*, 2000 WL 89379*4 (Mass.Super. 1999) (Summary judgment denied where evidence showed that although prescribing physician did not consult PDR or package insert, she consulted with pharmacist and expert in pulmonary hypertension, and plaintiffs alleged that had insert been altered to include the results of study or had manufacturer "**provided the medical community with adequate warnings** about such risks" or "provided the medical community with a timely warning" of pulmonary hypertension, pharmacist and physician would have warned her about the risk.)

The sales call notes, and the activities of all Merck detailmen are probative on the learned intermediary defense and the assertion by Merck that the warnings given to physicians were adequate. This evidence demonstrates that warnings were watered down and nullified by the over-promotion of Vioxx, and by disinformation presented to the medical community. This is the best evidence of what the medical community was being told, the state of knowledge within the medical community, and the perception of the risks and safety of Vioxx which was held by the medical community as a whole. The sales call notes database in its entirety documents the pattern and practice of over-

FAC Resp. Exhibit B -- 1869

promotion which shaped that perception, and which directly and indirectly influenced prescribing decisions.

## 7.  CIRCUMSTANTIAL EVIDENCE, IMPEACHMENT, CLASS ISSUES AND STATUTE OF LIMITATIONS

Aside from providing direct proof of the elements of Plaintiffs' claims and countering the defenses asserted by Merck, the complete sales call note database will provide circumstantial evidence of Merck's practices.  The evidence will also be used to impeach testimony of Merck employees. It is anticipated that Merck detailmen in the individual cases set for trial will deny engaging in the practices criticized in the Waxman memorandum, and/or that they will deny specific recollection of such practices. In fact some individual plaintiffs' counsel have reported that this has been occurring in depositions.

If the national sales call notes demonstrate a routine business practice where sales reps used the cardiovascular card and other misinformation to neutralize safety concerns of prescribing physicians, then that evidence would be admissible as impeachment. The national records would demonstrate that it was more likely that sales representatives followed the common corporate plan, pattern and practice. "**The routine practice of a business, group or organization may be admissible to show the business, group or organization acted in accordance with that custom or practice on a specific occasion.**" (FRE Rule 406, Adv. Comm. Notes; Jones, Rosen, Wegner & Jones, Rutter Group Practice Guide: Federal Civil Trials & Evidence, 8:1327 (The Rutter Group 2004); *Vining on Behalf of Vining v. Enterprise Fin'l Group, Inc.*, 148 F.3d 1206, 1218 (10th Cir. 1998) (Evidence that a credit life insurance company had a "pervasive, consistent

pattern" of rescinding its insurance contracts without determining whether it had good cause to do so was admissible to show that the insurer acted in conformity with that practice in a particular case.)

Additionally, the documents reflect upon class issues in the personal injury and consumer fraud class actions. They show not only a pattern and practice of misconduct and misrepresentation, but they also reflect upon the questions of commonality and predominance of issues necessary for class certification. Finally, aside from the relevance and admissibility of the discovery sought, timing is also a critical factor here. Calling production of the requested discovery a tremendous burden, in addition to attempting to limit detailer discovery to 'case-specific' information, Merck has proposed that the information be provided with the defendant fact sheet. In some cases individually responsible detailmen may be named as defendants. If Merck is permitted to delay providing information about them until plaintiffs receive defendant fact sheets, cases could be barred by statutes of limitations, which in some states are as short as one year.

## IV. CONCLUSION

The sales call note database, in its entirety, contains evidence which is not only discoverable, but admissible on the core issues of notice, defect, injury causation, due care, reasonableness, standard of care, adequacy of warnings, learned intermediary, warnings causation, fraud and misrepresentation, and punitive damages issues such as state of mind, malice, reckless disregard for safety and reprehensibility. They are also relevant and admissible for purposes such as commonality and predominance questions relating to class allegations, as well as circumstantial evidence of business practices and impeachment.

FAC Resp. Exhibit B -- 1871

FACTS is one of several Merck databases which contain records relating to its promotion and marketing of Vioxx, and it used this information to develop $10 Billion in sales.  In view of these facts, and the unique nature of its marketing and sales schemes, which produced 140,000 heart attacks, strokes and serious injuries nationwide, it should not be too much to ask Merck for full disclosure of what it knew and when, and what it was telling the public and the medical community.

If there was ever a case that cried out for full disclosure, this is it. Merck played 'Dodgeball' with doctors and tens of thousands of unwitting victims for over 5 years. It should not be permitted to dodge its obligations to the litigants or this tribunal in this litigation.  The game is over.

Respectfully submitted,

Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA  70113
PH:     (504) 581-4892
FAX:  (504) 561-6024
**Plaintiffs' Liaison Counsel**

| Richard J. Arsenault, Esq. | Gerald E. Meunier, Esq. |
|---|---|
| P.O. Box 1190 | Energy Centre |
| 2220 Bonaventure Court | 1100 Poydras Street, Suite 2800 |
| Alexandria, LA  71309-1190 | New Orleans, LA  70163-2800 |
| PH: (318) 487-9874 | PH: (504) 522-2304 |
| FAX: (318) 561-2591 | FAX: (504) 528-9973 |
| | |
| Andy D. Birchfield, Esq. (Co-Lead Counsel) | Troy Rafferty, Esq. |
| P.O. Box 4160 | 316 S. Baylen Street, Suite 400 |
| 234 Commerce Street | Pensacola, FL  32502 |
| Montgomery, AL  36103-4160 | PH: (850) 435-7000 |
| PH: (800) 898-2034 | FAX: (850) 497-7059 |
| FAX: (334) 954-7555 | |
| | Drew Ranier, Esq. |
| Elizabeth Cabraser, Atty. | 1419 Ryan Street |

| | |
|---|---|
| Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3339<br>PH: (415) 956-1000<br>FAX: (415-956-1008 | Lake Charles, LA 70601<br>PH: (337) 494-7171<br>FAX: (337) 494-7218 |
| Thomas Kline, Esq.<br>1525 Locust St.<br>19th Floor<br>Philadelphia, PA 19102<br>PH: (215) 772-1000<br>FAX: (215) 772-1371 | Mark Robinson, Esq.<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA 92660<br>PH: (949) 720-1288<br>FAX: (949) 720-1292 |
| Arnold Levin, Esq.<br>510 Walnut Street<br>Suite 500<br>Philadelphia, PA 19106-3875<br>PH: (215) 592-1500<br>FAX: (215) 592-4663 | Christopher Seeger, Esq. (Co-Lead Counsel)<br>One William Street<br>New York, NY 10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799 |
| Carlene Rhodes Lewis, Atty.<br>2200 Texaco Heritage Plaza<br>1111 Bagby<br>Houston, TX 77002<br>PH: (713) 650-0022<br>FAX: (713-650-1669 | Christopher Vincent Tisi, Esq.<br>2000 L Street, NW<br>Suite 400<br>Washington, DC 20036-4914<br>PH: (202) 783-6400<br>FAX: (307) 733-0028 |

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

    I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 7th day of June, 2005.

FAC Resp. Exhibit B -- 1873

## GUIDELINES FOR EX PARTE CONTACT WITH FORMER EMPLOYEES

Every state has rules of professional conduct which generally govern contacts with represented persons, and almost all jurisdictions allow ex parte communication with former employees of an opposing party to some extent. However, the specifics of the law and rules of ethics regarding such communication will vary dramatically from one state to the next, particularly as to disclosures which must be made to the former employee, and as to issues of confidentiality or privilege.

Specifics may be found in reported decisions and in ethics opinions issued by state bar associations. Many states have case law and formal ethics opinions on point under a variety of scenarios, but some may have only a single federal decision or informal ethics opinion generally addressing the subject. Others have neither case law nor guidance from the bar. Even where there is case law or an ethics opinion directly on point, it can still be difficult to obtain a precise answer for a particular situation.

There is usually no bright line test available, and frequently cases will avoid definitive answers to ethical questions, suggesting only that counsel exercise caution to avoid disclosure of privileged matters. Moreover, in those states with significant discussion of these issues in the cases and ethics opinions, there may be disagreement among the state and federal courts as to the extent of required or suggested disclosures and protocols for contacting and communicating with former employees.

This paper is to generally familiarize attorneys with the ethical rules relating to contact with former employees established by case law and bar opinions, which are common to most jurisdictions, and to set out generally accepted ethical standards and guidelines for initiating and conducting interviews. This is not intended to cover the subject of contacting current employees of corporate adversaries, who are subject to more complex and stringent rules for contact.

### The ABA Rules

Most states have enacted rules of professional conduct which are patterned after or track the language of the ABA Model Rules. Attorneys who intend to contact former employees of a corporate adversary should familiarize themselves with Rules 4.2, 4.3 and 4.4, which may be applicable to any contacts with employees or former employees.

1

RULE 4.2 (formerly DR 7-104), provides:

"COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."

Paragraph 7 of the comment to rule 4.2 is directed to the situation in which a party is an organization:

"[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4."

On two occasions the ABA Committee on Ethics and Professional Responsibility has issued formal opinions to the effect that Model Rule 4.2 does not prohibit contacts with former employees of a represented corporation, even if those former employees were at one time in one of the categories in which communication was prohibited while employed. In Formal Op. 91-359 (1991) the Committee opined:

"While the Committee recognizes that persuasive policy arguments can be and have been made for extending the ambit of Model Rule 4.2 to cover some former corporate employers, [sic] the fact remains that the text of the Rule does not do so and the comment gives no basis for concluding that such coverage was intended. Especially where, as here, the effect of the Rule is to inhibit the acquisition of information about one's case, the Committee is loath, given the text of Model Rule 4.2 and its Comment, to expand its coverage to former employees by means of liberal interpretation. Accordingly, it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer."  Id., at 3

FAC Resp. Exhibit B -- 1875

RULE 4.4 provides:

"RESPECT FOR RIGHTS OF THIRD PERSONS

(a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.

(b) A lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender.

Comment

[1] Responsibility to a client requires a lawyer to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons. It is impractical to catalogue all such rights, but they include legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship.

[2] Paragraph (b) recognizes that lawyers sometimes receive documents that were mistakenly sent or produced by opposing parties or their lawyers. If a lawyer knows or reasonably should know that such a document was sent inadvertently, then this Rule requires the lawyer to promptly notify the sender in order to permit that person to take protective measures. Whether the lawyer is required to take additional steps, such as returning the original document, is a matter of law beyond the scope of these Rules, as is the question of whether the privileged status of a document has been waived. Similarly, this Rule does not address the legal duties of a lawyer who receives a document that the lawyer knows or reasonably should know may have been wrongfully obtained by the sending person. For purposes of this Rule, "document" includes e-mail or other electronic modes of transmission subject to being read or put into readable form."

4

## General Considerations

The foregoing rules have formed the basis for most of the decisions and ethics opinions governing contact with former employees of a corporate adversary. Some states have adopted them almost verbatim, along with the comments. Others have adopted variations of them. The comments will vary from one jurisdiction to the next, as will the case law and ethics opinions interpreting the rules. Sometimes there are significant differences of opinion within the same jurisdiction. Some courts and bar associations have recommended written disclosures, and some have even mandated 'Miranda' type warnings. Others have set out lists of specific disclosures and admonitions that should be given to the person contacted.

There is also a distinction among states as to which types of former employees can be contacted, as a few jurisdictions prohibit contact with certain types of former employees, even those who are not represented by counsel. However, there are certain proscriptions and disclosures common to almost every state, from which a list of generally recognized do's and don'ts can be derived, and which are itemized below. Some of these may appear redundant, but most of them are direct quotes from case law and ethics opinions on the subject.

(Caveat: This is not intended to be a substitute for checking the law of the particular jurisidiction before any contact is initiated. Please consult the separate 50 state guide we have prepared to assist and serve as a starting point for determining the specifics of the law on ex parte communications with former employees in a particular jurisdiction)---

The lawyer may not contact a former employee of the opposing party that the lawyer knows to be represented by separate counsel without the consent of that counsel.

The lawyer should confirm that the former employee has not sought or consented to be represented in the matter by the corporation's attorneys

If the person declines to be interviewed, the contact should be ended. If the person contacted requests that her personal attorney or the company's attorney be present for the interview, the request must be honored.

Before proceeding with the interview, the lawyer must make full disclosure and obtain the consent of the former employee.

The attorney must immediately disclose his or her capacity to the former employee, and fully disclose the nature of the matter and purpose of the contact.

5

Inform the employee of the lawyer's role in the case, the identity of the lawyer's client, and the fact that the employee's former employer is an adverse party in pending or prospective litigation.

Make full disclosure of his connection with the litigation and explain the purpose of the interview.

A lawyer must disclose the fact that the lawyer represents a party with a claim against the employee's employer.

An attorney violates Rule 4.3 if the attorney causes an unrepresented person to believe that he or she has an obligation to submit to an interview or if the attorney disregards the request of an unrepresented person that the interview be terminated.

