II.     ANY NEW TRIAL SHOULD BE LIMITED TO DAMAGES ..........................................15

        A.     The Court Should Order a Remittitur, With Any Conditional New Trial
               Limited to Damages Only. ......................................................................................15

        B.     The Damages and Liability Issues are Not Inextricably Intertwined. ...................17

III.    THERE IS NO EVIDENCE, MUCH LESS A REASONABLE PROBABILITY, THAT
        THE VERDICT WAS THE RESULT OF PASSION OR PREJUDICE, OR OTHER
        IMPROPER MOTIVE, NOR THAT THE JURY'S FINDINGS ON LIABILITY WERE
        IMPROPERLY INFLUENCED. THE COURT SHOULD THEREFORE ISSUE A
        REMITTITUR. ........................................................................................................................22

IV.     THE VERDICT CANNOT BE INCONSISTENT, AS IT INVOLVES
        SEPARATE AND DISTINCT CLAIMS AND STANDARDS OF PROOF. ...................29

        A.     The Verdict Is Not Inconsistent - Strict Liability And Deceit Are Separate and
               Distinct Causes of Action with Different Standards of Proof. ...............................31

        B.     Even if the Jury Had Not Found for the Plaintiff on the Deceit Cause of Action,
               the Jury Instructions Rendered Negligence the Broader Theory of Recovery Under
               South Carolina Law. ..............................................................................................33

V.      THE GREAT WEIGHT OF THE EVIDENCE SUPPORTS THE JURY'S FINDINGS. 37

        A.     Knowledge of a Risk Associated with a Drug Does Not Absolve a Manufacturer
               of Liability. The Plaintiff's Physicians Were Not Provided Adequate Warnings
               Regarding Vioxx. ...................................................................................................38

        B.     The Evidence, Both Subjective and Objective, Establishes That Had Merck
               Provided an Adequate Warning, Dr. Mikola Would Not Have Prescribed Vioxx,
               and Mr. Barnett Would Not Have Continued to Take the Drug. ...........................43

        C.     The Weight of the Evidence is That in All Probability Vioxx Caused Mr.
               Barnett's Heart Attack and Accelerated His Atherosclerosis. ...............................46

VI.     CONCLUSION. ....................................................................................................................52

xiv

**INTRODUCTION**

During the course of this trial, Plaintiff proved unequivocally that he will lose nine to ten years from his life due to his ingestion of Vioxx. The weight of the evidence – unchallenged by a single Merck retained expert -showe d that Vioxx caused plaque build-up in the Plaintiff's heart, causing him to suffer from a heart attack, multiple surgical interventions, a second heart attack, and the fear of early death. Juries in South Carolina have rendered similar verdicts in cases involving serious injuries. See *Sheikh v. Lexington Medical Center*, Case No. 2003-CP-32-0675 (Lexington C.P. 9/18/06)(Plaintiff claimed drug heart sudden death; defense claimed heart attack-$30 million verdict.) Additionally, South Carolina courts have upheld $35.4 million and $16 million verdicts in personal injury cases. See *Welch v. Epstein*, 536 S.E.2d 408 (S.C.App. 2000); *Hundley v. Rite Aid of South Carolina, Inc.*, 529 S.E.2d 45 (S.C. App. 2000) Much like these cases, the Plaintiff believes that $50 million in compensatory damages is justified for the loss of a decade of life expectancy, yet acknowledges that this Court believes the amount was excessive. Although Plaintiff agrees with the Court that any new trial should be limited to damages, Plaintiff requests the option to accept a remittitur of $10 million for the compensatory damages, all the while leaving the punitive damages at $1 million. Each year taken off Jerry Barnett's life has a high value, and is arguably worth up to $1 million per year during the golden years of his life.

The Seventh Amendment, the law of the Fifth Circuit, considerations of judicial economy, as well as basic principles of equity and fairness, require that Plaintiff be given the option of remittitur. The Court concluded "that the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable," and stated that "the Court is not troubled by the $1 million punitive damage award." Under these circumstances remittitur is appropriate.

Moreover, if, as Merck suggests, the issues of liability are so intertwined as to require a new

1

trial of all issues, why should the Plaintiff be forced to take such a risk, either in this courtroom, or in the court of appeals, when liability has already been determined in his favor? It is not fair to the Plaintiff or the Court, nor consistent with the premise of bellwether trials in multi-district litigation to unnecessarily conduct a second trial. This was not a hung jury like Irvin/Plunkett. The jury clearly found in favor of Gerald Barnett on liability for negligence, breach of duty, deceit and proximate cause, and found by clear and convincing evidence that Merck's conduct was willful, wanton or in reckless disregard of the Plaintiff's rights.

The Court should not feel that by setting a value for a reasonable compensatory award in this bellwether case it would be placing a value on settlement for future cases. In reality, the ad damnum is going to be several times what the cases will eventually settle for, because there will be multiple defense verdicts as well as some plaintiff verdicts. However, in order for a plaintiff who tries a bellwether case to receive a reasonable net from a remitted award, the extraordinary costs and expenses must be considered.

## I.   PLAINTIFF'S DAMAGES AND THE EVIDENCE SUPPORTING THE JURY'S FINDING OF LIABILITY AND CAUSATION

Contrary to Merck's assertions at trial, this is not a case of a "small heart attack" with minimal medical billing. Jerry Barnett's heart attack was just the first manifestation of the multiple serious and ongoing injuries caused by Vioxx which took him from a favorable cardiac health status with prospects of a full life in 2000, to a dire situation in 2006, in which he now suffers from diffuse coronary disease throughout his heart and dismal prospects for the future. Since his heart attack in 2002 he has also suffered: a quintuple open-heart CABG surgery; continued rapid development of plaque; a second heart attack resulting in vein occlusions; another angiogram and placement of a stent; and the likelihood of further surgical intervention and a loss of nine to ten years of his life.

2

The evidence in this case showed, through the testimony of Dr. Zipes, that Mr. Barnett was a man who in 2000 had only a 1-2% risk of having a heart attack. However, just a short time later, he not only had a heart attack, but suffered from a severe amount of coronary artery disease, inexplicable by anything other than Vioxx. Dr. Karavan testified as to the difference in Mr. Barnett's cardiac status today as compared to the time of his heart attack in 2002. In each of Mr. Barnett's various coronary arteries, such as the LAD, the diagonals off the LAD, the Ramus Intermedius, the RCA and the posterolateral branch of the RCA, the plaque burden is worse today than it was at the time of the heart attack. Therefore, when evaluating the overall compensatory damages for this case, the focus should not be solely placed upon Mr. Barnett's heart attack and resulting CABG surgery. This is but one aspect of his overall damage from taking Vioxx. Instead the focus should be on the extensive coronary artery disease caused by Vioxx.

This trial was a story not just of a "small heart attack," but one of a disease process that aggressively occluded Mr. Barnett's arteries, not once, but twice to the point where he is now at increased risk of future cardiac events requiring surgical intervention, and the prospect of premature death. Mr. Barnett's damages are more than his lost years of life. The following is a brief summary of the ongoing damage that Jerry suffered as a result using Vioxx, starting with his overall health status in 2000, to the heart attack in 2002, to the CABG surgery in 2002, to his vein graft occlusions and second heart attack in 2004, to his decreased exercise tolerance and finally to his current status of occlusion. Included in the summary are excerpts from the trial transcript supporting showing what evidence the jury was able to consider when deciding to award damages to Mr. Barnett.

**A.      Vioxx Accelerated Mr. Barnett's Atherosclerosis.**

- Douglas Zipes, MD, 8/8/06 Tr. at 1677:13-1678:12

1677
13  A.  Sure. I do. When Vioxx, as a Cox-2 inhibitor, works, it

3

14 will prevent the development of the prostacyclin part of the
15 whole balance that I told you. So, then, that will lead to
16 thromboxane not being opposed, not being balanced, by the
17 prostacyclin.
18      And that, then, will lead to the steps that I talked
19 about before so that we're going to have constriction. We call
20 that vasoconstriction. That water pipe is going to get
21 narrower. The blood pressure is going to go up. The platelets
22 are going to get more sticky because they don't have the
23 prostacyclin to prevent them from sticking together. And there
24 are other things that can happen that I didn't touch on.
25      But, if you remember, in the very beginning I said

1678

1 that, if there is an injury to the inner wall, there is a
2 signal that's sent out for cells to come and try to repair that
3 injury. There is a balance between the thromboxane and
4 prostacyclin in terms of attracting those cells. It's called a
5 chemoattractant mechanism. And prostacyclin tends to prevent
6 the cells from adhering while thromboxane tends to encourage
7 the cells to adhere.
8      So if you get rid of the prostacyclin with Vioxx and
9 you get this little injury that we all have from age 10 or 20
10 years old, you're now going to have more of these cells migrate
11 into that area of the blood vessel, and this, then, can
12 accelerate the development of the plaque.

- Stephen Epstein, MD: Trial Transcript Volume 6, August 5, 2006, 1201:19-22;
  1203:2-7

1201

19 A.  **Well, our initial proposal to Merck had the hypotheses**
20 **that Vioxx would be protective against viral infection and**
21 **protective against the development of atherosclerosis, and we**
22 **found just the opposite.**

1203

2 Q.  Before we move on to this clinical study and away from
3 this e-mail, doctor, based on your experience in this area and
4 your study and your years of research in this area, **was Merck**
5 **given a yellow flag or a warning back in 2001 about the**
6 **potential harmful effects of Vioxx in humans?**
7 A.  **Yes.**

4

**B.      Mr. Barnett's Current Plaque Build-Up is Due to Vioxx.**

- Dr. Karavan, 8/5/06 Tr. at 1153:15-1154:11

1153

15   Q.   Given the amount of plaques that he's got, CAD, would you
16   be able to compare his prognosis versus a person who does not
17   have this level of plaque?
18   A.   I think he -- **clinically, the thing that would be the most**
19   **worrisome is that he has somewhat of a diffuse process and**
20   **progression of that process would be -- more progression of it**
21   **is the main concern to me.**
22          Again, given the fact that his heart pumps normally
23   and the overall blood flow is probably normal now -- it was
24   only mildly diminished -- that still would, overall, give him a
25   good prognosis, but I am concerned about his total plaque

1154

1    burden and that progression.
2    Q.   Do you have an opinion as to whether or not that total
3    plaque burden could shorten his life expectancy?
4    A.   **Well, one of the hardest things, in my mind, is to tell**
5    **someone how long they're going to live or have to live and**
6    **the -- but the amount of plaque burden would be one of the**
7    **things I'd be concerned about.  He certainly, from a cardiac**
8    **standpoint, would not have the same prognosis of someone that**
9    **had more simple, you know, less diffuse disease.  I think he**
10   **has a different prognosis than someone like that.**  I would not
11   put a number on it.

- Dr. Zipes, 8/8/06 Tr. at 1734:25-1735:14

1734

25   Q.   Why?

1735

1    A.   I can come up with no other answer.  As I expressed to
2    you, all of his risks were taken into consideration when he has
3    the first stress test January 24, 2000.  If being an FBI agent
4    and his wife's cancer, all of these things, family history had
5    played a role, whatever role it played, we should have seen it
6    on the stress test at January 24, 2000.  So we start basically
7    from that point.
8          Then he starts taking the Vioxx, and the one major
9    big risk that he had was the elevated LDL, the bad cholesterol.
10   that is brought under control by July of 2000 and comes down to
11   numbers that, as I cited from two trials, actually produced

5

12    reversal of coronary plaque. **So the only way I can account for**
13    **the progression of the plaque buildup that Jerry Barnett has**
14    **had is that it has to be the Vioxx.**

**C.**    **Before He Began Taking Vioxx, Mr. Barnett Had 5 Non-Occluded Coronary Vessels; Only the Small Circumflex Had Greater Than 50% Stenosis.**

- Jeffrey Popma, 8/7/06 Tr. at 1344:19-1345:5

1344

19    Q.  Now, can you tell from the results of this test whether
20    the blockage is confined to that one area?
21    A.  Again, I'm going to try to qualify the statement
22    "blockage." I think that there is blockages in the arteries.
23    but what I want to differentiate is:  are there important
24    blockages, more than 50 percent narrowings, that with maximum
25    exercise -- and this isn't just maximum exercise; this is

1345

1    rather heroic exercise -- that with this maximum exercise, with
2    the heart pumping, getting to 92 percent of his maximum
3    predicted heart rate, that **only one area right over here had**
4    **any important reduction of the blood flow. The rest of the**
5    **heart was functioning normally.**

**D.**    **The State of the Record Shows That Because of Vioxx and Accelerated Plaque Build-Up, Mr. Barnett Suffered From the Following:**

    **1.**    **Heart Attack on September 6, 2002 and a First Angiogram Showing 6-Vessel Stenosis.**

- Dr. Jeffrey Popma, 8/7/06 Tr. at 1366:9-20

9    Q.  And what's that stump?
10    A.  That stump is a combination of the cholesterol buildup and
11    blood clot.
12         And the blood clot, which is dynamic, which just came
13    on and formed a blood clot, **stopped the flow, caused the chest**
14    **pain, caused part of his heart muscle tissue to die, and cut**
15    **off the circulation to the distal portion of this vessel.**
16    Q.  And what is that called?
17    A.  In this particular case, it was called a non q-wave
18    myocardial infarction.
19    **Q.  Is that another term for a heart attack?**
20    **A.  Yes, exactly.**

6

- Dr. Mark Karavan, 8/4/06 Tr. at 1001:118

1001

1  Q.  And tell the jury what a cardiac catheterization is.
2  A.  That's a test where we slide tubes from the groin up into
3  the heart and inject contrast dye into the blood vessels of the
4  heart and feed blood to the heart and assess for blockage.
5  Q.  And blockage is -- is -- you'll give a percentage of the
6  blockage; is that right?
7  A.  Yes, sir, we give --
8  Q.  We'll come to that.
9  A.  Yes, sir.
10 Q.  Could you read into the record what you say in your
11 handwriting on 9/9/02 on exhibit 12.
12 A.  Cath without complication.  LVEF approximately 50 percent.
13 LVEDP 16.  **Left main, 50 percent distal.  LAD, mild proximal**
14 **irregularities, mid vessel 80 percent.  D1 small 80 percent.**
15 **D2 moderate, mild irregularities.  Circumflex, small diffuse,**
16 **high-grade disease.  Ramus, large, proximal 80 percent lesion.**
17 **RCA hundred percent PDA with collaterals.  Posterolateral**
18 **branch 80 percent.  Recommendation, CABG.**

**2.  CABG Surgery with 5 Grafts on September 10, 2002.**

- Dr. Karavan, 8/4/06 Tr. at 1014:4-11

1014

4  Q.  Okay.  He described on page 2 details of the operation;
5  right?
6  A.  That's correct.
7  Q.  Just in laymen's terms, what did he do there?
8  A.  **He performed a five way coronary artery bypass grafting to**
9  **Mr. Barnett.**
10 **Q.  Five different vessels?**
11 **A.  Five, that's correct.**

**3.  More Likely Than Not a Second Heart Attack in July 2004.**

- Dr. Zipes, 8/6/06 Tr. at 1726:10-20

1726

10 Q.  So, in other words, you didn't do the test.  You had
11 somebody else doing the tests.
12 A.  Absolutely.  Now, I looked at the tests after they had
13 done them and after they had written their decisions.  I didn't

7

14  change anything.  I didn't influence them.  Those are the
15  decisions that they came up with.
16      **They said two occluded vein grafts, new wall motion**
17  **abnormality -- that is abnormal squeeze -- when it had been**
18  **normal July of '03.  And I said I don't know how else to**
19  **explain it except that the vein grafts have closed and he**
20  **probably had a heart attack at this point.**

- Dr. Karavan, 8/4/06 Tr. at1116:11-1117:3

1116

11  Q.  Let me ask you this.  Was the ramus saphenous vein graft
12  the graft that was occluded?
13  A.  Correct.
14  Q.  Remember in the echocardiogram there was some wall motion
15  abnormalities; is that right?
16  A.  What we call mid basal and lateral, uh-huh.
17  Q.  Would that be consistent with a possible occlusion to the
18  ramus?
19  A.  I felt that most likely that area was ischemic, giving
20  that wall motion abnormality.  The vessel was patent.  It
21  wasn't 100 percent closed.  It was said to be ischemic, not
22  scarred, on his perfusion study.  So I think the wall motion
23  could be attributed to that vessel.  **Did he have a heart attack**
24  **there?  If he did, it wasn't a big one.  I can tell you that.**
25  **Q.  Is it possible that he had a small one?**

1117

1  **A.  Given the fact that he has a small wall motion abnormality**
2  **there, it's consistent -- it's possible that he might have had**
3  **a small market in that area.**

[The last line of this above excerpt was incorrectly transcribed by the court reporter at
trial.  In the deposition it is recorded correctly (*See* July 17, 2006 trial deposition, 41:7-
10.) Instead of reading "small market" it should read "small heart attack."]

4.  **A Second 2006 Angiogram Which Showed 2 Occluded Bypass Grafts, and a**
    **Stent Placed in the Native Ramus Coronary Vessel to Supply Replacement**
    **Perfusion For One of the Occluded Grafts, and 2 New Fully Occluded Native**
    **Vessels – the RCA and the PLSA.**

- Dr. Popma, 8/7/06 Tr. at 1377: 6-14; 1481:8-16

1377

6  Q.  I'm going to lay a foundation before I ask you the opinion
7  question.  Would you tell us, at some time after the

8

8   September 9 cath and the September 10 bypass operation, do you
9   have an opinion as to whether or not his grafts occluded?
10   A.   Yes, I do.
11   Q.   And what is that opinion?
12   A.   **The saphenous vein graft that went to the ramus branch**
13   **occluded, and one of the sequential limbs of the graft that**
14   **went to the bottom portion of the heart also occluded.**

1481

8   Q.   He then had a stent inserted by Dr. Karavan while he was
9   in the hospital; right?
10   A.   That's one -- yes.
11   Q.   The stent was inserted into the artery called the ramus?
12   A.   That's correct, because the vein graft to that ramus
13   branch had closed.
14   Q.   We'll talk about that.  The ramus was one of the arteries
15   that had been bypassed in 2002; true?
16   A.   That's correct.

E.   **Today, Mr. Barnett Has 2 Fully Occluded Native Vessels – the RCA and**
     **PLSA, 2 Occluded Bypass Grafts, and Some Blood Flow Vis a Vis Collaterals**
     **to the Very Bottom Part of the PDA.  He Does Not Have Proper Blood Flow**
     **to the Upper and Proximal Sections of the RCA.**

   •   Dr. Popma, 8/7/06 Tr. at 1388:8-1389:3

1388

8   Q.   **So add it up.  Between September 9, '02, and July 10, '06,**
9   **did you list or calculate how many areas of actual occlusion or**
10   **total blockage?**
11   A.   **Total blockages, yes.**
12   Q.   **How many?**
13   A.   **Four.**
14   Q.   **Tell the jury where they were.**
15   A.   **Oh, so from that period of time, 2002 to 2006, there were**
16   **four areas that became totally blocked.**
17         And as I've intimated, different, I mean, different
18   cardiologists will convince about how narrow something is,
19   between 50 and 70, and 70 and 80.  But total is total.  We
20   can't argue with the fact that it's totally blocked.
21         **And so we have the vein graft that went to the ramus**
22   **branch totally blocked that was likely open in July of 2003.**
23         The sequential limb -- I think the sequential limb to
24   the posterolateral branch -- others would say it's to the PDA,
25   but **one of the sequential limbs -- 100 percent blocked; the**
1389
9

1  distal portion of the coronary artery, a big vessel, totally
2  blocked; and finally **this limb right here of this segment right**
3  **there, "patent and open now," September 9, now totally blocked**.


F.   **In Addition to These Injuries, the Posterolateral Part of Heart (Not Seen on**
     **the Ventriculogram) Has Some Level of Kinesis.  Also, He Has Inferior Wall**
     **Hypokinesis Which is Permanent.**

   • Dr. Popma, 8/7/06 Tr. at 1379:20-1382:25

                                   1379
20  By Mr. Robinson:
21  Q.  Tell us about those tests that you relied upon.
22  A.  So there were three tests -- which I'll just go through
23  very briefly because they are in the record and we can talk
24  about them -- there were three tests that Dr. Zipes performed?
25  Q.  What's the date of the tests, for the jury?
                                   1380
1   A.  So the first test is an echocardiogram, and the
2   echocardiogram was performed on 5/2/06.  **Echocardiogram is a**
3   **soundwave test that allows us to look, without going into the**
4   **heart, through the procedures that I perform, how well the**
5   **heart contracts and are there any areas of scar and what's the**
6   **overall function.**
7          Now, although Mr. Barnett's overall function of his
8   heart was good, was normal, what was noted on that test was
9   that **there was incomplete contraction in the lateral and the**
10  **basal section of the heart down here.  It just didn't squeeze**
11  **normally.  And there was severely reduced wall motion that was**
12  **in the basal posterior and inferior portion.**
13         I'm just showing you on the heart where this is.  So
14  this is kind of this area, in this same zone that he had his
15  heart attack previously; but also, **as we'll see in just a**
16  **minute, in a zone where one of the vein grafts also occluded.**
17  **and importantly, it wasn't moving, which implies there is**
18  **actually a scar that is there.**
19         So the next test that he had was a ct angio.  Sorry.
20  Let me just say that -- a ct angiogram.
21  Q.  Quickly, what is a CT?
22  A.  A CT angiogram is another way we inject dye into the veins
23  and we can image, without our coronary angiography, what the
24  state of the vessels are.
25         On that, just very briefly, it appeared that one of
                                   1381
1   the main grafts that went to the ramus branch had occluded.
                                    10

2    and finally, he had an exercise stress test that was performed
3    on May 2, and he could no longer exercise with the same
4    capacity that he could do before.
5    Q.  How many minutes did he do in that exam?
6    A.  I think he got to nine minutes and 30 seconds.  So rather
7    than being 17.2 and 17.5 minutes, which is phenomenal
8    exercise --
9    Q.  The mets, you mean?
10   A.  The mets, yes, that he's actually down to 13.1 mets.
11   Q.  And how many minutes did he do before on the first
12   cardiolite?
13   A.  15 minutes and now we're down to 9 minutes.  So a marked
14   reduction in his exercise tolerance.
15   Q.  And what opinion do you have regarding the change?
16   A.  Well, we'll put this in aggregate, but I think that there
17   is evidence, which we'll see with the angiogram, that there was
18   more heart disease, either by occlusions of these grafts or by
19   progression of his native disease.
20        And interestingly, it's all in the setting when he
21   should be having additional plaque formation because his LDL
22   cholesterol has been so well controlled.
23        Now, just the final piece which I'll mention again.
24   it's a sestamibi scan.
25   Q.  What is a sestamibi scan?

1382

1    A.  Sorry.  Cardiolite.  A Cardiolite scan.  Thank you very
2    much.
3    Q.  Is the old name for it sestamibi?
4    A.  It is.  Thank you.  Yes.  And on that particular scan,
5    there was an area of reduced perfusion -- I'm reading from the
6    report -- in the inferior and infero -- and basal inferolateral
7    segments.
8    Q.  What does that mean?
9    A.  That area down here, that, with exercise, starts to fall
10   out.  But the important part of this is that, during rest, it
11   doesn't come back all in towards normal.  **There is still a**
12   **residual problem, and that implies that there has been some**
13   **heart muscle damage; a heart attack in that area.**
14   Q.  And can you tell me whether, in your opinion, was that the
15   same?  Was that the residue from the original heart attack, or
16   was that a residue from a new one?
17   A.  **I believe that it's new.**  And the reason I say that,
18   although it's impossible to predict these things, the reason I
19   say that is because his cardiolite test that he had back in
20   2003 --
21   Q.  July.

11

22   A.  -- didn't show this problem.  So if the old heart attack
23   healed up, had bypass surgery, everything got fixed, **there is**
24   **now a new abnormality, a new problem, to the back portion that**
25   **wasn't there in 2003.**

- Dr. Zipes, 8/8/06 Tr. at 1730:17-1731:18

17         Click again.  I measured the relaxed area that's red.
18   click again.  The squeezed area, healthy muscle, is yellow.
19   That gets thicker.  That's like squeezing your bicep.  Go
20   forward again.  This is the scarred area that's narrow.  Click
21   again.  This is the scarred area when the heart is contracting
22   staying narrow.  **This is absolute, unequivocable, unarguable**
23   **proof that he has damaged heart muscle; that he has scar in**
24   **that area; and that this changed from '03 to '06.  Something**
25   **happened, and my interpretation is that it's related to the**
                                    1731
1   **obstruction of the two vein grafts and he indeed had a heart**
2   **attack, and he now has to live with the scar.**
3   Q.  Go to the next slide, please.  You did a stress test;
4   right?
5   A.  I did.  Probably blow up, yeah --
6   Q.  What's the point of that?
7   A.  The point of that is this subtle basal inferior
8   hypokinesis.  This was read by our expert in this area, and he
9   confirms this is an abnormal area of contraction and that this
10   is the scar.  In addition, he says that "the mildly reduced
11   perfusion in the fifth inferobasal and inferolateral segments,
12   which is partially reversible, is suggestive of mild
13   stress-induced ischemia."
14         **"Partially reversible," what does that mean?  It**
15   **means that, at rest, the area that didn't take up the**
16   **cardiolite did not improve.  So it's scarred.  So even at rest,**
17   **it won't take up the cardiolite.  This is what we call a fixed**
18   **defect, and this is consistent with a heart attack.**

**G.     Pain and Suffering.**

In determining the appropriate amount for a remittitur the Court should take into account that

Mr. Barnett has suffered a great deal, both physically, as detailed above, and emotionally.

Physically, he has endured the pain of a heart attack and the burden of major medical procedures

such as catheterization, stent placement and bypass surgery.  As the Plaintiff's brother John testified,

12

he spent quality time with the Plaintiff before the heart attack, and together they engaged in many activities such as golf, shag dancing and walking on the beach. (8/7/06 Tr. at 1520:12-20.) John notes that since Mr. Barnett's heart attack and subsequent episodes of chest pain, the Plaintiff's energy level has markedly decreased. He states, "most definitely, as far as his energy level, he has never come back to the level that he had when he came down here to North Carolina." (*Id.* at 1514:6-9.) Reiterating this point, John testified that "I remember that in my mind that he seemed to be recovering slower than what I thought he ought to." (*Id.* at 1512:13-14.) John further describes the Plaintiff as "not quite hitting on all cylinders." (*Id.* at 1520:4-5.) As the Plaintiff described in his testimony, "I know after the heart attack I've been doing things at a lower level . . ." (8/8/06 Tr. at 1594:5-6.)

Mr. Barnett has also suffered emotionally. When asked about his concerns for the future, he responded that his major concern is dying early and leaving his wife behind. As he testified, "My biggest one would be my family, particularly my wife, because she really depends on me a lot. And I can't imagine her – you know, really what life would be life for her, you know, if I wasn't here . . . It's my biggest worry is, you know, my mom, how is she going to handle it, the brothers? But my wife, particularly, because she's more vulnerable." (*Id.* at 1594:11-17.) Each day, Mr. Barnett is fearful of another heart attack and premature death, which is a heavy burden for him to carry during his golden years. Nothing is more stressful in life than fear of death. This fear is a compensable damage everyday that he stays alive. Plaintiff's first heart attack and loss of years off of his life, in and of themselves, would justify a remitted award of $10 million in compensatory damages. When the overall permanent and life-threatening damage to Mr. Barnett's cardiac health caused by Vioxx is also considered, compensatory damages in that amount are clearly reasonable.

**H.    Merck's National Litigation Posture.**

13

The Court can and should also take into account Merck's national litigation posture and the effect the reduction of this verdict will have on other cases.[1] Despite Merck's argument that the Defendant and the people who currently run Merck had gotten the 'message' and taken it 'to heart,' it is ironic, though not surprising, that soon thereafter representatives of Merck were reiterating their scorched earth litigation strategy of trying every case. According to the Associated Press as reported in the Washington Post, in a news release a member of Merck's national defense team "said that the company intended to maintain its policy of trying every Vioxx case."

(http://www.washingtonpost.com/wp- dyn/content/article/2006/08/17/AR2006081701609.html)

This case and this verdict have national resonance.[2] Merck must accept the good and the bad which are inherent in its litigation strategy. It must live with the larger awards just as it has accepted the defense verdicts. Otherwise, if all large awards are artificially lowered Merck will only be encouraged to continue to try every case, requiring every plaintiff to spend millions of dollars to have their day in court. It is essential that the bellwether cases in the mass tort context be truly representative. *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997.) Because the purpose of test cases is to produce a reliable range of potential values, (Manual for Complex Litigation,

---

[1] As this Court noted in *In Re: Propulsid Products Liability Litigation*, Not Reported in F.Supp.2d, 2003 WL 22023398, *6, E.D. La., March 11, 2003:
   "Finally, the Court is mindful that its primary duty in this case is owed to the litigants in this case, but the Court cannot ignore its responsibilities as an MDL transferee court. The Court must balance the two interests. In doing so, the Court reiterates its previous statements that trial of the issue of adequate warnings will be helpful to all litigants, including the [plaintiffs], in an attempt to move this litigation forward toward an ultimate conclusion."

[2] According to the Manual for Complex Litigation, Fourth:
   "One of the values of multidistrict proceedings is that they bring before a single judge all of the federal cases, parties, and counsel comprising the litigation. They therefore afford a unique opportunity for the negotiation of a global settlement. Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court. As a transferee judge, it is advisable to make the most of this opportunity and facilitate the settlement of the federal and any related state cases." Id at §20.132.

14

Fourth, § 22.315(FJC 2004), any significant reduction of the jury's verdict here would artificially skew the global liability picture. It would render an unrealistic view of Merck's potential exposure in the Vioxx litigation, by narrowing and lowering the anticipated range of verdict amounts.

## II.   ANY NEW TRIAL SHOULD BE LIMITED TO DAMAGES.

### A.   The Court Should Order a Remittitur, With Any Conditional New Trial Limited to Damages Only.

Merck argues that Court has found the damages award was so excessive as to be the result of caprice, passion, or prejudice. Actually the court did not make such a finding, nor was it required to in order to find the verdict excessive. The Order states: "The Court finds that the $50 million compensatory damages award is excessive under any conceivable substantive standard of excessiveness," and that "no reasonable jury could have found that the Plaintiffs losses totaled $50 million." This does not mean the jury acted out of passion or prejudice, in either its award or its liability findings. To the contrary, the Court, having heard all the evidence, concluded " the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable," and that it "is not troubled by the $1 million punitive damage award in this case."

There is nothing in the record and no reason to believe that the jury, which acted dispassionately in its findings on the liability issues as well as its award of punitive damages, somehow acted with caprice, passion, and prejudice. Where, as here, the jury's liability findings are reasonable and supported by the evidence, any new trial, with or without remittitur, must be limited to damages. Merck should not be allowed to take advantage of the jury's generosity to obtain another chance at a verdict on liability. Merck had its day in court on the liability issues. Where the excessiveness of a verdict does not implicate the jury's liability findings, a new trial, where required, may be limited to damages. *Walters v. Mintec/International*, 758 F.2d 73, 82 (3rd Cir. 1985) citing

15

*Wagner v. Reading Co.,* 428 F.2d 289 (3d Cir. 1970) (ordering partial retrial on damages in personal injury action.)  Moreover, this Court is the best judge of the fact that the liability ruling was not in any way tainted. *City of Phoenix v. Com/Systems, Inc.,* 706 F.2d 1033, 1036 (9th Cir. 1983).

The excessive nature of an award does not impugn the reasonable liability findings. In fact, an excessive award may demonstrate that the jury had little doubt as to issues of liability. *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1242 (5th Cir. 1985). Even if a damages award is found to be the result of passion or prejudice, this does not mean the liability findings were improperly influenced or that liability must be retried. *Whitehead v. Food Max of Mississippi, Inc.,* 163 F.3d 265, 278-279 (5th Cir. 1998)("Here, the new trial need be only on damages. ....[T]he damage awards were high; this also indicates the jury's strong belief that Kmart was liable.")

This Court should also examine the question of a new trial in terms of the fairness to the Plaintiff, who has already proven liability, being forced to retry the issue solely because it is this court's opinion the jury by its honest judgment placed a much higher value on the injuries than most juries would have awarded. See *Ramar Coal Co., Inc. v. International Union, United Mine Workers of America,* 814 F. Supp. 502, 510 (W.D. Va. 1993) ("Defendants assert that they are entitled to a new trial on all issues because the jury did not fairly consider the issue of damages. Although the Court is convinced that the jury was mistaken as to damages, the Court finds nothing to suggest that the jury's verdict was based on anything other than honest judgment.") "Considerations of economy, fairness, and repose may provide justification for preserving a jury's liability determination that has been fairly and fully made and ordering only a new trial on damages "where there is no substantial indication that the liability and damage issues are inextricably interwoven, or that the first jury verdict was the result of a compromise of the liability and damage questions.'" *Atlas Food Systems and Services, Inc. v. Crane Nat. Vendors, Inc.,* 99 F.3d 587, 599-600 (4th Cir. 1996). See also *Maxey*

16

*v. Freightliner Corp.*, 727 F.2d 350, 351-352 (5th Cir. 1984)(" To subject the plaintiffs to re-entering the judicial fray, should they reject remittitur, to re-prove liability either for purposes of compensatory or exemplary damages (both issues decided favorably in plaintiffs' favor after three appellate appearances) would be judicially wasteful, as well as unfair to the plaintiffs.")

Where a new trial is appropriate because of an excessive damage award the Fifth Circuit has not hesitated to remand for a new trial limited to the issue of damages. *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 687-688 (5th Cir. 2003); *Poullard v. Turner*, 298 F.3d 421, 423 (5th Cir. 2002)(New trial on compensatory and punitive damages.) This often occurs with the court offering the plaintiff a choice of accepting a remittitur or a new trial on damages only. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176 (5th Cir. 1995); *Chemical Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478 (5th Cir. 1993); *Brunnemann v. Terra Intern., Inc.*, 975 F.2d 175,179 (5th Cir. 1992).

**B.     The Damages and Liability Issues are Not Inextricably Intertwined.**

Merck contends that the evidence of damages falls into three categories ((i) medical bills; (ii) non-economic damages and (iii) diminished life of nine to ten years), and argues that as to each of these injuries, there is conflicting evidence as to whether, and to what extent, it was caused by Vioxx, and that therefore "all of this requires specific causation evidence that is properly part of liability, not damages." In *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931), a breach of contract action, damages were entirely dependent upon very specific findings regarding the contracts and the contemplation of the parties. While damages for breach of contract are limited to the contemplation of the parties, tort actions are subject to an entirely different set of rules.  Merck is responsible for all damages suffered regardless of the extent to which its conduct contributed, and regardless of whether such damages were within the contemplation of the parties. *Hutson v. Continental Assurance Co.*, 269 S.C. 322, 332, 237 S.E.2d

17

375 (1977); *Lifschultz Fast Freight, Inc. v. Haynsworth, Marion, McKay & Guerard*, 324 S.C. 645, 653, 486 S.E.2d 14, (S.C.App. 1997.) See also *J.T. Baggerly v. CSX Transp., Inc.*, --- S.E.2d ----, 2006 WL 2474203,*3, S.C., August 28, 2006. Additionally, damages here are not dependent upon the extent to which Merck's conduct contributed to Mr. Barnett's heart attacks nor to which they contributed to his loss of life expectancy.  Under South Carolina law the defendant takes the plaintiff as he is found, and the plaintiff is entitled to recover damages resulting from the aggravation of pre-existing conditions. *Watson v. Wilkinson Trucking Co.*, 244 S.C. 217, 136 S.E.2d 286 (1964); *Raino v. Goodyear Tire & Rubber Co.,* 309 S.C. 255, 259, 422 S.E.2d 98, 100 (1992); See also, *Waring v. Johnson*, 341 S.C. 248, 260, 533 S.E.2d 906, 912-913 (S.C.App. 2000). Even if all issues of liability and damages were retried, the jury still would not be required to itemize each injury in special interrogatories, nor the extent to which Merck's conduct was a contributing factor to each injury.

The authorities cited by Merck are of no help. *Anderson v. Siemens Corp.*, 335 F.3d 466, 471-72 (5th Cir. 2003)(Liability finding  based upon erroneous admission of evidence and the court found it could not separate two intertwined *liability* issues. *Id.* at 475-476.);  *Mack Trucks, Inc. v. Arrow Aluminum Castings, Co.,* 510 F.2d 1029, 1034 (5th Cir. 1975) (rejecting separate trials on two different but related liability theories); *Eximco, Inc. v. Trane Co.*, 748 F.2d 287, 289 (5th Cir. 1984)(breach of contract and federal statutory violations.); *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1538-1539 (5th Cir.1984)(rejecting separate trials of fraud and breach of contract causes of action); *Davis v. Safeway Stores Inc.*, 532 F.2d 489, 491 (5th Cir. 1976)(default judgment in personal injury action reversed as to damages where affidavits insufficient); *Colonial Leasing v. Logistics Control Int'l*, 770 F.2d 479, 481-82 (5th Cir. 1985) (Plaintiff was entitled to new trial on all issues relevant to its right to recover under Texas Fraudulent Transfer Act, rather than solely to issue of creditor status.); *Williams v. Slade,* 431 F.2d 605, 609 (5th Cir. 1970))(Issue of

18

whether a retrial could be ordered only as to one defendant who had been erroneously granted a directed verdict, or whether case should be retried as to both.)

Unlike the cases cited by Merck, *Brunnemann v. Terra Int'l, Inc.,* 975 F.2d 175, 179 (5th Cir.1992), cited by this Court, actually involved a tort claim and actually addressed the issue of a possible new trial limited to damages. Although the appellate court found the verdict was excessive, because there was no evidence it was the result of passion or prejudice the court held that the appropriate remedy was remittitur, subject to a new trial on damages only if the plaintiff did not accept the reduced amount. *Id.* at 178-179. Like *Brunnemann*, there is no evidence that the jury's award was the result of passion or prejudice. As this Court noted, the jury's liability findings were reasonable. This combined with the relatively minimal award on punitive damages demonstrates this jury was attempting to be eminently fair. As is *Brunneman*, a new trial can be ordered on the issue of damages alone, conditioned upon the Plaintiff rejecting a remittitur.

