4. Would ordinary consumers have recognized the potential [risks/side effects/allergic reactions]?
___Yes ___No
If your answer to question 4 is no, then answer question 5. If you answered yes, stop here, answer no further questions, and have the presiding juror sign and date this form.
5. Did [name of defendant] fail to adequately warn [or instruct] of the potential [risks/side effects/allergic reactions]?
___Yes ___No
If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.
6. Was the [product] used [or misused] in a way that was reasonably foreseeable to [name of defendant]?
___Yes ___No
If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.
7. Was the lack of sufficient [instructions] [or] [warnings] a substantial factor in causing harm to [name of plaintiff]?
___Yes ___No

Each of these subjects is already covered in the underlying instruction CACI 1205.  By contrast, BAJI 16.11 covers the elements on both strict liability *and* negligence causes of action in only six questions:

BAJI 16.11

FORM OF SPECIAL VERDICT--NEGLIGENCE AND
PRODUCTS LIABILITY--COMPARATIVE FAULT
(Title of Court and Cause)
SPECIAL VERDICT
    We, the jury in the above entitled action, find the following Special Verdict on the questions submitted to us:
Question No. 1: **Was there a** [defect in manufacture] [defect in design] [**failure to warn defect**] of the product involved as to [any of] the [following] defendant[s]?
Answer "yes" or "no" after the name of [the] [each] defendant.
                    Yes   No
Answer: Defendant _____ _____ _____
        [Defendant _____ _____ _____]
        [Defendant _____ _____ _____]
    If you answer "no" as to [the] [each] defendant, answer Question No.

8

5. If you answer "yes" as to [one or more] defendant[s], then answer the next question only as to [that] [those] defendant[s].

Question No. 2: [As to each defendant that you answered "yes" in Question No. 1,] did the defect exist when it left the possession of such defendant?
Answer "yes" or "no" after the name of [each] [that] defendant.

|  | Yes | No |
|---|---|---|
| Answer:  Defendant _____ | _____ | _____ |
| [Defendant _____ | _____ | _____] |
| [Defendant _____ | _____ | _____] |

If you answer "no" as to [all] defendant[s], answer Question No. 5.
If you answer "yes" as to [one or more] defendant[s] as to both Questions No. 1 and No. 2, then answer the next question.

Question No. 3: [As to each defendant that you answered "yes" to both Questions No. 1 and No. 2,] was the defect a cause of injury to plaintiff?
Answer "yes" or "no" after the name of [each] [that] defendant.

|  | Yes | No |
|---|---|---|
| Answer:  Defendant _____ | _____ | _____ |
| [Defendant _____ | _____ | _____] |
| [Defendant _____ | _____ | _____] |

If you answer "no" as to [all] defendant[s], answer Question No. 5.
If you answer "yes" as to [one or more] defendant[s] to Questions No. 1, No. 2, and No. 3, then answer the next question.

Question No. 4: [As to each defendant that you answered "yes" in Questions No. 1, No. 2 and No. 3,] was plaintiff's injury caused by a use of the product that was reasonably foreseeable by [that] defendant?
Answer "yes" or "no" after the name of [each] [that] defendant.

|  | Yes | No |
|---|---|---|
| Answer:  Defendant _____ | _____ | _____ |
| [Defendant _____ | _____ | _____] |
| [Defendant _____ | _____ | _____] |

Question No. 5: **Was any defendant negligent?**
Answer "yes" or "no" after the name of [the] [each] defendant.

|  | Yes | No |
|---|---|---|
| Answer:  Defendant _____ | _____ | _____ |
| [Defendant _____ | _____ | _____] |
| [Defendant _____ | _____ | _____] |

If you answer Question No. 5 "no" as to [all] defendant[s], and you have answered "no" to any of Questions 1, 2, 3 or 4 as to [all] defendant[s], sign and return this verdict. If you answer Question No. 5 "yes" as to [any] defendant, then answer Question No. 6. If you answer Question No. 4 "yes" and Question No. 5 "no," answer Question No. 7.

9

FAC Resp. Exhibit B -- 2245

Question No. 6: Was the negligence of defendant[s] a cause of [injury] [damage] to plaintiff?
Answer "yes" or "no" after the name of [the] [each] defendant.

                    Yes      No
Answer:  Defendant  _____  _____  _____
         [Defendant  _____  _____  _____]
         [Defendant  _____  _____  _____]

BAJI 16.11 is designed for the same cause of action as the CACI form, yet it does not ask the following individual questions that are found in CACI VF-1203, "Did the [product] have potential [risks/side effects/allergic reactions] that were [known] [or] [knowable through the use of scientific knowledge available] at the time of [manufacture/distribution/sale]?;  Did the potential [risks/side effects/allergic reactions] present a substantial danger to users of the [product]?;  Would ordinary consumers have recognized the potential [risks/side effects/allergic reactions]?;  Did [name of defendant] fail to adequately warn [or instruct] of the potential [risks/side effects/allergic reactions]?"

Instead, because each of these issues is already contained in the underlying instruction on the elements of proof, BAJI 16.11 subsumes them all into a single question:

> 1:  **Was there a** [defect in manufacture] [defect in design] [**failure to warn defect**] of the product involved as to [any of] the [following] defendant[s]?

This makes more sense than splitting up several elements which are logically tied together in the underlying instruction, and then presenting them in a different form which is not only confusing, but which can, and did, end up end up being inconsistent with the underlying instructions, and inconsistent with the law.  The special verdict BAJI 16.11 covers two causes of action (both negligence and strict liability) in fewer questions than the CACI verdict form covers one. The added complexity of VF-1203 only increases the potential for juror confusion, and in the *Appell* and *Arrigale* cases, it led to an unnecessary and incorrect modification of a confusing question that was unnecessary to begin with.

## 3. THE SOLUTION:  VERDICT FORM BASED UPON BAJI

The foregoing problems could have been avoided altogether if the BAJI verdict form had been used. It is concise, it is accurate, and it has been used in California products liability litigation for well

10

FAC Resp. Exhibit B -- 2246

1   over a decade. The BAJI approach simplifies the findings into only essential questions, instead of parsing

2   out intertwined elements into myriad separate issues. This method reduces the risk of incorrect statements

3   of the law, it reduces the risk of inconsistency between the verdict form and the jury instructions, and it

4   reduces the risk of juror confusion.

5       A similar approach has been used by other courts in mass tort pharmaceutical litigation. For

6   example, in *O'Neill v. Novartis*, and *Lutz v. Novartis*, a joint 2004 trial involving the over-the-counter

7   medication PPA, (L.A.S.C. JCCP 4166) the Honorable Anthony Mohr utilized simplified verdict forms

8   which used a grand total of four questions on three causes of action. (Exhibits 2 and 3) The only liability

9   questions were as follows:

10      1.      Did plaintiff Linda Lutz prove a claim for defective design?
        2.      Did plaintiff Linda Lutz prove a claim for lack of sufficient warnings?
11      3.      Did plaintiff Linda Lutz prove a claim of fraud by concealment?
        4.      Did plaintiff Linda Lutz prove that Triaminicin was a cause of her stroke?
12

13      The *Lutz* and *O'Neill* verdict forms involved 3 causes of action--strict liability, negligence and
14
        fraud--and yet they utilized fewer questions than the single cause of action in *Appell* and *Arrigale*.  In
15
        *Barnett v. Merck*, tried in the Vioxx MDL last summer, Judge Eldon Fallon used a special verdict
16
        (Exhibit 4) which, aside from comparative fault questions, covered three causes of action-strict liability,
17
        negligence and fraud- in only three questions:
18
        1. Do you find that Merck & Co., Inc. failed to adequately warn Gerald Barnett's treating
19      physicians of a known or reasonably scientifically or medically knowable risk associated with
        Vioxx, and that such failure to adequately warn was a legal cause of an injury to Gerald Barnett?
20
        2. Do you find that Merck & Co, Inc. was negligent in failing to adequately warn Gerald
21      Barnett's treating physicians of a known or reasonably scientifically or medically knowable risk
22      associated with Vioxx, and that such negligence was a legal cause of an injury to Gerald Barnett?

23      3. Do you find that Merck & Co., Inc. knowingly misrepresented or failed to disclose a material
24      fact to Gerald Barnett's treating physicians in a circumstance where it was required to do so, that
        Gerald Barnett's treating physicians were entitled to and did rely on that misrepresentation or
25      non-disclosure, and that the misrepresentation or non-disclosure was a legal cause of an injury to
        Gerald Barnett?
26

27

28

1    In each of the cases noted, the specific elements of proof for each of the causes of action were set
2    forth in instructions to the jury. Unlike the CACI approach, the special verdicts used by Judge Mohr and
3    Judge Fallon kept the questions on each cause of action to a minimum and avoided confusion.

4    Therefore Plaintiff suggests that, instead of the CACI verdict form, this Court adopt the same
5    method which Judge Mohr and Judge Fallon utilized, and minimize the number of questions used. In the
6    alternative Plaintiff asks that the Court utilize a verdict form based upon the BAJI verdict forms, rather
7    than the CACI verdict forms. This is particularly necessary in this action, not only because of the
8    confusion created by the CACI instruction in *Appell* and *Arrigale*, but because the Plaintiff here is
9    asserting several additional causes of action which were not asserted in those actions. These include
10   causes of action which contain more elements than the standard products liability causes of action, and
11   for which the BAJI verdict forms contain several questions each.

12   Attached herewith is a proposed verdict form which is based upon and combines the following
13   applicable BAJI verdict forms:

14   BAJI 16.11    Form of Special Verdict—Negligence and Products Liability—Comparative Fault
15   BAJI 16.50.1  Form of Special Verdict--Concealment
16   BAJI 16.50.3  Form of Special Verdict—Negligent Misrepresentation
17   BAJI 16.13    Form of Special Verdict—Products Liability --Warranty

18
19   The form also includes modified versions of:
20   BAJI 16.81    Punitive Damages —Bifurcated Trial--Phase I
21   BAJI 16.82    Punitive Damages—Bifurcated Trial--Phase II
22
23   Finally, the form also includes proposed advisory questions on the 17200 and 17500 claims:
24
25   In connection with the sale of Vioxx, did Merck engage in any unlawful,
     unfair or fraudulent business act or practice, or any unfair, deceptive,
26   untrue or misleading advertising?
27
28

12

FAC Resp. Exhibit B -- 2248

1
2
3

In connection with the sale of Vioxx, did Merck disseminate or cause to be made or disseminated, any statement, concerning Vioxx which was untrue or misleading, and which was known, or which by the exercise of reasonable care should have been known, to be untrue or misleading?

**CONCLUSION**

Based upon the foregoing, Plaintiff requests that the Court utilize the proposed verdict form submitted herewith. The BAJI format reduces the risk of incorrect statements of the law, it reduces the risk of inconsistency between the verdict form and the jury instructions, and it reduces the risk of juror confusion.

DATED: February 26, 2007

ROBINSON, CALCAGNIE & ROBINSON

By: _____

MARK P. ROBINSON, JR.
KEVIN F. CALCAGNIE
CARLOS A. PRIETTO, III
Attorneys for Plaintiff
LOWELL BERWICK

13

FAC Resp. Exhibit B -- 2249

**PROOF OF SERVICE**

STATE OF CALIFORNIA    ) ss.
COUNTY OF ORANGE      )

I certify that I am over the age of 18 years and not a party to the within action.  My business address is:

ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, Suite 700
Newport Beach, CA 92660

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is:  Robinson, Calcagnie & Robinson, 620 Newport Center Drive, 7th Floor, Newport Beach, California 92660

On ___*Feb. 26,*_____, 2007, I served the foregoing document described as:

**PLAINTIFF'S BRIEF RE PROPOSED VERDICT FORM;
PLAINTIFF'S PROPOSED SPECIAL VERDICT FORM**

on all interested parties in this action through the use of the VIOXX Cases JCCP No. 4247 Website maintained by CaseHomePage.

I caused the foregoing document to be transmitted to CaseHomePage for electronic service in the following manner:

____  MAIL  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Newport Beach, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_X_  FAX  I caused each document to be sent by FAX to the parties listed on the attached service list.

_X_  CASE HOME PAGE I provided the document(s) listed above electronically to CaseHomePage through the CaseHomePage website pursuant to the instructions on that website.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on ___*2/26/07*_____, at Newport Beach, California.

_Darleen Perkins_

14

FAC Resp. Exhibit B -- 2250

1

<u>SERVICE LIST</u>

2
3
4
5
6

Michael K Brown, Esq.
Thomas J. Yoo, Esq.
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 457-8000
Facsimile: (213) 457-8080

Counsel for Defendant:
MERCK & CO., INC.

7
8
9
10
11

Ralph A. Campillo, Esq.
Wendy A. Tucker, Esq.
Karen Woodward, Esq.
SEDGWICK, DETERT, MORAN & ARNOLD, LLP
801 South Figueroa Street, 18th Floor
Los Angeles, CA 90017-5556
Telephone:  (213) 426-6900
Facsimile: (213) 426-6921

12
13
14
15
16

Anthony G. Brazil, Esq.
Kanika D. Corley, Esq.
MORRIS POLICH & PURDY, LLP
1055 West 17th Street, 24th Floor
Los Angeles, CA 90017
Telephone: (213) 891-9100
Facsimile:  (213) 488-1178

Counsel for Defendant:
McKESSON CORPORATION

17
18
19
20
21
22

Thomas V. Girardi, Esq.
James O'Callahan, Esq.
David N. Bigelow, Esq.
Vincent Carter, Esq.
GIRARDI & KEESE
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 977-0211
Facsimile:  (213) 481-1554

Plaintiffs' Liaison Counsel

23
24
25
26
27
28

PLAINTIFF'S BRIEF RE PROPOSED VERDICT FORM

FAC Resp. Exhibit B -- 2251

1  Mark P. Robinson, Jr., SBN 054426
   Kevin F. Calcagnie, SBN 08994
2  Carlos A. Prietto, III, SBN 166410
   Ted B. Wacker, SBN 157416
3  ROBINSON, CALCAGNIE & ROBINSON
   620 Newport Center Drive, Suite 700
4  Newport Beach, California 92660
   Tele: 949-720-1288; Fax: 949-720-1292
5
6
   Attorneys for Plaintiff
7  LOWELL BERWICK

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9           FOR THE COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST

10

11 Coordination Proceedings            )  Case No.: JCCP 4247
   Special Title (Rule 1550(b))        )
12 **VIOXX® CASES**                    )  Assigned to Honorable Victoria Chaney,
                                       )  Department 324
13 _____     )
   LOWELL BERWICK and CAROLE BERWICK )
14                                     )  [LASC Case Number:  BC328855]
                                       )
15      Plaintiff Lowell Berwick,      )  **PLAINTIFF'S PROPOSED SPECIAL**
   vs.                                 )  **VERDICT FORM**
16                                     )
   MERCK & COMPANY, INC., McKESSON     )
17 CORPORATION, and DOES 1 THROUGH 100,)  **Dept: 324**
   inclusive,                          )
18                                     )  Trial Date:  April 9, 2007
                                       )
19      Defendants                     )
   _____     )
20

21 WE THE JURORS IN THE ABOVE-ENTITLED ACTIONS, ANSWER THE QUESTIONS

22 SUBMITTED TO US AS FOLLOWS:

23

24 **Question No. 1:** Was Defendant Merck & Co., Inc. negligent?

25      Answer "Yes" or "No".

26      Answer:_____

27 *If you answer Question No. 1 "No", go to Question No. 3.*

28 *If you answer Question No. 1 "Yes", then answer Question No. 2.*

1

PLAINTIFF'S PROPOSED SPECIAL VERDICT FORM

**Question No. 2**: Was such negligence a cause of injury as to the Lowell Berwick?

      Answer "Yes" or "No".

      Answer:_____

*Now go to Question No. 3.*

**Question No. 3**: Was there a failure to warn defect in the Vioxx manufactured by Merck?

      Answer "Yes" or "No".

      Answer:_____

*Now go to question No. 4*

**Question No. 4:** If you answered "yes" to Question No. 3, did the defect exist when it left the possession of Defendant.

      Answer "Yes" or "No".

      Answer:_____

*Now go to Question No. 5.*

**Question No. 5:** If you answered "Yes" to Questions 3 and 4, was the defect a cause of injury to the Lowell Berwick?

      Answer "Yes" or "No".

      Answer:_____

*Now go to Question No. 6.*

2

PLAINTIFF'S PROPOSED SPECIAL VERDICT FORM

**Question No. 6:** If you answered "Yes" to Questions 3, 4 and 5, was Lowell Berwick' injury caused by a use of Vioxx that was reasonably foreseeable by Merck?

    Answer "Yes" or "No".

    Answer:_____

*Now go to Question No. 7.*

**Question No. 7:** Did Merck conceal or suppress a material fact?

    Answer "Yes" or "No".

    Answer:_____

*If you answered Question No. 7 "No", go to Question No. 12.  If you answer Question No. 7 "Yes", then answer Question No. 8.*

**Question No. 8:** Did the Merck intentionally conceal or suppress the fact with the intent to defraud?

    Answer "Yes" or "No".

    Answer:_____

*If you answer Question No. 8 "No", go to Question No. 12.  If you answer Question No. 8 "Yes", then answer Question No. 9.*

**Question No. 9:** Were Lowell Berwick's physicians aware of the fact at the time the Vioxx was prescribed to Plaintiff?

    Answer "Yes" or "No".

    Answer:_____

3

*If your answer Question No. 9 "Yes", go to Question No. 12.  If you answer Question No. 9 "No", then answer Question No. 10.*

**Question No. 10:** Would Lowell Berwick have ingested the Vioxx if he or his physicians had known of the concealed or suppressed fact?

    Answer "Yes" or "No".

    Answer:_____

*If you answer Question No. 10 "Yes", go to Question No. 12.  If you answer Question No. 10 "No", then answer Question No. 11.*

**Question No. 11:** Did Merck's concealment of suppression of the fact cause Plaintiff Lowell Berwick damage?

    Answer "Yes" or "No".

    Answer:_____

*Now go to Question No. 12.*

**Question No. 12:** Did Merck make a representation as to a past or existing material fact?

    Answer "Yes" or "No".

    Answer:_____

*If you answer Question No. 12 "No", go to Question No. 20.  If you answer Question No. 12 "Yes", then answer Question No. 13.*

**Question No. 13:** Was the representation false?

    Answer "Yes" or "No".

    Answer:_____

4

PLAINTIFF'S PROPOSED SPECIAL VERDICT FORM

*If you answer question No. 13 "No", go to Question No. 20.  If you answer Question No. 13 "Yes", then answer Question No. 14.*

**Question No. 14:**   Regardless of the Defendant's actual belief, did the Defendant make the representation without any reasonable grounds for believing it to be true?

      Answer "Yes" or "No".

      Answer:_____

*If you answer Question No. 14 "No", go to Question No. 20.  If you answer Question No. 14 "Yes" then answer Question No. 15.*

**Question No. 15**: Did Merck make the representation with the intent to induce the Lowell Berwick or his physicians to rely on it?

      Answer "Yes" or "No".

      Answer:_____

*If you answer Question 15 "No", go to Question No. 20.  If you answer Question 15 "Yes", then answer Question No. 16.*

**Question No. 16:** Was Lowell Berwick or were his physicians aware of the falsity of the representation?

      Answer "Yes" or "No".

      Answer:_____

5

*If you answer Question No. 16 "Yes" go to Question No. 20.  If you answer Question No. 16 "No", then answer Question No. 17.*

**Question No. 17:** Did Lowell Berwick or his physicians act in reliance upon the truth of the representation?

       Answer "Yes" or "No".

       Answer:_____

*If you answer Question No. 17 "No", go to Question No. 20.  If you answer Question No. 17 "Yes", then answer Question No. 18.*

**Question No. 18:** Was Lowell Berwick or were his physicians justified in relying upon the representation?

       Answer "Yes" or "No".

       Answer:_____

*If you answer Question No. 18 "No", go to Question 20.  If you answer Question No. 18 "Yes", then answer Question No. 19.*

**Question No. 19:** Did Defendant's misrepresentation cause Plaintiff Lowell Berwick' damage?

       Answer "Yes" or "No".

       Answer:_____

*Go to Question No. 20.*

**Question No. 20:** Did the Defendant impliedly warrant that the Vioxx would be fit for the purposes for which it was sold?

       Answer "Yes" or "No".

       Answer:_____

6

*If you answer Question No. 20 "No", go to The instructions after Question No. 24.  If you answer Question No. 20 "Yes", then answer Question No. 21.*

**Question No. 21:** Was the Vioxx fit for the purposes for which it was sold?

      Answer "Yes" or "No".

      Answer:_____

*If you answer Question No. 21 "Yes", go to The instructions after Question No. 24.  If you answer Question No. 21 "No", then answer Question No. 22.*

**Question No. 22:** Was the unfitness of the Vioxx a cause of injury to the Plaintiff Lowell Berwick?

      Answer "Yes" or "No".

      Answer:_____

*If you answer Question No. 22 "No", go to The instructions after Question No. 24.  If you answer Question No. 22 "Yes", then answer Question No. 23.*

**Question No. 23:** At the time of injury was Lowell Berwick using the Vioxx in a reasonable manner appropriate to the purpose for which it was intended?

      Answer "Yes" or "No".

      Answer:_____

*If you answer Question No. 23 "No", go to The instructions after Question No. 24.  If you answer Question No. 23 "Yes", then answer Question 24.*

7

FAC Resp. Exhibit B -- 2258

**Question No. 24:** Did the Lowell Berwick give notice to the Defendant of a breach of warranty within a reasonable time after the he knew or should have know the Vioxx was not fit for the purpose for which it was sold?

Answer "Yes" or "No".

Answer:_____

*If you answer "Yes" as to Question No. 2, or Question No. 6, or Question No. 11, or Question No. 19, or Question No. 24, proceed directly to Question No. 25.  If you answer "No" as to Question No. 1 or Question No. 2, and if you answer "No" as to any of questions 3 through 6, and if you answer "No" as to any of Questions 8 through 11, and if you answer "No" as to any of Questions 12 through 19, and if you answer "No" as to any of Questions 20 through 24, answer Question No. 30.*

**Question No. 25:** What do you find the amount of damages suffered by Plaintiff to be?

(a) economic damages          $

(b) non-economic damages      $

Total                         $

*Now go to Question No. 26.*

**Question No. 26:** Do you find by clear and convincing evidence that Defendant Merck & Co., Inc. was guilty of malice in the conduct upon which you base your finding of liability?

Answer "Yes" or "No".

Answer:_____

8

*Now go to Question No. 27.*

**Question No. 27:** Do you find by clear and convincing evidence that Merck & Co., Inc. committed fraud in the conduct upon which you base your finding of liability?

      Answer "Yes" or "No".

      Answer:_____

*If your answer is "No" to both Question No. 26 and Question No. 27, answer Question No. 30.  If you answer "Yes" to Question No. 26 or Question No. 27, or both, answer Question No. 28.*

**Question No. 28:** Shall punitive damages be assessed against Merck & Co., Inc.?

      Answer "Yes" or "No".

      Answer:_____

*If your answer is "Yes", answer the next question.  If your answer is "No", answer Question No. 30.*

**Question No. 29:** We assess punitive damages against Defendant Merck & Co., Inc. as follows:

                  Amount:   $_____

*Now go to Question No. 30.*

**Question No. 30:**

In connection with the sale of Vioxx, did Merck engage in any unlawful, unfair or fraudulent business act or practice, or any unfair, deceptive, untrue or misleading advertising?

Answer "Yes" or "No".

      Answer:_____

PLAINTIFF'S PROPOSED SPECIAL VERDICT FORM

FAC Resp. Exhibit B -- 2260

1  *Now go to Question No. 31.*

2

3  **Question No. 31:**

4  In connection with the sale of Vioxx, did Merck disseminate or cause to be made or disseminated , any

5  statement, concerning Vioxx which was untrue or misleading, and which was known, or which by the

6  exercise of reasonable care should have been  known, to be untrue or misleading?

7  Answer "Yes" or "No".

8  Answer:_____

9

10  *(Please sign the verdict form.)*

11

12      Signed:_____

13

14      Print Name:_____

    Presiding Juror

15      Dated:_____

16

17  *(After it has been signed inform the clerk that a verdict has been reached.)*

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S  PROPOSED SPECIAL VERDICT FORM

FAC Resp. Exhibit B -- 2261

J. Stewart White, Esq., NV Bar #1039
WHITE MEANY & WEATHERALL, LLP
3185 Lakeside Drive
Reno, Nevada 89509
Phone:  775-828-9999
Fax: 774-828-9998

and

Ted B. Wacker, CA SBN 157416
twacker@rcrlaw.net
Cynthia Lynn Garber, CA SBN 208922
cgarber@rcrlaw.net
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, 7th Floor
Newport Beach, California 92660
Phone: 949-720-1288
Fax:  949-720-1292

Attorneys for Plaintiff GERALD CRANDALL

## IN THE SECOND JUDICIAL DISTRICT COURT OF

## THE STATE OF NEVADA, IN AND FOR WASHOE COUNTY

| | |
|---|---|
| GERALD CRANDALL, | Case No. CV07-00666 |
| Plaintiff, | Dept No. 6 |
| vs. | **PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION** |
| MERCK & COMPANY, INC., et al., | |
| Defendants. | |

In the interest of judicial economy, Plaintiff, GERALD CRANDALL, hereby moves this Court for an order adopting and instructing the parties to use the below-enumerated deposition designations which have already been ruled upon by other courts in previous Vioxx trials.  Doing so will save the Court and parties literally hundreds of hours of labor recreating work that has already been done in this litigation.  Further, as to deposition designations which have not yet been ruled on, Plaintiff respectfully requests a more detailed deposition designation schedule that starts July 12, 2007, so that this Court will have ample

-1-

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

1   time to consider the issues, hear argument and make rulings. Plaintiff further respectfully

2   requests that the Court should adopt and commence the exhibit foundation process and

3   commence this process on July 12, 2007 (in Los Angeles, Plaintiffs' counsel have presented

4   exhibit foundation deposition excerpts which the Court has made tentative rulings on).

5   Without these requested rulings and if this Court is to rule anew on these deposition

6   designations and exhibit foundation excerpts, this Court could well spend an unnecessary

7   400-500 hours of its time doing so.

8

## I.    INTRODUCTION

9

10

### Deposition Designations

11

12        Because many of Merck's employees and the generic experts are unavailable for trial,

13   Plaintiff must rely on the use of their preserved testimony in the form of video deposition.

14   Fully 75% of the Merck witnesses and generic experts that Plaintiff anticipates calling at trial

15   will be called by video, rather than live.  This necessitates the process of designating

16   deposition excerpts, a process whereby the parties must choose portions of the deposition

17   transcript they wish to play and exchange these designations with each other prior to trial.

18   After these designations have been exchanged, each side has the opportunity to make

19   objections to the designations, and may opt to submit counter-designations in response to

20   what the other side has chosen to play.  If counter-designations are made, each side can make

21   objections to those counters.  The parties then reply to the objections to their designations

22   and counter-designations.

23        In other trials, the transcripts containing Plaintiff's and Merck's designations,

24   counter-designations, objections and replies were merged into a single color-coded

25   spreadsheet (red for Plaintiff, blue for Defense).  This spreadsheet was generated by an

26   outside vendor, and submitted to the Court for rulings.  If the Court sustains any of the

27   objections to any portion of the designation, these portions will come out of the transcript and

28   will not be played.  The transcript with rulings is transformed into a "playlist," a video is

-2-

_____

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

1   created from this playlist, and then ultimately, the video is played for the jury.  Given all of
2   these steps, the process can take several months to complete.
3           In a given Vioxx trial, as many as 15 or more witnesses can be designated by video.
4   With an average deposition transcript ranging from two to three hundred pages, the
5   designated transcript may be long and objections can be wide-ranging, requiring many hours
6   to prepare the transcript and to rule upon the objections to the testimony.  For example,
7   Jerome Avorn, M.D., a generic expert in the area of pharmacoepidemiology, was designated
8   in the trial of *Barnett v. Merck*.  The deposition designation of the direct examination was
9   143 pages with approximately 100 separate objections that needed to be ruled upon by Judge
10  Fallon.  The deposition designation of the cross-examination was 137 pages with
11  approximately 62 individual objections that required rulings.  The re-direct examination was
12  63 pages with 72 individual objections.  In all, this totals 343 pages of transcript with
13  approximately 234 objections that needing rulings - and this is just one witness.  (A true and
14  correct copy of the Dr. Avorn deposition designation rulings from the *Barnett* trial are
15  attached hereto as Exhibit 1).
16          In *Barnett*, before the final Dr. Avorn video was ready to be played to a jury, dozens
17  and dozens of hours were spent in the preparation of this single designation, by the Plaintiff,
18  Merck and the Court.  A similar process had to be done for each and every one of the
19  witnesses that were ultimately played.  Though some of the other witnesses had transcripts
20  shorter in length than Dr. Avorn, this process still amounted to hundreds of hours of work,
21  and took approximately three months to complete.  Despite this lead time, Judge Eldon
22  Fallon, the judge who presides over the federal Vioxx MDL and who presided over *Barnett*,
23  was still issuing rulings on deposition designations during the trial - sometimes the day
24  before a witness was to be played - due to the enormity of the work involved.
25
26          **Exhibit Foundation Deposition Excerpts**
27          In addition to evidence played by video deposition designations, Plaintiff also seeks
28  to introduce certain documents into evidence.  Traditionally, Merck has not stipulated to and

-3-

_____
PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

1  objects to the admissibility of core exhibits, which are mostly Merck company documents,

2  despite the fact that these documents have been admitted multiple times in multiple Vioxx

3  trials across the country.  At every turn, Merck will object to the same core documents – it

4  will object to Plaintiff's exhibit list, it will seek to exclude the documents through motions in

5  limine, and it will even seek to exclude them at trial with particular witnesses.  To avoid the

6  unnecessary consumption of jury and Court time arguing and rearguing the admissibility of

7  Merck documents, Plaintiff proposes to submit these documents to the Court once before trial

8  begins, for the Court to determine whether pre-admissibility is appropriate.  The purpose of

9  doing this is to create an efficient way for the Court to rule on the admissibility of a select

10  group of core exhibits outside of the presence of the jury in order to streamline the trial and

11  minimize jury down time.

