HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: ANAPOL SCHWARTZ WEISS & COHAN
      Sol Weiss, Esquire
      Gregory S. Spizer, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
     877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. WEISS:  You've all seen
 3         what I've submitted, and all I did
 4         submit was common benefit.  By
 5         that I mean, I did not submit,
 6         except for the Hatch case, any
 7         time on any individual case even
 8         though some of them Chris used to
 9         get ready for trial to drive the
10         litigation.
11              The second thing, none of
12         the 200-plus depositions we took,
13         either of the reps, the treaters,
14         are included in our submission to
15         common benefit.
16              MR. SEEGER:  Sol, did you
17         submit a three-page affidavit?  Is
18         that what you are talking about?
19              MR. WEISS:  No.  Benefit.
20              MR. LEVIN:  He's talking
21         about time submission.
22              MR. SEEGER:  Okay.
23              MR. WEISS:  So, the only
24         thing I did submit, again, is
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          liaison work of being the

2          architect, along with Dave, of

3          let's keep Merck busy by doing the

4          detail setup.  My office did

5          monitor I guess the 20 million

6          pages of detail documents that

7          came in.  We actually got copied,

8          and we checked to make sure, when

9          they started to get the same

10         detailer two or three times, and

11         they would go to Higbee and claim

12         they needed months and months and

13         months, we would go, oh, no, here

14         they are, here are the pages.

15              We also did a template for

16         New Jersey, and that's included,

17         all of the detail docs, that is,

18         all of the bulletins they got

19         every day, electric bulletins that

20         was actually embedded into, I

21         guess it was a Word monthly

22         calendar.  Our staff did that.

23         So, all you had to do was take a

24         look at the records you got from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        Merck for your prescribing

 2        physician, plug it into the chart,

 3        and you could then overlay what

 4        the reps knew, what they knew and

 5        when they told their docs.  We

 6        actually talked to Jerry about

 7        some of that stuff.

 8             We did take some of the

 9        early depositions that we took,

10        and we gave them to people like

11        Jerry and a couple others, and we

12        actually came up with, it must

13        have been five or six-hour

14        questions that Merck was asking

15        all of the treating doctors, all

16        of the prescribing docs.  That's

17        in there.

18             But, essentially, it's my

19        work as liaison, Dave's work in

20        helping Chris, and I helped a

21        little bit in the first trial.

22             MR. SEEGER:  Dave Jacoby, so

23        they know when you say "Dave."

24             MR. WEISS:  My partner, Dave
```

FAC Resp. Exhibit D -- 4

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        Jacoby.

2              Greg was in charge of doing

3        all of the individual case stuff.

4        Greg also did work from LMI, and

5        we did find them cheating.  LMI in

6        New Jersey, I guess they used them

7        in the MDL too, Merck used them to

8        get records.  We found some LMI

9        people actually writing letters to

10       the prescribers and treaters

11       saying that the Court ordered them

12       to relook through their documents

13       because not all the records were

14       there.  We caught them, and we had

15       a little brew ha-ha in front of

16       Higbee, very private, because they

17       were very embarrassed.

18              So, that's what we did.

19       Anything else, I'm here to answer

20       questions.

21              MR. SEEGER:  This is the

22       most refreshing presentation

23       that's over quickly.

24              MR. LANIER:  If you get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1      credit for the presentation, Sol,

2      you are an all right guy.

3           MR. WEITZ:  Sol, how many

4      cases did you submit to the

5      settlement, approximately?

6           MR. WEISS:  Well, that's a

7      hard question to answer.  As

8      primary counsel?

9           MR. LEVIN:  As primary.

10          MR. WEISS:  About 800.  And

11     then we have cases where we are

12     not primary, we are local counsel

13     with Birchfield.  There are 90

14     cases that we have an arrangement

15     with Sheller.  We did a lot of his

16     work behind the scenes for

17     Sheller.  We get a piece of

18     Sheller's fees.

19          Whatever is left that you

20     don't have in diet drugs, I get.

21     There's other firms in

22     Philadelphia that we do their mass

23     tort work quietly, and we have a

24     piece of all of those cases.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1          I'm going to say, Perry, when you

 2          add it all up, we are over 1,000.

 3               MR. WEITZ:  And as far as

 4          individual workup of cases that

 5          were on Judge Higbee's trial

 6          docket, how many of those cases

 7          would you say that your firm

 8          worked up?

 9               MR. SPIZER:  Trial or

10          discovery?

11               MR. WEITZ:  Trial or

12          discovery that you actually did

13          trial prep work?

14               MR. WEISS:  Abdul Malik and

15          Kimmelman were worked up the same

16          time we worked up Humeston.

17               MR. SEEGER:  And then Hatch.

18               MR. SPIZER:  Hatch.

19               MR. WEISS:  Hatch was a

20          standalone case.  We worked all

21          the way through until we got four

22          records they found that he was on

23          Celebrex and not Vioxx.

24               MR. WEITZ:  That was the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

                                                    Page 8

 1        scuba diver.

 2              MR. WEISS:  That was the

 3        scuba diver.

 4              Rodemoyer was worked up in a

 5        group of 39, along with another

 6        one, all the way through trial.

 7              MR. SPIZER:  We were going

 8        to trial January of '08 on

 9        Rodemoyer, George Biehls and

10        Gisela Levinson -- wait, there

11        were six, actually.

12              MR. WEISS:  There were four

13        in Pennsylvania and four in New

14        Jersey.  So, we had eight of

15        the -- we had two of the four

16        trials going in January.  And they

17        were fully worked up.

18              MR. SPIZER:  We had two

19        states, Pennsylvania and New

20        Jersey.

21              MR. WEISS:  We also worked

22        up and vetted some experts that

23        were used in New Jersey.  I don't

24        know if you used them in the MDL

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          or not.  One guy, Stuart Rich.

2               MR. SPIZER:  Steve Rich.

3               MR. WEISS:  Steve Rich, who

4          we really controlled.  Some people

5          tried to burn him out, but we kept

6          him pretty well focused.  The guy

7          that you used in Humeston, and I

8          know that someone else used him.

9               MR. SEEGER:  What was he?

10              MR. WEISS:  Cardiologist.

11              MR. SEEGER:  DePace.

12              MR. WEISS:  We worked DePace

13         up.

14              I helped Eric with Madigan

15         to some extent.  I helped Eric

16         with Kostis to a large extent.

17         Kostis did an analysis that he

18         superimposed Framingham over VIGOR

19         and APPROVe.

20              MR. RAFFERTY:  Who did that?

21              MR. WEISS:  John Kostis is

22         the head of cardiology at Robert

23         Wood Johnson Memorial Hospital,

24         which is the teaching hospital at

FAC Resp. Exhibit D -- 9

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          Rutgers.

2               MR. SEEGER:  How would you

3          say that Kostis' work, just focus

4          on him for a second, contributed

5          to the common benefit?

6               MR. WEISS:  It helped us

7          understand if you are going to try

8          a case with a lot of risk factors,

9          how Vioxx was probably one of the

10          leading risks percentage wise, and

11          he could actually tell you why.

12               He looked at, I think it was

13          1,000 clients, I think a third of

14          them were ours, or it turned out

15          to be that way.  We submitted all

16          the medical records.  They were

17          tabulated.  Kostis looked at them,

18          the risk factors and the length of

19          time you were on Vioxx, and then

20          looked at APPROVe, looked at

21          VIGOR, looked at ADVANTAGE, looked

22          at VICTOR, and was able to

23          identify the risks on the Vioxx

24          arm in those trials versus these

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1       people.  And it was pretty

2       amazing.  It turned out that for

3       about 85 percent of the population

4       he looked at, of those who smoked,

5       Vioxx was the larger risk for a

6       heart attack than smoking.

7            And as you know, Chris, the

8       problem was twofold.  Initially

9       Kostis wanted to be the settlement

10      recruiter and wanted Merck to

11      adopt his philosophy, and then he

12      finally agreed he was going to

13      testify at the latest trials.  But

14      they were obviously -- they were

15      settled.

16           MR. LEVIN:  I'm working on

17      the hours here.  Your hours are

18      under review.  They haven't been

19      rejected.  They are under review.

20      Have you been contacted by the

21      accountants with regard to

22      anything?  It could be because of

23      the time that they were submitted.

24           MR. WEISS:  The first thing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           we were contacted about, Arnie,

2           was that the sheets that I used

3           were not the sheets that you used,

4           and we redid them.

5                 MR. LEVIN:  That's probably

6           the reason, because you have about

7           6,900 hours and $561,000 in costs.

8                 MR. WEISS:  That's right.

9           Let me tell you about the costs so

10          you know.  Costs were in the

11          Hatch.  Case, Chris and I went out

12          to Palo Alto and spent two weeks

13          with Rodney.  I had Rich and

14          another expert that we developed.

15          That's common benefit, because

16          other people used him.

17                MR. LEVIN:  These are expert

18          fees?

19                MR. WEISS:  Expert fees.  I

20          had a copy of every transcript in

21          New Jersey.  I also ordered

22          transcripts from Linda.  I wanted

23          every transcript.  Every

24          transcript we got electronically,

FAC Resp. Exhibit D -- 12

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       and Linda embedded and also tied

2       the transcript to the CD, which we

3       had.

4           MR. LEVIN:  When I look at

5       the submissions that are under

6       review, it says MDL time and Hatch

7       time.  Now, is the MDL time really

8       New Jersey litigation time?

9           MR. WEISS:  It is.  It is

10      7300 time.

11          MR. LEVIN:  Could you make

12      sure that the accountant corrects

13      that?  Not because it matters.

14      The reason I'm saying that is, I

15      want to draw and have two charts

16      showing state litigation on one

17      side and MDL litigation on the

18      other.  And you guys are the --

19          MR. WEISS:  You guys made me

20      resubmit the time sheets --

21          MR. LEVIN:  I didn't make

22      you.

23          MR. WEISS:  Let me finish --

24      -- MDL 1657.  So all of the New

Page 14

