HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          there was a lot of work that was

2          not done to vet that issue.  So,

3          we spent a lot of time on that.

4                  Marvin Konstam, et cetera.

5                  So, while there was a lot of

6          questions about the wisdom of that

7          strategy, I think these

8          depositions really were the

9          backbone or a backbone of trials,

10         and virtually all of these

11         depositions, to one extent or

12         another, played a role in the

13         trials that came after, I think.

14                 MR. SEEGER:  I don't think

15         we had these, but in Humeston II,

16         and you know the difference in

17         Humeston I and II, we did play

18         Graham, Topol, Fries, and Avorn

19         was live.

20                 MR. TISI:  Avorn was live.

21                 Let me talk about Avorn for

22         a second, since you raised it.

23                 MR. SEEGER:  Which, by the

24         way, you helped us obtain him for

FAC Resp. Exhibit D -- 101

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        that trial.
 2             MR. TISI:  Originally, I
 3        remember, Chris, you said to me,
 4        if you can get him, I'd be very
 5        happy.
 6             MR. SEEGER:  And I was
 7        happy.
 8             MR. TISI:  We got him, and
 9        we originally decided to develop
10        him as a hybrid witness, which was
11        really difficult to do.  We
12        originally were going to -- and
13        this is where we worked on
14        Humeston, as well, but we
15        originally were going to call him
16        in Humeston as a witness, and we
17        spent some time as a fact witness
18        bringing him out, because he
19        obviously had a role.
20             We decided in the end of the
21        game that it was probably a better
22        idea to kind of develop him into a
23        hybrid, and I think the result was
24        a really good, you know, saying,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          look, this is what you knew and

2          this is what you thought, and then

3          now let's show you what the

4          company really had and now tell me

5          what you really think.  And I

6          think because of waiting and

7          developing that strategy, I think,

8          made that a much more effective

9          deposition.  But it took a lot of

10         time to develop that.

11              MR. BIRCHFIELD:  Chris, on

12         Avorn, and I would have to agree

13         with Ed, I think it was probably

14         one of the best depositions taken

15         in the litigation.

16              MR. SEEGER:  I agree as

17         well.

18              MR. BIRCHFIELD:  But him

19         testifying live at Humeston,

20         that's the first time he's

21         testified live at trial?

22              MR. TISI:  Ever.

23              MR. BIRCHFIELD:  Ever, in

24         any litigation.  Can you tell us a

FAC Resp. Exhibit D -- 103

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          little bit about how you were

2          instrumental in getting him live?

3               MR. TISI:  We did.  I'll be

4          honest, I was very concerned about

5          the idea of exposing him live

6          because his deposition testimony

7          was so good, I didn't want to

8          undermine that in subsequent

9          hearings, but we talked about it.

10          The compromise, or what we came up

11          with was he was going to show up

12          at the trial, I was there to prep

13          him, we helped him out, we worked

14          with him, and I think his

15          testimony went across very well.

16               MR. SEEGER:  You are being

17          way too modest.  I mean, the truth

18          is, there was a lot of

19          apprehension on your part and on

20          his.  I was on the phone with

21          you -- I was in the middle of the

22          trial, and I was on the phone with

23          you constantly.  You were also

24          talking with Mark.  Mark, I don't

FAC Resp. Exhibit D -- 104

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          think, had a lot of success

2          convincing you, and I remember

3          calling you and saying, Chris,

4          this is one for the team, just do

5          it, and he did it.

6                MR. TISI:  I'll just add,

7          because I want to add one point,

8          because everybody thinks of

9          Humeston/Hermans as a dual trial.

10         That case, up until the eve of

11         trial, was a four-plaintiff trial,

12         as you know, Perry.  It's

13         something I want to talk to the

14         committee about at the end of

15         this, because I didn't put in for

16         my time on that because I

17         didn't --

18                MR. BIRCHFIELD:  You should.

19                MR. RAFFERTY:  You should.

20                MR. HERMAN:  You obviously

21         didn't put in a lot of time that

22         you spent on the case.

23                MR. SEEGER:  Why did you do

24         that?

FAC Resp. Exhibit D -- 105

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          MR. TISI:  Well, because

2     Judge Fallon's order reads clearly

3     work for trials and verdicts.

4     That was a four-person --

5          MR. HERMAN:  Let me just

6     say, to the extent you can

7     supplement, because what his

8     intent is, is that if a trial was

9     set and it was worked up for

10     trial, even if it wasn't tried,

11     those hours count.

12          MR. TISI:  Okay.  Well, I

13     will recreate that and submit

14     that, but I appreciate that.

15          But it really was a

16     four-person trial.  We went

17     through focus groups, we did all

18     the discovery.  Now I'm going out

19     of order on where I wanted to go,

20     but --

21          MR. SEEGER:  You don't need

22     this anyway.

23          MR. TISI:  We did three or

24     four motions in limine, we worked

FAC Resp. Exhibit D -- 106

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        up the case to get it ready.  I

2        remember arguing the Avorn issue

3        in front of Judge Higbee.  So, I

4        think it's --  I will submit with

5        that, but I read him literally to

6        say if it was a trial, if it was a

7        bellwether trial, and since my

8        case was pulled off the docket the

9        day or two days before, I think

10       two business days before the trial

11       began, I didn't submit that time.

12       But I will do that.

13            MR. WEITZ:  Chris, it is

14       important that you think about any

15       other cases that you did the same

16       thing in, because we think that it

17       is very important to be able to

18       demonstrate to the judge the

19       people that helped move the

20       dockets, that put pressure on

21       Merck and forced them to --

22            MR. SEEGER:  But you were

23       helping us all prepare for trial.

24            MR. TISI:  I stayed for an

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 107

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          extra week-and-a-half to work on

2          the case.

3                MR. LEVIN:  Right.  Please

4          expedite that --

5                MR. TISI:  I will get that

6          done.

7                MR. LEVIN:  -- because the

8          fact that that's in for you helps

9          us with regard to the overall

10         picture of the whole case.

11               MR. HERMAN:  I want to say

12         one thing from my point of view.

13         This was your first PSC

14         appointment by a federal judge.

15               MR. TISI:  Yes.

16               MR. HERMAN:  I don't know if

17         it was Troy's first, but you and

18         Troy did outstanding work, as far

19         as from my perspective, as

20         compared with some others that

21         were appointed to the PSC.  It

22         certainly --

23               MR. SEEGER:  Who are

24         veterans of PSCs.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1              MR. HERMAN:  Yes.  Let me
2         tell you that it's certain from
3         just going through the MDL
4         process, it certainly made Chris
5         and Andy and myself a lot more
6         comfortable that you could be
7         called on, you weren't going to
8         give anybody back talk, you would
9         get the job done, and you did it
10        well.
11             MR. TISI:  So, the
12        third-party aspect is something I
13        take pretty carefully and I'm
14        particularly proud of.
15             I took a bunch of
16        depositions in the case.  I mean,
17        apart from Dr. Avorn, which we've
18        discussed, and apart from Steven
19        Nissen, which I've discussed, I
20        took the vice president of
21        scientific and medical affairs,
22        Peter Honig.  I took Gil Block,
23        who ran the Alzheimer's studies.
24        I had actually prepared to take

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          Wayne Ray, and the interesting

2          thing about Wayne Ray, that kind

3          of developed over a year.  We had

4          learned during the course of

5          preparing him for his preservation

6          testimony that there was some

7          facts that he was aware of that

8          hadn't come out before, and that

9          was the extent to which Merck had

10          had backdoor conversations with

11          Peter Honig at the FDA prior to

12          the first Advisory Committee.  It

13          took us several months to develop

14          that.  And we did, Dave and I and

15          others, and really worked up that

16          issue, and we were about ready to

17          offer him up for a deposition when

18          the settlement was announced.

19              But I had actually prepared

20          for his testimony.  It was going

21          to be really good.  I'm still

22          regretting that we didn't get a

23          chance to take it.  We had to pull

24          it back because we wanted to

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          develop that fact portion of it.

2          So, I wanted to highlight that as

3          something that had been done, and

4          it obviously was interrupted by

5          the settlement.

6                  David Graham, Eliav Barr,

7          other folks we worked on.

8                  Science and expert

9          committee.  Michelle and I worked

10         up, I think sometimes it is very

11         interesting to look at the people

12         that were actually named, but a

13         lot of work gets done looking at

14         the people you vetted who you

15         didn't choose for generic experts.

16         I know Michelle traveled all over

17         the country, met with Dr. Singh,

18         Dr. Lipiky, Dr. -- the former FDA

19         person, a bunch of people who were

20         in our affidavits, went all over

21         the country to try and see who we

22         could name.  Some of theses folks

23         we decided in the end of the day

24         were probably not people we wanted

FAC Resp. Exhibit D -- 111

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          to show.  But that took a lot of

2          time.

3               We worked on the expert

4          reports for Dr. Gueriguian, Dr.

5          Avorn, Dr. Kronmal.  Michelle and

6          I worked with Mike and Lisa

7          Dagostino on the stroke project

8          and Dr. Feldman.  So, we did a lot

9          of that stuff.

10               We were asked by the PSC to

11          work on the privilege committee

12          with Anthony and the other folks.

13          We met repeatedly with Special

14          Master Rice, did a lot of

15          briefing, did a lot of arguing.

16          It is the first case that I ever

17          remember where I ever got one

18          privileged document before the end

19          of the litigation, and I did

20          promise and I will put it on the

21          record, that if Anthony ever got a

22          document before the end of the

23          litigation, I owe him dinner, and

24          I still haven't dealt with that

FAC Resp. Exhibit D -- 112

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          yet.  But we did get those

2          documents, and I think that was a

3          good thing.

4               Law and briefing, we did a

5          lot of briefing.  That's in the

6          affidavit.  I can tell it is

7          lunchtime, and I'm not going to

8          spend a lot of time on that.  But

9          we did do a lot on that.

10              I wanted to go to the

11         bellwether trial issue, because I

12         think that that's an important

13         point.  Some of you were fortunate

14         to try some of these cases, and I

15         always was very -- I know we were

16         very envious of the opportunity to

17         be able to do so.  But I was also

18         pleased that I was asked, and

19         Michelle, as well, were asked on

20         several occasions to lend whatever

21         support we could to preparing

22         witnesses, briefing, preparing

23         stuff that went into the trials of

24         these cases.

FAC Resp. Exhibit D -- 113

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1              As I said, in almost all of
2          these cases, I remember sitting in
3          the courtroom for Irvin I with
4          Lisa doing the trial cuts for
5          Topol and the objections of Topol,
6          doing the counters and working on
7          all of those issues.  We did the
8          same thing for Curfman, we worked
9          on the counters, the objections,
10         all of those things that went into
11         the trial package ultimately.
12              MR. SEEGER:  Were you
13         involved in the taking of Curfman?
14              MR. TISI:  Peripherally.  I
15         was involved in arranging it.  I
16         mean, that really was taken by
17         Don, and he ran with it.  But in
18         terms of cutting it and making it
19         trial ready, all of that stuff,
20         that was something that we worked
21         on.
22              One thing I didn't mention
23         on the PSC side I wanted to
24         mention, is the work done by the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1            trial package committee.  We --

2                 MR. SEEGER:  Have you seen

3            the trial package?

4                 MR. TISI:  I have seen it.

5                 MR. SEEGER:  That was a

6            joke, for the record.

7                 MR. TISI:  It is a pretty

8            amazing trial package.  I mean, if

9            we had gone forward with this

10           litigation further, that trial

11           package would have been the core

12           of everything that had come on

13           following.  The case was pretty

14           much ready to be tried in a much

15           more --  the goal was really to

16           get cases that could be tried for

17           less money, that could be tried

18           with documents and that wouldn't

19           be as expensive as the first

20           couple trials were.

21                Trial involvement.  I'll

22           touch on that really briefly.  All

23           of these cases, Irvin I, Irvin II,

24           sat with Troy during Irvin II,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1           working with Dr. Kapit, I think.

2                   MR. HERMAN:  Did you help

3           with Madigan?

4                   MR. TISI:  No, no.  There's

5           an inside joke there somewhere.

6                   MR. HERMAN:  Actually, it is

7           not.  Do you know anything about

8           him?

9                   MR. RAFFERTY:  Do you know

10          who Dr. Magidan is?

11                  MR. TISI:  It is a familiar

12          name, quite frankly.

13                  MR. SEEGER:  I think that

14          just spoke volumes.

15                  MR. TISI:  Oh, he was the

16          guy from Philadelphia.  I do

17          remember that.

18                  I actually remember, Andy,

19          we were getting ready to

20          cross-examine Alise Reicin, and

21          you asked me, could you go through

22          the Advisory Committee transcripts

23          and see if you can put together a

24          cross-examination that will help

FAC Resp. Exhibit D -- 116

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1        me contribute to the results of

2        the Advisory Committee.  I think

3        we did a pretty good job in giving

4        you that.  I think that was that

5        big chart.

6               MR. BIRCHFIELD:  It was the

7        highlight.

8               MR. TISI:  It was a good

9        thing, and hopefully that was

10       helpful.  All of those things are

11       listed in my affidavit.  I don't

12       want to go through all of that

13       stuff.  But I think it's fair to

14       say that we spent a lot of time on

15       most of the trials that were out

16       there, and when asked, we always

17       put ourselves forward to assist if

18       we couldn't actually try the case.

19       We put ourselves in a position,

20       and it was constant.

21               I mean, I think that what's

22       key and one of the things that

23       Judge Fallon made clear is the

24       consistency of work throughout the

FAC Resp. Exhibit D -- 117

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
1        time.  I can tell you from my own

2        perspective, we worked, I know I

3        did, Michelle to a lesser extent,

4        but --

5            MR. SEEGER:  Could you take

6        a few minutes to talk about

7        Michelle's contribution?  I think

8        we are very familiar with yours,

9        but maybe less so --

10            MR. TISI:  Well, like I

11        said, Michelle spent a lot of

12        time, particularly early on,

13        working and vetting the experts.

14        I think that that was her main

15        task.  I think she was appointed

16        to work by John and Carlene, and

17        ultimately Shelly, to work on the

18        Daubert committee.  So, we spent a

19        lot of time with the various

20        experts, vetting them, vetting

21        their reports, vetting their CVs,

22        working with them on their

23        opinions, helping draft their

24        reports and editing their reports
```

FAC Resp. Exhibit D -- 118

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          that would be ready as the case

2          got forwarded.  She spent a lot of

3          time on that, particularly in the

4          early days.

5                MR. BIRCHFIELD:  She was

6          very helpful in filtering out some

7          that would not have been effective

8          witnesses for us.

9                MR. TISI:  Exactly.

10                MR. SEEGER:  Are there

11          certain experts that your firm

12          were the point person or

13          gatekeepers for?

14                MR. TISI:  Obviously I think

15          Avorn, I was.  I think that --

16                MR. SEEGER:  Or you brought

17          to the litigation?

18                MR. TISI:  Gueriguian was

19          another one that we worked on

20          developing the expert report and

21          getting him ready for the

22          deposition.

23                MR. BLIZZARD:  You can't get

24          him ready for a depo.

FAC Resp. Exhibit D -- 119

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1           MR. TISI:  Not anymore.  But

2       actually, funny story about

3       Gueriguian.  When he left the FDA,

4       I think I was the guy that

5       actually found him.

6           MR. RAFFERTY:  That was for

7       fen-phen.

8           MR. TISI:  He was very good

9       early on, and then he became a

10       little more...

11           But in any event, a lot of

12       the experts, and lot of the

13       efforts to Daubertize a lot of the

14       experts was something that

15       Michelle had done.

16           MR. RAFFERTY:  One thing

17       that Chris did a lot of, too, that

18       doesn't get talked a lot about is

19       not only a lot of the substantive

20       work, but also a lot of the

21       organizational work and the

22       day-to-day dealings with a lot of

23       our discovery issues that we

24       encountered.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

```
 1              MR. TISI:  Remember, Troy,
 2         when the Farquhar issue came up or
 3         the document --
 4              MR. SEEGER:  I remember
 5         that.
 6              MR. TISI:  -- or the
 7         document that was --
 8              MR. SEEGER:  The memo.
 9              MR. TISI:  The memo that
10         came up.  I mean, that was the
11         kind of thing, and that took days
12         of time before that ultimately got
13         before the judge.  It was like one
14         of those things that you wake up
15         on a Monday morning and you get a
16         phone call saying that you have to
17         deal with that issue, and it was
18         an issue that lasted a whole
19         while.  Those are the kinds of
20         things.
21              It is impossible for me,
22         quite frankly, to kind of
23         illustrate all of those things
24         that came up.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          I remember there was an

2     issue with Dr. Rarick and whether

3     she had an expert report in the

4     MDL, and we had a fight with Ted

5     Mayer about whether it was even

6     appropriate to name her and

7     cross-notice her in the MDL.  We

8     went back and forth on that issue.

9     There were just so many instances

10    where you wake up one morning and

11    the date -- I mean, we all do

12    that.

13         MR. BIRCHFIELD:  Chris, we

14    all recognize that you did

15    excellent work and you've been

16    here throughout the course of the

17    litigation, so, your work is

18    recognized and appreciated, and

19    you are a team player.

20         MR. BLIZZARD:  Historically,

21    I have been a hypercritic,

22    sometimes excessively so, of the

23    kind of work product that MDLs

24    turn out in terms of its usability

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          in trial.  That was not the case

2          here.  The work product from the

3          witness standpoint, I thought, was

4          very useful in trials.  I think

5          you were a big part of that, and I

6          appreciate that.  So, to me, hours

7          says something, and I know from

8          what's been said that you are not

9          great about keeping them.

10              MR. TISI:  I'm much better.

11          For the record and for my senior

12          partners, I'm much better.

13              MR. BLIZZARD:  But

14          ultimately it is the work product

15          that counts, and you had a big

16          hand in making this a great work

17          product.

18              MR. SEEGER:  I can't think

19          of an important part of this

20          litigation that you were not

21          central to.

22              MR. TISI:  I appreciate it.

23              MR. SEEGER:  I would have to

24          stretch my imagination.

FAC Resp. Exhibit D -- 123

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1            MR. TISI:  I appreciate

2        that, and it has been a pleasure

3        working with all of you as well.

4            MR. SEEGER:  Thank you.

5                -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 124

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 125

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -


FIRM: AUDET & PARTNERS, LLP
      Susanne Scovern, Esquire
      HOVDE DASSOW & DEETS, LLC
      Robert Dassow, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
      GOLKOW TECHNOLOGIES, INC.
   877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 126

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. DASSOW:  I feel like I'm
 3         coming to Congress and I'm looking
 4         for a bailout.
 5              Susanne and I decided to do
 6         this together, and we'll explain
 7         why in a few minutes.
 8              What's important is, we were
 9         fighting Merck at the beginning of
10         the litigation.  In the middle of
11         the litigation, we were fighting
12         Merck.  And at the end of the
13         litigation, we were fighting
14         Merck.  We worked out of New
15         Jersey, and we were always, always
16         fully engaged in this litigation
17         from the beginning.
18              I guess what I would like to
19         do first, fellows, is talk to you
20         a little bit about our firms.  The
21         partners are myself and Boyd
22         Hovde, Rick Hovde and Nick Deets.
23         Our partners, just by way of
24         background, two are in the
```

FAC Resp. Exhibit D -- 127

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1            International Trial Academy.

2            Three of us are in the National

3            American Trial Academy.  As long

4            as I can remember, we've been

5            preeminent lawyers with regard to

6            Martindale-Hubbell.  We've got 100

7            years of combined experience with

8            regard to trial advocacy.  We have

9            tried over 300 cases between all

10           of us.  I think that what I can

11           say about our Indianapolis firm is

12           we're always ready to go and try

13           cases.

14                MR. HERMAN:  One thing I

15           would like to note, if you'll work

16           it in, is you either had a joint

17           venture, whether it is a business

18           joint venture, but apparently a

19           work effort joint venture of some

20           sort.  So, would you give us some

21           detail on that.

22                MR. DASSOW:  Sure.  I can

23           tell you about that, and at the

24           bottom of the slide, Russ, you can

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        see it says separate fee

 2        applications, but we've got a

 3        common benefit.  Essentially what

 4        happened was, early on, Susanne

 5        and I got together, we knew each

 6        other from prior litigation.  We

 7        get along obviously very well.  We

 8        work well together.  What we did

 9        was, we essentially worked

10        together sort of like Chris and

11        Mark would work together with

12        regard to the trials, but

13        obviously they did different

14        things.  So, that's kind of what

15        we were doing.  Does that answer

16        your question, Russ?

17             MR. HERMAN:  Well, do you

18        have a cross fee participation at

19        all?

20             MR. DASSOW:  We do not.

21             MR. HERMAN:  And no joint

22        clients?

23             MR. DASSOW:  No joint

24        clients whatsoever.
```

FAC Resp. Exhibit D -- 129

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1           Does that help?  Does that

2       demarcate what we're talking

3       about?

4           MS. SCOVERN:  Our clients

5       were better than his.

6           MR. DASSOW:  I'll let

7       Susanne tell you about her firm,

8       and then we'll keep moving on.

9           MS. SCOVERN:  My firm

10      consists of eight attorneys, and

11      our Vioxx team that was dedicated

12      during the course of the

13      litigation consisted of five

14      attorneys.  Bill Audet is the

15      principal owner of the firm.

16      Myself, I have 20 years of

17      litigation experience.  We had two

18      six-year associates who did most

19      of the law and motion work for

20      Robb and I, and Adel, a third year

21      associate.  We also had some

22      paralegals and legal assistants,

23      legal litigation assistants to

24      assist us.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1            Bill Audet was the person

 2       most responsible for organizing

 3       us.  He organized us, and he

 4       conducted mini-seminars of our

 5       counsel and about a dozen other

 6       firms both in the Midwest and on

 7       the West Coast.

 8            MR. DASSOW:  This is preMDL.

 9       This is early on in January of '05

10       that we started doing this.

11            MS. SCOVERN:  Right.  And we

12       got together with trial experts

13       and litigation strategy experts

14       early on, like Robb said, and

15       mapped out the cases and trial

16       strategy that we wanted to

17       endeavor in mostly in New Jersey.

18       We had a few cases that we also

19       filed in California in front of

20       Judge Chaney.  But the bulk of our

21       cases and the counsel that we

22       worked with were filed in New

23       Jersey.

24            At one time, our firm had

FAC Resp. Exhibit D -- 131

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1        two trial cases of the bellwether

 2        case of Benjamin LoPresti in New

 3        Jersey and the Anderson case in

 4        California, plus, as Robb will

 5        describe later, we had several New

 6        Jersey trial pool cases.

 7             Bill was also responsible

 8        for organizing the Merck profile

 9        form along with Dave Buchanan from

10        Chris Seeger's office.  They

11        worked in tandem with the MDL

12        attorneys with the defense profile

13        sheet and the Merck profile form

14        and got that adopted by Judge

15        Higbee early on.  I think it was

16        around March of 2006, she adopted

17        the New Jersey Merck profile form.

18             Our firms also, as I

19        mentioned before, were

20        instrumental in the initial

21        bellwether cases in New Jersey.

22        In October of 2005, Robb and I, at

23        Judge Higbee's request from the

24        CMC, went through all of our case

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1      inventory and came up with our

 2      best New Jersey trial case.  At

 3      that time, she was focused on

 4      trying a few cases at the same

 5      time, but she did not want to deal

 6      with conflict of law issues, and

 7      so she wanted to focus on New

 8      Jersey cases.  Our New Jersey case

 9      that we proposed was Benjamin

10      LoPresti.

11           In November of 2005, she

12      selected that as a bellwether case

13      to be tried with other New Jersey

14      liaison counsel.  At the time, it

15      was the Hatch case with Anapol

16      Schwartz and also the McFarland

17      case with Seeger Weiss.  She

18      scheduled us for an April 2006

19      trial date, and so we had five

20      months to prepare for that trial

21      date.  And essentially Robb and I

22      dropped everything we were doing

23      and concentrated on that.  We were

24      involved in multiple discovery

FAC Resp. Exhibit D -- 133

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          meetings and teleconferences with

2          our New Jersey liaison counsel,

3          and we were one of the first firms

4          to review thousands of sales reps

5          documents that came through.

6               In looking at those sales

7          rep documents, we were the first

8          firm that went to Judge Higbee on

9          a series of redaction issues

10         involving prescribing depositions

11         that were redacted, Vioxx payments

12         to physicians that were redacted

13         and sales rep bonuses that were

14         redacted, and we had a couple of

15         in-camera motions with her

16         bringing forward those redacted

17         documents.

18               We also, in doing our

19         analysis of the sales reps

20         documents, discovered a window

21         into the widespread financial ties

22         between Merck and the doctors who

23         prescribed or recommended Vioxx.

24         Through the health education

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        learning programs that actually

 2        Ken Soh from Mark Lanier's office

 3        gave me the heads up on, those

 4        programs -- after the Ernst trial,

 5        he forwarded a lot of documents to

 6        my office, and it kind of started

 7        on looking at and tracking the

 8        money that Merck was paying to

 9        physicians.  This became something

10        of great interest to Judge Higbee

11        early on, and that permeated the

12        litigation all the way up into

13        settlement.  I will get into a

14        little bit more detail about that.

15              We also were the first firm

16        to give the American Express

17        reports of all the sales reps in

18        their custodial files.  We really

19        pressed Judge Higbee to open up

20        and to expose the amount of

21        payment that was going to the

22        Merck physicians through the

23        marketing department at Merck and

24        their 3,000 sales reps that were
```

FAC Resp. Exhibit D -- 135

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          touching base with the doctors on

2          a daily basis.  And an interesting

3          factor is that in 2003,

4          pharmaceutical companies were

5          spending $9 billion on marketing

6          and promotion of their products,

7          and out of that 9 billion, 6

8          billion was being spent directly

9          on prescribers.

10              In the particular case of

11         Benjamin LoPresti, Dr. Sheldon

12         Solomon was his prescriber, and we

13         were able to get his 1099s, which

14         showed thousands of dollars, if

15         not hundreds of thousands of

16         dollars, from 1999 to 2005.  He

17         was a Merck thought leader.  The

18         common benefit impact of exposing

19         the financial ties was introduced

20         to Judge Higbee early on, and the

21         conflict of interest that the

22         doctors had in receiving all of

23         that money and yet being very much

24         influenced by this money, in my

FAC Resp. Exhibit D -- 136

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          opinion, had a very negative

2          effect on a lot of our clients,

3          because they were taking money, it

4          was altering their prescribing

5          habits, and I think to the

6          detriment of a lot of our clients.

7               Soon after our work in the

8          LoPresti trial, Judge Higbee

9          ordered the production of 1099s

10         for all providers in the trial

11         cases moving forward.

12              MR. DASSOW:  I just want to

13         touch on a couple of other aspects

14         of the LoPresti trial and why it

15         is important.

16              First of all, at the

17         beginning, and this is early on in

18         the litigation, we've got Chris

19         Seeger's office, we've got Mark

20         Lanier's, we've got Perry's

21         office, and we've got Anapol

22         Schwartz and us, that's it, going

23         forward.  You are seeing a lot of

24         people, you guys, and they are all

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          telling you, we did a lot of

 2          common benefit, but I'm telling

 3          you, we were involved right away

 4          with Chris and Mark and Perry at

 5          the beginning with a trial case

 6          that we had five months to work

 7          up.

 8               Other than the Humeston

 9          trial, nothing had been going on.

10          Mark is working on the Ernst

11          trial.  I mean, we're involved and

12          we're going.  That's how we are

13          different at the beginning from

14          all the other folks that are

15          coming in and talking to you guys

16          and telling you how they did

17          common benefit things.  Well, we

18          were at the ground floor, and we

19          went all the way up the elevator

20          with everybody in this room.

21               I've got a couple of points

22          here.  You can tell we did 12

23          depositions.  Obviously, we all in

24          this room did a number of
```

FAC Resp. Exhibit D -- 138

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1      depositions.  At the beginning, we

 2      were the earliest firm to take

 3      sales reps other than Jerry

 4      Kristal.  I think that Moshe came

 5      along to a couple of deps with us,

 6      but Harley, O'Connor, Fagen,

 7      what's important there is there

 8      were six Merck lawyers at each of

 9      those depositions defending them

10      against us.  Each deposition.

11          We did some physician

12      depositions of family members.  I

13      want to note one last thing on

14      this slide.  You see the

15      deposition of Dr. Lynch?  What is

16      important is, in Chris' trial, I

17      believe, and in the first trial,

18      they brought up the green monkey,

19      and they want to talk about venous

20      and arterial problems that the

21      green monkey showed that you can't

22      have plaque accumulation, blah,

23      blah, blah, I won't go into all

24      the fun medical terms and things
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          like that today, but what's

 2          important is, through an expert of

 3          ours, I was told that Dr. Lynch

 4          would tell the truth.  I was told

 5          that Dr. Lynch would come forward

 6          and explain that the green monkey

 7          study meant nothing.  And that's

 8          exactly what he did.  I prepped,

 9          took his deposition in Philly, and

10          that applied to everybody.  You

11          never heard that again, unless

12          Mark and Chris can tell me, you

13          never heard about the green monkey

14          study ever again.  He was done.

15          Never heard about it again.  I

16          don't think in the MDL trials,

17          they may have brought it up, I'm

18          not sure, but it was over.

19               What's the impact of

20          LoPresti?  We disseminated all the

21          sales rep documents, deposition,

22          video clips to anybody who wanted

23          it in New Jersey.  Frankly, I

24          didn't care if they went to the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1         MDL.  I didn't care.
 2              We disseminated all the
 3         prescribers, all the cardiologist
 4         depositions we did.  We gave our
 5         outlines.  We didn't care, it was
 6         for the common benefit after the
 7         first four or five firms got it
 8         going.  We were ready to go and
 9         help anybody else.
10              Again, while Chris and the
11         folks in New Jersey are on trial,
12         and the best way I can explain is
13         they went on trial, and we are
14         right underneath them kicking
15         Merck's butt and keeping them as
16         busy as we possibly can at all
17         times.  That is true 'til November
18         of '07, until the settlement.
19              Susanne is going to just
20         touch on something of interest
21         that was about Rodney Jew, and you
22         know --
23              MS. SCOVERN:  As soon as
24         Judge Higbee gave us the green
```

FAC Resp. Exhibit D -- 141

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1        light for our bellwether cases to

 2        move forward, my firm set up a

 3        number of trial strategies,

 4        seminars presented by Rodney Jew.

 5        He is the foremost trial

 6        consultant and litigation

 7        strategist in Palo Alto.

 8            MR. DASSOW:  Other than Dr.

 9        Bob.

10            MS. SCOVERN:  So, we

11        attended two week-long sessions in

12        Palo Alto.  And at that time, we

13        were land mining and doing case

14        mapping from our respective cases.

15            And the overall impact,

16        common benefit impact I think with

17        our three firms working together,

18        Chris', Anapol Schwartz and ours,

19        our group, was it developed a

20        strategy for a coherent and

21        effective trial theme for future

22        common benefit cases or the common

23        benefit of future cases in New

24        Jersey.

FAC Resp. Exhibit D -- 142

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1              MR. DASSOW:  Richard Allen.

 2         After we were working on the

 3         Rodney Jew issue, Judge Higbee

 4         talked to us, and since we didn't

 5         get to go on that particular trial

 6         because of the other trials that

 7         were going, she chatted with us,

 8         along with Merck, and said we want

 9         you guys to put up some cases for

10         the next round.  So, what we did

11         in June was work on, go through

12         each one of our cases to figure

13         out, now that the judge has opened

14         up nonNew Jersey cases, she opened

15         up the entire United States, we

16         didn't have the conflict issue

17         anymore.  Judge Higbee opened it

18         up.  She wanted our cases in July

19         of '06.  As a result of what we

20         ponied up at that point, along

21         with other folks in this room,

22         Judge Higbee selected Richard

23         Allen as one of the main trial

24         cases of the 39.
```

FAC Resp. Exhibit D -- 143

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1              Richard Allen made the cut
 2        with Chris and Mark and Perry,
 3        made that cut down to one of the
 4        ten that was going to go in the
 5        next batch.
 6              What's important there is
 7        that we flew out and met with
 8        Mark, and we strategized about how
 9        are we going to put the trials
10        together, what cases mesh, how are
11        we going to do that, and, frankly,
12        Mark said, here's what we're
13        looking for, we want you
14        tag-teaming it, how are you going
15        to do this?  So that's what we
16        did.  And I point out a couple
17        other issues here.
18              We have 24 sales reps.  We
19        had hundreds of thousands of
20        documents.  We had the most
21        voluminous production with regard
22        to Mr. Allen, I think, of any of
23        the cases at that time.  We went
24        through that thoroughly.  And I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          came up with a couple of sales

 2          reps that we took.  In that case,

 3          in a matter of two-and-a-half

 4          months, we took nine discovery and

 5          de bene esse depositions.  This

 6          case was absolutely primed and

 7          ready to go to trial.  Morricol

 8          and Hillis, the cardiologist and

 9          the prescribing doctor, were

10          absolutely totally on board.  Had

11          they known about the risks of

12          Vioxx, they never would have

13          prescribed it.  I had a

14          cardiologist, and we had the

15          prescriber both saying that, and

16          saying many, many better things

17          for us.  The case was great.

18          Every case had warts, let's not

19          kid each other, every case had

20          warts.

21               The other thing to note with

22          regard to Allen is that we were

23          one of the first firms to be

24          allowed by Judge Higbee to get
```

FAC Resp. Exhibit D -- 145

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

 1          regional business managers.  This

 2          applied to all of the cases.  She

 3          allowed us to get the regional

 4          business manager.  Why is that

 5          important?  That tied in Anstice

 6          to the regional business manager

 7          to the low level sales reps.  We

 8          never got there, but we put

 9          pressure on them, and we are the

10          only people to get that, and that

11          was for the common benefit of

12          everybody.

13              I also mentioned there the

14          whistle blower.  I can't tell you

15          with the gentlemen sitting here

16          how many whistle blowers you had

17          or if you had any.  I ponied up

18          and offered a whistle blower to

19          Moshe on an occasion, Mark had the

20          ability, talked to Jerry Kristal

21          about it.  I had a nurse sales rep

22          in Indiana that was willing to

23          testify with regard to Merck.  She

24          had a TIA while she was on Vioxx,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        okay, while she was on Vioxx,

2        confronted her people and her

3        regional business manager and

4        said, this stuff is killing

5        people, it's causing heart attacks

6        and strokes.  He said, if you say

7        anything else, you are going to be

8        fired.  So, that gives you a

9        little background.

10            We never needed it.  We

11       couldn't really bring her in,

12       because the Indiana case never

13       went.  It was a decision made that

14       we never used it, but she was

15       available, and I made her

16       available for everyone in the

17       trial.

18            What's the quick common

19       benefit of that?  We continued to

20       put pressure on those nonstop with

21       regard to Allen.  First whistle

22       blower, as far as I know, and the

23       first regional business manager.

24            Susanne is now going to talk

FAC Resp. Exhibit D -- 147

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          to you about physician

2          compensation, kind of our pet

3          project that we had that was for

4          the common benefit of everybody

5          with regard to 1099s.

6               MS. SCOVERN:  It started off

7          with Ben LoPresti, as I mentioned,

8          and it carried through the entire

9          litigation.  What I was doing was

10         comparing the Merck profile form,

11         and for the MDL, it is called the

12         defense fact sheet, responses that

13         Merck provided for the payments to

14         doctors to their 1099s.

15               In the Merck profile form,

16         Merck is supposed to list all the

17         payments to doctors for their

18         presentations, their honorariums,

19         their clinical investigations of

20         any COX-2s, including Arcoxia, and

21         their expenses per calendar year

22         from 1999 to 2005.  If you looked

23         at what you were getting in the

24         Merck profile form for physician

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

 1      compensation and compared it

 2      against their 1099s, there were

 3      widespread discrepancies and

 4      redactions.

 5          Merck came up with a series

 6      of explanations trying to explain

 7      away the inconsistencies for a

 8      period of three to four months.

 9      Either they didn't have the 1099s

10      anymore or they were in storage or

11      they couldn't locate them or it

12      was an IRS reporting nuance or we

13      didn't know what the redactions

14      were on the Merck profile forms,

15      but we'll get back to you.

16          We were in Judge Higbee's

17      chambers at least six to eight

18      times between June and July on

19      this issue and multiple conference

20      calls with her.  In the end, what

21      we discovered was that they

22      redacted in the Merck profile form

23      all physician payments that went

24      to any clinical research,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          including Arcoxia, and any grants

2          that they gave to doctors.  And

3          when you compared that with the

4          1099s, in the end they told Judge

5          Higbee in chambers that they did

6          not issue 1099s to doctors for

7          clinical research work or grants

8          given to doctors.  And that's

9          millions of dollars.

10              MR. DASSOW:  Let me just say

11          this again.  They never issued

12          1099s to doctors ever.  Even in

13          clinicals, even in preceptorships,

14          even in tutorials, they never did

15          it, and they expensed it.

16              MS. SCOVERN:  So, that

17          opened up Merck to a very big

18          issue of liability with the IRS.

19              MR. DASSOW:  Hundreds of

20          millions of dollars we know.

21          That's what we were told by Merck.

22          That's what we were told by

23          Dechert.

24              MS. SCOVERN:  What Judge

FAC Resp. Exhibit D -- 150

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1        Higbee then ordered was the

 2        depositions of the executives at

 3        Merck who were responsible and

 4        signed off on the defendant fact

 5        sheets and Merck profile forms,

 6        the people who had to compile the

 7        physician data.  And we were able

 8        to explore how they went about

 9        trying to mine physician data, and

10        it was completely corrupt.

11             They were mining databases

12        based on the name of the

13        prescriber that a plaintiff would

14        provide in a plaintiff profile

15        form.  That's it.  If the

16        plaintiff misspelled the name, you

17        were not going to get physician

18        compensation.  If the plaintiff

19        did not list the address of the

20        professional corporation for the

21        prescriber, you are not going to

22        get their physician compensation.

23             They had this information

24        because they targeted doctors
```

FAC Resp. Exhibit D -- 151

Page 27

```
 1        through their sales reps, yet they

 2        failed to provide it on thousands

 3        of Merck profile forms and

 4        defendant fact sheets.

 5             MR. DASSOW:  Tens of

 6        thousands.  It applied not only to

 7        the New Jersey folks, but to the

 8        MDL, because we worked on the

 9        defense fact sheet and the Merck

10        profile form and know how we were

11        all getting cheated consistently.

12        And it was follow the money, and

13        we were not getting the

14        information.  So, what the effect

15        of that is, is when we would go

16        take -- for any of you guys, we

17        would go take a prescriber's

18        deposition, and you didn't know if

19        they were in Merck's pocket or you

20        didn't know whether they weren't

21        in Merck's pocket.  You didn't

22        know whether you had all the

23        contracts.  You didn't know

24        anything about that prescriber.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1        You were going to get blind sided

2        big time.  That's why we were

3        working on this for everybody.

4               MS. SCOVERN:  They did, they

5        withheld lots, I mean, thousands

6        of physician consulting

7        agreements.  They provided you

8        with the signature pages, but they

9        never provided you with the

10       payments to the doctors.  It is an

11       issue in this litigation, it is an

12       issue in all pharma litigation,

13       and it should be explored in all

14       of our mass torts.

15              MR. DASSOW:  And it was only

16       us, too, that were doing it.

17       Nobody else was doing it.  I don't

18       know about the MDL guys, I can't

19       tell you what you guys were doing,

20       but I can tell you that we're the

21       only two that Judge Higbee was

22       sending us out to do this and

23       taking the heads of Heins and

24       Scott, the head of people signing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1        these things, so we got them at

2        the top, and we can go down below.

3             MS. SCOVERN:  We actually

4        had a second series of depositions

5        scheduled with that group in the

6        first week of November right up

7        until the time of settlement in

8        2007.

9             The common benefit impact of

10       our physician compensation and

11       1099 investigation, the

12       credibility of Merck in front of

13       Judge Higbee was seriously,

14       seriously undermined, and she, in

15       the July 2007 CMC, expressed her

16       extreme disappointment with them

17       and the fact that she was in the

18       process of considering that Merck

19       reissue all Merck profile forms.

20             MR. DASSOW:  For all of New

21       Jersey.  And I can't tell you,

22       again, with regard to the MDL, but

23       I can tell you that that was the

24       next -- I'm sure Chris would have

FAC Resp. Exhibit D -- 154

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1        taken that up, we want to reissue

 2        50,000 Merck profile forms.  Can

 3        you imagine the cost to Merck to

 4        do that?  It would have been

 5        substantial.

 6             MS. SCOVERN:  The other

 7        thing that Judge Higbee did is she

 8        ordered production of 1099s for

 9        all prescribers in the expedited

10        discovery wave that was

11        established in 2007.  There were

12        two waves of 250 cases.  So, we

13        had 500 cases moving forward where

14        the exposure of the physician

15        payments was going to be made

16        readily available, and all firms

17        could have attacked Merck on that.

18             Merck had a serious issue

19        with the IRS as well.  And Judge

20        Higbee ordered that Merck send a

21        letter from the CFO to the IRS

22        explaining their 1099s and their

23        deficiencies in issuing 1099s from

24        1999 to 2005.
```

FAC Resp. Exhibit D -- 155

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

 1              MR. DASSOW:  We don't know

 2        as we sit here today really what's

 3        happened with it, but it's

 4        certainly an issue that I have

 5        already talked to the judge about

 6        with regard to our TPP cases.

 7              Also the AG issue, as you

 8        know, the knees and hips folks and

 9        everybody like that has paid

10        millions of dollars for the issue

11        that we're going after.  That's

12        why we pressured them with regard

13        to that.

14              The next slide is our

15        commitment to trials.  So, things

16        didn't go so well for some trials,

17        things went pretty well back and

18        forth.  Well, what happens now in

19        '07?  We never waned.  In fact, we

20        were picking up speed, the two of

21        us, our firms.  We are committed.

22        Now we're talking about trial pool

23        consideration.  The folks here,

24        some of them are on trial, so what

FAC Resp. Exhibit D -- 156

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1        are we requested to do?  We're

2        requested to go kick Merck's butt,

3        right, and support whoever is

4        going to trial.  So, what do we

5        do?  We pony up 17 cases in the

6        first wave.  17 cases.  We only

7        have 265 cases between us.  Okay?

8        I don't know if anybody in this

9        room ponied up 10 percent of their

10       cases for trial, but we did for

11       working on expedited discovery.

12       And I really truly believe that

13       that's significant.  I know that

14       most of you guys have more cases,

15       but if somebody has 1,000 cases,

16       nobody ponied up 100 cases, I

17       assure you.  This was a

18       tremendous, tremendous burden on

19       our firms to do this.  I mean,

20       tremendous burden.

21            I want to point out two

22       particular cases.  Tena and Fagel

23       were both going to be trial cases,

24       I assure you.  Both are death

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          cases.  Tena has two kids,

2          16-year-old honor student from New

3          Mexico.  Susanne had traveled like

4          crazy to New Mexico.

5               Merck put six lawyers on the

6          issue of whether we even get to

7          depose Dr. Sokoloff in New Mexico.

8          Six lawyers.

9               Ms. SCOVERN:  He was a

10         doctor that had over $200,000 in

11         payments -- he was involved in the

12         Arcoxia trials and the Vioxx

13         trials.

14              MR. DASSOW:  They hired

15         every firm.  They had Fulbright &

16         Jaworski flying out to defend

17         them, they have got Dechert.  They

18         have got everybody defending them.

19         I only talk about that case, as

20         well, because Susanne meets with

21         the pathologist, who is a Merck

22         pathologist.

23              MS. SCOVERN:  It was a

24         pathologist that conducted the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1       autopsy report on Mr. Tena, who

2       was 37 years old at the time of

3       his death.  And when I was meeting

4       with him, he said, let's go look

5       at the slides.  And we went down

6       to look at the pathology slides

7       together.  And he saw, you know, a

8       thrombus, and he just said, this

9       is one that you guys need to bring

10      further.

11          MR. DASSOW:  And he further

12      goes on and says, why didn't you

13      try this case?  But this was one

14      of those cases, as well as Fagel

15      was also a death case.  A

16      14-year-old little boy, son goes

17      up and finds him slumped over in

18      the basement.  That's in addition

19      to all the other cases we're

20      working up.  So, we've got those

21      issues.

22          Additional contribution --

23      we are almost done, fellows.  I

24      need your attention here for a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          little bit longer.  I know that

2          you guys are busy.

3              We participate in each and

4          every CMC from November of '04

5          until this case was settled.  We

6          were there.  Let me tell you this.

7          I looked at all the firms that

8          were presenting to you.  I want to

9          find somebody, other than the

10         folks that are here, that was at

11         each and every CMC, that was

12         flying out from Indianapolis, from

13         California, not driving in to New

14         Jersey, flying out consistently.

15         I was in attendance early on in

16         '05 at Anstice, Kim, Gilmartin and

17         Scolnick, all right?  I did not

18         put that time and expense down in

19         my submission to you guys.  Didn't

20         put it down, because I didn't take

21         the depositions.  Mark took the

22         depositions.  Chris took the

23         depositions.  I can't remember who

24         else took the depositions.  But I

FAC Resp. Exhibit D -- 160

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        was one of 15 lawyers learning the

2        case.  I didn't put that down as

3        time and expense.  Susanne goes to

4        Dr. Fries.  Mark, there's six

5        people there, Susanne is there

6        with you.

7             MS. SCOVERN:  I didn't have

8        to travel.

9             MR. DASSOW:  That was one

10       you didn't have to travel.

11            Graham's deposition.  We

12       went to every bellwether case

13       selection meeting in New York City

14       and Atlantic City.  We went to

15       discovery stuff at Battery Park

16       and Trump Plaza.  We filed

17       numerous motions that applied to

18       each and every case in New Jersey

19       and potentially applicable to the

20       MDL.

21            Sales reps redactions.

22            MS. SCOVERN:  Can I just add

23       that two weeks prior to the

24       settlement, the end of October,

FAC Resp. Exhibit D -- 161

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1         just days before the settlement,
 2         I, along with Jeff Grand and Jerry
 3         Kristal and Mike Wenkowitz,
 4         representing New Jersey plaintiffs
 5         in a special hearing called by
 6         Judge Higbee, made the motion for
 7         the 250 expedited cases in
 8         discovery at that time to get
 9         additional custodial and sales rep
10         files.  Each firm had issued their
11         own motion, and we were battling
12         it out trying to get sales rep
13         documents from Charlie Cohen and
14         Ben Barnett just two weeks prior
15         to the settlement.
16              I think overall, our common
17         benefit impact was tremendous.  We
18         worked with New Jersey liaison
19         counsel.  We are not at the same
20         tier as they are, but we worked
21         just as hard.  We put tremendous
22         pressure on Merck.
23              The intensity of our work
24         increased.  In 2007, as Robb said,
```

FAC Resp. Exhibit D -- 162

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1        we had 10 percent of our cases up

2        for expedited discovery.  This is

3        after we had lost a few.  And

4        believe you me, there were a lot

5        more seats at the CMC in 2007 when

6        we got there, but we accelerated

7        the process and increased our

8        work, and we did whatever was

9        asked from our firms.

10             MR. DASSOW:  I've got a

11        couple more comments, and then

12        we'll let you get on with somebody

13        else.

14             We have separate fee apps,

15        again, like I told you earlier,

16        and we teamed up because as

17        everybody teamed up in these

18        cases, you needed the manpower to

19        take on Merck because of all the

20        lawyers, as you well know.

21             Again, at the beginning, we

22        were there fighting Merck.  In the

23        middle, we were fighting Merck.

24        And at the end, we were fighting

FAC Resp. Exhibit D -- 163

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1         Merck.

2                One last comment.  There are

3         people on this committee that

4         obviously did a tremendous amount

5         of work and more than Susanne did

6         and have spent more money.  But I

7         can tell you as the tiers go, and

8         when you go to the next level and

9         you guys decide on this, I'm sure

10        you can tell how passionate I was

11        about the Vioxx, how passionate I

12        am about this, and I was really

13        motivated, and we're in the guts

14        of this case.  While we're not up

15        there with a lot of you folks that

16        tried the cases, we were ready,

17        willing and able to try cases, and

18        we did everything that was asked

19        of us.  I really appreciate it,

20        guys, really appreciate it.  Thank

21        you.

22                MR. LEVIN:  How are you

23        making out with the accountants

24        with all of your rejected hours?

FAC Resp. Exhibit D -- 164

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          MR. DASSOW:  We haven't had

2      anything rejected.

3          MR. LEVIN:  Yes, you have.

4          MR. DASSOW:  Okay.

5          MR. LEVIN:  The accountant's

6      records shows Bill Audet's firm

7      submitted 7,722 hours and $258,000

8      in costs and they are rejected.

9      It could be something procedural.

10          MS. SCOVERN:  The one thing

11      that they asked us to do was break

12      that out by calendar year, and

13      we're in the process of doing that

14      for them.

15          MR. LEVIN:  Hovde, 8,442

16      hours and $270,000 in costs that

17      are rejected.

18          MR. DASSOW:  Okay.  I have

19      no idea why.  I have to split them

20      up.

21          MR. LEVIN:  You have to find

22      out so that we can handle it.

23          MR. DASSOW:  Okay.  Let me

24      tell you this.  This is the first

FAC Resp. Exhibit D -- 165

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1           I've heard about it being

2           rejected.  They have called me six

3           times, and I told them, listen, if

4           you had told me from day one that

5           I was going to be sitting in front

6           of a committee, I would have had

7           it on my --

8                  MR. LEVIN:  I'm sure you

9           will straighten it out.

10                  MR. SEEGER:  By the way, it

11          is not a factor for today.

12                  MR. DASSOW:  Good.

13                  MR. SEEGER:  We just need it

14          done.

15                  MR. LEVIN:  I just want to

16          get it done.

17                  MR. BIRCHFIELD:  If you are

18          communicating with them and you

19          are running into difficulties, let

20          us know, somebody, Chris.

21                  MR. HERMAN:  You've got

22          15,000 hours reported between the

23          two firms, and obviously you've

24          worked together.  That's a

FAC Resp. Exhibit D -- 166

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1        significant number of hours.  You

 2        don't have to do it yourself, but

 3        I can tell you a number of firms

 4        that are just making an

 5        appointment, going in to sit with

 6        the CPA and working it out, and it

 7        can be worked out in maybe half a

 8        day.  It is probably worth your

 9        while to go ahead and do that.

10             I need to tell you that the

11        CPA firm does absolutely no work,

12        none, for any Vioxx entitled firm

13        or individual.  They are

14        completely independent, selected

15        by the judge.

16             MS. SCOVERN:  We've had a

17        great --

18             MR. DASSOW:  They've been

19        great.

20             MR. HERMAN:  They will work

21        with you, but given the Christmas

22        holidays coming up, et cetera, it

23        is probably worth somebody's while

24        to go make a trip and meet with
```

FAC Resp. Exhibit D -- 167

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          them.

2                MR. DASSOW:  It is

3          significant enough for us, Russ,

4          that we will fly down and meet

5          with them for half a day.  I can

6          answer questions.

7                MR. HERMAN:  Give them a

8          call.  Get yourself a slot.

9                MR. DASSOW:  No problem.

10               MR. HERMAN:  I have a couple

11         of questions.  I will try to make

12         them quick.

13               The 3,000 detail persons,

14         I'll use the old marketing term,

15         were those New Jersey, New York,

16         Pennsylvania?

17               MS. SCOVERN:  Those were

18         countrywide, throughout the

19         country.

20               MR. HERMAN:  We've got

21         18,000 in our database.  It took

22         us a long time to get them there.

23               MS. SCOVERN:  I have 3,000

24         from the Henry Waxman

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1        investigation into the Vioxx

2        marketing, Congressman Henry

3        Waxman.

4            MR. HERMAN:  In your cost,

5        do you remember what you paid

6        Rodney Jew?

7            MR. DASSOW:  I know that

8        Bill picked up the major tab of

9        that, if I remember.

10           MR. SEEGER:  It was some

11       flat number, I think.

12           MR. DASSOW:  It was a flat

13       number.  I think our firm paid 10

14       or 15, I mean my firm alone.

15           MS. SCOVERN:  I think it was

16       35,000.

17           MR. HERMAN:  That's

18       reasonable.  I'm interested,

19       because I know a great deal about

20       Rodney Jew, and I've talked with

21       him on occasion, and that sounds

22       reasonable to me.

23           MS. SCOVERN:  I think it was

24       35,000 each week.  And if you are

FAC Resp. Exhibit D -- 169

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1        going to use them in the future,

2        he's now in Napa.

3              MR. HERMAN:  Well, he's

4        great on colors and charts and

5        that -- well, what he's good on,

6        he's good.

7              MS. SCOVERN:  That's our

8        colors right there.

9              MR. DASSOW:  There's red.

10       You can see that he's getting too

11       old.

12             MS. SCOVERN:  Do you see

13       that now, Chris?

14             MR. SEEGER:  I do now that

15       you mention it.

16             MR. HERMAN:  I don't have

17       any other questions.  Mainly my

18       questions had to do with sales

19       reps.  But I do want you to know,

20       because you are not familiar with

21       the work in the MDL, that we had

22       many hearings and a Court-approved

23       Merck profile form, substantial

24       work done with regard to detail

FAC Resp. Exhibit D -- 170

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          persons, et cetera.

2                  The shame of it, and I'm

3          going to put this in the record,

4          is that law firms still continued

5          either to go off on their own and

6          think, well, I'm not going to be

7          an MDL lawyer, and then their

8          lawyers will say I'm an MDL

9          lawyer, I'm not going to be an

10         independent lawyer, and sooner or

11         later, this plaintiff bar is going

12         to have to find a way where we all

13         work together, because there's too

14         much talent out there, and there

15         are too many evildoers on the

16         other side for us to be

17         duplicating work.  Even though we

18         try to cooperate with each other,

19         we've got to find a better way of

20         coordinating these major cases.

21                  MS. SCOVERN:  This physician

22         relationship with payments from

23         big pharma to physicians is

24         something that permeates all

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1          pharmaceutical cases, and it needs

2          to be exploited and explored.

3               MR. HERMAN:  We're going to

4          find it in the chemical industry,

5          we're going to find it everywhere.

6               MR. RAFFERTY:  On the 17

7          cases, did you work up all 17 of

8          those cases?

9               MR. DASSOW:  No.  Because

10         you guys got the cases.

11              MR. RAFFERTY:  So, how many

12         of those got --

13              MR. DASSOW:  You guys

14         screwed up.  You got them settled.

15         What the heck.

16              I can't remember when the

17         tranche was, but I would say

18         several months for sure.

19              MS. SCOVERN:  I would say

20         half, Troy, half.

21              MR. SEEGER:  Thank you.

22              MR. BIRCHFIELD:  Thank you.

23                  -  -  -

24

FAC Resp. Exhibit D -- 172

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1                 C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4   Public and Certified Court Reporter of

5   the State of New Jersey, Registered

6   Diplomate Reporter, Federally-Approved by

7   the United States District Court of

8   Pennsylvania, do hereby certify that the

9   foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -


FIRM:          AUDET & PARTNERS, LLP
               William Audet, Esquire


BEFORE COMMITTEE MEMBERS:


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 174

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2              MR. GIRARDI:  Obviously, you

3         can tell there's a court reporter

4         here, and so everything will be

5         taken down.  The primary purpose

6         of this is for Judge Fallon, who

7         clearly is the final say on all of

8         this.

9              Further, as you know, you

10        have given half the presentation

11        before us, but not the California.

12        So, we gave permission so that you

13        could fill up that time, which I

14        think is about 12 minutes, with

15        respect to the California cases.

16        We don't do this to be unfair to

17        you, but we want to make sure we

18        are fair to everybody so everybody

19        gets the same time.  So, you may

20        go forward.

21              MR. AUDET:  Thank you very

22        much.  Well, I appreciate the

23        committee's time in allowing me

24        the opportunity to finish up the

FAC Resp. Exhibit D -- 175

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          presentation that we started in

 2          New Jersey, and I appreciate the

 3          fact that you have given me a

 4          little extra time to finish up,

 5          and I will do this in short order.

 6              Essentially, the focus of

 7          the presentation today by me will

 8          be less than five minutes and just

 9          discuss what I think was our

10          contribution to the California

11          cases.  I know there's a couple of

12          other firms in the same situation,

13          but my firm thought that it would

14          make sense to have basically cases

15          in New Jersey and in California.

16          We understood that at some point

17          in time there was a general

18          request that cases that could be

19          ready for trial in short order be

20          filed in California, and so my

21          firm filed just six cases in

22          California, all of which were

23          pretty good.  We then were given

24          the opportunity to present to
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 176

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1           Tom's office with the help of,

2           actually, Jim O'Callahan two cases

3           for selection.

4               One of them didn't get

5           selected.  It was an MI.  It was

6           Andreasen.  Our office had met

7           with him a number of times.  We

8           wanted to make sure that he was

9           ready to go to trial if need be.

10              If you look at our chart,

11          two of our cases were designated

12          out of the 18 in the January '06

13          selection process.  We were

14          selected by Judge Chaney in March

15          '06.  At that point we really got

16          heavily involved in the California

17          litigation overall.  Prior to

18          that, quite honestly, we had done

19          some work in California, but it

20          was at that point I assigned a

21          lawyer almost full time to work on

22          that case under my supervision.

23          We worked closely with Jim

24          O'Callahan, who I believe would

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        back up that we did bother him a

 2        lot with questions to get up to

 3        speed.

 4             Our client had a very unique

 5        issue which Jim thought was

 6        important or at least I thought

 7        was important, and that was

 8        military marketing.  Up until

 9        then, apparently there had been no

10        real pressing on the issue of

11        military marketing.  Our client

12        was in a VA hospital, was also in

13        a regular hospital, but was on VA

14        benefits.  We took a number of

15        depositions.

16             The common benefit impact of

17        the bellwether case was, we did at

18        least one deposition that Jim

19        thought was a good idea to do, and

20        that was a person most

21        knowledgeable regarding military

22        marketing.  We actually found some

23        information that was contrary to

24        their prior representations
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1           regarding the lack of military

2           marketing.  And that was one of

3           the issues that allowed us to

4           proceed and get an order from

5           Judge Chaney to open up more

6           military marketing issues.

7                Again, we looked, I think

8           the segment of the population was

9           eight to ten percent, but

10          nonetheless, we thought it might

11          be useful to others.  If our trial

12          didn't go forward, it was still

13          useful to press that issue.

14               We have a summary of

15          contributions, but I'll close on

16          my California contribution there

17          because, of course, I'm not here

18          to regurgitate what Suzanne

19          presented before to you.

20               MR. BLIZZARD:  One question

21          for you.  What happened to the

22          bellwether trial cases?

23               MR. AUDET:  Here's what

24          happened, unfortunately.  It was a

FAC Resp. Exhibit D -- 179

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        good idea.  The doctor had left

 2        the United States.  We hired a

 3        private investigator.  There was a

 4        critical issue about he was on it

 5        for six months.  We could show

 6        through him and through -- we had

 7        one of three, three of four, he

 8        kept some of the bottles.  We were

 9        able to show that there was six

10        months of usage, and that was

11        pretty critical.  Unfortunately,

12        we couldn't get the VA Hospital

13        records.  The Court declined an

14        issue ordering them to produce it.

15        We issued a subpoena.  They never

16        produced the records.  That's when

17        we hired, and Jim suggested --

18        actually, Mark Robinson suggested

19        with Jim on a call to me that I

20        hire a private investigator to

21        locate the doctor.  We located

22        him.  I hired someone to go see

23        him.  He's in Germany.  He

24        basically slammed the door on us.
```

FAC Resp. Exhibit D -- 180

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          He wouldn't give us any
 2          information, said it was
 3          privileged, confidential.  He had
 4          no obligation to come back to the
 5          United States.
 6               So, what happened was, we
 7          had a face-to-face with the judge,
 8          and it was myself, I think Jim was
 9          in, it was back in chambers, in
10          which the judge said, am I going
11          to have usage issues?  And they
12          would not stipulate -- even though
13          I could show through my client
14          that we had six months' usage,
15          they would not agree to it.  I
16          agreed to waive punitives.  I did
17          everything I could, and the judge
18          said, I'm not doing a usage issue
19          case.  I'm not going to have a
20          case in which you guys are going
21          to fight over usage for a week.
22               She said, it is up to you.
23          I talked to Jim about it.  Jim
24          said, take it as far as you can,
```

FAC Resp. Exhibit D -- 181

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          but you are going to have to
 2          dismiss this case if you can't
 3          prove usage.  We put almost a good
 4          year into the case.  We knew there
 5          was some usage proof issues.  We
 6          didn't know that we would never
 7          get the VA Hospital records that
 8          would prove it.  Again, because he
 9          went to the VA, he didn't pick
10          them up at Walgreen's, we just had
11          no choice.  We had his affidavit,
12          we had his wife's affidavit, who
13          went and picked it up for him, but
14          again, unfortunately, we had to
15          drop the trial.  We did not want
16          to drop the trial.  The plan was I
17          really wanted to take it to trial,
18          and I wanted to be one of the
19          California plaintiffs because it
20          was ready to go, but because of
21          the usage issue, that was it.
22               I think we had a great
23          plaintiff.  He was a former
24          military man.  He couldn't support
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          his family anymore.  I think he

2          was a really good client.  He had

3          some weight issues, but that

4          was -- I didn't think it was going

5          to be a problem.

6               MR. BLIZZARD:  So, when was

7          it dismissed?

8               MR. AUDET:  I have it

9          somewhere.  I know I have it

10         somewhere.  It was dismissed -- I

11         don't know if I have that with me.

12         Josh would have this.

13              MR. GIRARDI:  We have that.

14         Clearly the benefit and what you

15         did do was to show the marketing

16         to the government.  That was the

17         whole focus of this.

18              MR. AUDET:  Correct.

19              MR. GIRARDI:  Because that

20         was an area that Merck had denied,

21         and because of your work, you

22         opened that can of worms up and

23         then got very beneficial documents

24         and testimony to show they were

FAC Resp. Exhibit D -- 183

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          marketing to the government.

2          True?

3               MR. AUDET:  Yes, that's

4          correct.  And even June '07 I have

5          here, per the judge's request, we

6          did a telephonic deposition of a

7          military in charge of VA hospitals

8          in the western region with the

9          defendants.  They supposedly had

10         the primary prescriber, but we

11         could never get him to identify

12         himself.  That was the problem.

13         We had a court order that

14         basically he wasn't going to abide

15         by because he was in Germany.  So,

16         again, I did a lot of consulting

17         with Jim about this and what we

18         could do.  And again, his concern

19         was going forward.  But we were

20         committed to doing the trial, of

21         course, with Jim's help.  I don't

22         know if there's any other

23         questions.

24               MR. SEEGER:  Suzanne did a

FAC Resp. Exhibit D -- 184

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1         very thorough job about your

2         contributions.

3              MR. LEVIN:  And also

4         corrected the record with a letter

5         afterwards.

6              MR. AUDET:  I thank the

7         committee for pointing out the

8         deficiency.  We weren't aware of

9         that.  It's already been

10        corrected.  We've already given

11        them the zip file, I learned, last

12        night and this morning.

13             So, I do appreciate the

14        committee, actually, its time, its

15        efforts, and really that's my

16        presentation unless you have any

17        questions.

18             MR. GIRARDI:  Thank you.

19             MR. AUDET:  Thank you.

20                  -   -   -

21

22

23

24

FAC Resp. Exhibit D -- 185

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1                C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4      Public and Certified Court Reporter of

5      the State of New Jersey, Registered

6      Diplomate Reporter, Federally-Approved by

7      the United States District Court of

8      Pennsylvania, do hereby certify that the

9      foregoing is a correct transcript of the

10     testimony as taken stenographically by

11     and before me at the time, place and on

12     the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14     am neither a relative nor employee nor

15     attorney nor counsel of any of the

16     parties to this action, and that I am

17     neither a relative nor employee of such

18     attorney or counsel, and that I am not

19     financially interested in the action.

20

21     _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:  AYLSTOCK WITKIN KREIS &
       OVERHOLTZ, PLLC
       Justin Witkin, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
     877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 187

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. BIRCHFIELD:  Everything
 3         is on the record, and so we'll
 4         have a transcript in the event the
 5         judge needs it.  So, the floor is
 6         yours.
 7              MR. WITKIN:  Thanks for
 8         allowing me the opportunity to
 9         speak.  I apologize ahead of time
10         if I'm a little horse or if I
11         sniffle.  I'm coming off a little
12         cold.
13              I think I know all of you,
14         but I'm Justin Witkin from
15         Aylstock Witkin Kreis & Overholtz.
16         As I understand it, you've asked
17         me to come here today and talk
18         about how my firm's contribution
19         to the litigation benefited the
20         litigation and the end result as a
21         whole.  I've obviously submitted
22         an affidavit, and I won't rehash
23         that here.  I've prepared just a
24         few remarks.
```

FAC Resp. Exhibit D -- 188

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1                I think that, in essence,

2           the way I would answer the

3           question of how were the things

4           that we did beneficial to the MDL,

5           beneficial to the litigation, was

6           that we answered the call of the

7           PSC at the beginning of the

8           litigation.  Our role was largely

9           in response to requests for work

10          from the PSC, and those requests

11          came throughout the duration of

12          the litigation, at the beginning,

13          middle and end of the litigation.

14               A few examples of some of

15          the things that we were asked to

16          do and that we stepped up to do,

17          towards the sort of end of the

18          case, there was a desire to put

19          together a stroke package.  That

20          wasn't necessarily the most

21          desirable work, because the effort

22          had been on the MI cases.  The

23          request, I think, came through

24          your office, Russ, through Penny,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          and we stepped up and did that.

2          We sent multiple attorneys to

3          review stroke documents, to work

4          on the stroke package, when there

5          weren't really any other takers

6          for that job.

7              MR. SEEGER:  Justin, could

8          you identify the lawyers from your

9          office that worked on the case?

10             MR. WITKIN:  Sure.  We had

11         Bryan Aylstock, Ben Anderson,

12         Paula Bruner.  I'm not sure if Ken

13         Smith was over there at the time.

14         Ken Smith might have been over

15         there.

16             MR. LEVIN:  Ken Smith did

17         work.  He did work.

18             MR. WITKIN:  I'm trying to

19         remember whether he did the stroke

20         package work or not.

21             MR. LEVIN:  He had more

22         hours in discovery than anybody

23         else in your office.

24             MR. WITKIN:  Right.  I was

FAC Resp. Exhibit D -- 190

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          going to address that next,

 2          actually.

 3               In 2005/2006, the dates all

 4          blend together, when the documents

 5          first started rolling in or

 6          started rolling in in large

 7          volume, as I'm sure you all

 8          recall, the request every week

 9          was, who can send people to review

10          documents?  Who can send people to

11          review documents?  We've got a

12          depository in New York, we've got

13          a depository in Louisiana.  And we

14          did.  And we didn't just send the

15          contract lawyer or the guy that

16          has been in the firm for a year.

17          We sent a 25-year lawyer, Ken

18          Smith, with our firm, and he

19          reviewed documents for weeks on

20          end.  We had other people at other

21          times that reviewed documents,

22          but, again, we were answering the

23          call when the PSC put the call

24          out.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1              At the outset of the case,

 2         when things first started going

 3         and we got into some of the sales

 4         rep discovery, it was my firm that

 5         drafted the sales rep database

 6         brief, in conjunction with Dawn

 7         and some others, and had some

 8         input on it.  We did that.  Mark

 9         Robinson approached us and asked

10         us to be involved in the sales rep

11         discovery.  We got involved in

12         doing the -- Neil Overholtz of my

13         firm got involved in drafting some

14         of the subpoenas, took some

15         depositions with Lenny from your

16         office, Russ.

17              Initially there was an

18         effort to identify sales reps in

19         the state of Florida who we could

20         contact because they were no

21         longer employees of Merck, and we

22         were trying to figure out could we

23         do that, so we were involved in

24         that project.  That was a request
```

FAC Resp. Exhibit D -- 192

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          that was made at the beginning.

2          We stepped up and we did that.

3               The Irvin trial came along,

4          and obviously Andy's firm was

5          responsible for that.  Because of

6          its connection to Florida or maybe

7          because of our proximity to Andy

8          or because I'm so good looking,

9          Andy asked us to get involved in

10         that, and we did.  We got involved

11         both in Irvin I and in Irvin II,

12         and Irvin I in a more limited

13         capacity, helping on some depo

14         cuts and were doing some jury

15         questionnaires, we were out of

16         Houston for that.

17              In Irvin II, when the crunch

18         came down on the motions in

19         limine, I'm not sure if it was

20         Andy or if it was Leigh, called us

21         and said, we've got these 10,000

22         motions in limine, can you do

23         these?  And I literally pulled

24         every attorney, or not every

FAC Resp. Exhibit D -- 193

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1        attorney, I pulled six attorneys

 2        from my firm, Joshua Jones, Ken

 3        Smith, myself, Jason Richards,

 4        Russell Rein, Bryan Aylstock, all

 5        of us did nothing for a couple of

 6        days but take care of those motion

 7        in limine requests.  So, again,

 8        the call went out, we answered the

 9        call, and I assumed that, in the

10        scheme of things, Irvin was an

11        important part of the overall

12        effort to bring about the result

13        that we obtained here.

14             And then at the end of the

15        case, when the PSC was looking to

16        put a little more leverage, get a

17        little more leverage, try to bring

18        about a result, the request was

19        sent out, we're going to do this

20        rapid remand thing.  We want to

21        get some cases back into state

22        courts, we're going to file this

23        motion, put some cases back in

24        district courts so that we can get

FAC Resp. Exhibit D -- 194

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1              some pressure.  Let's identify

2              people who have cases who are up

3              to the task, and let's identify

4              the cases.  I did that, trying to

5              sort that out.  So, again,

6              answering the call, beginning,

7              middle and end.  I think that's

8              characteristic of all of our

9              efforts, which are more detailed,

10             obviously, in my affidavit.

11                  I'll talk just real briefly

12             about my appointment to the State

13             Liaison Committee.  I was

14             appointed to the State Liaison

15             Committee.  The State Liaison

16             Committee, it seems to me, served

17             an important role in litigation

18             like this for this reason.  This

19             is obviously one of the bigger

20             litigations that's out there.

21             When you have a litigation this

22             size and this disparate, you have

23             to have cohesiveness if you want

24             to bring about the end result.

FAC Resp. Exhibit D -- 195

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          You know that.  You can't get a

2          global settlement unless you've

3          got most of the people on board.

4               So, the role of the State

5          Liaison Committee, it seems to me,

6          the important role in the state

7          liaison committee, is to

8          facilitate that cohesiveness, to

9          make sure that the people who are

10         not necessarily at that middle of

11         the MDL process are on board or at

12         least are aware of what's going

13         on, so that when something

14         happens, they don't throw up their

15         hands and go, oh, gosh, oh, no,

16         and start to become the objectors.

17         Well, that's what the state

18         liaison committee did, and that's

19         what I did a lot of.

20              We published a newsletter,

21         and our names are out there in

22         front of hundreds, if not

23         thousands of attorneys.  And so we

24         would get random calls from Tom,

FAC Resp. Exhibit D -- 196

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        Dick and Harry, hey, what's going

2        on, can you tell me how to fill

3        out the plaintiff profile form.

4        Well, read the order.  Well, tell

5        me how to do it.  So, I spent a

6        lot of time doing that, and, you

7        know, to my detriment, most of

8        which I didn't capture and submit

9        as time.  But that was an

10       important role, I think, that

11       benefited the litigation as a

12       whole, because it was necessary to

13       have that kind of cohesiveness.

14            Beyond that, I think that

15       anything, any of my time spent on

16       the SLC, discharging the orders of

17       the Court, is necessarily

18       important to the outcome of the

19       litigation.  The Court says do

20       something, you do it.  So, when

21       the Court said catalog all the

22       remand motions and tell me how

23       many remand motions and come

24       report to us every week or every

FAC Resp. Exhibit D -- 197

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          status conference, I did that.

2          And when Dawn wasn't there, I

3          filled in and I made those reports

4          for the Court.

5              MR. SEEGER:  Did you attend

6          most of the status conferences?

7              MR. WITKIN:  You know, I

8          did, I would say up until end of

9          2006, and as things sort of

10          tapered down and we looked like we

11          were heading in towards the

12          settlement, I stopped coming, I

13          stopped getting as many questions,

14          to be honest.  Part of what I had

15          to do, or I appreciated that I had

16          to do in order to facilitate the

17          cohesiveness in the state liaison

18          committee was to stay abreast of

19          what was going on.  In the early

20          stages, obviously that's when all

21          of the pretrial orders were coming

22          out that were setting out

23          procedures, and it was important

24          for me, I felt, to be at each

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          status conference, to read every

2          pretrial order, to try to stay

3          abreast of all the things that

4          were going on.

5               MR. HERMAN:  Let me ask you

6          a couple of questions.

7               Ben Anderson, is Ben

8          Anderson a partner?

9               MR. WITKIN:  Yes.  I wanted

10         to address both Ben Anderson and

11         Ken Smith.  When Wegmann sent out

12         the form that they wanted us to

13         fill out, they said identify

14         people as associate, partner or

15         contract attorney.  I identified

16         both of them as of counsel, even

17         though that wasn't a category, and

18         I'll tell you why.  Both of them

19         were, I think, functionally -- I

20         don't think, they were employees

21         of our firm.  I paid all of their

22         wages.  They could do no work

23         without my blessing.  Now, titles

24         matter to some people, and Ken

FAC Resp. Exhibit D -- 199

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

    1        Smith and Ben --
    2             MR. LEVIN:  Let me tell you,
    3        the title "of counsel" is not
    4        necessarily a matter for us.  That
    5        was sent out so that we could get
    6        hourly rates and try to blend them
    7        in categories.  So, don't feel
    8        that you have hurt them or helped
    9        them or anything by listing them
   10        as of counsel.
   11             MR. WITKIN:  I just wanted
   12        to explain it.
   13             MR. LEVIN:  It is not really
   14        an issue from my perspective,
   15        because I initiated that, and that
   16        was just to get hourly rates.
   17             MR. WITKIN:  I guess the
   18        point I want to make is that Ken
   19        Smith and Ben Anderson were not
   20        contract attorneys.  They were
   21        employees of my firm.
   22             MR. HERMAN:  What about
   23        Paula Bruner?
   24             MR. WITKIN:  Paula Bruner is

FAC Resp. Exhibit D -- 200

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1          the same situation.  The only

 2          distinction between Paula Bruner

 3          and what I would call my other

 4          associates is that she lived in

 5          New Orleans.  I conditioned her

 6          becoming a full associate on

 7          moving to Pensacola, but she spent

 8          three years in my employment

 9          living in New Orleans.

10               MR. HERMAN:  I don't see any

11          hours for Neil Overholtz.

12               MR. WITKIN:  Well, then,

13          that is a bad oversight on our

14          part.

15               MR. HERMAN:  You need to

16          contact the CPA.  I need to tell

17          you that they don't have any

18          personal business with any Vioxx

19          lawyer or firm.  They are

20          independent.  The judge has

21          selected them.  You should call

22          them.  If you need a number or

23          something, call Lenny Davis in my

24          office.

FAC Resp. Exhibit D -- 201

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1              MR. LEVIN:  I seldom
 2         contradict Russ, but Overholtz has
 3         93 hours.
 4              MR. HERMAN:  That's not what
 5         I see here.
 6              MR. WEITZ:  You said that
 7         you had conducted some
 8         depositions.  What was the name of
 9         the deponent?
10              MR. WITKIN:  It was
11         Overholtz in my firm that
12         conducted the depositions.  He did
13         the 30(b)(6) of the MIS guy with
14         Lenny at the outset, and there was
15         one other one, and honestly I
16         don't recall the name.
17              MR. RAFFERTY:  Did he first
18         chair those, Justin?
19              MR. WITKIN:  I'm not sure
20         whether he did or not with Lenny.
21         I honestly don't know.  I know
22         that he did all the prep, but I
23         don't know whether he first
24         chaired it.
```

FAC Resp. Exhibit D -- 202

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1            MR. RAFFERTY:  Can you just

2       expand for me the work in the

3       stroke trial package, like what

4       y'all did and that kind of stuff?

5            MR. WITKIN:  I think that

6       the primary task, and my personal

7       involvement is less, so I can't

8       give you as detailed an answer as

9       I might like to, but we reviewed

10       the documents that were initially

11       coded as the stroke documents, to

12       try to identify those that would

13       be trial package documents.  And

14       from there, I think at the

15       direction of Russ' office, I'm not

16       sure what next steps we took or

17       whether we went so far as to

18       create depo cuts or what.

19            MR. HERMAN:  I just want to

20       say that Arnold has got an update

21       of the hours, so, you don't have

22       to worry about that.

23            MR. SEEGER:  Justin, on the

24       State Federal Liaison Committee

FAC Resp. Exhibit D -- 203

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          that you guys were involved with,

 2          did you have calls and things like

 3          that to update each other?  If so,

 4          how often and how long did they

 5          last?

 6               MR. WITKIN:  We did.  And,

 7          again, just like my attendance at

 8          status conferences, they started

 9          out a little more fast and furious

10          and tapered off at the end.  I

11          would say -- well, we met prior to

12          each status conference initially.

13          I had a lot of contact with Dawn,

14          so, I was talking to Dawn two or

15          three times a month.  We probably

16          had a formal call at least once a

17          month.

18               MR. HERMAN:  Dawn was here

19          earlier, and she described that

20          you were within a consortium of

21          attorney firms.  Who is in that

22          consortium?

23               MR. WITKIN:  The attorneys

24          that -- if you are referring to
```

FAC Resp. Exhibit D -- 204

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          the attorneys that we have a loose

2          joint venture with --

3                MR. SEEGER:  In your group.

4                MR. WITKIN:  In my group,

5          yes, and not the referral

6          attorneys?

7                MR. HERMAN:  No.

8                MR. WITKIN:  It is Dawn,

9          Arsenault, Lundy and Andrus.

10               MR. HERMAN:  It's Vance?

11               MR. WITKIN:  Yes.

12               MR. LEVIN:  When you say it

13         is a joint venture, do your pool

14         your fees and then split them in

15         different cases or you just sort

16         of support each other?

17               MR. WITKIN:  It is one of

18         these things where we probably

19         would have been well served to

20         have a lot more definition up

21         front.  The answer is no, sort of.

22         On the MDL side, there's no

23         pooling of fees at all.

24               MR. LEVIN:  Okay.

FAC Resp. Exhibit D -- 205

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1              MR. SEEGER:  Dawn told us, I

2         don't remember, but your group has

3         how many cases that are going into

4         the deal, the settlement?

5              MR. WITKIN:  There's 600

6         cases approximately.

7              MR. WEITZ:  Those cases were

8         filed in the MDL?

9              MR. WITKIN:  Majority.  We

10        have a few that were filed in New

11        Jersey, but the vast majority were

12        filed in the MDL.

13             MR. WEITZ:  Were there any

14        cases that you had worked up in

15        New Jersey or in the MDL for trial

16        that were your cases?

17             MR. WITKIN:  Individual

18        cases?  No.

19             MR. HERMAN:  Didn't someone

20        else from your firm second chair

21        Lenny in some FDA depositions, if

22        you recall?

23             MR. WITKIN:  I don't believe

24        so, no.

FAC Resp. Exhibit D -- 206

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1              MR. HERMAN:  In terms of the

2         consortium, what other cases has

3         the consortium been involved with

4         or is involved with from 2005 to

5         today?

6              MR. WITKIN:  We did Bextra/

7         Celebrex together, and we did

8         Guidant and Medtronic together.

9              MR. HERMAN:  How many

10        Bextra/Celebrex cases?

11             MR. WITKIN:  How many paid?

12             MR. HERMAN:  How many did

13        you have?

14             MR. WITKIN:  80.

15             MR. HERMAN:  Guidant?

16             MR. WITKIN:  How many

17        claimants do we have?  About 160.

18             MR. HERMAN:  And in

19        Medtronic?

20             MR. WITKIN:  110 maybe.

21             MR. HERMAN:  Have you

22        applied or are you applying for

23        common benefit in any of those?

24             MR. WITKIN:  Yes.  In

FAC Resp. Exhibit D -- 207

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          Guidant and Medtronic, we served
 2          significant roles and we did.  In
 3          Bextra/Celebrex, we will not be.
 4          In Ortho Evra, no, we are not.
 5               MR. HERMAN:  Is Richard
 6          Arsenault on the PSC in Guidant,
 7          do you know?
 8               MR. WITKIN:  Yes.
 9               MR. HERMAN:  And in
10          Medtronic?
11               MR. WITKIN:  He is.
12               MR. HERMAN:  This is Chris'
13          favorite question, but I'm going
14          to borrow it --
15               MR. SEEGER:  It used to be
16          mine.
17               MR. HERMAN:  -- because I
18          think it is a significant
19          question.
20               What do you consider, if you
21          had to name the most significant
22          contribution that your firm made
23          to the litigation to move it along
24          towards resolution, what would it
```

FAC Resp. Exhibit D -- 208

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      be?

2              MR. WITKIN:  You know, I

3      don't know that I would pick one

4      thing.  I went through five or six

5      things where, you know, you guys

6      tell me, what was the most

7      important thing in getting this

8      case to where it was.  I think

9      that we answered --

10             MR. SEEGER:  Trying cases.

11     Oh, I thought you were asking me a

12     question.  You asked.

13             MR. WITKIN:  Russ, I don't

14     know that out of the things that

15     we did I would say that one thing

16     clearly stood out as being

17     advancing the ball more than the

18     others, because to do that is to

19     suggest that you knew at the time

20     you were doing the things that you

21     were doing that it was going to be

22     the thing that would bring about

23     the outcome, and you didn't.

24             MR. LEVIN:  I guess what you

FAC Resp. Exhibit D -- 209

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          would say is you did everything

2          you were asked to do.

3               MR. WITKIN:  I did, and I

4          guess I would make this further

5          point.  I think there's a

6          distinction between work that you

7          do when you know what the outcome

8          is and work that you do when you

9          don't know what the outcome is.

10          If you go back and you look at the

11          examples I gave, I mean, the

12          stroke package for one, that

13          wasn't something that anybody else

14          really wanted to do.  Why?

15          Because nobody was feeling so

16          great about the stroke cases.  And

17          we did that work because there was

18          a request to do it.

19               MR. SEEGER:  I would just

20          correct that.  I mean, I know that

21          in our office we felt pretty high

22          on the stroke cases.  I think Dave

23          Buchanan would argue with you on

24          that.  But you are right, it was a

FAC Resp. Exhibit D -- 210

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1        little bit of an offering for a

2        while.

3              MR. HERMAN:  Let me say to

4        you that I think that's an

5        important thing, because without a

6        stroke package, again, trial

7        package, you can't then justify

8        people opting out who are going to

9        say, well, you didn't give me

10        anything, and stroke is an

11        important part of the resolution

12        of this case.  I know this is a

13        particular theme of mine, but it

14        is pretty difficult for lawyers to

15        go through a process, elect to

16        come into a settlement, and then

17        complain that they had no option

18        when the option was they had a

19        stroke package to try the case and

20        not come in, so...

21              MR. BIRCHFIELD:  Justin, I

22        think you summed it up.  Answering

23        the call, that's critical, and I

24        appreciate it.  Because there

FAC Resp. Exhibit D -- 211

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          wasn't a single time that we

2          called on you for help in a

3          specific role that you didn't step

4          up, and that's appreciated.

5                    MR. SEEGER:  Anybody else?

6                    (No response.)

7                    MR. SEEGER:  Thank you, sir.

8                    MR. HERMAN:  Thank you.

9                         -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 213

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:  BARRIOS, KINGSDORF & CASTEIX, LLP
       Dawn M. Barrios, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 214

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. HERMAN:  Everything is
 3         recorded.  You are going to get a
 4         copy of what everybody else has
 5         had to say.  Judge Fallon said if
 6         there's no fee agreement at the
 7         end of day, he's going to have a
 8         Special Master go through the
 9         Murphy Oil process.
10              MS. BARRIOS:  And as a
11         victim of the Murphy Oil process,
12         I will personally state that
13         nobody wants to do that.
14              I want to thank y'all for
15         allowing me to meet with you
16         today.  I told Ed in the hall I
17         kind of feel like I'm coming to a
18         firing squad.
19              MR. SEEGER:  A tired firing
20         squad.
21              MS. BARRIOS:  Seriously,
22         I've been in your position before,
23         so I'm only going to do the
24         highlights for you guys.  I want
```

FAC Resp. Exhibit D -- 215

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          to give you a couple of broad

 2          strokes.  I want you to know how

 3          small my law firm is.  We're only

 4          three lawyers, two who do

 5          litigation, and we've devoted a

 6          substantial amount of time for a

 7          three-man law firm to this

 8          litigation, and we have been in

 9          the beginning of this MDL.  I was

10          not in it before the recall, but I

11          really got involved, of course,

12          after it came to Louisiana.

13               All of my work stems from

14          three orders of the Court.  The

15          first was when the judge appointed

16          me to the state liaison committee,

17          and I took that job very seriously

18          because, as Russ and Arnold and

19          Chris know, I have that same job

20          in Propulsid, and I knew what the

21          judge wanted me to do.  I knew of

22          the coordination that needed to be

23          accomplished.  In order to

24          coordinate and move the case
```

FAC Resp. Exhibit D -- 216

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          forward, you have to communicate.

2          So, one of the first things that I

3          did was started up with the

4          newsletters.  I would send them to

5          Russ and Lenny to review, and I

6          started sending out all the

7          orders, all the information that

8          the MDL wanted to give to the

9          regular attorneys.  Because of

10         that communication, I got

11         innumerable calls asking me

12         questions.  Obviously the

13         experienced, the MDL litigators

14         didn't call me, but I had to deal

15         with Joe six pack who didn't

16         understand what an MDL was.  So, I

17         took a lot of those calls.

18              One of the first things that

19         I did, and I'm not too sure if

20         Russ was very happy with me that

21         day, but I stood up and I asked

22         Judge Fallon if the state liaison

23         committee could do a separate memo

24         on the sales reps, getting the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          sales reps notes from Merck,

2          because I felt that the state

3          attorneys really needed that,

4          particularly if they were going to

5          have diversity.  So, while I

6          didn't author the memo, I edited

7          it and sort of nursed it through.

8               I kept a gigantic database

9          of all the plaintiffs' lawyers.

10         Dave Buchanan would come to me and

11         ask me to send out information to

12         the people in the database.

13              I was asked by Fred Longer

14         to find the head class sales rep.

15         When class actions were filed and

16         there were no class reps, Fred

17         said, hit your database, go

18         through it, find me some class

19         reps.

20              Similarly, I was asked to

21         help find trials to occur in the

22         MDL and people to put their trial

23         cases up.  I helped Lisa

24         Dagostino, obviously she did it

FAC Resp. Exhibit D -- 218

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1      all, but I helped get her medical

2      records and assist her, and went

3      to a lot of friends I knew who

4      were good litigators to see if

5      they would bring their cases into

6      the MDL.  One of those is Ed

7      Blizzard, and luckily his Mason

8      case was selected to be tried

9      here.

10          I don't know, Ed, if I

11      should take some kind of credit

12      for bringing you in or not.  It

13      sort of depends on what these guys

14      feel about you.

15          MR. HERMAN:  We feel a lot

16      better about you than we do about

17      him.

18          MS. BARRIOS:  Okay.  So,

19      please be on your best behavior

20      from here on out.

21          Ed asked me to be his local

22      trial counsel in Mason.  I helped

23      mostly with the jury selection and

24      reporting to the jury consultant

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1    every day after the class and did

2    a memo.

3        Lenny Davis asked me to get

4    together a whole list of cases for

5    case-specific discovery when the

6    MDL was not moving as quickly as

7    everybody wanted.  There was a

8    motion, and I believe the motion

9    was filed for case-specific

10   discovery, and it was to be tee'd

11   up, and I helped Lenny locate some

12   cases to put for the discovery

13   track.

14       I met with Judge Fallon

15   privately, Judge Higbee, Judge

16   Wilson in coordinating with the

17   various menus.

18       When Merck selected a case

19   called Diaz to be tried here,

20   Jerry Meunier reached out to me,

21   because the local counsel for Diaz

22   was a female attorney, and she

23   felt more comfortable talking to

24   me.  I helped prepare the witness

FAC Resp. Exhibit D -- 220

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          for deposition and was going to

2          prepare the doctors, but she

3          ultimately dismissed the case.

4               With Ted Mayer and Doug

5          Marvin, I coordinated deposition

6          dates and worked with the

7          different attorneys in the various

8          jurisdictions to iron out how much

9          they could participate versus the

10         MDL participate.

11              I think that I was a go-to

12         person outside the PSC to get

13         things done because of my

14         relationships and my database.  My

15         goal was just to get critical mass

16         so that the MDL would be

17         successful.

18              My second bit of work comes

19         from the order that Judge Fallon

20         entered in July of 2005 in which

21         he ordered the SLC to keep track

22         of all the remands that came into

23         the MDL.  I really didn't know

24         what he was talking about when he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          first ordered that we do it, but

2          as chair of the SLC, I undertook

3          to figure out how to do it and

4          what to do.

5               We have kept track of over

6          955 cases with remand orders, with

7          remand motions.  We had to locate

8          them.  Remand motions do not come

9          with a record when it is

10         transferred over to the MDL.  So,

11         we worked with the clerk's office

12         and transferred reports to get all

13         of that information, put it

14         together.  We have a massive

15         database with hyperlinks for the

16         judge for every one of the motions

17         and orders.  Then he asked that we

18         break it down by state, so, we

19         went and did an entire

20         investigation broken down by

21         states, and then I didn't want him

22         to ask me to break them down even

23         further, and then I would have to

24         do it again, so I decided to break

FAC Resp. Exhibit D -- 222

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1              it down by issue.  Because he did

2              say from the bench that he was

3              going to rule on remand motions,

4              he would look at one of each

5              category, and then people were to

6              take it from there and figure out

7              what he would do with remands.

8              So, I started to classify them.

9              The reason for the remand was

10             diversity, was it federal

11             jurisdiction, was it a federal

12             question, et cetera.

13                  As I was doing this, it

14             became clear the value of this

15             remand motion for me was the fact

16             that it kept the heat on Merck.

17             When I got to stand up and say

18             that we have 955 remands, they

19             knew that that was going to come

20             some time down the pike.

21             Obviously I had to deal with all

22             the counsel and answering their

23             questions about remands and why

24             isn't Judge Fallon ruling on my

FAC Resp. Exhibit D -- 223

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           remand, when can I get out, can I

2           mandamus him to the Fifth Circuit.

3           That was ongoing.

4                   MR. SEEGER:  Can I ask a

5           quick question while you're

6           presenting?

7                   MS. BARRIOS:  Sure.

8                   MR. SEEGER:  On the state

9           liaison committee, could you

10          identify for us who your most

11          active and useful members were?

12                  MR. LEVIN:  Yeah, that would

13          be helpful.

14                  MS. BARRIOS:  Actually, the

15          person who always -- two people

16          always came to the status

17          conference.  Willie Singleton

18          and --

19                  MR. LEVIN:  Len Fodera.

20                  MS. BARRIOS:  -- Len Fodera

21          are generally the only two who

22          routinely appear.  In terms of

23          work, when Judge Fallon allowed us

24          to do a secondary memo to yours in

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1          support of the motion to get class

 2          representation, I turned to the

 3          Aylstock Witkin firm out of

 4          Florida, because I knew that they

 5          had done a similar memo in a

 6          different case, so that we didn't

 7          have to reinvent the wheel.

 8               Then when we were asked to

 9          do the case-specific discovery and

10          this other project called the

11          rapid remand motion that the PSC

12          filed in order to try to get some

13          remands done, and Lenny asked me

14          to pick the cases that I thought

15          people would actually try in the

16          MDL, I turned to Justin Witkin and

17          to Matt Lundy and asked them to

18          help me on telephone calls and

19          getting that information.

20               MR. SEEGER:  Did you have

21          monthly calls, weekly calls?  Did

22          you have regular calls?

23               MS. BARRIOS:  No.

24               MR. SEEGER:  So, you

FAC Resp. Exhibit D -- 225

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1          convened the committee when you

 2          had an issue?

 3               MS. BARRIOS:  Exactly.  When

 4          we had an issue.  I'm trying to

 5          think.  The newsletter, I would

 6          send out to Russ and to everybody

 7          on the state liaison committee

 8          asking for comments, but other

 9          than that, I didn't have any

10          routine calls.

11               MR. HERMAN:  State liaison

12          committee was essentially Dawn,

13          and she's correct that the two

14          people that showed up every time

15          were Singleton and Fodera.

16               Basically on the remand

17          issue, I know she answered a lot

18          of questions, because they would

19          come into our office and we would

20          refer them over to Dawn.

21               I have some questions, Dawn.

22               What are your costs in the

23          case?

24               MS. BARRIOS:  They were in

FAC Resp. Exhibit D -- 226

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          my affidavit, $17,477.95.

2                  MR. HERMAN:  Have you had

3          any problem with your costs in

4          terms of getting them verified by

5          the CPA or any of that business?

6                  MS. BARRIOS:  Sometimes they

7          would ask my bookkeeper questions,

8          and we answered them.

9                  MR. HERMAN:  Okay.  So, you

10         don't have a problem.  If you do

11         have a problem, be sure you call

12         them, because they'll be available

13         to you.

14                 MS. BARRIOS:  They have been

15         very responsive, so...

16                 MR. HERMAN:  The number of

17         cases you have?

18                 MS. BARRIOS:  I would say my

19         office has in an interest in about

20         500 cases.

21                 MR. HERMAN:  When you say

22         "an interest," are there other

23         folks who have an interest in the

24         same cases you have?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1              MS. BARRIOS:  Yes.

2              MR. HERMAN:  Who are they?

3              MS. BARRIOS:  Richard

4       Arsenault, Matt Lundy, Justin

5       Witkin and Vance Andrus.

6              MR. WEITZ:  Did you submit

7       those cases to the settlement?

8              MS. BARRIOS:  Yes.

9              MR. WEITZ:  Your firm?

10             MS. BARRIOS:  No.  Because

11      Richard Arsenault was the primary,

12      I forget, Andy, what you call

13      them --

14             MR. BIRCHFIELD:  Primary

15      counsel.

16             MS. BARRIOS:  So, they all

17      had Richard's name on them.  I

18      mean, I prepared cases to

19      submit --

20             MR. SEEGER:  But he's listed

21      as primary counsel?

22             MR. LEVIN:  So, it is 500

23      cases that the group has?

24             MS. BARRIOS:  Correct.

FAC Resp. Exhibit D -- 228

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1              MR. HERMAN:  In terms of --
 2         this is really a question Chris
 3         asks everybody.  What do you
 4         consider the most important things
 5         that you did to move the case to
 6         fruition?
 7              MS. BARRIOS:  That's hard to
 8         say.  I would say the work on the
 9         remand stuff, just keeping it
10         moving.  I created a double remand
11         database that got Kathy Snapka's
12         Garza case remanded, and she got
13         to try that case.
14              I now work with BrownGreer
15         on a weekly basis to find out what
16         remands will be moot by the
17         factors in the settlement.  So, I
18         take it very personally since this
19         was sort of my baby, this project,
20         so, I would have to say the remand
21         stuff is probably the most
22         important.
23              MR. HERMAN:  Now, you
24         mentioned Diaz.  Jerry Meunier and
```

FAC Resp. Exhibit D -- 229

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1         I agreed to split costs to try

2         that case.  Were you involved in

3         the expert search?

4              MS. BARRIOS:  No.  My only

5         involvement was really talking to

6         counsel, preparing Mr. Diaz for

7         his depo, and then I talked with

8         Jerry about splitting up the

9         treaters to prepare them for

10        depositions.

11             MR. BLIZZARD:  Dawn, I know

12        you kind of skimmed over your work

13        on Mason, maybe because it's

14        painful to talk about it

15        sometimes.

16             MS. BARRIOS:  You know, I

17        started thinking about that today,

18        and I just remember my feeling

19        when Mr. Mason said, oh, I don't

20        think I took Vioxx before my heart

21        attack.

22             MR. SEEGER:  Even the great

23        Ed Blizzard couldn't save that.

24             MR. BLIZZARD:  Dawn was good

FAC Resp. Exhibit D -- 230

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          at talking to Mr. Mason every day

2          and handling him when we were busy

3          doing other stuff.  Dawn was

4          really good help for our team.

5               MR. HERMAN:  Are you

6          involved in any way in Guidant and

7          Medtronic ?

8               MS. BARRIOS:  No.  When I

9          say "no," my partner, Bruce

10          Kingsdorf, did a couple of the

11          individual cases.  I went to the

12          Medtronic first MDL meeting, the

13          Guidant first MDL meeting, talked

14          about the state liaison stuff and

15          they weren't --

16               MR. LEVIN:  Nothing

17          happened.

18               MS. BARRIOS:  Yes, nothing

19          happened.

20               MR. HERMAN:  What about

21          Celebrex or Bextra?

22               MS. BARRIOS:  Did the same

23          thing with Elizabeth.  Went out

24          there a couple of times to do the

FAC Resp. Exhibit D -- 231

Page 19

 1          state stuff.  She told me I could

 2          do it, and there was no court

 3          order.

 4                  MR. HERMAN:  Elizabeth

 5          Cabraser?

 6                  MS. BARRIOS:  Right, in

 7          Bextra Celebrex.  There was no

 8          court order appointing the state

 9          liaison committee, and at that

10          time, we talked about maybe doing

11          some sort of joint newsletter to

12          the COX-2 people, and I just said

13          I can't do this.

14                  MR. HERMAN:  I do want to

15          tell you I was never angry with

16          you about anything you did in the

17          case.  You are a competent lawyer.

18          You knew what you were doing.  You

19          raised an issue that had to be

20          raised, so --

21                  MS. BARRIOS:  Thank you.

22                  MR. HERMAN:  -- I never had

23          a problem with that.

24                  In Guidant, Medtronic,

FAC Resp. Exhibit D -- 232

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Celebrex or Bextra, are you

2          involved in any way with the same

3          group of lawyers, Richard, Lundy,

4          Witkin, Vance, any of those?

5               MS. BARRIOS:  Yes.

6               MR. HERMAN:  Tell me about

7          that.

8               MS. BARRIOS:  We have a

9          consortium, and we do these kind

10         of cases together.

11              MR. HERMAN:  In Guidant,

12         Celebrex, Medtronic and Bextra,

13         the group is involved in those

14         cases?

15              MS. BARRIOS:  Yes.  But I

16         didn't, I, personally, didn't.

17              MR. HERMAN:  I understand.

18              How many hours do you have

19         in this case?

20              MR. RAFFERTY:  2,085.

21              MS. BARRIOS:  I just

22         resubmitted.  We have a new

23         submission.

24              MR. LEVIN:  As of May 31st,

FAC Resp. Exhibit D -- 233

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        I had 1,920.

2              MS. BARRIOS:  I didn't know

3        that you had a cutoff date.

4              MR. LEVIN:  I have the

5        accountants' report as of May, and

6        it says 1,922, so, you've got

7        hours after that, they are just

8        not here yet?

9              MS. BARRIOS:  Exactly.

10             MR. HERMAN:  So, you have

11       got 1,922 plus whatever since May?

12             MS. BARRIOS:  Yes.

13             MR. HERMAN:  You have an

14       estimate on that?

15             MS. BARRIOS:  I would say

16       maybe 200, 250.

17             MR. RAFFERTY:  Dawn, what

18       about the other hours?  I think in

19       your affidavit you said about

20       1,300 of them were yours?

21             MS. BARRIOS:  Yes.

22             MR. RAFFERTY:  What about

23       the other hours?  What were those

24       primarily involving?

FAC Resp. Exhibit D -- 234

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              MS. BARRIOS:  The way our

2         law firm works is that I usually

3         do the rainmaker type of stuff,

4         and my partner, Bruce, backs me up

5         with all the law.  So, every time

6         we needed to do law stuff and deal

7         with that, he handled it.  I have

8         heavy paralegal hours because of

9         the remand project.  I mean, I

10        couldn't go through 174

11        conditional transfer orders.

12              MR. LEVIN:  The 1,922 was

13        the total hours for your firm.  Of

14        that, yours was 1,119.  This,

15        again, is as of May.  Bruce had

16        157.  And after that, all of the

17        hours are law clerks and

18        paralegals?

19              MS. BARRIOS:  Correct,

20        correct.

21              Since you are asking about

22        the volume of hours, after

23        Katrina, there was some time that

24        I lost without being able to

FAC Resp. Exhibit D -- 235

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

 1          report it, but I would hope y'all

 2          would take that into

 3          consideration.

 4                  MR. HERMAN:  But I know you

 5          were active, because when the case

 6          moved to Houston, you were still

 7          active in the case.

 8                  MS. BARRIOS:  Right.

 9                  Can I just continue or do

10          you have any more questions?

11                  MR. HERMAN:  No, no.  Go

12          ahead.

13                  MS. BARRIOS:  Just the last

14          bit of information, and this is

15          really a question, formed the

16          basis of a question that I have is

17          the third order that Judge Fallon

18          handed down in July of this year

19          regarding the Attorney General

20          cases.  I mean, I've been working

21          with Chris on that a lot, with

22          Lenny on that.  Does that get

23          compensated in this group?

24                  MR. SEEGER:  Good question.

FAC Resp. Exhibit D -- 236

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1              MR. HERMAN:  Well, at this

2         point, we have --

3              MS. BARRIOS:  I don't need

4         an answer --

5              MR. HERMAN:  No.  It is a

6         fair question.  Up to now, the

7         only hours we've been concerned

8         with are common benefit hours.

9              MR. SEEGER:  That led to the

10        settlement, the PI stuff.

11             MR. HERMAN:  Yes, that led

12        to the settlement in this case,

13        which would be New Jersey, Texas,

14        California and the MDL.  The AGs,

15        we have been trying to -- they

16        have indicated that they would

17        like MDL work product, but there

18        has not been an agreement reached

19        yet.

20             MS. BARRIOS:  I'm working on

21        it.

22             MR. BLIZZARD:  We haven't

23        discussed it.  Just from my

24        personal standpoint, I would just

FAC Resp. Exhibit D -- 237

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          suggest that you submit your

 2          hours.  To the extent the hours

 3          are necessary, by virtue of your

 4          role in the MDL, I mean, I guess

 5          we'll just consider them.

 6                MR. SEEGER:  I think that's

 7          good.

 8                MR. HERMAN:  There's a

 9          problem, okay, particularly in

10          Louisiana, and we have Louisiana

11          AG counsel.  Louisiana has special

12          rules as to who can do what.

13          Assume that some arrangement is

14          made with the AGs for MDL work

15          product, then any work that you've

16          done causing that to happen is

17          certainly going to be counted.  I

18          don't want to get into -- I don't

19          want you to get into a problem or

20          us to get into a problem saying

21          that we're doing work for the AGs.

22                MS. BARRIOS:  I understand.

23          I just wanted to raise the issue,

24          because --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1              MR. HERMAN:  It is a good

2         issue, and hopefully there will be

3         some arrangement with the AGs to

4         get MDL work product, and you need

5         to keep your hours.

6              MR. SEEGER:  Yes, you are

7         reporting your hours anyway?

8              MS. BARRIOS:  I am, I am.

9         But I just know that that is at

10        least an issue for me, and we've

11        been working along that goal and

12        stay lifted and --

13             MR. HERMAN:  Well, you have

14        been instrumental in that, you

15        have been instrumental in, I don't

16        want to use the word agitating,

17        but being tenacious on the AG

18        issue.  If we come to hopefully

19        some good result, you certainly

20        have a strong part in that, and I

21        think we recognize that.  I really

22        don't want to go into the

23        Louisiana issue.

24             MS. BARRIOS:  That's fine.

FAC Resp. Exhibit D -- 239

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          MR. SEEGER:  Anybody have

2     anything else?

3          (No response.)

4          MR. SEEGER:  Thank you so

5     much.

6               -  -  -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 240

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1                    C E R T I F I C A T E

2

3                    I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13                    I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22           Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23           Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:   BROWN & CROUPPEN
        Seth Webb, Esquire

        THE DRISCOLL FIRM, P.C.
        John Driscoll, Esquire
ON BEHALF OF BROWN & CROUPPEN:
        GOFFSTEIN, RASKAS, POMERANTZ,
        KRAUS & SHERMAN, L.L.C.
        Edward L. Adelman, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 242

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -
 2              MR. SEEGER:  This is part of
 3         the majority of the fee committee
 4         that's been appointed by Judge
 5         Fallon in the Vioxx litigation.
 6         We've been charged with the task
 7         of really kind of going through
 8         what everybody did and at some
 9         point, I guess, talk to the judge
10         about where people are.
11              He wants a record of
12         everything that goes on, so, we
13         have a court reporter here so
14         everything is taken down.  You can
15         make any presentation you want.
16         You have 30 minutes.
17              MR. DRISCOLL:  At the
18         outset --
19              MR. ADELMAN:  Before Mr.
20         Driscoll speaks, I know I sent
21         correspondence to the committee,
22         to Mr. Herman's office.  My name
23         is Edward Adelman, and I represent
24         Brown & Crouppen, the law firm
```

FAC Resp. Exhibit D -- 243

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          that prosecuted the Schwaller

2          case, which is before the

3          committee today.  It is our

4          position that Mr. Driscoll, who is

5          a former associate of Brown &

6          Crouppen, should not be making a

7          presentation to this committee.

8          He was an employee of Brown &

9          Crouppen at that time and an

10         associate.  All the work and

11         effort he did was on behalf of the

12         law firm.  Any dispute he might

13         have with Brown & Crouppen

14         regarding any fee he might be

15         entitled to as a result of any

16         common benefit allocation that's

17         given to Brown & Crouppen should

18         remain in-house, and we

19         respectfully ask the committee

20         that Mr. Driscoll not be allowed

21         to make a statement.  He was

22         involved in the Vioxx matter, and

23         his contributions were much

24         appreciated, but since he's no

FAC Resp. Exhibit D -- 244

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          longer employed at Brown &

2          Crouppen, I don't believe it is

3          proper for the committee to hear

4          it.

5                MR. SEEGER:  Why don't we

6          make the record, and you guys have

7          plenty of time to fight this out.

8          The checks are not going out the

9          door.

10                MR. LEVIN:  From my

11          perspective, we're going to hear

12          everybody that has something to

13          say.  If there's a partnership

14          dissolution, that's not within our

15          jurisdiction.  I'm not even sure

16          that's within Judge Fallon's

17          jurisdiction.  That you will

18          attend to on your own, as all of

19          us have attended to, that have

20          been fortunate or unfortunate

21          enough to be involved with

22          dissolved partnerships.

23                MR. SEEGER:  Seth, just so

24          I'm clear with the players.  I

FAC Resp. Exhibit D -- 245

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        have you.  You're representing the

2        firm, correct?

3             MR. WEBB:  I work for Brown

4        & Crouppen and I'm here.

5             MR. SEEGER:  I just want to

6        know who is going to address us on

7        this issue.

8             MR. WEBB:  Sure.  With

9        regard to the work on the

10       Schwaller matter --

11            MR. LEVIN:  What we're

12       interested in is the work.  We're

13       not interested in how you

14       developed your --

15            MR. SEEGER:  Exactly right.

16       Your information is helpful to us

17       no matter what --

18            MR. ADELMAN:  I'm saying

19       that any statement from Mr.

20       Driscoll does not represent

21       anything of the law firm since

22       he's a former employee.

23            MR. BLIZZARD:  Let me see if

24       I understand it.  Has Brown &

FAC Resp. Exhibit D -- 246

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        Crouppen made the application or
2        is it Mr. Driscoll that has made
3        the application?
4              MR. ADELMAN:  Brown &
5        Crouppen.  Mr. Driscoll was an
6        employee of Brown & Crouppen at
7        the time.
8              MR. BLIZZARD:  So, is Brown
9        & Crouppen saying that as the
10       applicant for common benefit fees
11       that they do not want a
12       presentation made today?
13             MR. ADELMAN:  No.  Mr. Webb
14       is going to make the presentation.
15             MR. SEEGER:  That wasn't
16       clear.  You are saying you do have
17       somebody from Brown & Crouppen to
18       make this presentation?
19             MR. ADELMAN:  Correct.
20       That's Mr. Webb.
21             MR. DRISCOLL:  Any time Mr.
22       Adelman is finished, I'll chime
23       in.
24             MR. SEEGER:  Go ahead, John.

FAC Resp. Exhibit D -- 247

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1              MR. DRISCOLL:  My name is

2        John Driscoll.  I'm now with the

3        recently formed Driscoll Firm PC,

4        an Illinois law firm --

5              MR. SEEGER:  John, can I

6        just say one thing.

7              Just so you understand, I

8        don't think there's anybody being

9        prejudiced by allowing anybody to

10        speak.  We had a group yesterday

11        of about 15 people make

12        presentations for one group.  So,

13        this is really just information

14        gathering for us.  I think we

15        would like to hear Mr. Driscoll

16        out, but you've got your comments

17        on the record.

18              MR. DRISCOLL:  Thank you for

19        that.

20              I was an associate of Brown

21        & Crouppen at the time that this

22        case was prosecuted.  Of course,

23        we're talking about the Schwaller

24        case.  It is the Illinois case

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1      that was tried in Madison County
 2      State Court.  I, along with a
 3      number of other very fine lawyers,
 4      prosecuted this case.  I think by
 5      my last count, seven law firms
 6      were involved.  I believe other
 7      lawyers who were involved in that
 8      case have made presentations
 9      already.  The so-called Vioxx
10      Litigation Consortium was involved
11      in that case, Grant Kaiser, Mikal
12      Watts and others.  I'm
13      forgetting --
14          MR. WEITZ:  John, let me
15      say, the Schwaller case was a
16      Brown & Crouppen case?
17          MR. DRISCOLL:  Well, that's
18      not actually accurate, and quite
19      technically, and I'm sure we'll
20      fight this out in state court.  As
21      you see, breaking up is hard to
22      do.
23          MR. LEVIN:  Sometimes it is
24      very enjoyable.
```

FAC Resp. Exhibit D -- 249

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1              MR. DRISCOLL:  This case,

2         this client was actually referred

3         to me.  This is my case.  I

4         brought it in to Brown & Crouppen.

5         Brown & Crouppen has internally

6         what they call an associate's

7         agreement where you share in the

8         fees for any case that you

9         generate.  This is just one of

10        those cases.  In fact, there's

11        documents, some of which I have

12        with me today, and those that the

13        client signed off on.

14             MR. LEVIN:  We're not

15        interested in who represents the

16        client.  We're just interested

17        collectively in the work that was

18        done by you at the firm, other

19        members of the firm, you outside

20        of the firm, just that.

21             MR. DRISCOLL:  You've got

22        it.

23             MR. WEITZ:  I didn't know

24        who filed the Schwaller case, and

Page 10

1          that's what I was trying to find

2          out.

3              MR. SEEGER:  Brown &

4          Crouppen is on the complaint.

5              MR. DRISCOLL:  That's right.

6          I filed it while an associate at

7          Brown & Crouppen.  It was filed in

8          Madison County, Illinois.  It was

9          removed improperly and remanded.

10         In fact, Judge Murphy at the time,

11         our chief federal judge,

12         sanctioned Merck for the

13         improvident removal.

14         Unfortunately, those sanctions

15         were withdrawn in light of a

16         United States Supreme Court case

17         on 1447(C).  So, we didn't get our

18         money from Merck there.  The case

19         was remanded and tried for six

20         weeks.

21             MR. SEEGER:  Talk to us now

22         about what you specifically did

23         and your contribution on that

24         case, and then I'm going to allow

FAC Resp. Exhibit D -- 251

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Seth to speak for Brown &

2          Crouppen.

3              MR. DRISCOLL:  Absolutely.

4          Well, while I was an associate at

5          Brown & Crouppen, I was really the

6          singular attorney involved in the

7          case until a jury was actually

8          seated.  I did everything from

9          draft the complaint, filed the

10         complaint.  I was the singular

11         attorney involved in the

12         removal/remand process.  In fact,

13         I submitted my -- as I mentioned,

14         Judge Murphy granted sanctions

15         against Merck.  In that process, I

16         was required to submit the hours

17         and the work involved at least to

18         that point in the case so that

19         Judge Murphy could properly

20         calculate the sanctions involved.

21             I did everything from engage

22         in motion practice, drafted every

23         motion, every response.  I went to

24         nearly every deposition in the

Page 12

1          case of every expert.  As I

2          said --

3               MR. SEEGER:  Did you take

4          first or second chair in any of

5          these depositions?

6               MR. DRISCOLL:  First chair.

7          Nathan Rubin, he's a cardiologist

8          from here in Beverly Hills.  We

9          didn't end up using him at trial.

10         He's a cardiologist.  Second

11         chaired a lot of other depos.  I'm

12         sorry.  I'm not completely

13         prepared on each witness blow by

14         blow right now.

15              MR. WEITZ:  Is it in your

16         affidavit?

17              MR. DRISCOLL:  It is.

18              MR. SEEGER:  What did you do

19         with the trial team?  That was

20         Mike Watts and Andy, right, Andy

21         Birchfield?

22              MR. DRISCOLL:  Yes.  I sat

23         with them.  I did the plaintiff

24         himself.  It was actually the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1           widower of the decedent.

2                   MR. SEEGER:  You put him on

3           at trial?

4                   MR. DRISCOLL:  I put him on.

5                   MR. WEITZ:  Was the trial

6           while you were still an associate

7           Brown & Crouppen?

8                   MR. DRISCOLL:  Correct.

9                   MR. SEEGER:  Is it okay if

10          we hear from Seth?

11                  MR. DRISCOLL:  Absolutely.

12                  MR. SEEGER:  The floor is

13          yours.

14                  MR. WEBB:  Well, obviously,

15          not to get into the other

16          argument, but everything that John

17          just discussed I consider to be

18          what Brown & Crouppen did in this

19          case because that's what we did.

20          I also sat second chair at several

21          expert depositions, several sales

22          rep depositions, prepped

23          plaintiffs for multiple

24          depositions.  We did pretty much

FAC Resp. Exhibit D -- 254

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1       all the local work on this case

2       because it was in our backyard.

3           MR. WEITZ:  Can you state

4       your name again for the record?

5           MR. WEBB:  Seth Webb.

6           MR. BLIZZARD:  You said

7       plaintiffs.  Were there multiple

8       plaintiffs?

9           MR. WEBB:  Children,

10      decedent.

11          MR. LEVIN:  Collectively,

12      you have reported 780 hours, and

13      at one point they were rejected.

14      Now they are being reviewed by the

15      accountant.  Have you had dealings

16      with the accounting firm?

17          MR. WEBB:  Were they

18      rejected because of the format?

19          MR. LEVIN:  They may have

20      been.

21          MR. GIRARDI:  We don't know.

22          MR. WEBB:  Because we

23      submitted them originally not

24      monthly, and then we submitted

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          them monthly.

2                 MR. LEVIN:  That's right.

3          Now they are under review, so you

4          should know that.

5                 MR. WEBB:  Okay.  As long as

6          they are being reviewed.

7                 MR. SEEGER:  Of the 780

8          hours, do you guys know how it

9          breaks down, individual attorneys?

10                MR. DRISCOLL:  Off the top

11         of my head, I don't, but a lot of

12         that is paralegal time, and as

13         Seth mentioned, Seth performed

14         some work on the case as well as

15         I.  There's two lawyers.

16                MR. WEBB:  I have it broken

17         down between attorney and

18         paralegal.

19                MR. LEVIN:  I take it you

20         guys are not going to lunch today?

21                MR. DRISCOLL:  We had dinner

22         last night though.

23                MR. WEBB:  The attorney time

24         is 694 hours and one half,

FAC Resp. Exhibit D -- 256

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          actually.  And the paralegal time

2          is 86 hours and a quarter.

3               MR. SEEGER:  Okay.

4               MR. WEBB:  I don't have it

5          broken down by attorney either.

6               MR. SEEGER:  We're not here

7          to resolve any issues between you

8          guys.

9               MR. WEBB:  Obviously.

10               MR. LEVIN: Although we

11          collectively have a lot of

12          experience.

13               MR. SEEGER:  I don't have

14          any questions.

15               MR. WEITZ:  I just have a

16          couple more questions.

17               How many cases did Brown &

18          Crouppen file?

19               MR. WEBB:  Approximately

20          450.

21               MR. WEITZ:  Where did you

22          file those, all Madison County?

23               MR. WEBB:  No.  Some were in

24          St. Louis City, some in Madison

FAC Resp. Exhibit D -- 257

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          County, some in St. Clair County.

2                    MR. SEEGER:  All in state

3          court or both?

4                    MR. WEBB:  I believe that

5          they were all filed in state

6          court.  Now, the majority of them

7          got removed --

8                    MR. WEITZ:  Did you have any

9          other cases in any of those

10         jurisdictions that were assigned

11         for trial?

12                   MR. WEBB:  I don't believe

13         so.  Not Vioxx cases.  I think

14         this was the only Vioxx case that

15         actually got assigned for trial in

16         maybe the Midwest, definitely

17         Madison County.

18                   MR. SEEGER:  As far as I

19         know.

20                   MR. WEITZ:  Did you have any

21         cases in any of those

22         jurisdictions that were being

23         worked up for trial and prepped

24         for trial by the judge on a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1         specific docket in a specific

2         group?

3             MR. SEEGER:  Were you set

4         for trial?  Did you have any trial

5         settings anywhere else?

6             MR. WEBB:  No.

7             MR. SEEGER:  Thank you, and

8         hope everything works out okay.

9                 -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1            C E R T I F I C A T E

 2

 3            I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:  BURG SIMPSON ELDREDGE
        HERSH & JARDINE, PC
        Michael S. Burg, Esquire
        John M. Restaino, Jr., Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 261

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. SEEGER: We've been going
 3         around the country and having
 4         meetings giving everyone the
 5         opportunity not only to file an
 6         affidavit, but to make any
 7         statements they want about their
 8         common benefit contributions.  You
 9         should focus on common benefit,
10         obviously.
11              Everything that we discuss
12         is being taken down so there's a
13         record if Judge Fallon ever wants
14         to take a look at it, he will hear
15         what people have to say.
16              With that, there are no
17         other rules.  The floor is yours.
18              MR. BURG:  Let me just say,
19         we appreciate this.  Having been
20         involved in doing this for a long
21         time, to have this procedure where
22         we can actually come in and talk
23         to you, we really appreciate the
24         opportunity to be here.
```

FAC Resp. Exhibit D -- 262

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           With that, John, why don't

2      you go ahead and start with the

3      PowerPoint.

4           MR. RESTAINO:  Sure.  First,

5      thank you for this opportunity.  I

6      think those of you that have

7      worked with me at least in the

8      last 16 years know that it is not

9      my nature to come and ask for

10      anything.  I usually show up and

11      try to give --

12           MR. LEVIN:  Change your ways

13      today.

14           MR. RESTAINO:  Today I have

15      to change my ways, correct.  I

16      think that I've been called humble

17      to a fault.  I have got to change

18      that way today also.

19           So, with that in mind, this

20      is a little awkward, in that I

21      need to come back here at noon as

22      a representative of the now

23      defunct Lopez Hodes Restaino

24      Milman & Skikos.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1              MR. SEEGER:  May I interrupt

2         you?  I don't want to put you in a

3         bad position, Mike, because I know

4         there's two firms, but does it

5         make sense for you to do in the

6         next 30 minutes both so you don't

7         have to come back?  Because we're

8         focusing on your contribution.

9              MR. BURG:  The only problem

10        is, Steve Skikos is not here, and

11        he's flying in this morning.

12        Otherwise, it would have made

13        sense.

14              MR. SEEGER:  Sorry, John.

15              MR. RESTAINO:  It would

16        have.

17              As an introduction in that

18        regard, I was a named partner of

19        Lopez Hodes.  I do have to talk a

20        little bit about that for those of

21        you who may not be still familiar.

22        In January of '05 when we went to

23        New York City for the introductory

24        meeting that Chris and Dave and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          others held and talked about the

 2          Vioxx litigation, at that time

 3          Chris and Dave Buchanan talked to

 4          me about co-chairing the science

 5          committee.  I have co-chaired the

 6          science committee going back to

 7          fen-phen, Propulsid, Rezulin,

 8          Zyprexa, PPA, initially Ortho

 9          Evra, co-chairing it now for NSF.

10          As a result of my medical

11          background, it is just a natural

12          role for me.  So I was asked if I

13          would work with a lady who I had

14          not met prior to that by the name

15          of Carlene Lewis.  I was told she

16          would be my co-chair, and shortly

17          thereafter, especially everyone

18          who has had a chance to know or

19          knew Carlene, you couldn't help

20          but fall in love with Carlene.

21          I'm assuming that there's

22          something being filed on her

23          behalf by somebody.

24               MR. SEEGER:  Her partner,
```

FAC Resp. Exhibit D -- 265

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          Shelly, gave us a presentation.

2               MR. RESTAINO:  I just want

3          to let you know, I don't think I

4          have ever worked with a more

5          quality lawyer, smart, hard

6          working, than Carlene, and then,

7          quite honestly, Shelly.

8          Tremendous people.

9               She and I co-chaired it, and

10         then Shelly and I co-chaired it,

11         and I facetiously say, and today

12         is not the day for me to say this,

13         but I usually facetiously say that

14         the chair of the science committee

15         really doesn't do anything more

16         than shave his legs and set up the

17         conference calls.

18              Well, in reality, we do,

19         because especially with the

20         generic experts and with my

21         background with experts, I can't

22         do it all.  I just don't have the

23         time to work up an epidemiologist,

24         although I have a degree in

FAC Resp. Exhibit D -- 266

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
1        epidemiology from Johns Hopkins, I

2        cannot work with the

3        pharmacoepidemiologist, the

4        radiologist.  So, part of my role

5        and Shelly's role and Carlene's

6        role was to triage, so to speak.

7             So, when I was asked and I

8        brought Jerry Avorn into the

9        litigation, I turned to Chris

10       Tisi, who worked with him in the

11       past, and said, Chris, I don't

12       have the time, you have worked

13       with Jerry, you are comfortable

14       with this.  And that's part of it.

15       Oversee it a little bit.  But

16       people like that, and I'm going to

17       give the accolades where

18       appropriate because, again, in my

19       role as the other co-chair of

20       science, I did get to see who did

21       some really quality work and who

22       did a lot of less than quality

23       work.

24             My work continued, to bring
```

FAC Resp. Exhibit D -- 267

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          you up into Burg Simpson, 2005,

2          2006, but through 2007, I

3          continued.  I became a part of the

4          stroke subcommittee.  I had the

5          pleasure of working with a

6          goddess, Lisa Dagostino, quality

7          work, no wasted time, continued to

8          work with them and continued to

9          work with some of the key experts.

10              Throughout 2007, we

11         continued on the extensive medical

12         library that worked, reviewing the

13         articles.  Typically, truth be

14         told, because of my then student

15         role at Johns Hopkins, I had free

16         access to the Welch library.

17         During that time, I was able to

18         procure over $15,000 worth of

19         medical articles for free.  I was

20         able to do that until I graduated

21         this past May.  I may go back and

22         get my Ph.D. just to get access to

23         the library.  But I would take a

24         look at the article, review it and

FAC Resp. Exhibit D -- 268

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          see, who is this germane for.

2          It's another epi article.

3              Don Arbitblit, fantastic job

4      with Dr. John Farquhar, would send

5      me the reports and send me things

6      going on, and I would review it

7      and say, Don, you are doing a

8      great job, keep going.  That was

9      part of what I had to do.

10             2007, I flew to New York

11     City for the stroke subcommittees.

12     I flew to Philadelphia in October

13     2007.  So, I continued to work on

14     this litigation actively

15     throughout the year.  One of the

16     things, and, again, you are going

17     to see this earlier, that we did

18     early was, there were, and maybe I

19     think on the next series of

20     PowerPoints, there were like 74

21     members initially of the science

22     committee.  Everybody wanted on

23     the science committee.

24             So, one of the things that

FAC Resp. Exhibit D -- 269

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          Carlene and then Shelly and I, one

2          of the things we had to do, we set

3          up subcommittees to try to control

4          all of these individuals.

5          Everybody did want to do the work,

6          but there's only so much real work

7          to be done, and you are not going

8          to send out a medical record or an

9          expert and have ten attorneys

10         reviewing it.  So, we set up

11         subcommittees such as benefits,

12         indications, labeling,

13         international issues, as chaired

14         by Roberta Walburn, Shelly Sanford

15         and Leila Watson.  They are the

16         other members.  We would do this

17         and have subcommittee phone calls

18         by the chairs to somehow keep

19         managed on this 70 plus science

20         committee.

21              MR. SEEGER:  How often would

22         you do those calls, John?

23              MR. RESTAINO:  Well, we had

24         a weekly call.  The way we worked

FAC Resp. Exhibit D -- 270

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          it was, it became so unmanageable

2          that we did it biweekly with the

3          whole science committee, but then

4          biweekly also, so there was a call

5          every Friday with the chairs of

6          the different committees.  Let

7          them have conference calls as

8          needed during the week with their

9          people.  If something new was to

10         report, then on the Friday

11         subcommittee chair calls, they

12         would report to the executive

13         committee, who -- there's a slide

14         for it later, but I think the

15         executive committee was Carlene

16         and myself and a few other people,

17         and I'm blanking on that right now

18         without the benefit of the slide.

19             Here's one, mechanism of

20         action, pharmacology defense

21         issues.  This was chaired by Paul

22         Sizemore, Mark Hoffman and Max

23         Yefimenko.  I don't think I have

24         to introduce any of these

FAC Resp. Exhibit D -- 271

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1    individuals to you.  Max I may

2    have to.  Max is a

3    pharmacologist/attorney in our

4    firm, did a fabulous, fabulous job

5    early on in the pharmacology,

6    looking at the pharmacology

7    experts and spent countless time

8    in the depository reviewing those

9    studies, especially those germane

10   to pharmacology.

11        MR. BLIZZARD:  John, I'm a

12   little lost.  What firm --

13        MR. BURG:  He's with Burg

14   Simpson, and he was with Burg

15   Simpson from the beginning of the

16   time before John came over.

17        MR. BLIZZARD:  It would help

18   me to understand when you left and

19   went to Burg Simpson so that we

20   have a time frame for this

21   presentation.  Because we're going

22   to hear from you when you were at

23   Lopez Hodes later, it would help

24   me to know when the split

FAC Resp. Exhibit D -- 272

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          occurred.

2                    MR. RESTAINO:  Sure.  I was

3          with Lopez Hodes officially until

4          December 31st, 2006, and January

5          1st of 2007, I became a partner,

6          shareholder with Burg Simpson.

7                    MR. BLIZZARD:  So, with

8          respect to your work, we're

9          talking about from January of 2007

10         to the present in this

11         presentation?

12                   MR. RESTAINO:  In this

13         presentation.  Again, I apologize.

14         I have to give a little background

15         just so that --

16                   MR. BURG:  We broke down the

17         hours.  At the end, we'll give you

18         the amount of hours that were

19         worked from our time.

20                   MR. WEITZ:  Let me just tell

21         you.  Burg's hours submitted so

22         far are 1,177 to the accountants.

23         Lopez hours submitted are 5,104 to

24         date.

FAC Resp. Exhibit D -- 273

Page 14

1          MR. BURG:  We have the

2      hours, Perry, and I don't know if

3      that matches up.  I think we may

4      have --

5          MR. WEITZ:  This is why I

6      tell you.  These hours have to be

7      approved and accepted by the

8      accountants, third-party

9      accountants, and the expenses have

10     to.  Also, without them getting

11     and approving them, it is

12     meaningless what you have.

13         MR. BURG:  I understand.

14     But we tried to confirm, and I can

15     look, and at the end, we'll see if

16     they add up.

17         MR. LEVIN:  Let me help you.

18     With Burg Simpson, you submitted

19     1,177 hours.  318 and a quarter

20     have been accepted.  858.60 have

21     been rejected.  So, you are to

22     call Leonard Davis at Russ' office

23     and get him to get you in touch

24     with the accountant so that you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          could at least talk to him and

2          straighten that out.

3              You submitted $12,986.84 in

4          costs, of which $7,163.66 are

5          accepted, and $5,823.18 have been

6          rejected.

7              MR. BURG:  On the costs, our

8          numbers show, and we have the

9          submissions, that we submitted

10         $22,000, $22,439.68.  So, I'm

11         going to have to call and find out

12         why there's a discrepancy, because

13         I've got the submissions.

14             MR. LEVIN:  Time is of the

15         essence.

16             MR. BURG:  On the hours, I

17         don't know, I think we have more

18         than 1,100 hours.  Do you remember

19         the total?

20             MR. RESTAINO:  I thought it

21         was around 11.  I thought so.

22             MR. BURG:  Maybe it was.

23             MR. RESTAINO:  So, between

24         2005 and 2007, one of the key

FAC Resp. Exhibit D -- 275

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          aspects of the science committee,

2          of course, as with the PSC, is the

3          development of the generic

4          experts.  These are the experts

5          that we were involved in.  Those

6          that are in yellow are experts

7          that I either personally brought

8          to the table or had a significant

9          role in developing.  The first

10         one, Dr. Cecil Pace-Asciak, was a

11         background

12         consultant/pharmacologist who did

13         a lot of work with the Cox-2s out

14         of Toronto.  He was actually found

15         and developed by Max Yefimenko in

16         our office.

17              Egil Fosslien, who is the

18         cardiopathologist from Chicago

19         that I brought to the table, you

20         will hear more about him.

21              Les Cleland and Michael

22         James, Michael James was used by

23         Mark Robinson, and Les Cleland had

24         his preservation testimony taken.

FAC Resp. Exhibit D -- 276

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1            I found and developed all of

2            those.

3                 We used Preston Mason, who

4            was a background pharmacologist

5            from Harvard.

6                 Dr. Colin Bloor,

7            cardiopathologist, actually

8            testified in the Irvin I trial.

9                 Dr. Jerry Avorn is a

10           pharmacoepidemiologist from

11           Harvard.  I brought him in.

12                Dr. Mamdani, who is now at

13           Pfizer, is an epidemiologist.

14                Douglas Zipes, I didn't

15           develop.  Steve Skikos was more

16           involved with him, but I helped

17           with his Rule 26 report, reviewing

18           it for purposes of Daubert.

19                MR. BLIZZARD:  John, what

20           work was done for those witnesses

21           after January of 2007?

22                MR. RESTAINO:  Dr. Egil

23           Fosslien, he's the

24           cardiopathologist.  So, he was

FAC Resp. Exhibit D -- 277

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          asked to start talking about the

2          cardiovascular effects, especially

3          cerebral stroke by the stroke

4          committee.  And as you will see in

5          a moment, we spent a lot of time

6          in 2006 and 2007 developing

7          animation, which was then going

8          into the stroke, and you will see

9          what was done with him.  He was

10         actually at times present with the

11         animators, making sure they were

12         anatomically physiologically

13         correct.  So, he continued through

14         2007.

15               Les Cleland had his

16         preservation -- discovery

17         deposition taken in '06, but his

18         preservation testimony, he flew in

19         from Australia, and I came here in

20         '07 and took his preservation

21         testimony.

22               I think that's it.

23               Again, Fosslien was a

24         professor of pathology.  The

FAC Resp. Exhibit D -- 278

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1      reason we found him is because he

2      authored these key articles,

3      including the review article on

4      it.  We began with him in 2005,

5      assisted his report in 2006, met

6      with him in 2007, and he wrote his

7      supplementary report in

8      preparation for his preservation

9      testimony.  He met secretly, so to

10     speak, with Garret FitzGerald's

11     laboratory.  He spent four days in

12     New Orleans preparing for trial in

13     Barnett.

14          Cleland and James, as I

15     mentioned, were from Australia,

16     and James was used and wrote a

17     rebuttal report to one of the

18     defense biochemistry reports for

19     Mark Robinson.  Cleland did have

20     his preservation testimony done,

21     including writing a Rule 26

22     report.  The reason that we were

23     of interest with Cleland is in

24     1999 in the principal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          investigator's brochure, he was

 2          sent by Merck, he was warned to

 3          observe for increased

 4          cardiovascular events with Vioxx.

 5              I'm not going to go through

 6          a whole lot of this, but I

 7          defended his depo in '06 and I

 8          continued in May '07, did his

 9          preservation testimony.  Same

10          thing with James.  As I mentioned,

11          he did research in this area, and

12          he was named as an expert rebuttal

13          witness in the Barnett case by

14          Mark --

15              MR. BLIZZARD:  That's 2006,

16          though, right?

17              MR. RESTAINO:  That's 2006.

18          A lot of this is just background.

19          If you get the background, I can

20          skip over the earlier.

21              MR. WEITZ:  It's difficult

22          for us, and what we need to

23          clarify, John, is that Burg, now

24          Mike has told us, is submitting
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          22,000 hours.

2                    MR. BURG:  No.  I think it

3          is around 1,100.  $22,000 in

4          costs.

5                    MR. WEITZ:  Because I was

6          saying if you moved over to them

7          in '07, that's a lot of hours.

8                    MR. RESTAINO:  No, my total

9          hours that I think were submitted

10         on my behalf, it was a little over

11         500 for the entire year of '07.

12                    MR. WEITZ:  Lopez has

13         submitted over 5000 hours -- I'm

14         sorry, 5,104, and that's primarily

15         the work you are talking about?

16                    MR. RESTAINO:  A good

17         portion of this, yes.

18                    MR. BURG:  And with Max

19         Yefimenko in terms of this expert,

20         he was involved in developing this

21         expert, found this expert when he

22         was with our firm.

23                    MR. SEEGER:  That was before

24         John?

Page 22

1            MR. BURG:  Before John came

2        over.

3            MR. BLIZZARD:  I guess since

4        we're creating a record, it's

5        important from our perspective to

6        make sure we understand when you

7        are switching over from background

8        information to actual work that

9        was done by either Burg Simpson

10       employees or by you when you were

11       at Burg Simpson.

12           MR. RESTAINO:  Fair enough.

13           Again, it is even more

14       convoluted.  The reason I'm

15       putting up Cecil Pace-Asciak is

16       because, while I met with him and

17       these other individuals in Toronto

18       in '05/'06, I'm really putting it

19       up because Max Yefimenko has

20       submitted his time, and he was

21       there and he discovered him.

22       That's the reason for this slide.

23       So, I was a member of Lopez Hodes

24       at that time, but this is from Max

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          Yefimenko.

2               This is just a small snippet

3          of the animation that Dr. Douglas

4          Zipes and Fosslien showed, worked

5          on.  It's playing on my computer,

6          and the red blood cells are in the

7          background.  This is called

8          platelet aggregation.  You can see

9          the platelets aggregating.  Now

10         they release their thromboxane and

11         prostacyclin, resulting in

12         vasodilatation and

13         vasoconstriction.  There's the

14         vasoconstriction as a result of

15         the thromboxane.  So, you can see

16         the quality of work that these

17         cardiopathologists and

18         cardiologists did.  We worked on

19         this extensively.  This was to be

20         shown for the first time in his

21         preservation testimony, and then

22         the case settled.

23               MR. SEEGER:  John, was this

24         used anywhere, at any trials or

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        anything?  It was kind of at the

2        end.

3            MR. RESTAINO:  Right.  It

4        was now being developed for the

5        stroke committee if they needed it

6        there, and they started working

7        with us.

8            So, in summary, since '05,

9        Vioxx was the main thing I worked

10       on while I was with Lopez Hodes.

11       It continued to be a critical part

12       of what I was doing when I joined

13       Burg Simpson.  We had Max

14       Yefimenko working on it, as I

15       mentioned, and Mike will talk to

16       some of the others.  We were in

17       the final phases of the

18       preservation testimony of Egil

19       Fosslien when it settled.  The

20       animation project was to be

21       unveiled during that particular

22       time.  And so I'll let Mike talk a

23       little bit about --

24           MR. BURG:  Why don't we move

FAC Resp. Exhibit D -- 284

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          on to what we show.  This is what
 2          we show the total hours are.  So,
 3          I'm going to have to call Lenny
 4          and find out --
 5               MR. LEVIN:  He will get you
 6          to Phil Garrett, who is the
 7          accountant.
 8               MR. BURG:  -- what happened.
 9          First of all, let me say, for
10          those of you that have worked with
11          Burg Simpson, when we work, we
12          work.  We don't send people who
13          don't know what they are doing and
14          sit around and play games on their
15          computers if they are going to
16          look at documents.  We understand
17          the priority that you and other
18          people who do common benefit look
19          at in terms of what moves the ball
20          down the field.  And while the
21          other things that are needed don't
22          necessarily get the same emphasis
23          or are not as important,
24          everything is done.
```

FAC Resp. Exhibit D -- 285

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1          So, I really want to go

 2      through each of the people here.

 3      John, when he came over to our

 4      firm, obviously it was toward the

 5      end, we never knew it was the end,

 6      but near the end of at least the

 7      last part of the litigation was

 8      going on.  John continued to do

 9      his work --

10          MR. SEEGER:  By the way,

11      just so you know, I'm very

12      familiar with John's work because,

13      first of all, I was one of the

14      people that asked him to chair

15      that committee, but also Shelly

16      was on the PSC, and she would give

17      updates on the weekly PSC calls

18      about the science committee.  So

19      we don't have to spend any more

20      time talking about you, John, from

21      my perspective.  I get what you

22      do.  But I'm not as familiar with

23      what anybody else, Scott or Max --

24          MR. BURG:  Let me tell you
```

FAC Resp. Exhibit D -- 286

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1        what I did.  My role was obviously

2        much more minor than it has been

3        in other litigations.  I was

4        appointed by Judge Fallon to be on

5        the state/federal liaison

6        committee.  I worked, attended

7        hearings.  Sometimes when I had a

8        conflict, either Seth Katz or

9        Peter Burg would attend those

10       hearings in my absence.

11            We were involved in tracking

12       the state cases for most of the

13       western United States, not

14       including California.  California

15       was being tracked separately.  We

16       were involved in looking at the

17       other states not really from the

18       East Coast, but in the Midwest,

19       tracking those cases, keeping

20       control over those, talking to

21       lawyers who had cases, trying to

22       really make sure that the PSC --

23       and I know Chris and I had

24       numerous conversations about what

FAC Resp. Exhibit D -- 287

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          was going on, really trying to

2          make sure that nobody was going to

3          screw up the litigation, to be

4          candid about it.  We all know that

5          that's one of the dangers in an

6          MDL, that somebody who really

7          doesn't know what they are doing

8          is out there, has a state case,

9          and ends up thinking they can go

10         forward and try it.  That's what I

11         did.  Really my work was really

12         limited to my role on the

13         federal/state liaison committee as

14         appointed by Judge Fallon.

15              Max Yefimenko is a

16         pharmacologist, was involved as a

17         subcommittee chair.  Those of you

18         who have worked with him, and I'm

19         not sure how many of you have,

20         he's a brilliant guy.  He's able

21         to read these articles that are

22         related to the litigation, and he

23         did that, and did summaries,

24         involved with experts.  He was

Page 29

 1          involved in finding some experts

 2          in this particular case, was

 3          involved in working up the

 4          pharmacology, working with John

 5          and the other -- at that time,

 6          John was with Lopez Hodes.

 7               MR. RESTAINO:  If I may

 8          interject there, two years before

 9          I had any idea that I would end up

10          with the firm, Shelly and I would

11          go through -- we had a coding

12          project, and we would assign 15,

13          20, 30 articles to an attorney.

14          We would code these with the

15          coding form.  And Max was assigned

16          that coding form, again, in an

17          unbiased manner and equal number

18          as other people.

19               MR. BURG:  Max, that's what

20          he did.  That's what his specialty

21          is.  He's not going to be a trial

22          lawyer.  He's not going to be a

23          guy who you are going to have

24          doing depositions.  But he's a guy

Page 30

1          who is going to be in the back

2          room, who we believe had an effect

3          in moving this forward in terms of

4          making sure that the pharmacology

5          and all the articles, that nothing

6          was missed, and was also involved

7          in trying to get that.

8               Scott Eldredge, who was one

9          of our senior partners, he spent

10         most of his time at the

11         depository.  At that time, we

12         looked at this project as a

13         real -- we didn't send a

14         paralegal.  We didn't send

15         somebody who was -- and whether

16         that's a plus or a minus, we felt

17         we wanted to have somebody -- he

18         does mostly med-mal, does some

19         products cases in our office.  We

20         felt that we needed someone who,

21         because of the complexity of this

22         litigation, somebody who truly was

23         going to make a difference in

24         terms of knowing what they are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          looking for, and not sitting at

2          the screen and just putting time

3          down.

4                 MR. LEVIN:  How long has

5          Eldredge been out of law school?

6                 MR. BURG:  25 years.

7                 MR. LEVIN:  And Katz?

8                 MR. BURG:  15 years.

9                 MR. LEVIN:  You have hourly

10         rates, not that that's very

11         relevant to how we're going to do

12         this, but have any of those hourly

13         rates that are posted there been

14         judicially approved by any court?

15                MR. BURG:  Yes.

16                MR. LEVIN:  Which ones?

17                MR. BURG:  Some of the

18         rates, my rate, I believe, and

19         Seth's rate.  Seth's rate, which

20         was a little lower, was approved

21         in Zyprexa, I believe.  I also

22         know in class actions, we have had

23         federal judges in Colorado that

24         have approved my rate or $650.  In

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          fact, the chief judge, Judge

 2          Daniel, recently in a class action

 3          this year approved that rate.

 4               MR. LEVIN:  Fine.

 5               MR. BURG:  The only other

 6          thing I would say is this.  Just

 7          so everybody knows, we had trial

 8          teams, and we had trial teams that

 9          are not included on this, but I

10          think it is important that the

11          record reflect that.  We spent --

12          and John can tell you.  We spent

13          Saturdays, Sundays and nights with

14          three trial teams, putting

15          together three trial teams,

16          learning this case, not putting

17          one moment of that into this

18          submission because we understand

19          that was for us.  We were ready,

20          willing and prepared, as things

21          moved forward, to try those cases,

22          and we wanted to make sure that we

23          were up to speed.

24               MR. WEITZ:  Can you talk to
```

FAC Resp. Exhibit D -- 292

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          us about your cases?  Tell me how

2          many cases you guys had filed.

3                MR. BURG:  I think we had

4          157 cases was our total inventory.

5                MR. WEITZ:  Where were they

6          filed?

7                MR. BURG:  All over the

8          United States, but mostly in the

9          MDL.

10                MR. WEITZ:  So, you filed

11          them in Federal Court in the

12          United States?

13                MR. BURG:  I would say 98

14          percent or 95 percent of them were

15          in the MDL.  I think we had a few

16          in New Jersey, and we may have

17          had -- I'm trying to think if we

18          had any in California.

19                MR. GIRARDI:  Maybe one.

20                MR. BURG:  I think for the

21          most part, probably 95 to 98

22          percent were in the MDL.

23                MR. GIRARDI:  Tell me, I'm

24          sorry, how many cases all together

FAC Resp. Exhibit D -- 293

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1           again?

2                  MR. WEITZ:  157.

3                  MR. BURG:  I think it was

4           157, but I would have to go back

5           and check.

6                  MR. WEITZ:  Tell me what

7           cases were on any trial dockets,

8           whether it was New Jersey, the

9           MDL?

10                 MR. BURG:  As I sit here

11          today, we know that our cases were

12          potentially looked at for the MDL.

13          When I said we were getting

14          prepared, I don't think any of

15          them were really set for trial,

16          but our concern was, quite

17          frankly, having been at most of

18          the hearings, there was always

19          this question of whether or not

20          Judge Fallon was going to remand

21          these cases.  I know that was

22          something he talked about from the

23          bench at these hearings.  And we

24          in Colorado, as well as many other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1       states, the dockets are not as

2       crowded as -- it's not unheard of

3       in Colorado where you get a remand

4       order and you get a trial within

5       60 days unlike other federal

6       courts.  So, we were very

7       cognizant of the fact that there

8       was the potential that a

9       significant number of our cases

10      were going to be remanded and that

11      ultimately, because of that

12      remand, our trials were going to

13      come up very quickly.  That's why

14      we were working, and, in fact, we

15      had conversations with many people

16      who were on the PSC about the

17      potential, and we talked to Chris

18      about this.  The potential was

19      that if these remands happened,

20      getting him and Dave or other

21      people to come in so we make sure

22      that we're doing it at the highest

23      level.

24              MR. WEITZ:  So, it would be

FAC Resp. Exhibit D -- 295

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1       fair to say that you were working

2       up the individual cases in your

3       office, but they weren't in any of

4       the waves, the four waves that

5       Judge Higbee had or they weren't

6       being prepared for trial in the

7       MDL?

8               MR. BURG:  Correct.

9               MR. LEVIN:  John, with

10      regard to the stroke package, Dr.

11      Levine, did you work with him?

12              MR. RESTAINO:  No.

13              MR. LEVIN:  Do you know who

14      worked with him, what was done

15      with him?

16              MR. RESTAINO:  There were

17      the two stroke --

18              MR. LEVIN:  Feldman and

19      Levine?

20              MR. RESTAINO:  They were

21      both being handled separately,

22      going through the committee, but

23      there had already been attorneys

24      that had worked up with them.

FAC Resp. Exhibit D -- 296

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1           MR. LEVIN:  So, you are not

2      involved with --

3           MR. RESTAINO:  That was one

4      of those delegated things.  I

5      would review the Rule 26 report if

6      it got to that level.  They had

7      access.

8           MR. LEVIN:  Did you ever see

9      a report from Steve Levine?

10          MR. RESTAINO:  No, I did

11     not.  And they had access to Egil

12     Fosslien as the cardiopathologist

13     so they could be on the same page

14     and the materials.  So, again, my

15     role there as the co-chair is

16     again to triage, and what's

17     everybody doing, let's make sure

18     we're on the same page.  People

19     throw up because I used the

20     metaphor of Venn diagram way too

21     frequently.  That's what my role

22     was, to have these different

23     circles and have them overlap as

24     much as possible and try to

FAC Resp. Exhibit D -- 297

Page 38

 1          coordinate and keep certain

 2          individuals from running off the

 3          reservation.

 4                  MR. SEEGER:  Just to keep us

 5          on schedule, and we're going to

 6          see you later today, do you want

 7          to take a minute to sum up and if

 8          we have any questions?

 9                  MR. BURG:  The only thing I

10          would sum up saying is everybody

11          knows John's talents and what he's

12          done.  John is not there playing

13          around.  He's doing a good job.  I

14          believe our firm has that same

15          reputation.  We're not going to

16          come here and pad our numbers, and

17          I'm obviously very concerned that

18          there's some difference in the

19          numbers that we showed that were

20          submitted and the numbers --

21                  MR. SEEGER:  By the way,

22          just so you know and have some

23          peace of mind on this, the

24          questions about this, you don't

FAC Resp. Exhibit D -- 298

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1       need to have it done today.  We

2       just need it done before the

3       motion can be made.  All of us in

4       some level are going through it,

5       so don't worry about it.

6           MR. BURG:  I appreciate

7       that.  All I can say is we

8       understood that we were not the

9       guys, other than what John was

10      doing when he joined the firm, who

11      were at the forefront of the

12      litigation.  At the same time, we

13      understood our role, which was to

14      support.  In other litigations, we

15      may be more at the forefront, and

16      other people may be supporting.

17      We felt that our support and the

18      kind of talent that we bring to

19      the table has value in moving the

20      litigation forward.  I'm not going

21      to say anything about any other

22      firms, but there are people who

23      send bodies and are not absolutely

24      dedicated to the success of the

FAC Resp. Exhibit D -- 299

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

 1          project.

 2               MR. GIRARDI:  Really?

 3               MR. BURG:  It's a big

 4          surprise, I know.  We come ready

 5          to give you our best work product.

 6          I think in this case we did.  We

 7          appreciate the ability to come

 8          here and talk to you and be able

 9          to express what we felt we did

10          without trying to tell you guys we

11          did more than we did, but we also

12          feel we had a significant

13          contribution in the limited role

14          that we had.

15               MR. RESTAINO:  I'll just add

16          one thing because my time cards

17          are made contemporaneously with

18          what I do.  If I get a one and a

19          half hour phone call from Jerry

20          Avorn, when I hang up, I put it on

21          my time card.  My current time

22          card for the NSF litigation is as

23          current as of literally midnight

24          last night.  So, I don't go back

FAC Resp. Exhibit D -- 300

Page 41

```
 1          and reconstruct, I don't call my

 2          partners and say, what did we do

 3          in August on this stuff.  If at

 4          any time anyone says, John, let me

 5          see September '06 time card,

 6          Vioxx --

 7              MR. SEEGER:  That's real

 8          time.

 9              MR. RESTAINO:  There it is

10          right there.

11              MR. BURG:  That is our firm.

12          That is our requirement in our

13          firm that we keep

14          contemporaneously daily time

15          records of what is done.  Not one

16          hour of this was recreated or gone

17          back by anybody.  We basically

18          just took the time slips of the

19          time that was kept on the daily

20          basis and submitted it.

21              MR. SEEGER:  Thank you.

22              MR. BLIZZARD:  We would

23          expect nothing less of somebody

24          whose favorite word is Venn
```

FAC Resp. Exhibit D -- 301

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          diagram.

2                    MR. SEEGER:   Thank you.

3                    MR. GIRARDI:   Thank you.

4                    MR. RESTAINO:   Thank you.

5                    MR. BURG:   Thank you.

6                        -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147
23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 303

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM:  COHEN MILSTEIN
       Daniel W. Sigelman, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.

FAC Resp. Exhibit D -- 304

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

          1                    -  -  -

          2              MR. SIGELMAN:  Overall, I

          3         believe that Cohen Milstein

          4         contributed to the advancement of

          5         the scientific knowledge of the

          6         Vioxx case and that Cohen Milstein

          7         played a significant role in

          8         uncovering and developing critical

          9         liability and causation evidence

         10         against Merck in the scientific

         11         area.

         12              Some highlights, and I just

         13         picked a few of the major

         14         highlights of our common benefit

         15         contributions, are on the first --

         16         the second page of the handout,

         17         the PowerPoints that I handed out.

         18         One is the deposition of a case

         19         critical fact witness, Ned

         20         Braunstein.

         21              Another one is that our firm

         22         was a member of a small team,

         23         really an informal team,

         24         furnishing important work product

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 305

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        and documents to trial counsel and

2        their experts, both testifying and

3        nontestifying, before and during

4        the Cona/McDarby and

5        Hermans/Humeston trials, and we

6        had a significant role, a very

7        significant role in developing and

8        preparing important liability, as

9        well as causation experts, Harlan

10       Krumholz, as well as Dr. David

11       Madigan.

12            On the next slide, I give

13       some evidence, really

14       testimonials, that highlight some

15       of these highlights.  One is with

16       respect to the deposition of Ned

17       Braunstein.  And here I'm quoting

18       Harlan Krumholz in an e-mail to me

19       on Christmas Day.  And I presume

20       that you know that both of us are

21       not Christian.

22            In any event, he wrote me

23       December 25, 2006 saying, "The

24       more I get into your deposition of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        Braunstein, the more I appreciate
 2        what you did and how you did it.
 3        It is actually a masterful and
 4        scientifically strong piece of
 5        work - that combination of
 6        developing the case and being
 7        right on all the science is rare."
 8             In the Braunstein
 9        deposition, I actually used it as
10        an opportunity to try to develop
11        what I thought would be our expert
12        case down the road in the Vioxx
13        litigation.  So, it was very heavy
14        on the clinical trials, and
15        particularly the
16        placebo-controlled clinical
17        trials, and Merck's handling of
18        the data from those trials and the
19        manner in which it did or didn't
20        report that data and the analyses
21        that were done or could have been
22        done to the FDA and to the FDA
23        Advisory Committee.
24             The next slide really is
```

FAC Resp. Exhibit D -- 307

Page 5

1    with reference to the team that

2    was furnishing important work

3    product and documents to trial

4    counsel and their experts before

5    and during the Cona/McDarby and

6    Hermans/Humeston trials.  And here

7    I'm quoting Mark Lanier, actually,

8    in an e-mail he wrote me on

9    February 5, 2007, which was the

10    day that Dr. Krumholz was

11    initially called to testify in the

12    Hermans/Humeston trial.  And he

13    wrote, "Just finished the final

14    prep with Krumholz.  He paused me

15    this morning and told me how

16    important your help has been, Dan.

17    Thank you."

18         And then Mark continued,

19    "Amen on Harlan," because I

20    praised Harlan as an amazing

21    expert, "[as a great expert]!!!

22    (And in no small part because of

23    your work...)"

24         So, I use this just to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        illustrate that, in fact, it

2        really, I think, summarizes, it

3        culminates the work that I did

4        with Harlan Krumholz.  I spent

5        many, many hours with that man on

6        the phone and in long e-mails

7        analyzing data.  I remember, for

8        example, sending him a very

9        detailed analysis of how Merck

10       excluded important clinical trial

11       data in its three major

12       publications in the pooled

13       analyses of these trials:  The

14       Shapiro/Reicin paper, the Konstam

15       paper and the Weir paper.  He used

16       that, for example, in the

17       Hermans/Humeston trial.  He also

18       used other things that we

19       discussed.  I believe that Cohen

20       Milstein contributed to and

21       enhanced his knowledge and

22       understanding of the scientific

23       case.

24              Here I'm going to quote from

FAC Resp. Exhibit D -- 309

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1          him in an e-mail he wrote on
 2          February 7, 2007, which was one
 3          day after his first appearance in
 4          the Hermans/Humeston trial.  He
 5          appeared three times in that
 6          trial.  He came back in rebuttal,
 7          and then he was examined by Chris
 8          Seeger in the specific causation
 9          part of the case with the Humeston
10          case.  He said, "I feel privileged
11          and fortunate to have had the
12          opportunity to learn from you.
13          You made all the difference."
14              With respect to our common
15          benefit contributions, we did
16          common benefit work both in the
17          MDL and in the New Jersey
18          consolidated litigation.  I did
19          the primary work for the firm.  I
20          spent the most time on it.  Our of
21          counsel, Douglas McNamara, with
22          input from Richard Lewis, also
23          contributed to some of our common
24          benefit time.

FAC Resp. Exhibit D -- 310

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          Our common benefit work

2     began in early 2005, and it ended

3     in early November of 2007 pretty

4     much when we heard about the

5     nationwide settlement.  Our work

6     greatly intensified in August of

7     2005, when I was provided remote

8     access to the entire Concordance

9     Vioxx production database, for

10    which I was very grateful.  And

11    that enabled me to do a lot of

12    things in my office from that

13    point forward.

14          From August of 2005 to

15    November of 2007, I consistently

16    devoted most, the overwhelming

17    majority of my professional time,

18    to Vioxx common benefit work to

19    the exclusion of other available

20    firm project opportunities.

21          The next slide is on the

22    scope of activities of our firm.

23    Obviously, first of all, in the

24    MDL, we were appointed to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      science committee, and we

2      primarily concentrated with

3      respect to work with -- our

4      assignment to the clinical trials

5      epidemiology and proof of

6      causation subcommittee.

7           We did a lot of extensive

8      focused reviews for projects.  We

9      searched for and reviewed hundreds

10     of thousands of Merck documents in

11     Concordance.  We reviewed

12     voluminous medical and scientific

13     literature and culled and shared

14     countless pertinent documents with

15     other counsel and with testifying

16     and nontestifying experts.

17          We furnished work product

18     and documents on scientific and

19     FDA regulatory issues to counsel

20     and their consultants for use in

21     discovery and in the New Jersey

22     trials.

23          And we helped prepare

24     testifying experts for deposition

FAC Resp. Exhibit D -- 312

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1      and trial.

2            Generally I saw our

3      objectives, at least within our

4      firm, to be to try to characterize

5      Merck's misconduct, particularly

6      in the scientific areas, destroy

7      its scientific defenses and

8      support the affirmative scientific

9      proofs required to win trials.

10           The primary focus of our

11     common benefit work was, first of

12     all, conceptualizing and then

13     building plaintiffs' scientific

14     liability case and obliterating

15     Merck's scientific defenses that

16     we could through use of data from

17     Merck's own 'gold standard'

18     placebo-controlled Vioxx trials in

19     arthritis and Alzheimer's disease.

20           We were also interested in

21     establishing general causation

22     based on Merck's

23     placebo-controlled study data,

24     with particular emphasis on data

FAC Resp. Exhibit D -- 313

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1       generated before Vioxx was

2       withdrawn from the market.  It was

3       my feeling that with respect to

4       the 203 protocols, which consisted

5       of the APPROVe study, the VIP

6       study and VICTOR, that those had

7       been very comprehensively and well

8       dissected and dealt with by people

9       like Don Arbitblit, but I felt

10      that more work could be done in

11      areas of placebo-controlled trial

12      data that preceded the withdrawal

13      of Vioxx, although some very good

14      work had been done by other

15      lawyers, including Mr. Seeger's

16      firm and work that was done with

17      Dr. Kronmal, some very excellent

18      work.

19           On behalf of Cohen Milstein,

20      I developed a close and highly

21      productive working relationship

22      with some key firms, especially in

23      New Jersey.  I became one of a

24      handful of lawyers to whom other

FAC Resp. Exhibit D -- 314

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          lawyers in New Jersey would look

2          for help on generic scientific

3          liability questions.

4               I ultimately worked with a

5          group of lawyers such as, most

6          notably, Eric Weinberg, whom I

7          actually met for the first time in

8          late 2005.  We shared a lot of the

9          same ideas, and Eric had retained

10         an absolutely incredible

11         statistician, David Madigan at

12         Rutgers and now at Columbia

13         University.  I really wanted to

14         implement some ideas that I had

15         developed in the statistical area

16         that had not been developed by

17         others.  And my only avenue, I

18         thought at the time, was through

19         Dr. Madigan.  And so I started

20         working very hard with Eric and

21         Dr. Madigan.  And our group

22         expanded.  It really became a

23         rather informal group.  And to a

24         great extent, the group really

FAC Resp. Exhibit D -- 315

Page 13

 1      formed around Dr. David Egilman,

 2      to be quite honest, because he was

 3      hired by Mark Lanier's law firm as

 4      a consultant, and he likes to

 5      surround himself with people whom

 6      who he thinks he can learn from

 7      and get good information from.

 8           MR. SEEGER:  Either that or

 9      he likes to surround himself with

10      people he can abuse.

11           MR. LANIER:  He was the

12      personal physician to Daniel

13      Ortega.

14           MR. SIGELMAN:  But he

15      generated an incredible amount of

16      stuff, and he became a conduit for

17      people like me to submit all kinds

18      of analyses and documents, and he

19      was kind of the filter to send

20      them on to the trial team.  And so

21      that group was -- well, it was an

22      informal group.  We didn't really

23      meet except in cyberspace, but it

24      was Jeff Grand, it was Jerry

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        Kristal, it was Eric Weinberg, it

2        was Chris Placitella, it was David

3        Egilman, obviously, many members

4        of Mark Lanier's law firm.  And we

5        were sending things all the time,

6        and many of the things that Cohen

7        Milstein said to Dr. Egilman ended

8        up in the trials.  For example,

9        playing around with adjudications

10        in one of the Alzheimer patients

11        in 158 or protocol 906, which was

12        a study where some information

13        hadn't been conveyed to the FDA,

14        came from Cohen Milstein through

15        David Egilman.

16             This was a way that we all

17        shared information and benefited,

18        and it was an informal group that

19        I think it really advanced the

20        trial.  It was a real team effort.

21             MR. SEEGER:  Can I ask you a

22        question?  Don't you have both a

23        medical degree and a law degree?

24             MR. SIGELMAN:  Do I?  No, I

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 317

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1        do not.

 2            MR. SEEGER:  I thought you

 3        had both degrees.

 4            MR. LANIER:  He doesn't have

 5        a law degree.

 6            MR. SIGELMAN:  I don't have

 7        a law degree.  I'm practicing

 8        medicine and law without a

 9        license.

10            No, I have a lot of

11        experience in pharmaceutical

12        things because in the 1980s, I was

13        the principal congressional

14        investigator of the FDA, and we

15        had a lot of hearings that led to

16        prosecutions of drug companies.

17        So, I've been doing analysis of

18        pharmaceutical data for over a

19        quarter of a century.  But I don't

20        have a medical degree.

21            Cohen Milstein was one of a

22        small team of firms who furnished

23        common benefits work product and

24        documents, as I said, and the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1     slide also indicates the

2     assistance was provided directly

3     to trial counsel.  I remember some

4     occasions where Mark Lanier, for

5     example, asked me for some

6     documents.  I think one time I was

7     asked for documents on what the

8     Advisory Committee at FDA had said

9     about intention-to-treat analysis,

10    and so I sent them directly to

11    Mark.  Sometimes I would send it

12    to people at Mark's law firm and

13    often, obviously, through Dr.

14    Egilman, and Mark and his law firm

15    were on those e-mails.

16         I would like to give a case

17    in point of the kind of work that

18    I did.  And this is just one

19    illustration of something I

20    remember very distinctly.  From

21    April 8th through 9th of 2006,

22    there was feverish briefing going

23    on by Ellen Relkin of Weitz &

24    Luxenberg on the question of

FAC Resp. Exhibit D -- 319

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
1        Merck's noncompliance with FDA

2        reporting requirements.  The issue

3        was, could we get over the bar of

4        punitive damages -- of course now

5        punitive damages is history, at

6        least for the time being in New

7        Jersey -- but could we get over

8        the bar with the evidence that

9        Mark had brought up at the trial.

10       And so Ellen had come to me and

11       said, because of my FDA regulatory

12       background, could I help her.  And

13       I gave her a plethora of all the

14       FDA, NDA and IND regulations that

15       could conceivably apply, at least

16       to my knowledge, to the data at

17       issue.  And she incorporated all

18       of those in her briefing that

19       week, and, in fact, some of the

20       language that we had written were

21       incorporated wholesale in her

22       briefs.

23            And I remember her telling

24       me on that Sunday that Merck had
```

FAC Resp. Exhibit D -- 320

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        totally freaked out, because they

2        weren't expecting this plethora of

3        regulatory citations, and they had

4        come to Judge Higbee and asked her

5        for more time.  And that turned

6        out to be a real team effort,

7        because Ellen did an incredible

8        job, as she always does, on that

9        occasion, but it was a real team

10       effort, and it was very

11       successful, at least until the

12       appellate courts in New Jersey got

13       ahold of punitive damages.

14             And, obviously, as I've said

15       here before, I sent a lot of

16       documents to other people involved

17       in the trial.

18             Mark Lanier, for example,

19       acknowledged my contribution,

20       among others, in a very generous

21       e-mail to many people on April

22       12th of 2006 following the

23       Cona/McDarby trial.  And he said

24       something very nice about me that

FAC Resp. Exhibit D -- 321

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1     I obviously knew my stuff, or at

2     least so he thought, I was able to

3     trick someone else once again, and

4     acknowledged that he was able to

5     do what he was able to do because

6     of the hard work of many people

7     around him.

8         With respect to the

9     deposition of Ned Braunstein, he

10    was a Merck regulatory official,

11    this was an MDL deposition that I

12    first chaired.  My preparation of

13    it involved -- I decided to really

14    go whole hog on the science, so, I

15    actually reviewed over 260,000

16    documents that were tied to

17    Braunstein for this deposition.

18    In addition to that, I had

19    reviewed the entire file of the

20    FDA custodial file in Concordance,

21    because I wanted to be totally

22    familiar with what had been sent

23    to the FDA by Merck, whether these

24    were letters signed by Dr.

FAC Resp. Exhibit D -- 322

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1      Braunstein or not.

 2              I incorporated that into the

 3      deposition.  And as I said before,

 4      the deposition highlighted Merck's

 5      knowledge and handling of damaging

 6      evidence on the thrombotic

 7      cardiovascular hazards of Vioxx

 8      evidenced by its own

 9      placebo-controlled arthritis and

10      Alzheimer's disease trials

11      completed long before market

12      withdrawal.

13              And to look at what impact

14      the Braunstein deposition had on

15      subsequent litigation, testimony

16      and documents from the Braunstein

17      deposition played key roles in

18      opinions presented during the

19      Hermans/Humeston trial of the

20      cardiology expert, Harlan

21      Krumholz.  And he acknowledged the

22      contribution of that deposition to

23      his understanding of the case.

24              And I remember some

FAC Resp. Exhibit D -- 323

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        documents were used, I even think

2        in the latter part of the trial, I

3        think when Chris Seeger was

4        working on the specific causation

5        part of the trial, I remember

6        there was a famous e-mail from

7        Bolognese that we dug up from --

8        for the Braunstein deposition that

9        was very significant in the trial.

10       It was used at the latter part of

11       the trial, as was table 13 from

12       the 2003 pooled analysis update

13       that showed some incredible data

14       that Merck had really hidden from

15       the world.

16            Dr. Krumholz had told Mark

17       Lanier in a December 25, 2006

18       e-mail, "I do think that the work

19       Sigelman did in the Braunstein

20       deposition has merit...and we are

21       working to pull this together,"

22       and he was obviously referring for

23       use at trial.  He was trying to

24       come to an understanding of the

Page 22

 1          scientific issues, a fuller

 2          understanding.

 3                And Mark e-mailed me and

 4          said, "Thanks much.  Now I'm going

 5          to have to learn it."  The only

 6          reason I put that in there was not

 7          because Mark couldn't learn things

 8          and didn't know things, because I

 9          am awed by his ability to pick

10          things up, but I wanted to

11          emphasize that, obviously, Mark

12          had recognized that some part of

13          that Braunstein deposition,

14          whether specifically or

15          implicitly, was going to make its

16          way into that trial, and he was

17          going to learn some new material,

18          which he did do with his mutual

19          aplomb.

20                The technical and scientific

21          assistance that Cohen Milstein was

22          able to provide Dr. Krumholz and

23          Dr. Madigan marked the culmination

24          of much of the common benefit work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      that it had previously undertaken.

2          I worked very closely on

3      behalf of Cohen Milstein with

4      Harlan Krumholz to prepare him for

5      his testimony in Hermans/Humeston.

6      I sent him, I don't know, an

7      unbelievable number of documents,

8      a lot of data.  Some of the data,

9      in fact, was ongoing analysis from

10     Dr. Madigan, because there was

11     cross-pollination with these

12     experts.

13          MR. HERMAN:  Can I stop you

14     right there?  I'm sorry.  Dr.

15     Madigan's name has come up quite a

16     bit.  I believe Eric first spoke

17     about it.  Can you tell me a

18     little bit more about Dr. Madigan?

19          MR. SIGELMAN:  When you say

20     more?

21          MR. HERMAN:  Well, I would

22     like to know a little bit more

23     about his expertise and how he fit

24     into the entire litigation.

FAC Resp. Exhibit D -- 326

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           MR. LEVIN:  How he was

2      chosen?

3           MR. SIGELMAN:  How he was

4      chosen, he was chosen because he

5      was a world class statistician by

6      Eric Weinberg.  He is an actual

7      statistician, and we got him the

8      SAS data from the clinical trials.

9      Seeger Weiss had done a great job

10      of getting SAS data, and a lot of

11      it had been given to Dr. Kronmal.

12      And Dr. Kronmal had worked

13      previously with Dr. Madigan,

14      because Dr. Madigan at one time

15      was at the University of

16      Washington.  So, they did

17      communicate a little bit.

18           We were building on what

19      Kronmal had done and doing some

20      new things that Kronmal had not

21      done.  And so one of the big tasks

22      was to find out what SAS data were

23      available.  And what we found was

24      there was some SAS data that we

FAC Resp. Exhibit D -- 327

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1       needed that, for whatever reason,

2       had not been produced by Merck.

3       We went to David Buchanan and

4       worked with him to get that data.

5            For example, protocols 10

6       and 17 were early

7       placebo-controlled trials of four

8       weeks or greater duration.  We

9       didn't have the SAS data for that.

10      All the Celebrex studies,

11      comparing Celebrex with Vioxx and

12      placebo, that was

13      placebo-controlled data of four

14      weeks or longer.  We wanted all

15      studies of four weeks or longer in

16      placebo, because that's what Merck

17      looked at.  And we didn't have

18      those data.  We needed them,

19      because we wanted to do the entire

20      universe of placebo-controlled

21      studies of four weeks or longer.

22      And what we came up with --  this

23      is later in my PowerPoint, but I

24      can give it right now.  I think

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          this is a momentous finding that

2          we were prepared to go with in the

3          January 2008 trial.  That is, if

4          you followed Merck's approach in

5          the arthritis studies, in the

6          placebo-controlled trials, pooling

7          the data, and when I say Merck's

8          approach, you use adjudications

9          and confirmed events for the

10         studies that were adjudicated, and

11         you use investigator-reported

12         events for the studies that were

13         not, that was Merck's approach,

14         and instead of cherry picking like

15         Merck did, you use the entire

16         universe of studies four weeks or

17         longer, that includes 10 and 17

18         and the Celebrex studies which

19         were never included in any of the

20         pooled analyses of Merck, you have

21         a statistically significant

22         increase in thrombotic

23         cardiovascular events emerging in

24         arthritis, the primary indication

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1      for Vioxx in the year 2000.  That

2      is an unbelievably momentous

3      finding.

4           That is four years before

5      APPROVe, before they had the first

6      placebo data supposedly that led

7      to the market withdraw.  And think

8      about what happened in Hermans.

9      In Hermans, we had the misfortune

10     of the jury believing that the

11     VIGOR labeling was adequate.  So,

12     one of the things that we did with

13     Madigan is, we said we've got to

14     put our nose to the grindstone and

15     come up with some data that that

16     VIGOR labeling is grossly

17     inadequate.  That was one of the

18     findings.

19          MR. HERMAN:  Well, let me

20     stop you, because I think you've

21     been very thorough with that, and

22     I've got a better picture.  I've

23     got to ask you a couple of

24     questions that really are

FAC Resp. Exhibit D -- 330

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1        irrelevant to why you're here, but

2        I've got to know the answers to

3        them.

4              The first is, Madigan, his

5        field is statistics?

6              MR. SIGELMAN:  Right.

7              MR. HERMAN:  Not medical

8        causation; is that correct?

9              MR. SIGELMAN:  Correct.

10             MR. HERMAN:  What

11       information did you see about

12       skeletal or orthopedic problems or

13       failure in bone healing coming out

14       of Madigan?

15             MR. SIGELMAN:  There was a

16       little bit on that.  I mean, he

17       actually generated some data.  I

18       don't recall if he addressed those

19       data in his report, but he did

20       some runs on data like that,

21       because Eric Weinberg was pursuing

22       that.

23             MR. HERMAN:  Do you know why

24       Eric Weinberg was pursuing that?

FAC Resp. Exhibit D -- 331

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1            MR. SIGELMAN:  Yes.  Because

2      Eric was interested in the panoply

3      of all of the things that Vioxx

4      did.  And I think that we were

5      thinking in a creative way of

6      whether we could get into other

7      things in terms of risk/benefit.

8            MR. HERMAN:  That's fine.  I

9      appreciate you helping me out with

10      that.  And I didn't mean to take

11      up your time.

12            MR. SIGELMAN:  Oh, no

13      problem.

14            MR. HERMAN:  So go ahead

15      with your --

16            MR. SIGELMAN:  Ask me

17      anything.  That's fine.

18            Another e-mail in January

19      28, 2007 where it said, "You have

20      helped me so much with the placebo

21      trials."  So, we were interested

22      in -- you know, obviously, some

23      incredible trial work was done in

24      both the MDL and the states, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

 1       we were hoping that we could make

 2       even better the win/loss record,

 3       and we were hoping also to add

 4       some new things to the offense,

 5       because Merck had just heard all

 6       this stuff about VIGOR.  And we

 7       had these big debates.  I remember

 8       Egilman and I and Krumholz had

 9       these big debates about how we

10       should go and how Krumholz should

11       go in the Hermans/Humeston trial

12       depending, of course, on what Mark

13       wanted to do.  We wanted to throw

14       them some new curves at Merck, and

15       so we were really using Madigan

16       for that purpose.

17            And specifically after

18       VIGOR, Merck used gold standard

19       placebo-controlled trials as its

20       strength.  It said, you know, the

21       gold standard is placebo, and you

22       can talk about VIGOR until the

23       cows come home.  That's naproxen.

24       But placebo, man, placebo is our

FAC Resp. Exhibit D -- 333

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          baby.  And what we wanted to do

2          was take what Merck thought was

3          its strength and make that the

4          plaintiffs' sword.  And that's

5          what I believe the Madigan report

6          is.  It is using placebo data as

7          the plaintiffs' sword.

8                MR. SEEGER:  And just

9          because we're on a tight schedule,

10         just another five minutes.  I just

11         want to give you a heads up.

12               MR. SIGELMAN:  Okay.

13               The next slide, I've already

14         told you about the 2000, the

15         statistically significant

16         increased risk.  Obviously, Merck

17         used its Alzheimer's trials as a

18         sword, and we thought that the

19         Alzheimer's trials, if you look at

20         the totality of the data and you

21         used them as prespecified analysis

22         of the intention to treat that was

23         in the Alzheimer's trials, you

24         would actually get statistically

FAC Resp. Exhibit D -- 334

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1        significant increases not only in

2        all-cause mortality, but in

3        thrombotic cardiovascular events.

4        And Madigan's report is replete

5        with that.

6               With respect to Madigan's

7        report, what did we do?  First of

8        all, we suggested many of the

9        statistical analyses that Madigan

10       ran.  We actually said, we'd like

11       you to run this particular

12       analysis using ITT, look at this,

13       look at protocol 91, 78, do this,

14       do that.  We told him, we asked

15       him if he would use certain cutoff

16       dates for liability purposes.

17       Like September 15, 2000 was the

18       cutoff date for the data that was

19       used for the Advisory Committee

20       meeting in February of 2001.

21       March 16th, 2001 was the data

22       cutoff for the VIGOR labeling.  We

23       wanted all of these dates.  We

24       furnished him with countless,

FAC Resp. Exhibit D -- 335

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          hundreds of key documents.  We

2          determined what SAS data he

3          needed, and we obtained it, so we

4          would have a complete rendering of

5          their placebo-controlled trials.

6          And we consulted with him on

7          numerous technical issues such as

8          endpoint.

9               His expert report was served

10         in early October 2007, and his

11         report is replete with findings

12         from many of the statistical runs

13         and analyses earlier recommended

14         by Cohen Milstein.  For virtually

15         all of the drafting period, he

16         turned to Cohen Milstein for

17         review and input into the draft

18         report.  In fact, I was the only

19         person who saw that draft report

20         until the later drafts.  And Cohen

21         Milstein suggested many extensive

22         revisions.

23               MR. SEEGER:  In what case

24         was the report filed?

FAC Resp. Exhibit D -- 336

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

```
 1              MR. SIGELMAN:  Pardon me?
 2              MR. SEEGER:  Do you know
 3       what cases that report was
 4       ultimately filed in, the Madigan
 5       report?  We've asked this of other
 6       people.
 7              MR. SIGELMAN:  Whatever
 8       cases were up in January of 2008.
 9       And he was to give a deposition in
10       December, which obviously never
11       occurred.
12              And we suggested many
13       extensive revisions and additions
14       that he generally accepted and
15       incorporated into his final
16       report.
17              And then a couple more
18       slides.  First of all, you have
19       Jerry Avorn's comments on Dr.
20       Madigan's report.  He said, "His
21       review is far more detailed, more
22       quantitatively sophisticated and
23       appears to be based on a more
24       complete collection of trial data
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1      than I have seen before.  It is a

2      most comprehensive depiction of

3      their," that's Merck's,

4      "misstatement and

5      misinterpretation of this data

6      that I have seen.  Even people who

7      think they know 'the whole Vioxx

8      story' will be astonished at some

9      of his analyses."  And Dr.

10     Krumholz said, "Great job!  Best

11     report yet by far."

12            And, by the way, as I said

13     before, it wasn't the first time

14     Krumholz had seen Dr. Madigan's

15     data.  We were constantly sharing

16     his data.  And Dr. Krumholz was

17     using his statisticians at Yale,

18     particularly a man by the name of

19     Yung Fay Wang, to try to replicate

20     what Madigan had done so that he

21     could testify on it at trial.

22            So, anyway, that's generally

23     what I have to say, other than my

24     firm also complied with PTO 6 in

FAC Resp. Exhibit D -- 338

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

```
 1       terms of our time and expense

 2       submissions.

 3            MR. SEEGER:  Does anybody

 4       have any questions?

 5            MR. LEVIN:  Could you tell

 6       me about that meeting in

 7       Philadelphia when Mark Robinson

 8       was there?

 9            MR. SIGELMAN:  Yes.

10            MR. LEVIN:  How did it come

11       about?

12            MR. SIGELMAN:  That meeting

13       came about at the instance of Eric

14       Weinberg, and my recollection is

15       that Eric was interested in

16       sharing information with the MDL.

17       And I remember specifically that

18       Mark Robinson also had reached out

19       to Eric.  At some point, Don

20       Arbitblit then said he would like

21       to come to the meeting.  He hadn't

22       been invited, not that we didn't

23       want him, we thought Mark Robinson

24       just wanted to come for a meeting.
```

FAC Resp. Exhibit D -- 339

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1        So, Don came and Jenny Gross from

2        Lieff Cabraser was there, and

3        Jerry Kristal was at that meeting,

4        Dr. Madigan was at that meeting,

5        Dr. Egilman was at that meeting,

6        and somebody from Sol Weiss' firm

7        I think was at that meeting, if

8        memory serves.

9            In any event, and I

10       remember, I gave a presentation of

11       some of the main data from

12       Madigan's report, and we were

13       willing to share the report.  In

14       fact, Don Arbitblit was sent in

15       the later stages a draft of the

16       Madigan report which he reviewed,

17       and, in fact, made one

18       contribution to the report.  He

19       came up with a very useful

20       document that was in the Madigan

21       report.  So, those data were fully

22       shared with the MDL, and I think

23       Eric Weinberg was specifically

24       interested in possibly an exchange

FAC Resp. Exhibit D -- 340

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

 1      of information.

 2              MR. LEVIN:  Do you know

 3      whether Russ Herman, Chris Seeger

 4      or Andy Birchfield knew about that

 5      meeting?

 6              MR. SIGELMAN:  I don't know.

 7      I wasn't convening the meeting.  I

 8      presume that -- I know that -- you

 9      know, I got a call about that

10      meeting from you.  So, I presume

11      that unless you were

12      uncharacteristically quiet about

13      the meeting, that you might have

14      conveyed it.

15              MR. LEVIN:  How do you do?

16              MR. SIGELMAN:  And I

17      remember you had concerns

18      specifically about what the MDL --

19              MR. LEVIN:  It was another

20      world then.

21              MR. SIGELMAN:  Pardon me?

22              MR. LEVIN:  It is not your

23      concern.  It was another world.

24              MR. SIGELMAN:  Right.  In

FAC Resp. Exhibit D -- 341

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

 1          any event, I remember specifically

 2          that the information that we were

 3          using with Dr. Madigan was stuff

 4          that we developed since the MDL.

 5          To be quite honest, what happened

 6          in the MDL was, at some point, I

 7          wanted to do some things with a

 8          statistician, and I was informed

 9          by John Restaino that for

10          budgetary reasons, they just

11          couldn't afford more statistical

12          work.  So, I ended up doing the

13          work through --  work that I

14          wanted to do through Dr. Madigan.

15          And that's kind of how I ended up

16          doing even more in New Jersey.

17               MR. LEVIN:  Don't take this

18          the wrong way.  This is for future

19          reference.

20               MR. SIGELMAN:  No, I

21          understand.

22               MR. LEVIN:  Were your hours

23          reported in the MDL or in the New

24          Jersey litigation for that?

FAC Resp. Exhibit D -- 342

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1              MR. SIGELMAN:  Both.  Well,

2         I reported them separately to Russ

3         Herman.  I reported our hours for

4         MDL, and then I reported our hours

5         for New Jersey.

6              MR. SEEGER:  Okay.  Anybody

7         have anything?

8              MR. LANIER:  Thanks again,

9         Dan.

10                   -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 343

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1             C E R T I F I C A T E

2

3             I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 344

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: COHEN, PLACITELLA & ROTH
        Christopher M. Placitella, Esquire
        Harry M. Roth, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 345

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. SEEGER:  Chris, you sent
 3       in an affidavit, right?  I think
 4       we have something.
 5            MR. PLACITELLA:  It was a
 6       summary.
 7            MR. SEEGER:  So, this is the
 8       Court-appointed fee committee.  I
 9       think the idea here is to ensure
10       that we make sure everyone has had
11       an opportunity to express their
12       contributions to the case from the
13       common benefit standpoint.
14            Obviously we all know each
15       other.  I have a sense of what
16       went on in New Jersey and what
17       people did.  You've got 20
18       minutes, I believe, and we would
19       like to have 10 minutes at the end
20       for questions, if there are any.
21       You can use it any way you want.
22            MR. PLACITELLA:  I can
23       probably do this in five minutes.
24            MR. SEEGER:  It's up to you.
```

FAC Resp. Exhibit D -- 346

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1       Chris, just so you know, we've got

2       Linda here.  We're going to record

3       everything for Judge Fallon.

4               MR. PLACITELLA:  Right.

5               It is kind of a weird

6       position to be in with a bunch of

7       friends in a room talking about

8       money, but I guess there's worse

9       places to be in this world.

10              When I got involved or we

11      got involved in this case, it was

12      post recall, and what I attempted

13      to do was to try to figure out

14      what was done and then figure out

15      where we could contribute,

16      basically.  Because there was a

17      lot of great work that was done

18      and a lot of people took a lot of

19      risks long before we got in the

20      cases.

21              So, I spent a fair amount of

22      time in the beginning just

23      reviewing what had been done in

24      terms of depositions, documents,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        and things like that, and I

2        determined that the place where I

3        thought we could make the most

4        contribution was in the public

5        relations and marketing areas

6        because there was still a lot of

7        stuff to be developed.  So, that's

8        really where I focused my efforts,

9        not on who knew what and where in

10       terms of the science, but getting

11       and doing some unique things on

12       the PR side of things and on the

13       marketing side.

14            Just as an overview, it

15       looks like we spent, our firm,

16       about 5,000 hours, a little less,

17       slightly under that, which is

18       about two years' worth of full

19       time for a partner.  Now, I had

20       just left my old firm and joined

21       my new firm, and for the next two

22       years, I probably spent about 80

23       percent of my time doing Vioxx and

24       not generating many fees, and

FAC Resp. Exhibit D -- 348

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1    these guys kind of took a flyer on

2    our doing that.  So, there were

3    some real opportunity costs in

4    terms of what I did.  When I was

5    at Wilentz, I generated a lot of

6    work.  I was the number one

7    business getter there for years.

8    So, I really put that on hold in

9    developing our practice to do

10    Vioxx even when things weren't

11    going too well.

12         So, I spent, I figured about

13    80 percent of my time for two

14    years doing that, and other people

15    spent less portions of their time.

16         On the public relations side

17    of things, I don't think that that

18    had ever really been looked at

19    hard in the context of an MDL or a

20    mass tort that I had been involved

21    in, but it looked like a

22    vulnerable area in this case.  So,

23    I was involved and took the lead

24    in taking the depositions of Jan

FAC Resp. Exhibit D -- 349

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          Weiner and Mary Blake, doing all

2          the document reviews.  There were

3          probably, between those two

4          deponents alone, 70,000 documents

5          that had to be gone through in one

6          way or another.

7               Now, that does not mean that

8          I looked at 70,000 documents, but

9          scanning through the databases and

10         pushing stuff out and looking at

11         things that made sense, and then

12         summarizing them, putting them in

13         databases, constructing

14         PowerPoints.

15              There were other depositions

16         I was involved with but did not

17         take the lead in, say, like

18         Westrick, where I identified

19         people had to be taken, but other

20         people helped.

21              It's interesting.  I guess

22         this is when I knew I was off the

23         wall.  When my son was in the

24         hospital with a collapsed lung and

FAC Resp. Exhibit D -- 350

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        I was on the phone on a phone dep

 2        in the Westrick deposition, Motley

 3        Rice was taking the lead, that's

 4        when I really knew I was off the

 5        mark in terms of my priorities.

 6             But in the public relations

 7        stuff, in terms of depositions, I

 8        think a lot of that stuff was

 9        actually used in both the Federal

10        and State trials.  You know,

11        everybody in the world was told

12        that Vioxx didn't cause heart

13        attacks, and that message was

14        delivered ten times over to every

15        man, woman and child in the United

16        States in a single year.  I mean,

17        that was a significant piece of

18        evidence, I think.

19             We also spent a lot of time

20        battling over the video news

21        releases, you know, unearthing the

22        whole Loren Laine, Laura

23        Demopolous stuff.  We subpoenaed

24        the records, we litigated the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          right to have the videos.  Merck

2          wanted to keep them quiet.  We

3          unearthed them.

4               There were hundreds of hours

5          of videotape, most of which no one

6          ever had to look at.  I went

7          through them all, got the 15

8          minutes worth of gold, but there

9          was some pretty good stuff.

10              I think the Loren Laine

11         stuff was helpful in most cases.

12         We teamed up with Mark on the

13         Demopoulos depositions and those

14         videos.  We actually had to

15         litigate again the right to take

16         her deposition with conditions in

17         Philadelphia, and ultimately Judge

18         Higbee ruled that, as a result of

19         that battle, Merck could no longer

20         hire outside counsel for

21         independent witnesses and try to,

22         you know, keep secret what was

23         going on between Merck and outside

24         counsel's lawyers.  So, I thought

FAC Resp. Exhibit D -- 352

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1          that was significant.

 2                 Some of the documents we

 3          uncovered that I know were used as

 4          significant documents were the

 5          Westrick letter to the FDA where

 6          they were complaining that Pfizer

 7          was committing a violation by not

 8          giving both explanations of the

 9          VIGOR trial, an FDA violation; the

10          2001 profit plan, the strategic

11          plan for the public relations

12          which was do no harm to Vioxx; the

13          SWOT team memos; and there was

14          other stuff, but they were some of

15          the highlights.

16                 On the marketing side, I

17          spent a lot of time identifying

18          who should be deposed.  I thought

19          some of the depositions were more

20          productive than others, but,

21          nevertheless, most of them took

22          the same amount of time.  I know

23          we tag-teamed with the MDL on the

24          Charlotte McKines depositions.

FAC Resp. Exhibit D -- 353

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        She was the person who was the

2        ultimate supervisor for the "Be

3        the Power" and the development of

4        the CV card.  We took her for

5        multiple days.  Tens of thousands

6        of documents were reviewed.  We

7        met with experts to help us

8        prepare to do that right.

9            We took Wendy Dixon for

10       multiple days.  Interestingly

11       enough, I didn't really understand

12       the significance of Dixon's

13       depositions until much later,

14       because Dixon, the whole premise

15       of Merck's defense that they had

16       Dixon prepped for was the whole

17       Alzheimer's thing.  That was the

18       whole key that they had her

19       prepped on.  It wasn't until the

20       back end of the litigation when we

21       unraveled the Alzheimer's fraud

22       that if we ever had to go back to

23       Dixon again, I think we would

24       really kind of take her down.

FAC Resp. Exhibit D -- 354

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Jo Jerman I did with

2      Papantonio.  Papantonio, I think,

3      did a great job.  I tag-teamed

4      with him, but he really took the

5      lead.  My role in the Jo Jerman

6      dep is I have a cue card, and

7      every time he asked a question, I

8      would give Papantonio the cue card

9      and say, didn't the lawyers ask

10     you to do this.  So, we spent a

11     lot of time doing that.

12          The CME training programs,

13     doing all of those documents.  The

14     ghostwriting stuff or the STI, I

15     spearheaded for New Jersey.  That

16     ended up to be about 60,000

17     related documents.  It could have

18     been better coordinated with the

19     MDL, frankly, because I thought we

20     were doing some parallel work.  I

21     think that that never really

22     developed to where it should have

23     been, to be honest.  I identified

24     it, litigated it, got the

FAC Resp. Exhibit D -- 355

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        documents and then delegated to

2        have people finish it off.  And I

3        don't think it ever got finished

4        the way -- I mean, there was some

5        potential there that could have

6        been better, I thought.

7            I also was involved for New

8        Jersey in subpoenaing the Ogilvy

9        records.  We litigated the right

10       to get those records.  That review

11       was done in connection with the

12       Motley Rice firm.

13           I was originally the person,

14       I think, that got all the

15       advertising materials, integrated

16       them, all the commercials with the

17       print, and then distributed that

18       to all the lawyers around the

19       country who needed it.

20           All the information I did,

21       you know, the MDL coordination was

22       a little bit clumsy.  It got

23       better as it went along.  All the

24       stuff that we uncovered, we turned

FAC Resp. Exhibit D -- 356

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        over.  I know that Mark Robinson

2        actually took the stuff and used

3        it in seminars, but I actually got

4        on the phone and helped him prep

5        the marketing expert and turned

6        all those materials over.  I'm not

7        sure what route it ultimately

8        went, but I know that we spent

9        some amount of time doing that.

10            We were involved in the

11       whole Joanne Lahner privilege

12       fight, which to this day, I don't

13       think is actually over.  It was my

14       view that that was really a very

15       soft spot on the underbelly of

16       Merck and their Achilles' heel to

17       show that the legal department at

18       Merck was really at the base of

19       the fraud.  We had our in-camera

20       hearings before the judge where I

21       cross-examined Lahner.  I had

22       never been -- I have never

23       conducted a cross-examination

24       where then the judge asked me to

FAC Resp. Exhibit D -- 357

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          leave the room and then she

 2          conducted her own

 3          cross-examination.  Then during

 4          the examination, the law clerk

 5          would come out and ask me for

 6          different things that the judge

 7          could ask Lahner about.

 8                MR. GIRARDI:  That's

 9          happened to me.  They said to me,

10          get out of the room, Girardi, and

11          I'll do it myself.

12                MR. PLACITELLA:  Right.  So,

13          unfortunately, I think the Merck

14          lawyers stayed in there, so, they

15          had a lot of things to say that we

16          never really got to hear, and that

17          issue is still in flux, I guess,

18          although on the first round, she

19          wasn't going to give us all we

20          wanted, but there's still a lot of

21          privileged stuff under review.  I

22          think the settlement itself kind

23          of slowed that train down.  But I

24          still believe that that was a
```

FAC Resp. Exhibit D -- 358

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      significant effort that had

2      significant potential.

3           I did spend a fair amount of

4      time assisting Eric Weinberg, not

5      as the primary, but as the

6      secondary on experts.

7           I spent a lot of time, and I

8      don't know whether I drew the

9      short straw, but I spent a lot of

10     time with Dave Egilman in helping

11     with Mark's trials, doing his

12     depositions, Jay Geller, Sandra

13     Greenman, Michael Hoffman.   I

14     spent an awful lot of time with

15     Dr. Kostis, who gave us a lot of

16     guidance, and I think it actually

17     inured to the benefit of all for a

18     lot of reasons, but he gave us a

19     lot of guidance on even the

20     marketing end of things.

21           I spent a lot of time with

22     David Madigan, who I would submit,

23     although late in the game,

24     produced one of the best work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          products in terms of an expert
 2          that I had seen in the litigation
 3          in terms of his stuff on the
 4          Alzheimer's and the SAS data.  And
 5          I spent, I guess I was the
 6          exclusive person with Nesi for a
 7          long time, who ended up writing
 8          the book, and the only one that
 9          ever got in the book was Lanier,
10          none of the rest of us.
11               MR. HERMAN:  He's good at
12          that.
13               MR. LANIER:  And I never
14          talked to him.
15               MR. PLACITELLA:  You never
16          talked to him.  He's very good.
17          Never talked to him.  So, that was
18          a lot of time.
19               We also spent a lot of time
20          with lawyer training, especially
21          in New Jersey, of having people
22          there assembling materials to give
23          to them so they could better
24          represent their clients.
```

FAC Resp. Exhibit D -- 360

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1            We actually took a little

2       bit of everybody's work product.

3       We took some of the stuff that

4       Jerry Kristal did, we took some of

5       the stuff that Chris did, we took

6       some of the stuff that Andy did,

7       that Mark did, put it on a CD and

8       made it available to people so

9       they could actually go in and do a

10      decent job when it came time to do

11      a doctor's deposition and the

12      detail people's depositions.

13           MR. ROTH:  And having their

14      clients deposed.

15           MR. PLACITELLA:  And having

16      their clients deposed.

17            In terms of trial

18      assistance, I figure I spent

19      probably two full weeks in various

20      trials in New Jersey helping out,

21      whether it was prepping for an

22      expert, actually being the one who

23      did the depo cuts that no one

24      wanted to do, you know, the not

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           fun stuff.  So, I spent some time

2           in Perry's trials and Mark's

3           trials.  Hopefully we gave some

4           significant assistance there that

5           was helpful.

6                 After the settlement, I was

7           put in charge of working out or

8           helping to work out the lien

9           issues with Garretson, although I

10          would have to say that Garretson

11          really carried that ball.  I

12          didn't have to do that much other

13          than calm the forces inside of New

14          Jersey.  We took a leading role

15          with Judge Higbee in confronting

16          some of the ethics issues that

17          were being raised as it related to

18          the settlement.  We had gotten

19          independent ethics counsel, worked

20          through some of that stuff with

21          Chris' help and Judge Higbee, and

22          I think, you know, we played a

23          real role in keeping people

24          focused on what the real issues

FAC Resp. Exhibit D -- 362

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          were.

2               That's kind of an overview.

3          I'm assuming that almost everybody

4          here knew how hard we worked and

5          how much time we dedicated.  Some

6          efforts, frankly, when you are in

7          this kind of litigation, bear more

8          fruit than others, but I think we

9          produced some significant fruit,

10         and everybody here has made a

11         tremendous contribution, and I

12         think we helped fill in some of

13         the gaps, and saying more than

14         that is, frankly, a little

15         awkward.

16              MR. SEEGER:  That was very

17         helpful, actually, from my

18         perspective to remind everybody of

19         the things that you worked on,

20         because we're sort of at the end

21         of the road now, so, I think those

22         things could be forgotten, so, it

23         was helpful for me.

24              MR. HERMAN:  I just have a

FAC Resp. Exhibit D -- 363

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          couple of questions, Chris.  The

2          ethics counsel you retained, who

3          was that?

4                  MR. PLACITELLA:  Jeff

5          Pollack.

6                  MR. HERMAN:  The reason I'm

7          asking is that I'm not sure that

8          that issue is over yet, so, we may

9          be calling on you.

10                 MR. PLACITELLA:  Yeah.  He

11         helped us work through everything,

12         because one of our co-counsel from

13         Maryland had some major issues,

14         and they had a lawyer in their

15         office who was on the Maryland

16         ethics committee, and then we had

17         some kind of side shots from other

18         places, including the guys from

19         Connecticut.  And you know who all

20         those were.

21                 MR. SEEGER:  I was on some

22         of those calls with you.

23                 MR. PLACITELLA:  Right.  So,

24         we retained independent counsel

FAC Resp. Exhibit D -- 364

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        who was on the New Jersey ethics

2        committee really who was very,

3        very helpful, I thought.

4              MR. SEEGER:  Dennehy, right?

5              MR. PLACITELLA:  Dennehy

6        actually was the guy at Wilentz,

7        but Jeff Pollack.  He also had

8        some significant issues.  Jeff

9        Pollack, who was on the New Jersey

10       Supreme Court ethics committee.

11             MR. SEEGER:  I spoke with

12       him.

13             MR. PLACITELLA:  Yes.  We

14       retained him independently to help

15       us kind of get through some of

16       those moguls.  I thought he was

17       very helpful.  In fact, I think he

18       might have given us a written

19       opinion.

20             MR. ROTH:  He did.

21             MR. PLACITELLA:  He gave us

22       a written opinion.

23             MR. HERMAN:  You said that

24       Motley at one point was taking a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          deposition and your son was ill

2          and you were on the phone?

3                MR. PLACITELLA:  Right.

4                MR. HERMAN:  What sort of

5          interaction did you have with

6          Motley Rice?

7                MR. PLACITELLA:  Yeah, we

8          had an ongoing relationship with

9          him.  We're close friends for a

10         long time.  They worked on the

11         Ogilvy.  They helped on the public

12         relations.  They helped on the

13         privilege log issues

14         significantly.  They took the lead

15         in the Westrick deposition.  I

16         think Fred Thompson might have

17         done that deposition.  I think

18         they might have done some of the

19         work on the STI.

20                So, they were an integral

21         part of -- you know, there was too

22         much, frankly, for me just to do,

23         and they carried a lot of the

24         water on that end of things.

Page 23

1           MR. LANIER:  Based on the

2      way you perceive what Ness Motley

3      did, because I think you probably

4      worked closer with them than

5      anybody else, right?

6           MR. PLACITELLA:  Right.

7           MR. LANIER:  Based on the

8      way you perceive what they did and

9      what you perceived you did, if you

10     were called on to make the hard

11     decision, where do you

12     comparatively rank yourself with

13     Ness Motley?  Above, same level or

14     below in terms of contributions?

15          MR. PLACITELLA:  I think

16     that it was my job to steer the

17     ship, to figure out what had to be

18     done, try to figure out what the

19     soft spots were, and that was a

20     major contribution.

21          In terms of the number of

22     hours they put in, I don't even

23     know the number -- you know, I

24     don't know, I haven't seen their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          submission.  I'll say any time

2          they do things, they do it right

3          --

4               MR. WEITZ:  I think that

5          it's an important question,

6          because I'll tell you why, because

7          people like myself and Chris and

8          Mark know your contribution in

9          Jersey.  We worked with you, we

10         know what you guys did.  Ness

11         Motley was sort of out there in

12         the periphery.  They weren't in

13         the MDL, they weren't in New

14         Jersey, so we are trying to get a

15         feeling, and you really know

16         better than anybody, as to what

17         their contribution is.  So, try

18         to --

19              MR. PLACITELLA:  Well, I

20         know what they did in relation to

21         me, which was significant.  They

22         helped significantly on the Lahner

23         issue.  They spent a lot of time

24         going through the documents.  They

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        helped with the briefing on that

 2        issue.  They showed up at the

 3        hearing.

 4             MR. SEEGER:  You and Fred

 5        handled that, I remember that.

 6             MR. PLACITELLA:  Correct.

 7        So, they spent a lot of time on

 8        that.  They spent a lot of time on

 9        the Westrick PR issue.  They spent

10        a fair amount of time with

11        Hoffman, who was the ethics

12        expert.  That was the person that

13        they were in charge of taking.

14             They assisted with Kostis

15        and some others.  I mean, they did

16        a significant amount of work.

17             MR. WEITZ:  Were they doing

18        things in conjunction with you at

19        your direction or were they doing

20        it on their own?

21             MR. PLACITELLA:  No.  They

22        were really doing it in

23        coordination with what I was

24        doing.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          MR. LEVIN:  Were you giving

2     them the assignment?

3          MR. PLACITELLA:  No.  We'd

4     split it up.

5          MR. LEVIN:  You were like

6     working together?

7          MR. PLACITELLA:  Right,

8     right.  Since I had reviewed

9     pretty much everything at one

10     point, I saw my role as trying to

11     figure out where the gaps were

12     and --

13          MR. LEVIN:  I guess what you

14     are saying is, they weren't

15     duplicating what you were doing --

16          MR. PLACITELLA:  No, they

17     were not.

18          MR. LEVIN:  -- they were

19     supplementing?

20          MR. LANIER:  Did you get

21     them involved in the litigation,

22     did they get you involved, or did

23     they get involved independently?

24          MR. PLACITELLA:  I think it

FAC Resp. Exhibit D -- 370

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          was kind of independently, but,

2          actually, we had a work in

3          triumbrant with Sol Weiss where,

4          in the beginning, we had a --

5          because we don't really know how

6          the dynamics of things actually

7          unfold, but in the beginning, the

8          way we worked it out is Sol,

9          Motley Rice and our firm were

10         going to go in and do whatever we

11         thought needed to be done

12         together.  So, we kind of divided

13         up responsibilities.  So I wasn't

14         giving them direction.  We were in

15         it together.

16              Then, of course, as the

17         dynamics and all of these things

18         happened, directions change a

19         little bit because, well, you are

20         not going to duplicate what Seeger

21         is doing, and you are not going to

22         duplicate what Perry has done or

23         Mark has done.  You are just not

24         going to do that, so...

FAC Resp. Exhibit D -- 371

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1              MR. HERMAN:  What I'm really
 2        interested in is the fact that you
 3        primarily did the work for your
 4        firm, not someone else, not some
 5        paralegal, or anybody else, it was
 6        really you?
 7              MR. PLACITELLA:  It was
 8        primarily myself.  Harry helped,
 9        he did a lot of client stuff.
10        David Lenrow, who was a physician
11        in my office --
12              MR. HERMAN:  But these were
13        partner level folks?
14              MR. PLACITELLA:  Correct,
15        yeah.
16              MR. SEEGER:  Not low level
17        people?
18              MR. PLACITELLA:  Yes.
19              MR. HERMAN:  I think that's
20        important.
21              MR. WEITZ:  Chris did most
22        of the work.
23              MR. HERMAN:  With regard to
24        Motley Rice, Fred Thompson was the
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          main partner on that?

2                  MR. PLACITELLA:  Actually,

3          they had -- Fred was the partner

4          most of the time that was doing

5          that.  But they had Carmen Scott,

6          who is a very competent lawyer,

7          Henry Leventis, Josh Littlejohn.

8          I mean, they had a number --

9                  MR. WEITZ:  Wasn't Ann also

10         involved?

11                 MR. PLACITELLA:  Ann Ritter

12         was for a while.  Jeff Thompson in

13         the beginning.  So, they had some

14         significant people.  I mean, they

15         weren't just throwing a bunch of

16         low level people out.  They had

17         some senior people.

18                 MR. LEVIN:  Chris, was

19         somebody in your firm working with

20         the accountant to straighten out

21         your costs and hours?  Because you

22         have $41,000 in costs that you

23         want to recover and a significant

24         number of hours.  You say that's

FAC Resp. Exhibit D -- 373

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

 1          Harry?

 2               MR. ROTH:  Yes.  We're --

 3               MR. LEVIN:  Keep doing that

 4          so that we can get that plugged

 5          in.

 6               MR. ROTH:  We are hopeful

 7          that by the end of the week the

 8          accountant will have back the

 9          reformatted sheets.

10               MR. PLACITELLA:  By the way,

11          right before I left Wilentz, they

12          put in, I think, 50,000 for Nesi

13          as a contribution.  We never

14          claimed it.  I don't know if they

15          ever claimed it.  I don't know how

16          they would claim it, but that was

17          a clear common benefit.  It is not

18          my cost, but it is their cost.

19               MR. WEITZ:  Were you

20          handling Motley Rice's cases?

21               MR. PLACITELLA:  We were

22          local counsel.

23               MR. WEITZ:  And cases that

24          were in the Jersey court, had you

FAC Resp. Exhibit D -- 374

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          worked up cases on the discovery

2          docket?

3                    MR. PLACITELLA:  Yes.

4                    MR. WEITZ:  Tell us how

5          many.  Because I remember you

6          being actively involved as one of

7          the guys that were actually trying

8          to push some cases.

9                    MR. PLACITELLA:  Everybody

10         was -- you remember, it was who

11         can push their case out first.  We

12         were all trying to push out cases.

13         We were doing the docs.

14                    MR. SEEGER:  Actually, we

15         were --

16                    MR. WEITZ:  If you remember,

17         there were very few guys.

18                    MR. PLACITELLA:  I

19         remember --

20                    MR. ROTH:  You know, in

21         terms of the group that we were

22         working with, Motley Rice was also

23         one of the groups that was

24         interested in pushing their cases.

FAC Resp. Exhibit D -- 375

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          MR. PLACITELLA:  And

2     Simmons, they pushed pretty hard.

3          MR. ROTH:  These were not

4     guys that were taken aback.  We

5     had some guys who were sitting

6     around, hurry up, hurry up, get me

7     in, and Motley Rice was not one of

8     those guys.

9          MR. HERMAN:  How many cases

10     aggregate did you all have with

11     Motley Rice?

12          MR. PLACITELLA:  About 400?

13          MR. ROTH:  A little less.

14     360.

15          MR. WEITZ:  What was the

16     total number of cases that you

17     guys submitted to the settlement,

18     that Cohen Placitella submitted?

19          MR. PLACITELLA:  Or through

20     co-counsel?

21          MR. WEITZ:  Not through

22     co-counsel, but for your firm.

23          MR. PLACITELLA:  Oh,

24     probably not that many.  A few

FAC Resp. Exhibit D -- 376

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1              hundred.
2                    MR. ROTH:  I think we were,
3              I want to say 250, and that may be
4              generous.
5                    MR. BIRCHFIELD:  Is that
6              your cases and Motley Rice?
7                    MR. PLACITELLA:  No, no,
8              just ours.
9                    MR. BIRCHFIELD:  You talked
10             about the working relationship.
11             Was there a joint venture on these
12             cases with Sol?
13                   MR. PLACITELLA:  It was a
14             loose arrangement that was never
15             totally formalized.  But, you
16             know, we've been in this business
17             for a long time, and probably
18             there's a lot of things that
19             should be.  You just trust people.
20                   MR. LEVIN:  Was there a fee
21             sharing agreement?
22                   MR. PLACITELLA:  We never
23             got that all the way 'til the end.
24                   MR. LEVIN:  Is there a fee

FAC Resp. Exhibit D -- 377

Page 34

1              sharing agreement?

2                    MR. PLACITELLA:  We never

3              got all the way to the end.

4                    MR. LEVIN:  Will there be a

5              fee sharing agreement?  That's for

6              you being local counsel?

7                    MR. PLACITELLA:  Right.

8                    MR. LEVIN:  Not in terms of

9              anything else?

10                    MR. PLACITELLA:  Correct.

11                    MR. HERMAN:  Just a couple

12              of things.

13                    MR. SEEGER:  We have about

14              two minutes, just to stay on time.

15                    MR. HERMAN:  Just a couple

16              of things.  In fairness, make sure

17              you read the Fifth Circuit

18              opinions in a couple of cases.  If

19              you are not familiar with the

20              cases that are governing fees in

21              quasi class actions and class

22              actions, we'll send out a memo

23              again, but you can access those

24              cases on the judge's website.  One

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          is Murphy Oil, which is Judge

2          Fallon's latest, which gives you a

3          pretty good road map on the law

4          and where you need to go and where

5          we need to go.

6                Of course the Johnson

7          factors originated in the Fifth

8          Circuit, and those factors have

9          been reaffirmed in the Mobil Oil

10         case.  So, there are two or three

11         cases that you have to look at.

12                We hope that all the fee

13         issues are going to be resolved,

14         but Judge Fallon has advised us to

15         advise everyone seeking a fee that

16         in the event that things are not

17         resolved, he's going to do what

18         the Fifth Circuit requires him to

19         do.  He's going to have some

20         former Assistant U.S. Attorney put

21         people under oath, take

22         depositions, et cetera.

23                The two things that we're

24         responsible for are transparency

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 379

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        and consistency.  So, even though

2        you don't know, you are not

3        familiar with what Ness Motley,

4        for example, submitted or how many

5        hours, you will be privy to what

6        everybody else is privy to by the

7        time this process works its way

8        through.

9              MR. PLACITELLA:  I

10       appreciate it.  I know that this

11       is not an easy thing for you.  I

12       will say one thing about this

13       litigation.  In the end, it was

14       really a collaborative effort even

15       though it didn't start that way.

16       I mean, everybody -- it was always

17       like a substantial contributing

18       factor.  There were a lot of

19       really significant pieces, and

20       that's a tribute to everybody, I

21       think.

22             MR. LANIER:  You found the

23       Loren Laine piece that I used in

24       one of the trials.  I think you

FAC Resp. Exhibit D -- 380

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          found it by the third trial.  I

2          don't know if you found it by my

3          second.

4               MR. SEEGER:  Bogus quote.

5               MR. LANIER:  The bogus

6          quote.  That was you, wasn't it?

7               MR. PLACITELLA:  Right.

8               MR. LANIER:  It was a good

9          clip.

10               MR. PLACITELLA:  It was very

11          helpful.

12               MR. SEEGER:  By the way, I

13          don't see Wilentz's stuff.

14               MR. LEVIN:  No.

15               MR. SEEGER:  I don't know if

16          they submitted it.  I don't know

17          if you want to put a call in to

18          them.

19               MR. LEVIN:  If there's a

20          cost, you know, nobody wants to

21          see somebody not get reimbursed.

22               MR. PLACITELLA:  Because

23          they didn't really do much, you

24          know --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1              MR. SEEGER:  Even their

2        costs.

3              MR. PLACITELLA:  But their

4        costs, you know, that's a

5        significant piece.

6              MR. SEEGER:  That was

7        helpful.  Thank you.

8              MR. PLACITELLA:  Thank you.

9                   -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 382

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 383

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: CUNEO GILBERT & LADUCA
      Jonathan Cuneo, Esquire


BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 384

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2               MR. CUNEO:  For those of you

3          who don't me, my name is Jonathan

4          Cuneo, and I'm the senior partner

5          in a Washington, D.C.-based firm

6          called Cuneo Gilbert & LaDuca.

7          I've got sort of what I believe is

8          going to be an unusual story to

9          tell you, and I thought I might

10         approach it by simply asking and

11         answering a few questions and then

12         taking yours.

13              The first question is, who

14         are we and what is it that is

15         unique that we bring to the table?

16         And the answer is essentially like

17         this.  We are a Washington,

18         D.C.-based plaintiffs' commercial

19         firm.  Every one of our partners,

20         at the same time, has a deep

21         background in government or public

22         relations or running political

23         kind of campaigns.  And, so, for

24         example, I started my career at

FAC Resp. Exhibit D -- 385

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1    the Federal Trade Commission,

2    working in the office of the

3    general counsel, and then with

4    antitrust counsel to the House of

5    Representatives in the early

6    1980s.  That was my formal title,

7    but that was the sum and substance

8    of it when Peter Trevino was the

9    chairman.

10          I then formed my own

11    practice, and my choices at that

12    time were to go to a big law firm

13    and pretend that I graduated five

14    years before instead of nine years

15    before, or to start my own

16    practice, which I did.  I began a

17    dual practice of legislative work

18    and basically general commercial

19    litigation.  Through the years, I

20    have represented the securities

21    lawyers at an association called

22    NASCAT, the antitrust plaintiffs'

23    lawyers in a group called COSAL,

24    we continue to represent them, and

FAC Resp. Exhibit D -- 386

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        my law firm grew from just me and

 2        a telephone to about 16 lawyers.

 3            The principal lawyers who

 4        were involved here were me and my

 5        partner, Pamela Gilbert, who is a

 6        recognized consumer advocate in

 7        Washington.  She began her career

 8        at US PIRG and then became

 9        director of Congress Watch.  And

10        then during the Clinton

11        administration, she was the

12        executive director, which is the

13        top civilian job at the Consumer

14        Product Safety Commission.  She

15        has testified before Congress well

16        over 50 times.  She's done

17        literally hundreds of television

18        appearances, and she continues to

19        represent AAJ in a number of

20        capacities.  And I think she was

21        very honored that President Elect

22        Obama asked her to direct the

23        transition for the Consumer

24        Product Safety Commission.
```

FAC Resp. Exhibit D -- 387

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1              So, we have always had one
 2        foot in the litigation door.  I
 3        have a very active litigation
 4        practice, not as active as any of
 5        the lawyers in this room, but
 6        we've done about 100 cases around
 7        the country, antitrust, consumer,
 8        derivative kind of cases, and at
 9        the same time, we have a foot on
10        Capitol Hill, and we deal with the
11        media on a daily basis.
12              I used to work as a
13        reporter.  One of the people who
14        started with me on this case,
15        Michael Waldman, was director of
16        the office of speech writing for
17        President Bill Clinton.  If you
18        read his resume, he wrote four
19        State of the Union messages to
20        address us to the United Nations.
21              MR. LEVIN:  Now he runs the
22        Brennan Center.
23              MR. CUNEO:  Yes.  Now he is
24        the director of the Brennan Center
```

FAC Resp. Exhibit D -- 388

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          in New York.

2                So, what is it that caused

3          us and the committee that was

4          running this case to have a need

5          for our services?  Well, in

6          general, Congress was interested

7          in the issue of regulation and

8          preemption and also specifically

9          in Vioxx.  So, even before the

10         committee was formed, we

11         interacted with the various

12         congressional committees, covered

13         the hearings, sent the materials

14         on, and my main points of contact

15         with the committee have been my

16         old friends, Chris Seeger and

17         Arnold Levin.

18                And second, after Mark

19         achieved such a terrific and

20         unexpected result in the Ernst

21         case in Texas, the committee that

22         was running this case I think

23         correctly perceived an increased

24         political risk coming from that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

    1        verdict, because why is it?  Well,

    2        Merck was and probably still

    3        remains one of the most respected

    4        names in corporate America, ran a

    5        very successful public relations

    6        campaign to make it sound as if

    7        this was a Perry Mason result,

    8        that it was something that was

    9        against all the odds and the

   10        evidence.  And really this goes to

   11        show you the tremendous risks and

   12        terrors that the jury system in

   13        the United States imposed.

   14             So, as a group, they, I

   15        think, or people who were in this

   16        case, were correctly concerned

   17        about the possibility of an

   18        Arizona/McDonald's coffee case

   19        kind of a PR campaign by the

   20        defendants.  I was asked to look

   21        over the daily press, which I did

   22        while I was on vacation, and we

   23        held a number of conference calls,

   24        and what we decided to do was to

FAC Resp. Exhibit D -- 390

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        assemble an evidence book to show

 2        that this wasn't simply a matter

 3        of snake charming and magical

 4        tricks and Houdini, but actually

 5        there was some evidence at least

 6        to support them.

 7             So, in September,

 8        specifically September 21st, 2005,

 9        I was having difficulty accessing

10        exactly what the evidence is.  I

11        came and visited Chris Seeger, and

12        he at that time effectively Tom

13        Sawyered me into staying in

14        Atlantic City for the next seven

15        weeks.  As I told you, I ran, and

16        during that period of time, on a

17        daily basis I managed the press

18        for the trial, conducted

19        background briefings, we faxed

20        things all over the country, we

21        dealt with members of Congress, in

22        addition to running my own law

23        practice.

24             Now, if inconvenience were
```

FAC Resp. Exhibit D -- 391

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      the test of what kind of a fee

2      that we would be awarded, then we

3      would be entitled to a very high

4      fee, indeed, because like all of

5      us, we work in a workday world

6      where I have court hearings and

7      things that are scheduled, and we

8      basically dropped everything and

9      came to Atlantic City.  We missed

10     one day of trial in the next seven

11     weeks.

12          I was here or Pam was here

13     every single day.  Some days we

14     went back to work at night and

15     conducted business.  Some days I

16     went to New York and conducted

17     business, but we were here during

18     the trial for all seven weeks.

19          Now, that was a situation in

20     which I've learned at that time

21     that there were really three or

22     four aspects to what the

23     defendants were doing.  One is, it

24     was clear to me that they had a

FAC Resp. Exhibit D -- 392

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          courtroom presence where they were

2          chastened, and they learned from

3          their experience in Texas.  Every

4          single thing, from the fact that

5          Diane didn't wear any bling to the

6          way they got out of their bus and

7          marched in the courtroom and went

8          out at night had been focus

9          grouped and orchestrated.  It was

10         very, very careful.

11              In the room, in addition to

12         the lawyers who were actually

13         trying the case, was a partner

14         named Jim Fitzpatrick from the

15         Dewey firm in New York, who, in

16         turn, was being directed by a

17         partner whose name was Ted Mayer,

18         whose father, by the way, was a

19         great public health advocate,

20         ironically enough, as president of

21         Tufts University.

22              But in addition to helping

23         Jim, they had a professional,

24         former reporter, but a crisis

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          management professional whose name

 2          was Kent Jarrell.  So, Merck

 3          mounted a campaign that was meant

 4          to reflect their view of what was

 5          happening in the courtroom every

 6          day through the media, across the

 7          world, to the Congress, and

 8          basically an attempt to shape

 9          public opinion.

10               My role during that seven

11          weeks was to counter.  As I say,

12          we had a legitimate view, I think,

13          that if the Humeston case had gone

14          as I believe it should, and there

15          had been a significant -- in fact,

16          it did -- and there had been a

17          significant plaintiff's verdict,

18          we would have faced an onslaught

19          or the potential of an onslaught,

20          and my job was to start putting

21          down the sandbags in order to

22          prevent that from overwhelming our

23          position.

24               So, what results did we
```

FAC Resp. Exhibit D -- 394

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1      achieve?  Well, I think that we

 2      gave you increased connections on

 3      Capitol Hill.  By the way, this is

 4      something that we not only did for

 5      you, but we did it in a very

 6      formal role in the Enron case.  We

 7      were officially designated

 8      Washington counsel.  We had a

 9      huge, huge, huge amount of work to

10      do in that case.  As you know,

11      there were a whole series of

12      congressional hearings.  We

13      interacted with every committee,

14      every member of the press who was

15      up there, and we did it in a way

16      that was completely anonymous, I

17      might say.  And that's our role.

18      We did it in the Worldcom case,

19      and to a much lesser extent, we

20      did it with you.

21           At the end of the trial, it

22      didn't go in a way that we had

23      wanted it to go, and it didn't go

24      the way Chris had expected it to

FAC Resp. Exhibit D -- 395

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1     go, I think.  Maybe I was more

2     optimistic about it than he was,

3     because I thought that he and

4     David Buchanan did a magnificent

5     job in presenting the case to the

6     jury, but at that time, our role

7     ceased.  It ceased.  You did not

8     need the insurance policy against

9     Congressional action at that

10    point.  It was, you know, they won

11    one, you won one.

12          After that, it was merely a

13    matter of, it was like a World

14    Series.  It didn't have the same

15    inherent danger.  After that, in

16    consultation with a group who was

17    running the case, we ceased our

18    activities and essentially, with

19    very minor exception, have done

20    nothing else since.

21          So, that is basically 80 or

22    so percent of our work.

23          In addition, we had 20

24    percent of work that was performed

FAC Resp. Exhibit D -- 396

Page 14

1          by other members of our firm in

2          close consultation with Arnold

3          Levin, specifically.

4               MR. HERMAN:  I'm sorry, in

5          consultation with whom?

6               MR. CUNEO:  Arnold Levin,

7          specifically.

8               MR. HERMAN:  Okay.

9               MR. CUNEO:  At that time,

10          for example, we represented the

11          Massachusetts plaintiff in the

12          national class you were putting

13          together.  We did a lot of work on

14          the Massachusetts plaintiff, Iowa,

15          Indiana and others.  And so that

16          was a minor part of what we did,

17          but it was a part, nonetheless.

18          Again, those activities ceased a

19          long time ago.

20               I'm proud of the fact that

21          we were able to come here and

22          literally, at the drop of a hat,

23          help for a period of seven weeks

24          at the time.  I think that Chris

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          and others were very pleased with

2          the job that we did.  And at the

3          same time, like a member of the

4          Cincinnatus, we went home.  I had

5          many other cases to do, we got out

6          of your hair, so much so that I

7          didn't even follow it enough to

8          understand that I might have

9          presented an affidavit here.  We

10         did exactly as we were requested,

11         nothing more, nothing less,

12         nothing else.

13              MR. LANIER:  Can I ask a

14         question?  I don't mean to

15         interrupt.  Are you done?

16              MR. CUNEO:  No, I'm done.

17         I'm a little nervous that you are

18         asking.

19              MR. LANIER:  Were you paid

20         for any of that work that you did?

21         Did you bill for it?  What kind of

22         arrangement did you have?

23              MR. CUNEO:  It was purely

24         contingent.  We paid for our own

FAC Resp. Exhibit D -- 398

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
1       expenses.  We were not paid for

2       it.  I think I legitimately could

3       be an expense of the case, but

4       that's not the way it was.  We

5       billed our time, and we paid our

6       own expenses.

7            MR. LANIER:  Why wouldn't it

8       be an expense in the case?

9            MR. SEEGER:  Actually,

10      that's an interesting comment.  I

11      never even thought of it.

12           MR. LEVIN: It's something

13      that we have to discuss.

14           MR. SEEGER:  It was a very

15      busy time, obviously.  It was

16      right after Mark's Ernst verdict.

17      I had press all over the place.  I

18      actually got a call from you,

19      Arnie, saying if would be helpful

20      if you had somebody running to the

21      press.  And then, because it was

22      you, John, I knew you, I said yes,

23      that would be very helpful,

24      because we are getting swamped.
```

FAC Resp. Exhibit D -- 399

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          It was the first two trials.  We

2          were literally being swamped, and

3          they were flooding our workroom,

4          they were finding where we were.

5          So, John came down and ran

6          interference and handled that

7          aspect of the case.

8                MR. CUNEO:  Just so you know

9          it, too, in order that I didn't

10         get in their hair, there were

11         documents that had to --

12               MR. SEEGER:  Oh, you were in

13         our hair.  You had more requests

14         for documents.  You were doing

15         your job.

16               MR. CUNEO:  But I brought my

17         own guy up to copy documents and

18         to do work.  And he also helped

19         out.  In the 12 hours of the day

20         he wasn't working for me, he

21         worked with Chris as a paralegal.

22               MR. SEEGER:  Actually, I

23         forgot that.

24               MR. LEVIN:  The other work

FAC Resp. Exhibit D -- 400

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1         that John said he did, and it was

2         minimum, because everybody had

3         minimal work, Judge Fallon wanted

4         a master complaint with a

5         plaintiff for each state in the

6         event that there had to be state

7         issues and what have you, and I

8         think he provided five or six.

9              MR. SEEGER:  For subclasses?

10             MR. LEVIN:  Well, standalone

11        and state classes because he was a

12        resource there.

13             MR. HERMAN:  His direction,

14        actually, was see if you can group

15        states according to issues.

16             MR. LEVIN:  Yes.  And that's

17        what John did.

18             MR. HERMAN:  That's why we

19        needed it.

20             MR. CUNEO:  We did some work

21        on that.

22             MR. LEVIN:  John, this has

23        nothing to do with whether you

24        become a lawyer or a consultant, I

FAC Resp. Exhibit D -- 401

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          guess, but you have 1,429 hours

2          that are still being rejected.

3          Are you perfecting them?

4                    MR. CUNEO:  Yes.  We did

5          that last week.

6                    MR. LEVIN:  As of November

7          24th --

8                    MR. CUNEO:  No, we did that

9          last week.

10                   MR. LANIER:  Off the record.

11                        -  -  -

12                   (Whereupon, a discussion off

13         the record occurred.)

14                        -  -  -

15                   MR. CUNEO:  I guess that if

16         you wanted to go that route, what

17         you would have to do, Mark, would

18         be to allocate.  That is easily,

19         easily doable.

20                   MR. SEEGER:  We'll get back

21         to you.

22                   MR. LEVIN:  Could you do us

23         a favor and send us each -- see,

24         we don't have the accountants --

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1       we don't have your hours, I don't,

2       anyway, I just have totals from

3       the accountant.  If you could send

4       us what you sent to the accountant

5       as the breakdown, we can get it

6       amongst ourselves.

7               MR. LANIER:  Great idea.

8               MR. CUNEO:  Okay.  In other

9       words, there are two --

10              MR. LEVIN:  I know you have

11      sent it around 20 different times.

12              MR. CUNEO:  Can we go off

13      the record?

14              MR. LEVIN: Yes.

15                   -  -  -

16              (Whereupon, an

17      off-the-record discussion was

18      held.)

19                   -  -  -

20              MR. SEEGER:  Thank you.

21

22

23

24

FAC Resp. Exhibit D -- 403

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1            C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary
   Public and Certified Court Reporter of
4  the State of New Jersey, Registered
   Diplomate Reporter, Federally-Approved by
5  the United States District Court of
   Pennsylvania, do hereby certify that the
6  foregoing is a correct transcript of the
   testimony as taken stenographically by
7  and before me at the time, place and on
   the date hereinbefore set forth.

8

9              I DO FURTHER CERTIFY that I
   am neither a relative nor employee nor
10 attorney nor counsel of any of the
   parties to this action, and that I am
11 neither a relative nor employee of such
   attorney or counsel, and that I am not
12 financially interested in the action.

13

14

   _____

15         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147
16         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

17

18

19

20

21

22

23

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -


FIRM:          ENGSTROM, LIPSCOMB & LACK
               Walter J. Lack, Esquire


BEFORE COMMITTEE MEMBERS:


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 405

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -   -   -
 2               MR. GIRARDI:  Walter, here's
 3          the purpose for this, just so you
 4          know.  This is two-thirds of the
 5          fee allocation committee, and the
 6          transcript is being made for the
 7          purposes of Judge Fallon.  So, at
 8          the end of the day, obviously, it
 9          is Judge Fallon that's going to
10          make the call.  But about 50 firms
11          or so have requested to set forth
12          what they did, concerned primarily
13          with the group benefit, the
14          benefit to the overall Vioxx
15          litigation, as opposed to
16          individual situations.  So,
17          anyway, that's the format, and
18          then you can just say whatever you
19          want.
20               MR. LACK:  Like right now?
21               MR. GIRARDI:  Right now.
22               MR. LACK:  I haven't
23          prepared for this, but I've been
24          giving it some thought since I was
```

FAC Resp. Exhibit D -- 406

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

         1          informed about the interview.

         2               I think I should go back to

         3          how our firm got involved.  It is

         4          kind of an interesting story.

         5          We've done drug cases over the

         6          years, but have never sat on an

         7          MDL panel.  I personally have

         8          historically taken a dim view of

         9          that situation, but with modern

        10          litigation being what it is, I had

        11          better get with the program.

        12               We've always developed our

        13          own work product in our own cases

        14          based upon our own resources.

        15          This case -- and I'll perhaps

        16          refresh Tom's memory on this.

        17          This case actually came to us from

        18          a deep throat within Merck, who

        19          made contact with a woman by the

        20          name of Cheryl Blume, and all of

        21          you probably have worked with her

        22          over the years.  Her firm is

        23          called Pharmaceutical Development

        24          Group, Inc.  We had been working

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        with her on some other drug cases,

2        found her work product to be quite

3        impressive, and she was looking to

4        extend the number of cases she was

5        working on.  I recall getting a

6        call from her through our private

7        investigator, Arlene Friedman, who

8        does this work for her.  Arlene

9        Friedman is a lady in Beverly

10       Hills who works out of her home,

11       who provides what I consider to be

12       the highest level of competent

13       private investigation services.

14       We use her exclusively.  She did

15       all the investigation on the

16       Golden Buddha case for the

17       Cathcart firm, and it went for ten

18       years in the Philippines,

19       resulting in a $3 billion

20       judgment.  She did all the work on

21       that.

22            She called and she said that

23       she had been contacted by one of

24       the original epidemiologists that

FAC Resp. Exhibit D -- 408

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          set up the VIGOR study for Merck,
 2          an inside guy.  He was appalled by
 3          the fact that, I think it was
 4          licensed in about April of 2002.
 5          She had called us at the end of
 6          2004 saying this guy would love to
 7          spill the beans, but he still
 8          works there, but he's prepared to
 9          establish to your satisfaction,
10          and certainly to mine already,
11          that all the cardiovascular
12          disease patients were taken out of
13          that study and that it was slanted
14          from the very outset.  He thinks
15          he can provide some excellent
16          background information to tell you
17          where the bodies are buried.  So,
18          this got us interested.
19              I said, well, we need to
20          know a lot more about COX-2
21          inhibitors before we go down this
22          path.  We know that some bad
23          things are going to come out of
24          this.  And so she agreed at my
```

FAC Resp. Exhibit D -- 409

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          request and ultimately Tom's

2          request, because I immediately

3          conferred with him on this, to do

4          a definitive medical workup and to

5          locate experts that we could both

6          consult with and that would

7          ultimately be willing to testify.

8               As a result of that, she had

9          prepared -- this work that I

10         brought -- I just brought a little

11         bit of the file here, as you can

12         imagine.

13              But in February of 2005, by

14         that time, after our original

15         call, she was able to put together

16         a most definitive work product

17         here consisting of three different

18         binders.  This is, first of all, a

19         review of all the Vioxx, all the

20         data that went into this.  This is

21         long before any discovery was done

22         in the case, before any litigation

23         was really ongoing.

24              MR. SEEGER:  What year?

FAC Resp. Exhibit D -- 410

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1              MR. LACK:  This is early
 2         2005.  But all this work she's
 3         doing is in 2004.  If you want to
 4         page through, it is really very
 5         good work that she did.  She went
 6         all the way back to '94 to look at
 7         all the literature on COX-2
 8         inhibitors, the whole history of
 9         this.  She then prepared a dossier
10         on the labeling chronology for
11         this particular medication, and
12         every change is tabbed here by the
13         date.  And all of the literature
14         that was generated in connection
15         with the labeling changes she
16         secured from the FDA at our
17         request.  Also, every epi study
18         you ever wanted is in here.
19              Then we had two separate
20         sessions in my office attended by
21         at least four lawyers from the
22         Girardi firm and four or five
23         lawyers in my firm.  The thing
24         went on for at least four hours.
```

FAC Resp. Exhibit D -- 411

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          During the course of that, I call
 2          it a blackboard session, she
 3          brought in three experts.  She
 4          brought in a pharmacologist, she
 5          brought in a COX-2 inhibitor
 6          specialist, and then she brought
 7          in a general physician to talk
 8          about physiology or what happens
 9          when you take these things.  It
10          was a primer for us to be able to
11          go out and basically put on
12          seminars for lawyers to teach them
13          about what to look for in
14          screening these cases.
15               Then you'll recall most of
16          you people in this room were at
17          this conference in Miami.  I was
18          one of the speakers, and my topic
19          was giving an opening statement in
20          a pharmaceutical case.  Great fun.
21          You recall we had some lawyers
22          there from Merck in the audience,
23          and we were sort of off to the
24          races.
```

FAC Resp. Exhibit D -- 412

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1              After that, Tom thought it

 2         would be better, because I love

 3         financial scams, to get into what

 4         we thought would be a very

 5         relevant and ultimately admissible

 6         issue relating to the sale of

 7         options by all the senior

 8         management at Merck.  I hired an

 9         investment banker to do the

10         research to go on Bloomberg.  I

11         have a whole file on Gilmartin,

12         Reicin and the rest of that crowd

13         there.  We thought that if

14         Gilmartin had stayed, that would

15         be a very fruitful area for cross

16         examination.  She had her own

17         story of why she sold.  They all

18         sold at the all time high for

19         Merck stock.  There's quite a lot

20         of stuff in here.

21              Then we went to the State of

22         California.  Phil Angelides was

23         the state treasurer at the time.

24         We felt that the State of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        California should investigate this

2        and perhaps hire us to pursue

3        their own MediCal reimbursement

4        issues and on and on and on.  So,

5        I have a whole line of

6        correspondence with the state

7        treasurer's office about what

8        Merck has done and the fraud they

9        perpetrated.

10              Now, the Gilmartin thing

11       ended up not being useful, I

12       suppose, because of some court

13       rulings.  But I would say that we

14       could have tried this case in the

15       fall of 2005 just on the basis of

16       the work that we did.  And all of

17       this, of course, was turned over

18       to Jim O'Callahan at the Girardi

19       firm, who then incorporated it

20       into a massive database that we

21       all contributed costs towards.  I

22       didn't bring that.  But one of the

23       first things in this box that I

24       found that was the first thing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

      1          that O'Callahan and our office

      2          worked together on, one of my

      3          partners Brian Depew actually

      4          worked with him in his office, was

      5          to put together a so-called

      6          chronology of the story.  It

      7          starts in this volume.  I didn't

      8          bring all the volumes.  It starts

      9          in 1996 with the first reference

     10          to the Vioxx theory and goes on

     11          from there.  Some of these

     12          documents were used in the various

     13          trials, some were not, but they

     14          were all certainly relevant based

     15          upon what we knew at the time.

     16                  MR. SEEGER:  Can I see it?

     17                  MR. LACK:  Yes.

     18                  (Handing over documents.)

     19                  MR. LACK:  Here's the hard

     20          data from what we obtained from

     21          our investment banker and what was

     22          sold and disclosures made at the

     23          SEC.  You will have a separate

     24          binder just on SEC disclosures.

FAC Resp. Exhibit D -- 415

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1            I would say everything in

2        this room was paid for and

3        transferred over to the MDL

4        ultimately for use in whatever.

5            Then, of course, the

6        California cases went to trial.  I

7        was there.  I sat next to Tom

8        Brandi through a good deal of the

9        trial primarily because I wasn't

10        so interested in the facts of

11        those individual cases, but the

12        judge before whom all the

13        California cases was pending is a

14        very powerful and important judge

15        in California.

16            Judge Chaney has all my big

17        cases.  She sits in a courtroom

18        that's only -- it's got various

19        names, but Central Civil is one of

20        the names it goes by.  They have

21        six judges there that handle only

22        the most complex cases for the LA

23        region.  I think half my cases are

24        pending in front of her, and so

FAC Resp. Exhibit D -- 416

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          this is a very useful, show your

2          face down there.

3               MR. LEVIN:  I'm sure she

4          knows your face.

5               MR. LACK:  What was

6          bothering me most at the time was

7          getting muscled out not by anybody

8          in particular but, for instance,

9          Mark Robinson down there.  That

10         bothered me a lot.  So, I wanted

11         to be in the courtroom to make

12         sure she knew the next cases that

13         got picked, some of them were

14         going to be mine.

15              MR. SEEGER:  Walter, can I

16         ask you a question about that?

17         Did you get any support during

18         your trial from Robinson?

19              MR. LACK:  No.  And I wasn't

20         asked to.  I didn't ask him.  I

21         wasn't going to go seek his

22         support, because we had to put it

23         together, I thought.

24              MR. WEITZ:  Did he seek your

FAC Resp. Exhibit D -- 417

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1       support?

 2              MR. LACK:  No, no.  That

 3       wouldn't be something that came to

 4       pass.

 5              Then as the center of

 6       gravity of the case went from our

 7       little ten percent of all the

 8       cases filed in California to the

 9       MDL, it was very apparent that we

10       were just going to get swept along

11       with the tide.  So, when you are

12       in that situation, we are all

13       trying to conserve resources, I'm

14       not going to continue to labor --

15              MR. SEEGER:  And duplicate.

16              MR. LACK:  Right.  So, the

17       gravamen of my activities for,

18       let's say, the common good or

19       common issues would have ceased at

20       the end of the first trial in

21       California.

22              MR. GIRARDI:  That isn't

23       true.  End of the second trial in

24       California.

FAC Resp. Exhibit D -- 418

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1            MR. LACK:  Second trial.
 2       I'm sorry.
 3            MR. GIRARDI:  Because all of
 4       these documents were in.  We set
 5       up our own database for the
 6       California lawyers, and these
 7       documents were the most important
 8       part of that database.  Obviously,
 9       it got improved as time went on,
10       as other testimony came in and
11       things like that.  But this was
12       the foundation of the case.
13            MR. LACK:  Right.  Of
14       course, we were always looking for
15       more experts.  As the tide against
16       Merck started to swing, more and
17       more people were willing to come
18       forward and say what they should
19       have said.  We continued,
20       obviously, to follow it on a daily
21       basis until well into 2006.
22            MR. SEEGER:  After the two
23       cases were tried, Walter, did you
24       guys have any cases in the queue
```

FAC Resp. Exhibit D -- 419

Page 16

```
 1          that would come back up for trial?
 2               MR. LACK:  Yes.  I felt one
 3          of them was mine.  I had a very
 4          good heart attack case.
 5               MR. SEEGER:  Do you know the
 6          name?
 7               MR. LACK:  A guy named
 8          Cooper.  Just so you know, this
 9          guy named Cooper, the referring
10          lawyer filed suit against Merck
11          only, did not sue the dispensing
12          physician or anybody else in
13          California.  It got removed.  We
14          filed a motion in the MDL.  I went
15          down there twice to have it
16          remanded to California.  And even
17          today it still wasn't going to get
18          remanded.  He just said, I'll get
19          to that later and never got back
20          to it.  It was a pristine case.
21               I had another one where we
22          just got an award, it was a pretty
23          big award for a heart attack.
24               MR. SEEGER:  As part of the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          settlement?

2               MR. LACK:  Yes.  Over 100

3          clients.

4               MR. SEEGER:  How many cases

5          did you send into the settlement,

6          do you know?

7               MR. LACK:  I've sent in 53.

8               MR. WEITZ:  Walter, the case

9          you were talking about after

10         Robinson's case was in front of

11         Judge Chaney and it already had

12         been worked up, that was going to

13         be the next case that you thought

14         was going to go out for trial --

15              MR. LACK:  Yes.

16              MR. WEITZ:  We are also

17         trying to find the lawyers, and we

18         know you are one, that were moving

19         the dockets in the jurisdictions.

20         That's an important fact.  What

21         case was that?

22              MR. LACK:  I'm trying to

23         remember.  We had meetings in

24         O'Callahan's office.  I wasn't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          party to them.  Steve Terrell and

 2          Brian Depew in my office were the

 3          two advocating for -- we put three

 4          cases up, and, of course, one was

 5          a retired IBM executive who had

 6          severe brain damage as a result of

 7          a blood clot.  Everybody kind of

 8          agreed, well, we're not trying

 9          those yet, they are going to be

10          the hardest.  They are very

11          problematic by the law.  But it

12          was the biggest damage case.  The

13          guy had over a million and a half

14          in medicals, and he was only 52.

15              So, they shelved that, and

16          they agreed, okay, fine, you have

17          got a perfect heart attack case,

18          and we'll go with that, and only

19          O'Callahan can tell you the name,

20          because I've forgotten.

21              MR. SEEGER:  I know Depew.

22          I think I've seen him around Vioxx

23          circles.  When you mentioned his

24          name --
```

FAC Resp. Exhibit D -- 422

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              MR. LACK:  Depew spent a lot
2         of time with O'Callahan.
3              MR. SEEGER:  Tom's guy I saw
4         a lot.
5              MR. LEVIN:  I haven't seen
6         Brian here.  I've seen a lot of
7         Brian in Spokane.
8              MR. LACK:  We did turn in
9         some time records.
10              MR. SEEGER:  He was your
11         point guy for the case?
12              MR. LACK:  Hundreds of
13         hours.
14              MR. GIRARDI:  You may have
15         to look at those.  The form on
16         some of those maybe is not
17         appropriate, and we'll talk about
18         that and go through the
19         accountants.
20              MR. LEVIN:  Tom will work
21         with you getting that through the
22         accountant.  Right now they are in
23         a state that they haven't been
24         approved probably because of form,

FAC Resp. Exhibit D -- 423

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          so, Tom will take care of it.

2                MR. LACK:  All right.

3                MR. WEITZ:  Go over expenses

4          with him also so we make sure

5          those are right.

6                MR. LACK:  We put in $20,000

7          for common costs, and I've got

8          like 800,000.  I didn't want to

9          hassle.  Because it took longer to

10         do the format for these

11         accountants than it was worth to

12         get the money back.

13               MR. SEEGER:  Walter, if you

14         have worked up an expert and you

15         have spent a couple hundred

16         thousand, you should send that to

17         us.

18               MR. LACK:  Everything is

19         through his office.  I'd rather do

20         it that way.

21               MR. LEVIN:  That's fine,

22         just as long as you don't get

23         shortchanged.

24               MR. LACK:  I'm not really

FAC Resp. Exhibit D -- 424

Page 21

```
 1          worried about that, but the actual

 2          time to reconstruct this stuff --

 3          being a contingent fee lawyer, my

 4          time wasn't done contemporaneous

 5          with my actual work, but every

 6          other lawyer, we still do that in

 7          our firm.  We keep track of our

 8          time, quote, as a management tool,

 9          so we track their time.  I know

10          all of that is very accurate.  I

11          had to reconstruct mine because

12          you go through every page.

13               MR. LEVIN:  Because you only

14          have to deal with yourself when

15          you shave in the morning.

16               MR. SEEGER:  Thank you.

17               MR. LEVIN:  Thank you.

18                    -  -  -

19

20

21

22

23

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 426

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM: ESCOBEDO, TIPPIT & CARDENAS, L.L.P.
         Joe Escobedo, Jr., Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
         GOLKOW TECHNOLOGIES, INC.
      877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 427

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. ESCOBEDO:  Joe Escobedo.
 3              MR. BIRCHFIELD:  We
 4         appreciate you being here today.
 5         We've got a court reporter here.
 6         Everything is being transcribed.
 7              Judge Fallon in the Murphy
 8         Oil decision, if you followed
 9         that, it would be helpful to be
10         familiar with that order from his
11         court.  Transparency is key.  So,
12         he'll have this transcript
13         available for his use for whatever
14         he determines is appropriate.  So,
15         just know everything is being
16         taken down, and the floor is
17         yours.  We appreciate it.
18              MR. ESCOBEDO:  I didn't know
19         how many people were going to be
20         here today.
21              MR. BLIZZARD:  We can share.
22              MR. ESCOBEDO:  I think we
23         have enough.
24              I know it's been a long day
```

Page 3

```
 1        for you guys, so I'll see if I can
 2        give you some time back.
 3            Really what I want to focus
 4        my discussion on here today as far
 5        as the Order Rule 6(D) is the
 6        factors relating to whether
 7        counsel was already involved in
 8        the Vioxx litigation prior to the
 9        withdrawal of the drug and the
10        participation in any non-MDL
11        trials.  I prepared a short little
12        presentation here for you, the
13        second page after the cover page,
14        trying to give you an
15        understanding of what we did prior
16        to Vioxx being removed from the
17        market.
18            The second page basically is
19        the entire thing, and then I'll go
20        through and touch on some of
21        these, and then if y'all have any
22        questions, I can answer them.  I
23        think as the timeline shows, we
24        were extensively involved in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1     Vioxx litigation prior to the

2     withdrawal of the drug from the

3     market, and we did try a non-MDL

4     trial that we believe provided a

5     common benefit.

6          We were hired by the Garza

7     family back on April 15, 2002.  I

8     know at that point there was a

9     handful of cases.  We started

10    doing our investigation, which

11    involved getting as many records

12    as we can on the drug from the

13    FDA.  We also met with David

14    Miceli, who I believe used to be

15    with your firm and at that time

16    was very active in the litigation.

17         MR. BIRCHFIELD:  That's

18    right.

19         MR. ESCOBEDO:  He was very

20    helpful and gave us a lot of

21    information.  I know some of my

22    partners and associates met with,

23    I guess, just a handful of people

24    who had cases back then, 2002 and

FAC Resp. Exhibit D -- 430

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

    1        2003.  We retained experts.  Some

    2        of them are listed here and others

    3        as well.  Then we filed our

    4        lawsuit on March 10 of 2003 in

    5        Starr County, Texas.  Merck

    6        promptly removed the case to

    7        Federal Court, and it took us a

    8        while -- as you can see, it took

    9        us a while to get it back to state

   10        court.

   11            After that, once we got back

   12        to state court, I'm sure as

   13        everyone is familiar with, the

   14        discovery wars with Merck started.

   15        We literally had, I lost count of

   16        how many motions to compel, and

   17        motions for sanctions.  We also

   18        had a mandamus proceeding with a

   19        Court of Appeals involving the

   20        drug Arcoxia, which,

   21        unfortunately, we lost.

   22            But once we got all of that,

   23        then they inundated us with paper,

   24        and also we made them produce --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        the corporate rep depositions had

2        been taken at the time by your

3        firm, by Mr. Miceli.  I think Mr.

4        Lanier had taken some as well.

5        And what I did and what my firm

6        did at that point was started

7        reviewing the documents, reviewing

8        the depositions.  A lot of the

9        depositions, people that took

10       them, I'm sure are familiar with

11       them, that Merck at the time was

12       producing witnesses that at least

13       on some of the areas of

14       examination the particular

15       witnesses produced didn't have the

16       appropriate knowledge.

17            MR. GIRARDI:  They did that

18       with every one of them.  A guy

19       would come in, he wouldn't know

20       anything about Vioxx.

21            MR. ESCOBEDO:  So, what I

22       basically did, what my firm tried

23       to do was to build on the work

24       that had already been done.  We at

FAC Resp. Exhibit D -- 432

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          one point, our notice -- in Texas,

2          they are called areas of

3          examination, the corporate rep

4          depos.  I think once it was all

5          done and -- I think we had over

6          almost 200 areas of examination in

7          the notice, and then they started

8          producing corporate reps, and

9          that's what we did after that.

10              We did get a trial setting

11         on April 23rd.  The judge gave us

12         a trial setting for November 8,

13         2004, and it was also around this

14         time that our involvement with

15         Kathy Snapka started as well.

16              We started taking corporate

17         rep depositions in New York.

18              MR. HERMAN:  Excuse me.  I

19         want to state for the record that

20         Kathy Snapka was relentless in

21         appearing in the MDL to get this

22         case remanded, which the MDL

23         supported, and it was one of the

24         few cases -- I don't know that the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          judge remanded any more cases

2          other than this, but it was

3          important that you and Ms. Snapka

4          were tenacious in getting this

5          case sent back.

6               MR. ESCOBEDO:  Thank you,

7          sir.  And I remember when we met

8          with Judge Fallon, he basically

9          asked me one question:  Why is

10         your case different from all the

11         others that have been removed?

12         And I said, because we're ready to

13         go to trial, because this is the

14         second removal, because the basis

15         of the removal was bogus.  What

16         happened was this.  They wanted to

17         go, and they deposed one of my

18         experts, Dr. Simonini, which I

19         believe you used in your trial --

20              MR. GIRARDI:  Sure.

21              MR. ESCOBEDO:  --  and they

22         asked him, do you have any

23         criticism of the doctors?  He said

24         no.  Well, he wasn't my expert

FAC Resp. Exhibit D -- 434

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          against the doctors.  And they

2          removed the case.  The real reason

3          why, I believe, is because we were

4          set to go to trial in February,

5          and the judge wasn't going to

6          continue the case.

7               The depositions that we

8          took, some of them had already

9          been taken in other cases, but

10         some of them, we were the first

11         ones to take them, I believe, and

12         those are listed.

13              Linda Hostelley on the AEs.

14              Leonard Tacconi, I believe

15         we were the first one to depose

16         him.  He was on consumer

17         advertising.  Texas is a learned

18         intermediary state, but we knew,

19         for example, New Jersey had an

20         opinion where they were maybe

21         opening the door a little bit to

22         that.

23              As everybody in this room

24         knows, Merck did a lot of

FAC Resp. Exhibit D -- 435

Page 10

1        direct-to-consumer advertising.

2        We took a corporate dep on that.

3            Deborah Shapiro on the DSMB

4        for the VIGOR trial, we deposed

5        her as well, as well as the peer

6        review of the Konstam article.

7        Everybody here knows there was an

8        issue about that.

9            James Dunn, one of the sales

10       reps, there was a lot of issues

11       relating to sales reps and this

12       drug.

13           On June 21st 2004, we took

14       our second round of corporate rep

15       depos.  Bernadette McKeon, I

16       believe we were the first ones to

17       depose her.  They produced her on

18       the PIRs, the physician

19       information requests.  We had them

20       produce a bunch of PIRs, and we

21       limited it to the CV risk, but

22       there were a lot of PIRs where the

23       doctors were asking -- they were

24       very interested and obviously

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          concerned about the CV risk for

2          Vioxx.  So we took an extensive

3          deposition on the PIR process.

4                We took Ms. Reicin's depo.

5          I spent eight hours with her.  I

6          filed a motion to extend the six-

7          hour deadline.  Richard Josephson

8          calls me up, I'll give you eight.

9          I wanted ten, but I figured the

10         judge would give me eight anyway.

11         So, I agreed, and I took her

12         deposition for eight hours.

13         Anybody who has ever deposed her,

14         I know Mr. Lanier deposed her as

15         well, and everybody can tell you

16         that it is exhausting.

17               Mr. Casola on the FDA

18         warning letter --

19               MR. GIRARDI:  You should

20         have made a motion to have it be a

21         45-minute depo.

22               MR. ESCOBEDO:  I agree.  I

23         messed up on that one.  You are

24         absolutely right.

FAC Resp. Exhibit D -- 437

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        They did not bring her to

2    trial.  I believe that was the

3    first time they didn't.  I don't

4    know, obviously, why, but they

5    didn't bring her to trial.

6        We took Thomas Bold.  I

7    believe we were also the first one

8    to depose him.  He was safety

9    surveillance, trying to determine

10    trends.  He was one of the only

11    persons that I can say was very

12    nervous during the deposition

13    because he had never been deposed

14    before, and I don't think they

15    prepared him very well.

16        We also deposed the sales

17    reps that met with or called on

18    the two cardiologists.  I think

19    that was a big -- a unique facet

20    of our case.  We had sales reps

21    calling on cardiologists, which,

22    obviously, by the very nature of

23    their practice are going to have

24    patients with CV risk.  So, we did

FAC Resp. Exhibit D -- 438

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1           that as well.

2                 We designated our experts,

3           some of whom I already talked

4           about before.  There was a third

5           round of corporate rep depos.  We

6           took Mr. Silverstein's depo

7           because McKeon didn't know some of

8           the aspects of the PIR process.

9           So we made them produce somebody

10          else.

11                And then we took Nancy

12          Santanello's deposition, really

13          only on the issue -- that was the

14          time when they required the

15          withdrawal of Ms. Cannuscio's name

16          from that article, and we were

17          interested about that.  At this

18          time, everything was going

19          downhill, and it was all headed, I

20          guess, toward the withdrawal of

21          the drug.  But she was the last

22          corporate rep depo that we

23          deposed.

24                They designated their

FAC Resp. Exhibit D -- 439

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          experts, which I think is unusual,
 2          because we had expert reports from
 3          all their experts saying that
 4          there's absolutely nothing wrong
 5          with Vioxx, under no circumstances
 6          could it be prothrombotic.  Then a
 7          month later, they withdrew the
 8          drug from the market.  They did
 9          get a short continuance February
10          14.  That was the alternate trial
11          setting.  And then of course
12          September 30th, Vioxx was
13          withdrawn from the market, and
14          they filed another continuance,
15          the basis of which was --
16          actually, they were trying to help
17          me.  They kept saying it was for
18          my benefit, and I kept saying,
19          thank you, I don't want that
20          benefit.
21               Then in 2005, it really got
22          interesting, and they filed their
23          first motion for legislative
24          continuance.  For those of you
```

FAC Resp. Exhibit D -- 440

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          that are not familiar with that,

2          in Texas, you can get a

3          continuance if the legislature

4          isn't in session, and you have a

5          legislator lawyer, you can get a

6          continuance.

7              They hired Chuy Hinojosa.

8          We basically had a reporter that

9          we knew from the local media, and

10         you would have thought it was Ed

11         Bradley or something.  They went

12         in to go talk to him, he

13         apparently freaked out, and the

14         next day, he withdrew -- on his

15         own, withdrew the motion for

16         legislative continuance.  As you

17         might imagine, there's other

18         legislator attorneys available.

19         And the next day they hired

20         another one, and they filed a

21         legislative continuance.  We moved

22         for an evidentiary hearing and a

23         move to strike the legislative

24         continuance.  And then just to

FAC Resp. Exhibit D -- 441

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        make things -- I guess they didn't

 2        want to have that hearing, so they

 3        removed us to Federal Court again.

 4        Again, that was the basis that I

 5        talked about earlier, they deposed

 6        Dr. Simonini, but he wasn't my

 7        expert against the doctors.  We

 8        tried to get it back, but as you

 9        might imagine, it is hard to get

10        it back.  The local federal judge

11        said, well, it is going to go to

12        the MDL, and that was that.  Then

13        after that, JPML issued the

14        conditional transfer order.

15             And we fought, as you can

16        tell.  It got removed in January,

17        and it didn't get remanded back

18        until November.  We fought very

19        hard to try to get it remanded

20        because we were ready for trial.

21        We were ready to get the case

22        tried, and we wanted to go to

23        trial.  And quite frankly, we

24        wanted to go to trial because we
```

FAC Resp. Exhibit D -- 442

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          wanted to hit them for a really,

 2          really big verdict along the lines

 3          of what Mr. Lanier was able to do,

 4          obviously.  It didn't work out

 5          that way, but --

 6                    MR. LANIER:  You had a good

 7          one.

 8                    MR. BIRCHFIELD:  You had a

 9          good result.

10                    MR. ESCOBEDO:  I appreciate

11          that.

12                    Then in 2006, it was a weird

13          trial setting scheduled because

14          the judge has three counties or

15          responsibilities, so we could only

16          try it one week a month.

17                    MR. HERMAN:  Say that again.

18                    MR. BIRCHFIELD:  That's a

19          challenging way to try a case.

20                    MR. ESCOBEDO:  It was a

21          four-and-a-half week trial, but we

22          could only try it one week per

23          month.  So, we started in January,

24          and we tried one week in January.
```

FAC Resp. Exhibit D -- 443

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1                MR. HERMAN:  Same jury?

 2                MR. ESCOBEDO:  Same jury.

 3           And we came back in February and

 4           March, and finally on April 21st,

 5           we got a $32 million verdict.  It

 6           has, I'm sure as everyone is

 7           aware, unfortunately, been

 8           reversed and irrendered by the San

 9           Antonio Court of Appeals in what I

10           believe to be one horribly written

11           opinion, and I believe that for

12           Mr. Lanier's case as well.  We

13           filed a motion for rehearing, and

14           there's been amicus briefs, and

15           I'm very happy that people have

16           done that.

17                That's the extent of what I

18           wanted to say.  We were, I think,

19           involved.  The evidence shows we

20           were involved in this litigation

21           way before the withdrawal of the

22           drug, and I believe we tried a

23           case that was significant in that

24           it was the first short term
```

FAC Resp. Exhibit D -- 444

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          case -- short term use case.

2          Right after it, everyone is

3          familiar, the studies came out

4          where, I mean, sort of validating

5          what we were saying, which is the

6          danger, it can be almost

7          instantaneous.  And he had risks.

8          But the way we combatted that on

9          specific causation was, and of

10         course you never heard about this

11         in the media because it is too

12         complicated, but Mr. Garza had a

13         thallium scan less than a month

14         before he died.  The thallium scan

15         showed normal blood flow.  Then

16         one month later, he dies.  There's

17         an autopsy.  And the autopsy finds

18         not one, but two fresh clots in

19         the exact parts of the heart where

20         the thallium scan less than a

21         month earlier had found normal

22         blood flow.

23              So, I think that's the

24         reason why the case was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          significant.
 2                    MR. BIRCHFIELD:  Joe, we're
 3          all very familiar with the Garza
 4          case and your work in getting that
 5          case remanded and pushed through
 6          trial and the good verdict.
 7                    One of the things maybe you
 8          can help us on, did you have other
 9          cases that you were working up for
10          trial or trying to push to trial?
11                    MR. ESCOBEDO:  We had other
12          cases, but none to the point that
13          were developed as the Garza case.
14                    MR. BIRCHFIELD:  What about
15          cases that you have that are
16          submitted for the settlement
17          program?
18                    MR. ESCOBEDO:  We didn't
19          have that many.  I mean, we looked
20          at a bunch of them.  I'll have to
21          be honest, and I will be honest, I
22          think between 10 and 20 were
23          actually submitted.
24                    The firm broke up after the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        trial, and so the MDL part of it
 2        stayed probably by mutual
 3        agreement -- it was a very
 4        amicable breakup.  So, the MDL's
 5        part of it stayed with my former
 6        partner, and so I'm a little --
 7        I'm not that knowledgeable about
 8        that.  I'm sorry.  But there
 9        weren't that many.  I mean, like I
10        said, between 10 and 20.  We did
11        not have that many.  We're
12        geographically challenged.
13            MR. BLIZZARD:  Joe, the
14        expenses that y'all submitted for
15        that trial I think are around --
16        according to the accountant's
17        report, are $485,000.
18            MR. ESCOBEDO:  Right.
19            MR. BLIZZARD:  That
20        currently has been rejected, but
21        they have rejected a lot of
22        expenses because they didn't
23        really know exactly what the story
24        was.  And so whoever can -- we
```

FAC Resp. Exhibit D -- 447

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          will help get that through the

2          process and make sure you have

3          whatever documentation you need to

4          satisfy that.  If you will call

5          Lenny Davis in Russ's office.

6          It's probably better to do that in

7          person rather than over the phone.

8          So, you might want to consider

9          making an appointment to go down

10         there and sit with them and

11         explain the situation.

12              MR. ESCOBEDO:  Glad to do

13         that.

14              MR. BLIZZARD:  Also, it

15         might help, I know Kathy is going

16         to present next, to kind of give

17         us a sort of the breakdown of the

18         responsibilities between the two

19         of you in the involvement on this

20         trial.

21              MR. LEVIN:  Also, your hours

22         have been rejected.

23              MR. ESCOBEDO:  Okay.

24              MR. LEVIN:  So, when you

FAC Resp. Exhibit D -- 448

Page 23

1          talk about your costs, talk about

2          the hours.

3              MR. BIRCHFIELD:  That's not

4          unique to you.  That's happened.

5          We just need you to work with the

6          accountant and get that

7          straightened out.

8              MR. ESCOBEDO:  And I need to

9          talk to Mr. Davis.

10             MR. BIRCHFIELD:  Right.  And

11         he will put you in touch with Phil

12         Garrett at Wegmann-Dazet and set

13         up a meeting if that's necessary.

14             MR. HERMAN:  E-mail

15         ldavis@hhkc.com or call at (504)

16         581-4892 and tell Lenny Davis you

17         need to -- he needs to coordinate

18         for you either a meeting or a

19         conference call with Phil Garrett.

20         Now, most folks that have

21         substantial costs to date have

22         actually met with Phil Garrett and

23         his team.  He's an independent

24         appointed by the Court, a CPA, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          he has a whole team.  They are

2          there, actually, to assist and

3          help, rather than to impede.

4               MR. ESCOBEDO:  I will do

5          that.

6               MR. HERMAN:  I have a couple

7          questions.  Your Garza case is

8          still on appeal, right?

9               MR. ESCOBEDO:  Yes, sir.

10              MR. HERMAN:  Excuse me.

11         Let's go off the record for a

12         minute, please.

13                    -  -  -

14              (Whereupon, there was an

15         off-the-record discussion.)

16                    -  -  -

17              MR. ESCOBEDO:  I believe the

18         question that you were asking

19         about is about the

20         responsibilities of Kathy.  We got

21         involved -- well, we are old

22         friends, I've known her for a long

23         time.  We just by coincidence

24         found out we had cases and she had

FAC Resp. Exhibit D -- 450

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          cases, we had the Garza case and

2          some others that we were looking

3          at.  I knew that she had

4          prosecuted drug pharmaceutical

5          cases before, and we at the time

6          were -- we did primarily auto

7          products, some other kind of

8          cases, but primarily we're an auto

9          products liability firm.  So we

10         felt we needed to associate with

11         her, and we did.

12              Then later we also

13         associated with Kevin Dubose's

14         firm.  He's an appellate lawyer

15         here in Houston, because we felt

16         we needed to have book lawyers to

17         counter their book lawyers.  They

18         had a lot of them.  I mean, every

19         day of trial in the afternoon,

20         they would have a delivery.  I'm

21         sure everybody that had a trial,

22         they had their little delivery of

23         motions, and I had two associates

24         there, and that's all their job

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          was, basically just to read them

2          and start churning out responses

3          every day.

4                MR. BIRCHFIELD:  Any other

5          questions?

6                (No response.)

7                MR. HERMAN:  Thank you.

8                MR. ESCOBEDO:  Thank you.

9                     -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 452

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1               C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 453

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:   FIBICH, HAMPTON & LEEBRON, L.L.P.
        Sara J. Fendia, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 454

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2              MR. BLIZZARD:  Sarah, we

3         just want to let you know that

4         obviously we have a court reporter

5         here, and the court reporter is

6         going that take everything down.

7              The Judge in his order has

8         indicated that he's approaching

9         this in the same way he approached

10        the Murphy Oil case, and so you

11        need, obviously, to be familiar

12        with that case and those factors.

13        They were also in the original

14        order that has standards to look

15        to for common benefit work.  The

16        floor is going to be yours.  You

17        can say whatever you would like to

18        say, and then we may have some

19        questions at the end.  There may

20        be some people who will interrupt

21        with questions during your

22        presentation, and you can either

23        take them or push them to the end

24        if you want.

FAC Resp. Exhibit D -- 455

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1              MR. BIRCHFIELD:  Thank you
2         for being here.  Thank you for
3         giving us a few minutes to eat our
4         lunch.
5              MS. FENDIA:  Thank you for
6         giving us the time.
7              I'm here for Tommy Fibich,
8         who was not able to be here.
9         There was some confusion, and the
10        confusion probably originated at
11        my office about this meeting.  So,
12        he didn't get on the schedule
13        until yesterday.  He had a
14        deposition today and tried to
15        rearrange that deposition to be
16        here.  He looked at the list of
17        people who might be here and said,
18        these are all friends of mine, I
19        would like to go over and talk to
20        them, but he was not able to
21        rearrange the deposition.  It's in
22        a pretty critical case that we're
23        involved in now that he's been
24        working pretty hard on.

FAC Resp. Exhibit D -- 456

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1              I'm here.  I am a 20-year
2         lawyer.  I've been with Tommy for
3         19 of those 20 years.  I know him
4         well.  I know his work ethic well.
5         I can address those issues, and I
6         can address for you what I believe
7         that he accomplished in Vioxx, and
8         I hope that gets us to where we
9         need to be.
10             Let me start out by saying
11        that we did submit time.  Our
12        time, I am confident, is grossly
13        understated.  The reason for that
14        is that our primary efforts were
15        in the Texas MDL.  Tommy was a
16        state liaison for the Federal MDL
17        and obviously had time and
18        involvement in the hearings and in
19        dealing with some of the issues
20        that were required by that
21        position, but our primary focus
22        was with the Texas MDL.  The Texas
23        lawyers know that there is no
24        mechanism under the Texas MDL

FAC Resp. Exhibit D -- 457

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          statute to authorize common

2          benefit fees.  As a consequence of

3          that, we, unfortunately, didn't

4          keep time the way we should have

5          kept it.  So, when it came time to

6          submit time to the federal MDL, we

7          went back and we didn't submit

8          anything that we didn't have some

9          kind of piece of paper or record

10         to rely on in coming up with the

11         time.

12              Tommy's philosophy is he's

13         not one to promote himself in

14         terms of how much time is spent

15         and how much money is spent.

16         Those of you in the room that know

17         him probably know that about him.

18         You probably also know you

19         wouldn't want to get between him

20         and a reporter, but in terms of

21         promoting his time, he's very,

22         very conservative in that regard,

23         and that's just our firm

24         philosophy.

FAC Resp. Exhibit D -- 458

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1              I am the nuts and bolts

2        lawyer on a lot of his

3        pharmaceutical litigation, and I

4        am the one that took primary

5        responsibility for trying to

6        assemble the time records, but I

7        do believe they are grossly

8        understated.

9              When Tommy first got

10       involved in the Vioxx litigation,

11       he did as he has done in all

12       pharmaceutical litigation he's

13       been involved in.  He started

14       talking to experts and making

15       himself familiar with the issues

16       associated with Vioxx causation

17       issues, the epidemiology, where

18       the gaps were in the science and

19       what was going to have to happen

20       to develop this litigation.

21       Because of his stature in

22       pharmaceutical litigation -- I

23       look around this room, and you all

24       have a national stature in

FAC Resp. Exhibit D -- 459

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          pharmaceutical litigation, and I
 2          think you would agree with me that
 3          Tommy is one of your peers.  He's
 4          been at it for a long time.  He
 5          served on the PSC for Zyprexa and
 6          fen-phen, and, of course, I think
 7          a lot of people cut their teeth on
 8          fen-phen, and we certainly did
 9          too.
10              Because of his stature,
11          obviously, other lawyers in Texas
12          kind of looked at Tommy on the
13          Vioxx issue.  For the Texas MDL,
14          we were in Judge Randy Wilson's
15          court.  I think it's fair to say
16          that Randy Wilson looked
17          consistently to Tommy to work with
18          him, and for guidance and for
19          assistance and input as to how the
20          Texas MDL should proceed.
21              As it relates to the Texas
22          MDL, our law firm, along with, to
23          a great extent, Dave Matthews' law
24          firm, really took the lead on
```

FAC Resp. Exhibit D -- 460

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          briefing, arguing, advancing the

2          Texas MDL, assisting the Court in

3          developing pretrial orders, CMOs

4          and the like, and worked

5          consistently with the Court in

6          that regard.

7               Tommy was also notice

8          counsel for the State of Texas.

9               MR. HERMAN:  I'm sorry.

10         What does that mean?

11              MS. FENDIA:  That meant that

12         all notices served by the

13         defendants came through our

14         office, and from our office we

15         disseminated them to all Vioxx

16         counsel.

17              MR. HERMAN:  Liaison.

18              MR. SEEGER:  Actually,

19         Sarah, he was the liaison for

20         Texas, wasn't he?

21              MS. FENDIA:  Right.  I think

22         along with Grant Kaiser in the

23         Federal MDL.  Is that what you

24         meant?

FAC Resp. Exhibit D -- 461

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
1              MR. SEEGER:  I thought Judge
2         Wilson had appointed Tommy as the
3         state court liaison.
4              MR. BLIZZARD:  No.  That's
5         what really this notice counsel
6         serves, is the role of making sure
7         all of the communications are
8         facilitated in the state.  Then
9         there was a separate appointment,
10        I think, to be liaison to the
11        federal MDL, and that was Grant
12        and Tommy.
13             MR. HERMAN:  What did you
14        understand Grant's role to be?
15             MS. FENDIA:  I understood
16        Grant and Tommy were both state
17        liaison counsel to the Federal
18        MDL.  That's what I understood.  I
19        may be mistaken about Grant.  I
20        know I'm not about Tommy.
21             MR. BLIZZARD:  It was Judge
22        Wilson's attempt to make sure
23        Texas lawyers were informed of
24        what was going on in the MDL, to
```

FAC Resp. Exhibit D -- 462

Page 10

1              sort of appoint them as the people

2              to report back.

3                   MS. FENDIA:  So, over the

4              course of the Texas MDL

5              particularly, that's where my

6              heaviest involvement was, and

7              that's what I know most about, we

8              served on a daily basis all kinds

9              of functions in that capacity for

10             the Texas lawyers.

11                  There are a lot of small

12             Texas lawyers that had a few cases

13             and for one reason or another felt

14             they didn't have the ability to

15             fund some of the things that

16             needed to be -- you know, always

17             travel up to hearings, for

18             example, to participate in certain

19             aspects.  So they relied very

20             heavily on us.  I fielded calls

21             almost daily from Texas lawyers,

22             certainly none in this room, you

23             are certainly capable of dealing

24             with the issues themselves, but

FAC Resp. Exhibit D -- 463

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1      from a lot of the smaller firms

2      and lawyers that didn't have the

3      pharmaceutical experience.  We

4      dealt with that.

5           We dealt with making sure

6      everyone had notice.  We had many

7      questions from Judge Wilson about

8      who are the Texas counsel, where

9      are these cases, trying to get the

10     Texas MDL properly positioned.  So

11     we handled a lot of that kind of

12     work in our office.

13          Tommy, of course, was always

14     engaged in all of that.  He was

15     also on the Texas PSC, which

16     consisted of probably about seven

17     or eight lawyers including Dave

18     Matthews and Gallagher.  Mark, I

19     think you were on the committee.

20          MR. LANIER:  Yes.

21          MS. FENDIA:  And several

22     others.  Tommy continuously was

23     involved in meetings with the

24     Texas PSC, developing --

FAC Resp. Exhibit D -- 464

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      assisting, again, the Court in

2      developing this MDL and trying to

3      advance the cases.  A great deal

4      of time was spent in those kinds

5      of meetings.  Unfortunately, no

6      time records, so not all of that

7      appears on the time sheets, but a

8      great deal of time was spent in

9      that.

10          Again, I think, given

11     Tommy's stature generally in

12     Houston and Texas and I would say

13     beyond, I think that a lot of

14     lawyers did look to him for

15     leadership.  I know that Judge

16     Wilson did, and I think Mark and

17     Ed would concur with that.

18          As we came down in Texas to

19     a point that it was time to start

20     trying cases, Judge Wilson decided

21     he wanted to try a heart attack

22     case or a couple of heart attack

23     cases and a stroke case or a

24     couple of stroke cases and get a

FAC Resp. Exhibit D -- 465

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        sense of what the evidentiary

2        issues would be and try to make as

3        many rulings as we could so there

4        would be consistency around the

5        state.  To a large extent, he

6        visited with Tommy a lot on that

7        issue and conducted a number of

8        hearings on limine issues,

9        evidentiary issues, Daubert issues

10       and all of these types of things.

11       Tommy and, again, Dave Matthews,

12       to a large degree, took the lead

13       on all of that in assisting the

14       Court and getting ready to try

15       cases.

16            When it came down to

17       actually trying a case -- and I

18       know you had the same experience

19       in the Federal MDL, but when it

20       came down to actually trying a

21       case, every time a case came up to

22       go, someone nonsuited or there was

23       an issue associated, and we were

24       having trouble getting the case to

FAC Resp. Exhibit D -- 466

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          trial.

2                So, Tommy finally stepped in

3          and said we need to get a case to

4          trial, and he agreed to be the one

5          to take Ruby Ledbetter's case to

6          trial.  That was our first case

7          that was getting ready to go.  We

8          were working that up for trial,

9          all of the pretrial, and that's

10         our bellwether case.  Our time

11         will reflect the Ledbetter time,

12         because we believe it was the case

13         that was going to advance Texas

14         litigation for all Texas claims.

15              MR. BIRCHFIELD:  Sarah, was

16         that your case?

17              MS. FENDIA:  Yes.  Ruby

18         Ledbetter was our case.

19              MR. SEEGER:  You were

20         working that case up for trial?

21              MS. FENDIA:  Yes,

22         absolutely.  We were working that

23         up for trial.  It was in that case

24         that the defendants filed their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        preemption motions based on the

 2        Texas statute, and, of course, we

 3        all worked on that.  We did very

 4        heavy briefing on that.  The

 5        Matthews firm took a lot of the

 6        briefing on and a lot of the

 7        limine issues.  Mark's firm

 8        participated in that as well.  We

 9        took the initial briefing on the

10        preemption issues and the Texas

11        statute issues.  And then Collyn

12        Peddie from Williams and Bailey --

13        it is no longer Williams and

14        Bailey.

15            MR. BLIZZARD:  Williams

16        Kherkher.

17            MS. FENDIA:  -- jumped in.

18        She's a fine lawyer, and she was

19        involved with us on that as well.

20            Ultimately we lost that,

21        which the Texas lawyers know,

22        which kind of put all Texas

23        litigation on hold.

24            At that point, the decision
```

FAC Resp. Exhibit D -- 468

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          was made to appeal that case, and

 2          the appeal was underway.  Collyn

 3          Peddie took the lead on the

 4          appeal, and then your settlement

 5          came, and of course Ruby Ledbetter

 6          was excluded from that settlement,

 7          and that was unfortunate.

 8               MR. BIRCHFIELD:  On

 9          Ledbetter, just so you know, as we

10          were negotiating, you are right,

11          Ledbetter was excluded from the

12          settlement, but as we were

13          negotiating, we tried.  We tried

14          to get Ledbetter included in the

15          settlement, but Merck just

16          absolutely refused to include

17          Ledbetter, as well as several

18          other cases that were pending on

19          appeal at the time.

20               MS. FENDIA:  Right.  I think

21          we understood that.

22               MR. HERMAN:  Can you tell us

23          what depositions your firm took

24          and what experts you hired that
```

FAC Resp. Exhibit D -- 469

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          the firm considers to be of common

 2          benefit.

 3               MS. FENDIA:  Unfortunately,

 4          I wish I had looked back at that.

 5          Unfortunately, I'm having a little

 6          trouble recalling the names to

 7          mind.  I believe Tommy did, was it

 8          the Dolan deposition for the state

 9          of Texas?

10               MR. BLIZZARD:  He actually

11          sat and took the deposition of

12          somebody who was high up in the

13          sales and marketing group with

14          Mark Robinson.  I know that

15          because he told me about that

16          deposition.

17               MR. HERMAN:  I know Tommy is

18          not here, and we need to be fair

19          to you folks.  Frankly, I don't

20          have an affidavit with me.

21               MR. BLIZZARD:  It is in the

22          affidavit, Russ.

23               MR. HERMAN:  Maybe the

24          question I'm asking is already
```

FAC Resp. Exhibit D -- 470

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1             there.

2                   MR. BLIZZARD:  It is.

3                   MS. FENDIA:  There are no

4             names.  Can I supplement with

5             that?

6                   MR. HERMAN:  Yes.  That's

7             why I'm asking the question.

8                   MS. FENDIA:  So, depositions

9             and experts.

10                  MR. LEVIN:  Definitely the

11            experts, too, because it looks to

12            me like you submitted about

13            $80,000 in costs that were

14            rejected, but we'll tell you what

15            to do about that.  But you were

16            doing that in conjunction with

17            Matthews, who has $1,600,000 costs

18            that were rejected.  Some of that

19            must be expert fees.  So, Russ

20            will tell you how to call the

21            accountants and see whether you

22            can straighten that out.

23                  MR. HERMAN:  You can call

24            Leonard Davis at my office, (504)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1      581-4892 and ask him to set up a

2      conference call and an appointment

3      with Phil Garrett.  Phil Garrett

4      is a CPA appointed by the Court

5      who doesn't do any private work

6      for any lawyer in the litigation

7      or firm.  He'll sit with you or

8      have someone sit -- it might as

9      well be for both you and Fibich

10     and Matthews and work through the

11     costs.  We really need to get that

12     done.  The safest thing to protect

13     you is to make these contacts, and

14     if necessary, there's enough money

15     involved, to go sit with the CPA

16     firm.

17            MS. FENDIA:  Okay.  I'll do

18     that.

19            MR. LEVIN:  Your hours were

20     approved.  Matthews' hours have

21     not been approved.

22            MS. FENDIA:  Thank you.  I

23     felt they were reasonable.  As I

24     said, I felt they were

FAC Resp. Exhibit D -- 472

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1         understated.
 2              MR. HERMAN:  One of the
 3         questions I have is, after
 4         preemption in Texas, Judge
 5         Wilson's decision, what
 6         materials -- you might want to
 7         include this in a supplement.  I
 8         read all the affidavits, and I
 9         just don't remember seeing the
10         information I'm asking for.  If
11         you could list what materials were
12         sent to the MDL depository or New
13         Jersey depository and Chris'
14         office or Andy's office for common
15         benefit and when they were sent,
16         that also ought to be
17         supplemented.  I think it would be
18         unfair to ask you to do this off
19         the top of your head.
20              MS. FENDIA:  I can tell you
21         that I don't think that we
22         submitted materials.  I think we
23         have submitted our time based on
24         our activities in the Texas MDL.
```

FAC Resp. Exhibit D -- 473

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1       So, I can tell you candidly that I

2       don't believe that we submitted

3       materials to the Federal MDL or to

4       New Jersey.  I will certainly

5       follow up.

6               MR. HERMAN:  Check to be

7       sure.

8               MS. FENDIA:  I will.

9               MR. HERMAN:  Judge Fallon

10      appointed Dawn Barrios as chair of

11      the MDL liaison committee with the

12      states.  If you recall, what

13      interaction did you have with Dawn

14      Barrios?

15              MS. FENDIA:  My interaction

16      with Dawn Barrios was relatively

17      limited.  We dealt primarily with

18      mechanics.

19              MR. HERMAN:  Generically.

20              MS. FENDIA:  But Tommy

21      participated fairly regularly, at

22      least by phone, if not in

23      hearings, in the Federal MDL up

24      until -- probably until the Texas

FAC Resp. Exhibit D -- 474

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          MDL.  Up to the point he had more
 2          difficulty making those trips to
 3          New Orleans.  He and Dawn Barrios,
 4          I believe, talked regularly about
 5          what the issues were, as I
 6          understand it.  Unfortunately, I
 7          wasn't a party to those
 8          conversations.  But as I
 9          understand it, he had regular
10          conversations with her and dealt
11          with the issues that were being
12          raised by Judge Wilson to the
13          extent -- very often at the
14          hearings, Judge Wilson was talking
15          to Tommy about what is Judge
16          Fallon doing about this issue or
17          that issue or the next issue, and
18          my understanding is Tommy was
19          dealing with Dawn on those issues.
20          I will clarify that understanding
21          for you, but that is my
22          understanding.
23               MR. BIRCHFIELD:  Besides the
24          Ledbetter case, were there any
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          other cases that y'all worked up
 2          for trial that you were pushing or
 3          had trial ready?
 4               MS. FENDIA:  No.
 5               MR. BIRCHFIELD:  How many
 6          cases did your firm submit to the
 7          settlement, claims packages?
 8               MS. FENDIA:  100.  I'm
 9          sorry.  Between 90 and 100.
10          That's what our firm directly
11          submitted, and that's what we are
12          working on now.  We are secondary
13          counsel on another 250 that were
14          submitted out of Louisiana.
15               MR. HERMAN:  Who is primary
16          on those?
17               MS. FENDIA:  Robert Salin.
18               MR. HERMAN:  When you say
19          "primary," "secondary," I'm not
20          sure that I understand the
21          relationship.  Were these filed in
22          Texas where he was lead or filed
23          in Louisiana?
24               MS. FENDIA:  Many of them
```

FAC Resp. Exhibit D -- 476

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        were filed in Louisiana and are in

2        the MDL, I believe.  But his firm

3        took primary responsibility for

4        those files.  We were sharing the

5        fees.

6             MR. BIRCHFIELD:  When you

7        say "primary," you are talking

8        about for the settlement program?

9             MS. FENDIA:  Right.  For the

10       settlement program.

11            MR. BIRCHFIELD:  Any other

12       questions?

13            MR. WEITZ:  No.

14            MR. BLIZZARD:  No.

15            MR. HERMAN:  I think Ed has

16       asked some questions that are

17       important, and I know that the

18       Fibich firm has regularly

19       contributed to plaintiff bar

20       efforts, and I'm assuming that the

21       firm is still fighting the

22       preemption fight like the rest of

23       us.

24            MS. FENDIA:  Yes,

FAC Resp. Exhibit D -- 477

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1         absolutely, no question about it.

2         I think Ed knows Tommy's

3         involvement in that issue better

4         than I do.

5              MR. BLIZZARD:  Yes.  Let me

6         say from the outset that we all

7         worked closely on the Texas MDL,

8         even though many of us, including

9         Tommy, didn't have a lot of cases

10        filed in Texas.  Tommy clearly

11        took the lead in the motion

12        practice and also the interactions

13        with Judge Wilson.

14             When it came time for Judge

15        Fallon to appoint a committee to

16        help negotiate with Merck from the

17        plaintiffs' side, Judge Wilson

18        talked to Tommy, and Tommy said

19        that I would probably be the

20        person that should do that because

21        I had just tried a case in Judge

22        Fallon's court.  So Tommy was the

23        kind of --

24             MR. HERMAN:  He's the one we

FAC Resp. Exhibit D -- 478

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1          have to blame for that?

 2                MR. BLIZZARD:  Right.  He's

 3          the kind of team player who was

 4          not just looking out for his own

 5          interest, but was looking to make

 6          sure that the clients' interests

 7          were advanced first and foremost,

 8          and he thought that would be a

 9          more effective way of doing it

10          since I had worked closely with

11          Judge Fallon on my trial case.

12          So, Tommy put the clients'

13          interest ahead of anything else

14          for him and --

15                MR. HERMAN:  I think that's

16          an important commentary, Ed, for

17          this record.

18                MS. FENDIA:  Thank you.

19                MR. SEEGER:  Thank you,

20          Sara.

21                     -  -  -

22

23

24
```

FAC Resp. Exhibit D -- 479

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 480

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

-   -   -

VIOXX FEE COMMITTEE PRESENTATION

-   -   -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

-   -   -

DECEMBER 2, 2008

-   -   -

NEW ORLEANS, LOUISIANA

-   -   -

FIRM:   GAINSBURGH, BENJAMIN, DAVID,
        MEUNIER & WARSHAUER, LLC
        Gerald E. Meunier, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 481

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                 -  -  --  -  -

 2            MR. HERMAN:  Jerry,

 3       everything is on the record for

 4       Judge Fallon.  If you would like

 5       to add or subtract from your

 6       affidavit, let us know.

 7            We had a woman whose office

 8       had virtually been destroyed.  We

 9       had a client by the name of Diaz,

10       and the defendants picked Diaz.

11       Jerry stepped up with me, agreed

12       to share all the costs in that

13       case.  We went out looking for

14       experts.  I know that I believe

15       Jerry interviewed one at Tulane, I

16       had one at Hofstra, and we were

17       ready to prepare that case and try

18       that case when, in a conference,

19       the lawyer who had the client,

20       would not agree to let us call the

21       shots during trial.  It could have

22       been a disaster in pulling that

23       case following another case that

24       was pulled, but the fact that
```

Page 3

1          Jerry stepped up and we were ready

2          to go, and it wasn't our decision

3          not to try it, really saved the

4          situation.

5               Secondly, Jerry, at the time

6          when we needed a trial package,

7          volunteered to chair, co-chair the

8          trial package committee and did a

9          heck of a job.  I know he made

10          other contributions, but I'm

11          particularly grateful in those two

12          circumstances that Jerry stepped

13          up.

14               MR. MEUNIER:  Thank you,

15          Russ.

16               Well, first thing I wanted

17          to just say was that I'm neither a

18          competent nor an aggressive

19          timekeeper, so, I think my job

20          today is to try to communicate

21          some of the more tangible aspects

22          of whatever time I have as a

23          weighing factor for common benefit

24          purposes.  I think essentially my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        affidavit covers all the key

 2        points.  I'll just emphasize a few

 3        things.

 4             In the early going of the

 5        case, I saw my job as being

 6        focused on law issues, and then I

 7        realized we have the master in law

 8        among us, Arnie, and this is

 9        hardly needed, but I did do some

10        work on the master complaint,

11        helped with some Louisiana law

12        research.  Then it was my

13        experience that it was helpful for

14        the group to have a local attorney

15        here in town on a continuous

16        basis, because there were some

17        case management issues that arose

18        and some needs on a short notice

19        basis to meet with Phil Wittmann

20        or meeting with the judge.  I know

21        there were a couple of times I

22        went over to see Judge Fallon with

23        Russ to talk about, for example,

24        that Miller study that was being
```

FAC Resp. Exhibit D -- 484

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          published.

2                  I remember a meeting, too,

3          with Phil to talk about the

4          beginnings of a case management on

5          a class action.  So, I think a lot

6          of the work that I did in the

7          early going focused on the fact

8          that I was available and I was

9          here practicing in the state and

10         available to take those kinds of

11         things on.

12                 When we were talking about

13         class certification, I also

14         arranged Dean Ed Sherman's

15         involvement as an expert, and we

16         had a lunch meeting with him.

17                 Then as things evolved, I

18         became more involved with some of

19         the trials at least in an

20         ancillary way.  The Daubert

21         hearing, as I recall, was a group

22         effort, but I did take a role in

23         the presentation to Judge Fallon

24         on Daubert.  I had published on it

FAC Resp. Exhibit D -- 485

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          and spoken on Daubert and spoke

2          about general standards, as I

3          recall, with the Court.

4                And then the first trial of

5          Irvin occurred in November of '05

6          when the Court was displaced to

7          Houston because of Katrina, and as

8          Russ knows and local attorneys

9          know, that hurricane also

10         displaced law firms, including

11         mine, but we gathered ourselves,

12         kept the firm together, and I

13         maintained my level of commitment

14         to this case.

15               I flew to Houston for that

16         trial, as others did, and

17         essentially stayed there during

18         the entire trial.  I think I was

19         one of the few, besides Andy's

20         trial team, who were actually

21         there every day right through to

22         the end and staying through the

23         final weekend, as I recall.

24               It was good for me.  I got

FAC Resp. Exhibit D -- 486

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          to, obviously, learn more about

2          the case, but I got to know the

3          family.  I got to see firsthand

4          what the case was about from a

5          human standpoint, which was very

6          helpful.  During that trial, I did

7          handle the jury charge conference,

8          as I recall, that we had with

9          opposing counsel.  I also reported

10         to the PSC during that trial on a

11         key evidentiary ruling.  I found

12         myself in this case at various

13         times having to answer questions

14         about Judge Fallon's way of

15         thinking about certain things, and

16         I did --

17              MR. HERMAN:  I think it's

18         fair to say we were both shocked

19         at some of the rulings.

20              MR. MEUNIER:  We were

21         shocked at the decision he made

22         about the expert, the causation

23         expert in Irvin.

24              Now, when Irvin mistried,

FAC Resp. Exhibit D -- 487

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1           the Court decided, one, that the

2           retrial would occur here, we would

3           be back here in New Orleans, but

4           then, as Russ has already alluded

5           to, the next case up was going to

6           be Ellis Diaz.  And Bonnie

7           Zabotnick, who was the local

8           counsel, was just not equipped to

9           handle that trial.  As Russ said,

10          we agreed to team up on it.  I met

11          with Ellis Diaz.  I prepped him

12          for his deposition, I defended his

13          deposition, which was a lengthy

14          one in my office.

15              I had extensive meetings

16          with Bonnie Zabotnick about the

17          case.  We looked at the medical

18          records.  I did contact the local

19          cardiologist, Russ knows, we lined

20          him up, I met with him to talk

21          about causation issues.  There

22          were problems dealing with family

23          history in that case.  It was

24          going to be a challenging case.

FAC Resp. Exhibit D -- 488

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          As Russ says, ultimately it became

2          clear that there was no effective

3          way for the PSC to do what it

4          needed to do in that case.  I was,

5          I believe, instrumental in

6          convincing Zabotnick that the best

7          thing that should happen is an

8          agreement that the case be

9          withdrawn, because Judge Fallon

10         was not going to permit us to

11         simply pick another case.

12              In other words, Mr. Diaz had

13         to either drop his Vioxx case or

14         that was going to be the next case

15         after Irvin II.  And I think it

16         was helpful that the Ellis Diaz

17         case was not tried.

18              I remember during Irvin II,

19         and I was invited by Andy and with

20         Troy to join the trial team, sit

21         at counsel table for Irvin II.  We

22         actually suspended the trial of

23         Irvin II for a status conference

24         of Diaz.  I remember I had to put

FAC Resp. Exhibit D -- 489

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          on a second had during that,

2          actually sit in on the Diaz

3          conference as lead counsel at that

4          moment for him.

5               Irvin II, my job was not to

6          handle witnesses or have any

7          speaking role with the jury, but I

8          was asked to be responsible for

9          jury charges and then certain

10         evidentiary issues that came up.

11         Primarily, I think I was helpful

12         in giving input to that trial team

13         and to others that would follow

14         about just the Eastern District,

15         the trial of Eastern District jury

16         cases after Katrina.

17              I think at that point, I was

18         one of the few plaintiff lawyers

19         associated with this case who had

20         actually tried a case to verdict

21         after Katrina, it was a maritime

22         case, and we have a good verdict

23         in it, but I learned a lot about

24         the different demographics after

FAC Resp. Exhibit D -- 490

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Katrina of Eastern District

2          juries, and I think that helped me

3          give some input in a trial of

4          those cases.

5              After Irvin II, I was less

6          active, but still had input for

7          the Barnett case with Mark

8          Robinson and his team.  I remember

9          speaking with him about jury

10         themes and about presentation to

11         that jury.  I remember giving --

12         talking to Mark during the voir

13         dire, and I was present for and

14         attended that trial, as I did

15         Irvin I and II.

16             The next trial, and probably

17         the only other relative trial in

18         the federal MDL that I was

19         involved with was Dedrick, and

20         what I recall about that is Andy

21         asked me to come over to the hotel

22         where he and others were staying,

23         we had a meeting one evening about

24         certain issues that were

FAC Resp. Exhibit D -- 491

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          challenges in that case, certain

2          issues that needed to be addressed

3          and how the proof could better be

4          presented.

5               MR. BIRCHFIELD:  A few

6          challenges in that case.

7               MR. MEUNIER:  There were

8          challenges.

9               And so, in retrospect, I

10         believe I made helpful

11         contributions in Irvin I and II,

12         in Diaz, even though it wasn't

13         tried, in Barnett and Dedrick.

14         So, the trial activity for me in

15         the MDL was not insignificant, and

16         I think occupied most of my time

17         in the middle stage, the early

18         stage being more of the law and

19         case management and then the

20         middle stage trials.

21              And then the final stage was

22         the trial plan, as Russ mentioned.

23         I was asked to chair the trial

24         plan committee.  I want to make it

FAC Resp. Exhibit D -- 492

Page 13

1          very clear that there was a lot of

2          heavy lifting done by that

3          committee which was not done by

4          me.  There were people on that

5          committee, including Leigh O'Dell

6          and a host of others who really

7          had such a good, strong working

8          knowledge of the case that I

9          thought my role was to look at it

10         from the standpoint of a user of

11         the package, a trial lawyer who

12         would take that package with

13         little foreknowledge about Vioxx

14         and how would the package actually

15         serve a lawyer to put the case on.

16               So, I tried to keep a

17         pragmatic focus for the group,

18         giving whatever input I can from a

19         user standpoint.  And other than

20         that, served as a sounding board

21         just to help with the organization

22         of it.  There were a lot of

23         meetings for the trial plan, a lot

24         of phone conferences and in-person

Page 14

1          meetings, and then ultimately the

2          MI trial package group presented

3          to Judge Fallon, and I was part of

4          that presentation.  We then merged

5          with the stroke package committee

6          and basically had a larger working

7          group to then do the stroke

8          adjunct to the trial package.  And

9          so I continued to work in a

10         chair --

11              MR. HERMAN:  Let me

12         interrupt you for a second.

13              Jerry is being really overly

14         modest in terms of trial package,

15         because we were negotiating at the

16         time, unknown to Jerry, and I kept

17         pushing the deadlines, because I

18         knew that if we ever came to

19         fruition to get a settlement, we

20         had to have a stroke package in

21         place, and it had to be reviewed

22         by the judge.  So, Jerry really

23         organized that, pushed it, made

24         sure the deadlines were met.  And

FAC Resp. Exhibit D -- 494

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1           without his leadership and Pete's,

2           and I think at some point Pete was

3           trying a case with Troy, I don't

4           think the product would have been

5           as good, and I don't think we

6           would have had it as timely as we

7           did.  I don't think we can

8           undervalue Jerry's leadership in

9           terms of the trial package.

10               MR. SEEGER:  I agree with

11          that, by the way, but since names

12          are being mentioned, if I don't

13          mention that Jeff Grand and

14          Buchanan were involved, I'm going

15          to get yelled at when I get back.

16               MR. MEUNIER:  You can't

17          mention one without the others,

18          you're right.  Chris Tisi, I mean,

19          Shelly Sanford, there were many.

20               MR. SEEGER:  It was a great

21          team, but the team needed a lead,

22          and you were the lead.

23               MR. MEUNIER:  And Russ is

24          right.  We worked under pretty

FAC Resp. Exhibit D -- 495

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1           strict deadlines, and it took some

2           doing to get everybody on the same

3           page and working and meeting

4           deadlines.  I was pleased with the

5           product.  I think it's a great

6           trial package.

7                So, I started as a law clerk

8           in this Eastern District Court,

9           and I've done a lot of work in

10          this court, and was president of

11          the Federal Bar Association of the

12          New Orleans chapter, which is the

13          second largest chapter in the

14          nation, and I feel like I've grown

15          up here.  I feel like I've really

16          spent a lot of my time in this

17          court.

18               MR. LEVIN:  I feel like I've

19          grown up here.

20               MR. MEUNIER:  So, my final

21          thought is what I began with, I

22          think it was helpful to the group

23          to have me join Russ as a local

24          attorney who kind of knew the

FAC Resp. Exhibit D -- 496

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1    ropes here, who could give insight

2    to different aspects of how you

3    practice here and who this judge

4    is and how you approach juries,

5    and I was really pleased to serve

6    as a New Orleans member of the

7    committee itself, but I think in

8    retrospect, that was a key part of

9    my role in the case.

10        MR. HERMAN:  Off the record

11    for one second.

12            -  -  -

13        (Whereupon, an

14    off-the-record discussion was

15    held.)

16            -  -  -

17        MR. HERMAN:  How many hours

18    do you have in, Jerry?  Let me

19    preface this by saying your hour

20    of your work may be worth a great

21    deal more than somebody else's.

22    We're asking everybody how many

23    hours they had in.

24        MR. LEVIN:  I'll tell you --

FAC Resp. Exhibit D -- 497

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1               MR. MEUNIER:  You'd probably

2          know.

3               MR. LEVIN:  1,058, and the

4          firm has 1,123.25.

5               MR. BIRCHFIELD:  It is a

6          pleasure working with you on the

7          trial team.  The support role you

8          played, it was vital.  Everything

9          that you touched in this

10         litigation was done with

11         excellence and was much

12         appreciated.

13              MR. RAFFERTY:  I would echo

14         that.

15              MR. SEEGER:  This is the

16         first case we had ever worked on

17         together, and I don't want to be

18         negative about -- I don't have to

19         give a compliment by being

20         negative about others, but there

21         were some people who were not

22         really there for assignments.  You

23         were there for every single one,

24         and you helped us anywhere.  You

FAC Resp. Exhibit D -- 498

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          are a real team player.  I

2          definitely appreciate that.

3               MR. HERMAN:  Anybody have

4          any other questions?

5               MR. SEEGER:  Thank you for

6          everything.

7                    -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 499

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23         Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24
```

FAC Resp. Exhibit D -- 500

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          GANCEDO & NIEVES
               Hector G. Gancedo, Esquire
               Tina B. Nieves, Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 501

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. GIRARDI:  The reason the

 3         court reporter is here is for

 4         Judge Fallon actually.  Everything

 5         that we say, we'll have a record

 6         of for the purpose of getting this

 7         to Judge Fallon.

 8              With that, go ahead.

 9              MS. NIEVES:  I was going to

10         say that originally I prepared a

11         PowerPoint, but I've spoken to a

12         few of the people in New Orleans,

13         and they said oh, no, it is way

14         more informal.

15              MR. SEEGER:  If you printed

16         stuff, that's easier.

17              MS. NIEVES:  I'm going to

18         use it as bullet points basically

19         just for an outline.  Over the

20         course of six years, seven years,

21         there's been a lot done.

22              So, as Tom knows here, and I

23         think the rest of you, our firm

24         has been involved in the case from
```

FAC Resp. Exhibit D -- 502

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1           the outset.

 2               I see that one of the items

 3           that you want to delve into is how

 4           long pre-Vioxx withdrawal has the

 5           firm been involved.  We started

 6           investing in this case with Tom's

 7           firm back in 2001.  At that time,

 8           my partner, Hector, went with

 9           members of Girardi Keese out to

10           Mark Lanier's office to meet with

11           Goforth Lewis and members of

12           Mark's firm, and we had done a lot

13           of prefiling research at that

14           time.  We went out there and met

15           with them and put our heads

16           together and looked at what they

17           have come up with and augmented

18           our research.  We filed our first

19           case in 2002.

20               At that time, we had several

21           cases filed in California.  It was

22           the very beginning of the

23           litigation in California.  Our

24           firm filed and prepared the

FAC Resp. Exhibit D -- 503

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          initial coordination petition to

2          help get the cases coordinated in

3          CCW.

4               MR. SEEGER:  That's for

5          California?

6               MS. NIEVES:  This is all

7          California stuff.  So we did that,

8          and shortly thereafter, we were

9          before what became the first of

10         many judges, because as you've

11         probably heard with Walter, we

12         bounced around with a lot of

13         judges.  We were before the first

14         of the judges, and we were

15         appointed as one of the five

16         members of the Plaintiffs'

17         Executive Committee in California.

18         We regularly attended throughout

19         the litigation status conferences.

20         We attended the meetings with the

21         defendants early on regarding

22         coordination, how we're going to

23         strategize about that.

24               We then undertook to look

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          through the inventory of cases

2          that were filed at that point in

3          California.  At that point, we had

4          about 600 cases filed in

5          California, and we ended up with,

6          three of the five clients that

7          were going forward on bellwether

8          cases before Judge Lichtman were

9          our cases.  So we undertook a very

10         aggressive prelitigation schedule.

11              MR. BLIZZARD:  You may have

12         said this, Tina.  When was that

13         exactly, what was the time frame?

14              MS. NIEVES:  2002.  Well, I

15         don't know at that point.  It may

16         have been beginning of 2003, but

17         it was somewhere around then.

18         Basically at that point, the

19         pressure points for defendants was

20         what was going on in Houston and

21         what was going on in California at

22         that point.  Right, Chris?  Or in

23         New Jersey, too.

24              MR. BLIZZARD:  Coordination

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1      started in California around 2003

2      or late 2002.

3            MS. NIEVES:  Late 2002,

4      exactly.

5            MR. SEEGER:  I remember, and

6      I remember you having those issues

7      and going through judges, and one

8      case was set really fast, and then

9      you lost that judge, and then the

10     case got pushed --

11           MS. NIEVES:  Defendants used

12     a preemptory challenge on the

13     first one.  We used a preemptory

14     challenge on the second one.  The

15     third one, Judge Lichtman, we were

16     with him for two years, and then

17     he was disqualified when the

18     defendants discovered he has used

19     Vioxx.  Then we went to Judge

20     Chaney.

21           When we were before Judge

22     Lichtman, he had it for two years,

23     we had three of the five cases

24     that were set.  We did the full

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1         workup, actually, on those cases,

2         a lot of depositions and expert

3         work, et cetera.

4                And then in the interim, we

5         were sent over to Judge Chaney.

6         Then once we were with Judge

7         Chaney, at that point she dashed

8         what protocol Lichtman had in

9         place.  He had an all plaintiffs

10        pick slate, and Chaney said that

11        we're going to do a completely

12        different protocol.  So, we

13        started anew with members of the

14        executive committee to go through

15        and look at what was now a growing

16        number of cases in the California

17        inventory.

18               This is right around -- now

19        at this point we're around the

20        time when the MDL is about to

21        start.  Ultimately as we selected

22        the cases that were going to be

23        tried in this following group in

24        California, and right around then

FAC Resp. Exhibit D -- 507

Page 8

1       is when, like I said, the MDL

2       started to form and Hector and I

3       went out and saw all of you and we

4       went out to a lot of

5       organizational meetings.  Houston,

6       I can't remember where the others

7       were, but we went a number of

8       places.  We kind of shifted most

9       of our resources because we didn't

10      have a dog in the fight at that

11      point.

12              MR. GANCEDO:  We didn't have

13      a trial case in California.

14              MS. NIEVES:  We didn't have

15      a trial case going on.  We shifted

16      a lot of our resources at that

17      point to the MDL.  We were

18      appointed to both the science and

19      expert committee and to the

20      discovery committee.

21              Let's see.  So, I think the

22      most unique, in terms of what we

23      did for the MDL, and we did quite

24      a lot, but I think the most unique

FAC Resp. Exhibit D -- 508

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          contribution we did, and I don't

 2          have it put on the screen at the

 3          moment, but I have it right here,

 4          was this interactive multimedia

 5          trial package that we prepared.

 6          Basically what this was, and some

 7          of you, I think, have seen it, and

 8          I've actually got copies for all

 9          of you so you can run it on your

10          computers.  Chris, you already

11          have one of these probably because

12          I sent one to every member of the

13          executive committee.  It was made

14          part of the trial package.

15               MR. GIRARDI:  I have it.

16          Not only do I have it, but I

17          looked at it.

18               MS. NIEVES:  Okay.  The

19          purpose of this was based on our

20          experience with prior MDLs, we

21          have had situations where people

22          have complained that they received

23          a trial package and it seems

24          cumbersome for an individual trial
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          lawyer, let's say, in Nebraska,

2          who wasn't on the inside, didn't

3          have the inside knowledge and

4          didn't do any of the common

5          benefit work, and all of a sudden

6          has got this fast track case set

7          for trial and he needs to brush up

8          on it quickly.  And he's got a

9          huge amount of work product, but

10         it is difficult, it is cumbersome.

11              So, what we did was, we made

12         this interactive program, which is

13         essentially a very sophisticated

14         PowerPoint.  We tried a lot of

15         different programs, and this is

16         the best one.  We divided the case

17         into several different categories,

18         failure to warn and concealment,

19         scientific literature, FDA

20         overview, misleading marketing to

21         physicians and consumers and

22         profit over safety.

23              And then we further

24         divided -- so, we hyperlinked all

FAC Resp. Exhibit D -- 510

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          the key trial documents that were

 2          being used in all the MDL and

 3          state trials that we were

 4          tracking.  We hyperlinked them to

 5          the 375 events that we have in

 6          this program.  So you can go and

 7          say, here's a failure to warn

 8          story, you can click on each one,

 9          there's a summary of the event in

10          chronological order, and you can

11          then type the link into the

12          document, and we have it

13          highlighted for you.  We did this.

14          This evolved.  We worked on this

15          with the Robinson firm.  This

16          evolved --

17               MR. LEVIN:  Mark Robinson's

18          firm?

19               MS. NIEVES:  Yes.  Mark and

20          I actually went out and presented

21          it to Russ early on, Russ and Andy

22          early on, and it was approved to

23          be used as part of the trial

24          package.  And then it continued to
```

FAC Resp. Exhibit D -- 511

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      grow as the trials went on.

2           MR. BLIZZARD:  Was this part

3      of the work done in the MDL for

4      the discovery committee?

5           MS. NIEVES:  This had

6      started before the discovery

7      committee was formed, and so we

8      went and got authorization, and

9      then, yes, it was a continuation

10     of what was done in the discovery

11     committee.  As a matter of fact,

12     we worked very closely with the

13     theme grid committee to make sure

14     that these two things complemented

15     each other.  Basically, the theme

16     grid has a lot more issues, and it

17     has the entire universe of

18     documents that the parties are

19     using.  This has the key trial

20     documents that you are actually

21     walking into court with.  So, it

22     is the hottest of the hot

23     documents.

24           We further divided it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          into -- we put in these management

 2          organizations so that you could

 3          see who the players were.  There

 4          is a page where you can link on to

 5          each one and get the bio that's

 6          been marked in the deposition, and

 7          you can pull up the bios.  Then --

 8          don't worry, I'm not going through

 9          this whole thing, but I wanted to

10          show you a few of the things that

11          went into it.

12              We did a lot of the insider

13          trades.  We captured all of the

14          insider trades of the key

15          executives.  We have a section

16          that's profit over safety, and you

17          can look at that as it relates to

18          all the other issues and events

19          that are going on and you can see

20          how, for instance, Gilmartin or

21          Anstice or these guys were dumping

22          large amounts of stock just before

23          VIGOR was released, just before

24          Vioxx was withdrawn.
```

FAC Resp. Exhibit D -- 513

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1           MR. LEVIN:  Did you work

2       with anybody else with regard to

3       the insider trading?

4           MS. NIEVES:  The SEC.

5           MR. LEVIN:  I don't mean the

6       SEC.  I mean nobody else on the

7       committees or anything like in

8       California?

9           MS. NIEVES:  No.  This was

10      all done through the MDL.

11          MR. LEVIN:  Yes, but you

12      didn't work with any other

13      California lawyers on that other

14      than Mark?

15          MS. NIEVES:  Mark's firm.

16      We worked with Ted Wacker on it.

17      Then as we were getting into

18      discovery, of course, we worked

19      with members of the discovery

20      committee.  We were on these calls

21      every single week, and so we were

22      working very closely with them.

23          I just want to give you a

24      couple -- show you a couple of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1        examples.  Like here is where the

 2        VIGOR results were released.  This

 3        is 2000, and all you do is go to

 4        2000 and you go to the date and

 5        you go to where the VIGOR results

 6        were released.  Then on the next

 7        page, you are able to see where

 8        the stock was dumped, right here.

 9        It is all color coded.  So this is

10        the green for the profits over

11        safety.  If you click on any one

12        of these tabs at the top, you can

13        get a chronology only relating to

14        that one issue.  So, for instance,

15        if you are looking for a key

16        label, you can go straight to the

17        FDA tab and you can go right

18        through the labels and see exactly

19        when it was and pull it up.

20            We also made it so you can

21        go and do a plaintiffs' chronology

22        so it can be customized for any

23        attorney that this is sent out to.

24        So, let's take the attorney in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        Nebraska again.  He can input his

2        plaintiff's chronology, lay it

3        over the overall chronology and

4        see exactly when its usage was,

5        whether it was pre-VIGOR, post

6        VIGOR, et cetera.  We also made it

7        so it is enabled so you can import

8        all of your pharmacy records and

9        medical records straight from this

10       program.

11            You have the self-play

12       version, which runs a little bit

13       slower, but if you were actually

14       in a situation where you were

15       asking for the trial package from

16       the MDL, you would have one with

17       instructions that you load on your

18       computer, and it works very, very

19       quickly.  It is very user

20       friendly, and I think that it

21       creates a great benefit to the

22       persons actually using the MDL

23       trial package, as they can sit

24       down in the afternoon and learn

FAC Resp. Exhibit D -- 516

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           the whole case.

2                    MR. BLIZZARD:  When was this

3           project started?

4                    MS. NIEVES:  When did the

5           MDL start?

6                    MR. GANCEDO:  2005 probably.

7                    MS. NIEVES:  When was the

8           beginning of the MDL?

9                    MR. SEEGER:  It was April of

10          2005.  That was the beginning of

11          the MDL.

12                   MS. NIEVES:  It was the

13          beginning of 2005.

14                   MR. BLIZZARD:  So, this was

15          from the start an MDL project?

16                   MS. NIEVES:  Yes.

17                   MR. BLIZZARD:  It was put

18          into the trial package?

19                   MS. NIEVES:  Yes.

20                   Anyway, this is a really

21          powerful tool.  It's got a lot,

22          lot of documents, a lot of good

23          information.

24                   Something I forgot to tell

FAC Resp. Exhibit D -- 517

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          you, if you have a marketing case,

2          we have imported all of the live

3          commercials in there.  You can

4          play them straight from the

5          program and all the print ads.  We

6          also have the media tracking.  We

7          went through media tracking

8          centers to get information about

9          the money that was spent, the

10         spots that were purchased, the

11         regions that they were played in

12         and how many spots per day.

13         There's a pretty full and

14         comprehensive marketing case

15         there.

16              MR. BLIZZARD:  So, was Troy

17         the person who ultimately had

18         responsibility for this project as

19         chair of the discovery committee?

20              MS. NIEVES:  I suppose so.

21         Mark and I were spearheading it,

22         but we were constantly speaking

23         with other members of the

24         discovery committee and making

FAC Resp. Exhibit D -- 518

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1          sure we weren't eliminating things

 2          that were going in the theme grid.

 3          As I said, we worked very closely

 4          with the theme grid and the

 5          subcommittee.

 6                  MR. BLIZZARD:  Who was the

 7          vendor?  Was there a vendor?

 8                  MS. NIEVES:  Yes.  Executive

 9          Presentations.  And there were

10          instructions that went out with

11          all of the programs when they were

12          sent to the executive committee

13          and when they were sent for

14          inclusion in the trial package

15          that indicates that it can be

16          customized for you, for your own

17          trial, you're to contact Executive

18          Presentations, and they can put in

19          all your plaintiff's information.

20                  So that's the trial package.

21                  Then in addition to that,

22          let me move to the science

23          committee, science and expert

24          committee and what we did for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Shelly there.  We worked very

2          closely with Shelly.  We were very

3          active members throughout the

4          litigation on the science

5          committee.  One of the biggest

6          projects that she asked us to

7          undertake was to create a database

8          that was a science theme grid.

9          She wanted basically a combination

10         of what we had done in this

11         project, the trial package, and

12         what the theme grid committee had

13         done, and she wanted it only for

14         science.  So, we created a

15         multi-faceted access database

16         basically with a lot of fields so

17         you can search to find, for

18         instance, all the studies that

19         related to selectivity or all of

20         the FitzGerald studies or all the

21         studies that came out in different

22         years so you can search them in

23         many different ways.  When you

24         reach that through the science

FAC Resp. Exhibit D -- 520

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          theme grid, you have -- I'm sorry,

2          I lost my train of thought.

3              When you go through all of

4          that, you can pull it up and you

5          can search it.  We've highlighted

6          some of the things, and we've

7          summarized each one.  Then we

8          summarized it, categorized it.  I

9          led a team, a subgroup -- I don't

10         think we had a formal name, but a

11         subgroup of the science committee,

12         because she kind of needed this

13         quickly.  I think it was around

14         the time of the Dedrick trial,

15         just before the Dedrick trial, and

16         she needed this quickly.  We spent

17         a couple of months, maybe two,

18         three months putting the whole

19         thing together.  At the request of

20         she and Andy and Leigh O'Dell, we

21         augmented it during the Dedrick

22         trial to incorporate, I think it

23         was, all the Pratt-authored

24         studies.

FAC Resp. Exhibit D -- 521

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1            I forgot to mention that the

2        trial package was definitely used

3        in one of Mark's trials, I think

4        it was the Barnett trial.

5            MR. SEEGER:  Tina, I'm sorry

6        to waste your time, because if you

7        addressed it, I apologize.  How

8        closely did you work with Mark on

9        some of these projects?  Was he

10        kind of your point person?

11            MS. NIEVES:  On that one, we

12        worked closely with him.  We

13        designed the program, and then he

14        was doing a lot of discovery for

15        the discovery committee.  And

16        since we're both here and we were

17        doing a lot of work at the time

18        for the science committee, we

19        started putting our resources

20        together.  So, we were getting

21        help from Ted Wacker at his office

22        with respect to importing all the

23        documents, and then we were

24        summarizing them internally, and

FAC Resp. Exhibit D -- 522

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1       we were circulating it through the

2       discovery committee.

3            MR. SEEGER:  Okay.

4            MS. NIEVES:  So, we did the

5       science theme grid for Shelly.  We

6       also obviously attended all of the

7       science conference calls.  We were

8       the official gatekeeper for the

9       consulting group of Girkipal Singh

10      through whom we were able to

11      access a lot of Congressional

12      testimony and the Waxman documents

13      and some of the documents that

14      were under seal at the time in

15      connection with the Congressional

16      testimony.

17           We also attended the FDA

18      advisory COX-2 advisory meetings

19      that were out in Maryland and

20      D.C., and we attended one of those

21      with Dr. Singh when we were there.

22           We also assisted in

23      developing several of the experts.

24      I'll just kind of list them.  Dr.

Page 24

1              Sturkenboom, who had stroke data;

2              Dr. Pechmann, we were working with

3              Mark's firm on developing her in

4              the marketing area; Dr. Gislason;

5              Dr. La Puma; Dr. Edwards.  I went

6              up to Washington with Shelly to

7              meet Dr. Edwards and did followup

8              work with her.  And Dr. Farquhar

9              to an extent.  Mark and Dr. Singh

10             and I went up to Stanford and met

11             with Don Arbitblit and Dr.

12             Farquhar to kind of resolve or

13             reconcile some of the findings in

14             the Singh study as part of Dr.

15             Farquhar's analysis.

16                  We were also asked to do an

17             analysis by the science and expert

18             committee.  We were asked to do an

19             analysis of the FitzGerald

20             hypothesis, because in several

21             joint meetings that we went to in

22             Vegas and elsewhere between the

23             discovery and the science and

24             expert committees, there was

FAC Resp. Exhibit D -- 524

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1      questions as to whether or not we

2      really wanted to depose him.  It

3      was a two-edged sword, and we went

4      around and around on it.

5      Ultimately they asked us to do an

6      analysis.  We went through all of

7      his FDA hearings, all of his

8      testimony, his editorials,

9      studies, did a 28-page memo

10     analyzing it, and ultimately we

11     decided not to take his

12     deposition.

13          Document review.  I think

14     that we're probably a little bit

15     unique in that a lot of the firms,

16     I don't think, who have been

17     involved in this can say they made

18     a really consistent effort over

19     the long haul reviewing documents.

20     Partly the function of the fact

21     that we are working on all of

22     these other projects, we had

23     people either in Denver or in

24     Newport, or in some cases, with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          respect to the marketing

2          materials, the documents were sent

3          to us in our office, of having

4          people, partners and associates

5          reviewing documents on a

6          consistent basis over a very long

7          period of time.

8              We prepared materials for

9          several of the depositions in the

10         trials or in connection with the

11         trials including the Silver,

12         Farquhar, Krahe depositions.

13             We also served on the sales

14         and marketing subcommittee, which

15         was chaired I think -- yeah, it

16         was by Mark.  We attended the Las

17         Vegas subcommittee meeting, and we

18         took numerous sales representative

19         depositions.

20             In addition, I chaired the

21         science research, publications and

22         societies subcommittee, and this

23         was part of the discovery

24         committee.

FAC Resp. Exhibit D -- 526

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1            MR. SEEGER:  Science

2        research, what was that?

3            MS. NIEVES:  Scientific

4        research, publications and

5        societies subcommittee.  It still

6        catches me.  Basically, the

7        purpose of this was for us to go

8        to all the scientific symposiums

9        that were being held in the

10        medical community that were

11        covering COX-2s.  As you all know,

12        we had a lot of emerging issues in

13        the medical field relating to

14        COX-2s and actually what the

15        mechanism of action was.  We were

16        going there to find out what the

17        defense experts were saying and

18        see if we could identify experts

19        out there that would be friendly

20        to the plaintiffs.

21            MR. SEEGER:  Tina, I'm

22        sorry, if you don't mind me

23        jumping in.

24            MS. NIEVES:  No.

FAC Resp. Exhibit D -- 527

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1        MR. SEEGER:  Who was your

2        contact person on that project?

3        Who assigned it you and who did

4        you report to?

5        MS. NIEVES:  This was part

6        of the discovery committee.  So,

7        it was the chair of discovery.

8        MR. SEEGER:  It would have

9        been Troy or one of those guys?

10       MS. NIEVES:  Yes.

11       Absolutely.  It was on every

12       single agenda item, you'll see it.

13       It was one of the subcommittees of

14       the discovery committee.

15       So, I oversaw a small group

16       of firms that were going -- I was

17       identifying all these symposia

18       that were going on, and some of

19       them were over the pond, as they

20       say.  Some of them were in Europe.

21       MR. SEEGER:  I should have

22       gotten that assignment.

23       MS. NIEVES:  Some of the

24       firms were going and sitting in on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1              them.  The ones we personally

2              attended, our firm attended, was

3              the American Heart Association

4              scientific conference, and that

5              was in November of '05; the

6              scientific meeting conference of

7              the American College of

8              Rheumatology and International

9              Society of Pharmacoepidemiology in

10             Nashville, that was in August of

11             '05; the science subcommittee,

12             cardiology conference in Salt Lake

13             City; the rheumatology annual

14             scientific committee in San Diego

15             in '05.  These were all in '05.

16             We monitored by a live feed the

17             annual European Congress of

18             Rheumatology, which was held in

19             Amsterdam.  Then we had other

20             firms that were reporting on other

21             ones they had attended.

22                  With respect to direct

23             contributions to the MDL trials,

24             our firm worked on the deposition

FAC Resp. Exhibit D -- 529

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1        trial cuts with Pete Kaufman and

 2        other people that he was

 3        overseeing in connection with that

 4        project.

 5            We reviewed documents

 6        specific to various witnesses for

 7        the Barnett trial.

 8            We compiled, I think I

 9        already mentioned this, the

10        Pratt-authored articles and other

11        scientific literature for the

12        Dedrick trial at the request of

13        Andy and Leigh and Shelly.

14            We analyzed sales and

15        marketing documents and Ogilvy and

16        Arcoxia documents also at the

17        Barnett trial.

18            MR. SEEGER:  The assignment

19        from the Barnett trial would have

20        come from Robinson, and Dedrick

21        would have come from Andy?

22            MS. NIEVES:  Yes.  I think

23        how it worked was, Andy and Leigh

24        asked Shelly, and Shelly was there
```

FAC Resp. Exhibit D -- 530

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          working on the trial, so she

2          called and asked me to do it from

3          my office.

4               And then finally it's just

5          speaking engagements which, you

6          know, we were all out and about

7          trying to inform the plaintiffs'

8          bar as best we could on progress

9          of the MDL and common benefit work

10         and what was being done.  I

11         attended and presented at a number

12         of those, including several

13         seminars, ATLA seminars, the West

14         Palm Beach conference.  I

15         moderated the ATLA Vioxx mock

16         trial in New Orleans.  That's the

17         one that, Mark, I think you were

18         there, and I know Mark Lanier

19         presented there.  I presented at

20         the Mealey's conference with Mark

21         Robinson on the Irvin trial

22         highlights in December of '05.  I

23         served as a panelist with Russ and

24         Arnold and you at the Mealey's

FAC Resp. Exhibit D -- 531

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

 1          Vioxx conference at Amelia Island

 2          in Florida.

 3               MR. LEVIN:  I was there.

 4               MR. SEEGER:  I remember you

 5          being there.

 6               MS. NIEVES:  ATLA Vioxx

 7          teleconference which was FDA and

 8          painkillers, and I also reported

 9          for Mealey's on the FDA Advisory

10          Committee hearings for COX-2s out

11          in D.C. at the request of the

12          science committee.

13               So, you know, I think that,

14          as they say in Vegas, we were all

15          in on this case.  We put a lot of

16          resources in over a long period of

17          time, and I think we produced a

18          very high caliber of work.

19               MR. SEEGER:  Just for the

20          purposes of when we start just

21          piecing all of this together, it

22          sounds like the greatest -- and

23          I'm giving you credit for what you

24          have done.  You have had the

FAC Resp. Exhibit D -- 532

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          greatest contact with Mark,

2          probably Troy on the discovery

3          committee, Shelly on the science

4          committee.

5               MS. NIEVES:  John Restaino.

6               MR. SEEGER:  And John

7          Restaino.

8               MS. NIEVES:  I worked really

9          closely with Shelly and Mark's

10         firm.  Then a lot of the other --

11         definitely the other attorneys,

12         but a lot of that was through

13         teleconferences where they were

14         asking to report on what had been

15         done.  And while I'm sending it to

16         them, I wasn't doing a lot of that

17         in person though.

18               MR. SEEGER:  Is this part of

19         the trial package right here?

20         (Indicating.)

21               MS. NIEVES:  That is the

22         trial --

23               MR. LEVIN:  That's your

24         trial package that you prepared?

FAC Resp. Exhibit D -- 533

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1            MR. NIEVES:  You have it on

2        disk.  I just handed it to you.

3            MR. SEEGER:  So, the people

4        who put together what we are

5        calling the MDL trial package have

6        incorporated this?

7            MR. GANCEDO:  Yes.

8            MS. NIEVES:  That's in

9        there.  To me, this should be the

10       first stop for someone looking at

11       it.  Because they can look at this

12       and learn the overall picture and

13       see the key documents, and they

14       can go into depth in the theme

15       grid and start looking at the

16       depositions.

17           MR. SEEGER:  Who worked on

18       that project with you, that one

19       there?

20           MS. NIEVES:  Well, the

21       members of my firm and the members

22       of Mark's firm.  And then it's

23       kind of a hard question because

24       there's so much incorporated in

FAC Resp. Exhibit D -- 534

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          here.  Chris, you sent us a big

2          chronology, it was a compendium.

3          That was incorporated in here.  We

4          used things from Mark Lanier's

5          opening statements.  Mark Robinson

6          and I went out to the Ernst trial.

7          We used any exhibits that he used

8          that we haven't incorporated.  We

9          went to several states.  So, I

10         mean, it is everyone's work

11         product, but we designed this

12         program.

13              MR. SEEGER:  Have you gone

14         on line and seen the way the MDL

15         trial package is set up?  Have you

16         had a chance to see that?

17              MS. NIEVES:  I haven't

18         looked at that, no.

19              MR. SEEGER:  That's why I'm

20         asking.

21              MR. LEVIN:  We'll find it.

22              MS. NIEVES:  Russ had told

23         us at the beginning of the

24         litigation he definitely wanted

FAC Resp. Exhibit D -- 535

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        this in there.  I did call Leigh

2        at the end of the litigation to

3        make sure that it was

4        incorporated, and people were

5        checking in with me to make sure

6        we were working closely with the

7        theme grid people over the course

8        of the development to make sure we

9        were capturing all the best

10       documents that were in the theme

11       grid.  We were attending the

12       trials to make sure that we got

13       ahold of anything new that came up

14       for any of these subtimelines that

15       were being used as exhibits in the

16       various trials.

17            MR. SEEGER:  Okay.  Fine.

18            MS. NIEVES:  Questions?

19            MR. SEEGER:  Just to

20       summarize, I mean, what would you

21       pick as your top contribution to

22       the common benefit?  Would it be

23       the work on the trial package?

24            MS. NIEVES:  I think the

FAC Resp. Exhibit D -- 536

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          work on the trial package and the

2          work on the science theme grid,

3          because I know that that was -- I

4          mean, people were calling me while

5          they were in trial and saying we

6          need this immediately.  So, I know

7          that was used, and that was

8          important, and it was very

9          important to Shelly as she did the

10         work.

11              MR. WEITZ:  How many cases

12         did the firm have filed?

13              MS. NIEVES:  About 120.  Is

14         that right?

15              MR. GANCEDO:  110.

16              MR. WEITZ:  And you

17         submitted those all to the

18         settlement?

19              MR. GANCEDO:  Yes.

20              MR. WEITZ:  They were filed

21         in LA?

22              MS. NIEVES:  A lot of them

23         were in the MDL.  They were in

24         both jurisdictions.

FAC Resp. Exhibit D -- 537

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

 1              MR. WEITZ:  Other than those

 2         three out of five cases that were

 3         originally before Judge Lichtman,

 4         did you guys have any other cases

 5         that were --

 6              MS. NIEVES:  Selected for

 7         trial?

 8              MR. WEITZ:  -- selected for

 9         trial?

10              MS. NIEVES:  No.

11              MR. WEITZ:  Thank you.

12              MR. GIRARDI:  Judge Lichtman

13         was recused because he had taken

14         Vioxx, so the defendants recused

15         him.

16              MR. SEEGER:  That's

17         interesting, isn't it?

18              MS. NIEVES:  He did say it

19         wouldn't affect anything.

20         Remember?  He threw that out.

21         Remember that time he threw that

22         out and it went up on appeal.  I

23         was at the hearing.  I remember

24         him saying on the bench, saying I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1        took it.

2              MR. GIRARDI:  Thank you very

3        much.  Well done.

4                    -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 539

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 540

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -

FIRM:  IRPINO LAW FIRM
       Anthony Irpino, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 541

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                        -  -  -
 2              MR. HERMAN:  We have a court
 3        reporter here who will make a
 4        record of everything as part of
 5        the Court's direction on
 6        transparency so everybody knows
 7        what everybody is saying at the
 8        end of the day.
 9              Secondly, the affidavit, if
10        there's anything you want to add
11        or subtract from it, go ahead and
12        do it.
13              The judge has made it clear
14        that if the fee issues aren't
15        resolved a la Murphy Oil, then
16        what he's going to do is go
17        through virtually the same
18        process, folks are going to have
19        to be cross-examined, et cetera,
20        and basically that's it.
21              The committee is going to
22        publish whatever directive we get
23        from the judge when we get it.
24        So, that's about it.  The floor is
```

FAC Resp. Exhibit D -- 542

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          yours.

2                    MR. IRPINO:  Okay.

3                    Well, number one, thank you,

4          everybody, for allowing me to

5          present as to what I contributed

6          to the Vioxx litigation and the

7          MDL.

8                    My name is Anthony Irpino of

9          the Irpino Law Firm.  My address

10         is 365 Canal Street, Suite 2290,

11         New Orleans, Louisiana 70130.

12                   I've never presented to

13         anybody about the work I've done

14         in a case in a manner such as

15         this, so, I'm a little bit in the

16         dark.  But with that said, I just

17         figured --

18                   MR. SEEGER:  Can we help you

19         with that?

20                   MR. IRPINO:  Yes.

21                   MR. SEEGER:  We are all

22         interested in the way you see your

23         common benefit contributions, and

24         some of us know you and some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          people don't, so, speak to the

2          people that don't.

3               MR. IRPINO:   Okay.

4               I think that's a good point,

5          that a lot of you do know me.   I

6          worked very closely with a lot of

7          y'all in connection with this

8          case, and so in large part, for

9          the people who have worked with

10         me, I rest on what I've done, the

11         way I've done it, the vigor with

12         which I did it and the quality in

13         which I did it.   But that said, I

14         didn't work with y'all closely in

15         the case, and I do want to go into

16         some of those things so you know

17         it.

18              I did try and squeeze into

19         the affidavit some of the things

20         that I did.   Candidly, in a

21         three-page affidavit, you can't do

22         it.   In a 30-minute presentation,

23         I can't do it.

24              To go into what we did in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          this case, what I did in this case

 2          and what my teams did in this case

 3          I think would take days,

 4          literally.  I'll try and give as

 5          good of a recitation as I can, but

 6          it boils down into two primary

 7          roles that I played.

 8               Number one, first and

 9          foremost, is chairman of the

10          privilege log team.

11               Second role, which is

12          somewhat of a forgotten role,

13          somewhat of a less glamorous role,

14          was chairman of the document

15          repository team.  That was

16          significant, and I'll get into

17          that later, but certainly chairman

18          of the privilege log team was my

19          primary role.  I believe that it

20          is not an inaccurate statement to

21          say that I led that charge.  So,

22          all the issues that dealt with the

23          privilege log, which in this case

24          I think it's a fair statement,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1         became extensive.

2              With that said, I did want

3         to make everybody aware that this

4         was a team effort, the privilege

5         log team.  I did lead it, but

6         there were a lot of people

7         involved.  I wanted to go into the

8         names of who were involved,

9         because it was extensive.

10             First of all, I was kind of

11        appointed to it or put in that

12        position by Troy Rafferty and Russ

13        Herman.  They basically gave me

14        the power to do that, as well as

15        the other heads of the discovery

16        team, which included Dave

17        Buchanan, Richard Arsenault, Chris

18        Tisi.  It was critical that they

19        gave me the kind of power and the

20        time to say just to go do it, get

21        this done.  I mean, to have that

22        type of freedom in a case such as

23        this really allowed us to push

24        forward and do it.

FAC Resp. Exhibit D -- 546

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           The other members of the

2       team included Gary Wilson and Tara

3       Sutton, who were up in

4       Minneapolis, they worked very

5       hard, and I want that to be known

6       to everybody.

7           A woman by the name of Lynn

8       Swanson over at a firm called

9       Jones Swanson here in New Orleans

10      worked hard.

11          There were other people who

12      worked hard on that team.  Brian

13      Balser Andy Childers, Leslie

14      Bryan, Raul Bencomo each did some

15      good and helpful work.

16          Others included Mike Hugo

17      and Michael Stratton.  I wanted

18      y'all to know that.  I might have

19      left out a name or two, but I

20      wanted y'all to know that this was

21      a team effort, a lot of people

22      involved, a lot of coordination

23      involved.

24          I also wanted to speak real

FAC Resp. Exhibit D -- 547

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          briefly as to the --
 2               MR. SEEGER:  Anthony, is
 3          this a team that you assembled?
 4          I'm sorry.  Some of these names I
 5          recognize, some I don't.
 6               MR. IRPINO:  Well,
 7          essentially it was assembled -- I
 8          think it is fair to say that Troy,
 9          myself, Dave Buchanan, Chris Tisi
10          at the beginning, said, hey, who
11          wants to work on privilege log.
12          It was not a glamorous role.  They
13          said, who wants it?  Shoot, I'll
14          take it.  I'll take it and run
15          with it.
16               MR. LEVIN:  Well, the Robins
17          Kaplan group, how did they become
18          involved?
19               MR. IRPINO:  They also said
20          that they'll help.
21               MR. LEVIN:  In other words,
22          they hadn't been in the Army and
23          they volunteered?
24               MR. IRPINO:  Yes.  They put
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          their hand up.  I think the way
 2          things kind of started out and
 3          worked out is I kind of took the
 4          reins and ran with it.  I said,
 5          this is what we're going to do,
 6          this is how we're going to do it.
 7          Everybody followed, and everybody
 8          helped participate.  People
 9          worked.  And to give you a sense,
10          that team was being formulated in
11          June of '05, right after the MDL
12          was formed, very early on.  I'm
13          just going on memory.  There's so
14          much I'll leave out.  Troy was
15          saying, we need to get on this.
16          You know, we'll get on it.  We'll
17          do it.  We had some good
18          go-getting people.
19               Dave Buchanan said, look, we
20          have this privilege log they
21          produced in New Jersey, it is a
22          piece of crud, we need to get into
23          it.  So, we went through and
24          combed through that privilege log,
```

FAC Resp. Exhibit D -- 549

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        and we're talking about 30,000

2        privilege claims.  We're not

3        talking in a sense of, oh, you

4        know, let's take a look at it and

5        let's do some, quote, review.

6        Let's take a look at it.  I mean,

7        this was combing through this

8        thing, trying to find the best

9        examples of how they were not

10       documenting their privilege claims

11       properly, how they were hiding

12       documents.  When you are going

13       through and you are seeing

14       requests for legal review of

15       APPROVe study materials, what the

16       heck is that?  So, you wanted to

17       find out things that were, A,

18       clearly bogus privilege claims,

19       clearly claims that we could win

20       on.

21            We didn't want to go to

22       Judge Fallon and just randomly

23       say, Judge, take some privilege

24       claims, and here's some bad ones.

FAC Resp. Exhibit D -- 550

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           We wanted to go with the best of

2           the best.  So, we spent literally

3           a couple of months combing through

4           this privilege log.  And I'm not

5           talking about a little review.

6           This was combing through.

7                So, we got that process done

8           and presented it to Judge Fallon

9           on a plate that made him

10          understand that this was a serious

11          issue and that there were serious

12          violations here.  I think that

13          really, as much as anything in the

14          beginning, helped our cause along

15          those lines.

16               But getting back, we had

17          this committee, Troy formed it,

18          Dave formed it, Chris Tisi formed

19          it, and we were running through

20          and were just going and going.

21          And we organized it, we had weekly

22          calls.  And I'll tell you, these

23          weekly calls were not, hey, guys,

24          how are you doing.  I had an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          agenda each call.  This is what

2          we're going to discuss.  If you

3          want copies of them, I've got

4          copies of them, I promise you.

5          They are too voluminous to go

6          through, the agendas, the minutes,

7          but it was very well organized

8          from the beginning so that

9          everybody knew that this was a

10         team effort, that it was an

11         organized effort.

12              I think as much as anything

13         that I worry about in MDL work or

14         class action work is keeping

15         people engaged in the litigation,

16         keeping team members engaged,

17         because we know everybody has

18         another practice.  I mean,

19         oftentimes they are working on two

20         cases at once, three cases at once

21         or some other cases.  So, it is

22         very easy to lose sight of this

23         litigation, and one of my goals

24         was to keep people focused on this

Page 13

```
 1          litigation, and the way I know how
 2          to do that is keep engaged, keep
 3          organized and keep assignments
 4          running.  So, we did that
 5          throughout this process.
 6               So, those first several
 7          months were very detailed, very
 8          strenuous, very long hours
 9          working, working, working on this
10          stuff and putting together the
11          package so that we can attack this
12          thing properly.  That's kind of
13          how it began.
14               Later on -- and I want to
15          say this.  I mean, there were
16          different stages of the privilege
17          log fight.  Later on, you know, we
18          were up at the Fifth Circuit, and
19          let me tell you something --
20          Arnold, you are going to like
21          this.  Fred Longer and Arnold
22          Levin personally got involved at
23          that stage.  Russ Herman
24          personally got involved at that
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1           stage where we were collaborating

2           and coordinating on writing the

3           appellate briefs and making the

4           appellate argument, which Russ

5           made.  I mean, I guess there's so

6           much to go through from beginning

7           to end --

8                MR. SEEGER:  Let me ask you

9           questions.  What role did you have

10          in the briefing with Arnold and

11          his firm and Russ?

12               MR. LEVIN:  He worked on

13          it -- I don't have to answer it.

14               MR. SEEGER:  It is his

15          record.  Thank you, Mr. Levin,

16          we'll swear you in.

17               Tell us about your role in

18          the briefing.

19               MR. IRPINO:  My role in the

20          briefing was that I was one of the

21          co-coordinators of it.  First of

22          all, I mean, the way this works,

23          it was again not just like, hey,

24          let's do a brief up.  I mean, I

FAC Resp. Exhibit D -- 554

Page 15

```
 1          would brief the background to

 2          Russ, to Arnold, to Fred in memos.

 3          This is where we've come from,

 4          this is where we've been in memos.

 5          This is not like, oh, get on the

 6          phone and say -- you know, I don't

 7          know how many memos I wrote.  I

 8          have hundreds of memos in the file

 9          about this is what this is about,

10          this is where we've been, this is

11          where we're going.

12               But even the Fifth Circuit

13          briefing, and as frustrating of a

14          situation as I've been in, it was

15          that Fifth Circuit.  But, you

16          know, this is where we've been,

17          this is where we're going, and

18          this is the law, and this is what

19          we have to argue.  These are

20          pressure points.

21               MR. HERMAN:  Let me ask some

22          questions.

23               Approximately how many pages

24          of documents, if you can recall or
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          estimate, were reviewed?

2                MR. IRPINO:  Were reviewed

3          in terms of the privilege log?

4                MR. HERMAN:  Yes.

5                MR. IRPINO:  Well, that's an

6          interesting question, because the

7          privilege log itself, you are

8          talking about thousands and

9          thousands of pages, okay?  We got

10          Judge Fallon to essentially order

11          Merck to do a revised privilege

12          log.  Then there are thousands of

13          pages you are talking about

14          reviewing, okay?  Then in

15          connection with this assignment,

16          Merck said, we see the writing on

17          the wall, we're going to

18          deprivilege a bunch.  So, we got

19          Merck to voluntarily deprivilege

20          hundreds of thousands of pages of

21          documents.  That's in 2005.

22                There was a second

23          deprivileging of documents in

24          2006, and then a third

FAC Resp. Exhibit D -- 556

Page 17

1          deprivileging of documents.

2               MR. HERMAN:  How many boxes

3          of documents did Merck send to the

4          Court in camera that Judge Fallon

5          reviewed?

6               MR. IRPINO:  That's easy.

7          80, right around 80.

8               MR. HERMAN:  Okay.

9               Now, did there come a point

10         in time when the Court had to

11         appoint a Special Master to go

12         through and make a recommendation

13         on the documents that Merck

14         contended were privileged?

15               MR. IRPINO:  Yes, there was.

16         Let me give you just a brief

17         history of that.  Judge Fallon

18         spent two weeks, two weeks

19         straight reviewing deprivileged

20         documents.  Number one, I want

21         everybody to know that we viewed

22         that, our team, everybody viewed

23         that as a significant victory.

24         We've got Judge Fallon looking at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1      all of their privileged documents

2      and checking out and seeing where

3      the bones were buried and seeing

4      the dirt.  He saw it.  And I

5      thought we felt that there was

6      some sort of a change or some sort

7      of a victory of that in and of

8      itself, because Judge Fallon was

9      not happy with Merck through that

10     process.  When he got done after

11     two weeks of reviewing, quote,

12     privileged documents, something

13     changed in terms of the way he

14     viewed the parties even.  I think

15     I remember Russ saying something

16     about that at a PSC meeting where

17     I was called to discuss these

18     issues.

19          To give you an example,

20     there were 30,000 documents in

21     these 80 boxes.  Judge Fallon

22     found that 491 of them were

23     privileged.  The other 29,509

24     documents he found were not

FAC Resp. Exhibit D -- 558

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1           privileged.  Now, if you are a

2           Federal judge spending two weeks

3           reviewing privileged documents,

4           you expect a better number.  I

5           think it is fair to say that that

6           had a significant effect.  But

7           with that said, Judge Fallon did

8           it, the Fifth Circuit did what

9           they did, there was a lot of

10          briefing going on throughout this

11          process, and then we got a Special

12          Master.  Judge Fallon said, look,

13          we need to have a Special Master

14          review this because we're talking

15          about now we rereviewed all of

16          these documents, and the Fifth

17          Circuit made a decision, oddest

18          decision I have ever seen, that

19          includes a per curium order that

20          said that Merck gets to select

21          2,000 documents randomly out of

22          all of those documents I told you

23          about that they want to be

24          rereviewed and then we'll revisit

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1           this issue.  It is the damndest

2           thing you've ever seen.

3                So, Judge Fallon, and this

4           is no coincidence, Judge Fallon

5           selected Professor Paul Rice, who

6           we quoted extensively in all of

7           our briefing, to say this guy is

8           the man, this is how you do a

9           privilege log, these are how you

10          make privilege claims.  He took

11          that guy and appointed him.  So,

12          we saw that as a victory in and of

13          itself.  So, we got Professor

14          Rice, we met with Professor Rice,

15          this was back in, I think, April,

16          approximately April of '07, where

17          Professor Rice was appointed, went

18          to D.C., remember?

19                MR. SEEGER:  Yes.

20                MR. IRPINO:  I'm telling

21          you, throughout this process, I

22          mean, again, it is not just me, it

23          is a team.  We've got Fred Longer

24          involved, Troy Rafferty involved,

FAC Resp. Exhibit D -- 560

Page 21

1          Chris Seeger involved, we've got

2          Arnold Levin involved.  Look,

3          Russ' office became very involved.

4          Lenny Davis was very involved in a

5          lot of this stuff.  So, I just

6          want to let everybody know it is

7          not just Anthony Irpino alone.

8               MR. HERMAN:  Why don't you

9          move on to your other

10          contributions.

11               MR. SEEGER:  Can I ask a

12          quick question?  Anthony, prior to

13          the Vioxx MDL, had you been

14          involved in MDLs prior to that

15          where you held a leadership

16          position?

17               MR. IRPINO:  I was not

18          involved in an MDL where I held a

19          leadership position.  I was

20          involved in several class actions,

21          complex litigation, and that's

22          where a lot of my experience held

23          from.

24               MR. SEEGER:  I'm asking for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          a different reason, but go ahead,

2          answer Russ' question.

3              MR. IRPINO:  Let me just

4          speak quickly as to the Special

5          Master, because that process was

6          very, very extensive.  The process

7          lasted probably four months, four

8          to six months, I would say,

9          starting in April, ending in --

10          actually, the Special Master's

11          final report recommendation came

12          down November 1st of '07, okay?

13              That process was so

14          extensive, there were so many

15          briefs filed to the Special

16          Master, Merck went -- I mean,

17          first of all, Merck -- all you

18          have got to do is look at probably

19          Merck's billing to see how hard

20          this was fought.  They had, I

21          think, dozens of guys on this,

22          working a lot of hours on this

23          project.  I mean, that's what my

24          guess would be.  But we're talking

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          about literally dozens of briefs,

2          declarations.  They had Joanne

3          Lahner do a declaration.  They had

4          different employees doing

5          declarations to try and help prove

6          their privilege log claims.

7               Special Master's reports

8          came out, first report, second

9          report, third report, fourth

10         report.  We had a couple of

11         meetings with them, a couple

12         arguments with them, submitted

13         dozens of briefs from our

14         standpoint, which a lot was done,

15         myself, Fred Longer, Lenny worked

16         hard on that.

17              MR. SEEGER:  Anthony, did

18         you participate in the Joanne

19         Lahner issue?  Did you coordinate

20         with what was going on in New

21         Jersey, as well, because there

22         were challenges there?

23              MR. IRPINO:  There were

24         challenges with Joanne Lahner,

FAC Resp. Exhibit D -- 563

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1          there was coordinations of those
 2          efforts, and, in fact, we got
 3          certain things from New Jersey
 4          that were produced in there, and
 5          there was coordination of that.
 6               I just want to also say when
 7          you see these reports and
 8          recommendations, the first report
 9          and recommendation, the PSC had de
10          bene esse depos going on.  We
11          wanted to get these documents for
12          these de bene esse depos.  So, in
13          addition to Merck selecting 2,000
14          documents for the Special Master
15          review, we got the Special Master
16          to agree to allow us to select 500
17          or 600 documents that were
18          critical to the de bene esse depos
19          that we were doing.  Silverman and
20          Barr, if I'm not mistaken, were a
21          couple of them.  So, the Special
22          Master reviewed those documents.
23               The decisions came out --
24          let me just tell you the amount of
```

FAC Resp. Exhibit D -- 564

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          volume we're talking about and the

2          amount of work we're talking

3          about.  The report and

4          recommendation, I think the first

5          report was like 35 pages.  The

6          decisions took up 700 pages,

7          decisions, of individual document

8          claims, okay?  So, I'm in charge

9          of reviewing those, making sure

10         that we object to them properly,

11         because there were initial

12         determinations by the Special

13         Master.  We had a chance to

14         object, Merck had a chance to

15         object.  We had to respond, they

16         responded.  I'm telling you this

17         process was so in depth and so

18         detailed that it was very time

19         consuming, and it was very

20         thorough.

21              Couple other things about

22         the privilege log that sometimes

23         can get overlooked.  This wasn't

24         just Merck's privilege log, this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          was the FDA privilege log that we

2          dealt with, and these were

3          third-party privilege claims, all

4          right?  So, it wasn't just limited

5          to that.  So, at different times

6          we're dealing with different

7          issues.

8               But, again, it was a fairly

9          extensive battle, it was very time

10         consuming, and it was consistent.

11         As much as anything I would like

12         to say, we were consistent.  We

13         kept on this.  I'm telling you

14         right now, this was not an issue

15         that we couldn't just touch this

16         every once in a while.  You had to

17         stay on it, and you had to fight

18         it through.

19              MR. SEEGER:  How much of

20         your working time would you say,

21         from the time you were asked to be

22         involved in the project, did you

23         spend in terms of other

24         opportunities you might have

FAC Resp. Exhibit D -- 566

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1              gotten involved with or other

2              things you might have done with

3              your firm?  What percentage of

4              your time was involved?

5                    MR. IRPINO:  Was involved in

6              Vioxx?

7                    MR. SEEGER:  Yes.

8                    MR. IRPINO:  Over 50

9              percent, but outside of that, I'm

10             not terribly comfortable.  I mean,

11             I basically worked on two main

12             cases.

13                   MR. RAFFERTY:  And how many

14             lawyers are in the firm, Anthony,

15             during the time that you were

16             working on it?

17                   MR. IRPINO:  During some of

18             the time, it was me.

19                   MR. SEEGER:  You mean just

20             you and your firm?

21                   MR. IRPINO:  Just me and my

22             firm.  During some of the time, I

23             had an associate, and even my

24             associate worked.

FAC Resp. Exhibit D -- 567

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1                MR. LEVIN:  Was that Amy

2        Dunn?

3                MR. IRPINO:  Yes.  Amy Dunn

4        was my associate.  Amy Dunn worked

5        at the U.S. Supreme Court.  I

6        mean, no dummy.  You are talking

7        about graduating from Georgetown,

8        very bright, worked at big, big

9        defense firms like 600-person

10       defense firms in Chicago and New

11       York, and she came in and helped

12       extensively with the Fifth Circuit

13       briefing.

14               MR. RAFFERTY:  I think we

15       only have a few minutes.

16               MR. SEEGER:  Actually, we're

17       out of time, but let's wrap up.

18               MR. LEVIN:  What else did

19       you do --

20               MR. HERMAN:  Talk about the

21       depository.

22               MR. IRPINO:  Okay.  The

23       depository is almost something

24       that's near and dear to me,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          because we started out -- just so
2          you know, I started getting
3          involved, and there was a
4          requirement --  I think this is a
5          very good thing that should be
6          done in all cases.  There was a
7          requirement to say if you want to
8          do work in the discovery
9          committee, you need to go review
10         documents.  You need to get your
11         hands dirty, you need to go do
12         that.  So, I did that.  I went and
13         worked, and I did it where I could
14         and when I could, and there were
15         openings at the New York
16         depository, there were some
17         openings at the California
18         depository.  So, I went to each of
19         those.  As I said, I've never been
20         involved in a case where you had
21         four different document
22         depositories.  We were starting to
23         have some issues, and Penny Herman
24         was extensively involved, along

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1           with Mike Wagner, with taking care

2           of a lot of depository issues.

3                In the beginning, it was

4           Seeger Weiss, Mike Wagner doing

5           everything.  I mean, doing

6           everything, and doing a phenomenal

7           job, by the way.  It was very

8           clear at some point to me that

9           that was going to be overwhelming

10          with everything that's coming up.

11          So, I suggested that we form a

12          document depository committee.  I

13          brought it --  I didn't just do

14          it, brought it to Troy, brought it

15          to Lenny, brought it to Russ.

16          They agreed.  They said, let's do

17          it, go do it, run with it, okay?

18                This wound up being a pretty

19          regularly scheduled meeting,

20          weekly meeting again.  We had

21          probably approximately 50

22          conference calls, 5-0, 50

23          conference calls to take care of

24          various issues that would arise at

FAC Resp. Exhibit D -- 570

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1         the depositories.  And let me tell

2         you right now, the people who were

3         critical with that, Penny Herman,

4         Mike Wagner, critical.  I mean,

5         the job these two did, worked so

6         hard on this litigation.  I don't

7         know, Chris, you had better give

8         Mike Wagner -- I mean, the guy's

9         amazing --

10              MR. SEEGER:  Off the record.

11                   -  -  -

12              (Whereupon, an

13         off-the-record discussion was

14         held.)

15                   -  -  -

16              MR. IRPINO:  With these

17         guys, I just want to say the

18         dedication involved was extensive,

19         and the issues that would come up

20         with the depository were many.

21         Troy knows.  He was one of the

22         heads of the discovery.  I mean,

23         it was so extensive, so we needed

24         coordination, we needed

FAC Resp. Exhibit D -- 571

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          communication.  I mean, you had

2          four different depositories.

3          You've got somebody in LA doing

4          some of the same things that

5          somebody in New York is doing, and

6          we saw that.  We also needed to

7          make sure --

8               MR. SEEGER:  I want to be

9          clear that people understand what

10         you are talking about, because we

11         needed to have the depositories

12         talking to each other so that we

13         don't have people doing things,

14         repeating things and duplicating

15         efforts, and that was what you got

16         involved in.

17              MR. IRPINO:  Absolutely.

18         That's what I started.  I mean, to

19         be fair, I was proud of that as

20         anything, just coming up with the

21         idea, let's do this.

22              MR. SEEGER:  There were like

23         four satellites at one point doing

24         their own thing.

FAC Resp. Exhibit D -- 572

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1              MR. IRPINO:  That was

2         exactly it.  So, we had to

3         coordinate that, we had to

4         communicate.  But also there was a

5         need for communication between the

6         depositories and the different

7         committees.  Science committee, we

8         needed to get materials to the

9         stroke expert.  Okay.  Well, who

10        is going to put that together?

11        How are we going to do it?  What

12        materials do we get?  When do you

13        need them?  What's the deadline?

14        We needed to know that.

15             We would identify these

16        issues and go over them.  There

17        were many other issues that came

18        up on a fairly regular basis.  One

19        was making sure that we made this

20        as efficient as possible.  We had

21        some worker bees, but sometimes

22        depositories would be overcrowded.

23        We didn't have enough stations,

24        particularly in New York at

FAC Resp. Exhibit D -- 573

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          certain times, because a lot of

2          people would go to the New York

3          depository.  Lenny, we went to

4          Lenny and said, Lenny, we need

5          more computers in the New Orleans

6          depository.  Do you remember that?

7               MR. DAVIS:  Yes.

8               MR. IRPINO:  So, Lenny got

9          six computers.  We increased the

10         number of spaces in New Orleans.

11              Then it was a matter of too

12         many people coming on the same

13         week.  We had to schedule that

14         out, okay?  Penny Herman did that.

15         Then there were issues with

16         third-party document productions.

17         How would they get Bates stamped?

18         Where would they go?  Who would

19         get copies?  Who would pay for the

20         copies?  All right.  We worked out

21         deals where Merck and us, we would

22         split those costs and Merck would

23         get a CD, we would get a CD.

24              Then it is a question of

FAC Resp. Exhibit D -- 574

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1       what depositions are we taking and

2       who needs what documents when?

3       And when do we prioritize that?

4       You don't want to be having

5       somebody reviewing Joanne Lahner

6       custodial files when you have got

7       a deposition of Marty Carroll

8       coming up in a week.  You want to

9       make sure that those assignments

10      get given out, and you need one

11      person to track the assignments.

12      So, we had Penny Herman in charge

13      of tracking those assignments.

14      Where does that start from, where

15      does it flow from?  Communication

16      amongst the depositories, making

17      sure that everybody knows what

18      everybody else is doing, what the

19      left hand is doing, what the right

20      hand is doing.

21          Let me just say another

22      thing.  There was a problem that

23      came up not only with

24      overcrowding, not only with

FAC Resp. Exhibit D -- 575

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1           working, but some workers in the

2           depositories, and you know this

3           happens, worker bees, they get

4           lazy, they go around.  So, we had

5           to track that.  We started

6           implementing different procedures

7           and time sheets and different

8           supervisory procedures.

9                I went to the depositories,

10          and at one point we did a

11          presentation.  There was one time

12          there was a problem where, at the

13          beginning, people were clearly

14          over -- being overinclusive with

15          their coding, particularly with

16          their hot doc coding.  So, Troy is

17          going to take a deposition and he

18          says, print me out our hot doc

19          custodial file for Marty Carroll.

20          We print it out, and it is 10,000

21          documents.  Well, what good is

22          that?  It did no good.  And we had

23          that problem at the beginning.

24          So, we had to change the mindset

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1          of how people were coding.  So,

 2          identify the problem, diagnose the

 3          problem, and then solve the

 4          problem.  We brainstormed it and

 5          came up with, look, let's do an

 6          educational session.  Troy

 7          actually came in and did an

 8          educational session in the New

 9          Orleans depository for all of

10          those people.  I went to New York

11          and did an educational session

12          with them there.  We changed the

13          way people think.  Look, you don't

14          have to overcode.  Don't overcode.

15          That's a problem.  You are causing

16          more problems than good by

17          overcoding.  We had people hot

18          doc'ing articles.

19              MR. BIRCHFIELD:  Anthony,

20          with the limited time, one other

21          issue I would like for you to

22          address for me is, did you help

23          with any of the bellwether trials?

24          Talk about that.  Then any cases
```

FAC Resp. Exhibit D -- 577

Page 38

1          that you had that were worked up

2          or advanced, just talk about any

3          cases in moving the docket, those

4          two issues.

5               MR. IRPINO:  I appreciate

6          you asking me that.  I did not

7          have extensive work on the trials,

8          but there was one trial that I

9          assisted with, and that was the

10         Dedrick trial, and that was the

11         one that Andy Birchfield, Leigh

12         O'dell tried.  And Russ Herman had

13         actually asked for volunteers for

14         people to assist Andy and Lee with

15         jury selection being from New

16         Orleans, knowing we are dealing

17         with a New Orleans jury pool.  So,

18         we assisted with that for about a

19         week.  It took about a week, and

20         it was extensive.  That Dedrick

21         trial I would wish on no one, but

22         we assisted with that process in

23         terms of the jury selection, and

24         we went -- you know, we go all in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1          and we do work, okay?  We got one
 2          of our trial consultants to come
 3          in, Victoria came in, Southern
 4          Trial Consultants, assisted with
 5          it.  We went to -- to tell you the
 6          lengths we went to, she would
 7          drive by houses just to see what
 8          kind of information there would
 9          be, bumper stickers or something
10          like that.  I mean, you know,
11          in-depth research so that we can
12          give -- you know, some of the
13          people were from Slidell.  What
14          does this mean?  What does this
15          person mean from Jefferson?
16          Giving Andy and Lee help with it.
17               And let me just talk about
18          that process for 30 seconds.
19          Camping out at the Lowe's Hotel I
20          think they were stationed in.  I
21          think they moved the entire
22          Beasley Allen office down here.  I
23          mean, that was an effort that you
24          want out of your trial teams.  I
```

FAC Resp. Exhibit D -- 579

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          was very, very proud to be a part

2          of that effort.  It was extensive.

3          It was a, quote, loser case, and

4          it went full lore as if it was the

5          best case that you will ever have

6          a chance of winning.  That was a

7          pleasure to be a part of and a

8          great thing to see.

9               MR. BIRCHFIELD:  Y'all did

10          excellent work on the jury

11          selection.  I appreciate that.

12               MR. IRPINO:  Thank you.

13               MR. BIRCHFIELD:  What about

14          cases, did you have any cases that

15          were worked up to help move the

16          docket?

17               MR. IRPINO:  We had one case

18          that we helped -- that we had that

19          got us involved in the litigation,

20          and, unfortunately, that case did

21          not turn out to be a good case.

22          So, in terms of that aspect of it,

23          no.

24               MR. WEITZ:  How many cases

FAC Resp. Exhibit D -- 580

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          did you submit to the settlement?

2          Did you have cases you submitted

3          to the settlement?

4                    MR. IRPINO:  We actually

5          took it out, because we didn't --

6                    MR. SEEGER:  No, no.

7          Settlement.  How many cases did

8          you put into the settlement?

9                    MR. LEVIN:  He had one case.

10                   MR. IRPINO:  One case.  For

11         us, this was much more about

12         assisting with the MDL process and

13         effort and work product much more

14         so than focusing on any individual

15         cases or anything like that.  We

16         kind of went all in with that and

17         went about it that way.

18                   MR. WEITZ:  When did you

19         originally get involved in the

20         litigation?

21                   MR. LEVIN:  Through that one

22         case.

23                   MR. IRPINO:  Through that

24         one case, we said, look, we want

FAC Resp. Exhibit D -- 581

Page 42

1          to be --

2                MR. WEITZ:  To get involved

3          in the MDL and do some work?

4                MR. IRPINO:  Yes.  We want

5          to assist with the work product,

6          we want to assist with the work

7          done in the case.

8                MR. SEEGER:  All right.

9          Anthony, thank you very, very much

10         for everything.

11                      -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22         Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 583

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -


FIRM: KASOWITZ BENSON TORRES & FRIEDMAN
      Daniel J.  Fetterman, Esquire
      Christopher P. Johnson, Esquire


BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
     877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 584

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
  1                    -  -  -
  2             MR. FETTERMAN:  For those
  3        who don't know me, my name is
  4        Daniel Fetterman, and along with
  5        my partner, Chris Johnson, we're
  6        here today to present the
  7        application of Kasowitz Benson
  8        Torres & Friedman for an
  9        allocation from the common benefit
 10        fund.
 11             Kasowitz, Benson is a
 12        national firm with approximately
 13        290 lawyers which had over 250
 14        clients in the national Vioxx
 15        litigation.
 16             Chris Johnson and I have
 17        been the two partners principally
 18        responsible for day-to-day
 19        oversight of the Vioxx matters.
 20        We have participation of numerous
 21        partners and associates, including
 22        Mark Kasowitz and Dan Benson, two
 23        of the founding partners of the
 24        firm, along with David Rossner,
```

FAC Resp. Exhibit D -- 585

Page 3

1          one of our senior bankruptcy

2          partners.

3               I want to say at the outset

4          what a privilege it was to work

5          with many of the talented lawyers

6          in this matter, including many of

7          you here today, and what an

8          outstanding job was done in trying

9          and prosecuting these Vioxx cases.

10              In this litigation, Kasowitz

11         Benson played a valuable and

12         substantial supporting role.  So,

13         I don't want to take more credit

14         than we deserve, but at the same

15         time, I welcome the opportunity to

16         set forth what I think were

17         unique, important and

18         qualitatively valuable

19         contributions to the national

20         Vioxx effort.  I use the word

21         "unique," because I think it's

22         fair to say that Kasowitz Benson

23         was different from most of the

24         firms in the national litigation

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        because Kasowitz, Benson is a

2        large national firm that does both

3        plaintiffs and defense work, and

4        as such, we were able to bring and

5        to provide valuable support by

6        bringing defense insight into the

7        overall litigation strategy and

8        for particular trial teams as they

9        prepared for trial.

10              We also had resources in

11       terms of manpower and money, which

12       the firm willingly contributed

13       whenever asked.

14              Kasowitz Benson was

15       consistently and intensely

16       committed to the common Vioxx

17       effort from beginning to end.  Our

18       substantial commitment included

19       approximately 4,000 hours that had

20       been accepted by the Wegmann-Dazet

21       firm, along with another

22       approximately 450 preMDL hours

23       that were not accepted because

24       they were preMDL.

FAC Resp. Exhibit D -- 587

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1            MR. HERMAN:  Wait one

2       second.  You have 450 hours before

3       the MDL, the Federal MDL was

4       organized?

5            MR. FETTERMAN:  Correct.

6            MR. HERMAN:  You should

7       submit those.

8            MR. JOHNSON:  I think they

9       are in.

10           MR. LEVIN:  They are under

11      review now.

12           MR. FETTERMAN:  We

13      contributed to the New Jersey

14      Vioxx effort from the outset with

15      the Seeger Weiss fund and

16      contributing to the public

17      relations fund, as well, when they

18      started.  And I think it is fair

19      to say that we remained committed

20      from the beginning to the very

21      end, by, among other things,

22      substantially contributing to the

23      document review, consulting on

24      strategy, assisting trial teams to

FAC Resp. Exhibit D -- 588

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          prepare for trials through mock

2          trials, providing research and

3          editorial support, submitting

4          cases for trial in New Jersey,

5          although ours did not go, and

6          submitting our allocable share of

7          discovery cases in New Jersey in

8          the litigation, including late in

9          the game to put settlement

10         pressure on Merck, and also in

11         assisting with drafting of the

12         settlement agreement.

13              So, it's fair to say that

14         Kasowitz Benson was and remained

15         committed to the common Vioxx

16         effort from beginning to end.

17              And we had significant

18         partner participation.

19         Approximately eight partners

20         worked on the Vioxx matter,

21         including two of the named

22         partners, as I mentioned, two

23         senior trial counsel, which was

24         Chris Johnson and myself,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1          overseeing the day to day

 2          litigation, and other partners

 3          where appropriate.

 4                  We also had participation

 5          from approximately 15 other

 6          lawyers at all levels, including

 7          special counsel, senior and junior

 8          associates and staff attorneys,

 9          and all 29 different legal

10          professionals from Kasowitz Benson

11          assisted in the common benefit

12          fund effort.

13                  Addressing the quality of

14          our work, I'm happy to let members

15          of the panel who are here today

16          and are familiar with the quality

17          of the work that we produce speak

18          to that, but I think it's fair to

19          say that we expected and firmly

20          believe that we delivered the same

21          high quality for the national

22          Vioxx litigation projects as we do

23          for any of our defense clients.

24                  With respect to the

FAC Resp. Exhibit D -- 590

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1       litigation, our common benefit

2       efforts primarily centered in the

3       New Jersey litigation, because all

4       of our firms' cases were filed in

5       New Jersey.

6             I would like to now walk

7       through a little more specifically

8       the contributions that we made.

9             From the outset, Kasowitz

10      Benson's participation in the

11      litigation, which began in

12      February of 2005, shortly after

13      Merck's withdraw of Vioxx, we

14      supported the national litigation

15      effort.  And when we first became

16      involved, we talked to Chris

17      Seeger and Dave Buchanan, and we

18      asked them how we could help the

19      common effort.

20            And Seeger Weiss asked us to

21      do two things, both of which we

22      did.  One was to contribute to a

23      common fund.  They had a computer

24      system setup, and we made a

FAC Resp. Exhibit D -- 591

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        contribution to that fund.  And

2        the second was to assist in the

3        review of millions of pages of

4        Merck documents.

5              According to our time

6        records, we devoted over 1,000

7        hours to the common discovery

8        effort, a substantial portion of

9        which involved reviewing Merck

10       documents at Seeger Weiss.

11       Indeed, we regularly sent one or

12       two associates at a time down to

13       Seeger Weiss' offices to review

14       those documents.

15             And among other things,

16       Kasowitz Benson lawyers reviewed

17       documents for Ray Gilmartin's

18       deposition and documents

19       concerning Alise Reicin.

20             MR. SEEGER:  Let me just

21       take one moment, because it is

22       important because we have a lot of

23       different types of people doing

24       different things in the case, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1       they always sent very high quality

2       lawyers to the document review.

3       It was real document review by

4       people who were good at spotting

5       documents.  I just want to make a

6       note of that for the record.  As

7       opposed to somebody parking like

8       the contract lawyer in the

9       repository.  It was very different

10      for that.

11              For depositions, I know that

12      you guys would get a big dump of

13      documents, and your people would

14      go through them, and then we would

15      get back the best of.

16              MR. FETTERMAN:  Thank you.

17              I would like to address the

18      activities that Kasowitz Benson

19      participated in, including

20      bellwether trials and nonMDL

21      trials that impacted proceedings

22      on the common benefit level.

23              Kasowitz Benson also played

24      a substantial role in assisting

FAC Resp. Exhibit D -- 593

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1    specific trial teams in evaluating

2    and preparing their cases for

3    trial in four significant cases by

4    sharing our defense perspective

5    and anticipating Merck's defenses

6    as Merck adjusted and adapted

7    those defenses.

8         We also contributed to the

9    common benefit by participating in

10   the education of approximately 250

11   Vioxx lawyers from across the

12   country, and I'll describe those

13   efforts now in more detail.

14        We were initially asked by

15   Mark Lanier and Rick Meadow if we

16   would be willing to assist them in

17   preparing the Lanier trial team

18   for what turned out to be one of

19   the most significant bellwether

20   trials in the national litigation,

21   the Ernst trial.  We took that

22   role seriously and prepared for

23   that mock as if it were our own

24   case.  We retained a cardiologist

FAC Resp. Exhibit D -- 594

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          to advise us on specific

2          causation, focusing on where we

3          thought Merck would try to exploit

4          potential weaknesses in that case,

5          particularly with respect to

6          specific causation and the

7          coroner's observations that she

8          found no evidence of a heart

9          attack, that Ernst had died of

10         natural causes, specifically

11         arrhythmia, and that Ernst had

12         risk factors for arrhythmia and

13         the like.

14              Mark can speak to the value

15         that we added in his preparation

16         for that trial, but it's fair to

17         say that we had a spirited mock

18         trial, and I am still nursing the

19         battle scars from that.

20              As we all know, Mark did a

21         brilliant job in trying that case,

22         which resulted in an over $250

23         million jury verdict in a very

24         difficult case and set the tone

FAC Resp. Exhibit D -- 595

Page 13

1        for the entire Vioxx litigation.

2              I believe as a result of

3        that work, I was also asked to

4        participate in a continuing legal

5        education mock trial put on by the

6        Association of Trial Lawyers of

7        America in New Orleans for

8        approximately 250 Vioxx lawyers

9        from around the country in May of

10       2005.  Specifically, I was asked

11       to give the closing argument for a

12       hypothetical Vioxx case, the Smith

13       case, to teach Vioxx lawyers how

14       to try these cases.  This time

15       Mark and I were on the same team,

16       Mark opened and I closed.

17             Again, Kasowitz, Benson took

18       its role seriously, prepared

19       approximately 100 PowerPoint

20       slides, which included

21       professional medical graphics and

22       which marshalled all the then

23       available evidence in support of a

24       Vioxx claim as a road map for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1        other trial lawyers in the

 2        national litigation.  And we

 3        shared that at the mock.

 4             That presentation was very

 5        well received, and I'm happy to

 6        report that Mark and I were

 7        victorious in the Smith case.

 8             Again, I had the privilege

 9        of participating in a mock trial

10        for the second case that went to

11        trial in the New Jersey

12        litigation, the Cona/McDarby case,

13        with Mark Lanier, Perry Weitz and

14        Rob Gordon.

15             In that case, in that mock,

16        Perry and I defended Merck against

17        the formidable team of Mark Lanier

18        and Rob Gordon.  Again, we

19        prepared for that mock as if it

20        were our own case.  Kasowitz

21        Benson prepared approximately 90

22        slides for that, including

23        professional graphics.

24             The case was tried to the
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 597

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1       first win in New Jersey, and I

2       believe the second win in the

3       overall litigation, with the trial

4       team winning approximately $13

5       million in damages and attorneys'

6       fees.  And, again, another

7       important bellwether case for the

8       national litigation.

9           Addressing the fourth mock

10      that I participated in, I was

11      asked by Chris Seeger and Sol

12      Weiss to assist them in vetting

13      the next group of cases that were

14      on the New Jersey trial calendar

15      for the estate of Steven Hatch and

16      Robert McFarland.  They were

17      concerned about how these

18      plaintiffs, how well these

19      plaintiffs would do at trial, and

20      asked if I would cross the actual

21      plaintiffs so they could test how

22      they would hold up in a courtroom

23      setting.  This case was

24      significant, because at the time

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1      in the New Jersey litigation, the

2      win/loss record was 1 and 1. At

3      the mock, Kasowitz Benson

4      presented Merck's arguments on

5      both general and specific

6      causation, and I prepared for and

7      cross-examined these plaintiffs

8      just like I would have had I been

9      defending Merck at trial.

10          Robert McFarland had a heart

11      attack, but during the

12      cross-examination, we showed a

13      video of him hiking with his

14      family and water skiing after his

15      heart attack, seemingly in perfect

16      health, and argued that his eating

17      habits, particularly the eggs,

18      sausage and butter that he had

19      regularly for breakfast and other

20      significant risk factors caused

21      his heart attack, and not the

22      Vioxx.

23          With respect to Mr. Hatch,

24      we argued that Hatch did not have

FAC Resp. Exhibit D -- 599

Page 17

```
 1          a heart attack, but instead he

 2          died from an arrhythmia, that the

 3          evidence of his biofuse was

 4          sketchy at best.  We also

 5          cross-examined Mrs. Hatch on her

 6          work for this prescribing doctor's

 7          office, for taking Vioxx for her

 8          husband without recording it in

 9          his chart and other problems with

10          her testimony.

11              Neither plaintiff fared well

12          in that mock trial, and

13          plaintiff's counsel decided not to

14          move forward with the trial of

15          those cases.

16              Finally, we were asked to

17          participate in the mock for the

18          Humeston II trial, the retrial of

19          the Humeston case, where we

20          presented Merck's general

21          causation arguments at the mock

22          trial with the Lanier and Seeger

23          Weiss firms.  Humeston II, as you

24          all know, resulted in a total
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        damages award of over $47 million.

2        Again, a bellwether trial for the

3        national Vioxx litigation, and a

4        far better outcome for the New

5        Jersey litigation for the ultimate

6        settlement than if the

7        Hatch/McFarland trial had

8        proceeded.

9            In sum, Kasowitz Benson

10       assisted in preparing the trial

11       teams in three of the five winning

12       national Vioxx trials and helped

13       to vet a losing trial before it

14       occurred.  We also assisted in the

15       education of Vioxx lawyers

16       throughout the country through our

17       participation in the ATLA

18       continuing legal education program

19       in New Orleans.

20           We had other contributions.

21       In general, I would like to go

22       through some of those.  We

23       reviewed STI documents, prepared a

24       PowerPoint, and were in the

FAC Resp. Exhibit D -- 601

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        process of preparing for STI

2        depositions when the settlement

3        occurred.  We assisted with

4        general strategy and settlement

5        issues.  We provided research and

6        editorial support for the forum

7        non conveniens brief filed in New

8        Jersey, and we provided assistance

9        in drafting the settlement

10       agreement, particularly with

11       respect to letter of credit

12       issues.

13            To wrap up, we submitted

14       approximately 4,395 hours in time,

15       and $47,471 in expenses.  Based on

16       our current hourly rates, the

17       value of our time and expenses is

18       approximately $2.1 million,

19       2,132,370 to be more specific.  We

20       respectfully ask that the fee

21       allocation committee recommend

22       that we receive that amount times

23       whatever multiplier deemed

24       appropriate to recognize Kasowitz

FAC Resp. Exhibit D -- 602

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1        Benson's qualitative contributions

 2        and commitment to the national

 3        Vioxx litigation.

 4             I also want to say, on

 5        behalf of Kasowitz Benson, what a

 6        privilege and how much fun it was

 7        to participate in this important

 8        national litigation with you and

 9        other Vioxx counsel, and we look

10        forward to the next one.

11             Thank you.

12             MR. SEEGER:  Nicely done.

13        And I think from my perspective,

14        you did a very good and accurate

15        job in describing the work you did

16        in the litigation.

17             MR. LEVIN:  I'm from the

18        MDL, and I know not anything other

19        than what you did on the

20        settlement agreement, but it

21        confirms what others in New Jersey

22        said --

23             MR. SEEGER:  By the way, I

24        might have lost focus, but did you
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        have that in there?

2               MR. LEVIN:  Yes, he did,

3        because I said to Chris, you've

4        got to go to somebody that knows

5        what they are doing on a letter of

6        credit, and he mentioned your

7        firm.  And I said they do.

8               MR. WEITZ:  They are a

9        perfect example of a firm that, if

10        you were in New Jersey, you knew

11        was extraordinarily helpful in a

12        lot of ways, but probably did not

13        transcend to the MDL.  They were

14        there every time anybody asked to

15        help, and their work was

16        absolutely first class.

17               Arnie, do you have the right

18        expenses?

19               MR. LEVIN:  I don't have

20        them, but I'm sure they are okay.

21               MR. WEITZ:  What was your

22        number again?

23               MR. JOHNSON:  47,000.

24               MR. LEVIN:  I think 47 is

Page 22

1        exactly what I remember.

2                MR. SEEGER:  Dan, how many

3        individual cases do you have that

4        you are putting through the

5        settlement?

6                MR. FETTERMAN:  It is about

7        260.

8                MR. SEEGER:  Like I said,

9        that's a very accurate

10       presentation.  I know what you did

11       for us in the litigation.  It

12       really was a pleasure working with

13       you from my perspective.

14               MR. LEVIN:  It is a pleasure

15       not working with you and meeting

16       with you.

17               MR. SEEGER:  I don't have

18       any other questions.  Thank you.

19                    -   -   -

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 606

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM:  KLINE & SPECTER, P.C.
Thomas R. Kline, Esquire
Shanin Specter, Esquire
Lisa Dagostino, M.D., J.D.
Kathy Spurka

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 607

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -

 2              MR. KLINE:  For the record,

 3        I'm Tom Kline from the law firm of

 4        Kline & Specter.  I'm here with my

 5        partner, Shanin Specter, Lee

 6        Balefsky, my partner, recent

 7        partner, Lisa Dagostino, and legal

 8        assistant, Kathy Spurka.

 9              I want to start out with a

10        story, which those of us who

11        labored in the trenches I think

12        will appreciate, and some of you

13        will indulge me because you may

14        have heard it before.

15              It was the night before

16        Jerry Avorn's deposition, and I

17        was coming back from a good steak

18        with Buchanan and Tisi.  Actually,

19        I think Buchanan had two steaks

20        and a couple of drinks.  We were

21        staying at not the Four Seasons,

22        but the Sheraton in Boston where

23        the deposition was going to take

24        place.  There was a Lions
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        Convention in town at the time.

 2        We got in the elevator with a

 3        fellow who, to use a word or a

 4        description that I've heard Mark

 5        Lanier use during the course of

 6        this litigation, he looked like he

 7        was a pork chop away.  He was a

 8        man who looked like he had every

 9        one of the comorbidities that any

10        of our Vioxx clients had.  He was

11        short, he was obese, he looked

12        like, if I were to make a

13        diagnosis on the spot, he had

14        hypertension.

15              MR. LEVIN:  Objection.

16              MR. KLINE:  He looked like

17        he had diabetes based on my

18        analysis of the man.  As we were

19        going up the elevator on the 7th

20        floor, I said, admittedly after a

21        couple drinks, let me ask you a

22        question, and pushing 60 at the

23        time, I could say this, "I said,

24        pop, have you ever been on the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1      drug Vioxx?"  And he looked at me
 2      nonplused, like he had never heard
 3      of it before, and his wife looked
 4      at me and said, no, but if you
 5      have some, mistaking it for some
 6      other drug with the letter V, if
 7      you have some, I think we'd like
 8      to get it.
 9           There are two points that I
10      take from the story.  The first
11      is, that was the teamwork and
12      camaraderie of the Vioxx
13      litigation.  Any of us who stayed
14      up until the wee hours of the
15      morning, like I think everyone in
16      this room, everyone who labored in
17      the trenches of this litigation,
18      knows what it feels like to pull
19      together like we all did in a
20      remarkable effort.
21           And the second point that I
22      would make is, the story tells me,
23      as I reflected on it, just how
24      difficult we all knew the task was
```

FAC Resp. Exhibit D -- 610

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      and how we understood the

2      causation problems, the patient

3      population and the convincing that

4      it was going to take to win these

5      cases.

6           If I can start with the

7      first slide, I would start my

8      presentation with a quotation from

9      C.S. Lewis, and I think it is

10     apropos to my endeavors here

11     today.  "We all wish to be judged

12     by our peers, by the men 'after

13     our own heart'.  Only they really

14     know our mind and only they judge

15     it by the standard we fully

16     acknowledge.  Theirs is the praise

17     we really covet and the blame we

18     really dread."

19          You will see where I'm

20     going.  My presentation today I

21     see as more creating a necessary

22     record than to convince this panel

23     of colleagues who appreciate our

24     firm's, among many other firm's,

FAC Resp. Exhibit D -- 611

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        including those at this table,

2        contribution to the Vioxx

3        litigation.

4            Our firm has many

5        experienced trial lawyers, lawyers

6        experienced in mass tort and

7        catastrophic injury.  We brought a

8        team, and I calculated this

9        yesterday, to this litigation with

10       over 100 years of lawyering

11       experience and 40 years of medical

12       experience.  We were there at the

13       beginning, as those at the table

14       know.  We made a major

15       contribution, I believe, and that

16       contribution, as I said, was made

17       not only by our firm, but by many

18       other firms.

19           The litigation settled on

20       the strength of the collective

21       work that essentially is now

22       memorialized in something known as

23       the trial package.  It is heavy

24       with science and medicine and as

FAC Resp. Exhibit D -- 612

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          technical and complex as I've seen
 2          in 30 years of litigating complex
 3          drug product cases, back to the
 4          first one which I tried, which was
 5          a Dalkon Shield case.
 6               On the day that this case
 7          settled, and I take us back to the
 8          words of praise by C.S. Lewis, and
 9          we were headed to New Orleans, I
10          received the kindest note, kindest
11          note from Russ Herman, inviting
12          our firm to a dinner in New
13          Orleans with the highest praise,
14          which was appreciated then and
15          appreciated now.  I return that
16          praise, Russ, I return that praise
17          by saying we appreciate your
18          leadership.
19               His e-mail in the invitation
20          said, "Your firm's team is and has
21          been integral to all efforts."  My
22          presentation today will describe
23          all of those efforts and how they
24          were, I believe, integral to a
```

FAC Resp. Exhibit D -- 613

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1        collective effort that was made in

 2        this room and throughout the

 3        United States.

 4             An overview.  If you guys

 5        can just wait for me on the

 6        slides.  We're among friends.

 7             Here's how I see the

 8        overview for what we've done in

 9        showing how our role was integral.

10        We were involved since back in

11        2003.  No one at this table knows

12        better than Chris Seeger.  We, of

13        course, provided litigation

14        funding and took the risk with all

15        of those here.  We developed a

16        substantial portion of the

17        liability case principally through

18        depositions of Merck executives,

19        scientists, key third parties,

20        developed experts and did

21        extensive, I mean extensive

22        document review.

23             Next we developed a

24        substantial portion of the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      causation case, including

2      depositions, expert development,

3      medical literature review, work on

4      mechanism of action and

5      pharmacology.  This was the

6      scientific puzzle that we all

7      struggled with in the beginning.

8           If I might complement her,

9      Lisa Dagostino did the work in the

10     trenches, along with many others

11     whose names are familiar, Dave

12     Buchanan, very notably, as well as

13     others.

14          We did expert development,

15     and I'm going to discuss that with

16     you, and extensive document

17     review.  Trial package development

18     included significant portions of

19     the trial package, which I'll

20     discuss.  We were involved in the

21     preemption briefing in which Arnie

22     took the lead.  We worked very

23     closely, as everyone knows.  Lisa

24     argued the factual portion, while

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          others argued the other portion.

2                  We were intimately involved

3          in the trial, not only trial

4          selection, but trial strategy, in

5          many aspects of it, both formally

6          and informally, as this litigation

7          progressed.

8                  I know it's important, so my

9          next slide deals with leadership

10         positions and committee

11         memberships.

12                 The next slide on committee

13         memberships and leadership

14         positions, again, I believe most

15         people, if not everyone at the

16         table, knows our various roles.

17         Lee Balefsky and I were not only

18         at the status conferences, but we

19         were asked to be part of the

20         premeets with Judge Fallon and

21         were there, and I know viewed by

22         those in leadership in this

23         litigation as an important and

24         integral part of the think tank,

FAC Resp. Exhibit D -- 616

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1       if I could call it that.

2            Lee Balefsky was a member of

3       the discovery committee, liaison

4       counsel, and we were tasked with

5       developing significant parts, as

6       you know, of the stroke package.

7            Lisa Dagostino, her

8       membership on the science

9       committee is well known to

10      everyone at this table and the

11      countless hours -- I guess they

12      are not countless, because they

13      are counted -- but the hours which

14      amount to literally two years of

15      full-time work.

16           Lisa, as everyone knows, is

17      a physician and an attorney and

18      among the most knowledgeable, by

19      anyone's account, in the

20      litigation of the science and

21      medicine of Vioxx.  It's probably

22      only a shame for the victims of

23      Vioxx that Lisa Dagostino wasn't

24      Alise Reicin, because there may

FAC Resp. Exhibit D -- 617

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          not have been that tragedy.

2                  As part of the science

3          committee, Lisa undertook an

4          extensive review of the underlying

5          medical files for adverse events

6          in the Merck trials.  Those at

7          this table who were in the

8          litigation part of this know that

9          that was the, quote, adjudication

10         project.  That was some of the

11         most tedious work in dragging down

12         and undercutting the underbelly of

13         the various Merck studies,

14         especially the VIGOR trial, and

15         Lisa was involved.

16                  Moving to depositions.

17         Depositions of key Merck

18         scientists and executives, I think

19         probably our firm made one of its

20         most significant contributions

21         here.  I can tick them off.

22         Shanin Specter was one of the

23         three who deposed Ray Gilmartin, I

24         remember those days well, as will

FAC Resp. Exhibit D -- 618

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          Chris Seeger and Mark Lanier.

2               Ed Scolnick, I, in

3     particular, did what was then

4     called the label module.  It took

5     us all collectively, until my

6     redirect-examination, to figure

7     out that Ed Scolnick never

8     finished his residency and was

9     never board certified, and that's

10    why he didn't practice medicine.

11    That is a little historical fact

12    for those in the room who would

13    appreciate it.

14               Shanin, on four different

15    days, relentlessly and doggedly

16    day after day went after Peter

17    Kim, one of the best witnesses

18    that Merck had.

19               I've always to this day

20    thought that Alise Reicin loathed

21    Lanier more than me, but I had

22    three different cracks at her and

23    probably the best day of the

24    litigation, and I mean this,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1          because we all know Mark Lanier's

 2          contribution to this litigation.

 3          I was only lucky enough to be

 4          there when Chris Seeger ran into

 5          the room on the record, Mrs.

 6          Golkow will testify to this under

 7          oath, and said, we got a verdict,

 8          $250 million, and we were on the

 9          record.  True, Linda?

10               THE COURT REPORTER:  Yes.

11               MR. KLINE:  I said to Alise

12          Reicin, so, what do you think

13          about that, Dr. Reicin?  I was

14          only there to ask her what she

15          thought about it, Lanier got the

16          verdict, and it was a turning

17          point.

18               I was talking to Rick Meadow

19          today out in the hall, because

20          this is a time, I guess, to

21          reminisce, too, about how the

22          State cases and the Federal cases

23          and the effort, as I'm going to

24          talk about in a moment at the

FAC Resp. Exhibit D -- 620

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          Topol deposition, became a

2          collective one.  Everybody from

3          California to New Jersey, coast to

4          coast, banded together in this

5          litigation.  That's something I'm

6          proud of.

7               If I can have like one

8          little gem that I take credit for,

9          I want one little thing, defender

10          of the franchise.  Actually, Lisa

11          found it.  I only got, as Shanin

12          Specter would say, quoting Winston

13          Churchill, the roar.

14               Deborah Shapiro was taken by

15          Shanin Specter.  As you know, it

16          is the only evidence that Judge

17          Higbee found sufficient to present

18          to the jury on punitive damages in

19          Cona/McDarby, the Cona/McDarby

20          trial.  I have, and I know Mark

21          will indulge me with the e-mail

22          later in showing it, but I have

23          the nicest e-mail between Shanin

24          and Mark, which I would like to

FAC Resp. Exhibit D -- 621

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          share with this group, because I

2          think it shows, again, our

3          integral part.

4                  Continuing along, these were

5          the key Merck scientists and

6          executives.  For two days, Shanin

7          went at Alan Nies on the early

8          development of the drug, the

9          pharmacology, backed up by Lisa.

10                 We do not take credit for

11         the developing of the marketing

12         part of this case, it was ably

13         developed by other lawyers, but I

14         might add, we just wanted our toes

15         in the Anstice water, and so Lee

16         Balefsky got a small crack at him

17         that day.

18                 Continuing along, Barry

19         Gertz, as you all know, he's a

20         pharmacologist, he was a key guy,

21         and it was a very technical

22         deposition taken by Mark Hoffman

23         with something near 30 years of

24         experience as a former transplant

FAC Resp. Exhibit D -- 622

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1        surgeon, and one of the early

 2        developers and persons who figured

 3        out the science of this

 4        litigation.

 5            Tom Simon, the GI doc who

 6        designed the VIGOR trial, was

 7        taken on two separate days by Mark

 8        Hoffman.

 9            Continuing along, Kathy

10        Metters, who was the head of basic

11        research of Merck, you will all

12        remember the so-called claw back

13        document, the patent document.

14        That's what this deposition was

15        all about.

16            On this page, I've lumped

17        her with Joe Lynch, who was taken

18        by Shanin, and Lisa questioned

19        him, and that was the infamous

20        green monkey study.  Here's a

21        point that may get lost in the sea

22        of work that was done by so many

23        lawyers.

24            The green monkey study was a
```

FAC Resp. Exhibit D -- 623

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        major defense, as was the defenses

 2        presented by Metters.  It was

 3        neutralizing those defenses, not

 4        only presenting the evidence that

 5        we developed, but neutralizing the

 6        defenses, neutralizing the Peter

 7        Kims, neutralizing the Metters,

 8        neutralizing the Lynches of the

 9        Merck stable that contributed

10        significantly.

11             There were many trials in

12        this litigation, as we all know,

13        and we provided direct support and

14        assistance, deposition cuts, all

15        kinds of assistance.  I know that

16        in your small group, Andy can

17        speak to that.  He knows that we

18        were there, as does Chris and

19        others at these trials, during

20        these trials, for these trials.

21             Speaking of trials, I want

22        to, in passing, mention one case

23        which never did try.  That was the

24        Abrams case.  It was listed as the
```

FAC Resp. Exhibit D -- 624

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1      second MDL trial.  It was listed

2      in early 2006.  It was a

3      disappointment to pull that case.

4      After consulting with all of the

5      PEC, including Andy and Chris and

6      Russ and Arnie, I might add, as

7      well, we unanimously agreed that a

8      late discovered document made the

9      case undesirable as a bellwether

10     case.  I know that was a

11     disappointment to all of us, and I

12     know it was a disappointment to

13     Judge Fallon, but for those of us

14     who were involved in the decision,

15     I still think that it was the

16     right decision.

17          Depositions in this

18     litigation of third parties were,

19     as everyone here knows, very

20     important.  I was given the

21     responsibility to be involved in

22     taking two of what we at the time

23     in the trenches called the

24     third-party trinity, Topol, Graham

FAC Resp. Exhibit D -- 625

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1      and Nissen.

 2          The deposition of Eric

 3      Topol, which, of course, was

 4      extremely critical of Merck's

 5      conduct, was played at, I believe,

 6      every trial, certainly every trial

 7      which ended in a plaintiff's

 8      verdict, but I believe every

 9      trial.  He debunked many of the

10      theories.  It was our most solid

11      evidence on debunking Merck's

12      interpretation of the APPROVe data

13      that the increased risk of Vioxx

14      only happened at 18 months.

15          I could not have done that

16      deposition without Mark Lanier.

17      He and I know it.  He and I were

18      collaborators in a backstory that

19      probably will never be told on a

20      record.

21          MR. LANIER:  But it was a

22      darn good story.

23          MR. KLINE:  It was a hell of

24      a story, and it was one of the

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 626

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1      most fun things that I ever did as

2      a lawyer.

3          David Graham, his deposition

4      was taken by me, and we know the

5      story there.  He was the chief

6      critic.

7          Nissen was Topol's co-author

8      and FDA Advisory Committee member,

9      and Lisa worked extensively with

10     Chris Tisi on this litigation.  I

11     would be remiss, because I labored

12     so many hours, as did Lisa in

13     particular with Chris Tisi, and I

14     know it is my time to make a

15     pitch, but I can tell you that

16     Chris Tisi was the dogged pursuer

17     of the MDL third-party strategy.

18     He kept saying, let's take these

19     deps, let's take these deps, and

20     Topol was worth it, and we offer

21     congratulations to him.

22          I was responsible to go off

23     and take Curfman.  We all know how

24     the New England Journal was in the

FAC Resp. Exhibit D -- 627

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        middle of the fray.  I went up and

2        took Curfman's deposition after

3        the Expression of Concern was

4        written.  It became a very

5        important corollary to what was

6        going on at that time.

7             Jerry Avorn, Chris Tisi ably

8        took it.  Mark Lanier at trial did

9        it live, and Lisa did much of a

10       background and prep work on that.

11       I went up there for the

12       deposition, because somehow my

13       being there was supposed to

14       neutralize Phil Beck or something

15       like that.  I don't take any

16       credit for it, other than Lisa did

17       all the background work on Avorn.

18            And then, finally, I was up

19       there when they sent the dogs out

20       after Eric Topol and they decided

21       that Mal Mixon, the chairman of

22       the board of trustees of the

23       Cleveland Clinic, was going to

24       trash the guy.  I was sent to do

FAC Resp. Exhibit D -- 628

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      the cross-examination.  I don't

2      remember seeing that deposition

3      played during the course of the

4      Vioxx litigation, as I recall it.

5          Expert development.  A word

6      about it, if I may.  We were

7      involved in much of the major

8      expert development in this

9      litigation.  Jerry Avorn -- I'm

10     going to pass over a lot of this

11     quickly for the sake of time --

12     but they are names that are

13     familiar to everyone here.  Avorn

14     was clearly, in my view, was the

15     most distinguished expert.  Tisi,

16     Buchanan, Grand from Seeger Weiss,

17     the latter two did phenomenal

18     work, along with Lisa, in a key

19     deposition, as I believe we all

20     agree.

21          Ray, another highly

22     credentialed expert.  Lisa

23     Dagostino, Tisi and Buchanan

24     prepping him for a de bene esse

FAC Resp. Exhibit D -- 629

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          deposition.  And then there were

2          other experts, as well, that we

3          spent much time working with in

4          expert development, and that

5          includes Pace-Asciak, Parisian,

6          Levine, who is the stroke

7          expert -- I'll speak to that in

8          just a moment, I'll speak to

9          Feldman in a moment, who, in the

10         stroke part of the trial package,

11         was a project among many people,

12         including Mike Wenkowitz of Arnold

13         Levin's office and Lisa Dagostino.

14              That takes us to the trial

15         package.  It's kind of like a tour

16         of the Vioxx litigation, by the

17         way.

18              The trial package, I would

19         make just a few points.  The trial

20         package has been described, I've

21         heard it described as probably the

22         best trial package ever put

23         together in mass tort litigation.

24         It was a comprehensive effort of

FAC Resp. Exhibit D -- 630

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1        many people who put in countless

2        hours in the project.

3            I would say a couple of

4        things about our contribution.

5        The documents which are sitting

6        with Lisa to her right, if I can

7        just have them in my hand for a

8        moment, are really three.  They

9        became really the guide, if you

10       will, the way that someone would,

11       along with the updated --

12            MR. SEEGER:  Your time --

13            MR. KLINE:  I am going to

14       make it, and I appreciate the

15       indulgence.

16            -- along with the road map,

17       and what do you call the initial

18       --

19            MS. DAGOSTINO:  The theme

20       grid.

21            MR. KLINE:  The theme grid.

22       Along with the theme grid, which

23       the trial committee updated, which

24       was the original work of Buchanan,

FAC Resp. Exhibit D -- 631

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1        et al., Seeger, et al.  She

2        compiled the dictionary of terms,

3        the list of 3,200 articles in

4        Vioxx, which Lisa Dagostino

5        labored through and actually knows

6        and actually read.

7             This is essentially our data

8        bank, as is the cast of

9        characters, which essentially is a

10        road map of the who's who.  I know

11        this committee is familiar with

12        all of them.

13             In addition, we were

14        involved in doing all the things

15        that went into the package, which

16        is the deposition cuts, the

17        modules, et cetera.

18             I want to lead into my last

19        four minutes with "In the words of

20        our peers," this litigation was a

21        team effort.  I just want to show

22        a few things, and I know that

23        those who wrote them will be okay

24        with it, I guess is what I want to

FAC Resp. Exhibit D -- 632

Page 27

```
 1        say.
 2              First of all, Lanier.  This
 3        is on the Topol deposition, and I
 4        like it and I saved it.
 5              "Put down your
 6        computer/Blackberry."  He was in
 7        England.  "Go Outside...Listen.
 8        ..can you hear that???  Can you
 9        hear the applause?"  This is
10        classic Lanier, I might add.  "It
11        is coming from England...The
12        applause is so loud, it is
13        traveling the Atlantic.  I just
14        read the Topol depo.  If that is
15        not your best work, I would love
16        to see what is!  Fantastic!!!
17        Absolutely fantastic!!!  My
18        compliments and praise...Happy
19        Thanksgiving."
20              That was followed by a whole
21        bunch of e-mails about Bob Dylan,
22        which are not part of this
23        presentation.
24              From Mark, again, a very
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1        nice note saying, "Lisa/Shanin/
 2        Tom's incredible depositions of
 3        Shapiro/Topol."
 4             I would like to share with
 5        this group a really nice e-mail
 6        between Shanin and Mark.
 7             If we can skip this one and
 8        go to the next one, which is, "We
 9        got to punies because of you,"
10        said Lanier.  "Judge denied motion
11        to dismiss!!!
12             Specter quoting Churchill.
13        "I 'had the luck to give the
14        roar.'  Lisa Dagostino deserves
15        the credit."
16             And Lanier.  "You were
17        played in closing puni argument...
18        Great find and delivery from you
19        and Lisa both!!!"
20             Next, speaking to the
21        trials, our involvement in the
22        various trials, Steve Knowlton of
23        the Locks firm saying, "Please
24        tell Tom thanks for me.  Your
```

FAC Resp. Exhibit D -- 634

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1          work, as a firm, has been an
 2          essential part of the case."
 3              Pete Kaufman writing from
 4          the Levin Papantonio firm.  "Lisa,
 5          your contributions to the trial
 6          package have been astonishing.  If
 7          I knew a word better than
 8          'astonishing,' I would use it."
 9              And Chris Tisi saying, "Wow!
10          Lisa and Kathy...this is great to
11          have.  You are fantastic."  This
12          is a kudos to the many hours of
13          work that was done by Kathy
14          Spurka.  No Arnie, you cannot have
15          her back.  "You guys are the best.
16          I particularly want to thank
17          Kathy."
18              And finally from Russ, very
19          kindly sending to Lisa and telling
20          here, "Excellent work as usual."
21              And finally another e-mail
22          again from Russ in his true
23          gentlemanly style.  We in the
24          north still have much to learn
```

FAC Resp. Exhibit D -- 635

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1        from you, Russ.  It says here, "I

 2        personally appreciate your

 3        continuous work at a level of

 4        excellence.  Trial package and

 5        everything you have touched has

 6        been top notch.  Take care and

 7        thanks."

 8             My very few concluding

 9        thoughts.

10             MR. SEEGER:  Wait a second.

11        You don't have one nice e-mail

12        from me?

13             MR. KLINE:  You didn't send

14        me an e-mail or I would.

15             MS. DAGOSTINO:  We had to

16        redact certain words.

17             MR. HERMAN:  Mark recants,

18        but I don't.

19             MR. SEEGER:  I should have

20        written at least one nice e-mail.

21             MR. KLINE:  You didn't write

22        one to me, but you told me so.

23             MR. SEEGER:  Yes, I did.

24             MR. KLINE:  Here's the laugh
```

FAC Resp. Exhibit D -- 636

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1    line.  Here is my laugh line.

2         "I can live on a great

3    compliment for two months."  Mark

4    Twain.

5         Here's my last point.  This

6    was my official presentation, and

7    thank you for indulging me.  Thank

8    you again.  This was a successful

9    group effort.  Different people in

10   different firms did different

11   valuable things.  The

12   significantly contributing firms

13   of the PSC, of which ours is

14   clearly one, should be recognized

15   and recognized at the same

16   multiplier without

17   differentiation.  That's our view

18   of it.  Our work was undoubtedly

19   integral in the establishment of

20   the settlement and the success of

21   the litigation.

22         Thank you.

23         MR. HERMAN:  Let me say a

24   couple of things at this juncture.

FAC Resp. Exhibit D -- 637

Page 32

1          First of all, you made a

2      good move by making Lisa a

3      partner, because there are other

4      members of the PSC that if you

5      didn't, we would.  She would be

6      welcome at any time in any one of

7      the firms.

8          MR. LEVIN:  I have a

9      question, if I may interrupt you.

10          MR. HERMAN:  Wait a second,

11      it's my turn.

12          I want to thank Lisa

13      particularly.  The trial package

14      to me is one of the most important

15      single things that we can do,

16      because it justifies a common

17      benefit fee.  Individual trials,

18      those that won, some that didn't,

19      depositions, document review, we

20      all know what that is as lawyers.

21      But the ability to resolve the

22      case and at the same time produce

23      a trial package that no one can

24      deny cures a lot of issues in any

FAC Resp. Exhibit D -- 638

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1    view, and it's why I pushed so

2    hard for it.  I think we had our

3    best people on that committee in

4    terms of knowing the case.  Or I

5    should say representatives of the

6    best firms who know the case on

7    that committee.  Others were

8    trying cases at the time.

9        The reason for that is

10   everybody has got the opportunity

11   in this case to opt out.  You

12   don't have to opt in.  And in

13   order to justify the ethical

14   concerns, you have to have some

15   balance on the other side.  You

16   have to be able to say, hey, you

17   don't want in, you don't like the

18   deal, go try your case, here's a

19   package.  I think it's a

20   fundamental issue that's been lost

21   in all of this.  So, the work to

22   me on the trial package is a

23   fundamental situation absolutely

24   necessary in this case.  It is the

FAC Resp. Exhibit D -- 639

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          only trial package I have ever

2          seen come out of an MDL that's

3          worth a damn.  Nobody else had a

4          trial package where you could go

5          try a case.  This one you could.

6                  These trials were costing a

7          million-and-a-half, $1 million

8          apiece.  You can try a case maybe

9          for a couple hundred thousand with

10         this trial package.  I want to say

11         that because we're being recorded

12         on a record, and it's got to be

13         said at some point.

14                 Secondly, you made the issue

15         about the Abrams trial.  I did not

16         know until y'all called that that

17         case was going to be pulled.  It

18         caused some difficulty.  However,

19         Tom's work on Topol, which was

20         used in numerous trials to a great

21         advantage, was before Judge Fallon

22         on several occasions, and I'm sure

23         demonstrated his extraordinary

24         ability as a trial lawyer.  We all

FAC Resp. Exhibit D -- 640

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1        get surprised sooner or later in

2        this practice, it just happens, no

3        matter how hard you work.

4              Again, I want to say that

5        when you take 17 key depositions

6        in the case, and they are taken by

7        partners, and you've got two

8        physician lawyers doing the

9        background work, it's significant.

10        That's my view of this.

11              What comes out of this, I

12        don't know, because the best

13        advice, and I'm directed to say

14        this, you've got to read the Fifth

15        Circuit cases, you've got to read

16        Murphy Oil, you've got to read

17        Mobil, and, of course, the

18        original case setting the Johnson

19        factors, because if this matter is

20        not resolved among counsel in

21        terms of fee, then it is all going

22        to the Fifth Circuit sooner or

23        later.  So, whatever happens.

24              In addition to that, Judge

FAC Resp. Exhibit D -- 641

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        Fallon has said that if the matter

2        is not resolved, he's got some

3        former assistant U.S. Attorneys on

4        hand, he's got the three judges or

5        special masters on hand, he's

6        going to put all of us under oath,

7        and we're all going to be required

8        to testify about what we did and

9        what we didn't do.

10            I say that to you not

11       because I see any fluff in what

12       you've done in your presentation,

13       but you've got to be aware of

14       that, and if there's some changes

15       you want to make to the affidavit,

16       and I'm not suggesting there are,

17       you really have to look at it

18       closely.

19            So, that's what I've got to

20       say.

21            MR. LEVIN:  Off the record.

22                 -  -  -

23            (Whereupon, an

24       off-the-record discussion was

FAC Resp. Exhibit D -- 642

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1       held.)

 2                    -  -  -

 3            MR. KLINE:  Lisa was, in a

 4       way I've never seen, driven

 5       compulsively to the point that I

 6       didn't think it was healthy.  I'll

 7       say that on the record.

 8            MR. LANIER:  Her picture is

 9       in the dictionary next to the word

10       indefatigable.

11            MR. LEVIN:  I went off the

12       record only because of the comment

13       on the hours, but I think

14       everything else is worthy of

15       putting on the record.

16            MR. SEEGER:  From my

17       perspective, your presentation

18       really speaks for itself, and it

19       is a real reminder about how many

20       pieces of the litigation you were

21       involved with.  Clearly, from the

22       day we got involved together in

23       Vioxx, we were in it a little

24       earlier, probably the earliest,
```

FAC Resp. Exhibit D -- 643

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          you have been one of the go-to

2          people.  I think as Russ said,

3          which is key, it wasn't like you

4          sent -- I mean, you and Shanin

5          were taking the depositions and

6          Lisa, so --

7               MR. KLINE:  I appreciate

8          your saying it, and I appreciate

9          what Russ said.  We've all been

10         through a lot together, and I know

11         these proceedings are formal, and

12         I knew I had an obligation to the

13         law firm, the partners, to lay it

14         out.  It is a walk down memory

15         lane for a lot of us, and it is a

16         good walk.  There are a lot of

17         nice pieces to it.  It has been

18         very rewarding to work with the

19         folks in this room.  You know how

20         I feel personally about it.

21              I understand that there are

22         economic issues, and that's why

23         we're all going through the

24         process.  And to answer Russ'

Page 39

1          question, we're well familiar,

2          very familiar with the cases in

3          the Fifth Circuit.

4                    MR. LANIER:  Off the record

5          for a second.

6                         -  -  -

7                    (Whereupon, an

8          off-the-record discussion was

9          held.)

10                        -  -  -

11                   MR. BIRCHFIELD:  I got the

12         benefit of using the Topol

13         deposition first, and it was

14         remarkable work.  And you are

15         right, we were concerned about

16         Lisa's health, too, the hours that

17         she was putting in both on the

18         trial package, on the stroke

19         committee and helping us at

20         trials.  So, your work is really

21         phenomenal, and I appreciate that.

22         I told you before, but I want to

23         say it again.

24                   But one thing, and maybe it

Page 40

 1      is not something that you can

 2      address --

 3           MR. HERMAN:  Andy, would you

 4      raise your voice.

 5           MR. BIRCHFIELD:  One of the

 6      things I wanted you to help me a

 7      little bit on, the Abrams case, I

 8      was in trial when that decision

 9      was made.  Can you share with us

10      what happened there?

11           MR. KLINE:  I sure can.

12      Lisa, do you have the slide?

13           MS. DAGOSTINO:  Yes.

14           MR. KLINE:  I'll show you

15      exactly what happened, and

16      everyone here will understand.

17           We were putting these cases

18      up, as everyone in this room

19      knows.  We were just trying to

20      find cases, our best cases.  We

21      didn't have all of the records.

22      None of us had all of the records.

23      What happened here was you had a

24      self-prescribing doctor, a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          dentist, he was a dentist, whose

2          blood pressure was increasing on

3          Vioxx.  His doctor told him to get

4          off the drug, he didn't, he died.

5              When we saw this document

6          that I brought with me, Andy,

7          which I reported, and I distinctly

8          remember it, and I know the others

9          here do, I reported it to Chris, I

10         talked to Arnie about it, I talked

11         to Russ about it, I talked to you

12         about it, I believe at the time,

13         but in any event, here were the

14         facts, and here was the reasoning.

15             We had a document here that

16         said "Vioxx increasing blood

17         pressure, edema."  The doctor knew

18         that he had the symptoms that, by

19         the way, while we criticized the

20         warning, the label does say

21         certain things about risks, and he

22         told Mr. Abrams or Dr. Abrams, the

23         dentist, who was self-prescribing,

24         in number 4, discontinue Vioxx."

FAC Resp. Exhibit D -- 647

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1        I mean, it's in the "come on"

2        category.  He was told to get off

3        the Vioxx.  He wasn't prescribed

4        Vioxx by a doctor.  He was told by

5        a doctor get off of it.

6             I think that I can work with

7        some pretty bad facts, and I know,

8        Andy, you worked with some pretty

9        bad facts, I know that, but we

10        couldn't win this case.  And at

11        the time, we were all struggling,

12        all of us, with not losing cases,

13        with getting cases that we could

14        win.  We were jockeying with

15        Merck.  We all were involved in

16        this, the folks in the MDL, with

17        what cases to try, what cases not

18        to try.

19             Believe me, I know and I

20        regret that we pulled that case,

21        and I know through Russ and others

22        how Judge Fallon felt about it.

23        But if I can use a word, but damn

24        it, come on.

FAC Resp. Exhibit D -- 648

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          MR. HERMAN:  Well, let me

2      just cut this short, because I

3      don't think you really have to

4      apologize.  I think we were all

5      rubbed raw at the time.

6          But my view has always been,

7      and if you look at the table and

8      I'll look at you guys, the one

9      thing about this litigation is we

10      had real lawyers involved that

11      tried real cases.  I've never been

12      in a position ever of

13      second-guessing a real trial

14      lawyer when he says, hey, I've got

15      to pull the case, I have to do

16      that.  I just think that when you

17      let your arrogance get involved in

18      your best judgment, you are headed

19      for trouble.  I think with really

20      fine trial lawyers, we all

21      sometimes go off base.  I don't

22      think you were off base.  I think

23      that your work was excellent in

24      the case.  It wasn't easy, I'll

FAC Resp. Exhibit D -- 649

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          tell you -- well, it's not

2          important.  But at any rate, I

3          think we need to get past that.  I

4          don't think that ought to be a key

5          factor or a sine qua non in the

6          judgment of your work.  We all

7          have difficulties during trials,

8          we have difficulties, et cetera,

9          but the fact is, your firm made a

10         significant contribution and that

11         you are real lawyers.

12              MR. SEEGER:  From day one.

13              MR. HERMAN:  I want to get

14         past this.  The reason I do is I

15         got over it, and I think we all

16         ought to get over it.

17              MR. KLINE:  I appreciate

18         that, Russ.  We got over it, and

19         Lisa reminded me, what did we go

20         do the next week?  We took the

21         Topol deposition, I believe.

22              MS. DAGOSTINO:  It was the

23         day after.

24              MR. KLINE:  I think it was

FAC Resp. Exhibit D -- 650

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          the day after.  So, we were on to

2          doing the next thing.

3               Russ, I appreciate it.  I

4          felt obliged -- if I might have

5          just literally two seconds more.

6          I felt obliged to address it

7          because of Andy's question.

8               MR. HERMAN:  No, I'm glad

9          you did, and I think it needs to

10         be addressed, because in my own

11         mind --

12              MR. SEEGER:  It was good

13         that Andy asked the question.  It

14         needed to be addressed.

15              MR. KLINE:  It needed to be

16         addressed.  That's how I felt

17         about it.

18              MR. HERMAN:  I guess what I

19         want to say on the record is, in

20         our consideration, we really have

21         to get past it.  It provided a

22         very difficult time in the MDL.  I

23         think what really helps is the

24         fact that your performance and

FAC Resp. Exhibit D -- 651

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          your partners' performance in all

2          the depositions, but particularly

3          in Topol, were very dramatic, and

4          they were going to have to eat

5          Topol in every single trial.  Very

6          important to this litigation.

7               MR. BIRCHFIELD:  In raising

8          that issue, I was not diminishing

9          your work in any way.

10              MR. KLINE:  No, I understand

11         that.  But you couldn't, sitting

12         in our shoes or in my shoes, not

13         go back and look at it

14         reflectively, and this is an

15         opportunity to do that in a

16         self-critical analysis and say

17         what happened, and I know what

18         happened.  I was prepared to say

19         so.

20              MR. SEEGER:  You did.

21              MR. HERMAN:  How many cases

22         have you submitted in the

23         settlement total, do you know?

24         What's the range?

FAC Resp. Exhibit D -- 652

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1            MR. BALEFSKY:  600, a little

2       over 600.

3            MR. KLINE:  A little over

4       600 cases, Russ.

5            MR. SEEGER:  All right.

6       Thank you.

7            MR. HERMAN: Thank you.

8            MR. KLINE:  Thank you.

9            MR. BIRCHFIELD: Thank you.

10               -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 653

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

 1          C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 654

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 3, 2008
- - -
HOUSTON, TEXAS
- - -

FIRM:  LAW OFFICES OF BRIAN K. BALSER
       Brian K. Balser, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 655

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. BIRCHFIELD:  As you see,
 3         we have a court reporter here.
 4         Linda is taking down everything.
 5         There will be a transcript that's
 6         available for Judge Fallon.  He'll
 7         have the transcript for his review
 8         and whatever use he deems is
 9         appropriate.
10              So, you've got the floor.
11              MR. BALSER:  I'm Brian
12         Balser.  I'm in solo practice.
13         Cleveland, Ohio is my main office,
14         and I also have a satellite office
15         in Clearwater, Florida, where
16         hopefully I'll practice more at,
17         but not until my girls grow up.
18              I've been in practice for
19         over 20 years, started off like
20         most do, doing defense work and
21         then I prosecuted for a while.
22         Then I came to the right side and
23         did plaintiffs' work, which I have
24         done since then, almost
```

FAC Resp. Exhibit D -- 656

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           exclusively personal injury, solo

2           practice.  Background is medical

3           malpractice work.  Did a little

4           Sulzer Hip, did a lot of fen-phen.

5           I watched you do a lot of work in

6           the courtroom.

7                Then I got on to the course

8           with the Vioxx, and I was looking

9           forward to getting involved more

10          with it because I was finally on

11          something at the very beginning in

12          terms of it.  I was asked and

13          appointed to the discovery

14          committee, and first I asked what

15          I needed to do, and I called

16          Chris' office, and they said, come

17          on up, and I do believe it was

18          Mike that ran the --

19               MR. SEEGER:  Mike Wagner.

20               MR. BALSER:  -- ran the

21          depository.  I spent time going

22          through records in that one room

23          there.  Then I was appointed to a

24          couple of committees.  The main

FAC Resp. Exhibit D -- 657

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          was the privilege log committee.

2          To be honest, I was really

3          fortunate to get put on the

4          committee with the type of

5          attorneys that we had on there

6          from Anthony Irpino to Mike Hugo,

7          Tara Sutton, Gary Wilson and

8          myself.  Because when I first

9          looked at what we had to do in

10         terms of the privilege log, I

11         said, there's no way it is going

12         to happen.  I didn't see it

13         happening.  But we did the

14         conference calls sometimes two or

15         three times a week.  The nice

16         thing was the other attorneys were

17         as dedicated to this as I was.  If

18         there was something that needed to

19         get done, we made sure it got done

20         in terms of document reviews.

21              One of the examples, when

22         they released more documents up in

23         New York, Mike Hugo and I flew up

24         there, met up there, started

FAC Resp. Exhibit D -- 658

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          looking at the documents.  We

2          said, there was no way we could go

3          through all of these.  With the

4          approval of Anthony, we went and

5          bought an external hard drive.  We

6          downloaded some and shipped them

7          around to the other committee

8          members so that we could get

9          through the different documents we

10         had to get through.

11             The biggest thing, I guess,

12         that I liked is we succeeded in

13         terms of what we wanted to

14         accomplish in terms of getting

15         through the documents.  On the

16         conference calls, I have been on

17         other conference calls, I'm sure

18         you guys have been on a lot more

19         than I have, and you just sit

20         there and say, what the heck are

21         they doing.  Ours weren't like

22         that.  Ours were actually like

23         brain sessions where we actually

24         talked strategy, talked about what

FAC Resp. Exhibit D -- 659

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        we wanted to accomplish, and then

 2        the next call or even in between.

 3        I could call Mike Hugo up and say,

 4        I'm thinking about this, what do

 5        you think, and vice versa.  Same

 6        with Anthony Irpino, same thing

 7        with Tara.

 8             We finally came up with an

 9        idea in terms of, let's set this

10        out so it's easy enough so they

11        can present it to the Court and

12        also so that Judge Fallon would be

13        able to look through the privilege

14        log and say, okay, I see.

15             So, what we did was, we set

16        it up in specific protocols in

17        terms of categories.  I'm sure you

18        are aware of the different

19        categories we came up with based

20        on APPROVe, VIGOR, ADVANTAGE study

21        down through the list, public

22        relations.

23             We spent a lot of time

24        discussing and saying, okay,
```

FAC Resp. Exhibit D -- 660

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1         what's the best way to set this

2         up.  We would highlight it and we

3         would put little notes in them,

4         and we would go through them.  We

5         would do memos back and forth with

6         each other, a quick e-mail, a

7         quick phone call.  That's the

8         reason I think we were successful

9         with this committee because it

10        didn't matter what time of day it

11        was or what time of night,

12        everybody was accessible, which

13        was really, really nice.  It was

14        something different for me with

15        being in solo practice to bounce

16        ideas off of somebody.  It went

17        back and forth.  I really, really

18        enjoyed that part.

19            I must be honest.  It was a

20        lot more work than I thought it

21        was going to be when I first got

22        involved.  But being in solo

23        practice, it is a situation where

24        you keep the lights on based on

FAC Resp. Exhibit D -- 661

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        what you do.  There were periods

2        of time, about three months where

3        I was working over 30 hours a week

4        just on the Vioxx and the

5        privilege log, but I enjoyed it.

6        I really enjoyed it, and I enjoyed

7        working with who I was working

8        with.

9            I thought that the result we

10       got in terms of categorizing,

11       setting it up on a tee and letting

12       Russ and everybody else, when they

13       presented it to the judge, knock

14       it out of the park, made it even

15       more special to me in terms of

16       getting it done.

17           I also thought that the fact

18       that Judge Fallon was able to get

19       through those 80 boxes in two

20       weeks was really a compliment to

21       us in terms of the committee

22       because of the way we were able to

23       do it.

24           My work kind of stopped once

FAC Resp. Exhibit D -- 662

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          the judge made his ruling and they
 2          did the writs in the Fifth
 3          Circuit, there wasn't a lot more
 4          to do.  However, Anthony, there
 5          were times that he wanted a depo
 6          summary done.  I think it was
 7          Baumgartner's depo that I did a
 8          depo summary on.
 9              Also in terms of the request
10          for productions of documents, when
11          Merck wasn't giving us the
12          documents that we asked for, he
13          sent it out, and we broke it down
14          and sent back 20-page memos to him
15          saying, okay, here's the request,
16          these are the responses, and this
17          is where we go after them in terms
18          of that.
19              I enjoyed the work that I
20          did.  I enjoyed, like I said,
21          working with Anthony and everybody
22          who was in that group.  I would
23          have liked to have been more
24          involved, but I realize the
```

FAC Resp. Exhibit D -- 663

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          privilege log only had so much

2          work to do at that point in time.

3          I thought Mike Wagner did a great

4          job every time I was up at the

5          depository.

6                    MR. SEEGER:  That was an

7          important project.

8                    MR. BIRCHFIELD:  And a great

9          result.  You are absolutely right.

10               I'm showing that you have

11         submitted 680 something hours.

12                   MR. BALSER:  I didn't go

13         back through it and go over it.  I

14         thought it was about 600, maybe

15         680.

16                   MR. BIRCHFIELD:  Is the bulk

17         of that working on the privilege

18         log issue?

19                   MR. BALSER:  Almost all of

20         it -- not all it, almost all of

21         it, because originally I was doing

22         the document reviews.

23                   MR. BIRCHFIELD:  How many

24         cases did you submit for the

FAC Resp. Exhibit D -- 664

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1        settlement program?

 2              MR. BALSER:  I have 19.

 3              MR. BIRCHFIELD:  Were any of

 4        those cases set for trial or on

 5        the trial track?

 6              MR. BALSER:  No.  I

 7        submitted the Sandra Nelson case,

 8        and I think a couple of experts

 9        looked at it through Chris and

10        said it looks good.  She actually

11        had two heart attacks.  But we

12        weren't able to submit that one

13        because it was actually filed in

14        Ohio, and they were looking for

15        cases that had been filed directly

16        to the MDL.

17              MR. BIRCHFIELD:  Were all of

18        your cases in the MDL or do you

19        have some in New Jersey?

20              MR. BALSER:  No.  They are

21        all in the MDL.

22              MR. BIRCHFIELD:  Any

23        questions?

24              MR. BLIZZARD:  No.

FAC Resp. Exhibit D -- 665

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1            MR. BIRCHFIELD:  Where is he
 2       with the accounting firm?
 3            MR. LEVIN:  Everything was
 4       accepted, and the costs have been
 5       accepted.
 6            MR. GIRARDI:  You are the
 7       first guy today that that's
 8       happened to.
 9            MR. HERMAN:  Brian, I want
10       to thank you.  The privilege log
11       was something very important to
12       the PSC and the Executive
13       Committee and to me because I
14       always feel that's where the bones
15       are buried.  If we could just get
16       the judge to look at it, maybe it
17       changes his view about the other
18       side.  Even if we don't get the
19       documents in, it causes a reaction
20       that's very favorable, because we
21       always believe that's where some
22       bad stuff is.
23            MR. BIRCHFIELD:  Not only is
24       it a very significant result in

FAC Resp. Exhibit D -- 666

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
1              this litigation, but the

2              precedential value is significant,

3              and we appreciate your good and

4              hard work on that issue.

5                   MR. BALSER:  Thank you.

6                   MR. LEVIN:  Thank you.

7                        -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

FAC Resp. Exhibit D -- 667

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1                C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 668

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  LAW OFFICES OF DANIEL E. BECNEL,
       JR., ESQUIRE
       Daniel E. Becnel, Jr., Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
     877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 669

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2               MR. HERMAN:  Danny,
 3          everything is being recorded.  You
 4          will get a copy, not just of your
 5          transcript, but of everybody's.
 6               The judge, of course as you
 7          know, being very familiar with
 8          Mobil Oil, required transparency
 9          and consistency.
10               MR. BECNEL:  Murphy.
11               MR. HERMAN:  What did I say?
12               MR. BECNEL:  Mobil also.
13               MR. HERMAN:  Mobil and
14          Murphy.
15               In the event that there's a
16          fee dispute at the end, the judge
17          is going to appoint a Special
18          Master to take depositions, same
19          process, and at that time, if it
20          comes to that, if you want to
21          supplement or delete or add
22          something to your affidavit, it's
23          all right.
24               That's it.
```

FAC Resp. Exhibit D -- 670

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1              MR. BECNEL:  This case
 2        caught my interest because of a
 3        young lady who died, Carlene
 4        Lewis, who brought Chris into the
 5        case, brought Andy Birchfield into
 6        the case, and I think probably the
 7        greatest compliment you can get in
 8        a case like this.  We started
 9        looking at this case probably
10        about the same time as you did,
11        but we didn't have what you had, a
12        state action, and you doing an
13        individual.
14              Here's what she said.  "Dear
15        Danny, Thank you so much for your
16        kind introduction at the Windsor
17        Court meeting.  You have been very
18        generous to me.  I also want you
19        thank you for your support of
20        Houston and New Orleans before the
21        MDL panel.  You clearly have
22        extraordinary insight into the
23        process.  I'm anxious to work with
24        you and learn from you in this
```

FAC Resp. Exhibit D -- 671

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          battle for our clients.

2                 "Sincerely, Carlene Lewis."

3                 MR. HERMAN:  What's the date

4          on that?

5                 MR. BECNEL:  She didn't send

6          a date.  This was after the

7          hearing on the MDL.

8                 MR. SEEGER:  After the MDL

9          hearing, it must have been.

10                MR. BECNEL:  I had been

11         recruited --

12                MR. HERMAN:  After the

13         meeting that we all had in Windsor

14         Court?

15                MR. BECNEL:  Yes, right

16         after that hearing.

17                MR. HERMAN:  Right.  So, it

18         was after the MDL hearing and

19         before Judge Fallon had made any

20         appointments?

21                MR. BECNEL:  That's correct.

22                Prior to that time, I had a

23         case which I thought was a case,

24         which was Sal Christina in my

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1           office.  He's a lawyer in my

2           office, his dad owned the biggest

3           seafood -- every restaurant in New

4           Orleans got seafood from him, and

5           he had a massive heart attack, was

6           on Vioxx, and then we just didn't

7           think --  we always worried about

8           12(b)(6) sanctions on it and not

9           investigating it enough.

10                 MR. LEVIN:  Rule 11.

11                 MR. BECNEL:  Rule 11.  I'm

12           sorry, what did I say, 12(b)(6)?

13           Rule 11 sanctions, so, we were

14           looking at stuff.

15                 We weren't recording a lot

16           of the time in the beginning,

17           because we never thought it would

18           be an MDL, we didn't know if it

19           was really a case.  It was kind of

20           a personal project among the top

21           lawyers that I had.

22                 Then we filed the first case

23           in New Orleans.  When I filed for

24           the MDL, if you look at the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          pleadings, there were four cases

2          in Federal Court.  This is my

3          original complaint filed on

4          October the 1st, my motion for MDL

5          status was filed, and let me give

6          you the four cases.

7                MR. SEEGER:  In the Federal

8          courts?

9                MR. BECNEL:  In the Federal

10         courts.  It was the Eastern

11         District of New Orleans, which was

12         mine, the Sal Christina case;

13         Bucky Zimmerman, who I had worked

14         with had filed a case called

15         Grover in Minneapolis; there was

16         one case called Bridget Elaine

17         Michaud in South Carolina; one

18         case in Missouri called Whitmore;

19         and one case in Ohio called

20         Dauterman.  That was it.

21                MR. WEITZ:  When was this?

22                MR. BECNEL:  I filed for the

23         MDL in October of '05.  You are

24         welcome to have this.  This is

FAC Resp. Exhibit D -- 674

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          just an unstamped copy from my

 2          file.

 3               MR. BIRCHFIELD:  There was

 4          one that was in Mobile District

 5          Court that had been set for trial

 6          in August, Danny, I'm not sure.

 7               MR. BECNEL:  Well, that's

 8          all I knew about at this time.

 9          That's when I filed for the MDL.

10               We started trying to court

11          date things everywhere we could.

12          I mean, we had litigation groups.

13          Pap asked me to bring in some

14          experts because we were worried

15          about death cases.  How do you

16          prove a death case?  If you

17          remember, I brought two people, I

18          brought Cyril Wecht at my own

19          expense to Mass Torts Made

20          Perfect, and I brought Nachman

21          Brautbar, who was a toxicologist.

22          There's a famous book called --

23          and, I mean, I spent 10, $15,000

24          bringing them, because I paid for
```

FAC Resp. Exhibit D -- 675

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          their hotel, I paid for their

 2          airfare.

 3               MR. LEVIN:  Cyril comes from

 4          Pittsburgh?

 5               MR. BECNEL:  I had used

 6          Cyril for the first time 40 years

 7          ago and won a big, big verdict on

 8          a loss of chance of survival.  So,

 9          I had used him over and over.

10               Nachman, I had used many,

11          many times in breast implant and

12          all kinds of cases.

13               Well, when we had the MDL, I

14          made one mistake in this

15          litigation, and it is his fault

16          for telling me that.  Russ told me

17          he wanted to retire.  And so Jerry

18          Meunier, who I had worked with for

19          13 years --

20               MR. SEEGER:  We're not

21          letting Russ retire.

22               MR. LEVIN:  Mea culpa, after

23          all of this.

24               MR. BECNEL:  He and Barbara
```

FAC Resp. Exhibit D -- 676

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1        said -- I was on a plane, and he

2        said, Danny, after tobacco, I'm

3        retiring, and I'm going to hunt

4        for dinosaur bones and I'm going

5        to teach.

6            I said okay.  So, I had been

7        working with Jerry Meunier for 13

8        years, and we just got our money

9        in that, too, Russ got a little

10       bit of that, and he asked me,

11       Danny, I want to be liaison

12       counsel.  I said, well, is Russ

13       involved?  He says, I don't think

14       so.  I said, well, he told me he

15       was going to retire, so I'm fine

16       with that.  That's why I asked

17       some people to support Jerry,

18       because I thought he was out of

19       the picture.  It wasn't anything

20       personal.  I made a mistake.

21       Okay.

22            I knew Judge Fallon well.  I

23       had worked with him on numerous

24       cases in the past.  I had known

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          Judge Fallon and his ability from

 2          the Ferry Froster case 30 years

 3          ago, and I knew how meticulous he

 4          was, I knew how hard he worked.

 5               Although a lot of people

 6          wanted other places, remember,

 7          there were 56 jurisdictions being

 8          sought.  We knocked it down at the

 9          meeting, Chris, and those in

10          Houston, to 6.

11               MR. SEEGER:  Right.

12               MR. BECNEL:  There was 53, I

13          think it was, 53 jurisdictions

14          that people were asking for, and

15          we knocked it down to 6.  Well,

16          once the MDL was formed, I decided

17          to say, hey, look, let's all get

18          together and try to get some

19          leaders.

20               MR. WEITZ:  But you wouldn't

21          have known that Judge Fallon was

22          going to get the --

23               MR. BECNEL:  No, I said

24          after.  I promoted him.  That's
```

FAC Resp. Exhibit D -- 678

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          the argument I made in the

2          Christina case, which he got.

3                 MR. SEEGER:  To the MDL

4          panel?

5                 MR. BECNEL:  To the MDL

6          panel.  I promoted him.  I had

7          previously promoted him in the

8          Propulsid case, which was my case

9          originally, and Russ was involved,

10          and Judge Fallon was involved in

11          that case.  I know how after our

12          office and Russ' office both lost

13          the case, he crafted us to get the

14          thing resolved.  Now, you can't

15          get any better track record than

16          that.

17                 MR. WEITZ:  So, your

18          original Vioxx case, did you file

19          the MDL petition and Judge Fallon

20          was the judge assigned to it in

21          New Orleans?

22                 MR. BECNEL:  That's correct.

23          I had just known of his ability in

24          Propulsid in his first MDL.  So, I

FAC Resp. Exhibit D -- 679

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        preached and preached for that

2        jurisdiction.

3            After that occurred, I

4        called a meeting of everybody that

5        we knew, and prior to that time,

6        we had been disseminating -- Andy

7        Birchfield and his whole cadre of

8        lawyers was sending stuff out.

9            MR. WEITZ:  What was the

10       name of your New Orleans case?

11           MR. BECNEL:  Christina.

12       This is it right here.  That's the

13       Christina case, and that's the MDL

14       filing.

15           So, we called a meeting of

16       everybody that we knew of at that

17       time to come to New Orleans to

18       Antoine's to have a meeting to try

19       to formulate some committee, some

20       structure, whatever we could.

21           At that meeting, which I

22       paid for -- Chris, I don't

23       remember the exact number, but I

24       know there must have been 70, 80

FAC Resp. Exhibit D -- 680

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          people there at least, I nominated

2          Chris and Andy.

3               MR. SEEGER:  Actually,

4          sadly, that was the last time I

5          saw Michael Nast.

6               MR. BECNEL:  Me too.  He

7          came down.

8               But I nominated both, and it

9          was unanimous among the 60, 70

10          lawyers, that they should be lead

11          counsel.  I made a full report to

12          Judge Fallon.  We had a meeting.

13               So, before the MDL, I might

14          say that we sent a bunch of

15          lawyers to Mr. Birchfield's office

16          in advance of the MDL to start

17          doing documents and to start page

18          and line summaries.  I think our

19          office did one-fifth of all of the

20          depositions that had been taken at

21          that time, the page and line

22          summary.  I think they were in New

23          York and in Mr. Birchfield's

24          office.

FAC Resp. Exhibit D -- 681

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1               I would send lawyers every

2        week, they would leave at 3:00 in

3        the morning, they would drive 350

4        hours to Montgomery.  We didn't

5        bill time for the drive.  I gave

6        them a vehicle to go in.  They

7        would sleep two to a room, two

8        guys to a room, two girls to a

9        room, and they were doing

10       documents.  They worked over there

11       under his direction.

12               I sent Rebecca Todd from my

13       office to Chris's under his

14       direction. I had nothing to do

15       with it except paid for the hotel,

16       paid for the gas, paid for the

17       living --

18               MR. HERMAN:  How much in

19       costs do you have right now?

20               MR. BECNEL:  I spent in

21       costs, $149,316.08.

22               MR. LEVIN:  Has the

23       accountant approved all of that,

24       do you know?

FAC Resp. Exhibit D -- 682

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1              MR. SEEGER:  You sent

 2         everything to Wegmann?

 3              MR. BECNEL:  I sent

 4         everything I have.

 5              MR. LEVIN:  You haven't

 6         gotten any calls -- I don't have

 7         it with me.

 8              MR. BECNEL:  I have not.

 9         But as you know, Mr. Levin, I

10         watch nickels.

11              MR. HERMAN:  Let me ask you

12         a question about the costs.

13              MR. LEVIN:  I do know.

14              MR. HERMAN:  The costs don't

15         include any salaries, draws of

16         that sort?

17              MR. BECNEL:  Nothing,

18         nothing.  That's just my

19         out-of-pocket stuff.

20              John Restaino and the

21         committee, he and I were involved

22         with the experts a lot.  In fact,

23         one time we were in, I think,

24         Miami, and we were looking for an

FAC Resp. Exhibit D -- 683

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          FDA expert.  And Chris asked me if

2          I knew a good one, and I had Dr.

3          Suzanne Parisian from Tucson,

4          Arizona, and I said, yes, I do.

5               MR. SEEGER:  Actually, my

6          recollection of that is there was

7          a general meeting to educate

8          lawyers.  You were there.  We

9          discussed the need for it, and you

10         had actually come to me and said,

11         I have got the perfect person, and

12         I said, let's do it.

13              MR. BECNEL:  She got on a

14         plane that night, that night.  The

15         reason why is because she had

16         written this book called "Inside

17         and Out of the FDA," and this is

18         her thing to me.  It just says,

19         "To Danny from Suzanne Parisian,

20         my new best friend."  And this was

21         way, way in years, and I've used

22         it four or five times in various

23         cases.

24              ATLA then had a mock trial.

FAC Resp. Exhibit D -- 684

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          There were 25 lawyers that
 2          participated in it.  They asked me
 3          to be the judge, and they asked me
 4          to help debrief after the three
 5          juries that we had.  People were
 6          given assignments of certain
 7          witnesses, certain opening
 8          statements and so on and so forth.
 9               They asked me to try to rate
10          people from the 25.  Chris didn't
11          participate, but Paul Sizemore did
12          from your office, Mr.  Birchfield,
13          and Mark Lanier was with Carlene
14          and those.  So, I said, you know
15          what would be even better than
16          that, let me bring down a bunch of
17          experts at my cost and have them
18          critique this from both sides.
19          So, at that time, I brought down a
20          guy from the book Casarett and
21          Doull, "The Basic Science of
22          Poisons," Dr. Daniel Acosta, who
23          is the head of pharmacology at
24          Cincinnati, previously had been
```

FAC Resp. Exhibit D -- 685

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          from Texas.  I brought Dr. Daniel

 2          Acosta.  He wrote the chapter on

 3          the heart being affected by drugs

 4          in that book.  That's known as the

 5          Bible of toxicology.

 6                I brought Dr. Daniel Aruna.

 7          He's the head pharmacologist at

 8          Xavier, he's an African American,

 9          and Xavier has the best

10          pharmacology school in the

11          country.

12                I brought Dr. John Marcus

13          from Harvard.  Dr. Marcus had

14          worked with virtually a lot of

15          people --

16                MR. HERMAN:  Danny, let me

17          ask you this.

18                The people you are talking

19          about, who among them or how many

20          among them testified in bellwether

21          trials?

22                MR. BECNEL:  None of them

23          testified in bellwether trials.

24                MR. HERMAN:  Were they
```

FAC Resp. Exhibit D -- 686

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          deposed?

2                MR. BECNEL:  Never were

3          deposed.  These were the experts I

4          was going to use.  I kept asking

5          Judge Fallon, hey, let me try my

6          case, let me try my case, and I

7          did that until he -- I knew, once

8          he appointed the PSC, I knew those

9          cases would go first.  That's just

10         the way it is.  But I had to

11         prepare it, because my case --

12               MR. HERMAN:  No, I

13         understand.  I'm trying to get a

14         handle on this.

15               MR. BECNEL:  But what we did

16         with them, I had Dr. Wecht there,

17         I had Dr. Brautbar there, Dr.

18         Daniel Aruna, Dr. Acosta, Dr.

19         Marcus, and we brought them there.

20         After each of the presentations

21         were made, we would debrief them.

22               Carlene Lewis and myself and

23         Shelly Sanford then went to dinner

24         with them at night and were making

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          notes, what's good, what's bad,

 2          don't do this, do this and so on

 3          and so forth, because we knew

 4          Shelly's case and Carlene's case

 5          was going to probably go first.

 6          How much that helped or didn't

 7          help, I don't know.  But I paid

 8          for it.  And I didn't know where

 9          it was going, and I wasn't on the

10          PLC.

11               The one thing I think I do

12          more than almost anybody else, no

13          matter where the case goes,

14          whether I'm on a PLC or not on a

15          PLC, when they say do you need

16          people, do you need workers, do

17          you need this, do you need that, I

18          always step to the plate.  And I

19          do it without trying to control

20          anything.  I mean, we were told

21          initially if you do all of these

22          documents and stuff, you are going

23          to get to participate, you are

24          going to get to take depositions.
```

FAC Resp. Exhibit D -- 688

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1          Well, that didn't occur because

 2          the individual cases, people

 3          wanted to do their own, and I can

 4          understand that.

 5               MR. SEEGER:  I think a

 6          couple of things, Danny, that

 7          would be helpful for the record is

 8          that we need to understand and for

 9          you to identify for us what you

10          really feel were the contributions

11          you made that sort of added to the

12          common benefit and advance the

13          ball, number one.  But number two,

14          I do have a comment, and I think

15          it is important I ask it to you so

16          you can address it.  I think it is

17          very obvious the way these

18          litigations have developed over

19          the many years is that these have

20          become partner intensive, you

21          know, senior-type people doing

22          them.  The days of kind of putting

23          contract people in depositories

24          and racking up document review
```

FAC Resp. Exhibit D -- 689

Page 22

```
 1          time, I'm not saying has no value,
 2          I'm just saying, these are cases
 3          that are really run by trial
 4          lawyers driven by trials.  So, if
 5          you can talk to us on both of
 6          those.
 7               MR. BECNEL:  For example, if
 8          you didn't know the documents --
 9          the two of you really knew the
10          documents, but you had been
11          working on it in your own offices.
12               MR. HERMAN:  You are
13          referring to Andy and Chris?
14               MR. BECNEL:  Andy and Chris.
15          They knew the documents.  The
16          state courts were so far ahead of
17          the MDL, because it wasn't even
18          formed.
19               In the MDL, people, as I'm
20          saying, there was four, and if
21          Andy is correct with that Alabama
22          case I wasn't aware of, there was
23          five cases.  So, there wasn't a
24          lot of people doing documents.
```

Page 23

1           You two had the only production of

2           documents there were.

3                When Mark Robinson tried his

4           case, the first thing he did, he

5           said, Danny, give me your best

6           lawyer to help me so I can help

7           prepare.

8                MR. SEEGER:  Who was that?

9                MR. BECNEL:  Same person

10          that had spent a year almost in

11          your office, Rebecca Todd.  So, I

12          said, Mark, what do you want her

13          to do?  Send her to California for

14          me.  I sent her to California.

15               MR. HERMAN:  Is she a

16          partner with you, Danny, or a

17          contract lawyer?

18               MR. BECNEL:  Well, she was,

19          but then when one of the court

20          reporting firms -- she fell in

21          love with Reserve and Laplace and

22          New York, and one of the court

23          reporting firms, they hired her

24          away at a ton of money, and she

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        worked for -- I forget the name of

2        court reporting firm.

3             MR. HERMAN:  At the time

4        that she went to Mark Robinson,

5        that was before the Barnett case

6        was tried?

7             MR. BECNEL:  Oh, yes, well

8        before that.

9             MR. HERMAN:  Was she a

10        partner at the time, an equity

11        partner or a contractor?

12             MR. BECNEL:  I have no

13        partners.  My sons, my

14        daughters-in-law -- I have three

15        sons that are lawyers.  None of

16        them are partners.  My brother,

17        his wife, they are not partners.

18             MR. SEEGER:  You are a tough

19        boss.

20             MR. BECNEL:  The only reason

21        I do it that way is because I just

22        didn't want to get into meetings

23        and have people leave and have all

24        of this commotion going on.

FAC Resp. Exhibit D -- 692

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1       Everybody is perfectly fine with

2       it and nobody has any problem.

3              MR. HERMAN:  How many hours

4       do you have in the case?

5              MR. BECNEL:  Personally?

6              MR. HERMAN:  Yes.

7              MR. BECNEL:  1,800 --

8              MR. LEVIN:  Don't you have

9       209 hours you yourself?

10             MR. BECNEL:  No, no.  This

11      is what I have.  They asked me --

12      I have 1,896.

13             MR. LEVIN:  For yourself?

14             MR. BECNEL:  For me.

15             MR. LEVIN:  How many total

16      hours does your firm have?

17             MR. BECNEL:  16,167.50.

18             MR. LEVIN:  I'm not

19      cross-examining you.  I know it

20      may sound that way.  Have any of

21      your hours been rejected by the

22      accountant?

23             MR. BECNEL:  Nobody said one

24      word to me about anything.

FAC Resp. Exhibit D -- 693

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          MR. LEVIN:  Well, according
2     to the accountant's report, and
3     this is something you have got to
4     look into, Daniel E. Becnel, Jr.
5     has 209 hours.  Your firm has
6     9,400 hours.  That includes
7     paralegals and attorneys -- well,
8     no paralegals.
9          MR. BECNEL:  There was no
10    paralegal.
11         MR. LEVIN:  Rebecca Todd has
12    an even 1,500 hours.  Percy
13    Williams has 1,874 hours.  Now,
14    let's see if you have some that
15    are still under submission that he
16    hasn't reviewed.
17         MR. RAFFERTY:  I'm sorry,
18    Danny, I missed it, how much did
19    you say you had?
20         MR. BECNEL:  I had 1,896.
21    And remember, a lot of that
22    occurred before the MDL.  I think
23    that's probably you are looking at
24    just MDL hours.

FAC Resp. Exhibit D -- 694

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1              MR. LEVIN:  I'm looking at
 2         what the court accountant has
 3         given us to work with.
 4              MR. BECNEL:  This is my
 5         sheet, and here's the difference.
 6         All I can tell you --
 7              MR. HERMAN:  Wait a minute.
 8         Other people have had concern.
 9         You've got to go make an
10         appointment, just call up, make an
11         appointment with the CPA or his
12         cohorts and sit down with him and
13         go over your hours.  Your reported
14         hours and what they are giving you
15         credit for are not the same.  This
16         is not something isolated to you.
17         We've had at least a dozen folks
18         that have.  I know Lanier came in,
19         for example, and spent a day.  I
20         think Ed has spent time.
21         Virtually everybody, maybe it's
22         not everybody, some people have
23         spent time directly with them and
24         gotten their time and their hours
```

FAC Resp. Exhibit D -- 695

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1          and their costs straight.  I would
 2          advise you to do that sometime in
 3          the next two weeks.
 4                MR. BECNEL:  Well, when my
 5          people, and I'll just show you how
 6          I did it, when they were at Mr.
 7          Birchfield's office, they would
 8          leave, like I said, at 3:00 in the
 9          morning to get there to be able to
10          work, that's a 350-mile drive, and
11          there were no planes to go there.
12          It was quicker to drive than to
13          fly.  And then they would stay
14          Monday night, Tuesday night,
15          Wednesday night, Thursday night,
16          and they would work nonstop until
17          their office closed on Friday.
18                MR. HERMAN:  Danny, I don't
19          want to cut you short.  You have
20          said that.  That doesn't do us any
21          good, because we're not going to
22          review it.  The CPA is going to
23          review it.  You need to send
24          somebody that knows those records,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          if you are not going to go

2          yourself, and sit with the CPA and

3          get your hours straight.

4                Now, here's my question.

5                How many people, lawyers,

6          did you have work on the case?

7                MR. BECNEL:  19.

8                MR. HERMAN:  How many of

9          those were also involved in either

10         Bextra, Celebrex, Medtronic ,

11         Murphy Oil or the --

12               MR. BECNEL:  None were

13         involved with Murphy Oil.

14               Bextra, Celebrex, the only

15         hours anybody did was a few days

16         when Paul Sizemore asked them to

17         look at some documents.  But that

18         wasn't on the --

19               MR. HERMAN:  Medtronic and

20         Guidant?

21               MR. BECNEL:  I think Rebecca

22         Todd, for example, may have had

23         100 or so hours in Medtronic.

24               MR. HERMAN:  What about the

FAC Resp. Exhibit D -- 697

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        hurricane cases?

2                MR. BECNEL:  None of them

3        were for the hurricane cases.

4                MR. HERMAN:  So that you

5        were the only lawyer in those

6        cases where they didn't have

7        hours?

8                MR. BECNEL:  In the

9        hurricane cases?  Until you

10       release them from the

11       depository -- like Will.  Will was

12       released when there was no more

13       work for the depository, and then

14       I shifted him to the hurricane

15       cases.  Like Kevin Klibert, he

16       worked the hurricane cases

17       exclusively.  He had 14.50 hours

18       in Vioxx.  That's it.

19                But the rest, none of them

20       did, none of them did.

21                MR. LEVIN:  Dan, you have no

22       partners.  Are these all contract

23       employees?  Are them some of them

24       contract employees that you don't

FAC Resp. Exhibit D -- 698

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          pay benefits for?

2               MR. BECNEL:  No.  Here's

3          what I pay.  Everyone gets an

4          option to have health insurance or

5          extra money.  They all chose extra

6          money.  Every one of my main

7          lawyers, which includes about 16

8          of them, I give them a Mercedes, a

9          brand new Mercedes.  Every one of

10         them, I fund their homes, because

11         a lot of people can't fund their

12         homes at 5 percent interest.  So,

13         most of them have homes in the

14         $200,000 range.  It is not like

15         where you guys live.  So, I fund

16         that.

17              At the end of the case, they

18         get a percentage of the money that

19         they have earned, depending on

20         what is given, whether it is a

21         multiplier or not.  People in my

22         office in the past, for example,

23         in fen-phen, have made bonuses at

24         the end of the case of $1 million,

FAC Resp. Exhibit D -- 699

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          $800,000.  I wrote a check this

2          morning at 4:30 in the morning

3          with Kevin Klibert on a bunch of

4          insurance cases, you know, of

5          117,000 this morning on something

6          that he just settled.

7              That's how I pay.  I pay

8          different than everybody else.  I

9          make them feel that they shouldn't

10         leave the case because they are

11         not going to get the bonus until

12         the end of the case, and that

13         makes them stay when you are

14         giving them grunt work to do.

15         Now, we've all done it, but how

16         many of us would sit in a room and

17         do documents eight hours a day for

18         a year, you know, and pass up the

19         opportunity to make money?  That's

20         the way I did it, so, I didn't

21         have them coming in for a little

22         while and then leaving.

23             MR. WEITZ:  Do they get

24         salaries?

FAC Resp. Exhibit D -- 700

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1            MR. BECNEL:  Yes.  They get
 2       $50,000 base salary, plus I pay
 3       for all of their ATLA dues, I pay
 4       for two seminars a year, I give
 5       them two weeks paid vacation at my
 6       expense to places like Rome and
 7       Greece and just all over the
 8       world, wherever they want to go,
 9       they get to pick for two weeks.
10            MR. WEITZ:  Can I come work
11       for you?
12            MR. BECNEL:  And they go.
13            MR. LEVIN:  Could I be his
14       valet?
15            MR. WEITZ:  Are these 19
16       listed --
17            MR. BECNEL:  All on the
18       letterhead, all on my letterhead
19       with malpractice insurance.
20            MR. SEEGER:  Can I just try
21       to refocus this?  For my benefit,
22       Danny, there's a couple of things.
23       You did organize an early meeting,
24       and it was very helpful for
```

FAC Resp. Exhibit D -- 701

Page 34

     1          organizing the case.  The problem

     2          is, it is hard to assess a value

     3          for calling a meeting and throwing

     4          your support behind it, because my

     5          impression, and I have never

     6          really spoken to Andy about it,

     7          but my impression is that most of

     8          the people who showed up to that

     9          meeting had already pledged

    10          support for the leadership of our

    11          two firms because it made sense in

    12          so many ways.  Everyone here is a

    13          leader.  It makes sense under

    14          certain circumstances --

    15               MR. BECNEL:  I don't take

    16          credit for that.

    17               MR. SEEGER:  No.  Well, you

    18          organized the meeting.  My point

    19          is, to move beyond that, after the

    20          happened and the case is being

    21          litigated, if you could identify

    22          for the committee in the last

    23          couple of minutes like the major

    24          common benefit contributions.  One

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          of them was document review.  We

2          got it.  Was there anything -- I

3          want to make sure we haven't

4          missed anything.

5               MR. BECNEL:  For example,

6          Rebecca Todd, after helping Mark

7          with the documents, I gave her to

8          him, as I gave her to your office.

9               MR. SEEGER:  Well, she was

10         in the depository at my office.

11              MR. BECNEL:  Whatever you

12         needed her to do, she did.  And

13         she took his plaintiffs and went

14         over and actually lived up here at

15         some hotel where he was.

16              MR. SEEGER:  With Robinson's

17         team.

18              MR. BECNEL:  With Robinson

19         for three months and was in trial

20         with him every step of the way.

21         Mark asked her to babysit his

22         clients to help prepare for the

23         testimony.

24              MR. SEEGER:  Did Rebecca put

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1         her own affidavit in?

2              MR. BECNEL:  No.  I didn't

3         know you wanted that.

4              MR. SEEGER:  No, no, no.  I

5         thought I saw something separate.

6         Is she still with your firm?

7              MR. BECNEL:  No.  She went

8         to New York.

9              MR. BIRCHFIELD:  I think it

10        is a different Rebecca.

11             MR. SEEGER:  I'm confused.

12             MR. BECNEL:  Who is that big

13        firm, that court reporting firm?

14             THE COURT REPORTER.  Doerner

15        & Goldberg.

16             MR. BECNEL:  Doerner &

17        Goldberg, because Rebecca was

18        doing a bunch of documents and

19        stuff --

20             MR. HERMAN:  Look, we have

21        to get back.  Let me ask you this.

22             Who in your firm served on

23        the science committee?

24             MR. BECNEL:  Me.

FAC Resp. Exhibit D -- 704

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1              MR. HERMAN:  Who in your
 2         firm served on the discovery
 3         committee?
 4              MR. BECNEL:  Nobody was per
 5         se on the discovery committee.
 6         What we were told, Mr. Herman, was
 7         that the only way you were going
 8         to be able to do depositions is if
 9         you did the documents.  And we
10         were told that over and over and
11         over again.  And so I would send
12         these people to do them, they
13         would send me the hot documents, I
14         was putting them in the binders
15         and stuff trying --
16              MR. HERMAN:  Well, Danny,
17         you can call me, Russ.  I mean,
18         we've known each other a long
19         time, and I'm not going to call
20         you Mister, because we've known
21         each other too long.
22              I'm just trying to help you
23         explain the major contributions
24         that you made to the litigation.
```

FAC Resp. Exhibit D -- 705

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1      Okay?

2              MR. WEITZ:  Did you have a

3      case that you prepared for trial,

4      one of your cases?

5              MR. BECNEL:  The first one,

6      Christina.

7              MR. WEITZ:  Did that case

8      ever go to trial?

9              MR. BECNEL:  No, it didn't

10     go to trial, but I think everybody

11     on that committee would know that

12     every time I would stand up and

13     say --

14             MR. WEITZ:  It never got

15     designated.

16             MR. BECNEL:  It wasn't

17     designated.  I would say, Judge,

18     can I try my case?  You know, I'm

19     first in line in the Eastern

20     District, you see, and we thought

21     that he was going to try only

22     Eastern District cases first.  We

23     didn't know he was going to pull

24     cases.

FAC Resp. Exhibit D -- 706

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1           MR. HERMAN:  Danny

2      volunteered his case and to try

3      his case very early in the MDL at

4      whatever meetings he attended.

5      That's true.

6           MR. WEITZ:  How many cases

7      did you have that you submitted to

8      the settlement?

9           MR. BECNEL:  Well, I had

10     2,000 cases until I didn't get

11     appointed to the plaintiffs'

12     committee, and then I lost about

13     1,500.

14           MR. RAFFERTY:  So, how many?

15           MR. WEITZ:  So, the answer

16     is 500 cases you submitted to the

17     settlement?

18           MR. BECNEL:  No, I don't

19     think.  I think we submitted about

20     300, 400.  In fact, Paul Rhinegold

21     called me yesterday on some cases

22     he sent here that we did for him,

23     and I didn't even have a fee

24     agreement with him.  I said, Paul,

FAC Resp. Exhibit D -- 707

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

```
 1          whatever you want to send is fine.

 2          Send it to my son, because he

 3          hadn't worked for, you know --

 4          he's been on the campaign trail

 5          for 14 straight months.

 6                MR. WEITZ:  And all those

 7          cases were filed in the MDL?

 8                MR. BECNEL:  Every case I

 9          have.  I have none in state court.

10          Every case I have.  But I started

11          losing them after -- I have a lot

12          of referral lawyers like most of

13          you do.  But after I didn't get

14          appointed to the committee --

15                MR. SEEGER:  Your referrals

16          are conditioned upon your

17          appointment to a leadership role?

18                MR. BECNEL:  No, Chris --

19                MR. SEEGER:  That sounds

20          harsh.

21                MR. BECNEL:  It happens,

22          though.

23                MR. HERMAN:  I know you

24          applied for a common benefit fee
```

FAC Resp. Exhibit D -- 708

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1          in Murphy.  I'm familiar with your

 2          affidavit or your representation

 3          in Murphy.  If you applied or are

 4          you applying for common benefit in

 5          Guidant, Medtronic, Celebrex or

 6          Bextra?

 7              MR. BECNEL:  Well, we

 8          haven't made any applications in

 9          Bextra, Celebrex and Medtronic.  I

10          think I had a lot, lot of cases,

11          probably the top five to ten.  My

12          common benefit fee was less than

13          $250,000.

14              MR. HERMAN:  I'm not

15          disputing.  I'm just --

16              MR. BECNEL:  Compared to

17          most other people who got 2 and 3

18          and $4 million.

19              MR. BIRCHFIELD:  Let me ask

20          it in a little broader context.

21              During the period of time of

22          the Vioxx litigation, are there

23          any other MDLs where you are

24          making a petition for or you plan
```

FAC Resp. Exhibit D -- 709

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1        to make, you have made, a petition

2        for common benefit fees?

3            MR. BECNEL:  I think the two

4        are Guidant and Medtronic.  And I

5        think probably my fee in each is

6        below a quarter of a million

7        dollars common benefit.  And most

8        people that did a bunch of work in

9        those cases got 1 and 2 and $3

10       million each in common benefit.

11           MR. WEITZ:  What expenses

12       did you submit?  How much?

13           MR. BECNEL:  The only thing

14       I had was what I submitted.

15           MR. BLIZZARD:  149,000.

16           MR. LEVIN:  But I don't know

17       what the accountant has.

18           MR. RAFFERTY:  149,316.

19           MR. BECNEL:  For example, in

20       this 149, the only one I had in

21       here was Acosta and Wecht.  I

22       didn't submit those other people.

23           MR. WEITZ:  What do you

24       mean, what other people?

FAC Resp. Exhibit D -- 710

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1              MR. BECNEL:  The other

2         experts I had.  And Shelly and

3         Carlene, I mean, they spent most

4         of their time consulting with my

5         experts in preparation for their

6         case.

7              MR. SEEGER:  By the way,

8         Danny, did you include the expense

9         for the cost of that dinner?

10             MR. BECNEL:  Yes, I did.

11             MR. SEEGER:  Okay.

12             MR. BECNEL:  4,269.

13             MR. SEEGER:  Anybody have

14        any more questions?

15             MR. BECNEL:  The only other

16        thing is, as all of you know,

17        Carlis Griffen was my paralegal,

18        African American paralegal.  We

19        put her in Propulsid, and then

20        when Vioxx came up, they asked if

21        they could keep her in Vioxx, and

22        she was so familiar with Penny

23        Herman, who was kind of managing

24        Vioxx in the beginning and had

FAC Resp. Exhibit D -- 711

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1         managed Propulsid, and so I said

2         certainly.  And the PLC picked up

3         her expense, and she's still

4         working.

5              MR. SEEGER:  Is she still

6         with your firm?

7              MR. BECNEL:  Well, she's not

8         now, because she's on loan to you

9         guys.

10             MR. HERMAN:  The PSC has

11        paid her salary at the depository,

12        as well as whatever benefits are

13        offered through the PSC since her

14        retention.

15             MR. SEEGER:  Got it.

16             MR. BECNEL:  When this ends,

17        she's going to be back in my

18        office.  She just had the

19        experience, and after the

20        hurricane, it was really horrible,

21        because she had a place to live.

22        Most people in New Orleans didn't

23        have a place to live.

24             MR. LEVIN:  Dan, we talked

FAC Resp. Exhibit D -- 712

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          to you about your hours.  I don't

2          have with me what costs you

3          submitted, but I do know of

4          whatever costs they are, $15,814

5          has been rejected by the

6          accountants.  So, put that on your

7          list to do.

8                MR. SEEGER:  You just have

9          to call them, Danny.

10               MR. BECNEL:  Like I said,

11         nobody did it cheaper than I did

12         it.

13               MR. SEEGER:  That isn't even

14         the issue.  You could have

15         submitted something for $10.  If

16         it didn't fall into categories --

17               MR. WEITZ:  Everybody has

18         issues.

19               MR. LEVIN:  You're not

20         alone, Dan.

21               MR. WEITZ:  It is nothing

22         specific to you.

23               MR. LEVIN:  Nobody is

24         picking on you.

FAC Resp. Exhibit D -- 713

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1              MR. BECNEL:  I think Arnold

2         knows one thing about me.

3         Whenever you have a cash call, I

4         wasn't on his committee, and there

5         was three people that put up the

6         bulk of the money in that case, if

7         you remember.

8              MR. LEVIN:  Which case?

9              MR. BECNEL:  Pedicle screw.

10             MR. LEVIN:  Was I one?

11             MR. BECNEL:  You were one

12        and Cummings was one and I was the

13        third.

14             MR. LEVIN:  I just wanted to

15        make sure I was one.

16             MR. BECNEL:  And I wasn't on

17        that PLC either.

18             MR. SEEGER:  Just so we stay

19        on schedule, does anyone else have

20        anything else they want to ask

21        Danny?

22        (No response.)

23             MR. SEEGER:  Thank you.

24

FAC Resp. Exhibit D -- 714

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -


FIRM: LAW OFFICES OF ERIC H. WEINBERG
        Eric H. Weinberg, Esquire


BEFORE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 716

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

          1                  -  -  -

          2              MR. WEINBERG:  My firm got

          3         involved in the New Jersey

          4         litigation on September 30, 2006.

          5         We ended up filing about 300 cases

          6         in New Jersey.

          7              MR. LANIER:  How many?

          8              MR. WEINBERG:  About 300.

          9              MR. LANIER:  Okay.  Sorry.

         10              MR. WEINBERG:  I immediately

         11         got to work on Vioxx.  On October

         12         1st, I retained Caesar Roy, who

         13         was a former director of the New

         14         York field office of the FDA who

         15         assisted me in processing a FOIA

         16         request for the summary approval

         17         package and other documents from

         18         the FDA, which we got in about a

         19         week's time.

         20              And from that time until the

         21         case settled, I consistently went

         22         back and reviewed those FDA

         23         materials, created PowerPoints

         24         which we shared with our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          colleagues, to understand the

2          dynamic between Merck and the FDA.

3                Within a week of the drug

4          being pulled off the market, I

5          retained John Kostis, Chairman of

6          Medicine at Robert Wood Johnson.

7          Dr. Kostis was an invaluable

8          resource to us in this litigation,

9          consistently provided input,

10         advice, a man of great experience

11         that worked in the pharmaceutical

12         industry, clinical studies, world

13         renowned cardiologist, assisted on

14         trials.  I made Dr. Kostis

15         available to my colleagues who

16         needed input from a top shelf

17         cardiologist at trial.

18               Clearly I had the benefit of

19         the work product that existed at

20         the time I got into this case.

21         You guys were in this case for a

22         long time, and to a certain

23         extent, when you come into a case

24         and you are new and other people

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1      had been working on it, you stand

2      on your shoulders.  And I did

3      that.

4           As the case developed, I was

5      able to see how it played out with

6      the weaknesses and what the

7      strengths of the case were and to

8      sort of develop my approach to

9      discovering the case and what kind

10     of projects I was going to work

11     on.

12          I spent pretty much the vast

13     majority of my time on Vioxx.  My

14     business model is I'm a solo

15     practitioner, I work on one mass

16     tort at a time.  From '92 through

17     the early part of 2000, it was on

18     hemophilia HIV.  From 2001 through

19     about 2004, it was on Baycol.  And

20     from 2004 until the case settled,

21     it was on Vioxx.

22          I'm a solo practitioner, so

23     there are some limitations in

24     terms of what I can do, but I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          spent a good amount of time on

2          this case.

3                  I think that the work that

4          we put together is of great

5          quality.  I know that there's an

6          MDL trial package, I haven't seen

7          it, but it is my understanding

8          that an MDL trial package is

9          really a collection of the best

10         information in the case that's

11         given to lawyers that have to go

12         out and try cases in order to give

13         them the best chance of winning.

14                 Although a lot of our work

15         was done in New Jersey and some

16         people on the committee were not

17         familiar with it, I think that if

18         you look closely at the work

19         product, the way we attacked the

20         placebo-controlled clinical

21         studies I think really undercut

22         Merck's position with David

23         Madigan's report and the analyses

24         that he did.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1              Work that was done on the
 2         Alzheimer's studies, which were a
 3         key defense for Merck not only in
 4         the FDA, but in the litigation in
 5         the way that we went after the FDA
 6         and the Alzheimer's studies and
 7         developed the body of work that's
 8         substantial, the marketing work
 9         that Chris Placitella headed up --
10         and by the way, you know, I wasn't
11         alone in working on these issues
12         in the Madigan project.  Dan
13         Sigelman was a wonderful colleague
14         who developed a lot of ideas that
15         I adopted in terms of how to work
16         with Madigan.  I had recruited
17         Madigan in December of 2005.  I
18         had ideas about how we were going
19         to proceed with him.  Dan and I
20         started talking, and I liked his
21         approach, I liked some of the
22         things that he had to offer, and I
23         prioritized that.  I think that's
24         what you do when you're working
```

FAC Resp. Exhibit D -- 721

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      collaboratively.  You look at what

2      other people bring to the table.

3      And I did that.

4           So, this work, I think, is

5      clearly work that would and should

6      be in a trial package.  I have a

7      case to try.  I have one case that

8      opted out of the settlement.  I

9      don't know if other people do as

10     well.  But I would encourage you,

11     and at the end of this -- I'm

12     sorry that I'm giving you

13     something to take home and carry,

14     but it is hard to sort of capture

15     work in a brief presentation.

16          At the end of this document,

17     there's a bibliography of work.

18     All of that stuff is available.  I

19     would urge you to look at it,

20     because some of that should be in

21     the trial package for the lawyers

22     who are out there who are still

23     going to have to try cases.

24          One of the issues the Court

FAC Resp. Exhibit D -- 722

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          was concerned with was what did

2          you do after the litigation

3          started to go south and Merck

4          started to win consistently.  I

5          think it is fair to say, and I

6          kind of framed this in the last

7          year of the litigation, what work

8          did I do, what project was I

9          working on.  I put that into this

10          PowerPoint, and I'll just go

11          through it briefly.

12              The Alzheimer's discovery, I

13          noticed up the corporate rep

14          deposition, and Merck filed a

15          motion to quash that deposition,

16          we defeated that motion, and I

17          took the deposition of Gilbert

18          Block in two days.  The final day

19          was October 30, 2007.  So, that

20          was about a week before the

21          settlement.

22              Block had been deposed in

23          the MDL.  I spent time talking to

24          Chris Tisi about the deposition,

FAC Resp. Exhibit D -- 723

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1        he became very frustrated by
 2        Block.  I think I took Block's
 3        pants down and spanked him,
 4        frankly.
 5            The work that I did to
 6        develop the Alzheimer's story is
 7        captured in a paper that I wrote,
 8        which ultimately I will probably
 9        try and get published.  I think
10        Mark has seen it.  It is available
11        to you.  It lays out how Merck set
12        up the Alzheimer studies, and we
13        had the benefit of knowing the
14        analysis of the data from Madigan
15        that hadn't been out there before
16        that showed that there was
17        statistically significant
18        increased risk with cardiovascular
19        events and deaths by the year 2000
20        and 2001, so that what was in the
21        label was a lie.
22            Frankly, you know, part of
23        what inspired me to work on that
24        or to redouble my efforts was the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          Hermans verdict, because Mr.

 2          Hermans got treated unfairly.  He

 3          didn't get justice.  At the time

 4          that that verdict came down, I had

 5          already started working with David

 6          Madigan to analyze the Alzheimer's

 7          data, and I knew that what was in

 8          the label was a lie, we just

 9          didn't have the time to frame it

10          for that case.

11               So, that's sort of not only

12          standing on the shoulders of your

13          colleagues, but standing shoulder

14          to shoulder with them, and that's

15          what I tried to do.

16               In the last year, I also

17          worked on the placebo study

18          analysis done by David Madigan.  I

19          recruited Madigan.  I organized a

20          group of lawyers that funded

21          Madigan's work.  So, there was

22          actually a common benefit approach

23          to Madigan.

24               MR. SEEGER:  Can I stop you,
```

FAC Resp. Exhibit D -- 725

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          because I don't want to forget

2          these questions.  We're trying not

3          to interrupt people, but on that

4          point, I know Madigan's

5          involvement in Celebrex, Bextra,

6          and I'm not that aware of his

7          involvement really in Vioxx.  So,

8          if you can spend a little time

9          talking about the common benefit

10         contribution of Madigan.  What

11         work did he provide?  I'm not

12         aware of it.

13              MR. WEINBERG:  Absolutely.

14              Madigan wrote a report that

15         was served on October 8th, 2007.

16         It was served in all of the cases

17         that were pending for trial in New

18         Jersey in January of 2008.

19              MR. RAFFERTY:  It was served

20         when, Eric?  I'm sorry.

21              MR. WEINBERG:  Beginning of

22         October of 2007.

23              We obtained all of the SAS

24         data from Merck's

FAC Resp. Exhibit D -- 726

Page 12

1        placebo-controlled clinical

2        studies, all of it, working with

3        your folks, Chris.

4             MR. SEEGER:  Yes.

5             MR. WEINBERG:  We gave it to

6        Madigan.  Madigan is a

7        biostatistician.  He was at

8        Rutgers when I contacted him.  He

9        had been director of the Institute

10       of Biostatistics.  At the time

11       that I reached out to him, he was

12       dean of mathematics and physical

13       science.  He's now dean of

14       mathematics at Columbia.

15             Madigan is a highly

16       published young guy, Irish,

17       brilliant.  One of his particular

18       areas of expertise is data safety

19       mining.  So, he's a guy that

20       consults with the pharmaceutical

21       companies in looking at their data

22       and seeing what the risks are.  I

23       spent a lot of time, you know,

24       bringing him in.  You know how it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       is when you are trying to recruit

2       a good expert.  And I had to have

3       a level of credibility with him in

4       order to convince him to work.  He

5       did agree to come and work.

6            He analyzed the SAS data,

7       and it is in the bibliography.  He

8       wrote a report which basically

9       determined when there was

10      statistically significant risk of

11      cardiovascular thrombotic events

12      and cardiovascular thrombotic

13      deaths and other things.  We

14      looked at other things in the

15      Alzheimer's studies like

16      osteoporosis, like pneumonia

17      deaths, things that were

18      statistically significant early

19      on, and he found that in the

20      intent to treat analysis of that

21      data, which were prespecified

22      endpoints in the data analysis

23      plan, there was statistically

24      significant risk of death by the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1       year 2000.  So that when Merck was

2       negotiating with the FDA on the

3       label and taking the position that

4       it was not significant, that the

5       difference in death was not

6       significant, that was not true.

7       The numbers that are in the label

8       are 8 to 3, but the numbers in the

9       ITT are something like 18 to 5,

10      which are statistically

11      significant.  So, the curve was

12      separating over time.  That was a

13      highly obviously important fact.

14           Also, the CVT events became

15      statistically significant by, I

16      think, 2001.  And I have a couple

17      of the tables, the KM tables that

18      Madigan prepared in his report.  I

19      have pasted them into this

20      PowerPoint for you.

21           Madigan did testify in

22      Celebrex and Bextra.  I was not

23      involved in that case.  I declined

24      to be involved in Celebrex and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        Bextra, because I know my

2        limitations and I like to focus on

3        one case at a time and dig as

4        deeply into that case as I can.

5        However, because my colleagues had

6        those cases, Madigan testified in

7        those cases as an expert.

8              So, Madigan's report has

9        been commended by Dr. Avorn and

10       Dr. Krumholz as perhaps the best

11       scientific analysis that has been

12       done of the statistical evidence

13       related to Vioxx.  He is writing

14       the paper with Krumholz and

15       Egilman, or a series of papers, on

16       this issue.  I've been asked by

17       our colleagues in Australia,

18       Slatery Warden, if they can work

19       with Madigan, I will be working

20       with them and introduce evidence

21       in their cases I think in March in

22       Australia.

23             It's a beautiful piece of

24       work, and it's a unique piece of

FAC Resp. Exhibit D -- 730

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1      work, and it should clearly be a

2      part of the trial package.  And

3      Madigan, I'm told, did a good job

4      in testifying, so, I think he will

5      be a very powerful expert.

6              MR. LEVIN:  In Bextra and

7      Celebrex?

8              MR. WEINBERG:  In Bextra and

9      Celebrex, yes.  He was scheduled

10     to be deposed --

11             MR. LEVIN:  I understand.

12             MR. WEINBERG:  Other work in

13     the last year in the litigation,

14     FDA discovery.  I said that I

15     immediately got the FDA summary

16     approval packages.  I've developed

17     something of a track record in

18     terms of FDA issues.  I've taught

19     about it at Rutgers.

20             In this case, I served nine

21     FOIAs after the initial FOIAs,

22     which the FDA did not respond to,

23     so, I sued them personally in

24     District Court in New Jersey in

FAC Resp. Exhibit D -- 731

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        April of 2007.  FDA filed a motion

2        to quash my complaint, to stay my

3        complaint.  That was briefed

4        before Judge Hochberg.  I defeated

5        the FDA's motion.  We were ordered

6        to mediation.

7             We were in the process of

8        mediating this case and

9        approaching settlement when Merck

10       got wind for the fact that I had

11       had this discovery process outside

12       of the regular litigation where

13       the FDA was going to produce

14       documents to me personally and not

15       to Merck.  Merck made an

16       application to Judge Higbee to

17       compel me to turn over all of the

18       materials that I got from the FDA

19       to them.  This was, again, in

20       September, October of 2007.

21            We argued that before Judge

22       Higbee, and their application was

23       denied.  So, at the time of the

24       settlement, I was in a position of

FAC Resp. Exhibit D -- 732

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          having nine FOIA requests that the

2          FDA had to respond to to provide

3          documents to me related to Vioxx

4          which Merck had no stake in

5          whatsoever.  They would not know

6          what I was getting.  That was in

7          the last year of the litigation.

8              In late 2006, I drafted a

9          memorandum on public relations to

10         develop a public relations

11         strategy.  I felt that we needed

12         to have a cohesive strategy in

13         order to defeat the public

14         relations, Merck's public

15         relations agenda.  I tried to

16         think broadly and deeply about the

17         task that I take on when I'm

18         involved in a case, and I thought

19         the PR was important.  So, working

20         with Mike Ferrara and Mike

21         Grossman and Ben Morelli, we

22         retained a firm in New York called

23         Klore & Associates.  I wrote the

24         working memorandum that served as

FAC Resp. Exhibit D -- 733

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        a basis for that project, and we

2        got about 100 firms in New Jersey

3        to all kick in money together to

4        work together to develop that

5        strategy.

6             I believe that that strategy

7        was beginning to become effective,

8        that we were beginning to see in

9        media stories even where Merck was

10       winning cases, there were things

11       in the stories about the drag of

12       the litigation and so forth,

13       points that we wanted to make

14       whether we won or lost the cases.

15            MR. SEEGER:  Eric, I'm

16       sorry, Mike Ferrara, because he

17       was involved with that, too, if

18       you had to -- first of all, we're

19       not really allowing people to

20       submit extra stuff.

21            MR. WEINBERG:  I didn't

22       know --

23            MR. SEEGER:  No, it's okay.

24       I mean, I'll look at it.  I don't

FAC Resp. Exhibit D -- 734

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          know if other people will.  I

2          don't have a problem with it.  I'm

3          just saying, I'm going to look

4          this over, and I have a sense of

5          it.

6               If you wanted us to leave

7          here with us thinking of like two

8          or three big contributions you

9          think you made sort of to the

10         common benefit, what would you

11         want the committee to focus on?

12              MR. WEINBERG:  Well, I think

13         that in a trial package, you have

14         got to have three things that I

15         worked on.  One, the

16         placebo-controlled study.

17              MR. HERMAN:  Wait a minute.

18         You didn't submit any materials to

19         the current trial package; is that

20         right?

21              MR. WEINBERG:  That's

22         correct.

23              MR. HERMAN:  Why not?

24              MR. WEINBERG:  Because I was

FAC Resp. Exhibit D -- 735

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

 1      not involved in the MDL.

 2              MR. LEVIN:  I don't want to

 3      interrupt, and we're probably MDL

 4      oriented, and I'm going to look to

 5      Jersey counsel here as to what was

 6      going on in Jersey, but was the

 7      leadership in Jersey aware of

 8      everything you were doing and all

 9      the engagements of experts you did

10      and whether any of it was

11      duplicative of what they were

12      doing?

13              MR. WEINBERG:  I assume so.

14              MR. LEVIN:  Did you --

15              MR. WEINBERG:  Absolutely.

16              MR. LEVIN:  Did you report

17      to them, and did they approve,

18      disapprove, or were you basically

19      out there on your own doing a good

20      job?

21              MR. WEINBERG:  Well, you

22      know, there wasn't a defined

23      structure in New Jersey the way

24      there was in the MDL.  I did try.

FAC Resp. Exhibit D -- 736

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          Madigan was clearly a good guy and

2          a good expert.

3              MR. LEVIN:  Was there some

4          procedure by which they said, go

5          get Madigan, we'll endorse him,

6          we'll use him, or was that your

7          expert that you went out and

8          cultivated yourself?

9              MR. WEINBERG:  Well, first

10         of all, he was my expert who I

11         cultivated myself, but he was

12         offered to and was going to

13         testify for my colleagues.  He was

14         in Perry's cases.  He was in Sol

15         Weiss' cases.  He was offered

16         to -- I forget the other firm that

17         had cases.  I was going to work

18         Madigan in that case.

19             But in terms of the MDL,

20         Russ, we had a meeting in June of

21         2007 in Philadelphia where I

22         brought Madigan, and Mark Robinson

23         was there and Don Arbitblit was

24         there, and my proposal was to work

FAC Resp. Exhibit D -- 737

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          together.  In terms of the workup

2          of Madigan, I was working

3          primarily with Dave Buchanan and

4          Jeff Grand at Chris' office,

5          because they had worked with

6          Kronmal.  Again, this is standing

7          on the shoulders.  Kronmal did

8          terrific work, but I saw some

9          things, some directions that I

10         wanted to go that were a little

11         bit different.  I wanted to have

12         my own guy.  The discussion was,

13         let them work together.  Let them

14         peer review each other's work.

15         Let's have two brainchilds.

16              MR. HERMAN:  Here's the

17         problem that I have, and I need

18         your help with it.

19              On the trial package

20         committee, we had representatives

21         from the New Jersey litigation

22         that were not, per se, MDL folks.

23         None of them ever suggested that

24         you had materials that could be

FAC Resp. Exhibit D -- 738

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          incorporated into a trial package,

2          which is now complete.  Why that

3          is, I don't know.  It may be that

4          they just weren't aware of what

5          you were doing.

6               I'm particularly concerned,

7          because we put on a massive effort

8          in the MDL to get FDA documents.

9          We had several Assistant US

10         Attorneys involved, we had five or

11         six hearings.  We may have even --

12         I'm not certain whether we went to

13         the Fifth Circuit, but we

14         certainly had posted on the

15         website the Court's decisions

16         requiring the FDA to produce, and,

17         in fact, they are still producing

18         documents even post trial.

19              So, we do have FDA documents

20         within the trial package.  My

21         concern really isn't with your

22         presentation, it is with the fact

23         that we still have possibly 100

24         folks, claimants, and I don't know

FAC Resp. Exhibit D -- 739

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          how many pro se that want to try

 2          their cases, and we've got to -- I

 3          mean, if you've got materials that

 4          ought to be in the trial package,

 5          that's got to be explored.

 6               MR. RAFFERTY:  In terms of

 7          the FDA, Eric called me, I think

 8          before he filed the lawsuit

 9          against the FDA, and I provided

10          him with copies of what we had

11          done in the MDL to make sure that

12          you didn't duplicate.  I don't

13          know, are you still waiting on

14          those documents?

15               MR. WEINBERG:  We mediated

16          them.  Once the case settled, the

17          need for them was obviated.  They

18          were quoting me hundreds of

19          thousands of dollars in costs to

20          produce those documents.

21               MR. LEVIN:  Who would you

22          say you had the most contact with

23          in the leadership of the New

24          Jersey litigation?
```

FAC Resp. Exhibit D -- 740

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           MR. WEINBERG:  Dave, Jeff.

2           MR. LEVIN:  At Chris' firm?

3           MR. WEINBERG:  Chris at a

4    higher level, I guess.  Sol,

5    obviously.

6           MR. HERMAN:  How many hours

7    did you have put into the case?

8           MR. WEINBERG:  I calculated

9    about 6,000.  Obviously I'm

10   recreating hours.

11          MR. LEVIN:  You submitted

12   10,000 hours and 235,000 in costs.

13   Are you working with the

14   accountants to get them approved?

15   Because so far they have been

16   rejected.

17          MR. WEINBERG:  They

18   contacted me.  I spoke to Cliff

19   Newlin, and then we've been

20   trading phone calls.  But 10,000

21   hours is basically, of that time,

22   6,000 and change is mine.  I

23   worked essentially full time on

24   Vioxx for three years, and I work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1      hard.  So, I believe I probably

2      underestimated my hours.

3           MR. HERMAN:  The other

4      question I have, and I'm not

5      holding you to an exact number, of

6      the hours that you've

7      reconstructed, were they all yours

8      or did you have contract workers,

9      associates?

10          MR. WEINBERG:  All mine.

11          MR. HERMAN:  They were 100

12     percent yours?

13          MR. WEINBERG:  All mine.

14          Just to kind of finish the

15     point on the MDL issue.  I called

16     a meeting in Philadelphia in June

17     of 2007, because I was concerned

18     that we needed to have the best

19     evidence in those trials.  I was

20     very interested in working with --

21     we had some conversations with Don

22     Arbitblit.  Arbitblit became very

23     much interested in the Madigan

24     project and spent a lot of time

FAC Resp. Exhibit D -- 742

Page 28

1      talking to him, and he came to the

2      meeting.  Mark Robinson came to

3      the meeting.  Chris Placitella was

4      there.  Chris was handling

5      marketing stuff, and that's the

6      other thing that needs to be in

7      the trial package, if it is not,

8      because it is brilliant, brilliant

9      lawyering.  I was his sounding

10     board on that stuff.  Kostis was

11     also very much involved in that.

12     So, we had Mark, Don Arbitblit

13     myself, Chris, Dan Sigelman.

14          MR. LEVIN:  Was this the

15     meeting that Dan Sigelman from

16     Cohen Milstein went to in

17     Philadelphia?

18          MR. WEINBERG:  Philadelphia,

19     yes.

20          The intent of that meeting

21     was basically to say, let's work

22     together.  Let's put Madigan in

23     the MDL cases.  We were interested

24     in Zipes, who was a very good

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1        witness, I understood, in the

 2        trial that he testified in.

 3             You know, for reasons that,

 4        you know, I'm not -- there's not a

 5        blame game here, but it didn't

 6        work out.

 7             MR. LEVIN:  I know.

 8             MR. WEINBERG:  But I tried.

 9        So, in terms me being able to

10        communicate the work that I was

11        doing, I did try.  I think in

12        terms of the leadership in New

13        Jersey, I would consider Perry and

14        Mark, you know, they were on the

15        front lines of the cases, and I

16        know I worked with their firms on

17        a variety of issues including

18        Kostis.  Kostis was on the phone

19        with Rick.

20             MR. WEITZ:  I have to tell

21        you that Eric, although he was

22        focused on working up his cases,

23        he did bring a lot to the

24        litigation as far as his
```

FAC Resp. Exhibit D -- 744

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          participation and expertise.  He

2          did share it.  It is not that he

3          probably didn't coordinate with

4          the MDL as much as he possibly

5          could have and contributed, but he

6          was always available and always

7          sharing his experts.  I met with

8          Eric and Kostis.

9                    MR. HERMAN:  I need to

10          apologize.  Excuse me.  Off the

11          record.

12                       -  -  -

13               (Whereupon, an

14          off-the-record discussion was

15          held.)

16                       -  -  -

17                    MR. WEINBERG:  Russ, in

18          terms of what should be in the

19          trial package, I'm willing to

20          share all of it.  I do think that

21          you should have Madigan in the

22          trial package.

23                    MR. RAFFERTY:  I think you

24          started off saying there's three

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1        things.  One was Madigan.

2             MR. WEINBERG:  Madigan, the

3        Alzheimer's analysis, and the

4        marketing stuff.  We can look at

5        the FDA stuff, because I did -- I

6        went through the summary approval

7        packages and other stuff.  I have

8        long detailed PowerPoints which I

9        did share with experts that

10       excerpted key portions of those

11       documents.

12            Just to kind of finish up on

13       this point, because I know you

14       guys have a full day.

15            Other stuff in the last

16       year, I took discovery on a

17       project called the NitroMed

18       project, which was a very

19       interesting project that Merck did

20       with a company called NitroMed out

21       of Boston.  When Merck got the

22       results of protocol 136 and knew

23       they could no longer say that

24       their drug could be combined with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1    aspirin truthfully, because there

2    was no benefit from the data in

3    that study, they had to find a way

4    of improving the gastrointestinal

5    profile where you were combining

6    Vioxx with aspirin, otherwise,

7    they were losing a big marketing

8    benefit.  They thought that by

9    combining Vioxx with nitric oxide

10   that it would reduce the

11   gastrointestinal side effects of

12   the drug, and they sought out

13   companies that own proprietary

14   patents on combining Vioxx with

15   COX-2 inhibitors, because that

16   work had been going on for some

17   time.  NitroMed was the company

18   that had the best patents.  So,

19   Merck cut a deal with them.  It

20   was actually Merck Frosst.  So, I

21   got into the Merck Frosst

22   discovery, and this was work that

23   was ongoing at the time of the

24   settlement, but what I found out

FAC Resp. Exhibit D -- 747

Page 33

```
 1        was that NitroMed, when Merck

 2        approached them, said to Merck,

 3        hey, we can not only fix your

 4        gastrointestinal problems, we can

 5        fix your cardiovascular risk.  And

 6        this was in the middle of 2002.

 7             I served a commission for a

 8        subpoena in Boston and took the

 9        deposition of Gordon Letts, who

10        was the chief medical officer of

11        NitroMed, who said that Merck

12        rejected that offer.  They were

13        not interested in ameliorating the

14        cardiovascular side effects of

15        Vioxx.

16             Now that we know from

17        Madigan's analysis there was

18        statistically significant risk, I

19        think that evidence would be

20        interesting evidence in terms of

21        punitive conduct.  Here you have a

22        company that's telling you we can

23        improve the cardiovascular profile

24        of your drug and they're refusing
```

Page 34

1           it.  Not only that, there's

2           another company out there called

3           Nitrox, which today is working on

4           a nitric oxide enhanced COX-2 that

5           actually lowers blood pressure.

6           And they are in Phase III studies,

7           and that drug may be approved.

8                So, that was work that was

9           going on.  I took the deposition

10          of a Merck Frosst scientist named

11          Don Nicholson.  I had Ford

12          Hutchinson, another expert,

13          another Merck Frosst person named

14          Sophie Roy on my radar screen to

15          depose.  That was work going on in

16          the last year of the litigation.

17               I organized some working

18          meetings.  I tried to defer to the

19          people who were the leaders in

20          this litigation, because they had

21          been there before me, and at the

22          same time, fill in where I could

23          to work together.

24               I had a working meeting in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1        my office in November of 2006 with

2        John Kostis and several of the

3        attorneys from the MDL and State

4        Court on a specific causation

5        model.  I thought it was a good

6        model for settlement.  It ended up

7        not being used, but it was useful

8        in understanding specific

9        causation.  It became very

10        important in the McDarby case

11        where diabetes was the issue, and

12        the day before Dr. Krumholz'

13        deposition, Ellen reached out to

14        me and said, what do you know

15        about diabetes risk?  And I had

16        the information.  It was no

17        coincidence that I had it, because

18        I organized the meeting in June of

19        2007 in Philadelphia that Mark

20        Robinson and Don Arbitblit --

21            MR. SEEGER:  Take 60 seconds

22        and kind of sum up, because we've

23        got to stay on schedule.

24            MR. HERMAN:  I have one

FAC Resp. Exhibit D -- 750

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1      other question, excuse me.

2            I noted in your PowerPoint

3      under number IX, Roman Numeral IX,

4      fracture and bone healing.  Have

5      you had any contact with any pro

6      se folks or other folks alleging

7      that bone healing was either

8      retarded or mal affected by Vioxx?

9            MR. WEINBERG:  Not with pro

10     se folks, but I have had

11     discussions with Madigan about

12     that.  In fact, we analyzed the

13     data.  It does retard fracture

14     healing, and there was a

15     statistically significant

16     increased risk of --

17           MR. HERMAN:  Do you have a

18     client that you analyzed that for?

19           MR. WEINBERG:  No.  One of

20     the things that I did was to look

21     at the overall risk/benefit of

22     Vioxx because I felt that --

23           MR. HERMAN:  Wait a minute.

24     Let me explain to you that there

FAC Resp. Exhibit D -- 751

Page 37

1        are -- have you sent that material

2        in to the MDL or to New Jersey?

3             MR. WEINBERG:  It's in

4        Madigan's report.

5             MR. LANIER:  Is that a yes

6        or a no?

7             MR. WEINBERG:  Yes.  I don't

8        want to be cross-examined.

9             MR. HERMAN:  Would you

10       e-mail me a copy of that report or

11       fax it?

12            MR. LANIER:  You've got

13       information that may be helpful to

14       people with other cases right now

15       that we need to plug into.  So, we

16       need it not just lost in the

17       morass of 80 bazillion documents,

18       would you highlight it and send it

19       to Russ?

20            MR. WEINBERG:  Yes.

21            MR. LANIER:  Thank you.

22            MR. WEINBERG:  So, to sum

23       up, I did a lot of work on this

24       case.  I think a lot of it was of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

 1        the highest quality.  I worked

 2        diligently from beginning to end.

 3        When the track record was bad, I

 4        worked harder.  I tried to fill in

 5        where I saw that there were gaps.

 6             When I was called upon in

 7        each of the trials in New Jersey,

 8        except for the Locks folks really,

 9        I offered help, but they didn't

10        want it, but in each of those

11        cases, I was asked for help.  Even

12        in Ernst, Mark, I didn't realize

13        this, but I spent some time

14        prepping Egilman.  My role was

15        minimal, but I sat through

16        Egilman's deposition.  I think his

17        son accused me of falling asleep

18        at one point.  But what I brought

19        to, for example, the Humeston

20        case, the first Humeston case,

21        when Dave and Jeff and Chris were

22        looking at FDA issues, I had spent

23        a lot of time, between September

24        30, 2004 and when that case was

FAC Resp. Exhibit D -- 753

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1           tried, studying the FDA issues.

2           So, the fact that I was asked for

3           help is not a coincidence.  It was

4           because I had gone to school on

5           this case.

6               I'd be happy to share any of

7           my work product.  I'll send you --

8           Russ, I'll send you the Madigan

9           report.  I also have an expert, if

10          somebody needs an expert, I have a

11          guy named Pat O'Connor who was at

12          UMD&J who approached Merck in 2000

13          and said I think you need to do

14          some studies.  And I have the

15          documents on that issue.  And they

16          blew him off.  So, if somebody has

17          got an osteoporosis case, I can

18          help them.

19               But I did that, just to

20          finish, I looked at the overall

21          risk/benefit of the drug because I

22          felt that it was possible that if

23          Merck was arguing that

24          risk/benefit, gastrointestinal

FAC Resp. Exhibit D -- 754

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1      benefit and the issues were

2      cardiovascular risk, that other

3      benefits and risks should be fair

4      game.  And so I looked at the

5      universe of them as I could define

6      it and shared my work product

7      consistently and tried to be a

8      leader, tried to be a team player,

9      and just tried to represent my

10     clients the way that I was taught

11     when I took my first job out of

12     law school.

13          MR. SEEGER:  Thanks, Eric.

14          MR. LEVIN:  Thanks.

15          MR. WEINBERG:  Thank you.

16               -  -  -

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 755

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1                C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 756

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          LEWIS & ROBERTS
               Kimberly R. Wilson, Esquire
FIRM:          MARTIN & JONES
               H. Forest Horne, Jr., Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 757

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2             MR. SEEGER:  We're most of
 3        the fee committee.  We're making a
 4        record because Judge Fallon would
 5        like to have a record of things
 6        that are discussed here, but the
 7        floor is yours, and you can
 8        present and say whatever you want
 9        in the time you have.
10             MS. WILSON:  Okay.  Some of
11        you know me, some of you don't.
12        Chris and I go way back.  I got
13        involved in Vioxx literally the
14        day it was withdrawn from the
15        market.  Between 1500 and 2200
16        cases came across my desk.  The
17        way I did it was, I educated
18        myself very, very early.
19        Fortunately, I come from a family
20        of physicians and just decided
21        from the get-go, I was only going
22        to take, my firm, Lewis & Roberts,
23        we were only going to take cases
24        that we felt could go to trial.
```

FAC Resp. Exhibit D -- 758

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1      We ended up taking a very small

2      select group of cases, I think it

3      was around 50.

4           We filed all of our cases.

5      We filed in New Jersey state court

6      with the exception of one case

7      that I filed in the MDL.  We just

8      made a huge commitment from the

9      get-go, as did my partners, a

10     small firm, a firm of 20

11     attorneys, 11 partners, to make a

12     financial commitment and work

13     these cases up.  I got in early

14     and filed early and made it very

15     clear from the outset that I

16     wanted to push my cases because I

17     felt like in a case like this

18     where there was not a signature

19     injury and causation was

20     particularly tough, and Chris and

21     Mark did a great job with their

22     trials in getting over those

23     hurdles, the only way to really

24     resolve this particular mass tort

FAC Resp. Exhibit D -- 759

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        in a favorable way for the

2        plaintiffs was to have high

3        quality cases that got worked up.

4        Unfortunately, causation was so

5        hard, I think there's only a small

6        number of law firms that made that

7        financial commitment and also put

8        forth the labor to do so.  My firm

9        clearly did that.

10            We did it without being

11        asked to do that and then, of

12        course, when Chris and Dave and

13        Mark asked me to do more, I

14        certainly did more.  My firm alone

15        from North Carolina trucked 28

16        folks up to New Jersey and/or

17        Philadelphia for depositions.  I

18        did, I don't know, I think my

19        affidavit says four sales reps,

20        but it was actually eight sales

21        reps.  I did the depositions of 18

22        physicians and miscellaneous other

23        people along the way.  So, I was

24        actively involved.

FAC Resp. Exhibit D -- 760

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1              MR. WEITZ:  Was that for

 2         your individual cases where you

 3         did the four sales reps?

 4              MS. WILSON:  Yes.

 5              MR. WEITZ:  Judge Higbee had

 6         four different waves of cases.

 7         Could you tell us which of your 49

 8         cases were in which waves and if

 9         any of them were assigned a trial

10         date?

11              MS. WILSON:  The first wave,

12         Black and Smith got chosen, and it

13         went up to the very wire, got

14         worked up for trial, and then I

15         think the way -- and Chris can

16         correct me if I might be mistaken,

17         but there were 39 initially in

18         that first wave that got worked

19         up.  Black and Smith got chosen

20         for trial, and then for some

21         reason, collectively a small group

22         of us, probably me, Chris, Mark

23         Lanier, Dave Buchanan was in on

24         it, there was some reason those

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          two got bumped, and I think the

2          only reason was we ended up, that

3          first group, not trying as many as

4          what we thought.

5               MR. SEEGER:  I think we had

6          a striking procedure with them.

7          We selected, they selected, they

8          got strikes, we got strikes.  They

9          might have struck your two because

10         they were good cases.

11              MS. WILSON:  It went to the

12         bitter end.  We were working those

13         up and thinking those cases were

14         going to go to trial in January.

15         So, that was Black and Smith.

16         Then I kept putting cases up in

17         those trial waves.  And I think in

18         every wave, there was always a

19         chance my cases were going to go

20         to trial throughout the process.

21              MR. SEEGER:  Kim was always

22         one of those people that when we

23         would call for cases, she would

24         put cases in.

FAC Resp. Exhibit D -- 762

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           MS. WILSON:  And actively

2      engaged in discovery in all of

3      them.  I mean, every single case

4      that ended up -- there were a

5      couple of cases that I filed that

6      I ended up dismissing because I

7      felt there were huge causation

8      issues.  So, I got rid, along the

9      way, of any case that I felt was

10      more of a threat than an advantage

11      to us as a group.

12           MR. LEVIN:  You have about

13      $159,000 in costs that has been

14      approved by the accountant.  You

15      are ahead of a lot of people that

16      have not had them approved.  What

17      was the bulk of those costs, the

18      transportation, the lodging and

19      everything of your clients?

20           MS. WILSON:  Yes.  The other

21      thing I did was, with all of my

22      depositions, I had everything

23      videotaped.  And as soon as I got

24      those DVDs back, I disseminated

FAC Resp. Exhibit D -- 763

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1          them throughout the country to
 2          everyone.  So, I did a lot of
 3          digital stuff with my discovery
 4          just to help educate other
 5          attorneys, especially in regards
 6          to the sales reps, because early
 7          on, there was a group of us, and
 8          Forest was part of it, we had some
 9          excellent sales rep depos, I mean,
10          with incredible admissions.
11               MR. SEEGER:  Who from your
12          group was taking those for the
13          most part?
14               MS. WILSON:  Me.
15               MR. HORNE:  And I was.
16               MS. WILSON:  And Forest.  I
17          mean, I don't know any other
18          lawyers in North Carolina --
19               MR. HORNE:  That took any
20          sales reps.
21               MS. WILSON:  I don't think
22          so.
23               MR. WEITZ:  Did you
24          coordinate any of that with Jerry
```

Page 9

1           Kristal with Weitz & Luxenberg?

2                   MR. HORNE:  I did, and I

3           borrowed heavily from the fine

4           depositions that Jerry took, and

5           Dave also gave us some deposition

6           transcripts of sales reps.  So, I

7           borrowed heavily from those, but

8           we took -- I think Kim and I, I

9           think there was a different line

10          of thought on the sales reps.  All

11          the sales rep depositions that I

12          took were at least eight hours

13          long.  I mean, it was an all day

14          affair.

15                  MR. LEVIN:  Forest, were you

16          assisting her in processing her

17          cases or just your own?

18                  MR. HORNE:  Just my own.

19                  MR. LEVIN:  Your firm's?

20                  MR. HORNE:  Just my firm's.

21                  MR. LEVIN:  How many cases

22          did your firm have?

23                  MR. HORNE:  We filed 48

24          cases all in New Jersey.  We

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          screened probably -- I'm with a

2          15-lawyer plaintiffs firm with our

3          primary office in Raleigh, and so

4          we get a lot of calls when there

5          are these kind of drug cases.  We

6          screened probably 2000 cases and

7          narrowed that down to 48.  We only

8          filed and put up for expedited

9          discovery the ones where the Vioxx

10         usage was clear and where we

11         thought the causation was

12         relatively clear, at least early

13         on it seemed like it was clear.

14         It got hazier as you went along,

15         but we had 48 cases.  Every one of

16         them was filed in New Jersey.  We

17         filed the first case in January of

18         2005.  I think at the time there

19         were only about 300 filed in New

20         Jersey at that time, and then

21         within six months, we actually

22         screened -- we had an expert in

23         cardiology review every case that

24         we accepted before we filed it.

FAC Resp. Exhibit D -- 766

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        So, we had that.  Ira Gelb and

 2        Steve Rich were the two physicians

 3        that we had review all of our

 4        cases.

 5            Myself and my partner, Greg

 6        Martin, who was heavily involved

 7        in the fen-phen litigation -- I

 8        headed up the project for our firm

 9        and did most of the work, but my

10        partner, Greg Martin, worked on

11        the case.  And then we hired two

12        experienced associate lawyers to

13        come in to work on the cases.  We

14        devoted two paralegals exclusively

15        to Vioxx, and then we hired two

16        summer law clerks to come in and

17        go through the FACTS database.

18        That's all they did eight hours a

19        day for three months.

20            MR. LEVIN:  For your

21        individual cases?

22            MR. HORNE:  Kim and I, our

23        collaboration, a lot was on the

24        sales reps because we had mutual
```

FAC Resp. Exhibit D -- 767

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          sales reps, we had mutual

2          physicians and --

3              MR. LEVIN:  Same

4          jurisdiction.

5              MR. HORNE:  -- going through

6          those FACTS documents was

7          maddening.  Kim would call me

8          occasionally and say, did you see

9          this document on Dr. X, and then I

10         would find a document on Dr. Y.

11         We collaborated there, and we

12         collaborated on the sales rep

13         depositions, and I shared a lot

14         of -- Chris, I dealt with Dave and

15         Jeff Grand more than you.  Jerry

16         and I worked together a lot, but

17         we found a number of -- we had one

18         orthopedic physician, I didn't

19         write down his name, but he was an

20         orthopedic physician in

21         Fayetteville, North Carolina who

22         we found in the FACTS database had

23         been paid over $100,000 by Merck.

24         And in collaborating with Robb

FAC Resp. Exhibit D -- 768

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          Dassow and Dave, I think that's

 2          kind of what led to, along with

 3          some other folks, I'm sure, the

 4          order by Judge Higbee to require

 5          Merck to report the income that

 6          Merck had paid all these

 7          physicians.  And the one

 8          physician, the orthopedic

 9          physician that we found in

10          Fayetteville had been paid over

11          $100,000.  We found all of these

12          e-mails, including a PowerPoint

13          presentation where the Merck rep

14          had told the physician to take out

15          a slide that talked about an

16          increase in blood pressure, move

17          it to the end, and don't spend

18          much time on it.  We circulated

19          that with a number of folks in the

20          litigation.

21               MR. LEVIN:  How is

22          Fayetteville these days?

23               MR. SEEGER:  Still there.

24               MR. HORNE:  It is not very
```

FAC Resp. Exhibit D -- 769

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1        friendly.
 2             MR. LEVIN:  I used to be a
 3        policeman in Fayetteville.
 4             MR. HORNE:  Is that right?
 5             MR. LEVIN:  Military
 6        policeman.
 7             MR. HORNE:  The doctor, his
 8        name is Brad Broussard -- these
 9        Fayetteville physicians are very
10        conservative, but this is a short
11        story.
12             I had a 48-year-old client
13        who suffered a heart attack and
14        ended up having a
15        defibrillator/pacemaker installed.
16        He was in perfect health otherwise
17        and was on the heart transplant
18        list, and this physician that had
19        been paid over $100,000 by Merck
20        and was on the speakers bureau,
21        this was the very first case I
22        filed in New Jersey.  I
23        arranged -- one of the things that
24        I tried to do with all my clients
```

FAC Resp. Exhibit D -- 770

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        is arrange meetings with the

 2        prescribing physicians.  I went

 3        down and met with him, not knowing

 4        that he had been paid $100,000,

 5        and went into a conference -- paid

 6        him $1,000 to meet with him for an

 7        hour and went into a conference.

 8        He just waylaid me.  He said, no,

 9        I'm not going to say that I

10        wouldn't have prescribed it had I

11        known.  Little did I know that he

12        did know, and I found that out

13        later.  His deposition --

14             MR. GIRARDI:  Speaks for

15        it --

16             MR. HORNE:  He just clipped

17        me for $1000 and then was a jerk.

18        The only thing that saved the

19        meeting, the guy said if he was

20        deposed, and this case wasn't on

21        for trial, but he said if he was

22        deposed -- he finally came around,

23        I brought my client with me who

24        pleaded with the doctor, and he
```

FAC Resp. Exhibit D -- 771

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1           finally gave in.

2                 MR. SEEGER:  Did you guys

3           work closely with Robb Dassow and

4           Sue Scovern on these sales rep

5           things?

6                 MS. WILSON:  Forest did.

7                 MR. HORNE:  I worked with

8           Robb on that, and I also worked

9           with Robb on the Medco because we

10          had two cases where we sued Medco

11          because they were 50 milligram

12          cases where they had prescribed

13          for over 18 months of 50

14          milligrams.  So, we sued Merck-

15          Medco.  That was either two or

16          three cases.  I engaged in

17          discovery with Medco's lawyers on

18          those issues, trying to find a

19          connection between Medco and

20          Merck, and I worked closely with

21          Robb on that, and we shared a lot

22          of documents in that regard.

23                Kim put up, I don't know,

24          what was your percentage of cases?

FAC Resp. Exhibit D -- 772

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          I mean, you put up close to 50% of

2          your cases.

3               MS. WILSON:  It was over

4          50%.

5               MR. HORNE:  We filed 48

6          cases, and we had 12 in for the

7          expedited discovery.  And then

8          along with Steve Kherkher at

9          Williams Kherkher, I had two cases

10         from North Carolina in the four

11         trial groupings that were set for

12         trial originally in October, and

13         then were moved to January.  I

14         worked closely with Jerry on those

15         and attended all the meetings, and

16         also Dave and Jeff Grand were very

17         helpful.  Frankly, I knew the

18         settlement discussions were going

19         on, but I had no idea that y'all

20         had moved it along as far as it

21         was.  So, we were heavily

22         preparing for trial along with

23         Steve Kherkher.

24               Steve's firm had two North

FAC Resp. Exhibit D -- 773

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        Carolina cases, and my firm had

 2        two North Carolina cases that I

 3        put up.  So, we were collaborating

 4        together.  And then Judge Higbee

 5        changed her mind early on and said

 6        I only want prelabel change cases

 7        in the mix.  So, one of my cases

 8        dropped out because it was post

 9        label change.  And then in

10        discovery, the two cases that

11        Steve had developed usage

12        problems, so both of his cases

13        dropped out.  So, we were down to

14        one case in North Carolina, and I

15        communicated with Dave, and we had

16        a hearing with Judge Higbee,

17        fought Hope Freiwald tooth and

18        nail, and added another case that

19        was not on the expedited list for

20        trial.

21             So, I brought another case

22        in for the January '08 trial mix

23        and got that case -- even though

24        it wasn't in my expedited group, I
```

FAC Resp. Exhibit D -- 774

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          got the client and his wife up to

2          Philadelphia, went to Dechert,

3          dealt with Hope on all of those

4          depositions, got that done, got

5          the physicians deposed.  So, we

6          had those two cases set for trial.

7              I worked closely with Sol

8          Weiss on developing Steve Rich.  I

9          had been using Steve from early

10         '05 on specific causation, and

11         then Sol had worked with him on

12         general causation.  And Steve was

13         going to be our general causation

14         expert for the January '08 trial

15         set cases along with Sol.  I went

16         up to Philadelphia to defend

17         Steve's general causation

18         deposition, coordinated our

19         cardiologists, who saw all the

20         clients whose cases were trial set

21         on specific causation.

22             The Williams Kherkher firm

23         developed Dr. Goldberg for the

24         marketing case.  I wasn't involved

FAC Resp. Exhibit D -- 775

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1           in that, they were.

2                But we, like Kim, our firm

3           responded every time there was a

4           call to put more cases in the mix,

5           and I was pretty vocal about that

6           on the list serve, saying, guys,

7           we are all in this together.  So,

8           we volunteered over 25 percent of

9           our firm's caseload, and we worked

10          them up, and we brought quality

11          cases to the mix.

12               MR. GIRARDI:  Was it the

13          same 50 cases?

14               MR. HORNE:  No.

15               MS. WILSON:  No.

16               MR. GIRARDI:  How many cases

17          did you have?

18               MR. HORNE:  We filed 48.  We

19          screened 2000 to get 48, and we

20          only filed cases where -- we knew

21          from the fen-phen days that

22          causation was going to be an

23          issue, so we felt comfortable that

24          we either had affidavits from

FAC Resp. Exhibit D -- 776

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          doctors where there were sample

2          cases, and then otherwise we had

3          rock solid usage on our

4          prescriptions.

5                MR. LEVIN:  How many of your

6          cases did you put in the same

7          position that Kim's were where you

8          worked them up to trial?

9                MR. HORNE:  We had 11 cases

10         in the mix, but then we added the

11         additional ones, so, there were

12         12.  And we had a hearing with

13         Hope, and Dave was instrumental in

14         getting this other case added at

15         the last minute.  Otherwise, we

16         would have only had one case for

17         the North Carolina trial setting,

18         and we were able to get one of our

19         other cases in, so we had two.  I

20         attended all the meetings with

21         Jerry on that, we collaborated

22         closely on all of the preparations

23         for trial.

24                MR. BLIZZARD:  Forest, help

FAC Resp. Exhibit D -- 777

Page 22

1          me understand the timing of this

2          because I think we heard some of

3          this the other day from Steve

4          Kherkher.

5               When were those four cases,

6          two of yours and two of Williams

7          Kherkher, scheduled to go to trial

8          originally?

9               MR. HORNE:  October of '07.

10              MR. BLIZZARD:  Then as I

11         understood, three of them dropped

12         out because of various reasons,

13         including two of them because they

14         didn't have proof of use.

15              MR. HORNE:  Right.

16              MR. BLIZZARD:  So, there was

17         one left, and then you added one?

18              MR. HORNE:  Right.

19              MR. BLIZZARD:  That case was

20         then put off until February of

21         2008?

22              MR. HORNE:  No.  We got that

23         case -- I was in Salt Lake City in

24         depositions in another case and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          had a conference call with Dave

 2          Buchanan, Hope Freiwald and Judge

 3          Higbee, and Hope was screaming

 4          about adding one of our cases

 5          late.  It had been filed and had

 6          been there.

 7               MR. BLIZZARD:  I'm trying to

 8          find out, when were those two

 9          then, the one you added and the

10          one that still was there, when

11          were they set for trial?

12               MR. HORNE:  With the trial

13          grouping of four cases, and I

14          think the Weitz Luxenberg setting

15          had a problem with that expert,

16          and I think there was some talk at

17          the time of settlement of moving

18          it back, so there would only be

19          three cases.

20               MR. SEEGER:  Well, there was

21          actually, and then something

22          happened to that setting.  They

23          got moved to like September or

24          October.
```

FAC Resp. Exhibit D -- 779

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1              MR. HORNE:  It was October.

2              MR. SEEGER:  Then they got

3         bounced to January and then we

4         settled.

5              MR. BLIZZARD:  I'm confused,

6         because I thought I heard

7         yesterday Kherkher say the cases

8         were set in March of 2008, that

9         those were actually Martin & Jones

10        cases, but that they were working

11        on them.

12             MR. SEEGER:  They might have

13        been originally set for

14        March/April of '07, because that

15        was an original target date.  I

16        don't remember why we lost the

17        setting, there were so many facts.

18        Dave definitely will, because he

19        remembers everything.  But that

20        somehow wound up after the summer,

21        which was September/October, and

22        basically the settlement came

23        before you guys could try the

24        case.  But the cases were in the

FAC Resp. Exhibit D -- 780

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          queue, and they were going to go

2          at that point.

3               MR. HORNE:  Right.

4               MS. WILSON:  Black.  I

5          remember why we took Black off.

6          Black ended up, he was an MI and a

7          stroke, and Judge Higbee didn't

8          want to do that.

9               MR. SEEGER:  That's right.

10              MS. WILSON:  That's why

11         Black didn't go.

12              MR. SEEGER:  She tried to

13         keep the issues as close as she

14         could for trial groupings because

15         she was doing more than one case

16         at that point.

17              MS. WILSON:  Just my

18         affidavit --

19              MR. SEEGER:  Just so I'm

20         clear.  I'm sorry, Kim.  So

21         Kherkher was going to help you

22         guys try the case?

23              MR. HORNE:  No.

24              MR. SEEGER:  I'm not clear

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1          on that.

 2                MR. HORNE:  What happened

 3          was, Steve had two North Carolina

 4          cases, and I had two North

 5          Carolina cases.  We were at the

 6          hearing when the judge was asking

 7          for trial cases.  So, I offered

 8          both of mine up, and Steve offered

 9          both of his up.  We agreed to work

10          together, and I would work my

11          cases up, he would work his cases

12          up, and we would share the general

13          and specific causation experts for

14          trial.  At the beginning of that,

15          Judge Higbee at the last minute

16          changed her mind and said, I only

17          want three prelabel cases.  So,

18          one of mine dropped out, and it

19          was two of Steve's and one of

20          mine.  And then both of Steve's

21          dropped out, because in the

22          depositions they did, the

23          prescription usage and samples was

24          terrible, so, they voluntarily

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          dropped those.  That's when I

2          added another one of my cases.

3               MR. SEEGER:  You had two

4          cases?

5               MR. HORNE:  I had two cases.

6               MR. SEEGER:  At that point,

7          they didn't have a case in.

8               MR. HORNE:  They didn't have

9          a case in, but they had already

10         gone a long way down the road of

11         developing the experts.

12              MR. SEEGER:  Yes.  No

13         question.

14              MR. HORNE:  They continued

15         with that.  As far as my two

16         cases, I handled all the

17         depositions for my clients and

18         their spouses and the physicians

19         and the sales reps.  I did all of

20         that.

21              MR. SEEGER:  Okay.

22              MR. BLIZZARD:  Was there any

23         agreement that they would try your

24         two cases that remained?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1           MR. HORNE:  We were going to
2       try it together.  And I told Steve
3       this, and we had early on -- we've
4       got an office in Atlanta as well.
5       So, we had some Georgia cases, and
6       we had some -- a couple of good
7       Georgia cases that we were going
8       to put up.  Someone else had some
9       Georgia cases, and we couldn't
10       come to an accommodation, because
11       I told Steve, I'm going to be
12       involved in my cases.  I'm not
13       going to delegate it to you and
14       you do everything, because that's
15       just not the way I work or my firm
16       works.  So, I worked up my cases,
17       Steve worked up his cases.  We
18       were sharing the general and
19       specific causation witnesses for
20       trial.  And then we were going to
21       divide up opening, closing, cross
22       examinations, witness examinations
23       and that sort of thing.
24           MR. SEEGER:  Once their

FAC Resp. Exhibit D -- 784

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1       cases were out, how would the

2       trial have gone?  Would you have

3       taken the lead, would they have

4       worked with you on the trial

5       still?

6              MR. HORNE:  Yes.  And when

7       that happened, because --

8              MR. SEEGER:  You were still

9       dividing up.

10             MR. HORNE:  What happened

11      when Steve's cases dropped out, we

12      were down to one case.  They

13      didn't have any other North

14      Carolina cases.  And that's when

15      we had to get Dave involved.  And

16      I told Hope, look, I've got a case

17      that's been filed, fact sheets in,

18      you've got all the medical

19      records, basically everything is

20      there.  I'll get the client up to

21      Philadelphia next week with his

22      wife.  We'll make every

23      accommodation.  And I think the

24      one thing Judge Higbee did was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1          gave 30 extra days to designate

 2          the experts.  But I got that case

 3          in with Dave's help.  But Steve

 4          was so far down the road with the

 5          marketing expert and a fine

 6          cardiologist out of San Francisco

 7          that came back to North Carolina

 8          and saw both of these clients.  He

 9          was so far down the road with

10          that, I said let's --

11               MR. SEEGER:  Keep it

12          together.

13               MR. HORNE:  -- keep it

14          together, and that's what we did.

15               MR. WEITZ:  Forest, clarify

16          some times with me and cases.

17          Because in January of '07, you had

18          Hermans and Humeston, and then you

19          had Keeley and Rossi, which

20          Humeston was Chris's case, Hermans

21          was Lanier's, and Keeley and Rossi

22          were Weitz & Luxenberg cases.  She

23          set those cases down for trial in

24          January '07, and then Hermans and
```

FAC Resp. Exhibit D -- 786

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

 1          Humeston were tried in February

 2          '07.  Keeley and Rossi were then

 3          postponed to be tried in September

 4          of '07, and then the judge just

 5          put it on hold because there were

 6          negotiations going on.  Where were

 7          your cases with respect to that?

 8          Did you have an actual firm trial

 9          date?

10               MR. HORNE:  Yes.

11               MR. WEITZ:  From when?

12          Because Keeley and Rossi were the

13          next ones she was trying.  I'm

14          trying to figure out when you and

15          Kherkher had trial dates.  Was it

16          after those two cases?

17               MR. HORNE:  Originally there

18          were four states set forth for

19          trial.  It was North Carolina,

20          Pennsylvania, New Jersey and New

21          York.  Jerry was heading up the

22          New York, and Sol had both New

23          Jersey and Pennsylvania, and I had

24          North Carolina.  Those four cases

FAC Resp. Exhibit D -- 787

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          were all set on the same track.

 2          Then Jerry and I talked about the

 3          fact that his -- the general

 4          causation witness out of Canada

 5          called Jerry the night before his

 6          deposition and said, oops --

 7               MR. WEITZ:  He had an

 8          article --

 9               MR. HORNE:  -- he signed an

10          affidavit I think.  He said, I

11          think I signed an affidavit.  But

12          North Carolina was in that

13          setting.  We were in that setting.

14          And then because of that snafu

15          with Jerry's expert, I think Judge

16          Higbee -- and this was all about

17          the time the settlement came down

18          -- was going to move the New York

19          setting out to February because we

20          were down the road as far as when

21          the jury was going to come in, and

22          we were talking about renting out

23          the convention center at the hotel

24          and having the voir dire there.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          MR. WEITZ:  So, you were

2     part of the final stage in those

3     two cases?

4          MR. SEEGER:  Yes.

5          MR. HORNE:  Yes.  Jeff Grand

6     and Dave Buchanan and I worked --

7     Dave was very gracious --

8          MR. SEEGER:  By the way,

9     Jeff Grand just had a baby.  For

10    the record, let the record reflect

11    we're looking at Jeff's new baby.

12         MR. HORNE: My two cases were

13    Romans, Billy Ray Romans and Andy

14    Ray Sanderson.

15         MR. WEITZ:  The cases Forest

16    had ready for trial were Romans

17    and Sanderson.

18         MR. HORNE:  Yes.  Romans was

19    a prelabel change that was in the

20    mix originally.  Sanderson was the

21    case that was added after a motion

22    hearing with Dave and Judge Higbee

23    and Hope and myself, and Judge

24    Higbee agreed to add Sanderson.

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          So, Sanderson and Romans were the

2          two North Carolina cases that were

3          set to go to trial originally in

4          that October setting with the New

5          Jersey, Pennsylvania and New York

6          cases that Judge Higbee then moved

7          into January.

8               I went to the status

9          conference in November and left

10         there, flew back to Raleigh, North

11         Carolina, jumped in my car and

12         drove four hours to Asheville and

13         got to the hotel at 4:00 a.m. and

14         deposed a Merck rep on a Friday

15         from 9:00 in the morning until

16         6:00 at night, and then the next

17         week is when the settlement

18         happened.

19              And I didn't -- and Steve, I

20         don't know what Steve knew.  He

21         may have known more than he told

22         me, but after the fact -- I mean,

23         I knew the negotiations were

24         going, and I think that's -- even

FAC Resp. Exhibit D -- 790

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1       Judge Higbee said in a conference

2       that that's one of the

3       considerations for moving the

4       setting from October of '07 to

5       January '08.  But I had no idea

6       that y'all were that close, and

7       obviously a great result.

8               MR. LEVIN:  Neither did we.

9               MS. WILSON:  My cases are

10      real simple.  I did not work with

11      Kherkher at all.  I worked with

12      two people.  That was Chris Seeger

13      and Mark Lanier.  So, mine is real

14      clear-cut.  That was kind of the

15      get go.  Forest and I collaborated

16      a lot.

17              Something I would like to

18      add is, after the settlement was

19      announced, it was either Chris or

20      Mark, one, who got interviewed by

21      the Wall Street Journal reporter.

22      I think it was you who told that

23      person to call me.  They asked me

24      to describe my role in Vioxx in

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

 1          this litigation.

 2                  MR. SEEGER:  Must have been

 3          me.  Lanier would have never sent

 4          a reporter to someone else.

 5                  MS. WILSON:  I think we had

 6          some five star generals, and I was

 7          a front line soldier really every

 8          step of the way, and there weren't

 9          a lot of us out there.

10                  MR. SEEGER:  You also had a

11          case in Federal Court that you

12          were trying to get remanded to the

13          transfer court in North Carolina

14          that you wanted us to try

15          together.

16                  MS. WILSON:  That's right.

17          That's the Howard case, and I

18          think it is still probably right

19          now one of the best cases out

20          there.  I have no doubt it has

21          already been approved actually.

22          I'm just waiting on our points, I

23          guess I should say.  Great case,

24          and that was the plan.  We were

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          going to tee that up.  So, I did

2          have one in the MDL.

3               It was a tough litigation,

4          as you guys know.  I thought it

5          was far harder than Baycol,

6          fen-phen, Rezulin.  I don't think

7          anything compares to Vioxx.  I

8          really don't.  It was very tough.

9               Anyway, after the settlement

10         was announced, I certainly did my

11         part to help bring everyone

12         together in newspapers, on TV,

13         talked about what a tremendous job

14         everyone did, how tough this

15         litigation was.  Hard, hard cases,

16         difficult causation, and I was a

17         big supporter of this resolution.

18              MR. HORNE:  One thing I

19         would like to say about the

20         submission.  I sent every member

21         of the committee a copy of our

22         submission with detailed expenses

23         and time sheets.  I will say we

24         had about 1000 attorney hours that

FAC Resp. Exhibit D -- 793

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          we submitted for the committee's

2          consideration, and that is an

3          extremely conservative amount

4          because we don't keep hourly

5          bills.  I think Kim's firm, they

6          do keep track of their time.  We

7          don't.  I went back through, and

8          the only thing that I submitted

9          for this committee's consideration

10         are matters that were related to

11         the 12 cases and the trial and

12         those expenses.  There's nothing

13         in here for stuff that I didn't

14         truly think was for the common

15         benefit.

16              Going into this, Kim's firm

17         and my firm, we were really kind

18         of the only two firms in the

19         state.  So, in a way, we were

20         certainly competitors, but we also

21         collaborated from the very

22         beginning, and it was both of our

23         intentions to try these cases.  I

24         went to the first trial in

FAC Resp. Exhibit D -- 794

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1            Brazoria.  I went for the full

2            week, that first week there.  I

3            saw Mark Robinson was there and

4            had dinner.

5                 MR. LEVIN:  With Mark?

6                 MR. HORNE:  With Ben Morelli

7            and some other folks during that

8            trial.  I stayed there for the

9            whole week and saw the openings.

10           Chris, I watched you on Court TV.

11           I spent about a week watching

12           that.  I came back for the

13           Hermans/Humeston openings.

14                MR. SEEGER:  I remember

15           that.

16                MR. HORNE:  Because Hope

17           came over to ask you to get Kim

18           and me --

19                MR. SEEGER:  They were

20           sitting on the defense side, and

21           Hope said, these guys are

22           plaintiffs lawyers, would you tell

23           them to go on to the other side.

24           There's no line in the middle.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1              They can sit wherever they want.

2                    MR. WEITZ:  Judge Fallon's

3              PTO Order 6, he laid out

4              guidelines.  You are worried about

5              the hours.  The hours are a factor

6              to consider, but the judge laid

7              out in his Murphy Oil decision

8              that there are a lot of other

9              factors, people that were actually

10             litigating the cases and moving

11             the dockets in jurisdictions and

12             were preparing to try the cases.

13             Those are factors.

14                    MR. SEEGER:  This is helpful

15             to us.

16                    MR. HORNE:  Kim and I, we

17             traveled to New Jersey for like

18             two of the trials, I believe.  But

19             I saw openings or closings in -- I

20             was there for Jim Pettit's

21             closing, I was there for your

22             opening in Hermans/Humeston.  I

23             was there for Mark's opening in

24             the first case in Texas.  I was

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1            there for one of the other ones.
 2            And so it was --
 3                 MR. SEEGER:  I didn't get a
 4            chance to talk to you much.  I
 5            know that you worked a lot with
 6            Dave and Jeff.
 7                 I spoke to you all the time.
 8            Kim was always looking to get
 9            something set for trial.  That's
10            the fairest way to reflect it.
11            How many times did we talk to each
12            other on the phone?  I've got this
13            case, this is a great case for
14            trial, I've got two cases coming
15            to New Jersey.  You are our kind
16            of people.  That's the way to move
17            a case.
18                 MR. LEVIN:  Pleasure to have
19            met.  Up until now, I only knew
20            your hours.
21                 MR. SEEGER:  Do you have the
22            hours?
23                 MR. LEVIN:  He sent them to
24            everybody.  All of a sudden I got
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          binders.  Now I know.

2               MS. WILSON:  I did the same

3          thing.

4               MR. SEEGER:  Have they been

5          reviewed?

6               MR. LEVIN:  Yes.  Your hours

7          have been reviewed.  They have

8          been approved.

9               MR. SEEGER:  Which means you

10          have met all the guidelines.

11               MR. LEVIN:  In fact, your

12          costs to the seven cents were

13          approved.

14               MR. SEEGER:  What are they?

15               MR. LEVIN:  159,045.07.

16               MR. SEEGER:  Both firms?

17               MR. LEVIN:  No.

18               MR. WEITZ:  No.  Forest is

19          131 and change.

20               MR. SEEGER:  That was a very

21          helpful presentation.  Thank you.

22               MR. LEVIN:  It is a pleasure

23          to see professionals that are

24          truly professionals.

FAC Resp. Exhibit D -- 798

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1              MR. HORNE:  I want to thank

2         y'all for the work that went on

3         behind the scenes that we never

4         knew about.

5              MR. SEEGER:  Thank you.

6              MR. GIRARDI:  Thank you.

7              MR. BLIZZARD:  Thank you.

8                   -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 800

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -


FIRM:        LEWIS & ROBERTS
             Kimberly R. Wilson, Esquire
FIRM:        MARTIN & JONES
             H. Forest Horne, Jr., Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 801

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. SEEGER:  We're most of
 3       the fee committee.  We're making a
 4       record because Judge Fallon would
 5       like to have a record of things
 6       that are discussed here, but the
 7       floor is yours, and you can
 8       present and say whatever you want
 9       in the time you have.
10            MS. WILSON:  Okay.  Some of
11       you know me, some of you don't.
12       Chris and I go way back.  I got
13       involved in Vioxx literally the
14       day it was withdrawn from the
15       market.  Between 1500 and 2200
16       cases came across my desk.  The
17       way I did it was, I educated
18       myself very, very early.
19       Fortunately, I come from a family
20       of physicians and just decided
21       from the get-go, I was only going
22       to take, my firm, Lewis & Roberts,
23       we were only going to take cases
24       that we felt could go to trial.
```

FAC Resp. Exhibit D -- 802

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        We ended up taking a very small

2        select group of cases, I think it

3        was around 50.

4              We filed all of our cases.

5        We filed in New Jersey state court

6        with the exception of one case

7        that I filed in the MDL.  We just

8        made a huge commitment from the

9        get-go, as did my partners, a

10       small firm, a firm of 20

11       attorneys, 11 partners, to make a

12       financial commitment and work

13       these cases up.  I got in early

14       and filed early and made it very

15       clear from the outset that I

16       wanted to push my cases because I

17       felt like in a case like this

18       where there was not a signature

19       injury and causation was

20       particularly tough, and Chris and

21       Mark did a great job with their

22       trials in getting over those

23       hurdles, the only way to really

24       resolve this particular mass tort

FAC Resp. Exhibit D -- 803

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        in a favorable way for the

 2        plaintiffs was to have high

 3        quality cases that got worked up.

 4        Unfortunately, causation was so

 5        hard, I think there's only a small

 6        number of law firms that made that

 7        financial commitment and also put

 8        forth the labor to do so.  My firm

 9        clearly did that.

10             We did it without being

11        asked to do that and then, of

12        course, when Chris and Dave and

13        Mark asked me to do more, I

14        certainly did more.  My firm alone

15        from North Carolina trucked 28

16        folks up to New Jersey and/or

17        Philadelphia for depositions.  I

18        did, I don't know, I think my

19        affidavit says four sales reps,

20        but it was actually eight sales

21        reps.  I did the depositions of 18

22        physicians and miscellaneous other

23        people along the way.  So, I was

24        actively involved.
```

FAC Resp. Exhibit D -- 804

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1              MR. WEITZ:  Was that for

2         your individual cases where you

3         did the four sales reps?

4              MS. WILSON:  Yes.

5              MR. WEITZ:  Judge Higbee had

6         four different waves of cases.

7         Could you tell us which of your 49

8         cases were in which waves and if

9         any of them were assigned a trial

10        date?

11             MS. WILSON:  The first wave,

12        Black and Smith got chosen, and it

13        went up to the very wire, got

14        worked up for trial, and then I

15        think the way -- and Chris can

16        correct me if I might be mistaken,

17        but there were 39 initially in

18        that first wave that got worked

19        up.  Black and Smith got chosen

20        for trial, and then for some

21        reason, collectively a small group

22        of us, probably me, Chris, Mark

23        Lanier, Dave Buchanan was in on

24        it, there was some reason those

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1       two got bumped, and I think the

2       only reason was we ended up, that

3       first group, not trying as many as

4       what we thought.

5            MR. SEEGER:  I think we had

6       a striking procedure with them.

7       We selected, they selected, they

8       got strikes, we got strikes.  They

9       might have struck your two because

10      they were good cases.

11           MS. WILSON:  It went to the

12      bitter end.  We were working those

13      up and thinking those cases were

14      going to go to trial in January.

15      So, that was Black and Smith.

16      Then I kept putting cases up in

17      those trial waves.  And I think in

18      every wave, there was always a

19      chance my cases were going to go

20      to trial throughout the process.

21           MR. SEEGER:  Kim was always

22      one of those people that when we

23      would call for cases, she would

24      put cases in.

FAC Resp. Exhibit D -- 806

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          MS. WILSON:  And actively

2     engaged in discovery in all of

3     them.  I mean, every single case

4     that ended up -- there were a

5     couple of cases that I filed that

6     I ended up dismissing because I

7     felt there were huge causation

8     issues.  So, I got rid, along the

9     way, of any case that I felt was

10     more of a threat than an advantage

11     to us as a group.

12          MR. LEVIN:  You have about

13     $159,000 in costs that has been

14     approved by the accountant.  You

15     are ahead of a lot of people that

16     have not had them approved.  What

17     was the bulk of those costs, the

18     transportation, the lodging and

19     everything of your clients?

20          MS. WILSON:  Yes.  The other

21     thing I did was, with all of my

22     depositions, I had everything

23     videotaped.  And as soon as I got

24     those DVDs back, I disseminated

FAC Resp. Exhibit D -- 807

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          them throughout the country to

 2          everyone.  So, I did a lot of

 3          digital stuff with my discovery

 4          just to help educate other

 5          attorneys, especially in regards

 6          to the sales reps, because early

 7          on, there was a group of us, and

 8          Forest was part of it, we had some

 9          excellent sales rep depos, I mean,

10          with incredible admissions.

11               MR. SEEGER:  Who from your

12          group was taking those for the

13          most part?

14               MS. WILSON:  Me.

15               MR. HORNE:  And I was.

16               MS. WILSON:  And Forest.  I

17          mean, I don't know any other

18          lawyers in North Carolina --

19               MR. HORNE:  That took any

20          sales reps.

21               MS. WILSON:  I don't think

22          so.

23               MR. WEITZ:  Did you

24          coordinate any of that with Jerry
```

FAC Resp. Exhibit D -- 808

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1           Kristal with Weitz & Luxenberg?

2               MR. HORNE:  I did, and I

3           borrowed heavily from the fine

4           depositions that Jerry took, and

5           Dave also gave us some deposition

6           transcripts of sales reps.  So, I

7           borrowed heavily from those, but

8           we took -- I think Kim and I, I

9           think there was a different line

10          of thought on the sales reps.  All

11          the sales rep depositions that I

12          took were at least eight hours

13          long.  I mean, it was an all day

14          affair.

15              MR. LEVIN:  Forest, were you

16          assisting her in processing her

17          cases or just your own?

18              MR. HORNE:  Just my own.

19              MR. LEVIN:  Your firm's?

20              MR. HORNE:  Just my firm's.

21              MR. LEVIN:  How many cases

22          did your firm have?

23              MR. HORNE:  We filed 48

24          cases all in New Jersey.  We

FAC Resp. Exhibit D -- 809

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          screened probably -- I'm with a

2          15-lawyer plaintiffs firm with our

3          primary office in Raleigh, and so

4          we get a lot of calls when there

5          are these kind of drug cases.  We

6          screened probably 2000 cases and

7          narrowed that down to 48.  We only

8          filed and put up for expedited

9          discovery the ones where the Vioxx

10         usage was clear and where we

11         thought the causation was

12         relatively clear, at least early

13         on it seemed like it was clear.

14         It got hazier as you went along,

15         but we had 48 cases.  Every one of

16         them was filed in New Jersey.  We

17         filed the first case in January of

18         2005.  I think at the time there

19         were only about 300 filed in New

20         Jersey at that time, and then

21         within six months, we actually

22         screened -- we had an expert in

23         cardiology review every case that

24         we accepted before we filed it.

FAC Resp. Exhibit D -- 810

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
1        So, we had that.  Ira Gelb and

2        Steve Rich were the two physicians

3        that we had review all of our

4        cases.

5            Myself and my partner, Greg

6        Martin, who was heavily involved

7        in the fen-phen litigation -- I

8        headed up the project for our firm

9        and did most of the work, but my

10       partner, Greg Martin, worked on

11       the case.  And then we hired two

12       experienced associate lawyers to

13       come in to work on the cases.  We

14       devoted two paralegals exclusively

15       to Vioxx, and then we hired two

16       summer law clerks to come in and

17       go through the FACTS database.

18       That's all they did eight hours a

19       day for three months.

20           MR. LEVIN:  For your

21       individual cases?

22           MR. HORNE:  Kim and I, our

23       collaboration, a lot was on the

24       sales reps because we had mutual
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          sales reps, we had mutual

2          physicians and --

3              MR. LEVIN:  Same

4          jurisdiction.

5              MR. HORNE:  -- going through

6          those FACTS documents was

7          maddening.  Kim would call me

8          occasionally and say, did you see

9          this document on Dr. X, and then I

10         would find a document on Dr. Y.

11         We collaborated there, and we

12         collaborated on the sales rep

13         depositions, and I shared a lot

14         of -- Chris, I dealt with Dave and

15         Jeff Grand more than you.  Jerry

16         and I worked together a lot, but

17         we found a number of -- we had one

18         orthopedic physician, I didn't

19         write down his name, but he was an

20         orthopedic physician in

21         Fayetteville, North Carolina who

22         we found in the FACTS database had

23         been paid over $100,000 by Merck.

24         And in collaborating with Robb

FAC Resp. Exhibit D -- 812

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          Dassow and Dave, I think that's

 2          kind of what led to, along with

 3          some other folks, I'm sure, the

 4          order by Judge Higbee to require

 5          Merck to report the income that

 6          Merck had paid all these

 7          physicians.  And the one

 8          physician, the orthopedic

 9          physician that we found in

10          Fayetteville had been paid over

11          $100,000.  We found all of these

12          e-mails, including a PowerPoint

13          presentation where the Merck rep

14          had told the physician to take out

15          a slide that talked about an

16          increase in blood pressure, move

17          it to the end, and don't spend

18          much time on it.  We circulated

19          that with a number of folks in the

20          litigation.

21               MR. LEVIN:  How is

22          Fayetteville these days?

23               MR. SEEGER:  Still there.

24               MR. HORNE:  It is not very
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 813

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          friendly.

2               MR. LEVIN:  I used to be a

3          policeman in Fayetteville.

4               MR. HORNE:  Is that right?

5               MR. LEVIN:  Military

6          policeman.

7               MR. HORNE:  The doctor, his

8          name is Brad Broussard -- these

9          Fayetteville physicians are very

10         conservative, but this is a short

11         story.

12              I had a 48-year-old client

13         who suffered a heart attack and

14         ended up having a

15         defibrillator/pacemaker installed.

16         He was in perfect health otherwise

17         and was on the heart transplant

18         list, and this physician that had

19         been paid over $100,000 by Merck

20         and was on the speakers bureau,

21         this was the very first case I

22         filed in New Jersey.  I

23         arranged -- one of the things that

24         I tried to do with all my clients

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          is arrange meetings with the

2          prescribing physicians.  I went

3          down and met with him, not knowing

4          that he had been paid $100,000,

5          and went into a conference -- paid

6          him $1,000 to meet with him for an

7          hour and went into a conference.

8          He just waylaid me.  He said, no,

9          I'm not going to say that I

10         wouldn't have prescribed it had I

11         known.  Little did I know that he

12         did know, and I found that out

13         later.  His deposition --

14              MR. GIRARDI:  Speaks for

15         it --

16              MR. HORNE:  He just clipped

17         me for $1000 and then was a jerk.

18         The only thing that saved the

19         meeting, the guy said if he was

20         deposed, and this case wasn't on

21         for trial, but he said if he was

22         deposed -- he finally came around,

23         I brought my client with me who

24         pleaded with the doctor, and he

FAC Resp. Exhibit D -- 815

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          finally gave in.
 2              MR. SEEGER:  Did you guys
 3          work closely with Robb Dassow and
 4          Sue Scovern on these sales rep
 5          things?
 6              MS. WILSON:  Forest did.
 7              MR. HORNE:  I worked with
 8          Robb on that, and I also worked
 9          with Robb on the Medco because we
10          had two cases where we sued Medco
11          because they were 50 milligram
12          cases where they had prescribed
13          for over 18 months of 50
14          milligrams.  So, we sued Merck-
15          Medco.  That was either two or
16          three cases.  I engaged in
17          discovery with Medco's lawyers on
18          those issues, trying to find a
19          connection between Medco and
20          Merck, and I worked closely with
21          Robb on that, and we shared a lot
22          of documents in that regard.
23              Kim put up, I don't know,
24          what was your percentage of cases?
```

FAC Resp. Exhibit D -- 816

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          I mean, you put up close to 50% of

2          your cases.

3               MS. WILSON:  It was over

4          50%.

5               MR. HORNE:  We filed 48

6          cases, and we had 12 in for the

7          expedited discovery.  And then

8          along with Steve Kherkher at

9          Williams Kherkher, I had two cases

10         from North Carolina in the four

11         trial groupings that were set for

12         trial originally in October, and

13         then were moved to January.  I

14         worked closely with Jerry on those

15         and attended all the meetings, and

16         also Dave and Jeff Grand were very

17         helpful.  Frankly, I knew the

18         settlement discussions were going

19         on, but I had no idea that y'all

20         had moved it along as far as it

21         was.  So, we were heavily

22         preparing for trial along with

23         Steve Kherkher.

24               Steve's firm had two North

FAC Resp. Exhibit D -- 817

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          Carolina cases, and my firm had

2          two North Carolina cases that I

3          put up.  So, we were collaborating

4          together.  And then Judge Higbee

5          changed her mind early on and said

6          I only want prelabel change cases

7          in the mix.  So, one of my cases

8          dropped out because it was post

9          label change.  And then in

10         discovery, the two cases that

11         Steve had developed usage

12         problems, so both of his cases

13         dropped out.  So, we were down to

14         one case in North Carolina, and I

15         communicated with Dave, and we had

16         a hearing with Judge Higbee,

17         fought Hope Freiwald tooth and

18         nail, and added another case that

19         was not on the expedited list for

20         trial.

21              So, I brought another case

22         in for the January '08 trial mix

23         and got that case -- even though

24         it wasn't in my expedited group, I

Page 19

1          got the client and his wife up to

2          Philadelphia, went to Dechert,

3          dealt with Hope on all of those

4          depositions, got that done, got

5          the physicians deposed.  So, we

6          had those two cases set for trial.

7              I worked closely with Sol

8          Weiss on developing Steve Rich.  I

9          had been using Steve from early

10         '05 on specific causation, and

11         then Sol had worked with him on

12         general causation.  And Steve was

13         going to be our general causation

14         expert for the January '08 trial

15         set cases along with Sol.  I went

16         up to Philadelphia to defend

17         Steve's general causation

18         deposition, coordinated our

19         cardiologists, who saw all the

20         clients whose cases were trial set

21         on specific causation.

22             The Williams Kherkher firm

23         developed Dr. Goldberg for the

24         marketing case.  I wasn't involved

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1          in that, they were.

 2              But we, like Kim, our firm

 3          responded every time there was a

 4          call to put more cases in the mix,

 5          and I was pretty vocal about that

 6          on the list serve, saying, guys,

 7          we are all in this together.  So,

 8          we volunteered over 25 percent of

 9          our firm's caseload, and we worked

10          them up, and we brought quality

11          cases to the mix.

12              MR. GIRARDI:  Was it the

13          same 50 cases?

14              MR. HORNE:  No.

15              MS. WILSON:  No.

16              MR. GIRARDI:  How many cases

17          did you have?

18              MR. HORNE:  We filed 48.  We

19          screened 2000 to get 48, and we

20          only filed cases where -- we knew

21          from the fen-phen days that

22          causation was going to be an

23          issue, so we felt comfortable that

24          we either had affidavits from

FAC Resp. Exhibit D -- 820

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          doctors where there were sample

2          cases, and then otherwise we had

3          rock solid usage on our

4          prescriptions.

5               MR. LEVIN:  How many of your

6          cases did you put in the same

7          position that Kim's were where you

8          worked them up to trial?

9               MR. HORNE:  We had 11 cases

10         in the mix, but then we added the

11         additional ones, so, there were

12         12.  And we had a hearing with

13         Hope, and Dave was instrumental in

14         getting this other case added at

15         the last minute.  Otherwise, we

16         would have only had one case for

17         the North Carolina trial setting,

18         and we were able to get one of our

19         other cases in, so we had two.  I

20         attended all the meetings with

21         Jerry on that, we collaborated

22         closely on all of the preparations

23         for trial.

24               MR. BLIZZARD:  Forest, help

FAC Resp. Exhibit D -- 821

Page 22

1       me understand the timing of this

2       because I think we heard some of

3       this the other day from Steve

4       Kherkher.

5            When were those four cases,

6       two of yours and two of Williams

7       Kherkher, scheduled to go to trial

8       originally?

9            MR. HORNE:  October of '07.

10           MR. BLIZZARD:  Then as I

11      understood, three of them dropped

12      out because of various reasons,

13      including two of them because they

14      didn't have proof of use.

15           MR. HORNE:  Right.

16           MR. BLIZZARD:  So, there was

17      one left, and then you added one?

18           MR. HORNE:  Right.

19           MR. BLIZZARD:  That case was

20      then put off until February of

21      2008?

22           MR. HORNE:  No.  We got that

23      case -- I was in Salt Lake City in

24      depositions in another case and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          had a conference call with Dave

2          Buchanan, Hope Freiwald and Judge

3          Higbee, and Hope was screaming

4          about adding one of our cases

5          late.  It had been filed and had

6          been there.

7              MR. BLIZZARD:  I'm trying to

8          find out, when were those two

9          then, the one you added and the

10         one that still was there, when

11         were they set for trial?

12             MR. HORNE:  With the trial

13         grouping of four cases, and I

14         think the Weitz Luxenberg setting

15         had a problem with that expert,

16         and I think there was some talk at

17         the time of settlement of moving

18         it back, so there would only be

19         three cases.

20             MR. SEEGER:  Well, there was

21         actually, and then something

22         happened to that setting.  They

23         got moved to like September or

24         October.

FAC Resp. Exhibit D -- 823

Page 24

```
 1                 MR. HORNE:  It was October.

 2                 MR. SEEGER:  Then they got

 3           bounced to January and then we

 4           settled.

 5                 MR. BLIZZARD:  I'm confused,

 6           because I thought I heard

 7           yesterday Kherkher say the cases

 8           were set in March of 2008, that

 9           those were actually Martin & Jones

10           cases, but that they were working

11           on them.

12                 MR. SEEGER:  They might have

13           been originally set for

14           March/April of '07, because that

15           was an original target date.  I

16           don't remember why we lost the

17           setting, there were so many facts.

18           Dave definitely will, because he

19           remembers everything.  But that

20           somehow wound up after the summer,

21           which was September/October, and

22           basically the settlement came

23           before you guys could try the

24           case.  But the cases were in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          queue, and they were going to go

2          at that point.

3               MR. HORNE:  Right.

4               MS. WILSON:  Black.  I

5          remember why we took Black off.

6          Black ended up, he was an MI and a

7          stroke, and Judge Higbee didn't

8          want to do that.

9               MR. SEEGER:  That's right.

10               MS. WILSON:  That's why

11          Black didn't go.

12               MR. SEEGER:  She tried to

13          keep the issues as close as she

14          could for trial groupings because

15          she was doing more than one case

16          at that point.

17               MS. WILSON:  Just my

18          affidavit --

19               MR. SEEGER:  Just so I'm

20          clear.  I'm sorry, Kim.  So

21          Kherkher was going to help you

22          guys try the case?

23               MR. HORNE:  No.

24               MR. SEEGER:  I'm not clear

FAC Resp. Exhibit D -- 825

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          on that.

2               MR. HORNE:  What happened

3          was, Steve had two North Carolina

4          cases, and I had two North

5          Carolina cases.  We were at the

6          hearing when the judge was asking

7          for trial cases.  So, I offered

8          both of mine up, and Steve offered

9          both of his up.  We agreed to work

10         together, and I would work my

11         cases up, he would work his cases

12         up, and we would share the general

13         and specific causation experts for

14         trial.  At the beginning of that,

15         Judge Higbee at the last minute

16         changed her mind and said, I only

17         want three prelabel cases.  So,

18         one of mine dropped out, and it

19         was two of Steve's and one of

20         mine.  And then both of Steve's

21         dropped out, because in the

22         depositions they did, the

23         prescription usage and samples was

24         terrible, so, they voluntarily

FAC Resp. Exhibit D -- 826

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1           dropped those.  That's when I

2           added another one of my cases.

3                MR. SEEGER:  You had two

4           cases?

5                MR. HORNE:  I had two cases.

6                MR. SEEGER:  At that point,

7           they didn't have a case in.

8                MR. HORNE:  They didn't have

9           a case in, but they had already

10          gone a long way down the road of

11          developing the experts.

12               MR. SEEGER:  Yes.  No

13          question.

14               MR. HORNE:  They continued

15          with that.  As far as my two

16          cases, I handled all the

17          depositions for my clients and

18          their spouses and the physicians

19          and the sales reps.  I did all of

20          that.

21               MR. SEEGER:  Okay.

22               MR. BLIZZARD:  Was there any

23          agreement that they would try your

24          two cases that remained?

FAC Resp. Exhibit D -- 827

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1              MR. HORNE:  We were going to

2         try it together.  And I told Steve

3         this, and we had early on -- we've

4         got an office in Atlanta as well.

5         So, we had some Georgia cases, and

6         we had some -- a couple of good

7         Georgia cases that we were going

8         to put up.  Someone else had some

9         Georgia cases, and we couldn't

10        come to an accommodation, because

11        I told Steve, I'm going to be

12        involved in my cases.  I'm not

13        going to delegate it to you and

14        you do everything, because that's

15        just not the way I work or my firm

16        works.  So, I worked up my cases,

17        Steve worked up his cases.  We

18        were sharing the general and

19        specific causation witnesses for

20        trial.  And then we were going to

21        divide up opening, closing, cross

22        examinations, witness examinations

23        and that sort of thing.

24              MR. SEEGER:  Once their

FAC Resp. Exhibit D -- 828

Page 29

```
 1          cases were out, how would the

 2          trial have gone?  Would you have

 3          taken the lead, would they have

 4          worked with you on the trial

 5          still?

 6                MR. HORNE:  Yes.  And when

 7          that happened, because --

 8                MR. SEEGER:  You were still

 9          dividing up.

10                MR. HORNE:  What happened

11          when Steve's cases dropped out, we

12          were down to one case.  They

13          didn't have any other North

14          Carolina cases.  And that's when

15          we had to get Dave involved.  And

16          I told Hope, look, I've got a case

17          that's been filed, fact sheets in,

18          you've got all the medical

19          records, basically everything is

20          there.  I'll get the client up to

21          Philadelphia next week with his

22          wife.  We'll make every

23          accommodation.  And I think the

24          one thing Judge Higbee did was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        gave 30 extra days to designate

2        the experts.  But I got that case

3        in with Dave's help.  But Steve

4        was so far down the road with the

5        marketing expert and a fine

6        cardiologist out of San Francisco

7        that came back to North Carolina

8        and saw both of these clients.  He

9        was so far down the road with

10       that, I said let's --

11            MR. SEEGER:  Keep it

12       together.

13            MR. HORNE:  -- keep it

14       together, and that's what we did.

15            MR. WEITZ:  Forest, clarify

16       some times with me and cases.

17       Because in January of '07, you had

18       Hermans and Humeston, and then you

19       had Keeley and Rossi, which

20       Humeston was Chris's case, Hermans

21       was Lanier's, and Keeley and Rossi

22       were Weitz & Luxenberg cases.  She

23       set those cases down for trial in

24       January '07, and then Hermans and

FAC Resp. Exhibit D -- 830

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1        Humeston were tried in February

2        '07.  Keeley and Rossi were then

3        postponed to be tried in September

4        of '07, and then the judge just

5        put it on hold because there were

6        negotiations going on.  Where were

7        your cases with respect to that?

8        Did you have an actual firm trial

9        date?

10            MR. HORNE:  Yes.

11            MR. WEITZ:  From when?

12        Because Keeley and Rossi were the

13        next ones she was trying.  I'm

14        trying to figure out when you and

15        Kherkher had trial dates.  Was it

16        after those two cases?

17            MR. HORNE:  Originally there

18        were four states set forth for

19        trial.  It was North Carolina,

20        Pennsylvania, New Jersey and New

21        York.  Jerry was heading up the

22        New York, and Sol had both New

23        Jersey and Pennsylvania, and I had

24        North Carolina.  Those four cases

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1        were all set on the same track.
 2        Then Jerry and I talked about the
 3        fact that his -- the general
 4        causation witness out of Canada
 5        called Jerry the night before his
 6        deposition and said, oops --
 7             MR. WEITZ:  He had an
 8        article --
 9             MR. HORNE:  -- he signed an
10        affidavit I think.  He said, I
11        think I signed an affidavit.  But
12        North Carolina was in that
13        setting.  We were in that setting.
14        And then because of that snafu
15        with Jerry's expert, I think Judge
16        Higbee -- and this was all about
17        the time the settlement came down
18        -- was going to move the New York
19        setting out to February because we
20        were down the road as far as when
21        the jury was going to come in, and
22        we were talking about renting out
23        the convention center at the hotel
24        and having the voir dire there.
```

FAC Resp. Exhibit D -- 832

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1              MR. WEITZ:  So, you were

2         part of the final stage in those

3         two cases?

4              MR. SEEGER:  Yes.

5              MR. HORNE:  Yes.  Jeff Grand

6         and Dave Buchanan and I worked --

7         Dave was very gracious --

8              MR. SEEGER:  By the way,

9         Jeff Grand just had a baby.  For

10        the record, let the record reflect

11        we're looking at Jeff's new baby.

12             MR. HORNE: My two cases were

13        Romans, Billy Ray Romans and Andy

14        Ray Sanderson.

15             MR. WEITZ:  The cases Forest

16        had ready for trial were Romans

17        and Sanderson.

18             MR. HORNE:  Yes.  Romans was

19        a prelabel change that was in the

20        mix originally.  Sanderson was the

21        case that was added after a motion

22        hearing with Dave and Judge Higbee

23        and Hope and myself, and Judge

24        Higbee agreed to add Sanderson.

FAC Resp. Exhibit D -- 833

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          So, Sanderson and Romans were the

2          two North Carolina cases that were

3          set to go to trial originally in

4          that October setting with the New

5          Jersey, Pennsylvania and New York

6          cases that Judge Higbee then moved

7          into January.

8               I went to the status

9          conference in November and left

10         there, flew back to Raleigh, North

11         Carolina, jumped in my car and

12         drove four hours to Asheville and

13         got to the hotel at 4:00 a.m. and

14         deposed a Merck rep on a Friday

15         from 9:00 in the morning until

16         6:00 at night, and then the next

17         week is when the settlement

18         happened.

19              And I didn't -- and Steve, I

20         don't know what Steve knew.  He

21         may have known more than he told

22         me, but after the fact -- I mean,

23         I knew the negotiations were

24         going, and I think that's -- even

FAC Resp. Exhibit D -- 834

Page 35

1          Judge Higbee said in a conference

2          that that's one of the

3          considerations for moving the

4          setting from October of '07 to

5          January '08.  But I had no idea

6          that y'all were that close, and

7          obviously a great result.

8                    MR. LEVIN:  Neither did we.

9                    MS. WILSON:  My cases are

10         real simple.  I did not work with

11         Kherkher at all.  I worked with

12         two people.  That was Chris Seeger

13         and Mark Lanier.  So, mine is real

14         clear-cut.  That was kind of the

15         get go.  Forest and I collaborated

16         a lot.

17                    Something I would like to

18         add is, after the settlement was

19         announced, it was either Chris or

20         Mark, one, who got interviewed by

21         the Wall Street Journal reporter.

22         I think it was you who told that

23         person to call me.  They asked me

24         to describe my role in Vioxx in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

```
1          this litigation.

2               MR. SEEGER:  Must have been

3          me.  Lanier would have never sent

4          a reporter to someone else.

5               MS. WILSON:  I think we had

6          some five star generals, and I was

7          a front line soldier really every

8          step of the way, and there weren't

9          a lot of us out there.

10              MR. SEEGER:  You also had a

11         case in Federal Court that you

12         were trying to get remanded to the

13         transfer court in North Carolina

14         that you wanted us to try

15         together.

16              MS. WILSON:  That's right.

17         That's the Howard case, and I

18         think it is still probably right

19         now one of the best cases out

20         there.  I have no doubt it has

21         already been approved actually.

22         I'm just waiting on our points, I

23         guess I should say.  Great case,

24         and that was the plan.  We were
```

FAC Resp. Exhibit D -- 836

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          going to tee that up.  So, I did

2          have one in the MDL.

3               It was a tough litigation,

4          as you guys know.  I thought it

5          was far harder than Baycol,

6          fen-phen, Rezulin.  I don't think

7          anything compares to Vioxx.  I

8          really don't.  It was very tough.

9               Anyway, after the settlement

10         was announced, I certainly did my

11         part to help bring everyone

12         together in newspapers, on TV,

13         talked about what a tremendous job

14         everyone did, how tough this

15         litigation was.  Hard, hard cases,

16         difficult causation, and I was a

17         big supporter of this resolution.

18              MR. HORNE:  One thing I

19         would like to say about the

20         submission.  I sent every member

21         of the committee a copy of our

22         submission with detailed expenses

23         and time sheets.  I will say we

24         had about 1000 attorney hours that

Page 38

1       we submitted for the committee's

2       consideration, and that is an

3       extremely conservative amount

4       because we don't keep hourly

5       bills.  I think Kim's firm, they

6       do keep track of their time.  We

7       don't.  I went back through, and

8       the only thing that I submitted

9       for this committee's consideration

10      are matters that were related to

11      the 12 cases and the trial and

12      those expenses.  There's nothing

13      in here for stuff that I didn't

14      truly think was for the common

15      benefit.

16          Going into this, Kim's firm

17      and my firm, we were really kind

18      of the only two firms in the

19      state.  So, in a way, we were

20      certainly competitors, but we also

21      collaborated from the very

22      beginning, and it was both of our

23      intentions to try these cases.  I

24      went to the first trial in

FAC Resp. Exhibit D -- 838

Page 39

```
 1          Brazoria.  I went for the full
 2          week, that first week there.  I
 3          saw Mark Robinson was there and
 4          had dinner.
 5               MR. LEVIN:  With Mark?
 6               MR. HORNE:  With Ben Morelli
 7          and some other folks during that
 8          trial.  I stayed there for the
 9          whole week and saw the openings.
10          Chris, I watched you on Court TV.
11          I spent about a week watching
12          that.  I came back for the
13          Hermans/Humeston openings.
14               MR. SEEGER:  I remember
15          that.
16               MR. HORNE:  Because Hope
17          came over to ask you to get Kim
18          and me --
19               MR. SEEGER:  They were
20          sitting on the defense side, and
21          Hope said, these guys are
22          plaintiffs lawyers, would you tell
23          them to go on to the other side.
24          There's no line in the middle.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1           They can sit wherever they want.

2                   MR. WEITZ:  Judge Fallon's

3           PTO Order 6, he laid out

4           guidelines.  You are worried about

5           the hours.  The hours are a factor

6           to consider, but the judge laid

7           out in his Murphy Oil decision

8           that there are a lot of other

9           factors, people that were actually

10          litigating the cases and moving

11          the dockets in jurisdictions and

12          were preparing to try the cases.

13          Those are factors.

14                  MR. SEEGER:  This is helpful

15          to us.

16                  MR. HORNE:  Kim and I, we

17          traveled to New Jersey for like

18          two of the trials, I believe.  But

19          I saw openings or closings in -- I

20          was there for Jim Pettit's

21          closing, I was there for your

22          opening in Hermans/Humeston.  I

23          was there for Mark's opening in

24          the first case in Texas.  I was

FAC Resp. Exhibit D -- 840

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1          there for one of the other ones.
 2          And so it was --
 3               MR. SEEGER:  I didn't get a
 4          chance to talk to you much.  I
 5          know that you worked a lot with
 6          Dave and Jeff.
 7               I spoke to you all the time.
 8          Kim was always looking to get
 9          something set for trial.  That's
10          the fairest way to reflect it.
11          How many times did we talk to each
12          other on the phone?  I've got this
13          case, this is a great case for
14          trial, I've got two cases coming
15          to New Jersey.  You are our kind
16          of people.  That's the way to move
17          a case.
18               MR. LEVIN:  Pleasure to have
19          met.  Up until now, I only knew
20          your hours.
21               MR. SEEGER:  Do you have the
22          hours?
23               MR. LEVIN:  He sent them to
24          everybody.  All of a sudden I got
```

FAC Resp. Exhibit D -- 841

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          binders.  Now I know.

2                  MS. WILSON:  I did the same

3          thing.

4                  MR. SEEGER:  Have they been

5          reviewed?

6                  MR. LEVIN:  Yes.  Your hours

7          have been reviewed.  They have

8          been approved.

9                  MR. SEEGER:  Which means you

10         have met all the guidelines.

11                 MR. LEVIN:  In fact, your

12         costs to the seven cents were

13         approved.

14                 MR. SEEGER:  What are they?

15                 MR. LEVIN:  159,045.07.

16                 MR. SEEGER:  Both firms?

17                 MR. LEVIN:  No.

18                 MR. WEITZ:  No.  Forest is

19         131 and change.

20                 MR. SEEGER:  That was a very

21         helpful presentation.  Thank you.

22                 MR. LEVIN:  It is a pleasure

23         to see professionals that are

24         truly professionals.

FAC Resp. Exhibit D -- 842

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1              MR. HORNE:  I want to thank

2        y'all for the work that went on

3        behind the scenes that we never

4        knew about.

5              MR. SEEGER:  Thank you.

6              MR. GIRARDI:  Thank you.

7              MR. BLIZZARD:  Thank you.

8                   -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 843

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 844

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:  LIEFF CABRASER HEIMANN &
       BERNSTEIN, LLP
       Elizabeth J. Cabraser, Esquire
       Donald C. Arbitblit, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 845

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MS. CABRASER:  Good morning.
 3            MR. SEEGER:  Good morning.
 4            MS. CABRASER:  I think an
 5       appropriate way to start out our
 6       presentation, first thing is
 7       first, is to say thank you to
 8       everyone in this room for leading
 9       this case and for the
10       contributions to the common
11       benefit made by the leadership in
12       this case.
13            MR. SEEGER:  Thank you.
14            MS. CABRASER:  Every one of
15       us is probably the center of our
16       own universe, and our own clients
17       are closest to our hearts, but we
18       always like to feel that it is our
19       efforts that lead to their
20       success.  The definition of a mass
21       tort is that no one is alone, no
22       lawyer is alone, no client is
23       alone, and every client's success
24       comes from a collective effort,
```

FAC Resp. Exhibit D -- 846

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1         not just efforts of the people who

2         are the obvious leaders, but of

3         the many firms whose efforts we

4         might not even be aware of.  I

5         want to thank those people today,

6         as well, and also to give an extra

7         thanks to this type of work that

8         this committee is doing, because

9         it is arduous, it is detailed, it

10        comes at a time of year when I

11        know everyone would rather be

12        doing other things, and it's

13        necessary.

14             I wanted to spend a little

15        bit of time talking about the work

16        that I personally did in the Vioxx

17        litigation, but it really is more

18        general and generic on the law

19        side of the case, purchase claims

20        committee work, working on

21        briefing, oral argument for the

22        purchase claims committee, motion

23        to dismiss, our writing victories

24        and then defeats in the New Jersey

FAC Resp. Exhibit D -- 847

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          state court, the system on medical

2          monitoring and providing a support

3          role, one of many, on the state

4          side of purchase claims.

5               This mass tort, both on the

6          MDL side and in New Jersey was

7          really, to probably a unique

8          degree, most about the trials, the

9          trial preparation, the bellwether

10         trials, and the medical and

11         scientific issues that arose in

12         the course of preparing for and

13         conducting those trials.

14              The person in my firm that

15         spent the largest amount of

16         personal hours on the Vioxx

17         litigation, over 5,000 hours,

18         essentially full-time work for two

19         or three years, is my partner, Don

20         Arbitblit, and he focused on those

21         all important medical and

22         scientific issues.  So, I thought

23         or we thought it was most

24         appropriate to have Don take the

FAC Resp. Exhibit D -- 848

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          laboring oar in this presentation

2          to go through those efforts that

3          work, how it related to and how it

4          contributed to the sequence and

5          system of Daubert hearings,

6          depositions and bellwether trials

7          that, in turn, culminated in the

8          settlement of this case.

9               Don.

10              MR. ARBITBLIT:  Thank you,

11         Elizabeth, and thanks to everyone

12         in the room for all the work that

13         you have done to make this

14         possible.

15              I prepared a PowerPoint, but

16         we don't have computers.  I have

17         hard copies that, if you would

18         like to follow along on the

19         presentation, I have a couple of

20         extras.  How about if we pass one

21         to Chris and Perry and Ed, and,

22         I'm sorry, I'll just --

23              MS. CABRASER:  And it was a

24         true stroke of genius not to have

FAC Resp. Exhibit D -- 849

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
1        PowerPoint in this room.
2              MR. ARBITBLIT:  In any case,
3        the affidavit addressed the
4        criteria set forth in the order,
5        and I think we've ranked pretty
6        high on most all of those, so, I
7        won't go over those in all their
8        detail, but I do want to emphasize
9        certain aspects of the criteria,
10       in particular, the trial work,
11       depositions and discovery, some
12       significant motions and
13       recognition by co-counsel and even
14       one of the expert witnesses about
15       the quality and importance of the
16       work that we did during the Vioxx
17       case, which was full-time work for
18       me and done with a passion to get
19       the best result we could for
20       everyone.
21             Close to 19,000 hours, over
22       half of them by partners, and when
23       the partners weren't doing the
24       work, we were closely supervising
```

FAC Resp. Exhibit D -- 850

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1          it to make sure that it was --

 2              MR. LEVIN:  You said 19,000?

 3              MR. ARBITBLIT:  19,000,

 4          18,789 hours.

 5              MR. LEVIN:  That's how many

 6          hours you have?

 7              MR. ARBITBLIT:  Yes.

 8              MR. HERMAN:  Don, I'm

 9          familiar with the work you did,

10          certainly, particularly in the

11          science area, but who were the

12          other partners that actually

13          worked in the science area?

14              MR. ARBITBLIT:  Well, I

15          would say that my most important

16          assistant on the science is Jenny

17          Gross, who is up for partnership

18          this year, we'll see how that

19          goes, but she has a lot of

20          experience in science.  She is a

21          scientist, and she has skills that

22          I find unique in the plaintiff's

23          bar.

24              MR. SEEGER:  When you say "a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1        scientist," she has formal

 2        training?

 3             MR. ARBITBLIT:  She is two

 4        courses away from being a Ph.D.,

 5        and her work on the statistics and

 6        the data analysis was very unique

 7        in my experience.  I've been a

 8        lawyer for 29 years.

 9             MR. HERMAN:  Excuse me.  Her

10        Ph.D. would be in statistics?

11             MR. ARBITBLIT:  Yes.  And

12        I've never seen anyone like her in

13        all the years I've been

14        practicing, which is 29.

15             So, she's not a partner, but

16        she was my most important asset in

17        terms of digging out the data,

18        analyzing it and figuring out

19        where we could nail Merck on what

20        they were saying, as opposed to

21        what the data said and how we

22        could feed our experts the right

23        information and get the right

24        analysis.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1                MR. LEVIN:  Help me out with

 2          the hours.  I'm absorbed in hours.

 3          You have 18,000 hours, and, you

 4          know, that may very well be.  The

 5          accountant has you at 710 hours,

 6          which is mind boggling.

 7                MR. ARBITBLIT:  That's not

 8          true, Arnold.

 9                MR. LEVIN:  I know it is not

10          true.  Have you been contacted by

11          the accountant?  Do you know what

12          the problem was and how it's being

13          resolved, because --

14                MR. SEEGER:  We have to

15          clean it up.

16                MR. LEVIN:  -- you also have

17          about $785,000 in costs, which I

18          would imagine can't be all

19          airplanes, so, it must be expert

20          fees and everything that you paid

21          for.  I would imagine those

22          experts were -- tell us who they

23          were and that they were approved

24          by the committee, because it's a

FAC Resp. Exhibit D -- 853

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          substantial amount of money you

 2          have invested in the case.

 3               MR. ARBITBLIT:  Sure,

 4          Arnold.

 5               First of all, I have been in

 6          contact with Marcy Roussel from

 7          Wegmann-Dazet, and over the course

 8          of the last month, I have, as far

 9          as I know, cleared up every

10          question she had and submitted all

11          of our hours, which totalled to

12          the amount set forth in the

13          affidavit.  As far as I know,

14          there are no questions, and I was

15          in touch with her just before

16          Thanksgiving to verify that.  And

17          I hope that you will do the same

18          and let us know if there's any

19          questions.

20               MR. SEEGER:  This is really

21          just admin at this point.  We're

22          working off the hours in the

23          affidavit.

24               MR. ARBITBLIT:  Thank you,
```

FAC Resp. Exhibit D -- 854

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Chris.

2              On the experts, one of the

3          criteria was did you get involved

4          before there was an MDL.  The

5          answer is yes.  We did a

6          substantial amount of work before

7          the MDL.  I think in the

8          affidavit, it is listed as the

9          particular number of hours, but it

10         is in the thousands of hours, and

11         we also retained experts prior to

12         the MDL, one of whom was Dr.

13         Farquhar, who was the expert cited

14         by Judge Bechtle in the fen-phen

15         litigation upon whom he relied for

16         the medical monitoring decision.

17         Farquhar did quite a lot of work

18         before he was ever approved by the

19         MDL.  If fact, his 95-page report

20         was specifically cited by Judge

21         Fallon when I briefed and argued

22         the Daubert motion in November of

23         2005 as being a thorough and

24         explanatory 95-page report upon

FAC Resp. Exhibit D -- 855

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          which he relied in finding that

2          the plaintiffs used proper

3          methodology and had a reliable

4          qualified expert when we surpassed

5          the initial and comprehensive

6          Daubert hurdle on short-term

7          duration on the naproxen defense

8          on the epidemiology evidence.  So,

9          a lot of that work was being done

10         before there was an MDL and before

11         there was an authorization

12         process.

13              Once the MDL was in place,

14         Dr. Farquhar was submitted to the

15         PSC and approved, as well as

16         Nicholas Jewell and Phillip

17         Lavori, who were assistants of his

18         at UC Berkeley School of Public

19         Health, and Stanford, who did the

20         statistical analyses upon which

21         Farquhar relied.  So, those were

22         the principal expert costs that

23         are in that mix.

24              So, I wanted to talk a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1         little bit about early work that

2         we did, in particular,

3         communications that I had with

4         Carlene Lewis, who was a pioneer

5         and a beloved member of this

6         committee before her untimely

7         death.  Carlene was the initial

8         chair of the science committee and

9         also trial counsel on the Ernst

10        case.  At that point, I was

11        already the chair of the

12        epidemiology and causation

13        subcommittee, and I took it upon

14        myself to provide whatever

15        information I could to that trial

16        team as the trial was ongoing.

17        That included documents that were

18        being taken from the discovery

19        that was ongoing about the APPROVe

20        trial.  It included a document

21        that I used at a deposition during

22        the Ernst trial to show that Merck

23        had the authority to change the

24        label on its own without waiting

FAC Resp. Exhibit D -- 857

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          for the FDA, which was a subject

2          of great interest to them in the

3          trial.

4              This is at slide 9, there's

5          a summary of some of this, and

6          this was Dr. Bold, who was the

7          Merck witness who admitted that

8          they changed the label without

9          waiting for the FDA.  At the same

10         time, they were saying they

11         couldn't do that.

12             There's an e-mail, one of

13         many e-mails at slide 10 where

14         Carlene was asking initially for

15         my guidance on how to get through

16         the new drug application

17         submission.  I answered that

18         question, and then you can see at

19         the top what she said, which I

20         wouldn't say these things about

21         myself, but in this setting, it is

22         my job to tell you what others

23         have said.  She says, "Thanks so

24         much, Don.  You've been invaluable

FAC Resp. Exhibit D -- 858

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          this trial.  I owe you big time."

2          Coming from Carlene, that's a very

3          significant and meaningful message

4          for me to have obtained.

5               And the slide after that is

6          an e-mail from Chris Seeger, thank

7          you, Chris.

8               MR. SEEGER:  I remember

9          this.

10              MR. ARBITBLIT:  "Don, this

11         is a great find.  I'm using this

12         information about Merck's having

13         changed the label on a significant

14         adverse effect when they said that

15         that was not possible."

16              The next thing I wanted to

17         talk about briefly, I'm sure most

18         of you or probably all of you know

19         something about this New England

20         Journal of Medicine deposition and

21         Dr. Curfman.  This was something

22         that was my idea to take.  I

23         planned it, I implemented it, I

24         took the deposition.  I did it in

FAC Resp. Exhibit D -- 859

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          a way that shows -- the only way

2          that I could show confidential

3          documents to someone at the New

4          England Journal to show that they

5          had been snookered was by having a

6          deposition because, otherwise, I

7          would have been violating

8          confidentiality orders.  So, I

9          went to the deposition with a set

10         of materials to show him chapter

11         and verse, day by day, what Merck

12         knew, when they knew it and how

13         they couldn't possibly have in

14         good faith and in good conscience

15         withheld it from the Journal, yet

16         they did.  The editor, Dr.

17         Curfman, was outraged by it, and

18         he published an Expression of

19         Concern, which is equivalent to a

20         correction, and then that was

21         confirmed.

22              The Expression of Concern or

23         EoC said that Merck withheld

24         critical data about cardiovascular

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1            toxicity, you can see a summary of

2            this at slide 12, and then said

3            that the article was misleading

4            and did not accurately reflect the

5            potential for serious

6            cardiovascular toxicity with

7            rofecoxib.  That's pretty good

8            stuff from someone who is not

9            aligned with plaintiffs and had

10           never said anything that had

11           previously favored plaintiffs in

12           litigation.

13                What you can see at slide 13

14           is an actual document from Merck's

15           memo of July 2000 that was

16           reprinted by the New England

17           Journal.  What you see there is

18           exactly what the Journal was

19           concerned about that had been

20           withheld, that top line where

21           Vioxx had 47 versus 20 for

22           naproxen in the serious

23           thromboembolic events, which led

24           the Journal to conclude that for

FAC Resp. Exhibit D -- 861

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          every serious gastrointestinal

 2          event that was prevented by Vioxx,

 3          there was an offset of at least

 4          one serious heart attack, stroke

 5          or serious event.

 6                    MR. HERMAN:  Let me

 7          interrupt you --

 8                    MR. ARBITBLIT:  Yes, please.

 9                    MR. HERMAN:  -- because

10          there's some points I think I

11          would like you to make, and I've

12          been through the PowerPoint, and

13          my questions, some come from

14          memory and many from the

15          PowerPoint.

16                    Tell me what your

17          involvement was in Humeston.

18                    MR. ARBITBLIT:  Right.  I

19          was just about to get there,

20          actually, Russ, in two ways.

21                    First of all, as I had with

22          Ernst, and even probably more so,

23          because I had started my

24          involvement in this litigation in
```

FAC Resp. Exhibit D -- 862

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1            the fall of 2004, specifically

2            with Chris and Dave, and got my

3            initial assignments from Dave,

4            because he wanted lawyers with a

5            science aptitude.  So, I was

6            constantly in touch with Dave.

7            There are hundreds of e-mails back

8            and forth about every issue that

9            came to mind.  He asked me to help

10           prepare their expert, Dr. Kronmal.

11           I participated with him in

12           preparing his report, prepping him

13           for his trial testimony.  There

14           are many e-mails back and forth

15           about interpretation of APPROVe.

16                And then in Humeston, as it

17           was going on, he asked for my help

18           in preparing for cross-examination

19           of Dr. Reicin, and also I was

20           preparing him for Dr. Graziano,

21           their epidemiologist.

22                MR. HERMAN:  You were in New

23           York for that?

24                MR. ARBITBLIT:  No, I was

FAC Resp. Exhibit D -- 863

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          not in New York for that, I was in

2          California, but I was responding

3          by e-mail on an urgent basis.

4          Whenever Dave wrote, I was right

5          there writing back, or Chris.

6               MR. HERMAN:  What about the

7          Ernst trial?

8               MR. ARBITBLIT:  Can I just

9          finish on Humeston?

10              Humeston I was a loss, but

11         Judge Higbee specifically relied

12         on the New England Journal as the

13         basis for the motion for a new

14         trial that allowed Chris, Dave and

15         the team to secure this $47

16         million verdict in Humeston.

17              MR. HERMAN:  In Humeston II?

18              MR. ARBITBLIT:  In Humeston

19         II.  So, without the New England

20         Journal article, there might not

21         have been a new trial.  So, I take

22         no credit for the great job they

23         did at trial, but I feel very

24         happy and proud to enable them

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

 1          with that work.
 2                  MR. HERMAN:  What about the
 3          Ernst trial?
 4                  MR. ARBITBLIT:  The Ernst
 5          trial, as I mentioned, I was in
 6          touch with -- I was not in Texas,
 7          I was working with Carlene Lewis
 8          on a steady basis, providing her
 9          interpretations of documents and
10          studies, providing her with
11          documents that would show you
12          could have a Vioxx injury with
13          short duration, and as mentioned,
14          that Merck was able to change the
15          label regardless of whether the
16          FDA said that they could in
17          advance, which was a contested
18          issue.
19                  The Barnett trial, which was
20          here in New Orleans, I was a
21          full-time member of that trial
22          team.  I was specifically invited
23          on to that team by Mark Robinson,
24          because he knew I was working both

FAC Resp. Exhibit D -- 865

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          historically on other science

2          cases --

3               MR. HERMAN:  I note that in

4          your presentation, Mark had

5          requested various materials from

6          you even before that trial began.

7               MR. ARBITBLIT:  Yes.  Well,

8          I knew Mark all the way back to

9          fen-phen, and he knew that I dig

10         deep into the science issues, and

11         that's what he needed.  That's not

12         his strong suit.  He has many

13         strong suits, but he knows that he

14         needs help on that.  He gave me

15         the job of working with Dr. Zipes,

16         his key expert --

17              MR. HERMAN:  Did you go to

18         the Philadelphia meeting he

19         arranged?

20              MR. ARBITBLIT:  I went to

21         the Philadelphia meeting he

22         arranged.

23              MR. HERMAN:  Tell us about

24         that.

FAC Resp. Exhibit D -- 866

Page 23

1            MR. ARBITBLIT:  Well, my

2       understanding of it was that there

3       was an attempt to find a way to

4       reach common ground without

5       sharing work product, and so we

6       did not.  We talked about ideas,

7       but no MDL expert information was

8       provided to anyone outside the MDL

9       at that time or any other time

10      that I know of.

11            I had engaged in

12      discussions -- for example, I had

13      discussions with Jerry Kristal,

14      and I think there's some e-mails

15      in there where Jerry and I are

16      saying how much we like each

17      other's work.  One of them toward

18      the end says -- if you will look

19      at slides 25A and B, I did some

20      analysis of the VICTOR manuscript,

21      which went to Chris and --

22            MR. HERMAN:  I want to get

23      back -- I'm sorry.  I want to get

24      back to Philadelphia, this idea

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1          that there was a meeting.  I still

 2          don't understand that meeting.  I

 3          have to tell you that.  Because,

 4          frankly, at least in the MDL

 5          executive committee and various

 6          chairs, we had no idea the meeting

 7          was going on.

 8               MR. LEVIN:  How was it

 9          called, and what was Dan

10          Sigelman's role?

11               MR. ARBITBLIT:  I don't know

12          how it was called.  I only know

13          that Mark asked me to come and so

14          I did.  I did learn at the time of

15          the meeting on the day of the

16          meeting that there was concern at

17          the MDL that something improper

18          might occur, and certainly from my

19          standpoint, and from what I

20          observed of Mark's standpoint,

21          nothing improper occurred.  We

22          listened, primarily we listened to

23          what their expert, Dr. Madigan,

24          had to say.
```

FAC Resp. Exhibit D -- 868

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1              MR. HERMAN:  Whose expert

2         was Madigan?

3              MR. ARBITBLIT:  He was

4         the -- there was a New Jersey

5         team.  I don't know exactly --

6              MR. LEVIN:  Eric Weinberg?

7              MR. SEEGER:  Yes, it was

8         Weinberg.

9              MR. ARBITBLIT:  Weinberg was

10         one of the people working with

11         Madigan.  I don't know the extent

12         of who worked with Madigan, nor

13         who retained him.

14              MR. HERMAN:  Tell us about,

15         you were full time on the Barnett

16         trial team.  How long were you in

17         New Orleans?

18              MR. ARBITBLIT:  I was in New

19         Orleans for the entire trial,

20         which was approximately three

21         weeks and a couple of days ahead

22         of time.  And I had some pretty

23         significant tasks that are

24         described at slides 16 through 25.

FAC Resp. Exhibit D -- 869

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1            I got involved full time in April

2            2006 when Mark asked me to do

3            that.

4                 My initial job, based on

5            what I knew about the data, I

6            wanted to see how can we prove

7            this case.  The main thing to me

8            was what's the guy's blood

9            pressure history, because I knew

10           we had some good stuff on blood

11           pressure, a special high risk

12           category.  So, I went through the

13           guy's records, I found these

14           spikes where he had gone over 160

15           in his systolic blood pressure,

16           and I knew that put him in a high

17           risk category.  We developed

18           demonstratives to show exactly

19           what these were so that a jury

20           could understand.  I put a couple

21           of these in the PowerPoint at

22           slides 18 through 21.  These are

23           exhibits that we worked up for the

24           trial so that when Dr. Zipes got

FAC Resp. Exhibit D -- 870

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          on the stand, for example, at

2          slide 18, he could show the jury

3          when Merck said all these

4          painkillers are alike, that

5          actually Vioxx was twice as bad as

6          Celebrex.  So, we could use that

7          as the backup for the evidence

8          that Zipes talked about in slide

9          20, where if you are in that blood

10         pressure spike group that Vioxx

11         causes more of, you've got a three

12         out of four chance that Vioxx

13         causes a heart attack.  Dr. Zipes

14         testified to that.  I think it was

15         strong evidence for the jury.

16         That was information --

17              MR. HERMAN:  You helped

18         prepare Zipes, didn't you?

19              MR. ARBITBLIT:  I prepared

20         Zipes for several days, actually.

21              MR. SEEGER:  We had him for

22         a week.

23              MR. ARBITBLIT:  Well, he

24         needed it.  He's a very smart guy.

FAC Resp. Exhibit D -- 871

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          He's at the top of his field, but

2          he's also very demanding, and he

3          was very nervous.  There's an

4          e-mail that he sent that I wanted

5          folks to see, because I thought --

6                 MR. SEEGER:  22.

7                 MR. ARBITBLIT:  Thank you.

8          That's --

9                 MR. HERMAN:  August 11, '04,

10         '06 rather?

11                MR. ARBITBLIT:  Yes.  The

12         one where he says, "I have told my

13         wife all about you.  To me, you

14         epitomize what great lawyers are

15         like, and I can't express how much

16         I respect and admire you.  You

17         helped me tremendously and were so

18         patient and kind."

19                So, I mean, for someone --

20                MR. LEVIN:  What's this

21         "kind" stuff?

22                MS. CABRASER:  This is Don's

23         role in the firm.  I'm not kind.

24         Don is kind.

FAC Resp. Exhibit D -- 872

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1              MR. ARBITBLIT:  I protected

2         him from Mark.

3              MR. SEEGER:  Exactly.  We

4         all get that one.

5              MR. HERMAN:  Tell us your

6         involvement in Kozic.

7              MR. ARBITBLIT:  I was not

8         deeply involved, but at the time,

9         this was after some of the losses

10        and one of the criteria is did you

11        keep on working.  Yes, I was

12        working hard at new documents that

13        had been deprivileged for Dr.

14        Reicin.  I was involved -- I was

15        asked to participate in preparing

16        for her de bene esse deposition.

17             So, in the process of that,

18        I was preparing cross-examination

19        of Dr. Reicin about discrepancies

20        between the data on Vioxx risk

21        versus the --

22             MR. HERMAN:  Who did you

23        work closely with in terms of

24        trial team on that?

FAC Resp. Exhibit D -- 873

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1            MR. ARBITBLIT:  On Kozic?
 2            MR. HERMAN:  Yes.
 3            MR. ARBITBLIT:  I spoke with
 4       Troy specifically and only Troy.
 5       I think I had sent out an e-mail
 6       to several people explaining some
 7       of the discrepancies between what
 8       Merck knew and what published
 9       articles said.  Troy responded to
10       that and said --
11            MR. HERMAN:  That was a
12       Florida case that Troy and Pete
13       were involved in?
14            MR. ARBITBLIT:  Yes.
15            MR. HERMAN:  Did you go to
16       Florida in that case?
17            MR. ARBITBLIT:  No.  It
18       involved --
19            MR. HERMAN:  I don't want
20       you to take from what I'm asking
21       that you had to be in Florida or
22       any other place.
23            MR. ARBITBLIT:  I appreciate
24       that.  But what I did was I
```

FAC Resp. Exhibit D -- 874

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1          responded on an urgent basis,

 2          since Troy was a week away from

 3          trial, in giving him information

 4          that would be potentially of use.

 5              MR. HERMAN:  And you also

 6          were involved in Berwick in some

 7          way?

 8              MR. ARBITBLIT:  Berwick was

 9          Robinson's case in California.  He

10          asked me to take a deposition.

11              MR. HERMAN:  Is that the

12          case he withdrew?

13              MR. ARBITBLIT:  He did

14          withdraw it, yes.

15              MR. HERMAN:  Do you know

16          why?

17              MR. ARBITBLIT:  I don't know

18          specifically.  There were problems

19          with the plaintiff, but I don't

20          know what the specific problems

21          were.  That was after I had been

22          asked to and did take a deposition

23          of Dr. Pratt, who was one of

24          Merck's MDL experts that they were
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          using in state cases as well, and

2          that deposition is part of the

3          trial package for MDL lawyers, and

4          I think I got some good things out

5          of it.

6                MR. HERMAN:  What about

7          Irvin I and II?

8                MR. ARBITBLIT:  I was

9          involved with Andy and with Paul

10         Sizemore quite a bit in Irvin I

11         and II over the course of the fall

12         of 2005, more so in Irvin I than

13         in Irvin II.  Dr. Farquhar -- Paul

14         Sizemore came out to meet with me

15         and with Dr. Farquhar.  He was

16         named as a witness, but they chose

17         not to call him, because there was

18         an inconsistency between his

19         approach and the approach of Dr.

20         Baldwin, whom they did call, as

21         far as what to do with high risk.

22                Dr. Farquhar was very

23         insistent that high risk added to

24         the likelihood of a Vioxx event,

FAC Resp. Exhibit D -- 876

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          whereas Dr. Baldwin took a

2          different approach.  There was an

3          inconsistency that would not have

4          been helpful at trial from the

5          people trying the case for the

6          plaintiff.  So, he was not called.

7          But I prepared him.  I met with

8          Paul Sizemore and with Dr.

9          Farquhar.  I provided earlier the

10         320 --

11             MR. HERMAN:  Let me

12         interrupt you, and I'm sorry to do

13         this, but you've got an awful lot

14         to say in a short period of time.

15             Was Paul Sizemore with

16         Andy's firm or Tom Girardi's at

17         the time?

18             MR. ARBITBLIT:  He was with

19         Andy's firm at the time.

20             MR. HERMAN:  That was a

21         California --

22             MR. ARBITBLIT:  Irving was

23         an MDL case.

24             MR. HERMAN:  No, no, I'm

FAC Resp. Exhibit D -- 877

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          sorry.

2                 Irving was an MDL case in

3          New Orleans?

4                 MR. ARBITBLIT:  Correct.

5                 MR. SEEGER:  Actually, I

6          have a question, Russ, when you

7          are done.  Are you done?

8                 MR. HERMAN:  And you said

9          you did more in I than in II?

10                MR. ARBITBLIT:  That's

11         right.  Because Farquhar was not

12         going to be called in II, and he

13         was the principal person I was

14         working with.

15                MR. HERMAN:  Go ahead.

16                MR. SEEGER:  Elizabeth is

17         right, because there have been so

18         many people collaborating on so

19         many projects, and we're really

20         trying to sort some things out.

21         So, you don't have a lot of time

22         remaining, but it would be very

23         helpful to me -- and, look, I

24         know, you are a lawyer's lawyer.

FAC Resp. Exhibit D -- 878

Page 35

1          You are a good lawyer.  Everybody

2          knows that.

3              I would like to know what

4          projects you would consider were

5          the ones you owned.  Like I worked

6          a little bit on the Daubert, I did

7          this on that, but I kind of own

8          these two or three projects, and

9          this is what I did and provided

10         leadership on.

11              MR. ARBITBLIT:  Okay.  I

12         think that I marshalled the

13         evidence, to the extent there was

14         evidence, I marshalled all of it

15         for the short-term use issue on

16         Daubert and got us over that

17         hurdle.

18              I think I owned the New

19         England Journal Expression of

20         Concern that became a part of the

21         trials.

22              I owned the Watson issue and

23         the module that came of it that

24         showed there was a premarketing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1      signal of Vioxx toxicity that the

2      company never revealed to the FDA

3      and which became part of experts'

4      testimony after I circulated a

5      memo in June of 2005, including

6      Dr. Kronmal, Dr. Farquhar, Dr.

7      Moye, Dr. Gregory.

8           I own the osteoarthritis

9      initial analysis that was there a

10     three times greater risk for Vioxx

11     than placebo, which Merck had

12     denied, and that became a part of

13     some witness trial testimony or

14     expert testimony.

15          I owned the blood pressure

16     spike and the hypertension issue.

17     Shelly Sanford specifically

18     assigned me to write the

19     hypertension memo in October 2007

20     and to complete it after the

21     settlement because of the work I

22     had done previously.

23          MR. SEEGER:  That was for

24     the trial package, the memo?

FAC Resp. Exhibit D -- 880

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

 1            MR. ARBITBLIT:  It was for

 2       the trial package, as well as the

 3       stroke issue that I worked up for

 4       the trial package to show that,

 5       yes, there was a significant

 6       excess of strokes, as well as

 7       heart attacks, even independently

 8       of each other.  So, that

 9       hypertension issue between showing

10       Vioxx was worse for hypertension

11       and that people that had those

12       spikes were more susceptible to

13       heart attacks I think was integral

14       to the success of the Barnett

15       case.

16            So, being able to turn

17       around Humeston, being able to

18       participate in getting the Barnett

19       case as the only MDL victory, I

20       would say that those are

21       significant contributions, and

22       they were ongoing at the time.

23       It's always a mixed feeling.  My

24       office desk was full of documents

FAC Resp. Exhibit D -- 881

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

```
 1          on November 9th when the call came

 2          in for settlement, and I just

 3          said, well, I guess I'll go home

 4          for the day.

 5               MS. CABRASER:  He was very

 6          disappointed -- I mean, he was

 7          distraught.

 8               MR. WEITZ:  Don, how many

 9          cases did you submit to the

10          settlement?

11               MR. ARBITBLIT:  160.  And

12          we've had 100 percent of them

13          approved so far, which is about 60

14          of them.

15               MR. RAFFERTY:  Don, did

16          Farquhar end up testifying in any

17          of the trials?

18               MR. ARBITBLIT:  No, he was

19          not called as a witness.

20               MR. WEITZ:  Where were your

21          cases filed, in the MDL or in

22          California?

23               MR. ARBITBLIT:  Very few in

24          California.  There were some in
```

FAC Resp. Exhibit D -- 882

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1         New Jersey.  The majority in the

2         MDL.

3              MR. WEITZ:  Had you guys

4         worked up any cases that were on

5         the trial docket?

6              MR. ARBITBLIT:  We had one

7         at least.  There was another

8         gentleman named Ralph Barnett, a

9         different Barnett, who was on the

10        New Jersey docket.  We had

11        submitted several for additional

12        discovery in the fall of 2007

13        pursuant to Judge Higbee's request

14        for additional cases.

15             MR. WEITZ:  But the 39

16        cases, the cluster --

17             MR. SEEGER:  Excuse me for

18        interrupting, but I'm only making

19        this correction, and I hope you

20        don't find this as any statement

21        on the quality of the work you

22        did, it's just that because we

23        create this transcript and you go

24        around and you meet with people

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

```
 1          and everybody says, you know, I
 2          did this and that.
 3               I just want to make it clear
 4          that on the Humeston new motion
 5          trial, we had many grounds that we
 6          were seeking under.  Now, you
 7          found this piece, what turned into
 8          the EoC, which I just think gave
 9          the judge sort of a roadway to
10          overturn that verdict, which was
11          faulty on so many levels.  But
12          there was a whole team effort on
13          that.  Dave Buchanan did the
14          briefing, and I was involved and
15          many people.  But you gave us a
16          very important piece of evidence
17          there.
18               MR. ARBITBLIT:  Well, I
19          agree, Chris, and I totally agree,
20          you guys did a very thorough job.
21          I've read all the papers, and when
22          I read the judge's decision and
23          the quote, she said that --
24               MR. SEEGER:  You gave her
```

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 884

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          the roadway.  I'm saying that.

2                MR. ARBITBLIT:  And I know.

3          You guys worked day and night on

4          many, many different grounds.  If

5          that hadn't been there, it is

6          possible she would have found

7          another reason to do it.

8                MR. SEEGER:  Well, we don't

9          know.

10               MR. ARBITBLIT:  We don't

11         know.  She cited this one.  I'm

12         proud of it.

13               MR. WEITZ:  Don, let me just

14         get back to what I was asking.

15               Were there any cases that

16         you guys had in either the MDL or

17         in New Jersey where you actually

18         had a trial date and were going to

19         trial?

20               MR. ARBITBLIT:  No.

21               MR. HERMAN:  On the science

22         -- I'm sorry, Perry, are you done?

23               MR. WEITZ:  No, I'm done.

24               MR. HERMAN:  On the science

FAC Resp. Exhibit D -- 885

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1        committee that you were active in,

 2        other than yourself, what can you

 3        tell us about the members of the

 4        committee?  You don't have to

 5        highlight anybody if you don't

 6        want to.  If there was somebody

 7        that you thought was behind the

 8        work, we'd like to know who that

 9        is.

10             MR. ARBITBLIT:  Well, we had

11        weekly calls for a while.  I

12        stopped doing the weekly calls

13        when those calls just turned into

14        me lecturing, because I was

15        reading all the documents anyway,

16        and I wasn't getting any new

17        information from having those

18        calls.  I do recall that Tara

19        Sutton, who I see is up next, did

20        a good job on the project that I

21        asked her to do on analyzing some

22        of the epidemiology cases under

23        Daubert, and I used some of her

24        work when I wrote the brief.
```

FAC Resp. Exhibit D -- 886

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1              I don't get involved in what

2        some of the controversies are, I

3        try not to.  I understand that Dan

4        Sigelman later was working with

5        New Jersey people and that may be

6        a source of consternation to some,

7        but at the time that I knew him, I

8        knew that he was involved in the

9        MDL and he was on my committee and

10        he did work.  He was one of the

11        few who did work and had

12        experience to contribute and

13        he analyzed some of the --

14             MR. HERMAN:  Was Bert Black

15        on your committee?

16             MR. ARBITBLIT:  Bert Black

17        was on the committee.

18             MR. BLIZZARD:  I don't have

19        any questions, Don, but I do want

20        to say that this is not really

21        Vioxx related, but it comes out of

22        Vioxx.  I think that the New

23        England Journal of Medicine work

24        that you did, I don't have proof

FAC Resp. Exhibit D -- 887

Page 44

 1          of this, but I believe it laid the

 2          good groundwork for their help on

 3          the preemption issue, which was

 4          important to all of us, and I

 5          appreciate your work with the New

 6          England Journal of Medicine.  They

 7          are not a bunch of wild eyed libs,

 8          whatever Phil Beck wants to say,

 9          and getting them on their side or

10          our side of these issues is very

11          important to us going forward, and

12          I appreciate it.

13               MR. ARBITBLIT:  Thank you,

14          Ed, and I appreciate your saying

15          that, and I did include that Dr.

16          Curfman went to Congress also and

17          testified to the committee on that

18          very subject.

19               MR. SEEGER:  Let's go off

20          the record.

21               (Whereupon, a discussion was

22          held off the record.)

23               MR. WEITZ:  Let's go back to

24          the hours, because there's a large

FAC Resp. Exhibit D -- 888

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1        number of hours, and I think you

2        explained yourself and your

3        substantive contribution well in

4        this session.

5             But I think Elizabeth has

6        said that you did about 5,000

7        hours of work yourself.  Explain

8        to us the other 13,000 hours, and

9        really because we're trying to

10        differentiate between people that

11        just reviewed documents and

12        substantive work that really made

13        a difference in the litigation.

14             MR. ARBITBLIT:  Most closely

15        connected to me, I believe Jenny

16        Gross was in the neighborhood of a

17        couple thousand hours.  It might

18        have been more than that, but she

19        was a constant presence.  She was

20        here full time for the Barnett

21        trial.  Whenever I needed

22        something, she was there.  I'd get

23        e-mails from her in the middle of

24        the night.  She's a very hard

FAC Resp. Exhibit D -- 889

Page 46

1        worker, and digging into the

2        science was a lot of work for her,

3        not only the data, but the

4        documents.  She was a very good

5        detective.  So, there's a couple

6        thousand there.  I believe

7        Elizabeth's work is 1,900 to

8        2,000.

9            MS. CABRASER:  I'll talk

10        about that in a minute.

11            MR. LEVIN:  When you do

12        talk, differentiate between the

13        purchase claims.

14            MS. CABRASER:  Sure, I will.

15            MR. ARBITBLIT:  One of the

16        assignments that Paulina do Amaral

17        of our New York office received

18        was to head up the Arcoxia, which

19        was another COX-2 inhibitor,

20        discovery project, to see what

21        would be useful there.  So, a lot

22        of her time was spent on that,

23        which was also in the common

24        benefit bailiwick.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1            Wendy Fleishman's common

2        benefit work was probably on

3        medical monitoring.

4            MR. LEVIN:  That was in New

5        Jersey?

6            MR. ARBITBLIT:  In New

7        Jersey, yes.  Also the MDL had a

8        medical monitoring complaint,

9        didn't it?

10            MR. LEVIN:  Yes.

11            MR. ARBITBLIT:  So, it was

12        both.

13            Of course, the total time

14        includes paralegals and support

15        staff as well.  So, there was a

16        fair amount of, before I reviewed

17        documents, sometimes there would

18        be a paralegal -- often there

19        would be a paralegal who would

20        screen, and we had people working

21        on document reviews from the

22        get-go.

23            In December of 2004, Dave

24        Buchanan asked us to start

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

```
 1          reviewing part of a 500,000-page

 2          custodial file for Tom Simon for

 3          his deposition, and then there

 4          were hundreds of thousands of

 5          pages of adverse event reports

 6          that we were asked to review.  I

 7          didn't do all of that myself.  I

 8          did a lot of that myself,

 9          obviously, and I did the higher

10          end analysis and what to use for

11          exhibits and such.  But there was

12          help from associates on doing that

13          work.

14              But there was no work that

15          had no purpose.  There was never a

16          job where we just billed time.

17          Every job was done because it

18          needed to be done.  And that was

19          my job, to make sure nobody was

20          working on projects that I didn't

21          need to prove the case.

22              MR. WEITZ:  Were those jobs

23          that were given as a direction

24          from leadership on the MDL?
```

FAC Resp. Exhibit D -- 892

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1              MR. ARBITBLIT:  Yes.  I

2       would say yes, because I was the

3       chair of the epidemiology and

4       causation committee, so, I had a

5       fairly broad charge.  I had to

6       write up what my mission statement

7       was.  My mission statement was

8       approved, and everything that was

9       assigned through me fell into that

10      mission statement that the PSC had

11      approved.

12             MR. BIRCHFIELD:  Those

13      assignments came through Shelly,

14      the charge?

15             MR. ARBITBLIT:  Well,

16      Carlene initially, sure, and

17      Shelly.  It was still Carlene at

18      the time that the mission

19      statement was approved.  That was

20      about June of 2005, right after

21      the MDL --

22             MR. SEEGER:  Just to get

23      back on schedule, I know

24      Elizabeth, you wanted to add some

FAC Resp. Exhibit D -- 893

comments, but we should begin to sum up. We are starting to fall behind.

MR. LEVIN: We are running late.

MS. CABRASER: Got it.

Before Don sums up, let me just give you a very quick run through of my personal time, which is approximately 1,700 hours, so, less time than Don's, I think for the very obvious reasons.

Some MDLs are all about the law. This MDL was really most about the science, the evidence, the medicine and the trials. And, in fact, one of the main missions of the long briefing committee was not to get legal rulings on issues that might be issues of vulnerabilities. There's a tremendous strategy, which I think was primarily Arnold's strategy, on briefing with respect to how to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

```
 1              --
 2              MR. LEVIN:  Are you telling
 3         me my strategy was to do nothing?
 4              MR. SEEGER:  Amazing how he
 5         does that.
 6              MR. HERMAN:  You were
 7         successful in that strategy.
 8              MS. CABRASER:  It was to
 9         keep bad things from happening.
10              MR. LEVIN:  A great
11         recovery.
12              MS. CABRASER:  And it is a
13         very tough strategy.
14              MR. WEITZ:  He's actually
15         very good at that.
16              MS. CABRASER:  It was
17         maneuvering through a minefield.
18         Preemption was looming.  That was
19         a fabulous decision by Judge
20         Fallon on preemption, the best
21         decision, but that was due to a
22         strategy by law and briefing of
23         what to do, but more importantly,
24         what not to do.
```

FAC Resp. Exhibit D -- 895

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

1          In that respect, that was

2     primarily Arnold and his office

3     doing that.  My role on law and

4     briefing, although it was

5     co-chair, was really a support.

6     We did some briefing, we did some

7     research.  If I get a call to do

8     overnight briefing on a particular

9     issue, like the day that Graham

10    motion to quash subpoena, I would

11    do that.  Because we were in

12    California, we could be the

13    overnight crew.  We did that a lot

14    on motions in limine for various

15    trials.  Happy to do it.  Was it

16    pivotal to the litigation?  No.  I

17    think the David Graham stuff was

18    neat, and I did that.

19         The other thing that I did,

20    and I spent about 220 hours on

21    this, is purchase claims.  Again,

22    at the outset of the case, at the

23    request of leadership, I chaired

24    that committee mainly to deal with

FAC Resp. Exhibit D -- 896

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 53

```
 1        political issues and keep it out

 2        of the way, keep it alive, but

 3        keep it out of the way so that

 4        purchase claims could go ahead in

 5        New Jersey, where things were more

 6        favorable, so that Judge Fallon

 7        could focus on trials and personal

 8        injury claims.  I saw no conflict

 9        with that.  I think it is a

10        contribution.  I think it is a

11        valuable contribution, but, again,

12        it is certainly less sexy and less

13        dramatic than many of the other

14        contributions.  I was happy to do

15        it.  Could someone else have done

16        it politically with the purchase

17        claims crew?  I like to think I

18        was able to do something.  But,

19        again, the value of that

20        contribution has yet to prove out.

21             So, more than 50 percent of

22        my time was spent on the personal

23        injury side of the case, primarily

24        legal briefing, legal research,
```

FAC Resp. Exhibit D -- 897

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 54

```
 1        legal issues, but, again, I didn't

 2        argue most of the motions.  Russ

 3        and Arnold argued most of the

 4        motions.  I argued one major

 5        motion, the purchase claims

 6        committee motion to dismiss, and I

 7        don't know whether that was a good

 8        argument or not or whether it

 9        would be successful or not, but

10        the claims are still alive.

11             Involuntarily in New Jersey,

12        we got tagged with medical

13        monitoring, to try and keep that

14        claim alive.  Worked for a while,

15        ultimately it did not.

16             MR. LEVIN:  When you have

17        1,700 hours in briefing, that

18        includes all the briefing in New

19        Jersey?

20             MS. CABRASER:  Yes.  That's

21        a total.

22             MR. LEVIN:  That was where

23        you took medical monitoring

24        through the appellate system?
```

FAC Resp. Exhibit D -- 898

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 55

```
 1                MS. CABRASER:  Yes.  I have

 2          92 hours on Local 68 work in New

 3          Jersey.  Medical monitoring I

 4          tried to break out, it would be

 5          about that amount or less, but

 6          most of the briefing time was on

 7          the MDL side.

 8                MR. ARBITBLIT:  Can I have

 9          two minutes?

10                MR. SEEGER:  Yes.

11                MR. ARBITBLIT:  For one

12          minute I wanted to just talk about

13          something early, the physician

14          contacts issue that I know Russ

15          argued with Judge Fallon.

16                When the MDL was threatened

17          by the ruling that said

18          plaintiffs' lawyers couldn't talk

19          to the doctors, Chris asked me to

20          take on briefing this issue,

21          because I thought I had an idea,

22          it turned out to be an idea that

23          Russ was able to get the judge to

24          sign off on, and since has become
```

FAC Resp. Exhibit D -- 899

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 56

1           adopted by other courts, that

2           unless there's a specific naming

3           of the doctor, which was only true

4           in about 7 percent of the cases,

5           that the plaintiffs' lawyers could

6           have continued to have their

7           contacts with the doctors.  I

8           thought that was important in

9           terms of helping the MDL get off

10          the ground without having this

11          unlevel playing field, where

12          plaintiffs' lawyers would choose

13          state venues.

14               So, I've been committed to

15          the MDL from the outset, and I

16          wanted folks to know that, and I

17          wanted to make it clear that I

18          have done what I could to make

19          that viable.

20               On the Barnett trial, one

21          thing I didn't mention that I

22          don't know if people are aware of

23          is that I was assigned to take the

24          deposition of the defense expert,

FAC Resp. Exhibit D -- 900

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 57

1          Dr. Kim, and their science expert

2          a month-and-a-half before the

3          trial.

4               MR. HERMAN:  And you did

5          that and they withdrew him.

6               MR. ARBITBLIT:  They

7          withdrew him, that's right.  They

8          withdrew him at trial in part

9          because of what's on Exhibit 24,

10         which is slide 24, in his own

11         handwriting, showing that using

12         the APPROVe study, there would

13         have been a 78 percent chance of

14         that heart attack suffered by Mr.

15         Barnett was due to Vioxx.

16              MR. SEEGER:  You made him do

17         this calculation at the dep?

18              MR. ARBITBLIT:  I did.

19              MR. BLIZZARD:  Attributable

20         risk.

21              MR. ARBITBLIT:  Attributable

22         risk.  And he wouldn't have been

23         able to dance out of it, and so

24         they had no expert at trial, which

FAC Resp. Exhibit D -- 901

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 58

 1          is pretty unusual, and I own that,

 2          too.

 3               Thank you very much for all

 4          the work you have done.  It was a

 5          pleasure working with all of you.

 6               MR. SEEGER: Thank you.

 7               MR. HERMAN:  Thank you.

 8               MR. BIRCHFIELD: Thank you.

 9               MR. LEVIN: Thank you.

10               MS. CABRASER: Thank you.

11                    -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 59

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147
23            Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 903

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:   LOCKRIDGE GRINDAL NAUEN, PLLP
        Richard A. Lockridge, Esquire
        Yvonne Flaherty, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 904

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. LOCKRIDGE:  Well, thank

 3         you for having us here.  I'm Dick

 4         Lockridge, and with me is Yvonne

 5         Flaherty, and we're both from

 6         Minneapolis, the Minneapolis law

 7         firm of Lockridge Grindal Nauen.

 8         I'm here in a slightly awkward

 9         position in that I did not

10         personally do very much work on

11         Vioxx, although Yvonne did some.

12              Although I was at the

13         initial organization meeting, the

14         vast majority of the work was done

15         by Bert Black, who, as I'm sure

16         you all know, sent an

17         exceptionally unfortunate e-mail

18         in June or July '07, did not do

19         any more work in the case,

20         obviously, after that, and soon

21         thereafter left our firm and is no

22         longer with our firm.

23              But I think while he was

24         working on the case, he and a few
```

FAC Resp. Exhibit D -- 905

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          other people in our firm did a lot

2          of very, very excellent work.

3               MR. WEITZ:  I'm sorry, I'm

4          not familiar with that situation.

5               MR. SEEGER:  Perry, you're

6          going to make him go there?

7               MR. WEITZ:  No, no.  I just

8          don't know what you are talking

9          about.  I never heard of it.

10               MR. LOCKRIDGE:  Bert Black

11          is kind of the science guru, and

12          he was with our firm during the

13          Vioxx case, and he sent out an

14          e-mail I believe in June or July

15          of '07, castigating certain

16          individuals in the MDL and the MDL

17          leadership, which was an entirely

18          inappropriate and wrong e-mail.

19          He did it on his own, totally

20          without anybody else in the firm

21          knowing about it, and it was

22          pretty obnoxious.  And,

23          understandably, Russ was not happy

24          about it and terminated him from

FAC Resp. Exhibit D -- 906

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1         working any longer on the case,

2         and then a couple of weeks

3         thereafter, Bert left our firm.

4              MR. WEITZ:  Did he have an

5         official role in the MDL at that

6         time?

7              MR. LOCKRIDGE:  Bert?  Well,

8         he was on the science committee,

9         and I'll get to all the work that

10        he did do.

11             MR. SEEGER:  As soon as it

12        was brought to Dick's attention,

13        he took immediate action.

14             MR. LOCKRIDGE:  I was going

15        to address that at the end, but

16        that's fine.

17             But Bert, he was assisted by

18        Yvonne Flaherty and also Elizabeth

19        Odette of our firm.  Bert was on

20        the science committee, and he

21        worked extensively with Carlene

22        Lewis, John Restaino and Paul

23        Sizemore.  Most of his work was

24        through the science committee, and

FAC Resp. Exhibit D -- 907

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1         he was also on the epidemiology

2         proof of causation subcommittee

3         with Don Arbitblit, who, of

4         course, you just saw.

5              He was on the subcommittee

6         of mechanism of action

7         pharmacology defense issues, and

8         he was on the Daubert expert

9         witness development committee and

10        worked also there with several

11        people, including Michelle Parfitt

12        and some others.

13             I'll go through some of the

14        specific projects just briefly and

15        then touch on some in more detail.

16        Some of the work that he did was

17        on the so-called Vioxx science

18        story, which was a project that

19        supported causation and debunked

20        Merck's junk science myths.  This

21        was assigned through the science

22        committee, and I know he

23        circulated this to the PSC and the

24        trial teams.  He worked

FAC Resp. Exhibit D -- 908

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          extensively on the label change

2          memorandum, which was assigned to

3          him through the science committee

4          and John Restaino and Mark

5          Robinson and Troy Rafferty.

6               I think some of you saw,

7          this was a 71-page, single-spaced

8          history of the April 11, 2002

9          label change relating to VIGOR.

10         It is more than probably you

11         wanted to know, but it certainly

12         told you everything you ever

13         wanted to know about that topic.

14              MR. BIRCHFIELD:  It was very

15         thorough.

16              MR. RAFFERTY:  Very

17         thorough.

18              MR. LOCKRIDGE:  Very

19         thorough.

20              Bert, of course, worked

21         extensively on Daubert and Daubert

22         issues.  I'll get to that in a

23         little more detail.  He at least

24         argued a couple of Daubert motions

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          before Judge Fallon.  He retained

 2          Dr. Richard Kapit, who was an MDL

 3          expert, and he worked extensively

 4          with Paul Sizemore with Dr. Kapit.

 5          Bert and Paul Sizemore met with

 6          Dr. Kapit several times.

 7              He also worked with Ted

 8          Wacker in California with Dr.

 9          Kapit.  I know that Bert worked

10          with Dr. Kapit when he was a

11          witness, at least in the retrial

12          of the Irvin/Plunkett case.  He

13          prepared and worked with Dr. Kapit

14          in preparing his expert reports,

15          and obviously those were all

16          distributed to the trial teams.

17          He defended Dr. Kapit at two

18          different depositions, I think

19          September of '05 and then again in

20          June of '06.  Bert argued the

21          Daubert motion before Judge Fallon

22          in November of '05 where the

23          defendants wanted to exclude Dr.

24          Kapit.
```

FAC Resp. Exhibit D -- 910

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1            Bert and our associate

2        Elizabeth Odette prepared outlines

3        for direct examination and also

4        prepared outlines for expected

5        cross-examination for at least the

6        first Irvin/Plunkett trial for Dr.

7        Kapit, and I believe also for the

8        second Irvin trial.  So, he did a

9        lot of his work with Dr. Kapit.

10           Bert also retained Dr.

11       Robert Fletcher from Harvard.  He

12       met several times with Dr.

13       Fletcher.  He prepared the

14       response to the Daubert motion

15       regarding Dr. Fletcher.  Some of

16       you may recall Dr. Fletcher was

17       excluded by Judge Fallon, but

18       other experts were excluded, too.

19           Bert worked with Dr. Colin

20       Funk, who was an expert who was

21       actually proposed by Bert.  He met

22       several times with him, worked on

23       his expert report.  I don't

24       believe he was ever used, although

FAC Resp. Exhibit D -- 911

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          I know Mark Robinson, and maybe

 2          you, Andy, were also at one time

 3          at least considering using him.  I

 4          know at least Mark ultimately did

 5          not use him, although I think he

 6          was down actually at the trial.

 7               Bert worked with Dr.

 8          Benedict Lucchesi, who was an MDL

 9          expert.  I think he was the lead

10          off expert in Irvin I, maybe even

11          Irvin II, I'm not sure.

12               MR. BIRCHFIELD:  Irvin I.

13               MR. LOCKRIDGE: Irvin I?

14          Okay.

15               He worked on the response to

16          the Daubert motion, met with him

17          several times.  He and Paul

18          Sizemore worked on -- he and Paul

19          Sizemore worked on the preparation

20          for the Irvin trial and the second

21          Irvin trial in preparing Dr.

22          Lucchesi --

23               MS. FLAHERTY:  Lucchesi.

24               MR. LOCKRIDGE:  Lucchesi,
```

FAC Resp. Exhibit D -- 912

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          excuse me.  Thank you.

2                  He worked on an outline for

3          trial and expected cross.  Bert

4          also worked with Dr. Wayne Ray,

5          who was another MDL expert who I

6          believe testified at least at

7          Irvin II, maybe at Irvin I,

8          although I'm not sure.

9                  MR. BIRCHFIELD:  Irvin I.

10                 MR. LOCKRIDGE:  I believe

11         that he at least worked in

12         preparation with Dr. Ray for those

13         trials.

14                 I believe pursuant to Russ

15         Herman's request, Bert analyzed

16         Dr. Ray's statistics and causation

17         issues relating to Merck's

18         February 2006 motion.  I believe

19         it was for judgment of the

20         pleadings or summary judgment, I'm

21         not sure which.  This was all

22         circulated and prepared and sent

23         to the trial teams.

24                 Then, finally, he worked on

FAC Resp. Exhibit D -- 913

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          Dr. Bruce Squires, who, as I
 2          understand it, was not ever used,
 3          but he worked under the direction
 4          of Paul Sizemore and John Restaino
 5          for this.  Dr. Squires was, of
 6          course, the former editor of the
 7          Canadian Medical Association
 8          Journal.
 9              He did a lot of work on the
10          defense experts, too, as some of
11          you may recall.  He worked
12          involving Dr. Janet
13          Arrowsmith-Lowe.  He prepared
14          outlines.  Bert took her
15          deposition twice, once in October
16          of '05 and another time in June of
17          '06.
18              He worked on a Daubert
19          motion to exclude Arrowsmith-Lowe.
20          He argued the motion to exclude
21          her.  They worked on preparation
22          for her cross-examination at least
23          at the first Irvin/Plunkett trial
24          down in Houston.
```

FAC Resp. Exhibit D -- 914

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           Yvonne worked on research,

2      on background research on her for

3      other cases.  She's certainly been

4      in a lot of cases, as you recall.

5           Bert worked pretty

6      extensively on matters involving

7      Dr. Alise Reicin; is that correct?

8           MR. SEEGER:  Yes.

9           MR. LOCKRIDGE:  I know you

10     guys know, obviously.

11          Bert, I believe, worked a

12     lot on the two Irvin trials

13     involving her, had a lot of

14     meetings involving her, and my

15     understanding was, he also

16     prepared the cross-examination for

17     the Barnett trial, too.

18          Bert did also some work

19     involving some of the other

20     defense experts like Dr. Roach,

21     Dr. Lisa Rarick, Dr. Frank Lanza

22     and a few others.  At the request

23     of Mark Robinson, he worked with

24     Dr. Suzanne Parisian.

FAC Resp. Exhibit D -- 915

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

    1            In the trial work, Bert was

    2       at, I believe, the two Irvin

    3       trials, and at least for part of

    4       the Barnett trial.  He did work

    5       extensively on motions in limine

    6       in Irvin I, and I've indicated

    7       much of what he's done there.

    8            At the Irvin II trial, I

    9       believe, Andy, he worked on that

   10       case also again in the trenches.

   11       I believe he worked some at least

   12       on the outline of closing

   13       arguments.

   14            On the Barnett trial, I know

   15       he worked extensively with Mark

   16       Robinson and Ted Wacker there on

   17       that trial, preparing direct and

   18       cross-examinations, including,

   19       obviously, mainly with the

   20       experts.  These were some new

   21       experts, it was Flavahan and

   22       Morrison, and he worked on some

   23       motions in limine.

   24            The time records tell me he

FAC Resp. Exhibit D -- 916

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          did some things on the Berwick

2          trial, but, frankly, I don't know

3          what the heck he did.

4               He did do some FDA issues.

5          I've already mentioned the

6          labeling work that he did.  He

7          worked with Ted Wacker and Paul

8          Sizemore on some FDA issues.

9               He worked on AERs with Don

10         and the cerebrovascular event

11         research analysis.  This was not

12         with Don, but he did do a fair

13         amount of work on that.

14              Obviously our firm did some

15         other things, but this was

16         certainly the high points.  I

17         believe our MDL time is around 2.4

18         million.  We had most of our cases

19         in the MDL, although we had a few

20         cases in New Jersey.  I think we

21         had a total of 61 cases.

22              MR. HERMAN:  What was the

23         2.4 million?

24              MR. LEVIN:  That's the

FAC Resp. Exhibit D -- 917

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        loadstar.

2               MR. LOCKRIDGE:  I believe

3        that's the loadstar in the MDL for

4        common benefit time.  We obviously

5        had a lot more time.  There are

6        individual cases that we did not

7        submit and kept completely

8        separate.

9               MR. WEITZ:  How many

10       individual cases did you submit to

11       the settlement?

12              MS. FLAHERTY:  61.

13              MR. LOCKRIDGE:  61.

14              MR. WEITZ:  Where were those

15       cases filed?

16              MR. LOCKRIDGE:  Most of them

17       were here, but there were a few

18       filed in New Jersey.

19              MR. WEITZ:  Did you have any

20       of those cases prepared for trial?

21              MS. FLAHERTY:  In New

22       Jersey.  Those cases were coming

23       up.  Actually, we did a lot of

24       work with Robb Dassow and Suzanne

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          Scovern.  I recall before the

2          settlement, before things started

3          moving towards the settlement,

4          there was a call made out for good

5          cases in New Jersey, otherwise,

6          Judge Higbee, I believe, was going

7          to start selecting cases herself

8          if we didn't put the cases

9          forward.  So, our local counsel --

10               MR. WEITZ:  Who was Robb

11          Dassow?

12               MS. FLAHERTY:  No.  Robb

13          Dassow is actually licensed in

14          Indiana.  He did a lot of his work

15          in New Jersey, and then we worked

16          with him and Suzanne, who is from

17          California.

18               MR. WEITZ:  Scovern?

19               MS. FLAHERTY: Right.  Mike

20          Ferrara was our local counsel to

21          file cases in New Jersey.

22               MR. WEITZ:  So, when you say

23          you did a lot of work with Robb

24          Dassow and Suzanne, what kind of

FAC Resp. Exhibit D -- 919

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           work are you talking about?

2                 MS. FLAHERTY:  That was not

3           common benefit work that we

4           submitted for purposes of this

5           presentation today.  That was work

6           more on our individual cases.  We

7           did help them a little bit --

8                 MR. SEEGER:  Did you put

9           cases in the pool that were being

10          worked in?

11                MS. FLAHERTY:  Yes.

12                MR. SEEGER:  Some of that

13          we're considering.

14                MS. FLAHERTY:  Okay.  There

15          was a case, Donna Schwab was put

16          up toward the end, and I think

17          they sent out scheduling orders,

18          and I'm recalling it was going to

19          be, it was towards the end of the

20          year and maybe it was late, was it

21          '07 perhaps, maybe it was even

22          '06 --

23                MR. WEITZ:  It was towards

24          the end of the litigation.

FAC Resp. Exhibit D -- 920

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           MS. FLAHERTY:  Correct.  And

2       so I know they were scheduling,

3       there was a scheduling order that

4       came out, and things were kind of

5       put to a halt, and that was the

6       end of that.

7           MR. WEITZ:  So, you had

8       submitted a case, but you didn't

9       do any work on the case?

10          MS. FLAHERTY:  Not common

11      benefit work.

12          MR. WEITZ:  Okay.

13          MR. RAFFERTY:  Well, when

14      you say "not common benefit work,"

15      I mean, did y'all take

16      depositions?

17          MS. FLAHERTY:  No.  They

18      were being scheduled, it was on a

19      scheduling order, but everything

20      was put to a halt.

21          MR. LEVIN:  Just an

22      individual case.

23          MR. BLIZZARD:  Was Dr.

24      Parisian used in any of the cases?

FAC Resp. Exhibit D -- 921

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1            MR. SEEGER:  In Jersey?

 2            MR. BLIZZARD:  No, I'm

 3       sorry.  I'm back to, there was

 4       discussion about Suzanne Parisian,

 5       who I know to be an FDA expert

 6       that Merck was working with.  Did

 7       she get used in any of the cases?

 8            MR. RAFFERTY:  Not in

 9       Kosick, not in Irvin II.

10            MR. SEEGER:  Was she used in

11       Barnett, Parisian?

12            MR. BIRCHFIELD:  She was

13       being worked up for Barnett.

14            MR. SEEGER:  She was worked

15       up for a case or two, probably not

16       put on the stand though.

17            MR. BIRCHFIELD:  No, I don't

18       think she was.

19            MR. LOCKRIDGE:  I don't have

20       anything more, but if you have

21       other questions.

22            MR. BIRCHFIELD:  Just one

23       question.

24            You said that he worked

FAC Resp. Exhibit D -- 922

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          with, was it the Berwick trial,

2          was that the last one that you

3          mentioned?  Was that Mark's case

4          out in California?

5               MR. LOCKRIDGE:  It probably

6          was, yes, but I don't know very

7          much about it.  He didn't do much

8          on that.

9               MR. HERMAN:  You've got

10          about $70,000 in costs?

11               MR. LOCKRIDGE:  Yes.  I

12          guess we didn't get asked for an

13          assessment, but we don't have very

14          much in costs.  As you know, I'm

15          cheap, Arnie.

16               MR. HERMAN:  Let me say, and

17          I didn't say this at the

18          beginning, but I'm sure you'll

19          see.  Everything is being

20          recorded, and you are going to get

21          a copy.  The main thing the judge

22          is looking for is transparency and

23          consistency.

24               MR. LOCKRIDGE:  Certainly.

FAC Resp. Exhibit D -- 923

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1              MR. HERMAN:  Secondly, you

2         submitted an affidavit.  If we

3         don't resolve all the fee issues,

4         the judge is going to appoint a

5         Special Master and appoint people

6         to take lawyers' depositions, et

7         cetera.  Hopefully we can resolve

8         those issues.  If we can't, take a

9         look at your affidavit, and if

10        there's something you want to

11        supplement or delete, you may want

12        to consider that, but that's down

13        the line.

14             MR. LOCKRIDGE:  Okay.

15             MR. BIRCHFIELD:  I want to

16        say I appreciate your presentation

17        and your candor.

18             MR. LOCKRIDGE:  Thank you.

19        I really appreciate all of you

20        guys.  I know this is a big

21        effort.  I've been on the other

22        side of it.

23             MR. SEEGER:  Thank you.

24                      -  -  -

FAC Resp. Exhibit D -- 924

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1               C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4  Public and Certified Court Reporter of

5  the State of New Jersey, Registered

6  Diplomate Reporter, Federally-Approved by

7  the United States District Court of

8  Pennsylvania, do hereby certify that the

9  foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22       Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23       Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 925

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM: LOCKS LAW FIRM
        James Pettit, Esquire
        Steven P. Knowlton, Esquire
        Gene Locks, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 926

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                        -  -  -

2              MR. PETTIT:  Good morning.

3         My name is Jim Pettit, Locks Law

4         Firm.  Steve Knowlton is to my

5         right.  Mr. Locks is here.

6              MR. KNOWLTON:  Good morning.

7              MR. PETTIT:  I've handed up

8         a submission which I will

9         supplement with an affidavit when

10        I get back to my office.  It's got

11        13 points.  The thrust of it

12        really is, I think, our

13        presentation of the Doherty jury

14        trial, which was back in July of

15        2006, and to address a couple of

16        other points as well.

17             I took a rough stab at what

18        I thought were the most important

19        issues.  Obviously in a

20        five-and-a-half week trial, there

21        were a lot of issues, a lot of

22        rulings, a lot of handling of

23        evidence.  I thought that these

24        were the issues that would inure

FAC Resp. Exhibit D -- 927

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        to the common benefit of Vioxx

 2        plaintiffs across the country.

 3            So, the Doherty versus Merck

 4        verdict was a unanimous verdict on

 5        a very important issue despite

 6        being a defense verdict overall,

 7        and that is that the jury found

 8        seven to nothing that Merck failed

 9        to provide adequate warnings for

10        risk.  So, what that means, I

11        believe, is that the jury had to

12        have found that there were Vioxx

13        risks, that Vioxx risks existed.

14            Secondly, Merck either knew

15        the risks or should have known the

16        risks.

17            Third, Merck should have

18        adequately warned Doherty and did

19        not do so.

20            The jury was -- as you may

21        know, in New Jersey, we're not

22        allowed to talk to juries, but the

23        juries were interviewed

24        relentlessly by the press and
```

FAC Resp. Exhibit D -- 928

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

 1          actually was interviewed within an

 2          hour, I think, or less of the jury

 3          verdict.  And so in reading the

 4          press, as anyone could have, the

 5          jury said that there were

 6          overwhelming specific risk factors

 7          that they had found that Elaine

 8          Doherty had that caused her heart

 9          attack and not Vioxx.

10               So, the point that I guess

11          I'm making in issue number one is

12          that we had a unanimous liability

13          verdict and had the jury found,

14          which they could have in other

15          cases in the future after Doherty,

16          that, in fact, the case-specific

17          risk factors would have included

18          Vioxx as the substantial

19          contributing factor, that would

20          have been a plaintiff's verdict.

21          So, that's something I think that

22          Merck would have taken into

23          account, that there was one more

24          liability verdict in the country.

FAC Resp. Exhibit D -- 929

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          The Doherty case itself was

2     selected by our firm in

3     conjunction with a very elaborate

4     process which some of you know in

5     New Jersey as a bellwether case.

6     Elaine Doherty had many, many risk

7     factors and would not have been

8     ever probably a very, very high

9     potential verdict.  It had

10     potential to be a relatively high

11     verdict, but probably not millions

12     of dollars.

13          We picked that case so that

14     there would be, in fact, a

15     creation of a precedential value,

16     a verdict that had precedential

17     value, so that Merck could see a

18     New Jersey law firm trying a case

19     under New Jersey law with a

20     plaintiff that's had symptoms and

21     risk factors and a disease process

22     that was representative really, I

23     think, of the vast majority of

24     plaintiffs.

FAC Resp. Exhibit D -- 930

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1         So, it wasn't just we picked

2     our best case, it was a case that

3     we thought, had we won the

4     complete verdict, would have been

5     valuable to plaintiffs in New

6     Jersey and across the country.

7         We spent a half a million

8     dollars trying the case.  The case

9     took five-and-a-half weeks.  There

10    were four partners that tried the

11    case, along with many associates

12    and paralegals and staff people.

13        The second issue which I

14    think is perhaps equally as

15    important, if not more important,

16    is the direct-to-consumer issue.

17    As you can see from our

18    submission, it was created by the

19    New Jersey Supreme Court years

20    ago, 1999.  There has never been a

21    charge ever in New Jersey that a

22    jury should consider the defendant

23    to be liable if they fail to warn

24    a plaintiff herself.  So, we

FAC Resp. Exhibit D -- 931

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1         literally had the first
 2         direct-to-consumer charge ever in
 3         New Jersey, and we were not the
 4         first Vioxx case.
 5              Now, it is our
 6         understanding, and plaintiffs'
 7         lawyers are here, that the
 8         direct-to-consumer ruling that
 9         Judge Higbee made was an admixture
10         of law and very case-specific
11         facts.  So, what we did in the
12         Elaine Doherty case was hit that
13         very hard from day one.  Our
14         prescribing doctor, unlike perhaps
15         some of the prescribing doctors in
16         earlier trials, was very, very
17         unhealthy to us, and we presented
18         him by videotape so we knew going
19         in what we had to face.  So, we
20         really had to hit the
21         direct-to-consumer charge very
22         hard, and we did, and that was
23         what I think our major success was
24         with the unanimous verdict.
```

FAC Resp. Exhibit D -- 932

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          But for that, it would have
 2      been a complete defense verdict.
 3      What does that mean to the rest of
 4      the bar?  I think that that really
 5      created the law of the case for
 6      New Jersey after the Doherty case.
 7      So that all the -- not to minimize
 8      it, but all that plaintiff lawyers
 9      would have to do after that is
10      meet the factual predicate that
11      Judge Higbee saw that we had met
12      in Doherty.  Very difficult
13      deposition, very difficult motion
14      practice, and we spent a great
15      deal of time during the charging
16      conference just on the
17      direct-to-consumer.  Merck knew
18      what it meant and fought very
19      hard.
20          I'm going to let Steve
21      handle a couple of issues now and
22      then I'll come back.
23          MR. KNOWLTON:  Thanks, Jim.
24          First, number 3 is the trial

FAC Resp. Exhibit D -- 933

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        presentation of Merck, PR
 2        liability deps.  We spent a lot of
 3        time analyzing and getting these
 4        transcripts ready for presentation
 5        to the jury.  There is just one
 6        clarification.  The Laine and the
 7        Demopoulos testimony, while
 8        litigated during trial, were not
 9        actually presented to the jury.
10        It was the Blake deposition that
11        was presented to the jury.
12             And although this is our
13        application, I have to give credit
14        to Chris Placitella, because that
15        was probably the most powerful
16        seven-and-a-half minutes of
17        videotape that I have ever seen
18        based on the jury's reaction, as
19        Jim has just described to you, on
20        the DTC.  I think that had an
21        enormous impact on the jury and an
22        enormous impact on that verdict.
23             This was the first time that
24        that testimony had to be utilized,
```

FAC Resp. Exhibit D -- 934

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        and it was the first time it had

2        been litigated for trial in front

3        of Judge Higbee.  That material

4        was made available and is still

5        available to plaintiffs' counsel

6        across the country.

7             The next is the APPROVe ITT

8        and extension data.

9             As Chris Seeger remembers,

10       this data was released just days

11       before our jury selection and

12       caused quite a bit of a ruckus

13       immediately before.  There was a

14       question about the manner of

15       production that we ended up

16       litigating in front of Judge

17       Higbee, and then eventually she

18       ruled that the data could be

19       considered by both experts, so,

20       there were the corresponding

21       reports and depositions, and then

22       there were the pretrial arguments

23       and rulings.  And although at

24       trial it wasn't utilized

Page 11

1        extensively, it was mentioned and

2        brought up in both Dr.

3        Traberg's -- in both Dr. Traberg's

4        testimony and cross-examination,

5        as well as Dr. John MacGregor's

6        deposition.

7            We extensively reviewed that

8        data on an obviously expedited

9        basis with our expert, Dr.

10       MacGregor, who concluded that the

11       extension data did not bear out

12       Merck's established trial position

13       that it required 18 months of

14       exposure.  That view was then, of

15       course, correlated by other

16       experts, both by independent

17       experts, and then FDA, and also by

18       the plaintiffs' firms.

19            That was the first time,

20       perhaps due to circumstances, but

21       certainly due to hard work by John

22       MacGregor and our lawyers, that

23       that data had been presented to a

24       jury and had been examined for

Page 12

```
 1      trial.

 2             Moving on to number 6.  In

 3      the Doherty trial, prior to

 4      presentation before the jury,

 5      there was a Rule 104 hearing on

 6      the admissibility of the 4/6/05

 7      FDA document.  This document had

 8      been the center piece of much

 9      motion practice in New Jersey

10      prior to the Doherty trial, no

11      doubt, but this was first time

12      that we had presented and pushed

13      the issue both in correlation of

14      trying to get the entire document

15      admitted in front of the jury, and

16      also in advancing its COX-2 class

17      effect defense.

18             Judge Higbee ruled that

19      there would be a 104 hearing, and

20      the expert that Merck brought

21      forth was Dr. George Taylor, who

22      was noticed as an expert in our

23      trial as well.  Merck put Dr.

24      Taylor on, spent about 25 minutes
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          doing a direct.  He was

2          cross-examined.  At the end of the

3          hearing, from the bench, Judge

4          Higbee ruled that the 4/6/05

5          document was inadmissible in its

6          entirety and that there was no

7          basis, unless there was further

8          expert testimony, for bringing in

9          the COX-2 class effect defense in

10         front of the jury.  As an aside,

11         Dr. Taylor never appeared at

12         trial.

13              Moving on to number 8, this

14         is the preparation of the Topol

15         and Graham transcripts.  Again,

16         kudos for the effort to the

17         gentlemen who took those

18         depositions especially the folks

19         from Kline & Specter.  But these

20         deposition transcripts were

21         extensively litigated in a way

22         that was sensitive to other

23         plaintiffs' firms and their need

24         potentially to use it in future

Page 14

1        litigation.

2              As many of you will recall,

3        at the time, it was the Graham

4        transcript, I believe, that was

5        the subject of motion practice

6        before Judge Fallon, and it was

7        specifically the cross-examination

8        of Mr. Beck of that witness that

9        was at issue.

10             We were very, very

11       sensitive, the Locks' lawyers were

12       sensitive not to litigate the

13       transcripts in such a way that

14       would require potentially

15       precedential rulings from Judge

16       Higbee, knowing that there were

17       trials in front of her and in the

18       MDL that were coming after us.

19             So, we negotiated page and

20       line designations.  We also

21       negotiated exhibit presentations

22       during those depositions, and both

23       of those depositions were played,

24       we think, with good effect to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          jury.

2                    Dr. MacGregor, number 9, was

3          our expert that we identified

4          early on in the litigation.  Dr.

5          MacGregor testified for us in

6          Doherty and acted as a consulting

7          expert.  We believe, and I

8          certainly believe as the lawyer

9          who put him on at trial, he was

10         probably one of the easiest

11         experts I've ever had to work

12         with.  He was motivated and was

13         extraordinarily well prepared both

14         by us and also by his own efforts.

15                   Dr. MacGregor, we were free

16         with sharing his materials for the

17         plaintiffs' lawyers, and he's been

18         utilized, as you can see from our

19         submission, by other firms in

20         Vioxx and also in other

21         litigations to date.

22                   My last item would be the

23         STI document review.  Scientific

24         Therapeutics, Inc. was a third

FAC Resp. Exhibit D -- 940

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          party that Merck utilized in

2          communicating with physicians

3          about Vioxx, and specifically in

4          blunting the impact of the VIGOR

5          study.  Unfortunately, the STI

6          initiative never reached the

7          deposition stage.  There were

8          hundreds of thousands of pages of

9          documents that were reviewed by my

10         firm, and also that effort was

11         spearheaded by Eric Weinberg and

12         his firm.  Also, videotapes and

13         audiotapes, presentations were

14         reviewed.  PowerPoint programs

15         were put together in an effort to

16         link and follow the money chain

17         from Merck from the third-party

18         vendor to physicians concerning

19         their speaker bureaus, which they

20         used to impact VIGOR, and also

21         publications in, quote,

22         peer-reviewed journals that Merck

23         authored and then substituted

24         other scientist names to.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          I'm sorry, back to you, Jim.

2          MR. PETTIT:  I'm going to go

3     back to number 5, which was use of

4     Dr. Susan Parisian.  She was an

5     FDA officer, and the strategy in

6     using her was two part.  One was

7     to rebut the defense of the FDA

8     approval, which is not only a very

9     strong factual argument that Merck

10    made over and over again during

11    five-and-a-half weeks to the jury,

12    but it's a statutory defense, as

13    I'm sure most, if not all of you

14    know in New Jersey, and in many

15    other states.  If there's an FDA

16    approved warning, it is presumed

17    to be an adequate warning and

18    there's rebuttal and presumption.

19         But sort of in the trenches,

20    we used Dr. Parisian to persuade

21    the jury that the FDA is not a

22    mission, and, in fact, are the

23    opposite, that they are

24    understaffed, that their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1          procedures are not focused towards

 2          this kind of drug and getting it

 3          to the market safely.

 4               We also were able to, sort

 5          of as an aside, get a lot of the

 6          state-of-the-art evidence through

 7          Dr. Parisian rather than bringing

 8          in another state of the art

 9          witness.

10               So, the point of this for

11          common benefit is that Dr.

12          Parisian actually had been worked

13          up by other law firms, and we were

14          the first ones to use her in a

15          Vioxx trial.  I think we presented

16          her incredibly, and I think she

17          was very useful, and it was well

18          known to other plaintiff lawyers

19          had they, in fact, wanted to use

20          her.

21               The rulings that Judge

22          Higbee made, as you probably know,

23          were basically at the end of the

24          trial, that Judge Higbee would

FAC Resp. Exhibit D -- 943

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          present to the jury as a legal

2          charge what exactly the FDA

3          regulations meant.  So, she

4          presented factual testimony.

5               Number 7, the FDA preamble

6          that came out actually in January

7          of 2006, our trial, again, was

8          July of 2006, Merck argued that

9          extensively pretrial and trial,

10         probably argued it three different

11         times.  Judge Higbee finally made

12         an ultimate ruling during the

13         trial itself.  That really, I

14         think, was the centerpiece of the

15         preemption issue, obviously,

16         preemption being a tough legal

17         issue, but Merck was trying to get

18         that down on the ground to the

19         jury as a document, and Judge

20         Higbee very forcefully struck

21         that, and I think struck it and

22         made that for all Vioxx cases in

23         New Jersey.

24               I'm going to combine 11, 12

FAC Resp. Exhibit D -- 944

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      and 13.

2            We were the only firm in New

3      Jersey, and I think I may be

4      mistaken, the only firm in the

5      United States, that tried a Vioxx

6      jury trial by itself.  We relied

7      on the amazing incredible work

8      done by all the other plaintiffs'

9      attorneys for years up until July

10     of 2006, and we used their work

11     product and looked at their

12     trials.  I can't say enough about

13     that, obviously.  It almost goes

14     without saying that we were

15     talking about that that's an issue

16     that we tried the case by ourself,

17     I wanted to state that as clearly

18     and as gratefully as I can.

19            Having said that, I think

20     what Merck needed to see to come

21     to the table for global

22     negotiations is that a single law

23     firm is willing to try a case and

24     is able to try a case and is

FAC Resp. Exhibit D -- 945

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        willing to put up $500,000 and

2        invest four partners and

3        associates and weeks and, of

4        course, months to get to trial.  I

5        think Merck needed to see that,

6        they needed to see that we could

7        do that successfully, and as I

8        said, we came close to having a

9        plaintiff's verdict and certainly

10       had a liability verdict.  I think

11       that is the kind of thing that

12       contributes to making Vioxx, in

13       short, a mass tort.  Not only the

14       large verdicts, it has gotten to

15       the point where one law firm can

16       try the case.  I think that's an

17       important factor.

18            One of the questions that

19       the committee sent in their e-mail

20       was consistency, quantity,

21       duration and intensity.  We

22       continued to litigate the Vioxx

23       cases long after Doherty.  We had

24       Klug, Ellis and Pritch were going

FAC Resp. Exhibit D -- 946

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1        to be picked for bellwether

 2        trials.  We did not give up.  We

 3        continued to take depositions,

 4        defend depositions, take sales rep

 5        depositions, work up the cases.

 6        We did not really have judicial

 7        intervention in terms of discovery

 8        motion practice.  So, we didn't

 9        get that.  That was sort of an

10        answer to one of the issues raised

11        in your e-mail.

12             In addition to the funding,

13        extensive and large funding of the

14        Doherty trial and the rest of our

15        cases, we did contribute two

16        $7,500 submissions to the New

17        Jersey plaintiffs' funds for a

18        total of $15,000.  So, we did

19        contribute for funding.

20             Thank you.

21             MR. BIRCHFIELD:  Just a

22        note, before you submit this

23        affidavit, there was a single firm

24        trial in the MDL.
```

FAC Resp. Exhibit D -- 947

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1           MR. PETTIT:  I appreciate

2      you correcting me.

3           MR. HERMAN:  One question,

4      or more than one.

5           I have -- I see Mr. Locks,

6      and is it Pettit?

7           MR. SEEGER:  Knowlton and

8      Pettit.

9           MR. HERMAN:  I'm sorry.

10          MR. KNOWLTON:  I'm Mr.

11     Knowlton, this is Mr. Pettit, and

12     this is Mr. Locks.

13          MR. HERMAN:  Is it

14     K-N-O-W-L-T-O-N?

15          MR. KNOWLTON:  That's

16     correct, sir.

17          MR. HERMAN:  Since we've got

18     this on the record, I want to make

19     sure that the record notes that

20     all three of you are here.

21          I just have a couple of

22     other questions.

23          I apologize if our office,

24     because we were responsible for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          it, did not send out to you an

2          e-mail or communication to submit

3          a written material and affidavit

4          before this date.  I assume you

5          did get it.  If you didn't get it,

6          it is our fault.

7               MR. PETTIT:  We did not.

8               MR. HERMAN:  Well, I

9          apologize for that, and if you'd

10         get us an affidavit.

11              Now, did you submit your

12         time in hours?

13              MR. PETTIT:  Yes, we did.

14              MR. HERMAN:  In costs?

15              MR. PETTIT:  Yes, we did.

16              MR. HERMAN:  How much time

17         did you submit, do you recall?

18              MR. PETTIT:  Certainly

19         something I should have reviewed

20         before this morning.

21              MR. LEVIN:  I've reviewed

22         it.  7,505.  7,505 hours.

23              MR. HERMAN:  How much in

24         costs, Arnie?

FAC Resp. Exhibit D -- 949

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1              MR. LEVIN:  You are asking

2         me?  $433,301.77.

3              MR. HERMAN:  Excuse me.

4         $433 and how much?

5              MR. LEVIN:  301.77.

6              MR. HERMAN:  301.77 what?

7              MR. LEVIN:  Cents.

8         $433,301.77.

9              MR. HERMAN:  How much of

10        those costs were spent on your

11        trial, do you recall?

12             MR. PETTIT:  100 percent of

13        those costs, and by the way, I

14        think we did a slightly revised

15        cost.

16             MR. LEVIN:  I think your

17        original submission was rejected,

18        and I assume you are working with

19        the accountants to straighten it

20        out?

21             MR. PETTIT:  Right.  And as

22        far as I know, it has been

23        straightened out.

24             MR. LEVIN:  Good.

FAC Resp. Exhibit D -- 950

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1            MR. PETTIT:  The answer,

2        sir, to your question is that 100

3        percent of the costs were spent

4        either on Doherty or on very

5        specific review, as Mr. Knowlton

6        said, on the liability documents

7        and the page and line designations

8        that went on in 2005 and 2006

9        leading up.  But there was nothing

10       that was spent on another case --

11           MR. HERMAN:  No, no.  I'm

12       not suggesting that.  You rounded

13       off the cost of the trial to

14       $500,000.  I'm just trying to

15       determine whether there's another

16       $500,000 in costs or this is all

17       inclusive.

18           MR. PETTIT:  No.  That's

19       what our submission consists of.

20           MR. RAFFERTY:  Steve or

21       Jim --

22           MR. LOCKS:  There are

23       additional costs that we

24       submitted, a lot more.

Page 27

1          MR. RAFFERTY:  Approximately

2     out of the 7,500 hours or 7,000

3     hours, approximately how many of

4     those would be attributed to the

5     Doherty case, the vast majority?

6          MR. PETTIT:  Vast majority,

7     just in 2006.

8          MR. RAFFERTY:  You mentioned

9     the Klug, Ellis and Pritch cases?

10          MR. PETTIT:  Right.

11          MR. RAFFERTY:  Were those

12     the other three cases that y'all

13     worked up or were there more?

14          MR. PETTIT:  Those were the

15     three.  We had reached a certain

16     point in the bellwether selection

17     with the plaintiffs' attorneys and

18     the judge, and the judge was

19     talking about stroke and heart

20     attack, and those were the ones we

21     had reached to the point where

22     Merck was taking a lot of

23     depositions.

24          MR. RAFFERTY:  So those --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1              MR. PETTIT:  There were a

2      couple others that would have come

3      up on the stroke list and on the

4      heart attack list.  Those were the

5      three that we literally litigated

6      in 2006.

7              MR. RAFFERTY:  That's what I

8      want to know.

9              MR. KNOWLTON:  If I remember

10     properly, we had, at that point,

11     up until the time the settlement

12     was announced, we had either 16 or

13     21 cases where we had just begun

14     to start to litigate as far as

15     sales reps were concerned and

16     things like that, but these three

17     were the ones that were already on

18     point where there was discussion

19     as to whether or not there were

20     going to be trials set.

21             MR. LEVIN:  How many cases

22     did you submit to the settlement,

23     the Locks firm?  How many did you

24     submit to the settlement?

FAC Resp. Exhibit D -- 953

Page 29

1          MR. KNOWLTON:  An exact

2     number?

3          MR. LEVIN:  Approximately.

4          MR. SEEGER:  Approximately.

5          MR. BIRCHFIELD:  I'm showing

6     about 90.  Does that sound right?

7          MR. KNOWLTON:  90?  No.

8          MR. LOCKS:  No.  I thought

9     it was somewhere north of 200,

10    plus or minus 200.

11         MR. KNOWLTON:  That's about

12    right.  Around 200.

13         MR. LOCKS:  I think it was a

14    little more, but I don't know if

15    they would all pass the test.

16         MR. GIRARDI:  MacGregor is a

17    real good witness.

18         MR. WEITZ:  Great witness.

19         MR. KNOWLTON:  Thank you.

20         MR. SEEGER:  Thank you.

21         MR. BIRCHFIELD:  205.

22         MR. HERMAN:  Let me give you

23    a fax number.  (504) 561-6024.

24    The e-mail you should have on your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          notice about this meeting, you can

2          either e-mail or fax the affidavit

3          in.  I'm just going to attach it

4          to the submission.

5               MR. PETTIT:  We will get

6          right on it.  Thank you very much.

7               MR. SEEGER:  Thanks.

8                    -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 955

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1                C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number: 1060147

23          Notary Expiration: 1.2.10
             CCR Number: 30X100176200

24

FAC Resp. Exhibit D -- 956

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -


FIRM:  LOWE LAW FIRM
       Jeffrey Lowe, Esquire
       CAREY & DANIS, LLC
       Joseph P. Danis, Esquire

BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 957

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                       -   -   -

2                 MR. BIRCHFIELD:  Everything

3        is going to be on the record, so,

4        we will have a transcript of

5        everything that's said here in

6        case it's necessary for the judge

7        or for any proceedings later on.

8              One of the things that Judge

9        Fallon has asked us to do is to

10       let everybody know about the

11       process, we'll try to work out

12       having an agreement on the

13       allocation, but if there are

14       objections, he's going to follow

15       the same type of procedure similar

16       to what he did in the Murphy Oil

17       case.  It is important to be aware

18       of the Murphy Oil decision and the

19       process he followed there, where

20       he would appoint a special master,

21       depositions be taken and all of

22       that.

23              So, with that being said,

24       the floor is yours.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           MR. LOWE:  Nice to see you

2       guys.  Basically the question here

3       is, did we provide common benefit

4       work, and how much.  If you look

5       at section 9.2.4 of the settlement

6       agreement, and as it was

7       originally written, it provided

8       that common benefit work was

9       recoverable for attorneys doing

10      work in the MDL, in New Jersey,

11      California and Texas and in the

12      state court proceedings.

13          As you know, we filed an

14      objection to that, and we worked

15      it out, and you said that was

16      never the intent to include other

17      states.  So section 1.2.7 was

18      enacted on July 17th, '08 to

19      include common benefit work done

20      in any other state court.  What we

21      were seeking common benefit work

22      for is work that we did in

23      Illinois state court cases.

24          Before I go into that, I

FAC Resp. Exhibit D -- 959

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1       want to give you kind of an

2       overview of our involvement since

3       we were involved on the inside.

4       We filed a total of claims for

5       2,689 claimants.  In Missouri

6       alone, it was about 1,200, maybe a

7       little bit more, all of them were

8       filed in state court.  We joined

9       two local sales representatives

10      who lived in St. Louis city, and

11      we joined local pharmacies.  All

12      of them, we believe, are

13      nonremovable, but, of course, as

14      you know, Merck removed them, and

15      they never got remanded.  We filed

16      a motion to remand in every case.

17          In Illinois, we filed 172

18      cases, cases involving 172

19      claimants.  Of those, 11 cases

20      were remanded involving 65

21      plaintiffs by Judge Patrick

22      Murphy.  They were remanded to the

23      Circuit Courts of St. Clair County

24      and Madison County, Illinois.

FAC Resp. Exhibit D -- 960

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          Those are the cases that we're
 2      seeking to recover for common
 3      benefit work.
 4              California, we filed 29
 5      cases.
 6              New Jersey, we filed 53
 7      cases.  We were subject to
 8      case-specific discovery.  In some
 9      of those cases, I went out and
10      took doctor depositions, defendant
11      client depositions.  Again, we are
12      not seeking anything for those,
13      those were the case-specific work.
14              And the rest of the cases,
15      the 2,689 were filed directly in
16      the MDL.
17              MR. WEITZ:  How many was
18      that?
19              MR. LOWE:  It was a good
20      number.  I mean, I don't know the
21      exact number.  I can probably get
22      that for you if you guys want it.
23      It was several hundred for sure.
24      You know, cases came up on the
```

FAC Resp. Exhibit D -- 961

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1         one-year statute or two-year

2         statute, and we filed them

3         directly in the MDL.

4               MR. LEVIN:  Did I hear you

5         say that what you are seeking

6         common benefit for are only the 11

7         cases that Judge Murphy remanded

8         to state court?

9               MR. LOWE:  Correct.  11

10        cases involving 65 plaintiffs.

11              MR. LEVIN:  And is that for

12        the remand itself or --

13              MR. LOWE:  Well, the remand

14        itself, plus all the work that we

15        did once it got remanded.

16              MR. BIRCHFIELD:  Jeff, if

17        you would, take us through the

18        timing of that, when you got the

19        remands and the work that was

20        done.

21              MR. LOWE:  A lot of the work

22        we are seeking for is the first

23        case, it's called Donahue versus

24        Merck.  It was filed February 23rd

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 962

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      of 2005.  I don't know the dates

2      of the remand, but it had to be

3      remanded quickly, because,

4      otherwise, it would get

5      transferred to the MDL, and

6      somehow it would always remand a

7      few days before the transfer date.

8      So, they really were remanded over

9      a period of about six months, I

10     would say beginning in April of

11     2005.  I can get the exact dates.

12          The first case we filed was

13     a single case, Donahue versus

14     Merck.  And Walgreen's is an

15     Illinois corporation, and there's

16     some case law in Illinois that we

17     looked at before we filed the

18     cases that said, under certain

19     circumstances, you can sue a

20     pharmacy in Illinois if they

21     prescribe -- if they fill a

22     prescription for a drug knowing

23     that there might be

24     contraindications for that drug

FAC Resp. Exhibit D -- 963

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          without telling the people.  It's

2          a case called Happel.  So, based

3          on the Happel case, we filed the

4          cases in Illinois and started

5          working them up.

6               MR. BLIZZARD:  How many of

7          the 65 cases were actually

8          scheduled for trial?

9               MR. LOWE:  The only case

10          that was scheduled for trial, I

11          think it would be two.  There was

12          a lot of procedural maneuvering

13          that went on -- the Donahue versus

14          Merck case was originally set for

15          trial as a case that we thought

16          was a real trial schedule, October

17          of 2007.  We were working that

18          case up, and in the summer of

19          2007, the VICTOR study was

20          published.  Based on that, I was

21          using Dr. Gary Sander here in New

22          Orleans as an expert, and I

23          developed a local -- you know, we

24          tried.  I mean, I talked to Zipes,

FAC Resp. Exhibit D -- 964

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          I talked to other cardiologists.

 2          We developed a local cardiologist,

 3          Dr. Alan Maniet, who was a

 4          fen-phen expert for us, and so he

 5          was giving us case-specific

 6          testimony, too.  Anyway, they both

 7          had to be redeposed.  I was going

 8          to put the trial off to March of

 9          '08.  There's a Fifth Amendment

10          scheduling order that was entered

11          regarding that.

12              So, I paid $10,000, and Joey

13          paid $10,000, and I hired Dr. Moye

14          to be our expert, so he was going

15          to come and testify live, Sander

16          was going to testify live, Maniet

17          was going to testify live.  We

18          deposed the treating doctors in

19          Illinois.  Actually, they were

20          deposed twice.  In Illinois,

21          there's a discovery deposition and

22          evidence deposition, so, some of

23          them were deposed twice.

24              MR. SEEGER:  These are
```

FAC Resp. Exhibit D -- 965

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          experts that you did designate in

2          the case that was headed toward

3          trial?

4               MR. LOWE:  Yes.  In

5          Illinois, it is called a Rule 213

6          interrogatory.  Mark Robinson was

7          great.  We met with Mark and Ted

8          Wacker.  We were seeing if they

9          wanted to try the case, help us

10         try the case.  They wanted to get

11         Zipes on board, and we had already

12         contacted Zipes.  And then Zipes

13         decided he didn't want to do it,

14         because he testifies in cases

15         where there aren't many risk

16         factors, not when there are a lot

17         of risk factors.  And so based on

18         that, Zipes decided he didn't want

19         to do it, and based on that, Mark

20         decided he didn't want to do it.

21               MR. WEITZ:  Where in

22         Illinois was it filed?

23               MR. LOWE:  Madison County.

24         The client was a great client,

FAC Resp. Exhibit D -- 966

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        older guy, truck driver.  He was a

2        lifelong resident of Madison

3        County.  His son was the recorder

4        of deeds in Madison County, so he

5        was politically connected.  We

6        were in front of the same judge

7        Andy was in front of, Judge Stack,

8        who was a good guy, he's a good

9        judge.

10              In the meantime, and we put

11        this in our affidavit, we were

12        trying to get the MDL trial

13        package, but it wasn't available,

14        and I understand that.  So, I

15        began getting information from --

16        I got a lot of information from

17        Penny Herman, I got a lot of

18        information from Mark Robinson.

19        And so based on that and the

20        Schwaller case, I got the trial

21        transcript, all the trial exhibits

22        were introduced in the record, so

23        I got all of those for the first

24        time, had all the exhibits.  So,

FAC Resp. Exhibit D -- 967

Page 12

1        we were in the process of creating

2        our own trial package because we

3        couldn't get it from the MDL, they

4        didn't have it yet.

5             So, then I deposed Dr.

6        Waymack, I deposed Dr. Marks, and

7        my deposition of Marks was after

8        the VICTOR data, and he has this

9        theory that in the VICTOR study,

10       they say that the data is not

11       completely balanced.  So, he

12       rebalanced it, and then, based on

13       that, said there's no statistical

14       significance.  So, there's one

15       depo out there regarding that

16       which I took.

17            I took their case-specific

18       guys, Dr. Cohen, Dr. Saltzman,

19       which I think Andy experienced at

20       trial.  They had a doctor at Johns

21       Hopkins, Dr. Hastasian, so I took

22       his depo.  After I got all those

23       depos done, including our experts,

24       I sent all of that stuff to the

Page 13

```
 1          MDL, to Penny Herman, I .pdfed all

 2          the exhibits, so all that was

 3          there for everybody else to share.

 4               As far as I'm concerned, as

 5          plaintiffs' attorneys, whether

 6          you're on the PSC or your own

 7          case, we're all in this together

 8          against Merck.  That's what we

 9          were trying to do, was to proceed

10          and hopefully get a verdict

11          against Merck.  Even if I didn't

12          get a verdict, I learned a hell of

13          a lot more about Vioxx, and I had

14          65 more cases to go.

15               MR. SEEGER:  Jeff, how close

16          did you get to trial?

17               MR. LOWE:  The settlement

18          was in November of '07, and our

19          trial was put off in September of

20          '07 to April of '08.

21               MR. BIRCHFIELD:  So, you

22          were within like a month of trial?

23               MR. LOWE:  At one time we

24          were within two months of trial,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          and when the settlement came out,

2          there were deadlines of February

3          28th for fact witnesses and March

4          7 for experts.  But I had done

5          everything except for Vicki Starr.

6               MR. RAFFERTY:  Jeff, you

7          said the Donahue case and then

8          what other one?

9               MR. LOWE:  Well, there's

10         another cased called Auslander --

11              MR. RAFFERTY:  All of that

12         was Donahue?

13              MR. LOWE:  Yeah.  Basically

14         our lead case was Donahue.  We

15         were doing all of this in Donahue.

16         And once we got that created, we

17         could then proceed with the other

18         cases.

19              MR. RAFFERTY:  Was the other

20         case set yet?

21              MR. LOWE:  I know that

22         Auslander had a discovery schedule

23         and we were beginning fact

24         discovery in that.  It was a

FAC Resp. Exhibit D -- 970

Page 15

1     stroke case.  It was in Cook

2     County.  It was originally in

3     Madison County, but it got

4     transferred to Cook.

5          MR. RAFFERTY:  Can you spell

6     that?

7          MR. LUNDY:

8     A-U-S-L-A-N-D-E-R.

9          MR. BLIZZARD:  Was that

10    actually scheduled for a trial

11    date?

12         MR. LOWE:  I don't remember.

13    I remember it had a discovery

14    schedule.  Discovery schedules

15    usually have a trial date.  In

16    Cook County, you are looking out

17    like three years on a trial date.

18         MR. HERMAN:  That's fast.

19         MR. SEEGER:  The stuff that

20    you did, the stuff you worked up,

21    the deps of the experts, you sent

22    that all on to Penny.  Do you

23    remember the time frame?

24         MR. LOWE:  I would say April

FAC Resp. Exhibit D -- 971

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          of '08 is probably when I got it

2          all together for her.

3                MR. SEEGER:  Okay, thanks.

4                MR. WEITZ:  Why did the case

5          get put off in October of '07?

6                MR. LOWE:  That's when

7          VICTOR came out, and we said our

8          experts have new opinions

9          regarding VICTOR.  Sander was

10          redeposed in New Orleans, and

11          Maniet was redeposed in St. Louis

12          in the summer.  And so because of

13          that, we weren't going to be able

14          to meet the October date, because

15          they didn't want to produce their

16          experts until we had our experts

17          finalized.

18                Also, meanwhile, in the

19          other cases, when we started

20          combining cases, we may only have

21          one plaintiff who bought from

22          Walgreen's, and we'd throw nine

23          other plaintiffs in there who were

24          Illinois residents.  And then

FAC Resp. Exhibit D -- 972

Page 17

1        Judge Murphy said, one plaintiff,

2        one defendant, it's not removable.

3        But then when we got down, got to

4        trial court, they filed motions to

5        sever, motions for forum non

6        conveniens.  And so we fought

7        those, we lost those in front of

8        Judge Stack, some of them.

9            We also had a new idea in

10       St. Clair County where what we did

11       or what Judge O'Malley did was

12       severed out the people who were

13       St. Clair County people, and then

14       he transferred all the other ones

15       up to Cook County.  Because Merck

16       had his registered agent in Cook

17       County, and he had just gotten

18       reversed for not transferring his

19       case to Cook County on a class

20       action to Merck.

21           MR. HERMAN:  The Donahue

22       case, was that an MI or a stroke?

23           MR. LOWE:  An MI case.

24           MR. HERMAN:  And the other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          cause, Auslander?

2                  MR. LOWE:  Auslander was a

3          stroke.

4                  MR. BLIZZARD:  Do you know

5          what the expenses were that are

6          specific to the workup of Donahue

7          and Auslander, and have those been

8          submitted?

9                  MR. LOWE:  Yes.  It was like

10         $160,000.

11                 MR. LEVIN:  You submitted

12         160,688.39.  Your expenses and

13         your hours have been rejected by

14         the accountant.  Are you working

15         with them?

16                 MR. LOWE:  We just found out

17         yesterday it was rejected by them,

18         because they sent a letter

19         addressed to Carey & Danis without

20         addressing it to anybody in

21         particular, and so they just

22         called me yesterday, and they just

23         e-mailed me the letter.  So, yes,

24         we will now be working --

FAC Resp. Exhibit D -- 974

Page 19

1              MR. HERMAN:  That's okay.

2         As long as you work with them.

3              MR. LEVIN:  You have 6,285

4         hours, and I take it all of those

5         hours are related to the Donahue

6         case?

7              MR. LOWE:  Donahue case and

8         the other 64.

9              MR. BIRCHFIELD:  Jeff, can

10        you give us a sense of how many of

11        those hours would be your hours or

12        lawyer --

13             MR. LOWE:  My hours are

14        1,600 of those.

15             MR. BIRCHFIELD:  1,600.

16             MR. LOWE:  Yes.

17             MR. LEVIN:  Are there

18        paralegal hours in there?

19             MR. LOWE:  No.

20             MR. SEEGER:  You were going

21        to try the case, too, right?

22             MR. LOWE:  Yes.

23             MR. RAFFERTY:  On the other

24        64 cases, how far did those get?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Were there depos taken?

2              MR. LOWE:  There were depos

3          on probably about three of those

4          cases.  I know there's a depo in a

5          case called Brame, and there was a

6          depo in one other case, but what

7          happened is, after Judge O'Malley

8          transferred the rest of the cases

9          to Cook County, Merck appealed

10         three of the cases, it was Brame,

11         Riddle and Hardaway, and so we

12         went to the Court of Appeals, the

13         Fifth District, and we filed

14         briefs in that, and we ended up

15         winning all of those probably

16         pretty close to the time of the

17         settlement.  So all those cases

18         were then -- the transfer to Cook

19         County was --

20             MR. LEVIN:  Could you break

21         down the difference in the hours

22         between the Donahue case and the

23         other --

24             MR. LOWE:  On my time, if it

FAC Resp. Exhibit D -- 976

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1           was Donahue, I put Donahue.

2                MR. SEEGER:  You broke it

3           down by case?

4                MR. LOWE:  Yeah, I broke it

5           down by case on my time.

6                MR. LEVIN:  Give me a

7           ballpark figure.  With the 6,000

8           hours, how much of those 6,000

9           were just earmarked for Donahue,

10          the case going to trial?

11               MR. LOWE:  I could go

12          through it and recalculate it, but

13          I don't want to ballpark it.  I

14          don't really have any idea.  I

15          know Evan Schaeffer -- again, I

16          think everyone who was doing their

17          time, we were trying to do it

18          consistent with that strategy so

19          you could tell what we were

20          working on, which case.

21               MR. SEEGER:  Other than

22          Robinson, did you work with any

23          other people from the MDL in

24          working up the case or sharing?

FAC Resp. Exhibit D -- 977

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1              MR. LOWE:  No.  I mean, and
 2         I have the e-mails, because is it
 3         common benefit time?  And Mike
 4         Ferrara wrote to me or e-mailed
 5         everyone trying to get more money
 6         for the public relations campaign
 7         in New Jersey, and so I said,
 8         yeah, we forgot about it, we'll
 9         send you our two grand, by the
10         way, we've got this case set in
11         October, I'm trying to get the
12         trial package.  So, he writes me
13         back --
14              MR. HERMAN:  What's the date
15         of that?
16              MR. LOWE:  July of '07.  So,
17         July 26, '07, he writes me, "Hey,
18         Jeff, Thanks for the check.  We'll
19         advise the PR firm of your trial.
20         With regard to your October trial,
21         we want to win at all costs.  We
22         can't afford any more losses."
23         There was a bad streak there.
24         "There are four trials beginning
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          in October here in New Jersey.

2          Dave Buchanan is our liaison

3          counsel, and he has a trial in a

4          box."

5               So I e-mailed Dave, Dave

6          says, "Call me tomorrow."  I

7          called Dave.  And he didn't have

8          the trial in the box, but he

9          talked to me and gave me some

10         hints and some tips.

11              I was in touch with Pete

12         Kaufman at Levin, and he was the

13         head of the trial package team,

14         and so he finally just said send

15         me -- and I talked to him, and he

16         was helpful.

17              Illinois has a rule where

18         you can make a request for them to

19         bring anyone who is a management

20         employee to trial.  And so I was

21         asking them, who should I do?  And

22         so he told me like Charlotte

23         McKines was a good one, because

24         she wasn't as experienced, had

FAC Resp. Exhibit D -- 979

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1        some good depos.  So, I talked to

 2        him for half hour, an hour.  So,

 3        basically, I sent him the hard

 4        drive in August, and then October

 5        comes around, and I don't have the

 6        hard drive, so I finally asked him

 7        again.  He finally gives me the

 8        trial package.  I think I got it

 9        before anybody else.  So then I

10        started reviewing it and looking

11        at it.

12             MR. BLIZZARD:  In the

13        Donahue case, had you gotten to

14        the point where they had filed and

15        you had responded to Daubert

16        motions, motions in limine and

17        that sort of thing?

18             MR. LOWE:  No.  We had

19        gotten to the point where they

20        filed -- they filed a summary

21        judgment based on statute of

22        limitations claiming that anyone

23        would be put on notice within two

24        years -- within two years of --
```

FAC Resp. Exhibit D -- 980

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          before February 23rd of 2005 that

 2          Vioxx could cause heart attacks

 3          based on the VIGOR study and all

 4          the publicity.

 5               MR. LEVIN:  When was that

 6          motion filed?

 7               MR. LOWE:  It was filed -- I

 8          don't have the date of it.

 9               MR. LEVIN:  Was it filed

10          before the settlement here?

11               MR. LOWE:  Oh, yeah.  It was

12          in the summer.  It was filed

13          before it, and Judge Stack

14          overruled that pretty quickly, and

15          they had not filed any Daubert

16          motions.

17               MR. DANIS:  There were

18          negotiations where you would be

19          involved, kind of a period with

20          the CME evidence that was used in

21          Andy's case was going to be kind

22          of the agreement.

23               MR. HERMAN:  When did you

24          get the trial package?
```

FAC Resp. Exhibit D -- 981

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           MR. LOWE:  I can tell you

2       exactly.  It was either

3       September -- October 25, 2007.

4           I met with Ken Soh at one

5       time, too.

6           MR. BLIZZARD:  Had you

7       gotten to the point of a pretrial

8       order where you had to do

9       case-specific depo designations

10      and counters and objections?

11          MR. LOWE:  We had not done

12      that, but that's what I was

13      preparing.  That was my biggest

14      concern, to have a time to go

15      through all the depos and make

16      depo designations, and then we

17      were within a month or so of doing

18      that.  So, we were in the process

19      of gathering up the stuff to do

20      that.

21          MR. HERMAN:  Let me get back

22      to the trial package issue.  When

23      was your case continued?

24          MR. LOWE:  When was it

FAC Resp. Exhibit D -- 982

Page 27

1          continued?  September 5th, 2007.

2                    MR. RAFFERTY:  And it was

3          set for?

4                    MR. LOWE:  End of October of

5          2007.

6                    MR. HERMAN:  So, it was

7          continued in September --

8                    MR. LOWE:  Right.

9                    MR. HERMAN:  -- to April.

10         You got the trial package in

11         October.

12                   Let me ask you, before

13         November of 2007, did you send any

14         of your work product to the

15         depository?

16                   MR. LOWE:  No, I hadn't done

17         that yet.

18                   MR. HERMAN:  And just one

19         other question.

20                   When did you, if you recall,

21         sign an MDL participation

22         agreement?

23                   MR. LOWE:  Early on, right

24         away, because it was supposed to

FAC Resp. Exhibit D -- 983

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1        be the lower amount.  We signed it
 2        quickly.  I would say in '05, late
 3        '05.
 4               MR. WEITZ:  Were you guys
 5        appointed to any of the committees
 6        on the MDL or in state court?
 7               MR. LOWE:  No.  I mean, we
 8        kind of considered we were State
 9        Court of Illinois.  We had almost
10        all the cases.  So we kind of
11        think we ran that mini MDL.  We
12        thought about trying to
13        consolidate it at one time, but
14        then we were afraid of where they
15        would consolidate it.
16               MR. HERMAN:  Wasn't there a
17        case tried in Illinois?
18               MR. LOWE:  Andy's case, the
19        Schwaller case.  We were
20        originally set ahead of them, and
21        then we got ours continued behind
22        his.
23               MR. WEITZ:  Was that tried
24        in Madison County?
```

FAC Resp. Exhibit D -- 984

Page 29

```
 1              MR. LOWE:  Yes.

 2              MR. WEITZ:  Judge Stack

 3         tried that?

 4              MR. LOWE:  Yes.

 5              MR. WEITZ:  Were you given

 6         any of your assignments for the

 7         work that you did from any of the

 8         leadership at the MDL?

 9              MR. LOWE:  No.

10              MR. WEITZ:  So, you were

11         basically working up your case for

12         trial and then sharing that

13         information with the MDL?

14              MR. LOWE:  Yes.  I mean, I

15         say I talked to a lot of different

16         people within the MDL trying to

17         get more information.

18              MR. WEITZ:  But that was in

19         pursuit of working up your case?

20              MR. LOWE:  True.  Our cases,

21         and then the other 65 behind it,

22         and then possibly trying cases in

23         the MDL, or if we have a case in

24         New Jersey, it would be the Boaten
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        case, significant stroke case,

2        Alberta Boaten, that was in the

3        trial pool or the discovery,

4        case-specific discovery pool

5        there.  So, we had already done

6        the plaintiff's treating

7        neurologist, et cetera.  So, we

8        were trying to gather this

9        information so that we could try

10       Vioxx cases.

11              MR. HERMAN:  How many cases

12       have you enrolled in the

13       settlement?

14              MR. LOWE:  We enrolled all

15       of our cases.

16              MR. HERMAN:  I don't mean

17       enrolled.

18              MR. DANIS:  2,300.

19              MR. BIRCHFIELD:  Submitted.

20              MR. LOWE:  We enrolled all

21       2,689, to the best of my

22       knowledge.  And then any case

23       involving a blood clot, a DVT, a

24       pulmonary embolism, we disengaged

FAC Resp. Exhibit D -- 986

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

 1          those clients.  So, any MI or

 2          stroke case we put in, which is, I

 3          think in the 2,100 range, plus

 4          200.

 5               MR. BIRCHFIELD:  What did

 6          you say?

 7               MR. DANIS:  It is 2,300.

 8               MR. LOWE:  Walther Glenn was

 9          part of our group, and they had

10          200 separate cases that they

11          referred to us.  Part of our

12          agreement with him was that he

13          would work and do the plaintiff

14          fact sheets and all of that stuff.

15               MR. BIRCHFIELD:  He

16          submitted those as primary

17          counsel, is that what you are

18          saying?

19               MR. LOWE:  No.  We all

20          submitted it under our umbrella,

21          but he did the work.

22               MR. HERMAN:  Who else was in

23          your group?

24               MR. LOWE:  A guy named Evan

FAC Resp. Exhibit D -- 987

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          Schaeffer of a firm called
 2          Schaeffer & Lamere.  He's a former
 3          partner of Carey & Danis, and then
 4          Carey & Danis, with their
 5          associates and support staff, and
 6          then me.  Basically that was it.
 7          And Evan and I, we did a lot of
 8          the work --
 9               MR. HERMAN:  What's his
10          firm?
11               MR. LOWE:  Schaeffer &
12          Lamere.
13               MR. HERMAN:  Where is it
14          located?
15               MR. LOWE:  Godfrey,
16          Illinois.
17               MR. BIRCHFIELD:  Any other
18          questions?
19               MR. SEEGER:  No.  That was
20          very informative.  Thank you.
21               MR. WEITZ:  Thank you.
22               MR. HERMAN:  Thank you.
23                    -  -  -
24
```

FAC Resp. Exhibit D -- 988

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1                 C E R T I F I C A T E

2

3                 I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                 I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:  LUNDY & DAVIS, LLP
       Matthew E. Lundy, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 990

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -
 2            MR. HERMAN:  We're going to
 3       have a transcript, and if matters
 4       can't be resolved at the end of
 5       the day, the judge is going to use
 6       some sort of procedure akin to
 7       Murphy Oil.
 8            MR. LUNDY:  Okay.
 9            We got involved in Vioxx and
10       wanted to be involved in the MDL,
11       I even applied for a position on
12       the PSC, so, we were dedicated
13       from the beginning to get involved
14       in this work and the work with the
15       PSC in the MDL, and we did.  We
16       did what the PSC wanted us to do.
17       We volunteered our services early
18       on, and whatever projects we were
19       asked to do, we worked on it and
20       gave it 100 percent effort.
21            I worked on the discovery
22       committee and specifically on the
23       sales and marketing.
24            We reviewed documents in the
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 991

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1          repository, but we also reviewed

 2          sales and marketing documents to

 3          prepare for depositions that I was

 4          involved in in Texas.  One was Han

 5          Nguyen-Vo Mariacher,

 6          M-A-R-I-A-C-H-E-R, and Dr. Isaacs

 7          was a Merck consultant and

 8          mouthpiece for Merck and did a lot

 9          of presentations for doctors

10          around Texas, and I was in her

11          deposition.  So, I went through

12          documents and got prepared for

13          those.

14              I worked with Ted Wacker and

15          with Pete Kaufman on the case

16          chronology and the exhibit

17          authorization and exhibit

18          admissions in, I think it was Mark

19          Robinson's trial.  So, worked on

20          those.

21              Andy asked us early on to

22          help him in the trials that he

23          had.  We did depo cuts.  We did

24          motions in limine.  We worked on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

 1          jury questonnaires for Andy.  I

 2          think we did that both in Irvin I

 3          and II.

 4               We sent lawyers to Chris

 5          Seeger's office to review

 6          documents early on, had people up

 7          in New York doing that.

 8               I was also appointed to the

 9          state liaison committee where we

10          tried to keep lawyers around the

11          country, state lawyers, informed

12          of what was going on.  A lot of

13          that time I didn't even keep,

14          because it was just phone calls,

15          cell phone calls, and we did that.

16               As a part of that committee,

17          I worked on the rapid remand

18          project and case selection

19          project.  Those occurred at a

20          time, I think, when things were

21          moving more quickly in New Jersey

22          than they were in the MDL, and we

23          were strategizing and thinking of

24          ways to move the MDL further to

FAC Resp. Exhibit D -- 993

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          put pressure on Merck.  I talked

2          with Lenny, and Lenny called me

3          and asked us to help with this,

4          and I did.  He contacted lawyers

5          around the country to see who had

6          cases that could be remanded and

7          ready for trial, and we were

8          looking at cases and talking with

9          lawyers around the country to help

10         move the MDL along, and I think

11         that was successful.

12              Those are the highlights of

13         the work that our firm was

14         involved in, and as I said, we

15         were willing to do the substantive

16         work and the hard work necessary

17         to help the MDL to make it

18         successful.  You won't see a lot

19         of receipt and review of

20         documents, none of that.

21              MR. HERMAN:  Dawn has

22         already told us about your group

23         work together.  As we understand

24         it, you all together in your group

FAC Resp. Exhibit D -- 994

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          had 500 to 600 cases for the

2          settlement?

3               MR. LUNDY:  That's probably

4          right.

5               MR. HERMAN:  Is that about

6          right?

7               MR. LUNDY:  Yes.

8               We're sharing the cases, but

9          there's no sharing in the --

10              MR. LEVIN:  MDL.

11              MR. LUNDY:  -- MDL.  That's

12         separate and apart.

13              MR. HERMAN:  When you say

14         you don't share in the MDL, you

15         mean in the common benefit?

16              MR. LUNDY:  The common

17         benefit.

18              MR. BIRCHFIELD:  What were

19         your total hours and expenses?

20              MR. LUNDY:  I think it's

21         about 18,000 in expenses, Andy.

22              MR. LEVIN:  You have got

23         about $900 in expenses that have

24         been rejected, so you may want to

FAC Resp. Exhibit D -- 995

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1          call the accountants to see what's

 2          doing with that.

 3              MR. LUNDY:  How do I find

 4          out what was --

 5              MR. HERMAN:  Touch base with

 6          Lenny.

 7              MR. LEVIN:  As far as the

 8          accounting form, you have no hours

 9          rejected, no hours under

10          submission.  You have 277 hours in

11          the whole case.

12              MR. RAFFERTY:  177?

13              MR. LEVIN:  277.

14              MR. LUNDY:  That's not what

15          I have.

16              MR. BIRCHFIELD:  That's why

17          I asked.

18              MR. LUNDY:  I've got about

19          608.

20              MR. LEVIN:  You not only

21          have 400 hours that are

22          unaccounted for, the accountant

23          doesn't know about them, because

24          they are neither under submission

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        nor rejected.

2                MR. BLIZZARD:  Are these

3        personal hours of Matt's or are

4        you talking about his firm's?

5                MR. LEVIN:  No.  I'm talking

6        about the firm.

7                MR. LUNDY:  Because we

8        submitted them all to both,

9        whatever that thing is, and to

10       Russ' office.

11               MR. RAFFERTY:  Who else in

12       your firm was doing work on it?

13               MR. HERMAN:  Matt, let me

14       just give you the procedure.  What

15       happens is, people submit their

16       hours and we send them directly to

17       the CPA, Wegmann-Dazet.  Phil

18       Garrett is the head of that team,

19       and he's court appointed.  What

20       happens is, when there's some

21       discrepancy in hours or costs,

22       lawyers call there, they work out

23       whatever the snafu is, so, you're

24       going to want to --

FAC Resp. Exhibit D -- 997

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1            MR. LUNDY:  I had been

2       e-mailing with whatever the guy's

3       name is.

4            MR. LEVIN:  Phil Garrett?

5            MR. LUNDY:  One of the guys

6       in their office.

7            MR. BIRCHFIELD:  Cliff

8       Newlin.

9            MR. LUNDY:  Cliff Newlin,

10      that's it.  And I sent you and he

11      the same thing a couple of times.

12           MR. HERMAN:  Give him a

13      call, and let's see if we can get

14      this updated.  Otherwise, you are

15      understated.

16           MR. BIRCHFIELD:  So, you

17      have got about 680?

18           MR. LUNDY:  680 I think is

19      what I've got.

20           MR. BIRCHFIELD:  Is that

21      your time, Matt, or lawyer time or

22      paralegal time?

23           MR. LUNDY:  I think it is

24      all lawyer time, between Lisa

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          Stewart, myself and three other

 2          lawyers, a guy named Charles

 3          Beckham, guy named Billy Quinn.

 4               MR. LEVIN:  The problem may

 5          be there's no Billy Quinn, and

 6          there's no Charles here.  We have

 7          you, Lisa, and Karen as a

 8          paralegal.  She has one half hour.

 9               MR. LUNDY:  I'll look into

10          that.  Thank you.

11               MR. SEEGER:  Thank you.

12               MR. HERMAN: Thank you.

13                    -  -  -

14

15

16

17

18

19

20

21

22

23

24
```

FAC Resp. Exhibit D -- 999

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 1000

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:  MATTHEWS & ASSOCIATES
       David P. Matthews, Esquire
       Julie L. Rhoades, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1001

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                - - -

2              MR. BIRCHFIELD:  We've got

3         Linda here.  She's taking

4         everything down.  Judge Fallon

5         wants everybody to be aware of his

6         order in Murphy Oil, take a look

7         at those criteria.  I'm sure you

8         are already familiar with that.

9              MR. MATTHEWS:  Yes.

10              MR. BIRCHFIELD:

11         Transparency is a big issue.  We

12         have a transcript, and it will be

13         available for him to review and

14         use in whatever way he sees fit.

15         So, with that, the floor is yours.

16              MR. MATTHEWS:  Well, I think

17         I know everybody in the room here,

18         but my name is David Matthews, and

19         I'm here with Julie Rhoades to

20         talk briefly about our position on

21         common benefit expenses and fees.

22              We have included quite a bit

23         of information in writing, so, I

24         would like to incorporate that.  I

FAC Resp. Exhibit D -- 1002

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1      don't want to repeat myself.  You

 2      guys have been here for a long

 3      time.

 4           I'll start just by saying

 5      that we were involved in Vioxx in

 6      the early, middle and late, and we

 7      were committed participants in the

 8      litigation early on.  I think that

 9      we had cases we were filing

10      several months prior to the drug

11      being withdrawn from the market.

12      I don't think we were in as early

13      as you and Chris and Mark, but we

14      were in earlier than most, I'll

15      say that.

16           I did participate and

17      actually talked at the Advisory

18      Committee hearing back in February

19      of '05 after the drug was

20      withdrawn --

21           MR. BIRCHFIELD:  The FDA

22      Advisory Committee?

23           MR. MATTHEWS:  The FDA

24      Advisory Committee, and it was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          discussing three drugs, three

 2          COX-2s and what they were going to

 3          do with them.  I had argued at

 4          that time that all three drugs

 5          need to be off the market, and

 6          there should be criminal penalties

 7          leveled against CEOs and suggested

 8          some type of criminal penalty with

 9          all the CEOs in the room, which

10          was met with a pretty stern lip

11          from the folks.  But Dr. Jeb Wait

12          and I were the only two plaintiffs

13          lawyers at the Advisory Committee

14          hearing.  So, I think that is some

15          evidence and example of our

16          commitment early on in the

17          litigation.

18               MR. BIRCHFIELD:  Jeb is your

19          partner?

20               MR. MATTHEWS:  Dr. Jeb Wait

21          has been with our firm as a

22          consultant.  He's still a

23          consultant at the firm.  He was

24          involved early, in the middle and
```

FAC Resp. Exhibit D -- 1004

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          late, as well.

2                  So, that started, and our

3          involvement was the filing of

4          suits prior to the withdrawal,

5          continued filing.  We filed a

6          great number of suits, and I think

7          without looking at these

8          documents, approximately 430 cases

9          in Texas.  We filed another

10         several hundred in New Jersey, I

11         think, with Chris' firm, and then

12         several hundred in New Orleans in

13         the MDL.

14                 So, we had a three-prong

15         attack.  It's my belief -- I've

16         been handling drug litigation for

17         about ten years now, and my

18         approach has always been multi-

19         litigation approaches, that is,

20         both State and Federal.  From

21         Vioxx -- I'm sorry, from Rezulin

22         days, Andy, when you and I were

23         working together where I had cases

24         in six or seven different states,

FAC Resp. Exhibit D -- 1005

Page 6

1          state court litigation, it has

2          always been my belief to have a

3          multi-prong attack, and that's

4          what we were doing and planning on

5          doing in Vioxx, and that's what we

6          did.

7              MR. WEITZ:  Dave, how many

8          total cases did you have?

9              MR. MATTHEWS:  We looked at

10         over 6,000 or 7,000 cases, and we

11         had whittled it down to 1900.  So,

12         we were at about 1930, give or

13         take.

14             MR. WEITZ:  Did you submit

15         that for settlement, 1930?

16             MR. MATTHEWS:  1930 minus.

17         We're still in the process of

18         about, I want to say 200.  So, we

19         submitted approximately 1700.  And

20         like I say, when I say "in the

21         process," the last 200, they were

22         registered, of course, but we're

23         still working on medical records

24         and followup material.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1           MS. ROSE:  I think our final

2      number will be about 1,823.

3           MR. MATTHEWS:  So,

4      continuing on with the litigation

5      in Texas, without overspeaking, I

6      think I was probably instrumental

7      in the formation of the Texas MDL

8      based on statutes in Texas that

9      allow for an MDL because the

10     defendants wanted it.  We dealt,

11     and I was kind of the point person

12     with that.  I worked with Ed and

13     Tommy Fibich, Mike Gallagher, and

14     we spearheaded the Texas MDL.

15     Again, without overspeaking, I

16     would say that I probably did the

17     lion's share of the work in the

18     Texas MDL.

19          MR. SEEGER:  What are some

20     of the things, Dave, as we have

21     some people here that might not be

22     familiar, that you worked on as

23     point person in the Texas MDL?

24          MR. MATTHEWS:  Well, I

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          started by offering my office as

 2          the Texas depository.  That's

 3          really where it started.  Chris,

 4          you and your outfit in New Jersey

 5          had your own depository, but we

 6          had geographically a need in the

 7          center of the country to have a

 8          depository.  So, I offered and

 9          paid for and continued to update

10          and maintain the Texas depository,

11          which I believe was thoroughly

12          complete.  Depositions, both

13          coasts, as well as the MDL, all

14          state and Texas depositions, both

15          specific and general deposition,

16          expert and fact deposition,

17          continuing to update on the

18          production of documents of which

19          we paid for.  A lot of this,

20          hopefully all of it was submitted.

21          But that was an expensive venture.

22          So, that was, I think, our initial

23          involvement.

24              Secondly, we worked with the
```

FAC Resp. Exhibit D -- 1008

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          defendants and tried to determine

2          which judge was going to be the

3          head of the MDL in Texas.

4                    MR. HERMAN:  Let me stop

5          you, David, for a minute.  I want

6          to try to understand better, and I

7          don't, how the various -- Texas

8          has got some of the best lawyers

9          in the country.  I'm not just

10         saying that.  I know that.  I

11         don't understand how the various

12         groups of lawyers work together.

13         I want to give you an example so

14         that you can see where I'm coming

15         from.

16                   We have a Texas Vioxx

17         litigation group, five firms,

18         Walter Umphrey, John Eddie's firm

19         and so on.  They had their own, as

20         I understand it, their own

21         building, their own case

22         depository for their own clients

23         and their own document

24         accumulation.  I won't call it a

FAC Resp. Exhibit D -- 1009

Page 10

1      depository, but accumulation.  How

2      did you all articulate with each

3      other?  Mark had his.  Ed was

4      involved with you and Tommy.  We

5      just heard from Kathy Snapka, who

6      was running her own accumulation

7      of experts and documents.  What

8      happened in the Texas MDL in terms

9      of the articulation of the Texas

10     groups with each other and then

11     with New Jersey and Andy, Tom in

12     California?

13            MR. MATTHEWS:  Well, we

14     worked with Merck in trying to

15     determine a fair judge, and we

16     arrived at Randy Wilson by process

17     of exclusion.  So, he was the MDL

18     judge pursuant to Texas state

19     statute.

20            At that point, we formed a

21     PSC, which included anybody that

22     really had a great deal of

23     involvement in the litigation.

24     Mark Lanier had kind of separated

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          and was really litigating on the

 2          East Coast, really not much in

 3          Texas.  So, this was folks that

 4          had the majority of cases in

 5          Texas.  Mr. Lanier had a good

 6          number of cases in Texas, but was

 7          really more concentrating, in my

 8          opinion, in the East.

 9               MR. LANIER:  I would send

10          Ken Soh to this stuff generally

11          more than myself.

12               MR. MATTHEWS:  Ken Soh from

13          Mark's firm was there always, so

14          we coordinated with him.  In terms

15          of the consortium with Watts, and

16          Umphrey and John Eddie and Grant

17          Kaiser and one other --

18               MR. BIRCHFIELD:  Drew, Drew

19          Ranier.

20               MR. MATTHEWS:  -- I would

21          regularly work with those guys in

22          terms of what we needed, and we

23          would share information.  It was

24          my opinion we had to have a Texas
```

FAC Resp. Exhibit D -- 1011

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          depository, which was used by

2          many, many lawyers, not just

3          Texas.

4                MR. HERMAN:  But everybody

5          fed information into your

6          depository?

7                MR. MATTHEWS:  Yes.  I paid

8          for depositions with Linda

9          Golkow's company and others so we

10         could have direct access.

11               MR. BLIZZARD:  Russ, just to

12         supplement and clarify, I don't

13         think that the consortium had

14         their own document depository.  I

15         think at their Vioxx Center, their

16         individual case files were worked

17         up.  The depository was at David's

18         office.

19               MR. MATTHEWS:  I think

20         that's right, but I can't speak to

21         exactly what was in there.

22               MR. HERMAN:  I'm glad you

23         clarified that, because I thought

24         what I heard when I took notes

FAC Resp. Exhibit D -- 1012

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
1          earlier was that they had gathered

2          expert material and depositions

3          and transcripts from other cases

4          and were maintaining their own --

5               MR. BLIZZARD:  Russ, I think

6          they may well have gathered

7          transcripts --

8               MR. HERMAN:  I'm not arguing

9          the point, I'm --

10              MR. WEITZ:  Let's ask Dave.

11         Dave, what firms were substantial

12         contributors to your document

13         depository and the work that was

14         done in the Texas MDL?

15              MR. MATTHEWS:  Well, in

16         terms of creating, maintaining the

17         depository, that fell in my lap,

18         probably 95 percent of that.

19         There were some contributors, and

20         I can't tell you off the top of my

21         head exactly what they

22         contributed.  It was an expensive

23         venture, and I, again, included

24         all of these receipts and whatnot
```

FAC Resp. Exhibit D -- 1013

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          in our submission.  The document

2          depository was used by many, many

3          firms.  We had people inside of

4          Texas and outside of Texas using

5          the depository.  So, we would

6          have, for instance, Ed, Scott

7          Nabers would come and they would

8          come and spend time looking

9          through documents.  I had an IT

10         guy that was full time working on

11         this thing.  It was a big deal,

12         and as everybody at this table

13         knows, to put together something

14         of 20 million documents,

15         searchable format, and then

16         include all depositions taken to

17         date from all jurisdictions, both

18         State and Federal, and then

19         continue updating with new

20         discovery that's coming in, while

21         my office continually did

22         discovery, written discovery, as

23         well as our own depositions.  So,

24         it was a very, very big project.

FAC Resp. Exhibit D -- 1014

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1              MR. WEITZ:  That you had

2         taken upon yourself?

3              MR. MATTHEWS:  Yes.  I

4         offered to do it.  Somebody had to

5         do it, and I said I would do it.

6              MR. WEITZ:  Were you

7         organizing information in the

8         depository for other lawyers in

9         Texas?

10             MR. MATTHEWS:  Yes.

11        Everybody could use it inside of

12        Texas and outside of Texas.  We

13        had people coming from New Mexico,

14        and there was nothing really, to

15        my knowledge, in Louisiana as far

16        as a depository goes.  So, if

17        people from Louisiana wanted it,

18        all they had to do was sign the

19        confidentiality order.  That's all

20        they did.

21             MR. WEITZ:  Was it being

22        used by a lot of lawyers

23        throughout Texas?

24             MR. MATTHEWS:  Throughout

FAC Resp. Exhibit D -- 1015

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1          Texas, yes.  Yes.  I don't have a

 2          log with me, but I would say many,

 3          many firms use that depository.  I

 4          offered my staff if they needed to

 5          figure out how to search it, use

 6          it, find a document.  We all know

 7          that the case was really about 50

 8          or maybe 100 documents.  How do we

 9          get that one document?  We would

10          always offer our help.

11               MR. BIRCHFIELD:  Dave, will

12          you talk to us for a few minutes

13          about the cases that you worked up

14          for trial and how you were moving

15          the Texas docket in the MDL.  Let

16          me say, and you also may want to

17          touch on this, but the first MDL

18          trial was moved to Houston after

19          Katrina, and you helped us try

20          that case, and we used your

21          office.

22               MR. MATTHEWS:  I forgot to

23          submit those hours, by the way,

24          which was silly, but I did prepare
```

FAC Resp. Exhibit D -- 1016

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          probably 40 hours before the trial

2          just on that trial.  Then I would

3          say we worked probably 60 hours a

4          week for two weeks or at least I

5          did.  I can't speak for anybody

6          else.

7               MR. SEEGER:  Did anybody

8          else from your office -- I know

9          you were there, I saw you.  But

10         anybody else from your office?

11              MR. MATTHEWS:  Well, I had a

12         lawyer there, but really we did

13         not really submit any other time

14         for any other lawyer.  It was more

15         of an education time for that

16         lawyer.  I was the one that did

17         the work.  I didn't submit

18         anything from the other lawyer.

19              We also did a couple of my

20         trials with you, Andy, as you

21         know, and I think we even split

22         the cost at one point of an expert

23         or two and possibly Robert

24         Hirschhorn, who was the trial

FAC Resp. Exhibit D -- 1017

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
1        strategist.  We split the cost of
2        Hirschhorn.
3            We did offer Andy to use my
4        office for the first trial in the
5        MDL.  Not that that was a big
6        expense, but I offered it to
7        anyone that needed it.  You
8        clearly had a big staff there, and
9        I'm not saying we didn't want you
10       there, but we did offer that.
11           We also had a great deal of
12       involvement I think in the first
13       stroke case, and I think this is
14       very significant in my opinion.
15       We worked up from beginning to end
16       an entire stroke case with
17       epidemiology from Moye and
18       Plunkett, with a neurologist from
19       New York who I have used before by
20       the name is Steve Levine, who I
21       think is an excellent witness.  I
22       did work with Tom Kline's office a
23       bit, and we met there a couple of
24       times, because you were also going
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          to use them in the MDL is my
 2          understanding, but we had a case
 3          ready for trial.
 4               MR. LEVIN:  Did you get a
 5          report from Steve Levine?
 6               MR. MATTHEWS:  Yes, we did.
 7          I can't remember if we deposed him
 8          now.  Jason Webster in my office
 9          was working with Dr. Levine on and
10          off for many, many months.  We had
11          been to New York twice to work
12          with him.  We had been to Philly
13          to Tom Kline's office to work with
14          him.  He was ready to go to trial.
15          We were two weeks short of trial.
16          Actually, I had put this
17          information here, but just an
18          example of how much work was done
19          in that particular case, I had
20          stated in here the experts, and
21          there were a lot of them.  Dr.
22          Moye, Dr. Ushchmann, Dr.
23          Glandville, Dr. Guevarra, Dr.
24          Joshi, Dr. Keith, Dr. Rock, Dr.
```

FAC Resp. Exhibit D -- 1019

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        Stephen Levine, and then a host of

2        other case specific depositions

3        that were taken in that case.  We

4        were ready to try the case.

5            MR. HERMAN:  What's the name

6        of that case?

7            MR. MATTHEWS:  Elvis

8        Anderson, Elvis Presley Anderson.

9        He's a Native American, and we

10       were in the Choctaw Nation Tribal

11       Court.  We were going to try a

12       case in Tribal Court, and Merck

13       was, in my opinion, scared

14       greatly.

15           MR. HERMAN:  What was your

16       trial date, Dave?

17           MR. MATTHEWS:  The trial

18       date was August 7, 2006.  I had

19       spent a lot of money and a great

20       deal of time on that case.  I was

21       pretty excited.  We were going to

22       try it with six Native American

23       jurors.  Elvis was a car dealer at

24       the Choctaw Nation casino and was

FAC Resp. Exhibit D -- 1020

Page 21

1      well known in the community and a

2      good plaintiff in my opinion, and

3      we were going to rock the boat.

4      Suddenly, two weeks prior to

5      trial, there was a motion to

6      abstain from finding jurisdiction

7      in the case, and the Tribal Court

8      abstained from jurisdiction,

9      completely pulled the rug from

10     underneath us.  I still to this

11     day don't know exactly what

12     happened, but it happened.  I'll

13     leave it at that.

14          So, that was another case we

15     worked up.  The first case that

16     was going to be tried in Texas was

17     James Miller, Jay Miller or James

18     Miller.  Julie knows the case well

19     because, again, we worked this

20     thing up from beginning to end.

21     This thing was set, the first case

22     in Texas, and we used and deposed

23     Dr. Tom Mayor, Dr. Eric Price, Dr.

24     Thomas Baldwin, the cardiologist

FAC Resp. Exhibit D -- 1021

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          from KC that you got us, Andy, Dr.
 2          Plunkett, Dr. Moye, Dr. Frias and
 3          Dr. Rosin, ready to try that case.
 4          They filed a summary judgment
 5          motion on a bankruptcy proceeding
 6          because Miller had filed the
 7          bankruptcy two years prior to our
 8          filing suit, and the bankruptcy
 9          was dismissed prior to filing
10          suit, but he had been injured in
11          the interim.  They said that he
12          did not list it in his -- this was
13          just two weeks again prior to
14          trial.  They said he didn't list
15          it.  Julie had argued a summary
16          judgment motion, and our judge,
17          Randy Wilson, found for the
18          defendants with that case.  We
19          appealed to the 14th Court of
20          Appeals, and it was on appeal at
21          the time the settlement was
22          announced.  Unbelievable to me.
23              MR. HERMAN:  When was the
24          Miller case set for trial?
```

FAC Resp. Exhibit D -- 1022

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1            MR. MATTHEWS:  Elvis
 2       Anderson was August 7, 2006.  This
 3       would have been prior to that.
 4       This would have been in early
 5       2006.  I don't have a specific
 6       date right in front of me here.
 7       Is there a process that you would
 8       like somebody to follow up on
 9       that?
10            MR. HERMAN:  No.  I was just
11       trying to place it.
12            MR. MATTHEWS:  Early '06.
13            At that point, we moved on
14       to the next couple of cases, and
15       we fully worked up Eura Fowler,
16       Herlinda Melindez, Sharon Rigby,
17       Nancy Springfield and Ruby
18       Ledbetter, which was a Fibich case
19       that Fibich had asked that I get
20       involved in and try it either by
21       myself or with him.  We were kind
22       of in that mode.  During the last
23       case I just talked about, Ruby
24       Ledbetter, is when Wilson came
```

FAC Resp. Exhibit D -- 1023

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1         down with the preemption finding,

2         which put everything in

3         standstill.

4              MR. BIRCHFIELD:  You named

5         several plaintiffs there together.

6         Were those going to be tried

7         together?

8              MR. MATTHEWS:  They were all

9         going to be tried individually.

10        The Court wanted us to submit

11        cases so we had several cases

12        ready to try.  I kind of was the

13        point person for that.  We would

14        submit ten cases, and, again, this

15        is what Dr. Wait spent a great

16        deal of time with.  It is a

17        hundreds of hours project, in my

18        opinion, that is, going through

19        your cases, as we all know, and

20        finding cases that you think

21        should be tried or can be tried.

22        A great deal of time was spent on

23        that.

24              This is the short story to

FAC Resp. Exhibit D -- 1024

Page 25

1          that long story.  After whittling

2          it down to these cases, we worked

3          all of these cases up.  Again, I

4          put this in the written materials.

5          All the experts were taken, all

6          the fact witnesses, all the family

7          members, all the treaters, all the

8          detailers, all the prescribers,

9          you know, the whole --

10               MR. SEEGER:  Can I ask you a

11          question, Dave?  I don't mean this

12          to be a provocative question, but

13          I have to ask it, and you are the

14          best guy to address it.  There

15          have been certain statements made

16          that cases were put up for trial,

17          were worked up and then were being

18          dismissed.  Some of this was

19          aggravating the judge, that people

20          either appeared to be trial ready

21          or they were getting cases set.

22               MR. MATTHEWS:  I appreciate

23          the question.

24               MR. SEEGER:  You are the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1          best guy to address this.
 2                MR. MATTHEWS:  I think it's
 3          me.  If you want to ask the
 4          person, I think it's me.
 5                There was one case in
 6          particular that was Sharon Rigby,
 7          that was dismissed, the only case
 8          that was dismissed prior to trial.
 9          Sharon Rigby, I really don't think
10          I should talk about it because it
11          truly is attorney-client
12          information, and I'm not going to
13          talk about it, but Sharon Rigby
14          was dismissed for a variety of
15          reasons that needed to be
16          dismissed.  Other than that,
17          that's just simply not the case.
18                MR. SEEGER:  By anybody
19          else, Dave?  Was anybody else --
20                MR. MATTHEWS:  Not to my
21          recollection.  I think all the
22          cases that were up for trial were
23          mine, both stroke and heart
24          attack, I think.
```

FAC Resp. Exhibit D -- 1026

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          MR. SEEGER:  Do you know how

2      many that would have been?  I

3      think you told us, but how many

4      cases were in the queue?

5          MR. MATTHEWS:  I would say

6      we had about eight or nine cases.

7      I'm sorry.  Eight cases, and then

8      Elvis Anderson was in Tribal Court

9      in the city.

10          MR. HERMAN:  Was your stroke

11      expert and specific causation

12      reports and depositions shared

13      with the New Jersey depository or

14      the MDL depository?

15          MR. MATTHEWS:  I don't know

16      the answer to that, but I know

17      that Tom Kline --

18          MR. LEVIN:  Well, Steve

19      Levine was an expert for the MDL.

20      My question to you was, did you

21      get a report?  Because we never

22      got a report from him in the MDL,

23      and he went by the wayside for

24      whatever reason, and Feldman is

FAC Resp. Exhibit D -- 1027

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          our stroke expert.

2               MR. MATTHEWS:  Steve

3          Levine -- I have worked with Steve

4          Levine --

5               MR. LEVIN:  He's Selikoff's

6          guy.

7               MR. MATTHEWS:  I worked with

8          Steve Levine several years prior

9          to Vioxx.  That's how I knew Steve

10          Levine.  We worked on the PPA.  I

11          was real familiar with his work.

12          We had literally gotten, like I

13          said, two weeks, maybe two and

14          half weeks prior to trial, so I

15          have to believe a report was

16          furnished to the defendants, but

17          they didn't take his deposition,

18          to my memory right now.

19               MR. HERMAN:  The reason I

20          ask the question is, we were being

21          pushed for stroke cases not only

22          to try, but at the same time, we

23          were putting together a stroke

24          trial package.  There's a dearth

FAC Resp. Exhibit D -- 1028

Page 29

1       of material that's provided to the

2       MDL depository on stroke, and if,

3       when you get back, you have a

4       chance to look at it, if you can

5       provide a list of what stroke

6       materials were provided to either

7       the New Jersey depository or the

8       MDL, it would be helpful.

9           MR. MATTHEWS:  I'll say

10      this.  I know, because I presented

11      both Plunkett and Moye, Plunkett,

12      a pharmacologist, and Moye, an

13      epidemiologist, for deposition in

14      the stroke case, Elvis Anderson.

15      So, there has been expert

16      testimony about epidemiology and

17      pharmacology.  I'll find that out

18      for you.

19          MR. BLIZZARD:  Dave, why

20      don't you explain Judge Wilson's

21      approach to the stroke cases, as

22      well as your development of the

23      Elvis Anderson case, because I

24      think some people may not

Page 30

1          understand that Wilson focused on

2          stroke because heart attack cases

3          had already been tried.  Why don't

4          you explain that.

5              MR. MATTHEWS:  Judge Wilson

6          believed we needed to get a stroke

7          case to trial, and he, being an

8          innovative judge, wanted to try

9          the first stroke case.  We, I

10         guess, were kind of elected,

11         again, by exclusion, to be the

12         firm that was going to go through

13         the cases.  So, I had contacted

14         all plaintiffs lawyers in Texas or

15         elsewhere, but had cases in Texas

16         that had strokes.  We were trying

17         to get through those cases because

18         Judge Wilson was really pushing us

19         to get these cases to get to

20         trial.  Not only did we get Dr.

21         Wait and his group to kind of

22         whittle away down to cases we

23         could try and my cases in Texas,

24         but we did the same thing with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          stroke.  This is an ongoing

2          battle, I'll say, with Merck as to

3          what case or what cases would be

4          tried.  So, that was another thing

5          that was going on at the time.

6                    MR. LANIER:  Did we put

7          those stroke cases up?  Did we put

8          up two?

9                    MR. MATTHEWS:  I think so.

10         Let me just say, there was not a

11         great deal of discovery done.

12         Other than Elvis Anderson in the

13         Texas MDL, there wasn't a great

14         deal of discovery done.  The

15         plaintiffs were always trying to

16         push it to the side, let's get a

17         heart attack case, because we all

18         know in this room that stroke

19         cases were harder.  We had less

20         clinical trial data.

21                    Let's see.  I can go on and

22         answer questions.  I had filed

23         some time ago to be part of the

24         Plaintiffs' Steering Committee,

FAC Resp. Exhibit D -- 1031

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          and, frankly, I have not always
 2          been involved in MDLs.  I maybe
 3          avoided them, and I guess I'm
 4          doing that less so now, but I did
 5          for several years.  But I did file
 6          a motion to be in the Federal MDL,
 7          and I have included that in the
 8          materials.
 9               Looking at the Court's
10          order, pretrial 6(D), just to
11          quickly go through what the Court
12          had asked, and that's the extent
13          each common benefit firm made a
14          substantial contribution to the
15          outcome of the litigation, I do
16          believe our biggest contribution
17          was the stroke arena, because I
18          think we pushed it because we
19          happened to have one in what I
20          think was a desirable venue and
21          jurisdiction to try it.  We were
22          also getting pushed in Texas.  So,
23          I think that was probably one of
24          our bigger contributions.
```

FAC Resp. Exhibit D -- 1032

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1              I'll say that when Texas
 2         didn't go as we had hoped with the
 3         preemption ruling, I was ready to
 4         try the Ledbetter case.  We were
 5         going to try it.  It went south on
 6         us.  That didn't slow us down.  We
 7         continued to push litigation.
 8              We again continued to work
 9         with Chris' firm, Seeger Weiss in
10         New York and New Jersey, to push
11         those cases.  We were presenting
12         plaintiffs for deposition, taking
13         prescribers and working with
14         Chris' group to push that
15         litigation because Texas had
16         slowed down.
17              We also filed for the appeal
18         of Texas, and we worked prior to
19         that on all of the briefing.  I
20         hired an appellate lawyer and
21         spent $75,000, it is a typical
22         defense firm in Houston, and Ed is
23         familiar with them, with David
24         Gunn with Beck, Redden & Secrest,
```

FAC Resp. Exhibit D -- 1033

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          which is a very well known defense

2          group who I felt would help us on

3          the appellate and briefing points.

4          So, we spent 75, $85,000 in that

5          arena.

6               We continued to fight

7          through the preemption arguments.

8          I made all the arguments, which I

9          probably should not take credit

10         for.

11              MR. SEEGER:  Just as it's

12         coming down.

13              MR. MATTHEWS:  Let me back

14         up.  I only did about half of

15         them.

16              MR. BIRCHFIELD:  Did you

17         have cases in the trial pools that

18         were coming up?  What was the

19         status of the New Jersey cases?

20              MR. MATTHEWS:  Right at the

21         time the settlement was announced,

22         to my memory, we had several cases

23         in the trial pool.  Where they

24         were in the queue, I can't tell

FAC Resp. Exhibit D -- 1034

Page 35

1          you.

2                MR. SEEGER:  I can tell you

3          sitting here right now, I can't

4          either.  I will tell you that

5          there was a big push to get 250

6          cases worked up so that Judge

7          Higbee would have a trial pool to

8          constantly dip into.  I do know

9          Dave had cases in that pool.  I

10         don't know where they were though.

11               MR. HERMAN:  At that time,

12         there was a large pool of cases in

13         New Jersey, and I know Tom Girardi

14         was pushing a large pool in

15         California at the same time.

16               MR. LANIER:  Thank you.

17               MR. HERMAN:  I want to thank

18         you because you have very

19         concisely cleared up some

20         misinformation that I know I

21         received thirdhand, and I think it

22         was important for me personally to

23         hear.

24               I also need to say that a

FAC Resp. Exhibit D -- 1035

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

```
 1          lot of strange things happened in

 2          this litigation.  If your tribal

 3          case had gone to trial -- we

 4          always deal with ifs, but there

 5          are a lot of mysterious things

 6          that Merck had happen in this

 7          case, and it is real tough for a

 8          front line trial lawyer to go

 9          ahead and prepare a case, have it

10          set up, know where it is going to

11          trial, and all of a sudden the

12          case disappears and you can't even

13          explain it to the client.

14               More importantly, the

15          negotiating committee for eleven

16          months found it very difficult

17          going in terms of stroke cases in

18          negotiations.  I'm certain lawyers

19          that prepared stroke cases, Merck

20          knew about.  At some point we were

21          able to get stroke cases included.

22          For my own part, the work you did

23          in stroke cases is a common

24          benefit, and I appreciate it.
```

FAC Resp. Exhibit D -- 1036

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          MR. MATTHEWS:  Some of it

2     was unwitting.

3          MR. HERMAN:  I'd rather have

4     unwitting contributions than

5     witless contributions.

6          MR. MATTHEWS:  I'm going to

7     finish this real quick.  I'm going

8     to wrap it up in a minute because

9     I don't want to take any other

10    time.

11         Just to follow up, we had

12    Julie, Jason, Jeb and I, we had

13    four lawyers working on this

14    litigation since its inception.  I

15    think we were committed from the

16    beginning to the end until the

17    announcement of the settlement.

18    Consistency, I don't think it ever

19    waned.  I think we were always

20    involved 100 percent.

21         In terms of the PSC, I think

22    I was on the science committee.  I

23    did not do work on the science

24    committee.  I was more doing work

FAC Resp. Exhibit D -- 1037

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1        in individual cases, preparing my

2        own experts.  We had Dr.

3        Zabalgortia, we had Entman, we had

4        Plunkett, Moye and others that we

5        were preparing and presenting for

6        deposition and trial.

7             The trial I talked about

8        with Andy.

9             Not involved in the

10       allocation, fee committee.

11            We were involved prior to

12       its withdrawal.

13            After negative consequences

14       in Texas, we continued to stay

15       involved.

16            I think that's what the

17       Court had asked that we talk

18       about.

19            MR. HERMAN:  Arnie, what do

20       you have on costs and hours?

21            MR. LEVIN:  Ed will do it.

22            MR. BLIZZARD:  Dave and

23       Julie and I have had a meeting

24       previously and talked about the

FAC Resp. Exhibit D -- 1038

Page 39

1          cost submissions and the time

2          submission.  I think they are

3          still showing at Wegmann-Dazet as

4          not being approved at this point.

5          So, whatever we can do to help.  I

6          think it is a good idea to maybe

7          set an appointment with them and

8          go down in person.  And if I can

9          go down and help in person with

10         you, I'll do that, to make sure

11         that you've got whatever they need

12         to get your expenses and time

13         approved.

14             MS. RHOADES:  I think I have

15         another --

16             MR. LEVIN:  You have

17         $1,660,000 in expenses, so, it is

18         worth the trip to New Orleans.

19             MR. MATTHEWS:  I think

20         that's probably worth a trip.  We

21         obviously spent more than that.

22         I've already seen some problems,

23         Ed, you and I talked about this.

24             MR. HERMAN:  Let me give you

FAC Resp. Exhibit D -- 1039

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          the contact, my partner,

2          ldavis@hhkc.com, (504) 581-4892.

3          Lenny can set up or connect you in

4          with Phil Garrett, who is the

5          independent CPA appointed by the

6          Court.  I recommend with that much

7          in expenses that you send someone

8          knowledgeable.  They are helpful.

9          They are there to help and assist,

10         not impede, and they will be happy

11         to go over what the expenses are.

12              MR. BIRCHFIELD:  If you have

13         a report from Steve Levine, will

14         you get that to Lenny?

15              MR. MATTHEWS:  I will give

16         it to Russ.

17              MR. BIRCHFIELD:  Lenny in

18         Russ' office, just e-mail it.

19              MR. MATTHEWS:  Okay.

20              Julie, is there something

21         you want to add?

22              MS. RHOADES:  Sounds great

23         to me.

24                   -  -  -

FAC Resp. Exhibit D -- 1040

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1041

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM:  MORELLI RATNER
       Benedict Morelli, Esquire
       David Ratner, Esquire


BEFORE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1042

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -

 2             MR. MORELLI:  Good morning,

 3        everyone.  I decided not to do a

 4        PowerPoint because Mark is here,

 5        and he's the best PowerPoint

 6        person I know.  I said I'm not to

 7        embarrass myself.  He's going to

 8        mark and critique me for the next

 9        year.

10             MR. SEEGER:  He's going to

11        do that anyway.

12             MR. MORELLI:  I want to say

13        that there are a couple of people

14        on the panel that don't really

15        know me that well, if at all.  I'm

16        in a very unique and unusual

17        situation in this litigation,

18        because I've been trying cases

19        since the '70s, and I've had a lot

20        of high profile cases, and at the

21        time when Mark asked me to assist

22        him on the Ernst trial, I had just

23        been elected the president of the

24        New York State Trial Lawyers
```

FAC Resp. Exhibit D -- 1043

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        Association.  At the same time
2        that I was elected, I left for
3        Houston and gave up my summer, two
4        months of it.  I don't know a
5        whole lot of people who decide
6        that they are going to spend their
7        summers in Houston.
8             When I spoke to Mark and he
9        asked me to help him on the Ernst
10       trial, we started out by taking
11       the depositions of the executives
12       of Merck, and I second seated him
13       with all of those depositions,
14       Scolnick, Reicin, Kim, Gilmartin,
15       I think six depositions in all.
16            And when he was off in
17       Houston finishing his preparation
18       of the trial, I took the national
19       sales manager's deposition, Mr.
20       Dunn, I did that myself.  When I
21       went to Houston and started
22       working with Mark, I got there at
23       the jury selection.  I was there
24       from jury selection through the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          verdict for two months.

 2                  As a trial lawyer, I think

 3          that I was always in control.  I

 4          decided which cases I was going to

 5          try, how I was going to try them,

 6          the order of the witnesses.  I've

 7          tried every kind of civil case in

 8          my career.  And for 25 straight

 9          years, I never lost a case.  And

10          when I took the bullet in the Cona

11          case, because that was the second

12          trial I was on with Mark Lanier, I

13          knew I was taking it.

14                  MR. WEITZ:  Explain that.

15          Explain what you mean by that.

16                  MR. MORELLI:  Let me go back

17          and explain about the fact that I

18          was on two trials with Mark.  One

19          was approximately two months, and

20          the other one was maybe a

21          month-and-a-half, and that was

22          Cona/McDarby.

23                  The Cona/McDarby case was a

24          unique situation where Judge
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        Higbee asked us to try two cases
 2        at the same time.  Mark took the
 3        lead in trying the liability in
 4        the case, and the damages were
 5        tried separately by Mark's firm
 6        and by Weitz & Luxenberg.  I was
 7        part of that trial team for the
 8        entire time, from jury selection
 9        through verdict.
10             MR. WEITZ:  Also before
11        that, explain the prep that you
12        were involved with in the mock
13        trials.
14             MR. MORELLI:  We also had
15        mock trials, and I actually
16        allowed myself to be embarrassed
17        for the common good, of course, by
18        wearing the robes of the judge,
19        which were too long for me.  They
20        were all the way down to here.
21        (Indicating.)
22             MR. LEVIN:  I think you'll
23        grow into them.
24             MR. MORELLI:  My mother was
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1046

Page 6

1           optimistic like you.

2                   MR. LEVIN:  So was mine.

3                   MR. MORELLI:  When I was 50,

4           she told me I'd still be growing.

5           If she was alive, she would still

6           be telling me that.

7                   But I was involved in the

8           mock trials.

9                   When Mark and I were taking

10          the depositions of the executives,

11          I sat next to him at every single

12          deposition.  I tried to give him

13          my experience, my advice, my

14          questions.  He would ask me, did I

15          leave out anything, or he would

16          take questions from me.  The two

17          of us actually gave up a lot of

18          our ego for this litigation,

19          because anybody who knows anything

20          about a trial lawyer knows that

21          they don't like to give up

22          control.  I never second seated

23          anyone in my entire career until

24          the Vioxx litigation.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          This litigation has been

2     unique and unusual, and I find

3     myself again not in control.  Not

4     in control during the whole

5     litigation.  Second seating in the

6     Ernst trial for two months; second

7     seating in Cona/McDarby, where I

8     know that I brought a lot of

9     maturity to that trial.  I

10    prepared witnesses, I prepared

11    documents.  I argued every motion

12    in limine in the Ernst trial in

13    Houston.  The uniqueness of this

14    is that never did I have the

15    prospect of a fee.  Never did I

16    discuss with Mark, am I going to

17    get paid?  Never did I have any

18    kind of an arrangement.  No one

19    offered to pay me.  Every single

20    thing I did, I did for the good

21    and the common good of this

22    litigation.

23          The first trial was a

24    verdict of $253 million, and I

Page 8

1     have to say that I think I had a

2     lot to do with that.  I wrote a

3     summation over three or four

4     weeks, and I presented it to Mark

5     in the hotel, just not because I

6     thought that he was incapable of

7     doing it himself, because anyone

8     who has ever seen him knows how

9     capable he is, but because he had

10    asked me to join him, to give him

11    insight, to bring him experience.

12          I've been trying cases since

13    1977, from trip and fall cases to

14    DES.  There's nothing I haven't

15    tried.  There's no case that I

16    haven't tried.  I've tried more

17    cases than most lawyers who

18    practice law today, and when Mark

19    asked me to join him and to second

20    seat him, I took my ego and put it

21    aside and said okay.

22          When we were on the

23    Cona/McDarby trial in New Jersey,

24    we knew that the damages in that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1          case were in trouble because it

 2          was all based on samples.  And the

 3          treating doctor did not testify

 4          that he gave the plaintiff

 5          samples.  And I put the daughter

 6          on the witness stand in that case,

 7          and then I agreed to give the

 8          summation in a case that I knew

 9          was a loser.  Because as a trial

10          lawyer, and I've taught how to try

11          cases for a very, very long time,

12          I know you can't win a case in the

13          summation.  You can get money in

14          the summation, but you can't win

15          the case if it is a loser.

16              So, when I agreed to sum up

17          in that case, I did it for the

18          common good, because I wanted the

19          liability in the case to stay

20          pristine so that we would win.

21          And we did win the liability in

22          the case, and we won the liability

23          in the Cona/McDarby case.  The

24          Cona/McDarby verdict was a very

FAC Resp. Exhibit D -- 1050

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          big verdict.

2                Those two trials that I was

3          on, Ernst and Cona/McDarby, had as

4          much to do to shape the litigation

5          here and to bring about a global

6          settlement than anything.  I don't

7          think that there's anybody in this

8          litigation who has been on two

9          trial teams who gave up almost

10         four months of their career and

11         didn't have a case, it wasn't

12         their case personally.

13               Now, when I was sworn in as

14         the president of the New York

15         State Trial Lawyers, and by the

16         way, the second largest trial

17         association, bar association in

18         the country other than AAJ, I gave

19         up a lot of my presidency to spend

20         two months in Houston.  I didn't

21         see my family for two months in

22         the summer when my kids are home

23         and my wife wants to go to the

24         beach.  I didn't do any of that.

FAC Resp. Exhibit D -- 1051

Page 11

1      I did it not because I thought

2      there was a pot of gold at the end

3      for me, but we had to win the

4      litigation.  I'm a trial lawyer.

5      We had to win the litigation.

6      That's all I cared about.

7          And please understand that

8      there was a lot of sacrifice made

9      because many of the perks of being

10     president of the New York State

11     Trial Lawyers I gave up to be on

12     this trial.  And, look, I believe

13     that I deserve a determination on

14     the merits.  There are a number of

15     people on this panel who I know

16     fairly well.  I'm not asking you

17     for any favors.  I don't deserve

18     any favors.  But I certainly

19     deserve full consideration being

20     in such a unique position.

21          Because when all of my cases

22     were brought in New Jersey, I

23     didn't warehouse cases, I didn't

24     toll any cases.  I filed them all.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1    I got medical records on every

2    case.  And when Judge Higbee asked

3    for people to put forth cases to

4    move this litigation toward a

5    global settlement, we stepped up

6    to the plate.

7        My firm, with fewer than 15

8    lawyers, put five lawyers,

9    including my partner, who is

10    sitting next to me, David Ratner,

11    and myself to prepare these cases.

12    And as a matter of fact, when

13    Judge Higbee called for what she

14    called the original 39 cases that

15    went to 10, because she said we

16    would try 10 cases at once, out of

17    those 10 cases, 4 were mine.  And

18    we prepared those cases.  I hired

19    a pathologist in Chicago, and

20    because I had a very unique death

21    case called Weiss, my client died

22    midair on his way to Hong Kong in

23    his wife's arms, and Merck was so

24    afraid of that case, they fought

FAC Resp. Exhibit D -- 1053

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1      me tooth and nail to make sure

2      that that case never went to

3      trial.  I had to hire a lawyer in

4      Hong Kong to be able to get the

5      pathology slides, because they did

6      an autopsy in Hong Kong.

7            To this day, that case has

8      never been tried, because as my

9      four cases were part of the ten,

10     and that ten got reduced to eight,

11     then got reduced to four, and I

12     still had a case in there, then it

13     got reduced to two, and I was shut

14     out after I spent time, money and

15     effort, my personal time.  I

16     wasn't allowed to try any cases.

17           But it wasn't because -- and

18     by the way, my firm does

19     individual cases, personal injury,

20     medical malpractice and employment

21     discrimination.  That's the bread

22     and butter.  For three years, it

23     put such a strain on my firm

24     financially because I was in the

FAC Resp. Exhibit D -- 1054

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        Vioxx business, and I was

2        hell-bent on making sure that we

3        won and that we got to the right

4        result.

5              I've always been, you know,

6        tough in the courtroom, and it was

7        very, very difficult for me to

8        take a second seat and not, you

9        know, stand up in Houston at every

10       turn.  And I want you to know, the

11       economist was who I put on in

12       Ernst.  And anybody who has ever

13       put an economist on the stand

14       knows that it is like watching

15       grass grow, okay?  It is not

16       exactly what you would choose to

17       do.  Somebody would not be

18       fighting, let me put on the

19       economist.

20             When I tell you that when we

21       did these trials, Ernst and

22       Cona/McDarby, it changed the

23       litigation.

24             Now, look, I know that there

FAC Resp. Exhibit D -- 1055

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      are people who dedicated

2      themselves to the litigation and

3      were certainly essential to the

4      common good, and I'm not saying

5      I'm number one on the list, no

6      way.  There's people in this room,

7      in my opinion, who should be in

8      the top tier of people who get

9      compensated because of what they

10     dedicated to this litigation.

11         But it's my opinion that my

12     firm, what I gave up in time and

13     money, and let me tell you, when I

14     took the bullet in Cona, okay, I

15     did it publicly, live stream.  All

16     right?  And it is interesting,

17     because there was an article

18     written about me in New York

19     Magazine in March of 2000, and as

20     a result of that article, I was on

21     a television show for two years

22     called Power of Attorney, where we

23     tried cases on television.  A

24     couple of members of the panel

FAC Resp. Exhibit D -- 1056

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        know this story.  And to show you

2        that my son, my youngest son, who

3        had come to watch me try cases and

4        knew that it was so important for

5        me to win, win, win, okay, he said

6        to me, dad, I saw you on

7        television today.  I said, yeah?

8        He said, yeah.  He said, you were

9        trying a case.  I said, yeah.  He

10       said, you lost.  He said, you lose

11       cases?  I said, only on

12       television.  Okay?

13            And on Vioxx, luckily it was

14       only on television in my head.

15       But we all know it wasn't just on

16       television.  And I tell you, in

17       those cases, not only did I bring

18       my experience as a trial lawyer --

19       and, by the way, you know, I could

20       have boards and PowerPoints and

21       everything, but I'm talking to you

22       the old-fashioned way, the way I

23       sum up.

24            I stand in front of a jury,

FAC Resp. Exhibit D -- 1057

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          I look them in the eye, and I
 2          don't ask them, could you be fair
 3          when I select the jury because I
 4          know I'm going to get the answer
 5          from them that they expect me to
 6          hear.  So, I'm not going to ask
 7          any of you could you be fair.  I'm
 8          going to say, please be fair with
 9          my firm.
10               And my partner will tell
11          you, because he -- I manage my own
12          office.  The finances, the
13          business, I interview clients, I
14          bring in business, all of that was
15          really hurt by my decision to
16          spend so much time in Vioxx.  Now,
17          I'm a big boy, and I'm going to
18          survive, but when you decide who
19          is in the most unique position of
20          anybody in this litigation, I hope
21          you think it's Benedict Morelli,
22          not the way it's spelled in the
23          e-mail, Bendict, it's Benedict
24          like the Pope.  Okay?  Benedict
```

FAC Resp. Exhibit D -- 1058

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

    1          Morelli had a lot to do with the
    2          Vioxx litigation.
    3               And a lot of my of counsel
    4          clients, who normally give us
    5          individual cases, were hard
    6          pressed to do so, because they
    7          would say to me on the phone and
    8          to my partner, you guys are in the
    9          Vioxx business.  Morelli is not
   10          around to try these cases.  He's
   11          not around to look and see how it
   12          should be tried or what judge it
   13          is going to be in front of.  So,
   14          we lost a lot of money because of
   15          the Vioxx litigation, and I'm so
   16          happy we did what we did, because
   17          I think without Ernst, without
   18          Cona/McDarby, and without a number
   19          of people on this panel who pushed
   20          forward even when it felt
   21          impossible, because let me tell
   22          you, they kept saying, we're not
   23          going to settle these cases.
   24               So, I had no cases, zero

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1      cases in the MDL.  I never

2      expected to be assessed.  All my

3      cases were in New Jersey.  So, I

4      certainly wasn't thinking, oh, I'm

5      going to get the common benefit

6      fund one day.  But think about how

7      strange it is that I would be in

8      this position, because at the time

9      I had 1,200 cases, I was on the

10     first trial and the third or

11     fourth trial, and I'm not even on

12     the panel making the decision of

13     how much money people get.  Once

14     again, not in control.

15          So, I have to leave it to

16     all of you and your good

17     conscience.  I just want my

18     partner to say one or two things

19     about the way it affected our

20     firm.

21          MR. RATNER:  When Ben was in

22     Houston and in New Jersey, he was

23     obviously not in the office.  When

24     he's not in the office, he's not

FAC Resp. Exhibit D -- 1060

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1           there to interview clients, he's

2           not there to talk to prospective

3           referring attorneys, he's not

4           there to do things like that.  So,

5           that had one effect on the

6           business.

7                But there was a second and

8           greater effect, and that is when

9           we were preparing the four New

10          Jersey cases for trial, we took

11          the five most senior lawyers in

12          the office, me, Les Salmon, three

13          other people, who tried the bulk

14          of our personal injury cases, and

15          said, we're going to defer that

16          for a while and we're going to

17          prepare these four cases, the four

18          most important cases in the firm.

19               And I flew all around the

20          country preparing our prescribing

21          doctors, our treating doctors for

22          their depositions.  In every one

23          of the cases, the prescribing

24          doctor testified, had I known

FAC Resp. Exhibit D -- 1061

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1      now -- had I known then what I

2      know now, I would not have given

3      Vioxx to this patient.  And all

4      the treating doctors testified

5      that Vioxx was the cause of the

6      heart attack in that particular

7      case.

8           We had our senior trial

9      lawyer, Les Salmon, taking all the

10     sales reps depositions in all of

11     these four cases.  So, we put our

12     full court press to get these

13     cases ready.  But what did that

14     mean?  That meant that I wasn't

15     available to try any cases in New

16     York.  Les, who got a $70 million

17     verdict in a medical malpractice

18     case last year, wasn't available

19     to try any cases in New York.  He

20     wasn't available to take any

21     depositions in New York.  He

22     wasn't available to conference

23     cases in New York.  I wasn't

24     available and Ben wasn't available

FAC Resp. Exhibit D -- 1062

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        to be on the phone to settle cases

2        in New York.  So, as a result of

3        that, our income and cash flow

4        were severely affected.  And we

5        did that because we thought we

6        were going to get money on these

7        four cases?  No.  Because we

8        thought that getting cases ready

9        for trial and pressing Merck and

10       pressing Merck and getting ready

11       to take depositions and making

12       them take doctor depositions and

13       making them prepare sales rep

14       depositions would put pressure on

15       them to bring them to the table.

16       And we hoped that it did, and we

17       think that it did, and we think we

18       should be compensated for it.

19            MR. MORELLI:  Just two

20       things in closing.  The unique and

21       unusual, that's what I want you to

22       think about when you think about

23       me, because I think I am, and in

24       this litigation, I certainly was

FAC Resp. Exhibit D -- 1063

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
1          unique and unusual.  I think about

2          now being assessed and maybe at

3          the end being lucky enough to get

4          my own assessment back.  How fair

5          do you think that would look when

6          somebody like me gave up so much?

7               MR. WEITZ:  Ben, how many

8          cases did you submit to the

9          settlement?  How many cases did

10         your firm submit?

11              MR. MORELLI:  860.  We were

12         on board from the beginning with

13         the settlement.  We applauded

14         Chris and everyone else who put

15         the settlement together.

16              MR. WEITZ:  Tell us about

17         your expenses.

18              MR. MORELLI:  I don't

19         remember them offhand, but I did

20         give the spreadsheet.

21              MR. WEITZ:  They were pretty

22         significant.

23              MR. LEVIN:  They were

24         $166,000.
```

FAC Resp. Exhibit D -- 1064

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           MR. RATNER:  Sounds right.

2           MR. SEEGER:  Arnold

3      memorized all of them.

4           MR. MORELLI:  Let me just

5      answer that, because that's an

6      interesting thing that you would

7      know the exact amount.

8           MR. SEEGER:  Well, we have

9      it right here.

10          MR. LEVIN:  Ben, what do you

11     think this is?

12          MR. MORELLI:  No, no, no, I

13     appreciate that.  But let me

14     explain what they would have been

15     had we been able to try the four

16     cases that were part of the ten.

17     It would have been millions of

18     dollars.

19          MR. LEVIN:  Exactly.

20          MR. MORELLI:  Because in

21     this litigation, I don't think it

22     should be judged at how much your

23     expenses were, because we never

24     backed down, and we never backed

FAC Resp. Exhibit D -- 1065

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          up in this litigation.  Every time

2          Judge Higbee asked for volunteers,

3          you can ask Buchanan, my firm was

4          right there ready to try cases.

5               As a matter of fact, after

6          Humeston got tried for the second

7          time with Mark, and I forget the

8          name of your case, Mark, in those

9          two cases, I had -- Judge Higbee

10         promised that our cases would be

11         tried next either with a trial

12         team or just with my office.  So,

13         I was willing to put up whatever

14         money it was for the common good.

15              MR. WEITZ:  Well, when I say

16         expenses also, I didn't mean just

17         your hard costs that you

18         submitted.  But you had a lot of

19         expenses on individual cases too,

20         right?

21              MR. MORELLI:  Absolutely.

22              MR. SEEGER:  I want to say,

23         none of us know where any of this

24         is heading, and we're just working

FAC Resp. Exhibit D -- 1066

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1      as hard as we can to put something

2      together for the judge to

3      consider.  I just want to

4      personally say, I know what you

5      did, I know how hard you guys

6      worked, and you really were team

7      players, from somebody who was

8      involved both in the MDL and New

9      Jersey.  So, I think I thanked you

10     privately, but I want to thank you

11     on the record.

12          MR. WEITZ:  Well, I also

13     know Ben for 30 years, and I know

14     the firm Dave and Ben have.

15     Although you take a look at my

16     firm, I have a lot of people and I

17     contributed a lot of people to

18     this, but when these guys really

19     say that it truly affected their

20     income stream and the kind of work

21     that it did and their opportunity,

22     this is a firm that it really did.

23     So, I don't want that to go

24     lightly.

FAC Resp. Exhibit D -- 1067

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          MR. LEVIN:  Work with the

2     accountants to straighten out

3     those costs so that you can get

4     approved.

5          MR. MORELLI:  Okay.

6          MR. SEEGER:  From my

7     perspective, I think you've done a

8     great job summing up your

9     contributions, and it is a lot

10    harder to be number two on a trial

11    team than number one.

12         We have two minutes if there

13    are any questions.

14         MR. HERMAN:  First of all, I

15    do know you by reputation.  Your

16    reputation as a trial lawyer is

17    really important.  One of the

18    things that I think distinguished

19    this litigation is that, by and

20    large, these were not class action

21    lawyers handling the cases, they

22    were lawyers that know how to try

23    cases, that go in and try cases,

24    and that always has an effect.

FAC Resp. Exhibit D -- 1068

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          We still believe people

2     settle cases out of fear, and

3     Merck had its own reasons, but I

4     think that contributions made by a

5     number of lawyers caused them to

6     give second thought to the fact

7     that they were spending over a

8     billion dollars to defend cases,

9     and there are a lot more coming

10    down the road.

11         Just a couple of things.

12         You've got to be aware of

13    the Fifth Circuit and look at the

14    Johnson factors, look at Judge

15    Fallon's decision in Murphy Oil.

16    Read it, because it is going to

17    affect common benefit in this

18    case.  There's no question about

19    it.  There's another case, Mobil

20    Oil, that came out last year in

21    the Fifth Circuit out of the

22    Eastern District.

23         Judge Fallon has indicated

24    that if there's no resolution, he

FAC Resp. Exhibit D -- 1069

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1       is going to put lawyers under oath

2       and have former assistant US

3       attorneys and maybe the special

4       masters question and make sure the

5       affidavit is in good shape.

6            I say those things to you

7       because I think you have to know

8       that.  You have to be aware of the

9       Fifth Circuit, which is very

10      different than the First, Second

11      or Eleventh.  So, I appreciate you

12      being here.

13           MR. MORELLI:  Thank you.

14      You didn't see anything in my

15      affidavit that gives you pause,

16      did you?

17           MR. HERMAN:  I saw a lot of

18      things that give me pause, but

19      none in your affidavit.

20           MR. BIRCHFIELD:  When did

21      you start with Vioxx?  When did

22      you first start?

23           MR. MORELLI:  Well, it is

24      interesting.  I started after it

FAC Resp. Exhibit D -- 1070

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1        was withdrawn from the market, and

 2        that also puts me in a unique

 3        position, because even though that

 4        was true, I didn't warehouse the

 5        tolling cases, I went right on the

 6        first trial and actually six

 7        depositions in the first trial.

 8            I was not one of the

 9        pioneers who started in '01 like

10        some of y'all.  So, that is

11        absolutely true.

12            MR. SEEGER:  Thank you, Ben.

13            MR. WEITZ:  Thank you.

14            MR. MORELLI:  Thank you.

15            -  -  -

16

17

18

19

20

21

22

23

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1072

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: MOTLEY RICE, LLC
        Fred Thompson III, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1073

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. THOMPSON:  I appreciate
 3         you taking the time to listen to
 4         me.  I hope to go pretty quickly,
 5         because I understand that
 6         everybody is sort of a traveling
 7         show, and so if I say something
 8         that is boring or redundant, how
 9         about just pull your ear and I'll
10         move on to something else.
11              First of all, there's no
12         reason for me to come before you
13         and claim that I single-handedly
14         resolved the Vioxx litigation.
15         I'm actually looking at people who
16         did a tremendous job, and this is
17         the first opportunity that I've
18         actually had to congratulate you
19         and thank you on behalf of my
20         clients for getting a very solid
21         resolution to a case which had
22         tremendous issues of individual
23         causation, which it was a Joe-type
24         accomplishment for you, and I
```

FAC Resp. Exhibit D -- 1074

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        appreciate that.

2              Having said that, I'm not

3        going to take undue credit.  I do

4        think that our firm did do

5        valuable constructive work that is

6        worthy of a common fund award, and

7        I do want to go down that list

8        very briefly for you just on some

9        individual items for your

10       consideration.

11             We submitted a time sheet.

12       That time sheet has actually been

13       bounced back to us for some

14       presentation faults, and we are

15       now in a 30-day cure period, but

16       substantially the hours will be

17       the same.  We did locate some

18       additional hours, but they don't

19       change the shape of the

20       submission.

21             We chose to participate in

22       the New Jersey state forum, and

23       all but very few hours are hours

24       that were expended in pursuing the

FAC Resp. Exhibit D -- 1075

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

 1        New Jersey state consolidation.

 2        We pressed our cases for trial,

 3        and we, in fact, had an

 4        opportunity and were on the list

 5        to be on the next -- on a trial

 6        cycle in the fall of 2007, at

 7        which time Merck made due process

 8        objections to the size of the

 9        trial grouping, and we were, in

10        essence, asked to take a step back

11        and allow some other folks to go

12        forward.  And we, for the good of

13        the litigation, we, in fact,

14        agreed to do that.

15             We were on the list for

16        trial cases in the winter and

17        early spring of 2008, and, of

18        course, the settlement preempted

19        that.  But we were doing

20        preparation work for those cases

21        as well.

22             We did not in our fee

23        petition submit hours for

24        individual cases.  And that would

FAC Resp. Exhibit D -- 1076

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          include the cases that we were

2          working up as members of Judge

3          Higbee's trial group.  We did not

4          submit those hours, but let me

5          just suggest to you that given

6          Judge Fallon's opinion that he

7          views the majority of cases as

8          somewhat free riding cases, that

9          they were not worked up and that a

10         push down was somehow justified

11         for that, we in New Jersey

12         followed a procedure that Sol and

13         Chris and Dave Buchanan put out

14         that was designed to put

15         continuous pressure on Merck.  We

16         were actually nominating -- as a

17         group, we were nominating 250

18         cases per quarter, and we were

19         tendering those for depositions of

20         the plaintiffs, the family and

21         close friends, treater, prescriber

22         and two sales reps.  And so we

23         actually were working up a broad

24         number of cases in those pool

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1              settings.  Sometimes it felt like

2              Dechert was pinning us down rather

3              than us pinning them down, but

4              that was the strategy, and we were

5              good soldiers.  None of those

6              hours show up in our fee petition,

7              but I do want to point out that we

8              were very active in pursuing that.

9                  As far as traditional common

10             fund work, one of the things that

11             our co-liaison, Sol Weiss -- early

12             on, we looked at the marketing

13             side, and we took on a substantial

14             responsibility in reviewing tens

15             of thousands of marketing

16             documents.  We identified the head

17             of the medical/legal office, Ellen

18             Westrick, who was present during

19             the period of time that Merck was

20             filing the petitions and filing

21             the various forms that were

22             required regarding the naproxen

23             cardioprotective theory.  We

24             worked those documents up, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        worked up the deposition of Ms.

2        Westrick, and we were the lead

3        counsel on that.

4              We also did a substantial

5        document review and a subpoena

6        practice with several third-party

7        PR firms, Ogilvy and DDB, and we

8        did that over a period of time.

9        We were in the process of

10       scheduling depositions when this

11       case changed its nature into a

12       claims facility.  One of the key

13       things that we looked at --

14             MR. HERMAN:  Excuse me.

15       When you say third-party PR

16       firms --

17             MR. THOMPSON:  Yes, sir.

18             MR. HERMAN:  -- are you

19       talking about Merck's PR machine?

20             MR. THOMPSON:  Yes, Ogilvy,

21       DDB.

22             MR. HERMAN:  Okay.

23             MR. THOMPSON:  One of the

24       things that we had looked at early

FAC Resp. Exhibit D -- 1079

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1        on was, if you look at the

 2        privilege logs, particularly the

 3        period around April of 2000, Merck

 4        threw a blanket over that period

 5        of time where they were

 6        considering, first of all, the

 7        VIGOR results, and then their

 8        public response, which was the

 9        VIGOR results were related to the

10        naproxen cardioprotective theory.

11             Many of those documents were

12        completely hidden away, because

13        their general counsel, a lady

14        named Joanne Lahner, was cc'd and

15        attended practically every meeting

16        for that period of time.  We set

17        out very strongly to try to get

18        those documents, and we briefed

19        it, we made motions to take her

20        deposition.  We had three hearings

21        with Judge Higbee, one of which

22        was an evidentiary hearing in

23        which Ms. Lahner took the stand.

24             And we were proceeding, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        thought we had -- we found,

 2        actually, some documents that the

 3        defendant tried to claw back,

 4        because they were very

 5        demonstrative of Ms. Lahner's

 6        editing and the way that she was

 7        trying to handle this.  We thought

 8        we were well on our way to getting

 9        Merck to make privilege releases

10        when all of a sudden Judge Higbee

11        went dark, and in retrospect, it

12        was clear that at that point in

13        time, there were some settlement

14        discussions going on.  But that

15        was an effort, and I'll just be

16        frank with you right now, I don't

17        think anybody has ever seen those

18        documents.  And if we ever do,

19        we're going to see a very clear

20        picture of some corporate venality

21        that Merck really doesn't want us

22        to ever see.

23              So, we participated in the

24        joint prosecution in New Jersey.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        We worked carefully with Jeff

2        Grand in providing order books,

3        motions in limine and various

4        things that would be a part of --

5        Judge Higbee's plan was to try to

6        routinize these cases so that she

7        could farm them out and have

8        trials by many state court judges.

9        And part of that was her making

10       preemptory rulings on many

11       evidentiary issues and many issues

12       of law.  And we were involved with

13       Jeff.  I don't want to claim much

14       credit beyond the fact that we

15       volunteered for that program,

16       Carmen Scott in our office drafted

17       it up, and we sent a series of

18       things that were included in that

19       effort.

20            I think we talked a little

21       bit about marketing already, but

22       we did review the marketing sales,

23       FDA DDMAC documents, and found a

24       series of hot documents, including

FAC Resp. Exhibit D -- 1082

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        some really great ones from Ms.

2        Westrick.

3            We participated early in

4        developing a business ethics

5        expert.  Chris probably remembers

6        this.  Mr. Michael Hoffman.  He

7        had a beautiful opinion that Judge

8        Higbee decided that she didn't

9        want to put in front of the jury.

10       So, if you are looking at it from

11       today back, maybe that was not a

12       big bearer of fruit, but looking

13       at it in a forward-looking aspect,

14       looking at it in terms of an

15       ongoing war in which there are

16       many battlefields in which there

17       are many things that need to be

18       addressed, we did expend the time

19       and the expense to develop that

20       expert.  And given another judge

21       who would accept that type of

22       business expert testimony, Dr.

23       Hoffman would be a good witness.

24           We worked also with Eric

FAC Resp. Exhibit D -- 1083

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      Weinberg on a damage causation

2      expert, I think it is Dr. Kostis

3      and Madigan, who were working on

4      trying to use -- trying to apply

5      some Framingham data to try to

6      show or illustrate the causation

7      trying to show an enhanced risk of

8      some substantial contributing

9      factor on these individual

10     causation cases, which, of course,

11     is the real tough part of this

12     case.

13          We used some pretty senior

14     people.  Don Migliori was going to

15     be our partner, who was going to

16     actually be on the trial team of

17     the cases, myself, Ann Ritter, who

18     did a substantial amount of

19     background work on the experts and

20     on the third-party documents.  Two

21     associates, Carmen Scott and Henry

22     Leventis.  This case has gone on

23     long enough that the law clerk in

24     our papers has now become an

FAC Resp. Exhibit D -- 1084

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        associate.  Josh is now an

2        associate.  I guess I will next

3        become of counsel before we're

4        finally through.

5             But that's sort of the quick

6        run through.

7             MR. LEVIN:  Don't become of

8        counsel.  That's where elephants

9        go to die.

10            MR. THOMPSON:  Well, I don't

11       want that.  I'll go senior, one of

12       the judges, the senior status.

13            That's just a very, very

14       quick overview.  Certainly I can

15       keep going on and on, but I think

16       that if you've heard from seven or

17       eight or nine people, you've

18       probably heard all of us claiming

19       credit for many of the same things

20       over and over again.

21            I do believe that we made an

22       effort in our submission not to

23       fluff it up, not to do a lot of

24       redundant time, not to do things

FAC Resp. Exhibit D -- 1085

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1       beyond what the scope of our work

2       was.  I don't think we've

3       overstated anything, but we did do

4       productive work that was of

5       material benefit to the resolution

6       of this case.

7            I sometimes worry that the

8       folks in the MDL don't know what

9       exactly was going on in the state

10      court consolidation, just like I,

11      as a member of the state court

12      consolidation, don't know exactly

13      what was going on in the Federal

14      MDL.  Although I was lucky, I had

15      a good many friends who were

16      keeping me somewhat abreast of it.

17           But I don't want to give the

18      impression that the state court

19      litigation in New Jersey was a

20      side show.  It was well

21      coordinated between --

22           MR. SEEGER:  Nobody here

23      thinks that.

24           MR. LEVIN:  I'm in the MDL,

FAC Resp. Exhibit D -- 1086

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        and I can assure you that Perry,

2        Mark and Chris have made it clear

3        to all of us, not that we didn't

4        know it already, that New Jersey

5        was not a side show.

6             MR. THOMPSON:  Okay.  Well,

7        in that case, I will end my

8        remarks on that subject.

9             MR. LEVIN:  You have three

10       superb advocates at this table.

11            MR. SEEGER:  Well, but the

12       important point you made is the

13       reason for these meetings is this

14       cross mixture of lawyers in state

15       and Federal litigations, some

16       people did both, is to make sure

17       everybody at the end of this

18       process has talked everything out.

19            MR. HERMAN:  The original

20       lawyers, at least when I became

21       involved, that were primary in

22       this litigation, were Lanier,

23       Birchfield, Seeger and some

24       others.  They were not in the MDL.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

 1        They were in New Jersey, New York.

 2        There was a group in Texas.

 3             To the credit of Chris and

 4        Andy, they both, for mutual

 5        benefit, participated in the MDL,

 6        and Perry and Mark and others were

 7        trying cases.  Tom was organizing

 8        California.  There were cases

 9        tried in California.  So, there

10        were no side shows.  For whatever

11        comfort I can give you, the main

12        thing that we're looking at is the

13        quality of the lawyering, wherever

14        it was.  We're fortunate that we

15        had a lot of quality lawyering.

16             I think also it's important

17        for lawyers to know that other

18        lawyers give them credit.  When

19        Chris Placitella was here earlier,

20        he talked about him being local

21        counsel for your firm and also,

22        though, for the contributions that

23        you made, Fred, with regards to

24        Ogilvy and other things.

FAC Resp. Exhibit D -- 1088

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1              So, I think we're getting

2        enough information.  We've had 100

3        lawyers, actually, 106, submit

4        affidavits, and 60 or so have said

5        that they want to make oral

6        presentations.  So, I think we're

7        getting a pretty good view of the

8        landscape.

9              MR. WEITZ:  When you were

10       doing your work with Westrick and

11       Lahner and Ogilvy, were you

12       getting your direction from Sol as

13       co-liaison counsel to do that

14       work?

15             MR. THOMPSON:  Here's how we

16       handled that with Sol.  We were

17       careful to make sure that we were

18       not going off on some rogue

19       tangent.  The last thing we wanted

20       to do is everybody is busy, nobody

21       wants to do something that's not

22       productive.  So, we would talk

23       carefully with Chris about where

24       the litigation was going.

FAC Resp. Exhibit D -- 1089

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           There was a sense early on

2      that we would win this case on the

3      science itself.  And it became, I

4      don't want to say clear, but it

5      became more and more apparent that

6      the marketing fraud, the marketing

7      overstatement and the deception

8      was very important to us.  So, we

9      checked in and we made sure that

10      Sol approved any kind of activity

11      that we were going to go down.

12           MR. WEITZ:  You did a lot of

13      your discovery in coordination

14      with Placitella?

15           MR. THOMPSON:  Yes, sir.

16      Yes, sir.

17           Well, when they say the

18      Court has no questions, that means

19      you haven't laid a glove on them.

20      So, I apologize if I haven't.

21           MR. SEEGER:  No, no.  It was

22      great.

23           MR. GIRARDI:  Thank you,

24      Fred.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1                    -   -   -

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 1091

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

Golkow Technologies, Inc. - 1.877.370.DEPS

FAC Resp. Exhibit D -- 1092

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:          PANISH SHEA & BOYLE
               Brian Panish, Esquire


BEFORE COMMITTEE MEMBERS:


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.



COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1093

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -
 2              MR. GIRARDI:  Mr. Panish,
 3         nice of you to accommodate us and
 4         get here early.  I know you ran
 5         down from San Francisco and got
 6         here as quickly as you could, and
 7         it is very helpful because some of
 8         these people are on their way back
 9         to New York.
10              As you can tell, Brian,
11         there's a court reporter here, and
12         the purpose of this really is for
13         Judge Fallon.  At the end of the
14         day, Judge Fallon is going to call
15         the shots, and he wanted to get
16         everybody's ideas and stories and
17         so forth.
18              The thing we're primarily
19         interested in is the work that you
20         performed for the overall good of
21         Vioxx, of the Vioxx litigation.
22         So, that's the focus of this.  We
23         have a pretty good idea, we have
24         seen your declaration, we've spent
```

FAC Resp. Exhibit D -- 1094

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          time on that.  So, it's not quite

 2          a situation where you have to

 3          start from the beginning of the

 4          world, but nonetheless, primarily

 5          for Judge Fallon, we wanted to

 6          make sure we had everything in one

 7          place so that he could look at

 8          your efforts, look at your

 9          results, and then be able to

10          compare them to the efforts of

11          others and their results.  So,

12          with that, you may go forward.

13                MR. PANISH:  Thanks for

14          seeing me.  I'm proud to be here.

15          I want to thank everyone that

16          worked on the litigation.  I know

17          how hard it was.  I know all the

18          great work you did.  I read some

19          Ed Blizzard cross of Briggs

20          Morrison that I used in my trial,

21          and Chris and all of you and all

22          of your work.  I'm proud to have

23          been a part of it.  I'm not going

24          to take a ton of time.  I feel
```

FAC Resp. Exhibit D -- 1095

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1           like the guy that finally got in

2           the game and they go run the

3           clock.  It's 50 to nothing.

4                What I would just like to

5           talk about are the contributions

6           my firm and myself made that we

7           believe contributed to the

8           ultimate resolution of the Vioxx

9           litigation.  We filed many cases

10          in California.  We were a member

11          of the PSC.

12               I tried the appellate case,

13          which I believe at the time there

14          had been a lot of losses in the

15          trials and that it was important

16          that we do the best we could on

17          that trial in California to move

18          the litigation towards resolution.

19          So, myself, my firm, my partner,

20          Kevin Boyle, with Tom Girardi's

21          firm, worked day and night from

22          September through January on the

23          trial.  I drafted the state

24          questionnaire for the jury, which

FAC Resp. Exhibit D -- 1096

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          was gone into every single

2          question.  I don't have to tell

3          you what it is like to litigate.

4          I would say this.  I've tried

5          about 100 cases, and I have never

6          been in a trial that was as

7          contentious and as hard fought as

8          this case.  The lawyers were good

9          on the other side, and they had

10          many of them.  All of you know

11          that tried the cases how hard it

12          really was just compared to

13          regular cases, and most of my

14          cases are against large corporate

15          defendants that fight hard, but it

16          was especially hard, I thought, in

17          this case.

18              I thought that the

19          cooperation among the plaintiff

20          lawyers was excellent and

21          extraordinary, that much of the

22          work that we started with was

23          given to us by the lawyers, and we

24          were able to expand on that in

FAC Resp. Exhibit D -- 1097

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          terms of the jury questionnaire,

 2          focus groups that we ran here and

 3          jury consultants.  Part of it is

 4          because some of the work that had

 5          been done before we weren't

 6          allowed to use, other focus groups

 7          that had been done in the prior

 8          trial from the MDL.  So we had to

 9          do a lot of that ourselves.

10               Specifically in the

11          appellate case, the prescribing

12          physician was a Vietnam veteran

13          and flight surgeon, had been paid

14          $750,000 by Merck to run clinical

15          trials, had prescribed Vioxx and

16          was given 60,000 samples by Merck

17          and was an adverse witness to the

18          plaintiff.  I called him adversely

19          to cross-examine him.  He had been

20          paid 750 for clinical trials on

21          Vioxx himself.  So, I had to call

22          him as an adverse witness and did

23          get him to admit that if he had a

24          heart attack, he wouldn't have
```

FAC Resp. Exhibit D -- 1098

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        given it, although when Merck

2        examined him, he flip-flopped for

3        them.  But it was very difficult.

4            The California law is

5        different than a lot of states on

6        the learned intermediary and

7        failure to warn, and we had a

8        difficult time with our

9        prescribing physician and dealing

10       with the learned intermediary and

11       dealing with the judge and the

12       law.  We spent a lot of time on

13       briefing the law, arguing, working

14       on the verdict forms, not only for

15       this case, but for the next case.

16       This case ended up in a hung jury,

17       three final arguments made in the

18       trial.  Go back, jury questions

19       for three straight weeks.  Got

20       some good findings in the trial,

21       and we're prepared to retry the

22       case.  We changed experts, took

23       out Merck's -- after the trial,

24       Merck no longer was using the same

FAC Resp. Exhibit D -- 1099

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          cardiologist, Dr. Friedman, who

2          had had over 75 meetings with

3          Merck lawyers and prepared to

4          testify in all the California

5          cases.  So, he was no longer

6          designated after that case.  Ready

7          for the retrial.

8               We had other cases, had put

9          up many cases for trial.  I had

10         other cases, Schechter case, other

11         cases that were going to be in the

12         mix.  Mr. Girardi had set up a

13         plan, in addition to trying to

14         have four or five cases going

15         simultaneous with ten or more

16         plaintiffs in each case, and we

17         had signed on to be part of that,

18         to try whatever number of cases

19         were necessary to be tried.

20              We spent hundreds of

21         thousands of dollars.  We

22         submitted all the time sheets.

23              MR. LEVIN:  Your time sheets

24         and your costs, the 400 plus

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          thousand was approved by the

 2          accountant.

 3              MR. PANISH:  450 plus --

 4          plenty of costs, prepared to put

 5          in plenty more costs.  I think we

 6          were ready to try the case, and

 7          they knew they took their best

 8          shot, and they couldn't beat us.

 9          We were ready to continue on, and

10          I think they knew that.  Not that

11          they would ever admit it, but they

12          knew that we were ready to go and

13          continue forward, committed to

14          resolution of the litigation.  I

15          was fortunate to be there at court

16          when it was announced, and I was

17          proud to be a lawyer and to have

18          been part of that and to have

19          worked with Tom Girardi and Tom

20          directing us here and the great

21          leadership in California for all

22          of us.  In all cases, California

23          is important.  Los Angeles County

24          is the seventh largest state.
```

FAC Resp. Exhibit D -- 1101

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1        California is an important player

2        in overall global litigation.

3            I've submitted my stuff.  I

4        can talk for a long time.

5            MR. SEEGER:  Who actually

6        tried the case with you?  I knew

7        about your role in the trial.

8            MR. PANISH:  My case for

9        Mr. Appell, just me.  There was

10       another plaintiff.  Mr. Arrigale

11       was represented by Tom Brandi.

12           MR. SEEGER:  You and Brandi

13       did it?

14           MR. PANISH:  My whole case,

15       just me.  I picked the jury, did

16       the final arguments, everything.

17       Three final arguments.

18           MR. SEEGER:  Why was that?

19           MR. PANISH:  There's a new

20       law.  The jury would have

21       questions on issues, and she would

22       give an hour and a half more for

23       each side to argue.  So we would

24       have to reprepare for those final

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          arguments to deal with that issue.

2          Then we went over Christmas, we

3          came back January 3rd or after the

4          New Year, they would have

5          questions on another issue.  So

6          now we have to prepare another

7          final argument and give that final

8          argument.

9               MR. SEEGER:  That's the way

10          you do it?

11               MR. PANISH:  It's kind a new

12          law, and the judge wanted to try

13          to -- she wanted to get a

14          resolution.  She didn't want a

15          hung jury, obviously.  So, we did

16          it.  We didn't have any choice.

17          She said that's what we're doing,

18          so we did it.

19               MR. WEITZ:  How many cases

20          did you have filed?

21               MR. PANISH:  100 plus

22          probably.

23               MR. WEITZ:  All in LA?

24               MR. PANISH:  All in LA.

FAC Resp. Exhibit D -- 1103

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1        Some were moved to MDL, but all

 2        were filed in State Court, Los

 3        Angeles.

 4              MR. GIRARDI:  Brian, truly

 5        you did -- not only did you do a

 6        terrific job in that case, which I

 7        thought had some difficulties,

 8        because I think Sizemore and

 9        O'Callahan would report to me

10        nightly how difficult a case it

11        was.  So, not only did you do a

12        great job on that case, but when

13        we were told to get 60 more cases

14        ready, 20 for Judge Chaney, 20 for

15        Judge McLaughlin and 20 for Judge

16        Chavez, you came to the fore and

17        immediately started running

18        through all of your cases to give

19        us the best ones to put in that

20        group, which was a massive amount

21        of work.  Obviously those things

22        never went on due to the

23        resolution of the case, but you

24        did a terrific job.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1              Also, I think it's great

 2         that last week in the Sunday

 3         edition of the Los Angeles Times,

 4         you were named the second best

 5         trial lawyer in California.

 6              MR. SEEGER:  Who was number

 7         one?

 8              MR. GIRARDI:  Oh, that was

 9         me.

10              MR. PANISH:  I'm glad to be

11         there.

12              MR. GIRARDI:  I'm just

13         teasing, obviously.  In all

14         honesty, you did a terrific job,

15         no kidding.  I think as far as the

16         California efforts, our two firms

17         carried the ball, and there's no

18         question about it.  You are to be

19         commended for all of your good

20         hard work, and it was a hell of a

21         contribution to the overall

22         resolution of these cases.

23              MR. SEEGER:  I only got to

24         know you through the case
```

FAC Resp. Exhibit D -- 1105

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          recently, but I really learned

2          about you, first, through your

3          trial work.  So, based on what I

4          have known what you have done, I

5          have to second that.  Thank you.

6                  MR. PANISH:  I want to thank

7          all of you guys, and, Tom, the

8          extraordinary efforts Mr. Girardi

9          did in California.  It wasn't

10          easy.  Lawyers were not stepping

11          up to try the cases despite what

12          they might tell you now.

13                  MR. WEITZ:  We know.

14                  MR. SEEGER:  As soon as

15          there was a loss, guys were

16          running for the hills.

17                  MR. PANISH:  People would

18          dismiss cases on the day of trial.

19          Tom had tried the first case, and

20          it didn't go so well, and he

21          didn't bat an eyelash.  He was

22          prepared to go forward.  We'd

23          still be trying Vioxx cases.  I

24          thank you for giving me an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          opportunity and for all the work.

2                    MR. GIRARDI:  Thank you.

3                    MR. SEEGER:  Thank you.

4                    MR. BLIZZARD:  Thank you.

5                         -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 1107

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22         Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23         Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 1108

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRMS:     RANIER GAYLE & ELLIOT, L.L.C.
           Drew Ranier, Esquire
           Sarah Ranier, Esquire
           Brett M. Powers, Esquire
           PROVOST UMPHREY LAW FIRM, LLP
           Walter Umphrey, Esquire
           Darren Brown, Esquire
           WILLIAMS KHERKHER
           Steven J. Kherkher, Esquire
           John T. Boundas, Esquire
           Amy Carter, Esquire
           Brandon Steffey, Esquire
           THE WATTS FIRM
           Mikal Watts, Esquire
           Larry Wright, Esquire
           THE KAISER FIRM
           Grant Kaiser, Esquire
           John Furnish, Esquire
           Gerilyn Gordon, Esquire


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1109

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1   BEFORE FEE COMMITTEE MEMBERS:
 2

     ANDY D. BIRCHFIELD, ESQUIRE
 3   Beasley Allen Crow Methvin
     Portis & Miles, PC
 4

     EDWARD F. BLIZZARD, ESQUIRE
 5   Blizzard, McCarthy & Nabers
 6   THOMAS V. GIRARDI, ESQUIRE
     Girardi & Keese
 7

     RUSS M. HERMAN, ESQUIRE
 8   Herman, Herman, Katz & Cotlar, LLP
 9   W. MARK LANIER, ESQUIRE
     The Lanier Law Firm
10

     ARNOLD LEVIN, ESQUIRE
11   Levin, Fishbein, Sedran & Berman
12   TROY RAFFERTY, ESQUIRE
     Levin, Papantonio, Thomas, Mitchell,
13   Echsner & Proctor, P.A.
14   CHRISTOPHER A. SEEGER, Esquire
     Seeger Weiss, LLP
15

     PERRY WEITZ, ESQUIRE
16   Weitz & Luxenberg, P.C.
17
18
19
20
21
22
23
24
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

                                                    Page 3

         1                 -  -  -
         2              MR. BLIZZARD:  We've got a
         3         court reporter here today, and
         4         obviously we had individual time
         5         slots for everybody, but John
         6         called me earlier and said that
         7         you guys wanted to present as a
         8         group, and that's obviously fine
         9         with us.
        10              The court reporter is going
        11         to record everything because of
        12         Judge Fallon's interest in
        13         transparency.
        14              Really the floor is yours.
        15         However you want to organize it,
        16         however you want to present, you
        17         can start.
        18              MR. RANIER:  Good.  Thank
        19         you.  I would be shocked --
        20              MR. HERMAN:  I'm sorry.
        21         Just one other thing.  I know you
        22         are familiar with the cases, but
        23         Mobil out of the Fifth Circuit and
        24         the Murphy Oil case has been

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        settled now.  So, the only opinion

2        in Murphy Oil is the opinion that

3        the Fifth Circuit more or less

4        adopted or did not review

5        actually.  So, it would be Judge

6        Fallon's opinion in Murphy Oil

7        that is probably the same process

8        that's going to operate here, and

9        that's what the Judge has

10       indicated to this committee.

11            MR. RANIER:  I'll be very

12       surprised if we would use all of

13       our time with the combined five

14       firms.  I think we'll do less than

15       that.  We have a bit to say, but I

16       think it will be beneficial to all

17       of y'all's time to do this at

18       once.

19            MR. BLIZZARD:  I said this

20       to John out in the hall.  He may

21       have communicated it to y'all too.

22       We had a very inspirational

23       presentation this morning from

24       Shelly Sanford, who spoke really

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          only about Carlene and her work to

2          start this litigation.  I wish

3          that all of you could have heard

4          it, because it was a wonderful

5          presentation.  It really has

6          inspired us all this morning to

7          really try as best we can to do

8          the right thing here.  So,

9          whatever y'all want to say, go

10         ahead.

11              MR. HERMAN:  Drew, I'm sorry

12         to interrupt you again.  We need

13         everybody in this room to

14         introduce themselves.  We know a

15         number of you and some we don't.

16              MR. WRIGHT:  Larry Wright,

17         Watts Law Firm.

18              MR. WATTS:  Mikal Watts,

19         Watts Law Firm.

20              MR. FURNISH:  John Furnish

21         with the Kaiser Firm.

22              MR. STEFFEY:  Brandon

23         Steffey, Williams Kherkher.

24              MS. GORDON:  Gerilyn Gordon,

FAC Resp. Exhibit D -- 1113

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1          The Kaiser Firm.

 2               MR. KAISER:  Grant Kaiser.

 3               MR. POWERS:  Brett Powers,

 4          Ranier, Gayle & Elliot.

 5               MR. RANIER:  Drew Ranier.

 6               MR. UMPHREY:  Walter

 7          Umphrey.

 8               MR. BROWN:  Darren Brown.

 9               MR. KHERKHER:  Steven

10          Kherkher.

11               MS. CARTER:  Amy Carter.

12               MR. BOUNDAS:  John Boundas

13          with Williams Kherkher.

14               MR. GIRARDI:  I'm Tom

15          Girardi.

16               MR. RANIER:  Well, I'll

17          start by saying good morning to

18          everybody and Seasons Greetings

19          with all the decorations coming

20          down the hall.  I'm Drew Ranier,

21          R-A-N-I-E-R, and I'm going to do

22          an overview of the efforts of the

23          Vioxx Litigation Consortium.  That

24          is what the five firms that are

FAC Resp. Exhibit D -- 1114

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1          here today call themselves and

 2          have worked together on Vioxx

 3          under that name.  Basically I will

 4          do an overview, and then other

 5          members of our group will address

 6          several specific areas.

 7              Mikal Watts will lead the

 8          discussion on the trial work.

 9          Grant Kaiser will do the

10          organization and function of the

11          Vioxx Litigation Consortium, how

12          it is organized.  Walter Umphrey

13          will talk about financial

14          commitment.  I'll talk some about

15          the PSC work that I did as a PSC

16          member.

17              So, there are a lot of

18          lawyers in this room who have done

19          exceptional work in this case and

20          have done top tier work in this

21          case, and we respect that, and we

22          know that.  We know how difficult

23          it was to do that and how much of

24          a commitment it required to do

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          that.  So, we want to tip our hats

2          to you all who have done so much,

3          and we want to say that we have

4          made a top tier commitment to this

5          litigation also.  We are going to

6          describe that here for you today,

7          and that's what we're here to talk

8          about.

9               Let me just introduce the

10         firms briefly.  I know for some of

11         you this will be old hat, but just

12         for the record so we have it here,

13         John Eddie Williams could not be

14         here today because of family

15         commitments and a death in the

16         family --

17               MR. SEEGER:  By the way,

18         would you send him our regards.

19               MR. RANIER:  I will.  Thank

20         you.  I'm sure he'll be happy to

21         get them.

22               His reputation, first in his

23         class at Baylor Law School,

24         Fulbright & Jaworski, built one of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          the largest and most successful

2          plaintiffs' practices in the

3          United States.  Just an absolutely

4          brilliant lawyer, senior partner

5          of Williams Kherkher Hart &

6          Boundas, 30 years of practice,

7          John Eddie.

8               Walter Umphrey, who is

9          sitting on my left here, one of

10          the most successful litigators in

11          the United States, practiced for

12          43 years.  Walter was doing mass

13          torts before most of us in this

14          room even thought about going to

15          law school.  Baylor Law School is

16          named after him.  Words like

17          pioneer and legend and dean are

18          frequently used in referring to

19          Walter.  As I say, he's been doing

20          this for 43 years.

21               Mikal Watts, who I know many

22          of you know well, the word that

23          comes to mind when I think about

24          Mikal is prodigious.  He is an

FAC Resp. Exhibit D -- 1117

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          incredible trial lawyer.  He just

2          turned 40 years old.  At 60, I

3          would be happy to have

4          accomplished as much as he did in

5          the courtroom.  His trial

6          schedule, which he takes in

7          stride, by anybody's imagination,

8          even experienced trial lawyers, is

9          incredible, is punishing.  It's

10         like every Monday or every other

11         Monday, he's there, and he's there

12         on big and important cases.  Mikal

13         has been practicing, even at the

14         age of 40, for 19 years.

15             Grant Kaiser on my right

16         supervised and directed some of

17         the most far reaching and biggest

18         litigation in United States

19         history.  Grant has been

20         practicing for 27 years, and I am

21         personally proud of every word

22         that has come out of the Vioxx

23         Litigation Consortium.  Every

24         piece of paper, nothing is not

FAC Resp. Exhibit D -- 1118

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        screened, goes through Grant to
 2        make sure it is appropriate, and
 3        we all know about it.  So, we are
 4        in this very much as a group, and
 5        we formed this group to do that
 6        and take on the challenge that we
 7        thought Vioxx presented.
 8              In my own case, I've been
 9        practicing for 33 years.  I did
10        three years of insurance defense
11        work after I graduated from the
12        University of Texas Law School,
13        although I'm from Lake Charles and
14        practice in Lake Charles, which is
15        25 miles this side or the other
16        side of the Sabine River.
17              My first toxic tort case was
18        tried in 1978 with Fred Baron, who
19        came to Lake Charles to try a
20        phosgene case with me.  Our jury
21        consultant was a woman named Lisa
22        Blue, who, of course, later became
23        Mrs. Fred Baron.
24              So, with the senior partners
```

FAC Resp. Exhibit D -- 1119

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          alone in these five firms, we have

2          got about 152 years of experience

3          that we bring to the table or

4          brought to the table in this

5          litigation.

6              I've got a chart of how we

7          set ourselves up and how we formed

8          this organization.  And just to

9          say it quickly once at the

10         beginning, the purpose of this

11         organization that we formed with

12         these five firms is that we,

13         because of our past experiences,

14         wanted to build a litigation

15         machine and a litigation pipeline

16         that would last indefinitely and

17         would relentlessly and

18         continuously produce triable

19         cases.  We're glad the case

20         settled, but we started this out

21         and we continued to the very end

22         like we might have a Vioxx docket

23         for ten years, and we wanted to be

24         viable, financially viable and be

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          able to do that.  So, the common

2          sense of it is that five firms

3          that put all those resources

4          together, you know, another five

5          firms in this room that did that,

6          would be able to sustain this

7          thing longer and in a bigger way

8          than any one firm can.  That's the

9          underlying common sense thing

10         about what we did here.  It's

11         really not a lot more complicated

12         than that, but that we didn't get

13         these cases to settle them, we're

14         glad we did, but we didn't know if

15         they'd do individual settlements.

16         We tried to apply the maximum

17         amount of pressure to Merck, and

18         we did that through this

19         organization.  So, let me start by

20         just quickly going over the

21         organization.

22              We will have copies of these

23         provided later if they are too

24         small for anybody to see.  I'll

FAC Resp. Exhibit D -- 1121

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          bring it up here where I can show

2          everybody.

3               The Vioxx Litigation

4          Consortium basically consisted of

5          36 attorneys from these firms, two

6          physicians, one CPA manager, five

7          Registered Nurse paralegals and 69

8          paralegals and staff.  We've got

9          the five firms and their

10         commitments in terms of attorneys

11         who worked on Vioxx down below

12         here.

13               In addition to the five

14         firms, we've got the Vioxx Center.

15         That was an independent -- it was

16         not in anybody's office.  We had a

17         separate office, an office

18         building down here on the corner

19         of 16 and 59 and had a whole

20         floor, I think, almost a whole

21         floor of that office building, if

22         not more.  In that Vioxx Center,

23         we had totally dedicated to Vioxx

24         four attorneys, one CPA manager,

FAC Resp. Exhibit D -- 1122

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          two physicians, five RN paralegals

 2          and 38 paralegals and staff.  So,

 3          that was the core dedicated center

 4          of the Vioxx operation.  Grant

 5          Kaiser is going to talk about how

 6          that functioned and how it was

 7          organized.  But that was the

 8          center of the operation, and these

 9          are the supporting and the

10          cooperating firms.  That's the way

11          it worked, but this thing is

12          Vioxx, totally dedicated to Vioxx.

13          That's what enabled us in many

14          ways to produce this flow of

15          continuous trial cases that we'll

16          talk about in a minute.

17               MR. SEEGER:  Drew, are

18          questions okay along the way or

19          would you rather do the

20          presentation?

21               MR. RANIER:  They are.  Why

22          don't you let me finish the

23          overview, and then we're going to

24          have individual people talk a
```

FAC Resp. Exhibit D -- 1123

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          little more about the details of

2          this.

3                MR. SEEGER:  I'm sorry I

4          interrupted.

5                MR. RANIER:  Let me try and

6          just do that.

7                While I'm on the subject,

8          here's a little more graphic form

9          of how that worked.  These are

10         approximate numbers.  We had

11         approximately 30,000 client

12         contacts, and those client

13         contacts went through the Vioxx

14         Center, which of course required a

15         substantial financial commitment,

16         complete medical records,

17         dedicated doctors, nurses and

18         lawyers, and then the five firms

19         vetting those cases.  And from the

20         30,000, we reduced that to 2,000

21         triable cases.  From those, at the

22         time of settlement, we had about

23         50 triable cases ready to go.

24         That includes the 30 that was the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1      last tranche that we put up in New

2      Jersey, and we were on schedule

3      and organized so we could produce

4      20 cases a month to try.  That was

5      our schedule at the time of

6      settlement.  So, with these 50, we

7      actually had 20 waiting in the

8      wings behind it, and we were going

9      to have 20 new ones up every

10      month.  That's basically the way

11      the organization worked.  Grant

12      can talk a little bit more about

13      that in detail later.

14          We're five firms.  We

15      operated as one firm.  We took all

16      of our resources, we pooled them

17      together.  We are asking for one

18      fee from common benefit.

19          Our presenters today and

20      their areas that they will cover

21      will be Mikal Watts, who will take

22      the lead, along with John Boundas,

23      Steve Kherkher and Amy Carter on

24      describing our trial work.  Grant

FAC Resp. Exhibit D -- 1125

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1      Kaiser is going to do the

2      organization and function of our

3      group.  I'll talk about our PSC

4      work and our time.  Walter Umphrey

5      is going to do financial

6      commitment.

7           I would like just to say a

8      few words about each of those

9      areas before I turn it over to

10     them from an overview standpoint.

11          In the trial area, a lot of

12     you know this, and I want to make

13     a general comment too about this

14     group.  While we did this sort of

15     standalone, not knowing where

16     things would go, I think it was

17     characterized from start to finish

18     by cooperation with our

19     colleagues.  A number of you

20     sitting at this table have been

21     co-counsel in cases that we have

22     had.  Andy Birchfield helped us

23     try a case.  He did a great job.

24     Chris Seeger is co-counsel in our

FAC Resp. Exhibit D -- 1126

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          cases in New Jersey and would have

2          been soon trying cases with us.

3               We tried two cases to

4          verdict.  We tried a Merck pick in

5          the MDL, a defense pick.  You

6          know, a lot of firms dismiss cases

7          rather than going to trial, but

8          that was our case, and we stepped

9          up and tried that case.  That was

10         the snow shovel case, where the

11         guy shoveled snow for quite a long

12         time before he had a heart attack.

13              MR. BLIZZARD:  Drew, that

14         had nothing to do with his heart

15         attack.

16              MR. RANIER:  Ed, I agree

17         with you.  I don't describe that

18         as a bad case.  We'll talk more

19         about that later, too, on some of

20         the work we did on epi.  I totally

21         agree with you.

22              MR. BLIZZARD:  Just to

23         interrupt for a moment.  You may

24         be going to get to this too, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1       Amy Carter was somebody who helped

2       on our trial on Mason.  John Eddie

3       graciously, when we needed help

4       getting ready for Mason, Amy had

5       just been in the Smith trial, and

6       so he said that Amy could come and

7       help us, and she did a great job

8       for us.

9               MS. CARTER:  Now you have

10      done about 50% of my entire

11      presentation.

12              MR. SEEGER:  You are off the

13      hook, Amy.

14              MR. RANIER:  I was just

15      about to mention that.  We tried

16      the two cases to verdict.  We

17      tried the Merck pick in the MDL,

18      one of those two cases.  We had

19      two cases fixed for trial in New

20      Jersey in November of 2007, and

21      for settlement related reasons,

22      that did not go to trial.  But the

23      judge continued it to January

24      pending settlement.  So, that was

FAC Resp. Exhibit D -- 1128

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          there and totally worked up and

2          ready for trial.

3                We submitted two other cases

4          to the PSC.  The PSC approved,

5          they went through the approval

6          process.  Lisa Dagostino, I know,

7          and others reviewed those cases.

8          Merck vetoed both of those cases,

9          28-year-old female heart attack,

10         and a mid-50s sudden death cardiac

11         man.

12               MR. KAISER:  We don't know

13         why they vetoed them.

14               MR. RANIER:  We had one case

15         set in California in 2007.  We had

16         three others for trial set in

17         2008.  And we had another 30 that

18         we had nominated or were about to

19         be nominated for the next tranche

20         in New Jersey and more in the

21         pipeline behind that.

22               So, I want to again say from

23         the outset that we went from

24         30,000 to 2,000, but we didn't

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              inventory those cases.  They were

2              not parked.  We built a trial

3              machine, and we built a pipeline

4              that flowed continuously with

5              these cases.  They did not just

6              sit there.

7                   Grant, I've said a lot

8              already about organization and

9              function.  I will let Grant do

10             that.

11                  On the PSC, a general

12             comment I will make on that, I

13             will do some details later, is

14             that because I was on the PSC, I

15             was a direct pipeline to these

16             five firms into the PSC and back.

17             These five firms took that very

18             seriously.  They fully

19             participated, fully involved

20             themselves in the MDL and the PSC

21             process.  We did not always agree

22             with everybody there.  I did not

23             always agree.  But we fully

24             participated, and we were fully

FAC Resp. Exhibit D -- 1130

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1              committed to it.  I was the chair

2              of the insurance committee and did

3              some other things that we'll talk

4              about later.

5                    Walter is going to talk

6              about financials.  Let's do a

7              summary chart on it here, and he

8              can go into some more detail.

9              This sort of sums it up for our

10             group, 13.5 million at the time of

11             settlement and 200,000 hours of

12             work.

13                   MR. HERMAN:  Have you got a

14             breakdown chart on the 13.5

15             million with you?

16                   MR. RANIER:  Walter does,

17             and Walter will present that.

18             That's at the time of settlement.

19                   Just to give you some idea

20             of the scope of that kind of

21             investment, the PSC, which I'm a

22             member of at the time of

23             settlement, Russ, correct me if

24             I'm wrong, but we were -- as a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1        group, we were at about 3.65
 2        million or something in that range
 3        at the time of settlement that we
 4        put up in cash.  So, these five
 5        firms had committed three or four
 6        times that amount of money to this
 7        litigation at that point.
 8             MR. HERMAN:  I'm not --
 9             MR. RANIER:  I understand.
10             MR. HERMAN:  The actual
11        dollars that the firms put up of a
12        similar nature exceeded $50
13        million.  There were 3.5 million,
14        I believe, to 4.5 million
15        contributed to a common cost fund.
16        But the actual dollars spent by
17        the law firms participating in
18        Vioxx exceeded -- not counting
19        your 13.5, exceeded $50 million.
20        What the exact figure is, I can't
21        even estimate right now because
22        the CPAs are still working with
23        it.
24             MR. LEVIN:  That didn't
```

FAC Resp. Exhibit D -- 1132

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          include individual case costs?

2                  MR. RANIER:  The 13.5

3          million?

4                  MR. LEVIN:  I don't know

5          what yours did.  The 50 million

6          that Russ says were common

7          expenses and that were held costs,

8          that didn't include individual

9          case costs for processing

10         individual cases?

11                 MR. RANIER:  I'm sorry.  I'm

12         getting my millions confused here.

13                 MR. LEVIN:  It is hard to

14         talk in millions.

15                 MR. RANIER:  The PSC, which

16         I was a member of, we had

17         contributed or raised about 3.65

18         at the time.

19                 MR. LEVIN:  That was the

20         assessment.  But then there were

21         common expenses in excess of $50

22         million for everybody.  And in

23         addition to that, the caseload

24         costs, the individual costs are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          not in that 50.

2                  MR. RANIER:  And the

3          common benefit -- you are talking

4          about expenses that people

5          submitted as common benefit

6          expenses on the forms from all PSC

7          firms or all firms?

8                  MR. LEVIN:  All firms.

9                  MR. RANIER:  All firms.

10                 MR. SEEGER:  I think the

11         point he's trying to make is it

12         doesn't include case specific

13         expenses, it was just common.

14                 MR. KAISER:  Gotcha.

15                 MR. RANIER:  Well, some

16         relatively small percentage of our

17         firm costs were carried in that

18         13.5.  That is not our firm

19         overhead.  The only thing that

20         that 13.5 applies to is the Vioxx

21         Center.  So, it's clearly not

22         nearly everything that we spent on

23         this litigation.

24                 MR. SEEGER:  That's where

FAC Resp. Exhibit D -- 1134

Page 27

1          the cases were processed?

2               MR. RANIER:  That's right.

3          That's right.  And I mean they are

4          back and forth to the firms, too,

5          Chris.  It is a constant vetting

6          process, vetting things with the

7          five firms.  But that was the

8          central coordination of that.

9               Before I turn it over to

10         Mikal about trial work, I would

11         like to suggest a few questions

12         for y'all to consider while you

13         are listening to the presentation

14         and while you're thinking about

15         fees in our case.

16              First of all, how many firms

17         seeking common benefit fees did

18         more trial work than these five

19         firms in the Vioxx Litigation

20         Consortium?

21              How many firms did more?

22              How many firms made greater

23         financial contributions to the

24         litigation than these five firms?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1           How many firms contributed
2       more cases and more quality cases
3       to the litigation?
4           How many firms were active
5       in more venues?  Grant is going to
6       talk about Texas, California, New
7       Jersey, New Orleans and state
8       court, selected state courts.
9           How many firms contributed
10      more time to the litigation?
11          How many firms brought more
12      experience to the table than these
13      five firms?
14          We are seeking one fee.  We
15      believe the answer to each of
16      these questions is few or none.
17      That means that this group should
18      be in the top tier of common
19      benefit fee awards.
20          MR. HERMAN:  Let me ask some
21      questions about that.
22          Of the 13.5, you said that
23      relates to your center, correct?
24          MR. RANIER:  That relates to

FAC Resp. Exhibit D -- 1136

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

 1        everything but firm overhead.

 2               MR. HERMAN:  I need to

 3        understand that better, because

 4        you have on other occasions said

 5        to me that y'all spent a terrific

 6        amount of money getting from

 7        30,000 cases to 2,000 cases.

 8               MR. RANIER:  That's where

 9        that money --

10               MR. HERMAN:  Is that that

11        13.5?

12               MR. RANIER:  I think Walter

13        will get into more detail --

14               MR. HERMAN:  How does that

15        differ -- and I'm being perfectly

16        honest with you, and I've had this

17        disagreement from the beginning.

18        How does that differ from any law

19        firm's case selection where you

20        get -- I don't care whether you've

21        got a consortium, a single firm or

22        a 600 person firm, you get in

23        cases, you put doctors, nurses,

24        paralegals on them, and then you

Page 30

1          determine which cases you are

2          going to jettison and which cases

3          you are going to keep.

4                Why is that 13.5 million to

5          be considered in any common

6          benefit?  Now, I'm not asking a

7          rhetorical question.  I'm asking a

8          question that really concerns me.

9          I don't think it just concerns me,

10         but that's something that you

11         really have to address and Walter

12         has to address, because right now,

13         in terms of the 13.5, I'm

14         completely unconvinced as to how

15         that differs from my individual

16         firm starting with 600 cases,

17         putting doctors and nurses on it

18         to get down to 120, which are my

19         firm's costs that I don't believe

20         I can recover not just in this

21         case, but in any case.

22                MR. RANIER:  Let me answer

23         in general terms first and then

24         talk about the details of the

Page 31

 1          money.

 2                MR. HERMAN:  I don't think

 3          it would be fair to you, Drew, if

 4          I didn't raise the question.

 5                MR. RANIER:  I understand.

 6          The way we have approached this is

 7          we have taken Judge Fallon's

 8          statements in Murphy Oil and have

 9          read those carefully, and in his

10          orders -- and 6(D) is even in

11          there.  It says that the important

12          thing in determining these fees is

13          the overarching contribution that

14          the firm made to the litigation.

15          You can start cutting it as fine

16          as you want down to hours and CPAs

17          and everything like that, but the

18          bottom line on this is the

19          overarching contribution that you

20          made to the litigation.  I'm happy

21          to cut it fine and talk about

22          that, but that's where we're

23          coming from on this.

24                All of the other stuff in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          this case, great legal work, great

 2          things done, I'm not criticizing

 3          anybody about that.  It has to

 4          stem and flow from a continuous

 5          and strong supply of trial cases

 6          and the ability to try a lot of

 7          cases for a long time.

 8               MR. HERMAN:  Let me --

 9               MR. RANIER:  That's what

10          this chart is talking about.

11               MR. HERMAN:  Let me put it

12          in a different perspective.

13               Your group not only tried a

14          case in the MDL that I monitored,

15          it was well tried --

16               MR. RANIER:  Thank you.

17               MR. HERMAN:  -- it was tried

18          to the highest level of trial

19          practice.  That's my view.  I

20          don't have a problem with anything

21          that went into that trial,

22          preparing it, who took the

23          depositions, what was done.  I

24          still do not see how I can recover
```

FAC Resp. Exhibit D -- 1140

Page 33

 1          for the 600 cases that I

 2          jettisoned after having physicians

 3          and nurses and paralegals and

 4          trial lawyers review and say, hey,

 5          these cases are not worthy of our

 6          representation in Vioxx.  That

 7          amount of money, let's take it out

 8          of your group, and why is my firm

 9          worthy of recovery and common

10          benefit?

11               MR. UMPHREY:  Russ, let me

12          answer that.  We're not asking for

13          that 5.7 million back.  That's

14          costs we absorbed.  We're not

15          asking for reimbursement of that.

16          We are talking about the screening

17          tests and to decide whether it is

18          a viable case or whether it is

19          not.

20               MR. KAISER:  Let me explain,

21          Russ.  I think we've gotten off on

22          the wrong track.  We're not

23          requesting reimbursement out of

24          the common benefit fee and expense

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1        fund of 13.6 million.  We're

2        telling you what we invested in

3        the case to push these cases

4        along.  What we submitted, we've

5        submitted.  It is a million and a

6        half, 2 million maybe as common

7        benefit.  So, we're not asking to

8        reimburse that amount.

9             MR. HERMAN:  Well, I think

10        that's really clear, Walter, and I

11        thank you for making it clear.

12             MR. LANIER:  So, what you

13        are saying is, what you spent for

14        common benefit is a million and a

15        half to 2 million, but you overall

16        committed that much money to try

17        to justify your involvement in the

18        litigation?

19             MR. HERMAN:  That makes a

20        lot of sense.

21             MR. LEVIN:  Which shows your

22        commitment to the case.

23             MR. KAISER:  Right.

24             MR. RANIER:  That's relevant

FAC Resp. Exhibit D -- 1142

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1           to fee, independent of expenses.

2                   MR. KAISER:  They understand

3           that.  This is about fee.

4                   MR. LEVIN:  It is part of

5           the gestalt process here.

6                   MR. WEITZ:  But, Drew, what

7           you are saying is, the amount of

8           money shows your commitment to the

9           litigation, and you want us to

10          take that into consideration in

11          evaluating the fee?

12                  MR. RANIER:  Right.

13                  MR. WEITZ:  That's really

14          what's being said.

15                  MR. HERMAN:  I have a weak

16          spot for Drew because he brought

17          Sarah with him.

18                  MS. RANIER:  It always

19          works.

20                  MR. HERMAN:  I see you back

21          there, Sarah.

22                  MR. SEEGER:  I'm still

23          afraid of her from the first time

24          I met her.

FAC Resp. Exhibit D -- 1143

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

 1            MR. RANIER:  Just a quick

 2       note on -- that's it.

 3            I think it is time that we

 4       move to Mikal Watts to talk about

 5       trial work.  Mikal.

 6            MR. WATTS:  Before I do

 7       that, Drew asked me to spend just

 8       a couple of minutes to talk about

 9       pre-recall work.

10            Let me just give you

11       background.  I tried a case

12       against Firestone in 2001, and

13       some guy calls me out of the blue

14       and wants me to try a Rezulin

15       case.  In 2001, myself,

16       Papantonio, Troy over there and

17       some other guys, Roe Frazier,

18       tried a big Rezulin case, got a

19       huge verdict.  That led to

20       something else.  Before you know

21       it, I'm doing Sulzer work and

22       trying cases with Blizzard and

23       we're involved.

24            My entry into this

FAC Resp. Exhibit D -- 1144

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          litigation actually is Andy's

2          fault.  I was, I think, at Mass

3          Torts Made Perfect in September of

4          2002, and to be honest with you, I

5          had never heard of Vioxx at that

6          time, and I was giving some speech

7          about the Rezulin verdict or the

8          Sulzer verdict, I don't remember,

9          but I'm listening to this speech

10         about Vioxx, and it seems to not

11         be getting a whole lot of traction

12         in terms of people understanding

13         because nobody has heard of it.

14         But I remember I respected Andy a

15         lot because we worked together on

16         Baycol and a whole lot of stuff,

17         and so I said, huh, and gave it

18         some thought.

19             Then a guy that came to work

20         for me named Chris Pinedo was

21         getting more and more involved

22         with Shelly Sanford on some stuff,

23         and so he came to me and said,

24         well, Shelly has some cases, and I

FAC Resp. Exhibit D -- 1145

Page 38

1      think Mark is going to try them.

2      I had already seen a speech and

3      everything, and I decided

4      basically on strength of

5      association, this is before I was

6      even involved, I think, that

7      something has to be going on.

8           So, in the spring of '03 I

9      think it was, my firm

10     individually, this is before this

11     consortium came together, I made

12     the decision that we were going to

13     start getting involved.  I don't

14     want to be disingenuous, but based

15     on if Andy is in it and Lanier is

16     going to be in it, it is probably

17     going to be fun.  So, we got

18     involved, the Watts Law Firm got

19     involved at that time.

20          For about a year, we began

21     working on bringing cases.  I

22     think my affidavit said we took --

23     we pared it down to between three

24     and 4,000 cases to somewhere

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          between 450 and 500 cases.

2          Unfortunately, a lot of the work

3          that I did was with a

4          cardiologist, a friend of mine, a

5          guy Allison put me in touch with

6          named Antonio Pacifico, who is a

7          very world renowned or was a very

8          world renowned cardiologist here

9          in Houston until he went down in a

10         Gulfstream right after the recall.

11              We also spent some time with

12         Joseph Burton, who I think was in

13         your original case, Andy, a guy I

14         use a lot in car cases working on

15         just grabbing all the COX-2 stuff

16         that, frankly, you guys had

17         developed, and spent a lot of time

18         working on that.  I think you and

19         I had some discussions about your

20         case before you tried it, and I

21         began working with Tommy Jacks,

22         who I think had cases in

23         Tennessee.  That's the way that

24         Larry, who now works with me, and

FAC Resp. Exhibit D -- 1147

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1        I got hooked up.

2              So, my firm individually was

3        kind of working on getting up to

4        speed, if you will, on Vioxx.  I

5        don't pretend to be as involved as

6        Andy was or as Chris was, and I

7        think Mark, obviously, did some

8        wonderful work in preparation for

9        his eventual trial in 2005.

10             What happened is, the recall

11       was announced, our four firms were

12       working on welding rods.  I had

13       this case because I knew enough

14       about the COX-2s, knew enough

15       about the science and the

16       literature and what was involved.

17       I think we were flying out to

18       Miami or something, and Walter and

19       I had a discussion about it.  And

20       he said, why don't we try to wrap

21       this up and really get in in a big

22       way, and we flew in, the four of

23       us, like we did in welding rods.

24       So, I took all of our firm's work

FAC Resp. Exhibit D -- 1148

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1        product and all of our cases and

 2        contributed them to this new

 3        entity that led to that.

 4             So, let me put that aside.

 5        I'm not going to talk about money

 6        or anything like.  The trial work,

 7        it's probably no secret, maybe to

 8        the chagrin of one or two of you

 9        in some litigation, I like to go

10        out and try a bunch of cases.

11        Sometimes it works, Firestone,

12        Rezulin, Sulzer.  Sometimes it

13        doesn't, Baycol.  I felt like it

14        was important to catch up as fast

15        as we could to start assisting

16        with trying cases.

17             Obviously, Mark's verdict

18        blew the whole thing up and got

19        everybody really jacked up, but at

20        least from the standpoint of where

21        I was, we had been in the case for

22        over a year, had started this up

23        before everybody knew about Mark's

24        prodigious talent in the
```

FAC Resp. Exhibit D -- 1149

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1          courtroom.  I mean, they knew

 2          about it, but the verdict.

 3              Anyway, where we found

 4          ourselves, or at least inside of

 5          ourselves or where I found myself

 6          is that when you looked at the

 7          Ernst case that Mark had success

 8          on versus the Irvin case that you

 9          guys had trouble on, when I read

10          the transcripts, what I saw was

11          that Mark seemed to win the fight

12          about this guy was a marathoner

13          who didn't have a whole bunch of

14          risk factors, and maybe you guys

15          were losing the fight about risk

16          factors.  I looked at my docket of

17          cases and saw 95 percent of the

18          people having a whole bunch of

19          risk factors, looking like me, you

20          are probably overweight, you don't

21          exercise a lot and whatever it is.

22          So, to me, in setting up the

23          trials that I wanted to be

24          involved in, I thought it was
```

FAC Resp. Exhibit D -- 1150

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1      important that we not just cherry

2      pick the very best cases, but we'd

3      be willing to show Merck that

4      we're going to try every one of

5      them since their attitude was,

6      we're going to make you try every

7      one of them.

8          I know that John is going to

9      talk about some stuff that I

10     pushed hard to start funding, and

11     that was to get some epi going

12     with respect to the presence of

13     risk factors, and I'm not going to

14     steal his thunder about that.  But

15     it was real clear to me that

16     somebody had to be willing to try

17     difficult cases, and to Andy's

18     credit, I thought he was already

19     doing that.

20         I volunteered, and Kherkher

21     over there and Boundas agreed.

22     There was no shortage of people

23     willing to do the plaintiffs'

24     picks, but we agreed to do the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1           defense pick.  I also agreed to

2           get involved in some case up in

3           Illinois that I knew nothing about

4           that involved a 290 pound

5           plaintiff.

6                   MR. WRIGHT:  298.

7                   MR. WATTS:  298, depending

8           upon the state of her diet.

9                   So, in effect, when we were

10          assigned to try the defense pick

11          in Smith, there was an epi paper

12          out there about shoveling snow.  I

13          think the attributable risk was in

14          excess of 99 percent, the relative

15          risk was over 200.  We're not

16          really involved in shoveling snow

17          down here, but apparently somebody

18          writes about it up in the

19          Northeast.

20                  MR. LANIER:  That's how it

21          made it through that screening

22          process from 30,000 to 2,000.  It

23          should have been 1,999.

24                  MR. WATTS:  With my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          prodigious ability to pick cases,

2          I get to try the case with a

3          relative risk of 200 and some

4          percent and a 290-pound plaintiff.

5               But the bottom line is, what

6          we tried to do and what I tried to

7          personally do is, this committee

8          had done some work that I thought

9          was real good work, and the

10         documents that were in some of

11         Mark's depositions were just

12         outstanding, but it was pretty

13         clear to me that at the time of

14         the first document attack, if you

15         will, reading through all the

16         documents was done, the people

17         that did it didn't know as much

18         about the litigation as we knew

19         three years later.  I thought

20         there would be some benefit of

21         going through and doing them all

22         over again from the standpoint of

23         just the corporate

24         representatives.  So, what I did

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

```
 1        is, with respect to largely some

 2        crosses that you had done, Nancy

 3        Santanello, Alise Reicin, Briggs

 4        Morrison, I worked with your firm,

 5        and I forget the paralegal that

 6        was so good.

 7             MR. SEEGER:  Mike Wagner.

 8             MR. WATTS:  Yes.  Somebody

 9        worked with Russ Abney, and any

10        document with any one of those

11        people's name on it, and there

12        were, it seemed like hundreds of

13        thousands of them, I had them all

14        sent to me, any transcript, any

15        paper, and I just started anew as

16        if they had never been through the

17        process.  We found a bunch of very

18        interesting stuff that, frankly,

19        weren't in any of the previous

20        records.

21             Steve focused on it.  I

22        agreed to try that case.  John

23        worked up the science, and Steve

24        was doing a lot of the jury work
```

FAC Resp. Exhibit D -- 1154

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

```
 1          and the plaintiff work, and my job

 2          was to do the corporate

 3          representatives.

 4               In the Schwaller case, same

 5          kind of thing, although in that

 6          case, I did the voir dire.  Andy

 7          and I have been good friends a

 8          long time.  I think Russ and I

 9          called him and said, hey, do you

10          want to go play together, let's

11          try this case together.  And he

12          very appropriately, I thought, and

13          I think it's a testament to -- one

14          of the factors when the litigation

15          isn't going that well, did you

16          quit or did you keep fighting.

17          Well, Andy Birchfield kept

18          fighting, and I think we did too.

19          Obviously, the guys to my right

20          over here were great.

21               So, that's primarily what my

22          focus was in trial.  I think I

23          crossed Briggs Morrison for a day

24          and a half, I crossed Alise Reicin
```

FAC Resp. Exhibit D -- 1155

Page 48

```
 1          for a day and a half.
 2               MR. SEEGER:  Those are two
 3          difficult crosses.
 4               MR. WATTS:  Well, they were
 5          fun crosses.  They were fun
 6          crosses.  And I literally did
 7          documents, annotations I sent to
 8          Chris, sent to Mark, sent to Andy
 9          to try to move things along, sent
10          to Ed, you know, just from the
11          standpoint of anything that
12          anybody had missed when those
13          original sweeps were done to try
14          to get those into the record.
15               MR. BIRCHFIELD:  I'm still
16          amazed at your ability to go
17          through documents.  It's
18          phenomenal.
19               MR. WATTS:  Well, it helps
20          when you've got Amy Carter
21          standing right behind you on that.
22               But that's primarily the
23          role that I did in terms of trial
24          preparation.
```

FAC Resp. Exhibit D -- 1156

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1           MR. SEEGER:  Amy, was that

2      the other half of your

3      presentation?

4           MR. WATTS:  Actually, I

5      moved to San Antonio for about

6      three months for the Smith trial.

7      I just didn't show up for work for

8      about three months, stayed at my

9      house and did nothing but read

10     this stuff.  It actually was a

11     good thing because there was a lot

12     of stuff done.  I'm not used to

13     bragging about defense verdicts,

14     and don't want to because I don't

15     believe in excuses, but they were

16     hard cases that needed to be

17     tried.

18          I think at the same time of

19     that, we had in place a second

20     strategy, and I know Chris and I

21     talked and Mark and I talked, I

22     wanted to go up to New Jersey and

23     help out where I could.  And I

24     know Steve was taking very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 50

1          significant steps to get us set as

2          fast as we could in New Jersey.

3          And then Walter's firm had another

4          effort going in California just to

5          apply as much trial pressure as we

6          could.  That continued up until

7          the time that you guys cut the

8          deal that you cut.  And so that

9          was kind of what we did with

10         respect to trials or what I did

11         with respect to trials.

12              If you have any questions,

13         I'll answer them.  Otherwise, I'll

14         pass it along.

15              MR. HERMAN:  I want to say I

16         frequented those trials.

17              MR. WATTS:  I know.

18              MR. HERMAN:  And I thought

19         they were extraordinarily well

20         tried.

21              MR. WATTS:  Thank you.

22              MR. HERMAN:  I have a

23         different view about trials than a

24         number of lawyers, and that is

FAC Resp. Exhibit D -- 1158

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

```
 1          because everybody gets a dog filed

 2          when you start off.  You get the

 3          worst of the worst.  And sometimes

 4          the defendants just have to know

 5          that you may not win the case, but

 6          you are going to bloody them in

 7          the process.  So, I think it is

 8          important -- lawyers that tell me

 9          that they've never lost a case, I

10          have problems with that.  Like my

11          dad used to say, if you want to

12          get a $1 million verdict, just

13          mistry a $3 million case.

14               MR. WATTS:  I did that last

15          week.

16               MR. HERMAN:  I don't think

17          enough can be said about the

18          quality of the trial work.

19               MR. SEEGER:  I would like to

20          say something about that, too,

21          about Mike.  Because from the

22          minute we started working with

23          each other on Vioxx, he has really

24          been a team player.  In fact, I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

```
 1          think I probably know you at some
 2          level better than most people in
 3          the group other than Drew.  The
 4          first trial that I had, Humeston,
 5          which didn't go well, and luckily
 6          Mark helped us right that one, you
 7          were one of the first people to
 8          write a very encouraging and
 9          supportive e-mail to me which I
10          have saved.  I wanted to thank you
11          for that at the time.  You really
12          are a team player, and the work
13          you did was fantastic.
14               MR. WATTS:  Thank you.
15               MR. HERMAN:  There are a
16          couple of other things I think I
17          can safely say, which is that post
18          Katrina, the jury venire changed.
19          For those of us that have tried a
20          lot of cases in that particular
21          federal courthouse, some of the
22          rulings on evidentiary matters and
23          in limine made it difficult for
24          plaintiffs.  Sometimes it happens
```

FAC Resp. Exhibit D -- 1160

Page 53

```
 1          to us.
 2                  From the overall
 3          perspective, when you've got 60 or
 4          70 defense firms, each one of them
 5          being paid by a corporate
 6          defendant to go to a particular
 7          venue and try 30 trials, they have
 8          an advantage over a plaintiff.
 9          So, I don't think there should be
10          any regrets.  I don't think there
11          should be any diminution in the
12          work that was done in the trials
13          that you folks conducted.  I have
14          no reservations about this, as I
15          said, and I want to make that
16          clear on the record.
17                  MR. BOUNDAS:  If anyone has
18          any questions, feel free to cut me
19          off.
20                  For the record, John Boundas
21          here from Williams Kherkher Hart
22          Boundas.
23                  A lot of people in this
24          room, I think, know our law firm
```

FAC Resp. Exhibit D -- 1161

Page 54

1          and the commitment and

2          determination that we show.

3               MR. HERMAN:  I apologize.  I

4          have one continuing family

5          emergency.  Let me step out for

6          just one minute.

7                    -  -  -

8               (Whereupon, a recess was

9          taken from 9:57 until 10:09 a.m.)

10                   -  -  -

11              MR. BOUNDAS: Anyway, for the

12         record, John Boundas, Williams

13         Kherkher.

14              A lot of the people in this

15         room know our firm and the level

16         of commitment and determination

17         that we show when we get involved

18         in a litigation.  I'm proud to say

19         that John Eddie, our managing

20         partner, has built a firm that a

21         defendant knows when we get

22         involved in a case that we're

23         going to commit whatever time,

24         whatever resources, talent, money,

FAC Resp. Exhibit D -- 1162

Page 55

1      whatever it takes to see it

2      through to the end.  Ed Blizzard

3      was there with us when we tried, I

4      think, 12 separate jury trials in

5      fen-phen all over the United

6      States.

7          When we got involved in the

8      Vioxx litigation, our partners in

9      the VLC and we saw that this

10     litigation might break much the

11     same way, in that we may have to

12     do the same thing, take the same

13     approach and get ready, if

14     necessary, to try case after case

15     after case.  Merck was saying they

16     were going to try every case,

17     Mikal mentioned that, and we felt

18     like that's what they're saying,

19     that's what we're going to say.

20     We sort of took that approach.

21          We tried cases, we conducted

22     jury research.  We worked cases up

23     for trial.  We worked with and

24     developed a whole host of expert

FAC Resp. Exhibit D -- 1163

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 56

```
 1        witnesses, some of which I will

 2        talk to you about later.  We were

 3        out there on the front lines.

 4             As far as the quality of our

 5        work, Russ, I appreciate what

 6        you've said about us.  I think a

 7        lot of you know, the lawyers in

 8        this room, haven't gotten a chance

 9        to work with Mikal and Steve and

10        Walter Umphrey and Grant and Drew.

11        I would put the quality of lawyers

12        in our group up against anyone.

13        And there were a lot of great

14        lawyers in this litigation and a

15        lot of lawyers whose work that we

16        used.  We used Mark Lanier's

17        depositions, and Andy helped us

18        tremendously.  So, this whole

19        litigation is to the credit of an

20        enormous number of people.  We're

21        not here saying we did it all, but

22        we are saying that we feel like we

23        were right there with everybody.

24             I want to talk a minute
```

FAC Resp. Exhibit D -- 1164

Page 57

```
 1          about the MDL and some of the work
 2          that we did.  When cases needed to
 3          get put up for trial, we were
 4          there.  We were asked to put up
 5          some plaintiff pick cases, we did
 6          it, we put up two cases, they were
 7          good cases, and Merck struck them.
 8          And I think that speaks to the
 9          quality of the kind of cases that
10          we were able to bring to the
11          table.
12              When a defense pick case
13          needed to be tried, we were there.
14          And I kind of felt like Mikey and
15          those Life Cereal commercials.
16          Well, who wants to try the defense
17          pick?  And all of a sudden they
18          pointed at me and Kherkher and
19          Mikal.  We stepped up and tried
20          that case.  It's been talked about
21          a little bit, the snow shoveling
22          issue.  After we lost the case, my
23          mom sent me an e-mail.  She grew
24          up in Chicago.  What were you guys
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 58

1          doing trying that case?  Everybody

2          knows when an old guy goes out to

3          shovel snow, he's going to have a

4          heart attack.  That's great.

5               On the DecisionQuest issue,

6          the shadow jury did award us $5

7          million, so, we're going to try

8          and recover some of that, spread

9          it around.  But, you know, that

10         was a tough case.  And I think we

11         did a good job in the case.

12         Obviously we wanted to win.  Mr.

13         Smith was a great guy, and I think

14         he had a good case.  But what I

15         think it showed Merck was that

16         this is going to be a tough

17         litigation if they want to go try

18         every case when they pick one and

19         it is going to be contested all

20         the way down to the wire.  That's

21         what I think that showed.

22               New Jersey, again, when

23         cases needed to be submitted for

24         trial, and the PSC and Chris and

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 59

```
 1          Dave Buchanan did a heck of a job
 2          up there, when they were asking,
 3          you guys need to submit cases, we
 4          were there.  We submitted, I
 5          think, 45 cases in New Jersey as
 6          wave I through III for trial.  At
 7          one point I think they only gave
 8          us 10 slots and we submitted 20.
 9          And so we submitted those cases.
10          We had 30 more cases literally
11          ready to go out the door for wave
12          IV, if necessary.
13               The way those cases got
14          submitted, I think Grant will
15          cover this a little bit, but we
16          had a team of lawyers, myself,
17          Grant, Amy, Steve, a bunch of
18          lawyers from our firm, nurses, to
19          go through all of those files, vet
20          the cases.  We would have long
21          meetings where we would go through
22          them and really tried to pick
23          cases that if Judge Higbee said,
24          hey, you guys are going to trial
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 60

```
 1        five times in March, that we'd

 2        have five cases to bring to the

 3        table.  So, we really made some

 4        efforts there.

 5             MR. HERMAN:  I'm going to

 6        interrupt you for one minute.  Did

 7        you submit any stroke cases?

 8             MR. BOUNDAS:  I don't think

 9        Judge Higbee ever got --

10             MR. HERMAN:  In the MDL?

11             MR. BOUNDAS:  We did not.

12        Is that right, Grant?

13             MR. RANIER:  We were working

14        on it, Russ, and that's actually a

15        note I have.

16             Brett might have been on

17        that.

18             MR. HERMAN:  I think you are

19        correct, in fact, I know you are,

20        that there were not a lot of firms

21        submitting cases in the MDL in MI.

22        We didn't have any on stroke.  But

23        your firm did step up, and the

24        cases were tried.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 61

1              With regard to

2        DecisionQuest, your mock jurors,

3        your shadow jurors were easy to

4        spot in the courtroom, including

5        the guy in the second to last row

6        reading the racing form.

7              MR. WATTS:  He was our

8        sinker.

9              MR. HERMAN:  I say that

10       because I want to emphasize again

11       that everyone around this table

12       has different views of different

13       things, but I think there's no

14       question about the willingness to

15       work up cases, to submit cases and

16       to try cases by the Vioxx

17       Litigation Consortium.

18             What I personally would like

19       to hear and what we're trying to

20       do is to make a record that's

21       fair, and particularly fair to

22       you, to give you the opportunity,

23       is to talk more about

24       contributions beyond the trial

FAC Resp. Exhibit D -- 1169

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 62

1           work because we know that.

2           Anybody that disputes that is

3           going to get a big argument from

4           me.  The other contributions that

5           you made, I think, are significant

6           enough that you ought to talk

7           about them or someone ought to

8           talk about them.

9                MR. BOUNDAS:  I've got some

10          of that.  I'm only going to be a

11          few minutes, but I do have some

12          other issues to cover.

13               For example, on, not just

14          the trial work, but in New Jersey,

15          we were working those cases up, we

16          were getting experts, depositions

17          were being taken.  Those cases in

18          the pipeline were being worked.

19               MR. BLIZZARD:  John, let me

20          ask you.  How many of them were

21          being worked up for trial where

22          you actually presented people for

23          depo?

24               MR. BOUNDAS:  I think we

FAC Resp. Exhibit D -- 1170

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 63

1          presented at least four plaintiffs

2          for depo, maybe more.

3              MR. KHERKHER:  Two of them

4          got shut down for various reasons,

5          but we were always there.  I mean,

6          Dave Buchanan was my new best

7          friend, and he told me exactly

8          what to say.  I mean, I feel

9          awkward trying to build ourselves

10         up when I look across the table

11         and I did it because of you guys.

12         I mean, I wasn't able to get in

13         the door if it wasn't for Dave

14         Buchanan.  He whispered in my ear

15         and told us what to say.  The only

16         compliment I got -- I mean,

17         granted, here I am learning how to

18         try a Vioxx case, and I saw Mark

19         Lanier try it and Chris Seeger try

20         it, but Judge Higbee, the best

21         compliment she ever gave me was,

22         you are the first one to raise

23         your hand that you want to try a

24         case.  We were going to try the

FAC Resp. Exhibit D -- 1171

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 64

```
 1        Georgia cases, and we were going
 2        to try the New York cases, the
 3        Pennsylvania cases, and Sol Weiss
 4        got in, and we tried to work with
 5        everybody.  But when Russ says,
 6        what did y'all contribute, we were
 7        part of the team.  I mean, we were
 8        ready to push this entire
 9        litigation with the help of you
10        guys and get to the end result.
11        So, that's what we were doing.
12             MR. SEEGER:  I have to tell
13        you, Steve, on the trial front, I
14        think we are all in agreement when
15        I look at you and John and Mike, I
16        mean, we know who were the guys,
17        the trial lawyers in the trenches
18        every single time saying, coach,
19        put me in the game, put me in the
20        game.  You guys were there.
21        Nobody can dispute that.
22             MR. KHERKHER:  But as far as
23        the intangible contributions,
24        that's part of it.  What more can
```

FAC Resp. Exhibit D -- 1172

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 65

1           I say other than, what gets us to

2           the end result is these trial

3           settings, knowing that -- when I

4           was at the University of Houston,

5           I wasn't good enough to play

6           football, but I was a ball boy.  I

7           was a water boy.  My claim to fame

8           is Lionel Wilson, the quarterback,

9           busted his helmet, and I fixed his

10          helmet.  He only missed one play,

11          he got back in the game, and he

12          scored the touchdown.  Did I score

13          the touchdown?  No.  But I was

14          part of the team.

15               MR. LANIER:  I always

16          thought you scored that, Kherkher.

17          That's not the way Susan told us

18          the story.

19               MR. LEVIN:  You are lucky it

20          was his head and not your head.

21               MR. KHERKHER:  Now, granted,

22          I wish I was on your side of the

23          table, but we're all part of the

24          team.  You guys are the owner,

FAC Resp. Exhibit D -- 1173

Page 66

```
 1          general manager and quarterback,

 2          and maybe we're not the water

 3          boys, maybe we're just the

 4          superstar running backs that

 5          helped the whole team get to where

 6          we needed to be.  I mean, whether

 7          it is off in our building which

 8          was in Houston, Texas when we had

 9          meetings for the consortium and

10          other plaintiff lawyers, but I

11          still feel awkward because we

12          could not get here -- I mean, Andy

13          Birchfield, I didn't even know

14          him, he's giving me his cell

15          number so I can call him so he can

16          feed me information.

17               MR. BLIZZARD:  That was a

18          mistake.

19               MR. KHERKHER:  It helped me,

20          Russ, to provide you information

21          on -- other than trial settings,

22          what we helped this great team to

23          get to where you need to be

24          because I'm missing it other than
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 67

 1          just --

 2                 MR. HERMAN:  Well, there's

 3          no question that preparing for

 4          trial, getting the experts, doing

 5          the mock juries, putting the cases

 6          up is extraordinarily significant.

 7          But fortunately in this room,

 8          there's not a lawyer here that

 9          doesn't try cases and hasn't been

10          through the wars.  We understand

11          completely the significance of

12          that and the gravity of it.  I

13          think there are other

14          contributions that you made

15          outside of that, and that's what

16          I'm trying to get at.

17                 MR. BOUNDAS:  I've got some

18          of that.  Let me give you an

19          example.  At our firm, we had 12

20          attorneys commit time to Vioxx.

21          Some of them took expert depos,

22          presented plaintiffs, worked cases

23          up.  But Collyn Peddie, she's got

24          25 years of experience as an

FAC Resp. Exhibit D -- 1175

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 68

```
 1          appellate lawyer.  Anybody --
 2              MR. HERMAN:  Let me try and
 3          help you out.  Y'all did send
 4          expert depositions and reports to
 5          the depository?
 6              MR. BOUNDAS:  Right.
 7              MR. HERMAN:  Now, that's a
 8          contribution, okay, of common
 9          benefit because other lawyers get
10          the advantage of that work
11          product.  That's the type of thing
12          that I'm asking you about and I'm
13          trying to --
14              MR. BOUNDAS:  I'm getting to
15          it.
16              MR. BIRCHFIELD:  Let me say
17          this to you because, please, don't
18          mishear what we're saying because
19          we know the tremendous value that
20          comes from trying cases, working
21          cases up and moving the docket.
22          So, we're not diminishing that at
23          all.  I think all Russ is saying
24          is that we've got that.  We've
```

FAC Resp. Exhibit D -- 1176

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 69

1          heard you on that.  We've heard

2          you, but not only that, we knew.

3          I think Mikal's point is an

4          excellent one, and Mikal is

5          fearless, and he will try any

6          case, and they know it.

7               What John was saying on the

8          snow shoveling case, Merck

9          couldn't turn around -- they knew

10         there were some lawyers that could

11         set their case and they'd get a

12         dismissal and they could come to

13         the status conference and they

14         could report.  This is another

15         case that was set for trial and

16         dismissed by the plaintiff's

17         lawyer.  That did not happen.

18         That did not happen with you and

19         your group.

20              And so we know the value of

21         trying cases, the value of saying,

22         put me in, coach, we're here,

23         we've got cases ready to try,

24         working those up.  We're not

FAC Resp. Exhibit D -- 1177

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 70

1          diminishing that in any respect.

2          What we're saying is that we've

3          got that.

4               MR. HERMAN:  Let me put it a

5          different way.  There are

6          carnivorites and vegetarians.  And

7          the carnivorites like blood meat.

8          They want to try cases, and they

9          know how to do it.  We understand

10          how important that is.  You made

11          other contributions you should

12          talk about.  You've got a lot of

13          time to talk about it.

14               MR. WEITZ:  Let me highlight

15          a little bit about what Steve said

16          and what Andy said.  You have to

17          understand that a lot of us on the

18          committee went through what you

19          guys went through in the beginning

20          of your presentation, sifted

21          through thousands and thousands of

22          cases, put in an enormous

23          financial contribution into this,

24          had dozens of lawyers and

FAC Resp. Exhibit D -- 1178

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          paralegals working on this.  So,

2          we know not only the hard costs,

3          but the soft costs and the

4          dedication that the Texas group

5          put into it.  So, a lot of that or

6          all of that does not go on deaf

7          ears.  We get it, and we know the

8          contribution that makes towards

9          moving the litigation, and that's

10         what we're focused on.  It is not

11         just the hours, it is the quality

12         of work, it is a lot of the things

13         that Andy said about moving the

14         cases and having the ability and

15         the resources to do that.  So,

16         Andy is right.  We get that.

17             What we need a little bit

18         from you also is when you talk

19         about New Jersey and Judge Higbee

20         and the waves, I mean, Chris and I

21         were there, and we had most of the

22         cases on that docket.  We need to

23         know specifically cases that had

24         work done on them, not just put in

FAC Resp. Exhibit D -- 1179

Page 72

1          a tranche, but actually tell us,

2          okay, this was done, there were

3          Daubert motions that were done,

4          the experts were proffered, there

5          were motions in limine.  What

6          stage did you get?  Because we

7          know that you guys were ready to

8          move cases, but did they actually

9          get to a certain stage?  So, see

10         if you can focus on that.

11              MR. BOUNDAS:  This is all on

12         the page here.

13              MR. SEEGER:  Just hand in

14         your paper.

15              MR. BOUNDAS:  I'll answer

16         your question.

17              MR. HERMAN:  You had better

18         do it before I get another call.

19              MR. BOUNDAS:  We had the

20         Romans and Sanderson cases in New

21         Jersey.  They were the next cases

22         up for trial, and they were set I

23         think originally October, then I

24         think it occurred to me that Judge

Page 73

```
 1          Higbee must have known something.
 2          She moved them up.  We worked
 3          those cases up, we got experts.
 4          I'm going to tell you about a
 5          couple of the new experts that we
 6          were going to bring to New Jersey
 7          that we were going to offer and
 8          actually offered our marketing
 9          expert for common use.  But on
10          Romans and Sanderson, we worked
11          the cases up, we presented the
12          plaintiffs, we did the discovery.
13          We were literally spending months
14          getting ready for that trial.
15               And to give you one example,
16          we got Dr. Martin Wells, who is a
17          biostatistician from Cornell.  We
18          got him all the raw data from
19          Merck's clinical trials, the raw
20          stuff, the SAS files, all of that
21          stuff, and he went through that
22          data and was able to show some
23          very interesting things.  One was
24          that the signal shows up far
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 74

1          earlier in Merck's data than you

2          can ever imagine when you actually

3          analyze it the way they were

4          supposed to do it at the outset.

5               The second thing is what

6          Mikal mentioned, was that we saw

7          that risk factors were going to be

8          the dominant defense here.  So,

9          what Dr. Wells did was look at,

10         well, can we take Merck's data and

11         use it against them on the risk

12         factor issue.  And he came up with

13         a report showing that we can take

14         their own clinical trial data and

15         demonstrate that Vioxx is more

16         dangerous than all of these other

17         risk factors.  And so we were

18         going to present that in a graphic

19         way to show the jury that, look,

20         we're just using their data,

21         here's how the risk factors line

22         up and here's where Vioxx stacks

23         up.  We thought that was a big

24         piece.

FAC Resp. Exhibit D -- 1182

Page 75

1          MR. LANIER:  Can I interrupt

2      and ask a question, please?

3          MR. BOUNDAS:  Sure.

4          MR. LANIER:  Two questions

5      on that point.

6          First, do you know if your

7      materials and the experts and the

8      Cornell fellow, for example, have

9      y'all given that material to the

10     MDL to put into the trial package?

11         MR. BOUNDAS:  Grant, I think

12     that was turned in.

13         MR. KAISER:  I'll have to

14     check.

15         MR. BOUNDAS:  I've got a

16     copy of the report.  I assume it

17     was turned in.  The thing you need

18     to know is that that report was

19     completed and filed -- or not

20     filed, I don't remember, it was

21     like a week before the settlement

22     was announced, so, I'm not sure

23     how it fell into that mix.

24         MR. HERMAN:  Can you check

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 76

1          on that?

2                  MR. RANIER:  Mark, you are

3          right.  It needs to be there.

4                  MR. LANIER:  Right.  You

5          don't want on the record an

6          argument that that doesn't really

7          contribute to the common benefit

8          because it was done a week before

9          the settlement was announced, but

10         if you get it into the trial

11         package, then arguably it is

12         something that's out there now for

13         the people who maybe didn't take

14         the settlement.

15                 MR. LEVIN: It's also our

16         obligation and --

17                 MR. BOUNDAS:  You've got it,

18         and that's available.  So, I think

19         it has a double benefit.  One was

20         we were getting ready to try these

21         cases with some new stuff for

22         Merck, and we were working on

23         that.

24                 MR. BIRCHFIELD:  John, on

FAC Resp. Exhibit D -- 1184

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 77

1           the trial package point, because

2           this is a significant fact, and

3           I'm almost certain that

4           Mikal's cross-examination of the

5           corporate rep, I'm sure that was

6           submitted for the trial package.

7           Mikal took advantage of some

8           favorable Illinois law on a

9           corporate rep there and laid the

10          foundation for a tremendous number

11          of documents.  That's part of the

12          trial package.  That's the kind of

13          thing we're talking about.

14                MR. HERMAN:  Because it's

15          important.  The way that we

16          justify in this case common

17          benefit, because it's not a class

18          action, it's not a class action

19          settlement, it's a contractual

20          thing, is by saying, okay, for you

21          folks that didn't want to put your

22          cases in, you can't complain about

23          this settlement.  And the reason

24          you can't complain is here's a

FAC Resp. Exhibit D -- 1185

Page 78

1          trial package on MI, here's a

2          trial package on stroke, go try

3          your cases.

4               I know we've all been in

5          cases where people talk about

6          trial packages and you would take

7          that package and just throw it in

8          a trash can.  I know what folks

9          spent preparing and getting these

10         cases to trial.  Most of them cost

11         between a half a million and a

12         million and a half bucks.  The

13         trial package enables folks to try

14         cases for less than $200,000.

15              Getting that report into the

16         trial package now has value.  No

17         one can say it comes late because

18         there's still people out there

19         that say they are going to try

20         cases.  And we say, okay, here,

21         take it.  So, what you have to say

22         is very important, and it

23         shouldn't be --

24              MR. BOUNDAS:  I think also

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 79

1          as a side point, Grant Kaiser's

2          affidavit that we have submitted

3          has a large amount of materials

4          that we did submit to the trial

5          package.  I think Grant will cover

6          that.  I just can't tell you right

7          now if that report is in.

8               Another report that we did

9          is we spent a lot of time

10         realizing that putting together

11         the marketing case in a really

12         coherent way for a jury, Ed did

13         this in his trial with Dr.

14         Pechmann, struck us as a good

15         idea.  We went out and worked with

16         Dr. Marvin Goldberg at Penn State

17         who put together a really first

18         rate comprehensive report going

19         through Merck's entire marketing

20         plan and really explaining how

21         calculated, devious, the kind of

22         message they were trying to get

23         across.  So, that was something

24         else that we had brought to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 80

```
1          table.  And actually at one of the

2          hearings, I offered to the New

3          Jersey group that we would make

4          that available for common use.

5          Again, the case settles within a

6          week of that designation date.

7          So, the same issue, and I hear

8          you, that we may need to get that

9          out there.

10               So, on those cases, those

11          weren't just cases we threw in the

12          trial pool.  So, I also have to

13          add we were working with a lawyer

14          named Forest Horn at Martin &

15          Jones.  Forest was our co-counsel,

16          and I think you guys are meeting

17          with him.  He certainly

18          contributed.  So, not just putting

19          cases in the hopper, but we were

20          getting ready for the next trial.

21          Then there were trials after that

22          we were getting ready for.

23               Some other contributions.  I

24          mentioned our firm committed 12
```

FAC Resp. Exhibit D -- 1188

Page 81

1        lawyers at various stages.  We

2        submitted affidavits.  I'm not

3        going to rehash all that.

4             But to give you one example,

5        Collyn Peddie is a very

6        experienced appellate attorney,

7        very well known across the country

8        at this point for her work on

9        preemption issues --

10            MR. LEVIN:  She's been

11       terrific.

12            MR. BOUNDAS:  She's an

13       excellent lawyer.  And the Texas

14       MDL, we didn't file a lot of cases

15       there, but we saw in the Ledbetter

16       case that things were going south,

17       and that could hurt everybody.

18       And John Eddie stepped up to the

19       plate with Collyn's agreement and

20       said, hey, Collyn, will you go in

21       there and take that case on.  And

22       she took it on kind of late in the

23       game, she filed a motion for a new

24       trial, handled the entire appeal,

Page 82

 1          which, you know, fortunately now

 2          is dismissed due to the settlement

 3          presence.  That wasn't our case.

 4          We don't have a fee interest in

 5          that case and never did.  Collyn

 6          spent, I think, over 1,200 hours

 7          on that case, arguing it, briefing

 8          it, fighting it, all for the

 9          common good.  I think we had 14

10          cases in Texas.  So, it certainly

11          helped our clients, but helped a

12          lot of other people.

13              Collyn also came to the MDL,

14          filed motions and numerous

15          responses to Daubert motions that

16          I'm sure are in the trial package,

17          they are excellent work product,

18          and I'm happy to say in that case

19          I don't recall a significant

20          evidentiary ruling that we lost.

21          Actually, we got Judge Fallon to

22          turn around on a couple of

23          important issues, one of which was

24          Dr. Graham's analysis of how many

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 83

1      people had been killed or had

2      heart attacks as a result of

3      taking Vioxx across the country.

4      As I understand, Judge Fallon had

5      not let that in before.  We got

6      that evidence in in that case.  I

7      think that was a benefit.  A lot

8      of people deserve the credit for

9      that.

10          Collyn did a lot of work

11     there.  I think in all, she spent

12     17, 1,800 hours on common benefit,

13     briefing, researching, doing a lot

14     of hard work with a person who's

15     extremely talented.  That's

16     another --

17          I'll leave it at this point

18     to let Amy cover her contribution.

19          MR. SEEGER:  John, if I can

20     ask you a question before you wrap

21     up.  If it's in there, it is easy,

22     but in your affidavit, actually,

23     it's the group because you have

24     multiple law firms, do they

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 84

```
 1          outline contributions in terms of

 2          legal briefing, discovery

 3          contributions, things you did sort

 4          of that go, like I say, beyond the

 5          obvious stuff that we know, the

 6          background stuff.  Amy, are you

 7          going to be getting into this?

 8              MR. BOUNDAS:  Yes.  For

 9          example, we had two lawyers who

10          put on the mock trial.  That will

11          be in there.  We had a number

12          of -- like Jim Doyle and some

13          other lawyers took depos of Merck

14          expert witnesses, and that's going

15          to be in there.

16              MR. SEEGER:  Other than Drew

17          and his position on the PSC, were

18          there any members that had liaison

19          or positions on any committees?

20              MR. KAISER:  Yes.

21              MR. SEEGER:  That's in

22          there?

23              MR. KAISER:  My affidavit.

24              MR. RANIER:  It is in
```

FAC Resp. Exhibit D -- 1192

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 85

1          Mikal's affidavit, and I know it

2          is in Grant's.

3               MR. LANIER:  When you talked

4          about the way y'all were

5          coordinating through Drew and the

6          MDL, I was not an MDL lawyer, I

7          did my work --

8               MR. WATTS:  Short lived

9          liaison counsel.

10              MR. LANIER:  But I don't

11         have an intimate familiarity with

12         a lot of the MDL stuff.  I do have

13         intimate familiarity with a number

14         of other jurisdictions though.

15         And having tried three of these

16         cases, I have a decent grasp of

17         who the witnesses are.  When you

18         talk about the efforts y'all did

19         with your Cornell statistician,

20         one of the thoughts that occurs to

21         me is, did y'all integrate with

22         Drew to see whether or not you

23         were running a duplicate tract of

24         what was being done, or was this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 86

1      being done at the behest of the

2      MDL, or was this being done

3      independently and now looking to

4      merge into it?  Can you give me a

5      feel for how that was done?

6          MR. BOUNDAS:  To give you an

7      overall point, I flew around the

8      country and met with experts in

9      probably five or six different

10     states.  We had people -- we had

11     all kinds of expert work going on

12     that was not, hey, guys, go out

13     and get experts because we were

14     figuring we're going to have to

15     have to try cases.  We're going to

16     need five cardiologists and not

17     one.  We're going to need

18     epidemiologists.  A lot of that

19     was at the behest of the MDL.

20     I'll let Drew answer on Dr. Wells

21     specifically.  All I know is we

22     went out there and did it.

23          MR. BIRCHFIELD:  What about

24     in New Jersey?  I know you were

FAC Resp. Exhibit D -- 1194

Page 87

1          working with Dave.  Was Marty

2          Wells, was Dave aware --

3               MR. POWERS:  Dave got us the

4          data.

5               MR. RANIER:  The way that

6          started was I called Dave Buchanan

7          and said, Dave, we would like to

8          take a look at the raw data.

9          Because everybody had seen the

10         runs, everybody knew that they

11         diluted the Konstam -- they

12         diluted the Konstam meta-analysis

13         with Alzheimer studies, and they

14         would get crossed on that.  But

15         nobody had ever gotten the actual

16         data itself under the --

17              MR. LANIER:  Actually,

18         Madigan did --

19              MR. SEEGER:  That's not

20         true.  I have to correct you on

21         that one.  Because we got in

22         electronic native format all of

23         the SAS files and all of the

24         backup.  I have to check with

Page 88

1          Dave.  It could be that you may

2          not have had it in your hands and

3          you needed it for your guy.  But

4          you've got to remember that

5          Kronmal, who was a biostatistician

6          from University of Washington, had

7          gone through all of that, and then

8          Madigan came along --

9                  MR. LANIER:  Madigan came in

10         and did the same thing.

11                 MR. SEEGER:  -- and looked

12         at it in a little bit different

13         light.  Your guy was doing the

14         same thing.  I'm not diminishing

15         the idea, but I just want to be

16         clear on the record what was

17         available and what was not.

18                 MR. WEITZ:  But it was done

19         in Jersey.

20                 MR. BOUNDAS:  Some of it was

21         those experts weren't available

22         for that particular trial, and we

23         knew -- Kronmal is a good example.

24                 MR. SEEGER:  We were trying

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 89

1        to build a bullpen.

2                MR. LANIER:  I know a good

3        example is y'all had asked me

4        about using Krumholz, and Krumholz

5        would not agree to helping y'all

6        out, so y'all needed someone

7        extra.  Krumholz, for example, had

8        used that same data in our third

9        trial to say the signal was there

10       in 2000.

11               MR. BOUNDAS:  I think I read

12       his transcript.

13               MR. RANIER:  Did he do the

14       risk factor data?  Did he break

15       out diabetes, high blood pressure,

16       and all of that like Wells did?

17               MR. SEEGER:  That was done.

18               MR. LANIER:  Yes.

19               MR. WEITZ:  Walter?

20               MR. UMPHREY:  I think one of

21       the main issues on common benefit

22       that we contributed was the

23       ethical issue.  When you folks

24       negotiated a settlement, I know

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 90

1          that we were at a difference of

2          opinion, and we were not in a

3          position to recommend that to any

4          of our clients, and we wouldn't

5          have done it.  Mr. Williams took

6          the lead in this issue and Drew

7          and worked it out satisfactorily

8          where we felt under the Texas

9          ethical rules we were okay.  I

10         think by doing that, we saved a

11         lot of problems for a lot of other

12         lawyers.

13              MR. LANIER:  And probably

14         helped a lot of other Texas

15         lawyers sign on even that had

16         cases in New Jersey, because I

17         would be bound by Texas rules in

18         New Jersey.  That was a big help.

19              MR. UMPHREY:  They never

20         would have had the numbers for the

21         settlement if not for our efforts

22         in that regard.

23              MR. SEEGER:  I guess I want

24         to be clear because we're taking

FAC Resp. Exhibit D -- 1198

Page 91

1      this down, and Walter, I have

2      nothing but the highest respect

3      for you, your firm, everybody.  I

4      think what we ultimately wound up

5      doing is getting a clarification

6      about what the language meant.

7      That was very helpful to you.  But

8      I can tell you from the very

9      moment it was negotiated and the

10     intention of the committee, we

11     very much had Texas as the big

12     concern because we know that

13     that's a very difficult state.  I

14     think that John Eddie was a little

15     uncomfortable with the way some of

16     the verbiage was, and we clarified

17     some things.  I want to just make

18     that clear for the record.

19          MR. UMPHREY:  I also think

20     this group contributed heavily by

21     cooperating with your group.  We

22     did that in the very beginning.

23     Nothing was ever withheld from you

24     or we didn't make full disclosure,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 92

1          full cooperation.  Whatever it may

2          be, we were there.  And I think we

3          should be given a plus mark for

4          that.

5               MR. BIRCHFIELD:  I agree 100

6          percent on that, Walter, and that

7          was really the purpose of this

8          series of questions about, was

9          this coordinated through New

10          Jersey.  I mean, we all know that

11          there are lawyers out there that

12          have basically taken their cases

13          and done their own thing and run

14          their own show and kept it all to

15          themselves.  That plays different

16          in a common benefit setting than

17          someone who is coordinating and

18          communicating with the other

19          jurisdictions.  That was the

20          purpose of those questions.

21               MR. BLIZZARD:  Let me say

22          something, too, because I think

23          this will be helpful.

24               MR. UMPHREY:  I have always

FAC Resp. Exhibit D -- 1200

Page 93

1           found over the years that when you

2           take good lawyers like those that

3           surround us at this table, when it

4           comes to fee division, good

5           lawyers are fair.  They recognize

6           the work of other lawyers and what

7           it contributed, and they are

8           willing to reward their friends

9           and their associates in the

10          economic aspect of it.

11               MR. SEEGER:  I agree with

12          that personally.

13               MR. BLIZZARD:  I just want

14          to say when we were getting ready

15          for Mason, our trial, right after

16          you guys had tried Smith, not only

17          did Mikal send me everything that

18          he had, but Steve and John and Amy

19          came and sat down with our team

20          and debriefed us on what had

21          happened, what witnesses worked,

22          what didn't work, what might be

23          helpful in the next trial.  That's

24          the way that teams approach

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 94

```
 1          things.  You guys didn't have to

 2          do that.  We had worked closely in

 3          the past, obviously, on fen-phen.

 4          We knew each other.  But it wasn't

 5          just that.  I mean, it is the kind

 6          of thing that John mentioned, John

 7          Eddie threw Collyn into the mix on

 8          preemption.  We know how important

 9          that was in Texas, but not only in

10          Texas, but nationally that

11          preemption issue was hanging over

12          our heads even after we settled

13          this case.  There was a period of

14          time that we sometimes forget

15          about where they could walk away

16          from the deal and leave 4.8

17          billion dollars, 85, don't want to

18          forget that 5.

19               MR. HERMAN:  Please don't.

20               MR. BLIZZARD:  A lot of

21          people in this room stepped up and

22          made not only commitments of work

23          and effort to try to fight the

24          preemption issue, but put money on
```

FAC Resp. Exhibit D -- 1202

Page 95

1            the table to help fight that

2            issue.  I think that the group

3            here, as well as people on the

4            committee itself, made, again, a

5            team response to that threat.  I

6            think that is a contribution that

7            was made throughout this.  All of

8            you guys said we're in this

9            together.

10                MR. BOUNDAS:  I think in the

11           New Jersey litigation, there was a

12           high level of coordination.  It

13           wasn't just our case.  We had

14           Romans and Sanderson set.  I know

15           that Sol had a case set.  There

16           were probably two or three others.

17           Mark Lanier had one.  The idea

18           was, we're going to try all of

19           these cases at the same time,

20           we're going to share resources if

21           we have to have experts shuttle

22           from one courtroom to the other,

23           work on depo cuts together.  Steve

24           did a lot to coordinate that.  The

Page 96

```
 1          idea there was we're going to try

 2          these four cases, and then Judge

 3          Higbee said we're going to set

 4          some in March, April or June if

 5          this doesn't settle.  That was

 6          really, I think, a team effort.

 7               MR. KHERKHER:  We had three

 8          meetings at Sol Weiss'

 9          Philadelphia office that I

10          coordinated with the help of Dave

11          Buchanan, of course.  Again, I

12          feel every time I say something

13          great we did, I did it with the

14          help of you guys also.  But we

15          were a great team.  You are right,

16          Ed.  We were a great team.

17               MR. HERMAN:  I want to get

18          back to the ethics thing that

19          Walter mentioned.  This isn't our

20          opportunity to pat ourselves on

21          the back, but I think you should

22          know that Ed Blizzard during the

23          negotiation made everyone on the

24          negotiating committee aware of the
```

FAC Resp. Exhibit D -- 1204

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 97

1          Texas rules, and I think we had

2          three ethics experts before

3          anything was put on paper.  Ed was

4          extraordinarily conscientious, and

5          it did help.  We had a meeting --

6          I don't even remember where we had

7          a meeting.  We had a meeting where

8          you brought in, I think, Harry

9          Potter.

10                MR. KAISER:  In Atlanta.

11                MR. LANIER:  You were

12         excited when you heard Harry

13         Potter was coming.

14                MR. HERMAN:  Yes, I was.  I

15         looked for the little mark on his

16         head.

17                But you brought in a couple

18         of folks and, Walt, I thought that

19         meeting was extremely productive.

20         I think it is important to know

21         that without resolving the special

22         ethics agitation that comes from

23         Texas rulings in light of trial

24         practice, it not only solved it

FAC Resp. Exhibit D -- 1205

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 98

```
 1        for Texas, but it had an impact in
 2        other jurisdictions as well.
 3        Because there were lawyers that
 4        really were looking to the Texas
 5        lawyers who were tag-alongs.  They
 6        don't do very much, but when they
 7        see some group of excellent
 8        lawyers come up with an issue,
 9        they immediately want to jump on
10        it.  And the fact that it was
11        resolved to the satisfaction of
12        your group had an impact beyond
13        Texas.  So, I'm glad you brought
14        that up.  I don't think we would
15        have recalled that contribution,
16        actually, and I think it was
17        significant.
18             I have some other
19        questions -- go ahead.  It is your
20        turn.
21             MS. CARTER:  I think it is
22        my turn.
23             You asked earlier, Russ,
24        what we sent in as far as expert
```

FAC Resp. Exhibit D -- 1206

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 99

```
 1          reports and depositions and that

 2          sort of thing to the MDL package.

 3          Essentially John Eddie sent me in.

 4          I was first involved in Smith, and

 5          I did all of the deposition cuts

 6          and all of that behind the scenes

 7          stuff that everyone hates to do

 8          but takes up a lot of time.  There

 9          were many 4:00 morning meetings

10          with Carrie Jablonski where she

11          said, well, we have already done

12          this before and this is not how we

13          did it, and the Court has already

14          said off the record that this is

15          how he wants things done.  Sorting

16          all of that out during the Smith

17          trial took a lot of time and

18          aggravation.

19              And at the end of the trial

20          when the Court was looking toward

21          Mason, he said that he would like

22          to see some continuity in the

23          plaintiff's side of the process

24          because that was such a difficult
```

FAC Resp. Exhibit D -- 1207

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 100

1          aspect of getting the depositions

2          and the exhibits and everything

3          else done.  So, John Eddie

4          essentially sent me into the MDL

5          trial package because I was the

6          person who had done all of that.

7          So, I volunteered my time for the

8          Mason case.  We did not have a fee

9          interest in that case.  And I

10         again did all of the deposition

11         cuts and the exhibits and all of

12         those negotiations with Carrie

13         Jablonski at 3:00 in the morning

14         for the Mason trial, which I think

15         added a lot of continuity to the

16         second trial and helped with a lot

17         of headaches.

18             My other contribution was a

19         lot of time spent in New Jersey

20         getting ready for those last

21         trials.

22             The North Carolina cases

23         were the cases we were going to

24         try a week before, and I spent

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 101

1       weeks in North Carolina

2       interviewing fact witnesses and

3       figuring out proof and all of

4       those details that go into making

5       a good case factually.  That's how

6       I ended my days on Vioxx,

7       basically in North Carolina.

8               MR. HERMAN:  Who was going

9       to try that case?

10              MR. KHERKHER:  I was.

11              MS. CARTER:  Steve and John.

12              MR. KHERKHER:  And Forest.

13      Those were actually Forest Horn's

14      cases, and he asked us to help him

15      try the cases.

16              MR. HERMAN:  MIs?

17              MR. KHERKHER:  Yes, both of

18      them.

19              We actually had some cases

20      in Georgia that we were going to

21      try, and then we had a telephone

22      conference, and Paul Hanley out of

23      New York wanted to try those

24      cases.  We were going to work with

FAC Resp. Exhibit D -- 1209

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 102

1          Paul, but I forgot who his

2          colleague was, they didn't want

3          too many chefs, so we stepped

4          aside.  That's when Judge Higbee

5          said, Kherkher, you are the first

6          one to raise your hand.  So, we

7          were going to try any case,

8          whether it was New York.  We were

9          going to work together even if it

10         wasn't our plaintiff under our

11         contract, we were either going to

12         try the Pennsylvania cases, the

13         New York cases.  I think there

14         were New Jersey and then Georgia

15         and them North Carolina, and we

16         got the North Carolina cases.

17              MR. BIRCHFIELD:  Mikal, do

18         you have --

19              MR. WATTS:  I was going to

20         bring up something.  You asked

21         about the work that Wells did.  My

22         recollection of that in terms of

23         working with the MDL, and I think

24         Andy and I talked about this, I'm

FAC Resp. Exhibit D -- 1210

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 103

1          a big fan of Moye.  I thought he

2          won our case on Rezulin.  But I

3          thought the cross about his report

4          that it screwed up and mentioning

5          the other drug was just

6          devastating.  And I told everybody

7          to listen.  I think that was kind

8          of the origin for -- and it is not

9          that we had contacted anybody in

10         terms of the necessity of getting

11         it done.  And that's when we

12         started contacting you about your

13         guy that wasn't available and

14         said, we've just got to do it.

15         So, I think it sprang from a

16         problem that came up, you know,

17         and I just thought that cross was

18         unsustainable to keep eating that

19         with your chief epi guy.

20              MR. UMPHREY:  Russ, let me

21         mention one other point that you

22         may want to consider for common

23         benefit.  It is not a subject that

24         I like to talk about, but it is

Page 104

1        advertising.

2            That 4.7 million number, 3.7

3        million of that was spent on

4        advertising.  Now, you ask how

5        could that be a common benefit?

6        People have a right to know and be

7        informed if they have been exposed

8        to a certain product and they have

9        certain problems.  The average

10       person is not aware of that unless

11       they are educated and they have

12       responsible lawyers that can tell

13       them whether they have a case of

14       whether they don't.

15           MR. HERMAN:  Walter, I lost

16       that fight years ago.

17           MR. UMPHREY:  Let me finish

18       what I'm saying.

19           MR. HERMAN:  Let me say

20       something to you.  Judge Fallon in

21       every case that I know of that

22       he's handled, as well as the other

23       judges in the Houston District,

24       consider the number of cases that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 105

```
 1        you bring to the table as an
 2        important ingredient.  It really
 3        doesn't make any difference to me,
 4        frankly, whether you advertise
 5        them, whether you've got your
 6        referral sources sending you
 7        letters.  You are the lead lawyers
 8        in the case, you bring them to the
 9        table, that's got --
10             MR. UMPHREY:  You asked for
11        common benefit, and the common
12        benefit is we brought 1,000 cases
13        that are makeable, triable cases
14        to the table for consideration by
15        Merck on the settlement.  That's a
16        common benefit.  Those thousand
17        were screened very heavily, and
18        they were gotten through the
19        advertising process.  The other
20        thousand came from referrals from
21        other lawyers.  But for the
22        thousand people that will get a
23        benefit out of this, it certainly
24        is a benefit that should
```

FAC Resp. Exhibit D -- 1213

Page 106

```
 1        contribute to your consideration
 2        on the common benefit fund.  We
 3        don't expect to get our money
 4        back.  We're not asking for that.
 5        We just ask you that we be
 6        considered for those thousand
 7        meritorious cases that we did get
 8        through the advertising.
 9             MR. HERMAN:  There are very
10        few trial lawyers of your stature
11        in this country.  Unfortunately,
12        most of them have passed on.  I
13        have great respect for you.  I
14        don't believe that it makes -- in
15        my consideration, and I'm going to
16        level with you, I don't think the
17        fact that you advertise for cases
18        or you didn't means anything.
19        People that advertise for cases
20        have business plans.  They
21        consider how many cases they are
22        going to get in.  They vet them.
23        It all goes into the bottom line
24        of, are we going to be able to
```

FAC Resp. Exhibit D -- 1214

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 107

```
 1        handle these cases, how we're

 2        going the handle them.

 3            MR. BOUNDAS:  Well, Russ, I

 4        hope Judge Fallon would consider

 5        the fact that we spent a

 6        significant amount of money

 7        stirring up the pot, if you will,

 8        to help other folks, maybe even

 9        your clients, pick up the phone

10        and protect their legal rights.

11            MR. HERMAN:  I can assure

12        you he's going to read every word

13        of the transcript, and he

14        considers everything.  That's one

15        reason why it is transcribed and

16        we have affidavits.  But I always

17        like to be straight up so people

18        know where I'm coming from, and I

19        just consider advertising costs of

20        doing business whether you

21        advertise or not.  It's the same

22        cost that lawyers have when they

23        get themselves on seminar programs

24        that result in referrals.
```

FAC Resp. Exhibit D -- 1215

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 108

```
 1              MR. UMPHREY:  I'm not
 2         concerned about how it affects
 3         lawyers.  My point is that it is a
 4         common benefit to those folks that
 5         receive compensation that wouldn't
 6         have had it otherwise.  That's
 7         what I'm asking you to consider.
 8              MR. HERMAN:  I understand
 9         that, Walter, but I can't agree
10         with that, I'm just telling you
11         straight out.  Because you've got
12         those people that you are serving,
13         and this was really, with all due
14         respect, Ralph Nader when he
15         started this idea of lawyer
16         advertising, and I think that
17         Chief Justice Burger is the only
18         one at the Senate in those
19         original decisions, is that you
20         help those people, and that's what
21         we're supposed to do as plaintiff
22         lawyers.  And those people pay for
23         the help that you give them.  So,
24         you get good cases in whether they
```

FAC Resp. Exhibit D -- 1216

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 109

1        are through referrals or

2        advertising or reputation.

3        However you get those cases in,

4        from my perspective, is not a

5        factor I consider.

6             What I do consider is the

7        fact that you have 2,000 cases

8        that you bring to the table,

9        however you got them --

10            MR. KHERKHER:  Well, Russ,

11       that's where we respectfully

12       disagree.  One of the most sacred

13       things we have is due process, as

14       you know.  I remember on a

15       Saturday morning you and I argued

16       with Judge Fallon on the

17       advertising.  And so what Walter

18       is saying is, this money we spent

19       is allowing all these folks that

20       don't have Internet that just do

21       drywall, Bubba doesn't do

22       Internet, he does drywall, we help

23       them help you come to the table.

24       So, let's just agree to disagree.

FAC Resp. Exhibit D -- 1217

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 110

1          I hear what you are saying.

2                MR. SEEGER:  You are not

3          totally disagreeing.  I think what

4          Russ is saying, you got the cases,

5          you brought them here --

6                MR. KHERKHER:  But there's

7          an intangible.  As you know, you

8          did your share of advertising, and

9          we all together woke up America to

10         protect their legal rights.

11               MR. HERMAN:  I understand

12         that, and I'm trying to say to you

13         that not only will the judge, but

14         we consider the number of cases

15         you bring to the table, no matter

16         how you got them, is very

17         important in determining a common

18         benefit.

19               MR. LANIER:  I think one of

20         the reasons this is getting a lot

21         of response maybe from the

22         committee is because there are a

23         lot of folks that did a whole lot

24         of advertising that no one has

FAC Resp. Exhibit D -- 1218

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 111

1          really been putting that into the

2          record until y'all.  I think that

3          just may be some of the reaction,

4          if that makes sense.

5               MR. BOUNDAS:  So, if anyone

6          has any more questions.

7               MR. GIRARDI:  How many cases

8          did you submit to the settlement,

9          the exact number?

10              MR. WEITZ:  How many cases

11         did you submit to the settlement?

12              MR. FURNISH:  We had 2,021.

13         We registered in all but 53.

14              MR. WEITZ:  Where were those

15         cases filed?  In what

16         jurisdiction?  What percentages?

17              MR. BOUNDAS:  We filed

18         around 800 cases in the MDL.  We

19         filed, I think, 763, I could be

20         wrong by a few, in New Jersey.

21         So, 1500 plus were filed, and I

22         think 600 cases were tolled.  And

23         then we also filed cases in Texas,

24         California, Illinois, I believe,

FAC Resp. Exhibit D -- 1219

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 112

```
 1          Wisconsin.  We had cases all over
 2          the country, again, as part of the
 3          strategy to, if necessary, try
 4          cases.
 5               MR. WEITZ:  When you say
 6          "all over the country," you mean
 7          you filed them in district courts,
 8          and then they got transferred to
 9          state court?
10               MR. BOUNDAS:  No.  State
11          court.  For example, the Schwaller
12          case was actually tried in state
13          court in Illinois.
14               MR. KAISER:  And federal
15          district courts, too, so we could
16          make sure they would come back
17          there for trial so we wouldn't
18          clog up New Orleans.
19               MR. WEITZ:  Now, talk to us
20          about some of the cases that might
21          have been trial ready in any of
22          the other jurisdictions.
23               MR. BOUNDAS:  I think Darren
24          Brown from Provost Umphrey could
```

FAC Resp. Exhibit D -- 1220

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 113

1          speak about our California cases.

2              MR. BROWN:  Set for trial in

3          November, we had the Feldman case,

4          which we had submitted to the

5          trial docket as a plaintiff pick.

6          It was a 69-year-old, one of the

7          older plaintiffs that we had dealt

8          with, but very few risk factors.

9              MR. LEVIN:  That's not old.

10             MR. RAFFERTY:  That was set

11         for trial in November of '07?

12             MR. BROWN:  November of '07.

13             Along with four other

14         plaintiff picks.  Then Merck had

15         four defendant picks that were set

16         for trial, and we had one of

17         those.  Then we had three other

18         cases that were set for trial in

19         March and June of the following

20         year of '08, the Lativio case,

21         Espinoza case.  Of course, those

22         didn't go forward.  The settlement

23         was reached.

24             MR. BOUNDAS:  Then another

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 114

```
 1        example, we had a case in Cook
 2        County, Illinois, in Chicago,
 3        called the Mitchell case.  That
 4        case had a scheduling order.  Off
 5        the top of my head, I don't
 6        remember the trial date, but we
 7        were working it up, getting
 8        experts, and that was another case
 9        we were going to try.  I know it
10        had a date, but I can't tell you
11        exactly --
12            MR. KHERKHER:  Russ, another
13        thing I just remembered when you
14        asked me is, Judge Higbee said,
15        will anyone try a stroke case.
16        And we agreed to try the first
17        stroke case, Dave Buchanan and I,
18        and I think we were in the process
19        -- before you guys settled, we
20        were going to submit nine -- we
21        had nine stroke cases.  So, for
22        whatever that is worth.
23            Another thing, this might be
24        corny, but --
```

FAC Resp. Exhibit D -- 1222

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 115

```
 1              MR. SEEGER:  That's actually

 2         worth a lot because there's an

 3         impression by a very small group

 4         of people that there were people

 5         out there not willing to try them.

 6         We were willing to try them, our

 7         firm was willing to try them,

 8         people at this table, all of us.

 9              MR. KHERKHER:  We had nine

10         cases we were going to submit, and

11         then y'all settled.

12              MR. HERMAN:  I'm just going

13         to make a comment that in the MDL,

14         for about four months, the judge

15         pushed us to put stroke cases up.

16         And we could not find a stroke

17         case to put up.  We got absolutely

18         no responses.  So that the fact

19         that you were willing to put up

20         stroke cases in New Jersey was of

21         obvious benefit.

22              MR. KHERKHER:  After Judge

23         Higbee told Dave and I that, and

24         she was impressed that we
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 116

```
 1        volunteered, Grant Kaiser and his
 2        team, we spent that weekend -- I
 3        don't know if you all know Glenda
 4        Grainger, and you are right, there
 5        were some tough ones, but we found
 6        nine, and then the settlement
 7        occurred.
 8             Another thing that might be
 9        silly, Russ, that may factor in, I
10        coordinated -- because we had
11        these four trial settings up in
12        New Jersey, I coordinated --
13        because I watched when Mark picked
14        his jury, the judge was kind
15        enough to give him two or three
16        days to read the questionnaires.
17        She didn't want that.  We had to
18        do it overnight.  I had an 18
19        wheeler with three copy machines,
20        and we were going to copy all
21        questionnaires for all trial
22        teams.  So, we had that set up.
23        Maybe that's a factor for common
24        benefit.
```

FAC Resp. Exhibit D -- 1224

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 117

```
 1            MR. BLIZZARD:  Did you
 2       submit the cost of the 18 wheeler?
 3            MR. KHERKHER:  I didn't have
 4       to put down a retainer because we
 5       all settled because everything
 6       happened simultaneously, but we
 7       were ready to go.
 8            MR. BLIZZARD:  One of the
 9       things that I want to make sure we
10       cover is that there's been a lot
11       of time that was submitted to the
12       accountant and a lot of expenses
13       that have been submitted to the
14       accountant that for whatever
15       reason have been rejected.  That
16       has happened to a lot of people on
17       this side of the table as well,
18       and so whatever we need to do to
19       help get whatever records in order
20       to make it work for the
21       accountant, we'll do.
22            MR. LEVIN:  If you call the
23       accountant.
24            MR. KHERKHER:  That's my
```

FAC Resp. Exhibit D -- 1225

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 118

1          biggest fear.  I have never billed

2          for my time, so, I'm sure we left

3          a lot of time on the table.

4                  MR. LEVIN:  We'll straighten

5          it out.  Feel free to call me.

6                  MR. KHERKHER:  Yes, sir,

7          thank you.

8                  MR. HERMAN:  If you call

9          Lenny Davis in my office, he will

10         set up an appointment with Phil

11         Garrett and his team.  Phil

12         Garrett was chosen by the judge.

13         That firm and he, they do no

14         personal work for any lawyer

15         that's got a Vioxx claim, either

16         firm work or personal work.  So,

17         they are purely independent.  They

18         will drop what they are doing and

19         meet with you.  I really suggest

20         -- and I don't know what the

21         differences are as to what they've

22         accepted and what they haven't or

23         even the reason for it.  But we

24         have had lawyers continuously call

FAC Resp. Exhibit D -- 1226

Page 119

1        up, get an appointment, go meet

2        with them for a couple of hours,

3        and those things are resolved in

4        just one sitting.  I don't think

5        they are well resolved over the

6        phone.  But somebody very

7        knowledgeable about what your

8        costs are and the hours you

9        submitted, one of two people ought

10        to get an appointment and sit with

11        Phil Garrett.

12              MR. BOUNDAS:  Unless anyone

13        has any other questions on trial,

14        I'm not going to belabor the

15        point.

16              MR. RANIER:  Thank you,

17        John.

18              Grant is next on the

19        organization and function and

20        having done this.

21              I have got a question for

22        y'all.  If this is not an

23        appropriate question, it's a

24        record issue, but can the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 120

1          committee consider how much common

2          benefit fee is going to be gotten

3          from us?

4                    MR. KAISER:  Generated by

5          our cases.

6                    MR. RANIER:  Generated by

7          our cases in deciding how much

8          common benefit fee we're entitled

9          to?  I mean, that may not be --

10                   MR. LEVIN:  Just leave that

11         hanging.

12                   MR. LANIER:  That's a dicey

13         thing that has to be parsed out,

14         because to an extent, there's the

15         issue if someone got 100 cases and

16         you did, Drew, common benefit work

17         for that person, then they need to

18         pay you for the 100.  If you did

19         common benefit, Drew, for someone

20         that has 5,000 cases, then they

21         benefited 50 times more from your

22         work than the person who had only

23         100 cases and arguably would be 50

24         times more.  By the same token,

FAC Resp. Exhibit D -- 1228

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 121

1         there's the other side of the

2         coin, too.  So, it is a two-edged

3         sword, and I don't know where we

4         land on it.

5              MR. HERMAN:  Let me just say

6         one other thing.  The judge

7         specifically has directed us not

8         to talk about allocating dollars

9         until he has determined what the

10        percentage is.  Anything that we

11        talk about in allocation or

12        consider in terms of dollars to

13        specific firms is a fiction in the

14        judge's mind.  He has to

15        determine, first, what the

16        percentage is going to be, and

17        then we have to deal with that

18        pot, so to speak.  Also, he's made

19        it very clear that whatever he

20        considers the pot to be, costs are

21        to be in addition to that.  So,

22        common benefit costs are very

23        important here, and it is easier

24        to deal with the costs than it is

FAC Resp. Exhibit D -- 1229

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 122

1         with an unknown amount of common

2         benefit dollars.  I think you are

3         going to find in the next two or

4         three weeks, I think we have

5         California folks appearing Friday,

6         I'll tell you for your own -- so

7         you know what we know, 106 people

8         or firms submitted requests for

9         common benefit.  Less than 50 have

10        decided to come make a

11        presentation.  But when all of

12        that information is gathered in

13        the next three weeks, you are

14        going to see a motion and brief

15        file with the Court to set common

16        benefit, a pot, and costs.

17             You've taken various

18        positions, we've taken various

19        positions, but you need to know

20        that's coming.  It's coming before

21        any allocation is made.  I would

22        think the amount of dollars that

23        the Court says are going to be in

24        the common benefit pot and in the

FAC Resp. Exhibit D -- 1230

Page 123

```
 1          cost pot are going to affect all

 2          the considerations.

 3               MR. KHERKHER:  Russ, Judge

 4          Fallon is a tough grader.  I was

 5          telling someone the other day that

 6          -- I was practicing what I was

 7          going to tell you guys and how I

 8          did what Mark Lanier did, I knew

 9          all 200 jurors by name, I read

10          those questionnaires, I knew them

11          backwards and forwards.  And when

12          we were going through the

13          preemptive strikes before, Judge

14          Fallon knew them all too.  So,

15          here I am doing a great job, and

16          he's saying, oh, yeah, Mr.

17          Kherkher, that guy, his favorite

18          show is CSI.  Here's the hardest

19          working judge, stays up all night

20          and reads 200 questionnaires, and

21          so I know he's going to be tough.

22               MR. HERMAN:  Let me give you

23          one experience.

24               The first meeting I had with
```

FAC Resp. Exhibit D -- 1231

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 124

1      him, he said, I want all the

2      articles that have been published

3      dealing with Vioxx.

4           By the next meeting that

5      Chris and Andy and I had with him

6      before the PSC order came out, he

7      had read every one of the articles

8      and had about seven or eight

9      cross-examination questions for

10     us.  And I know that he did the

11     same thing with Merck.  So, the

12     important thing is, he will

13     remember, and this transcript will

14     remind him of the quality of the

15     work that you folks put forth.

16          Let me tell you, he was a

17     heck of a trial lawyer, I mean, a

18     very fine trial lawyer.  When he

19     was nominated for the presidency

20     of the state bar, he had universal

21     support by both the plaintiff bar

22     and the defense bar.  We all know

23     that doesn't happen very often.

24     So, not only are we trying to be

FAC Resp. Exhibit D -- 1232

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 125

```
 1        fair, if we're not fair, he's

 2        going to make us fair.

 3             MR. RANIER:  We know.

 4             MR. WEITZ:  Drew, the short

 5        answer is that the number of cases

 6        that you have and the commitment

 7        of everybody on those cases are

 8        looked at, and the factors

 9        involved surrounding the number of

10        cases will be weighed.

11             MR. RANIER:  I appreciate

12        that.  And the quality issue is

13        there, too.  If you produce

14        quality cases to drive the

15        litigation, you pay a bigger

16        common benefit tax than you would

17        if you --

18             MR. WEITZ:  Than if you are

19        just storing cases and warehousing

20        cases.  I think that all the

21        judges have made that point very

22        clear, and I think you guys have

23        distinguished yourself in that

24        category.
```

FAC Resp. Exhibit D -- 1233

Page 126

1           MR. KAISER:  If I might just

2       have a few minutes, and I think

3       this point has been made.

4           I'm going to take a couple

5       of minutes.  These were the 28,000

6       plus contacts we had.  We have

7       them from every state.  And like

8       Perry discussed, we did have a

9       very sophisticated filing strategy

10      where we evaluated every specific

11      case, where the best venue for

12      that case was.  And if we were in

13      a good Federal Court venue, we

14      were going to come back, we would

15      file it in that court.  Otherwise,

16      we would file it in Judge Fallon's

17      direct file.  And you take a risk

18      then if you are going to come back

19      to your home district or not.

20           But in state cases, the

21      same issues.  We filed where each

22      case needed to be filed.

23           To answer your question

24      specifically, Perry, we ended up

FAC Resp. Exhibit D -- 1234

Page 127

1          filing about half our cases in New

2          Jersey, about half of them in the

3          MDL, and I think there was 60 in

4          California and a handful in Texas

5          for obvious reasons.  I think this

6          has come across, but you know the

7          way Merck played this game, and

8          that is to throw everything at

9          you.  If you imagine a task force

10         set up with all the pieces, we

11         moved all the pieces all at once

12         back at Merck.  We did it with

13         trial settings, we did it with

14         experts, we did it with our

15         administration to be able to get

16         those cases in line for trials and

17         to be able to do that.  We all

18         know about what moves cases, and

19         that's verdicts and trial

20         settings.  That's the message that

21         we're trying to say, is that our

22         entire effort to put the pressure

23         on Merck was what our goal was.

24              You guys that negotiated the

FAC Resp. Exhibit D -- 1235

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 128

1        settlement know better than we do

2        what kind of pressure, having five

3        different trials going on in New

4        Jersey starting in October of

5        multiple plaintiffs each, had on

6        Merck.  We were told at the time

7        that it was extremely important to

8        put these cases up and got letters

9        and e-mails from Dave Buchanan

10       begging people to put cases up and

11       from Sol saying, this is enough, I

12       can't believe you aren't going to

13       do this, because then the Court is

14       going to pick them then.  So, you

15       are ruining the opportunity if you

16       don't do it.  So, we were there

17       for that.

18            That's really our point

19       here, is that our total effort was

20       to push all the pieces at once at

21       Merck, and I think we did that --

22       not every firm does that, and not

23       every group of firms did that.

24            To carry the analogy even

FAC Resp. Exhibit D -- 1236

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 129

```
 1          further, Walter will appreciate

 2          this, we were all into the case in

 3          terms of poker, too.  We put

 4          everything in that we had.

 5              MR. HERMAN:  Let me ask you

 6          a question.  In cases that were

 7          filed wherever they were filed,

 8          I'm assuming in most of those

 9          cases that were actual filed

10          cases, you had a Merck defense

11          counsel enter an appearance?

12              MR. KAISER:  Absolutely.

13              MR. HERMAN:  If you could

14          get me a list of those cases and

15          the defense firm that entered an

16          appearance, it will be of some use

17          to us in illustrating why we think

18          lawyers that did substantial

19          common benefit work should receive

20          compensation.

21              MR. KAISER:  We'll certainly

22          do that.

23              MR. HERMAN:  After all,

24          everyone at this table takes a
```

FAC Resp. Exhibit D -- 1237

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 130

1           risk that none of those firms

2           take, and those firms can be

3           cross-referenced through American

4           Lawyer with their earnings, which

5           is something we intend to do.

6                MR. KAISER:  I was

7           day-to-day responsible for all the

8           activities, so, if y'all have any

9           questions from start to finish,

10          ask me about them, and we'll tell

11          you what the deal is.  You can do

12          it now or after Walter speaks or

13          whichever.

14                Thank you.

15                MR. RANIER:  Walter, do you

16          want to talk about the financial

17          commitment.

18                MR. UMPHREY:  Just for a

19          minute.  I think everybody has

20          covered most of the topics.  But

21          our firm did the accounting on the

22          Texas tobacco litigation, and we

23          inherited it to do on this.  So,

24          that's why I was asked to talk

FAC Resp. Exhibit D -- 1238

Page 131

1              about it.

2                    But we have a total of 13.6.

3              This is not a recoverable expense

4              from the common fund or the

5              client.  This is our screening

6              costs.  These were cases that we

7              did develop for trial and the

8              expenses through the medical and

9              of what have you.  3.7 of this was

10             the advertising which we absorbed.

11             And the other million went towards

12             personal expenses of travel and

13             the firms.  We didn't reimburse

14             each firm as we went for

15             out-of-pocket expense on travel

16             and what have you, for a total of

17             13.6.

18                    MR. HERMAN:  I'm sorry, I

19             can't read it.  Smith or

20             Schwaller?

21                    MR. RAFFERTY:  Schwaller is

22             474.

23                    MR. HERMAN:  Is that

24             500,000?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 132

```
 1              MR. KAISER:  527,000 for

 2         Smith, 474,000 for the Schwaller

 3         case, which adds up to basically a

 4         million.  Take the million out of

 5         the other 3 point million total

 6         that we spent on trial

 7         development.  You have another 2

 8         million that we spent beyond those

 9         two cases that went to trial --

10              MR. HERMAN:  That's what I

11         want to understand, and I'll make

12         sure this gets circulated to the

13         committee.

14              MR. POWERS:  I have copies

15         for you.

16              MR. HERMAN:  Good.

17              MR. UMPHREY:  We understood

18         early on from Merck that we were

19         going to have to try each

20         individual case.  We prepared

21         these cases for that purpose.  We

22         didn't drive a nail halfway.  I

23         think that our involvement, our

24         preparation of these cases went a
```

FAC Resp. Exhibit D -- 1240

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 133

```
 1        long way, as well as knowing that

 2        we had the financial resources to

 3        back it up to be a common benefit

 4        for the final settlement of this

 5        matter.  I will answer any other

 6        questions you have.

 7             MR. HERMAN:  The 3.1, other

 8        than Smith and Schwaller, I want

 9        to make sure.  I understand those

10        are the workup of cases that John

11        spoke about in New Jersey, et

12        cetera?

13             MR. KAISER:  Yes.

14             MR. UMPHREY:  We had 50

15        cases for trial at the time you

16        settled.

17             MR. HERMAN:  Have you

18        submitted costs other than Smith

19        and Schwaller on the workup of

20        those cases?

21             MR. KAISER:  No.

22             MR. HERMAN:  You should.

23             MR. WATTS:  No.

24             MR. HERMAN:  You should
```

FAC Resp. Exhibit D -- 1241

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 134

1           itemize it, and you should submit

2           it.

3                MR. KAISER:  Okay.  We will.

4                MR. LEVIN:  Has Smith and

5           Schwaller been submitted?

6                MR. KAISER:  Yes.  The only

7           thing that hasn't been submitted

8           in the Smith case is the DQ

9           aspect.

10                MR. HERMAN:  You just take

11           care of that and then send us

12           whatever.

13                MR. BLIZZARD:  Grant, we're

14           going to need to see exactly what

15           the other 2 million is to

16           understand whether it should or

17           should not be submitted.

18                MR. HERMAN:  In fairness, we

19           have indicated to every lawyer and

20           every firm that actually worked up

21           cases for trial that the remainder

22           of that 3.1 beyond Smith and

23           Schwaller should be submitted as a

24           common benefit cost.

FAC Resp. Exhibit D -- 1242

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 135

1              MR. UMPHREY:  Right.

2              MR. KAISER:  We'll do that.

3              MR. HERMAN:  If we get that

4         within a week, that would --

5              MR. UMPHREY:  Whatever you

6         folks do for us, we appreciate.

7         But primarily we appreciate being

8         involved with good lawyers that

9         are prepared and that have been to

10        the well before and litigation

11        that helps our individual clients.

12        We thank you for your time.

13             MR. SEEGER:  Thank you.

14             MR. HERMAN:  Well, I think

15        we're honored to have you here

16        today, and I don't say that in a

17        condescending matter or in a light

18        manner.  You have always brought

19        to the table something special.

20             MR. UMPHREY:  I'm getting

21        older, and they don't let me out

22        very much.

23             MR. RANIER:  This is the PSC

24        piece.  We did a lot on the PSC.

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1243

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 136

1          I want to quickly go through some

2          of the things that we did on the

3          PSC that we haven't already

4          discussed.  Of course, I served on

5          the committee and meetings and the

6          status conference and everything

7          and went to almost every one of

8          those.

9              I chaired the insurance

10         committee, and I had the support

11         of these five firms, obviously,

12         but the work on that committee,

13         the discovery, the motions, I read

14         every policy, every insurance

15         policy.  We had a voluminous

16         amount of material on that.  One

17         of the interesting things on that

18         is that of course we established

19         that Merck had more insurance than

20         they said they did, but the big

21         thing here on liability is when

22         they got their extra insurance.

23         Basically they went from under 500

24         million to a billion dollars, and

FAC Resp. Exhibit D -- 1244

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 137

 1          the year on that is like 1998.  It

 2          is just about the same time when

 3          we coordinated that with all the

 4          time things that everybody had

 5          done with trials that it is about

 6          the time that, I think, they

 7          unblinded Vioxx, that they had

 8          results from the 090 study and a

 9          couple of other studies that were

10          strongly suggesting that they had

11          some liability problems here.

12                Of course, we found out we

13          weren't the only persons that had

14          recognized that, but the insurance

15          companies had figured that out

16          also.  They took Merck to

17          arbitration in London.  So, there

18          was a whole body of evidence out

19          there regarding the insurer's

20          allegations and what evidence they

21          used to show that Merck knew and

22          misrepresented and covered up.  We

23          tried to get that from Judge

24          Fallon.  That was in May of 2007.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 138

1              I don't know whether he had

2         his eye on the settlement or not.

3         He declined to produce that after

4         our motions and lengthy briefs and

5         whatever to order it produced.

6         But our strategy at that point was

7         to go through the Louisiana Direct

8         Action Statute, and we were at the

9         time of settlement working on

10        filing a direct action Vioxx case

11        that we could keep in Louisiana

12        court or to go get one -- either

13        to get removed and to go back to

14        Judge Fallon with arguments under

15        the Direct Action Statute, which

16        had been stronger for production

17        of that evidence.

18              But just for anybody who is

19        still doing this and general

20        information, there's a pot of

21        evidence out there.  We had an

22        insurance consultant that worked

23        with us on this and who

24        participates in a lot of these

FAC Resp. Exhibit D -- 1246

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 139

1          arbitrations in London, and we've

2          confirmed that it's there.  It's

3          stuff that's probably not been

4          seen before.

5               MR. SEEGER:  Drew, can I ask

6          you a question?  I'm sorry to

7          interrupt.  I just want to make

8          sure I ask a couple of points.

9          The chart, I'm seeing this for the

10         first time, has this been provided

11         to the PSC, the chart that you are

12         working off of?

13              MR. RANIER:  It should be in

14         the depository because this is all

15         a matter of record.  We introduced

16         the chart with the motions.

17              MR. SEEGER:  That was

18         attached to the motions?

19              MR. RANIER:  Judge Fallon

20         has seen this.  This is our chart.

21         We did this.  Every policy.  Every

22         policy.  That's kind of a brief

23         summary of what was done on

24         insurance.  It is not only there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 140

1          from the standpoint of financial

2          liquidity of Merck, but also

3          there's some important liability

4          aspects to this that haven't been

5          finished and are still out there.

6              LECG -- there's a mistake in

7          my affidavit.  I said in my

8          affidavit that LECG was paid

9          exclusively by the Vioxx

10         Litigation Consortium.  That's not

11         correct.  LECG is an econometrics

12         firm out of Boston, formerly the

13         Bridle Group, and we got engaged

14         with them early on various aspects

15         of Merck's business model and what

16         have you.  The PSC did share some

17         of the expense of the LECG group.

18         I can't remember exactly how much.

19         It is not a fantastically high

20         number, but it could be 10, 20,

21         $30,000.  And so my statement in

22         my affidavit that the Vioxx

23         Litigation Consortium paid for all

24         of that is not accurate.  We paid

FAC Resp. Exhibit D -- 1248

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 141

1        for some of it, but the PSC paid

2        for some of it.

3            MR. HERMAN:  Let me stop you

4        so I can alert you to something.

5        First of all, if you find

6        something in your affidavit that

7        you want to add, subtract, in the

8        event that we do not resolve fee

9        issues and the Judge has looked at

10        everything and he issues his

11        opinion and there's still fee

12        issues unresolved, he's going to

13        embark on a Murphy Oil process.

14        Before that happens, you will be

15        given an opportunity to give

16        another look at your affidavits.

17            MR. RANIER:  It is not a big

18        deal.

19            MR. HERMAN:  I hadn't said

20        that before, and I wanted to make

21        sure I did say it.

22            MR. RANIER:  It was very

23        early on.  It was 2000.  It was, I

24        think, before the first MDL trial.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 142

```
 1          It might have been after Ernst.

 2          But Kenneth Gartrell, our

 3          econometrics expert that we worked

 4          with, in addition to Gerald, Dr.

 5          Gerald, who was the former SEC

 6          Commissioner, and we have an

 7          expert report from him too, but

 8          analyzed Merck's financial

 9          situation.  And basically, if

10          nothing else, this is, in

11          retrospect, due diligence from the

12          PSC about actually how much cash

13          Merck could come up with in any

14          given settlement aside from

15          preemption and causation issues

16          and all of that.  So, the PSC had

17          developed this early on, and I

18          basically took the lead on that

19          and did that.  So, there are two

20          draft expert reports.

21              The third step was supposed

22          to be that we would develop Ken

23          Gartrell as the witness to say

24          what most people in their trials
```

FAC Resp. Exhibit D -- 1250

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 143

1       did on cross with regard to the

2       economic reasons why Merck kept

3       selling Vioxx, even though they

4       knew they had problems with it

5       from a scientific standpoint.

6       While I heard a lot of that on

7       cross, and I think there might

8       have been a couple of witnesses,

9       actually a California witness, I

10      remember one who actually

11      testified to this, this was all

12      part of that process.  The PSC

13      said, no, we're not going to spend

14      all of that money on that now.

15      We're going to let the individual

16      trials develop that.  That's where

17      that stayed, but that was part of

18      what was done for the PSC.

19          We've already talked a lot

20      about the Konstam coverup, and

21      that was not officially PSC.  We

22      developed Martin Wells on that,

23      but there was a lot of talk and

24      discussion about that especially

FAC Resp. Exhibit D -- 1251

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 144

```
 1          with Dave Buchanan and me on the
 2          raw data and how much we needed to
 3          plumb that.  And the basic focus
 4          there was to undermine that risk
 5          factor defense, because I still
 6          think that the snow shoveling guy
 7          is the last guy in the world who
 8          ought to be taking Vioxx and
 9          anybody that's doing any kind of
10          exertion or whatever.  So, we can
11          call those bad cases, but I've
12          never really believed they are.  I
13          know they are hard to win with
14          juries.  But the more evidence we
15          had, and I think, for instance, in
16          the chart that we've got on Dr.
17          Wells, once the data is actually
18          plumbed -- I mean, in diabetes, I
19          mean, you could see the risk
20          factor in diabetes is 10.33.  I
21          mean, that's like lung cancer and
22          smoking.  That's how much more
23          likely you are to have a heart
24          attack if you've got diabetes
```

FAC Resp. Exhibit D -- 1252

Page 145

1          taking Vioxx than if not.

2                    MR. WEITZ:  Drew, I don't

3          know if you read the Cona/McDarby

4          trial transcript.

5                    MR. RANIER:  I attended a

6          couple of days of it, but I didn't

7          see that testimony.

8                    MR. WEITZ:  In our mock

9          trials, we found out from the jury

10         that you needed to embrace the

11         risk factors, and we actually

12         completely embraced that theory in

13         the case.

14                   MR. RANIER:  It was your

15         partner, Rob Gordon, who was

16         McDarby's lawyer?

17                   MR. WEITZ:  He had actual

18         diabetes, and he was 90% occluded,

19         it was a defense pick, and had all

20         those things.  We actually

21         embraced the risk factors.

22                   MR. WATTS:  I read that

23         transcript and used a lot of that.

24                   MR. RANIER:  Here's your epi

FAC Resp. Exhibit D -- 1253

Page 146

```
 1          number.
 2                  MR. WEITZ:  It is
 3          staggering.
 4                  MR. HERMAN:  We had a
 5          discussion early on, and Drew and
 6          I have been together in a lot of
 7          cases, and we always end up at the
 8          same place, but usually we don't
 9          agree as it goes along.  But I
10          agree with him, and I still do,
11          that it is the straw that broke
12          the camel's back and felt from the
13          beginning that somewhere along the
14          line some case was going to be
15          tried with a lot of risk factors,
16          and Vioxx was going to -- the jury
17          was going to accept that in a way
18          that it could be replicated.  And
19          I think, actually, the way Mark
20          tried his case, he was able to do
21          that.
22                  MR. LANIER:  Yes.  I took
23          the edge of the desk, and I took a
24          cup, and I said, the edge of the
```

Page 147

1        desk is a cliff.  The cliff is a

2        heart attack.  And all of us are

3        different distances from that

4        cliff.  A 15-year-old kid may be

5        way over here, and I put the cup

6        over here.  And I said, you get

7        diabetes, you are a little closer.

8        You smoke, you are a little

9        closer.  You are overweight, you

10       are a male, you are over 50.  And

11       what Vioxx is, it's a shove.  It

12       is a shove towards the cliff.  You

13       can give that 15-year-old kid

14       Vioxx all day long.  Who you are

15       putting at risk is the person who

16       is already close to the edge of

17       the cliff.  You give them Vioxx,

18       and they are gone, and I knocked

19       that cup over.  I knocked the cup

20       over, and the jury goes 'ahhh'.  I

21       think there's a lot of truth to

22       that.

23            Then we took Krumholz and

24       added him to that.  Krumholz took

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 148

```
 1        the Framingham risk factors for a
 2        heart attack and all the different
 3        breakout rates, and he showed that
 4        if you take the Vioxx data, every
 5        one of those risk factors, Vioxx
 6        is a greater risk factor for a
 7        heart attack than diabetes, than
 8        all of these different things
 9        except for smoking.  That's the
10        only thing that beats it.
11            MR. HERMAN:  On the other
12        hand, we know it made the cases
13        tougher to try.
14            MR. RANIER:  Talk about
15        knocking the glass off, Percy
16        Foreman came to Lake Charles when
17        I was just out of law school and
18        was defending union members on
19        some union violence.  He sat
20        smoking a cigar -- you could smoke
21        in the courtrooms in those days.
22        He sat smoking a cigar during the
23        closing argument of the state, and
24        he had something in the cigar, in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 149

1       the ash, so the ash never fell,

2       and he's right next to the jury.

3       True story.  And the ash kept

4       getting longer and longer, and

5       nobody was listening to the

6       state's argument.

7            MR. BIRCHFIELD:  He got that

8       from Abraham Lincoln.

9            MR. RANIER:  I saw him do

10      it.

11           MR. LANIER:  The only risk

12      factor that I deemed would damage

13      trial at one of these cases is

14      smoking, because people smoke in

15      spite of the fact that they have a

16      warning that it could cause a

17      heart attack.  Who is to say if

18      they had been warned about Vioxx,

19      they wouldn't have still taken it.

20      That was the one that was tough to

21      get over.  I mocked seven of

22      these, and that was the one that

23      was tough to get over.

24           MR. KHERKHER:  But, Mark,

FAC Resp. Exhibit D -- 1257

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 150

```
 1          you also would have educated the

 2          jury how smoking is a horrible

 3          addiction.

 4               MR. LANIER:  If I had had

 5          Russ' material maybe or Walter's,

 6          I didn't know that stuff, or

 7          Grant's.

 8               MR. KAISER:  Thank you,

 9          gentlemen.

10               MR. RANIER:  Thank you.

11               MR. WATTS:  Thank you.

12               MR. SEEGER:  Thank you.

13               MR. BLIZZARD:  Thank you.

14                    -  -  -

15

16

17

18

19

20

21

22

23

24
```

FAC Resp. Exhibit D -- 1258

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 151

1                 C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -

FIRM:  ROBINS, KAPLAN, MILLER &
       CIRESI, LLP
       Gary Wilson, Esquire
       Tara Sutton, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1260

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                     -  -  -
 2               MR. HERMAN:  Everything is
 3          being taken down by Linda.  You
 4          are going to get a copy at the end
 5          of this.  The judge is very strong
 6          on transparency in the process,
 7          consistency.
 8               Secondly, if we don't
 9          resolve all the fee issues, he's
10          got a process where he's going to
11          come in and put all the lawyers
12          under oath and cross-examine them.
13          I hope we don't get that far, but
14          we appreciate you being here.
15               In addition to that, did you
16          all make a written submission?
17               MR. WILSON:  We did, yes.
18               MR. HERMAN:  Do me a favor.
19          When you get back, just fax me or
20          e-mail my office an affidavit
21          saying that this is yours, and
22          we'll put it in the file with
23          everybody else's.
24               I'm going to pass this down
```

FAC Resp. Exhibit D -- 1261

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        to this side of the table or the
 2        other side of the table.
 3             MS. SUTTON:   I wanted to
 4        thank everybody for giving us this
 5        opportunity.  It is especially
 6        important to us because we weren't
 7        on the PSC, and I think our work
 8        may have been a little less
 9        visible, and this gives us a
10        chance to talk about what we
11        thought our contributions to the
12        MDL were.  We, of course, realize
13        that our contributions don't even
14        begin to compare with what all of
15        you have put into this litigation
16        and bringing it to such a
17        successful conclusion.
18             We initially had applied to
19        be on the Plaintiffs' Steering
20        Committee, because we hoped to
21        bring our mass tort experience to
22        the litigation, our trial
23        experience, and, of course, our
24        financial resources.  But when
```

FAC Resp. Exhibit D -- 1262

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          that didn't happen, we stepped

 2          back and we tried to look at how

 3          it was we thought we could bring

 4          our expertise and our experience

 5          and bring the highest value we

 6          could to the litigation.  So, we

 7          decided to focus on the science

 8          committee and the discovery

 9          committee.  I wanted to first

10          maybe touch on the work we did in

11          the science committee and then

12          move over to the discovery

13          committee work.

14               On the science committee,

15          our partner, Roberta Walburn, who

16          was one of the vice chairs of the

17          committee, and really kind of some

18          of the main work that we did on

19          the science committee early on,

20          there was a request by John

21          Restaino and Carlene Lewis that we

22          have a really comprehensive review

23          of the law on how we are going to

24          prove causation and get our
```

FAC Resp. Exhibit D -- 1263

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        experts qualified under Daubert.

 2        We volunteered in the summer of

 3        2005 to take on that project and

 4        do a very complete survey of an

 5        analysis of the law on how you

 6        prove causation.  It resulted in

 7        July of 2005 this legal research

 8        memo that we provided to the

 9        members of the science committee

10        to use kind of as a roadmap of how

11        we were going to qualify experts

12        at trial.

13            I took a lot of grief

14        because this was pretty big, but

15        we were trying to make sure that

16        we did a very comprehensive --

17            MR. HERMAN:  Excuse me, I

18        don't mean to interrupt, but it

19        would be helpful to us when you

20        get back if you would send us a

21        copy of that.  I want to review it

22        in connection with the trial

23        package that's out there and take

24        a look at the depository and
```

FAC Resp. Exhibit D -- 1264

Page 6

1          whether it is in the depository.

2                 MS. SUTTON:  Sure.  We can

3          get it back to you.

4                 We did this fairly quickly.

5          We provided this to the science

6          committee in July of 2005, so, it

7          was just within a month or so

8          after the request was made, and we

9          know it was used and read very

10         closely by the folks --

11                MR. HERMAN:  Don't send it.

12         Troy and Andy indicate that they

13         believe that it was used in the

14         trial package.  It is in the

15         depository.

16                MS. SUTTON:  Okay.  And then

17         for that first trial, we worked

18         really closely with Andy's

19         partner, Paul Sizemore and Leigh

20         O'Dell, in helping write the legal

21         section of the main brief opposing

22         their Daubert motion on causation.

23         We wrote -- you folks wrote the

24         facts, but we provided the legal

FAC Resp. Exhibit D -- 1265

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1          section.  I think a lot of that

 2          was used.

 3               During the first trial, we

 4          were also asked to do a lot of

 5          spot legal research on some very

 6          difficult issues like the

 7          admissibility of post hoc analyses

 8          of epidemiological data.  We also

 9          did legal research on how you can

10          use Daubert challenges to go after

11          defense experts.  There was

12          learned intermediary research, a

13          lot of different legal research

14          memos we provided to the science

15          team.

16               We also were asked to do a

17          comprehensive labeling history for

18          Vioxx.  That was some work product

19          that we provided to the science

20          committee.  We have copies of

21          that, we can provide that as well.

22               MR. HERMAN:  Did you work

23          with Bert Black on that?

24               MS. SUTTON:  We did the work

FAC Resp. Exhibit D -- 1266

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          product at our office, but I know

2          he reviewed it.

3               MR. WILSON:  We were on the

4          phone with Bert a lot.

5               MS. SUTTON:  We talked to

6          Bert a lot.

7               We worked really closely

8          with Don Arbitblit.  Don was a

9          great help in helping us think

10         about the approach to causation

11         and epidemiology from a legal

12         standpoint and gave input into the

13         memo that we did.  We stayed very

14         involved in the science committee

15         through the billable time that --

16              MR. HERMAN:  Was your firm

17         involved in Celebrex or Bextra?

18              MS. SUTTON:  No, we aren't.

19              Did I miss anything about

20         the science committee?

21              MR. WILSON:  No.  I think

22         you covered it pretty well.  We

23         got a lot of feedback saying that

24         the work was good and it was

FAC Resp. Exhibit D -- 1267

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      useful.  So, we weren't just

2      writing stuff into the air.  I

3      think that was a major

4      contribution.

5           MR. WEITZ:  Did you have

6      weekly meetings or conference

7      calls or were they monthly or you

8      didn't have them?

9           MS. SUTTON:  The science

10      committee had a weekly conference

11      call.  Then there were

12      subcommittees, as well, that we

13      participated in that would meet

14      less frequently by phone.  But

15      there were a lot of calls.

16           Then the epidemiology group

17      that Don was part of, we would

18      meet as a smaller group on the

19      phone and talk about these

20      legal -- these are very difficult

21      legal issues, and we would talk

22      about how we were going to use the

23      science to prove causation and to

24      qualify the experts.

FAC Resp. Exhibit D -- 1268

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1              MR. WEITZ:  Did you have any

2        individual cases that you

3        submitted into the settlement?

4              MS. SUTTON:  Yes.

5              MR. WEITZ:  How many?

6              MS. SUTTON:  Close to 100.

7              MR. WEITZ:  Where did you

8        file those cases?

9              MS. SUTTON:  Minnesota.

10             MR. WEITZ:  Minnesota.  Had

11       you guys worked up any cases for

12       trial?

13             MS. SUTTON:  We're working

14       up one now.

15             MR. WILSON:  We may have one

16       case.

17             MS. SUTTON:  We have a

18       beautiful case we are going to

19       hopefully try next year.  It was

20       filed after the settlement.

21             MR. WEITZ:  After the

22       settlement.  It was an opt out

23       case?

24             MR. SEEGER:  It was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        excluded.

2                MR. WILSON:  We applied for

3        the settlement, but it was

4        rejected because it was after the

5        settlement date.

6                MR. SEEGER:  Right.

7                MR. WILSON:  But it is a

8        Minnesota case, so the statute is

9        still good.  It is a great case.

10       It is a marathoner.  He had a

11       previous workup, no problems,

12       heart attack while running, and

13       he's got terrible mental sequelae.

14       He's basically in a nursing home,

15       46 years old.

16               MS. SUTTON:  So, we're

17       really looking forward to getting

18       that case back and trying it.

19               MR. LEVIN:  When you say

20       "Minnesota," you are filing it in

21       the Federal Court, you are coming

22       here and then they're going back?

23               MS. SUTTON:  Yes.  Our cases

24       were filed in Federal Court in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          Minnesota.

2                 MR. WILSON:  We have a

3          six-year statute of limitations.

4                 MS. SUTTON:  Which is being

5          challenged now.  The Supreme Court

6          in Minnesota is going to look at

7          it.  We hope to get involved in

8          that, the briefing of that.

9                 MR. LEVIN:  That happened in

10         Mississippi with the statute that

11         they had.  You will look at the

12         history.

13                MR. HERMAN:  Went to 6 to 3

14         and also eliminated most

15         out-of-state filings.

16                MR. LEVIN:  Right.

17                MS. SUTTON:  Andy, is your

18         firm going to be involved in that

19         Minnesota statute of limitations

20         issue?

21                MR. BIRCHFIELD:  Yes.

22                MS. SUTTON:  I would like to

23         talk to you when you get a minute.

24                MR. BIRCHFIELD:  Okay.

FAC Resp. Exhibit D -- 1271

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1           MS. SUTTON:  What we can do

2      to help on that.

3           MR. BIRCHFIELD:  I think

4      there was a conference call

5      yesterday, I believe.

6           MS. SUTTON:  Good.

7           Then the second thing was

8      really our work on the discovery

9      committee, and I know you've heard

10      from Anthony Irpino, who we worked

11      extremely closely with on the

12      privilege saga.  We were on the --

13      we got involved in the discovery

14      committee at the first meeting

15      that I think Dave Buchanan had,

16      and the first conference call, and

17      we brought up, based on that first

18      conference call, the idea of

19      really going hard after privilege

20      claims, because we had a lot of

21      success in doing that in the

22      tobacco litigation in Minnesota.

23           Dave said it was a problem,

24      and you were having problems in

FAC Resp. Exhibit D -- 1272

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        New Jersey with the privilege

2        claims, so we asked to --

3        suggested maybe a committee, a

4        subcommittee be set up.  That

5        happened, and Anthony chaired it

6        and did just an incredible job.

7            We asked to see those New

8        Jersey logs, and Dave got them to

9        us, and we painstakingly went

10       through those logs.  Gary and I

11       both wrote a letter that I think

12       Russ sent out in the summer of

13       '05, July of '05, that went

14       through all the deficiencies in

15       the log and basically grouped the

16       types of documents we thought

17       weren't privileged.  There were

18       science documents on the logs,

19       there were marketing documents on

20       the logs, there were things that

21       clearly weren't privileged.  We

22       gave many examples and laid out

23       the law, and we did the research

24       at our firm on why these things

FAC Resp. Exhibit D -- 1273

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        weren't privileged, and we wrote
 2        the letter, and I know Russ sent
 3        out the letter.  We built a great
 4        record, and we got the MDL log,
 5        they did an MDL log, and we went
 6        and looked at that closely and did
 7        another letter that went to the
 8        defendants.  Then eventually we
 9        drafted the first draft of the
10        motion to compel that Richard
11        Arsenault argued, I think it was
12        in October perhaps of '05, and
13        going through and saying there's
14        huge categories of documents that
15        should not be on this privilege
16        log.  They are not privileged.  I
17        think the judge really seemed to
18        listen.  He told them that their
19        logs weren't good and they needed
20        to provide new logs, and when they
21        did provide new logs, they
22        deprivileged a quarter of their
23        privileged documents.  I think
24        they went from 40,000 to 30,000
```

FAC Resp. Exhibit D -- 1274

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          privileged documents.  Our firm,

2          along with other members of the

3          committee, we went through all of

4          those privileged documents.

5               Then I think the judge had

6          all 30,000 documents brought to be

7          reviewed in camera, which is, I

8          think, an amazing feat for -- I

9          mean, Judge Fallon gets a lot of

10         credit.  To get a judge to take

11         and look at all the privilege

12         documents in camera, that doesn't

13         happen very often in litigation.

14         So, he did look at them, and I

15         think he was ready to deprivilege

16         most of them when they went up to

17         the Fifth Circuit.

18              MR. LEVIN:  The Fifth

19         Circuit wasn't as kind to Judge

20         Fallon as you are.

21              MS. SUTTON:  I think --

22              MR. WILSON:  He kept it

23         alive, Arnie.

24              MS. SUTTON:  But I think the

FAC Resp. Exhibit D -- 1275

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           Fifth Circuit recognized that the

2           privileged documents had to be

3           reviewed, and I think the thing

4           that we'd advocated in our

5           committee is that there were too

6           many privileged documents.  He

7           couldn't look at all of them.  So,

8           he needed to sample them.  The

9           Fifth Circuit wrote a decision

10          that will be something used in all

11          litigation from now on that it is

12          okay to sample privileged

13          documents and make a privilege

14          determination based on sampling

15          and not looking at all of them.

16              We have been working,

17          frankly, our butts off at our firm

18          trying to get an appellate court

19          to put that in writing, and that

20          happened in Vioxx.  There was

21          sampling done in the Minnesota

22          tobacco litigation, but we never

23          got an order in the Supreme Court

24          on that.

FAC Resp. Exhibit D -- 1276

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1              MR. SEEGER:  They didn't

2         like the sampling, but it was okay

3         to do it.

4              MS. SUTTON:  Gary flew down

5         and helped on the Fifth Circuit

6         brief with Lenny, and everybody

7         pitched in on that mandamus brief.

8              MR. WILSON:  Irpino

9         especially worked on that.

10             MS. SUTTON:  Yes.  I think

11        that it is hard for us to know how

12        much influence the privilege

13        documents had on Judge Fallon and

14        his thinking about Vioxx and

15        Merck.  I mean, because you guys

16        know better than us, I think, the

17        impact it may have had on him, but

18        I think it definitely, I would

19        hope, helped educate the judge

20        about the games that were being

21        played and gave him an impression

22        that we hope helped contribute to

23        the success of the litigation.

24             MR. HERMAN:  What privilege

FAC Resp. Exhibit D -- 1277

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          issue did Arsenault argue?

2                  MR. WILSON:  Actually, he

3          didn't argue it.  He relied upon

4          the brief.

5                  MR. HERMAN:  He didn't argue

6          it.

7                  MR. WILSON:  He stood up and

8          said, on this one, we're going to

9          rely on the brief, Your Honor.

10                 MS. SUTTON:  That was the

11         brief we wrote.

12                 MR. LEVIN:  It was a good

13         argument.

14                 MR. SEEGER:  The brief was

15         better than the argument.

16                 MR. WILSON:  It's a good

17         brief.

18                 MR. HERMAN:  Well, just one

19         other thing, and that is, the

20         Fifth Circuit actually departed

21         from the Federal rules, appellate

22         rules and also some internal rules

23         to snatch up that issue.  We're

24         not certain how that happened, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          certainly had they done what we

2          interpret the rules to be, let's

3          put it that way, as lawyers, then

4          Judge Fallon's initial opinion

5          would have held, and it would have

6          meant that the litigation had

7          really been spurred at that point.

8               MR. LEVIN:  They never

9          granted a mandamus and wrote an

10         opinion.  They had no

11         jurisdiction.

12              MS. SUTTON:  Exactly.

13              MR. WILSON:  I was there for

14         that.  We were over in Irpino's

15         office, the emergency stay was

16         there, we replied to that, and

17         then the next day we had to file

18         the brief.

19              MS. SUTTON:  Yes.  I mean,

20         Judge Fallon looked at all 30,000

21         documents.  He did what he needed

22         to do.  He should have been upheld

23         on that.

24              So, we also relied heavily

FAC Resp. Exhibit D -- 1279

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        on Paul Rice in presenting his

2        textbook to the judge.  I know he

3        eventually adopted or used him as

4        the Special Master.

5              MR. HERMAN:  What are your

6        costs in the case?

7              MR. WILSON:  Just under

8        50,000 or just over 50,000.

9              MS. SUTTON:  50,418.22.

10             MR. HERMAN:  Primarily, what

11       are those costs?

12             MS. SUTTON:  We did 11 full

13       weeks of document review at the

14       document depository.

15             MR. WILSON:  In New York and

16       in Alabama.

17             MR. LEVIN:  So,

18       transportation and hotel lodging?

19             MS. SUTTON:  Right.

20             MR. HERMAN:  And partner

21       hours in the case?

22             MR. LEVIN:  1,950.

23             MR. WILSON:  In our

24       three-page thing --

FAC Resp. Exhibit D -- 1280

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1            MR. LEVIN:  Did you say

2       partner hours?

3            MR. HERMAN:  Yes.

4            MR. LEVIN:  Partner hours --

5            MS. SUTTON:  That might be

6       right.

7            MR. WILSON:  We have a total

8       of 2,400 hours, partners and

9       associates.

10            MR. LEVIN:  The accountant

11       says you have 1,950.  You ought to

12       look into that.  The hours

13       reported are Peter Sutton Toepfer,

14       Roberta's, yours, Gary and

15       Zimmerman's and Tara's.

16            MS. SUTTON:  There's some

17       associates in there.

18            MR. LEVIN:  Jaycox, Moccio

19       and Narotsky.

20            MR. WILSON:  Do we talk to

21       the accountant about that, Arnold?

22            MR. HERMAN:  Yes, please.

23            MR. LEVIN:  Yes.

24            MR. HERMAN:  The accountant

FAC Resp. Exhibit D -- 1281

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          has made himself available, and so

2          you know, that CPA and the people

3          working with him do not do any

4          work whatsoever for any of the law

5          firms involved in the case or any

6          of the lawyers involved in the

7          case on a personal basis.  It is

8          Judge Fallon's choice.  But they

9          are extremely approachable.  If

10          you have any questions about their

11          review of either hours or dollars,

12          costs, they will straighten it out

13          with you.

14               MS. SUTTON:  Okay.

15               MR. WILSON:  Then we were

16          also on other committees.  We were

17          on the science -- well, we talked

18          about the science committee, but

19          we were on the law committee, Tara

20          mentioned we did the document

21          review, and we actually did the

22          document review.  I know there are

23          some people who would fly in and

24          spend the day there and then go to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1        the Yankees game.  We did five-day

 2        weeks.

 3             MR. SEEGER:  And you worked.

 4             MR. WILSON:  We went through

 5        them.

 6             MS. SUTTON:  We listened on

 7        those conference calls when we'd

 8        get yelled at.  We made sure we

 9        were there five days a week.

10             MR. SEEGER:  All right.

11             MR. HERMAN:  You said you

12        were both in Montgomery and New

13        York?

14             MS. SUTTON:  Correct.

15             MR. WILSON:  And also here.

16        I think Toepfer was here for a

17        week.

18             MR. HERMAN:  Anybody else

19        have any questions?

20             MR. SEEGER:  I think we're

21        done.

22                  -   -   -

23

24
```

FAC Resp. Exhibit D -- 1283

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Exhibit D -- 1284

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -


FIRM: Sanford Pinedo, LLP
PRESENTER:  Shelly A. Sanford, Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, P.C

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.

FAC Resp. Exhibit D -- 1285

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

 1          MR. BIRCHFIELD:  Shelly,

 2     everything is being recorded for a

 3     transcript and will be available

 4     for future use if it's needed.

 5     So, with that, the floor is yours.

 6          Everybody here knows your

 7     contribution and what you did in

 8     starting this litigation, and it's

 9     very much appreciated, but I want

10     you to take this time to say

11     whatever you want to say.

12          MS. SANFORD:  Thank you,

13     Andy.  There may be one point at

14     which I might have to go off the

15     record very briefly, and I hope

16     nobody minds.

17          MR. BIRCHFIELD:  Not at all.

18          MS. SANFORD:  I want to say

19     first what an honor it is for me

20     to have been a member of the PSC

21     and to have worked with each one

22     of you.  I will be brief on this

23     this morning.  Probably the

24     hardest thing I've had to do since

FAC Resp. Exhibit D -- 1286

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

    1      Carlene died is to write the

    2      affidavit.  I'll try not to cry.

    3          MR. SEEGER:  Don't worry

    4      about it.

    5          MR. HERMAN:  Shelly, it

    6      might be easier if you consider

    7      you are talking to family.

    8          MR. LEVIN:  Because you are.

    9          MR. LANIER:  If worst comes

   10      to worst, there are about six of

   11      us that would jump in and testify

   12      on your behalf and give the same

   13      speech you are going to give

   14      anyway.

   15          MS. SANFORD:  Thank you.  I

   16      would really like for this not to

   17      be about me but to be about

   18      Carlene.  She was the most humble

   19      person I have ever known and

   20      trusted each one of you as well.

   21          Perry, I'm sorry you didn't

   22      really have a chance to get to

   23      know her.

   24          MR. WEITZ:  I am, too.

FAC Resp. Exhibit D -- 1287

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1            MS. SANFORD:  A truly humble
 2       and wonderful person.
 3            I tried to put all that I
 4       could in the affidavit.
 5            Carlene's obituary was in
 6       the New York Times, and part of
 7       that was that she was a pioneer in
 8       Vioxx.  So, I know that you get
 9       that she's a pioneer in this
10       litigation.  I thought about
11       bringing that, but I think that's
12       a good testament to who she was
13       and what she did in this
14       litigation, that even the New York
15       Times would pick up the story on
16       her death.
17            Not to minimize her degree
18       at Harvard and her University of
19       Virginia law degree and the other
20       incredible things that she's done
21       in her life, but this was
22       extremely important to her, and
23       she dedicated herself to this
24       litigation.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1              It started for us in 2000,

 2         eight years ago here at the St.

 3         Regis, a little bit after that

 4         with you, Chris, and Mark, of

 5         course, with you and Tom and Andy,

 6         your firm, everybody, but it's

 7         been a little bit of a long road.

 8         It was a five-and-a-half year road

 9         for Carlene up until the time she

10         died.

11              She gave speeches in the

12         beginning of this litigation that

13         I would like to encourage you to

14         consider allowing her time for,

15         because for her it was not about

16         getting cases or gathering cases.

17         She believed that this was a bad

18         drug, wanted to encourage other

19         lawyers to come out and be

20         involved in this litigation.  So,

21         we went to a number of places that

22         were simply designed to encourage

23         people to file claims against

24         Merck and help this litigation
```

FAC Resp. Exhibit D -- 1289

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1    move forward years before it ever

2    came off the market.  I don't know

3    how that is playing out in fee

4    allocation considerations.

5         MR. HERMAN:  Why don't you

6    tell us about some of the places.

7         MS. SANFORD:  I almost

8    brought one of those speeches

9    here, but it is a little bit too

10   hard.   I can supplement the file

11   with those if you guys would like

12   because many of those were

13   recorded.

14        MR. HERMAN:  I would like to

15   know the various places.

16        MS. SANFORD:  She went to

17   the Mass Torts Made Perfect in

18   2002.  We were there.  We started

19   the Vioxx litigation group at ATLA

20   with David Miceli, and Carlene

21   gave really a speech almost every

22   year at every convention, the

23   annual conventions we did, and

24   encouraged people to come up until

FAC Resp. Exhibit D -- 1290

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1       we turned that over in 2006.

2              We went to Mealey's and did

3       a speech, and the actual

4       culmination of that was with

5       Mealey's right when Vioxx came off

6       the market and a number of you --

7              MR. BIRCHFIELD:  Pasadena.

8              MS. SANFORD:  --  gave

9       speeches there.  Yes, Pasadena.

10      But the thing that really spoke to

11      me about that particular speech,

12      people always complimented her and

13      said, we really think we want to

14      get in this litigation. Mark, you

15      know how effective Carlene was at

16      trying to persuade people to jump

17      in and encourage that.

18             But she was in the hospital

19      the second time, the last time she

20      was in the hospital, and she got

21      an e-mail from a lawyer in New

22      York who had watched the Mealey's

23      presentation and just e-mailed her

24      and said, I don't know you, but

Page 8

1        you've restored my faith in

2        lawyers, a defense lawyer wrote

3        that, and Carlene showed that to

4        me and was just so touched that

5        somebody would do that.

6             We wrote articles for

7        various places, trial magazines,

8        but mostly it was ATLA and Mass

9        Torts Made Perfect and Mealey's.

10       We also did the Harris Martin and

11       those sorts of things.

12            So, there were really a

13       number of things.  They would

14       probably be reflected in the time.

15       I tried to capture those for her

16       in the pre-2005 formation of the

17       MDL time that we submitted, and I

18       would encourage you to look at

19       that because it did impact

20       lawyers.  I know that may not be a

21       common, common benefit time issue,

22       but it was important to Carlene,

23       and I think it was very effective

24       and helped the litigation move

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        forward.
 2              Mark, I looked at your
 3        eulogy of Carlene, I listened to
 4        that yesterday, and what a tribute
 5        it was to her.  The things you
 6        said about her, about Vioxx,
 7        really stood out to me.   I think
 8        you know it is true, if you gave
 9        something to Carlene, you could
10        take it off your list.  It was
11        done.   That was very true in this
12        litigation.  You called her a
13        leader in the Vioxx fight, and I
14        think that's accurate.
15        Importantly, you told her girls
16        that there are pharmaceutical
17        companies that will never do
18        business the same way because she
19        took justice by the hand until it
20        came to fruition.  I believe that
21        is true and accurate.
22              I remember, again, shortly
23        before Carlene passed away,
24        watching a commercial with her on
```

FAC Resp. Exhibit D -- 1293

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          TV of Tylenol.  The president of

 2          Tylenol got on the commercial and

 3          said, we have this problem with

 4          our drug and we don't want you to

 5          take it.  We would rather you not

 6          take Tylenol than have this

 7          problem.   Carlene looked at me

 8          and said, I think we helped to

 9          make a difference with that and

10          that kind of pride in what she

11          did.  It's remarkable, and I

12          believe it is true as well.  I'm

13          glad she had it.

14              It was easy to see that she

15          was a visionary about the Vioxx

16          litigation.  She walked into my

17          office in October of 2000 after

18          having visited with Ms. Bell and

19          said, this is a bad drug, and we

20          need to do something about it.

21          That's how she proceeded in this

22          litigation.  She looked at Vioxx

23          and said it is a bad drug, it is

24          hurting people, we've got to do
```

Page 11

```
 1        something to help.  That's how she

 2        looked at the litigation all the

 3        way through.

 4             It was a very proud moment

 5        for her when Vioxx came off the

 6        market, an extremely proud moment

 7        when she was appointed to this

 8        PSC, and even prouder when she

 9        chaired the science committee.

10        When you voted her in, the taxi

11        ride to the airport after that was

12        one of the happiest moments that I

13        remember from her, and she was

14        very appreciative of that, and I

15        think did a tremendous job.

16             Here's where I'll go off the

17        record for one second.

18                  -  -  -

19             (Whereupon, an

20        off-the-record discussion was

21        held.)

22                  -  -  -

23             MR. BIRCHFIELD:  Shelly,

24        appointing Carlene and then you as
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          chair of the science committee,

2          that was probably one of the

3          easiest and most obvious decisions

4          that we made in this litigation.

5               MS. SANFORD:  Thank you for

6          that.  We didn't take it lightly,

7          and I don't intend to overstate

8          either one of our positions or

9          understate them, but I think you

10         all know where we were in it and

11         at least where our heart was, and

12         you got the best of both of us,

13         and in particular, the best of

14         Carlene.

15              I think in regard to being a

16         visionary, she was able to

17         recognize a bad drug.  She was

18         able to look at Mrs. Ernst when

19         she came in the door and say, this

20         is the case that needs to go to

21         trial, and it needs to be tried by

22         Mark.  She was committed to that,

23         Mark, in a way that it's just

24         amazing to me.  She loved that

FAC Resp. Exhibit D -- 1296

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        trial, loved how you tried it,

2        loved being a part of it, loved

3        the result.  Happy, happy day for

4        her.  And we'll just say thank you

5        to you for being part of that.

6             She recognized the need for

7        giant people to be involved in

8        this litigation and encouraged, I

9        think, all of you in ways that

10       were, I hope, memorable to you

11       because she loved each one of you.

12            MR. HERMAN:  I think you

13       ought to know that it was a big

14       blow to everyone, not just in a

15       professional sense, but in a

16       personal sense, and there never

17       was a question at all as to who

18       would be recommended to fill the

19       spot on the PSC.  You always give

20       more and take less credit yourself

21       for what you do.  I know this

22       isn't easy for you, and you don't

23       find it easy to talk about

24       yourself.

FAC Resp. Exhibit D -- 1297

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1           MS. SANFORD:  No.

2           MR. HERMAN:  So, I think

3     some of us are going to have to do

4     that for you.

5           MR. SEEGER:  I was just

6     about to say, true to character,

7     she's talking about what everybody

8     else did but her.  You were right

9     there with Carlene from the very

10    beginning.  The very first meeting

11    I had was with the two of you.

12          Shelly, Carlene was a very

13    special person.  We all miss her.

14    It was a huge blow, and it felt

15    like there was just a huge hole in

16    our committee and in our team when

17    she left, but you filled it.

18    Even before that, you were so

19    active and so involved.

20          I don't want to go into all

21    the details like what you did on

22    the science committee and how you

23    supported every trial effort,

24    Andy, mine, Mark's, everybody's,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        Perry's.  You were always there

2        moving us on, helping us,

3        providing us with valuable

4        information.  You have been steady

5        and constant from the very minute

6        I met you right here in this

7        hotel.  So, I thank you.

8            MR. LANIER:  I also want the

9        record to reflect, and I think

10       those of us on the committee know

11       this, but I'm not certain, and I

12       hope this isn't something that I

13       know from some other means that I

14       shouldn't say, but the monies you

15       get from this have already been

16       pre-divided in such a way that

17       Carlene's children and her ex-law

18       partner are going to get the

19       lion's share compared to what you

20       get.  If you add those two

21       together, it is two to one, what

22       you would take out of this.   I

23       think that needs to be on the

24       record as well.  It's another good

FAC Resp. Exhibit D -- 1299

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        reason for you to be talking not

 2        just about what you did, but about

 3        what Carlene did, because this is

 4        our chance for her offspring to

 5        get what's coming to them from her

 6        efforts.

 7             MR. LEVIN:  How are those

 8        pretty girls?

 9             MS. SANFORD:  They are good.

10        They are tremendous.  They are a

11        testament to their mom really.

12        Carla, the oldest, is at Harvard

13        and followed in her mom's

14        footsteps, and Christie is a

15        senior in high school.  They are

16        very good children.

17             MR. LEVIN:  It's good that

18        they have you.

19             MS. SANFORD:  Thank you.  It

20        is a joy for me to have them, and

21        thank you for the comments.  I'm

22        in awe of each one of you and the

23        things that you have done and have

24        been glad to be a part of it and
```

FAC Resp. Exhibit D -- 1300

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1        would give my all for you on any

 2        case that I was involved in with

 3        you, and I do believe that Merck

 4        is --

 5             MR. HERMAN:  It takes a lot

 6        of mules to pull one cart, and we

 7        wouldn't be where we are without

 8        your contribution and Carlene's.

 9             I just want to add a little,

10        because you are not making a

11        pretty good record for somebody

12        else to read even though we know

13        what you did.  I think your

14        participation on, for example, the

15        science committee, the trial

16        package committee, monitoring the

17        trials, giving the input, being

18        there from the beginning to the

19        end, the consistency with which

20        you and Carlene performed, and

21        even after Carlene was facing a

22        really untoward situation, there

23        wasn't any stop.  You guys just

24        kept plowing ahead.  You are still

FAC Resp. Exhibit D -- 1301

Page 18

1          not making the case for yourself.

2                MR. LANIER:  Let me add, in

3          the Ernst case, we go to trial in

4          Ernst, no one has tried any Vioxx

5          cases yet.  We are going where no

6          man has gone before.  Alan Nies

7          gets put on the stand.  I don't

8          have a deposition of Alan Nies to

9          read.  I have absolutely nothing

10         from Alan Nies.  So, I'm going

11         through documents, and I'm putting

12         together a cross with some of the

13         best stuff I had on Alan Nies.

14         You and Carlene found, in terms of

15         Alan Nies' "oh, I moved down here

16         to be with my grandkids," blah,

17         blah, blah.  He did not.  He moved

18         down here for a consulting job

19         making a quarter million dollars a

20         year for a sugarland company down

21         the freeway there.  And y'all

22         found that, which allowed me to

23         absolutely totally destroy his

24         credibility in the first five

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        minutes of my cross-examination.

2        And that was y'all.

3             MS. SANFORD:  You did

4        destroy his credibility.  That was

5        very pleasant.  Thank you for

6        that.

7             MR. GIRARDI:  Shelly, let me

8        say this.  We were in this case in

9        2001.  I know you were and Chris

10       was in 2001.  Nobody at this table

11       knew how to spell Vioxx.  The only

12       reason this came about is you two

13       guys, no question about it.  If

14       you look at all of the bad drug

15       cases, you never see this sort of

16       a lead time between what you guys

17       did back in 2000 versus then it

18       gets withdrawn several years later

19       and then the MDL is set up in

20       2005.  All of that was because of

21       you.  I mean, no question about

22       it.

23            MR. LANIER:  I still recall

24       you helping me get ready to take

FAC Resp. Exhibit D -- 1303

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1        Alise Reicin's deposition.  Before
 2        they pulled the drug off the
 3        market, we deposed Alise Reicin,
 4        got her locked into some lies
 5        before she ever knew this thing
 6        was going to go forward, and y'all
 7        helped prep me for that.
 8             MR. BIRCHFIELD:  We all know
 9        your role early on and your
10        commitment throughout it.  Chris
11        mentioned the support and the help
12        that you gave.  Mark has mentioned
13        the role that you and Carlene
14        played in Ernst.  But you were
15        there for our trial.  I mean,
16        every MDL trial, you were there to
17        help.  So, we know your role
18        there.  We know the contribution
19        that you made on the committees,
20        the science committee and the
21        trial package and the stroke
22        committee.  I mean, all of that is
23        well known to the folks on this
24        committee.
```

FAC Resp. Exhibit D -- 1304

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

 1          One of the things that may

 2      not be as well known that would be

 3      helpful, if you could spend a few

 4      minutes talking about how y'all

 5      really advanced the litigation

 6      with your own cases.  We know

 7      about Ernst, but you had other

 8      cases that y'all had worked up

 9      that were ready for trial that you

10      were pushing to get to trial.  Can

11      you talk to us a few minutes about

12      that?  That would be helpful.

13          MR. SEEGER:  Excellent

14      question.

15          MS. SANFORD:  Most

16      particularly the case that I think

17      was helpful in advancing the

18      litigation -- with the exception

19      of Ernst, which I think was an

20      amazing thing to be able to get to

21      trial within four months of the

22      MDL being formed.  Again, I will

23      say that Carlene was so

24      appreciative that the PSC

Page 22

1        supported that, allowed that case

2        to go to trial, encouraged it and,

3        Mark, your role in that, but that

4        that was able to go to trial then

5        was tremendous.   We spent a very

6        big amount of time with Mark's

7        firm on that.

8            We also had the Pikul case,

9        which I think made a significant

10       difference in this litigation as

11       well.  When I say the Pikul case,

12       it is a case that we had in 2003.

13       We filed that he was a person who

14       had 50 milligram usage for more

15       than 30 months and got all of his

16       drugs from Merck-Medco directly.

17       They sent him the last 90-day

18       supply that killed him.  He had a

19       blood clot.  The clot was found by

20       the medical examiner here who had

21       pictures of the clot, testified in

22       that actual pathology record that

23       it was Vioxx related prior to

24       Vioxx even being withdrawn from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          the market.  The actual physician,

2          I took his deposition, and he said

3          Merck was in his office telling

4          him that Vioxx was safe, go ahead

5          and continue to prescribe it in 50

6          milligram doses on a chronic

7          basis, which was contrary to the

8          label.  We had that case wired up,

9          and Merck knew it, and so every

10         time it came to the table in the

11         MDL to be the trial case --

12              MR. SEEGER:  They ran away

13         from it.

14              MS. SANFORD:  -- they ran

15         away from it.  They said that it

16         is not representative because it

17         is too good and those sorts of

18         things.  And I think it had a lot

19         to do, in my opinion and Carlene's

20         opinion, with how the cases got

21         selected for trial and how

22         eventually they would have faced

23         that case.

24              MR. BIRCHFIELD:  That case

FAC Resp. Exhibit D -- 1307

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          was trial ready?

2               MS. SANFORD:  It was trial

3          ready.  The doctors, the experts,

4          the plaintiff's depositions were

5          taken, the representatives.  It is

6          the only case that Carlene

7          considered, as she was in the

8          hospital the first time, possibly

9          filing mandamus for Judge Fallon

10         because he was not getting his day

11         in court, and it was ready at the

12         time the MDL was formed.  And of

13         course we didn't do that because

14         that's not really something we

15         would have done, but it was that

16         strongly felt in her that this was

17         a case that should be tried and

18         should have been the first trial

19         in the MDL.  And Merck's ability

20         to strike that was helpful to

21         other cases like Barnett and those

22         that got put on the table.   I

23         think that was significant.  Thank

24         you for asking that question.

FAC Resp. Exhibit D -- 1308

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        When I think of one of the things
 2        I'm proud about, I'm proud for
 3        Carlene about, that's one of the
 4        things that comes up.
 5             There are a few other things
 6        I will go through very quickly,
 7        but just fun little facts that I'm
 8        proud of them.  The video news
 9        release that was played in every
10        trial which Merck never mentioned
11        in there that there was a five
12        times risk of heart attack with
13        their drug.  They touted the
14        naproxen effects, and they sent
15        that out right after VIGOR was
16        released.  It was the first video
17        marketing material that we got.
18        It was document 0001 in 2001, and
19        that was something that Mark used
20        at the first trial.  It was a very
21        good piece.
22             The second piece of
23        information that was very
24        beneficial I think to the
```

Page 26

1        litigation overall was the "Be the

2        Power" presentation.

3            Tom, I don't know if you

4        remember this, but you had a black

5        and white PowerPoint presentation

6        that you gave Carlene and I when

7        we came down the second time to

8        see you, and it was almost

9        illegible.  We took it and we were

10       able to file a 30(b)(6) motion.

11       Carlene and I took the deposition

12       and got documents, and among those

13       documents was the "Be the Power"

14       video.  It was James Dunn's

15       production as it came in, and we

16       looked at it and saw this cartoon

17       basically that they had put

18       together undermining and

19       minimizing the effects.

20            MR. SEEGER:  Shelly,

21       something else just really

22       occurred to me.  You are so quiet

23       and you are so understated, but

24       you were really the central

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1          organizer of the West Coast, the
 2          East Coast, all of us, before the
 3          MDL, and you were still, even
 4          after the MDL was created, very
 5          much involved with lawyers all
 6          over the country, Mark, Tom's
 7          office, us.  So, you provided a
 8          lot of leadership in that respect.
 9               MS. SANFORD:  I appreciate
10          that.  Thank you.
11               We had meetings in Mark's
12          office with everybody in your new
13          office when it first came in, when
14          you first went there, Mark, after
15          we dogged you downtown for so many
16          years to get involved.
17               MR. SEEGER:  I know.  I
18          remember I couldn't find his
19          office the first time he invited
20          me down.
21               MS. SANFORD:  That "Be the
22          Power" presentation, I think, was
23          significant, and it was played in
24          -- every trial that had a verdict
```

FAC Resp. Exhibit D -- 1311

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1         for plaintiffs included that

2         presentation, and that was as a

3         result of that, and that was when

4         Merck filed personal

5         Interrogatories against me and

6         Carlene and the request for

7         admission and tried to figure out

8         how we got that.  And then when we

9         were able to stop that from

10        happening, we got motions for

11        sanctions on that and those sorts

12        of things early on, because they

13        were just furious that we knew

14        about it.  But it was a very good

15        deal, and I was proud of that.

16             We had 10 million pages of

17        documents by the summer of 2002,

18        and that ultimately became part of

19        the repository, I think, in New

20        Jersey, and I thought that was a

21        very good factor.

22             MR. HERMAN:  Shelly,

23        everybody on this committee has

24        recognized that one hour of work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1       by a lawyer of your caliber or

2       Carlene's may be worth 100 of

3       somebody else's.  So, hours aren't

4       the sine qua non, I think, for

5       this committee.

6            But I do want to get on the

7       record the last report that I

8       have, which is -- I rounded off

9       7,084 hours by the firm and your

10      own hours, close to 4,000.

11      That's significant because there

12      was a time when you weren't even

13      dealing with hours and Carlene

14      wasn't dealing with hours.  But in

15      an effort to be consistent, I want

16      to make sure your hours are stated

17      on the record.

18           What are your outstanding

19      costs at this point for you and

20      Carlene?

21           MS. SANFORD:  I did not

22      bring that with me.

23           MR. HERMAN:  Can you

24      ballpark it for us?

FAC Resp. Exhibit D -- 1313

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1                MR. LEVIN:  We have it here.

2                MS. SANFORD:  You do?  Maybe

3         300?

4                MR. HERMAN:  Arnie, do you

5         have it?

6                MR. LEVIN:  You have about

7         7,000 hours in the cases reported,

8         and for some reason, your costs --

9         take a look at this.

10               MR. BLIZZARD:  $79,000 in

11        costs.

12               MS. SANFORD:  In expenses in

13        addition -- I mean less the PSC

14        contribution --

15               MR. LEVIN:  That has nothing

16        to do with the assessments.

17               MR. HERMAN:  How much?

18               MR. LEVIN:  $79,000.

19               MR. HERMAN:  It sounds low

20        to me.

21               MS. SANFORD:  It is low in a

22        sense that very graciously Mark

23        and Carlene came to a deal on the

24        cases where Mark fronted.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1           MR. SEEGER:  That explains

2      how --

3           MR. LEVIN:  That explains

4      Mark's costs now.

5           MS. SANFORD:  We paid a

6      significant amount, but Mark very

7      graciously contributed --

8           MR. HERMAN:  Check what you

9      and Carlene were out of pocket,

10      notwithstanding what Mark did, and

11      if it is different than around

12      80,000.  You have got Mark's

13      number.  Just call it into us

14      while we're here, and we'll put it

15      on the record.

16           MS. SANFORD:  I will

17      actually do that.  There was time

18      submitted for pre-MDL formation,

19      and I don't know what you are

20      doing with that.

21           MR. LEVIN:  We want to know

22      that.

23           MR. HERMAN:  We want to know

24      that.

FAC Resp. Exhibit D -- 1315

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1           MR. LEVIN:  Get that in.

2           MS. SANFORD:  I submitted it

3       a year ago probably to your

4       office, Russ.

5           MR. LEVIN:  Well, then, it

6       is in there.

7           MR. HERMAN:  Well, then, we

8       should have it.

9           MR. SEEGER:  Shelly, do you

10      have somebody who can make a call

11      to Wegmann to make sure the

12      accountants have your pre-MDL

13      hours?

14          MR. HERMAN:  And your costs.

15          MR. LEVIN:  Shelly, I can

16      say this, that you are one of the

17      few, that every hour that you have

18      put in has been accepted by the

19      accountants.  There's nothing

20      rejected.  There's nothing under

21      review.  It's current --

22          MR. SEEGER:  That makes

23      Arnold very happy.

24          MR. LANIER:  Which also

FAC Resp. Exhibit D -- 1316

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1      brings up another point that I

2      think is useful on the record that

3      ties all of this together.

4           You and Carlene and Danny,

5      as this thing started, really were

6      a defense firm, and you lost and

7      burned some defense bridges by

8      stepping out in a plaintiff's

9      cause of action.  It is why you

10     weren't in a position to fund this

11     litigation and why I stepped in to

12     do your funding.  It is also why

13     you keep really good hours.  You

14     know how to do it.   They are

15     legitimate hours, and they are

16     real.

17           MS. SANFORD:  Thank you.

18           MR. LANIER:  But I say that

19     to underscore that I know for a

20     fact that y'all burned some

21     bridges with some defense clients

22     by, quote, going to the

23     plaintiff's side, closed quote.

24           MS. SANFORD:  We absolutely

FAC Resp. Exhibit D -- 1317

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

```
 1       did, and Carlene gave up a major

 2       defense client to do this

 3       litigation that funded her and her

 4       family very well.

 5           MR. HERMAN:  The last thing

 6       I want to say about you and

 7       Carlene is Louie L'Amour wrote a

 8       lot about Texas and a pioneer's

 9       spirit.  In one of the books, one

10       of his novels, he talks about a

11       female pioneer.  And the phrase he

12       used was, "She was fit to ride the

13       river with," which in those days

14       meant they would stick to it and

15       be tough.  Everybody wants to be a

16       pioneer, but we're looking at one

17       right now.  It would be a

18       discredit to us if we discounted

19       the work that you and Carlene did

20       in the early stages of the

21       litigation.  I'm glad you started

22       with that.  I want you to know

23       that we recognize it, and it is

24       meaningful.
```

FAC Resp. Exhibit D -- 1318

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1           MS. SANFORD:  Thank you for

2      that, Russ.  I have one request in

3      that regard.  If you decide that

4      it's time that's valuable and able

5      to be recompensed in this, I would

6      accept that.  If you decide that

7      it isn't, I would encourage you to

8      rethink that on Carlene's time, as

9      she couldn't continue because she

10     passed away.

11          MR. HERMAN:  We're not deep

12     thinkers, Carlene.

13          MS. SANFORD:  But I will

14     give you that.  This is what we

15     submitted to them.  It is roughly

16     the same amount of hours

17     previously, and that's what we put

18     in there.

19          Russ, the picture that

20     Carlene hung on her wall that I

21     now have, actually, is a quote

22     from Abraham Lincoln, and it says,

23     "A lawyer's time and advice are

24     her stock in trade."

FAC Resp. Exhibit D -- 1319

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1              MR. HERMAN:  I'm just going

2        to read the front page for the

3        record, and then I'll turn this in

4        myself when I get back.

5              From January 1st, 2000 to

6        April 5th, 2005, Carlene Lewis had

7        3,079 hours, and Shelly Sanford

8        had 3,596 hours, and Jeff Larson,

9        29 hours.  That's really a

10       significant amount of time when

11       you are talking about a five-year

12       stretch before the MDL really got

13       geared up.

14             MS. SANFORD:  Thank you for

15       that.

16             Couple of just final

17       comments, and I thank you very

18       much for listening to me on this.

19             MR. LEVIN:  Shelly, will you

20       call the accountants to make sure

21       that the time is straight?

22             MR. SEEGER:  We told her

23       that, Arnie.

24             MR. LEVIN:  This time

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1          appears to be not in there.

 2                  MR. SEEGER:  She just gave

 3          it to us.

 4                  MR. HERMAN:  She just gave

 5          it to me.

 6                  MR. LEVIN:  I know, but he

 7          has to get it in there.

 8                  MR. HERMAN:  I'll take care

 9          of it.

10                  MR. SEEGER:  Go ahead.

11                  MS. SANFORD:  I communicated

12          with Lenny on it probably a month

13          ago just to make sure that it was

14          included, and he was looking into

15          it with Regina on that issue.

16                  I think that in regards to

17          myself and to Carlene, what I'm

18          most proud of in this litigation

19          is that I think we might be river

20          ready, but we have a dogged

21          persistence, and I think that's

22          tantamount to who she was, and I

23          hope that I was able to honor her

24          in that in following that same
```

FAC Resp. Exhibit D -- 1321

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1        persistence.  We just loved

2        working with you guys and

3        appreciate the opportunity to have

4        done it and thank you for that.

5             MR. BLIZZARD:  Shelly,

6        sometimes the most valuable

7        contribution somebody can make is

8        to inspire other people, and I

9        think Carlene did that, and I

10       really thank you for inspiring us

11       this morning.

12            MR. BIRCHFIELD:  Amen.

13            MR. SEEGER:  Well said, Ed.

14            MS. SANFORD:  Thank you.

15                 -   -   -

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 1322

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1              C E R T I F I C A T E

2

3

4         I, LINDA L. GOLKOW, a Notary
   Public and Certified Court Reporter of
5   the State of New Jersey, Registered
   Diplomate Reporter, Federally-Approved by
6   the United States District Court of
   Pennsylvania, do hereby certify that the
7   foregoing is a correct transcript of the
   testimony as taken stenographically by
8   and before me at the time, place and on
   the date hereinbefore set forth.

9

10

11

         I DO FURTHER CERTIFY that I am
12   neither a relative nor employee nor
   attorney nor counsel of any of the
13   parties to this action, and that I am
   neither a relative nor employee of such
14   attorney or counsel, and that I am not
   financially interested in the action.

15

16

17

18   _____

   Linda L. Golkow, RDR, CRR, CCR
19   Notary Number:  1060147
   Notary Expiration:  1.2.10
20   CCR Number:  30X100176200

21

22

23

24

FAC Resp. Exhibit D -- 1323

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM:  SHELLER, P.C.
       Brian J. McCormick, Jr., Esquire
       Claudine O. Homolash, Esquire


BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1324

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. SEEGER:  We do have a
 3       court reporter keeping track, so,
 4       if you could just put your names
 5       on the record when you start
 6       speaking.
 7            MR. MCCORMICK:  Brian
 8       McCormick, and with me is Claudine
 9       Homolash from the Sheller firm.
10            MR. HERMAN:  I'm sorry.  I'm
11       Russ Herman.  I don't think we've
12       met.  And would you give me your
13       partner's name, Sharon?
14            MR. MCCORMICK:  Claudine
15       Homolash.
16            MR. HERMAN:  Claudine?  How
17       does Claudine spell her name?
18            MS. HOMOLASH:
19       C-L-A-U-D-I-N-E.
20            MR. HERMAN: No, no, your
21       last name.
22            MS. HOMOLASH:
23       H-O-M-O-L-A-S-H.
24            MR. SEEGER:  Go ahead.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1            MR. MCCORMICK:  I'm going to
2       be brief.  I'll get you guys get
3       back on schedule.
4            Thanks for giving us a
5       chance to make a brief
6       presentation.
7            The affidavit that Steve
8       Sheller from my firm presented
9       back on October 31st, 2008, that
10      affidavit was based on a number of
11      discussions and conferences with
12      several of the attorneys who
13      worked on the various Vioxx
14      matters at the time in our firm.
15      I'm going to concentrate primarily
16      on three attorneys who worked
17      primarily on Vioxx matters from
18      the Sheller firm over the course
19      of 2005 and 2006.
20           Haile DeBass was one of the
21      attorneys who began work in
22      February of 2005, several weeks
23      before the MDL began.  Jonathan
24      Shub, another one of our

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        attorneys, Gregory Waks.  Jon Shub

 2        began work early in the case

 3        working on the assessment and view

 4        of the case.  He worked primarily

 5        on the third-party payor complaint

 6        in the beginning.  Mr.  DeBass'

 7        became one of the managers of the

 8        New York document depository at

 9        Seeger Weiss.  He assisted Michael

10        Wagner of Seeger Weiss very

11        carefully, very closely.  Some of

12        his primary responsibilities that

13        he was given over the course of

14        the time were he would train the

15        other attorneys and the

16        paralegals.  He was asked to

17        allocate assignments among the

18        attorneys and the paralegals.  He

19        organized and managed the

20        deposition packages.  He helped

21        Michael Wagner allocate the seats

22        at the depository, which I

23        understand were scarce at times,

24        and he worked with Penny Herman at
```

FAC Resp. Exhibit D -- 1327

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        the document depository in New

 2        Orleans on a pretty regular,

 3        almost daily basis.

 4             Mr.  DeBass responsibilities

 5        were greatly increased in the fall

 6        of 2005 after Hurricane Katrina

 7        when he took over and the New York

 8        depository became the primary

 9        depository, and then again when

10        Mr. Wagner began to assist the

11        various attorneys at trial, was

12        traveling around the country.  I

13        think that the people who worked

14        with them on a daily basis at the

15        depository would say that, for a

16        while, Mr.  DeBass was the de

17        facto manager of the depository.

18             Mr. DeBass also helped work

19        on several of the bellwether cases

20        by preparing and organizing the

21        exhibits for use at trial and

22        preparing the trial exhibit

23        outlines.  One of the projects he

24        was able to specifically describe
```

FAC Resp. Exhibit D -- 1328

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        was one with Dave Buchanan where
 2        he worked for several days that
 3        turned into several weeks on a
 4        label project.  He also worked
 5        extensively with the SAS database
 6        and assisted the experts in
 7        pulling documents and reviewing
 8        that.
 9             The way I understand it,
10        after Hurricane Katrina, Mr.
11        DeBass and several of the other
12        Sheller attorneys, including Mr.
13        Waks, became the primary attorneys
14        at the Seeger Weiss depository
15        working on the documents.
16             We also provided a paralegal
17        for the Humeston trial here in
18        Atlantic City in the fall of 2005,
19        who lived in Atlantic City.  His
20        name was Joseph Yanick.
21             Mr. Shub has made me aware
22        that he worked with several of the
23        other attorneys both in the
24        personal injury cases and the
```

Page 7

1       third-party payor cases and

2       interviewing and working with some

3       of the experts.

4              When Mr. DeBass began to

5       become more busy with the

6       administrative-type tasks in New

7       York at the depository, we moved

8       another attorney from our office

9       named Gregory Waks up to New York,

10      who was working 12 to 13-hour days

11      in the document depository.

12             And, basically, to go

13      through the factors that are set

14      forth in rule or PTO 6(D),

15      substantial contribution, I think

16      has been explained, but any

17      attorneys who worked with Mr.

18      Shub, Mr. DeBass and Mr. Waks, I

19      think, recognize their

20      contribution.

21             The quality of the work,

22      Mr. DeBass' work, I believe was

23      unquestioned as he took on and was

24      given many more responsibilities

FAC Resp. Exhibit D -- 1330

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          than simply a document reviewer.

 2                 Mr. Shub's work is known to

 3          many of you here, and I think is

 4          unquestionable.

 5                 The consistency and duration

 6          of the work that the Sheller firm

 7          did, the firm dedicated several

 8          attorneys to the litigation.  It

 9          began in the very beginning, our

10          first time entry was in February

11          of 2005, and then the last entry

12          was in October of 2006, when 5,000

13          hours was billed individually by

14          the different attorneys at

15          Sheller, to the litigation.

16                 The assistance of bellwether

17          cases, while we didn't try any of

18          the cases, Mr. DeBass was

19          apparently enormously helpful in

20          preparing for many of the trials,

21          and we dedicated a paralegal to

22          that trial team and offered help

23          wherever needed.

24                 On the leadership

FAC Resp. Exhibit D -- 1331

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        committees, Mr. Shub served on the

2        leadership of the third-party

3        payor committee, and Mr. DeBass

4        was very active in the discovery

5        and trial preparation committees

6        and the conference calls and the

7        weekly meetings.

8            All time spent by Sheller

9        was specifically authorized or

10       requested by a member of the PSC

11       or one of the other committees.

12       It was never taken for granted

13       that their work was going to be

14       just done randomly.

15           I think it is important to

16       remember that the Sheller

17       attorneys did the unsung work, the

18       discovery work that, frankly, no

19       one really wants to do, but is

20       critical to a case like this.

21       After Mr. DeBass began to work

22       closely with Mr. Wagner and Ms.

23       Herman, then he took over more of

24       the responsibilities of the New

FAC Resp. Exhibit D -- 1332

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          York depository.  As I said, he

2          was de facto manager.

3              I think it's also important

4          that Sheller, after we got into

5          the litigation through Mr. Shub's

6          different relationships, we

7          staffed it with very experienced

8          and able attorneys and really dug

9          into the work.  Many of the

10         attorneys who worked on that

11         project are still working on some

12         of the related cases and we

13         supported the cases to the end.

14             That's all I have.  I don't

15         have a PowerPoint, but I'm willing

16         to take questions on the work.

17             MR. SEEGER:  I have to make

18         the committee aware of something,

19         because it might be strange to

20         you, because John Shub is a

21         partner of mine.  John Shub was at

22         Sheller's office, and I forget

23         exactly when, about a year or so

24         ago, maybe two years ago,

FAC Resp. Exhibit D -- 1333

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          transferred his practice to Seeger
 2          Weiss.  I am very familiar with
 3          what he did.  DeBass, he was a
 4          contract lawyer for Sheller,
 5          right?
 6                  MR. MCCORMICK:  Yes, he was.
 7                  MR. SEEGER:  We're talking
 8          about document review,
 9          essentially, right?  I want to
10          make sure I understand.
11                  MR. MCCORMICK:  Right.  We
12          are.
13                  MR. LEVIN:  Of your 1,800
14          hours that are recorded here by
15          the accountants, close to 1,400 of
16          it is from a contract employee.
17          Was he an attorney or a paralegal?
18                  MR. MCCORMICK:  He was an
19          attorney.
20                  MR. LEVIN:  How long was he
21          out of law school?
22                  MR. MCCORMICK:  Mr.
23          DeBass had been -- I don't know
24          his exact resume, Arnie.  I would
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          have to look that up.

2                MR. LEVIN:  But he was just

3          picked up for this case?

4                MR. MCCORMICK:  I think he

5          had worked on several cases with

6          Sheller before and with Mr. Shub.

7          I don't think he was picked

8          specifically for the Vioxx case.

9                MR. LEVIN:  MR. Shub was the

10         most senior attorney that worked

11         on this case?

12               MR. MCCORMICK:  Yes, he was.

13               MR. LEVIN:  He had 162

14         hours, and DeBass had 1,388; is

15         that correct?

16               MR. MCCORMICK:  I believe it

17         is more hours than that, but I'll

18         have to check on that.

19               MR. LEVIN:  Was DeBass in

20         New York -- did I pronounce his

21         name right?

22               MR. MCCORMICK:  It's DeBass.

23               MR. LEVIN:  There's no E on

24         the end.

FAC Resp. Exhibit D -- 1335

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1                 There were two depositories

2          in New York, as I understand it, a

3          third-party depository?

4                 MR. SEEGER:  Yes.  I

5          actually know this.  The review

6          they did was really limited to the

7          third-party payors.  John Shub did

8          not have a leadership role in

9          those cases, but he --

10                MR. LEVIN:  He worked the

11         third-party cases.

12                MR. SEEGER:  Right.

13                MR. LEVIN:  And the

14         third-party cases was the Local 68

15         and others?

16                MR. SEEGER:  Correct.

17                MR. HERMAN:  Were the hours

18         kept contemporaneously or are

19         these reconstructed or do you

20         know?

21                MR. MCCORMICK:  They were

22         kept contemporaneously.

23                MR. HERMAN:  I'm sorry?

24                MR. MCCORMICK:  They were

FAC Resp. Exhibit D -- 1336

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        kept as they went.

2                MR. HERMAN:  Okay.  Just so

3        you will know and the record is

4        clear, in the fall, on August 29,

5        2005, Katrina hit New Orleans.

6        That depository was moved to

7        Houston and up and running in

8        October of 2005.

9                Penny Herman, I don't know

10       what Mr. DeBass did to work with

11       Penny Herman after 2005, but I'd

12       like to know more specifics on

13       that, because that depository

14       was -- the MDL depository was kept

15       in my office, and I'm not doubting

16       that he came and worked in that

17       office --

18               MR. MCCORMICK:  I don't

19       think he worked in that office.

20       I'm sorry if I've misled you.  I

21       meant he worked or was in contact

22       with Ms. Herman during the

23       turnover.

24               MR. HERMAN:  Okay.  I

FAC Resp. Exhibit D -- 1337

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1      understand.

 2            Because various requests

 3      would be made of the MDL

 4      depository.  She would relay those

 5      requests, if the material wasn't

 6      in the MDL depository, either

 7      to -- or generally to the

 8      depository in Chris Seeger's

 9      office and to Andy Birchfield's

10      office.  I suppose he would be one

11      of the people in New York that

12      would respond to those requests.

13            MR. MCCORMICK:  I'll try

14      and find out more.

15            MR. HERMAN:  I think I have

16      it now.  In other words, he was

17      working in New York at a

18      depository, and a request would

19      come in from the MDL depository,

20      he would respond.

21            MR. MCCORMICK:  Right.

22            MR. WEITZ:  How many cases,

23      individual cases has your firm

24      submitted to the settlement?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1              MR. MCCORMICK:  I believe

2       88 at this point.

3              MR. WEITZ:  Did your firm

4       work up any individual cases in

5       either the MDL or any of the other

6       state jurisdictions for trial?

7              MS. HOMOLASH:  We have just

8       plaintiff depositions.

9              MR. WEITZ:  Did you

10      participate in any of the trials

11      as a second chair or first chair?

12             MR. MCCORMICK:  No, none of

13      our attorneys did.

14             MR. WEITZ:  Thank you.

15             MR. SEEGER:  Thank you very

16      much.

17             MR. MCCORMICK:  Thank you.

18             MR. HERMAN:  Appreciate you

19      coming in.

20                    -  -  -

21

22

23

24

FAC Resp. Exhibit D -- 1339

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 3, 2008
- - -
HOUSTON, TEXAS
- - -

FIRM:        THE BRANCH LAW FIRM
             Turner W. Branch, Esquire
             Cindy Zedalis, Esquire
             Margaret Moses Branch, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
         GOLKOW TECHNOLOGIES, INC.
         877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1341

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                - - -

2              MR. GIRARDI:  Thank you.

3              MR. BRANCH:  Cindy Zedalis

4         from our office is going to

5         present a summary, and I felt it

6         was important to come and answer

7         any questions you might have and

8         to tell you that I did do my very

9         best to attend.  I didn't miss any

10        of Judge Higbee's meetings in New

11        Jersey.  I think that can all be

12        verified by the attendance roles.

13        We did participate actively, I

14        think -- well, I don't think, I

15        know that were actively involved.

16             We had cases that we were

17        getting ready for trial.  We had

18        11 cases that we were putting up

19        for trial.  A lot of this I'm just

20        summarizing because we did make a

21        submission.

22             Those of you who were in New

23        Jersey, I saw on a regular basis.

24        Arnold, you were there.  Perry, I

FAC Resp. Exhibit D -- 1342

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          saw your office and you many

2          times.  Mr. Lanier, I saw there.

3          And I certainly saw my good friend

4          at the end of the table there.  We

5          never got to try a case.  We

6          tried.  We had two cases, Mary

7          Velasquez and Senator Ben

8          Altamirano from New Mexico up for

9          trial.  I thought they were good

10         plaintiffs.

11              Senator Altamirano was

12         President Pro-Tem of the New

13         Mexico Senate, and he had a

14         myocardial infarction associated

15         with Vioxx, and, unfortunately, he

16         had another myocardial infarction

17         a year ago tomorrow and died.  We

18         think that was probably

19         associated.  But he was one of the

20         clients we were putting up, as was

21         Mary Velasquez.

22              We participated whenever

23         asked by Eric Weinberg or others

24         on any study.

FAC Resp. Exhibit D -- 1343

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1              We did, and I think you can

 2         verify this, maybe some of you

 3         don't know, but we did retain, and

 4         I think she would tell you, Lynn

 5         Baker early on before anyone here

 6         did about checking out some

 7         conflict problems that we thought

 8         might exist.  And I think Mr.

 9         Lanier, Mark, can tell you that.

10         Some of her work was merged into

11         what happened eventually in the

12         global settlement, but I don't

13         take credit for her answering

14         questions that existed in the

15         global, but we did retain her

16         early on, like 2004, to address

17         those matters.  And then some of

18         the questions she did address

19         eventually while the settlement

20         was going on which we didn't know

21         about.

22              Here's Margaret.

23              (Whereupon, there was a

24         brief recess.)
```

FAC Resp. Exhibit D -- 1344

Page 5

```
 1                  MR. BRANCH:  Do I take
 2          credit for any new ideas or
 3          creative ideas that hadn't been
 4          developed by others?  No.  Do I
 5          expect an extraordinary amount for
 6          our effort?  No, we don't.  We
 7          would just ask that we be treated
 8          fairly, and I think our time
 9          substantiates what we did.  I'll
10          be happy to answer questions.
11                  I wanted to be here out of
12          respect for each of you, and I'm
13          honored to appear before you and
14          to thank you for what you guys did
15          for a lot of people that were
16          injured.  I know there's a lot of
17          complaints from time to time and
18          you are never given credit for
19          what you do, but I will say thank
20          you to all of you for what you
21          have done because I think you've
22          helped a lot of people that
23          otherwise would get no help.
24                  I think with that, I will
```

FAC Resp. Exhibit D -- 1345

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          let Cindy summarize.  Cindy

2          Zedalis worked on this case for

3          almost six years.  She's an

4          attorney in our office, went to

5          University of California Law

6          School and works with our office.

7          Her husband is a pediatric

8          oncologist in Albuquerque, and he

9          temporarily got transferred to

10         Tulane University Medical School,

11         and she attended the MDL, a lot of

12         those in New Orleans, but we were

13         mainly active in New Jersey with

14         Judge Carol Higbee.  I don't think

15         Cindy missed any hearings either.

16              We had three other people

17         working on this in our office.

18         Once the settlement was reached,

19         we had over, I think, about 28

20         people working on settlement

21         packages, contract folks.

22              MR. LEVIN:  How many cases

23         did you put in the settlement,

24         Turner?

FAC Resp. Exhibit D -- 1346

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1              MR. BRANCH:  We're going to
 2         tell you, but it is 1,919 cases --
 3              MR. LEVIN:  It was a good
 4         year.
 5              MR. BRANCH:  -- we submitted
 6         settlement packages on.
 7              MS. ZEDALIS:  That's as of
 8         Monday.
 9              MR. BRANCH:  As of Monday.
10         I don't think it's growing much.
11         Cindy, you can address that.  I
12         think we're pretty much done.
13              MR. LEVIN:  Turner, that was
14         the year you and I were born.
15              MR. BRANCH:  That's right.
16         But we were fortunate enough to
17         work with other attorneys on
18         referrals, and we got a lot of
19         help from the New York attorneys,
20         and I certainly want to give
21         credit to that and to Mark Lanier
22         for helping us.  We were able to
23         -- most of our cases are
24         co-counsel cases, to submit that
```

FAC Resp. Exhibit D -- 1347

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          many claims packages.  I think the

2          staff did a really good job on

3          those.  I don't take any credit

4          for those.  I did learn how to do

5          a claims package, and I can do

6          one.  I didn't do a lot of them.

7          I mainly complained, let's see

8          what we had done.  They did a good

9          job.

10               Cindy, I'll let you kind of

11          summarize what you think some of

12          our contributions were.

13               I was at the Borgata enough

14          to get a black card for playing

15          blackjack.  I don't know how long

16          you have to be there to do that,

17          but I did get a black card.

18          That's kind of it.  It's been an

19          interesting experience.  It has

20          been some of the most challenging

21          litigation.  Again, I think the

22          credit goes to all of you for

23          getting the results you did, and

24          we contributed a little, and

FAC Resp. Exhibit D -- 1348

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          that's about it.

2                Cindy, do you want to kind

3          of summarize?

4                MS. ZEDALIS:  I had passed

5          around kind of a highlight sheet,

6          a cheat sheet, basically

7          summarizing the work that our firm

8          did for the common benefit of all

9          the plaintiffs in the litigation.

10         And of the 7400 hours of legal

11         time that we incurred, none of

12         that was incurred for discovery of

13         our individual cases.  I was the

14         person responsible for going

15         through all the time sheets and

16         basically cutting out anything

17         spent on obtaining discovery from

18         clients, doing PPFs, which really

19         took up a large chunk of most

20         people's time, which I'm sure you

21         are all familiar from complaints

22         from your staff.  With the

23         exception of our trial cases, none

24         of that time is reflected in the

FAC Resp. Exhibit D -- 1349

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          74 hours.  This was all --

2                    MR. LEVIN:  7400.

3                    MS. ZEDALIS:  7400 hours.  I

4          don't think we would be here if it

5          was 74 hours.

6                    So, in preparation, we had

7          filed almost 2,500 claims,

8          individual claims.  The majority

9          of them were in New Jersey, 780 in

10         the MDL, almost 200 in the Texas

11         MDL, 238 in New Mexico that were

12         ultimately transferred to the MDL,

13         and the remaining in Washington,

14         D.C.  As Turner told you, we had

15         filed a little over 1900 cases or

16         enrolled 1900 cases and are either

17         dismissed or in the process of

18         dismissing some of those that

19         don't quite meet the settlement

20         criteria.

21                   MR. HERMAN:  The CPA that's

22         getting all the information, I

23         would call and check with them.

24         You can e-mail my office.  I'll

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          give you the e-mail of my partner,

2          ldavis@hhkc.com.  Ask him to put

3          you in touch with Phil Garrett so

4          you can check with them

5          particularly on the expenses you

6          submitted.  He's an independent

7          CPA appointed by the Court.  He

8          doesn't have any connection in

9          doing any personal work for any of

10         the lawyers or firms.  I would say

11         50% of all firms submitting time

12         costs, they are going through

13         these and checking, and a number

14         of us have had to go back and sit

15         with them and explain things,

16         particularly on the costs.  I

17         don't know how much of your costs

18         right now they have accepted and

19         how much they haven't.

20               MS. ZEDALIS:  Will they tell

21         us?

22               MR. HERMAN:  Absolutely.

23               MS. ZEDALIS:  Because this

24         has been vetted.

FAC Resp. Exhibit D -- 1351

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1               MR. HERMAN:  Not only do

2          they tell you, they are there to

3          help, not to discourage.

4               MS. ZEDALIS:  I see.  That's

5          helpful.

6               MR. LEVIN:  Let me direct

7          myself to that.  We're in Houston

8          and we have a problem.

9               According to the accountant,

10         you have 323 hours approved.  That

11         means there's no hours under

12         submission, there's no hours that

13         are rejected.  Somehow they don't

14         have all of your hours.  According

15         to the accountant, you never

16         submitted any costs, and they

17         never approved any costs.  You

18         have to do what Russ says to

19         straighten that out.

20              MS. ZEDALIS:  I know we have

21         e-mail confirmations.

22              MR. LEVIN:  That's a big

23         difference, very big difference --

24              MR. HERMAN:  Fastest way to

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1        do this, I know you have a lot of
 2        money at stake here, is call
 3        Lenny, and he'll connect you with
 4        Garrett.  Spend whatever time.  A
 5        lot of the firms, I don't know how
 6        many have gone to their office and
 7        spent three or four hours and come
 8        out of there with everything
 9        reconciled.
10             MS. ZEDALIS:  I know our
11        package was about this thick, and
12        I thought we FedExed it also and
13        we e-mailed it because it was too
14        large for a single attachment, but
15        maybe something happened.
16             MR. BIRCHFIELD:  On the
17        expenses, and I know you will work
18        that out with the accountant, but
19        is this primarily -- what's
20        reflected in these expenses?  You
21        had mentioned --
22             MS. ZEDALIS:  Travel
23        expenses to and from Albuquerque
24        to New Jersey.  Travel expenses to
```

FAC Resp. Exhibit D -- 1353

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          and from Albuquerque and New

2          Orleans.  It's CLE conferences.

3          It reflects -- we had payments

4          made to the law firms, the Legal

5          Consortium.  I think there were

6          two payments of $25,000 apiece.

7                 MR. LEVIN:  That was in New

8          Jersey?

9                 MS. ZEDALIS:  That was for

10         the New Jersey litigation.

11                MR. LEVIN:  As we

12         anticipate, that cost will come

13         back out of that fund because the

14         New Jersey leadership are going to

15         file a separate affidavit for

16         those costs, and when they are

17         approved, you will get your

18         $50,000 back.  So, they shouldn't

19         be in here.

20                MS. ZEDALIS:  Okay.

21                MR. SEEGER:  Wait a second

22         though.

23                MR. LEVIN:  It is an

24         assessment.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1              MR. SEEGER:  No.  But the
 2         Jersey assessments weren't
 3         $50,000.  Was that for a specific
 4         project?
 5              MR. BRANCH:  I don't know.
 6         Why don't you check with the
 7         accountant.
 8              MR. LEVIN:  That's a
 9         different consortium.
10              MR. BRANCH:  That's probably
11         right.  We also had some things on
12         studies.
13              MS. ZEDALIS:  We had for Dr.
14         Kostis.
15              MR. WEITZ:  That was a
16         separate project.  That wasn't --
17         that was unrelated to --
18              MR. LEVIN:  Are you speaking
19         of the New Jersey consortium when
20         you say that, Eric Weinberg's
21         group?
22              MS. ZEDALIS:  That was for
23         Dr. Kostis.  The other larger sum,
24         I thought it was two payments of
```

FAC Resp. Exhibit D -- 1355

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        $25,000.

 2               MR. BRANCH:  It might have

 3        been 15.

 4               MS. ZEDALIS:  It wasn't to

 5        Weinberg.  I thought it was to --

 6               MR. WEITZ:  My firm, Weitz &

 7        Luxenberg.  We'll find out.

 8               MR. BRANCH:  It is what it

 9        is, and we'll submit it.

10               MR. WEITZ:  Working with the

11        accountant will actually figure

12        out exactly what the payments were

13        for, and then we'll figure out how

14        you get reimbursed.

15               MR. SEEGER:  By the way, if

16        you can go back and see what

17        portions are for Kostis because

18        there was a $15,000 assessment.

19               MR. BRANCH:  I know we paid

20        that, and the rest of them, we

21        will have cancelled checks and

22        itemizations on, and I appreciate

23        Russ' idea of calling the

24        accountants, because we didn't
```

FAC Resp. Exhibit D -- 1356

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          know we had an incomplete

 2          application.  For example, I

 3          didn't know we didn't have

 4          everything submitted.

 5               MR. HERMAN:  Turner, there

 6          are 106 firms, and among those

 7          firms are consortiums of firms

 8          that have submitted a packet.  It

 9          could be a snafu on our end.

10               MR. BRANCH:  We didn't

11          submit it with anyone else.

12               MR. HERMAN:  What I'm saying

13          is, when you get all of that

14          material at one time, but I'm

15          certain that Garrett and Wegmann-

16          Dazet --

17               MS. ZEDALIS:  Is he in

18          Covington?

19               MR. HERMAN:  In Metairie.

20          Right across the City Line in

21          Metairie.

22               They are very accessible,

23          they'll be happy to help.  If you

24          have any problem, call Lenny or
```

FAC Resp. Exhibit D -- 1357

Page 18

1          myself while you are meeting or

2          after your meeting with them.

3          We'll take a personal interest.

4                    MR. BRANCH:  We thank you

5          for that, and we will do that.

6          Like I said, it is what it is, and

7          we will have the cancelled checks

8          and the verifications.

9                    MR. HERMAN:  Can you

10         ballpark the dollars within any

11         range of what you think in these

12         costs are expert witness costs?

13                   MR. BRANCH:  I thought we

14         had everything itemized as to

15         every single cost that we

16         submitted, Cindy.

17                   MS. ZEDALIS:  We paid some

18         experts on our trial cases.

19                   MR. BRANCH:  Of course, I

20         may be wrong, but I think we did.

21                   MR. SEEGER:  We'll work it

22         out.  We'll help figure it out.

23                   MR. BRANCH:  He's asking for

24         a ballpark.  Do you know what that

FAC Resp. Exhibit D -- 1358

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1    would be?

2         MS. ZEDALIS:  I couldn't

3    come up with it.

4         MR. SEEGER:  We don't need

5    it for today.

6         MR. WEITZ:  Cynthia, Chris

7    and I know your involvement in New

8    Jersey.  Our firms worked with you

9    guys.  As Turner said, you

10   attended all the conferences, you

11   had cases that you were pushing

12   for trial.  Explain to everybody

13   else about your 11 cases and what

14   waves they were in within Higbee's

15   court, if you had any that were

16   fully prepared for trial.

17        MS. ZEDALIS:  They were

18   identified.  We had 11 cases on, I

19   think it was the first wave or

20   second wave trial calendar.  They

21   were supposed to go in March of

22   2008.  They were identified by

23   Judge Higbee as trial cases, I

24   believe, in December of 2006.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          we had 11 clients, New Mexico

2          residents with heart attacks, and

3          a lot of time was spent reviewing

4          all of the records produced by

5          Merck.

6                    MR. BRANCH:  You might

7          address the depositions like

8          Senator Altamirano and Mary

9          Velasquez.  The 11 we had, you

10         might just talk about depositions,

11         and we were back for a couple of

12         months doing depos, and we can

13         tell you about that.

14                   MS. ZEDALIS:  One of the

15         lawyers in our office, Frank

16         Baldaramo, he had packed a bag for

17         three days, he was supposed to

18         attend one deposition in Cherry

19         Hill, I think it was in your

20         office, and he started buying his

21         clothes at Wal-Mart.  He was

22         there, I think, for

23         four-and-a-half weeks defending

24         depositions for our clients.  So,

FAC Resp. Exhibit D -- 1360

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          a lot of time was spent on those

2          11 trial cases, and we were ready

3          to go on those, including meeting

4          with the clients, talking to the

5          doctors, getting the hospital

6          records, traveling to -- I believe

7          all the depositions were conducted

8          in either Philadelphia -- I think

9          Ben Altamirano, who was our state

10         Senator, who is deceased now, and

11         Senator Pro-Tem of the New Mexico

12         State Senate, had a heart attack

13         after taking Vioxx, and he and his

14         wife both went and spent a few

15         days.

16              MR. BRANCH:  And the same

17         with the Velasquez family and the

18         others.

19              MS. ZEDALIS:  I can't

20         remember all the names off the top

21         of my head, but there were 11

22         clients, and they were all deposed

23         either in New Jersey or

24         Philadelphia.

FAC Resp. Exhibit D -- 1361

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              MR. BRANCH:  James Frazier

2         from Roswell, and we had 11 that

3         were put up for trial that were

4         accepted.  We had more than that,

5         but they were found for various

6         reasons not to be representative

7         clients that should be put up for

8         trial at the time, and we ferreted

9         those out.

10             Ben Altamirano, the Senator,

11        was going to be one of the first

12        cases.  He was an excellent

13        plaintiff.  As Cindy said and I

14        started to say earlier, he was the

15        President Pro-Tem of the State

16        Senate of New Mexico and had been

17        in the Senate for 47 years.  I

18        think he would have made an

19        excellent exemplar plaintiff.  He

20        was great, and his wife was

21        wonderful too.

22             Mary Velasquez -- well, all

23        of them we put up were acceptable

24        because they were ferreted by

FAC Resp. Exhibit D -- 1362

Page 23

1          various and sundry people to be

2          acceptable because we had a lot of

3          rejects, too, of course that

4          weren't acceptable.

5               We did work those cases up,

6          and I think, as Cindy said, they

7          were going to be going.  Chris,

8          you and Perry can tell us more

9          exact, but I think they were going

10         to be in a wave that started

11         February or March.

12              MR. WEITZ:  That's right.

13              MR. SEEGER:  That's right.

14              MS. ZEDALIS:  Actually, the

15         11 cases that were selected, we

16         had the most of any firm with

17         representative clients in New

18         Jersey.  Our firm did.  That took

19         a large chunk of time.  I believe

20         we had cases set on the second

21         wave also, but thanks to you nice

22         people, the case settled.

23              MR. BRANCH:  We had a case

24         also set with judge -- is it Randy

Page 24

```
 1          Wilson in Texas?  Mr. Lanier knows
 2          about this, because we were
 3          getting help from them and Tommy
 4          Fibich.  But that case, of course,
 5          when the judge granted his order
 6          to take everything north to Austin
 7          because of preemption, that case
 8          went with him.  I think we had 206
 9          Texas cases with --
10               MS. ZEDALIS:  Almost 200,
11          197 in the Texas MDL.
12               MR. BRANCH:  Cindy, anything
13          else you want to highlight or any
14          questions we can answer?
15               MR. BLIZZARD:  Turner, you
16          said that you had co-counsel
17          cases?  I think you said most of
18          your cases --
19               MR. BRANCH:  Most all of our
20          cases were co-counsel with
21          referring attorneys.
22               MR. BLIZZARD:  So, you have
23          referring attorneys?
24               MR. BRANCH:  Yes, we do.  We
```

FAC Resp. Exhibit D -- 1364

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          have to share on the fees.

2                  MR. BLIZZARD:  Isn't that a

3          terrible thing?

4                  MR. BRANCH:  It is not so

5          bad.

6                  MR. SEEGER:  Thank you.

7          Always great seeing you.

8                  MR. BRANCH:  Good to see

9          everyone.

10                        -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Exhibit D -- 1365

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 3, 2008
- - -
HOUSTON, TEXAS
- - -

FIRM:          THE SNAPKA LAW FIRM
               Kathryn Snapka, Esquire
               Anita Shahani, Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
               GOLKOW TECHNOLOGIES, INC.
          877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1367

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                        -  -  -
 2                MR. BIRCHFIELD:  Kathy, we
 3           appreciate you being here.  As you
 4           know, everything is being
 5           transcribed.  Judge Fallon wanted
 6           to make sure that everybody is
 7           aware of the Murphy Oil decision
 8           and the criteria that he's set out
 9           in that order.  Transparency is
10           key, and so we have a transcript
11           that will be available for his use
12           for whatever he decides is
13           appropriate.
14                Know that everything is
15           being taken down, and the floor is
16           yours.
17                MS. SNAPKA:  Great.
18                As I hope y'all remember, I
19           was involved in Vioxx back -- I
20           started in 2003.  I was initially
21           contacted with regard to four
22           cases, Benavides, Eller, Zajicek
23           and -- three cases and Garza.  I
24           became involved in Garza in 2004,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          but I'll get to that in a second.

2               Do I need to attach by

3          reference my affidavit and the

4          cover letter to the hours,

5          incorporate this?

6               MR. HERMAN:  No.

7               MS. SNAPKA:  I didn't know

8          how formal we were being about

9          that sort of thing.

10               I started in 2003 to

11          investigate the medical causation

12          and had many conversations with

13          experts that I had used before,

14          people literally in the field with

15          their experiences with marketing,

16          the heavy-handed marketing that

17          was done.  Zajicek looked to be

18          the best case.  It was a good case

19          with no risk factors in a

20          favorable venue, and I began

21          preparing -- I filed my cases and

22          began preparing Zajicek for trial.

23               In the meantime, because

24          I've worked with them for years,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          the law firm of Hockema Tippit &

2          Escobedo, as they were known at

3          the time, I was talking to David

4          Hockema, and David said his

5          partner, Joe Escobedo, was working

6          on a Vioxx case in Starr County,

7          and they were further along than I

8          was.  He said, you've done

9          pharmaceutical litigation, because

10         I had done a fen-phen case, and he

11         said, why don't you try the case

12         with us.  So, I said, that was

13         fine, I would bring what I had,

14         they would bring what they had.

15             I talked to Joe about the

16         depositions, the corporate

17         depositions that he had done.  One

18         of the things that was happening

19         was, particularly when Shelly was

20         taking the depositions, they were

21         saying, I don't know, I'm not

22         sure, you would have to talk to

23         somebody else who would know that.

24         So, Joe was actually one of the --

FAC Resp. Exhibit D -- 1370

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      he was the first person to take

2      Bold, Tacconi, Silverstein and, of

3      course, Santanello.  He was the

4      first one to take the documents we

5      had distilled from the production

6      and take those depositions first.

7      I think they became obviously

8      critically important later.

9      Santanello was used in both Mark's

10      trial with the corporate rep and

11      in the Garza trial as the

12      corporate rep.

13          We prepared Garza and had a

14      trial setting, and we were getting

15      the case ready for trial.  It was

16      set for trial in November of 2004.

17      As you all know, it was removed,

18      remanded, and then I got the

19      Zajicek case -- as I said, I was

20      working both Zajicek, Eller, and

21      Benavides was not a strong case, I

22      did some research into it, but it

23      was not -- the plan was to try

24      Garza first and then to try

FAC Resp. Exhibit D -- 1371

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        Zajicek.

2               MR. BIRCHFIELD:  Where was

3        Zajicek pending?

4               MS. SNAPKA:  It was in

5        Jackson County, Texas.  As you

6        know, Andy, it was the case where

7        we went and visited with the

8        medical examiner, and he actually

9        was able to -- kept the blood and

10       was able to run it some years

11       after her death and found

12       rofecoxib in the blood.  So, I

13       think that had an impact, I

14       understand later on, from what you

15       told me.

16               MR. BIRCHFIELD:  There's a

17       clause in the settlement agreement

18       just for that case.

19               MS. SNAPKA:  That's right.

20       I never understood why other

21       people didn't do the same test,

22       because I thought it would be very

23       instructive on cases where

24       autopsies were performed and blood

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        was retained, but anyway, they may
 2        have.
 3            So, we were prepared for
 4        trial, we were ready to go to
 5        trial, and Merck got a continuance
 6        granted in November of 2004.  We
 7        got a resetting for February of
 8        2005.  And after the withdrawal --
 9        I'm just going to go in sequential
10        order because it is more logical
11        for me to do that.
12            At the time of the
13        withdrawal, I knew that Vioxx was
14        going to be important litigation.
15        And so what I did was, I had
16        already been in contact with
17        Shelly, I knew that she was
18        working with you, Mark.
19            MR. BIRCHFIELD:  Shelly
20        Sanford?
21            MS. SNAPKA:  Yes.  And
22        actually had been out to visit
23        David.
24            MR. BIRCHFIELD:  David
```

FAC Resp. Exhibit D -- 1373

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        Miceli?

2              MS. SNAPKA:  That's right.

3        David Miceli.  And so what I did

4        was, as far as Texas was

5        concerned, knowing from the

6        fen-phen litigation that the Texas

7        litigators would be and should be

8        out front in this litigation, I

9        set up a meeting at the Four

10       Seasons Hotel in October of 2004

11       and tried to get everybody I could

12       think of and encourage them to get

13       everybody they could think of so

14       that we could share the

15       depositions, the theories, what we

16       knew from preparing for the Garza

17       trial.

18              I remember I talked to Maura

19       from your office, Mark, and you

20       were in trial, and I think we

21       moved it, but y'all still weren't

22       able to make it, unfortunately,

23       for that meeting.

24              MR. LANIER:  Nine week

FAC Resp. Exhibit D -- 1374

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          trial.

 2               MS. SNAPKA:  We had probably

 3          40 people, and I thought that was

 4          important to get everybody

 5          together and everybody connected,

 6          show them what we had and make

 7          available what we had learned

 8          through the deposition process,

 9          but most importantly, the

10          documents that we had gleaned from

11          going through the millions of

12          pages of production as y'all are

13          aware.

14               I organized another meeting

15          December 8th, and I was trying to

16          remember -- one of the things I

17          would like to point out is the

18          hours I reconstructed are only

19          attorney hours.  The legal

20          assistant, who was my prime legal

21          assistant during this time period,

22          left to go sell real estate.  I

23          did not feel competent that I

24          could accurately represent legal
```

FAC Resp. Exhibit D -- 1375

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          assistant time, so, for the time

2          period that I've submitted, those

3          are only attorney hours, period.

4          Nothing else.

5               In any event, I know that

6          you and Paul, Andy, you and Paul

7          Sizemore came to one of the

8          meetings that we had in Houston

9          because I was trying to get

10         everybody that I could think of

11         together so that we could share

12         and present a unified and united

13         front.

14               I was also desperately

15         trying to get the Garza case to

16         trial because I knew the case, I

17         knew the case well, I knew that it

18         was in a really great venue, and

19         even though there were a lot of

20         risk factors which I thought was

21         critical to push that case for

22         trial, because it would

23         demonstrate that the target group

24         for Vioxx was going to be the most

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        affected, and I knew that we could
 2        make that case based upon the
 3        distinct fact pattern of Garza.
 4              As you know, the MDL was
 5        created, Merck removed it again,
 6        less than 30 days before trial,
 7        and everything sort of ground to a
 8        halt at that time.
 9              MR. BIRCHFIELD:  Just so you
10        know, Kathy, we just met with Joe
11        Escobedo, and Russ outlined for
12        him your tremendous effort, the
13        effort that both of y'all made in
14        getting that case remanded.  Joe
15        took us through the timeline of
16        the incredible struggle, the
17        timeline of getting that case
18        remanded and getting it sent back.
19        Let me tell you what Russ said to
20        Joe.  I mean, your effort in
21        getting that case remanded was
22        spectacular.  You dogged it all
23        the way.
24              MR. HERMAN:  I thought you
```

FAC Resp. Exhibit D -- 1377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      were tenacious, persistent, and

2      without you pushing that at every

3      PSC meeting and every status

4      conference, that case might still

5      be lingering now.

6           MS. SNAPKA:  Thank you very

7      much.  I appreciate that

8      recognition.  It means a lot to

9      me.

10          MR. BIRCHFIELD:  Joe

11     provided us with a detailed

12     timeline of the Garza case.

13          MS. SNAPKA:  I will say that

14     Joe is a tremendous lawyer, and he

15     is the one who literally looked at

16     every page of that production when

17     we were putting the case together.

18     I can't say enough about what he

19     personally did as far as getting

20     that prepared.  We were

21     prepared -- that was what was so

22     frustrating for me personally, is,

23     we were prepared to go to trial.

24     We were ready to go, and then we

FAC Resp. Exhibit D -- 1378

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       did go.

2              In the meantime, what I was

3       doing was continuing -- I was

4       named by the Texas Supreme Court

5       as the plaintiffs' liaison

6       counsel, and then I continued in

7       that role, and we had -- and I

8       don't want to misrepresent, but it

9       was the first or second hearing I

10      think I was replaced by Tommy

11      Fibich as liaison, which certainly

12      made sense, because Tommy is in

13      Houston.  But I continued on the

14      Texas MDL, flying back and forth

15      and trying to push four trials.

16             In the meantime, I had

17      referred many other cases and

18      wanted to pick the best cases to

19      try.  In that mix was the Nettles

20      case, which was a young man who

21      suffered a catastrophic stroke.  I

22      was developing that case, meeting

23      with his neurologist, meeting with

24      his treating physicians,

Page 14

1          proceeding with what I could

2          there.

3               I was also working on

4          Zajicek, because it was not

5          constrained by any of the Texas

6          MDL.  After we got it back out of

7          the Texas MDL, both Eller and

8          Zajicek, since they were pre-MDL

9          cases, both of those cases were

10         not subject to the constrictions

11         of time on either of the Texas MDL

12         or the federal MDL.  So, we

13         continued to pursue discovery,

14         retention and consultation with

15         experts.  And while we sought

16         remand -- Russ, you were there at

17         the emergency motion for remand in

18         July of 2005.  And then, of

19         course, your unfortunate

20         experience with the hurricane sort

21         of brought that to a standstill.

22              But we continued on with

23         discovery in Nettles and Zajicek.

24         And then of course in November, we

FAC Resp. Exhibit D -- 1380

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          got the great news that Garza got
 2          the remand.
 3              And honestly from that point
 4          until we got the verdict, that was
 5          what we did.  We prepared for
 6          Garza, and I'm sure if -- I don't
 7          want to duplicate what you've
 8          heard, but we have an odd system
 9          in Starr County where you start
10          trial for a week --
11              MR. LEVIN:  We heard.
12              MS. SNAPKA:  It is not like
13          you can say, okay, I'm going to
14          take a break and go try another
15          case and then come back.  So, what
16          you do is you get your daily copy,
17          and you plan what you are going to
18          do next.  There was a week in
19          there that is not accounted for
20          when my son had a tonsillectomy in
21          Houston.  Other than that -- other
22          than the tonsillectomy, I was back
23          at it.  And we stayed with the
24          Garza trial, and I outlined what
```

FAC Resp. Exhibit D -- 1381

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1           we did.  I selected the jury, I

2           put on our cardiologist, I

3           cross-examined Dr. Wheeler, I put

4           on a plaintiff or two, and I was

5           supposed to cross-examine Dr.

6           Reicin.  And I kept asking over

7           and over again, are you going to

8           bring her?  And that's the one

9           case they didn't bring her in.

10          So, I didn't get to cross-examine

11          her, which was a huge

12          disappointment to me.

13                After that, sometime during

14          that time period, they had

15          selected Arnold and Gomez for a

16          preemption motion, and I told

17          Anita to drop everything and begin

18          briefing.  We had briefed quite a

19          lot of it because she had filed

20          several responses in other cases,

21          and then we started to coordinate

22          with your office, Arnold.  I know

23          I was very protective because my

24          feelings always --

FAC Resp. Exhibit D -- 1382

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1            MR. LEVIN:  It was your

 2       client.

 3            MS. SNAPKA:  It is my client

 4       and my case, and I appreciate very

 5       much the assistance, but I also

 6       appreciate the fact that I was

 7       allowed to speak and certainly

 8       present the facts.

 9            MR. LEVIN:  Collectively, we

10       did it.

11            MS. SNAPKA:  Collectively,

12       we did it.

13            Then when Nettles was

14       removed, again, I was there to try

15       and pull Nettles back because it

16       was the double remand case.  Andy,

17       you had some double remand cases,

18       and my goal was to get these cases

19       back to demonstrate that Merck was

20       simply trying to avoid going to

21       trial and would do anything.  I

22       have the transcripts where it was

23       discussed.  Even though it never

24       got remanded, I was there in my
```

FAC Resp. Exhibit D -- 1383

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          spot to try to get them remanded.

2               Zajicek proceeded, and we

3          actually -- the first trial

4          setting for Zajicek was actually

5          October of 2005.  Since the plan

6          was to try Garza first, we ended

7          up moving the Zajicek trial.  It

8          was set for trial in February of

9          2008.  It was set for trial at the

10         time that the settlement was

11         announced.

12              At the point at which

13         Zajicek -- where we were was, we

14         were going to do some genetic

15         testing on Vanessa Zajicek's blood

16         to eliminate the genetic tendency

17         toward arrhythmia because we

18         believed she didn't have it.  So

19         we were actually scheduled for a

20         hearing at the end of November on

21         the testing of the blood to again

22         eliminate that as a possibility

23         for her arrhythmia and sudden

24         cardiac death.

FAC Resp. Exhibit D -- 1384

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              I was under the impression

2         that I was supposed to just stop

3         at November 9th, and I could be

4         wrong about that.

5              MR. HERMAN:  Well, why don't

6         you tell us since November 9 what

7         activities you've had.

8              MS. SNAPKA:  The primary

9         activity, honestly, I believed --

10        I was sitting in court when the

11        settlement was announced.  Of

12        course, I had no idea --

13        everybody was rumoring, and there

14        were people calling me saying send

15        us all of your cases, there's

16        going to be a settlement or

17        whatever.  So, as the settlement

18        was being explained, the one thing

19        that concerned me greatly was the

20        requirement that the attorney was

21        obligated to recommend the

22        settlement to all clients.  I

23        believed in my heart that that was

24        a violation of Texas ethics.  And

FAC Resp. Exhibit D -- 1385

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1          although I was clearly not part of

 2          the plaintiffs' negotiating

 3          committee, I believed that I had a

 4          duty and responsibility to say

 5          something.  I understood that Lynn

 6          Baker had been retained, and so I

 7          was the one that called Charlie

 8          Silver, the professor who hired

 9          Lynn Baker, and I said, I need you

10          to review this.  I had a

11          conversation with Ed, and Ed kept

12          saying no, no, it is okay, we

13          talked to Lynn about it.  I

14          nonetheless wanted independent

15          confirmation that the settlement

16          was as good as it could be and

17          that everybody in the nation

18          could, without reservation,

19          participate in the settlement.

20               So, I personally retained

21          Charlie Silver, and then within a

22          day or two, Tommy Fibich joined me

23          in retaining Charlie Silver.  Then

24          there were several other people

FAC Resp. Exhibit D -- 1386

Page 21

1          who also, we discussed it.  We

2          went to New Jersey and met with

3          Judge Higbee.  I believe that

4          there were some --

5               MR. SEEGER:  Which I

6          arranged for you.

7               MS. SNAPKA:  Absolutely,

8          Chris, thank you very much.  What

9          I appreciated from the committee

10         was that even though it was

11         difficult to discuss, that I think

12         everybody kept in mind that what

13         we were trying to do was to make

14         this settlement one that everyone

15         without reservation could enter

16         into and not feel that they had

17         any qualms whatsoever about it,

18         and I think we ended up

19         accomplishing that.

20              MR. BIRCHFIELD:  Your

21         initial reaction is certainly

22         understandable.  You got the

23         settlement agreement, and it had

24         to be for all clients.  But what

Page 22

1          you were not able to distill at

2          that moment is that we had been

3          working for 11 months to make sure

4          that it would be a settlement that

5          would work and would be in the

6          interest of every client

7          regardless of risk factors and all

8          of that.  And so that's why your

9          reaction was understandable.

10              MR. HERMAN:  Let me add what

11          I said earlier today in another

12          presentation.

13              First of all, throughout our

14          negotiations, Ed Blizzard was in

15          the forefront particularly in

16          terms of the Texas potential

17          ethics situation.  There wasn't

18          anything put on paper without the

19          retention of three ethics experts,

20          and Lynn Baker, actually, along

21          with two other ethics experts,

22          drafted the language of the

23          agreement.

24              Once the agreement went into

FAC Resp. Exhibit D -- 1388

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          effect and Judge Higbee, Judge

2          Fallon and Judge Chaney looked at

3          it and it passed muster with them,

4          our collective feeling was not

5          that the lawyers in Texas were out

6          of line in getting the ethics

7          opinions that they needed to

8          satisfy themselves and their

9          clients.

10              MR. SEEGER:  I agree with

11         that, by the way.

12              MR. HERMAN:  We had a full

13         day meeting in Atlanta.  I believe

14         that Professor Silver was there.

15         I know that also they brought

16         Harry Potter in.  So, I want you

17         to know that we don't have an

18         adverse reaction at all to that

19         being done.  As a matter of fact,

20         once the Texas concern, legitimate

21         concern, was resolved --

22              MR. SEEGER:  I have to stop

23         you there, because there's

24         something very important, Kathy,

FAC Resp. Exhibit D -- 1389

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1          I'm sorry, but just because we are
 2          making a record.
 3              The agreement had not been
 4          changed.  There are people that
 5          have this impression.  It says
 6          exactly what it says.  It says
 7          exactly what we intended it to
 8          say.  I think at the end of the
 9          day, what happened was, we had
10          some letters passed around, some
11          documents clarifying, saying this
12          is how we understand this.
13              MS. SNAPKA:  The
14          interpretation.
15              MR. SEEGER:  That was really
16          because you guys had a concern
17          with it.  But the document, we
18          were very comfortable in the
19          beginning and still are.  This
20          sounds like a technicality --
21              MR. HERMAN:  After the
22          various points were expressed, it
23          not only had a good effect and a
24          better understanding for Texas,
```

FAC Resp. Exhibit D -- 1390

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          but also for the country.  Because
 2          there were other folks from other
 3          states that were looking for a way
 4          to criticize, and they had sort of
 5          latched on to this issue.  When it
 6          was resolved and the document was
 7          fully understood, it went away for
 8          everybody.
 9               MS. SNAPKA:  And I know I
10          wasn't popular.  I understand
11          that.
12               MR. LEVIN:  You were never
13          not popular.
14               MR. SEEGER:  I hope we're
15          not leaving you with that
16          impression, but you were very
17          helpful.
18               MS. SNAPKA:  To the simple
19          extent that we are talking about
20          common benefit work done, I would
21          hope that my concerns and my
22          actions that I took in hiring
23          Charlie initially and then getting
24          everybody together to talk about
```

FAC Resp. Exhibit D -- 1391

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1          it were viewed as ultimately

 2          beneficial.  That's my purpose in

 3          discussing it.  That's all I'm

 4          saying.  That's what I meant.

 5                 MR. LEVIN:  We understand.

 6                 MR. HERMAN:  I think you can

 7          be assured of that.

 8                 MS. SNAPKA:  Because you

 9          said, go ahead and talk about what

10          it was after that.  That's what I

11          would say, is whatever I did

12          initially and ultimately in

13          working with everybody to get it

14          to where it is right now.  That's

15          what I'm trying to say.

16                 MR. BIRCHFIELD:  Kathy, how

17          many cases have you submitted to

18          the settlement program?

19                 MS. SNAPKA:  All of my

20          clients elected to go into the

21          settlement program, which is 87.

22                 MR. WEITZ:  Other than

23          Nettles and Zajicek, did you have

24          any other cases that were on
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1         trial --

2              MS. SNAPKA:  Yes.  Eller.

3         In fact, what's really funny is,

4         Eller is still set for trial.

5         That's a very interesting one.

6         And I talked to Phil Wittmann

7         after that to say, you reported no

8         trial settings, but we actually do

9         have a trial setting in Eller.

10        It's a quirk, but, yes.  Eller has

11        been and continues to be set for

12        trial.

13             MR. BIRCHFIELD:  Have you

14        submitted Eller in the settlement?

15             MS. SNAPKA:  Yes.  Eller is

16        submitted, but the judge refused

17        to dismiss it while the settlement

18        was pending because --

19             MR. BIRCHFIELD:  In case it

20        doesn't pass the gates?

21             MS. SNAPKA:  That's correct.

22             MR. BLIZZARD:  Where was

23        Nettles pending?

24             MS. SNAPKA:  It was

FAC Resp. Exhibit D -- 1393

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          originally filed in Beaumont, and

2          then it was removed to Federal

3          Court.  Judge Crone remanded it.

4          It went back to Beaumont, to

5          Jefferson County, and then it went

6          into the Texas MDL where it was

7          removed again, and then it was in

8          the Federal MDL.  But there was

9          extensive discovery done on the

10         case.  Nettles was one of the

11         cases that was a Texas pick for

12         stroke.

13             MR. BLIZZARD:  But it was in

14         the Federal MDL ultimately?  Where

15         was it in terms of discovery when

16         it was removed the last time to

17         the federal MDL?

18             MS. SNAPKA:  The treating

19         physician, we had retained the

20         experts and designated them, the

21         case specific experts.  I believe

22         the case was removed at that time.

23             MR. BLIZZARD:  Depo of the

24         plaintiff.  Were there depos of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

 1          other experts?

 2                 MS. SNAPKA:  Only of the

 3          treating/prescribing physician,

 4          who had given him the Vioxx.

 5                 But to the extent that there

 6          were double removal cases, and I

 7          was, again, trying to demonstrate

 8          a pattern with Merck trying to

 9          avoid trials, I was up there every

10          time being annoying.

11                 MS. SHAHANI:  Or dispatching

12          me to do that.

13                 MS. SNAPKA:  If I couldn't

14          be there.

15                 I believe that anything post

16          November 9 is pretty much taken

17          up -- I've already discussed the

18          issues, and that would be the only

19          thing that I would be submitting

20          additionally.  I don't know if I

21          can or will and whatever.

22                 MR. BIRCHFIELD:  Any other

23          questions?

24                 MR. SEEGER:  No.

FAC Resp. Exhibit D -- 1395

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1           MR. BLIZZARD:  I was just

2      going to point out that currently

3      your hours are under review by the

4      accountant at least according to

5      this report that we have, and the

6      expenses are being shown as being

7      under review also.  Is there

8      anything we can do to help with

9      that?

10          MR. LEVIN:  He's probably

11     working on that because if you

12     were in trouble, they would be

13     rejected.

14          MS. SNAPKA:  That's good to

15     know.  Let me just say that --

16          MR. BIRCHFIELD:  Don't panic

17     if you get a rejection letter.

18     Just respond quickly and get us

19     involved.  It has happened quite

20     frequently.  You just need to work

21     at it.

22          MR. SEEGER:  We'll give you

23     Arnold's cell phone number.

24          MS. SNAPKA:  I think I have

FAC Resp. Exhibit D -- 1396

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1        it, actually.

 2             One of the things they did

 3        do is they rejected all of my

 4        hours prior to the MDL, and I went

 5        nuts.

 6             MR. SEEGER:  They did with

 7        me too, though.  We all went

 8        there.

 9             MR. LEVIN:  They were

10        working under guidelines of the

11        MDL.  And then when all the state

12        litigants came in, it took them a

13        while to get oriented.

14             MS. SNAPKA:  I'll let y'all

15        know.

16             In 28 years of practicing

17        law, what I found with every type

18        of case is that corporations will

19        recognize, assess and contain

20        their risk only after trial or if

21        there's a threat of trial or

22        during trial.  I say that as a

23        perspective from a trial lawyer.

24        I was trained at Baylor like Ed
```

FAC Resp. Exhibit D -- 1397

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          was, and they taught us to try

2          cases.  That's all I know how to

3          do.  I'm not good at the other

4          stuff.  That was the one thing

5          that I thought, as far as a common

6          benefit, was they had me sort of

7          as a loose cannon out there.

8          Every time I possibly could, I was

9          going to push for a trial.  That's

10         where I was headed.  My only

11         regret is I didn't get to try more

12         cases.

13              Do y'all have any questions?

14              MR. SEEGER:  I think we

15         asked them.

16              MS. SNAPKA:  Thank you.

17              MR. BIRCHFIELD:  Thank you,

18         Kathy.

19                   -  -  -

20

21

22

23

24

FAC Resp. Exhibit D -- 1398

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number: 1060147

23        Notary Expiration: 1.2.10
          CCR Number: 30X100176200

24

FAC Resp. Exhibit D -- 1399

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          WHITE & WETHERALL, LLP
               J. Stewart White, Esquire


BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Exhibit D -- 1400

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. SEEGER:  As you know,
 3         we're the Vioxx fee committee.
 4         We've got a court reporter taking
 5         everything down because Judge
 6         Fallon at some point may want to
 7         take a look at the transcript.
 8         You can say and do anything you
 9         want.  The floor is yours to
10         present any way you want.
11              You should probably state
12         your name for the record and tell
13         us your common benefit
14         contributions.
15              MR. WHITE:  I'm Stewart
16         White from the law firm of White &
17         Wetherall in Reno, Nevada.  It
18         used to be White Meany &
19         Wetherall, but we got rid of
20         Meany.
21              You will be happy to hear
22         that I had nothing whatsoever to
23         do with Barnett.
24              MR. SEEGER:  I'm very happy
```

FAC Resp. Exhibit D -- 1401

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          to hear that.

2                    MR. WHITE:  I've just got a

3          ten-minute analysis of the factors

4          of 6(D) that I think applied, and

5          I'll be kind of businesslike and

6          right to the point.  I want to

7          thank you for your time in doing

8          all of this.  I know it's got to

9          be hard for you.

10                   But our case, as you

11         probably know, did not actually go

12         to trial.  It was scheduled very

13         close in October of '07 --

14                   MR. WEITZ:  What was the

15         name of that case?

16                   MR. WHITE:  Crandall versus

17         Merck.

18                   We weren't on any of these

19         plaintiff committees.  We are on

20         the HT governing committee, but

21         there's four of us attorneys, so

22         we can't be on every one of them.

23         Nevertheless, I feel that our

24         pending Crandall case was one of

FAC Resp. Exhibit D -- 1402

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        many factors that must have gone

2        into the decision of Merck to

3        settle all the cases.  We were

4        just working them and pounding

5        them on this Crandall case with

6        great vigor from January '07, when

7        we selected it, all the way up to,

8        even past October of '07, right up

9        until the time the settlement was

10       announced.

11             The Court authorized in 6(D)

12       some appropriate -- the applicable

13       state courts for common benefit,

14       and that's me.

15             MR. WEITZ:  Did you have a

16       trial date?

17             MR. WHITE:  Yes.  October 1,

18       '07.

19             MR. BLIZZARD:  What

20       happened?

21             MR. WHITE:  When that Oxford

22       study came out -- my co-counsel

23       was Mark Robinson and all of his

24       people.  When that Oxford study

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        came out, what was it, VICTOR or

 2        something, there was a lot of

 3        additional good information in

 4        that that Mark -- and it came out

 5        in July or something, and we

 6        wanted to make this one perfect,

 7        and we stipulated to a

 8        continuance.  We reset it for June

 9        of the following year.  But we

10        kept working and deciding motions

11        even after that.  We didn't just

12        drop it.  We kept going.

13              MR. BLIZZARD:  So, the

14        VICTOR study came out in June.

15              MR. WHITE:  I don't know,

16        wasn't it June or July or

17        something like that?

18              MR. BLIZZARD:  Did you seek

19        a continuance around that time?

20              MR. WHITE:  Right.  Right.

21              MR. BLIZZARD:  It was in

22        Reno?

23              MR. WHITE:  Reno, Nevada.

24              Anyway, the affidavit
```

FAC Resp. Exhibit D -- 1404

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          factors.  One is -- the first one,

2          it says the extent to which my

3          firm made a substantial

4          contribution to the outcome.

5          Basically, that's so general, you

6          have to look at all of the other

7          factors.  It was selected in early

8          '07 by us for trial.  It was set

9          initially for June of '07 in a

10         prior case's spot, but we had a

11         lot of work done then basically on

12         Crandall, just concentrating on

13         that one case from January '07 --

14         December '06 on.  The defendant

15         got the trial moved back from June

16         '07 to October 1, '07, but we used

17         that additional time to prepare

18         even more.

19              The other factor, quality of

20         our firm's work.  Basically, they

21         did not win, Merck did not win one

22         motion of any substance whatsoever

23         during this entire litigation.

24         They only had two successes

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          really.  One is that they got that

2          trial moved back from June 20th of

3          '07 to October 1, a very short

4          period of time, not the several

5          many, many months they wanted

6          because of all of this pending

7          litigation.  The Court granted

8          their motion to stop my brother

9          from making so many speaking

10         objections at the doctors'

11         depositions.  That was it.  That

12         was the only two won.

13               This is the quality I want

14         to talk about.  We maneuvered

15         first to get all of the Reno Vioxx

16         cases before an experienced trial

17         judge.  Our firm was the only one

18         that was doing Vioxx in Nevada

19         basically.  We had some cases in

20         Reno or northern Nevada and some

21         cases in Las Vegas.

22               There was one other

23         attorney, Will Kemp, some of you

24         may know him, from Kemp &

FAC Resp. Exhibit D -- 1406

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          Harrison.  He had some Vioxx

2          cases, but he said they were

3          really bad cases, so you go first.

4          So, we were going first, and we

5          did.

6               We got in front of an

7          experienced Judge Brent Adams with

8          whom we had other successes.  He

9          knew we were competent in drug

10         litigation.  He trusted us.  The

11         local defense counsel from Merck

12         was from Las Vegas.  The judge

13         didn't really know them.  The

14         other defense counsel were

15         primarily guys like Andrew Rudge

16         and Paul Boehm and David Blatt

17         from Williams & Connolly.  At some

18         depositions they would send people

19         from Venable in D.C. and Fulbright

20         & Jaworksi, I don't remember who,

21         Cooley Godward Kronish, Sedgwick

22         Detert, Hughes Hubbard & Reed.

23         They were paying a lot of

24         attention to the case, I think.

FAC Resp. Exhibit D -- 1407

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1          So, from the very beginning,

 2     they wanted a role in selecting

 3     the bellwether cases.  We did not

 4     let them have a role.  The judge

 5     denied them.  We told the judge

 6     that we had a burden of proof, we

 7     get to pick the case that goes

 8     first, and we picked them.

 9          MR. WEITZ:  That's a good

10     way to approach it.  I wish more

11     judges would do that.

12          MR. WHITE:  There's a lot of

13     good reasons.  I read all those

14     bellwether arguments.  There's

15     lots of good reasons to do it the

16     other way besides the way we did

17     it.  So far we have been able to

18     keep that out of Nevada in our HT

19     litigations and fen-phen and

20     everything else.  We just show him

21     that's the way we've always done

22     these mass torts, and they keep

23     doing it every year from then on.

24     I'm certainly not criticizing the

FAC Resp. Exhibit D -- 1408

Page 10

1          way it works in the other

2          jurisdictions because there are

3          just some things that have to

4          happen like that.

5                MR. WEITZ:  I think we wish

6          that in all jurisdictions.

7                MR. WHITE:  That's what we

8          did.

9                And then the Court didn't

10         set the case out for two years

11         like they wanted to set it out.

12         They set it real quickly.  Then we

13         won all the other arguments, from

14         the timing of the sales rep

15         deposition, to using expert

16         reports on general causation that

17         were in the other litigation in

18         Nevada, using already decided

19         expert depo designations and

20         exhibit foundations from -- like

21         Robinson's case in Berwick in

22         California and the MDL.

23                My impression, basically, we

24         kept them pretty much on their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          heels the whole time from January

 2          '07 until October of '07, November

 3          '07 when the settlement was

 4          announced.

 5               MR. WEITZ:  What was the

 6          division of work between your firm

 7          and Robinson's firm?

 8               MR. WHITE:  Basically, as

 9          you can see from the time, it

10          worked out 60 percent our work, 40

11          percent Mark's work.  They were

12          just invaluable along with Andrews

13          & Thornton in getting experts.

14          They had gone through the trial.

15          They knew the evidence.  They knew

16          all of those hundreds of thousands

17          of documents and which ones were

18          the best hot documents to use.

19          So, they were in charge basically

20          of getting our experts, of

21          handling all of our experts.  I

22          don't remember all their names.

23          Abramson and some of the others

24          that Mark Robinson's firm used and
```

FAC Resp. Exhibit D -- 1410

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          Andrews & Thornton's firm used.

2          They assisted in the treating

3          physicians' depositions even to

4          the point of coming over sometimes

5          and helping us prepare them for

6          the depositions, but not on all of

7          them.

8               And then at trial basically

9          I was going to be doing like a lot

10         of the local people, my clients,

11         some of the smaller doctors, the

12         local doctors.  If they were

13         experts, Mark's firm's people were

14         going to handle them.  We had just

15         innumerable people at our disposal

16         from Mark's firm, and they helped

17         quite a bit as well.

18               Anyway, there's another

19         three factors I'm going to put

20         together, that one about

21         consistency, amount, duration and

22         intensity to the litigation,

23         commitment, level of partner

24         participation, and activities

Page 13

1          surrounding the individual trials,

2          including non-MDL bellwether

3          trials that impacted proceedings.

4          The consistency, amount and

5          duration you can see from our time

6          sheets.  I've got like 1500 hours

7          in this from January until we

8          stopped.

9               My partner, Geoff, my

10         brother also, was involved in the

11         successful motion to remand the

12         Crandall case after Merck removed

13         it on the grounds of fraudulent

14         joinder.  We sued Merck and about

15         11 Merck sales reps that were from

16         Nevada in order to defeat federal

17         diversity jurisdiction.  We got

18         their names from a source that we

19         had that was a sales rep in the HT

20         litigation, and so we knew they

21         were Nevada people, and of course

22         they removed it on the grounds of

23         fraudulent joinder.  Geoff did all

24         of that work in June and August of

FAC Resp. Exhibit D -- 1412

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          '05 on this case, Crandall.

2               We filed 20 lawsuits with

3          about five or six plaintiffs plus

4          their spouses in each case and

5          tried them all together.

6               MR. WEITZ:  How many total

7          cases?

8               MR. WHITE:  We had about 106

9          cases after we carefully vetted

10         them all.  We still have about 93

11         or 94 in the settlement that are

12         going through the settlement.

13              MR. WEITZ:  Did you file

14         them all in Reno state court?

15              MR. WHITE:  We filed about

16         half in Reno and about half in

17         Vegas.  If they lived in the

18         southern Nevada area, that's where

19         they went.  If they lived in

20         Carson City, little towns around

21         Reno, they went to Reno.

22              But Geoff did all that work,

23         and he was specifically involved

24         in all the treating doctors'

FAC Resp. Exhibit D -- 1413

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          depositions, preparing them for

2          depositions, attending some of

3          them in April and June of 2007,

4          went to all the status conferences

5          with the Court, attended the

6          meetings, a lot of the meetings we

7          had with defense counsel and

8          co-counsel.  That's that partner.

9               David Meany, my partner,

10          became more deeply involved in it

11          when fen-phen slowed down a little

12          bit in the treating doctor depos

13          and a lot of those sales rep

14          depositions.  But he's a very good

15          researcher and writer, and he

16          handled all of that motion

17          practice that Merck just throws at

18          you continually.

19               Partner, Peter Wetherall,

20          was in Vegas.  He had pretty

21          peripheral involvement because we

22          had that HT trial coming up also

23          in October '07 at the same time as

24          this trial, and he was doing that

FAC Resp. Exhibit D -- 1414

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        with Zoe Littlepage and Rainey
 2        Booth, and he attended status
 3        conferences, but he mostly just
 4        kept them percolating down there.
 5        The judges down there thought it
 6        was okay if we went first.
 7             We kind of worked out a
 8        state coordination on our own.
 9        All of our 20 cases were filed in
10        random number with different
11        judges, but Judge Adams, we
12        convinced, was a good one to do
13        these cases.  And so we basically
14        had all the Reno cases in front of
15        Judge Adams, and I forgot the name
16        of the judge down in Vegas.  All
17        the Vegas cases were in front of
18        that judge.  Periodically those
19        two judges would talk, but not
20        much.  But we kind of did our own
21        coordination with the cooperation
22        of Merck's counsel.
23             Then myself, participating
24        as a partner, and then I had one
```

FAC Resp. Exhibit D -- 1415

Page 17

1        or two paralegals extensively

2        involved really throughout, we're

3        just concentrating on Crandall,

4        though, we did the initial vetting

5        of the case and getting all the

6        medical records and plaintiff fact

7        sheets and all of that.  That's

8        kind of normal stuff.  Then the

9        summer of 2005 remand stuff.

10            In late 2006, early 2007, we

11        decided that Crandall was a better

12        case than the case we had set for

13        June of '07, and convinced the

14        judge to let us switch cases in

15        January of '07.  There was -- the

16        ones we had set were a couple of

17        stroke cases and a heart attack,

18        and we thought there was much

19        better science for heart attack

20        cases.  So, we wanted to do a

21        heart attack like Crandall first.

22        So, we got the Court's permission

23        to move it in its place.  And

24        that's Jerry Crandall.  That's

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          eventually -- the judge moved it

2          from June '07 back to October of

3          '07.  Crandall was a white male,

4          mid 40s, nonsmoker, no other real

5          risk factors.  Good health,

6          physically active, hiking, cross

7          country skiing, all of that,

8          taking 50 milligrams of Vioxx for

9          a couple of months before his

10         heart attack from his general

11         practitioner for thumb arthritis

12         in one thumb.  Thought it was a

13         really good representative case.

14         September 4, 2004, he's hiking up

15         Mt. Talac overlooking Lake Tahoe,

16         and the top of the mountain is

17         10,000 feet.  He goes 4,500 to

18         10,000 feet with his adult

19         daughter.  He was taking Vioxx

20         daily.  He specifically remembers

21         taking it that morning because he

22         says, I know from my hiking

23         experience coming down the

24         mountain, there's such a pounding

FAC Resp. Exhibit D -- 1417

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1    on your joints, and my joints hurt

2    a lot, and so I took Vioxx, I'm

3    sure, that morning.  He had a

4    heart attack while he was sitting

5    there resting up at the top.  He

6    could feel it was a heart attack.

7    There was no phone service or

8    anything up there.  But he's an

9    experienced hiker, and altitude

10    sickness, you use aspirin, so, he

11    always had aspirin in his

12    backpack, and he took an aspirin

13    right after he started down.  And

14    it turned into kind of a mild

15    heart attack.  That was okay.  I

16    didn't care -- I mean, it would

17    have been nice if he had really

18    great injuries, but it was still a

19    really good case.

20         MR. WEITZ:  It saved his

21    life.

22         MR. WHITE:  I think so.  So,

23    we switched that in there.  And

24    insofar as activities in this

FAC Resp. Exhibit D -- 1418

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          trial that impacted the

2          proceedings on a common benefit

3          level, a lot of it had to do with

4          the jurisdiction in Nevada, which

5          I'll go into in a minute, and

6          probably a lot of it had to do

7          with having Robinson Calcagnie as

8          co-counsel, which helped a lot,

9          because they'd run that other

10         case.  I told you what their role

11         was.

12              One activity that I

13         mentioned already was suing the 11

14         sales reps.  That kept us out of

15         Federal Court, which we didn't

16         want to be there, and you'll see

17         why in a minute.  But we also

18         thought one of them might get us

19         some pretty good information about

20         the marketing of the drug.

21              An example of Merck not

22         winning any motion, the Court

23         denied Merck's telephonic motion

24         in May of '07 for a protective

Page 21

```
 1        order to not let us take

 2        depositions of sales reps unless

 3        they had actually detailed one of

 4        our doctors.  The Court denied

 5        that motion, our argument being

 6        that, well, no, this sales rep

 7        detailed Dr. A, and Dr. A infected

 8        our doctor.  We took everybody's

 9        deposition we wanted to take.  It

10        turns out that Merck prepared

11        those -- during their depositions,

12        they all said they were prepared

13        for two days for their

14        depositions, which lasted about

15        for half a day.  It was like

16        talking to a bunch of robots, all

17        identical, good looking, and they

18        all had the same answers to

19        everything.  It was just amazing.

20        But I mean we did make them do a

21        lot of work on those sales rep

22        depositions in Vegas and Reno.

23              Another activity of common

24        benefit was successfully opposing
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1       their attempt to keep us from

2       talking ex parte to treating

3       physicians and prescribers before

4       their depositions, which I had

5       never heard of until this case.

6       But apparently Judge Fallon had

7       granted that, and I had read that

8       because I was on that list serve.

9               Nevertheless, we argued to

10      the Court that we should be able

11      to prepare properly a treating

12      doctor or prescriber.  We told the

13      Court that we would keep track of

14      the documents that we were giving

15      to them, medical journal articles

16      and things to read beforehand, and

17      brought them to the deposition,

18      and it went off just fine with not

19      any problem.  The doctors gave

20      good factual testimony that was

21      then able to be used by our

22      specific causation experts later

23      on.

24              Another thing is, despite it

FAC Resp. Exhibit D -- 1421

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          being a state court action, we got

2          a stipulation from Merck that we

3          could use the MDL produced

4          documents in this case, and we

5          could use the general causation

6          reports from the California cases

7          and MDLs.

8               But another really good

9          thing, I think, was that aspect

10         where we, over Merck's pretty

11         strong objections, got the Court

12         to grant our motion in August '07,

13         this was even after we got the

14         continuance, we were still working

15         on it, that we could use the depo

16         designations and the exhibit

17         foundations from Barnett and

18         Berwick and other trials in our

19         trial.  It saved everybody

20         hundreds and hundreds of hours,

21         because apparently that's quite a

22         grueling process.

23               One of the last two

24         things -- well, last thing really,

FAC Resp. Exhibit D -- 1422

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1      we got them to deny Merck's motion

2      that we each would only get a

3      certain number of hours of trial

4      time, which we had not ever

5      confronted that either.  The judge

6      said, no, you have a specific

7      amount, four weeks for this trial,

8      and use it up.  I'm not going any

9      further, and you guys work it out.

10     We were going to have to work it

11     out.  It wasn't going to be 60/40

12     or anything like that, nothing

13     specific.

14          So, all those things, I

15     think, helped Merck see that a big

16     verdict might be coming their way

17     in their case because they weren't

18     winning anything.

19          The other aspect, one of the

20     factors is on jurisdiction in

21     which non-MDL common benefit work

22     occurred, and that's one of the

23     main issues, because Nevada really

24     is a good, good jurisdiction for

FAC Resp. Exhibit D -- 1423

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          drug litigation.  We have no

2          Daubert at all, and we take

3          special steps to file amicus

4          briefs for the Nevada justice

5          association when anybody tries it

6          to keep it out.  We give seminars

7          to plaintiff groups, and Geoff

8          does that mostly on Daubert.

9               Secondly, we have not only

10         the failure to warn cause of

11         action, but we have pretty much

12         pure strict products liability.

13         There's a 1994 Nevada Supreme

14         Court case, Allison versus Merck,

15         involving brain damage to a kid

16         from a measles/mumps rubella

17         vaccine, and it was held that if

18         the plaintiff can prove the

19         vaccine caused the brain damage,

20         then the vaccine failed to perform

21         in a manner reasonably to be

22         expected in light of its nature

23         and intended function.  While the

24         drug company is not an insurer of

FAC Resp. Exhibit D -- 1424

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          their product, if it causes

2          injury, the manufacturer and the

3          distributors are responsible.  The

4          Court rejected specifically

5          comment K, 402A of the restatement

6          and said we don't have to consider

7          factors like usefulness and

8          reasonable risks and marketing and

9          everything like that.

10              MR. LEVIN:  We're all coming

11         to Nevada.

12              MR. WHITE:  It is a fine

13         cause of action to keep out all

14         that warning stuff, which is so

15         hard all the time.  That's a

16         really hard burden to meet that

17         one.

18              Thirdly, it is a small

19         state, Nevada is.  That has

20         several impacts.  You can get into

21         court relatively fast, in about a

22         year from filing, especially in

23         northern Nevada.  We have good

24         State and Federal trial and

FAC Resp. Exhibit D -- 1425

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1           appellate judges experienced in

2           drug litigation because we bring

3           them drug litigation.  We are the

4           only ones there that do that.

5           They know us.  They know we know

6           our business.  They trust us.  We

7           see them at county and state bar

8           meetings and other functions.  But

9           it is not to say we have had

10          success in this and other cases

11          because of personal relationships.

12          It's just because they know that

13          typically we are right.  And

14          plaintiffs' attorneys usually are

15          right in these things, and we have

16          a history of being right with

17          these judges.

18               For example, I told you we

19          sued the sales reps on the

20          misrepresentation counts, and they

21          removed them, claiming fraudulent

22          joinder.  We made our motion to

23          remand.  You have to allege you

24          have a good claim against the

FAC Resp. Exhibit D -- 1426

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          sales reps, and that should be all

2          that you need.  But we've been

3          doing this in Nevada with these

4          same federal judges so long that

5          we can attach to our motions to

6          remand other orders on remand on

7          the same cases with sales reps

8          like from our fen-phen cases.  The

9          same judge looking at his own

10         order where we sued sales reps in

11         fen-phen.  So, we didn't have to

12         reinvent the wheel and didn't

13         really have to spend a great

14         amount of time on motions to

15         remand.

16             It is a small state, quick

17         trial, good law, seasoned judges

18         who know our reputation, good

19         juries.  That's why we got a $16

20         million breast implant verdict

21         years ago not only against Dow

22         Corning, but Dow Chemical, I think

23         the only one in the nation.  In

24         that same month, in October of

FAC Resp. Exhibit D -- 1427

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

 1          '07, that HT did go to trial and

 2          we got that 134 million verdict

 3          for three women, all tried at once

 4          with one jury and one judge.

 5               So when you have that 13

 6          factor, when the number of adverse

 7          verdicts happened, did their

 8          commitment to litigation ebb, our

 9          commitment didn't waiver.  There

10          were other states supplying other

11          law -- or the Federal Court, and

12          it worried us.  I'm not saying

13          that it didn't worry us, but it

14          didn't affect our commitment to

15          this litigation, and we pressed

16          on.

17               One other factor was we were

18          involved in the litigation with

19          the JP MDL.  That was in April of

20          '05 because we started on this

21          right as soon as they took it off

22          the market.

23               We don't have any

24          involvement in any of those other

FAC Resp. Exhibit D -- 1428

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1          factors.  We weren't on any of

 2          these committees or funding the

 3          litigation.  But I think Nevada is

 4          a good jurisdiction and a scary

 5          place for drug manufacturers.  We

 6          just set in Las Vegas a multi

 7          plaintiff HT trial for August of

 8          '09 when a lot of other courts are

 9          just waiting for Wyeth versus

10          Levine.  They tried to get them

11          stayed, and our judges wouldn't

12          stay them, so we are moving

13          forward on those.

14              I think that Merck could see

15          attorneys that were prepared.  We

16          took every doctor's deposition,

17          every sales rep's deposition.  We

18          had our exhibits list because the

19          judge wanted it in by June, even

20          before the continuance kind of

21          stuff.  All those exhibits,

22          hundreds and hundreds of pages,

23          all those arguments over that.

24          All the deposition designations,
```

FAC Resp. Exhibit D -- 1429

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1        case specific expert reports were

2        in.

3              MR. SEEGER:  Everybody here

4        has tried a Vioxx case, so we have

5        a sense.

6              MR. WHITE:  All that was

7        done, and we were ready to go, and

8        they knew it.  I think that

9        knowing that had an effect, as did

10       all the other attorneys that were

11       plugging away, pounding away at

12       Merck and not just sitting back

13       warehousing their cases, that's

14       what we were doing, and then

15       putting them through that.

16             Hourly rates in Reno, I

17       don't ever do an hourly rate, but

18       I checked with some other

19       plaintiff litigation guy, and they

20       are about $400, $450 an hour.  I

21       think costs are separate

22       proceedings, right.

23             So, I do hope that you can

24       see your way with these several

FAC Resp. Exhibit D -- 1430

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          factors that I've talked to you

 2          about that I think Crandall versus

 3          Merck had a substantial common

 4          benefit and that you can pay the

 5          hours that my firm has put out,

 6          about 14, 1500 hours, I forget

 7          what it was, and Robinson has had

 8          about 1000 hours on the same

 9          thing.  I think it went a long

10          way.

11              MR. SEEGER:  We were

12          definitely aware of the case and

13          appreciate you coming here.

14              MR. WEITZ:  Thank you.

15              MR. WHITE:  Appreciate you

16          assisting me as well.

17                  -   -   -

18

19

20

21

22

23

24
```

FAC Resp. Exhibit D -- 1431

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23        Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24
```

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

FAC Resp. Exhibit D -- 1432