**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In Re: VIOXX | MDL No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON |
| ALL GOVERNMENT ACTIONS | MAG. JUDGE KNOWLES |

**MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER
IMPOSING COMMON BENEFIT OBLIGATION UPON THE RECOVERY OF
GOVERNMENT ACTION PARTICIPANTS IN THE GOVERNMENT ACTION THIRD
PARTY PAYOR SETTLEMENT PROGRAM**

## I.   INTRODUCTION

The Plaintiffs' Steering Committee ("PSC") respectfully moves this Honorable Court

to enter an Order that requires the deposit by Defendant Merck of, or the imposition of a

constructive trust upon, the equivalent of an appropriate percentage of the recoveries of

participants in the Government Action Third Party Payor settlement program, and otherwise

provides for the payment of common benefit fees (to be determined by this Court) to any counsel

who provided substantial services toward prosecution of such Government Action claims, the

enhancement of their value, or the creation and implementation of the government action

settlement program.[1]

---

[1] In a recent decision, this Court determined that 6.5% was the appropriate percentage of a claim
benefit award from the personal injury settlement with Merck. The PSC requests that the Court
make a determination, based upon the principles and rationale attributed in *In re Vioxx Prods.*

914215.1

Over the course of the past year, several law firms, including the Court-appointed PSC and Government Action Plaintiffs Case Management Committee, have dedicated long hours to develop, prosecute, discover, and evaluate the value of government payor claims; and in pursuit of a creative solution to protect the rights of Government Action participants in MDL No. 1657: *In Re: Vioxx Products Liability Litigation*. These efforts include encouraging the implementation of a Government Action Third Party Payor settlement program. These labors will result in the creation of a unique resolution program, will maximize the value of both the "litigating" and "non-litigating" Attorney Generals' claims, and will benefit all Government Action third party payors whose rights may not have been otherwise advanced, supported or protected. The time, efforts, and advocacy undertaken under the auspices of this MDL proceeding by the various committees and firms in pursuit of this settlement program created tremendous value and common benefit for both the litigating and non-litigating Government Actions. In recognition of this fact, the PSC respectfully moves this Court for entry of an Order requiring payment by Merck into a common benefit fund of a percentage (to be determined by the Court) of the gross recovery of all participants in the Government Action Third Party Payor settlement program currently under negotiation, and all recoveries on the claims asserted in the Government Actions in this MDL, for the reasons set forth below.

---

*Liab. Litig.*, 2010 U.S. Dist. LEXIS 139917 (E.D. La. 2010), of an appropriate percentage in this case.

## II.    <u>BACKGROUND</u>

Pursuant to PTO No. 19, this Court established a litigation expense fund to compensate and reimburse attorneys for services performed and expenses incurred for the common benefit of all plaintiffs in MDL No. 1657. An assessment can be imposed to provide a mechanism to compensate the PSC and other common benefit attorneys for MDL administration and common benefit services for cases that are being prepared for trial.

In early 2005, the State of Louisiana and other Attorney Generals filed suit against Merck & Company, Inc. ("Merck") for economic injuries over the wrongful purchase and/or reimbursement of the pharmaceutical drug, Vioxx. On February 16, 2005, the Judicial Panel on Multidistrict Litigation ruled that cases alleging injury from the use of Vioxx, pending in various federal district courts across the country should be transferred to the Eastern District of Louisiana and appointed Your Honor to conduct coordinated and consolidated proceedings. Beginning in 2008, the parties (Merck, PLC, and many Attorney Generals) began discussions regarding possible common discovery and other issues. At the July 11, 2008 status conference the Court appointed a special liaison counsel just for the Government Actions. Subsequently, the parties participated in a status conference on December 18, 2008 in which several matters were discussed pertaining to the actions by various state governmental entities, including the coordination of common discovery in the MDL and selection of cases for potential trial. On July 9, 2009, this Court entered PTO 44 which appointed the Government Action Plaintiffs' Case Management Committee and charged such committee members to initiate, coordinate and supervise the efforts of Plaintiffs' counsel in the areas of discovery, briefing, trial and settlement

decisions. In addition PTO 39 and 39A set forth a case management schedule for all Government Actions with the exception of *State of Louisiana ex rel. Caldwell v. Merck & Co., Inc*. Docket No. 05-3700 (State of Louisiana) which was governed by its own scheduling orders PTO 53 and 53A.

