```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


IN RE: VIOXX                              *        MDL NO. 1657
                                          *
PRODUCTS LIABILITY                        *
 LITIGATION                               *        SECTION  L
                                          *
THIS DOCUMENT RELATES                     *        JUDGE FALLON
TO ALL CASES                              *        MAG. JUDGE KNOWLES
                                          *        SPECIAL MASTER
FILER: Robert E. Arceneaux/Margaret Woodward  *    PATRICK A. JUNEAU
                                          *        March 21, 2011
                                          *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

## MEMORANDUM IN SUPPORT OF MOTION
## TO RESTORE COMMON BENEFIT FUND

MAY IT PLEASE THE COURT:

      This memorandum is respectfully submitted on behalf of Objectors and all other claimants to the common benefit fund, in support of their motion seeking the return to the common benefit fund of $18,539,236.85 by the parties who removed it: Messrs. Herman, Birchfield, and Seeger, any committee members who knew of or participated in the removal, and BrownGreer, the Administrator of the fund. Although undersigned counsel have not yet obtained the requested discovery concerning this matter, they have learned enough to know that the removal was unauthorized and therefore improper, and warrants redress.

–1–

**FACTS**

The seeds for the improper disbursement of trust funds were sown at the beginning of the Vioxx MDL, when the PSC sought to encourage participation by offering an "early bird" special on enrollment. In June 2005, the PSC petitioned this Court to authorize plaintiffs' counsel to choose from three options based on speed of decision. *See* PSC Petition, filed June 29, 2005. The PSC attached to its petition samples of the contracts they asked the Court to authorize. *Id.*

At a July 2005 status conference, the PSC reiterated the importance of generating cases within the MDL and for contracts that would encourage that participation. As stated by Andrew Birchfield on behalf of the PSC:

> The proposal that we have filed with the Court includes three options. The first option we call the full participation option, and it calls for a two percent assessment for attorney's fees plus one percent for costs. This option is designed to foster cooperation and coordination between the lawyers that are litigating cases in the MDL in federal courts and those in state court litigation.

Transcript of July 19, 2005 Status Conference, at 21, attached as Ex. 1. As Mr. Birchfield also stated, "I'm not aware of any pharmaceutical MDLs with an assessment that low, but that's designed to foster cooperation." *Id.*

By order dated August 4 2005, the Court accepted the PSC's recommendation. It called for the creation of an interest-bearing escrow account into which assessments for the common benefit fund would be paid and directed that plaintiffs' counsel who agreed to participate in the MDL pay an assessment based on their speed of decision:

> *The "full participation" option.* Plaintiffs' counsel agreeing to participate in the MDL within 90 days of the August 4 Order, would pay 3% of any gross monetary recovery (2% for common benefit fees, 1% for common benefit costs), to be

> subtracted from the attorneys' fees portion of individual fee contracts, for all cases included in the MDL.
>
> *The "traditional assessment" opinion.* Plaintiffs' counsel agreeing to participate in the MDL *after* the 90-day period would pay 4% of any gross monetary recovery for cases filed in state court, and 6% of such recovery for cases included in the MDL.
>
> *The "limited waiver" option.* Plaintiffs' counsel agreeing to participate in the MDL *after* the 90-day period permitted for the full participation option would pay 6% of any gross monetary recovery for cases included in the MDL and would use any common benefit materials only in MDL cases.

*See* Pre-Trial Order 19, Record Document No.786. The Order attached sample contracts for each these three options, as drafted by the PSC. *Id.*

The Full Participation Option ("FPO") appears to be at the center of attention. While we do not know the statistics yet, it was designed to be the popular choice, given the incentive built in for its selection. Significantly, the August 4 Order required all PSC members to exercise the full participation option. *Id.* at 3-4. It provided as follows:

> It is the intention of the parties that **such assessment shall be in full and final satisfaction of any present or future obligation** on the part of each Plaintiff and/or Participating Attorney to contribute to any fund for the payment or reimbursement of any legal fees, services or expenses incurred by, or due to, the MDL and/or any Common Benefit Attorneys.

