1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2                        NEW ORLEANS, LOUISIANA

3

4

5

IN RE:  VIOXX PRODUCTS          *    Docket MDL 1657-L
6    LIABILITY LITIGATION          *
                                   *    July 19, 2005
7                                  *
                                   *    9:30 a.m.
8    * * * * * * * * * * * * * * * *

9

10

                     STATUS CONFERENCE BEFORE THE
11                    HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14

     For the Plaintiffs:            Herman, Herman, Katz & Cotlar
15                                   BY:  RUSS M. HERMAN, ESQ.
                                     820 O'Keefe Avenue
16                                   New Orleans, Louisiana 70113

17

     For the Defendants:            Stone Pigman Walther Wittmann
18                                   BY:  PHILLIP A. WITTMANN, ESQ.
                                     546 Carondelet Street
19                                   New Orleans, Louisiana 70130

20

     Official Court Reporter:       Toni Doyle Tusa, CCR
21                                   500 Poydras Street, Room B-406
                                     New Orleans, Louisiana 70130
22                                   (504) 589-7778

23

24

     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

1          MR. BIRCHFIELD:  Your Honor, good morning.  In

2     Pretrial Order 6 the Court created the PSC and you charged us

3     with the duties and responsibilities for managing and advancing

4     this litigation.  Since that time, we have made great strides

5     in that direction.  We have established subcommittees that are

6     very active now and working on various aspects of the

7     litigation.  We have established a depository here in

8     New Orleans, as well as the one in New York and in Montgomery.

9          We have undertaken additional discovery,

10    including third-party discovery that has been outlined for you

11    this morning.  We have also taken depositions.  Before this

12    litigation was started in the MDL, several members of the PSC

13    had spent several years involved in this litigation.  We have

14    taken those depositions, the discovery has been completed, and

15    we are building on that foundation in order to move this

16    litigation forward in the most efficient manner possible.

17          A tremendous amount of work has been done, but a

18    lot remains to be done.  We are doing a tremendous amount of

19    work to move it forward expeditiously.  In Pretrial Order 6,

20    the mechanism that you outlined called for the attorneys

21    working with the PSC and at the PSC's direction to submit their

22    time records with the expectation they would be compensated for

23    that time and for the expenses that inure to the benefit of all

24    the plaintiffs.  We think now is the appropriate time for the

25    Court to establish that fund.

1              The proposal that we have filed with the Court

2    includes three options.  The first option we call the full

3    participation option, and it calls for a two percent assessment

4    for attorney's fees plus one percent for costs.  This option is

5    designed to foster cooperation and coordination between the

6    lawyers that are litigating cases in the MDL in federal courts

7    and those that are in state court litigation.  I'm not aware of

8    any pharmaceutical MDLs with an assessment that low, but that's

9    designed to foster that cooperation.

10             We are committed to producing an excellent work

11   product here, and to show that commitment we think that it's

12   imperative that those that are doing the work -- the PSC

13   members, the members of the committees that we have set up, the

14   state liaison committee -- all show their commitment by

15   participating in this full participation option.  We think by

16   doing that it fosters coordination and cooperation and not

17   competition among the various jurisdictions.

18             THE COURT:  It's your intent that all of the cases,

19   including those held by the PSC, will be assessed that amount?

20             MR. BIRCHFIELD:  Yes, Your Honor.  That's our

21   proposal, that it is voluntary, only by agreement.  Attorneys

22   that will sign this agreement, they agree to participate with

23   the MDL regardless of whether they are litigating in state

24   court or they have unfiled cases or case on the tolling

25   agreement.  We want to have this proposal available for a

1    limited period.  We want to encourage participation and

2    cooperation early in this litigation.  We want to make this

3    option available for 90 days from the time the Court enters

4    that order.

5              The second option is a traditional assessment

6    option and, really, we envision that applying to lawyers who

7    get cases late.  They would receive the MDL work product.  The

8    assessment for those cases that are pending in federal court

9    would be six percent and four percent for those that are in

10   state court.

11             The third option is what we call the limited

12   waiver option, and that is for lawyers who have cases both in

13   federal court and in state court and they wish to use the MDL

14   work product only for their federal court cases and not in

15   their state court cases.  The assessment there would be six

16   percent.

17             Your Honor, as was mentioned earlier, the first

18   Vioxx case is under way right now in Texas.  There are a number

19   of additional cases that are set for trial in the upcoming

20   months, including one hopefully here in the MDL within the next

21   four to five months, so we think that the time is appropriate

22   for the Court to establish a fund.  We would ask that you enter

23   an order establishing a fund and employing the proposal that we

24   submitted to the Court.

25             THE COURT:  Any comments?

1      MR. HILL:  Does the order apply to a member of the

2 state liaison committee who does not expect to share in common

3 benefit, is not intended to submit time or expense records for

4 reimbursement?

5      MR. BIRCHFIELD:  The proposal that we have submitted

6 would apply to all members of the state liaison committee, the

7 PSC, all committee members that are working in the litigation,

8 and the idea is to show our commitment to the work product and

9 to create a situation where there's not competition among the

10 jurisdictions, but a spirit of cooperation.  We think this

11 proposal achieves that objective.

12      THE COURT:  All right.

13      MR. BECNEL:  Your Honor, I would like to commend the

14 plaintiffs' committee on this because it will definitely bring

15 all of the cases with full cooperation.  The only request I

16 make of the Court is if I sign on -- which I will -- for me and

17 all of my referral lawyers from around the country -- and some

18 of them are still getting cases in, as I'm sure everybody in

19 the PLC is still getting cases in.  If I don't do it within 90

20 days, am I out, or if I can sign a general that everything I

21 get from here until the end of the case is under this two

22 percent, one percent -- I would like to have the Court enter an

23 order that you can put it all in now and not have to be worried

24 about whether it's a six-month-down-the-road case or a

25 two-year-down-the-road case.

