UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| THIS DOCUMENT RELATES TO ALL CASES | * | JUDGE FALLON<br>MAG. JUDGE KNOWLES<br>SPECIAL MASTER PATRICK A. JUNEAU<br>March 16, 2011 |
| FILER: Robert E. Arceneaux/Margaret Woodward Pascal Calogero, Jr. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OR ALTERNATIVELY, MOTION TO STRIKE, and MOTION FOR ADDITIONAL DISCOVERY

MAY IT PLEASE THE COURT:

This reply memorandum is respectfully submitted by Robert E. Arceneaux and Margaret E. Woodward, co-Lead Counsel for Objectors, in reply to the FAC's memoranda in opposition to Objectors' Motion for Partial Summary Judgment, and Motion for Additional Discovery. Although styled as separate memoranda, the FAC has filed one brief wearing two hats, hence this combined reply.

### I. MOVERS HAVE NOT ATTACKED THE PROCESS; ONLY THE FAC'S RECOMMENDED OUTCOME.

Every time the matter of fee allocation comes up, the FAC reviews yet again the "process" that it went through to produce its recommendation. However, the process is not at issue here. The process, at least as designed by this Court, is open and transparent, complies with procedural due process, and has not been the subject of any of Objectors' criticisms.

**EXHIBIT B**

Objectors have only criticized the FAC's recommendations, which, far from being the logical end result of this Court's carefully-articulated "process" are anathema to it. Indeed, it appears increasingly obvious that the FAC tossed aside the years of work that went into the Court-ordained process, and came up with a point system guide and allocation all its own. The FAC's recommendation does not build upon the substantial foundation of process this Court erected on top of bedrock principles of law. Instead, the FAC hastily erected a house of cards on a folding table. The FAC's structure did not take years to construct; it could've been done in a day or two of concerted effort. It would be laughably fanciful if it did not purport to dispose of more than $300,000,000. And it can be deconstructed with the poke of only one finger– the lodestar index.

The FAC cannot rely on this Court's solid process to defend its fanciful recommendation. That defense must begin with a defense of the FAC's late point of departure from the process: its recommended allocation. The chart Objectors attached to their motion for partial summary judgment shows in graphic detail a laudable process gone terribly astray – probably because the directions this Court gave were either not understood or simply ignored. There is no conceivable justification for the kinds of disparities in the recommended allocation that will survive even cursory review under the applicable legal standards. The process was fine; the FAC's patently illegal departure is not; and the FAC cannot justify its departure by the process itself.

## II. THE FAC ADMITS THAT IT DID NOT FOLLOW THIS COURT'S INSTRUCTIONS ON HOW TO ALLOCATE FEES.

Pre-Trial Order 6C, Chapter 9 of the MSA, and the applicable jurisprudence all demand a lodestar/*Johnson* analysis as the basis of the fee allocation. The lodestar/*Johnson* analysis begins with reported hours as its raw data, then makes adjustments to reflect application of the *Johnson* factors. This Court was well aware of the importance of lodestar to any proper allocation of fees. Part of its years of process involved having all claimants report their hours and rates on a monthly basis, having those hours audited by Phil Garrett according to strict guidelines spelled out in Pre-Trial Order 6C, and having the data input, at a cost of more than $1,000,000 to the common benefit fund. Movers have now had the occasion to meet with Mr. Garrett, and were convinced beyond a doubt, after an extensive interview with him and review of his work, that Mr. Garrett took his role very seriously; he in fact "analyzed" the reported hours according to the criteria given to him by this Court. Numerous hours of inappropriate, duplicative, non-common benefit, or suspicious time, were disallowed to insure that the lodestar hours upon which the fee allocation would be based was as accurate as it could be. All of that "process" was designed to support a reliable lodestar calculation.

