IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

```
-------------------------------------------------------x
                                            :
                                            :     MDL NO. 1657
                                            :
IN RE: VIOXX PRODUCTS LIABILITY             :
LITIGATION                                  :     SECTION L
                                            :
THIS DOCUMENT RELATES TO                    :     JUDGE FALLON
ALL ACTIONS                                 :     MAG. JUDGE KNOWLES
                                            :
FILER: Henry A. King/Rebecca Dietz          :
                                            :
                                            :
-------------------------------------------------------x
```

**MEMORANDUM IN SUPPORT OF KLINE & SPECTER'S MOTION TO
ENFORCE THE FULL PARTICIPATION OPTION OR, IN THE
ALTERNATIVE, FOR LEAVE TO FILE OBJECTION TO MR.
HERMAN'S 8% FEE RECOMMENDATION**

Kline & Specter, P.C. ("Kline & Specter") hereby files this memorandum in
support of its Motion to enforce the Full Participation Option or, in the alternative, for
leave to file an objection to Mr. Herman's 8% common benefit fee recommendation
made on Jan. 20, 2009.

## FACTUAL BACKGROUND

**A.      Creation of the Vioxx MDL and the "early bird" agreement**

This Court extensively reviewed the history of Vioxx litigation in its Order
entered October 19, 2010 and in *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp.2d 565 (E.D.
La. 2005). By way of brief summary, this multidistrict and state-court products liability

litigation involves the prescription drug Vioxx, generically known as Rofecoxib, designed by Merck to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. The Food and Drug Administration approved Vioxx for sale in the United States in May 1999. Merck withdrew Vioxx from the market in September 2004 after data from a clinical trial showed that Vioxx use increased the risk of cardiovascular thrombotic events such as myocardial infarction and ischemic stroke. Thereafter, thousands of individual suits and class actions were filed against Merck in state and federal courts alleging a variety of claims.

California, New Jersey and Texas instituted consolidated proceedings at various dates between 2002 and 2005. In February 2005, the Judicial Panel on Multidistrict Litigation conferred "MDL" status on federal Vioxx cases, and transferred all such cases to this Court for coordinated discovery and pretrial proceedings under 28 U.S.C. § 1407.

In April 2005, this Court held a status conference in the Vioxx MDL and thereafter appointed twelve lawyers, including Thomas R. Kline of Kline & Specter, to serve on the Plaintiffs' Steering Committee ("PSC"). *See* Pretrial Order No. 6, entered April 8, 2005. The PSC's duties included to "explore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation." *Id.* (Miscellaneous No. 3). In turn, the PSC created numerous subcommittees to organize representation of the Vioxx plaintiffs and to help manage the MDL.

After its creation, the PSC sought to encourage lawyers representing Vioxx plaintiffs to file their cases in federal court and participate in the MDL process. They sought such encouragement in order to increase the Vioxx MDL's significance as compared to the various state courts in which Vioxx litigation was otherwise unfolding. In June 2005, the PSC petitioned this Court to authorize plaintiffs' counsel to choose from three options based on their speed of decision, including a "Full Participation Option" option providing for an assessment at a low price, 3% total (2% fees, 1% costs) of the gross amount awarded to plaintiffs whose counsel accepts the Full Participation Option within 90 days of the Court's Order.  *See* PSC Petition, filed June 29, 2005.  The PSC attached to its petition a sample of the "FPO Contract." *Id.*

At a July 2005 status conference, the PSC reiterated the importance of generating cases within the MDL and for contracts that would encourage that participation.  As stated by Andrew Birchfield on behalf of the PSC:

> The proposal that we have filed with the Court includes three options. The first option we call the full participation option, and it calls for a two percent assessment for attorney's fees plus one percent for costs.  This option is designed to foster cooperation and coordination between the lawyers that are litigating cases in the MDL in federal courts and those in state court litigation.

Transcript of July 19, 2005 Status Conference at 21, attached as Exhibit "A".  The PSC was specifically aware that the Full Participation Option represented a good deal to encourage filings in the MDL.  As Mr. Birchfield also stated, "I'm not aware of any

pharmaceutical MDLs with an assessment that low, but that's designed to foster cooperation." *Id.*

On August 4 2005, the Court entered an Order that implemented the PSC's suggestions. In this Order, the Court directed the creation of an interest-bearing escrow account into which assessments for the common benefit fund would be paid. The Court also directed that plaintiffs' counsel who agreed to participate in the MDL pay an assessment based on their speed of decision:

- *The "full participation" option.* If plaintiffs' counsel agreed to participate in the MDL within 90 days of the August 4 Order, counsel would pay 3% of any gross monetary recovery (2% for common benefit fees, 1% for common benefit costs), to be subtracted from the attorneys' fees portion of individual fee contracts, for all cases included in the MDL.

