UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION  L |
| | * | |
| THIS DOCUMENT RELATES | * | JUDGE FALLON |
| TO ALL CASES | * | MAG. JUDGE KNOWLES |
| | * | SPECIAL MASTER |
| FILER: Robert E. Arceneaux/Margaret Woodward | * | PATRICK A. JUNEAU |
| | * | April 11, 2011 |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**APPEAL OF SPECIAL MASTER'S REPORT AND SCHEDULING ORDER**

MAY IT PLEASE THE COURT:

This appeal is submitted on behalf of Objectors, who seek review of the Special Master's

Report and Scheduling Order dated March 31, 2011 (Rec. Doc. No. 62735).

**OVERVIEW**

This Court has taken great pains to establish two fundamental premises with regard to the

fee allocation process: (1) the Court is committed to the transparency and objectivity required by

the Fifth Circuit's *In re High Sulfur* line of cases, and (2)  it intends to make the ultimate decision

with regard to allocation based upon a number of "independent" sources, including the

recommendation of the FAC, the objections tendered, the independent and separate recommendation

of Master Juneau, and its own knowledge of the case.

The Court's recent pronouncements implied that Special Master Juneau would conduct a

review of all claims to common benefit fees and oversee discovery to insure that a factual record was

made that supported his independent recommendation, and presumably for this Court to use as well

in itsown allocation. When this Court referred this matter to the Special Master, it charged him to "submit a written recommendation of the amount every common benefit fee applicant should receive." Rec. Doc. 62606, at 2-3.  Preparatory to that task, this Court directed the Special Master to "oversee discovery" and "review any relevant documents." *Id.* at 2.  Pursuant to Rule 53(b)(2)(D) of the Federal Rules of Civil Procedure, this Court further directed the Special Master to establish time limits and other procedures for its fee allocation work.  The Court noted that under Rule 53(f)(2) any party could object to any "report, ruling, or finding" by the Special Master within 21 days of service, and the Court would review such objections *de novo. Id.* at 3.

Objectors construed this Court's call for "a written recommendation of the amount every common benefit fee applicant should receive" as a charge to do exactly that.  Accordingly, co-lead counsel for the Objectors have worked diligently, and with the haste dictated by this Court's call for an expeditious resolution, to propound the necessary discovery.  We devoted considerable attention to exposing the deficiencies in the FAC's work, demonstrating at the same time the inadequacies of the record the FAC had allegedly based its recommendation upon, for its own use and more importantly perhaps, for use by the Special Master, this Court and the Court of Appeal.  We sought discovery of subjective information relied upon by the FAC in its recommendation and discovery of objective information apparently not used by the FAC in crafting its recommendations.

This Court made clear in its ruling denying Objectors' Motion for Partial Summary Judgment that the FAC's recommendation  was just one piece of information to which the Court would accord such weight as it merited.  It also made clear that Master Juneau's report and recommendation was to be independent, and not predicated in any way upon the FAC recommendation. *See* Rec. Doc. 62716.

The Special Master's Report and Scheduling Order suggests a departure from this charge. It makes findings of fact concerning the propriety of the  FAC's actions which are erroneous and

suggest an unwarranted approval of the FAC's methods. More importantly, it denies discovery essential to the creation of a record upon which a proper fee allocation can be grounded. Finally, it establishes a schedule and procedures which would deny Objectors due process of law. As a single example of this, the schedule would require Objectors to complete depositions by April 18, 2011, before the procedural window for appeal of that scheduling order would run. Moreover, it limits the entire hearing of this matter to an opportunity for Objectors briefly to rebut what is a presumptively valid FAC recommendation; it does not impose upon the FAC the burden of proving its own members' or any of the other 80 some-odd non-objectors' rights to collect any fees, much less the unprecedented amounts represented by the FAC recommendation.

Because Master Juneau's ruling seems at odds with the procedures outlined by this Court, as recently as its denial of the Motion for Summary Judgment and to Strike, and apparently prohibits essential discovery, Objectors appeal the order.

## I.    THE REPORT CONTAINS ERRONEOUS FINDINGS OF FACT AND LAW.

### A.    The Report erroneously finds that the FAC employed a lodestar calculation.

The Special Master's Report finds, as a matter of fact, that the FAC performed a lodestar analysis in formulating its recommendation:

> A lodestar analysis was used in completing the grid. A lodestar analysis was also subsequently used as an overall cross check.[1] In that regard, after the initial recommended award was calculated based on the points system, the FAC considered the claimed lodestar for each attorney/firm and considered whether an adjustment was warranted.

Report, at. 4-5. (Special Master's footnote omitted; Objectors' footnote inserted). In a footnote, the Report refers for corroboration of this finding to Mr. Garrett's affidavits and to "the voluminous

---

[1] As Objectors showed in their reply memorandum in support of their motion for partial summary judgment, a lodestar "cross-check" is only allowed in the context of determining the amount of a common benefit *assessment*, not in the context of fee *allocation*, where lodestar must be the principal consideration.

June 10, 2010 compilation by category and timekeeper prepared by the court-appointed CPA, Phil Garrett, of the hours reviewed by Mr.Garrett. . .."   *Id.   See also* Report, at. 6 ("The process utilized by the PAC [sic] also included a lodestar analysis– both initially and later as a crosscheck.")

