IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

--------------------------------------------------------x

|  |  |  |
|---|---|---|
|  | : | CIVIL ACTION |
|  | : | NO. 08-1633 |
|  | : |  |
| In Re: Vioxx Products Liability Litigation | : |  |
|  | : | SECTION L, MAG. 3 |
|  | : |  |
|  | : | HONORABLE ELDON E. FALLON |
|  | : | HONORABLE DANIEL E. KNOWLES |
| FILER:  Anapol, Schwartz, Weiss, Cohan | : |  |
|       Feldman & Smalley, P.C. | : |  |
|  | : | In Relation To: MDL No. 1657 |
|  | : |  |
|  | : |  |

--------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF ANAPOL, SCHWARTZ, WEISS, COHAN,
FELDMAN & SMALLEY P.C.'S RULE 60(B) MOTION FOR RELIEF FROM
THIS COURT'S OCTOBER 19, 2010 ORDER ESTABLISHING
A COMMON BENEFIT FEE OF 6.5%**

Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C. ("Anapol") hereby files this

Memorandum in Support of its Motion for Relief from this Court's October 19, 2010 Order

which established a common benefit fee of 6.5%.

## I.    FACTUAL BACKGROUND

### A.    Vioxx Litigation – Pre-Withdrawal

In May, 1999, the Food and Drug Administration approved the prescription drug Vioxx,

generally known as Rofecoxib, for sale in the United States.  Vioxx, manufactured and marketed

by Merck & Co., Inc., was designed to relieve pain and inflammation resulting from

osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches.

Not long after Vioxx was introduced to the market, results of the VIGOR clinical study

were released.  VIGOR demonstrated Vioxx had a small but significant increased risk for

ischemic events.  Anapol and a small group of firms investigated and ultimately prosecuted Vioxx cases based upon VIGOR.

In late 2002, Anapol filed one of the first Vioxx cases against Merck, a New Jersey Corporation, in New Jersey State Court.  Anapol and other firms continued to file Vioxx cases in New Jersey in the early part of 2003.  The amount of filed cases caused the New Jersey Supreme Court  to designate Vioxx as a Mass Tort in May 2003. *See* May 20, 2003 Order from the New Jersey Supreme Court, attached hereto as Exhibit "A".  The New Jersey Vioxx Litigation was assigned to the Honorable Carol E. Higbee of the Superior Court of New Jersey, Atlantic County.

The New Jersey Coordinated Vioxx Proceeding was actively litigated.  Merck answered several liability interrogatories and made initial document productions.  Plaintiffs reviewed thousands of documents and developed the theories of liability that would form the basis of the "Vioxx Story" which became part at trials years later.  Depositions of corporate representatives were also taken to learn about Merck's personnel, its electronic programs/databases, and its early defense strategies.  A New Jersey Short Form Complaint was agreed upon and a Plaintiff's Fact Sheet was developed.  All of this work product was completed prior to the announcement of the APPROVe clinical trial, the results of which forced Merck to withdraw Vioxx from the market on September 30, 2004.

### B.    Vioxx Litigation – Post Withdrawal (MDL)

After Vioxx was withdrawn from the market, thousands of individual suits and class actions were filed against Merck in the New Jersey Coordination as well as in various federal and state courts.  To handle the influx of cases, California and Texas established Vioxx coordinated proceedings and, in February 2005, the Judicial Panel on Multidistrict Litigation conferred "MDL" status on federal Vioxx cases.  All federal Vioxx cases, both those presently

on file and future filings, were transferred to this Honorable Court for coordinated discovery and pretrial proceedings pursuant to 28 U.S.C. § 1407.

Shortly after the MDL's formation, this Court appointed twelve lawyers to serve on the MDL's Plaintiffs' Steering Committee ("PSC"). *See* MDL Pretrial Order No. 6. Included as members of the PSC were Russ Herman, Esquire (Plaintiffs' Liaison Counsel) and Christopher Seeger, Esquire, and Andrew Birchfield, Esquire (Plaintiffs' Co-Lead Counsel). To encourage lawyers to file their cases in the Vioxx MDL, as opposed to the state court, the PSC petitioned this Court in June 2005 to authorize plaintiffs' counsel to choose from one of three options with respect to an attorney fee/cost assessment.

Anapol and a number of other firms made a strategic decision: it would continue to file all of its cases in New Jersey rather than participate in the Vioxx MDL. Anapol found the New Jersey coordinated litigation fair, impartial, and a good venue to try cases without inherent procedural hurdles confronting MDL courts. Anapol did not feel an MDL assessment on its cases was warranted given the litigation was already in active discovery in New Jersey. Anapol worked with firms such as Weitz & Luxenberg; Morelli Ratner; The Lanier Law Firm; and Cohen, Placitella and Roth, outside and apart from the MDL. In this regard, Anapol Senior Partner, Sol H. Weiss, Esquire, resigned his position on the MDL State Court Liaison Committee when membership would have required paying an MDL assessment.

Because all of its filings were in New Jersey, Anapol did not sign a Participation Agreement with the MDL. Anapol understood it might not qualify for a common benefit fee for work it performed in New Jersey for the common good of the litigation.

## C.   Settlement

Over the next several years, the Vioxx Litigation continued in earnest. Extensive discovery was conducted on multiple fronts (MDL, New Jersey, California and Texas).

Numerous jury verdicts occurred in multiple jurisdictions.  Some trials did not use MDL only designated evidence or experts.

While litigation was ongoing, this Court appointed a Negotiating Plaintiffs' Committee ("NPC") to attempt to reach a settlement with Merck to resolve the Vioxx cases.  In November 2007, Merck and the NPC announced that they had reached a settlement for the sum of $4.85 billion dollars.  *See* Settlement Agreement, In re Vioxx Prods. Liab. Litig., MDL 1657 (E.D. La. Nov. 9, 2007), available at http://www.browngreer.com/vioxxsettlement.  The Settlement Agreement stated that the common benefit fees would be assessed and fixed by the MDL Court:

> To ensure that [the common benefit attorneys] are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys' fees will be imposed at no more than 8% of the gross amount recovered for every client that registers under the terms of the Settlement Agreement.

*Id.* at § 9.2.1.

Despite the fact that Anapol had not signed a Participation Agreement and was not party to the MDL's work product or forum, it strongly encouraged its more than 750 clients to participate and receive compensation inside the National Vioxx Settlement Program.  Anapol subjugated its MDL assessment concerns so its clients could benefit from the settlement and was willing to absorb up to an 8% assessment on its contingency fee agreements with its clients.  Because its clients accepted the settlement program, Anapol could and did submit its New Jersey work product for common benefit consideration.

### D.    Creation of the Common Benefit Fund

In January 2009, Russ Herman, Plaintiffs' Liaison Counsel, petitioned this Court to award a common benefit fee of 8% of the $4.85 billion settlement.  *See* PLC's Motion for Award of Common Benefit Counsel Fees and Reimbursement of Expenses, filed January 20, 2009.  The 8% was to be deducted from the attorney fee portion of each client's individual recovery.

- 4 -

On April 16, 2009, the Court held that objections to the 8% assessment request could be filed on or before May 8, 2009. Over 60 objections were filed. One such objection was proffered by the Stratton Faxon law firm. *See* Stratton Faxon's May 5, 2009 Objection. Stratton had signed a Full Participation Option Agreement with the MDL and, as such, requested that its contribution to the common benefit fund be limited to 3%. *Id.* Given the number of objectors, the Court appointed Michael Stratton of Stratton Faxon as Liaison Counsel for the objectors. Anapol did not file an objection to the 8% assessment request. Anapol did not utilize any MDL work product, was not in favor of any assessment, let alone 8%, but it was willing to abide by the Court's determination on the eventual assessment, expecting, under due process notions, all counsel would be treated the same.

Discovery specific to the assessment dispute ensued. After a period of litigation, The PLC reduced its assessment recommendation to 7.5%. Mr. Stratton acknowledged, in writing to the Court, that 7.5% was an appropriate assessment. This was the factual record by which this Court fashioned its October 19, 2010 Order, that a 6.5% assessment of the settlement fund was a fair sum to be set aside to compensate those who had performed common benefit attorney work. *See* the Court's October 19, 2010 Order attached hereto as Exhibit "B". The 6.5% assessment to the settlement fund created a common benefit pool of $315,250,000.[1]

### E.     Resolution of 8% Assessment Objections

Facts have now come to light after October 19, 2010, that sixty-two (62) law firms, who did not perform much traditional common benefit work, paid a 4% assessment. Anapol learned of this from the transcript of a July 27, 2010 conversation attached by Cohen, Placitella and Roth

---

[1] Anapol contributed $7,721,166.53 to the common benefit fund as a result of the 6.5% assessment, or 2.45% of the fund.

as an exhibit to its Supplemental Objection filed on February 4, 2011. The conversation, which occurred outside the Court's presence, includes the following:

- Messrs. Herman, Seeger and Birchfield agreed that the objectors to the 8% assessment would pay a net assessment of 4% toward the common benefit fund.

- In return for this consideration, Mr. Stratton, as liaison counsel for all objectors to the 8% assessment, would withdraw their objections and recommend that 7.5% was an appropriate assessment.

- It was further agreed that the difference between the 8% being held in escrow by the Settlement Administrator, Brown Greer, and the 4% assessment now to be paid by the objectors, would be disbursed to Mr. Stratton.

- The 4% difference to be reimbursed totaled $18,539,236.85. This amount would be transferred to the trust account of Mr. Stratton.

- Mr. Stratton was to receive a list of the objectors to the 8% assessment so that each individual objectors' portion of the $18,539,236.85 could be refunded to the respective plaintiff firm.

The following day, July 28, 2010, Mr. Stratton, as agreed, delivered a letter to the Court which recommended a 7.5% assessment. *See* July 28, 2010 Letter from Michael Stratton, Esquire to Judge Fallon, attached hereto as Exhibit "C". That letter did not disclose that he and the rest of the 8% assessment objectors would only pay a 4% assessment. Brown Greer directly disbursed $18,539,236.85 to Stratton without Court approval.[2] Anapol and other similarly situated firms were unaware some law firms had their common benefit assessment obligation to 4% (instead of 6.5%).

---

[2] Apparently, this private agreement was entered into without Court knowledge – "I was advised that the objectors withdrew the objection. That's all I know of it. I wasn't involved in any discussions or agreements. That's why I didn't issue any orders." *See,* Transcript of February 17, 2011 Court hearing, at 12, attached hereto as Exhibit "D". *See also* September 7, 2010 letter from Daniel Becnel to Michael Stratton, attached hereto as Exhibit "E".

**F.      Failed Attempts for discovery on the "Stratton" Deal**

The Court appointed liaison counsel for the objectors, Mr. Pascal Calogero, and co-lead

counsel, Ms. Margaret Woodward and Mr. Robert Arceneuax.  At a hearing conducted by the

Court on February 17, 2011, Mr. Arceneaux asked members of the FAC to answer questions

relative to the Stratton deal.  Messrs. Herman, Seeger, and Birchfield promised to respond in a

meeting with Mr. Arceneaux on February 23, 2010.  Mr. Arceneaux met with these individuals

as planned; Kathy Snapka, a Stratton objector, also attended the meeting.  In that session, Mr.

Herman stated that Mr. Stratton represented the group of objectors to the common benefit

assessment, and that Ms. Snapka should address any questions about the deal to him.  The FAC

refused to respond to specific questions because "that deal was subject to a confidentiality

agreement".  Nor did the FAC produce information about how Brown Greer dispersed funds to

Stratton absent a Court Order.  *See* §9.2.3 of the Settlement Agreement Requiring Court

Approval.

On the latter question of how common benefit funds had been disbursed, on February 21,

2011, Mr. Arceneaux and Ms. Woodward directed a subpoena *duces tecum* to BrownGreer as the

court-appointed administrator of the common benefit fund.  *See* Subpoena, attached hereto as

Exhibit "F".  Because it appeared the common benefit fund was depleted without Court Order,

the subpoena sought "documents, written or electronic, including Court orders, or directives of

any person or entity, instructing disbursement of any funds from any such accounts to any

attorney or law firm," and also sought to discover how much money remained in the common

benefit fund.  *Id.*  BrownGreer objected to the subpoena on multiple grounds, including that the

information could be obtained elsewhere.  In their February 23rd meeting with Messrs. Herman,

Seeger and Birchfield, Mr. Arceneaux asked for the very information denied by BrownGreer. Mr. Arceneaux was given a copy of the motion to quash the BrownGreer subpoena in response.