The interviewing lawyer should neither state nor imply to the former employee that he is disinterested in the matter. A lawyer's attempt to obtain information under false pretenses or by the use of deceit is unethical.

An attorney making *ex parte* contacts with either current or former employees must be extremely cautious to avoid invading the attorney-client privilege claimed by the opposing party.

Attorney must be acutely aware of his obligations under rule 4.4, and be careful not to elicit the privileged or confidential information of the corporation.

The attorney must avoid inquiring into any privileged communications between the employee and counsel for his former employer.

A lawyer shall not conduct ex parte communications about the matter of the representation with former employees of an opposing party when there is a substantial likelihood that the communication will cause or elicit the disclosure of confidential information subject to the attorney-client privilege.

When factors point to the conclusion that there is a substantial risk of disclosure of privileged matters, as opposed to the risk of the adverse party learning information which might be damaging to the former employer's litigation position, then appropriate notice should be given to the former employees concerning the prohibition against disclosing attorney-client confidences of the former employer and, perhaps, the former employer's counsel should be notified prior to any ex parte interview.

The lawyer who recieves information that is protected from disclosure shall (1) terminate the communication immediately and (2) give notice of the disclosure to any tribunal in which the matter is pending and to the person entitled to enforce the protection against disclosure.

6

A former employee should not be asked what they said or communicated to the corporate attorney but, rather, inquiries should be limited to what the witness saw or knows about the matter being investigated.

An attorney who abuses the interview process by inquiring into privileged matters, or even by permitting an employee to refer to confidential communications without immediately warning the employee that such communications are protected and should not be disclosed, is subject to appropriate sanctions.

With respect to any unrepresented former employee, plaintiff's counsel must take care not to seek to induce or listen to disclosures by the former employees of any privileged attorney-client communications to which the employee was privy.

An attorney may not seek to cause the former employee of his adversary's counsel to reveal the confidences or secrets of the former employer's client.

A lawyer who receives an unsolicited and unauthorized communication from a former employee of an adversary's law firm may not seek information from that person if the communication would exploit the adversary's confidences or secrets.

Where the information communicated involves alleged criminal or fraudulent conduct in which opposing counsel may be assisting, the receiving lawyer should communicate with a tribunal or other appropriate authority to get further direction as to the use of the information.

An attorney may not ask or permit a former employee to disclose to any communications that the former employee had with defense attorneys pertaining to the employment.

If counsel recognizes that an interviewee is disclosing privileged communications, he shall stop the interviewee from continuing to speak and explain the restriction to that person.

***The following have been recommended or even required by some courts:

The attorney should advise such persons that they have the right to refuse to be interviewed or, if they wish, to be interviewed with the company's counsel present.

The attorney should inform the employee of his or her right to have their own counsel present during the *ex parte* contact.

It is preferable that these disclosures be made in writing.

**Law of New Jersey, Florida and Louisiana**

**New Jersey**

New Jersey Rules of Professional Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by another lawyer in the matter, including members of an organization's litigation control group as defined by RPC 1.13, unless the lawyer has the consent of the other lawyer, or is authorized by law or court order to do so, or unless the sole purpose of the communication is to ascertain whether the person is in fact represented. Reasonable diligence shall include, but not be limited to, a specific inquiry of the person as to whether that person is represented by counsel. Nothing in this rule shall, however, preclude a lawyer from counseling or representing a member or former member of an organization's litigation control group who seeks independent legal advice.

Official Comment by Supreme Court (November 17, 2003)

Concerning organizations, RPC 4.2 addresses the issue of who is represented under the rule by precluding a lawyer from communicating with members of the organization's litigation control group. The term "litigation control group" is not intended to limit application of the rule to matters in litigation. As the Report of the Special Committee on RPC 4.2 states, "... the 'matter' has been defined as a 'matter whether or not in litigation.'" The primary determinant of membership in the litigation control group is the person's role in determining the organization's legal position. *See Michaels v. Woodland, 988 F.Supp. 468, 472 (D.N.J. 1997).*
...

----------

Klier v. Sordoni Skanska Const. Co.,
337 N.J.Super. 76, 766 A.2d 761, N.J.Super.A.D., January 26, 2001

Nothing in the rules of professional conduct prohibits an attorney's ex parte communication with a former employee of an adversary who was not within that adversary's litigation control group and who was not otherwise represented by counsel. RPC 4.2.

"The current rules prohibit communication only with employees who are members of the organization's litigation control group, or are represented by another lawyer in the matter. *R.P.C.* 4.2. This is in accord with the Committee's recommendation that the prohibition against *ex parte* communication should not

8

extend to employees who were only fact witnesses or involved with the subject matter of the litigation. Committee Rep., *supra*, 139 *N.J.L.J.* at 1195-96. The Committee explained that extending the prohibition against *ex parte* communication to employees who were only involved in the subject matter of the litigation would include too many people "whose interests are most likely not only not congruent with the organization's but also, in many cases, in conflict with it." *Ibid.* (quoted in *Michaels, supra*, 988 *F.Supp.* at 471). The Committee determined that the bar against *ex parte* communications should only apply in those situations where the employee is not only a fact witness, but also is significantly involved in determining the organization's legal position as opposed to merely supplying information. Committee Rep., *supra*, 139 *N.J.L.J.* at 1195-96. In its recommendation, the Committee specifically provided that "[s]ignificant involvement requires involvement greater than merely supplying factual information regarding *90 the matter in question." *Id.* at 1195. Moreover, in its comment on proposed *R.P.C.* 1:13, the Committee specifically noted that the bar "does not include persons whose actions bind the organization or are imputable to the organization or who are responsible for other aspects of organizational policy unless they meet the 'legal position' test." Committee Rep., *supra*, 139 *N.J.L.J.* at 1196.

Thus, the first determination that must be made by a court in considering whether to allow *ex parte* interviews of current and former employees of an organization **769 is whether the witness is a current or former employee. *R.P.C.* 1:13(a); *Michaels, supra*, 988 *F.Supp.* at 472. If the witness is a current employee, the judge must determine whether the person is within the litigation control group as defined by *R.P.C.* 1:13(a), and, if not, whether the person has obtained other representation. *R.P.C.* 4.2; *Michaels, supra*, 988 *F.Supp.* at 472. *R.P.C.* 4.2 prohibits an adverse attorney from having *ex parte* contact with any current employee who is within the litigation control group. *Ibid.* On the other hand, if the current employee is not within the litigation control group and has not obtained other representation, *ex parte* contact is permitted consistent with *R.P.C.* 4.2 and *R.P.C.* 4.3. In addition, a former employee who was within the litigation control group is presumptively represented by the organization. *R.P.C.* 1:13(a); *Michaels, supra*, 988 *F.Supp.* at 472. However, pursuant to *R.P.C.* 1.13(a) and *R.P.C.* 4.2, the lawyer may interview a former employee who was within the litigation control group, if he or she disavows that representation. Hence, nothing in the Rules prohibits *ex parte* communication with a former employee who was not within the litigation control group and who was not otherwise represented by counsel. *Michaels, supra*, 988 *F.Supp.* at 472."

Id., at 89-90

----------

<u>Andrews v. Goodyear Tire & Rubber Co., Inc.</u>,
191 F.R.D. 59, D.N.J., Feb 14, 2000

Pursuant to rules of professional conduct governing ex parte contacts, plaintiffs'
attorney in employment discrimination suit was not obligated to determine if
managerial employee was in employer's litigation control group or otherwise
represented by counsel "before making contact" with employee; rather, attorney
was only required to make such determination prior to engaging in any
substantive ex parte communications.

"Upon publication of the initial report by the Special Committee on <u>RPC</u> 4.2, the
Court received an abundance of comments. As a result of those comments, the
Committee reconvened and filed a Supplemental Report on May 6, 1996. *See
Notice to the Bar,* 145 N.J.L.J. 318 (July 15, 1996). Therein, the Committee noted
that it was adhering to the *76 reasoning set forth in the initial report with the
exception of minimalmodifications to *RPCs* 4.2 and 1.13 as set forth in the
supplemental report. *See id.*
The first modification to the original report involved "former" employees of a
corporation and their recommended status as members of the litigation control
group. *See id.* The Committee reaffirmed its initial position that former employees
of a corporation presumptively should be deemed members of the litigation
control group. The Committee added, however, that, because both current and
former employees of a corporation do not lose their right to seek independent
legal advice as a result of their current or former employment, *RPC* 4.2 should be
amended to reflect that option.
The second modification to the initial report also involved former employees of a
corporation. The Committee recognized that because the interests of a former
employee may become adverse to the present interests of a corporation, an
approaching attorney making communications pursuant to <u>RPC</u> 4.3 "may inquire
as to whether the former employee disavows organizational representation or
not." *Id.* Thus, the Committee recommended amending <u>RPC</u> 1.13 to reflect such
"disavowing" language.
In conclusion, the Committee suggested that, if the recommended amendments
to the *RPCs* caused any confusion for an attorney seeking to inquire about
representation pursuant to <u>RPC</u> 4.2, the attorney could consult the scripts set
forth in <u>In re Prudential Insurance Company of America Sales Practices
Litigation, 911 F.Supp. 148, 152 n. 5 (D.N.J.1995)</u> and <u>In re Environmental
Insurance Declaratory Judgment Actions, 252 N.J.Super. 510, 523, 600 A.2d 165
(1991).</u>

…On June 28, 1996, the New Jersey Supreme Court adopted the amendment to
<u>RPC</u> 4.3 as proposed by the Committee in the initial report and also adopted
those amendments to *RPCs* 4.2 and 1.13 as proposed in both the initial and

supplemental reports. *See id.* The amendments to *RPCs* 4.2, 4.3 and 1.13 became effective on September 1, 1996." Id., at 75-76

"Finally, the Court amended <u>RPC</u> 1.13. The pertinent language is as follows: (a) A lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents. For the purposes of <u>RPC 4.2</u> or <u>4.3</u>, however, the organization's lawyer shall be deemed to represent not only the organizational entity but also the members of its litigation control group. Members of the litigation control group shall be deemed to include current agents and employees responsible for, or significantly involved in, the determination of the organization's legal position in the matter whether or not in the litigation, provided, however, that "significant involvement" requires involvement greater, and other than, the supplying of factual information or data respecting the matter. Former agents and employees who were members of the litigation control group shall presumptively be deemed to be represented in the matter by the organization's lawyer but may at any time disavow said representation." Id., at 77

### Florida

Florida Bar Rule 4-4.2

Communication With Person Represented by Counsel

(a) In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer. Notwithstanding the foregoing, an attorney may, without such prior consent, communicate with another's client in order to meet the requirements of any court rule, statute or contract requiring notice or service of process directly on an adverse party, in which event the communication shall be strictly restricted to that required by the court rule, statute or contract, and a copy shall be provided to the adverse party's attorney.

…

COMMENT

…

In the case of an organization, this rule prohibits communications by a lawyer for 1 party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an

11

admission on the part of the organization. If an agent or employee of the organization is represented in the matter by the agent's or employee's own counsel, the consent by that counsel to a communication will be sufficient for purposes of this rule. Compare rule 4-3.4(f). ...

----------

Florida State Bar Association

Florida Ethics Opinion 88-14, 1989 WL 380139  (3/7/89) Amended 2/29/96

A plaintiff's attorney may communicate with former managers and former employees of a defendant corporation without seeking and obtaining consent of corporation's attorney.

The inquiring attorney's law firm represents the plaintiffs in a civil action against a corporation. The attorneys wish to have ex parte interviews with former employees of the defendant corporation who were employed by the corporation during the period when the actions or decisions on which the suit is based occurred. The former employees may include some who had managerial responsibilities and some whose acts or omissions during their employment might be imputed to the corporation for purposes of civil liability. As is usually the case, the defendant corporation objects to ex parte contacts with its former employees.

The issue is whether Rule 4-4.2, Rules Regulating The Florida Bar, prescribes the plaintiffs' attorneys from contacting former managers and other former employees of the defendant corporation except with the permission of the corporation's attorneys. As regards former managers and other former employees who have not maintained any ties with the corporation--who are no longer part of the corporate entity--and who have not sought or consented to be represented in the matter by the corporation's attorneys, the answer must be in the negative.

...

Rule 4-4.2 cannot reasonably be construed as requiring a lawyer to obtain permission of a corporate party's attorney in order to communicate with former managers or other former employees of the corporation unless such individuals have in fact consented to or requested representation by the corporation's attorney. A former manager or other employee who has not maintained ties to the corporation (as a litigation consultant, for example) is no longer part of the corporate entity and therefore is not subject to the control or authority of the corporation's attorney. In many cases it may be true that the interests of the former manager or employee are not allied with the interests of the corporation. In such cases the conflict of interests would preclude the corporation's attorney

FAC Resp. Exhibit B -- 1884

from actually representing the individual and therefore would preclude the corporation's attorney from controlling access to the individual. As the comment indicates with regard to current employees, if a former manager or former employee is represented in the matter by his personal attorney, permission of that attorney must be obtained for ex parte contacts, including contacts by the corporation's attorney.