Merck argues that the jury never decided which, if any, of Mr. Barnett's injuries resulted from his Vioxx use, and that a second jury would be required to reexamine all the issue of general and specific causation in order to do so. However, this same argument could be applied to almost any products liability case, and virtually every one of thousands of cases in the Vioxx litigation. Accepting Merck's argument would guarantee a retrial of all issues in every Vioxx case, every time a jury renders an excessive award.[3] Merck would always argue that different aspects of damages and the absence of jury findings separating out medical bills and preexisting conditions, two factors

---

[3] Merck's position is not unlike the argument made by the defendant in *Levesque v. Marine Drilling Co.,* 783 F.Supp. 302, 306 (E.D.Tex. 1992), that the plaintiff's credibility on liability was 'intertwined' with his credibility on damages. ("Plaintiff's credibility has already been determined as to liability. A new jury can judge his credibility as to damages. The credibility of the plaintiff is present in every case. If the court follows the defendant's suggestion, no case could ever be tried on damages alone. Such a position is contrary to the law.")

19

present in most Vioxx cases, foreclose a trial on damages without retrying liability. The resulting waste of judicial resources, and the unfair burden to injured victims of Vioxx, would be monumental.

The requirement that issues retried be separate and distinct from those not retried is to ensure that improper influence that may have affected one did not affect the other, (*Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 455 (3rd Cir. 2001)) and to avoid a risk of inconsistent verdicts. *In re Plywood Antitrust Litigation*, 655 F.2d 627, 636 (5th Cir. 1981). However, there is no danger of inconsistency here, nor is there any evidence that the cause of the allegedly excessive award affected the jury's findings on liability. Merck asserts that it is a practical impossibility to try damages alone in that it would require presentation of most or all of the evidence from the first trial. The cases Merck cites for this proposition all concern bifurcation of trials in class actions. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 749-751 (5th Cir.1996); *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303-1304 (7th Cir. 1995).

The fact that some of the evidence relevant to one claim may have to be presented again to the second jury does not implicate the constitutional concerns behind the rule. See *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1128 (7th Cir. 1999)("…Seventh Amendment argument boils down to an assertion that much of the evidence presented in the first trial would have been re-examined in the second. Yet, this alone does not raise constitutional concerns. The Seventh Amendment is concerned about factual conclusions, not evidence: "The prohibition is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues." (citing *Paine, Webber, Jackson & Curtis, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 587 F.Supp. 1112, 1117 (D. Del. 1984)) and *In re Innotron Diagnostics*, 800 F.2d 1077, 1986 (Fed Cir. 1986) (Bifurcation of anti-trust and patent claims upheld despite likelihood that "most of the facts and issues in the patent trial [were] overwhelmingly intertwined and overlapping with

20

those [in the anti-trust case].")

A new trial on the amount of punitive damages does not, as Merck contends, necessitate a retrial of liability issues. See *White v. Ford Motor Company*, 2003 WL 23353600 (D.Nev. Dec 30, 2003) (NO. CV-N-95-0279-DWH) Not Reported in F.Supp.2d, 2003 WL 23353600, *2 (Rejecting argument that retrial of amount of punitive damages must include retrial of liability issues.) Even if some evidence of the conduct for which Merck was found liable must be put before a second jury to determine the appropriate amount of the award of punitive damages, this does not require a new trial on liability issues. See *e.g. Automotive Products v. Tilton Engineering, Inc.*, Not Reported in F.Supp., 1993 WL 661138,*1, C.D.Cal., November 18, 1993.( "Although the Court agrees that AP and *Tilton* must present the evidence of liability to the new jury, the jury does not need to retry that issue…") Proper deference to the Seventh Amendment precludes entry of a judgment that disregards any material jury finding. *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 427-428 (2d Cir. 1995). "Whether and to what extent issues should be separated out should be considered in light of the legal principles that, even when general verdicts are vacated, the parties are still bound by the jury's answers to the written interrogatories, *Green v. American Tobacco Co.,* 325 F.2d 673, 678 (5th Cir. 1963) ("the parties may not re-litigate the issues already decided under the guise of presenting evidence on the issue [that needs to be retried]"), and the Court may not enter a judgment that disregards any material jury finding." *Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.*, 419 F.Supp.2d 225, 234 (N.D.N.Y. 2005) citing *LeBlanc, supra, at* 427.)  The Plaintiff's Seventh Amendment rights are at stake here as well, and Mr. Barnett is entitled to the benefit of the findings by the jury on the liability issues already tried.

21

III.     **THERE IS NO EVIDENCE, MUCH LESS A REASONABLE PROBABILITY, THAT THE VERDICT WAS THE RESULT OF PASSION OR PREJUDICE, OR OTHER IMPROPER MOTIVE, NOR THAT THE JURY'S FINDINGS ON LIABILITY WERE IMPROPERLY INFLUENCED. THE COURT SHOULD THEREFORE ISSUE A REMITTITUR.**

The jury's verdict in this case was based upon Plaintiff's presentation of a wealth of evidence showing that Vioxx caused acceleration of atherosclerosis and heart attacks. Plaintiff's experts relied upon numerous studies, in humans and animals, as well as data from clinical trials, to explain the mechanism by which Vioxx causes increased cardiovascular risk and accelerated atherosclerosis. Through the testimony of Drs. Zipes and Avorn, the Plaintiff proved that Vioxx causes an increased risk of heart attacks. This evidence went unrebutted, as Merck offered not a single retained expert witness in response. (Drs. Karavan and Bryan concededly were not knowledgeable about the Vioxx science.) Merck's witness, Dr. Reicin admitted APPROVe showed an increased cardiovascular risk at 18 months or longer, (8/14/06 Tr. at 2354:22-2355:1), and Mr. Barnett used Vioxx for 31 months. Merck concedes that APPROVe is a statistically significant, placebo controlled, clinical trial, yet argues that Dr. Moye suggested "one study is not enough." However, Merck ignores his testimony that the FDA has decided "if they have one good, large and well-designed, well-executed, well-analyzed confirmation study, that will be enough." (8/3/06 Tr. at 778:20-23.)

Standing alone, APPROVe is statistically significant, scientifically reliable evidence that Vioxx causes cardiovascular events at the 25 mg dose. Dr. Zipes also relied upon statistically significant evidence from the Alzheimer's trials. (8/8/06 Tr. at 1713:23-1714:20.) In addition to epidemiological data from various clinical studies, Zipes relied upon the Plaintiff's medical records and the results of the 2005 FDA Advisory Committee, wherein 32 independent scientists reviewed clinical data and concluded, 32 to zero, that Vioxx causes an increase in cardiovascular events. (*Id.* Tr. at 1666:11-1667:6.) Dr. Avorn testified how the VIGOR study results showed a 5-fold increased

22

risk of heart attack with Vioxx versus naproxen, (8/1/06 Tr. at 295:23-297:14) and why he dismissed Merck's theory that naproxen is cardioprotective. (*Id.* at 323:22-324:18.)I n his own study, he found an increased risk of MI in people taking regular doses of Vioxx, (*Id.* at 336:5-336:14) and the FDA medical reviewer cited several studies that suggest trends toward higher rates of myocardial infarction with Vioxx, even with lower doses of Vioxx or shorter duration. (*Id.* at 373:10-374:6.) The ADVANTAGE trial showed an increased risk of heart attack, (*Id.* at 367:16-20), as did Study 090. (*Id.* at 367:23-368:9.) In the Alzheimer's trials the number of cardiac deaths was "striking," (*Id.* at 378:25-379:5), and even Merck's own internal meta-analysis conducted by Dr. Shapiro showed an increased risk of heart attack. (*Id.* at 559:7-561:4; 8/1/06 Tr. at 365:24-366:10.)

From all of this evidence it was more than reasonable for a jury to conclude that Vioxx causes an increase of cardiovascular events at the 25 mg dose. The experts provided reliable and compelling explanations of how Mr. Barnett's use of Vioxx caused his extensive cardiac injuries. Dr. Zipes demonstrated - unrebutted by any defense expert opinion to the contrary - the mechanism by which Vioxx caused Mr. Barnett's rapid progression of atherosclerosis. Based upon clinical experience as well as hundreds of hours reviewing materials regarding Vioxx and Cox-2 inhibition (8/8/06 Tr. at 1654:7-20), Dr. Zipes explained that Vioxx prevents the development of prostacyclin, creating an imbalance favoring thromboxane, leading to vasoconstriction, platelet clumping, narrowing of the artery and eventual heart attack. Because of the imbalance, cells will tend to adhere to an injury in the blood vessel, causing an increase in platelet migration to that area, which in turn causes an acceleration of plaque build-up. (*Id.* at 1677:9-1679:2; 1679:10-1680:12.) In his testimony regarding the APPROVe follow-up data, Zipes described how the acceleration of atherosclerosis can affect a person even after Vioxx use is discontinued. In essence, the damage done to the artery, or the plaque that has accumulated within the artery during the time that a person

23

was on Vioxx remains, putting the individual at greater risk for a thrombotic event. (8/8/06 Tr. at 1700:21-1701:17.)

Dr. Zipes explained the body of evidence which demonstrates that Vioxx accelerates atherosclerosis, including human data from Merck's own clinical trials, the APPROVe follow-up data as well as the Alzheimer's data from study 078 described in the *Thal* article. These studies were in humans and showed that Vioxx continued to increase the risk of cardiovascular events even after discontinuation of the drug, which is best explained by the acceleration of atherosclerosis while the person was on the drug. As discussed by Merck's own consultant, Dr. FitzGerald, "Patients in the APPROVe study should continue to be followed. This will allow some estimate of how quickly the developed risk may dissipate given the relatively short-half lives of these compounds. Such dissipation may occur rapidly. On the other hand, if treatment accelerates atherosclerosis, the offset of the risk may be more gradual." Indeed, as described by Dr. Zipes, the APPROVe follow-up data proved exactly the prediction provided by Dr. FitzGerald, namely that the risk dissipates gradually after discontinuation of the drug. (*See*, testimony of Dr. Zipes - 8/8/06 Tr. at 1700:18–1704:23; 1713:21–1714:20; 8/10/06 Tr. at 1857:1-8; 1861:1-12; 1863:7–1864:10; 1867:19-25.) Protocol 112 also provides evidence that Vioxx increases cardiovascular risk by showing that in a comparison between Celebrex and other NSAIDs, Vioxx caused a greater increase in blood pressure than any of the other drugs. (8/8/06 Tr. at 1709:25-1710:24.)

Dr. Zipes also relied upon animal studies which provide "an understanding of mechanisms that help us interpret clinical information." (*Id.* at 1793:9-10.) Ignoring all of the human data relied upon by Plaintiff's experts, Merck cites several cases and argues that "animal studies cannot establish causation in humans." However, two of the cases involved animal studies which themselves were unreliable. See *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194 (5th Cir. 1996)

24

(Affirming exclusion where the animal studies themselves were inconclusive and unreliable, (*Id.* at 195) and there were numerous contrary reputable epidemiological studies. (*Id.* at 197); *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 313 (5th Cir.1989)("We need not address at length the animal studies presented by plaintiffs below, except to note several of the more important studies and their methodological flaws." *Id.* at 313.) The other cases involved unique case-specific problems not present here. *Maurer v. Heyer-Schulte Corp.*, 2002 WL 31819160, E.D.La., December 13, 2002 (Summary judgment granted where the only scientific support was an FDA report regarding effect of chemical on rats.); (*Wade-Greaux v. Whitehall Lab. Inc.,* 874 F.Supp. 1441, 1480 (D.Vi. 1994), *aff'd* 46 F.3d 1120 (3d Cir.1994) (Summary judgment in action alleging birth defects where expert testified in other litigation that "because so many substances are teratogenic in animals, before you can make a conclusion that a substance is teratogenic in humans, you must look to the human data." *Id.* at 1483.)

Despite these limited factual scenarios, the use of animal studies is an accepted and reliable methodology. See *e.g.* Reference Manual on Scientific Evidence 2d Ed. 345-346 (FJC 2000.) Blanket arguments against animal studies like Merck is making here, were rejected by the court in *Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 842 (9th Cir. 2001):

> "First, *Daubert II* itself recognized that animal studies are not per se inadmissible and should be subjected to substantive analysis, just like other scientific evidence. ... None of these cases holds that animal studies will always be too unreliable to provide admissible evidence about human health issues. Notwithstanding the moral and ethical problems often surrounding animal studies, in some circumstances they provide useful data about human health. The district court erred in rejecting the animal studies proffered by Metabolife merely because of the species gap." *Id.* at 842.

Large-scale epidemiological studies are not essential to the formation of an expert opinion as to causation. See *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929 (8th Cir. 2001); *Brasher v. Sandoz Pharm. Corp.,* 160 F.Supp.2d 1291, 1296-98 (N.D. Ala.2001; *Ruff v. Ensign-Bickford Indus., Inc.,*

FAC Resp. Exhibit B -- 2098

168 F.Supp.2d 1271, (D. Utah 2001). See also *Hopkins v. Dow Corning,* 33 F.3d 1116, 1124-25 (9th Cir. 1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995). Even ignoring the studies and data involving humans upon which Dr. Zipes relied, the animal studies provided compelling evidence about the mechanism by which Vioxx accelerates atherosclerosis. Genetic alteration allows scientists to closely mimic the conditions of a human heart under the influence of Cox-2s, thereby providing reliable predictors of the mechanism by which Vioxx accelerates atherosclerosis. Dr. Epstein testified that animal studies are relevant to the human situation, (8/5/06 Tr. at 1176:13-16) and that his animal study raised a yellow flag for Merck that Vioxx caused accelerated atherosclerosis. (*Id.* at 1201:19-25.) Dr. Zipes also testified how the animal studies help to explain the mechanism by which Vioxx causes heart attacks. (8/8/06 Tr. at 1686:21-1687:1.)

Based upon the totality of the evidence presented at trial, the jury's findings were reasonable and based on scientifically reliable evidence, including clinical data, medical literature, and studies involving both humans and animals.

Merck argues that the jury ignored the Court's instructions and awarded a verdict intended to punish Merck. Merck's basis for this assertion is defense counsel's unrecorded recollection of the jurors nodding in agreement with his argument to that effect, to wit: "My guess is that you have already awarded punitive damages and that you did not know that this stage was even a possibility." (8/17/06 Tr. at 2696:19-22.) If this is evidence, it opens up a whole new chapter in the FRE. But even assuming, *arguendo,* that this were actually part of the record, and admissible evidence of anything, the statement is ambiguous, as is the alleged 'response' of the jurors. If they in fact nodded, the jurors could just as easily have been agreeing that they did not know punitive damages were even a possibility in phase 1, and therefore they did not intend to punish Merck or make them part of the phase 1 award.

26

Regardless of Merck's rank speculation as to this undocumented communication from the jury, of actual significance is that this Court found that "the jury's findings on liability are reasonable in this case," and that "the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable." This contradicts Merck's empty assertions that the award was the result of improper jury conduct. The authorities cited by Merck all involved misconduct of counsel which the court found to have improperly influenced the jury, or circumstances where there was concrete evidence that the jury disregarded the court's instructions. *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 292 (5th Cir. 1975)(Jury failed to respond to instructions and court found "clear and prejudicial error in the closing arguments of plaintiff's counsel which unduly influenced the jury's sympathies." *Id.* at 283.); *Evers v. Equifax, Inc.*, 650 F.2d 793, 798 (5th Cir. 1981)(Verdict of liability itself was affected by improper considerations where counsel twice made improper argument to the jury to, in effect, award punitive damages despite admonition against and withdrawal of punitive damages issue.); *Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1040 (8th Cir.1978)(Verdict was "tainted with the trial court's erroneous and prejudicial admission of parole evidence," and jury added punitive damages where the issue had not been submitted to them.); *Christopher v. Florida*, 449 F.3d 1360, 1368 (11th Cir. 2006)(Plaintiff's counsel made a series of statements which implied to the jury that the State of Florida was underwriting the costs of defense.); *Williams v. Slade*, 431 F.2d 605, 609 (5th Cir.1970)( Passion or prejudice was not in issue, but rather, whether a retrial could be ordered only as to one defendant who had been erroneously granted a directed verdict.)

Unlike the authorities it relies upon, Merck has nothing to point to here other than the size of the award to support its contention the verdict "was infected with passion and prejudice." Where a damages award is found to be excessive courts do not blindly assume that a liability finding has been

27

wrongfully decided. Even where a damages award is excessive or has been improperly influenced, if liability is "firmly and correctly established" the court should issue a remittitur. *Willett v. Western Oceanic, Inc.,* 117 F.R.D. 379, 382-383 (E.D. La. 1987)("A jury's finding as to liability can be binding even though its monetary award is found to be excessive or even improperly influenced-our deference to faith in the jury system demands at least this much.") Merck is unable to cite a single case where the size of the damages award alone was enough to support a finding of passion and prejudice, let alone one where it was found to have affected the finding of liability as well. This is why Merck has gone to great lengths to attempt to convince this Court that a finding that the award is excessive necessarily includes a finding that it was also the result of passion and prejudice, and "improper jury conduct." The Court made no such finding, nor was it required to in order to find the award excessive, or to issue a remittitur.

Just because a trial court believes an award is excessive, does not mean it was the result of passion or prejudice sufficient to require a new trial. *Curtis Publishing Co. v. Butts,* 351 F.2d 702, 718 (5th Cir. 1965)("Reviewing the amount of the verdict and reaching the conclusion that it is more than the law would permit is not, therefore, the equivalent of the judge's determination that excessiveness is due to a runaway jury, under the spell of passion or bias."); See also *Lowe v. General Motors Corp.,* 624 F.2d 1373, 1383-1384 (5th Cir. 1980)(Ordering remittitur or new trial on damages only, even though trial court had opined that the damages awarded were "excessive and demonstrate(d) prejudice, bias and passion.") Numerous courts have held that the size of an award does not by itself demonstrate that it resulted from prejudice and passion. *Bianchi v. City of Philadelphia,* 80 Fed.Appx. 232, 237, 2003 WL 22490388 (3rd Cir. 2003)("[T]he defendant's only evidence of jury prejudice and passion is the amount of the punitive damage award itself. This is insufficient..."); *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1561 (10th Cir. 1991); *Hurley v. Atlantic*

28

*City Police Dept.,* 174 F.3d 95, 114 (3rd Cir. 1999); *Evans v. Port Authority of New York and New Jersey,* 273 F.3d 346, 352 (3rd Cir. 2001). See also *Murray v. Bank of America, N.A.,* 354 S.C. 337,344, 580 S.E.2d 194 (S.C. App. 2003)("Mere undue liberality on the part of the jury does not warrant an inference that the verdict resulted from caprice, passion, prejudice, or other improper motives.")

The rule in the 5th Circuit is that "when a jury verdict results from passion or prejudice, a new trial is the proper remedy, but when a damage award is merely excessive or so large as to appear contrary to right reason, remittitur is the appropriate remedy." *Laxton v. Gap Inc.,* 333 F.3d 572, 586 (5th Cir. 2003), citing *Brunnemann v. Terra Int'l., Inc.,* 975 F.2d 175, 178 (5th Cir.1992)("Damage awards which are merely excessive or so large as to appear contrary to right reason, however, are subject to remittitur, not a new trial. 'When a jury's award exceed[s] the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so.'...If the plaintiff refuses to remit, we order a new trial on damages only." *Id.* at 178-179.)

While the jury's award of $50 million in compensatory damages is admittedly high, and in this court's opinion excessive, there is no evidence that the jury's award was the result of passion or prejudice or improper motive, much less a 'reasonable probability.' There is certainly no evidence that there were any improper influences upon the findings of liability, which this Court has already found to be reasonable. Accordingly, the Court should give Plaintiff the option of either accepting the maximum amount the jury could properly have awarded, or submitting to a new trial limited to the issue of damages.

**IV.   THE VERDICT CANNOT BE INCONSISTENT, AS IT INVOLVES SEPARATE AND DISTINCT CLAIMS AND STANDARDS OF PROOF.**

When a party contends that a verdict is inconsistent, the remedy is to request that the court

29

order the jury to continue its deliberations. "[T]he proper procedure is for the attorney to request the verdict to be clarified before the jury was discharged." *Continental Cas. Co. v. Howard,* 775 F.2d 876, 886 (7th Cir. 1985) citing *Fox v. United States,* 417 F.2d 84, 88 (5th Cir. 1969.) See *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 547 (5ᵗʰ Cir. 1974). Counsel for Merck never requested that the verdict be clarified.

Moreover, there is in fact no inconsistency in the verdict. The cases cited by Merck involve unique unusual circumstances of actual and obvious inconsistency which are not present here.[4] *Kellassy v. Cirrus Design Corp.,* No. 3:04-CV-0727-N, 2006 U.S. Dist. Lexis 34347, at *13-14 (N.D. Tex. May 30, 2006)(Plaintiff failed to designate experts on causation and could not under Texas law demonstrate a defect without expert testimony. *Id.* at *5.); *Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1480, 1481 (Jury deadlock on negligent failure to warn "as well as whether any negligence in testing or inspection caused injury" foreclosed a finding of negligent failure to warn under California law.); *Richard v. Firestone Tire & Rubber Co.,* 853 F.2d 1258, 1260 (5th Cir.1988)(Jury answered interrogatory finding no causation between defect and injury, but assigned 10% of the fault for injury to manufacturer.); *Duk v. MGM Grand Hotel, Inc.,* 320 F.3d 1052, 1056-1057 (Even though Nevada's comparative negligence law allowed damages only if a plaintiff is 50% negligent or less, jury found 65%, ignored stop instruction in special verdict form and awarded damages.); *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26, 47 (5th Cir. 1972) (After jury in action for treble damages under Sherman Act determined that harm to plaintiff extended for ten

---

[4] Two of the cases cited by Merck support the Plaintiff's position here. *Gallick v. Balitmore & Ohio R. Co.,* 372 U.S. 108, 119(1963) ("But it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them: 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.' (citations omitted) We therefore must attempt to reconcile the jury's findings, by exegesis if necessary…"); *Johnson v. Ablt Trucking Co., Inc.,* 412 F.3d 1138, 1144 (10th Cir.2005)("If there is any plausible theory that supports the verdict, the reviewing court must affirm the judgment.")

FAC Resp. Exhibit B -- 2103

years, court could not properly base remittitur on finding of lesser duration.); *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973) (Special verdict that third defendant was guilty of passive negligence and not proximate cause of injury, taken with colloquy between judge and jury in which jury indicated that plaintiff was to be awarded some damages, was inconsistent and did not support judgment as to third defendant.); *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1151, 1152 (6th Cir. 1996)( Strict liability and negligence instructions were directed toward the actions of an "ordinarily prudent" manufacturer "fully aware of the risk" of accidental injury. "From the manner in which the instructions were propounded to the jury, it is difficult for this court to determine the distinctions between the two different theories of recovery." *Id.* at 1150.)

None of the cases cited by Merck involved a situation where a separate claim was brought under a theory of fraudulent deceit,none  involved negligence allegations beyond failure to warn, and none involved instructions which would have allowed a broader theory of liability under negligence.

**A.      The Verdict Is Not Inconsistent - Strict Liability And Deceit Are Separate and Distinct Causes of Action with Different Standards of Proof.**

This Court need not even address whether the findings on Strict Liability and Negligence are inconsistent. As the court correctly observed in its Order of 8/30/06 "Regardless, the jury's finding for the Plaintiff on the deceit by concealment claim would be unaffected by either potential consequence, and thus he would still be entitled to damages." The jury found in favor of the Plaintiff on his cause of action for Deceit, a separate and entirely distinct claim which involves not only different elements, but a higher standard of proof.   Under these  circumstances  there  is  no inconsistency which would affect the verdict on that independent cause of action. See *Brunner v. Maritime Overseas Corp.*, 779 F.2d 296, 299 (5th Cir. 1986) ("In the present case, the jury answers to the negligence and unseaworthiness interrogatories are not in irreconcilable conflict. Rather, they

31

represent differing answers to two separate theories of recovery. The judgment was properly based upon the jury verdict. It must be upheld.") (See 9A Wright & Miller, *Federal Practice and Procedure* § 2510 (2006), "[A]lthough both claims arose from the same alleged unsafe condition, negligence and unseaworthiness require different standards of proof for causation..." *Id.* at FN 8.); *Haynes v. Manning*, 717 F.Supp. 730, 735-736 (D. Kan. 1989)("Here, we have a verdict resolving separate and distinct causes of action (breach of warranty and fraud) in favor of both parties. Therefore, the verdicts are not inconsistent on their face."); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1547 (10th Cir. 1993) (No facial inconsistency between jury's general verdict finding liability under RICO fraud counts and general verdict finding no liability under Securities Act.); *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1424-1425 (10th Cir.), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

Strict liability and deceit are entirely separate and distinct causes of action under South Carolina law. The elements of a strict liability claim are established by statue. S.C.Code Ann. § 15-73-10 (1976) (the Defective Products Act), provides that "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if (a) The seller is engaged in the business of selling such a product, and (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold;  See also, *Bray v. Marathon Corp.*, 356 S.C. 111, 116, 588 S.E.2d 93 (S.C. 2003)( "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer....")  However, a cause of action for fraud is an entirely different theory of liability. "To establish fraud, the following nine elements must be shown: 1) a representation or nondisclosure of a material fact, 2) its falsity, 3) its materiality,

32

4) either knowledge of its falsity or a reckless disregard of its truth or falsity, 5) intent that the representation be acted upon, 6) the hearer's ignorance of its falsity, 7) the hearer's reliance on its truth, 8) the hearer's right to rely thereon, and 9) the hearer's consequent and proximate injury." *Kiriakides v. Atlas Food Systems & Services, Inc.*, 338 S.C. 572, 586, 527 S.E.2d 371 (S.C. App. 2000). In addition, a fraud claim must be proven by clear and convincing evidence.

Based upon the evidence the jury could have reasonably found that, regardless of the warnings issued with Vioxx, and regardless of whether or not Vioxx was defective and unreasonably dangerous, Merck in connection with the marketing and promotion of Vioxx "knowingly misrepresented or failed to disclose a material fact to Plaintiff's treating physicians in a circumstance where it was required to do so, that the Plaintiff's treating physicians were entitled to and did rely on that the misrepresentation or nondisclosure, and that the misrepresentation or nondisclosure was a legal cause" of Mr. Barnett's injuries. (Jury Charge, Page 12.) The strict liability and deceit claims have entirely different elements, are based upon entirely different evidence and allegations, and require different standards of proof. Because the jury found for the Plaintiff on the deceit claim, a separate and distinct cause of action from the strict liability claim, no inconsistency exists. The jury's verdict based upon the deceit cause of action stands. It is unaffected by the jury's findings on the strict liability claim, and provides an independent basis for upholding the verdict.

> **B.      Even if the Jury Had Not Found for the Plaintiff on the Deceit Cause of Action, the Jury Instructions Rendered Negligence the Broader Theory of Recovery Under South Carolina Law.**

Even where there is an inconsistency in the jury's verdict, a court is obligated to attempt to reconcile and harmonize the jury's answers to validate the verdict. "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atlantic & Gulf Stevedores v. Ellerman Lines,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798

33

(1962); *Stockton v. Altman,* 432 F.2d 946, 951 (5th Cir. 1970) (A reviewing court "is duty bound to reconcile or harmonize answers to interrogatories if it can reasonably do so...Indeed, '* * * a search of one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment.')"A jury's answers "should be considered inconsistent ... only if there is no way to reconcile them." *National Hispanic Circus, Inc. v. Rex Trucking, Inc.,* 414 F.3d 546, FN16 (5th Cir. 2005); As the court stated in *White v. Grinfas,* 809 F.2d 1157, 1161 (5th Cir. 1987):

> "When the jury's answers appear to conflict, we are obliged to reconcile the answers, if possible, in order to validate the jury's verdict. *See, e.g., Federal Deposit Ins. Corp. v. Munn,* 804 F.2d 860, 867 (5th Cir.1986); *Crossland v. Canteen Corp.,* 711 F.2d 714, 725 (5th Cir.1983). Indeed, this effort is required by the Seventh Amendment. *See, e.g., Crossland,* 711 F.2d at 725. The touchstone in reconciling apparent conflict is whether "the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted.""

In keeping with the court's obligation to 'attempt to harmonize the jury's answers' 'where there is a view of the case that makes the jury's answers to special interrogatories consistent,' verdicts in product liability actions which may seem inconsistent at first glance, are routinely upheld. See *e.g. Bigham v. J.C. Penney Co.,* 268 N.W.2d 892, 898 (Minn. 1978); *Morales v. American Honda Motor Co., Inc.,*151 F.3d 500, 511 (6th Cir. 1998) (Jury verdict finding that motorbike was defective, that manufacturer had failed to exercise ordinary care in design and sale of motorbike, and manufacturer had breached warranties, but that plaintiff had failed to show that directions and warnings of potential dangers were inadequate, was not legally inconsistent.)

When the alleged inconsistency here is examined according to these principles and South Carolina substantive law, as well as the instructions that were given to the jury, it becomes apparent that the verdict on the negligence claim must stand, regardless of the negative finding on the strict liability claim. A products liability case in South Carolina may be brought under several theories, including negligence, strict liability, and warranty. *Rife v. Hitachi Const. Machinery Co., Ltd.* (S.C.

34

App. 2005) 363 S.C. 209, 215, 609 S.E.2d 565, 569; *Little v. Brown & Williamson Tobacco Corp.,* 243 F.Supp.2d 480 (D .S.C. 2001). A finding in favor of the manufacturer on a strict liability claim does not preclude a verdict based upon a finding of negligence. Anderson, S.C. Requests to Charge - Civil, § 32-2 (2002)

The few cases cited by Merck which actually involved the circumstance of a verdict on strict liability for the manufacturer with a verdict for the plaintiff on failure to warn, are uniformly distinguishable. First of all, they were all decided upon state substantive laws which, as interpreted by their appellate courts, did not distinguish between strict liability and negligent failure to warn. *E.g. Garrett v. Hamilton Standard Controls, Inc.,* 850 F.2d 253 (5th Cir. 1988) ("In Texas, the standard of care is the same in failure to warn cases brought under negligence and strict liability theories." *Id.*a t FN4.) The is not the law in South Carolina.[5] *Talkington v. Atria Reclamelucifers Fabrieken BV,* 152 F.3d 254, 261-262 (4th Cir. 1998) citing *Bragg v. Hi-Ranger, Inc.,* 319 S.C. 531, 540, 462 S.E.2d 321 (1995). Under South Carolina law, a jury finding for the manufacturer on a strict liability claim does not exonerate the manufacturer for a claim based upon negligence. Moreover, negligence may be the broader theory of recovery under the instructions given to the jury, thereby eliminating any alleged inconsistency. In *Talkington,* the jury found for the manufacturer on the strict liability claim and against the manufacturer on the negligence cause of action. *Id.* at 258. The Court of Appeals held that under South Carolina law the two findings were not inconsistent:

---

[5]Nor is it the law in Louisiana. This Court addressed the distinction between strict liability and failure to warn under Louisiana Law in *In Re: Propulsid Products Liability Litigtion.*,Not Reported in F.Supp.2d, 2003 WL 22023398, *4, E.D. La., March 11, 2003:

"Thus, the design defects and inadequate warnings claims are separable. A finding of liability on one theory does not guarantee or preclude a finding of liability on the other. The required elements of proof are also different and distinct. A warnings claim in a prescription drug case such as this one focuses on whether the defendant adequately warned the plaintiff's doctor of the dangers of the product, while the defective design claim focuses on the actions of the defendant in manufacturing the drug despite alternative designs."

35

"The distinction between strict liability and negligence in design-defect and failure-to-warn cases is that in strict liability, knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer, whereas in negligence these elements must be proven.

Whether strict liability or negligence affords a plaintiff the broader theory of recovery will depend largely on the scope of evidence admitted by the trial court and on the jury instructions given under each theory." *Id.* at 261-262.

Similarly, a reading of the jury instructions here shows that the negligence cause of action here afforded the broader theory of recovery. In the strict liability charge the jury was told: "you must determine whether Vioxx was defective and unreasonably dangerous by reason of an inadequate warning." Jury Charge at 8. As to the negligence claim, they were instructed that the Plaintiff must prove that "1. Merck negligently failed to adequately warn the Plaintiff's treating physicians or the medical community of a known or reasonably scientifically or medically knowable risk associated with Vioxx, 2. He suffered injuries as a result of Merck's alleged failure to warn, and 3. Merck's negligence was the proximate cause of his injuries." Jury Charge at 11.

Additionally, the negligence cause of action included instructions regarding the duty to conduct inspections and conduct adequate testing. As part of the negligence cause of action, jurors were instructed: "A manufacturer owes a duty to conduct adequate tests and inspections of its products such as will reveal latent defects or defects that are not apparent upon a reasonable inspection so that it can give adequate warnings. The failure to exercise reasonable care in fulfilling any of these duties constitutes negligence." Jury Charge at 12.

Looking at the jury charge in its entirety, the instructions rendered the negligence cause of action the broader theory of recovery. Substantial evidence was presented at trial regarding Merck's negligent conduct in connection with the testing of Vioxx, and showing that Merck had failed to conduct adequate testing of Vioxx prior to and after marketing the drug. The instructions on the strict

36

liability theory did not encompass negligent testing and inspection, nor did they tell the jury to analyze the conduct of the manufacturer. The jury could have found that Merck was negligent in failing to conduct adequate testing, and that such negligence was a proximate cause of Plaintiff's injuries.

Moreover, the instructions on strict liability stated that 'a product is defective due to inadequate warning if the manufacturer fails to give a reasonably prudent physician adequate warning.' Jury Charge at 8-9. However, the instructions on negligence stated that the Plaintiff must prove that Merck 'negligently failed to adequately warn the Plaintiff's treating physicians *or the medical community*.' Jury Charge at 11.

Under these instructions negligence was again the broader theory. The jury could have found that Merck had failed to adequately warn the medical community, and that such negligence was a proximate cause of the Plaintiff's injuries. An alternative explanation for the different findings is that the jury simply wanted to leave no doubt that they believed Merck to be negligent, and that an affirmative answer to the first question, which made no reference to negligence, might be misinterpreted as implying that Merck was not negligent. "Even a jury verdict inconsistent on its face is not inconsistent if it can be explained by assuming the jury reasonably misunderstood the instructions." *Willard v. The John Hayward*, 577 F.2d 1009, 1011 (5th Cir. 1978), citing *Miller v. Royal Netherlands Steamship Co.*, 508 F.2d 1103, 1106 (5th Cir. 1975).

## V.    THE GREAT WEIGHT OF THE EVIDENCE SUPPORTS THE JURY'S FINDINGS.

The unrebutted evidence presented at trial demonstrates that the Plaintiff in fact suffered significant, serious, permanent and life-threatening damage and disability as a result of his use of Vioxx, which has substantially reduced his remaining life expectancy. The damages evidence

37

presented at trial showed even though he was personally modifying every modifiable coronary disease risk factor, Mr. Barnett was unknowingly subjected to 55 months of Vioxx-induced plaque build-up in his arteries.  The jury had the benefit of Mr. Barnett's well-documented medical history, which includes objective serial diagnostic testing before, during and after Vioxx use.

On January 24, 2000, the same month he started Vioxx, he underwent a cardiolite test which showed mild lateral ischemia and one mild vessel greater than 50% blockage.  At that time his LDL cholesterol was 174.  Then on September 6, 2002 he had a heart attack.  The testing three days later showed 6 vessel blockage of 50-80%, even though in 27 months his LDL had been reduced to 101.  As of July 2006, Mr. Barnett's LDL was only 52, yet he has now suffered 2 heart attacks as a consequence of Vioxx use, and he has two occluded bypass graft occlusions which occurred while he was taking Vioxx.

The compensatory award undoubtedly reflects the unrebutted mountain of evidence of "plaque burden" which has taken 10 years off Mr. Barnett's life expectancy.  The award demonstrates a realistic measure of what juries will award in long term exposure cases, because of the plaque build-up caused by Vioxx.  It also shows that there is an upper range of reasonable jury awards in cases such as this, where the plaintiff suffers serious debilitating and life-threatening injuries.

### A. Knowledge of a Risk Associated with a Drug Does Not Absolve a Manufacturer of Liability. The Plaintiff's Physicians Were Not Provided Adequate Warnings Regarding Vioxx.

Merck asserts that "when a prescribing physician has independent knowledge of the risks associated with a drug from sources other than the manufacturer, an absent or allegedly inadequate warning is not the cause of the plaintiff's injury." This oversimplification and generalization of a complex issue is not only incorrect, but it is contrary to established law. Again, Merck relies upon a string of factually inapposite cases. *E.g. Odom v. G.D. Searle & Co.,* 979 F.2d 1001, 1003 (4th Cir.

1992)(Summary judgment granted where physician "stated that he had always believed and still believed that "the Cu-7 is the best IUD that's ever been on the market," and that he would still prescribe it today," (*Id.* at 1002) and physician's "own estimate of the risk actually exceeded" that of the plaintiff's expert.)

Merck ignores a large body of law regarding prescription drugs and what a manufacturer is required to disclose. The manufacturer's duty is to warn of all potential dangers in its prescription drugs that it knew or should have known to exist, and a warning must be correct, complete, and fully descriptive, and must convey updated information as to all of the drug's known side effects. *Martin v. Hacker*, 83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993); *Krasnopolsky v. Warner-Lambert Co.*, 799 F.Supp. 1342, 1345-46 (E.D. N.Y. 1992) The warning must also have clarity so that the language of the warning is "direct, unequivocal and sufficiently forceful to convey the risk." *Martin* supra, 83 N.Y.2d, at 11.

Merely mentioning a possible injury or adverse effect is not necessarily adequate. *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 267 (5th Cir. 2002)) A manufacturer's disclosure of a particular risk of injury does not foreclose liability if the degree of risk is not sufficiently conveyed. *McDonnell v. Chelsea Mfrs., Inc.*, 259 A.D.2d 674, 676, 687 N.Y.S.2d 172, (N.Y.A.D. 2 Dept. 1999); *Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D. Tex. 1999)(Summary judgment denied even though package insert and PDR entry disclosed risk of myocardial infarction injury suffered by the plaintiff.) Even where a 'dear doctor letter' discloses the risk, affirmatively misleading information may cause a warning to be inadequate. *Woodbury v. Janssen Pharmaceutica, Inc.*, 1997 WL 201571*8 (N.D. Ill. 1997).

A prescribing physician's awareness of risks involved with a drug does not absolve a manufacturer of liability, where a jury could reasonably infer that additional and more complete

39

disclosures should have been made and the physician was not sufficiently informed. See *Tatum v. Schering Corp.,* 795 F.2d 925, 928-929 (11th Cir. 1986)(Jury could infer from the evidence that prescriber "did not possess the knowledge that he described himself as having."); *Timm v. Upjohn Co.,* 624 F.2d 536 (5th Cir.1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981)(Affirming verdict for the plaintiff, noting that although prescriber testified he was aware of the risks involved, he had responded to a hypothetical that had he known of the types and incidence of certain adverse reactions he probably would not have prescribed the drug. *Id.* at 538-539.)