12       The process of submitting exhibits for rulings on foundation and admissibility in

13  advance of trial has been undertaken in California by Vioxx Coordination Judge Victoria

14  Chaney.  In that venue, Plaintiffs have chosen certain core exhibits where clear foundation

15  exists, and have submitted "packets" to the court for each exhibit.  The packets contain: the

16  exhibit itself; the deposition testimony that lays foundation for the exhibit; Merck's

17  objections to the admissibility of the exhibit; and whether the exhibit was previously

18  admitted in a California Vioxx trial (Examples of these packets are attached hereto as Exhibit

19  2).  In *Crandall,* Plaintiff proposes to submit the same type of packets to this Court.  Unlike

20  exhibits contained within deposition designations (which are submitted along with the

21  merged spreadsheets described above for ruling), these exhibits are not contained within a

22  deposition designation submitted by Plaintiff, but are documents that Plaintiff intends to use

23  at trial.

24       Pre-admissibility of documents also saves time in that it prevents the need for

25  Plaintiff to play added video. In order for Plaintiff to lay foundation for these exhibits,

26  (which is mostly laid through unavailable Merck employees in their video depositions),

27  Plaintiff would have to play hours of superfluous video testimony to get one or two

28

-4-

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

documents admitted.  Through this process of pre-admissibility, the Court can consider these
deposition excerpts without taking time to do so during trial.

## II.     PLAINTIFF PROPOSES TO PLAY PREVIOUSLY RULED UPON DEPOSITION DESIGNATIONS IN ORDER TO SAVE HOURS OF COURT AND ATTORNEY TIME

Due to the fact that the deposition designation process is a time consuming and costly
undertaking, Plaintiff proposes that this Court order the parties to use certain deposition
designations that have already been ruled upon by other courts in the *Barnett* (MDL),
*Appell/Arrigale* (California) and *Berwick* (California) cases.  These videos are a product of
both Plaintiffs' and Merck's careful selection of transcript excerpts and each Court's
thoughtful consideration of the objections made to the transcripts.  In the *Barnett* trial, the
rulings were made by Judge Fallon in the federal Vioxx MDL.  Judge Fallon has presided
over six Vioxx trials resulting in five verdicts.  Barnett was the third case to go to trial in the
MDL, so Judge Fallon was already well-acquainted with issues pertaining to the Vioxx
litigation when he made his rulings on the deposition designations.  In the *Appell/Arrigale*
trial and in preparation for the *Berwick* trial (a case which was dismissed before trial began),
Judge Chaney had also presided over a prior Vioxx trial before making her rulings on these
deposition designations.

With this prior Vioxx trial experience, Judge Fallon and Judge Chaney made their
rulings with a sound factual understanding of the Vioxx litigation and were familiar with
these Merck witnesses and generic experts, having seen them before.  Therefore, it is
Plaintiff's position that the efforts put forth by counsel and these courts need not be re-
invented in this case.  The witnesses' testimony has been preserved, so no new testimony will
be elicited from them in the time before the *Crandall* trial.  The substantive testimony of
these witnesses is on a range of general topics applicable to all Vioxx cases and therefore, the
designation is not plaintiff dependent or based on case specifics.  Similarly, the evidentiary

-5-

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

1   issues associated with these designations are similar across jurisdictions, enough so that prior

2   rulings would be consistent with the types of rulings this Court would make.  Again, the story

3   these witnesses tell is the same from trial to trial, as is the question of whether the evidence is

4   properly admitted.

5          The following thirteen deposition designations have been either ruled upon or, in the

6   case of Plaintiff's expert Dr. Pechmann, tentatively ruled upon, by other courts in other

7   Vioxx trials. (Copies of the ruled upon transcripts are attached hereto as Exhibit 3).  These

8   ruled upon designations represent hundreds of pages of transcripts with objections.  Plaintiff

9   proposes that these designations be adopted wholesale in the *Crandall* case, and be played

10  according to the rulings that have already been made, without further objections or changes

11  to the playlists from either side.  This will enable the parties and the Court to concentrate on

12  transcripts that have not yet been ruled upon, which is a more constructive use of resources

13  and time.

14

15         A.     From *Barnett v. Merck*:

16

17              Edward Scolnick

18              Eric Topol

19              Jerome Avorn

20              Jan Weiner

21              Mary Blake

22              Tom Cannell

23              Laura Demopolous

24              David Anstice[1]

25

26  _____

27  [1] Please note, the content of this video was agreed upon in advance by Plaintiff and Merck –

28  therefore no rulings were made necessary.

-6-

_____

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

B.    From *Appell/Arrigale v. Merck*:

James Fries

Deborah Shapiro

Wendy Dixon

Susan Baumgartner

C.    From *Berwick v. Merck*:

Cornelia Pechmann, Ph.D.[2]

## III.   A NEW DEPOSITION DESIGNATION SCHEDULE IS NEEDED TO AFFORD THIS COURT ENOUGH TIME TO MAKE RULINGS

In terms of deposition designations that have not yet been ruled upon in other trials and will need to be addressed by this Court, a new schedule for completing this process must be devised.  The current schedule for deposition designations, as it exists in CMO 4, is not a complete or sufficient schedule for the following reasons:

A.    The current schedule does not provide enough time for the Court to make rulings on the transcripts.

As it stands, the current schedule has a final deadline of September 21, 2007

---

[2] Please note, these are tentative rulings by Judge Chaney at this time, as this deposition was recently taken on March 13, 2007.  A final ruling has not yet been entered; argument on the tentative rulings will be heard on August 13, 2007.

-7-

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

1  for Plaintiff to object to Merck designations.  Assuming Plaintiffs could then turn around and

2  get all of the transcripts to the Court on that date, the Court would have only one week to

3  issue its rulings on *all* of the 15 or so witnesses to be played at trial.  The Court will be

4  needlessly short on time and burdened with deposition work in a week that will also likely be

5  filled with hearings on other issues, such as pre-trial motions and issues regarding jury

6  instructions, jury verdict forms and voir dire.  Plaintiff will be at a distinct disadvantage,

7  since he will be first to put on his case-in-chief on October 1 and may not have videos ready

8  to play.  Even if the Court were able to issue rulings on depositions in that week, the Plaintiff

9  would still need time to adjust the video to take out any portions of the designation that have

10 sustained objections.  In short, only Merck benefits from this expedited time schedule, as it

11 creates a situation where the Court has an abbreviated time to complete a tremendous amount

12 of work and where Plaintiff, due to time constraints, may not be able to play video

13 depositions of the witnesses he wants, in the order he wants.

14

15       B.     The current schedule does not provide enough detail; more deadlines should

16              be added

17       The schedule set out in CMO 4 has only three deadlines for deposition

18 designations – 1) Plaintiff designations due September 1, 2007; 2) Defense designations due

19 and objections to Plaintiff designations due September 11, 2007; and 3) Plaintiff's objections

20 to Defense designations due September 21, 2007.  The schedule does not provide for a

21 number of variables, including the following:

22

23       1.     Delineation between generic and case specific designations

24       In order to provide the Court the opportunity to begin ruling on

25 designations earlier in the process, Plaintiff proposes creating two waves of designations in

26 the schedule – the first wave would have earlier deadlines dealing with the general Merck

27 employee witnesses and generic experts.  Once the first wave is complete, the Court may

28 begin to rule on those witnesses, while the parties continue to work on the second wave of

-8-

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

designations, for case specific witnesses, if any will be called by video. During this time, the parties can get rulings from the first wave back from the Court on a rolling basis and make adjustments to the transcripts as the Court completes each witness. Then, once the second wave is complete, the Court can begin ruling on case specific witnesses. In this way, if the Court is allowed to begin rulings earlier, the parties can get the rulings back well in advance of the trial, rather than getting everything to the Court at one late date and being pushed for time on the eve of trial. This wave system of designations was used both in the *Barnett* and *Berwick* trials.

## 2.      Provision for counter-designations and objections to counter-designations

In the current schedule, there is no provision for counter-designations or objections to counter-designations, which are an important aspect of this process. For example, if Merck makes an affirmative designation of a witness' direct examination and the Plaintiff did not plan to affirmatively play that witness in its case-in-chief, Plaintiff may choose to counter-designate testimony from the cross-examination of that witness during Merck's case, and vice versa. Counter-designations have been used by both sides in most, if not all, Vioxx trials to date, and should be so used in this case. Once counter-designation deadlines have been added to the schedule, a deadline for objections to counter-designations should also be added.

## 3.      Provision for replies to objections made to both affirmative designations and counter-designations

In the *Barnett* trial, Judge Fallon allowed the parties to reply to each other's objections, so that the Court could have a full reading of the issues. Plaintiff proposes that replies to objections be similarly built into the *Crandall* schedule, so that when the Court receives the transcript, both parties will have had the opportunity to be heard on a given objection.

-9-

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

C.   The current schedule does not describe the format in which designations should be submitted to the Court

It is important that both sides settle on a format by which the designations will be submitted to the Court early in the process, so that it can be created and used from the beginning of the exchange process.  This will save the parties time from creating it at the end, and will allow the transcripts to get to the Court more quickly, providing the Court with more time to rule.  In other trials, the parties have submitted a spreadsheet with merged transcript containing both sides' designations in a color coded format.  (An example of this format is attached hereto as Exhibit 4).  The transcript bears the objections and replies of both parties next to the portion of the testimony to which they pertain, and allows space for the Court to write rulings next to the objections.  This method has worked well in the past.  If the Court would prefer this spreadsheet format, Plaintiff proposes exchanging designations in a spreadsheet from the beginning of the process, rather than generating it at the end.

The following is a new deposition designation schedule that Plaintiff proposes be adopted in this case.  It builds in all of the variables discussed above.  It also gives the Court approximately five weeks to rule on generic transcripts and approximately two weeks to rule on case specific transcripts, as opposed to the current schedule, which gives the court only one week to rule on all of the witnesses.  The vast majority of transcripts will likely be of generic witnesses, hence, more time is built in to make rulings on those designations.

**Wave 1 (Generic Deposition Designations)**

**July 12, 2007:**  Plaintiff Affirmative Generic Depo Designations Due

**July 19, 2007:**  Defense Affirmative Generic Depo Designations Due

**July 26, 2007:** Defense Objections to Plaintiff Affirmative Generic Depo Designations/Counter-Designations Due

**July 31, 2007:** Plaintiff Objections to Defense Affirmative Generic Depo Designations/Counter-Designations Due

-10-

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

**August 6, 2007:** Defense and Plaintiff Replies to Objections to Affirmative Designations and Objections to Counter-Designations Due

**August 13, 2007:** Plaintiff and Defense Replies to Objections to Counter-Designations Due

**August 20, 2007:** *On or before this date, all generic deposition designation transcripts and exhibits must be submitted to the Court in the color-coded spreadsheet format for rulings; Court will return rulings on a rolling basis*

**Wave 2 (Case Specific Deposition Designations)**

**August 23, 2007:** Plaintiff Affirmative Case Specific Depo Designations Due

**August 27, 2007:** Defense Affirmative Case Specific Depo Designations Due

**August 31, 2007:** Plaintiff and Defense Objections to Affirmative Case Specific Depo Designations Due/Counter-Designations to Case Specific Affirmative Depo Designations Due

**September 5, 2007:** Plaintiff and Defense Replies to Objections to Affirmative Case Specific Due/Objections to Counter-Designations Due

**September 10, 2007:** Plaintiff and Defense Replies to Objections to Counter-Designations Due

**September 17, 2007:** *On or before this date, all case specific deposition designation transcripts and exhibits must be submitted to the Court in the color-coded spreadsheet format for rulings; Court will return rulings on a rolling basis*

**IV.    THIS COURT SHOULD COMMENCE THE DOCUMENT FOUNDATION PROCESS ON JULY 12, 2007**

Much like the deposition designation process, Plaintiff requests that this Court adopt the document foundation process and commence this process on July 12, 2007 according to the following schedule:

-11-

---

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

FAC Resp. Exhibit B -- 2272

**July 12, 2007:** Plaintiff to submit core exhibit packets with deposition testimony supporting document foundation to Defense

**July 23, 2007:** Defense to submit objections to the exhibit packets to Plaintiff

**July 30, 2007:** Plaintiff to reply to Defense objections and finalize packets; submit to Court

**August 7, 2007 (or available date):** Hearing with Court to argue admissibility of core exhibits

## V.     CONCLUSION

In the interest of time and effort, Plaintiff respectfully requests that this Court order the parties to use the deposition designations outlined above from the *Barnett*, *Appell/Arrigale* and *Berwick* trials which have already been considered and ruled upon. Regarding the deposition designations that have not yet been ruled upon, the Plaintiff requests that this Court adopt the revised schedule as proposed above.  Finally, Plaintiff requests that the Court rule on the pre-admissibility of certain core exhibits that are not already within the deposition designations, using the schedule for submission of these exhibits and a hearing on the issues as set forth above.

Dated: June 20, 2007      ROBINSON, CALCAGNIE & ROBINSON

By_____
   TED B. WACKER
   CYNTHIA LYNN GARBER
   Attorneys for Plaintiff
   GERALD CRANDALL

-12-

PLAINTIFF'S MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION

J. Stewart White, Esq., NV Bar #1039
WHITE MEANY & WEATHERALL, LLP
3185 Lakeside Drive
Reno, Nevada 89509
Phone: 775-828-9999
Fax: 774-828-9998

and

Ted B. Wacker, CA SBN 157416
twacker@rcrlaw.net
Cynthia Lynn Garber, CA SBN 208922
cgarber@rcrlaw.net
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, 7th Floor
Newport Beach, California 92660
Phone: 949-720-1288
Fax:  949-720-1292

Attorneys for Plaintiff
GERALD CRANDALL

# IN THE SECOND JUDICIAL DISTRICT COURT OF

# THE STATE OF NEVADA, IN AND FOR WASHOE COUNTY

| | |
|---|---|
| GERALD CRANDALL, | Case No. CV07-00666 |
| | Dept No. 6 |
| Plaintiff, | |
| vs. | **PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPOSITION DESIGNATIONS AND EXHIBIT FOUNDATION** |
| MERCK & COMPANY, INC., et al., | |
| Defendants. | |

Plaintiff, GERALD CRANDALL, hereby submits Plaintiff's Reply to

Merck's Opposition to Motion Re Deposition Designation and Exhibit

Foundation.

-1-

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

## I.    INTRODUCTION

Merck's opposition to Plaintiff's Motion re Deposition Designations and Exhibit Foundation, as well as to Merck's opposition to Plaintiff's Motion to Amend CMO 4, seeks to divert the Court's attention away from Plaintiff's proposal to save the Court time by adopting certain ruled upon deposition designations. Instead, Merck uses its opposition to pre-condition the Court on an entirely separate issue involving the admissibility of documents and testimony that pre-date the April 2002 label change.[1]  In its opposition, Merck introduces this critical issue to the Court by citing to Dr. Avorn's discussion of the 1999 label, claiming that it is "decidedly not relevant." (Merck Opp. at 7) Merck argues Plaintiff did not start taking Vioxx until May 2003, after the introduction of the April 2002 Vioxx label that incorporated the cardiovascular data from Merck's VIGOR trial, and that therefore, evidence offered to show that the 1999 label was inadequate is irrelevant: " . . . Dr. Avorn's testimony regarding the adequacy of the 1999 label is not relevant to this case where Mr. Crandall was prescribed Vioxx years later, after the new 2002 post-VIGOR label went into effect, and he and his doctor read that updated labeling." (Merck Opp. at 8)

On the contrary, Plaintiff asserts that the 1999 label and other pre-2002 label change evidence is highly relevant to show how Merck's overpromotion of Vioxx from as early as 1999 shaped the medical community's prescribing practices even after the label changed in 2002.  This evidence is also relevant to prove punitive damages, as further detailed below. Plaintiff therefore asks that this Court recognize Merck's arguments for what they are – an attempt to

---

[1] Merck has argued this issue extensively in the *Berwick* matter, and it is the subject of a motion in limine on which Judge Victoria Chaney has not yet ruled.

-2-

FAC Resp. Exhibit B -- 2275

hinder the Plaintiff from introducing documents and testimony that are both probative and critical to his case.

## I.   EVIDENCE PRE-DATING THE APRIL 2002 LABEL CHANGE IS HIGHLY RELEVANT TO THIS CASE

Merck is essentially asking the Court to be absolved from liability for all Vioxx-related conduct before April 2002, treating the label change as some sort of confessional which establishes a clean slate.  Merck seems to be saying that none of its prior wrongdoing, concealment, delays and efforts to water down and dilute the warnings could have affected the thinking and decisions of Plaintiff's physicians after that date.  Merck apparently believes that physicians make decisions based only upon what they learn from a label existing at a precise moment in time, and nothing else that happens before that.

Merck's argument is based upon the incorrect premise that the prior lack of or neutralized warning, which physicians had relied upon for several years, had no effect on their decisions.  Merck cannot establish that the inadequacies of the prior warning as well as the delay in changing the label it had no influence whatsoever on the prescribing habits of physicians in 2003 and 2004.  Merck's conduct before the label change and efforts to delay the change cannot be divorced from its post-change conduct.  This is because the influences on a physician's prescribing decisions are not limited to the drug's current label.

Plaintiff's expert Dr. John Abramson is a physician that has studied the safety and efficacy of Vioxx for hundreds of hours.  As part of his expert report, Dr. Abramson attached a declaration he wrote regarding the issue of how physicians acquire knowledge of a medicine over time and how the accumulation of information they receive regarding a drug such as Vioxx shapes their prescribing practices.  (Attached hereto as Exhibit 1)  He states, "It would not be correct to assume that the only or even the primary resource that

-3-

_____

1  doctors rely upon is the information contained in the current label.  Rather,
2  physicians' decisions are based upon the cumulative information received, and
3  the impressions and opinions about this information that are formed over a
4  period of time, which may be several years or more." (Abramson Decl. at para
5  11)  Dr. Hoskins, the prescribing physician in this case, stated that he first heard
6  about Vioxx in 1999 at a medical lecture. (5/15/07 Depo Tr. at 66:7-19,
7  attached as Exhibit 2)  Therefore, the documents and testimony that pre-date the
8  2002 label change are not irrelevant here, as Merck would suggest, but instead
9  form the basis of knowledge that Dr. Hoskins had about Vioxx from 1999 until
10  he first prescribed the drug to Mr. Crandall in 2004.
11         Also relevant to this case is evidence that Merck delayed changing the
12  Vioxx label to include the cardiovascular data from VIGOR showing an
13  increased risk of heart attack with Vioxx.  Though Merck had the results from
14  the VIGOR trial showing this increased cardiovascular risk in 2000, they did
15  not change the label until April 2002.  As Dr. Abramson points out in his
16  declaration, "this delay led doctors to build up a two year (plus) confidence in
17  prescribing Vioxx.  When the April 2002 label change occurred, doctors had
18  already heard assurances about the naproxen cardioprotective claims put out by
19  Merck in press releases, PIR letters, Merck medical education seminars, and the
20  Bombardier New England Journal article." (Abramson Decl at para 30)
21  Therefore, the prior label as well as evidence of the delay in changing it,
22  demonstrate not only that Merck was negligent and failed to act as a reasonably
23  prudent manufacturer in connection with Vioxx, but that the delay was all part
24  of an ongoing plan to conceal the true risks of Vioxx and forestall for as long as
25  possible any change in the warning, which would reduce demand for the drug.
26  This is a key and integral part of the entire Vioxx story and cannot be ignored.
27  This evidence is relevant to the underlying claims of negligence, strict liability
28

-4-

FAC Resp. Exhibit B -- 2277

1  and concealment, as well as liability for punitive damages and conscious
2  disregard for safety.

4  **A.     The Delay in Revising the Inadequate Prior Label is Relevant**
5  **and Probative on Punitive Damages Issues**

6      In order to recover punitive damages in Nevada, clear and convincing
7  evidence of malice must be shown. *Evans v. Dean Witter Reynolds, Inc.*, 116
8  Nev. 598, 5 P.3d 1043, 1052 Nev., August 18, 2000 (No. 30843). N.R.S.
9  42.001 defines malice as "conduct which is intended to injure a person or
10  despicable conduct which is engaged in with a conscious disregard of the rights
11  or safety of others." Malice may be established "by a showing that the
12  defendant consciously and deliberately disregarded known safety measures in
13  conscious disregard of the possible results." *Jeep Corp. v.* Murray, 101 Nev.
14  640, 708 P.2d 297, 54 USLW 2292, Prod.Liab.Rep. (CCH) P 10,751, Nev.
15  October 29, 1985 (NO. 15354).

16      Due to the similarity between Nevada and California law on punitive
17  damages, Nevada case law suggests it is appropriate to look for guidance in
18  California decisions involving punitive damages. *Nevada Cement Co. v.*
19  *Lemler*, 89 Nev. 447, 514 P.2d 1180, 1182 Nev., October 15, 1973 (NO. 6897)
20  ("That statute was first enacted in the State of Nevada in 1965 and is verbatim
21  with California Civil Code, Sec. 3294, which was first enacted in 1872 and has
22  not been amended since 1905. The cases decided in that jurisdiction have
23  interpreted that the malice contemplated by that section is malice in fact and
24  that the phrase 'express or implied' has reference only to the evidence by which
25  malice is established.") The Court in *Nevada Cement Co.* further goes on to
26  define the showing required for malice, citing the California case *Toole v.*
27  *Richardson-Merrell, Inc.* ("Malice in fact, sufficient to support an award of
28  damages within the scope of NRS 42.010, 'may be established by a showing

-5-

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

1   that the (appellants') wrongful conduct was wilful, intentional, and done in

2   reckless disregard of its possible results.'" *Nevada Cement Co. v. Lemler,* 89

3   Nev. 447, 452 (*citing Toole v. Richardson-Merrell, Inc.*, 251 Cal.App.2d 689,

4   60 Cal.Rptr. 398 (1967)).  Although the statute has been amended since *Nevada*

5   *Cement Co.* to require a showing of clear and convincing evidence for punitive

6   damages, the basic substance of the grounds for punitive damages is unchanged,

7   making it proper to look to law from California punitive damages cases.

8         In California, the punitive damages inquiry in a product liability case is

9   not limited to the effect of the defendant's conduct on the plaintiff.  Reckless

10   conduct by a manufacturer-even conduct which could not have had any effect

11   upon the plaintiff- is relevant on the issues relating to punitive damages.

12   *Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 400-401, 196 C.R. 117

13   ("In proving that defendant Robins acted in conscious disregard of the safety of

14   others, plaintiff Hilliard was not limited to Robins' conduct and activities that

15   directly caused her injuries.  The conscious disregard concept of malice does

16   not limit an inquiry into the effect of the conduct and activities of the defendant

17   on the plaintiff, the inquiry is directed at and is concerned with defendant's

18   conduct affecting the safety of others."); See also *Philip Morris USA v.*

19   *Williams*, 127 S.Ct. 1057, 1065, 75 USLW 4101, 07 Cal. Daily Op. Serv. 1754,

20   20 Fla. L. Weekly Fed. S 80, U.S.Or., February 20, 2007 (Holding that while

21   courts cannot authorize procedures that create a risk that a jury may punish for

22   the harm caused others, a jury may consider harm caused to others in

23   determining reprehensibility)("We have explained why we believe the Due

24   Process Clause prohibits a State's inflicting punishment for harm caused

25   strangers to the litigation.  At the same time we recognize that conduct that risks

26   harm to many is likely more reprehensible than conduct that risks harm to only

27   a few.  And a jury consequently may take this fact into account in determining

28   reprehensibility.")

-6-

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

Here, the delay in changing the label to include the VIGOR data and the inadequacy of the earlier label are entirely relevant to Merck's conscious disregard for safety. The delay is all part of the same course of fraudulent and reckless conduct in connection with the marketing of Vioxx which ultimately harmed the Plaintiff. It also demonstrates a conscious disregard for the safety of others, establishing malice. Evidence of the Defendant's misconduct directed toward others is relevant and admissible on the issues relating to liability for punitive damages.

## B.    The Delay in Revising the Inadequate Prior Label is Relevant and Probative on each of Plaintiff's Claims

Aside from its clear relevance to liability for punitive damages, Merck's delay in changing the inadequate warnings and its attempts to dilute and minimize the effects of the change evidence its continuing fraudulent conduct in postponing the disclosure of the true facts about Vioxx. This is relevant and highly probative on the underlying causes of action. To argue otherwise is to say that Plaintiff's physician knew absolutely nothing about Vioxx prior to the label change, that he knew nothing about the widespread use of the drug by other physicians, that he had no knowledge of what was going on in the medical community regarding the prescription of Vioxx, and that he retained no information whatsoever from what he had been told by Merck sales representatives.

In other words, anything he saw or heard about Vioxx, the impressions he obtained from the sales representatives, other physicians, articles, advertisements, documents, conversations, was forgotten when the new label arrived. Any knowledge he had acquired or that Merck had failed to provide can be disregarded. A clean slate. This is Merck's premise. The reality is that Merck's conduct over the course of several years, including leaving the

-7-

---

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

1   inadequate label unchanged, affected what physicians knew and thought about
2   Vioxx in 2003 and 2004. Merck put out a label for four years influencing
3   prescribing habits, and Merck's delay in changing that label, in conjunction
4   with its overpromotion of Vioxx, most certainly contributed to Dr. Hoskins'
5   prescribing habits.
6         As established by its own internal documents, Merck clearly knew that
7   the timing of the label change and the type of warning would impact
8   physicians' prescribing practices, as well as Merck's profit margin.  In 2001,
9   Merck conducted an analysis of the financial impact of the timing of the label
10  change.  Merck's conclusion was that even a five month delay in changing the
11  label would save the company $229 million (Merck 2002 Profit Plan Attached
12  as Exhibit 3 at MRK-ABW0005452).  Merck also evaluated what the financial
13  impact would be if reference to the heart attack risk was placed in a lesser
14  section of the new label (*i.e.,* the Precautions section) versus a more significant
15  (*i.e.,* the Warnings section).  In his declaration, Dr. Abramson summarizes
16  Merck's conclusion in this regard, as set forth in Merck's U.S. Long Range
17  Operating Plan, dated July 2001, "Merck estimates that, compared to CV risks
18  of Vioxx appearing in the PRECAUTIONS section of the label consistent with
19  other COX-2 inhibitors, CV risks appearing in the WARNINGS section of the
20  label would reduce sales by 50% in 2006, charted as more than $500 million per
21  year." (Abramson Expert Report re Gerald Crandall at p.9, attached as Exhibit
22  4[2]) (U.S. Long Range Operating Plan attached as Exhibit 5 at MRK-
23  ABI0008674).  Motivated by the desire to avoid these significant financial
24  consequences, Merck delayed the label change, leaving the inadequate label in
25  place long enough for physicians to rely on the label's lack of safety
26
27  ——————————————————————
28  [2] Plaintiff has attached Dr. Abramson's report without the exhibits for the ease
    of the Court, but can provide the exhibits if the Court so requests.

-8-

1  information and to be reassured by Merck that Vioxx did not pose a

2  cardiovascular risk.

3       Merck marketed the drug from May of 1999 on television and in doctors'

4  offices, and subjected physicians, including the Plaintiff's, to intensive

5  detailing.  In his declaration, Dr. Abramson states that physicians receive

6  information from many different sources, including communications from

7  "individuals who have built up trusted relationships with the physicians over

8  time -- just as drug reps are taught to do."  (Abramson Decl. at para 16) Dr.

9  Hoskins further testified that he relied on "face-to-face interchanges" with the

10  sales reps when educating himself about the medications he was prescribing.

11  (5/15/07 Depo Tr. at 45:5-8, attached as Exhibit 6).  Merck cannot claim that if

12  it had changed the label before 2002, and issued better, more complete

13  warnings sooner, before Vioxx had been on the market for four years, that its

14  action would have had absolutely no effect upon Dr. Hoskins and his

15  prescribing habits in 2003.