```
 1          Jersey time had to be resubmitted.
 2               MR. LEVIN:  Is that the way
 3          we're doing it?
 4               MR. SEEGER:  I think that's
 5          the way it's been.
 6               MR. WEISS:  So you'll know,
 7          I also had to give him, because I
 8          keep contemporaneous time records,
 9          they are the designation for Vioxx
10          common benefit is 73 with four
11          zeros at the end.
12               MR. LEVIN:  And that is New
13          Jersey time, but --
14               MR. WEISS:  That's all New
15          Jersey.
16               MR. LEVIN:  This is for me.
17          I'm not being critical.
18               MR. WEISS:  I understand.
19          You are never critical with me.
20               MR. LEVIN:  Yes, I have
21          been.
22               I want to be able to get
23          those hours out to show how much
24          the state lawyers did so that it
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          is not messed up in the MDL time.

2               MR. WEISS:  So you

3          understand, none of my time was in

4          the MDL.  I did this with Chris

5          and Andy going back to when it was

6          removed from the market, I said I

7          was staying out of the MDL.

8               MR. LEVIN:  You mentioned

9          Madigan.  Was that time included

10         in the MDL time for you, when you

11         were working with Eric?

12              MR. WEISS:  Any time I

13         worked on common benefit, it was

14         7300, yes.

15              MR. LEVIN:  But you

16         considered that common benefit,

17         working with Madigan?

18              MR. WEISS:  Absolutely.

19              MR. HERMAN:  Let me ask you

20         a question about Eric Weinberg.

21              You were co-lead in New

22         Jersey?

23              MR. WEISS:  Yes.

24              MR. HERMAN:  What

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        specifically did you assign him to

2        do?

3              MR. WEISS:  Eric was the guy

4        who was working up experts and

5        science.  For example --

6              MR. HERMAN:  You assigned

7        him to work up specific experts?

8              MR. WEISS:  Absolutely.

9              MR. HERMAN:  When he worked

10       them up, where did that work

11       product go?

12             MR. WEISS:  It went to me,

13       and it went to Dave Buchanan.

14             MR. HERMAN:  Okay.

15             MR. WEISS:  So you will

16       know, for example, Madigan was

17       used by the MDL people.  Elizabeth

18       Cabraser used Madigan's report in

19       the Sinclair class action.

20             MR. SEEGER:  Dave was

21       involved in this?

22             MR. WEISS:  Yes.

23             MR. LEVIN:  Sinclair was the

24       head of the monitoring of the New

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          Jersey state litigation?

2               MR. WEISS: Yes.

3               MR. HERMAN:  Liz Cabraser, I

4          want to make sure I understand,

5          used Madigan in what?

6               MR. WEISS:  In the medical

7          monitoring Vioxx class action in

8          New Jersey.  And I know Rich was

9          used by some people in the MDL, at

10         least they wanted to use him, and

11         I said okay.  I had to make sure

12         that they didn't make him go where

13         he wasn't qualified.  But there's

14         a couple of others.

15              DePace was used, I think by

16         some people in the MDL, but I know

17         he was also used by other people

18         in New Jersey.  I know he was used

19         in the MDL.  He's the

20         cardiologist.

21              MR. HERMAN:  Well, at this

22         point, I'm just trying to get a

23         handle on who was assigned to do

24         what.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1              MR. WEISS:  Eric's job was
 2         to work the science in New Jersey.
 3              MR. HERMAN:  Who else was
 4         assigned to do that?  Was he the
 5         only one?
 6              MR. WEISS:  It is hard to
 7         say, Russ, because we didn't do it
 8         the same way that you guys did it
 9         or I do it in MDLs.  Eric was one
10         of the lead people that worked the
11         science.  Dave Buchanan worked the
12         science.
13              MR. HERMAN:  Did your firm
14         have Bextra and Celebrex cases
15         also?
16              MR. WEISS:  Yes.
17              MR. HERMAN:  Was Madigan
18         used in those cases?
19              MR. WEISS:  Not by me, they
20         were used by Perry.
21              MR. HERMAN:  I'm sorry?
22              MR. WEISS:  He was used by
23         Perry, not us.  And all my Bextra
24         cases were with Mark.  I think
```

FAC Resp. Exhibit D -- 18

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          every one but two were in New York

2          State Court, right, Mark?

3               MR. LANIER:  Yes, sir.

4               MR. WEISS:  We did develop

5          some other cardiologists that were

6          very good like Altobelli, a young

7          well-qualified cardiologist who

8          actually reviewed cases for trial

9          and was going to testify at trial.

10         Eric was instrumental on doing

11         that.  I helped.  We took a whole

12         bunch, and I think they are in

13         this.  We took a bunch of Merck's

14         expert cardiologists in Kimmelman,

15         Humeston, the second round, in the

16         third round.  We gave you the

17         transcripts.  I know you guys had

18         them, with our pleasure.

19              I actually worked with

20         Hornbeck doing Flavahan.

21              MR. SEEGER:  Flavahan.

22              MR. WEISS:  What a favorite

23         he was.  Remember him, Mark?

24              MR. LANIER:  He was a joke.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Put that on the record.  He was a

2          joke, he was.  Had a really good

3          accent.

4               MR. WEISS:  That's the guy

5          we caught with the article that

6          was very critical on COX-2s in

7          some offbeat publication.

8               Any other questions for us

9          or anybody else, guys?

10              MR. SEEGER:  No.  No, sir.

11         Thank you.

12              MR. WEISS:  Again, if you

13         are counting time for the detail

14         people, and if you are counting

15         time for all the trial cases that

16         we worked up, they are not here.

17         So, if that's part of the package,

18         I would like an opportunity to

19         submit the extra time.

20              MR. SEEGER:  Submit it.

21              MR. HERMAN:  Submit it.

22              MR. LEVIN:  I think you

23         ought to submit it.

24              MR. HERMAN:  Just identify

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          it when you do.

2                  MR. LEVIN:  Because it will

3          be helpful.

4                  MR. WEISS:  So, I'm going to

5          give you the time for those cases

6          we worked up for trial, and also

7          you want the detail time, too?

8                  MR. LEVIN:  It was part of

9          Judge Higbee's plan to work them

10         up.

11                 MR. WEISS:  Yes.  There was

12         12, then 29, then there was 39,

13         and, for example, Andy, do you

14         remember the first cases we worked

15         up way, way back when?

16                 MR. HERMAN:  Well, Sol, in

17         fairness to you, other people are

18         submitting those hours, and I

19         think you ought to do it also.

20                 MR. WEISS:  I understand,

21         but I was told they weren't

22         counting.  That's why I didn't do

23         them.

24                 MR. HERMAN:  Submit them.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          MR. LEVIN:  They are

2     counting them now.

3          MR. HERMAN:  Those that were

4     worked up for trial.

5          MR. WEISS:  So, you want

6     them on these forms?

7          MR. LEVIN:  Yes.

8          MR. WEISS:  It is going to

9     say MDL 16 --

10          MR. LEVIN:  Just write a

11     cover letter to the accountant

12     saying this is a supplemental

13     submission dealing with such and

14     such.

15          MR. HERMAN:  It is not my

16     rule, but Arnold wants your blood

17     type, your thumbprint, your eye.

18     Send them as soon as you can get

19     them in, Sol.

20          MR. WEISS:  It will take a

21     couple of weeks.

22          MR. HERMAN:  Within a week?

23          MR. LEVIN:  Could you do it

24     faster?

FAC Resp. Exhibit D -- 22

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          MR. WEISS:  Those individual

2     cases are not on time sheets.

3          MR. LEVIN:  Okay.  Well, as

4     fast as you can.

5          MR. WEITZ:  But it is not

6     your individual inventory of cases

7     --

8          MR. WEISS:  No, no.

9          MR. LEVIN:  He just didn't

10    keep the time.

11         MR. WEISS:  In other words

12    if we had a case called for trial,

13    I don't have my people keep time

14    sheets.  I only keep time sheets

15    on stuff I think is the common

16    benefit.

17         MR. HERMAN:  You know what

18    you ought to do?

19         MR. WEISS:  What's that?

20         MR. HERMAN:  You ought to

21    say, estimate these hours the best

22    you can as an estimate and send

23    them in.

24         MR. WEISS:  Anything else?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1            (No response.)

2            MR. SEEGER:  Thank you.

3            MR. HERMAN:  Thank you.

4                - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1                C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR

23        Notary Number:  1060147 Exp. 1.2.10

24        CCR Number:  30X10017620

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

                                                          Page 1

                        -   -   -
              VIOXX FEE COMMITTEE PRESENTATION
                        -   -   -
                  HIGHLY CONFIDENTIAL
            FEE COMMITTEE ATTORNEYS' EYES ONLY
                        -   -   -
                    DECEMBER 3, 2008
                        -   -   -
                     HOUSTON, TEXAS
                        -   -   -
        FIRM:           ANASTOPOULO & CLORE, L.L.C.
                        Samuel K. Allen, Esquire


        BEFORE FEE COMMITTEE MEMBERS:

        ANDY D. BIRCHFIELD, ESQUIRE
        Beasley Allen Crow Methvin
        Portis & Miles, PC

        EDWARD F. BLIZZARD, ESQUIRE
        Blizzard, McCarthy & Nabers
        THOMAS V. GIRARDI, ESQUIRE
        Girardi & Keese

        RUSS M. HERMAN, ESQUIRE
        Herman, Herman, Katz & Cotlar, LLP
        W. MARK LANIER, ESQUIRE
        The Lanier Law Firm

        ARNOLD LEVIN, ESQUIRE
        Levin, Fishbein, Sedran & Berman
        TROY RAFFERTY, ESQUIRE
        Levin, Papantonio, Thomas, Mitchell,
        Echsner & Proctor, P.A.
        CHRISTOPHER A. SEEGER, Esquire
        Seeger Weiss, LLP

        PERRY WEITZ, ESQUIRE
        Weitz & Luxenberg, P.C.
        COURT REPORTER:  Linda L. Golkow, RDR
                GOLKOW TECHNOLOGIES, INC.
              877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2             MR. BIRCHFIELD:  Sam, just
 3        so you know, we've got Linda here,
 4        and she's taking everything down.
 5             Judge Fallon has really
 6        stressed the transparency, but he
 7        will have a transcript available
 8        for his review and however he
 9        deems that the transcript should
10        be used.
11             With that being said, the
12        floor is yours.
13             MR. ALLEN:  Well, gentlemen,
14        I know most of you, and some of
15        you I have just met today.  My
16        name is Sam Allen, and I'm a
17        partner with Mark Clore and Bob
18        Berry with Anastopoulo & Clore.
19        We have a small practice that does
20        products liability, medical
21        malpractice, and other specialty
22        litigation, but exclusively
23        litigation work.  Mark and Bob
24        were partners here in Texas for
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        about 30 years doing specialty
 2        work in medical malpractice.  We
 3        were involved in Baycol pretty
 4        extensively, had the Strong case
 5        in working with Andy and others
 6        and trying to get maximum value in
 7        Baycol.  Chris and the people that
 8        I'm familiar with on this panel,
 9        in trying to maximize the value of
10        that, we found out that sometimes
11        it helps to have people like Mark
12        and Bob's experience in context
13        with experts, obviously, in these
14        type of litigation cases to get
15        the premier experts for the
16        bellwether cases.
17             We did the same thing in the
18        Vioxx litigation from the point of
19        view of trying to go out and get
20        some exclusive experts for
21        specific reasons, particularly for
22        bellwether cases.  We were able
23        to, with the help of Joe
24        Alexander, retain a gentleman in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
1        cardiology by the name of Mark
2        Entman, one of the top
3        cardiologists at the Baylor
4        College of Medicine.  He sent a
5        pretty specific detailed report to
6        Mr. Gallagher in support of
7        allowing review of cases after we
8        met with him and talked with him,
9        probably a gentleman that would
10       not have come into the Vioxx
11       litigation had it not been for
12       Mark's experience and time with
13       Mr. Entman.
14            Because the focus in, I
15       believe --
16            MR. SEEGER:  I'm sorry.  It
17       is A-N --
18            MR. ALLEN:  Mark Entman,
19       E-N-T-M-A-N.
20            We then spoke with other
21       individuals about where we could
22       be of assistance with experts.  I
23       think everybody in this room is
24       familiar with the difficulty we
```