Pursuant to the Court's Pre-Trial Orders, the parties began conducting a program of common mutual discovery in the Government Actions Third Party Payor cases. Throughout 2009 and 2010, the parties were obligated to negotiate case management orders, engage in extensive discovery involving millions of documents from Merck and third parties, attend and conduct numerous fact and expert witness depositions and expend thousands of hours on pleadings and complex motions practice. The Government Action Plaintiffs' document review included accessing the PSC's document depositories and MDL discovery (documents, databases, depositions, responses to discovery, expert reports, trial transcripts, trial exhibits, and trial packages(s)) as well as requesting additional limited discovery from Merck that was not previously produced to the PSC. Settlement discussions, and informal discovery and analysis in support thereof, continue to the present.

As limited common discovery was ongoing, this Court scheduled the first Government Action bellwether trial in the *State of Louisiana ex rel. Caldwell v. Merck & Co., Inc.* In PTO 53, this Court set forth a rigorous trial schedule to ensure the case was prepared and tried in this Court in an expeditious manner. Both the State of Louisiana and Merck engaged in written discovery requests, depositions, expert discovery, and status conferences, and briefed and argued various Daubert motions, motions in limine and summary judgment motions over the course of

2009 and early 2010. A trial date of April 12, 2010 was selected and intensive trial preparation intensified further to meet that date.

The Louisiana AG bench trial lasted approximately two weeks and included testimony by pre-eminent experts. Subsequently, this Court issued its Findings of Fact & Conclusions of Law, ruling in favor of defendant Merck and dismissing the Louisiana AG's redhibition claim with prejudice and costs. On July 28, 2010, the State of Louisiana filed a Notice of Appeal. Appeal is pending. In addition, Plaintiff's counsel worked expeditiously on producing the first trial package for the Government Action Plaintiffs and this trial package was delivered to the PSC for deposit in the depository. The bellwether trial involved, necessarily, the specific fact patterns unique to Louisiana's program, but much of the trial focused on the common questions of the Vioxx product and Merck's conduct in its marketing, which can be adopted and adjusted for use in other trials. The trial package is currently available to all Government Action Plaintiffs.

On June 29, 2010, this Court issued PTO 39A applicable to all cases governed by PTO 39 and set forth a Remand/Transfer Scheduling Order. In addition, PTO 39A set forth certain grouping of Government Actions Cases. The groupings consisted of "Group 1 – Florida, New York (including Chatauqua County, Erie County, and Orange County), Oklahoma, and Pennsylvania"; "Group 2 – Alaska, District of Columbia, Montana, and Utah"; "Group 3 – Colorado, Kentucky, Mississippi, South Carolina and Santa Clara County" and included a staggered discovery and remand schedule. Over the last several months, the PSC and Government Action Plaintiffs Case Management Committee has held numerous meet and confers, worked diligently on resolving discovery disputes with Merck, attended Status

Conferences, met with the Court, on a number of occasions initiated settlement decisions with the Department of Justice on certain Federal Medicaid-related issues, and have kept the Court continuously informed of all new developments and on-going disputes with Merck. Document productions in these Government Actions have continued on a rolling basis; however, on November 22, 2010, the Court issued a minute entry staying discovery in all pending government action cases to facilitate global resolution discussions, with the exception of specific information necessary to enable informed settlement discussions and decisions. The PSC and Government Action Plaintiffs Case Management Committee also engaged the services of Special Master Patrick Juneau to assist with settlement negotiations and mediation for certain discovery disputes.

The PSC and Government Action Plaintiffs have continuously monitored the activities of Merck and the Department of Justice with respect to the global statewide settlement of certain Medicaid claims that have been feverishly litigated and/or contested within this MDL. On January 6, 2011, the Court ordered that the stay of these actions be extended for thirty days, with the understanding that Merck will provide information to assist the Attorneys General in evaluating their non-Medicaid claims for the purpose of global resolution discussions. To date, the Government Action Plaintiffs have devoted thousands of hours and have incurred tremendous expenses developing and prosecuting government claims.