*See Id.* (emphasis added).

The FPO Contract also made clear that amounts deposited in the escrow account were for the ***exclusive purpose*** of compensating attorneys who performed common benefit work, and that such money would distributed only pursuant to Court Order:

> The amounts deposited in the MDL Fee and Cost Account shall be available for distribution to attorneys who have performed professional services or incurred expenses for the benefit of the plaintiffs in MDL 1657 and the coordinated state

–3–

> court litigation pursuant to written authorization from the Liaison counsel of the PSC. ***Such sums shall be distributed only upon an Order of the Court in MDL 1657*** . . .

*Id.* (Emphasis added).

Various plaintiffs' counsel signed up for the several options, and as this Court is well aware, extensive litigation ensued. In November 2007, Merck and the NPC announced that they had reached a Settlement Agreement for an overall sum of $4.85 billion. *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007), available at http://www.browngreer.com/vioxx_settlement. The agreement was a voluntary "opt-in" agreement, and contemplated that this Court would oversee aspects of the administrative process. It echoed the Court's prior statements that common benefit fees would be assessed and fixed by the Court:

> To ensure that [the common benefit attorneys] are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys' fees will be imposed at no more than 8% of the gross amount recovered for every client that registers under the terms of the Settlement Agreement.

Ex. 2, at 35, § 9.2.1.

But, the Settlement Agreement also authorized a retreat from the assessment negotiated by the PSC in accordance with the August 4, 2005 Order. It stated that the maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19. *Id* (emphasis added). However, there was no consideration for this clause, as Merck had no "dog in the fight" of how its settlement funds were distributed. Thus, the provision appears to have been inserted by the NPC for its own

–4–

reasons having nothing to do with Merck, although Mr. Herman was more than vague about that in his deposition. *See* Ex. 3 hereto, at 142-55. The MSA is more clear, in that Merck specifically stated in Article 9.2.6 that it took "no position regarding... the award of common benefit attorneys' fees... and waives the right to contest these matters." See Ex. 2, at 36-37.

In January 2009, Russ Herman, in his capacity as Plaintiffs' Liaison Counsel, invoked this provision of the Settlement Agreement, and moved this Court to assess a common benefit fee of 8% of the $4.85 billion settlement regardless of the contractual arrangements between the PSC and plaintiffs' counsel. *See* Record Document No. 17642,.

On April 16, 2009, the Court invited any interested party to file a Notice of Objection on or before May 8, 2009. See Document Number 18264. Over 60 objections were filed. Included among them was the law firm Stratton Faxon, which had signed an FPO Contract and asked the Court to enforce that Contract such that its contribution to the common benefit fund would be capped at an aggregate of 3%. *See* Record Document No. 18649. On Mr. Stratton's unopposed motion, see Record Document No. 24215, the Court appointed him Liaison Counsel for the objector group. *See* Pre Trial Order 52, Record Document No. 24522.

Contemporaneously, the Vioxx Litigation Consortium ("VLC") contested the Court's authority to cap its fees at 32%, and it lodged an appeal with the 5th Circuit on the issue. During the pendency of this dispute, this Court placed the Stratton objections "on hold," given that there was a pending question as to the jurisdiction of the Court over much of the attorneys fees, which if resolved in the VLC's favor would render the Stratton objection moot. The Court appointed the Tulane Law Clinic to represent the plaintiff claimants in the VLC dispute, briefs were filed,

–5–

and this Court rejected the VLC"s position. The VLC gave notice of appeal. However, before briefs were filed, that appeal was dismissed without explanation.