24

 1          MR. BIRCHFIELD:  Your Honor, there's no objection.

 2          THE COURT:  I see the point.  That's what I would

 3     anticipate.  Also, there's got to be some flexibility in the

 4     90-day situation.  There's got to be some situations where

 5     people either didn't get notice or a case didn't come in or

 6     something of that sort that they ought to be grandfathered in

 7     in some way, but I will be looking at that.

 8          MR. BIRCHFIELD:  Thank you.

 9          THE COURT:  Thank you.  Anything further from

10     anybody?

11          MR. HERMAN:  Just a comment.  Mr. Ranier is chair of

12     our insurance committee.  We anticipate by the next meeting to

13     have made a determination as to whether to join or not join

14     insurers under the direct action statute, Louisiana cases, and

15     what additional discovery we would request.  We have asked the

16     defense to provide us some additional copies of some of the

17     dec. sheets that they have previously provided because they are

18     not legible.  Our marketing discovery committee Mark Robinson

19     chairs is ready to go as soon as the FACTS issue and the

20     detailer issues are determined.

21          THE COURT:  Any other issues that we need to focus

22     on?

23          MR. WITTMANN:  Not from our side, Your Honor.

24          THE COURT:  The next status conference will be

25     August 25 at 9:30 a.m.  I will meet with liaison counsel at

25

1    8:00 in the morning.  Thank you very much.  Court will stand in

2    recess.

3            THE DEPUTY CLERK:  Everyone rise.

4            (WHEREUPON, the Court was in recess.)

5                              * * *

6                          CERTIFICATE

7            I, Toni Doyle Tusa, CCR, Official Court Reporter,

8    United States District Court, Eastern District of Louisiana, do

9    hereby certify that the foregoing is a true and correct

10   transcript, to the best of my ability and understanding, from

11   the record of the proceedings in the above-entitled and

12   numbered matter.

13

14

15                          _____

16                          Toni Doyle Tusa, CCR
                            Official Court Reporter

17

18

19

20

21

22

23

24                          EXHIBIT 1

25

SETTLEMENT AGREEMENT

Between

Merck & Co., Inc.

And

The Counsel Listed on the Signature Pages Hereto

Dated As Of November 9, 2007

EXHIBIT 2

8.1.4.4.    WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL
BY JURY OF ANY ACTION, SUIT OR PROCEEDING PURSUANT TO THIS
SECTION 8.1.4 AND AGREES THAT ANY SUCH DISPUTE SHALL BE
TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

## Article 9
### Attorneys' Fees

### Section 9.1.    Individual Counsel Attorneys' Fees

Neither Merck nor any other Released Party shall have any responsibility
whatsoever for the payment of Enrolled Program Claimants' (and/or related Executing
Derivative Claimant's) attorneys' fees or costs. The Claims Administrator shall endeavor to
make all Settlement Payments owed in relation to any particular Program Claim pursuant to this
Agreement payable in the name of the relevant Enrolled Program Claimant, his Counsel (if any)
and each related Executing Derivative Claimant, subject to a reduction pursuant to common
benefit fees and reimbursement of costs as set forth in Section 9.2 below as determined by the
Chief Administrator. (For the avoidance of doubt, any such reduction nonetheless shall
constitute a Settlement Payment.) However, none of the Released Parties or the Claims
Administrator shall have any Liability for any failure to do so. No notice of representation or
change in representation by any Enrolled Program Claimant (and/or any Executing Derivative
Claimant with respect to such Enrolled Program Claimant), other than that which is made in such
Enrolled Program Claimant's Enrollment Form, shall change the application of this Section 9.1.
Any division of any Settlement Payment with respect to, and as between, any Enrolled Program
Claimant, any related Executing Derivative Claimants and/or his or their respective counsel is to
be determined by such Persons and any such division, or any dispute in relation to such division,
shall in no way affect the validity of this Agreement or the Release or Dismissal With Prejudice
Stipulation executed by such Enrolled Program Claimant (and any related Executing Derivative
Claimants) or his Counsel, as applicable. Nothing in this Section 9.1 limits or qualifies Article
12 (including in particular Sections 12.1.3 and 12.1.5).

### Section 9.2.    Common Benefit Fees and Reimbursement of Litigation Costs

9.2.1.    To ensure that NPC, PSC, PEC, PLC, and common benefit attorneys
(hereinafter referred to as "Common Benefit Attorneys") are fairly compensated but that
their fees are in conformance with reasonable rates, an assessment of common benefit
attorneys' fees will be imposed at no more than 8% of the gross amount recovered for
every client that registers under the terms of the Settlement Agreement. Any sum paid as
a common benefit fee shall be deducted from the total amount of counsel fees payable
under individual plaintiffs' counsel's retainer agreement. The maximum 8% attorneys'
fee assessment shall supersede the assessment provided to MDL common benefit
attorneys pursuant to Pretrial Order No. 19.

9.2.2.    In addition to those amounts provided in Section 9.2 above, Common
Benefit Attorneys shall also be entitled to reimbursement of their reasonable common
benefit expenses. Reimbursement of these expenses shall be deducted from the clients'
net recovery. The PLC shall submit to the Claims Administrator the audited common

35

benefit expenses of Common Benefit Attorneys,' which sum will be deducted on an equal percentage basis from the MI Settlement Fund and IS Settlement Fund.