The FAC, did not even obtain the data from Mr. Garrett that would have supported a lodestar calculation, as Movers learned when they met with Mr. Garrett last week, . Mr. Garrett advised that a computer print out of the hours was not even generated for the FAC until December 10, 2011, sometime after undersigned counsel began calling for its production. All the FAC had at its disposal when it crafted its recommendation were the *total* hours and the *blended* hourly rates calculated by this Court in concert with Mr. Garrett. The FAC then, did not conduct a lodestar analysis; nor did it conduct even the lodestar "cross-check" it improperly posits as a back-up to its point-system-driven recommendation. This explains how the FAC subjectively arrived at a recommendation that pays some paralegals $2000/hr. while valuing some of the nation's most accomplished trial counsel

0/hr.

## III. THE FAC'S "MERIT"-BASED METHODOLOGY IS PATENTLY UNLAWFUL

Implicitly recognizing the impossibility of demonstrating how its Point System Guide complies with the legally-compelled lodestar/*Johnson* analysis, the FAC advances its all-new "merit-based" approach as an acceptable substitute. Under the FAC's method, people who did far less work, but according to the FAC more "meaningful work," are to be compensated grandly without regard to their lodestars. The FAC cites Mr. Blizzard and Mr. Meunier as examples of "worthies" on the one hand, and Mr. Escobido and Ms. Nast as examples of "unworthies" on the other. The former two lawyers, while not actually spending many hours on this project, are entitled to astronomical fees under the FAC's approach because their minimal time allegedly made a major contribution, while the other lawyers, who dutifully toiled in their offices and or in court doing hours and hours of work, are to be paid a pittance because their work was, in the mind of the FAC, of little consequence.

"Merit"-based billing, by which the FAC would move enormous sums from subjectively-devalued claimants to subjectively valued ones, has never before been used to allocate fees. Objectors could not find a single case where this was done, and with good reason. "Value based" billing, such as through the FAC's point system, is a purely subjective determination of the worth of a lawyer's hour. Yet, no one, not even the most learned judge, can ever say with any measure of certainty whether the relatively small number of hours contributed by a select few in the spotlight, or the thousands and thousands of hours of hard, real, everyday lawyering, performed outside the purview of the court, produced a global settlement. All that can be said with any degree of

-4-

confidence is that a result was achieved, from an aggregate of all that work produced it. That is why, when this Court awarded $315,200,000 in common benefit fees, it relied upon the aggregate of 563,000 hours to make that award – not the "important" or "valuable" hours performed by a select few.

The inherent unreliability of the FAC's subjective methodology can be demonstrated by a closer look at an example of "unworthy" effort the FAC itself cites in brief. According to the FAC, RodaNast "performed nine non-critical legal research tasks... [which] were hardly noticeable in view of the body of law and briefing work required.[1]" Response, p. 10. True, RodaNast's contribution was not a comparatively large one: the firm contributed only 1268 hours out of the total of 563,000 expended by all claimants to the common benefit fund. *But a lodestar calculation would recognize the comparatively slight contribution by compensating RodaNast **only for the comparatively few hours expended.*** At the blended hourly rate, RodaNast would receive some $500,000.

The FAC's methodology, however, would yield an award of only $45,000 to RodaNast. That amounts to either 10% of *the time actually spent on its research and writing jobs or 10% of the blended hourly rate.* In other words, the FAC's "merit"-based method, dictated by a Point System it has never explained or justified, subjectively *disallows* 90% of RodaNast's hours as "hardly

---

[1] Undersigned counsel use the RodaNast case only by way of illustration, as does the FAC. Objectors could, and at the appropriate time will, respond to each of the FAC's similarly insupportable dismissals of Objectors' time. However, undersigned counsel's charge from Objectors is to challenge the FAC's recommendation and to assist in creating the basis for a proper reallocation. They cannot fairly or without conflict represent each Objector's interests. When the time comes for a full response to the FAC's unjust devaluation of Objectors' work, undersigned counsel will represent their original clients, Chris Placitella and the firm of Cohen Placitella and Roth and Eric Weinberg and the firm of the Law Offices of Eric Weinberg.

noticeable." But Mr. Garrett noticed, audited, and counted those 1268 hours; the PLC noticed and counted them in defending its claim to a common benefit fund based upon 563,000 hours that included RodaNast's time *in full*; and this Court noticed and counted them in fixing the size of the common benefit fund.