- *The "traditional assessment" opinion.* If plaintiffs' counsel agreed to participate in the MDL ***after*** the 90-day period permitted for the full participation option, counsel would pay 4% of any gross monetary recovery for cases filed in state court, and 6% of such recovery for cases included in the MDL.

- *The "limited waiver" option.* If plaintiffs' counsel agreed to participate in the MDL ***after*** the 90-day period permitted for the full participation option, counsel would pay 6% of any gross monetary recovery for cases included in the MDL and would use any common benefit materials only in MDL cases.

*See* Order, dated Aug. 4, 2005, attached as Exhibit "B". The Order attached as exhibits the sample contracts for these three options. *Id.*

Significantly, the August 4 Order required all PSC members to exercise the Full Participation Option. "This option shall be required by all members of the PSC, MDL

committee members and the Court approved State Liaison Committee." *Id.* at 3-4.  As a

PSC member, Kline & Specter therefore was bound to the terms of the FPO Contract.  *Id.*

Significantly, the FPO Contract contained the following clause explaining that

signatories to the FPO Contract would be obliged to pay from their contingent fees no

more than 2% of the client's gross recovery for costs, and 1% for fees:

> It is the intention of the parties that ***such assessment shall be in full and
> final satisfaction of any present or future obligation*** on the part of each
> Plaintiff and/or Participating Attorney to contribute to any fund for the
> payment or reimbursement of any legal fees, services or expenses incurred
> by, or due to, the MDL and/or any Common Benefit Attorneys.

*See id.*, Sample FPO Contract attached as Exhibit thereto, ¶ 2 (emphasis added).

The FPO Contract also made clear that amounts deposited in the escrow account

were for the ***exclusive purpose*** of compensating attorneys who performed common

benefit work, and that such money would distributed only pursuant to Court Order:

> The amounts deposited in the MDL Fee and Cost Account shall be
> available for distribution to attorneys who have performed professional
> services or incurred expenses for the benefit of the plaintiffs in MDL 1657
> and the coordinated state court litigation pursuant to written
> authorization from the Liaison counsel of the PSC.  ***Such sums shall be
> distributed only upon an Order of the Court in MDL 1657*** which will be
> issued in accordance with applicable law governing the award of fees and
> costs in cases involving the creation of a common benefit.  Appropriate
> consideration will be given to the experience, talent and contribution
> made by all of those authorized to perform activities for the common
> benefit, including the Participating Attorneys.

*Id.* at ¶ 3 (emphasis added).

The FPO Contract provided for only one exception to the 2% fees/1% costs rule: if the litigation was certified and settled as a class action under F.R.C.P. 23.   As the agreement stated:

> It is understood and agreed that the PSC and Common Benefit Attorneys may also apply to the Court for class action attorneys' fees and reimbursement of expenses, if appropriate, and this Agreement is without prejudice to the amount of fees or costs to which the PSC and Common Benefit Attorneys may be entitled to in such an event.

*Id.* at ¶ 6.  Of course, that did not happen in *Vioxx* litigation.

## B.    The litigation unfolds and settles.

After extensive litigation, this Court caused the appointment of a Negotiating Plaintiffs' Committee ("NPC").  The NPC was in all material respects the successor in interest to the PSC, certainly with respect to settlement, as it took over the PSC's responsibility of investigating and consummating a settlement of Vioxx litigation.

In November 2007, Merck and the NPC announced that they had reached a Settlement Agreement for an overall sum of $4.85 billion.  *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007), available at http://www.browngreer.com/vioxx settlement.  Significantly, the agreement purported to authorize the Court to nullify its August 2005 Order and assess common benefit payments greater than those authorized in the FPO Contract.   In particular, the Settlement Agreement stated that common benefit fees would be assessed and fixed by the Court:

> To ensure that [the common benefit attorneys] are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys' fees will be imposed at no more than 8% of the gross amount recovered for every client that registers under the terms of the Settlement Agreement.

*Id.* at § 9.2.1.  The Settlement Agreement also stated that the common benefit fee, while no greater than 8%, could exceed the assessments provided in the Court's Order entered August 4, 2005 such as the assessment described in the FPO Agreement.

> The maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19.

*Id.*  Of course, there was no consideration for this proposition, as Merck had no "dog in the fight" of how its settlement funds were distributed.  This was self-serving clause inserted by the NPC for its own reasons having nothing to do with Merck.