Mr. Garrett's affidavit of August 4, 2010 reported to this Court that 562,943.55 hours of professional time had been properly documented, and that "[t]he total lodestar value of the professional time is $249,546,751.20."  (Exh. G-3 to Report, at. 5).  These figures, as the Special Master notes, were supported by Mr. Garrett's aggregate lodestar calculation, but they do not show a firm-by-firm lodestar calculation.  Moreover, the report of June 10, 2010, does not show any lodestar calculation, aggregate or by firm.   Mr. Garrett's June 10th report, the first and last pages of which are attached as Exhibit F to the Special Master's Report and the full substance of which appears as Exhibit C to the FAC's Response to Objections, only lists the timekeepers' *hours*; there is no listing of *rates.*  Consequently, the FAC could not have performed a lodestar analysis on the basis of Mr. Garrett's June 10th report.

Nor is it clear that the FAC had any other report which would have supported a lodestar analysis.  Among the "complete" discovery that the FAC has produced in its alleged effort to be totally transparent, there are no lodestar figures, much less firm-by-firm lodestar figures. Had the FAC gotten firm-by-firm lodestars, the FAC's numbers, wildly aberrant from lodestar, belie its claim it paid any attention to them at all. No lodestar analysis could yield the 100 to 1 ratios the FAC recommends, nor could a rate of over $2000/hr. for a favored paralegal and  $20/hr. or less to experienced trial counsel survive a lodestar cross-check .

In fact, the FAC made a special point in its argument that it *did not* use a lodestar analysis, because it believed (erroneously) that such was not required or prudent.  The FAC claims that while it "considered" the hours expended on common benefit work, it "did not treat the number of hours as the prevailing factor in arriving at the recommended allocation for each firm."  Rec. Doc. No.

62656-33, at 3.  Instead, for a number of reasons (all of which the jurisprudence rejects), it "chose to use hours submitted as a  crosscheck." *Id.* at 14.   But "hours," which the FAC had available to it from Mr. Garrett's report and which it claims to have used as a crosscheck, are only one component of the lodestar, which further takes into account a timekeeper's hourly rate.  The FAC apparently did not have this information at its disposal because it is not among the records produced by the FAC, whichallegedly consist of its "complete" files with regard to fee allocation. Nowhere in those files is there any record of attorney, paralegal, law clerk, or any other category of timekeeper rate. It is probable that they are not in the records because they never asked Mr. Garrett to provide them  And it did not ask for them probably because, in its own words, "the Committee strongly disagrees with [Objectors'] contention that lodestar must control common benefit allocations." *Id.* at 17.

Likewise, in its opposition to the Objectors' motion for partial summary judgment  the FAC stated that:

> the lodestar approach rewards time-keeping not advancing the litigation, form over substance. The Court has directed the Fee Allocation Committee to pursue a value-driven approach, and the Committee has endeavored to do so.

Rec. Doc. No. 62675-2 , at 11. It further stated that, because it did not trust the hours reported by the various firms, "the Committee chose to use hours submitted as a crosscheck rather than the gold standard that the Objectors would have the Court adopt.." *Id.*, at 15

The FAC's disagreement, however, is not with Objectors alone.  Its opposition to a lodestar analysis puts it squarely into conflict with the approach described by the United States Supreme Court as "the guiding light of our fee-shifting jurisprudence," *Perdue v. Kenny A. ex rel. Winn*, __ US __, 130 S.Ct. 1662, 1672, 176 L.Ed.2d 494 (2010), and required by the Fifth Circuit, which has stated that "[t]he district court may. . . adjust the lodestar upward or downward depending on the respective weights of the twelve [*Johnson*] factors," but failure to base an award (or allocation) of

fees upon a lodestar calculation in the first instance is reversible error.   *See* See Riley v. City of Jackson, Miss., 99 F.3d 757, 760 (5th Cir.1996. The Report's conclusion, then, that the FAC performed a lodestar analysis and crosscheck is material, substantial, and fundamentally unfair.

**B**.   **The Report errs in concluding that the FAC employed a *Johnson* analysis.**

To avoid purely mechanical adherence to lodestar, the Fifth Circuit requires application of the *Johnson* factors, which will weigh the value of time to the common benefit.  The record must "clearly indicate[ ] that the district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation." *In re High Sulfur Content Gasoline Products Liability Litigation*, NO. 09-30313 ,384 Fed.Appx. 299 (5th Cir., 2010) (*"High Sulphur II"*), citing *In re High Sulfur Content Gasoline Prods. Liab. Litig. ("High Sulfur I")*, 517 F.3d 220, 227 (5th Cir.2008), and *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir.2000). *See also Cobb v. Miller*, 818 F.2d 1227, 1232 (5th Cir.1987).

 The Report states that "[t]he FAC developed a points system which was intended to utilize a *Johnson* factor analysis and to weigh the applicant's contributions to the overall success of the litigation."  Report, at. 4.   The Report later concludes that the FAC  not only "intended" to utilize a *Johnson* factor analysis but succeeded in this objective:

> Implicit in the evaluation of the categories established in the Point System as it applies to individual applicants is a consideration of the *Johnson* factors.  The designated categories cover the full gambit [sic] of effort, risk, and skill that is required in complex litigation and an evaluation of these categories by their very definition require consideration of the *Johnson* factors.