Mr. Arceneaux raised the matter again in a meeting among lead and liaison counsel for the FAC and Objectors with Special Master Juneau on February 24, 2011. At that time, the FAC stated it held settlement talks with Mr. Stratton, with the Court's encouragement, in order to resolve an apparently serious challenge to the common benefit fund. At that time, the FAC took the position the fund "belonged to nobody." The Court was not informed of the terms of the deal because "he [the Court] didn't want to know."

On February 28, 2010, the Objectors' co-lead counsel filed a Motion for Additional Discovery Related to the "Stratton" Settlement and Any Undisclosed Settlements or Side Deals Which Affect Allocation of the Fund Awarded by This Court's Order of October 19, 2010. On March 11, 2011, after discovering the existence of additional side deals, co-lead counsel for the Objectors filed a Supplemental Memorandum in Support of the Motion for Additional Discovery. [3]

On March 31, 2011, Special Master Juneau issued a Report and Recommendation to the Objectors' discovery requests, deferring this issue to this Court.

## II.   ARGUMENT

### A.   The October 19, 2010 Order Should be Reopened

The Federal Rules of Civil Procedure allow for relief from a final judgment, order or proceeding upon the finding of newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial. *See* Fed. R. Civ. P. 60(b). *Fontenot v.*

---

3 Additionally, a consortium of Texas attorneys, commonly referred to as the "VLC", filed an objection to this Court's attorney fee cap of 32%. That objection was later withdrawn and it is believed that consideration from the common fund was provided in exchange for this withdrawal.

*Axxis Drilling, Inc.*, 2011 U.S. Dist. Lexis 3484 (E.D. La. Jan. 12, 2011). *See Lavespere v.*
*Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 174-74 (5th Cir. 1990); *Resolution Trust Corp.*
*v. Holmes*, 846 F. Supp. 1310, 1314 (S.D. Tex 1994); *Tomlinson v. Allstate Indem. Co.*, No. 06-
0617, 2007 U.S. Dist. Lexis 8075, 2007 WL 430642 (E.D. La February 5, 2007); *Garcia v.*
*Woman's Hospital of Tex.*, 97 F.3d 810, 814 (5th Cir. 1996); *Swift Chemical Co. v. Usamex*
*Fertilizers*, 409 F. Supp. 1343, 1349-50 (E.D. La. 1980); *Edward H. Bohlin Co. v. The Banning*
*Co.,* 6 F.3d 350, 356 (5th Cir. 1993); *Blois v. Friday,* 612 F.2d 938 (5th Cir 1980). *See also*
*Maronge v. Hunt Petroleum Co.,* 2011 U.S. Dist. Lexis 500 (E.D. La. Jan. 4, 2011); *Prior v. U.S.*
*Postal Serv.,* 769 F.2d 281, 287 (5th Cir. 1985); *Motorola Credit Corp v. Uzan*, 561 F.3d 123,
127 (2d Cir. 2009); *Seven Elves, Inc. v. Eskenazi,* 635 F.2d 396, 402 (5th Cir 1981); *Bankers*
*Mortgage Co. v. United States,* 423 F.2d 73, 77 (5th Cir. 1970); *Crutcher v. Aetna Life Ins. Co.,*
746 F.2d 1076, 1082 (5th Cir. 1984) (citing *United States v. Gould,* 301 F.2d 353, 355-56 (5th Cir.
1962)). The deal with Mr. Stratton is newly discovered. It was not publicized or disclosed by
any of the parties involved. There was no Court hearing or record upon which the objecting
parties could have discovered its existence. Neither the PSC nor FAC revealed its existence
prior to the Joint Supplemental Objection filed by Eric Weinberg, Chris Placitella and Cohen,
Placitella and Roth. *See* Supplemental Memorandum, filed Feb. 4, 2011 (Docket No. 61362).

The Stratton deal is not only newly discovered evidence, but it also undermines basic
predicates of this Court's October 19, 2010 Order regarding common benefit assessments. When
ruling that 6.5% was an appropriate common benefit assessment, the Court received
representations from the FAC and the assessment objectors that 7.5% was an equitable number.[4]
Thus, requiring plaintiffs' counsel to pay only a 6.5% assessment seemed generous. However,

---

[4]*See* pages 24-25.

had the Court been informed that the FAC had agreed that 4% was a reasonable assessment for some plaintiffs' counsel, many of whom performed no common benefit work, the Court would have had a much different record upon which to render its common benefit decision.

In light of this newly discovered evidence, the Federal Rules call for a re-evaluation of this Court's Common Benefit Assessment Order.

### B.     Anapol's Assessment Should Be 4%

#### 1.     Consistency

Baseball umpires are criticized when their calls are not consistent. A strike, two inches off the plate in the first inning, must also be a strike in the ninth inning and it must be a strike for both teams. As long as the calls are consistent, the competition is fair.

The same is true for the law. Courts in this Circuit have long held that parties must be treated equally. *See Laxey v. Louisiana Bd. of Trustees,* 22 F.3d 621 (5th Cir. 1994) quoting *King v. Chide,* 974 F.2d 653, 655-56 (5th Cir.1992) ("We referee this contest on a level playing field by consulting the applicable substantive law to determine what facts and issues are material.) *Spotville v. Cain,* 149 F.3d 374 (5th Cir. 1998) citing *Cooper v. Brookshire,* 70 F.3d 377, 381 (5th Cir. 1995) (holding that a time-bar should have the same effect on *all pro se* litigants, because they are "needful of a level playing field"); and *Schimmelpenninck v. Byrne (In re Schimmelpenninck),* 183 F.3d 347 (5th Cir. 1999) ("The Code furthers this design by permitting a foreign debtor to enjoin actions by U.S. creditors that seek to collect or control property that is involved in the foreign bankruptcy. Ultimately, the interests of all creditors, foreign and domestic, are to be put on a level playing field, with like-situated claimants being treated equally....").

Here, the playing field was far from level. Each law firm was treated differently. Most firms, such as Anapol, had no idea that a 4% assessment was a viable option. At a minimum, the

4% Stratton deal should have been properly disclosed so that all law firms could have had an opportunity to evaluate and consider same.

The Stratton deal also should have been disclosed to this Court.  Had the Court been aware that law firms were subjected to different assessment percentages based on their participation in the Stratton deal, its October 19, 2010 Order may have been vastly different. Certainly, the Court has ample grounds to reconsider its October 19, 2010 Order by allowing those firms who were not aware of the Stratton deal, such as Anapol, to be charged only a 4% common benefit assessment.

### 2.    Transparency

Hornbook law requires transparent judicial proceedings.  Motions to seal and confidentiality clauses are frowned upon because our Courts are to remain open and visible.  The 5th Circuit upheld this legal tenet in a recent attorney fee dispute.

> On a broad public level, fee disputes, like other litigation with millions at stake ought to be litigated openly.  Attorneys' fees, after all, are not state secrets that will jeopardize national security if they are released to the public.  As the Third Circuit has noted, "public confidence [in our judicial system] cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view. *United States v. Cianfrani,* 573 F.2d 835, 851 (3d. Cir. 1978).  From the perspective of class welfare, publicizing the process leading to attorneys' fee allocation may discourage favoritism and unsavory dealings among attorneys even as it enables the court better to conduct oversight of the fees....

*See In Re: High Sulfur Content Gasoline Products Liability Litigation*, 517 F. 3d 220, 230 (5th Cir. 2008).

As set forth above, the Stratton deal was conducted in secret and not in an open forum as required by the Fifth Circuit.  There was no disclosure to the Court, the parties or any other interested parties.  It was consummated in private.  Even Objectors to the 8% assessment were

not informed why they were receiving funds from Mr. Stratton, their liaison counsel. *See* Notice to the Court of Daniel Becnel, filed March 9, 2011 (Docket No. 62671). By keeping this agreement confidential, Anapol and other similarly situated firms that did not file objections to the 8% common fee recommendation, were not aware of alternative assessment options. Without this basic information, Anapol was prejudiced by its inability to make a knowing and informed decision or even knew there was a decision to be made.

Now that the curtain has been lifted on the Stratton deal, Anapol and other similarly situated firms deserve the same opportunity what 62 other firms received – a 4% assessment on its cases.

### 3. Estoppel

Estoppel - "a legal principle that prevents a person from asserting or denying something in court that contradicts what has already been established as truth". http://legaldefinition.us/estoppel.html. *See also Brandon v. Interfirst Corp.,* 858 F.2d 266, 268 (5th Cir. 1988) (The Court described judicial estoppel as a "common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position.") Not only are Anapol and other similarly situated firms entitled to a 4% assessment, but the FAC's actions estop them from arguing to the contrary.

When the Stratton deal was reached, Messrs. Herman, Seeger and Birchfield agreed to a 4% assessment for 62 firms. Their actions confirm that a 4% assessment was fair, reasonable and equitable. Logic dictates that if a 4% assessment was appropriate for 62 firms, it is appropriate for Anapol and other similarly situated firms as well.

## III.    **CONCLUSION**

For the foregoing reasons, Anapol respectfully requests that its Motion to Overturn This Court's October 19, 2010 Order which Established a Common Benefit Fee of 6.5% be granted. Anapol also respectfully requests that it and other similarly situated firms have their common benefit fee assessment reduced to 4%.

Respectfully submitted,

/s/ Sol H. Weiss

Sol H. Weiss, Esquire
Gregory S. Spizer, Esquire
Anapol, Schwartz, Weiss, Cohan
Feldman and Smalley, P.C.
1710 Spruce Street
Philadelphia, PA  19103
(215) 735-1130

Dated:  April 15, 2011

# EXHIBIT A

 

**New Jersey Courts**
Independence · Integrity · Fairness · Quality Service

|Notice Home| |Vioxx Mass Tort Home|

### NOTICE TO THE BAR

### RE: Designation of Vioxx Litigation as a Mass Tort

Accompanying the publication of this Notice to the Bar is a copy of the Supreme Court's May 20, 2003 Order designating all pending and future litigation statewide involving the drug Vioxx as a mass tort and transferring the management of all such cases to Atlantic County to be handled on a coordinated basis by the Honorable Carol E. Higbee.

All questions relating to this matter should be directed to the following:

Michelle V. Perone, Esq.
Chief, Civil Court Programs
Civil Practice Division
P.O. Box 981
Trenton, NJ 08625
(609) 292-8471
FAX (609) 777-0844
E-Mail: Michelle.Perone@judiciary.state.nj.us

Richard J. Williams, J.A.D.
Administrative Director of the Courts
Dated: June 6, 2003

---

### ORDER

It is hereby ORDERED that, in the matter of all pending and future litigation involving damages or other relief arising out of the manufacture, sale, distribution and/or use of the drug Vioxx, all complaints that have been filed in the various counties and that are under case management or in discovery or awaiting case management and discovery are transferred from the county of venue to Superior Court, Law Division, Atlantic County (Vicinage No. 1), and assigned to Superior Court Judge Carol E. Higbee;

It is FURTHER ORDERED that venue in all existing such litigation as specified above is transferred to Atlantic County (Vicinage No. 1); and

It is FURTHER ORDERED that, pursuant to N.J. Const. (1947), Art.VI, sec.2, par.3, Rule 4:3-2 governing venue in the Superior Court is supplemented and relaxed so that all future complaints seeking damages or other relief arising out of the manufacture, sale, distribution and/or use of the drug Vioxx, no matter where they might be venued, shall be transferred to Atlantic County (Vicinage No. 1) and assigned to Judge Higbee; and

It is FURTHER ORDERED that Judge Higbee shall oversee all management and trial issues for such cases and may, in her discretion, return such cases to the original county of venue for disposition; and

It is FURTHER ORDERED that no Special Master may be appointed in this litigation without the express approval of the Chief Justice.

For the Court
Deborah T. Poritz
Chief Justice
Dated: May 20, 2003

Copyrighted © 2001 - New Jersey Judiciary

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : | |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
| | : | |
| | : | **JUDGE FALLON** |
| | : | |
| | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO ALL CASES**

## ORDER & REASONS

Currently pending before this Court is Plaintiff Liaison Counsel ("PLC")'s Motion for an

Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses (Rec. Doc.