A former manager or employee is no longer in a position to speak for the corporation. Further, under both the federal and the Florida rules of evidence, statements that might be made by a former manager or other former employee during an ex parte interview would not be admissible against the corporation. Both Rule 801(d)(2)(D), Federal Rules of Evidence, and Section 90.803(18)(e), Florida Evidence Code, provide that a statement by an agent or servant of a party is admissible against the party if it concerns a matter within the scope of the agency or employment and is made during the existence of the agency or employment relationship.

*3 This Committee has not previously had occasion to issue an opinion on the question of communicating with former managers and employees but, as indicated above, bar ethics committees in a number of states have done so. The clear consensus is that former managers and other former employees are not within the scope of the rule against ex parte contacts.

...

As stated above, it is ethically permissible for the inquiring attorney to contact former managers and other former employees of the opposing party without obtaining permission from the corporation's attorney unless those former employees are in fact represented by the corporation's attorney. But as indicated by some of the ethics committees cited above, the attorney should not inquire into matters that are within the corporation's attorney-client privilege (e.g., asking a former manager to relate what he had told the corporation's attorney concerning the subject matter of the representation).

----------

Henry v. National Health Care Affiliates, Inc.,
696 So.2d 1223, 22 Fla. L. Weekly D1355, Fla.App. 2 Dist., May 30, 1997

We grant the petition for writ of certiorari and quash the order of the trial court which prohibited counsel from engaging in ex parte contact with former employees of National Health Care Affiliates, Inc., d/b/a Woodlands Nursing Center, who cared for and treated the decedent whose estate is a party to this case. ...Recently, the Florida Supreme Court disapproved *Barfuss* and held that Florida Rule of Professional Conduct 4-4.2 does not prohibit "an attorney's ex parte communications with former employees of a defendant-employer." *H.B.A.*

13

*Management, Inc. v. Schwartz*, 693 So.2d 541, 546 (Fla. 1997). Accordingly, the petition for writ of certiorari is granted, and the order prohibiting counsel from engaging in ex parte contact is quashed.

----------

H.B.A. Management, Inc. v. Estate of Schwartz By and Through Schwartz, 693 So.2d 541, 57 A.L.R.5th 855, 22 Fla. L. Weekly S236, Fla., May 01, 1997

Professional conduct rule governing contact by attorneys with persons represented by counsel does not prohibit claimant's attorney from engaging in ex parte communications with former employees of defendant-employer. West's F.S.A. Bar Rule 4-4.2.

"A former employee is simply no longer in the position of the "person" contemplated by rule 4-4.2's restrictions. That former employees may have engaged in "actions or inactions" while they were employed that may give rise to liability of the employer is simply a matter of historical fact. In this regard we agree with the Florida Bar Ethics Committee and the *Wright* court that there is no valid reason to distinguish "between former employees who witnessed an event and those whose act or omission caused the event." Florida Bar Professional Ethics Comm. Op. 88-14 at 3 (citing *Wright*, 691 P.2d at 569). An employee's departure terminates the agency or respondeat superior connection that had previously permitted that employee to create liability for her employer or to bind or make admissions for that employer. Hence, the underlying concerns and purpose of rule 4-4.2 is simply no longer served by restricting contacts with former employees.
In summary, we hold that Florida Rule of Professional Conduct 4-4.2 was intended to specifically regulate an attorney's contact with a person represented by counsel and the rule neither contemplates nor prohibits an attorney's ex parte communications with former employees of a defendant-employer."   Id., at 546

## Louisiana

Lousiana Rules of Professional Conduct, Rule 4.2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with:

(a) a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by

law or a court order.

(b) a person the lawyer knows is presently a director, officer, employee, member, shareholder or other constituent of a represented organization and
(1) who supervises, directs or regularly consults with the organization's lawyer concerning the matter;
(2) who has the authority to obligate the organization with respect to the matter; or
(3) whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

----------

Schmidt v. Gregorio,
705 So.2d 742, 25,305 (La.App. 2 Cir. 10/27/93), La.App. 2 Cir., October 27, 1993

Rule of Profession Conduct concerning communication with party represented by attorney does not prohibit counsel from conducting informal ex parte interviews with former employees of adversary; former employees are not "parties" represented by attorney for purposes of rule. Schmidt v. Gregorio, App. 2 Cir.1993, 705 So.2d 742, 25,305 (La.App. 2 Cir. 10/27/93), rehearing denied. Attorney And Client ⚖═32(12)

"Although this rule is essentially the same as American Bar Association Model Rule of Professional Conduct 4.2, it lacks the following ABA clarifying comment: In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person, whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability, or whose statement may constitute an admission on the part of an organization.
As there is no existing jurisprudence in Louisiana providing guidance on this issue, the trial court relied upon the ABA comment, and the federal jurisprudence interpreting it, as persuasive authority. In particular, the trial court found that the decision in *Public Serv. Elec. & Gas v. Associated Elec. & Gas*, 745 F.Supp. 1037 (D.N.J.1990) operated to bar such ex parte contact with former employees. However, a recent ABA opinion interpreting Rule 4.2 and subsequent decisions questioning and rejecting *Public Serv., supra,* reach a different result. *Hanntz v. Shiley, Inc.,* 766 F.Supp. 258 (D.N.J.1991) and *Curley v. Cumberland Farms, Inc.,* 134 F.R.D. 77 (D.N.J.1991).
ABA formal ethical opinion 91-359 issued March 22, 1991, states that ABA Rule 4.2 does not, by its terms, apply to former employees. Although courts have used

15

the rule in various ways, the opinion notes that the rule is **3 limited to present employees. The comment under ABA Rule 4.2 limits even present employees with whom contact is prohibited: Ex parte contact should not be made with present corporate employees (1) who have managerial responsibility on behalf of the defendant corporation, (2) whose act or admission concerning the litigation subject matter may be imputed to the corporation, and (3) whose statement may constitute an admission by the corporation.

Since the ABA comment limits unrepresented corporate employees with whom ex parte communication is prohibited to the above three categories, the ABA 91-359 opinion finds the clear implication that communication with all other employees on the subject matter of the litigation is permissible without consent of the corporate attorney. After reviewing various authorities the opinion concludes that:

A lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4-2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer.

We find ABA Formal Op. 91-359 and the cited jurisprudence to be persuasive. Accordingly, we hold that the Schmidts' counsel may contact the unrepresented former employees of HCA about the subject of the representation without violating Louisiana State Bar Association Rule of Professional Conduct 4.2, and is not merely relegated to formal discovery." Id., at 743-744

----------

In re Bank of Louisiana/Kenwin Shops Inc., Contract Litigation,
Not Reported in F.Supp.2d, 1998 WL 788776, E.D.La., Nov 10, 1998

"Most courts have found that Rule 4.2 does not generally bar *ex parte* contacts with former employees; however, it proscribes inquiry by opposing counsel into matters subject to the attorney-client privilege. *Torch,* page 3, *citing Action Air Freight,* 769 F.Supp. 899, 903-04 (E.D.Pa.1991); *Hantz v. Shiley, Inc.,* 766 F.Supp. 258, 265-69 (D.N.J.1991). See Vernia, Benjamin *Right of Attorney to Conduct Ex Parte Interviews With Former Corporate Employees,* 57 A.L.R.5th 633 (1998) (most court have concluded ethical rules do not problem *ex parte* communication so long as interviewing attorney does not inquire into privileged matters). [FN2]

FN2. Other decisions following this approach rendered in Louisiana courts are *Jenkins v. Wal-Mart Stores, Inc.,* 956 F.Supp. 695 (W.D.La.1997); *Lirette v. Delchamps Inc.,* 1996 WL 267991 (E.D.La.1996); *Barron Builders & Management Co. v. J & A Conditioning & Refrigeration, Inc.,* 1997 WL 685352 (E.D.La.1997); *Schmidt v. Gregorio,* 25-305 La.App. 2 Cir. 10/27/93, 1993 WL 852155 (La. Ct. App 2d Cir.1993).

FAC Resp. Exhibit B -- 1888

Indeed, as noted in *Valassis v. Samelson,* 143 F.R.D. 118 (E.D.Mich.1992), the American Bar Association Committee held in its ABA Formal Opinion 91-359 issued in March 1991, that Rule 4.2 does not extend to former employees, including former managerial employees. It stated with respect to Rule 4.2: While the Committee recognizes that persuasive policy arguments can be and have been made for extending the the ambit of Model Rule 4.2 to cover some former corporate employees, the fact remains that the text of the rule does not do so and the comment gives no basis for concluding that such coverage was intended. Especially where, as here, the effect of the rule is to inhibit the acquisition of information about one's case, the Committee is loath, given the text of the Model Rule 4.2 and its Comment, to expand its coverage to former employees by means of liberal interpretation.

*3* Accordingly, it is the opinion of the committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4 .2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporations's lawyer. *Valassis,* 143 F.R.D. at 121. Nonetheless, former employees are "barred from discussing privileged information to which they are privy." *Orlowski v. Dominick's Finer Foods, Inc.,* 937 F.Supp. 723, 728 (N.D.Ill.1996). Thus, as this Court has stated before, "an attorney can investigate the underlying facts leading up to the disputed matter, but he must forgo inquiry into attorney-client communication during the contact. *Torch,* p.3. Thus, no wrongdoing was committed by BOL's counsels in so far as its counsel having communications with former employees such as Evelyn Kelley, so long as such conversations did not concern attorney-client communications." Id., at *2-3

/////

FAC Resp. Exhibit B -- 1889

**Confidential: Attorney Work Product**

# Ex Parte Communication with Former Employees of a Corporate Adversary:

# A 50 State Reference Guide to Case Law, Ethics Opinions and Rules of Professional Conduct

## In re: VIOXX
## PRODUCTS LIABILITY LITIGATION
## MDL Docket No. 1657

**Prepared by**
**Robinson, Calcagnie & Robinson**
**Newport Beach, Ca.**

**8/9/05**

1

FAC Resp. Exhibit B -- 1890

## Introduction

What are the ethical boundaries of ex parte communication with a former employee of a corporate adversary? Are the rules any different if the former employee is alleged to have participated in the specific misconduct at issue in the litigation, as opposed to merely a percipient witness? What if the former employee was in a high level management position or had access to privileged information? What if the former employee has spoken with defense counsel, or defense counsel unilaterally claims to represent the former employee?

While every state has rules of professional conduct which generally govern contacts with represented persons, questions of this type are not always easily answered. Almost all jurisdictions allow ex parte communication with former employees of an opposing party to some extent, but the specifics of the law and rules of ethics regarding such communication will vary dramatically from one state to the next, particularly as to disclosures which must be made to the former employee, and as to issues of confidentiality or privilege.

The answers to questions like these may be found in reported decisions and in ethics opinions issued by state bar associations. Many states have case law and formal ethics opinions on point under a variety of scenarios, but some may have only a single federal decision or informal ethics opinion generally addressing the subject. Others have neither case law nor guidance from the bar. Even where there is case law or an ethics opinion directly on point, it can still be difficult to obtain a precise answer for a particular situation.

There is usually no bright line test available, and frequently courts steer clear of definitive answers to ethical questions, suggesting only that counsel exercise caution to avoid disclosure of privileged matters. Moreover, in those states with significant discussion of these issues in the cases and ethics opinions, there may be disagreement among the state and federal courts as to the extent of the required or suggested disclosures and/or protocols for contacting and communicating with former employees.

With the foregoing in mind, this guide is intended to assist and serve as a starting point for determining the law on ex parte communications with former employees in a particular jurisdiction.  Listed below in alphabetical order are controlling code sections for each state, as well as excerpts and headnotes from state and/or federal decisions on the specific subject of communicating with former employees.  Where available, relevant ethics opinions issued by the state's bar association are also excerpted.

## The ABA Rule

Most states have enacted rules of professional conduct which are patterned after or track the language of ABA Model Rule 4.2 (formerly DR 7-104), which provides:

> "RULE 4.2 COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL
>
> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."

2

Paragraph 7 of the comment to rule 4.2 is directed to the situation in which a party is an organization:

> "[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4."

On two occasions the ABA Committee on Ethics and Professional Responsibility has issued formal opinions to the effect that Model Rule 4.2 does not prohibit contacts with former employees of a represented corporation, even if those former employees were at one time in one of the categories in which communication was prohibited while employed. In Formal Op. 91-359 (1991) the Committee opined:

> "While the Committee recognizes that persuasive policy arguments can be and have been made for extending the ambit of Model Rule 4.2 to cover some former corporate employers, [sic] the fact remains that the text of the Rule does not do so and the comment gives no basis for concluding that such coverage was intended. Especially where, as here, the effect of the Rule is to inhibit the acquisition of information about one's case, the Committee is loath, given the text of Model Rule 4.2 and its Comment, to expand its coverage to former employees by means of liberal interpretation. Accordingly, it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer." Id., at 3

Similarly, in Formal Opinion 95-396, the committee advised that "[w]hen a corporation or other organization is known to be represented with respect to a particular matter, the bar applies only to communications with those employees who have managerial responsibility, those whose act or omission may be imputed to the organization, and those whose statements may constitute admissions by the organization with respect to the matter in question." ABA, Formal Op. 95-396 (1995). "[T]he ABA reaffirmed that "Rule 4.2 does not prohibit contacts with former officers or employees of a represented corporation, even if they were in one of the categories with which communication was prohibited while they were employed." Seitel Geophysical, Inc. v. Greenhill Petroleum Corp., Not Reported in F.Supp., 1995 WL 686754, *2 (E.D.La., Nov 17, 1995)

3

## Alabama

Alabama Rules of Prof.Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Comment

...