Merck's argument is also unsupported by the record. The weight of the evidence is that Mr. Barnett's prescribing doctors were not sufficiently aware of the risks associated with Vioxx. Dr. Mikola, who began prescribing Vioxx for Mr. Barnett at least as early as 12/28/2001 (8/4/06 Tr. at 925:6-11), was never told by Merck that the President of Merck Research Laboratories believed that the CV events associated with Vioxx in the VIGOR trial were mechanism-based. (*Id.* at 912:23-913:1.) While he reviewed the VIGOR study, neither the title of the article nor the abstract stated that Vioxx significantly increases the risk of heart attack. (*Id.* at 973:20-974:15.) He further testified that if Merck had had information of a statistically-significant increase in the risk of serious cardiovascular thrombotic events, that information was not shared with him. (*Id.* at 977:13-978:15.)

Dr. Mikola further testified that had he been aware of or seen the information in the FDA's proposed label change to the effect that Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events, such as those with a history of myocardial infarction and angina and in patients with preexisting hypertension and congestive heart failure, he would not have put Mr. Barnett on Vioxx. (*Id.* at 914:16-915:11.) Dr. Mikola's testimony establishes that Merck withheld information vital to his making a fully informed decision as to whether or not to prescribe Vioxx to Mr. Barnett. In failing to provide Mr. Barnett's prescribing physician with such

40

information, Merck removed the possibility that he could act as a learned intermediary.

Dr. Avorn also explained how Merck's incomplete and misleading communications mislead physicians. (8/1/06 Tr. at 298:20-300:12; 301:4-302:15.) According to Dr. Avorn "...Merck's conduct of ... communication ... was inadequate in that it failed to truthfully represent what was known to Merck at the time about the risks of its drug in relation to the cardiovascular symptoms." (*Id.* at 289:12-290:1.) He also testified that "...Doctors did not have adequate information presented to them by Merck to make a fair and reasonable evidence-based decision about Vioxx." (*Id.* at 290:2-15.) It is also important to note that Dr. Avorn's opinion testimony regarding the inadequacy and inaccuracy of Merck's communications with physicians was unopposed by any defense witness.

Furthermore, assuming *arguendo* that Mr. Barnett's physicians had in fact been fully apprised of all pertinent and necessary information in Merck's possession, Merck would still not be relieved of liability. This is because the evidence showed that Merck's overpromotion of the drug had the effect of nullifying the already inadequate warnings. *Caraker v. Sandoz Pharmaceuticals Corp.,* 172 F.Supp.2d 1018, 1030 ( S.D. Ill. 2001): *Salmon v. Parke Davis & Co.,* 520 F.2d 1359, 1363-1364 (4th Cir. 1975); *Stevens v. Parke, Davis & Company,* 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973); *Incollingo v. Ewing,* 444 Pa. 263, 288-289, 282 A.2d 206 (1971); *Nobles v. Astrazeneca Pharmaceuticals,* 48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003) Merck's integrated national marketing campaign downplayed, deemphasized and misrepresented the true risks of Vioxx to such a degree as to result in the overpromotion of Vioxx. (8/1/06 Tr. at 325:21-326:16; 399:21-400:14.) Merck instructed its sales representatives ("detailers") to treat negative findings about Vioxx's risks as "obstacles" and to suppress open discussion of such information within the medical community. (*Id.* at 342:1-343:22; 400:15-401:20.) As Dr. Avorn testified, Merck's news releases were "an inadequate and a deceptive way of presenting this

41

information to the press, to doctors, to patients, or to anyone." (*Id.* at 393:14-395:20.)

Merck's studies were published in such a way as to bury risk data (*Id.* at 368:10-20; 398:11-21) while other studies were never published at all by Merck. (*Id.* at 368:21-369:1.) Data from the APPROVe study was presented in an inaccurate and unfair manner, (*Id.* at 395:21-398:10), and even though Merck had data from Alzheimer's studies related to an increased mortality rate associated with Vioxx, Merck did not convey this data to physicians. (*Id.* at 398:22-399:2.) Dr. Avorn summed up all the major Vioxx publications by testifying,…. "I have never known a collection of papers on any one topic in which there has been such a constellation of skewed and distorted presentation of data in any drug studies that I've ever looked at." (*Id.* at 399:3-20.)

Merck's overpromotion is also illustrated in a FDA Warning Letter that Merck received in September 2001. (P1.0006; *See also* 8/14/2006 Tr. at 2421:1-2424:1 (Test. of Alise Reicin).) That letter references three facets of Merck's Vioxx promotional campaign that minimized the cardiovascular findings of VIGOR and misrepresented Vioxx's safety profile. According to the FDA, these activities and materials were "…false, lacking fair balance, or otherwise misleading…" (*Id.* at p.1, para. 1 and 3.) In the year 2000 Merck generated "a billion" media impressions that carried Merck's message that Vioxx does not cause heart attacks. (8/5/06 Tr. at 1277:1-25.)Me rck issued press released and videos giving the impression that Vioxx was safe from a cardiovascular standpoint and completely failed to mention that Vioxx could cause heart attacks, and that one explanation for the VIGOR results was that Vioxx caused the heart attacks. (*Id.* at 1289:12-1295:22);(296:23-1299:13.) Merck's integrated campaign amounted to overpromotion of the drug that minimized and deemphasized the true nature of the drug's risks. From this evidence the jury could reasonably have found that regardless of the knowledge of the prescribing physicians, even if Merck had provided complete and thorough warnings and disclosures, Merck's overpromotion had

42

the effect of eroding the warnings, rendering them inadequate.  (Jury Charge at 10.)

    **B.**    **The Evidence, Both Subjective and Objective, Establishes That Had Merck Provided an Adequate Warning, Dr. Mikola Would Not Have Prescribed Vioxx, and Mr. Barnett Would Not Have Continued to Take the Drug.**

Merck next argues that there is no evidence that a different warning would have changed Mr.

Barnett's doctors' decisions to prescribe Vioxx to him. Again, Merck is wrong. First, Dr. Mikola's

testimony unequivocally shows that had he been adequately informed as to the risks of Vioxx and

what Merck knew, he would not have prescribed Vioxx to Mr. Barnett:

915

```
3Q.   OKAY. NOW, GIVEN THE INFORMATION THAT YOU'VE READ IN
4EXHI BITS I'VE JUST SHOWN YOU AND THIS PROPOSED LABEL, IF YOU
5HAD  KNOWN THAT INFORMATION THAT I'VE SHOWN YOU AND YOU HAD SEEN
6A  LABEL LIKE THIS, WOULD YOU HAVE PRESCRIBED VIOXX TO
7MR.  BARNETT, GIVEN HIS HISTORY WITH POSSIBLE ANGINA, IN JANUARY
8OF  2000?
9A.   I BELIEVE I WOULD HAVE LEFT HIM ON FELDENE.
10 Q.  YOU WOULDN'T HAVE PUT HIM ON VIOXX?
11 A.  I DON'T BELIEVE SO, NO, SIR.
```

(8/14/06 Tr. at 915:3-11)

928

```
2Q.   AND GIVEN WHAT YOU'VE READ TODAY, THAT COMBINED WITH HIS
3ANG INA, WOULD YOU SAY THAT FROM EVERYTHING YOU'VE READ ABOUT
4VI OXX TODAY, THAT YOU PROBABLY WOULD NOT HAVE PRESCRIBED VIOXX
5FOR,   HIM  IF  YOU'D  KNOWN  ALL  OF  THIS  INFORMATION,  IN  2000?
6A.   HAVING KNOWN TODAY WHAT I KNOW ABOUT VIOXX, I WOULD NOT
7HAV  E PRESCRIBED IT.
```
(*Id.* at 928:2-7)

Based on this uncontroverted testimony alone the jury could have reasonably found that

Merck's inadequate warning was a cause of Mr. Barnett's injuries.

Second, assuming *arguendo* that Dr. Mikola did not testify as he did that the inadequate

warning caused him to prescribe the drug, the jury could still have reasonably found that Merck's

inadequate warning was a cause of Mr. Barnett's injuries. Proof that the inadequacy of a warning is

43

a proximate cause of injury is not limited to, nor dependent solely upon, the testimony of the prescribing physician. "To satisfy the burden of establishing warning causation, a plaintiff may introduce either objective evidence of how a reasonable physician would have responded to an adequate warning, or subjective evidence of how the treating physician would have responded." *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992); *Hermes v. Pfizer, Inc.*, 848 F.2d 66, 69-70 (5th Cir. 1988). Testimony from a prescribing physician that he or she appreciated the risks does not preclude a finding that the warnings were inadequate, nor does it preclude a finding of causation. *Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804, 808-809 (S.D. Tex. 1999); *Whitley v. Cubberly,* 24 N.C.App. 204, 210 S.E.2d 289, 207-208 (1974); *Stevens v. Parke-Davis & Co.*, (1973) 9 Cal.3d 51, 54-56, 507 P.2d 653. See also, *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971), (cited by the court in *Salmon v. Parke Davis* & Co., 520 F.2d 1359, 1363 (4th Cir. 1975)) ("Dr. Cucinotta stated, in effect, that he was adequately warned and understood the dangers and proper use of the drug. The jury was not obliged to believe the oral, uncorroborated testimony of either doctor. The evidence of Parke, Davis' efforts in promoting the drug would tend to refute Dr. Cucinotta's testimony in the sense that he may have been influenced by the efforts, perhaps even unconsciously, to prescribe the drug ...." *Id.* at 221-222.)

Merck's overpromotion and misleading statements about Vioxx, through its integrated marketing campaign, nullified the already insufficient warning.  Thus, even if Dr. Mikola had testified that he would still have prescribed Vioxx even if he had received an adequate warning (as is not the case here), the jury could still have reasonably found that Dr. Mikola was not in a position to fully appreciate Vioxx's risks and that he would have taken Mr. Barnett off of Vioxx had he been provided with an adequate warning.

Moreover, even where a risk is disclosed, and even where the prescribing physician testifies

44

he would have still prescribed the drug in light of the risk, liability is not foreclosed.  See *e.g., McNeil v. Wyeth,* 464 F.3d 364, 372-373 (5th Cir. 2006).  The court in *McNeil* also found it significant that the plaintiff testified she would not have taken the drug had she been made aware of the full extent of the risk.  See also *Hermes v. Pfizer, Inc.,* 848 F.2d 66, 69-70 (5th Cir.1988) ("Furthermore, Hermes herself testified that she would not have taken the Sinequan had she known that it could cause the injury she experienced." *Id.* at FN.20.)

Similarly, the actions that Mr. Barnett took after his heart attack shed light upon what he would have done if he had been adequately informed of the risks *before* his heart attack.  After his heart attack, Mr. Barnett initiated a conversation with Dr. Mikola about the potential cardiac risk from any of his medications he was taking (including Vioxx.) Dr. Mikola assured him that he had no concerns.  In March 2003, three years after the VIGOR study was published, and approximately one year after Merck changed the Precautions section of its label, Dr. Mikola informed Mr. Barnett that Vioxx did not increase the risk of heart attacks. (8/4/06 (Mikola) Tr. at 926:3-21.) This is strong evidence of Dr. Mikola's lack of awareness of the risks of Vioxx, and that the inadequacy of Merck's warnings was a cause of Mr. Barnett's injuries.  The fact that Mr. Barnett would not have taken Vioxx had he been warned of the cardiac risks is illustrated by the fact that once he learned about the potential risks of Vioxx, he again initiated a conversation with Dr. Huberty, one of his physicians, and stopped taking Vioxx at that point.  Further evidence that he would not have taken Vioxx if his doctors had warned him of the heart attack risk is that he stopped taking Metabolife when he learned that drug had the potential for adverse effects on the heart. (8/7/06 Tr. at 1552:4-1554:15.)

Mr. Barnett also testified that if Dr. Mikola had known of the risks of Vioxx and wanted to put him back on Feldene, he would have been happy to revert to Feldene for his pain relief medication. (8/7/06 Tr. at 1556:23-1557:11.)  Under cross-examination by Mr. Goldman, Mr.

45

Barnett was shown the label for another NSAID, Mobic, which contained a detailed black-box warning of cardiovascular risks. Mr. Barnett testified that upon learning of the information in that label, he immediately stopped taking Mobic. He also testified that if he had ever known of the risks he would not have taken the drug. (8/8/06 Tr. at 1603:21-1605:8; 1607:7-14.)

### C. The Weight of the Evidence is That in All Probability Vioxx Caused Mr. Barnett's Heart Attack and Accelerated His Atherosclerosis.

Merck argues that 'the weight of the evidence is that Mr. Barnett's use of Vioxx did not accelerate his atherosclerosis or cause his heart attack,' and 'the specific causation opinion of Dr. Zipes amounts to nothing more than a temporal proximity argument.' The cases relied upon by Merck are either completely off point (*Ohio v. U.S. Dept. of Interior*, 880 F.2d 432, 473 (D.C.Cir.1989) (criteria for determining whether oil spills and hazardous substance releases caused injury to natural resources ) or involved obvious flaws in the experts' methodologies. *E.g. McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1242-1243 (11th Cir. 2005)( Plaintiffs' expert had no opinion about dose that could would cause injury.)("He only said that any amount of *Metabolife* is too much, which clearly contradicts the principles of reliable methodology...."); *Moore v. Ashland Chem. Ins.*, 151 F.3d 269, 278 (5th Cir.1998)( Expert relied solely upon Material Safety Data Sheet from the manufacturer stating that the contents of the drum in question were 'irritating to the lungs.') See also, *Curtis v. M&S Petroleum*, Inc., 174 F.3d 661, 670 (5th Cir. 1999), distinguishing *Moore*, supra. (Trial court abused its discretion in excluding the plaintiffs' expert's specific causation opinion.)("[A] temporal connection is entitled to greater weight when there is an established scientific connection between exposure and illness or other circumstantial evidence supporting the causal link.")

Unlike the expert in *Moore* and the other cases cited by Merck, the Plaintiffs' experts here

46

relied upon a broad spectrum of reliable scientific evidence demonstrating that Vioxx causes heart

attacks as well as atherosclerosis, and that, in all likelihood Vioxx caused Mr. Barnett's heart attack

and accelerated his atherosclerosis. Dr. Zipes described in detail the basis of his opinions and in

order to provide the court with an outline the Plaintiff categorized the issues Dr. Zipes discussed:

1. Cause of Heart Attacks in General – (8/8/06 Tr. at 672: 2-17);
2.  Pharmacology of Cox-2 Inhibitors – (8/8/06 Tr. at 672:9-25 to 1677:1-7);
3. Mechanism of Action for Vioxx – (8/8/06 Tr. at 1677:9-25 to 1679:1-9);
4. Vioxx accelerates Plaque Build-up – (8/8/06 Tr. at 1679:10-25 to 1683: 1-13);
5. Vioxx Inhibits Prostacyclin – (8/8/06 Tr. at 1683:14-25 to 1685:1-17);
6. Vioxx Accelerates Atherosclerosis – (8/8/06 Tr. at 685:18-23);
7.  Basis of Opinion That Vioxx Accelerates Atherosclerosis – (8/8/06 Tr. at 1685:23-25 to1692:1-3);
8.  Dr. FitzGerald and Others Support that Vioxx Accelerates Atherosclerosis – (8/8/06  Tr. at 1692:7-25 to 1697);
9. The Biologic Plausibility for Vioxx Accelerating Atherosclerosis –(8/8 /06 Tr. at 1697:11-25 to 1700:1-16);
10. APPROVe Follow-up Data Provide Evidentiary Support in Humans of Vioxx Accelerating Atherosclerosis – (8/8/06 Tr. at 1700:17-25 to 1704:1-23);
11. FDA Advisory Committee Votes 32-0 that Vioxx Significantly Increases the Risk of Heart Attack – (8/8/06 Tr. at 1704:24-25 to 1705:1-23);
12. VIGOR Data Provides Evidence of Vioxx Causing Heart Attacks – (8/8/06 Tr. at 1705:24-25 to 1710:1-10);
13. Protocol 112 – Shows Vioxx Significantly Increases Blood Pressure More Than Any Other NSAID – (8/8/06 Tr. at 1709:18-25 to 1711:1-6);
14. APPROVe Clinical Trial Shows Blood Pressure Spikes Which Increase the Relative Risk of Heart Attacks and Atherosclerosis Acceleration – (8/8/06 Tr. at 1711:1-7 to 1715:1-3.)

Merck chose not to offer any expert testimony to challenge Dr. Zipes' opinions. In response

to the scientific evidence, including the opinions of two highly qualified experts, scientific literature,

and clinical trial data as well as Merck internal documents, Merck did not offer any testimony from a

qualified cardiologist in rebuttal. In fact, Merck never called its own designated expert cardiologist

Paul Roach, M.D. The only reasonable explanation for the defense failing to call its own expert is

that he could not rebut the opinions of Plaintiffs' experts.

As to specific causation, Plaintiff offered opinions from Dr. Zipes and Dr. Popma, and again,

Merck offered no expert testimony in rebuttal. (8/8/06 Tr. at 1666:11-1667:6; *See also*, *Id.*  Tr. at 1715:15-24; 1734:23-1735:15.) Prior to taking Vioxx for 31 months, Mr. Barnett's risk of a heart attack was no more than approximately 2%. (*Id.* Tr. at 1715:25-1717:1.)  In January 2000, Mr. Barnett underwent a cardiolite stress test which showed nothing more than "mild ischemia" in one minor vessel in his heart. (*Id.* Tr. at 1718:22-1724:24.)  Nevertheless, after taking Vioxx for 31 months during which time he had blood pressure spikes like the patients in the APPROVe study, he suffered a heart attack and underwent 5-way bypass surgery.

After his heart attack and bypass surgery in September 2002, Mr. Barnett continued taking Vioxx for another 24 months for a total of 55 months.  While on Vioxx, he suffered a second heart attack. (*Id.* Tr. at 1726:10-1727:2.)  As of May of 2006 Mr. Barnett had 2 occluded vein grafts from the underlying bypass surgery, which were likely closed due to the acceleration of his plaque caused by Vioxx. (*Id.* Tr. at 1722:25-1726:9.)  Ultimately, the 2 occluded vein grafts required stents and additional cardiovascular surgery in July 2006.  (8/8/06 Tr. at 1727:3-25 - 1729:2.)  Contrary to Merck's assertions, Dr. Zipes described in detail Mr. Barnett's damages from Vioxx, as well as his current condition (*Id.* Tr. at 1728:21-1733:18), including the fact that Mr. Barnett in all likelihood has a reduced life expectancy of 9-10 years.  (8/8/06 Tr. at 1733:19-1734:23.)

Offering no expert testimony in rebuttal, Merck was content to argue as it does now, that Mr. Barnett had other risk factors and coronary artery disease ("CAD") before he took Vioxx. Merck contends that to establish specific causation, plaintiff must "rule out" the possibility that his heart attack was caused by something other than Vioxx." This is a misstatement of the law.  "Obvious alternative causes need to be ruled out.  All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted." *Heller v. Shaw Industries, Inc.,* 167 F.3d 146 (3d Cir. 1999), citing Professor Capra, Reporter to the Advisory Committee on the Federal Rules

48

of Evidence. ("[T]o require the experts to rule out categorically all other possible causes for an injury would mean that few experts would ever be able to testify…. Obvious alternative causes need to be ruled out. All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted." Daniel J. Capra, *The* Daubert *Puzzle,* 32 Ga.L.Rev. 699, 728 (1998).); See also *Asad v. Continental Airlines, Inc.*, 314 F.Supp.2d 726, 740 (N.D. Ohio 2004) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury. *Jahn v. Equine Services, PSC,* 233 F.3d 382, 390 (6th Cir. 2000). The fact that several possible causes might remain "uneliminated" goes to the accuracy of the conclusion and not to the soundness of the methodology. *Id")*

Federal circuit courts of appeal have found differential diagnosis to be a reliable scientific method of determining causation in an individual case, even when physicians do not rule out every potential cause of the patient's illness. *See e.g., In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 759 (3rd Cir. 1994)(finding "sometimes differential diagnosis can be reliable with less than full information and, to the extent that the district court concluded otherwise, we hold that it abused its discretion"); *Heller v. Shaw Industries, Inc.,* 167 F.3d 146 (3d Cir.1999)(not addressing every possible alternative cause in a differential diagnosis did not render expert's opinion inadmissible); *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194 (4th Cir. 2001) (recognizing that a medical expert opinion based upon differential diagnosis normally should not be excluded because "the opinion fails to rule out every possible alternative cause of a plaintiff's illness.")(citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir. 1999).)

The cases cited by Merck almost all involved situations where the experts could not even 'rule in' the defendant's product, let alone 'rule out' other more likely causes. *E.g. Wheat v. Pfizer, Inc.,* 31 F.3d 340, 342-43 (5th Cir.1994) (Despite evidence that the decedent had been exposed to

FAC Resp. Exhibit B -- 2122

hepatitis, and testimony by her treating physicians that she had a viral hepatitis unrelated to medication, plaintiffs offered no evidence or expert testimony excluding it as a cause. *Id.* at 342-343); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F.Supp.2d 1118, 1133 (D. Minn.2003) (Expert conceded he was aware of no published literature supporting his opinion on causation and could not 'rule in' the defendant's products); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*, 22 F.Supp.2d 942, 952 (E.D. Ark. 1998)("[E]xperts must turn to epidemiological studies, in vitro studies, animal studies, and other indirect methods in an attempt to make the connection.FN5 Here, there are no such studies." *Id.* at 952.); *Turner v. Iowa Fire Equipment Co.,* 229 F.3d 1202, 1208 (8th Cir.2000)(Physician "admitted that he made no attempt to consider all the possible causes, or to exclude each potential cause until only one remained, or to consider which of two or more non-excludable causes was the more likely to have caused the condition." *Id.* at 1208.); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 610 (D. N.J. 2002)(Expert offered no reliable methodology for ruling out alternative causes, and defendant presented testimony of experts demonstrating that smoking was a greater risk factor for leukemia than PCE exposure.)

Unlike the cases cited by Merck, Plaintiff's experts provided substantial reliable scientific evidence of both general and specific causation. Plaintiff's experts were able not only to 'rule in' Vioxx as the most probable cause of Mr. Barnett's heart attack and increased atherosclerosis, but to rule out each of the other 'possible' causes which Merck has alleged. In January 2000, Mr. Barnett's treating physician, Dr. Mikola, felt that Barnett was at low risk for a coronary event. (8/7/06 Tr. at 1493:6-1493:23.) The January 2000 Cardiolite established that Mr. Barnett had superb exercise tolerance, only mild disease located in only one small area of his heart, and that he had an excellent prognosis. (*Id.* at 1342:15-1343:16; 1344:7-1345:18; 1445:25-1446:10.) Contrary to Merck's assertions, as of January of 2000 Mr. Barnett had minimal coronary artery disease in his five major

50

vessels. (*Id.* at 1353:21-1355:15; 1447:15-1449:4.)   According to Dr. Zipes, when Mr. Barnett first started Vioxx he had a 2% or less chance or having a heart attack within the next three years. (*Id.* at 1349:20-1350:19; 1352:19-1353:20; 1445:25-1446:10; 1486:18-1486:22.)

Between January 2000 and Mr. Barnett's heart attack in September 2002, Mr. Barnett took steps to further decrease his risk such as reducing his LDL cholesterol levels, which dramatically slows the progression of plaque. (*Id.* at 1357:24-1361:8.) Nevertheless, in September 2002, at the time of his heart attack,which  was the result of plaque build-up and a blood clot, Mr. Barnett had multiple blockages that were not present when he began taking Vioxx in January of 2000. (*Id.* at 1364:2-1369:11.)

Dr. Popma testified that after Mr. Barnett's heart attack and bypass surgery in September 2002, as of his July 2003 Cardiolite exam his bypass grafts were working and Mr. Barnett was almost back to the cardiac level he was back in January 2000.  At that time the bypass grafts were still open and were not blocked or occluded. (*Id.* at 1372:18-1373:22.) From the time of Barnett's heart attack and bypass surgery in 2002 until July 2006, the trend of his LDL cholesterol was a progressive decline to such a degree that since October 2005 his LDL levels have been in the range where plaque begins to regress. (*Id.* at 1360:18-1361:8.) Mr. Barnett's LDL cholesterol levels were so low from 2002 to 2006 that a dramatic progression of blockages within the arteries would not be expected during that time frame. (*Id.* at 1362:3-1362:14.) This evidence supported Dr. Popma's conclusion that his cholesterol levels played little, if any, role in accelerating his plaque build-up.

Notwithstanding the decrease in his cholesterol levels, in July 2004 two of the Plaintiff's vein grafts occluded.  A May 2006 CT angiogram showed that Mr. Barnett's saphenous graft to the Ramus branch and one of the sequential limbs of a second graft had completely occluded. This rapid progression of plaque occurred at a time when Barnett's LDL was well controlled.  The May 2006

51

Cardiolite showed that Barnett had experienced new heart muscle damage since the original heart attack in September 2002 (*Id.* at 1377:6-1383:14) and that in comparison with the January 2000 and July 2003 examinations, Mr. Barnett had a marked reduction in exercise tolerance and a decreased heart rate. (*Id.* at 1477:1-1478:6.) Further, from September 2002 to July 2006 (a time period when Mr. Barnett had reduced his LDL levels to the point of significantly slowing and then reversing plaque development), he experienced unexpected, dramatic progression of plaque to the point of complete occlusion or blockage in four new vessels, including two of the grafted vessels. (*Id.* at 1383:17-1389:9; 1391:10-1394:25; 1494:9-1495:18.) Mr. Barnett's rapid plaque progression from 2002 to 2006 was very unusual and not explained by traditional risk factors, particularly since he was lowering his LDL levels to the point of reversing plaque development. (*Id.* at 1396:18-1397:8.) In summary, there was more than sufficient evidence to rule out the risk factors and rule in Vioxx as the cause of Mr. Barnett's heart attack and accelerated atherosclerosis.

**VI.     CONCLUSION.**

This Court was entirely correct when it concluded that the jury's findings on liability are reasonable on the negligent failure-to-warn and deceit-by-concealment claims. Although the Plaintiff believes the jury's damages award in its entirety is appropriate, if the Court believes a new trial is appropriate, the Plaintiff should be permitted the option of either accepting a remittitur in an amount the Court deems reasonable, or a new trial limited to damages.

Date:  October 31, 2006                          Respectfully submitted,


By:   /s/ MARK P. ROBINSON, JR.
               Mark P. Robinson, Jr.
               Kevin F. Calcagnie
               Carlos A. Prietto, III
               Ted B. Wacker
               Lexi W. Myer

FAC Resp. Exhibit B -- 2125

ROB   INSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California  92660
Telephone:  (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

53

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants'

Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs'

Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No.

8A, and that the foregoing was electronically filed with the Clerk of the Court of the United

States District Court for the Eastern District of Louisiana by using the CM/ECF system which

will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657

on this 31st day of October, 2006.


By:  /s/ MARK P. ROBINSON, JR.
      MARK P. ROBINSON, JR.
      State Bar No. 054426
      Attorney for Plaintiff
      Robinson, Calcagnie & Robinson

FAC Resp. Exhibit B -- 2127

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO.  02:06CV00485 |

**PLAINTIFF GERALD BARNETT'S MEMORANDUM IN OPPOSITION TO MOTION OF MERCK & CO., INC. ("MERCK") FOR A NEW TRIAL**

## TABLE OF CONTENTS

INTRODUCTION. ................................................................................................... 1

1.   MERCK'S RENEWED MOTION FOR NEW TRIAL IS AN IMPROPER MOTION
     FOR RECONSIDERATION, AND IS BASED SOLELY UPON ARGUMENTS
     PREVIOUSLY RAISED IN THE BRIEFING AND ARGUMENT ON ITS
     PREVIOUS MOTION FOR NEW TRIAL. ...................................................................2

2.   THERE WAS MORE THAN SUFFICIENT EVIDENCE IN THE RECORD
     FOR THE COURT TO INVOKE ITS DISCRETION IN GRANTING
     REMITTITUR. ................................................................................................6

3.   THE COURT CORRECTLY EXERCISED ITS DISCRETION IN CALCULATING
     AN APPROPRIATE AMOUNT FOR A REMITTED AWARD. ...................................10

CONCLUSION.................................................................................................... 17

ii

## TABLE OF AUTHORITIES

**CASES**

*Betancourt v. J.C. Penney Co.,*
    554 F.2d 1206, 1209 (1st Cir. 1977)................................................................3, 13

*Boan v. Blackwell,*
    343 S.C. 498, 541 S.E. 2d 242 (S.C. 2001) ....................................................10

*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.,*
    312 F.3d 1292, 1296 n. 3 (10th Cir. 2002) ....................................................4

*Bonura v. Sea Land Service, Inc.,*
    505 F.2d 665, 669 (5th Cir.1974) ..................................................................11

*Daves v. Cleary,*
    355 S.C. 216, 584 S.E.2d 423, 430 (S.C. App. 2003) ....................................11

*De Centeno v. Gulf Fleet Crews, Inc.,*
    798 F.2d 138, 142-143 (5th Cir.1986)............................................................12

*Denton v. Morgan,*
    136 F.3d 1038, 1046 (5th Cir.1998) ...............................................................11

*Edwards v. Lawton,*
    244 S.C. 276, 136 S.E.2d 708, 710 (1964) ....................................................15

*Gautreaux v. Insurance Company of North America,*
    811 F.2d 908 (5th Cir.1987) ........................................................................3, 14

*Harris v. Gusman,*
    Slip Copy, 2007 WL 1812613, *1 E.D.La., June 18, 2007
    (Civil Action No. 05-4992) ...........................................................................4

*In re Vioxx Products Liability Litigation,*
    230 F.R.D. 473, 474-475 E.D.La., July 22, 2005 (No. MDL 1657)................4

*Iwai Co. v. Occidental Crude Sales, Inc.,*
    729 F.2d 1530, 1547-48 (5th Cir. 1984)........................................................13

*King v. Ames,*
    179 F.3d 370 n. 8 (5th Cir. 1999) ..................................................................11

FAC Resp. Exhibit B -- 2130

*Knight v. Texaco, Inc.,*
    786 F.2d 1296, 1299-1300 (5th Cir. 1986) ...................................................................... 12

*LeClerc v. Webb,*
    419 F.3d 405 n. 13 (5th Cir. 2005) ..................................................................................... 4

*Lowe v. General Motors Corp.,*
    624 F.2d 1373, 1383 (5th Cir. 1980) ................................................................................ 10

*Maxey v. Freightliner Corp.,*
    722 F.2d 1238,1242 (5th Cir. 1984) ................................................................................. 12

*Mims v. Florence Co. Ambulance Serv. Comm'n,*
    296 S.C. 4, 370 S.E.2d 96 (S.C. App. 1988) ................................................................... 15

*Murray v. Bank of America, N.A.,*
    354 S.C. 337, 345, 580 S.E.2d 194 (S.C.App. 2003) ...................................................... 15

*Osburn v. Anchor Laboratories, Inc.,*
    825 F.2d 908, 919 (5th Cir. 1987) ............................................................................... 14-15

*Shu-Tao Lin v. McDonnell Douglas Corp.,*
    742 F.2d 45, 49 (2d Cir. 1984) ................................................................................... 3, 12

*Templet v. HydroChem Inc.,*
    367 F.3d 473, 479 (5th Cir. 2004) ..................................................................................... 4

*United States v. Flores,*
    981 F.2d 231, 237 (5th Cir. 1993) ................................................................................... 5

*Vogler v. Blackmore,*
    352 F.3d 150,156 (5th Cir. 2003) .................................................................................... 11

**STATUTES**

Federal Rule of Civil Procedure 59 ................................................................................. 2, 4

iv

## INTRODUCTION

For the second time Merck has filed a motion for new trial on all issues. Realizing that this recent motion is just a rehash of arguments previously made in briefing and oral argument on its first motion, Merck has attempted to rephrase its arguments regarding the propriety of remittitur to make it appear that this renewed motion is somehow based upon circumstances unforeseen prior to the Court's order of June 5, 2007, which denied Merck's motion in part and issued a remittitur.

However, on closer analysis the Defendant's argument is essentially that Merck did not anticipate the Court would not accept the arguments it made the first time around.  Merck was well aware during briefing and argument on the first motion that Plaintiff has contended all along that a remittitur is appropriate, and that while the Court found the verdict to be excessive, it did not find it to be the result of passion or prejudice.  Merck has been aware of those arguments since at least last October. That is why Merck chose to argue in the briefing on the first motion, and in oral argument, that the Court had insufficient facts upon which to base the amount of a remittitur- the same argument which forms the basis of the current motion. ("A court cannot remit an award when there is insufficient evidence on which to base the amount of remittitur. … Thus, the Court has no basis upon which to decide what damages Mr. Barnett suffered, let alone what they are worth.  (Reply of Merck in support of motion for new trial on all issues, 3/8/07, at 6-7))

There is nothing about the Court's order of June 5, 2007 which changes those arguments, nor which raises new issues.  What Merck is left with is an improper motion for reconsideration of arguments which have already been briefed, argued and ruled upon.  The Court's decision was entirely correct, and in view of the fact Merck was successful in reducing a $51 million verdict to

1

$1.6 million, the Court was more than fair to the Defendant. Merck's motion should therefore be summarily denied.

1.   **MERCK'S RENEWED MOTION FOR NEW TRIAL IS AN IMPROPER MOTION FOR RECONSIDERATION, AND IS BASED SOLELY UPON ARGUMENTS PREVIOUSLY RAISED IN THE BRIEFING AND ARGUMENT ON ITS PREVIOUS MOTION FOR NEW TRIAL.**

For the second time Merck moves for a new trial on all issues, pursuant to Federal Rule of Civil Procedure 59. Although styled as a "Motion for New Trial," Merck's motion is clearly a motion for reconsideration, as it is simply repeating arguments made in its first motion for new trial on all issues. Merck is forced to concede this fact in its brief when it says, "A new trial on all issues is warranted for the reasons articulated in Merck's September 5, 2006 motion for a new trial on all issues - and, in that sense, this motion seeks reconsideration of the Court's June 5, 2007 Order denying in part and deferring ruling in part on Merck's September 5, 2006 motion." (Motion at 2.)

However, Merck attempts to skirt around the fact this is a motion for reconsideration and merely a rehash of prior arguments, by implying that the Court's recent order somehow raises new issues or changes the scope of the previous arguments. It does neither. Merck's brief has one heading and essentially makes one argument- an argument which it already made in the briefing and in oral argument on its first motion- "Because the jury's compensatory damages award cannot be separated into 'reasoned' and 'excessive' portions, the Court's remittitur was inappropriate." (Motion at 3.)

Specifically, Merck contends that "there is insufficient evidence in the record on which to base a remitted compensatory damages award" and therefore it is impossible for the Court to remove the excess portion of the verdict. (Motion at 7)

2

Merck also contends that "Because the jury's findings did not specify which injuries it intended to compensate, let alone the amount of compensation it awarded for each injury, the Court had no basis upon which to decide what damages Mr. Barnett suffered, or what they were worth," (Id.) and that "Because there is no way to determine what damages the jury concluded Mr. Barnett suffered, let alone what compensation it awarded for each component of his damages, there is no way to lop off - or even calculate - the "excessive" part of the jury's award. Nor is there any way to justify a reduction of the award to $600,000 by reference to the evidence in the record or the jury's findings." (Motion at 5)

Although it has rephrased them, Merck made these identical arguments before, citing the same cases, (e.g.. *Gautreaux v. Insurance Company of North America*, 811 F.2d 908 (5th Cir.1987); *Betancourt v. J. C. Penney Co.*, 554 F.2d 1206, 1209 n.5, 1210 (1st Cif. 1977); *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)) in its reply filed 3/8/07:

> "Even if remittitur were a proper remedy under these circumstances - which it is not - there is no principled basis upon which the award should be reduced to plaintiff's suggested figure of $10 million dollars, as opposed to any other number. A court cannot remit an award when there is insufficient evidence on which to base the amount of remittitur. ...
>
> Barnett made no effort to quantify his damages at trial, and the jury made no findings on either the extent or quantum of his damages, other than the excessive $50 million award. In particular, the jury did not specify which of Mr. Barnett's claimed damages (first heart attack, increased atherosclerosis, second alleged heart attack, alleged reduced life expectancy, etc.) it ascribed to Merck. Which, if any, of these damages is attributable to Merck was hotly contested. Thus, the Court has no basis upon which to decide what damages Mr. Barnett suffered, let alone what they are worth. Under the circumstances, remittitur is prohibited.." (Reply of Merck at 6-7)

As can be seen, these are issues which were thoroughly briefed and argued by counsel, and which Merck is now seeking to rehash and re-debate, after the Court has already rejected the

3

same arguments. Merck has advanced no reason why the Court should entertain this motion. The Federal Rules of Civil Procedure do not expressly recognize a motion for reconsideration. See *Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, 312 F.3d 1292, 1296 n. 3 (10th Cir. 2002). If the court has entered a final order or judgment, then a motion for reconsideration is considered a motion to alter or amend the judgment under rule 59(e). See *id.* at 1296.

"Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004); A motion for reconsideration may not be used to rehash rejected arguments or introduce new arguments.") *LeClerc v. Webb*, 419 F.3d 405, n.13 (5th Cir. 2005) "[R]econsideration ... should not be used to relitigate old matters, raise new arguments, or present evidence that could have been raised prior to the entry of judgment." *Harris v. Gusman, Slip Copy*, 2007 WL 1812613, *1 E.D.La., June 18, 2007 (Civil Action No. 05-4992.) "[M]otions for reconsideration are not to be used "to re-debate the merits of a particular motion." *In re Vioxx Products Liability Litigation*, 230 F.R.D. 473, 474-475 E.D.La., July 22, 2005 (No. MDL 1657).

As the court stated in *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir.2004):

> "A Rule 59(e) motion "calls into question the correctness of a judgment." In re Transtexas Gas Corp., 303 F.3d 571, 581 (5th Cir.2002). This Court has held *479 that such a motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment. Simon v. United States, 891 F.2d 1154, 1159 (5th Cir.1990). Rather, Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." Waltman v. Int'l Paper Co., 875 F.2d 468, 473 (5th Cir.1989) (internal quotations omitted). Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly. Clancy v. Employers Health Ins. Co., 101 F.Supp.2d 463, 465 (E.D.La.2000) (citing 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice & Procedure § 2810.1, at 124 (2d ed.1995))."

4

*United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993), cited by Merck, is inapposite, and in fact, supports denial of the present motion. (Affirming trial court's dismissal of second motion to vacate heroin distribution sentence as abusive, where motion "primarily rehashed" claims asserted in prior motion.)

Merck concedes that it "has addressed the propriety of remittitur before, in its reply brief in support of its September 5, 2006 motion for a new trial on all issues." However, Merck argues that it "did not make the precise argument presented in this brief - because, at the time, it understood the Court's August 30, 2006 ruling to be, in relevant part, that the jury's compensatory damages award was the result of passion or prejudice."