16       Merck spent hundreds of millions of dollars on marketing to affect the

17  prescribing habits of physicians.  One Merck document containing a draft

18  speech for the Vioxx launch party demonstrates the extensive nature of Merck's

19  marketing campaign for Vioxx. (Attached as Exhibit 7)  In the speech, David

20  Anstice, President of Merck's Human Health (marketing) department, details

21  the "Top 10" reasons why Vioxx would be a blockbuster drug.  These reasons

22  were that Merck was putting forth the largest sales force ever of 3,800

23  representatives; it was distributing $17 million worth of samples; it was

24  spending over $3 million per month in Health Education Liaison money to

25  lecture to doctors in the year 1999; and it was hiring 560 advocates to speak to

26  doctors about the virtues of Vioxx.  It is clear these efforts were widespread and

27  sought to influence the prescribing practices of doctors on a national, ongoing

28  basis.  As Dr. Abramson set forth in his declaration, these sales and marketing

-9-

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

1   techniques contributed to the "cumulative information" received by the doctors.
2   (Abramson Decl at para 11)
3         In addition to the impact these sales and marketing efforts had on
4   physicians, Merck concedes that through its integrated campaign for Vioxx, it
5   made one billion media impressions. Not one of these impressions mentioned
6   that Vioxx could cause heart attacks, allowing Merck to further conceal the
7   safety risks of the drug.  In her deposition, Mary Blake, a member of Merck's
8   public relations department, testifies to the following:
9               73
10      6   BY MR. PLACITELLA:
11      7       Q.    A billion impressions, had you ever
12      8   heard that?
       9       A.    I've heard that before, yes.
13
14              74
15      2       Q.    In fact, it was the Merck message for
16      3   the billion media impressions, whenever asked, that
17      4   Vioxx does not cause heart attacks, correct?
       5       A.    That was Merck Research Labs, yes.
18
19      (11/29/05 Depo Tr. at 73:6-9; and 74:2-5, attached as Exhibit 8)
20
21        Merck's marketing and intensive detailing and marketing, combined with
22   its concealment and delay in getting the true risks of Vioxx to the public, and its
23   conduct in leaving the same grossly inadequate label on Vioxx for four years,
24   directly affected physicians' prescribing habits and their impressions about
25   Vioxx in 2003 and 2004, including Dr. Hoskins.
26        In contrast to its inadequate warnings and national integrated marketing
27   campaign, Merck knew since before the approval of Vioxx that Vioxx had an
28   increased risk of heart attacks. Merck knew as early as 1992 that an imbalance

-10-

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

of prostacyclin and thromboxane favoring thromboxane, could cause an increased risk of clotting.  This information was readily available in 1992 in Merck's own publication, "The Merck Manual." Several years later, however, in the months before Vioxx was placed on the market, Merck took this chapter out of its manual in when it became clear that Vioxx caused this very same imbalance.  Merck was also advised by its own scientific advisory committee in a report dated May1998, which showed that Vioxx could cause plaque rupture, one of the known mechanisms for causing heart attacks.  Yet Merck delayed as long as possible in strengthening the inadequate warning, in order to build up Vioxx safety in the minds of physicians and to minimize the safety risks for as long as possible, to establish prescribing habits and reliance upon the use of Vioxx for their patients.

Merck is now looking for a free pass, to eliminate an essential piece of evidence in this case, related to its delay in getting out necessary information about Vioxx to the medical community.  This is all part and parcel of every aspect of Plaintiff's claims, and not just punitive damages.  It is directly relevant to issues of negligence, strict liability and concealment, including causation, failure to exercise due care, adequacy of warnings, knowledge and knowability, motive and reliance.

Contrary to Merck's implication, there is no magical date that cuts off Merck's responsibility.  The label change did not undo the years of concealment, overpromotion, media impressions and the influence of Merck's sales force, and it did not in one magical document completely undo the carefully manipulated prescribing habits of Dr. Hoskins and other prescribers.  The label change did not cure Merck's delay in changing the prior misleading label, nor Merck's replacement of it with a label which was still inadequate and misleading.  Dr. Hoskins did not somehow forget everything that he knew about Vioxx before the label change.  The label change did not undo all the effects of

-11-

---

FAC Resp. Exhibit B -- 2284

1  all the contacts that he had with Merck and the years of exposure he had to
2  Merck's marketing efforts and it prior label.  Therefore, it is highly relevant to
3  allow documents and testimony pre-dating the April 2002 label change,
4  including Dr. Avorn's testimony regarding the inadequacy of the 1999 label.
5  Merck's suggestion that all deposition designation testimony regarding such
6  evidence be deemed irrelevant and inadmissible because Mr. Crandall did not
7  take Vioxx until 2003, is simply a thinly veiled attempt to keep out probative
8  evidence that is unfavorable to Merck.
9
10  **III.   PLAINTIFF'S PROPOSAL REGARDING DEPOSITION DESIGNATIONS IS**
11  **IN THE INTEREST OF JUDICIAL EFFICIENCY**
12       Plaintiff's proposal to adopt certain already ruled upon deposition
13  designations is in the interest of judicial efficiency.  The depositions that have
14  been submitted to this Court represent hours and hours of careful consideration
15  and the collective experience of courts familiar with Vioxx. The very same
16  evidence that is being put forth in these designations has been admitted in
17  multiple trials in various jurisdictions.  Plaintiff merely suggests using these
18  designations, which Merck has been instrumental in preparing, in order to save
19  time and resources for other matters.  In its opposition, Merck cites several
20  reasons why Plaintiff's proposal is untenable, each discussed in turn below.
21
22       **A.   Plaintiff's Proposed Deposition Designations Properly Address**
23            **the Factual Issues of this Case**
24       First, Merck contends that because Mr. Crandall took 50 mg of
25  Vioxx in this case, the deposition designations he proposes to use are
26  inappropriate to adopt wholesale as they were created for Plaintiffs who took 25
27  mg of Vioxx.  Merck's idea that a 50mg dosage somehow makes this case
28  unique is a red herring.  The evidence presented in the deposition designations

-12-

is not dose dependent. It is true that the designations present evidence that the lower dosages are dangerous – Study 090 (discussed in Dr. Topol's designation beginning at p.136) demonstrates an increased risk of cardiovascular events at the 12.5mg dosage, and the APPROVe Study shows an increased risk of cardiovascular events at the 25mg dose.  However, this merely establishes the premise that if Vioxx is dangerous at 12.5 and 25mg levels, it is equally, if not more dangerous at the 50 mg dosage.  Therefore, the evidence that Vioxx is dangerous at lower doses, as presented in the designations Plaintiff has proposed, is highly relevant.  Any evidence that Merck knew of the dangers of Vioxx at a lower dosage is relevant to show Merck's notice that Vioxx presented an increased risk of cardiovascular events at the 50 mg dose. Therefore, although these designations were made for Plaintiffs taking the 25mg dose, this does not affect the probative value of the evidence for a Plaintiff, such as Mr. Crandall, taking the 50mg dose.

Moreover, these deposition designations do address the 50mg issue despite the fact that the cases from which these designations are derived involved Plaintiffs who took 25mg.  Merck's largest study of Vioxx, the VIGOR trial, is a 50 mg study.  The impact of VIGOR is addressed at length in many of the witness' deposition designations, both from a scientific and marketing standpoint.  In regard to short term use, Plaintiff's proposed deposition designation of Dr. Topol deals directly with this issue.  (Designation excerpt of Dr. Topol attached as Exhibit 9 at 129:3-7, 129:10-130:3, 130:18-131:5, 131:20-132:2, 132:5-22, 133:1-4; 133:7-16, 136:5-11, and 136:14-138:10).  Therefore, Plaintiff's proposed designations are not factually inadequate as Merck suggests.  The designations contain liability evidence at all doses and durations, which is relevant to each and every plaintiff.

-13-

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

**B.      Plaintiff Has Not "Cherry-Picked" His Proposed Deposition Designations**

In its opposition, Merck suggests that Plaintiff has "cherry-picked" deposition designations favorable to him.  This is not the case.  The same documents that are being offered in Plaintiff's proposed designations have been admitted by Judge Fallon, Judge Chaney and Judge Higbee in other trials.  The evidence Plaintiff seeks to admit through these designations also has been admitted for punitive damages not only in *Barnett* by Judge Fallon, but also in the New Jersey *Humeston* case by Judge Higbee.

In addition, Plaintiff has selected deposition designations that are a result of negotiation and compromise from both sides, as well as of fair rulings by the courts.  Not only have the Plaintiffs in *Barnett, Appell/Arrigale* and *Berwick* not had all of their evidence admitted in these designations, but their objections to Merck's evidence have, in many instances, been overruled.  As an example, Judge Fallon sustained objections to five pages of Topol deposition testimony that Plaintiff designated.  In the cross examination that Plaintiff proposes to use of Dr. Avorn, forty-six of Plaintiff's objections were overruled.  Nevertheless, in an effort to conserve judicial resources, Plaintiff is willing to be bound to the decisions by the respective courts that ruled on these designations, though many of the rulings are not all favorable to him.

**C.      Plaintiff is not Requesting this Court to Abdicate Its Power, and Only Seeks to Ensure Enough Time is Provided for the Designation Process**

Merck argues that the Plaintiff is asking this Court to abdicate its power to make evidentiary decisions by adopting already ruled upon deposition designations wholesale.  Plaintiff is merely making a proposal to save the Court valuable time.  If the Court decides that it does not wish to adopt these

-14-

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

deposition designations, Plaintiff is perfectly willing to commence the designation process.  He asks only that this Court revise the designation schedule to provide the Court more time to review, hear argument and rule on the deposition testimony.  Plaintiff would like to start the designation process on July 12, 2007 and follow the schedule as proposed in his original motion.

The reason Plaintiff has proposed this schedule is to avoid delay. Merck claims that it will only ask the Court to review deposition designations on which the parties cannot agree.  However, though Merck has had Plaintiff's proposed designations since the initial motion was filed two weeks ago on June 21, 2007, it has made no indication to Plaintiff that it agrees or disagrees with the use of any of these designations, though Merck is familiar with them from other trials.  This underscores Plaintiff's belief that Merck is delaying the deposition designation process, as weeks have already gone by.  Should the Court not agree to accept the proposed designations wholesale, Plaintiff, concurrently with the filing of this reply, has served affirmative deposition designations for the thirteen witnesses that are the subject of his original motion on defense to begin this process.[3]  Plaintiff has also served these spreadsheets on Merck electronically for the sake of ease, so that Merck can type its objections directly into the reports.  Plaintiff understands that expert discovery and motion in limine practice has not yet concluded, yet he is willing to be bound by these designations.  Due to the fact that Merck has Plaintiff's expert reports and has submitted the same motions in limine in trial after trial, Plaintiff feels as though Merck should be able to respond to these designations according to the schedule he has proposed.  Therefore, Plaintiff respectfully reiterates his

---

[3] In addition to these witnesses, Plaintiff does intend to designate testimony from a few additional general liability witnesses, and will serve these designations on July 12.

-15-

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

1   request that this Court amend CMO 4 as set forth in Plaintiff's motion, so as to
2   alleviate the time pressure imposed by the current schedule.
3
4   Dated: _7/3/07_                    ROBINSON, CALCAGNIE & ROBINSON
5
6                              By    _____
7                                   TED B. WACKER
8                                   CYNTHIA LYNN GARBER
                                    Attorneys for Plaintiff
9                                   GERALD CRANDALL
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-16-

PLAINTIFF'S REPLY TO MERCK'S OPPOSITION TO MOTION RE DEPO DESIGNATION

FAC Resp. Exhibit B -- 2289

<u>CERTIFICATE OF SERVICE</u>

Pursuant to NRCP 5(b), I hereby certify that I am an employee of ROBINSON, CALCAGNIE & ROBINSON, and that on the 3RD day of July, 2007, I served a true and correct copy of the foregoing document by:

<u>X</u>    Depositing for mailing, in a sealed enveloped, U.S. Postage prepaid, at Newport Beach, CA

\_\_    Personal Delivery

\_\_    Facsimile

\_\_    Federal Express/Airborne Express/Other Overnight Delivery

\_\_    Reno Carson Messenger Service

addressed as follows:

Kristina Pickering, Esquire
MORRIS PICKERING & PETERSON
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada   89101

Paul Boehm, Esquire
WILLIAMS & CONNOLLY, LLP
725 Twelfth St. N.W.
Washington, D.C. 20005

J. Stewart White, Esquire
WHITE, MEANY & WETHERALL, LLP
3185 Lakeside Drive
Reno, NV 89509

CYNTHIA GARBER

1   3370

SCANNED
AUG 2 7 2007
BY: _____

FILED
AUG 2 2 2007
RONALD A. LONGTIN, JR., CLERK
By: _____
DEPUTY

IN THE SECOND JUDICIAL DISTRICT COURT OF

THE STATE OF NEVADA IN AND FOR THE

COUNTY OF WASHOE

GERALD CRANDALL, a Nevada
Resident,

                    Plaintiff,

vs.

MERCK & COMPANY, INC., a foreign
corporation; MISTY L. KUPERMAN,
TRACEY PHILLIPPI, KAREN SHOUSE,
LADON GAY SILVA, RICKY GULATI,
SERGE BRUNRY, TINA DIMORE, JULIE
DIANE WURCH, NICOLE LORENZZI,
LEANN BONNER-WELCH and PAUL
PERRY, individuals, and DOES 1 through
25, inclusive,

                    Defendants.

Case No. CV07-00666

Dept. No. 6

**ORDER**

The Court held a status conference in this matter on August 1, 2007

at which it heard argument on several pending motions and other pretrial

issues. The Court has considered the briefs, the affidavits and other evidence

presented, and the oral arguments of counsel.

        GOOD CAUSE APPEARING, IT IS HEREBY ORDERED THAT:

        1.      Plaintiff's June 21, 2007 Motion re Deposition Designations

and Exhibit Foundation is GRANTED IN PART and DENIED IN PART.  The

FAC Resp. Exhibit B -- 2291

1   Court will adopt other court's rulings on the requested deposition designations

2   and exhibit foundations *except for* rulings as to relevance and rulings under NRS

3   48.035, which rulings the Court reserves for itself.  This Order does not,

4   however, adopt or otherwise limit the portions of videotape depositions that

5   either party may designate and offer in this matter.

6             2.      Merck's June 22, 2007 Motion to Compel Answers to Merck's

7   First Set of Interrogatories is GRANTED.  Plaintiff shall, within 15 days, serve

8   complete answers to each defendant's first set of interrogatories.  Plaintiff's

9   answers shall not include any reservation or qualification as to presenting

10  additional facts, witnesses, or evidence at trial beyond what is specified in the

11  interrogatory answers to be served as a result of this Order.

12            3.      Plaintiff's July 3, 2007 Motion to Compel Clarification of

13  Merck's Certification is GRANTED to this extent only:  Merck shall, within five

14  days, file an amended certification certifying pursuant to Nev. R. Civ. P. 11 and

15  26(g) that, to the best of counsel's knowledge, information, and belief, formed

16  after a reasonable inquiry, Merck's production of discoverable documents is

17  complete and correct as to the categories of documents as described verbatim in

18  the Court's June 18, 2007 Order.

19            4.      The Court RESERVES RULING on Merck's July 16, 2007

20  Motion for Protective Order Prohibiting Plaintiff from Taking the Depositions of

21  Drs. Arrowsmith-Lowe and Flavahan.  The parties shall notify the Court by

22  October 1, 2007 whether the issues that are the subject of the motion have been

23  resolved or if issues remain in dispute and the Court will address the motion at

24  that time, if necessary.

25            5.      The Court likewise RESERVES RULING on Merck's July 16,

26  2007 Motion to Compel Compliance with Case Management Order (concerning

27  the production of trial exhibits).  The parties shall notify the Court if the issues

28

FAC Resp. Exhibit B -- 2292

1  that are the subject of this motion are not resolved and the Court will address the

2  motion at that time, if necessary.

3         6.     The parties shall meet and confer on a protocol for numbering

4  trial exhibits such that there is a single numbering system for trial shared by

5  both parties.

6         7.     The parties shall likewise meet and confer on whether to use a

7  juror questionnaire and what form that questionnaire should take.

8         8.     The parties shall schedule a trial setting conference for August

9  7, 2007, at which the parties shall reset this case for trial for a date meeting the

10  requirements of the July 23, 2007 Stipulation and Order to Continue Trial.

11  Counsel may appear at the setting conference telephonically.

12         9.     At the trial setting conference, the parties shall also

13  provisionally schedule a formal status conference for late August 2007 to resolve

14  any remaining disputes arising from the Case Management Order that is due

15  from the parties on August 17. This CMO should, to the extent possible, address

16  the remaining expert witness discovery, the protocol on exhibits, the time for the

17  trial, and the allocation of time in the trial. The Court strongly encourages the

18  parties to adopt an order allocating trial time, and orders the parties to meet and

19  confer to determine how trial time should be allocated.

20         10.    All submissions in this case, including any requests for relief

21  or for an order, shall be made in a formal, captioned pleading rather than by

22  letter to the Court or by *ex parte* communication. Prior to filing any motion,

FAC Resp. Exhibit B -- 2293

1    except a motion on a dispositive legal issue, the Court first requires that the

2    parties personally meet and confer about the issue presented in the motion.

3         DATED this _22_ day of _August_, 2007.

4

5                               Brent Adams

6                                DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FAC Resp. Exhibit B -- 2294

1  **2540**
   MORRIS PICKERING & PETERSON
2  Kristina Pickering, No. 992
   Denise Barton, No. 5579
3  Robert R. McCoy, No. 9121
   900 Bank of America Plaza
4  300 South Fourth Street
   Las Vegas, Nevada  89101
5  Telephone:  (702) 474-9400
   Facsimile:   (702) 474-9422
6
7  Attorneys for Defendants
   Merck & Co., Inc., Leanne Boner-Welch,
8  Paul Perry, Karen Shouse, Mary Tracey
   Philippi, Neeraj Gulati, Ladon Silva,
9  Julie Wurch, Misty Kuperman, Nicole
   Lorenzi, Tina Damore and Serge Brunet
10

11            IN THE SECOND JUDICIAL DISTRICT COURT OF

12            THE STATE OF NEVADA IN AND FOR THE

13                     COUNTY OF WASHOE

14  GERALD CRANDALL, a Nevada        )  Case No. CV07-00666
15  Resident,                        )
                                     )  Dept. No. 6
16            Plaintiff,             )
    vs.                              )
17                                   )
    MERCK & COMPANY, INC., a foreign )
18  corporation; MISTY L. KUPERMAN,  )
    TRACEY PHILLIPPI, KAREN SHOUSE,  )
19  LADON GAY SILVA,  RICKY GULATI,  )  **NOTICE OF ENTRY OF ORDER**
    SERGE BRUNRY, TINA DIMORE, JULIE )
20  DIANE WURCH, NICOLE LORENZZI,    )
    LEANN BONNER-WELCH and PAUL      )
21  PERRY, individuals, and DOES 1 through )
    25, inclusive,                   )
22                                   )
                                     )
23            Defendants.            )
    ─────────────────────────────────)
24

25            PLEASE TAKE NOTICE that an Order re a Status Conference held

26  on August 1, 2007 was entered in the above-entitled case on the 22nd day of

27

28

MORRIS PICKERING
& PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

FAC Resp. Exhibit B -- 2295

1    August, 2007.  A copy of this Order is attached hereto.

2

3                                          MORRIS PICKERING & PETERSON

4

5                                          By:_____
6                                              Kristina Pickering, No. 992
                                               Denise Barton, No. 5579
7                                              Robert R. McCoy, No. 9121
                                               900 Bank of America Plaza
8                                              300 South Fourth Street
                                               Las Vegas, NV  89101
9
                                           Attorneys for Defendants
10                                         Merck & Co., Inc., Leanne Boner-
                                           welch, Paul Perry, Karen Shouse,
11                                         Mary Tracey Philippi, Neeraj Gulati,
                                           Ladon Silva, Julie Wurch, Misty
12                                         Kuperman, Nicole Lorenzi, Tina
                                           Damore and Serge Brunet
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

.RIS PICKERING
& PETERSON
ATTORNEYS AT LAW
300 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
· 702/474-9400
FAX 702/474-9422

FAC Resp. Exhibit B -- 2296

1

### CERTIFICATE OF SERVICE

2       Pursuant to Nev. R. Civ. P. 5(b), I certify that I am an employee of

3   MORRIS PICKERING & PETERSON; that I am familiar with the firm's practice of

4   collection and processing documents for mailing; that, in accordance therewith, I

5   caused the following document to be deposited with the U.S. Postal Service at

6   Las Vegas, Nevada, in a sealed envelope, with first class postage prepaid, on the

7   date and to the addressee(s) shown below: **NOTICE OF ENTRY OF ORDER**

8   J. Stewart White, No. 1039
    WHITE MEANY &
9        WETHERALL, LLP
    3185 Lakeside Drive
10  Reno, NV  89509
    Tel:   (775) 828-9999
11  Fax:   (775) 828-9998

12
    Attorneys for Plaintiff
13

14       DATED this ___ day of August, 2007.

15

16                          By: _____

17

18

19

20

21

22

23  A courtesy copy of the above document was provided via U.S. Mail to:

24  Ted Wacker
    Cynthia Garber
25  Robinson Calcagnie & Robinson
    620 Newport Center Drive, 7th Floor
26  Newport Beach, California 92660
    Telephone: (949) 720-1288
27  Facsimile:  (949) 720-1292

28

...RIS PICKERING
& PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 3 of 4

FAC Resp. Exhibit B -- 2297

STATE OF ALABAMA        §
MONTGOMERY COUNTY   §

**Affidavit of Andy D. Birchfield, Jr. in Support of Beasley, Allen
Crow, Methvin, Portis & Miles, P.C.'s Fee Petition**

On this day, Mr. Andy D. Birchfield, Jr. appeared before me, the undersigned notary public. After I administered an oath to him, he said:

"My name is Andy D. Birchfield, Jr. I am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct:

I serve as Co-Lead Counsel in the Vioxx MDL. I was lead or co-lead counsel in five bellwether trials. I personally invested approximately 9,000 hours for the common benefit of all Vioxx litigants, including approximately 2,200 hours that were devoted to settlement terms and negotiations. In regard to contributions made to bellwether trials, MDL leadership, settlement negotiations, settlement administration, and clients, I have contributed more to the litigation than any other lawyer. In addition to serving as Co-Lead Counsel, I have served as a member of the Plaintiffs' Executive Committee, PSC, Negotiating Committee, Gates Committee, Fee Committee and the Vioxx Settlement Liaison Group. I have maintained an undivided commitment to the litigation, and in so doing, have fulfilled a vital role in every aspect of the case. I continue to carefully attend to the details necessary to ensure the fair and efficient administration of the settlement program.

Moreover, Beasley Allen has been at the forefront of the Vioxx litigation since its inception in 2001. Beasley Allen filed the second case in the country in September 2001, 3 years before Vioxx was withdrawn from the market and more than 3½ years before the MDL was formed. Beasley Allen represents 5,250 clients and has expended in excess of $13.5 million over the course of the litigation, expenses of over $3.125 million dollars inured to the common benefit of all Vioxx litigants. In reaching the total number of clients represented, Beasley Allen evaluated the claims of more than 40,000 individuals. In addition to its efforts on behalf of their clients, Beasley Allen shareholders, associates, and staff have expended over 34,000 hours for common benefit and to ensure the success of the Vioxx litigation. The majority of this time has been invested by Beasley Allen shareholders.

As a Senior Partner at Beasley Allen, I have brought to bear my knowledge, experience and expertise from successfully litigating other mass tort claims, including Rezulin, Lotronex, Meridia, Baycol, and Fen-Phen, among others. In this litigation, bellwether trials proved to be critical, perhaps even the most critical factor in establishing conditions conducive to resolution. Shortly after the formation of the MDL, Judge Fallon announced a plan to conduct four trials in the MDL. Judge Fallon emphasized that the trials would reveal the strengths and weaknesses of each party's case and outlined his intent to bring the parties together at the conclusion of the trial schedule to begin settlement negotiations. True to his word, Judge Fallon convened the parties for initial discussions the day after a jury returned a verdict in the final MDL trial. I served as co-counsel in five bellwether trials – *Irvin I, Irvin II, Barnett, Dedrick,* and *Schwaller* – more than any other lawyer in the country. The Vioxx litigation has been difficult. Proving one's case involved the time-consuming and strenuous process of marshalling complex scientific data, digesting and assimilating thousands of exhibits and multitudes of depositions, in addition to the arduous task of fighting Merck & Co. defense teams with seemingly unlimited manpower and resources. Merck's six-year, scorched-earth defense strategy at a cost of approximately $1.6 billion was unprecedented. Meeting Merck's defenses on multiple fronts, from those asserted in bellwether trials to the more subtle strategies that played out in MDL pleading practice and ultimately, settlement negotiations, has been a daunting task. Throughout the process, I remained committed to daily wage this battle over the course of this difficult and challenging litigation.

My commitment to the Vioxx litigation has precluded my pursuit of employment in other litigations. I have foregone opportunities to serve on other PSC's and opportunities to pursue other major litigations within my area of practice in order to devote full, undivided attention to the Vioxx litigation. In light of the thousands of hours I have devoted to the Vioxx litigation and now continue to devote to the Vioxx resolution program, it would have been physically impossible to pursue further employment. During settlement negotiations, I developed and tested a settlement model by evaluating approximately 500 randomly selected individual cases. This model was used to shape and test proposed settlement terms. The random sample proved to be strategic over the eleven-month negotiation and interestingly, the results from the model have proven to be remarkably accurate when compared against actual results of the Vioxx resolution program. The careful attention that the Negotiating Committee, particularly Ed Blizzard and I, paid to every detail of the settlement led to a settlement program that is unparalleled in mass torts for fairness and efficiency and sets a new standard for future resolution programs.

**Contributions before the Creation of the Vioxx MDL**

Under my leadership, Beasley Allen spearheaded, along with Seeger Weiss, Lanier Law Firm, and Shelly Sanford's firm, the initial discovery in the Vioxx litigation, plowing early ground in regard to corporate liability. Our firm reviewed tens of thousands of Merck documents. David Micelli, a former Beasley Allen shareholder, took the early and foundational depositions of key Merck corporate witnesses such as Dr. Edward Scolnick, Dr. Alise Reicin, Dr. Briggs Morrison, Dr. Barry Gertz, Mr. Adam Schechter, among others. Portions of these depositions were ultimately used during MDL bellwether trials and others were valuable building blocks for later depositions. Beginning in 2000, Mr. Micelli pioneered scientific theories which have ultimately been validated in trials and by the Vioxx resolution program. Mr. Micelli developed the important testimony of Dr.

FAC Resp. Exhibit B -- 2298

Benedict Luchessi, and other foundational experts.  The month before Vioxx was pulled from the market, a Beasley Allen case was scheduled to be the first Vioxx trial in the nation.  This case, *Younge v. Merck*, was originally set for trial in the United States District Court for the Southern District of Alabama in August 2004.  Beasley Allen prepared the case for trial, but the Court continued the case on the eve of trial due to the Court's schedule.  Vioxx was then withdrawn from the market and the *Younge* case was transferred to the MDL upon its creation.  More than two years before Vioxx was withdrawn from the market, I was speaking at national seminars and alerting lawyers to the dangers of Vioxx.  When Vioxx was pulled off the market, instead of taking a proprietary approach, Beasley Allen shared with lawyers throughout the country the theories of the case, discovery, contacts, and other resources it had developed.  Beasley Allen has worked diligently to cultivate a spirit of cooperation among lawyers in state courts and the MDL.  Specifically, prior to the formation of the MDL, I encouraged common leadership in the MDL and New Jersey consolidated litigations in order to foster mutual aid and collaboration.  Teamwork between state and federal proceedings has been a hallmark of the litigation and essential to its overall success.

## Contributions to Vioxx MDL Process

In addition to my contributions to the MDL, Frank Woodson, a Beasley Allen shareholder, served on the MDL sales and marketing committee.  Paul Sizemore, a former Beasley Allen shareholder, played a vital role on the Science Committee and worked with numerous experts used in the MDL as well as in other coordinated litigations, such as Dr. Benedict Luchessi, Dr. Colin Bloor, Dr. Lemuele Moye, Dr. Donna Arnett, Dr. Connie Pechman and Dr. Ira Gelb.  During his tenure at Beasley Allen, Mr. Sizemore also served as co-counsel in *Irvin v. Merck* and *Grossberg v. Merck*.

Ms. Leigh O'Dell, a Beasley Allen shareholder, served as a member of the MDL Law and Briefing Committee and the Trial Package Committee.  Ms. O'Dell has contributed more than 7,400 hours of time to the MDL to date.  Beasley Allen took a lead role in the preparation of the Trial Package.  Beasley Allen gathered the grand majority of the pleadings, depositions, deposition trial designations, exhibits, transcripts, and scientific articles that were utilized in bellwether trials.  Ms. O'Dell made critical contributions to the Trial Package, co-authoring with Chris Tisi comprehensive memorandums outlining testimony and trial exhibits that can be effectively utilized to rebut Merck's defenses.  Ms. O'Dell reviewed documents for the Theme Grid, reviewed protocols for all Merck clinical trials, and served as a point person for the presentation of the Trial Package to the MDL Court.  Ms. O'Dell served as co-counsel in *Dedrick v. Merck*, and assisted in the trials of four other bellwether cases.  Furthermore, as a result of Ms. O'Dell's broad knowledge about the litigation and settlement program, numerous lawyers from around the country turned to her for assistance and advice regarding litigation matters and continue to look to her for assistance pertaining to the settlement.