FAC Resp. Exhibit D -- 29

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        were having with cardiovascular

 2        cases, and as far as getting top

 3        end cardiologists, but more

 4        importantly, we were having a lot

 5        more difficulty in the stroke

 6        cases.  So --

 7             MR. BIRCHFIELD:  Entman, was

 8        he designated as the expert in the

 9        Ledbetter case, do you know?

10             MR. ALLEN:  I can't tell you

11        today for sure which one that was.

12        I know he was designated in our

13        case, which was the top case to be

14        released on the Texas consolidated

15        litigation after, obviously, some

16        cases were tried outside of that.

17        Mark's case was tried outside of

18        that.  Kathy's case was tried

19        outside of that.

20             As of the e-mail that I

21        attached, we were the next case to

22        be released hopefully, called

23        Colleen Reck, death case of Fred

24        Reck.  That case was filed in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1           Tarrant County, but we believe

2           that that's going to be tried

3           either through some consolidated

4           issue where a judge would be

5           assigned to it or not.  We got

6           through discovery on that.  He was

7           designated in that.

8                To go back to discussing

9           experts, we were trying to help

10          regarding the stroke cases.  We

11          were able to get John Abrahamson

12          on board and retained to help

13          also.  This is pretty much where

14          our efforts were focused in the

15          case, was helping in getting those

16          experts lined up.

17               We then spoke, I believe,

18          with Beasley Allen and maybe you,

19          Chris, regarding how we could

20          potentially get one of our cases

21          lined up for a bellwether case, a

22          stroke case for the MDL.  That's

23          what we were discussing trying to

24          get done.  After review of our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        cases, we didn't have it.  We

 2        didn't have one that we felt was

 3        going to be one we would want to

 4        put forward, although we did feel

 5        the Reck case was one we could try

 6        successfully.  It was a gentleman

 7        who had no cardiac history

 8        whatsoever, and upon autopsy had

 9        no cardiovascular disease at all,

10        drew a large clot and died.  So,

11        we felt like that case would do

12        well.  That's how we promoted it

13        up.  It was already filed in the

14        Texas litigation and was working

15        from that point of view.

16            I'm simply here asking you

17        for reimbursement for costs of the

18        retainers of those experts, which

19        is actually -- and I think the

20        total amount we're seeking is less

21        than $100,000.

22            MR. SEEGER:  Were the

23        reports sent on either to my

24        office or somebody's office?
```

FAC Resp. Exhibit D -- 32

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1              MR. ALLEN:  I attached
 2         Entman's letter to Mike Gallagher
 3         as part of his efforts to support
 4         and willingness to support the
 5         Texas consolidated litigation
 6         statements, but I don't know that
 7         it went further from there.
 8              MR. BIRCHFIELD:  Can you get
 9         that in?  Send it to Lenny Davis
10         at Russ Herman's office.
11              You've submitted those costs
12         to Wegmann?
13              MR. LEVIN:  Costs have been
14         submitted, and you just made some
15         money today.
16              MR. SEEGER:  Arnold, do you
17         have the whole amount?
18              MR. LEVIN:  You submitted
19         $197,000 in costs.  It's okay.
20         Don't look surprised.  You are
21         okay.
22              MR. ALLEN:  I think it was
23         $97,000.
24              MR. LEVIN:  I had the wrong
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          guy.

2               MR. HERMAN:  Anything you

3          want to send, you can e-mail it to

4          ldavis@hhkc.com.  The phone number

5          is (504) 581-4892.

6               MR. SEEGER:  We just need to

7          make sure we have the expenses.

8               MR. ALLEN:  I don't want to

9          misspeak, because one of the other

10         things that was submitted as part

11         of that cost was a database

12         contribution of $50,000.  That was

13         one part of that -- part of the

14         cost that was submitted.

15              MR. LEVIN:  Ed will

16         straighten me out.

17              MR. BLIZZARD:  You submitted

18         a total cost of $101,366.40, and

19         those costs to this point have

20         been rejected.  But as Russ points

21         out, we'll do what we can to put

22         you together with the accountant

23         to make sure that everything that

24         can be done is done to comply with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1              their requirements.

2                   Also, is Abrahamson the

3         doctor from Massachusetts?

4              MR. ALLEN:  No, different.

5              MR. BIRCHFIELD:  John

6         Abrahamson not from Harvard?

7              MR. ALLEN:  I'm not sure.

8              MR. BIRCHFIELD:  You are

9         talking about a different John

10        Abrahamson.

11             MR. ALLEN:  I believe since

12        that rejection, I filed with the

13        accountant an amended petition and

14        withdrew -- I have it right here.

15                  The main request was for

16        Abrahamson, and Richard Zane was

17        also retained.  Because 93 percent

18        of the total costs were in four

19        separate transactions, three

20        retention bills and a contribution

21        to the OCR documents and some

22        hours that were submitted on

23        behalf of preparing expert

24        packages by staff that we --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        specialized staff we hired to do

2        that.  I think there's like 500

3        hours or so submitted regarding

4        those staff and individuals coming

5        down and meeting with the experts

6        and doing those type things to

7        make sure we can get them on

8        board.

9            The other thing is, I'm here

10       really on behalf of my select

11       handful of clients because,

12       obviously, that $100,000 would

13       make a difference in their

14       recovery now that you take away

15       $100,000 from the case that you

16       really thought had more than $1

17       million value and under the new

18       structure, obviously, what's best

19       for our clients, but not

20       necessarily best for the

21       bellwether clients who would have

22       had a stronger case.

23            I want to answer any

24       questions that the board might

FAC Resp. Exhibit D -- 36

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          have.

2                    MR. GIRARDI:  No questions.

3                    MR. HERMAN:  Thank you.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4   Public and Certified Court Reporter of

5   the State of New Jersey, Registered

6   Diplomate Reporter, Federally-Approved by

7   the United States District Court of

8   Pennsylvania, do hereby certify that the

9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23        Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 38

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:          ANDREWS & THORNTON
               Anne Andrews, Esquire
               John Thornton, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 39

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -
 2               MR. GIRARDI:  As you can
 3         see, there's a court reporter in
 4         the room, and she's taking down
 5         these proceedings for Judge
 6         Fallon, because at the end of the
 7         day, he's the person that has to
 8         make the final evaluation of
 9         everything.
10               It is pretty much of a free
11         fashion sort of a situation.
12         Primarily, we're interested in
13         contributions to the Vioxx effort
14         as opposed to maybe individual
15         cases.  That's the format of this.
16         That's what we would like to get
17         your thoughts about with respect
18         to the record in the case.
19               MR. THORNTON:  You know you
20         are going to have Anne first.
21               MS. ANDREWS:  I'm first up
22         because I sort of started this
23         story.  I know all of you in the
24         room, some better than others.
```