## III.   ARGUMENT

The overarching principles of the common benefit doctrine, pursuant to which modern "common benefit" or "assessment" orders are issued by MDL judges in the exercise of their

inherent case management authority, are threefold: 1) the common benefit system spreads the necessary costs of litigation equitably among all who actually receive a benefit from the litigation; 2) the common benefit system incentivizes counsel to advance such necessary costs (and time) at their own expense, and on a contingent basis, for the benefit of all; and 3) the system actually produces a net benefit to all participants by eliminating duplication of cost and effort, and most fully realizing the potential economies of scale inherent in mass tort/mass disaster litigation. Thus, the common benefit system not only reduces the per-plaintiff expense of litigation, it shifts the initial responsibility and risk for the expenditure of those costs from the many who cannot afford to advance them to the few who can. In Government Action litigation, as in private party litigation, often the many must, or wish to, benefit from the active involvement of the few. Not all states, for example, have the resources or can feasibly make the politically-inflected decision to initiate and actively prosecute solo fraud litigation against companies such as Merck. The strength in numbers and the anonymity of the group that are the dynamics of the MDL means they do not have to; they can choose, by electing inaction or by asserting claims that become part of an MDL, to benefit from the efforts of others, with the option of actively assisting and participating in those efforts.

Under authority granted by the Supreme Court's common benefit doctrine, courts may enter orders to provide for the fair and equitable sharing among plaintiffs of the costs of special services performed and expenses incurred by attorneys acting for the common benefit of all plaintiffs in complex litigation. *See Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *Mills v. Electric Auto-Life Co.,* 396 U.S. (1970); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116

(1885); *Trustees v. Greenough*, 105 U.S. 527 (1881). Courts have adopted and utilized this authority in the MDL context on multiple occasions. *See, e.g., In re: Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d. 1006, 1019-21 (5th Cir. 1977); *In re: MGM Grand Hotel Fire Litigation*, 660 F. Supp. 522, 525-29 (D.Nev. 1987).

    A.    <u>The Federal District Courts Have The Authority And Discretion To Enter The Proposed Assessment Order Under The Common Benefit Doctrine.</u>

Courts appointed to serve as MDL transferee courts possess broad discretion and authority to coordinate and supervise complex multidistrict litigation that is centralized under their stewardship. *In re Linerboard Antitrust Litig.* (MDL No. 1261), 292 F. Supp. 2d 644, 653 (E.D. Pa. 2003). To manage such complex litigation, the transferee court may appoint lead and liaison counsel to coordinate and conduct investigation, discovery, and other pretrial preparation and trial work. *See Manual for Complex Litigation (Fourth)*, § 22.62. The "necessary corollary to court appointment of lead and liaison counsel . . . is the power to assure that these attorneys receive reasonable compensation for their work." *In re Linerboard*, 292 F. Supp. 2d at 653. The common benefit orders thus reflect a basic equitable principle: a party whose efforts benefit other parties should receive notable compensation for those benefits conferred.

The Supreme Court has repeatedly held that a party who expended resources to secure a common benefit should be compensated by *all* those who benefited. The Court first articulated this common benefit doctrine over 125 years ago, long before the advent of modern class action or multidistrict litigation, in the landmark decision of *Trustees v. Greenough*, 105 U.S. 527 (1881). The doctrine articulated in *Trustees v. Greenough* ensures that litigants and counsel

whose efforts and expenditures have recovered or preserved funds for the benefit of others are ratably reimbursed and compensated by the beneficiaries of their efforts—a matter of equitably apportioning the costs of a benefit conferred. This line of authority concludes it is unjust enrichment and contrary to public policy for claimants who benefit from others' work in a litigation, to do so without contributing to the cost of the efforts that produced the benefit, and therefore recognizes a right to payment from them. *See Trustees*, *supra*; *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 166 (1939). The common benefit doctrine "reflects the traditional practice in courts of equity" and "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).[2]

The equitable common benefit doctrine has become a staple of effective case management in multidistrict litigation. An early appellate affirmation of common benefit assessment as a fair, practical, and effective multidistrict litigation case management decision, *In re Air Crash Disaster at Florida Everglades* (MDL No. 139), 549 F.2d 1006 (5th Cir. 1977) ("*Florida Everglades*"), followed the Supreme Court's *Trustees*, *Sprague* and *Pettus* common benefit decisions to hold that proper management of multidistrict litigation requires entry of "common fund" orders such as that sought by this Motion. Because "lead counsel's services are