This released the "hold" on the Stratton issue. The Court allowed some limited discovery, including the depositions of Michael Stratton and Russ Herman, which were held on April 28, 2010. Thereafter, the record reflects that, just as in the case of the VLC, another objection was withdraw without explanation. By letter dated July 29,2010, Mr. Stratton notified the Court that his objectors agreed that a 7.5% assessment was appropriate. See Record Document No 47918.

With these impediments removed, the Court proceeded on October 19, 2010, to enter a decision fixing 6.5% as the proper assessment, producing an expected common benefit fund of $315,250,000.  *See*  Record Document No. 54040.  The Court specifically adverted to its belief that the Stratton objections had been compromised by a mutual agreement to recommend a 7.5% assessment to the Court: "While the matter was pending before this Court, the PLC reduced its request for a common benefit fee award to 7.5% and the objectors withdrew their objections." *Id..*, at 10.  This flexibility, the Court said, supported its further reduction of the assessment to 6.5%.

Unknown to the Court, however, the FAC had entered into side deals with both Mr. Stratton and the VLC to secure their cooperation.  The terms of the VLC deal are still largely unknown, but the Stratton deal involved a reduction of the objectors' assessment not to the 7.5% suggested to the Court, but to 4%; and the PSC leadership further agreed immediately to refund to the Stratton group the sums needed to accomplish that objective.

The private deal was consummated on July 27, 2010 in the Court's chambers, *outside the*

–6–

*judge's presence,* between (1) Russ Herman, purportedly on behalf of the NPC, and Chris Seeger and Andy Birchfield purportedly on behalf of the PSC, and (2) Mr. Stratton, purporting to represent the objectors to the 8% assessment:

> MR. BIRCHFIELD:  Here in the conference room we have Michael Stratton, who serves as the liaison for the objectors; Russ Herman, who is plaintiff liaison counsel; co-lead counsel Chris Seeger and Andy Birchfield.  This is in MDL Docket 1657.
>
> We have entered into a private agreement where Mr. Stratton is speaking on behalf of all of the objectors to the plaintiff liaison counsel's petition for assessment and Russ Herman is speaking on behalf of the NPC.
>
> The parties have agreed that each side will recommend to the Court that there be a global assessment in the amount of 7.5 percent.  For each of the objectors who timely filed an objection to the plaintiff liaison counsel's petition, they will pay a total of a 4 percent assessment, and the difference will be disbursed from the account that's held in escrow now by BrownGreer.
>
> The aggregate amount for that list of objectors is $18,549,236.85.  That amount will be transferred to the trust account of Mr. Stratton.  Any common benefit fees or costs will be a matter of agreement between Mr. Stratton and the individual objectors.
>
> The parties will prepare a list of objectors that will be submitted to BrownGreer for the amount of the funds to be released for each of those individual accounts.  Again, the aggregate, that total sum, will be wired to the trust account of Stratton Faxon.
>
> MR. SEEGER.  I would just like, for the record, for Mike to acknowledge the reasonableness of the 7.5 percent.
>
> MR. STRATTON:  Yes.  As liaison counsel for the objectors, we have gotten well through discovery.  We have spoken to experts.  We have taken depositions, had depositions taken of us, and done the research.  At the end of the day, on behalf of all the objectors, I can say that we all feel 7.5 percent is a reasonable fee for the common benefit attorneys in this case.
>
> I would also add that any future cases that result in some sort of recovery brought by anybody who was a timely objector to this fee petition will be treated at the 4

–7–

> percent level.
>
> Further, it's our understanding that BrownGreer will be instructed as soon as possible to make this disbursement to the objectors via the Stratton Faxon trustee account.
>
> \*\*\*
>
> MR. STRATTON. Liaison counsel for the objectors, being me, on behalf of all of the objectors in this case to the fee petition, withdraw all of those objections. We no longer have any objection to the fee petition filed by the NPC to the extent that our recommendation is that it ought to be reduced to 7.5 percent. We'll be putting that on the record.

See Record Document No. 61362, at 7-11, attached hereto as Ex 5 .