9.2.3.    Pursuant to Sections 9.2.1 and 9.2.2, the attorneys' fees and common benefit expenses deducted by the Claims Administrator shall be deposited into an interest bearing escrow account (the "Settlement Fee and Cost Account"). The Settlement Fee and Cost Account shall be maintained at a financial institution. Funds within the Settlement Fee and Cost Account shall be administered by the Honorable Eldon E. Fallon and all awards therefrom will be subject to approval, upon due consideration by him in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson, and in accordance with established Fifth Circuit precedent, e.g., Blum v. Stenson, 465 U.S. 886, 900 (1984); Copper Liquor, Inc. v. Adolph Coors Co., 624 F.2d 575, 583 n. 15 (5th Cir.1980); Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974); Strong v. BellSouth Telecomms., Inc., 137 F.3d 844, 851-52 & n. 5 (5th Cir.1998); Forbush v. J.C. Penney Co., 98 F.3d 817, 823 (5th Cir.1996); Turner v. Murphy Oil USA, Inc., 472 F.Supp.2d 830 (E.D.La. 2007).

9.2.4.    The Honorable Eldon E. Fallon will be asked to appoint a committee of eight plaintiffs' counsel which shall include all members of the NPC and two additional plaintiffs' attorneys to be responsible for recommending to the Honorable Eldon E. Fallon the allocation of awards of attorneys' fees from the Settlement Fee and Cost Account. In making its recommendation the "Allocation Committee" is to review the contemporaneous time records, or properly reconstructed time records and expense reports of all plaintiffs' counsel that request compensation for common benefit work, as audited by the CPA firm of Wegman Dazett. The Allocation Committee shall take into consideration the common benefit work of counsel in the MDL, and the work of counsel in the state litigations in Texas, California and New Jersey. The Allocation Committee shall be guided by these objective measures of common benefit counsel's contributions, in addition to their subjective understanding of the relative contributions of counsel towards generating the Settlement Fund in accordance with established fee jurisprudence and subject to the approval of the Honorable Eldon E. Fallon in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson.

9.2.5.    The Honorable Eldon E. Fallon shall provide appropriate notices governing the procedure by which he shall determine common benefit attorneys' fees and reimbursement of common benefit expenses, including Common Benefit Attorneys' joint submission of papers by the PLC requesting compensation for their common benefit work, including the submission of contemporaneous time records, or properly reconstructed time records and expense reports, and any accompanying affidavits. The Honorable Eldon E. Fallon shall insure that there is ample opportunity for objections and comments to the application and notice of a hearing regarding the same. The Honorable Eldon E. Fallon shall set time and place of said hearing.

9.2.6.    Merck takes no position regarding, and has no responsibility or Liability for, the award of common benefit attorneys' fees and the reimbursement of costs

under this Section, or the allocation of the same, and waives the right to contest these matters.

## Article 10
## Quality Control and Audit Procedures

Section 10.1.   Prevention and Detection of Fraud - General

        10.1.1.   The Claims Administrator shall have the authority and obligation to institute claim-auditing procedures and other procedures designed to detect and prevent the payment of fraudulent Program Claims.

        10.1.2.   The submission of fraudulent Claims will violate the criminal laws of the United States, and subject those responsible to criminal prosecution in the federal courts.

        10.1.3.   The Claims Administrator shall notify the Special Master, Merck and the NPC, as well as any implicated Program Claimant and his Counsel, of any indicia of deception, dishonesty or fraud of which it becomes aware relating to any Program Claim or in any way to the Program. The Program Claimant and/or his Counsel shall have the right to contest such suggestion of misconduct to the Special Master by requesting a hearing within 10 days of receiving such notice. The Special Master may promulgate and revise rules for reviewing and resolving allegations of deception, dishonesty or fraud.

        10.1.4.   No Settlement Payment may be paid in respect of a Program Claim while that Claim (i) is the subject of an audit by the Claims Administrator (and to that end, the Claims Administrator shall notify Merck and the NPC from time to time of which Program Claims are then subject to audit) or (ii) is the subject of an audit by Merck or the NPC for good cause.

Section 10.2.   Mandatory Periodic Audits

        10.2.1.   Without limitation of Section 10.1, (i) after 2,500 Program Claims have been Completed (or, if later and if so requested by Merck, 60 days after the Enrollment Deadline Date) (the applicable date, the "Periodic Audit Start Date"), on a quarterly basis the Claims Administrator shall audit between 2.0% and 5.0% (the precise percentage within such range to be reasonably determined by Merck and the NPC from time to time or, if they cannot agree, as determined by the Claims Administrator (within such range) in its discretion) of the total Program Claims Completed by Enrolled Program Claimants during the prior quarter (or, in the case of the first such audit, since the Execution Date) and (ii) the Claims Administrator otherwise may audit such other Program Claims as the Claims Administrator, in its discretion, shall determine is warranted.

        10.2.2.   Program Claims shall be selected for audit on such basis as the Claims Administrator may determine from time to time (taking into account, without limitation, any suspicions of, or past findings of, fraud, deception or dishonesty in connection with the Program).

37

Confidential

Page 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

-   -   -

IN RE:                  : MDL DOCKET
VIOXX LITIGATION        : NO. 1647
                        :

-   -   -

April 28, 2010

-   -   -

CONFIDENTIAL

-   -   -


Oral deposition of RUSS M.

HERMAN, held at the law offices of Herman

Herman Katz & Cotlar, 820 O'Keefe, New

Orleans, Louisiana, beginning at 9:38

a.m. CST, on the above date, before Linda

L. Golkow, a Federally Approved Certified

Realtime Reporter, Registered Diplomate

Reporter and Notary Public.