Well might Roda Nast's time have been counted, *for it was performed at the specific request of the PLC, which depended upon RodaNast to draft its pleadings, and, delighted with the work product, returned to the firm again and again for more research and writing.* At the $35.50/hr., the rate at which the FAC would compensate RodaNast, the firm *lost* money doing the PLC's bidding. If RodaNast had known that its work would be "hardly noticeable" when it came time for payment, it and many other Objectors would no doubt have declined the PLC's urgent pleas for help.

The only support the FAC can offer for this "valued based" alternative is the *Johnson*-based multiplier. But the *Johnson* factors begin with a lodestar calculation and then adjust the lodestar up or down by modest increments based on merit. This Court surely adverted to those criteria in mentioning the importance of trial and settlement work in the calculation; the Court did not, however, authorize the FAC to dispense with the lodestar altogether, or give the FAC license to discard hours expended at the request of the PLC or otherwise contributed to the common benefit.

The FAC also relies on "percentage of fund' jurisprudence, confusing the fundamental distinction between determining the size of the pie and fixing the proportions of the slices. "Percentage of the fund" is a popular method of determining the size of a common benefit fund that will be awarded to common benefit counsel (although always tempered with a *Johnson* lodestar cross check). It has never, once, been used as the FAC would use it in the allocation phase – to divide a common benefit fund among attorneys. Fund allocation is always accomplished according

to the *Johnson* lodestar with adjustments analysis.

Ironically, the FAC's most-cited case, *Hensley v. Eckerhart*, which it uses to support its mantra that fee disputes should not result in ancillary litigation[2], contains something far more important than the sentence that the FAC has seized upon and taken out of context; *Hensley* says that if the FAC had properly done its job, we wouldn't need ancillary litigation:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. **This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services.** The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), abrogated on other grounds *Tex. States Teachers Assoc. v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)(emphasis added).

By the late 1980's the no-ancillary-trial phrase quoted by the FAC had proved to be an unattainable dream:

> The Supreme Court's oft-repeated wish that litigation about fees not turn into a second major lawsuit (e.g., Hensley, *supra*, 461 U.S. at 437, 103 S.Ct. at 1941) is an unattainable dream. The computation of hourly fees depends on the number of hours "reasonably" expended, the hourly rate of each, the calculation of the time value of money (to account for delay in payment), potential increases and decreases to account for risk and the results obtained, and

---

[2] Showing even greater creativity, the FAC also cites *In re High Sulfur Content Gasoline Products Litigation*, No. 09-30313, 384 Fed. Appx. 299 (5th Cir. 2010), which, the FAC says, "upheld the district court's allocation order where the objectors were afforded an opportunity to submit a 3-page affidavit and a brief, but no additional discovery was allowed and no evidentiary hearing was held." FAC Response, p. 3. Of course, the FAC has skipped over a few years and a few steps– including a complete revision of the allocation process, the appointment of a different district court judge and special master, and a complete reallocation of fees– between the initial allocation and the summary process the FAC advocates. *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F. 3d 220 (5th Cir. 2008).

-7-

> a complex of other considerations under the heading of "billing judgment." The stakes-in this case the request for fees was double the judgment, in others the request for fees may be millions of dollars-ensure that the parties will pursue all available opportunities for litigation. *Cf. Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.,* 776 F.2d 646 (7th Cir.1985); *In re Fine Paper Antitrust Litigation,* 751 F.2d 562 (3d Cir.1984). The fuzziness of the criteria (what is a "reasonable" number of hours?) ensures that people seeking opportunities to contest the fees will not need to search hard.

*Kirchoff v. Flynn,* 786 F.2d 320, 325 (7th Cir.1986).

On the other hand, *Hensley's* reliance upon lodestar calculations, overlooked by the FAC, has "become the guiding light of our fee-shifting jurisprudence." *Perdue v. Kenny A. ex rel. Winn,* __ US __, 130 S.Ct. 1662, 1672, 176 L.Ed.2d 494 (2010).