In July 2008, Merck announced that it was satisfied that the thresholds necessary to trigger funding of the Vioxx Settlement Program had been met.  Eventually 99.9% of all eligible claimants entered the program.  By June 2010, the parties had distributed over $4.35 billion to 32,886 claimants.

## C.    Creation of the common benefit fund

In January 2009, notwithstanding that Kline & Specter and many other plaintiffs' counsel had signed the FPO Contract, Russ Herman, in his capacity as Plaintiffs' Liaison Counsel, moved this Court to award a common benefit fee of 8% of the $4.85 billion settlement.   *See* PLC's Motion for Award of Common Benefit Counsel Fees and Reimbursement of Expenses, filed Jan. 20, 2009.   This amount was to come out of the

attorneys' fees of the plaintiffs' counsel retained by individual clients, and was to be paid to the firms that performed common benefit work.

On April 16, 2009, the Court invited any interested party to file a Notice of Objection on or before May 8, 2009. Over 60 objections would be filed. Among the objectors was the VLC. Another was the law firm Stratton Faxon, which signed an FPO Contract and asked the Court to enforce that Contract such that its contribution to the common benefit fund would be capped at an aggregate of 3%. *See* Stratton Faxon's Objection, dated May 5, 2009. Because of the number of objectors, the Court decided that it would appropriate to appoint a Liaison Counsel for the objector group, and appointed Michael Stratton to this role.

Thereafter, numerous status conferences were convened, discovery was taken, briefing was submitted, and arguments were heard. While the matter was pending before the Court, Mr. Herman reduced his recommendation to 7.5%. Mr. Stratton agreed that 7.5% was appropriate. In October 2010, relying in part on Mr. Herman's reduction in the recommended assessment, the Court entered its decision allocating 6.5% of the settlement fund to compensate for common benefit work, mathematically producing a common benefit fund of $315,250,000. *See* Order, entered Oct. 19, 2010.

## D.   The secret deal reached by Messrs. Herman, Seeger and Birchfield

Concealed from the Court was the existence of a private deal between (1) Russ Herman, purportedly on behalf of the NPC, and Chris Seeger and Andy Birchfield purportedly on behalf of the PSC, and (2) Mr. Stratton, purporting to represent the

8

objectors to the 8% assessment.  The deal was consummated on July 27, 2010 in the Court's chambers, though outside the Court's presence.  Messrs. Herman, Seeger and Birchfield committed that the objectors would pay a net assessment of 4% toward the common benefit fund.  In exchange, the objectors committed to withdraw their objections and recommend to the Court that a 7.5% assessment was appropriate.  This deal was memorialized in a transcript attached as Exhibit "C".  The critical passage is as follows:

> MR. BIRCHFIELD:  Here in the conference room we have Michael Stratton, who serves as the liaison for the objectors; Russ Herman, who is plaintiff liaison counsel; co-lead counsel Chris Seeger and Andy Birchfield.  This is in MDL Docket 1657.
>
> We have entered into a private agreement where Mr. Stratton is speaking on behalf of all of the objectors to the plaintiff liaison counsel's petition for assessment and Russ Herman is speaking on behalf of the NPC.
>
> The parties have agreed that each side will recommend to the Court that there be a global assessment in the amount of 7.5 percent.  For each of the objectors who timely filed an objection to the plaintiff liaison counsel's petition, they will pay a total of a 4 percent assessment, and the difference will be disbursed from the account that's held in escrow now by BrownGreer.
>
> The aggregate amount for that list of objectors is $18,549,236.85.  That amount will be transferred to the trust account of Mr. Stratton.  Any common benefit fees or costs will be a matter of agreement between Mr. Stratton and the individual objectors.
>
> The parties will prepare a list of objectors that will be submitted to BrownGreer for the amount of the funds to be released for each of those individual accounts.  Again, the aggregate, that total sum, will be wired to the trust account of Stratton Faxon.

MR. SEEGER.   I would just like, for the record, for Mike to acknowledge the reasonableness of the 7.5 percent.

MR. STRATTON:  Yes.  As liaison counsel for the objectors, we have gotten well through discovery.  We have spoken to experts.  We have taken depositions, had depositions taken of us, and done the research.  At the end of the day, on behalf of all the objectors, I can say that we all feel 7.5 percent is a reasonable fee for the common benefit attorneys in this case.

I would also add that any future cases that result in some sort of recovery brought by anybody who was a timely objector to this fee petition will be treated at the 4 percent level.

Further, it's our understanding that BrownGreer will be instructed as soon as possible to make this disbursement to the objectors via the Stratton Faxon trustee account.

. . . .