*Id.* at 6.

Objectors showed at great length in their Memorandum in Support of Partial Summary Judgment that the FAC's point system does not take into account the considerations detailed by the *Johnson* factors, and even more troublingly, does not *weigh* the allocation of points in a sensible

way.  The FAC's response did not even attempt to rebut these criticisms of its point system, making the Report's unexplained conclusion of compliance as mysterious as it indefensible.

### C.     THE REPORT ERRONEOUSLY CONCLUDES THAT THIS COURT HAS JURISDICTION.

For the reasons previously articulated by this Court, the Report concludes that this Court has jurisdiction over this matter.  Several Objectors, including those individually represented by undersigned counsel, have challenged this Court's jurisdiction.  Others have not. This Court has stated on the record that it does not wish to receive further briefing on this issue. However, error is assigned to the Special Master's ruling in this regard to avoid any contention that of waiver should this matter reach the Court of Appeal.

## II.    THE REPORT ACCORDS IMPLICIT DEFERENCE TO THE FAC RECOMMENDATION.

The FAC's recommendations, indefensibly lopsided, patently out of step with controlling law and the orders of this Court under which they were to be drawn,  and illogical on their face, are entitled to no weight whatsoever.  The main thrust of Objectors' Motion for Partial Summary Judgment was to strip the FAC's recommendation of presumptive weight.  *See* Rec. Doc . 62695-1, Objectors' Reply Memorandum, at 12.  In denying that motion, this Court said, "it is premature to judge the persuasive weight of the FAC's recommendation or the Objectors' objections." Rec. Doc. 62716, at 3.  Rather, the Court indicated that it would await the Special Master's recommendations and assign to the FAC's, Objectors', and  Special Master's input "as much or as little weight as they merit in light of the applicable law and the evidence. . .." *Id.*

But the Special Master appears to have already assigned great weight to the FAC's recommendations, first in finding, mistakenly, that the FAC's methodology comported with law, and next in curtailing the proceedings before him in a way that favors the FAC's recommendations. This is particularly troubling because, as this Court envisioned it, the Special Master's allocation

recommendation was to present an "outsider's" view as a counterweight to the "insider's" view provided by the FAC

A.   **The Special Master appears to have narrowed his inquiry to the allocations recommended for Objectors**

As noted above, in referring this matter to the Special Master, the Court directed him to oversee discovery, outline further proceedings, and finally, "submit a recommendation of the amount *every* common benefit fee applicant should receive." Rec. Doc. 62606, at 2-3 (Emphasis added). The issue of the extent of the Special Master's charge – to recommend a complete allocation or only a reconsideration of the Objectors' allocations– had been the subject of extensive briefing by the parties. The FAC argued that in view of acceptance of its recommendation by a majority of claimants, only the allocation to the 18 Objectors remained at issue; from what source any increases in their allocations might come, the FAC never said. Objectors responded that in dealing with a limited fund, "[a]llocation means proportion; how does the share lead counsel is taking compare to the shares others are getting?" *In re Vitamins Antitrust Litig*., 398 F. Supp.2d 209, 234 (D.D.C. 2005). Because the FAC's final recommendation purported to have allocated the full measure of the common benefit fund,[2] any increase of the allocations to one claimant would necessarily compel the equivalent decrease from one or more other claimants. Considering the number of Objectors and the size of the contested shortfall, Objectors contemplated a substantial shift from the FAC's recommendation. The Court's request for a complete allocation recommendation from the Special Master seemingly rejected the FAC's argument that adjustments need only be made to the 18 Objectors.

_____

[2] As this Court is aware, Objectors are uncertain about the actual size of the common benefit fund. The disbursement to the Stratton objectors and possibly other beneficiaries of side deals with the FAC, the possible inclusion of interest and funds from other sources, such as the third party payor fund, have created tremendous confusion. To date, Objectors have been denied requested discovery on the question of deposits into or withdrawals from the common benefit fund.

The Special Master's Report, however, appears to adopt the FAC's argument that only a narrow review is required.  The Report signals that position most tellingly in its restriction of trial testimony to the Objectors and one member of the FAC. It would appear that  the Master considers this the only relevant testimony, as all that he intends to do is decide whether the FAC's recommendations for Objectors is appropriate. However, every dollar shifted in the allocation must come from somewhere. The issues to be tried before the Master, if he is to announce his own independent allocation, are broader than simply whether the FAC's recommendation is unfair  to Objectors. He will have to determine the amount that should be awarded to all 109 claimants, something that will be impossible for him to do under the limitations of his process, and the announced restriction of discovery and testimony.  Accordingly, his order prevents him from securing the information he will need to complete the task that he was assigned to perform by this Court – an independent allocation.  It would also improperly restrict the record available to this Court for the final allocation it contemplates making close on the heels of the Master's recommendation, and would create a woefully inadequate record for appeal to the Fifth Circuit, which does not have the benefit of this Court's experience with the Vioxx MDL.