17642).  Having previously resolved the issue of reimbursement of expenses,[1] the Court now

turns its attention to a determination of the appropriate common benefit fee amount.[2]

---

[1] On September 23, 2009, the Court ordered that $48.5 million, which represents 1% of the total settlement amount in this case, be set aside as the Common Benefit Expense Fund.  *See* Pretrial Order No. 51 (Sept. 23, 2009).  The Court also ordered that $40,049,748.16 in costs be reimbursed at that time.  *Id.*  Those requests for reimbursement of common benefit costs were vetted first by the Court-appointed CPA, then by a sub-committee of the Fee Allocation Committee, and finally by the entire Fee Allocation Committee.  On December 17, 2009, the Court ordered that an additional $49,216.08 in costs be reimbursed.  *See* Order, Rec. Doc. 30153 (Dec. 17, 2009).  Finally, the Court established a procedure whereby future common expenses would be reviewed and reimbursed.  *See* Pretrial Order No. 51 (Sept. 23, 2009).

[2] The allocation of the common benefit fee amongst the fee applicants, which is the responsibility of this Court pursuant to the Settlement Agreement, will not be addressed at this time.  The Court will merely determine the appropriate total fee amount, leaving allocation for another day.

## I.     FACTUAL BACKGROUND

To put this matter in perspective, a brief review of this litigation is appropriate.  This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib.  Merck, a New Jersey corporation, researched, designed, manufactured, marketed and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States.  Vioxx remained publicly available until September 20, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke.  Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims.  It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004.  Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[3]

California was the first state to institute a consolidated state court proceeding on October 30, 2002.  New Jersey and Texas soon followed suit, on May 20, 2003 and September 6, 2005, respectively.  On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL") conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial

_____

[3]For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352

(J.P.M.L. 2005). Even after the creation of this federal MDL, many cases remained pending in

the various state courts.

On March 18, 2005, this Court held the first status conference in the Vioxx MDL to

consider strategies for moving forward with the proceedings. Shortly thereafter, the Court

appointed committees of counsel to represent the parties. In addition to a five member

Defendants' Steering Committee, see Pretrial Order No. 7 (Apr. 8, 2005), the Court appointed

twelve attorneys to serve on the Plaintiffs' Steering Committee ("PSC"), see Pretrial Order No. 6

(Apr. 8, 2005).[4] Thereafter, the PSC created a number of subcommittees which were tasked with

---

[4]Some have suggested that the attorneys themselves should select the Plaintiffs' Steering
Committee with the attorney with the largest number of plaintiff cases having the laboring oar.
*See* Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-
District Litigations: Problems and a Proposal*, 63 Vand. L. Rev. 107, 159-77 (2010). But the
experience of the MDL courts suggest otherwise. *See* Carolyn A. Dubay, Federal Judicial
Center, *Trends and Problems in the Appointment and Compensation of Common Benefit Counsel
in Complex Multi-District Litigation: An Empirical Study of Ten Mega MDLs* (forthcoming)
(July 2010 manuscript at 59). Having a large number of cases in the MDL often indicates skill at
advertising, but does not guarantee the best lawyering or even the selection of those best suited
to handle the matter in a cooperative endeavor which is crucial for MDL proceedings. The
ability to work in a team setting tends to be more difficult for the plaintiff bar than for defense
attorneys. But the efficient and successful resolution of an MDL is dependent on coordination
and cooperation of lead counsel for all sides. There is room for both vigorous advocacy and
professional cooperation. *See, e.g., The Sedona Conference Cooperation Proclamation* (2008),
available at http://www.thesedonaconference.org/content/
tsc_cooperation_proclamation/proclamation.pdf. In an MDL setting where there can be a
thousand plaintiffs' attorneys it not only takes a good lawyer to qualify for lead or liaison
counsel but one who has the diplomatic skills to coordinate the efforts of a diverse group.
Selecting lead and liaison counsel by a neutral party such as an MDL judge may not be the best
method but as between it and the selection by other counsel it is the better way. Moreover, the
selection of lead counsel by their fellow attorneys would involve intrigue and side agreements
which would make Macbeth appear to be a juvenile manipulator. Frequently, recommendations
by attorneys for positions on leadership committees are governed more on friendship, past
commitments and future hopes than on current issues.

focusing on the many aspects of MDL management.[5]  Membership on these subcommittees was open to all attorneys who had clients and wanted to participate and was not limited to the members of the Steering Committee.

Furthermore, to give transparency to this litigation, the Court created a web site accessible to all counsel and the public at large.  All motions, Court orders, opinions, recent developments, a calendar of scheduled events, and various other matters were posted on this web site.[6]  Throughout the litigation monthly status conferences were held in open court.  Notice of the meetings were posted on the web site and were open to all.  Transcripts of these conferences were posted on the Court's web site for those who could not attend.

On April 8, 2005, the Court appointed a CPA to record and review the submissions of common benefit counsel in this MDL.  *See* Pretrial Order No. 6 (Apr. 8, 2005).  Those doing common benefit work and incurring common benefit expenses were ordered to report the hours and expenses to the Court-appointed CPA.  Subsequently, the Court entered Pretrial Order No. 19, which established a Plaintiffs' Litigation Expense Fund to compensate and reimburse attorneys for services performed and expenses incurred for the common benefit.  Pursuant to this Order, any case that was settled, compromised, dismissed, or otherwise reduced to judgment for monetary relief, with or without trial, was subject to an assessment.  In order to avail themselves of the initial work of the common benefit attorneys, individual plaintiffs' counsel could, for a limited time, enter into a contract that was to dictate the assessment amount.  The "Full

_____

[5]The various consolidated state court proceedings also established similar management structures to coordinate the litigation.

[6]*MDL-1657 Vioxx Products Liability Litigation*, http://vioxx.laed.uscourts.gov/.

-4-

Participation Option," which was one such option, established an assessment of 2% of the recovery for fees and 1% of the recovery for costs. *See* Pretrial Order No. 19 (Aug. 4, 2005). Counsel were able to select the "Full Participation Option" within 90 days of the entry of Pretrial Order 19. Following that period, counsel could accept a "Traditional Assessment Option" providing for 6% assessment of recoveries in MDL cases and 4% assessment of recoveries in state court cases.

Discovery rapidly commenced. The common benefit attorneys were responsible for all aspects of pre-trial preparation, including document discovery, the taking of depositions, preparation of experts, motions practice, and to some extent, coordination of federal and state court proceedings. Millions of documents were discovered and collated. Thousands of depositions were taken and at least 1,000 discovery motions were argued. After a reasonable period for discovery, the Court assisted the parties in selecting and preparing certain test cases to proceed as bellwether trials. Additionally, similar trials were scheduled in state court.

This Court conducted six Vioxx bellwether trials.[7] The first of the bellwether trials took place in Houston, Texas, while this Court was displaced following Hurricane Katrina. The five subsequent bellwether trials took place in New Orleans, Louisiana. Only one of the trials resulted in a verdict for the plaintiff. Of the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the defendant. During the same period that this Court was

---

[7]*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. Filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. Filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. Filed Feb. 16, 2006 (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. Filed June 21, 2005) (sixth bellwether trial).

-5-

conducting six bellwether trials, approximately thirteen additional Vioxx-related cases were tried

before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida.

With the benefit of experience from these bellwether trials, as well as the encouragement of the

several coordinated courts,[8] the parties soon began settlement discussions in earnest.

   The Court appointed Negotiating Plaintiffs' Counsel ("the NPC") to explore and engage

in settlement discussions with Merck.  Counsel for Merck and the NPC met together more than

fifty times and held several hundred telephone conferences.  Although the parties met and

negotiated independently, they kept this Court and the coordinate state courts of Texas, New

Jersey, and California informed of their progress in settlement discussions.

   On November 9, 2007, Merck and the NPC formally announced that they had reached a

Settlement Agreement.  *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657

(E.D. La. Nov. 9, 2007) ("Settlement Agreement" or "MSA"), *available at*

http://www.browngreer.com/vioxxsettlement.  The private Settlement Agreement establishes a

pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck

as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"),

and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion.  *Id.* § "Recitals".[9]  The

Settlement Agreement is a voluntary opt-in agreement and expressly contemplates that this Court

---

   [8]The Court once again expresses its thanks to Judge Carol E. Higbee of the Superior
Court of New Jersey, Judge Victoria Chaney of the Superior Court of Los Angeles County in
California, and Judge Randy Wilson of the 157th Civil District Court of Harris County, Texas
for their efforts in bringing this litigation to completion.

   [9]For a more detailed factual background of the various mechanics of the Settlement
Agreement, including the provisions for the mandatory resolution of governmental liens, *see In
re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) (denying motions to
enjoin disbursement of interim settlement payments).

shall oversee various aspects of the administration of settlement proceedings, including appointing a Fee Allocation Committee, allocating a percentage of the settlement proceeds to a Common Benefit Fund, approving a cost assessment, and modifying any provisions of the Settlement Agreement that are otherwise unenforceable.[10]   Accordingly, this Court has consistently exercised its inherent authority over the MDL proceedings, *see* Manual for Complex Litigation (Fourth) §§ 10.224, 14.215-16, 14.231-.216 (2004), in coordination with its express authority under the terms of the Settlement Agreement to ensure that the settlement proceedings move forward in a uniform and efficient manner.[11]

As part of the Settlement Agreement, the parties included a provision that expressly provides for a common benefit fee assessment to be fixed by the Court. *Id.* § 9.2.  Specifically, the Settlement Agreement provides that:

> [t]o ensure that [the common benefit attorneys] are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys' fees will be imposed at no more than 8% of the gross amount recovered for every client that registers under the terms of the Settlement Agreement.

---

[10]*See, e.g.,* Settlement Agreement § 9.2.4 (establishing that the Court shall appoint a Fee Allocation Committee); § 9.2.5 (establishing that the Court shall "provide appropriate notices governing the procedure by which [it] shall determine the common benefit attorneys' fees and reimbursement of common benefit expenses"); § 16.4.2 (establishing that the Court may modify any provision of the Agreement under certain limited circumstances if the Court determines that the provision "is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable").

[11]*See e.g.,* Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's "inherent authority over this multidistrict litigation" as well as its express authority under Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving the right to "issue subsequent Orders governing the procedure by which the Allocation Committee shall carry out its function"; and providing that members appointed to the committee may not be substituted by other attorneys "except with the prior approval of the Court").

*Id.* § 9.2.1.  Additionally, the Settlement Agreement states that this common benefit fee

assessment supersedes the assessments provided for in Pretrial Order No. 19.  *Id.* ("The

maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL

common benefit attorneys pursuant to Pretrial Order No. 19.")

On July 17, 2008, Merck formally announced that it was satisfied that the thresholds

necessary to trigger funding of the Vioxx Settlement Program would be met.  *See Minute Entry,*

*July 17, 2008*, Rec. Doc. 15362 (July 17, 2008).  Merck further advised that it intended to waive

its walk away privileges and that it would commence funding the Vioxx Settlement Program by

depositing an initial sum of $500 million into the settlement fund, clearing the way for

distribution of interim payments to eligible claimants.  *Id.*  Eventually some 99.9% of all eligible

claimants enrolled in the program.

The Settlement Program proceeded at a very rapid rate in order to ensure that the

plaintiffs would recover in a timely fashion.  Final payments to heart attack claimants were

completed prior to October 14, 2009, final payments to stroke claimants were completed by June

14, 2010, and final extraordinary injury payments were completed by June 29, 2010.  Thus, in

only 31 months, the parties to this case were able to reach a global settlement and distribute

$4,353,152,064 to 32,886 claimants, out of a pool of 49,893 eligible and enrolled claimants.

This efficiency is unprecedented in mass tort settlements of this size.  It was due in large part to

the ability, industry, and professionalism of the attorneys for both sides and the plan

administrators.