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule.

...

----------

Alabama State Bar Ethics Opinion Number: 1993-05  (3/31/93)

Rule 4.2 does not prohibit plaintiff's counsel from contacting former employees of a corporate defendant

...

Plaintiff's counsel may not, without notice and permission, interview current employees who are in a position to bind the corporate defendant. However, ex parte contact with a former employee is not subject to the same scrutiny applied to current employees of a corporate defendant.

As the Commission stated in RO-92-12, "...there is a strong argument that Rule 4.2 does not even apply to former employees at any level." The one qualification might be, as discussed in Hazard and Hodes in the treatise The Law of Lawyering, those employees who occupied a managerial level position and were involved in the underlying transaction and being privy to privileged information, including a work product, which would prohibit plaintiff's counsel from accessing said information without a valid waiver by the organization and/or discovery and evidence rules. However, such an exception would be restricted to situations wherein these facts exist.

The instant holding of the Disciplinary Commission is supported by ABA Formal Opinion 91-359 (1991), a copy of which is attached hereto. Therein, the ABA Committee on Ethics and Professional Responsibility determined that former employees of a corporation could be contacted by plaintiff's counsel without consulting with the corporate defendant's counsel since the former employees were no longer in a position of authority, and, thus, could not "bind" the corporation.

4

//////////////////////////////////////

## Alaska

Alaska Rules of Professional Conduct, Rule 4.2.

Communication with Person Represented by Counsel.

In representing a client, a lawyer shall not communicate about the subject of the representation with a party or person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. (SCO 1123 effective July 15, 1993)

COMMENT

...

In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent of that counsel to a communication will be sufficient for purposes of this Rule. ...

----------

Alaska Bar Association Ethics Opinion No. 88-3 (6/7/88)

RE: Communication with Former Employees of Corporations Represented by Counsel

The committee has been asked whether it is a violation of the disciplinary rules for an attorney to speak with the former employees of a corporate opponent party. The committee is advised that the attorney wishes to question these former employees regarding the subject matter of the pending litigation since the former employees dealt closely with the transaction which gives rise to the existing law suit against their prior corporate employer.

It is the opinion of this committee that an attorney representing an opposing party in a law suit against a corporation may contact former employees of the corporation, including former members of the corporation's control group, who dealt with the subject matter of the litigation without permission of corporate counsel. It should be noted that counsel may still be prohibited from direct communication with a former employee if that person is individually represented with regard to the pending matter. Further, the questioning attorney may not inquire into privileged attorney-client communications. The interrogating attorney may not listen while the former employee tries to reveal privileged communications voluntarily. The existence of any privileged matter among the former employee and the corporate employer's counsel can only be waived by the corporation who possess this privilege.

A lawyer may communicate with a former employee of an adverse party if the former employee is not represented by counsel. If the lawyer must directly communicate with an unrepresented person, the lawyer should not provide advice, though he may suggest that the third party seek a lawyer. ...

5

After leaving the organization's employment, a former employee cannot bind the organization under the law. Therefore, an attorney does not violate DR7-104(A)(1) by communication directly with the organization's former employees about the substantive dispute without the prior consent of the organization's counsel. ...

In summary, direct communication with former control group or managerial employees may result in eliciting information adverse to the corporation. However, this no more deprives the corporation of the benefit of counsel than does direct communication with any potential bystander witness. Former officers or employees have no authority to commit the organization since such prior employees can no longer be the alter ego of the corporation.

/////////////////////////////////////////////

## Arizona

Arizona Rules of Professional Conduct, ER 4.2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENT

...

[2] In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. ...

----------

State Bar of Arizona Ethics Opinion 2000-05 (9/00)

SUMMARY

A lawyer may interview ex parte a client's employee concerning litigation with the employee's former employer, subject to the limits recognized in Lang v. Superior Court, 170 Ariz. 602, 826 P.2d 1228 (App. 1992). In interviewing an employee in these circumstances, the lawyer must also comply with other applicable ethical rules in addition to ER 4.2, particularly ERs 4.3 and 4.4. [ERs 4.2, 4.3, 4.4]

FACTS

6

The inquiring attorney represents a client in defending litigation for alleged breach of contract. The client now employs a person who formerly worked for the opposing party while the contract was in effect. The attorney proposes to interview his client's employee, who is also the opposing party's former employee, on matters relevant to the litigation. Counsel for the opposing party has asserted a right to attend any such interview.

QUESTION PRESENTED

May an attorney conduct an ex parte interview of a client's employee regarding that person's previous employment by an opposing party?

...

Arizona's ethical rules allow ex parte contacts with the former employees of an opposing party except in particular circumstances identified in Lang. There, the Court of Appeals held:

> [C]ounsel may have ex parte contact with a former employee of an opposing party who is represented by counsel without violating ER 4.2 unless the acts or omissions of the former employee gave rise to the underlying litigation or the former employee has an ongoing relationship with the former employer in connection with the litigation.

170 Ariz. at 608-09, 826 P.2d at 1234-35 (emphasis added).

Contacts with a former employee are not prohibited merely because that person may have information which is harmful to the opposing party; nor does the fact that a former employee may be a prospective witness, even a critical one, trigger the prohibition. Id. at 606, 826 P.2d at 1232. See also Ariz. Op. 95-07 (noting fact that testimony of former employee may be detrimental to former employer does not determine propriety of contact).

The analysis in Lang also governs the situation where the former employee is now employed by the client of the lawyer who proposes to interview the employee. Arizona's ethical rules do not generally prohibit ex parte interviews of such employees. But the fact that the party opposing the former employer has hired the latter's erstwhile employee does not authorize ex parte contacts that otherwise would be prohibited by Lang. The inquiry suggests that the former employee is not separately represented. Of course, if the employee is separately represented by counsel in the matter, ER 4.2 bars ex parte contacts, absent the consent of the employee's counsel. Moreover, where a lawyer seeks to interview a client's employee regarding litigation with that person's former employer, the lawyer must also take care to comply with all other ethical rules, particularly the requirements of ER 4.3 for dealings with unrepresented persons and ER 4.4 concerning respect for the rights of third parties.

Lang and the applicable ethical rules suggest the following guidelines:

1. A lawyer is not generally prohibited from conducting an ex parte interview of a client's employee concerning litigation against that person's former employer.

2. ER 4.2 will apply to an interview of the client's employee if that person's conduct while formerly employed gave rise to the litigation or if the person has an ongoing relationship with the former employer in connection with the litigation.

3. If 4.2 applies, an ex parte interview generally will not be permitted without the consent of counsel representing the former employer. If, however, the former employee is separately represented in the matter by his or her own counsel, consent by that

7

counsel will suffice for ER 4.2 and an interview may occur without the presence or consent of the former employee's lawyer.  See ER 4.2, Comment.  Cf. Ariz. Op. 95-07 (observing that if employee has counsel, that lawyer's consent should be obtained for communications with current, non-managerial employee of adverse party).

    4.  If an ex parte interview occurs, to ensure compliance with ERs 4.3 and 4,4, the lawyer for the current employer must inform the employee of the lawyer's role in the case, the identity of the lawyer's client, and the fact that the employee's former employer is an adverse party.  See Ariz. Op. 96-02 (noting disclosures required by lawyer in making ex parte contacts with general members of homeowners' association).  See also Shearson Lehman Bros. v. Wasatch Bank, 139 F.R.D. 412, 416-18 (D. Utah 1991) (attorney contacting former employees must comply with ERs 4.3 and 4.4); Reynoso v. Greynolds Park Manor, Inc. 659 So.2d 1156, 1162-63 (Fla. Ct. App. 1995) (same).

    5.  In any interview with the employee, the lawyer for the current employer must avoid inquiring into any privileged communications between the employee and counsel for his former employer.  See, e.g., PPG Industries v. BASF Corp., 134 F.R.D. 118, 123-24 (W.D. Pa. 1990) (noting where current employee formerly worked for adverse party, the counsel for current employer could not inquire into privileged communications with counsel for former employer); Reynoso, 659 So.2d at 1162-63 (cautioning that counsel should not seek to induce employee to breach any privileged communications); Strawser v. Exxon Co. U.S.A., 843 P.2d 613, 622 (Wyo. 1992) (same); ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 91-359 (same).

----------

State Bar of Arizona Ethics Opinion 95-07 (11/1/95)

This opinion will address in turn communications with a witness who is first a current employee, and then a witness who is a former employee, of an adverse party represented by counsel, with respect to each of the three enumerated circumstances, in the absence of consent by the adverse party employer's counsel.

...

II.     Former employee

    A.     Witness's testimony may be detrimental to the employer.

That the testimony of the former employee may be detrimental to her former employer is not determinative.  The Arizona Court of Appeals held in Lang v. Superior Court, 170 Ariz. 602, 826 P.2d 1228 (App. 1992) that communication with a former employee by counsel for a party adverse to the former employer is permissible in the absence of consent by counsel for the employer, unless the acts or omissions of the former employee gave rise to the underlying litigation.  In the language of the Comment to ER 4.2, communication is prohibited if "an act or omission [of the former employee] . . . may be imputed to the organization for purposes of civil or criminal liability . . . ."  The court also held in Lang that communication was prohibited without the consent of the former employer's counsel if the former employee has some ongoing relationship with the employer in connection with the litigation.

    B.     Employee may have witnessed an unlawful act of his former employer.

That the former employee may have witnessed an unlawful act by his former employer or representative is not relevant to whether communication by counsel for a party adverse to the former employer is permitted under ER 4.2.  Whether or not communication with a

8

former employee is permitted under such circumstances is governed by the same analysis set out in section II.A. above.

...

----------

### Lang v. Superior Court, In and For County of Maricopa,
170 Ariz. 602, 826 P.2d 1228, Ariz.App. Div. 1, Feb 27, 1992

Counsel may have ex parte contact with former employee of opposing party who is represented by counsel without violating professional conduct rule, unless acts or omissions of former employee gave rise to underlying litigation or former employee has ongoing relationship with former employer in connection with litigation. 17A A.R.S. Sup.Ct.Rules, Rule 42, Rules of Prof.Conduct, ER 4.2.

"We believe the better approach is to permit *ex parte* contacts with former employees. First, neither the rule nor its comments specifically mention former employees. Had the rule been intended to cover former employees, it could have explicitly said so. Second, the rule does not ban all *ex parte* contacts, but only those with individuals listed in the comments. There is no reason to expand the scope of the ban once the employment relationship ends. Third, we agree with the *Polycast Technology* court that neither the threat of disclosure of confidential information nor the desire to protect the organization from liability-creating statements justifies a blanket ban on *ex parte* communications. These concerns are best dealt with on a case-by-case basis. Also, any movement away from informal discovery procedures will greatly increase the cost of litigation.
We do not, however, adopt a *per se* rule of permitting *ex parte* contacts simply because the individual is a former employee. Such an approach does not comply with the requirement of ER 4.2 of prohibiting *ex parte* contacts with persons whose acts or omissions in connection with the matter may be imputed to the organization. For example, if an employee hired to drive a truck is involved in an accident that occurs in the course and scope of employment, the fact that the employee leaves his or her employment should not determine the propriety of *ex parte* communications. Clearly, the employee's acts or omissions in connection with any litigation that arises out of the accident can be imputed to the former employer for purposes of civil liability. Obviously, the former employer's lawyer should be given the opportunity to consent to an *ex parte* contact with that employee.
We agree with the distinction recognized in *Amarin Plastics,* and hold that ER 4.2 does not bar counsel from having *ex parte* contacts with a former employee of an opposing party where the former employer is represented by counsel *unless* the acts or omissions of the former employee gave rise to the underlying litigation or the former employee has an ongoing relationship with the former employer in connection with the litigation."
Id., at 607


//////////////////////////////

## Arkansas

Arkansas Rules of Professional Conduct, Rule 4.2 effective 5/1/05

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL.

9

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law.

COMMENT:

...

[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4.

...

[9] In the event the person with whom the lawyer communicates is not known to be represented by counsel in the matter, the lawyer's communications are subject to Rule 4.3.