This is a distinction without a difference. First of all Merck has not explained, and cannot explain, how the Court's ruling of June 5, 2007 raises any new issues which were not already covered in the briefing and argument on Merck's motion for new trial. The parties addressed the issue of passion or prejudice at length, as well as the import of the Court's statements in its August 30, 2006 order. Plaintiff contended from the very outset of his opposition to the first motion for a new trial that the verdict was not the result of passion or prejudice, that the Court found the award to be merely excessive, and that remittitur was the appropriate remedy.

Merck acts as if it is surprised by the remittitur and the Court's finding that the award was excessive but not "passionate," when Plaintiff made it very clear that the Court was merely quoting a case in the August 2006 order and not actually making a finding of passion or prejudice. This was addressed not only in the briefing on original motion, but in oral argument as well. In short, Merck's motion is based upon nothing more than the patently meritless claim that it somehow could not have anticipated the Court would accept the Plaintiff's position.

5

The June 5 order merely confirms that Plaintiff was correct and that the Court rejected Merck's arguments on that issue.  Merck is simply reasserting arguments it has already made, and the Court's recent order clarifying its earlier ruling does not change Merck's argument, as is evident form the fact the Defendant continues to assert that "even with that clarification, remittitur is impermissible in this case."  (Motion at 20)  Merck has advanced no sound reason why it should be permitted to reassert arguments about issues which it has already briefed and argued, and which the Court has already ruled upon.

## 2. THERE WAS MORE THAN SUFFICIENT EVIDENCE IN THE RECORD FOR THE COURT TO INVOKE ITS DISCRETION IN GRANTING REMITTITUR

Merck argues that "[t]here is scant evidence of damages in the record."  The record shows just the opposite.  There is in fact ample evidence to support a remitted award of $600,000 in compensatory damages.  Not only does the record provide proof that as a result of taking Vioxx Mr. Barnett suffered a heart attack in September 2002 requiring a 5-way open-heart CABG surgery, but it also provides evidence of the related sequelae, including an accelerated development of atherosclerosis, a second heart attack resulting in occluded veins, further angiogram and stent placement, decreased exercise tolerance, the possibility of future surgical intervention and a loss of life expectancy of nine to ten years.

Over and above the medical expenses incurred to undergo these surgical procedures, the pain and suffering the Plaintiff has endured from any one of these conditions, let alone a combination of them, alone justify an award of $600,000 in damages.   A brief review of the trial record indicates that before Mr. Barnett began taking Vioxx in January 2000, he had five non-occluded coronary vessels.  As Dr. Popma testified, a Cardiolite exam taken on January 24, 2000,

6

showed that Mr. Barnett had only one small area in his heart that had a reduction in blood flow – the rest of his heart was functioning normally. (8/7/06 Tr. at 1344:19-1345:5)  Dr. Zipes testified that in 2000, Mr. Barnett had only a 1-2% risk of having a heart attack over the following three years (8/8/06 Tr. at 1716:18-1717:1).  Yet despite his low risk in 2000, Mr. Barnett suffered a heart attack just a short time later on September 6, 2002, after taking Vioxx for 31 months.

Dr. Mark Karavan, Mr. Barnett's treating cardiologist, testified that the catheterization performed during the Plaintiff's hospitalization showed six-vessel stenosis and he therefore recommended a CABG surgery.  (8/4/06 Tr. at 1001:1-18)  Compared with his January 2000 Cardiolite exam, Mr. Barnett's rapid progression of atherosclerosis in such a short period of time was a phenomenon that Dr. Zipes stated he had never seen happen in his career.  (8/8/06 Tr. at 1715:10-24)  After considering all of Mr. Barnett's possible risk factors, Dr. Zipes concluded that this accelerated atherosclerosis could only have been caused by Vioxx.  (Id. at 1716:18-1717:1; 1734:25-1735:14)

Mr. Barnett's resulting open-heart CABG surgery was a painful, invasive procedure.  At trial, Mr. Barnett's cardiac surgeon, Dr. Bryan, described the surgery in detail:

> 2200
> 25   Doctor, if you could kindly for the jury explain
>
> 2201
> 1   what you did during the surgery?
> 2   A.   Well, basically what we do during the surgery is make an
> 3   incision down the middle of the chest, starts a little bit
> 4   below the notch in your neck and goes just to the end of your
> 5   chest where you feel the little bit of cartilage at the end of
> 6   your chest.  At the same time that is going on, typically, the
> 7   physician assistant is taking vein out of one of the legs.  And
> 8   back in 2002 that would have been done with an open incision
> 9   all the way up and down the leg.
>
> . . .

7

2201

15  A.   While he's doing that, I would take the mammary artery off
16  the chest wall.  We lifted the left side of the sternum up a
17  little bit with a retractor and then take down the artery off
18  the chest wall.
19       Then, typically, after I have all of the conduit vein
20  artery harvested, we will go on the heart/lung machine by
21  putting a canula in their aorta and a canula in their right
22  atrium so that we can stop their heart.  And we put a clamp on
23  their aorta, stop the heart, and then we're going to sew on
24  these grafts beyond the blockage.  We don't do anything to the
25  blockage.  We go beyond it.

2202

1  Q.   So you don't remove these vessels?
2  A.   No.  We don't remove any of the plaque.  Typically, we
3  don't do that.  Typically we don't do that.
4       Then after we finish making all of the connections to
5  restore blood flow.  We take the clamp off the aorta and the
6  heart starts beating, and we put some drains in, typically put
7  little some wires on the surface of the heart to keep the – if
8  their heart rate is a little slow, so we can keep them a little
9  faster and – and then close their chest up and take them back
10  to the ICU.

(8/11/06 Tr. at 2200:25-2201:9; 2201:15-2202:10)

Because of the serious nature of open-heart surgery and its effect on his body, it took Mr.
Barnett six weeks to sufficiently heal from the incisions in his chest and down the entire length of
his leg.  Once healed, he participated in a program of rehabilitation to build up the muscles in his
chest and legs, and his overall endurance.  (8/8/07 Tr. at 1582:22-1583:17)

Initially, the September 9, 2002 CABG surgery helped to re-open the vessels in Mr.
Barnett's heart.  However, in the months following and as Mr. Barnett continued to take Vioxx,
he experienced further injuries to his heart.  Both Dr. Popma and Dr. Zipes testified that two of
the Plaintiff's vein grafts which had been open in September 2002 after the CABG surgery, had
re-occluded.  (8/7/06 Tr. at 1377:7-14; 1388:8-1389:9 and 8/8/06 Tr. at 1726:10-20)  Dr.

8

Karavan performed a stent placement in one of the occluded vein grafts in 2006.  (8/7/06 Tr. 1481:8-16)  Dr. Popma testified that between 2002 and 2006, there were four areas of Mr. Barnett's heart that occluded.  (Id. at 1388:8-1389:6)  These blockages occurred even though Mr. Barnett had lowered his cholesterol to the point where, as Dr. Popma stated, "the plaque should be getting – regressing, going away." (Id. at 1389:7-9)

In addition to the occluded vein grafts, Dr. Zipes determined from a set of May 2006 physical examinations of Mr. Barnett's heart, that he more likely than not suffered a second heart attack between 2003 and 2006.  (8/8/06 Tr. at 1726:16-1727:1).  Dr. Popma and Dr. Zipes added that there was scarring and damage to the heart muscle, a new abnormality that was not present in 2003, and was consistent with a second heart attack.  (8/7/06 Tr. at 1379:20-1382:25 and 8/8/07 Tr. at 1730:17-1731:18)

The effect of these injuries on Mr. Barnett is an overall decrease in energy level.  (8/7/06 Tr. at 1519:23-1520:6; 1525:23-1526:10)  He also suffers from an increased plaque burden that is worrisome to Dr. Karavan, who stated that Mr. Barnett's prognosis is not the same as someone with less diffuse disease.  (8/5/06 Tr. at 1153:15-1154:11)  Even though Mr. Barnett was extremely diligent in modifying his risk factors – Dr. Karavan stated that Mr. Barnett did more than 99% of his patients in terms of modifying risk factors (Id. at 1153:6-10) – he still experienced multiple, ongoing, and severe injuries due to Vioxx.  Dr. Zipes testified that because of all of the damage to Mr. Barnett's heart, his life expectancy has been reduced by nine or ten years. (8/8/06 Tr. at 1733:24-1734:16; 1734:25-1735:14)

In sum, the record contains an abundance of evidence to justify a compensatory damage award of $600,000.  Neither side disputes that Mr. Barnett had the September 2002 heart attack.  The general damages from this injury alone justify the award.  In describing the heart attack, Dr.

9

Popma testified that a blood clot "stopped the flow, caused the chest pain, caused part of his heart muscle tissue to die, and cut off the circulation to the distal portion of this vessel." (Tr. 8/7/06 at 1366:13-15) Dr. Bryan confirmed that once heart muscle tissue has died, it cannot ever be healed (Tr. 8/11/06 at 2202:11-15)

Moreover, Mr. Barnett's damages are not confined to physical injuries. He understandably fears a future heart attack and premature death, and will always carry with him this significant emotional burden. *Boan v. Blackwell*, 343 S.C. 498, 541 S.E. 2d 242 (S.C. 2001) ("Loss of enjoyment of life" is a compensable element of damages.) At trial, Mr. Barnett testified that the fear of further injury and death causes him concern over leaving his wife and family behind were he to die prematurely. (Tr. 8/8/06 at 1594:11-17) Evidence of this apprehension and anxiety unquestionably supports the Court's remitted award.

## 3.   THE COURT CORRECTLY EXERCISED ITS DISCRETION IN CALCULATING  AN APPROPRIATE AMOUNT FOR A REMITTED AWARD.

Merck is correct that the 5th Circuit applies the maximum recovery rule.  The rule provides that the trial court fix the remitted amount based upon what the court feels is appropriate from the record.  *Lowe v. General Motors Corp.*, 624 F.2d 1373, 1383 (5th Cir. 1980):

> "In proceeding to fix the remittitur, then, the Court will be guided by the principle that the plaintiff who has been awarded an excessive amount by one jury should have the option of taking the maximum amount that the jury could properly have awarded or of taking a new trial before another one.  In determining this, it appears proper first to fix the amount that (the District) Court thinks a properly functioning jury would have awarded, and this may be merely another way of saying that the starting point is the amount of damages the Court itself thinks proper on the record under the mandate of the Court of Appeals. After that, the maximum recovery rule requires the Court to determine the maximum amount of deviation from that verdict that could be allowed without requiring a new trial."

10

This is exactly what this Court has correctly and appropriately done. "In calculating the amount of remittitur and the maximum amount a reasonable jury could have awarded under the 'maximum recovery rule,' the court looks not only to actual awards, but may also apply a multiplier of fifty percent to past similar awards, so long as no multiplier was used in calculating those past awards." *Vogler v. Blackmore*, 352 F.3d 150,156 (5th Cir. 2003)  With that in mind, this Court's compensatory damages remittitur of $600,000 is not only consistent with other awards for similar injuries, but well within the ballpark and below the maximum recovery.  See e.g. *Daves v. Cleary*, 355 S.C. 216, 584 S.E.2d 423, 430 (S.C. App. 2003)(Affirming a $500,000 jury verdict in a medical malpractice action under South Carolina law, to a man who suffered a heart attack while in a hospital.)  The plaintiff in *Daves* (who had had a previous heart attack 10 years earlier), required two heart catheterizations, three thoracentesis procedures and a triple bypass operation, and incurred medical expenses totaling approximately $140,000. Id. at 221-222.

The decision to grant a remittitur is in the sound discretion of the trial judge and is reviewed for abuse of discretion. See *Denton v. Morgan*, 136 F.3d 1038, 1046 (5th Cir.1998). "Like the decision to alter or amend judgment, the trial court's decision to grant or deny a remittitur rests within the sound discretion of the trial judge." *King v. Ames*, 179 F.3d 370, n. 8 (5th Cir. 1999) "The standard for review, however, is strict; and the trial court will be reversed only if the party opposed to the remittitur shows an abuse of discretion on the part of the judge. (citations)  The reason for this strict standard is that the court's power to condition a denial of a new trial upon consent to a remittitur is founded upon its power to grant a new trial for excessiveness of verdict." *Bonura v. Sea Land Service, Inc.*, 505 F.2d 665, 669 (5th Cir.1974)  A

11

trial court "abuses its discretion if it requires remission of a sum that would reduce the verdict below the maximum award that is reasonably supported by the evidence." *Maxey v. Freightliner Corp.*,722 F.2d 1238, 1242 (5th Cir. 1984)

In the 5th Circuit significant deference is afforded to the trial court's decision in granting remittitur. As the Court stated in *Knight v. Texaco, Inc.*, 786 F.2d 1296, 1299-1300 (5th Cir. 1986)(affirming remittitur):

> "Finally, Texaco attacks the damage award as excessive by arguing that the district court erred in granting too small a remittitur. The rule is firmly established in this Circuit that this Court will not reverse a jury verdict for excessiveness except on the strongest of showings. Dixon, 754 F.2d at 590; Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir.1983); Shows, 671 F.2d at 934. In addition, where, as here, "the trial court already has invoked its discretion in granting a remittitur, our scope of review is even narrower than usual." Stapleton v. Kawasaki Heavy Industries, Ltd., 608 F.2d 571, 574 n. 7 (5th Cir.1979), modified on other grounds, 612 F.2d 905 (5th Cir.1980);…"

Merck has completely misread *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984). While the court there found that remittitur was inappropriate, it was not because of a lack of information to guide the court, but rather, because the "defendants did not have a fair trial. Numerous errors occurred in the course of the trial." Id. at 49. "We need not choose among these various rules, however, for these formulations are not appropriate for use in the instant case. These formulations are designed for circumstances in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award. They are not designed for a case such as the present one, in which prejudicial error has infected the jury's entire consideration of plaintiff's pecuniary loss." Id. at 50.

*De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 142-143 (5th Cir.1986) is similarly inapposite. The Court there elected to remand for a new trial on damages only, because of

12

improper arguments by counsel in a Jones Act death claim that the jury should award damages for "loss of love and affection" which were not legally recoverable, and counsel's misstatements as to earnings loss which were contrary to uncontroverted evidence . ("In this circumstance where we cannot determine the reason the verdict is excessive-because it is unclear whether the jury improperly awarded sums for loss of love and affection or whether it simply awarded excessive sums for legally recoverable items of damage-we elect to remand this case for a new damage trial.")

In the present case, there was no such improper argument by counsel as to earnings loss, nor as to any element of damages, nor was there argument for unrecoverable items of damages. The jury simply awarded what this Court believed were excessive sums for legally recoverable items of general damage.  The other cases relied upon by Merck are readily distinguishable, and involved clearly dissimilar circumstances. *Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1547-48 (5th Cir. 1984) (Action by oil purchaser against producer for breach of agreement to provide crude oil involved only economic losses.) *Betancourt v. J.C. Penney Co.*, 554 F.2d 1206, 1209 (1st Cir. 1977)(Estimation of proper awards for the plaintiffs would rest solely on speculation because there was no evidence of damages regarding four minor plaintiffs other than their mother's testimony.)

Merck argues, as it did before, that "[b]ecause we cannot determine which injuries the jury ascribed to Merck, we also cannot know which if any of Mr. Barnett's medical expenses the jury intended to award as part of verdict, or whether it included general damages with respect to some or all of the alleged injuries." First of all, even assuming arguendo that the jury found Merck responsible only for Mr. Barnett's first heart attack, and not for reduced life expectancy, nor the second heart attack- in other words the smallest quantum of injury that is consistent with

13

the jury's findings on the special verdict- the Court's remitted amount is entirely reasonable.  The sequelae and medical bills from this heart attack alone support an award of at least $600,000.

More importantly, Merck ignores the fact that, as this Court pointed out, Mr. Barnett's damages were primarily noneconomic in nature.  The decision in *Gautreaux v. Insurance Company of North America*, 811 F.2d 908 (5th Cir.1987), cited by Merck now and in its first motion, hinged upon the court's inability to determine economic damages resulting from lost earning capacity.  However, Mr. Barnett had no lost wages or lost earning capacity.  Directly on point is *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 919 (5th Cir. 1987), cited by this Court, which distinguished *Gautreaux* for that very same reason and pointed out that general damages awards are "somewhat amalgamated by their very nature":

> "Where the district court used a general verdict interrogatory and instructed on several elements of damages, it is sometimes impossible to determine the reason the verdict was excessive.  In that event, an appellate court may elect to grant a new trial without providing the option of remittitur. ...
> In this case, however, we think a mandatory new trial on damages is unnecessary and that a remittitur is preferable.  The jury verdict separated Mr. and Mrs. Osburn's damages.  Although Mr. Osburn's award lumped together a number of elements, the amount the jury could properly have awarded--and very likely did award--for loss of earning capacity and past medical expenses can be easily calculated on the basis of the evidence in the record. [FN17] Under the facts of this case, the other damages items upon which the jury was instructed--pain and suffering, mental anguish, and loss of physical capacity-- are somewhat amalgamated by their very nature. For purposes of applying our maximum recovery rule, we are therefore able to consider them together. Since we can determine the proper amount for a remittitur in this case despite the district court's failure to submit special interrogatories to the jury on the individual items of damages, we elect not to require a new damages trial.
> FN17. We believe that this case is properly distinguished from Gautreaux, for there we noted that "on the record before us we cannot determine to what extent or in what amount Gautreaux's injury impairs his future earnings" and "we are completely unable to determine loss of future earnings." 811 F.2d at 915, 916."

14

Just like the plaintiffs in *Osburn*, the bulk of Mr. Barnett's damages were noneconomic in nature. There was no lost earning capacity, and medical expenses relating to the heart attack were easily calculated. Noneconomic damages by their very nature are incapable of precise calculation, and this is clear not only from 5th Circuit authority, but under South Carolina law as well. *Mims v. Florence Co. Ambulance Serv. Comm'n*, 296 S.C. 4, 370 S.E.2d 96 (S.C. App. 1988)("The amount of damages a jury may award for physical pain and suffering and for mental pain and suffering is incapable of exact measurement and is therefore left for determination by the jury.")

As with most states, South Carolina law recognizes this fact and does not require mathematical precision in calculation of damages. As the South Carolina Supreme Court stated in *Edwards v. Lawton*, 244 S.C. 276, 136 S.E.2d 708, 710 (1964):

> "Damages for pain and suffering are unliquidated and indeterminate in character and the assessment of unliquidated damages must rest in the sound discretion of the jury, controlled by the discretionary power of the trial Judge. Wright v. Gilbert et al., 227 S.C. 334, 88 S.E.2d 72. Pain and suffering have no market price. They are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured. Hence, the amount of damages to be awarded for pain and suffering must be left to the judgment of the jury, subject on to correction by the courts for abuse.' Harper v. Bolton, supra, 239 S.C. 541, 124 S.E.2d 54."

The same is true of future damages. See Haltiwanger v. Barr, 258 S.C. 27, 32-33, 186 S.E.2d 819 (1972) "The rule is not always easy to apply. Future damages in personal injury cases need not be proved to a mathematical certainty. Oftentimes a verdict involving future damages must be approximated. A wide latitude is allowed the jury."

In *Murray v. Bank of America, N.A.*, 354 S.C. 337, 345, 580 S.E.2d 194 (S.C.App. 2003) a woman brought an action for negligence against a bank for allowing an imposter to open an account in her name and write fraudulent checks. The plaintiff was arrested for 12 hours and

15

forced to attend 3 criminal court hearings, and although she was exonerated, she sought damages for embarrassment and discomfort, including numbness in her face "prompting a visit to the doctor," and because "due to her acute embarrassment of being arrested in front of her neighbors, she moved to a more expensive apartment, which strained her finances and caused more stress." Although the Plaintiff had no physical injury, the court affirmed a jury award of $300,000 in damages, stating:

> "Most of the damages Murray suffered were intangible. "One cannot easily or with any mathematical certainty place a value on the amount of a person's pain and suffering."  Smalls v. South Carolina Dep't of Educ., 339 S.C. 208, 218, 528 S.E.2d 682, 687 (Ct.App.2000). We find the jury's verdict of $300,000 is not so shocking to the conscience of the court that it clearly indicates the verdict was the result of improper motive. Thus, we hold the trial court did not err in denying the Bank's motion for a new trial absolute."

In light of the evidence in the record and the substantial injury suffered by Mr. Barnett, under these circumstances a reduction in the award of $50,000,000 to $600,000 in compensatory damages is more than fair to Merck, and is an appropriate exercise of this Court's discretion.

16

## CONCLUSION

For the reasons stated above, as well as the reasons previously set forth in response to Merck's first motion, Plaintiff respectfully requests that the Court deny Merck's motion in its entirety.

Date: August _10_, 2007                    Respectfully submitted,

                                           By: _Mark P. Robinson, Jr._
                                                Mark P. Robinson, Jr.
                                                Kevin F. Calcagnie
                                                Ted B. Wacker
                                                Lexi W. Myer
                                                ROBINSON, CALCAGNIE & ROBINSON
                                                620 Newport Center Dr., 7th Floor
                                                Newport Beach, California  92660
                                                Telephone:  (949) 720-1288
                                                Facsimile: (949) 720-1292

                                                Andy D. Birchfield, Jr.
                                                P. Leigh O'Dell
                                                BEASLEY, ALLEN, CROW,
                                                METHVIN, PORTIS & MILES, P.C.
                                                P.O. Box 4160
                                                234 Commerce Street
                                                Montgomery, Alabama  36103-4160
                                                Telephone:  (334) 269-2343
                                                Facsimile: (334) 954-7555

                                                Donald C. Arbitblit
                                                LIEFF, CABRASER, HEIMANN and
                                                BERNSTEIN, LLP
                                                275 Battery Street, 30th Floor
                                                San Francisco, California   94111
                                                Telephone:  (415) 956-1000
                                                Facsimile:  (415) 956-1008

                                                Counsel for Plaintiff

17

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants'

Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs'

Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No.

8B, and that the foregoing was electronically filed with the Clerk of the Court of the United

States District Court for the Eastern District of Louisiana by using the CM/ECF system which

will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657

on this _10_ day of August , 2007.

By: _Mark P. Robinson, Jr._

MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson
620 Newport Center Drive, Suite 700
Newport Beach, California  92660
Telephone:  (949) 720-1288
Facsimile:  (949) 720-1292

18

Thomas V. Girardi, SBN 36603
James O'Callahan, SBN 126975
GIRARDI KEESE
1126 Wilshire Blvd.
Los Angeles, CA 90017

Mark P. Robinson, Jr., SBN 054426
Kevin F. Calcagnie, SBN
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, 7th Floor
Newport Beach, CA 92660
949-720-1288; Fax 949-720-1292

**On behalf of the Plaintiffs' Executive Committee**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES–CENTRAL CIVIL WEST

| | |
|---|---|
| **COORDINATION PROCEEDING SPECIAL TITLE [Rule 1550(b)]**<br><br>**IN RE VIOXX® CASES** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **JCCP 4247**<br><br>RESPONSE OF PLAINTIFFS' EXECUTIVE COMMITTEE TO DEFENDANT MERCK'S STATEMENT REGARDING CASE MANAGEMENT AND TRIAL SELECTION PROTOCOL<br><br>Honorable Peter D. Lichtman<br>Dept. 322 |

1.    **INTRODUCTION**

At the December  6, 2004 Status Conference, the Court directed the parties to submit briefs regarding the Court's suggestion that the Plaintiffs Executive Committee submit a proposal for five cases in the coordinated litigation to be set for the initial trials.   On December

FAC Resp. Exhibit B -- 2150

29, 2004, plaintiffs served Merck with a list of those five cases.  The Court indicated its belief that allowing the PEC to select the initial cases makes the most sense for quickly setting values on all cases.

However, Merck has objected to this method as counterproductive and unfair, arguing that a case selection protocol must allow for input from Merck. Merck proposes instead that both plaintiffs and Merck should nominate slates of cases against which the other side could exercise a limited number of peremptory challenges, and then the Court would then make a final selection of cases drawn equally from the two slates. Additionally, Merck argues that the Court should set cases for individual, not group, trials, contending that 'group trials of claims involving complex and individualized medical causation issues are inherently prejudicial, especially in the context of "immature" torts like this one.'

Merck is wrong on both counts. The PEC submits that the Court had it right the first time and that the procedure suggested by the Court is in fact the most efficient, economic and pragmatic way to establish a standard by which to evaluate the other cases and work toward an early resolution of all cases, without sacrificing fairness and due process.  This is a coordination court and a coordination issue involving matters of judicial resources, court personnel hours and litigation expenditures statewide.  If experience is any guide, by setting the best cases for early trial, following the same path as the Fen-Phen and Ford/Firestone coordinated cases, there is a good chance that the vast majority of the cases will settle sooner rather than later.

However, choosing the route suggested by Merck will result in a situation similar to the PPA and Rezulin cases, where many have settled but many are still dragging on years later.  A 'split the baby' approach will be hit or miss, will not move the litigation along, and will likely result in wasted time and years of litigation.  Likewise, Merck's suggestion that cases must only be tried on an individual basis, would add insult to injury, and would result in an even greater waste of time and resources.

## II.    THE COORDINATION COURT HAS BROAD DISCRETION AND FLEXIBILITY IN THE SELECTION, SCHEDULING AND SEQUENCE OF

1

**CASES FOR TRIAL.**

2

3    A coordination judge is vested with significant discretion in fashioning suitable

4    procedures it deems appropriate 'to ease the transition through the judicial system of the logjam

5    of cases which gives rise to coordination.'    (*McGhan Med. Corp. v. Sup.Ct.* (Hogan) (1992) 11

6    Cal.App.4th  804, 812, 14 Cal.Rptr.2d 264, 269-270)   According to Weil and Brown:

7

8            "[12:374]  On any question not covered by the coordination
9            statute, or the Ca Rules of Court Rule Rules, the coordination
             judge will follow the provisions of the Code of Civil Procedure
10           applicable to civil actions generally. If none are in point, the judge
             "may prescribe any suitable manner of proceeding." [Ca Rules of
11           Court Rule  1504(b)]

12           The intent is to vest in the coordination judge "whatever great
13           breadth of discretion may be necessary and appropriate to ease the
             transition through the judicial system of the logjam of cases which
14           gives rise to coordination." [ McGhan Med. Corp. v. Sup.Ct.
             (Hogan) (1992) 11 Cal.App.4th 804, 812, 14 Cal.Rptr.2d 264, 269-
15           270]

16
             ...
17

18           d. [12:375.5] Power to tailor cases for trial:  The coordination
             trial judge may remand any action, or any severable claim, may
19           transfer claims, may add on other cases, or may terminate the
             action or actions. [See Ca Rules of Court Rule  1542- 1545]
20

21           The trial court may order "any issue or defense to be tried
             separately and prior to the trial of the remaining issues." [Ca Rules
22           of Court Rule  1541(b)(3)]"

23           (Weil & Brown, CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL (The Rutter
24           Group 2004))

25    According to the court in *McGhan, supra:*

26           "A review of applicable rules adopted by the Judicial Council
27           indicates that the procedures which may be utilized by the
             coordinating judge are flexible indeed.   Rule 1541 provides that

28

1
2
3
4
5
6
7
8
9

the court may order any issue or defense tried separately;  hearings may be conducted at various sites in the state as may be selected to provide convenience to witnesses, parties, and counsel;  the court can prescribe all manner of pretrial discovery devices designed to aid the litigation.  Rule 1543 gives the coordinating judge the power to sever cases or claims from the coordination pool and transfer them back to their original venue.  Rule 1528 gives the judge power to try specific issues separately.  Generally, we are satisfied that it is the intent of the Judicial Council to vest in the coordinating judge whatever great breadth of discretion may be necessary and appropriate to ease the transition through the judicial system of the logjam of cases which gives rise to coordination."

(11 Cal.App. 4th at 812.)

10
11

Similarly, the court in Abelson v. National Union Fire Ins. Co. (1994) 28 Cal.App.4th 776, 786, 35 Cal.Rptr.2d 13, 18, stated:

12
13
14
15
16
17
18
19
20
21
22
23

"The purposes of coordination include promoting the efficient use of judicial resources.  ( Code Civ.Proc., § 404.1;  Christensen v. Superior Court (1991) 54 Cal.3d 868, 877, fn. 6, 2 Cal.Rptr.2d 79, 820 P.2d 181.)  As a general matter the rules implementing our coordination statutes  (FN7) vest the coordinating judge with flexible procedures and "whatever great breadth of discretion may be necessary and appropriate to ease the transition through the judicial system of the logjam of cases which gives rise to coordination...."  (McGhan Medical Corp. v. Superior Court (1992) 11 Cal.App.4th 804, 812, 14 Cal.Rptr.2d 264.)   For example, rule 1541(b) mandates that the coordination trial judge "assume an active role in managing all steps of the pretrial, discovery and trial proceedings to expedite the just determination of the coordinated actions without delay...."  Consistent with this mandate, the coordination judge may "(3) order any issue or defense to be tried separately and prior to the trial of the remaining issues when it appears the disposition of any of the coordinated actions might thereby be expedited."

24    ///
25    ///
26    ///
27
28

STATEMENT OF PLAINTIFFS' EXECUTIVE COMMITTEE REGARDING CASE MANAGEMENT
AND TRIAL SELECTION PROTOCOL

4

**III.   THE COURT'S PROPOSAL WILL RESULT  IN THE MOST EFFICIENT USE OF COURT RESOURCES, WHILE AT THE SAME TIME PROVIDE THE OPTIMAL METHOD FOR INCREASING THE PROBABILITY OF AN EARLY AND FAIR RESOLUTION OF THIS LITIGATION.**

The Court's proposal that the cases for initial trials be selected by the Plaintiffs' Executive Committee, is the most, and in fact the only, pragmatic approach.  The ivory tower method suggested by Merck has historically led to years and years of protracted litigation and delay in other cases.  For example, in the Rezulin coordinated litigation the (In re Rezulin Litigation, JCCP No. 4122) Judge West utilized an approach similar to what the Merck is requesting here.  While many cases have settled, there are many others continuing forward today with no end in sight, because there is no defined settlement value that has been obtained from trials.

By contrast, both the Diet Drugs (Fen-Phen) and Ford/Firestone coordinations, whether by intent or original design, ended up with initial trials selected from among the plaintiffs' best cases.  In both, the vast majority of other cases settled quickly and fairly within a very short period of time after the initial cases were scheduled for trial.  As this Court has recognized, the goal of the initial trials is to determine reasonable case values, and using the best cases will establish an approximate ceiling by which to measure the value of lesser cases.  This is the only practical means of identifying potential case value, as a defense verdict on a weak case says nothing about the value of other cases.

Despite differences among plaintiffs' counsel, as a practical matter, if the plaintiffs win the initial trials there will be a recognizable upper limit on the value of the best cases, and a basis for a sliding scale.  Should the plaintiffs lose one of the best cases, it will necessarily  cause others to lower their settlement expectations.  As the Court pointed out, if initial verdicts are

lower than the the plaintiffs had hoped, they will be unable to claim or rationalize that they did not try their best case and that somehow later cases will fare better.

The same cannot be said if the worst are tried first. If the plaintiffs lose a weak or slim liability case selected by the defense, plaintiff counsel will be correct in assuming they have better cases to try, and in seeking settlement amounts far in excess of the verdict. If the defense wins a "worst case" case, no value of any sort will be established. Everyone will have a better case and will view the result as anomalous.

Merck has advanced several arguments against the Court's suggestion, but each is patently flawed or contradicted by Merck's own statements. Merck complains that 'the Court has provided no guidance as to what constitutes a "best" case.' No guideline is needed. There is no reason for the PEC to select any cases which do not involve the most significant injuries and the best potential for a plaintiff's verdict. The PEC has no incentive to choose anything less. Merck's suggestion that the PEC may want to 'gamble' with a 'sympathetic plaintiff' with a 'weak medical causation case' defies logic, when the PEC could instead choose a 'sympathetic plaintiff' with a strong causation case. The intent is to determine value, and a point below which other cases should settle. A plaintiffs verdict on a better case will provide a standard by which to measure weaker cases and cases with less significant damages. There is no rational incentive to 'gamble' and obtain a defense verdict which tells us nothing, or to seek an unrealistic outcome which the defense will see as an aberration and refuse to acknowledge as a settlement guidepost. As Merck has pointed out in another part of its brief, "Both sides obviously would have incentive to select cases they believed they could win…"

Merck's fallback position, a request for a peremptory challenge to strike certain cases from the selection process, would adversely undermine the purpose of the initial trials. Merck

1    could, and would, simply throw out the best cases, thereby artificially lowering the ceiling, and

2    reducing confidence in the verdict as a guidepost.

3        Merck's reliance upon the 'The Manual for Complex Litigation § 22.315 at p. 360 (4th ed.

4    2004) is misplaced.   That section and its discussion of 'representativeness' and 'resolution on a

5    group basis' are based entirely upon the federal case In re Chevron U.S.A., Inc., 109 F.. 3d 1016,

6    1019 (5th Cir. 1997).   Although *Chevron* mentions settlement valuation as one possible benefit

7    of a bellwether trial generally, it is clear from the opinion that the only real concern was one of

8    due process- the trial court there was attempting to conduct a unitary trial of *common liability*

9    *issues* for 3,000 cases and the trial plan was "clearly designed to resolve the issue of liability on

10   the part of Chevron to *all of the plaintiffs* by referring to a unitary trial on the issues of general

11   liability or causation..." (Id at 1018. Quoted italics in original text.)

12       The issue in *Chevron* was not the adequacy of the trial plan for moving the settlement

13   process along, but rather, the propriety of establishing a procedure whereby the trial of a few

14   cases would be binding on issues of liability as to several thousand others.  Clearly there were

15   due process problems. ("Our substantive due process concerns are based on the lack of

16   fundamental fairness contained in a system that permits the extinguishment of claims or the

17   imposition of liability in nearly 3,000 cases based upon results of a trial of a non-representative

18   sample of plaintiffs.   Such a procedure is inherently  unfair when the substantive rights of both

19   plaintiffs and the defendant are resolved in a manner that lacks the requisite level of confidence

20   in the reliability of its result." Id at 1020-21)

21       Merck goes on to argue that allowing both sides to participate in the selection process

22   will ensure fundamental fairness.  Interestingly, the *Chevron* court recommended against the

23   very procedure which Merck is suggesting- each side selecting their best cases, ("Whatever may

1   be said about the trial contemplated by the district court's December 19, 1996 order, one thing is

2   clear.   It is not a bellwether trial. It is simply a trial of fifteen (15) of the "best" and fifteen (15)

3   of the "worst" cases contained in the universe of claims involved in this litigation.   There is no

4   pretense that the thirty (30) cases selected are representative of the 3,000 member group of

5   plaintiffs.")  Again, the *Chevron* court was concerned about a trial of a handful of cases which

6

7   would have been binding on liability issues as to thousands of others.

8        *Chevron* and the section of the manual upon which Merck relies, are simply inapposite.

9   Likewise, so is is the other case cited, Liggett Group Inc. v. Engle, 853 So.2d 434, 455 (Fla.App.

10  2003)(Extrapolation of class representatives' damages to the rest of the class during the punitive

11  damages phase of class action trial was not permissible, where there was insufficient proof

12

13  concerning actual class size, class composition, and the amounts of compensatory damages

14  ultimately recoverable by class members, and the three class representatives were hand-picked

15  by counsel and could not be viewed as a statistically significant or representative sample of the

16  state-wide class of 700,000 cigarette smokers.)

17

18       Merck next points out that one case arises under Arizona law, and another under

19  Washington law and argues that this limits their utility as comparators for the other cases here

20  which arise under California law.   However, despite subtle nuances in substantive products

21  liability law between the states, the trial of these cases will still yield the most important

22

23  information- the probable jury verdict range for the most significant injuries in the best cases.

24       This is a coordinated proceeding and a coordination judge has to take into account not

25  only what is best for his or her courtroom, but the complex panel, and the courts and courtroom

26  staffs in other counties.  The approach suggested by the Court recognizes this, and is the optimal

27  path for resolution of this litigation in a timely fashion.

28

## IV.    THE COURT SHOULD SET CASES FOR CONSOLIDATED TRIALS.

Merck argues that the Court should set the selected cases for individual and not group trials, and that 'grouping two or more plaintiffs in one initial trial would grossly prejudice Merck, provide yet another one-sided advantage to plaintiffs, and further undermine the utility of early trials of selected cases.'  While plaintiffs are not suggesting that the court try 10 to 14 cases simultaneously, (as in the Mississippi and Alabama decisions cited by Merck), Plaintiffs strongly disagree that the court should only try cases individually.  Under California law consolidated trials of smaller numbers of cases are in fact appropriate, and have been utilized in other mass tort cases.

Todd-Stenberg v. Dalkon Shield Claimants Trust (1996) 48 Cal.App.4th 976, 56 Cal.Rptr. 2d 16, is right on point.  Todd-Stenberg involved  an intrauterine device which caused pelvic inflammatory disease (PID).  Six personal injury cases were consolidated, and the three actions remaining by the time of trial were tried together.  Following a jury verdict which awarded varying amounts of damages to each plaintiff, the defendant appealed, making an argument similar to Merck's.  Pointing out the irrelevance of authorities involving class actions and trials of large numbers of claimants, the court stated:

> "The out-of-state cases cited by the Trust, while potentially
> persuasive in similar actions, provide no binding precedent for
> their position.  In addition, they are, for the most part,
> distinguishable from the present case.  Most involved a
> substantially greater number of plaintiffs than the three, or even
> the original six, plaintiffs in the present case.  (E.g., *In re Agent
> Orange Prod. Liability Litigation* (2d Cir.1987) 818 F.2d 145:
> over 100,000 notified plaintiffs; *In re Fibreboard Corp.* (5th
> Cir.1990) 893 F.2d 706: 3,031 cases; *In re Northern Dist. of Cal.,
> Dalkon Shield, etc.* (9th Cir.1982) 693 F.2d 847:166 northern
> California actions consolidated and nationwide class certified,
> noting that approximately 2.2 million Dalkon Shields had been

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> inserted in women and 1,573 claims were then pending.)  In such cases there is a far more significant possibility of confusing the jury than existed here.  Furthermore, the percentage of trial time devoted to individual issues increases with every additional plaintiff."
> (48 Cal.App.4th at 981.)