In addition to the hours expended on bellwether trials and settlement negotiations, Beasley Allen has invested more than 8,300 hours in the general MDL process.

## Contributions to Bellwether Trials

Beasley Allen lawyers participated in more Vioxx trials than any firm in the country.  Of the seventeen trials that took place during the litigation, Beasley Allen lawyers served as lead counsel, co-counsel, or support counsel in seven.  *Irvin v. Merck*, a Beasley Allen case, was pending in Florida state court when the case was selected by the parties and the Court to be the first case to be tried in the MDL.  After the case was selected at the end of August 2005, Beasley Allen re-filed the case in the MDL and bore the expense and responsibility of preparing the first MDL trial under an extremely tight time-frame of 3 months.  The work product developed in preparation for the *Irvin* case became the foundation for preparation in other MDL trials and some state court cases.  For example, Daubert motions and oppositions to Merck's Daubert motions, motions in limine, jury instructions, exhibit lists and exhibits, and deposition trial excerpts prepared in *Irvin* were all used in some measure in other federal and state trials.  Beasley Allen commissioned and participated in extensive jury research prior to the *Irvin* trial.  Due to the devastation and destruction of Hurricane Katrina, the first *Irvin* trial took place in Houston, Texas.  The case was tried in November 2005 for approximately two weeks and resulted in a hung jury.  The Court ordered a second trial just 8 weeks later in New Orleans during February 2006.  The second trial lasted more than two weeks and resulted in a defense verdict.  The Court granted Beasley Allen's motion for a third trial after finding that Merck's expert cardiologist misrepresented his qualifications during *Irvin II*.  The Plaintiff's Negotiating Committee and Merck entered into the settlement agreement before the third trial could take place.  Beasley Allen invested approximately 9,200 hours in the preparation and trials of the *Irvin* case.

Following the second *Irvin* trial, Mark Robinson of Robinson, Calcagnie, & Robinson asked me to serve as co-counsel in *Barnett v. Merck*, the third MDL bellwether trial.  I agreed and devoted extensive time and energy to the preparation and the trial of the case.  In addition, Ms. O'Dell, along with Kevin Calcagnie of Robinson, Calcagnie, prepared motions in limine and Daubert briefing.  Ms. O'Dell and other Beasley Allen staff took the lead in preparing deposition testimony for the trial, exhibits, and other vital trial materials.  After a nearly three-week trial during July and August 2006, the jury returned a verdict in favor of Mr. Barnett in the amount of $51,000,000.  Beasley Allen invested more than 2,500 hours in the preparation and trial of the *Barnett* case.  Beasley Allen did not have a fee interest in the *Barnett* case, but made the contributions outlined above purely for the advancement of the overall litigation.

During June, July and August 2005, while Mr. Sizemore was a shareholder at Beasley Allen, he served as co-counsel in *Grossberg v. Merck*, a Girardi Keese case which was tried in the California consolidated litigation.  Mr. Sizemore spent nearly eight weeks in California preparing and participating in this trial.  Beasley Allen did not have a fee interest in the *Grossberg* case, but made the contributions outlined above purely for the advancement of the overall litigation.  Mr. Sizemore subsequently joined the Girardi Keese firm at least in part to head up its Vioxx litigation.

Another Beasley Allen case, *Dedrick v. Merck* was the last MDL bellwether trial.  The *Dedrick* case was a defense selected trial case.  Mr. Dedrick had a personal history of alcohol and drug abuse.  In addition, Mr. Dedrick had numerous risk factors for heart attack, including a history of smoking, family history of heart disease, diabetes, hypertension and

FAC Resp. Exhibit B -- 2299

hypercholesterolemia.  *Dedrick* was a very difficult case.  Beasley Allen did not withdraw the case from the trial process as is often the practice.  Committed to the completion of Judge Fallon's MDL bellwether trial schedule and convinced that demonstrating a willingness to press forward despite a challenging fact pattern was critical to the overall success of the litigation, I, along with Ms. O'Dell and the entire Beasley Allen team, gave Mr. Dedrick our best efforts, trying the case for almost three weeks.  The case resulted in a defense verdict.  Beasley Allen invested approximately 5,500 hours and over $1 million in the preparation and trial of the *Dedrick* case.

While the *Dedrick* trial was underway in the MDL, *Albright v. Merck* was tried in the Circuit Court of Jefferson County, Alabama.  Ben Locklar, a Beasley Allen shareholder, assisted in the preparation and trial of the *Albright* case.  Beasley Allen did not have a fee interest in the *Albright* case, but rather assisted with the case purely for the advancement of the overall litigation.

Lastly, I served as co-counsel with Mikal Watts in the trial of *Schwaller v. Merck* in Madison County, Illinois.  I worked with Watts Firm to develop trial strategy, and directed and cross-examined key plaintiff and defense witnesses.  Ms. O'Dell prepared and argued all deposition designations and oversaw the admission of all evidence at trial.  Beasley Allen invested approximately 2,250 hours in the preparation and trial of the *Schwaller* case.  Beasley Allen did not have a fee interest in the *Schwaller* case, but made the contributions outlined above purely for the advancement of the litigation.

From August 2005 until March 2007, Ms. O'Dell and I devoted the vast majority of our time to the preparation or the trial of bellwether cases.  In addition, we also spent considerable time advising and contributing to the development of trial strategies for other cases in which we were not directly involved.

### Contributions to Settlement Negotiations

On December 14, 2006, the day after the jury returned a verdict in *Dedrick v. Merck*, negotiations between Plaintiffs' counsel and Merck began and continued until a resolution was reached during the early morning hours of November 9, 2007.  As members of the Plaintiffs' Negotiating Committee, Ed Blizzard and I took the lead in negotiating the actual terms of the Settlement Agreement, carefully researching and testing the effect of key provisions such as various risk factors and degrees of injury to ensure a fair settlement and appropriate compensation for all participants.  The success of our efforts is seen in the 99% voluntary participation rate of all eligible claimants.  I, along with Ms. O'Dell and Roger Smith, a Beasley Allen shareholder, spent hundreds of hours developing a random sample upon which settlement terms might be tested.  The random sample involved the claims of approximately 500 claimants.  Negotiation points such as injury level definitions, risk factor reductions, consistency adjustments and label adjustments were tested using the sample model.  Beasley Allen retained and worked with a biostatistician, Dr. Mark Carpenter, to verify the sample and extrapolate test results across the 50,000-person Vioxx claimant population.  These predictions were vital as negotiations progressed.  More importantly, the projections based on the sample have proven to be remarkably accurate when compared against actual results currently being seen in the Resolution Program.  I coordinated with other Plaintiff Negotiating counsel the drafting process for the settlement agreement.  Immediately following the signing of the settlement agreement, I played a pivotal role in educating other plaintiff counsel about the program.  Beasley Allen invested approximately 5,400 hours in the settlement negotiation process.

### Contributions to Settlement Administration

The efficient operation of the Vioxx Resolution Program requires daily attention to myriad details.  In order to ensure that the Resolution Program is implemented in keeping with the agreement of the parties and with efficiency, I have maintained nearly daily contact with Merck and Brown Greer, the Vioxx Claims Administrator.  These contacts are in addition to weekly Vioxx Liaison calls and have canvassed material settlement terms such as registration, enrollment, walk-away rights, the submission of claims materials, the pass/fail ratios, the calculation of Merck pushes, among other issues.  I have spent and continue to spend considerable time working through enrollment deficiency issues with Brown Greer and Merck.  I shepherded the calculation of the estimated MI point value.  Moreover, I serve on the Gate Committee and along with Ms. O'Dell, have reviewed and continue to review hundreds of Vioxx claims pending before the Gate Committee.

Beasley Allen, under my leadership, has been at the forefront of the Vioxx litigation from beginning to present – from the filing of the earliest lawsuits, to the formation of the MDL, through the bellwether trial process, and finally, into the settlement phase.  No other firm has made more substantive and expansive contributions to each facet of the litigation process.  Therefore, no firm should be awarded a higher common benefit fee than Beasley Allen."

Andy D. Birchfield, Jr.

SWORN to and SUBSCRIBED before me this the 31st day of October, 2008.

NOTARY PUBLIC
My Commission Expires:  5-15-10



## COHEN MILSTEIN
### HAUSFELD & TOLL<sup>PLLC</sup>

Daniel W. Sigelman
(202) 589-2285
dsigelman@cmht.com

November 7, 2008

**VIA E-MAIL AND VIA UPS OVERNIGHT**

Russ M. Herman, Esq.
Plaintiffs' Liaison Counsel
Vioxx Products Liability Litigation, MDL 1657
c/o Herman, Herman, Katz & Cotlar, L.L.P.
820 O'Keefe Avenue
New Orleans, Louisiana   70113

      *Re:*    *Affidavit to the Vioxx Common Benefit Fee Allocation Committee*

Dear Mr. Herman:

    Enclosed please find the affidavit I have made describing my firm's common benefit contributions to the Vioxx MDL and New Jersey consolidated Vioxx litigation. Due to a calendaring error in our office, it is being submitted after the October 31, 2008, deadline set forth in Pre-Trial Order No. 6(D) entered by Judge Fallon on September 15, 2008. I sincerely apologize for this error and any inconvenience it may cause the Allocation Committee.

    Should you have any questions or concerns, please do not hesitate to contact me.

                  Sincerely,

                  Daniel W. Sigelman

DWS/gj
Enclosure

cc:    Leonard A. Davis, Esq.

---

1100 New York Avenue, N.W.    Suite 500, West Tower    Washington, D.C. 20005    t: 202 408 4600    f: 202 408 4699    www.cmht.com
Washington D.C.    New York    Philadelphia    Chicago    London

FAC Resp. Exhibit B -- 2301

## AFFIDAVIT OF DANIEL W. SIGELMAN

Comes now before me, an officer authorized to administer oaths, Daniel W. Sigelman, who, having been duly sworn, deposes and says:

1.      I am a partner at Cohen, Milstein, Hausfeld & Toll, P.L.L.C.  I am making this affidavit based on my personal knowledge for use by the Allocation Committee in assessing my firm's common benefit contributions.

2.      I made the vast preponderance of contributions to the common benefit work my firm performed in the Vioxx MDL and the New Jersey consolidated Vioxx litigation.

3.      My firm previously submitted its common benefit time in these litigations in the manner required by Pretrial Order Nos. 6 and 6C.

4.      I devoted the overwhelming majority of my professional time (during the periods covered by my Vioxx common benefit time record submissions) to Vioxx common benefit work. I extensively reviewed medical and scientific literature and Merck internal and FDA documents. In fact, I personally reviewed many hundreds of thousands of documents over the course of this litigation.  My intensive commitment to this work necessitated my rejection of several other litigation opportunities at my firm.

5.      I have devoted much of my professional life over the past 27 years to reviewing, analyzing, and interpreting clinical and epidemiological studies of drugs, both as counsel to a congressional investigative subcommittee overseeing FDA's regulation of drug safety and in private practice.  In May 2005, I was appointed to the MDL Science Committee and, soon thereafter, I joined the Clinical Trials/Epidemiology/Proof of Causation subcommittee.  Virtually all of my common benefit time for the Vioxx MDL was expended in connection with my responsibilities on this subcommittee.

6.      In recognition of my potential to assist in the discovery of relevant regulatory, scientific and technical documents and data of common benefit to the litigation, in August 2005 I was afforded remote access to the entire Vioxx Concordance production.  I spent a large part of my common benefit time searching, obtaining, and then sharing with other counsel and experts documents and data I located in this database.  I was frequently consulted by attorneys and experts because of my knowledge of scientific liability aspects of the case.

7.      For seven years I conducted oversight of FDA's regulation of drug safety as counsel to the House Human Resources and Intergovernmental Relations Subcommittee.  Given my extensive FDA regulatory background, the PSC authorized me to prepare for and first-chair the deposition of former Merck regulatory affairs official, Dr. Ned Braunstein.  In preparation for Dr. Braunstein's deposition, I reviewed in excess of 250,000 documents relating to or authored or received by him, not counting the large number of documents I also reviewed in Merck's "FDA custodian" files in Concordance.

8.     A primary Merck defense was that placebo-controlled data, including pooled data from its trials, demonstrated no increased cardiovascular risk until APPROVe.  A central objective of much of my common benefit work was building the scientific liability case against Merck based on analyzing the evolving data emanating from its "gold standard" placebo-controlled trials. For example, much of Dr. Braunstein's deposition focused on Merck's handling of data from its placebo-controlled arthritis and Alzheimer's studies that associated Vioxx with a statistically significant increase in thrombotic cardiovascular events.   The testimony and documents featured in Dr. Braunstein's deposition played a prominent role in the formulation of some of the causation opinions that Yale cardiovascular expert Dr. Harlan Krumholz rendered in the largely successful *Hermans/Humeston* trial in the New Jersey consolidated litigation.  Dr. Krumholz, in fact, acknowledged to me the contribution that the Braunstein deposition made to his appreciation of strong and relatively early evidence of the cardiovascular hazards of Vioxx.

9.     I provided documents and substantive work product to the trial teams in New Jersey during the *Cona/McDarby* and *Hermans/Humeston* trials.  On numerous occasions trial counsel or their non-testifying consultants (*e.g.*, Dr. David Egilman) solicited and secured my assistance.  I also assisted critical experts—most notably, Dr. Harlan Krumholz—in preparing for trial testimony.  I worked especially closely and extensively with Dr. Krumholz prior to and during his two appearances in the *Hermans/Humeston* trial.  I sent him large amounts of data, numerous documents, and data analyses that persuaded him to center much of his scientific and medical causation testimony at trial on Merck's placebo-controlled arthritis and Alzheimer's trials.

10.     Trial counsel and their experts in *Cona/McDarby* and *Hermans/Humeston* acknowledged that I had substantially contributed to their efforts.

11.     I devised and through a statistical expert, Dr. David Madigan, implemented a strategy that yielded data showing that as early as ***2000,*** underlying SAS data from Merck's clinical trials associated Vioxx with a statistically significant increased risk of thrombotic cardiovascular events in Merck's placebo-controlled ***arthritis*** studies.  I also worked with Dr. Madigan to demonstrate, again based on SAS data, that Merck's placebo-controlled Alzheimer's studies, which Merck used as a defense to VIGOR, actually underscored the drug's thrombotic cardiovascular toxicity.

12.     To facilitate Dr. Madigan's work, I determined what additional SAS data the plaintiffs needed to obtain from Merck.  I also suggested many of the statistical analyses that Dr. Madigan ran and upon which he based his conclusions.  I also furnished him hundreds of documents and consulted with him on his methods and choice of endpoints.  I also edited and heavily revised his expert report, which was served on Merck in early October 2007 and on which he was scheduled to give a deposition in December 2007 (for which I spent considerable time preparing him) prior to testimony he was slated to give in New Jersey trials scheduled for January 2008.  Two of plaintiffs' most important experts in the Vioxx litigation, Drs. Jerry Avorn and Harlan Krumholz, highly commended the Madigan report. Dr. Avorn wrote: "His [Dr. Madigan's] review is far more detailed, more quantitatively sophisticated, and appears to be based on a more complete collection of trial data than I have seen before. . .  It is the most comprehensive depiction of their [Merck's] mis-statement and mis-interpretation of these data

2

that I have seen. . . Even people who think they know 'the whole Vioxx story' will be astonished at some of his analyses." Dr. Krumholz simply wrote: "Great job! Best report yet. By far."

13.     My common benefit work included many other tasks, including, but not limited to, drafting an extensive memorandum for the MDL Science Committee and several members of PSC firms recommending additional searches and analyses of Merck's clinical trials SAS databases; drafting extensive scientific analyses to be considered by expert witnesses (*e.g.,* the hypertension analyses in Dr. John Farquhar's report); coding trial exhibits for the *Humeston I* trial; providing potentially important documents to several members of the MDL on numerous subjects ranging from Merck's handling of hypertension and edema data from its studies comparing Vioxx with Celebrex to its premarket failure to apprise FDA of Dr. Garrett's FitzGerald's concerns that the differential effects of Vioxx on prostacyclin and thromboxane observed in Protocol 023 suggested that Vioxx may predispose individuals to increased cardiovascular risk; identifying FDA redactions of subpoenaed documents based on invocation of deliberative privilege that should considered for challenge; searching for and furnishing documents and suggested lines of inquiry to individuals first-chairing depositions (*e.g.,* Dr. Gregory Curfman's deposition); and serving on and attending a meeting in Philadelphia of the "Stroke Subcommittee".

**FURTHER AFFIANT SAYETH NOT.**

Daniel W. Sigelman

Subscribed and sworn to before me

this 7th day of November 2008.

Notary Public

My Commission Expires 12/14/08

3

**Vioxx Common Benefit Summary**

Formatted: Left:  72 pt, Right:  72 pt

## I.   Introduction

Shortly after the recall of Vioxx our law firm was retained by a number of clients to prosecute cases concerning Vioxx related heart attacks and strokes.  We were clearly not the first to enter the litigation, as a number of law firms had already been prosecuting cases prior to the recall. Our first task was to find out what discovery had already been completed, and how we could materially contribute to the common goal of amassing the evidence needed to prosecute these cases.  Our research indicated that significant and important work had already been done concerning Merck's historical knowledge of the dangers of Vioxx.  During the course of that research, it became evident that our greatest contribution to the litigation could be made through the discovery of the marketing and public relations activities of Merck in response to the historical information already procured by other plaintiffs' attorneys.  Accordingly, we charted a discovery plan to accomplish those goals. Thousands of hours of attorney, paralegal and law clerk time were devoted to developing this crucial evidence that had not been disclosed to or discovered by anyone in the litigation previously. This evidence was shared with and relied upon by both MDL and state court lawyers. Set forth herein is a short summary of the various projects that we worked on, most of which we initiated.

The specific time devoted to common benefit work is set forth in section **V. III** below.  While working both on common benefit and specific cases, for the most part the work responsibility within our office was divided by function.  For instance, Harry Roth  devoted the majority of his time to client specific tasks while Chris Placitella devoted his time almost exclusively to common benefit work. As set forth below, more than **3700  hours** of partner time and 1000 hours of  paralegal time were devoted to common benefit work.

Formatted: Font: Bold

Formatted: Font: Bold

## II.   Public Relations

It was clear from a review of the press releases issued by Merck that significant discovery needed to be done concerning Merck's public relations strategy and how they arrived at the public statements they made concerning Vioxx.  In this regard, we were able to contribute to the litigation by preparing for and taking crucial depositions as well as finding some of the critical documents exposing the Merck public relations strategy. The evidence included the strategy to "First, do no harm to Vioxx,", the Video News Releases, the Westrick letter to the FDA complaining about Pfizer , "The 2001 Profit Plan" and critical depositions. Specific projects are discussed below.

### IIA.   Public Relations Depositions & Document Review

We identified Jan Weiner & Mary Blake as key figures in constructing and carrying out the Merck public relations strategy. The preparation for these depositions involved an extensive document review as well as prior discovery taken in the case. The Weiner document review involved 29,356 documents and the Blake review 40,753 documents. While we did not read each and every page of every document, we  reviewed virtually all the relevant documents and we read thousands of documents in their entirety. The key documents were then summarized, categorized and incorporated into the Case Map database as well as Sanction and PowerPoint presentations. Upon completion of the extensive document reviews, we conducted the depositions of the Merck public relations executives Jan Weiner and Mary Elizabeth Blake, which fully exposed the Merck public relations fraud. The depositions took place over multiple days and were contentious to say the least. Eric Weinberg worked with me on these depositions. These depositions clearly demonstrated that Merck's strategy was to tell the world that despite its internal knowledge; Merck's message was that Vioxx "does not cause heart attacks".  This message, according to the depositions, was communicated in effect to every man, woman and child in the United States ten times over within a 12-month cycle.  Thereafter, these depositions were utilized in a number of trials as a cornerstone for demonstrating Merck's fraudulent conduct.

### IIB.   Video News Releases

Our initial research started with finding all of the video news releases generated by Merck that were available in the public sphere.  We searched both the Merck databases and hired an expert to locate additional information.  Upon reviewing those releases, we conducted extensive research to determine who was involved in their production and under what circumstances.  We eventually learned that the releases were produced by D.W.J. Associates in conjunction with Merck's in-house public relations department.  Thereafter, we subpoenaed all of the records of D.W.J. and were fortunate enough to be provided with some of the true gems discovered in the litigation, which gave immediate insight into the entire public relations strategy of Merck.  The D.W.J. production, included videotape and transcripts related to the production of the VNR's for Vioxx, as well as numerous other Merck drugs which took literally hundreds of hours to review and analyze.  Our request included outtakes and non-edited masters which provided further insight into Merck's manipulation of the risks of the drug.  After days of sifting through the videotape, it was clear that we had discovered crucial evidence. Thereafter, we hired media consultants to help extract the video and prepare multi media presentations for depositions and Court. This information was then used in numerous depositions and trials.

### IIC.   Loren Laine

The Loren Laine VNR related to the release prepared by Merck after the VIGOR study.  The video news release involved Merck's consultant and VIGOR study author, Loren Laine, who was asked by Merck to provide information to the general public that was clearly contrary to the actual medical evidence.  The very information contained in the VNR eventually released by Loren Laine on behalf of Merck contained information that Loren Laine himself called "totally bogus," as well as other unsupported fraudulent sound bites.  Other tape left on the cutting room floor also indicated that Loren Lane, along with the other Merck researchers were "purposely cagey" with the New England Journal of Medicine in relating the results of the VIGOR study.  The Merck database contained more than 32,000 records related to Loren Laine which needed refined searches and review necessary to obtain all of the background related to Loren Laine.

### IID.    Laura Demopoulos

The production of the video news release prepared by Merck in conjunction with Laura Demopoulos is equally revealing.  This release was produced in response to the anticipated article by Eric Topal concerning the health hazards associated with Vioxx.  The videotape left on the cutting room floor clearly depicts the process that the public relations arm of Merck went through in addressing issues that Merck knew would be a concern to the public.  The videotape demonstrates that Laura Demopoulos clearly disagreed with the approach taken by Merck in releasing the onslaught of their public relations campaign "standing behind the cardio vascular safety of Vioxx."  In the beginning of the news release production, Demopoulos was in fact complimentary of Topal and his efforts.  By the end, all complimentary comments were eliminated because the Merck lawyers would not approve.  Demopoulos also told Merck in the now well-known quote that everyone within Merck knew that one of the explanations for the VIGOR study was that "Vioxx caused heart attacks."  Although Demopoulos told Merck it would be wrong to stand behind the cardiovascular safety of Vioxx that was in fact the message eventually delivered by Demopoulos and all the other public relations material.  This videotape was used as key evidence in a number of trials.

Subsequent to discovering the Demopoulos VNR outtakes, extensive litigation ensued over the deposition of Laura Demopoulos and Merck's attempted hiring of an attorney for Demopoulos to shield discovery discussions between Merck and Demopoulos.  The Court ultimately decided not only in the case of Demopoulos, but for all cases, that Merck could not engage in this practice.  The deposition of Laura Demopoulos was subsequently taken over two days pursuant to Commissions which were opposed by Merck in the Philadelphia Court of Common Pleas.  Mark Lanier and Eric Weinberg participated in those depositions as well.

### III.  Marketing Practices

Discovery related to Merck's marketing practices took place over a two year period and included the review of hundreds of thousands of documents and multiple depositions. . The discovery sought was vigorously litigated by Merck and frequently required extensive briefing and court intervention. In order to accomplish this task, it was also necessary to first review all of the depositions taken in the litigation by others so that we would add to and not duplicate or contradict other work product. In addition to obtaining discovery directly from Merck, the discovery also involved third party discovery of companies that supported Merck in their marketing of Vioxx. This third party discovery was accomplished after succeeding through motion practice in over coming Merck's significant objections. Significant documents were uncovered and incorporated into a Case Map database and shared with other plaintiffs' counsel around the country. PowerPoint presentations were prepared that outlined the key documents and their significance in Merck's overall marketing and public relations schemes. This work product was shared with other plaintiffs' counsel taking an active role in prosecuting this litigation.

### IIIA.   Charlotte McKines

We identified Charlotte McKines as the person ultimately responsible for shaping the Merck marketing message for Vioxx. The Merck database contained more than 22,000 documents related to Charlotte McKines. McKines was the ultimate supervisor of the divisions responsible for "Be the Power," the development of the CV card and the training of the sales representatives. The deposition of Charlotte McKines was taken over the course of a number of days and required extensive research and preparation. Critical information and important admissions were procured during the course of her questioning.

### IIIB.   Wendy Dixon

We identified Wendy Dixon as a person with important knowledge concerning Merck's marketing practices. The scope, as well of the obtaining of the Dixon deposition was litigated before the Court. Dixon was the head of marketing for Vioxx in the United States. The Merck database contained more than 60,000 documents related to Wendy Dixon. , We spent weeks culling through this mass of documents reviewing all the relevant information and preparing for the deposition. The deposition of Dixon took place over several days and provided extensive information related to the marketing practices and justification by Merck for their message. This deposition was taken by us in conjunction with Sol Weiss, of the Anapol Schwartz firm and Eric Weinberg. According to Dixon, the entire justification for Merck's marketing practices surrounded the Alzheimer's trials which we now know clearly misrepresented the safety and risks of Vioxx to the public and the FDA.

### IIIC.   David Anstice

David Anstice was identified early on as a person with relevant knowledge that needed to be deposed. Anstice ultimately became a central figure in almost all the Merck trials.  While we did not take the lead in deposing Anstice (Sol Weiss was lead for New Jersey), we performed extensive research and preparation to support those depositions.  The Anstice project was really a group project, which Mark Lanier ultimately perfected in the various trials where he served as lead counsel.  The Merck database contained more than 15,000 documents related to Mr. Anstice.  We spent hundreds of  hours sifting through the database to review and identify the documents relevant to the deposition and most helpful for the interrogation.

### IIID.  Jo Jerman

We participated in this deposition, on behalf of New Jersey, which was originally noticed in the MDL.  Michael Papantonio took the lead, and I supported his efforts.  This deposition focused again on Merck's marketing practices and the training programs for Merck's sales people.

### IIIE.  CME Training Programs

We were advised by our marketing expert to investigate the programs that Merck was conducting for medical education.  We discovered these programs were not overt, but were conducted by stealth and they were being used to promote the Merck message concerning the safety of Vioxx. This research involved both a search of the Merck database and external research done in conjunction with our marketing expert.  Searches of the Merck database revealed more than 20,000 documents related to continuing medical education or CMEs.  We refined further searches to uncover the information significant evidence of this "under the radar" marketing by Merck. .

### IIIF.  Joanne Lahner and Privileged Information

Our research indicated that the in-house lawyer for Merck, Joanne Lahner, approved each and every public relations and marketing message of Merck.  It was our contention that the deposition of Joanne Lahner should be taken as a critical piece of evidence in the litigation.  This project was undertaken along with Anapol Schwartz, Eric Weinberg, David Buchanan and Motley Rice.  In support of our motion to allow her deposition, we created a video CD which was produced to the Court. The CD is so damaging that Merck asked that it be stricken from the record and not be distributed to any other plaintiff's counsel.  The CD contained deposition video clips and documents  which summarized  all the fraud evidence related to Ms. Lahner and that, contrary to Merck's assertion that she was its attorney that she served as the gate keeper for its public relations, marketing and scientific messages. The final CD was the product of hundreds of hours of work. This discovery dispute concerning Ms. Lahner involved extensive briefing and Court hearings.  The Court preliminarily denied this application pending the review of additional

materials which is still pending.  One closed hearing involved our cross examination of Ms. Lahner before Judge Higbee.  Although the Court has not ordered the deposition, we uncovered a vast amount of helpful information during our preparation and discovery process.  The Merck database contained more than 70,000 documents related to Ms. Lahner.  Many documents were withheld under assertion of privilege which is still being contested.  We at least cursorily reviewed almost all of the non privileged documents and we reviewed thousands of documents in their entirety and in detail.  As part of the process, we excerpted key portions of documents for final work product which were incorporated in motions, Power Points and a key document database.

### IIIG.  STI

During the discovery concerning the marketing case, we learned that Merck was ghost writing medical articles.  We then subpoenaed the records of STI Associates who were involved in arranging the ghost writing.  This is an ongoing project even to this day.  The Merck database also contained in excess of 60,000 related documents.  We spent extensive time refining our searches and reviewing relevant documents. Our right to review and distribute these documents was litigated by Merck. We ultimately prevailed in preventing Merck from claiming privilege over these documents.

### IIIH.  Ogilvy

Ogilvy is the public relations firm engaged by Merck in the marketing of Vioxx.  We subpoenaed Ogilvy's records and after litigating our right to obtain those records, secured them for the New Jersey litigation.  The review of the records was ultimately done in conjunction with the Motley Rice firm.