FAC Resp. Exhibit D -- 40

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        But the story of why our role in

2        the Vioxx litigation became of

3        interest and we think we would

4        like to be compensated for it is

5        because for several years before

6        the Vioxx litigation started, this

7        firm had focused its efforts on a

8        drug case that -- a dietary

9        supplement case involving a drug

10       now outlawed by the name of

11       Ephedra, and it took us very

12       deeply into the world of

13       cardiology.  We had a real fight

14       on our hands in that case with

15       turning around an industry, a

16       government.  In fact, you know,

17       the story of that case is not just

18       that we were able to persuade the

19       top experts in cardiology in the

20       United States, if not the world,

21       to take our side against this

22       powerful industry, but they, in

23       fact, were the main course of our

24       Daubert proceedings in an MDL that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        Ed was -- I was lucky enough to

 2        work with Ed Blizzard on, and

 3        Chris Seeger was familiar with

 4        that litigation and even Ellen

 5        Relkin from Perry's firm, Weitz &

 6        Luxenberg, was a colleague of ours

 7        in that litigation and remains a

 8        colleague and a friend of mine

 9        today.

10             Your role --

11             MR. THORNTON:  My role was

12        my role.

13             MS. ANDREWS:  And you

14        certainly know the story.

15             That trial brought us into

16        the wheelhouse of some of the

17        great cardiology experts in the

18        world who had never testified in

19        the history of litigation against

20        big pharma.  As a matter of fact,

21        they had been only ever clinical

22        researcher and provided

23        Congressional testimony and, in

24        fact, court testimony for big
```

FAC Resp. Exhibit D -- 42

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
1        pharma.

2             As a matter of fact, kind of

3        a centerpiece expert of this case

4        who is familiar to all of you now

5        is Dr. Douglas Zipes, who had

6        actually been a Daubert qualified

7        witness for the defense in Judge

8        Fallon's courtroom.

9             So, there was a particularly

10       interesting moment during this

11       litigation in New York where Ed

12       and John and a number of other

13       people worked very hard for many

14       years to bring it to a successful

15       conclusion in a very lengthy

16       Daubert trial when y'all were

17       transferring cases to the Vioxx

18       MDL.  We knew because of our very,

19       very close encounters and length

20       of time that we worked with

21       Douglas Zipes that he was being

22       courted by industry to work on the

23       Vioxx litigation by Pfizer, Merck

24       and others.  We knew because he
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1          was sharing with us what they were

 2          asking of him at that time.

 3                So, there was a moment in

 4          time where the discussion about

 5          the drug and the events that were

 6          rapidly developing, he was often

 7          writing the Wall Street Journal

 8          about many breaking events at the

 9          time, he was a much quoted source

10          for the New York Times and the

11          Wall Street Journal, that I made

12          the bold move and retained him for

13          the Vioxx clients that we probably

14          didn't represent at that time.

15                MR. THORNTON:  For us all.

16          We didn't have any Vioxx clients.

17                MS. ANDREWS:  We didn't have

18          any Vioxx clients, but we knew

19          that this was going to be an

20          important time that Andrews &

21          Thornton was in a unique position

22          to have the access and the

23          credibility and the knowledge to

24          turn them into a very important

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1             think tank.

2                   So, with that, Dr. Zipes

3             accepted.  I want it to be very

4             clear, and it's on the record, and

5             the methodology of what I did and

6             when I did it has been testified

7             to, I'm sure some of you were

8             present for it, I'm sure some of

9             you have read that testimony,

10            because he was certainly

11            cross-examined any number of times

12            about it, was that he was asked by

13            Andrews & Thornton and retained to

14            review all of the medical

15            literature pertaining to COX-2s

16            and to review all sides of the

17            issue.  Everything about a

18            comprehensive analysis would be

19            made by him of the drug, of the

20            data.  We knew from working with

21            Dr. Zipes how he worked and what

22            his requirements were and what it

23            would take for him to become

24            persuaded to a position.  So, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          embarked on that journey.

2                    MR. SEEGER:  Besides Mark

3          Robinson, who at the MDL did you

4          work with or coordinate with on

5          Zipes and science?

6                    MS. ANDREWS:  John Restaino

7          through Steve Skikos.

8                    MR. THORNTON:  And you met

9          with --

10                    MS. ANDREWS:  And later

11          meetings -- initially, it was

12          Steve through John, and then we

13          had a face-to-face meeting where

14          Dr. Zipes met with your firm, met

15          with Dave Buchanan.  We had a very

16          lengthy --

17                    MR. THORNTON:  That was in

18          May of 2005.

19                    MR. LEVIN:  Michelle

20          Parfitt, several, Chris Tisi.

21                    MS. ANDREWS:  But the

22          scientific presentation of the

23          plaintiffs' case had sufficient

24          enough -- had been sufficiently

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          developed enough that there was a

2          critical kind of exquisite moment

3          in Washington where Michelle and

4          Dave and Troy Rafferty were all in

5          the same room working on the case,

6          and I was able to bring all the

7          people into the same room and let

8          them sort of hear from Dave

9          principally, Chris, and Troy was

10         also very enthusiastic, the story

11         of the plaintiffs' case

12         essentially.  He was open to it at

13         that point because he had reviewed

14         a lot of the materials.

15              MR. WEITZ:  Did that become

16         part of the MDL trial package?

17              MS. ANDREWS:  It was an off

18         the record --

19              MR. THORNTON:  I don't think

20         so.

21              MR. WEITZ:  I mean the Zipes

22         --

23              MR. THORNTON:  The Rule 26

24         report?  We circulated it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1            MR. SEEGER:  I would imagine

2        it would be --

3            MR. LEVIN:  It was used in

4        Barnett, and Barnett was part of

5        the MDL product.

6            MR. THORNTON:  Can I explain

7        what we did.  I don't want to step

8        on your --

9            MS. ANDREWS:  I'll let John

10        address what became part of the

11        trial package.

12            MR. THORNTON:  Let me

13        explain briefly what we did.  I

14        think Chris knows the story.

15            Part of what we did had a

16        lot of sensitivity.  What Zipes

17        really had in mind to do, and we

18        worked through this with a

19        consultant we used named Mark

20        Haigney, who is a top doc in his

21        own right, but not quite a

22        national class doc.  He had this

23        concept that we're going to get

24        together a panel and we're going

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          to vet basically all the top

2          cardiologists in America.

3                 If I may go off the record.

4                     -   -   -

5                 (Whereupon, an

6          off-the-record discussion was

7          held.)

8                     -   -   -

9                 MR. THORNTON:  The concept

10         was that we vetted through this

11         process most of the top

12         cardiologists in America to see

13         who they were working for.

14                MR. WEITZ:  When was this?

15         When was this process?

16                MR. THORNTON:  This all

17         occurred basically from March --

18         in March and April and probably

19         May as well.

20                MR. WEITZ:  Of what year?

21                MR. THORNTON:  Of '05, the

22         vetting process.

23                We came up with a concept,

24         because we knew Vioxx was going to

FAC Resp. Exhibit D -- 49

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           be really big.  We're proud of our

2           victory in Ephedra, but we knew

3           the Ephedra industry wasn't Merck.

4           This was going to be big, and this

5           was going to be a full scale war.

6           We came up with this concept of,

7           instead of developing one expert,

8           developing a panel of experts in a

9           systematic way that would be very

10          difficult to impeach.

11               MS. ANDREWS:  They could

12          cover the disciplines that y'all

13          were advancing from

14          atherosclerosis to hypertension.

15          We knew this was going to be a

16          multidisciplinary MDL Daubert

17          hearing, and we were concerned

18          that no one expert could fill that

19          bill.  So, we wanted to really

20          push the data into a broad group

21          of people, from epidemiology,

22          through every -- these were all

23          superstars.

24               MR. THORNTON:  Sometimes we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          didn't get exactly the person we

2          were looking for, but --

3               MR. WEITZ:  Was this an

4          assignment from somebody, either

5          from the MDL or from State Court?

6               MR. THORNTON:  I would

7          describe it as our idea.  We took

8          it to Restaino and Skikos, who

9          said, this is really a good idea,

10         and then we did it.

11              MR. WEITZ:  That's

12         important, because John was the

13         co-chair of the science committee

14         for the MDL.

15              MR. THORNTON:  I understand.

16         Restaino, we've been working

17         together on cases for over a

18         decade.  Restaino said it was

19         cool, and Skikos said it was cool.

20              So, we got these guys, and

21         I've got pictures of them.  These

22         were people not only that were

23         good researchers, but they weren't