---

[2] "Since the decisions in *Trustees v. Greenough*, 105 U.S. 527 (1882) and *Central Railroad and Banking Co. v. Pettus*, 113 U.S. 116 (1885), this Court has recognized consistently that a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing*, 444 U.S. at 478.

in part for all parties with like interests and their lawyers," a multidistrict litigation transferee court is obligated to compensate counsel who developed and prosecuted a case from the recovery of others who reaped the benefit of that work and followed on its coat-tails. *Id.* at 1017 (emphasis added).

> As the Fifth Circuit explained in *Florida Everglades*,
>
> if lead counsel are to be an effective tool, the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation.

*Florida Everglades*, 549 F.2d at 1016. Underlying these and other decisions, in a wide variety of class action, MDL, consolidated, and other complex litigation contexts, is "the equitable notion that those who have benefited from litigation should share its costs." *Skelton v. General Motors Corp.*, 860 F.2d 250, 252 (7th Cir. 1988) (citation omitted).

Thus, under the common benefit doctrine, multidistrict transferee courts are empowered to require that fees be equitably shared in complex civil litigation. *See, e.g.*, *Florida Everglades*, 549 F.2d at 1016 ("We hold that the district court had the power to direct that the Committee and its counsel be compensated and that requiring the payment come from other [non-member] attorneys was permissible."); *Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992) ("District courts have exercised this power to establish fee structures designed to compensate committee members for their work on behalf of all plaintiffs involved in consolidated litigation."); *Walitalo v. Iacocca*, 968 F.2d 741, 747 (8th Cir. 1992) ("It is well established that courts can impose liability for court-appointed counsel's fees on all plaintiffs benefiting from

their services"); *accord*, *In re San Juan Dupont Plaza Hotel Fire Litig.* (MDL No. 721), 111

F.3d 220, 223-25 (1st Cir. 1997); *In re MGM Grand Hotel Fire Litig.* (MDL No. 453), 660

F.Supp. 522 (D.Nev. 1982); *In re FTC Line of Business Report Litig.*, 626 F.2d 1022, 1027 (D.C.

Cir. 1980).

> B.   **The Common Benefit Doctrine Incentivizes Contingent Efforts And Expenditures To Conserve The Resources Of Litigants.**

Based on the common benefit doctrine, the *Manual for Complex Litigation (4th ed.*

*2004)* (the "*Manual 4th*"), emphasizes that, together with an MDL court's power and obligation

to appoint responsible counsel to represent all plaintiffs, comes the power and obligation to

ensure that counsel who have undertaken core work on the litigation, particularly court-

appointed counsel, receive appropriate compensation, including from later-filed (or unfiled)

cases and settlements that take advantage of and piggy-back on their work. The *Manual 4th*

states:

> "Class counsel generally have the benefit of the common fund doctrine to support payment for their efforts on behalf of the class or consolidated litigants. MDL judges generally issue orders directing that defendants who settle MDL-related cases contribute a fixed percentage of the settlement to a general fund to pay national counsel." *Id.* § 20.312; see also *id.* §§ 11.211, 14.211, 14.215, 22.927.[3]

---

[3] The common benefit doctrine is applied frequently, but not exclusively, in class actions. It was developed by the Supreme Court independent of the class action procedure, and long before modern Rule 23 was enacted. It applies to all substantive and procedural litigation contexts. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 166 (1939). "That the party in a situation like the present neither purported to sue for a class nor formally established by litigation a fund available to the class, does not seem to be a differentiating factor so far as it affects the source of the recognized power of equity to grant reimbursements of the kind for which the petitioner in this case appealed to the Chancellor's discretion." Rather, the power to withhold, collect and spread costs through a common benefit mechanism applies regardless of the form of action, or the