The end of the story played out exactly as planned by the settlors. The following day, on July 28, 2010, Mr. Stratton sent the promised letter to the Court recommending a global assessment of 7.5%. *See* Record Document No. 47918, attached hereto as Ex. 6. The letter was also widely disseminated on File and Serve. See Lexis File and Serve No. 32379622. Of course, the letter did not disclose that Mr. Stratton's group would pay a net assessment of 4%, or that almost 6 % of the fund would, by agreement of the parties, be disbursed with no relation to the common benefit work performed by the ultimate recipients, and in the vast majority of cases (with the exception of the VLC, Daniel Becnel, and Kathy Snapka), to persons who were not even claiming to have performed any common benefit work at all.  Shortly thereafter, BrownGreer apparently distributed $18,549,236.85 to Mr. Stratton, who distributed it to other objectors. As best as we can determine, this occurred as a result of a simple phone call from Andy Birchfield to BrownGreer, instructing it to wire the money into Mr. Stratton's account.

No order authorized the transfer of more than 5% of the fund to parties who were not

–8–

even asked to demonstrate a commensurate common benefit. As the Court would say during a hearing on Feb. 17, 2011:

> BY THE COURT: The only thing I know of it is that there was an objection to the total sum of the common benefit fund, that Mr. Stratton represented the objectors, and I . . . gave them the opportunity to do some discovery early on. They did some discovery. They had some issues. I resolved the discovery issues, the evidentiary issues. They proceeded on with the case. I was advised that the objectors withdrew the objection. That's all that I know of it. I wasn't involved in any discussions or agreements. That's why I didn't issue any orders.

Transcript of Feb. 17, 2011 hearing, at 12, attached as Ex. 6.

At this point, it is unclear how much is actually in the Common Benefit Fund. One can assume that at least $315,200,000 was there at some point, because when this Court reduced the assessments from 8 to 6.5%, BrownGreer did disburse reimbursement checks to all counsel who had paid assessments. Whatever the amount in the fund, it seems clear that there is a significant portion that has been disbursed without authority, and it is this amount – $18,549,236.85 paid to Mr. Stratton – that Movants seek to have returned, with interest.

## DISCUSSION

Federal law specifies that money deposited pursuant to Court order must remain on deposit pending ultimate judicial distribution.

> § 2041. Deposit of moneys in pending or adjudicated cases
>
> All moneys paid into any court of the United States, **or received by the officers thereof,** in any case pending or adjudicated in such court, shall be forthwith deposited with the Treasurer of the United States **or a designated depositary**, in the name and to the credit of such court.

28 U.S.C.A. § 2041 (emphasis added). "No money deposited under section 2041 of this title

–9–

shall be withdrawn except by order of court." 28 U.S.C.A. § 2042.

The common benefit fee fund was a trust created for the benefit of all persons who deposited money therein – they had an interest either in the return of the assessments they paid or in receiving an allocated share of the fund for common benefit work they performed. This was made clear by the order which initially created it, Pre-Trial order 19, which expressly stated:

> These funds will be held as funds subject to the direction of the Court. No party or attorney has any individual right to any of these funds except to the extent of amounts directed to be disbursed to such person by order of the Court. These funds will not constitute the separate property of any party or attorney....

Record Document No. 786, at 1.

Subsequently, after Global Settlement, Chapter 9 of the MSA specified that the trust could not be invaded, and no funds disbursed, absent the approval of this Court, after notice and hearing:

> 9.2.3. Pursuant to Sections 9.2.1 and 9.2.2, **the attorneys' fees and common benefit expenses deducted by the Claims Administrator shall be deposited into an interest bearing escrow account (the "Settlement Fee and Cost Account").** The Settlement Fee and Cost Account shall be maintained at a financial institution. **Funds within the Settlement Fee and Cost Account shall be administered by the Honorable Eldon E. Fallon and all awards therefrom will be subject to approval, upon due consideration by him** in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson, and in accordance with established Fifth Circuit precedent....