-   -   -


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph| 917.951.5672
deps@golkow.com

EXHIBIT 3

Confidential

**Page 142**

1   question.
2       MR. STRATTON: I wish I
3   could, but I only have three hours
4   so it is --
5       MR. LEVIN: You don't have
6   the MSA?
7   BY MR. STRATTON:
8       Q.   Let me ask the question.
9       A.   Let me answer the question
10  so we can get through this. Paragraph 9
11  doesn't say that.
12      Q.   What does it say?
13      A.   It says that if you enter
14  this agreement, it is vitiated or
15  superseded.
16      Q.   Who --
17      A.   That's what it says.
18      Q.   How was that placed into the
19  MSA?
20      A.   I don't understand what you
21  are talking about.
22      Q.   How did Paragraph 9 that
23  says that this vitiation superseding
24  prior contracts, how did that language

**Page 143**

1   get into the MSA?
2       MR. LEVIN: How did it get
3   in?
4   BY MR. STRATTON:
5       Q.   How did it get in? Merck
6   didn't have a dog in this fight. Who put
7   that term into the MSA?
8       MR. LEVIN: You are being
9   argumentative now.
10  BY MR. STRATTON:
11      Q.   Which one of our
12  fidiuciaries put that term into the MSA?
13      MR. LEVIN: Objection to the
14  form. He's not going to answer
15  that question.
16  BY MR. STRATTON:
17      Q.   That's what I want to know.
18  That's what really makes me angry.
19      MR. LEVIN: You are
20  screaming, and you know what, you
21  are angry. You're angry.
22      MR. STRATTON: I'm
23  screaming --
24      MR. LEVIN: You're angry.

**Page 144**

1   You are a hostile person.
2       MR. STRATTON: That's pure
3   corruption, and it does make me
4   angry.
5       MR. LEVIN: You are
6   screaming corruption. I'm not
7   going to let him go on like that.
8   That is totally inappropriate.
9       MR. STRATTON: Somebody here
10  at this table better feel it in
11  the bottom of their damn stomachs
12  because this is disgusting. What
13  our PSC did is disgusting.
14      THE WITNESS: I'm going to
15  tell you, this is a glass top
16  table.
17      MR. LEVIN: Don't bang on
18  that.
19      MR. STRATTON: I'm not I'm
20  sure I'm not the first person
21  that's ever banged on this
22  table.
23      THE WITNESS: Well, you may
24  be the first person that I've had

**Page 145**

1   to say, look, be careful, if you
2   bust this glass you are going to
3   cut yourself miserably.
4   BY MR. STRATTON:
5       Q.   Who put that term into the
6   MSA?
7       A.   I don't understand your
8   question. Okay? The MSA has to be read
9   in para materia. The negotiating --
10      Q.   Is that pig Latin? What
11  does that mean, "para materia"? I have
12  to talk in English. This is an English
13  deposition.
14      MR. LEVIN: It is a legal
15  term.
16      THE WITNESS: It means you
17  have to read everything inter say.
18  You can't take something out of
19  context. Now, how is it placed
20  there? From the plaintiffs' point
21  of view, point advantage, the
22  agreement, the contract was from
23  the NPC. So, in a generic way,
24  the NPC. On the other hand, every

Confidential

Page 146

1      lawyer that elected in the best
2      interest of his clients to submit
3      to this contract agreed to its
4      terms.  And as far as my knowledge
5      is concerned, no one, including
6      you, has ever suffered a
7      detriment.
8    BY MR. STRATTON:
9        Q.   Did Mr. Marvin or anybody on
10   the other side of the table for Merck
11   suggest including that term?  The
12   vitiation and superseding of the full
13   participation contracts, did anybody on
14   that end of the table suggest putting in
15   that language?
16            MR. LEVIN:  Objection to the
17       form of the question.
18            THE WITNESS:  Any issue
19       regarding fee was discussed after
20       every other element of substance
21       had been agreed to.  All I can
22       tell you is that it's there, it
23       was discussed, it was the NPC
24       speaking for the NPC.  I can tell

Page 147

1        you, and I'll take it on myself as
2        chair of the NPC, I believe it was
3        reasonable, I believe it was fair,
4        and I believe it is the only way
5        that a global resolution could
6        have been accomplished at the
7        direction of a federal judge and
8        three state judges.
9    BY MR. STRATTON:
10       Q.   So, are you telling me that
11   Mr. Herman inserted this term, along with
12   his other members of the NPC, that it was
13   your side of the table that inserted that
14   term into the MSA?
15       A.   I'm not going to say
16   anything like that.  It's a contract.
17   It's a contract.
18       Q.   It's a contract with who?
19       A.   It's a contract for a global
20   resolution at every --
21       Q.   Can you name one interest
22   that Merck has in how much the NPC gets
23   paid?
24       A.   Global resolution by

Page 148

1    contract calls for a meeting of the
2    minds.  I can't -- I can only tell you
3    that we were acting at the direction of
4    four judges.   There were 80 cases in
5    California set for trial.  I mean, I
6    don't know how -- what you do with
7    attorneys that have 80 cases set for
8    trial in California.
9        Q.   You are not being
10   responsive.
11       A.   I am responsive.
12       Q.   You indicated earlier that
13   during the settlement process, there were
14   no mediators.  Is that correct?
15       A.   That is correct.
16       Q.   So, these four judges, they
17   weren't near the settlement agreement
18   before it was announced publicly sometime
19   after 4:30 a.m. on November 9, 2007?
20            MR. LEVIN:  Objection to the
21       form.
22    BY MR. STRATTON:
23       Q.   These judges didn't know
24   anything about the contents of this

Page 149

1    agreement, what was in the agreement,
2    until it was publicly announced and inked
3    sometime after 430 a.m. on November 9,
4    2007?
5            MR. LEVIN:  Objection to the
6        form.
7            THE WITNESS:  I can't speak
8        for the judiciary.  I can only
9        indicate to you that Mr. Marvin
10       and myself on a regular basis
11       communicated with the progress of
12       negotiation.  Before an order was
13       entered, I know that the agreement
14       was reviewed by the judiciary.  To
15       my recollection, Judges Higbee and
16       Chaney were present physically.
17       To my recollection, Judge Wilson
18       had been intended to be present
19       but had some difficulty.
20   BY MR. STRATTON:
21       Q.   When are we talking about
22   here?
23       A.   Excuse me?
24            MR. LEVIN:  Will you let him