> Although the lodestar method is not perfect, it has several important virtues. First, in accordance with our understanding of the aim of fee-shifting statutes, the lodestar looks to "the prevailing market rates in the relevant community." Blum v. Stenson, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Developed after the practice of hourly billing had become widespread, see Gisbrecht, supra, at 801, 122 S.Ct. 1817, **the lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case.** Second, the lodestar method is readily administrable, see Dague, 505 U.S., at 566, 112 S.Ct. 2638; see also Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 609, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); and unlike the *Johnson* approach, *the lodestar calculation is "objective,"* Hensley, supra, at 433, 103 S.Ct. 1933, and thus **cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results.**

*Id.* (emphasis added).

## IV. SIDE-DEALS MUST BE INVESTIGATED SO THAT APPROPRIATE REMEDIES CAN BE IMPOSED.

The FAC's professed bewilderment at the obvious significance of the side deals it has

confected – and perhaps continues to confect – reflects that it has no appreciation for its role as a quasi-judicial body. It was entrusted with a sizeable trust fund and charged with faithful and transparent adherence to a process designed to produce a recommended allocation of that fund; its recommendations were to comport with this Court's allocation criteria, and those ordained by the applicable case laws. The FAC gives frequent lip service to those responsibilities, but when undersigned counsel point to actions in conflict with its statements, the FAC takes offense. With regard to the apparently unauthorized invasion of the trust fund and ongoing side deals, it defends its role as an instrument of negotiation and settlement, horse-trading fees with obvious disregard for lodestar and *Johnson* factors in an attempt to reach an amicable resolution.

Settlements can be and often are to everyone's ultimate advantage. But the best – and only enforceable – settlements are those confected with the participation of all those who are interested in the outcome. For this reason, the Court and the jurisprudence demand due process and transparency in disposing of the common benefit fund. With all due respect, it is not the FAC's place to make private deals, pay them out of the common benefit fund, and "work" the system to produce a settlement. It is for this Court to determine the ultimate merits of any "deal," and the making of deals that are hidden from the Court and the other claimants at the very least sidestep the requirements of due process. And,, these deals have nothing whatsoever to do with allocating fees under the criteria ordained by the Court.

The only question is how many deal have been made, for how much, at what cost to the common benefit fund, and whether they are legally sustainable. Discovery is necessary to uncover these deals and to correct them as may be required. The lack of such transparency makes of a mockery of the whole judicial process of fee allocation under controlling legal rules; it turns what

is meant to be an adjudicative process implementing rules of law into a swap meet where haggling and bargaining are the *modus operandi*.

The Stratton affair shows how the process was abandoned in order to eliminate a potentially thorny opposition that might have complicated fee allocation. The FAC argues that it made a good deal for the benefit of all claimants. But as Objectors noted in their original pleadings, that argument begs the questions of whether the FAC was authorized to make the secret deal, of whether a transparent and Court-approved deal might not have been better, and of whether the Court and other claimants might not have made different decisions on other matters had they known of the favored position the FAC conferred on the Stratton objectors.

The FAC also claims that it *was authorized* to make a private deal with the Stratton group and to pay for it from the common benefit fund. It points, for example, to the document authorizing Brown Greer to pay out common benefit funds. However, Section 3.07 of that Administrative Agreement expressly states: "By signing this Agreement, Brown Greer agrees to be bound by, perform and comply with all the terms of the Settlement Agreement applicable to the Claims Administrator under the Program." Chapter 9 of the MSA could not be more clear in its requirement that no common benefit funds be disbursed without the approval of this Court. Indeed, the FAC has yet to show how the Stratton settlement was justified by document or legal precept which granted the FAC, NPC, or PSC the power to use its fiduciaries' funds to settle a dispute privately without court approval. How it came to be, then, that a phone call from Andy Birchfield resulted in an $18 million wire transfer authorized by Brown Greer into a third party's trust account must be investigated. And that investigation must include the possibility that there were other such unauthorized transactions. While one might think we have discovered all there is to know about

the Stratton settlement, new facts continue to raise new issues, such as the new information that the deal was struck at least as early as July 23, 2009, almost a week before it was perfected and the misleading "7.5% solution" letter was sent to this Court.