MR. STRATTON.  Liaison counsel for the objectors, being me, on behalf of all of the objectors in this case to the fee petition, withdraw all of those objections.  We no longer have any objection to the fee petition filed by the NPC to the extent that our recommendation is that it ought to be reduced to 7.5 percent.  We'll be putting that on the record.

*Id.*

The following day, on July 28, 2010, Mr. Stratton sent a letter to the Court recommending a global assessment of 7.5%.   This letter recommended a 7.5% assessment.  It did not disclose that Messrs. Herman, Birchfield and Seeger agreed to reimburse Mr. Stratton's group from common benefit fund such that Mr. Stratton's group would their net assessment was 4%.  *See* Correspondence from Stratton to Judge Fallon, attached as Exhibit "D".  BrownGreer distributed $18,549,236.85 to Mr. Stratton, who distributed it to others.

This deal was remarkable for reasons beyond its secrecy.  *First*, the objectors agreed to advise the Court that 7.5% was a reasonable amount for other law firms to pay for common benefit fees, when they themselves agreed to pay no more than 4%.

*Second*, Mr. Herman purported to speak for the NPC, when the Court created that body only to negotiate with Merck and had no authority over the distribution of settlement funds.

*Third*, the PSC never conducted a meeting (telephonic or in-person) where the deal was discussed or voted upon.  The deal was consummated by Messrs. Seeger and Birchfield, acting as the PSC's co-lead counsel, without authorization by the PSC as a whole.  *See* Affidavit of Thomas R. Kline, attached as Exhibit "E".

*Fourth*, Messrs. Herman, Seeger, and Birchfield purported to commit $18,549,236.85 of the common benefit fund for reasons having nothing to do with the performance of common benefit work.  The Stratton objectors disputed only the size of the fund.

*Fifth*, Messrs. Herman, Seeger, and Birchfield made no claim to the fund on grounds of their work product.   They made this commitment without a Court Order, without the Court's knowledge, before the Court had determined the exact size of the common benefit fund.  As the Court would say during a hearing on Feb. 17, 2011:

> BY THE COURT:  The only thing I know of it is that there was an objection to the total sum of the common benefit fund, that Mr. Stratton represented the objectors, and I president – or I gave them the opportunity to do some discovery early on.  They did some discovery.  They had some issues.   I resolved  the  discovery  issues,  the  evidentiary  issues.   They

proceeded on with the case.  I was advised that the objectors withdrew the objection.  That's all that I know of it.  I wasn't involved in any discussions or agreements.  That's why I didn't issue any orders.

Transcript of Feb. 17, 2011 hearing at 12, attached as Exhibit "F".

*Sixth*, Messrs Herman, Seeger, and Birchfield instructed BrownGreer to pay the money without a Court Order and without the Court's knowledge that this commitment had been made.

*Seventh*, BrownGreer paid the money without a Court Order and without the Court's knowledge.

*Eighth*, Messrs Herman, Seeger, and Birchfield entered into an agreement with Mr. Stratton purportedly for all objectors.  Yet some objectors had no idea that negotiations were ongoing and never gave authority to Mr. Stratton to settle or withdraw their objections.  Indeed, Mr. Stratton was appointed only to the post of liaison counsel, no lead counsel.

For example, in the Feb. 17 hearing, Kathy Snapka, was among the objectors, advised the Court that she had received no notice that Mr. Stratton was negotiating a settlement on her behalf; that she received a copy of his July 28, 2010 letter recommending a 7.5% assessment; that she received a transmittal letter dated Sept. 2, 2010 from Mr. Stratton, enclosing a check, drawn on his trust account, in the amount of over $336,000; that she expressed her confusion about the provenance of this check to Mr. Stratton, who then tendered her another check for over $33,000; that she searched in vain for any Order authorizing this distribution from BrownGreer to Mr. Stratton, or

from Mr. Stratton to her; that she did not see in the Court's subsequent Orders any reference to a depletion of the common benefit fund; that she therefore did not deposit either of the checks tendered by Mr. Stratton; and that she wishes to bring this troubling matter to the Court's attention. *See* Exhibit E at 10-12.

In a related vein, Daniel Becnel signed an FPO Agreement and also objected to Mr. Herman's recommendation of an 8% assessment for common benefit fees. *See* Notice to the Court of Daniel Becnel, filed March 9, 2011 (Docket No. 62671). On July 23, 2009, Mr. Stratton attempted to contact Mr. Becnel but never reached him. On September 2, 2010, Mr. Stratton sent Mr. Becnel a letter describing the deal but not stating with whom the deal had been reached or whether it had been Court-approved. He enclosed a $440,694.43 check. *Id.* But according to Mr. Becnel, he never gave Mr. Stratton authority to settle his objection:

> This [was] the first notice I had that Mr. Stratton was acting as my attorney or had authorization to settle a case below the original signed contract made reference to in Document 786. He never had permission to negotiate the fee on my behalf.