.     **B.     The Special Master's curtailment of discovery prevents a thorough rebuttal of the FAC's recommendation**

The Report's strict curtailment of discovery suggests that the Special Master has concluded that Objectors' requests seek materials that are either irrelevant, superfluous, or unnecessary. Objectors have already propounded numerous interrogatories and requests for production to the FAC.  They also issued a subpoena to BrownGreer.   Further requests are in preparation.   In their first meeting with the Special Master, Objectors outlined their intention to depose multiple members of the FAC and other claimants once written discovery had been completed.   Many of the outstanding written requests were the subject of pending motions when the Report  issued, which

states that "the requests for additional discovery and production are denied, except insofar as is consistent with the following Scheduling Order."  Report, p. 8.

Objectors  sought clarification of the ruling by letter dated April 1,2011, copied to the Court and attached hereto as Exhibit A hereto. The Special Master replied by letter dated April 6 that those requests related to the Stratton matter have been retained for this Court's consideration along with the Motion to Restore the Common Benefit Fund.  Other possible adjustments to the scheduling order, he said, awaited the filing of an appeal.  *See* Exhibit B hereto.

The Report offers no explicit reasons for denying Objectors' discovery requests.  To some extent, the Special Master's reasoning is implicit in the listing of materials already provided to Objectors, which suggests he believes they have already received everything they need.  If all that the Objectors had to do was defend their own work, or rebut the FAC's recommendation, there might be room to make such an argument, as has the FAC.  But, the as this Court has stated, "[t]he FAC's allocation is simply one piece of evidence, not a target that the Objectors must demolish before the Court can blindly approve it."  Rec. Doc. 62716, at 2.  At the upcoming hearing, Objectors did not intend to  demolish the FAC's recommendation (they believe they have already done that); they intended to present the Master with the case for substantially higher awards to each of them, which necessarily will require an alternative recommendation.

Objectors' discovery requests are neither redundant nor designed to support supernumerary assaults against the FAC.  Every inquiry is directed at an item of importance, and if this Court is to give *any* consideration to the FAC's recommendation, even simply as one more item of evidence in the mix, Objectors are entitled to show the biases, hypocrisies, and outright falsehoods which underlie that recommendation.  By limiting the depositions to a single FAC representative whom the FAC may designate, and by denying the written discovery requests, the Special Master has permitted the FAC to determine what Objectors may see, and has thus afforded the FAC's work a

presumption of regularity which it does not deserve.

## III.   THE REPORT ERRS IN DENYING LEGITIMATE AND IMPORTANT DISCOVERY

### A.   Written discovery was improperly denied.

The Special Master's Report includes a list of the various documents that the FAC has produced, which is supposedly illustrative of the transparency of the process and of the propriety of denying Objectors additional discovery.[3]  Neither inference could be further from the truth.  This Court has *tried hard* to make the fee allocation transparent.  The point made directly or indirectly in Objectors' spate of filings is that the FAC has effectively undermined those efforts.  A process under which the FAC has been free to make private deals, pay out common benefit funds, commingle funds, and recommend –  and possibly commit –  to allocations according to some hidden process of its own which would capture for itself 70% of the fund  not only does not "set the standard for due process and transparency," as the Special Master's Report concludes at p. 7, but presents a compelling case for intervention.

It is not difficult for Objectors "to imagine how more transparency on [sic] due process could be imagined." *Id.*[4]  Objectors need, and are entitled to, all of the extensive written discovery they

---

[3] While the FAC has produced these documents with much fanfair, let us not forget that the ONLY reason it has done so is because early on this process, lead counsel, even before it was lead counsel, filed requests for information on behalf of Weinberg and Placitella, and these requests were OPPOSED by the FAC. Only after the Court adopted the transparency requirement of the *In re High Sulfur* cases did the FAC jump on that bandwagon. Yet, it still opposes production of most of its workpapers– as if transparency means the revelation of only those things that the FAC wants to reveal (presumably those things that support its work).

[4] The evidence of record does not support this finding. The following are specific instances of known evidence of a lack of transparency on matters  material to the Fee Allocation:

    1.      Objectors did not receive a completed "point grid" prior to the February 4, 2011 objection deadline.

    2       The methodology used to formulate the point grid has not been described.

(continued...)

have propounded, and continue to maintain that the Motion to Compel should have been granted as the FAC has offered NO justification or defense of its failure to comply with properly propounded discovery.  For  the purposes of this motion, and without waiving any rights with regard to the propounded discovery, Objectors wish to highlight a few areas where the Special Master's decision to disallow any discovery is particularly harmful.

1.      **Discovery related to the justifications offered by the FAC with regard to the allocations proposed for Objectors.**

The FAC has filed a long written explanation of its disparate treatment of Objectors in its recommended allocation. Almost every one of these depends upon bald factual assertions that are unsupported in the record.  The FAC maintains, for example, that Kathy Snapka personally asked that the bellweather *Garza* trial be excluded from consideration for common benefit fees, and that Eric Weinberg's paradigm-shifting work on the scientific evidence was inconsequential and trivial. Every Objector deserves the right to discover all documents which support  these assertions. Without such discovery, the hearing before Master Juneau will most assuredly be trial by ambush.