Before the pay outs commenced the Court turned its attention to attorneys' fees for

primary counsel, or counsel who were retained directly by the claimants.  Primary counsel came

from nearly every state in the Union. Their fee contracts ranged from 33 1/3% to over 40%. This inconsistency of fees for attorneys doing roughly the same work and having the same responsibility seemed unsustainable and inappropriate. Moreover, one benefit of the MDL process is economy of scale, namely the principle of obtaining an economic benefit from sheer numbers. It appeared to the Court that the claimants themselves were the only ones not benefitting from this principle. Accordingly, the Court issued an Order & Reasons, which provided "that contingent fee arrangements for all attorneys representing claimants in the Vioxx global settlement shall be capped at 32% plus reasonable costs." *Order & Reasons, August 27, 2008,* Rec. Doc. 15722, 20-21 (Aug. 27, 2008) (published as *In re Vioxx Prods. Liab. Litig.,* 574 F. Supp. 2d 606 (E.D. La. 2008)). Following this Order, a group of five attorneys, identified as the Vioxx Litigation Consortium ("VLC"), filed a Motion for Reconsideration/Revision of the Court's Order Capping Contingent Fees and Alternatively for Entry of Judgment. (Rec. Doc. 17395). The matter was set for hearing and the Tulane Law Clinic was appointed to represent the claimants themselves since there was a clear conflict between the claimants and their counsel. After extensive briefing and a hearing, the Court affirmed its position with the alteration that would allow the Court to deviate from the 32% cap in appropriate rare circumstances. *In re Vioxx Prods. Liab. Litig.,* 650 F. Supp. 2d 549 (E.D. La. 2009). The Court's ruling was appealed to the Fifth Circuit Court of Appeals but after a time the appeal was withdrawn.

The PLC filed the instant motion on January 20, 2009, requesting a common benefit fee award of 8% of the $4.85 billion settlement amount. This amount was to come out of the attorneys' fees of primary counsel. The motion was sent to all parties and announced by the

Court at public status conferences.  On April 16, 2009, the Court invited any interested party to

file a Notice of Objection on or before May 8, 2009.  After receiving numerous objections, the

Court concluded that it would be appropriate to appoint a Liaison Counsel for the Common

Benefit Fee Application Objectors and appointed Michael Stratton to this role.  *See* Pretrial

Order No. 52 (Sept. 30, 2009).  Thereafter, numerous status conferences were convened,

discovery was taken, briefing was submitted, and arguments were heard.  While the matter was

pending before this Court, the PLC reduced its request for a common benefit fee award to 7.5%

and the objectors withdrew their objections.  With this back story in mind and after considering

the briefs and oral argument, the Court is now fully apprised of the factual and legal issues

involved in the PLC's request and is ready to rule.

## II.     COMMON BENEFIT ATTORNEYS' FEES–LAW & ANALYSIS

### A.     Introduction

"[U]nder the 'American Rule,' the prevailing litigant is ordinarily not entitled to collect a

reasonable attorneys' fee from the loser." *Pennsylvania v. Del. Valley Citizens' Council for*

*Clean Air*, 478 U.S. 546, 561 (1986) (quotation omitted).  Likewise, the attorney for the

prevailing litigant must generally look to his or her own client for payment of attorneys' fees.

Since the nineteenth century, however, the Supreme Court has recognized an equitable exception

to this rule, known as the common fund or common benefit doctrine, that permits the creation of

a common fund in order to pay reasonable attorneys' fees for legal services beneficial to persons

other than a particular client, thus spreading the cost of the litigation to all beneficiaries. *See In*

*re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring).[12]  This

equitable common fund doctrine was originally, and perhaps still is, most commonly applied to

awards of attorneys' fees in class actions.  *E.g.*, 4 Alba Conte & Herbert B. Newberg, *Newberg*

*on Class Actions* § 13:76 (4th ed. 2002) (discussing common fund doctrine in context of class

actions); Fed. R. Civ. P. 23(h).

   But the common fund doctrine is not limited solely to class actions.  *See Sprague v.*

*Ticonic National Bank*, 307 U.S. 161 (1939) (employing common benefit doctrine to award fees

and costs to litigant whose success benefitted unrelated parties by establishing their legal rights);

Alan Hirsh & Diane Sheeley, Fed. Judicial Ctr., *Awarding Attorneys' Fees and Managing Fee*

*Litigation* 51 (2nd ed. 2005) ("Although many common fund cases are class actions ... the

common fund doctrine is not limited to class actions."); Manual for Complex Litigation (Fourth)

§ 14.121 (2004).  As class actions morph into multidistrict litigation, as is the modern trend, the

common benefit concept has migrated into the latter area.  The theoretical bases for the

application of this concept to MDLs are the same as for class actions, namely equity and her

blood brother, quantum meruit.  However, there is a difference.  In class actions the beneficiary

of the common benefit is the claimant; in MDLs the beneficiary is the primary attorney.

   MDL courts have consistently cited the common fund doctrine as a basis for assessing

---

[12]Some authorities have commented on the "persistent and confusing identification of
common-fund recovery as an 'exception' to the American rule on attorneys' fees," noting that in
a common fund situation the funds are actually distributed "among those aligned with the
plaintiff rather than extract[ed] ... from the defeated adversary."  *See* Restatement (Third) of
Restitution § 30 Reporter's Note a (Tentative Draft No. 3, 1994) (quoting Thomas D. Rowe, Jr.,
*The Legal Theory of Attorney Fee Shifting: A Critical Overview*, 1982 Duke L. J. 651, 662
(1982)).  Regardless of specific taxonomy, the common-fund doctrine, as well as the Court's
inherent power to assess fees to compensate appointed managing attorneys, constitute departures
from the traditional rule that each litigant bears his or her own costs.

common benefit fees in favor of attorneys who render legal services beneficial to all MDL

plaintiffs. *E.g.*, *In re Genetically Modified Rice Litig.*, MDL No. 06-1811, 2010 WL 716190, at

*4 (E.D. Mo. Feb. 24, 2010) (relying on common fund doctrine as an alternate basis to inherent

managerial authority and concluding that "[b]oth sources of authority provide the same result");

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL

682174, at *4 (D. Minn. Mar. 7, 2008); *accord In re Zyprexa*, 594 F.3d at 128-30 (Kaplan, J.,

concurring).[13]

       In addition to judicial precedent the Court also finds authority to assess common benefit

attorneys' fees in its inherent managerial authority, particularly in light of the complex nature of

this MDL. The Fifth Circuit has long recognized that a court's power to consolidate and manage

litigation necessarily implies a corollary authority to appoint lead or liaison counsel and to

compensate them for their work. *See In re Air Crash Disaster at Fl. Everglades on Dec. 29,

1972*, 549 F.2d 1006 (1977) ("*Everglades*"). In *Everglades*, the JPML transferred all federal

cases arising out of a passenger plane crash near Miami to the Southern District of Florida. *Id.* at

1008. The transferee court appointed a Plaintiffs' Committee to coordinate discovery and

pretrial matters, and then to conduct bellwether trials. *Id.* The court compensated the

Committee through an assessment on the contingent fees of attorneys who represented MDL

---

       [13]On the other hand, some commentators take the position that the common fund doctrine
does not justify assessment of common benefit fees in consolidated mass tort MDLs. Silver &
Miller, *supra*, at 120-30; Restatement (Third) of Restitution § 30 cmt. b (Tentative Draft No. 3,
1994) ("By comparison with class actions, court-imposed fees to appointed counsel in
consolidated litigation frequently appear inconsistent with restitution principles, since litigants
may have no choice but to accept and pay for certain legal services as directed by the court. The
fact that such fees may not be authorized by this Section is probably irrelevant, however, since
their predominant rationale is not unjust enrichment but administrative convenience.").

plaintiffs but were not on the Committee. *Id.* The non-Committee attorneys appealed and the

Fifth Circuit upheld the district court's authority to make that assessment.  The Fifth Circuit

explained that a district court has inherent authority "to bring management power to bear upon

massive and complex litigation to prevent it from monopolizing the services of the court to the

exclusion of other litigants." *Id.* at 1012.  Therefore, an MDL court "may designate one attorney

or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-

parties coincide." *Id.* at 1014.  Naturally, this authority would be "illusory if it is dependent

upon lead counsel's performing the duties desired of them for no additional compensation." *Id.*

at 1016.  Assessment of those fees against other retained lawyers who benefitted from the work

done was permissible and appropriate. *See id.* at 1019-20.[14]  Other courts have applied this

inherent authority to compensate common benefit counsel in complex litigation. *E.g.*, *In re Diet*

*Drugs*, 582 F.3d 524, 546-47 (3rd Cir. 2009); *In re Genetically Modified Rice Litig.*, 2010 WL

716190, at *4 ("An MDL court's authority to establish a trust and to order compensations to

compensate leadership counsel derives from its 'managerial' power over the consolidated

litigation, and, to some extent, from its inherent equitable power."); *In re Guidant*, 2008 WL

682174, at *5; *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 265-66 (E.D.N.Y. 2006);

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 653-56 (E.D. Pa. 2003); *see also* Manual

for Complex Litigation (Fourth) § 22.62 (2004); Restatement (Third) of Restitution § 30

Reporter's Note b (Tentative Draft No. 3, 1994) ("In contrast to the standard view of class-action

---

[14]The Fifth Circuit also found support in "the body of law concerning the inherent
equitable power of a trial court to allow counsel fees and litigation expenses out of the proceeds
of a fund that has been created ... by successful litigation," which the Court discussed above. *Id.*
at 1017.

fees, which explains them as restitutionary, the leading accounts of fees to court-appointed counsel in consolidated litigation properly emphasize factors independent of restitution to justify the imposition of a liability by court order.") (citing *Everglades*).

In addition to equity, quantum meruit, and inherent managerial authority, the Court derives express authority in this case from the terms of the Settlement Agreement entered into by the parties and consented to by their primary attorneys. Section 9.2 of the Settlement Agreement governs common benefit fees and expressly authorizes the Court to determine common benefit attorneys' fees. Settlement Agreement § 9.2.5.[15] In fact the PLC asks the Court to exercise the aforementioned authority and award common benefit fees under the terms of the Settlement Agreement.

Although the Objectors have now withdrawn their objections to this fee request, the Court has had the benefit of their briefing and argument, as well as briefs and supplemental

---

[15]The Court takes this opportunity to discuss the initial fee assessments set by the Court in Pretrial Order 19, as well as criticism that the NPC did an end-run around those agreements and "used their control of settlement negotiations to make more money available for themselves." Silver & Miller, *supra* at 132. The PTO 19 fee assessment agreements were reasonable and appropriate to create a fund to compensate common benefit attorneys for the consolidated MDL discovery work that was contemplated at that early stage of the litigation. When circumstances changed as a result of the extensive discovery, numerous trials, and through negotiation and implementation of a global opt-in settlement, it became necessary to reevaluate the reasonable compensation for the common benefit attorneys who accomplished those tasks. The claimants and their attorneys acknowledged those changed circumstances when they accepted the terms of the Settlement Agreement which supplanted the PTO 19 assessments. Settlement Agreement § 9.2.1. Moreover, the Court's equitable and managerial authority and duty to award fair common benefit fees or to adjust contingent fees exists independent of contractual agreement, and the Court's authority to do justice by reducing attorneys' fees necessarily encompasses the corollary authority to increase fees where appropriate. *See Guidant*, 2008 WL 682174, at *11-12.

briefs from the PLC honed through the fair opportunity for objection.[16]  *Compare In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 38 (D.N.H. 2006) ("With no adversary to challenge the Plaintiffs' proposal, the Court has been left to fend for itself in crafting an approach for assessing reasonableness.").  Merck has remained silent pursuant to the terms of the Settlement Agreement.  Settlement Agreement § 9.2.6.

The PLC contends in its briefing and argument that its requested award of 7.5% of the settlement amount as common benefit fees is justified by other common benefit assessments and awards in MDL cases, by the work done, by a review of the *Johnson* factors, and by a lodestar cross-check.  Keeping in mind that the ultimate goal is reasonableness while mindful that reasonableness, like beauty, is often in the eye of the beholder, the Court is prepared to rule.

**B.**     **Methodology for Calculation of Attorneys' Fees**

*1.*     *Generally*

Over the years courts have employed various methods to determine the reasonableness of an award of attorneys' fees.  These methods include the "lodestar" method, which entails multiplying the reasonable hours expended on the litigation by an adjusted reasonable hourly rate, *see Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 583 & n.15 (5th Cir. 1980); the percentage method, in which the Court compensates attorneys who recovered some identifiable sum by awarding them a fraction of that sum; or, more recently, a combination of both methods

---

[16]This not to say that third parties have not commented upon and criticized the PLC's fee request.  Professors Silver and Miller assert that "[the PLC] used their position to benefit themselves at the expense of those they were charged to represent.  Conduct of this sort establishes a predicate for fee forfeiture, not for fee enhancement."  63 Vand. L. Rev. at 135.  Professors Silver and Miller served "as paid consultants to a group of attorneys in the Vioxx MDL who have questioned or challenged aspects of the settlement, including the fee assessment."  *Id.* at 107 n.1.

in which a percentage is awarded and checked for reasonableness by use of the lodestar method.