----------

Arkansas Bar Association  Professional Ethics Committee Advisory Opinion 2004-01 (2/17/04)

Subject: Ex Parte Communication with Former Employees of Corporate Adversary

... The Rule prohibits communications by the attorney for one party with persons having a managerial responsibility in the corporation, and with any other person whose act or omission may be imputed to the corporation for purposes of liability, or whose statement may constitute an admission. Comment 2 to the Rule. Accordingly, the attorney for the plaintiff in a slip and fall accident may not communicate with managers of the defendant, nor with employees who may have been involved or whose statements may constitute an admission of liability. In the absence of the consent of the corporate attorney, the attorney for the plaintiff must proceed through formal discovery methods to obtain information from such employees.

Here the issue, however, is with former employees of the corporate defendant. Neither the rule nor the comments address this situation. But several reasons lead this committee to the conclusion that former employees, no matter what their former position, are to be treated differently.

.... Some opinions draw a distinction between those former employees who were in the litigation control group or management group and those who were not. For example, Klier v. Sordoni Skanska Constr. Co., 766 A. 2d 761 (N.J. 2001). However, we find no basis for any distinction except between present employees and former employees. The purpose of 4.2 is to protect the attorney-client representation and the accompanying confidences. However, the former employee is no longer represented by the corporate attorney. The

10

no-contact rule should not be expanded or interpreted in such a fashion that it creates further restrictions on the flow of information.

We do note the limitations of our opinion. Although the plaintiff's attorney is permitted to communicate with those former employees, they are not compelled to speak. Those former employees may be represented by their own counsel in the matter; and upon knowledge of that representation, the plaintiff's attorney must cease communication with them. In addition, other factors may bar the former employees from speaking. For example, former corporate attorneys may remain bound by the evidentiary privilege or the ethical standard of confidentiality. Likewise other corporate officials may be bound by confidentiality agreements. The former employee may be still represented by corporate counsel. The comment to Rule 4.4 emphasizes that the lawyer in seeking information must do nothing that violates the rights of the corporation or is an unwarranted intrusion into a legal relationship. See Proposed Comment 1 to Rule 4.4.

Conclusion: Within the scope of Rule 4.2, an attorney is permitted to communicate in regard to the matter in question with former corporate employees without seeking or obtaining the consent of the corporate attorney.

/////////////////////////////

## California

California Rules of Professional Conduct, Rule 2-100

Communication With a Represented Party

(A) While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer.

(B) For purposes of this rule, a "party" includes:
(1) An officer, director, or managing agent of a corporation or association, and a partner or managing agent of a partnership; or
(2) An association member or an employee of an association, corporation, or partnership, if the subject of the communication is any act or omission of such person in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

(C) This rule shall not prohibit:

(1) Communications with a public officer, board, committee, or body;
(2) Communications initiated by a party seeking advice or representation from an independent lawyer of the party's choice; or
(3) Communications otherwise authorized by law.

DISCUSSION

...

Paragraph (B) is intended to apply only to persons employed at the time of the communication. (See Triple A Machine Shop, Inc. v. State of California (1989) 213 Cal.App.3d 131 [261 Cal.Rptr. 493].)

11

----------

Vapnek, Tuft, Peck & Wiener, CAL. PRAC. GUIDE: PROFESSIONAL RESPONSIBILITY (The Rutter Group 2004)

"(4) [8:353] Compare--*former* officers and employees: CRPC 2-100 is not intended to apply to communications with persons no longer holding office or employed by an adverse corporate party: 'Paragraph (B) is intended to apply only to persons employed at the time of the communication.' [See CRPC 2-100, Discussion; and *Triple A Machine Shop, Inc. v. State of Calif.* (1989) 213 CA3d 131, 140, 261 CR 493, 498]

(a) [8:354] Ex parte contact permitted: CRPC 2-100(B) applies only to persons employed at the time of the ex parte contact. Therefore, it is *not* a violation or ground for disqualification for counsel to interview unrepresented *former* employees of a corporation without the knowledge or consent of the attorneys representing the corporation. [*Continental Ins. Co. v. Sup.Ct. (Commercial Bldg. Maint. Co.)* (1995) 32 CA4th 94, 118-119, 37 CR2d 843, 857- 858; see also *Mills Land & Water Co. v. Golden West Refining Co.* (1986) 186 CA3d 116, 129-130, 230 CR 461, 468; and Bobele v. Sup.Ct. (*Valley Hilton Hotel*) (1988) 199 CA3d 708, 713-714, 245 CR 144, 147]

1) [8:355] Effect: The corporation cannot bring former employees 'back into the fold' merely because they have confidential information regarding it. As third party witnesses, they are 'fair game' for opposing counsel. [*Bobele v. Sup.Ct. (Valley Hilton Hotel)*, supra, 199 CA3d at 713-714, 245 CR at 147]

2) [8:356] Shareholder status immaterial: Ex parte contact is proper even if the former officer, director, etc. is still a minority shareholder in the adverse party. [*Nalian Truck Lines, Inc. v. Nakano Warehouse & Transp. Corp.* (1992) 6 CA4th 1256, 1264, 8 CR2d 467, 472, fn. 9]

3) [8:357] 'Control group' status immaterial? One court has stated in dictum that ex parte contact is improper with former employees who 'remain members of the corporation's control group as that term is defined in *Upjohn Co. v. United States.*' [Bobele v. Sup.Ct. (*Valley Hilton Hotel*), supra, 199 CA3d at 714, 245 CR at 148]
But later cases reject this limitation, stating CRPC 2-100 does not apply *at all* to *former* employees. [*Nalian Truck Lines, Inc. v. Nakano Warehouse & Transp. Corp.*, supra, 6 CA4th at 1264, 8 CR2d at 472; *Continental Ins. Co. v. Sup.Ct. (Commercial Bldg. Maint. Co.)*, supra, 32 CA4th at 119-120, 37 CR2d at 858-859 (dictum because employee not member of control group)]

• [8:358] Comment: The latter cases seem correct. A 'bright line' test (present employment) is essential because it enables the attorney to determine beforehand whether ex parte contact is permissible. Otherwise, zealous representation could be 'chilled' by fear of disqualification. [*Nalian Truck Lines, Inc. v. Nakano Warehouse & Transp. Corp.*, supra, 6 CA4th at 1264, 8 CR2d at 472]

(b) [8:359] Limitation--inquiry re privileged communications prohibited: 'Counsel representing a client opposing a corporate defendant has a right to meet ex parte with ex-employees of the corporation, even if they were managerial employees. While *counsel may not inquire about privileged communications, inquiry may be made with regard to relevant facts.*' [*State Farm Fire & Cas. Co. v. Sup.Ct. (Taylor)* (1997) 54 CA4th 625, 652, 62 CR2d 834, 852 (internal citations omitted); see Bobele v. Sup.Ct. (*Valley Hilton Hotel*), supra, 199 CA3d at 714, 245 CR at 148]"
[8:360-364] *Reserved*.

----------

12

**Continental Ins. Co. v. Superior Court,**
32 Cal.App.4th 94, 37 Cal.Rptr.2d 843, Cal.App. 2 Dist., Jan 18, 1995

Rule prohibiting attorneys from communicating about subject of representation with party represented by another lawyer does not apply to former employees of corporate party represented by counsel. Prof.Conduct Rule 2-100(B)(2).

Even if rule prohibiting attorney from communicating with party attorney knows to be represented by another lawyer applied to communications with corporation's former employees, insurer's attorney did not violate rule when he contacted maintenance company's former employee concerning employee's actions prior to fire at insured building, absent showing that employee's communications involved any act or omissions that would be binding on employer or that any statement of employee could constitute admission on part of employer. Prof.Conduct Rule 2-100

"A diligent search of California authorities in the last 20 years would have led a reasonable attorney to conclude that ex parte contact with former non-control group employees like Fleites did not violate rule 2-100. While a nationwide search of authorities would have revealed some federal courts which interpreted ABA Rule 4.2 to apply to some former employees, "The approach of the PSE & G court [*Public Service Electric & Gas Co. v. Associated Electric & Gas Insurance Services, Ltd., supra,* 745 F.Supp. 1037] appears to be the minority view. Prior to *PSE & G,* other *120 federal courts relying on the commentary to Rule 4.2 had suggested that the anticontact rule might apply to some former employees of a corporation, but none drew the prohibition so broadly. Many courts, as well as a recent opinion of the American Bar Association Committee on Ethics and Professional Responsibility, have concluded that the anticontact rule does not prohibit contact with a corporation's former employees at all. Further, in *Hanntz v. Shiley, Inc.* [ (D.N.J.1991) 766 F.Supp. 258], another New Jersey federal judge rejected *PSE & G 's* approach." (Sinaiko, *supra,* 66 N.Y.U.L.Rev. 1456, 1491-1492, fns. omitted.) We also believe that a broad or liberal interpretation of paragraph (B)(2) of rule 2-100 to apply to former employees would be inconsistent with several policy objectives affected by such rule: "Several problems inhere in an approach that prohibits ex parte communication with former employees of a corporate adversary. First, such communication with a former employee does not effect an end-run around the protections afforded by the corporate attorney-client relationship. **859 Clearly, ex parte communication with former employees cannot improperly influence settlement because such employees have no influence over the corporation's litigation strategy or over decisions to settle. Similarly, since the former employee is not involved in the corporation's attorney-client relationship, ex parte communication cannot undermine that relationship. Additionally, because the former employee no longer is an agent of the corporation, she cannot make revelations that bind the corporation as evidentiary admissions so that the concern about improvident statements is not implicated. Second, prohibiting ex parte contact with former employees, like a blanket prohibition on such contact with present employees, unduly impedes the flow of information and unnecessarily increases the costs of litigation.""

----------

**Snider v. Superior Court,**
113 Cal.App.4th 1187, 7 Cal.Rptr.3d 119, 03 Cal. Daily Op. Serv. 10,390, 2003 Daily Journal D.A.R. 13,056, Cal.App. 4 Dist., Dec 03, 2003

To avoid potential violations of the attorney-client privilege or Bar rule, an attorney contacting an employee of a represented organization should question the employee, at the beginning of the conversation before discussing substantive matters, about the

13

employee's status at that organization, whether the employee is represented by counsel, and whether the employee has spoken to the organization's counsel concerning the matter at issue. Prof.Conduct Rule 2-100(B)(2).

/////////////////////////

## Colorado

Colorado Rules of Professional Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENT

...

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for the purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f)...

Current with amendments received through April 15, 2005

----------

Colorado Bar Formal Ethics Opinion 69

PROPRIETY OF COMMUNICATING WITH EMPLOYEE OR FORMER EMPLOYEE OF AN ADVERSE PARTY ORGANIZATION Revision adopted June 20, 1987. Addendum issued 1995.

...

An attorney may interview a former employee ex parte with regard to all matters except as to communications which are the subject of the attorney-client privilege.

....

The distinction between bystander and non-bystander witnesses does not apply to an organization's former employees. After leaving the organization's employ, a former employee cannot bind the organization as a matter of law. See, e.g., Rule 801(d)(2)(D), C.R.E.; 4 J. Weinstein and M. Berger, Weinstein's Evidence 801(d)(2)(D)[01] at 801-222 n. 16 (1985); Securities and Exchange Commission v. Geon Industries, Inc., 531 F.2d 39,

14

43 n. 3 (2d Cir. 1976). As a former employee is thus not the "party," i.e., the organization, an attorney does not violate DR 7-104(A)(1) by communicating directly with the organization's former employee about the substantive dispute without the prior consent of the organization's counsel. Wright v. Group Health Hospital, 103 Wash.2d 192, 691 P.2d 564, 569 (1984); see also American Protection Insurance Co. v. MGM Grand Hotel-Las Vegas, Inc., No. CV-LV-82-26-HDM (D. Nev. March 11,1986) (discussing who may be contacted ex parte, when the ex parte contact may occur, and the consequences arising from improper ex parte contacts) (see n. 1, supra). However, as discussed above, DR 7-104(A)(1) is designed in part to preserve the confidentiality of privileged attorney-client communications. Accordingly, the inquiring attorney may not, while communicating with the organization's former employee, inquire into privileged attorney-client communications; nor may the inquiring attorney listen while the former employee attempts to divulge privileged communications voluntarily. Any privilege existing between the former employee and the organization's counsel belongs to the organization, and can be waived only by the organization. See A. v. District Court, 191 Colo. 10, 550 P.2d 315, 323 (1976), cert. denied, 429 U.S. 1040 (1977).

In conclusion, then, a current employee of an adverse party organization who has authority - as described above - to commit the organization to a position with regard to the subject matter of the communicating attorney's representation, may not receive communication from the adverse party's counsel or his agent without the consent of the organization's attorney. A former employee of an adverse party organization may be interviewed ex parte with regard to all matters except as to communications which are the subject of the attorney-client privilege.

----------

**Sequa Corp. v. Lititech, Inc.,**
807 F.Supp. 653, D.Colo., Nov 05, 1992

Attorney's consent to interview of former legal secretary is required only when privileged information is sought; if party to action seeks only nonprivileged information from former legal secretary of adverse party to that action, ex parte interview is permitted. West's C.R.S.A. § 13-90-107(1)(b).