In rejecting the defendant's arguments, the appellate court commented upon the sound practical reasons for trying the cases together:

> "Six actions were consolidated.  By the time of trial, however, only three actions remained.  In each, the plaintiff claimed she had suffered pelvic inflammatory disease (PID) as a result of her use of a Dalkon Shield.  **The trial court correctly anticipated that a large portion of the trial would be devoted to issues common to the three cases:  how PID occurs, whether it can be caused by the use of Dalkon Shield, and what other factors might cause or contribute to the disease.**  In short, a large part of the trial was devoted to educating the jury about the female reproductive system, the Dalkon Shield and PID.  Some of this evidence was in the form of deposition testimony relating to the structure of the Dalkon Shield, and did not consider the plaintiffs' individual cases in any way.  Other evidence was adduced through expert witnesses called by the parties at trial.  Much of this evidence was relevant to the structure of the Dalkon Shield and its propensity to cause or contribute to PID, and did not consider the plaintiffs' individual cases.  In addition, **the parties were able to use the same witnesses not only to discuss these general issues, but to address the probable cause, extent and result of the PID in each of the plaintiffs.  Had there been three separate trials the same deposition testimony would have been introduced, many of the same expert witnesses called and much of the same evidence presented.  The record, therefore, discloses that consolidation was appropriate.**"
> (48 Cal.App.4th at 979.  Emphasis added)

Similarly, in the present case, there will be substantial common issues and common evidence among the cases.  A large portion of any trial will be devoted to issues common to all cases, including how Vioxx acts in the body, how the heart and brain function, how Vioxx causes strokes and cardiac events, and what other factors might cause or contribute to strokes

---

FAC Resp. Exhibit B -- 2159

and heart attacks.  The parties will be able to use the same witnesses to discuss common issues as well as individual causation.  Most of the same expert witnesses will be called on issues common to all plaintiffs.  The same is true with respect to documentary evidence.

The overwhelming majority of the liability evidence will be essentially the same in each case.  That evidence will consume the bulk of the trial time and will involve numerous documents and exhibits, video deposition testimony and live testimony, both by percipient witnesses and experts regarding Merck's  duties and obligations with respect to the approval and marketing of Vioxx.  Similarly, the same general causation evidence will be relevant to each of the cases, i.e., how Vioxx causes injury, the rates of injury, the mechanism of injury,  whether the risk of injury is warranted in any case, and the like.   The only issues which are distinct as between the first 5 plaintiffs are specific causation – which will require minimal expert witness testimony with respect to each plaintiff – and individual damages, which again will require very little trial time relative to that which will be spent on liability and general causation issues.

Because the liability and general causation evidence will consume the vast majority of trial time, it is logical to try these first five cases as a unit.   That such "group trials" can be successfully accomplished without confusion to the jury and with an enormous savings in both time and resources has been demonstrated in the Lockheed litigation, tried by Girardi & Keese. Attached as Exhibit ___ for the Court's reference is a true and correct copy of the scheduling order in the Lockheed litigation issued by Judge Kalin, in which the court made findings regarding the appropriateness and judicial efficiency of trying several of the personal injury cases together:

> "The court finds that these cases involve complex issues of medicine, toxicology, epidemiology, chemistry and industrial hygiene, among other disciplines, and absent careful judicial

1  management, will consume vast and unjustified amounts of public,
2  judicial and private resources, both in the pre-trial and trial phases.
   In fashioning this order, the court finds significant that: (1) the
3  defendants in each are substantially identical; and (2) each
   plaintiff's legal theories are substantially identical; and (3) there is
4  a substantial similarity in the facts underlying each plaintiff's
5  causes of action (although the plaintiffs' alleged injuries and
   damages vary).
6
7  "Accordingly, the court believes that there is a substantial
   likelihood that the parties will resolve, without a series of
8  protracted and expensive trials, all or a substantial portion of
   plaintiffs' claims following a plenary trial of a meaningful number
9  of plaintiff's cases."
10 (Case Management Order, March 24, 1992, *Orozco v. Lockheed*
   *Corporation*, Case No NCC 30559B, Exhibit ___, p. 3, line 23-page 4,     line
11 10.)

12 Based upon those findings, Judge Kalin ordered 15 plaintiffs' cases to be tried in a single

13 trial.  Similarly, Judge West entered an order in the Rezulin litigation which provided:

14     "Efficient Use of Judicial and Party Resources in Consolidated
15     Trial

16     The Court finds the interests of judicial economy weigh in favor of
       trying all six cases together. The consolidation of these six
17     plaintiffs' cases for trial is expressly authorized by CCP § 1048.
       Clearly, these cases present numerous common questions of law
18     and fact. **The very nature of these coordinated proceedings
19     demands that the Court consolidate matters for trial. Separate
       trials would unduly burden the Court, the parties, and
20     witnesses. The cost, the time involved, and the duplication of
       common evidence in separate trials is not warranted**. The Court
21     is confident that appropriate steps may be taken to eliminate the
22     risk of jury confusion or prejudice to the Defendants."
              ( Minute Order, May 28, 2002, In re
23            Rezulin Litigation, JCCP No. 4122,
24            Exhibit ___ attached)

25 / / /

26 / / /

27

28

## V.   FACT DISCOVERY SHOULD BE STAYED OR LIMITED IN THE REMAINING CASES.

Merck has requested that the Court allow non expert discovery to continue in all cases not set for trial, and asserts that fact discovery should remain open in all cases during the work-up and trials of the test cases.

The Plaintiffs' Executive Committee submits that discovery should be stayed or limited as to the cases which are not scheduled for the initial trials. Experience with preparation for the Rezulin trials, the Fen-Phen trials, the Baycol trials and the PPA trials has demonstrated that the focus and the amount of work that will be involved in the trial cases, and the preparation of those five cases for trial, will be a massive undertaking in terms of time and resources for the Plaintiffs' counsel, as well as the defense firms preparing for this trial. That preparation should be the total focus. Once those verdicts are in, we will have a way to properly, effectively and quickly evaluate all of the other cases. Until that time, discovery should be stayed or limited in the cases not set for trial.

## VI.   CONCLUSION

Plaintiffs are not suggesting fairness should be sacrificed for efficiency.  There is nothing unfair about asking that certain cases be tried before others.  On the other hand, it is unfair to adopt procedures which have been proven to unduly protract similar litigation and to force large numbers of cases to go unresolved for several years. This Court is entirely correct in recognizing that the faster values are set on these cases, the sooner it will be to the benefit of everyone, including judges and litigants in other state and federal courts.

The method proposed by the Court will simply prioritize the better cases among hundreds

STATEMENT OF PLAINTIFFS' EXECUTIVE COMMITTEE REGARDING CASE MANAGEMENT
AND TRIAL SELECTION PROTOCOL

13

of others, while saving all parties the undue expense and burden of trying numerous cases that might not otherwise have to be tried.  The Court's proposal will avoid unnecessary delay, excessive litigation expenses and legal bills, and prevent this litigation from dragging on indefinitely.


DATED:        January 18, 2005                    ROBINSON, CALCAGNIE & ROBINSON


                                                                  _____
                                                                  MARK P. ROBINSON, JR.
                                                                  On behalf of the Plaintiffs' Executive Committee

Mark P. Robinson, Jr., SBN 054426
Kevin F. Calcagnie, SBN 08994
Carlos A. Prietto, III, SBN 166410
Ted B. Wacker, SBN 157416
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, Suite 700
Newport Beach, California   92660
Tele: 949-720-1288; Fax: 949-720-1292

Attorneys for Plaintiff
LOWELL BERWICK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST

| | |
|---|---|
| Coordination Proceedings<br>Special Title (Rule 1550(b))<br>**VIOXX® CASES** | Case No.: JCCP 4247 |
| | Assigned to Honorable Victoria Chaney,<br>Department 324 |
| LOWELL BERWICK and CAROLE BERWICK | |
| Plaintiffs, | [LASC Case Number: BC328855] |
| vs. | **PLAINTIFF'S BRIEF RE THE NOERR-<br>PENNINGTON DOCTRINE** |
| MERCK & COMPANY, INC., McKESSON<br>CORPORATION, and DOES 1 THROUGH 100,<br>inclusive, | **AND ITS INAPPLICABILITY TO<br>PLAINTIFF'S CLAIMS AND EVIDENCE** |
| Defendants | Trial Date: April 9, 2007 |

i

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

    1. THE NOERR-PENNINGTON DOCTRINE IN CALIFORNIA  ...............................2

    2. EVEN WHERE THE DOCTRINE IS APPLICABLE, EVIDENCE OF PETITIONING OR
       LOBBYING THE GOVERNMENT IS STILL ADMISSIBLE TO SHOW THE
       CHARACTER AND PURPOSE OF NONEXEMPT ACTIVITIES ..........................2

    3. THE DOCTRINE DOES NOT APPLY WHERE A PARTY HAS MADE
       DELIBERATELY FALSE STATEMENTS TO A GOVERNMENT AGENCY ......................5

    4. THE DOCTRINE DOES NOT APPLY WHERE THE DEFENDANT IS SEEKING
       APPROVAL FROM A REGULATORY BODY, AND IS NOT REQUESTING A
       MODIFICATON OR CHANGE IN THE LAW ......................................................6

    5. THE DOCTRINE DOES NOT APPLY WHERE THE ACTION IS BASED ON CONDUCT
       OTHER THAN PETITIONING OR LOBBYING THE GOVERNMENT ................................7

CONCLUSION ....................................................................................................................8

ii

FAC Resp. Exhibit B -- 2165

# TABLE OF AUTHORITIES

**CASES**

*Buell-Wilson v. Ford Motor Co.,*
  141 Cal.App.4th 525, 561-562, 46 Cal.Rptr.3d 147 (2006) ............................................. 1

*Cantor v. Detroit Edison Co.,*
  428 U.S. 579, 601-602, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1979) ................................... 6, 7

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
  365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ................................................... passim

*Hi-Top Steel Corp. v. Lehrer,*
  24 Cal.App.4th 570, 29 Cal.Rptr.2d 646 (Cal.App. 2 Dist.1994) ..................................... 2

*Mason v. Texaco, Inc.,*
  741 F.Supp. 1472, 1499-1500, 31 Fed. R. Evid. Serv. 97 (D.Kan.1990) ...................... 3, 5

*MCI Communications Corp. v. American Tel. & Tel. Co.,*
  708 F.2d 1081, 1160 (7th Cir. 1983) ............................................................................ 3, 4

*National Flood Services, Inc. v. Torrent Technologies, Inc.,*
  Slip Copy, 2006 WL 1518886, *8 (W.D.Wash. 2006) ...................................................... 5

*Premier Medical Management Systems, Inc. v. California Ins. Guarantee,*
  136 Cal.App.4th 464, 39 Cal.Rptr.3d 43 (Cal.App. 2 Dist. 2006) ................................... 7

*Snyder v. American Ass'n of Blood Banks,*
  144 N.J. 269, 676 A.2d 1036 (N.J.1996) ..................................................................... 1, 8

*United Mine Workers of America v. Pennington,*
  381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) ............................................... passim

*United States v. Title Ins. Rating Bureau of Arizona,*
  (D. Ariz. 1981) 517 F. Supp. 1053, 1060, aff'd, (9th Cir. 1983) 700 F.2d 1247,
  cert. denied, (1984) 467 U.S. 1240 ............................................................................... 6

*Whelan v. Abell,*
  48 F.3d 1247, 1253-55 (D.C.Cir.1995) ........................................................................... 5

FAC Resp. Exhibit B -- 2166

# INTRODUCTION

Merck's assertion of the *Noerr-Pennington* doctrine should be rejected in its entirety. A search of Westlaw demonstrates that although the doctrine has been around for over 40 years, its use under these circumstances would be unprecedented. Perhaps this is why Merck did not think to raise the doctrine in any of its 23 motions in the first instance, nor in the two previous trials in California, nor in the Barnett trial in the MDL. An examination of the fundamentals of the doctrine, its limits and its exceptions, and how it has been interpreted by other courts including the Supreme Court itself, demonstrates that it is neither a bar to Plaintiff's claims and allegations here, nor to the admission of the evidence of Merck's interactions with the FDA.

One must ask why the doctrine has never arisen in any of the numerous reported California appellate decisions involving pharmaceuticals and products such as automobiles which are also subject to regulatory action and safety standards, (see e.g. *Buell-Wilson v. Ford Motor Co.* (2006)141 Cal.App.4th 525, 561-562, 46 Cal.Rptr.3d 147), and why does it not appear in any of the dozens of other reported pharmaceutical products liability decisions from federal and state courts around the country.[1] The answer is that from the beginning *Noerr-Pennington* decisions have made it clear that the doctrine does not apply in a case like this. There are several reasons why the doctrine is inapplicable here, each of which is sufficient in and of itself to reject Merck's assertion. Moreover, even if the doctrine could be invoked here, it would not bar admission of the evidence Merck wants to exclude. Merck is asking this Court to make new law and expand the *Noerr-Pennington* doctrine far beyond where any court in California or anywhere else has ever taken it.

---

[1] A search of the Weslaw.com database of all state and federal decisions up to and including 3/20/07 using the search terms: "Noerr & FDA or "Food and Drug Administration"" turned up 81 cases. Although counsel for Plaintiff does not claim to have read every decision, almost all of them appear to involve antitrust cases and business entities suing other business entities. Counsel was unable to locate a single reported decision involving an individual personal injury action against a pharmaceutical manufacturer within those cases. In fact, the only case involving an individual personal injury action involves a claim against a trade association, and actually supports the position of Plaintiff here. See *Snyder v. American Ass'n of Blood Banks* 144 N.J. 269, 676 A.2d 1036 (N.J.,1996), discussed infra at 8.

1

## 1. THE NOERR-PENNINGTON DOCTRINE IN CALIFORNIA

The doctrine has been recognized and discussed by California courts and is described at length in *Hi-Top Steel Corp. v. Lehrer*, 24 Cal.App.4th 570, 574-575, 29 Cal.Rptr.2d 646 (Cal.App. 2 Dist.1994):

> "The *Noerr -Pennington* doctrine provides that there is no antitrust liability under the Sherman Act for efforts to influence government which are protected by the First Amendment right to petition for redress of grievances, even if the motive behind the efforts is anticompetitive. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1133, 270 Cal.Rptr. 1, 791 P.2d 587; *575 Blank v. Kirwan* (1985) 39 Cal.3d 311, 320, 216 Cal.Rptr. 718, 703 P.2d 58.) ...
>
> ... "The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." ( Id. at p. 139, 81 S.Ct. at p. 530.)"
> ...
> "In *Mine Workers v. Pennington* (1965) 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626, the court reiterated that Noerr "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.... Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." (At p. 670, 85 S.Ct. at p. 1593.)"

While the court noted that the *Noerr-Pennington* doctrine was formulated in the context of antitrust cases, and has been applied or discussed in cases involving other types of civil liability, no California case has ever applied it in a products liability action, despite the fact that manufacturers' communications and representations to regulatory agencies such as the FDA are frequently an issue.

## 2. EVEN WHERE THE DOCTRINE IS APPLICABLE, EVIDENCE OF PETITIONING OR LOBBYING THE GOVERNMENT IS STILL ADMISSIBLE TO SHOW THE CHARACTER AND PURPOSE OF NONEXEMPT ACTIVITIES.

Even assuming, *arguendo*, that *Noerr-Pennington* is applicable, (and as will be shown *infra*, it is not), the doctrine does not preclude the admission of evidence of protected petitioning or lobbying activity where such evidence is relevant to show the character or purpose of nonexempt activity. The Supreme Court in *Pennington* made this very clear:

> "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. The jury should have been so

2

---

1  instructed and, given the obviously telling nature of this evidence, we cannot hold this lapse
   to be mere harmless error.

2  **It would of course still be within the province of the trial judge to admit this evidence, if**
   **he deemed it probative and not unduly prejudicial, under the 'established judicial rule**

3  **of evidence that testimony of prior or subsequent transactions, which for some reason**
   **are barred from forming the basis for a suit, may nevertheless be introduced if it tends**

4  **reasonably to show the purpose and character of the particular transactions under**
   **scrutiny."** *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 n. 3, 85 S.Ct.

5  1585, 1593 n. 3, 14 L.Ed.2d 626 (1965) (Emphasis in bold added throughout this brief.)

6

7  *Pennington's* allowance for the admission of evidence of otherwise protected activity has been

8  applied in a variety of circumstances. For example, in *Mason v. Texaco, Inc.,* 741 F.Supp. 1472, 1499-

9  1500, 31 Fed. R. Evid. Serv. 97 (D.Kan.1990), aff'd (10th Cir. 1991), 948 F.2d 1546, a failure to warn

10  action against a benzene manufacturer arising from the plaintiff's benzene-related leukemia, the court

11  excluded evidence that an organization of which the defendant was a member had filed a lawsuit

12  challenging OSHA's efforts to lower workplace exposure limits to benzene. However, quoting the

13  identical passage above from *Pennington*, the court held that evidence of positions taken by the defendant

14  as to the OSHA efforts to change the standard were nevertheless admissible:

15  "Contrary to defendant's present assertion, the court never precluded introducing evidence of
   positions taken by Texaco *individually* with respect to OSHA's efforts to lower the workplace

16  exposure limits to benzene. For several reasons, the court repeatedly rejected defendant's
   attempts to insulate Texaco's own private actions from scrutiny under the auspices of the

17  *Noerr-Pennington* doctrine.[FN21] First and foremost, Texaco was not a party to the API

18  lawsuit. Thus, defendant's First Amendment right to petition the courts is not implicated by
   evidence of its own private positions expressed on other persons' lawsuits. Further, even

19  assuming an identity between Texaco and the API, the *Noerr-Pennington* doctrine would
   have no applicability to this case."

20

21  The Court also noted several reasons why the doctrine was inapplicable, and why evidence of the

22  defendant's opposition to the standard was relevant to punitive damages on the failure to warn claim:

23  "Accordingly, courts have invoked the doctrine only where the cause of action itself is based
   on the act of lobbying or filing a lawsuit. *Cf. MCI Communications Corp. v. American Tel. &*

24  *Tel. Co.,* 708 F.2d 1081, 1160 (7th Cir.) (defendant's actions before FCC admissible as
   evidence of the purpose and character of decisions that were relevant to charges not based on

25  defendant's *1501 first amendment activities), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78

26  L.Ed.2d 226 (1983); *Alexander v. National Farmers Org.,* 687 F.2d 1173, 1196 (8th
   Cir.1982) (exempt conduct may be considered to the extent it tends to show purpose and

27  character of nonexempt activity); *Feminist Women's Health Center, Inc. v. Mohammad,* 586
   F.2d 530, 543 n. 7 (5th Cir.1978) (evidence of activity protected by Noerr doctrine

28  admissible to show purpose and character of other non-protected activity if not unduly

3

PLAINTIFF'S BRIEF RE THE NOERR-PENNINGTON DOCTRINE AND ITS
INAPPLICABILITY TO PLAINTIFF'S CLAIMS AND EVIDENCE

prejudicial), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). **Because plaintiff's claim of failure to warn adequately is based on actions other than the API lawsuit, evidence of Texaco's own position regarding this lawsuit does not fall within the proscriptive sweep of *Noerr-Pennington.***

**..... As to Texaco's own individual actions, however, Texaco's express opposition to this standard, in light of its purported knowledge of the necessity of a 1 ppm limit, would indicate a conscious indifference for workplace safety relevant to the issue of punitive damages." Id. at 1500-1501.**

In *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1160 (7th Cir.), an antitrust action, the court cited the same quote from *Pennington* in holding that evidence of the defendant's actions before the FCC was admissible to show the purpose and character of its business decisions which were relevant to charges not based on protected activities:

> **"MCI referred to AT & T's actions before the FCC only as evidence of the purpose and character of business decisions which had already been made and which were relevant to charges other than the filings of state tariffs.** "Evidence of activity that is protected by the *Noerr* doctrine may be admitted to show the purpose and character of other activities if doing so is not overly prejudicial to the defendants." (citations) We find no error in the district court's refusal to give a general *Noerr-Pennington* instruction."

Similarly, in the present case, even if Merck could credibly argue that the documents it is asking the Court to exclude were in fact evidence of protected activity, (which they are not), the evidence would still be admissible to show the purpose and character of Merck's nonexempt conduct relating to its marketing of Vioxx, its failure to warn, the inadequacy of its warnings, and its intention and motives to conceal, downplay and minimize knowledge of the risks of Vioxx. The evidence which Merck seeks to exclude demonstrates that for purely financial reasons, Merck was working to keep the VIGOR language in the precautions section of its Vioxx labels instead of the warnings section, in order to bring in an additional $2.5 billion dollars over 5 years. That is why Dr. Scolnick referred to the label as "ugly cubed." (Exhibit 1002, attached.)[2]

The FDA had no knowledge of Merck's financial analysis, nor Merck's attitudes and motives. However, the documents, including those which Merck argues are protected, demonstrate why Merck

---

[2] On March 19, 2007 counsel for Merck e-mailed counsel for Plaintiff a list of five exhibits which it expects its motion on *Noerr-Pennington* to cover, indicating there may be more. Those exhibits, Nos. 1001, 1104, 1002, 1058 and 1128, are attached herewith. A cursory examination reveals that although they relate to and reference Merck's actions with respect to the FDA, none are actual communications with the FDA, but rather, internal Merck communications.

4

misled the February 2001 FDA Advisory Committee, and withheld the Shapiro meta-analysis which showed greater than a 2.0 risk for heart attacks. They demonstrate why, when the FDA recommended a warning label, Merck had already done a financial analysis and made a business decision to defeat it. This evidence is entirely relevant to and probative on the purpose and character of Merck's unprotected conduct, including its motives and its conscious disregard for safety. (*Mason*, supra.)

### 3. THE DOCTRINE DOES NOT APPLY WHERE A PARTY HAS MADE DELIBERATELY FALSE STATEMENTS TO A GOVERNMENT AGENCY

Where a party has made deliberately false statements to the government the doctrine does not apply. See e.g. *Whelan v. Abell,* 48 F.3d 1247, 1253-55 (D.C.Cir.1995)(*Noerr-Pennington* doctrine did not bar tort claims based on filing of lawsuit and submissions to state securities officials where it was alleged that the defendants had made deliberately false statements.)("However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods. "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport,* 404 U.S. at 513, 92 S.Ct. at 613; see also *PREI,* 508 U.S. at ---- n. 6, 113 S.Ct. at 1929 n. 6... ") As the court stated in *Whelan*:

> "In a decision four years after *Noerr* and months after *Pennington*, the Court said, without discussion of either case, that a firm could not invoke a patent as a defense to antitrust charges if it "obtained the patent by knowingly and willfully misrepresenting facts to the Patent Office." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). And we said in *Federal Prescription Serv., Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 263 (D.C.Cir.1981), "Attempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of *Noerr*."

See also *National Flood Services, Inc. v. Torrent Technologies, Inc.*, Slip Copy, 2006 WL 1518886, *8 (W.D.Wash. 2006)(On counterclaim alleging anticompetitive strategies to monopolize and restrain competition in the flood insurance market, doctrine did not apply to copyright registration which described business model and its planned technology, where counter-claimant alleged that copyright registration was obtained by making fraudulent representations to the U.S. Copyright Office):

5

"… ***Noerr* does not apply where a fraud has been alleged.** *See Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1261 (9th Cir.1982) (**"[T]he fraudulent furnishing of false information to an agency in connection with an adjudicatory proceeding can be the basis for antitrust liability,** if the requisite predatory intent is present and the other elements of an antitrust claim are proven."). For the purposes of this motion, the Court takes Defendants' allegations, as to the fraud committed upon the United States Copyright Office by Plaintiffs, as true. Thus, Plaintiffs' fraudulent registration of the copyright is not immune from antitrust liability under the *Noerr-Pennington* doctrine."

Here, in connection with its representations to the FDA, Merck made deliberately false statements in order to keep the risks of Vioxx minimized on the label and in the medical community. This is just one more reason why Merck's conduct in obtaining the approval of Vioxx and its activities in connection with the label, are not protected by the *Noerr-Pennington* doctrine.

**4. THE DOCTRINE DOES NOT APPLY WHERE THE DEFENDANT IS SEEKING APPROVAL FROM A REGULATORY BODY, AND IS NOT REQUESTING A MODIFICATON OR CHANGE IN THE LAW.**

The *Noerr-Pennington* doctrine protects petitioning or lobbying efforts seeking a modification or change in the law.  However, it is limited in scope and does not extend to conduct which does neither, such as a business entity seeking approval of proposals it makes to a government regulatory agency. *United States v. Title Ins. Rating Bureau of Arizona* (D. Ariz. 1981) 517 F. Supp. 1053, 1060, aff'd, (9th Cir. 1983) 700 F.2d 1247, cert. denied, (1984) 467 U.S. 1240 (**"This Court views the Doctrine as one which protects activities undertaken to modify or change the laws, whether laws were promulgated by the legislature or a regulatory agency.** The defendants' attempt to shoehorn rate filings, which are required by law to be done, into a protected activity, misapprehends the caselaw and the underlying policy. The mere filing of something required by law does not in any way invoke the right to petition. The defendants' filing of its rates is not an attempt by an individual or entity to employ the democratic process in order to effectuate change; it is mere compliance with the law.")

The court in the *Title Insurance, supra,* relied on the Supreme Court's decision in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 601-602, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1979), an antitrust action brought by the owner of drugstore which sold electrical light bulbs, alleging that an electric utility had damaged him in his business by distributing free light bulbs to residential subscribers in exchange for burned-out bulbs. The defendant utility sought protection under the *Noerr-Pennington* doctrine, arguing

6

1  that the Commission's approval of its proposal relating to light-bulb marketing practices exempted it from

2  liability.  However, the Supreme Court rejected this argument:

3     **"Moreover, nothing in the Noerr opinion implies that *602 the mere fact that a state**
4     **regulatory agency may approve a proposal included in a tariff, and thereby require that**
      **the proposal be implemented until a revised tariff is filed and approved, is a sufficient**
5     **reason for conferring antitrust immunity on the proposed conduct.** The passage quoted
      in the dissent, Post, at 3132, sets up an assumed dichotomy between a restraint imposed by
6     governmental action, as contrasted with one imposed by private action, and then cites United
      States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, and Parker for the
7     conclusion that the former does not violate the Sherman Act.[FN44] That passing reference to
8     Parker sheds no light on the significance of **state action which amounts to little more than**
      **approval of a private proposal.** It surely does not qualify the categorical statement in
9     Parker that "a state does not give immunity to those who violate the Sherman Act by
      authorizing them to violate it, or by declaring that their action is lawful." 317 U.S., at 351, 63
10    S.Ct., at 314. Yet **the dissent would allow every state agency to grant precisely that**
      **immunity by merely including a direction to engage in the proposed conduct in an**
11    **approval order."**

12    Similarly, under *Cantor* Merck is not entitled to the protection of *Noerr-Pennington* here, when it

13  was seeking neither a change nor a modification of FDA regulations. Its filings were required by law and

14  the proposals it made to the FDA were part and parcel of its obligations.  Approval of Merck's proposals

15  regarding its labels is not the equivalent of petitioning the government "with respect to the passage or

16  enforcement of laws," and Merck is not entitled to the protections of the doctrine.

17

18    **5.  THE DOCTRINE DOES NOT APPLY WHERE THE ACTION IS BASED ON**
19    **CONDUCT OTHER THAN PETITIONING OR LOBBYING THE GOVERNMENT**

20    Even in cases where protected petitioning activity is actually present, the *Noerr-Pennington* doctrine is

21  only applied to defeat a claim which is based solely upon the protected conduct.  See e.g. *Premier Medical*

22  *Management Systems, Inc. v. California Ins. Guarantee* 136 Cal.App.4th 464, 479, 39 Cal.Rptr.3d 43

23  (Cal.App. 2 Dist.2006)(Action by management company against insurers and employers, was barred by the

24  *Noerr-Pennington* doctrine, where the gravamen of action arose from activity of defendants in petitioning

25  the Workers' Compensation Appeals Board (WCAB) to stay processing of workers' compensation bills and

26  lien claims by plaintiff, because "[a]ll of the actions which form the basis for the complaint took place in

27  anticipation of, or during, proceedings before the WCAB.")

28

1    While petitioning activities alone are not actionable, the doctrine does not apply when related

2  conduct is actionable. An example is found in *Snyder v. American Ass'n of Blood Banks* 144 N.J. 269, 676

3  A.2d 1036 (N.J. 1996). In *Snyder* a transfusion recipient who contracted AIDS after receiving blood

4  contaminated with HIV, brought a negligence action against the AABB, a trade association of voluntary

5  blood banks that set standards for blood banks and was "an active member of the FDA's influential Blood

6  Products Advisory Council and advised the FDA on issues concerning the blood industry." Id. at 279. The

7  plaintiff alleged that the association had negligently enhanced the recipient's risk of contracting AIDS by

8  failing to recommend surrogate testing of donors. Appealing from a judgment for the plaintiff, the

9  defendant asserted the *Noerr-Pennington* doctrine. However, the Court of appeal affirmed:

10

11   "We need not determine whether the *Noerr-Pennington* doctrine extends beyond antitrust
      law to tort liability. The AABB's liability does not rest on its right to petition government.
12    The jury found that the AABB was negligent for failing to recommend that its member banks
      adopt surrogate testing, and not for the AABB's lobbying efforts or its participation on the
13    FDA Blood Products Advisory Board. In brief, the *Noerr-Pennington* doctrine does not
      apply." (Id. at 1050.)
14

15    Similarly, the basis of Plaintiff's causes of action is not a failure to warn the FDA, nor a fraud-on-

16  the-FDA claim. Merck's contacts with the FDA are relevant to but not the basis for Plaintiff's claims.

17  Evidence of how Merck has interacted with the FDA and made representations and proposals to the FDA

18  in connection with its marketing and labeling is highly probative, and does not implicate Merck's right to

19  petition the government, nor does it give rise to *Noerr-Pennington* protection.

20                                    **CONCLUSION**

21    Based upon the foregoing, Merck's motion to preclude the admission of evidence under the Noerr-

22  Pennington doctrine should be denied, and any such objection should be overruled.

23  DATED: March 21, 2007                    ROBINSON, CALCAGNIE & ROBINSON

24

25                                  By: _____
                                         MARK P. ROBINSON, JR.
26                                       KEVIN F. CALCAGNIE
                                         CARLOS A. PRIETTO, III
27                                       Attorneys for Plaintiff
                                         LOWELL BERWICK
28

8

**Cannuscio, Carolyn C**

| | |
|---|---|
| **From:** | Guess, Harry A |
| **Sent:** | Tuesday, February 13, 2001 12:43 AM |
| **To:** | Watson, Douglas J.; Rhodes, Thomas; Cannuscio, Carolyn C; Holmes, Richard; Ramey, Dena Rosen; Cai, Bing |
| **Cc:** | Williams, George W (U.S.); Santanello, Nancy C. |
| **Subject:** | passing along a note of thanks from last week |

Hi Folks.

I wanted to thank all of you again for the tremendous effort all of you put into the VIOXX Adv Com Mtg. Our efforts were appreciated.

Harry


-----Original Message-----

| | |
|---|---|
| **From:** | Scolnick, Edward M. |
| **Sent:** | Thursday, February 08, 2001 9:10 PM |
| **To:** | Greene, Douglas Dr.; Reicin, Alise S.; Nies, Alan S.; Guess, Harry A; Shapiro, Deborah R.; Simon, Thomas |
| **Subject:** | Today |

To ALL: I bit my nails all day. You all were FANTASTIC. You made them look like grade d high school students and you won big huge and completely. You should be proud happy and .... exhausted. enjoy and bask in the warmth of having done an impossible job superbly/ Ed

P1.0001

EXHIBIT 1001

MRK-ACT0018064

FAC Resp. Exhibit B -- 2175

**Anstice, David W.**

| | |
|---|---|
| From: | Scolnick, Edward M. |
| Sent: | Tuesday, October 16, 2001 12:08 AM |
| To: | Anstice, David W. |
| Subject: | RE: vioxx label |

it is ugly cubed. thye are bastards

-----Original Message-----
From:      Anstice, David W.
Sent:      Monday, October 15, 2001 6:32 PM
To:        Scolnick, Edward M.
Subject:   RE: vioxx label

Ed, Thanks. I just received a copy 5 minutes ago and will digest tonight. We knew it would be UGLY and it is. We'll fight back and see where we get. I agree that we should ask for an advisory committee if necessary.  David

-----Original Message-----
From:      Scolnick, Edward M.
Sent:      Monday, October 15, 2001 6:02 PM
To:        Anstice, David W.
Subject:   vioxx label

*David  Be assured we will not accept this label. if we need to we will ask to go to an advisory committee meeting/Ed*

Wendy +

RECEIVED
OCT 17 2001
WENDY L. DIXON

Legal hold

1

P1.0002

EXHIBIT 1002

Confidential - Subject To Protective Order

MRK-ABW0004799

FAC Resp. Exhibit B -- 2176

| To: | Goldmann, Bonnie J; Greene, Douglas Alan; Kim, Peter S |
| --- | --- |
| From: | Scolnick, Edward M. |
| Cc | |
| Bcc: | |
| Date: | 2002-02-25 19:05:32 |
| Subject: | Vioxx label |

To ALL: If you get this label it will be an Al Michaels quote: " Do you believe in miracles?" But a 2002 version.Just plain terrific!/ Ed

EXHIBIT 1058

P1.0305

MRK-ACR0009297

| | |
|---|---|
| **To:** | Greene, Douglas Alan; Goldmann, Bonnie J |
| **From:** | Scolnick, Edward M. |
| **Cc** | Kim, Peter S |
| **Bcc:** | |
| **Date:** | 2001-11-08 13:31:20 |
| **Subject:** | History lesson |

Doug and Bonnie   twice in my life I have had to say to the FDA" That label is unacceptable, we will not under any circumstances accept it." Once when they wanted a black box warning for angioedema in vasotec in 1985 and once in 1989 when Steve Fred wanted a warning about potential colon cancer in the prilosec label. You WILL have to do that on the cardiac warning for Vioxx. I assure you
that you will . And i assure you i will NOT sign off on any lable that had a cardiac warning. the data review yesterday convinces me that we do not have an unsafe drug and I am willing if needed to spend several hours one on one with anyone at the FDA going through the data until they in fact get it/ Ed Scolnick

**EXHIBIT 1104**

**P1.1098**

Confidential - Subject To Protective Order

MRK-AFJ0001537

FAC Resp. Exhibit B -- 2178

| To: | Greene, Douglas Dr.; Nies, Alan S.; Reicin, Alise S.; Goldmann, Bonnie J; Gertz, Barry J. |
|---|---|
| From: | Scolnick, Edward M. |
| Cc | Slater, Eve; Blois, David W.; McGlynn, Margie G; Anstice, David W. |
| Bcc: | |
| Date: | 2001-01-21 13:59:47 |
| Subject: | Vigor Adv meeting |

To ALL;    I have been stewing about the FDA review of Vigor since reading the document Friday. Doug and I spoke briefly Sat. Morning about it. The more I think about it the more I think we need to change slightly the emphasis of the talks. Not the slides , obviously not the data but what we say.

Let me take you through the logic. (My office is undergoing asbestos repair and I am at home Monday morning before going to a MMD annual meeting in Arizona)
If you want to talk about what i am going to say please call me at home before 10 30 AM

I think it must be stated clearly that we know the dose for RA. 25mg. That at the time we did Vigor we did not know., That it is unfortunate that Vigor came to conclusion before the RA program but that they MUST know-explicitly and not waiting for a question- that the dose for RA is 25mg.Clearly have data ready to show and acknowledge that the fDA has not seen it although i think we should send them the essence of it. A couple of tables and graphs.

Then i think as you go through the prior ulcer data which compares to ibuprofen you emphasize the DOSE RESPONSE curve. WE NOW KNOW THE ANSWER THAT WAS NOT CLEAR WHEN VIGOR WAS DESIGNED. We know that 50mg og Vioxx in 2 ulcer studies is higher than placebo. We know Mk663 at 120 mg is higher than placebo.
Heads in the sand, or hoping for a miracle which will not happen in the fianl endoscopy study will not help.. Thus we point out that it is expected that 50mg will be lower than the SECOND NSAID we tested against in Vigor ie Naproxen since it was lower than ibuprofen for ulcers even at 50mg but it will not be placebo at 50mg.  The need now that we have data is to tie the ulcer data to the outcome data. We NOW can do that. By doing that we can introduce the dose response concept. THIS IS ABSOLUTELT VITAL in presenting Vigor to the committee and in a public affairs way.

We gain the following : We emphasize the safety of 12.5mg and 25mg. The benefit risk is clear. we have no appreciable hypertension or edema at 25mg, we have ulcers comparable to placebo, and we have no CV events in the placebo controlled trials including the Alzheimer's trial.We isolate the 50mg data and say THAT WE HAVE PROVEN IF THERE IS DOSAGE CREEP THAT EVEN AT 50MG WE ARE LOWER FOR GI EVENTS THAN NAPROXEN . We point out that since the ulcer data is vs Ibuprofen , and the outcomes data is vs naproxen that we have in fact tested Vioxx vs  TWO NOT ONE NSAID.

This will allow us to argue that the label should reflect  a different statement using the lower doses for Gi safety. for example. Assuming the warning is retained we could get to lump the ulcer data in an intelligent way to the outcomes  which now should be doable. The logic is very tight that we should be able to say: the outcomes were less than naproxen at 50mg Vioxx, the ulcers which are a marker for the outcomes although not one for one, were much lower than another nsaid at 12.5 and 25 mg, Thus across the dosage range this class has  lower risk of GI safety problems than the prior class. getting that bland a statement even retaining the warning would be a big win. BIG. For managed care and the class of drugs, this would be an enormous help. The logic for this approach is sound. we can stand behind it scientifically with integrity. The agency can moan and groan as usual but we can win the argument for this type of statement. But we will not win by couching our statements  and not ebing explicit with the words that describe the data. The MK663 data and the table that shows ll the ulcer endo data is unambiguous.By looking at the data and not relying on our preconceived notions we can now formulate a correct strategy to the meeting and the upcoming round two battle with this group, and win the public affairs war.

As I have said if you want to talk i am at home Monday morning while an asbestos abatement is being finished in my office. I ahve asked Bob Bissett to set up a telecon wed or thur to discuss the Public Affairs handling of Vigor andwe can also talk then. But I plead and urge you to take this approach. I deeply believe we will end up in a horribel situation otherwise/ Ed

*Reicin*
EXHIBIT NO. 48
8.19.05
L. GOLKOW

P1.1437

**EXHIBIT 1128**

Confidential  Subject To Protective Order

MRK ABH0019058

03/23/2006 14:42 FAX 2134811554          GIRARDI & KEESE                    ☑002

1  GIRARDI | KEESE
   1126 Wilshire Boulevard
2  Los Angeles, California 90017
   213-977-0211
3  THOMAS V. GIRARDI - BAR NO. 36603
   JAMES O'CALLAHAN - BAR NO. 126975
4  VINCENT CARTER - BAR NO.