### III I.  Advertising Materials

We hired an outside consultant to assist us in securing all of the commercials related to Vioxx. We also spent weeks going through publications collecting all of Merck's print advertisements for Vioxx. Thereafter, we searched and reviewed the documents in the Merck database related to the commercials and advertisements. Once that process was complete, we created a timeline of all the advertisements and commercials and compared the warning information contained in that material to Merck's internal knowledge, doctor's letters, stand by statements and PDR's for Vioxx. Ultimately this information was incorporated into a PowerPoint that was used for depositions. This PowerPoint  was  distributed to other plaintiffs' counsel who were actively prosecuting the cases for their use during discovery and at trial. Some of this material was introduced into evidence in trials.

## IV. Lawyer Training

We assembled all of the marketing materials, medical articles and video clips of depositions of sales representatives (taken from Jerry Kristal) and put them into a CD for distribution for lawyers in the litigation who were going to conduct sales representative and doctor depositions. We organized multiple meetings to go over this information with the lawyers, and the information was used as part of the discovery process.  We prepared outlines for questioning as guides to assist these lawyers.   In addition to providing that material we spent several hours outlining the depositions of plaintiffs taken by Merck and provided other plaintiffs' lawyers with a list of areas of Merck's questioning to help lawyers prepare their clients for their depositions. We also worked with other lawyers to put together a compendium of medical literature and the evidence regarding Merck's marketing and public relations strategies as a tool for lawyers to use when meeting with their clients treating physicians to help overcome any barriers they would have to assisting plaintiff's lawyers.

## V.  Trial Assistance

During the New Jersey trials, we provided support to the litigation team by identifying relevant documents and extracting the page and line designations for the Merck liability case.  We also assisted in the deposition and the preparation of experts.

## VI. Experts

We were involved with the development, preparation and financing of the following experts: David Egilman, Jay H. Geller (FDA), Sander Greenland (epidemiologist), Michael Hoffman (ethicist), John Kostis (cardiologist), David Madigan (biostatistician), Anthony Altobelli (cardiologist), and Thomas Nesi (marketing and public relations).  This work involved hundreds of hours of work and research.  Most of the work was done in conjunction with other lawyers. The work related to Doctors Kostis, Geller, Madigan and Altobelli was extensive and spearheaded by Eric Weinberg   who took the lead for our firm.

## VII.  Information Exchange Website

Early on in the litigation it became obvious that we needed a vehicle to share information with other plaintiff's counsel around the country. As a result, we developed, financed and hosted vioxxplaintiffscounsel.com. The purpose of the website was to facilitate a free exchange of

information. Early in the litigation the website was accessed frequently by plaintiffs counsel to retrieve depositions, documents and medical articles.

## VIII  Cohen, Placitella & Roth Common Benefit Time Reports

As a matter of business practice, Cohen, Placitella & Roth has historically not kept time records while working on personal injury cases.  Accordingly we have reconstructed our time as permitted by order of the Court. We  maintain electronic or paper  records of the vast majority of our work product and calenders. In this regard, the record of our  office's extensive work on common benefit issues is captured in hard drive folders, hard copy documents, archived documents and in emails.  These materials are available for review if necessary. The  time entries in the attached exhibits are supported by  electronic records that reflect either the date the document is created, reviewed or incorporated into our databases. No doubt there is significant other time such as phone calls for which  there is no backup and thus are not submitted by us as common benefit time although clearly part of our common benefit work.  There is no question that there is significant time spent in consultation with many of the lawyers who were actively prosecuting these cases that were specifically related to the development of general litigation and trial strategies and settlement models that are not being submitted.  **Exhibit A** attached hereto  is the spread sheet summarizing the attorney and paralegal time as required by the Court. That record reflects **3789.85**  hours in attorney time and  **1192**  hours of paralegal time. **Exhibit B** are the daily reconstructed records for Chris Placitella. **Exhibit C** are the time records for other attorneys and paralegals.  **Exhibit D** is a record of expenses we believe that were incurred as part of our common benefit work.

## Conclusion

As is hopefully evident from the forgoing, we believe that we made a material and significant contribution to the prosecution of this litigation. We dedicated thousands of hours of partner time and firm resources along with other devoted and able counsel from around the country to bring this litigation to a successful conclusion and ask that our efforts be recognized and that we be fairly compensated for contributing to the common benefit of all personal injury litigants.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE:VIOXX PRODUCTS** | * | **MDL NO. 1657** |
| **LIABILITY LITIGATION** | * | |
| | * | |
| | * | **SECTION L** |
| | * | **JUDGE FALLON** |
| | * | |
| | * | **DIVISION 3, MAG. JUDGE** |
| | * | **KNOWLES** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PTO 6(D) AFFIDAVIT FOR
### JONES, SWANSON, HUDDELL & GARRISON, LLC
### (F/K/A JONES, VERRAS & FREIBERG, LLC)

**STATE OF LOUISIANA**
**PARISH OF ORLEANS**

      **BEFORE ME**, the undersigned Notary Public, personally came and appeared

### EBERHARD D. GARRISON

who after having been first duly sworn, did depose and say that:

      He is of the full age of majority and a resident of Jefferson Parish, Louisiana.

      Eberhard D. Garrison and Lynn E. Swanson, both named partners in Jones, Swanson,

Huddell & Garrison, LLC (f/k/a Jones, Verras & Freiberg, LLC), were members of the Science

Committee and the Discovery Committee beginning early in the Vioxx MDL, soon after the creation

of the Plaintiffs' Steering Committee in 2005.

      Additionally, both Eberhard D. Garrison and Lynn E. Swanson were members of numerous

subcommittees related to the Science and Discovery Committees including the following: Privilege

Log; Mechanism of Action/Pharmacology Defense Issues; Daubert - Expert Witness Development;

Medical Communications-Marketing, and; Scientific Research, Publications/Society Meetings. As

part of these efforts, both Lynn E. Swanson and Eberhard D. Garrison regularly participated in

conference calls with the PSC leadership wherein case strategy and planning were discussed.

Both Lynn E. Swanson and Eberhard D. Garrison, in addition to other firm attorneys, were involved with numerous projects related to the foregoing subcommittees including:

• reviewing and coding of documents at the document depository;

• working with Anthony Irpino on the Privilege Log Committee reviewing privilege log, reviewing and coding of documents, performing legal research, reviewing and summarizing depositions, and assisting with drafting motions and opposition memoranda;

• reviewing and coding science and journal articles;

• regularly attending meetings, hearings and status conferences;

• regularly participating in conference calls.

All of these efforts contributed to the Vioxx Settlement. For example, Jones, Swanson, Huddell & Garrison's regular and focused work with the privilege log subcommittee contributed to Merck's release of tens of thousands of documents which were previously withheld as privileged. Thereafter, Jones, Swanson, Huddell & Garrison reviewed and coded de-privileged documents.

Jones, Swanson, Huddell & Garrison's commitment to the Vioxx case began early with review of over four hundred (400) claims beginning in October 2004. Additionally, in October 2004, Jones, Swanson, Huddell & Garrison became counsel of record in *Mallet v. Merck and Company, Inc.*, Civil Action No. CV-02-2304, (U.S.D.C. W.D.L.A.), one of the first cases filed in Louisiana. In October 2007, just before the preliminary Vioxx Settlement was announced, Eberhard D. Garrison was working with Troy Rafferty in an effort to have the *Mallet* case presented in an MDL trial. A significant amount of effort previously went into working up the medical and causation aspects of the *Mallet* case in anticipation that it would be presented in an MDL trial. Ultimately, the *Mallet*

2

claim was enrolled in the Vioxx MDL Settlement.

Jones, Swanson, Huddell & Garrison expended over eight hundred (800) PSC-authorized common benefit hours of attorney time early in the case before any reasonable expectation of successful resolution of the Vioxx litigation. All of that time was contemporaneously recorded and submitted to lead counsel in accord with PTO 6 and the corresponding Vioxx MDL Time and Expense Guidelines. Jones, Swanson, Huddell & Garrison responded affirmatively to all requests for contribution, performing only PSC approved work while never receiving any complaints with regard to the timeliness or quality of the work.

The efforts of Jones, Swanson, Huddell & Garrison resulted in contribution to the common benefit of all Vioxx claimants, particularly in light of the fact that the aforementioned efforts were consistent, concentrated in and performed during early planning and strategic phases of the litigation.

EBERHARD D. GARRISON

SWORN TO AND SUBSCRIBED

BEFORE ME, NOTARY, THIS

6TH DAY OF NOVEMBER, 2008

NOTARY PUBLIC

PAUL H. VILLALOBOS
NOTARY PUBLIC
STATE OF LOUISIANA
My Commission is issued for Life
Bar Roll Number 22881

3

 KHORRAMI POLLARD & ABIR LLP

**ttorneys At Law**

Shawn Khorrami
Dylan Pollard
Danny Abir
Matt Bailey
Bahar Dejban
Nancy Gardner
Deborah Gutierrez
Becki Kammerling
James Kenna
Galorah Keshavarz
Scott Leviant
Louis Pacella
Mark Ravis
Sonia Tandon
Karen Travis
Annalissa Ward
*Of Counsel*
Payum Banafshe
Mikel Jones
David Mallen

October 30, 2008

***Via Federal Express Mail***

Plaintiffs' Liaison Counsel

Russ M. Herman, Esq.
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue,
New Orleans, LA 70113

> ***Re:   Application for and award of attorney's fees and costs incurred for common benefit work on Vioxx MDL 1657/ JCCP4247***

Dear Mr. Herman:

Enclosed please find the Khorrami Pollard & Abir, LLP submission to the Allocation Committee for common benefit work in the Vioxx Litigation.

Khorrami Pollard & Abir, LLP's request for compensation in the amount of $66,940.05 is supported by an affidavit from James M. Kenna, Esq, (attached as Exhibit A), true and correct copies of receipts and invoices substantiating litigation costs (attached as Exhibit B), and Certification of Senior Partner Dylan F. Pollard (attached as Exhibit C.)

Respectfully submitted,

James M. Kenna, Esq.

JMK/wb
Enclosure

FAC Resp. Exhibit B -- 2316

1
2
3
4
5

AFFIDAVIT OF JAMES M. KENNA, ESQ. IN SUPPORT OF APPLICATION FOR
COMMON BENEFIT AWARD FOR COMPENSABLE TIME SPENT BY
KHORRAMI POLLARD & ABIR, LLP ON VIOXX MDL 1657/JCCP 4247
RELATED WORK

6       1.      I, James M. Kenna, Esq., do hereby submit this affidavit to describe the
7   common benefit work performed by myself and my firm (Khorrami Pollard & Abir,
8   LLP).  While the work described herein was performed solely in the Judicial Council
9   Coordinated Proceeding in California (JCCP 4247), it was instrumental in moving the
10  Vioxx litigation closer to the settlement achieved by the Negotiating Plaintiffs' Counsel
11  and Merck on November 9, 2007.

12      2.      I personally have been involved in the Vioxx litigation for over six years
13  and filed some of the first personal injury cases in California in early 2002.  In June
14  2002, I petitioned the Judicial Council in California to coordinate the Vioxx litigation.
15  I was successful at oral argument in securing Los Angeles County as the venue over
16  defendant Merck's choice of Contra Costa County.  I was a member of the California
17  Plaintiff's Steering Committee and was actively involved with the Girardi | Keese law
18  firm, and later the Robinson Calcagnie & Robinson law firm in the organization of the
19  California proceeding.  As a member of the MDL Science Committee, I performed
20  numerous approved assignments including monitoring scientific conferences in
21  California, Utah, and Tennessee.  I performed extensive document review at the offices
22  of Robinson Calcagnie & Robinson in preparation for the MDL trial in 2006.  These
23  common benefit contributions will be compensated to my previous employer and are
24  not the subject of this submission.

25      3.      In May 2007, I accepted a position with Khorrami Pollard & Abir, LLP, to
26  work in their pharmaceutical division, and *exclusively* on the Vioxx litigation.  At that
27  time, Judge Victoria Chaney had set in motion procedures for trial selection for the
28  California JCCP.  I was contacted by liaison counsel (Girardi | Keese) and asked to

**AFFIDAVIT OF JAMES M. KENNA, ESQ. IN SUPPORT OF APPLICATION FOR COMMON BENEFIT AWARD FOR WORK PERFORMED BY KHORRAMI POLLARD & ABIR, LLP FOR COMPENSABLE TIME SPENT ON VIOXX MDL 1657/JCCP 4247 RELATED WORK**

FAC Resp. Exhibit B -- 2317

1    submit cases for trial selection.  I conducted an extensive analysis of the firm's
2    inventory which included reviewing medical and pharmacy records and researching and
3    consulting with potential experts.  The final list submitted as Plaintiffs' Designation of
4    Trial Cases contained four Khorrami Pollard & Abir, LLP clients, while the
5    Defendants' Designation of Trial cases contained an additional six, for a total of ten
6    Khorrami Pollard & Abir, LLP clients.

7         4.    On June 6, 2007, Defendants designated four cases for trial which
8    included two from liaison counsel (Girardi |Keese) and one from Khorrami Pollard &
9    Abir, LLP.[1]  As part of our preparation for trial, I met with our plaintiff to prepare him
10   for his deposition and trial testimony.  I met with his treating and prescribing doctors
11   and reviewed his extensive medical and pharmacy records.  I then consulted with our
12   expert, nurse consultant and other firm attorneys to develop a particular trial strategy
13   for this client.

14        5.    By the fall of 2007 there had been a number of verdicts that were adverse
15   to plaintiffs.  And even though other firms had dismissed their cases rather than
16   undergo the cost of preparation for trial in November 2007, this firm was committed to
17   trying our case in November 2007, as part of the overall strategy to keep pressure on
18   defendant Merck.    I was unaware of any negotiations between the PNC and Merck that
19   were taking place at this time, and I believed that the time I spent in preparing our case
20   for trial would ultimately benefit all plaintiffs (and counsel) involved in the Vioxx
21   litigation.

22        6.    The work collectively performed by my firm in the aforementioned areas
23   is itemized collectively in **EXHIBIT "A"** (which consists of certified copy of a
24   summary sheet plus itemized billing records for the four KPA lawyers who contributed
25   to this work: Partners Shawn Khorrami, Esq. and Dylan Pollard, Esq. and Senior
26   Associates James M. Kenna, Esq. and Nancy Gardner, Esq.) hereto and accounts for

27
28   [1] Plaintiff's counsel representing the fourth designated case immediately
     dismissed, leaving three set for trial starting November 26, 2007.

.P&A

ORRAMI POLLARD & ABIR LLP

1  128.25 hours of attorney time which translates to **$56,112.50** at KPA's 2007 billing

2  rates.

3        7.     Attached hereto as **EXHIBIT "B"** are true and correct copies of receipts

4  and invoices substantiating litigation costs totaling **$10,827.55**, for which KPA now

5  seeks reimbursement.

6        8.     Attached hereto as **EXHIBIT "C"** is the "Certification of Senior Partner

7  Dylan F. Pollard to KPA Billing Records and Summary Thereof" as is

8  suggested/required by Pretrial Order No. 6 when submitting fees for consideration to

9  the Allocation Committee.

10        Executed under penalty of perjury under the laws of the State of California, this

11  30th day of October, 2008.

12

13

14                            James M. Kenna, Esq., "Declarant"

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**AFFIDAVIT OF JAMES M. KENNA, ESQ. IN SUPPORT OF APPLICATION FOR COMMON
BENEFIT AWARD FOR WORK PERFORMED BY KHORRAMI POLLARD & ABIR, LLP FOR
COMPENSABLE TIME SPENT ON VIOXX MDL 1657/JCCP 4247 RELATED WORK**

FAC Resp. Exhibit B -- 2319

### Summary of Khorrami Pollard & Abir LLP

### COMPENSABLE TIME SPENT ON VIOXX MDL /JCCP 4247 RELATED COMMON BENEFIT WORK

| Attorney | Hours Expended | Rate | Total |
|---|---|---|---|
| Shawn Khorrami, Esq. | 10.5 hours | $600 | $6300.00 |
| Dylan Pollard, Esq. | 7.75 hours | $550 | $4262.50 |
| James Kenna, Esq | 79 Hours | $400 | $31,600.00 |
| Nancy Gardner, Esq. | 31 hours | $450 | $13,950.00 |
| Expenses as itemized below | | | $10,827.55 |
| **TOTAL HOURS** | **128.25 hours** | | $56,112.50 |
| **TOTAL TIME + EXPENSES** | | | $66,940.05 |

| Description of Expense (Dates) | Amount Expended |
|---|---|
| Airfare/Travel for Jim Kenna to San Jose, CA from LAX to consult with Joe Klapper, M.D. (8/31/07) | $268.80 |
| Retainer Fee for Joseph Lee Klapper, M.D. for consultation on Bryson Bellweather Trial Case | $5000.00 |
| Retainer/Invoice for Helen P. McDaniel R.N. for work performed on preparing Bryson Bellweather case for trial | $5378.75 |
| Misc. Travel expenses/mileage for client prep, expert prep, taxi | $180.00 |

## COMPENSABLE TIME SPENT ON VIOXX MDL /JCCP 4247 RELATED WORK

**Shawn Khorrami, Esq.**
**Khorrami, Pollard & Abir, LLP**
**444 South Flower Street, Ste. 3300**
**Los Angeles, CA 90071**

1.    **SELECTION OF POTENTIAL TRIAL CASES**

    a.    June 6, 2007 - Conference with James Kenna (JK) to discuss game plan for analysis of case inventory for selection of bellweather cases for trial; review of Bryson designation (D's 4th Supp Designation of Potential Trial Cases); Conference at Girardi|Keese re: bellweather trials.. . . .    **4.25 hrs**

    b.    June 8, 2007 - Conference with JK re: Selection of Bryson, et al., for trial; further vetting of case; draft/respond to multiple emails with co-counsel re: trial selection/preparation    **1.75 hrs**

    **SUBTOTAL:** . . .    **6.0 hrs**

2.    **PREPARATION OF ACTUAL TRIAL CASE IN JCCP 4247**

    a.    July 5, 2007–Review Nancy Gardner memo re: Klapper expert opinions    **1.0 hr**

    b .    July 20, 2007 - Conference with JK and Dylan Pollard (DP) re: case experts, medical records, trial plan, discovery . . .    **1.0 hr**

    c.    August 9, 2007 - Conference with JK and DP re clients preparedness for trial, meeting with client on 8/8/07, review detailed memorandum from JK re Client meeting . . .    **1.5 hr**

    d.    August 14, 2007--Review General Trial Deadlines Chart; Specific Memorandum Re: Bryson Trial Prep Prepared by JK; conference with DP re: same    **.75 hrs**

    e.    August 15, 2007–Multiple email correspondence with JK, Richard Kellner re: general causation    **.25 hrs**

    **SUBTOTAL:**    **4.5 hrs**

**TOTAL HRS (for SK):  10.5 hrs X $600.00/hr =$6300.00**

## COMPENSABLE TIME SPENT ON VIOXX MDL /JCCP 4247 RELATED WORK

**Dylan F. Pollard, Esq.**
**Khorrami, Pollard & Abir, LLP**
**444 South Flower Street, Ste. 3300**
**Los Angeles, CA 90071**

1.  SELECTION OF POTENTIAL TRIAL CASES
    a.  June 6, 2007 - Conference with James Kenna (JK) to discuss game plan
        for analysis of case inventory for selection of bellweather cases for trial.. .
        .                                                                      **1.25 hrs**
    b.  June 8, 2007 - Conference with JK re: Selection of Bryson, et al., for trial;
        further vetting of case                                             **1.0 hr**
                                                    **SUBTOTAL: . . .     2.25 hrs**

2.  PREPARATION OF ACTUAL TRIAL CASE IN JCCP 4247
    a.  July 5, 2007–Review Nancy Gardner memo re: Klapper
        expert opinions                                                     **1.0 hr**
    b.  July 20, 2007 - Conference with JK and Shawn Khorrami (SK) re: case
        experts, medical records, trial plan, discovery . . .              **1.0 hr**
    c.  August 9, 2007 - Conference with JK and SK re clients preparedness for
        trial, meeting with client on 8/8/07, review detailed memorandum from JK
        re Client meeting . . .                                             **1.5 hr**
    d.  August 14, 2007--Review General Trial Deadlines Chart; Specific
        Memorandum Re: Bryson Trial Prep Preparaed by JK                   **1.5 hrs**
    e.  August 15, 2007–Multiple email correspondence with JK, Richard Kellner
        re: general causation                                               **.5 hrs**
                                                    **SUBTOTAL:      5.5 hrs**

**TOTAL HRS (for DP):  7.75 hrs X $550.00/hr =$4262.50**

**COMPENSABLE TIME SPENT ON VIOXX MDL /JCCP 4247 RELATED WORK**
**James M. Kenna, Esq.**
**Khorrami, Pollard & Abir, LLP**
**444 South Flower Street, Ste. 3300**
**Los Angeles, CA 90071**

1. <u>SELECTION OF POTENTIAL TRIAL CASES</u>
   a. June 4, 2007 - At the request of liaison counsel (Girardi | Keese), conducted an analysis of our inventory to select trial cases for submission as part of Plaintiff's Fifth Designation of Potential Trial Cases. . . . **8 hrs**
   b. June 5, 2007 - Analysis of medical and pharmacy records of potential cases for trial - Brett Gipson, Betty Nulton, Carl Oehring, and Margo Smith. . . . . . . **8 hrs**
   c. June 6, 2007 - Researched potential experts to testify at trial; Conference with liaison counsel (Girardi | Keese) ) re same. . . . . **6.5 hrs**
   d. June 7, 2007 - Telephonic conferences with expert - Dr. Joseph Klapper - regarding selected trial cases, Gipson, Nulton, Oehring, and Smith... **2 hrs**
   e. June 8, 2007 - Conference with liaison counsel and submission of Gipson, Nulton, Oehring and Smith cases as part of Plaintiff's Fifth Designation of Potential Trial Cases. . . . . . . . . . . . . **1.5 hr**

   **SUBTOTAL: . . .26.00 hrs**

2. <u>PREPARATION OF ACTUAL TRIAL CASE IN JCCP 4247</u>
   a. June 6, 2007 - Review of defendants' filing - Fourth Supplemental Designation of Potential Trial Cases - which included this firm's case involving plaintiff Raymond Bryson; Conference with Dylan Pollard and Shawn Khorrami re same; Conference with liaison counsel (Girardi | Keese) re same. . . . . **2 hrs**
   b. June 8, 2007 - Placed requests for all pharmacy and medical records pertaining to trial case - Raymond Bryson; review case file **1 hr**
   c. July 18, 2007 - Review of medical records for trial case (Raymond Bryson) received from Scripps Clinic, Hemet Valley, Fallbrook Hospital, and Veterans Home of California in Yountville, CA. . . . . . **8 hrs**
   d. July 20, 2007 - Review of medical records for trial case (Raymond Bryson) received from prescribers and treaters - Dr. Mamring, Dr. Treister, Dr. Oslund and Dr. Brooks; Telephonic conference with expert Dr. Joseph Klapper re same; Conference with Dylan Pollard and Shawn Khorrami re same; Conference with liaison counsel (Girardi |Keese) re same. . . . **8 hrs**
   e. August 8, 2007 - Travel to/from client's residence in Fallbrook, California to do initial trial and deposition preparation . . . **8 hrs**
   f. August 9, 2007 - Conference with Dylan Pollard and Shawn Khorrami re clients preparedness for trial; Conference with liaison counsel (Girardi | Keese) re same; . . . **1 hr**

g.     August 15, 2007 - Telephonic conference with nurse consultant Helen McDaniel regarding issues related to plaintiff Raymond Bryson. . .   **1 hr**

g.     August 29, 2007 - Conference with attorney Nancy Gardner re causation issues related to Raymond Bryson; Review of medical records. . . .   **3 hrs**

h.     August 30, 2007 - Drove to prescribing doctor's residence (Manring) in Fallbrook, California to review client's medical history and records prior to prescriber's deposition, . . . .   **10 hrs**

i.     August 31, 2007 - Conference with liaison counsel re meeting with expert - Dr. Joseph Klapper; Telephonic conference with Dr. Klapper regarding Bryson case and setting up meeting. . .   **1 hr**

j.     September 3, 2007 - Conference call with nurse consultant Helen McDaniel re plaintiff Raymond Bryson's medical records. . . .   **1.5 hr**

j.     September 5, 2007 - Drive to LAX, flight to San Jose for meeting with liaison counsel(Jim O'Callahan of Girardi | Keese) and Dr. Joseph Klapper regarding Klapper's preparedness for trial. . . .   **<u>8.5 hrs</u>**

                                                                           **SUBTOTAL: 53.00 hrs**

**TOTAL HRS (for JMK):   79.00 hrs X $400.00/hr =$31,600.00**

## COMPENSABLE TIME SPENT ON VIOXX MDL/JCCP 4247 RELATED WORK

**Nancy L. Gardner, Esq.**
**Khorrami, Pollard & Abir**
**444 South Flower Street, 33rd Floor**
**Los Angeles, CA 90071**

1.     PREPARATION OF TRIAL CASE IN JCCP 4247

   A.     June 18, 2007 -Review medical records for trial
          case of Raymond Bryson from Scripps Clinic,
          Hemet Valley, Fallbrook Hospital and Veterans
          Home of California in Yountville, CA, in
          preparation for telephonic conference with
          cardiology expert Dr. Joseph Klapper re opinion as
          to specific causation

                                                                        8.0 hrs

   B.     June 19, 2007 - Review medical records for trial
          case of Raymond Bryson from prescribers and
          treaters from Dr. Manring, Dr. Treister, Dr. Oslund
          and Dr. Brooks in preparation for telephonic
          conference with cardiology expert Dr. Joseph
          Klapper re opinions as to specific causation

                                                                        8.0 hrs

   C.     June 20, 2007 - telephonic conference with Dr.
          Klapper re findings and opinions

                                                                        .75 hr

   D.     June 22, 2007- telephonic conference with Dr.
          Klapper re findings and opinons.

                                                                        .75 hr

   E.     June 25, 2007 - telephonic conference with Dr.
          Trapper re findings and opinions.

                                                                        .75 hr

   F.     July 2, 2007 - telephonic conference with Dr.
          Trapper re findings and opinions regarding
          specific Vioxx causation as to myocardial
          infarction suffered by Raymond Bryson

                                                                        1.0 hr

G.    July 2, 2007 - Draft of memorandum to Dylan Pollard, Shawn Khorrami regarding findings and opinions of retained cardiology expert, Dr. Joseph Klapper.