24         people that couldn't talk.  They

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          were people who could command.

2          They were people of authority.

3          They were people not just with a

4          great CV, but they were opinion

5          leaders in the cardiology

6          community, because really what we

7          wanted to make sure of is that

8          Merck didn't manage to come up

9          with a whole group of opinion

10         leaders in the cardiology

11         community on the other side.

12         Believe me, the cardiologists at

13         the outset, they had read a little

14         bit from the New England Journal,

15         but they didn't understand Vioxx

16         from anything until we had this

17         panel.  So I got the people in

18         here.

19              Paul Ridker could have been

20         a tremendously dangerous guy on

21         the other side.  He is a

22         cardioepidemiologist of just

23         incredible renown.  Jeffrey Popma,

24         who did testify in the Barnett

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          trial, it turns out.  And Doug

2          Zipes, who became the star of the

3          litigation.

4                  MR. SEEGER:  He's cardio

5          also, Popma?

6                  MR. THORNTON:  Yes.

7                  MS. ANDREWS:  Yes.

8          Interventional.

9                  MR. THORNTON:  So we put

10         Haigney in and paid Haigney a lot

11         of money.  So, what we did is, we

12         came up with the most neutral

13         package of literature possible, we

14         arranged basically this panel.  We

15         paid everybody basically a

16         comparable amount to the amount

17         the pharmaceutical industry paid

18         them.  And the goal was to really

19         basically let them all meet

20         together.  Our real thought was to

21         try to put together a consensus of

22         these experts without attorneys

23         being around so we could mass

24         produce experts on the one hand,

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          but organically through a process

2          that they couldn't be impeached

3          for.

4              I've included the panel, the

5          agenda of the first scientific

6          discussion that they had.  They

7          had this meeting without lawyers

8          present, and it achieved 100

9          percent consensus that Vioxx

10         causes heart attacks and Vioxx

11         causes death.  All these really

12         excellent, extraordinary

13         physicians, each and every one of

14         them was ready to go forward at

15         the next meeting, was interested

16         in the litigation.  Not one of

17         them said, no, it's too difficult

18         for my blood.

19             MS. ANDREWS:  Or it's not --

20         the evidence is close.  It was not

21         close.

22             MR. THORNTON:  Overwhelming.

23             MS. ANDREWS:  Overwhelming

24         evidence for us for the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1        plaintiff's position in which they
 2        agreed to come to a second meeting
 3        for a slightly more in tune
 4        agenda.
 5             By then, by the time of the
 6        second meeting, the New England
 7        Journal of Medicine scandal had
 8        broken.
 9             MR. THORNTON:  That was very
10        helpful, because it was exactly --
11             MR. SEEGER:  That made them
12        feel like they were on the right
13        team, right?
14             MR. THORNTON:  Right.  The
15        first panel meeting was science
16        kind of removed, the
17        unimpeachable.  The second panel
18        meeting was sort of the Dave
19        Buchanan meeting, we did it, but
20        where Skikos and Anne and I really
21        presented a very strong statement
22        of just -- I've got a great little
23        cartoon here that I really enjoy.
24        I'm going to have to buy this one,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          the ability to obscure truth.

2                   And so we told them about

3          the scientific advisors, and I'll

4          tell you, there are two slides

5          that they just obsessed on.  One

6          is, of course, the --

7                   MR. SEEGER:  The Scolnick

8          e-mail.

9                   MR. THORNTON:  The Scolnick

10         e-mail.

11                  MS. ANDREWS:  They were

12         shocked.

13                  MR. THORNTON: They know

14         Scolnick.  And I remember they

15         were looking, saying, yeah, he

16         knew.  He knew.

17                  MS. ANDREWS:  The second

18         meeting was the show us meeting.

19         It really proved to us bad things

20         happen because drugs get out and

21         hurt people and we don't know for

22         many, many years what happens, but

23         you show us bad conduct in this

24         second meeting, we're all in.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1                MR. THORNTON:  They weren't
 2           buying the naproxen
 3           rationalization.  The other one
 4           was Konstam, because they think --
 5           it was kind of a view that
 6           Konstam's piece in defense of
 7           Vioxx early threw a lot of
 8           physicians off.  They had some
 9           fairly grave remarks about that as
10           well.
11                MR. SEEGER:  About his piece
12           on the APPROVe data?
13                MS. ANDREWS:  Exactly.
14                MR. THORNTON:  We spent
15           $194,749 on these experts, 200
16           grand out of our little firm, and
17           at this point we were creating
18           experts --
19                MR. LEVIN:  This may be a
20           good time to go over this.
21                MR. THORNTON:  -- for the
22           greater war.
23                MR. LEVIN:  John, we have
24           the hours that you reported to the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1           accountant.  We also have your

2           costs here.

3                   MR. THORNTON:  Okay.

4                   MR. LEVIN:  But we also know

5           from their report that all your

6           hours are rejected.  Don't get

7           excited.  $166,000 worth of costs,

8           all of your costs were rejected.

9                   MR. THORNTON:  Not

10          encouraging.

11                  MR. LEVIN:  This may mean

12          you filled out the wrong forms.

13                  MR. SEEGER:  It is probably

14          formatting.

15                  MR. LEVIN:  Call Leonard

16          Davis at Russ Herman's office,

17          (504)581-4892, and have him put

18          you as soon as possible in touch

19          with a Phil Garrett at the

20          accounting firm so that they could

21          work it out with you.  If you are

22          having any problems, give me a

23          call.

24                  MR. SEEGER:  For your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        purposes, just so you know, we are

 2        treating this as if every nickel

 3        has been accepted.  We need the

 4        accounting done.

 5            MR. THORNTON:  Sure.

 6            MS. ANDREWS:  And whatever,

 7        wrong or right, we will fix it.

 8            MR. LEVIN:  When we file it,

 9        we want it to be right, but we're

10        assuming that it is right.

11            MR. WEITZ:  50 percent of --

12            MR. SEEGER:  You have a lot

13        of company in this respect.  A lot

14        of people have hours and money

15        rejected.  You are definitely not

16        the only one.

17            MR. THORNTON:  I set out

18        what the cost of these conferences

19        were just so you can understand

20        how much of this was really this

21        general expert development.

22        Because I know there's kind of the

23        sense that, well, aren't Anne and

24        John something to do with Barnett,
```

FAC Resp. Exhibit D -- 59

Page 22

```
 1          and certainly Barnett was the
 2          vehicle by which our project was
 3          realized.
 4               MS. ANDREWS:  The payload
 5          was delivered.
 6               MR. THORNTON:  But this was
 7          not a joint venture with the
 8          Robinson firm.  Robinson's claim
 9          to fame or the thing that he did,
10          I should say from the standpoint
11          of this, was that Robinson sent us
12          a case that met the criteria that
13          the panel was really looking for.
14          What was the panel looking for?
15          It came from Jeffrey Popma's lips.
16          How would I feel if I had a
17          patient who had these risk
18          factors?  Because we obviously
19          knew that Vioxx cases weren't
20          going to be easy, even though we
21          knew there was a good science case
22          against it, because we had a lot
23          of people with risk factors.  How
24          would I feel as a physician if I
```

Page 23

1          had a patient who was doing

2          everything right, exercising, on

3          medication, lowered lipids, all

4          that, and I gave them Vioxx for

5          symptoms and he had a heart

6          attack.  I would know in my heart,

7          now that I know this, now that

8          I've seen this, that the Vioxx

9          probably caused the heart attack.

10          That is the quintessential case

11          that we were looking for.  Mr.

12          Barnett was that case.  Mr.

13          Barnett was one of the most health

14          conscious people I've ever seen,

15          and he was the perfect -- he did

16          everything right, and Vioxx gave

17          him a heart attack, two heart

18          attacks, as a matter of fact.

19               We were not even retained by

20          Barnett until we had spent all of

21          this money and all of this time.

22          You will see a lot of our time --

23          most of Ann's time was before

24          Barnett at all.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1              I might mention who Dr.

2         Shlipak is.  There's a fairly

3         large expenditure for him.  He's a

4         professor of epidemiology in

5         biostatistics in San Francisco

6         State.  I used him as a consultant

7         in the epidemiologic issues

8         because Ridker is so busy that as

9         a practical matter -- the Rule 26

10        report is kind of two halves of

11        it.  There's the Barnett half,

12        which I had very little to do

13        with, and there's the generic

14        half, which I had a lot to do

15        with.

16              MR. SEEGER:  Did you guys

17        attend any or participate in any

18        of the science committee calls

19        that John Restaino would organize,

20        or were you communicating with

21        John, reporting to him and saying,

22        hey, we've got these experts,

23        John, I want you to know we've got

24        this guy warming up?  I just need

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          to get a sense of the structure.