Funds held back under a common benefit order are distributed to counsel only after court scrutiny and approval of the reasonableness of the time and costs for which awards are requested. *See generally*, *Manual for Complex Litigation, 4th* (Federal Judicial Center 2004, §§ 10.223; 14.215; 14.22-14.232) Numerous courts have enforced the common benefit doctrine in the context of non-class, mass tort or product liability multidistrict litigation, as the early decrees in *Florida Everglades*, *supra*, *In re MGM Grand Hotel Fire Litigation* (MDL No. 453) 570 F. Supp. 913 (D. Nev. 1983), and the recent common benefit orders entered in the *Avandia*, *Trasylol*, *Bextra* and *Kugel Mesh* MDLs demonstrate.[4]

Indeed, as this Court has explained in the pervious common benefit orders,[5] the common benefit doctrine is particularly useful in the MDL context. By designating a relatively small group of plaintiffs' attorneys with substantial resources that they are willing to risk in a common cause—the prosecution of the MDL on behalf of all plaintiffs—significant benefit accrues to all plaintiffs, their counsel, and to the Court. Such benefit creation merits Court-

---

identity or status of the parties or beneficiaries. It is plenary, "part of the original authority of the Chancellor to do equity in a particular situation." 307 U.S. at 166. The doctrine rests on the broadest and most fundamental principle of equity: "on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." *Id.* at 478.

[4] *See also, In re Diet Drugs*, MDL No. 1203, 582 F.3d 524 (3d Cir. Oct. 8, 2009) ("*Diet Drugs*") (approving final award of common benefit fees and reduction to 6 percent, in light of availability of settlement funds from which court-awarded fees and costs were paid, of initial 9% fee assessment on opt-out plaintiffs whose claims proceeded in federal court, *see* 1999 WL 124414); *In re Linerboard Antitrust Litig.* (MDL No. 1261), 292 F. Supp. 2d 644 (E.D. Pa. 2003) ("*Linerboard*") (establishing common fund and requiring set-aside for class counsel in antitrust multidistrict litigation).

[5] *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 139917 (E.D. La. 2010); 650 F.Supp.2d 549 (E.D. La. 2010); 574 F.Supp.2d 606 (E.D. La. 2008).

approved consideration for compensation, because it creates the real net benefit of lower costs and less work for individual counsel, some of which would otherwise be required to conduct all discovery and retain all experts on their own. However, the only work entitled to compensation from a common benefit fund is work that has demonstrably provided a benefit to the litigation, or to a defined group as a whole—the common benefit work. In contrast, work benefiting only a single plaintiff is, of course, compensated under the terms of that plaintiffs' fee contract with his or her individual counsel.

### C.   Common Benefit in MDL 1657

This Court, like the majority of MDL courts, has recognized the necessity and value of common benefit work. The Court specifically recognized the dedicated efforts and extraordinary contributions of common benefit work in this MDL litigation when it granted the PLC's Motion for an Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses (Rec. Doc. 17642) on October 19, 2010. The PSC and Government Action Plaintiffs Case Management Committee have taken negotiations with Merck for the benefit of all Government Action Plaintiffs. Certain Government Action Plaintiffs, have been actively involved in the litigation from the beginning, have coordinated a bellwether trial,[6] and, with the PSC, played a

---

[6] The Court has repeatedly recognized the pivotal role of bellwether trials in MDLs such as this one in providing valuable information to the parties for litigation strategies and settlement decisions, and to provide trial packages that enable plaintiffs to go to trial cost-effectively without undue duplication of time and effort, and without repeating what is otherwise a steep and expensive learning curve. *See, e.g.*, *Vioxx*, 574 F.Supp.2d at 608-609; 616-618; Fallon, *et al*, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008).

significant role in crafting a Government Action Third Party Payor settlement program, in which all of the Government Action Plaintiffs are allowed to participate.

In 2009, the Court selected the State of Louisiana v. Merck case as the first bellwether trial of a government entity claim seeking reimbursement of costs for purchase of Vioxx on behalf of its citizens. The preparation and trial of the Louisiana AG case included responsibility for developing issues of CV risk and the timeline of knowledge of risk, mustering the substantial array of clinical trials, published scientific articles, expert reports on both sides of the issues, and analyzing, for government plaintiff use, a vast set of prior deposition and trial testimony of corporate and expert witnesses. Louisiana counsel assumed responsibility for issues specific to the State's claim and the Medicaid statutes. As the Court is aware, Merck was ably represented by a large, active and talented team from several law firms, and plaintiffs were kept exceptionally busy responding to defense motions and preparing our case. Thus far, the Louisiana case is the only governmental claim to be tried in the Vioxx litigation.