>
> \* \* \*
>
> 9.2.5. The Honorable Eldon E. Fallon **shall provide appropriate notices governing the procedure by which he shall determine common benefit attorneys' fees and reimbursement of common benefit expenses**, including Common Benefit Attorneys' joint submission of papers by the PLC requesting compensation for their common benefit work, including the submission of contemporaneous time records, or properly reconstructed time records and

–10–

>expense reports, and any accompanying affidavits. **The Honorable Eldon E. Fallon shall insure that there is ample opportunity for objections and comments to the application and notice of a hearing regarding the same**. The Honorable Eldon E. Fallon shall set time and place of said hearing.

Ex. 2, at 35-36  (emphasis added).

The order forming the Fee Allocation Committee reiterated its limited advisory role. Nothing in any subsequent order suggested any retreat from this Court's ultimate authority over the fund, nor from the requirement that "all awards therefrom will be subject to approval," nor was any authority conferred upon the FAC to disburse common benefit funds for any purpose or by any means.  *See e.g.*, Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's "inherent authority over this multi district litigation" as well as its express authority under Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving the right to "issue subsequent Orders governing the procedure by which the Allocation Committee shall carry out its function"; and providing that members appointed to the committee may not be substituted by other attorneys "except with the prior approval of the Court").

The Agreement governing BrownGreer's administration of the fund also expressly referenced the Master Settlement Agreement and bound BrownGreer to its terms.  BrownGreer contracted that "all Services performed by it under the terms of this Agreement shall. . .be performed in a diligent, professional, and commercially reasonable manner (and in any event using not less than the same degree of skill and care as BrownGreer exercises with respect to its other clients in rendering comparable services); and be in compliance with all applicable laws, rules, and regulations."  Agreement, ¶4.03, Attached as Exhibit C to FAC Opposition to Objectors' Motion for Partial Summary Judgment.

–11–

The Court's ultimate authority over the fund was underscored by its order allowing a limited return of attorneys fees when it finalized the 32% cap:

> [The] Claims Administrator shall release all undisputed attorneys fees to the appropriate party, **less, of course, the amount escrowed for common benefit counsel fees.**
>
> The Court notes that, at this time, the amount of common benefit counsel fees remains in dispute. Pursuant to the Settlement Agreement, this amount shall not exceed 8% of the total settlement amount. **Accordingly, this amount shall remain in escrow pending a determination by this Court of the appropriate common benefit counsel fee award.**

Record Document No. 32651, Order, Jan 21, 2010 (emphasis added).

The creation of a common benefit fund and allocation of common benefit fees are exclusively judicial functions. This is apparent from every case to address the topic, including *High Sulfur* and this Court's decision in *Turner v. Murphy Oil USA, Inc.*, 582 F. Supp.2d 797 (E.D. La. 2008). This Court's exclusive authority over common benefit fee issues is also manifest in its orders addressing the topic, notably its October 19 Order creating the common benefit fund.

Notwithstanding the Court's exclusive authority over the fund, and while we do not know all the facts, we know enough to state two things categorically:

1. Herman, Birchfield and Seeger apparently acting on behalf of the FAC, PSC, and NPC, authorized the distribution of $18,539,236.85 from the fund pursuant to a secret agreement with Mr. Stratton. These persons, and all of the other knowing members of the committees they served upon[1] unquestionably owed not only the duty of candor and loyalty to this Court, but also fiduciary duties to their

---

[1] Undersigned counsel have been advised, however, that not all members of the PSC were aware of the deal. They do not know which members of the committees allegedly represented by Messrs. Herman, Birchfield, and Seeger knew of and approved it.

–12–

>    colleagues.
>
> 2.   BrownGreen acted upon the instructions from someone, presumably Mr. Birchfield, and did in fact wire the $18,539,236.85 into Mr. Stratton's account, without any court order or authority, or without even, apparently, bothering, to ask if such existed. BrownGreer was unquestionably the trustee of these funds, and owed the duty of a trustee to preserve them for the trust beneficiaries, who were the eventual claimants of common benefit fees.