38  (Pages 146 to 149)

Confidential

Page 150

1    answer the question.
2         No, finish the answer, Russ.
3         THE WITNESS:  There was a
4    full courtroom.  There were
5    lawyers participating also by
6    phone.  The document was
7    presented, it was reviewed, and
8    lawyers thereafter for more than a
9    year elected as to what they were
10   going to do.
11   BY MR. STRATTON:
12        Q.   What I'm asking you is, as
13   you sit here right now, are you saying
14   that the negotiators for Merck and Mr.
15   Marvin were involved in inserting a term
16   that vitiated and superseded or attempted
17   to vitiate or supersede the full
18   participation option contracts?
19        A.   It is a contract that was
20   signed by both parties.
21        Q.   Did they add the term?
22        A.   I've answered this question.
23        Q.   What did the plaintiff's
24   side get or what did the Merck side get

Page 151

1    by that term being added to the contract?
2         A.   Sir, fairness and
3    reasonableness.
4         Q.   What is Merck's interest in
5    whether or not the full participation
6    option contracts are enforced or whether
7    they are vitiated?  Can you name one of
8    their interests?
9         MR. LEVIN:  Wait a minute.
10   Article 9 speaks for itself.  Use
11   the language of Article 9.
12        MR. STRATTON:  No, I want to
13   know about the negotiations.
14   That's what I'm talking about.
15   This is negotiation.  Things don't
16   end up in settlement agreements
17   unless they are negotiated, right?
18        MR. LEVIN:  You are talking
19   two different --
20   BY MR. STRATTON:
21        Q.   Is that fair to say?  Things
22   don't end up in settlement agreements --
23        A.   I'm going to tell you
24   something.  If you raise your voice to me

Page 152

1    again or you hit this table again, we're
2    going to take a recess so that you can
3    calm down.
4         Q.   Yeah, well, for the record,
5    I am not out of control.  My voice is
6    raised because I'm trying to get an
7    answer, and I'm not getting the answer.
8    I'm getting the runaround.
9         What did Merck get in return
10   for that particular provision?
11        MR. LEVIN:  Objection.
12   BY MR. STRATTON:
13        Q.   What did the plaintiffs get
14   for that particular provision, Paragraph
15   9?
16        A.   Well, there are two
17   questions and a preamble.  First of all,
18   I disagree with the preamble.  First of all,
19   answered your questions directly under
20   oath to the best of my ability.  Your two
21   questions as to who got what, the answer
22   is a document, a contract was signed that
23   effected 99.79% of all claimants  in a
24   global contract resolution.  That's what

Page 153

1    resulted from the agreement.  That's what
2    both parties got.
3         Q.   I'm going to ask you a
4    question under oath.
5         MR. LEVIN:  All of the
6    questions have been under oath.
7    BY MR. STRATTON:
8         Q.   Do you know how Paragraph 9
9    specifically made it into the final MSA?
10   Do you know who proposed it?
11        A.   I know it was discussed, I
12   know we had ethics input into it, and I
13   know it was agreed to because the parties
14   signed off on it.
15        Q.   So, the ethics input would
16   have been so the NPC went out and sought
17   an ethics decision or opinion as to
18   whether it was appropriate to put that
19   provision into the MSA?
20        A.   All provisions.
21        Q.   Including that one?
22        A.   All provisions.
23        Q.   Did Merck ever propose this
24   language that appears in Paragraph 9, the

39 (Pages 150 to 153)

Confidential

Page 154

1  vitiation agreement?  Did anybody on
2  Merck's team ever propose that that
3  language go into the contract?
4      A.  I've answered this question
5  before.  I'm going to answer it again.
6  It was discussed.  That's number one.
7          Number two, it was involved.
8          Number three, it constitutes
9  part of a contract, and 99.79 of all
10  claimants entered the contract.
11      Q.  I want to know who mentioned
12  it first.  Did --
13      A.  I don't know.
14      Q.  You don't know as you sit
15  here right now?
16      A.  I don't know.  My belief is,
17  I can tell you what my belief is, and I'm
18  willing to do that.  My belief is that
19  the judges requested Texas, California
20  and New York, and that the attorneys who
21  had carried the load be treated fairly
22  and reasonably, and, therefore, having
23  had that communicated to the NPC and
24  having all parties represented, that that

Page 155

1  issue of the entire agreement, including
2  9, was discussed, period.
3      Q.  Settlement drafts, we've
4  talked about this before.  Where would I
5  find the penultimate settlement MSA, the
6  rough drafts of the MSA?  Where would
7  those be?
8      A.  I don't know.  I haven't
9  looked.
10      Q.  Would they be in this office
11  somewhere?  Would you have possession of
12  them?
13      A.  Some of them.  All of them,
14  I don't know.  I haven't looked.
15      Q.  Well, given that you are the
16  liaison counsel, I guess these are things
17  that if you didn't have immediate access
18  to, you could gather them from other PSC
19  members, et cetera?
20      A.  I don't know.  I haven't
21  asked.  I haven't looked.
22      Q.  Would you agree with me that
23  if every one of these 50,000 plus cases
24  had to be tried that the common benefit

Page 156

1  attorneys would have done a lot more
2  work?
3      A.  Yes.
4      Q.  How many years do you think
5  that would have taken to try 50,000
6  cases?
7      A.  I don't know.  They would
8  all have to have been remanded to
9  wherever they originated.  I don't know
10  what would have happened to those that
11  were on tolling agreements.  I don't know
12  how long it would have taken.  I think it
13  would depend on a number of things that I
14  can't answer.
15      Q.  Just your 100 cases, your
16  100 or so cases you had here in the
17  office, based on your knowledge of being
18  in New Orleans for a long time, how long
19  would it have taken to try those 100
20  cases individually?
21      A.  I would have to look at the
22  docket numbers and to what judges
23  allotted and where they were.  I don't
24  know.  Some judges try six, ten cases at