We know even less about the VLC settlement, except that the FAC has all but admitted that it offered the VLC significant common benefit fees in exchange for its dismissal of an appeal challenging this Court's jurisdiction to regulate attorneys fees. The depths of the impermissible conduct and improper side deals surrounding this matter have yet to be investigated.

Finally, we now know that the "final" recommended allocation is a moving target, and has nothing whatsoever to do with the criteria ordained by this Court for allocating fees or a lodestar/*Johnson* analysis. Three allocations have been produced, and even to this date the FAC's recommendations continue to change. As it admits in its most recent filing:

> In a good faith effort to avoid the fee allocation process becoming a second major litigation, the Fee Allocation Committee gave careful consideration to points raised by the applicant firms and, where appropriate, reached a compromise regarding its recommendation for individual applicant firms. In keeping with this effort, the Fee Allocation Committee has modified its recommendation for the firms as indicated in Exhibit 1 to this response.

Of course, the FAC does not explain how its numbers can continue to change, when those numbers are supposed to be based upon its assessment of each claimant's contribution to the common benefit. The FAC's willingness to erase penciled-in numbers from its grids and write in new numbers in order to move toward settlement proves that what it is doing is not presenting this Court with an evaluation of the contributions of each claimant; it is just telling this Court the numbers that are necessary to settle this dispute.

Interestingly, the FAC only "disclosed" its post-"final" allocation recommendations after undersigned counsel had already discovered them -- buried deep in Volume 12 of the FAC's

-11-

exhibits – which undersigned counsel might never had reached if Special Master Juneau had granted the FAC's request to conduct a hearing on the merits on March 12, 2011. Also interestingly, on the very same day that undersigned counsel filed their supplemental brief asserting that the ten newly-discovered side deals supported their requests for additional discovery, the FAC filed its brief claiming that Objectors' concerns about side deals rested upon unsubstantiated "bald assertions." More than ever, the FAC's opposition to discovery appears to be motivated not by a legitimate desire to avoid a wasteful and time-consuming fishing expedition but instead by a desire to avoid exposure of all-too-pertinent facts which demand judicial scrutiny.

## V.   CONCLUSION

The FAC's radical and illogical departure from the requisite lodestar calculation is the fuel for the "ancillary litigation" it so vigorously opposes. If this Court would simply declare that the FAC's recommendation *will be accorded no presumptive weight in the fee allocation process*, undersigned counsel could stop attacking the FAC's work and devote their attention entirely to the more constructive process of assisting the Special Master in fashioning a new recommendation. But so long as the FAC opposes discovery needful to a comprehensive reworking of its unsustainable allocation, so long as the FAC attempts to move this process headlong towards a final allocation that will only have time and data to ratify its recommendations, so long as it advances the number of "acceptors" in opposition to a global reallocation, and so long as the opponents of this unworkable plan are called "objectors" – a label which in itself accords presumptive weight to the FAC's recommendation – the ancillary litigation must continue.

Respectfully submitted:

/s/ Robert E. Arceneaux

Robert E. Arceneaux, La Bar No. 01199
ROBERT E. ARCENEAUX LLC
47 Beverly Garden Drive
Metairie, LA 70001
(504) 833-7533 office
(504) 833-7612 fax
rea7001@cox.net

/s/ Margaret E. Woodward

MARGARET E. WOODWARD, La. Bar No.13677
3701 Canal Street, Suite C
New Orleans, Louisiana 70119
(504) 301-4333 office
(504) 301-4365 fax
mewno@aol.com

**CO-LEAD COUNSEL FOR OBJECTORS IDENTIFIED IN FEB. 8 ORDER**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Reply Memorandum in Support of Motion for Partial Summary Judgment or Alternatively, Motion to Strike, and Motion for Additional Discovery has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, March 16, 2011.

/s/ Robert Arceneaux