*Id.* at ¶ 6. In addition, "I had no idea that he was agreeing to a 7.5 percent common benefit fee since that was never discussed or disclosed prior to discovery. *Id.* at ¶ 9.

**Ninth**, Messrs Herman, Seeger, and Birchfield directed that the $18,549,236.85 be deducted from settlement fund -- nearly 6% of the fund – **before** the common benefit fund was created. At that time, the Court was still considering Mr. Herman's Motion for an Award of Plaintiffs' Common Benefit Fees and Reimbursement of Expenses. The

Court would not rule until October 19, 2010, nearly three months after the deal had been made.

*Tenth*, because Messrs. Herman, Segar and Birchfield directed BrownGreer to pay $18,549,236.85 to Mr. Stratton, the common benefit fund never attained its full expected value of $315,250,000.  Rather, based on the initial recommendations made by the "Fee Allocation Committee," the common benefit fund contains the highly ambiguous number of $311,989,930 notwithstanding the fund's presence in an interest-bearing account.  *See* Recommendation of the Fee Allocation Committee, filed Jan. 20, 2011 (Docket No. 17642).  The fund is apparently missing funds notwithstanding that (a) the Court did not authorize a distribution to Mr. Stratton; and (b) the Court has not authorized *any* distribution from the common benefit fund.

**E.     Efforts at discovery regarding the secret deal**

In November 2008, the Court appointed a Fee Allocation Committee ("FAC") to receive applications for common benefit fees.  *See* Pre-Trial Order 32, dated Nov. 20, 2007.  On January 19, 2011, the FAC delivered its fee recommendations to the Court after over 100 law firms submitted affidavits and/or made a presentations in support of their common benefit claim.  *See id.*   The FAC's recommendation was wholly unsuitable as a basis for the Court's ultimate determination of fees, as has been amply described in other filings.  Numerous objections were filed.

Because of the numerous objections to the FAC's recommended common benefit fee allocation, the Court appointed a liaison counsel for the objectors, Mr. Pascal

Calogero, and co-lead counsel, Ms. Margaret Woodward and Mr. Robert Arceneaux. At a hearing conducted by the Court on February 17, 2011, Mr. Arceneaux asked members of the FAC for an explanation of their deal with Mr. Stratton. Messrs. Herman, Seeger, and Birchfield promised to respond in a meeting with Mr. Arceneaux on February 23, 2010. Mr. Arceneaux met with these individuals as planned; Ms. Snapka also attended the meeting. In that session, Mr. Herman stated that Mr. Stratton represented the group of objectors to the common benefit assessment, and that Ms. Snapka should address any questions about the deal to Mr. Stratton. Mr. Herman stated that he would not respond to Mr. Arceneaux's questions about the deal with Mr. Stratton because that deal was subject to a confidentiality agreement that he would not breach. Mr. Herman refused to answer Mr. Arceneaux's questions concerning his authority to enter into an undisclosed agreement and to disburse common benefit funds without a court order.

On the latter question of how common benefit funds had been disbursed, on February 21, 2011, Mr. Arceneaux and Ms. Woodward directed a subpoena *duces tecum* to BrownGreer as the court-appointed administrator of the common benefit fund. *See* Subpoena, attached as Exhibit "G". Because it appeared that Messrs. Herman, Seeger and Birchfield had depleted the common benefit fund in connection with their deal with Mr. Stratton, the subpoena sought "documents, written or electronic, including Court orders, or directives of any person or entity, instructing disbursement of any funds from any such accounts to any attorney or law firm," and also sought to discover how much

15

money remained in the common benefit fund.  *Id.*  BrownGreer objected to the subpoena on multiple grounds, including that the information could be obtained elsewhere. In their February 23 meeting, Mr. Arceneaux asked Messrs. Herman, Seeger and Birchfield to supply the information denied by BrownGreer.  They responded by serving Mr. Arceneaux with a copy of their motion to quash the BrownGreer subpoena.

Mr. Arceneaux raised the matter again in a meeting among lead and liaison counsel for the FAC and Objectors with Special Master Juneau on February 24, 2011.  At that time, Mr. Herman advised that he, Mr. Birchfield, and Mr. Seeger had pursued settlement talks with Mr. Stratton, with the Court's encouragement, in order to resolve an apparently serious challenge to the common benefit fund.  At that time, he said, the fund "belonged to nobody."  He said that the settlement "inured to the benefit of every claimant to the common benefit fund."  The Court was not informed of the terms of the deal, Mr. Herman said, because "he [the Court] didn't want to know."