---

[4](...continued)

3.      The methodology used to assign specific points has not been described.

4       Whether or not some allocations were the result of agreements rather than a uniform application of any methodology has not been discussed.

5       The methodology by which the *Johnson* factors were applied has not been explained.

6.      The methodology by which the "multiplier" was determined has not been described.

7.      Whether the *Johnson* factors were used in the point grid, the multiplier, both or neither has not been described.

8.      The effect of the "agreement" with Michael Stratton on the fee allocations has not been disclosed.

9.      The existence or non-existence of other "agreements" and the effect of those agreements on the fee allocation has not been disclosed.

10      The apparent disparate treatment of trials that are not settled under the MSA is undisclosed.

11.     The trials that were not settled under the MSA have never been fully disclosed.

Objectors are in the process of propounding additional discovery related to the specific assertions of the FAC. Much of this information has already been requested in the master discovery propounded by Objector's lead counsel. All of it should be allowed. There is simply no reason for the Court to restrict the sharing of information.  Many of the FAC's arguments are based upon its subjective evaluations about the quality and worth of all of the claimants' work, including its own. Open and full discovery is particularly appropriate given that there is no way to challenge an opinion without documentary evidence proving it is unfounded.  And much of it, including the above examples related to the efforts of Texas and New Jersey counsel, fall outside the area of this Court's MDL experience, lending added, unwarranted credence to the FAC's subjective determinations.

> ### 2.    Discovery needed to disprove the Special Master's erroneous factual conclusions.

The Special Master has implicitly recognized the importance of a lodestar calculation by providing Objectors with full access to Mr. Garrett and his data.  However, the Report denies Objectors' right to pursue the interrogatories and requests for production which seek evidence to determine whether a firm-by-firm lodestar was ever examined by the FAC, and if it was, how it was used in its allocation.

Moreover, no discovery has been allowed about matters that Mr. Garrett cannot supply – such as actual billing rates. Many firms did not supply rates, so Mr. Garret constructed a "modified billing rate," which is nothing more than the average of all rates by timekeeper category, such as "attorney," or "paralegal," etc. There must be discovery of the rates  actually charged by the firms involved in order for there to be a meaningful and legal firm-by-firm lodestar, which is the starting point for fee allocation is dictated by the Fifth Circuit.

As just one example of why this discovery is due, Mr. Garrett's data, newly provided to Objectors, appears to exclude hundreds of hours submitted by the Murray firm.  According to Mr.

Garrett, an intentional exclusion would have resulted in correspondence which the Objector did not receive.  Additional discovery on this subject is required to determine how, why, and by whom those hours were stricken.  The Special Master's report, which allows further discovery consistent with the scheduling order, does not appear to leave any time for such inquiries.  But considering that lodestar is the starting point of an appropriate fee allocation, due process requires that all claimants' time be properly accounted for.

### 3.    Discovery related to settlement offers

Interrogatory No. 11 relates to the settlement with Merck, and asks for the various iterations of Mercks' settlement offers throughout the negotiation period. The FAC has awarded itself significant compensation for its role in confecting the settlement. Discovery related to how much their negotiation efforts actually contributed to the ultimate settlement amount offered by Merck is of obvious relevance in gauging whether the NPC, or any other plaintiff's lawyer, had any direct impact upon Merck's offer, or merely served to negotiate peripheral details as to how the total amount to be paid was to be administered and the settlement accomplished..

### 4.    Discovery regardign the deposits into, disbursements from, and side deals relating to the common benefit fund.

In any transparent allocation of attorneys' fees, it seems elementary that the claimants to the common benefit fund should be entitled to know how much is in the fund, what moneys have been deposited into the fund, what moneys have been taken out, and what commitments have been made against the fund.  If this were an ordinary case, claimants would believe the answers to these basic questions lay in this Court's published rulings: However, the FAC takes the position that the Fund is private, and accordingly, Objectors have no right to question any details regarding it.

> The common benefit fund is not composed of moneys that have been paid into the Court.
> Rather, the fund was created by operation of a private settlement agreement, and pursuant
> to a private escrow agreement, the moneys are deposited in a commercial banking institution.
> Neither settlement funds nor common benefit funds have been deposited in the Court's

registry.

Rec. Doc. No. 62790, at 2. FAC.  After the FAC indicated its unwillingness to disclose any such information about he fund to Objectors, notwithstanding its fiduciary relationship to them, Objectors also issued a *subpoena duces tecum* to BrownGreer requesting the following documents:

1.　　　Copies of all bank statements of all accounts established by you, under your control, or for which you serve any administrative or clerical function, in connection with the duties and responsibilities given to you by court order in MDL 1657, *In re Vioxx Products Liability Litigation*;

2.　　　Copies of all correspondence, letters, e-mails, or other documents, written or electronic, including Court orders , or directives of any person or entity, instructing disbursement of any funds from any such accounts to any attorney or law firm;

3.　　　Copies of any and all documents or work papers or spreadsheets, written or electronic, which show the amount of money that has been paid to any individual or firm, or any tabulation of the total thereof,  from any fund that is under your control or administration which was established for the payment of fees or costs to those individuals or firms who have made or will make a claim for entitlement to "common benefit" fees and expenses, including funds established by Court order or by Chapter 9 of the Master Settlement Agreement;

4.　　　Copies of any and all documents or work papers or spreadsheets, written or electronic, which show the amount of money any individual or firm has contributed to the fund that has been awarded to the claimants for common benefit fees in the order of the Court dated October 19, 2010.