In the Fifth Circuit, attorneys' fees have traditionally been calculated using the lodestar method. The resulting lodestar figure, or the product of the reasonable hours worked by the reasonable hourly rate, is then adjusted by a multiplier in light of the twelve *Johnson* factors. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.*; *see also Von Clark v. Butler*, 916 F.2d 255, 258 n.3 (5th Cir. 1990).[17]

The lodestar method is not without flaws, especially when employed in common fund cases. As an influential report by the Third Circuit Task Force concluded, the drawbacks of the lodestar method include:

(1) increased workload on an already overtaxed judicial system, (2) inconsistent

---

[17]In *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002), the Fifth Circuit held that "[s]tate law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." The Court will nevertheless utilize the *Johnson* framework in this case. This matter is before the court through MDL jurisdiction and the global settlement of these claims ensures that state law has supplied no rule of decision. Further, as previously noted in connection with its Order and Reasons capping attorneys' fees at 32%, this Court has the equitable and inherent authority in all federal courts to determine a fair common benefit fee as well as express authority under the Settlement Agreement. *In re Vioxx*, 650 F. Supp. 2d at 558-62; *In re Vioxx*, 574 F. Supp. 2d at 610-14.

application of the approach and widely varied fee awards, (3) illusory mathematical precision unwarranted by the realities of the practice of law, (4) potential for manipulation, (5) reward of wasteful and excessive attorney effort, (6) disincentive for early settlement, (7) insufficient flexibility for judicial control of litigation, (8) discouragement of public interest litigation, and (9) confusion and lack of predictability in setting fee awards.

See Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases*, 18 Geo. J. Legal Ethics 1453, 1456 (2005) (summarizing *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985)) (internal quotations omitted).

In reaction to the difficulties with the lodestar method, courts turned to awarding a percentage of the recovered common benefit fund as attorneys' fees. The popularity of this method gained momentum following the publication of the aforementioned Third Circuit Task Force report in 1985. Recognizing the "contingent risk of nonpayment" in such cases, courts have found that class or lead counsel ought to be compensated "both for services rendered and for risk of loss or nonpayment assumed by carrying through with the case." *In re Combustion, Inc.*, 968 F. Supp. 1116, 1132 (W.D. La. 1997) (summarizing the various methods used to calculate attorneys' fees); *see In re Cabletron*, 239 F.R.D. at 37 (stating that the percentage method "allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure") (quotation omitted); *see also* Samuel R. Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?*, 126 U. Pa. L. Rev. 281 (1977). Moreover, courts find that the percentage method provides more predictability to attorneys and class members or plaintiffs, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys. *See* Walker & Horwich, *supra*, at 1456-57 (citing *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D.

-17-

Cal. 1989)); *accord In re Diet Drugs*, 582 F.3d at 540.

While the United States Supreme Court has approved the percentage method in common fund cases, it has never formally adopted the lodestar method in common fund cases. *See Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 773-74 (11th Cir. 1991) (reading *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984), as the Supreme Court's "acknowledgment" of the percentage method in common fund cases); *In re Prudential-Bache Energy Income P'ships Sec. Litig.*, MDL No. 888, 1994 WL 150742, (E.D. La. Apr. 13, 1994) (tracing the history of the various methods). Conversely, the Fifth Circuit appears to be the only Court of Appeals that has not explicitly endorsed the percentage method. Manual for Complex Litigation (Fourth) § 14.121 (2004). However, neither has the Fifth Circuit "explicitly *disapproved* of the percentage method of calculating fees in common fund cases." *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 WL 512081, at *18 (E.D. La. Mar. 2, 2009) (emphasis added). Therefore, the Fifth Circuit appears to tolerate the percentage method, so long as the *Johnson* framework is utilized to ensure that the fee awarded is reasonable. *See id.*; *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 851-52 & n.5 (5th Cir. 1998); *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823-25 (5th Cir. 1996).

Accordingly, numerous district courts in this Circuit have applied a "blended" percentage method to determine a reasonable fee award, while staying within the *Johnson* framework. *See, e.g., In re OCA*, 2009 WL 512081, at *19; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 766, 778 (S.D. Tex. 2008); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 859-61 (E.D. La. 2007); *In re Bayou Sorrel Class Action*, No. 04-1101, 2006 WL 3230771, at *3 (W.D. La. Oct. 31, 2006); *In re Educ. Testing Serv. Praxis Principles of Learning*

*& Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 628-29 (E.D. La. 2006); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 531 (N.D. Miss. 2003); *In re Combustion, Inc.*, 968 F. Supp. at 1135-36; *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 499-501 (N.D. Miss. 1996).

Keeping in line with Fifth Circuit precedent and this Court's prior experience, the Court finds that the blended percentage approach is an appropriate method for calculating reasonable common benefit attorneys' fees in this case. Accordingly, the Court will first determine the valuation of the benefit received by the claimants and then select an initial benchmark percentage. The Court will then determine whether the benchmark should be adjusted based on the application of the *Johnson* factors to the particular circumstances of this case. Finally, the Court will conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award. The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method.

### 2.    *Valuation of the Benefit Obtained*

The Settlement Agreement created a $4.85 billion fund for the compensation of Vioxx claimants. Out of that amount, $4 billion was allotted to myocardial infarction claims, and $850 million to ischemic stroke claims. The Court finds no reason to omit any portion of that settlement fund from consideration with respect to the reasonable amount of common benefit fees. Accordingly, $4.85 billion is the appropriate amount for calculation of a reasonable percentage of common benefit fees.

### 3.    *Benchmark Percentage*

The next task is to determine an initial benchmark percentage. The Court's goal in setting a benchmark percentage is not to rubber-stamp the PLC's proposed figure. Rather, the

Court will endeavor to arrive at an independent and justified reasonable percentage appropriate to the facts particular to this global settlement. To accomplish that end, several resources may be utilized.

First, this Court is among the many throughout the country that have considered data compiled in a pair of recent empirical studies of attorneys' fees in class action settlements, Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 31-32 (2004) ("Eisenberg & Miller 2004"), and Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) ("Eisenberg & Miller 2010"), when computing the appropriate benchmark percentage in a class settlement. *See In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, MDL No. 08-1999, 2010 WL 3310264, at *13-14 (E.D. Wis. Aug. 16, 2010); *Murphy Oil*, 472 F. Supp. 2d at 862-64; *In re ETS*, 447 F. Supp. 2d at 630; *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006); *In re Cabletron Sys.*, 239 F.R.D. at 37 n.12, 41. The Eisenberg and Miller studies are helpful for providing concrete evidence for the relationship between the amount recovered and the attorneys' fee award; the empirical data shows that as settlement amounts rise, the reasonable percentage of attorneys' fees decreases. Eisenberg & Miller 2004 at 54-55; Eisenberg & Miller 2010 at 263-65. However, given the amount of the settlement in the Vioxx MDL and the opt-in nature of the Master Settlement Agreement, the studies are of limited usefulness in determining a reasonable benchmark percentage for a common benefit fee award.[18]

---

[18] *See* William B. Rubenstein, *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 Class Action Att'y Fee Dig. 87, 89 (2009) ("As a judicially imposed *portion* of a larger privately-negotiated contingent fee, the common benefit fee is logically, therefore, generally a

Eisenberg and Miller studied settlements of class actions, and although this Court has recognized

that in some respects the MDL resembles a class action, in other respects this case is quite

different.

In a typical application for a class action fee award, the Court allocates a percentage of

the class's recovery to class counsel as compensation. Fed. R. Civ. P. 23(h). Class counsel

perform all the work on behalf of the class and are the sole attorneys for the class members.

With few exceptions, all work done by class counsel benefits all members in the class and not

just the lead plaintiffs. Thus, in a typical class action fee award the tension is between the

interests of counsel in receiving reasonable compensation for their work, and class members in

ensuring that counsel does not receive a windfall.

The dynamic involved in the fee application in the present case is different. The

Settlement Agreement was not a class action settlement, but was rather a complicated opt-in

resolution of individual personal injury claims. The vast majority of these personal injury claims

were governed by a contingent fee contract between the individual claimant and his or her

primary attorney. The Court, as mentioned, previously capped the amount of those contingent

fee contracts at 32%. By the terms of the Settlement Agreement and this Court's Order capping

fees, a common benefit award is deducted not from the claimant's portion but from the total

amount of counsel fees payable under the individual contingent fee arrangements. Thus, 32% of

$4.85 billion represents the total amount of possible attorney compensation, including work done

by the claimant's primary attorney on his or her behalf and work done by common benefit

attorneys on behalf of all Vioxx claimants. The tension in this case is between the attorneys who

_____

lower fee than the class action fee award.") (emphasis in original).

have done common benefit work and the primary attorneys who have not.

Members of the PSC and others who performed common benefit work in the MDL are undoubtedly entitled to compensation.  So, too are the primary attorneys who represented individual claimants and bore the responsibility of obtaining information from them and keeping them advised of all developments.  This Court has acknowledged the substantial work done by individual attorneys.  *In re Vioxx*, 650 F. Supp. 2d at 564.  But the undeniable fact remains that the great bulk of the work as well as the expense was borne by the attorneys who performed common benefit work.  Thus, in determining a reasonable common benefit fee the Court must resolve the "taffy pull" between the interests of common benefit counsel and primary attorneys in receiving fair compensation for their respective work.  At first blush to award common benefit fees  might be criticized as double dipping and not appropriate.  But on closer scrutiny it clearly is not.  It is true that many of those who have done common benefit work have their own clients and have received or will receive a fee from them.  But it is not double dipping because the common benefit fee will not come from any client.  Instead it will come from the attorneys, most of whom have not done any common benefit work but have received enormous benefit from it.  Thus as between a common benefit attorney who expended considerable time, resources, and took significant economic risks to produce the fee, and the primary attorney who did not, it is appropriate and equitable that the former receive some economic recognition from the beneficiary of this work.

To determine an appropriate common benefit fee in this case the Court looks to comparable MDL set-aside assessments and awards of common benefit fees.  Two notable examples are found in the *Zyprexa* and *Guidant* litigations, which this Court has previously cited

as being similar to the Vioxx litigation. In *In re Zyprexa*, the court established two separate common benefit funds to compensate common benefit work done by two separate Plaintiffs' Steering Committees. The first PSC was compensated by a set-aside of 1% of the gross amount of a master settlement, plus interest on the amount held in escrow. *See In re Zyprexa*, 467 F. Supp. 2d at 263. A second fund was established to compensate the second PSC through a 3% hold-back of any subsequent recoveries, to be split evenly between the claimant's recovery and the fees otherwise payable to the individual attorney. *See In re Zyprexa*, 467 F. Supp. 2d at 261; *In re Zyprexa*, MDL No. 1596, 2007 WL 2340790, at *1 (E.D.N.Y. Aug. 17, 2007). The court in *Zyprexa* also capped contingent fees at 35% of amounts greater than $5,000. *In re Zyprexa*, 424 F. Supp.2 d 488 (E.D.N.Y. 2006).

In *In re Guidant*, the court awarded 14.375% of a global settlement amount as a common benefit award and initially capped individual contingent fees at 20%. *In re Guidant*, 2008 WL 451076, at *1. The court found that the parties had contracted around a previous 4% common benefit fee assessment by entering into a Master Settlement Agreement. *Id.* at *11-12. In a subsequent reconsideration, the court capped the total attorney fees (including the share of the common benefit award plus individual contingent fees) at the lowest of 37.18%, or a lower contingent fee arrangement, or a state-imposed contingent fee limit. *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 3896006, at *1 (D. Minn. Aug. 21, 2008).