"DR 7-104 prohibits counsel from communicating on the subject of the representation with a party he knows to be represented by counsel. Colorado Bar Association Revised Ethics Opinion 69 interprets this rule in the context of present and former employees of an adverse party. As to a present employee of an adverse party, Revised 69 permits an ex parte interview if the employee is a "bystander" witness who has no authority to bind the organization to a position in the litigation. As to a former ***660** employee, Revised 69 allows an ex parte interview "with regard to all matters except as to communications which are the subject of the attorney-client privilege." The opinion mandates that an interviewing attorney may not inquire into privileged communications or listen while the former employee divulges privileged communications voluntarily."

/////////////////////////

## Connecticut

Connecticut Rules of Professsional Conduct, Rule 4.2

15

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Commentary

...

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. (Compare Rule 3.4(6)).

...

---------

Connecticut Bar Association Informal Ethics Opinion 99-43, 1999 WL 33115193

INTERVIEWING FORMER EMPLOYEE OF OPPONENT

Informal Opinion Number 99-43 (9/17/99)

You have asked for the committee's opinion on the following set of facts:

You are representing a plaintiff in bringing a negligent security action against a corporate fast-food defendant. You have asked whether or not you may speak with a former employee who was not an officer, manager or member of the corporate defendant's control group without the attorney for the defendant corporation having knowledge or giving consent to the interview. You have indicated that this former employee was a counter person who witnessed an assault upon your client. You have indicated that the corporation that owns the restaurant is being sued and that the former employee is not being individually sued.

You know the corporation is represented by counsel.

This committee has had an opportunity in the past to opine on Rule 4.2, notably in Informal Opinion 88-17 and in Informal Opinion 92-11. However, neither opinion addresses the treatment of former employees.

The American Bar Association Standing Committee on Ethics and Professional Responsibility has, however, opined that Rule 4.2's prohibition does not extend to contact with former employees of a corporate party, regardless of whether those former employees did or did not have managerial responsibility concerning the matter in litigation. See Formal Opinion 91-359 (1991). That opinion was cited with approval in Dubois v. Gradco Systems, Inc., 136 F.R.D. 341 CD. Conn. 1991, (Cabranes, J.). Formal Opinion 91-359 was reaffirmed in ABA Formal Opinion 95-396, n. 47 (1995).

The facts we address do not require us to deal with the entire scope of these opinions.

16

*2 It is understood that you have no notice that this person is represented by counsel in this matter and that any act or failure to act by this former employee is not to be imputed to the corporation.

Based upon these facts, you may speak to the former employee without notice to the attorney representing the corporation without violating Rule 4.2. The requirements of Rule 4.3, Dealing with Unrepresented Persons, should be remembered and the interviewing lawyer should neither state nor imply to the former employee that he is disinterested in the matter.

----------

### Amity Reg. School Dist. No. 5 v. Atlas Const. Co.,
Not Reported in A.2d, 2001 WL 219724, 29 Conn. L. Rptr. 327, Conn.Super., Feb 09, 2001

"In an analogous provision of the Rules of Professional Conduct, Rule 4.2 restricts a lawyer's communications with persons represented by counsel. The comment to Rule 4.2 indicates that in the case of an organization, a lawyer is prohibited from communicating with certain employees of the organization. A number of authorities have held that this prohibition does not apply to former employees. See *U.S. v. Housing Authority for the Town of Milford*, 179 F.R.D. 69 (D.Conn.1997); *Dubois v. Gradco Systems, Inc.*, 136 F.R.D. 341 (D.Conn.1991); G. Hazard and W. Hodes, *supra*, at 739.
In *Dubois v. Gradco*, Judge Cabranas of the United States District Court for the District of Connecticut relied on *Polycast Technology Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621 (S.D.N.Y.1990), for the proposition that "under either Rule 4.2 or its predecessor and analogue, Disciplinary Rule 7-104(A)(1) of the Code of Professional Responsibility, there is no ethical rule barring ex parte communications with a former employee of an adverse corporate party." *Dubois v. Gradco, supra*, 136 F.R.D. 343-44.
[T]o the extent that Rule 4.2 and D.R. 7-104(A)(1) were formulated to preserve the integrity of the attorney-client relationship, there would be no current attorney-client relationship to jeopardize in the case of a former employee ⋯ [T]here was nothing in Rule 4.2 or the Comment to justify departing from the traditional view that former employees are not encompassed within the term "party" ⋯ and so may be contacted without notice to the corporation's attorney ⋯
(Citations omitted; internal quotation marks omitted.) *Id.*, 344. This analysis logically would apply equally in the context of obtaining discovery from a corporation's former agent." Id., at *7

----------

### Carrier Corp. v. Home Ins. Co.,
Not Reported in A.2d, 1992 WL 32568, 6 Conn. L. Rptr. 3, Conn.Super., Feb 11, 1992

"The plaintiff claims that certain former employees should be treated as parties under Rule 4.2 of the Connecticut Rules of Professional Conduct. The plaintiff also claims that Rules 4.2 and 4.3 are insufficient to govern *ex parte* interviews with former employees and that a protective order is necessary to govern those interviews. The defendants argue that Rule 4.2 does not apply to former employees and that the defendant has the right to conduct *ex parte* interviews with such employees without limitation or advance notice.
Rule 4.2 is substantially similar to Disciplinary Rule 7-104(A)(1) of the Code of Professional Responsibility. "The Rule clearly prohibits a lawyer from discussing a case with a party on the matter who is also represented by counsel, unless the lawyer has the permission of counsel or a court rule authorizing it." *Dubois v. Gradco Systems, Inc.*, 136 F.R.D. 341, 343 (D.Conn.1991). The purpose of the Rule is to preserve the integrity of the attorney client relationship by protecting the represented party from superior knowledge and skill of the opposing attorney. *Pinsky v. Statewide Grievance Committee*, 216 Conn. 228, 236, 578 A.2d 1075 (1990). Additionally, the comment to Rule 4.2

17

suggests three groups of individuals with whom an attorney representing the opposing party is prohibited contact without prior approval:
1. persons having managerial responsibility on behalf of the organization, or
2. any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability; or
3. (any other person) whose statement may constitute an admission on the part of the organization.
Contact with former employees is not prohibited. Case law supports this premise. "There is no ethical Rule barring *ex parte* communications with a former employee of an adverse corporate party." *Dubois,* supra at 344. See, *Polycast Technology Corporation v. Uniroyal, Inc.,* 129 F.R.D. 621 (S.D.N.Y.1990). The traditional view is that former employees are not encompassed within the term 'party'. *Id.* Therefore, speaking with a former employer does not damage the policy underlying Rule 4.2. "Id., at *1

----------

**Dubois v. Gradco Systems, Inc.,**
136 F.R.D. 341, 59 USLW 2771, D.Conn., May 02, 1991

In communicating with former employees of adverse corporate party, plaintiff's attorney would have to make clear to employees the nature of his role in case, including identity of plaintiff and fact that employer was adverse party. Conn.Rules of Prof.Conduct, Rule 4.2; ABA Rules of Prof.Conduct, Rule 4.3.

Plaintiff filed motion in limine asking court to determine that Connecticut Rule of Professional Conduct did not prohibit plaintiff's counsel from contacting or interviewing on ex parte basis nonparty former employees of defendant. The District Court, José A. Cabranes, J., held that former employees of adverse corporate party could not themselves be considered "adverse parties," within meaning of Connecticut Rule of Professional Conduct prohibiting lawyer from communicating about subject of representation with adverse party represented by attorney unless lawyer first obtains attorney's consent.
So ordered.

//////////////////////////////

## Delaware

Delaware Rules of Professional Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

COMMENT

...

[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the

18

organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4.

----------

**Monsanto Co. v. Aetna Cas. & Sur. Co.,** 593 A.2d 1013, Del.Super., Sep 10, 1990

When investigators working for insurers that were disputing their liability to insured did not determine if former employees of insured were represented by counsel, did not clearly identify themselves as working for attorneys who were representing client involved in litigation against insured which formerly employed employees, did not clearly state purpose of interview, and made affirmative misrepresentations regarding such matters, rules of professional conduct governing dealing with unrepresented person and governing communication with person represented by counsel were violated. Affirmative misleading of former employees of insured involved in litigation with insurers warranted protective order requiring disclosure of investigators' contacts with former employees and mandatory script for further interviewing of former employees.

----------

**DiOssi v. Edison,**
583 A.2d 1343, Del.Super., May 14, 1990

Rule prohibiting ex parte communications with party represented by counsel relates only to present principals, officers, employees, agents, etc. of represented entity; it does not prohibit ex parte communications with former employees. Rules of Prof.Conduct, Rule 4.2, Del.C.Ann.

"It is clear from the context of the comment language cited by defendant that this Rule is intended to preclude *ex parte* communications with those who could currently bind or admit liability for the represented entity. Its clear purpose is to foster and protect the attorney-client relationship and not to provide protection to a party in civil litigation nor to place a limit on discoverable material. The comment language immediately following the sentence cited by defendant allows for communication with an agent or employee who has his/her own attorney without notice to the organization, corporate entity or its attorney. This language clearly defeats the purpose advanced by defendant for Rule 4.2. The Court, therefore, agrees with the ethics decisions that this Rule relates only to present principals, officers, employees, agents, etc. of a represented entity. Because the Rule does not prohibit *ex parte* communications with former employees, the defendant's motion to exclude the evidence at trial and to compel the plaintiff to produce the records that reflect the communication is DENIED." Id., at 1345

/////////////////////////

# District of Columbia

19

District of Columbia Rules of Professional Conduct, Rule 4.2

Communication Between Lawyer and Opposing Parties

   (a) During the course of representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party known to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.

   (b) During the course of representing a client, a lawyer may communicate about the subject of the representation with a nonparty employee of the opposing party without obtaining the consent of that party's lawyer. However, prior to communicating with any such nonparty employee, a lawyer must disclose to such employee both the lawyer's identity and the fact that the lawyer represents a party with a claim against the employee's employer.

   (c) For purposes of this Rule, the term "party" includes any person, including an employee of a party organization, who has the authority to bind a party organization as to the representation to which the communication relates.

   ...

Comment

   ...

   [2] In the case of an organization, this Rule prohibits communication by a lawyer for one party concerning the matter in representation with persons having the power to bind the organization as to the particular representation to which the communication relates. If an agent or employee of the organization with authority to make binding decisions regarding the representation is represented in the matter by separate counsel, the consent by that agent's or employee's counsel to a communication will be sufficient for purposes of this Rule.

   [3] The Rule does not prohibit a lawyer from communicating with employees of an organization who have the authority to bind the organization with respect to the matters underlying the representation if they do not also have authority to make binding decisions regarding the representation itself. A lawyer may therefore communicate with such persons without first notifying the organization's lawyer. See D.C. Bar Legal Ethics Committee Opinion No. 129 (1983). But before communicating with such a "nonparty employee," the lawyer must disclose to the employee the lawyer's identity and the fact that the lawyer represents a party with a claim against the employer. It is preferable that this disclosure be made in writing. The notification requirements of Rule 4.2(b) apply to contacts with government employees who do not have the authority to make binding decisions regarding the representation.

   [4] This Rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question.

   [5] This Rule does not apply to the situation in which a lawyer contacts employees of an organization for the purpose of obtaining information generally available to the public, or obtainable under the Freedom of Information Act, even if the information in question is related to the representation. For example, a lawyer for a plaintiff who has filed suit

20

against an organization represented by a lawyer may telephone the organization to request a copy of a press release regarding the representation, without disclosing the lawyer's identity, obtaining the consent of the organization's lawyer, or otherwise acting as paragraphs (a) and (b) of this Rule require.

...

----------

District of Columbia Bar Legal Ethics Committee, Opinion No. 287, (1/19/99)

Ex Parte Contact With Former Employees of Party-Opponents

A lawyer may contact unrepresented former employees of a party-opponent without obtaining consent from that party irrespective of the position formerly held by the ex-employee in the opposing organization. Prior to any substantive communication, the lawyer must disclose to the former employee the lawyer's identity and the fact that the lawyer represents a party adverse to the ex-employee's former employer. During the communication the lawyer may not solicit privileged information of the party opponent.

...

Discussion

District of Columbia Rule of Professional Conduct 4.2 (a) generally prohibits communication about the subject of a representation between a lawyer and a party known to be represented by another lawyer in the matter, unless the lawyer has prior consent of opposing counsel to the communication or is authorized by law to do so. The Rule does not expressly address the propriety of ex parte contact between a lawyer and a former employee of a party-opponent. The provisions and commentary of Rule 4.2, however, lead to the conclusion that ex parte contact between a lawyer and a former employee of a party-opponent is permitted, subject to observance of certain safeguards.

...