5  Plaintiffs' Liaison Counsel

6  ROBINSON, CALCAGNIE & ROBINSON
   620 Newport Center Drive, Suite 700
7  Newport Beach, California 92660
   (949) 720-1288
8  MARK P. ROBINSON, JR. - BAR NO. 054426
   KEVIN F. CALCAGNIE - BAR NO. 108994
9
   On behalf of the Plaintiffs' Executive Committee
10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                   FOR THE COUNTY OF LOS ANGELES

13

14  Coordination Proceeding          )  Case No. JCCP 4247
    Special Title (Rule 1550(b))     )
15                                   )  Assigned to Honorable Victoria Chaney,
    IN RE: VIOXX® CASES              )  Department 324
16  ─────────────────────────       )
                                     )  PLAINTIFFS' BRIEF RE STRICT LIABILITY
17  THIS DOCUMENT RELATES TO ALL     )  FAILURE TO WARN IN PRESCRIPTION
    CASES                            )  DRUG LITIGATION
18                                   )            April 10, 2006
    Plaintiff,                       )  Date:    ~~March 20, 2006~~
19                                   )  Time:    ~~9:30 a.m.~~ 10:00 AM
    vs.                              )  Dept.:   324
20                                   )  Trial Date: None
    MERCK & COMPANY, INC., a corporation; )
21  McKESSON CORPORATION, a          )
    corporation; DOES 1 to 100,      )
22  PHARMACEUTICAL DISTRIBUTOR       )
    DOES 101 to 200, PHARMACY        )
23  DEFENDANT DOES 201 to 300, inclusive. )
                                     )
24      Defendants.                  )
                                     )
25  ─────────────────────────       )

26

27

28

                                    1
────────────────────────────────────────────────────────────
Plaintiffs' Brief re: Strict Liability for Failure to Warn in Prescription Drug Litigation

FAC Resp. Exhibit B -- 2180

# TABLE OF AUTHORITIES

<u>CASES</u>

Brown v. Superior Court (1988) 44 Cal.3d 1049, 1061, 245 Cal.Rptr. 412,
751 P.2d 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Carlin v. Superior Court (1996) 13 C.4th 1104, 1108-1110, 56 C.R.2d 162, 920 P.2d 1347 . . 1, 5, 6

Le Francois v. Goel (2005) 35 Cal.4th 1094, 1108, 29 Cal.Rptr.3d 249, 112 P.3d 636 . . . . . . . . . 3

Murphy v. E.R. Squibb & Sons, Inc. (1985) 40 Cal.3d 672, 221 Cal.Rptr. 447, 710 P.2d 247 . . 4, 5

<u>OTHER</u>

6 Witkin, Summary 10th (2005) Torts, § 1477, p. 913 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

CACI 1205, Judicial Council of California Civil Jury Instructions, Jan. 2006 . . . . . . . . . . . . . . 1, 7

Flahavan, Rea & Kelly, CAL. PRAC. GUIDE: PERSONAL INJURY
(The Rutter Group 2005) 2:595-2:597; 2:687) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       Plaintiffs submit the following brief in support of their request at the status conference of

3   March 20, 2006, that the Court reconsider its Ruling of March 3, 2006, which sustained without

4   leave to amend the Demurrer of the Distributor Defendants to the 1st Cause of Action for Strict

5   Liability - Failure to Warn.  Plaintiffs believe that the order is contrary to established California law,

6   including the California Supreme Court's decision in Carlin v. Superior Court (1996) 13 C.4th

7   1104, 1110, 56 C.R.2d 162, 920 P.2d 1347, in that the order is based upon the incorrect assumption

8   that pharmaceutical manufacturers cannot be held strictly liable for failure to warn.  The law is

9   clearly the opposite, according to authorities which unfortunately were not brought to the Court's

10  attention by either party in the briefing:

11  **"Prescription drug manufacturers are strictly liable for failure to warn."**
    6 Witkin, Summary 10th (2005) Torts, § 1477, p. 913

12  "In this case we address the question whether a plaintiff alleging injury from
13  ingesting a **prescription drug** can state a claim against the manufacturer for **strict**
    **liability** and breach of warranty **for failure to warn** about the known or reasonably
14  scientifically knowable dangerous propensities of its product.  We conclude that she
    can."
15  Carlin v. Superior Court (1996) 13 C.4th 1104, 1108, 56 C.R.2d 162, 920 P.2d 1347
    (Emphasis in bold added throughout this brief.)

16  **"In prior cases, we have expressly and repeatedly applied a strict liability**
17  **standard to manufacturers of prescription drugs for failure to warn of known**
    **or reasonably scientifically knowable risks.  We merely reaffirm those**
18  **precedents here."**  Id. at 1110

19  **"Strict Liability-Failure to Warn**-Essential Factual Elements
    ...To establish this claim, [name of plaintiff] must prove all of the following:
20  1. That [name of **defendant**] [**manufactured/distributed/sold**] the [product]; ...[The
    warning must be given to the prescribing physician and must include the potential
21  risks, side effects, or allergic reactions that may follow the foreseeable use of the
    product....
22  .....The last bracketed paragraph should be read only **in prescription product**
    cases..."
23  CACI 1205, Judicial Council of California Civil Jury Instructions, Jan. 2006

24   **"Strict Liability** for Defective Products:  The "strict product liability" theory of
    recovery exposes a broad range of defendants to legal accountability for "defective"
25  products.  ...Broad range of potential defendants:  The theory permits the imposition
    of tort liability against all those directly in the marketing chain--e.g., **not only**
26  **manufacturers, but also wholesalers, distributors and retailers.**  "Regardless of
    the identity of a particular defendant or his position in the commercial chain, **the**
27  **basis for his liability remains that he has marketed or distributed** a defective
    product.'"
28  Flahavan, et al., CAL. PRAC. GUIDE: PERSONAL INJURY (TRG 2005) 2:595-2:597

# INTRODUCTION

The portion of the Court's ruling sustaining without leave to amend the Demurrer of the Distributor Defendants to the cause of action for strict liability for failure to warn, reads as follows:

"B.    Strict Liability

In their first cause of action plaintiffs allege strict liability–failure to warn–against "Pharmaceutical Distributor Does 101 to 200." (Compl., p. 13.)
Pharmacists cannot be held strictly liable for defects in prescription pharmaceuticals or for failure to warn of such defects. (Murphy v. E.R. Squibb & Son., Inc. (1985) 40 Cal.3d 672 [pharmacists not strictly liable because they have no discretion to depart from a valid prescription, and strict liability would raise the price of prescription drugs, which is against public policy].) Neither can manufacturers. (Brown v. Superior Court (1988) 44 Cal.3d 1049, 1060-1061 [no strict liability against pharmaceutical manufacturers].)
It would be an anomalous to hold a distributor, who stands between the manufacturer and pharmacist in the chain of distribution, to a different standard.
Therefore, the distributor defendants' demurrer to the first cause of action is sustained without leave to amend."

While the ruling is correct that *Murphy* does not permit strict liability against pharmacists, (who, in addition to being sellers, are service providers), the ruling as to manufacturers and distributors is erroneous and based upon an incorrect statement of the law. *Brown* precludes only strict liability for *design* defects in prescription drug cases. It does *not* preclude strict liability for failure to warn against pharmaceutical manufacturers or distributors. Strict liability for failure to warn is clearly recognized in post-*Brown* decisions involving prescription drugs. In fact, it is so well-recognized that this same cause of action has been pursued for several years and is part of the Master Complaints in both the Diet Drugs JCCP overseen by Judge Pratt, and the Rezulin JCCP overseen by Judge West, both coordinated proceedings involving prescription drugs.

The *Brown* decision is not a model of clarity on the subject, and therefore the fault for the Court's misunderstanding lies in part with counsel for Plaintiffs in failing to bring the authorities cited above to the Court's attention, particularly the *Carlin* decision, which is crystal clear on this issue. Plaintiffs apologize to the Court for not adequately briefing this issue earlier. However, if this Court's ruling were to remain in effect, it would essentially eliminate what is the single most important cause of action in this case.

2

## 1. UPON ITS OWN MOTION OR THE REQUEST OF ANY PARTY THE COURT MAY RECONSIDER ANY PRIOR ORDER WHICH IT BELIEVES TO BE ERRONEOUS

Although CCP § 1008 has specific requirements relating to motions for reconsideration, it is not the exclusive method by which a party may seek reconsideration of an order. Even where a party does not seek reconsideration based upon "new or different facts, circumstances, or law," the court still has jurisdiction to reconsider an erroneous ruling, on its own motion or when an error is brought to its attention by a party. As stated by the California Supreme Court in Le Francois v. Goel (2005) 35 Cal.4th 1094, 29 Cal.Rptr.3d 249, 112 P.3d 636:

> "We cannot prevent a party from communicating the view to a court that it should reconsider a prior ruling (although any such communication should never be ex parte). We agree that it should not matter whether the "judge has an unprovoked flash of understanding in the middle of the night" (Remsen v. Lavacot, supra, 87 Cal.App.4th at p. 427, 104 Cal.Rptr.2d 612) or acts in response to a party's suggestion. **If a court believes one of its prior interim orders was erroneous, it should be able to correct that error no matter how it came to acquire that belief. For example, nothing would prevent the losing party from asking the court at a status conference to reconsider a ruling.** (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, supra, § 9:327.8, p. 9(1)-107.) But a party may not file a written *motion* to reconsider that has procedural significance if it does not satisfy the requirements of section 437c, subdivision (f)(2), or 1008. The [112 P.3d 646] court need not rule on any suggestion that it should reconsider a previous ruling and, without more, another party would not be expected to respond to such a suggestion. As one court explained, "were a party to suggest that the court reconsider a motion, the court would have every right to do so, even if that required the party to bring a new motion. In that circumstance, the responding party would not bear the burden of preparing opposition unless the court indicated an interest in reconsideration." (Schachter v. Citigroup, Inc., supra, 126 Cal.App.4th at p. 739, 23 Cal.Rptr.3d 920.)" Id. at 1108-1109.

## 2. WITH THE EXCEPTION OF PHARMACISTS, WHO ARE A 'HYBRID' AND PRIMARILY SERVICE PROVIDERS, ALL THOSE DIRECTLY IN THE MARKETING CHAIN, INCLUDING 'NON-MANUFACTURING SELLERS', ARE SUBJECT TO STRICT LIABILITY

In addition to product manufacturers, non-manufacturers such as sellers and distributors are subject to strict liability for defective products. According to Flahavan, Rea & Kelly, CAL. PRAC. GUIDE: PERSONAL INJURY (The Rutter Group 2005):

> [2:596] General considerations: **Strict product liability is an outgrowth of predominating public policy considerations. The concept is that all those involved in the marketing "enterprise," and who have reaped profits by placing a defective product in the stream of commerce, should bear the costs of injuries caused by that product.** [Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 262, 37 Cal.Rptr. 896, 899]

3

...

(1) [2:597]  Broad range of potential defendants:  The theory permits the imposition of tort liability against **all those directly in the marketing chain**--e.g., not only manufacturers, but also wholesalers, distributors and retailers.  "**Regardless of the identity of a particular defendant or his position in the commercial chain**, the basis for his liability remains that he has marketed or distributed a defective product." [Daly v. General Motors Corp. (1978) 20 Cal.3d 725, 739, 144 Cal.Rptr. 380, 388; see  Peterson v. Super.Ct. (Banque Paribas) (1995) 10 Cal.4th 1185, 1199-1202, 43 Cal.Rptr.2d 836, 844-846; and more detailed discussion at ¶2:662 ff.]

(a) [2:597.1]  Rationale:  **All those involved in the distribution chain** play a part in stimulating consumer demand for the product through advertising and marketing techniques in order to enhance their own profits.  By so doing, they necessarily increase the number of persons exposed to risk of injury from the product.  Having increased the risk, they should bear the burden of resulting injuries. [Bay Summit Community Ass'n v. Shell Oil Co. (1996) 51 Cal.App.4th 762, 771-776, 59 Cal.Rptr.2d 322, 327-330;  LaRosa v. Super.Ct. (Joe Clar & Sons) (1981) 122 Cal.App.3d 741, 756-757, 176 Cal.Rptr. 224, 233]

[2:666] Wholesalers, **distributors:** **Any person or entity involved in the marketing chain between the original manufacturer and the ultimate retail seller is also exposed to strict product liability.** [Barth v. B.F. Goodrich Tire Co. (1968) 265 CA2d 228, 253, 71 CR 306, 321]

Murphy v. E.R. Squibb & Sons, Inc. (1985) 40 Cal.3d 672, 221 Cal.Rptr. 447, 710 P.2d 247, provides an exception to the general rule of strict liability on the part of anyone in the marketing chain.  This is because pharmacists, unlike defendants which only manufacture or only distribute prescription drugs, are primarily providers of a service.  As the court stated in Murphy:

"It seems clear to us that the pharmacist is engaged in a hybrid enterprise, combining the performance of services and the sale of prescription drugs.  It is pure hyperbole to suggest, as does plaintiff, that the role of the pharmacist is similar to that of a clerk in an ordinary retail store.  With a few exceptions, only a licensed pharmacist may dispense prescription drugs, and as indicated above there are stringent educational and professional requirements *679 for obtaining and retaining a license.  A pharmacist must not only use skill and care in accurately filling and labelling a prescribed drug, but he must be aware of problems regarding the medication, and on occasion he provides doctors as well as patients with advice regarding such problems." Id. at 678-679

"If pharmacies were held strictly liable for the drugs they dispense, some of them, to avoid liability, might restrict availability by refusing to dispense*681 drugs which pose even a potentially remote risk of harm, although such medications may be essential to the health or even the survival of patients.  Furthermore, in order to assure that a pharmacy receives the maximum protection in the event of suit for defects in a drug, the pharmacist may select the more expensive product made by an established manufacturer when he has a choice of several brands of the same drug." Id at 680-681

...

4

1    "The fact that a pharmacy may be owned by an enterprise which also deals in
     ordinary merchandise does not justify the conclusion that it should be held strictly
2    liable when it performs a service." Id at 681

3    Flahavan, et al. explain pharmacists' immunity from strict liability as being based upon the

4    fact that their dominant function is providing a service instead of selling a product:

5
         [2:687] Hybrid cases--pharmacists: Pharmacists fall into a more problematic
6        category. They obviously provide a 'service' in the dispensing of prescription drugs.
         But they are also providers (sellers, in fact) of consumer goods, arguably no different
7        from other retailers in a marketing enterprise; unlike doctors and hospitals (above),
         they are not 'essentially' service providers. Even so (absent relevant legislation),
8        **strict product liability in these 'hybrid' cases turns on a 'dominant role'
         test--i.e., whether defendant's dominant role in supplying the product should be**
9        **characterized as the performance of a service or the sale of a product.** [Murphy
         v. E.R. Squibb & Sons, Inc. (1985) 40 C3d 672, 221 CR 447]
10
         **The 'dominant' function of pharmacists is deemed to be the performance of a**
11       **service and, therefore, pharmacists are immune from strict product liability** for
         injuries caused by 'defective' drugs they dispense. [See Murphy v. E.R. Squibb &
12       Sons, Inc., supra (analogizing to blood product manufacturers and looking to
         legislation describing practice of pharmacy as a 'dynamic patient-oriented health
13       service')]"

14

15   *Murphy* on its face applies only to pharmacies and pharmacists. Unlike pharmacies and

16   pharmacists, distributors and manufacturers of prescription drugs which are in the marketing chain

17   are not 'hybrid cases.' Their dominant role is the sale of a product, and they are still subject to the

18   same rules of strict liability. As will be shown below, in the case of prescription drugs this includes

19   strict liability for failure to warn.

20

21   **3.  PHARMACEUTICAL MANUFACTURERS AND DISTRIBUTORS ARE NOT
     SUBJECT TO STRICT LIABILITY FOR DESIGN DEFECTS, BUT THEY ARE SUBJECT**
22   **TO STRICT LIABILITY UNDER FAILURE TO WARN.**

23   In Brown v. Superior Court (1988) 44 Cal.3d 1049, 1061, 245 Cal.Rptr. 412, 751 P.2d 470,

24   the California Supreme Court held that strict liability for design defect is not available in a

25   prescription drug action. However, the Court did not hold that strict liability for failure to warn was

26   unavailable in such a case. Eight years after *Brown* the California Supreme Court left no doubt on

27   this issue in Carlin v. Superior Court (1996) 13 C.4th 1104, 56 C.R.2d 162, 920 P.2d 1347. Perhaps

28   the clearest statement of the viability of a cause of action for strict liability for failure to warn in a

prescription drug case is found in 6 Witkin, Summary 10th (2005) Torts, § 1477, p. 913, which discusses *Carlin*:

> "The Anderson analysis was reaffirmed in Carlin v. Superior Court (1996) 13 C.4th 1104, 56 C.R.2d 162, 920 P.2d 1347. Plaintiff brought suit against defendant drug manufacturer for injuries allegedly sustained from side effects of the sleeping pill Halcion, which was prescribed by her physician for several years. Plaintiff claimed that defendant was strictly liable for failure to warn of these known side effects. The trial judge sustained defendant's demurrer without leave to amend, and plaintiff petitioned for mandamus. The Court of Appeal issued the writ, directing the trial judge to overrule the demurrer. Held, affirmed.

> **(a) Prescription drug manufacturers are strictly liable for failure to warn.**
> In Anderson, an asbestos case, the court held that manufacturers generally are strictly liable for injuries caused by their failure to warn of dangers known to the scientific community at the time they manufacture and distribute products. There is no sound reason to reject the Anderson strict liability standard in prescription drug cases. California courts have expressly and repeatedly applied a strict liability standard to prescription drug manufacturers for failure to warn of "known or reasonably scientifically knowable" risks. The court merely reaffirms these precedents here. (13 C.4th 1110.)

> (b) Knowledge or knowability requirement. Strict liability is not absolute liability; it is not intended to make the **manufacturer or distributor** of a product its insurer. **Actual or constructive knowledge of potential risk or danger is required before strict liability for failure to warn may be imposed. (13 C.4th 1110.) This requirement applies to all products, including prescription drugs. (13 C.4th 1111.)"**

The statements of the California Supreme Court in the *Carlin* decision are equally clear and leave no doubt about the viability of a cause of action based upon strict liability for failure to warn in a prescription drug action:

> "In this case we address the question whether a plaintiff alleging injury from ingesting a prescription drug can state a claim against the manufacturer for strict liability and breach of warranty for failure to warn about the known or reasonably scientifically knowable dangerous propensities of its product. We conclude that she can." Id. at 1108

> "Upjohn Company (hereafter Upjohn), a manufacturer of prescription drugs, urges us to now reject the strict liability standard under Anderson for cases involving failure to warn of known or reasonably scientifically knowable risks from prescription drugs, and adopt a new standard of simple negligence for that industry only. We discern no sound basis for doing so." Id. at 1109

> "Upjohn contends that the Court of Appeal erred in vacating the superior court's order sustaining a demurrer on Carlin's cause of action for strict liability for failure to warn. It argues that California courts have "long refused to expand the scope of

1  potential liability of prescription pharmaceutical manufacturers beyond traditional
2  negligence principles." Not so.  In prior cases, we have expressly and repeatedly
   applied a strict liability standard to manufacturers of prescription drugs for failure to
3  warn of known or reasonably scientifically knowable risks.  We merely reaffirm
   those precedents here." Id. at 1110
4

5      The law could not be any clearer.  Strict liability for failure to warn applies in a prescription

6  drug case.  This is why manufacturers, distributors and sellers are all included in CACI 1205, the

7  jury instruction on strict liability for failure to warn, which specifically references prescription

8  products:

9      "1205. **Strict Liabilty-Failure to Warn-Essential Factual Elements**

10  [Name of plaintiff] claims that the [product] lacked sufficient [instructions] [or]
    [warning of potential [risks/side effects/allergic reactions]].  To establish this claim,
11  [name of plaintiff]     must prove all of the following:
        1. That [name of **defendant] [manufactured/distributed/sold) the [product];**
12      2. That the [product] had potential [risks/side effects/allergic reactions] that were
    [known] [or] [knowable by the use of scientific knowledge available] at the
13      time of [manufacture/distribution/sale];
        3. That the potential [risks/side effects/allergic reactions] presented a substantial
14  danger to users of the [product];
        4. That ordinary consumers would not have recognized the potential [risks/side
15  effects/allergic reactions];
        5. That [name of defendant] failed to adequately warn [or instruct] of the
16  potential [risks/side effects/allergic reactions];
        6. That the [product] was used [or misused] in a way that was reasonably
17  foreseeable to [name of defendant];
        7. That [name of plaintiff] was harmed; and
18      8. That lack of sufficient [instructions] [or] [warnings] was a substantial factor in
    causing [name of plaintiff]'s harm.
19      [The warning must be given to the **prescribing physician** and must include the
    potential risks, side effects, or allergic reactions that may follow the foreseeable use
20  of the product.  [Name of defendant] had a continuing duty to warn physicians as
    long as the product was in use.]"
21

22      The 'DIRECTIONS FOR USE' for 1205 make it clear that it is used in prescription drug

23  cases, noting that  "The last bracketed paragraph should be read only in prescription product cases:

24  In the case of prescription drugs and implants, the physician stands in the shoes of the 'ordinary

25  user' ..."

26  //

27  //

28  //

**CONCLUSION**

Based upon the forgoing, Plaintiffs respectfully request that the Court reconsider its ruling

on the Demurrer as to the 1st Cause of Action for Strict Liability-Failure to Warn.

Dated:    3 - 17 - 06                               ROBINSON, CALCAGNIE & ROBINSON


                                                    BY: _Mark P. Robinson, Jr._
                                                         MARK P. ROBINSON, JR.
                                                         Attorneys for Plaintiffs

8

FAC Resp. Exhibit B -- 2189

1  GIRARDI | KEESE
   1126 Wilshire Blvd.
2  Los Angeles, CA 90017
   (213) 977-0211
3  FAX (213) 481-1554
   THOMAS V. GIRARDI - BAR NO. 36603
4  JAMES G. O'CALLAHAN, STATE BAR NO. 126975
5
6  Plaintiffs Liaison Counsel
7
8
9              SUPERIOR COURT OF THE STATE OF CALIFORNIA
10                        COUNTY OF LOS ANGELES
11  Coordination Proceeding Special Title (Rule 1550(b))
12
13  **This Document Applies to All**      )    CASE NO. JCCP No. 4247
                                          )
14  **VIOXX ® CASES**                     )    Assigned to the Honorable Victoria
                                          )    Chaney, Department 324
15                                        )
                                          )    NOTICE OF RULING
16                                        )
17
18  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:
19       Pursuant to the court's minute order, attached hereto is a copy of the court's revised ruling
20  pertaining to the distributor defendant's demurrer in the above-captioned matter.
    Dated: May 22, 2006
21                                             GIRARDI AND KEESE
22
23                                  By:   _Jun  6 O'Callah___
                                          James G. O'Callahan
24                                        Plaintiffs' Liaison Counsel
25
26
27
28

-1-

05/23/2006 10:45 FAX 2134811554        GIRARDI & KEESE                         ☑003

*Vince ETI*

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 05/16/06 | **DEPT.** 324 |
| HONORABLE VICTORIA CHANEY            JUDGE | E. SABALBURO          DEPUTY CLERK |
| HONORABLE                  JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| #7 | |
| F. ROJAS, C.A.        Deputy Sheriff | NONE                   Reporter |

JCCP4247                           Plaintiff
                                   Counsel
COORDINATION PROCEEDING SPECIAL
TITLE RULE (1550 (b))             Defendant
                                   Counsel
VIOXX Cases

**RECEIVED**
MAY 17 2006
GIRARDI & KEESE

                                NO APPEARANCES

---

NATURE OF PROCEEDINGS:

REVISED RULING ON SUBMITTED MATTER HEARD APRIL 10,
2006

The Court hereby makes its revised ruling pursuant to
the "REVISED RULING ON REQUEST FOR RECONSIDERATION"
as signed and filed this date.

On its own motion the court GRANTS reconsideration of
its ruling of March 3, 2006 in which it sustained the
distributor defendants' demurrer to plaintiffs' cause
of action for strict liability--failure to warn. Upon
reconsideration, the demurrer is OVERRULED.

Counsel James G. O'Callahan is ordered to serve a copy
of the court's ruling on all parties.

              CLERK'S CERTIFICATE OF MAILING/
                NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the
above-entitled court, do hereby certify that I am not
a party to the cause herein, and that this date I
served Notice of Entry of the above minute order of
5-16-2006 upon each party or counsel named below by
depositing in the United States mail at the courthouse
in Los Angeles, California, one copy of the
original entered herein in a separate sealed envelope
for each, addressed as shown below with the postage
thereon fully prepaid.

                Page    1 of    2    DEPT. 324

                                        **MINUTES ENTERED**
                                        05/16/06
                                        COUNTY CLERK

05/23/2006 10:46 FAX 2134811554         GIRARDI & KEESE                      ☒004

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 05/16/06 | | DEPT. 324 |
|---|---|---|
| HONORABLE VICTORIA CHANEY | JUDGE | E. SABALBURO | DEPUTY CLERK |
| HONORABLE #7 | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| F. ROJAS, C.A. | Deputy Sheriff | NONE | Reporter |

| JCCP4247 | Plaintiff Counsel | |
|---|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE RULE (1550 (b)) | Defendant Counsel | |
| VIOXX Cases | | |
| | | NO APPEARANCES |

**NATURE OF PROCEEDINGS:**

Date: 5-16-2006

John A. Clarke, Executive Officer/Clerk

By: _____
        E. Sabalburo

James G. O'Callahan
GIRARDI KEESE
1126 Wilshire Blvd.
Los Angeles, CA 90017

Page    2 of    2    DEPT. 324

MINUTES ENTERED
05/16/06
COUNTY CLERK

MAY 1 7 2006

GIRARDI & KEESE

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

FILED
LOS ANGELES SUPERIOR COURT

MAY 16 2006

JOHN A. CLARKE, CLERK

BY E. SABALBURO, DEPUTY

IN RE VIOXX CASES

CASE NO. JCCP 4247

REVISED RULING ON REQUEST FOR RECONSIDERATION

Hearing date:      4/11/06

Ruling date:       5/16/06

After considering the moving, opposition and reply papers and the arguments of counsel at the hearing, the court now rules as follows:

**On its own motion the court GRANTS reconsideration of its ruling of March 3, 2006 in which it sustained the distributor defendants' demurrer to plaintiffs' cause of action for strict liability—failure to warn.  Upon reconsideration, the demurrer is OVERRULED.**

I.      INTRODUCTION

In their first cause of action plaintiffs allege strict liability—failure to warn—against "Pharmaceutical Distributor Does 101 to 200." (Compl., p. 13.)  In sustaining the distributor defendants' demurrer to this cause of action the court on March 3, 2006 ruled that

Pharmacists cannot be held strictly liable for defects in prescription pharmaceuticals or for failure to warn of such defects. (*Murphy v. E.R. Squibb &*

-1-

FAC Resp. Exhibit B -- 2193

*Sons, Inc.* (1985) 40 Cal.3d 672 [pharmacists not strictly liable because they have no discretion to depart from a valid prescription, and strict liability would raise the price of prescription drugs, which is against public policy].)  Neither can manufacturers.  (*Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1060-1061 [no strict liability against pharmaceutical manufacturers].)  [¶]  It would be an anomalous to hold a distributor, who stands between  the manufacturer and pharmacist in the chain of distribution, to a different standard.

At a status conference on April 11, 2006, plaintiffs requested that the court sua sponte reconsider the above in light of *Carlin v. Superior Court* (1996) 13 Cal. 4th 1104 (*Carlin*), a case they did not cite in their opposition to the demurrer.  In opposition, the distributor defendants argued, as they argued in their demurrer, that exemption of distributors of prescription drugs from the doctrine of strict liability is supported by California case law, public policy, and the Restatement (Third) of Torts.

The court agreed to reconsider the matter, and now reverses its earlier ruling.

## II.    DISCUSSION

### A.    Reconsideration

A court may, on its own motion, reconsider its interim rulings.  (*Le Francois v. Goel* (2005) 35 Cal.4th 1094.)  A court may also take under advisement a party's request that it reconsider a ruling.  (*Id.* at p. 1108.)

### B.    Strict Liability

The parties well know the law of strict liability.  A manufacturer may be held strictly liable for injuries caused by a defective product that it knew would not be inspected by the consumer for defects.  (*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57.)  This is so because a "manufacturer, unlike the public, can anticipate or guard against the recurrence of hazards, [] the cost of injury may be an overwhelming

-2-

misfortune to the person injured whereas the manufacturer can insure against the risk and distribute the cost among the consuming public, and [] it is in the public interest to discourage the marketing of defective products." (*Brown v. Superior Court, supra*, 44 Cal.3d at p. 1056 (*Brown*).) Strict liability also applies to retailers (*Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256) but not to "'those who sell their services for the guidance of others . . . .'" (*Murphy v. E.R. Squibb & Sons, Inc., supra*, 40 Cal.3d at p. 677 (*Murphy*), quoting *Gagne v. Bertran* (1954) 43 Cal.2d 481, 487).

There are three types of product defects for which a manufacturer and distributor may be held liable:  Manufacturing defects, design defects, and deficient warnings or instructions. (*Brown, supra*, at p. 1057.)  Though strong policy considerations—protection of consumers and distribution of the cost of injury—support the doctrine of strict liability generally, other policy considerations—including the "public interest in the availability of drugs at an affordable price" (*Brown, supra*, at p. 1063)—militate against applying the doctrine specifically to prescription drugs.

In its March 3 ruling the court identified two boundaries in the chain of distribution—the drug manufacturer and the ultimate retailer—where, for policy reasons, the courts have held strict liability not to apply.  The court then reasoned that if strict liability does not apply at the book-ends of distribution, it doesn't apply in the middle. As will be discussed below, the court misapprehended the case law's treatment of the book-ends.

## C.   California Case Law

In its March 3 ruling, *supra*, the court overstated the rule of *Brown* and failed to limit *Murphy* to its rationale.

In *Brown*, the court considered whether a manufacturer of prescription drugs could, like other manufacturers, be held strictly liable for injuries caused by its products. After discussing various policy considerations the court held prescription drugs should be treated differently from other products.  However, *Brown* did not, as this court stated,

-3-

hold that manufacturers of prescription drugs are exempt from strict liability altogether; it held only that they may not be held strictly liable for injuries caused by design defects in their products (*id.* at p. 1065) or by failure to warn of unknowable risks (*id.* at p. 1066.) *Brown* held drug manufacturers *could* be held strictly liable for injuries caused by failure to warn of known or reasonably scientifically knowable risks. (*Id.* at p. 1069.)

Thus falls one of the book-ends relied upon by this court in its March 3 ruling, for plaintiff alleges the distributor defendants are subject to liability in the same wise as were the manufacturer defendants in *Brown*—liability for failure to warn of risks about which they knew or reasonably should have known.

The other book-end was *Murphy*. There, the court held pharmacists cannot be held strictly liable for defects in prescription pharmaceuticals or for failure to warn of such defects. (*Id.* at p. 681.) Defendants liken themselves to pharmacists and argue *Murphy* exempts them, too, from strict liability.

In *Murphy*, the plaintiff asserted that a pharmacy that sells prescription drugs "is in the same position as a retailer of any other consumer product, and that the reasons advanced in *Greenman* and *Vandermark* for imposing strict liability necessarily apply to a pharmacy." (*Murphy*, at p. 676.) The court disagreed, ultimately affirming the trial court's granting of a pharmacy defendant's motion for judgment on the pleadings. (*Id.* at p. 681.)

To understand why it did so requires close reading. First, the court noted "[i]t is critical to the issue posed to determine if the dominant role of a pharmacist in supplying a prescription drug should be characterized as the performance of a service or the sale of a product." (*Id.* at p. 677.) "'[T]hose who sell their services for the guidance of others . . . are not liable in the absence of negligence or intentional misconduct.'" (*Ibid.*, citation omitted.) The court surveyed case law, amicus briefs, and the Business and Professions and Health and Safety Codes, ultimately finding that while a "pharmacist is engaged in a hybrid enterprise, combining the performance of services and the sale of prescription drugs" (*id.* at p. 678), "[t]he Legislature must have intended . . . that even though a

-4-

FAC Resp. Exhibit B -- 2196

1   pharmacist is paid for the medication he dispenses, his conduct in filling a prescription is

2   to be deemed a service, and . . . is immune from strict liability" (*id.* at p. 680).

3         Thus falls the second book-end relied upon by this court in its March 3 ruling, for

4   the distributor defendants cannot argue their business is, like a pharmacist, to provide a

5   service. They are thus in a position different from that of the pharmacy in *Murphy* and

6   cannot apply its holding to them.

7         The final case on point is *Carlin, supra*. There, after an extensive policy

8   discussion the supreme court affirmed its earlier ruling in *Brown*: A manufacturer of

9   prescription drugs "should bear the costs, in terms of preventable injury or death, of its

10  own failure to provide adequate warnings of known or reasonably scientifically knowable

11  risks." (*Id.* at p. 1117.)

12        No California case law supports defendants' argument that distributors of

13  prescription drugs should not be held strictly liable for injuries caused by their failure to

14  warn of known or reasonably scientifically knowable risks. The only law nearly on point

15  is to the contrary: In general, the strict liability doctrine applies to those in the chain of

16  distribution. (See *Vandermark v. Ford Motor Co., supra*, 61 Cal.2d at pp. 262-263

17  ["Retailers like manufacturers . . . . are an integral part of the overall producing and

18  marketing enterprise that should bear the cost of injuries resulting from defective

19  products."].)

20

21  **D.    Public Policy**

22

23        There being no California case law on point, the distributor defendants argue the

24  public policy considerations discussed and acknowledged in *Brown, Murphy* and *Carlin*

25  require that distributors of prescription drugs not be held strictly liable for injuries caused

26  by their failure to warn of known or reasonably scientifically knowable risks.

27        For the court's present purpose, the important point to take away from *Brown* and

28  *Carlin* is that while for policy reasons prescription drugs are treated differently from

    other products, those reasons are not compelling enough to exempt drug manufacturers

                                          -5-

1   from strict liability altogether.  And policy considerations were not the basis of *Murphy's*

2   holding at all.  (After holding that pharmacies provide a service when they dispense

3   prescription drugs, the court speculated as to why "[t]he Legislature may have

4   determined that it is not in the public interest to subject [pharmacies] to strict liability,"

5   (*Murphy*, at p. 680), discussing various possible policy considerations the Legislature

6   could have relied upon.  However, those policy considerations were discussed only

7   insofar as they supported the Legislature's action, not the court's holding, which merely

8   relied upon the Legislature's action.)  There is therefore no California authority for

9   defendants' proposition that public policy requires that distributors of prescription drugs

10  be treated differently from distributors of other products for purposes of strict liability.

11

12  **E.     Restatement**

13

14        Finally, defendants argue the Third Restatement of Torts holds distributors may be

15  held liable only for negligence.

16        At issue is section 6, subdivision (e), Products Liability:

17        A retail seller or other distributor of a prescription drug or medical device is
18        subject to liability for harm caused by the drug or device if:  [¶]  (1) at the time of
        sale or other distribution the drug or medical device contains a manufacturing
19        defect . . . ; or [¶] (2) at or before the time of sale or other distribution of the drug
        or medical device the retail seller or other distributor *fails to exercise reasonable*
20        *care* and such failure causes harm to persons.

21

22  (Rest.3d Torts, Products Liability, § 6, subd. (e), emphasis added.)

23        Missing from this description is the word "only".—though the rule states that a

24  distributor of as prescription drug may be held liable for injuries caused by its failure to

25  exercise reasonable care, it does not state that is the only circumstance in which a

26  distributor may be held liable.  But that is what it means, as evidenced by comment h:

27

28        The rule governing most products imposes liability on wholesalers and retailers
        for selling a defectively designed product, or one without adequate instructions or
        warnings, even though they have exercised reasonable care in marketing the

-6-

product. [Citations.] Courts have refused to apply this general rule to nonmanufacturing retail sellers of prescription drugs and medical devices and, instead, have adopted the rule stated in Subsection (e). That rule subjects retailers to liability *only* if the product contains a manufacturing defect or if the retailer fails to exercise reasonable care in connection with distribution of the drug or medical device. In so limiting the liability of intermediary parties, courts have held that they should be permitted to rely on the special expertise of manufacturers, prescribing and treating health-care providers, and governmental regulatory agencies. They have also emphasized the needs of medical patients to have ready access to prescription drugs at reasonable prices.

(Rest.3d Torts, Products Liability, § 6, subd. (e), com. h, emphasis added.)

As discussed above, though California cases discuss policy considerations attendant upon the manufacture and distribution of prescription drugs, none has found those considerations to require that actors in the chain of distribution be exempt from strict liability altogether. (Though in *Murphy* a pharmacy was exempted from strict liability, it was because a pharmacy provides a service, not because public policy requires the exemption.)

The cases considered by The American Law Institute are no different. The court will survey them:

*Elsroth v. Johnson & Johnson* (S.D.N.Y. 1988) 700 F.Supp. 151 held a manufacturer and retailer cannot be liable in damages for the criminal conduct of unknown third party who tampered with the manufacturer's product post-distribution.

*Jones v. Irvin* (S.D.Ill. 1985) 602 F.Supp. 399 held a pharmacist had no duty to warn a customer that a drug is being prescribed in dangerous amounts, that the customer is being over medicated, or that various drugs in their prescribed quantities could cause adverse reactions.

*Murphy, supra,* held a pharmacy cannot be held strictly liable because in dispensing prescription medications it predominantly provides a service, as opposed to effecting a sale.

*Leesley v. West* (Ill.App.Ct. 1988) 518 N.E.2d 758 held that under the learned intermediary doctrine a drug manufacturer has a duty to warn only prescribing doctors of

-7-

the inherent dangers of the drug, not consumers directly, and that a pharmacist should be held to no greater duty than a manufacturer.

*Lemire v. Garrard Drugs* (Mich.Ct.App. 1980) 291 N.W.2d 103 held a successor drug store could not be held liable for injuries caused by the predecessor drug store's filling a doctor's prescription.

*Parker v. St. Vincent Hosp.* (N.M.App. 1996) 919 P.2d 1104 held public policy favored not imposing strict liability on hospitals for supplying a *defectively designed* implant selected by a physician.  The court reversed the grant of summary judgment on plaintiff's negligence claim, holding the hospital may have a duty to investigate the safety of the implants before supplying them.

*Batiste v. American Home Products Corp.* (N.C.Ct.App. 1977) 231 S.E.2d 269 noted that under North Carolina law the doctrine of strict liability does not apply to retailers (*id.* at p. 275) and held a druggist is not strictly liable for providing a drug ordered by a physician (*id.* at pp. 275-276).

*Coyle v. Richardson-Merrell, Inc.* (Pa. 1991) 584 A.2d 1383 held that public policy requires that a pharmacist not be held strictly liable damages caused because by the pharmacist's failure to provide warnings of the risks of a drug to a patient/consumer. (This case goes one step beyond *Murphy*, *supra*, but still does not extend the rule to defendant distributors.)