1.75 hrs

H.    Travel to residence of treating physician Dr. Manring in Fallbrook, CA to review client's medical history, care and treatment, prescribing patterns and opinions re Vioxx as causative agent in myocardial infarction suffered by client Bryson

<u>10 hrs</u>

**Subtotal:**    31 hrs.

**TOTAL FEES: 31 hours X 450.00/hr = $13,950.00**

KHORRAMI POLLARD & ABIR LLP
JV COSTS ACT
14550 HAYNES STREET, 3RD FLOOR
VAN NUYS, CALIFORNIA  91411
(818) 947-5111

WELLS FARGO BANK, N.A.
CALIFORNIA

2007

16-24/1220

6/15/2007

PAY TO THE
ORDER OF    Joseph Lee Klapper

$ **5,000.00

Five Thousand and 00/100***************************************************

DOLLARS

Joseph Lee Klapper

MEMO
Retainer

JP

⑆00 2007⑆ ⑉12 2000 247⑊ 688 58 546 19⑆

KHORRAMI POLLARD & ABIR LLP

2007

Joseph Lee Klapper

6/15/2007

per Jim's request

5,000.00



WF Khorr Poll & Abi   Retainer

5,000.00

KHORRAMI POLLARD & ABIR LLP

Joseph Lee Klapper

2007

per Jim's request

6/15/2007

5,000.00

WF Khorr Poll & Abi   Retainer

5,000.00

SFMS001NL-1

AFEGUARD

REORDER FROM YOUR LOCAL SAFEGUARD DISTRIBUTOR. IF UNKNOWN, CALL 800-523-2422

FAC Resp. Exhibit B -- 2327
GJPJD00020000   V07SF004118

Joseph Lee Klapper, MD
Cardiovascular Diseases
8631 West Third Street
Suite #1110-E
Los Angeles, California 90048
(310)289-5944
cell phone: (310)467-0412
info@stopheartattacks.com

Mailing address for records:
25381 Alicia Parkway
Suite G, #2
Laguna Hills, CA  92653

## FEE SCHEDULE:

## MEDICAL RECORDS REVIEW:
Review of medical records with subsequent consultation to discuss patient health, medical care, treatment history and appropriateness of care

Fee: $500.00/1st inch of medical records; $275.00/subsequent inch of medical records

## DEPOSITIONS:

### NON-VIDEOTAPED
$750.00/hr with 3 hour minimum

### VIDEO-TAPED
$1000.00/hour with 3 hour minimum

## COURT AND ARBITRATION FEES

½ day: $2500.00
1 day:  $4500.00

## CONSULTATIONS/CONFERENCES/DEPOSITION REVIEW

$375.00/hour

## RETAINER

$5000.00

Retainer agreement available under separate cover

*V/ørk*

**KHORRAMI POLLARD & ABIR LLP**
JV COSTS ACT
14550 HAYNES STREET, 3RD FLOOR
VAN NUYS, CALIFORNIA 91411
(818) 947-5111

WELLS FARGO BANK, N.A.
CALIFORNIA

2070

16-24/1220

10/12/2007

PAY TO THE
ORDER OF        Helen Mc Daniel                                    $  **5,378.75

Five Thousand Three Hundred Seventy-Eight and 75/100********************************************

Helen Mc Daniel, RN
129 Harvard Lane
Seal Beach, CA 90740

DOLLARS

MEMO
S/A dtd 10/4/07  Vioxx litigation - Bryson



⑈00 20 70⑈  ⑆1 2200 0 24 7⑆  688 58 54 6 19⑈

---

KHORRAMI POLLARD & ABIR LLP

Helen Mc Daniel                                                        2070

                    S/A dtd 10/4/07  Vioxx litigation - Bryson        10/12/2007
                    S/A dtd 10/4/07  Vioxx litigation - Bryson   kbk sh          2,689.38
                                                                                 2,689.37



WF Khorr Poll & Abir J   S/A dtd 10/4/07  Vioxx litigation - Bryson

                                                                                 5,378.75

KHORRAMI POLLARD & ABIR LLP

Helen Mc Daniel                                                        2070

                    S/A dtd 10/4/07  Vioxx litigation - Bryson        10/12/2007
                    S/A dtd 10/4/07  Vioxx litigation - Bryson   kbk sh          2,689.38
                                                                                 2,689.37

WF Khorr Poll & Abir J   S/A dtd 10/4/07  Vioxx litigation - Bryson

                                                                                 5,378.75

FROM :         PHONE NO. : 562 598 0035         Oct. 03 2007 10:21PM P2

Submitted on:
**9/20/2007 Revised 10/4/2007**

Helen P. McDaniel RN,LNCC,CNLCP,CNOR
Legal Nurse Consultant Certified
129 Harvard Lane
Seal Beach, CA 90740
Ph 562-598-9443
Fax. 562-598-0035

By Helen P Mc Daniel, RN

**Attorney/Client Name:**
Khorrami Pollard & Abir
**Case Number:**
(enter here)

**Case Name:**
Vioxx Litigation -BRYSON
**Rate/Hr:**
$125.00

| Activity | Date | Hours | Cost |
|---|---|---|---|
| Van Nuys Office Meet w/Attorneys & Travel | 7/9/07 | 2.00 | N/C |
| Indexing and Tabbing Medical Records | 9/2/07 | 1.75 | $218.75 |
| Inputting Data Chronologically, Analysis, Research | 9/3-9/4/07 | 9.50 | $1,187.50 |
| L.A. Meeting with N. Garner & LNC Renee | 9/5/07 | 1.50 | $187.50 |
| Inputting Data Chronologically, Analysis, Research | 9/6-9/19/07 | 30.00 | $3,750.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| Additional Expenses:
9/5/07 Parking | | | $35.00 |
| Less Retainer: (enter Below) | | | |
| | Totals: | | **$5,378.75** |

ORIGINAL DOCUMENT PRINTED ON CHEMICAL REACTIVE PAPER WITH MICROPRINTED BORDER

**KHORRAMI POLLARD & ABIR LLP**
**JV COSTS ACT**
14550 HAYNES STREET, 3RD FLOOR
VAN NUYS, CALIFORNIA 91411
(818) 947-5111

WELLS FARGO BANK, N.A.
CALIFORNIA

16-24/1220

2051

9/27/2007

PAY TO THE
ORDER OF      James Kenna

$  **180.00

One Hundred Eighty and 00/100**************************************************************************************DOLLARS

James Kenna

MEMO

reimbursement of expenses - Raymond Bryson/pati

⑈00205⑈ ⑆122000247⑆ 688585461⑈

KHORRAMI POLLARD & ABIR LLP

James Kenna                                                                    2051

|                                                    | 9/27/2007 |        |
| -------------------------------------------------- | --------- | ------ |
| 8/30  drive to Dr Manning -  client Raymond Bryson |           |        |
| 8/30  drive to Dr Manning -  client Raymond Bryson  - |        | 50.00  |
| 9/5  drive to airport for sanjose                  |           | 50.00  |
| 9/5  drive to airport for sanjose  - kbk sh        |           | 20.00  |
| 9/5  cab fare to airport                           |           | 20.00  |
| 9/5  cab fare to airport  - kbk sh                 |           | 20.00  |
| reimbursement of expenses - Raymond Bryson/pati    |           | 20.00  |

WF Khorr Poll & Abir J   reimbursement of expenses - Raymond Bryson/

180.00

KHORRAMI POLLARD & ABIR LLP

James Kenna                                                                    2051

|                                                    | 9/27/2007 |        |
| -------------------------------------------------- | --------- | ------ |
| 8/30  drive to Dr Manning -  client Raymond Bryson |           |        |
| 8/30  drive to Dr Manning -  client Raymond Bryson  - |        | 50.00  |
| 9/5  drive to airport for sanjose                  |           | 50.00  |
| 9/5  drive to airport for sanjose  - kbk sh        |           | 20.00  |
| 9/5  cab fare to airport                           |           | 20.00  |
| 9/5  cab fare to airport  - kbk sh                 |           | 20.00  |
| reimbursement of expenses - Raymond Bryson/pati    |           | 20.00  |

FAC Resp. Exhibit B -- 2331

WF Khorr Poll & Abir J   reimbursement of expenses - Raymond Bryson/

180.00

Prepared For
**FARSHID ABIR**
**KHORRAMI & ABIR**

Account Number
XXXX-XXXXX8-51001

Closing Date
09/30/07

Page 3 of 16

**e in Full continued**

Amount $

08/31/07    SOUTHWEST AIRLINES  DALLAS    TX                                              266.30
            SOUTHWEST AIRLINES
            From:               To:                    Carrier:      Class:
            LOS ANGELES CA      SAN JOSE CA            WN            Y
                                LOS ANGELES CA        WN            Y
            Ticket Number: 52623327998219             Date of Departure: 09/05
            Passenger Name: KENNA/JAMES
            Document Type: PASSENGER TICKET

                                                                                          236.30

## Certification of Senior Partner Dylan F. Pollard to KPA Billing Records and Summary Thereof

I, DYLAN POLLARD, declare:

      1.      I am an attorney licensed to practice law in the State of California. I am a partner at Khorrami Pollard & Abir LLP ("KAP"), Plaintiff's counsel for the Raymond Bryson matter (among many other active Vioxx cases). I have personal knowledge of the matters stated herein and if so called upon as a witness, could testify completely thereto.

      2.      This declaration is submitted in support of KPA's Application for and award of attorneys fees and costs incurred for common benefit work on the Vioxx MDL/JCCP 4247 matter.

## KPA'S ATTORNEYS FEES AND COSTS

      3.      I do hereby certify that the attached summary form (attached as **Exhibit A** to the Affidavit of James Kenna) , which is supported by the actual time records of the KPA attorneys involved in this matter is accurate and correct, and reflects an accounting of contemporaneously-kept time records.

      4.      The hourly rates charged by KPA, as set forth in KPA's Billing Summary are well with the range of rates deemed reasonable considering the complexity of the issues present in this action, KPA's experience in litigating such matters, and the standard rates charged by similar class action/mass tort firms within the State of California.  As set forth therein, the range of hourly KPA is seeking on this case for the 2007 is $550-$600 for senior partners Shawn Khorrami and Dylan Pollard, and $400-450 for senior associates James Kenna and Nancy Gardner.

      5.      As an initial point, KPA's hourly rates are commensurate with KPA's experience

in litigating class action/mass tort cases.  KPA has been lead and co-lead counsel in numerous class action cases, including the following which were successfully litigated on behalf of the respective classes:

- *Checkmate v. Yahoo*, Central District of California Case No. CV 05-4588 CAS (Hon. Christina A. Snyder) (nationwide class settlement in case alleging that defendant charged advertising clients for fraudulent pay-per-click internet advertising).

- *Hurtado v. TEG/LVI, Environmental Services Inc.*, LASC Case No. BC276468 (Hon. Carl J. West) (trail verdict on behalf of class for failure to pay prevailing wages; settlement on claims that defendant failed to pay employees prevailing wages, overtime, and rest breaks).

- *The Great Escape Promotion Cases*, California Superior Court, JCCP No. 4343 (Hon. Carl J. West) (Settlement of claims alleging that supermarket failed to honor promotion).

- *Ho v. Samsung*, Sacramento County Superior Court Case No. 03AS03429 (no trial court assigned) (settlement in case alleging that defendant failed to honor its consumer rebates).

- *Cornwell v. Platinum Auto Haus*, LASC Case No. BC318495 (Hon. Maureen Duffy-Lewis) (settlement on claims alleging that defendant overcharged consumers for State Auto Licensing fees and Smog testing).

- *Becker v. Bally Total Fitness*, LASC Case No. BC 277 804 (Hon. John P. Shook) (settlement of claims alleging that defendant overcharged members for health club contracts).

- *Dennis v. Travelocity*, LASC Case No. BC273172 (Hon. Victoria Chaney) (settlement of claims alleging that defendants failed to honor travel benefit promotion).

- *Cossey v. BCI Coca-Cola Bottling Co. of Los Angeles*, LASC Case No BC367978 (Hon. Anthony J. Mohr) (Class Settlement pending on claims alleging employer failed to pay overtime and meal and rest periods).

- *Lockette v. Ross Stores, Inc*, Northern District of California Case No. CV 03430 MMC (Hon. Maxine M. Chesney) (Settlement pending in nation-wide FLSA collective action case alleging claims for unpaid overtime based on misclassification of assistant managers as exempt).

6.    Moreover, the hourly rates billed by KPA in this action are commensurate with the hourly rates billed by other plaintiff firms that practice complex class and mass tort litigation in the State of California.

7.    In addition to professional time expended in this case for common benefit work, my firm incurred litigation costs in the prosecution of this common benefit time in the amount of $10,827.55.

I declare under penalty of perjury under the laws of the State of California and that the foregoing is true and correct. Executed this 30th Day of October, 2008.

Dated: October 30, 2008

DYLAN POLLARD, ESQ

```
-------------------------------------------------------------X
```
IN RE VIOXX PRODUCTS
LIABIILITY LITIGATION

THIS DOCUMENT RELATES TO ALL CASES

```
-------------------------------------------------------------X
```

MDL DOCKET NO. 1657

SECTION L

JUDGE FALLON

MAG. JUDGE KNOWLES

## AFFIDAVIT OF MICHAEL A. LONDON ON BEHALF OF
## DOUGLAS & LONDON, P.C.

STATE OF NEW YORK   }
                         s.s.:
COUNTY OF NEW YORK}

MICHAEL A. LONDON, being duly sworn, deposes and says:

1.      Pursuant to Pre-Trial Order No. 6(D) filed September 15, 2008, I submit this
affidavit to the Allocation Committee on behalf of my law firm, Douglas & London, P.C.
enclosing my firm's common benefit work (hours) and expenses for the Vioxx litigation and
describing those aspects of my firm's work which I believe best describes the firm's common
benefit contributions.

2.      With respect to the hours incurred by my firm, the common benefit work was
essentially handled by Michael Rabinowitz, Esq., and Virginia E. Anello, Esq. at separate times
(hours are attached).

3.      As it pertains to my hours, I unfortunately did not keep contemporaneous time
records.  While they could be reconstructed, I hope this is not necessary, because I am claiming a
mere 50 hours of common benefit work.  However, should I need to reconstruct them, I suspect the
number would be higher, given my involvement initially and as needed during conference calls,
meetings and other brainstorming sessions, as well as my involvement with our selected core
discovery plaintiffs whose depositions were taken and additional fact discovery performed.

4.      Nevertheless, as it pertains to the time for common benefit work performed by my
firm in this litigation, the attached chart (Exhibit A) sets forth the hourly time my firm, and each
responsible person, expended for common benefit work, as well as applicable hourly rates, with
loadstar application.

5.      My firm's common benefit expenses are $4,324.00.  I am attaching a spreadsheet
setting forth the proper allocation for these expenses. (Exhibit B).

6.      Accordingly, our common benefit attorney time is $77,500.00 and, as noted above,
our common benefit expenses and disbursements are $4,324.00; making the **total fee** that I am
seeking from the common benefit fund to be in the amount of **$81,824.00**

7.     This firm, through our common benefit work, has made a substantial contribution to the outcome of the litigation.  While our contribution was <u>not</u> as one of the leading firms which had the opportunity to try cases or which negotiated the final settlement, we worked on behalf of all plaintiffs, and, when requested, we did what was asked in our designated role.[1]

8.     Our firm has been actively committed to the Vioxx litigation since our first case was filed in New Jersey in 2004.  Indeed, since our first case was filed, we filed over 180 cases in New Jersey and federal court alone.  We have attended numerous conferences in New Jersey and assisted plaintiff's counsel each and every time additional funds were needed for things such as public relations efforts or reimbursement of expenses and other costs.  We have always answered the call and assisted members of the Vioxx team on whatever project we have been asked to participate in, no matter how mundane the project.   Such active commitment to the Vioxx litigation has caused us to turn away other potential litigations that we were interested in pursuing.

9.     Our firm was a member of the Vioxx discovery committee in both the MDL and in New Jersey.

10.     Among the various common benefit work which our firm performed for the Vioxx litigation was document review, fact discovery and depositions of designated and selected New Jersey cases. The document review assisted all parties involved in the litigation in securing the proof needed to hold Merck accountable for their actions. To this end, there were countless calls for firms to contribute people to assist in the review of Merck's millions of pages of documents and we responded accordingly.  The fact discovery and depositions which took place further demonstrated to Merck that viable cases still existed in which a jury could find them liable.  The ground work performed by our firm and many others helped pave the way for the trials and, ultimately, the settlement negotiations and, thus, the settlement of a majority of the claims against Merck.  While our work was such that we did not try a case or second seat a case, we did what we could and what was needed of us, and further, when asked to participate, we always stepped up.

11.     With respect to the New Jersey "core discovery" cases, our firm, which only had approximately 90 cases filed in New Jersey, was responsible for conducting discovery regarding 8 of those 90 cases.  This discovery entailed reviewing and submitting medical records, employment records, etc. to Merck for review and conducting depositions of plaintiffs, spouses, sales representatives, prescribing doctors, treating doctors, etc.  By answering the call and putting these cases forward, while many attorneys sat quiet, we showed Merck that there were many viable cases left to be tried.

12.     The quality of our work has never been questioned.  I have sat on Court-appointed Plaintiffs Steering Committees in seven prior national litigations because I have shown that the quality of the work out firm delivers is nothing short of excellent; and I have held specific higher leadership roles in two of those seven litigations.[2]  Please be advised, that your undersigned

---

[1] As noted below, my office has served as a leader in other litigations and was and remains responsible for trials and global settlement negotiations in other mass tort litigations, while others firms filled in with lesser roles.

[2] In Re Composix Kugel Hernia Repair Patch Litigation, MDL-1842; In Re Ortho Evra Products Liability Litigation, MDL-1742; In Re Zyprexa Products Liability Litigation, MDL-1596; In Re Imagitas, Inc. Drivers' Protection Privacy Act Litigation, MDL-1828; In Re Heparin Products Liability Litigation, MDL-1953; In Re Claims for Vaccine Injuries Resulting in Autism Spectrum Disorder or Similar Neurodevelopment Disorder v. Sec. HHS, U.S. Ct. of Fed. Claims; and In Re Bextra/Celebrex Products Liability Litigation, NY State Court.

FAC Resp. Exhibit B -- 2337

applied to sit on the Vioxx Litigation's Plaintiffs Steering Committee.   Unfortunately, said application was denied as were many, many others.

13.    In addition, the above activities performed by my firm involved time, labor and commitment which precluded myself as well as the attorneys in my firm from engaging in other forms of involvement in legal endeavors.

14.    I thank the Allocation Committee for its time and cooperation and please let me know if you have any further concerns with this submission.

MICHAEL A. LONDON

Sworn to before me this
3 (  day of October, 2008.

NOTARY PUBLIC

JOHN K. COYLE
Notary Public, State of New York
No. 01CO5046090
Qualified in Queens County
Commission Expires July 3, 2011

3

# EXHIBIT A

# VIOXX PRODUCTS LIABILITY LITIGATION REPORT OF MEMBER FIRM TIME

**Firm Name:**        Douglas & London, P.C.

| Name of Individual | Identify Position | Total Hours | Work Performed | Billable Rate | Total |
|---|---|---|---|---|---|
| Michael London, Esq. | Attorney | 50 | Conference Calls/Meetings | $ 500.00 | $ 25,000.00 |
| Michael Rabinowitz, Esq. | Attorney | 140 | Document Review | $ 250.00 | $ 35,000.00 |
| Virginia E. Anello, Esq. | Attorney | 70 | Depositions/Fact Discovery | $ 250.00 | $ 17,500.00 |
| **TOTAL** | | **260** | | | **$ 77,500.00** |

# EXHIBIT
# B

9:52 AM
10/31/08

## Douglas & London, P.C.

### Unbilled Costs by Job

#### All Transactions

Accrual Basis

## Vioxx Common Benefit

| Date | Source Name | | Account | Amount |
|---|---|---|---|---|
| 01/11/2008 | Virginia Anello Vender | VIOXX case travel 11/9/2007 | Travel | $ 18.75 |
| 01/11/2008 | Virginia Anello Vender | VIOXX case travel 12/05/2007 | Travel | $ 31.00 |
| 01/11/2008 | Virginia Anello Vender | VIOXX 12/5/2007 | Travel | $ 51.00 |
| 03/04/2005 | Michael Rabinowitz Vendor | Vioxx General | Travel & Meeting | $ 155.00 |
| 08/03/2005 | Michael Rabinowitz Vendor | Vioxx Case | Travel & Meeting | $ 28.00 |
| 08/03/2005 | Michael Rabinowitz Vendor | Vioxx Case | Travel & Meeting | $ 28.00 |
| 01/03/2005 | Credit Card Charges | US Airways | Travel & Meeting | $ 241.60 |
| 01/03/2005 | Credit Card Charges | US airways | Travel & Meeting | $ 241.60 |
| 01/03/2005 | Credit Card Charges | Fairmont Hotels | Travel & Meeting | $ 32.60 |
| 01/03/2005 | Credit Card Charges | Delta Air | Travel & Meeting | $ 243.10 |
| 01/03/2005 | Credit Card Charges | Red Cab of Worcester | Travel & Meeting | $ 100.00 |
| 01/03/2005 | Credit Card Charges | AMtrak INTER | Travel & Meeting | $ 150.00 |
| 03/02/2007 | Michael London | Vioxx cases expenses | Travel & Meeting | $ 35.00 |
| 06/12/2007 | Virginia Anello Vender | Reimbursements travel expenses | Travel & Meeting | $ 482.65 |
| 07/27/2007 | Virginia Anello | travel | Travel & Meeting | $ 31.00 |
| 10/17/2007 | Paul Lepe | 9/24/2007 | Travel & Meeting | $ 45.00 |
| 10/26/2007 | Paul Lepe Vendor | travel to NJ | Travel & Meeting | $ 55.00 |
| 11/15/2007 | Virginia Anello Vender | VIOXX Stttement seminar | Travel & Meeting | $ 99.00 |
| 11/16/2007 | Credit Card Charge | Travel | Travel & Meeting | $ 28.26 |
| 11/16/2007 | Credit Card Charge | Travel | Travel & Meeting | $ 168.21 |
| 11/20/2007 | Virginia Anello Vender | VIOXX case travel Philadelphia | Travel & Meeting | $ 406.00 |
| 11/20/2007 | Paul Lepe Vendor | 11/20 Vioxx Conference | Travel & Meeting | $ 14.00 |
| 12/04/2007 | Paul Lepe Vendor | travel | Travel & Meeting | $ 15.00 |
| 12/20/2007 | Virginia Anello Vender | VIOXX case travel | Travel & Meeting | $ 10.00 |
| 12/20/2007 | Virginia Anello Vender | VIOXX case travel | Travel & Meeting | $ 55.00 |
| 01/17/2008 | Credit Card Charge | travel | Travel & Meeting | $ 521.96 |
| 01/17/2008 | Credit Card Charge | travel | Travel & Meeting | $ 74.97 |
| 01/17/2008 | Credit Card Charge | travel 12/28/2007 | Travel & Meeting | $ 190.90 |
| 01/17/2008 | Virginia Anello Vender | 1/11/2008 | Travel & Meeting | $ 50.00 |
| 02/14/2008 | Credit Card Charge | Travel | Travel & Meeting | $ 336.00 |
| 02/14/2008 | Credit Card Charge | Travel | Travel & Meeting | $ 28.58 |
| 02/14/2008 | Credit Card Charge | Travel | Travel & Meeting | $ 36.38 |
| 04/14/2008 | Credit Card Charge | 3/15/2008 | Travel & Meeting | $ 189.98 |
| 05/09/2008 | Virginia Anello Vender | travel 5/1/2008 | Travel & Meeting | $ 60.00 |
| 07/02/2008 | Virginia Anello Vender | Travel & Meeting-Vioxx-7/1/2008 | Travel & Meeting | $ 13.46 |
| 07/11/2008 | Virginia Anello Vender | Travel & Meeting-Vioxx 7/2/2008 | Travel & Meeting | $ 57.00 |
| **Total Vioxx General Litigation** | | | | $ 4,324.00 |
| **TOTAL** | | | | $ 4,324.00 |

## Matthews & Associates'[1] Affidavit in Support of Common Benefit Award

In February of 2004, David P. Matthews and Jeb Wait, M.D. were the only personal injury lawyers to attend and give presentations at the FDA advisory committee meeting on Vioxx. Mr. Matthews and Dr. Wait argued for withdrawal of the drug and criminal penalties for Merck executives. However, the Vioxx related work by Matthews & Associates ("M&A") actually began more than eight months before the September 28, 2004 withdrawal.

On behalf of all Texas claimants, Matthews reached an agreement with Merck's counsel whereby cases filed in Texas state courts against Merck, alone, would not be removed to the federal system based on diversity jurisdiction. Cases filed per this agreement were consolidated for pre-trial purposes in the Texas Vioxx MDL. Pursuant to this agreement, M&A filed over 434 cases in state court in Texas.[2] Ultimately, approximately 902 cases were filed for pre-trial in the Texas MDL.

From the onset, Matthews took lead for the Texas Vioxx PSC. More than $543,733.00 of the M&A expenses are related to the creation and maintenance of Texas Plaintiffs' Document Depository. This searchable database, *inter alia*, includes all Merck production in the federal MDL and New Jersey litigation, and transcripts from most non-case specific depositions, making the M&A Texas Document Depository the most comprehensive collection of Merck documents in the nation.[3] M&A continually updated this depository and bore 100% of the expenses related to the database, including costs of document copies, deposition transcripts, staffing, technology, and hardware.

Upon formation of the Federal Vioxx MDL, David Matthews applied for appointment to the federal PSC.[4] Although not so appointed, Matthews actively participated in the Discovery and Science

---

[1]   Prior to January 1, 2007, David Matthews, Julie Rhoades, C. F. "Jeb" Wait, and Jason Webster were with Abraham, Watkins, Nichols, Sorrels, Matthews, and Friend. As of January 1, 2007, they and their staff moved to Matthews and Associates. Resumés for the attorneys are attached hereto as Exhibit A. For simplicity, the references herein to Matthews and Associates ("M&A") includes work performed by the attorneys and staff while with Abraham, Watkins.
[2]   Ultimately, through a network of referring attorneys and direct case intake, M&A evaluated more than 3312 claims, ultimately representing over 2300 Vioxx clients. In addition to their 434 Texas court cases, M&A filed approximately 1340 federal MDL cases and over 220 cases in New Jersey state court.
[3]   This depository was available to all attorneys involved in Vioxx cases in the Texas MDL and who signed the requisite confidentiality agreement.
[4]   A copy of Matthews PSC application is attached hereto.

FAC Resp. Exhibit B -- 2343

Committee matters of the Federal MDL. In connection therewith and in liaison with the Texas PSC, Matthews met and conferred with federal MDL lawyers on a frequent basis.

In connection with the Texas PSC and his responsibilities on behalf of the federal MDL Discovery and Science Committee, M&A retained[5] numerous experts, including epidemiologist Lemuel Moyé, neurologist Steve Levine, M.D., pharmacologist Laura Plunkett, epidemiologist Benedict Lucchesi, cardiologist and former Merck clinical trial investigator Miguel Zabalgortia, M.D., cardiologist Thomas Baldwin, M.D., and cardiologist Mark Entman, M.D. The M&A team worked extensively to prepare and, often, present these experts for depositions and, as necessary, defend their qualifications when challenged pursuant to *Daubert* and its spawn. M&A was the first to retain the services of Dr. Lynn Baker, Professor of Ethics, University of Texas and was instrumental in obtaining the testimony of former Merck salesperson and whistleblower Barbara DeBato.[6] On behalf of M&A, attorney and physician Jeb Wait reviewed all proposed Texas MDL trial cases and conferred with the Texas PSC to select the cases submitted by Plaintiffs for the Texas MDL trial docket.[7]

Two mock trials were conducted in Houston by M&A and Beasley Allen. M&A facilities and personnel, including attorneys Matthews and Webster, were intricately involved in both mock trials and M&A absorbed expenses related thereto. After Judge Fallon's court and New Orleans was devastated by hurricane, the first federal MDL Vioxx trial, *Plunkett v. Merck*, was held in Houston. M&A's offices hosted and provided staff support for the Beasley Allen trial team and the other PSC attorneys. M&A attorneys Matthews and Webster participated in this first MDL trial, cross examining experts and presenting *Plunkett* family members.

The M&A team, particularly David Matthews and Julie Rhoades, retained, prepared, and presented the necessary FDA experts[8] and prepared the responses to related *Daubert* challenges and the

---

[5]   "Retention of experts" includes payment of retainers, as required by most experts.

[6]   M&A client Barbara Debato was actually the Merck sales representative for the prescribing physician in the case tried by Girardi Keese in California. In connection therewith, Rhoades presented her for deposition, Matthews prepared her for trial and the firm flew her to California to testify at trial.

[7]   Most of the cases (myocardial infarction and stroke) submitted as trial cases by the Texas PSC were M&A cases.

[8]   James Morrison and John Guerigian were both retained as experts, prepared affidavits, and gave deposition testimony in connection with the FDA pre-emption and Texas FDA presumption statute motions filed by Merck in the Texas MDL.

FAC Resp. Exhibit B -- 2344

FDA Presumption / Pre-emption Motion for Summary Judgment filed in the Texas MDL. In addition, the firm had retained the services of appellate counsel from the onset. Following the adverse preemption/presumption ruling by the Texas MDL court, M&A appealed the ruling to prevent finality, which could have affected the value of claims by ALL Texas claimants, regardless of jurisdiction or counsel.

M&A also continued to push cases in the New Jersey litigation, where the firm had over 200 cases on file. In connection therewith, M&A worked with Seeger Weiss to depose treaters and Merck detailers and with presenting plaintiffs. Likewise, M&A assisted Paul Sizemore and Tom Girardi with their Vioxx trial in California.[9]

As indicated above and by the submitted time and expense records, M&A attorneys David Matthews and Jason Webster, and their staff devoted at least eighty to ninety percent of their time for four years to Vioxx litigation. Julie Rhoades' involvement increased to a similar level during the last year and a half. This involvement required these attorneys to decline other opportunities, such as individual personal injury cases and cases involving other drugs or devices (including Paxil, Ortho Evra, billary stents, Smith and Nephew knees, and Fentanyl patch).

The attached Exhibit B details the cases that were prepared for trial by M&A.

The foregoing is upon my oath and true and correct, as are all Exhibits.

David P. Matthews
Partner, Matthews & Associates

Signed and sworn before me on the 31st day of October, 2008.

CANDACE A. CAPILONGO
Notary Public, State of Texas
My Commission Expires
January 18, 2012

Notary Public in and for the
State of Texas

---

[9]   M&A prepared the former Merck detailer, an M&A client, for trial flew her to California to testify.

 LexisNexis®

Print   Close Window

## Matthews & Associates

 M&A Matthews & Associates

**Matthews & Associates** [in]
**Houston, Texas Office**
View all offices

2905 Sackett Street
Houston, Texas  77098
(Ft. Bend, Harris & Montgomery Cos.)

Telephone: 713-222-8080
Toll Free: 888-222-7052
Fax: 713-535-7184
URL: http://www.matthewsandassociateslawfirm.com
http://www.thematthewslawfirm.com

**Office Hours:**
Monday: 08:30 AM-05:00 PM
Tuesday: 08:30 AM-05:00 PM
Wednesday: 08:30 AM-05:00 PM
Thursday: 08:30 AM-05:00 PM
Friday: 08:30 AM-05:00 PM
Saturday: 08:30 AM-05:00 PM
Sunday: 08:30 AM-05:00 PM

**Visibility Ranking [i]**
**#125** out of 3,066 law firms in **Houston, Texas**
**#10,170** out of 193,091 **law firms**

### About this office:

Founded by David P. Matthews, a former partner in one of the oldest plaintiff's firms in Texas, Matthews & Associates is a personal injury firm of trial lawyers as well as researchers, investigators, consultants and an of counsel licensed physician. All specialize in standing up for people harmed by negligence, greed or incompetence. With more than 70 years of combined legal experience, we have represented injured victims in most of the 50 states and Puerto Rico.