2                MR. THORNTON:  I think there

3          were a number of calls we

4          participated in, but I don't think

5          that they were formal science

6          committee meetings.  Nobody said

7          this was a science committee

8          meeting.  But people were talking

9          about the issues.  I mean, Dave

10         was on a lot of these calls.  I

11         mean, just a handful of people

12         that really were in the know as

13         far as I was concerned about all

14         those issues.

15               MS. ANDREWS:  By the time

16         these reports were being drafted,

17         y'all were in your own state court

18         trials, and California was heating

19         up, and you guys were certainly in

20         the trenches, and everybody was

21         warming up.  We were sort of just

22         waiting for what we knew these

23         experts wanted in terms of the

24         right plaintiff.  We knew that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1          that person was going to arrive,

 2          that case was going to arrive, and

 3          we were looking for it and

 4          interacting with a number of our

 5          colleagues.

 6                  We had cases in Reno we were

 7          reviewing, and we didn't even put

 8          in time for the comprehensive

 9          review we did of the entire Reno

10          practice.  You will see Stewart

11          White probably later this

12          afternoon.  We were called in to

13          do the same thing and open up

14          another state court front.

15                  But we knew that the right

16          case was going to come.  By the

17          time it arrived, there were cases

18          that had been lost, there were

19          cases that had been won.

20                  MR. THORNTON:  Predictable.

21          Vioxx was not going to be all

22          victories with the patient

23          population.

24                  MS. ANDREWS:  Merck had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1          announced the scorched earth
 2          policy.  And it didn't look like
 3          there was going to be any changing
 4          from that policy until pretty late
 5          in the game.  Ellen Relkin and I
 6          were working on a collaboration of
 7          some of these experts with your
 8          next trial.  Next thing we knew,
 9          the settlement was being
10          announced.
11              MR. SEEGER:  I want you to
12          know, the reason I'm asking, and
13          what you are saying is very
14          helpful, but we're trying to get
15          down to where people actually
16          provided a common benefit.  So,
17          working up one expert for one
18          case, your own case, would be one
19          thing, but providing an expert for
20          an MDL trial like you did in
21          Barnett and working up other
22          experts that other people are able
23          to use is another.  I'm just
24          trying to connect the dots.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1              MR. WEITZ:  I know from my
 2         office that Anne and Ellen work --
 3              MR. SEEGER:  Yes.  And you
 4         are telling me you were talking
 5         with Dave, too, so those are the
 6         kinds of people, if they are in
 7         the loop, yes.
 8              MR. WEITZ:  Talking about
 9         cases, how many cases did your
10         firm have?
11              MR. THORNTON:  22.
12              MR. WEITZ:  Were they all
13         put into the settlement?
14              MR. THORNTON:  Yes.
15              MR. WEITZ:  Where were they
16         filed?
17              MR. LEVIN:  In the MDL or
18         state?
19              MS. ANDREWS:  Los Angeles.
20         State Court, Los Angeles.  MDL and
21         a few in Los Angeles.
22              MR. WEITZ:  In any of those
23         cases, were they prepared for
24         trial?
```

FAC Resp. Exhibit D -- 66

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1            MR. THORNTON:  No.  No.  We

2       were never assigned a trial date,

3       and we didn't think that our cases

4       were necessarily trial worthy.

5       You might have been able to win it

6       but --

7            We worked with and didn't

8       put in the time -- we were

9       developing Michael Shlipak for the

10       retrial of the Appell and Arrigale

11       trial with Tom Brandi, a lot of

12       stuff behind the scenes.  We were

13       trying to work things out to try

14       to help the general good.

15            MS. ANDREWS:  When we were

16       called, usually when something was

17       not coming together in a case and

18       it was in Tom Brandi's case, we

19       were close with his trial team,

20       and they would say, you know, we

21       really are in trouble on this

22       issue, can you help.  And John

23       would jump on a plane, run to

24       wherever they needed us, develop

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          an expert.

2                    MR. THORNTON:  There were so

3          many people that did that.  John

4          Hornbeck.

5                    MR. WEITZ:  You should

6          submit the hours for that work.

7                    MS. ANDREWS:  We're not the

8          only ones.

9                    MR. THORNTON:  I've been

10         really bad about submitting hours.

11         A lot of this time was

12         reconstructed.  I think it is very

13         accurate reconstruction because I

14         keep -- I know what I was doing on

15         that exact day.

16                   MS. ANDREWS:  I think the

17         thing that I would like this

18         committee to know the most about

19         what we feel we did was, we

20         devised a strategy that we

21         discussed with this committee's

22         leadership, the science

23         committee's leadership that was

24         extremely unique, was very risky.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          We had no idea if all of these

2          giants in cardiology were going to

3          jump on our team and on our side,

4          and we certainly -- when they all

5          did with the force in which they

6          did, to then go into the case

7          specific work that it would take

8          to get each one of them ready for

9          a trial never occurred.  But Doug

10         Zipes and Jeff Popma did come to

11         the only MDL trial, and the

12         benefit of that testimony we

13         certainly think you all know the

14         full value of.

15              MR. THORNTON:  It is

16         important to see what experts of

17         this quality bring to something

18         like this.  So, they see Barnett.

19         They get Barnett's series of

20         medical records.  They say he

21         meets the profile.  They are the

22         ones that found the thrombus on

23         the angiogram, and I say "they"

24         meaning Zipes and Haigney, who was

Page 32

```
 1          basically working as his

 2          assistant.

 3               Then we decided we should

 4          bring Popma into the case because

 5          it was the issue of whether there

 6          really was a clot or whether there

 7          wasn't a clot, but there were some

 8          issues like that.

 9               Zipes found the Q wave, that

10          it was a Q wave MI, which the

11          treaters hadn't found.  Nobody had

12          found it up until that time.

13          Zipes basically found the second

14          heart attack.  It became really a

15          big issue in the trial.  Beck in

16          his opening statement comes out

17          and calls Zipes out, I mean, Doug

18          Zipes is lying to you guys, and

19          he's made up this second heart

20          attack for litigation.  And

21          Haigney and I looked at each other

22          and said we're going to kill that.

23          And so we run down and work with

24          those DecisionQuest people, who
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1          were pretty remarkable of creating

 2          what we conceived, and I have one

 3          color version of the slide that we

 4          showed the difference in the

 5          perfusion between the two dates.

 6               MR. SEEGER:  John and Anne,

 7          could you take a minute to sum up.

 8          One thing you just did that was

 9          very helpful was saying this is

10          what I feel like our big benefit

11          was, and we get that.  It's just

12          so we can keep the schedule going.

13               MS. ANDREWS:  We provided

14          the linchpin expert for the only

15          MDL trial that we think caused a

16          general causation finding for

17          which every plaintiff was going to

18          be able to use the benefit on a

19          multi-disciplinary approach on two

20          theories.  The fact that we

21          started it way in the beginning

22          and pulled it through to this one

23          trial -- we're not going to take

24          credit for the results in Barnett.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1        We're taking credit for the

2        science that was pulled through

3        the needle and all the work it

4        took to build a fabric of that

5        trial through these experts that

6        turned the tide in this

7        litigation.  We feel that that was

8        a very important piece that only

9        our firm with these experts could

10       provide and would dare take credit

11       for among all the contributions of

12       all of you.

13            MR. THORNTON:  So many

14       contributions helped.  I mentioned

15       in the PowerPoint of all the

16       people that helped us from Dave to

17       Hornbeck to Skikos to Restaino.

18       But I think we did a little bit

19       more than that really.  I think,

20       remember, Merck knew about this

21       panel.  They knew that there were

22       these top cardiologists out there,

23       they were very agitated about it.

24       They made an in limine motion to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          keep the entire panel discussion

2          out.  So, at least we were

3          vindicated that we had not created

4          a problem with impeachment.  They

5          knew these other experts were

6          there.  We were actually trying to

7          encourage people to use other

8          experts.

9              The only unfortunate thing

10         that happened in my mind after

11         this was over, after Barnett, is

12         that everybody made Zipes the

13         superstar.  And Dr. Zipes is a

14         superstar, but there was a panel

15         of superstars.

16             MS. ANDREWS:  And Marty

17         LeWinter, terrific.

18             MR. THORNTON:  We were

19         really quite anxious that others

20         were used, because there was so

21         much talent here.

22             MR. SEEGER:  Did you work

23         with experts from any of the other

24         trials, winning or losing, other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1           than Barnett, just so we have a

2           picture?

3                   MR. THORNTON:  I worked a

4           little bit with Kronmal --

5                   MS. ANDREWS:  And with the

6           epis.

7                   MR. THORNTON:  Nothing I

8           even submitted.  Shlipak, we had

9           him set aside for the retrial in

10          California.

11                  MS. ANDREWS:  You know, Doug

12          Zipes because of the illness of

13          the epidemiologist, happened to

14          take on the third discipline of

15          epidemiology in Barnett.  He

16          carried three different

17          disciplines that, quite frankly,

18          we only ever targeted him for one.

19          So, it was a unique circumstance.

20                  MR. GIRARDI:  Anne, to your

21          credit, with a small number of

22          cases, you put out $250,000

23          basically for the benefit of

24          experts to be used in other cases.