>    D.    **Common Benefit in the Timeline: The Initial Bellwether Efforts**

The Louisiana AG plaintiffs' counsel were required to take responsibility for research and briefing of a large number of complex and demanding motions during the prosecution of the Louisiana AG case, including the following:

>    **Affirmative Daubert Motions/Replies:**

- Plaintiff's Motion to Exclude Certain Opinion Testimony of Merck's Experts Concerning the Relative Safety and Efficacy of Vioxx Compared to Other Medications

- Plaintiff's Motion to Exclude Certain Opinion Testimony and Statements Concerning the Safety and Efficacy of Vioxx Based on Personal Experience

**Affirmative Summary Judgment Motion:**

- Motion for Summary Judgment that the 2002 Vioxx Label was False and Misleading as to Purported GI Benefits to Non-Steroid Users in the VIGOR Study, and associated Affidavits, Exhibits, and Statement of Undisputed Material Facts

**Summary Judgment Opposition Briefs:**

- The majority of Plaintiff's Opposition to Merck's Motion for Summary Judgment, and the majority of the associated Affidavits, Exhibits, and Opposition to Merck's Statement of Undisputed Material Facts

**Oppositions to Merck's Daubert Motions:**

- Plaintiff's Opposition to Merck's Motions to Exclude Testimony of John MacGregor, Jerry Avorn, Cornelia Pechmann, Neil Julie, David Garaham and Richard Kronmal.

**Oppositions to Merck's Motions in Limine:**

- Plaintiff's Opposition to Merck's Motion to Exclude Evidence or Argument Criticizing the Food and Drug Administration or Its Approval of Vioxx

- Plaintiff's Opposition to Merck's Motion to Exclude Evidence or Argument that Merck Misled the Food and Drug Administration

- Plaintiff's Opposition to Merck's Motion to Exclude Testimony or Argument that Merck Should Have Changed the Vioxx Label Prior to April 2002

- Plaintiff's Opposition to Merck's Motion to Exclude Evidence of and Reference to Post-Marketing Adverse Event Reports

- Plaintiff's Opposition to Merck's Motion to Exclude Evidence or Argument about Dr. David Graham's Excess Events Calculations

914215.1

- Plaintiff's Opposition to Merck's Motion to Exclude Evidence or Testimony Regarding Reports of Nicholas Jewell

- Plaintiff's Opposition to Merck's Motion to Exclude Evidence or Argument Regarding "All Cause" Mortality Data From Alzheimer's Disease Clinical Trials

- Plaintiff's Opposition to Merck's Motion to Exclude Evidence Relating to the New England Journal of Medicine's Expression of Concern

- Plaintiff's Opposition to Merck's Motion to Exclude Communications with the FDA Regarding Improper Marketing of Vioxx

- Plaintiff's Opposition to Merck's Motion to Exclude Unreliable and Irrelevant Medical and Scientific Evidence

- Plaintiff's Opposition to Merck's Motion to Exclude the Testimony of Dr. Topol

- Plaintiff's Opposition to Merck's Motion for Order Excluding the Fries Letter

In addition to the substantial briefing efforts, described above, the Louisiana AG's attorneys assembled and attached hundreds of supporting exhibits to those briefs, requiring significant staff and attorney hours to cull through and select excerpts from thousands of pages of deposition testimony, expert reports, scientific articles, and internal Merck documents.

The project of selecting exhibits for trial required review of thousands of possible exhibits from several prior bellwether trials in this Court and the State courts, to select those that would be relevant and admissible. In addition, counsel identified and added 86 new trial exhibits that had not been listed in prior Vioxx bellwether trials. This project alone utilized seven paralegals, eight support staff, and two full-time attorneys, working on an exigent basis to not only identify the exhibits, but also to negotiate objections with defense counsel and prepare

914215.1

formal objections to the Court when agreements could not be reached. Louisiana Counsel also reviewed a large number of depositions, prepared deposition cuts for trial, responded to defendant's objections to such excerpts, and reviewed and objected to the deposition cuts proposed by defense counsel.