While there is no case law specifying a remedy for violation of Sections 2041 and 2042, certainly they empower the court with the authority to command that those who invade a court-supervised fund immediately return any funds removed therefrom without authority. Aside from the general inherent authority of the court to police improper conduct by litigants, *See Chambers v. NASCO, Inc*., 501 U.S. 32, 111 S.Ct. 2123, 15 L.Ed.2d (1991). "'[I]t appears clear from the law that money deposited in escrow essentially constitutes a trust fund and can be used only for the purposes of the trust". *MacKendree v. Commercial Nat. Bank,* 340 So.2d 1080, 1082 (La.App. 1 Cir.1976) (citation omitted).  A trustee's unauthorized disbursement of funds from the trust is a "clear breach of the trustee's duty to the beneficiaries" and is s liable for return of those funds plus compound interest from the date the funds were improperly disbursed. *See Matter of Donald E. Bradford Trust*, 538 So.2d 263. 269 (La. Jan 30, 1989).[2]

---

[2]The MSA provides that its provisions will be governed by the laws of New York, and BrownGreen, the trustee, is located in Virginia. Neither New York nor Virginia law differ from Louisiana law with regard to the obligation of a trustee to replace trust property improperly taken from the trust. It is in general the duty of a trustee to retain the possession, control, and management of a trust estate after he or she accepts the trust and takes such estate into his or her custody. A breach of this duty makes the trustee a guarantor against any resulting loss and of the value of the trust property in question. 76 Am. Jur. 2d Trusts § 405, citing *Restatement Second, Trusts* § 175 ("The trustee is under a duty to the beneficiary to take reasonable steps to take and keep control of the trust property."). *See also Will of Mead*, 90 Misc.2d 144, 146, 394 N.Y.S.2d 123, 124 (N.Y.Sur. 1977)
(continued...)

The same result obtains for breach of a fiduciary duty owed by one who is not a trustee, but who owes a fiduciary duty to another, such as a partner, administrator, or an agent.

> The Louisiana Supreme Court, interpreting La. R.S. 12:91, has held that persons with a fiduciary duty "may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights" of the person or entity to which they owe that duty. *Noe v. Roussel*, 310 So.2d 806 (La.1975). The fiduciary's dealings are subject to rigorous scrutiny. The court concluded that, "an agent who acquires his principal's property, or one who otherwise acts in a fiduciary capacity, bears the burden of establishing that the transaction was an arm's length affair." Id. at 818-819.

*Scurria v. Hodge*, 31,207 *8  (La.App. 2 Cir. 10/30/98), 720 So.2d 460, 465, *writ denied*, 1999-0011 (La. 3/19/99),  739 So.2d 782.

> [I]t is immaterial whether its breach is described as constructive fraud, unjust enrichment, fraudulent breach of trust, breach of fiduciary obligation, gross negligence, or otherwise, and whether **the remedy is given by a constructive trust, restitution, or accounting**. These are all relative terms describing broad equitable concepts. The standard of a fiduciary's duty to his beneficiary, depending upon the instant relation and the facts of the particular case, lies somewhere between simple negligence and willful misconduct or fraud with the intent to deceive. The actual intent to deceive is not required where one party is so placed in such an advantageous position to the other.

*Id.* At 764-65, citing *Mansfield Hardwood Lumber Co. v. Johnson*, 263 F.2d 748. 754 (5th Cir.1959)[3].

---

[2](...continued)
("A fiduciary has an obligation to protect and preserve assets which have been placed in his care."). Comment (f) to the Restatement makes clear that duty, while perhaps delegable, is exclusively: "The duty of the trustee is not only to take and keep control, but to take and keep exclusive control."