Page 157

1  a time.  My guess, and it is purely a
2  guess, I don't know, because in these
3  pharmaceutical cases, as you know,
4  there's a difference between general
5  causation and specific.
6      Q.  Were you aware of the
7  defense costs to Merck for trying each
8  one of these cases?
9      A.  No.  I wouldn't say "aware."
10  I believe that, as I understand it,
11  substantially more than what plaintiffs
12  were spending.
13      Q.  So, if Merck had actually
14  engaged in a scorched earth strategy, is
15  it fair to say that it would be costing
16  them a half million dollars a case to try
17  them?
18      A.  I can't hear you.  What did
19  you say.
20      Q.  Half million bucks for each
21  case at least?
22      A.  Who?
23      Q.  If Merck tried each and
24  every one those cases?

40  (Pages 154 to 157)

**From:** Cronen, Leslie [mailto:lcronen@BHTrialLaw.com]
**Sent:** Friday, July 23, 2010 11:30 AM
**To:** _Vioxx Working Group
**Subject:** NEED INPUT ASAP - Common Benefit Fee AGREEMENT TENTATIVELY REACHED
**Importance:** High

I just got off the phone with Michael Stratton, liaison counsel for the objectors regarding the common benefit fee dispute. He indicated that after conducting some discovery and their expert from Harvard giving the PSC a hard time, they have reached a tentative agreement on a **reduction** in the 8% assessment.

Specifically, for any attorney/firm that filed an objection _and_ had a prior contract with the PSC (we did both), the common benefit fee would be **decreased to 4%**. For any attorney/firm who did not object or did not have a prior contract, the fee will be reduced to 7.5%. Mike feels this is a very good deal, as he thinks Fallon is leaning towards letting them have the full 8%.



Please let me know if you are in agreement with this or if you have questions/concerns you would like to share with Mike. I am supposed to get back in touch with him over the weekend or at the latest, Monday. PLEASE RESPOND ASAP!

Sincerely,

**BUBALO, HIESTAND**
**& ROTMAN,**plc
CIVIL TRIAL ADVOCATES

Leslie M. Cronen, Esq.
9300 Shelbyville Road, Suite 215
Louisville, KY 40222
502.753.1630 (direct)
502.753.1631 (facsimile)

# EXHIBIT 4

1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF LOUISIANA

3

4

5

6 IN RE: VIOXX PRODUCTS     * Docket 05-MD-1657-L
     LIABILITY LITIGATION   *

7                * July 27, 2010
                *

8 This Document Relates to All Cases * 1:00 p.m.
 * * * * * * * * * * * * * * * * * *

9

10

11     PRIVATE PROCEEDINGS BETWEEN COUNSEL
     HELD IN THE CONFERENCE ROOM OF

12     THE HONORABLE ELDON E. FALLON
     UNITED STATES DISTRICT JUDGE

13

14 <u>Appearances</u>:

15

16 For the Plaintiffs:    Herman Herman Katz & Cotlar
             BY: RUSS M. HERMAN, ESQ.

17             820 O'Keefe Avenue
             New Orleans, Louisiana 70113

18

19 For the Plaintiffs:    Beasley Allen
             BY: ANDY D. BIRCHFIELD JR., ESQ.

20             218 Commerce Street
             Montgomery, Alabama 36104

21

22 For the Plaintiffs:    Seeger Weiss
             BY: CHRISTOPHER A. SEEGER, ESQ.

23             One William Street
             New York, New York 10004

24

25

EXHIBIT 5

1    <u>Appearances</u>:

2

3    For the Objectors:              Stratton Faxon
                                      BY:  MICHAEL STRATTON, ESQ.
                                      59 Elm Street
4                                     New Haven, Connecticut 06510

5

     Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
6                                     500 Poydras Street, Room B-406
                                      New Orleans, Louisiana 70130
7                                     (504) 589-7778

8

9

10

     Proceedings recorded by mechanical stenography; transcript
11   produced by computer.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            **PROCEEDINGS**

2            **(July 27, 2010)**

3            (WHEREUPON the following proceedings were held in

4      chambers outside the presence of the Court.)

5            **MR. BIRCHFIELD:**  Here in the conference room we have

6      Michael Stratton, who serves as the liaison for the objectors;

7      Russ Herman, who is plaintiff liaison counsel; co-lead counsel

8      Chris Seeger and Andy Birchfield.  This is in MDL Docket 1657.

9            We have entered into a private agreement where

10     Mr. Stratton is speaking on behalf of all of the objectors to

11     the plaintiff liaison counsel's petition for assessment and

12     Russ Herman is speaking on behalf of the NPC.

13           The parties have agreed that each side will

14     recommend to the Court that there be a global assessment in the

15     amount of 7.5 percent.  For each of the objectors who timely

16     filed an objection to the plaintiff liaison counsel's petition,

17     they will pay a total of a 4 percent assessment, and the

18     difference will be disbursed from the account that's held in

19     escrow now by BrownGreer.

20           The aggregate amount for that list of objectors

21     is $18,539,236.85.  That amount will be transferred to the

22     trust account at Stratton Faxon to be disbursed to the

23     objectors by Mr. Stratton.  Any common benefit fees or costs

24     will be a matter of agreement between Mr. Stratton and the

25     individual objectors.

 1              The parties will prepare a list of objectors

 2     that will be submitted to BrownGreer for the amount of the

 3     funds to be released for each of those individual accounts.