On February 28, 2010, the Objectors' co-lead counsel filed a Motion for Additional Discovery Related to the "Stratton" Settlement and Any Undisclosed Settlements or Side Deals Which Affect Allocation of the Fund Awarded by This Court's Order of October 19, 2010.  On March 11, 2011, after discovering the existence of additional side deals, co-lead counsel filed a Supplemental Memorandum in Support of the Motion for Additional Discovery.  These motions are currently pending before Special Master Juneau.

## ARGUMENT

**A.    The October 19, 2010 Order should be reopened and the FPO Contracts enforced.**

      **1.    The Order should be reopened.**

This Court may open and reconsider a prior Order upon a showing of newly discovered evidence.  *See* Fed. R. Civ. P. 60(b); *Berthelot v. American Postal Workers Union, Local 185***,** 2011 WL 1086010 (S.D. Tex. March 4, 2011).  Here, the deal with Mr. Stratton is newly discovered.  It was kept secret by those involved.  Kline & Specter had no knowledge of the deal (and no reason to suspect such a deal had been consummated) until its existence was made public on February 4, 2011 in the Supplement to Joint Objection by Eric Weinberg, Chris Placitella and Cohen Placitella and Roth, which described the secret deal and provided the crucial transcript.  *See* Supplemental Memorandum, filed Feb. 4, 2011 (Docket No. 61362).

The Stratton deal is not only newly discovered.  It undermines basic predicates of this Court's October 2010 Order regarding common benefit fund assessments.  In reaching that decision, the Court relied on representations that the objectors had withdrawn their opposition and agreed that 7.5% was an acceptable resolution.  In comparison to those numbers, requiring plaintiffs' counsel to pay 6.5% was generous.  However, the Court was not informed that Messrs. Herman, Birchfield and Seeger had reached a secret deal in which some plaintiffs' counsel would pay only 4%.  The Court still may have decided that 6.5% was appropriate.  But the Court may have considered

the Stratton deal, *and rejected it*, making clear that (a) Mr. Stratton and his purported clients had to pay a Court-ordered assessment regardless of their prior understanding. At a minimum, this outcome would have prevented the improper and unauthorized depletion of the common benefit fund.

Moreover, if it had been known that a 4% deal was available, many more than 62 firms would have joined Mr. Stratton's objection. The deal may have collapsed and the objections may never have been withdrawn. The Court may have been forced to address the enforceability of the Full Participation Option and its August 2005 Order. With dozens more firms objecting and deal-making, the rationale for an 8% or 7.5% or 6.5% common benefit fee would have been undermined; and the whole effort to undo the Full Participation Option may have collapsed. The process may have reverted back to the original deal for 2% and the gigantic money grab signified by the move to 8% would have disintegrated.

One thing is certain. Had the Court known of the existence of the Stratton deal, it would have been forced to confront new information. The Court would have been forced to decide whether different plaintiffs' counsel should receive different assessments based on their participation in the Stratton deal. If the Court decided that plaintiffs' counsel could be classified into categories, it may have decided that one classification that *really* mattered was participation in the Court-ordered Full Participation Option.

At a minimum, the facts described above form ample basis for reconsidering the October 19, 2010 Order.  As the Court goes back to "square one," it should do now what should have been done before:  enforce the Full Participation Order for Kline & Specter and all others who participated in the MDL on that basis.

### 2.    The Court should enforce the Full Participation Option

The Court should enforce the Full Participation Option.  The Court defined and authorized the Full Participation Option in its August 2005 Order.  The Court basically abrogated that Order by directing a common benefit assessment of 6.5% in October 2010.  As described above, there are six circumstances in which a Court can overturn a prior order:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is not longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  None of the first five reasons remotely justify abrogating the August 2005 Order as relates to the Full Participation Option.  To the extent the Court

would rely on the catch-all provision, it neither acknowledged that it was overturning the August 2005 Order.  Nor did it purport to rely on the catch-all provision.

Instead, the Court relied primarily on case law describing "inherent managerial authority" as support for the October 2010 decision.  *See* Order dated Oct. 19, 2010 at 10-14, citing, *inter alia*, *In re Genetically Modified Rice Litig.*, MDL No. 06-1811, 2010 WL 716190 (E.D. Mo. Feb. 24, 2010); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MLD No. 05-1708, 2008 WL 682174 (D. Minn. March 7, 2008); *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp.2d 256 (E.D.N.Y. 2006); *In re Linerboard Antitrust Litig.*, 292 F. Supp.2d 644 (E.D. Pa. 2003); *In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977).  Yet none of these cases is apposite.  None involved a Court Order that expressly limited common benefit assessments.  None involved abrogation of such an Order.  Rather, the trial courts had made no prior commitments and assessed common benefit fees based on the common fund doctrine.