BrownGreer has refused to answer this subpoena, and the FAC, who has no standing, has filed a motion to quash it.

Details about the fund are basic building blocks in the creation of a fair allocation.[5] This Court apparently believes that, since it has required that it be constantly apprised about details

---

[5]The Special Master and subsequently this Court  must know if some of the FAC fee allocations were the result of "agreements" that had no relationship to the "point system," the *Johnson* Factors or any other measure of the applicants' actual contribution to the generation of the fund.. The value of FAC's contribution to the common benefit fund can not be determined without transparency on the subject of its management of common benefit funds. If, for example, FAC members were involved in "agreements" that were unauthorized, did not inure to the common benefit, or were actually detrimental to the common benefit, that should reduce their allocations.

regarding the fund. And, the FAC obviously thinks so too, as during its meeting with each of the Objectors, it had readily available at its fingertips information from BrownGreer about how much each objector had contributed to the fund, and how much each objector had earned in fees from its settled cases, facts that the FAC used to justify its allocation. Finally, the inputs into the fund, the withdrawals from the fund, and any other details about how this asset was used by the FAC or by anyone else, is critical discovery.[6] Would this Court find such information unimportant to its own allocation? If not, then it should obviously be available to Objectors, and not merely the court and the FAC.

### 5.    Discovery of side deals

Even since its supplemental request for discovery filed on behalf of objectors Weinberg and Placitella, lead counsel has been pursuing information relating to side deals that the FAC may have entered into which impact upon how the fees allocated by this Court will be actually paid and who will actually receive them. Judge John Grady in MDL 986, *In re Factor VIII Concentrate Litigation*, found such information of obvious importance, and ordered its production, because common benefit fees are supposed to be disbursed on the basis of the value of common benefit effort – in that

---

[6]There may be other moneys commingled with the common benefit fund. For example, it appears from informal statements made by Mr. Herman that the FAC may have diverted funds intended for a Third Party Payor ("TPP") common benefit fund into the common benefit fund at issue, in order to make up for the Stratton shortfall. Under the terms of a TPP agreement with Merck dated September 14, 2009, "Common Benefit Attorneys agree that they will establish a process consistent with Articles V and VI of this Agreement that allows plaintiffs' attorneys to make an application for costs and fees," see 2.1.2, and that under "these applications, reasonable allocations of funds will be dispersed for payment of fees and costs from the Common Benefit Fees and Expense Fund," see 2.13. Pursuant to paragraph 5.2.2, "Christopher A. Seeger of Seeger Weiss LLP and Russ M. Herman of Herman, Herman, Katz & Cotler" were "to be responsible for devising and recommending a plan of allocation of awards of Common Benefit Fees and Expenses," said plan to be submitted to the Honorable Eldon Fallon. Undersigned counsel have searched the record, and can find no rule, order, or anything else establishing a process for "plaintiffs' attorneys to make an application for costs and fees" pursuant the Agreement, as required by section 2.12. Nor can we find any submission of a plan to this Court, or any ruling by it on any such plan.

circumstance fee-sharing agreements, normally a matter of only private concern, are of public interest. *See* Manual Complex Lit. § 14.223 (4th ed.) ("In class actions, all agreements or understandings made in connection with a settlement must be described in writing and may have to be disclosed."); *In re Agent Orange Product Liability Litigation*, 818 F.2d 216 (2nd Cir), cert. denied, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987) ("We reject this authority, however, to the extent it allows counsel to divide the award among themselves in any manner they deem satisfactory under a private fee sharing agreement. Such a division overlooks the district court's role as protector of class interests under Fed.R.Civ.P. 23(e) and its role of assuring reasonableness in the awarding of fees in equitable fund cases.").  Public disclosure, and swift action thereon, is the only antidote to the appearance of impropriety that erodes public confidence in the judiciary. *See e.g., In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1349 (5th Cir. 1981) , where counsel was disqualified because there was a strong inference of impropriety, even though the issue was raised late in the litigation ("[T]he client may not, by delay or any other action, remove from the court the responsibility of weighing the likelihood of public suspicion of the legal profession when Canon 9 (avoiding the appearance of impropriety) is involved.).  Finally, discovery is critical for this Court to determine if its authority is in need of vindication with swift and salutary action. *See e.g., Winkler v Eli Lilly* , 101 F.3d 1196, 1204 (7th Cir. 1996),  "a case about attempts to discover the terms of a secret agreement" between lead counsel and the defendant that may have required lead counsel to fall on his sword during a bellwether trial and then immediately withdraw; the court of appeal reversed a lower court injunction prohibiting discovery about the matter because "[u]ntil such a substantive inquiry is made, the sparseness of the record before us leads us to believe that there is no way of knowing whether the secret agreement confirms the district court's best hopes, or plaintiffs' worst fears."