Other MDL courts have also established funds for common benefit compensation by ordering set-aside assessments of individual plaintiff settlements and awarded fees from those funds. *E.g., In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,

-23-

553 F. Supp. 2d 442, 457-58, 491-96 (E.D. Pa. 2008) (describing 9% federal and 6% state

assessments later reduced to 6% and 4%, respectively; awarding less than total fund created by

assessments); *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907,

909, 919 n.19 (N.D. Ohio 2003) (awarding common benefit fees out of $50,000,000 fund created

through assessment representing 4.8% of settlement value); *In re Protegen Sling & Vesica Sys.*

*Prods. Liab. Litig.*, MDL No. 1387, 2002 WL 31834446, at *1, *3 (D. Md. Apr. 12, 2002) (9%

federal, 6% coordinated state assessments); *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348,

2002 WL 441342, at *1 (S.D.N.Y. Mar. 20, 2002) (6% withholding in federal cases, 4% in

participating state cases); *In re Orthopedic Bone Screws Prods. Liab. Litig.*, MDL No. 1014,

2000 WL 1622741 (E.D. Pa. Oct. 23, 2000) (awarding full 12% of withheld fees); *see also*

Rubenstein, *supra* at 87 (2009) (collecting cases and concluding that most common benefit

assessments range from 4% to 6%); 4 Alba Conte & Herbert B. Newberg, *Newberg on Class*

*Actions* § 14:9 (4th ed. 2002) ("Most [MDL] courts have assessed common benefit fees at about

a 4-6% level, generally 4% for a fee and 2% for costs."); Paul D. Rheingold, *Litigating Mass*

*Tort Cases* § 7:35 (2010) ("[P]ercentages awarded for common funds in recent MDLS ... were in

the 4-6% range.") (citation omitted).

These examples demonstrate that a reasonable common benefit assessment or award can

vary from MDL to MDL and that there is no mathematical formula for deriving a "correct"

amount. Indeed, the Court notes that the PLC initially requested a common benefit award of 8%

and contended such an amount would be presumptively reasonable. A year and a half later, after

Objector's Liaison Counsel had an opportunity for discovery, the PLC reduced its common

benefit award request to 7.5%. If 8% was presumptively reasonable but the PLC nonetheless

voluntarily reduced the request to 7.5%, the Court is led to conclude that even the PLC believes

that a reasonable benchmark percentage is a flexible concept.  With that this Court agrees.

In light of the foregoing, and guided by this Court's observations over the last five years

of the nature and scope of the work and effort of those attorneys who performed common benefit

work, the Court finds that 6% of the settlement amount is a reasonable benchmark percentage for

a common benefit fee award.  This figure represents about 20% of the total attorneys' fees.  This

figure is within the range of MDL awards and assessments described above.  No part of this 6%

will come from the recovery of any Vioxx claimant; rather, it will be assessed against the

contingent fee recoveries of all Vioxx primary plaintiffs' attorneys.  Furthermore, in

recommending the Settlement Agreement to their clients and participating in the Settlement

Program, all Vioxx primary plaintiffs' attorneys consented to a common benefit assessment of

up to 8%.  Accordingly, an assessment of 6% is clearly acceptable to them. It is now appropriate

to test this percentage in the crucible of the *Johnson* factors to determine whether an adjustment,

upwards or downwards, is in order.

### 4.   *Consideration of the* Johnson *Factors*

The Court will now consider the *Johnson* factors, addressing them in conjunction with

the circumstances of this case.[19]

> **(a)   The Time and Labor Required; Time Limitations Imposed by
> the Client or the Circumstances; The Preclusion of Other
> Employment by the Attorney Due to Acceptance of the Case**

---

[19] The Fifth Circuit advises that it does "not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228-29 (5th Cir. 2008) (quoting *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 331 (5th Cir. 1995)).  The Court shall attempt to comply with this guidance.

Throughout the Vioxx litigation, the Court has repeatedly expressed its intent and desire to see an expedited resolution. Indeed, all interested parties, including the PSC and Merck, have recognized that prompt resolution would be invaluable to those impacted by Vioxx. The Herculean effort expended by the PSC and other counsel performing common benefit work in realizing that goal can hardly be understated. They have documented and submitted over 560,000 hours of work during the course of this litigation. As a matter of fact this Court finds that this is a realistic and fair assessment of the work required to bring about the achieved result.

Counsel met and exceeded this Court's desire for expedited resolution of this matter. Following the formal appointment of the PLC and the PSC, the attorneys committed to intensive discovery and pretrial efforts. The PSC operated on many fronts, preparing pleadings and Master Class Action complaints, taking over 2,000 depositions, reviewing and compiling over 50,000,000 documents, briefing and arguing over 1,000 discovery motions, assembling a trial package, conducting bellwether trials, negotiating the global Settlement Agreement, and implementing the payout under the Agreement. The time and labor expended in this effort is impressive.

The *Johnson* court explained that the "time limitations factor imposed by the client or the circumstances" factor is intended to address "[p]riority work that delays the lawyer's other legal work" or the situation in which "a new counsel is called in to prosecute the appeal or handle other matters at a late stage in the proceedings." *Johnson*, 488 F.2d at 718. This factor encompasses the same considerations discussed in connection with the "time and labor" factor. Likewise, the "time and labor" and "preclusion of other employment" factors appear to the Court to overlap. Collectively, these three factors require the Court to give appropriate credit to the

intensive and sustained efforts of common benefit counsel to bring this litigation to a timely

resolution.  Bellwether trials began within a year of the MDL designation.  Settlement was

achieved within three years, interim payments began within a year of the settlement agreement,

and final resolution of nearly 50,000 claims was made between one and two years thereafter.

The "time and labor" factor warrants a moderate upward variance.

### (b)      The Novelty and Difficulty of the Questions; The "Undesirability" of the Case

The Vioxx litigation was novel and difficult on a variety of levels.  Substantively, the

litigation required complex medical and scientific knowledge, including analysis of

pharmaceutical trials and causation issues.  Globally, the parties hotly disputed the general

causation question of whether Vioxx caused the sorts of injuries alleged as well as the

significance of various pharmaceutical studies.  Individually, each Vioxx case tried before this

Court and the coordinated state courts involved unique, complicated, and disputed issues of

specific causation. The legal aspects of the litigation were equally diverse and complicated.  As

this Court previously observed:

> [T]his is essentially a products liability case, and all products liability cases pose
> significant challenges to plaintiffs' counsel. ... In addition, the basic challenges
> inherent in any products liability case were compounded in this case by a host of
> complex legal issues unique to the instant litigation, including (to name only a
> few) the learned intermediary doctrine, contributory negligence, causation,
> federal preemption laws, and Merck's assertion of attorney-client privilege with
> respect to thousands of documents in its possession.

574 F. Supp. 2d at 616-17.  Finally, the sheer magnitude of the Vioxx litigation posed its own

legal, logistical, and managerial challenges.  Accordingly, the novelty and difficulty of the

questions confronted by the PSC and other common benefit attorneys weighs in favor of an

upward adjustment.

On the other hand, the Court finds that the complexity and difficulty of this litigation does not imply any "undesirability" in the *Johnson* framework.  The *Johnson* court offered as an example a civil rights attorneys whose representation of an unpopular client may "not [be] pleasantly received by the community or his contemporaries" and "can have an economic impact on his practice." 488 F.2d at 719.  The Court finds that the Vioxx litigation was not undesirable in this sense, and this factor does not affect the Court's analysis.

### (c)   The Skill Requisite to Perform the Legal Service; The Experience, Reputation, and Ability of the Attorneys

The Court recognizes the expertise possessed and employed by the PSC and other common benefit attorneys to bring this litigation to its successful resolution.  The attorneys doing common benefit work are among the finest attorneys practicing in the field.  However, the primary attorneys who represented individual Vioxx claimants also brought substantial skill and ability to bear in assessing cases, instructing their paralegals on properly and efficiently collecting information and filling out various forms, and assisting their clients through the settlement process.  The Court cannot say that the skill required and the skill brought to bear by attorneys doing common benefit work was so superior to that possessed by primary attorneys representing individual clients as to warrant a *Johnson* adjustment which would in effect shift attorneys' fees from one group to the other.  There were many excellent, hard-working attorneys who did not make it on to the PSC simply due to limitations of committee size.  Accordingly, neither of these factors call for an adjustment of the benchmark percentage in this case.

### (d)   Nature and Length of the Professional Relationship with the Client

The PSC states that this factor is "neutral as it relates to the requested percentage since

there are few, if any, longstanding client relations with the Vioxx Claimants." (Rec. Doc.

17642-3 at 65). The Court agrees. "'The relationship did not antedate the litigation, nor will it

likely continue beyond the closure of this case.'" *Murphy Oil*, 472 F. Supp. 2d at 866-67

(quoting *In re ETS*, 447 F. Supp. 2d at 632).

**(e)      Customary fee; Whether the Fee is Fixed or Contingent**

"These factors primarily deal with the expectation of plaintiffs' attorneys at the outset of

' the case when measuring the risks involved and deciding whether to accept the case." *Murphy*

*Oil*, 472 F. Supp. 2d at 866 (citing *Johnson*, 488 F.2d at 718). "In effect, these factors seek to

reward the attorney for accepting the risk and achieving successful results." *Id.* The PLC argues

that the Vioxx litigation was fraught with risk for plaintiffs' attorneys, and furthermore that in

light of customary fees their requested 7.5% is appropriate compensation for common benefit

work. The Court has already recognized the novelty and the substantial legal hurdles to

successfully resolving these claims in connection with a prior *Johnson* factor. Furthermore, at an

early stage in this litigation the Court established a fund to compensate attorneys for common

benefit fees and expenses; accordingly, the risk assumed by common benefit attorneys was

somewhat mitigated. Finally, the Court's analysis of the range of common benefit fee awards

and assessments in other MDLs adequately addresses the customary fee. These factors in and of

themselves do not warrant adjustment of the benchmark percentage.

**(f)      The Amount Involved and the Results Obtained**

Attorneys doing common benefit work on behalf of Vioxx users have achieved a

favorable and meaningful global resolution:

> This is not a case in which the class receives only illusory benefits in the form of
> coupons or discounts. Rather, counsel has achieved a substantial settlement in an

-29-

> efficient manner that minimizes the drain on the parties' and the Court's resources. Counsel also devised a plan for distribution of the fund and payment of claims that is practical, streamlined and fair.

*In re ETS*, 447 F. Supp. 2d at 632.

As discussed above, resolution of this multidistrict litigation through the global Settlement Agreement was vastly preferable to expensive and time-consuming case-by-case trial of individual Vioxx claims, or to piecemeal settlement. The Settlement Agreement ensured fair and comprehensive compensation to all qualified participants. The overwhelming participation rate of 99.9% further underscores the benefit of the results obtained. PSC members achieved more than a fair and adequate bargain for Vioxx users. Thus, the Court finds that this factor supports an upward adjustment of the benchmark percentage.

### (g)   Awards in Similar Cases

As the Court described above, there is a wide range of common benefit fee assessments and awards in MDL cases and other complex litigation. *E.g.*, *In re Diet Drugs*, 553 F. Supp. 2d at 457-58, 491-96 (describing various 9% federal and 6% state assessments later reduced to 6% and 4%, respectively; awarding less than total fund created by assessments); *Guidant*, 2008 WL 451076, at *1 (14.375% of settlement value); *In re Zyprexa*, 467 F. Supp. 2d at 261-63 (1% and 3% of separate settlement amounts); *In re Sulzer Hip Prosthesis & Knee Prosthesis*, 268 F. Supp. 2d at 909, 919 n.19 (awarding common benefit fees out of $50,000,000 fund created through assessment representing 4.8% of settlement value); *In re Protegen Sling & Vesica Sys.*, 2002 WL 31834446, at *1, *3 (9% federal, 6% coordinated state assessments); *In re Rezulin*, 2002 WL 441342, at *1 (6% withholding in federal cases, 4% in participating state cases); *In re Orthopedic Bone Screws*, 2000 WL 1622741 (awarding full 12% of withheld fees); *see generally*

Paul D. Rheingold, *Litigating Mass Tort Cases* § 7:46 *et seq.* (2010) (collecting fee award case histories). The 6% benchmark percentage is comfortably within that range, and not so out of line that it requires upward or downward adjustment.

### 5.    *Adjusted Benchmark Percentage*

The Court has found that at least three of the *Johnson* factors warrant an upward adjustment of the benchmark percentage. Based on its observation and knowledge of the amount and nature of the common benefit work done in this case, the Court concludes that a reasonable adjustment is 0.5%. Accordingly, the Court will increase the benchmark percentage upward from 6% to 6.5% of $4,850,000,000, or $315,250,000. Primary Vioxx attorneys will still receive over 25% of the total settlement value in this matter, amounting to approximately $1,236,750,000. This should be adequate compensation for the primary attorneys, particularly in light of the benefits of economies of scale and for the relief of the burden of pretrial discovery and settlement negotiation.