Consideration of the policies underlying Rule 4.2 supports the conclusion that lawyers may make ex parte contact with unrepresented former employees of party-opponents. As the ABA noted in Formal Opinion 95-396 (1995), Rule 4.2 is not designed to protect against disclosure of prejudicial facts. Instead, the Rule is targeted at protecting the attorney-client relationship and safeguarding against a litigant being injured by binding ex parte disclosures. Since a principal purpose of Rule 4.2 is to foster and protect the lawyer-client relationship, not to restrict the flow of relevant, non-privileged information, interpreting Rule 4.2 to forbid ex parte contacts with former employees would require parties to spend more time, money, and resources by utilizing formal discovery to obtain information that could have been obtained informally. Such an expansive reading of Rule 4.2 would place too heavy a burden on the fact gathering process without protecting any legitimate interest sought to be safeguarded by the Rule.

At the same time, a lawyer does not have carte blanche with respect to the scope of communications with former employees of a party opponent. The most significant concern in such communications is the possibility that the former employees were privy to privileged information and that, without counsel present, they might be inclined to reveal this information to the opposing lawyer.2 This concern is serious and a lawyer may

21

not solicit information when communicating with former employees of a party-opponent that is reasonably known or which reasonably should be known to the lawyer to be protected from disclosure by statute or by an established evidentiary privilege.3 We base this conclusion on Rule 4.4, which requires lawyers to refrain from using "methods of obtaining evidence that violate the legal rights of [third parties]." These rights include the former employer's right to protect its privileged information from disclosure.4

In order to reduce the possibility that privileged information is revealed in the ex parte communication or the occurrence of other hazards that Rule 4.2 is designed to prevent, a lawyer must at the outset disclose the lawyer's identity and the fact that the lawyer represents a party that is adverse to the ex-employee's former employer in pending or prospective litigation. Comment [3] to Rule 4.2 states that it is preferable to give this notice in writing. Rule 4.3 reinforces this protection by requiring the lawyer to take affirmative steps to avoid misunderstandings and assure that the former employee correctly understands the lawyer's role in the matter.

Suffice it to say, a lawyer should proceed cautiously in communicating with former employees of a party opponent. Certain former employees may be involved on an ongoing basis with the matter concerning which the contact is sought, or they may be engaged, on the basis of their knowledge and experience, to consult with organizational management or with legal counsel in the matter. Of course, if the former employees are represented by their own counsel in the matter, the bar against communication without consent of that counsel applies unless that communication is authorized by law.

Conclusion

A lawyer may communicate with unrepresented former employees of a party opponent without consent from that party. At the outset, the lawyer must make the disclosures required by Rule 4.2. Throughout the communication, the lawyer must follow the dictates of Rules 4.3 and 4.4.

----------

**Banks v. Office of Senate Sergeant-at-Arms,**
222 F.R.D. 1, D.D.C., Feb 05, 2004

In Title VII action against Office of Sergeant-at-Arms of United States Senate, counsel for Office could not use their representation of employee and their concomitant "right" to withhold their consent as means to prevent employee's counsel from interviewing present or former employees of Office; on the other hand, employee's counsel could not ask any question that would reasonably threaten witness's disclosure of any information protected by attorney-client or work product privileges. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.; Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

"The D.C. Bar Legal Ethics Committee has opined, however, that if the opposing party is a corporation, a lawyer may interview persons employed by that corporation without opposing counsel's consent if those employees do not have the authority to bind the corporation with respect to the pending litigation. D.C. Bar Legal Ethics Comm. No. 129. Most significantly in that opinion, the D.C. Committee cited as authoritative an opinion of the ABA Committee on Ethics and Professional Responsibility that spoke to the precise question presented here: must a lawyer secure the consent of opposing counsel before interviewing persons employed by a government agency? The ABA Committee indicated that the lawyer did not have to seek such consent, stating, in pertinent part, the

22

following:
Nor should the rule [requiring consent of counsel before opposing counsel interviews her client] extend to government employees who are merely witnesses, or otherwise sources of information, but who have no decisional authority with regard to the *6 subject matter of the representation, for such an extension would inhibit the search for truth without protecting any government interest legitimately sought to be protected by the rule. D.C. Bar Legal Ethics Comm. No. 129 (*quoting ABA Formal Opinion 80*)." Id., at *5-6

----------

**U.S. v. Western Elec. Co., Inc.,**
Not Reported in F.Supp., 1990 WL 39129, 1990-1 Trade Cases P 68,939, D.D.C., Feb 28, 1990

"A former employee is not a "party" for purposes of Rule 4.2 (or its predecessor, Disciplinary Rule 7-104), for he lacks the authority to bind the company. Opinion No. 129, D.C. Bar Ethics Committee; ABA/BNA Lawyers Manual on Professional Conduct, 71:303-4 (1988). See also, Fed. R. Evid. 801(d)(2)(D). To extend the term "party" to include former employees of U S West who might have witnessed illegal activity by the company's management would in practice bar access by law enforcement to a vast number of potential witnesses with direct knowledge of such wrongdoing. See Frey v. Dept. of Health and Human Services, 106 F.R.D. 32, 36 (E.D.N.Y. 1985). [FN5] No precedent sanctions this bald attempt by the company to shield itself and its management from investigation of possible wrongdoing, whether such wrongdoing took the form of the commission of a crime or of violations of the decree herein." Id., at *2

/////////////////////////////

# Florida

Florida Bar Rule 4-4.2

Communication With Person Represented by Counsel

(a) In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer. Notwithstanding the foregoing, an attorney may, without such prior consent, communicate with another's client in order to meet the requirements of any court rule, statute or contract requiring notice or service of process directly on an adverse party, in which event the communication shall be strictly restricted to that required by the court rule, statute or contract, and a copy shall be provided to the adverse party's attorney.
...

COMMENT

...

In the case of an organization, this rule prohibits communications by a lawyer for 1 party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by

23

the agent's or employee's own counsel, the consent by that counsel to a communication will be sufficient for purposes of this rule. Compare rule 4-3.4(f). ...

----------

Florida State Bar Association

Florida Ethics Opinion 88-14, 1989 WL 380139  (3/7/89) Amended 2/29/96

A plaintiff's attorney may communicate with former managers and former employees of a defendant corporation without seeking and obtaining consent of corporation's attorney.

The inquiring attorney's law firm represents the plaintiffs in a civil action against a corporation. The attorneys wish to have ex parte interviews with former employees of the defendant corporation who were employed by the corporation during the period when the actions or decisions on which the suit is based occurred. The former employees may include some who had managerial responsibilities and some whose acts or omissions during their employment might be imputed to the corporation for purposes of civil liability. As is usually the case, the defendant corporation objects to ex parte contacts with its former employees.

The issue is whether Rule 4-4.2, Rules Regulating The Florida Bar, prescribes the plaintiffs' attorneys from contacting former managers and other former employees of the defendant corporation except with the permission of the corporation's attorneys. As regards former managers and other former employees who have not maintained any ties with the corporation--who are no longer part of the corporate entity--and who have not sought or consented to be represented in the matter by the corporation's attorneys, the answer must be in the negative.

...

Rule 4-4.2 cannot reasonably be construed as requiring a lawyer to obtain permission of a corporate party's attorney in order to communicate with former managers or other former employees of the corporation unless such individuals have in fact consented to or requested representation by the corporation's attorney. A former manager or other employee who has not maintained ties to the corporation (as a litigation consultant, for example) is no longer part of the corporate entity and therefore is not subject to the control or authority of the corporation's attorney. In many cases it may be true that the interests of the former manager or employee are not allied with the interests of the corporation. In such cases the conflict of interests would preclude the corporation's attorney from actually representing the individual and therefore would preclude the corporation's attorney from controlling access to the individual. As the comment indicates with regard to current employees, if a former manager or former employee is represented in the matter by his personal attorney, permission of that attorney must be obtained for ex parte contacts, including contacts by the corporation's attorney.

A former manager or employee is no longer in a position to speak for the corporation. Further, under both the federal and the Florida rules of evidence, statements that might be made by a former manager or other former employee during an ex parte interview would not be admissible against the corporation. Both Rule 801(d)(2)(D), Federal Rules of Evidence, and Section 90.803(18)(e), Florida Evidence Code, provide that a statement by an agent or servant of a party is admissible against the party if it concerns a matter within the scope of the agency or employment and is made during the existence of the agency or employment relationship.

24

*3 This Committee has not previously had occasion to issue an opinion on the question of communicating with former managers and employees but, as indicated above, bar ethics committees in a number of states have done so. The clear consensus is that former managers and other former employees are not within the scope of the rule against ex parte contacts.

...

As stated above, it is ethically permissible for the inquiring attorney to contact former managers and other former employees of the opposing party without obtaining permission from the corporation's attorney unless those former employees are in fact represented by the corporation's attorney. But as indicated by some of the ethics committees cited above, the attorney should not inquire into matters that are within the corporation's attorney-client privilege (e.g., asking a former manager to relate what he had told the corporation's attorney concerning the subject matter of the representation).

----------

### Henry v. National Health Care Affiliates, Inc.,
696 So.2d 1223, 22 Fla. L. Weekly D1355, Fla.App. 2 Dist., May 30, 1997

We grant the petition for writ of certiorari and quash the order of the trial court which prohibited counsel from engaging in ex parte contact with former employees of National Health Care Affiliates, Inc., d/b/a Woodlands Nursing Center, who cared for and treated the decedent whose estate is a party to this case. ...Recently, the Florida Supreme Court disapproved *Barfuss* and held that Florida Rule of Professional Conduct 4-4.2 does not prohibit "an attorney's ex parte communications with former employees of a defendant-employer." *H.B.A. Management, Inc. v. Schwartz,* 693 So.2d 541, 546 (Fla. 1997). Accordingly, the petition for writ of certiorari is granted, and the order prohibiting counsel from engaging in ex parte contact is quashed.

----------

### H.B.A. Management, Inc. v. Estate of Schwartz By and Through Schwartz,
693 So.2d 541, 57 A.L.R.5th 855, 22 Fla. L. Weekly S236, Fla., May 01, 1997

Professional conduct rule governing contact by attorneys with persons represented by counsel does not prohibit claimant's attorney from engaging in ex parte communications with former employees of defendant-employer. West's F.S.A. Bar Rule 4-4.2.

"A former employee is simply no longer in the position of the "person" contemplated by rule 4-4.2's restrictions. That former employees may have engaged in "actions or inactions" while they were employed that may give rise to liability of the employer is simply a matter of historical fact. In this regard we agree with the Florida Bar Ethics Committee and the *Wright* court that there is no valid reason to distinguish "between former employees who witnessed an event and those whose act or omission caused the event." Florida Bar Professional Ethics Comm. Op. 88-14 at 3 (citing *Wright,* 691 P.2d at 569). An employee's departure terminates the agency or respondeat superior connection that had previously permitted that employee to create liability for her employer or to bind or make admissions for that employer. Hence, the underlying concerns and purpose of rule 4-4.2 is simply no longer served by restricting contacts with former employees.
In summary, we hold that Florida Rule of Professional Conduct 4-4.2 was intended to specifically

25

regulate an attorney's contact with a person represented by counsel and the rule neither contemplates nor prohibits an attorney's ex parte communications with former employees of a defendant-employer."  Id., at 546

/////////////////////////////

## Georgia

Georgia State Bar Rules of Professional Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

(a) A lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by constitutional law or statute.

(b) Attorneys for the State and Federal Government shall be subject to this Rule in the same manner as other attorneys in this State.

The maximum penalty for a violation of this Rule is disbarment.

COMMENT

...

[4A] In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare *Rule 3.4(f): Fairness to Opposing Party and Counsel.*

[4B] In administering this Rule it should be anticipated that in many instances, prior to the beginning of the interview, the interviewing lawyer will not possess sufficient information to determine whether or not the relationship of the interviewee to the entity is sufficiently close to place the person in the "represented" category. In those situations the good faith of the lawyer in undertaking the interview should be considered. Evidence of good faith includes an immediate and candid statement of the interest of the person on whose behalf the interview is being taken, a full explanation of why that person's position is adverse to the interests of the entity with which the interviewee is associated, the exploration of the relationship issue at the outset of the interview and the cessation of the interview immediately upon determination that the interview is improper.

----------

State Bar of Georgia Formal Advisory Opinion No. 94-3 (9/9/94)

QUESTION PRESENTED:

26

May a lawyer properly contact and interview former employees of an organization represented by counsel to obtain information relevant to litigation against the organization?

SUMMARY ANSWER:

A lawyer may properly contact and interview former employees of an organization that is represented by counsel to obtain non-privileged information relevant to litigation against the organization provided that: (1) the lawyer makes full disclosure as to the identity of his/her client; and (2) the former employee consents.

OPINION

The question presented involves attempts to obtain information from former employees of an organization represented by counsel and is an aspect of the perennial problem of information control by lawyers engaged in litigation. Lawyers do not want their adversary colleagues to contact and interview employees of their client organization for the purpose of obtaining information that may be used against the organization. But a rule prohibiting such contact without consent of the organization's lawyer gives that lawyer a right of information control, a right that is easily subject to abuse. Therefore, strong policy reasons must support such a rule.

...