*Makripodis v. Merrell-Dow Pharmaceuticals., Inc.* (Pa.Super.Ct. 1987) 523 A.2d 374 is to the same effect as *Coyle v. Richardson-Merrell*, *supra*.

*Pittman v. Upjohn Co.* (Tenn. 1994) 890 S.W.2d 425 held a manufacturer and a prescribing physician had only a duty to use reasonable care in giving warnings about an unavoidably dangerous drug.

In sum, none of the cases relied upon by the American Law Institute in formulating section 6, subdivision (3) of the Restatement supports the proposition that distributors of prescription drugs (other than pharmacists) should be exempt from strict liability for failure to warn of known or reasonably knowable risks.

-8-

F.    **Question of First Impression**

Though no California case, no recitation of public policy found in California case law, and no case supporting the Third Restatement of Torts supports the proposition that an exception to the strict liability doctrine should be made for distributors of prescription drugs, no authority prohibits such an exception either, and the proposition that there should be one has its appeal. Some of the policy considerations applicable to pharmacists may apply to distributors:

> [T]he wide availability of a full range of prescription drugs at economical cost [may] outweigh[] the advantage to the individual consumer of being able to recover for injuries on a strict liability basis rather than to be limited to claims arising from negligence.
>
> If [distributors] were held strictly liable for the drugs they [distribute], some of them, to avoid liability, might restrict availability by refusing to [distribute] drugs which pose even a potentially remote risk of harm, although such medications may be essential to the health or even the survival of patients. Furthermore, in order to assure that a [distributor] receives the maximum protection in the event of suit for defects in a drug, the [distributor] may select the more expensive product made by an established manufacturer when he has a choice of several brands of the same drug. . . . "Why choose a new company's inexpensive product, which has received excellent reviews in the literature for its quality, over the more expensive product of an established multinational corporation which will certainly have assets available for purpose of indemnification 10, 20, or 30 years down the line?" [Citation omitted.]
>
> [S]ince the doctor who ordered the drug provided by the [distributor] cannot be held strictly liable for its defects and in some circumstances the manufacturer who created the defect can also escape liability, it would be unfair and burdensome to expose the [distributor] alone to strict liability . . . .

(*Murphy*, *supra*, at pp. 680-681.)

But these considerations are speculative, and the court, being aware of no judicial conclusion on them, will leave their resolution to the Legislature.

Finally, the distributor defendants argue that a distributor who neither created nor tested a drug "has no connection with physicians, certainly knows far less about the drug than does the manufacturer, [] is in no position to independently test or analyze a drug

-9-

1    and/or its labeling," and is "not privy to proprietary and non-public information known to

2    the manufacturers", and therefore cannot reasonably be held strictly liable for failure to

3    warn. (Opp., p. 7.)

4      This argument, too, has its appeal.  But the same can be said of distributors of

5    many products, and with respect to them public policy is well established:

6       [T]the seller, by marketing his product for use and consumption, has undertaken

7      and assumed a special responsibility toward any member of the consuming public

8      who may be injured by it; [] the public has the right to and does expect, in the case
       of products which it needs and for which it is forced to rely upon the seller, that

9      reputable sellers will stand behind their goods; [] public policy demands that the

10     burden of accidental injuries caused by products intended for consumption be
       placed on those who market them, and be treated as a cost of production against

11     which liability insurance can be obtained; and [] the consumer of such products is

12     entitled to the maximum of protection at the hands of someone, and the proper
       persons to afford it are those who market the products.

13   (Rest.2d Torts, § 402A, com. c.)

14     Defendants point to no authority that makes an exception to the doctrine of strict

15   liability for distributors in an industry analogous to the prescription pharmaceutical

16   industry.  This court will not be the first to make such an exception at the pleading stage.

17

18   **In sum:**

19     **On its own motion the court GRANTS reconsideration of its ruling of March**

20   **3, 2006 in which it sustained the distributor defendants' demurrer to plaintiffs'**

21   **cause of action for strict liability—failure to warn.  Upon reconsideration, the**

22   **demurrer is OVERRULED.**

23

24   IT IS SO ORDERED.
     Dated: 5/16/06

25

26

27               Victoria Gerrard Chaney

28

             Judge

FAC Resp. Exhibit B -- 2202

## ELECTRONIC PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1126 Wilshire Boulevard, Los Angeles, California 90017.

On May 23, 2006, pursuant to the Court's Electronic Case Management Order (CMO No. 1),

[ ]    I submitted an electronic version of the following document via file transfer protocol to CaseHomePage.

[X]    I submitted a hard copy of the following document to CaseHomePage by facsimile.

[ ]    I submitted an electronic version of the document via file transfer protocol and a hard copy of the exhibits via facsimile to CaseHome Page.

Notice of Ruling

Executed on May 23, 2006, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Colleen Teeman

-1-

FAC Resp. Exhibit B -- 2203

1  Mark P. Robinson, Jr., SBN 054426
   Kevin F. Calcagnie, SBN 08994
2  Ted B. Wacker, SBN 157416
   ROBINSON, CALCAGNIE & ROBINSON
3  620 Newport Center Drive, Suite 700
   Newport Beach, California  92660
4  Tele: 949-720-1288; Fax:  949-720-1292
5
6  Thomas V. Girardi, SBN 36603
   James G. O'Callahan, SBN 126975
7  Vincent J. Carter, SBN 208899
   GIRARDI | KEESE
8  1126 Wilshire Boulevard
   Los Angeles, California  90017
9  Tele: 213-977-0211; Fax:  213-481-1554
10
11 On Behalf of the Plaintiffs'
   Executive Committee
12
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
13
                  FOR THE COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST
14

| | |
|---|---|
| 15  Coordination Proceedings<br>Special Title  (Rule 1550(b))<br>16  **VIOXX® CASES** | ) Case No.: JCCP 4247<br>)<br>) Assigned to Honorable Victoria Chaney<br>) Department 324 |
| 17 _____<br>18  This Document Applies To: | )<br>) [LASC Case Number:  BC359006]<br>) |
| 19<br>20  ALL VIOXX CASES | ) **PLAINTIFFS' EXECUTIVE COMMITTEE'S**<br>) **OPPOSITION TO MOTION OF MERCK FOR**<br>) **(1) RECONSIDERATION OF RULING**<br>) **REGARDING EX PARTE**<br>) **COMMUNICATIONS WITH PLAINTIFFS'** |
| 21<br>22           and | ) **PHYSICIANS; AND (2) SANCTIONS**<br>) |
| 23<br>24  REBECCA JUREWICZ Plaintiff, | ) **Hearing Date: August 13, 2007**<br>) **Time:  8:30 a.m.**<br>) **Dept:  324** |
| 25<br>26           v.<br>27  MERCK & CO., INC. Defendant. | )<br>)<br>)<br>) |

28

i

FAC Resp. Exhibit B -- 2204

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

1.   DEFENSE COUNSEL ARE PROHIBITED FROM INFORMAL EX PARTE
     COMMUNICATIONS WITH A PLAINTIFF'S TREATING PHYSICIANS. ..........................5

2.   THERE IS NOTHING UNFAIR OR IMPROPER ABOUT ONE PARTY HAVING
     EXCLUSIVE EX PARTE ACCESS TO A PARTICULAR CATEGORY OF WITNESSES,
     INCLUDING A DEFENDANT'S EMPLOYEES AND A PLAINTIFF'S TREATING
     DOCTORS................................................................................................................9

3.   CALIFORNIA PRACTICE GUIDES GIVE DETAILED RECOMMENDATIONS FOR
     EXTENSIVE PREPARATION OF NON-PARTY WITNESSES PRIOR TO DEPOSITION
     OR TRIAL TESTIMONY WHERE EX PARTE CONTACT IS NOT PROHIBITED BY
     PRIVILEGE............................................................................................................11

CONCLUSION ...............................................................................................................15

FAC Resp. Exhibit B -- 2205

**TABLE OF AUTHORITIES**

<u>CASES</u>

*Heller v. Norcal Mut. Ins. Co.*, 8 Cal. 4th 30, 41 (1994)..................................................8

*Province v. Center for Women's Health & Family Birth*
    20 Cal.App.4th 1673, 1685, 25 Cal.Rptr.2d 667  (1993) ........................................5, 7

*Torres v. Super.Ct.* (Daily)
    221 Cal.App.3d 181, 188, 270 Cal.Rptr. 401  (1990) .........................................5, 7-8


<u>STATUTES</u>

Confidentiality of Medical Information Act (Civ.Code, §  56) .............................................8


<u>OTHER</u>

Haning, Flahavan & Kelly, CAL. PRAC. GUIDE: PERSONAL INJURY
    (The Rutter Group 2006) ...........................................................................5, 8

Jones, Rosen, Wegner & Jones, RUTTER GROUP PRACTICE GUIDE:
    FEDERAL CIVIL TRIALS & EVIDENCE (The Rutter Group 2006) ....................................14

Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS & EVIDENCE
    (The Rutter Group 2006) ...........................................................................7, 12

Weil & Brown, CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL (The Rutter Group 2006)..........11

FAC Resp. Exhibit B -- 2206

# INTRODUCTION

Merck is back again asking the Court to further alter for the Defendant's benefit what has been the law of discovery and the practice in this state for decades, and to change this Court's prior ruling in these coordinated cases. This time Merck is asking the Court to "reconsider and modify its prior ruling to either: (1) prohibit plaintiffs' counsel from having ex parte contact with treating physicians prior to their discovery depositions; or (2) allow Merck's counsel to have ex parte communications with treating physicians." In addition, Merck is asking the Court to sanction plaintiffs counsel in the *Jurewicz* case and to specially instruct the jury regarding their alleged contact with a treating physician.

It is the Plaintiffs' Executive Committee's understanding that Girardi & Keese will be filing an opposition addressing the specifics of Merck's allegations regarding *Jurewicz*. Therefore this brief, which is filed on behalf of the PEC, will address Merck's motion only to the extent it seeks a ruling which would affect all plaintiffs in the coordinated Vioxx litigation.

The last time it brought this motion, which was in connection with the *Berwick* case, Merck asked that "the Court prohibit both parties from engaging in substantive ex parte contact of any kind with Mr. Berwick's treating and prescribing physicians prior to their deposition." As a fallback position Merck also requested that "should the Court deem such ex parte communications proper," that the Court "allow Merck equal access to the physicians as that afforded plaintiff's counsel." For the Court's convenience, attached as exhibit 1 is a copy of the brief and exhibits filed by the plaintiff in *Berwick v. Merck* several months ago.

The matter was argued on February 14, 2007. Although the Court did place certain restrictions on ex parte contacts by plaintiffs' counsel with respect to the manner in which documents are supplied to physicians, the Court rejected the same arguments Merck is making for the second time here, and denied Merck's alternative requests to prohibit contact by plaintiffs' counsel or to permit contact by defense counsel:

33

```
"10  All right.  Number one, Mr. Campillo, I
 11  respectfully disagree with your motion to limit access
 12  to treating physicians, and I believe that and I'm
 13  ruling that plaintiff's counsel may have full access
```

1

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2207

14  to plaintiff's treating physicians and ask them anything
15  regarding the treatment given to the plaintiff, show them
16  any documents, provided that those documents were or are,
17  number one, kept and given to plaintiff's physician at least
18  at the time of the deposition are unmarked, unabridged, in
19  other words, clean copies, unredacted, and as I said before
20  preserved so that there's no confusion later on.
21       Plaintiff does have the burden of proof, and
22  the Question No. 3 on the CACI verdict form where the jury
23  did hang is a good example of the need of plaintiff to
24  understand exactly what it is that the treating doctor
25  thought and knew and would or wouldn't have done.  This is
26  different than the treating doctor in a rear-end accident
27  case where the doctor had nothing to do or arguably had no
28  connection with the mechanism of injury, unless the doctor

                                34
1  happened to be the rear-ender there, but in the Vioxx Cases
2  it's a little different.
3       Defendant does not have an absolute right to
4  interview the doctor ahead of time, "ahead of time" being
5  ahead of the deposition, unless defendant had a demonstrated
6  prior relationship with the doctor, such as a thought
7  leader, somebody that did clinical trials, somebody that
8  they went to for advice, "they went to," that is, Merck went
9  to for advice at that time, and if that is the case then
10 Merck should have access to that doctor as they would any
11 other regular witness.
12      But absent that showing, I do not believe that
13 Merck has a right to discuss the plaintiff with the treating
14 physician prior to the deposition.
15      Mr. Campillo, I think any questions are fair
16 game, but I do agree with you that it would be inappropriate
17 to show the treating physician something that is either
18 abridged with circles all around it, and it would probably
19 be inappropriate to show the physician something like an
20 argument chart, for lack of a better word, like this is
21 what I want you to do, so an outline or something that is
22 lawyer-created, I really don't care if it's from some other
23 source, the New England Journal of Medicine, e-mails sent
24 by Dr. Scolnick, I don't really care what it is.
25      But I think the one thing I would put on
26 this, Mr. Robinson, is since this is not a yet-named --
27 the treating physician is not yet named as an expert, I
28 know that they might be, what is it, a nonretained expert,

                                2

35

1 I think Mr. O'Callahan taught me that expression, but since
2 the person is not an expert, I think any argument charts,
3 any outlines that are created by the lawyer is probably not
4 appropriate, because I would like to preserve the accuracy
5 of the physician's memory and position as much as possible.
6 And my goal is getting the truth to the jury, Mr. Robinson.
7      So, the motion is denied. "

....

37

10     THE COURT:  Mr. Robinson, I'm going to make this
11 quick and dirty.
12     MR. ROBINSON:  Okay.
13     THE COURT:  Anything that you show a treating
14 physician you need to keep, preserve, give to the defense
15 at least 48 hours ahead of time.
16     MR. ROBINSON:  Yes.
17     THE COURT:  It has to be unabridged; it cannot be
18 a plaintiff-produced argument chart, for lack of a better
19 wording.  All right?
20      I don't know why you'd be giving something to
21 somebody that didn't prescribe Vioxx, though, all this other
22 information, because I think it would be kind of a waste of
23 time.  But, you know, if you do it, it's going to come out
24 and I'll deal with it at the time.
25      But I'm not going to say you can't do that.
26 Whatever is necessary to prepare a case.
27      And no, Mr. Campillo, you don't get access
28 ahead of time.  Defense does not get access ahead of time."
(Tr. 2/14/07, Exhibit 2 attached.)


The Court's ruling was more than fair to Merck, and in fact, gave the defense more than they are entitled under the law.  The Court placed limits on ex parte contact by plaintiffs' counsel, without a quid pro quo granting plaintiffs' counsel similar rights with respect to Merck employees.  Nevertheless, consistent with Merck's essential litigation tenet of perpetually revisiting issues and continually chipping away at existing law and procedure, the Defendant is now back for a second bite at this apple.  However, since the first time the Court ruled on this issue, nothing has changed which would warrant a further departure from existing law.

3

FAC Resp. Exhibit B -- 2209

1       Merck's argument about "a level playing field" ignores the fundamentals of litigation.   It is
2   important to remember, as this Court noted at the hearing the first time around, that the Plaintiffs have the
3   burden of proof on the issue of warnings causation. They must have ex parte access to discuss these
4   issues with their clients' treating physicians. There is nothing unfair or unduly prejudicial about one party
5   having exclusive informal access to a witness, just as Merck has access to its former and current sales
6   representatives and employees. Certain witnesses will not or cannot voluntarily speak informally with
7   counsel for one side, whether by choice or as a result of a privileged relationship. It is a fact of life in
8   litigation.

9       Merck has already had extensive and long term contact with plaintiffs' physicians in person
10   through its sales representatives, as well as through dear doctor letters, PIRs, conferences, press releases,
11   advertisements and its integrated marketing campaign.  Merck has had unfettered access to physicians
12   and was able to convey to physicians incomplete and biased information about Vioxx, and its
13   interpretation of Vioxx data and studies, exclusively from its perspective for several years without
14   anyone giving physicians a complete picture or the other side of the story.  It is only fair that plaintiffs
15   should and do have the right, under longstanding California law, to show their own doctors what Merck
16   did not, and to engage in discussions with their doctors on the important documents and the issues to
17   which they relate, so they can reflect both sides of these issues, and not just Merck's representations.

18       The Court was correct the first time in denying Merck's requests to prohibit contact by plaintiffs'
19   counsel, and in denying Merck's request to permit ex parte contact by defense counsel. The singular
20   alleged violation in *Jurewicz v. Merck* does not support a departure from the law.  Even assuming
21   arguendo that the Merck's allegations were true, it would not demonstrate that this Court's ruling of
22   February 14 will be violated in the future, nor that the Court's order is impractical or unworkable.  Merck
23   has advanced no reason for altering existing law, nor for changing the procedures established by the
24   Court.  Merck is simply exploiting an isolated incident in an attempt to gain another unwarranted
25   advantage over thousands of other litigants.

26

27

28

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2210

1. **DEFENSE COUNSEL ARE PROHIBITED FROM INFORMAL EX PARTE COMMUNICATIONS WITH A PLAINTIFF'S TREATING PHYSICIANS.**

California law is straightforward on the issue of defendants communicating with treating physicians outside the scope of discovery. It's prohibited. Merck's renewed requests are still contrary to well established law and practice. Recognized treatises on California personal injury practice and civil trials and evidence specifically caution against ex parte contacts by defense counsel with the plaintiff's treating physicians, as a potentially violative of both statutory privileges as well as rules of ethics.

Contact by defense attorneys with a plaintiffs treating physicians outside the ordinary discovery process is improper and prohibited, irrespective of whether or not the physician has been designated as retained or non-retained. See *Torres v. Super.Ct.* (Daily) (1990) 221 Cal.App.3d 181, 188, 270 Cal.Rptr. 401 (Pretrial communications between defendants and patient's former treating physician, prospective defense expert, must be restricted to formal discovery.) ("While the ex parte interview process may be time efficient and cost effective, we believe Torres's right to ensure no violation of his statutory privilege occurs in an ex parte interview dictates this discovery should be limited to the statutorily mandated manner.").

Moreover, despite Merck's arguments, such contact is prohibited even if the plaintiff has waived the physician-patient privilege by filing suit. *Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1685, 25 Cal.Rptr.2d 667. The subject is discussed at length in Haning, Flahavan & Kelly, CAL. PRAC. GUIDE: PERSONAL INJURY (The Rutter Group 2006):

> (d) [2:37] Caution physician against ex parte communications with defense:
>
> …
>
> But the **treating physicians should also be reminded in writing not to engage in ex parte communications about plaintiff's condition or the injury case with any representative of the defendant. Ex parte interviews outside the presence of the patient's attorney may result in the disclosure of privileged medical information (the physician-patient privilege in personal injury litigation is waived only as to the condition in controversy in the lawsuit; see ¶ 6:75) and could have a "chilling effect" on the physician-patient relationship, hindering further treatment.** [Cf. Cal. State Bar Form. Opn. No. 1975-33]
>
> …

5

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2211

[2:1089] Special concerns re physicians: Additional guidelines apply regarding ex parte contacts with an opposing party's physician.

(a) [2:1090] Ethical ban re consulting physicians: A physician who has consulted with or obtained confidential information from one party in a legal matter ethically should not consult with the opposing party. [See Cal. State Bar Form. Opn., No. 1975-33 (adopting position taken by Inter-Professional Code of Professional Ethics, also approved by California Medical Association)]

(b) [2:1091] Treating physicians: **The physician-patient privilege severely restricts defendant's right to engage a personal injury plaintiff's treating physician in ex parte communications. Even assuming the defense may have a right to call the treating physician as an expert witness for its own case (see ¶ 9:405.2), pretrial communications between the physician and defense representatives must be limited to formal discovery so as to give plaintiff a reasonable opportunity to protect against improper invasion of his or her physician-patient privilege; ...**

Additionally, the defense's ex parte contacts with plaintiff's treating physician regarding the scope of the physician's care may violate the Health Insurance and Portability Accountability Act of 1996 (42 USC § 1320d et seq.), which regulates disclosures by a physician of a patient's health information and, in the litigation context, appears to allow disclosure only pursuant to formal discovery. [See Crenshaw v. Mony Life Ins. Co., supra, 318 F.Supp.2d at 1027-1029; Law v. Zuckerman (D MD 2004) 207 F.Supp.2d 705, 708-711]

...

[2:1093] PRACTICE POINTER: Absent a court order expressly allowing the ex parte communications (¶ 2:1091), any defense ex parte interview with plaintiff's treating physician (other than a physician who is an actual or potential malpractice defendant, above), should proceed only if defense counsel first obtains plaintiff's counsel's express permission. **(As a practical matter, plaintiff's attorney should never give such consent and, at the very least, should permit the informal interview only if he or she is also present.) Otherwise, the defense must utilize normal discovery procedures.** [See Torres v. Super.Ct. (Daily), supra; Cal. State Bar Form. Opn. No. 1975-33]

[6:76.10] Caveat--ethical concerns re ex parte contacts with physician despite privilege waiver/exceptions: Even where, because of a waiver or statutory exception, the physician-patient privilege does not protect otherwise confidential information from compelled disclosure, opposing counsel should avoid ex parte contacts with plaintiff's physician in an attempt to elicit the information.

6

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2212

Similarly, Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS & EVIDENCE (The Rutter Group 2006), provides:

> [11:78.7] Limitation re pretrial discovery: To prevent any violation of the physician-patient privilege, there should be no ex parte interviews before trial between plaintiff's physician and the defendant. Defendant's access to the treating physician's opinions should be through deposition proceedings, at which plaintiff will have the opportunity to assert the physician-patient privilege. [Torres v. Sup.Ct. (Daily), supra, 221 CA3d at 188, 270 CR at 405]

Merck's arguments are nothing new, and in fact were made the last time it brought this motion. The two cases Merck relies upon do not support its arguments. Merck argues that "California law acknowledges that in personal injury cases such as these, defense counsel may be allowed to meet with treating physicians because plaintiffs have waived the physician-patient privilege by filing their lawsuit," and cites *Torres v. Sup. Ct. (Daily)*, 221 Cal. App. 3d 181, 185, 188 (1990) However, a closer look at what the court in *Torres* actually said shows that Merck has misread the opinion. The exception the court mentioned was limited to circumstances where the defendant could show that the testimony would not impinge upon the physician-patient privilege, and in any event, *only after formal discovery*:

> "While the ex parte interview process may be time efficient and cost effective, we believe Torres's right to ensure no violation of his statutory privilege occurs in an ex parte interview dictates this discovery should be limited to the statutorily mandated manner.
> ... The trial court is directed to restrict pretrial communications concerning this litigation between Goodman and defense representatives to formal discovery conducted pursuant to the Code of Civil Procedure in order that Torres will have a reasonable opportunity to preclude an improper violation of his privilege. **After such discovery**, if Real Parties show that Goodman's expert testimony will not impinge on Torres's physician-patient privilege, the trial court may then permit ex parte communications between Goodman and Real Parties as may be necessary for trial preparation." Id at 188.

See also *Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1685, 25 Cal.Rptr.2d 667 (Holding that although the plaintiff as in *Torres* had "generally waived the privilege by tendering the very matter at issue," and although the treating doctor's expression of opinions

7

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS, AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2213

"do not appear to violate the physician-patient privilege," defense counsel should "**avoid ex parte communications with physicians before discovery is completed.**")

Similarly, Merck cites *Heller v. Norcal Mut. Ins. Co.*, 8 Cal. 4th 30, 41 (1994). Yet *Heller* is patently distinguishable. There the California Supreme Court found *Torres* inapposite because it did not involve a suit under the Confidentiality of Medical Information Act (Civ.Code, § 56 et seq.), and the physician never testified. More importantly, the court noted that there is an express statutory exception to the Act for medical malpractice actions:

> "As we explain, we conclude that because the purpose of the ex parte discussions was to assist Norcal in defending the malpractice action against Geis, Yamaguchi (and VPSMG) are exempt from liability under section 56.10, subdivision (c)(4) (hereafter, section 56.10(c)(4)), which allows health care providers and insurers to conduct ex parte discussions to facilitate preparation of a defense to a malpractice action." Id at 35.

Merck incredibly argues that "the evidence Merck's counsel is interested in addressing with the physicians --e.g., information about the doctor's clinical experience with Vioxx, their knowledge of the risks and benefits of Vioxx at a given point in time, and the sources through which they gained this information -- is not subject to any privilege." Merck misses the point entirely. Regardless of the claims of defense counsel as to their intentions to narrow the scope of their inquiry, there is too great a risk that the privilege will be violated.

In Merck's "fox guarding the chicken coop" world, where defense counsel and the plaintiffs' physicians will decide on their own where to draw the line, patients will be reluctant to confide in their physicians out of fear that their confidences will be wrongfully disclosed. This will hinder treatment and have a chilling effect upon the physician-patient relationship. (Haning, et al., supra at 2:37)  This is precisely why these same arguments have been made and rejected by courts in pharmaceutical litigation time and time again, including this Court. This is also why the law in California requires that there be no ex parte contact by defense counsel with a plaintiff's treating physicians until *after completion of discovery*, and *after a showing that the privilege will not be violated.*

These are the Plaintiffs' treating physicians, not Merck's. California law is clear that in order to protect the physician-patient relationship and confidentiality a defendant has no right to communicate

8

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2214

with them under informal or ex parte circumstances.  Merck has cited no evidence which would warrant such an extreme departure from what has been the practice and the law for decades.

## 2. THERE IS NOTHING UNFAIR OR IMPROPER ABOUT ONE PARTY HAVING EXCLUSIVE EX PARTE ACCESS TO A PARTICULAR CATEGORY OF WITNESSES, INCLUDING A DEFENDANT'S EMPLOYEES AND A PLAINTIFF'S TREATING DOCTORS.

Merck argues that "it is fundamentally unfair to permit plaintiffs' counsel to have unbridled ex parte communications with treating physicians while prohibiting Merck from having an equal right of access. "and that [a]t this point, the only fair and meaningful remedy is to stop plaintiffs' counsel from having ex parte communications altogether.  Only then can discovery proceed on a level playing field."

First of all, Merck's request to prohibit contact by plaintiffs' counsel would work an injustice upon thousands of litigants in this coordinated litigation. As the Court recognized last time Merck made these same arguments, the plaintiffs here have a unique burden of proof:

> "21      Plaintiff does have the burden of proof, and
> 22   the Question No. 3 on the CACI verdict form where the jury
> 23   did hang is a good example of the need of plaintiff to
> 24   understand exactly what it is that the treating doctor
> 25   thought and knew and would or wouldn't have done.  This is
> 26   different than the treating doctor in a rear-end accident
> 27   case where the doctor had nothing to do or arguably had no
> 28   connection with the mechanism of injury, unless the doctor
>
>                                  34
>
> 1   happened to be the rear-ender there, but in the Vioxx Cases
> 2   it's a little different." (TR. 2/14/07, Exhibit 2)

Moreover, Merck ignores the fact that the "playing field" has been tilted in its favor for years. Its representatives have had numerous contacts with these doctors.  It is the PEC's understanding that Merck's sales representatives had 275 visits to the physician in *Jerewicz* alone, and had given him over 32,000 samples. Merck has had significant and extensive contacts with this doctor already.

The rule in California, and the predominant rule in the United States for that matter, is that it is impermissible for defense counsel to have ex parte contact with a plaintiff's treating physicians. Likewise the law in California and the predominant law nationally allows ex parte contact by the plaintiffs attorney

9

FAC Resp. Exhibit B -- 2215

1   with the plaintiff's treating doctors.  This rule is no more unfair than permitting a defendant's attorney

2   exclusive access to meet and thoroughly prepare a defendant's current employees for deposition.  That is

3   likewise common practice, and has been for decades.

4       Merck's argument that there is something inherently unfair about one side having ex parte access

5   to witnesses, ignores a fundamental fact of life in any litigation.  Certain categories of non-party

6   witnesses are more accessible to one side than others, or exclusively available to one party for informal

7   contact.  Some refuse to meet informally because of an association with a party, others because of a

8   statutorily protected relationship. Either way, the party without access cannot cry foul.

9       Merck complains that "[a]ll of this conduct impedes the search for truth because it gives plaintiffs'

10   counsel the ability to influence a physician's independent recollection of what he or she knew about

11   Vioxx and when, which are crucial facts in these failure-to-warn actions."  Merck's argument rests on the

12   erroneous premise that physicians cannot separate what new information they receive from what they

13   already know.  It presumes they cannot distinguish documents which they could not possibly have been

14   shown before, and which clearly Merck would not have shown them, from those which they have seen.

15   Additionally, Merck's argument on this point is so generic in nature that it would apply to virtually any ex

16   parte contact with any witness, including contacts by defense counsel with Merck employees.

17       Merck sees nothing unfair about its exclusive access to its current employees, including those

18   unrepresented by counsel, such as lower level employees and detailmen whose testimony is equally

19   critical to the issues in this litigation. Merck, like other drug manufacturers in similar litigation, does and

20   will do everything it can to prevent these individuals from talking to plaintiffs' attorneys, and will

21   prepare them ex parte for their depositions, sometimes in multiple sessions, despite the fact some of these

22   individuals are neither parties, nor persons whose statements, acts or omissions may be binding on the

23   defendant in connection with the matter in dispute. In fact, the potential for influence, if it exists, is

24   certainly much greater where the witness is dependent upon his employer for his livelihood.

25       Ex parte preparation of a non-party witness who cannot or will not talk with an adversary's

26   counsel takes place in virtually any litigation where witnesses exist. It's entirely appropriate. That is why

27   Merck counsel felt comfortable meeting with a Merck employee on no less than nine occasions prior to

28   her deposition in the Vioxx litigation, and with other employees on several occasions prior to theirs.

10

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2216

1   Absent a privilege, such as that which prohibits plaintiffs' counsel from meeting with certain employees,

2   it is common practice in state and federal courts to meet with witnesses prior to their testimony, whether

3   preparing for deposition or trial.

4     **3. CALIFORNIA PRACTICE GUIDES GIVE DETAILED RECOMMENDATIONS FOR**

5       **EXTENSIVE PREPARATION OF NON-PARTY WITNESSES PRIOR TO DEPOSITION OR TRIAL TESTIMONY WHERE EX PARTE CONTACT IS NOT PROHIBITED BY**

6       **PRIVILEGE.**

7     Preparation of clients as well as third party witnesses for deposition is a fundamental part of

8   discovery.  It is common practice not only for plaintiff's counsel to meet with the plaintiff's physician to

9   prepare for deposition, but to discuss key documents with them at depositions.   Weil and Brown

10   emphasize preparation of third party deponents in one of their "practice pointers':

11       [8:877.1]  PRACTICE POINTER:  This is the reason, of course, **it is so**

12       **crucially important to spend the time and effort necessary to prepare your clients and witnesses thoroughly before they testify at their**

13       **depositions!** (Weil & Brown, CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL (The Rutter Group 2006)[1]

14

15     The treatise gives "practice pointers' on preparing witnesses for deposition, including preparing

16   them for specific questions and discussing how to answer them:

17       "=> [8:705.1]   PRACTICE POINTER--Preparing deponent to testify:

18       Some deponents assume that, because a question is asked, they must give an answer whether it is correct or not. Others react in the opposite manner;

19       if a question makes them the least bit uncomfortable, they resort to "I don't know" or "I don't remember." (Id)

20

21       "Either of these approaches may cause the deponent to be impeached or come across as less than credible at trial. Therefore, **be sure to discuss**

22       **these matters with your witnesses when preparing them for deposition and caution them against both extremes."**

23

24

25   ————————————

26   [1] Weil and Brown even mention time consumption necessitated by preparation of witnesses for deposition as one of the

27   'disadvantages' of oral depositions. "Time-consuming: The lawyer who will do the questioning has to spend as much time preparing for a deposition as to prepare for examining an adverse witness at trial; e.g., reviewing investigators' reports, witness statements, the pleadings, earlier discovery, etc. **The lawyer whose client or witness is being deposed also has to spend**

28   **considerable time; e.g., reviewing the same materials and meeting with the client or witness beforehand to prepare for the deposition."** Id at 8:418

1  Additionally, both state and federal practice guides in California contain detailed
2  recommendations as to how counsel should prepare witnesses for their trial testimony, including
3  familiarizing the witnesses with key evidence, **and covering themes and elements of the case**, as well
4  as anticipated questions from opposing counsel.  According to Wegner, Fairbank, Epstein & Chernow,
5  CAL. PRAC. GUIDE: CIVIL TRIALS & EVIDENCE (The Rutter Group 2006):

> "[1:265] **Meeting "friendly" witnesses** (including the client, of course)
> **for the purpose of preparing their testimony is an essential ingredient**
> **of trial preparation.**  Following are some of the considerations affecting
> such meetings:
> 1. [1:266] Timing of **Prep Sessions:** Witness preparation should be
> arranged well in advance of the witness' scheduled testimony (several
> weeks or a month is fine). This avoids last-minute pressures, gives the
> witness time to reflect upon the matters covered, and allows for further
> consultation if required.
> => [1:267] **PRACTICE POINTER:** One **meeting may not be enough for**
> **important witnesses!**  It is better to schedule several shorter meetings than
> to attempt to cover everything in a prolonged session. A "brush-up" session
> is also usually required immediately before the witness is called to testify.
> ...
> 3. [1:269] **Preparation vs. Instruction:** It is entirely proper for counsel to
> remind the witness of facts, point out discrepancies or weaknesses in the
> witness' story, and even advise how to answer a question.
> However, counsel must be careful to avoid telling a witness what to say. It
> is both unethical and illegal for an attorney to instruct a witness to give
> false testimony. [See Bus. & Prof.C. §§ 6068(d), 6128(a); CRPC 5-200(B)]
> => [1:270] **PRACTICE POINTER:** Conduct these interviews yourself
> rather than delegating them to an associate. **To assure thorough coverage,**
> **prepare an outline of:**
> --**the specific points the witness will be called upon to establish**
> **(elements of your claim or defense); and**
> --**potential pitfalls and likely cross-examination questions (e.g., prior**
> **inconsistent statements, etc.).**
> ...
> 5. [1:273] **Review Facts of Case: Make sure that percipient witnesses**
> **are familiar with the events they will be asked to testify about.** If
> necessary, take them back to the place where the event occurred and ask
> them to recreate exactly what they saw, heard, etc. Where appropriate, note
> the location of physical objects and approximate distances. Remember that
> their testimony must relate what they recall ... not what someone else told
> them (hearsay).

FAC Resp. Exhibit B -- 2218

If you plan to ask the witness to draw a diagram or demonstrate how something happened, tell the witness beforehand and ask him or her to practice doing so.

6. [1:274] **Review Exhibits: The witness should be shown any document or exhibit that he or she may be shown while testifying. The witness must take the time to read and study documents carefully before trial so that he or she will know precisely what the records contain and can refer to them without hesitation at trial.** If the witness will be asked to authenticate records, he or she should be able to testify to how they were prepared and have been maintained.

**Caution:** Documents shown to the witness to refresh his or her recollection may have to be shown to opposing counsel; see discussion at ¶ 9:186.

...

9. [1:277] **How to Respond to Questions:** The client and witnesses should also be given some guidance about how to act on the witness stand...."

Practice guides such as these give detailed recommendations on preparing witnesses for their testimony, and as can be seen, they are not limited to preparing clients. It is also important to remember that prescribing and treating physicians, in addition to being percipient witnesses, are also experts. The practice guides also discuss how experts should be prepared for testimony, including review of litigation 'themes,' different opinions under varying facts, and documentary evidence:

[1:281] Additional Matters in Preparing Expert Witnesses: The above matters should be reviewed with expert as well as lay **witnesses. In addition, expert witness preparation should cover the following:**
a. [1:282] Review case theme: **Review your litigation "theme" with the expert so that he or she is aware of what you are trying to establish and where his or her testimony "fits in."**
...
[1:286] **Matters reviewed: Reexamine the documents and other source materials the expert used to arrive at his or her opinion.**
--Review each item of demonstrative evidence the expert will use at trial to educate the jury about the field involved and to better communicate his or her opinion.
...
(a) [1:287] **Review opposing experts' depositions and reports:** Ask for your expert's assistance in focusing on critical areas of difference, and in developing proper questions for cross-examination of the opposing expert.
(3) [1:288] **Eliciting expert opinion:**...
Keep in mind that an expert's opinion is only as valuable as the factual premises on which it is based. If the jury disbelieves certain facts, the expert's opinion will probably also be discredited.

13

1  **Thus, it is good practice to review alternative versions of the facts and**
2  **determine what the expert's opinion would be under all the variables.**
   A decision can then be made as to which premises to stress, and which to
3  drop, during in-court questioning.

4  11. [1:291] **Rehearse Questioning**: To avoid the witness being caught off
   guard or "freezing up" on the stand, it is a good idea to practice questioning
5  in the same manner and form expected at trial. I.e., rather than simply ask
   for a narrative or discussion of the matter, pose the same types of questions
6  you will ask on direct examination.
   ...
7
8  c. [1:295] **Simulated cross-examination:** Wherever possible, witnesses
   should be exposed to simulated crossexamination on the key points of their
9  testimony: Concentrate particularly on weaknesses in the witness'
   testimony or on other possible bases for impeachment. Practice such
10 questions until the witness responds readily with credible explanations for
   all potential areas of attack.[2]
11

12      As can be seen, familiarizing a cooperative witness with the issues of the case and documentary

13 evidence is a necessary and fundamental part of preparation for the witness's deposition. Although these

14 recommendations go far beyond what any plaintiff has done or will do in this litigation in terms of

15 preparation, they illustrate the scope of witness preparation that is customary and proper. Despite

16 repeated attempts by Merck in other jurisdictions, the PEC is unaware of any court which has gone along

17 with Merck on its wish list to allow it to contact plaintiffs' physicians ex parte, or to prohibit such contact

18 by plaintiffs' counsel.

19

20

21

22

23

24

25

26 _____

[2] The Rutter Group California federal practice guide has similar, and on some issues, identical, advice on preparing witnesses.
27 See Jones, Rosen, Wegner & Jones, RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL TRIALS & EVIDENCE (The
   Rutter Group 2006) 1:245 et seq.

28

14

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2220

## CONCLUSION

Merck is again pushing the envelope. Merck has not cited a single California case where a court has limited the scope of pre-deposition communication between a plaintiff's attorney and non-party treating physicians. Yet it obtained such an order last time. Likewise, Merck cannot cite a single case where a California court has permitted pre-deposition ex parte contact by defense lawyers with treating doctors, or prohibited such contact by plaintiff counsel. Yet it what Merck is asking for again.

Despite occasional failed attempts by defendants to change the rules in coordinated pharmaceutical litigation, the law has remained unchanged for decades. Merck will have its opportunity to examine the physicians at each deposition and to present whatever it wants to them at that time. After years of one-sided communication with these physicians, Merck cannot claim it will be prejudiced by complying with longstanding California law and established discovery custom and practice.