A nationally-recognized personal injury firm, our attorneys have recovered hundreds of millions of dollars for our injured clients. Our personal injury lawyers have represented clients who have suffered serious and catastrophic injuries or death due to harmful drugs; defective medical devices and medical products; work accidents; truck accidents; motor vehicle, pedestrian, bicycle, aviation and construction accidents; premises liability; medical malpractice; other accident and toxic tort cases including but not limited to mesothelioma related to asbestos exposure; electrocutions; chemical release; explosions; petrochemical accidents; dangerous highways; birth injuries; rape, sexual molestation, nursing home abuse, and abuse by clergy.

View the People at this office

🔅 **Bar Register Practice Areas:**   Learn More about the Bar Register

Personal Injury                                    Premises Liability
Product Liability Law

### Statement of Practice Summary:

General Civil Practice, Trial Practice in many State and Federal Courts, Personal Injury, Products Liability, Medical Malpractice, and Wrongful Death.

**Year Established:** 2007


PLAINTIFF'S
EXHIBIT
A

FAC Resp. Exhibit B - 2346
8/25/2008

# DAVID P.  MATTHEWS
**Matthews & Associates**
**2905 Sackett**
**Houston, Texas 77098**

**ADMISSIONS:**

| | |
|---|---|
| State Bar of Texas | 1988 |
| State Bar of Mississippi | 2004 |
| State Bar of New York | 2004 |
| U.S. District Court, Southern District of Texas | 1990 |
| U.S. District Court, Northern District of Texas | 1993 |
| U.S. District Court, Eastern District of Texas | 1996 |
| U.S. District Court, Western District of Texas | 1998 |
| U. S. Court of Appeals, 5th Circuit | 1990 |

**CERTIFICATIONS:**

Board Certified,  Personal Injury Trial Law
Texas Board of Legal Specialization

**HONORS and AWARDS:**

Texas Super Lawyer

**FIRM AFFILIATIONS:**

| | |
|---|---|
| Matthews & Associates | January 1, 2007 - present |
| Abraham, Watkins, Nichols, Sorrels, Matthews & Friend | |
|     Associate & Partner | 1990 - 2006 |

**PROFESSIONAL ASSOCIATIONS & MEMBERSHIPS:**

American Board of Trial Lawyers (ABOTA)
American Bar Association
American Association for Justice
Houston Bar Association
Houston Trial Lawyers Association
Mississippi Bar Association
National Board of Trial Advocacy
New York Bar Association
State Bar of Texas
Texas Bar Foundation
Texas Trial Lawyers Association, Board of Directors
United States Court of Federal Claims Bar Association

**EDUCATION:**

| | |
|---|---|
| J.D., South Texas College of Law, Houston, Texas | 1988 |

    Honors:
    Recipient, American Jurisprudence Awards: Property, Civil Procedure
    Law Review, South Texas College of Law, Assistant Editor, 1988
    Law Review, South Texas College of Law, Comment Editor

| | |
|---|---|
| B.A., University of Wisconsin at Madison | 1984 |

## JULIE L. RHOADES

Matthews & Associates
2905 Sackett
Houston, Texas 77098
Direct dial:  713-535-7172; Facsimile:  713-535-7184
jrhoades@thematthewslawfirm.com

**ADMISSIONS:**

State Bar of Texas, November 1988
State Bar of New York, 2006
United States Court of Appeals, Fifth Circuit
United States District Court: Southern, Eastern, Western and Northern Districts of Texas

**EMPLOYMENT:**

*Matthews & Associates*
Senior Associate - January 1, 2007 to present
Preparation of personal injury cases for trial and of appellate briefs and arguments, responsible for supervision of other associates.  Focus:  pharmaceutical product liability (including Avandia, Baycol, Fen-phen, Gadolinium, Seroquel, Trasylol, Vioxx, and Zyprexa).

*Abraham, Watkins, Nichols, Sorrels, Matthews & Friend*
Associate - February 1, 1999 to December 31, 2006
Preparation of personal injury and commercial cases for trial, including briefing and trial work for Vioxx, Rezulin, Baycol, PPA, Ephedra, Serzone, Seroquel, and Zyprexa, and attorney-in-charge of 2400 fen-phen lawsuits in various jurisdictions.  Publications:  *HMO Liability*, 15th Annual Advanced Personal Injury Law Course, State Bar of Texas, 1999, by Randall O. Sorrels, Julie L. Rhoades, and Mark T. Murry.

*Self-employed Contract Attorney - August 1, 1997 to February 1, 1999*
Retained for contract work, as needed, primarily by Andrews & Kurth (toxic tort defense) and Abraham, Watkins, Nichols, Sorrels, Matthews & Friend (personal injury and commercial litigation).

*Royston, Rayzor, Vickery & Williams, L.L.P.*
Contract Attorney - June 14, 1996 to June 30, 1997
Retained to close docket of medical malpractice (nursing home) cases after partner-in-charge left firm.  Subsequent coordination and supervision of written discovery and depositions for 840 plaintiff toxic exposure case.

*Butler & Binion, L.L.P.*
Associate, Tort Litigation Section - September 1, 1989 to June 15, 1995
Preparation and trial of personal injury lawsuits, with an emphasis on the medical malpractice, product liability, asbestos toxic tort actions, and "bad faith" insurance.  Authored and assisted with preparation of coverage opinions and appellate briefs.  Oral arguments before Texas State

Courts, Texas Courts of Appeals, United States District Courts, and United States Court of Appeals for the Fifth Circuit.

### Court of Appeals for the Fifth District of Texas at Dallas
Briefing Attorney - September 1, 1988 to August 31, 1989
Assigned to Sr. Assoc. Justice Bill Stephens and Assoc. Justice Joe Bill Burnett.

## MEMBERSHIPS:

State Bar of Texas
New York State Bar Association
Federal Bar Association (FBA)
American Association for Justice (AAJ)
Texas Trial Lawyers Association (TTLA)
Houston Trial Lawyers Association (HTLA)
Houston Bar Association (HBA)
Association of Women Attorneys (AWA)
Former member:  Greater Houston Society of Health Risk Managers (GHSHRM)

## EDUCATION:

### South Texas College of Law
Doctor of Jurisprudence, *cum laude*; May 1988
Rank:  17/175 (top 10 percent)
Lead Articles Editor, *South Texas Law Review*
Am. Jur. Awards:  Torts I, Property II, Marital Property, Law Office Technology, Western Legal Tradition (jurisprudence)
STCL Dean's List (5 semesters)
Order of Lytae Honor Society

### Southwest Texas State University, San Marcos
Bachelor of Arts, Political Science (3.2 GPA); August 1983
Graduate study, Public Administration (4.0 GPA); May - December 1983
Delta Zeta Sorority
Sigma Nu Fraternity Sweetheart, 1983

**Curriculum Vitae**

**C.F. JEB WAIT, M.D., J.D.**

Business Address: 2905 Sackett St.
Houston, Texas 770098
Business Phone:   (713) 222-8080; Facsimile: (713)535-7184

# EDUCATION

College:            Texas A&M University, College Station, Texas
1977-1981
Bachelor of Art:  Cum Laude, May 9, 1981
Major: Biology; Minors: Chemistry, Psychology

Medical School:     Baylor College of Medicine, Houston, Texas
1981-1984
Doctor of Medicine:   November 16, 1984

Internship:         Transitional Internship through Baylor College of Medicine
Affiliated Hospitals: Ben Taub General Hospital,
Jefferson Davis Hospital, The Methodist Hospital
June 1985 to June 1986

Law School:         South Texas College of Law, 1987-1990
Juris Doctor:   May 5, 1990

Mediation Training:  A.A. White Dispute Resolution Institute,
Houston, Texas
Spring, 1991
Attorney-Mediators Institute, Dallas, Texas, 1991

**LICENSURE**:       Texas Medical License, 1985
Texas State Bar, 1990
West Virginia State Bar, 2005
United States District Court, Southern District of Texas

FAC Resp. Exhibit B -- 2350

# JASON CHARLES WEBSTER

1678 Kelliwood Oaks
Katy, TX 77450
713-409-6464
jwebster@thematthewslawfirm.com

## LEGAL EMPLOYMENT

**01/2007 – present**
**MATTHEWS & ASSOCIATES**
· Attorney handling pharmaceutical litigation files all over the continental United States thru time of trial.
· Pre-trial and trial experience in all types of general tort cases.
· Numerous depositions, hearings, and mediations in State and Federal court in both Texas and Mississippi.
· Responsible for complete trial docket.
· Nine years experience in handling pharmaceutical cases which accounts for eighty percent of the docket.
· Trial work completed for the following MDLs: PPA, Fen Phen, Rezulin, Baycol, Guidant, Medtronic, Vioxx, Zyprexa, Seroquel and Gadolinium.

**11/2001 – 01/2007**
**ABRAHAM, WATKINS, NICHOLS, SORRELS, MATTHEWS & FRIEND**
· Attorney handling pharmaceutical litigation files all over the continental United States thru time of trial.
· Pre-trial and trial experience in all types of general tort cases.
· Numerous depositions, hearings, and mediations in State and Federal court in both Texas and Mississippi.

**12/2000 – 11/2001**
**WHEAT, FOLGER & OPPERMAN (FORMALLY KILLEEN & WHEAT, P.L.C.)**
· Law clerk assisting in all types of insurance defense and commercial litigation.
· Large concentration of cases in maritime defense.

**9/2000 – 12/2000**
**BROWN SIMS, P.C.**
· Law clerk maritime and commercial litigation.

**9/1999 – 8/2000**
**ABRAHAM, WATKINS, NICHOLS, SORRELS, MATTHEWS & FRIEND**
· Law clerk to Richard J. Plezia – assisted in client interviews, depositions and trial in all types of personal injury.
· Responsible for all discovery, pleadings, and pretrial motions.

**5/1997 – 8/1997**
**DALLAS DISTRICT ATTORNEY'S OFFICE**
· Assistant Investigator during summer clerkship.
· Responsible for calling witnesses, jury background checks, and preparing dockets for trial.

## EDUCATIONAL BACKGROUND

**Licensed to practice in the following Jurisdictions**: Southern, Eastern and Western Districts of Texas,
5TH Circuit Court of Appeals, Northern and Southern Districts of Mississippi, All Chancery and Circuit

Courts of Mississippi, United States Court of Federal Claims and admitted pro hac vice in at least six other states. Graduate of TTLA's Trial Advocacy College.

## SOUTH TEXAS COLLEGE OF LAW
Class Rank:   Top 25% - Dean's List
              Competed in both Moot Court and Mock trial competitions.

## SAM HOUSTON STATE UNIVERSITY
Degree in Bachelor of Arts in Criminal Justice
GPA: overall 3.35/4.0
Graduated Fall 1997

**Honors:**      Dean's List, National Criminal Justice Honor Society

**Activities:**  2 years of Football at Tarleton State University
                 Member Lambda Alpha Epsilon Criminal Justice Fraternity

## MEMBERSHIPS
Texas Trial Lawyers Association
Association of Trial Lawyers of America
Houston Bar Association
American  Bar Association
National Rifle Association
American Civil Liberties Union
State Bar of Texas
State Bar of Mississippi
United State District Courts for the Southern, Northern, and Eastern Districts of Texas
United State District Courts for the Southern District of Mississippi
U.S. 5th Circuit Court of Appeals

## CIVIL TRIALS (first chair)

Cause No. 2001-43908, *Harrell et. al. v. Harris County et. al .,* In the 80th Judicial District Court of Harris County, Texas. Defense verdict, City of Houston Defense lawyer.  Auto Accident regarding 3 inmates.
Judge Carolyn Johnson

Cause No. 97V-103, *Cliff Jones v. Carl Wayne Herin,* In the 155th Judicial District Court of Austin County, Texas. Plaintiff verdict in the amount of medicals.  Road Rage case.
Judge Beck

Cause No. 797,620; *Thomas B. "Tody" Dupont vs. Javier Lugo*; In the County Civil Court at Law No. One (1) of Harris County, Texas, Plaintiff's verdict in the amount of 13,790.00, contested liability, James (Jim) Ebanks, Ebanks, Smith and Carlson Defense Attorneys. Auto Wreck case.
Judge "Cactus Jack" Cagle

Campbell v. Healthsouth Rehabilitation

CAUSE NO. E-0170948; *Irene Salas, individually and as representative of the Estate of Aurilano Salas (deceased), et al. v. Christus St. Mary Hospital a/k/a Christus Health Southeast Texas, et al.*; In the 172nd Jefferson County, Texas

Cause No. 2004-02285; *Jane Doe vs. Simon Property Group Texas, L.P., Simon Property Group Delaware, Inc.; Simon Property Group Administrative Services Partnership, L.P., and IPC International Corporation*; In the 151st District Court of Harris County, Texas

## BENCH TRIALS

Cause No. CV42C5010833 L  *Lakesha Hays v. Alisa Franklin* In the Justice of the Peace Court Precinct 4, Place 2 Harris County Texas.  Plaintiff Verdict on a breach of contract case.

Cause No. 2004-39829; *In the Matter of the Marriage of Marisol Medina and Oscar R. Medina, and in the Interest of Jazmine Marissa Medina and Juliette Anabel Medina, Children*; In the 247th Judicial District Court of Harris County, Texas.  Child custody dispute in which the Judge awarded custody to my client and child support for the same.

Cause No. CAUSE NO. 07-06-06423-CV; *Jessica McAdams, Individually and On Behalf of Charles L. McAdams, Minor vs. Little Angels Playhouse, Pat Morales and Richard Morales*; County Court No. 2, Montgomery County, Texas

EXHIBIT B

Matthews & Associates (formerly part of Abraham, Watkins, Nichols, Sorrels, Matthews & Friend) had numerous trial settings in the Texas MDL Court prior to Judge Wilson's preemption ruling, including a case pending in the Choctaw Tribal Nation for Plaintiff Elvis Anderson.

A summary of those cases is as follows:

1.      Elvis Anderson – Trial date was scheduled for August 7, 2006.  Numerous depositions were taken in this stroke case which was the first one to be worked up in the country.    Plaintiff's Counsel retained Steven Levine and several other experts in preparation for this case and many of which were deposed.      The deposition of Dr. Stephen Levine, Nathaniel Fentress, Dr. Ruth Fredericks, Dr. Ushchmann, Dr. Moye, Dr. Glandville, Dr. Victoria Guevarra, Dr. Joshi, Dr. John Keith, Dr. William Rock, Bill Brister, Dr. Laura Plunkett, Linda Fulton, Shelia Uithoeven, Jeumane Rush, Nancy Melton, and Tonya Anderson were taken in this case.  Numerous oral arguments and telephone conferences with the Tribal Judge were taken and including arguments regarding a Motion to Dismiss for jurisdictional purposes.  Extensive hours went into the discovery, preparation and scientific efforts with respect to this case especially since it was the first stroke case set for trial in the Country.

The following cases were set for trial at the following times in the Texas Vioxx MDL.  All of these cases were set for trial which were the cases held by the law firm of Matthews & Associates for trial in this matter:



PLAINTIFF'S
EXHIBIT
B

1.     Eura Fowler

2.     Herlinda Melindez

3.     James Miller

4.     Sharon Rigby

5.     Nancy Springfield

6.     Ruby Ledbetter

7.     Russell Accord

All of the above cases were thoroughly worked up with all Plaintiffs, fact witnesses, treating physicians, and experts deposed for trial. Each one of these cases was worked up fully prior to Judge Randy Wilson's dismissing the case based on preemption.

The first case set in the Texas Vioxx MDL was Plaintiff James Miller represented by Matthews & Associates. Mr. Miller's case was completely worked up including discovery, pleadings, expert designations, exhibit lists, motions in limine, and the depositions of Plaintiff, Plaintiff's wife, Plaintiff's parents, Sales Representative of Martin Gordon and Melea Horton, Dr. Thomas Baldwin, Dr. Tom Mayor, Dr. Eric Price, Dr. Laura Plunkett, Dr. Moye, Dr. Angelica Frias, and Dr. Susan Rosin. Plaintiffs were ready to proceed to trial when it was time then Judge Randy Wilson granted Summary Judgment due to a bankruptcy technicality in the following case. The case was then appealed to the Texas 14th Court of Appeals and was pending at the time of settlement.

Sharon Rigby's trial was set for trial in November 8, 2006. Mrs. Rigby's case was completely worked up including discovery, pleadings, expert designations, exhibit lists, motions in limine, and the depositions of Dr. Wellborne, Dr. Sid Acharya, Paul Rigby,

2

Dr. John Stafford, Crissy Morris, Dr. Elizabeth Davis, Dr. Paul Waymack, Dr. Robert Ferrell, Dr. Mark Entman, Dr. Theresa Vicroy, Dr. Thomas Baldwin, Sales Representative Molly Whisenant and Lisa Daniels. Just before that time, Ms. Rigby had an anxiety break down and could not proceed. Therefore, the case was continued.

Herlinda Melendez's trial was set for March 20, 2006 and then for May 22, 2006. Mrs. Melendez's case was completely worked up including discovery, pleadings, expert designations, exhibit lists, motions in limine, and the depositions of Dr. Mirza Biag, Dr. Mobeen Mazhar, Dr. Sarah Svoboda, Dr. A.J. Haddock, and Dr. Hubert Smith. Based on the no fault of counsel on either side, the Judge reset the cases in May 2006 for trial allowing Ruby Ledbetter to go first. After depositions were taken in the matter, pretrial began in front of Judge Randy Wilson but then was discarded as a potential trial case.

Sandy Kelly's trial was set for March 20, 2006. Mrs. Kelly's case was completely worked up including discovery, pleadings, expert designations, exhibit lists, motions in limine, and the depositions of Dr. Weldon Butler and Dr. Shanti Neerukonda. Based on the no fault of counsel on either side, the Judge reset the cases in May 2006 for trial. After depositions were taken in the matter, pretrial began in front of Judge Randy Wilson but then was discarded as a potential trial case.

Nancy Springfield was sent for trial on March 20, 2006 and then May 22, 2006. Mrs. Springfield's case was completely worked up including discovery, pleadings, expert designations, exhibit lists, motions in limine, and the depositions of Dr. Curtis Catrell, Dr. Jeffrey Carr, Dr. A.J. Haddock, Dr. Don O'Neal, Dr. Shakiq Khalid, Dr. Randy Randell, Dr. Scott Wright, and Barbara Faulkner, PA. Based on the no fault of counsel

FAC Resp. Exhibit B -- 2356

on either side, the Judge reset the cases in May 2006 for trial allowing Ruby Ledbetter to go first. After depositions taken in the matter, pretrial began in front of Judge Randy Wilson but then was discarded as a potential trial case.

James Stephenson was set for trial in May 2006. Mr. Stephenson's case was completely worked up including discovery, pleadings, expert designations, exhibit lists, motions in limine, and the depositions of Dr. David Webster and Dr. Alolph Mares. Based on the no fault of counsel on either side, the Judge reset the cases in May 2006 for trial allowing Ruby Ledbetter to go first. After depositions taken in the matter, pretrial began in front of Judge Randy Wilson but then was discarded as a potential trial case.

Ruby Ledbetter was also a case that was set for trial with Sharon Rigby. Plaintiff's Counsel was negotiating with Defendants to try Rigby first when it was time she was the one who was not able to proceed forward due to her anxiety attack. Based on the no fault of counsel on either side, the Judge reset the cases in May 2006 for trial allowing Ruby Ledbetter to go first. After over 15 – 20 depositions taken in the matter, pretrial began in front of Judge Randy Wilson. Ruby Ledbetter's case was fully worked up for trial but then was discarded as a potential trial case by Judge Randy Wilson.

Sandi Stone was set for trial on May 22, 2006. Mr. Miller's case was completely worked up including discovery, pleadings, expert designations, exhibit lists, motions in limine, and the depositions of Dr. Weldon Butler and Dr. Shanti Neerukonda. Based on the no fault of counsel on either side, the Judge reset the cases in May 2006 for trial allowing Ruby Ledbetter to go first. After depositions taken in the matter, pretrial began in front of Judge Randy Wilson but then was discarded as a potential trial case.

4

Eura Fowler was also a case that was set for trial with Ruby Ledbetter.  Based on the no fault of counsel on either side, the Judge reset the cases in May 2006 for trial allowing Ruby Ledbetter to go first.  After over 15 – 20 depositions taken in the matter, pretrial began in front of Judge Randy Wilson.  Eura Fowler's case was fully worked up for trial but then was discarded as a potential trial case by Judge Randy Wilson.

The following cases did not have a trial date, but depositions were taken place in the New Jersey Vioxx MDL.  All of these cases were set for trial which were the cases held by the law firm of Matthews & Associates for trial in this matter:

1.    Richard Casteel

2.    Martin Czebotar

3.    Ronald Sokol

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re:  VIOXX <br><br> PRODUCTS LIABILITY LITIGATION | **MDL Docket No. 1657** <br><br> **SECTION L** <br><br> **JUDGE FALLON** <br><br> **MAGISTRATE JUDGE KNOWLES** |

---

### SUPPLEMENTAL AFFIDAVIT OF FRED THOMPSON IN SUPPORT OF MOTLEY RICE'S VIOXX COMMON BENEFIT FEE APPLICATION

1.      I am a member in good standing of the South Carolina Bar and have been since 1975.

2.      During a recent audit of my firm's time records it was discovered that one of our firm's senior lawyers, Ann Ritter, contributed 159 hours for the common benefit to the New Jersey Plaintiffs' Steering Committee.  (*See* Exhibit A).  These hours were not included with our previous submission to the Vioxx® Cost Fee Allocation Committee.  I regret this oversight and would ask that the Committee consider these hours along with those already under submission.

FAC Resp. Exhibit B -- 2359

Fred Thompson, III

SWORN to before me
this 12th day of November, 2008.

Notary Public
State of South Carolina                **My Commission Expires**
                                        **01-30-2014**
My Commission Expires:_____

2

# Exhibit A

## MOTLEY RICE LLC
## TIME REPORT – ANN K. RITTER

| DATE | TIME (hr in tenths) | DESCRIPTION |
|---|---|---|
| 10/1/04 | .70 | Organized & participated in conference call regarding Motley Rice MDL participation |
| 10/3/04 | .30 | Communications at Motley Rice about MDL |
| 10/4/04 | .40 | Conference call with co-counsel regarding MDL participation and strategy |
| 10/5/04 | .50 | Research regarding timeline of events/Vioxx FDA submissions |
| 10/6/04 | 1.20 | Attacks/identifications of FDA expert |
| 10/7/04 | 2.50 | Review of FDA files on Vioxx, Vigor |
| 10/8/04 | .20 | Internal discussion regarding clinical trials status |
| 10/20/04 | .40 | Communications with expert and co-counsel regarding medical evidence/kidney failure |
| 11/3/04 | 1.80 | Continued review of FDA files on Vioxx, Vigor, etc. |
| 11/17/04 | .80 | Communications internally and with co-counsel regarding committee organization of MDL |
| 11/29/04 | .50 | Analysis of Lancet data on risk, communication with co-counsel on same |
| 11/30/04 | .20 | Communications with counsel on executive compensation issues |
| 12/7/04 | 2.50 | Analysis of Vioxx congressional hearing transcript |
| 12/9/04 | 5.50 | Meeting in Philadelphia with Weiss/Placitella on Vioxx expert development and liability strategy/review of possible experts prep for meeting |
| 12/30/04 | 5.40 | Analysis of Vioxx scientific articles in connection with expert |

| | | selection |
|---|---|---|
| 1/24/05 | 6.60 | Review of materials relating to Merck vs. Pfizer (Celebrex) and FDA for workup of expert and liability |
| 1/26/05 | — | |
| 1/25/05 | 2.40 | Discussion with expert Hoffman and internally on testimony |
| 1/27/05 | .40 | Communications regarding retainer of expert Hoffman |
| 1/28/05 | 3.50 | Compilation of materials for Dr. Hoffman and analysis of same |
| 1/30/05 | 3.50 | Review of ads for prep of Dr. Hoffman |
| 2/4/05 – 2/10/05 | 25.00 | Analysis of business ethics materials and documents for Dr. Hoffman prep |
| 2/22/05 | .60 | Communications with co-counsel on epidemiology issues for defendant depositions |
| 2/24/05 | .60 | Prep and discussions with Dr. Hoffman |
| 2/26/05 | — | |
| 3/1/05 – 3/2/05 | 10.00 | Preparation of Scolnick outline/policy/FDA and input analysis of materials for case map |
| 3/5/05 | 2.10 | Travel to Newark, NJ for meeting on document access and hearing/prep for attendance at meeting |
| 3/6/05 | 10.50 | Prep for Hoffman meeting and call with Howe/document highlights/etc. |
| 3/14/05 | 6.50 | Prep for and meeting with co-counsel and expert Hoffman in Washington, D.C. |
| 3/17/05 | 8.00 | Follow up with Dr. Hoffman/Supplemental articles and transcripts |
| 3/20/05 | — | |
| 6/22/05 | 2.40 | Travel to NJ for meeting with co-counsel on strategy/prep and attendance of meeting |

| Date | Hours | Description |
|---|---|---|
| 6/10/05 | .40 | Prep of Hoffman on phone |
| 6/11/05 | 3.50 | Prep of additional materials for Hoffman |
| 8/1/05 | .20 | Expert Hoffman depo prep/follow up |
| 8/4/05 – 8/9/05 | 12.30 | Analysis of documents and transcripts for Westrick outline |
| 8/12/05 | 4.50 | Analysis of materials and prep for Westrick and communications with internal team on same |
| 8/17/05 | 3.50 | Communication with co-counsel on obtaining additional documents on Merck vs. Pfizer dispute in 2000/ for Westrick and review of documents on same |
| 8/18/05 | 4.50 | Analysis of issues dealing with possible motion in limine on Dr. Hoffman, review of prior legal memo and disclosures, communications with co-counsel on same |
| 8/22/05 | 3.50 | Preparation of Ogilvy and Westrick discovery/review of documents/drafting subpoenas/communications, internal on same |
| 8/24/05 – | 12.00 | Continued prep for Westrick outline, analysis of Weiner and Gilmartin for same |
| 8/27/05 | | |
| 8/30/05 | 2.10 | Analysis of briefs in other cases regarding Dr. Hoffman in prep for motions |
| 9/6/05 | .30 | Communications regarding trial plan meeting |
| 10/11/05 | .40 | Communications regarding discovery motions, input on documents to see in MTC |
| 11/1/05 | 2.50 | Review of Westrick transcript and comments for part two of depo |
| 11/30/05 | 4.40 | Analysis of Ogilvy documents on ad issue |
| TOTAL HOURS | 159.10 | |

FAC Resp. Exhibit B -- 2364

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | MDL  Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| | JUDGE FALLON |
| | MAGISTRATE JUDGE KNOWLES |

## AFFIDAVIT OF CHISTOPHER A. SEEGER IN SUPPORT OF THE SEEGER WEISS LLP FEE ALLOCATION SUBMISSION

I, Christopher A Seeger, make the following sworn statement based on personal knowledge:

1.    I am the founding Partner of the law firm, Seeger Weiss LLP. During the course of the Vioxx litigation, Seeger Weiss dedicated a large number of senior partners, associates, and paralegals to actively participate in both the federal multi-district litigation and the mass tort litigation centralized in Atlantic County, New Jersey. The attorneys involved not only made significant contributions to the litigation, but assumed key leadership roles as well. *See* annexed Appendix, at ¶ 1. This contribution was made in several areas and on multiple fronts, including but not limited to: case administration and discovery; trial prosecution and trial package development; and settlement negotiations and administration. As detailed in its time and expense submissions, Seeger Weiss attorneys and paralegals spent more than 57,000 hours litigating these actions, and expended in excess of $3.9 million. Indeed, for some of our attorneys, the Vioxx litigation was the primary focus of their practice.

**Case Administration & Discovery**

2.    Early on Seeger Weiss took on a leadership role with its appointment as liaison counsel for the coordinated New Jersey VIOXX litigation in the summer of 2003. Seeger Weiss litigated the case aggressively in New Jersey, through tough negotiations, extensive motion practice, and coordinated discovery efforts with plaintiffs' counsel in New Jersey and elsewhere. These efforts resulted in large-scale and unprecedented discovery for plaintiffs across the country. *See* Appendix at ¶ 2. Prior to the formation of the MDL, Seeger Weiss made significant discovery advances, including but not limited to:

- Built and maintained the infrastructure for a large, multi-user electronic document depository at its offices in New York. This depository also made available numerous databases and raw clinical data produced by Merck, as well as deposition transcripts and exhibits. Additionally, created document review and coding protocols, and custodial file review assignments for a database that would ultimately exceed 30 million pages;

- Reviewed countless pages of documents and identified some of the most significant "hot docs" in the litigation. Seeger Weiss organized such documents by theme, facilitating their use at deposition, in motion practice, and at trial. ***Ultimately, this document collection was the genesis of the MDL Exhibit Database and Theme Grid***; and

- Conducted, assisted in, or coordinated numerous depositions of important corporate witnesses, including but not limited to Beth Seidenberg, Brian Daniels, Thomas Bold, Louis Sherwood, Doug Watson, Adam Schechter, Jennifer Ng, David Anstice, Briggs Morrison, Alise Reicin, and Alan Nies.