FAC Resp. Exhibit D -- 74

Page 37

1           250, I'm just using that number,

2           plus or minus, but that's about

3           right.

4                MR. SEEGER:  You submitted

5           all of that, right?

6                MR. LEVIN:  It is here.  It

7           has to be moved from one column to

8           another.

9                MR. THORNTON:  Just to give

10          you an idea of the fact that it

11          was the experts, the compact we

12          made with the experts, because

13          they were reluctant to get

14          involved in this wild litigation,

15          was I will protect you.  We will

16          protect you.  We are not the

17          agents of Mark Robinson in the

18          Barnett case.  We are actually

19          your agents in assuring you that

20          your professional standing and

21          reputation is held up.  I was in

22          Barnett until Dr. Zipes testified,

23          and I left -- and Dr. Popma

24          testified in that trial, too.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

```
 1          People don't talk about that.  He
 2          was a tremendous --
 3               MR. SEEGER:  Actually, Steve
 4          Skikos told us that.
 5               MR. THORNTON:  They were
 6          really good.  And if the war had
 7          continued, I think eventually they
 8          would have all been used.  That
 9          was fully my expectation, with the
10          possible exception of Ridker, who
11          was so darn busy that it may have
12          been another matter.
13               MR. SEEGER:  Thank you.
14          That was very helpful.
15               MR. THORNTON:  Thank you.
16               MR. GIRARDI:  Thank you.
17                    -  -  -
18
19
20
21
22
23
24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23        Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 77

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:   ASHCRAFT & GEREL, LLP
        Christopher V. Tisi, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

        1                  -  -  -

        2              MR. HERMAN:  As you can see,

        3          everything is recorded.  You are

        4          going to be getting a copy of what

        5          everybody has had to say at some

        6          point.

        7              If we can't resolve fees,

        8          the judge is going to go through

        9          some process similar to Murphy Oil

       10          where he's going to have lawyers

       11          come in, swear under oath, be

       12          cross-examined.

       13              If there's some addition or

       14          subtraction you want to make to

       15          your affidavit, at that point we

       16          can't resolve all the fee issues,

       17          I would go ahead and do that.

       18          Basically that's it.

       19              MR. TISI:  Okay.  Just for

       20          the record, my name is Chris Tisi,

       21          and I'm a senior partner at the

       22          law firm of Ashcraft & Gerel.  I'm

       23          going to try to be quick, as quick

       24          as I can.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           Really, I do have to say

2      this.  I've been involved in a

3      couple of these things, and this

4      is the first time I've had the

5      opportunity to actually present.

6      So, I really do appreciate the

7      opportunity to do that.  Vioxx has

8      been a labor of love for me and

9      for people in my firm.

10          I've spent the better part

11      of four years, four-plus years,

12      almost five years, working on this

13      litigation, even though I think we

14      only had about 100 cases.  So, I

15      do appreciate the opportunity to

16      at least present myself and to be

17      cross-examined, if need be, not

18      only on my work, but on other

19      folks' work.  I'm happy do that.

20          I did prepare a little bit

21      of a presentation.  I'm going to

22      hand it out.  It is mostly for my

23      own guidance, so you can follow it

24      or not if you want to, but this is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          it.

2                (Handing over document.)

3                I know some of you real

4          well.  Some of you I don't know

5          very well, and so I think I'm kind

6          of in a unique position, because I

7          did a lot of MDL work, but I also

8          did a lot of work on the stateside

9          as well, and so some of the folks

10         who did MDL work may not be aware

11         of the work we did on the

12         stateside and vice versa.  So, I'm

13         going to try to take the

14         opportunity to do both.

15               MR. HERMAN:  I want to state

16         one other thing on the record.

17         Excuse me.

18               A number of you know that in

19         some cases we partner with

20         Ashcraft & Gerel.  We did not do

21         that in this case.  The work that

22         Chris and his firm did was work

23         they did independently of any

24         association.  We don't have any

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          fee sharing, cost sharing or

2          anything else in Vioxx.

3              MR. TISI:  Thank you.

4              This is what I'm going to

5          do.  I'm going to go over, I

6          think, generally speaking, what we

7          did both on the State and Federal

8          side, and then I want to focus

9          primarily on the factors that

10         Judge Fallon laid out in PTO 6.

11             On the second page of this,

12         on the PSC side, I think it is

13         fair to say that I was a very

14         active member of the Plaintiffs'

15         Steering Committee; an active

16         chair, vice chair of the discovery

17         committee with Troy and Dave

18         Buchanan; very active with the

19         science and expert committee,

20         working up, I think, several key

21         experts in the case with others;

22         an active member of the briefing

23         committee; an active member of the

24         privilege committee; and an active

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          member of the trial package

2          committee for both stroke and MI.

3               Now, I say "active," because

4          I think it's important to note

5          that when we did the work that we

6          did, it was not with the intent of

7          trying to have titles.  It was an

8          intent to try and actually do the

9          work, and I think we did do that.

10              I think we also contributed

11         to most of the trials -- a

12         majority of the trials that were

13         involved in both federal and state

14         court, and I think we actively

15         worked on Humeston I, on Humeston

16         II, we worked on Irvin I, Irvin

17         II, Barnett, I helped Mark and

18         others.

19              MR. HERMAN:  Let me stop

20         you.

21              Tell me what you did in

22         Barnett at Mark's request.

23              MR. TISI:  As I recall it, I

24         wasn't at the trial itself, but as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1           I recall, his primary liability

2           witness was Jerry Avorn.  Apart

3           from actually having done that

4           deposition and prepared that

5           deposition, it was the first trial

6           in which that deposition was

7           actually used.  So, I prepared not

8           only for the Daubert hearing that

9           preceded that case, although the

10          judge ultimately decided that

11          there was nothing here, because he

12          was so well qualified, but I

13          prepared with Lisa Dagostino, we

14          prepared the direct examination,

15          the counters, the cross, the

16          objections, all of those things

17          were done in anticipation of the

18          Barnett case.  So, I know that he

19          called me to help him with

20          Pechmann, but that was more

21          tangential than anything else.

22          So, that was primarily my role in

23          that case.

24               MR. BLIZZARD:  Was there a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          better deposition taken in the

 2          case than Jerry Avorn?

 3               MR. TISI:  I tend to think

 4          he did pretty well.

 5               MR. BLIZZARD:  The lawyer

 6          did pretty well, I think.

 7               MR. SEEGER:  I agree with

 8          that.

 9               MR. TISI:  So, that's kind

10          of the overview.  But let me just

11          focus on some of the criteria that

12          I think at least I would like to

13          focus on.

14               When I was preparing to make

15          this presentation, I thought that

16          if you combined all the 14 factors

17          together, the question would be

18          whether or not, if you pulled the

19          lawyers or the firm out of a mix,

20          would the case have been

21          substantially different in the way

22          that it was rolled out.

23               MR. SEEGER:  That's a very

24          good test.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1                MR. LEVIN:  That's well put.
 2                MR. TISI:  I really do think
 3         that in several material ways, and
 4         I'm going to just highlight the
 5         ones that I really think that I'm
 6         most proud of and that we
 7         contributed to, the ways in which
 8         the case changed over time because
 9         of the work that we did.
10                I'm going to take these a
11         little bit out of order.  I'm
12         going to focus first on the preMDL
13         work and the preVioxx withdrawal
14         work.  I remember getting a call
15         from Dave Buchanan, we were
16         wrapping up the Rezulin work, and
17         Dave said, we're working on this
18         case, I would really like you to
19         work on it, it's a clinical trials
20         case.  You worked with a guy by
21         the name of Dick Kronmal, I have
22         him as an expert in this case, and
23         I would really like to get you
24         involved in the case.  That was in
```

FAC Resp. Exhibit D -- 86

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          the spring -- I keep getting the
 2          years wrong.  That was in the
 3          spring of 2004.
 4               I went to New York, spent
 5          some time with Dave, Tom Moore, a
 6          couple other folks.  We went
 7          through the VIGOR trial, went
 8          through some of the data.  At that
 9          point, he had an initial, if I
10          remember correctly, initial report
11          done for Dick Kronmal and for
12          Wayne Ray.  Over the next couple
13          of months, he spoke to me and
14          others about how to plod out the
15          discovery in the case.  We spent
16          some time, I remember during that
17          time frame, I think you were
18          taking Adam Schechter, we did some
19          work in reviewing the documents,
20          and there was a lot of preliminary
21          work being done at that period of
22          time before there any was real
23          MDL.
24               MR. SEEGER:  As you said, it
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          was prior to the withdrawal, and

2          there were very few firms.  I

3          remember Dave being in my office

4          and us discussing, hey, we've got

5          to call Tisi to see if he is

6          available to help us.

7               MR. TISI:  I appreciated the

8          call, and I also do now.

9               MR. LEVIN:  And you will.

10              MR. TISI:  And really, that

11         was at that time when we didn't

12         really have that many cases.  I

13         mean, we had just a handful of

14         cases, if I remember correctly,

15         and he said, you have to get

16         involved in this, and we did.  The

17         case was obviously transformed by

18         the withdrawal of the drug from

19         the market and the establishment

20         of the MDL.