During the last few weeks before trial and the trial itself, Louisiana AG attorneys from several firms worked seven days a week, double-digit hours per day, including many all-nighters, to keep up with the demands of the case and provide best efforts on behalf of the Louisiana AG and the common benefit of all government entity plaintiffs.

Although the result of this Court trial was not a plaintiff victory (and, indeed, the majority of the Vioxx bellwether personal injury trials have not been), we believe that our efforts in this first battle have significantly advanced the process for all government plaintiffs. The Louisiana bellwether case was selected by the Court for the first, and thus far the only trial. The evidence on scientific and general liability issues was prepared to a high standard, and all of the expert witnesses' testimony survived *Daubert* challenges and Motions *in Limine*. All of the expert reports and depositions are now part of the Trial Package available to all other government plaintiffs. These include the report and deposition of former FDA chief David Kessler, M.D., an important witness for future trials. The report of John MacGregor, M.D., on cardiology issues, and Dr. MacGregor's testimony at trial provided a "state of the art" presentation of the cardiovascular risks of Vioxx, supporting this Court's significant finding that Vioxx more likely than not does increase the risk of such harm. The Court's Findings of Fact on these issues will thus also be of benefit to subsequent government entity plaintiffs.

914215.1                                    -17-

**E.**      **PSC-MDL Contributions Which Merit Common Benefit Consideration**

The PSC and others in MDL 1657 have, for more than 30 months, provided additional

MDL resources to the litigating and non-litigation Governmental Authorities including State

Attorneys General before the Court.  These services include, but are not limited to, the following:

**General/ Organization**:

- Providing an MDL forum for *in camera* conferences;

- Full participation in status conferences;

- Liaison with Merck's counsel at invitation of Merck or AGs;

- Discussions between and among Co-Lead PSC Counsel, Liaison Counsel, State Coordination Counsel Dawn Barrios, PSC Member Elizabeth Cabraser, Merck's Attorneys and various AGs;

- Hosting and organizing meetings with AGs (either by phone or in person) prior to each AG status conference in New Orleans to determine which issues the AGs wished to raise with the Court;

- Leading AG conference calls each Tuesday to discuss status, issues, responses to Merck, and generally how to move the case forward; create agendas for same and circulate to all AGs;

- Interfacing and communicating with Merck over all issues with any AGs;

- Contacting NAAG, per Judge Fallon's wishes and urge participation in MDL;

- Attending and participating in each AG status conference and hearing, and arguing issues common to all AGs before the Court;

- Participate in person and by telephone numerous meet and confers with Merck to attempt to narrow the issues;

- Ordering all AG issue transcripts and circulating to all AGs;

- Creating and maintaining database of all AGs, counsel, causes of actions and pill costs (which are confidentially kept), unique state issues, measures of damages, and remand status;

- Keeping all AGs up to date on developments in any AG case that may affect them;

- Upon request, providing Judge Fallon's law clerk with list of pending cases;

**Pleadings**:

- Negotiating with Merck and the AGs and crafting special confidential orders (PTOs 13 A and 13 C); and ensuring all AGs executed same;

- Reviewing each AG complaint and motion for remand for each jurisdiction;

- Researching merits of motions to remand under 5th Circuit law and advising AGs of likelihood of being remanded;

- Attempting successful negotiation of agreed upon price for trial package for volunteers to try cases in MDL;

- Filing pleadings through CM/ECF and serving pleadings through Lexis Nexis for AG's without filing privileges;

- Communicating with counsel re: *Lexecon* waivers;

**Discovery/ Depository**:

- Providing materials for and assisting in the development of damage models;

- Providing all documents, depositions, and trial packages and access to depository.

- Various meet and confers with PSC, Liaison Counsel in discussion of witnesses, experts, proofs and evidences.

- In particular, AG New York counsel and Florida counsel met several times with the PSC Executive Committee members to discuss liability avenues and potential proofs.