[3]Herman, Birchfield, and Seeger, as well as the other FAC members responsible for invasion of the trust,  owed fiduciary duties as a result of the obligations imposed upon them by the offices created in Louisiana under the authority of this Court. If the substantive law of a particular state, as opposed to the inherent authority of this Court, controls, it is Louisiana law that governs the extent of their duties, and the remedies for its breach.

–14–

Accordingly, it is appropriate at this time that this Court enter an order commanding BrownGreen, Messrs. Herman, Seeger, Birchfield, and all members of the PSC, FAC, or NPC who authorized and participated in the unlawful distribution, to replace the money improperly removed from the Common Benefit Fund, with interest.[4] Other potential remedies, such as stripping of committee positions, forfeiture of fees, etc, are matters for this Court to determine pursuant to its inherent power to vindicate its own authority.[5] But Objectors, along with all other claimants to the common benefit fund, clearly have standing to call for replacement of the

---

[4] It is no defense, as has been claimed, that the Stratton deal was a "good deal" for the benefit of the fund. The impropriety of the failure to give notice, allow opposition and a hearing, and secure judicial approval, precludes any argument that the ends justified the means..*See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 247, 64 S.Ct. 997, 1002, 88 L.Ed. 1250 (1944). *See also Alexander v. Robertson,* 882 F.2d 421, 424 (9th Cir.1989).

[5] For example, under general law, the respondents to this motion may have a third party claim against those persons who ultimately received the disbursements of the funds. Yet, the ultimate recipients' conduct, by comparison, with perhaps the exception of Mr. Stratton, seems blameless. This Court may well decide that the settlement that was struck on their behalf is binding as to them, and that they are entitled to keep the rebate of their assessments. All Objectors are not necessarily of the same view in terms of other remedies that should or may be pursued. Some Objectors are of the view that the serious breach of duty represented by these facts will give Objectors standing to argue against any "multiplier" that might be claimed by certain PSC, FAC, and NPC members, or that they should not be given any common benefit credit for their work on these committees at all. Doing so would appear to violate the fundamental maxim that one cannot profit from one's own wrongdoing. And there is certainly authority for the Court to penalize these persons by depriving them of extra fees as a result of their breach of the obligations and duties they owed, not only to the parties, but to the Court. *See* Restatement (Third) of Law Governing Lawyers, § 37 (2000). There are even those that think that the infractions are so serious as to warrant stripping certain members of their appointments, which would of course involve forfeiture of all fees expected to be derived therefrom. Again regardless of the possible differing views of Objectors, these are matters for the Court to decide when it considers whether to vindicate its own authority under its inherent powers. "[T]ampering with the administration of justice in [this] manner ... involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public." *Hazel-Atlas,* 322 U.S., at 246, 64 S.Ct., at 1001, cited in *Chambers v. Nasco, Inc., supra*.

missing money, although the "Acceptors" whom the FAC claims to represent, may not be aware of the issue.  Accordingly, the undersigned file this request on behalf of all beneficiaries of the trust that was depleted by almost $19,000,000 without court authority, in violation of trust law, and in breach of fiduciary duty.

Respectfully submitted:

/s/ Robert E. Arceneaux

Robert E. Arceneaux, La Bar No. 01199
ROBERT E. ARCENEAUX LLC
47 Beverly Garden Drive
Metairie, LA 70001
(504) 833-7533 office
(504) 833-7612 fax
rea7001@cox.net

/s/ Margaret E. Woodward

MARGARET E. WOODWARD, La. Bar No.13677
3701 Canal Street, Suite C
New Orleans, Louisiana  70119
(504) 301-4333 office
(504) 301-4365 fax
mewno@aol.com

**CO-LEAD COUNSEL FOR OBJECTORS IDENTIFIED IN FEB. 8 ORDER**

## CERTIFICATE OF SERVICE

     I hereby certify that the above and foregoing Memorandum has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, March 21, 2011.


/s/ Robert Arceneaux