 4     Again, the aggregate, that total sum, will be wired to the

 5     trust account of Stratton Faxon.

 6              MR. SEEGER:  I would just like, for the record, for

 7     Mike to acknowledge the reasonableness of the 7.5 percent.

 8              MR. STRATTON:  Yes.  As the liaison counsel for the

 9     objectors, we have gotten well through discovery.  We have

10     spoken to experts.  We have taken depositions, had depositions

11     taken of us, and done the research.  At the end of the day, on

12     behalf of all the objectors, I can say that we all feel

13     7.5 percent is a reasonable fee for the common benefit

14     attorneys in this case.

15              I would also add that any future cases that

16     result in some sort of recovery brought by anybody who was a

17     timely objector to this fee petition will be treated at the

18     4 percent level.

19              Further, it's our understanding that BrownGreer

20     will be instructed as soon as possible to make this

21     disbursement to the objectors via the Stratton Faxon trustee

22     account.

23              MR. BIRCHFIELD:  I will transmit a list to you of the

24     objectors and the amount for you to verify that each of the

25     objectors is listed and the amount is correct.  Once you give

1   that to us, then we will act promptly to instruct BrownGreer to

2   release the funds.

3         MR. STRATTON:  Liaison counsel for the objectors,

4   being me, on behalf of all of the objectors in this case to the

5   fee petition, withdraw all of those objections.  We no longer

6   have any objection to the fee petition filed by the NPC to the

7   extent that our recommendation is that it ought to be reduced

8   to 7.5 percent.  We'll be putting that on the record.

9         MR. HERMAN:  One other issue.  We all recognize that

10  Judge Fallon, as the MDL judge in this matter, has the

11  authority and power to reduce the 7.5 percent that we have

12  recommended but will not increase the fund beyond 7.5 percent.

13        MR. SEEGER:  Correct.

14        MR. STRATTON:  Correct.  It's also understood by

15  everybody here, Mr. Herman, I'm assuming, that in no case will

16  any of the objectors ever pay more than 4 percent of their

17  aggregate settlements for the fees of common benefit lawyers in

18  this case.  I just want to make that crystal clear.  That's

19  true?  4 percent is it.  That's what they are paying into the

20  quantum.

21        MR. HERMAN:  Correct.

22                              * * *

23

24

25

1      **<u>CERTIFICATE</u>**

2              I, Toni Doyle Tusa, CCR, FCRR, Official Court

3      Reporter for the United States District Court, Eastern District

4      of Louisiana, do hereby certify that the foregoing is a true

5      and correct transcript, to the best of my ability and

6      understanding, from the record of the proceedings in the

7      above-entitled and numbered matter.

8

9

10                                          s/ Toni Doyle Tusa
                                            Toni Doyle Tusa, CCR, FCRR
11                                          Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25


EXHIBIT A

# Stratton Faxon

Connecticut's Firm for Trial Law

Michael A. Stratton
mstratton@strattonfaxon.com

July 28, 2010

VIA FACSIMILE

Honorable Eldon E. Fallon
U.S. District Court
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA 70130
(504) 589-6966

> Re:   **MDL No. 1657**
> **Section L**
> **In Re Vioxx Products Liability Litigation**
>
> **Common Benefit Fees**

Dear Judge Fallon:

As you know, the objectors through undersigned examined 500,000 hours submitted by common benefit lawyers, took depositions, briefed several issues, and consulted with mass tortclass action fee experts in academia. The 7.5 percent joint recommendation made yesterday is well supported by our investigation, precedent, and the academic writings in this field. Moreover, our experts agreed that 7.5 percent was a fair fee award for the common benefit lawyers given precedent and the work done in this case.

Thank you for allowing us to clarify the basis for our asking for a reduction of the fee to 7.5 percent.

Very truly yours,

Michael A. Stratton

---

59 Elm Street, New Haven, CT 06510 • Telephone: 203.624.9500 • Fax: 203.624.9100 Toll-free: 866.351.9500 • www.strattonfaxon.com

EXHIBIT 6

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3   ****************************************************************

 4

     IN RE:  VIOXX PRODUCTS
 5       LIABILITY LITIGATION

 6                              DOCKET NO. 05-MDL-1657
                                NEW ORLEANS, LOUISIANA
 7                              THURSDAY, FEBRUARY 17, 2011, 3:30 A.M.

 8   THIS DOCUMENT RELATES TO
     ALL CASES
 9

10   ****************************************************************

11

12                      TRANSCRIPT OF PROCEEDINGS
             HEARD BEFORE THE HONORABLE ELDON E. FALLON
13                    UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15

16   FOR THE PLAINTIFFS:     HERMAN HERMAN KATZ & COTLAR
                             BY:  RUSS M. HERMAN, ESQUIRE
17                           820 O'KEEFE AVENUE
                             NEW ORLEANS LA  70113
18

19                           BEASLEY ALLEN CROW METHVIN
                             PORTIS & MILES
20                           BY:  ANDY D. BIRCHFIELD, JR., ESQUIRE
                             234 COMMERCE STREET
21                           POST OFFICE BOX 4160
                             MONTGOMERY AL  36103
22