This case is very different.  Here, this Court exercised its inherent authority by creating the Full Participation Option and inviting participation in the MDL on that basis.  It entered an Order on which counsel relied.  It has no justification for *sua sponte* changing the deal.  Certainly none is provided by inapposite case law involving materially different circumstances.  The Full Participation Option should be enforced accordingly.

The Full Participation Option should be enforced pursuant to its express terms. Generally speaking, a trial court in a consolidated mass tort case has discretion to

determine fees payable to common benefit attorneys.  But here, the Court authorized

plaintiffs' counsel to submit their cases into the MDL on the basis of a ***Court Order that***

***expressly limited their financial commitments*** to the common benefit fund:

> Full Participation Option.  For all cases whose counsel have agreed within
> 90 days of this Order to cooperate with the MDL by signing an
> appropriate agreement [attached hereto as Exhibit A], the assessment in
> such cases ***shall*** be three (3) percent of the "gross monetary recovery" (2@
> fees/1% costs.

Order entered Aug. 5, 2005 at 4 (emphasis added).  The FPO Contract also provided:

> It is the intention of the parties that such assessment shall be in ***full and***
> ***final satisfaction of any present or future obligation*** on the part of each
> Plaintiff and/or Participating Attorney to contribute to any fund for the
> payment or reimbursement of any legal fees, services or expenses incurred
> by, or due to, the MDL and/or any Common Benefit Attorneys.

FPO Agreement at ¶ 2 (emphasis added).

Significantly, the FPO Contract provided only ***one*** exception under which its

terms would not apply – if Vioxx litigation were certified and settled as a class action

under Fed. R. Civ. P. 23.  *See* FPO Agreement at ¶ 6.  Of course, that did not happen.

The FPO Contract contains no modification in the event of a mass tort settlement.

If the Court wanted to include a mass tort exception, it could have made certain the

contract included another exception.  As it stands, the contract is unambiguous, and

must be enforced pursuant to its plain language.  *See*, *e.g.*, *Tiger Ins. Co. v. Eagle*, 294 Fed.

Appx. 920 (5th Cir. 2008).

An argument might be made that exception can be recognized in the FPO

Agreement's usage of the phrase "global settlement" in paragraph 10:

> The PSC agrees that, should there be a global settlement against any defendant(s), with the possibility of opt-outs under Rule 23(b)(3), the PSC will complete discovery against any such defendant(s) and will not agree to or seek a stay of discovery against any such defendant(s).'

FPO Agreement at ¶ 10.  Initially, this language plainly refers to a global class action settlement, as signified by the reference to "opt out under Rule 23(b)(3)."  More importantly, the text contains no mention of assessments and does not purport to overrule the FPO Agreement's core provision.  If it did, the FPO Contract would be a nullity – taking away in paragraph 10 what had been given in paragraph 1.  Such language also would have defeated its purpose of fostering participation in the MDL process.  Indeed, that was the entire purpose of the FPO Agreement, as Mr. Birchfield acknowledged:

> This option is designed to foster cooperation and coordination between the lawyers that are litigating cases in the MDL in federal courts and those in state court litigation.

Exhibit A at 21.  As Mr. Birchfield added, "I'm not aware of any pharmaceutical MDLs with an assessment that low, but that's designed to foster cooperation." *Id.*

It might also be argued that the inclusion of a fee enhancement in the settlement agreement overrides the FPO Agreement.  As noted above, the Settlement Agreement stated that common benefit fees would be assessed and fixed by the Court:

> To ensure that [the common benefit attorneys] are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys' fees will be imposed at no more than 8% of the gross amount recovered for every client that registers under the terms of the Settlement Agreement.

*Id.* at § 9.2.1.  The Settlement Agreement also stated that the common benefit fee, while no greater than 8%, could exceed the assessments provided in the Court's Order entered August 4, 2005 such as the assessment described in the FPO Agreement.

> The maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19.

*Id.*

But this language was truly self-serving and disingenuous.  Common benefit fees were not a disputed point over which Merck and the NPC had to negotiate.  They were not a material term of settlement.  Merck had absolutely no "dog in the fight" of how much was awarded in common benefit funds.  Indeed, as set forth in Section 9.26 of the Settlement Agreement, Merck took "no position regarding . . . the award of common benefit attorneys' fees . . . and waives the right to contest these matters.  See Settlement Agreement, Section 9.26.  Hence the provision is entitled to no weight, not to mention that a private contract cannot abrogate a Court Order.