When these requests for disclosure of side deals were made, little was known about the

Stratton matter, the Vioxx Litigation Consortium's settlement, or the post-final-grid negotiations where the FAC bought more acceptances by offering would-be objectors more money than was justified by the points on its grid in order to reduce the number of objectors to its final recommendation. Now, we know that all sorts of horse-trading has occurred, much of which may not pass muster under a variety of legal standards.

Yet, the Special Master has refused to allow any discovery into these issues. The existence of side deals, and their impact upon how the allocation was reached, and more importantly how any money allocated by this Court will ultimately be paid, is vital discovery that should not have been withheld.

### 6. Discovery of related Vioxx cases

Interrogatories Nos. 10 and 11, and Requests for Production Nos. 12 and 13 seek information regarding other Vioxx cases that were not resolved in the MSA.  These were are necessary in order to obtain information about all recoveries produced for all claimants through common benefit work. Some claimants, such as third party payors or attorneys-general, have been paid. No accounting has been made of such payments. All such recoveries may be taxed, as the FAC's recent claim for common benefit funds in the AG cases suggests. If that occurs, these proceeds should be divided among the common benefit workers. This discovery is necessary for these purposes.

### B. Depositions should not be taken until after the conclusion of written discovery
.

The Special Master's report imposes a discovery schedule that would force the taking of depositions without the benefit of any written discovery. If Objectors are entitled to the written discovery requested, then the deposition schedule must be delayed until after the conclusion of that discovery.

### C. Objectors are entitled to take multiple depositions in which they are allowed to participate directly.

Objectors notified the FAC and the Special Master of their intention to take the depositions of several FAC members as well as those of other claimants, whose recommended awards are not, in Objectors' view, supported by the evidence of record. Having received no written discovery, they cannot yet determine whose depositions they will need, and they should not be required to identify the deponents nor to complete the deposition process by April 18, 2011, before the delay for taking this appeal has run.

At a minimum, however, Objectors are entitled to make their own determination of which FAC members they wish to depose. The FAC is not a corporate entity which can best ascertain who within its employ can answer specific questions under Rule 30(b)(6). The FAC is a collection of individuals appointed by this Court and charged with the responsibility of acting as quasi-judicial officers, with individual fiduciary responsibilities to the Court and to the claimants to the common benefit fund. This Court has noted on multiple occasions that it appointed certain members outside the PSC for the express purpose of obtaining their input into matters outside the Court's immediate purview. Chris Seeger was appointed, for example, to advise the Court on the New Jersey litigation. If Objectors were confined to taking a single deposition and the FAC designated Mr. Herman as its representative in accordance with the Special Master's ruling, Objectors would have no opportunity whatsoever to examine Mr. Seeger's thinking about the New Jersey claimants.

Undoubtedly, the FAC did not assign all tasks to all individuals. This is why Objectors want to know, for example, who supposedly conducted the *Johnson* analysis before deposing that individual. Objectors also anticipate reaching beyond the FAC in taking depositions. The Lanier firm, for example, is to receive $40 million dollars under the FAC's recommendation, under a calculation which values every hour it performed in this action at 100 times the rate of some of Objectors' recommended rates. If allocation is truly proportion, Objectors are entitled to show that the Lanier firm's contribution was not so disproportionate to their own as the FAC has concluded.

Additionally, Objectors envisioned a process whereby, for efficiency's sake, lead counsel would propound those questions common to all Objectors, and then individual Objectors would be permitted to pose their own questions, perhaps restricted to a reasonable period of time such as thirty minutes apiece. As undersigned counsel have reiterated on several occasions, their individual clients are in competition with other Objectors for a greater share of a limited fund. They do not wish to fall into the same ethical conflicts that have plagued the FAC's operations, and have taken careful steps to avoid doing so. They cannot ethically represent all Objectors in all depositions, and they do not have the knowledge of Objectors' individual claims which would be necessary to an effective representation of all Objectors in deposition– nor would they expect the Objectors to share such knowledge with counsel who have conflicts with them.

## IV.  THE ORDER IMPROPER LIMITS THE LENGTH AND SCOPE OF THE HEARING.

The Scheduling Order has fixed this matter for a hearing of one week's duration. It anticipates testimony from the 18 Objectors, a single member of the FAC, and Mr. Garrett. Assuming each Objector only produced a single witness, this schedule would still require an average of four witnesses to be taken each day, restricting each witness to under two hours for both direct and cross-examination.

Again, the process favors the FAC, which was allowed to curtail severely both the written and oral presentations the claimants made to it. In Pretrial Order 6D, the Court directed each claimant to submit "an affidavit not to exceed 3 pages describing those aspects of that counsel's work that they believe best describes their firm's common benefit contributions." The Court further instructed the FAC to conduct hearings, not to exceed thirty minutes, during which each claimant could present "reasons, grounds, and explanations" for the recovery of both common benefit fees and expenses. Finally, it authorized that FAC to "implement additional processes to provide

appropriate deliberative fairness to those participating attorneys."  The FAC used its discretion to provide "deliberative fairness" to a favored few, who were permitted to file much longer affidavits, and make longer presentations, and were then rewarded with higher recommendations by the FAC. The FAC also required all claimants to testify under oath, save members of the FAC.  The Scheduling Order proposes to allow claimants to millions of dollars in fees only a couple more hours to make their claims.