### C.    Lodestar Cross-Check

To confirm that the determined percentage-fee value in this case is appropriate, the Court believes it is important to conduct a lodestar cross-check. In the cross-check, the Court multiplies the reasonable hours worked by reasonable billing rates to calculate a time-fee value for the common benefit work performed. Then, the Court divides the percentage-fee value by the time-fee value to determine a lodestar multiplier and to test whether the percentage fee value represents an unreasonable award or "windfall" over the reasonable value of the work performed. *See, e.g.*, *In re Diet Drugs*, 553 F. Supp. 2d at 485-86. This use of the lodestar as verification rather than as a method for determining a reasonable attorneys' fee award dates to

the mid-1990s, when courts sought to address some disadvantages to the percentage method,

such as a lack of guidance on how to adjust percentage fees in light of the circumstances of a

particular case. *See* Walker & Horwich, *supra*, at 1458-63 (tracing the evolution of the lodestar

cross-check and its "rising use"). The application of the lodestar analysis as a cross-check is

helpful in determining whether the benchmark percentage is reasonable given the circumstances

of the case, and appropriate according to Fifth Circuit precedent. The lodestar cross-check is

meant to be a rough analysis:

> (It) need entail neither mathematical precision nor bean counting. For example, a
> court performing a lodestar cross-check need not scrutinize each time entry; reliance
> on representations by class counsel as to total hours may be sufficient . . . .
> Furthermore, the lodestar cross-check can be simplified by use of a blended hourly
> rate . . . .

Walker & Horwich, *supra*, at 1463-64 (citing *In re Rite Aid Corp. Sec. Litig*, 396 F.3d 294, 306

(3d Cir. 2005)).[20]

The cross-check process begins with an analysis of the time logged and the appropriate

hourly rate to be assigned. To assist in this process, the Court approved the retention of Philip

Garrett, CPA, to receive, compile, and report the common benefit time and expense submissions

of counsel. Mr. Garrett provided monthly reports of time and expenses submitted by the PLC

pursuant to procedures set forth in Pretrial Order 6. The Court has reviewed these reports

---

[20] A district court's scrutinizing of attorney time includes painstaking review of each
time entry under the lodestar procedure. The experience level of the attorney and the type of
work performed may reduce the hourly rate. For example, the district court may ask such
questions as whether the attorney was conducting the deposition or only attending a deposition;
whether he or she was traveling at the time or in the office, or how many years of experience the
attorney possessed. The court also compares and cross-checks the entries of different attorneys
to ensure that any duplication of effort is accounted for and no over-billing occurs. These are
just some examples, by no means exhaustive, of the detailed and time-consuming tasks required
of the district court if the traditional lodestar method is faithfully applied.

throughout the litigation.

With respect to the number of common benefit hours submitted, Mr. Garrett provided

summaries in connection with the PLC's motion in January, 2009, and again in July, 2010.  In

the January, 2009 report he presented a figure of 503,185 hours of common benefit work

reported by attorneys from 109 firms.  Mr. Garrett in an affidavit explained the procedures he

followed to vet and disallow inadequately detailed submissions, pursuant to which the submitters

"voluntarily withdrew from inclusion in the collective lodestar analysis substantial submissions

of hours of time having a significant lodestar value."  Mr. Garrett later submitted an updated

collective calculation for common benefit work through July 30, 2010.  The updated submission

accounts for approximately 562,943.55 hours of professional time submitted by 109 law firms as

of July 30, 2010.[21]  Those updated submissions were also subjected to the same vetting

procedures.  Thus, the PLC has submitted documentation of 562,943.55 hours, which has been

checked and approved by the Court-appointed CPA.  The Court finds those hours to be reliable

and supported in light of the procedures put in place by PTO 6 and implemented by Mr.

Garrett.[22]

With respect to the appropriate hourly rate, Mr. Garrett utilized each individual

---

[21]The PLC also submitted a compilation of time reports disclosing that up to July 7, 2010, attorneys had submitted 448,195.95 hours.  Thus, out of the 562,943.55 hours submitted through July 30, 2010, at least 79.6% of the hours submitted for the lodestar calculation were attorney hours, rather than hours worked by paralegals or others.  The PLC also submitted individual breakdowns of each attorney's hours, without specifying whether the attorney is a partner or associate, or the attorney's hourly rate used in calculating the lodestar.  The PLC did not submit the ratio of partner to associate hours.

[22]This finding is sufficient for the purposes of the rough lodestar cross-check.  This finding does not preclude the Allocation Committee or the Court from disallowing any particular submissions of common benefit time when allocating the common benefit fee award.

submitter's actual reported billing rate.  In connection with the January 2009 report, the average

billing rate for all partner, associate, and other professional common benefit time was $431.51

per hour.  In connection with the July 2010 updated report, the average billing rate for all

partner, associate, and other professional common benefit time was $443.29 per hour.  The Court

recognizes that attorneys from across the country contributed common benefit work to the MDL,

and that billing rates vary among legal markets.  The Court has previously used a range of $300

to $400 per hour for members of a Plaintiffs' Steering Committee and $100 to $200 per hour for

associates to "reasonably reflect the prevailing [billable time] rates in *this* jurisdiction." *Murphy*

*Oil*, 472 F. Supp. 2d at 868-69 (emphasis added).  But in *Murphy Oil*, all of the attorneys were

local to the Eastern District of Louisiana so it was appropriate to use a rate consistent with local

standards.  In Vioxx, on the other hand, the attorneys come from states across the country.  Thus

a more national rate is the appropriate pole star to guide the Court.  Although the Court has not

been provided with the individual attorney billing rates used by Mr. Garrett to calculate the

lodestar, for the purposes of the lodestar cross-check the Court need not crunch the numbers for

individual attorneys and other legal professionals from 109 law firms across the country, or to

apply a single billing structure.[23]  The Court finds that the hourly rate of $443.29 (the average of

the billing rates for common benefit submitters) is an appropriate hourly rate from which to start

the analysis in view of the fact that it is a combined rate and does not distinguish between work

done by various level of attorneys including the work done by others.  Further, this rate is in line

---

[23]*See In re Orthopedic Bone Screws*, 2000 WL 1622741, at *8 n.18 ("[T]he hourly rate to
be used in computing counsel's lodestar is the rate that is normally charged by counsel of
comparable standing, reputation, experience and ability in the community where counsel
practices. .... Presumptively, this is the attorney's 'usual' billing rate.").

with hourly rates used by other courts supervising other national MDLs. *E.g.*, *In re Guidant*, 2008 WL 682174, at *15 (D. Minn. Mar. 7, 2008) (average attorney rate of $379.40 per hour and paralegal rate of $127.49 per hour).

Utilizing the reasonable amounts for the number of hours worked and the averaged billing rate, Mr. Garrett calculated several collective time-fee values for the common benefit services. Through January 2009, he multiplied each individual's hours, totaling 503,185 hours of common benefit work, by that individual's actual billing rate, averaging $431.51 per hour, to calculate a time-fee value for all common benefit work through January, 14, 2009, of $217,128,800.40.[24] Mr. Garrett updated his time-fee value calculation for additional hours submitted through July 30, 2010. He multiplied each submitting individual's hours, totaling 562,943.55 hours of common benefit work, by that individual's actual billing rate, averaging $443.29 per hour, to generate a total time-fee value for all common benefit work through July 30, 2010, of $249,546,751.20. The Court has found that the submitted hours are reasonable and that the actual billing rates which average $443.29 are reasonable. Accordingly, the Court accepts Mr. Garrett's calculation of a time-fee value of $249,546,751.20 for all common benefit work performed through July 30, 2010.

The next step in the lodestar cross-check is to compare the time-fee value to the Court's adjusted percentage-fee value and determine whether a lodestar multiplier is warranted.[25] That is

---

[24]Mr. Garrett also calculated a time-fee value using the same number of hours, but multiplying those hours by the highest billing rate of each category of submitter, such as partner, associate, or paralegal. The highest billing rate time-fee value was $321,897,534.95, which reflects an average billing rate of $639.72 per hour.

[25] The Supreme Court recently addressed lodestar and lodestar multiplier analysis in the context of a civil rights fee-shifting statute. *Perdue v. Kenny A. ex rel Winn*, 130 S. Ct. 1662

-35-

to say, the Court must verify its percentage calculation and determine whether the percentage fee should be increased or decreased in view of other factors. The use of a multiplier is not mandatory and depends on the circumstances of the case. Indeed, a multiplier may not be warranted if the time-fee value adequately compensates the attorneys for their services. *See, e.g, Strong*, 137 F.2d at 851 (affirming district court decision not to use multiplier to award additional fees). In the present case, however, the Court has already considered the *Johnson* factors and concluded that a 0.5% increase in the benchmark percentage is warranted. Therefore, it is appropriate to allow for an appropriate lodestar multiplier to the time-fee value in performing the lodestar cross-check.

The Court has concluded that 6.5% of the total settlement amount, or $315,250,000, is a reasonable common benefit fee award. To test this percentage-fee value by the lodestar method it is necessary to divide $315,250,000 by the time-fee value of the common benefit work, which is $249,546,751.20. This produces a lodestar multiplier of approximately 1.2633.[26] This lodestar multiplier is well within the range computed in other comparable MDL or mass tort cases. *See, e.g., In re Diet Drugs*, 553 F. Supp. 2d at 485-87 (E.D. Pa. 2008) (2.6 multiplier, and

---

(2010). In *Perdue*, the Supreme Court held that the lodestar analysis pursuant to U.S.C. § 1988 generally takes into account any factors that might justify a multiplier of the lodestar amount. *Id.* at 1673-75. Therefore, absent "rare" and "exceptional" circumstances, the lodestar amount is presumptively reasonable. *Id.* The Supreme Court also held that under those facts, the district court's 75% multiplier of the lodestar amount was essentially arbitrary. *Id.* at 1675-76. The Supreme Court's holding was informed by the Supreme Court's lodestar jurisprudence and the statutory purpose of § 1988. *Id.* at 1676-77. Accordingly, *Perdue* has little bearing on the use of the lodestar as a cross-check of a common benefit fee awarded as a percentage of a common fund.

[26]Mr. Garrett calculated a lodestar multiplier by dividing the PSC's requested common benefit fee of 7.5% of $4.85 billion, or $363,750,000, by the time-fee value, or $249,546,751.20, and calculated that the 7.5% fee would represent a multiplier of 1.4576 times the time-fee value.

collecting cases with multipliers between 2.4 and 4.45). Other MDL courts have applied lower

multipliers. *In re Guidant*, 2008 WL 682174, at *15 (D. Minn. Mar. 7, 2008) (1.19 multiplier);

*In re Orthopedic Bone Screws*, 2000 WL 1622741, at *8-9 (applying reducing factor because

requested fee exceeded available funds). Therefore, the Court is satisfied that the rough lodestar

cross-check demonstrates that the 6.5% blended percentage fee is well within the reasonable

range. Accordingly, the Court determines that the lodestar cross-check firmly supports an award

of 6.5% of the total settlement of $4.85 billion.

### D. Fee Award

For the foregoing reasons, the Court awards a common benefit fee of $315,250,000,

which is equivalent to 6.5% of $4,850,000,000.

This amount will be available for distribution among all attorneys who performed

common benefit work in the MDL and associated state litigation. The Court will first allow the

Allocation Committee designated in Pretrial Order 32 to arrive at a suggested distribution,

pursuant to the Allocation Guidelines set forth in Pretrial Order 6D and consistent with the

evidence produced during hearings conducted or to be conducted for the purpose of determining

an appropriate distribution. If disputes arise, the Court will consider appointing a special master

to evaluate the recommendation of the allocation committee and the evidence on which it based

its recommendation, and to take additional evidence if necessary. The special master will submit

a report of his or her findings to the Court for a final determination. The Court retains

jurisdiction for purposes of supervising the allocation.

### III. CONCLUSION

For the foregoing reasons, IT IS ORDERED that the PLC's Motion for Award of

Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses (Rec. Doc. 17642) is

GRANTED IN PART as set forth in the foregoing Order & Reasons.

New Orleans, Louisiana, this 19th day of October, 2010.

UNITED STATES DISTRICT JUDGE

# EXHIBIT C

# Stratton Faxon

### Connecticut's Firm for Trial Law

Michael A. Stratton
mstratton@strattonfaxon.com

July 28, 2010

**VIA FACSIMILE**

Honorable Eldon E. Fallon
U.S. District Court
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA 70130
(504) 589-6966

> Re:   **MDL No. 1657**
> **Section L**
> **In Re Vioxx Products Liability Litigation**
>
> **Common Benefit Fees**

Dear Judge Fallon:

As you know, the objectors through undersigned examined 500,000 hours submitted by common benefit lawyers, took depositions, briefed several issues, and consulted with mass tort class action fee experts in academia. The 7.5 percent joint recommendation made yesterday is well supported by our investigation, precedent, and the academic writings in this field. Moreover, our experts agreed that 7.5 percent was a fair fee award for the common benefit lawyers given precedent and the work done in this case.