The words of a former employee can provide only information, and those words cannot have a binding effect on the former employer. Since neither words nor actions of a former employee can bind the organization, the policy relied on in Formal Adv. Op. 87-5 is not applicable to former employees. When the purpose of the rule ends, the rule itself ends. Therefore, a lawyer may contact and interview the former employees of an organization to obtain non-privileged information to use against that organization in a dispute.

That, however, does not conclude the matter. Just as a rule prohibiting such contact would be an example of information control unsupported by any valid policy considerations, so the lawyer's contact and interview without informing the employee of the purpose would be an example of information control in the same category. A former employee may not wish to give information against the former employer, and since he or she is entitled not to do so, it would be unethical to use deceit and false pretenses to deny the former employee his or her right. Consequently, the former employee is entitled to know the identity of the lawyer's client, the reason for the contact, the purpose of the interview and any other information necessary under the circumstances to make the interview not misleading. A refusal of the former employee to grant the interview means only that the lawyer must resort to the normal discovery processes and witness procedures.

...

It follows, then, that while a lawyer may contact a former employee of an organization for the purposes of an interview, before proceeding with the interview, that lawyer must make full disclosure and obtain the consent of the former employee.

While this opinion has not dealt with the situation in which the organization is not represented by a lawyer, it is well to note two things. First, there is no rule of ethics

27

prohibiting the contact in such a situation; second, even when there is no lawyer representing the organization, the former employee still has a right to know the reason for the contact and the purpose of the interview. Therefore, it would be unethical for a lawyer to attempt to obtain information without full disclosure. In this context as in others, a lawyer's attempt to obtain information under false pretenses or by the use of deceit is unethical.

----------

### Sanifill of Georgia, Inc. v. Roberts,
232 Ga.App. 510, 502 S.E.2d 343, 98 FCDR 2130, Ga.App., May 08, 1998

Attorney of plaintiff who filed suit against corporate defendant could communicate ex parte with former employee of defendant, even though plaintiff was seeking to impute liability to defendant for acts or omissions of former employee, and thus defendant was not entitled to prohibition on use of former employee's statements, where attorney made full disclosure as to identity of client and former employee consented. State Bar Rules and Regulations, Rule 4-102(d), Standard 47.

"Nonetheless, by its plain language, the rule only applies to a party "represented by a lawyer." Regardless of policy considerations, a former employee who is not represented by a lawyer simply does not fall within the wording of the rule. In March 1991, the American Bar Association Committee on Ethics and Professional Responsibility issued Formal Opinion 91-359 recognizing this. The Committee concluded that while "persuasive policy arguments can be and have been made for extending the ambit of [RPC] 4.2 to cover some former corporate employees, the fact remains that the text of the Rule does not do so and the comment gives no basis for concluding such coverage was intended." Accordingly, the opinion states that "a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer." This interpretation has been adopted by a majority of the courts which have considered the issue.

Consistent with the ABA's 1991 opinion, Georgia Supreme Court Formal Advisory Opinion 94-3, interpreting Standard 47, concluded: "A lawyer may properly contact and interview former employees of an organization that is represented by counsel to obtain nonprivileged information relevant to litigation against the organization provided that: (1) the lawyer makes full disclosure as to the identity of his/her client; and (2) the former employee consents." The record shows that these conditions were satisfied. No violation of Standard 47 appears." Id., at 512

----------

### In re Domestic Air Transp. Antitrust Litigation,
141 F.R.D. 556, 1992-1 Trade Cases P 69,732, 35 Fed. R. Evid. Serv. 207, N.D.Ga., Feb 07, 1992

Plaintiffs in antitrust litigation were entitled to contact defendant airlines' former employees on ex parte basis without notifying airlines of intention to interview them, but plaintiffs had to comply with model rule relating to lawyer's dealings with unrepresented persons; plaintiffs were not required to inform former employees of name, address and telephone number of relevant airline's counsel. Ga.State Bar Rules and Regulations, Rule 7-104; Rule 4- 102(d), Standard 47; ABA Rules of Prof.Conduct, Rules 4.2, 4.3, 4.4; ABA

28

Code of Prof.Resp., DR 7-104.

"The Court finds the opinion and reasoning of the ABA committee persuasive on this matter and will direct defendants to provide the identifying information about former employees requested by plaintiffs. [FN3] *562 The Court will not require plaintiffs to notify defendants of their intention to interview former employees, nor will it mandate that plaintiffs allow counsel for defendants to be present during the interview. [FN4]

FN3. The Court will not require defendants to furnish social security numbers of former employees. "[E]mployees have a strong privacy interest in their Social Security numbers." *I.B.E.W. Local Union No. 5 v. Department of Housing and Urban Development,* 852 F.2d 87, 89 (3rd Cir.1988). Names, last known addresses, and telephone numbers are sufficient identifying information.

FN4. As to defendants' concern that any *ex parte* communication may violate the attorney-client privilege, the Court advises plaintiffs to heed the ABA Committee's caution that the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the privilege attaching to attorney-client communications to the extent his or her communications as a former employee with his or her former employer's counsel are protected by the privilege.

*Id.* at 16. Inquiry by plaintiffs into such communications would violate Rule 4.4 requiring respect for the rights of third parties.

The Court will require, however, that plaintiffs comply with Model Rule 4.3 as it relates to a lawyer's dealings with unrepresented persons. Accordingly, prior to making any *ex parte* contact with former employees of the defendant airlines, plaintiffs must deliver to the former employee a letter informing her of the nature of the lawyer's role in the matter giving occasion for the contact, including the identity of the lawyer's client and the fact that the witness's former employer is an adverse party. Counsel must also inform the former employee that she has no obligation to talk with plaintiffs' counsel. The Court will not require, as requested by defendants, that the letter include the name, address, and telephone number of the relevant corporate defendant's counsel." Id., at 561-2

/////////////////////////////

## Hawaii

Hawai'i Rules of Professional Conduct, Rule 4.2.

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL.

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

COMMENT:

...

[4] In the case of an organization, this rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having a

29

managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this rule. Compare HRPC 3.4(h).

/////////////////////////////

## Idaho

Idaho Rules of Professional Conduct, Rule 4.2

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Commentary

...

[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4, Comment [2].

----------

http://www.stoel.com/resources/articles/ethics/IBLEthics.pdf

ETHICS FOR IDAHO BUSINESS LAWYERS & LITIGATORS Defensive Lawyering in Office and Trial Practice Idaho State Bar/Idaho Law Foundation Annual Ethics CLE Boise November 21, 2003

   Idaho RPC 4.2 presently reads as follows: —In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

In an organizational setting, both the current comments to RPC 4.2 and the proposed amended set make plain that organizational management and those line-level employees whose conduct the organization is responsible for fall within the ambit of the organization's representation and, as such, are —off limits "to opposing counsel. By

30

contrast, line-level employees who are merely occurrence witnesses are generally —fair game.‟ Finally, all former employees of whatever stripe are —fair game‟–with the important caveat that a lawyer cannot invade an organization's attorney-client privilege when interviewing its former employees.

//////////////////////////////

## Illinois

Illinois Rules of Professional Conduct, Rule 4.2

Communication With Person Represented by Counsel

During the course of representing a client a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by another lawyer in that matter unless the first lawyer has obtained the prior consent of the lawyer representing such other party or as may otherwise be authorized by law.

----------

Illinois State Bar Advisory Association Opinion on Professional Conduct

Opinion No. 85-12 (April 1986; Affirmed by Board of Governors 1/91)

Topic: Communication with former employee of adverse party

Digest: Former employees of a corporation are not part of the corporate entity for purpose of prohibition against direct communication with the adverse party.

...

QUESTION

Whether an attorney may communicate directly with a former employee of a corporate party defendant about matters arising during the employee's tenure with the corporation without the consent of the corporate defendant's attorney? Whether the fact that the former employee may arguably have been a member of the corporate control group during the relevant time period would affect the propriety of any such communication?

OPINION

...

Consistent with this rationale, most authorities have limited the scope of the protection of a corporate party to those managerial or other employees whose actions and statements can bind or be imputed to the corporation. In re F.M.C. Corp., 430 F.Supp 1108, 1110-11 (S.D.W.Va. 1977); ABA Informal Opinion 1377 (June 2, 1977); ABA Model Rule 4.2 Comment. This interpretation was recently adopted by the Illinois Court of Appeals in Fair Automotive Repair v. Car-X Systems, 128 Ill.App.3d 763 (1984). In Fair Automotive the court considered the propriety of plaintiffs' use of investigators to elicit information from

31

employees at defendant's shops. The Court held that for the purpose of the Rule 7-104(a)(1) prohibition, a corporate "party" constitutes only "those top management persons who had the responsibility of making final decisions and those employees whose advisory roles to top management are such that a decision would not normally be made without those persons' advice or opinion or whose opinions in fact form the basis of any final decision." Id. at 771.

This same reasoning would exclude former employees from the scope of the Rule 7-104(a)(1) protection, even if those employees were formerly part of the corporate control group. Since former employees are no longer in a position to act or speak on behalf of the corporation, direct communication with these persons does not deprive the corporation of legal counsel. However, this Rule may prohibit direct communication with a former employee if that person is individually represented regarding the matter in question. Other bar association ethics committees concur in this conclusion regarding direct communication with former employees. See, e.g., Communication with Corporate Employees, 19 Md.B.J. No. 11, p.22 (1/1986); Wisconsin Opinion E-82-10 (1982).

Direct communication with former control group employees may result in eliciting information adverse to the corporation; but no more deprives the corporation of the benefit of counsel than does direct communication with any potential witness. Whether other legal or ethical principles would limit the discovery or use of information from former control group employees is not within the scope of this opinion.

----------

### Orlowski v. Dominick's Finer Foods, Inc.,
937 F.Supp. 723, N.D.Ill., Aug 09, 1996

Former employees, including former managers, were not encompassed by rule forbidding ex parte contact, and could freely engage in conversation with counsel representing other employees who brought sex discrimination suit against employer; however, former employees were barred from discussing any privileged information to which they were privy. Orlowski v. Dominick's Finer Foods, Inc., N.D. Ill.1996, 937 F.Supp. 723. Attorney And Client ⊙=32(12)

"This Court finds that former employees, including former managers, are not encompassed by Rule 4.2, and may freely engage in communications with Plaintiffs' counsel. Neither Rule 4.2, nor the Comment, makes any reference to former employees, or implies that former employees constitute parties "represented by another lawyer." Brown v. St. Joseph County, 148 F.R.D. 246, 252 (N.D.Ind.1993) (emphasis omitted). Although the Seventh Circuit has not specifically held that former employees are excluded from Rule 4.2, most courts addressing this issue have concluded that Rule 4.2 "does not encompass a defendant organization's former employees." Ahern v. Board of Educ. of City of Chicago, No. 92 C 4074, 1995 WL 680476, at *1 (N.D.Ill. Nov. 14, 1995); see also Shamlin v. Commonwealth Edison Co., No. 93 C 2149, 1994 WL 148701, at *3 (N.D.Ill. Apr. 20, 1994) (finding that Rule 4.2 does not preclude lawyer from contacting corporation's former employees, despite lack of corporation's consent).

In Ahern, the court determined that expanding Rule 4.2 to include former employees would be problematic because it "would unduly hinder attorneys' ability to conduct informal discovery in cases with employer party-opponents." Ahern, 1995 WL 680476, at

32

*1 (citing _Oak Indus. v. Zenith Indus.,_ No. 86 C 4302, 1988 WL 79614, at *2 (N.D.Ill. July 27, 1988)). In _Oak Industries,_ the court concluded that, affording former employees the protection of Rule 4.2 and "requiring the formal consent of an employer's counsel prior to contacting former employees will only increase the costs of litigation and possibly decrease the willingness of former employees to provide information." _Oak Indus.,_ 1988 WL 79614, at *2. The possibility that former employees may reveal damaging information, which may give rise to a corporation's liability, is insufficient to implicate Rule 4.2. _Ahern,_ 1995 WL 680476, at *1-2. Additionally, former employees are outside the scope of the Rule because, unlike current employees, they "cannot bind the corporation in the sense that an agent binds a principal." _Brown,_ 148 F.R.D. at 252 (citing _Hanntz v. Shiley, Inc.,_ 766 F.Supp. 258, 269-70 (D.N.J.1991)). Thus, this Court finds that communications between Plaintiffs' counsel and any former employees (including former managers) will not violate Rule 4.2. However, this Court reminds Plaintiffs that former and current managers, or any former or current employees for that matter, are barred from discussing with Plaintiffs any privileged information to which they were privy. _Breedlove,_ 1992 WL 202147, at *2." Id., at 728

/////////////////////////////

## Indiana

Indiana Rules of Professional Conduct, Rule 4.2

Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law or a court order.

Comment

...

[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4.

-----------

### P.T. Barnum's Nightclub v. Duhamell,
766 N.E.2d 729, Ind.App., Apr 23, 2002

Rule of attorney professional conduct prohibiting attorney from communicating about subject of the representation with a party the attorney knows to be represented by counsel did not prohibit attorney representing patron in action against adult

33