Merck is simply repeating the same arguments it made last time and the Court should reject them for the same reasons it did before. This Court has already placed restrictions on plaintiffs counsel, with no reciprocal restrictions upon Merck with respect to its access to its employees. The procedures set by the Court were followed in *Berwick v. Merck*, and there is no reason to change them. *Jurewicz* is an individual case with individual issues which will be addressed by counsel in a separate brief. Regardless of how the Court resolves those issues, *Jurewicz* should not be used as a basis for changing the Court's prior ruling as to all Vioxx plaintiffs.

The Plaintiffs' Executive Committee will do everything necessary to assist the Court in preventing violations of its orders. However, Merck should not be allowed to exploit a single alleged incident in a single case to the disadvantage of Vioxx plaintiffs throughout California.

DATED: August 7, 2007

ROBINSON, CALCAGNIE & ROBINSON

By:_____
MARK P. ROBINSON, JR.
KEVIN F. CALCAGNIE
TED B. WACKER
On Behalf of the Plaintiffs' Executive Committee

15

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2221

## PROOF OF SERVICE

1

2      I am a resident of the State of California, over the age of eighteen years, and not a party to the

3   within action. My business address is Robinson, Calcagnie & Robinson, 620 Newport Center Drive,

    Suite 700, Newport Beach, California 92660.

4

5      On the date indicated below, I served the within document as follows:   **PLAINTIFFS'
    EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1)
6   RECONSIDERATION OF RULING REGARDING EX PARTE COMMUNICATIONS WITH
    PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

7

8    _X_   E-MAIL - By e-mailing to the following addresses: Ralph Campillo at
         ralph.campillo@sdma.com; Wendy Tucker at wendy.tucker@sdma.com; Karen Woodward at
9        karen.woodward@sdma.com; and Richard Goetz at RGoetz@OMM.com and James O'Callahan
         at jgocallahan@girardikeese.com

10

11   _X_  CASE HOME PAGE – by submitting an electronic version of the above-referenced documents
         via file transfer protocol to CaseHomePage. Pursuant to the Court's Electronic Case Managemetn
12       Order (CMO No. 1), service upon all parties listed in the 31st Master Service List is deemed
         complete when the above-referenced documents have been posted on CaseHomePage. The 33rd
13       Master Service List is currently available for review on CaseHomePage under the folder Vioxx
         Service Lists entitled Thirty-Second Amended Master Service List.

14

15   _X_  MAIL – by placing the document(s) listed above in a sealed envelope with postage thereon fully
         prepaid, in the United States mail at Newport Beach, California, addressed as set forth below. I
16       am readily familiar with the firm's practice of collection and processing correspondence for
         mailing. Under practice, it would be deposited with the U.S. Postal Service on same day with
17       postage thereon fully prepaid at Newport Beach, California in the ordinary course of business. I
         am aware that on motion of the party served, service is presumed invalid if postal cancellation
18       date or postage meter date is more than one day after date of deposit for mailing in affidavit.

19

20   ___  PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s)
         at the address(es) set forth below.

21

22   ___  OVERNIGHT COURIER – by placing the document(s) listed above in a sealed envelope with
         shipping prepaid, and depositing in a collection box for next day delivery to the person(s) at the
23       address(es) set forth below via Federal Express.

24

25      I declare under penalty of perjury under the laws of the State of California that the above is true
    and correct.
26      Executed on _Augusт 7, 2007_____, at Newport Beach, California.

27

28                                              _____
                                                Darleen Perkins

                              16

FAC Resp. Exhibit B -- 2222

SERVICE LIST

| | |
|---|---|
| Michael K Brown, Esq. | Counsel for Defendant: |
| Thomas J. Yoo, Esq. | MERCK & CO., INC. |
| REED SMITH LLP | |
| 355 South Grand Avenue, Suite 2900 | |
| Los Angeles, CA 90071 | |
| Telephone: (213) 457-8000 | |
| Facsimile: (213) 457-8080 | |

Ralph A. Campillo, Esq.
Wendy A. Tucker, Esq.
Karen Woodward, Esq.
SEDGWICK, DETERT, MORAN & ARNOLD, LLP
801 South Figueroa Street, 18th Floor
Los Angeles, CA 90017-5556
Telephone: (213) 426-6900
Facsimile: (213) 426-6921

Anthony G. Brazil, Esq.                       Counsel for Defendant:
Megan S. Wynne, Esq.                          McKESSON CORPORATION
MORRIS POLICH & PURDY, LLP
1055 West 17th Street, 24th Floor
Los Angeles, CA 90017
Telephone: (213) 891-9100
Facsimile:  (213) 488-1178

Thomas V. Girardi, Esq.                       Plaintiffs' Liaison Counsel
James O'Callahan, Esq.
David N. Bigelow, Esq.
Vincent Carter, Esq.
GIRARDI & KEESE
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 977-0211
Facsimile:  (213) 481-1554

PLAINTIFFS' EXECUTIVE COMMITTEE'S OPPOSITION TO MOTION OF MERCK FOR (1) RECONSIDERATION OF RULING
REGARDING EX PARTE COMMUNICATIONS WITH PLAINTIFFS' PHYSICIANS; AND (2) SANCTIONS

FAC Resp. Exhibit B -- 2223

1  Mark P. Robinson, Jr., SBN 054426
2  Kevin F. Calcagnie, SBN 08994
   Carlos A. Prietto, III, SBN 166410
3  Ted B. Wacker, SBN 157416
   ROBINSON, CALCAGNIE & ROBINSON
4  620 Newport Center Drive, Suite 700
   Newport Beach, California   92660
5  Tele: 949-720-1288; Fax:  949-720-1292
6
   Attorneys for Plaintiff
7  LOWELL BERWICK
8
                 SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
             FOR THE COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST
10
11
12 | Coordination Proceedings            ) Case No.: JCCP 4247
   | Special Title  (Rule 1550(b))       )
13 | **VIOXX® CASES**                     ) Assigned to Honorable Victoria Chaney,
   |                                      ) Department 324
14 |                                      )
   | LOWELL BERWICK and CAROLE BERWICK )
15 |                                      ) [LASC Case Number:  BC328855]
   |                                      )
16 |          Plaintiffs,                 )
   | vs.                                  ) **PLAINTIFF'S BRIEF RE JURY**
17 |                                      ) **INSTRUCTIONS ON STRICT LIABILITY**
   | MERCK & COMPANY, INC., McKESSON      ) **AND CONCEALMENT PROPOSED B Y**
18 | CORPORATION, and DOES 1 THROUGH 100, ) **MERCK**
   | inclusive,                           )
19 |                                      )
20 |          Defendants                  )
   |                                      ) Trial Date:  April 9, 2007
21 |                                      )
   |                                      )
22

23     **INTRODUCTION**

24         Merck's proposed instructions are a paradigm example of how not to prepare jury instructions. In

25 fact, they violate just about every basic rule regarding jury instructions. They are repetitive, they place

26 undue emphasis on Merck's defenses, they are argumentative, and they contain incorrect statements of

27 the law.

28

                                         1

For example, the most obvious problem is Merck's claim that as to the learned intermediary defense "the standard CACI instruction fails to incorporate this doctrine as is necessary for a prescription drug case and Merck's proposed instructions correct the deficiency." This is just wrong. CACI 1205 does in fact specifically provide for a paragraph to be read prescription drug cases to account for the learned intermediary doctrine:

> **"[The warning must be given to the prescribing physician and must include the potential risks, side effects, or allergic reactions that may follow the foreseeable use of the product. [Name of defendant] had a continuing duty to warn physicians as long as the product was in use.]"**

As can be seen, the standard CACI instruction incorporates the doctrine by providing a paragraph for that very reason. Referring to the *Carlin* case, the accompanying Directions for Use make it clear that this is designed specifically for the use which Merck is ostensibly adding in its own repetitive language:

> **"The last bracketed paragraph should be read only in prescription product cases:** "In the case of prescription drugs and implants, the physician stands in the shoes of the 'ordinary user' because it is through the physician that a patient learns of the properties and proper use of the drug or implant. Thus, the duty to warn in these cases runs to the physician, not the patient." (Valentine v. Baxter Healthcare Corp. (1999) 68 Cal.App.4th 1467, 1483 [81 Cal.Rptr.2d 252].**)"**

While the Directions also provide for a slight modification of the definition of "scientific knowledge" in certain cases, to "knowable in light of the generally recognized and prevailing best scientific and medical knowledge available," they do *not* recommend repeating that phrase *four* times in the seven sentences of the instruction, as Merck is attempting to do. Nor do they recommend chanting the phrase "known or reasonably knowable" *five* times in seven sentences, like some magical incantation, as Merck is suggesting the Court do. Apparently Merck is worried the jury might not remember it unless it is in just about every sentence.

Unfortunately for Merck, this is not permissible. According to Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS & EVIDENCE (The Rutter Group 2006):

> " [14:56]  Not repetitive:  Finally, jury instructions should provide the relevant rules of law generally and avoid singling out or stressing particular evidentiary items or legal theories; otherwise, the court's emphasis of certain facts or issues may cause jurors to attach undue

2

importance or credibility to the selected matters. [See > Powell v. Bartmess (1956) 139 Cal.App.2d 394, 404, 294 P.2d 150, 156;…"…

"[14:98] Instructions creating undue emphasis:  Instructions that place undue emphasis on particular evidence in the case are also improper since they suggest to the jury that special consideration should be given to those facts. [> Estate of Martin (1915) 170 Cal. 657, 672, 151 P 138, 144; and see > ¶14:100 re argumentative instructions]"…

"[14:100]  Argumentative instructions:  "Argumentative" instructions are those that, instead of stating rules of law generally, go too elaborately into the facts relied on by one of the parties. Such instructions are improper because they put the court in the position of making an argument to the jury. Moreover, because the instructions emphasize certain facts or theories, the jury may be misled into thinking they are true or extremely important. [See > Fibreboard Paper Products Corp. v. East Bay Union of Machinists (1964) 227 Cal.App.2d 675, 718, 39 Cal.Rptr. 64, 91; > Slayton v. Wright (1969) 271 Cal.App.2d 219, 238, 76 Cal.Rptr. 494, 506]"…

"[14:118]  Repetitious instructions as reversible error:  The giving of repetitious instructions constitutes error when the effect is to unduly emphasize issues, theories or defenses. [> Fibreboard Paper Products Corp. v. East Bay Union of Machinists (1964) 227 Cal.App.2d 675, 718, 39 Cal.Rptr. 64, 91]"

Merck's instructions are contrary to each of these rules, and as will be shown herein, they contain incorrect statements of law as well.  Accordingly, they must be rejected.

### 1.   The Proposed Instructions Contain Incorrect Statements of Applicable Law.

The instruction proposed by Merck regarding the essential elements of a strict liability claim (Exhibit "1") has several flaws. First of all, unlike CACI 1205 or even BAJI 9.00.7, it incorporates redundant and superfluous statements  The phrase 'known and knowable' risks is referred to no less than 5 times in 7 sentences, whereas CACI 1205 is designed such that 'known and knowable risks' are referred to only once in describing the elements of the strict liability claim:

PRODUCTS LIABILITY
1205
Strict Liability
Failure to Warn—Essential Factual Elements
[Name of plaintiff] claims that the [product] lacked sufficient [instructions] [or] [warning of potential [risks/side effects/allergic reactions]]. To establish this claim, [name of plaintiff] must prove all of the following:
1. That [name of defendant] [manufactured/distributed/sold] the [product];
2. That the [product] had potential [risks/side effects/allergic reactions] that were [known] [or] [knowable by the use of scientific knowledge available] at

the time of [manufacture/distribution/sale];
3. That the potential [risks/side effects/allergic reactions] presented a
substantial danger to users of the [product];
4. That ordinary consumers would not have recognized the potential [risks/side
effects/allergic reactions];
5. That [name of defendant] failed to adequately warn [or instruct] of the
potential [risks/side effects/allergic reactions];
6. That the [product] was used [or misused] in a way that was reasonably
foreseeable to [name of defendant];
7. That [name of plaintiff] was harmed; and
8. That lack of sufficient [instructions] [or] [warnings] was a substantial factor
in causing [name of plaintiff]'s harm.
[The warning must be given to the prescribing physician and must include the
potential risks, side effects, or allergic reactions that may follow the foreseeable use
of the product. [Name of defendant] had a continuing duty to warn physicians as long
as the product was in use.]

Just like CACI 1205, BAJI 9.00.7, the corresponding BAJI instruction on the elements of strict

liability for failure to warn, makes only a single reference to 'known and knowable' risks.

The second problem is that Merck's proposed instruction uses a redundant and erroneous 'cut-off'

date, which ends Merck's duty to warn as of May 8, 2003, the date of first prescription.  This is not the

law in this state.  The continuing duty to warn ran as long as the Plaintiff was using Vioxx.  (See CACI

1205, 8.: "[Name of defendant] had a continuing duty to warn physicians as long as the product was in

use.]")  (This makes sense for the simple reason many physicians took their patients off of Vioxx when

they became aware of its harmful effects which Merck had failed to disclose.)

Third, there is an additional error involved which will create problems similar to those caused by

the verdict form *Arrigale/Appell.*  The error lies in the use of an incorrect statement of the law regarding

one of the elements. As the Court will recall, the *Arrigale/Appell* special verdict form as modified

contained a question (No. 3) which should not have been used, because it misstated the legal standard in

a case involving proof of a failure to warn claim. Specifically, the question was:

> "3. Would Mr. Appell's prescribing physician, Dr. McAdam, have
> recognized the potential risks or side effects?"

This is an incorrect standard. It erroneously limited the question to the subjective recognition of

the plaintiff's physician. The question, if it was even necessary, (and it was not for the verdict form)

should instead have asked what an *ordinary physician* would have recognized, and not what the

4

plaintiff's specific physicians would have recognized.  The question as unmodified came from question No. 4 in CACI VF-1203, which originally stated:

> "4. Would ordinary consumers have recognized the potential [risks/side effects/ allergic reactions]?"

This is an objective standard based not upon the plaintiff's subjective recognition, but that of the 'ordinary consumer.' (Or, as stated in BAJI 9.00.7, the 'ordinary user.' See also CACI 1205:"4.  That **ordinary consumers would not have recognized the potential [risks**/side effects/allergic reactions]")  This question, which became question No. 3 in the *Arrigale* and *Appell* special verdicts, and which was the subject of some confusion among the jurors, was probably modified with the thought that in a prescription drug action "warnings concerning the drug's properties are **properly directed to the physician rather than the patient.**"  *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1118, 920 P.2d 1347, 56 Cal.Rptr.2d 162.   In a prescription drug action the physician steps in the shoes of the patient and becomes the consumer. ("We are aware of no authority which requires a manufacturer to warn of a risk which is readily known and apparent to **the consumer, in this case the physician.**" *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362 [13 Cal.Rptr.2d 811], quoted with approval in *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1354, 920 P.2d 1347, 56 Cal.Rptr.2d 162.)

The duty to warn is owed to the physician and not to the patient.  ("Moreover, in the case of prescription drugs, **the duty to warn runs to the physician, not to the patient....**" "In the case of medical prescriptions, 'if adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed.'" *Carlin*, supra, at 1116, quoting *Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1062-1061, 245 Cal.Rptr. 412, 751 P.2d 470 and *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 507 P.2d 653.)

As with the objective standard of the 'ordinary consumer,' the adequacy for the physician is judged by the ordinary knowledge common to the medical community.  (See *Carmichael v. Reitz* (1971) 17 Cal.App.3d 958, 989, 95 Cal.Rptr. 381.  "[I]t is the prescribing doctor who in reality stands in the shoes of 'the ordinary consumer.'  Consequently in the situation presented here, it was not error to instruct the jury that Enovid had to be 'dangerous to an extent beyond that which would be contemplated by her

5

1  physician who purchases it, with the **ordinary knowledge common to the medical community** as to its

2  characteristics."' See also *Carlin*, supra, at 1118. "Thus, a pharmaceutical manufacturer may not be

3  required to provide warning of a risk **known to the medical community**." Id at 1116.)

4      Therefore, assuming arguendo that it was even necessary to modify the question in the *Appell* and

5  *Arrigale* special verdicts, it should have been directed to whether ordinary physicians would have

6  recognized the potential risks or side effects.   Instead, the question was limited to the plaintiffs'

7  physicians' subjective knowledge, which not only was wrong, but confusing to jurors. While the

8  subjective knowledge of the physician, along with objective evidence of what a reasonable physician

9  would have done, is relevant to the issue of warnings causation, it is irrelevant to the element of proof

10  described in CACI 1205 as "4. That ***ordinary consumers*** would not have recognized the potential

11  [risks/side effects/allergic reactions]…"

12      With its latest instruction Merck has changed its tactics, but it is still misstating the law, in

13  addition to imposing a greater burden upon the Plaintiff than the law specifies. Merck has now added

14  language suggesting that Plaintiff must prove this element both as to ordinary physicians ***and*** Mr.

15  Berwick's prescribing physician so that Plaintiff must now prove: "3. That, as of May 8, 2003, **Mr.**

16  **Berwick's prescribing physician was not aware, nor would a reasonably well-informed physician**

17  **have been aware**, of the potential risks from Vioxx that were known or reasonably knowable in light of

18  the generally recognized and prevailing best scientific and medical knowledge available at the time;…"

19      This is not what the law requires and the instruction as proposed is patently defective.

20      The proposed instruction on concealment contains similar errors. It too is repetitive and uses the

21  initial prescription date of May 8, 2003 as the last date Merck had a duty to warn.  Additionally, the last

22  sentence of CACI 1901 provides: "That [name of defendant]'s concealment was a substantial factor in

23  causing [name of plaintiff]'s harm."  However, Merck instead wants the instruction to say that "Merck's

24  concealment was a substantial factor in Mr. Berwick's physician's decision to prescribe Vioxx to Mr.

25  Berwick on May 8, 2003."  In addition to misstating the law, this elaboration on the critical causation

26  portion of the instruction is both unnecessary and argumentative. No such elaboration was proposed for

27  CACI 1205 in a prescription drug case, and there is no reason to include one in the concealment

28  instruction either.

**2.  Modification with Additional Redundant Reference to the Plaintiff's Treating Physician Is Unnecessary and Not Contemplated by the Drafters of the CACI Instructions.**

It is easy to see how the confusion came about in *Arrigale/Appell*, both with the proposed instruction as well as the deliberations.  BAJI 9.00.7, the instruction on strict liability failure to warn, which has worked fine for decades, is similar to CACA1205, but has always used the language "ordinary user" instead of "ordinary consumer":

BAJI 9.00.7

"FAILURE TO WARN--ESSENTIAL ELEMENTS

The essential elements of a claim based upon an alleged defect from failure to warn are:
1. The defendant was the [manufacturer] [_____] of a product, namely ___(identify the product)___;
2. The product was defective;
3. The product defect was a cause of injury to the plaintiffs; and
4. Plaintiff's injury resulted from a use of the product that was reasonably foreseeable to the defendant.
A product is defective if the [manufacturer] [_____] of a product of a product has a duty to warn of dangers, and fails to provide an adequate warning of that danger.
[A [manufacturer] [_____] has a duty to warn if 1) the use of the product in a manner that is reasonably foreseeable by the ___(manufacturer, etc.)___ **involves a substantial danger that would not be readily recognized by the ordinary user of the product**, and 2) this danger was known or knowable in light of the generally recognized and prevailing best scientific [and medical] knowledge available at the time of the manufacture and distribution.]
[A manufacturer has a duty to provide an adequate warning to the user on how to use the product if a reasonably foreseeable use of the product involves a substantial danger of which the manufacturer either is aware or should be aware, and that would not be readily recognized by the ordinary user.]
[A manufacturer has a duty to provide an adequate warning to the consumer of a product of potential risks or side effects which may follow the foreseeable use of the product, and which are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution.]
**[In the case of prescription drugs, the warning must be given to the physician.]...**"

7

The last sentence of BAJI 9.00.7 also provides a special addition for prescription drug cases, stating, "In the case of prescription drugs, the warning must be given to the physician." However, that addition did not change the objective standard of the 'ordinary user.' This is because the 'user' is the physician, and the adequacy of the warning is tested by the 'ordinary' physician's knowledge.

In the analogous CACI instruction, 1205, the words 'ordinary consumers' were substituted for 'ordinary user.' Since the 'user' in a prescription drug case is the physician, likewise the 'consumers' are physicians. The setting of a prescription drug case was specifically contemplated in CACI 1205 as well. As with 9.00.7, in CACI 1205 the jury is told that "The warning must be given to the prescribing physician."

The drafters of the CACI instructions never intended a modification of the instruction on the elements of a claim to add in the treating physician for the "ordinary consumers." This is evident by the fact that although they specifically inserted an additional provision in CACI 1205 for prescription drug cases to note that the warning must be given to the physician, they made no suggestion for a change in the portion of the instruction which refers to 'ordinary consumers.'

The last paragraph addition in the brackets was provided to tell jurors that the warning must be given to the physician and that there is "a continuing duty was to warn physicians." However, CACI does not suggest that as to the 'ordinary consumers' in prescription drug cases the language should be altered, removed, or modified in any way. Nor does it suggest adding to the instruction to increase the burden to the Plaintiff. Likewise, there is no suggestion that a similar addition or modification be made to the CACI verdict form VF-1203 in a prescription drug case.

## CONCLUSION

In addition to superfluous and redundant language highlighting its defenses and imposing an excessive burden of proof, Merck's proposed jury instructions contain patently erroneous statements of law. The extensive and unnecessary wholesale modifications Merck proposes would carry the same potential confusion which hung up the jury in *Arrigale/Appell.*

To put it bluntly, Merck is just asking for trouble. Plaintiff suggests that the reasonable approach would be to use CACI 1901 on the deceit cause of action, and either CACI 1205 or BAJI 9.00.7 on the

1  strict liability cause of action. This will avoid needless editorializing, undue repetition, errors of law and

2  argumentative add-ons, and will reduce the risk of error and juror confusion.

3

4  DATED: March  28, 2007                           ROBINSON, CALCAGNIE & ROBINSON

5

6                                                   By: _____

7                                                        MARK P. ROBINSON, JR.
                                                         KEVIN F. CALCAGNIE
8                                                        CARLOS A. PRIETTO, III
                                                         Attorneys for Plaintiff
9                                                        LOWELL BERWICK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S BRIEF RE JURY INSTRUCTIONS ON STRICT LIABILITY AND CONCEALMENT PROPOSED BY MERCK

FAC Resp. Exhibit B -- 2232

Mark P. Robinson, Jr., SBN 054426
Kevin F. Calcagnie, SBN 08994
Carlos A. Prietto, III, SBN 166410
Ted B. Wacker, SBN 157416
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, Suite 700
Newport Beach, California  92660
Tele: 949-720-1288; Fax:  949-720-1292

Attorneys for Plaintiff
LOWELL BERWICK

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST

| | |
|---|---|
| Coordination Proceedings<br>Special Title  (Rule 1550(b))<br>**VIOXX® CASES**<br><br>LOWELL BERWICK and CAROLE BERWICK<br><br>    Plaintiffs,<br><br>vs.<br><br>MERCK & COMPANY, INC., McKESSON<br>CORPORATION, and DOES 1 THROUGH 100,<br>inclusive,<br><br>    Defendants | Case No.: JCCP 4247<br><br>Assigned to Honorable Victoria Chaney,<br>Department 324<br><br>[LASC Case Number:  BC328855]<br><br>**PLAINTIFF'S BRIEF RE PROPOSED<br>VERDICT FORM**<br><br>Trial Date:  April 9, 2007 |

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

1.   THE COURT IS NOT REQUIRED TO USE THE CACI FORMS ...............................1

2.   THE PROBLEMS WITH CACI VF-1203 AND THE APPELL/ARRIGALE
     VERDICT FORM.................................................................................................2

     a.   The Verdict Forms in Appell and Arrigale Contained a Modification Based Upon an
          Incorrect Statement of Applicable Law ..........................................................2

     b.   The Modification Regarding the Plaintiff's Treating Physician Was Unnecessary and
          Not Contemplated by the Drafters of the CACI Instructions ...........................4

     c.   Even the Unmodified CACI Verdict Form Adds Undue Complexity and Confusion
          to the Jurors' Deliberations...........................................................................7

3.   THE SOLUTION:  VERDICT FORM BASED UPON BAJI ................................. 10

CONCLUSION ...............................................................................................................13

ii

FAC Resp. Exhibit B -- 2234

1

## TABLE OF AUTHORITIES

2  <u>CASES</u>

3  *Brown v. Superior Court,*
4      (1988) 44 Cal.3d 1049, 1062-1061, 245 Cal.Rptr. 412, 751 P.2d 470 ........................4

5  *Carlin v. Superior Court,*
    (1996) 13 Cal.4th 1104, 1118, 920 P.2d 1347, 56 Cal.Rptr.2d 162. ........................3, 4
6

7  *Carmichael v. Reitz,*
    (1971) 17 Cal.App.3d 958, 989, 95 Cal.Rptr. 381............................................4
8

9  Plenger v. Alza Corp.,
    (1992) 11 Cal.App.4th 349, 362, 13 Cal.Rptr.2d 811 ........................................3
10

11  *Stevens v. Parke, Davis & Co.,*
    (1973) 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 507 P.2d 653 ....................................4

12

13  <u>STATUTES</u>

14
    Cal.Rules of Court, Rule 2.1050(e) ....................................................................1
15

16

17  <u>OTHER</u>

18  BAJI 9.00.7 ......................................................................................3, 4, 5

19  BAJI 16.11    Form of Special Verdict—Negligence and Products Liability—
20      Comparative Fault.....................................................................8, 12

21  BAJI 16.13    Form of Special Verdict—Products Liability –Warranty ..............................12

22  BAJI 16.50.1   Form of Special Verdict—Concealment ..............................................12

23  BAJI 16.50.3   Form of Special Verdict—Negligent Misrepresentation................................12

24  BAJI 16.81    Punitive Damages– Bifurcated Trial--Phase I.......................................12

25  BAJI 16.82    Punitive Damages– Bifurcated Trial--Phase II......................................12

26

27

28

iii

CACI VF-1203.......................................................................................................2, 7

CACI 1205 ..............................................................................................................5, 6

Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS &
EVIDENCE (The Rutter Group 2006) ............................................................................2

iv

FAC Resp. Exhibit B -- 2236

## INTRODUCTION

Plaintiff Lowell Berwick respectfully requests that the Court utilize the Plaintiff's Proposed Special Verdict submitted with this brief, which is based upon a combination of several BAJI special verdict forms, rather than the CACI verdict forms. As this Court knows from the experience in the *Arrigale* and *Appell* cases with the verdict form CACI VF-1203, the CACI verdict forms are less than perfect and can lead to confusion. This brief will discuss why:

    a. The Verdict Forms in *Appell* and *Arrigale* Contained a Modification Based Upon an Incorrect Statement of Applicable Law.

    b. The Modification Was Unnecessary and Not Contemplated by the Drafters of the CACI Instructions.

    c. Even the Unmodified CACI Verdict Form Adds Undue Complexity and Confusion to the Jurors' Deliberations.

This brief will also show why the Court should instead utilize a verdict form based upon BAJI, similar to verdict forms used in other pharmaceutical mass torts such as the PPA JCCP and the Vioxx MDL. This approach is much less complex and reduces the risk of incorrect statements of the law, inconsistency between the verdict form and the jury instructions, and juror confusion.

## 1. THE COURT IS NOT REQUIRED TO USE THE CACI FORMS.

It is important to remember that the Court is not required to use the CACI instructions. While their use is 'strongly encouraged,' it is 'recommended' that the judge use applicable CACI instructions **"unless he or she finds that a different instruction would more accurately state the law and be understood by jurors."** See Cal.Rules of Court, Rule 2.1050(e), eff. Jan. 1, 2007.  According to

FAC Resp. Exhibit B -- 2237

Wegner, Fairbank, Epstein & Chernow, CAL. PRAC. GUIDE: CIVIL TRIALS & EVIDENCE (The Rutter Group 2006):[1]

> => [14:58.6]  PRACTICE POINTER:  The CACI instructions, while carefully crafted and reviewed by a select Judicial Council advisory committee, are relatively new and there may be some errors. Keep in mind that the purpose of the instructions is to restate the law in terms understandable by laypersons, not to make new law. If you have authority to demonstrate that a particular instruction is wrong in some respect, that error may be pointed out in aid of a different instruction, which might be the BAJI version on the same subject.

It is also important to note that several CACI verdict forms, including VF-1203 state:

> "DIRECTIONS FOR USE
> The special-verdict forms in this section are intended only as models. They may need to be modified depending on the facts of the case. ...."

## 2. THE PROBLEMS WITH CACI VF-1203 AND THE APPELL/ARRIGALE VERDICT FORM

There are at least three problems with the verdict form used in *Arrigale* and *Appell*, a modified version of VF-1203.  (Exhibit 1)  First of all, it contained a question which was based upon an incorrect statement of the applicable law. Secondly, the modification was unnecessary and not contemplated by the drafters of CACI, who apparently felt that the subject of the modification was already covered by an addition to CACI 1205, the underlying instruction on strict liability failure to warn. Finally, even without the modification, the CACI VF-1203 verdict form adds undue complexity to the jurors' deliberations.

### a.  The Verdict Forms in Appell and Arrigale Contained a Modification Based Upon an Incorrect Statement of Applicable Law.

---

[1]  Emphasis throughout this brief added unless otherwise indicated.

FAC Resp. Exhibit B -- 2238

The *Arrigale* and *Appell* special verdict form as modified contained a question (No. 3) which should not have been used, because it misstated the legal standard in a case involving proof of a failure to warn claim. Specifically, the question was:

> "3. Would Mr. Appell's prescribing physician, Dr. McAdam, have recognized the potential risks or side effects?"(Exhibit 1)

This is an incorrect standard. It erroneously limits the question to the subjective recognition of the plaintiff's physician. The question, if it was even necessary, (and it was not) should instead have asked what an *ordinary physician* would have recognized, and not what the plaintiff's specific physicians would have recognized. The question as unmodified came from question No. 4 in CACI VF-1203, which originally stated:

> "4. Would ordinary consumers have recognized the potential [risks/side effects/ allergic reactions]?"

This is an objective standard based not upon the plaintiff's subjective recognition, but that of the 'ordinary consumer.' (Or, as stated in BAJI 9.00.7, the 'ordinary user.' See also CACI 1205:"4. That **ordinary consumers would not have recognized the potential [risks**/side effects/allergic reactions]") This question, which became question No. 3 in the *Arrigale* and *Appell* special verdicts, and which was the subject of some confusion among the jurors, was probably modified with the thought that in a prescription drug action "warnings concerning the drug's properties are **properly directed to the physician rather than the patient.**" *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1118, 920 P.2d 1347, 56 Cal.Rptr.2d 162.   In a prescription drug action the physician steps in the shoes of the patient and becomes the consumer. ("We are aware of no authority which requires a manufacturer to warn of a risk which is readily known and apparent to **the consumer, in this case the physician.**" *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362 [13 Cal.Rptr.2d 811], quoted with approval in *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1354, 920 P.2d 1347, 56 Cal.Rptr.2d 162.)

The duty to warn is owed to the physician and not to the patient. ("Moreover, in the case of prescription drugs, **the duty to warn runs to the physician, not to the patient**…." "In the case of medical prescriptions, 'if adequate warning of potential dangers of a drug has been given to doctors, there

3

is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed.'" *Carlin*, supra, at 1116, quoting *Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1062-1061, 245 Cal.Rptr. 412, 751 P.2d 470 and *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 507 P.2d 653.)

As with the objective standard of the 'ordinary consumer,' the adequacy for the physician is judged by the ordinary knowledge common to the medical community.  (See *Carmichael v. Reitz* (1971) 17 Cal.App.3d 958, 989, 95 Cal.Rptr. 381.  "[I]t is the prescribing doctor who in reality stands in the shoes of 'the ordinary consumer.'  Consequently in the situation presented here, it was not error to instruct the jury that Enovid had to be 'dangerous to an extent beyond that which would be contemplated by her physician who purchases it, with the **ordinary knowledge common to the medical community** as to its characteristics.'" See also *Carlin*, supra, at 1118. "Thus, a pharmaceutical manufacturer may not be required to provide warning of a risk **known to the medical community**." Id at 1116.)

Therefore, assuming arguendo that it was even necessary to modify the question in the *Appell* and *Arrigale* special verdicts, it should have been directed to whether ordinary physicians would have recognized the potential risks or side effects.   Instead, the question was limited to the plaintiffs' physicians' subjective knowledge, which not only was wrong, but confusing to jurors.

**b.  The Modification Regarding the Plaintiff's Treating Physician Was Unnecessary and Not Contemplated by the Drafters of the CACI Instructions.**

It is easy to see how the confusion came about, both with the proposed instruction as well as the deliberations.  BAJI 9.00.7, the instruction on strict liability failure to warn, which has worked fine for decades, is similar to CACA1205, but has always used the language "ordinary user" instead of "ordinary consumer":

BAJI 9.00.7

"FAILURE TO WARN--ESSENTIAL ELEMENTS

The essential elements of a claim based upon an alleged defect from

4

FAC Resp. Exhibit B -- 2240

failure to warn are:

    1. The defendant was the [manufacturer] [_____] of a product, namely ___(identify the product)___;

    2. The product was defective;

    3. The product defect was a cause of injury to the plaintiffs; and

    4. Plaintiff's injury resulted from a use of the product that was reasonably foreseeable to the defendant.

    A product is defective if the [manufacturer] [_____] of a product has a duty to warn of dangers, and fails to provide an adequate warning of that danger.

    [A [manufacturer] [_____] has a duty to warn if 1) the use of the product in a manner that is reasonably foreseeable by the ___(manufacturer, etc.)___ **involves a substantial danger that would not be readily recognized by the ordinary user of the product,** and 2) this danger was known or knowable in light of the generally recognized and prevailing best scientific [and medical] knowledge available at the time of the manufacture and distribution.]

    [A manufacturer has a duty to provide an adequate warning to the user on how to use the product if a reasonably foreseeable use of the product involves a substantial danger of which the manufacturer either is aware or should be aware, and that would not be readily recognized by the ordinary user.]

    [A manufacturer has a duty to provide an adequate warning to the consumer of a product of potential risks or side effects which may follow the foreseeable use of the product, and which are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution.]

    **[In the case of prescription drugs, the warning must be given to the physician.]…"**

The last sentence of BAJI 9.00.7 also provides a special addition for prescription drug cases, stating, "In the case of prescription drugs, the warning must be given to the physician." However, that addition did not change the objective standard of the 'ordinary user.' This is because the 'user' is the physician, and the adequacy of the warning is tested by the 'ordinary' physician's knowledge.

In the analogous CACI instruction, 1205, the words 'ordinary consumers' were substituted for 'ordinary user.' Since the 'user' in a prescription drug case is the physician, likewise the 'consumers' are physicians. The setting of a prescription drug case was specifically contemplated in CACI 1205 as well. As with 9.00.7, in CACI 1205 the jury is told that "The warning must be given to the prescribing physician."

FAC Resp. Exhibit B -- 2241

The drafters of the CACI instructions never intended a modification of the verdict form to substitute the treating physician for the "ordinary consumers." This is evident by the fact that although they specifically inserted an additional provision in CACI 1205, the underlying instruction, to note that the warning must be given to the physician in prescription drug cases, they made no suggestion for a change in the portion of the instruction which refers to ordinary consumers. CACI 1205, which sets out the elements of a strict liability failure to warn claim, provides:

> PRODUCTS LIABILITY
> 1205
> Strict Liability
> Failure to Warn--- Essential Factual Elements
> [Name of plaintiff] claims that the [product] lacked sufficient [instructions] [or] [warning of potential [risks/side effects/allergic reactions]]. To establish this claim, [name of plaintiff] must prove all of the following:
> 1. That [name of defendant] [manufactured/distributed/sold] the [product];
> 2. That the [product] had potential [risks/side effects/allergic reactions] that were [known] [or] [knowable by the use of scientific knowledge available] at the time of [manufacture/distribution/sale];
> 3. That the potential [risks/side effects/allergic reactions] presented a substantial danger to users of the [product];
> **4. That ordinary consumers would not have recognized the potential [risks/side effects/**allergic reactions];
> 5. That [name of defendant] failed to adequately warn [or instruct] of the potential [risks/side effects/allergic reactions];
> 6. That the [product] was used [or misused] in a way that was reasonably foreseeable to [name of defendant];
> 7. That [name of plaintiff] was harmed; and
> 8. That lack of sufficient [instructions] [or] [warnings] was a substantial factor in causing [name of plaintiff]'s harm.
> **[The warning must be given to the prescribing physician and must include the potential risks, side effects, or allergic reactions that may follow the foreseeable use of the product. [Name of defendant] had a continuing duty to warn physicians as long as the product was in use.]"**

The last paragraph addition in the brackets was provided to tell jurors that the warning must be given to the physician and that there is "a continuing duty was to warn physicians." However, CACI 1205 does not suggest altering or removing the subjective standard of the 'ordinary consumer,' who in the situation here is the ordinary physician. Nor is there any suggestion that a similar provision, addition or modification be made to the CACI verdict form VF-1203 in a prescription drug case.

6

FAC Resp. Exhibit B -- 2242

Significantly, even though the drafters inserted the addition in the last paragraph of CACI 1205 for prescription drug cases, they did not provide for or even suggest that a similar modification or addition would be necessary for the verdict form, VF-1203. This is undoubtedly because the subject is covered in the underlying instruction, and no such modification is necessary on the verdict form. Thus, the form used in *Appell* and *Arrigale* not only substituted a standard which was legally incorrect, it used a modification which the drafters of CACI did not feel was even necessary.

**c. Even the Unmodified CACI Verdict Form Adds Undue Complexity and Confusion to the Jurors' Deliberations.**

Even in its unmodified form, the CACI VF-1203 is inherently problematic in that, simply stated, it uses too many questions. It breaks up a single cause of action, strict liability failure to warn, into seven different questions on the issue of liability only:

> **CACI**
> **VERDICT FORMS**
> VF-1203
> Strict Products Liability
> Failure to Warn
> We answer the questions submitted to us as follows:
> 1. Did [name of defendant] [manufacture/distribute/sell] the [product]?
> ___Yes ___No
> If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.
> 2. Did the [product] have potential [risks/side effects/allergic reactions] that were [known] [or] [knowable through the use of scientific knowledge available] at the time of [manufacture/distribution/sale]?
> ___Yes ___No
> If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.
> 3. Did the potential [risks/side effects/allergic reactions] present a substantial danger to users of the [product]?
> ___Yes ___No
> If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

FAC Resp. Exhibit B -- 2243