3.    The Vioxx MDL, which was not formed until early 2005, directly benefited from the efforts described above and in the annexed Appendix, as Seeger Weiss' accomplishments in New Jersey resulted in identical, and in some cases, broader, productions and/or more favorable

FAC Resp. Exhibit B -- 2366

rulings in the MDL. Indeed, much of the work-product created by Seeger Weiss, including but not limited to motions, discovery materials, and document summaries and compilations, were provided to the MDL and/or served as templates for subsequent MDL work product.

4.     After the MDL was formed, Seeger Weiss continued in its leadership role through significant participation in both the coordinated New Jersey proceedings and the MDL. Further, Seeger Weiss fostered unprecedented cooperation among state and MDL plaintiffs' counsel, resulting in coordinated discovery, litigation, and trial strategies. While serving as both co-chair of the MDL and co-liaison counsel in New Jersey, Seeger Weiss advised and consulted with counsel from around the country, litigating in both state courts and in the MDL, in advance of their depositions, court hearings, and trials.

5.     Further, Seeger Weiss continued to make significant contributions to discovery efforts after the Vioxx MDL was formed, both in New Jersey and MDL litigation. *See* Appendix at ¶ 3. Specifically, Seeger Weiss was primarily responsible for, or made significant contributions to:

- Significant participation and/or leadership on MDL committees, including but not limited to the: Plaintiffs' Steering Committee; Trial Committee; Discovery Committee; Science Committee; and Trial Package Committee, and

- Critical depositions of Merck corporate representatives and third-party witnesses, including but not limited to: Ray Gilmartin, Alise Reicin, Edward Scolnick, Dr. Eric Topol, Dr. Jerry Avorn, and Dr. David Graham. Where a Seeger Weiss attorney was not the lead examiner, he either participated in the depositions or played a significant role in the preparation for such depositions.

6.     In 2006 and 2007, Seeger Weiss organized co-plaintiffs' counsel and secured large-scale discovery and scheduling orders in New Jersey that required Merck to: (a) work up large numbers of cases for potential trial, and (b) collect and produce nearly 1,000 custodial files of Merck sales representatives. These orders placed a significant burden on Merck and Plaintiffs estimate that Merck spent several hundred million dollars in legal fees as a result of these discovery orders. It cannot be disputed that such an outcome had a significant benefit to plaintiffs in all jurisdictions, including the MDL.

**Trial Prosecution and Trial Package Development**

7.     Seeger Weiss served as lead and co-lead counsel in the cases of *Humeston v. Merck* and *Hermans/Humeston v. Merck* in 2005 and 2007, respectively. The 2007 *Humeston* trial resulted in a plaintiffs' verdict for $47.5 million. Additionally, Seeger Weiss attorneys provided valuable assistance and support to other trials throughout the country by providing exhibits, deposition cuts, motion support and templates, examination kits, appearance at oral argument and assistance with pre-trial proceedings, or simply advice regarding specific witnesses and trial themes. Seeger Weiss provided such assistance in *Ernst v. Merck, Plunkett v. Merck, Cona/McDarby v. Merck, Barnett v. Merck,* as well as trials in California and Florida. The *Ernst, McDarby,* and *Barnett*

2

trials all resulted in plaintiffs' verdicts.

8.    Seeger Weiss was also involved in the development of numerous experts with varying specialties—regardless of whether that witness was to appear in the MDL or in another jurisdiction.   Seeger Weiss attorneys were primarily responsible or played a significant role in the development and preparation of the following experts:  Wayne Ray, Dr. Richard Kronmal, Dr. David Egilman, Dr. Jerry Avorn, Cheryl Blume, John Guerigian, and Dr. Harlan Krumholz.

9.    Similarly, as detailed in the Appendix at ¶ 4, Seeger Weiss played a significant role in the development of the MDL trial package, including the Exhibit Database and Theme Grid.

**Settlement Negotiations and Administration**

10.    In the Fall of 2006, Merck and plaintiff representatives from the MDL and various coordinated state court litigations, entered into a dialogue regarding potential settlement of certain VIOXX personal injury claims.  I took a leading role in these negotiations, which ultimately resulted in agreement to the $4.85 billion settlement program announced in November 2007.  These negotiations spanned nearly a year and involved multiple conference calls and face-to-face meetings.  Further, when it came time to draft the agreement and finalize its terms, Seeger Weiss attorneys again took on a significant role.  Even while I was negotiating a potential settlement agreement, Seeger Weiss attorneys began to litigate the Vioxx case more aggressively in New Jersey.  These efforts resulted in court-ordered trial settings and burdensome discovery orders on Merck that placed tremendous pressure on the Defendant to settle the litigation on a global scale.

11.    Following announcement of the Settlement Program, Seeger Weiss attorneys have participated in numerous meetings, conferences, and telephone calls with counsel from around the country, to facilitate a speedy and successful resolution to those claims subject to the settlement program.   Additionally, Seeger Weiss attorneys have appeared at numerous hearings to resolve disputes relating to the settlement.   Further, to help insure the success of the settlement program, Seeger Weiss continues to review claim packages and participate in Gates Committee meetings and teleconferences.

12.    Seeger Weiss's leadership, tenacity, and superior work product have been acknowledged by co-counsel, defense counsel, and the courts presiding over these actions.  Our significant contributions to virtually every aspect of the Vioxx litigation placed tremendous pressure on Merck and ultimately led to the successful resolution of the majority of Vioxx personal injury claims in federal and state courts.

Christopher A. Seeger, Founding Partner
Seeger Weiss, LLP

3

**Memorandum of Work on Vioxx Common Issues**

From: Eric H. Weinberg
Date:  June 25, 2008
Re:    Common Benefit
To:    Fee Committee

## <u>Overview</u>

My firm became involved in Vioxx litigation in October 2004.  We filed several hundred cases, all in the Superior Court of New Jersey.

There was a substantial work product developed by plaintiffs' counsel prior to September 30, 2004, and work that was ongoing, and I had the benefit of seeing and thinking about what had been done, and what was ongoing.  I immediately began to contribute to the Common Benefit, by developing and implementing discovery strategies and recruiting and teaching key experts about the case.  My goals were to help to define Merck's conduct, destroy their defenses, and support the affirmative proofs required to win cases at trial.

I provide this Summary to assist the Fee Committee appointed by Judge Fallon in determining a fair allocation of the common benefit fees to my firm.  A summary of work seems appropriate in these circumstances, where State Court lawyers not required to maintain time records contemporaneously during the State Court litigations are now required to submit evidence of their work in order to be awarded Common Benefit Fees.

I am in the process of reconstructing my time records, and ask the Committee's leeway in permitting me to submit these records shortly.   Judge Fallon has modified the Court's Pretrial Order to allow for reconstruction of time.  I will report reconstructed time by relying upon sources of information that document my work product, including calendar entries, electronic and hard copy files and folders including documents, reference to document searches conducted by topic and by custodial files, and emails.  I have made my best effort to faithfully document the underlying evidence of my work that will permit an assessment of the time expended by my firm in this case.  All of the sources I have used to reconstruct time are open to this Committee to inspect.  This Summary provides context to the reporting of hours, and describes the various projects we developed over the course of the litigation.

I developed productive and beneficial working relationships with key firms in this litigation.  I became one of a handful of lawyers in this litigation other lawyers would ask for help.  I helped to advance the scientific knowledge of the case; uncovered and developed key evidence against Merck; recruited highly regarded expert witnesses; was a reliable help to trial firms in New Jersey; provided input from experts I retained and worked with experts retained by other counsel to improve their understanding of the case; and developed and shared a science based settlement strategy.

I have twenty years of experience in litigating cases involving pharmaceutical products. I tried a case involving a defective apnea monitor that resulted in the death of an infant in Middlesex County in 1992. From 1991 through 2003 I represented persons with hemophilia and HIV. I developed a key theory of liability in these cases, which was certified as a federal class issue by Federal District Court Judge John Grady. I was appointed to the Plaintiffs' Steering Committee of MDL-986 by Judge Grady. I was selected by my peers on that Committee to be on the Executive Committee charged with management of the litigation. I helped to negotiate the settlement of the case with Baxter, Bayer, Rhone Poulenc and Green Cross of Japan, the primary defendants in the litigation. I was appointed by Lead Counsel to review the recommendations of the Fee Committee. I prosecuted approximately 50 individual cases in New Jersey and New York, and selected juries in three individual cases that settled at trial. I helped to organize and direct legislative strategies to extend statutes of limitation in New Jersey and New York, which were signed into law by Republican governors of both states.

From 2001 through 2004, my office played a leading role in the Baycol consolidated litigation in Philadelphia, conducting a substantial part of the liability discovery in that case. I retained the key expert witness in the litigation, Wayne Ray, PhD, who later was retained in Vioxx litigation, and worked with Dr. Ray to develop a report that focused on the key scientific failures in that case. I took the deposition of Bayer's Director of Pharmacoepidemiology for three full days in Amsterdam, and obtained highly damaging testimony on key issues in the case. I spent six weeks in Corpus Christi, Texas participating in the first Baycol trial, and eventually negotiated settlement of over one hundred Baycol cases with Bayer.

All of my prior work and experience informed my approach to the Vioxx litigation.

The summary of my firm's contribution to the Common Benefit is summarized as follows:

1. *Work done during negotiations*
2. *Projects*
3. *Experts*
4. *Depositions*
5. *Other Work*

FAC Resp. Exhibit B -- 2370

### 1.  Work done during negotiations

Between October 2006 and November 2007, while negotiations were ongoing, I:

(a) noticed the deposition of Merck's most knowledgeable person regarding the Alzheimer's Studies; prevailed against Merck's Motion for a Protective Order to Quash my Notice of Deposition; deposed Gilbert Block, the Clinical Monitor for the Alzheimer's Studies that were included in the revised label, for two days in Philadelphia; obtained highly damaging testimony to Merck; and obtained an agreement from Merck counsel to produce both Scott Reines MD, Block's boss, and of a Merck 30(b)(6) witness, for further deposition testimony about these key studies;

(b) served the report of Dr. David Madigan on Merck on October 8, 2007 based on his analysis of Merck's placebo controlled study SAS data, which has been commended by Drs. Avorn and Krumholz as the single most important report and analysis of Merck's misconduct yet written;

(c) filed a Complaint against the FDA, based upon the FDA's failure to respond to ten separate FOIA requests I served, all related to Vioxx, between October 2004 and August 2006; prevailed against a Motion filed by FDA, by Order of Judge Hochberg dated October 10, 2007, to stay the Complaint; and successfully argued against Merck's efforts to persuade Judge Higbee to compel production of any documents I obtained from FDA;

(d) continued to help to manage a Public Relations effort that had become effective in presenting the continuing litigation as a negative on Merck's public image;

(e) deposed Donald Nicholson, PhD of Merck, in New York, and then Gordon Letts, PhD of NitroMed in Boston, after obtaining a Commission for Subpoena, and established facts related to Merck Frosst work on Vioxx, including the fact that in 2002 Merck was offered a method to reduce the cardiovascular risks of Vioxx, and refused to engage in a research program to determine whether the method worked.

(f) provided substantive work product, and expert witness resources to the trial teams in New Jersey during the Hermans/Humeston trial.

(g) hosted a meeting in late 2006 at my office, attended by state court and MDL counsel, with Dr. John Kostis, Chairman of Medicine at the Robert Wood Johnson University Hospital in New Brunswick, to discuss a specific causation model;

(h) organized a meeting in June of 2007 with MDL and NJ counsel to discuss collaboration with experts with respect to upcoming trials in New Jersey and elsewhere;

(h) organized a meeting of NJ counsel on October 24, 2007 to streamline and assist on core discovery procedures for NJ litigation, to improve the plaintiffs' approaches to case specific discovery

FAC Resp. Exhibit B -- 2371

All of the work described in this Memorandum involved extensive review of data and document, was conducted concurrently, and was highly probative of knowledge of risk and misrepresentation of information by Merck.

## *2. Projects*

## I. The Alzheimer's Studies

I developed a strategy designed to destroy the Alzheimer's Studies as a defense in this litigation. The Alzheimer's Studies were Merck's primary defense to VIGOR, and were Merck's primary defense in trials. The overall strategy I designed and implemented was novel and dramatically advanced the understanding of the case. The product of my work is summarized in paper I authored about the Alzheimer's Studies.

At my request a Notice of Deposition for a Merck witness most knowledgeable about these critical studies was issued and Merck filed a Motion for a Protective Order and to Quash our Notice of Deposition, contending that liability discovery was concluded in the case and plaintiffs were not permitted to conduct further discovery of Merck's conduct. This Motion was denied by Judge Higbee. Merck counsel delayed producing a witness but in the summer and fall of 2007 I deposed Gilbert Block, the Clinical Monitor for the two Alzheimer's Studies included in the revised label. He had been deposed in the MDL in November of 2005.

The Alzheimer's Studies were described by the FDA Medical Officer to the 2001 Advisory Committee as the most important evidence that persuaded FDA to allow Merck to sell Vioxx without a Warning in the Product label. I conducted an extensive document review and consulted with my retained experts and with colleagues to develop a discovery strategy. My investigation incorporated the unfolding statistical information about cardiovascular and other risks that emerged in the study data analyzed by my expert statistician, David Madigan PhD, based upon his review of Merck's SAS database for the Alzheimer's Studies.

This work did much to advance our common understanding of these studies. I submit that had this work been used in trials in January of 2008 and thereafter, serious damage would have been done to Merck's "Alzheimer's defense" by revealing the true story of how the studies were inappropriately conducted, and how Merck failed to disclose the complete study data to FDA, physicians and the public. I believe the evidence I developed would support a criminal prosecution of Merck for the harms caused to patients in the Vioxx arm of the PRAISE Study.

In December of 2005, I retained Dr. Madigan, Dean of Mathematics and Physical Sciences at Rutgers (and currently Chairman of the Department of Mathematics at Columbia University) to analyze Merck statistical data. Dr. Madigan has been called upon by the pharmaceutical industry to conduct and teach their statisticians data safety

mining.   He is a world class statistician. The evidence of risk discovered by Dr. Madigan in the SAS data was an integral part of this project.


## II. Placebo Studies analysis

I obtained the SAS data for the universe of Merck's placebo controlled studies, and provided them to Dr. Madigan for analysis.  Merck's other primary defense to the safety of Vioxx was that until APPROVe, there was no placebo controlled data to suggest any cardiovascular risk associated with Vioxx.  The analysis of Merck's SAS data for the universe of Merck's placebo controlled studies proved otherwise.  At the time of the settlement, the truth about Merck's placebo data was to be introduced at trials beginning in January of 2008.

I worked collaboratively with Dan Sigelman, of Cohen Milstein, and other lawyers including Chris Placitella and Jerry Krystal, on this project.

Dr. Madigan's report was served upon Merck on October 8, 2007.  His work has been commended by many, including two of the most important plaintiff's experts in the litigation, Drs. Harlan Krumholz of Yale and Jerry Avorn of Harvard.  Both Krumholz and Avorn complimented the Madigan report as the most important work in the litigation. Dr. Avorn commented upon the extensive database and information provided to Dr. Madigan – which had been provided to him through my efforts.

Obtaining the SAS data required sending my IT consultant to NYC to download data from the database onto 11 hard drives, then copying them and providing them to Dr. Madigan.


## III. The Merck-NitroMed collaboration

I investigated Merck's NDA for NO Vioxx and deposed two witnesses regarding Merck's collaboration with Nitromed to develop a safer version of Vioxx.  I deposed Dr. Donald Nicholson of Merck Frosst, a senior scientist charged with management of the NitroMed project, in New York City.  I deposed Dr. Gordon Letts, Senior Vice President and Medical Director of NitroMed, pursuant to subpoena obtained by Commission, in Boston, Massachusetts.  My work on this initiative, including investigation of Merck Frosst's participation in the ongoing development and reformulation of the Vioxx molecule,  was ongoing at time of settlement.  I had identified several key Merck Frosst witnesses for future deposition, which would have been noticed but for the settlement, including Drs. Sophie Roy, Mervyn Turner and Anthony Ford-Hutchinson.

This work was unique and significant in different respects.  First, I uncovered evidence that Merck scientists did consider the possible cardiotoxicity of Vioxx as a problem that required a solution.  Drs. Peter Kim and Anthony Ford Hutchinson and Sophie Roy, among the most senior scientists in the company, expressed opinions about the

FAC Resp. Exhibit B -- 2373

cardiovascular risk of Vioxx in documents I uncovered during preparation for the depositions of Drs. Donald Nicholson of Merck and Gordon Letts of NitroMed.

Second, I developed evidence that, at a time when the SAS data provided strong evidence of cardiovascular risk, Merck had been offered a scientific method, requiring investigation, that had the potential to reduce the cardiovascular risks associated with Vioxx.  Merck refused to investigate this potential improvement to the safety of Vioxx, despite the fact that Merck's own data, in the very same time frame, indicated that Vioxx caused cardiovascular events at a statistically significant increased risk compared to placebo.

 I consulted with experts regarding this project, including Dr. Joseph LoScalzo, Dr. John Kostis and Dr. David Egilman.

I also developed a strategy for discovery of Protocol 136, a highly important efficacy study that was directly connected to the NitroMed project and indeed served as impetus for Merck's decision to develop a new Vioxx compound by adding a vasodilator agent to the original Vioxx.  This important study indicated that there was no GI benefit for high risk patients who took Vioxx and aspirin.  Merck obtained the data from this study in late 2001, during intense label negotiations with FDA, but failed to provide the data to FDA for a year, during which time the revised label was approved.  Incredibly, the revised label advised patients who required aspirin prophylaxis that Vioxx was not a substitute for aspirin – but failed to advise patients that taking aspirin and Vioxx eliminated all of the theoretical GI benefit of Vioxx, while exposing high risk patients to yet another cardiovascular risk factor.

My work on NitroMed is summarized in a powerpoint presentation.


## IV. FDA and FOIA

Beginning immediately after the withdrawal of Vioxx from the market, I obtained thousands of pages of FDA documents, including the Summary Approval Packages for Vioxx through the Freedom of Information Act.  I analyzed and summarized FDA documents and prepared powerpoint presentations to help explain interactions between FDA and Merck related to Vioxx.

In 2004 and 2005, I retained several former FDA employees to assist me in the understanding of the Merck-FDA interactions, including Dr. John Gueriguian, Jay Geller JD (a former FDA lawyer), and Caesar Roy, Sandra Whetstone and Bette Jones, all former FDA management level employees.

The information I developed, and the experts that I retained, were made available to my colleagues in this litigation without hesitation in order to advance our common interests in prosecuting Merck for their conduct related to Vioxx.

6

I filed suit against the FDA in 2007, alleging failures to comply with the Freedom of Information Act related to Vioxx.  In October of 2007 the FDA's Motion to Stay my Complaint was denied by Judge Hochberg in the US District Court; the case was pending at the time the settlement was announced.  Merck had raised the FOIA action with the Court and expressed concern over what documents would be produced, and whether they would have access to them.  It was during this time that the Vioxx Settlement Agreement was signed.

My work on FDA is summarized in several powerpoints, including a 117 slide powerpoint created in the spring of 2005 after my extensive and detailed review of FDA Summary Approval Packages and other materials.  This powerpoint, and others, was shared with colleagues.

## V.  APPROVe

I investigated the APPROVe study.  My approach to this project was to review both the statistical analyses of the data and to review, in great detail, the workings of the ESMB that was instituted to protect the safety of the patients in the study, and whose recommendations led to the withdrawal of Vioxx from the worldwide market in September of 2004.

The Merck unblinded statistician for the APPROVe study was Dr. Hui Quan.  Dr. Quan had not been deposed prior to the time that I took his deposition in New York City in 2006.  In preparation for this deposition, I personally reviewed over 50,000 documents, extensive medical literature, and the private emails of Dr. James Neaton, a member of the APPROVe ESMB.  I marked and reviewed over 70 exhibits with Dr. Quan, most of which had never previously been reviewed in depositions with Merck witnesses.

My work on the Neaton emails, which reveal the knowledge and concerns of the APPROVe ESMB, including the opinion of members of the ESMB expressed in February 2004 that the evidence in the study against Vioxx was "damning" is summarized in a powerpoint presentation.

## VI. STI

I organized a team of law firms to review documents related to Merck's relationship with STI, a medical meeting and information contractor.  This project was ongoing at the time of the settlement.  In connection with this project, my office reviewed thousands of documents and prepared summaries of information and powerpoints.  I also directed counsel in the approach to the review of this information.

FAC Resp. Exhibit B -- 2375

**VII. Specific Causation**

I retained experts to develop a model to establish specific causation.  This work began in late 2004, and continued to the time of settlement.  The purpose of this model was twofold; to establish a method of assessing the specific causation of Vioxx, relative to other cardiovascular risk factors,  in individual cases for trial; and for settlement purposes, to assist in evaluating cases based on the extent to which Vioxx contributed to a cardiovascular thrombotic event.  I retained Dr. John Kostis, Chairman of Medicine of the Robert Wood Johnson University Hospital and Chief Medical Officer of the University of Medicine and Dentistry of New Jersey, and a world leading cardiologist, to develop this model.  Ultimately I brought in several experts to provide peer review and critique of the model, including Dr. Madigan, Dr.Curt Furberg, Dr. Michael Alderman, Dr. Harlan Krumholz and Dr. Bruce Psaty.

This model was made available to Merck and to MDL and state court lawyers for review.  The model considered enhanced risk to patients with preexisting risk factors, and measured the extent to which Vioxx contributed to an event.

**VIII.  Public Relations**

I was a central player in the public relations project that was organized and funded by many firms in NJ.  I wrote the working memorandum outlining possible PR strategies, met with the public relations firm in New York City, and worked closely with Mike Ferrara and Marc Grossman in organizing and directing the public relations agenda. This project began to take hold and generate positive results, including skepticism within the media that Merck really had a handle on the litigation.  In the context of a secret negotiation, which served to preserve Merck's stock value by keeping news of a possible settlement out of the media, our efforts here were important.

**IX.  Fracture Healing and Bone Mineral Density**

I retained Dr. Patrick O'Connor from UMDNJ in Newark, a researcher in bone fracture healing, to review documents related to this issue.   Merck's Scientific Board of Advisors had raised the potential effects of Vioxx on bone mineral density as a concern in 1998.  Once I determined that Vioxx caused osteoporosis in the PRAISE study, I began to research Merck's knowledge of this potential side effect and what information about this risk Merck communicated with FDA and with physicians and patients.  I learned that Dr. O'Connor had approached Merck in 2000 with a suggestion that based upon his research it would be prudent for Merck to study bone fracture effects of Vioxx.  I also discovered that he published an important paper on the subject in 2002, and that Merck geared up a public relations effort to discredit his work.

FAC Resp. Exhibit B -- 2376

Merck ultimately attributed osteoporosis in PRAISE – which was statistically significant against Vioxx – to "chance."

### X.  New England Journal of Medicine – Curfman Depositions

In January of 2006 I was asked by New Jersey liason counsel to attend the deposition of Gregory Curfman MD in Boston on behalf of the New Jersey litigation.   Because I had only a days' notice I reserved the right of New Jersey counsel to question Dr. Curfman. A year later, in January of 2007 I attended Dr. Curfman's deposition in Boston.  Though I did not take the deposition, I had prepared a detailed outline together with about three dozen exhibits in anticipation of taking the deposition.  I traveled to Boston and assisted deposing counsel in the deposition of Dr. Curfman.

### XI.  VICTOR

I was asked by NJ liason counsel to head up discovery on this important study.  I developed a plan to work through the Hague Commission to take discovery of the primary investigators of the study at Oxford in the United Kingdom.  I reviewed extensive documents and the draft articles and final article in anticipation of the depositions.  As the result of the settlement these depositions did not go forward.

### XII. Marketing

I assisted my colleague and partner Chris Placitella, who took the lead in uncovering evidence of Merck's marketing strategies for Vioxx.  Chris's work on this aspect of Merck's conduct was unique, highly creative, and highly effective.  I served as his second chair on several depositions, and I provided input and advice on issues he discovered in document review and in examination of Merck witnesses.  I reviewed documents and videotapes related to this part of the case, including the videos of Laura Demopolous MD, who I deposed in Radnor Pennsylvania over several days.

My contributions to this critical area of the case is also discussed in Chris Placitella's summary of work on common benefit matters

### *3. Expert development/Consulting*

FAC Resp. Exhibit B -- 2377

I consulted with several experts and consultants, and frequently shared the benefit of their expertise and my work product, including:

Dr. John Kostis
Dr. David Madigan
Dr. James Wright
Dr. John Guerigian
Dr. Sheldon Krimsky
Dr. Jonathan Moreno
Christine Whitman
Jay Geller JD
Caesar Roy
Sandra Whetstone & Bette Jones
Dr. Patrick O'Connor
Dr. Joseph Loscalzo
Dr. Anthony Altobelli
Dr. Harlan Krumholz
Dr. Curt Furberg
Dr. Bruce Psaty
Dr. Michael Alderman
Dr. Joseph Loscalzo
Kevin Michaels JD

### *4. Depositions*

I first chaired five depositions covering seven days of testimony.  I second chaired six depositions covering eleven days of testimony.  I defended the expert deposition of Dr. Thomas Nesi.  I attended several depositions and offered substantive suggestions to counsel for plaintiffs.

Dr. Laura Demopoulos (first chair)
Dr. Hui Quan (first chair)
Dr. Donald Nicholson (first chair)
Dr. Gordon Letts (first chair)
Dr. Gilbert Block (first chair)
Dr. Ned Braunstein (2d chair)
Dr. Gregory Curfman NEJM (2xs 2d chair)
Dr. David Egilman (attend)
Dr. Alise Reicin  (attend)
Dr. Peter Honig (2d chair)
Raymond Gilmartin (attend)
Dr. Edward Scolnick (attend)
Marketing depositions (Jan Weiner, Mary Blake, Wendy Dixon) (2d chair)
Dr. Tom Nesi (defend)

### *5. Other work*

FAC Resp. Exhibit B -- 2378

## I. Trial Support

I assisted each of the trial teams during trials in New Jersey, providing documents, research, access to experts, and input.  I attended several days of each trial.  Several experts I recruited to provide input and advice in my development of this case were made available to trial counsel to assist on important issues, including Dr. Kostis, Dr. Altobelli, Mr. Geller, Dr. Nesi, and Dr. Madigan.  On several occasions trial counsel reached out to me for assistance and I consistently responded immediately with support.  I also assisted key experts recruited by my colleagues, in preparing for trial testimony.   My contribution to the success of the trials was acknowledged by trial counsel and by testifying experts.

I was deeply involved in the preparation of cases for trial in January of 2008.  Two experts I retained and developed were identified as expert witnesses for the trials – Dr. David Madigan and Dr. Anthony Altobelli – and I was deeply involved in preparing those experts for testimony..

## II.  Document Review and Expert/Consultant development

I conducted extensive document review beginning in October of 2004, and continuing to date.  I reviewed medical literature, Merck internal documents, third party documents, and FDA documents.  I personally reviewed hundreds of thousands of documents over the course of this litigation.   I contacted dozens of potential experts and consultants and retained several.  I contacted a former Merck VP and met with him to discuss issues related to Vioxx.  (Dr. Richard Dybas)

## III.  Lawyer Working meetings hosted/organized

I organized several meetings to which plaintiffs counsel were invited, to develop working strategies and meet with experts, including:

1.  Endgame settlement strategy meeting in November 2006 meeting with Dr.Kostis.

2.  Sales representative and doctor deposition strategies, organized meeting at CPR in 2007.

3.  Liability case meeting in Philadelphia in June 2007 with Drs. Madigan and Egilman.

4.  Case specific discovery meeting in October 2007 at Anapol.

5.  Several meetings with Dr. Madigan and counsel.

## Summary

FAC Resp. Exhibit B -- 2379

In pharmaceutical drug litigation, it is typical that a few plaintiffs' firms contribute meaningfully to developing the common liability evidence in a case.  Most firms who accept representation of clients do no common benefit work at all.  Some firms contribute in important, but limited ways.

In the Vioxx litigation, my firm was among those few firms who helped to meaningfully advance a common understanding of Merck's conduct with respect to Vioxx.  My firm developed important common liability evidence, recruited and worked with world class experts, and worked collaboratively with colleagues to help win cases.

I am a solo practitioner, and am Of Counsel to the firm of Cohen Placitella & Roth, my partners in this litigation.  The vast majority of my professional time since Vioxx was withdrawn has been spent on this case.

I ask this Committee to be considered for a fair award of Common Benefit fees.

FAC Resp. Exhibit B -- 2380