21              I know I was privileged, I

22         think, to be appointed to the

23         steering committee, and I know

24         some of you supported that, and I

Page 12

1          really appreciated that.  It was

2          an opportunity that I had not had

3          before.

4               We, Michelle Parfitt and I,

5          she worked more on the science

6          side, I worked more on the

7          liability side, but I really -- we

8          dove head -- I think it's fair to

9          say we dove head in.

10              Let me just back up for just

11          one second on the prespring

12          2004/2005 time.

13              Obviously there was no MDL

14          and there was no common benefit

15          work.  Now, I did have, obviously,

16          things that I did that I can

17          pinpoint by travel records and try

18          to reconstruct my time.  I did

19          pull together our time for that

20          time frame.

21              MR. LEVIN:  Did you put that

22          into the accountant?

23              MR. TISI:  We gave it to the

24          accountant.  But, quite frankly,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        for those of you that have worked

2        with us in the past, know that I'm

3        much better than I ever was,

4        Arnold, but, honestly, in the

5        preMDL time, there was just not --

6        we were all working on the

7        individual cases and for the

8        common good.  There was no real

9        reason to do that.  So, I

10       reconstructed what I could, and I

11       did what I did, and you have what

12       I have.

13            One thing I did not do.  If

14       I couldn't document my time in a

15       way that I felt comfortable with,

16       I didn't do it.  If I put an hour

17       of time, it is a real hour of

18       time.  I was better once the MDL

19       was put together, but in the

20       preMDL, there was just no need for

21       it.

22            The PSC work in the

23       committee and the leadership

24       factors, I think it is fair to say

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1        over the next three, four years,

 2        there was almost not a day where

 3        Troy or Dave or I or Lenny

 4        actually didn't spend time talking

 5        with each other.

 6              MR. SEEGER:  I don't want to

 7        interrupt your presentation, but

 8        there's a couple of important

 9        things.  One is really everybody

10        here is very familiar with how

11        important you are in this case.

12        Why don't you dive into the stuff,

13        the real projects that you owned,

14        that you were responsible for, the

15        prep work you did behind the

16        scenes, the trial support work you

17        did, let people know that.

18              MR. TISI:  I will, but I

19        think it's also important to know,

20        and I will do that right, but I

21        think it is really important to

22        know --

23              MR. SEEGER:  Now.

24              MR. TISI:  -- the grunt
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          work, the grunt work that was

2          done, the running the

3          depositories, the scheduling, the

4          scheduling and coordination with

5          State and Federal Court.  Dealing

6          with Ted Mayer and having

7          everybody being jerked all around,

8          quite frankly, all over the

9          country on just the scheduling

10         issues.  Running discovery

11         meetings, reviewing the documents,

12         reporting to the PSC on the weekly

13         calls.  All that stuff was just

14         part of the grunt work that we

15         did.

16              But going to the next page,

17         I really want to focus on some of

18         these things, as you said, Chris,

19         that I think I'm most proud of.

20              Early on in the case, I

21         think I drafted with Richard

22         Arsenault the plaintiff profile

23         form that was used, and I think it

24         was much more streamlined than

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          some of the other work on some of
 2          the other ones that we had had.
 3          We negotiated it, we briefed it, I
 4          think we submitted memos to you,
 5          Russ, that you submitted to the
 6          judge, and he ultimately decided.
 7          I think this is the first case I
 8          had the opportunity to develop a
 9          corresponding reciprocal
10          case-specific requirement for the
11          defense.
12               MR. SEEGER:  Had that ever
13          been done prior?
14               MR. TISI:  I appreciate the
15          softball.  That's a good one.  But
16          that's the first time it ever has
17          been done.
18               MR. HERMAN:  I want to say
19          that you championed that issue.
20          That issue would not have been
21          brought to the floor without you
22          pushing it.
23               MR. TISI:  I appreciate
24          that.  It came as a result of in
```

FAC Resp. Exhibit D -- 93

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1      fen-phen, going to the depositions

2      where the defense had more

3      information about the doctors than

4      I ever had, and it was a real

5      disadvantage.  I think it was

6      something that was taken and done

7      in New Jersey, I think you

8      transported a profile form into

9      New Jersey, so, it not only had a

10     benefit for the federal litigants,

11     but it also was used in the state

12     courts.

13          MR. SEEGER:  A lot of the

14     work that you did was both in the

15     MDL and in the state courts.

16          MR. TISI:  Yes.  Now, we

17     drafted the Interrogatories,

18     totally redrafted the

19     Interrogatories, and I venture to

20     say, in almost any case,

21     Interrogatories have not been

22     substantive.  The responses that

23     we got in this case were

24     substantive, because they were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        carefully drafted, they were
 2        negotiated ahead of time, and we
 3        got a lot of information about
 4        trials, about sales, marketing, et
 5        cetera, that were actually useful
 6        in the litigation.
 7             We worked with Jeff and Dave
 8        on the master set of Requests for
 9        Production of Documents.  We
10        negotiated with the Food & Drug
11        Administration, I know Troy and
12        Russ and Lenny and others.  We
13        worked to get those documents
14        produced in a timely manner and
15        developed a schedule to get those
16        documents done.
17             We had --
18             MR. HERMAN:  Excuse me.  Do
19        you recall being in Washington
20        with us when we met with the FDA?
21             MR. TISI:  Actually, I did
22        not go to that particular meeting,
23        Russ, because I couldn't make it,
24        but I was on the phone with them
```

FAC Resp. Exhibit D -- 95

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
1              repeatedly over time.
2                   MR. HERMAN:  I thought you
3              had gone with us.
4                   MR. TISI:  No.  I wanted to
5              go, but I couldn't get out of town
6              because I think we had a
7              snowstorm.  It was in the
8              wintertime.
9                   MR. LEVIN:  That's why you
10             live there.
11                  MR. TISI:  That's in
12             addition to having several people
13             at the depository.  I think we had
14             somebody pretty much living up in
15             New York at the depository during
16             that time.
17                  I want to focus and turn to
18             what I think I'm most proud of of
19             all the things.  When we got the
20             case in, most of the work that was
21             being done was depositions of the
22             corporate witnesses.  I think we
23             really pushed, I know I did, the
24             idea of going around the Merck
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          witnesses.  By that point, they
 2          had pretty much gone to school on
 3          just about everything we were
 4          doing, and I felt that the best
 5          thing that we could do was to try
 6          and develop a third-party strategy
 7          for getting key witnesses out in
 8          front, people like Nissen, Topol,
 9          Graham, Avorn and other people.
10          In retrospect, it seemed like it
11          was the right thing to do.  But at
12          the time, there was a lot of
13          controversy within the PSC and
14          elsewhere whether that was the
15          right thing to do, because a lot
16          of theses folks had had writings
17          out there, people wanted to rely
18          upon their writings, thought that
19          opening up to cross-examination
20          would not be the best thing to
21          do --
22               MR. SEEGER:  Everybody felt
23          it would be a mixed bag.
24               MR. TISI:  A mixed bag.  I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1          think in retrospect, it seemed
 2          like the right thing to do, but at
 3          the time, I think I was a real
 4          proponent of that, and we really
 5          discussed witness by witness
 6          whether that was the right thing
 7          to do.  And I put a chart here of
 8          just some of them.
 9               David Graham, we got his
10          documents.  We filed a motion, I
11          think the ruling on David Graham
12          was one of the more important
13          discovery rulings that we got from
14          the judge.  Mike Wenkowitz and I
15          worked on the brief.  I argued it.
16          We prepped him.  Tom Kline took a
17          great deposition, but I was second
18          chair of that one and worked very
19          closely with him on that.
20               Eric Topol, I don't think
21          anybody would doubt that that was
22          a terrific deposition.  There was
23          a lot of controversy on whether
24          that was the right thing to do.
```

Case 2:05-md-01657-EEF-DEK  Document 62659-29  Filed 03/04/11  Page 99 of 100

Page 22

```
 1              Dr. Fries --
 2              MR. SEEGER:  I need to make
 3         this comment, because it is
 4         important.  With Topol in
 5         particular, you were very much
 6         involved in that in every way,
 7         getting our team ready, and it was
 8         one that you really wanted to
 9         take, and somebody else was
10         actually put up for it, and you
11         graciously stepped back and
12         allowed it.  But it was one that
13         you --
14              MR. TISI:  I wasn't so
15         gracious at the time.
16              MR. SEEGER:  You were pretty
17         gracious, and that's a very good
18         example of where you were very
19         much a team player.  So, I just
20         think that's important, because I
21         was involved in talking to you
22         about that.  I think it is
23         important that people know that.
24              MR. TISI:  I think the one
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          deposition came later on in the

2          process that we kind of decided

3          was Steve Nissen, and I take

4          particular pride in that.  When I

5          took that one, he was a

6          participant in both of the

7          Advisory Committees involving

8          Vioxx, and I think having him on

9          board saying that I was pretty

10         much duped by the company in the

11         original -- if it had the

12         opportunity to be played more, I

13         think it was played in the

14         Illinois case --

15              MR. BIRCHFIELD:  It was.

16              MR. TISI:  -- it would have

17         been used more as time went on.

18              There were some we didn't

19         decide to take.  We really spent a

20         lot of time talking about

21         FitzGerald, whether that was the

22         right thing to do.  We decided

23         against it.  But the fact that we

24         didn't take it didn't mean that