- Seeking consensus on the master discovery to be propounded to Merck, leading the meets and confers with Merck prior to serving the master discovery, and preparing for same;

- Urging consistent objections and responses, and preparing same to Merck's master discovery directed to each AG;

- Organizing and attending meetings to discuss MDL discovery;

- Transmitting all AG discovery to depository and to Merck;

- Transmitting all discovery updates of materials in the depository to the AGs;

- Negotiating with AGs on discovery timeline and remand time table to be made a Court order, and then negotiating it with Merck (PTO 39A);

- Composing letters to the Court (and getting AG approval for same) raising deficiencies in Merck's discovery production and defending the AGs' discovery production;

- Communicating with Court through the law clerk to set up formal AG status conferences and discovery telephone hearings;

- Working with AGs and Merck on method to organize discovery so that all AG discovery is presented in a master set to Merck;

- Creating common issues for AG discovery and circulating same for approval before going into master discovery;

- Negotiating with Merck to lift stay for AG discovery; approving motion and order to lift stay;

**Mediation/ Settlement**:

- Attempting to gain consensus for mediation with Special Master Juneau and contacting the Special Master re: same;

- Setting up meeting or conference call for each AG with Special Master Juneau;

- Obtaining and organizing white papers for the Special Master and participating in several meetings with him re: AGs' and Merck's positions;

- Conference with Matt Garrettson re: how Medicaid costs were treated in PI settlement, and advise AGs of same;

- Attend status conference with Department of Justice and Merck re: Medicaid claims, and all AG status conference; provide the Court with contact information for NAMFCU attorney.

Given the continuous MDL-PSC common benefit contributions of time and resources to the government claims, those government's achieving resolution with Merck, should be assessed common benefit costs and fees.

Many other Government Action Plaintiffs, without any labor of their own, have benefited from the time, efforts and advocacy engaged by the PSC and Government Action Plaintiffs Case Management Committee. In the words of this Court, when the "contributions of [the PSC and Government Action Plaintiffs Case Management Committee] to the outcome of the litigation" are considered in this instance and the substantial monetary benefit to these additional Government Action Plaintiffs made clear, justice, requires that these additional participants not be allowed to act as free riders, reaping the benefits of the labor of others for nothing. The PSC respectfully request that an amount equivalent to 6.5% (or whatever other percentage this Court

-21-

deems appropriate) be contributed to common benefit work on behalf of settling Government

Action Plaintiffs and governmental entities, through the imposition of a constructive trust or

holdback of settlement funds to be paid by Merck.

## IV.   **CONCLUSION**

For the reasons articulated herein, the PSC respectfully seeks an Order requiring the

contribution to a Common Benefit Fund of the equivalent of 6.5% of gross proceeds gained by

participating Government Action Third Party Payors in the settlement program, including any

case now pending or later filed, transferred to, or removed to, this Court, as well as unfiled or

tolled cases and treated as part of these coordinated MDL proceedings, and cases later remanded

to a state court or any cases on tolling agreements filed in any state court.

                                Respectfully submitted,

Dated: March 16th , 2011            By:  _/s/_ *Leonard A. Davis*_____
                                        Russ M. Herman (Bar No. 6819)
                                        Leonard A. Davis (Bar No. 14190)
                                        Stephen J. Herman (Bar No. 23129)
                                        Herman, Herman, Katz & Cotlar, L.L.P.
                                        820 O'Keefe Avenue
                                        New Orleans, Louisiana 70113
                                        Telephone: (504) 581-4892
                                        Facsimile: (504) 561-6024

                                        PLAINTIFFS' LIAISON COUNSEL

Andy D. Birchfield, Jr., Esquire
Leigh O'Dell, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
Shanin Specter, Esquire
David J. Caputo, Esquire
Lisa S. Dagostino, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W., Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

Arnold Levin, Esquire **(on brief)**
Fred S. Longer, Esquire **(on brief)**
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelly A. Sanford, Esquire
Sanford Pinedo LLP
2016 Bissonnet Street
Houston, Texas 77005
(713) 524-6677 (telephone)
(713) 524-6611 (telecopier)

914215.1

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA  70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA  92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

914215.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on Liaison Counsel, Philip Wittmann, by U.S mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 16th day of March, 2011.

  _/s/_ *Leonard A. Davis*_____
Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
Herman, Herman, Katz & Cotlar, L.L.P.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Facsimile: (504) 561-6024