23                           SEEGER WEISS
                             BY:  CHRISTOPHER A. SEEGER, ESQUIRE
24                           ONE WILLIAM STREET
                             NEW YORK NY  10004
25
```

08:50AM
08:50AM
08:50AM
08:50AM

EXHIBIT 7

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE OBJECTORS:        MARGARET E. WOODWARD
                               ATTORNEY AT LAW
 4                             3701 CANAL STREET, SUITE C
                               NEW ORLEANS LA   70119
 5

 6                             ROBERT E. ARCENEAUX
                               ATTORNEY AT LAW
 7                             47 BEVERLY GARDEN DRIVE
                               METAIRIE LA   70001
 8

 9                             AJUBITA LEFTWICH & SALZER
                               PASCAL F. CALOGERO, JR., ESQUIRE
10                             1100 POYDRAS STREET
                               NEW ORLEANS LA   70163
11

12

13   SPECIAL MASTER:          JUNEAU DAVID
                               BY:  PATRICK A. JUNEAU, ESQUIRE
14                             THE HARDING CENTER
                               1018 HARDING STREET, SUITE 202
15                             P.O. DRAWER 51268
                               LAFAYETTE LA   70505
16

17

18   OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RMR, CRR
                                   CERTIFIED REALTIME REPORTER
19                                 500 POYDRAS STREET, ROOM B406
                                   NEW ORLEANS, LOUISIANA 70130
20                                 (504) 589-7779

21

22   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.

23

24

25
```

03:40PM 1   comfortable with where they came from.  Also, on October 19th,

03:40PM 2   this Court issued an order which went through the Stratton

03:41PM 3   objection and made no mention of any sort of deal or payment of

03:41PM 4   money or anything like that.

03:41PM 5       On January 21st, when the total amounts came out, I was

03:41PM 6   again concerned because, instead of 315,250,000, I expected there

03:41PM 7   to be 18.5 million or $19.2 million less than that; but, instead,

03:41PM 8   the total added up to 311 million.

03:41PM 9       I wanted to bring this to the Court's attention because now

03:41PM 10  my attorney is in possession of these checks, and I'm concerned

03:41PM 11  about this, wanted to bring this to the Court's attention.  I

03:41PM 12  know this Court values transparency above all, and I'm confused

03:41PM 13  by the issue.  I thank the Court for allowing me to address this

03:41PM 14  issue.

03:41PM 15      THE COURT:  Fine.  The only thing I know of it is that

03:41PM 16  there was an objection to the total sum of the common benefit

03:42PM 17  fund, that Mr. Stratton represented the objectors, and I presided

03:42PM 18  -- or I gave them an opportunity to do some discovery early on.

03:42PM 19  They did some discovery.  They had some issues.  I resolved the

03:42PM 20  discovery issues, the evidentiary issues.  They proceeded on with

03:42PM 21  the case.

03:42PM 22      I was advised that the objectors withdrew the objection.

03:42PM 23  That's all that I know of it.  I wasn't involved in any

03:42PM 24  discussions or agreements.  That's why I didn't issue any orders.

03:42PM 25  It didn't come to my attention in that form or fashion.  If any

03:42PM  1    of the --
03:42PM  2                    MR. HERMAN:  I'll be happy to respond, Your Honor.
03:42PM  3                    THE COURT:  Sure.
03:42PM  4                    MR. HERMAN:  Mr. Stratton, on behalf of a number of
03:42PM  5    objectors who had objected to the 8 percent withdrawal from -- in
03:43PM  6    order to fund common benefit fees, filed, actually, an action
03:43PM  7    within the MDL to have those -- that 8 percent judgment set
03:43PM  8    aside, at least for those objectors.
03:43PM  9         If Ms. Snapka received a check, she was an objector.
03:43PM 10    Mr. Stratton then affirmed on the record in writing and before
03:43PM 11    Your Honor that he had unanimous consent to negotiate and resolve
03:43PM 12    all the objections.
03:43PM 13         We entered negotiation after, and Mr. Stratton took my
03:43PM 14    deposition and I took his deposition.  We entered a settlement
03:44PM 15    negotiation which was supposed to be confidential as regards
03:44PM 16    Mr. Stratton, which obviously is not confidential, and settlement
03:44PM 17    resolutions are not necessarily published.
03:44PM 18         The return of funds to the various objectors resolved their
03:44PM 19    objections as regards deductions from them of common benefit
03:44PM 20    fees.  The common benefit fund, therefore, was reduced by the
03:44PM 21    objectors receiving back funds which they had contended were not
03:44PM 22    due to be placed in the common fund.
03:44PM 23         As regards any communications between Mr. Stratton and
03:44PM 24    Ms. Snapka or Mr. Stratton and any other objector who received
03:45PM 25    their monies back, we have no knowledge.  We certainly don't know

03:45PM  1   what fees Mr. Stratton charged Ms. Snapka or anyone else.

03:45PM  2          MS. WOODWARD:  If I may.  Your Honor, Margaret Woodward.

03:45PM  3   This has been a matter of great concern and speculation to

03:45PM  4   the objectors because, as Ms. Snapka pointed out, there is

03:45PM  5   nothing in the record indicating how this transpired.

03:45PM  6          It is our understanding that Mr. Herman, the FAC, and the

03:45PM  7   other committees have no authority whatsoever to invade the

03:45PM  8   common benefit fund without this Court's expressed authorization.

03:45PM  9          We did not want to raise this matter explicitly until we

03:46PM 10   heard from the Court how this might have transpired; but, we now

03:46PM 11   have really serious concerns about this operation altogether, and

03:46PM 12   one of those concerns relates to Mr. Herman and his committee

03:46PM 13   acting *ultra vires*, because we don't think that this fund can be

03:46PM 14   disbursed without court order.

03:46PM 15          The second is we are very concerned about how Brown and

03:46PM 16   Greer might have disbursed $19 million of common benefit funds

03:46PM 17   without notice to anyone, including the objectors and the rest of

03:46PM 18   the claimants.

03:46PM 19          There has been an invasion of the common benefit fund

03:46PM 20   without notice, apparently, even to the Court.  So we will be

03:46PM 21   pursuing this matter further, but we need to have some discovery

03:46PM 22   about how this occurred.  Thank you.

03:47PM 23          THE COURT:  Okay.

03:47PM 24          MR. HERMAN:  I just have one further comment,

03:47PM 25   Your Honor.  As I recall, and I believe the record will show, we