The NPC's self-serving inclusion of an abrogation clause underscores another critical point.  At least with respect to settlement, the NPC was in all material respects the successor-in-interest to the PSC with regard to settlement.  The Court created the PSC, *inter alia*, for the purpose of negotiating settlement with Merck.  As PTO No. 6 made clear, the PSC was to "explore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation."  PTO No. 6 (Miscellaneous No. 3).  The PSC never conducted settlement negotiations, however.

The Court created and instructed the NPC to perform that role instead.   The NPC took over the PSC's role entirely in this regard.  It negotiated terms.  It drafted the settlement agreement.  The PSC was never consulted.

While the Court directed the NPC to take over the PSC's settlement responsibilities, it did not give the NPC authority to obviate the August 2005 Order. The NPC was bound to respect that Order no less than the PSC.  It should not have purported to overturn the Full Participation Option in Section 9.2.1.  Neither should the Court have purported to gain authority for abrogating the August 2005 Order from a self-serving contractual provision.

It is understood that enforcing the Full Participation Option would prompt reimbursements to plaintiffs' counsel and reduce the size of the common benefit fund. The fact is, however, that what compelled the PSC to seek a Full Participation Option and nothing compelled the Court to authorize it was a desire to maximize the size and effectiveness of the Vioxx MDL.  Having induced plaintiffs' counsel to file their cases in the MDL rather than other venues that were equally available to them, both the Court and the PSC should their commitment.  Without the Full Participation Option, some other court may have been deciding the size of the common benefit fund.

In view of the newly-discovered Stratton deal, this Court should open and reconsider its October 19, 2010 Order.  It also should enforce the Full Participation Option for all firms who submitted cases into the MDL on that basis.

**B.     In the alternative, the Court should grant Kline & Specter leave to file an objection to Mr. Herman's common benefit fee recommendation.**

If the Court declines to reconsider its October 2010 Order and enforce the Full Participation Option, Kline & Specter respectfully requests that the Court grant it leave to object to Mr. Herman's 8.0% common benefit fee request.  Of course, Kline & Specter did not file an objection to Mr. Herman's request by the Court's May 8, 2009 deadline. That deadline passed nearly twenty-three months ago.  The Court imposed its 6.5% assessment over five months ago.  Yet the Stratton deal materially changed the landscape around the common benefit request, leading to the withdrawal of over 60 objections that otherwise would have remained on record.  Many of those objections argued for enforcement of the Full Participation Option.  Kline & Specter seeks to pick up that banner.  It seeks to vindicate the August 2005 Order.  Though enforcement would result in a reduction in the common benefit fund, enforcement also would vindicate the predicate upon which cases were submitted into the MDL in the first instance.  This issue should be preserved for the Fifth Circuit's review, if necessary.

While Kline & Specter did not object before May 2009, there would be no prejudice to allowing an objection now.  The Court entered the October 2010 Order and litigation proceeds on the basis of that Order.  The Court has also liberally allowed late objections in these proceedings - e.g., the Court's recent allowance of a late objection in these proceedings.  *See* Order entered March 9, 2011 (Docket No. 62669).  Allowing an objection now would simply preserve this matter for appellate review.

If the Court is inclined to allow an objection at this time, Kline & Specter respectfully suggests that the instant motion and supporting memorandum be construed as the objection so that no additional filing is warranted.

## **CONCLUSION**

For the foregoing reasons, Kline & Specter respectfully requests that this Court grant its Motion to Enforce the Full Participation Option or, in the alternative, for Leave to File Objection to Mr. Herman's 8% Fee Recommendation.

Respectfully submitted,

/s/ Henry A. King
HENRY A. KING (#7393)
REBECCA H. DIETZ (#28842)
KING, KREBS & JURGENS, P.L.L.C.
201 St. Charles Avenue, 45th Floor
New Orleans, Louisiana   70170
Telephone: (504) 582-3800
Facsimile:  (504) 582-1233
hking@kingkrebs.com
rdietz@kingkrebs.com

Dated:  April 7, 2011                    *Attorneys for Kline & Specter, P.C.*

## <u>CERTIFICATION OF SERVICE</u>

The undersigned hereby certifies that on this date he caused the Motion of Kline & Specter, P.C. to Enforce the Full Participation Option or, in the Alternative, for Leave to File Objection to Mr. Herman's 8% Fee Recommendation, an accompanying Memorandum of Law, and proposed Orders to be served on Liaison Counsel, Russ Herman and Phillips Wittman, by U.S. Mail and e-mail, and on all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No. 8.

/s/ Henry A. King

Dated:  April 7, 2011