The FAC has repeatedly made the argument that this proceeding should not be a "trial." Ironically, *Hensley v. Eckerhart*, which it  uses to support its mantra that fee disputes should not result in ancillary litigation, contains something far more important than the sentence that the FAC has seized upon and taken out of context; *Hensley* says that if the FAC had properly done its job, we wouldn't need ancillary litigation:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. **This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services**. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), abrogated on other grounds *Tex. States Teachers Assoc. v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)(emphasis added).

By the late 1980's the no-ancillary-trial phrase quoted by the FAC had proved to be an unattainable dream:

> The Supreme Court's oft-repeated wish that litigation about fees not turn into a second major lawsuit (e.g., Hensley, *supra*, 461 U.S. at 437, 103 S.Ct. at 1941) is an unattainable dream. The computation of hourly fees depends on the number of hours "reasonably" expended, the hourly rate of each, the calculation of the time value of money (to account for delay in payment), potential increases and decreases to account for risk and the results obtained, and a complex of other considerations under the heading of "billing judgment." The stakes-in this case the request for fees was double the judgment, in others the request for fees may be

millions of dollars-ensure that the parties will pursue all available opportunities for litigation. *Cf. Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.,* 776 F.2d 646 (7th Cir.1985); *In re Fine Paper Antitrust Litigation*, 751 F.2d 562 (3d Cir.1984). The fuzziness of the criteria (what is a "reasonable" number of hours?) ensures that people seeking opportunities to contest the fees will not need to search hard.

*Kirchoff v. Flynn,* 786 F.2d 320, 325 (7th Cir.1986).

Showing even greater creativity, the FAC also cites *In re High Sulfur Content Gasoline Products Litigation*, No. 09-30313, 384 Fed. Appx. 299 (5th Cir. 2010), which, the FAC says, "upheld the district court's allocation order where the objectors were afforded an opportunity to submit a 3-page affidavit and a brief, but no additional discovery was allowed and no evidentiary hearing was held." Rec. Doc.62690 , at 3.   Of course, the FAC has skipped over a few years and a few steps – including a complete revision of the allocation process, the appointment of a different district court judge and special master, and a complete reallocation of fees –  between the initial allocation and the summary process the FAC advocates.  *In re High Sulfur Content Gasoline Products Liability Litigation,* 517 F. 3d 220 (5th Cir. 2008).

Why should the FAC oppose an ancillary proceeding?  After all, the FAC is comprised of trial lawyers, and at the rates the FAC plans to be paid for its time, it could wish for no better work. Clearly, its objection to an extended hearing derives from other concerns than the burden upon its time: the more Objectors are allowed to say, the more effectively they can contest the FAC's claim to 72% of the common benefit fund; and the longer Objectors take to say their piece, the further the FAC strays from the unauthorized promise it extended to multiple non-objectors– that they would receive speedy payment of the FAC's recommended allocations.

With $315,000,000 at stake, this fee allocation proceeding represents a more significant controversy than many cases tried at much greater length.  Among them, the 18 Objectors represented thousands of clients, participated in multiple complex trials, and devoted many years of work to the common benefit  of the Vioxx actions.   To restrict them to a two-hour presentation

of their efforts is to require them to leave out great chunks of work, to deemphasize their obstacles, efforts, and achievements, and to prohibit them from effectively comparing their contributions to others– in short, to prevent them from making their best cases for the fees they have claimed and to deny them due process of law.

Moreover, Objectors anticipate the need to call additional witnesses, including possibly several experts, such as an accountant or IT expert and an ethicist.  The Special Master's Report does not allow for any witnesses outside of Objectors themselves and has not scheduled any time for their testimony.  This amounts to the restriction of this civil action to the testimony of the parties alone– regardless of their capacities to present their cases fully–  and constitutes a fundamental denial of due process.

## CONCLUSION

The Special Master's refusal to allow discovery or an appropriately expansive hearing neutralizes value of having an "outsider" make an independent evaluation.  Under the constraints established by the Scheduling Order, the independent Special Master has not given himself room for anything more than decide whether to accept the recommendation of the insider. We do not believe that this is what this Court had in mind in its articulation of the process it intended to follow.

For all of these reasons, Objectors ask that this Court immediately suspend the imposition of the Special Master's Scheduling Order, revise that order to permit the discovery that due process requires, and  establish procedures consonant with due process.


Respectfully submitted:


/s/ Robert E. Arceneaux                                    ROBERT E. ARCENEAUX LLC
_____          47 Beverly Garden Drive
Robert E. Arceneaux, La Bar No. 01199          Metairie, LA 70001

(504) 833-7533 office                         /s/ Margaret E. Woodward
(504) 833-7612 fax                            _____
rea7001@cox.net                               MARGARET E. WOODWARD, La. Bar
                                              No.13677
                                              3701 Canal Street, Suite C
                                              New Orleans, Louisiana  70119
                                              (504) 301-4333 office
                                              (504) 301-4365 fax
                                              mewno@aol.com


**CO-LEAD COUNSEL FOR OBJECTORS IDENTIFIED IN FEB. 8 ORDER**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, April11, 2011.

/s/ Robert Arceneaux