Thank you for allowing us to clarify the basis for our asking for a reduction of the fee to 7.5 percent.

Very truly yours,

Michael A. Stratton

59 Elm Street, New Haven, CT 06510 • Telephone: 203.624.9500 • Fax: 203.624.9100 Toll-free: 866.351.9500 • www.strattonfaxon.com

EXHIBIT B

# EXHIBIT D

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3   ****************************************************************

 4
     IN RE:  VIOXX PRODUCTS
 5      LIABILITY LITIGATION

 6                              DOCKET NO. 05-MDL-1657
                                NEW ORLEANS, LOUISIANA
 7                              THURSDAY, FEBRUARY 17, 2011, 3:30 A.M.

 8   THIS DOCUMENT RELATES TO
     ALL CASES
 9

10   ****************************************************************

11
                        TRANSCRIPT OF PROCEEDINGS
12      HEARD BEFORE THE HONORABLE ELDON E. FALLON
                  UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15

16   FOR THE PLAINTIFFS:     HERMAN HERMAN KATZ & COTLAR
                             BY:  RUSS M. HERMAN, ESQUIRE
17                           820 O'KEEFE AVENUE
                             NEW ORLEANS LA  70113
18

19                           BEASLEY ALLEN CROW METHVIN
                             PORTIS & MILES
20                           BY:  ANDY D. BIRCHFIELD, JR., ESQUIRE
                             234 COMMERCE STREET
21                           POST OFFICE BOX 4160
                             MONTGOMERY AL  36103
22

23                           SEEGER WEISS
                             BY:  CHRISTOPHER A. SEEGER, ESQUIRE
24                           ONE WILLIAM STREET
                             NEW YORK NY  10004
25
```

08:50AM
08:50AM
08:50AM
08:50AM

EXHIBIT C

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR THE OBJECTORS:          MARGARET E. WOODWARD
                                  ATTORNEY AT LAW
 4                                3701 CANAL STREET, SUITE C
                                  NEW ORLEANS LA   70119
 5

 6                                ROBERT E. ARCENEAUX
                                  ATTORNEY AT LAW
 7                                47 BEVERLY GARDEN DRIVE
                                  METAIRIE LA   70001
 8

 9                                AJUBITA LEFTWICH & SALZER
                                  PASCAL F. CALOGERO, JR., ESQUIRE
10                                1100 POYDRAS STREET
                                  NEW ORLEANS LA   70163
11

12

13    SPECIAL MASTER:            JUNEAU DAVID
                                  BY:  PATRICK A. JUNEAU, ESQUIRE
14                                THE HARDING CENTER
                                  1018 HARDING STREET, SUITE 202
15                                P.O. DRAWER 51268
                                  LAFAYETTE LA   70505
16

17

18    OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
                                  CERTIFIED REALTIME REPORTER
19                                500 POYDRAS STREET, ROOM B406
                                  NEW ORLEANS, LOUISIANA 70130
20                                (504) 589-7779

21

22    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
      PRODUCED BY COMPUTER.

23

24

25
```

03:40PM 1   comfortable with where they came from.  Also, on October 19th,

03:40PM 2   this Court issued an order which went through the Stratton

03:41PM 3   objection and made no mention of any sort of deal or payment of

03:41PM 4   money or anything like that.

03:41PM 5       On January 21st, when the total amounts came out, I was

03:41PM 6   again concerned because, instead of 315,250,000, I expected there

03:41PM 7   to be 18.5 million or $19.2 million less than that; but, instead,

03:41PM 8   the total added up to 311 million.

03:41PM 9       I wanted to bring this to the Court's attention because now

03:41PM 10  my attorney is in possession of these checks, and I'm concerned

03:41PM 11  about this, wanted to bring this to the Court's attention.  I

03:41PM 12  know this Court values transparency above all, and I'm confused

03:41PM 13  by the issue.  I thank the Court for allowing me to address this

03:41PM 14  issue.

03:41PM 15      THE COURT:  Fine.  The only thing I know of it is that

03:41PM 16  there was an objection to the total sum of the common benefit

03:42PM 17  fund, that Mr. Stratton represented the objectors, and I presided

03:42PM 18  -- or I gave them an opportunity to do some discovery early on.

03:42PM 19  They did some discovery.  They had some issues.  I resolved the

03:42PM 20  discovery issues, the evidentiary issues.  They proceeded on with

03:42PM 21  the case.

03:42PM 22      I was advised that the objectors withdrew the objection.

03:42PM 23  That's all that I know of it.  I wasn't involved in any

03:42PM 24  discussions or agreements.  That's why I didn't issue any orders.

03:42PM 25  It didn't come to my attention in that form or fashion.  If any

03:42PM  1   of the --

03:42PM  2           MR. HERMAN:   I'll be happy to respond, Your Honor.

03:42PM  3           THE COURT:   Sure.

03:42PM  4           MR. HERMAN:   Mr. Stratton, on behalf of a number of

03:42PM  5   objectors who had objected to the 8 percent withdrawal from -- in

03:43PM  6   order to fund common benefit fees, filed, actually, an action

03:43PM  7   within the MDL to have those -- that 8 percent judgment set

03:43PM  8   aside, at least for those objectors.

03:43PM  9           If Ms. Snapka received a check, she was an objector.

03:43PM  10  Mr. Stratton then affirmed on the record in writing and before

03:43PM  11  Your Honor that he had unanimous consent to negotiate and resolve

03:43PM  12  all the objections.

03:43PM  13          We entered negotiation after, and Mr. Stratton took my

03:43PM  14  deposition and I took his deposition.  We entered a settlement

03:44PM  15  negotiation which was supposed to be confidential as regards

03:44PM  16  Mr. Stratton, which obviously is not confidential, and settlement

03:44PM  17  resolutions are not necessarily published.

03:44PM  18          The return of funds to the various objectors resolved their

03:44PM  19  objections as regards deductions from them of common benefit

03:44PM  20  fees.  The common benefit fund, therefore, was reduced by the

03:44PM  21  objectors receiving back funds which they had contended were not

03:44PM  22  due to be placed in the common fund.

03:44PM  23          As regards any communications between Mr. Stratton and

03:44PM  24  Ms. Snapka or Mr. Stratton and any other objector who received

03:45PM  25  their monies back, we have no knowledge.  We certainly don't know

# EXHIBIT E

# BECNEL LAW FIRM, LLC

**ATTORNEYS AND COUNSELORS AT LAW**

NOTARIES PUBLIC

DANIEL E. BECNEL, JR.*
DANIEL E. BECNEL, III *
DARRYL J. BECNEL
MATTHEW B. MORELAND
KEVIN P. KLIBERT
SALVADORE CHRISTINA, JR.
WILLIAM A. PERCY, III
CHRISTOPHER D. BECNEL
KATHRYN W. BECNEL*
TONI S. BECNEL
CHANCE C. WHITE
KRISTIE D. HOLM
MARISHA H. FRAAZA
*Of Counsel:*
BRADLEY D. BECNEL
JUDGE RUCHE J. MARINO (RETIRED)
*Also Admitted in Colorado*

*Please Reply To:*
☑ 106 WEST SEVENTH STREET
P.O. DRAWER H
RESERVE, LOUISIANA 70084
(985) 536-1186
(985) 536-7904
· FAX (985) 536-6445
E-MAIL: dbecnel@becnellaw.com
www.becnellaw.com

☐ 425 WEST AIRLINE HIGHWAY
SUITE B
LAPLACE, LOUISIANA 70068
(985) 651-6101
(985) 652-3643
(985) 652-3668
FAX (985) 651-6104
E-MAIL: becket@becnellaw.com

Kay K. Serven
   *Office Administrator*
Susan B. Williams
   *Nurse*

September 7, 2010

**VIA FACSIMILE NO. (203) 624-9100**
**and by EMAIL mstratton@strattonfaxon.com**

Mr. Michael A. Stratton
Stratton Faxon
59 Elm Street
New Haven, CT 06510

Re:   Vioxx Common Benefit Assessment Rebate

Dear Mr. Stratton:

Please be advised that your letter to me does not comply with Louisiana law concerning a settlement accounting. This case was originally filed by me and I argued that the case be moved to Judge Fallon before the MDL Committee, Judge Fallon ultimately was given the case. I also filed an objection to the common benefit fee being raised to 8% since I had filed the necessary paperwork for an assessment of 2% fees and 2% costs (see enclosed). As you know, my firm was one of the major firms who did a great deal of common benefit work in this case (16,167.50 hours). You advised me today that you spoke to Sal Christina of my firm on three occasions. Mr. Christina has advised me that you called him but not me about the case. He also called you on one occasion to get an update but you were not in, he left a message and you returned his call.

$1,166,287.17 was the total withheld from my firms attorney fees based upon the 8% requested by the PSC.

September 7, 2010
Page 2

To date, you have not furnished me with an itemization of costs and/or fees. You have made reference to an expert from Harvard however, you have not furnished me with a copy of the expert report, much less his time and charges.  This is the first communication in writing that I have received from you.

You have given me no accounting of costs incurred by your firm, much less a settlement breakdown in this case.  According to the Louisiana Rules of Professional Conduct, specifically Rule 1.5, (b) and (e) we have an obligation to inform all of our clients of all of the names of attorneys and law firms collecting a fee from their case.  In order for us to comply with our Rules of Professional Conduct I must have an itemization of all costs and fees that are being collected by your firm regarding my clients.  Without this, Louisiana law will not allow us to share fees with your firm.

I trust I will hear from you shortly.

Very cordially yours,

Daniel E. Becnel, Jr.
Attorney at Law

DEBJr/ks
Enclosure
cc:    Honorable Eldon Fallon
       Russ Herman, Esq.

# EXHIBIT F

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

## for the

### Eastern District of Louisiana

| | | |
|---|---|---|
| IN RE: VIOXX | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  BROWN GREER, PC

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:  SEE ATTACHMENT

| Place:  Margaret E. Woodward, 3701 Canal St., Ste. C, New Orleans, LA., or via email to mewno@aol.com | Date and Time:<br><br>02/28/2011 1:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___02/18/2011___

*CLERK OF COURT*

OR

_____          s/ Margaret Woodward
*Signature of Clerk or Deputy Clerk*                   *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   those persons identified as Objectors in Feb. 8, 2011 Court Order _____ , who issues or requests this subpoena, are:
Margaret E. Woodward, 3701 Canal St., Suite C, New Orleans, LA. 70119, (504) 301-4333, mewno@aol.com,  co-lead counsel for Objectors

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   MDL NO. 1657

# PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION  L |
| | * | |
| THIS DOCUMENT RELATES | * | JUDGE FALLON |
| TO ALL CASES | * | MAG. JUDGE KNOWLES |
| | * | |
| FILER: Robert E. Arceneaux/Margaret Woodward | * | February 21, 2011 |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## ATTACHMENT A TO BROWN GREER PC SUBPOENA DUCES TECUM

1.   Copies of all bank statements of all accounts established by you, under your control, or for which you serve any administrative or clerical function, in connection with the duties and responsibilities given to you by court order in MDL 1657, *In re Vioxx Products Liability Litigation*;

2.   Copies of all correspondence, letters, e-mails, or other documents, written or electronic, including Court orders , or directives of any person or entity, instructing disbursement of any funds from any such accounts to any attorney or law firm;

3.   Copies of any and all documents or work papers or spreadsheets, written or electronic, which show the amount of money that has been paid to any individual or firm, or any tabulation of the total thereof,  from any fund that is under your control or administration which was established for the payment of fees or costs to those individuals or firms who have made or will make a claim for entitlement to "common benefit" fees and expenses, including funds established by Court order or by Chapter 9 of the Master Settlement Agreement;

4.   Copies of any and all documents or work papers or spreadsheets, written or electronic, which show the amount of money any individual or firm has contributed to the fund that has been awarded to the claimants for common benefit fees in the order of the Court dated October 19, 2010.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on liaison and co-lead counsels, Russ Herman, Andy Birchfield, and Christopher Seeger, by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, April 15, 2011

/s/ Sol H. Weiss

Sol H. Weiss