HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: ANAPOL SCHWARTZ WEISS & COHAN
      Sol Weiss, Esquire
      Gregory S. Spizer, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
     877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                    -  -  -

2              MR. WEISS:  You've all seen

3        what I've submitted, and all I did

4        submit was common benefit.  By

5        that I mean, I did not submit,

6        except for the Hatch case, any

7        time on any individual case even

8        though some of them Chris used to

9        get ready for trial to drive the

10       litigation.

11             The second thing, none of

12       the 200-plus depositions we took,

13       either of the reps, the treaters,

14       are included in our submission to

15       common benefit.

16             MR. SEEGER:  Sol, did you

17       submit a three-page affidavit?  Is

18       that what you are talking about?

19             MR. WEISS:  No.  Benefit.

20             MR. LEVIN:  He's talking

21       about time submission.

22             MR. SEEGER:  Okay.

23             MR. WEISS:  So, the only

24       thing I did submit, again, is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1       liaison work of being the

2       architect, along with Dave, of

3       let's keep Merck busy by doing the

4       detail setup.  My office did

5       monitor I guess the 20 million

6       pages of detail documents that

7       came in.  We actually got copied,

8       and we checked to make sure, when

9       they started to get the same

10      detailer two or three times, and

11      they would go to Higbee and claim

12      they needed months and months and

13      months, we would go, oh, no, here

14      they are, here are the pages.

15          We also did a template for

16      New Jersey, and that's included,

17      all of the detail docs, that is,

18      all of the bulletins they got

19      every day, electric bulletins that

20      was actually embedded into, I

21      guess it was a Word monthly

22      calendar.  Our staff did that.

23      So, all you had to do was take a

24      look at the records you got from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        Merck for your prescribing

 2        physician, plug it into the chart,

 3        and you could then overlay what

 4        the reps knew, what they knew and

 5        when they told their docs.  We

 6        actually talked to Jerry about

 7        some of that stuff.

 8             We did take some of the

 9        early depositions that we took,

10        and we gave them to people like

11        Jerry and a couple others, and we

12        actually came up with, it must

13        have been five or six-hour

14        questions that Merck was asking

15        all of the treating doctors, all

16        of the prescribing docs.  That's

17        in there.

18             But, essentially, it's my

19        work as liaison, Dave's work in

20        helping Chris, and I helped a

21        little bit in the first trial.

22             MR. SEEGER:  Dave Jacoby, so

23        they know when you say "Dave."

24             MR. WEISS:  My partner, Dave
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          Jacoby.

2               Greg was in charge of doing

3          all of the individual case stuff.

4          Greg also did work from LMI, and

5          we did find them cheating.  LMI in

6          New Jersey, I guess they used them

7          in the MDL too, Merck used them to

8          get records.  We found some LMI

9          people actually writing letters to

10         the prescribers and treaters

11         saying that the Court ordered them

12         to relook through their documents

13         because not all the records were

14         there.  We caught them, and we had

15         a little brew ha-ha in front of

16         Higbee, very private, because they

17         were very embarrassed.

18               So, that's what we did.

19         Anything else, I'm here to answer

20         questions.

21               MR. SEEGER:  This is the

22         most refreshing presentation

23         that's over quickly.

24               MR. LANIER:  If you get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1        credit for the presentation, Sol,

 2        you are an all right guy.

 3             MR. WEITZ:  Sol, how many

 4        cases did you submit to the

 5        settlement, approximately?

 6             MR. WEISS:  Well, that's a

 7        hard question to answer.  As

 8        primary counsel?

 9             MR. LEVIN:  As primary.

10             MR. WEISS:  About 800.  And

11        then we have cases where we are

12        not primary, we are local counsel

13        with Birchfield.  There are 90

14        cases that we have an arrangement

15        with Sheller.  We did a lot of his

16        work behind the scenes for

17        Sheller.  We get a piece of

18        Sheller's fees.

19             Whatever is left that you

20        don't have in diet drugs, I get.

21        There's other firms in

22        Philadelphia that we do their mass

23        tort work quietly, and we have a

24        piece of all of those cases.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1        I'm going to say, Perry, when you

2        add it all up, we are over 1,000.

3              MR. WEITZ:  And as far as

4        individual workup of cases that

5        were on Judge Higbee's trial

6        docket, how many of those cases

7        would you say that your firm

8        worked up?

9              MR. SPIZER:  Trial or

10        discovery?

11              MR. WEITZ:  Trial or

12        discovery that you actually did

13        trial prep work?

14              MR. WEISS:  Abdul Malik and

15        Kimmelman were worked up the same

16        time we worked up Humeston.

17              MR. SEEGER:  And then Hatch.

18              MR. SPIZER:  Hatch.

19              MR. WEISS:  Hatch was a

20        standalone case.  We worked all

21        the way through until we got four

22        records they found that he was on

23        Celebrex and not Vioxx.

24              MR. WEITZ:  That was the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        scuba diver.
 2             MR. WEISS:  That was the
 3        scuba diver.
 4             Rodemoyer was worked up in a
 5        group of 39, along with another
 6        one, all the way through trial.
 7             MR. SPIZER:  We were going
 8        to trial January of '08 on
 9        Rodemoyer, George Biehls and
10        Gisela Levinson -- wait, there
11        were six, actually.
12             MR. WEISS:  There were four
13        in Pennsylvania and four in New
14        Jersey.  So, we had eight of
15        the -- we had two of the four
16        trials going in January.  And they
17        were fully worked up.
18             MR. SPIZER:  We had two
19        states, Pennsylvania and New
20        Jersey.
21             MR. WEISS:  We also worked
22        up and vetted some experts that
23        were used in New Jersey.  I don't
24        know if you used them in the MDL
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          or not.  One guy, Stuart Rich.

2                  MR. SPIZER:  Steve Rich.

3                  MR. WEISS:  Steve Rich, who

4          we really controlled.  Some people

5          tried to burn him out, but we kept

6          him pretty well focused.  The guy

7          that you used in Humeston, and I

8          know that someone else used him.

9                  MR. SEEGER:  What was he?

10                 MR. WEISS:  Cardiologist.

11                 MR. SEEGER:  DePace.

12                 MR. WEISS:  We worked DePace

13         up.

14                 I helped Eric with Madigan

15         to some extent.  I helped Eric

16         with Kostis to a large extent.

17         Kostis did an analysis that he

18         superimposed Framingham over VIGOR

19         and APPROVe.

20                 MR. RAFFERTY:  Who did that?

21                 MR. WEISS:  John Kostis is

22         the head of cardiology at Robert

23         Wood Johnson Memorial Hospital,

24         which is the teaching hospital at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1      Rutgers.

2            MR. SEEGER:  How would you

3      say that Kostis' work, just focus

4      on him for a second, contributed

5      to the common benefit?

6            MR. WEISS:  It helped us

7      understand if you are going to try

8      a case with a lot of risk factors,

9      how Vioxx was probably one of the

10     leading risks percentage wise, and

11     he could actually tell you why.

12            He looked at, I think it was

13     1,000 clients, I think a third of

14     them were ours, or it turned out

15     to be that way.  We submitted all

16     the medical records.  They were

17     tabulated.  Kostis looked at them,

18     the risk factors and the length of

19     time you were on Vioxx, and then

20     looked at APPROVe, looked at

21     VIGOR, looked at ADVANTAGE, looked

22     at VICTOR, and was able to

23     identify the risks on the Vioxx

24     arm in those trials versus these

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1    people.  And it was pretty

2    amazing.  It turned out that for

3    about 85 percent of the population

4    he looked at, of those who smoked,

5    Vioxx was the larger risk for a

6    heart attack than smoking.

7         And as you know, Chris, the

8    problem was twofold.  Initially

9    Kostis wanted to be the settlement

10   recruiter and wanted Merck to

11   adopt his philosophy, and then he

12   finally agreed he was going to

13   testify at the latest trials.  But

14   they were obviously -- they were

15   settled.

16         MR. LEVIN:  I'm working on

17   the hours here.  Your hours are

18   under review.  They haven't been

19   rejected.  They are under review.

20   Have you been contacted by the

21   accountants with regard to

22   anything?  It could be because of

23   the time that they were submitted.

24         MR. WEISS:  The first thing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1          we were contacted about, Arnie,

 2          was that the sheets that I used

 3          were not the sheets that you used,

 4          and we redid them.

 5                MR. LEVIN:  That's probably

 6          the reason, because you have about

 7          6,900 hours and $561,000 in costs.

 8                MR. WEISS:  That's right.

 9          Let me tell you about the costs so

10          you know.  Costs were in the

11          Hatch.  Case, Chris and I went out

12          to Palo Alto and spent two weeks

13          with Rodney.  I had Rich and

14          another expert that we developed.

15          That's common benefit, because

16          other people used him.

17                MR. LEVIN:  These are expert

18          fees?

19                MR. WEISS:  Expert fees.  I

20          had a copy of every transcript in

21          New Jersey.  I also ordered

22          transcripts from Linda.  I wanted

23          every transcript.  Every

24          transcript we got electronically,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1          and Linda embedded and also tied

 2          the transcript to the CD, which we

 3          had.

 4               MR. LEVIN:  When I look at

 5          the submissions that are under

 6          review, it says MDL time and Hatch

 7          time.  Now, is the MDL time really

 8          New Jersey litigation time?

 9               MR. WEISS:  It is.  It is

10          7300 time.

11               MR. LEVIN:  Could you make

12          sure that the accountant corrects

13          that?  Not because it matters.

14          The reason I'm saying that is, I

15          want to draw and have two charts

16          showing state litigation on one

17          side and MDL litigation on the

18          other.  And you guys are the --

19               MR. WEISS:  You guys made me

20          resubmit the time sheets --

21               MR. LEVIN:  I didn't make

22          you.

23               MR. WEISS:  Let me finish --

24          -- MDL 1657.  So all of the New

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          Jersey time had to be resubmitted.
 2              MR. LEVIN:  Is that the way
 3          we're doing it?
 4              MR. SEEGER:  I think that's
 5          the way it's been.
 6              MR. WEISS:  So you'll know,
 7          I also had to give him, because I
 8          keep contemporaneous time records,
 9          they are the designation for Vioxx
10          common benefit is 73 with four
11          zeros at the end.
12              MR. LEVIN:  And that is New
13          Jersey time, but --
14              MR. WEISS:  That's all New
15          Jersey.
16              MR. LEVIN:  This is for me.
17          I'm not being critical.
18              MR. WEISS:  I understand.
19          You are never critical with me.
20              MR. LEVIN:  Yes, I have
21          been.
22              I want to be able to get
23          those hours out to show how much
24          the state lawyers did so that it
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      is not messed up in the MDL time.

2            MR. WEISS:  So you

3      understand, none of my time was in

4      the MDL.  I did this with Chris

5      and Andy going back to when it was

6      removed from the market, I said I

7      was staying out of the MDL.

8            MR. LEVIN:  You mentioned

9      Madigan.  Was that time included

10     in the MDL time for you, when you

11     were working with Eric?

12           MR. WEISS:  Any time I

13     worked on common benefit, it was

14     7300, yes.

15           MR. LEVIN:  But you

16     considered that common benefit,

17     working with Madigan?

18           MR. WEISS:  Absolutely.

19           MR. HERMAN:  Let me ask you

20     a question about Eric Weinberg.

21           You were co-lead in New

22     Jersey?

23           MR. WEISS:  Yes.

24           MR. HERMAN:  What

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1       specifically did you assign him to

2       do?

3            MR. WEISS:  Eric was the guy

4       who was working up experts and

5       science.  For example --

6            MR. HERMAN:  You assigned

7       him to work up specific experts?

8            MR. WEISS:  Absolutely.

9            MR. HERMAN:  When he worked

10      them up, where did that work

11      product go?

12           MR. WEISS:  It went to me,

13      and it went to Dave Buchanan.

14           MR. HERMAN:  Okay.

15           MR. WEISS:  So you will

16      know, for example, Madigan was

17      used by the MDL people.  Elizabeth

18      Cabraser used Madigan's report in

19      the Sinclair class action.

20           MR. SEEGER:  Dave was

21      involved in this?

22           MR. WEISS:  Yes.

23           MR. LEVIN:  Sinclair was the

24      head of the monitoring of the New

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1          Jersey state litigation?

 2               MR. WEISS: Yes.

 3               MR. HERMAN:  Liz Cabraser, I

 4          want to make sure I understand,

 5          used Madigan in what?

 6               MR. WEISS:  In the medical

 7          monitoring Vioxx class action in

 8          New Jersey.  And I know Rich was

 9          used by some people in the MDL, at

10          least they wanted to use him, and

11          I said okay.  I had to make sure

12          that they didn't make him go where

13          he wasn't qualified.  But there's

14          a couple of others.

15               DePace was used, I think by

16          some people in the MDL, but I know

17          he was also used by other people

18          in New Jersey.  I know he was used

19          in the MDL.  He's the

20          cardiologist.

21               MR. HERMAN:  Well, at this

22          point, I'm just trying to get a

23          handle on who was assigned to do

24          what.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          MR. WEISS:  Eric's job was

2      to work the science in New Jersey.

3          MR. HERMAN:  Who else was

4      assigned to do that?  Was he the

5      only one?

6          MR. WEISS:  It is hard to

7      say, Russ, because we didn't do it

8      the same way that you guys did it

9      or I do it in MDLs.  Eric was one

10     of the lead people that worked the

11     science.  Dave Buchanan worked the

12     science.

13          MR. HERMAN:  Did your firm

14     have Bextra and Celebrex cases

15     also?

16          MR. WEISS:  Yes.

17          MR. HERMAN:  Was Madigan

18     used in those cases?

19          MR. WEISS:  Not by me, they

20     were used by Perry.

21          MR. HERMAN:  I'm sorry?

22          MR. WEISS:  He was used by

23     Perry, not us.  And all my Bextra

24     cases were with Mark.  I think

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1           every one but two were in New York

2           State Court, right, Mark?

3                MR. LANIER:  Yes, sir.

4                MR. WEISS:  We did develop

5           some other cardiologists that were

6           very good like Altobelli, a young

7           well-qualified cardiologist who

8           actually reviewed cases for trial

9           and was going to testify at trial.

10          Eric was instrumental on doing

11          that.  I helped.  We took a whole

12          bunch, and I think they are in

13          this.  We took a bunch of Merck's

14          expert cardiologists in Kimmelman,

15          Humeston, the second round, in the

16          third round.  We gave you the

17          transcripts.  I know you guys had

18          them, with our pleasure.

19               I actually worked with

20          Hornbeck doing Flavahan.

21               MR. SEEGER:  Flavahan.

22               MR. WEISS:  What a favorite

23          he was.  Remember him, Mark?

24               MR. LANIER:  He was a joke.

Page 20

1          Put that on the record.  He was a

2          joke, he was.  Had a really good

3          accent.

4                  MR. WEISS:  That's the guy

5          we caught with the article that

6          was very critical on COX-2s in

7          some offbeat publication.

8                  Any other questions for us

9          or anybody else, guys?

10                 MR. SEEGER:  No.  No, sir.

11         Thank you.

12                 MR. WEISS:  Again, if you

13         are counting time for the detail

14         people, and if you are counting

15         time for all the trial cases that

16         we worked up, they are not here.

17         So, if that's part of the package,

18         I would like an opportunity to

19         submit the extra time.

20                 MR. SEEGER:  Submit it.

21                 MR. HERMAN:  Submit it.

22                 MR. LEVIN:  I think you

23         ought to submit it.

24                 MR. HERMAN:  Just identify

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1    it when you do.

2         MR. LEVIN:  Because it will

3    be helpful.

4         MR. WEISS:  So, I'm going to

5    give you the time for those cases

6    we worked up for trial, and also

7    you want the detail time, too?

8         MR. LEVIN:  It was part of

9    Judge Higbee's plan to work them

10   up.

11        MR. WEISS:  Yes.  There was

12   12, then 29, then there was 39,

13   and, for example, Andy, do you

14   remember the first cases we worked

15   up way, way back when?

16        MR. HERMAN:  Well, Sol, in

17   fairness to you, other people are

18   submitting those hours, and I

19   think you ought to do it also.

20        MR. WEISS:  I understand,

21   but I was told they weren't

22   counting.  That's why I didn't do

23   them.

24        MR. HERMAN:  Submit them.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          MR. LEVIN:  They are

2      counting them now.

3          MR. HERMAN:  Those that were

4      worked up for trial.

5          MR. WEISS:  So, you want

6      them on these forms?

7          MR. LEVIN:  Yes.

8          MR. WEISS:  It is going to

9      say MDL 16 --

10          MR. LEVIN:  Just write a

11      cover letter to the accountant

12      saying this is a supplemental

13      submission dealing with such and

14      such.

15          MR. HERMAN:  It is not my

16      rule, but Arnold wants your blood

17      type, your thumbprint, your eye.

18      Send them as soon as you can get

19      them in, Sol.

20          MR. WEISS:  It will take a

21      couple of weeks.

22          MR. HERMAN:  Within a week?

23          MR. LEVIN:  Could you do it

24      faster?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          MR. WEISS:  Those individual

2     cases are not on time sheets.

3          MR. LEVIN:  Okay.  Well, as

4     fast as you can.

5          MR. WEITZ:  But it is not

6     your individual inventory of cases

7     --

8          MR. WEISS:  No, no.

9          MR. LEVIN:  He just didn't

10    keep the time.

11         MR. WEISS:  In other words

12    if we had a case called for trial,

13    I don't have my people keep time

14    sheets.  I only keep time sheets

15    on stuff I think is the common

16    benefit.

17         MR. HERMAN:  You know what

18    you ought to do?

19         MR. WEISS:  What's that?

20         MR. HERMAN:  You ought to

21    say, estimate these hours the best

22    you can as an estimate and send

23    them in.

24         MR. WEISS:  Anything else?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1              (No response.)

2              MR. SEEGER:  Thank you.

3              MR. HERMAN:  Thank you.

4                   -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR

23        Notary Number:  1060147 Exp. 1.2.10

24        CCR Number:  30X10017620

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:          ANASTOPOULO & CLORE, L.L.C.
               Samuel K. Allen, Esquire


BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2              MR. BIRCHFIELD:  Sam, just
 3         so you know, we've got Linda here,
 4         and she's taking everything down.
 5              Judge Fallon has really
 6         stressed the transparency, but he
 7         will have a transcript available
 8         for his review and however he
 9         deems that the transcript should
10         be used.
11              With that being said, the
12         floor is yours.
13              MR. ALLEN:  Well, gentlemen,
14         I know most of you, and some of
15         you I have just met today.  My
16         name is Sam Allen, and I'm a
17         partner with Mark Clore and Bob
18         Berry with Anastopoulo & Clore.
19         We have a small practice that does
20         products liability, medical
21         malpractice, and other specialty
22         litigation, but exclusively
23         litigation work.  Mark and Bob
24         were partners here in Texas for
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1       about 30 years doing specialty

2       work in medical malpractice.  We

3       were involved in Baycol pretty

4       extensively, had the Strong case

5       in working with Andy and others

6       and trying to get maximum value in

7       Baycol.  Chris and the people that

8       I'm familiar with on this panel,

9       in trying to maximize the value of

10      that, we found out that sometimes

11      it helps to have people like Mark

12      and Bob's experience in context

13      with experts, obviously, in these

14      type of litigation cases to get

15      the premier experts for the

16      bellwether cases.

17           We did the same thing in the

18      Vioxx litigation from the point of

19      view of trying to go out and get

20      some exclusive experts for

21      specific reasons, particularly for

22      bellwether cases.  We were able

23      to, with the help of Joe

24      Alexander, retain a gentleman in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          cardiology by the name of Mark

2          Entman, one of the top

3          cardiologists at the Baylor

4          College of Medicine.  He sent a

5          pretty specific detailed report to

6          Mr. Gallagher in support of

7          allowing review of cases after we

8          met with him and talked with him,

9          probably a gentleman that would

10         not have come into the Vioxx

11         litigation had it not been for

12         Mark's experience and time with

13         Mr. Entman.

14              Because the focus in, I

15         believe --

16              MR. SEEGER:  I'm sorry.  It

17         is A-N --

18              MR. ALLEN:  Mark Entman,

19         E-N-T-M-A-N.

20              We then spoke with other

21         individuals about where we could

22         be of assistance with experts.  I

23         think everybody in this room is

24         familiar with the difficulty we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          were having with cardiovascular

2          cases, and as far as getting top

3          end cardiologists, but more

4          importantly, we were having a lot

5          more difficulty in the stroke

6          cases.  So --

7               MR. BIRCHFIELD:  Entman, was

8          he designated as the expert in the

9          Ledbetter case, do you know?

10              MR. ALLEN:  I can't tell you

11         today for sure which one that was.

12         I know he was designated in our

13         case, which was the top case to be

14         released on the Texas consolidated

15         litigation after, obviously, some

16         cases were tried outside of that.

17         Mark's case was tried outside of

18         that.  Kathy's case was tried

19         outside of that.

20              As of the e-mail that I

21         attached, we were the next case to

22         be released hopefully, called

23         Colleen Reck, death case of Fred

24         Reck.  That case was filed in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          Tarrant County, but we believe

 2          that that's going to be tried

 3          either through some consolidated

 4          issue where a judge would be

 5          assigned to it or not.  We got

 6          through discovery on that.  He was

 7          designated in that.

 8              To go back to discussing

 9          experts, we were trying to help

10          regarding the stroke cases.  We

11          were able to get John Abrahamson

12          on board and retained to help

13          also.  This is pretty much where

14          our efforts were focused in the

15          case, was helping in getting those

16          experts lined up.

17              We then spoke, I believe,

18          with Beasley Allen and maybe you,

19          Chris, regarding how we could

20          potentially get one of our cases

21          lined up for a bellwether case, a

22          stroke case for the MDL.  That's

23          what we were discussing trying to

24          get done.  After review of our
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        cases, we didn't have it.  We

 2        didn't have one that we felt was

 3        going to be one we would want to

 4        put forward, although we did feel

 5        the Reck case was one we could try

 6        successfully.  It was a gentleman

 7        who had no cardiac history

 8        whatsoever, and upon autopsy had

 9        no cardiovascular disease at all,

10        drew a large clot and died.  So,

11        we felt like that case would do

12        well.  That's how we promoted it

13        up.  It was already filed in the

14        Texas litigation and was working

15        from that point of view.

16             I'm simply here asking you

17        for reimbursement for costs of the

18        retainers of those experts, which

19        is actually -- and I think the

20        total amount we're seeking is less

21        than $100,000.

22             MR. SEEGER:  Were the

23        reports sent on either to my

24        office or somebody's office?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          MR. ALLEN:  I attached
2       Entman's letter to Mike Gallagher
3       as part of his efforts to support
4       and willingness to support the
5       Texas consolidated litigation
6       statements, but I don't know that
7       it went further from there.
8          MR. BIRCHFIELD:  Can you get
9       that in?  Send it to Lenny Davis
10      at Russ Herman's office.
11          You've submitted those costs
12      to Wegmann?
13          MR. LEVIN:  Costs have been
14      submitted, and you just made some
15      money today.
16          MR. SEEGER:  Arnold, do you
17      have the whole amount?
18          MR. LEVIN:  You submitted
19      $197,000 in costs.  It's okay.
20      Don't look surprised.  You are
21      okay.
22          MR. ALLEN:  I think it was
23      $97,000.
24          MR. LEVIN:  I had the wrong

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        guy.
 2             MR. HERMAN:  Anything you
 3        want to send, you can e-mail it to
 4        ldavis@hhkc.com.  The phone number
 5        is (504) 581-4892.
 6             MR. SEEGER:  We just need to
 7        make sure we have the expenses.
 8             MR. ALLEN:  I don't want to
 9        misspeak, because one of the other
10        things that was submitted as part
11        of that cost was a database
12        contribution of $50,000.  That was
13        one part of that -- part of the
14        cost that was submitted.
15             MR. LEVIN:  Ed will
16        straighten me out.
17             MR. BLIZZARD:  You submitted
18        a total cost of $101,366.40, and
19        those costs to this point have
20        been rejected.  But as Russ points
21        out, we'll do what we can to put
22        you together with the accountant
23        to make sure that everything that
24        can be done is done to comply with
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1            their requirements.

2                  Also, is Abrahamson the

3            doctor from Massachusetts?

4                  MR. ALLEN:  No, different.

5                  MR. BIRCHFIELD:  John

6            Abrahamson not from Harvard?

7                  MR. ALLEN:  I'm not sure.

8                  MR. BIRCHFIELD:  You are

9            talking about a different John

10           Abrahamson.

11                 MR. ALLEN:  I believe since

12           that rejection, I filed with the

13           accountant an amended petition and

14           withdrew -- I have it right here.

15                 The main request was for

16           Abrahamson, and Richard Zane was

17           also retained.  Because 93 percent

18           of the total costs were in four

19           separate transactions, three

20           retention bills and a contribution

21           to the OCR documents and some

22           hours that were submitted on

23           behalf of preparing expert

24           packages by staff that we --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1      specialized staff we hired to do

2      that.  I think there's like 500

3      hours or so submitted regarding

4      those staff and individuals coming

5      down and meeting with the experts

6      and doing those type things to

7      make sure we can get them on

8      board.

9           The other thing is, I'm here

10     really on behalf of my select

11     handful of clients because,

12     obviously, that $100,000 would

13     make a difference in their

14     recovery now that you take away

15     $100,000 from the case that you

16     really thought had more than $1

17     million value and under the new

18     structure, obviously, what's best

19     for our clients, but not

20     necessarily best for the

21     bellwether clients who would have

22     had a stronger case.

23          I want to answer any

24     questions that the board might

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          have.

2                    MR. GIRARDI:  No questions.

3                    MR. HERMAN:  Thank you.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1               C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147

23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          ANDREWS & THORNTON
               Anne Andrews, Esquire
               John Thornton, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                         -  -  -

2             MR. GIRARDI:  As you can

3        see, there's a court reporter in

4        the room, and she's taking down

5        these proceedings for Judge

6        Fallon, because at the end of the

7        day, he's the person that has to

8        make the final evaluation of

9        everything.

10            It is pretty much of a free

11       fashion sort of a situation.

12       Primarily, we're interested in

13       contributions to the Vioxx effort

14       as opposed to maybe individual

15       cases.  That's the format of this.

16       That's what we would like to get

17       your thoughts about with respect

18       to the record in the case.

19            MR. THORNTON:  You know you

20       are going to have Anne first.

21            MS. ANDREWS:  I'm first up

22       because I sort of started this

23       story.  I know all of you in the

24       room, some better than others.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        But the story of why our role in
2        the Vioxx litigation became of
3        interest and we think we would
4        like to be compensated for it is
5        because for several years before
6        the Vioxx litigation started, this
7        firm had focused its efforts on a
8        drug case that -- a dietary
9        supplement case involving a drug
10       now outlawed by the name of
11       Ephedra, and it took us very
12       deeply into the world of
13       cardiology.  We had a real fight
14       on our hands in that case with
15       turning around an industry, a
16       government.  In fact, you know,
17       the story of that case is not just
18       that we were able to persuade the
19       top experts in cardiology in the
20       United States, if not the world,
21       to take our side against this
22       powerful industry, but they, in
23       fact, were the main course of our
24       Daubert proceedings in an MDL that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1         Ed was -- I was lucky enough to
 2         work with Ed Blizzard on, and
 3         Chris Seeger was familiar with
 4         that litigation and even Ellen
 5         Relkin from Perry's firm, Weitz &
 6         Luxenberg, was a colleague of ours
 7         in that litigation and remains a
 8         colleague and a friend of mine
 9         today.
10              Your role --
11              MR. THORNTON:  My role was
12         my role.
13              MS. ANDREWS:  And you
14         certainly know the story.
15              That trial brought us into
16         the wheelhouse of some of the
17         great cardiology experts in the
18         world who had never testified in
19         the history of litigation against
20         big pharma.  As a matter of fact,
21         they had been only ever clinical
22         researcher and provided
23         Congressional testimony and, in
24         fact, court testimony for big
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        pharma.

2             As a matter of fact, kind of

3        a centerpiece expert of this case

4        who is familiar to all of you now

5        is Dr. Douglas Zipes, who had

6        actually been a Daubert qualified

7        witness for the defense in Judge

8        Fallon's courtroom.

9             So, there was a particularly

10       interesting moment during this

11       litigation in New York where Ed

12       and John and a number of other

13       people worked very hard for many

14       years to bring it to a successful

15       conclusion in a very lengthy

16       Daubert trial when y'all were

17       transferring cases to the Vioxx

18       MDL.  We knew because of our very,

19       very close encounters and length

20       of time that we worked with

21       Douglas Zipes that he was being

22       courted by industry to work on the

23       Vioxx litigation by Pfizer, Merck

24       and others.  We knew because he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          was sharing with us what they were

2          asking of him at that time.

3               So, there was a moment in

4          time where the discussion about

5          the drug and the events that were

6          rapidly developing, he was often

7          writing the Wall Street Journal

8          about many breaking events at the

9          time, he was a much quoted source

10         for the New York Times and the

11         Wall Street Journal, that I made

12         the bold move and retained him for

13         the Vioxx clients that we probably

14         didn't represent at that time.

15              MR. THORNTON:  For us all.

16         We didn't have any Vioxx clients.

17              MS. ANDREWS:  We didn't have

18         any Vioxx clients, but we knew

19         that this was going to be an

20         important time that Andrews &

21         Thornton was in a unique position

22         to have the access and the

23         credibility and the knowledge to

24         turn them into a very important

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          think tank.
 2                So, with that, Dr. Zipes
 3          accepted.  I want it to be very
 4          clear, and it's on the record, and
 5          the methodology of what I did and
 6          when I did it has been testified
 7          to, I'm sure some of you were
 8          present for it, I'm sure some of
 9          you have read that testimony,
10          because he was certainly
11          cross-examined any number of times
12          about it, was that he was asked by
13          Andrews & Thornton and retained to
14          review all of the medical
15          literature pertaining to COX-2s
16          and to review all sides of the
17          issue.  Everything about a
18          comprehensive analysis would be
19          made by him of the drug, of the
20          data.  We knew from working with
21          Dr. Zipes how he worked and what
22          his requirements were and what it
23          would take for him to become
24          persuaded to a position.  So, I
```

FAC Resp. Amended Exhibit D -- 45

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          embarked on that journey.

 2                    MR. SEEGER:  Besides Mark

 3          Robinson, who at the MDL did you

 4          work with or coordinate with on

 5          Zipes and science?

 6                    MS. ANDREWS:  John Restaino

 7          through Steve Skikos.

 8                    MR. THORNTON:  And you met

 9          with --

10                    MS. ANDREWS:  And later

11          meetings -- initially, it was

12          Steve through John, and then we

13          had a face-to-face meeting where

14          Dr. Zipes met with your firm, met

15          with Dave Buchanan.  We had a very

16          lengthy --

17                    MR. THORNTON:  That was in

18          May of 2005.

19                    MR. LEVIN:  Michelle

20          Parfitt, several, Chris Tisi.

21                    MS. ANDREWS:  But the

22          scientific presentation of the

23          plaintiffs' case had sufficient

24          enough -- had been sufficiently

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          developed enough that there was a

2          critical kind of exquisite moment

3          in Washington where Michelle and

4          Dave and Troy Rafferty were all in

5          the same room working on the case,

6          and I was able to bring all the

7          people into the same room and let

8          them sort of hear from Dave

9          principally, Chris, and Troy was

10         also very enthusiastic, the story

11         of the plaintiffs' case

12         essentially.  He was open to it at

13         that point because he had reviewed

14         a lot of the materials.

15              MR. WEITZ:  Did that become

16         part of the MDL trial package?

17              MS. ANDREWS:  It was an off

18         the record --

19              MR. THORNTON:  I don't think

20         so.

21              MR. WEITZ:  I mean the Zipes

22         --

23              MR. THORNTON:  The Rule 26

24         report?  We circulated it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1              MR. SEEGER:  I would imagine

 2         it would be --

 3              MR. LEVIN:  It was used in

 4         Barnett, and Barnett was part of

 5         the MDL product.

 6              MR. THORNTON:  Can I explain

 7         what we did.  I don't want to step

 8         on your --

 9              MS. ANDREWS:  I'll let John

10         address what became part of the

11         trial package.

12              MR. THORNTON:  Let me

13         explain briefly what we did.  I

14         think Chris knows the story.

15              Part of what we did had a

16         lot of sensitivity.  What Zipes

17         really had in mind to do, and we

18         worked through this with a

19         consultant we used named Mark

20         Haigney, who is a top doc in his

21         own right, but not quite a

22         national class doc.  He had this

23         concept that we're going to get

24         together a panel and we're going

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          to vet basically all the top

2          cardiologists in America.

3                  If I may go off the record.

4                      -  -  -

5                  (Whereupon, an

6          off-the-record discussion was

7          held.)

8                      -  -  -

9                  MR. THORNTON:  The concept

10         was that we vetted through this

11         process most of the top

12         cardiologists in America to see

13         who they were working for.

14                 MR. WEITZ:  When was this?

15         When was this process?

16                 MR. THORNTON:  This all

17         occurred basically from March --

18         in March and April and probably

19         May as well.

20                 MR. WEITZ:  Of what year?

21                 MR. THORNTON:  Of '05, the

22         vetting process.

23                 We came up with a concept,

24         because we knew Vioxx was going to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          be really big.  We're proud of our

2          victory in Ephedra, but we knew

3          the Ephedra industry wasn't Merck.

4          This was going to be big, and this

5          was going to be a full scale war.

6          We came up with this concept of,

7          instead of developing one expert,

8          developing a panel of experts in a

9          systematic way that would be very

10          difficult to impeach.

11               MS. ANDREWS:  They could

12          cover the disciplines that y'all

13          were advancing from

14          atherosclerosis to hypertension.

15          We knew this was going to be a

16          multidisciplinary MDL Daubert

17          hearing, and we were concerned

18          that no one expert could fill that

19          bill.  So, we wanted to really

20          push the data into a broad group

21          of people, from epidemiology,

22          through every -- these were all

23          superstars.

24               MR. THORNTON:  Sometimes we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          didn't get exactly the person we

2          were looking for, but --

3               MR. WEITZ:  Was this an

4          assignment from somebody, either

5          from the MDL or from State Court?

6               MR. THORNTON:  I would

7          describe it as our idea.  We took

8          it to Restaino and Skikos, who

9          said, this is really a good idea,

10          and then we did it.

11               MR. WEITZ:  That's

12          important, because John was the

13          co-chair of the science committee

14          for the MDL.

15               MR. THORNTON:  I understand.

16          Restaino, we've been working

17          together on cases for over a

18          decade.  Restaino said it was

19          cool, and Skikos said it was cool.

20               So, we got these guys, and

21          I've got pictures of them.  These

22          were people not only that were

23          good researchers, but they weren't

24          people that couldn't talk.  They

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        were people who could command.

2        They were people of authority.

3        They were people not just with a

4        great CV, but they were opinion

5        leaders in the cardiology

6        community, because really what we

7        wanted to make sure of is that

8        Merck didn't manage to come up

9        with a whole group of opinion

10       leaders in the cardiology

11       community on the other side.

12       Believe me, the cardiologists at

13       the outset, they had read a little

14       bit from the New England Journal,

15       but they didn't understand Vioxx

16       from anything until we had this

17       panel.  So I got the people in

18       here.

19            Paul Ridker could have been

20       a tremendously dangerous guy on

21       the other side.  He is a

22       cardioepidemiologist of just

23       incredible renown.  Jeffrey Popma,

24       who did testify in the Barnett

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          trial, it turns out.  And Doug
 2          Zipes, who became the star of the
 3          litigation.
 4               MR. SEEGER:  He's cardio
 5          also, Popma?
 6               MR. THORNTON:  Yes.
 7               MS. ANDREWS:  Yes.
 8          Interventional.
 9               MR. THORNTON:  So we put
10          Haigney in and paid Haigney a lot
11          of money.  So, what we did is, we
12          came up with the most neutral
13          package of literature possible, we
14          arranged basically this panel.  We
15          paid everybody basically a
16          comparable amount to the amount
17          the pharmaceutical industry paid
18          them.  And the goal was to really
19          basically let them all meet
20          together.  Our real thought was to
21          try to put together a consensus of
22          these experts without attorneys
23          being around so we could mass
24          produce experts on the one hand,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        but organically through a process

2        that they couldn't be impeached

3        for.

4            I've included the panel, the

5        agenda of the first scientific

6        discussion that they had.  They

7        had this meeting without lawyers

8        present, and it achieved 100

9        percent consensus that Vioxx

10       causes heart attacks and Vioxx

11       causes death.  All these really

12       excellent, extraordinary

13       physicians, each and every one of

14       them was ready to go forward at

15       the next meeting, was interested

16       in the litigation.  Not one of

17       them said, no, it's too difficult

18       for my blood.

19            MS. ANDREWS:  Or it's not --

20       the evidence is close.  It was not

21       close.

22            MR. THORNTON:  Overwhelming.

23            MS. ANDREWS:  Overwhelming

24       evidence for us for the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          plaintiff's position in which they

 2          agreed to come to a second meeting

 3          for a slightly more in tune

 4          agenda.

 5               By then, by the time of the

 6          second meeting, the New England

 7          Journal of Medicine scandal had

 8          broken.

 9               MR. THORNTON:  That was very

10          helpful, because it was exactly --

11               MR. SEEGER:  That made them

12          feel like they were on the right

13          team, right?

14               MR. THORNTON:  Right.  The

15          first panel meeting was science

16          kind of removed, the

17          unimpeachable.  The second panel

18          meeting was sort of the Dave

19          Buchanan meeting, we did it, but

20          where Skikos and Anne and I really

21          presented a very strong statement

22          of just -- I've got a great little

23          cartoon here that I really enjoy.

24          I'm going to have to buy this one,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          the ability to obscure truth.

2                And so we told them about

3          the scientific advisors, and I'll

4          tell you, there are two slides

5          that they just obsessed on.  One

6          is, of course, the --

7                MR. SEEGER:  The Scolnick

8          e-mail.

9                MR. THORNTON:  The Scolnick

10          e-mail.

11                MS. ANDREWS:  They were

12          shocked.

13                MR. THORNTON: They know

14          Scolnick.  And I remember they

15          were looking, saying, yeah, he

16          knew.  He knew.

17                MS. ANDREWS:  The second

18          meeting was the show us meeting.

19          It really proved to us bad things

20          happen because drugs get out and

21          hurt people and we don't know for

22          many, many years what happens, but

23          you show us bad conduct in this

24          second meeting, we're all in.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1              MR. THORNTON:  They weren't
 2         buying the naproxen
 3         rationalization.  The other one
 4         was Konstam, because they think --
 5         it was kind of a view that
 6         Konstam's piece in defense of
 7         Vioxx early threw a lot of
 8         physicians off.  They had some
 9         fairly grave remarks about that as
10         well.
11              MR. SEEGER:  About his piece
12         on the APPROVe data?
13              MS. ANDREWS:  Exactly.
14              MR. THORNTON:  We spent
15         $194,749 on these experts, 200
16         grand out of our little firm, and
17         at this point we were creating
18         experts --
19              MR. LEVIN:  This may be a
20         good time to go over this.
21              MR. THORNTON:  -- for the
22         greater war.
23              MR. LEVIN:  John, we have
24         the hours that you reported to the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1           accountant.  We also have your

2           costs here.

3                   MR. THORNTON:  Okay.

4                   MR. LEVIN:  But we also know

5           from their report that all your

6           hours are rejected.  Don't get

7           excited.  $166,000 worth of costs,

8           all of your costs were rejected.

9                   MR. THORNTON:  Not

10          encouraging.

11                  MR. LEVIN:  This may mean

12          you filled out the wrong forms.

13                  MR. SEEGER:  It is probably

14          formatting.

15                  MR. LEVIN:  Call Leonard

16          Davis at Russ Herman's office,

17          (504)581-4892, and have him put

18          you as soon as possible in touch

19          with a Phil Garrett at the

20          accounting firm so that they could

21          work it out with you.  If you are

22          having any problems, give me a

23          call.

24                  MR. SEEGER:  For your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1         purposes, just so you know, we are

2         treating this as if every nickel

3         has been accepted.  We need the

4         accounting done.

5              MR. THORNTON:  Sure.

6              MS. ANDREWS:  And whatever,

7         wrong or right, we will fix it.

8              MR. LEVIN:  When we file it,

9         we want it to be right, but we're

10        assuming that it is right.

11             MR. WEITZ:  50 percent of --

12             MR. SEEGER:  You have a lot

13        of company in this respect.  A lot

14        of people have hours and money

15        rejected.  You are definitely not

16        the only one.

17             MR. THORNTON:  I set out

18        what the cost of these conferences

19        were just so you can understand

20        how much of this was really this

21        general expert development.

22        Because I know there's kind of the

23        sense that, well, aren't Anne and

24        John something to do with Barnett,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          and certainly Barnett was the

2          vehicle by which our project was

3          realized.

4                    MS. ANDREWS:  The payload

5          was delivered.

6                    MR. THORNTON:  But this was

7          not a joint venture with the

8          Robinson firm.  Robinson's claim

9          to fame or the thing that he did,

10          I should say from the standpoint

11          of this, was that Robinson sent us

12          a case that met the criteria that

13          the panel was really looking for.

14          What was the panel looking for?

15          It came from Jeffrey Popma's lips.

16          How would I feel if I had a

17          patient who had these risk

18          factors?  Because we obviously

19          knew that Vioxx cases weren't

20          going to be easy, even though we

21          knew there was a good science case

22          against it, because we had a lot

23          of people with risk factors.  How

24          would I feel as a physician if I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          had a patient who was doing
 2          everything right, exercising, on
 3          medication, lowered lipids, all
 4          that, and I gave them Vioxx for
 5          symptoms and he had a heart
 6          attack.  I would know in my heart,
 7          now that I know this, now that
 8          I've seen this, that the Vioxx
 9          probably caused the heart attack.
10          That is the quintessential case
11          that we were looking for.  Mr.
12          Barnett was that case.  Mr.
13          Barnett was one of the most health
14          conscious people I've ever seen,
15          and he was the perfect -- he did
16          everything right, and Vioxx gave
17          him a heart attack, two heart
18          attacks, as a matter of fact.
19              We were not even retained by
20          Barnett until we had spent all of
21          this money and all of this time.
22          You will see a lot of our time --
23          most of Ann's time was before
24          Barnett at all.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           I might mention who Dr.

2       Shlipak is.  There's a fairly

3       large expenditure for him.  He's a

4       professor of epidemiology in

5       biostatistics in San Francisco

6       State.  I used him as a consultant

7       in the epidemiologic issues

8       because Ridker is so busy that as

9       a practical matter -- the Rule 26

10      report is kind of two halves of

11      it.  There's the Barnett half,

12      which I had very little to do

13      with, and there's the generic

14      half, which I had a lot to do

15      with.

16           MR. SEEGER:  Did you guys

17      attend any or participate in any

18      of the science committee calls

19      that John Restaino would organize,

20      or were you communicating with

21      John, reporting to him and saying,

22      hey, we've got these experts,

23      John, I want you to know we've got

24      this guy warming up?  I just need

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

 1          to get a sense of the structure.

 2              MR. THORNTON:  I think there

 3          were a number of calls we

 4          participated in, but I don't think

 5          that they were formal science

 6          committee meetings.  Nobody said

 7          this was a science committee

 8          meeting.  But people were talking

 9          about the issues.  I mean, Dave

10          was on a lot of these calls.  I

11          mean, just a handful of people

12          that really were in the know as

13          far as I was concerned about all

14          those issues.

15              MS. ANDREWS:  By the time

16          these reports were being drafted,

17          y'all were in your own state court

18          trials, and California was heating

19          up, and you guys were certainly in

20          the trenches, and everybody was

21          warming up.  We were sort of just

22          waiting for what we knew these

23          experts wanted in terms of the

24          right plaintiff.  We knew that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          that person was going to arrive,

2          that case was going to arrive, and

3          we were looking for it and

4          interacting with a number of our

5          colleagues.

6               We had cases in Reno we were

7          reviewing, and we didn't even put

8          in time for the comprehensive

9          review we did of the entire Reno

10         practice.  You will see Stewart

11         White probably later this

12         afternoon.  We were called in to

13         do the same thing and open up

14         another state court front.

15               But we knew that the right

16         case was going to come.  By the

17         time it arrived, there were cases

18         that had been lost, there were

19         cases that had been won.

20               MR. THORNTON:  Predictable.

21         Vioxx was not going to be all

22         victories with the patient

23         population.

24               MS. ANDREWS:  Merck had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          announced the scorched earth

2          policy.  And it didn't look like

3          there was going to be any changing

4          from that policy until pretty late

5          in the game.  Ellen Relkin and I

6          were working on a collaboration of

7          some of these experts with your

8          next trial.  Next thing we knew,

9          the settlement was being

10         announced.

11              MR. SEEGER:  I want you to

12         know, the reason I'm asking, and

13         what you are saying is very

14         helpful, but we're trying to get

15         down to where people actually

16         provided a common benefit.  So,

17         working up one expert for one

18         case, your own case, would be one

19         thing, but providing an expert for

20         an MDL trial like you did in

21         Barnett and working up other

22         experts that other people are able

23         to use is another.  I'm just

24         trying to connect the dots.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1              MR. WEITZ:  I know from my
 2         office that Anne and Ellen work --
 3              MR. SEEGER:  Yes.  And you
 4         are telling me you were talking
 5         with Dave, too, so those are the
 6         kinds of people, if they are in
 7         the loop, yes.
 8              MR. WEITZ:  Talking about
 9         cases, how many cases did your
10         firm have?
11              MR. THORNTON:  22.
12              MR. WEITZ:  Were they all
13         put into the settlement?
14              MR. THORNTON:  Yes.
15              MR. WEITZ:  Where were they
16         filed?
17              MR. LEVIN:  In the MDL or
18         state?
19              MS. ANDREWS:  Los Angeles.
20         State Court, Los Angeles.  MDL and
21         a few in Los Angeles.
22              MR. WEITZ:  In any of those
23         cases, were they prepared for
24         trial?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1                    MR. THORNTON:  No.  No.  We

2            were never assigned a trial date,

3            and we didn't think that our cases

4            were necessarily trial worthy.

5            You might have been able to win it

6            but --

7                 We worked with and didn't

8            put in the time -- we were

9            developing Michael Shlipak for the

10           retrial of the Appell and Arrigale

11           trial with Tom Brandi, a lot of

12           stuff behind the scenes.  We were

13           trying to work things out to try

14           to help the general good.

15                    MS. ANDREWS:  When we were

16           called, usually when something was

17           not coming together in a case and

18           it was in Tom Brandi's case, we

19           were close with his trial team,

20           and they would say, you know, we

21           really are in trouble on this

22           issue, can you help.  And John

23           would jump on a plane, run to

24           wherever they needed us, develop

FAC Resp. Amended Exhibit D -- 67

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          an expert.

2                MR. THORNTON:  There were so

3          many people that did that.  John

4          Hornbeck.

5                MR. WEITZ:  You should

6          submit the hours for that work.

7                MS. ANDREWS:  We're not the

8          only ones.

9                MR. THORNTON:  I've been

10         really bad about submitting hours.

11         A lot of this time was

12         reconstructed.  I think it is very

13         accurate reconstruction because I

14         keep -- I know what I was doing on

15         that exact day.

16               MS. ANDREWS:  I think the

17         thing that I would like this

18         committee to know the most about

19         what we feel we did was, we

20         devised a strategy that we

21         discussed with this committee's

22         leadership, the science

23         committee's leadership that was

24         extremely unique, was very risky.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          We had no idea if all of these

2          giants in cardiology were going to

3          jump on our team and on our side,

4          and we certainly -- when they all

5          did with the force in which they

6          did, to then go into the case

7          specific work that it would take

8          to get each one of them ready for

9          a trial never occurred.  But Doug

10         Zipes and Jeff Popma did come to

11         the only MDL trial, and the

12         benefit of that testimony we

13         certainly think you all know the

14         full value of.

15              MR. THORNTON:  It is

16         important to see what experts of

17         this quality bring to something

18         like this.  So, they see Barnett.

19         They get Barnett's series of

20         medical records.  They say he

21         meets the profile.  They are the

22         ones that found the thrombus on

23         the angiogram, and I say "they"

24         meaning Zipes and Haigney, who was

FAC Resp. Amended Exhibit D -- 69

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

    1          basically working as his

    2          assistant.

    3               Then we decided we should

    4          bring Popma into the case because

    5          it was the issue of whether there

    6          really was a clot or whether there

    7          wasn't a clot, but there were some

    8          issues like that.

    9               Zipes found the Q wave, that

   10          it was a Q wave MI, which the

   11          treaters hadn't found.  Nobody had

   12          found it up until that time.

   13          Zipes basically found the second

   14          heart attack.  It became really a

   15          big issue in the trial.  Beck in

   16          his opening statement comes out

   17          and calls Zipes out, I mean, Doug

   18          Zipes is lying to you guys, and

   19          he's made up this second heart

   20          attack for litigation.  And

   21          Haigney and I looked at each other

   22          and said we're going to kill that.

   23          And so we run down and work with

   24          those DecisionQuest people, who

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1           were pretty remarkable of creating

2           what we conceived, and I have one

3           color version of the slide that we

4           showed the difference in the

5           perfusion between the two dates.

6                MR. SEEGER:  John and Anne,

7           could you take a minute to sum up.

8           One thing you just did that was

9           very helpful was saying this is

10          what I feel like our big benefit

11          was, and we get that.  It's just

12          so we can keep the schedule going.

13               MS. ANDREWS:  We provided

14          the linchpin expert for the only

15          MDL trial that we think caused a

16          general causation finding for

17          which every plaintiff was going to

18          be able to use the benefit on a

19          multi-disciplinary approach on two

20          theories.  The fact that we

21          started it way in the beginning

22          and pulled it through to this one

23          trial -- we're not going to take

24          credit for the results in Barnett.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          We're taking credit for the

2          science that was pulled through

3          the needle and all the work it

4          took to build a fabric of that

5          trial through these experts that

6          turned the tide in this

7          litigation.  We feel that that was

8          a very important piece that only

9          our firm with these experts could

10         provide and would dare take credit

11         for among all the contributions of

12         all of you.

13              MR. THORNTON:  So many

14         contributions helped.  I mentioned

15         in the PowerPoint of all the

16         people that helped us from Dave to

17         Hornbeck to Skikos to Restaino.

18         But I think we did a little bit

19         more than that really.  I think,

20         remember, Merck knew about this

21         panel.  They knew that there were

22         these top cardiologists out there,

23         they were very agitated about it.

24         They made an in limine motion to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          keep the entire panel discussion

2          out.  So, at least we were

3          vindicated that we had not created

4          a problem with impeachment.  They

5          knew these other experts were

6          there.  We were actually trying to

7          encourage people to use other

8          experts.

9               The only unfortunate thing

10         that happened in my mind after

11         this was over, after Barnett, is

12         that everybody made Zipes the

13         superstar.  And Dr. Zipes is a

14         superstar, but there was a panel

15         of superstars.

16              MS. ANDREWS:  And Marty

17         LeWinter, terrific.

18              MR. THORNTON:  We were

19         really quite anxious that others

20         were used, because there was so

21         much talent here.

22              MR. SEEGER:  Did you work

23         with experts from any of the other

24         trials, winning or losing, other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          than Barnett, just so we have a

2          picture?

3               MR. THORNTON:  I worked a

4          little bit with Kronmal --

5               MS. ANDREWS:  And with the

6          epis.

7               MR. THORNTON:  Nothing I

8          even submitted.  Shlipak, we had

9          him set aside for the retrial in

10         California.

11              MS. ANDREWS:  You know, Doug

12         Zipes because of the illness of

13         the epidemiologist, happened to

14         take on the third discipline of

15         epidemiology in Barnett.  He

16         carried three different

17         disciplines that, quite frankly,

18         we only ever targeted him for one.

19         So, it was a unique circumstance.

20              MR. GIRARDI:  Anne, to your

21         credit, with a small number of

22         cases, you put out $250,000

23         basically for the benefit of

24         experts to be used in other cases.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          250, I'm just using that number,

2          plus or minus, but that's about

3          right.

4                  MR. SEEGER:  You submitted

5          all of that, right?

6                  MR. LEVIN:  It is here.  It

7          has to be moved from one column to

8          another.

9                  MR. THORNTON:  Just to give

10         you an idea of the fact that it

11         was the experts, the compact we

12         made with the experts, because

13         they were reluctant to get

14         involved in this wild litigation,

15         was I will protect you.  We will

16         protect you.  We are not the

17         agents of Mark Robinson in the

18         Barnett case.  We are actually

19         your agents in assuring you that

20         your professional standing and

21         reputation is held up.  I was in

22         Barnett until Dr. Zipes testified,

23         and I left -- and Dr. Popma

24         testified in that trial, too.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

```
1          People don't talk about that.  He

2          was a tremendous --

3              MR. SEEGER:  Actually, Steve

4          Skikos told us that.

5              MR. THORNTON:  They were

6          really good.  And if the war had

7          continued, I think eventually they

8          would have all been used.  That

9          was fully my expectation, with the

10         possible exception of Ridker, who

11         was so darn busy that it may have

12         been another matter.

13             MR. SEEGER:  Thank you.

14         That was very helpful.

15             MR. THORNTON:  Thank you.

16             MR. GIRARDI:  Thank you.

17                   -   -   -

18

19

20

21

22

23

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

 1          C E R T I F I C A T E

 2

 3               I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23          Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:   ASHCRAFT & GEREL, LLP
        Christopher V. Tisi, Esquire


BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -

 2              MR. HERMAN:  As you can see,

 3         everything is recorded.  You are

 4         going to be getting a copy of what

 5         everybody has had to say at some

 6         point.

 7              If we can't resolve fees,

 8         the judge is going to go through

 9         some process similar to Murphy Oil

10         where he's going to have lawyers

11         come in, swear under oath, be

12         cross-examined.

13              If there's some addition or

14         subtraction you want to make to

15         your affidavit, at that point we

16         can't resolve all the fee issues,

17         I would go ahead and do that.

18         Basically that's it.

19              MR. TISI:  Okay.  Just for

20         the record, my name is Chris Tisi,

21         and I'm a senior partner at the

22         law firm of Ashcraft & Gerel.  I'm

23         going to try to be quick, as quick

24         as I can.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           Really, I do have to say

2     this.  I've been involved in a

3     couple of these things, and this

4     is the first time I've had the

5     opportunity to actually present.

6     So, I really do appreciate the

7     opportunity to do that.  Vioxx has

8     been a labor of love for me and

9     for people in my firm.

10          I've spent the better part

11    of four years, four-plus years,

12    almost five years, working on this

13    litigation, even though I think we

14    only had about 100 cases.  So, I

15    do appreciate the opportunity to

16    at least present myself and to be

17    cross-examined, if need be, not

18    only on my work, but on other

19    folks' work.  I'm happy do that.

20          I did prepare a little bit

21    of a presentation.  I'm going to

22    hand it out.  It is mostly for my

23    own guidance, so you can follow it

24    or not if you want to, but this is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1           it.

2                  (Handing over document.)

3                  I know some of you real

4           well.  Some of you I don't know

5           very well, and so I think I'm kind

6           of in a unique position, because I

7           did a lot of MDL work, but I also

8           did a lot of work on the stateside

9           as well, and so some of the folks

10          who did MDL work may not be aware

11          of the work we did on the

12          stateside and vice versa.  So, I'm

13          going to try to take the

14          opportunity to do both.

15                 MR. HERMAN:  I want to state

16          one other thing on the record.

17          Excuse me.

18                 A number of you know that in

19          some cases we partner with

20          Ashcraft & Gerel.  We did not do

21          that in this case.  The work that

22          Chris and his firm did was work

23          they did independently of any

24          association.  We don't have any

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          fee sharing, cost sharing or

2          anything else in Vioxx.

3               MR. TISI:  Thank you.

4               This is what I'm going to

5          do.  I'm going to go over, I

6          think, generally speaking, what we

7          did both on the State and Federal

8          side, and then I want to focus

9          primarily on the factors that

10         Judge Fallon laid out in PTO 6.

11              On the second page of this,

12         on the PSC side, I think it is

13         fair to say that I was a very

14         active member of the Plaintiffs'

15         Steering Committee; an active

16         chair, vice chair of the discovery

17         committee with Troy and Dave

18         Buchanan; very active with the

19         science and expert committee,

20         working up, I think, several key

21         experts in the case with others;

22         an active member of the briefing

23         committee; an active member of the

24         privilege committee; and an active

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1      member of the trial package

2      committee for both stroke and MI.

3           Now, I say "active," because

4      I think it's important to note

5      that when we did the work that we

6      did, it was not with the intent of

7      trying to have titles.  It was an

8      intent to try and actually do the

9      work, and I think we did do that.

10          I think we also contributed

11     to most of the trials -- a

12     majority of the trials that were

13     involved in both federal and state

14     court, and I think we actively

15     worked on Humeston I, on Humeston

16     II, we worked on Irvin I, Irvin

17     II, Barnett, I helped Mark and

18     others.

19          MR. HERMAN:  Let me stop

20     you.

21          Tell me what you did in

22     Barnett at Mark's request.

23          MR. TISI:  As I recall it, I

24     wasn't at the trial itself, but as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        I recall, his primary liability

2        witness was Jerry Avorn.  Apart

3        from actually having done that

4        deposition and prepared that

5        deposition, it was the first trial

6        in which that deposition was

7        actually used.  So, I prepared not

8        only for the Daubert hearing that

9        preceded that case, although the

10       judge ultimately decided that

11       there was nothing here, because he

12       was so well qualified, but I

13       prepared with Lisa Dagostino, we

14       prepared the direct examination,

15       the counters, the cross, the

16       objections, all of those things

17       were done in anticipation of the

18       Barnett case.  So, I know that he

19       called me to help him with

20       Pechmann, but that was more

21       tangential than anything else.

22       So, that was primarily my role in

23       that case.

24              MR. BLIZZARD:  Was there a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          better deposition taken in the

 2          case than Jerry Avorn?

 3               MR. TISI:  I tend to think

 4          he did pretty well.

 5               MR. BLIZZARD:  The lawyer

 6          did pretty well, I think.

 7               MR. SEEGER:  I agree with

 8          that.

 9               MR. TISI:  So, that's kind

10          of the overview.  But let me just

11          focus on some of the criteria that

12          I think at least I would like to

13          focus on.

14               When I was preparing to make

15          this presentation, I thought that

16          if you combined all the 14 factors

17          together, the question would be

18          whether or not, if you pulled the

19          lawyers or the firm out of a mix,

20          would the case have been

21          substantially different in the way

22          that it was rolled out.

23               MR. SEEGER:  That's a very

24          good test.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1              MR. LEVIN:  That's well put.

 2              MR. TISI:  I really do think

 3         that in several material ways, and

 4         I'm going to just highlight the

 5         ones that I really think that I'm

 6         most proud of and that we

 7         contributed to, the ways in which

 8         the case changed over time because

 9         of the work that we did.

10              I'm going to take these a

11         little bit out of order.  I'm

12         going to focus first on the preMDL

13         work and the preVioxx withdrawal

14         work.  I remember getting a call

15         from Dave Buchanan, we were

16         wrapping up the Rezulin work, and

17         Dave said, we're working on this

18         case, I would really like you to

19         work on it, it's a clinical trials

20         case.  You worked with a guy by

21         the name of Dick Kronmal, I have

22         him as an expert in this case, and

23         I would really like to get you

24         involved in the case.  That was in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1           the spring -- I keep getting the

2           years wrong.  That was in the

3           spring of 2004.

4                I went to New York, spent

5           some time with Dave, Tom Moore, a

6           couple other folks.  We went

7           through the VIGOR trial, went

8           through some of the data.  At that

9           point, he had an initial, if I

10          remember correctly, initial report

11          done for Dick Kronmal and for

12          Wayne Ray.  Over the next couple

13          of months, he spoke to me and

14          others about how to plod out the

15          discovery in the case.  We spent

16          some time, I remember during that

17          time frame, I think you were

18          taking Adam Schechter, we did some

19          work in reviewing the documents,

20          and there was a lot of preliminary

21          work being done at that period of

22          time before there any was real

23          MDL.

24                MR. SEEGER:  As you said, it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           was prior to the withdrawal, and

2           there were very few firms.  I

3           remember Dave being in my office

4           and us discussing, hey, we've got

5           to call Tisi to see if he is

6           available to help us.

7                MR. TISI:  I appreciated the

8           call, and I also do now.

9                MR. LEVIN:  And you will.

10               MR. TISI:  And really, that

11          was at that time when we didn't

12          really have that many cases.  I

13          mean, we had just a handful of

14          cases, if I remember correctly,

15          and he said, you have to get

16          involved in this, and we did.  The

17          case was obviously transformed by

18          the withdrawal of the drug from

19          the market and the establishment

20          of the MDL.

21               I know I was privileged, I

22          think, to be appointed to the

23          steering committee, and I know

24          some of you supported that, and I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          really appreciated that.  It was

2          an opportunity that I had not had

3          before.

4               We, Michelle Parfitt and I,

5          she worked more on the science

6          side, I worked more on the

7          liability side, but I really -- we

8          dove head -- I think it's fair to

9          say we dove head in.

10              Let me just back up for just

11         one second on the prespring

12         2004/2005 time.

13              Obviously there was no MDL

14         and there was no common benefit

15         work.  Now, I did have, obviously,

16         things that I did that I can

17         pinpoint by travel records and try

18         to reconstruct my time.  I did

19         pull together our time for that

20         time frame.

21              MR. LEVIN:  Did you put that

22         into the accountant?

23              MR. TISI:  We gave it to the

24         accountant.  But, quite frankly,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          for those of you that have worked

2          with us in the past, know that I'm

3          much better than I ever was,

4          Arnold, but, honestly, in the

5          preMDL time, there was just not --

6          we were all working on the

7          individual cases and for the

8          common good.  There was no real

9          reason to do that.  So, I

10         reconstructed what I could, and I

11         did what I did, and you have what

12         I have.

13              One thing I did not do.  If

14         I couldn't document my time in a

15         way that I felt comfortable with,

16         I didn't do it.  If I put an hour

17         of time, it is a real hour of

18         time.  I was better once the MDL

19         was put together, but in the

20         preMDL, there was just no need for

21         it.

22              The PSC work in the

23         committee and the leadership

24         factors, I think it is fair to say

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1        over the next three, four years,

 2        there was almost not a day where

 3        Troy or Dave or I or Lenny

 4        actually didn't spend time talking

 5        with each other.

 6             MR. SEEGER:  I don't want to

 7        interrupt your presentation, but

 8        there's a couple of important

 9        things.  One is really everybody

10        here is very familiar with how

11        important you are in this case.

12        Why don't you dive into the stuff,

13        the real projects that you owned,

14        that you were responsible for, the

15        prep work you did behind the

16        scenes, the trial support work you

17        did, let people know that.

18             MR. TISI:  I will, but I

19        think it's also important to know,

20        and I will do that right, but I

21        think it is really important to

22        know --

23             MR. SEEGER:  Now.

24             MR. TISI:  -- the grunt
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          work, the grunt work that was

2          done, the running the

3          depositories, the scheduling, the

4          scheduling and coordination with

5          State and Federal Court.  Dealing

6          with Ted Mayer and having

7          everybody being jerked all around,

8          quite frankly, all over the

9          country on just the scheduling

10         issues.  Running discovery

11         meetings, reviewing the documents,

12         reporting to the PSC on the weekly

13         calls.  All that stuff was just

14         part of the grunt work that we

15         did.

16              But going to the next page,

17         I really want to focus on some of

18         these things, as you said, Chris,

19         that I think I'm most proud of.

20              Early on in the case, I

21         think I drafted with Richard

22         Arsenault the plaintiff profile

23         form that was used, and I think it

24         was much more streamlined than

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        some of the other work on some of

 2        the other ones that we had had.

 3        We negotiated it, we briefed it, I

 4        think we submitted memos to you,

 5        Russ, that you submitted to the

 6        judge, and he ultimately decided.

 7        I think this is the first case I

 8        had the opportunity to develop a

 9        corresponding reciprocal

10        case-specific requirement for the

11        defense.

12             MR. SEEGER:  Had that ever

13        been done prior?

14             MR. TISI:  I appreciate the

15        softball.  That's a good one.  But

16        that's the first time it ever has

17        been done.

18             MR. HERMAN:  I want to say

19        that you championed that issue.

20        That issue would not have been

21        brought to the floor without you

22        pushing it.

23             MR. TISI:  I appreciate

24        that.  It came as a result of in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          fen-phen, going to the depositions

2          where the defense had more

3          information about the doctors than

4          I ever had, and it was a real

5          disadvantage.  I think it was

6          something that was taken and done

7          in New Jersey, I think you

8          transported a profile form into

9          New Jersey, so, it not only had a

10         benefit for the federal litigants,

11         but it also was used in the state

12         courts.

13              MR. SEEGER:  A lot of the

14         work that you did was both in the

15         MDL and in the state courts.

16              MR. TISI:  Yes.  Now, we

17         drafted the Interrogatories,

18         totally redrafted the

19         Interrogatories, and I venture to

20         say, in almost any case,

21         Interrogatories have not been

22         substantive.  The responses that

23         we got in this case were

24         substantive, because they were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          carefully drafted, they were
 2          negotiated ahead of time, and we
 3          got a lot of information about
 4          trials, about sales, marketing, et
 5          cetera, that were actually useful
 6          in the litigation.
 7               We worked with Jeff and Dave
 8          on the master set of Requests for
 9          Production of Documents.  We
10          negotiated with the Food & Drug
11          Administration, I know Troy and
12          Russ and Lenny and others.  We
13          worked to get those documents
14          produced in a timely manner and
15          developed a schedule to get those
16          documents done.
17               We had --
18               MR. HERMAN:  Excuse me.  Do
19          you recall being in Washington
20          with us when we met with the FDA?
21               MR. TISI:  Actually, I did
22          not go to that particular meeting,
23          Russ, because I couldn't make it,
24          but I was on the phone with them
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1           repeatedly over time.

2                   MR. HERMAN:  I thought you

3           had gone with us.

4                   MR. TISI:  No.  I wanted to

5           go, but I couldn't get out of town

6           because I think we had a

7           snowstorm.  It was in the

8           wintertime.

9                   MR. LEVIN:  That's why you

10          live there.

11                  MR. TISI:  That's in

12          addition to having several people

13          at the depository.  I think we had

14          somebody pretty much living up in

15          New York at the depository during

16          that time.

17                  I want to focus and turn to

18          what I think I'm most proud of of

19          all the things.  When we got the

20          case in, most of the work that was

21          being done was depositions of the

22          corporate witnesses.  I think we

23          really pushed, I know I did, the

24          idea of going around the Merck

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      witnesses.  By that point, they

2      had pretty much gone to school on

3      just about everything we were

4      doing, and I felt that the best

5      thing that we could do was to try

6      and develop a third-party strategy

7      for getting key witnesses out in

8      front, people like Nissen, Topol,

9      Graham, Avorn and other people.

10     In retrospect, it seemed like it

11     was the right thing to do.  But at

12     the time, there was a lot of

13     controversy within the PSC and

14     elsewhere whether that was the

15     right thing to do, because a lot

16     of theses folks had had writings

17     out there, people wanted to rely

18     upon their writings, thought that

19     opening up to cross-examination

20     would not be the best thing to

21     do --

22          MR. SEEGER:  Everybody felt

23     it would be a mixed bag.

24          MR. TISI:  A mixed bag.  I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          think in retrospect, it seemed

2          like the right thing to do, but at

3          the time, I think I was a real

4          proponent of that, and we really

5          discussed witness by witness

6          whether that was the right thing

7          to do.  And I put a chart here of

8          just some of them.

9              David Graham, we got his

10         documents.  We filed a motion, I

11         think the ruling on David Graham

12         was one of the more important

13         discovery rulings that we got from

14         the judge.  Mike Wenkowitz and I

15         worked on the brief.  I argued it.

16         We prepped him.  Tom Kline took a

17         great deposition, but I was second

18         chair of that one and worked very

19         closely with him on that.

20             Eric Topol, I don't think

21         anybody would doubt that that was

22         a terrific deposition.  There was

23         a lot of controversy on whether

24         that was the right thing to do.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

 1            Dr. Fries --
 2            MR. SEEGER:  I need to make
 3       this comment, because it is
 4       important.  With Topol in
 5       particular, you were very much
 6       involved in that in every way,
 7       getting our team ready, and it was
 8       one that you really wanted to
 9       take, and somebody else was
10       actually put up for it, and you
11       graciously stepped back and
12       allowed it.  But it was one that
13       you --
14            MR. TISI:  I wasn't so
15       gracious at the time.
16            MR. SEEGER:  You were pretty
17       gracious, and that's a very good
18       example of where you were very
19       much a team player.  So, I just
20       think that's important, because I
21       was involved in talking to you
22       about that.  I think it is
23       important that people know that.
24            MR. TISI:  I think the one

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1    deposition came later on in the

2    process that we kind of decided

3    was Steve Nissen, and I take

4    particular pride in that.  When I

5    took that one, he was a

6    participant in both of the

7    Advisory Committees involving

8    Vioxx, and I think having him on

9    board saying that I was pretty

10   much duped by the company in the

11   original -- if it had the

12   opportunity to be played more, I

13   think it was played in the

14   Illinois case --

15        MR. BIRCHFIELD:  It was.

16        MR. TISI:  -- it would have

17   been used more as time went on.

18        There were some we didn't

19   decide to take.  We really spent a

20   lot of time talking about

21   FitzGerald, whether that was the

22   right thing to do.  We decided

23   against it.  But the fact that we

24   didn't take it didn't mean that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          there was a lot of work that was

2          not done to vet that issue.  So,

3          we spent a lot of time on that.

4                  Marvin Konstam, et cetera.

5                  So, while there was a lot of

6          questions about the wisdom of that

7          strategy, I think these

8          depositions really were the

9          backbone or a backbone of trials,

10         and virtually all of these

11         depositions, to one extent or

12         another, played a role in the

13         trials that came after, I think.

14                 MR. SEEGER:  I don't think

15         we had these, but in Humeston II,

16         and you know the difference in

17         Humeston I and II, we did play

18         Graham, Topol, Fries, and Avorn

19         was live.

20                 MR. TISI:  Avorn was live.

21                 Let me talk about Avorn for

22         a second, since you raised it.

23                 MR. SEEGER:  Which, by the

24         way, you helped us obtain him for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          that trial.

2                   MR. TISI:  Originally, I

3          remember, Chris, you said to me,

4          if you can get him, I'd be very

5          happy.

6                   MR. SEEGER:  And I was

7          happy.

8                   MR. TISI:  We got him, and

9          we originally decided to develop

10         him as a hybrid witness, which was

11         really difficult to do.  We

12         originally were going to -- and

13         this is where we worked on

14         Humeston, as well, but we

15         originally were going to call him

16         in Humeston as a witness, and we

17         spent some time as a fact witness

18         bringing him out, because he

19         obviously had a role.

20                  We decided in the end of the

21         game that it was probably a better

22         idea to kind of develop him into a

23         hybrid, and I think the result was

24         a really good, you know, saying,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1        look, this is what you knew and
 2        this is what you thought, and then
 3        now let's show you what the
 4        company really had and now tell me
 5        what you really think.  And I
 6        think because of waiting and
 7        developing that strategy, I think,
 8        made that a much more effective
 9        deposition.  But it took a lot of
10        time to develop that.
11             MR. BIRCHFIELD:  Chris, on
12        Avorn, and I would have to agree
13        with Ed, I think it was probably
14        one of the best depositions taken
15        in the litigation.
16             MR. SEEGER:  I agree as
17        well.
18             MR. BIRCHFIELD:  But him
19        testifying live at Humeston,
20        that's the first time he's
21        testified live at trial?
22             MR. TISI:  Ever.
23             MR. BIRCHFIELD:  Ever, in
24        any litigation.  Can you tell us a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          little bit about how you were

2          instrumental in getting him live?

3               MR. TISI:  We did.  I'll be

4          honest, I was very concerned about

5          the idea of exposing him live

6          because his deposition testimony

7          was so good, I didn't want to

8          undermine that in subsequent

9          hearings, but we talked about it.

10         The compromise, or what we came up

11         with was he was going to show up

12         at the trial, I was there to prep

13         him, we helped him out, we worked

14         with him, and I think his

15         testimony went across very well.

16              MR. SEEGER:  You are being

17         way too modest.  I mean, the truth

18         is, there was a lot of

19         apprehension on your part and on

20         his.  I was on the phone with

21         you -- I was in the middle of the

22         trial, and I was on the phone with

23         you constantly.  You were also

24         talking with Mark.  Mark, I don't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1           think, had a lot of success

2           convincing you, and I remember

3           calling you and saying, Chris,

4           this is one for the team, just do

5           it, and he did it.

6                   MR. TISI:  I'll just add,

7           because I want to add one point,

8           because everybody thinks of

9           Humeston/Hermans as a dual trial.

10          That case, up until the eve of

11          trial, was a four-plaintiff trial,

12          as you know, Perry.  It's

13          something I want to talk to the

14          committee about at the end of

15          this, because I didn't put in for

16          my time on that because I

17          didn't --

18                  MR. BIRCHFIELD:  You should.

19                  MR. RAFFERTY:  You should.

20                  MR. HERMAN:  You obviously

21          didn't put in a lot of time that

22          you spent on the case.

23                  MR. SEEGER:  Why did you do

24          that?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1               MR. TISI:  Well, because

2          Judge Fallon's order reads clearly

3          work for trials and verdicts.

4          That was a four-person --

5               MR. HERMAN:  Let me just

6          say, to the extent you can

7          supplement, because what his

8          intent is, is that if a trial was

9          set and it was worked up for

10         trial, even if it wasn't tried,

11         those hours count.

12              MR. TISI:  Okay.  Well, I

13         will recreate that and submit

14         that, but I appreciate that.

15              But it really was a

16         four-person trial.  We went

17         through focus groups, we did all

18         the discovery.  Now I'm going out

19         of order on where I wanted to go,

20         but --

21              MR. SEEGER:  You don't need

22         this anyway.

23              MR. TISI:  We did three or

24         four motions in limine, we worked

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        up the case to get it ready.  I

2        remember arguing the Avorn issue

3        in front of Judge Higbee.  So, I

4        think it's --  I will submit with

5        that, but I read him literally to

6        say if it was a trial, if it was a

7        bellwether trial, and since my

8        case was pulled off the docket the

9        day or two days before, I think

10        two business days before the trial

11        began, I didn't submit that time.

12        But I will do that.

13             MR. WEITZ:  Chris, it is

14        important that you think about any

15        other cases that you did the same

16        thing in, because we think that it

17        is very important to be able to

18        demonstrate to the judge the

19        people that helped move the

20        dockets, that put pressure on

21        Merck and forced them to --

22             MR. SEEGER:  But you were

23        helping us all prepare for trial.

24             MR. TISI:  I stayed for an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          extra week-and-a-half to work on

2          the case.

3              MR. LEVIN:  Right.  Please

4          expedite that --

5              MR. TISI:  I will get that

6          done.

7              MR. LEVIN:  -- because the

8          fact that that's in for you helps

9          us with regard to the overall

10          picture of the whole case.

11              MR. HERMAN:  I want to say

12          one thing from my point of view.

13          This was your first PSC

14          appointment by a federal judge.

15              MR. TISI:  Yes.

16              MR. HERMAN:  I don't know if

17          it was Troy's first, but you and

18          Troy did outstanding work, as far

19          as from my perspective, as

20          compared with some others that

21          were appointed to the PSC.  It

22          certainly --

23              MR. SEEGER:  Who are

24          veterans of PSCs.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1            MR. HERMAN:  Yes.  Let me
 2       tell you that it's certain from
 3       just going through the MDL
 4       process, it certainly made Chris
 5       and Andy and myself a lot more
 6       comfortable that you could be
 7       called on, you weren't going to
 8       give anybody back talk, you would
 9       get the job done, and you did it
10       well.
11            MR. TISI:  So, the
12       third-party aspect is something I
13       take pretty carefully and I'm
14       particularly proud of.
15            I took a bunch of
16       depositions in the case.  I mean,
17       apart from Dr. Avorn, which we've
18       discussed, and apart from Steven
19       Nissen, which I've discussed, I
20       took the vice president of
21       scientific and medical affairs,
22       Peter Honig.  I took Gil Block,
23       who ran the Alzheimer's studies.
24       I had actually prepared to take
```

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          Wayne Ray, and the interesting

2          thing about Wayne Ray, that kind

3          of developed over a year.  We had

4          learned during the course of

5          preparing him for his preservation

6          testimony that there was some

7          facts that he was aware of that

8          hadn't come out before, and that

9          was the extent to which Merck had

10         had backdoor conversations with

11         Peter Honig at the FDA prior to

12         the first Advisory Committee.  It

13         took us several months to develop

14         that.  And we did, Dave and I and

15         others, and really worked up that

16         issue, and we were about ready to

17         offer him up for a deposition when

18         the settlement was announced.

19              But I had actually prepared

20         for his testimony.  It was going

21         to be really good.  I'm still

22         regretting that we didn't get a

23         chance to take it.  We had to pull

24         it back because we wanted to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1      develop that fact portion of it.

2      So, I wanted to highlight that as

3      something that had been done, and

4      it obviously was interrupted by

5      the settlement.

6          David Graham, Eliav Barr,

7      other folks we worked on.

8          Science and expert

9      committee.  Michelle and I worked

10     up, I think sometimes it is very

11     interesting to look at the people

12     that were actually named, but a

13     lot of work gets done looking at

14     the people you vetted who you

15     didn't choose for generic experts.

16     I know Michelle traveled all over

17     the country, met with Dr. Singh,

18     Dr. Lipiky, Dr. -- the former FDA

19     person, a bunch of people who were

20     in our affidavits, went all over

21     the country to try and see who we

22     could name.  Some of theses folks

23     we decided in the end of the day

24     were probably not people we wanted

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          to show.  But that took a lot of

2          time.

3               We worked on the expert

4          reports for Dr. Gueriguian, Dr.

5          Avorn, Dr. Kronmal.  Michelle and

6          I worked with Mike and Lisa

7          Dagostino on the stroke project

8          and Dr. Feldman.  So, we did a lot

9          of that stuff.

10              We were asked by the PSC to

11         work on the privilege committee

12         with Anthony and the other folks.

13         We met repeatedly with Special

14         Master Rice, did a lot of

15         briefing, did a lot of arguing.

16         It is the first case that I ever

17         remember where I ever got one

18         privileged document before the end

19         of the litigation, and I did

20         promise and I will put it on the

21         record, that if Anthony ever got a

22         document before the end of the

23         litigation, I owe him dinner, and

24         I still haven't dealt with that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          yet.  But we did get those

2          documents, and I think that was a

3          good thing.

4               Law and briefing, we did a

5          lot of briefing.  That's in the

6          affidavit.  I can tell it is

7          lunchtime, and I'm not going to

8          spend a lot of time on that.  But

9          we did do a lot on that.

10               I wanted to go to the

11          bellwether trial issue, because I

12          think that that's an important

13          point.  Some of you were fortunate

14          to try some of these cases, and I

15          always was very -- I know we were

16          very envious of the opportunity to

17          be able to do so.  But I was also

18          pleased that I was asked, and

19          Michelle, as well, were asked on

20          several occasions to lend whatever

21          support we could to preparing

22          witnesses, briefing, preparing

23          stuff that went into the trials of

24          these cases.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          As I said, in almost all of

2      these cases, I remember sitting in

3      the courtroom for Irvin I with

4      Lisa doing the trial cuts for

5      Topol and the objections of Topol,

6      doing the counters and working on

7      all of those issues.  We did the

8      same thing for Curfman, we worked

9      on the counters, the objections,

10     all of those things that went into

11     the trial package ultimately.

12          MR. SEEGER:  Were you

13     involved in the taking of Curfman?

14          MR. TISI:  Peripherally.  I

15     was involved in arranging it.  I

16     mean, that really was taken by

17     Don, and he ran with it.  But in

18     terms of cutting it and making it

19     trial ready, all of that stuff,

20     that was something that we worked

21     on.

22          One thing I didn't mention

23     on the PSC side I wanted to

24     mention, is the work done by the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          trial package committee.  We --

2                  MR. SEEGER:  Have you seen

3          the trial package?

4                  MR. TISI:  I have seen it.

5                  MR. SEEGER:  That was a

6          joke, for the record.

7                  MR. TISI:  It is a pretty

8          amazing trial package.  I mean, if

9          we had gone forward with this

10         litigation further, that trial

11         package would have been the core

12         of everything that had come on

13         following.  The case was pretty

14         much ready to be tried in a much

15         more --  the goal was really to

16         get cases that could be tried for

17         less money, that could be tried

18         with documents and that wouldn't

19         be as expensive as the first

20         couple trials were.

21                 Trial involvement.  I'll

22         touch on that really briefly.  All

23         of these cases, Irvin I, Irvin II,

24         sat with Troy during Irvin II,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1        working with Dr. Kapit, I think.

2              MR. HERMAN:  Did you help

3        with Madigan?

4              MR. TISI:  No, no.  There's

5        an inside joke there somewhere.

6              MR. HERMAN:  Actually, it is

7        not.  Do you know anything about

8        him?

9              MR. RAFFERTY:  Do you know

10       who Dr. Magidan is?

11             MR. TISI:  It is a familiar

12       name, quite frankly.

13             MR. SEEGER:  I think that

14       just spoke volumes.

15             MR. TISI:  Oh, he was the

16       guy from Philadelphia.  I do

17       remember that.

18             I actually remember, Andy,

19       we were getting ready to

20       cross-examine Alise Reicin, and

21       you asked me, could you go through

22       the Advisory Committee transcripts

23       and see if you can put together a

24       cross-examination that will help

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1        me contribute to the results of

2        the Advisory Committee.  I think

3        we did a pretty good job in giving

4        you that.  I think that was that

5        big chart.

6                MR. BIRCHFIELD:  It was the

7        highlight.

8                MR. TISI:  It was a good

9        thing, and hopefully that was

10        helpful.  All of those things are

11        listed in my affidavit.  I don't

12        want to go through all of that

13        stuff.  But I think it's fair to

14        say that we spent a lot of time on

15        most of the trials that were out

16        there, and when asked, we always

17        put ourselves forward to assist if

18        we couldn't actually try the case.

19        We put ourselves in a position,

20        and it was constant.

21                I mean, I think that what's

22        key and one of the things that

23        Judge Fallon made clear is the

24        consistency of work throughout the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1            time.  I can tell you from my own
 2            perspective, we worked, I know I
 3            did, Michelle to a lesser extent,
 4            but --
 5                 MR. SEEGER:  Could you take
 6            a few minutes to talk about
 7            Michelle's contribution?  I think
 8            we are very familiar with yours,
 9            but maybe less so --
10                 MR. TISI:  Well, like I
11            said, Michelle spent a lot of
12            time, particularly early on,
13            working and vetting the experts.
14            I think that that was her main
15            task.  I think she was appointed
16            to work by John and Carlene, and
17            ultimately Shelly, to work on the
18            Daubert committee.  So, we spent a
19            lot of time with the various
20            experts, vetting them, vetting
21            their reports, vetting their CVs,
22            working with them on their
23            opinions, helping draft their
24            reports and editing their reports
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1        that would be ready as the case

 2        got forwarded.  She spent a lot of

 3        time on that, particularly in the

 4        early days.

 5            MR. BIRCHFIELD:  She was

 6        very helpful in filtering out some

 7        that would not have been effective

 8        witnesses for us.

 9            MR. TISI:  Exactly.

10            MR. SEEGER:  Are there

11        certain experts that your firm

12        were the point person or

13        gatekeepers for?

14            MR. TISI:  Obviously I think

15        Avorn, I was.  I think that --

16            MR. SEEGER:  Or you brought

17        to the litigation?

18            MR. TISI:  Gueriguian was

19        another one that we worked on

20        developing the expert report and

21        getting him ready for the

22        deposition.

23            MR. BLIZZARD:  You can't get

24        him ready for a depo.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1                MR. TISI:  Not anymore.  But

2          actually, funny story about

3          Gueriguian.  When he left the FDA,

4          I think I was the guy that

5          actually found him.

6                MR. RAFFERTY:  That was for

7          fen-phen.

8                MR. TISI:  He was very good

9          early on, and then he became a

10         little more...

11               But in any event, a lot of

12         the experts, and lot of the

13         efforts to Daubertize a lot of the

14         experts was something that

15         Michelle had done.

16               MR. RAFFERTY:  One thing

17         that Chris did a lot of, too, that

18         doesn't get talked a lot about is

19         not only a lot of the substantive

20         work, but also a lot of the

21         organizational work and the

22         day-to-day dealings with a lot of

23         our discovery issues that we

24         encountered.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1           MR. TISI:  Remember, Troy,

2      when the Farquhar issue came up or

3      the document --

4           MR. SEEGER:  I remember

5      that.

6           MR. TISI:  -- or the

7      document that was --

8           MR. SEEGER:  The memo.

9           MR. TISI:  The memo that

10     came up.  I mean, that was the

11     kind of thing, and that took days

12     of time before that ultimately got

13     before the judge.  It was like one

14     of those things that you wake up

15     on a Monday morning and you get a

16     phone call saying that you have to

17     deal with that issue, and it was

18     an issue that lasted a whole

19     while.  Those are the kinds of

20     things.

21          It is impossible for me,

22     quite frankly, to kind of

23     illustrate all of those things

24     that came up.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

 1            I remember there was an

 2       issue with Dr. Rarick and whether

 3       she had an expert report in the

 4       MDL, and we had a fight with Ted

 5       Mayer about whether it was even

 6       appropriate to name her and

 7       cross-notice her in the MDL.  We

 8       went back and forth on that issue.

 9       There were just so many instances

10       where you wake up one morning and

11       the date -- I mean, we all do

12       that.

13            MR. BIRCHFIELD:  Chris, we

14       all recognize that you did

15       excellent work and you've been

16       here throughout the course of the

17       litigation, so, your work is

18       recognized and appreciated, and

19       you are a team player.

20            MR. BLIZZARD:  Historically,

21       I have been a hypercritic,

22       sometimes excessively so, of the

23       kind of work product that MDLs

24       turn out in terms of its usability

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          in trial.  That was not the case

2          here.  The work product from the

3          witness standpoint, I thought, was

4          very useful in trials.  I think

5          you were a big part of that, and I

6          appreciate that.  So, to me, hours

7          says something, and I know from

8          what's been said that you are not

9          great about keeping them.

10              MR. TISI:  I'm much better.

11          For the record and for my senior

12          partners, I'm much better.

13              MR. BLIZZARD:  But

14          ultimately it is the work product

15          that counts, and you had a big

16          hand in making this a great work

17          product.

18              MR. SEEGER:  I can't think

19          of an important part of this

20          litigation that you were not

21          central to.

22              MR. TISI:  I appreciate it.

23              MR. SEEGER:  I would have to

24          stretch my imagination.

FAC Resp. Amended Exhibit D -- 123

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1            MR. TISI:  I appreciate

2        that, and it has been a pleasure

3        working with all of you as well.

4            MR. SEEGER:  Thank you.

5                -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4   Public and Certified Court Reporter of

5   the State of New Jersey, Registered

6   Diplomate Reporter, Federally-Approved by

7   the United States District Court of

8   Pennsylvania, do hereby certify that the

9   foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: AUDET & PARTNERS, LLP
      Susanne Scovern, Esquire
      HOVDE DASSOW & DEETS, LLC
      Robert Dassow, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
       GOLKOW TECHNOLOGIES, INC.
    877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. DASSOW:  I feel like I'm
 3         coming to Congress and I'm looking
 4         for a bailout.
 5              Susanne and I decided to do
 6         this together, and we'll explain
 7         why in a few minutes.
 8              What's important is, we were
 9         fighting Merck at the beginning of
10         the litigation.  In the middle of
11         the litigation, we were fighting
12         Merck.  And at the end of the
13         litigation, we were fighting
14         Merck.  We worked out of New
15         Jersey, and we were always, always
16         fully engaged in this litigation
17         from the beginning.
18              I guess what I would like to
19         do first, fellows, is talk to you
20         a little bit about our firms.  The
21         partners are myself and Boyd
22         Hovde, Rick Hovde and Nick Deets.
23         Our partners, just by way of
24         background, two are in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          International Trial Academy.

2          Three of us are in the National

3          American Trial Academy.  As long

4          as I can remember, we've been

5          preeminent lawyers with regard to

6          Martindale-Hubbell.  We've got 100

7          years of combined experience with

8          regard to trial advocacy.  We have

9          tried over 300 cases between all

10         of us.  I think that what I can

11         say about our Indianapolis firm is

12         we're always ready to go and try

13         cases.

14              MR. HERMAN:  One thing I

15         would like to note, if you'll work

16         it in, is you either had a joint

17         venture, whether it is a business

18         joint venture, but apparently a

19         work effort joint venture of some

20         sort.  So, would you give us some

21         detail on that.

22              MR. DASSOW:  Sure.  I can

23         tell you about that, and at the

24         bottom of the slide, Russ, you can

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        see it says separate fee

2        applications, but we've got a

3        common benefit.  Essentially what

4        happened was, early on, Susanne

5        and I got together, we knew each

6        other from prior litigation.  We

7        get along obviously very well.  We

8        work well together.  What we did

9        was, we essentially worked

10       together sort of like Chris and

11       Mark would work together with

12       regard to the trials, but

13       obviously they did different

14       things.  So, that's kind of what

15       we were doing.  Does that answer

16       your question, Russ?

17            MR. HERMAN:  Well, do you

18       have a cross fee participation at

19       all?

20            MR. DASSOW:  We do not.

21            MR. HERMAN:  And no joint

22       clients?

23            MR. DASSOW:  No joint

24       clients whatsoever.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1           Does that help?  Does that

 2       demarcate what we're talking

 3       about?

 4           MS. SCOVERN:  Our clients

 5       were better than his.

 6           MR. DASSOW:  I'll let

 7       Susanne tell you about her firm,

 8       and then we'll keep moving on.

 9           MS. SCOVERN:  My firm

10       consists of eight attorneys, and

11       our Vioxx team that was dedicated

12       during the course of the

13       litigation consisted of five

14       attorneys.  Bill Audet is the

15       principal owner of the firm.

16       Myself, I have 20 years of

17       litigation experience.  We had two

18       six-year associates who did most

19       of the law and motion work for

20       Robb and I, and Adel, a third year

21       associate.  We also had some

22       paralegals and legal assistants,

23       legal litigation assistants to

24       assist us.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1            Bill Audet was the person

 2       most responsible for organizing

 3       us.  He organized us, and he

 4       conducted mini-seminars of our

 5       counsel and about a dozen other

 6       firms both in the Midwest and on

 7       the West Coast.

 8            MR. DASSOW:  This is preMDL.

 9       This is early on in January of '05

10       that we started doing this.

11            MS. SCOVERN:  Right.  And we

12       got together with trial experts

13       and litigation strategy experts

14       early on, like Robb said, and

15       mapped out the cases and trial

16       strategy that we wanted to

17       endeavor in mostly in New Jersey.

18       We had a few cases that we also

19       filed in California in front of

20       Judge Chaney.  But the bulk of our

21       cases and the counsel that we

22       worked with were filed in New

23       Jersey.

24            At one time, our firm had
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          two trial cases of the bellwether

2          case of Benjamin LoPresti in New

3          Jersey and the Anderson case in

4          California, plus, as Robb will

5          describe later, we had several New

6          Jersey trial pool cases.

7               Bill was also responsible

8          for organizing the Merck profile

9          form along with Dave Buchanan from

10         Chris Seeger's office.  They

11         worked in tandem with the MDL

12         attorneys with the defense profile

13         sheet and the Merck profile form

14         and got that adopted by Judge

15         Higbee early on.  I think it was

16         around March of 2006, she adopted

17         the New Jersey Merck profile form.

18              Our firms also, as I

19         mentioned before, were

20         instrumental in the initial

21         bellwether cases in New Jersey.

22         In October of 2005, Robb and I, at

23         Judge Higbee's request from the

24         CMC, went through all of our case

FAC Resp. Amended Exhibit D -- 132

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        inventory and came up with our
 2        best New Jersey trial case.  At
 3        that time, she was focused on
 4        trying a few cases at the same
 5        time, but she did not want to deal
 6        with conflict of law issues, and
 7        so she wanted to focus on New
 8        Jersey cases.  Our New Jersey case
 9        that we proposed was Benjamin
10        LoPresti.
11            In November of 2005, she
12        selected that as a bellwether case
13        to be tried with other New Jersey
14        liaison counsel.  At the time, it
15        was the Hatch case with Anapol
16        Schwartz and also the McFarland
17        case with Seeger Weiss.  She
18        scheduled us for an April 2006
19        trial date, and so we had five
20        months to prepare for that trial
21        date.  And essentially Robb and I
22        dropped everything we were doing
23        and concentrated on that.  We were
24        involved in multiple discovery
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        meetings and teleconferences with

2        our New Jersey liaison counsel,

3        and we were one of the first firms

4        to review thousands of sales reps

5        documents that came through.

6             In looking at those sales

7        rep documents, we were the first

8        firm that went to Judge Higbee on

9        a series of redaction issues

10        involving prescribing depositions

11        that were redacted, Vioxx payments

12        to physicians that were redacted

13        and sales rep bonuses that were

14        redacted, and we had a couple of

15        in-camera motions with her

16        bringing forward those redacted

17        documents.

18             We also, in doing our

19        analysis of the sales reps

20        documents, discovered a window

21        into the widespread financial ties

22        between Merck and the doctors who

23        prescribed or recommended Vioxx.

24        Through the health education

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1       learning programs that actually

2       Ken Soh from Mark Lanier's office

3       gave me the heads up on, those

4       programs -- after the Ernst trial,

5       he forwarded a lot of documents to

6       my office, and it kind of started

7       on looking at and tracking the

8       money that Merck was paying to

9       physicians.  This became something

10      of great interest to Judge Higbee

11      early on, and that permeated the

12      litigation all the way up into

13      settlement.  I will get into a

14      little bit more detail about that.

15          We also were the first firm

16      to give the American Express

17      reports of all the sales reps in

18      their custodial files.  We really

19      pressed Judge Higbee to open up

20      and to expose the amount of

21      payment that was going to the

22      Merck physicians through the

23      marketing department at Merck and

24      their 3,000 sales reps that were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          touching base with the doctors on

2          a daily basis.  And an interesting

3          factor is that in 2003,

4          pharmaceutical companies were

5          spending $9 billion on marketing

6          and promotion of their products,

7          and out of that 9 billion, 6

8          billion was being spent directly

9          on prescribers.

10              In the particular case of

11          Benjamin LoPresti, Dr. Sheldon

12          Solomon was his prescriber, and we

13          were able to get his 1099s, which

14          showed thousands of dollars, if

15          not hundreds of thousands of

16          dollars, from 1999 to 2005.  He

17          was a Merck thought leader.  The

18          common benefit impact of exposing

19          the financial ties was introduced

20          to Judge Higbee early on, and the

21          conflict of interest that the

22          doctors had in receiving all of

23          that money and yet being very much

24          influenced by this money, in my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      opinion, had a very negative

2      effect on a lot of our clients,

3      because they were taking money, it

4      was altering their prescribing

5      habits, and I think to the

6      detriment of a lot of our clients.

7           Soon after our work in the

8      LoPresti trial, Judge Higbee

9      ordered the production of 1099s

10     for all providers in the trial

11     cases moving forward.

12          MR. DASSOW:  I just want to

13     touch on a couple of other aspects

14     of the LoPresti trial and why it

15     is important.

16          First of all, at the

17     beginning, and this is early on in

18     the litigation, we've got Chris

19     Seeger's office, we've got Mark

20     Lanier's, we've got Perry's

21     office, and we've got Anapol

22     Schwartz and us, that's it, going

23     forward.  You are seeing a lot of

24     people, you guys, and they are all

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1        telling you, we did a lot of

 2        common benefit, but I'm telling

 3        you, we were involved right away

 4        with Chris and Mark and Perry at

 5        the beginning with a trial case

 6        that we had five months to work

 7        up.

 8             Other than the Humeston

 9        trial, nothing had been going on.

10        Mark is working on the Ernst

11        trial.  I mean, we're involved and

12        we're going.  That's how we are

13        different at the beginning from

14        all the other folks that are

15        coming in and talking to you guys

16        and telling you how they did

17        common benefit things.  Well, we

18        were at the ground floor, and we

19        went all the way up the elevator

20        with everybody in this room.

21             I've got a couple of points

22        here.  You can tell we did 12

23        depositions.  Obviously, we all in

24        this room did a number of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        depositions.  At the beginning, we

2        were the earliest firm to take

3        sales reps other than Jerry

4        Kristal.  I think that Moshe came

5        along to a couple of deps with us,

6        but Harley, O'Connor, Fagen,

7        what's important there is there

8        were six Merck lawyers at each of

9        those depositions defending them

10       against us.  Each deposition.

11            We did some physician

12       depositions of family members.  I

13       want to note one last thing on

14       this slide.  You see the

15       deposition of Dr. Lynch?  What is

16       important is, in Chris' trial, I

17       believe, and in the first trial,

18       they brought up the green monkey,

19       and they want to talk about venous

20       and arterial problems that the

21       green monkey showed that you can't

22       have plaque accumulation, blah,

23       blah, blah, I won't go into all

24       the fun medical terms and things

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        like that today, but what's

 2        important is, through an expert of

 3        ours, I was told that Dr. Lynch

 4        would tell the truth.  I was told

 5        that Dr. Lynch would come forward

 6        and explain that the green monkey

 7        study meant nothing.  And that's

 8        exactly what he did.  I prepped,

 9        took his deposition in Philly, and

10        that applied to everybody.  You

11        never heard that again, unless

12        Mark and Chris can tell me, you

13        never heard about the green monkey

14        study ever again.  He was done.

15        Never heard about it again.  I

16        don't think in the MDL trials,

17        they may have brought it up, I'm

18        not sure, but it was over.

19             What's the impact of

20        LoPresti?  We disseminated all the

21        sales rep documents, deposition,

22        video clips to anybody who wanted

23        it in New Jersey.  Frankly, I

24        didn't care if they went to the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          MDL.  I didn't care.

2               We disseminated all the

3          prescribers, all the cardiologist

4          depositions we did.  We gave our

5          outlines.  We didn't care, it was

6          for the common benefit after the

7          first four or five firms got it

8          going.  We were ready to go and

9          help anybody else.

10              Again, while Chris and the

11         folks in New Jersey are on trial,

12         and the best way I can explain is

13         they went on trial, and we are

14         right underneath them kicking

15         Merck's butt and keeping them as

16         busy as we possibly can at all

17         times.  That is true 'til November

18         of '07, until the settlement.

19              Susanne is going to just

20         touch on something of interest

21         that was about Rodney Jew, and you

22         know --

23              MS. SCOVERN:  As soon as

24         Judge Higbee gave us the green

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1    light for our bellwether cases to

2    move forward, my firm set up a

3    number of trial strategies,

4    seminars presented by Rodney Jew.

5    He is the foremost trial

6    consultant and litigation

7    strategist in Palo Alto.

8         MR. DASSOW:  Other than Dr.

9    Bob.

10         MS. SCOVERN:  So, we

11    attended two week-long sessions in

12    Palo Alto.  And at that time, we

13    were land mining and doing case

14    mapping from our respective cases.

15         And the overall impact,

16    common benefit impact I think with

17    our three firms working together,

18    Chris', Anapol Schwartz and ours,

19    our group, was it developed a

20    strategy for a coherent and

21    effective trial theme for future

22    common benefit cases or the common

23    benefit of future cases in New

24    Jersey.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          MR. DASSOW:  Richard Allen.

2          After we were working on the

3          Rodney Jew issue, Judge Higbee

4          talked to us, and since we didn't

5          get to go on that particular trial

6          because of the other trials that

7          were going, she chatted with us,

8          along with Merck, and said we want

9          you guys to put up some cases for

10         the next round.  So, what we did

11         in June was work on, go through

12         each one of our cases to figure

13         out, now that the judge has opened

14         up nonNew Jersey cases, she opened

15         up the entire United States, we

16         didn't have the conflict issue

17         anymore.  Judge Higbee opened it

18         up.  She wanted our cases in July

19         of '06.  As a result of what we

20         ponied up at that point, along

21         with other folks in this room,

22         Judge Higbee selected Richard

23         Allen as one of the main trial

24         cases of the 39.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1            Richard Allen made the cut
 2       with Chris and Mark and Perry,
 3       made that cut down to one of the
 4       ten that was going to go in the
 5       next batch.
 6            What's important there is
 7       that we flew out and met with
 8       Mark, and we strategized about how
 9       are we going to put the trials
10       together, what cases mesh, how are
11       we going to do that, and, frankly,
12       Mark said, here's what we're
13       looking for, we want you
14       tag-teaming it, how are you going
15       to do this?  So that's what we
16       did.  And I point out a couple
17       other issues here.
18            We have 24 sales reps.  We
19       had hundreds of thousands of
20       documents.  We had the most
21       voluminous production with regard
22       to Mr. Allen, I think, of any of
23       the cases at that time.  We went
24       through that thoroughly.  And I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          came up with a couple of sales

2          reps that we took.  In that case,

3          in a matter of two-and-a-half

4          months, we took nine discovery and

5          de bene esse depositions.  This

6          case was absolutely primed and

7          ready to go to trial.  Morricol

8          and Hillis, the cardiologist and

9          the prescribing doctor, were

10         absolutely totally on board.  Had

11         they known about the risks of

12         Vioxx, they never would have

13         prescribed it.  I had a

14         cardiologist, and we had the

15         prescriber both saying that, and

16         saying many, many better things

17         for us.  The case was great.

18         Every case had warts, let's not

19         kid each other, every case had

20         warts.

21              The other thing to note with

22         regard to Allen is that we were

23         one of the first firms to be

24         allowed by Judge Higbee to get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          regional business managers.  This

2          applied to all of the cases.  She

3          allowed us to get the regional

4          business manager.  Why is that

5          important?  That tied in Anstice

6          to the regional business manager

7          to the low level sales reps.  We

8          never got there, but we put

9          pressure on them, and we are the

10          only people to get that, and that

11          was for the common benefit of

12          everybody.

13              I also mentioned there the

14          whistle blower.  I can't tell you

15          with the gentlemen sitting here

16          how many whistle blowers you had

17          or if you had any.  I ponied up

18          and offered a whistle blower to

19          Moshe on an occasion, Mark had the

20          ability, talked to Jerry Kristal

21          about it.  I had a nurse sales rep

22          in Indiana that was willing to

23          testify with regard to Merck.  She

24          had a TIA while she was on Vioxx,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          okay, while she was on Vioxx,

2          confronted her people and her

3          regional business manager and

4          said, this stuff is killing

5          people, it's causing heart attacks

6          and strokes.  He said, if you say

7          anything else, you are going to be

8          fired.  So, that gives you a

9          little background.

10              We never needed it.  We

11         couldn't really bring her in,

12         because the Indiana case never

13         went.  It was a decision made that

14         we never used it, but she was

15         available, and I made her

16         available for everyone in the

17         trial.

18              What's the quick common

19         benefit of that?  We continued to

20         put pressure on those nonstop with

21         regard to Allen.  First whistle

22         blower, as far as I know, and the

23         first regional business manager.

24              Susanne is now going to talk

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          to you about physician

2          compensation, kind of our pet

3          project that we had that was for

4          the common benefit of everybody

5          with regard to 1099s.

6               MS. SCOVERN:  It started off

7          with Ben LoPresti, as I mentioned,

8          and it carried through the entire

9          litigation.  What I was doing was

10         comparing the Merck profile form,

11         and for the MDL, it is called the

12         defense fact sheet, responses that

13         Merck provided for the payments to

14         doctors to their 1099s.

15              In the Merck profile form,

16         Merck is supposed to list all the

17         payments to doctors for their

18         presentations, their honorariums,

19         their clinical investigations of

20         any COX-2s, including Arcoxia, and

21         their expenses per calendar year

22         from 1999 to 2005.  If you looked

23         at what you were getting in the

24         Merck profile form for physician

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1      compensation and compared it

2      against their 1099s, there were

3      widespread discrepancies and

4      redactions.

5           Merck came up with a series

6      of explanations trying to explain

7      away the inconsistencies for a

8      period of three to four months.

9      Either they didn't have the 1099s

10     anymore or they were in storage or

11     they couldn't locate them or it

12     was an IRS reporting nuance or we

13     didn't know what the redactions

14     were on the Merck profile forms,

15     but we'll get back to you.

16          We were in Judge Higbee's

17     chambers at least six to eight

18     times between June and July on

19     this issue and multiple conference

20     calls with her.  In the end, what

21     we discovered was that they

22     redacted in the Merck profile form

23     all physician payments that went

24     to any clinical research,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        including Arcoxia, and any grants

 2        that they gave to doctors.  And

 3        when you compared that with the

 4        1099s, in the end they told Judge

 5        Higbee in chambers that they did

 6        not issue 1099s to doctors for

 7        clinical research work or grants

 8        given to doctors.  And that's

 9        millions of dollars.

10            MR. DASSOW:  Let me just say

11        this again.  They never issued

12        1099s to doctors ever.  Even in

13        clinicals, even in preceptorships,

14        even in tutorials, they never did

15        it, and they expensed it.

16            MS. SCOVERN:  So, that

17        opened up Merck to a very big

18        issue of liability with the IRS.

19            MR. DASSOW:  Hundreds of

20        millions of dollars we know.

21        That's what we were told by Merck.

22        That's what we were told by

23        Dechert.

24            MS. SCOVERN:  What Judge
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1     Higbee then ordered was the

2     depositions of the executives at

3     Merck who were responsible and

4     signed off on the defendant fact

5     sheets and Merck profile forms,

6     the people who had to compile the

7     physician data.  And we were able

8     to explore how they went about

9     trying to mine physician data, and

10    it was completely corrupt.

11         They were mining databases

12    based on the name of the

13    prescriber that a plaintiff would

14    provide in a plaintiff profile

15    form.  That's it.  If the

16    plaintiff misspelled the name, you

17    were not going to get physician

18    compensation.  If the plaintiff

19    did not list the address of the

20    professional corporation for the

21    prescriber, you are not going to

22    get their physician compensation.

23         They had this information

24    because they targeted doctors

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          through their sales reps, yet they

2          failed to provide it on thousands

3          of Merck profile forms and

4          defendant fact sheets.

5                MR. DASSOW:  Tens of

6          thousands.  It applied not only to

7          the New Jersey folks, but to the

8          MDL, because we worked on the

9          defense fact sheet and the Merck

10         profile form and know how we were

11         all getting cheated consistently.

12         And it was follow the money, and

13         we were not getting the

14         information.  So, what the effect

15         of that is, is when we would go

16         take -- for any of you guys, we

17         would go take a prescriber's

18         deposition, and you didn't know if

19         they were in Merck's pocket or you

20         didn't know whether they weren't

21         in Merck's pocket.  You didn't

22         know whether you had all the

23         contracts.  You didn't know

24         anything about that prescriber.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          You were going to get blind sided

2          big time.  That's why we were

3          working on this for everybody.

4               MS. SCOVERN:  They did, they

5          withheld lots, I mean, thousands

6          of physician consulting

7          agreements.  They provided you

8          with the signature pages, but they

9          never provided you with the

10         payments to the doctors.  It is an

11         issue in this litigation, it is an

12         issue in all pharma litigation,

13         and it should be explored in all

14         of our mass torts.

15              MR. DASSOW:  And it was only

16         us, too, that were doing it.

17         Nobody else was doing it.  I don't

18         know about the MDL guys, I can't

19         tell you what you guys were doing,

20         but I can tell you that we're the

21         only two that Judge Higbee was

22         sending us out to do this and

23         taking the heads of Heins and

24         Scott, the head of people signing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1        these things, so we got them at

 2        the top, and we can go down below.

 3             MS. SCOVERN:  We actually

 4        had a second series of depositions

 5        scheduled with that group in the

 6        first week of November right up

 7        until the time of settlement in

 8        2007.

 9             The common benefit impact of

10        our physician compensation and

11        1099 investigation, the

12        credibility of Merck in front of

13        Judge Higbee was seriously,

14        seriously undermined, and she, in

15        the July 2007 CMC, expressed her

16        extreme disappointment with them

17        and the fact that she was in the

18        process of considering that Merck

19        reissue all Merck profile forms.

20             MR. DASSOW:  For all of New

21        Jersey.  And I can't tell you,

22        again, with regard to the MDL, but

23        I can tell you that that was the

24        next -- I'm sure Chris would have
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1      taken that up, we want to reissue

 2      50,000 Merck profile forms.  Can

 3      you imagine the cost to Merck to

 4      do that?  It would have been

 5      substantial.

 6           MS. SCOVERN:  The other

 7      thing that Judge Higbee did is she

 8      ordered production of 1099s for

 9      all prescribers in the expedited

10      discovery wave that was

11      established in 2007.  There were

12      two waves of 250 cases.  So, we

13      had 500 cases moving forward where

14      the exposure of the physician

15      payments was going to be made

16      readily available, and all firms

17      could have attacked Merck on that.

18           Merck had a serious issue

19      with the IRS as well.  And Judge

20      Higbee ordered that Merck send a

21      letter from the CFO to the IRS

22      explaining their 1099s and their

23      deficiencies in issuing 1099s from

24      1999 to 2005.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

 1            MR. DASSOW:  We don't know
 2       as we sit here today really what's
 3       happened with it, but it's
 4       certainly an issue that I have
 5       already talked to the judge about
 6       with regard to our TPP cases.
 7            Also the AG issue, as you
 8       know, the knees and hips folks and
 9       everybody like that has paid
10       millions of dollars for the issue
11       that we're going after.  That's
12       why we pressured them with regard
13       to that.
14            The next slide is our
15       commitment to trials.  So, things
16       didn't go so well for some trials,
17       things went pretty well back and
18       forth.  Well, what happens now in
19       '07?  We never waned.  In fact, we
20       were picking up speed, the two of
21       us, our firms.  We are committed.
22       Now we're talking about trial pool
23       consideration.  The folks here,
24       some of them are on trial, so what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          are we requested to do?  We're

2          requested to go kick Merck's butt,

3          right, and support whoever is

4          going to trial.  So, what do we

5          do?  We pony up 17 cases in the

6          first wave.  17 cases.  We only

7          have 265 cases between us.  Okay?

8          I don't know if anybody in this

9          room ponied up 10 percent of their

10         cases for trial, but we did for

11         working on expedited discovery.

12         And I really truly believe that

13         that's significant.  I know that

14         most of you guys have more cases,

15         but if somebody has 1,000 cases,

16         nobody ponied up 100 cases, I

17         assure you.  This was a

18         tremendous, tremendous burden on

19         our firms to do this.  I mean,

20         tremendous burden.

21              I want to point out two

22         particular cases.  Tena and Fagel

23         were both going to be trial cases,

24         I assure you.  Both are death

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1          cases.  Tena has two kids,

 2          16-year-old honor student from New

 3          Mexico.  Susanne had traveled like

 4          crazy to New Mexico.

 5               Merck put six lawyers on the

 6          issue of whether we even get to

 7          depose Dr. Sokoloff in New Mexico.

 8          Six lawyers.

 9               Ms. SCOVERN:  He was a

10          doctor that had over $200,000 in

11          payments -- he was involved in the

12          Arcoxia trials and the Vioxx

13          trials.

14               MR. DASSOW:  They hired

15          every firm.  They had Fulbright &

16          Jaworski flying out to defend

17          them, they have got Dechert.  They

18          have got everybody defending them.

19          I only talk about that case, as

20          well, because Susanne meets with

21          the pathologist, who is a Merck

22          pathologist.

23               MS. SCOVERN:  It was a

24          pathologist that conducted the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1        autopsy report on Mr. Tena, who

2        was 37 years old at the time of

3        his death.  And when I was meeting

4        with him, he said, let's go look

5        at the slides.  And we went down

6        to look at the pathology slides

7        together.  And he saw, you know, a

8        thrombus, and he just said, this

9        is one that you guys need to bring

10       further.

11            MR. DASSOW:  And he further

12       goes on and says, why didn't you

13       try this case?  But this was one

14       of those cases, as well as Fagel

15       was also a death case.  A

16       14-year-old little boy, son goes

17       up and finds him slumped over in

18       the basement.  That's in addition

19       to all the other cases we're

20       working up.  So, we've got those

21       issues.

22            Additional contribution --

23       we are almost done, fellows.  I

24       need your attention here for a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1        little bit longer.  I know that

2        you guys are busy.

3            We participate in each and

4        every CMC from November of '04

5        until this case was settled.  We

6        were there.  Let me tell you this.

7        I looked at all the firms that

8        were presenting to you.  I want to

9        find somebody, other than the

10       folks that are here, that was at

11       each and every CMC, that was

12       flying out from Indianapolis, from

13       California, not driving in to New

14       Jersey, flying out consistently.

15       I was in attendance early on in

16       '05 at Anstice, Kim, Gilmartin and

17       Scolnick, all right?  I did not

18       put that time and expense down in

19       my submission to you guys.  Didn't

20       put it down, because I didn't take

21       the depositions.  Mark took the

22       depositions.  Chris took the

23       depositions.  I can't remember who

24       else took the depositions.  But I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        was one of 15 lawyers learning the

2        case.  I didn't put that down as

3        time and expense.  Susanne goes to

4        Dr. Fries.  Mark, there's six

5        people there, Susanne is there

6        with you.

7             MS. SCOVERN:  I didn't have

8        to travel.

9             MR. DASSOW:  That was one

10       you didn't have to travel.

11            Graham's deposition.  We

12       went to every bellwether case

13       selection meeting in New York City

14       and Atlantic City.  We went to

15       discovery stuff at Battery Park

16       and Trump Plaza.  We filed

17       numerous motions that applied to

18       each and every case in New Jersey

19       and potentially applicable to the

20       MDL.

21            Sales reps redactions.

22            MS. SCOVERN:  Can I just add

23       that two weeks prior to the

24       settlement, the end of October,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

 1          just days before the settlement,

 2          I, along with Jeff Grand and Jerry

 3          Kristal and Mike Wenkowitz,

 4          representing New Jersey plaintiffs

 5          in a special hearing called by

 6          Judge Higbee, made the motion for

 7          the 250 expedited cases in

 8          discovery at that time to get

 9          additional custodial and sales rep

10          files.  Each firm had issued their

11          own motion, and we were battling

12          it out trying to get sales rep

13          documents from Charlie Cohen and

14          Ben Barnett just two weeks prior

15          to the settlement.

16               I think overall, our common

17          benefit impact was tremendous.  We

18          worked with New Jersey liaison

19          counsel.  We are not at the same

20          tier as they are, but we worked

21          just as hard.  We put tremendous

22          pressure on Merck.

23               The intensity of our work

24          increased.  In 2007, as Robb said,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1      we had 10 percent of our cases up

2      for expedited discovery.  This is

3      after we had lost a few.  And

4      believe you me, there were a lot

5      more seats at the CMC in 2007 when

6      we got there, but we accelerated

7      the process and increased our

8      work, and we did whatever was

9      asked from our firms.

10          MR. DASSOW:  I've got a

11     couple more comments, and then

12     we'll let you get on with somebody

13     else.

14          We have separate fee apps,

15     again, like I told you earlier,

16     and we teamed up because as

17     everybody teamed up in these

18     cases, you needed the manpower to

19     take on Merck because of all the

20     lawyers, as you well know.

21          Again, at the beginning, we

22     were there fighting Merck.  In the

23     middle, we were fighting Merck.

24     And at the end, we were fighting

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

 1        Merck.

 2             One last comment.  There are

 3        people on this committee that

 4        obviously did a tremendous amount

 5        of work and more than Susanne did

 6        and have spent more money.  But I

 7        can tell you as the tiers go, and

 8        when you go to the next level and

 9        you guys decide on this, I'm sure

10        you can tell how passionate I was

11        about the Vioxx, how passionate I

12        am about this, and I was really

13        motivated, and we're in the guts

14        of this case.  While we're not up

15        there with a lot of you folks that

16        tried the cases, we were ready,

17        willing and able to try cases, and

18        we did everything that was asked

19        of us.  I really appreciate it,

20        guys, really appreciate it.  Thank

21        you.

22             MR. LEVIN:  How are you

23        making out with the accountants

24        with all of your rejected hours?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1           MR. DASSOW:  We haven't had

2       anything rejected.

3           MR. LEVIN:  Yes, you have.

4           MR. DASSOW:  Okay.

5           MR. LEVIN:  The accountant's

6       records shows Bill Audet's firm

7       submitted 7,722 hours and $258,000

8       in costs and they are rejected.

9       It could be something procedural.

10          MS. SCOVERN:  The one thing

11      that they asked us to do was break

12      that out by calendar year, and

13      we're in the process of doing that

14      for them.

15          MR. LEVIN:  Hovde, 8,442

16      hours and $270,000 in costs that

17      are rejected.

18          MR. DASSOW:  Okay.  I have

19      no idea why.  I have to split them

20      up.

21          MR. LEVIN:  You have to find

22      out so that we can handle it.

23          MR. DASSOW:  Okay.  Let me

24      tell you this.  This is the first

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1          I've heard about it being

 2          rejected.  They have called me six

 3          times, and I told them, listen, if

 4          you had told me from day one that

 5          I was going to be sitting in front

 6          of a committee, I would have had

 7          it on my --

 8               MR. LEVIN:  I'm sure you

 9          will straighten it out.

10               MR. SEEGER:  By the way, it

11          is not a factor for today.

12               MR. DASSOW:  Good.

13               MR. SEEGER:  We just need it

14          done.

15               MR. LEVIN:  I just want to

16          get it done.

17               MR. BIRCHFIELD:  If you are

18          communicating with them and you

19          are running into difficulties, let

20          us know, somebody, Chris.

21               MR. HERMAN:  You've got

22          15,000 hours reported between the

23          two firms, and obviously you've

24          worked together.  That's a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1      significant number of hours.  You

2      don't have to do it yourself, but

3      I can tell you a number of firms

4      that are just making an

5      appointment, going in to sit with

6      the CPA and working it out, and it

7      can be worked out in maybe half a

8      day.  It is probably worth your

9      while to go ahead and do that.

10          I need to tell you that the

11     CPA firm does absolutely no work,

12     none, for any Vioxx entitled firm

13     or individual.  They are

14     completely independent, selected

15     by the judge.

16          MS. SCOVERN:  We've had a

17     great --

18          MR. DASSOW:  They've been

19     great.

20          MR. HERMAN:  They will work

21     with you, but given the Christmas

22     holidays coming up, et cetera, it

23     is probably worth somebody's while

24     to go make a trip and meet with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1      them.

2           MR. DASSOW:  It is

3      significant enough for us, Russ,

4      that we will fly down and meet

5      with them for half a day.  I can

6      answer questions.

7           MR. HERMAN:  Give them a

8      call.  Get yourself a slot.

9           MR. DASSOW:  No problem.

10          MR. HERMAN:  I have a couple

11     of questions.  I will try to make

12     them quick.

13          The 3,000 detail persons,

14     I'll use the old marketing term,

15     were those New Jersey, New York,

16     Pennsylvania?

17          MS. SCOVERN:  Those were

18     countrywide, throughout the

19     country.

20          MR. HERMAN:  We've got

21     18,000 in our database.  It took

22     us a long time to get them there.

23          MS. SCOVERN:  I have 3,000

24     from the Henry Waxman

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          investigation into the Vioxx

2          marketing, Congressman Henry

3          Waxman.

4                 MR. HERMAN:  In your cost,

5          do you remember what you paid

6          Rodney Jew?

7                 MR. DASSOW:  I know that

8          Bill picked up the major tab of

9          that, if I remember.

10                MR. SEEGER:  It was some

11         flat number, I think.

12                MR. DASSOW:  It was a flat

13         number.  I think our firm paid 10

14         or 15, I mean my firm alone.

15                MS. SCOVERN:  I think it was

16         35,000.

17                MR. HERMAN:  That's

18         reasonable.  I'm interested,

19         because I know a great deal about

20         Rodney Jew, and I've talked with

21         him on occasion, and that sounds

22         reasonable to me.

23                MS. SCOVERN:  I think it was

24         35,000 each week.  And if you are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1        going to use them in the future,

2        he's now in Napa.

3             MR. HERMAN:  Well, he's

4        great on colors and charts and

5        that -- well, what he's good on,

6        he's good.

7             MS. SCOVERN:  That's our

8        colors right there.

9             MR. DASSOW:  There's red.

10       You can see that he's getting too

11       old.

12            MS. SCOVERN:  Do you see

13       that now, Chris?

14            MR. SEEGER:  I do now that

15       you mention it.

16            MR. HERMAN:  I don't have

17       any other questions.  Mainly my

18       questions had to do with sales

19       reps.  But I do want you to know,

20       because you are not familiar with

21       the work in the MDL, that we had

22       many hearings and a Court-approved

23       Merck profile form, substantial

24       work done with regard to detail

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          persons, et cetera.

2                    The shame of it, and I'm

3          going to put this in the record,

4          is that law firms still continued

5          either to go off on their own and

6          think, well, I'm not going to be

7          an MDL lawyer, and then their

8          lawyers will say I'm an MDL

9          lawyer, I'm not going to be an

10          independent lawyer, and sooner or

11          later, this plaintiff bar is going

12          to have to find a way where we all

13          work together, because there's too

14          much talent out there, and there

15          are too many evildoers on the

16          other side for us to be

17          duplicating work.  Even though we

18          try to cooperate with each other,

19          we've got to find a better way of

20          coordinating these major cases.

21                    MS. SCOVERN:  This physician

22          relationship with payments from

23          big pharma to physicians is

24          something that permeates all

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1        pharmaceutical cases, and it needs

2        to be exploited and explored.

3              MR. HERMAN:  We're going to

4        find it in the chemical industry,

5        we're going to find it everywhere.

6              MR. RAFFERTY:  On the 17

7        cases, did you work up all 17 of

8        those cases?

9              MR. DASSOW:  No.  Because

10        you guys got the cases.

11              MR. RAFFERTY:  So, how many

12        of those got --

13              MR. DASSOW:  You guys

14        screwed up.  You got them settled.

15        What the heck.

16              I can't remember when the

17        tranche was, but I would say

18        several months for sure.

19              MS. SCOVERN:  I would say

20        half, Troy, half.

21              MR. SEEGER:  Thank you.

22              MR. BIRCHFIELD:  Thank you.

23                  -  -  -

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24
```

FAC Resp. Amended Exhibit D -- 173

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:          AUDET & PARTNERS, LLP
               William Audet, Esquire


BEFORE COMMITTEE MEMBERS:


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                       -  -  -

2              MR. GIRARDI:  Obviously, you

3         can tell there's a court reporter

4         here, and so everything will be

5         taken down.  The primary purpose

6         of this is for Judge Fallon, who

7         clearly is the final say on all of

8         this.

9              Further, as you know, you

10        have given half the presentation

11        before us, but not the California.

12        So, we gave permission so that you

13        could fill up that time, which I

14        think is about 12 minutes, with

15        respect to the California cases.

16        We don't do this to be unfair to

17        you, but we want to make sure we

18        are fair to everybody so everybody

19        gets the same time.  So, you may

20        go forward.

21             MR. AUDET:  Thank you very

22        much.  Well, I appreciate the

23        committee's time in allowing me

24        the opportunity to finish up the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          presentation that we started in

 2          New Jersey, and I appreciate the

 3          fact that you have given me a

 4          little extra time to finish up,

 5          and I will do this in short order.

 6               Essentially, the focus of

 7          the presentation today by me will

 8          be less than five minutes and just

 9          discuss what I think was our

10          contribution to the California

11          cases.  I know there's a couple of

12          other firms in the same situation,

13          but my firm thought that it would

14          make sense to have basically cases

15          in New Jersey and in California.

16          We understood that at some point

17          in time there was a general

18          request that cases that could be

19          ready for trial in short order be

20          filed in California, and so my

21          firm filed just six cases in

22          California, all of which were

23          pretty good.  We then were given

24          the opportunity to present to
```

FAC Resp. Amended Exhibit D -- 176

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          Tom's office with the help of,

 2          actually, Jim O'Callahan two cases

 3          for selection.

 4               One of them didn't get

 5          selected.  It was an MI.  It was

 6          Andreasen.  Our office had met

 7          with him a number of times.  We

 8          wanted to make sure that he was

 9          ready to go to trial if need be.

10               If you look at our chart,

11          two of our cases were designated

12          out of the 18 in the January '06

13          selection process.  We were

14          selected by Judge Chaney in March

15          '06.  At that point we really got

16          heavily involved in the California

17          litigation overall.  Prior to

18          that, quite honestly, we had done

19          some work in California, but it

20          was at that point I assigned a

21          lawyer almost full time to work on

22          that case under my supervision.

23          We worked closely with Jim

24          O'Callahan, who I believe would
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      back up that we did bother him a

2      lot with questions to get up to

3      speed.

4           Our client had a very unique

5      issue which Jim thought was

6      important or at least I thought

7      was important, and that was

8      military marketing.  Up until

9      then, apparently there had been no

10     real pressing on the issue of

11     military marketing.  Our client

12     was in a VA hospital, was also in

13     a regular hospital, but was on VA

14     benefits.  We took a number of

15     depositions.

16          The common benefit impact of

17     the bellwether case was, we did at

18     least one deposition that Jim

19     thought was a good idea to do, and

20     that was a person most

21     knowledgeable regarding military

22     marketing.  We actually found some

23     information that was contrary to

24     their prior representations

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          regarding the lack of military

2          marketing.  And that was one of

3          the issues that allowed us to

4          proceed and get an order from

5          Judge Chaney to open up more

6          military marketing issues.

7               Again, we looked, I think

8          the segment of the population was

9          eight to ten percent, but

10         nonetheless, we thought it might

11         be useful to others.  If our trial

12         didn't go forward, it was still

13         useful to press that issue.

14               We have a summary of

15         contributions, but I'll close on

16         my California contribution there

17         because, of course, I'm not here

18         to regurgitate what Suzanne

19         presented before to you.

20               MR. BLIZZARD:  One question

21         for you.  What happened to the

22         bellwether trial cases?

23               MR. AUDET:  Here's what

24         happened, unfortunately.  It was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          good idea.  The doctor had left

2          the United States.  We hired a

3          private investigator.  There was a

4          critical issue about he was on it

5          for six months.  We could show

6          through him and through -- we had

7          one of three, three of four, he

8          kept some of the bottles.  We were

9          able to show that there was six

10         months of usage, and that was

11         pretty critical.  Unfortunately,

12         we couldn't get the VA Hospital

13         records.  The Court declined an

14         issue ordering them to produce it.

15         We issued a subpoena.  They never

16         produced the records.  That's when

17         we hired, and Jim suggested --

18         actually, Mark Robinson suggested

19         with Jim on a call to me that I

20         hire a private investigator to

21         locate the doctor.  We located

22         him.  I hired someone to go see

23         him.  He's in Germany.  He

24         basically slammed the door on us.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          He wouldn't give us any

2          information, said it was

3          privileged, confidential.  He had

4          no obligation to come back to the

5          United States.

6               So, what happened was, we

7          had a face-to-face with the judge,

8          and it was myself, I think Jim was

9          in, it was back in chambers, in

10         which the judge said, am I going

11         to have usage issues?  And they

12         would not stipulate -- even though

13         I could show through my client

14         that we had six months' usage,

15         they would not agree to it.  I

16         agreed to waive punitives.  I did

17         everything I could, and the judge

18         said, I'm not doing a usage issue

19         case.  I'm not going to have a

20         case in which you guys are going

21         to fight over usage for a week.

22               She said, it is up to you.

23         I talked to Jim about it.  Jim

24         said, take it as far as you can,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          but you are going to have to

2          dismiss this case if you can't

3          prove usage.  We put almost a good

4          year into the case.  We knew there

5          was some usage proof issues.  We

6          didn't know that we would never

7          get the VA Hospital records that

8          would prove it.  Again, because he

9          went to the VA, he didn't pick

10         them up at Walgreen's, we just had

11         no choice.  We had his affidavit,

12         we had his wife's affidavit, who

13         went and picked it up for him, but

14         again, unfortunately, we had to

15         drop the trial.  We did not want

16         to drop the trial.  The plan was I

17         really wanted to take it to trial,

18         and I wanted to be one of the

19         California plaintiffs because it

20         was ready to go, but because of

21         the usage issue, that was it.

22              I think we had a great

23         plaintiff.  He was a former

24         military man.  He couldn't support

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          his family anymore.  I think he
 2          was a really good client.  He had
 3          some weight issues, but that
 4          was -- I didn't think it was going
 5          to be a problem.
 6               MR. BLIZZARD:  So, when was
 7          it dismissed?
 8               MR. AUDET:  I have it
 9          somewhere.  I know I have it
10          somewhere.  It was dismissed -- I
11          don't know if I have that with me.
12          Josh would have this.
13               MR. GIRARDI:  We have that.
14          Clearly the benefit and what you
15          did do was to show the marketing
16          to the government.  That was the
17          whole focus of this.
18               MR. AUDET:  Correct.
19               MR. GIRARDI:  Because that
20          was an area that Merck had denied,
21          and because of your work, you
22          opened that can of worms up and
23          then got very beneficial documents
24          and testimony to show they were
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1       marketing to the government.

2       True?

3             MR. AUDET:  Yes, that's

4       correct.  And even June '07 I have

5       here, per the judge's request, we

6       did a telephonic deposition of a

7       military in charge of VA hospitals

8       in the western region with the

9       defendants.  They supposedly had

10      the primary prescriber, but we

11      could never get him to identify

12      himself.  That was the problem.

13      We had a court order that

14      basically he wasn't going to abide

15      by because he was in Germany.  So,

16      again, I did a lot of consulting

17      with Jim about this and what we

18      could do.  And again, his concern

19      was going forward.  But we were

20      committed to doing the trial, of

21      course, with Jim's help.  I don't

22      know if there's any other

23      questions.

24            MR. SEEGER:  Suzanne did a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          very thorough job about your

2          contributions.

3               MR. LEVIN:  And also

4          corrected the record with a letter

5          afterwards.

6               MR. AUDET:  I thank the

7          committee for pointing out the

8          deficiency.  We weren't aware of

9          that.  It's already been

10          corrected.  We've already given

11          them the zip file, I learned, last

12          night and this morning.

13               So, I do appreciate the

14          committee, actually, its time, its

15          efforts, and really that's my

16          presentation unless you have any

17          questions.

18               MR. GIRARDI:  Thank you.

19               MR. AUDET:  Thank you.

20                    -  -  -

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1             C E R T I F I C A T E

2

3             I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  AYLSTOCK WITKIN KREIS &
       OVERHOLTZ, PLLC
       Justin Witkin, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
       GOLKOW TECHNOLOGIES, INC.
    877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. BIRCHFIELD:  Everything
 3         is on the record, and so we'll
 4         have a transcript in the event the
 5         judge needs it.  So, the floor is
 6         yours.
 7              MR. WITKIN:  Thanks for
 8         allowing me the opportunity to
 9         speak.  I apologize ahead of time
10         if I'm a little horse or if I
11         sniffle.  I'm coming off a little
12         cold.
13              I think I know all of you,
14         but I'm Justin Witkin from
15         Aylstock Witkin Kreis & Overholtz.
16         As I understand it, you've asked
17         me to come here today and talk
18         about how my firm's contribution
19         to the litigation benefited the
20         litigation and the end result as a
21         whole.  I've obviously submitted
22         an affidavit, and I won't rehash
23         that here.  I've prepared just a
24         few remarks.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1              I think that, in essence,

2         the way I would answer the

3         question of how were the things

4         that we did beneficial to the MDL,

5         beneficial to the litigation, was

6         that we answered the call of the

7         PSC at the beginning of the

8         litigation.  Our role was largely

9         in response to requests for work

10        from the PSC, and those requests

11        came throughout the duration of

12        the litigation, at the beginning,

13        middle and end of the litigation.

14              A few examples of some of

15        the things that we were asked to

16        do and that we stepped up to do,

17        towards the sort of end of the

18        case, there was a desire to put

19        together a stroke package.  That

20        wasn't necessarily the most

21        desirable work, because the effort

22        had been on the MI cases.  The

23        request, I think, came through

24        your office, Russ, through Penny,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          and we stepped up and did that.

2          We sent multiple attorneys to

3          review stroke documents, to work

4          on the stroke package, when there

5          weren't really any other takers

6          for that job.

7               MR. SEEGER:  Justin, could

8          you identify the lawyers from your

9          office that worked on the case?

10              MR. WITKIN:  Sure.  We had

11         Bryan Aylstock, Ben Anderson,

12         Paula Bruner.  I'm not sure if Ken

13         Smith was over there at the time.

14         Ken Smith might have been over

15         there.

16              MR. LEVIN:  Ken Smith did

17         work.  He did work.

18              MR. WITKIN:  I'm trying to

19         remember whether he did the stroke

20         package work or not.

21              MR. LEVIN:  He had more

22         hours in discovery than anybody

23         else in your office.

24              MR. WITKIN:  Right.  I was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          going to address that next,

2          actually.

3               In 2005/2006, the dates all

4          blend together, when the documents

5          first started rolling in or

6          started rolling in in large

7          volume, as I'm sure you all

8          recall, the request every week

9          was, who can send people to review

10         documents?  Who can send people to

11         review documents?  We've got a

12         depository in New York, we've got

13         a depository in Louisiana.  And we

14         did.  And we didn't just send the

15         contract lawyer or the guy that

16         has been in the firm for a year.

17         We sent a 25-year lawyer, Ken

18         Smith, with our firm, and he

19         reviewed documents for weeks on

20         end.  We had other people at other

21         times that reviewed documents,

22         but, again, we were answering the

23         call when the PSC put the call

24         out.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1           At the outset of the case,

2     when things first started going

3     and we got into some of the sales

4     rep discovery, it was my firm that

5     drafted the sales rep database

6     brief, in conjunction with Dawn

7     and some others, and had some

8     input on it.  We did that.  Mark

9     Robinson approached us and asked

10    us to be involved in the sales rep

11    discovery.  We got involved in

12    doing the -- Neil Overholtz of my

13    firm got involved in drafting some

14    of the subpoenas, took some

15    depositions with Lenny from your

16    office, Russ.

17           Initially there was an

18    effort to identify sales reps in

19    the state of Florida who we could

20    contact because they were no

21    longer employees of Merck, and we

22    were trying to figure out could we

23    do that, so we were involved in

24    that project.  That was a request

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          that was made at the beginning.

2          We stepped up and we did that.

3               The Irvin trial came along,

4          and obviously Andy's firm was

5          responsible for that.  Because of

6          its connection to Florida or maybe

7          because of our proximity to Andy

8          or because I'm so good looking,

9          Andy asked us to get involved in

10         that, and we did.  We got involved

11         both in Irvin I and in Irvin II,

12         and Irvin I in a more limited

13         capacity, helping on some depo

14         cuts and were doing some jury

15         questionnaires, we were out of

16         Houston for that.

17              In Irvin II, when the crunch

18         came down on the motions in

19         limine, I'm not sure if it was

20         Andy or if it was Leigh, called us

21         and said, we've got these 10,000

22         motions in limine, can you do

23         these?  And I literally pulled

24         every attorney, or not every

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          attorney, I pulled six attorneys

2          from my firm, Joshua Jones, Ken

3          Smith, myself, Jason Richards,

4          Russell Rein, Bryan Aylstock, all

5          of us did nothing for a couple of

6          days but take care of those motion

7          in limine requests.  So, again,

8          the call went out, we answered the

9          call, and I assumed that, in the

10          scheme of things, Irvin was an

11          important part of the overall

12          effort to bring about the result

13          that we obtained here.

14              And then at the end of the

15          case, when the PSC was looking to

16          put a little more leverage, get a

17          little more leverage, try to bring

18          about a result, the request was

19          sent out, we're going to do this

20          rapid remand thing.  We want to

21          get some cases back into state

22          courts, we're going to file this

23          motion, put some cases back in

24          district courts so that we can get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          some pressure.  Let's identify

2          people who have cases who are up

3          to the task, and let's identify

4          the cases.  I did that, trying to

5          sort that out.  So, again,

6          answering the call, beginning,

7          middle and end.  I think that's

8          characteristic of all of our

9          efforts, which are more detailed,

10         obviously, in my affidavit.

11              I'll talk just real briefly

12         about my appointment to the State

13         Liaison Committee.  I was

14         appointed to the State Liaison

15         Committee.  The State Liaison

16         Committee, it seems to me, served

17         an important role in litigation

18         like this for this reason.  This

19         is obviously one of the bigger

20         litigations that's out there.

21         When you have a litigation this

22         size and this disparate, you have

23         to have cohesiveness if you want

24         to bring about the end result.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          You know that.  You can't get a

2          global settlement unless you've

3          got most of the people on board.

4               So, the role of the State

5          Liaison Committee, it seems to me,

6          the important role in the state

7          liaison committee, is to

8          facilitate that cohesiveness, to

9          make sure that the people who are

10          not necessarily at that middle of

11          the MDL process are on board or at

12          least are aware of what's going

13          on, so that when something

14          happens, they don't throw up their

15          hands and go, oh, gosh, oh, no,

16          and start to become the objectors.

17          Well, that's what the state

18          liaison committee did, and that's

19          what I did a lot of.

20               We published a newsletter,

21          and our names are out there in

22          front of hundreds, if not

23          thousands of attorneys.  And so we

24          would get random calls from Tom,

FAC Resp. Amended Exhibit D -- 196

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Dick and Harry, hey, what's going

2          on, can you tell me how to fill

3          out the plaintiff profile form.

4          Well, read the order.  Well, tell

5          me how to do it.  So, I spent a

6          lot of time doing that, and, you

7          know, to my detriment, most of

8          which I didn't capture and submit

9          as time.  But that was an

10         important role, I think, that

11         benefited the litigation as a

12         whole, because it was necessary to

13         have that kind of cohesiveness.

14              Beyond that, I think that

15         anything, any of my time spent on

16         the SLC, discharging the orders of

17         the Court, is necessarily

18         important to the outcome of the

19         litigation.  The Court says do

20         something, you do it.  So, when

21         the Court said catalog all the

22         remand motions and tell me how

23         many remand motions and come

24         report to us every week or every

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          status conference, I did that.

2          And when Dawn wasn't there, I

3          filled in and I made those reports

4          for the Court.

5               MR. SEEGER:  Did you attend

6          most of the status conferences?

7               MR. WITKIN:  You know, I

8          did, I would say up until end of

9          2006, and as things sort of

10         tapered down and we looked like we

11         were heading in towards the

12         settlement, I stopped coming, I

13         stopped getting as many questions,

14         to be honest.  Part of what I had

15         to do, or I appreciated that I had

16         to do in order to facilitate the

17         cohesiveness in the state liaison

18         committee was to stay abreast of

19         what was going on.  In the early

20         stages, obviously that's when all

21         of the pretrial orders were coming

22         out that were setting out

23         procedures, and it was important

24         for me, I felt, to be at each

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1        status conference, to read every
 2        pretrial order, to try to stay
 3        abreast of all the things that
 4        were going on.
 5             MR. HERMAN:  Let me ask you
 6        a couple of questions.
 7             Ben Anderson, is Ben
 8        Anderson a partner?
 9             MR. WITKIN:  Yes.  I wanted
10        to address both Ben Anderson and
11        Ken Smith.  When Wegmann sent out
12        the form that they wanted us to
13        fill out, they said identify
14        people as associate, partner or
15        contract attorney.  I identified
16        both of them as of counsel, even
17        though that wasn't a category, and
18        I'll tell you why.  Both of them
19        were, I think, functionally -- I
20        don't think, they were employees
21        of our firm.  I paid all of their
22        wages.  They could do no work
23        without my blessing.  Now, titles
24        matter to some people, and Ken
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1      Smith and Ben --

2           MR. LEVIN:  Let me tell you,

3      the title "of counsel" is not

4      necessarily a matter for us.  That

5      was sent out so that we could get

6      hourly rates and try to blend them

7      in categories.  So, don't feel

8      that you have hurt them or helped

9      them or anything by listing them

10     as of counsel.

11          MR. WITKIN:  I just wanted

12     to explain it.

13          MR. LEVIN:  It is not really

14     an issue from my perspective,

15     because I initiated that, and that

16     was just to get hourly rates.

17          MR. WITKIN:  I guess the

18     point I want to make is that Ken

19     Smith and Ben Anderson were not

20     contract attorneys.  They were

21     employees of my firm.

22          MR. HERMAN:  What about

23     Paula Bruner?

24          MR. WITKIN:  Paula Bruner is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1          the same situation.  The only

 2          distinction between Paula Bruner

 3          and what I would call my other

 4          associates is that she lived in

 5          New Orleans.  I conditioned her

 6          becoming a full associate on

 7          moving to Pensacola, but she spent

 8          three years in my employment

 9          living in New Orleans.

10               MR. HERMAN:  I don't see any

11          hours for Neil Overholtz.

12               MR. WITKIN:  Well, then,

13          that is a bad oversight on our

14          part.

15               MR. HERMAN:  You need to

16          contact the CPA.  I need to tell

17          you that they don't have any

18          personal business with any Vioxx

19          lawyer or firm.  They are

20          independent.  The judge has

21          selected them.  You should call

22          them.  If you need a number or

23          something, call Lenny Davis in my

24          office.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1            MR. LEVIN:  I seldom

2        contradict Russ, but Overholtz has

3        93 hours.

4            MR. HERMAN:  That's not what

5        I see here.

6            MR. WEITZ:  You said that

7        you had conducted some

8        depositions.  What was the name of

9        the deponent?

10            MR. WITKIN:  It was

11        Overholtz in my firm that

12        conducted the depositions.  He did

13        the 30(b)(6) of the MIS guy with

14        Lenny at the outset, and there was

15        one other one, and honestly I

16        don't recall the name.

17            MR. RAFFERTY:  Did he first

18        chair those, Justin?

19            MR. WITKIN:  I'm not sure

20        whether he did or not with Lenny.

21        I honestly don't know.  I know

22        that he did all the prep, but I

23        don't know whether he first

24        chaired it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1              MR. RAFFERTY:  Can you just
 2         expand for me the work in the
 3         stroke trial package, like what
 4         y'all did and that kind of stuff?
 5              MR. WITKIN:  I think that
 6         the primary task, and my personal
 7         involvement is less, so I can't
 8         give you as detailed an answer as
 9         I might like to, but we reviewed
10         the documents that were initially
11         coded as the stroke documents, to
12         try to identify those that would
13         be trial package documents.  And
14         from there, I think at the
15         direction of Russ' office, I'm not
16         sure what next steps we took or
17         whether we went so far as to
18         create depo cuts or what.
19              MR. HERMAN:  I just want to
20         say that Arnold has got an update
21         of the hours, so, you don't have
22         to worry about that.
23              MR. SEEGER:  Justin, on the
24         State Federal Liaison Committee
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          that you guys were involved with,

2          did you have calls and things like

3          that to update each other?  If so,

4          how often and how long did they

5          last?

6               MR. WITKIN:  We did.  And,

7          again, just like my attendance at

8          status conferences, they started

9          out a little more fast and furious

10         and tapered off at the end.  I

11         would say -- well, we met prior to

12         each status conference initially.

13         I had a lot of contact with Dawn,

14         so, I was talking to Dawn two or

15         three times a month.  We probably

16         had a formal call at least once a

17         month.

18              MR. HERMAN:  Dawn was here

19         earlier, and she described that

20         you were within a consortium of

21         attorney firms.  Who is in that

22         consortium?

23              MR. WITKIN:  The attorneys

24         that -- if you are referring to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          the attorneys that we have a loose

 2          joint venture with --

 3               MR. SEEGER:  In your group.

 4               MR. WITKIN:  In my group,

 5          yes, and not the referral

 6          attorneys?

 7               MR. HERMAN:  No.

 8               MR. WITKIN:  It is Dawn,

 9          Arsenault, Lundy and Andrus.

10               MR. HERMAN:  It's Vance?

11               MR. WITKIN:  Yes.

12               MR. LEVIN:  When you say it

13          is a joint venture, do your pool

14          your fees and then split them in

15          different cases or you just sort

16          of support each other?

17               MR. WITKIN:  It is one of

18          these things where we probably

19          would have been well served to

20          have a lot more definition up

21          front.  The answer is no, sort of.

22          On the MDL side, there's no

23          pooling of fees at all.

24               MR. LEVIN:  Okay.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1              MR. SEEGER:  Dawn told us, I
 2         don't remember, but your group has
 3         how many cases that are going into
 4         the deal, the settlement?
 5              MR. WITKIN:  There's 600
 6         cases approximately.
 7              MR. WEITZ:  Those cases were
 8         filed in the MDL?
 9              MR. WITKIN:  Majority.  We
10         have a few that were filed in New
11         Jersey, but the vast majority were
12         filed in the MDL.
13              MR. WEITZ:  Were there any
14         cases that you had worked up in
15         New Jersey or in the MDL for trial
16         that were your cases?
17              MR. WITKIN:  Individual
18         cases?  No.
19              MR. HERMAN:  Didn't someone
20         else from your firm second chair
21         Lenny in some FDA depositions, if
22         you recall?
23              MR. WITKIN:  I don't believe
24         so, no.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          MR. HERMAN:  In terms of the

2     consortium, what other cases has

3     the consortium been involved with

4     or is involved with from 2005 to

5     today?

6          MR. WITKIN:  We did Bextra/

7     Celebrex together, and we did

8     Guidant and Medtronic together.

9          MR. HERMAN:  How many

10    Bextra/Celebrex cases?

11         MR. WITKIN:  How many paid?

12         MR. HERMAN:  How many did

13    you have?

14         MR. WITKIN:  80.

15         MR. HERMAN:  Guidant?

16         MR. WITKIN:  How many

17    claimants do we have?  About 160.

18         MR. HERMAN:  And in

19    Medtronic?

20         MR. WITKIN:  110 maybe.

21         MR. HERMAN:  Have you

22    applied or are you applying for

23    common benefit in any of those?

24         MR. WITKIN:  Yes.  In

FAC Resp. Amended Exhibit D -- 207

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          Guidant and Medtronic, we served

2          significant roles and we did.  In

3          Bextra/Celebrex, we will not be.

4          In Ortho Evra, no, we are not.

5               MR. HERMAN:  Is Richard

6          Arsenault on the PSC in Guidant,

7          do you know?

8               MR. WITKIN:  Yes.

9               MR. HERMAN:  And in

10         Medtronic?

11              MR. WITKIN:  He is.

12              MR. HERMAN:  This is Chris'

13         favorite question, but I'm going

14         to borrow it --

15              MR. SEEGER:  It used to be

16         mine.

17              MR. HERMAN:  -- because I

18         think it is a significant

19         question.

20              What do you consider, if you

21         had to name the most significant

22         contribution that your firm made

23         to the litigation to move it along

24         towards resolution, what would it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      be?

2            MR. WITKIN:  You know, I

3      don't know that I would pick one

4      thing.  I went through five or six

5      things where, you know, you guys

6      tell me, what was the most

7      important thing in getting this

8      case to where it was.  I think

9      that we answered --

10           MR. SEEGER:  Trying cases.

11     Oh, I thought you were asking me a

12     question.  You asked.

13           MR. WITKIN:  Russ, I don't

14     know that out of the things that

15     we did I would say that one thing

16     clearly stood out as being

17     advancing the ball more than the

18     others, because to do that is to

19     suggest that you knew at the time

20     you were doing the things that you

21     were doing that it was going to be

22     the thing that would bring about

23     the outcome, and you didn't.

24           MR. LEVIN:  I guess what you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1        would say is you did everything
 2        you were asked to do.
 3             MR. WITKIN:  I did, and I
 4        guess I would make this further
 5        point.  I think there's a
 6        distinction between work that you
 7        do when you know what the outcome
 8        is and work that you do when you
 9        don't know what the outcome is.
10        If you go back and you look at the
11        examples I gave, I mean, the
12        stroke package for one, that
13        wasn't something that anybody else
14        really wanted to do.  Why?
15        Because nobody was feeling so
16        great about the stroke cases.  And
17        we did that work because there was
18        a request to do it.
19             MR. SEEGER:  I would just
20        correct that.  I mean, I know that
21        in our office we felt pretty high
22        on the stroke cases.  I think Dave
23        Buchanan would argue with you on
24        that.  But you are right, it was a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

 1          little bit of an offering for a

 2          while.

 3               MR. HERMAN:  Let me say to

 4          you that I think that's an

 5          important thing, because without a

 6          stroke package, again, trial

 7          package, you can't then justify

 8          people opting out who are going to

 9          say, well, you didn't give me

10          anything, and stroke is an

11          important part of the resolution

12          of this case.  I know this is a

13          particular theme of mine, but it

14          is pretty difficult for lawyers to

15          go through a process, elect to

16          come into a settlement, and then

17          complain that they had no option

18          when the option was they had a

19          stroke package to try the case and

20          not come in, so...

21               MR. BIRCHFIELD:  Justin, I

22          think you summed it up.  Answering

23          the call, that's critical, and I

24          appreciate it.  Because there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          wasn't a single time that we

2          called on you for help in a

3          specific role that you didn't step

4          up, and that's appreciated.

5              MR. SEEGER:  Anybody else?

6              (No response.)

7              MR. SEEGER:  Thank you, sir.

8              MR. HERMAN:  Thank you.

9                 -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1                C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22         Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23         Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 213

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -

FIRM:  BARRIOS, KINGSDORF & CASTEIX, LLP
       Dawn M. Barrios, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. HERMAN:  Everything is
 3         recorded.  You are going to get a
 4         copy of what everybody else has
 5         had to say.  Judge Fallon said if
 6         there's no fee agreement at the
 7         end of day, he's going to have a
 8         Special Master go through the
 9         Murphy Oil process.
10              MS. BARRIOS:  And as a
11         victim of the Murphy Oil process,
12         I will personally state that
13         nobody wants to do that.
14              I want to thank y'all for
15         allowing me to meet with you
16         today.  I told Ed in the hall I
17         kind of feel like I'm coming to a
18         firing squad.
19              MR. SEEGER:  A tired firing
20         squad.
21              MS. BARRIOS:  Seriously,
22         I've been in your position before,
23         so I'm only going to do the
24         highlights for you guys.  I want
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          to give you a couple of broad

2          strokes.  I want you to know how

3          small my law firm is.  We're only

4          three lawyers, two who do

5          litigation, and we've devoted a

6          substantial amount of time for a

7          three-man law firm to this

8          litigation, and we have been in

9          the beginning of this MDL.  I was

10         not in it before the recall, but I

11         really got involved, of course,

12         after it came to Louisiana.

13               All of my work stems from

14         three orders of the Court.  The

15         first was when the judge appointed

16         me to the state liaison committee,

17         and I took that job very seriously

18         because, as Russ and Arnold and

19         Chris know, I have that same job

20         in Propulsid, and I knew what the

21         judge wanted me to do.  I knew of

22         the coordination that needed to be

23         accomplished.  In order to

24         coordinate and move the case

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          forward, you have to communicate.

 2          So, one of the first things that I

 3          did was started up with the

 4          newsletters.  I would send them to

 5          Russ and Lenny to review, and I

 6          started sending out all the

 7          orders, all the information that

 8          the MDL wanted to give to the

 9          regular attorneys.  Because of

10          that communication, I got

11          innumerable calls asking me

12          questions.  Obviously the

13          experienced, the MDL litigators

14          didn't call me, but I had to deal

15          with Joe six pack who didn't

16          understand what an MDL was.  So, I

17          took a lot of those calls.

18              One of the first things that

19          I did, and I'm not too sure if

20          Russ was very happy with me that

21          day, but I stood up and I asked

22          Judge Fallon if the state liaison

23          committee could do a separate memo

24          on the sales reps, getting the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        sales reps notes from Merck,

 2        because I felt that the state

 3        attorneys really needed that,

 4        particularly if they were going to

 5        have diversity.  So, while I

 6        didn't author the memo, I edited

 7        it and sort of nursed it through.

 8             I kept a gigantic database

 9        of all the plaintiffs' lawyers.

10        Dave Buchanan would come to me and

11        ask me to send out information to

12        the people in the database.

13             I was asked by Fred Longer

14        to find the head class sales rep.

15        When class actions were filed and

16        there were no class reps, Fred

17        said, hit your database, go

18        through it, find me some class

19        reps.

20             Similarly, I was asked to

21        help find trials to occur in the

22        MDL and people to put their trial

23        cases up.  I helped Lisa

24        Dagostino, obviously she did it
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
1        all, but I helped get her medical

2        records and assist her, and went

3        to a lot of friends I knew who

4        were good litigators to see if

5        they would bring their cases into

6        the MDL.  One of those is Ed

7        Blizzard, and luckily his Mason

8        case was selected to be tried

9        here.

10            I don't know, Ed, if I

11       should take some kind of credit

12       for bringing you in or not.  It

13       sort of depends on what these guys

14       feel about you.

15            MR. HERMAN:  We feel a lot

16       better about you than we do about

17       him.

18            MS. BARRIOS:  Okay.  So,

19       please be on your best behavior

20       from here on out.

21            Ed asked me to be his local

22       trial counsel in Mason.  I helped

23       mostly with the jury selection and

24       reporting to the jury consultant
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1      every day after the class and did

 2      a memo.

 3          Lenny Davis asked me to get

 4      together a whole list of cases for

 5      case-specific discovery when the

 6      MDL was not moving as quickly as

 7      everybody wanted.  There was a

 8      motion, and I believe the motion

 9      was filed for case-specific

10      discovery, and it was to be tee'd

11      up, and I helped Lenny locate some

12      cases to put for the discovery

13      track.

14          I met with Judge Fallon

15      privately, Judge Higbee, Judge

16      Wilson in coordinating with the

17      various menus.

18          When Merck selected a case

19      called Diaz to be tried here,

20      Jerry Meunier reached out to me,

21      because the local counsel for Diaz

22      was a female attorney, and she

23      felt more comfortable talking to

24      me.  I helped prepare the witness

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1      for deposition and was going to

2      prepare the doctors, but she

3      ultimately dismissed the case.

4           With Ted Mayer and Doug

5      Marvin, I coordinated deposition

6      dates and worked with the

7      different attorneys in the various

8      jurisdictions to iron out how much

9      they could participate versus the

10     MDL participate.

11          I think that I was a go-to

12     person outside the PSC to get

13     things done because of my

14     relationships and my database.  My

15     goal was just to get critical mass

16     so that the MDL would be

17     successful.

18          My second bit of work comes

19     from the order that Judge Fallon

20     entered in July of 2005 in which

21     he ordered the SLC to keep track

22     of all the remands that came into

23     the MDL.  I really didn't know

24     what he was talking about when he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1    first ordered that we do it, but

2    as chair of the SLC, I undertook

3    to figure out how to do it and

4    what to do.

5         We have kept track of over

6    955 cases with remand orders, with

7    remand motions.  We had to locate

8    them.  Remand motions do not come

9    with a record when it is

10   transferred over to the MDL.  So,

11   we worked with the clerk's office

12   and transferred reports to get all

13   of that information, put it

14   together.  We have a massive

15   database with hyperlinks for the

16   judge for every one of the motions

17   and orders.  Then he asked that we

18   break it down by state, so, we

19   went and did an entire

20   investigation broken down by

21   states, and then I didn't want him

22   to ask me to break them down even

23   further, and then I would have to

24   do it again, so I decided to break

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1          it down by issue.  Because he did

 2          say from the bench that he was

 3          going to rule on remand motions,

 4          he would look at one of each

 5          category, and then people were to

 6          take it from there and figure out

 7          what he would do with remands.

 8          So, I started to classify them.

 9          The reason for the remand was

10          diversity, was it federal

11          jurisdiction, was it a federal

12          question, et cetera.

13              As I was doing this, it

14          became clear the value of this

15          remand motion for me was the fact

16          that it kept the heat on Merck.

17          When I got to stand up and say

18          that we have 955 remands, they

19          knew that that was going to come

20          some time down the pike.

21          Obviously I had to deal with all

22          the counsel and answering their

23          questions about remands and why

24          isn't Judge Fallon ruling on my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1         remand, when can I get out, can I

2         mandamus him to the Fifth Circuit.

3         That was ongoing.

4              MR. SEEGER:  Can I ask a

5         quick question while you're

6         presenting?

7              MS. BARRIOS:  Sure.

8              MR. SEEGER:  On the state

9         liaison committee, could you

10        identify for us who your most

11        active and useful members were?

12             MR. LEVIN:  Yeah, that would

13        be helpful.

14             MS. BARRIOS:  Actually, the

15        person who always -- two people

16        always came to the status

17        conference.  Willie Singleton

18        and --

19             MR. LEVIN:  Len Fodera.

20             MS. BARRIOS:  -- Len Fodera

21        are generally the only two who

22        routinely appear.  In terms of

23        work, when Judge Fallon allowed us

24        to do a secondary memo to yours in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          support of the motion to get class

2          representation, I turned to the

3          Aylstock Witkin firm out of

4          Florida, because I knew that they

5          had done a similar memo in a

6          different case, so that we didn't

7          have to reinvent the wheel.

8               Then when we were asked to

9          do the case-specific discovery and

10         this other project called the

11         rapid remand motion that the PSC

12         filed in order to try to get some

13         remands done, and Lenny asked me

14         to pick the cases that I thought

15         people would actually try in the

16         MDL, I turned to Justin Witkin and

17         to Matt Lundy and asked them to

18         help me on telephone calls and

19         getting that information.

20              MR. SEEGER:  Did you have

21         monthly calls, weekly calls?  Did

22         you have regular calls?

23              MS. BARRIOS:  No.

24              MR. SEEGER:  So, you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          convened the committee when you

2          had an issue?

3               MS. BARRIOS:  Exactly.  When

4          we had an issue.  I'm trying to

5          think.  The newsletter, I would

6          send out to Russ and to everybody

7          on the state liaison committee

8          asking for comments, but other

9          than that, I didn't have any

10         routine calls.

11              MR. HERMAN:  State liaison

12         committee was essentially Dawn,

13         and she's correct that the two

14         people that showed up every time

15         were Singleton and Fodera.

16              Basically on the remand

17         issue, I know she answered a lot

18         of questions, because they would

19         come into our office and we would

20         refer them over to Dawn.

21              I have some questions, Dawn.

22              What are your costs in the

23         case?

24              MS. BARRIOS:  They were in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          my affidavit, $17,477.95.

2                    MR. HERMAN:  Have you had

3          any problem with your costs in

4          terms of getting them verified by

5          the CPA or any of that business?

6                    MS. BARRIOS:  Sometimes they

7          would ask my bookkeeper questions,

8          and we answered them.

9                    MR. HERMAN:  Okay.  So, you

10         don't have a problem.  If you do

11         have a problem, be sure you call

12         them, because they'll be available

13         to you.

14                   MS. BARRIOS:  They have been

15         very responsive, so...

16                   MR. HERMAN:  The number of

17         cases you have?

18                   MS. BARRIOS:  I would say my

19         office has in an interest in about

20         500 cases.

21                   MR. HERMAN:  When you say

22         "an interest," are there other

23         folks who have an interest in the

24         same cases you have?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1              MS. BARRIOS:  Yes.

 2              MR. HERMAN:  Who are they?

 3              MS. BARRIOS:  Richard

 4         Arsenault, Matt Lundy, Justin

 5         Witkin and Vance Andrus.

 6              MR. WEITZ:  Did you submit

 7         those cases to the settlement?

 8              MS. BARRIOS:  Yes.

 9              MR. WEITZ:  Your firm?

10              MS. BARRIOS:  No.  Because

11         Richard Arsenault was the primary,

12         I forget, Andy, what you call

13         them --

14              MR. BIRCHFIELD:  Primary

15         counsel.

16              MS. BARRIOS:  So, they all

17         had Richard's name on them.  I

18         mean, I prepared cases to

19         submit --

20              MR. SEEGER:  But he's listed

21         as primary counsel?

22              MR. LEVIN:  So, it is 500

23         cases that the group has?

24              MS. BARRIOS:  Correct.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1              MR. HERMAN:  In terms of --
 2         this is really a question Chris
 3         asks everybody.  What do you
 4         consider the most important things
 5         that you did to move the case to
 6         fruition?
 7              MS. BARRIOS:  That's hard to
 8         say.  I would say the work on the
 9         remand stuff, just keeping it
10         moving.  I created a double remand
11         database that got Kathy Snapka's
12         Garza case remanded, and she got
13         to try that case.
14              I now work with BrownGreer
15         on a weekly basis to find out what
16         remands will be moot by the
17         factors in the settlement.  So, I
18         take it very personally since this
19         was sort of my baby, this project,
20         so, I would have to say the remand
21         stuff is probably the most
22         important.
23              MR. HERMAN:  Now, you
24         mentioned Diaz.  Jerry Meunier and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           I agreed to split costs to try

2           that case.  Were you involved in

3           the expert search?

4                MS. BARRIOS:  No.  My only

5           involvement was really talking to

6           counsel, preparing Mr. Diaz for

7           his depo, and then I talked with

8           Jerry about splitting up the

9           treaters to prepare them for

10          depositions.

11               MR. BLIZZARD:  Dawn, I know

12          you kind of skimmed over your work

13          on Mason, maybe because it's

14          painful to talk about it

15          sometimes.

16               MS. BARRIOS:  You know, I

17          started thinking about that today,

18          and I just remember my feeling

19          when Mr. Mason said, oh, I don't

20          think I took Vioxx before my heart

21          attack.

22               MR. SEEGER:  Even the great

23          Ed Blizzard couldn't save that.

24               MR. BLIZZARD:  Dawn was good

FAC Resp. Amended Exhibit D -- 230

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        at talking to Mr. Mason every day

 2        and handling him when we were busy

 3        doing other stuff.  Dawn was

 4        really good help for our team.

 5             MR. HERMAN:  Are you

 6        involved in any way in Guidant and

 7        Medtronic ?

 8             MS. BARRIOS:  No.  When I

 9        say "no," my partner, Bruce

10        Kingsdorf, did a couple of the

11        individual cases.  I went to the

12        Medtronic first MDL meeting, the

13        Guidant first MDL meeting, talked

14        about the state liaison stuff and

15        they weren't --

16             MR. LEVIN:  Nothing

17        happened.

18             MS. BARRIOS:  Yes, nothing

19        happened.

20             MR. HERMAN:  What about

21        Celebrex or Bextra?

22             MS. BARRIOS:  Did the same

23        thing with Elizabeth.  Went out

24        there a couple of times to do the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          state stuff.  She told me I could

2          do it, and there was no court

3          order.

4                  MR. HERMAN:  Elizabeth

5          Cabraser?

6                  MS. BARRIOS:  Right, in

7          Bextra Celebrex.  There was no

8          court order appointing the state

9          liaison committee, and at that

10          time, we talked about maybe doing

11          some sort of joint newsletter to

12          the COX-2 people, and I just said

13          I can't do this.

14                  MR. HERMAN:  I do want to

15          tell you I was never angry with

16          you about anything you did in the

17          case.  You are a competent lawyer.

18          You knew what you were doing.  You

19          raised an issue that had to be

20          raised, so --

21                  MS. BARRIOS:  Thank you.

22                  MR. HERMAN:  -- I never had

23          a problem with that.

24                  In Guidant, Medtronic,

FAC Resp. Amended Exhibit D -- 232

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          Celebrex or Bextra, are you

2          involved in any way with the same

3          group of lawyers, Richard, Lundy,

4          Witkin, Vance, any of those?

5                 MS. BARRIOS:  Yes.

6                 MR. HERMAN:  Tell me about

7          that.

8                 MS. BARRIOS:  We have a

9          consortium, and we do these kind

10         of cases together.

11                MR. HERMAN:  In Guidant,

12         Celebrex, Medtronic and Bextra,

13         the group is involved in those

14         cases?

15                MS. BARRIOS:  Yes.  But I

16         didn't, I, personally, didn't.

17                MR. HERMAN:  I understand.

18                How many hours do you have

19         in this case?

20                MR. RAFFERTY:  2,085.

21                MS. BARRIOS:  I just

22         resubmitted.  We have a new

23         submission.

24                MR. LEVIN:  As of May 31st,

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          I had 1,920.

2               MS. BARRIOS:  I didn't know

3          that you had a cutoff date.

4               MR. LEVIN:  I have the

5          accountants' report as of May, and

6          it says 1,922, so, you've got

7          hours after that, they are just

8          not here yet?

9               MS. BARRIOS:  Exactly.

10              MR. HERMAN:  So, you have

11         got 1,922 plus whatever since May?

12              MS. BARRIOS:  Yes.

13              MR. HERMAN:  You have an

14         estimate on that?

15              MS. BARRIOS:  I would say

16         maybe 200, 250.

17              MR. RAFFERTY:  Dawn, what

18         about the other hours?  I think in

19         your affidavit you said about

20         1,300 of them were yours?

21              MS. BARRIOS:  Yes.

22              MR. RAFFERTY:  What about

23         the other hours?  What were those

24         primarily involving?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

 1            MS. BARRIOS:  The way our

 2       law firm works is that I usually

 3       do the rainmaker type of stuff,

 4       and my partner, Bruce, backs me up

 5       with all the law.  So, every time

 6       we needed to do law stuff and deal

 7       with that, he handled it.  I have

 8       heavy paralegal hours because of

 9       the remand project.  I mean, I

10       couldn't go through 174

11       conditional transfer orders.

12            MR. LEVIN:  The 1,922 was

13       the total hours for your firm.  Of

14       that, yours was 1,119.  This,

15       again, is as of May.  Bruce had

16       157.  And after that, all of the

17       hours are law clerks and

18       paralegals?

19            MS. BARRIOS:  Correct,

20       correct.

21            Since you are asking about

22       the volume of hours, after

23       Katrina, there was some time that

24       I lost without being able to

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          report it, but I would hope y'all

2          would take that into

3          consideration.

4                    MR. HERMAN:  But I know you

5          were active, because when the case

6          moved to Houston, you were still

7          active in the case.

8                    MS. BARRIOS:  Right.

9                    Can I just continue or do

10         you have any more questions?

11                   MR. HERMAN:  No, no.  Go

12         ahead.

13                   MS. BARRIOS:  Just the last

14         bit of information, and this is

15         really a question, formed the

16         basis of a question that I have is

17         the third order that Judge Fallon

18         handed down in July of this year

19         regarding the Attorney General

20         cases.  I mean, I've been working

21         with Chris on that a lot, with

22         Lenny on that.  Does that get

23         compensated in this group?

24                   MR. SEEGER:  Good question.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1            MR. HERMAN:  Well, at this

2        point, we have --

3            MS. BARRIOS:  I don't need

4        an answer --

5            MR. HERMAN:  No.  It is a

6        fair question.  Up to now, the

7        only hours we've been concerned

8        with are common benefit hours.

9            MR. SEEGER:  That led to the

10        settlement, the PI stuff.

11            MR. HERMAN:  Yes, that led

12        to the settlement in this case,

13        which would be New Jersey, Texas,

14        California and the MDL.  The AGs,

15        we have been trying to -- they

16        have indicated that they would

17        like MDL work product, but there

18        has not been an agreement reached

19        yet.

20            MS. BARRIOS:  I'm working on

21        it.

22            MR. BLIZZARD:  We haven't

23        discussed it.  Just from my

24        personal standpoint, I would just

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          suggest that you submit your

 2          hours.  To the extent the hours

 3          are necessary, by virtue of your

 4          role in the MDL, I mean, I guess

 5          we'll just consider them.

 6               MR. SEEGER:  I think that's

 7          good.

 8               MR. HERMAN:  There's a

 9          problem, okay, particularly in

10          Louisiana, and we have Louisiana

11          AG counsel.  Louisiana has special

12          rules as to who can do what.

13          Assume that some arrangement is

14          made with the AGs for MDL work

15          product, then any work that you've

16          done causing that to happen is

17          certainly going to be counted.  I

18          don't want to get into -- I don't

19          want you to get into a problem or

20          us to get into a problem saying

21          that we're doing work for the AGs.

22               MS. BARRIOS:  I understand.

23          I just wanted to raise the issue,

24          because --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1            MR. HERMAN:  It is a good

2       issue, and hopefully there will be

3       some arrangement with the AGs to

4       get MDL work product, and you need

5       to keep your hours.

6            MR. SEEGER:  Yes, you are

7       reporting your hours anyway?

8            MS. BARRIOS:  I am, I am.

9       But I just know that that is at

10      least an issue for me, and we've

11      been working along that goal and

12      stay lifted and --

13           MR. HERMAN:  Well, you have

14      been instrumental in that, you

15      have been instrumental in, I don't

16      want to use the word agitating,

17      but being tenacious on the AG

18      issue.  If we come to hopefully

19      some good result, you certainly

20      have a strong part in that, and I

21      think we recognize that.  I really

22      don't want to go into the

23      Louisiana issue.

24           MS. BARRIOS:  That's fine.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1             MR. SEEGER:  Anybody have

2        anything else?

3             (No response.)

4             MR. SEEGER:  Thank you so

5        much.

6                  -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22         Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23         Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

JANUARY 23, 2009

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

NEW YORK, NEW YORK

- - -

FIRM: BEASLEY ALLEN CROW METHVIN
      PORTIS & MILES, PC
      Andy D. Birchfield, Esquire


BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers, LLP
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
1                    -   -   -

2              MR. BIRCHFIELD:  This is

3         quite a challenge, as you know, to

4         try to reduce nine years into a

5         30-minute conversation or into a

6         three-page affidavit no matter how

7         small you get the print.

8              One of the benefits that I

9         have is that I'm going last, and I

10        can say that I agree with nearly

11        everything that's been said so far

12        and so let me just add a ditto to

13        that and cut out some of those

14        comments.

15             There's one thing that I

16        think bears pointing out.  Every

17        one of us around the table on this

18        committee has talked about the

19        importance of teamwork and how we

20        have worked together as a team.

21        One benefit that we have is that

22        we're on this committee because

23        Judge Fallon listened to Russ, he

24        trusts Russ, he knew that Russ
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          could advise him on the committee,
 2          and he selected and put on this
 3          committee lawyers who know the
 4          litigation and know the role of
 5          other lawyers.  So, we have the
 6          benefit of really knowing most of
 7          what one another has done, but I
 8          do want to emphasize this.  We
 9          talk about teamwork, and everybody
10          has been consistent.  But that's
11          not to be taken for granted,
12          because all of us have been
13          involved in major mass tort
14          litigation where teamwork is not
15          really the hallmark of that
16          litigation.  Instead, you have
17          venues fighting against venues,
18          you have plaintiff lawyers that
19          are trying to boost their position
20          by stepping on others, and we're
21          not in that place.  This
22          litigation truly is marked by
23          teamwork.  That's true for the
24          lawyers, the plaintiffs' lawyers,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1    and it is also true for the

2    judges.

3         Judge Fallon, in a

4    remarkable demonstration of

5    facilitating the teamwork, reached

6    out to the state court judges.

7    That is not something that you

8    regularly see from a Federal Court

9    judge, but he fostered teamwork

10   from that side of the bench, and

11   we were able to develop remarkable

12   teamwork among the jurisdictions

13   on the plaintiffs' side.

14        I want to take a few minutes

15   to drop back to the very

16   beginning, and I'll tell you how

17   the Vioxx litigation started for

18   me and our firm.

19        In 2000, a pharmacist from a

20   small town outside of Montgomery,

21   who happens to be a father-in-law

22   of one of my law partners, came to

23   see me because he was seeing a

24   disturbing trend among his clients

who were taking Vioxx, a problem with blood pressure associated with those folks taking Vioxx. So, we began investigating. We checked out the literature.

I head up our mass torts section, and the lawyers in my section work under my direction. I assigned David Miceli to be the point person in this litigation. He consulted with some experts, and we began looking at cases, investigating cases. We filed our first case in September of 2001. It was a case that was filed in Mississippi, Mrs. Lauderdale. It was a death case. She was on both Vioxx and Celebrex. That was filed in September. As far as we knew at that point, that was the first Vioxx case that was on file.

Shortly after we filed that case, Shelly Sanford and Carlene

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        Lewis called us, and we learned

2        that they had already had a case

3        on file, and we began cooperating

4        with them through discovery.

5            The judge in the Lauderdale

6        case  took a liberal view of

7        discovery, and we were able to get

8        some documents.  They were not

9        electronic at that point.  We were

10       getting truckloads of boxes

11       typically about two or three weeks

12       before a deposition was set.  Dave

13       Miceli took the first deposition

14       of Ed Scolnick, Barry Gertz.  Mark

15       took the first deposition of Alise

16       Reicin, but David Miceli and he

17       worked up, began to work with

18       Benedict Lucchesi, who was really

19       the preeminent expert on the

20       mechanism of action in Vioxx.

21           MR. SEEGER:  Melted down on

22       me, by the way.

23           MR. BIRCHFIELD:  He did well

24       in some trials as a testifying

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          expert, not so well in others.

2          But he is the preeminent man on

3          the mechanism of action.

4               Maybe this is just testimony

5          about how well we work together as

6          a team, because the last thing I

7          want to do is get into any kind of

8          dispute over something that really

9          doesn't matter too much, but Dave

10         Miceli would kill me if I just let

11         it stand.  We were working

12         cooperatively, but David Miceli

13         identified Benedict Lucchesi and

14         began working with him.  He was

15         communicating with Carlene and

16         with Shelly on that.  David

17         Miceli's mother is a nurse, and

18         she had both the 16th and 17th

19         edition of the Merck Manual and

20         told him about that very early on.

21         In fact, he used it in the very

22         first deposition.

23               MR. SEEGER:  I didn't want

24         to hurt your feelings, but Shelly

FAC Resp. Amended Exhibit D -- 248

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          told me about it, too.

 2                  MR. LANIER:  We still found

 3          it for us.  I don't even know who

 4          David Miceli is.

 5                  MR. BIRCHFIELD:  Part of the

 6          teamwork was established in those

 7          very early days because we were

 8          working together.  In fact, we had

 9          boxes or a box of the 50 best

10          documents that we had identified

11          so far.  David Miceli met with

12          David Buchanan at a national

13          conference and went through all of

14          those documents.  Then when the

15          litigation opened up in New

16          Jersey, they worked well together.

17          We were able then to use some of

18          those first documents to

19          demonstrate what else was out

20          there and opened the door on that

21          litigation.

22                  MR. SEEGER:  Absolutely.

23                  MR. BIRCHFIELD:  We had that

24          case filed in Mississippi, we had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        that case filed in northern

2        Alabama, in Federal Court, and a

3        case that was filed in Federal

4        Court, a stroke case in Mobile

5        County.  It was in federal

6        District Court.  That case was

7        actually set for trial in August

8        of 2004, a year before the Ernst

9        case actually went to trial.  The

10       federal judge reviewed the files

11       of Daubert material, decided that

12       he needed more time, and so in

13       August, he continued the trial

14       until November.  And that

15       September, September 30th, Merck

16       withdrew the drug from the market.

17            In October, MDL petitions

18       were filed, and so he sat on it

19       when that case went to the MDL.

20       But that shows just how far

21       advanced the litigation was.

22       Prior to the withdrawal of the

23       drug, we were trial ready,

24       certainly not to the extent that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        we learned from one another, but

 2        every case built on the one before

 3        it.

 4             Mark talked about seeing his

 5        lines in a number of other

 6        transcripts, and certainly I would

 7        say that.  I have watched Mark in

 8        trial.  I read those transcripts.

 9        I watched Tom Girardi, and I

10        watched Chris in trial, and I

11        watched Perry Weitz's partners in

12        trial.  We learned from one

13        another.  We improved this case as

14        we went along.  It is a remarkable

15        demonstration of the teamwork

16        among the plaintiffs' bar.  In

17        this litigation, we still have the

18        lawyers that would prefer to do

19        things their own way.  You are

20        going to have that.  But overall,

21        it was a remarkable demonstration

22        of teamwork.  But that doesn't

23        just happen automatically.

24             When the drug was pulled off
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          the market, we went from having a

2          handful of law firms that were

3          involved in this litigation, we

4          were and Shelly and Carlene and

5          Chris and Mark were certainly

6          deeply involved at this point.  In

7          fact, we had a number of these

8          depositions, we were ready for

9          trial.  We had enough information.

10         We had the experts that were

11         necessary to take us to trial when

12         it was pulled off the market, and

13         everyone in the plaintiffs' bar

14         jumped in. There was an enormous

15         amount of interest in the

16         litigation at that point.  There

17         was a decision to make, do we wrap

18         our arms around the material that

19         we have and do we try to maximize

20         it for our own benefit or do we

21         share, do we openly and freely

22         share what we have with the

23         plaintiffs' bar.  And we made that

24         decision.  Chris and I got

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        together, and we talked about

2        this, and we decided that that's

3        the way to go.  This is an

4        enormous case.  We need to be a

5        united plaintiffs' bar, and so we

6        agreed.

7             Mealey's called.  I chaired

8        a conference in California.  Chris

9        and I pulled together at

10       conferences in Atlanta, as Chris

11       talked about.  We hosted one in

12       his office where we worked

13       together.  We invited plaintiffs'

14       lawyers, and we shared.  We shared

15       the information.  Chris' office

16       put together binders of those

17       exhibits, and we distributed them

18       to plaintiffs' lawyers.

19            We had another decision to

20       make, and that was regarding the

21       leadership.  The MDL petition was

22       filed even before we knew where

23       the MDL would be located.  There

24       were lawyers that were saying,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1        look, Chris is co-liaison, co-lead

 2        in New Jersey, and we should have

 3        Andy as the MDL lead in the MDL,

 4        we should proffer Andy as the lead

 5        to the judge.  Chris and I talked,

 6        and we decided that that was not

 7        the way to go.  There was the

 8        thinking that we need to create

 9        chaos, not a coordinated effort,

10        and so Chris and I, we could talk,

11        but we shouldn't be co-lead.  That

12        was a major push.  A large number

13        of lawyers suggested that

14        approach.  Chris and I said no,

15        that's not the way we need to go.

16        We should ask the MDL judge, and

17        once we knew that it was in New

18        Orleans and that Russ was going to

19        be liaison counsel, Chris and I

20        talked to Russ, and Russ, I think,

21        recommended that we serve as

22        co-lead counsel.  But that was a

23        decision that we made to develop

24        this litigation from a teamwork
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          approach and a united plaintiffs'

2          bar.

3              First, we have all agreed

4          that there's remarkable teamwork

5          in this litigation.  The second

6          thing that we have all agreed on

7          around this table, and Russ said

8          it to begin with, is that the

9          resolution of cases is driven by

10         fear.  Merck at the end knew that

11         we would try these cases.  So, one

12         of the things that we all agree on

13         is that pushing cases to trial,

14         showing Merck that we have the

15         wherewithal to withstand their

16         scorched earth approach and that

17         we will stand up and we will try

18         these cases was a key, a primary

19         key to a good resolution in this

20         case.

21             But that was not always the

22         thinking.  There was major debate

23         internally about the best

24         approach.  If we go to trial and

FAC Resp. Amended Exhibit D -- 255

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        Merck wins, if we have a

2        plaintiffs' loss that hurts us,

3        that was a major debate.   Chris

4        and I and Russ talked about this.

5        I mean, we got Russ' advice.  Russ

6        has always said, we've got to be

7        willing to go forward with trial.

8             I think that I led by

9        example there.   There were six

10       bellwether trials in the MDL.   I

11       tried four of them.   The very

12       first case that was set for trial,

13       the way that the selection process

14       worked is Judge Fallon said, okay,

15       don't give me four cases, give me

16       four cases to go to trial.   The

17       plaintiffs' committee selected the

18       Pikul case.   It was actually

19       Shelly's case.   It was a case that

20       was ready for trial.  All the

21       discovery had been completed, and

22       it was ready for trial.  We said,

23       we're putting this forward as our

24       first case.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1            We picked the Irvin case as

 2       the second case to go to trial.

 3       And Merck said no, we're not going

 4       to try the Pikul case, but we'll

 5       select the Irvin case to go first.

 6       The problem with that was that

 7       while we had had the Irvin case on

 8       file in Florida, it had been on

 9       file since 2003, it had been

10       removed three times.  We had

11       gotten it remanded the third time

12       with sanctions.  It was in West

13       Palm Beach, Florida.  They picked

14       it to go first.  But no discovery

15       had been done because we had been

16       fighting off remands the whole

17       time.  And so Judge Fallon says,

18       okay, we're going to set the Irvin

19       case first.  So, we had three

20       months to fully discover that case

21       and go to trial.  In the middle of

22       those three months, Katrina hits,

23       and we go to Houston, and we try

24       the case there in Houston.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           Another example of the
2        teamwork.  When we went to
3        Houston, I felt very strongly that
4        we needed Houston counsel.  I
5        talked to Mark about that.  I
6        think it was a problem for Mark
7        because I think his son was in
8        Oxford and could not do that, so,
9        he couldn't try the case with us,
10       but he offered Dr. Bob to provide
11       his services to us and help us
12       support the case.  No charge.  He
13       just provided that service.  And
14       it is much appreciated.  We tried
15       that case, and it ended in a hung
16       jury.
17           Judge Fallon then set the
18       case for trial in February in New
19       Orleans.  New Orleans looked like
20       a war zone in February of 2006.  I
21       called Troy and said, Troy, will
22       you help me try this case?  Troy
23       never hesitated.  He came in, and
24       he and his team worked tirelessly.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        Pete came down, and he brought a
 2        paralegal and staff, and it was a
 3        remarkable working experience.
 4              As Troy alluded to, it was a
 5        different case when we tried it in
 6        New Orleans.  One thing that
 7        happened is on the eve of trial,
 8        Judge Fallon excluded all of our
 9        specific causation expert
10        testimony, and so we were faced
11        with a very difficult decision.
12        We asked them to reconsider, and
13        we asked for additional time, but
14        there was no continuance.  And
15        there were folks on the
16        plaintiffs' side that were
17        strongly recommending that we just
18        dismiss the case, we not go
19        forward with the trial, that it is
20        virtually unwinnable.  But we were
21        convinced that we needed to show
22        Merck that we were not going to
23        back down, and so we tried the
24        case.  We got a defense verdict,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          and then later we were able to get

2          a new trial granted.

3              Then we tried the Barnett

4          case with Mark Robinson.  Mark

5          called me, asked me to help him

6          try the Barnett case.  So, I took

7          Leigh O'Dell and three paralegals,

8          and we moved back in to New

9          Orleans and we tried that case

10         with Mark, no interest in the

11         case, no fee interest in the case.

12         It was purely to advance the

13         litigation.  We were able to get a

14         $51 million verdict in that case

15         that was reduced to $1.6 million.

16         But that was the only plaintiffs'

17         win in the MDL.

18             Then following Ed's trial in

19         the MDL, we started the Dedrick

20         case, which was a defense pick

21         case.  We've heard about the

22         lawyers here in this room, and all

23         of us are trial lawyers, and we'll

24         stand up, and we've heard about

FAC Resp. Amended Exhibit D -- 260

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          the difficult cases, but this was

2          the mother of all defense picks, I

3          assure you.  This gentleman was 47

4          years old, he smoked for over 30

5          years, was still smoking at the

6          time of trial.  He had a prior

7          heart attack, he had diabetes, he

8          was obese, he had hypertension,

9          high cholesterol.  You name it, he

10         had it.  Plus a couple of felony

11         convictions to throw in the mix.

12         Merck was absolutely convinced

13         that there's no way that we would

14         try it.  But I was convinced that

15         it was important for Merck to see

16         that we would try these cases.  We

17         would try a heart attack case with

18         risk factors or not, we were not

19         backing down.  And we tried it.

20         And we spent $1 million and an

21         enormous amount of time.  We gave

22         it our very best shot.  I think

23         except for a credibility issue

24         that came out with our client on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1       the stand, I think we had a very

2       good chance of winning that.  In

3       fact, Phil Beck told me that when

4       the jury went out, that they were

5       very concerned.  I mean, we tried

6       it, and I think that we tried it

7       well.  We certainly gave it our

8       very best shot.  In the end, I

9       think it is our ability as a group

10      of plaintiffs' lawyers to show

11      Merck that we were not going away

12      that brought them to the table in

13      this litigation.

14           I think that that's one of

15      our major contributions, was the

16      trying the bellwether cases.  Even

17      while we were negotiating the

18      cases, I went to Illinois and

19      spent five weeks trying the case

20      with Mikal Watts.  Again, no fee

21      interest in the case.  It was to

22      advance the litigation.  But I

23      viewed our role here as a team

24      player.

FAC Resp. Amended Exhibit D -- 262

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1           When Tom Girardi was getting

2      ready to try the first case in

3      California, the Grossberg case,

4      Tom is a superb lawyer, no doubt,

5      but he asked for help.  I sent

6      Paul Sizemore, a law partner who

7      is a key player in the science,

8      especially in the science, also

9      taking a number of key discovery

10     depositions, I sent him out there

11     to help, no fee interest in the

12     case.  It was for the overall good

13     of the litigation.  Paul goes out

14     there, spends, I think it was

15     about eight weeks in trial, and he

16     ended up staying.  And he's still

17     out there.

18           MR. SEEGER:  Can I say one

19     thing quickly?  I'm sorry to

20     interrupt.  What's important, and

21     it's consistent with your theme,

22     it's just that I want to make

23     sure, it was the same lawyers in

24     this litigation that continued to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1        step up and try cases.  We
 2        couldn't get other lawyers to step
 3        up.  That is why when the fee
 4        committee looks at something,
 5        we're saying, hey, trying cases
 6        mattered.
 7             MR. BIRCHFIELD:  In
 8        addition, there was a case in
 9        Alabama that was going on at the
10        same time that we were trying the
11        Dedrick case, I believe.  We were
12        in trial, Leigh and I were in
13        trial in New Orleans when they
14        were trying the case in
15        Birmingham.  I sent one of my law
16        partners up there.  He spent the
17        entire time helping them try that
18        case, Ben Locklar.  Ben also
19        worked up some cases when Judge
20        Higbee -- most of our cases were
21        in the MDL, but we had some cases
22        from very early on in New Jersey.
23        Even though our primary focus was
24        in the MDL, Ben Locklar worked up
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           those cases to put in the trial

2           pool and was taking the individual

3           discovery and stuff on those

4           cases.

5                When we moved to the

6           settlement negotiations, it was a

7           team effort, there is no doubt.

8           Russ in developing his

9           relationship with Doug Marvin,

10          having the trust of Judge Fallon.

11          The judges were critical in

12          keeping the settlement

13          negotiations moving forward.

14          Russ did a masterful job in

15          providing the leadership for the

16          negotiation committee.  And

17          Arnold, with a tremendous amount

18          of experience, I mean, he's just a

19          walking encyclopedia of complex

20          litigation on the law and knowing

21          the ins and outs and the traps and

22          the land mines that we needed to

23          avoid in these settlement

24          negotiations, provided tremendous

Page 25

 1      wisdom in directing this.

 2              And Chris, Chris

 3      acknowledges that, hey, he's not a

 4      detail person, but he played a

 5      very vital role.  He had a very

 6      good relationship with Ted Mayer

 7      especially that had been built

 8      over the years in litigation in

 9      New Jersey.  That was very

10      helpful in the process.

11              Tom Girardi, Tom was always

12      good to break the tension.  But I

13      consider it to be a tremendous

14      honor and a vote of confidence

15      when the fee committee allowed Ed

16      and I, when we were at an impasse,

17      to step in and to see if we could

18      work through that.  There were

19      some very thorny issues.   Ed

20      outlined those earlier.  One thing

21      that they were absolutely stuck on

22      is we cannot pay for every heart

23      attack.  They were looking at a

24      bottom tier of 15 percent of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1      cases that would take nothing.

2      They would have to give a release

3      and pay nothing.   They had a

4      very, very long list of risk

5      factors, of lupus and atrial

6      fibrillation and sleep apnea and

7      you name it that we had to work

8      through.

9          MR. SEEGER:  Shoveling snow?

10         MR. BIRCHFIELD:  Shoveling

11     snow.  One of the things that was

12     crucial on working through this

13     that we considered to be most

14     important, Merck insisted on 100

15     percent participation.  Lawyers

16     had to recommend it to 100 percent

17     of their clients, so, we had to

18     have a plan that worked for 100

19     percent of the clients.  You could

20     not have clients that are

21     submitting the release with no

22     pay.  So, we had to work through

23     those issues.  It took a lot of

24     time to do that.   Ed has enormous

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1      experience, and it certainly

2      showed, just very practical ways

3      to solve problems.  I mean, true

4      impasses, Ed would find a way to

5      work through it.  I was kind of a

6      bulldog, and I got locked in on an

7      issue, and Ed would provide the

8      direction there and say, Andy,

9      this is one we need to compromise

10     on.  Or no, let's don't give up on

11     this one.  Ed provided remarkable

12     direction there.

13          In that process, one of the

14     things that proved to be most

15     critical, I think, was that we

16     developed a random sample that

17     served as a model.  500 cases that

18     we selected, had staff go through

19     and work up, look at all the risk

20     factors, look at all the gates,

21     and we analyzed that and we used

22     that.  We used that in developing

23     the definitions to know which

24     cases would come in and which ones

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          would not, to develop a model that

2          would actually work.  We also used

3          that model, we retained a

4          biostatistician who worked with us

5          to make sure that we could take

6          those numbers and extrapolate

7          those numbers to a population of

8          50,000 people.  We worked with the

9          biostatistician to crosscheck that

10         model sample with some of Chris'

11         cases and to ensure that we had a

12         settlement that would work.

13              I was involved in the

14         details on the settlement

15         negotiation.  I also think I had a

16         good sense of the big picture of

17         where we needed to end up, and

18         that was a settlement that would

19         provide -- it would be fast and

20         efficient and get money into the

21         client's hands.  That's one of the

22         issues that we bulldogged.  We

23         made sure that we would have --

24         Merck was looking at ten years of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          medical records.  Ten years of

2          medical records.  And the

3          settlement says it's based on the

4          event records.  The risk factors

5          are based on the event records.

6          So, we have a system, a settlement

7          in place that is fair, and it is

8          efficient, and I think I played an

9          important role.

10              MR. SEEGER:  I have to say

11          something to the two of you, Andy

12          and Ed.  The truth is, we all

13          played a good role.  That's great.

14          Some of us are big picture.  But

15          every time we hit a deadline,

16          every time we hit our numbers,

17          every time we show under 70

18          percent, every time we look at

19          those default cases that fall into

20          that small, little group, you guys

21          ought to take a lot of pride in

22          the work the two of you did

23          because you are mostly responsible

24          for it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          MR. BIRCHFIELD:  Thank you.

2          One of the things that we

3      did is we had to project a value.

4      A lawyer, if he is going to

5      recommend it to 100 percent of his

6      clients, he has to know what the

7      case is worth.  So we used that

8      model to be able to develop a

9      point projection.  So, before the

10     settlement was announced, we

11     projected what a point would be

12     worth so lawyers could know.  They

13     could use the calculator, and they

14     could know, and they could make a

15     decision about whether to

16     recommend it to their clients or

17     not.  That's a tremendous amount

18     of work to develop that, and it

19     has been remarkably accurate,

20     remarkably accurate.

21          MR. SEEGER:  Right on.  Like

22     20 bucks you were off, I think.

23          MR. BIRCHFIELD:  I also was

24     honored, the negotiating committee

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1       allowed me to be the spokesperson

2       as we went out and began the

3       education.  We all made the

4       commitment.  It was a tremendous

5       sacrifice to serve as the

6       spokesperson or educating them.

7       Since then, since the settlement

8       has been announced, I mean, we get

9       calls constantly.  Fortunately,

10      Leigh takes more than I do, but

11      we're getting calls constantly

12      about lawyers to help them

13      navigate through the settlement

14      process.

15          Ed in his e-mail said that

16      there's many a slip between the

17      cup and the lip.  That is so true.

18      And that is true here.  Arnold

19      said that this settlement protocol

20      will serve as a model.  That is

21      true if it comes to a successful

22      conclusion.  But if this

23      settlement breaks down, if it

24      takes three or four or five years

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1        to complete, not concluded on the

2        heart attacks this year like we

3        promised everybody, it will not be

4        the model, it be seen as a

5        failure.  And so while there have

6        been opportunities, I've had

7        opportunities to get involved,

8        I've been asked to represent AGs

9        in this litigation, I've been

10       asked to represent some

11       third-party payors, to be involved

12       in that litigation, I have passed

13       on that, because I'm committed.

14       I'm going to work 100 percent of

15       my time on this.  This is what I'm

16       doing until the cup reaches the

17       lip to make sure that there's no

18       spill.  And the gates committee is

19       a major part of that.  We've got

20       to get it done.  It was a key

21       component of the settlement.  It

22       was the only way it would work out

23       fairly.  So, I've got five lawyers

24       on my staff, five lawyers in our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1          firm that are partner level

 2          lawyers that are working on the

 3          gates committee, in addition to

 4          five top paralegals or legal

 5          assistants that I have.  It is an

 6          enormous task.  That's something

 7          that's going to be going on, Russ

 8          said, until September.  That would

 9          be terrific.  I think it is

10          probably going to be -- at least

11          on the stroke cases, it's going to

12          be at least through the end of the

13          year.  But I'm committed to seeing

14          this done, even though that's

15          something that does not get a lot

16          of recognition, and that's

17          something that a lot of lawyers

18          around the country would take for

19          granted.  But every day, this is

20          what I'm doing.  I'm working with

21          Brown Greer.  We have weekly

22          calls.  I'm making sure that there

23          are no missteps.  I want to make

24          sure that this lawsuit is
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          successfully concluded.

2                  Not to disappoint Russ,

3          Abraham Lincoln once posed the

4          question, if you call the tail a

5          leg, how many legs does a dog

6          have?  And then he answered four.

7          Just because you say something

8          doesn't make it the case.   In

9          every litigation, you know, you'll

10         have plaintiffs' lawyers that say

11         we're ready to try cases, we're

12         ready to try cases.  But we've

13         stepped forward.  Everybody around

14         this table is a trial lawyer.  I

15         tried 5 of the 17 bellwether

16         cases, 4 of the 6 in the MDL.

17         Everyone will say, hey, we're in

18         it 100 percent, and thankfully,

19         we've got a core group here that

20         is committed to this litigation.

21         But if you look at the work that

22         we've done in the trials, our role

23         in the settlement and the

24         post-settlement work that I am

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1      doing to make sure that this

2      litigation is brought to a

3      successful conclusion, I'm not

4      saying something that is not true.

5      I mean, look at my hours.

6      Personally, I have 9,000 hours.

7      I've got over 9,000 hours in the

8      case.  That's my personal time.

9      We've made major commitments to

10     the litigation from our firm

11     resources as well.

12          One of the things that I

13     think is also important, and there

14     are different views on this, but

15     we represent over 5,000 clients.

16     That is an enormous undertaking.

17     We had over 80 people, you know,

18     lawyers and staff, to work these

19     cases.  We worked them up, and we

20     worked them through.  You got the

21     medical records and submitted them

22     through the claims base.  What

23     does that have to do with common

24     benefit?  I have really tried to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

 1        figure this out, because you can

 2        say, hey, I'm going to be assessed

 3        on those cases, so, hey, I'm

 4        contributing a major portion to

 5        the pot.  Others would say, yeah,

 6        but you're getting a real benefit.

 7        I'm trying to figure out, how does

 8        the number of cases really work as

 9        to a common benefit?  I think it's

10        like this.  What would Merck pay

11        to bring this litigation to a

12        successful conclusion?  We know

13        they would pay 4.85 billion.  How

14        would they do it if it was not a

15        global settlement?  They would

16        look to the people around this

17        table and they would say, you

18        know, you will stand up, we know

19        you have the wherewithal to try

20        the cases, and you will do it.

21        So, a premium would be placed on

22        our cases.  Folks that warehouse

23        cases and don't work them up or

24        have had trial settings and have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
1        backed down, those cases are less

2        valuable.  So, I think that our

3        cases, because we have a

4        significant number of cases, and

5        they know that we will step up and

6        try them, and that's true for

7        everybody around this table, then

8        there's a premium.  There wouldn't

9        have been a premium on those cases

10        that is now taken off and spread

11        to the rest of the group for a

12        global resolution. That's the

13        nature of the game.  But I think

14        that there is some value to our

15        commitment in working up those

16        cases and the common benefit that

17        it will put into the pot there.

18            There's one other benefit, I

19        think, and that is when lawyers

20        look, and when I stand up and say,

21        hey, this is a good settlement,

22        you ought to follow my lead, I've

23        got skin in the game, they know I

24        have a major investment, and I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1        think it lends some credibility.

2        And the same thing for Chris.

3        Chris had a major group of cases.

4        And so when he stands up and says,

5        this is good, they look to him and

6        say, he's putting his cases in,

7        he's got skin in the game.  So, I

8        think that is an added benefit to

9        representing cases.

10            Let me just say this.  I

11       agree with the sentiment that has

12       been expressed here.  This has

13       been a tremendous group of lawyers

14       to work with, and I'm honored to

15       be a part of this group, this fee

16       allocation group, and to have been

17       assigned the challenge of working

18       through this problem like we have

19       the rest of the litigation.  There

20       have been an enormous amount of

21       sacrifice and folks willing to put

22       other interests ahead of

23       themselves, and I thank you.

24            MR. HERMAN:  Andy, before

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1        you go, I want to make two
 2        comments.  First of all, I'm going
 3        to reiterate again for anybody
 4        that wants this transcript, the
 5        leaders in this litigation are
 6        Andy Birchfield and Chris Seeger.
 7        There's no question about it.
 8        Anybody that doubts that is going
 9        to have to deal with me, and it
10        ain't going to be fun.
11             Secondly, Judge Fallon makes
12        his own decisions.  I don't want
13        the record to look like I had any
14        influence other than when the
15        judge asked me for
16        recommendations, I gave them.  But
17        that doesn't mean he always
18        followed them, because he's got
19        his own thoughts.  He's
20        extraordinarily experienced.  We
21        owe a debt of gratitude to all the
22        judges, Judge Fallon for
23        recognizing very early and saying
24        over and over again, my MDL, in
```

FAC Resp. Amended Exhibit D -- 280

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1       quotes, my MDL is not going to be

2       a black hole.

3            MR. SEEGER:  From day one.

4            MR. HERMAN:  And number two,

5       for saying that he expected us to

6       work as a team.

7            Number three, my favorite

8       feeling about this, and I want to

9       thank Chris and Andy in particular

10      for this, is I resent inventory

11      sales, because you're leaving a

12      lot of clients behind.  It may be

13      that there are 300, 800, 900

14      lawyers out there who don't put

15      their nose to the grindstone, who

16      owe a lot of referral fees, a lot

17      of advertising costs, warehousing.

18      Those clients will never get

19      compensated in what I call an

20      inventory sale.  It's apparent

21      that Chris and Andy and other

22      people around this table could

23      have split off.  I want to thank

24      Judge Fallon for making it clear

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

```
 1          that he wanted a global settlement
 2          in bringing the other judges in.
 3          It is very difficult when Judge
 4          Fallon called particularly Chris
 5          and Andy and I in and then the
 6          other folks that comprised a
 7          secret group who continues to be
 8          criticized.  It's very difficult
 9          when you look for three state
10          judges and a federal judge, and
11          Merck looks at them and says, you
12          will begin settlement
13          negotiations, not to begin.  No
14          matter what doubts we had, when
15          Judge Fallon, supported by Judge
16          Chaney in particular and Judge
17          Higbee in particular, told Merck
18          they had to bring the
19          decision-maker to the table and
20          meet with us, when that guy showed
21          up, a heck of a lawyer,
22          incidentally, and he was there at
23          the final days of negotiation,
24          when he showed up, at least it
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1        gave us not the feeling that

2        settlement would take place, but

3        that it could.

4              The last thing I want to say

5        is for all of us.  We're going to

6        be heavily criticized.  The reason

7        we are is because if you make a

8        fair allocation, the group of

9        lawyers that presented today are

10       going to be entitled to the

11       substantial sums of money they're

12       entitled to.  It's going to be

13       said, well, the allocation

14       committee took care of itself.

15       We're going to have to be careful

16       about that, but this is what I

17       want to say, and some people have

18       said, I had a lot of fun.  But I

19       want to tell you something.  We

20       cannot continue to do more than

21       our share in the battleground in

22       Congress, in media, pro bono work

23       that we do and taking on the

24       Philistines time after time after

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          time.  David's only got three

2          rocks in the sling.  And unless

3          the lawyers at this table are

4          fully and fairly compensated, it

5          sends not just a signal to us, but

6          to every other plaintiff lawyer

7          who is willing to take the risk.

8          That's what's lost sight of here.

9          We took the risk, and we're going

10         to take the risk, and we're going

11         to take the criticism.  So,

12         whoever makes this ultimate

13         decision, the judge, Special

14         Master, the Fifth Circuit, the

15         U.S. Supreme Court, folks have got

16         to realize that when you take on a

17         major, major litigation that

18         benefits society, we're not going

19         to get paid what somebody that

20         makes a movie for gets paid, we're

21         not going to get paid $4 million a

22         year for sitting on a bench for

23         some basketball team, we're not

24         going to get paid a $20 million or

FAC Resp. Amended Exhibit D -- 284

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

```
 1          $50 million parachute for helping
 2          to fail some major corporation in
 3          a year.  We're not going to get
 4          accolades from the Wall Street
 5          Journal.  We are going to get
 6          blamed for the economic downturn
 7          and all the other ills of society,
 8          but we're willing to keep
 9          fighting.
10              I'll tell you, I've got
11          about four more years hopefully of
12          actively trying cases.  I hope I'm
13          trying them with you, because I've
14          learned a lot.  I value your
15          friendship.  I'm going to fight
16          like hell for eight percent,
17          because I will tell you, if we
18          don't get eight percent, we will
19          not be fairly compensated at all.
20              It's very difficult when
21          you've got a lot of people
22          claiming work product that you
23          know didn't contribute one iota
24          and still maintaining
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          relationships at the bar.  We've

2          got to fight some feeling amongst

3          some members of the judiciary that

4          have never tried a major case

5          ever, who have never taken a risk,

6          who think that we're overpaid but

7          don't understand that when you put

8          $6 million into a case and three

9          years of your life and your

10         marriage breaks up because of it,

11         that you have made sacrifices.  Or

12         in this case when you've got tens

13         of millions of dollars, you've got

14         your whole firm fighting against

15         folks that have created a health

16         problem that's pervasive for

17         elderly people.  I mean, what kind

18         of society is it that permits a

19         corrupt FDA, a corrupt sales

20         force, a corrupt media to target

21         people over the age of 45 who are

22         already suffering health problems.

23              So, what we have done,

24         irrespective of the pay, is

FAC Resp. Amended Exhibit D -- 286

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1        extraordinarily important; but at

2        the same time, we deserve to get

3        paid and paid well.  And nobody

4        should be embarrassed about that,

5        unless you are ready to retire,

6        and I don't think any of us are.

7            MR. LEVIN:  Not even me.

8            MR. SEEGER:  One thing

9        before we're all ready to run out.

10       I mean this seriously, like I'm

11       talking to brothers.  We really

12       have stuck together.  We have been

13       divided at times but not for long.

14       Let's not let any nonmaterial

15       difference divide us at this

16       point.  Let's stick together and

17       get this done.

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

```
 1              C E R T I F I C A T E.
 2              I, LINDA L. GOLKOW, a Notary
     Public and Certified Court Reporter of
 3   the State of New Jersey, Registered
     Diplomate Reporter, Federally-Approved by
 4   the United States District Court of
     Pennsylvania, do hereby certify that the
 5   foregoing is a correct transcript of the
     testimony as taken stenographically by
 6   and before me at the time, place and on
     the date hereinbefore set forth.
 7
 8
 9              I DO FURTHER CERTIFY that I
     am neither a relative nor employee nor
10   attorney nor counsel of any of the
     parties to this action, and that I am
11   neither a relative nor employee of such
     attorney or counsel, and that I am not
12   financially interested in the action.
13
14
15
16
     _____
17          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147
18          Notary Expiration:  1.2.10
            CCR Number:  30X100176200
19
20
21
22
23
24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
JANUARY 23, 2009
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
NEW YORK, NEW YORK
- - -
FIRM:  BLIZZARD McCARTHY & NABERS, LLP
       Edward F. Blizzard, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Amended Exhibit D -- 289

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. BLIZZARD:  Russ talked

 3         about some of the disagreements

 4         that sometimes we had.  If we had

 5         disagreements, we had respectful

 6         disagreements.

 7              I agree with much of what

 8         has been said this morning.  Russ

 9         eloquently described this morning

10         the trial practice, and I'm a

11         trial attorney and proud of it,

12         have been one for 31 years, and

13         also know the problems of dealing

14         with mass tort practice.  I'm not

15         somebody who is prone to

16         exaggeration, and I don't think it

17         exaggerates to describe the mass

18         tort practice from the plaintiff

19         side as being harder than herding

20         cats.  I would just like to say

21         that Russ had the responsibility,

22         the ultimate responsibility of

23         herding the cats.

24              I saw the other day in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        courtroom where there were 961
 2        different firms who have submitted
 3        cases to the settlement.  We know
 4        on the other side that they have
 5        giant law firms that are well
 6        coordinated, and they have massive
 7        amounts of resources that they can
 8        devote to the effort.  And to take
 9        the 961 threads and weave a
10        beautiful mosaic is very
11        difficult.  That got done here,
12        and it only got done because it
13        was a team effort.  It wouldn't
14        have gotten done if it was one of
15        our firms, because even when you
16        have a big plaintiff firm, it is a
17        small firm when it compares to the
18        defense firms.  So, it was a real
19        challenge to make this a team
20        effort.
21             I want to kind of share with
22        you an e-mail that I wrote.  We
23        had responses back to it from
24        everybody really on our
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        negotiating team, but I'm only
 2        going to read one response that
 3        Arnold sent back.
 4             This was on Saturday after
 5        the announcement of the
 6        settlement, I wrote to everyone,
 7        "Having just now fought my way out
 8        of the sleepless fog, I just
 9        wanted to say that it has been a
10        pleasure working with this team.
11        We have struck an excellent deal.
12        Now we have to close it.  I am
13        looking forward to working with
14        you guys to accomplish that,
15        because there are many a slip
16        between the cup and lip.  I think
17        we should talk soon about our
18        strategy going forward, Monday
19        morning at the latest.  Let me
20        know."
21             Then Arnold wrote in
22        response, "Youse guys were the
23        best and brightest group I ever
24        worked with."  And really, that
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1       expresses my feelings about this

 2       as well.

 3            In addition to the six of us

 4       who were on that negotiating team,

 5       we had three other people who have

 6       been added to this fee committee.

 7       Those were obvious choices, people

 8       that I've worked with before and

 9       who I had great respect with.

10       When we talked about who we should

11       add, it was clear who needed to be

12       added to this fee allocation

13       process to make sure that we had

14       on the fee team the people who

15       really advanced the litigation.  I

16       think that that was done.

17            I also want to say, before I

18       get started talking about myself,

19       which is also something that

20       doesn't really come natural to me,

21       that I want to agree with Tom,

22       that money is really not the

23       object here.  I think Russ said

24       that his dad taught him that this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          isn't a business, that it's a

2          profession.  I feel proud that I'm

3          working with professionals here.

4               Don Bowen was a great trial

5          attorney in Houston, did a lot of

6          FELA work.  He started working on

7          fen-phen.  It was the first mass

8          tort he ever got involved in.  He

9          told us that it was the best

10         experience he ever had as a trial

11         attorney, because he got to work

12         with great lawyers, other

13         plaintiffs' lawyers, that before

14         he worked on mass torts, it was

15         just him against the other side.

16         You didn't collaborate with

17         anybody else.  But Don learned

18         what a joy it is to work with

19         other great plaintiff attorneys.

20         Sadly, he passed away from

21         pancreatic cancer during the time

22         that we were still engaged in the

23         fen-phen litigation.  Even after

24         he got sick, he said that he never

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1       regretted spending that time

 2       working up that case, because,

 3       again, he got to work with great

 4       lawyers and his own partners in

 5       his firm that he had really not

 6       worked closely with on cases.

 7            So, I just want to say at

 8       the outset that we're making these

 9       presentations here today about our

10       common benefit work, but I know

11       each and every person in this room

12       is more concerned about their

13       professionalism, their integrity,

14       their clients than they are about

15       the money.  That's what makes me

16       really so proud to work with this

17       group.

18            As I said, I've been a trial

19       attorney for 31 years.  I

20       graduated from Baylor Law School.

21       My classmate was John Eddie

22       Williams.

23            I went to Fulbright &

24       Jaworski straight out of law

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1       school, where Mark also practiced

2       for a period of time.  John Eddie

3       was there at Fulbright & Jaworski

4       with me.

5            We left together three years

6       later and formed a firm.  We

7       practiced together for some time.

8       We eventually split but remained

9       friends.

10            I've had my own practice

11       since 1984.  I've been doing mass

12       tort work for over 25 years.  I've

13       been doing exclusively

14       pharmaceutical and medical device

15       work for now over 20 years.  I've

16       been involved in most of the major

17       cases from breast implants through

18       Sulzer Hip implant litigation and

19       fen-phen, to name just a few.

20            I was one of the principal

21       negotiators, one out of four of us

22       who negotiated the Dow Corning/Dow

23       Chemical breast implant settlement

24       of $3.8 billion.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1              I was also involved in the

 2        Sulzer Hip implant negotiation.  I

 3        was one of six people there who

 4        negotiated a $1.2 billion

 5        settlement.  BrownGreer happened

 6        to be the claims administrator on

 7        that settlement, and it was the

 8        first time that I had met them,

 9        and I was very impressed with

10        their work and continue to be even

11        more impressed now that they are

12        the Vioxx claims administrator.

13              I was the principal,

14        essentially the only negotiator of

15        an inventory settlement of over

16        6,500 fen-phen cases, the round

17        two settlement, really on behalf

18        of a joint venture that included

19        first Williams Bailey, then named

20        Williams Kherkher, and our firm.

21        So, I have had a lot of experience

22        in negotiating big settlements,

23        and I think that really helped in

24        bringing this settlement to at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1      least its written conclusion.

2              I was on the PSC in Texas

3      when it was formed for Vioxx.

4      This just kills us Texans.  From

5      the perspective of advancing the

6      litigation, I think the Texas

7      litigation was behind, other than

8      Mark's effort obviously in Ernst,

9      but the Texas litigation itself

10     was behind New Jersey and was

11     behind the MDL.  But I think that

12     the work effort there and in

13     Houston was significant, but I'm

14     not really claiming a common

15     benefit contribution for the work

16     that I did in the PSC in Houston.

17             My common benefit effort

18     really began with the selection of

19     my Mason case for trial.  During

20     the 18 months before the selection

21     of Mason for trial in February of

22     2006, I had tried three fen-phen

23     cases to verdict and one Ephedra

24     case to verdict.  So, I had been

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1       engaged in other things in 2005

2       and 2004 and was not really

3       full-time engaged in Vioxx until

4       the Mason case was selected for

5       trial.

6            We all know that in these

7       cases, when these cases are

8       selected for trial, there's a

9       monumental effort that goes into

10      it.  I have a small firm.  There

11      are five lawyers, three partners

12      and two associates.  It fully

13      occupied my firm for ten months.

14      Let me get the actual numbers

15      here.  We consulted 25 different

16      experts in order to decide which

17      experts we were going to call in

18      the Mason case.  We took 10 expert

19      depositions.  We had 20 meetings

20      with case-specific witnesses and

21      experts.  We actually took 14

22      case-specific depositions.  All of

23      these depositions, all of these

24      meetings were conducted by a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1         partner in the firm, one of the

 2         three partners.  These were not

 3         things that were delegated to

 4         associates.

 5              We did delegate one of our

 6         associates to attend the two

 7         trials that occurred in the MDL in

 8         Judge Fallon's court that preceded

 9         ours, the Barnett case and the

10         Smith case.

11              We hired a jury consultant

12         who had not had previous

13         experience with Vioxx but had

14         worked with us on other cases.

15         So, we had to get the jury

16         consultant up to speed.  A lot of

17         people who don't really know our

18         business think that when you hire

19         a jury consultant, they do the

20         work.

21              MR. SEEGER:  They make more

22         work.

23              MR. BLIZZARD:  And the good

24         ones want to be completely brought

FAC Resp. Amended Exhibit D -- 300

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        up to speed, and it forces you to

2        learn the case.  So, we spent an

3        enormous amount of time working

4        with our jury consultant, looking

5        at the jury pool in the New

6        Orleans area, and also conducting

7        the focus group research.

8              We had the usual mountain of

9        paper to deal with.  We filed

10       seven Daubert motions.  We

11       responded to ten Daubert motions.

12       We filed ten motions in limine,

13       responded to eight motions in

14       limine.

15             Then there were the depo

16       cuts.  A lot of people had already

17       done depo cuts in this litigation.

18       A lot of groundwork had already

19       been plowed, but we wanted to see

20       if we could make it better.  We

21       knew that the Curfman deposition

22       as played had put people to sleep.

23       We tried to recut it.  We knew the

24       Graham deposition had some issues,

FAC Resp. Amended Exhibit D -- 301

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        and so we tried to recut that.

2        There's an enormous amount of

3        work, as we all know, in trying to

4        cut and recut these depositions to

5        get them right so it doesn't put

6        the jury to sleep.  Again, that

7        was work that was not delegated to

8        other people.  That was work done

9        by myself and my partners.

10            Exhibit lists.

11            Endless meetings with Merck

12        regarding the depo cuts.

13            We didn't have the benefit

14        of the DecisionQuest cuts or some

15        of the cuts that had already been

16        done on video, so, we had to

17        recreate the video.

18            And as you know, the way

19        Judge Fallon required it, you had

20        to have an agreement about when

21        the exhibit would come up and how

22        long it would stay on the screen,

23        and so we had endless meetings

24        with Merck over those kinds of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        questions.

 2              The trial itself involved

 3        our entire firm of five attorneys

 4        and six paralegals.  We came to

 5        New Orleans on October 26.  The

 6        trial started on October 30, and

 7        it ended on November 16.  All of

 8        us know the enormous costs of the

 9        trial, but I'll just list them.

10              There's the actual hard

11        costs, which in our case was over

12        $600,000 for that trial.

13              There's the cost of not

14        doing anything else during that

15        time period.  We all know that as

16        trial lawyers that when you are in

17        trial, you are focused only on the

18        trial, you are not focused on any

19        other business or getting any

20        other business.  It fully consumed

21        our firm.  So, we didn't get

22        business that we would otherwise

23        get during that ten months.

24              And then you know the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        personal cost.  As much fun as I

2        have trying cases, I don't get

3        much sleep when I try a case, and

4        there's a lot of stress.  What

5        questions to ask, what not to ask,

6        what witnesses to put on the

7        stand, what witnesses not to put

8        on the stand.  And I'm a firm

9        believer that what questions you

10       don't ask are just as important as

11       the ones that you do.

12            So, those are things that

13       were the cost of doing this trial,

14       and it wasn't as if we were

15       inexperienced at it.  We had done

16       it many times before.  So, I

17       thought we brought a level of

18       experience and skill to the

19       courtroom that had been developed

20       over a number of years through a

21       lot of painful experiences

22       sometimes.

23            I'm not proud of the result

24       we had in the Mason trial, but I'm

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        proud of the effort.  I'm a

2        believer in the adage that if you

3        are winning all of your cases, you

4        are not trying enough cases, and

5        you are settling too cheap.

6             So, we lost.  I'm sorry that

7        we lost, and there are excuses

8        that can be made, but I don't care

9        to make any excuses on the record.

10            Following the Mason trial,

11       shortly following the Mason trial,

12       I was privileged to be selected by

13       Judge Fallon as one of the six

14       people to try to negotiate a

15       settlement with Merck.  I've

16       already read the e-mail to you

17       about what I think about that

18       experience, but I want to share

19       with you just a few stories and

20       perspectives so that those who

21       weren't there understand what that

22       was like.

23            First let me say that I

24       agree wholeheartedly with Tom,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1    that everybody brought something

2    different to the table in this

3    room.  That was really true of our

4    negotiating team.  I actually

5    pride myself as somebody who has a

6    very good handle on the overall

7    settlement strategy and also knows

8    details.  There are some people

9    who are hilltop people and some

10   people who are valley people.  I

11   think I'm, I won't say rare, but

12   I'll say an unusual person who can

13   cover both the hilltops and the

14   valleys.  That really was

15   something that I devoted myself to

16   in these settlement negotiations.

17        The negotiations began in

18   December of 2006 and continued

19   until the settlement was concluded

20   on November 9th.  As Russ has

21   indicated, there were over 50

22   in-person meetings and over 100

23   phone conferences.

24        But for the first few

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1       months, we talked only about how

2       we could close the doors for

3       Merck.  When they finally proposed

4       a structure to us, a grid and a

5       program, you guys may remember

6       that we almost walked out, because

7       the structure had a large number

8       of people getting nothing.  They

9       would come in through the gates,

10      they would be trapped and couldn't

11      exit the program, but they would

12      get zero.  Merck's position was,

13      that's what happened in the real

14      world of trials, and that should

15      be reflected in the settlement.

16      We were so angry about that

17      because a settlement is a

18      settlement, it is not a trial.  We

19      knew that we couldn't sell this

20      program to ourselves, much less to

21      other people, if large numbers of

22      people were going to be getting

23      zero.

24             So, we had this meeting in

FAC Resp. Amended Exhibit D -- 307

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1        Arnold's office in Philadelphia.

 2        We were angry, and we were going

 3        to walk out.  I remember Tom had a

 4        few choice descriptions of Merck.

 5        So, we really eventually, our

 6        cooler heads prevailed, and we

 7        decided that the way we would

 8        handle it is -- and this really

 9        took a lot of sacrifice.  Because

10        everybody during settlement

11        negotiations, if you're on a team,

12        you want to be in the room.  You

13        don't want to be left out.  But

14        the people on our team said Andy

15        and I should go talk to them about

16        the risk factors and just continue

17        that discussion and see if we

18        could make the ball move.  I give

19        real credit to the four people

20        that said it is okay, I don't have

21        to be in the room.  That was a

22        bigger sacrifice than Andy and my

23        sacrifice of going and talking to

24        them.  But it was over a period of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1      time, that really did advance the

2      ball, and ultimately we were able

3      to convince them that if people

4      came through the gates, they would

5      have to get something.

6           Now, we were able to

7      describe a group of cases that

8      really nobody would ever want to

9      try that really did get very

10     little, the special marker cases.

11     That satisfied Merck's need,

12     because they wanted some group of

13     cases that would be cases that

14     wouldn't get very much, and it

15     turns out that it is a very low

16     percentage.  But I think it was

17     the group's ingenuity and sticking

18     with it that caused us to get over

19     that hurdle.

20          Then there was the

21     negotiation over the number.  That

22     didn't come until later.  Then at

23     the end, the strokes got really

24     thrown into the mix.  That threw

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1        us all for a loop, but it was a
 2        good loop to be thrown for.  The
 3        way we arrived at the number was
 4        not something that could have been
 5        done by people who were
 6        inexperienced or people who
 7        weren't experienced in Vioxx
 8        litigation.  This settlement had
 9        to be negotiated by people who
10        knew about negotiations, who knew
11        about Vioxx litigation, and who
12        knew about the medicines in the
13        Vioxx litigation.  Because unlike
14        Merck, we didn't have a bunch of
15        consultants that came in and
16        looked at risk factors and told us
17        about risk factors.  We read it
18        ourselves.  We had people on the
19        team who knew it.  So, that was, I
20        thought -- I guess the way I would
21        sum it up is don't try this
22        yourself at home.  This was
23        something that could only have
24        been accomplished by experienced
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

 1     mass tort pharmaceutical

 2     litigators who also had experience

 3     in negotiations.

 4          After we arrived at the

 5     number, then we had to paper the

 6     deal.  That was no easy task.

 7     Ultimately, that was being

 8     captained by Andy in Montgomery.

 9     That's the way it started out.

10          Then we had a target date of

11     November 9, a status conference to

12     announce the settlement, because

13     we had the number.  But there were

14     large parts of the structure that

15     were still not in place, and a lot

16     of the documents had not yet been

17     done.  So, there wasn't much

18     progress being made.  Judge Fallon

19     ordered us to come to New Orleans

20     to finish it.

21          The deal had a 90% trigger.

22     So, we had to sell it to 90% of

23     the people.  So, we knew that the

24     documents had to be clear and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          actually had to show how

2          attractive this deal was.  And

3          because we were not getting any

4          interest on the money, we knew

5          that the money had to be paid out

6          quickly.  So we had pushed for

7          very tight deadlines on the

8          settlement, because we've all seen

9          settlements in the past where it

10         looks good on the front end, but

11         then the money never comes out in

12         a timely fashion. So, we wanted to

13         create a settlement that not only

14         was the top number good and the

15         individual numbers good, but it

16         would get paid to the client

17         quickly.  We knew from our

18         experience that that would sell

19         this deal better than anything,

20         not only fair numbers to the

21         clients, but quick payments to the

22         clients and interim payments to

23         the clients.

24              We literally stayed up

FAC Resp. Amended Exhibit D -- 312

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1        around the clock when we got to

2        New Orleans to close this deal.

3        To give sort of one example of the

4        kind of detailed doggedness that

5        resulted in the kind of deal that

6        we have, November 8th, maybe

7        before midnight, but certainly

8        close to midnight, Merck began a

9        concerted effort to move one of

10       the deadlines, the claims filing

11       deadline, by three months.  They

12       also inserted a provision in there

13       that the final payment could not

14       be paid until the EIF was

15       evaluated and paid out.  So, all

16       the EIF claims would have to be

17       evaluated before they paid the

18       final payment, and also they

19       wanted to push the claims filing

20       deadline out three months.  Well,

21       because the final payment cannot

22       be made until all the points are

23       known and every claim evaluated,

24       those two provisions would

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1       potentially have cost us more than

2       $10 million a month in interest.

3       They were insistent that they

4       wanted those.  We absolutely stood

5       by our position that we were not

6       moving it.  That happened from

7       around midnight through 2:00 a.m.

8       in the morning.  It was only

9       because we stood by our guns and

10      didn't let them push us around

11      that I think we now have

12      essentially saved that --

13          MR. LEVIN:  One other thing,

14      Ed.  Russ and I fell asleep.

15          MR. BLIZZARD:  Well, you

16      guys were team leaders on this

17      program, and I do believe, Arnold,

18      as I've said in this e-mail, it

19      was a total team effort.  The deal

20      wasn't done on November 9.  I

21      mean, the paper was there, but we

22      still had to educate people about

23      the settlement, because,

24      unfortunately, the way this was

FAC Resp. Amended Exhibit D -- 314

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1          written, this was written by a

 2          transaction lawyer in New York and

 3          nobody could understand it.  As a

 4          matter of fact, they inserted a

 5          provision the night that we closed

 6          this deal that said "the earlier

 7          of, the later of."  There was some

 8          deadline that they described as

 9          "the earlier of, the later of."  I

10          read it over and over, what does

11          this mean, "the earlier of, the

12          later of," because I'm a dummy and

13          it took a while to sink in that it

14          really was just the earlier of.

15          It made me so angry, I got up, and

16          I was going to go in their room

17          with their client present and

18          embarrass them, I was so mad about

19          it.  Andy, who is usually the one

20          to get angry, stopped me.

21               So, we had to educate people

22          about what the settlement really

23          said.  We did that with these

24          meetings where we went around from
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1        city to city and educated people.

2        We did it with private meetings,

3        as Tom has described.

4             You know a lot of the Texans

5        are mavericks.  John McCain is not

6        a maverick compared to Texas trial

7        lawyers.  So a lot of them were

8        skeptical of a global deal.  They

9        wanted to cut their own inventory

10       deals.  So we had to sell them on

11       it.  One of the concerns that they

12       raised was the ethics of the 100

13       percent recommendation rule that

14       was in this settlement.  And we

15       had to fight that battle, convince

16       them, negotiate with them over

17       that issue.  So, that was a work

18       effort.

19            And then since then, we've

20       had the gates committee work,

21       which is a massive undertaking.

22       We're now committed to 4,000 a

23       month in order to get this deal

24       done on time and get the final

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          payment out.  There's a liaison

2          committee that I'm on, and that

3          liaison committee has a weekly

4          call.  These are mind-numbing

5          details of claims administration

6          that are discussed on these

7          liaison calls.  But they are

8          extremely important, because they

9          decide who gets paid and when they

10         get paid.  That's what our clients

11         really are concerned about, am I

12         going to get paid and when am I

13         going to get paid.  Those claims

14         administration liaison calls are

15         about that.

16              So, I really want to finish

17         where I started, and that's with

18         the e-mail.  I said in the e-mail

19         that we need to close the deal.  I

20         appreciate the effort, but we

21         still need to close the deal.  We

22         need to get the money that Merck

23         has into our clients' pockets,

24         because, as I said, there's many a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1        slip between the cup and lip, and

 2        I don't want to have some drink

 3        all down my shirt.  I want to get

 4        this out.  I'm committed to it.

 5        I've been committed to it from the

 6        time I got involved in doing

 7        common benefit work, and I'm going

 8        to see this to conclusion.

 9            I want to say a special word

10        about working with Andy on the

11        settlement negotiations.  I say

12        that everybody contributed to the

13        programs of the settlement

14        discussions.  Everybody had their

15        role.  And they did.  Everybody

16        contributed significantly.  Andy,

17        though, he was our pusher.  He was

18        somebody who was constantly

19        pushing us to be tough on

20        ourselves about the details of the

21        settlement, about the timing of

22        the payments, about getting Merck

23        to finally talk to us about money.

24        Sometimes he would raise the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          uncomfortable issues that we

2          didn't want to talk about.  So, I

3          just want to say that it's been a

4          pleasure working with Andy,

5          working with all of you.

6                  I want to, I guess,

7          reiterate what Tom said.  I've

8          been friends with some of you for

9          a long time, and with Arnold --

10                 MR. LEVIN:  It is a rebirth.

11         Mark, I'm born again now.

12                 MR. BLIZZARD:  Some of you

13         are new friends.

14                 MR. SEEGER:  Or renewed.

15                 MR. BLIZZARD:  That's been

16         the most gratifying part of the

17         entire experience, is making the

18         friends.  Thank you.

19                      -   -   -

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1              C E R T I F I C A T E

 2

                I, LINDA L. GOLKOW, a Notary
 3   Public and Certified Court Reporter of
     the State of New Jersey, Registered
 4   Diplomate Reporter, Federally-Approved by
     the United States District Court of
 5   Pennsylvania, do hereby certify that the
     foregoing is a correct transcript of the
 6   testimony as taken stenographically by
     and before me at the time, place and on
 7   the date hereinbefore set forth.

 8

 9              I DO FURTHER CERTIFY that I
     am neither a relative nor employee nor
10   attorney nor counsel of any of the
     parties to this action, and that I am
11   neither a relative nor employee of such
     attorney or counsel, and that I am not
12   financially interested in the action.

13

14

15

16

17

18   _____
             Linda L. Golkow, RDR, CRR, CCR
19           Notary Number:  1060147
             Notary Expiration:  1.2.10
20           CCR Number:  30X100176200

21

22

23

24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -

FIRM:   BROWN & CROUPPEN
        Seth Webb, Esquire

        THE DRISCOLL FIRM, P.C.
        John Driscoll, Esquire
ON BEHALF OF BROWN & CROUPPEN:
        GOFFSTEIN, RASKAS, POMERANTZ,
        KRAUS & SHERMAN, L.L.C.
        Edward L. Adelman, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -
 2              MR. SEEGER:  This is part of
 3        the majority of the fee committee
 4        that's been appointed by Judge
 5        Fallon in the Vioxx litigation.
 6        We've been charged with the task
 7        of really kind of going through
 8        what everybody did and at some
 9        point, I guess, talk to the judge
10        about where people are.
11              He wants a record of
12        everything that goes on, so, we
13        have a court reporter here so
14        everything is taken down.  You can
15        make any presentation you want.
16        You have 30 minutes.
17              MR. DRISCOLL:  At the
18        outset --
19              MR. ADELMAN:  Before Mr.
20        Driscoll speaks, I know I sent
21        correspondence to the committee,
22        to Mr. Herman's office.  My name
23        is Edward Adelman, and I represent
24        Brown & Crouppen, the law firm
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           that prosecuted the Schwaller

2           case, which is before the

3           committee today.  It is our

4           position that Mr. Driscoll, who is

5           a former associate of Brown &

6           Crouppen, should not be making a

7           presentation to this committee.

8           He was an employee of Brown &

9           Crouppen at that time and an

10          associate.  All the work and

11          effort he did was on behalf of the

12          law firm.  Any dispute he might

13          have with Brown & Crouppen

14          regarding any fee he might be

15          entitled to as a result of any

16          common benefit allocation that's

17          given to Brown & Crouppen should

18          remain in-house, and we

19          respectfully ask the committee

20          that Mr. Driscoll not be allowed

21          to make a statement.  He was

22          involved in the Vioxx matter, and

23          his contributions were much

24          appreciated, but since he's no

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          longer employed at Brown &

 2          Crouppen, I don't believe it is

 3          proper for the committee to hear

 4          it.

 5               MR. SEEGER:  Why don't we

 6          make the record, and you guys have

 7          plenty of time to fight this out.

 8          The checks are not going out the

 9          door.

10               MR. LEVIN:  From my

11          perspective, we're going to hear

12          everybody that has something to

13          say.  If there's a partnership

14          dissolution, that's not within our

15          jurisdiction.  I'm not even sure

16          that's within Judge Fallon's

17          jurisdiction.  That you will

18          attend to on your own, as all of

19          us have attended to, that have

20          been fortunate or unfortunate

21          enough to be involved with

22          dissolved partnerships.

23               MR. SEEGER:  Seth, just so

24          I'm clear with the players.  I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          have you.  You're representing the

 2          firm, correct?

 3               MR. WEBB:  I work for Brown

 4          & Crouppen and I'm here.

 5               MR. SEEGER:  I just want to

 6          know who is going to address us on

 7          this issue.

 8               MR. WEBB:  Sure.  With

 9          regard to the work on the

10          Schwaller matter --

11               MR. LEVIN:  What we're

12          interested in is the work.  We're

13          not interested in how you

14          developed your --

15               MR. SEEGER:  Exactly right.

16          Your information is helpful to us

17          no matter what --

18               MR. ADELMAN:  I'm saying

19          that any statement from Mr.

20          Driscoll does not represent

21          anything of the law firm since

22          he's a former employee.

23               MR. BLIZZARD:  Let me see if

24          I understand it.  Has Brown &
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        Crouppen made the application or
2        is it Mr. Driscoll that has made
3        the application?
4               MR. ADELMAN:  Brown &
5        Crouppen.  Mr. Driscoll was an
6        employee of Brown & Crouppen at
7        the time.
8               MR. BLIZZARD:  So, is Brown
9        & Crouppen saying that as the
10       applicant for common benefit fees
11       that they do not want a
12       presentation made today?
13              MR. ADELMAN:  No.  Mr. Webb
14       is going to make the presentation.
15              MR. SEEGER:  That wasn't
16       clear.  You are saying you do have
17       somebody from Brown & Crouppen to
18       make this presentation?
19              MR. ADELMAN:  Correct.
20       That's Mr. Webb.
21              MR. DRISCOLL:  Any time Mr.
22       Adelman is finished, I'll chime
23       in.
24              MR. SEEGER:  Go ahead, John.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          MR. DRISCOLL:  My name is

2     John Driscoll.  I'm now with the

3     recently formed Driscoll Firm PC,

4     an Illinois law firm --

5          MR. SEEGER:  John, can I

6     just say one thing.

7          Just so you understand, I

8     don't think there's anybody being

9     prejudiced by allowing anybody to

10    speak.  We had a group yesterday

11    of about 15 people make

12    presentations for one group.  So,

13    this is really just information

14    gathering for us.  I think we

15    would like to hear Mr. Driscoll

16    out, but you've got your comments

17    on the record.

18         MR. DRISCOLL:  Thank you for

19    that.

20         I was an associate of Brown

21    & Crouppen at the time that this

22    case was prosecuted.  Of course,

23    we're talking about the Schwaller

24    case.  It is the Illinois case

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        that was tried in Madison County

2        State Court.  I, along with a

3        number of other very fine lawyers,

4        prosecuted this case.  I think by

5        my last count, seven law firms

6        were involved.  I believe other

7        lawyers who were involved in that

8        case have made presentations

9        already.  The so-called Vioxx

10       Litigation Consortium was involved

11       in that case, Grant Kaiser, Mikal

12       Watts and others.  I'm

13       forgetting --

14            MR. WEITZ:  John, let me

15       say, the Schwaller case was a

16       Brown & Crouppen case?

17            MR. DRISCOLL:  Well, that's

18       not actually accurate, and quite

19       technically, and I'm sure we'll

20       fight this out in state court.  As

21       you see, breaking up is hard to

22       do.

23            MR. LEVIN:  Sometimes it is

24       very enjoyable.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1                MR. DRISCOLL:  This case,

2           this client was actually referred

3           to me.  This is my case.  I

4           brought it in to Brown & Crouppen.

5           Brown & Crouppen has internally

6           what they call an associate's

7           agreement where you share in the

8           fees for any case that you

9           generate.  This is just one of

10          those cases.  In fact, there's

11          documents, some of which I have

12          with me today, and those that the

13          client signed off on.

14               MR. LEVIN:  We're not

15          interested in who represents the

16          client.  We're just interested

17          collectively in the work that was

18          done by you at the firm, other

19          members of the firm, you outside

20          of the firm, just that.

21               MR. DRISCOLL:  You've got

22          it.

23               MR. WEITZ:  I didn't know

24          who filed the Schwaller case, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1              that's what I was trying to find

2              out.

3                   MR. SEEGER:  Brown &

4              Crouppen is on the complaint.

5                   MR. DRISCOLL:  That's right.

6              I filed it while an associate at

7              Brown & Crouppen.  It was filed in

8              Madison County, Illinois.  It was

9              removed improperly and remanded.

10             In fact, Judge Murphy at the time,

11             our chief federal judge,

12             sanctioned Merck for the

13             improvident removal.

14             Unfortunately, those sanctions

15             were withdrawn in light of a

16             United States Supreme Court case

17             on 1447(C).  So, we didn't get our

18             money from Merck there.  The case

19             was remanded and tried for six

20             weeks.

21                   MR. SEEGER:  Talk to us now

22             about what you specifically did

23             and your contribution on that

24             case, and then I'm going to allow

FAC Resp. Amended Exhibit D -- 330

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        Seth to speak for Brown &
 2        Crouppen.
 3            MR. DRISCOLL:  Absolutely.
 4        Well, while I was an associate at
 5        Brown & Crouppen, I was really the
 6        singular attorney involved in the
 7        case until a jury was actually
 8        seated.  I did everything from
 9        draft the complaint, filed the
10        complaint.  I was the singular
11        attorney involved in the
12        removal/remand process.  In fact,
13        I submitted my -- as I mentioned,
14        Judge Murphy granted sanctions
15        against Merck.  In that process, I
16        was required to submit the hours
17        and the work involved at least to
18        that point in the case so that
19        Judge Murphy could properly
20        calculate the sanctions involved.
21            I did everything from engage
22        in motion practice, drafted every
23        motion, every response.  I went to
24        nearly every deposition in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1        case of every expert.  As I
 2        said --
 3             MR. SEEGER:  Did you take
 4        first or second chair in any of
 5        these depositions?
 6             MR. DRISCOLL:  First chair.
 7        Nathan Rubin, he's a cardiologist
 8        from here in Beverly Hills.  We
 9        didn't end up using him at trial.
10        He's a cardiologist.  Second
11        chaired a lot of other depos.  I'm
12        sorry.  I'm not completely
13        prepared on each witness blow by
14        blow right now.
15             MR. WEITZ:  Is it in your
16        affidavit?
17             MR. DRISCOLL:  It is.
18             MR. SEEGER:  What did you do
19        with the trial team?  That was
20        Mike Watts and Andy, right, Andy
21        Birchfield?
22             MR. DRISCOLL:  Yes.  I sat
23        with them.  I did the plaintiff
24        himself.  It was actually the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          widower of the decedent.

2                    MR. SEEGER:  You put him on

3          at trial?

4                    MR. DRISCOLL:  I put him on.

5                    MR. WEITZ:  Was the trial

6          while you were still an associate

7          Brown & Crouppen?

8                    MR. DRISCOLL:  Correct.

9                    MR. SEEGER:  Is it okay if

10         we hear from Seth?

11                   MR. DRISCOLL:  Absolutely.

12                   MR. SEEGER:  The floor is

13         yours.

14                   MR. WEBB:  Well, obviously,

15         not to get into the other

16         argument, but everything that John

17         just discussed I consider to be

18         what Brown & Crouppen did in this

19         case because that's what we did.

20         I also sat second chair at several

21         expert depositions, several sales

22         rep depositions, prepped

23         plaintiffs for multiple

24         depositions.  We did pretty much

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          all the local work on this case

2          because it was in our backyard.

3              MR. WEITZ:  Can you state

4          your name again for the record?

5              MR. WEBB:  Seth Webb.

6              MR. BLIZZARD:  You said

7          plaintiffs.  Were there multiple

8          plaintiffs?

9              MR. WEBB:  Children,

10         decedent.

11             MR. LEVIN:  Collectively,

12         you have reported 780 hours, and

13         at one point they were rejected.

14         Now they are being reviewed by the

15         accountant.  Have you had dealings

16         with the accounting firm?

17             MR. WEBB:  Were they

18         rejected because of the format?

19             MR. LEVIN:  They may have

20         been.

21             MR. GIRARDI:  We don't know.

22             MR. WEBB:  Because we

23         submitted them originally not

24         monthly, and then we submitted

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          them monthly.

2              MR. LEVIN:  That's right.

3          Now they are under review, so you

4          should know that.

5              MR. WEBB:  Okay.  As long as

6          they are being reviewed.

7              MR. SEEGER:  Of the 780

8          hours, do you guys know how it

9          breaks down, individual attorneys?

10             MR. DRISCOLL:  Off the top

11         of my head, I don't, but a lot of

12         that is paralegal time, and as

13         Seth mentioned, Seth performed

14         some work on the case as well as

15         I.  There's two lawyers.

16             MR. WEBB:  I have it broken

17         down between attorney and

18         paralegal.

19             MR. LEVIN:  I take it you

20         guys are not going to lunch today?

21             MR. DRISCOLL:  We had dinner

22         last night though.

23             MR. WEBB:  The attorney time

24         is 694 hours and one half,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          actually.  And the paralegal time

2          is 86 hours and a quarter.

3               MR. SEEGER:  Okay.

4               MR. WEBB:  I don't have it

5          broken down by attorney either.

6               MR. SEEGER:  We're not here

7          to resolve any issues between you

8          guys.

9               MR. WEBB:  Obviously.

10               MR. LEVIN: Although we

11          collectively have a lot of

12          experience.

13               MR. SEEGER:  I don't have

14          any questions.

15               MR. WEITZ:  I just have a

16          couple more questions.

17               How many cases did Brown &

18          Crouppen file?

19               MR. WEBB:  Approximately

20          450.

21               MR. WEITZ:  Where did you

22          file those, all Madison County?

23               MR. WEBB:  No.  Some were in

24          St. Louis City, some in Madison

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1          County, some in St. Clair County.

 2                  MR. SEEGER:  All in state

 3          court or both?

 4                  MR. WEBB:  I believe that

 5          they were all filed in state

 6          court.  Now, the majority of them

 7          got removed --

 8                  MR. WEITZ:  Did you have any

 9          other cases in any of those

10          jurisdictions that were assigned

11          for trial?

12                  MR. WEBB:  I don't believe

13          so.  Not Vioxx cases.  I think

14          this was the only Vioxx case that

15          actually got assigned for trial in

16          maybe the Midwest, definitely

17          Madison County.

18                  MR. SEEGER:  As far as I

19          know.

20                  MR. WEITZ:  Did you have any

21          cases in any of those

22          jurisdictions that were being

23          worked up for trial and prepped

24          for trial by the judge on a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          specific docket in a specific

2          group?

3               MR. SEEGER:  Were you set

4          for trial?  Did you have any trial

5          settings anywhere else?

6               MR. WEBB:  No.

7               MR. SEEGER:  Thank you, and

8          hope everything works out okay.

9                    -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1                 C E R T I F I C A T E

2

3                 I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13                 I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 339

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:  BURG SIMPSON ELDREDGE
       HERSH & JARDINE, PC
       Michael S. Burg, Esquire
       John M. Restaino, Jr., Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                      -  -  -

2                 MR. SEEGER: We've been going

3          around the country and having

4          meetings giving everyone the

5          opportunity not only to file an

6          affidavit, but to make any

7          statements they want about their

8          common benefit contributions.  You

9          should focus on common benefit,

10         obviously.

11              Everything that we discuss

12         is being taken down so there's a

13         record if Judge Fallon ever wants

14         to take a look at it, he will hear

15         what people have to say.

16              With that, there are no

17         other rules.  The floor is yours.

18                 MR. BURG:  Let me just say,

19         we appreciate this.  Having been

20         involved in doing this for a long

21         time, to have this procedure where

22         we can actually come in and talk

23         to you, we really appreciate the

24         opportunity to be here.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1             With that, John, why don't

 2        you go ahead and start with the

 3        PowerPoint.

 4             MR. RESTAINO:  Sure.  First,

 5        thank you for this opportunity.  I

 6        think those of you that have

 7        worked with me at least in the

 8        last 16 years know that it is not

 9        my nature to come and ask for

10        anything.  I usually show up and

11        try to give --

12             MR. LEVIN:  Change your ways

13        today.

14             MR. RESTAINO:  Today I have

15        to change my ways, correct.  I

16        think that I've been called humble

17        to a fault.  I have got to change

18        that way today also.

19             So, with that in mind, this

20        is a little awkward, in that I

21        need to come back here at noon as

22        a representative of the now

23        defunct Lopez Hodes Restaino

24        Milman & Skikos.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1              MR. SEEGER:  May I interrupt

2         you?  I don't want to put you in a

3         bad position, Mike, because I know

4         there's two firms, but does it

5         make sense for you to do in the

6         next 30 minutes both so you don't

7         have to come back?  Because we're

8         focusing on your contribution.

9              MR. BURG:  The only problem

10        is, Steve Skikos is not here, and

11        he's flying in this morning.

12        Otherwise, it would have made

13        sense.

14              MR. SEEGER:  Sorry, John.

15              MR. RESTAINO:  It would

16        have.

17              As an introduction in that

18        regard, I was a named partner of

19        Lopez Hodes.  I do have to talk a

20        little bit about that for those of

21        you who may not be still familiar.

22        In January of '05 when we went to

23        New York City for the introductory

24        meeting that Chris and Dave and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          others held and talked about the

 2          Vioxx litigation, at that time

 3          Chris and Dave Buchanan talked to

 4          me about co-chairing the science

 5          committee.  I have co-chaired the

 6          science committee going back to

 7          fen-phen, Propulsid, Rezulin,

 8          Zyprexa, PPA, initially Ortho

 9          Evra, co-chairing it now for NSF.

10          As a result of my medical

11          background, it is just a natural

12          role for me.  So I was asked if I

13          would work with a lady who I had

14          not met prior to that by the name

15          of Carlene Lewis.  I was told she

16          would be my co-chair, and shortly

17          thereafter, especially everyone

18          who has had a chance to know or

19          knew Carlene, you couldn't help

20          but fall in love with Carlene.

21          I'm assuming that there's

22          something being filed on her

23          behalf by somebody.

24              MR. SEEGER:  Her partner,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1          Shelly, gave us a presentation.
 2               MR. RESTAINO:  I just want
 3          to let you know, I don't think I
 4          have ever worked with a more
 5          quality lawyer, smart, hard
 6          working, than Carlene, and then,
 7          quite honestly, Shelly.
 8          Tremendous people.
 9               She and I co-chaired it, and
10          then Shelly and I co-chaired it,
11          and I facetiously say, and today
12          is not the day for me to say this,
13          but I usually facetiously say that
14          the chair of the science committee
15          really doesn't do anything more
16          than shave his legs and set up the
17          conference calls.
18               Well, in reality, we do,
19          because especially with the
20          generic experts and with my
21          background with experts, I can't
22          do it all.  I just don't have the
23          time to work up an epidemiologist,
24          although I have a degree in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
1          epidemiology from Johns Hopkins, I

2          cannot work with the

3          pharmacoepidemiologist, the

4          radiologist.  So, part of my role

5          and Shelly's role and Carlene's

6          role was to triage, so to speak.

7                So, when I was asked and I

8          brought Jerry Avorn into the

9          litigation, I turned to Chris

10         Tisi, who worked with him in the

11         past, and said, Chris, I don't

12         have the time, you have worked

13         with Jerry, you are comfortable

14         with this.  And that's part of it.

15         Oversee it a little bit.  But

16         people like that, and I'm going to

17         give the accolades where

18         appropriate because, again, in my

19         role as the other co-chair of

20         science, I did get to see who did

21         some really quality work and who

22         did a lot of less than quality

23         work.

24               My work continued, to bring
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          you up into Burg Simpson, 2005,

2          2006, but through 2007, I

3          continued.  I became a part of the

4          stroke subcommittee.  I had the

5          pleasure of working with a

6          goddess, Lisa Dagostino, quality

7          work, no wasted time, continued to

8          work with them and continued to

9          work with some of the key experts.

10          Throughout 2007, we

11          continued on the extensive medical

12          library that worked, reviewing the

13          articles.  Typically, truth be

14          told, because of my then student

15          role at Johns Hopkins, I had free

16          access to the Welch library.

17          During that time, I was able to

18          procure over $15,000 worth of

19          medical articles for free.  I was

20          able to do that until I graduated

21          this past May.  I may go back and

22          get my Ph.D. just to get access to

23          the library.  But I would take a

24          look at the article, review it and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          see, who is this germane for.

2          It's another epi article.

3              Don Arbitblit, fantastic job

4          with Dr. John Farquhar, would send

5          me the reports and send me things

6          going on, and I would review it

7          and say, Don, you are doing a

8          great job, keep going.  That was

9          part of what I had to do.

10             2007, I flew to New York

11         City for the stroke subcommittees.

12         I flew to Philadelphia in October

13         2007.  So, I continued to work on

14         this litigation actively

15         throughout the year.  One of the

16         things, and, again, you are going

17         to see this earlier, that we did

18         early was, there were, and maybe I

19         think on the next series of

20         PowerPoints, there were like 74

21         members initially of the science

22         committee.  Everybody wanted on

23         the science committee.

24             So, one of the things that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          Carlene and then Shelly and I, one

2          of the things we had to do, we set

3          up subcommittees to try to control

4          all of these individuals.

5          Everybody did want to do the work,

6          but there's only so much real work

7          to be done, and you are not going

8          to send out a medical record or an

9          expert and have ten attorneys

10         reviewing it.  So, we set up

11         subcommittees such as benefits,

12         indications, labeling,

13         international issues, as chaired

14         by Roberta Walburn, Shelly Sanford

15         and Leila Watson.  They are the

16         other members.  We would do this

17         and have subcommittee phone calls

18         by the chairs to somehow keep

19         managed on this 70 plus science

20         committee.

21              MR. SEEGER:  How often would

22         you do those calls, John?

23              MR. RESTAINO:  Well, we had

24         a weekly call.  The way we worked

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           it was, it became so unmanageable

2           that we did it biweekly with the

3           whole science committee, but then

4           biweekly also, so there was a call

5           every Friday with the chairs of

6           the different committees.  Let

7           them have conference calls as

8           needed during the week with their

9           people.  If something new was to

10          report, then on the Friday

11          subcommittee chair calls, they

12          would report to the executive

13          committee, who -- there's a slide

14          for it later, but I think the

15          executive committee was Carlene

16          and myself and a few other people,

17          and I'm blanking on that right now

18          without the benefit of the slide.

19              Here's one, mechanism of

20          action, pharmacology defense

21          issues.  This was chaired by Paul

22          Sizemore, Mark Hoffman and Max

23          Yefimenko.  I don't think I have

24          to introduce any of these

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      individuals to you.  Max I may

2      have to.  Max is a

3      pharmacologist/attorney in our

4      firm, did a fabulous, fabulous job

5      early on in the pharmacology,

6      looking at the pharmacology

7      experts and spent countless time

8      in the depository reviewing those

9      studies, especially those germane

10      to pharmacology.

11          MR. BLIZZARD:  John, I'm a

12      little lost.  What firm --

13          MR. BURG:  He's with Burg

14      Simpson, and he was with Burg

15      Simpson from the beginning of the

16      time before John came over.

17          MR. BLIZZARD:  It would help

18      me to understand when you left and

19      went to Burg Simpson so that we

20      have a time frame for this

21      presentation.  Because we're going

22      to hear from you when you were at

23      Lopez Hodes later, it would help

24      me to know when the split

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       occurred.

2               MR. RESTAINO:  Sure.  I was

3       with Lopez Hodes officially until

4       December 31st, 2006, and January

5       1st of 2007, I became a partner,

6       shareholder with Burg Simpson.

7               MR. BLIZZARD:  So, with

8       respect to your work, we're

9       talking about from January of 2007

10      to the present in this

11      presentation?

12              MR. RESTAINO:  In this

13      presentation.  Again, I apologize.

14      I have to give a little background

15      just so that --

16              MR. BURG:  We broke down the

17      hours.  At the end, we'll give you

18      the amount of hours that were

19      worked from our time.

20              MR. WEITZ:  Let me just tell

21      you.  Burg's hours submitted so

22      far are 1,177 to the accountants.

23      Lopez hours submitted are 5,104 to

24      date.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1           MR. BURG:  We have the

2      hours, Perry, and I don't know if

3      that matches up.  I think we may

4      have --

5           MR. WEITZ:  This is why I

6      tell you.  These hours have to be

7      approved and accepted by the

8      accountants, third-party

9      accountants, and the expenses have

10     to.  Also, without them getting

11     and approving them, it is

12     meaningless what you have.

13          MR. BURG:  I understand.

14     But we tried to confirm, and I can

15     look, and at the end, we'll see if

16     they add up.

17          MR. LEVIN:  Let me help you.

18     With Burg Simpson, you submitted

19     1,177 hours.  318 and a quarter

20     have been accepted.  858.60 have

21     been rejected.  So, you are to

22     call Leonard Davis at Russ' office

23     and get him to get you in touch

24     with the accountant so that you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          could at least talk to him and

2          straighten that out.

3              You submitted $12,986.84 in

4          costs, of which $7,163.66 are

5          accepted, and $5,823.18 have been

6          rejected.

7              MR. BURG:  On the costs, our

8          numbers show, and we have the

9          submissions, that we submitted

10         $22,000, $22,439.68.  So, I'm

11         going to have to call and find out

12         why there's a discrepancy, because

13         I've got the submissions.

14             MR. LEVIN:  Time is of the

15         essence.

16             MR. BURG:  On the hours, I

17         don't know, I think we have more

18         than 1,100 hours.  Do you remember

19         the total?

20             MR. RESTAINO:  I thought it

21         was around 11.  I thought so.

22             MR. BURG:  Maybe it was.

23             MR. RESTAINO:  So, between

24         2005 and 2007, one of the key

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          aspects of the science committee,

2          of course, as with the PSC, is the

3          development of the generic

4          experts.  These are the experts

5          that we were involved in.  Those

6          that are in yellow are experts

7          that I either personally brought

8          to the table or had a significant

9          role in developing.  The first

10         one, Dr. Cecil Pace-Asciak, was a

11         background

12         consultant/pharmacologist who did

13         a lot of work with the Cox-2s out

14         of Toronto.  He was actually found

15         and developed by Max Yefimenko in

16         our office.

17              Egil Fosslien, who is the

18         cardiopathologist from Chicago

19         that I brought to the table, you

20         will hear more about him.

21              Les Cleland and Michael

22         James, Michael James was used by

23         Mark Robinson, and Les Cleland had

24         his preservation testimony taken.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1    I found and developed all of

2    those.

3         We used Preston Mason, who

4    was a background pharmacologist

5    from Harvard.

6         Dr. Colin Bloor,

7    cardiopathologist, actually

8    testified in the Irvin I trial.

9         Dr. Jerry Avorn is a

10   pharmacoepidemiologist from

11   Harvard.  I brought him in.

12        Dr. Mamdani, who is now at

13   Pfizer, is an epidemiologist.

14        Douglas Zipes, I didn't

15   develop.  Steve Skikos was more

16   involved with him, but I helped

17   with his Rule 26 report, reviewing

18   it for purposes of Daubert.

19        MR. BLIZZARD:  John, what

20   work was done for those witnesses

21   after January of 2007?

22        MR. RESTAINO:  Dr. Egil

23   Fosslien, he's the

24   cardiopathologist.  So, he was

FAC Resp. Amended Exhibit D -- 356

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1         asked to start talking about the

2         cardiovascular effects, especially

3         cerebral stroke by the stroke

4         committee.  And as you will see in

5         a moment, we spent a lot of time

6         in 2006 and 2007 developing

7         animation, which was then going

8         into the stroke, and you will see

9         what was done with him.  He was

10        actually at times present with the

11        animators, making sure they were

12        anatomically physiologically

13        correct.  So, he continued through

14        2007.

15              Les Cleland had his

16        preservation -- discovery

17        deposition taken in '06, but his

18        preservation testimony, he flew in

19        from Australia, and I came here in

20        '07 and took his preservation

21        testimony.

22              I think that's it.

23              Again, Fosslien was a

24        professor of pathology.  The

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          reason we found him is because he

2          authored these key articles,

3          including the review article on

4          it.  We began with him in 2005,

5          assisted his report in 2006, met

6          with him in 2007, and he wrote his

7          supplementary report in

8          preparation for his preservation

9          testimony.  He met secretly, so to

10          speak, with Garret FitzGerald's

11          laboratory.  He spent four days in

12          New Orleans preparing for trial in

13          Barnett.

14               Cleland and James, as I

15          mentioned, were from Australia,

16          and James was used and wrote a

17          rebuttal report to one of the

18          defense biochemistry reports for

19          Mark Robinson.  Cleland did have

20          his preservation testimony done,

21          including writing a Rule 26

22          report.  The reason that we were

23          of interest with Cleland is in

24          1999 in the principal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1          investigator's brochure, he was

 2          sent by Merck, he was warned to

 3          observe for increased

 4          cardiovascular events with Vioxx.

 5              I'm not going to go through

 6          a whole lot of this, but I

 7          defended his depo in '06 and I

 8          continued in May '07, did his

 9          preservation testimony.  Same

10          thing with James.  As I mentioned,

11          he did research in this area, and

12          he was named as an expert rebuttal

13          witness in the Barnett case by

14          Mark --

15              MR. BLIZZARD:  That's 2006,

16          though, right?

17              MR. RESTAINO:  That's 2006.

18          A lot of this is just background.

19          If you get the background, I can

20          skip over the earlier.

21              MR. WEITZ:  It's difficult

22          for us, and what we need to

23          clarify, John, is that Burg, now

24          Mike has told us, is submitting

FAC Resp. Amended Exhibit D -- 359

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          22,000 hours.

2              MR. BURG:  No.  I think it

3          is around 1,100.  $22,000 in

4          costs.

5              MR. WEITZ:  Because I was

6          saying if you moved over to them

7          in '07, that's a lot of hours.

8              MR. RESTAINO:  No, my total

9          hours that I think were submitted

10         on my behalf, it was a little over

11         500 for the entire year of '07.

12             MR. WEITZ:  Lopez has

13         submitted over 5000 hours -- I'm

14         sorry, 5,104, and that's primarily

15         the work you are talking about?

16             MR. RESTAINO:  A good

17         portion of this, yes.

18             MR. BURG:  And with Max

19         Yefimenko in terms of this expert,

20         he was involved in developing this

21         expert, found this expert when he

22         was with our firm.

23             MR. SEEGER:  That was before

24         John?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          MR. BURG:  Before John came

2      over.

3          MR. BLIZZARD:  I guess since

4      we're creating a record, it's

5      important from our perspective to

6      make sure we understand when you

7      are switching over from background

8      information to actual work that

9      was done by either Burg Simpson

10     employees or by you when you were

11     at Burg Simpson.

12         MR. RESTAINO:  Fair enough.

13         Again, it is even more

14     convoluted.  The reason I'm

15     putting up Cecil Pace-Asciak is

16     because, while I met with him and

17     these other individuals in Toronto

18     in '05/'06, I'm really putting it

19     up because Max Yefimenko has

20     submitted his time, and he was

21     there and he discovered him.

22     That's the reason for this slide.

23     So, I was a member of Lopez Hodes

24     at that time, but this is from Max

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          Yefimenko.

2               This is just a small snippet

3          of the animation that Dr. Douglas

4          Zipes and Fosslien showed, worked

5          on.  It's playing on my computer,

6          and the red blood cells are in the

7          background.  This is called

8          platelet aggregation.  You can see

9          the platelets aggregating.  Now

10         they release their thromboxane and

11         prostacyclin, resulting in

12         vasodilatation and

13         vasoconstriction.  There's the

14         vasoconstriction as a result of

15         the thromboxane.  So, you can see

16         the quality of work that these

17         cardiopathologists and

18         cardiologists did.  We worked on

19         this extensively.  This was to be

20         shown for the first time in his

21         preservation testimony, and then

22         the case settled.

23               MR. SEEGER:  John, was this

24         used anywhere, at any trials or

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           anything?  It was kind of at the

2           end.

3                MR. RESTAINO:  Right.  It

4           was now being developed for the

5           stroke committee if they needed it

6           there, and they started working

7           with us.

8                So, in summary, since '05,

9           Vioxx was the main thing I worked

10          on while I was with Lopez Hodes.

11          It continued to be a critical part

12          of what I was doing when I joined

13          Burg Simpson.  We had Max

14          Yefimenko working on it, as I

15          mentioned, and Mike will talk to

16          some of the others.  We were in

17          the final phases of the

18          preservation testimony of Egil

19          Fosslien when it settled.  The

20          animation project was to be

21          unveiled during that particular

22          time.  And so I'll let Mike talk a

23          little bit about --

24                MR. BURG:  Why don't we move

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          on to what we show.  This is what
 2          we show the total hours are.  So,
 3          I'm going to have to call Lenny
 4          and find out --
 5              MR. LEVIN:  He will get you
 6          to Phil Garrett, who is the
 7          accountant.
 8              MR. BURG:  -- what happened.
 9          First of all, let me say, for
10          those of you that have worked with
11          Burg Simpson, when we work, we
12          work.  We don't send people who
13          don't know what they are doing and
14          sit around and play games on their
15          computers if they are going to
16          look at documents.  We understand
17          the priority that you and other
18          people who do common benefit look
19          at in terms of what moves the ball
20          down the field.  And while the
21          other things that are needed don't
22          necessarily get the same emphasis
23          or are not as important,
24          everything is done.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1          So, I really want to go
 2      through each of the people here.
 3      John, when he came over to our
 4      firm, obviously it was toward the
 5      end, we never knew it was the end,
 6      but near the end of at least the
 7      last part of the litigation was
 8      going on.  John continued to do
 9      his work --
10          MR. SEEGER:  By the way,
11      just so you know, I'm very
12      familiar with John's work because,
13      first of all, I was one of the
14      people that asked him to chair
15      that committee, but also Shelly
16      was on the PSC, and she would give
17      updates on the weekly PSC calls
18      about the science committee.  So
19      we don't have to spend any more
20      time talking about you, John, from
21      my perspective.  I get what you
22      do.  But I'm not as familiar with
23      what anybody else, Scott or Max --
24          MR. BURG:  Let me tell you
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1        what I did.  My role was obviously

2        much more minor than it has been

3        in other litigations.  I was

4        appointed by Judge Fallon to be on

5        the state/federal liaison

6        committee.  I worked, attended

7        hearings.  Sometimes when I had a

8        conflict, either Seth Katz or

9        Peter Burg would attend those

10       hearings in my absence.

11            We were involved in tracking

12       the state cases for most of the

13       western United States, not

14       including California.  California

15       was being tracked separately.  We

16       were involved in looking at the

17       other states not really from the

18       East Coast, but in the Midwest,

19       tracking those cases, keeping

20       control over those, talking to

21       lawyers who had cases, trying to

22       really make sure that the PSC --

23       and I know Chris and I had

24       numerous conversations about what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1       was going on, really trying to

2       make sure that nobody was going to

3       screw up the litigation, to be

4       candid about it.  We all know that

5       that's one of the dangers in an

6       MDL, that somebody who really

7       doesn't know what they are doing

8       is out there, has a state case,

9       and ends up thinking they can go

10      forward and try it.  That's what I

11      did.  Really my work was really

12      limited to my role on the

13      federal/state liaison committee as

14      appointed by Judge Fallon.

15          Max Yefimenko is a

16      pharmacologist, was involved as a

17      subcommittee chair.  Those of you

18      who have worked with him, and I'm

19      not sure how many of you have,

20      he's a brilliant guy.  He's able

21      to read these articles that are

22      related to the litigation, and he

23      did that, and did summaries,

24      involved with experts.  He was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1     involved in finding some experts

2     in this particular case, was

3     involved in working up the

4     pharmacology, working with John

5     and the other -- at that time,

6     John was with Lopez Hodes.

7          MR. RESTAINO:  If I may

8     interject there, two years before

9     I had any idea that I would end up

10    with the firm, Shelly and I would

11    go through -- we had a coding

12    project, and we would assign 15,

13    20, 30 articles to an attorney.

14    We would code these with the

15    coding form.  And Max was assigned

16    that coding form, again, in an

17    unbiased manner and equal number

18    as other people.

19         MR. BURG:  Max, that's what

20    he did.  That's what his specialty

21    is.  He's not going to be a trial

22    lawyer.  He's not going to be a

23    guy who you are going to have

24    doing depositions.  But he's a guy

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        who is going to be in the back

2        room, who we believe had an effect

3        in moving this forward in terms of

4        making sure that the pharmacology

5        and all the articles, that nothing

6        was missed, and was also involved

7        in trying to get that.

8            Scott Eldredge, who was one

9        of our senior partners, he spent

10       most of his time at the

11       depository.  At that time, we

12       looked at this project as a

13       real -- we didn't send a

14       paralegal.  We didn't send

15       somebody who was -- and whether

16       that's a plus or a minus, we felt

17       we wanted to have somebody -- he

18       does mostly med-mal, does some

19       products cases in our office.  We

20       felt that we needed someone who,

21       because of the complexity of this

22       litigation, somebody who truly was

23       going to make a difference in

24       terms of knowing what they are

Page 31

1          looking for, and not sitting at

2          the screen and just putting time

3          down.

4                    MR. LEVIN:  How long has

5          Eldredge been out of law school?

6                    MR. BURG:  25 years.

7                    MR. LEVIN:  And Katz?

8                    MR. BURG:  15 years.

9                    MR. LEVIN:  You have hourly

10          rates, not that that's very

11          relevant to how we're going to do

12          this, but have any of those hourly

13          rates that are posted there been

14          judicially approved by any court?

15                    MR. BURG:  Yes.

16                    MR. LEVIN:  Which ones?

17                    MR. BURG:  Some of the

18          rates, my rate, I believe, and

19          Seth's rate.  Seth's rate, which

20          was a little lower, was approved

21          in Zyprexa, I believe.  I also

22          know in class actions, we have had

23          federal judges in Colorado that

24          have approved my rate or $650.  In

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1           fact, the chief judge, Judge

2           Daniel, recently in a class action

3           this year approved that rate.

4                MR. LEVIN:  Fine.

5                MR. BURG:  The only other

6           thing I would say is this.  Just

7           so everybody knows, we had trial

8           teams, and we had trial teams that

9           are not included on this, but I

10          think it is important that the

11          record reflect that.  We spent --

12          and John can tell you.  We spent

13          Saturdays, Sundays and nights with

14          three trial teams, putting

15          together three trial teams,

16          learning this case, not putting

17          one moment of that into this

18          submission because we understand

19          that was for us.  We were ready,

20          willing and prepared, as things

21          moved forward, to try those cases,

22          and we wanted to make sure that we

23          were up to speed.

24                MR. WEITZ:  Can you talk to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1        us about your cases?  Tell me how

2        many cases you guys had filed.

3              MR. BURG:  I think we had

4        157 cases was our total inventory.

5              MR. WEITZ:  Where were they

6        filed?

7              MR. BURG:  All over the

8        United States, but mostly in the

9        MDL.

10             MR. WEITZ:  So, you filed

11        them in Federal Court in the

12        United States?

13             MR. BURG:  I would say 98

14        percent or 95 percent of them were

15        in the MDL.  I think we had a few

16        in New Jersey, and we may have

17        had -- I'm trying to think if we

18        had any in California.

19             MR. GIRARDI:  Maybe one.

20             MR. BURG:  I think for the

21        most part, probably 95 to 98

22        percent were in the MDL.

23             MR. GIRARDI:  Tell me, I'm

24        sorry, how many cases all together

Page 34

1        again?

2               MR. WEITZ:  157.

3               MR. BURG:  I think it was

4        157, but I would have to go back

5        and check.

6               MR. WEITZ:  Tell me what

7        cases were on any trial dockets,

8        whether it was New Jersey, the

9        MDL?

10              MR. BURG:  As I sit here

11       today, we know that our cases were

12       potentially looked at for the MDL.

13       When I said we were getting

14       prepared, I don't think any of

15       them were really set for trial,

16       but our concern was, quite

17       frankly, having been at most of

18       the hearings, there was always

19       this question of whether or not

20       Judge Fallon was going to remand

21       these cases.  I know that was

22       something he talked about from the

23       bench at these hearings.  And we

24       in Colorado, as well as many other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1        states, the dockets are not as
 2        crowded as -- it's not unheard of
 3        in Colorado where you get a remand
 4        order and you get a trial within
 5        60 days unlike other federal
 6        courts.  So, we were very
 7        cognizant of the fact that there
 8        was the potential that a
 9        significant number of our cases
10        were going to be remanded and that
11        ultimately, because of that
12        remand, our trials were going to
13        come up very quickly.  That's why
14        we were working, and, in fact, we
15        had conversations with many people
16        who were on the PSC about the
17        potential, and we talked to Chris
18        about this.  The potential was
19        that if these remands happened,
20        getting him and Dave or other
21        people to come in so we make sure
22        that we're doing it at the highest
23        level.
24                MR. WEITZ:  So, it would be
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1           fair to say that you were working

2           up the individual cases in your

3           office, but they weren't in any of

4           the waves, the four waves that

5           Judge Higbee had or they weren't

6           being prepared for trial in the

7           MDL?

8                MR. BURG:  Correct.

9                MR. LEVIN:  John, with

10          regard to the stroke package, Dr.

11          Levine, did you work with him?

12                MR. RESTAINO:  No.

13                MR. LEVIN:  Do you know who

14          worked with him, what was done

15          with him?

16                MR. RESTAINO:  There were

17          the two stroke --

18                MR. LEVIN:  Feldman and

19          Levine?

20                MR. RESTAINO:  They were

21          both being handled separately,

22          going through the committee, but

23          there had already been attorneys

24          that had worked up with them.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          MR. LEVIN:  So, you are not
2      involved with --
3          MR. RESTAINO:  That was one
4      of those delegated things.  I
5      would review the Rule 26 report if
6      it got to that level.  They had
7      access.
8          MR. LEVIN:  Did you ever see
9      a report from Steve Levine?
10          MR. RESTAINO:  No, I did
11      not.  And they had access to Egil
12      Fosslien as the cardiopathologist
13      so they could be on the same page
14      and the materials.  So, again, my
15      role there as the co-chair is
16      again to triage, and what's
17      everybody doing, let's make sure
18      we're on the same page.  People
19      throw up because I used the
20      metaphor of Venn diagram way too
21      frequently.  That's what my role
22      was, to have these different
23      circles and have them overlap as
24      much as possible and try to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

```
 1          coordinate and keep certain

 2          individuals from running off the

 3          reservation.

 4                MR. SEEGER:  Just to keep us

 5          on schedule, and we're going to

 6          see you later today, do you want

 7          to take a minute to sum up and if

 8          we have any questions?

 9                MR. BURG:  The only thing I

10          would sum up saying is everybody

11          knows John's talents and what he's

12          done.  John is not there playing

13          around.  He's doing a good job.  I

14          believe our firm has that same

15          reputation.  We're not going to

16          come here and pad our numbers, and

17          I'm obviously very concerned that

18          there's some difference in the

19          numbers that we showed that were

20          submitted and the numbers --

21                MR. SEEGER:  By the way,

22          just so you know and have some

23          peace of mind on this, the

24          questions about this, you don't
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          need to have it done today.  We

2          just need it done before the

3          motion can be made.  All of us in

4          some level are going through it,

5          so don't worry about it.

6               MR. BURG:  I appreciate

7          that.  All I can say is we

8          understood that we were not the

9          guys, other than what John was

10         doing when he joined the firm, who

11         were at the forefront of the

12         litigation.  At the same time, we

13         understood our role, which was to

14         support.  In other litigations, we

15         may be more at the forefront, and

16         other people may be supporting.

17         We felt that our support and the

18         kind of talent that we bring to

19         the table has value in moving the

20         litigation forward.  I'm not going

21         to say anything about any other

22         firms, but there are people who

23         send bodies and are not absolutely

24         dedicated to the success of the

Page 40

1        project.

2            MR. GIRARDI:  Really?

3            MR. BURG:  It's a big

4        surprise, I know.  We come ready

5        to give you our best work product.

6        I think in this case we did.  We

7        appreciate the ability to come

8        here and talk to you and be able

9        to express what we felt we did

10       without trying to tell you guys we

11       did more than we did, but we also

12       feel we had a significant

13       contribution in the limited role

14       that we had.

15            MR. RESTAINO:  I'll just add

16       one thing because my time cards

17       are made contemporaneously with

18       what I do.  If I get a one and a

19       half hour phone call from Jerry

20       Avorn, when I hang up, I put it on

21       my time card.  My current time

22       card for the NSF litigation is as

23       current as of literally midnight

24       last night.  So, I don't go back

Page 41

1          and reconstruct, I don't call my

2          partners and say, what did we do

3          in August on this stuff.  If at

4          any time anyone says, John, let me

5          see September '06 time card,

6          Vioxx --

7               MR. SEEGER:  That's real

8          time.

9               MR. RESTAINO:  There it is

10          right there.

11               MR. BURG:  That is our firm.

12          That is our requirement in our

13          firm that we keep

14          contemporaneously daily time

15          records of what is done.  Not one

16          hour of this was recreated or gone

17          back by anybody.  We basically

18          just took the time slips of the

19          time that was kept on the daily

20          basis and submitted it.

21               MR. SEEGER:  Thank you.

22               MR. BLIZZARD:  We would

23          expect nothing less of somebody

24          whose favorite word is Venn

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          diagram.

2                    MR. SEEGER:   Thank you.

3                    MR. GIRARDI:   Thank you.

4                    MR. RESTAINO:   Thank you.

5                    MR. BURG:   Thank you.

6                         -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

           C E R T I F I C A T E

 1

 2

 3            I, LINDA L. GOLKOW, a Notary

 4  Public and Certified Court Reporter of

 5  the State of New Jersey, Registered

 6  Diplomate Reporter, Federally-Approved by

 7  the United States District Court of

 8  Pennsylvania, do hereby certify that the

 9  foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number: 1060147

23        Notary Expiration: 1.2.10
          CCR Number: 30X100176200

24

FAC Resp. Amended Exhibit D -- 382

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM:  COHEN MILSTEIN
       Daniel W. Sigelman, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -

 2            MR. SIGELMAN:  Overall, I

 3       believe that Cohen Milstein

 4       contributed to the advancement of

 5       the scientific knowledge of the

 6       Vioxx case and that Cohen Milstein

 7       played a significant role in

 8       uncovering and developing critical

 9       liability and causation evidence

10       against Merck in the scientific

11       area.

12            Some highlights, and I just

13       picked a few of the major

14       highlights of our common benefit

15       contributions, are on the first --

16       the second page of the handout,

17       the PowerPoints that I handed out.

18       One is the deposition of a case

19       critical fact witness, Ned

20       Braunstein.

21            Another one is that our firm

22       was a member of a small team,

23       really an informal team,

24       furnishing important work product
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1    and documents to trial counsel and

2    their experts, both testifying and

3    nontestifying, before and during

4    the Cona/McDarby and

5    Hermans/Humeston trials, and we

6    had a significant role, a very

7    significant role in developing and

8    preparing important liability, as

9    well as causation experts, Harlan

10   Krumholz, as well as Dr. David

11   Madigan.

12        On the next slide, I give

13   some evidence, really

14   testimonials, that highlight some

15   of these highlights.  One is with

16   respect to the deposition of Ned

17   Braunstein.  And here I'm quoting

18   Harlan Krumholz in an e-mail to me

19   on Christmas Day.  And I presume

20   that you know that both of us are

21   not Christian.

22        In any event, he wrote me

23   December 25, 2006 saying, "The

24   more I get into your deposition of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1     Braunstein, the more I appreciate

2     what you did and how you did it.

3     It is actually a masterful and

4     scientifically strong piece of

5     work - that combination of

6     developing the case and being

7     right on all the science is rare."

8          In the Braunstein

9     deposition, I actually used it as

10    an opportunity to try to develop

11    what I thought would be our expert

12    case down the road in the Vioxx

13    litigation.  So, it was very heavy

14    on the clinical trials, and

15    particularly the

16    placebo-controlled clinical

17    trials, and Merck's handling of

18    the data from those trials and the

19    manner in which it did or didn't

20    report that data and the analyses

21    that were done or could have been

22    done to the FDA and to the FDA

23    Advisory Committee.

24          The next slide really is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1          with reference to the team that

 2          was furnishing important work

 3          product and documents to trial

 4          counsel and their experts before

 5          and during the Cona/McDarby and

 6          Hermans/Humeston trials.  And here

 7          I'm quoting Mark Lanier, actually,

 8          in an e-mail he wrote me on

 9          February 5, 2007, which was the

10          day that Dr. Krumholz was

11          initially called to testify in the

12          Hermans/Humeston trial.  And he

13          wrote, "Just finished the final

14          prep with Krumholz.  He paused me

15          this morning and told me how

16          important your help has been, Dan.

17          Thank you."

18                And then Mark continued,

19          "Amen on Harlan," because I

20          praised Harlan as an amazing

21          expert, "[as a great expert]!!!

22          (And in no small part because of

23          your work...)"

24                So, I use this just to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        illustrate that, in fact, it

2        really, I think, summarizes, it

3        culminates the work that I did

4        with Harlan Krumholz.  I spent

5        many, many hours with that man on

6        the phone and in long e-mails

7        analyzing data.  I remember, for

8        example, sending him a very

9        detailed analysis of how Merck

10       excluded important clinical trial

11       data in its three major

12       publications in the pooled

13       analyses of these trials:  The

14       Shapiro/Reicin paper, the Konstam

15       paper and the Weir paper.  He used

16       that, for example, in the

17       Hermans/Humeston trial.  He also

18       used other things that we

19       discussed.  I believe that Cohen

20       Milstein contributed to and

21       enhanced his knowledge and

22       understanding of the scientific

23       case.

24              Here I'm going to quote from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1        him in an e-mail he wrote on

 2        February 7, 2007, which was one

 3        day after his first appearance in

 4        the Hermans/Humeston trial.  He

 5        appeared three times in that

 6        trial.  He came back in rebuttal,

 7        and then he was examined by Chris

 8        Seeger in the specific causation

 9        part of the case with the Humeston

10        case.  He said, "I feel privileged

11        and fortunate to have had the

12        opportunity to learn from you.

13        You made all the difference."

14             With respect to our common

15        benefit contributions, we did

16        common benefit work both in the

17        MDL and in the New Jersey

18        consolidated litigation.  I did

19        the primary work for the firm.  I

20        spent the most time on it.  Our of

21        counsel, Douglas McNamara, with

22        input from Richard Lewis, also

23        contributed to some of our common

24        benefit time.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          Our common benefit work

2      began in early 2005, and it ended

3      in early November of 2007 pretty

4      much when we heard about the

5      nationwide settlement.  Our work

6      greatly intensified in August of

7      2005, when I was provided remote

8      access to the entire Concordance

9      Vioxx production database, for

10     which I was very grateful.  And

11     that enabled me to do a lot of

12     things in my office from that

13     point forward.

14          From August of 2005 to

15     November of 2007, I consistently

16     devoted most, the overwhelming

17     majority of my professional time,

18     to Vioxx common benefit work to

19     the exclusion of other available

20     firm project opportunities.

21          The next slide is on the

22     scope of activities of our firm.

23     Obviously, first of all, in the

24     MDL, we were appointed to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        science committee, and we

2        primarily concentrated with

3        respect to work with -- our

4        assignment to the clinical trials

5        epidemiology and proof of

6        causation subcommittee.

7            We did a lot of extensive

8        focused reviews for projects.  We

9        searched for and reviewed hundreds

10       of thousands of Merck documents in

11       Concordance.  We reviewed

12       voluminous medical and scientific

13       literature and culled and shared

14       countless pertinent documents with

15       other counsel and with testifying

16       and nontestifying experts.

17           We furnished work product

18       and documents on scientific and

19       FDA regulatory issues to counsel

20       and their consultants for use in

21       discovery and in the New Jersey

22       trials.

23           And we helped prepare

24       testifying experts for deposition

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1      and trial.

2           Generally I saw our

3      objectives, at least within our

4      firm, to be to try to characterize

5      Merck's misconduct, particularly

6      in the scientific areas, destroy

7      its scientific defenses and

8      support the affirmative scientific

9      proofs required to win trials.

10          The primary focus of our

11     common benefit work was, first of

12     all, conceptualizing and then

13     building plaintiffs' scientific

14     liability case and obliterating

15     Merck's scientific defenses that

16     we could through use of data from

17     Merck's own 'gold standard'

18     placebo-controlled Vioxx trials in

19     arthritis and Alzheimer's disease.

20          We were also interested in

21     establishing general causation

22     based on Merck's

23     placebo-controlled study data,

24     with particular emphasis on data

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1       generated before Vioxx was

2       withdrawn from the market.  It was

3       my feeling that with respect to

4       the 203 protocols, which consisted

5       of the APPROVe study, the VIP

6       study and VICTOR, that those had

7       been very comprehensively and well

8       dissected and dealt with by people

9       like Don Arbitblit, but I felt

10      that more work could be done in

11      areas of placebo-controlled trial

12      data that preceded the withdrawal

13      of Vioxx, although some very good

14      work had been done by other

15      lawyers, including Mr. Seeger's

16      firm and work that was done with

17      Dr. Kronmal, some very excellent

18      work.

19           On behalf of Cohen Milstein,

20      I developed a close and highly

21      productive working relationship

22      with some key firms, especially in

23      New Jersey.  I became one of a

24      handful of lawyers to whom other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           lawyers in New Jersey would look

2           for help on generic scientific

3           liability questions.

4                I ultimately worked with a

5           group of lawyers such as, most

6           notably, Eric Weinberg, whom I

7           actually met for the first time in

8           late 2005.  We shared a lot of the

9           same ideas, and Eric had retained

10          an absolutely incredible

11          statistician, David Madigan at

12          Rutgers and now at Columbia

13          University.  I really wanted to

14          implement some ideas that I had

15          developed in the statistical area

16          that had not been developed by

17          others.  And my only avenue, I

18          thought at the time, was through

19          Dr. Madigan.  And so I started

20          working very hard with Eric and

21          Dr. Madigan.  And our group

22          expanded.  It really became a

23          rather informal group.  And to a

24          great extent, the group really

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1        formed around Dr. David Egilman,

 2        to be quite honest, because he was

 3        hired by Mark Lanier's law firm as

 4        a consultant, and he likes to

 5        surround himself with people whom

 6        who he thinks he can learn from

 7        and get good information from.

 8             MR. SEEGER:  Either that or

 9        he likes to surround himself with

10        people he can abuse.

11             MR. LANIER:  He was the

12        personal physician to Daniel

13        Ortega.

14             MR. SIGELMAN:  But he

15        generated an incredible amount of

16        stuff, and he became a conduit for

17        people like me to submit all kinds

18        of analyses and documents, and he

19        was kind of the filter to send

20        them on to the trial team.  And so

21        that group was -- well, it was an

22        informal group.  We didn't really

23        meet except in cyberspace, but it

24        was Jeff Grand, it was Jerry
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        Kristal, it was Eric Weinberg, it

2        was Chris Placitella, it was David

3        Egilman, obviously, many members

4        of Mark Lanier's law firm.  And we

5        were sending things all the time,

6        and many of the things that Cohen

7        Milstein said to Dr. Egilman ended

8        up in the trials.  For example,

9        playing around with adjudications

10       in one of the Alzheimer patients

11       in 158 or protocol 906, which was

12       a study where some information

13       hadn't been conveyed to the FDA,

14       came from Cohen Milstein through

15       David Egilman.

16            This was a way that we all

17       shared information and benefited,

18       and it was an informal group that

19       I think it really advanced the

20       trial.  It was a real team effort.

21            MR. SEEGER:  Can I ask you a

22       question?  Don't you have both a

23       medical degree and a law degree?

24            MR. SIGELMAN:  Do I?  No, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        do not.
 2              MR. SEEGER:  I thought you
 3        had both degrees.
 4              MR. LANIER:  He doesn't have
 5        a law degree.
 6              MR. SIGELMAN:  I don't have
 7        a law degree.  I'm practicing
 8        medicine and law without a
 9        license.
10              No, I have a lot of
11        experience in pharmaceutical
12        things because in the 1980s, I was
13        the principal congressional
14        investigator of the FDA, and we
15        had a lot of hearings that led to
16        prosecutions of drug companies.
17        So, I've been doing analysis of
18        pharmaceutical data for over a
19        quarter of a century.  But I don't
20        have a medical degree.
21              Cohen Milstein was one of a
22        small team of firms who furnished
23        common benefits work product and
24        documents, as I said, and the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        slide also indicates the
 2        assistance was provided directly
 3        to trial counsel.  I remember some
 4        occasions where Mark Lanier, for
 5        example, asked me for some
 6        documents.  I think one time I was
 7        asked for documents on what the
 8        Advisory Committee at FDA had said
 9        about intention-to-treat analysis,
10        and so I sent them directly to
11        Mark.  Sometimes I would send it
12        to people at Mark's law firm and
13        often, obviously, through Dr.
14        Egilman, and Mark and his law firm
15        were on those e-mails.
16            I would like to give a case
17        in point of the kind of work that
18        I did.  And this is just one
19        illustration of something I
20        remember very distinctly.  From
21        April 8th through 9th of 2006,
22        there was feverish briefing going
23        on by Ellen Relkin of Weitz &
24        Luxenberg on the question of
```

FAC Resp. Amended Exhibit D -- 398

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        Merck's noncompliance with FDA

2        reporting requirements.  The issue

3        was, could we get over the bar of

4        punitive damages -- of course now

5        punitive damages is history, at

6        least for the time being in New

7        Jersey -- but could we get over

8        the bar with the evidence that

9        Mark had brought up at the trial.

10       And so Ellen had come to me and

11       said, because of my FDA regulatory

12       background, could I help her.  And

13       I gave her a plethora of all the

14       FDA, NDA and IND regulations that

15       could conceivably apply, at least

16       to my knowledge, to the data at

17       issue.  And she incorporated all

18       of those in her briefing that

19       week, and, in fact, some of the

20       language that we had written were

21       incorporated wholesale in her

22       briefs.

23            And I remember her telling

24       me on that Sunday that Merck had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        totally freaked out, because they

 2        weren't expecting this plethora of

 3        regulatory citations, and they had

 4        come to Judge Higbee and asked her

 5        for more time.  And that turned

 6        out to be a real team effort,

 7        because Ellen did an incredible

 8        job, as she always does, on that

 9        occasion, but it was a real team

10        effort, and it was very

11        successful, at least until the

12        appellate courts in New Jersey got

13        ahold of punitive damages.

14             And, obviously, as I've said

15        here before, I sent a lot of

16        documents to other people involved

17        in the trial.

18             Mark Lanier, for example,

19        acknowledged my contribution,

20        among others, in a very generous

21        e-mail to many people on April

22        12th of 2006 following the

23        Cona/McDarby trial.  And he said

24        something very nice about me that
```

FAC Resp. Amended Exhibit D -- 400

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          I obviously knew my stuff, or at
 2          least so he thought, I was able to
 3          trick someone else once again, and
 4          acknowledged that he was able to
 5          do what he was able to do because
 6          of the hard work of many people
 7          around him.
 8               With respect to the
 9          deposition of Ned Braunstein, he
10          was a Merck regulatory official,
11          this was an MDL deposition that I
12          first chaired.  My preparation of
13          it involved -- I decided to really
14          go whole hog on the science, so, I
15          actually reviewed over 260,000
16          documents that were tied to
17          Braunstein for this deposition.
18          In addition to that, I had
19          reviewed the entire file of the
20          FDA custodial file in Concordance,
21          because I wanted to be totally
22          familiar with what had been sent
23          to the FDA by Merck, whether these
24          were letters signed by Dr.
```

FAC Resp. Amended Exhibit D -- 401

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      Braunstein or not.

2           I incorporated that into the

3      deposition.  And as I said before,

4      the deposition highlighted Merck's

5      knowledge and handling of damaging

6      evidence on the thrombotic

7      cardiovascular hazards of Vioxx

8      evidenced by its own

9      placebo-controlled arthritis and

10     Alzheimer's disease trials

11     completed long before market

12     withdrawal.

13          And to look at what impact

14     the Braunstein deposition had on

15     subsequent litigation, testimony

16     and documents from the Braunstein

17     deposition played key roles in

18     opinions presented during the

19     Hermans/Humeston trial of the

20     cardiology expert, Harlan

21     Krumholz.  And he acknowledged the

22     contribution of that deposition to

23     his understanding of the case.

24          And I remember some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

 1          documents were used, I even think

 2          in the latter part of the trial, I

 3          think when Chris Seeger was

 4          working on the specific causation

 5          part of the trial, I remember

 6          there was a famous e-mail from

 7          Bolognese that we dug up from --

 8          for the Braunstein deposition that

 9          was very significant in the trial.

10          It was used at the latter part of

11          the trial, as was table 13 from

12          the 2003 pooled analysis update

13          that showed some incredible data

14          that Merck had really hidden from

15          the world.

16               Dr. Krumholz had told Mark

17          Lanier in a December 25, 2006

18          e-mail, "I do think that the work

19          Sigelman did in the Braunstein

20          deposition has merit...and we are

21          working to pull this together,"

22          and he was obviously referring for

23          use at trial.  He was trying to

24          come to an understanding of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1        scientific issues, a fuller

 2        understanding.

 3            And Mark e-mailed me and

 4        said, "Thanks much.  Now I'm going

 5        to have to learn it."  The only

 6        reason I put that in there was not

 7        because Mark couldn't learn things

 8        and didn't know things, because I

 9        am awed by his ability to pick

10        things up, but I wanted to

11        emphasize that, obviously, Mark

12        had recognized that some part of

13        that Braunstein deposition,

14        whether specifically or

15        implicitly, was going to make its

16        way into that trial, and he was

17        going to learn some new material,

18        which he did do with his mutual

19        aplomb.

20            The technical and scientific

21        assistance that Cohen Milstein was

22        able to provide Dr. Krumholz and

23        Dr. Madigan marked the culmination

24        of much of the common benefit work
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          that it had previously undertaken.

2                I worked very closely on

3          behalf of Cohen Milstein with

4          Harlan Krumholz to prepare him for

5          his testimony in Hermans/Humeston.

6          I sent him, I don't know, an

7          unbelievable number of documents,

8          a lot of data.  Some of the data,

9          in fact, was ongoing analysis from

10         Dr. Madigan, because there was

11         cross-pollination with these

12         experts.

13               MR. HERMAN:  Can I stop you

14         right there?  I'm sorry.  Dr.

15         Madigan's name has come up quite a

16         bit.  I believe Eric first spoke

17         about it.  Can you tell me a

18         little bit more about Dr. Madigan?

19               MR. SIGELMAN:  When you say

20         more?

21               MR. HERMAN:  Well, I would

22         like to know a little bit more

23         about his expertise and how he fit

24         into the entire litigation.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          MR. LEVIN:  How he was

2     chosen?

3          MR. SIGELMAN:  How he was

4     chosen, he was chosen because he

5     was a world class statistician by

6     Eric Weinberg.  He is an actual

7     statistician, and we got him the

8     SAS data from the clinical trials.

9     Seeger Weiss had done a great job

10    of getting SAS data, and a lot of

11    it had been given to Dr. Kronmal.

12    And Dr. Kronmal had worked

13    previously with Dr. Madigan,

14    because Dr. Madigan at one time

15    was at the University of

16    Washington.  So, they did

17    communicate a little bit.

18          We were building on what

19    Kronmal had done and doing some

20    new things that Kronmal had not

21    done.  And so one of the big tasks

22    was to find out what SAS data were

23    available.  And what we found was

24    there was some SAS data that we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1       needed that, for whatever reason,

2       had not been produced by Merck.

3       We went to David Buchanan and

4       worked with him to get that data.

5           For example, protocols 10

6       and 17 were early

7       placebo-controlled trials of four

8       weeks or greater duration.  We

9       didn't have the SAS data for that.

10      All the Celebrex studies,

11      comparing Celebrex with Vioxx and

12      placebo, that was

13      placebo-controlled data of four

14      weeks or longer.  We wanted all

15      studies of four weeks or longer in

16      placebo, because that's what Merck

17      looked at.  And we didn't have

18      those data.  We needed them,

19      because we wanted to do the entire

20      universe of placebo-controlled

21      studies of four weeks or longer.

22      And what we came up with --  this

23      is later in my PowerPoint, but I

24      can give it right now.  I think

FAC Resp. Amended Exhibit D -- 407

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1    this is a momentous finding that

2    we were prepared to go with in the

3    January 2008 trial.  That is, if

4    you followed Merck's approach in

5    the arthritis studies, in the

6    placebo-controlled trials, pooling

7    the data, and when I say Merck's

8    approach, you use adjudications

9    and confirmed events for the

10   studies that were adjudicated, and

11   you use investigator-reported

12   events for the studies that were

13   not, that was Merck's approach,

14   and instead of cherry picking like

15   Merck did, you use the entire

16   universe of studies four weeks or

17   longer, that includes 10 and 17

18   and the Celebrex studies which

19   were never included in any of the

20   pooled analyses of Merck, you have

21   a statistically significant

22   increase in thrombotic

23   cardiovascular events emerging in

24   arthritis, the primary indication

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1    for Vioxx in the year 2000.  That

2    is an unbelievably momentous

3    finding.

4         That is four years before

5    APPROVe, before they had the first

6    placebo data supposedly that led

7    to the market withdraw.  And think

8    about what happened in Hermans.

9    In Hermans, we had the misfortune

10   of the jury believing that the

11   VIGOR labeling was adequate.  So,

12   one of the things that we did with

13   Madigan is, we said we've got to

14   put our nose to the grindstone and

15   come up with some data that that

16   VIGOR labeling is grossly

17   inadequate.  That was one of the

18   findings.

19        MR. HERMAN:  Well, let me

20   stop you, because I think you've

21   been very thorough with that, and

22   I've got a better picture.  I've

23   got to ask you a couple of

24   questions that really are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          irrelevant to why you're here, but

2          I've got to know the answers to

3          them.

4               The first is, Madigan, his

5          field is statistics?

6               MR. SIGELMAN:  Right.

7               MR. HERMAN:  Not medical

8          causation; is that correct?

9               MR. SIGELMAN:  Correct.

10               MR. HERMAN:  What

11          information did you see about

12          skeletal or orthopedic problems or

13          failure in bone healing coming out

14          of Madigan?

15               MR. SIGELMAN:  There was a

16          little bit on that.  I mean, he

17          actually generated some data.  I

18          don't recall if he addressed those

19          data in his report, but he did

20          some runs on data like that,

21          because Eric Weinberg was pursuing

22          that.

23               MR. HERMAN:  Do you know why

24          Eric Weinberg was pursuing that?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1            MR. SIGELMAN:  Yes.  Because
2       Eric was interested in the panoply
3       of all of the things that Vioxx
4       did.  And I think that we were
5       thinking in a creative way of
6       whether we could get into other
7       things in terms of risk/benefit.
8            MR. HERMAN:  That's fine.  I
9       appreciate you helping me out with
10      that.  And I didn't mean to take
11      up your time.
12           MR. SIGELMAN:  Oh, no
13      problem.
14           MR. HERMAN:  So go ahead
15      with your --
16           MR. SIGELMAN:  Ask me
17      anything.  That's fine.
18           Another e-mail in January
19      28, 2007 where it said, "You have
20      helped me so much with the placebo
21      trials."  So, we were interested
22      in -- you know, obviously, some
23      incredible trial work was done in
24      both the MDL and the states, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          we were hoping that we could make

2          even better the win/loss record,

3          and we were hoping also to add

4          some new things to the offense,

5          because Merck had just heard all

6          this stuff about VIGOR.  And we

7          had these big debates.  I remember

8          Egilman and I and Krumholz had

9          these big debates about how we

10         should go and how Krumholz should

11         go in the Hermans/Humeston trial

12         depending, of course, on what Mark

13         wanted to do.  We wanted to throw

14         them some new curves at Merck, and

15         so we were really using Madigan

16         for that purpose.

17              And specifically after

18         VIGOR, Merck used gold standard

19         placebo-controlled trials as its

20         strength.  It said, you know, the

21         gold standard is placebo, and you

22         can talk about VIGOR until the

23         cows come home.  That's naproxen.

24         But placebo, man, placebo is our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1        baby.  And what we wanted to do
 2        was take what Merck thought was
 3        its strength and make that the
 4        plaintiffs' sword.  And that's
 5        what I believe the Madigan report
 6        is.  It is using placebo data as
 7        the plaintiffs' sword.
 8             MR. SEEGER:  And just
 9        because we're on a tight schedule,
10        just another five minutes.  I just
11        want to give you a heads up.
12             MR. SIGELMAN:  Okay.
13             The next slide, I've already
14        told you about the 2000, the
15        statistically significant
16        increased risk.  Obviously, Merck
17        used its Alzheimer's trials as a
18        sword, and we thought that the
19        Alzheimer's trials, if you look at
20        the totality of the data and you
21        used them as prespecified analysis
22        of the intention to treat that was
23        in the Alzheimer's trials, you
24        would actually get statistically
```

FAC Resp. Amended Exhibit D -- 413

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1    significant increases not only in

2    all-cause mortality, but in

3    thrombotic cardiovascular events.

4    And Madigan's report is replete

5    with that.

6         With respect to Madigan's

7    report, what did we do?  First of

8    all, we suggested many of the

9    statistical analyses that Madigan

10   ran.  We actually said, we'd like

11   you to run this particular

12   analysis using ITT, look at this,

13   look at protocol 91, 78, do this,

14   do that.  We told him, we asked

15   him if he would use certain cutoff

16   dates for liability purposes.

17   Like September 15, 2000 was the

18   cutoff date for the data that was

19   used for the Advisory Committee

20   meeting in February of 2001.

21   March 16th, 2001 was the data

22   cutoff for the VIGOR labeling.  We

23   wanted all of these dates.  We

24   furnished him with countless,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1      hundreds of key documents.  We

2      determined what SAS data he

3      needed, and we obtained it, so we

4      would have a complete rendering of

5      their placebo-controlled trials.

6      And we consulted with him on

7      numerous technical issues such as

8      endpoint.

9           His expert report was served

10     in early October 2007, and his

11     report is replete with findings

12     from many of the statistical runs

13     and analyses earlier recommended

14     by Cohen Milstein.  For virtually

15     all of the drafting period, he

16     turned to Cohen Milstein for

17     review and input into the draft

18     report.  In fact, I was the only

19     person who saw that draft report

20     until the later drafts.  And Cohen

21     Milstein suggested many extensive

22     revisions.

23           MR. SEEGER:  In what case

24     was the report filed?

FAC Resp. Amended Exhibit D -- 415

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          MR. SIGELMAN:  Pardon me?

2          MR. SEEGER:  Do you know

3      what cases that report was

4      ultimately filed in, the Madigan

5      report?  We've asked this of other

6      people.

7          MR. SIGELMAN:  Whatever

8      cases were up in January of 2008.

9      And he was to give a deposition in

10     December, which obviously never

11     occurred.

12          And we suggested many

13     extensive revisions and additions

14     that he generally accepted and

15     incorporated into his final

16     report.

17          And then a couple more

18     slides.  First of all, you have

19     Jerry Avorn's comments on Dr.

20     Madigan's report.  He said, "His

21     review is far more detailed, more

22     quantitatively sophisticated and

23     appears to be based on a more

24     complete collection of trial data

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1      than I have seen before.  It is a

2      most comprehensive depiction of

3      their," that's Merck's,

4      "misstatement and

5      misinterpretation of this data

6      that I have seen.  Even people who

7      think they know 'the whole Vioxx

8      story' will be astonished at some

9      of his analyses."  And Dr.

10     Krumholz said, "Great job!  Best

11     report yet by far."

12           And, by the way, as I said

13     before, it wasn't the first time

14     Krumholz had seen Dr. Madigan's

15     data.  We were constantly sharing

16     his data.  And Dr. Krumholz was

17     using his statisticians at Yale,

18     particularly a man by the name of

19     Yung Fay Wang, to try to replicate

20     what Madigan had done so that he

21     could testify on it at trial.

22           So, anyway, that's generally

23     what I have to say, other than my

24     firm also complied with PTO 6 in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

 1          terms of our time and expense

 2          submissions.

 3               MR. SEEGER:  Does anybody

 4          have any questions?

 5               MR. LEVIN:  Could you tell

 6          me about that meeting in

 7          Philadelphia when Mark Robinson

 8          was there?

 9               MR. SIGELMAN:  Yes.

10               MR. LEVIN:  How did it come

11          about?

12               MR. SIGELMAN:  That meeting

13          came about at the instance of Eric

14          Weinberg, and my recollection is

15          that Eric was interested in

16          sharing information with the MDL.

17          And I remember specifically that

18          Mark Robinson also had reached out

19          to Eric.  At some point, Don

20          Arbitblit then said he would like

21          to come to the meeting.  He hadn't

22          been invited, not that we didn't

23          want him, we thought Mark Robinson

24          just wanted to come for a meeting.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          So, Don came and Jenny Gross from

2          Lieff Cabraser was there, and

3          Jerry Kristal was at that meeting,

4          Dr. Madigan was at that meeting,

5          Dr. Egilman was at that meeting,

6          and somebody from Sol Weiss' firm

7          I think was at that meeting, if

8          memory serves.

9               In any event, and I

10         remember, I gave a presentation of

11         some of the main data from

12         Madigan's report, and we were

13         willing to share the report.  In

14         fact, Don Arbitblit was sent in

15         the later stages a draft of the

16         Madigan report which he reviewed,

17         and, in fact, made one

18         contribution to the report.  He

19         came up with a very useful

20         document that was in the Madigan

21         report.  So, those data were fully

22         shared with the MDL, and I think

23         Eric Weinberg was specifically

24         interested in possibly an exchange

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

         1      of information.

         2              MR. LEVIN:  Do you know

         3      whether Russ Herman, Chris Seeger

         4      or Andy Birchfield knew about that

         5      meeting?

         6              MR. SIGELMAN:  I don't know.

         7      I wasn't convening the meeting.  I

         8      presume that -- I know that -- you

         9      know, I got a call about that

        10      meeting from you.  So, I presume

        11      that unless you were

        12      uncharacteristically quiet about

        13      the meeting, that you might have

        14      conveyed it.

        15              MR. LEVIN:  How do you do?

        16              MR. SIGELMAN:  And I

        17      remember you had concerns

        18      specifically about what the MDL --

        19              MR. LEVIN:  It was another

        20      world then.

        21              MR. SIGELMAN:  Pardon me?

        22              MR. LEVIN:  It is not your

        23      concern.  It was another world.

        24              MR. SIGELMAN:  Right.  In

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          any event, I remember specifically

2          that the information that we were

3          using with Dr. Madigan was stuff

4          that we developed since the MDL.

5          To be quite honest, what happened

6          in the MDL was, at some point, I

7          wanted to do some things with a

8          statistician, and I was informed

9          by John Restaino that for

10         budgetary reasons, they just

11         couldn't afford more statistical

12         work.  So, I ended up doing the

13         work through --  work that I

14         wanted to do through Dr. Madigan.

15         And that's kind of how I ended up

16         doing even more in New Jersey.

17              MR. LEVIN:  Don't take this

18         the wrong way.  This is for future

19         reference.

20              MR. SIGELMAN:  No, I

21         understand.

22              MR. LEVIN:  Were your hours

23         reported in the MDL or in the New

24         Jersey litigation for that?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1           MR. SIGELMAN:  Both.  Well,

2      I reported them separately to Russ

3      Herman.  I reported our hours for

4      MDL, and then I reported our hours

5      for New Jersey.

6           MR. SEEGER:  Okay.  Anybody

7      have anything?

8           MR. LANIER:  Thanks again,

9      Dan.

10               -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

                    C E R T I F I C A T E

 1

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147
23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 423

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: COHEN, PLACITELLA & ROTH
       Christopher M. Placitella, Esquire
       Harry M. Roth, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. SEEGER:  Chris, you sent
 3         in an affidavit, right?  I think
 4         we have something.
 5              MR. PLACITELLA:  It was a
 6         summary.
 7              MR. SEEGER:  So, this is the
 8         Court-appointed fee committee.  I
 9         think the idea here is to ensure
10         that we make sure everyone has had
11         an opportunity to express their
12         contributions to the case from the
13         common benefit standpoint.
14              Obviously we all know each
15         other.  I have a sense of what
16         went on in New Jersey and what
17         people did.  You've got 20
18         minutes, I believe, and we would
19         like to have 10 minutes at the end
20         for questions, if there are any.
21         You can use it any way you want.
22              MR. PLACITELLA:  I can
23         probably do this in five minutes.
24              MR. SEEGER:  It's up to you.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          Chris, just so you know, we've got

2          Linda here.  We're going to record

3          everything for Judge Fallon.

4                    MR. PLACITELLA:  Right.

5                    It is kind of a weird

6          position to be in with a bunch of

7          friends in a room talking about

8          money, but I guess there's worse

9          places to be in this world.

10                   When I got involved or we

11         got involved in this case, it was

12         post recall, and what I attempted

13         to do was to try to figure out

14         what was done and then figure out

15         where we could contribute,

16         basically.  Because there was a

17         lot of great work that was done

18         and a lot of people took a lot of

19         risks long before we got in the

20         cases.

21                   So, I spent a fair amount of

22         time in the beginning just

23         reviewing what had been done in

24         terms of depositions, documents,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        and things like that, and I

 2        determined that the place where I

 3        thought we could make the most

 4        contribution was in the public

 5        relations and marketing areas

 6        because there was still a lot of

 7        stuff to be developed.  So, that's

 8        really where I focused my efforts,

 9        not on who knew what and where in

10        terms of the science, but getting

11        and doing some unique things on

12        the PR side of things and on the

13        marketing side.

14             Just as an overview, it

15        looks like we spent, our firm,

16        about 5,000 hours, a little less,

17        slightly under that, which is

18        about two years' worth of full

19        time for a partner.  Now, I had

20        just left my old firm and joined

21        my new firm, and for the next two

22        years, I probably spent about 80

23        percent of my time doing Vioxx and

24        not generating many fees, and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          these guys kind of took a flyer on

2          our doing that.  So, there were

3          some real opportunity costs in

4          terms of what I did.  When I was

5          at Wilentz, I generated a lot of

6          work.  I was the number one

7          business getter there for years.

8          So, I really put that on hold in

9          developing our practice to do

10          Vioxx even when things weren't

11          going too well.

12               So, I spent, I figured about

13          80 percent of my time for two

14          years doing that, and other people

15          spent less portions of their time.

16               On the public relations side

17          of things, I don't think that that

18          had ever really been looked at

19          hard in the context of an MDL or a

20          mass tort that I had been involved

21          in, but it looked like a

22          vulnerable area in this case.  So,

23          I was involved and took the lead

24          in taking the depositions of Jan

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1      Weiner and Mary Blake, doing all

2      the document reviews.  There were

3      probably, between those two

4      deponents alone, 70,000 documents

5      that had to be gone through in one

6      way or another.

7           Now, that does not mean that

8      I looked at 70,000 documents, but

9      scanning through the databases and

10     pushing stuff out and looking at

11     things that made sense, and then

12     summarizing them, putting them in

13     databases, constructing

14     PowerPoints.

15          There were other depositions

16     I was involved with but did not

17     take the lead in, say, like

18     Westrick, where I identified

19     people had to be taken, but other

20     people helped.

21          It's interesting.  I guess

22     this is when I knew I was off the

23     wall.  When my son was in the

24     hospital with a collapsed lung and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        I was on the phone on a phone dep

2        in the Westrick deposition, Motley

3        Rice was taking the lead, that's

4        when I really knew I was off the

5        mark in terms of my priorities.

6             But in the public relations

7        stuff, in terms of depositions, I

8        think a lot of that stuff was

9        actually used in both the Federal

10       and State trials.  You know,

11       everybody in the world was told

12       that Vioxx didn't cause heart

13       attacks, and that message was

14       delivered ten times over to every

15       man, woman and child in the United

16       States in a single year.  I mean,

17       that was a significant piece of

18       evidence, I think.

19            We also spent a lot of time

20       battling over the video news

21       releases, you know, unearthing the

22       whole Loren Laine, Laura

23       Demopolous stuff.  We subpoenaed

24       the records, we litigated the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          right to have the videos.  Merck

2          wanted to keep them quiet.  We

3          unearthed them.

4               There were hundreds of hours

5          of videotape, most of which no one

6          ever had to look at.  I went

7          through them all, got the 15

8          minutes worth of gold, but there

9          was some pretty good stuff.

10              I think the Loren Laine

11         stuff was helpful in most cases.

12         We teamed up with Mark on the

13         Demopoulos depositions and those

14         videos.  We actually had to

15         litigate again the right to take

16         her deposition with conditions in

17         Philadelphia, and ultimately Judge

18         Higbee ruled that, as a result of

19         that battle, Merck could no longer

20         hire outside counsel for

21         independent witnesses and try to,

22         you know, keep secret what was

23         going on between Merck and outside

24         counsel's lawyers.  So, I thought

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          that was significant.

2                    Some of the documents we

3          uncovered that I know were used as

4          significant documents were the

5          Westrick letter to the FDA where

6          they were complaining that Pfizer

7          was committing a violation by not

8          giving both explanations of the

9          VIGOR trial, an FDA violation; the

10         2001 profit plan, the strategic

11         plan for the public relations

12         which was do no harm to Vioxx; the

13         SWOT team memos; and there was

14         other stuff, but they were some of

15         the highlights.

16                    On the marketing side, I

17         spent a lot of time identifying

18         who should be deposed.  I thought

19         some of the depositions were more

20         productive than others, but,

21         nevertheless, most of them took

22         the same amount of time.  I know

23         we tag-teamed with the MDL on the

24         Charlotte McKines depositions.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          She was the person who was the
2          ultimate supervisor for the "Be
3          the Power" and the development of
4          the CV card.  We took her for
5          multiple days.  Tens of thousands
6          of documents were reviewed.  We
7          met with experts to help us
8          prepare to do that right.
9              We took Wendy Dixon for
10         multiple days.  Interestingly
11         enough, I didn't really understand
12         the significance of Dixon's
13         depositions until much later,
14         because Dixon, the whole premise
15         of Merck's defense that they had
16         Dixon prepped for was the whole
17         Alzheimer's thing.  That was the
18         whole key that they had her
19         prepped on.  It wasn't until the
20         back end of the litigation when we
21         unraveled the Alzheimer's fraud
22         that if we ever had to go back to
23         Dixon again, I think we would
24         really kind of take her down.

Page 11

```
 1              Jo Jerman I did with
 2         Papantonio.  Papantonio, I think,
 3         did a great job.  I tag-teamed
 4         with him, but he really took the
 5         lead.  My role in the Jo Jerman
 6         dep is I have a cue card, and
 7         every time he asked a question, I
 8         would give Papantonio the cue card
 9         and say, didn't the lawyers ask
10         you to do this.  So, we spent a
11         lot of time doing that.
12              The CME training programs,
13         doing all of those documents.  The
14         ghostwriting stuff or the STI, I
15         spearheaded for New Jersey.  That
16         ended up to be about 60,000
17         related documents.  It could have
18         been better coordinated with the
19         MDL, frankly, because I thought we
20         were doing some parallel work.  I
21         think that that never really
22         developed to where it should have
23         been, to be honest.  I identified
24         it, litigated it, got the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          documents and then delegated to

2          have people finish it off.  And I

3          don't think it ever got finished

4          the way -- I mean, there was some

5          potential there that could have

6          been better, I thought.

7               I also was involved for New

8          Jersey in subpoenaing the Ogilvy

9          records.  We litigated the right

10         to get those records.  That review

11         was done in connection with the

12         Motley Rice firm.

13              I was originally the person,

14         I think, that got all the

15         advertising materials, integrated

16         them, all the commercials with the

17         print, and then distributed that

18         to all the lawyers around the

19         country who needed it.

20              All the information I did,

21         you know, the MDL coordination was

22         a little bit clumsy.  It got

23         better as it went along.  All the

24         stuff that we uncovered, we turned

Page 13

1          over.  I know that Mark Robinson

2          actually took the stuff and used

3          it in seminars, but I actually got

4          on the phone and helped him prep

5          the marketing expert and turned

6          all those materials over.  I'm not

7          sure what route it ultimately

8          went, but I know that we spent

9          some amount of time doing that.

10              We were involved in the

11         whole Joanne Lahner privilege

12         fight, which to this day, I don't

13         think is actually over.  It was my

14         view that that was really a very

15         soft spot on the underbelly of

16         Merck and their Achilles' heel to

17         show that the legal department at

18         Merck was really at the base of

19         the fraud.  We had our in-camera

20         hearings before the judge where I

21         cross-examined Lahner.  I had

22         never been -- I have never

23         conducted a cross-examination

24         where then the judge asked me to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          leave the room and then she

2          conducted her own

3          cross-examination.  Then during

4          the examination, the law clerk

5          would come out and ask me for

6          different things that the judge

7          could ask Lahner about.

8                  MR. GIRARDI:  That's

9          happened to me.  They said to me,

10         get out of the room, Girardi, and

11         I'll do it myself.

12                 MR. PLACITELLA:  Right.  So,

13         unfortunately, I think the Merck

14         lawyers stayed in there, so, they

15         had a lot of things to say that we

16         never really got to hear, and that

17         issue is still in flux, I guess,

18         although on the first round, she

19         wasn't going to give us all we

20         wanted, but there's still a lot of

21         privileged stuff under review.  I

22         think the settlement itself kind

23         of slowed that train down.  But I

24         still believe that that was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        significant effort that had

2        significant potential.

3             I did spend a fair amount of

4        time assisting Eric Weinberg, not

5        as the primary, but as the

6        secondary on experts.

7             I spent a lot of time, and I

8        don't know whether I drew the

9        short straw, but I spent a lot of

10       time with Dave Egilman in helping

11       with Mark's trials, doing his

12       depositions, Jay Geller, Sandra

13       Greenman, Michael Hoffman.  I

14       spent an awful lot of time with

15       Dr. Kostis, who gave us a lot of

16       guidance, and I think it actually

17       inured to the benefit of all for a

18       lot of reasons, but he gave us a

19       lot of guidance on even the

20       marketing end of things.

21            I spent a lot of time with

22       David Madigan, who I would submit,

23       although late in the game,

24       produced one of the best work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          products in terms of an expert

 2          that I had seen in the litigation

 3          in terms of his stuff on the

 4          Alzheimer's and the SAS data.  And

 5          I spent, I guess I was the

 6          exclusive person with Nesi for a

 7          long time, who ended up writing

 8          the book, and the only one that

 9          ever got in the book was Lanier,

10          none of the rest of us.

11               MR. HERMAN:  He's good at

12          that.

13               MR. LANIER:  And I never

14          talked to him.

15               MR. PLACITELLA:  You never

16          talked to him.  He's very good.

17          Never talked to him.  So, that was

18          a lot of time.

19               We also spent a lot of time

20          with lawyer training, especially

21          in New Jersey, of having people

22          there assembling materials to give

23          to them so they could better

24          represent their clients.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          We actually took a little

2          bit of everybody's work product.

3          We took some of the stuff that

4          Jerry Kristal did, we took some of

5          the stuff that Chris did, we took

6          some of the stuff that Andy did,

7          that Mark did, put it on a CD and

8          made it available to people so

9          they could actually go in and do a

10         decent job when it came time to do

11         a doctor's deposition and the

12         detail people's depositions.

13              MR. ROTH:  And having their

14         clients deposed.

15              MR. PLACITELLA:  And having

16         their clients deposed.

17              In terms of trial

18         assistance, I figure I spent

19         probably two full weeks in various

20         trials in New Jersey helping out,

21         whether it was prepping for an

22         expert, actually being the one who

23         did the depo cuts that no one

24         wanted to do, you know, the not

FAC Resp. Amended Exhibit D -- 440

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          fun stuff.  So, I spent some time

2          in Perry's trials and Mark's

3          trials.  Hopefully we gave some

4          significant assistance there that

5          was helpful.

6                  After the settlement, I was

7          put in charge of working out or

8          helping to work out the lien

9          issues with Garretson, although I

10         would have to say that Garretson

11         really carried that ball.  I

12         didn't have to do that much other

13         than calm the forces inside of New

14         Jersey.  We took a leading role

15         with Judge Higbee in confronting

16         some of the ethics issues that

17         were being raised as it related to

18         the settlement.  We had gotten

19         independent ethics counsel, worked

20         through some of that stuff with

21         Chris' help and Judge Higbee, and

22         I think, you know, we played a

23         real role in keeping people

24         focused on what the real issues

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1           were.

2                 That's kind of an overview.

3           I'm assuming that almost everybody

4           here knew how hard we worked and

5           how much time we dedicated.  Some

6           efforts, frankly, when you are in

7           this kind of litigation, bear more

8           fruit than others, but I think we

9           produced some significant fruit,

10          and everybody here has made a

11          tremendous contribution, and I

12          think we helped fill in some of

13          the gaps, and saying more than

14          that is, frankly, a little

15          awkward.

16                MR. SEEGER:  That was very

17          helpful, actually, from my

18          perspective to remind everybody of

19          the things that you worked on,

20          because we're sort of at the end

21          of the road now, so, I think those

22          things could be forgotten, so, it

23          was helpful for me.

24                MR. HERMAN:  I just have a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          couple of questions, Chris.  The

 2          ethics counsel you retained, who

 3          was that?

 4              MR. PLACITELLA:  Jeff

 5          Pollack.

 6              MR. HERMAN:  The reason I'm

 7          asking is that I'm not sure that

 8          that issue is over yet, so, we may

 9          be calling on you.

10              MR. PLACITELLA:  Yeah.  He

11          helped us work through everything,

12          because one of our co-counsel from

13          Maryland had some major issues,

14          and they had a lawyer in their

15          office who was on the Maryland

16          ethics committee, and then we had

17          some kind of side shots from other

18          places, including the guys from

19          Connecticut.  And you know who all

20          those were.

21              MR. SEEGER:  I was on some

22          of those calls with you.

23              MR. PLACITELLA:  Right.  So,

24          we retained independent counsel
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          who was on the New Jersey ethics

2          committee really who was very,

3          very helpful, I thought.

4                MR. SEEGER:  Dennehy, right?

5                MR. PLACITELLA:  Dennehy

6          actually was the guy at Wilentz,

7          but Jeff Pollack.  He also had

8          some significant issues.  Jeff

9          Pollack, who was on the New Jersey

10         Supreme Court ethics committee.

11               MR. SEEGER:  I spoke with

12         him.

13               MR. PLACITELLA:  Yes.  We

14         retained him independently to help

15         us kind of get through some of

16         those moguls.  I thought he was

17         very helpful.  In fact, I think he

18         might have given us a written

19         opinion.

20               MR. ROTH:  He did.

21               MR. PLACITELLA:  He gave us

22         a written opinion.

23               MR. HERMAN:  You said that

24         Motley at one point was taking a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          deposition and your son was ill

2          and you were on the phone?

3               MR. PLACITELLA:  Right.

4               MR. HERMAN:  What sort of

5          interaction did you have with

6          Motley Rice?

7               MR. PLACITELLA:  Yeah, we

8          had an ongoing relationship with

9          him.  We're close friends for a

10         long time.  They worked on the

11         Ogilvy.  They helped on the public

12         relations.  They helped on the

13         privilege log issues

14         significantly.  They took the lead

15         in the Westrick deposition.  I

16         think Fred Thompson might have

17         done that deposition.  I think

18         they might have done some of the

19         work on the STI.

20              So, they were an integral

21         part of -- you know, there was too

22         much, frankly, for me just to do,

23         and they carried a lot of the

24         water on that end of things.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1           MR. LANIER:  Based on the

2       way you perceive what Ness Motley

3       did, because I think you probably

4       worked closer with them than

5       anybody else, right?

6           MR. PLACITELLA:  Right.

7           MR. LANIER:  Based on the

8       way you perceive what they did and

9       what you perceived you did, if you

10      were called on to make the hard

11      decision, where do you

12      comparatively rank yourself with

13      Ness Motley?  Above, same level or

14      below in terms of contributions?

15          MR. PLACITELLA:  I think

16      that it was my job to steer the

17      ship, to figure out what had to be

18      done, try to figure out what the

19      soft spots were, and that was a

20      major contribution.

21          In terms of the number of

22      hours they put in, I don't even

23      know the number -- you know, I

24      don't know, I haven't seen their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        submission.  I'll say any time

2        they do things, they do it right

3        --

4              MR. WEITZ:  I think that

5        it's an important question,

6        because I'll tell you why, because

7        people like myself and Chris and

8        Mark know your contribution in

9        Jersey.  We worked with you, we

10       know what you guys did.  Ness

11       Motley was sort of out there in

12       the periphery.  They weren't in

13       the MDL, they weren't in New

14       Jersey, so we are trying to get a

15       feeling, and you really know

16       better than anybody, as to what

17       their contribution is.  So, try

18       to --

19             MR. PLACITELLA:  Well, I

20       know what they did in relation to

21       me, which was significant.  They

22       helped significantly on the Lahner

23       issue.  They spent a lot of time

24       going through the documents.  They

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          helped with the briefing on that

2          issue.  They showed up at the

3          hearing.

4                  MR. SEEGER:  You and Fred

5          handled that, I remember that.

6                  MR. PLACITELLA:  Correct.

7          So, they spent a lot of time on

8          that.  They spent a lot of time on

9          the Westrick PR issue.  They spent

10         a fair amount of time with

11         Hoffman, who was the ethics

12         expert.  That was the person that

13         they were in charge of taking.

14                 They assisted with Kostis

15         and some others.  I mean, they did

16         a significant amount of work.

17                 MR. WEITZ:  Were they doing

18         things in conjunction with you at

19         your direction or were they doing

20         it on their own?

21                 MR. PLACITELLA:  No.  They

22         were really doing it in

23         coordination with what I was

24         doing.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1            MR. LEVIN:  Were you giving

2        them the assignment?

3            MR. PLACITELLA:  No.  We'd

4        split it up.

5            MR. LEVIN:  You were like

6        working together?

7            MR. PLACITELLA:  Right,

8        right.  Since I had reviewed

9        pretty much everything at one

10       point, I saw my role as trying to

11       figure out where the gaps were

12       and --

13           MR. LEVIN:  I guess what you

14       are saying is, they weren't

15       duplicating what you were doing --

16           MR. PLACITELLA:  No, they

17       were not.

18           MR. LEVIN:  -- they were

19       supplementing?

20           MR. LANIER:  Did you get

21       them involved in the litigation,

22       did they get you involved, or did

23       they get involved independently?

24           MR. PLACITELLA:  I think it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1        was kind of independently, but,

2        actually, we had a work in

3        triumbrant with Sol Weiss where,

4        in the beginning, we had a --

5        because we don't really know how

6        the dynamics of things actually

7        unfold, but in the beginning, the

8        way we worked it out is Sol,

9        Motley Rice and our firm were

10       going to go in and do whatever we

11       thought needed to be done

12       together.  So, we kind of divided

13       up responsibilities.  So I wasn't

14       giving them direction.  We were in

15       it together.

16            Then, of course, as the

17       dynamics and all of these things

18       happened, directions change a

19       little bit because, well, you are

20       not going to duplicate what Seeger

21       is doing, and you are not going to

22       duplicate what Perry has done or

23       Mark has done.  You are just not

24       going to do that, so...

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1              MR. HERMAN:  What I'm really
 2         interested in is the fact that you
 3         primarily did the work for your
 4         firm, not someone else, not some
 5         paralegal, or anybody else, it was
 6         really you?
 7              MR. PLACITELLA:  It was
 8         primarily myself.  Harry helped,
 9         he did a lot of client stuff.
10         David Lenrow, who was a physician
11         in my office --
12              MR. HERMAN:  But these were
13         partner level folks?
14              MR. PLACITELLA:  Correct,
15         yeah.
16              MR. SEEGER:  Not low level
17         people?
18              MR. PLACITELLA:  Yes.
19              MR. HERMAN:  I think that's
20         important.
21              MR. WEITZ:  Chris did most
22         of the work.
23              MR. HERMAN:  With regard to
24         Motley Rice, Fred Thompson was the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          main partner on that?

2               MR. PLACITELLA:  Actually,

3          they had -- Fred was the partner

4          most of the time that was doing

5          that.  But they had Carmen Scott,

6          who is a very competent lawyer,

7          Henry Leventis, Josh Littlejohn.

8          I mean, they had a number --

9               MR. WEITZ:  Wasn't Ann also

10         involved?

11              MR. PLACITELLA:  Ann Ritter

12         was for a while.  Jeff Thompson in

13         the beginning.  So, they had some

14         significant people.  I mean, they

15         weren't just throwing a bunch of

16         low level people out.  They had

17         some senior people.

18              MR. LEVIN:  Chris, was

19         somebody in your firm working with

20         the accountant to straighten out

21         your costs and hours?  Because you

22         have $41,000 in costs that you

23         want to recover and a significant

24         number of hours.  You say that's

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

 1      Harry?

 2              MR. ROTH:  Yes.  We're --

 3              MR. LEVIN:  Keep doing that

 4      so that we can get that plugged

 5      in.

 6              MR. ROTH:  We are hopeful

 7      that by the end of the week the

 8      accountant will have back the

 9      reformatted sheets.

10              MR. PLACITELLA:  By the way,

11      right before I left Wilentz, they

12      put in, I think, 50,000 for Nesi

13      as a contribution.  We never

14      claimed it.  I don't know if they

15      ever claimed it.  I don't know how

16      they would claim it, but that was

17      a clear common benefit.  It is not

18      my cost, but it is their cost.

19              MR. WEITZ:  Were you

20      handling Motley Rice's cases?

21              MR. PLACITELLA:  We were

22      local counsel.

23              MR. WEITZ:  And cases that

24      were in the Jersey court, had you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1          worked up cases on the discovery

 2          docket?

 3                MR. PLACITELLA:  Yes.

 4                MR. WEITZ:  Tell us how

 5          many.  Because I remember you

 6          being actively involved as one of

 7          the guys that were actually trying

 8          to push some cases.

 9                MR. PLACITELLA:  Everybody

10          was -- you remember, it was who

11          can push their case out first.  We

12          were all trying to push out cases.

13          We were doing the docs.

14                MR. SEEGER:  Actually, we

15          were --

16                MR. WEITZ:  If you remember,

17          there were very few guys.

18                MR. PLACITELLA:  I

19          remember --

20                MR. ROTH:  You know, in

21          terms of the group that we were

22          working with, Motley Rice was also

23          one of the groups that was

24          interested in pushing their cases.

FAC Resp. Amended Exhibit D -- 454

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

 1          MR. PLACITELLA:  And

 2     Simmons, they pushed pretty hard.

 3          MR. ROTH:  These were not

 4     guys that were taken aback.  We

 5     had some guys who were sitting

 6     around, hurry up, hurry up, get me

 7     in, and Motley Rice was not one of

 8     those guys.

 9          MR. HERMAN:  How many cases

10     aggregate did you all have with

11     Motley Rice?

12          MR. PLACITELLA:  About 400?

13          MR. ROTH:  A little less.

14     360.

15          MR. WEITZ:  What was the

16     total number of cases that you

17     guys submitted to the settlement,

18     that Cohen Placitella submitted?

19          MR. PLACITELLA:  Or through

20     co-counsel?

21          MR. WEITZ:  Not through

22     co-counsel, but for your firm.

23          MR. PLACITELLA:  Oh,

24     probably not that many.  A few

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          hundred.

2                    MR. ROTH:  I think we were,

3          I want to say 250, and that may be

4          generous.

5                    MR. BIRCHFIELD:  Is that

6          your cases and Motley Rice?

7                    MR. PLACITELLA:  No, no,

8          just ours.

9                    MR. BIRCHFIELD:  You talked

10         about the working relationship.

11         Was there a joint venture on these

12         cases with Sol?

13                   MR. PLACITELLA:  It was a

14         loose arrangement that was never

15         totally formalized.  But, you

16         know, we've been in this business

17         for a long time, and probably

18         there's a lot of things that

19         should be.  You just trust people.

20                   MR. LEVIN:  Was there a fee

21         sharing agreement?

22                   MR. PLACITELLA:  We never

23         got that all the way 'til the end.

24                   MR. LEVIN:  Is there a fee

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          sharing agreement?

2                    MR. PLACITELLA:  We never

3          got all the way to the end.

4                    MR. LEVIN:  Will there be a

5          fee sharing agreement?  That's for

6          you being local counsel?

7                    MR. PLACITELLA:  Right.

8                    MR. LEVIN:  Not in terms of

9          anything else?

10                   MR. PLACITELLA:  Correct.

11                   MR. HERMAN:  Just a couple

12         of things.

13                   MR. SEEGER:  We have about

14         two minutes, just to stay on time.

15                   MR. HERMAN:  Just a couple

16         of things.  In fairness, make sure

17         you read the Fifth Circuit

18         opinions in a couple of cases.  If

19         you are not familiar with the

20         cases that are governing fees in

21         quasi class actions and class

22         actions, we'll send out a memo

23         again, but you can access those

24         cases on the judge's website.  One

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1       is Murphy Oil, which is Judge

2       Fallon's latest, which gives you a

3       pretty good road map on the law

4       and where you need to go and where

5       we need to go.

6              Of course the Johnson

7       factors originated in the Fifth

8       Circuit, and those factors have

9       been reaffirmed in the Mobil Oil

10      case.  So, there are two or three

11      cases that you have to look at.

12             We hope that all the fee

13      issues are going to be resolved,

14      but Judge Fallon has advised us to

15      advise everyone seeking a fee that

16      in the event that things are not

17      resolved, he's going to do what

18      the Fifth Circuit requires him to

19      do.  He's going to have some

20      former Assistant U.S. Attorney put

21      people under oath, take

22      depositions, et cetera.

23             The two things that we're

24      responsible for are transparency

FAC Resp. Amended Exhibit D -- 458

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          and consistency.  So, even though

2          you don't know, you are not

3          familiar with what Ness Motley,

4          for example, submitted or how many

5          hours, you will be privy to what

6          everybody else is privy to by the

7          time this process works its way

8          through.

9               MR. PLACITELLA:  I

10          appreciate it.  I know that this

11          is not an easy thing for you.  I

12          will say one thing about this

13          litigation.  In the end, it was

14          really a collaborative effort even

15          though it didn't start that way.

16          I mean, everybody -- it was always

17          like a substantial contributing

18          factor.  There were a lot of

19          really significant pieces, and

20          that's a tribute to everybody, I

21          think.

22               MR. LANIER:  You found the

23          Loren Laine piece that I used in

24          one of the trials.  I think you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          found it by the third trial.  I

2          don't know if you found it by my

3          second.

4                    MR. SEEGER:  Bogus quote.

5                    MR. LANIER:  The bogus

6          quote.  That was you, wasn't it?

7                    MR. PLACITELLA:  Right.

8                    MR. LANIER:  It was a good

9          clip.

10                    MR. PLACITELLA:  It was very

11          helpful.

12                    MR. SEEGER:  By the way, I

13          don't see Wilentz's stuff.

14                    MR. LEVIN:  No.

15                    MR. SEEGER:  I don't know if

16          they submitted it.  I don't know

17          if you want to put a call in to

18          them.

19                    MR. LEVIN:  If there's a

20          cost, you know, nobody wants to

21          see somebody not get reimbursed.

22                    MR. PLACITELLA:  Because

23          they didn't really do much, you

24          know --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          MR. SEEGER:  Even their

2     costs.

3          MR. PLACITELLA:  But their

4     costs, you know, that's a

5     significant piece.

6          MR. SEEGER:  That was

7     helpful.  Thank you.

8          MR. PLACITELLA:  Thank you.

9               -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1            C E R T I F I C A T E

 2

 3            I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24
```

FAC Resp. Amended Exhibit D -- 462

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: CUNEO GILBERT & LADUCA
        Jonathan Cuneo, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Amended Exhibit D -- 463

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. CUNEO:  For those of you

 3         who don't me, my name is Jonathan

 4         Cuneo, and I'm the senior partner

 5         in a Washington, D.C.-based firm

 6         called Cuneo Gilbert & LaDuca.

 7         I've got sort of what I believe is

 8         going to be an unusual story to

 9         tell you, and I thought I might

10         approach it by simply asking and

11         answering a few questions and then

12         taking yours.

13              The first question is, who

14         are we and what is it that is

15         unique that we bring to the table?

16         And the answer is essentially like

17         this.  We are a Washington,

18         D.C.-based plaintiffs' commercial

19         firm.  Every one of our partners,

20         at the same time, has a deep

21         background in government or public

22         relations or running political

23         kind of campaigns.  And, so, for

24         example, I started my career at
```

FAC Resp. Amended Exhibit D -- 464

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1      the Federal Trade Commission,

2      working in the office of the

3      general counsel, and then with

4      antitrust counsel to the House of

5      Representatives in the early

6      1980s.  That was my formal title,

7      but that was the sum and substance

8      of it when Peter Trevino was the

9      chairman.

10          I then formed my own

11     practice, and my choices at that

12     time were to go to a big law firm

13     and pretend that I graduated five

14     years before instead of nine years

15     before, or to start my own

16     practice, which I did.  I began a

17     dual practice of legislative work

18     and basically general commercial

19     litigation.  Through the years, I

20     have represented the securities

21     lawyers at an association called

22     NASCAT, the antitrust plaintiffs'

23     lawyers in a group called COSAL,

24     we continue to represent them, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        my law firm grew from just me and

 2        a telephone to about 16 lawyers.

 3            The principal lawyers who

 4        were involved here were me and my

 5        partner, Pamela Gilbert, who is a

 6        recognized consumer advocate in

 7        Washington.  She began her career

 8        at US PIRG and then became

 9        director of Congress Watch.  And

10        then during the Clinton

11        administration, she was the

12        executive director, which is the

13        top civilian job at the Consumer

14        Product Safety Commission.  She

15        has testified before Congress well

16        over 50 times.  She's done

17        literally hundreds of television

18        appearances, and she continues to

19        represent AAJ in a number of

20        capacities.  And I think she was

21        very honored that President Elect

22        Obama asked her to direct the

23        transition for the Consumer

24        Product Safety Commission.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          So, we have always had one

2      foot in the litigation door.  I

3      have a very active litigation

4      practice, not as active as any of

5      the lawyers in this room, but

6      we've done about 100 cases around

7      the country, antitrust, consumer,

8      derivative kind of cases, and at

9      the same time, we have a foot on

10     Capitol Hill, and we deal with the

11     media on a daily basis.

12          I used to work as a

13     reporter.  One of the people who

14     started with me on this case,

15     Michael Waldman, was director of

16     the office of speech writing for

17     President Bill Clinton.  If you

18     read his resume, he wrote four

19     State of the Union messages to

20     address us to the United Nations.

21          MR. LEVIN:  Now he runs the

22     Brennan Center.

23          MR. CUNEO:  Yes.  Now he is

24     the director of the Brennan Center

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          in New York.

2                 So, what is it that caused

3          us and the committee that was

4          running this case to have a need

5          for our services?  Well, in

6          general, Congress was interested

7          in the issue of regulation and

8          preemption and also specifically

9          in Vioxx.  So, even before the

10         committee was formed, we

11         interacted with the various

12         congressional committees, covered

13         the hearings, sent the materials

14         on, and my main points of contact

15         with the committee have been my

16         old friends, Chris Seeger and

17         Arnold Levin.

18                And second, after Mark

19         achieved such a terrific and

20         unexpected result in the Ernst

21         case in Texas, the committee that

22         was running this case I think

23         correctly perceived an increased

24         political risk coming from that

FAC Resp. Amended Exhibit D -- 468

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      verdict, because why is it?  Well,

2      Merck was and probably still

3      remains one of the most respected

4      names in corporate America, ran a

5      very successful public relations

6      campaign to make it sound as if

7      this was a Perry Mason result,

8      that it was something that was

9      against all the odds and the

10     evidence.  And really this goes to

11     show you the tremendous risks and

12     terrors that the jury system in

13     the United States imposed.

14         So, as a group, they, I

15     think, or people who were in this

16     case, were correctly concerned

17     about the possibility of an

18     Arizona/McDonald's coffee case

19     kind of a PR campaign by the

20     defendants.  I was asked to look

21     over the daily press, which I did

22     while I was on vacation, and we

23     held a number of conference calls,

24     and what we decided to do was to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          assemble an evidence book to show

 2          that this wasn't simply a matter

 3          of snake charming and magical

 4          tricks and Houdini, but actually

 5          there was some evidence at least

 6          to support them.

 7              So, in September,

 8          specifically September 21st, 2005,

 9          I was having difficulty accessing

10          exactly what the evidence is.  I

11          came and visited Chris Seeger, and

12          he at that time effectively Tom

13          Sawyered me into staying in

14          Atlantic City for the next seven

15          weeks.  As I told you, I ran, and

16          during that period of time, on a

17          daily basis I managed the press

18          for the trial, conducted

19          background briefings, we faxed

20          things all over the country, we

21          dealt with members of Congress, in

22          addition to running my own law

23          practice.

24              Now, if inconvenience were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      the test of what kind of a fee

2      that we would be awarded, then we

3      would be entitled to a very high

4      fee, indeed, because like all of

5      us, we work in a workday world

6      where I have court hearings and

7      things that are scheduled, and we

8      basically dropped everything and

9      came to Atlantic City.  We missed

10     one day of trial in the next seven

11     weeks.

12          I was here or Pam was here

13     every single day.  Some days we

14     went back to work at night and

15     conducted business.  Some days I

16     went to New York and conducted

17     business, but we were here during

18     the trial for all seven weeks.

19          Now, that was a situation in

20     which I've learned at that time

21     that there were really three or

22     four aspects to what the

23     defendants were doing.  One is, it

24     was clear to me that they had a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1      courtroom presence where they were

2      chastened, and they learned from

3      their experience in Texas.  Every

4      single thing, from the fact that

5      Diane didn't wear any bling to the

6      way they got out of their bus and

7      marched in the courtroom and went

8      out at night had been focus

9      grouped and orchestrated.  It was

10     very, very careful.

11          In the room, in addition to

12     the lawyers who were actually

13     trying the case, was a partner

14     named Jim Fitzpatrick from the

15     Dewey firm in New York, who, in

16     turn, was being directed by a

17     partner whose name was Ted Mayer,

18     whose father, by the way, was a

19     great public health advocate,

20     ironically enough, as president of

21     Tufts University.

22          But in addition to helping

23     Jim, they had a professional,

24     former reporter, but a crisis

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1    management professional whose name

 2    was Kent Jarrell.  So, Merck

 3    mounted a campaign that was meant

 4    to reflect their view of what was

 5    happening in the courtroom every

 6    day through the media, across the

 7    world, to the Congress, and

 8    basically an attempt to shape

 9    public opinion.

10         My role during that seven

11    weeks was to counter.  As I say,

12    we had a legitimate view, I think,

13    that if the Humeston case had gone

14    as I believe it should, and there

15    had been a significant -- in fact,

16    it did -- and there had been a

17    significant plaintiff's verdict,

18    we would have faced an onslaught

19    or the potential of an onslaught,

20    and my job was to start putting

21    down the sandbags in order to

22    prevent that from overwhelming our

23    position.

24         So, what results did we

FAC Resp. Amended Exhibit D -- 473

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1         achieve?  Well, I think that we

2         gave you increased connections on

3         Capitol Hill.  By the way, this is

4         something that we not only did for

5         you, but we did it in a very

6         formal role in the Enron case.  We

7         were officially designated

8         Washington counsel.  We had a

9         huge, huge, huge amount of work to

10        do in that case.  As you know,

11        there were a whole series of

12        congressional hearings.  We

13        interacted with every committee,

14        every member of the press who was

15        up there, and we did it in a way

16        that was completely anonymous, I

17        might say.  And that's our role.

18        We did it in the Worldcom case,

19        and to a much lesser extent, we

20        did it with you.

21             At the end of the trial, it

22        didn't go in a way that we had

23        wanted it to go, and it didn't go

24        the way Chris had expected it to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        go, I think.  Maybe I was more

2        optimistic about it than he was,

3        because I thought that he and

4        David Buchanan did a magnificent

5        job in presenting the case to the

6        jury, but at that time, our role

7        ceased.  It ceased.  You did not

8        need the insurance policy against

9        Congressional action at that

10       point.  It was, you know, they won

11       one, you won one.

12            After that, it was merely a

13       matter of, it was like a World

14       Series.  It didn't have the same

15       inherent danger.  After that, in

16       consultation with a group who was

17       running the case, we ceased our

18       activities and essentially, with

19       very minor exception, have done

20       nothing else since.

21            So, that is basically 80 or

22       so percent of our work.

23            In addition, we had 20

24       percent of work that was performed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          by other members of our firm in

2          close consultation with Arnold

3          Levin, specifically.

4                  MR. HERMAN:  I'm sorry, in

5          consultation with whom?

6                  MR. CUNEO:  Arnold Levin,

7          specifically.

8                  MR. HERMAN:  Okay.

9                  MR. CUNEO:  At that time,

10         for example, we represented the

11         Massachusetts plaintiff in the

12         national class you were putting

13         together.  We did a lot of work on

14         the Massachusetts plaintiff, Iowa,

15         Indiana and others.  And so that

16         was a minor part of what we did,

17         but it was a part, nonetheless.

18         Again, those activities ceased a

19         long time ago.

20                 I'm proud of the fact that

21         we were able to come here and

22         literally, at the drop of a hat,

23         help for a period of seven weeks

24         at the time.  I think that Chris

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        and others were very pleased with

 2        the job that we did.  And at the

 3        same time, like a member of the

 4        Cincinnatus, we went home.  I had

 5        many other cases to do, we got out

 6        of your hair, so much so that I

 7        didn't even follow it enough to

 8        understand that I might have

 9        presented an affidavit here.  We

10        did exactly as we were requested,

11        nothing more, nothing less,

12        nothing else.

13             MR. LANIER:  Can I ask a

14        question?  I don't mean to

15        interrupt.  Are you done?

16             MR. CUNEO:  No, I'm done.

17        I'm a little nervous that you are

18        asking.

19             MR. LANIER:  Were you paid

20        for any of that work that you did?

21        Did you bill for it?  What kind of

22        arrangement did you have?

23             MR. CUNEO:  It was purely

24        contingent.  We paid for our own
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          expenses.  We were not paid for
2          it.  I think I legitimately could
3          be an expense of the case, but
4          that's not the way it was.  We
5          billed our time, and we paid our
6          own expenses.
7                MR. LANIER:  Why wouldn't it
8          be an expense in the case?
9                MR. SEEGER:  Actually,
10         that's an interesting comment.  I
11         never even thought of it.
12               MR. LEVIN: It's something
13         that we have to discuss.
14               MR. SEEGER:  It was a very
15         busy time, obviously.  It was
16         right after Mark's Ernst verdict.
17         I had press all over the place.  I
18         actually got a call from you,
19         Arnie, saying if would be helpful
20         if you had somebody running to the
21         press.  And then, because it was
22         you, John, I knew you, I said yes,
23         that would be very helpful,
24         because we are getting swamped.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        It was the first two trials.  We

2        were literally being swamped, and

3        they were flooding our workroom,

4        they were finding where we were.

5        So, John came down and ran

6        interference and handled that

7        aspect of the case.

8            MR. CUNEO:  Just so you know

9        it, too, in order that I didn't

10       get in their hair, there were

11       documents that had to --

12           MR. SEEGER:  Oh, you were in

13       our hair.  You had more requests

14       for documents.  You were doing

15       your job.

16           MR. CUNEO:  But I brought my

17       own guy up to copy documents and

18       to do work.  And he also helped

19       out.  In the 12 hours of the day

20       he wasn't working for me, he

21       worked with Chris as a paralegal.

22           MR. SEEGER:  Actually, I

23       forgot that.

24           MR. LEVIN:  The other work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          that John said he did, and it was

2          minimum, because everybody had

3          minimal work, Judge Fallon wanted

4          a master complaint with a

5          plaintiff for each state in the

6          event that there had to be state

7          issues and what have you, and I

8          think he provided five or six.

9               MR. SEEGER:  For subclasses?

10               MR. LEVIN:  Well, standalone

11          and state classes because he was a

12          resource there.

13               MR. HERMAN:  His direction,

14          actually, was see if you can group

15          states according to issues.

16               MR. LEVIN:  Yes.  And that's

17          what John did.

18               MR. HERMAN:  That's why we

19          needed it.

20               MR. CUNEO:  We did some work

21          on that.

22               MR. LEVIN:  John, this has

23          nothing to do with whether you

24          become a lawyer or a consultant, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
1        guess, but you have 1,429 hours

2        that are still being rejected.

3        Are you perfecting them?

4            MR. CUNEO:  Yes.  We did

5        that last week.

6            MR. LEVIN:  As of November

7        24th --

8            MR. CUNEO:  No, we did that

9        last week.

10           MR. LANIER:  Off the record.

11               -  -  -

12           (Whereupon, a discussion off

13       the record occurred.)

14               -  -  -

15           MR. CUNEO:  I guess that if

16       you wanted to go that route, what

17       you would have to do, Mark, would

18       be to allocate.  That is easily,

19       easily doable.

20           MR. SEEGER:  We'll get back

21       to you.

22           MR. LEVIN:  Could you do us

23       a favor and send us each -- see,

24       we don't have the accountants --
```

FAC Resp. Amended Exhibit D -- 481

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          we don't have your hours, I don't,

2          anyway, I just have totals from

3          the accountant.  If you could send

4          us what you sent to the accountant

5          as the breakdown, we can get it

6          amongst ourselves.

7               MR. LANIER:  Great idea.

8               MR. CUNEO:  Okay.  In other

9          words, there are two --

10              MR. LEVIN:  I know you have

11         sent it around 20 different times.

12              MR. CUNEO:  Can we go off

13         the record?

14              MR. LEVIN: Yes.

15                   -  -  -

16              (Whereupon, an

17         off-the-record discussion was

18         held.)

19                   -  -  -

20              MR. SEEGER:  Thank you.

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1            C E R T I F I C A T E
 2
 3            I, LINDA L. GOLKOW, a Notary
      Public and Certified Court Reporter of
 4    the State of New Jersey, Registered
      Diplomate Reporter, Federally-Approved by
 5    the United States District Court of
      Pennsylvania, do hereby certify that the
 6    foregoing is a correct transcript of the
      testimony as taken stenographically by
 7    and before me at the time, place and on
      the date hereinbefore set forth.
 8
 9            I DO FURTHER CERTIFY that I
      am neither a relative nor employee nor
10    attorney nor counsel of any of the
      parties to this action, and that I am
11    neither a relative nor employee of such
      attorney or counsel, and that I am not
12    financially interested in the action.
13
14
      _____
15            Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147
16            Notary Expiration:  1.2.10
              CCR Number:  30X100176200
17
18
19
20
21
22
23
24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:          ENGSTROM, LIPSCOMB & LACK
               Walter J. Lack, Esquire


BEFORE COMMITTEE MEMBERS:


EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -   -   -
 2              MR. GIRARDI:  Walter, here's
 3         the purpose for this, just so you
 4         know.  This is two-thirds of the
 5         fee allocation committee, and the
 6         transcript is being made for the
 7         purposes of Judge Fallon.  So, at
 8         the end of the day, obviously, it
 9         is Judge Fallon that's going to
10         make the call.  But about 50 firms
11         or so have requested to set forth
12         what they did, concerned primarily
13         with the group benefit, the
14         benefit to the overall Vioxx
15         litigation, as opposed to
16         individual situations.  So,
17         anyway, that's the format, and
18         then you can just say whatever you
19         want.
20              MR. LACK:  Like right now?
21              MR. GIRARDI:  Right now.
22              MR. LACK:  I haven't
23         prepared for this, but I've been
24         giving it some thought since I was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          informed about the interview.

2                I think I should go back to

3          how our firm got involved.  It is

4          kind of an interesting story.

5          We've done drug cases over the

6          years, but have never sat on an

7          MDL panel.  I personally have

8          historically taken a dim view of

9          that situation, but with modern

10         litigation being what it is, I had

11         better get with the program.

12               We've always developed our

13         own work product in our own cases

14         based upon our own resources.

15         This case -- and I'll perhaps

16         refresh Tom's memory on this.

17         This case actually came to us from

18         a deep throat within Merck, who

19         made contact with a woman by the

20         name of Cheryl Blume, and all of

21         you probably have worked with her

22         over the years.  Her firm is

23         called Pharmaceutical Development

24         Group, Inc.  We had been working

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1         with her on some other drug cases,

2         found her work product to be quite

3         impressive, and she was looking to

4         extend the number of cases she was

5         working on.  I recall getting a

6         call from her through our private

7         investigator, Arlene Friedman, who

8         does this work for her.  Arlene

9         Friedman is a lady in Beverly

10        Hills who works out of her home,

11        who provides what I consider to be

12        the highest level of competent

13        private investigation services.

14        We use her exclusively.  She did

15        all the investigation on the

16        Golden Buddha case for the

17        Cathcart firm, and it went for ten

18        years in the Philippines,

19        resulting in a $3 billion

20        judgment.  She did all the work on

21        that.

22             She called and she said that

23        she had been contacted by one of

24        the original epidemiologists that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1          set up the VIGOR study for Merck,

 2          an inside guy.  He was appalled by

 3          the fact that, I think it was

 4          licensed in about April of 2002.

 5          She had called us at the end of

 6          2004 saying this guy would love to

 7          spill the beans, but he still

 8          works there, but he's prepared to

 9          establish to your satisfaction,

10          and certainly to mine already,

11          that all the cardiovascular

12          disease patients were taken out of

13          that study and that it was slanted

14          from the very outset.  He thinks

15          he can provide some excellent

16          background information to tell you

17          where the bodies are buried.  So,

18          this got us interested.

19              I said, well, we need to

20          know a lot more about COX-2

21          inhibitors before we go down this

22          path.  We know that some bad

23          things are going to come out of

24          this.  And so she agreed at my
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          request and ultimately Tom's

2          request, because I immediately

3          conferred with him on this, to do

4          a definitive medical workup and to

5          locate experts that we could both

6          consult with and that would

7          ultimately be willing to testify.

8                  As a result of that, she had

9          prepared -- this work that I

10         brought -- I just brought a little

11         bit of the file here, as you can

12         imagine.

13                 But in February of 2005, by

14         that time, after our original

15         call, she was able to put together

16         a most definitive work product

17         here consisting of three different

18         binders.  This is, first of all, a

19         review of all the Vioxx, all the

20         data that went into this.  This is

21         long before any discovery was done

22         in the case, before any litigation

23         was really ongoing.

24                 MR. SEEGER:  What year?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1              MR. LACK:  This is early
 2         2005.  But all this work she's
 3         doing is in 2004.  If you want to
 4         page through, it is really very
 5         good work that she did.  She went
 6         all the way back to '94 to look at
 7         all the literature on COX-2
 8         inhibitors, the whole history of
 9         this.  She then prepared a dossier
10         on the labeling chronology for
11         this particular medication, and
12         every change is tabbed here by the
13         date.  And all of the literature
14         that was generated in connection
15         with the labeling changes she
16         secured from the FDA at our
17         request.  Also, every epi study
18         you ever wanted is in here.
19              Then we had two separate
20         sessions in my office attended by
21         at least four lawyers from the
22         Girardi firm and four or five
23         lawyers in my firm.  The thing
24         went on for at least four hours.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          During the course of that, I call

2          it a blackboard session, she

3          brought in three experts.  She

4          brought in a pharmacologist, she

5          brought in a COX-2 inhibitor

6          specialist, and then she brought

7          in a general physician to talk

8          about physiology or what happens

9          when you take these things.  It

10         was a primer for us to be able to

11         go out and basically put on

12         seminars for lawyers to teach them

13         about what to look for in

14         screening these cases.

15             Then you'll recall most of

16         you people in this room were at

17         this conference in Miami.  I was

18         one of the speakers, and my topic

19         was giving an opening statement in

20         a pharmaceutical case.  Great fun.

21         You recall we had some lawyers

22         there from Merck in the audience,

23         and we were sort of off to the

24         races.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          After that, Tom thought it

2     would be better, because I love

3     financial scams, to get into what

4     we thought would be a very

5     relevant and ultimately admissible

6     issue relating to the sale of

7     options by all the senior

8     management at Merck.  I hired an

9     investment banker to do the

10    research to go on Bloomberg.  I

11    have a whole file on Gilmartin,

12    Reicin and the rest of that crowd

13    there.  We thought that if

14    Gilmartin had stayed, that would

15    be a very fruitful area for cross

16    examination.  She had her own

17    story of why she sold.  They all

18    sold at the all time high for

19    Merck stock.  There's quite a lot

20    of stuff in here.

21          Then we went to the State of

22    California.  Phil Angelides was

23    the state treasurer at the time.

24    We felt that the State of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        California should investigate this

2        and perhaps hire us to pursue

3        their own MediCal reimbursement

4        issues and on and on and on.  So,

5        I have a whole line of

6        correspondence with the state

7        treasurer's office about what

8        Merck has done and the fraud they

9        perpetrated.

10            Now, the Gilmartin thing

11       ended up not being useful, I

12       suppose, because of some court

13       rulings.  But I would say that we

14       could have tried this case in the

15       fall of 2005 just on the basis of

16       the work that we did.  And all of

17       this, of course, was turned over

18       to Jim O'Callahan at the Girardi

19       firm, who then incorporated it

20       into a massive database that we

21       all contributed costs towards.  I

22       didn't bring that.  But one of the

23       first things in this box that I

24       found that was the first thing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        that O'Callahan and our office

 2        worked together on, one of my

 3        partners Brian Depew actually

 4        worked with him in his office, was

 5        to put together a so-called

 6        chronology of the story.  It

 7        starts in this volume.  I didn't

 8        bring all the volumes.  It starts

 9        in 1996 with the first reference

10        to the Vioxx theory and goes on

11        from there.  Some of these

12        documents were used in the various

13        trials, some were not, but they

14        were all certainly relevant based

15        upon what we knew at the time.

16             MR. SEEGER:  Can I see it?

17             MR. LACK:  Yes.

18             (Handing over documents.)

19             MR. LACK:  Here's the hard

20        data from what we obtained from

21        our investment banker and what was

22        sold and disclosures made at the

23        SEC.  You will have a separate

24        binder just on SEC disclosures.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          I would say everything in

2     this room was paid for and

3     transferred over to the MDL

4     ultimately for use in whatever.

5          Then, of course, the

6     California cases went to trial.  I

7     was there.  I sat next to Tom

8     Brandi through a good deal of the

9     trial primarily because I wasn't

10    so interested in the facts of

11    those individual cases, but the

12    judge before whom all the

13    California cases was pending is a

14    very powerful and important judge

15    in California.

16          Judge Chaney has all my big

17    cases.  She sits in a courtroom

18    that's only -- it's got various

19    names, but Central Civil is one of

20    the names it goes by.  They have

21    six judges there that handle only

22    the most complex cases for the LA

23    region.  I think half my cases are

24    pending in front of her, and so

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          this is a very useful, show your

2          face down there.

3              MR. LEVIN:  I'm sure she

4          knows your face.

5              MR. LACK:  What was

6          bothering me most at the time was

7          getting muscled out not by anybody

8          in particular but, for instance,

9          Mark Robinson down there.  That

10         bothered me a lot.  So, I wanted

11         to be in the courtroom to make

12         sure she knew the next cases that

13         got picked, some of them were

14         going to be mine.

15             MR. SEEGER:  Walter, can I

16         ask you a question about that?

17         Did you get any support during

18         your trial from Robinson?

19             MR. LACK:  No.  And I wasn't

20         asked to.  I didn't ask him.  I

21         wasn't going to go seek his

22         support, because we had to put it

23         together, I thought.

24             MR. WEITZ:  Did he seek your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          support?

2                  MR. LACK:  No, no.  That

3          wouldn't be something that came to

4          pass.

5                  Then as the center of

6          gravity of the case went from our

7          little ten percent of all the

8          cases filed in California to the

9          MDL, it was very apparent that we

10         were just going to get swept along

11         with the tide.  So, when you are

12         in that situation, we are all

13         trying to conserve resources, I'm

14         not going to continue to labor --

15                 MR. SEEGER:  And duplicate.

16                 MR. LACK:  Right.  So, the

17         gravamen of my activities for,

18         let's say, the common good or

19         common issues would have ceased at

20         the end of the first trial in

21         California.

22                 MR. GIRARDI:  That isn't

23         true.  End of the second trial in

24         California.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1              MR. LACK:  Second trial.

2         I'm sorry.

3              MR. GIRARDI:  Because all of

4         these documents were in.  We set

5         up our own database for the

6         California lawyers, and these

7         documents were the most important

8         part of that database.  Obviously,

9         it got improved as time went on,

10        as other testimony came in and

11        things like that.  But this was

12        the foundation of the case.

13             MR. LACK:  Right.  Of

14        course, we were always looking for

15        more experts.  As the tide against

16        Merck started to swing, more and

17        more people were willing to come

18        forward and say what they should

19        have said.  We continued,

20        obviously, to follow it on a daily

21        basis until well into 2006.

22             MR. SEEGER:  After the two

23        cases were tried, Walter, did you

24        guys have any cases in the queue

FAC Resp. Amended Exhibit D -- 498

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          that would come back up for trial?

2               MR. LACK:  Yes.  I felt one

3          of them was mine.  I had a very

4          good heart attack case.

5               MR. SEEGER:  Do you know the

6          name?

7               MR. LACK:  A guy named

8          Cooper.  Just so you know, this

9          guy named Cooper, the referring

10         lawyer filed suit against Merck

11         only, did not sue the dispensing

12         physician or anybody else in

13         California.  It got removed.  We

14         filed a motion in the MDL.  I went

15         down there twice to have it

16         remanded to California.  And even

17         today it still wasn't going to get

18         remanded.  He just said, I'll get

19         to that later and never got back

20         to it.  It was a pristine case.

21              I had another one where we

22         just got an award, it was a pretty

23         big award for a heart attack.

24              MR. SEEGER:  As part of the

Page 17

```
 1        settlement?
 2               MR. LACK:  Yes.  Over 100
 3        clients.
 4               MR. SEEGER:  How many cases
 5        did you send into the settlement,
 6        do you know?
 7               MR. LACK:  I've sent in 53.
 8               MR. WEITZ:  Walter, the case
 9        you were talking about after
10        Robinson's case was in front of
11        Judge Chaney and it already had
12        been worked up, that was going to
13        be the next case that you thought
14        was going to go out for trial --
15               MR. LACK:  Yes.
16               MR. WEITZ:  We are also
17        trying to find the lawyers, and we
18        know you are one, that were moving
19        the dockets in the jurisdictions.
20        That's an important fact.  What
21        case was that?
22               MR. LACK:  I'm trying to
23        remember.  We had meetings in
24        O'Callahan's office.  I wasn't
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          party to them.  Steve Terrell and

2          Brian Depew in my office were the

3          two advocating for -- we put three

4          cases up, and, of course, one was

5          a retired IBM executive who had

6          severe brain damage as a result of

7          a blood clot.  Everybody kind of

8          agreed, well, we're not trying

9          those yet, they are going to be

10         the hardest.  They are very

11         problematic by the law.  But it

12         was the biggest damage case.  The

13         guy had over a million and a half

14         in medicals, and he was only 52.

15              So, they shelved that, and

16         they agreed, okay, fine, you have

17         got a perfect heart attack case,

18         and we'll go with that, and only

19         O'Callahan can tell you the name,

20         because I've forgotten.

21              MR. SEEGER:  I know Depew.

22         I think I've seen him around Vioxx

23         circles.  When you mentioned his

24         name --

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1              MR. LACK:  Depew spent a lot
 2         of time with O'Callahan.
 3              MR. SEEGER:  Tom's guy I saw
 4         a lot.
 5              MR. LEVIN:  I haven't seen
 6         Brian here.  I've seen a lot of
 7         Brian in Spokane.
 8              MR. LACK:  We did turn in
 9         some time records.
10              MR. SEEGER:  He was your
11         point guy for the case?
12              MR. LACK:  Hundreds of
13         hours.
14              MR. GIRARDI:  You may have
15         to look at those.  The form on
16         some of those maybe is not
17         appropriate, and we'll talk about
18         that and go through the
19         accountants.
20              MR. LEVIN:  Tom will work
21         with you getting that through the
22         accountant.  Right now they are in
23         a state that they haven't been
24         approved probably because of form,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          so, Tom will take care of it.

2               MR. LACK:  All right.

3               MR. WEITZ:  Go over expenses

4          with him also so we make sure

5          those are right.

6               MR. LACK:  We put in $20,000

7          for common costs, and I've got

8          like 800,000.  I didn't want to

9          hassle.  Because it took longer to

10         do the format for these

11         accountants than it was worth to

12         get the money back.

13              MR. SEEGER:  Walter, if you

14         have worked up an expert and you

15         have spent a couple hundred

16         thousand, you should send that to

17         us.

18              MR. LACK:  Everything is

19         through his office.  I'd rather do

20         it that way.

21              MR. LEVIN:  That's fine,

22         just as long as you don't get

23         shortchanged.

24              MR. LACK:  I'm not really

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          worried about that, but the actual

2          time to reconstruct this stuff --

3          being a contingent fee lawyer, my

4          time wasn't done contemporaneous

5          with my actual work, but every

6          other lawyer, we still do that in

7          our firm.  We keep track of our

8          time, quote, as a management tool,

9          so we track their time.  I know

10         all of that is very accurate.  I

11         had to reconstruct mine because

12         you go through every page.

13              MR. LEVIN:  Because you only

14         have to deal with yourself when

15         you shave in the morning.

16              MR. SEEGER:  Thank you.

17              MR. LEVIN:  Thank you.

18                   -  -  -

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1                 C E R T I F I C A T E

2

3                 I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                 I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22            Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23            Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -


FIRM: ESCOBEDO, TIPPIT & CARDENAS, L.L.P.
        Joe Escobedo, Jr., Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -

 2              MR. ESCOBEDO:  Joe Escobedo.

 3              MR. BIRCHFIELD:  We

 4         appreciate you being here today.

 5         We've got a court reporter here.

 6         Everything is being transcribed.

 7              Judge Fallon in the Murphy

 8         Oil decision, if you followed

 9         that, it would be helpful to be

10         familiar with that order from his

11         court.  Transparency is key.  So,

12         he'll have this transcript

13         available for his use for whatever

14         he determines is appropriate.  So,

15         just know everything is being

16         taken down, and the floor is

17         yours.  We appreciate it.

18              MR. ESCOBEDO:  I didn't know

19         how many people were going to be

20         here today.

21              MR. BLIZZARD:  We can share.

22              MR. ESCOBEDO:  I think we

23         have enough.

24              I know it's been a long day
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        for you guys, so I'll see if I can
 2        give you some time back.
 3            Really what I want to focus
 4        my discussion on here today as far
 5        as the Order Rule 6(D) is the
 6        factors relating to whether
 7        counsel was already involved in
 8        the Vioxx litigation prior to the
 9        withdrawal of the drug and the
10        participation in any non-MDL
11        trials.  I prepared a short little
12        presentation here for you, the
13        second page after the cover page,
14        trying to give you an
15        understanding of what we did prior
16        to Vioxx being removed from the
17        market.
18            The second page basically is
19        the entire thing, and then I'll go
20        through and touch on some of
21        these, and then if y'all have any
22        questions, I can answer them.  I
23        think as the timeline shows, we
24        were extensively involved in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          Vioxx litigation prior to the
 2          withdrawal of the drug from the
 3          market, and we did try a non-MDL
 4          trial that we believe provided a
 5          common benefit.
 6               We were hired by the Garza
 7          family back on April 15, 2002.  I
 8          know at that point there was a
 9          handful of cases.  We started
10          doing our investigation, which
11          involved getting as many records
12          as we can on the drug from the
13          FDA.  We also met with David
14          Miceli, who I believe used to be
15          with your firm and at that time
16          was very active in the litigation.
17               MR. BIRCHFIELD:  That's
18          right.
19               MR. ESCOBEDO:  He was very
20          helpful and gave us a lot of
21          information.  I know some of my
22          partners and associates met with,
23          I guess, just a handful of people
24          who had cases back then, 2002 and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1      2003.  We retained experts.  Some

2      of them are listed here and others

3      as well.  Then we filed our

4      lawsuit on March 10 of 2003 in

5      Starr County, Texas.  Merck

6      promptly removed the case to

7      Federal Court, and it took us a

8      while -- as you can see, it took

9      us a while to get it back to state

10     court.

11          After that, once we got back

12     to state court, I'm sure as

13     everyone is familiar with, the

14     discovery wars with Merck started.

15     We literally had, I lost count of

16     how many motions to compel, and

17     motions for sanctions.  We also

18     had a mandamus proceeding with a

19     Court of Appeals involving the

20     drug Arcoxia, which,

21     unfortunately, we lost.

22          But once we got all of that,

23     then they inundated us with paper,

24     and also we made them produce --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          the corporate rep depositions had

2          been taken at the time by your

3          firm, by Mr. Miceli.  I think Mr.

4          Lanier had taken some as well.

5          And what I did and what my firm

6          did at that point was started

7          reviewing the documents, reviewing

8          the depositions.  A lot of the

9          depositions, people that took

10         them, I'm sure are familiar with

11         them, that Merck at the time was

12         producing witnesses that at least

13         on some of the areas of

14         examination the particular

15         witnesses produced didn't have the

16         appropriate knowledge.

17              MR. GIRARDI:  They did that

18         with every one of them.  A guy

19         would come in, he wouldn't know

20         anything about Vioxx.

21              MR. ESCOBEDO:  So, what I

22         basically did, what my firm tried

23         to do was to build on the work

24         that had already been done.  We at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        one point, our notice -- in Texas,

 2        they are called areas of

 3        examination, the corporate rep

 4        depos.  I think once it was all

 5        done and -- I think we had over

 6        almost 200 areas of examination in

 7        the notice, and then they started

 8        producing corporate reps, and

 9        that's what we did after that.

10            We did get a trial setting

11        on April 23rd.  The judge gave us

12        a trial setting for November 8,

13        2004, and it was also around this

14        time that our involvement with

15        Kathy Snapka started as well.

16            We started taking corporate

17        rep depositions in New York.

18            MR. HERMAN:  Excuse me.  I

19        want to state for the record that

20        Kathy Snapka was relentless in

21        appearing in the MDL to get this

22        case remanded, which the MDL

23        supported, and it was one of the

24        few cases -- I don't know that the
```

FAC Resp. Amended Exhibit D -- 512

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1         judge remanded any more cases

 2         other than this, but it was

 3         important that you and Ms. Snapka

 4         were tenacious in getting this

 5         case sent back.

 6               MR. ESCOBEDO:  Thank you,

 7         sir.  And I remember when we met

 8         with Judge Fallon, he basically

 9         asked me one question:  Why is

10         your case different from all the

11         others that have been removed?

12         And I said, because we're ready to

13         go to trial, because this is the

14         second removal, because the basis

15         of the removal was bogus.  What

16         happened was this.  They wanted to

17         go, and they deposed one of my

18         experts, Dr. Simonini, which I

19         believe you used in your trial --

20               MR. GIRARDI:  Sure.

21               MR. ESCOBEDO:  --  and they

22         asked him, do you have any

23         criticism of the doctors?  He said

24         no.  Well, he wasn't my expert

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          against the doctors.  And they

2          removed the case.  The real reason

3          why, I believe, is because we were

4          set to go to trial in February,

5          and the judge wasn't going to

6          continue the case.

7               The depositions that we

8          took, some of them had already

9          been taken in other cases, but

10         some of them, we were the first

11         ones to take them, I believe, and

12         those are listed.

13              Linda Hostelley on the AEs.

14              Leonard Tacconi, I believe

15         we were the first one to depose

16         him.  He was on consumer

17         advertising.  Texas is a learned

18         intermediary state, but we knew,

19         for example, New Jersey had an

20         opinion where they were maybe

21         opening the door a little bit to

22         that.

23              As everybody in this room

24         knows, Merck did a lot of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          direct-to-consumer advertising.

2          We took a corporate dep on that.

3               Deborah Shapiro on the DSMB

4          for the VIGOR trial, we deposed

5          her as well, as well as the peer

6          review of the Konstam article.

7          Everybody here knows there was an

8          issue about that.

9               James Dunn, one of the sales

10         reps, there was a lot of issues

11         relating to sales reps and this

12         drug.

13              On June 21st 2004, we took

14         our second round of corporate rep

15         depos.  Bernadette McKeon, I

16         believe we were the first ones to

17         depose her.  They produced her on

18         the PIRs, the physician

19         information requests.  We had them

20         produce a bunch of PIRs, and we

21         limited it to the CV risk, but

22         there were a lot of PIRs where the

23         doctors were asking -- they were

24         very interested and obviously

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1          concerned about the CV risk for

 2          Vioxx.  So we took an extensive

 3          deposition on the PIR process.

 4              We took Ms. Reicin's depo.

 5          I spent eight hours with her.  I

 6          filed a motion to extend the six-

 7          hour deadline.  Richard Josephson

 8          calls me up, I'll give you eight.

 9          I wanted ten, but I figured the

10          judge would give me eight anyway.

11          So, I agreed, and I took her

12          deposition for eight hours.

13          Anybody who has ever deposed her,

14          I know Mr. Lanier deposed her as

15          well, and everybody can tell you

16          that it is exhausting.

17              Mr. Casola on the FDA

18          warning letter --

19              MR. GIRARDI:  You should

20          have made a motion to have it be a

21          45-minute depo.

22              MR. ESCOBEDO:  I agree.  I

23          messed up on that one.  You are

24          absolutely right.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          They did not bring her to

2     trial.  I believe that was the

3     first time they didn't.  I don't

4     know, obviously, why, but they

5     didn't bring her to trial.

6          We took Thomas Bold.  I

7     believe we were also the first one

8     to depose him.  He was safety

9     surveillance, trying to determine

10    trends.  He was one of the only

11    persons that I can say was very

12    nervous during the deposition

13    because he had never been deposed

14    before, and I don't think they

15    prepared him very well.

16         We also deposed the sales

17    reps that met with or called on

18    the two cardiologists.  I think

19    that was a big -- a unique facet

20    of our case.  We had sales reps

21    calling on cardiologists, which,

22    obviously, by the very nature of

23    their practice are going to have

24    patients with CV risk.  So, we did

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        that as well.

2            We designated our experts,

3        some of whom I already talked

4        about before.  There was a third

5        round of corporate rep depos.  We

6        took Mr. Silverstein's depo

7        because McKeon didn't know some of

8        the aspects of the PIR process.

9        So we made them produce somebody

10       else.

11           And then we took Nancy

12       Santanello's deposition, really

13       only on the issue -- that was the

14       time when they required the

15       withdrawal of Ms. Cannuscio's name

16       from that article, and we were

17       interested about that.  At this

18       time, everything was going

19       downhill, and it was all headed, I

20       guess, toward the withdrawal of

21       the drug.  But she was the last

22       corporate rep depo that we

23       deposed.

24           They designated their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          experts, which I think is unusual,

2          because we had expert reports from

3          all their experts saying that

4          there's absolutely nothing wrong

5          with Vioxx, under no circumstances

6          could it be prothrombotic.  Then a

7          month later, they withdrew the

8          drug from the market.  They did

9          get a short continuance February

10         14.  That was the alternate trial

11         setting.  And then of course

12         September 30th, Vioxx was

13         withdrawn from the market, and

14         they filed another continuance,

15         the basis of which was --

16         actually, they were trying to help

17         me.  They kept saying it was for

18         my benefit, and I kept saying,

19         thank you, I don't want that

20         benefit.

21             Then in 2005, it really got

22         interesting, and they filed their

23         first motion for legislative

24         continuance.  For those of you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        that are not familiar with that,

2        in Texas, you can get a

3        continuance if the legislature

4        isn't in session, and you have a

5        legislator lawyer, you can get a

6        continuance.

7              They hired Chuy Hinojosa.

8        We basically had a reporter that

9        we knew from the local media, and

10       you would have thought it was Ed

11       Bradley or something.  They went

12       in to go talk to him, he

13       apparently freaked out, and the

14       next day, he withdrew -- on his

15       own, withdrew the motion for

16       legislative continuance.  As you

17       might imagine, there's other

18       legislator attorneys available.

19       And the next day they hired

20       another one, and they filed a

21       legislative continuance.  We moved

22       for an evidentiary hearing and a

23       move to strike the legislative

24       continuance.  And then just to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        make things -- I guess they didn't
 2        want to have that hearing, so they
 3        removed us to Federal Court again.
 4        Again, that was the basis that I
 5        talked about earlier, they deposed
 6        Dr. Simonini, but he wasn't my
 7        expert against the doctors.  We
 8        tried to get it back, but as you
 9        might imagine, it is hard to get
10        it back.  The local federal judge
11        said, well, it is going to go to
12        the MDL, and that was that.  Then
13        after that, JPML issued the
14        conditional transfer order.
15             And we fought, as you can
16        tell.  It got removed in January,
17        and it didn't get remanded back
18        until November.  We fought very
19        hard to try to get it remanded
20        because we were ready for trial.
21        We were ready to get the case
22        tried, and we wanted to go to
23        trial.  And quite frankly, we
24        wanted to go to trial because we
```

Page 17

1          wanted to hit them for a really,

2          really big verdict along the lines

3          of what Mr. Lanier was able to do,

4          obviously.  It didn't work out

5          that way, but --

6                    MR. LANIER:  You had a good

7          one.

8                    MR. BIRCHFIELD:  You had a

9          good result.

10                    MR. ESCOBEDO:  I appreciate

11          that.

12                    Then in 2006, it was a weird

13          trial setting scheduled because

14          the judge has three counties or

15          responsibilities, so we could only

16          try it one week a month.

17                    MR. HERMAN:  Say that again.

18                    MR. BIRCHFIELD:  That's a

19          challenging way to try a case.

20                    MR. ESCOBEDO:  It was a

21          four-and-a-half week trial, but we

22          could only try it one week per

23          month.  So, we started in January,

24          and we tried one week in January.

Page 18

1          MR. HERMAN:  Same jury?

2          MR. ESCOBEDO:  Same jury.

3     And we came back in February and

4     March, and finally on April 21st,

5     we got a $32 million verdict.  It

6     has, I'm sure as everyone is

7     aware, unfortunately, been

8     reversed and irrendered by the San

9     Antonio Court of Appeals in what I

10     believe to be one horribly written

11     opinion, and I believe that for

12     Mr. Lanier's case as well.  We

13     filed a motion for rehearing, and

14     there's been amicus briefs, and

15     I'm very happy that people have

16     done that.

17          That's the extent of what I

18     wanted to say.  We were, I think,

19     involved.  The evidence shows we

20     were involved in this litigation

21     way before the withdrawal of the

22     drug, and I believe we tried a

23     case that was significant in that

24     it was the first short term

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          case -- short term use case.

2          Right after it, everyone is

3          familiar, the studies came out

4          where, I mean, sort of validating

5          what we were saying, which is the

6          danger, it can be almost

7          instantaneous.  And he had risks.

8          But the way we combatted that on

9          specific causation was, and of

10         course you never heard about this

11         in the media because it is too

12         complicated, but Mr. Garza had a

13         thallium scan less than a month

14         before he died.  The thallium scan

15         showed normal blood flow.  Then

16         one month later, he dies.  There's

17         an autopsy.  And the autopsy finds

18         not one, but two fresh clots in

19         the exact parts of the heart where

20         the thallium scan less than a

21         month earlier had found normal

22         blood flow.

23              So, I think that's the

24         reason why the case was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          significant.

2                    MR. BIRCHFIELD:  Joe, we're

3          all very familiar with the Garza

4          case and your work in getting that

5          case remanded and pushed through

6          trial and the good verdict.

7                    One of the things maybe you

8          can help us on, did you have other

9          cases that you were working up for

10         trial or trying to push to trial?

11                   MR. ESCOBEDO:  We had other

12         cases, but none to the point that

13         were developed as the Garza case.

14                   MR. BIRCHFIELD:  What about

15         cases that you have that are

16         submitted for the settlement

17         program?

18                   MR. ESCOBEDO:  We didn't

19         have that many.  I mean, we looked

20         at a bunch of them.  I'll have to

21         be honest, and I will be honest, I

22         think between 10 and 20 were

23         actually submitted.

24                   The firm broke up after the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          trial, and so the MDL part of it

2          stayed probably by mutual

3          agreement -- it was a very

4          amicable breakup.  So, the MDL's

5          part of it stayed with my former

6          partner, and so I'm a little --

7          I'm not that knowledgeable about

8          that.  I'm sorry.  But there

9          weren't that many.  I mean, like I

10         said, between 10 and 20.  We did

11         not have that many.  We're

12         geographically challenged.

13              MR. BLIZZARD:  Joe, the

14         expenses that y'all submitted for

15         that trial I think are around --

16         according to the accountant's

17         report, are $485,000.

18              MR. ESCOBEDO:  Right.

19              MR. BLIZZARD:  That

20         currently has been rejected, but

21         they have rejected a lot of

22         expenses because they didn't

23         really know exactly what the story

24         was.  And so whoever can -- we

FAC Resp. Amended Exhibit D -- 526

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          will help get that through the

2          process and make sure you have

3          whatever documentation you need to

4          satisfy that.  If you will call

5          Lenny Davis in Russ's office.

6          It's probably better to do that in

7          person rather than over the phone.

8          So, you might want to consider

9          making an appointment to go down

10         there and sit with them and

11         explain the situation.

12              MR. ESCOBEDO:  Glad to do

13         that.

14              MR. BLIZZARD:  Also, it

15         might help, I know Kathy is going

16         to present next, to kind of give

17         us a sort of the breakdown of the

18         responsibilities between the two

19         of you in the involvement on this

20         trial.

21              MR. LEVIN:  Also, your hours

22         have been rejected.

23              MR. ESCOBEDO:  Okay.

24              MR. LEVIN:  So, when you

Page 23

 1          talk about your costs, talk about

 2          the hours.

 3              MR. BIRCHFIELD:  That's not

 4          unique to you.  That's happened.

 5          We just need you to work with the

 6          accountant and get that

 7          straightened out.

 8              MR. ESCOBEDO:  And I need to

 9          talk to Mr. Davis.

10              MR. BIRCHFIELD:  Right.  And

11          he will put you in touch with Phil

12          Garrett at Wegmann-Dazet and set

13          up a meeting if that's necessary.

14              MR. HERMAN:  E-mail

15          ldavis@hhkc.com or call at (504)

16          581-4892 and tell Lenny Davis you

17          need to -- he needs to coordinate

18          for you either a meeting or a

19          conference call with Phil Garrett.

20          Now, most folks that have

21          substantial costs to date have

22          actually met with Phil Garrett and

23          his team.  He's an independent

24          appointed by the Court, a CPA, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

 1          he has a whole team.  They are

 2          there, actually, to assist and

 3          help, rather than to impede.

 4                  MR. ESCOBEDO:  I will do

 5          that.

 6                  MR. HERMAN:  I have a couple

 7          questions.  Your Garza case is

 8          still on appeal, right?

 9                  MR. ESCOBEDO:  Yes, sir.

10                  MR. HERMAN:  Excuse me.

11          Let's go off the record for a

12          minute, please.

13                      -  -  -

14                  (Whereupon, there was an

15          off-the-record discussion.)

16                      -  -  -

17                  MR. ESCOBEDO:  I believe the

18          question that you were asking

19          about is about the

20          responsibilities of Kathy.  We got

21          involved -- well, we are old

22          friends, I've known her for a long

23          time.  We just by coincidence

24          found out we had cases and she had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1           cases, we had the Garza case and

2           some others that we were looking

3           at.  I knew that she had

4           prosecuted drug pharmaceutical

5           cases before, and we at the time

6           were -- we did primarily auto

7           products, some other kind of

8           cases, but primarily we're an auto

9           products liability firm.  So we

10          felt we needed to associate with

11          her, and we did.

12               Then later we also

13          associated with Kevin Dubose's

14          firm.  He's an appellate lawyer

15          here in Houston, because we felt

16          we needed to have book lawyers to

17          counter their book lawyers.  They

18          had a lot of them.  I mean, every

19          day of trial in the afternoon,

20          they would have a delivery.  I'm

21          sure everybody that had a trial,

22          they had their little delivery of

23          motions, and I had two associates

24          there, and that's all their job

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          was, basically just to read them

2          and start churning out responses

3          every day.

4               MR. BIRCHFIELD:  Any other

5          questions?

6               (No response.)

7               MR. HERMAN:  Thank you.

8               MR. ESCOBEDO:  Thank you.

9                    -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1                    C E R T I F I C A T E

2

3                    I, LINDA L. GOLKOW, a Notary

4       Public and Certified Court Reporter of

5       the State of New Jersey, Registered

6       Diplomate Reporter, Federally-Approved by

7       the United States District Court of

8       Pennsylvania, do hereby certify that the

9       foregoing is a correct transcript of the

10      testimony as taken stenographically by

11      and before me at the time, place and on

12      the date hereinbefore set forth.

13                    I DO FURTHER CERTIFY that I

14      am neither a relative nor employee nor

15      attorney nor counsel of any of the

16      parties to this action, and that I am

17      neither a relative nor employee of such

18      attorney or counsel, and that I am not

19      financially interested in the action.

20

21      _____

22           Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 532

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:   FIBICH, HAMPTON & LEEBRON, L.L.P.
        Sara J. Fendia, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Amended Exhibit D -- 533

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2             MR. BLIZZARD:  Sarah, we
 3        just want to let you know that
 4        obviously we have a court reporter
 5        here, and the court reporter is
 6        going that take everything down.
 7             The Judge in his order has
 8        indicated that he's approaching
 9        this in the same way he approached
10        the Murphy Oil case, and so you
11        need, obviously, to be familiar
12        with that case and those factors.
13        They were also in the original
14        order that has standards to look
15        to for common benefit work.  The
16        floor is going to be yours.  You
17        can say whatever you would like to
18        say, and then we may have some
19        questions at the end.  There may
20        be some people who will interrupt
21        with questions during your
22        presentation, and you can either
23        take them or push them to the end
24        if you want.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           MR. BIRCHFIELD:  Thank you
2      for being here.  Thank you for
3      giving us a few minutes to eat our
4      lunch.
5           MS. FENDIA:  Thank you for
6      giving us the time.
7           I'm here for Tommy Fibich,
8      who was not able to be here.
9      There was some confusion, and the
10     confusion probably originated at
11     my office about this meeting.  So,
12     he didn't get on the schedule
13     until yesterday.  He had a
14     deposition today and tried to
15     rearrange that deposition to be
16     here.  He looked at the list of
17     people who might be here and said,
18     these are all friends of mine, I
19     would like to go over and talk to
20     them, but he was not able to
21     rearrange the deposition.  It's in
22     a pretty critical case that we're
23     involved in now that he's been
24     working pretty hard on.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1              I'm here.  I am a 20-year
 2         lawyer.  I've been with Tommy for
 3         19 of those 20 years.  I know him
 4         well.  I know his work ethic well.
 5         I can address those issues, and I
 6         can address for you what I believe
 7         that he accomplished in Vioxx, and
 8         I hope that gets us to where we
 9         need to be.
10              Let me start out by saying
11         that we did submit time.  Our
12         time, I am confident, is grossly
13         understated.  The reason for that
14         is that our primary efforts were
15         in the Texas MDL.  Tommy was a
16         state liaison for the Federal MDL
17         and obviously had time and
18         involvement in the hearings and in
19         dealing with some of the issues
20         that were required by that
21         position, but our primary focus
22         was with the Texas MDL.  The Texas
23         lawyers know that there is no
24         mechanism under the Texas MDL
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          statute to authorize common

2          benefit fees.  As a consequence of

3          that, we, unfortunately, didn't

4          keep time the way we should have

5          kept it.  So, when it came time to

6          submit time to the federal MDL, we

7          went back and we didn't submit

8          anything that we didn't have some

9          kind of piece of paper or record

10          to rely on in coming up with the

11          time.

12               Tommy's philosophy is he's

13          not one to promote himself in

14          terms of how much time is spent

15          and how much money is spent.

16          Those of you in the room that know

17          him probably know that about him.

18          You probably also know you

19          wouldn't want to get between him

20          and a reporter, but in terms of

21          promoting his time, he's very,

22          very conservative in that regard,

23          and that's just our firm

24          philosophy.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1              I am the nuts and bolts
 2         lawyer on a lot of his
 3         pharmaceutical litigation, and I
 4         am the one that took primary
 5         responsibility for trying to
 6         assemble the time records, but I
 7         do believe they are grossly
 8         understated.
 9              When Tommy first got
10         involved in the Vioxx litigation,
11         he did as he has done in all
12         pharmaceutical litigation he's
13         been involved in.  He started
14         talking to experts and making
15         himself familiar with the issues
16         associated with Vioxx causation
17         issues, the epidemiology, where
18         the gaps were in the science and
19         what was going to have to happen
20         to develop this litigation.
21         Because of his stature in
22         pharmaceutical litigation -- I
23         look around this room, and you all
24         have a national stature in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          pharmaceutical litigation, and I
 2          think you would agree with me that
 3          Tommy is one of your peers.  He's
 4          been at it for a long time.  He
 5          served on the PSC for Zyprexa and
 6          fen-phen, and, of course, I think
 7          a lot of people cut their teeth on
 8          fen-phen, and we certainly did
 9          too.
10              Because of his stature,
11          obviously, other lawyers in Texas
12          kind of looked at Tommy on the
13          Vioxx issue.  For the Texas MDL,
14          we were in Judge Randy Wilson's
15          court.  I think it's fair to say
16          that Randy Wilson looked
17          consistently to Tommy to work with
18          him, and for guidance and for
19          assistance and input as to how the
20          Texas MDL should proceed.
21              As it relates to the Texas
22          MDL, our law firm, along with, to
23          a great extent, Dave Matthews' law
24          firm, really took the lead on
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          briefing, arguing, advancing the

2          Texas MDL, assisting the Court in

3          developing pretrial orders, CMOs

4          and the like, and worked

5          consistently with the Court in

6          that regard.

7               Tommy was also notice

8          counsel for the State of Texas.

9               MR. HERMAN:  I'm sorry.

10         What does that mean?

11              MS. FENDIA:  That meant that

12         all notices served by the

13         defendants came through our

14         office, and from our office we

15         disseminated them to all Vioxx

16         counsel.

17              MR. HERMAN:  Liaison.

18              MR. SEEGER:  Actually,

19         Sarah, he was the liaison for

20         Texas, wasn't he?

21              MS. FENDIA:  Right.  I think

22         along with Grant Kaiser in the

23         Federal MDL.  Is that what you

24         meant?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1              MR. SEEGER:  I thought Judge
 2         Wilson had appointed Tommy as the
 3         state court liaison.
 4              MR. BLIZZARD:  No.  That's
 5         what really this notice counsel
 6         serves, is the role of making sure
 7         all of the communications are
 8         facilitated in the state.  Then
 9         there was a separate appointment,
10         I think, to be liaison to the
11         federal MDL, and that was Grant
12         and Tommy.
13              MR. HERMAN:  What did you
14         understand Grant's role to be?
15              MS. FENDIA:  I understood
16         Grant and Tommy were both state
17         liaison counsel to the Federal
18         MDL.  That's what I understood.  I
19         may be mistaken about Grant.  I
20         know I'm not about Tommy.
21              MR. BLIZZARD:  It was Judge
22         Wilson's attempt to make sure
23         Texas lawyers were informed of
24         what was going on in the MDL, to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          sort of appoint them as the people

2          to report back.

3              MS. FENDIA:  So, over the

4          course of the Texas MDL

5          particularly, that's where my

6          heaviest involvement was, and

7          that's what I know most about, we

8          served on a daily basis all kinds

9          of functions in that capacity for

10         the Texas lawyers.

11             There are a lot of small

12         Texas lawyers that had a few cases

13         and for one reason or another felt

14         they didn't have the ability to

15         fund some of the things that

16         needed to be -- you know, always

17         travel up to hearings, for

18         example, to participate in certain

19         aspects.  So they relied very

20         heavily on us.  I fielded calls

21         almost daily from Texas lawyers,

22         certainly none in this room, you

23         are certainly capable of dealing

24         with the issues themselves, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          from a lot of the smaller firms

2          and lawyers that didn't have the

3          pharmaceutical experience.  We

4          dealt with that.

5               We dealt with making sure

6          everyone had notice.  We had many

7          questions from Judge Wilson about

8          who are the Texas counsel, where

9          are these cases, trying to get the

10         Texas MDL properly positioned.  So

11         we handled a lot of that kind of

12         work in our office.

13              Tommy, of course, was always

14         engaged in all of that.  He was

15         also on the Texas PSC, which

16         consisted of probably about seven

17         or eight lawyers including Dave

18         Matthews and Gallagher.  Mark, I

19         think you were on the committee.

20              MR. LANIER:  Yes.

21              MS. FENDIA:  And several

22         others.  Tommy continuously was

23         involved in meetings with the

24         Texas PSC, developing --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1       assisting, again, the Court in

 2       developing this MDL and trying to

 3       advance the cases.  A great deal

 4       of time was spent in those kinds

 5       of meetings.  Unfortunately, no

 6       time records, so not all of that

 7       appears on the time sheets, but a

 8       great deal of time was spent in

 9       that.

10            Again, I think, given

11       Tommy's stature generally in

12       Houston and Texas and I would say

13       beyond, I think that a lot of

14       lawyers did look to him for

15       leadership.  I know that Judge

16       Wilson did, and I think Mark and

17       Ed would concur with that.

18            As we came down in Texas to

19       a point that it was time to start

20       trying cases, Judge Wilson decided

21       he wanted to try a heart attack

22       case or a couple of heart attack

23       cases and a stroke case or a

24       couple of stroke cases and get a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

     1          sense of what the evidentiary

     2          issues would be and try to make as

     3          many rulings as we could so there

     4          would be consistency around the

     5          state.  To a large extent, he

     6          visited with Tommy a lot on that

     7          issue and conducted a number of

     8          hearings on limine issues,

     9          evidentiary issues, Daubert issues

    10          and all of these types of things.

    11          Tommy and, again, Dave Matthews,

    12          to a large degree, took the lead

    13          on all of that in assisting the

    14          Court and getting ready to try

    15          cases.

    16               When it came down to

    17          actually trying a case -- and I

    18          know you had the same experience

    19          in the Federal MDL, but when it

    20          came down to actually trying a

    21          case, every time a case came up to

    22          go, someone nonsuited or there was

    23          an issue associated, and we were

    24          having trouble getting the case to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          trial.
 2               So, Tommy finally stepped in
 3          and said we need to get a case to
 4          trial, and he agreed to be the one
 5          to take Ruby Ledbetter's case to
 6          trial.  That was our first case
 7          that was getting ready to go.  We
 8          were working that up for trial,
 9          all of the pretrial, and that's
10          our bellwether case.  Our time
11          will reflect the Ledbetter time,
12          because we believe it was the case
13          that was going to advance Texas
14          litigation for all Texas claims.
15               MR. BIRCHFIELD:  Sarah, was
16          that your case?
17               MS. FENDIA:  Yes.  Ruby
18          Ledbetter was our case.
19               MR. SEEGER:  You were
20          working that case up for trial?
21               MS. FENDIA:  Yes,
22          absolutely.  We were working that
23          up for trial.  It was in that case
24          that the defendants filed their
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          preemption motions based on the

2          Texas statute, and, of course, we

3          all worked on that.  We did very

4          heavy briefing on that.  The

5          Matthews firm took a lot of the

6          briefing on and a lot of the

7          limine issues.  Mark's firm

8          participated in that as well.  We

9          took the initial briefing on the

10          preemption issues and the Texas

11          statute issues.  And then Collyn

12          Peddie from Williams and Bailey --

13          it is no longer Williams and

14          Bailey.

15               MR. BLIZZARD:  Williams

16          Kherkher.

17               MS. FENDIA:  -- jumped in.

18          She's a fine lawyer, and she was

19          involved with us on that as well.

20               Ultimately we lost that,

21          which the Texas lawyers know,

22          which kind of put all Texas

23          litigation on hold.

24               At that point, the decision

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          was made to appeal that case, and

2          the appeal was underway.  Collyn

3          Peddie took the lead on the

4          appeal, and then your settlement

5          came, and of course Ruby Ledbetter

6          was excluded from that settlement,

7          and that was unfortunate.

8                  MR. BIRCHFIELD:  On

9          Ledbetter, just so you know, as we

10         were negotiating, you are right,

11         Ledbetter was excluded from the

12         settlement, but as we were

13         negotiating, we tried.  We tried

14         to get Ledbetter included in the

15         settlement, but Merck just

16         absolutely refused to include

17         Ledbetter, as well as several

18         other cases that were pending on

19         appeal at the time.

20                 MS. FENDIA:  Right.  I think

21         we understood that.

22                 MR. HERMAN:  Can you tell us

23         what depositions your firm took

24         and what experts you hired that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        the firm considers to be of common

2        benefit.

3             MS. FENDIA:  Unfortunately,

4        I wish I had looked back at that.

5        Unfortunately, I'm having a little

6        trouble recalling the names to

7        mind.  I believe Tommy did, was it

8        the Dolan deposition for the state

9        of Texas?

10             MR. BLIZZARD:  He actually

11       sat and took the deposition of

12       somebody who was high up in the

13       sales and marketing group with

14       Mark Robinson.  I know that

15       because he told me about that

16       deposition.

17             MR. HERMAN:  I know Tommy is

18       not here, and we need to be fair

19       to you folks.  Frankly, I don't

20       have an affidavit with me.

21             MR. BLIZZARD:  It is in the

22       affidavit, Russ.

23             MR. HERMAN:  Maybe the

24       question I'm asking is already

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          there.

2                    MR. BLIZZARD:  It is.

3                    MS. FENDIA:  There are no

4          names.  Can I supplement with

5          that?

6                    MR. HERMAN:  Yes.  That's

7          why I'm asking the question.

8                    MS. FENDIA:  So, depositions

9          and experts.

10                   MR. LEVIN:  Definitely the

11         experts, too, because it looks to

12         me like you submitted about

13         $80,000 in costs that were

14         rejected, but we'll tell you what

15         to do about that.  But you were

16         doing that in conjunction with

17         Matthews, who has $1,600,000 costs

18         that were rejected.  Some of that

19         must be expert fees.  So, Russ

20         will tell you how to call the

21         accountants and see whether you

22         can straighten that out.

23                   MR. HERMAN:  You can call

24         Leonard Davis at my office, (504)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1      581-4892 and ask him to set up a

2      conference call and an appointment

3      with Phil Garrett.  Phil Garrett

4      is a CPA appointed by the Court

5      who doesn't do any private work

6      for any lawyer in the litigation

7      or firm.  He'll sit with you or

8      have someone sit -- it might as

9      well be for both you and Fibich

10     and Matthews and work through the

11     costs.  We really need to get that

12     done.  The safest thing to protect

13     you is to make these contacts, and

14     if necessary, there's enough money

15     involved, to go sit with the CPA

16     firm.

17            MS. FENDIA:  Okay.  I'll do

18     that.

19            MR. LEVIN:  Your hours were

20     approved.  Matthews' hours have

21     not been approved.

22            MS. FENDIA:  Thank you.  I

23     felt they were reasonable.  As I

24     said, I felt they were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          understated.

2                   MR. HERMAN:  One of the

3          questions I have is, after

4          preemption in Texas, Judge

5          Wilson's decision, what

6          materials -- you might want to

7          include this in a supplement.  I

8          read all the affidavits, and I

9          just don't remember seeing the

10         information I'm asking for.  If

11         you could list what materials were

12         sent to the MDL depository or New

13         Jersey depository and Chris'

14         office or Andy's office for common

15         benefit and when they were sent,

16         that also ought to be

17         supplemented.  I think it would be

18         unfair to ask you to do this off

19         the top of your head.

20                  MS. FENDIA:  I can tell you

21         that I don't think that we

22         submitted materials.  I think we

23         have submitted our time based on

24         our activities in the Texas MDL.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1      So, I can tell you candidly that I

2      don't believe that we submitted

3      materials to the Federal MDL or to

4      New Jersey.  I will certainly

5      follow up.

6            MR. HERMAN:  Check to be

7      sure.

8            MS. FENDIA:  I will.

9            MR. HERMAN:  Judge Fallon

10     appointed Dawn Barrios as chair of

11     the MDL liaison committee with the

12     states.  If you recall, what

13     interaction did you have with Dawn

14     Barrios?

15            MS. FENDIA:  My interaction

16     with Dawn Barrios was relatively

17     limited.  We dealt primarily with

18     mechanics.

19            MR. HERMAN:  Generically.

20            MS. FENDIA:  But Tommy

21     participated fairly regularly, at

22     least by phone, if not in

23     hearings, in the Federal MDL up

24     until -- probably until the Texas

FAC Resp. Amended Exhibit D -- 553

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          MDL.  Up to the point he had more

2          difficulty making those trips to

3          New Orleans.  He and Dawn Barrios,

4          I believe, talked regularly about

5          what the issues were, as I

6          understand it.  Unfortunately, I

7          wasn't a party to those

8          conversations.  But as I

9          understand it, he had regular

10         conversations with her and dealt

11         with the issues that were being

12         raised by Judge Wilson to the

13         extent -- very often at the

14         hearings, Judge Wilson was talking

15         to Tommy about what is Judge

16         Fallon doing about this issue or

17         that issue or the next issue, and

18         my understanding is Tommy was

19         dealing with Dawn on those issues.

20         I will clarify that understanding

21         for you, but that is my

22         understanding.

23              MR. BIRCHFIELD:  Besides the

24         Ledbetter case, were there any

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1           other cases that y'all worked up

2           for trial that you were pushing or

3           had trial ready?

4                MS. FENDIA:  No.

5                MR. BIRCHFIELD:  How many

6           cases did your firm submit to the

7           settlement, claims packages?

8                MS. FENDIA:  100.  I'm

9           sorry.  Between 90 and 100.

10          That's what our firm directly

11          submitted, and that's what we are

12          working on now.  We are secondary

13          counsel on another 250 that were

14          submitted out of Louisiana.

15               MR. HERMAN:  Who is primary

16          on those?

17               MS. FENDIA:  Robert Salin.

18               MR. HERMAN:  When you say

19          "primary," "secondary," I'm not

20          sure that I understand the

21          relationship.  Were these filed in

22          Texas where he was lead or filed

23          in Louisiana?

24               MS. FENDIA:  Many of them

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1         were filed in Louisiana and are in

2         the MDL, I believe.  But his firm

3         took primary responsibility for

4         those files.  We were sharing the

5         fees.

6                MR. BIRCHFIELD:  When you

7         say "primary," you are talking

8         about for the settlement program?

9                MS. FENDIA:  Right.  For the

10         settlement program.

11                MR. BIRCHFIELD:  Any other

12         questions?

13                MR. WEITZ:  No.

14                MR. BLIZZARD:  No.

15                MR. HERMAN:  I think Ed has

16         asked some questions that are

17         important, and I know that the

18         Fibich firm has regularly

19         contributed to plaintiff bar

20         efforts, and I'm assuming that the

21         firm is still fighting the

22         preemption fight like the rest of

23         us.

24                MS. FENDIA:  Yes,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          absolutely, no question about it.

2          I think Ed knows Tommy's

3          involvement in that issue better

4          than I do.

5              MR. BLIZZARD:  Yes.  Let me

6          say from the outset that we all

7          worked closely on the Texas MDL,

8          even though many of us, including

9          Tommy, didn't have a lot of cases

10          filed in Texas.  Tommy clearly

11          took the lead in the motion

12          practice and also the interactions

13          with Judge Wilson.

14              When it came time for Judge

15          Fallon to appoint a committee to

16          help negotiate with Merck from the

17          plaintiffs' side, Judge Wilson

18          talked to Tommy, and Tommy said

19          that I would probably be the

20          person that should do that because

21          I had just tried a case in Judge

22          Fallon's court.  So Tommy was the

23          kind of --

24              MR. HERMAN:  He's the one we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1          have to blame for that?
 2              MR. BLIZZARD:  Right.  He's
 3          the kind of team player who was
 4          not just looking out for his own
 5          interest, but was looking to make
 6          sure that the clients' interests
 7          were advanced first and foremost,
 8          and he thought that would be a
 9          more effective way of doing it
10          since I had worked closely with
11          Judge Fallon on my trial case.
12          So, Tommy put the clients'
13          interest ahead of anything else
14          for him and --
15              MR. HERMAN:  I think that's
16          an important commentary, Ed, for
17          this record.
18              MS. FENDIA:  Thank you.
19              MR. SEEGER:  Thank you,
20          Sara.
21                  -  -  -
22
23
24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1                    C E R T I F I C A T E

2

3             I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 559

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -

FIRM:  GAINSBURGH, BENJAMIN, DAVID,
       MEUNIER & WARSHAUER, LLC
       Gerald E. Meunier, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
       GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1                  -  -  --  -  -

2                  MR. HERMAN:  Jerry,

3          everything is on the record for

4          Judge Fallon.  If you would like

5          to add or subtract from your

6          affidavit, let us know.

7                  We had a woman whose office

8          had virtually been destroyed.  We

9          had a client by the name of Diaz,

10         and the defendants picked Diaz.

11         Jerry stepped up with me, agreed

12         to share all the costs in that

13         case.  We went out looking for

14         experts.  I know that I believe

15         Jerry interviewed one at Tulane, I

16         had one at Hofstra, and we were

17         ready to prepare that case and try

18         that case when, in a conference,

19         the lawyer who had the client,

20         would not agree to let us call the

21         shots during trial.  It could have

22         been a disaster in pulling that

23         case following another case that

24         was pulled, but the fact that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        Jerry stepped up and we were ready
 2        to go, and it wasn't our decision
 3        not to try it, really saved the
 4        situation.
 5             Secondly, Jerry, at the time
 6        when we needed a trial package,
 7        volunteered to chair, co-chair the
 8        trial package committee and did a
 9        heck of a job.  I know he made
10        other contributions, but I'm
11        particularly grateful in those two
12        circumstances that Jerry stepped
13        up.
14             MR. MEUNIER:  Thank you,
15        Russ.
16             Well, first thing I wanted
17        to just say was that I'm neither a
18        competent nor an aggressive
19        timekeeper, so, I think my job
20        today is to try to communicate
21        some of the more tangible aspects
22        of whatever time I have as a
23        weighing factor for common benefit
24        purposes.  I think essentially my
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          affidavit covers all the key

2          points.  I'll just emphasize a few

3          things.

4              In the early going of the

5          case, I saw my job as being

6          focused on law issues, and then I

7          realized we have the master in law

8          among us, Arnie, and this is

9          hardly needed, but I did do some

10         work on the master complaint,

11         helped with some Louisiana law

12         research.  Then it was my

13         experience that it was helpful for

14         the group to have a local attorney

15         here in town on a continuous

16         basis, because there were some

17         case management issues that arose

18         and some needs on a short notice

19         basis to meet with Phil Wittmann

20         or meeting with the judge.  I know

21         there were a couple of times I

22         went over to see Judge Fallon with

23         Russ to talk about, for example,

24         that Miller study that was being

Page 5

1      published.

2            I remember a meeting, too,

3      with Phil to talk about the

4      beginnings of a case management on

5      a class action.  So, I think a lot

6      of the work that I did in the

7      early going focused on the fact

8      that I was available and I was

9      here practicing in the state and

10     available to take those kinds of

11     things on.

12           When we were talking about

13     class certification, I also

14     arranged Dean Ed Sherman's

15     involvement as an expert, and we

16     had a lunch meeting with him.

17           Then as things evolved, I

18     became more involved with some of

19     the trials at least in an

20     ancillary way.  The Daubert

21     hearing, as I recall, was a group

22     effort, but I did take a role in

23     the presentation to Judge Fallon

24     on Daubert.  I had published on it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1       and spoken on Daubert and spoke

2       about general standards, as I

3       recall, with the Court.

4              And then the first trial of

5       Irvin occurred in November of '05

6       when the Court was displaced to

7       Houston because of Katrina, and as

8       Russ knows and local attorneys

9       know, that hurricane also

10      displaced law firms, including

11      mine, but we gathered ourselves,

12      kept the firm together, and I

13      maintained my level of commitment

14      to this case.

15             I flew to Houston for that

16      trial, as others did, and

17      essentially stayed there during

18      the entire trial.  I think I was

19      one of the few, besides Andy's

20      trial team, who were actually

21      there every day right through to

22      the end and staying through the

23      final weekend, as I recall.

24             It was good for me.  I got

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1          to, obviously, learn more about

 2          the case, but I got to know the

 3          family.  I got to see firsthand

 4          what the case was about from a

 5          human standpoint, which was very

 6          helpful.  During that trial, I did

 7          handle the jury charge conference,

 8          as I recall, that we had with

 9          opposing counsel.  I also reported

10          to the PSC during that trial on a

11          key evidentiary ruling.  I found

12          myself in this case at various

13          times having to answer questions

14          about Judge Fallon's way of

15          thinking about certain things, and

16          I did --

17               MR. HERMAN:  I think it's

18          fair to say we were both shocked

19          at some of the rulings.

20               MR. MEUNIER:  We were

21          shocked at the decision he made

22          about the expert, the causation

23          expert in Irvin.

24               Now, when Irvin mistried,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        the Court decided, one, that the

 2        retrial would occur here, we would

 3        be back here in New Orleans, but

 4        then, as Russ has already alluded

 5        to, the next case up was going to

 6        be Ellis Diaz.  And Bonnie

 7        Zabotnick, who was the local

 8        counsel, was just not equipped to

 9        handle that trial.  As Russ said,

10        we agreed to team up on it.  I met

11        with Ellis Diaz.  I prepped him

12        for his deposition, I defended his

13        deposition, which was a lengthy

14        one in my office.

15             I had extensive meetings

16        with Bonnie Zabotnick about the

17        case.  We looked at the medical

18        records.  I did contact the local

19        cardiologist, Russ knows, we lined

20        him up, I met with him to talk

21        about causation issues.  There

22        were problems dealing with family

23        history in that case.  It was

24        going to be a challenging case.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          As Russ says, ultimately it became

2          clear that there was no effective

3          way for the PSC to do what it

4          needed to do in that case.  I was,

5          I believe, instrumental in

6          convincing Zabotnick that the best

7          thing that should happen is an

8          agreement that the case be

9          withdrawn, because Judge Fallon

10         was not going to permit us to

11         simply pick another case.

12              In other words, Mr. Diaz had

13         to either drop his Vioxx case or

14         that was going to be the next case

15         after Irvin II.  And I think it

16         was helpful that the Ellis Diaz

17         case was not tried.

18              I remember during Irvin II,

19         and I was invited by Andy and with

20         Troy to join the trial team, sit

21         at counsel table for Irvin II.  We

22         actually suspended the trial of

23         Irvin II for a status conference

24         of Diaz.  I remember I had to put

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          on a second had during that,

2          actually sit in on the Diaz

3          conference as lead counsel at that

4          moment for him.

5               Irvin II, my job was not to

6          handle witnesses or have any

7          speaking role with the jury, but I

8          was asked to be responsible for

9          jury charges and then certain

10          evidentiary issues that came up.

11          Primarily, I think I was helpful

12          in giving input to that trial team

13          and to others that would follow

14          about just the Eastern District,

15          the trial of Eastern District jury

16          cases after Katrina.

17               I think at that point, I was

18          one of the few plaintiff lawyers

19          associated with this case who had

20          actually tried a case to verdict

21          after Katrina, it was a maritime

22          case, and we have a good verdict

23          in it, but I learned a lot about

24          the different demographics after

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1         Katrina of Eastern District

2         juries, and I think that helped me

3         give some input in a trial of

4         those cases.

5              After Irvin II, I was less

6         active, but still had input for

7         the Barnett case with Mark

8         Robinson and his team.  I remember

9         speaking with him about jury

10        themes and about presentation to

11        that jury.  I remember giving --

12        talking to Mark during the voir

13        dire, and I was present for and

14        attended that trial, as I did

15        Irvin I and II.

16             The next trial, and probably

17        the only other relative trial in

18        the federal MDL that I was

19        involved with was Dedrick, and

20        what I recall about that is Andy

21        asked me to come over to the hotel

22        where he and others were staying,

23        we had a meeting one evening about

24        certain issues that were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1          challenges in that case, certain

 2          issues that needed to be addressed

 3          and how the proof could better be

 4          presented.

 5               MR. BIRCHFIELD:  A few

 6          challenges in that case.

 7               MR. MEUNIER:  There were

 8          challenges.

 9               And so, in retrospect, I

10          believe I made helpful

11          contributions in Irvin I and II,

12          in Diaz, even though it wasn't

13          tried, in Barnett and Dedrick.

14          So, the trial activity for me in

15          the MDL was not insignificant, and

16          I think occupied most of my time

17          in the middle stage, the early

18          stage being more of the law and

19          case management and then the

20          middle stage trials.

21               And then the final stage was

22          the trial plan, as Russ mentioned.

23          I was asked to chair the trial

24          plan committee.  I want to make it
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1          very clear that there was a lot of

 2          heavy lifting done by that

 3          committee which was not done by

 4          me.  There were people on that

 5          committee, including Leigh O'Dell

 6          and a host of others who really

 7          had such a good, strong working

 8          knowledge of the case that I

 9          thought my role was to look at it

10          from the standpoint of a user of

11          the package, a trial lawyer who

12          would take that package with

13          little foreknowledge about Vioxx

14          and how would the package actually

15          serve a lawyer to put the case on.

16               So, I tried to keep a

17          pragmatic focus for the group,

18          giving whatever input I can from a

19          user standpoint.  And other than

20          that, served as a sounding board

21          just to help with the organization

22          of it.  There were a lot of

23          meetings for the trial plan, a lot

24          of phone conferences and in-person
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          meetings, and then ultimately the

2          MI trial package group presented

3          to Judge Fallon, and I was part of

4          that presentation.  We then merged

5          with the stroke package committee

6          and basically had a larger working

7          group to then do the stroke

8          adjunct to the trial package.  And

9          so I continued to work in a

10         chair --

11              MR. HERMAN:  Let me

12         interrupt you for a second.

13              Jerry is being really overly

14         modest in terms of trial package,

15         because we were negotiating at the

16         time, unknown to Jerry, and I kept

17         pushing the deadlines, because I

18         knew that if we ever came to

19         fruition to get a settlement, we

20         had to have a stroke package in

21         place, and it had to be reviewed

22         by the judge.  So, Jerry really

23         organized that, pushed it, made

24         sure the deadlines were met.  And

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        without his leadership and Pete's,

2        and I think at some point Pete was

3        trying a case with Troy, I don't

4        think the product would have been

5        as good, and I don't think we

6        would have had it as timely as we

7        did.  I don't think we can

8        undervalue Jerry's leadership in

9        terms of the trial package.

10            MR. SEEGER:  I agree with

11       that, by the way, but since names

12       are being mentioned, if I don't

13       mention that Jeff Grand and

14       Buchanan were involved, I'm going

15       to get yelled at when I get back.

16            MR. MEUNIER:  You can't

17       mention one without the others,

18       you're right.  Chris Tisi, I mean,

19       Shelly Sanford, there were many.

20            MR. SEEGER:  It was a great

21       team, but the team needed a lead,

22       and you were the lead.

23            MR. MEUNIER:  And Russ is

24       right.  We worked under pretty

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
1         strict deadlines, and it took some

2         doing to get everybody on the same

3         page and working and meeting

4         deadlines.  I was pleased with the

5         product.  I think it's a great

6         trial package.

7             So, I started as a law clerk

8         in this Eastern District Court,

9         and I've done a lot of work in

10        this court, and was president of

11        the Federal Bar Association of the

12        New Orleans chapter, which is the

13        second largest chapter in the

14        nation, and I feel like I've grown

15        up here.  I feel like I've really

16        spent a lot of my time in this

17        court.

18            MR. LEVIN:  I feel like I've

19        grown up here.

20            MR. MEUNIER:  So, my final

21        thought is what I began with, I

22        think it was helpful to the group

23        to have me join Russ as a local

24        attorney who kind of knew the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1        ropes here, who could give insight

 2        to different aspects of how you

 3        practice here and who this judge

 4        is and how you approach juries,

 5        and I was really pleased to serve

 6        as a New Orleans member of the

 7        committee itself, but I think in

 8        retrospect, that was a key part of

 9        my role in the case.

10             MR. HERMAN:  Off the record

11        for one second.

12                  -  -  -

13             (Whereupon, an

14        off-the-record discussion was

15        held.)

16                  -  -  -

17             MR. HERMAN:  How many hours

18        do you have in, Jerry?  Let me

19        preface this by saying your hour

20        of your work may be worth a great

21        deal more than somebody else's.

22        We're asking everybody how many

23        hours they had in.

24             MR. LEVIN:  I'll tell you --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1              MR. MEUNIER:  You'd probably

2         know.

3              MR. LEVIN:  1,058, and the

4         firm has 1,123.25.

5              MR. BIRCHFIELD:  It is a

6         pleasure working with you on the

7         trial team.  The support role you

8         played, it was vital.  Everything

9         that you touched in this

10        litigation was done with

11        excellence and was much

12        appreciated.

13             MR. RAFFERTY:  I would echo

14        that.

15             MR. SEEGER:  This is the

16        first case we had ever worked on

17        together, and I don't want to be

18        negative about -- I don't have to

19        give a compliment by being

20        negative about others, but there

21        were some people who were not

22        really there for assignments.  You

23        were there for every single one,

24        and you helped us anywhere.  You

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          are a real team player.  I

2          definitely appreciate that.

3              MR. HERMAN:  Anybody have

4          any other questions?

5              MR. SEEGER:  Thank you for

6          everything.

7                   -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
           Notary Number:  1060147
23         Notary Expiration:  1.2.10
           CCR Number:  30X100176200

24
```

FAC Resp. Amended Exhibit D -- 579

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -


FIRM:        GANCEDO & NIEVES
             Hector G. Gancedo, Esquire
             Tina B. Nieves, Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Amended Exhibit D -- 580

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -
 2             MR. GIRARDI:  The reason the
 3       court reporter is here is for
 4       Judge Fallon actually.  Everything
 5       that we say, we'll have a record
 6       of for the purpose of getting this
 7       to Judge Fallon.
 8             With that, go ahead.
 9             MS. NIEVES:  I was going to
10       say that originally I prepared a
11       PowerPoint, but I've spoken to a
12       few of the people in New Orleans,
13       and they said oh, no, it is way
14       more informal.
15             MR. SEEGER:  If you printed
16       stuff, that's easier.
17             MS. NIEVES:  I'm going to
18       use it as bullet points basically
19       just for an outline.  Over the
20       course of six years, seven years,
21       there's been a lot done.
22             So, as Tom knows here, and I
23       think the rest of you, our firm
24       has been involved in the case from
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          the outset.

 2                  I see that one of the items

 3          that you want to delve into is how

 4          long pre-Vioxx withdrawal has the

 5          firm been involved.  We started

 6          investing in this case with Tom's

 7          firm back in 2001.  At that time,

 8          my partner, Hector, went with

 9          members of Girardi Keese out to

10          Mark Lanier's office to meet with

11          Goforth Lewis and members of

12          Mark's firm, and we had done a lot

13          of prefiling research at that

14          time.  We went out there and met

15          with them and put our heads

16          together and looked at what they

17          have come up with and augmented

18          our research.  We filed our first

19          case in 2002.

20                  At that time, we had several

21          cases filed in California.  It was

22          the very beginning of the

23          litigation in California.  Our

24          firm filed and prepared the
```

Page 4

1          initial coordination petition to

2          help get the cases coordinated in

3          CCW.

4                  MR. SEEGER:  That's for

5          California?

6                  MS. NIEVES:  This is all

7          California stuff.  So we did that,

8          and shortly thereafter, we were

9          before what became the first of

10         many judges, because as you've

11         probably heard with Walter, we

12         bounced around with a lot of

13         judges.  We were before the first

14         of the judges, and we were

15         appointed as one of the five

16         members of the Plaintiffs'

17         Executive Committee in California.

18         We regularly attended throughout

19         the litigation status conferences.

20         We attended the meetings with the

21         defendants early on regarding

22         coordination, how we're going to

23         strategize about that.

24                 We then undertook to look

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1         through the inventory of cases

2         that were filed at that point in

3         California.  At that point, we had

4         about 600 cases filed in

5         California, and we ended up with,

6         three of the five clients that

7         were going forward on bellwether

8         cases before Judge Lichtman were

9         our cases.  So we undertook a very

10        aggressive prelitigation schedule.

11             MR. BLIZZARD:  You may have

12        said this, Tina.  When was that

13        exactly, what was the time frame?

14             MS. NIEVES:  2002.  Well, I

15        don't know at that point.  It may

16        have been beginning of 2003, but

17        it was somewhere around then.

18        Basically at that point, the

19        pressure points for defendants was

20        what was going on in Houston and

21        what was going on in California at

22        that point.  Right, Chris?  Or in

23        New Jersey, too.

24             MR. BLIZZARD:  Coordination

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        started in California around 2003
 2        or late 2002.
 3             MS. NIEVES:  Late 2002,
 4        exactly.
 5             MR. SEEGER:  I remember, and
 6        I remember you having those issues
 7        and going through judges, and one
 8        case was set really fast, and then
 9        you lost that judge, and then the
10        case got pushed --
11             MS. NIEVES:  Defendants used
12        a preemptory challenge on the
13        first one.  We used a preemptory
14        challenge on the second one.  The
15        third one, Judge Lichtman, we were
16        with him for two years, and then
17        he was disqualified when the
18        defendants discovered he has used
19        Vioxx.  Then we went to Judge
20        Chaney.
21             When we were before Judge
22        Lichtman, he had it for two years,
23        we had three of the five cases
24        that were set.  We did the full
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          workup, actually, on those cases,

2          a lot of depositions and expert

3          work, et cetera.

4                And then in the interim, we

5          were sent over to Judge Chaney.

6          Then once we were with Judge

7          Chaney, at that point she dashed

8          what protocol Lichtman had in

9          place.  He had an all plaintiffs

10         pick slate, and Chaney said that

11         we're going to do a completely

12         different protocol.  So, we

13         started anew with members of the

14         executive committee to go through

15         and look at what was now a growing

16         number of cases in the California

17         inventory.

18                This is right around -- now

19         at this point we're around the

20         time when the MDL is about to

21         start.  Ultimately as we selected

22         the cases that were going to be

23         tried in this following group in

24         California, and right around then

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          is when, like I said, the MDL

2          started to form and Hector and I

3          went out and saw all of you and we

4          went out to a lot of

5          organizational meetings.  Houston,

6          I can't remember where the others

7          were, but we went a number of

8          places.  We kind of shifted most

9          of our resources because we didn't

10         have a dog in the fight at that

11         point.

12              MR. GANCEDO:  We didn't have

13         a trial case in California.

14              MS. NIEVES:  We didn't have

15         a trial case going on.  We shifted

16         a lot of our resources at that

17         point to the MDL.  We were

18         appointed to both the science and

19         expert committee and to the

20         discovery committee.

21              Let's see.  So, I think the

22         most unique, in terms of what we

23         did for the MDL, and we did quite

24         a lot, but I think the most unique

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          contribution we did, and I don't

2          have it put on the screen at the

3          moment, but I have it right here,

4          was this interactive multimedia

5          trial package that we prepared.

6          Basically what this was, and some

7          of you, I think, have seen it, and

8          I've actually got copies for all

9          of you so you can run it on your

10          computers.  Chris, you already

11          have one of these probably because

12          I sent one to every member of the

13          executive committee.  It was made

14          part of the trial package.

15               MR. GIRARDI:  I have it.

16          Not only do I have it, but I

17          looked at it.

18               MS. NIEVES:  Okay.  The

19          purpose of this was based on our

20          experience with prior MDLs, we

21          have had situations where people

22          have complained that they received

23          a trial package and it seems

24          cumbersome for an individual trial

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        lawyer, let's say, in Nebraska,

2        who wasn't on the inside, didn't

3        have the inside knowledge and

4        didn't do any of the common

5        benefit work, and all of a sudden

6        has got this fast track case set

7        for trial and he needs to brush up

8        on it quickly.  And he's got a

9        huge amount of work product, but

10       it is difficult, it is cumbersome.

11            So, what we did was, we made

12       this interactive program, which is

13       essentially a very sophisticated

14       PowerPoint.  We tried a lot of

15       different programs, and this is

16       the best one.  We divided the case

17       into several different categories,

18       failure to warn and concealment,

19       scientific literature, FDA

20       overview, misleading marketing to

21       physicians and consumers and

22       profit over safety.

23            And then we further

24       divided -- so, we hyperlinked all

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1           the key trial documents that were

2           being used in all the MDL and

3           state trials that we were

4           tracking.  We hyperlinked them to

5           the 375 events that we have in

6           this program.  So you can go and

7           say, here's a failure to warn

8           story, you can click on each one,

9           there's a summary of the event in

10          chronological order, and you can

11          then type the link into the

12          document, and we have it

13          highlighted for you.  We did this.

14          This evolved.  We worked on this

15          with the Robinson firm.  This

16          evolved --

17               MR. LEVIN:  Mark Robinson's

18          firm?

19               MS. NIEVES:  Yes.  Mark and

20          I actually went out and presented

21          it to Russ early on, Russ and Andy

22          early on, and it was approved to

23          be used as part of the trial

24          package.  And then it continued to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          grow as the trials went on.

2               MR. BLIZZARD:  Was this part

3          of the work done in the MDL for

4          the discovery committee?

5               MS. NIEVES:  This had

6          started before the discovery

7          committee was formed, and so we

8          went and got authorization, and

9          then, yes, it was a continuation

10         of what was done in the discovery

11         committee.  As a matter of fact,

12         we worked very closely with the

13         theme grid committee to make sure

14         that these two things complemented

15         each other.  Basically, the theme

16         grid has a lot more issues, and it

17         has the entire universe of

18         documents that the parties are

19         using.  This has the key trial

20         documents that you are actually

21         walking into court with.  So, it

22         is the hottest of the hot

23         documents.

24               We further divided it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          into -- we put in these management

2          organizations so that you could

3          see who the players were.  There

4          is a page where you can link on to

5          each one and get the bio that's

6          been marked in the deposition, and

7          you can pull up the bios.  Then --

8          don't worry, I'm not going through

9          this whole thing, but I wanted to

10         show you a few of the things that

11         went into it.

12              We did a lot of the insider

13         trades.  We captured all of the

14         insider trades of the key

15         executives.  We have a section

16         that's profit over safety, and you

17         can look at that as it relates to

18         all the other issues and events

19         that are going on and you can see

20         how, for instance, Gilmartin or

21         Anstice or these guys were dumping

22         large amounts of stock just before

23         VIGOR was released, just before

24         Vioxx was withdrawn.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1              MR. LEVIN:  Did you work

2         with anybody else with regard to

3         the insider trading?

4              MS. NIEVES:  The SEC.

5              MR. LEVIN:  I don't mean the

6         SEC.  I mean nobody else on the

7         committees or anything like in

8         California?

9              MS. NIEVES:  No.  This was

10        all done through the MDL.

11             MR. LEVIN:  Yes, but you

12        didn't work with any other

13        California lawyers on that other

14        than Mark?

15             MS. NIEVES:  Mark's firm.

16        We worked with Ted Wacker on it.

17        Then as we were getting into

18        discovery, of course, we worked

19        with members of the discovery

20        committee.  We were on these calls

21        every single week, and so we were

22        working very closely with them.

23             I just want to give you a

24        couple -- show you a couple of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          examples.  Like here is where the

2          VIGOR results were released.  This

3          is 2000, and all you do is go to

4          2000 and you go to the date and

5          you go to where the VIGOR results

6          were released.  Then on the next

7          page, you are able to see where

8          the stock was dumped, right here.

9          It is all color coded.  So this is

10         the green for the profits over

11         safety.  If you click on any one

12         of these tabs at the top, you can

13         get a chronology only relating to

14         that one issue.  So, for instance,

15         if you are looking for a key

16         label, you can go straight to the

17         FDA tab and you can go right

18         through the labels and see exactly

19         when it was and pull it up.

20             We also made it so you can

21         go and do a plaintiffs' chronology

22         so it can be customized for any

23         attorney that this is sent out to.

24         So, let's take the attorney in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        Nebraska again.  He can input his

2        plaintiff's chronology, lay it

3        over the overall chronology and

4        see exactly when its usage was,

5        whether it was pre-VIGOR, post

6        VIGOR, et cetera.  We also made it

7        so it is enabled so you can import

8        all of your pharmacy records and

9        medical records straight from this

10       program.

11           You have the self-play

12       version, which runs a little bit

13       slower, but if you were actually

14       in a situation where you were

15       asking for the trial package from

16       the MDL, you would have one with

17       instructions that you load on your

18       computer, and it works very, very

19       quickly.  It is very user

20       friendly, and I think that it

21       creates a great benefit to the

22       persons actually using the MDL

23       trial package, as they can sit

24       down in the afternoon and learn

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           the whole case.

2                   MR. BLIZZARD:  When was this

3           project started?

4                   MS. NIEVES:  When did the

5           MDL start?

6                   MR. GANCEDO:  2005 probably.

7                   MS. NIEVES:  When was the

8           beginning of the MDL?

9                   MR. SEEGER:  It was April of

10          2005.  That was the beginning of

11          the MDL.

12                  MS. NIEVES:  It was the

13          beginning of 2005.

14                  MR. BLIZZARD:  So, this was

15          from the start an MDL project?

16                  MS. NIEVES:  Yes.

17                  MR. BLIZZARD:  It was put

18          into the trial package?

19                  MS. NIEVES:  Yes.

20                  Anyway, this is a really

21          powerful tool.  It's got a lot,

22          lot of documents, a lot of good

23          information.

24                  Something I forgot to tell

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          you, if you have a marketing case,

2          we have imported all of the live

3          commercials in there.  You can

4          play them straight from the

5          program and all the print ads.  We

6          also have the media tracking.  We

7          went through media tracking

8          centers to get information about

9          the money that was spent, the

10         spots that were purchased, the

11         regions that they were played in

12         and how many spots per day.

13         There's a pretty full and

14         comprehensive marketing case

15         there.

16              MR. BLIZZARD:  So, was Troy

17         the person who ultimately had

18         responsibility for this project as

19         chair of the discovery committee?

20              MS. NIEVES:  I suppose so.

21         Mark and I were spearheading it,

22         but we were constantly speaking

23         with other members of the

24         discovery committee and making

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1           sure we weren't eliminating things

2           that were going in the theme grid.

3           As I said, we worked very closely

4           with the theme grid and the

5           subcommittee.

6                MR. BLIZZARD:  Who was the

7           vendor?  Was there a vendor?

8                MS. NIEVES:  Yes.  Executive

9           Presentations.  And there were

10          instructions that went out with

11          all of the programs when they were

12          sent to the executive committee

13          and when they were sent for

14          inclusion in the trial package

15          that indicates that it can be

16          customized for you, for your own

17          trial, you're to contact Executive

18          Presentations, and they can put in

19          all your plaintiff's information.

20               So that's the trial package.

21               Then in addition to that,

22          let me move to the science

23          committee, science and expert

24          committee and what we did for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        Shelly there.  We worked very

2        closely with Shelly.  We were very

3        active members throughout the

4        litigation on the science

5        committee.  One of the biggest

6        projects that she asked us to

7        undertake was to create a database

8        that was a science theme grid.

9        She wanted basically a combination

10       of what we had done in this

11       project, the trial package, and

12       what the theme grid committee had

13       done, and she wanted it only for

14       science.  So, we created a

15       multi-faceted access database

16       basically with a lot of fields so

17       you can search to find, for

18       instance, all the studies that

19       related to selectivity or all of

20       the FitzGerald studies or all the

21       studies that came out in different

22       years so you can search them in

23       many different ways.  When you

24       reach that through the science

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

 1          theme grid, you have -- I'm sorry,

 2          I lost my train of thought.

 3              When you go through all of

 4          that, you can pull it up and you

 5          can search it.  We've highlighted

 6          some of the things, and we've

 7          summarized each one.  Then we

 8          summarized it, categorized it.  I

 9          led a team, a subgroup -- I don't

10          think we had a formal name, but a

11          subgroup of the science committee,

12          because she kind of needed this

13          quickly.  I think it was around

14          the time of the Dedrick trial,

15          just before the Dedrick trial, and

16          she needed this quickly.  We spent

17          a couple of months, maybe two,

18          three months putting the whole

19          thing together.  At the request of

20          she and Andy and Leigh O'Dell, we

21          augmented it during the Dedrick

22          trial to incorporate, I think it

23          was, all the Pratt-authored

24          studies.

Page 22

1           I forgot to mention that the

2       trial package was definitely used

3       in one of Mark's trials, I think

4       it was the Barnett trial.

5           MR. SEEGER:  Tina, I'm sorry

6       to waste your time, because if you

7       addressed it, I apologize.  How

8       closely did you work with Mark on

9       some of these projects?  Was he

10      kind of your point person?

11          MS. NIEVES:  On that one, we

12      worked closely with him.  We

13      designed the program, and then he

14      was doing a lot of discovery for

15      the discovery committee.  And

16      since we're both here and we were

17      doing a lot of work at the time

18      for the science committee, we

19      started putting our resources

20      together.  So, we were getting

21      help from Ted Wacker at his office

22      with respect to importing all the

23      documents, and then we were

24      summarizing them internally, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1       we were circulating it through the

2       discovery committee.

3               MR. SEEGER:  Okay.

4               MS. NIEVES:  So, we did the

5       science theme grid for Shelly.  We

6       also obviously attended all of the

7       science conference calls.  We were

8       the official gatekeeper for the

9       consulting group of Girkipal Singh

10      through whom we were able to

11      access a lot of Congressional

12      testimony and the Waxman documents

13      and some of the documents that

14      were under seal at the time in

15      connection with the Congressional

16      testimony.

17              We also attended the FDA

18      advisory COX-2 advisory meetings

19      that were out in Maryland and

20      D.C., and we attended one of those

21      with Dr. Singh when we were there.

22              We also assisted in

23      developing several of the experts.

24      I'll just kind of list them.  Dr.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1          Sturkenboom, who had stroke data;

 2          Dr. Pechmann, we were working with

 3          Mark's firm on developing her in

 4          the marketing area; Dr. Gislason;

 5          Dr. La Puma; Dr. Edwards.  I went

 6          up to Washington with Shelly to

 7          meet Dr. Edwards and did followup

 8          work with her.  And Dr. Farquhar

 9          to an extent.  Mark and Dr. Singh

10          and I went up to Stanford and met

11          with Don Arbitblit and Dr.

12          Farquhar to kind of resolve or

13          reconcile some of the findings in

14          the Singh study as part of Dr.

15          Farquhar's analysis.

16              We were also asked to do an

17          analysis by the science and expert

18          committee.  We were asked to do an

19          analysis of the FitzGerald

20          hypothesis, because in several

21          joint meetings that we went to in

22          Vegas and elsewhere between the

23          discovery and the science and

24          expert committees, there was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1           questions as to whether or not we

2           really wanted to depose him.  It

3           was a two-edged sword, and we went

4           around and around on it.

5           Ultimately they asked us to do an

6           analysis.  We went through all of

7           his FDA hearings, all of his

8           testimony, his editorials,

9           studies, did a 28-page memo

10          analyzing it, and ultimately we

11          decided not to take his

12          deposition.

13               Document review.  I think

14          that we're probably a little bit

15          unique in that a lot of the firms,

16          I don't think, who have been

17          involved in this can say they made

18          a really consistent effort over

19          the long haul reviewing documents.

20          Partly the function of the fact

21          that we are working on all of

22          these other projects, we had

23          people either in Denver or in

24          Newport, or in some cases, with

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          respect to the marketing

2          materials, the documents were sent

3          to us in our office, of having

4          people, partners and associates

5          reviewing documents on a

6          consistent basis over a very long

7          period of time.

8               We prepared materials for

9          several of the depositions in the

10         trials or in connection with the

11         trials including the Silver,

12         Farquhar, Krahe depositions.

13              We also served on the sales

14         and marketing subcommittee, which

15         was chaired I think -- yeah, it

16         was by Mark.  We attended the Las

17         Vegas subcommittee meeting, and we

18         took numerous sales representative

19         depositions.

20              In addition, I chaired the

21         science research, publications and

22         societies subcommittee, and this

23         was part of the discovery

24         committee.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1               MR. SEEGER:  Science

2        research, what was that?

3               MS. NIEVES:  Scientific

4        research, publications and

5        societies subcommittee.  It still

6        catches me.  Basically, the

7        purpose of this was for us to go

8        to all the scientific symposiums

9        that were being held in the

10        medical community that were

11        covering COX-2s.  As you all know,

12        we had a lot of emerging issues in

13        the medical field relating to

14        COX-2s and actually what the

15        mechanism of action was.  We were

16        going there to find out what the

17        defense experts were saying and

18        see if we could identify experts

19        out there that would be friendly

20        to the plaintiffs.

21               MR. SEEGER:  Tina, I'm

22        sorry, if you don't mind me

23        jumping in.

24               MS. NIEVES:  No.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1              MR. SEEGER:  Who was your

2        contact person on that project?

3        Who assigned it you and who did

4        you report to?

5              MS. NIEVES:  This was part

6        of the discovery committee.  So,

7        it was the chair of discovery.

8              MR. SEEGER:  It would have

9        been Troy or one of those guys?

10             MS. NIEVES:  Yes.

11       Absolutely.  It was on every

12       single agenda item, you'll see it.

13       It was one of the subcommittees of

14       the discovery committee.

15             So, I oversaw a small group

16       of firms that were going -- I was

17       identifying all these symposia

18       that were going on, and some of

19       them were over the pond, as they

20       say.  Some of them were in Europe.

21             MR. SEEGER:  I should have

22       gotten that assignment.

23             MS. NIEVES:  Some of the

24       firms were going and sitting in on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1          them.  The ones we personally
 2          attended, our firm attended, was
 3          the American Heart Association
 4          scientific conference, and that
 5          was in November of '05; the
 6          scientific meeting conference of
 7          the American College of
 8          Rheumatology and International
 9          Society of Pharmacoepidemiology in
10          Nashville, that was in August of
11          '05; the science subcommittee,
12          cardiology conference in Salt Lake
13          City; the rheumatology annual
14          scientific committee in San Diego
15          in '05.  These were all in '05.
16          We monitored by a live feed the
17          annual European Congress of
18          Rheumatology, which was held in
19          Amsterdam.  Then we had other
20          firms that were reporting on other
21          ones they had attended.
22              With respect to direct
23          contributions to the MDL trials,
24          our firm worked on the deposition
```

FAC Resp. Amended Exhibit D -- 608

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          trial cuts with Pete Kaufman and

2          other people that he was

3          overseeing in connection with that

4          project.

5               We reviewed documents

6          specific to various witnesses for

7          the Barnett trial.

8               We compiled, I think I

9          already mentioned this, the

10         Pratt-authored articles and other

11         scientific literature for the

12         Dedrick trial at the request of

13         Andy and Leigh and Shelly.

14              We analyzed sales and

15         marketing documents and Ogilvy and

16         Arcoxia documents also at the

17         Barnett trial.

18              MR. SEEGER:  The assignment

19         from the Barnett trial would have

20         come from Robinson, and Dedrick

21         would have come from Andy?

22              MS. NIEVES:  Yes.  I think

23         how it worked was, Andy and Leigh

24         asked Shelly, and Shelly was there

Page 31

1          working on the trial, so she

2          called and asked me to do it from

3          my office.

4                And then finally it's just

5          speaking engagements which, you

6          know, we were all out and about

7          trying to inform the plaintiffs'

8          bar as best we could on progress

9          of the MDL and common benefit work

10         and what was being done.  I

11         attended and presented at a number

12         of those, including several

13         seminars, ATLA seminars, the West

14         Palm Beach conference.  I

15         moderated the ATLA Vioxx mock

16         trial in New Orleans.  That's the

17         one that, Mark, I think you were

18         there, and I know Mark Lanier

19         presented there.  I presented at

20         the Mealey's conference with Mark

21         Robinson on the Irvin trial

22         highlights in December of '05.  I

23         served as a panelist with Russ and

24         Arnold and you at the Mealey's

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          Vioxx conference at Amelia Island
 2          in Florida.
 3               MR. LEVIN:  I was there.
 4               MR. SEEGER:  I remember you
 5          being there.
 6               MS. NIEVES:  ATLA Vioxx
 7          teleconference which was FDA and
 8          painkillers, and I also reported
 9          for Mealey's on the FDA Advisory
10          Committee hearings for COX-2s out
11          in D.C. at the request of the
12          science committee.
13               So, you know, I think that,
14          as they say in Vegas, we were all
15          in on this case.  We put a lot of
16          resources in over a long period of
17          time, and I think we produced a
18          very high caliber of work.
19               MR. SEEGER:  Just for the
20          purposes of when we start just
21          piecing all of this together, it
22          sounds like the greatest -- and
23          I'm giving you credit for what you
24          have done.  You have had the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          greatest contact with Mark,

2          probably Troy on the discovery

3          committee, Shelly on the science

4          committee.

5                    MS. NIEVES:  John Restaino.

6                    MR. SEEGER:  And John

7          Restaino.

8                    MS. NIEVES:  I worked really

9          closely with Shelly and Mark's

10         firm.  Then a lot of the other --

11         definitely the other attorneys,

12         but a lot of that was through

13         teleconferences where they were

14         asking to report on what had been

15         done.  And while I'm sending it to

16         them, I wasn't doing a lot of that

17         in person though.

18                   MR. SEEGER:  Is this part of

19         the trial package right here?

20         (Indicating.)

21                   MS. NIEVES:  That is the

22         trial --

23                   MR. LEVIN:  That's your

24         trial package that you prepared?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          MR. NIEVES:  You have it on

2     disk.  I just handed it to you.

3          MR. SEEGER:  So, the people

4     who put together what we are

5     calling the MDL trial package have

6     incorporated this?

7          MR. GANCEDO:  Yes.

8          MS. NIEVES:  That's in

9     there.  To me, this should be the

10     first stop for someone looking at

11     it.  Because they can look at this

12     and learn the overall picture and

13     see the key documents, and they

14     can go into depth in the theme

15     grid and start looking at the

16     depositions.

17          MR. SEEGER:  Who worked on

18     that project with you, that one

19     there?

20          MS. NIEVES:  Well, the

21     members of my firm and the members

22     of Mark's firm.  And then it's

23     kind of a hard question because

24     there's so much incorporated in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          here.  Chris, you sent us a big

2          chronology, it was a compendium.

3          That was incorporated in here.  We

4          used things from Mark Lanier's

5          opening statements.  Mark Robinson

6          and I went out to the Ernst trial.

7          We used any exhibits that he used

8          that we haven't incorporated.  We

9          went to several states.  So, I

10         mean, it is everyone's work

11         product, but we designed this

12         program.

13              MR. SEEGER:  Have you gone

14         on line and seen the way the MDL

15         trial package is set up?  Have you

16         had a chance to see that?

17              MS. NIEVES:  I haven't

18         looked at that, no.

19              MR. SEEGER:  That's why I'm

20         asking.

21              MR. LEVIN:  We'll find it.

22              MS. NIEVES:  Russ had told

23         us at the beginning of the

24         litigation he definitely wanted

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

```
 1          this in there.  I did call Leigh
 2          at the end of the litigation to
 3          make sure that it was
 4          incorporated, and people were
 5          checking in with me to make sure
 6          we were working closely with the
 7          theme grid people over the course
 8          of the development to make sure we
 9          were capturing all the best
10          documents that were in the theme
11          grid.  We were attending the
12          trials to make sure that we got
13          ahold of anything new that came up
14          for any of these subtimelines that
15          were being used as exhibits in the
16          various trials.
17               MR. SEEGER:  Okay.  Fine.
18               MS. NIEVES:  Questions?
19               MR. SEEGER:  Just to
20          summarize, I mean, what would you
21          pick as your top contribution to
22          the common benefit?  Would it be
23          the work on the trial package?
24               MS. NIEVES:  I think the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          work on the trial package and the

2          work on the science theme grid,

3          because I know that that was -- I

4          mean, people were calling me while

5          they were in trial and saying we

6          need this immediately.  So, I know

7          that was used, and that was

8          important, and it was very

9          important to Shelly as she did the

10         work.

11              MR. WEITZ:  How many cases

12         did the firm have filed?

13              MS. NIEVES:  About 120.  Is

14         that right?

15              MR. GANCEDO:  110.

16              MR. WEITZ:  And you

17         submitted those all to the

18         settlement?

19              MR. GANCEDO:  Yes.

20              MR. WEITZ:  They were filed

21         in LA?

22              MS. NIEVES:  A lot of them

23         were in the MDL.  They were in

24         both jurisdictions.

FAC Resp. Amended Exhibit D -- 616

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1              MR. WEITZ:  Other than those

2         three out of five cases that were

3         originally before Judge Lichtman,

4         did you guys have any other cases

5         that were --

6              MS. NIEVES:  Selected for

7         trial?

8              MR. WEITZ:  -- selected for

9         trial?

10             MS. NIEVES:  No.

11             MR. WEITZ:  Thank you.

12             MR. GIRARDI:  Judge Lichtman

13        was recused because he had taken

14        Vioxx, so the defendants recused

15        him.

16             MR. SEEGER:  That's

17        interesting, isn't it?

18             MS. NIEVES:  He did say it

19        wouldn't affect anything.

20        Remember?  He threw that out.

21        Remember that time he threw that

22        out and it went up on appeal.  I

23        was at the hearing.  I remember

24        him saying on the bench, saying I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          took it.

2                MR. GIRARDI:  Thank you very

3          much.  Well done.

4                      -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 619

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
JANUARY 23, 2009
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
NEW YORK, NEW YORK
- - -

FIRM:  GIRARDI KEESE
       Thomas V. Girardi, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
BLIZZARD, MCCARTY & NABERS, LLP
Edward F. Blizzard, Esquire

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. GIRARDI:  Good morning.

 3         My name is Tom Girardi.

 4              I think in a certain respect

 5         that a good argument could be made

 6         that none of us should get

 7         anything for this case, because

 8         truly it's really been a lot of

 9         fun.  Quite honestly, too,

10         although I know all of you more or

11         less, I didn't know you the way I

12         now know you.  Having this massive

13         problem that these nine people

14         solved, no question about it, was

15         really terrific.  So, I think if

16         none of us are awarded anything, I

17         think it was still a very

18         profitable, wonderful experience

19         that we had, although it would be

20         nice, I suppose, if we got paid a

21         little bit, as well.

22              Our law firm is a very fine

23         firm.  I'm very proud of it.  The

24         Daily Journal or some publication,
```

FAC Resp. Amended Exhibit D -- 621

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        The Times, I guess, listed the

 2        five most important law firms in

 3        California:  Gibson Dunn &

 4        Crutcher; O'Melveny & Myers;

 5        Latham & Watkins; Munger, Tolles &

 6        Olson, all those people have more

 7        than 1,000 lawyers, and Girardi &

 8        Keese, which is pretty cool.

 9             Two weeks ago, the LA Times

10        called us the finest trial firm in

11        California due to various things

12        we've had.

13             We've had a lot of success

14        in the mass tort arena, going back

15        to Erin Brockovich and in the

16        class arena with Sempra Energy and

17        2.2 billion in trial and then El

18        Paso for $1.5 billion, et cetera.

19        So, we did come to the table with

20        some good credentials, but I'm

21        just saying that because I guess

22        we have to say things like that

23        for this record.  This isn't my

24        normal style of talking about
```

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1           either myself or this law firm.

2                 How about this.  We opened

3           the Vioxx file December 2000.

4           That's when we got involved in

5           Vioxx.  We heard about the

6           potential that one of their reps

7           or something was thinking that

8           maybe the drug wasn't too safe.

9           We then were able to get FDA

10          documents, which were public

11          documents, but nobody could get

12          them.  It was fortunately another

13          drug company was helpful to get

14          them for us.  So, we started

15          building our base, and June 21st,

16          2001, we filed the Vioxx case of

17          seven different plaintiffs.  This

18          was obviously four years before it

19          was withdrawn, five years before

20          the MDL got into existence, et

21          cetera.

22                Then we had a pretty good

23          complaint of 11 causes of action

24          which were upheld by jurors on,

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1        yes, on all those causes of action

 2        when we tried the couple of cases

 3        that we tried.

 4             We developed a trial package

 5        in 2001 for the lawyers of

 6        California.  I think it's

 7        important to note that this isn't

 8        really an MDL settlement.  This is

 9        an MDL settlement, a California

10        settlement, a New Jersey

11        settlement and a Texas settlement.

12        And in certain respects, all of

13        those -- you know, something had

14        been raised that there were an

15        awful lot of hours in this case.

16        But indeed, when you had basically

17        four different MDLs going forward

18        with not total cross-pollenization

19        at all, the fact that there were a

20        lot of hours, I think, is because

21        of the fact that there were four

22        MDLs.  Indeed, Judge Chaney and

23        Judge Higbee often would say, I

24        don't care how they do it in New

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        Orleans, we're doing it this way,

 2        et cetera.  So, you had to carve

 3        out your own situation.  For

 4        example, in the ethics issues,

 5        although we were very good at

 6        getting those ethics opinions,

 7        quite honestly, Judge Chaney

 8        insisted she wanted ethical

 9        opinions under California law from

10        a California, et cetera.  So, we

11        manipulated all of that stuff.

12             Ten percent of the cases

13        were in California.  Ten percent

14        of the lawyers were lawyers with

15        California cases.  The service

16        list had 116.  Some of those I

17        didn't have to worry about too

18        much.  Andy's firm had a few

19        California cases, so they are on

20        that list.  But when we saw

21        yesterday that there were 900 and

22        some law firms who were involved

23        in the eventual settlement, 10

24        percent of those came from
```

FAC Resp. Amended Exhibit D -- 625

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1    California along with 10 percent

2    of the cases.

3        The cases started off with

4    Judge -- we got them consolidated

5    into a complex case, which was

6    very important.  In the complex

7    department, there were two judges

8    that we were very worried about.

9    Fortunately, we didn't go there,

10   and we got Judge Chaney, who now a

11   bunch of you know is a very fair

12   judge and someone who works very

13   hard to do the right thing, and I

14   think over the years became a

15   fairly good pal of Judge Higbee.

16   I think probably at night they

17   would share certain information,

18   because we would get a glimpse of

19   that every once in a while.

20        In the MDL, there were

21   several committees.  There was the

22   science committee, the expert

23   committee, the discovery

24   committee, the marketing

FAC Resp. Amended Exhibit D -- 626

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          committee, the liaison committee.

2          In California, our firm, we were

3          on all of those committees.  We

4          garnered all the experts.  We

5          garnered all the science.  We

6          garnered all the documents.  We

7          made all the court appearances in

8          the case.

9              I was blown away by this

10         thing here.  I have a list of all

11         the court appearances that our

12         firm did.  497 court appearances

13         and depositions in the state cases

14         only.  Here I have this broken

15         out.  Well, I don't have it broken

16         out, somebody broke it out.  Is

17         this a state matter or an MDL

18         matter, because we attended,

19         obviously, a lot of the MDL

20         hearings and so forth as well.

21         But 497, I've got to take 15 off

22         of that, because those were

23         telephone conferences.  But these

24         were actual depositions all over

FAC Resp. Amended Exhibit D -- 627

Page 9

1          the country that we took in the

2          state cases.

3               So, we're in a very

4          favorable jurisdiction.  Listening

5          to my previous pal about the risk

6          factors, imaginative lawyers are

7          good at this.  I recall your doing

8          the risk factor of putting the

9          glass up, so, I'll steal that.

10         That's real good.  I finally

11         figured out that I've never had a

12         good original legal thought.  I've

13         stolen it from everybody.  That's

14         all there is to it.

15              MR. HERMAN:  We're the

16         greatest plagiarists that have

17         ever lived.

18              MR. LANIER:  Can I copy

19         that?

20              MR. SEEGER:  We all are.

21              MR. GIRARDI:  Then when

22         Perry was talking about the risk

23         factors and so forth, in

24         California, we have a great jury

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          instruction, which says there may

 2          be more than one cause of an

 3          accident or injury.  If two or

 4          more causes bring about the

 5          accident or the injury, both is a

 6          cause, irrespective of the

 7          percentage that each contributed.

 8          So, we didn't quite have the same

 9          appellate battle you did.  We got

10          on first base already.  Then we

11          did some imaginative stuff on

12          this.  We decided we would prove

13          that Vioxx was absolutely,

14          positively safe unless you have

15          some other potential problem.  We

16          did this with a computerized

17          designation of showing arteries

18          which were clear, and the clogging

19          then of Vioxx wouldn't cause

20          anything.  Then we had them

21          clogged somewhat with cholesterol

22          and how then that would be the

23          answer.  So, the whole focus that

24          we did out there in California was
```

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          very similar to what you were

2          doing there.  So, good minds, I

3          think, or good legal minds speak

4          the same.

5               We originally were assigned

6          to Judge Peter Lichtman, who is a

7          wonderful judge out there in

8          complex.  Merck got rid of him

9          because he admitted that he took

10         Vioxx.  He said he didn't have a

11         problem, but Merck wanted him out

12         of there.

13              Then we ended up with Judge

14         Chaney.  Judge Chaney is a little

15         bit difficult to work with because

16         she's so massively prepared and

17         expects the lawyers to be

18         massively prepared, too.  That's

19         the only difficulty.  I mean that

20         in a very complimentary way, not

21         in a bad way.

22              But the fact of the matter

23         is, so, we did all the work.  Our

24         law firm did all the work on ten

FAC Resp. Amended Exhibit D -- 630

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1       percent of the cases in all

2       honesty.  We had a good

3       jurisdiction.  Generally speaking,

4       the California complex court is

5       considered the best place for

6       plaintiffs to try their cases

7       probably in the country.  There's

8       the east, the St. Louis section

9       and things like that.  But day in

10      and day out, the verdicts that are

11      there, I don't think we would have

12      obtained the verdicts that we have

13      done, the 11-figure verdicts and

14      things like that, without the type

15      of personalities and so forth that

16      are in the Los Angeles court.  We

17      knew that Merck was very concerned

18      about the LA cases.

19           In Federal Court, the

20      unanimous verdict situation,

21      everything is more modulated.  In

22      the state court, 9 out of 12, and

23      you've got yourself a verdict.

24      So, Merck had expressed on several

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          occasions, even to me, that they

2          had a huge concern about the

3          California system.

4              I devoted, Russ, I'll say to

5          you, it wasn't 90% of my time, but

6          I devoted -- I was the lawyer in

7          this case back starting in 2000

8          all the way through basically the

9          current time.  The lawyers in our

10         case were high experienced

11         lawyers, very similar to the

12         people that you have. Lawyers with

13         30 years of experience, 28 years

14         of experience, 50 years of

15         experience, they were the lawyers

16         that did the majority of our work.

17             I had the great pleasure to

18         lose the first Vioxx case in

19         California.  I would like to say

20         it wasn't our fault.  The guy

21         didn't take the Vioxx.  The doctor

22         prescribed it, he had the

23         prescriptions for it.

24             MR. LANIER:  Been there.  Go

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          ahead.

2                  MR. SEEGER:  We've all been

3          there.

4                  MR. GIRARDI:  As luck would

5          have it, he didn't get them

6          filled.  The reason he didn't get

7          them filled is because his

8          insurance carrier wouldn't

9          reimburse him because the Vioxx

10         was too expensive.  The fact this

11         guy is still walking around alive

12         is somewhat unreasonable.

13                 But in all honesty, the

14         findings of the jury in that case

15         were terrific.  We proved the drug

16         was defective.  We proved it

17         wasn't properly warned about.  We

18         proved that they violated a bunch

19         of California consumer statutes.

20         The jury found that they had a

21         careless disregard in their drug

22         and in their marketing.  The jury

23         found that they were guilty under

24         our burden of proof of fraud,

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          oppression or malice because of

2          the testimony.  So, those

3          findings, although we didn't win

4          the case, were very helpful with

5          respect to Judge Chaney's

6          evaluation of the case and Merck's

7          evaluation of the case.  As you

8          were seeing out there, all of a

9          sudden, it wasn't so hot.  Sooner

10         or later, they were going to get

11         their comeuppance.

12              The second trial that took

13         place, Brian Panish and Tom Brandi

14         had responsibility for it.  On the

15         other hand, our same lawyers were

16         over there and basically guiding

17         them through the arena, because it

18         was basically our lawyers that had

19         gotten everything together.  To

20         give some idea, not only the

21         almost 500 court appearances and

22         depos only in the state cases,

23         they did all of the CDs -- we got

24         most of the documents before the

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        MDL came into existence, because

2        we had more -- we had 2 million

3        documents.  But most of those

4        documents were the important ones

5        that we had in the year 2001,

6        2002, et cetera, arena that were

7        very helpful.

8             I have 50 pages here of CDs

9        and documents only, fairly small

10       print, which were the documents

11       that we, in fact, reviewed.

12       Clearly I did not review them,

13       except after they had been

14       reviewed by others, and the idea

15       would be that these are fairly

16       important.

17            The second case also had

18       similar findings, although it was

19       a hung jury as to one.  They were

20       two Merck cases.  Quite honestly,

21       I preferred not to -- all three of

22       the cases that went to trial were

23       Merck selections, as luck would

24       have it, which I don't want to

FAC Resp. Amended Exhibit D -- 635

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          cast any bad stones here, and so I

2          won't say why.  So, we had our job

3          to do with respect to those cases.

4               We only have listed 18,000

5          hours, not counting the settlement

6          time.  That is all reconstructed.

7          We didn't keep time.  Now that

8          we've even gone back and looked at

9          it, clearly that number was -- our

10         number is much greater than that.

11         A lot of firms, I think, in

12         looking at some of it, have the

13         reverse as true.  Clearly I will

14         tell you under oath that indeed

15         the fact of the matter is that we

16         had many more hours in this case

17         than was indicated.

18               Now then, a very

19         important -- I'll go back before I

20         go forward.  We were very

21         successful in the expert division.

22         As a matter of fact, one of our

23         experts I think you liked

24         enormously from UCLA, who we got

FAC Resp. Amended Exhibit D -- 636

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           involved in the case as early as

2           2001, that I think testified in

3           your case, was massively --

4                 MR. HERMAN:  Stop.  Hold on

5           one second.

6                 Don't use pronouns, because

7           this record won't show the "you"

8           to whom you're referring.

9                 MR. GIRARDI:  Everybody

10          knows when I said "you" that I was

11          referring to none other than Mark

12          Lanier.

13                MR. LANIER:  The female

14          sheep of the lot, the ewe.

15                MR. GIRARDI:  We interviewed

16          approximately 40 experts in the

17          case.  Initially it was hard to

18          get somebody to take Merck on.

19          Some were concerned about there

20          wasn't enough science for them to

21          base opinions, et cetera.  But we

22          did put together some very good

23          experts, and we spent a fortune in

24          the case.

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1            MR. LANIER:  Dr. Weiner from

2      UCLA, electrocardiographic

3      specialist, cardiology.  Excellent

4      witness we used.

5            MR. GIRARDI:  Obviously, the

6      case was fairly intensive for our

7      law firm, although, once again,

8      this was a lot of fun, to take

9      this cocky organization down due

10      to the work of all of you guys.

11            Our breakthrough in the

12      case, as Merck continued to say,

13      we'll try them one at a time, I

14      was able to successfully get the

15      presiding judge to say we've got

16      to get more cases tried.  I

17      suggested we take a page out of

18      the Lockheed book.

19            We represented 600 Lockheed

20      workers against 27 manufacturers

21      of solvents and so forth.  All the

22      major oil companies were

23      defendants in the case.  They had

24      a Merck idea, too, that we'll try

FAC Resp. Amended Exhibit D -- 638

HIGHLY CONFIDENTIAL -   FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        them one at a time.  We persuaded

2        the presiding judge to set 20 at a

3        time.  One jury would hear all of

4        them.  A very interesting thing

5        happened.  In those cases, like in

6        Vioxx, the only real issue is

7        causation.  There's no real issue

8        as to Merck's bad conduct.

9        There's no real issue as to what

10       they did, what they knew.  Those

11       initial documents that came out

12       before they sold the first tablet

13       that they knew that Vioxx causes

14       MIs, I mean, it was disgusting.

15       So, you don't have to be real big

16       time in my view to be able to win

17       those issues, and the fact that we

18       won those issues in California is

19       more of a tribute to Merck's way

20       they did business and how they

21       marketed this drug rather than to

22       certainly my ability.

23            On the other hand, the

24       causation issues were.  That's the

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        ballgame.  What we learned, if you

2        have 20 people at a time and the

3        only issue is causation, and the

4        only thing the 20 people have in

5        common, some are too fat, some are

6        high cholesterol, some had a heart

7        attack, the only thing they really

8        have in common is they took Vioxx,

9        causation is out of the case.  In

10       the Lockheed litigation, we tried

11       20, 1 out of 20.  Some of the

12       injuries were smoking related or

13       whatever.  It didn't matter.  The

14       jurors gave different amounts.

15       But the causation issue

16       disappeared.  That case took four

17       months to try.  Then we took the

18       next 20, won every single case

19       there.  We took the next 20.  I

20       tried those cases five times, and

21       we won the cases.  Our thought was

22       that if we could get a large group

23       of cases all to go to trial at the

24       same time, this would be a pretty

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1      good vehicle to get the litigation

2      resolved.

3           The presiding judge

4      appointed two other judges, Judge

5      Chavez and Judge McLaughlin, both

6      former presiding judges.  They set

7      60 cases for trial in January, the

8      case having settled the previous

9      November.  That order was entered

10     in June, and they said, okay, go

11     get 60 trials ready.  The question

12     would be how would the 60 trials

13     be picked.  Judge Lichtman had an

14     idea on this that he's used in

15     other mass tort cases.  He says,

16     plaintiff, pick your best cases,

17     because I want the barometer.  I

18     don't want you to come back later

19     on and say, oh, these cases are

20     really better than the ones that

21     we got nickels and dimes for.

22     Although it was never quite

23     decided if that was going to be

24     the policy, because each judge,

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1        Judge Chavez, Judge McLaughlin and

 2        Judge Chaney were going to have

 3        their own way to do things, we

 4        thought that at least two of them

 5        would probably follow Judge

 6        Lichtman's rule that we would

 7        select all 20 for their particular

 8        court.

 9            Now then, to find 60 cases

10        out there all up and down the

11        state that we wanted to go to

12        trial, was a challenging arena.

13        We hired four additional nurses on

14        medical records.  We traveled up

15        and down the state to look at

16        these files.  We asked lawyers to

17        look at files.  We found that they

18        didn't know what they were looking

19        for in this mass tort arena.

20        There are the people that get the

21        cases and then the people that

22        read the file.  Here are the

23        people that read the file.  Some

24        of my pals in California didn't
```

FAC Resp. Amended Exhibit D -- 642

HIGHLY CONFIDENTIAL -   FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          really have much of a handle on

2          anything.  So, we went up and down

3          the state trying to -- first of

4          all, we were looking at our own as

5          well, and we wanted to be

6          inclusive, to bring some of these

7          other lawyers in and also get some

8          help.  This required virtually 25

9          people at the law firm, 10

10         lawyers, 15 paralegals and nurses.

11         We had 4 nurses looking at the

12         stuff, because we were under some

13         huge time constraints to get the

14         list out.

15              It was rumored through a

16         conversation from Merck to a

17         conversation with another drug

18         company executive that -- this

19         kind of makes me angry -- that

20         some bald guy in Los Angeles

21         convinced the judge to try 60

22         cases at a time.  We know that our

23         causation issues are going to be

24         much more difficult.

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1           MR. HERMAN:  Yul Brenner was

2       out there?

3           MR. GIRARDI:  Also, what we

4       did, which I thought was a little

5       imaginative, is we did some mock

6       trials to try to figure out -- we

7       did mock trials before the regular

8       trials that we had, but then we

9       did mock trials to try to figure

10      out who should we get, what cases

11      are the best to handle out there.

12      For example, there were some

13      warnings by Merck.  So then we had

14      some analysis done through mock

15      jurors.  We found out the

16      following:  That if a drug is

17      being given to a child, 90% of

18      mothers will examine the package

19      insert.  If the drug is being

20      taken by a man, 15% of the men

21      look at the warnings on the box.

22      Simply, the doctor gave it to me,

23      I'm using it.  We got that sort of

24      information, because we were --

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          okay, who are we going to get for

2          jurors in this case and then what

3          sort of injury.

4              We found out a problem with

5          respect to somebody who didn't

6          take Vioxx for a considerable

7          period of time, even though by now

8          there was evidence out there that

9          you don't have to take it too long

10         and it can really cause a problem,

11         the fact of the matter is, our

12         mock jurors didn't like it.  So,

13         we wanted to maybe not go in that

14         direction either.

15             We did another thing that I

16         thought was pretty good.  We noted

17         when we started trial in the

18         California cases that all of a

19         sudden in Los Angeles, there were

20         these ads about how great Merck

21         is.  For example, they talked

22         about how Merck was the company

23         that was helping the people in

24         Africa with the blah, blah, blah.

FAC Resp. Amended Exhibit D -- 645

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1        It didn't have anything to do with

 2        Vioxx.  It didn't say, buy Vioxx

 3        or buy any Merck thing.  It was

 4        just brought to you by Merck.

 5        Then we were able to track that

 6        they were just using that

 7        commercial in Los Angeles.  They

 8        were not using it, say, in San

 9        Francisco or San Diego.  So, we

10        decided we would cut our own

11        commercial.  We hired a very

12        pretty woman, actually, Erika.

13             MR. LEVIN:  Everybody

14        concurs.

15             MR. GIRARDI:  She was in

16        charge of the Pharmaceutical

17        Fairness to Consumers group.  So,

18        she came out with a statement, and

19        she had all these drugs that were

20        on the market and taken off the

21        market from Rezulin to fen-phen

22        and so forth.  She gave a little

23        pitch on that and then said, if

24        pharmaceuticals were fair, none of
```

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1        these drugs would be brought out

2        and then taken off the market, and

3        so we demand fairness from the

4        pharmaceutical companies,

5        something like that.  So, we just

6        ran that by Merck and we said,

7        guess what, pal.  If you guys want

8        to do how Merck saved the people

9        of Africa, we're doing a fairness

10       to the users coalition ad.

11       Obviously we didn't play it except

12       to Merck, but we didn't see any

13       more of that ad that came about

14       down there.

15            The five people here in the

16       room, four others besides myself,

17       had another opportunity for this

18       settlement situation.  It was

19       really terrific.  Everybody

20       contributed a heck of a lot.

21            What we did, as various

22       issues in the settlement came up,

23       for example, how long did you take

24       Vioxx before it would kick in,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1        when was the last time you used

2        the pills before it would kick in,

3        we had five groups of 100 cases

4        that I would then ask the nurses

5        and the law clerks, okay, take

6        100, how many of the people would

7        this exclude, how many of it would

8        it include, as we tried to fashion

9        what sort of a response we would

10       get if these various factors, this

11       were negotiated throughout, came

12       into play.  We thought that if

13       there was some factor that would

14       eliminate half of the cases, that

15       would be very good.  But we were

16       running about 80 percent of these

17       various gates that Merck had put

18       up when we ran them through this.

19       We used 100 alphabetically, the

20       next hundred alphabetically, just

21       for the things in our firm.  As I

22       did mention, Judge Chaney was

23       concerned about some of the

24       aspects of the settlement

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1       agreement and wanted her own

2       ethics opinions or wanted me to

3       get ethics opinions from the

4       California State Bar from

5       ethicists there in California,

6       which, of course, we did.

7            We put out about

8       four-and-a-half million dollars.

9       Less than half of what we applied

10      was benefit, cost benefit, but we

11      were deeply committed to the

12      project.  I was really deeply

13      committed because I thought Merck

14      was so despicable.  I understand a

15      bunch of guys stealing all the old

16      people's money out of the pension

17      fund.  Can you imagine selling one

18      tablet when you know this is going

19      to probably cause some guy to have

20      a heart attack?  So, I was

21      motivated by that, I think, more

22      than anything else in the case.

23           We made some personal

24      sacrifices as well.  Most of these

FAC Resp. Amended Exhibit D -- 649

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          meetings in the settlement

2          situation I flew privately,

3          although we didn't get compensated

4          for that.  Our firm, it probably

5          cost them about $2 million.  I was

6          pretty serious about making sure I

7          was present at all of those

8          meetings.

9               Following the settlement,

10          the work began with respect to the

11          California lawyers.  I talked to

12          approximately 400 to 500 clients

13          not of our firm's, but of other

14          firms, who had various questions

15          that they just referred to us.  I

16          traveled up and down the state.

17          We had one seminar that several of

18          you were at in San Francisco.  Not

19          too many people showed up to that

20          because we had talked to just

21          about all of them at seminars in

22          our office.  I gave them at that

23          time the data with respect to

24          costs of the case.  We let them

FAC Resp. Amended Exhibit D -- 650

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

 1        see our cost books.  We shared

 2        with them the surveys that we had

 3        done with respect to how many

 4        people these various factors would

 5        affect, et cetera, et cetera.

 6            I might say that out of all

 7        the California firms, everyone

 8        signed on to it.  No one has

 9        appealed to the Fifth Circuit.

10        There was one firm we couldn't

11        get.  There's one guy out there

12        that nothing is working.  I

13        brought him down to Chaney.  I

14        brought him myself, whatever.  So

15        he remains the only person.

16            So, I don't want to take too

17        much more time.  I think that

18        we're a very dedicated firm.  We

19        have good credibility with the

20        Court.  We've put in a massive

21        effort in the case, both working

22        the cases up, and we think we had

23        something to do with this thing

24        eventually resolving.

FAC Resp. Amended Exhibit D -- 651

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1               I'm not going to say any

2          nice things about anybody else

3          here, because nice things have

4          already been said.  I want to move

5          this along.  But it seems to me

6          that everybody here brought

7          something different to the table,

8          be it the briefs, Arnie, that you

9          did, be it some of the trial stuff

10         that you did, Mark, you did,

11         Chris, Andy.

12              MR. SEEGER:  He pointed to a

13         bunch of people.

14              MR. GIRARDI:  A whole bunch

15         of people, all the way.  I mean

16         that from absolutely everybody

17         here contributed massively to

18         this.  This is historic, man.  How

19         you could get a settlement like

20         this, which you have various

21         injuries in all of these people,

22         how you could get something that's

23         fair that the other side agreed to

24         with a lot of arm twisting, is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1      really terrific.  So, I think

2      you've done a terrific job, and

3      I'm very, very proud to have been

4      a part of it.  Quite honestly, I'm

5      very proud to have had such

6      wonderful friends in my life, and

7      you guys will be friends of mine

8      forever.  I mean that.

9           One thing I was going to

10     show you.  I think I showed you

11     this before.  Here are our

12     Vioxx files.  These are not case

13     files.  Our case files are

14     alphabetically in another section.

15     These are also not documents,

16     because the documents are all on

17     the disks, et cetera.  These are

18     just our case files of the Vioxx

19     litigation.  Pretty hip.  Nothing

20     further.

21           Thank you.

22                   -  -  -

23

24

FAC Resp. Amended Exhibit D -- 653

HIGHLY CONFIDENTIAL -  FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1              C E R T I F I C A T E
2
              I, LINDA L. GOLKOW, a Notary
3    Public and Certified Court Reporter of
     the State of New Jersey, Registered
4    Diplomate Reporter, Federally-Approved by
     the United States District Court of
5    Pennsylvania, do hereby certify that the
     foregoing is a correct transcript of the
6    testimony as taken stenographically by
     and before me at the time, place and on
7    the date hereinbefore set forth.
8
9              I DO FURTHER CERTIFY that I
     am neither a relative nor employee nor
10   attorney nor counsel of any of the
     parties to this action, and that I am
11   neither a relative nor employee of such
     attorney or counsel, and that I am not
12   financially interested in the action.
13
14
15
16
17
18
19
20   _____
             Linda L. Golkow, RDR, CRR, CCR
21           Notary Number:  1060147
             Notary Expiration:  1.2.10
22           CCR Number:  30X100176200
23
24

FAC Resp. Amended Exhibit D -- 654

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
JANUARY 23, 2009
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
NEW YORK, NEW YORK
- - -

FIRM:  HERMAN, HERMAN, KATZ & COTLAR, LLP
       Russ M. Herman, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers, LLP
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. HERMAN:  My name is
 3      Russ Herman.  I've been admitted
 4      to practice in Louisiana in the
 5      federal system in many states and
 6      in several federal courts of
 7      appeal and before the Supreme
 8      Court of the United States.
 9              I graduated with a B.A. from
10      Tulane University in '63 and
11      graduated from Tulane University
12      in 1966.  I joined a small
13      plaintiff firm founded by my dad
14      and my uncle in 1940 and have
15      practiced plaintiff's law ever
16      since.
17              I have had an opportunity to
18      represent some major corporations,
19      but I'm a plaintiff's lawyer, and
20      I'm very proud of it, and
21      basically, as most of us, started
22      off trying everything including
23      the barking dogs that were handed
24      down by the firm, and have been a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        trial lawyer ever since.

2             I entered the class action

3        field about ten years ago, it's

4        been longer now.  My mother died

5        of COPD from tobacco, and on her

6        deathbed, my brother and I made a

7        pledge that we would join two

8        efforts against the tobacco

9        companies and decided that the way

10       for our firm to go was to get

11       involved heavily in complex

12       litigation and class action.

13            I've been lead counsel in

14       more than a dozen class actions of

15       different types since then.  There

16       has been some talk in the

17       transcript that you will read by

18       attorneys who talk about tobacco

19       litigation, and I'm the only

20       lawyer in Vioxx among the several

21       hundred lawyers who actually tried

22       a tobacco case to verdict, and it

23       took three years.  I say that as

24       an introduction to some of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1      Johnson factors, but only to give
2      some background.
3           At the outset, Pretrial
4      Order 2, I was appointed liaison
5      counsel by Judge Fallon.  Judge
6      Fallon makes his own decisions.
7      It was evident that Chris Seeger
8      and Andy Birchfield should lead
9      the MDL as co-leads among all the
10     lawyers that came into the MDL
11     full spirit, had been in the case
12     the longest, knew the case and
13     knew the players, and I can say
14     without reservation that I
15     strongly recommended them as
16     co-leads in the MDL.  There were
17     other recommendations I was asked
18     for, but Judge Fallon, as usual,
19     makes his own choices.  There were
20     some 60, 70 resumes submitted.
21     Judge Fallon selected a
22     Plaintiffs' Steering Committee,
23     and in Pretrial Order Number 6,
24     Andy Birchfield and Chris Seeger

FAC Resp. Amended Exhibit D -- 658

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        were appointed co-leads, and I was

2        appointed as the third member of

3        an executive committee.

4            The negotiating committee,

5        which I chaired, was appointed in

6        order 6C.   I will have more to

7        say about that later.

8            The fee allocation

9        committee, this committee was

10       appointed in Order Number 32, and

11       in addition to that, each member

12       of the fee allocation committee

13       sits on a gates committee, which

14       reviews cases as they go through

15       the process, and that will be an

16       ongoing charge, in my judgment,

17       through September.  Hopefully, by

18       September, there won't be a

19       necessity after that.

20           I am going to discuss these

21       committees and my involvement, the

22       Johnson factors, the key

23       contributions that I believe our

24       firm made.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1              I want to talk a bit about
 2         the nature of global and complex
 3         litigation and really how
 4         difficult it is for all of us.  In
 5         my view, there is accepted where
 6         there's injunctive relief for a
 7         single casualty, for example, an
 8         air crash in the field of personal
 9         injuries.  I'm not going to get
10         into special laws that govern
11         finance, securities, et cetera,
12         but in personal injuries, it is
13         pretty much impossible to get a
14         federal class action certified.
15         The Class Action Fairness Act is
16         really an antagonist to any sort
17         of consumer relief in class
18         actions.  It makes the lawyers who
19         choose to handle these cases and
20         devote time and resources severely
21         at risk, and that is a factor that
22         should be considered in terms of
23         every application that's made for
24         fee.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1            In addition to that, there's
 2      developed a pretty sophisticated
 3      class action bar.  I think
 4      nationally we pretty much know who
 5      we are, and there are not many of
 6      us.  When I say "there are not
 7      many," if I had to, off the top of
 8      my head, list the firms that I
 9      consider the top plaintiff firms
10      in the country who handle complex
11      litigation on a really highly
12      skilled level, there are probably
13      less than 20, and there's a subset
14      of those that have specialized in
15      pharmaceutical litigation.
16            I tried my first case
17      against major manufacturers and
18      pharmacies more than 25 years ago,
19      and I took on Wyeth and Syntex for
20      high level estrogen birth control
21      pills that were killing the liver
22      of young women, destroying it at a
23      time when there were no liver
24      transplants.  So, I've been
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          involved in pharmaceutical

 2          litigation.

 3               I actually was trained for

 4          my early career on medical

 5          negligence cases and tried

 6          possibly 100 to verdict.

 7               The nature of complex

 8          litigation is such that everybody

 9          that participates believes that

10          they are the one that really gave

11          the monumental relief.  In my

12          view, cases are settled out of

13          fear, and until you exert enough

14          leverage and enough fear in the

15          defendant, then I can come to the

16          table, because they're acting in

17          their best interest just as we're

18          acting in our best interest.

19               Another thing that makes

20          this type of litigation difficult

21          is you don't have the usual

22          personal relationship or rapport

23          with the clients.  That means that

24          you've got to take extra steps to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1         keep your clients and your

 2         referral attorneys in sync in some

 3         way with what's going on in the

 4         litigation.  There are many other

 5         difficulties.  You face the best

 6         firms in the country.  They have

 7         literally hundreds of millions of

 8         dollars to throw into the case.

 9         The cases, and I've monitored the

10         cases that were tried in Texas,

11         New Orleans and New Jersey, and

12         when I say "monitored," I don't

13         mean to imply that I sat as second

14         chair or I tried those cases, I

15         was in and out of those cases

16         enough to sense what was going on

17         and particularly the cases that

18         were tried in the MDL.  And in

19         those cases, our lawyers, who were

20         very skilled trying those cases,

21         perhaps had four or five lawyer

22         teams and paralegals at the most,

23         and the defense was throwing

24         several hundred lawyers and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1      paralegals into every case in New

2      Orleans, for example, the Beck

3      firm, very accomplished, filled

4      the courtroom literally with

5      lawyers and paralegals, which

6      exert a terrific amount of

7      pressure because they're getting

8      paid.

9           In this case, Merck spent as

10      of perhaps six months ago $1.6

11      billion in defense without risk.

12      Their lawyers had no risk.  So,

13      given that background, it's

14      necessary to talk about what Judge

15      Fallon and the judges of the three

16      state courts involved, New Jersey,

17      California and Texas expect, which

18      is, they expect transparency, and

19      they expect this group to act

20      fairly, and in that sense, I have

21      a few things to say about this

22      group before I begin.

23           Of course, these are my

24      judgments, I haven't discussed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1         them with anyone, but I would feel

2         remiss if I didn't say these

3         things.  Building a case is not

4         like building a house.  It's like

5         building a fortress.  You need a

6         foundation, and the foundation in

7         this case was set very early on

8         before recall.  A number of firms

9         were involved heavily, including

10        the co-leads in the MDL,

11        California, Texas, New Jersey, and

12        something has to be said for

13        courage in the first risk.

14        Certainly Carlene and Shelly

15        Sanford deserve to be rewarded for

16        biting into this case when no one

17        else did.

18             In building a fortress, your

19        walls have to be tough, internally

20        you have to be strong, and there's

21        got to be a roof over your head.

22        I don't think any team of lawyers

23        deserves a greater recognition in

24        this case than Chris Seeger and

FAC Resp. Amended Exhibit D -- 665

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          Andy Birchfield based upon my

2          view.  Seeger was lead counsel

3          also in New Jersey, his partner,

4          Buchanan, and other frontline

5          lawyers were involved in New

6          Jersey and the MDL.

7               Andy Birchfield and his

8          partner, Leigh O'Dell, tried more

9          cases in the MDL than any other

10         firm, and they were tough cases.

11              Arnold Levin and Fred Longer

12         and his group, and I'm speaking

13         mainly about the MDL now, I know

14         I'm going to get into how many

15         briefs and motions, et cetera,

16         were filed, but Arnold's firm had

17         90 percent easily responsibility

18         for at least the first draft of

19         every motion, was heavily involved

20         in strategy, was able to turn

21         around briefs and motions in less

22         than 24 hours of a very high

23         caliber.  Every one of the briefs,

24         motions, et cetera, was reviewed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1        by Seeger, Birchfield, myself,

 2        Leonard Davis and Steve Herman,

 3        and that's not to say we didn't

 4        contribute to briefing, because we

 5        did, but Arnold's firm did an

 6        exemplary job.

 7             Nobody or no group provided

 8        more base experience, trial

 9        experience in Vioxx than Troy

10        Rafferty and Pete Kaufman.  It is

11        not easy for frontline lawyers at

12        the top of their game to be second

13        chair in just about every case

14        that was tried.  You get to where

15        this group is, and we're heavily

16        egocentric.  It's partially due to

17        success and partially defense

18        mechanism and partially due to

19        personality for whatever reason.

20        Every case just about that I

21        monitored, Levin Papantonio was

22        there through Troy Rafferty and

23        Pete Kaufman, who also served on

24        the science and executive
```

FAC Resp. Amended Exhibit D -- 667

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        committee.  They were in

2        California, they were in New

3        Jersey and in the MDL.

4            Chris Tisi did extraordinary

5        work in depositions and science

6        and experts, and he did it gladly

7        and mostly is responsible for

8        insisting and in telling me to

9        insist that Merck would have a

10       profile form, that it was unfair

11       for plaintiffs to have profile

12       forms without the defense to have

13       fact sheets.

14           In addition to the lawyers

15       that I've mentioned, and if I

16       haven't mentioned members of the

17       Plaintiffs' Steering Committee,

18       for example, in the MDL, it's

19       because I believe that the lawyers

20       I've mentioned deserve special

21       recognition.

22           There are a group of lawyers

23       that weren't in the MDL PSC that

24       deserve special mention.  Mark

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        Lanier, extraordinarily gifted
 2        trial lawyer, tried cases
 3        successfully in New Jersey and
 4        Texas.
 5            Tom Girardi, who is the
 6        California lawyer -- I'm very
 7        familiar with that bar.  I was a
 8        member of the Consumer Lawyers of
 9        California before they changed
10        their name.  I was recruited by
11        Dave Casey, Jr. and Brown Green
12        years ago to raise money to fight
13        in legislative battles.  I
14        attended numerous meetings of the
15        Los Angeles Trial Lawyers. It is a
16        group of lawyers who are not only
17        successful, but gifted and have
18        their own inner Nicene wars, not
19        as bad as New York, but Tom
20        Girardi was universally respected
21        when he was selected by the
22        California judge to be a member of
23        the negotiating team and by Judge
24        Fallon and the other judges on the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        allocation committee.

2              Perry Weitz for years has

3        been a leader in the New York bar,

4        has done extraordinary work in

5        asbestos and other cases, not only

6        is himself a gifted trial lawyer,

7        but he has been able to attract

8        and keep gifted trial lawyers.

9              Ed Blizzard, who tried

10       extraordinarily well a terrible

11       case in the MDL and whom I have

12       come to admire and rely on not

13       only as a gifted trial lawyer, but

14       has a great deal of common sense.

15       I think as chair of the

16       negotiating committee, one of the

17       things you have to do is listen,

18       and a couple of times when I got

19       off track, it was Ed Blizzard that

20       put me right back on track, which

21       I appreciated.  Fortunately, we

22       have not reacted to each other in

23       a negative way for advice or when

24       our sense differs.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          Again, I want to bring up

2      Arnold Levin, who if the five

3      families of New York had Arnold as

4      a consigliere, there would still

5      be five families.

6          MR. LEVIN:  Thanks, Russ.

7          MR. HERMAN:  I give these

8      remarks because I know that no one

9      person pulls a ship like this.

10     This is the largest case of its

11     kind.  We have no idea how much

12     money will go to common benefit at

13     this point.  But whatever it is,

14     I'm certain the lawyers I've

15     mentioned deserve special

16     recognition and allocation,

17     because without them, this could

18     not have been done.

19          One more word about my

20     colleagues, Lanier, Girardi, Weitz

21     and Blizzard.  Perry Weitz and

22     Mark Lanier were not members of

23     the negotiating committee, but I

24     want to affirm that the case could

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          not have been settled without

 2          their agreement.  Merck absolutely

 3          insisted that the people at this

 4          table, and I'm going to give their

 5          names again, Seeger, Birchfield,

 6          Blizzard, Weitz, Levin, Rafferty,

 7          myself, Lanier and Girardi had to

 8          agree to a settlement and be part

 9          of it or they were not willing to

10          settle at all.

11               That leads me to the role of

12          our firm in the litigation, which

13          is substantial, and of course I

14          believe it was certainly as

15          important as any role that was

16          played, and I don't believe we

17          would be where we are today if our

18          firm had not played the role that

19          we had.  I say that because the

20          only global resolution could have

21          come through the MDL.  He's the

22          only judge with the power to do

23          that.  Merck persisted in its

24          position that it would not settle
```

FAC Resp. Amended Exhibit D -- 672

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          and then persisted on a position

2          that there would be no inventory

3          settlements, none.  And I,

4          frankly, have my doubts.  There

5          are some lawyers outside of this

6          room that are now claiming common

7          benefit, and their whole effort

8          was towards an inventory

9          settlement and really not towards

10         common benefit.  I feel strongly

11         about that, and so here's what I

12         believe, and I'll speak first

13         about liaison counsel and

14         executive committee counsel, but

15         particularly our role as liaison

16         counsel.

17              We had  eight lawyers and

18         paralegals involved in the case.

19         Lenny Davis certainly as my right

20         arm did a fabulous job in

21         administering this case.

22              Steve Herman, who, next to

23         Arnold, I rely on for his

24         knowledge of complex litigation.

FAC Resp. Amended Exhibit D -- 673

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        He teaches those courses at both

2        Loyola University and Tulane.  So,

3        the first is the confidence of the

4        bench and the bar in liaison

5        counsel.  That's extraordinarily

6        important.  I think I have a

7        rapport with Judge Fallon that

8        I've developed over a number of

9        years.  I hold him in great

10       respect.  I've been able, where

11       I've made a mistake, to admit it

12       freely to him.  When I've asked

13       for recommendations, I've given

14       the judge my best recommendation.

15       Time records won't show it, but

16       from the time we were appointed,

17       there literally have been hundreds

18       of conferences with the judge,

19       with the judge's law clerk, and

20       the way those work was I would

21       call Doug Marvin or Phil Wittmann

22       and say I needed to see the judge

23       about something, would it be okay

24       to go.  It's not about an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        adversary issue, you are not going
 2        to find those showing up anywhere,
 3        because I consider them
 4        confidential communication.  The
 5        judge has to have, I believe,
 6        confidence that liaison counsel is
 7        going to report and attempt to
 8        resolve problems on a regular
 9        basis.
10             In terms of the bar, my
11        father had a saying that no matter
12        who you were, no matter how strong
13        you are, competent or wealthy you
14        are, there's always going to be
15        someone around the corner
16        stronger, smarter and wealthier
17        and that you had to pay back, that
18        law was a calling and a privilege
19        and not a business, that I could
20        go sell shoes if I wanted.  I've
21        lived by that spirit for 42 years
22        and am fortunate enough to have
23        served as president of four
24        national or three national
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1        associations and have been elected
 2        to four peer groups.  All that
 3        means is that I believe I have a
 4        network of lawyers that know they
 5        can trust what I say and I can do
 6        business with them on a handshake,
 7        and I think that's important,
 8        because one of the things that
 9        liaison counsel is called upon to
10        do is resolve conflict.
11             The second is
12        professionalism, particularly in a
13        courtroom.  I think everyone at
14        the table knows that I've tried to
15        conduct myself with good humor and
16        professionalism.
17             The third requisite is to be
18        a listener.  If you can't listen
19        and you can't accept criticism or
20        advice, you are in big trouble as
21        liaison counsel.  First of all, it
22        causes resentment because there
23        are other lawyers equally as
24        competent as you, some have more
```

FAC Resp. Amended Exhibit D -- 676

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1      experience than you, and certainly

2      some have more experience in Vioxx

3      than I came to the table with.  We

4      started in Vioxx about four months

5      before the Vioxx was withdrawn,

6      went to a seminar in Houston, went

7      to a meeting that Chris called in

8      New York, and at the time we had

9      about 70 cases, we had our own

10     experts, we had done our

11     literature research, but we were

12     not as knowledgeable as others.

13     You have to be able to listen, and

14     not just to listen, but to back

15     down, not to be hard headed when

16     you feel you've heard something

17     that makes sense to you.

18          Number four, I think you

19     have the responsibility for

20     picking what battles are going to

21     be fought along with other members

22     of the executive committee.  It

23     doesn't do you any good to keep

24     fighting battles that are

FAC Resp. Amended Exhibit D -- 677

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1      insignificant, attacking lawyers

2      rather than the case, or time

3      after time, bringing motions about

4      matters you are not going to win.

5      Making sure that whatever disputes

6      you have with your opposite member

7      on the defense team, that you are

8      tough, they know you are tough,

9      but that you are not going to take

10     unfair advantage, because somebody

11     has to deal with them on a daily

12     basis, and if you don't have that

13     sort of trust, you are not going

14     to get much done.

15         Number five, report honestly

16     and accurately to the judge.  I'm

17     not going to say anything more

18     than that, but I've fulfilled

19     that.  And then to be able to

20     accurately report back to the

21     executive committee or the PSC or

22     the negotiating committee what you

23     can report that the judge is doing

24     and what Judge Fallon hasn't told

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1    you to try to intuit because of

2    the relationship where we need to

3    perform as a group.  You need to

4    know the issues in the case.  And

5    I say that because the job isn't

6    to execute a deposition, it's to

7    make sure that the people that

8    know how to take depositions are

9    taking the depositions.  We all

10   have seen cases destroyed because

11   some lawyers just went whole hog

12   in the depositions, established

13   terrible ground work that you have

14   to plow over if you can, but you

15   probably have to live with.  In

16   addition to that, early trials can

17   kill cases by lawyers that aren't

18   prepared and aren't doing their

19   work.  So, you've got to know what

20   the issues are and who can handle

21   them.

22        One of the primary jobs of

23   liaison counsel is to police the

24   ethics.  We plaintiff lawyers have

FAC Resp. Amended Exhibit D -- 679

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1      been criticized since 1920 for

2      practicing unethical or being

3      bagged as trash.  We've come into

4      prominence probably somewhere in

5      the '50s or '60s.  We're still

6      stigmatized by the tort reformers

7      and a lot of the media, and we

8      have to be extra careful in these

9      cases.  Liaison counsel had from

10     the beginning counsel with Dean

11     David Sherman and retired Supreme

12     Court Judge Harry Lemmon on an

13     ongoing basis just to make sure

14     that we were on the right track.

15     I want to explain how difficult

16     that is.

17          Ordinarily, you only have

18     two duties, one as an officer of

19     the Court, and the other is to the

20     client.  Virtually everything that

21     you do revolves around those two

22     ethical duties.  Candor to the

23     Court, fairness to the opposition,

24     they all involve around being an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          officer of the Court.  Protecting

2          the client and client issues

3          revolve around the client, that's

4          not true in an MDL or complex

5          litigation.  You have other

6          considerations.  If you are in a

7          leadership position, you've got a

8          fiduciary responsibility to the

9          other folks that the Court has

10         appointed.  If you are in a

11         leadership position, you also have

12         a fiduciary duty to lawyers who

13         aren't in leadership and to

14         protect their clients.  Every

15         decision you make has to comport

16         with those various fiduciary

17         duties or you are in trouble.

18              I'm particularly grateful

19         that the negotiating committee and

20         the allocation committee has

21         sought outside ethics opinions at

22         every turn, but beginning when the

23         MDL started, we were confronted

24         with all of these various and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1          sometimes conflicting
 2          responsibilities, and walking your
 3          way through them is very
 4          important.
 5               Administration of the case,
 6          it is a big job to coordinate the
 7          MDL with three states, including
 8          assemble all the reports, all the
 9          trial transcripts, establish the
10          depository, meet on a daily basis,
11          if necessary, with the Court,
12          prepare status conference reports,
13          circulate them, get the input,
14          organize who was going to do what,
15          make sure the assignments are
16          spaced correctly, rely on the
17          input particularly of your
18          executive committee to make sure
19          everybody is being treated fairly.
20               Hurricane Katrina and Rita
21          in -- I think we were appointed in
22          February of 2005.  In August 2005,
23          Hurricane Katrina hit, we had the
24          major depository in New Orleans
```

FAC Resp. Amended Exhibit D -- 682

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1     with about 40 computer setups,

2     millions of documents,

3     depositions, et cetera.  We were

4     fortunate that in Birmingham and

5     in New York --

6          MR. BIRCHFIELD:  Montgomery.

7          MR. HERMAN:  In Montgomery

8     and in New York we had

9     depositories.  But in order that

10    the case not be delayed in any

11    way, Judge Fallon took immediate

12    steps to establish with the Court,

13    Federal District Court in Houston,

14    a courtroom and office, et cetera.

15         While we were relocating and

16    setting up offices for the firm in

17    three different cities within two

18    weeks of Katrina, we had three

19    moving vans and 20 men come into

20    New Orleans and move the entire

21    depository to Houston, rent office

22    space, and then Hurricane Rita

23    hit.  Despite the hurricanes and

24    the relocation, the MDL did not

FAC Resp. Amended Exhibit D -- 683

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          miss a beat.

2                  MR. SEEGER:  You did

3          something else, and I don't want

4          to forget it in my presentation.

5          Humeston I was going on during

6          Katrina, and you did not miss one

7          day with calling me and asking me

8          how things were going and provide

9          support and saying positive

10         things, and I personally want to

11         thank you -- you know that first

12         one didn't turn out so well, and

13         the case owes you a thank you

14         because you should have been

15         thinking about yourself and your

16         family at the time or could have

17         been.

18                 MR. HERMAN:  Thank you,

19         Chris.

20                 Since your name goes on

21         every document that's filed in the

22         MDL, you'd better read them, and

23         you'd better read them very

24         carefully.  I learned everything

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1        is a learning process.  In

2        Propulsid, after a hard

3        negotiation, and that settlement

4        was not nearly as good as this

5        one, in fact, we were all

6        searching for a way of how do you

7        settle globally in these cases

8        given what the federal courts have

9        determined you can and can't do.

10       You learn a lot with having gone

11       through in Judge Fallon's court

12       with another case.  In a second

13       settlement, based on a first

14       settlement that we had negotiated,

15       it was represented to me that the

16       papers were the same, the

17       settlement was the same.  I should

18       have read it a lot more thoroughly

19       because there were three words in

20       it that were different.  I'm going

21       to be able to resolve that after a

22       year, but it taught me a lesson,

23       and that is, no matter what's

24       going on in your personal life or

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1        anything else, if you're liaison

 2        counsel and your name is going on

 3        the line, the buck stops with you.

 4              So, everything that was ever

 5        filed in the MDL was reviewed by

 6        me, every e-mail, and I have

 7        something to say about that.  The

 8        people in this room charged with

 9        responsibility should take the

10        time to read e-mails, but there

11        are an awful lot of people out

12        there that have nothing to do with

13        issues that read an e-mail and

14        then note their time.  That sort

15        of bothers me.

16              You have to respond to

17        inquiries.  We actually, because

18        of a plaintiff lawyer by the name

19        of Sam Gainsburg, for 20 years

20        have kept contemporaneous time

21        records in every case, and we

22        carry a 90% contingent fee

23        caseload.  We found it very

24        helpful for monitoring what
```

FAC Resp. Amended Exhibit D -- 686

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1         happens in the case.

 2              In this case, we were

 3         charged to record our time in the

 4         MDL contemporaneously and report

 5         it on a monthly basis.  When I say

 6         "respond to inquiries," we had 20

 7         or 30 telephone calls or e-mails a

 8         day that there's no time recorded

 9         for because they lasted less than

10         five minutes.  I've never felt

11         comfortable recording a half-hour

12         or a quarter hour of time on a

13         phone call that's five minutes or

14         less or reading an e-mail that's

15         two lines.  But from 2005 through

16         today, if we don't get 20 to 30

17         e-mails and phone calls and

18         inquiries from claimants, lawyers,

19         et cetera, it would be remarkable.

20         They have to be responded to.  You

21         can't let them sit when they are

22         not responded to or  you are

23         headed for trouble.

24              You have to know the talent
```

FAC Resp. Amended Exhibit D -- 687

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          and understand the talent and be

2          able to assign it.  You also have

3          to know who is going to shirk the

4          load.  It's very important.  The

5          Court does the best job it can to

6          appoint members of the committee.

7          I can say without any hesitation

8          that the negotiating committee and

9          the gates committee and the

10         allocation committee, everybody

11         has pulled their load.  I can't

12         say that about the PSC.  That's

13         not unusual.  But you've got to

14         know the talent, and you have to

15         be able to shift responsibility

16         without causing internal problems.

17         If lawyer A is assigned to a

18         science committee, but he's off

19         handling Bextra and some other

20         types of cases and not doing the

21         work, rather than criticizing that

22         person, which would create

23         internal issues, and recognizing

24         it is the judge's appointment, not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1           your own, you have to shift that

2           work somehow.  You have to be able

3           to shift it to somebody.  If you

4           don't have anybody on the PSC,

5           you've got to go out and find

6           somebody who works hard, who knows

7           what they are doing, and shift

8           work to them.

9                You also have to know that

10          when one of the members in this

11          room is in trial, they are going

12          to be focused on winning their

13          trial.  They can't be burdened

14          with other issues, and you've got

15          to be able to, without offending

16          them, shift some workload to other

17          folks.  You need to monitor the

18          discovery in the trials.

19                Some of the depositions in

20          the case had to be retaken in my

21          judgment.  There was not a serious

22          deposition in this case of an

23          expert or a Merck employee that I

24          did not personally review.  Some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          of them were excellent and some of

2          them were mediocre, and you

3          learned that monitoring the trials

4          just so that whoever has got their

5          trial responsibility knows you are

6          there if they need something and

7          they are not getting it, to make

8          sure that they get it.  And to

9          monitor trials outside the MDL.

10         You need to know what's working in

11         other cases and being able to

12         relate it, and you have to look at

13         that talent, because what you may

14         want to do is try to draft some of

15         that talent into your cases.

16               You need to troubleshoot.

17         You've got to anticipate where the

18         trouble is and nip it in the bud.

19         If you want to maintain a

20         relationship with the judge, Judge

21         Fallon's favorite saying is, well,

22         put it on me, put it on me.  Well,

23         the fact is that you hope to

24         resolve conflicts by

FAC Resp. Amended Exhibit D -- 690

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1      troubleshooting and getting them

2      resolved so that you don't burden

3      the judge with nagging things,

4      maintaining internal rapport and

5      decorum, calling the PSC meetings,

6      making sure that the minutes are

7      recorded, being able to

8      communicate, and hopefully do it

9      most of the time without getting

10     angry.

11          Next, preparing all court

12     arguments, whether you make them

13     or not, and I made most of them.

14     Here are the key issues that I

15     think I argued and argued well.

16          Statute of limitations.  We

17     had no statute of limitations

18     adverse ruling in the MDL.

19          Preemption.  I'm not going

20     to say I was wholly responsible,

21     we had great briefing on that, but

22     I think we made a preemption

23     argument when it needed to be made

24     at a time it needed to be made,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          and it sent a signal, and Judge

2          Fallon's opinion has been looked

3          upon favorably by other courts,

4          scholars, et cetera.  After Judge

5          Wilson in Texas had granted

6          Merck's motion on preemption, it

7          was really necessary that we not

8          delay that issue any more, and we

9          had delayed it, because we wanted

10         to get as much leverage in the MDL

11         as we could, it became the timing.

12              The next issue is privilege,

13         and this is just a pet theory of

14         mine based on experience, that's

15         where the bones are buried.

16         Defendants will always bury the

17         bone in privilege.  I think the

18         lawyers that tried these cases did

19         an excellent job, lawyers in

20         discovery, of turning up

21         documents.  While I was always

22         convinced and hadn't gotten much

23         traction on privilege in the

24         states, so, I put privilege at the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1      top of the list, had really good

2      people working on it on a daily

3      basis, and I think that Judge

4      Fallon did an extraordinary job of

5      reviewing every document, 18

6      boxes.  When you saw some of the

7      things that they put aside on

8      privilege, we had to have a

9      Special Master appointed on

10     privilege.  Then the Fifth Circuit

11     made a ruling that most people

12     don't understand.  We had to go

13     through privilege again.

14     Privilege to me was an issue of

15     leverage.  And evidentiary

16     rulings, we lost a number, but a

17     number we won.  Those evidentiary

18     rulings carried over to other

19     cases.

20          Another major issue was FDA

21     discovery.  And the way to do FDA

22     discovery was in the MDL, because

23     a federal judge dealing with a US

24     attorney in a federal agency has

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

```
 1          some power you don't get in state
 2          courts.  We did do extensive
 3          discovery at the FDA.  We had at
 4          one time three Assistant U.S
 5          Attorneys involved.  We had
 6          conferences in Washington, New
 7          Orleans and elsewhere and put a
 8          lot of leverage on Merck because
 9          of their almost symbiotic
10          relationship with the FDA.
11               Monitoring the press, as we
12          all do, but it is extremely
13          important in an MDL, because you
14          are dealing with very skilled PR
15          people who are paid millions of
16          dollars each year, both outside
17          agencies and inside agencies, to
18          spin every case that comes out.
19          If it's a plaintiff victory, it is
20          spun as a fluke and a jury gone
21          wild and a judge doesn't know what
22          the jury is doing.  If it's a
23          loss, then it confirms everything
24          the defendant says.  Monitoring
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1        the press on a daily basis,

2        establishing relationships to try

3        and get a decent story is

4        important.

5            To me, to be a liaison

6        counsel serving on an executive

7        committee is to know where the

8        leverage is on the case.  Here's

9        where the leverage is on the case

10       from my standpoint.

11           Every case that's tried

12       well, every single case, I have

13       never ever -- and I've lost cases,

14       not many, but I know when I walked

15       out of that courtroom, my client

16       felt good, and I'm talking about

17       cases that I lost, and the

18       defendant never wanted to go to

19       trial with me again.  It's hard to

20       judge what's a win and a loss.

21       But we had a lot of bad cases we

22       were forced to try, and they were

23       tried extraordinarily well.  If

24       you can teach someone on the other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
1        side that you don't care who they

2        are, that you've got the courage

3        to go back in to court, try a case

4        and take the consequences, that

5        creates leverage.  Winning the

6        case creates leverage because the

7        bean counters and the corporations

8        are looking at dollars, and they

9        are translating those dollars into

10       potential exposure.

11            The pace of discovery.  If

12       you lose the high ground, if you

13       ever allow a defendant to dictate

14       discovery rather than you forcing

15       discovery, you lose leverage in

16       the case in the depositions you

17       take, the written discovery you

18       take, but not only that, the

19       willingness to follow up with

20       motions, particularly where a

21       judge is going to hear his own

22       discovery motions and not send

23       them to a magistrate.

24            Keeping the peace
```

FAC Resp. Amended Exhibit D -- 696

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1    internally, knowing the law on an

2    ongoing basis, overseeing the

3    depository, knowing when to listen

4    and creating mutual respect.

5          Now, let's talk about

6    meetings and telephone

7    conferences.  Meetings with Judge

8    Fallon, meetings with three

9    judges, meetings with special

10   masters, meeting with special

11   masters, meetings with Merck reps,

12   meetings with the PSC, meetings

13   with individual lawyers.

14          Maintaining verdicts.  I

15   think it is important when you get

16   a verdict in the MDL that you

17   brief it and you do whatever you

18   can to maintain that verdict.

19          Seminars.

20          Dealing with state liaison.

21          Input on who gets appointed

22   to what committees.

23          Resolving conflicts with

24   vendors.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          Dealing with claims

2     administrators.

3          Dealing with the bank.

4          Dealing with Garretson.

5          Dealing with the judge's law

6     clerks on a daily basis.

7          Dealing with the Clerk of

8     Court.

9          Dealing with pro se

10    appointed counsel.

11         Post settlement meetings,

12    information conferences post

13    settlement.

14         Our key contributions,

15    number one, the trial package.

16    There's never been a trial package

17    in any complex litigation like

18    this.  I insisted on it, I pushed

19    it, and I can remember Andy and

20    Chris calling and saying they

21    wanted Leigh and Jeff on that

22    committee.  We had people on that

23    committee that put together an

24    extraordinary trial package, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1        it was necessary.  Because if

2        Merck was going to try every case,

3        we were damn well going to try

4        every case, but we were going to

5        do it for under $100,000.

6            If they weren't going to try

7        every case, we had to have a way

8        for those people that didn't come

9        into the settlement to say, okay,

10       don't come in here, go try your

11       case, and to do it without

12       something that was superficial.

13       Every other case I've been in, the

14       trial packages really have been

15       superficial.  They throw in

16       deposition outlines and that's

17       about it.

18           Relentless FDA discovery.

19       I'm very proud of that.  I'm very

20       proud of privilege discovery,

21       third party discovery against ESI,

22       advertisers that work for the

23       industry, electronic discovery,

24       trial theory.

FAC Resp. Amended Exhibit D -- 699

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1           I believed from the

2      beginning, and I kept saying it,

3      that to me it was the straw that

4      broke the camel's back.  They put

5      a target on the back of these

6      folks who were most susceptible,

7      and somewhere, the causation

8      theories of acceleration,

9      activation and aggregation were

10     lost trying alternative better --

11     Celebrex and Bextra.  We had to

12     stay away from those cases.  We

13     have to show in Louisiana an

14     alternative safe design.  I pled

15     with lawyers who had that defense

16     to please not take Celebrex and

17     Bextra cases.  We were lucky in

18     this settlement.  We were lucky.

19     We sent all our Celebrex and

20     Bextra cases out without fee

21     sharing.  From the moment we were

22     appointed, we did not take another

23     case.  We were not involved in any

24     conflict or potential conflict

FAC Resp. Amended Exhibit D -- 700

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1       where somebody could say we were

2       using the leadership position to

3       get cases.  We originally had

4       about 600 cases, and we got down

5       to about 125.

6              I'm not going to go into the

7       internal conflict resolutions

8       because it wouldn't be fair to

9       folks who were very earnest who

10      didn't agree at some times, and we

11      weren't able to do that.

12             Status reports, motion

13      arguments, oral presentation.

14             The Diaz case.  We felt very

15      strongly we needed Louisiana

16      lawyers to try a case in the MDL.

17      The lawyer's office was destroyed,

18      and she had a good client.  Jerry

19      Meunier and I each offered to put

20      up half a million dollars apiece

21      to prepare and try the Diaz case,

22      interview experts, were ready to

23      do the case, and the Diaz lawyer,

24      Ms. Zabotnick, would not give us

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1           the ultimate authority to call the

2           shots in the case.  Because of

3           that, the case was taken off the

4           docket.  We were ready to try it

5           and had begun to prepare it.

6                Attended depositions, took

7           depositions.

8                Reviewed FDA discovery

9           scheduling.

10               There were 60,000

11          plaintiffs, 27,000 lawsuits,

12          14,500 tolled cases.

13               We served in every aspect on

14          the settlement committee.  I think

15          one of the things that you've got

16          to know is how much money there

17          is, and you've got to establish

18          immediately a rapport and build on

19          it with your opposite.  I think

20          throughout the settlement and

21          today, I think I have a tremendous

22          rapport with Doug Marvin, and it

23          got us ultimately, with a lot of

24          pushing from the other people on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1          this committee whose efforts I

2          don't diminish one bit, a

3          settlement.

4               We negotiated for 11 months

5          in secrecy, that was amazing, in

6          New Orleans, Memphis, Montgomery,

7          D.C., New York, Philadelphia, LA

8          and Houston, 59 negotiations in 50

9          weeks, 123 conference calls.

10              We retained five medical

11         experts, three ethics experts.

12         People will not know how hard we

13         had to fight to get stroke cases

14         included.  It wasn't really until

15         the last month or so of the

16         negotiation that we were able to

17         get stroke cases included.

18              Post settlement meetings,

19         seminars, gates committee.  D.C.,

20         New York, New Orleans, Puerto Rico

21         and Atlanta.

22              Allocation committee, we met

23         in five different cities.  We had

24         written submissions from every

FAC Resp. Amended Exhibit D -- 703

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 50

```
 1        lawyer. We have had oral

 2        presentations by, I believe, 100

 3        firms -- I'm sorry, by 60 firms.

 4        We set the guidelines, made sure

 5        they had affidavits, and even

 6        though they weren't supposed to

 7        submit Powerpoints, relaxed our

 8        own rules so that lawyers could

 9        make a full presentation.

10             In terms of Johnson

11        factors -- I'll try to get through

12        this quickly -- experience.  I

13        believe I'm experienced.  The case

14        was novel, is complex on a number

15        of levels, very difficult case.

16             It precluded participation

17        in other cases.  I turned down

18        eight cases in the last two years

19        because the client insisted that

20        I'd have to be trial counsel.  The

21        last one was against a major oil

22        company in a Superfund case.

23             The case was not popular

24        when it started.  Nobody said that
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

1       the plaintiffs would succeed.  In

2       terms of contingent, it's all

3       contingent.  Whatever time I've

4       had since 2005, spent basically

5       about 90 percent of my time in

6       Vioxx and 10 percent of my time

7       trying to wind up Propulsid.

8            In terms of credentials, and

9       I don't feel the least bit

10      embarrassed, I've been given

11      awards, the top award by ABA TIPS,

12      regularly have lectured at six

13      different law schools and in 50

14      states.  USA Lawyers Weekly

15      honored David Buchanan and I as

16      lawyers of the year.  National Law

17      Journal listed me as one of the

18      top ten PI lawyers in the country.

19      I was recently listed as top

20      plaintiff lawyer in Louisiana.

21      Have been listed in Best Lawyers

22      every year in various things, in

23      complex litigation, maritime, PI

24      and appeals, peer groups of BODA

FAC Resp. Amended Exhibit D -- 705

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

1        and the National Academy of Trial

2        Lawyers and the National Society

3        of Barristers.

4             I authored the two-volume

5        series in Louisiana on personal

6        injuries and Courtroom Persuasion:

7        Art, Drama & Science, and I'm out

8        of time.

9             MR. LEVIN:  You not only

10       made a presentation for yourself,

11       but you made a presentation for

12       just about everybody else here,

13       and I would ask that your comments

14       about everybody and the work of

15       the various committees be

16       incorporated by reference with

17       regard to the presentation of

18       others as if they said it

19       themselves and we can move along.

20            You gave an overview of the

21       litigation and an overview of the

22       committee work that we will not

23       have to duplicate.  Thank you.

24            MR. SEEGER:  Thank you.

FAC Resp. Amended Exhibit D -- 706

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 53

1              MR. HERMAN: Thank you.

2                    -  -  -

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Amended Exhibit D -- 707

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 54

```
 1              C E R T I F I C A T E
 2
                I, LINDA L. GOLKOW, a Notary
 3     Public and Certified Court Reporter of
       the State of New Jersey, Registered
 4     Diplomate Reporter, Federally-Approved by
       the United States District Court of
 5     Pennsylvania, do hereby certify that the
       foregoing is a correct transcript of the
 6     testimony as taken stenographically by
       and before me at the time, place and on
 7     the date hereinbefore set forth.
 8
 9              I DO FURTHER CERTIFY that I
       am neither a relative nor employee nor
10     attorney nor counsel of any of the
       parties to this action, and that I am
11     neither a relative nor employee of such
       attorney or counsel, and that I am not
12     financially interested in the action.
13
14
15
16     _____
               Linda L. Golkow, RDR, CRR, CCR
17             Notary Number:  1060147
               Notary Expiration:  1.2.10
18             CCR Number:  30X100176200
19
20
21
22
23
24
```

FAC Resp. Amended Exhibit D -- 708

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -


FIRM:  IRPINO LAW FIRM
       Anthony Irpino, Esquire

BEFORE FEE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
1                      -  -  -
2              MR. HERMAN:  We have a court
3         reporter here who will make a
4         record of everything as part of
5         the Court's direction on
6         transparency so everybody knows
7         what everybody is saying at the
8         end of the day.
9              Secondly, the affidavit, if
10        there's anything you want to add
11        or subtract from it, go ahead and
12        do it.
13             The judge has made it clear
14        that if the fee issues aren't
15        resolved a la Murphy Oil, then
16        what he's going to do is go
17        through virtually the same
18        process, folks are going to have
19        to be cross-examined, et cetera,
20        and basically that's it.
21             The committee is going to
22        publish whatever directive we get
23        from the judge when we get it.
24        So, that's about it.  The floor is
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1          yours.

 2                  MR. IRPINO:  Okay.

 3                  Well, number one, thank you,

 4          everybody, for allowing me to

 5          present as to what I contributed

 6          to the Vioxx litigation and the

 7          MDL.

 8                  My name is Anthony Irpino of

 9          the Irpino Law Firm.  My address

10          is 365 Canal Street, Suite 2290,

11          New Orleans, Louisiana 70130.

12                  I've never presented to

13          anybody about the work I've done

14          in a case in a manner such as

15          this, so, I'm a little bit in the

16          dark.  But with that said, I just

17          figured --

18                  MR. SEEGER:  Can we help you

19          with that?

20                  MR. IRPINO:  Yes.

21                  MR. SEEGER:  We are all

22          interested in the way you see your

23          common benefit contributions, and

24          some of us know you and some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          people don't, so, speak to the

2          people that don't.

3              MR. IRPINO:  Okay.

4              I think that's a good point,

5          that a lot of you do know me.  I

6          worked very closely with a lot of

7          y'all in connection with this

8          case, and so in large part, for

9          the people who have worked with

10          me, I rest on what I've done, the

11          way I've done it, the vigor with

12          which I did it and the quality in

13          which I did it.  But that said, I

14          didn't work with y'all closely in

15          the case, and I do want to go into

16          some of those things so you know

17          it.

18              I did try and squeeze into

19          the affidavit some of the things

20          that I did.  Candidly, in a

21          three-page affidavit, you can't do

22          it.  In a 30-minute presentation,

23          I can't do it.

24              To go into what we did in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          this case, what I did in this case

2          and what my teams did in this case

3          I think would take days,

4          literally.  I'll try and give as

5          good of a recitation as I can, but

6          it boils down into two primary

7          roles that I played.

8              Number one, first and

9          foremost, is chairman of the

10         privilege log team.

11             Second role, which is

12         somewhat of a forgotten role,

13         somewhat of a less glamorous role,

14         was chairman of the document

15         repository team.  That was

16         significant, and I'll get into

17         that later, but certainly chairman

18         of the privilege log team was my

19         primary role.  I believe that it

20         is not an inaccurate statement to

21         say that I led that charge.  So,

22         all the issues that dealt with the

23         privilege log, which in this case

24         I think it's a fair statement,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          became extensive.

2               With that said, I did want

3          to make everybody aware that this

4          was a team effort, the privilege

5          log team.  I did lead it, but

6          there were a lot of people

7          involved.  I wanted to go into the

8          names of who were involved,

9          because it was extensive.

10              First of all, I was kind of

11         appointed to it or put in that

12         position by Troy Rafferty and Russ

13         Herman.  They basically gave me

14         the power to do that, as well as

15         the other heads of the discovery

16         team, which included Dave

17         Buchanan, Richard Arsenault, Chris

18         Tisi.  It was critical that they

19         gave me the kind of power and the

20         time to say just to go do it, get

21         this done.  I mean, to have that

22         type of freedom in a case such as

23         this really allowed us to push

24         forward and do it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          The other members of the

2     team included Gary Wilson and Tara

3     Sutton, who were up in

4     Minneapolis, they worked very

5     hard, and I want that to be known

6     to everybody.

7          A woman by the name of Lynn

8     Swanson over at a firm called

9     Jones Swanson here in New Orleans

10    worked hard.

11         There were other people who

12    worked hard on that team.  Brian

13    Balser Andy Childers, Leslie

14    Bryan, Raul Bencomo each did some

15    good and helpful work.

16         Others included Mike Hugo

17    and Michael Stratton.  I wanted

18    y'all to know that.  I might have

19    left out a name or two, but I

20    wanted y'all to know that this was

21    a team effort, a lot of people

22    involved, a lot of coordination

23    involved.

24         I also wanted to speak real

FAC Resp. Amended Exhibit D -- 715

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          briefly as to the --
 2               MR. SEEGER:  Anthony, is
 3          this a team that you assembled?
 4          I'm sorry.  Some of these names I
 5          recognize, some I don't.
 6               MR. IRPINO:  Well,
 7          essentially it was assembled -- I
 8          think it is fair to say that Troy,
 9          myself, Dave Buchanan, Chris Tisi
10          at the beginning, said, hey, who
11          wants to work on privilege log.
12          It was not a glamorous role.  They
13          said, who wants it?  Shoot, I'll
14          take it.  I'll take it and run
15          with it.
16               MR. LEVIN:  Well, the Robins
17          Kaplan group, how did they become
18          involved?
19               MR. IRPINO:  They also said
20          that they'll help.
21               MR. LEVIN:  In other words,
22          they hadn't been in the Army and
23          they volunteered?
24               MR. IRPINO:  Yes.  They put
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

     1        their hand up.  I think the way

     2        things kind of started out and

     3        worked out is I kind of took the

     4        reins and ran with it.  I said,

     5        this is what we're going to do,

     6        this is how we're going to do it.

     7        Everybody followed, and everybody

     8        helped participate.  People

     9        worked.  And to give you a sense,

    10        that team was being formulated in

    11        June of '05, right after the MDL

    12        was formed, very early on.  I'm

    13        just going on memory.  There's so

    14        much I'll leave out.  Troy was

    15        saying, we need to get on this.

    16        You know, we'll get on it.  We'll

    17        do it.  We had some good

    18        go-getting people.

    19            Dave Buchanan said, look, we

    20        have this privilege log they

    21        produced in New Jersey, it is a

    22        piece of crud, we need to get into

    23        it.  So, we went through and

    24        combed through that privilege log,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1    and we're talking about 30,000

2    privilege claims.  We're not

3    talking in a sense of, oh, you

4    know, let's take a look at it and

5    let's do some, quote, review.

6    Let's take a look at it.  I mean,

7    this was combing through this

8    thing, trying to find the best

9    examples of how they were not

10   documenting their privilege claims

11   properly, how they were hiding

12   documents.  When you are going

13   through and you are seeing

14   requests for legal review of

15   APPROVe study materials, what the

16   heck is that?  So, you wanted to

17   find out things that were, A,

18   clearly bogus privilege claims,

19   clearly claims that we could win

20   on.

21        We didn't want to go to

22   Judge Fallon and just randomly

23   say, Judge, take some privilege

24   claims, and here's some bad ones.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1    We wanted to go with the best of

2    the best.  So, we spent literally

3    a couple of months combing through

4    this privilege log.  And I'm not

5    talking about a little review.

6    This was combing through.

7         So, we got that process done

8    and presented it to Judge Fallon

9    on a plate that made him

10   understand that this was a serious

11   issue and that there were serious

12   violations here.  I think that

13   really, as much as anything in the

14   beginning, helped our cause along

15   those lines.

16        But getting back, we had

17   this committee, Troy formed it,

18   Dave formed it, Chris Tisi formed

19   it, and we were running through

20   and were just going and going.

21   And we organized it, we had weekly

22   calls.  And I'll tell you, these

23   weekly calls were not, hey, guys,

24   how are you doing.  I had an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1         agenda each call.  This is what
2         we're going to discuss.  If you
3         want copies of them, I've got
4         copies of them, I promise you.
5         They are too voluminous to go
6         through, the agendas, the minutes,
7         but it was very well organized
8         from the beginning so that
9         everybody knew that this was a
10        team effort, that it was an
11        organized effort.
12             I think as much as anything
13        that I worry about in MDL work or
14        class action work is keeping
15        people engaged in the litigation,
16        keeping team members engaged,
17        because we know everybody has
18        another practice.  I mean,
19        oftentimes they are working on two
20        cases at once, three cases at once
21        or some other cases.  So, it is
22        very easy to lose sight of this
23        litigation, and one of my goals
24        was to keep people focused on this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1              litigation, and the way I know how

2              to do that is keep engaged, keep

3              organized and keep assignments

4              running.  So, we did that

5              throughout this process.

6                   So, those first several

7              months were very detailed, very

8              strenuous, very long hours

9              working, working, working on this

10             stuff and putting together the

11             package so that we can attack this

12             thing properly.  That's kind of

13             how it began.

14                  Later on -- and I want to

15             say this.  I mean, there were

16             different stages of the privilege

17             log fight.  Later on, you know, we

18             were up at the Fifth Circuit, and

19             let me tell you something --

20             Arnold, you are going to like

21             this.  Fred Longer and Arnold

22             Levin personally got involved at

23             that stage.  Russ Herman

24             personally got involved at that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        stage where we were collaborating

2        and coordinating on writing the

3        appellate briefs and making the

4        appellate argument, which Russ

5        made.  I mean, I guess there's so

6        much to go through from beginning

7        to end --

8              MR. SEEGER:  Let me ask you

9        questions.  What role did you have

10       in the briefing with Arnold and

11       his firm and Russ?

12             MR. LEVIN:  He worked on

13       it -- I don't have to answer it.

14             MR. SEEGER:  It is his

15       record.  Thank you, Mr. Levin,

16       we'll swear you in.

17             Tell us about your role in

18       the briefing.

19             MR. IRPINO:  My role in the

20       briefing was that I was one of the

21       co-coordinators of it.  First of

22       all, I mean, the way this works,

23       it was again not just like, hey,

24       let's do a brief up.  I mean, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          would brief the background to

2          Russ, to Arnold, to Fred in memos.

3          This is where we've come from,

4          this is where we've been in memos.

5          This is not like, oh, get on the

6          phone and say -- you know, I don't

7          know how many memos I wrote.  I

8          have hundreds of memos in the file

9          about this is what this is about,

10         this is where we've been, this is

11         where we're going.

12              But even the Fifth Circuit

13         briefing, and as frustrating of a

14         situation as I've been in, it was

15         that Fifth Circuit.  But, you

16         know, this is where we've been,

17         this is where we're going, and

18         this is the law, and this is what

19         we have to argue.  These are

20         pressure points.

21              MR. HERMAN:  Let me ask some

22         questions.

23              Approximately how many pages

24         of documents, if you can recall or

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          estimate, were reviewed?

2                MR. IRPINO:  Were reviewed

3          in terms of the privilege log?

4                MR. HERMAN:  Yes.

5                MR. IRPINO:  Well, that's an

6          interesting question, because the

7          privilege log itself, you are

8          talking about thousands and

9          thousands of pages, okay?  We got

10         Judge Fallon to essentially order

11         Merck to do a revised privilege

12         log.  Then there are thousands of

13         pages you are talking about

14         reviewing, okay?  Then in

15         connection with this assignment,

16         Merck said, we see the writing on

17         the wall, we're going to

18         deprivilege a bunch.  So, we got

19         Merck to voluntarily deprivilege

20         hundreds of thousands of pages of

21         documents.  That's in 2005.

22                There was a second

23         deprivileging of documents in

24         2006, and then a third

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          depriviledging of documents.

2                    MR. HERMAN:  How many boxes

3          of documents did Merck send to the

4          Court in camera that Judge Fallon

5          reviewed?

6                    MR. IRPINO:  That's easy.

7          80, right around 80.

8                    MR. HERMAN:  Okay.

9                    Now, did there come a point

10         in time when the Court had to

11         appoint a Special Master to go

12         through and make a recommendation

13         on the documents that Merck

14         contended were privileged?

15                   MR. IRPINO:  Yes, there was.

16         Let me give you just a brief

17         history of that.  Judge Fallon

18         spent two weeks, two weeks

19         straight reviewing depriviledged

20         documents.  Number one, I want

21         everybody to know that we viewed

22         that, our team, everybody viewed

23         that as a significant victory.

24         We've got Judge Fallon looking at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1           all of their privileged documents

2           and checking out and seeing where

3           the bones were buried and seeing

4           the dirt.  He saw it.  And I

5           thought we felt that there was

6           some sort of a change or some sort

7           of a victory of that in and of

8           itself, because Judge Fallon was

9           not happy with Merck through that

10          process.  When he got done after

11          two weeks of reviewing, quote,

12          privileged documents, something

13          changed in terms of the way he

14          viewed the parties even.  I think

15          I remember Russ saying something

16          about that at a PSC meeting where

17          I was called to discuss these

18          issues.

19                To give you an example,

20          there were 30,000 documents in

21          these 80 boxes.  Judge Fallon

22          found that 491 of them were

23          privileged.  The other 29,509

24          documents he found were not

FAC Resp. Amended Exhibit D -- 726

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          privileged.  Now, if you are a

 2          Federal judge spending two weeks

 3          reviewing privileged documents,

 4          you expect a better number.  I

 5          think it is fair to say that that

 6          had a significant effect.  But

 7          with that said, Judge Fallon did

 8          it, the Fifth Circuit did what

 9          they did, there was a lot of

10          briefing going on throughout this

11          process, and then we got a Special

12          Master.  Judge Fallon said, look,

13          we need to have a Special Master

14          review this because we're talking

15          about now we rereviewed all of

16          these documents, and the Fifth

17          Circuit made a decision, oddest

18          decision I have ever seen, that

19          includes a per curium order that

20          said that Merck gets to select

21          2,000 documents randomly out of

22          all of those documents I told you

23          about that they want to be

24          rereviewed and then we'll revisit
```

FAC Resp. Amended Exhibit D -- 727

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1        this issue.  It is the damndest

 2        thing you've ever seen.

 3             So, Judge Fallon, and this

 4        is no coincidence, Judge Fallon

 5        selected Professor Paul Rice, who

 6        we quoted extensively in all of

 7        our briefing, to say this guy is

 8        the man, this is how you do a

 9        privilege log, these are how you

10        make privilege claims.  He took

11        that guy and appointed him.  So,

12        we saw that as a victory in and of

13        itself.  So, we got Professor

14        Rice, we met with Professor Rice,

15        this was back in, I think, April,

16        approximately April of '07, where

17        Professor Rice was appointed, went

18        to D.C., remember?

19             MR. SEEGER:  Yes.

20             MR. IRPINO:  I'm telling

21        you, throughout this process, I

22        mean, again, it is not just me, it

23        is a team.  We've got Fred Longer

24        involved, Troy Rafferty involved,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          Chris Seeger involved, we've got

2          Arnold Levin involved.  Look,

3          Russ' office became very involved.

4          Lenny Davis was very involved in a

5          lot of this stuff.  So, I just

6          want to let everybody know it is

7          not just Anthony Irpino alone.

8               MR. HERMAN:  Why don't you

9          move on to your other

10         contributions.

11              MR. SEEGER:  Can I ask a

12         quick question?  Anthony, prior to

13         the Vioxx MDL, had you been

14         involved in MDLs prior to that

15         where you held a leadership

16         position?

17              MR. IRPINO:  I was not

18         involved in an MDL where I held a

19         leadership position.  I was

20         involved in several class actions,

21         complex litigation, and that's

22         where a lot of my experience held

23         from.

24              MR. SEEGER:  I'm asking for

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          a different reason, but go ahead,

2          answer Russ' question.

3               MR. IRPINO:  Let me just

4          speak quickly as to the Special

5          Master, because that process was

6          very, very extensive.  The process

7          lasted probably four months, four

8          to six months, I would say,

9          starting in April, ending in --

10         actually, the Special Master's

11         final report recommendation came

12         down November 1st of '07, okay?

13              That process was so

14         extensive, there were so many

15         briefs filed to the Special

16         Master, Merck went -- I mean,

17         first of all, Merck -- all you

18         have got to do is look at probably

19         Merck's billing to see how hard

20         this was fought.  They had, I

21         think, dozens of guys on this,

22         working a lot of hours on this

23         project.  I mean, that's what my

24         guess would be.  But we're talking

Page 23

1        about literally dozens of briefs,

2        declarations.  They had Joanne

3        Lahner do a declaration.  They had

4        different employees doing

5        declarations to try and help prove

6        their privilege log claims.

7             Special Master's reports

8        came out, first report, second

9        report, third report, fourth

10       report.  We had a couple of

11       meetings with them, a couple

12       arguments with them, submitted

13       dozens of briefs from our

14       standpoint, which a lot was done,

15       myself, Fred Longer, Lenny worked

16       hard on that.

17            MR. SEEGER:  Anthony, did

18       you participate in the Joanne

19       Lahner issue?  Did you coordinate

20       with what was going on in New

21       Jersey, as well, because there

22       were challenges there?

23            MR. IRPINO:  There were

24       challenges with Joanne Lahner,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          there was coordinations of those

2          efforts, and, in fact, we got

3          certain things from New Jersey

4          that were produced in there, and

5          there was coordination of that.

6               I just want to also say when

7          you see these reports and

8          recommendations, the first report

9          and recommendation, the PSC had de

10         bene esse depos going on.  We

11         wanted to get these documents for

12         these de bene esse depos.  So, in

13         addition to Merck selecting 2,000

14         documents for the Special Master

15         review, we got the Special Master

16         to agree to allow us to select 500

17         or 600 documents that were

18         critical to the de bene esse depos

19         that we were doing.  Silverman and

20         Barr, if I'm not mistaken, were a

21         couple of them.  So, the Special

22         Master reviewed those documents.

23               The decisions came out --

24         let me just tell you the amount of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1    volume we're talking about and the

2    amount of work we're talking

3    about.  The report and

4    recommendation, I think the first

5    report was like 35 pages.  The

6    decisions took up 700 pages,

7    decisions, of individual document

8    claims, okay?  So, I'm in charge

9    of reviewing those, making sure

10   that we object to them properly,

11   because there were initial

12   determinations by the Special

13   Master.  We had a chance to

14   object, Merck had a chance to

15   object.  We had to respond, they

16   responded.  I'm telling you this

17   process was so in depth and so

18   detailed that it was very time

19   consuming, and it was very

20   thorough.

21        Couple other things about

22   the privilege log that sometimes

23   can get overlooked.  This wasn't

24   just Merck's privilege log, this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1        was the FDA privilege log that we

 2        dealt with, and these were

 3        third-party privilege claims, all

 4        right?  So, it wasn't just limited

 5        to that.  So, at different times

 6        we're dealing with different

 7        issues.

 8              But, again, it was a fairly

 9        extensive battle, it was very time

10        consuming, and it was consistent.

11        As much as anything I would like

12        to say, we were consistent.  We

13        kept on this.  I'm telling you

14        right now, this was not an issue

15        that we couldn't just touch this

16        every once in a while.  You had to

17        stay on it, and you had to fight

18        it through.

19              MR. SEEGER:  How much of

20        your working time would you say,

21        from the time you were asked to be

22        involved in the project, did you

23        spend in terms of other

24        opportunities you might have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

 1          gotten involved with or other

 2          things you might have done with

 3          your firm?  What percentage of

 4          your time was involved?

 5               MR. IRPINO:  Was involved in

 6          Vioxx?

 7               MR. SEEGER:  Yes.

 8               MR. IRPINO:  Over 50

 9          percent, but outside of that, I'm

10          not terribly comfortable.  I mean,

11          I basically worked on two main

12          cases.

13               MR. RAFFERTY:  And how many

14          lawyers are in the firm, Anthony,

15          during the time that you were

16          working on it?

17               MR. IRPINO:  During some of

18          the time, it was me.

19               MR. SEEGER:  You mean just

20          you and your firm?

21               MR. IRPINO:  Just me and my

22          firm.  During some of the time, I

23          had an associate, and even my

24          associate worked.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            MR. LEVIN:  Was that Amy

2        Dunn?

3            MR. IRPINO:  Yes.  Amy Dunn

4        was my associate.  Amy Dunn worked

5        at the U.S. Supreme Court.  I

6        mean, no dummy.  You are talking

7        about graduating from Georgetown,

8        very bright, worked at big, big

9        defense firms like 600-person

10       defense firms in Chicago and New

11       York, and she came in and helped

12       extensively with the Fifth Circuit

13       briefing.

14           MR. RAFFERTY:  I think we

15       only have a few minutes.

16           MR. SEEGER:  Actually, we're

17       out of time, but let's wrap up.

18           MR. LEVIN:  What else did

19       you do --

20           MR. HERMAN:  Talk about the

21       depository.

22           MR. IRPINO:  Okay.  The

23       depository is almost something

24       that's near and dear to me,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          because we started out -- just so
2          you know, I started getting
3          involved, and there was a
4          requirement --  I think this is a
5          very good thing that should be
6          done in all cases.  There was a
7          requirement to say if you want to
8          do work in the discovery
9          committee, you need to go review
10         documents.  You need to get your
11         hands dirty, you need to go do
12         that.  So, I did that.  I went and
13         worked, and I did it where I could
14         and when I could, and there were
15         openings at the New York
16         depository, there were some
17         openings at the California
18         depository.  So, I went to each of
19         those.  As I said, I've never been
20         involved in a case where you had
21         four different document
22         depositories.  We were starting to
23         have some issues, and Penny Herman
24         was extensively involved, along

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

 1        with Mike Wagner, with taking care
 2        of a lot of depository issues.
 3             In the beginning, it was
 4        Seeger Weiss, Mike Wagner doing
 5        everything.  I mean, doing
 6        everything, and doing a phenomenal
 7        job, by the way.  It was very
 8        clear at some point to me that
 9        that was going to be overwhelming
10        with everything that's coming up.
11        So, I suggested that we form a
12        document depository committee.  I
13        brought it --  I didn't just do
14        it, brought it to Troy, brought it
15        to Lenny, brought it to Russ.
16        They agreed.  They said, let's do
17        it, go do it, run with it, okay?
18             This wound up being a pretty
19        regularly scheduled meeting,
20        weekly meeting again.  We had
21        probably approximately 50
22        conference calls, 5-0, 50
23        conference calls to take care of
24        various issues that would arise at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          the depositories.  And let me tell

2          you right now, the people who were

3          critical with that, Penny Herman,

4          Mike Wagner, critical.  I mean,

5          the job these two did, worked so

6          hard on this litigation.  I don't

7          know, Chris, you had better give

8          Mike Wagner -- I mean, the guy's

9          amazing --

10              MR. SEEGER:  Off the record.

11                  -  -  -

12              (Whereupon, an

13          off-the-record discussion was

14          held.)

15                  -  -  -

16              MR. IRPINO:  With these

17          guys, I just want to say the

18          dedication involved was extensive,

19          and the issues that would come up

20          with the depository were many.

21          Troy knows.  He was one of the

22          heads of the discovery.  I mean,

23          it was so extensive, so we needed

24          coordination, we needed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1           communication.  I mean, you had

2           four different depositories.

3           You've got somebody in LA doing

4           some of the same things that

5           somebody in New York is doing, and

6           we saw that.  We also needed to

7           make sure --

8                MR. SEEGER:  I want to be

9           clear that people understand what

10          you are talking about, because we

11          needed to have the depositories

12          talking to each other so that we

13          don't have people doing things,

14          repeating things and duplicating

15          efforts, and that was what you got

16          involved in.

17               MR. IRPINO:  Absolutely.

18          That's what I started.  I mean, to

19          be fair, I was proud of that as

20          anything, just coming up with the

21          idea, let's do this.

22               MR. SEEGER:  There were like

23          four satellites at one point doing

24          their own thing.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1           MR. IRPINO:  That was

2      exactly it.  So, we had to

3      coordinate that, we had to

4      communicate.  But also there was a

5      need for communication between the

6      depositories and the different

7      committees.  Science committee, we

8      needed to get materials to the

9      stroke expert.  Okay.  Well, who

10     is going to put that together?

11     How are we going to do it?  What

12     materials do we get?  When do you

13     need them?  What's the deadline?

14     We needed to know that.

15          We would identify these

16     issues and go over them.  There

17     were many other issues that came

18     up on a fairly regular basis.  One

19     was making sure that we made this

20     as efficient as possible.  We had

21     some worker bees, but sometimes

22     depositories would be overcrowded.

23     We didn't have enough stations,

24     particularly in New York at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          certain times, because a lot of

2          people would go to the New York

3          depository.  Lenny, we went to

4          Lenny and said, Lenny, we need

5          more computers in the New Orleans

6          depository.  Do you remember that?

7               MR. DAVIS:  Yes.

8               MR. IRPINO:  So, Lenny got

9          six computers.  We increased the

10         number of spaces in New Orleans.

11              Then it was a matter of too

12         many people coming on the same

13         week.  We had to schedule that

14         out, okay?  Penny Herman did that.

15         Then there were issues with

16         third-party document productions.

17         How would they get Bates stamped?

18         Where would they go?  Who would

19         get copies?  Who would pay for the

20         copies?  All right.  We worked out

21         deals where Merck and us, we would

22         split those costs and Merck would

23         get a CD, we would get a CD.

24              Then it is a question of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          what depositions are we taking and

2          who needs what documents when?

3          And when do we prioritize that?

4          You don't want to be having

5          somebody reviewing Joanne Lahner

6          custodial files when you have got

7          a deposition of Marty Carroll

8          coming up in a week.  You want to

9          make sure that those assignments

10          get given out, and you need one

11          person to track the assignments.

12          So, we had Penny Herman in charge

13          of tracking those assignments.

14          Where does that start from, where

15          does it flow from?  Communication

16          amongst the depositories, making

17          sure that everybody knows what

18          everybody else is doing, what the

19          left hand is doing, what the right

20          hand is doing.

21              Let me just say another

22          thing.  There was a problem that

23          came up not only with

24          overcrowding, not only with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

```
 1        working, but some workers in the

 2        depositories, and you know this

 3        happens, worker bees, they get

 4        lazy, they go around.  So, we had

 5        to track that.  We started

 6        implementing different procedures

 7        and time sheets and different

 8        supervisory procedures.

 9            I went to the depositories,

10        and at one point we did a

11        presentation.  There was one time

12        there was a problem where, at the

13        beginning, people were clearly

14        over -- being overinclusive with

15        their coding, particularly with

16        their hot doc coding.  So, Troy is

17        going to take a deposition and he

18        says, print me out our hot doc

19        custodial file for Marty Carroll.

20        We print it out, and it is 10,000

21        documents.  Well, what good is

22        that?  It did no good.  And we had

23        that problem at the beginning.

24        So, we had to change the mindset
```

FAC Resp. Amended Exhibit D -- 744

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1          of how people were coding.  So,
 2          identify the problem, diagnose the
 3          problem, and then solve the
 4          problem.  We brainstormed it and
 5          came up with, look, let's do an
 6          educational session.  Troy
 7          actually came in and did an
 8          educational session in the New
 9          Orleans depository for all of
10          those people.  I went to New York
11          and did an educational session
12          with them there.  We changed the
13          way people think.  Look, you don't
14          have to overcode.  Don't overcode.
15          That's a problem.  You are causing
16          more problems than good by
17          overcoding.  We had people hot
18          doc'ing articles.
19               MR. BIRCHFIELD:  Anthony,
20          with the limited time, one other
21          issue I would like for you to
22          address for me is, did you help
23          with any of the bellwether trials?
24          Talk about that.  Then any cases
```

FAC Resp. Amended Exhibit D -- 745

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          that you had that were worked up

2          or advanced, just talk about any

3          cases in moving the docket, those

4          two issues.

5               MR. IRPINO:  I appreciate

6          you asking me that.  I did not

7          have extensive work on the trials,

8          but there was one trial that I

9          assisted with, and that was the

10         Dedrick trial, and that was the

11         one that Andy Birchfield, Leigh

12         O'dell tried.  And Russ Herman had

13         actually asked for volunteers for

14         people to assist Andy and Lee with

15         jury selection being from New

16         Orleans, knowing we are dealing

17         with a New Orleans jury pool.  So,

18         we assisted with that for about a

19         week.  It took about a week, and

20         it was extensive.  That Dedrick

21         trial I would wish on no one, but

22         we assisted with that process in

23         terms of the jury selection, and

24         we went -- you know, we go all in

FAC Resp. Amended Exhibit D -- 746

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1      and we do work, okay?  We got one

2      of our trial consultants to come

3      in, Victoria came in, Southern

4      Trial Consultants, assisted with

5      it.  We went to -- to tell you the

6      lengths we went to, she would

7      drive by houses just to see what

8      kind of information there would

9      be, bumper stickers or something

10     like that.  I mean, you know,

11     in-depth research so that we can

12     give -- you know, some of the

13     people were from Slidell.  What

14     does this mean?  What does this

15     person mean from Jefferson?

16     Giving Andy and Lee help with it.

17          And let me just talk about

18     that process for 30 seconds.

19     Camping out at the Lowe's Hotel I

20     think they were stationed in.  I

21     think they moved the entire

22     Beasley Allen office down here.  I

23     mean, that was an effort that you

24     want out of your trial teams.  I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          was very, very proud to be a part

2          of that effort.  It was extensive.

3          It was a, quote, loser case, and

4          it went full lore as if it was the

5          best case that you will ever have

6          a chance of winning.  That was a

7          pleasure to be a part of and a

8          great thing to see.

9              MR. BIRCHFIELD:  Y'all did

10         excellent work on the jury

11         selection.  I appreciate that.

12             MR. IRPINO:  Thank you.

13             MR. BIRCHFIELD:  What about

14         cases, did you have any cases that

15         were worked up to help move the

16         docket?

17             MR. IRPINO:  We had one case

18         that we helped -- that we had that

19         got us involved in the litigation,

20         and, unfortunately, that case did

21         not turn out to be a good case.

22         So, in terms of that aspect of it,

23         no.

24             MR. WEITZ:  How many cases

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          did you submit to the settlement?

2          Did you have cases you submitted

3          to the settlement?

4               MR. IRPINO:  We actually

5          took it out, because we didn't --

6               MR. SEEGER:  No, no.

7          Settlement.  How many cases did

8          you put into the settlement?

9               MR. LEVIN:  He had one case.

10              MR. IRPINO:  One case.  For

11         us, this was much more about

12         assisting with the MDL process and

13         effort and work product much more

14         so than focusing on any individual

15         cases or anything like that.  We

16         kind of went all in with that and

17         went about it that way.

18              MR. WEITZ:  When did you

19         originally get involved in the

20         litigation?

21              MR. LEVIN:  Through that one

22         case.

23              MR. IRPINO:  Through that

24         one case, we said, look, we want

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1        to be --
 2               MR. WEITZ:  To get involved
 3        in the MDL and do some work?
 4               MR. IRPINO:  Yes.  We want
 5        to assist with the work product,
 6        we want to assist with the work
 7        done in the case.
 8               MR. SEEGER:  All right.
 9        Anthony, thank you very, very much
10        for everything.
11                      -   -   -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1                  C E R T I F I C A T E

2

3                  I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                  I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 751

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -


FIRM: KASOWITZ BENSON TORRES & FRIEDMAN
      Daniel J.  Fetterman, Esquire
      Christopher P. Johnson, Esquire


BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
      877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
1                - - -
2              MR. FETTERMAN:  For those
3         who don't know me, my name is
4         Daniel Fetterman, and along with
5         my partner, Chris Johnson, we're
6         here today to present the
7         application of Kasowitz Benson
8         Torres & Friedman for an
9         allocation from the common benefit
10        fund.
11             Kasowitz, Benson is a
12        national firm with approximately
13        290 lawyers which had over 250
14        clients in the national Vioxx
15        litigation.
16             Chris Johnson and I have
17        been the two partners principally
18        responsible for day-to-day
19        oversight of the Vioxx matters.
20        We have participation of numerous
21        partners and associates, including
22        Mark Kasowitz and Dan Benson, two
23        of the founding partners of the
24        firm, along with David Rossner,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1          one of our senior bankruptcy

 2          partners.

 3              I want to say at the outset

 4          what a privilege it was to work

 5          with many of the talented lawyers

 6          in this matter, including many of

 7          you here today, and what an

 8          outstanding job was done in trying

 9          and prosecuting these Vioxx cases.

10              In this litigation, Kasowitz

11          Benson played a valuable and

12          substantial supporting role.  So,

13          I don't want to take more credit

14          than we deserve, but at the same

15          time, I welcome the opportunity to

16          set forth what I think were

17          unique, important and

18          qualitatively valuable

19          contributions to the national

20          Vioxx effort.  I use the word

21          "unique," because I think it's

22          fair to say that Kasowitz Benson

23          was different from most of the

24          firms in the national litigation

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        because Kasowitz, Benson is a
 2        large national firm that does both
 3        plaintiffs and defense work, and
 4        as such, we were able to bring and
 5        to provide valuable support by
 6        bringing defense insight into the
 7        overall litigation strategy and
 8        for particular trial teams as they
 9        prepared for trial.
10             We also had resources in
11        terms of manpower and money, which
12        the firm willingly contributed
13        whenever asked.
14             Kasowitz Benson was
15        consistently and intensely
16        committed to the common Vioxx
17        effort from beginning to end.  Our
18        substantial commitment included
19        approximately 4,000 hours that had
20        been accepted by the Wegmann-Dazet
21        firm, along with another
22        approximately 450 preMDL hours
23        that were not accepted because
24        they were preMDL.
```

FAC Resp. Amended Exhibit D -- 755

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1            MR. HERMAN:  Wait one

2       second.  You have 450 hours before

3       the MDL, the Federal MDL was

4       organized?

5            MR. FETTERMAN:  Correct.

6            MR. HERMAN:  You should

7       submit those.

8            MR. JOHNSON:  I think they

9       are in.

10            MR. LEVIN:  They are under

11       review now.

12            MR. FETTERMAN:  We

13       contributed to the New Jersey

14       Vioxx effort from the outset with

15       the Seeger Weiss fund and

16       contributing to the public

17       relations fund, as well, when they

18       started.  And I think it is fair

19       to say that we remained committed

20       from the beginning to the very

21       end, by, among other things,

22       substantially contributing to the

23       document review, consulting on

24       strategy, assisting trial teams to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          prepare for trials through mock

2          trials, providing research and

3          editorial support, submitting

4          cases for trial in New Jersey,

5          although ours did not go, and

6          submitting our allocable share of

7          discovery cases in New Jersey in

8          the litigation, including late in

9          the game to put settlement

10         pressure on Merck, and also in

11         assisting with drafting of the

12         settlement agreement.

13              So, it's fair to say that

14         Kasowitz Benson was and remained

15         committed to the common Vioxx

16         effort from beginning to end.

17              And we had significant

18         partner participation.

19         Approximately eight partners

20         worked on the Vioxx matter,

21         including two of the named

22         partners, as I mentioned, two

23         senior trial counsel, which was

24         Chris Johnson and myself,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1       overseeing the day to day

2       litigation, and other partners

3       where appropriate.

4             We also had participation

5       from approximately 15 other

6       lawyers at all levels, including

7       special counsel, senior and junior

8       associates and staff attorneys,

9       and all 29 different legal

10      professionals from Kasowitz Benson

11      assisted in the common benefit

12      fund effort.

13            Addressing the quality of

14      our work, I'm happy to let members

15      of the panel who are here today

16      and are familiar with the quality

17      of the work that we produce speak

18      to that, but I think it's fair to

19      say that we expected and firmly

20      believe that we delivered the same

21      high quality for the national

22      Vioxx litigation projects as we do

23      for any of our defense clients.

24            With respect to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1    litigation, our common benefit

2    efforts primarily centered in the

3    New Jersey litigation, because all

4    of our firms' cases were filed in

5    New Jersey.

6         I would like to now walk

7    through a little more specifically

8    the contributions that we made.

9         From the outset, Kasowitz

10   Benson's participation in the

11   litigation, which began in

12   February of 2005, shortly after

13   Merck's withdraw of Vioxx, we

14   supported the national litigation

15   effort.  And when we first became

16   involved, we talked to Chris

17   Seeger and Dave Buchanan, and we

18   asked them how we could help the

19   common effort.

20        And Seeger Weiss asked us to

21   do two things, both of which we

22   did.  One was to contribute to a

23   common fund.  They had a computer

24   system setup, and we made a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          contribution to that fund.  And

2          the second was to assist in the

3          review of millions of pages of

4          Merck documents.

5               According to our time

6          records, we devoted over 1,000

7          hours to the common discovery

8          effort, a substantial portion of

9          which involved reviewing Merck

10         documents at Seeger Weiss.

11         Indeed, we regularly sent one or

12         two associates at a time down to

13         Seeger Weiss' offices to review

14         those documents.

15              And among other things,

16         Kasowitz Benson lawyers reviewed

17         documents for Ray Gilmartin's

18         deposition and documents

19         concerning Alise Reicin.

20              MR. SEEGER:  Let me just

21         take one moment, because it is

22         important because we have a lot of

23         different types of people doing

24         different things in the case, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1      they always sent very high quality

2      lawyers to the document review.

3      It was real document review by

4      people who were good at spotting

5      documents.  I just want to make a

6      note of that for the record.  As

7      opposed to somebody parking like

8      the contract lawyer in the

9      repository.  It was very different

10     for that.

11          For depositions, I know that

12     you guys would get a big dump of

13     documents, and your people would

14     go through them, and then we would

15     get back the best of.

16          MR. FETTERMAN:  Thank you.

17          I would like to address the

18     activities that Kasowitz Benson

19     participated in, including

20     bellwether trials and nonMDL

21     trials that impacted proceedings

22     on the common benefit level.

23          Kasowitz Benson also played

24     a substantial role in assisting

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1      specific trial teams in evaluating

2      and preparing their cases for

3      trial in four significant cases by

4      sharing our defense perspective

5      and anticipating Merck's defenses

6      as Merck adjusted and adapted

7      those defenses.

8          We also contributed to the

9      common benefit by participating in

10     the education of approximately 250

11     Vioxx lawyers from across the

12     country, and I'll describe those

13     efforts now in more detail.

14         We were initially asked by

15     Mark Lanier and Rick Meadow if we

16     would be willing to assist them in

17     preparing the Lanier trial team

18     for what turned out to be one of

19     the most significant bellwether

20     trials in the national litigation,

21     the Ernst trial.  We took that

22     role seriously and prepared for

23     that mock as if it were our own

24     case.  We retained a cardiologist

FAC Resp. Amended Exhibit D -- 762

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1    to advise us on specific

2    causation, focusing on where we

3    thought Merck would try to exploit

4    potential weaknesses in that case,

5    particularly with respect to

6    specific causation and the

7    coroner's observations that she

8    found no evidence of a heart

9    attack, that Ernst had died of

10   natural causes, specifically

11   arrhythmia, and that Ernst had

12   risk factors for arrhythmia and

13   the like.

14        Mark can speak to the value

15   that we added in his preparation

16   for that trial, but it's fair to

17   say that we had a spirited mock

18   trial, and I am still nursing the

19   battle scars from that.

20        As we all know, Mark did a

21   brilliant job in trying that case,

22   which resulted in an over $250

23   million jury verdict in a very

24   difficult case and set the tone

Page 13

1        for the entire Vioxx litigation.

2             I believe as a result of

3        that work, I was also asked to

4        participate in a continuing legal

5        education mock trial put on by the

6        Association of Trial Lawyers of

7        America in New Orleans for

8        approximately 250 Vioxx lawyers

9        from around the country in May of

10       2005.  Specifically, I was asked

11       to give the closing argument for a

12       hypothetical Vioxx case, the Smith

13       case, to teach Vioxx lawyers how

14       to try these cases.  This time

15       Mark and I were on the same team,

16       Mark opened and I closed.

17            Again, Kasowitz, Benson took

18       its role seriously, prepared

19       approximately 100 PowerPoint

20       slides, which included

21       professional medical graphics and

22       which marshalled all the then

23       available evidence in support of a

24       Vioxx claim as a road map for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        other trial lawyers in the

2        national litigation.  And we

3        shared that at the mock.

4             That presentation was very

5        well received, and I'm happy to

6        report that Mark and I were

7        victorious in the Smith case.

8             Again, I had the privilege

9        of participating in a mock trial

10       for the second case that went to

11       trial in the New Jersey

12       litigation, the Cona/McDarby case,

13       with Mark Lanier, Perry Weitz and

14       Rob Gordon.

15            In that case, in that mock,

16       Perry and I defended Merck against

17       the formidable team of Mark Lanier

18       and Rob Gordon.  Again, we

19       prepared for that mock as if it

20       were our own case.  Kasowitz

21       Benson prepared approximately 90

22       slides for that, including

23       professional graphics.

24            The case was tried to the

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1    first win in New Jersey, and I

2    believe the second win in the

3    overall litigation, with the trial

4    team winning approximately $13

5    million in damages and attorneys'

6    fees.  And, again, another

7    important bellwether case for the

8    national litigation.

9        Addressing the fourth mock

10   that I participated in, I was

11   asked by Chris Seeger and Sol

12   Weiss to assist them in vetting

13   the next group of cases that were

14   on the New Jersey trial calendar

15   for the estate of Steven Hatch and

16   Robert McFarland.  They were

17   concerned about how these

18   plaintiffs, how well these

19   plaintiffs would do at trial, and

20   asked if I would cross the actual

21   plaintiffs so they could test how

22   they would hold up in a courtroom

23   setting.  This case was

24   significant, because at the time

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

 1          in the New Jersey litigation, the

 2          win/loss record was 1 and 1.  At

 3          the mock, Kasowitz Benson

 4          presented Merck's arguments on

 5          both general and specific

 6          causation, and I prepared for and

 7          cross-examined these plaintiffs

 8          just like I would have had I been

 9          defending Merck at trial.

10               Robert McFarland had a heart

11          attack, but during the

12          cross-examination, we showed a

13          video of him hiking with his

14          family and water skiing after his

15          heart attack, seemingly in perfect

16          health, and argued that his eating

17          habits, particularly the eggs,

18          sausage and butter that he had

19          regularly for breakfast and other

20          significant risk factors caused

21          his heart attack, and not the

22          Vioxx.

23               With respect to Mr. Hatch,

24          we argued that Hatch did not have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          a heart attack, but instead he

 2          died from an arrhythmia, that the

 3          evidence of his biofuse was

 4          sketchy at best.  We also

 5          cross-examined Mrs. Hatch on her

 6          work for this prescribing doctor's

 7          office, for taking Vioxx for her

 8          husband without recording it in

 9          his chart and other problems with

10          her testimony.

11               Neither plaintiff fared well

12          in that mock trial, and

13          plaintiff's counsel decided not to

14          move forward with the trial of

15          those cases.

16               Finally, we were asked to

17          participate in the mock for the

18          Humeston II trial, the retrial of

19          the Humeston case, where we

20          presented Merck's general

21          causation arguments at the mock

22          trial with the Lanier and Seeger

23          Weiss firms.  Humeston II, as you

24          all know, resulted in a total
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        damages award of over $47 million.

2        Again, a bellwether trial for the

3        national Vioxx litigation, and a

4        far better outcome for the New

5        Jersey litigation for the ultimate

6        settlement than if the

7        Hatch/McFarland trial had

8        proceeded.

9            In sum, Kasowitz Benson

10       assisted in preparing the trial

11       teams in three of the five winning

12       national Vioxx trials and helped

13       to vet a losing trial before it

14       occurred.  We also assisted in the

15       education of Vioxx lawyers

16       throughout the country through our

17       participation in the ATLA

18       continuing legal education program

19       in New Orleans.

20           We had other contributions.

21       In general, I would like to go

22       through some of those.  We

23       reviewed STI documents, prepared a

24       PowerPoint, and were in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1          process of preparing for STI

 2          depositions when the settlement

 3          occurred.  We assisted with

 4          general strategy and settlement

 5          issues.  We provided research and

 6          editorial support for the forum

 7          non conveniens brief filed in New

 8          Jersey, and we provided assistance

 9          in drafting the settlement

10          agreement, particularly with

11          respect to letter of credit

12          issues.

13               To wrap up, we submitted

14          approximately 4,395 hours in time,

15          and $47,471 in expenses.  Based on

16          our current hourly rates, the

17          value of our time and expenses is

18          approximately $2.1 million,

19          2,132,370 to be more specific.  We

20          respectfully ask that the fee

21          allocation committee recommend

22          that we receive that amount times

23          whatever multiplier deemed

24          appropriate to recognize Kasowitz

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1         Benson's qualitative contributions

 2         and commitment to the national

 3         Vioxx litigation.

 4              I also want to say, on

 5         behalf of Kasowitz Benson, what a

 6         privilege and how much fun it was

 7         to participate in this important

 8         national litigation with you and

 9         other Vioxx counsel, and we look

10         forward to the next one.

11              Thank you.

12              MR. SEEGER:  Nicely done.

13         And I think from my perspective,

14         you did a very good and accurate

15         job in describing the work you did

16         in the litigation.

17              MR. LEVIN:  I'm from the

18         MDL, and I know not anything other

19         than what you did on the

20         settlement agreement, but it

21         confirms what others in New Jersey

22         said --

23              MR. SEEGER:  By the way, I

24         might have lost focus, but did you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        have that in there?

2                MR. LEVIN:  Yes, he did,

3        because I said to Chris, you've

4        got to go to somebody that knows

5        what they are doing on a letter of

6        credit, and he mentioned your

7        firm.  And I said they do.

8                MR. WEITZ:  They are a

9        perfect example of a firm that, if

10       you were in New Jersey, you knew

11       was extraordinarily helpful in a

12       lot of ways, but probably did not

13       transcend to the MDL.  They were

14       there every time anybody asked to

15       help, and their work was

16       absolutely first class.

17               Arnie, do you have the right

18       expenses?

19               MR. LEVIN:  I don't have

20       them, but I'm sure they are okay.

21               MR. WEITZ:  What was your

22       number again?

23               MR. JOHNSON:  47,000.

24               MR. LEVIN:  I think 47 is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        exactly what I remember.

2              MR. SEEGER:  Dan, how many

3        individual cases do you have that

4        you are putting through the

5        settlement?

6              MR. FETTERMAN:  It is about

7        260.

8              MR. SEEGER:  Like I said,

9        that's a very accurate

10       presentation.  I know what you did

11       for us in the litigation.  It

12       really was a pleasure working with

13       you from my perspective.

14             MR. LEVIN:  It is a pleasure

15       not working with you and meeting

16       with you.

17             MR. SEEGER:  I don't have

18       any other questions.  Thank you.

19                   -   -   -

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1                    C E R T I F I C A T E

2

3                    I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                    I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22           Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23           Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 774

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM:  KLINE & SPECTER, P.C.
       Thomas R. Kline, Esquire
       Shanin Specter, Esquire
       Lisa Dagostino, M.D., J.D.
       Kathy Spurka

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. KLINE:  For the record,

 3         I'm Tom Kline from the law firm of

 4         Kline & Specter.  I'm here with my

 5         partner, Shanin Specter, Lee

 6         Balefsky, my partner, recent

 7         partner, Lisa Dagostino, and legal

 8         assistant, Kathy Spurka.

 9              I want to start out with a

10         story, which those of us who

11         labored in the trenches I think

12         will appreciate, and some of you

13         will indulge me because you may

14         have heard it before.

15              It was the night before

16         Jerry Avorn's deposition, and I

17         was coming back from a good steak

18         with Buchanan and Tisi.  Actually,

19         I think Buchanan had two steaks

20         and a couple of drinks.  We were

21         staying at not the Four Seasons,

22         but the Sheraton in Boston where

23         the deposition was going to take

24         place.  There was a Lions
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1    Convention in town at the time.

2    We got in the elevator with a

3    fellow who, to use a word or a

4    description that I've heard Mark

5    Lanier use during the course of

6    this litigation, he looked like he

7    was a pork chop away.  He was a

8    man who looked like he had every

9    one of the comorbidities that any

10   of our Vioxx clients had.  He was

11   short, he was obese, he looked

12   like, if I were to make a

13   diagnosis on the spot, he had

14   hypertension.

15            MR. LEVIN:  Objection.

16            MR. KLINE:  He looked like

17   he had diabetes based on my

18   analysis of the man.  As we were

19   going up the elevator on the 7th

20   floor, I said, admittedly after a

21   couple drinks, let me ask you a

22   question, and pushing 60 at the

23   time, I could say this, "I said,

24   pop, have you ever been on the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

 1      drug Vioxx?"  And he looked at me

 2      nonplused, like he had never heard

 3      of it before, and his wife looked

 4      at me and said, no, but if you

 5      have some, mistaking it for some

 6      other drug with the letter V, if

 7      you have some, I think we'd like

 8      to get it.

 9          There are two points that I

10      take from the story.  The first

11      is, that was the teamwork and

12      camaraderie of the Vioxx

13      litigation.  Any of us who stayed

14      up until the wee hours of the

15      morning, like I think everyone in

16      this room, everyone who labored in

17      the trenches of this litigation,

18      knows what it feels like to pull

19      together like we all did in a

20      remarkable effort.

21          And the second point that I

22      would make is, the story tells me,

23      as I reflected on it, just how

24      difficult we all knew the task was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          and how we understood the

2          causation problems, the patient

3          population and the convincing that

4          it was going to take to win these

5          cases.

6               If I can start with the

7          first slide, I would start my

8          presentation with a quotation from

9          C.S. Lewis, and I think it is

10         apropos to my endeavors here

11         today.  "We all wish to be judged

12         by our peers, by the men 'after

13         our own heart'.  Only they really

14         know our mind and only they judge

15         it by the standard we fully

16         acknowledge.  Theirs is the praise

17         we really covet and the blame we

18         really dread."

19               You will see where I'm

20         going.  My presentation today I

21         see as more creating a necessary

22         record than to convince this panel

23         of colleagues who appreciate our

24         firm's, among many other firm's,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1      including those at this table,

 2      contribution to the Vioxx

 3      litigation.

 4           Our firm has many

 5      experienced trial lawyers, lawyers

 6      experienced in mass tort and

 7      catastrophic injury.  We brought a

 8      team, and I calculated this

 9      yesterday, to this litigation with

10      over 100 years of lawyering

11      experience and 40 years of medical

12      experience.  We were there at the

13      beginning, as those at the table

14      know.  We made a major

15      contribution, I believe, and that

16      contribution, as I said, was made

17      not only by our firm, but by many

18      other firms.

19           The litigation settled on

20      the strength of the collective

21      work that essentially is now

22      memorialized in something known as

23      the trial package.  It is heavy

24      with science and medicine and as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      technical and complex as I've seen

2      in 30 years of litigating complex

3      drug product cases, back to the

4      first one which I tried, which was

5      a Dalkon Shield case.

6           On the day that this case

7      settled, and I take us back to the

8      words of praise by C.S. Lewis, and

9      we were headed to New Orleans, I

10     received the kindest note, kindest

11     note from Russ Herman, inviting

12     our firm to a dinner in New

13     Orleans with the highest praise,

14     which was appreciated then and

15     appreciated now.  I return that

16     praise, Russ, I return that praise

17     by saying we appreciate your

18     leadership.

19           His e-mail in the invitation

20     said, "Your firm's team is and has

21     been integral to all efforts."  My

22     presentation today will describe

23     all of those efforts and how they

24     were, I believe, integral to a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1     collective effort that was made in

 2     this room and throughout the

 3     United States.

 4         An overview.  If you guys

 5     can just wait for me on the

 6     slides.  We're among friends.

 7         Here's how I see the

 8     overview for what we've done in

 9     showing how our role was integral.

10     We were involved since back in

11     2003.  No one at this table knows

12     better than Chris Seeger.  We, of

13     course, provided litigation

14     funding and took the risk with all

15     of those here.  We developed a

16     substantial portion of the

17     liability case principally through

18     depositions of Merck executives,

19     scientists, key third parties,

20     developed experts and did

21     extensive, I mean extensive

22     document review.

23         Next we developed a

24     substantial portion of the

FAC Resp. Amended Exhibit D -- 782

Page 9

1      causation case, including

2      depositions, expert development,

3      medical literature review, work on

4      mechanism of action and

5      pharmacology.  This was the

6      scientific puzzle that we all

7      struggled with in the beginning.

8          If I might complement her,

9      Lisa Dagostino did the work in the

10     trenches, along with many others

11     whose names are familiar, Dave

12     Buchanan, very notably, as well as

13     others.

14         We did expert development,

15     and I'm going to discuss that with

16     you, and extensive document

17     review.  Trial package development

18     included significant portions of

19     the trial package, which I'll

20     discuss.  We were involved in the

21     preemption briefing in which Arnie

22     took the lead.  We worked very

23     closely, as everyone knows.  Lisa

24     argued the factual portion, while

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          others argued the other portion.

2                   We were intimately involved

3          in the trial, not only trial

4          selection, but trial strategy, in

5          many aspects of it, both formally

6          and informally, as this litigation

7          progressed.

8                   I know it's important, so my

9          next slide deals with leadership

10         positions and committee

11         memberships.

12                  The next slide on committee

13         memberships and leadership

14         positions, again, I believe most

15         people, if not everyone at the

16         table, knows our various roles.

17         Lee Balefsky and I were not only

18         at the status conferences, but we

19         were asked to be part of the

20         premeets with Judge Fallon and

21         were there, and I know viewed by

22         those in leadership in this

23         litigation as an important and

24         integral part of the think tank,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1      if I could call it that.

2           Lee Balefsky was a member of

3      the discovery committee, liaison

4      counsel, and we were tasked with

5      developing significant parts, as

6      you know, of the stroke package.

7           Lisa Dagostino, her

8      membership on the science

9      committee is well known to

10     everyone at this table and the

11     countless hours -- I guess they

12     are not countless, because they

13     are counted -- but the hours which

14     amount to literally two years of

15     full-time work.

16          Lisa, as everyone knows, is

17     a physician and an attorney and

18     among the most knowledgeable, by

19     anyone's account, in the

20     litigation of the science and

21     medicine of Vioxx.  It's probably

22     only a shame for the victims of

23     Vioxx that Lisa Dagostino wasn't

24     Alise Reicin, because there may

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          not have been that tragedy.

2               As part of the science

3          committee, Lisa undertook an

4          extensive review of the underlying

5          medical files for adverse events

6          in the Merck trials.  Those at

7          this table who were in the

8          litigation part of this know that

9          that was the, quote, adjudication

10         project.  That was some of the

11         most tedious work in dragging down

12         and undercutting the underbelly of

13         the various Merck studies,

14         especially the VIGOR trial, and

15         Lisa was involved.

16              Moving to depositions.

17         Depositions of key Merck

18         scientists and executives, I think

19         probably our firm made one of its

20         most significant contributions

21         here.  I can tick them off.

22         Shanin Specter was one of the

23         three who deposed Ray Gilmartin, I

24         remember those days well, as will

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1        Chris Seeger and Mark Lanier.

 2             Ed Scolnick, I, in

 3        particular, did what was then

 4        called the label module.  It took

 5        us all collectively, until my

 6        redirect-examination, to figure

 7        out that Ed Scolnick never

 8        finished his residency and was

 9        never board certified, and that's

10        why he didn't practice medicine.

11        That is a little historical fact

12        for those in the room who would

13        appreciate it.

14             Shanin, on four different

15        days, relentlessly and doggedly

16        day after day went after Peter

17        Kim, one of the best witnesses

18        that Merck had.

19             I've always to this day

20        thought that Alise Reicin loathed

21        Lanier more than me, but I had

22        three different cracks at her and

23        probably the best day of the

24        litigation, and I mean this,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1      because we all know Mark Lanier's

 2      contribution to this litigation.

 3      I was only lucky enough to be

 4      there when Chris Seeger ran into

 5      the room on the record, Mrs.

 6      Golkow will testify to this under

 7      oath, and said, we got a verdict,

 8      $250 million, and we were on the

 9      record.  True, Linda?

10            THE COURT REPORTER:  Yes.

11            MR. KLINE:  I said to Alise

12      Reicin, so, what do you think

13      about that, Dr. Reicin?  I was

14      only there to ask her what she

15      thought about it, Lanier got the

16      verdict, and it was a turning

17      point.

18            I was talking to Rick Meadow

19      today out in the hall, because

20      this is a time, I guess, to

21      reminisce, too, about how the

22      State cases and the Federal cases

23      and the effort, as I'm going to

24      talk about in a moment at the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        Topol deposition, became a

 2        collective one.  Everybody from

 3        California to New Jersey, coast to

 4        coast, banded together in this

 5        litigation.  That's something I'm

 6        proud of.

 7             If I can have like one

 8        little gem that I take credit for,

 9        I want one little thing, defender

10        of the franchise.  Actually, Lisa

11        found it.  I only got, as Shanin

12        Specter would say, quoting Winston

13        Churchill, the roar.

14             Deborah Shapiro was taken by

15        Shanin Specter.  As you know, it

16        is the only evidence that Judge

17        Higbee found sufficient to present

18        to the jury on punitive damages in

19        Cona/McDarby, the Cona/McDarby

20        trial.  I have, and I know Mark

21        will indulge me with the e-mail

22        later in showing it, but I have

23        the nicest e-mail between Shanin

24        and Mark, which I would like to
```

Page 16

1        share with this group, because I

2        think it shows, again, our

3        integral part.

4              Continuing along, these were

5        the key Merck scientists and

6        executives.  For two days, Shanin

7        went at Alan Nies on the early

8        development of the drug, the

9        pharmacology, backed up by Lisa.

10             We do not take credit for

11        the developing of the marketing

12        part of this case, it was ably

13        developed by other lawyers, but I

14        might add, we just wanted our toes

15        in the Anstice water, and so Lee

16        Balefsky got a small crack at him

17        that day.

18             Continuing along, Barry

19        Gertz, as you all know, he's a

20        pharmacologist, he was a key guy,

21        and it was a very technical

22        deposition taken by Mark Hoffman

23        with something near 30 years of

24        experience as a former transplant

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1      surgeon, and one of the early

2      developers and persons who figured

3      out the science of this

4      litigation.

5           Tom Simon, the GI doc who

6      designed the VIGOR trial, was

7      taken on two separate days by Mark

8      Hoffman.

9           Continuing along, Kathy

10     Metters, who was the head of basic

11     research of Merck, you will all

12     remember the so-called claw back

13     document, the patent document.

14     That's what this deposition was

15     all about.

16          On this page, I've lumped

17     her with Joe Lynch, who was taken

18     by Shanin, and Lisa questioned

19     him, and that was the infamous

20     green monkey study.  Here's a

21     point that may get lost in the sea

22     of work that was done by so many

23     lawyers.

24          The green monkey study was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1    major defense, as was the defenses

2    presented by Metters.  It was

3    neutralizing those defenses, not

4    only presenting the evidence that

5    we developed, but neutralizing the

6    defenses, neutralizing the Peter

7    Kims, neutralizing the Metters,

8    neutralizing the Lynches of the

9    Merck stable that contributed

10   significantly.

11        There were many trials in

12   this litigation, as we all know,

13   and we provided direct support and

14   assistance, deposition cuts, all

15   kinds of assistance.  I know that

16   in your small group, Andy can

17   speak to that.  He knows that we

18   were there, as does Chris and

19   others at these trials, during

20   these trials, for these trials.

21        Speaking of trials, I want

22   to, in passing, mention one case

23   which never did try.  That was the

24   Abrams case.  It was listed as the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1    second MDL trial.  It was listed

2    in early 2006.  It was a

3    disappointment to pull that case.

4    After consulting with all of the

5    PEC, including Andy and Chris and

6    Russ and Arnie, I might add, as

7    well, we unanimously agreed that a

8    late discovered document made the

9    case undesirable as a bellwether

10   case.  I know that was a

11   disappointment to all of us, and I

12   know it was a disappointment to

13   Judge Fallon, but for those of us

14   who were involved in the decision,

15   I still think that it was the

16   right decision.

17         Depositions in this

18   litigation of third parties were,

19   as everyone here knows, very

20   important.  I was given the

21   responsibility to be involved in

22   taking two of what we at the time

23   in the trenches called the

24   third-party trinity, Topol, Graham

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1      and Nissen.

2           The deposition of Eric

3      Topol, which, of course, was

4      extremely critical of Merck's

5      conduct, was played at, I believe,

6      every trial, certainly every trial

7      which ended in a plaintiff's

8      verdict, but I believe every

9      trial.  He debunked many of the

10     theories.  It was our most solid

11     evidence on debunking Merck's

12     interpretation of the APPROVe data

13     that the increased risk of Vioxx

14     only happened at 18 months.

15          I could not have done that

16     deposition without Mark Lanier.

17     He and I know it.  He and I were

18     collaborators in a backstory that

19     probably will never be told on a

20     record.

21          MR. LANIER:  But it was a

22     darn good story.

23          MR. KLINE:  It was a hell of

24     a story, and it was one of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

 1      most fun things that I ever did as

 2      a lawyer.

 3           David Graham, his deposition

 4      was taken by me, and we know the

 5      story there.  He was the chief

 6      critic.

 7           Nissen was Topol's co-author

 8      and FDA Advisory Committee member,

 9      and Lisa worked extensively with

10      Chris Tisi on this litigation.  I

11      would be remiss, because I labored

12      so many hours, as did Lisa in

13      particular with Chris Tisi, and I

14      know it is my time to make a

15      pitch, but I can tell you that

16      Chris Tisi was the dogged pursuer

17      of the MDL third-party strategy.

18      He kept saying, let's take these

19      deps, let's take these deps, and

20      Topol was worth it, and we offer

21      congratulations to him.

22           I was responsible to go off

23      and take Curfman.  We all know how

24      the New England Journal was in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1    middle of the fray.  I went up and

2    took Curfman's deposition after

3    the Expression of Concern was

4    written.  It became a very

5    important corollary to what was

6    going on at that time.

7         Jerry Avorn, Chris Tisi ably

8    took it.  Mark Lanier at trial did

9    it live, and Lisa did much of a

10   background and prep work on that.

11   I went up there for the

12   deposition, because somehow my

13   being there was supposed to

14   neutralize Phil Beck or something

15   like that.  I don't take any

16   credit for it, other than Lisa did

17   all the background work on Avorn.

18        And then, finally, I was up

19   there when they sent the dogs out

20   after Eric Topol and they decided

21   that Mal Mixon, the chairman of

22   the board of trustees of the

23   Cleveland Clinic, was going to

24   trash the guy.  I was sent to do

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1        the cross-examination.  I don't

2        remember seeing that deposition

3        played during the course of the

4        Vioxx litigation, as I recall it.

5            Expert development.  A word

6        about it, if I may.  We were

7        involved in much of the major

8        expert development in this

9        litigation.  Jerry Avorn -- I'm

10       going to pass over a lot of this

11       quickly for the sake of time --

12       but they are names that are

13       familiar to everyone here.  Avorn

14       was clearly, in my view, was the

15       most distinguished expert.  Tisi,

16       Buchanan, Grand from Seeger Weiss,

17       the latter two did phenomenal

18       work, along with Lisa, in a key

19       deposition, as I believe we all

20       agree.

21            Ray, another highly

22       credentialed expert.  Lisa

23       Dagostino, Tisi and Buchanan

24       prepping him for a de bene esse

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          deposition.  And then there were

2          other experts, as well, that we

3          spent much time working with in

4          expert development, and that

5          includes Pace-Asciak, Parisian,

6          Levine, who is the stroke

7          expert -- I'll speak to that in

8          just a moment, I'll speak to

9          Feldman in a moment, who, in the

10         stroke part of the trial package,

11         was a project among many people,

12         including Mike Wenkowitz of Arnold

13         Levin's office and Lisa Dagostino.

14              That takes us to the trial

15         package.  It's kind of like a tour

16         of the Vioxx litigation, by the

17         way.

18              The trial package, I would

19         make just a few points.  The trial

20         package has been described, I've

21         heard it described as probably the

22         best trial package ever put

23         together in mass tort litigation.

24         It was a comprehensive effort of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1      many people who put in countless

2      hours in the project.

3          I would say a couple of

4      things about our contribution.

5      The documents which are sitting

6      with Lisa to her right, if I can

7      just have them in my hand for a

8      moment, are really three.  They

9      became really the guide, if you

10     will, the way that someone would,

11     along with the updated --

12          MR. SEEGER:  Your time --

13          MR. KLINE:  I am going to

14     make it, and I appreciate the

15     indulgence.

16          -- along with the road map,

17     and what do you call the initial

18     --

19          MS. DAGOSTINO:  The theme

20     grid.

21          MR. KLINE:  The theme grid.

22     Along with the theme grid, which

23     the trial committee updated, which

24     was the original work of Buchanan,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1        et al., Seeger, et al.  She

2        compiled the dictionary of terms,

3        the list of 3,200 articles in

4        Vioxx, which Lisa Dagostino

5        labored through and actually knows

6        and actually read.

7            This is essentially our data

8        bank, as is the cast of

9        characters, which essentially is a

10       road map of the who's who.  I know

11       this committee is familiar with

12       all of them.

13           In addition, we were

14       involved in doing all the things

15       that went into the package, which

16       is the deposition cuts, the

17       modules, et cetera.

18           I want to lead into my last

19       four minutes with "In the words of

20       our peers," this litigation was a

21       team effort.  I just want to show

22       a few things, and I know that

23       those who wrote them will be okay

24       with it, I guess is what I want to

Page 27

1       say.

2               First of all, Lanier.  This

3       is on the Topol deposition, and I

4       like it and I saved it.

5               "Put down your

6       computer/Blackberry."  He was in

7       England.  "Go Outside...Listen.

8       ..can you hear that???  Can you

9       hear the applause?"  This is

10      classic Lanier, I might add.  "It

11      is coming from England...The

12      applause is so loud, it is

13      traveling the Atlantic.  I just

14      read the Topol depo.  If that is

15      not your best work, I would love

16      to see what is!  Fantastic!!!

17      Absolutely fantastic!!!  My

18      compliments and praise...Happy

19      Thanksgiving."

20              That was followed by a whole

21      bunch of e-mails about Bob Dylan,

22      which are not part of this

23      presentation.

24              From Mark, again, a very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1      nice note saying, "Lisa/Shanin/

2      Tom's incredible depositions of

3      Shapiro/Topol."

4              I would like to share with

5      this group a really nice e-mail

6      between Shanin and Mark.

7              If we can skip this one and

8      go to the next one, which is, "We

9      got to punies because of you,"

10     said Lanier.  "Judge denied motion

11     to dismiss!!!

12             Specter quoting Churchill.

13     "I 'had the luck to give the

14     roar.'  Lisa Dagostino deserves

15     the credit."

16             And Lanier.  "You were

17     played in closing puni argument...

18     Great find and delivery from you

19     and Lisa both!!!"

20             Next, speaking to the

21     trials, our involvement in the

22     various trials, Steve Knowlton of

23     the Locks firm saying, "Please

24     tell Tom thanks for me.  Your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1      work, as a firm, has been an

2      essential part of the case."

3          Pete Kaufman writing from

4      the Levin Papantonio firm.  "Lisa,

5      your contributions to the trial

6      package have been astonishing.  If

7      I knew a word better than

8      'astonishing,' I would use it."

9          And Chris Tisi saying, "Wow!

10     Lisa and Kathy...this is great to

11     have.  You are fantastic."  This

12     is a kudos to the many hours of

13     work that was done by Kathy

14     Spurka.  No Arnie, you cannot have

15     her back.  "You guys are the best.

16     I particularly want to thank

17     Kathy."

18         And finally from Russ, very

19     kindly sending to Lisa and telling

20     here, "Excellent work as usual."

21         And finally another e-mail

22     again from Russ in his true

23     gentlemanly style.  We in the

24     north still have much to learn

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          from you, Russ.  It says here, "I

2          personally appreciate your

3          continuous work at a level of

4          excellence.  Trial package and

5          everything you have touched has

6          been top notch.  Take care and

7          thanks."

8               My very few concluding

9          thoughts.

10              MR. SEEGER:  Wait a second.

11         You don't have one nice e-mail

12         from me?

13              MR. KLINE:  You didn't send

14         me an e-mail or I would.

15              MS. DAGOSTINO:  We had to

16         redact certain words.

17              MR. HERMAN:  Mark recants,

18         but I don't.

19              MR. SEEGER:  I should have

20         written at least one nice e-mail.

21              MR. KLINE:  You didn't write

22         one to me, but you told me so.

23              MR. SEEGER:  Yes, I did.

24              MR. KLINE:  Here's the laugh

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          line.  Here is my laugh line.

2                "I can live on a great

3          compliment for two months."  Mark

4          Twain.

5                Here's my last point.  This

6          was my official presentation, and

7          thank you for indulging me.  Thank

8          you again.  This was a successful

9          group effort.  Different people in

10         different firms did different

11         valuable things.  The

12         significantly contributing firms

13         of the PSC, of which ours is

14         clearly one, should be recognized

15         and recognized at the same

16         multiplier without

17         differentiation.  That's our view

18         of it.  Our work was undoubtedly

19         integral in the establishment of

20         the settlement and the success of

21         the litigation.

22               Thank you.

23               MR. HERMAN:  Let me say a

24         couple of things at this juncture.

Page 32

1        First of all, you made a

2     good move by making Lisa a

3     partner, because there are other

4     members of the PSC that if you

5     didn't, we would.  She would be

6     welcome at any time in any one of

7     the firms.

8        MR. LEVIN:  I have a

9     question, if I may interrupt you.

10        MR. HERMAN:  Wait a second,

11     it's my turn.

12        I want to thank Lisa

13     particularly.  The trial package

14     to me is one of the most important

15     single things that we can do,

16     because it justifies a common

17     benefit fee.  Individual trials,

18     those that won, some that didn't,

19     depositions, document review, we

20     all know what that is as lawyers.

21     But the ability to resolve the

22     case and at the same time produce

23     a trial package that no one can

24     deny cures a lot of issues in any

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          view, and it's why I pushed so

2          hard for it.  I think we had our

3          best people on that committee in

4          terms of knowing the case.  Or I

5          should say representatives of the

6          best firms who know the case on

7          that committee.  Others were

8          trying cases at the time.

9              The reason for that is

10         everybody has got the opportunity

11         in this case to opt out.  You

12         don't have to opt in.  And in

13         order to justify the ethical

14         concerns, you have to have some

15         balance on the other side.  You

16         have to be able to say, hey, you

17         don't want in, you don't like the

18         deal, go try your case, here's a

19         package.  I think it's a

20         fundamental issue that's been lost

21         in all of this.  So, the work to

22         me on the trial package is a

23         fundamental situation absolutely

24         necessary in this case.  It is the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1      only trial package I have ever

2      seen come out of an MDL that's

3      worth a damn.  Nobody else had a

4      trial package where you could go

5      try a case.  This one you could.

6           These trials were costing a

7      million-and-a-half, $1 million

8      apiece.  You can try a case maybe

9      for a couple hundred thousand with

10     this trial package.  I want to say

11     that because we're being recorded

12     on a record, and it's got to be

13     said at some point.

14          Secondly, you made the issue

15     about the Abrams trial.  I did not

16     know until y'all called that that

17     case was going to be pulled.  It

18     caused some difficulty.  However,

19     Tom's work on Topol, which was

20     used in numerous trials to a great

21     advantage, was before Judge Fallon

22     on several occasions, and I'm sure

23     demonstrated his extraordinary

24     ability as a trial lawyer.  We all

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1        get surprised sooner or later in

 2        this practice, it just happens, no

 3        matter how hard you work.

 4             Again, I want to say that

 5        when you take 17 key depositions

 6        in the case, and they are taken by

 7        partners, and you've got two

 8        physician lawyers doing the

 9        background work, it's significant.

10        That's my view of this.

11             What comes out of this, I

12        don't know, because the best

13        advice, and I'm directed to say

14        this, you've got to read the Fifth

15        Circuit cases, you've got to read

16        Murphy Oil, you've got to read

17        Mobil, and, of course, the

18        original case setting the Johnson

19        factors, because if this matter is

20        not resolved among counsel in

21        terms of fee, then it is all going

22        to the Fifth Circuit sooner or

23        later.  So, whatever happens.

24             In addition to that, Judge
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

```
 1        Fallon has said that if the matter

 2        is not resolved, he's got some

 3        former assistant U.S. Attorneys on

 4        hand, he's got the three judges or

 5        special masters on hand, he's

 6        going to put all of us under oath,

 7        and we're all going to be required

 8        to testify about what we did and

 9        what we didn't do.

10             I say that to you not

11        because I see any fluff in what

12        you've done in your presentation,

13        but you've got to be aware of

14        that, and if there's some changes

15        you want to make to the affidavit,

16        and I'm not suggesting there are,

17        you really have to look at it

18        closely.

19             So, that's what I've got to

20        say.

21             MR. LEVIN:  Off the record.

22             -  -  -

23             (Whereupon, an

24        off-the-record discussion was
```

FAC Resp. Amended Exhibit D -- 810

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

```
 1      held.)

 2                    -  -  -

 3            MR. KLINE:  Lisa was, in a

 4      way I've never seen, driven

 5      compulsively to the point that I

 6      didn't think it was healthy.  I'll

 7      say that on the record.

 8            MR. LANIER:  Her picture is

 9      in the dictionary next to the word

10      indefatigable.

11            MR. LEVIN:  I went off the

12      record only because of the comment

13      on the hours, but I think

14      everything else is worthy of

15      putting on the record.

16            MR. SEEGER:  From my

17      perspective, your presentation

18      really speaks for itself, and it

19      is a real reminder about how many

20      pieces of the litigation you were

21      involved with.  Clearly, from the

22      day we got involved together in

23      Vioxx, we were in it a little

24      earlier, probably the earliest,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

```
 1        you have been one of the go-to
 2        people.  I think as Russ said,
 3        which is key, it wasn't like you
 4        sent -- I mean, you and Shanin
 5        were taking the depositions and
 6        Lisa, so --
 7              MR. KLINE:  I appreciate
 8        your saying it, and I appreciate
 9        what Russ said.  We've all been
10        through a lot together, and I know
11        these proceedings are formal, and
12        I knew I had an obligation to the
13        law firm, the partners, to lay it
14        out.  It is a walk down memory
15        lane for a lot of us, and it is a
16        good walk.  There are a lot of
17        nice pieces to it.  It has been
18        very rewarding to work with the
19        folks in this room.  You know how
20        I feel personally about it.
21              I understand that there are
22        economic issues, and that's why
23        we're all going through the
24        process.  And to answer Russ'
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1      question, we're well familiar,

2      very familiar with the cases in

3      the Fifth Circuit.

4           MR. LANIER:  Off the record

5      for a second.

6                -  -  -

7           (Whereupon, an

8      off-the-record discussion was

9      held.)

10               -  -  -

11          MR. BIRCHFIELD:  I got the

12     benefit of using the Topol

13     deposition first, and it was

14     remarkable work.  And you are

15     right, we were concerned about

16     Lisa's health, too, the hours that

17     she was putting in both on the

18     trial package, on the stroke

19     committee and helping us at

20     trials.  So, your work is really

21     phenomenal, and I appreciate that.

22     I told you before, but I want to

23     say it again.

24          But one thing, and maybe it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1        is not something that you can

2        address --

3              MR. HERMAN:  Andy, would you

4        raise your voice.

5              MR. BIRCHFIELD:  One of the

6        things I wanted you to help me a

7        little bit on, the Abrams case, I

8        was in trial when that decision

9        was made.  Can you share with us

10        what happened there?

11              MR. KLINE:  I sure can.

12        Lisa, do you have the slide?

13              MS. DAGOSTINO:  Yes.

14              MR. KLINE:  I'll show you

15        exactly what happened, and

16        everyone here will understand.

17              We were putting these cases

18        up, as everyone in this room

19        knows.  We were just trying to

20        find cases, our best cases.  We

21        didn't have all of the records.

22        None of us had all of the records.

23        What happened here was you had a

24        self-prescribing doctor, a

FAC Resp. Amended Exhibit D -- 814

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1     dentist, he was a dentist, whose

2     blood pressure was increasing on

3     Vioxx.  His doctor told him to get

4     off the drug, he didn't, he died.

5          When we saw this document

6     that I brought with me, Andy,

7     which I reported, and I distinctly

8     remember it, and I know the others

9     here do, I reported it to Chris, I

10    talked to Arnie about it, I talked

11    to Russ about it, I talked to you

12    about it, I believe at the time,

13    but in any event, here were the

14    facts, and here was the reasoning.

15          We had a document here that

16    said "Vioxx increasing blood

17    pressure, edema."  The doctor knew

18    that he had the symptoms that, by

19    the way, while we criticized the

20    warning, the label does say

21    certain things about risks, and he

22    told Mr. Abrams or Dr. Abrams, the

23    dentist, who was self-prescribing,

24    in number 4, discontinue Vioxx."

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1       I mean, it's in the "come on"

2       category.  He was told to get off

3       the Vioxx.  He wasn't prescribed

4       Vioxx by a doctor.  He was told by

5       a doctor get off of it.

6            I think that I can work with

7       some pretty bad facts, and I know,

8       Andy, you worked with some pretty

9       bad facts, I know that, but we

10      couldn't win this case.  And at

11      the time, we were all struggling,

12      all of us, with not losing cases,

13      with getting cases that we could

14      win.  We were jockeying with

15      Merck.  We all were involved in

16      this, the folks in the MDL, with

17      what cases to try, what cases not

18      to try.

19            Believe me, I know and I

20      regret that we pulled that case,

21      and I know through Russ and others

22      how Judge Fallon felt about it.

23      But if I can use a word, but damn

24      it, come on.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          MR. HERMAN:  Well, let me

2      just cut this short, because I

3      don't think you really have to

4      apologize.  I think we were all

5      rubbed raw at the time.

6          But my view has always been,

7      and if you look at the table and

8      I'll look at you guys, the one

9      thing about this litigation is we

10     had real lawyers involved that

11     tried real cases.  I've never been

12     in a position ever of

13     second-guessing a real trial

14     lawyer when he says, hey, I've got

15     to pull the case, I have to do

16     that.  I just think that when you

17     let your arrogance get involved in

18     your best judgment, you are headed

19     for trouble.  I think with really

20     fine trial lawyers, we all

21     sometimes go off base.  I don't

22     think you were off base.  I think

23     that your work was excellent in

24     the case.  It wasn't easy, I'll

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          tell you -- well, it's not

2          important.  But at any rate, I

3          think we need to get past that.  I

4          don't think that ought to be a key

5          factor or a sine qua non in the

6          judgment of your work.  We all

7          have difficulties during trials,

8          we have difficulties, et cetera,

9          but the fact is, your firm made a

10         significant contribution and that

11         you are real lawyers.

12              MR. SEEGER:  From day one.

13              MR. HERMAN:  I want to get

14         past this.  The reason I do is I

15         got over it, and I think we all

16         ought to get over it.

17              MR. KLINE:  I appreciate

18         that, Russ.  We got over it, and

19         Lisa reminded me, what did we go

20         do the next week?  We took the

21         Topol deposition, I believe.

22              MS. DAGOSTINO:  It was the

23         day after.

24              MR. KLINE:  I think it was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1      the day after.  So, we were on to

2      doing the next thing.

3            Russ, I appreciate it.  I

4      felt obliged -- if I might have

5      just literally two seconds more.

6      I felt obliged to address it

7      because of Andy's question.

8            MR. HERMAN:  No, I'm glad

9      you did, and I think it needs to

10     be addressed, because in my own

11     mind --

12            MR. SEEGER:  It was good

13     that Andy asked the question.  It

14     needed to be addressed.

15            MR. KLINE:  It needed to be

16     addressed.  That's how I felt

17     about it.

18            MR. HERMAN:  I guess what I

19     want to say on the record is, in

20     our consideration, we really have

21     to get past it.  It provided a

22     very difficult time in the MDL.  I

23     think what really helps is the

24     fact that your performance and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          your partners' performance in all

2          the depositions, but particularly

3          in Topol, were very dramatic, and

4          they were going to have to eat

5          Topol in every single trial.  Very

6          important to this litigation.

7               MR. BIRCHFIELD:  In raising

8          that issue, I was not diminishing

9          your work in any way.

10               MR. KLINE:  No, I understand

11          that.  But you couldn't, sitting

12          in our shoes or in my shoes, not

13          go back and look at it

14          reflectively, and this is an

15          opportunity to do that in a

16          self-critical analysis and say

17          what happened, and I know what

18          happened.  I was prepared to say

19          so.

20               MR. SEEGER:  You did.

21               MR. HERMAN:  How many cases

22          have you submitted in the

23          settlement total, do you know?

24          What's the range?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1              MR. BALEFSKY:  600, a little

2        over 600.

3              MR. KLINE:  A little over

4        600 cases, Russ.

5              MR. SEEGER:  All right.

6        Thank you.

7              MR. HERMAN: Thank you.

8              MR. KLINE:  Thank you.

9              MR. BIRCHFIELD: Thank you.

10                  -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FAC Resp. Amended Exhibit D -- 821

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 822

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:  LAW OFFICES OF BRIAN K. BALSER
        Brian K. Balser, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. BIRCHFIELD:  As you see,

 3         we have a court reporter here.

 4         Linda is taking down everything.

 5         There will be a transcript that's

 6         available for Judge Fallon.  He'll

 7         have the transcript for his review

 8         and whatever use he deems is

 9         appropriate.

10              So, you've got the floor.

11              MR. BALSER:  I'm Brian

12         Balser.  I'm in solo practice.

13         Cleveland, Ohio is my main office,

14         and I also have a satellite office

15         in Clearwater, Florida, where

16         hopefully I'll practice more at,

17         but not until my girls grow up.

18              I've been in practice for

19         over 20 years, started off like

20         most do, doing defense work and

21         then I prosecuted for a while.

22         Then I came to the right side and

23         did plaintiffs' work, which I have

24         done since then, almost
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          exclusively personal injury, solo

 2          practice.  Background is medical

 3          malpractice work.  Did a little

 4          Sulzer Hip, did a lot of fen-phen.

 5          I watched you do a lot of work in

 6          the courtroom.

 7               Then I got on to the course

 8          with the Vioxx, and I was looking

 9          forward to getting involved more

10          with it because I was finally on

11          something at the very beginning in

12          terms of it.  I was asked and

13          appointed to the discovery

14          committee, and first I asked what

15          I needed to do, and I called

16          Chris' office, and they said, come

17          on up, and I do believe it was

18          Mike that ran the --

19               MR. SEEGER:  Mike Wagner.

20               MR. BALSER:  -- ran the

21          depository.  I spent time going

22          through records in that one room

23          there.  Then I was appointed to a

24          couple of committees.  The main
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          was the privilege log committee.

2          To be honest, I was really

3          fortunate to get put on the

4          committee with the type of

5          attorneys that we had on there

6          from Anthony Irpino to Mike Hugo,

7          Tara Sutton, Gary Wilson and

8          myself.  Because when I first

9          looked at what we had to do in

10         terms of the privilege log, I

11         said, there's no way it is going

12         to happen.  I didn't see it

13         happening.  But we did the

14         conference calls sometimes two or

15         three times a week.  The nice

16         thing was the other attorneys were

17         as dedicated to this as I was.  If

18         there was something that needed to

19         get done, we made sure it got done

20         in terms of document reviews.

21              One of the examples, when

22         they released more documents up in

23         New York, Mike Hugo and I flew up

24         there, met up there, started

FAC Resp. Amended Exhibit D -- 826

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          looking at the documents.  We

2          said, there was no way we could go

3          through all of these.  With the

4          approval of Anthony, we went and

5          bought an external hard drive.  We

6          downloaded some and shipped them

7          around to the other committee

8          members so that we could get

9          through the different documents we

10         had to get through.

11             The biggest thing, I guess,

12         that I liked is we succeeded in

13         terms of what we wanted to

14         accomplish in terms of getting

15         through the documents.  On the

16         conference calls, I have been on

17         other conference calls, I'm sure

18         you guys have been on a lot more

19         than I have, and you just sit

20         there and say, what the heck are

21         they doing.  Ours weren't like

22         that.  Ours were actually like

23         brain sessions where we actually

24         talked strategy, talked about what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          we wanted to accomplish, and then

2          the next call or even in between.

3          I could call Mike Hugo up and say,

4          I'm thinking about this, what do

5          you think, and vice versa.  Same

6          with Anthony Irpino, same thing

7          with Tara.

8                We finally came up with an

9          idea in terms of, let's set this

10         out so it's easy enough so they

11         can present it to the Court and

12         also so that Judge Fallon would be

13         able to look through the privilege

14         log and say, okay, I see.

15               So, what we did was, we set

16         it up in specific protocols in

17         terms of categories.  I'm sure you

18         are aware of the different

19         categories we came up with based

20         on APPROVe, VIGOR, ADVANTAGE study

21         down through the list, public

22         relations.

23               We spent a lot of time

24         discussing and saying, okay,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1       what's the best way to set this

2       up.  We would highlight it and we

3       would put little notes in them,

4       and we would go through them.  We

5       would do memos back and forth with

6       each other, a quick e-mail, a

7       quick phone call.  That's the

8       reason I think we were successful

9       with this committee because it

10      didn't matter what time of day it

11      was or what time of night,

12      everybody was accessible, which

13      was really, really nice.  It was

14      something different for me with

15      being in solo practice to bounce

16      ideas off of somebody.  It went

17      back and forth.  I really, really

18      enjoyed that part.

19           I must be honest.  It was a

20      lot more work than I thought it

21      was going to be when I first got

22      involved.  But being in solo

23      practice, it is a situation where

24      you keep the lights on based on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        what you do.  There were periods

2        of time, about three months where

3        I was working over 30 hours a week

4        just on the Vioxx and the

5        privilege log, but I enjoyed it.

6        I really enjoyed it, and I enjoyed

7        working with who I was working

8        with.

9            I thought that the result we

10       got in terms of categorizing,

11       setting it up on a tee and letting

12       Russ and everybody else, when they

13       presented it to the judge, knock

14       it out of the park, made it even

15       more special to me in terms of

16       getting it done.

17           I also thought that the fact

18       that Judge Fallon was able to get

19       through those 80 boxes in two

20       weeks was really a compliment to

21       us in terms of the committee

22       because of the way we were able to

23       do it.

24           My work kind of stopped once

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        the judge made his ruling and they

2        did the writs in the Fifth

3        Circuit, there wasn't a lot more

4        to do.  However, Anthony, there

5        were times that he wanted a depo

6        summary done.  I think it was

7        Baumgartner's depo that I did a

8        depo summary on.

9            Also in terms of the request

10       for productions of documents, when

11       Merck wasn't giving us the

12       documents that we asked for, he

13       sent it out, and we broke it down

14       and sent back 20-page memos to him

15       saying, okay, here's the request,

16       these are the responses, and this

17       is where we go after them in terms

18       of that.

19            I enjoyed the work that I

20       did.  I enjoyed, like I said,

21       working with Anthony and everybody

22       who was in that group.  I would

23       have liked to have been more

24       involved, but I realize the

Page 10

1          privilege log only had so much

2          work to do at that point in time.

3          I thought Mike Wagner did a great

4          job every time I was up at the

5          depository.

6                    MR. SEEGER:  That was an

7          important project.

8                    MR. BIRCHFIELD:  And a great

9          result.  You are absolutely right.

10                   I'm showing that you have

11         submitted 680 something hours.

12                   MR. BALSER:  I didn't go

13         back through it and go over it.  I

14         thought it was about 600, maybe

15         680.

16                   MR. BIRCHFIELD:  Is the bulk

17         of that working on the privilege

18         log issue?

19                   MR. BALSER:  Almost all of

20         it -- not all it, almost all of

21         it, because originally I was doing

22         the document reviews.

23                   MR. BIRCHFIELD:  How many

24         cases did you submit for the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1      settlement program?

2              MR. BALSER:  I have 19.

3              MR. BIRCHFIELD:  Were any of

4      those cases set for trial or on

5      the trial track?

6              MR. BALSER:  No.  I

7      submitted the Sandra Nelson case,

8      and I think a couple of experts

9      looked at it through Chris and

10     said it looks good.  She actually

11     had two heart attacks.  But we

12     weren't able to submit that one

13     because it was actually filed in

14     Ohio, and they were looking for

15     cases that had been filed directly

16     to the MDL.

17             MR. BIRCHFIELD:  Were all of

18     your cases in the MDL or do you

19     have some in New Jersey?

20             MR. BALSER:  No.  They are

21     all in the MDL.

22             MR. BIRCHFIELD:  Any

23     questions?

24             MR. BLIZZARD:  No.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1              MR. BIRCHFIELD:  Where is he

2         with the accounting firm?

3              MR. LEVIN:  Everything was

4         accepted, and the costs have been

5         accepted.

6              MR. GIRARDI:  You are the

7         first guy today that that's

8         happened to.

9              MR. HERMAN:  Brian, I want

10        to thank you.  The privilege log

11        was something very important to

12        the PSC and the Executive

13        Committee and to me because I

14        always feel that's where the bones

15        are buried.  If we could just get

16        the judge to look at it, maybe it

17        changes his view about the other

18        side.  Even if we don't get the

19        documents in, it causes a reaction

20        that's very favorable, because we

21        always believe that's where some

22        bad stuff is.

23             MR. BIRCHFIELD:  Not only is

24        it a very significant result in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1              this litigation, but the

2              precedential value is significant,

3              and we appreciate your good and

4              hard work on that issue.

5                    MR. BALSER:  Thank you.

6                    MR. LEVIN:  Thank you.

7                         -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23        Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 836

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  LAW OFFICES OF DANIEL E. BECNEL,
       JR., ESQUIRE
       Daniel E. Becnel, Jr., Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
     877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2               MR. HERMAN:  Danny,

 3          everything is being recorded.  You

 4          will get a copy, not just of your

 5          transcript, but of everybody's.

 6               The judge, of course as you

 7          know, being very familiar with

 8          Mobil Oil, required transparency

 9          and consistency.

10               MR. BECNEL:  Murphy.

11               MR. HERMAN:  What did I say?

12               MR. BECNEL:  Mobil also.

13               MR. HERMAN:  Mobil and

14          Murphy.

15               In the event that there's a

16          fee dispute at the end, the judge

17          is going to appoint a Special

18          Master to take depositions, same

19          process, and at that time, if it

20          comes to that, if you want to

21          supplement or delete or add

22          something to your affidavit, it's

23          all right.

24               That's it.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           MR. BECNEL:  This case

2      caught my interest because of a

3      young lady who died, Carlene

4      Lewis, who brought Chris into the

5      case, brought Andy Birchfield into

6      the case, and I think probably the

7      greatest compliment you can get in

8      a case like this.  We started

9      looking at this case probably

10      about the same time as you did,

11      but we didn't have what you had, a

12      state action, and you doing an

13      individual.

14           Here's what she said.  "Dear

15      Danny, Thank you so much for your

16      kind introduction at the Windsor

17      Court meeting.  You have been very

18      generous to me.  I also want you

19      thank you for your support of

20      Houston and New Orleans before the

21      MDL panel.  You clearly have

22      extraordinary insight into the

23      process.  I'm anxious to work with

24      you and learn from you in this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          battle for our clients.

2                 "Sincerely, Carlene Lewis."

3                 MR. HERMAN:  What's the date

4          on that?

5                 MR. BECNEL:  She didn't send

6          a date.  This was after the

7          hearing on the MDL.

8                 MR. SEEGER:  After the MDL

9          hearing, it must have been.

10                MR. BECNEL:  I had been

11         recruited --

12                MR. HERMAN:  After the

13         meeting that we all had in Windsor

14         Court?

15                MR. BECNEL:  Yes, right

16         after that hearing.

17                MR. HERMAN:  Right.  So, it

18         was after the MDL hearing and

19         before Judge Fallon had made any

20         appointments?

21                MR. BECNEL:  That's correct.

22                Prior to that time, I had a

23         case which I thought was a case,

24         which was Sal Christina in my

Page 5

1          office.  He's a lawyer in my

2          office, his dad owned the biggest

3          seafood -- every restaurant in New

4          Orleans got seafood from him, and

5          he had a massive heart attack, was

6          on Vioxx, and then we just didn't

7          think --  we always worried about

8          12(b)(6) sanctions on it and not

9          investigating it enough.

10               MR. LEVIN:  Rule 11.

11               MR. BECNEL:  Rule 11.  I'm

12          sorry, what did I say, 12(b)(6)?

13          Rule 11 sanctions, so, we were

14          looking at stuff.

15               We weren't recording a lot

16          of the time in the beginning,

17          because we never thought it would

18          be an MDL, we didn't know if it

19          was really a case.  It was kind of

20          a personal project among the top

21          lawyers that I had.

22               Then we filed the first case

23          in New Orleans.  When I filed for

24          the MDL, if you look at the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          pleadings, there were four cases

2          in Federal Court.  This is my

3          original complaint filed on

4          October the 1st, my motion for MDL

5          status was filed, and let me give

6          you the four cases.

7               MR. SEEGER:  In the Federal

8          courts?

9               MR. BECNEL:  In the Federal

10         courts.  It was the Eastern

11         District of New Orleans, which was

12         mine, the Sal Christina case;

13         Bucky Zimmerman, who I had worked

14         with had filed a case called

15         Grover in Minneapolis; there was

16         one case called Bridget Elaine

17         Michaud in South Carolina; one

18         case in Missouri called Whitmore;

19         and one case in Ohio called

20         Dauterman.  That was it.

21              MR. WEITZ:  When was this?

22              MR. BECNEL:  I filed for the

23         MDL in October of '05.  You are

24         welcome to have this.  This is

FAC Resp. Amended Exhibit D -- 842

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          just an unstamped copy from my
 2          file.
 3               MR. BIRCHFIELD:  There was
 4          one that was in Mobile District
 5          Court that had been set for trial
 6          in August, Danny, I'm not sure.
 7               MR. BECNEL:  Well, that's
 8          all I knew about at this time.
 9          That's when I filed for the MDL.
10               We started trying to court
11          date things everywhere we could.
12          I mean, we had litigation groups.
13          Pap asked me to bring in some
14          experts because we were worried
15          about death cases.  How do you
16          prove a death case?  If you
17          remember, I brought two people, I
18          brought Cyril Wecht at my own
19          expense to Mass Torts Made
20          Perfect, and I brought Nachman
21          Brautbar, who was a toxicologist.
22          There's a famous book called --
23          and, I mean, I spent 10, $15,000
24          bringing them, because I paid for
```

FAC Resp. Amended Exhibit D -- 843

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1           their hotel, I paid for their

2           airfare.

3               MR. LEVIN:  Cyril comes from

4           Pittsburgh?

5               MR. BECNEL:  I had used

6           Cyril for the first time 40 years

7           ago and won a big, big verdict on

8           a loss of chance of survival.  So,

9           I had used him over and over.

10              Nachman, I had used many,

11          many times in breast implant and

12          all kinds of cases.

13              Well, when we had the MDL, I

14          made one mistake in this

15          litigation, and it is his fault

16          for telling me that.  Russ told me

17          he wanted to retire.  And so Jerry

18          Meunier, who I had worked with for

19          13 years --

20              MR. SEEGER:  We're not

21          letting Russ retire.

22              MR. LEVIN:  Mea culpa, after

23          all of this.

24              MR. BECNEL:  He and Barbara

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        said -- I was on a plane, and he

2        said, Danny, after tobacco, I'm

3        retiring, and I'm going to hunt

4        for dinosaur bones and I'm going

5        to teach.

6            I said okay.  So, I had been

7        working with Jerry Meunier for 13

8        years, and we just got our money

9        in that, too, Russ got a little

10       bit of that, and he asked me,

11       Danny, I want to be liaison

12       counsel.  I said, well, is Russ

13       involved?  He says, I don't think

14       so.  I said, well, he told me he

15       was going to retire, so I'm fine

16       with that.  That's why I asked

17       some people to support Jerry,

18       because I thought he was out of

19       the picture.  It wasn't anything

20       personal.  I made a mistake.

21       Okay.

22            I knew Judge Fallon well.  I

23       had worked with him on numerous

24       cases in the past.  I had known

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          Judge Fallon and his ability from

2          the Ferry Froster case 30 years

3          ago, and I knew how meticulous he

4          was, I knew how hard he worked.

5               Although a lot of people

6          wanted other places, remember,

7          there were 56 jurisdictions being

8          sought.  We knocked it down at the

9          meeting, Chris, and those in

10         Houston, to 6.

11              MR. SEEGER:  Right.

12              MR. BECNEL:  There was 53, I

13         think it was, 53 jurisdictions

14         that people were asking for, and

15         we knocked it down to 6.  Well,

16         once the MDL was formed, I decided

17         to say, hey, look, let's all get

18         together and try to get some

19         leaders.

20              MR. WEITZ:  But you wouldn't

21         have known that Judge Fallon was

22         going to get the --

23              MR. BECNEL:  No, I said

24         after.  I promoted him.  That's

Page 11

1           the argument I made in the

2           Christina case, which he got.

3                MR. SEEGER:  To the MDL

4           panel?

5                MR. BECNEL:  To the MDL

6           panel.  I promoted him.  I had

7           previously promoted him in the

8           Propulsid case, which was my case

9           originally, and Russ was involved,

10          and Judge Fallon was involved in

11          that case.  I know how after our

12          office and Russ' office both lost

13          the case, he crafted us to get the

14          thing resolved.  Now, you can't

15          get any better track record than

16          that.

17               MR. WEITZ:  So, your

18          original Vioxx case, did you file

19          the MDL petition and Judge Fallon

20          was the judge assigned to it in

21          New Orleans?

22               MR. BECNEL:  That's correct.

23          I had just known of his ability in

24          Propulsid in his first MDL.  So, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        preached and preached for that

2        jurisdiction.

3            After that occurred, I

4        called a meeting of everybody that

5        we knew, and prior to that time,

6        we had been disseminating -- Andy

7        Birchfield and his whole cadre of

8        lawyers was sending stuff out.

9            MR. WEITZ:  What was the

10       name of your New Orleans case?

11           MR. BECNEL:  Christina.

12       This is it right here.  That's the

13       Christina case, and that's the MDL

14       filing.

15           So, we called a meeting of

16       everybody that we knew of at that

17       time to come to New Orleans to

18       Antoine's to have a meeting to try

19       to formulate some committee, some

20       structure, whatever we could.

21           At that meeting, which I

22       paid for -- Chris, I don't

23       remember the exact number, but I

24       know there must have been 70, 80

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1           people there at least, I nominated

2           Chris and Andy.

3               MR. SEEGER:  Actually,

4           sadly, that was the last time I

5           saw Michael Nast.

6               MR. BECNEL:  Me too.  He

7           came down.

8               But I nominated both, and it

9           was unanimous among the 60, 70

10          lawyers, that they should be lead

11          counsel.  I made a full report to

12          Judge Fallon.  We had a meeting.

13              So, before the MDL, I might

14          say that we sent a bunch of

15          lawyers to Mr. Birchfield's office

16          in advance of the MDL to start

17          doing documents and to start page

18          and line summaries.  I think our

19          office did one-fifth of all of the

20          depositions that had been taken at

21          that time, the page and line

22          summary.  I think they were in New

23          York and in Mr. Birchfield's

24          office.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          I would send lawyers every

2      week, they would leave at 3:00 in

3      the morning, they would drive 350

4      hours to Montgomery.  We didn't

5      bill time for the drive.  I gave

6      them a vehicle to go in.  They

7      would sleep two to a room, two

8      guys to a room, two girls to a

9      room, and they were doing

10     documents.  They worked over there

11     under his direction.

12          I sent Rebecca Todd from my

13     office to Chris's under his

14     direction. I had nothing to do

15     with it except paid for the hotel,

16     paid for the gas, paid for the

17     living --

18          MR. HERMAN:  How much in

19     costs do you have right now?

20          MR. BECNEL:  I spent in

21     costs, $149,316.08.

22          MR. LEVIN:  Has the

23     accountant approved all of that,

24     do you know?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1              MR. SEEGER:  You sent
 2         everything to Wegmann?
 3              MR. BECNEL:  I sent
 4         everything I have.
 5              MR. LEVIN:  You haven't
 6         gotten any calls -- I don't have
 7         it with me.
 8              MR. BECNEL:  I have not.
 9         But as you know, Mr. Levin, I
10         watch nickels.
11              MR. HERMAN:  Let me ask you
12         a question about the costs.
13              MR. LEVIN:  I do know.
14              MR. HERMAN:  The costs don't
15         include any salaries, draws of
16         that sort?
17              MR. BECNEL:  Nothing,
18         nothing.  That's just my
19         out-of-pocket stuff.
20              John Restaino and the
21         committee, he and I were involved
22         with the experts a lot.  In fact,
23         one time we were in, I think,
24         Miami, and we were looking for an
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          FDA expert.  And Chris asked me if
 2          I knew a good one, and I had Dr.
 3          Suzanne Parisian from Tucson,
 4          Arizona, and I said, yes, I do.
 5               MR. SEEGER:  Actually, my
 6          recollection of that is there was
 7          a general meeting to educate
 8          lawyers.  You were there.  We
 9          discussed the need for it, and you
10          had actually come to me and said,
11          I have got the perfect person, and
12          I said, let's do it.
13               MR. BECNEL:  She got on a
14          plane that night, that night.  The
15          reason why is because she had
16          written this book called "Inside
17          and Out of the FDA," and this is
18          her thing to me.  It just says,
19          "To Danny from Suzanne Parisian,
20          my new best friend."  And this was
21          way, way in years, and I've used
22          it four or five times in various
23          cases.
24               ATLA then had a mock trial.
```

FAC Resp. Amended Exhibit D -- 852

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           There were 25 lawyers that

2           participated in it.  They asked me

3           to be the judge, and they asked me

4           to help debrief after the three

5           juries that we had.  People were

6           given assignments of certain

7           witnesses, certain opening

8           statements and so on and so forth.

9               They asked me to try to rate

10          people from the 25.  Chris didn't

11          participate, but Paul Sizemore did

12          from your office, Mr. Birchfield,

13          and Mark Lanier was with Carlene

14          and those.  So, I said, you know

15          what would be even better than

16          that, let me bring down a bunch of

17          experts at my cost and have them

18          critique this from both sides.

19          So, at that time, I brought down a

20          guy from the book Casarett and

21          Doull, "The Basic Science of

22          Poisons," Dr. Daniel Acosta, who

23          is the head of pharmacology at

24          Cincinnati, previously had been

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        from Texas.  I brought Dr. Daniel
 2        Acosta.  He wrote the chapter on
 3        the heart being affected by drugs
 4        in that book.  That's known as the
 5        Bible of toxicology.
 6             I brought Dr. Daniel Aruna.
 7        He's the head pharmacologist at
 8        Xavier, he's an African American,
 9        and Xavier has the best
10        pharmacology school in the
11        country.
12             I brought Dr. John Marcus
13        from Harvard.  Dr. Marcus had
14        worked with virtually a lot of
15        people --
16             MR. HERMAN:  Danny, let me
17        ask you this.
18             The people you are talking
19        about, who among them or how many
20        among them testified in bellwether
21        trials?
22             MR. BECNEL:  None of them
23        testified in bellwether trials.
24             MR. HERMAN:  Were they
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          deposed?

2                  MR. BECNEL:  Never were

3          deposed.  These were the experts I

4          was going to use.  I kept asking

5          Judge Fallon, hey, let me try my

6          case, let me try my case, and I

7          did that until he -- I knew, once

8          he appointed the PSC, I knew those

9          cases would go first.  That's just

10         the way it is.  But I had to

11         prepare it, because my case --

12                 MR. HERMAN:  No, I

13         understand.  I'm trying to get a

14         handle on this.

15                 MR. BECNEL:  But what we did

16         with them, I had Dr. Wecht there,

17         I had Dr. Brautbar there, Dr.

18         Daniel Aruna, Dr. Acosta, Dr.

19         Marcus, and we brought them there.

20         After each of the presentations

21         were made, we would debrief them.

22                 Carlene Lewis and myself and

23         Shelly Sanford then went to dinner

24         with them at night and were making

FAC Resp. Amended Exhibit D -- 855

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1         notes, what's good, what's bad,

2         don't do this, do this and so on

3         and so forth, because we knew

4         Shelly's case and Carlene's case

5         was going to probably go first.

6         How much that helped or didn't

7         help, I don't know.  But I paid

8         for it.  And I didn't know where

9         it was going, and I wasn't on the

10        PLC.

11             The one thing I think I do

12        more than almost anybody else, no

13        matter where the case goes,

14        whether I'm on a PLC or not on a

15        PLC, when they say do you need

16        people, do you need workers, do

17        you need this, do you need that, I

18        always step to the plate.  And I

19        do it without trying to control

20        anything.  I mean, we were told

21        initially if you do all of these

22        documents and stuff, you are going

23        to get to participate, you are

24        going to get to take depositions.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          Well, that didn't occur because

2          the individual cases, people

3          wanted to do their own, and I can

4          understand that.

5              MR. SEEGER:  I think a

6          couple of things, Danny, that

7          would be helpful for the record is

8          that we need to understand and for

9          you to identify for us what you

10         really feel were the contributions

11         you made that sort of added to the

12         common benefit and advance the

13         ball, number one.  But number two,

14         I do have a comment, and I think

15         it is important I ask it to you so

16         you can address it.  I think it is

17         very obvious the way these

18         litigations have developed over

19         the many years is that these have

20         become partner intensive, you

21         know, senior-type people doing

22         them.  The days of kind of putting

23         contract people in depositories

24         and racking up document review

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          time, I'm not saying has no value,

2          I'm just saying, these are cases

3          that are really run by trial

4          lawyers driven by trials.  So, if

5          you can talk to us on both of

6          those.

7              MR. BECNEL:  For example, if

8          you didn't know the documents --

9          the two of you really knew the

10         documents, but you had been

11         working on it in your own offices.

12             MR. HERMAN:  You are

13         referring to Andy and Chris?

14             MR. BECNEL:  Andy and Chris.

15         They knew the documents.  The

16         state courts were so far ahead of

17         the MDL, because it wasn't even

18         formed.

19             In the MDL, people, as I'm

20         saying, there was four, and if

21         Andy is correct with that Alabama

22         case I wasn't aware of, there was

23         five cases.  So, there wasn't a

24         lot of people doing documents.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          You two had the only production of

2          documents there were.

3               When Mark Robinson tried his

4          case, the first thing he did, he

5          said, Danny, give me your best

6          lawyer to help me so I can help

7          prepare.

8               MR. SEEGER:  Who was that?

9               MR. BECNEL:  Same person

10         that had spent a year almost in

11         your office, Rebecca Todd.  So, I

12         said, Mark, what do you want her

13         to do?  Send her to California for

14         me.  I sent her to California.

15              MR. HERMAN:  Is she a

16         partner with you, Danny, or a

17         contract lawyer?

18              MR. BECNEL:  Well, she was,

19         but then when one of the court

20         reporting firms -- she fell in

21         love with Reserve and Laplace and

22         New York, and one of the court

23         reporting firms, they hired her

24         away at a ton of money, and she

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        worked for -- I forget the name of

2        court reporting firm.

3            MR. HERMAN:  At the time

4        that she went to Mark Robinson,

5        that was before the Barnett case

6        was tried?

7            MR. BECNEL:  Oh, yes, well

8        before that.

9            MR. HERMAN:  Was she a

10       partner at the time, an equity

11       partner or a contractor?

12           MR. BECNEL:  I have no

13       partners.  My sons, my

14       daughters-in-law -- I have three

15       sons that are lawyers.  None of

16       them are partners.  My brother,

17       his wife, they are not partners.

18           MR. SEEGER:  You are a tough

19       boss.

20           MR. BECNEL:  The only reason

21       I do it that way is because I just

22       didn't want to get into meetings

23       and have people leave and have all

24       of this commotion going on.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1          Everybody is perfectly fine with

2          it and nobody has any problem.

3                MR. HERMAN:  How many hours

4          do you have in the case?

5                MR. BECNEL:  Personally?

6                MR. HERMAN:  Yes.

7                MR. BECNEL:  1,800 --

8                MR. LEVIN:  Don't you have

9          209 hours you yourself?

10               MR. BECNEL:  No, no.  This

11         is what I have.  They asked me --

12         I have 1,896.

13               MR. LEVIN:  For yourself?

14               MR. BECNEL:  For me.

15               MR. LEVIN:  How many total

16         hours does your firm have?

17               MR. BECNEL:  16,167.50.

18               MR. LEVIN:  I'm not

19         cross-examining you.  I know it

20         may sound that way.  Have any of

21         your hours been rejected by the

22         accountant?

23               MR. BECNEL:  Nobody said one

24         word to me about anything.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           MR. LEVIN:  Well, according

2      to the accountant's report, and

3      this is something you have got to

4      look into, Daniel E. Becnel, Jr.

5      has 209 hours.  Your firm has

6      9,400 hours.  That includes

7      paralegals and attorneys -- well,

8      no paralegals.

9           MR. BECNEL:  There was no

10     paralegal.

11          MR. LEVIN:  Rebecca Todd has

12     an even 1,500 hours.  Percy

13     Williams has 1,874 hours.  Now,

14     let's see if you have some that

15     are still under submission that he

16     hasn't reviewed.

17          MR. RAFFERTY:  I'm sorry,

18     Danny, I missed it, how much did

19     you say you had?

20          MR. BECNEL:  I had 1,896.

21     And remember, a lot of that

22     occurred before the MDL.  I think

23     that's probably you are looking at

24     just MDL hours.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1            MR. LEVIN:  I'm looking at
 2       what the court accountant has
 3       given us to work with.
 4            MR. BECNEL:  This is my
 5       sheet, and here's the difference.
 6       All I can tell you --
 7            MR. HERMAN:  Wait a minute.
 8       Other people have had concern.
 9       You've got to go make an
10       appointment, just call up, make an
11       appointment with the CPA or his
12       cohorts and sit down with him and
13       go over your hours.  Your reported
14       hours and what they are giving you
15       credit for are not the same.  This
16       is not something isolated to you.
17       We've had at least a dozen folks
18       that have.  I know Lanier came in,
19       for example, and spent a day.  I
20       think Ed has spent time.
21       Virtually everybody, maybe it's
22       not everybody, some people have
23       spent time directly with them and
24       gotten their time and their hours
```

FAC Resp. Amended Exhibit D -- 863

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1          and their costs straight.  I would

 2          advise you to do that sometime in

 3          the next two weeks.

 4               MR. BECNEL:  Well, when my

 5          people, and I'll just show you how

 6          I did it, when they were at Mr.

 7          Birchfield's office, they would

 8          leave, like I said, at 3:00 in the

 9          morning to get there to be able to

10          work, that's a 350-mile drive, and

11          there were no planes to go there.

12          It was quicker to drive than to

13          fly.  And then they would stay

14          Monday night, Tuesday night,

15          Wednesday night, Thursday night,

16          and they would work nonstop until

17          their office closed on Friday.

18               MR. HERMAN:  Danny, I don't

19          want to cut you short.  You have

20          said that.  That doesn't do us any

21          good, because we're not going to

22          review it.  The CPA is going to

23          review it.  You need to send

24          somebody that knows those records,
```

FAC Resp. Amended Exhibit D -- 864

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1          if you are not going to go

 2          yourself, and sit with the CPA and

 3          get your hours straight.

 4                  Now, here's my question.

 5                  How many people, lawyers,

 6          did you have work on the case?

 7                  MR. BECNEL:  19.

 8                  MR. HERMAN:  How many of

 9          those were also involved in either

10          Bextra, Celebrex, Medtronic ,

11          Murphy Oil or the --

12                  MR. BECNEL:  None were

13          involved with Murphy Oil.

14                  Bextra, Celebrex, the only

15          hours anybody did was a few days

16          when Paul Sizemore asked them to

17          look at some documents.  But that

18          wasn't on the --

19                  MR. HERMAN:  Medtronic and

20          Guidant?

21                  MR. BECNEL:  I think Rebecca

22          Todd, for example, may have had

23          100 or so hours in Medtronic.

24                  MR. HERMAN:  What about the
```

FAC Resp. Amended Exhibit D -- 865

Page 30

1        hurricane cases?

2             MR. BECNEL:  None of them

3        were for the hurricane cases.

4             MR. HERMAN:  So that you

5        were the only lawyer in those

6        cases where they didn't have

7        hours?

8             MR. BECNEL:  In the

9        hurricane cases?  Until you

10       release them from the

11       depository -- like Will.  Will was

12       released when there was no more

13       work for the depository, and then

14       I shifted him to the hurricane

15       cases.  Like Kevin Klibert, he

16       worked the hurricane cases

17       exclusively.  He had 14.50 hours

18       in Vioxx.  That's it.

19            But the rest, none of them

20       did, none of them did.

21            MR. LEVIN:  Dan, you have no

22       partners.  Are these all contract

23       employees?  Are them some of them

24       contract employees that you don't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1          pay benefits for?

 2                  MR. BECNEL:  No.  Here's

 3          what I pay.  Everyone gets an

 4          option to have health insurance or

 5          extra money.  They all chose extra

 6          money.  Every one of my main

 7          lawyers, which includes about 16

 8          of them, I give them a Mercedes, a

 9          brand new Mercedes.  Every one of

10          them, I fund their homes, because

11          a lot of people can't fund their

12          homes at 5 percent interest.  So,

13          most of them have homes in the

14          $200,000 range.  It is not like

15          where you guys live.  So, I fund

16          that.

17                  At the end of the case, they

18          get a percentage of the money that

19          they have earned, depending on

20          what is given, whether it is a

21          multiplier or not.  People in my

22          office in the past, for example,

23          in fen-phen, have made bonuses at

24          the end of the case of $1 million,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          $800,000.  I wrote a check this

2          morning at 4:30 in the morning

3          with Kevin Klibert on a bunch of

4          insurance cases, you know, of

5          117,000 this morning on something

6          that he just settled.

7              That's how I pay.  I pay

8          different than everybody else.  I

9          make them feel that they shouldn't

10         leave the case because they are

11         not going to get the bonus until

12         the end of the case, and that

13         makes them stay when you are

14         giving them grunt work to do.

15         Now, we've all done it, but how

16         many of us would sit in a room and

17         do documents eight hours a day for

18         a year, you know, and pass up the

19         opportunity to make money?  That's

20         the way I did it, so, I didn't

21         have them coming in for a little

22         while and then leaving.

23             MR. WEITZ:  Do they get

24         salaries?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1              MR. BECNEL:  Yes.  They get
 2         $50,000 base salary, plus I pay
 3         for all of their ATLA dues, I pay
 4         for two seminars a year, I give
 5         them two weeks paid vacation at my
 6         expense to places like Rome and
 7         Greece and just all over the
 8         world, wherever they want to go,
 9         they get to pick for two weeks.
10              MR. WEITZ:  Can I come work
11         for you?
12              MR. BECNEL:  And they go.
13              MR. LEVIN:  Could I be his
14         valet?
15              MR. WEITZ:  Are these 19
16         listed --
17              MR. BECNEL:  All on the
18         letterhead, all on my letterhead
19         with malpractice insurance.
20              MR. SEEGER:  Can I just try
21         to refocus this?  For my benefit,
22         Danny, there's a couple of things.
23         You did organize an early meeting,
24         and it was very helpful for
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1        organizing the case.  The problem

2        is, it is hard to assess a value

3        for calling a meeting and throwing

4        your support behind it, because my

5        impression, and I have never

6        really spoken to Andy about it,

7        but my impression is that most of

8        the people who showed up to that

9        meeting had already pledged

10       support for the leadership of our

11       two firms because it made sense in

12       so many ways.  Everyone here is a

13       leader.  It makes sense under

14       certain circumstances --

15            MR. BECNEL:  I don't take

16       credit for that.

17            MR. SEEGER:  No.  Well, you

18       organized the meeting.  My point

19       is, to move beyond that, after the

20       happened and the case is being

21       litigated, if you could identify

22       for the committee in the last

23       couple of minutes like the major

24       common benefit contributions.  One

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          of them was document review.  We

2          got it.  Was there anything -- I

3          want to make sure we haven't

4          missed anything.

5               MR. BECNEL:  For example,

6          Rebecca Todd, after helping Mark

7          with the documents, I gave her to

8          him, as I gave her to your office.

9               MR. SEEGER:  Well, she was

10         in the depository at my office.

11              MR. BECNEL:  Whatever you

12         needed her to do, she did.  And

13         she took his plaintiffs and went

14         over and actually lived up here at

15         some hotel where he was.

16              MR. SEEGER:  With Robinson's

17         team.

18              MR. BECNEL:  With Robinson

19         for three months and was in trial

20         with him every step of the way.

21         Mark asked her to babysit his

22         clients to help prepare for the

23         testimony.

24              MR. SEEGER:  Did Rebecca put

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1           her own affidavit in?

2                   MR. BECNEL:  No.  I didn't

3           know you wanted that.

4                   MR. SEEGER:  No, no, no.  I

5           thought I saw something separate.

6           Is she still with your firm?

7                   MR. BECNEL:  No.  She went

8           to New York.

9                   MR. BIRCHFIELD:  I think it

10          is a different Rebecca.

11                  MR. SEEGER:  I'm confused.

12                  MR. BECNEL:  Who is that big

13          firm, that court reporting firm?

14                  THE COURT REPORTER.  Doerner

15          & Goldberg.

16                  MR. BECNEL:  Doerner &

17          Goldberg, because Rebecca was

18          doing a bunch of documents and

19          stuff --

20                  MR. HERMAN:  Look, we have

21          to get back.  Let me ask you this.

22                  Who in your firm served on

23          the science committee?

24                  MR. BECNEL:  Me.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1            MR. HERMAN:  Who in your

2        firm served on the discovery

3        committee?

4            MR. BECNEL:  Nobody was per

5        se on the discovery committee.

6        What we were told, Mr. Herman, was

7        that the only way you were going

8        to be able to do depositions is if

9        you did the documents.  And we

10       were told that over and over and

11       over again.  And so I would send

12       these people to do them, they

13       would send me the hot documents, I

14       was putting them in the binders

15       and stuff trying --

16           MR. HERMAN:  Well, Danny,

17       you can call me, Russ.  I mean,

18       we've known each other a long

19       time, and I'm not going to call

20       you Mister, because we've known

21       each other too long.

22           I'm just trying to help you

23       explain the major contributions

24       that you made to the litigation.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1      Okay?

2              MR. WEITZ:  Did you have a

3      case that you prepared for trial,

4      one of your cases?

5              MR. BECNEL:  The first one,

6      Christina.

7              MR. WEITZ:  Did that case

8      ever go to trial?

9              MR. BECNEL:  No, it didn't

10     go to trial, but I think everybody

11     on that committee would know that

12     every time I would stand up and

13     say --

14             MR. WEITZ:  It never got

15     designated.

16             MR. BECNEL:  It wasn't

17     designated.  I would say, Judge,

18     can I try my case?  You know, I'm

19     first in line in the Eastern

20     District, you see, and we thought

21     that he was going to try only

22     Eastern District cases first.  We

23     didn't know he was going to pull

24     cases.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1           MR. HERMAN:  Danny

2       volunteered his case and to try

3       his case very early in the MDL at

4       whatever meetings he attended.

5       That's true.

6           MR. WEITZ:  How many cases

7       did you have that you submitted to

8       the settlement?

9           MR. BECNEL:  Well, I had

10      2,000 cases until I didn't get

11      appointed to the plaintiffs'

12      committee, and then I lost about

13      1,500.

14           MR. RAFFERTY:  So, how many?

15           MR. WEITZ:  So, the answer

16      is 500 cases you submitted to the

17      settlement?

18           MR. BECNEL:  No, I don't

19      think.  I think we submitted about

20      300, 400.  In fact, Paul Rhinegold

21      called me yesterday on some cases

22      he sent here that we did for him,

23      and I didn't even have a fee

24      agreement with him.  I said, Paul,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1            whatever you want to send is fine.

2            Send it to my son, because he

3            hadn't worked for, you know --

4            he's been on the campaign trail

5            for 14 straight months.

6                 MR. WEITZ:  And all those

7            cases were filed in the MDL?

8                 MR. BECNEL:  Every case I

9            have.  I have none in state court.

10           Every case I have.  But I started

11           losing them after -- I have a lot

12           of referral lawyers like most of

13           you do.  But after I didn't get

14           appointed to the committee --

15                MR. SEEGER:  Your referrals

16           are conditioned upon your

17           appointment to a leadership role?

18                MR. BECNEL:  No, Chris --

19                MR. SEEGER:  That sounds

20           harsh.

21                MR. BECNEL:  It happens,

22           though.

23                MR. HERMAN:  I know you

24           applied for a common benefit fee

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          in Murphy.  I'm familiar with your

2          affidavit or your representation

3          in Murphy.  If you applied or are

4          you applying for common benefit in

5          Guidant, Medtronic, Celebrex or

6          Bextra?

7                MR. BECNEL:  Well, we

8          haven't made any applications in

9          Bextra, Celebrex and Medtronic.  I

10         think I had a lot, lot of cases,

11         probably the top five to ten.  My

12         common benefit fee was less than

13         $250,000.

14               MR. HERMAN:  I'm not

15         disputing.  I'm just --

16               MR. BECNEL:  Compared to

17         most other people who got 2 and 3

18         and $4 million.

19               MR. BIRCHFIELD:  Let me ask

20         it in a little broader context.

21               During the period of time of

22         the Vioxx litigation, are there

23         any other MDLs where you are

24         making a petition for or you plan

FAC Resp. Amended Exhibit D -- 877

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          to make, you have made, a petition

2          for common benefit fees?

3              MR. BECNEL:  I think the two

4          are Guidant and Medtronic.  And I

5          think probably my fee in each is

6          below a quarter of a million

7          dollars common benefit.  And most

8          people that did a bunch of work in

9          those cases got 1 and 2 and $3

10         million each in common benefit.

11             MR. WEITZ:  What expenses

12         did you submit?  How much?

13             MR. BECNEL:  The only thing

14         I had was what I submitted.

15             MR. BLIZZARD:  149,000.

16             MR. LEVIN:  But I don't know

17         what the accountant has.

18             MR. RAFFERTY:  149,316.

19             MR. BECNEL:  For example, in

20         this 149, the only one I had in

21         here was Acosta and Wecht.  I

22         didn't submit those other people.

23             MR. WEITZ:  What do you

24         mean, what other people?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

 1           MR. BECNEL:  The other
 2      experts I had.  And Shelly and
 3      Carlene, I mean, they spent most
 4      of their time consulting with my
 5      experts in preparation for their
 6      case.
 7           MR. SEEGER:  By the way,
 8      Danny, did you include the expense
 9      for the cost of that dinner?
10           MR. BECNEL:  Yes, I did.
11           MR. SEEGER:  Okay.
12           MR. BECNEL:  4,269.
13           MR. SEEGER:  Anybody have
14      any more questions?
15           MR. BECNEL:  The only other
16      thing is, as all of you know,
17      Carlis Griffen was my paralegal,
18      African American paralegal.  We
19      put her in Propulsid, and then
20      when Vioxx came up, they asked if
21      they could keep her in Vioxx, and
22      she was so familiar with Penny
23      Herman, who was kind of managing
24      Vioxx in the beginning and had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

```
 1          managed Propulsid, and so I said

 2          certainly.  And the PLC picked up

 3          her expense, and she's still

 4          working.

 5               MR. SEEGER:  Is she still

 6          with your firm?

 7               MR. BECNEL:  Well, she's not

 8          now, because she's on loan to you

 9          guys.

10               MR. HERMAN:  The PSC has

11          paid her salary at the depository,

12          as well as whatever benefits are

13          offered through the PSC since her

14          retention.

15               MR. SEEGER:  Got it.

16               MR. BECNEL:  When this ends,

17          she's going to be back in my

18          office.  She just had the

19          experience, and after the

20          hurricane, it was really horrible,

21          because she had a place to live.

22          Most people in New Orleans didn't

23          have a place to live.

24               MR. LEVIN:  Dan, we talked
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          to you about your hours.  I don't

2          have with me what costs you

3          submitted, but I do know of

4          whatever costs they are, $15,814

5          has been rejected by the

6          accountants.  So, put that on your

7          list to do.

8               MR. SEEGER:  You just have

9          to call them, Danny.

10              MR. BECNEL:  Like I said,

11         nobody did it cheaper than I did

12         it.

13              MR. SEEGER:  That isn't even

14         the issue.  You could have

15         submitted something for $10.  If

16         it didn't fall into categories --

17              MR. WEITZ:  Everybody has

18         issues.

19              MR. LEVIN:  You're not

20         alone, Dan.

21              MR. WEITZ:  It is nothing

22         specific to you.

23              MR. LEVIN:  Nobody is

24         picking on you.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1              MR. BECNEL:  I think Arnold

2         knows one thing about me.

3         Whenever you have a cash call, I

4         wasn't on his committee, and there

5         was three people that put up the

6         bulk of the money in that case, if

7         you remember.

8              MR. LEVIN:  Which case?

9              MR. BECNEL:  Pedicle screw.

10             MR. LEVIN:  Was I one?

11             MR. BECNEL:  You were one

12        and Cummings was one and I was the

13        third.

14             MR. LEVIN:  I just wanted to

15        make sure I was one.

16             MR. BECNEL:  And I wasn't on

17        that PLC either.

18             MR. SEEGER:  Just so we stay

19        on schedule, does anyone else have

20        anything else they want to ask

21        Danny?

22             (No response.)

23             MR. SEEGER:  Thank you.

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 883

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: LAW OFFICES OF ERIC H. WEINBERG
        Eric H. Weinberg, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2            MR. WEINBERG:  My firm got
 3       involved in the New Jersey
 4       litigation on September 30, 2006.
 5       We ended up filing about 300 cases
 6       in New Jersey.
 7            MR. LANIER:  How many?
 8            MR. WEINBERG:  About 300.
 9            MR. LANIER:  Okay.  Sorry.
10            MR. WEINBERG:  I immediately
11       got to work on Vioxx.  On October
12       1st, I retained Caesar Roy, who
13       was a former director of the New
14       York field office of the FDA who
15       assisted me in processing a FOIA
16       request for the summary approval
17       package and other documents from
18       the FDA, which we got in about a
19       week's time.
20            And from that time until the
21       case settled, I consistently went
22       back and reviewed those FDA
23       materials, created PowerPoints
24       which we shared with our
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1      colleagues, to understand the

2      dynamic between Merck and the FDA.

3           Within a week of the drug

4      being pulled off the market, I

5      retained John Kostis, Chairman of

6      Medicine at Robert Wood Johnson.

7      Dr. Kostis was an invaluable

8      resource to us in this litigation,

9      consistently provided input,

10     advice, a man of great experience

11     that worked in the pharmaceutical

12     industry, clinical studies, world

13     renowned cardiologist, assisted on

14     trials.  I made Dr. Kostis

15     available to my colleagues who

16     needed input from a top shelf

17     cardiologist at trial.

18          Clearly I had the benefit of

19     the work product that existed at

20     the time I got into this case.

21     You guys were in this case for a

22     long time, and to a certain

23     extent, when you come into a case

24     and you are new and other people

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1      had been working on it, you stand

2      on your shoulders.  And I did

3      that.

4           As the case developed, I was

5      able to see how it played out with

6      the weaknesses and what the

7      strengths of the case were and to

8      sort of develop my approach to

9      discovering the case and what kind

10     of projects I was going to work

11     on.

12          I spent pretty much the vast

13     majority of my time on Vioxx.  My

14     business model is I'm a solo

15     practitioner, I work on one mass

16     tort at a time.  From '92 through

17     the early part of 2000, it was on

18     hemophilia HIV.  From 2001 through

19     about 2004, it was on Baycol.  And

20     from 2004 until the case settled,

21     it was on Vioxx.

22          I'm a solo practitioner, so

23     there are some limitations in

24     terms of what I can do, but I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        spent a good amount of time on

 2        this case.

 3             I think that the work that

 4        we put together is of great

 5        quality.  I know that there's an

 6        MDL trial package, I haven't seen

 7        it, but it is my understanding

 8        that an MDL trial package is

 9        really a collection of the best

10        information in the case that's

11        given to lawyers that have to go

12        out and try cases in order to give

13        them the best chance of winning.

14             Although a lot of our work

15        was done in New Jersey and some

16        people on the committee were not

17        familiar with it, I think that if

18        you look closely at the work

19        product, the way we attacked the

20        placebo-controlled clinical

21        studies I think really undercut

22        Merck's position with David

23        Madigan's report and the analyses

24        that he did.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1              Work that was done on the
 2         Alzheimer's studies, which were a
 3         key defense for Merck not only in
 4         the FDA, but in the litigation in
 5         the way that we went after the FDA
 6         and the Alzheimer's studies and
 7         developed the body of work that's
 8         substantial, the marketing work
 9         that Chris Placitella headed up --
10         and by the way, you know, I wasn't
11         alone in working on these issues
12         in the Madigan project.  Dan
13         Sigelman was a wonderful colleague
14         who developed a lot of ideas that
15         I adopted in terms of how to work
16         with Madigan.  I had recruited
17         Madigan in December of 2005.  I
18         had ideas about how we were going
19         to proceed with him.  Dan and I
20         started talking, and I liked his
21         approach, I liked some of the
22         things that he had to offer, and I
23         prioritized that.  I think that's
24         what you do when you're working
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1           collaboratively.  You look at what

2           other people bring to the table.

3           And I did that.

4                So, this work, I think, is

5           clearly work that would and should

6           be in a trial package.  I have a

7           case to try.  I have one case that

8           opted out of the settlement.  I

9           don't know if other people do as

10          well.  But I would encourage you,

11          and at the end of this -- I'm

12          sorry that I'm giving you

13          something to take home and carry,

14          but it is hard to sort of capture

15          work in a brief presentation.

16               At the end of this document,

17          there's a bibliography of work.

18          All of that stuff is available.  I

19          would urge you to look at it,

20          because some of that should be in

21          the trial package for the lawyers

22          who are out there who are still

23          going to have to try cases.

24               One of the issues the Court

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1     was concerned with was what did

2     you do after the litigation

3     started to go south and Merck

4     started to win consistently.  I

5     think it is fair to say, and I

6     kind of framed this in the last

7     year of the litigation, what work

8     did I do, what project was I

9     working on.  I put that into this

10    PowerPoint, and I'll just go

11    through it briefly.

12         The Alzheimer's discovery, I

13    noticed up the corporate rep

14    deposition, and Merck filed a

15    motion to quash that deposition,

16    we defeated that motion, and I

17    took the deposition of Gilbert

18    Block in two days.  The final day

19    was October 30, 2007.  So, that

20    was about a week before the

21    settlement.

22         Block had been deposed in

23    the MDL.  I spent time talking to

24    Chris Tisi about the deposition,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1    he became very frustrated by

2    Block.  I think I took Block's

3    pants down and spanked him,

4    frankly.

5         The work that I did to

6    develop the Alzheimer's story is

7    captured in a paper that I wrote,

8    which ultimately I will probably

9    try and get published.  I think

10   Mark has seen it.  It is available

11   to you.  It lays out how Merck set

12   up the Alzheimer studies, and we

13   had the benefit of knowing the

14   analysis of the data from Madigan

15   that hadn't been out there before

16   that showed that there was

17   statistically significant

18   increased risk with cardiovascular

19   events and deaths by the year 2000

20   and 2001, so that what was in the

21   label was a lie.

22        Frankly, you know, part of

23   what inspired me to work on that

24   or to redouble my efforts was the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1      Hermans verdict, because Mr.

 2      Hermans got treated unfairly.  He

 3      didn't get justice.  At the time

 4      that that verdict came down, I had

 5      already started working with David

 6      Madigan to analyze the Alzheimer's

 7      data, and I knew that what was in

 8      the label was a lie, we just

 9      didn't have the time to frame it

10      for that case.

11          So, that's sort of not only

12      standing on the shoulders of your

13      colleagues, but standing shoulder

14      to shoulder with them, and that's

15      what I tried to do.

16          In the last year, I also

17      worked on the placebo study

18      analysis done by David Madigan.  I

19      recruited Madigan.  I organized a

20      group of lawyers that funded

21      Madigan's work.  So, there was

22      actually a common benefit approach

23      to Madigan.

24          MR. SEEGER:  Can I stop you,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1          because I don't want to forget

 2          these questions.  We're trying not

 3          to interrupt people, but on that

 4          point, I know Madigan's

 5          involvement in Celebrex, Bextra,

 6          and I'm not that aware of his

 7          involvement really in Vioxx.  So,

 8          if you can spend a little time

 9          talking about the common benefit

10          contribution of Madigan.  What

11          work did he provide?  I'm not

12          aware of it.

13                  MR. WEINBERG:  Absolutely.

14                  Madigan wrote a report that

15          was served on October 8th, 2007.

16          It was served in all of the cases

17          that were pending for trial in New

18          Jersey in January of 2008.

19                  MR. RAFFERTY:  It was served

20          when, Eric?  I'm sorry.

21                  MR. WEINBERG:  Beginning of

22          October of 2007.

23                  We obtained all of the SAS

24          data from Merck's
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          placebo-controlled clinical

2          studies, all of it, working with

3          your folks, Chris.

4               MR. SEEGER:  Yes.

5               MR. WEINBERG:  We gave it to

6          Madigan.  Madigan is a

7          biostatistician.  He was at

8          Rutgers when I contacted him.  He

9          had been director of the Institute

10         of Biostatistics.  At the time

11         that I reached out to him, he was

12         dean of mathematics and physical

13         science.  He's now dean of

14         mathematics at Columbia.

15               Madigan is a highly

16         published young guy, Irish,

17         brilliant.  One of his particular

18         areas of expertise is data safety

19         mining.  So, he's a guy that

20         consults with the pharmaceutical

21         companies in looking at their data

22         and seeing what the risks are.  I

23         spent a lot of time, you know,

24         bringing him in.  You know how it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          is when you are trying to recruit

2          a good expert.  And I had to have

3          a level of credibility with him in

4          order to convince him to work.  He

5          did agree to come and work.

6                  He analyzed the SAS data,

7          and it is in the bibliography.  He

8          wrote a report which basically

9          determined when there was

10         statistically significant risk of

11         cardiovascular thrombotic events

12         and cardiovascular thrombotic

13         deaths and other things.  We

14         looked at other things in the

15         Alzheimer's studies like

16         osteoporosis, like pneumonia

17         deaths, things that were

18         statistically significant early

19         on, and he found that in the

20         intent to treat analysis of that

21         data, which were prespecified

22         endpoints in the data analysis

23         plan, there was statistically

24         significant risk of death by the

FAC Resp. Amended Exhibit D -- 896

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1    year 2000.  So that when Merck was

2    negotiating with the FDA on the

3    label and taking the position that

4    it was not significant, that the

5    difference in death was not

6    significant, that was not true.

7    The numbers that are in the label

8    are 8 to 3, but the numbers in the

9    ITT are something like 18 to 5,

10   which are statistically

11   significant.  So, the curve was

12   separating over time.  That was a

13   highly obviously important fact.

14        Also, the CVT events became

15   statistically significant by, I

16   think, 2001.  And I have a couple

17   of the tables, the KM tables that

18   Madigan prepared in his report.  I

19   have pasted them into this

20   PowerPoint for you.

21        Madigan did testify in

22   Celebrex and Bextra.  I was not

23   involved in that case.  I declined

24   to be involved in Celebrex and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      Bextra, because I know my

2      limitations and I like to focus on

3      one case at a time and dig as

4      deeply into that case as I can.

5      However, because my colleagues had

6      those cases, Madigan testified in

7      those cases as an expert.

8          So, Madigan's report has

9      been commended by Dr. Avorn and

10     Dr. Krumholz as perhaps the best

11     scientific analysis that has been

12     done of the statistical evidence

13     related to Vioxx. He is writing

14     the paper with Krumholz and

15     Egilman, or a series of papers, on

16     this issue. I've been asked by

17     our colleagues in Australia,

18     Slatery Warden, if they can work

19     with Madigan, I will be working

20     with them and introduce evidence

21     in their cases I think in March in

22     Australia.

23         It's a beautiful piece of

24     work, and it's a unique piece of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1    work, and it should clearly be a

2    part of the trial package.  And

3    Madigan, I'm told, did a good job

4    in testifying, so, I think he will

5    be a very powerful expert.

6         MR. LEVIN:  In Bextra and

7    Celebrex?

8         MR. WEINBERG:  In Bextra and

9    Celebrex, yes.  He was scheduled

10   to be deposed --

11        MR. LEVIN:  I understand.

12        MR. WEINBERG:  Other work in

13   the last year in the litigation,

14   FDA discovery.  I said that I

15   immediately got the FDA summary

16   approval packages.  I've developed

17   something of a track record in

18   terms of FDA issues.  I've taught

19   about it at Rutgers.

20        In this case, I served nine

21   FOIAs after the initial FOIAs,

22   which the FDA did not respond to,

23   so, I sued them personally in

24   District Court in New Jersey in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           April of 2007.  FDA filed a motion

2           to quash my complaint, to stay my

3           complaint.  That was briefed

4           before Judge Hochberg.  I defeated

5           the FDA's motion.  We were ordered

6           to mediation.

7                 We were in the process of

8           mediating this case and

9           approaching settlement when Merck

10          got wind for the fact that I had

11          had this discovery process outside

12          of the regular litigation where

13          the FDA was going to produce

14          documents to me personally and not

15          to Merck.  Merck made an

16          application to Judge Higbee to

17          compel me to turn over all of the

18          materials that I got from the FDA

19          to them.  This was, again, in

20          September, October of 2007.

21                We argued that before Judge

22          Higbee, and their application was

23          denied.  So, at the time of the

24          settlement, I was in a position of

FAC Resp. Amended Exhibit D -- 900

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1        having nine FOIA requests that the

 2        FDA had to respond to to provide

 3        documents to me related to Vioxx

 4        which Merck had no stake in

 5        whatsoever.  They would not know

 6        what I was getting.  That was in

 7        the last year of the litigation.

 8             In late 2006, I drafted a

 9        memorandum on public relations to

10        develop a public relations

11        strategy.  I felt that we needed

12        to have a cohesive strategy in

13        order to defeat the public

14        relations, Merck's public

15        relations agenda.  I tried to

16        think broadly and deeply about the

17        task that I take on when I'm

18        involved in a case, and I thought

19        the PR was important.  So, working

20        with Mike Ferrara and Mike

21        Grossman and Ben Morelli, we

22        retained a firm in New York called

23        Klore & Associates.  I wrote the

24        working memorandum that served as

FAC Resp. Amended Exhibit D -- 901

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1        a basis for that project, and we

 2        got about 100 firms in New Jersey

 3        to all kick in money together to

 4        work together to develop that

 5        strategy.

 6             I believe that that strategy

 7        was beginning to become effective,

 8        that we were beginning to see in

 9        media stories even where Merck was

10        winning cases, there were things

11        in the stories about the drag of

12        the litigation and so forth,

13        points that we wanted to make

14        whether we won or lost the cases.

15             MR. SEEGER:  Eric, I'm

16        sorry, Mike Ferrara, because he

17        was involved with that, too, if

18        you had to -- first of all, we're

19        not really allowing people to

20        submit extra stuff.

21             MR. WEINBERG:  I didn't

22        know --

23             MR. SEEGER:  No, it's okay.

24        I mean, I'll look at it.  I don't
```

FAC Resp. Amended Exhibit D -- 902

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1       know if other people will.  I

2       don't have a problem with it.  I'm

3       just saying, I'm going to look

4       this over, and I have a sense of

5       it.

6            If you wanted us to leave

7       here with us thinking of like two

8       or three big contributions you

9       think you made sort of to the

10      common benefit, what would you

11      want the committee to focus on?

12           MR. WEINBERG:  Well, I think

13      that in a trial package, you have

14      got to have three things that I

15      worked on.  One, the

16      placebo-controlled study.

17           MR. HERMAN:  Wait a minute.

18      You didn't submit any materials to

19      the current trial package; is that

20      right?

21           MR. WEINBERG:  That's

22      correct.

23           MR. HERMAN:  Why not?

24           MR. WEINBERG:  Because I was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        not involved in the MDL.
 2              MR. LEVIN:  I don't want to
 3        interrupt, and we're probably MDL
 4        oriented, and I'm going to look to
 5        Jersey counsel here as to what was
 6        going on in Jersey, but was the
 7        leadership in Jersey aware of
 8        everything you were doing and all
 9        the engagements of experts you did
10        and whether any of it was
11        duplicative of what they were
12        doing?
13              MR. WEINBERG:  I assume so.
14              MR. LEVIN:  Did you --
15              MR. WEINBERG:  Absolutely.
16              MR. LEVIN:  Did you report
17        to them, and did they approve,
18        disapprove, or were you basically
19        out there on your own doing a good
20        job?
21              MR. WEINBERG:  Well, you
22        know, there wasn't a defined
23        structure in New Jersey the way
24        there was in the MDL.  I did try.
```

FAC Resp. Amended Exhibit D -- 904

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          Madigan was clearly a good guy and

2          a good expert.

3               MR. LEVIN:  Was there some

4          procedure by which they said, go

5          get Madigan, we'll endorse him,

6          we'll use him, or was that your

7          expert that you went out and

8          cultivated yourself?

9               MR. WEINBERG:  Well, first

10         of all, he was my expert who I

11         cultivated myself, but he was

12         offered to and was going to

13         testify for my colleagues.  He was

14         in Perry's cases.  He was in Sol

15         Weiss' cases.  He was offered

16         to -- I forget the other firm that

17         had cases.  I was going to work

18         Madigan in that case.

19               But in terms of the MDL,

20         Russ, we had a meeting in June of

21         2007 in Philadelphia where I

22         brought Madigan, and Mark Robinson

23         was there and Don Arbitblit was

24         there, and my proposal was to work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

 1      together.  In terms of the workup

 2      of Madigan, I was working

 3      primarily with Dave Buchanan and

 4      Jeff Grand at Chris' office,

 5      because they had worked with

 6      Kronmal.  Again, this is standing

 7      on the shoulders.  Kronmal did

 8      terrific work, but I saw some

 9      things, some directions that I

10      wanted to go that were a little

11      bit different.  I wanted to have

12      my own guy.  The discussion was,

13      let them work together.  Let them

14      peer review each other's work.

15      Let's have two brainchilds.

16           MR. HERMAN:  Here's the

17      problem that I have, and I need

18      your help with it.

19           On the trial package

20      committee, we had representatives

21      from the New Jersey litigation

22      that were not, per se, MDL folks.

23      None of them ever suggested that

24      you had materials that could be

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          incorporated into a trial package,

2          which is now complete.  Why that

3          is, I don't know.  It may be that

4          they just weren't aware of what

5          you were doing.

6               I'm particularly concerned,

7          because we put on a massive effort

8          in the MDL to get FDA documents.

9          We had several Assistant US

10         Attorneys involved, we had five or

11         six hearings.  We may have even --

12         I'm not certain whether we went to

13         the Fifth Circuit, but we

14         certainly had posted on the

15         website the Court's decisions

16         requiring the FDA to produce, and,

17         in fact, they are still producing

18         documents even post trial.

19              So, we do have FDA documents

20         within the trial package.  My

21         concern really isn't with your

22         presentation, it is with the fact

23         that we still have possibly 100

24         folks, claimants, and I don't know

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
1        how many pro se that want to try
2        their cases, and we've got to -- I
3        mean, if you've got materials that
4        ought to be in the trial package,
5        that's got to be explored.
6             MR. RAFFERTY:  In terms of
7        the FDA, Eric called me, I think
8        before he filed the lawsuit
9        against the FDA, and I provided
10       him with copies of what we had
11       done in the MDL to make sure that
12       you didn't duplicate.  I don't
13       know, are you still waiting on
14       those documents?
15             MR. WEINBERG:  We mediated
16       them.  Once the case settled, the
17       need for them was obviated.  They
18       were quoting me hundreds of
19       thousands of dollars in costs to
20       produce those documents.
21             MR. LEVIN:  Who would you
22       say you had the most contact with
23       in the leadership of the New
24       Jersey litigation?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1              MR. WEINBERG:  Dave, Jeff.

2              MR. LEVIN:  At Chris' firm?

3              MR. WEINBERG:  Chris at a

4       higher level, I guess.  Sol,

5       obviously.

6              MR. HERMAN:  How many hours

7       did you have put into the case?

8              MR. WEINBERG:  I calculated

9       about 6,000.  Obviously I'm

10      recreating hours.

11             MR. LEVIN:  You submitted

12      10,000 hours and 235,000 in costs.

13      Are you working with the

14      accountants to get them approved?

15      Because so far they have been

16      rejected.

17             MR. WEINBERG:  They

18      contacted me.  I spoke to Cliff

19      Newlin, and then we've been

20      trading phone calls.  But 10,000

21      hours is basically, of that time,

22      6,000 and change is mine.  I

23      worked essentially full time on

24      Vioxx for three years, and I work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1       hard.  So, I believe I probably

2       underestimated my hours.

3             MR. HERMAN:  The other

4       question I have, and I'm not

5       holding you to an exact number, of

6       the hours that you've

7       reconstructed, were they all yours

8       or did you have contract workers,

9       associates?

10            MR. WEINBERG:  All mine.

11            MR. HERMAN:  They were 100

12      percent yours?

13            MR. WEINBERG:  All mine.

14            Just to kind of finish the

15      point on the MDL issue.  I called

16      a meeting in Philadelphia in June

17      of 2007, because I was concerned

18      that we needed to have the best

19      evidence in those trials.  I was

20      very interested in working with --

21      we had some conversations with Don

22      Arbitblit.  Arbitblit became very

23      much interested in the Madigan

24      project and spent a lot of time

FAC Resp. Amended Exhibit D -- 910

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          talking to him, and he came to the

2          meeting.  Mark Robinson came to

3          the meeting.  Chris Placitella was

4          there.  Chris was handling

5          marketing stuff, and that's the

6          other thing that needs to be in

7          the trial package, if it is not,

8          because it is brilliant, brilliant

9          lawyering.  I was his sounding

10         board on that stuff.  Kostis was

11         also very much involved in that.

12         So, we had Mark, Don Arbitblit

13         myself, Chris, Dan Sigelman.

14               MR. LEVIN:  Was this the

15         meeting that Dan Sigelman from

16         Cohen Milstein went to in

17         Philadelphia?

18               MR. WEINBERG:  Philadelphia,

19         yes.

20               The intent of that meeting

21         was basically to say, let's work

22         together.  Let's put Madigan in

23         the MDL cases.  We were interested

24         in Zipes, who was a very good

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          witness, I understood, in the

2          trial that he testified in.

3               You know, for reasons that,

4          you know, I'm not -- there's not a

5          blame game here, but it didn't

6          work out.

7               MR. LEVIN:  I know.

8               MR. WEINBERG:  But I tried.

9          So, in terms me being able to

10         communicate the work that I was

11         doing, I did try.  I think in

12         terms of the leadership in New

13         Jersey, I would consider Perry and

14         Mark, you know, they were on the

15         front lines of the cases, and I

16         know I worked with their firms on

17         a variety of issues including

18         Kostis.  Kostis was on the phone

19         with Rick.

20              MR. WEITZ:  I have to tell

21         you that Eric, although he was

22         focused on working up his cases,

23         he did bring a lot to the

24         litigation as far as his

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

```
 1          participation and expertise.  He
 2          did share it.  It is not that he
 3          probably didn't coordinate with
 4          the MDL as much as he possibly
 5          could have and contributed, but he
 6          was always available and always
 7          sharing his experts.  I met with
 8          Eric and Kostis.
 9               MR. HERMAN:  I need to
10          apologize.  Excuse me.  Off the
11          record.
12                    -  -  -
13               (Whereupon, an
14          off-the-record discussion was
15          held.)
16                    -  -  -
17               MR. WEINBERG:  Russ, in
18          terms of what should be in the
19          trial package, I'm willing to
20          share all of it.  I do think that
21          you should have Madigan in the
22          trial package.
23               MR. RAFFERTY:  I think you
24          started off saying there's three
```

FAC Resp. Amended Exhibit D -- 913

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          things.  One was Madigan.

2               MR. WEINBERG:  Madigan, the

3          Alzheimer's analysis, and the

4          marketing stuff.  We can look at

5          the FDA stuff, because I did -- I

6          went through the summary approval

7          packages and other stuff.  I have

8          long detailed PowerPoints which I

9          did share with experts that

10         excerpted key portions of those

11         documents.

12              Just to kind of finish up on

13         this point, because I know you

14         guys have a full day.

15              Other stuff in the last

16         year, I took discovery on a

17         project called the NitroMed

18         project, which was a very

19         interesting project that Merck did

20         with a company called NitroMed out

21         of Boston.  When Merck got the

22         results of protocol 136 and knew

23         they could no longer say that

24         their drug could be combined with

FAC Resp. Amended Exhibit D -- 914

Page 32

1          aspirin truthfully, because there

2          was no benefit from the data in

3          that study, they had to find a way

4          of improving the gastrointestinal

5          profile where you were combining

6          Vioxx with aspirin, otherwise,

7          they were losing a big marketing

8          benefit.  They thought that by

9          combining Vioxx with nitric oxide

10         that it would reduce the

11         gastrointestinal side effects of

12         the drug, and they sought out

13         companies that own proprietary

14         patents on combining Vioxx with

15         COX-2 inhibitors, because that

16         work had been going on for some

17         time.  NitroMed was the company

18         that had the best patents.  So,

19         Merck cut a deal with them.  It

20         was actually Merck Frosst.  So, I

21         got into the Merck Frosst

22         discovery, and this was work that

23         was ongoing at the time of the

24         settlement, but what I found out

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          was that NitroMed, when Merck

2          approached them, said to Merck,

3          hey, we can not only fix your

4          gastrointestinal problems, we can

5          fix your cardiovascular risk.  And

6          this was in the middle of 2002.

7               I served a commission for a

8          subpoena in Boston and took the

9          deposition of Gordon Letts, who

10         was the chief medical officer of

11         NitroMed, who said that Merck

12         rejected that offer.  They were

13         not interested in ameliorating the

14         cardiovascular side effects of

15         Vioxx.

16              Now that we know from

17         Madigan's analysis there was

18         statistically significant risk, I

19         think that evidence would be

20         interesting evidence in terms of

21         punitive conduct.  Here you have a

22         company that's telling you we can

23         improve the cardiovascular profile

24         of your drug and they're refusing

FAC Resp. Amended Exhibit D -- 916

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

    1         it.  Not only that, there's

    2         another company out there called

    3         Nitrox, which today is working on

    4         a nitric oxide enhanced COX-2 that

    5         actually lowers blood pressure.

    6         And they are in Phase III studies,

    7         and that drug may be approved.

    8              So, that was work that was

    9         going on.  I took the deposition

   10         of a Merck Frosst scientist named

   11         Don Nicholson.  I had Ford

   12         Hutchinson, another expert,

   13         another Merck Frosst person named

   14         Sophie Roy on my radar screen to

   15         depose.  That was work going on in

   16         the last year of the litigation.

   17              I organized some working

   18         meetings.  I tried to defer to the

   19         people who were the leaders in

   20         this litigation, because they had

   21         been there before me, and at the

   22         same time, fill in where I could

   23         to work together.

   24              I had a working meeting in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1        my office in November of 2006 with
 2        John Kostis and several of the
 3        attorneys from the MDL and State
 4        Court on a specific causation
 5        model.  I thought it was a good
 6        model for settlement.  It ended up
 7        not being used, but it was useful
 8        in understanding specific
 9        causation.  It became very
10        important in the McDarby case
11        where diabetes was the issue, and
12        the day before Dr. Krumholz'
13        deposition, Ellen reached out to
14        me and said, what do you know
15        about diabetes risk?  And I had
16        the information.  It was no
17        coincidence that I had it, because
18        I organized the meeting in June of
19        2007 in Philadelphia that Mark
20        Robinson and Don Arbitblit --
21            MR. SEEGER:  Take 60 seconds
22        and kind of sum up, because we've
23        got to stay on schedule.
24            MR. HERMAN:  I have one
```

FAC Resp. Amended Exhibit D -- 918

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1    other question, excuse me.

2         I noted in your PowerPoint

3    under number IX, Roman Numeral IX,

4    fracture and bone healing.  Have

5    you had any contact with any pro

6    se folks or other folks alleging

7    that bone healing was either

8    retarded or mal affected by Vioxx?

9         MR. WEINBERG:  Not with pro

10   se folks, but I have had

11   discussions with Madigan about

12   that.  In fact, we analyzed the

13   data.  It does retard fracture

14   healing, and there was a

15   statistically significant

16   increased risk of --

17        MR. HERMAN:  Do you have a

18   client that you analyzed that for?

19        MR. WEINBERG:  No.  One of

20   the things that I did was to look

21   at the overall risk/benefit of

22   Vioxx because I felt that --

23        MR. HERMAN:  Wait a minute.

24   Let me explain to you that there

FAC Resp. Amended Exhibit D -- 919

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          are -- have you sent that material

2          in to the MDL or to New Jersey?

3               MR. WEINBERG:  It's in

4          Madigan's report.

5               MR. LANIER:  Is that a yes

6          or a no?

7               MR. WEINBERG:  Yes.  I don't

8          want to be cross-examined.

9               MR. HERMAN:  Would you

10         e-mail me a copy of that report or

11         fax it?

12              MR. LANIER:  You've got

13         information that may be helpful to

14         people with other cases right now

15         that we need to plug into.  So, we

16         need it not just lost in the

17         morass of 80 bazillion documents,

18         would you highlight it and send it

19         to Russ?

20              MR. WEINBERG:  Yes.

21              MR. LANIER:  Thank you.

22              MR. WEINBERG:  So, to sum

23         up, I did a lot of work on this

24         case.  I think a lot of it was of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

```
 1        the highest quality.  I worked

 2        diligently from beginning to end.

 3        When the track record was bad, I

 4        worked harder.  I tried to fill in

 5        where I saw that there were gaps.

 6             When I was called upon in

 7        each of the trials in New Jersey,

 8        except for the Locks folks really,

 9        I offered help, but they didn't

10        want it, but in each of those

11        cases, I was asked for help.  Even

12        in Ernst, Mark, I didn't realize

13        this, but I spent some time

14        prepping Egilman.  My role was

15        minimal, but I sat through

16        Egilman's deposition.  I think his

17        son accused me of falling asleep

18        at one point.  But what I brought

19        to, for example, the Humeston

20        case, the first Humeston case,

21        when Dave and Jeff and Chris were

22        looking at FDA issues, I had spent

23        a lot of time, between September

24        30, 2004 and when that case was
```

FAC Resp. Amended Exhibit D -- 921

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1        tried, studying the FDA issues.
 2        So, the fact that I was asked for
 3        help is not a coincidence.  It was
 4        because I had gone to school on
 5        this case.
 6            I'd be happy to share any of
 7        my work product.  I'll send you --
 8        Russ, I'll send you the Madigan
 9        report.  I also have an expert, if
10        somebody needs an expert, I have a
11        guy named Pat O'Connor who was at
12        UMD&J who approached Merck in 2000
13        and said I think you need to do
14        some studies.  And I have the
15        documents on that issue.  And they
16        blew him off.  So, if somebody has
17        got an osteoporosis case, I can
18        help them.
19            But I did that, just to
20        finish, I looked at the overall
21        risk/benefit of the drug because I
22        felt that it was possible that if
23        Merck was arguing that
24        risk/benefit, gastrointestinal
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

 1        benefit and the issues were

 2        cardiovascular risk, that other

 3        benefits and risks should be fair

 4        game.  And so I looked at the

 5        universe of them as I could define

 6        it and shared my work product

 7        consistently and tried to be a

 8        leader, tried to be a team player,

 9        and just tried to represent my

10        clients the way that I was taught

11        when I took my first job out of

12        law school.

13             MR. SEEGER:  Thanks, Eric.

14             MR. LEVIN:  Thanks.

15             MR. WEINBERG:  Thank you.

16                  -  -  -

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

              C E R T I F I C A T E

1

2

3          I, LINDA L. GOLKOW, a Notary

4   Public and Certified Court Reporter of

5   the State of New Jersey, Registered

6   Diplomate Reporter, Federally-Approved by

7   the United States District Court of

8   Pennsylvania, do hereby certify that the

9   foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13          I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22       Linda L. Golkow, RDR, CRR, CCR
         Notary Number:  1060147

23       Notary Expiration:  1.2.10
         CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
JANUARY 23, 2009
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
NEW YORK, NEW YORK
- - -

FIRM:  LEVIN FISHBEIN SEDRAN & BERMAN
       Arnold Levin, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers, LLP
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
         GOLKOW TECHNOLOGIES, INC.

Case 2:05-md-01657-EEF-DEK   Document 62888-1   Filed 04/26/11   Page 926 of 1814

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1              - - -
                MR. LEVIN:  I've been
 2      practicing law longer than some of
 3      you have been in this world, and I
 4      can tell you that I have not met a
 5      finer group of lawyers than appear
 6      at this table, and particularly Ed
 7      Blizzard, because we did have some
 8      rocky times, and it was
 9      philosophical.  It had nothing to
10      do with anything else.  He is a
11      gem, and it is a pleasure being
12      with you and having the
13      relationship I now have with you.
14              MR. BLIZZARD:  Thank you
15      very much, Arnold.  I feel the
16      same way.
17              MR. LEVIN:  In 1964, I got
18      out of the Army and got into law
19      school three days after it
20      started.  Upon graduation, I went
21      to work with a major plaintiffs
22      firm in Philadelphia, Freedman,
23      Borowsky & Lorry.  Abe Freedman
24      had established the maritime law
```

FAC Resp. Amended Exhibit D -- 926

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          in this country.  For those of you

2          that are involved in maritime law,

3          his case was Seracki, his case was

4          Pope & Talbot vs. Hawn.  At one

5          point in time, he argued more

6          cases in the Supreme Court than

7          any other attorney.  That was

8          before civil rights litigation,

9          and it was when the Supreme Court

10         really cared about people and

11         people's issues.

12              I continued to do maritime

13         law, and then in 1972, my world

14         came to an end, or at least I

15         thought my professional world came

16         to an end, because the Congress in

17         1972 amended the Longshoremen and

18         Harbor Workers' Act, Section

19         905(b).  You don't remember things

20         like that unless they hit you

21         hard.  And no longer could we try

22         a case for a longshoreman

23         utilizing a breach of the warranty

24         of seaworthiness.  So, I thought I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1      would probably have to drive a
 2      truck afterwards, but I found out
 3      there was this rule, Rule 23, and
 4      it sounded like a pretty good
 5      thing.  I mean, there were two
 6      lawyers in Philadelphia that were
 7      the gurus in the country, Harold
 8      Kohn and Dave Berger.  And Abe
 9      Freedman let me go with it.
10          I brought my first class
11      action, which was an antitrust
12      case against mortgage companies
13      for not paying interest on escrow.
14      I finally disclosed in front of
15      Judge Fallon about two weeks ago
16      that I picked the defendants out
17      of the Yellow Pages.  Five of them
18      were not proper, and I had a Rule
19      11 sanction for it, which Abe
20      found very funny.
21          But in 1979, Three Mile
22      Island occurred, and Dave Berger
23      and I became lead counsel in Three
24      Mile Island.  That's when I
```

FAC Resp. Amended Exhibit D -- 928

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        finally had the ability to mix or

 2        blend personal injury with the

 3        Rule 23 process both for, in those

 4        days, personal injury, first

 5        medical monitoring case brought.

 6        Mike Fishbein was a young lawyer,

 7        maybe a year out, and he put

 8        medical monitoring in the

 9        Complaint, I didn't even know it

10        at the time, and that's when

11        medical monitoring became a cause

12        of action.

13             From then on in, I handled

14        personal injury cases, as well as

15        complex and prolix litigation,

16        which you now know is not the

17        mystique that it appears to be.

18        I've tried over 100 jury trials,

19        well over 100 jury trials, and I

20        thought that was a lot until last

21        night Andy told me he had 100 jury

22        trials before he began practicing

23        law.  I have been admitted to just

24        about every Court of Appeals but
```

FAC Resp. Amended Exhibit D -- 929

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        two, Supreme Court, various state

2        admissions, various honor

3        societies, like the International

4        Society of Barristers, and I would

5        just incorporate

6        Martindale-Hubbell.

7              I bring a lot of experience

8        to the table, some good and some

9        bad.  Rule 11 is bad.  I have been

10       on executive committees and

11       leadership roles in well over 100

12       MDLs.  When I was there, in the

13       beginning, these MDLs were not

14       numbered in the hundreds, but they

15       were in single digits.  They

16       didn't have an MDL panel until

17       shortly before I started class

18       actions, which came out of the

19       plumbing and electrical antitrust

20       cases.

21              I think in this case, my

22       appointment to the Plaintiffs'

23       Steering Committee, looking back,

24       propelled me to the Number 4

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        position on the PSC.  The three

 2        above me, and some, if not all,

 3        very much above me in terms of

 4        what they did in this litigation,

 5        were Russ, Chris and Andy.  But

 6        they were good enough to allow me

 7        to partake in every major decision

 8        that was made in this litigation

 9        and to listen to me even though I

10        wasn't part of their executive

11        committee, and I appreciate that.

12             MR. SEEGER:  You were de

13        facto on it.

14             MR. BIRCHFIELD:  Absolutely.

15             MR. LEVIN:  Our primary role

16        was the briefing and the law

17        committee.  I think I'm uniquely

18        qualified for that because I

19        basically know all of the cases

20        that have occurred in the last 20,

21        25 years involving MDLs and

22        especially pharmaceuticals.  Now

23        that Vioxx is resolved, I have

24        been in a leadership role in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        two largest pharmaceutical cases,

 2        fen-phen and Vioxx.  And some of

 3        us in the third largest now that

 4        we know it, the Rezulin case,

 5        after Judge Kaplan announced that

 6        last Friday.

 7            Judge Fallon not only

 8        appointed me to the Plaintiffs'

 9        Steering Committee, but when Judge

10        Fallon decided, along with the

11        three state judges, that it was

12        now time to try to have an end

13        game and talk settlement, he

14        appointed me to that committee.  I

15        was the only member of the

16        steering committee that was not on

17        the executive committee that was a

18        member of that committee.  So, I

19        was on the negotiating committee,

20        and I'm in the allocation

21        committee, and I'm principally

22        responsible for filing the fee

23        briefs, especially the one that

24        was filed last week, with a lot of
```

FAC Resp. Amended Exhibit D -- 932

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1       help from Russ with his affidavit

2       and the briefing and a lot of help

3       from the state lawyers, Mr.

4       Blizzard, Mr. Girardi and Mr.

5       Seeger's office with regard to the

6       activities that occurred in the

7       state courts, because my partner,

8       Fred Longer, and I were not fully

9       aware of all of the activities

10      that occurred there, and hopefully

11      we put them together.

12          I'm in a unique position in

13      this case, looking at everybody

14      here, because I absolutely know at

15      least on paper what you've done.

16      On a weekly basis, I've been

17      looking at your hours and costs

18      and watching them move from

19      rejected to under review to

20      accepted and being kosher hours

21      and costs in this litigation. I

22      can tell you that most of you

23      basically have the proper hours

24      and costs vis-a-vis others in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        litigation, except for two

 2        individuals, who are great lawyers

 3        but don't know how to keep time

 4        records.  And that's Chris Tisi,

 5        who is not here, and Troy

 6        Rafferty, who is here.  When you

 7        hear what Troy has done, and you

 8        will hear what Troy has done, you

 9        know that his hours are

10        understated.

11             MR. SEEGER:  I wish I could

12        give his presentation, because

13        I'll do better than he will for

14        himself.

15             MR. LEVIN:  When you look at

16        the hours of the other 100

17        lawyers, there's 109 fee

18        applications here, you can see a

19        lot of hours.  But based upon the

20        hours that you see, most of them

21        should be in heaven or hell by now

22        if that was based upon their

23        hours.  But this group, this core

24        group, has very, very competent
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        records.
 2              Speaking for my firm, I
 3        can't do it alone.  I happen to
 4        have great partners and great
 5        colleagues that I work with that
 6        are very talented.  Most of you
 7        have seen Fred Longer, and Fred is
 8        a superb lawyer despite a lot of
 9        the nonsense that I give him.
10              Mike Fishbein, who has not
11        worked this case but has consulted
12        without putting hours in, is
13        beyond being a great lawyer.
14              Mike Wenkowitz, who is a
15        young lawyer, practices above his
16        years.  In this case, myself, Fred
17        Longer, Mike Wenkowitz and Matt
18        Gaughan, who is a baby lawyer --
19        anybody under ten years is a baby
20        lawyer as far as I'm concerned,
21        ten years in practice.  Most of
22        you are adolescents by my
23        standards.  Not you, Tom, not you,
24        Russ.  All of us have worked most
```

FAC Resp. Amended Exhibit D -- 935

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1          of our time on this case since the

 2          MDL started, with few exceptions.

 3                We have the sixth highest

 4          hours in this litigation, and I

 5          alone have 4,300 hours in the

 6          case, which is a lot for an old

 7          man.  We prepared well over 150

 8          substantive motions and responded

 9          to still more.  Most of the

10          motions that are attached as

11          Exhibit B to Russ Herman's

12          affidavit in support of the 8% fee

13          were either prepared by our

14          office, responded by our office,

15          and with the exception of certain

16          discovery motions, were at least

17          reviewed by our office, although

18          the discovery team did a lot of

19          those motions and briefs.  For

20          some reason, class actions become

21          a part of this litigation and have

22          to be processed in a

23          pharmaceutical, even though there

24          is very little chance of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1     certification after Amchem and

2     Ortiz, but they hang around there

3     on the fringes of the litigation

4     as a vehicle to settle the case

5     and as a vehicle to toll statutes

6     of limitations in most

7     jurisdictions.  We put together

8     the Master Class Action Complaint

9     both for medical monitoring and

10    for personal injury.  We knew that

11    we would have great difficulty in

12    a proposed national class, so, we

13    had standalone state classes that

14    we started in many different

15    jurisdictions.  Many of you,

16    particularly Andy, gave us

17    plaintiffs in various

18    jurisdictions to start those

19    particular class actions that

20    tolled the statute of limitations

21    in those particular jurisdictions.

22    Fortunately, we went to settlement

23    with a private settlement, which

24    is very unique and probably will

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1    be the protocol for future

2    settlements, do not need the class

3    actions, and now we're wrapping

4    them up and dismissing them.

5        I think of all the 150

6    motions and briefs that were filed

7    in this case, the preemption

8    motion, the response to the

9    preemption motion was the most

10   important briefing that we did.

11   In order to do that, we monitored

12   every preemption case in the

13   country, state and federal, for a

14   two, two-and-a-half year period

15   before.  We put together a brief

16   that we did not meet everything,

17   but we raised constitutional

18   issues of equal protection and due

19   process, taking of a cause of

20   action, which is property without

21   proper hearing, without proper

22   notice.  Fortunately, we got a

23   very, very good decision by Judge

24   Fallon on the preemption issue.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        But that didn't solve the

2    anxiety that I had, because my

3    anxiety was with regard to

4    appellate review.  The appellate

5    review would be in the Fifth

6    Circuit.  If the Fifth Circuit had

7    the case with other cases coming

8    along, like Colicchio, a few

9    others, I was worried about the

10   Fifth Circuit slowing down the

11   litigation or ultimately ending

12   the litigation.  So, we devised a

13   strategy whereby one of the last

14   acts of President Clinton was to

15   enter an executive order that an

16   agency couldn't change the terrain

17   and infringe upon state litigation

18   without seeing what the states

19   thought of the same.  The FDA

20   complied with that after the fact

21   by stating that they spoke to

22   Haley Barbour, who is the governor

23   of Mississippi, who was also a

24   lobbyist for Big Pharma, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          Governor Daniels, who was the

 2          governor of Indiana, who, before

 3          entering public service, was the

 4          CEO for Eli Lilly.  It was led to

 5          believe that they had nothing but

 6          good things to say about this. So,

 7          we filed subpoenas on them,

 8          received their records, and Russ

 9          took a 56(f) affidavit so that

10          when the defendants attempted to

11          appeal to the Fifth Circuit under

12          12.28 U.S.C. 1292(b), we said, you

13          can't do it, there's still

14          discovery opened.  Judge Fallon

15          agreed with us, and it stopped.

16          Haley Barbour never knew what

17          happened.  We found out that the

18          papers that were sent to him never

19          got to his desk.  Governor

20          Daniels, basically the same thing.

21          We found out the state

22          legislatures all wrote letters to

23          the FDA against their position on

24          preemption.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1                Another major motion was the

2           statute of limitations motion.

3           The office did briefing on too

4           many motions to sit here and go

5           one by one and discuss them one by

6           one.  But we were involved and

7           briefed the privilege issue before

8           Special Master Rice.  We were

9           involved and briefed motions to

10          quash subpoenas, motions to compel

11          the appearance of David Anstice,

12          motions and motions and motions.

13          We also were involved in several

14          trials with the motions in limine,

15          and we were asked to do the same.

16          We were involved in the briefing

17          on the Humeston post-trial

18          motions, as well, along with

19          yeoman's work by Chris' office.

20                I know what we did, and I

21          know what Fred Longer did.  But I

22          have this little guy running

23          around my office by the name of

24          Mike Wenkowitz.  I don't know

FAC Resp. Amended Exhibit D -- 941

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        everything he did, because I

2        turned him loose on discovery and

3        on science.  He developed Dr.

4        Feldman, who was the stroke expert

5        that will be in the trial package

6        with regard to strokes.  It is a

7        doctor that we had used in the

8        past.  I'm pretty proud of what he

9        did with regard to Feldman and

10       what others did helping him with

11       regard to Feldman.  Because there

12       was two doctors there.  There was

13       Steve Levin and Dr. Feldman.

14       Steve Levin was basically, from my

15       recollection, Selikoff's

16       successor.  And very good.  But

17       tons of money were spent on Steve

18       Levin, and we don't have one piece

19       of paper or one report for it.

20       But there will be a report from

21       Dr. Feldman.

22            Wenkowitz worked on many

23       other things.  He digested

24       articles.  He did excessive --

FAC Resp. Amended Exhibit D -- 942

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1        this is his words -- systematic

 2        review of underlying clinical

 3        trials and medical records, et

 4        cetera, et cetera, et cetera.  But

 5        what I do know about him is,

 6        because I was involved with the

 7        settlement negotiations, he did

 8        the point calculator with the

 9        settlement.  He's now helping out

10        with the gates committee.  And as

11        of two days ago, when Andy called,

12        I put two more people on the gates

13        committee from my office.  And if

14        you need more, we will do them as

15        we train them.

16            I don't want to say too much

17        about Wenkowitz, because most

18        people know what he did, Vioxx

19        timelines, worked on casts of

20        characters, but I don't want to

21        misspeak myself, because I can

22        remember misspeaking myself once

23        and embarrassing myself.  I opened

24        for a nine-month jury trial in St.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1      Louis with dioxin claims.  And, of

 2      course, everybody prepared things

 3      for me.  I got up, and I was

 4      really great.  And I got to a

 5      point where I said, and you will

 6      hear from the good, the bad and

 7      the ugly, and we will bring in

 8      such and such a person.  And

 9      everybody in the courtroom started

10      to laugh.  He was dead.  So, I've

11      learned my lesson not to misspeak

12      myself.

13           But I've been involved in

14      just about everything in this

15      litigation, all the major, and

16      unlike Mary Poppins, I just didn't

17      drop in for one thing and leave.

18      I've been here for everything, and

19      I will be here for the duration.

20           When I say that, we have a

21      settlement, and settlements breed

22      objections and nuisance-ors, and I

23      don't mind saying this on the

24      record, like Attorney Stratton,

FAC Resp. Amended Exhibit D -- 944

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1          Attorney Benjamin and others.
 2          Fortunately, I've been around and
 3          I have information on a lot of
 4          these guys that appear in every
 5          litigation.  One in particular was
 6          Benjamin, who has filed all kinds
 7          of motions in this litigation.  I
 8          happen to know that he was
 9          disbarred for stealing horses.  He
10          was reinstated and he's still
11          around, and he lost his cases in
12          diet drugs the same way he lost
13          the cases here, by objecting to
14          pretrial orders 28 and their
15          progeny.  Judge Fallon utilized
16          that information when he dismissed
17          Benjamin's objections, tangential
18          objections to this settlement.  I
19          think it is important to have that
20          type of resource, because it is a
21          small bar that we practice in.  We
22          all know each other.  We know
23          those that do the work, and we
24          know those that are on the
```

FAC Resp. Amended Exhibit D -- 945

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1      sidelines that try to throw the

2      monkey wrench into the process to

3      get their own private settlement,

4      present company excluded.

5          This will go on.  We also

6      did the major briefing with regard

7      to the AvMed and Greater New York

8      motions.  We briefed in the Fifth

9      Circuit with regard to those

10     motions. I would incorporate by

11     reference to my affidavit Exhibit

12     A, which lists the major motions

13     as of the time of the affidavit.

14         With regard to this group of

15     people that I've grown to know,

16     some lately and some for the

17     period of the litigation and

18     others for well before the

19     litigation, like Russ here, this

20     would make one hell of a law firm

21     if you were all partners, except I

22     think you would have to wear flack

23     jackets for a partners meeting,

24     because you all have very strong

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1        views and good views about things,

2        and you are tenacious and you

3        stick to your views.  The fact

4        that we do get along the way we

5        get along is because of the

6        respect that we have for each

7        other.

8              I'm not going into other

9        various and sundry things like

10        preparing the qualified, the QSF,

11        and preparing the end games orders

12        like 28, 29, 30 and 31.

13              The one last thing that I do

14        want to comment on that I warrant

15        to you, is that even though there

16        are other things more important

17        than money, this group has a lot

18        of people that rely on them for

19        health insurance, for their

20        employees, for their partners, for

21        their living, for their families,

22        and we would be remiss to say that

23        we don't have to be compensated

24        for the work that we do, because

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          collectively, we're not an

2          eleemosynary institution.  I

3          warrant to you that the papers

4          that I file with regard to Article

5          9 of the settlement agreement, the

6          briefing and materials that were

7          filed this week and the allocation

8          materials, you will find none

9          better, because I will devote the

10         rest of this litigation to

11         bringing that home.

12              Thank you.

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1            C E R T I F I C A T E.

2

3

               I, LINDA L. GOLKOW, a
4   Notary Public and Certified Court
    Reporter of the State of New Jersey,
5   Registered Diplomate Reporter,
    Federally-Approved by the United States
6   District Court of Pennsylvania, do hereby
    certify that the foregoing is a correct
7   transcript of the testimony as taken
    stenographically by and before me at the
8   time, place and on the date hereinbefore
    set forth.

9

10             I DO FURTHER CERTIFY that I
    am neither a relative nor employee nor
11  attorney nor counsel of any of the
    parties to this action, and that I am
12  neither a relative nor employee of such
    attorney or counsel, and that I am not
13  financially interested in the action.

14

15

16

17

18  _____
            Linda L. Golkow, RDR, CRR, CCR
19          Notary Number:  1060147
            Notary Expiration:  1.2.10
20          CCR Number:  30X100176200

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

-   -   -

VIOXX FEE COMMITTEE PRESENTATION

-   -   -

JANUARY 23, 2009

-   -   -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

-   -   -

NEW YORK, NEW YORK

-   -   -

FIRM:  LEVIN, PAPANTONIO, THOMAS,
       MITCHELL, ECHSNER & PROCTOR, P.A.
       Troy Rafferty, Esquire
       Pete Kaufman, Esquire


BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers, LLP

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -
 2            MR. RAFFERTY:  For the
 3       record, I'm Troy Rafferty.  With
 4       me is Pete Kaufman, my partner.
 5            At the risk of being
 6       repetitive, I think it's necessary
 7       for me also to say how proud I am
 8       of having the opportunity to work
 9       with each and every one of you.
10       Quite frankly, I've worked with
11       some of you before this.  Chris,
12       he and I worked together before
13       this.  Russ, I had the opportunity
14       to work with you and Lenny and
15       your firm before in some very big
16       litigations and enjoyed it.  Ed,
17       as well.
18            I think one of the things
19       that I have enjoyed most out of
20       several years of battle has really
21       been getting to know a lot of
22       people, getting to see a lot of
23       great lawyering, and quite
24       frankly, I learn a lot from
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        lawyers when I watch what they do.

 2        I learned a lot over the last few

 3        years from people in this room and

 4        from people that aren't in this

 5        room that were involved in this

 6        litigation.  So, for that, I want

 7        to thank each one of you.

 8               As I said, I'm proud of

 9        being appointed to the PSC by

10        Judge Fallon.  I was proud of

11        being appointed to this committee.

12        I guess for purposes of this

13        presentation, I'm kind of like Ed.

14        This doesn't come naturally to me,

15        to talk about myself or talk about

16        my firm, but it is a necessary

17        evil in this regard.

18               I am proud of my firm.  I'm

19        proud of the accomplishments of

20        our firm.  I think our firm brings

21        a lot to the table in any

22        litigation that we get in, and I

23        think one of the things that we

24        bring to the table is, quite
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        frankly, when we're in a

 2        litigation, we are in the

 3        litigation.  We are in it from the

 4        start, and we are in it until it's

 5        over.  We do not come and go out

 6        of it, and we put all of our

 7        resources in it.  We did that in

 8        this litigation.  We've done it in

 9        a number of litigations before

10        this.

11             As everybody knows, Mike

12        Papantonio, my partner, has been

13        handling mass tort work,

14        pharmaceutical work, asbestos

15        work, as Perry knows, for many,

16        many years.  He is widely regarded

17        as one of the top trial lawyers,

18        as is my other partner, Fred

19        Levin, who is very accomplished

20        and one of the top trial lawyers

21        in the country.  Our firm has been

22        involved in trying, not just

23        handling, but actually trying

24        numerous complex cases involving a
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1       number of pharmaceuticals, a

2       number of products, a number of

3       environmental cases, including

4       breast implants, asbestos,

5       Rezulin, fen-phen, PPA, Accutane.

6       I mean, a number of cases, just to

7       name some.

8           I think Perry brought up

9       this issue of making sure that

10      Merck knew that we had the

11      resources to go forward in this

12      battle.  I think everybody in this

13      firm brings that to the table.  I

14      think we're in that as well.  I

15      mean, we have the resources, the

16      manpower to put together trial

17      teams and to handle these cases,

18      and that's what we did.  We did

19      that in this case.

20          I think our firm is in a

21      very unique situation in this

22      case.  I think we're in a unique

23      situation because we were involved

24      in a number of different aspects

FAC Resp. Amended Exhibit D -- 954

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1    of the case, and really most of

2    the major aspects of the case,

3    quite frankly.  I think we were

4    involved in just about everything

5    other than the negotiating

6    committee.

7         I want to thank the

8    negotiating committee.  I was not

9    a part of it, but I can tell you

10   I've been involved in very large

11   negotiations and large

12   settlements.  It's an unbelievable

13   amount of work.  A lot of the time

14   is not very glorious work, but it

15   is much appreciated.  I know I

16   appreciate it, and I thank the

17   negotiating committee for all of

18   their work and effort on behalf of

19   our clients.

20        We were involved in the case

21   early.  We had cases I think going

22   back all the way to 2001 or 2002.

23   Our involvement was certainly not

24   anywhere near what was going on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1        with Chris' firm and Andy's and

2        others, but we were involved early

3        on in the litigation.  Our

4        involvement continued all the way

5        up through today and is going to

6        continue until it is completed.

7             I think one of the important

8        things to point out is that we

9        were actually, when we did try the

10       last Vioxx case to jury, we were

11       trying that case evidently,

12       unbeknownst to me, and quite

13       frankly, it made for an

14       interesting call from my client

15       after the announcement, but be

16       that as it may, I think we got the

17       verdict in the Kozic vs. Merck

18       case in Florida in around October

19       of '07, and obviously the

20       settlement was announced in

21       November of '07.

22             I want to talk a little bit

23       about Kozic, because that's not

24       one of those cases that was in one

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          of the consolidations.  It was, as

2          Mark talked about it, a one-off

3          case.  It's a unique case.  I want

4          to spend a few minutes of my

5          allotted time talking about it.

6          We got involved in that case at a

7          time when Perry had one of his

8          defining moment things on his

9          timeline, and that was in '07.

10         That was not a case that we had

11         filed, got remanded and all of

12         that.  It was a case that we got

13         involved with at the request of

14         the local counsel down in Tampa in

15         '07.

16              Anyway, we got involved in

17         this case in 2007 at a time when,

18         quite frankly, there had been some

19         losses, a number of losses.  In

20         fact, we had just got done

21         co-counseling the appellate case

22         in California with Brian Panish,

23         who is a fantastic trial lawyer.

24         I'm going to talk a little bit

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1        about our involvement in appellate

2        a little later.  But it was one of

3        those situations that I had

4        already finished the Irvin II

5        trial with Andy, trying that case

6        with Andy, so, this was after we

7        had a lot of resources invested in

8        this project.

9            When I got the call, I took

10       it to my partners, because we're a

11       law firm, and they have to know

12       that I'm getting ready to spend a

13       lot of money.  I remember there

14       were partners in my firm, quite

15       frankly, who do not do mass tort

16       work who had thought we had gone

17       mad, that Pap and I and Pete had

18       gone mad.  They said, are you

19       nuts, why are you going to invest

20       hundreds of thousands of dollars,

21       all this time, all these

22       resources, in a case, quite

23       frankly, that involved a

24       professional athlete, a retired

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1      professional athlete.  He was

 2      affectionately referred to in the

 3      Tampa paper as the ironman of the

 4      Rowdies, which was a big

 5      professional soccer team in Tampa

 6      for many years.  It was a

 7      short-term usage case, nine weeks,

 8      no prescriptions, samples only.

 9      He worked at the clinic where he

10      got the samples.  He had just

11      finished a soccer game and was

12      walking to his car when he started

13      having the chest pains and got to

14      the hospital.  They put a stent

15      in, and there was very little in

16      terms of followup damage or

17      treatment.  So, I will say it

18      was a -- in fact, one of my

19      partners, Fred Levin, had thought

20      I had lost my mind.  It was an

21      interesting meeting.

22           After all of that and after

23      explaining everything, not only

24      did our firm obviously decide to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          go ahead and try the case, but

2          Fred, in fact, decided to get

3          involved also.  So, from that time

4          forward, Fred really invested an

5          enormous amount of time and energy

6          in working up the case.  And

7          really, for those of you that

8          don't know Fred very well, he's

9          worked seven days a week.  Once he

10         decides he's going to do

11         something, he does it, and he goes

12         all in.  He did that in this case,

13         too.  He spent many, many months

14         reviewing all of the transcripts,

15         depositions, studies, everything.

16         Ultimately we got ready and we

17         tried the case.  We, myself and

18         Pete, other lawyers involved in

19         the case, Fred, went down to

20         Tampa, and we tried the case.

21              It was a unique case in many

22         respects.  It obviously ended up

23         being a defense verdict.  As Ed

24         said, there were a number of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1         reasons for that.  I'm not going

2         to make excuses on the record as

3         to why we lost in that case, but

4         we lost the case.  But it was an

5         extremely well tried case.  I was

6         proud of the way it was tried.

7              One of the things I want to

8         emphasize is that in all of the

9         cases that we were involved in, we

10        did not just rest on material that

11        was previously done or previously

12        reproduced.  We continued to recut

13        depositions, refiled motions,

14        redrafted motions, argued motions,

15        tried to take fresh new looks at

16        everything to try and improve on

17        some terrific work product that we

18        participated in and many other

19        people around this table and

20        others participated in.  We did

21        that in this case, and I think it

22        was a very well tried case.  I

23        think, quite frankly, some of the

24        work product from that case which

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1     ended up in the trial package was

2     very beneficial.  We worked up,

3     and I think we were the first ones

4     to really work up a couple of

5     different experts that would have

6     ended up being used in a number of

7     different trials.

8            So, I think that was a

9     significant case, and I can't

10    imagine that it hurt having a

11    trial team in trial while y'all

12    were trying to put the paper

13    together on the settlement.

14           MR. SEEGER:  No, it helped.

15           MR. RAFFERTY:  The other

16    cases that we were involved in I

17    want to touch just briefly on.

18           Irvin II I had the privilege

19    of trying with Andy Birchfield.

20    Quite frankly, after the Irvin I

21    case, Andy called me and asked if

22    I would try the case with him.  I

23    was happy to.  It was something

24    that I had to talk with my wife

Page 14

 1          about, because my wife was very

 2          far along in the pregnancy of our

 3          first child, which she gave me

 4          permission.  And we got involved

 5          in that case.  And I was proud to

 6          try it with Andy.

 7               And I think one of the

 8          things that I want to point out

 9          about that, too, is that we spent

10          an enormous amount of time once

11          again.  This wasn't just a retrial

12          of Irvin I.  In fact, it was a

13          very different trial for a number

14          of reasons.  I'll let Andy talk

15          about that if he wants to during

16          his presentation.  But quite

17          frankly, we really did.  We really

18          sat down and went through all of

19          the order of proof, came up with

20          what we felt was the best of the

21          witnesses, the best of the

22          depositions, all of that.  We

23          restructured it, got some

24          different experts involved, spent

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        a lot of time reworking the case
2        and ended up trying it in front of
3        Judge Fallon.  Unfortunately, that
4        resulted in a defense verdict, but
5        we got a new trial out of it based
6        on some defense testimony.
7            I'm going to talk about some
8        trials that we were involved with
9        first.  The appellate case, which
10       is the California case, was tried
11       by Brian Panish.  We were
12       co-counsel with Brian in that
13       case.  We were co-counsel with him
14       on all of his cases.  Quite
15       frankly, in the workup of that
16       case, we put on -- we worked it up
17       significantly.  We took the trial
18       testimony of the cardiologist.  We
19       developed the expert.  One of the
20       biggest issues in that case was
21       the prescribing doctor was a real
22       problem, Dr. McAdams.  He was a
23       thought leader for Merck,
24       four-time clinical investigator,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        had been paid in excess of half a

 2        million dollars by Merck and was

 3        really going to hurt us, quite

 4        frankly, in that case.

 5            My partner, Pete Kaufman,

 6        quite frankly, spent an enormous

 7        amount of time, probably weeks

 8        going through documents and

 9        putting together an outline of a

10        cross-examination and deposed him

11        for two days.  Pete deposed him

12        for two days and really set the

13        stage and put together a real good

14        product so that when he was called

15        for trial, Brian was able to,

16        quite frankly, handle that

17        problem.

18            Pete was out there for

19        basically the entire trial in

20        California, away from home.  Brian

21        tried the case.  Brian handled the

22        witnesses on behalf of the

23        appellate in the courtroom.  I

24        don't know, quite frankly, what
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        constitutes second chair or third

2        chair.  I had a lawyer that once

3        told me he third chaired a

4        deposition.  I wasn't quite sure

5        what that entailed.

6               MR. LANIER:  He drove.

7               MR. RAFFERTY:  I don't know

8        what that entails.  I can tell you

9        that Pete Kaufman put an enormous

10       amount of work and time and energy

11       into that appellate case, as did

12       Brian and as did Tom Girardi's

13       office and others.  But certainly

14       I think I want to give some credit

15       to my partner, Pete, who put an

16       enormous amount of time and effort

17       into that case.

18               MR. KAUFMAN:  Because we

19       didn't actually lose that case.

20       We didn't win it either.

21               MR. RAFFERTY:  It is still

22       pending, and we agreed to retry

23       it.

24               We also moved the docket.

FAC Resp. Amended Exhibit D -- 966

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1    In addition to working on these

2    cases and trying these cases, we

3    also worked on and helped out on

4    Humeston I.  I remember getting a

5    call from Chris at one point

6    asking if I would take the trial

7    testimony of Dr. Avorn at the

8    time.  He was not an expert, but

9    he had significant fact testimony.

10   So I dropped what I was doing.  I

11   concentrated on that for a

12   significant period of time.

13        A number of lawyers, Pete

14   included, worked with Jeff Grand

15   and Dave Buchanan, who I can't say

16   enough good things about Jeff

17   Grand or Dave.  In fact, Pete had

18   a great quote at one of the

19   seminars at one time where he

20   said, listen, if Merck knew what

21   they were doing, had any kind of

22   intel, they would have Jeff Grand

23   assassinated.  They would have

24   Jeff Grand killed.  That's true.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          I will say the same should have

2          been said about Pete, quite

3          frankly.  They should waited until

4          they were together having dinner

5          and taken them both out.

6               We were also moving the

7          docket in other ways.  We were

8          also involved in another case in

9          Florida that was set for trial in

10         early 2008, the Record case with

11         the Liddell Wagner firm in south

12         Florida.  That was a case that I

13         believe we already had the

14         punitive damage motion granted in,

15         and the case was set, and I

16         believe we were getting ready for

17         that one in early '08.  We put

18         cases up in New Jersey, worked

19         those cases up when asked, because

20         we had a number of cases filed in

21         New Jersey.  We put those up for

22         trial, worked those up.  So, we

23         were involved in all of those

24         areas, MDL trials, state court

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          trials, Florida, California,

2          working up what we could on New

3          Jersey.

4                We were also involved, I was

5          the co-chair of the discovery

6          committee in the MDL.  For anybody

7          that has ever been involved in the

8          MDL or been the co-chair of the

9          discovery committee in the MDL, it

10         is a position that you want to be

11         careful what you ask for because

12         it is something.  In this case it

13         was something, because we had

14         dozens, literally dozens of

15         lawyers throughout the country

16         that were basically initially,

17         anyway, wanting to participate.

18         We had to set up several

19         subcommittees, and we did have

20         several subcommittees.  But from a

21         management standpoint and from a

22         leadership standpoint, we

23         organized that.  We had regular

24         meetings and calls.  We had the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1    subcommittees set up.  I think

2    some of that, there was a number

3    of good things that came out of

4    all of that, including a lot of

5    the FDA discovery, the privilege

6    log stuff that Russ talked about

7    earlier that he and Anthony Irpino

8    headed up.

9        The other thing was the

10   actual discovery in the MDL,

11   because that was another aspect

12   that we were very actively

13   involved in.  Because a lot of

14   this stuff happens over a number

15   of years, I want to go back a

16   little bit.  When we first kind of

17   started getting going in the

18   discovery, my partner, Mike

19   Papantonio, actually really dove

20   into the case, reviewed the

21   documents, went through and

22   established a number of

23   cross-examination outlines,

24   themes, all of those things, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1      took the depositions and

2      cross-examined a number of the

3      sales and marketing people,

4      including Susan Baumgartner, Marty

5      Carroll, Jo Jerman, James Dunn.  I

6      think he did all of those himself.

7      Quite frankly, we played several

8      of those in our cases.  I know we

9      played Marty Carroll in the Irvin

10     II case.  There was some great

11     material that was generated in

12     those depositions.

13          Pete took Charlotte McKines'

14     deposition that was played in a

15     number of different cases.  James

16     Fries, I took James Fries'

17     deposition.  I was the lead on

18     that deposition for the MDL.  That

19     was played in a number of cases.

20     So, we were actively involved in

21     all of those aspects.

22          We were involved in taking

23     key witness depositions in the

24     MDL.  We were involved in setting

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          up the theme grid in the MDL.  We

2          were involved in putting together

3          the cross-cuts.  We were involved

4          in deposition cuts.  One of the

5          things in the Irvin II trial,

6          quite frankly, I think it was

7          quite helpful and ended up being

8          one of the foundations of the

9          trial package, was the deposition

10         cut notebooks basically that were

11         created and that we ended up

12         creating and kind of started off

13         using in the Irvin II trial, which

14         consisted of having basically

15         witness notebooks with all of the

16         deposition cuts, the previous

17         rulings, if there were any, what

18         the defense arguments were, what

19         our arguments were all laid out in

20         the margin so that Judge Fallon --

21         Judge Fallon, quite frankly, ruled

22         on probably 95 percent of those

23         just using those notebooks and

24         just either granting or overruling

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          the objections.  That is now part

2          of the trial notebook.

3               Pete was co-chair of the

4          trial package committee, worked

5          tirelessly with Jeff Grand, Mike

6          Wenkowitz, Lisa Dagostino, Chris

7          Tisi, a number of people putting

8          together the entire trial package.

9          Leigh O'Dell.  Andy.  And I should

10         say that, too, about Leigh,

11         because I don't want to leave

12         Leigh out because Leigh was

13         fantastic during this entire

14         litigation.  There were a few

15         go-to people, quite frankly, when

16         you needed something, and Leigh

17         O'Dell was certainly one of those

18         people.  She doesn't a lot of

19         times get a lot of the credit, but

20         she certainly deserves it.  She

21         was fantastic.

22               I guess to kind of go back a

23         little bit, from our firm's

24         perspective, we were involved

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          early.  We were involved in a
 2          number of the trials.  If we
 3          weren't trying the cases, quite
 4          frankly, we were at the trials, in
 5          the hotels, in the war rooms,
 6          cutting depositions, arguing depo
 7          cuts, writing motions, doing
 8          whatever, quite frankly, we could.
 9          We were involved in the MDL.  We
10          were involved in the nuts and
11          bolts of the MDL, quite frankly,
12          the discovery, everything else.  I
13          don't think there was ever a time,
14          quite frankly, where there was
15          something going on or somebody
16          asked for something to be done and
17          our firm wasn't there.  Quite
18          frankly, that's the way we've
19          always done it, that's the way
20          we've practiced law, and that's
21          the way we will continue to do it.
22              I guess just to sum up, I
23          think we devoted our firm to this
24          litigation for a number of years.
```

FAC Resp. Amended Exhibit D -- 974

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1      We devoted an enormous amount of

 2      time and an enormous amount of

 3      resources.  We started off at the

 4      beginning, and we never waivered,

 5      right up to trying the last jury

 6      trial of this litigation and being

 7      ready to try another one and

 8      another one and another one.  I

 9      think, looking back on it, if

10      everybody in the room brings

11      something unique to the table,

12      which everybody does, I think ours

13      is that we were there in almost

14      every aspect other than the

15      negotiating committee throughout

16      the entire litigation.  And I

17      think that's where we were.

18          MR. SEEGER:  I would agree.

19      Your fingerprints are on

20      everything.

21          MR. HERMAN:  I have two

22      things that I want to add.  It was

23      in recognition of the work that

24      Troy and Pete did.  After all,

FAC Resp. Amended Exhibit D -- 975

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1        they litigated in California,

 2        Atlantic City, New Orleans and

 3        Florida.  I think they are the

 4        only people that did that in four

 5        different forums and actually

 6        litigated, and that Pete was named

 7        as co-chair of the trial package

 8        committee, first of all, in

 9        recognition of what they did, but

10        also based upon, we knew that they

11        would get it done as a theme from

12        the book and the movie The Fixer,

13        that the more a man runs and

14        hides, the more he has to run and

15        hide.  Unfortunately, we had

16        people drop out of this litigation

17        that are now claiming common

18        benefit.  We had people that

19        stayed the course.  Certainly Troy

20        and Pete stayed the course without

21        reservation.

22            The last thing I want to say

23        is, I've had a lot of experience

24        with Levin Papantonio through the
```

FAC Resp. Amended Exhibit D -- 976

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1      years, and they have a great deal

2      of integrity in the sense that

3      they never claim other people's

4      work as their own.  And to

5      highlight that, in Propulsid, Mike

6      Papantonio was originally on the

7      PSC and had other commitments.

8      When it came time for fee

9      allocation, he said to me very

10     directly, our firm did not warrant

11     a fee, a common benefit fee, in

12     Propulsid.  Just pay our expenses.

13     So that when Troy and Pete appear

14     for their firm claiming common

15     benefit, you can be sure that it's

16     done with a great deal of

17     integrity, and the fact that they

18     have a reputation not only for

19     excellence, but they never claimed

20     something they are not entitled

21     to.

22          MR. SEEGER:  It is rare in

23     our business to have guys as

24     talented as these two guys and as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          modest as they are at the same

2          time.  I mean, they are real team

3          players.  I don't even want to be

4          in the litigation unless they are

5          in it.  So, I personally thank you

6          for everything you have done for

7          us and the litigation.

8               MR. RAFFERTY:  Thank you,

9          Chris.

10                    -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1                    C E R T I F I C A T E.

2

3                    I, LINDA L. GOLKOW, a Notary
    Public and Certified Court Reporter of
4    the State of New Jersey, Registered
    Diplomate Reporter, Federally-Approved by
5    the United States District Court of
    Pennsylvania, do hereby certify that the
6    foregoing is a correct transcript of the
    testimony as taken stenographically by
7    and before me at the time, place and on
    the date hereinbefore set forth.

8

9

                     I DO FURTHER CERTIFY that I
10    am neither a relative nor employee nor
    attorney nor counsel of any of the
11    parties to this action, and that I am
    neither a relative nor employee of such
12    attorney or counsel, and that I am not
    financially interested in the action.

13

14

15

16

17

18

19

20    _____
            Linda L. Golkow, RDR, CRR, CCR
21          Notary Number:  1060147
            Notary Expiration:  1.2.10
22          CCR Number:  30X100176200

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -


FIRM:        LEWIS & ROBERTS
             Kimberly R. Wilson, Esquire
FIRM:        MARTIN & JONES
             H. Forest Horne, Jr., Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. SEEGER:  We're most of

 3         the fee committee.  We're making a

 4         record because Judge Fallon would

 5         like to have a record of things

 6         that are discussed here, but the

 7         floor is yours, and you can

 8         present and say whatever you want

 9         in the time you have.

10              MS. WILSON:  Okay.  Some of

11         you know me, some of you don't.

12         Chris and I go way back.  I got

13         involved in Vioxx literally the

14         day it was withdrawn from the

15         market.  Between 1500 and 2200

16         cases came across my desk.  The

17         way I did it was, I educated

18         myself very, very early.

19         Fortunately, I come from a family

20         of physicians and just decided

21         from the get-go, I was only going

22         to take, my firm, Lewis & Roberts,

23         we were only going to take cases

24         that we felt could go to trial.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        We ended up taking a very small

2        select group of cases, I think it

3        was around 50.

4             We filed all of our cases.

5        We filed in New Jersey state court

6        with the exception of one case

7        that I filed in the MDL.  We just

8        made a huge commitment from the

9        get-go, as did my partners, a

10       small firm, a firm of 20

11       attorneys, 11 partners, to make a

12       financial commitment and work

13       these cases up.  I got in early

14       and filed early and made it very

15       clear from the outset that I

16       wanted to push my cases because I

17       felt like in a case like this

18       where there was not a signature

19       injury and causation was

20       particularly tough, and Chris and

21       Mark did a great job with their

22       trials in getting over those

23       hurdles, the only way to really

24       resolve this particular mass tort

Page 4

```
 1        in a favorable way for the

 2        plaintiffs was to have high

 3        quality cases that got worked up.

 4        Unfortunately, causation was so

 5        hard, I think there's only a small

 6        number of law firms that made that

 7        financial commitment and also put

 8        forth the labor to do so.  My firm

 9        clearly did that.

10             We did it without being

11        asked to do that and then, of

12        course, when Chris and Dave and

13        Mark asked me to do more, I

14        certainly did more.  My firm alone

15        from North Carolina trucked 28

16        folks up to New Jersey and/or

17        Philadelphia for depositions.  I

18        did, I don't know, I think my

19        affidavit says four sales reps,

20        but it was actually eight sales

21        reps.  I did the depositions of 18

22        physicians and miscellaneous other

23        people along the way.  So, I was

24        actively involved.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1              MR. WEITZ:  Was that for

 2         your individual cases where you

 3         did the four sales reps?

 4              MS. WILSON:  Yes.

 5              MR. WEITZ:  Judge Higbee had

 6         four different waves of cases.

 7         Could you tell us which of your 49

 8         cases were in which waves and if

 9         any of them were assigned a trial

10         date?

11              MS. WILSON:  The first wave,

12         Black and Smith got chosen, and it

13         went up to the very wire, got

14         worked up for trial, and then I

15         think the way -- and Chris can

16         correct me if I might be mistaken,

17         but there were 39 initially in

18         that first wave that got worked

19         up.  Black and Smith got chosen

20         for trial, and then for some

21         reason, collectively a small group

22         of us, probably me, Chris, Mark

23         Lanier, Dave Buchanan was in on

24         it, there was some reason those

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          two got bumped, and I think the

2          only reason was we ended up, that

3          first group, not trying as many as

4          what we thought.

5                MR. SEEGER:  I think we had

6          a striking procedure with them.

7          We selected, they selected, they

8          got strikes, we got strikes.  They

9          might have struck your two because

10         they were good cases.

11               MS. WILSON:  It went to the

12         bitter end.  We were working those

13         up and thinking those cases were

14         going to go to trial in January.

15         So, that was Black and Smith.

16         Then I kept putting cases up in

17         those trial waves.  And I think in

18         every wave, there was always a

19         chance my cases were going to go

20         to trial throughout the process.

21               MR. SEEGER:  Kim was always

22         one of those people that when we

23         would call for cases, she would

24         put cases in.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1              MS. WILSON:  And actively
2         engaged in discovery in all of
3         them.  I mean, every single case
4         that ended up -- there were a
5         couple of cases that I filed that
6         I ended up dismissing because I
7         felt there were huge causation
8         issues.  So, I got rid, along the
9         way, of any case that I felt was
10        more of a threat than an advantage
11        to us as a group.
12              MR. LEVIN:  You have about
13        $159,000 in costs that has been
14        approved by the accountant.  You
15        are ahead of a lot of people that
16        have not had them approved.  What
17        was the bulk of those costs, the
18        transportation, the lodging and
19        everything of your clients?
20              MS. WILSON:  Yes.  The other
21        thing I did was, with all of my
22        depositions, I had everything
23        videotaped.  And as soon as I got
24        those DVDs back, I disseminated

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        them throughout the country to
 2        everyone.  So, I did a lot of
 3        digital stuff with my discovery
 4        just to help educate other
 5        attorneys, especially in regards
 6        to the sales reps, because early
 7        on, there was a group of us, and
 8        Forest was part of it, we had some
 9        excellent sales rep depos, I mean,
10        with incredible admissions.
11              MR. SEEGER:  Who from your
12        group was taking those for the
13        most part?
14              MS. WILSON:  Me.
15              MR. HORNE:  And I was.
16              MS. WILSON:  And Forest.  I
17        mean, I don't know any other
18        lawyers in North Carolina --
19              MR. HORNE:  That took any
20        sales reps.
21              MS. WILSON:  I don't think
22        so.
23              MR. WEITZ:  Did you
24        coordinate any of that with Jerry
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1          Kristal with Weitz & Luxenberg?
 2               MR. HORNE:  I did, and I
 3          borrowed heavily from the fine
 4          depositions that Jerry took, and
 5          Dave also gave us some deposition
 6          transcripts of sales reps.  So, I
 7          borrowed heavily from those, but
 8          we took -- I think Kim and I, I
 9          think there was a different line
10          of thought on the sales reps.  All
11          the sales rep depositions that I
12          took were at least eight hours
13          long.  I mean, it was an all day
14          affair.
15               MR. LEVIN:  Forest, were you
16          assisting her in processing her
17          cases or just your own?
18               MR. HORNE:  Just my own.
19               MR. LEVIN:  Your firm's?
20               MR. HORNE:  Just my firm's.
21               MR. LEVIN:  How many cases
22          did your firm have?
23               MR. HORNE:  We filed 48
24          cases all in New Jersey.  We
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1       screened probably -- I'm with a

2       15-lawyer plaintiffs firm with our

3       primary office in Raleigh, and so

4       we get a lot of calls when there

5       are these kind of drug cases.  We

6       screened probably 2000 cases and

7       narrowed that down to 48.  We only

8       filed and put up for expedited

9       discovery the ones where the Vioxx

10      usage was clear and where we

11      thought the causation was

12      relatively clear, at least early

13      on it seemed like it was clear.

14      It got hazier as you went along,

15      but we had 48 cases.  Every one of

16      them was filed in New Jersey.  We

17      filed the first case in January of

18      2005.  I think at the time there

19      were only about 300 filed in New

20      Jersey at that time, and then

21      within six months, we actually

22      screened -- we had an expert in

23      cardiology review every case that

24      we accepted before we filed it.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        So, we had that.  Ira Gelb and

2        Steve Rich were the two physicians

3        that we had review all of our

4        cases.

5            Myself and my partner, Greg

6        Martin, who was heavily involved

7        in the fen-phen litigation -- I

8        headed up the project for our firm

9        and did most of the work, but my

10       partner, Greg Martin, worked on

11       the case.  And then we hired two

12       experienced associate lawyers to

13       come in to work on the cases.  We

14       devoted two paralegals exclusively

15       to Vioxx, and then we hired two

16       summer law clerks to come in and

17       go through the FACTS database.

18       That's all they did eight hours a

19       day for three months.

20           MR. LEVIN:  For your

21       individual cases?

22           MR. HORNE:  Kim and I, our

23       collaboration, a lot was on the

24       sales reps because we had mutual

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1          sales reps, we had mutual

 2          physicians and --

 3               MR. LEVIN:  Same

 4          jurisdiction.

 5               MR. HORNE:  -- going through

 6          those FACTS documents was

 7          maddening.  Kim would call me

 8          occasionally and say, did you see

 9          this document on Dr. X, and then I

10          would find a document on Dr. Y.

11          We collaborated there, and we

12          collaborated on the sales rep

13          depositions, and I shared a lot

14          of -- Chris, I dealt with Dave and

15          Jeff Grand more than you.  Jerry

16          and I worked together a lot, but

17          we found a number of -- we had one

18          orthopedic physician, I didn't

19          write down his name, but he was an

20          orthopedic physician in

21          Fayetteville, North Carolina who

22          we found in the FACTS database had

23          been paid over $100,000 by Merck.

24          And in collaborating with Robb
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          Dassow and Dave, I think that's

2          kind of what led to, along with

3          some other folks, I'm sure, the

4          order by Judge Higbee to require

5          Merck to report the income that

6          Merck had paid all these

7          physicians.  And the one

8          physician, the orthopedic

9          physician that we found in

10         Fayetteville had been paid over

11         $100,000.  We found all of these

12         e-mails, including a PowerPoint

13         presentation where the Merck rep

14         had told the physician to take out

15         a slide that talked about an

16         increase in blood pressure, move

17         it to the end, and don't spend

18         much time on it.  We circulated

19         that with a number of folks in the

20         litigation.

21              MR. LEVIN:  How is

22         Fayetteville these days?

23              MR. SEEGER:  Still there.

24              MR. HORNE:  It is not very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1    friendly.

2            MR. LEVIN:  I used to be a

3    policeman in Fayetteville.

4            MR. HORNE:  Is that right?

5            MR. LEVIN:  Military

6    policeman.

7            MR. HORNE:  The doctor, his

8    name is Brad Broussard -- these

9    Fayetteville physicians are very

10   conservative, but this is a short

11   story.

12            I had a 48-year-old client

13   who suffered a heart attack and

14   ended up having a

15   defibrillator/pacemaker installed.

16   He was in perfect health otherwise

17   and was on the heart transplant

18   list, and this physician that had

19   been paid over $100,000 by Merck

20   and was on the speakers bureau,

21   this was the very first case I

22   filed in New Jersey.  I

23   arranged -- one of the things that

24   I tried to do with all my clients

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1          is arrange meetings with the

 2          prescribing physicians.  I went

 3          down and met with him, not knowing

 4          that he had been paid $100,000,

 5          and went into a conference -- paid

 6          him $1,000 to meet with him for an

 7          hour and went into a conference.

 8          He just waylaid me.  He said, no,

 9          I'm not going to say that I

10          wouldn't have prescribed it had I

11          known.  Little did I know that he

12          did know, and I found that out

13          later.  His deposition --

14               MR. GIRARDI:  Speaks for

15          it --

16               MR. HORNE:  He just clipped

17          me for $1000 and then was a jerk.

18          The only thing that saved the

19          meeting, the guy said if he was

20          deposed, and this case wasn't on

21          for trial, but he said if he was

22          deposed -- he finally came around,

23          I brought my client with me who

24          pleaded with the doctor, and he
```

FAC Resp. Amended Exhibit D -- 994

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          finally gave in.

2               MR. SEEGER:  Did you guys

3          work closely with Robb Dassow and

4          Sue Scovern on these sales rep

5          things?

6               MS. WILSON:  Forest did.

7               MR. HORNE:  I worked with

8          Robb on that, and I also worked

9          with Robb on the Medco because we

10         had two cases where we sued Medco

11         because they were 50 milligram

12         cases where they had prescribed

13         for over 18 months of 50

14         milligrams.  So, we sued Merck-

15         Medco.  That was either two or

16         three cases.  I engaged in

17         discovery with Medco's lawyers on

18         those issues, trying to find a

19         connection between Medco and

20         Merck, and I worked closely with

21         Robb on that, and we shared a lot

22         of documents in that regard.

23               Kim put up, I don't know,

24         what was your percentage of cases?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          I mean, you put up close to 50% of

2          your cases.

3               MS. WILSON:  It was over

4          50%.

5               MR. HORNE:  We filed 48

6          cases, and we had 12 in for the

7          expedited discovery.  And then

8          along with Steve Kherkher at

9          Williams Kherkher, I had two cases

10         from North Carolina in the four

11         trial groupings that were set for

12         trial originally in October, and

13         then were moved to January.  I

14         worked closely with Jerry on those

15         and attended all the meetings, and

16         also Dave and Jeff Grand were very

17         helpful.  Frankly, I knew the

18         settlement discussions were going

19         on, but I had no idea that y'all

20         had moved it along as far as it

21         was.  So, we were heavily

22         preparing for trial along with

23         Steve Kherkher.

24               Steve's firm had two North

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1          Carolina cases, and my firm had
 2          two North Carolina cases that I
 3          put up.  So, we were collaborating
 4          together.  And then Judge Higbee
 5          changed her mind early on and said
 6          I only want prelabel change cases
 7          in the mix.  So, one of my cases
 8          dropped out because it was post
 9          label change.  And then in
10          discovery, the two cases that
11          Steve had developed usage
12          problems, so both of his cases
13          dropped out.  So, we were down to
14          one case in North Carolina, and I
15          communicated with Dave, and we had
16          a hearing with Judge Higbee,
17          fought Hope Freiwald tooth and
18          nail, and added another case that
19          was not on the expedited list for
20          trial.
21               So, I brought another case
22          in for the January '08 trial mix
23          and got that case -- even though
24          it wasn't in my expedited group, I
```

FAC Resp. Amended Exhibit D -- 997

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        got the client and his wife up to

2        Philadelphia, went to Dechert,

3        dealt with Hope on all of those

4        depositions, got that done, got

5        the physicians deposed.  So, we

6        had those two cases set for trial.

7            I worked closely with Sol

8        Weiss on developing Steve Rich.  I

9        had been using Steve from early

10       '05 on specific causation, and

11       then Sol had worked with him on

12       general causation.  And Steve was

13       going to be our general causation

14       expert for the January '08 trial

15       set cases along with Sol.  I went

16       up to Philadelphia to defend

17       Steve's general causation

18       deposition, coordinated our

19       cardiologists, who saw all the

20       clients whose cases were trial set

21       on specific causation.

22            The Williams Kherkher firm

23       developed Dr. Goldberg for the

24       marketing case.  I wasn't involved

FAC Resp. Amended Exhibit D -- 998

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          in that, they were.

2                But we, like Kim, our firm

3          responded every time there was a

4          call to put more cases in the mix,

5          and I was pretty vocal about that

6          on the list serve, saying, guys,

7          we are all in this together.  So,

8          we volunteered over 25 percent of

9          our firm's caseload, and we worked

10         them up, and we brought quality

11         cases to the mix.

12               MR. GIRARDI:  Was it the

13         same 50 cases?

14               MR. HORNE:  No.

15               MS. WILSON:  No.

16               MR. GIRARDI:  How many cases

17         did you have?

18               MR. HORNE:  We filed 48.  We

19         screened 2000 to get 48, and we

20         only filed cases where -- we knew

21         from the fen-phen days that

22         causation was going to be an

23         issue, so we felt comfortable that

24         we either had affidavits from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          doctors where there were sample

2          cases, and then otherwise we had

3          rock solid usage on our

4          prescriptions.

5               MR. LEVIN:  How many of your

6          cases did you put in the same

7          position that Kim's were where you

8          worked them up to trial?

9               MR. HORNE:  We had 11 cases

10         in the mix, but then we added the

11         additional ones, so, there were

12         12.  And we had a hearing with

13         Hope, and Dave was instrumental in

14         getting this other case added at

15         the last minute.  Otherwise, we

16         would have only had one case for

17         the North Carolina trial setting,

18         and we were able to get one of our

19         other cases in, so we had two.  I

20         attended all the meetings with

21         Jerry on that, we collaborated

22         closely on all of the preparations

23         for trial.

24               MR. BLIZZARD:  Forest, help

FAC Resp. Amended Exhibit D -- 1000

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        me understand the timing of this

2        because I think we heard some of

3        this the other day from Steve

4        Kherkher.

5              When were those four cases,

6        two of yours and two of Williams

7        Kherkher, scheduled to go to trial

8        originally?

9              MR. HORNE:  October of '07.

10             MR. BLIZZARD:  Then as I

11       understood, three of them dropped

12       out because of various reasons,

13       including two of them because they

14       didn't have proof of use.

15             MR. HORNE:  Right.

16             MR. BLIZZARD:  So, there was

17       one left, and then you added one?

18             MR. HORNE:  Right.

19             MR. BLIZZARD:  That case was

20       then put off until February of

21       2008?

22             MR. HORNE:  No.  We got that

23       case -- I was in Salt Lake City in

24       depositions in another case and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

 1          had a conference call with Dave

 2          Buchanan, Hope Freiwald and Judge

 3          Higbee, and Hope was screaming

 4          about adding one of our cases

 5          late.  It had been filed and had

 6          been there.

 7               MR. BLIZZARD:  I'm trying to

 8          find out, when were those two

 9          then, the one you added and the

10          one that still was there, when

11          were they set for trial?

12               MR. HORNE:  With the trial

13          grouping of four cases, and I

14          think the Weitz Luxenberg setting

15          had a problem with that expert,

16          and I think there was some talk at

17          the time of settlement of moving

18          it back, so there would only be

19          three cases.

20               MR. SEEGER:  Well, there was

21          actually, and then something

22          happened to that setting.  They

23          got moved to like September or

24          October.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1            MR. HORNE:  It was October.

 2            MR. SEEGER:  Then they got

 3       bounced to January and then we

 4       settled.

 5            MR. BLIZZARD:  I'm confused,

 6       because I thought I heard

 7       yesterday Kherkher say the cases

 8       were set in March of 2008, that

 9       those were actually Martin & Jones

10       cases, but that they were working

11       on them.

12            MR. SEEGER:  They might have

13       been originally set for

14       March/April of '07, because that

15       was an original target date.  I

16       don't remember why we lost the

17       setting, there were so many facts.

18       Dave definitely will, because he

19       remembers everything.  But that

20       somehow wound up after the summer,

21       which was September/October, and

22       basically the settlement came

23       before you guys could try the

24       case.  But the cases were in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

 1          queue, and they were going to go

 2          at that point.

 3               MR. HORNE:  Right.

 4               MS. WILSON:  Black.  I

 5          remember why we took Black off.

 6          Black ended up, he was an MI and a

 7          stroke, and Judge Higbee didn't

 8          want to do that.

 9               MR. SEEGER:  That's right.

10               MS. WILSON:  That's why

11          Black didn't go.

12               MR. SEEGER:  She tried to

13          keep the issues as close as she

14          could for trial groupings because

15          she was doing more than one case

16          at that point.

17               MS. WILSON:  Just my

18          affidavit --

19               MR. SEEGER:  Just so I'm

20          clear.  I'm sorry, Kim.  So

21          Kherkher was going to help you

22          guys try the case?

23               MR. HORNE:  No.

24               MR. SEEGER:  I'm not clear

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1        on that.

2              MR. HORNE:  What happened

3        was, Steve had two North Carolina

4        cases, and I had two North

5        Carolina cases.  We were at the

6        hearing when the judge was asking

7        for trial cases.  So, I offered

8        both of mine up, and Steve offered

9        both of his up.  We agreed to work

10       together, and I would work my

11       cases up, he would work his cases

12       up, and we would share the general

13       and specific causation experts for

14       trial.  At the beginning of that,

15       Judge Higbee at the last minute

16       changed her mind and said, I only

17       want three prelabel cases.  So,

18       one of mine dropped out, and it

19       was two of Steve's and one of

20       mine.  And then both of Steve's

21       dropped out, because in the

22       depositions they did, the

23       prescription usage and samples was

24       terrible, so, they voluntarily

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          dropped those.  That's when I

2          added another one of my cases.

3               MR. SEEGER:  You had two

4          cases?

5               MR. HORNE:  I had two cases.

6               MR. SEEGER:  At that point,

7          they didn't have a case in.

8               MR. HORNE:  They didn't have

9          a case in, but they had already

10         gone a long way down the road of

11         developing the experts.

12              MR. SEEGER:  Yes.  No

13         question.

14              MR. HORNE:  They continued

15         with that.  As far as my two

16         cases, I handled all the

17         depositions for my clients and

18         their spouses and the physicians

19         and the sales reps.  I did all of

20         that.

21              MR. SEEGER:  Okay.

22              MR. BLIZZARD:  Was there any

23         agreement that they would try your

24         two cases that remained?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1              MR. HORNE:  We were going to

 2         try it together.  And I told Steve

 3         this, and we had early on -- we've

 4         got an office in Atlanta as well.

 5         So, we had some Georgia cases, and

 6         we had some -- a couple of good

 7         Georgia cases that we were going

 8         to put up.  Someone else had some

 9         Georgia cases, and we couldn't

10         come to an accommodation, because

11         I told Steve, I'm going to be

12         involved in my cases.  I'm not

13         going to delegate it to you and

14         you do everything, because that's

15         just not the way I work or my firm

16         works.  So, I worked up my cases,

17         Steve worked up his cases.  We

18         were sharing the general and

19         specific causation witnesses for

20         trial.  And then we were going to

21         divide up opening, closing, cross

22         examinations, witness examinations

23         and that sort of thing.

24              MR. SEEGER:  Once their
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1        cases were out, how would the

 2        trial have gone?  Would you have

 3        taken the lead, would they have

 4        worked with you on the trial

 5        still?

 6             MR. HORNE:  Yes.  And when

 7        that happened, because --

 8             MR. SEEGER:  You were still

 9        dividing up.

10             MR. HORNE:  What happened

11        when Steve's cases dropped out, we

12        were down to one case.  They

13        didn't have any other North

14        Carolina cases.  And that's when

15        we had to get Dave involved.  And

16        I told Hope, look, I've got a case

17        that's been filed, fact sheets in,

18        you've got all the medical

19        records, basically everything is

20        there.  I'll get the client up to

21        Philadelphia next week with his

22        wife.  We'll make every

23        accommodation.  And I think the

24        one thing Judge Higbee did was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          gave 30 extra days to designate

2          the experts.  But I got that case

3          in with Dave's help.  But Steve

4          was so far down the road with the

5          marketing expert and a fine

6          cardiologist out of San Francisco

7          that came back to North Carolina

8          and saw both of these clients.  He

9          was so far down the road with

10         that, I said let's --

11              MR. SEEGER:  Keep it

12         together.

13              MR. HORNE:  -- keep it

14         together, and that's what we did.

15              MR. WEITZ:  Forest, clarify

16         some times with me and cases.

17         Because in January of '07, you had

18         Hermans and Humeston, and then you

19         had Keeley and Rossi, which

20         Humeston was Chris's case, Hermans

21         was Lanier's, and Keeley and Rossi

22         were Weitz & Luxenberg cases.  She

23         set those cases down for trial in

24         January '07, and then Hermans and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1          Humeston were tried in February

 2          '07.  Keeley and Rossi were then

 3          postponed to be tried in September

 4          of '07, and then the judge just

 5          put it on hold because there were

 6          negotiations going on.  Where were

 7          your cases with respect to that?

 8          Did you have an actual firm trial

 9          date?

10               MR. HORNE:  Yes.

11               MR. WEITZ:  From when?

12          Because Keeley and Rossi were the

13          next ones she was trying.  I'm

14          trying to figure out when you and

15          Kherkher had trial dates.  Was it

16          after those two cases?

17               MR. HORNE:  Originally there

18          were four states set forth for

19          trial.  It was North Carolina,

20          Pennsylvania, New Jersey and New

21          York.  Jerry was heading up the

22          New York, and Sol had both New

23          Jersey and Pennsylvania, and I had

24          North Carolina.  Those four cases
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1            were all set on the same track.
 2            Then Jerry and I talked about the
 3            fact that his -- the general
 4            causation witness out of Canada
 5            called Jerry the night before his
 6            deposition and said, oops --
 7                 MR. WEITZ:  He had an
 8            article --
 9                 MR. HORNE:  -- he signed an
10            affidavit I think.  He said, I
11            think I signed an affidavit.  But
12            North Carolina was in that
13            setting.  We were in that setting.
14            And then because of that snafu
15            with Jerry's expert, I think Judge
16            Higbee -- and this was all about
17            the time the settlement came down
18            -- was going to move the New York
19            setting out to February because we
20            were down the road as far as when
21            the jury was going to come in, and
22            we were talking about renting out
23            the convention center at the hotel
24            and having the voir dire there.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1              MR. WEITZ:  So, you were
 2         part of the final stage in those
 3         two cases?
 4              MR. SEEGER:  Yes.
 5              MR. HORNE:  Yes.  Jeff Grand
 6         and Dave Buchanan and I worked --
 7         Dave was very gracious --
 8              MR. SEEGER:  By the way,
 9         Jeff Grand just had a baby.  For
10         the record, let the record reflect
11         we're looking at Jeff's new baby.
12              MR. HORNE: My two cases were
13         Romans, Billy Ray Romans and Andy
14         Ray Sanderson.
15              MR. WEITZ:  The cases Forest
16         had ready for trial were Romans
17         and Sanderson.
18              MR. HORNE:  Yes.  Romans was
19         a prelabel change that was in the
20         mix originally.  Sanderson was the
21         case that was added after a motion
22         hearing with Dave and Judge Higbee
23         and Hope and myself, and Judge
24         Higbee agreed to add Sanderson.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1       So, Sanderson and Romans were the

2       two North Carolina cases that were

3       set to go to trial originally in

4       that October setting with the New

5       Jersey, Pennsylvania and New York

6       cases that Judge Higbee then moved

7       into January.

8            I went to the status

9       conference in November and left

10      there, flew back to Raleigh, North

11      Carolina, jumped in my car and

12      drove four hours to Asheville and

13      got to the hotel at 4:00 a.m. and

14      deposed a Merck rep on a Friday

15      from 9:00 in the morning until

16      6:00 at night, and then the next

17      week is when the settlement

18      happened.

19           And I didn't -- and Steve, I

20      don't know what Steve knew.  He

21      may have known more than he told

22      me, but after the fact -- I mean,

23      I knew the negotiations were

24      going, and I think that's -- even

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1        Judge Higbee said in a conference

2        that that's one of the

3        considerations for moving the

4        setting from October of '07 to

5        January '08.  But I had no idea

6        that y'all were that close, and

7        obviously a great result.

8              MR. LEVIN:  Neither did we.

9              MS. WILSON:  My cases are

10       real simple.  I did not work with

11       Kherkher at all.  I worked with

12       two people.  That was Chris Seeger

13       and Mark Lanier.  So, mine is real

14       clear-cut.  That was kind of the

15       get go.  Forest and I collaborated

16       a lot.

17             Something I would like to

18       add is, after the settlement was

19       announced, it was either Chris or

20       Mark, one, who got interviewed by

21       the Wall Street Journal reporter.

22       I think it was you who told that

23       person to call me.  They asked me

24       to describe my role in Vioxx in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

```
 1          this litigation.
 2               MR. SEEGER:  Must have been
 3          me.  Lanier would have never sent
 4          a reporter to someone else.
 5               MS. WILSON:  I think we had
 6          some five star generals, and I was
 7          a front line soldier really every
 8          step of the way, and there weren't
 9          a lot of us out there.
10               MR. SEEGER:  You also had a
11          case in Federal Court that you
12          were trying to get remanded to the
13          transfer court in North Carolina
14          that you wanted us to try
15          together.
16               MS. WILSON:  That's right.
17          That's the Howard case, and I
18          think it is still probably right
19          now one of the best cases out
20          there.  I have no doubt it has
21          already been approved actually.
22          I'm just waiting on our points, I
23          guess I should say.  Great case,
24          and that was the plan.  We were
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1        going to tee that up.  So, I did

 2        have one in the MDL.

 3             It was a tough litigation,

 4        as you guys know.  I thought it

 5        was far harder than Baycol,

 6        fen-phen, Rezulin.  I don't think

 7        anything compares to Vioxx.  I

 8        really don't.  It was very tough.

 9             Anyway, after the settlement

10        was announced, I certainly did my

11        part to help bring everyone

12        together in newspapers, on TV,

13        talked about what a tremendous job

14        everyone did, how tough this

15        litigation was.  Hard, hard cases,

16        difficult causation, and I was a

17        big supporter of this resolution.

18             MR. HORNE:  One thing I

19        would like to say about the

20        submission.  I sent every member

21        of the committee a copy of our

22        submission with detailed expenses

23        and time sheets.  I will say we

24        had about 1000 attorney hours that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          we submitted for the committee's

2          consideration, and that is an

3          extremely conservative amount

4          because we don't keep hourly

5          bills.  I think Kim's firm, they

6          do keep track of their time.  We

7          don't.  I went back through, and

8          the only thing that I submitted

9          for this committee's consideration

10         are matters that were related to

11         the 12 cases and the trial and

12         those expenses.  There's nothing

13         in here for stuff that I didn't

14         truly think was for the common

15         benefit.

16              Going into this, Kim's firm

17         and my firm, we were really kind

18         of the only two firms in the

19         state.  So, in a way, we were

20         certainly competitors, but we also

21         collaborated from the very

22         beginning, and it was both of our

23         intentions to try these cases.  I

24         went to the first trial in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          Brazoria.  I went for the full

2          week, that first week there.  I

3          saw Mark Robinson was there and

4          had dinner.

5               MR. LEVIN:  With Mark?

6               MR. HORNE:  With Ben Morelli

7          and some other folks during that

8          trial.  I stayed there for the

9          whole week and saw the openings.

10         Chris, I watched you on Court TV.

11         I spent about a week watching

12         that.  I came back for the

13         Hermans/Humeston openings.

14              MR. SEEGER:  I remember

15         that.

16              MR. HORNE:  Because Hope

17         came over to ask you to get Kim

18         and me --

19              MR. SEEGER:  They were

20         sitting on the defense side, and

21         Hope said, these guys are

22         plaintiffs lawyers, would you tell

23         them to go on to the other side.

24         There's no line in the middle.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1          They can sit wherever they want.

2              MR. WEITZ:  Judge Fallon's

3          PTO Order 6, he laid out

4          guidelines.  You are worried about

5          the hours.  The hours are a factor

6          to consider, but the judge laid

7          out in his Murphy Oil decision

8          that there are a lot of other

9          factors, people that were actually

10         litigating the cases and moving

11         the dockets in jurisdictions and

12         were preparing to try the cases.

13         Those are factors.

14             MR. SEEGER:  This is helpful

15         to us.

16             MR. HORNE:  Kim and I, we

17         traveled to New Jersey for like

18         two of the trials, I believe.  But

19         I saw openings or closings in -- I

20         was there for Jim Pettit's

21         closing, I was there for your

22         opening in Hermans/Humeston.  I

23         was there for Mark's opening in

24         the first case in Texas.  I was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          there for one of the other ones.
2          And so it was --
3              MR. SEEGER:  I didn't get a
4          chance to talk to you much.  I
5          know that you worked a lot with
6          Dave and Jeff.
7              I spoke to you all the time.
8          Kim was always looking to get
9          something set for trial.  That's
10         the fairest way to reflect it.
11         How many times did we talk to each
12         other on the phone?  I've got this
13         case, this is a great case for
14         trial, I've got two cases coming
15         to New Jersey.  You are our kind
16         of people.  That's the way to move
17         a case.
18             MR. LEVIN:  Pleasure to have
19         met.  Up until now, I only knew
20         your hours.
21             MR. SEEGER:  Do you have the
22         hours?
23             MR. LEVIN:  He sent them to
24         everybody.  All of a sudden I got

FAC Resp. Amended Exhibit D -- 1020

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          binders.  Now I know.

2                  MS. WILSON:  I did the same

3          thing.

4                  MR. SEEGER:  Have they been

5          reviewed?

6                  MR. LEVIN:  Yes.  Your hours

7          have been reviewed.  They have

8          been approved.

9                  MR. SEEGER:  Which means you

10          have met all the guidelines.

11                  MR. LEVIN:  In fact, your

12          costs to the seven cents were

13          approved.

14                  MR. SEEGER:  What are they?

15                  MR. LEVIN:  159,045.07.

16                  MR. SEEGER:  Both firms?

17                  MR. LEVIN:  No.

18                  MR. WEITZ:  No.  Forest is

19          131 and change.

20                  MR. SEEGER:  That was a very

21          helpful presentation.  Thank you.

22                  MR. LEVIN:  It is a pleasure

23          to see professionals that are

24          truly professionals.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1           MR. HORNE:  I want to thank

2      y'all for the work that went on

3      behind the scenes that we never

4      knew about.

5           MR. SEEGER:  Thank you.

6           MR. GIRARDI:  Thank you.

7           MR. BLIZZARD:  Thank you.

8                -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13           I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 5, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

BEVERLY HILLS, CALIFORNIA

- - -

FIRM:         LEWIS & ROBERTS
              Kimberly R. Wilson, Esquire
FIRM:         MARTIN & JONES
              H. Forest Horne, Jr., Esquire


BEFORE COMMITTEE MEMBERS:
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. SEEGER:  We're most of
 3         the fee committee.  We're making a
 4         record because Judge Fallon would
 5         like to have a record of things
 6         that are discussed here, but the
 7         floor is yours, and you can
 8         present and say whatever you want
 9         in the time you have.
10              MS. WILSON:  Okay.  Some of
11         you know me, some of you don't.
12         Chris and I go way back.  I got
13         involved in Vioxx literally the
14         day it was withdrawn from the
15         market.  Between 1500 and 2200
16         cases came across my desk.  The
17         way I did it was, I educated
18         myself very, very early.
19         Fortunately, I come from a family
20         of physicians and just decided
21         from the get-go, I was only going
22         to take, my firm, Lewis & Roberts,
23         we were only going to take cases
24         that we felt could go to trial.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1      We ended up taking a very small

2      select group of cases, I think it

3      was around 50.

4             We filed all of our cases.

5      We filed in New Jersey state court

6      with the exception of one case

7      that I filed in the MDL.  We just

8      made a huge commitment from the

9      get-go, as did my partners, a

10     small firm, a firm of 20

11     attorneys, 11 partners, to make a

12     financial commitment and work

13     these cases up.  I got in early

14     and filed early and made it very

15     clear from the outset that I

16     wanted to push my cases because I

17     felt like in a case like this

18     where there was not a signature

19     injury and causation was

20     particularly tough, and Chris and

21     Mark did a great job with their

22     trials in getting over those

23     hurdles, the only way to really

24     resolve this particular mass tort

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          in a favorable way for the

 2          plaintiffs was to have high

 3          quality cases that got worked up.

 4          Unfortunately, causation was so

 5          hard, I think there's only a small

 6          number of law firms that made that

 7          financial commitment and also put

 8          forth the labor to do so.  My firm

 9          clearly did that.

10              We did it without being

11          asked to do that and then, of

12          course, when Chris and Dave and

13          Mark asked me to do more, I

14          certainly did more.  My firm alone

15          from North Carolina trucked 28

16          folks up to New Jersey and/or

17          Philadelphia for depositions.  I

18          did, I don't know, I think my

19          affidavit says four sales reps,

20          but it was actually eight sales

21          reps.  I did the depositions of 18

22          physicians and miscellaneous other

23          people along the way.  So, I was

24          actively involved.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1              MR. WEITZ:  Was that for
 2         your individual cases where you
 3         did the four sales reps?
 4              MS. WILSON:  Yes.
 5              MR. WEITZ:  Judge Higbee had
 6         four different waves of cases.
 7         Could you tell us which of your 49
 8         cases were in which waves and if
 9         any of them were assigned a trial
10         date?
11              MS. WILSON:  The first wave,
12         Black and Smith got chosen, and it
13         went up to the very wire, got
14         worked up for trial, and then I
15         think the way -- and Chris can
16         correct me if I might be mistaken,
17         but there were 39 initially in
18         that first wave that got worked
19         up.  Black and Smith got chosen
20         for trial, and then for some
21         reason, collectively a small group
22         of us, probably me, Chris, Mark
23         Lanier, Dave Buchanan was in on
24         it, there was some reason those
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        two got bumped, and I think the

2        only reason was we ended up, that

3        first group, not trying as many as

4        what we thought.

5            MR. SEEGER:  I think we had

6        a striking procedure with them.

7        We selected, they selected, they

8        got strikes, we got strikes.  They

9        might have struck your two because

10       they were good cases.

11           MS. WILSON:  It went to the

12       bitter end.  We were working those

13       up and thinking those cases were

14       going to go to trial in January.

15       So, that was Black and Smith.

16       Then I kept putting cases up in

17       those trial waves.  And I think in

18       every wave, there was always a

19       chance my cases were going to go

20       to trial throughout the process.

21           MR. SEEGER:  Kim was always

22       one of those people that when we

23       would call for cases, she would

24       put cases in.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1              MS. WILSON:  And actively
 2         engaged in discovery in all of
 3         them.  I mean, every single case
 4         that ended up -- there were a
 5         couple of cases that I filed that
 6         I ended up dismissing because I
 7         felt there were huge causation
 8         issues.  So, I got rid, along the
 9         way, of any case that I felt was
10         more of a threat than an advantage
11         to us as a group.
12              MR. LEVIN:  You have about
13         $159,000 in costs that has been
14         approved by the accountant.  You
15         are ahead of a lot of people that
16         have not had them approved.  What
17         was the bulk of those costs, the
18         transportation, the lodging and
19         everything of your clients?
20              MS. WILSON:  Yes.  The other
21         thing I did was, with all of my
22         depositions, I had everything
23         videotaped.  And as soon as I got
24         those DVDs back, I disseminated
```

Page 8

1        them throughout the country to

2        everyone.  So, I did a lot of

3        digital stuff with my discovery

4        just to help educate other

5        attorneys, especially in regards

6        to the sales reps, because early

7        on, there was a group of us, and

8        Forest was part of it, we had some

9        excellent sales rep depos, I mean,

10       with incredible admissions.

11            MR. SEEGER:  Who from your

12       group was taking those for the

13       most part?

14            MS. WILSON:  Me.

15            MR. HORNE:  And I was.

16            MS. WILSON:  And Forest.  I

17       mean, I don't know any other

18       lawyers in North Carolina --

19            MR. HORNE:  That took any

20       sales reps.

21            MS. WILSON:  I don't think

22       so.

23            MR. WEITZ:  Did you

24       coordinate any of that with Jerry

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        Kristal with Weitz & Luxenberg?
 2             MR. HORNE:  I did, and I
 3        borrowed heavily from the fine
 4        depositions that Jerry took, and
 5        Dave also gave us some deposition
 6        transcripts of sales reps.  So, I
 7        borrowed heavily from those, but
 8        we took -- I think Kim and I, I
 9        think there was a different line
10        of thought on the sales reps.  All
11        the sales rep depositions that I
12        took were at least eight hours
13        long.  I mean, it was an all day
14        affair.
15             MR. LEVIN:  Forest, were you
16        assisting her in processing her
17        cases or just your own?
18             MR. HORNE:  Just my own.
19             MR. LEVIN:  Your firm's?
20             MR. HORNE:  Just my firm's.
21             MR. LEVIN:  How many cases
22        did your firm have?
23             MR. HORNE:  We filed 48
24        cases all in New Jersey.  We
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          screened probably -- I'm with a

 2          15-lawyer plaintiffs firm with our

 3          primary office in Raleigh, and so

 4          we get a lot of calls when there

 5          are these kind of drug cases.  We

 6          screened probably 2000 cases and

 7          narrowed that down to 48.  We only

 8          filed and put up for expedited

 9          discovery the ones where the Vioxx

10          usage was clear and where we

11          thought the causation was

12          relatively clear, at least early

13          on it seemed like it was clear.

14          It got hazier as you went along,

15          but we had 48 cases.  Every one of

16          them was filed in New Jersey.  We

17          filed the first case in January of

18          2005.  I think at the time there

19          were only about 300 filed in New

20          Jersey at that time, and then

21          within six months, we actually

22          screened -- we had an expert in

23          cardiology review every case that

24          we accepted before we filed it.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          So, we had that.  Ira Gelb and

2          Steve Rich were the two physicians

3          that we had review all of our

4          cases.

5              Myself and my partner, Greg

6          Martin, who was heavily involved

7          in the fen-phen litigation -- I

8          headed up the project for our firm

9          and did most of the work, but my

10         partner, Greg Martin, worked on

11         the case.  And then we hired two

12         experienced associate lawyers to

13         come in to work on the cases.  We

14         devoted two paralegals exclusively

15         to Vioxx, and then we hired two

16         summer law clerks to come in and

17         go through the FACTS database.

18         That's all they did eight hours a

19         day for three months.

20             MR. LEVIN:  For your

21         individual cases?

22             MR. HORNE:  Kim and I, our

23         collaboration, a lot was on the

24         sales reps because we had mutual

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          sales reps, we had mutual

2          physicians and --

3               MR. LEVIN:   Same

4          jurisdiction.

5               MR. HORNE:  -- going through

6          those FACTS documents was

7          maddening.  Kim would call me

8          occasionally and say, did you see

9          this document on Dr. X, and then I

10         would find a document on Dr. Y.

11         We collaborated there, and we

12         collaborated on the sales rep

13         depositions, and I shared a lot

14         of -- Chris, I dealt with Dave and

15         Jeff Grand more than you.  Jerry

16         and I worked together a lot, but

17         we found a number of -- we had one

18         orthopedic physician, I didn't

19         write down his name, but he was an

20         orthopedic physician in

21         Fayetteville, North Carolina who

22         we found in the FACTS database had

23         been paid over $100,000 by Merck.

24         And in collaborating with Robb

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

 1          Dassow and Dave, I think that's

 2          kind of what led to, along with

 3          some other folks, I'm sure, the

 4          order by Judge Higbee to require

 5          Merck to report the income that

 6          Merck had paid all these

 7          physicians.  And the one

 8          physician, the orthopedic

 9          physician that we found in

10          Fayetteville had been paid over

11          $100,000.  We found all of these

12          e-mails, including a PowerPoint

13          presentation where the Merck rep

14          had told the physician to take out

15          a slide that talked about an

16          increase in blood pressure, move

17          it to the end, and don't spend

18          much time on it.  We circulated

19          that with a number of folks in the

20          litigation.

21               MR. LEVIN:  How is

22          Fayetteville these days?

23               MR. SEEGER:  Still there.

24               MR. HORNE:  It is not very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1          friendly.

 2                 MR. LEVIN:  I used to be a

 3          policeman in Fayetteville.

 4                 MR. HORNE:  Is that right?

 5                 MR. LEVIN:  Military

 6          policeman.

 7                 MR. HORNE:  The doctor, his

 8          name is Brad Broussard -- these

 9          Fayetteville physicians are very

10          conservative, but this is a short

11          story.

12                 I had a 48-year-old client

13          who suffered a heart attack and

14          ended up having a

15          defibrillator/pacemaker installed.

16          He was in perfect health otherwise

17          and was on the heart transplant

18          list, and this physician that had

19          been paid over $100,000 by Merck

20          and was on the speakers bureau,

21          this was the very first case I

22          filed in New Jersey.  I

23          arranged -- one of the things that

24          I tried to do with all my clients

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        is arrange meetings with the

2        prescribing physicians.  I went

3        down and met with him, not knowing

4        that he had been paid $100,000,

5        and went into a conference -- paid

6        him $1,000 to meet with him for an

7        hour and went into a conference.

8        He just waylaid me.  He said, no,

9        I'm not going to say that I

10       wouldn't have prescribed it had I

11       known.  Little did I know that he

12       did know, and I found that out

13       later.  His deposition --

14            MR. GIRARDI:  Speaks for

15       it --

16            MR. HORNE:  He just clipped

17       me for $1000 and then was a jerk.

18       The only thing that saved the

19       meeting, the guy said if he was

20       deposed, and this case wasn't on

21       for trial, but he said if he was

22       deposed -- he finally came around,

23       I brought my client with me who

24       pleaded with the doctor, and he

FAC Resp. Amended Exhibit D -- 1038

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          finally gave in.

2                  MR. SEEGER:  Did you guys

3          work closely with Robb Dassow and

4          Sue Scovern on these sales rep

5          things?

6                  MS. WILSON:  Forest did.

7                  MR. HORNE:  I worked with

8          Robb on that, and I also worked

9          with Robb on the Medco because we

10         had two cases where we sued Medco

11         because they were 50 milligram

12         cases where they had prescribed

13         for over 18 months of 50

14         milligrams.  So, we sued Merck-

15         Medco.  That was either two or

16         three cases.  I engaged in

17         discovery with Medco's lawyers on

18         those issues, trying to find a

19         connection between Medco and

20         Merck, and I worked closely with

21         Robb on that, and we shared a lot

22         of documents in that regard.

23                 Kim put up, I don't know,

24         what was your percentage of cases?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           I mean, you put up close to 50% of

2           your cases.

3                 MS. WILSON:  It was over

4           50%.

5                 MR. HORNE:  We filed 48

6           cases, and we had 12 in for the

7           expedited discovery.  And then

8           along with Steve Kherkher at

9           Williams Kherkher, I had two cases

10          from North Carolina in the four

11          trial groupings that were set for

12          trial originally in October, and

13          then were moved to January.  I

14          worked closely with Jerry on those

15          and attended all the meetings, and

16          also Dave and Jeff Grand were very

17          helpful.  Frankly, I knew the

18          settlement discussions were going

19          on, but I had no idea that y'all

20          had moved it along as far as it

21          was.  So, we were heavily

22          preparing for trial along with

23          Steve Kherkher.

24                Steve's firm had two North

Page 18

1        Carolina cases, and my firm had

2        two North Carolina cases that I

3        put up.  So, we were collaborating

4        together.  And then Judge Higbee

5        changed her mind early on and said

6        I only want prelabel change cases

7        in the mix.  So, one of my cases

8        dropped out because it was post

9        label change.  And then in

10       discovery, the two cases that

11       Steve had developed usage

12       problems, so both of his cases

13       dropped out.  So, we were down to

14       one case in North Carolina, and I

15       communicated with Dave, and we had

16       a hearing with Judge Higbee,

17       fought Hope Freiwald tooth and

18       nail, and added another case that

19       was not on the expedited list for

20       trial.

21            So, I brought another case

22       in for the January '08 trial mix

23       and got that case -- even though

24       it wasn't in my expedited group, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          got the client and his wife up to

 2          Philadelphia, went to Dechert,

 3          dealt with Hope on all of those

 4          depositions, got that done, got

 5          the physicians deposed.  So, we

 6          had those two cases set for trial.

 7              I worked closely with Sol

 8          Weiss on developing Steve Rich.  I

 9          had been using Steve from early

10          '05 on specific causation, and

11          then Sol had worked with him on

12          general causation.  And Steve was

13          going to be our general causation

14          expert for the January '08 trial

15          set cases along with Sol.  I went

16          up to Philadelphia to defend

17          Steve's general causation

18          deposition, coordinated our

19          cardiologists, who saw all the

20          clients whose cases were trial set

21          on specific causation.

22              The Williams Kherkher firm

23          developed Dr. Goldberg for the

24          marketing case.  I wasn't involved
```

FAC Resp. Amended Exhibit D -- 1042

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          in that, they were.

2               But we, like Kim, our firm

3          responded every time there was a

4          call to put more cases in the mix,

5          and I was pretty vocal about that

6          on the list serve, saying, guys,

7          we are all in this together.  So,

8          we volunteered over 25 percent of

9          our firm's caseload, and we worked

10         them up, and we brought quality

11         cases to the mix.

12               MR. GIRARDI:  Was it the

13         same 50 cases?

14               MR. HORNE:  No.

15               MS. WILSON:  No.

16               MR. GIRARDI:  How many cases

17         did you have?

18               MR. HORNE:  We filed 48.  We

19         screened 2000 to get 48, and we

20         only filed cases where -- we knew

21         from the fen-phen days that

22         causation was going to be an

23         issue, so we felt comfortable that

24         we either had affidavits from

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1        doctors where there were sample
 2        cases, and then otherwise we had
 3        rock solid usage on our
 4        prescriptions.
 5             MR. LEVIN:  How many of your
 6        cases did you put in the same
 7        position that Kim's were where you
 8        worked them up to trial?
 9             MR. HORNE:  We had 11 cases
10        in the mix, but then we added the
11        additional ones, so, there were
12        12.  And we had a hearing with
13        Hope, and Dave was instrumental in
14        getting this other case added at
15        the last minute.  Otherwise, we
16        would have only had one case for
17        the North Carolina trial setting,
18        and we were able to get one of our
19        other cases in, so we had two.  I
20        attended all the meetings with
21        Jerry on that, we collaborated
22        closely on all of the preparations
23        for trial.
24             MR. BLIZZARD:  Forest, help
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          me understand the timing of this
 2          because I think we heard some of
 3          this the other day from Steve
 4          Kherkher.
 5               When were those four cases,
 6          two of yours and two of Williams
 7          Kherkher, scheduled to go to trial
 8          originally?
 9               MR. HORNE:  October of '07.
10               MR. BLIZZARD:  Then as I
11          understood, three of them dropped
12          out because of various reasons,
13          including two of them because they
14          didn't have proof of use.
15               MR. HORNE:  Right.
16               MR. BLIZZARD:  So, there was
17          one left, and then you added one?
18               MR. HORNE:  Right.
19               MR. BLIZZARD:  That case was
20          then put off until February of
21          2008?
22               MR. HORNE:  No.  We got that
23          case -- I was in Salt Lake City in
24          depositions in another case and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          had a conference call with Dave

 2          Buchanan, Hope Freiwald and Judge

 3          Higbee, and Hope was screaming

 4          about adding one of our cases

 5          late.  It had been filed and had

 6          been there.

 7               MR. BLIZZARD:  I'm trying to

 8          find out, when were those two

 9          then, the one you added and the

10          one that still was there, when

11          were they set for trial?

12               MR. HORNE:  With the trial

13          grouping of four cases, and I

14          think the Weitz Luxenberg setting

15          had a problem with that expert,

16          and I think there was some talk at

17          the time of settlement of moving

18          it back, so there would only be

19          three cases.

20               MR. SEEGER:  Well, there was

21          actually, and then something

22          happened to that setting.  They

23          got moved to like September or

24          October.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1             MR. HORNE:  It was October.

 2             MR. SEEGER:  Then they got

 3        bounced to January and then we

 4        settled.

 5             MR. BLIZZARD:  I'm confused,

 6        because I thought I heard

 7        yesterday Kherkher say the cases

 8        were set in March of 2008, that

 9        those were actually Martin & Jones

10        cases, but that they were working

11        on them.

12             MR. SEEGER:  They might have

13        been originally set for

14        March/April of '07, because that

15        was an original target date.  I

16        don't remember why we lost the

17        setting, there were so many facts.

18        Dave definitely will, because he

19        remembers everything.  But that

20        somehow wound up after the summer,

21        which was September/October, and

22        basically the settlement came

23        before you guys could try the

24        case.  But the cases were in the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1          queue, and they were going to go

 2          at that point.

 3               MR. HORNE:  Right.

 4               MS. WILSON:  Black.  I

 5          remember why we took Black off.

 6          Black ended up, he was an MI and a

 7          stroke, and Judge Higbee didn't

 8          want to do that.

 9               MR. SEEGER:  That's right.

10               MS. WILSON:  That's why

11          Black didn't go.

12               MR. SEEGER:  She tried to

13          keep the issues as close as she

14          could for trial groupings because

15          she was doing more than one case

16          at that point.

17               MS. WILSON:  Just my

18          affidavit --

19               MR. SEEGER:  Just so I'm

20          clear.  I'm sorry, Kim.  So

21          Kherkher was going to help you

22          guys try the case?

23               MR. HORNE:  No.

24               MR. SEEGER:  I'm not clear
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           on that.

2                MR. HORNE:  What happened

3           was, Steve had two North Carolina

4           cases, and I had two North

5           Carolina cases.  We were at the

6           hearing when the judge was asking

7           for trial cases.  So, I offered

8           both of mine up, and Steve offered

9           both of his up.  We agreed to work

10          together, and I would work my

11          cases up, he would work his cases

12          up, and we would share the general

13          and specific causation experts for

14          trial.  At the beginning of that,

15          Judge Higbee at the last minute

16          changed her mind and said, I only

17          want three prelabel cases.  So,

18          one of mine dropped out, and it

19          was two of Steve's and one of

20          mine.  And then both of Steve's

21          dropped out, because in the

22          depositions they did, the

23          prescription usage and samples was

24          terrible, so, they voluntarily

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1           dropped those.  That's when I

2           added another one of my cases.

3                MR. SEEGER:  You had two

4           cases?

5                MR. HORNE:  I had two cases.

6                MR. SEEGER:  At that point,

7           they didn't have a case in.

8                MR. HORNE:  They didn't have

9           a case in, but they had already

10          gone a long way down the road of

11          developing the experts.

12               MR. SEEGER:  Yes.  No

13          question.

14               MR. HORNE:  They continued

15          with that.  As far as my two

16          cases, I handled all the

17          depositions for my clients and

18          their spouses and the physicians

19          and the sales reps.  I did all of

20          that.

21               MR. SEEGER:  Okay.

22               MR. BLIZZARD:  Was there any

23          agreement that they would try your

24          two cases that remained?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            MR. HORNE:  We were going to

2        try it together.  And I told Steve

3        this, and we had early on -- we've

4        got an office in Atlanta as well.

5        So, we had some Georgia cases, and

6        we had some -- a couple of good

7        Georgia cases that we were going

8        to put up.  Someone else had some

9        Georgia cases, and we couldn't

10       come to an accommodation, because

11       I told Steve, I'm going to be

12       involved in my cases.  I'm not

13       going to delegate it to you and

14       you do everything, because that's

15       just not the way I work or my firm

16       works.  So, I worked up my cases,

17       Steve worked up his cases.  We

18       were sharing the general and

19       specific causation witnesses for

20       trial.  And then we were going to

21       divide up opening, closing, cross

22       examinations, witness examinations

23       and that sort of thing.

24            MR. SEEGER:  Once their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

 1          cases were out, how would the

 2          trial have gone?  Would you have

 3          taken the lead, would they have

 4          worked with you on the trial

 5          still?

 6                MR. HORNE:  Yes.  And when

 7          that happened, because --

 8                MR. SEEGER:  You were still

 9          dividing up.

10                MR. HORNE:  What happened

11          when Steve's cases dropped out, we

12          were down to one case.  They

13          didn't have any other North

14          Carolina cases.  And that's when

15          we had to get Dave involved.  And

16          I told Hope, look, I've got a case

17          that's been filed, fact sheets in,

18          you've got all the medical

19          records, basically everything is

20          there.  I'll get the client up to

21          Philadelphia next week with his

22          wife.  We'll make every

23          accommodation.  And I think the

24          one thing Judge Higbee did was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1           gave 30 extra days to designate

2           the experts.  But I got that case

3           in with Dave's help.  But Steve

4           was so far down the road with the

5           marketing expert and a fine

6           cardiologist out of San Francisco

7           that came back to North Carolina

8           and saw both of these clients.  He

9           was so far down the road with

10          that, I said let's --

11               MR. SEEGER:  Keep it

12          together.

13               MR. HORNE:  -- keep it

14          together, and that's what we did.

15               MR. WEITZ:  Forest, clarify

16          some times with me and cases.

17          Because in January of '07, you had

18          Hermans and Humeston, and then you

19          had Keeley and Rossi, which

20          Humeston was Chris's case, Hermans

21          was Lanier's, and Keeley and Rossi

22          were Weitz & Luxenberg cases.  She

23          set those cases down for trial in

24          January '07, and then Hermans and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

 1          Humeston were tried in February

 2          '07.  Keeley and Rossi were then

 3          postponed to be tried in September

 4          of '07, and then the judge just

 5          put it on hold because there were

 6          negotiations going on.  Where were

 7          your cases with respect to that?

 8          Did you have an actual firm trial

 9          date?

10               MR. HORNE:  Yes.

11               MR. WEITZ:  From when?

12          Because Keeley and Rossi were the

13          next ones she was trying.  I'm

14          trying to figure out when you and

15          Kherkher had trial dates.  Was it

16          after those two cases?

17               MR. HORNE:  Originally there

18          were four states set forth for

19          trial.  It was North Carolina,

20          Pennsylvania, New Jersey and New

21          York.  Jerry was heading up the

22          New York, and Sol had both New

23          Jersey and Pennsylvania, and I had

24          North Carolina.  Those four cases

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1          were all set on the same track.

 2          Then Jerry and I talked about the

 3          fact that his -- the general

 4          causation witness out of Canada

 5          called Jerry the night before his

 6          deposition and said, oops --

 7                MR. WEITZ:  He had an

 8          article --

 9                MR. HORNE:  -- he signed an

10          affidavit I think.  He said, I

11          think I signed an affidavit.  But

12          North Carolina was in that

13          setting.  We were in that setting.

14          And then because of that snafu

15          with Jerry's expert, I think Judge

16          Higbee -- and this was all about

17          the time the settlement came down

18          -- was going to move the New York

19          setting out to February because we

20          were down the road as far as when

21          the jury was going to come in, and

22          we were talking about renting out

23          the convention center at the hotel

24          and having the voir dire there.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

 1                MR. WEITZ:  So, you were
 2           part of the final stage in those
 3           two cases?
 4                MR. SEEGER:  Yes.
 5                MR. HORNE:  Yes.  Jeff Grand
 6           and Dave Buchanan and I worked --
 7           Dave was very gracious --
 8                MR. SEEGER:  By the way,
 9           Jeff Grand just had a baby.  For
10           the record, let the record reflect
11           we're looking at Jeff's new baby.
12                MR. HORNE: My two cases were
13           Romans, Billy Ray Romans and Andy
14           Ray Sanderson.
15                MR. WEITZ:  The cases Forest
16           had ready for trial were Romans
17           and Sanderson.
18                MR. HORNE:  Yes.  Romans was
19           a prelabel change that was in the
20           mix originally.  Sanderson was the
21           case that was added after a motion
22           hearing with Dave and Judge Higbee
23           and Hope and myself, and Judge
24           Higbee agreed to add Sanderson.

FAC Resp. Amended Exhibit D -- 1056

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1            So, Sanderson and Romans were the

2            two North Carolina cases that were

3            set to go to trial originally in

4            that October setting with the New

5            Jersey, Pennsylvania and New York

6            cases that Judge Higbee then moved

7            into January.

8                 I went to the status

9            conference in November and left

10           there, flew back to Raleigh, North

11           Carolina, jumped in my car and

12           drove four hours to Asheville and

13           got to the hotel at 4:00 a.m. and

14           deposed a Merck rep on a Friday

15           from 9:00 in the morning until

16           6:00 at night, and then the next

17           week is when the settlement

18           happened.

19                 And I didn't -- and Steve, I

20           don't know what Steve knew.  He

21           may have known more than he told

22           me, but after the fact -- I mean,

23           I knew the negotiations were

24           going, and I think that's -- even

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

 1          Judge Higbee said in a conference

 2          that that's one of the

 3          considerations for moving the

 4          setting from October of '07 to

 5          January '08.  But I had no idea

 6          that y'all were that close, and

 7          obviously a great result.

 8               MR. LEVIN:  Neither did we.

 9               MS. WILSON:  My cases are

10          real simple.  I did not work with

11          Kherkher at all.  I worked with

12          two people.  That was Chris Seeger

13          and Mark Lanier.  So, mine is real

14          clear-cut.  That was kind of the

15          get go.  Forest and I collaborated

16          a lot.

17               Something I would like to

18          add is, after the settlement was

19          announced, it was either Chris or

20          Mark, one, who got interviewed by

21          the Wall Street Journal reporter.

22          I think it was you who told that

23          person to call me.  They asked me

24          to describe my role in Vioxx in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          this litigation.

2                    MR. SEEGER:  Must have been

3          me.  Lanier would have never sent

4          a reporter to someone else.

5                    MS. WILSON:  I think we had

6          some five star generals, and I was

7          a front line soldier really every

8          step of the way, and there weren't

9          a lot of us out there.

10                   MR. SEEGER:  You also had a

11         case in Federal Court that you

12         were trying to get remanded to the

13         transfer court in North Carolina

14         that you wanted us to try

15         together.

16                   MS. WILSON:  That's right.

17         That's the Howard case, and I

18         think it is still probably right

19         now one of the best cases out

20         there.  I have no doubt it has

21         already been approved actually.

22         I'm just waiting on our points, I

23         guess I should say.  Great case,

24         and that was the plan.  We were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1         going to tee that up.  So, I did

2         have one in the MDL.

3              It was a tough litigation,

4         as you guys know.  I thought it

5         was far harder than Baycol,

6         fen-phen, Rezulin.  I don't think

7         anything compares to Vioxx.  I

8         really don't.  It was very tough.

9              Anyway, after the settlement

10        was announced, I certainly did my

11        part to help bring everyone

12        together in newspapers, on TV,

13        talked about what a tremendous job

14        everyone did, how tough this

15        litigation was.  Hard, hard cases,

16        difficult causation, and I was a

17        big supporter of this resolution.

18             MR. HORNE:  One thing I

19        would like to say about the

20        submission.  I sent every member

21        of the committee a copy of our

22        submission with detailed expenses

23        and time sheets.  I will say we

24        had about 1000 attorney hours that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1        we submitted for the committee's

2        consideration, and that is an

3        extremely conservative amount

4        because we don't keep hourly

5        bills.  I think Kim's firm, they

6        do keep track of their time.  We

7        don't.  I went back through, and

8        the only thing that I submitted

9        for this committee's consideration

10       are matters that were related to

11       the 12 cases and the trial and

12       those expenses.  There's nothing

13       in here for stuff that I didn't

14       truly think was for the common

15       benefit.

16            Going into this, Kim's firm

17       and my firm, we were really kind

18       of the only two firms in the

19       state.  So, in a way, we were

20       certainly competitors, but we also

21       collaborated from the very

22       beginning, and it was both of our

23       intentions to try these cases.  I

24       went to the first trial in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1          Brazoria.  I went for the full
 2          week, that first week there.  I
 3          saw Mark Robinson was there and
 4          had dinner.
 5               MR. LEVIN:  With Mark?
 6               MR. HORNE:  With Ben Morelli
 7          and some other folks during that
 8          trial.  I stayed there for the
 9          whole week and saw the openings.
10          Chris, I watched you on Court TV.
11          I spent about a week watching
12          that.  I came back for the
13          Hermans/Humeston openings.
14               MR. SEEGER:  I remember
15          that.
16               MR. HORNE:  Because Hope
17          came over to ask you to get Kim
18          and me --
19               MR. SEEGER:  They were
20          sitting on the defense side, and
21          Hope said, these guys are
22          plaintiffs lawyers, would you tell
23          them to go on to the other side.
24          There's no line in the middle.
```

Page 40

1          They can sit wherever they want.

2              MR. WEITZ:  Judge Fallon's

3          PTO Order 6, he laid out

4          guidelines.  You are worried about

5          the hours.  The hours are a factor

6          to consider, but the judge laid

7          out in his Murphy Oil decision

8          that there are a lot of other

9          factors, people that were actually

10          litigating the cases and moving

11          the dockets in jurisdictions and

12          were preparing to try the cases.

13          Those are factors.

14              MR. SEEGER:  This is helpful

15          to us.

16              MR. HORNE:  Kim and I, we

17          traveled to New Jersey for like

18          two of the trials, I believe.  But

19          I saw openings or closings in -- I

20          was there for Jim Pettit's

21          closing, I was there for your

22          opening in Hermans/Humeston.  I

23          was there for Mark's opening in

24          the first case in Texas.  I was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1        there for one of the other ones.

2        And so it was --

3              MR. SEEGER:  I didn't get a

4        chance to talk to you much.  I

5        know that you worked a lot with

6        Dave and Jeff.

7              I spoke to you all the time.

8        Kim was always looking to get

9        something set for trial.  That's

10       the fairest way to reflect it.

11       How many times did we talk to each

12       other on the phone?  I've got this

13       case, this is a great case for

14       trial, I've got two cases coming

15       to New Jersey.  You are our kind

16       of people.  That's the way to move

17       a case.

18             MR. LEVIN:  Pleasure to have

19       met.  Up until now, I only knew

20       your hours.

21             MR. SEEGER:  Do you have the

22       hours?

23             MR. LEVIN:  He sent them to

24       everybody.  All of a sudden I got

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          binders.  Now I know.

2              MS. WILSON:  I did the same

3          thing.

4              MR. SEEGER:  Have they been

5          reviewed?

6              MR. LEVIN:  Yes.  Your hours

7          have been reviewed.  They have

8          been approved.

9              MR. SEEGER:  Which means you

10          have met all the guidelines.

11              MR. LEVIN:  In fact, your

12          costs to the seven cents were

13          approved.

14              MR. SEEGER:  What are they?

15              MR. LEVIN:  159,045.07.

16              MR. SEEGER:  Both firms?

17              MR. LEVIN:  No.

18              MR. WEITZ:  No.  Forest is

19          131 and change.

20              MR. SEEGER:  That was a very

21          helpful presentation.  Thank you.

22              MR. LEVIN:  It is a pleasure

23          to see professionals that are

24          truly professionals.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          MR. HORNE:  I want to thank

2     y'all for the work that went on

3     behind the scenes that we never

4     knew about.

5          MR. SEEGER:  Thank you.

6          MR. GIRARDI:  Thank you.

7          MR. BLIZZARD:  Thank you.

8               -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1                    C E R T I F I C A T E

2

3                    I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13                    I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 1067

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:   LIEFF CABRASER HEIMANN &
        BERNSTEIN, LLP
        Elizabeth J. Cabraser, Esquire
        Donald C. Arbitblit, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Amended Exhibit D -- 1068

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MS. CABRASER:  Good morning.
 3              MR. SEEGER:  Good morning.
 4              MS. CABRASER:  I think an
 5        appropriate way to start out our
 6        presentation, first thing is
 7        first, is to say thank you to
 8        everyone in this room for leading
 9        this case and for the
10        contributions to the common
11        benefit made by the leadership in
12        this case.
13              MR. SEEGER:  Thank you.
14              MS. CABRASER:  Every one of
15        us is probably the center of our
16        own universe, and our own clients
17        are closest to our hearts, but we
18        always like to feel that it is our
19        efforts that lead to their
20        success.  The definition of a mass
21        tort is that no one is alone, no
22        lawyer is alone, no client is
23        alone, and every client's success
24        comes from a collective effort,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1        not just efforts of the people who

2        are the obvious leaders, but of

3        the many firms whose efforts we

4        might not even be aware of.  I

5        want to thank those people today,

6        as well, and also to give an extra

7        thanks to this type of work that

8        this committee is doing, because

9        it is arduous, it is detailed, it

10       comes at a time of year when I

11       know everyone would rather be

12       doing other things, and it's

13       necessary.

14            I wanted to spend a little

15       bit of time talking about the work

16       that I personally did in the Vioxx

17       litigation, but it really is more

18       general and generic on the law

19       side of the case, purchase claims

20       committee work, working on

21       briefing, oral argument for the

22       purchase claims committee, motion

23       to dismiss, our writing victories

24       and then defeats in the New Jersey

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1         state court, the system on medical

2         monitoring and providing a support

3         role, one of many, on the state

4         side of purchase claims.

5              This mass tort, both on the

6         MDL side and in New Jersey was

7         really, to probably a unique

8         degree, most about the trials, the

9         trial preparation, the bellwether

10        trials, and the medical and

11        scientific issues that arose in

12        the course of preparing for and

13        conducting those trials.

14             The person in my firm that

15        spent the largest amount of

16        personal hours on the Vioxx

17        litigation, over 5,000 hours,

18        essentially full-time work for two

19        or three years, is my partner, Don

20        Arbitblit, and he focused on those

21        all important medical and

22        scientific issues.  So, I thought

23        or we thought it was most

24        appropriate to have Don take the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        laboring oar in this presentation

2        to go through those efforts that

3        work, how it related to and how it

4        contributed to the sequence and

5        system of Daubert hearings,

6        depositions and bellwether trials

7        that, in turn, culminated in the

8        settlement of this case.

9             Don.

10            MR. ARBITBLIT:  Thank you,

11       Elizabeth, and thanks to everyone

12       in the room for all the work that

13       you have done to make this

14       possible.

15            I prepared a PowerPoint, but

16       we don't have computers.  I have

17       hard copies that, if you would

18       like to follow along on the

19       presentation, I have a couple of

20       extras.  How about if we pass one

21       to Chris and Perry and Ed, and,

22       I'm sorry, I'll just --

23            MS. CABRASER:  And it was a

24       true stroke of genius not to have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1        PowerPoint in this room.

2              MR. ARBITBLIT:  In any case,

3        the affidavit addressed the

4        criteria set forth in the order,

5        and I think we've ranked pretty

6        high on most all of those, so, I

7        won't go over those in all their

8        detail, but I do want to emphasize

9        certain aspects of the criteria,

10       in particular, the trial work,

11       depositions and discovery, some

12       significant motions and

13       recognition by co-counsel and even

14       one of the expert witnesses about

15       the quality and importance of the

16       work that we did during the Vioxx

17       case, which was full-time work for

18       me and done with a passion to get

19       the best result we could for

20       everyone.

21             Close to 19,000 hours, over

22       half of them by partners, and when

23       the partners weren't doing the

24       work, we were closely supervising

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1          it to make sure that it was --
 2               MR. LEVIN:  You said 19,000?
 3               MR. ARBITBLIT:  19,000,
 4          18,789 hours.
 5               MR. LEVIN:  That's how many
 6          hours you have?
 7               MR. ARBITBLIT:  Yes.
 8               MR. HERMAN:  Don, I'm
 9          familiar with the work you did,
10          certainly, particularly in the
11          science area, but who were the
12          other partners that actually
13          worked in the science area?
14               MR. ARBITBLIT:  Well, I
15          would say that my most important
16          assistant on the science is Jenny
17          Gross, who is up for partnership
18          this year, we'll see how that
19          goes, but she has a lot of
20          experience in science.  She is a
21          scientist, and she has skills that
22          I find unique in the plaintiff's
23          bar.
24               MR. SEEGER:  When you say "a
```

FAC Resp. Amended Exhibit D -- 1074

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        scientist," she has formal

2        training?

3            MR. ARBITBLIT:  She is two

4        courses away from being a Ph.D.,

5        and her work on the statistics and

6        the data analysis was very unique

7        in my experience.  I've been a

8        lawyer for 29 years.

9            MR. HERMAN:  Excuse me.  Her

10       Ph.D. would be in statistics?

11           MR. ARBITBLIT:  Yes.  And

12       I've never seen anyone like her in

13       all the years I've been

14       practicing, which is 29.

15           So, she's not a partner, but

16       she was my most important asset in

17       terms of digging out the data,

18       analyzing it and figuring out

19       where we could nail Merck on what

20       they were saying, as opposed to

21       what the data said and how we

22       could feed our experts the right

23       information and get the right

24       analysis.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1              MR. LEVIN:  Help me out with
 2         the hours.  I'm absorbed in hours.
 3         You have 18,000 hours, and, you
 4         know, that may very well be.  The
 5         accountant has you at 710 hours,
 6         which is mind boggling.
 7              MR. ARBITBLIT:  That's not
 8         true, Arnold.
 9              MR. LEVIN:  I know it is not
10         true.  Have you been contacted by
11         the accountant?  Do you know what
12         the problem was and how it's being
13         resolved, because --
14              MR. SEEGER:  We have to
15         clean it up.
16              MR. LEVIN:  -- you also have
17         about $785,000 in costs, which I
18         would imagine can't be all
19         airplanes, so, it must be expert
20         fees and everything that you paid
21         for.  I would imagine those
22         experts were -- tell us who they
23         were and that they were approved
24         by the committee, because it's a
```

Page 10

1      substantial amount of money you

2      have invested in the case.

3          MR. ARBITBLIT:  Sure,

4      Arnold.

5          First of all, I have been in

6      contact with Marcy Roussel from

7      Wegmann-Dazet, and over the course

8      of the last month, I have, as far

9      as I know, cleared up every

10     question she had and submitted all

11     of our hours, which totalled to

12     the amount set forth in the

13     affidavit.  As far as I know,

14     there are no questions, and I was

15     in touch with her just before

16     Thanksgiving to verify that.  And

17     I hope that you will do the same

18     and let us know if there's any

19     questions.

20         MR. SEEGER:  This is really

21     just admin at this point.  We're

22     working off the hours in the

23     affidavit.

24         MR. ARBITBLIT:  Thank you,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          Chris.

2               On the experts, one of the

3          criteria was did you get involved

4          before there was an MDL.  The

5          answer is yes.  We did a

6          substantial amount of work before

7          the MDL.  I think in the

8          affidavit, it is listed as the

9          particular number of hours, but it

10         is in the thousands of hours, and

11         we also retained experts prior to

12         the MDL, one of whom was Dr.

13         Farquhar, who was the expert cited

14         by Judge Bechtle in the fen-phen

15         litigation upon whom he relied for

16         the medical monitoring decision.

17         Farquhar did quite a lot of work

18         before he was ever approved by the

19         MDL.  If fact, his 95-page report

20         was specifically cited by Judge

21         Fallon when I briefed and argued

22         the Daubert motion in November of

23         2005 as being a thorough and

24         explanatory 95-page report upon

FAC Resp. Amended Exhibit D -- 1078

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          which he relied in finding that

2          the plaintiffs used proper

3          methodology and had a reliable

4          qualified expert when we surpassed

5          the initial and comprehensive

6          Daubert hurdle on short-term

7          duration on the naproxen defense

8          on the epidemiology evidence.  So,

9          a lot of that work was being done

10         before there was an MDL and before

11         there was an authorization

12         process.

13              Once the MDL was in place,

14         Dr. Farquhar was submitted to the

15         PSC and approved, as well as

16         Nicholas Jewell and Phillip

17         Lavori, who were assistants of his

18         at UC Berkeley School of Public

19         Health, and Stanford, who did the

20         statistical analyses upon which

21         Farquhar relied.  So, those were

22         the principal expert costs that

23         are in that mix.

24              So, I wanted to talk a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          little bit about early work that

2          we did, in particular,

3          communications that I had with

4          Carlene Lewis, who was a pioneer

5          and a beloved member of this

6          committee before her untimely

7          death.  Carlene was the initial

8          chair of the science committee and

9          also trial counsel on the Ernst

10         case.  At that point, I was

11         already the chair of the

12         epidemiology and causation

13         subcommittee, and I took it upon

14         myself to provide whatever

15         information I could to that trial

16         team as the trial was ongoing.

17         That included documents that were

18         being taken from the discovery

19         that was ongoing about the APPROVe

20         trial.  It included a document

21         that I used at a deposition during

22         the Ernst trial to show that Merck

23         had the authority to change the

24         label on its own without waiting

FAC Resp. Amended Exhibit D -- 1080

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          for the FDA, which was a subject

2          of great interest to them in the

3          trial.

4               This is at slide 9, there's

5          a summary of some of this, and

6          this was Dr. Bold, who was the

7          Merck witness who admitted that

8          they changed the label without

9          waiting for the FDA.  At the same

10         time, they were saying they

11         couldn't do that.

12              There's an e-mail, one of

13         many e-mails at slide 10 where

14         Carlene was asking initially for

15         my guidance on how to get through

16         the new drug application

17         submission.  I answered that

18         question, and then you can see at

19         the top what she said, which I

20         wouldn't say these things about

21         myself, but in this setting, it is

22         my job to tell you what others

23         have said.  She says, "Thanks so

24         much, Don.  You've been invaluable

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          this trial.  I owe you big time."

2          Coming from Carlene, that's a very

3          significant and meaningful message

4          for me to have obtained.

5               And the slide after that is

6          an e-mail from Chris Seeger, thank

7          you, Chris.

8               MR. SEEGER:  I remember

9          this.

10               MR. ARBITBLIT:  "Don, this

11          is a great find.  I'm using this

12          information about Merck's having

13          changed the label on a significant

14          adverse effect when they said that

15          that was not possible."

16               The next thing I wanted to

17          talk about briefly, I'm sure most

18          of you or probably all of you know

19          something about this New England

20          Journal of Medicine deposition and

21          Dr. Curfman.  This was something

22          that was my idea to take.  I

23          planned it, I implemented it, I

24          took the deposition.  I did it in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1         a way that shows -- the only way

2         that I could show confidential

3         documents to someone at the New

4         England Journal to show that they

5         had been snookered was by having a

6         deposition because, otherwise, I

7         would have been violating

8         confidentiality orders.  So, I

9         went to the deposition with a set

10        of materials to show him chapter

11        and verse, day by day, what Merck

12        knew, when they knew it and how

13        they couldn't possibly have in

14        good faith and in good conscience

15        withheld it from the Journal, yet

16        they did.  The editor, Dr.

17        Curfman, was outraged by it, and

18        he published an Expression of

19        Concern, which is equivalent to a

20        correction, and then that was

21        confirmed.

22             The Expression of Concern or

23        EoC said that Merck withheld

24        critical data about cardiovascular

FAC Resp. Amended Exhibit D -- 1083

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          toxicity, you can see a summary of

2          this at slide 12, and then said

3          that the article was misleading

4          and did not accurately reflect the

5          potential for serious

6          cardiovascular toxicity with

7          rofecoxib.  That's pretty good

8          stuff from someone who is not

9          aligned with plaintiffs and had

10         never said anything that had

11         previously favored plaintiffs in

12         litigation.

13              What you can see at slide 13

14         is an actual document from Merck's

15         memo of July 2000 that was

16         reprinted by the New England

17         Journal.  What you see there is

18         exactly what the Journal was

19         concerned about that had been

20         withheld, that top line where

21         Vioxx had 47 versus 20 for

22         naproxen in the serious

23         thromboembolic events, which led

24         the Journal to conclude that for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        every serious gastrointestinal

 2        event that was prevented by Vioxx,

 3        there was an offset of at least

 4        one serious heart attack, stroke

 5        or serious event.

 6              MR. HERMAN:  Let me

 7        interrupt you --

 8              MR. ARBITBLIT:  Yes, please.

 9              MR. HERMAN:  -- because

10        there's some points I think I

11        would like you to make, and I've

12        been through the PowerPoint, and

13        my questions, some come from

14        memory and many from the

15        PowerPoint.

16              Tell me what your

17        involvement was in Humeston.

18              MR. ARBITBLIT:  Right.  I

19        was just about to get there,

20        actually, Russ, in two ways.

21              First of all, as I had with

22        Ernst, and even probably more so,

23        because I had started my

24        involvement in this litigation in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

```
 1          the fall of 2004, specifically

 2          with Chris and Dave, and got my

 3          initial assignments from Dave,

 4          because he wanted lawyers with a

 5          science aptitude.  So, I was

 6          constantly in touch with Dave.

 7          There are hundreds of e-mails back

 8          and forth about every issue that

 9          came to mind.  He asked me to help

10          prepare their expert, Dr. Kronmal.

11          I participated with him in

12          preparing his report, prepping him

13          for his trial testimony.  There

14          are many e-mails back and forth

15          about interpretation of APPROVe.

16               And then in Humeston, as it

17          was going on, he asked for my help

18          in preparing for cross-examination

19          of Dr. Reicin, and also I was

20          preparing him for Dr. Graziano,

21          their epidemiologist.

22               MR. HERMAN:  You were in New

23          York for that?

24               MR. ARBITBLIT:  No, I was
```

FAC Resp. Amended Exhibit D -- 1086

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        not in New York for that, I was in

2        California, but I was responding

3        by e-mail on an urgent basis.

4        Whenever Dave wrote, I was right

5        there writing back, or Chris.

6              MR. HERMAN:  What about the

7        Ernst trial?

8              MR. ARBITBLIT:  Can I just

9        finish on Humeston?

10             Humeston I was a loss, but

11       Judge Higbee specifically relied

12       on the New England Journal as the

13       basis for the motion for a new

14       trial that allowed Chris, Dave and

15       the team to secure this $47

16       million verdict in Humeston.

17             MR. HERMAN:  In Humeston II?

18             MR. ARBITBLIT:  In Humeston

19       II.  So, without the New England

20       Journal article, there might not

21       have been a new trial.  So, I take

22       no credit for the great job they

23       did at trial, but I feel very

24       happy and proud to enable them

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

 1          with that work.

 2              MR. HERMAN:  What about the

 3          Ernst trial?

 4              MR. ARBITBLIT:  The Ernst

 5          trial, as I mentioned, I was in

 6          touch with -- I was not in Texas,

 7          I was working with Carlene Lewis

 8          on a steady basis, providing her

 9          interpretations of documents and

10          studies, providing her with

11          documents that would show you

12          could have a Vioxx injury with

13          short duration, and as mentioned,

14          that Merck was able to change the

15          label regardless of whether the

16          FDA said that they could in

17          advance, which was a contested

18          issue.

19              The Barnett trial, which was

20          here in New Orleans, I was a

21          full-time member of that trial

22          team.  I was specifically invited

23          on to that team by Mark Robinson,

24          because he knew I was working both

FAC Resp. Amended Exhibit D -- 1088

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          historically on other science

2          cases --

3                  MR. HERMAN:  I note that in

4          your presentation, Mark had

5          requested various materials from

6          you even before that trial began.

7                  MR. ARBITBLIT:  Yes.  Well,

8          I knew Mark all the way back to

9          fen-phen, and he knew that I dig

10         deep into the science issues, and

11         that's what he needed.  That's not

12         his strong suit.  He has many

13         strong suits, but he knows that he

14         needs help on that.  He gave me

15         the job of working with Dr. Zipes,

16         his key expert --

17                 MR. HERMAN:  Did you go to

18         the Philadelphia meeting he

19         arranged?

20                 MR. ARBITBLIT:  I went to

21         the Philadelphia meeting he

22         arranged.

23                 MR. HERMAN:  Tell us about

24         that.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1              MR. ARBITBLIT:  Well, my

2         understanding of it was that there

3         was an attempt to find a way to

4         reach common ground without

5         sharing work product, and so we

6         did not.  We talked about ideas,

7         but no MDL expert information was

8         provided to anyone outside the MDL

9         at that time or any other time

10        that I know of.

11             I had engaged in

12        discussions -- for example, I had

13        discussions with Jerry Kristal,

14        and I think there's some e-mails

15        in there where Jerry and I are

16        saying how much we like each

17        other's work.  One of them toward

18        the end says -- if you will look

19        at slides 25A and B, I did some

20        analysis of the VICTOR manuscript,

21        which went to Chris and --

22             MR. HERMAN:  I want to get

23        back -- I'm sorry.  I want to get

24        back to Philadelphia, this idea

FAC Resp. Amended Exhibit D -- 1090

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          that there was a meeting.  I still
2          don't understand that meeting.  I
3          have to tell you that.  Because,
4          frankly, at least in the MDL
5          executive committee and various
6          chairs, we had no idea the meeting
7          was going on.
8               MR. LEVIN:  How was it
9          called, and what was Dan
10         Sigelman's role?
11              MR. ARBITBLIT:  I don't know
12         how it was called.  I only know
13         that Mark asked me to come and so
14         I did.  I did learn at the time of
15         the meeting on the day of the
16         meeting that there was concern at
17         the MDL that something improper
18         might occur, and certainly from my
19         standpoint, and from what I
20         observed of Mark's standpoint,
21         nothing improper occurred.  We
22         listened, primarily we listened to
23         what their expert, Dr. Madigan,
24         had to say.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1           MR. HERMAN:  Whose expert

2       was Madigan?

3           MR. ARBITBLIT:  He was

4       the -- there was a New Jersey

5       team.  I don't know exactly --

6           MR. LEVIN:  Eric Weinberg?

7           MR. SEEGER:  Yes, it was

8       Weinberg.

9           MR. ARBITBLIT:  Weinberg was

10      one of the people working with

11      Madigan.  I don't know the extent

12      of who worked with Madigan, nor

13      who retained him.

14          MR. HERMAN:  Tell us about,

15      you were full time on the Barnett

16      trial team.  How long were you in

17      New Orleans?

18          MR. ARBITBLIT:  I was in New

19      Orleans for the entire trial,

20      which was approximately three

21      weeks and a couple of days ahead

22      of time.  And I had some pretty

23      significant tasks that are

24      described at slides 16 through 25.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          I got involved full time in April

2          2006 when Mark asked me to do

3          that.

4               My initial job, based on

5          what I knew about the data, I

6          wanted to see how can we prove

7          this case.  The main thing to me

8          was what's the guy's blood

9          pressure history, because I knew

10         we had some good stuff on blood

11         pressure, a special high risk

12         category.  So, I went through the

13         guy's records, I found these

14         spikes where he had gone over 160

15         in his systolic blood pressure,

16         and I knew that put him in a high

17         risk category.  We developed

18         demonstratives to show exactly

19         what these were so that a jury

20         could understand.  I put a couple

21         of these in the PowerPoint at

22         slides 18 through 21.  These are

23         exhibits that we worked up for the

24         trial so that when Dr. Zipes got

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          on the stand, for example, at

2          slide 18, he could show the jury

3          when Merck said all these

4          painkillers are alike, that

5          actually Vioxx was twice as bad as

6          Celebrex.  So, we could use that

7          as the backup for the evidence

8          that Zipes talked about in slide

9          20, where if you are in that blood

10         pressure spike group that Vioxx

11         causes more of, you've got a three

12         out of four chance that Vioxx

13         causes a heart attack.  Dr. Zipes

14         testified to that.  I think it was

15         strong evidence for the jury.

16         That was information --

17              MR. HERMAN:  You helped

18         prepare Zipes, didn't you?

19              MR. ARBITBLIT:  I prepared

20         Zipes for several days, actually.

21              MR. SEEGER:  We had him for

22         a week.

23              MR. ARBITBLIT:  Well, he

24         needed it.  He's a very smart guy.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          He's at the top of his field, but

2          he's also very demanding, and he

3          was very nervous.  There's an

4          e-mail that he sent that I wanted

5          folks to see, because I thought --

6               MR. SEEGER:  22.

7               MR. ARBITBLIT:  Thank you.

8          That's --

9               MR. HERMAN:  August 11, '04,

10         '06 rather?

11              MR. ARBITBLIT:  Yes.  The

12         one where he says, "I have told my

13         wife all about you.  To me, you

14         epitomize what great lawyers are

15         like, and I can't express how much

16         I respect and admire you.  You

17         helped me tremendously and were so

18         patient and kind."

19              So, I mean, for someone --

20              MR. LEVIN:  What's this

21         "kind" stuff?

22              MS. CABRASER:  This is Don's

23         role in the firm.  I'm not kind.

24         Don is kind.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1              MR. ARBITBLIT:  I protected
 2         him from Mark.
 3              MR. SEEGER:  Exactly.  We
 4         all get that one.
 5              MR. HERMAN:  Tell us your
 6         involvement in Kozic.
 7              MR. ARBITBLIT:  I was not
 8         deeply involved, but at the time,
 9         this was after some of the losses
10         and one of the criteria is did you
11         keep on working.  Yes, I was
12         working hard at new documents that
13         had been deprivileged for Dr.
14         Reicin.  I was involved -- I was
15         asked to participate in preparing
16         for her de bene esse deposition.
17              So, in the process of that,
18         I was preparing cross-examination
19         of Dr. Reicin about discrepancies
20         between the data on Vioxx risk
21         versus the --
22              MR. HERMAN:  Who did you
23         work closely with in terms of
24         trial team on that?
```

FAC Resp. Amended Exhibit D -- 1096

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1           MR. ARBITBLIT:  On Kozic?

2           MR. HERMAN:  Yes.

3           MR. ARBITBLIT:  I spoke with

4       Troy specifically and only Troy.

5       I think I had sent out an e-mail

6       to several people explaining some

7       of the discrepancies between what

8       Merck knew and what published

9       articles said.  Troy responded to

10      that and said --

11          MR. HERMAN:  That was a

12      Florida case that Troy and Pete

13      were involved in?

14          MR. ARBITBLIT:  Yes.

15          MR. HERMAN:  Did you go to

16      Florida in that case?

17          MR. ARBITBLIT:  No.  It

18      involved --

19          MR. HERMAN:  I don't want

20      you to take from what I'm asking

21      that you had to be in Florida or

22      any other place.

23          MR. ARBITBLIT:  I appreciate

24      that.  But what I did was I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          responded on an urgent basis,

2          since Troy was a week away from

3          trial, in giving him information

4          that would be potentially of use.

5                    MR. HERMAN:  And you also

6          were involved in Berwick in some

7          way?

8                    MR. ARBITBLIT:  Berwick was

9          Robinson's case in California.  He

10         asked me to take a deposition.

11                   MR. HERMAN:  Is that the

12         case he withdrew?

13                   MR. ARBITBLIT:  He did

14         withdraw it, yes.

15                   MR. HERMAN:  Do you know

16         why?

17                   MR. ARBITBLIT:  I don't know

18         specifically.  There were problems

19         with the plaintiff, but I don't

20         know what the specific problems

21         were.  That was after I had been

22         asked to and did take a deposition

23         of Dr. Pratt, who was one of

24         Merck's MDL experts that they were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          using in state cases as well, and

2          that deposition is part of the

3          trial package for MDL lawyers, and

4          I think I got some good things out

5          of it.

6                    MR. HERMAN:  What about

7          Irvin I and II?

8                    MR. ARBITBLIT:  I was

9          involved with Andy and with Paul

10         Sizemore quite a bit in Irvin I

11         and II over the course of the fall

12         of 2005, more so in Irvin I than

13         in Irvin II.  Dr. Farquhar -- Paul

14         Sizemore came out to meet with me

15         and with Dr. Farquhar.  He was

16         named as a witness, but they chose

17         not to call him, because there was

18         an inconsistency between his

19         approach and the approach of Dr.

20         Baldwin, whom they did call, as

21         far as what to do with high risk.

22                    Dr. Farquhar was very

23         insistent that high risk added to

24         the likelihood of a Vioxx event,

FAC Resp. Amended Exhibit D -- 1099

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

 1          whereas Dr. Baldwin took a

 2          different approach.  There was an

 3          inconsistency that would not have

 4          been helpful at trial from the

 5          people trying the case for the

 6          plaintiff.  So, he was not called.

 7          But I prepared him.  I met with

 8          Paul Sizemore and with Dr.

 9          Farquhar.  I provided earlier the

10          320 --

11               MR. HERMAN:  Let me

12          interrupt you, and I'm sorry to do

13          this, but you've got an awful lot

14          to say in a short period of time.

15               Was Paul Sizemore with

16          Andy's firm or Tom Girardi's at

17          the time?

18               MR. ARBITBLIT:  He was with

19          Andy's firm at the time.

20               MR. HERMAN:  That was a

21          California --

22               MR. ARBITBLIT:  Irving was

23          an MDL case.

24               MR. HERMAN:  No, no, I'm

FAC Resp. Amended Exhibit D -- 1100

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          sorry.

2                Irving was an MDL case in

3          New Orleans?

4                MR. ARBITBLIT:  Correct.

5                MR. SEEGER:  Actually, I

6          have a question, Russ, when you

7          are done.  Are you done?

8                MR. HERMAN:  And you said

9          you did more in I than in II?

10               MR. ARBITBLIT:  That's

11         right.  Because Farquhar was not

12         going to be called in II, and he

13         was the principal person I was

14         working with.

15               MR. HERMAN:  Go ahead.

16               MR. SEEGER:  Elizabeth is

17         right, because there have been so

18         many people collaborating on so

19         many projects, and we're really

20         trying to sort some things out.

21         So, you don't have a lot of time

22         remaining, but it would be very

23         helpful to me -- and, look, I

24         know, you are a lawyer's lawyer.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1      You are a good lawyer.  Everybody

2      knows that.

3          I would like to know what

4      projects you would consider were

5      the ones you owned.  Like I worked

6      a little bit on the Daubert, I did

7      this on that, but I kind of own

8      these two or three projects, and

9      this is what I did and provided

10     leadership on.

11         MR. ARBITBLIT:  Okay.  I

12     think that I marshalled the

13     evidence, to the extent there was

14     evidence, I marshalled all of it

15     for the short-term use issue on

16     Daubert and got us over that

17     hurdle.

18         I think I owned the New

19     England Journal Expression of

20     Concern that became a part of the

21     trials.

22         I owned the Watson issue and

23     the module that came of it that

24     showed there was a premarketing

FAC Resp. Amended Exhibit D -- 1102

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          signal of Vioxx toxicity that the

2          company never revealed to the FDA

3          and which became part of experts'

4          testimony after I circulated a

5          memo in June of 2005, including

6          Dr. Kronmal, Dr. Farquhar, Dr.

7          Moye, Dr. Gregory.

8                    I own the osteoarthritis

9          initial analysis that was there a

10         three times greater risk for Vioxx

11         than placebo, which Merck had

12         denied, and that became a part of

13         some witness trial testimony or

14         expert testimony.

15                   I owned the blood pressure

16         spike and the hypertension issue.

17         Shelly Sanford specifically

18         assigned me to write the

19         hypertension memo in October 2007

20         and to complete it after the

21         settlement because of the work I

22         had done previously.

23                   MR. SEEGER:  That was for

24         the trial package, the memo?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1              MR. ARBITBLIT:  It was for

2         the trial package, as well as the

3         stroke issue that I worked up for

4         the trial package to show that,

5         yes, there was a significant

6         excess of strokes, as well as

7         heart attacks, even independently

8         of each other.  So, that

9         hypertension issue between showing

10        Vioxx was worse for hypertension

11        and that people that had those

12        spikes were more susceptible to

13        heart attacks I think was integral

14        to the success of the Barnett

15        case.

16              So, being able to turn

17        around Humeston, being able to

18        participate in getting the Barnett

19        case as the only MDL victory, I

20        would say that those are

21        significant contributions, and

22        they were ongoing at the time.

23        It's always a mixed feeling.  My

24        office desk was full of documents

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          on November 9th when the call came

2          in for settlement, and I just

3          said, well, I guess I'll go home

4          for the day.

5               MS. CABRASER:  He was very

6          disappointed -- I mean, he was

7          distraught.

8               MR. WEITZ:  Don, how many

9          cases did you submit to the

10         settlement?

11              MR. ARBITBLIT:  160.  And

12         we've had 100 percent of them

13         approved so far, which is about 60

14         of them.

15              MR. RAFFERTY:  Don, did

16         Farquhar end up testifying in any

17         of the trials?

18              MR. ARBITBLIT:  No, he was

19         not called as a witness.

20              MR. WEITZ:  Where were your

21         cases filed, in the MDL or in

22         California?

23              MR. ARBITBLIT:  Very few in

24         California.  There were some in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          New Jersey.  The majority in the

2          MDL.

3               MR. WEITZ:  Had you guys

4          worked up any cases that were on

5          the trial docket?

6               MR. ARBITBLIT:  We had one

7          at least.  There was another

8          gentleman named Ralph Barnett, a

9          different Barnett, who was on the

10         New Jersey docket.  We had

11         submitted several for additional

12         discovery in the fall of 2007

13         pursuant to Judge Higbee's request

14         for additional cases.

15               MR. WEITZ:  But the 39

16         cases, the cluster --

17               MR. SEEGER:  Excuse me for

18         interrupting, but I'm only making

19         this correction, and I hope you

20         don't find this as any statement

21         on the quality of the work you

22         did, it's just that because we

23         create this transcript and you go

24         around and you meet with people

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

 1          and everybody says, you know, I

 2          did this and that.

 3              I just want to make it clear

 4          that on the Humeston new motion

 5          trial, we had many grounds that we

 6          were seeking under.  Now, you

 7          found this piece, what turned into

 8          the EoC, which I just think gave

 9          the judge sort of a roadway to

10          overturn that verdict, which was

11          faulty on so many levels.  But

12          there was a whole team effort on

13          that.  Dave Buchanan did the

14          briefing, and I was involved and

15          many people.  But you gave us a

16          very important piece of evidence

17          there.

18              MR. ARBITBLIT:  Well, I

19          agree, Chris, and I totally agree,

20          you guys did a very thorough job.

21          I've read all the papers, and when

22          I read the judge's decision and

23          the quote, she said that --

24              MR. SEEGER:  You gave her

FAC Resp. Amended Exhibit D -- 1107

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1        the roadway.  I'm saying that.

2              MR. ARBITBLIT:  And I know.

3        You guys worked day and night on

4        many, many different grounds.  If

5        that hadn't been there, it is

6        possible she would have found

7        another reason to do it.

8              MR. SEEGER:  Well, we don't

9        know.

10             MR. ARBITBLIT:  We don't

11       know.  She cited this one.  I'm

12       proud of it.

13             MR. WEITZ:  Don, let me just

14       get back to what I was asking.

15             Were there any cases that

16       you guys had in either the MDL or

17       in New Jersey where you actually

18       had a trial date and were going to

19       trial?

20             MR. ARBITBLIT:  No.

21             MR. HERMAN:  On the science

22       -- I'm sorry, Perry, are you done?

23             MR. WEITZ:  No, I'm done.

24             MR. HERMAN:  On the science

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

```
 1        committee that you were active in,
 2        other than yourself, what can you
 3        tell us about the members of the
 4        committee?  You don't have to
 5        highlight anybody if you don't
 6        want to.  If there was somebody
 7        that you thought was behind the
 8        work, we'd like to know who that
 9        is.
10             MR. ARBITBLIT:  Well, we had
11        weekly calls for a while.  I
12        stopped doing the weekly calls
13        when those calls just turned into
14        me lecturing, because I was
15        reading all the documents anyway,
16        and I wasn't getting any new
17        information from having those
18        calls.  I do recall that Tara
19        Sutton, who I see is up next, did
20        a good job on the project that I
21        asked her to do on analyzing some
22        of the epidemiology cases under
23        Daubert, and I used some of her
24        work when I wrote the brief.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1              I don't get involved in what

2        some of the controversies are, I

3        try not to.  I understand that Dan

4        Sigelman later was working with

5        New Jersey people and that may be

6        a source of consternation to some,

7        but at the time that I knew him, I

8        knew that he was involved in the

9        MDL and he was on my committee and

10        he did work.  He was one of the

11        few who did work and had

12        experience to contribute and

13        he analyzed some of the --

14              MR. HERMAN:  Was Bert Black

15        on your committee?

16              MR. ARBITBLIT:  Bert Black

17        was on the committee.

18              MR. BLIZZARD:  I don't have

19        any questions, Don, but I do want

20        to say that this is not really

21        Vioxx related, but it comes out of

22        Vioxx.  I think that the New

23        England Journal of Medicine work

24        that you did, I don't have proof

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          of this, but I believe it laid the

2          good groundwork for their help on

3          the preemption issue, which was

4          important to all of us, and I

5          appreciate your work with the New

6          England Journal of Medicine.  They

7          are not a bunch of wild eyed libs,

8          whatever Phil Beck wants to say,

9          and getting them on their side or

10         our side of these issues is very

11         important to us going forward, and

12         I appreciate it.

13              MR. ARBITBLIT:  Thank you,

14         Ed, and I appreciate your saying

15         that, and I did include that Dr.

16         Curfman went to Congress also and

17         testified to the committee on that

18         very subject.

19              MR. SEEGER:  Let's go off

20         the record.

21              (Whereupon, a discussion was

22         held off the record.)

23              MR. WEITZ:  Let's go back to

24         the hours, because there's a large

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1     number of hours, and I think you

2     explained yourself and your

3     substantive contribution well in

4     this session.

5          But I think Elizabeth has

6     said that you did about 5,000

7     hours of work yourself.  Explain

8     to us the other 13,000 hours, and

9     really because we're trying to

10    differentiate between people that

11    just reviewed documents and

12    substantive work that really made

13    a difference in the litigation.

14         MR. ARBITBLIT:  Most closely

15    connected to me, I believe Jenny

16    Gross was in the neighborhood of a

17    couple thousand hours.  It might

18    have been more than that, but she

19    was a constant presence.  She was

20    here full time for the Barnett

21    trial.  Whenever I needed

22    something, she was there.  I'd get

23    e-mails from her in the middle of

24    the night.  She's a very hard

FAC Resp. Amended Exhibit D -- 1112

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          worker, and digging into the

2          science was a lot of work for her,

3          not only the data, but the

4          documents.  She was a very good

5          detective.  So, there's a couple

6          thousand there.  I believe

7          Elizabeth's work is 1,900 to

8          2,000.

9               MS. CABRASER:  I'll talk

10          about that in a minute.

11               MR. LEVIN:  When you do

12          talk, differentiate between the

13          purchase claims.

14               MS. CABRASER:  Sure, I will.

15               MR. ARBITBLIT:  One of the

16          assignments that Paulina do Amaral

17          of our New York office received

18          was to head up the Arcoxia, which

19          was another COX-2 inhibitor,

20          discovery project, to see what

21          would be useful there.  So, a lot

22          of her time was spent on that,

23          which was also in the common

24          benefit bailiwick.

FAC Resp. Amended Exhibit D -- 1113

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1           Wendy Fleishman's common

2       benefit work was probably on

3       medical monitoring.

4           MR. LEVIN:  That was in New

5       Jersey?

6           MR. ARBITBLIT:  In New

7       Jersey, yes.  Also the MDL had a

8       medical monitoring complaint,

9       didn't it?

10          MR. LEVIN:  Yes.

11          MR. ARBITBLIT:  So, it was

12      both.

13          Of course, the total time

14      includes paralegals and support

15      staff as well.  So, there was a

16      fair amount of, before I reviewed

17      documents, sometimes there would

18      be a paralegal -- often there

19      would be a paralegal who would

20      screen, and we had people working

21      on document reviews from the

22      get-go.

23          In December of 2004, Dave

24      Buchanan asked us to start

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

1          reviewing part of a 500,000-page

2          custodial file for Tom Simon for

3          his deposition, and then there

4          were hundreds of thousands of

5          pages of adverse event reports

6          that we were asked to review.  I

7          didn't do all of that myself.  I

8          did a lot of that myself,

9          obviously, and I did the higher

10         end analysis and what to use for

11         exhibits and such.  But there was

12         help from associates on doing that

13         work.

14              But there was no work that

15         had no purpose.  There was never a

16         job where we just billed time.

17         Every job was done because it

18         needed to be done.  And that was

19         my job, to make sure nobody was

20         working on projects that I didn't

21         need to prove the case.

22              MR. WEITZ:  Were those jobs

23         that were given as a direction

24         from leadership on the MDL?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1              MR. ARBITBLIT:  Yes.  I

2     would say yes, because I was the

3     chair of the epidemiology and

4     causation committee, so, I had a

5     fairly broad charge.  I had to

6     write up what my mission statement

7     was.  My mission statement was

8     approved, and everything that was

9     assigned through me fell into that

10    mission statement that the PSC had

11    approved.

12             MR. BIRCHFIELD:  Those

13    assignments came through Shelly,

14    the charge?

15             MR. ARBITBLIT:  Well,

16    Carlene initially, sure, and

17    Shelly.  It was still Carlene at

18    the time that the mission

19    statement was approved.  That was

20    about June of 2005, right after

21    the MDL --

22             MR. SEEGER:  Just to get

23    back on schedule, I know

24    Elizabeth, you wanted to add some

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 50

1          comments, but we should begin to

2          sum up.  We are starting to fall

3          behind.

4               MR. LEVIN:  We are running

5          late.

6               MS. CABRASER:  Got it.

7               Before Don sums up, let me

8          just give you a very quick run

9          through of my personal time, which

10         is approximately 1,700 hours, so,

11         less time than Don's, I think for

12         the very obvious reasons.

13              Some MDLs are all about the

14         law.  This MDL was really most

15         about the science, the evidence,

16         the medicine and the trials.  And,

17         in fact, one of the main missions

18         of the long briefing committee was

19         not to get legal rulings on issues

20         that might be issues of

21         vulnerabilities.  There's a

22         tremendous strategy, which I think

23         was primarily Arnold's strategy,

24         on briefing with respect to how to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

```
 1              --
 2              MR. LEVIN:  Are you telling
 3         me my strategy was to do nothing?
 4              MR. SEEGER:  Amazing how he
 5         does that.
 6              MR. HERMAN:  You were
 7         successful in that strategy.
 8              MS. CABRASER:  It was to
 9         keep bad things from happening.
10              MR. LEVIN:  A great
11         recovery.
12              MS. CABRASER:  And it is a
13         very tough strategy.
14              MR. WEITZ:  He's actually
15         very good at that.
16              MS. CABRASER:  It was
17         maneuvering through a minefield.
18         Preemption was looming.  That was
19         a fabulous decision by Judge
20         Fallon on preemption, the best
21         decision, but that was due to a
22         strategy by law and briefing of
23         what to do, but more importantly,
24         what not to do.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

1            In that respect, that was

2       primarily Arnold and his office

3       doing that.  My role on law and

4       briefing, although it was

5       co-chair, was really a support.

6       We did some briefing, we did some

7       research.  If I get a call to do

8       overnight briefing on a particular

9       issue, like the day that Graham

10      motion to quash subpoena, I would

11      do that.  Because we were in

12      California, we could be the

13      overnight crew.  We did that a lot

14      on motions in limine for various

15      trials.  Happy to do it.  Was it

16      pivotal to the litigation?  No.  I

17      think the David Graham stuff was

18      neat, and I did that.

19           The other thing that I did,

20      and I spent about 220 hours on

21      this, is purchase claims.  Again,

22      at the outset of the case, at the

23      request of leadership, I chaired

24      that committee mainly to deal with

Page 53

1           political issues and keep it out

2           of the way, keep it alive, but

3           keep it out of the way so that

4           purchase claims could go ahead in

5           New Jersey, where things were more

6           favorable, so that Judge Fallon

7           could focus on trials and personal

8           injury claims.  I saw no conflict

9           with that.  I think it is a

10          contribution.  I think it is a

11          valuable contribution, but, again,

12          it is certainly less sexy and less

13          dramatic than many of the other

14          contributions.  I was happy to do

15          it.  Could someone else have done

16          it politically with the purchase

17          claims crew?  I like to think I

18          was able to do something.  But,

19          again, the value of that

20          contribution has yet to prove out.

21               So, more than 50 percent of

22          my time was spent on the personal

23          injury side of the case, primarily

24          legal briefing, legal research,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 54

1          legal issues, but, again, I didn't

2          argue most of the motions.  Russ

3          and Arnold argued most of the

4          motions.  I argued one major

5          motion, the purchase claims

6          committee motion to dismiss, and I

7          don't know whether that was a good

8          argument or not or whether it

9          would be successful or not, but

10         the claims are still alive.

11              Involuntarily in New Jersey,

12         we got tagged with medical

13         monitoring, to try and keep that

14         claim alive.  Worked for a while,

15         ultimately it did not.

16              MR. LEVIN:  When you have

17         1,700 hours in briefing, that

18         includes all the briefing in New

19         Jersey?

20              MS. CABRASER:  Yes.  That's

21         a total.

22              MR. LEVIN:  That was where

23         you took medical monitoring

24         through the appellate system?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 55

1           MS. CABRASER:  Yes.  I have

2      92 hours on Local 68 work in New

3      Jersey.  Medical monitoring I

4      tried to break out, it would be

5      about that amount or less, but

6      most of the briefing time was on

7      the MDL side.

8           MR. ARBITBLIT:  Can I have

9      two minutes?

10          MR. SEEGER:  Yes.

11          MR. ARBITBLIT:  For one

12     minute I wanted to just talk about

13     something early, the physician

14     contacts issue that I know Russ

15     argued with Judge Fallon.

16          When the MDL was threatened

17     by the ruling that said

18     plaintiffs' lawyers couldn't talk

19     to the doctors, Chris asked me to

20     take on briefing this issue,

21     because I thought I had an idea,

22     it turned out to be an idea that

23     Russ was able to get the judge to

24     sign off on, and since has become

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 56

1          adopted by other courts, that

2          unless there's a specific naming

3          of the doctor, which was only true

4          in about 7 percent of the cases,

5          that the plaintiffs' lawyers could

6          have continued to have their

7          contacts with the doctors.  I

8          thought that was important in

9          terms of helping the MDL get off

10         the ground without having this

11         unlevel playing field, where

12         plaintiffs' lawyers would choose

13         state venues.

14              So, I've been committed to

15         the MDL from the outset, and I

16         wanted folks to know that, and I

17         wanted to make it clear that I

18         have done what I could to make

19         that viable.

20              On the Barnett trial, one

21         thing I didn't mention that I

22         don't know if people are aware of

23         is that I was assigned to take the

24         deposition of the defense expert,

Page 57

1           Dr. Kim, and their science expert

2           a month-and-a-half before the

3           trial.

4                MR. HERMAN:  And you did

5           that and they withdrew him.

6                MR. ARBITBLIT:  They

7           withdrew him, that's right.  They

8           withdrew him at trial in part

9           because of what's on Exhibit 24,

10          which is slide 24, in his own

11          handwriting, showing that using

12          the APPROVe study, there would

13          have been a 78 percent chance of

14          that heart attack suffered by Mr.

15          Barnett was due to Vioxx.

16               MR. SEEGER:  You made him do

17          this calculation at the dep?

18               MR. ARBITBLIT:  I did.

19               MR. BLIZZARD:  Attributable

20          risk.

21               MR. ARBITBLIT:  Attributable

22          risk.  And he wouldn't have been

23          able to dance out of it, and so

24          they had no expert at trial, which

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 58

1          is pretty unusual, and I own that,

2          too.

3               Thank you very much for all

4          the work you have done.  It was a

5          pleasure working with all of you.

6               MR. SEEGER: Thank you.

7               MR. HERMAN:  Thank you.

8               MR. BIRCHFIELD: Thank you.

9               MR. LEVIN: Thank you.

10               MS. CABRASER: Thank you.

11                    -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 59

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23            Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24
```

FAC Resp. Amended Exhibit D -- 1126

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 2, 2008

- - -

NEW ORLEANS, LOUISIANA

- - -

FIRM:  LOCKRIDGE GRINDAL NAUEN, PLLP
       Richard A. Lockridge, Esquire
       Yvonne Flaherty, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                - - -
 2            MR. LOCKRIDGE:  Well, thank
 3        you for having us here.  I'm Dick
 4        Lockridge, and with me is Yvonne
 5        Flaherty, and we're both from
 6        Minneapolis, the Minneapolis law
 7        firm of Lockridge Grindal Nauen.
 8        I'm here in a slightly awkward
 9        position in that I did not
10        personally do very much work on
11        Vioxx, although Yvonne did some.
12            Although I was at the
13        initial organization meeting, the
14        vast majority of the work was done
15        by Bert Black, who, as I'm sure
16        you all know, sent an
17        exceptionally unfortunate e-mail
18        in June or July '07, did not do
19        any more work in the case,
20        obviously, after that, and soon
21        thereafter left our firm and is no
22        longer with our firm.
23            But I think while he was
24        working on the case, he and a few
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          other people in our firm did a lot

2          of very, very excellent work.

3                  MR. WEITZ:  I'm sorry, I'm

4          not familiar with that situation.

5                  MR. SEEGER:  Perry, you're

6          going to make him go there?

7                  MR. WEITZ:  No, no.  I just

8          don't know what you are talking

9          about.  I never heard of it.

10                 MR. LOCKRIDGE:  Bert Black

11         is kind of the science guru, and

12         he was with our firm during the

13         Vioxx case, and he sent out an

14         e-mail I believe in June or July

15         of '07, castigating certain

16         individuals in the MDL and the MDL

17         leadership, which was an entirely

18         inappropriate and wrong e-mail.

19         He did it on his own, totally

20         without anybody else in the firm

21         knowing about it, and it was

22         pretty obnoxious.  And,

23         understandably, Russ was not happy

24         about it and terminated him from

FAC Resp. Amended Exhibit D -- 1129

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          working any longer on the case,

2          and then a couple of weeks

3          thereafter, Bert left our firm.

4                MR. WEITZ:  Did he have an

5          official role in the MDL at that

6          time?

7                MR. LOCKRIDGE:  Bert?  Well,

8          he was on the science committee,

9          and I'll get to all the work that

10         he did do.

11               MR. SEEGER:  As soon as it

12         was brought to Dick's attention,

13         he took immediate action.

14               MR. LOCKRIDGE:  I was going

15         to address that at the end, but

16         that's fine.

17               But Bert, he was assisted by

18         Yvonne Flaherty and also Elizabeth

19         Odette of our firm.  Bert was on

20         the science committee, and he

21         worked extensively with Carlene

22         Lewis, John Restaino and Paul

23         Sizemore.  Most of his work was

24         through the science committee, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          he was also on the epidemiology

2          proof of causation subcommittee

3          with Don Arbitblit, who, of

4          course, you just saw.

5               He was on the subcommittee

6          of mechanism of action

7          pharmacology defense issues, and

8          he was on the Daubert expert

9          witness development committee and

10         worked also there with several

11         people, including Michelle Parfitt

12         and some others.

13              I'll go through some of the

14         specific projects just briefly and

15         then touch on some in more detail.

16         Some of the work that he did was

17         on the so-called Vioxx science

18         story, which was a project that

19         supported causation and debunked

20         Merck's junk science myths.  This

21         was assigned through the science

22         committee, and I know he

23         circulated this to the PSC and the

24         trial teams.  He worked

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        extensively on the label change

 2        memorandum, which was assigned to

 3        him through the science committee

 4        and John Restaino and Mark

 5        Robinson and Troy Rafferty.

 6              I think some of you saw,

 7        this was a 71-page, single-spaced

 8        history of the April 11, 2002

 9        label change relating to VIGOR.

10        It is more than probably you

11        wanted to know, but it certainly

12        told you everything you ever

13        wanted to know about that topic.

14              MR. BIRCHFIELD:  It was very

15        thorough.

16              MR. RAFFERTY:  Very

17        thorough.

18              MR. LOCKRIDGE:  Very

19        thorough.

20              Bert, of course, worked

21        extensively on Daubert and Daubert

22        issues.  I'll get to that in a

23        little more detail.  He at least

24        argued a couple of Daubert motions
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      before Judge Fallon.  He retained

2      Dr. Richard Kapit, who was an MDL

3      expert, and he worked extensively

4      with Paul Sizemore with Dr. Kapit.

5      Bert and Paul Sizemore met with

6      Dr. Kapit several times.

7           He also worked with Ted

8      Wacker in California with Dr.

9      Kapit.  I know that Bert worked

10     with Dr. Kapit when he was a

11     witness, at least in the retrial

12     of the Irvin/Plunkett case.  He

13     prepared and worked with Dr. Kapit

14     in preparing his expert reports,

15     and obviously those were all

16     distributed to the trial teams.

17     He defended Dr. Kapit at two

18     different depositions, I think

19     September of '05 and then again in

20     June of '06.  Bert argued the

21     Daubert motion before Judge Fallon

22     in November of '05 where the

23     defendants wanted to exclude Dr.

24     Kapit.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          Bert and our associate
 2     Elizabeth Odette prepared outlines
 3     for direct examination and also
 4     prepared outlines for expected
 5     cross-examination for at least the
 6     first Irvin/Plunkett trial for Dr.
 7     Kapit, and I believe also for the
 8     second Irvin trial.  So, he did a
 9     lot of his work with Dr. Kapit.
10          Bert also retained Dr.
11     Robert Fletcher from Harvard.  He
12     met several times with Dr.
13     Fletcher.  He prepared the
14     response to the Daubert motion
15     regarding Dr. Fletcher.  Some of
16     you may recall Dr. Fletcher was
17     excluded by Judge Fallon, but
18     other experts were excluded, too.
19          Bert worked with Dr. Colin
20     Funk, who was an expert who was
21     actually proposed by Bert.  He met
22     several times with him, worked on
23     his expert report.  I don't
24     believe he was ever used, although

FAC Resp. Amended Exhibit D -- 1134

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1         I know Mark Robinson, and maybe

2         you, Andy, were also at one time

3         at least considering using him.  I

4         know at least Mark ultimately did

5         not use him, although I think he

6         was down actually at the trial.

7              Bert worked with Dr.

8         Benedict Lucchesi, who was an MDL

9         expert.  I think he was the lead

10        off expert in Irvin I, maybe even

11        Irvin II, I'm not sure.

12             MR. BIRCHFIELD:  Irvin I.

13             MR. LOCKRIDGE: Irvin I?

14        Okay.

15             He worked on the response to

16        the Daubert motion, met with him

17        several times.  He and Paul

18        Sizemore worked on -- he and Paul

19        Sizemore worked on the preparation

20        for the Irvin trial and the second

21        Irvin trial in preparing Dr.

22        Lucchesi --

23             MS. FLAHERTY:  Lucchesi.

24             MR. LOCKRIDGE:  Lucchesi,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          excuse me.  Thank you.

2                  He worked on an outline for

3          trial and expected cross.  Bert

4          also worked with Dr. Wayne Ray,

5          who was another MDL expert who I

6          believe testified at least at

7          Irvin II, maybe at Irvin I,

8          although I'm not sure.

9                  MR. BIRCHFIELD:  Irvin I.

10                 MR. LOCKRIDGE:  I believe

11         that he at least worked in

12         preparation with Dr. Ray for those

13         trials.

14                 I believe pursuant to Russ

15         Herman's request, Bert analyzed

16         Dr. Ray's statistics and causation

17         issues relating to Merck's

18         February 2006 motion.  I believe

19         it was for judgment of the

20         pleadings or summary judgment, I'm

21         not sure which.  This was all

22         circulated and prepared and sent

23         to the trial teams.

24                 Then, finally, he worked on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        Dr. Bruce Squires, who, as I

2        understand it, was not ever used,

3        but he worked under the direction

4        of Paul Sizemore and John Restaino

5        for this.  Dr. Squires was, of

6        course, the former editor of the

7        Canadian Medical Association

8        Journal.

9            He did a lot of work on the

10       defense experts, too, as some of

11       you may recall.  He worked

12       involving Dr. Janet

13       Arrowsmith-Lowe.  He prepared

14       outlines.  Bert took her

15       deposition twice, once in October

16       of '05 and another time in June of

17       '06.

18           He worked on a Daubert

19       motion to exclude Arrowsmith-Lowe.

20       He argued the motion to exclude

21       her.  They worked on preparation

22       for her cross-examination at least

23       at the first Irvin/Plunkett trial

24       down in Houston.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1            Yvonne worked on research,

 2       on background research on her for

 3       other cases.  She's certainly been

 4       in a lot of cases, as you recall.

 5            Bert worked pretty

 6       extensively on matters involving

 7       Dr. Alise Reicin; is that correct?

 8            MR. SEEGER:  Yes.

 9            MR. LOCKRIDGE:  I know you

10       guys know, obviously.

11            Bert, I believe, worked a

12       lot on the two Irvin trials

13       involving her, had a lot of

14       meetings involving her, and my

15       understanding was, he also

16       prepared the cross-examination for

17       the Barnett trial, too.

18            Bert did also some work

19       involving some of the other

20       defense experts like Dr. Roach,

21       Dr. Lisa Rarick, Dr. Frank Lanza

22       and a few others.  At the request

23       of Mark Robinson, he worked with

24       Dr. Suzanne Parisian.

FAC Resp. Amended Exhibit D -- 1138

Page 13

1            In the trial work, Bert was

2       at, I believe, the two Irvin

3       trials, and at least for part of

4       the Barnett trial.  He did work

5       extensively on motions in limine

6       in Irvin I, and I've indicated

7       much of what he's done there.

8            At the Irvin II trial, I

9       believe, Andy, he worked on that

10      case also again in the trenches.

11      I believe he worked some at least

12      on the outline of closing

13      arguments.

14           On the Barnett trial, I know

15      he worked extensively with Mark

16      Robinson and Ted Wacker there on

17      that trial, preparing direct and

18      cross-examinations, including,

19      obviously, mainly with the

20      experts.  These were some new

21      experts, it was Flavahan and

22      Morrison, and he worked on some

23      motions in limine.

24           The time records tell me he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          did some things on the Berwick

2          trial, but, frankly, I don't know

3          what the heck he did.

4               He did do some FDA issues.

5          I've already mentioned the

6          labeling work that he did.  He

7          worked with Ted Wacker and Paul

8          Sizemore on some FDA issues.

9               He worked on AERs with Don

10         and the cerebrovascular event

11         research analysis.  This was not

12         with Don, but he did do a fair

13         amount of work on that.

14              Obviously our firm did some

15         other things, but this was

16         certainly the high points.  I

17         believe our MDL time is around 2.4

18         million.  We had most of our cases

19         in the MDL, although we had a few

20         cases in New Jersey.  I think we

21         had a total of 61 cases.

22              MR. HERMAN:  What was the

23         2.4 million?

24              MR. LEVIN:  That's the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        loadstar.

2             MR. LOCKRIDGE:  I believe

3        that's the loadstar in the MDL for

4        common benefit time.  We obviously

5        had a lot more time.  There are

6        individual cases that we did not

7        submit and kept completely

8        separate.

9             MR. WEITZ:  How many

10       individual cases did you submit to

11       the settlement?

12            MS. FLAHERTY:  61.

13            MR. LOCKRIDGE:  61.

14            MR. WEITZ:  Where were those

15       cases filed?

16            MR. LOCKRIDGE:  Most of them

17       were here, but there were a few

18       filed in New Jersey.

19            MR. WEITZ:  Did you have any

20       of those cases prepared for trial?

21            MS. FLAHERTY:  In New

22       Jersey.  Those cases were coming

23       up.  Actually, we did a lot of

24       work with Robb Dassow and Suzanne

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        Scovern.  I recall before the
 2        settlement, before things started
 3        moving towards the settlement,
 4        there was a call made out for good
 5        cases in New Jersey, otherwise,
 6        Judge Higbee, I believe, was going
 7        to start selecting cases herself
 8        if we didn't put the cases
 9        forward.  So, our local counsel --
10            MR. WEITZ:  Who was Robb
11        Dassow?
12            MS. FLAHERTY:  No.  Robb
13        Dassow is actually licensed in
14        Indiana.  He did a lot of his work
15        in New Jersey, and then we worked
16        with him and Suzanne, who is from
17        California.
18            MR. WEITZ:  Scovern?
19            MS. FLAHERTY: Right.  Mike
20        Ferrara was our local counsel to
21        file cases in New Jersey.
22            MR. WEITZ:  So, when you say
23        you did a lot of work with Robb
24        Dassow and Suzanne, what kind of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           work are you talking about?

2                   MS. FLAHERTY:  That was not

3           common benefit work that we

4           submitted for purposes of this

5           presentation today.  That was work

6           more on our individual cases.  We

7           did help them a little bit --

8                   MR. SEEGER:  Did you put

9           cases in the pool that were being

10          worked in?

11                  MS. FLAHERTY:  Yes.

12                  MR. SEEGER:  Some of that

13          we're considering.

14                  MS. FLAHERTY:  Okay.  There

15          was a case, Donna Schwab was put

16          up toward the end, and I think

17          they sent out scheduling orders,

18          and I'm recalling it was going to

19          be, it was towards the end of the

20          year and maybe it was late, was it

21          '07 perhaps, maybe it was even

22          '06 --

23                  MR. WEITZ:  It was towards

24          the end of the litigation.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

 1          MS. FLAHERTY:  Correct.  And

 2      so I know they were scheduling,

 3      there was a scheduling order that

 4      came out, and things were kind of

 5      put to a halt, and that was the

 6      end of that.

 7          MR. WEITZ:  So, you had

 8      submitted a case, but you didn't

 9      do any work on the case?

10          MS. FLAHERTY:  Not common

11      benefit work.

12          MR. WEITZ:  Okay.

13          MR. RAFFERTY:  Well, when

14      you say "not common benefit work,"

15      I mean, did y'all take

16      depositions?

17          MS. FLAHERTY:  No.  They

18      were being scheduled, it was on a

19      scheduling order, but everything

20      was put to a halt.

21          MR. LEVIN:  Just an

22      individual case.

23          MR. BLIZZARD:  Was Dr.

24      Parisian used in any of the cases?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1                    MR. SEEGER:  In Jersey?

2                    MR. BLIZZARD:  No, I'm

3          sorry.  I'm back to, there was

4          discussion about Suzanne Parisian,

5          who I know to be an FDA expert

6          that Merck was working with.  Did

7          she get used in any of the cases?

8                    MR. RAFFERTY:  Not in

9          Kosick, not in Irvin II.

10                   MR. SEEGER:  Was she used in

11         Barnett, Parisian?

12                   MR. BIRCHFIELD:  She was

13         being worked up for Barnett.

14                   MR. SEEGER:  She was worked

15         up for a case or two, probably not

16         put on the stand though.

17                   MR. BIRCHFIELD:  No, I don't

18         think she was.

19                   MR. LOCKRIDGE:  I don't have

20         anything more, but if you have

21         other questions.

22                   MR. BIRCHFIELD:  Just one

23         question.

24                   You said that he worked

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          with, was it the Berwick trial,

2          was that the last one that you

3          mentioned?  Was that Mark's case

4          out in California?

5               MR. LOCKRIDGE:  It probably

6          was, yes, but I don't know very

7          much about it.  He didn't do much

8          on that.

9               MR. HERMAN:  You've got

10          about $70,000 in costs?

11               MR. LOCKRIDGE:  Yes.  I

12          guess we didn't get asked for an

13          assessment, but we don't have very

14          much in costs.  As you know, I'm

15          cheap, Arnie.

16               MR. HERMAN:  Let me say, and

17          I didn't say this at the

18          beginning, but I'm sure you'll

19          see.  Everything is being

20          recorded, and you are going to get

21          a copy.  The main thing the judge

22          is looking for is transparency and

23          consistency.

24               MR. LOCKRIDGE:  Certainly.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          MR. HERMAN:  Secondly, you

2     submitted an affidavit.  If we

3     don't resolve all the fee issues,

4     the judge is going to appoint a

5     Special Master and appoint people

6     to take lawyers' depositions, et

7     cetera.  Hopefully we can resolve

8     those issues.  If we can't, take a

9     look at your affidavit, and if

10     there's something you want to

11     supplement or delete, you may want

12     to consider that, but that's down

13     the line.

14          MR. LOCKRIDGE:  Okay.

15          MR. BIRCHFIELD:  I want to

16     say I appreciate your presentation

17     and your candor.

18          MR. LOCKRIDGE:  Thank you.

19     I really appreciate all of you

20     guys.  I know this is a big

21     effort.  I've been on the other

22     side of it.

23          MR. SEEGER:  Thank you.

24                    -  -  -

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23          Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM: LOCKS LAW FIRM
      James Pettit, Esquire
      Steven P. Knowlton, Esquire
      Gene Locks, Esquire


BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
      877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2          MR. PETTIT:  Good morning.
 3     My name is Jim Pettit, Locks Law
 4     Firm.  Steve Knowlton is to my
 5     right.  Mr. Locks is here.
 6          MR. KNOWLTON:  Good morning.
 7          MR. PETTIT:  I've handed up
 8     a submission which I will
 9     supplement with an affidavit when
10     I get back to my office.  It's got
11     13 points.  The thrust of it
12     really is, I think, our
13     presentation of the Doherty jury
14     trial, which was back in July of
15     2006, and to address a couple of
16     other points as well.
17          I took a rough stab at what
18     I thought were the most important
19     issues.  Obviously in a
20     five-and-a-half week trial, there
21     were a lot of issues, a lot of
22     rulings, a lot of handling of
23     evidence.  I thought that these
24     were the issues that would inure
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

 1        to the common benefit of Vioxx

 2        plaintiffs across the country.

 3              So, the Doherty versus Merck

 4        verdict was a unanimous verdict on

 5        a very important issue despite

 6        being a defense verdict overall,

 7        and that is that the jury found

 8        seven to nothing that Merck failed

 9        to provide adequate warnings for

10        risk.  So, what that means, I

11        believe, is that the jury had to

12        have found that there were Vioxx

13        risks, that Vioxx risks existed.

14              Secondly, Merck either knew

15        the risks or should have known the

16        risks.

17              Third, Merck should have

18        adequately warned Doherty and did

19        not do so.

20              The jury was -- as you may

21        know, in New Jersey, we're not

22        allowed to talk to juries, but the

23        juries were interviewed

24        relentlessly by the press and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        actually was interviewed within an

2        hour, I think, or less of the jury

3        verdict.  And so in reading the

4        press, as anyone could have, the

5        jury said that there were

6        overwhelming specific risk factors

7        that they had found that Elaine

8        Doherty had that caused her heart

9        attack and not Vioxx.

10            So, the point that I guess

11       I'm making in issue number one is

12       that we had a unanimous liability

13       verdict and had the jury found,

14       which they could have in other

15       cases in the future after Doherty,

16       that, in fact, the case-specific

17       risk factors would have included

18       Vioxx as the substantial

19       contributing factor, that would

20       have been a plaintiff's verdict.

21       So, that's something I think that

22       Merck would have taken into

23       account, that there was one more

24       liability verdict in the country.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          The Doherty case itself was

2     selected by our firm in

3     conjunction with a very elaborate

4     process which some of you know in

5     New Jersey as a bellwether case.

6     Elaine Doherty had many, many risk

7     factors and would not have been

8     ever probably a very, very high

9     potential verdict.  It had

10    potential to be a relatively high

11    verdict, but probably not millions

12    of dollars.

13          We picked that case so that

14    there would be, in fact, a

15    creation of a precedential value,

16    a verdict that had precedential

17    value, so that Merck could see a

18    New Jersey law firm trying a case

19    under New Jersey law with a

20    plaintiff that's had symptoms and

21    risk factors and a disease process

22    that was representative really, I

23    think, of the vast majority of

24    plaintiffs.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          So, it wasn't just we picked

2     our best case, it was a case that

3     we thought, had we won the

4     complete verdict, would have been

5     valuable to plaintiffs in New

6     Jersey and across the country.

7          We spent a half a million

8     dollars trying the case.  The case

9     took five-and-a-half weeks.  There

10    were four partners that tried the

11    case, along with many associates

12    and paralegals and staff people.

13         The second issue which I

14    think is perhaps equally as

15    important, if not more important,

16    is the direct-to-consumer issue.

17    As you can see from our

18    submission, it was created by the

19    New Jersey Supreme Court years

20    ago, 1999.  There has never been a

21    charge ever in New Jersey that a

22    jury should consider the defendant

23    to be liable if they fail to warn

24    a plaintiff herself.  So, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        literally had the first

 2        direct-to-consumer charge ever in

 3        New Jersey, and we were not the

 4        first Vioxx case.

 5             Now, it is our

 6        understanding, and plaintiffs'

 7        lawyers are here, that the

 8        direct-to-consumer ruling that

 9        Judge Higbee made was an admixture

10        of law and very case-specific

11        facts.  So, what we did in the

12        Elaine Doherty case was hit that

13        very hard from day one.  Our

14        prescribing doctor, unlike perhaps

15        some of the prescribing doctors in

16        earlier trials, was very, very

17        unhealthy to us, and we presented

18        him by videotape so we knew going

19        in what we had to face.  So, we

20        really had to hit the

21        direct-to-consumer charge very

22        hard, and we did, and that was

23        what I think our major success was

24        with the unanimous verdict.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        But for that, it would have
2    been a complete defense verdict.
3    What does that mean to the rest of
4    the bar?  I think that that really
5    created the law of the case for
6    New Jersey after the Doherty case.
7    So that all the -- not to minimize
8    it, but all that plaintiff lawyers
9    would have to do after that is
10    meet the factual predicate that
11    Judge Higbee saw that we had met
12    in Doherty.  Very difficult
13    deposition, very difficult motion
14    practice, and we spent a great
15    deal of time during the charging
16    conference just on the
17    direct-to-consumer.  Merck knew
18    what it meant and fought very
19    hard.
20        I'm going to let Steve
21    handle a couple of issues now and
22    then I'll come back.
23        MR. KNOWLTON:  Thanks, Jim.
24        First, number 3 is the trial

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1        presentation of Merck, PR

2        liability deps.  We spent a lot of

3        time analyzing and getting these

4        transcripts ready for presentation

5        to the jury.  There is just one

6        clarification.  The Laine and the

7        Demopoulos testimony, while

8        litigated during trial, were not

9        actually presented to the jury.

10       It was the Blake deposition that

11       was presented to the jury.

12            And although this is our

13       application, I have to give credit

14       to Chris Placitella, because that

15       was probably the most powerful

16       seven-and-a-half minutes of

17       videotape that I have ever seen

18       based on the jury's reaction, as

19       Jim has just described to you, on

20       the DTC.  I think that had an

21       enormous impact on the jury and an

22       enormous impact on that verdict.

23            This was the first time that

24       that testimony had to be utilized,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1        and it was the first time it had

 2        been litigated for trial in front

 3        of Judge Higbee.  That material

 4        was made available and is still

 5        available to plaintiffs' counsel

 6        across the country.

 7            The next is the APPROVe ITT

 8        and extension data.

 9            As Chris Seeger remembers,

10        this data was released just days

11        before our jury selection and

12        caused quite a bit of a ruckus

13        immediately before.  There was a

14        question about the manner of

15        production that we ended up

16        litigating in front of Judge

17        Higbee, and then eventually she

18        ruled that the data could be

19        considered by both experts, so,

20        there were the corresponding

21        reports and depositions, and then

22        there were the pretrial arguments

23        and rulings.  And although at

24        trial it wasn't utilized

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          extensively, it was mentioned and

2          brought up in both Dr.

3          Traberg's -- in both Dr. Traberg's

4          testimony and cross-examination,

5          as well as Dr. John MacGregor's

6          deposition.

7               We extensively reviewed that

8          data on an obviously expedited

9          basis with our expert, Dr.

10          MacGregor, who concluded that the

11          extension data did not bear out

12          Merck's established trial position

13          that it required 18 months of

14          exposure.  That view was then, of

15          course, correlated by other

16          experts, both by independent

17          experts, and then FDA, and also by

18          the plaintiffs' firms.

19               That was the first time,

20          perhaps due to circumstances, but

21          certainly due to hard work by John

22          MacGregor and our lawyers, that

23          that data had been presented to a

24          jury and had been examined for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1      trial.

 2            Moving on to number 6.  In

 3      the Doherty trial, prior to

 4      presentation before the jury,

 5      there was a Rule 104 hearing on

 6      the admissibility of the 4/6/05

 7      FDA document.  This document had

 8      been the center piece of much

 9      motion practice in New Jersey

10      prior to the Doherty trial, no

11      doubt, but this was first time

12      that we had presented and pushed

13      the issue both in correlation of

14      trying to get the entire document

15      admitted in front of the jury, and

16      also in advancing its COX-2 class

17      effect defense.

18            Judge Higbee ruled that

19      there would be a 104 hearing, and

20      the expert that Merck brought

21      forth was Dr. George Taylor, who

22      was noticed as an expert in our

23      trial as well.  Merck put Dr.

24      Taylor on, spent about 25 minutes

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        doing a direct.  He was

2        cross-examined.  At the end of the

3        hearing, from the bench, Judge

4        Higbee ruled that the 4/6/05

5        document was inadmissible in its

6        entirety and that there was no

7        basis, unless there was further

8        expert testimony, for bringing in

9        the COX-2 class effect defense in

10       front of the jury.  As an aside,

11       Dr. Taylor never appeared at

12       trial.

13            Moving on to number 8, this

14       is the preparation of the Topol

15       and Graham transcripts.  Again,

16       kudos for the effort to the

17       gentlemen who took those

18       depositions especially the folks

19       from Kline & Specter.  But these

20       deposition transcripts were

21       extensively litigated in a way

22       that was sensitive to other

23       plaintiffs' firms and their need

24       potentially to use it in future

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1      litigation.

2              As many of you will recall,

3      at the time, it was the Graham

4      transcript, I believe, that was

5      the subject of motion practice

6      before Judge Fallon, and it was

7      specifically the cross-examination

8      of Mr. Beck of that witness that

9      was at issue.

10             We were very, very

11     sensitive, the Locks' lawyers were

12     sensitive not to litigate the

13     transcripts in such a way that

14     would require potentially

15     precedential rulings from Judge

16     Higbee, knowing that there were

17     trials in front of her and in the

18     MDL that were coming after us.

19             So, we negotiated page and

20     line designations.  We also

21     negotiated exhibit presentations

22     during those depositions, and both

23     of those depositions were played,

24     we think, with good effect to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      jury.

2           Dr. MacGregor, number 9, was

3      our expert that we identified

4      early on in the litigation.  Dr.

5      MacGregor testified for us in

6      Doherty and acted as a consulting

7      expert.  We believe, and I

8      certainly believe as the lawyer

9      who put him on at trial, he was

10     probably one of the easiest

11     experts I've ever had to work

12     with.  He was motivated and was

13     extraordinarily well prepared both

14     by us and also by his own efforts.

15          Dr. MacGregor, we were free

16     with sharing his materials for the

17     plaintiffs' lawyers, and he's been

18     utilized, as you can see from our

19     submission, by other firms in

20     Vioxx and also in other

21     litigations to date.

22          My last item would be the

23     STI document review.  Scientific

24     Therapeutics, Inc. was a third

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          party that Merck utilized in

2          communicating with physicians

3          about Vioxx, and specifically in

4          blunting the impact of the VIGOR

5          study.  Unfortunately, the STI

6          initiative never reached the

7          deposition stage.  There were

8          hundreds of thousands of pages of

9          documents that were reviewed by my

10         firm, and also that effort was

11         spearheaded by Eric Weinberg and

12         his firm.  Also, videotapes and

13         audiotapes, presentations were

14         reviewed.  PowerPoint programs

15         were put together in an effort to

16         link and follow the money chain

17         from Merck from the third-party

18         vendor to physicians concerning

19         their speaker bureaus, which they

20         used to impact VIGOR, and also

21         publications in, quote,

22         peer-reviewed journals that Merck

23         authored and then substituted

24         other scientist names to.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1           I'm sorry, back to you, Jim.

2           MR. PETTIT:  I'm going to go

3       back to number 5, which was use of

4       Dr. Susan Parisian.  She was an

5       FDA officer, and the strategy in

6       using her was two part.  One was

7       to rebut the defense of the FDA

8       approval, which is not only a very

9       strong factual argument that Merck

10      made over and over again during

11      five-and-a-half weeks to the jury,

12      but it's a statutory defense, as

13      I'm sure most, if not all of you

14      know in New Jersey, and in many

15      other states.  If there's an FDA

16      approved warning, it is presumed

17      to be an adequate warning and

18      there's rebuttal and presumption.

19           But sort of in the trenches,

20      we used Dr. Parisian to persuade

21      the jury that the FDA is not a

22      mission, and, in fact, are the

23      opposite, that they are

24      understaffed, that their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        procedures are not focused towards

 2        this kind of drug and getting it

 3        to the market safely.

 4              We also were able to, sort

 5        of as an aside, get a lot of the

 6        state-of-the-art evidence through

 7        Dr. Parisian rather than bringing

 8        in another state of the art

 9        witness.

10              So, the point of this for

11        common benefit is that Dr.

12        Parisian actually had been worked

13        up by other law firms, and we were

14        the first ones to use her in a

15        Vioxx trial.  I think we presented

16        her incredibly, and I think she

17        was very useful, and it was well

18        known to other plaintiff lawyers

19        had they, in fact, wanted to use

20        her.

21              The rulings that Judge

22        Higbee made, as you probably know,

23        were basically at the end of the

24        trial, that Judge Higbee would
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        present to the jury as a legal

2        charge what exactly the FDA

3        regulations meant.  So, she

4        presented factual testimony.

5              Number 7, the FDA preamble

6        that came out actually in January

7        of 2006, our trial, again, was

8        July of 2006, Merck argued that

9        extensively pretrial and trial,

10       probably argued it three different

11       times.  Judge Higbee finally made

12       an ultimate ruling during the

13       trial itself.  That really, I

14       think, was the centerpiece of the

15       preemption issue, obviously,

16       preemption being a tough legal

17       issue, but Merck was trying to get

18       that down on the ground to the

19       jury as a document, and Judge

20       Higbee very forcefully struck

21       that, and I think struck it and

22       made that for all Vioxx cases in

23       New Jersey.

24              I'm going to combine 11, 12

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

 1      and 13.

 2            We were the only firm in New

 3      Jersey, and I think I may be

 4      mistaken, the only firm in the

 5      United States, that tried a Vioxx

 6      jury trial by itself.  We relied

 7      on the amazing incredible work

 8      done by all the other plaintiffs'

 9      attorneys for years up until July

10      of 2006, and we used their work

11      product and looked at their

12      trials.  I can't say enough about

13      that, obviously.  It almost goes

14      without saying that we were

15      talking about that that's an issue

16      that we tried the case by ourself,

17      I wanted to state that as clearly

18      and as gratefully as I can.

19            Having said that, I think

20      what Merck needed to see to come

21      to the table for global

22      negotiations is that a single law

23      firm is willing to try a case and

24      is able to try a case and is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1       willing to put up $500,000 and

2       invest four partners and

3       associates and weeks and, of

4       course, months to get to trial.  I

5       think Merck needed to see that,

6       they needed to see that we could

7       do that successfully, and as I

8       said, we came close to having a

9       plaintiff's verdict and certainly

10      had a liability verdict.  I think

11      that is the kind of thing that

12      contributes to making Vioxx, in

13      short, a mass tort.  Not only the

14      large verdicts, it has gotten to

15      the point where one law firm can

16      try the case.  I think that's an

17      important factor.

18          One of the questions that

19      the committee sent in their e-mail

20      was consistency, quantity,

21      duration and intensity.  We

22      continued to litigate the Vioxx

23      cases long after Doherty.  We had

24      Klug, Ellis and Pritch were going

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          to be picked for bellwether

2          trials.  We did not give up.  We

3          continued to take depositions,

4          defend depositions, take sales rep

5          depositions, work up the cases.

6          We did not really have judicial

7          intervention in terms of discovery

8          motion practice.  So, we didn't

9          get that.  That was sort of an

10         answer to one of the issues raised

11         in your e-mail.

12              In addition to the funding,

13         extensive and large funding of the

14         Doherty trial and the rest of our

15         cases, we did contribute two

16         $7,500 submissions to the New

17         Jersey plaintiffs' funds for a

18         total of $15,000.  So, we did

19         contribute for funding.

20              Thank you.

21              MR. BIRCHFIELD:  Just a

22         note, before you submit this

23         affidavit, there was a single firm

24         trial in the MDL.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1        MR. PETTIT:  I appreciate

2    you correcting me.

3        MR. HERMAN:  One question,

4    or more than one.

5        I have -- I see Mr. Locks,

6    and is it Pettit?

7        MR. SEEGER:  Knowlton and

8    Pettit.

9        MR. HERMAN:  I'm sorry.

10       MR. KNOWLTON:  I'm Mr.

11   Knowlton, this is Mr. Pettit, and

12   this is Mr. Locks.

13       MR. HERMAN:  Is it

14   K-N-O-W-L-T-O-N?

15       MR. KNOWLTON:  That's

16   correct, sir.

17       MR. HERMAN:  Since we've got

18   this on the record, I want to make

19   sure that the record notes that

20   all three of you are here.

21       I just have a couple of

22   other questions.

23       I apologize if our office,

24   because we were responsible for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          it, did not send out to you an

2          e-mail or communication to submit

3          a written material and affidavit

4          before this date.  I assume you

5          did get it.  If you didn't get it,

6          it is our fault.

7               MR. PETTIT:  We did not.

8               MR. HERMAN:  Well, I

9          apologize for that, and if you'd

10         get us an affidavit.

11              Now, did you submit your

12         time in hours?

13              MR. PETTIT:  Yes, we did.

14              MR. HERMAN:  In costs?

15              MR. PETTIT:  Yes, we did.

16              MR. HERMAN:  How much time

17         did you submit, do you recall?

18              MR. PETTIT:  Certainly

19         something I should have reviewed

20         before this morning.

21              MR. LEVIN:  I've reviewed

22         it.  7,505.  7,505 hours.

23              MR. HERMAN:  How much in

24         costs, Arnie?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1           MR. LEVIN:  You are asking

2      me?  $433,301.77.

3           MR. HERMAN:  Excuse me.

4      $433 and how much?

5           MR. LEVIN:  301.77.

6           MR. HERMAN:  301.77 what?

7           MR. LEVIN:  Cents.

8      $433,301.77.

9           MR. HERMAN:  How much of

10      those costs were spent on your

11      trial, do you recall?

12           MR. PETTIT:  100 percent of

13      those costs, and by the way, I

14      think we did a slightly revised

15      cost.

16           MR. LEVIN:  I think your

17      original submission was rejected,

18      and I assume you are working with

19      the accountants to straighten it

20      out?

21           MR. PETTIT:  Right.  And as

22      far as I know, it has been

23      straightened out.

24           MR. LEVIN:  Good.

Page 26

```
 1              MR. PETTIT:  The answer,
 2         sir, to your question is that 100
 3         percent of the costs were spent
 4         either on Doherty or on very
 5         specific review, as Mr. Knowlton
 6         said, on the liability documents
 7         and the page and line designations
 8         that went on in 2005 and 2006
 9         leading up.  But there was nothing
10         that was spent on another case --
11              MR. HERMAN:  No, no.  I'm
12         not suggesting that.  You rounded
13         off the cost of the trial to
14         $500,000.  I'm just trying to
15         determine whether there's another
16         $500,000 in costs or this is all
17         inclusive.
18              MR. PETTIT:  No.  That's
19         what our submission consists of.
20              MR. RAFFERTY:  Steve or
21         Jim --
22              MR. LOCKS:  There are
23         additional costs that we
24         submitted, a lot more.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          MR. RAFFERTY:  Approximately

2      out of the 7,500 hours or 7,000

3      hours, approximately how many of

4      those would be attributed to the

5      Doherty case, the vast majority?

6          MR. PETTIT:  Vast majority,

7      just in 2006.

8          MR. RAFFERTY:  You mentioned

9      the Klug, Ellis and Pritch cases?

10          MR. PETTIT:  Right.

11          MR. RAFFERTY:  Were those

12      the other three cases that y'all

13      worked up or were there more?

14          MR. PETTIT:  Those were the

15      three.  We had reached a certain

16      point in the bellwether selection

17      with the plaintiffs' attorneys and

18      the judge, and the judge was

19      talking about stroke and heart

20      attack, and those were the ones we

21      had reached to the point where

22      Merck was taking a lot of

23      depositions.

24          MR. RAFFERTY:  So those --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1        MR. PETTIT:  There were a
2     couple others that would have come
3     up on the stroke list and on the
4     heart attack list.  Those were the
5     three that we literally litigated
6     in 2006.
7        MR. RAFFERTY:  That's what I
8     want to know.
9        MR. KNOWLTON:  If I remember
10    properly, we had, at that point,
11    up until the time the settlement
12    was announced, we had either 16 or
13    21 cases where we had just begun
14    to start to litigate as far as
15    sales reps were concerned and
16    things like that, but these three
17    were the ones that were already on
18    point where there was discussion
19    as to whether or not there were
20    going to be trials set.
21       MR. LEVIN:  How many cases
22    did you submit to the settlement,
23    the Locks firm?  How many did you
24    submit to the settlement?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1          MR. KNOWLTON:  An exact

2    number?

3          MR. LEVIN:  Approximately.

4          MR. SEEGER:  Approximately.

5          MR. BIRCHFIELD:  I'm showing

6    about 90.  Does that sound right?

7          MR. KNOWLTON:  90?  No.

8          MR. LOCKS:  No.  I thought

9    it was somewhere north of 200,

10   plus or minus 200.

11         MR. KNOWLTON:  That's about

12   right.  Around 200.

13         MR. LOCKS:  I think it was a

14   little more, but I don't know if

15   they would all pass the test.

16         MR. GIRARDI:  MacGregor is a

17   real good witness.

18         MR. WEITZ:  Great witness.

19         MR. KNOWLTON:  Thank you.

20         MR. SEEGER:  Thank you.

21         MR. BIRCHFIELD:  205.

22         MR. HERMAN:  Let me give you

23   a fax number.  (504) 561-6024.

24   The e-mail you should have on your

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          notice about this meeting, you can

2          either e-mail or fax the affidavit

3          in.  I'm just going to attach it

4          to the submission.

5               MR. PETTIT:  We will get

6          right on it.  Thank you very much.

7               MR. SEEGER:  Thanks.

8                    -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

         1            C E R T I F I C A T E

         2

         3            I, LINDA L. GOLKOW, a Notary

         4    Public and Certified Court Reporter of

         5    the State of New Jersey, Registered

         6    Diplomate Reporter, Federally-Approved by

         7    the United States District Court of

         8    Pennsylvania, do hereby certify that the

         9    foregoing is a correct transcript of the

        10    testimony as taken stenographically by

        11    and before me at the time, place and on

        12    the date hereinbefore set forth.

        13            I DO FURTHER CERTIFY that I

        14    am neither a relative nor employee nor

        15    attorney nor counsel of any of the

        16    parties to this action, and that I am

        17    neither a relative nor employee of such

        18    attorney or counsel, and that I am not

        19    financially interested in the action.

        20

        21    _____

        22            Linda L. Golkow, RDR, CRR, CCR
                      Notary Number:  1060147

        23            Notary Expiration:  1.2.10
                      CCR Number:  30X100176200

        24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -


FIRM:  LOWE LAW FIRM
       Jeffrey Lowe, Esquire
       CAREY & DANIS, LLC
       Joseph P. Danis, Esquire


BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                   -  -  -
 2              MR. BIRCHFIELD:  Everything
 3         is going to be on the record, so,
 4         we will have a transcript of
 5         everything that's said here in
 6         case it's necessary for the judge
 7         or for any proceedings later on.
 8              One of the things that Judge
 9         Fallon has asked us to do is to
10         let everybody know about the
11         process, we'll try to work out
12         having an agreement on the
13         allocation, but if there are
14         objections, he's going to follow
15         the same type of procedure similar
16         to what he did in the Murphy Oil
17         case.  It is important to be aware
18         of the Murphy Oil decision and the
19         process he followed there, where
20         he would appoint a special master,
21         depositions be taken and all of
22         that.
23              So, with that being said,
24         the floor is yours.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1           MR. LOWE:  Nice to see you

2      guys.  Basically the question here

3      is, did we provide common benefit

4      work, and how much.  If you look

5      at section 9.2.4 of the settlement

6      agreement, and as it was

7      originally written, it provided

8      that common benefit work was

9      recoverable for attorneys doing

10     work in the MDL, in New Jersey,

11     California and Texas and in the

12     state court proceedings.

13           As you know, we filed an

14     objection to that, and we worked

15     it out, and you said that was

16     never the intent to include other

17     states.  So section 1.2.7 was

18     enacted on July 17th, '08 to

19     include common benefit work done

20     in any other state court.  What we

21     were seeking common benefit work

22     for is work that we did in

23     Illinois state court cases.

24           Before I go into that, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1       want to give you kind of an

2       overview of our involvement since

3       we were involved on the inside.

4       We filed a total of claims for

5       2,689 claimants.  In Missouri

6       alone, it was about 1,200, maybe a

7       little bit more, all of them were

8       filed in state court.  We joined

9       two local sales representatives

10      who lived in St. Louis city, and

11      we joined local pharmacies.  All

12      of them, we believe, are

13      nonremovable, but, of course, as

14      you know, Merck removed them, and

15      they never got remanded.  We filed

16      a motion to remand in every case.

17           In Illinois, we filed 172

18      cases, cases involving 172

19      claimants.  Of those, 11 cases

20      were remanded involving 65

21      plaintiffs by Judge Patrick

22      Murphy.  They were remanded to the

23      Circuit Courts of St. Clair County

24      and Madison County, Illinois.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

 1          Those are the cases that we're

 2          seeking to recover for common

 3          benefit work.

 4               California, we filed 29

 5          cases.

 6               New Jersey, we filed 53

 7          cases.  We were subject to

 8          case-specific discovery.  In some

 9          of those cases, I went out and

10          took doctor depositions, defendant

11          client depositions.  Again, we are

12          not seeking anything for those,

13          those were the case-specific work.

14               And the rest of the cases,

15          the 2,689 were filed directly in

16          the MDL.

17               MR. WEITZ:  How many was

18          that?

19               MR. LOWE:  It was a good

20          number.  I mean, I don't know the

21          exact number.  I can probably get

22          that for you if you guys want it.

23          It was several hundred for sure.

24          You know, cases came up on the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1           one-year statute or two-year

2           statute, and we filed them

3           directly in the MDL.

4                 MR. LEVIN:  Did I hear you

5           say that what you are seeking

6           common benefit for are only the 11

7           cases that Judge Murphy remanded

8           to state court?

9                 MR. LOWE:  Correct.  11

10          cases involving 65 plaintiffs.

11                MR. LEVIN:  And is that for

12          the remand itself or --

13                MR. LOWE:  Well, the remand

14          itself, plus all the work that we

15          did once it got remanded.

16                MR. BIRCHFIELD:  Jeff, if

17          you would, take us through the

18          timing of that, when you got the

19          remands and the work that was

20          done.

21                MR. LOWE:  A lot of the work

22          we are seeking for is the first

23          case, it's called Donahue versus

24          Merck.  It was filed February 23rd

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1      of 2005.  I don't know the dates

2      of the remand, but it had to be

3      remanded quickly, because,

4      otherwise, it would get

5      transferred to the MDL, and

6      somehow it would always remand a

7      few days before the transfer date.

8      So, they really were remanded over

9      a period of about six months, I

10     would say beginning in April of

11     2005.  I can get the exact dates.

12          The first case we filed was

13     a single case, Donahue versus

14     Merck.  And Walgreen's is an

15     Illinois corporation, and there's

16     some case law in Illinois that we

17     looked at before we filed the

18     cases that said, under certain

19     circumstances, you can sue a

20     pharmacy in Illinois if they

21     prescribe -- if they fill a

22     prescription for a drug knowing

23     that there might be

24     contraindications for that drug

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1          without telling the people.  It's

2          a case called Happel.  So, based

3          on the Happel case, we filed the

4          cases in Illinois and started

5          working them up.

6               MR. BLIZZARD:  How many of

7          the 65 cases were actually

8          scheduled for trial?

9               MR. LOWE:  The only case

10         that was scheduled for trial, I

11         think it would be two.  There was

12         a lot of procedural maneuvering

13         that went on -- the Donahue versus

14         Merck case was originally set for

15         trial as a case that we thought

16         was a real trial schedule, October

17         of 2007.  We were working that

18         case up, and in the summer of

19         2007, the VICTOR study was

20         published.  Based on that, I was

21         using Dr. Gary Sander here in New

22         Orleans as an expert, and I

23         developed a local -- you know, we

24         tried.  I mean, I talked to Zipes,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          I talked to other cardiologists.

2          We developed a local cardiologist,

3          Dr. Alan Maniet, who was a

4          fen-phen expert for us, and so he

5          was giving us case-specific

6          testimony, too.  Anyway, they both

7          had to be redeposed.  I was going

8          to put the trial off to March of

9          '08.  There's a Fifth Amendment

10         scheduling order that was entered

11         regarding that.

12             So, I paid $10,000, and Joey

13         paid $10,000, and I hired Dr. Moye

14         to be our expert, so he was going

15         to come and testify live, Sander

16         was going to testify live, Maniet

17         was going to testify live.  We

18         deposed the treating doctors in

19         Illinois.  Actually, they were

20         deposed twice.  In Illinois,

21         there's a discovery deposition and

22         evidence deposition, so, some of

23         them were deposed twice.

24             MR. SEEGER:  These are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          experts that you did designate in

 2          the case that was headed toward

 3          trial?

 4               MR. LOWE:  Yes.  In

 5          Illinois, it is called a Rule 213

 6          interrogatory.  Mark Robinson was

 7          great.  We met with Mark and Ted

 8          Wacker.  We were seeing if they

 9          wanted to try the case, help us

10          try the case.  They wanted to get

11          Zipes on board, and we had already

12          contacted Zipes.  And then Zipes

13          decided he didn't want to do it,

14          because he testifies in cases

15          where there aren't many risk

16          factors, not when there are a lot

17          of risk factors.  And so based on

18          that, Zipes decided he didn't want

19          to do it, and based on that, Mark

20          decided he didn't want to do it.

21               MR. WEITZ:  Where in

22          Illinois was it filed?

23               MR. LOWE:  Madison County.

24          The client was a great client,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          older guy, truck driver.  He was a

2          lifelong resident of Madison

3          County.  His son was the recorder

4          of deeds in Madison County, so he

5          was politically connected.  We

6          were in front of the same judge

7          Andy was in front of, Judge Stack,

8          who was a good guy, he's a good

9          judge.

10              In the meantime, and we put

11          this in our affidavit, we were

12          trying to get the MDL trial

13          package, but it wasn't available,

14          and I understand that.  So, I

15          began getting information from --

16          I got a lot of information from

17          Penny Herman, I got a lot of

18          information from Mark Robinson.

19          And so based on that and the

20          Schwaller case, I got the trial

21          transcript, all the trial exhibits

22          were introduced in the record, so

23          I got all of those for the first

24          time, had all the exhibits.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        we were in the process of creating

2        our own trial package because we

3        couldn't get it from the MDL, they

4        didn't have it yet.

5             So, then I deposed Dr.

6        Waymack, I deposed Dr. Marks, and

7        my deposition of Marks was after

8        the VICTOR data, and he has this

9        theory that in the VICTOR study,

10       they say that the data is not

11       completely balanced.  So, he

12       rebalanced it, and then, based on

13       that, said there's no statistical

14       significance.  So, there's one

15       depo out there regarding that

16       which I took.

17            I took their case-specific

18       guys, Dr. Cohen, Dr. Saltzman,

19       which I think Andy experienced at

20       trial.  They had a doctor at Johns

21       Hopkins, Dr. Hastasian, so I took

22       his depo.  After I got all those

23       depos done, including our experts,

24       I sent all of that stuff to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          MDL, to Penny Herman, I .pdfed all

2          the exhibits, so all that was

3          there for everybody else to share.

4                  As far as I'm concerned, as

5          plaintiffs' attorneys, whether

6          you're on the PSC or your own

7          case, we're all in this together

8          against Merck.  That's what we

9          were trying to do, was to proceed

10         and hopefully get a verdict

11         against Merck.  Even if I didn't

12         get a verdict, I learned a hell of

13         a lot more about Vioxx, and I had

14         65 more cases to go.

15                 MR. SEEGER:  Jeff, how close

16         did you get to trial?

17                 MR. LOWE:  The settlement

18         was in November of '07, and our

19         trial was put off in September of

20         '07 to April of '08.

21                 MR. BIRCHFIELD:  So, you

22         were within like a month of trial?

23                 MR. LOWE:  At one time we

24         were within two months of trial,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          and when the settlement came out,

2          there were deadlines of February

3          28th for fact witnesses and March

4          7 for experts.  But I had done

5          everything except for Vicki Starr.

6               MR. RAFFERTY:  Jeff, you

7          said the Donahue case and then

8          what other one?

9               MR. LOWE:  Well, there's

10         another cased called Auslander --

11              MR. RAFFERTY:  All of that

12         was Donahue?

13              MR. LOWE:  Yeah.  Basically

14         our lead case was Donahue.  We

15         were doing all of this in Donahue.

16         And once we got that created, we

17         could then proceed with the other

18         cases.

19              MR. RAFFERTY:  Was the other

20         case set yet?

21              MR. LOWE:  I know that

22         Auslander had a discovery schedule

23         and we were beginning fact

24         discovery in that.  It was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          stroke case.  It was in Cook

2          County.  It was originally in

3          Madison County, but it got

4          transferred to Cook.

5              MR. RAFFERTY:  Can you spell

6          that?

7              MR. LUNDY:

8          A-U-S-L-A-N-D-E-R.

9              MR. BLIZZARD:  Was that

10         actually scheduled for a trial

11         date?

12             MR. LOWE:  I don't remember.

13         I remember it had a discovery

14         schedule.  Discovery schedules

15         usually have a trial date.  In

16         Cook County, you are looking out

17         like three years on a trial date.

18             MR. HERMAN:  That's fast.

19             MR. SEEGER:  The stuff that

20         you did, the stuff you worked up,

21         the deps of the experts, you sent

22         that all on to Penny.  Do you

23         remember the time frame?

24             MR. LOWE:  I would say April

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1          of '08 is probably when I got it
 2          all together for her.
 3               MR. SEEGER:  Okay, thanks.
 4               MR. WEITZ:  Why did the case
 5          get put off in October of '07?
 6               MR. LOWE:  That's when
 7          VICTOR came out, and we said our
 8          experts have new opinions
 9          regarding VICTOR.  Sander was
10          redeposed in New Orleans, and
11          Maniet was redeposed in St. Louis
12          in the summer.  And so because of
13          that, we weren't going to be able
14          to meet the October date, because
15          they didn't want to produce their
16          experts until we had our experts
17          finalized.
18               Also, meanwhile, in the
19          other cases, when we started
20          combining cases, we may only have
21          one plaintiff who bought from
22          Walgreen's, and we'd throw nine
23          other plaintiffs in there who were
24          Illinois residents.  And then
```

Page 17

1          Judge Murphy said, one plaintiff,

2          one defendant, it's not removable.

3          But then when we got down, got to

4          trial court, they filed motions to

5          sever, motions for forum non

6          conveniens.  And so we fought

7          those, we lost those in front of

8          Judge Stack, some of them.

9               We also had a new idea in

10         St. Clair County where what we did

11         or what Judge O'Malley did was

12         severed out the people who were

13         St. Clair County people, and then

14         he transferred all the other ones

15         up to Cook County.  Because Merck

16         had his registered agent in Cook

17         County, and he had just gotten

18         reversed for not transferring his

19         case to Cook County on a class

20         action to Merck.

21              MR. HERMAN:  The Donahue

22         case, was that an MI or a stroke?

23              MR. LOWE:  An MI case.

24              MR. HERMAN:  And the other

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        cause, Auslander?

2                MR. LOWE:  Auslander was a

3        stroke.

4                MR. BLIZZARD:  Do you know

5        what the expenses were that are

6        specific to the workup of Donahue

7        and Auslander, and have those been

8        submitted?

9                MR. LOWE:  Yes.  It was like

10        $160,000.

11                MR. LEVIN:  You submitted

12        160,688.39.  Your expenses and

13        your hours have been rejected by

14        the accountant.  Are you working

15        with them?

16                MR. LOWE:  We just found out

17        yesterday it was rejected by them,

18        because they sent a letter

19        addressed to Carey & Danis without

20        addressing it to anybody in

21        particular, and so they just

22        called me yesterday, and they just

23        e-mailed me the letter.  So, yes,

24        we will now be working --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1            MR. HERMAN:  That's okay.

2        As long as you work with them.

3            MR. LEVIN:  You have 6,285

4        hours, and I take it all of those

5        hours are related to the Donahue

6        case?

7            MR. LOWE:  Donahue case and

8        the other 64.

9            MR. BIRCHFIELD:  Jeff, can

10        you give us a sense of how many of

11        those hours would be your hours or

12        lawyer --

13            MR. LOWE:  My hours are

14        1,600 of those.

15            MR. BIRCHFIELD:  1,600.

16            MR. LOWE:  Yes.

17            MR. LEVIN:  Are there

18        paralegal hours in there?

19            MR. LOWE:  No.

20            MR. SEEGER:  You were going

21        to try the case, too, right?

22            MR. LOWE:  Yes.

23            MR. RAFFERTY:  On the other

24        64 cases, how far did those get?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1           Were there depos taken?

2                MR. LOWE:  There were depos

3           on probably about three of those

4           cases.  I know there's a depo in a

5           case called Brame, and there was a

6           depo in one other case, but what

7           happened is, after Judge O'Malley

8           transferred the rest of the cases

9           to Cook County, Merck appealed

10          three of the cases, it was Brame,

11          Riddle and Hardaway, and so we

12          went to the Court of Appeals, the

13          Fifth District, and we filed

14          briefs in that, and we ended up

15          winning all of those probably

16          pretty close to the time of the

17          settlement.  So all those cases

18          were then -- the transfer to Cook

19          County was --

20                MR. LEVIN:  Could you break

21          down the difference in the hours

22          between the Donahue case and the

23          other --

24                MR. LOWE:  On my time, if it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          was Donahue, I put Donahue.

2                    MR. SEEGER:  You broke it

3          down by case?

4                    MR. LOWE:  Yeah, I broke it

5          down by case on my time.

6                    MR. LEVIN:  Give me a

7          ballpark figure.  With the 6,000

8          hours, how much of those 6,000

9          were just earmarked for Donahue,

10         the case going to trial?

11                   MR. LOWE:  I could go

12         through it and recalculate it, but

13         I don't want to ballpark it.  I

14         don't really have any idea.  I

15         know Evan Schaeffer -- again, I

16         think everyone who was doing their

17         time, we were trying to do it

18         consistent with that strategy so

19         you could tell what we were

20         working on, which case.

21                   MR. SEEGER:  Other than

22         Robinson, did you work with any

23         other people from the MDL in

24         working up the case or sharing?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

    1              MR. LOWE:  No.  I mean, and

    2         I have the e-mails, because is it

    3         common benefit time?  And Mike

    4         Ferrara wrote to me or e-mailed

    5         everyone trying to get more money

    6         for the public relations campaign

    7         in New Jersey, and so I said,

    8         yeah, we forgot about it, we'll

    9         send you our two grand, by the

   10         way, we've got this case set in

   11         October, I'm trying to get the

   12         trial package.  So, he writes me

   13         back --

   14              MR. HERMAN:  What's the date

   15         of that?

   16              MR. LOWE:  July of '07.  So,

   17         July 26, '07, he writes me, "Hey,

   18         Jeff, Thanks for the check.  We'll

   19         advise the PR firm of your trial.

   20         With regard to your October trial,

   21         we want to win at all costs.  We

   22         can't afford any more losses."

   23         There was a bad streak there.

   24         "There are four trials beginning

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          in October here in New Jersey.

2          Dave Buchanan is our liaison

3          counsel, and he has a trial in a

4          box."

5               So I e-mailed Dave, Dave

6          says, "Call me tomorrow."  I

7          called Dave.  And he didn't have

8          the trial in the box, but he

9          talked to me and gave me some

10         hints and some tips.

11              I was in touch with Pete

12         Kaufman at Levin, and he was the

13         head of the trial package team,

14         and so he finally just said send

15         me -- and I talked to him, and he

16         was helpful.

17              Illinois has a rule where

18         you can make a request for them to

19         bring anyone who is a management

20         employee to trial.  And so I was

21         asking them, who should I do?  And

22         so he told me like Charlotte

23         McKines was a good one, because

24         she wasn't as experienced, had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1          some good depos.  So, I talked to

 2          him for half hour, an hour.  So,

 3          basically, I sent him the hard

 4          drive in August, and then October

 5          comes around, and I don't have the

 6          hard drive, so I finally asked him

 7          again.  He finally gives me the

 8          trial package.  I think I got it

 9          before anybody else.  So then I

10          started reviewing it and looking

11          at it.

12               MR. BLIZZARD:  In the

13          Donahue case, had you gotten to

14          the point where they had filed and

15          you had responded to Daubert

16          motions, motions in limine and

17          that sort of thing?

18               MR. LOWE:  No.  We had

19          gotten to the point where they

20          filed -- they filed a summary

21          judgment based on statute of

22          limitations claiming that anyone

23          would be put on notice within two

24          years -- within two years of --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        before February 23rd of 2005 that

 2        Vioxx could cause heart attacks

 3        based on the VIGOR study and all

 4        the publicity.

 5             MR. LEVIN:  When was that

 6        motion filed?

 7             MR. LOWE:  It was filed -- I

 8        don't have the date of it.

 9             MR. LEVIN:  Was it filed

10        before the settlement here?

11             MR. LOWE:  Oh, yeah.  It was

12        in the summer.  It was filed

13        before it, and Judge Stack

14        overruled that pretty quickly, and

15        they had not filed any Daubert

16        motions.

17             MR. DANIS:  There were

18        negotiations where you would be

19        involved, kind of a period with

20        the CME evidence that was used in

21        Andy's case was going to be kind

22        of the agreement.

23             MR. HERMAN:  When did you

24        get the trial package?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           MR. LOWE:  I can tell you

2      exactly.  It was either

3      September -- October 25, 2007.

4           I met with Ken Soh at one

5      time, too.

6           MR. BLIZZARD:  Had you

7      gotten to the point of a pretrial

8      order where you had to do

9      case-specific depo designations

10      and counters and objections?

11           MR. LOWE:  We had not done

12      that, but that's what I was

13      preparing.  That was my biggest

14      concern, to have a time to go

15      through all the depos and make

16      depo designations, and then we

17      were within a month or so of doing

18      that.  So, we were in the process

19      of gathering up the stuff to do

20      that.

21           MR. HERMAN:  Let me get back

22      to the trial package issue.  When

23      was your case continued?

24           MR. LOWE:  When was it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          continued?  September 5th, 2007.

2                  MR. RAFFERTY:  And it was

3          set for?

4                  MR. LOWE:  End of October of

5          2007.

6                  MR. HERMAN:  So, it was

7          continued in September --

8                  MR. LOWE:  Right.

9                  MR. HERMAN:  -- to April.

10         You got the trial package in

11         October.

12                 Let me ask you, before

13         November of 2007, did you send any

14         of your work product to the

15         depository?

16                 MR. LOWE:  No, I hadn't done

17         that yet.

18                 MR. HERMAN:  And just one

19         other question.

20                 When did you, if you recall,

21         sign an MDL participation

22         agreement?

23                 MR. LOWE:  Early on, right

24         away, because it was supposed to

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1    be the lower amount.  We signed it

2    quickly.  I would say in '05, late

3    '05.

4            MR. WEITZ:  Were you guys

5    appointed to any of the committees

6    on the MDL or in state court?

7            MR. LOWE:  No.  I mean, we

8    kind of considered we were State

9    Court of Illinois.  We had almost

10   all the cases.  So we kind of

11   think we ran that mini MDL.  We

12   thought about trying to

13   consolidate it at one time, but

14   then we were afraid of where they

15   would consolidate it.

16           MR. HERMAN:  Wasn't there a

17   case tried in Illinois?

18           MR. LOWE:  Andy's case, the

19   Schwaller case.  We were

20   originally set ahead of them, and

21   then we got ours continued behind

22   his.

23           MR. WEITZ:  Was that tried

24   in Madison County?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

 1              MR. LOWE:  Yes.

 2              MR. WEITZ:  Judge Stack

 3         tried that?

 4              MR. LOWE:  Yes.

 5              MR. WEITZ:  Were you given

 6         any of your assignments for the

 7         work that you did from any of the

 8         leadership at the MDL?

 9              MR. LOWE:  No.

10              MR. WEITZ:  So, you were

11         basically working up your case for

12         trial and then sharing that

13         information with the MDL?

14              MR. LOWE:  Yes.  I mean, I

15         say I talked to a lot of different

16         people within the MDL trying to

17         get more information.

18              MR. WEITZ:  But that was in

19         pursuit of working up your case?

20              MR. LOWE:  True.  Our cases,

21         and then the other 65 behind it,

22         and then possibly trying cases in

23         the MDL, or if we have a case in

24         New Jersey, it would be the Boaten

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          case, significant stroke case,

2          Alberta Boaten, that was in the

3          trial pool or the discovery,

4          case-specific discovery pool

5          there.  So, we had already done

6          the plaintiff's treating

7          neurologist, et cetera.  So, we

8          were trying to gather this

9          information so that we could try

10         Vioxx cases.

11              MR. HERMAN:  How many cases

12         have you enrolled in the

13         settlement?

14              MR. LOWE:  We enrolled all

15         of our cases.

16              MR. HERMAN:  I don't mean

17         enrolled.

18              MR. DANIS:  2,300.

19              MR. BIRCHFIELD:  Submitted.

20              MR. LOWE:  We enrolled all

21         2,689, to the best of my

22         knowledge.  And then any case

23         involving a blood clot, a DVT, a

24         pulmonary embolism, we disengaged

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1          those clients.  So, any MI or

 2          stroke case we put in, which is, I

 3          think in the 2,100 range, plus

 4          200.

 5               MR. BIRCHFIELD:  What did

 6          you say?

 7               MR. DANIS:  It is 2,300.

 8               MR. LOWE:  Walther Glenn was

 9          part of our group, and they had

10          200 separate cases that they

11          referred to us.  Part of our

12          agreement with him was that he

13          would work and do the plaintiff

14          fact sheets and all of that stuff.

15               MR. BIRCHFIELD:  He

16          submitted those as primary

17          counsel, is that what you are

18          saying?

19               MR. LOWE:  No.  We all

20          submitted it under our umbrella,

21          but he did the work.

22               MR. HERMAN:  Who else was in

23          your group?

24               MR. LOWE:  A guy named Evan
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          Schaeffer of a firm called

2          Schaeffer & Lamere.  He's a former

3          partner of Carey & Danis, and then

4          Carey & Danis, with their

5          associates and support staff, and

6          then me.  Basically that was it.

7          And Evan and I, we did a lot of

8          the work --

9              MR. HERMAN:  What's his

10         firm?

11             MR. LOWE:  Schaeffer &

12         Lamere.

13             MR. HERMAN:  Where is it

14         located?

15             MR. LOWE:  Godfrey,

16         Illinois.

17             MR. BIRCHFIELD:  Any other

18         questions?

19             MR. SEEGER:  No.  That was

20         very informative.  Thank you.

21             MR. WEITZ:  Thank you.

22             MR. HERMAN:  Thank you.

23                 -  -  -

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1           C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -

FIRM:  LUNDY & DAVIS, LLP
       Matthew E. Lundy, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

            1                    -  -  -

            2              MR. HERMAN:  We're going to

            3         have a transcript, and if matters

            4         can't be resolved at the end of

            5         the day, the judge is going to use

            6         some sort of procedure akin to

            7         Murphy Oil.

            8              MR. LUNDY:  Okay.

            9              We got involved in Vioxx and

           10         wanted to be involved in the MDL,

           11         I even applied for a position on

           12         the PSC, so, we were dedicated

           13         from the beginning to get involved

           14         in this work and the work with the

           15         PSC in the MDL, and we did.  We

           16         did what the PSC wanted us to do.

           17         We volunteered our services early

           18         on, and whatever projects we were

           19         asked to do, we worked on it and

           20         gave it 100 percent effort.

           21              I worked on the discovery

           22         committee and specifically on the

           23         sales and marketing.

           24              We reviewed documents in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          repository, but we also reviewed

2          sales and marketing documents to

3          prepare for depositions that I was

4          involved in in Texas.  One was Han

5          Nguyen-Vo Mariacher,

6          M-A-R-I-A-C-H-E-R, and Dr. Isaacs

7          was a Merck consultant and

8          mouthpiece for Merck and did a lot

9          of presentations for doctors

10          around Texas, and I was in her

11          deposition.  So, I went through

12          documents and got prepared for

13          those.

14              I worked with Ted Wacker and

15          with Pete Kaufman on the case

16          chronology and the exhibit

17          authorization and exhibit

18          admissions in, I think it was Mark

19          Robinson's trial.  So, worked on

20          those.

21              Andy asked us early on to

22          help him in the trials that he

23          had.  We did depo cuts.  We did

24          motions in limine.  We worked on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          jury questionnaires for Andy.  I
2          think we did that both in Irvin I
3          and II.
4                We sent lawyers to Chris
5          Seeger's office to review
6          documents early on, had people up
7          in New York doing that.
8                I was also appointed to the
9          state liaison committee where we
10         tried to keep lawyers around the
11         country, state lawyers, informed
12         of what was going on.  A lot of
13         that time I didn't even keep,
14         because it was just phone calls,
15         cell phone calls, and we did that.
16                As a part of that committee,
17         I worked on the rapid remand
18         project and case selection
19         project.  Those occurred at a
20         time, I think, when things were
21         moving more quickly in New Jersey
22         than they were in the MDL, and we
23         were strategizing and thinking of
24         ways to move the MDL further to

FAC Resp. Amended Exhibit D -- 1216

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          put pressure on Merck.  I talked

2          with Lenny, and Lenny called me

3          and asked us to help with this,

4          and I did.  He contacted lawyers

5          around the country to see who had

6          cases that could be remanded and

7          ready for trial, and we were

8          looking at cases and talking with

9          lawyers around the country to help

10         move the MDL along, and I think

11         that was successful.

12              Those are the highlights of

13         the work that our firm was

14         involved in, and as I said, we

15         were willing to do the substantive

16         work and the hard work necessary

17         to help the MDL to make it

18         successful.  You won't see a lot

19         of receipt and review of

20         documents, none of that.

21              MR. HERMAN:  Dawn has

22         already told us about your group

23         work together.  As we understand

24         it, you all together in your group

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          had 500 to 600 cases for the

2          settlement?

3                    MR. LUNDY:  That's probably

4          right.

5                    MR. HERMAN:  Is that about

6          right?

7                    MR. LUNDY:  Yes.

8                    We're sharing the cases, but

9          there's no sharing in the --

10                    MR. LEVIN:  MDL.

11                    MR. LUNDY:  -- MDL.  That's

12          separate and apart.

13                    MR. HERMAN:  When you say

14          you don't share in the MDL, you

15          mean in the common benefit?

16                    MR. LUNDY:  The common

17          benefit.

18                    MR. BIRCHFIELD:  What were

19          your total hours and expenses?

20                    MR. LUNDY:  I think it's

21          about 18,000 in expenses, Andy.

22                    MR. LEVIN:  You have got

23          about $900 in expenses that have

24          been rejected, so you may want to

FAC Resp. Amended Exhibit D -- 1218

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1            call the accountants to see what's

2            doing with that.

3                  MR. LUNDY:  How do I find

4            out what was --

5                  MR. HERMAN:  Touch base with

6            Lenny.

7                  MR. LEVIN:  As far as the

8            accounting form, you have no hours

9            rejected, no hours under

10           submission.  You have 277 hours in

11           the whole case.

12                 MR. RAFFERTY:  177?

13                 MR. LEVIN:  277.

14                 MR. LUNDY:  That's not what

15           I have.

16                 MR. BIRCHFIELD:  That's why

17           I asked.

18                 MR. LUNDY:  I've got about

19           608.

20                 MR. LEVIN:  You not only

21           have 400 hours that are

22           unaccounted for, the accountant

23           doesn't know about them, because

24           they are neither under submission

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          nor rejected.

2                  MR. BLIZZARD:  Are these

3          personal hours of Matt's or are

4          you talking about his firm's?

5                  MR. LEVIN:  No.  I'm talking

6          about the firm.

7                  MR. LUNDY:  Because we

8          submitted them all to both,

9          whatever that thing is, and to

10         Russ' office.

11                 MR. RAFFERTY:  Who else in

12         your firm was doing work on it?

13                 MR. HERMAN:  Matt, let me

14         just give you the procedure.  What

15         happens is, people submit their

16         hours and we send them directly to

17         the CPA, Wegmann-Dazet.  Phil

18         Garrett is the head of that team,

19         and he's court appointed.  What

20         happens is, when there's some

21         discrepancy in hours or costs,

22         lawyers call there, they work out

23         whatever the snafu is, so, you're

24         going to want to --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1              MR. LUNDY:  I had been

2        e-mailing with whatever the guy's

3        name is.

4              MR. LEVIN:  Phil Garrett?

5              MR. LUNDY:  One of the guys

6        in their office.

7              MR. BIRCHFIELD:  Cliff

8        Newlin.

9              MR. LUNDY:  Cliff Newlin,

10        that's it.  And I sent you and he

11        the same thing a couple of times.

12              MR. HERMAN:  Give him a

13        call, and let's see if we can get

14        this updated.  Otherwise, you are

15        understated.

16              MR. BIRCHFIELD:  So, you

17        have got about 680?

18              MR. LUNDY:  680 I think is

19        what I've got.

20              MR. BIRCHFIELD:  Is that

21        your time, Matt, or lawyer time or

22        paralegal time?

23              MR. LUNDY:  I think it is

24        all lawyer time, between Lisa

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          Stewart, myself and three other

 2          lawyers, a guy named Charles

 3          Beckham, guy named Billy Quinn.

 4              MR. LEVIN:  The problem may

 5          be there's no Billy Quinn, and

 6          there's no Charles here.  We have

 7          you, Lisa, and Karen as a

 8          paralegal.  She has one half hour.

 9              MR. LUNDY:  I'll look into

10          that.  Thank you.

11              MR. SEEGER:  Thank you.

12              MR. HERMAN: Thank you.

13                  -  -  -

14

15

16

17

18

19

20

21

22

23

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1                C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

-  -  -

VIOXX FEE COMMITTEE PRESENTATION

-  -  -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

-  -  -

DECEMBER 3, 2008

-  -  -

HOUSTON, TEXAS

-  -  -

FIRM:   MATTHEWS & ASSOCIATES
        David P. Matthews, Esquire
        Julie L. Rhoades, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
            GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                - - -
 2               MR. BIRCHFIELD:  We've got
 3         Linda here.  She's taking
 4         everything down.  Judge Fallon
 5         wants everybody to be aware of his
 6         order in Murphy Oil, take a look
 7         at those criteria.  I'm sure you
 8         are already familiar with that.
 9               MR. MATTHEWS:  Yes.
10               MR. BIRCHFIELD:
11         Transparency is a big issue.  We
12         have a transcript, and it will be
13         available for him to review and
14         use in whatever way he sees fit.
15         So, with that, the floor is yours.
16               MR. MATTHEWS:  Well, I think
17         I know everybody in the room here,
18         but my name is David Matthews, and
19         I'm here with Julie Rhoades to
20         talk briefly about our position on
21         common benefit expenses and fees.
22               We have included quite a bit
23         of information in writing, so, I
24         would like to incorporate that.  I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          don't want to repeat myself.  You

2          guys have been here for a long

3          time.

4               I'll start just by saying

5          that we were involved in Vioxx in

6          the early, middle and late, and we

7          were committed participants in the

8          litigation early on.  I think that

9          we had cases we were filing

10         several months prior to the drug

11         being withdrawn from the market.

12         I don't think we were in as early

13         as you and Chris and Mark, but we

14         were in earlier than most, I'll

15         say that.

16              I did participate and

17         actually talked at the Advisory

18         Committee hearing back in February

19         of '05 after the drug was

20         withdrawn --

21              MR. BIRCHFIELD:  The FDA

22         Advisory Committee?

23              MR. MATTHEWS:  The FDA

24         Advisory Committee, and it was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

    1        discussing three drugs, three
    2        COX-2s and what they were going to
    3        do with them.  I had argued at
    4        that time that all three drugs
    5        need to be off the market, and
    6        there should be criminal penalties
    7        leveled against CEOs and suggested
    8        some type of criminal penalty with
    9        all the CEOs in the room, which
   10        was met with a pretty stern lip
   11        from the folks.  But Dr. Jeb Wait
   12        and I were the only two plaintiffs
   13        lawyers at the Advisory Committee
   14        hearing.  So, I think that is some
   15        evidence and example of our
   16        commitment early on in the
   17        litigation.
   18            MR. BIRCHFIELD:  Jeb is your
   19        partner?
   20            MR. MATTHEWS:  Dr. Jeb Wait
   21        has been with our firm as a
   22        consultant.  He's still a
   23        consultant at the firm.  He was
   24        involved early, in the middle and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      late, as well.

2              So, that started, and our

3      involvement was the filing of

4      suits prior to the withdrawal,

5      continued filing.  We filed a

6      great number of suits, and I think

7      without looking at these

8      documents, approximately 430 cases

9      in Texas.  We filed another

10      several hundred in New Jersey, I

11      think, with Chris' firm, and then

12      several hundred in New Orleans in

13      the MDL.

14              So, we had a three-prong

15      attack.  It's my belief -- I've

16      been handling drug litigation for

17      about ten years now, and my

18      approach has always been multi-

19      litigation approaches, that is,

20      both State and Federal.  From

21      Vioxx -- I'm sorry, from Rezulin

22      days, Andy, when you and I were

23      working together where I had cases

24      in six or seven different states,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          state court litigation, it has

2          always been my belief to have a

3          multi-prong attack, and that's

4          what we were doing and planning on

5          doing in Vioxx, and that's what we

6          did.

7                MR. WEITZ:  Dave, how many

8          total cases did you have?

9                MR. MATTHEWS:  We looked at

10         over 6,000 or 7,000 cases, and we

11         had whittled it down to 1900.  So,

12         we were at about 1930, give or

13         take.

14               MR. WEITZ:  Did you submit

15         that for settlement, 1930?

16               MR. MATTHEWS:  1930 minus.

17         We're still in the process of

18         about, I want to say 200.  So, we

19         submitted approximately 1700.  And

20         like I say, when I say "in the

21         process," the last 200, they were

22         registered, of course, but we're

23         still working on medical records

24         and followup material.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1              MS. ROSE:  I think our final
2         number will be about 1,823.
3              MR. MATTHEWS:  So,
4         continuing on with the litigation
5         in Texas, without overspeaking, I
6         think I was probably instrumental
7         in the formation of the Texas MDL
8         based on statutes in Texas that
9         allow for an MDL because the
10        defendants wanted it.  We dealt,
11        and I was kind of the point person
12        with that.  I worked with Ed and
13        Tommy Fibich, Mike Gallagher, and
14        we spearheaded the Texas MDL.
15        Again, without overspeaking, I
16        would say that I probably did the
17        lion's share of the work in the
18        Texas MDL.
19             MR. SEEGER:  What are some
20        of the things, Dave, as we have
21        some people here that might not be
22        familiar, that you worked on as
23        point person in the Texas MDL?
24             MR. MATTHEWS:  Well, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          started by offering my office as

 2          the Texas depository.  That's

 3          really where it started.  Chris,

 4          you and your outfit in New Jersey

 5          had your own depository, but we

 6          had geographically a need in the

 7          center of the country to have a

 8          depository.  So, I offered and

 9          paid for and continued to update

10          and maintain the Texas depository,

11          which I believe was thoroughly

12          complete.  Depositions, both

13          coasts, as well as the MDL, all

14          state and Texas depositions, both

15          specific and general deposition,

16          expert and fact deposition,

17          continuing to update on the

18          production of documents of which

19          we paid for.  A lot of this,

20          hopefully all of it was submitted.

21          But that was an expensive venture.

22          So, that was, I think, our initial

23          involvement.

24              Secondly, we worked with the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          defendants and tried to determine

2          which judge was going to be the

3          head of the MDL in Texas.

4                  MR. HERMAN:  Let me stop

5          you, David, for a minute.  I want

6          to try to understand better, and I

7          don't, how the various -- Texas

8          has got some of the best lawyers

9          in the country.  I'm not just

10         saying that.  I know that.  I

11         don't understand how the various

12         groups of lawyers work together.

13         I want to give you an example so

14         that you can see where I'm coming

15         from.

16                 We have a Texas Vioxx

17         litigation group, five firms,

18         Walter Umphrey, John Eddie's firm

19         and so on.  They had their own, as

20         I understand it, their own

21         building, their own case

22         depository for their own clients

23         and their own document

24         accumulation.  I won't call it a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1         depository, but accumulation.  How

 2         did you all articulate with each

 3         other?  Mark had his.  Ed was

 4         involved with you and Tommy.  We

 5         just heard from Kathy Snapka, who

 6         was running her own accumulation

 7         of experts and documents.  What

 8         happened in the Texas MDL in terms

 9         of the articulation of the Texas

10         groups with each other and then

11         with New Jersey and Andy, Tom in

12         California?

13              MR. MATTHEWS:  Well, we

14         worked with Merck in trying to

15         determine a fair judge, and we

16         arrived at Randy Wilson by process

17         of exclusion.  So, he was the MDL

18         judge pursuant to Texas state

19         statute.

20              At that point, we formed a

21         PSC, which included anybody that

22         really had a great deal of

23         involvement in the litigation.

24         Mark Lanier had kind of separated

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        and was really litigating on the

 2        East Coast, really not much in

 3        Texas.  So, this was folks that

 4        had the majority of cases in

 5        Texas.  Mr. Lanier had a good

 6        number of cases in Texas, but was

 7        really more concentrating, in my

 8        opinion, in the East.

 9            MR. LANIER:  I would send

10        Ken Soh to this stuff generally

11        more than myself.

12            MR. MATTHEWS:  Ken Soh from

13        Mark's firm was there always, so

14        we coordinated with him.  In terms

15        of the consortium with Watts, and

16        Umphrey and John Eddie and Grant

17        Kaiser and one other --

18            MR. BIRCHFIELD:  Drew, Drew

19        Ranier.

20            MR. MATTHEWS:  -- I would

21        regularly work with those guys in

22        terms of what we needed, and we

23        would share information.  It was

24        my opinion we had to have a Texas
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          depository, which was used by

2          many, many lawyers, not just

3          Texas.

4               MR. HERMAN:  But everybody

5          fed information into your

6          depository?

7               MR. MATTHEWS:  Yes.  I paid

8          for depositions with Linda

9          Golkow's company and others so we

10         could have direct access.

11              MR. BLIZZARD:  Russ, just to

12         supplement and clarify, I don't

13         think that the consortium had

14         their own document depository.  I

15         think at their Vioxx Center, their

16         individual case files were worked

17         up.  The depository was at David's

18         office.

19              MR. MATTHEWS:  I think

20         that's right, but I can't speak to

21         exactly what was in there.

22              MR. HERMAN:  I'm glad you

23         clarified that, because I thought

24         what I heard when I took notes

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          earlier was that they had gathered

2          expert material and depositions

3          and transcripts from other cases

4          and were maintaining their own --

5              MR. BLIZZARD:  Russ, I think

6          they may well have gathered

7          transcripts --

8              MR. HERMAN:  I'm not arguing

9          the point, I'm --

10             MR. WEITZ:  Let's ask Dave.

11         Dave, what firms were substantial

12         contributors to your document

13         depository and the work that was

14         done in the Texas MDL?

15             MR. MATTHEWS:  Well, in

16         terms of creating, maintaining the

17         depository, that fell in my lap,

18         probably 95 percent of that.

19         There were some contributors, and

20         I can't tell you off the top of my

21         head exactly what they

22         contributed.  It was an expensive

23         venture, and I, again, included

24         all of these receipts and whatnot

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          in our submission.  The document

2          depository was used by many, many

3          firms.  We had people inside of

4          Texas and outside of Texas using

5          the depository.  So, we would

6          have, for instance, Ed, Scott

7          Nabers would come and they would

8          come and spend time looking

9          through documents.  I had an IT

10         guy that was full time working on

11         this thing.  It was a big deal,

12         and as everybody at this table

13         knows, to put together something

14         of 20 million documents,

15         searchable format, and then

16         include all depositions taken to

17         date from all jurisdictions, both

18         State and Federal, and then

19         continue updating with new

20         discovery that's coming in, while

21         my office continually did

22         discovery, written discovery, as

23         well as our own depositions.  So,

24         it was a very, very big project.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1           MR. WEITZ:  That you had

2     taken upon yourself?

3           MR. MATTHEWS:  Yes.  I

4     offered to do it.  Somebody had to

5     do it, and I said I would do it.

6           MR. WEITZ:  Were you

7     organizing information in the

8     depository for other lawyers in

9     Texas?

10          MR. MATTHEWS:  Yes.

11    Everybody could use it inside of

12    Texas and outside of Texas.  We

13    had people coming from New Mexico,

14    and there was nothing really, to

15    my knowledge, in Louisiana as far

16    as a depository goes.  So, if

17    people from Louisiana wanted it,

18    all they had to do was sign the

19    confidentiality order.  That's all

20    they did.

21          MR. WEITZ:  Was it being

22    used by a lot of lawyers

23    throughout Texas?

24          MR. MATTHEWS:  Throughout

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          Texas, yes.  Yes.  I don't have a

2          log with me, but I would say many,

3          many firms use that depository.  I

4          offered my staff if they needed to

5          figure out how to search it, use

6          it, find a document.  We all know

7          that the case was really about 50

8          or maybe 100 documents.  How do we

9          get that one document?  We would

10         always offer our help.

11              MR. BIRCHFIELD:  Dave, will

12         you talk to us for a few minutes

13         about the cases that you worked up

14         for trial and how you were moving

15         the Texas docket in the MDL.  Let

16         me say, and you also may want to

17         touch on this, but the first MDL

18         trial was moved to Houston after

19         Katrina, and you helped us try

20         that case, and we used your

21         office.

22              MR. MATTHEWS:  I forgot to

23         submit those hours, by the way,

24         which was silly, but I did prepare

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1          probably 40 hours before the trial

 2          just on that trial.  Then I would

 3          say we worked probably 60 hours a

 4          week for two weeks or at least I

 5          did.  I can't speak for anybody

 6          else.

 7              MR. SEEGER:  Did anybody

 8          else from your office -- I know

 9          you were there, I saw you.  But

10          anybody else from your office?

11              MR. MATTHEWS:  Well, I had a

12          lawyer there, but really we did

13          not really submit any other time

14          for any other lawyer.  It was more

15          of an education time for that

16          lawyer.  I was the one that did

17          the work.  I didn't submit

18          anything from the other lawyer.

19              We also did a couple of my

20          trials with you, Andy, as you

21          know, and I think we even split

22          the cost at one point of an expert

23          or two and possibly Robert

24          Hirschhorn, who was the trial
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          strategist.  We split the cost of

2          Hirschhorn.

3               We did offer Andy to use my

4          office for the first trial in the

5          MDL.  Not that that was a big

6          expense, but I offered it to

7          anyone that needed it.  You

8          clearly had a big staff there, and

9          I'm not saying we didn't want you

10         there, but we did offer that.

11              We also had a great deal of

12         involvement I think in the first

13         stroke case, and I think this is

14         very significant in my opinion.

15         We worked up from beginning to end

16         an entire stroke case with

17         epidemiology from Moye and

18         Plunkett, with a neurologist from

19         New York who I have used before by

20         the name is Steve Levine, who I

21         think is an excellent witness.  I

22         did work with Tom Kline's office a

23         bit, and we met there a couple of

24         times, because you were also going

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        to use them in the MDL is my

2        understanding, but we had a case

3        ready for trial.

4               MR. LEVIN:  Did you get a

5        report from Steve Levine?

6               MR. MATTHEWS:  Yes, we did.

7        I can't remember if we deposed him

8        now.  Jason Webster in my office

9        was working with Dr. Levine on and

10       off for many, many months.  We had

11       been to New York twice to work

12       with him.  We had been to Philly

13       to Tom Kline's office to work with

14       him.  He was ready to go to trial.

15       We were two weeks short of trial.

16       Actually, I had put this

17       information here, but just an

18       example of how much work was done

19       in that particular case, I had

20       stated in here the experts, and

21       there were a lot of them.  Dr.

22       Moye, Dr. Ushchmann, Dr.

23       Glandville, Dr. Guevarra, Dr.

24       Joshi, Dr. Keith, Dr. Rock, Dr.

FAC Resp. Amended Exhibit D -- 1242

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1         Stephen Levine, and then a host of
 2         other case specific depositions
 3         that were taken in that case.  We
 4         were ready to try the case.
 5              MR. HERMAN:  What's the name
 6         of that case?
 7              MR. MATTHEWS:  Elvis
 8         Anderson, Elvis Presley Anderson.
 9         He's a Native American, and we
10         were in the Choctaw Nation Tribal
11         Court.  We were going to try a
12         case in Tribal Court, and Merck
13         was, in my opinion, scared
14         greatly.
15              MR. HERMAN:  What was your
16         trial date, Dave?
17              MR. MATTHEWS:  The trial
18         date was August 7, 2006.  I had
19         spent a lot of money and a great
20         deal of time on that case.  I was
21         pretty excited.  We were going to
22         try it with six Native American
23         jurors.  Elvis was a car dealer at
24         the Choctaw Nation casino and was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

```
 1          well known in the community and a

 2          good plaintiff in my opinion, and

 3          we were going to rock the boat.

 4          Suddenly, two weeks prior to

 5          trial, there was a motion to

 6          abstain from finding jurisdiction

 7          in the case, and the Tribal Court

 8          abstained from jurisdiction,

 9          completely pulled the rug from

10          underneath us.  I still to this

11          day don't know exactly what

12          happened, but it happened.  I'll

13          leave it at that.

14               So, that was another case we

15          worked up.  The first case that

16          was going to be tried in Texas was

17          James Miller, Jay Miller or James

18          Miller.  Julie knows the case well

19          because, again, we worked this

20          thing up from beginning to end.

21          This thing was set, the first case

22          in Texas, and we used and deposed

23          Dr. Tom Mayor, Dr. Eric Price, Dr.

24          Thomas Baldwin, the cardiologist
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          from KC that you got us, Andy, Dr.

2          Plunkett, Dr. Moye, Dr. Frias and

3          Dr. Rosin, ready to try that case.

4          They filed a summary judgment

5          motion on a bankruptcy proceeding

6          because Miller had filed the

7          bankruptcy two years prior to our

8          filing suit, and the bankruptcy

9          was dismissed prior to filing

10         suit, but he had been injured in

11         the interim.  They said that he

12         did not list it in his -- this was

13         just two weeks again prior to

14         trial.  They said he didn't list

15         it.  Julie had argued a summary

16         judgment motion, and our judge,

17         Randy Wilson, found for the

18         defendants with that case.  We

19         appealed to the 14th Court of

20         Appeals, and it was on appeal at

21         the time the settlement was

22         announced.  Unbelievable to me.

23              MR. HERMAN:  When was the

24         Miller case set for trial?

FAC Resp. Amended Exhibit D -- 1245

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

 1            MR. MATTHEWS:  Elvis

 2       Anderson was August 7, 2006.  This

 3       would have been prior to that.

 4       This would have been in early

 5       2006.  I don't have a specific

 6       date right in front of me here.

 7       Is there a process that you would

 8       like somebody to follow up on

 9       that?

10            MR. HERMAN:  No.  I was just

11       trying to place it.

12            MR. MATTHEWS:  Early '06.

13            At that point, we moved on

14       to the next couple of cases, and

15       we fully worked up Eura Fowler,

16       Herlinda Melindez, Sharon Rigby,

17       Nancy Springfield and Ruby

18       Ledbetter, which was a Fibich case

19       that Fibich had asked that I get

20       involved in and try it either by

21       myself or with him.  We were kind

22       of in that mode.  During the last

23       case I just talked about, Ruby

24       Ledbetter, is when Wilson came

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          down with the preemption finding,

2          which put everything in

3          standstill.

4                    MR. BIRCHFIELD:  You named

5          several plaintiffs there together.

6          Were those going to be tried

7          together?

8                    MR. MATTHEWS:  They were all

9          going to be tried individually.

10         The Court wanted us to submit

11         cases so we had several cases

12         ready to try.  I kind of was the

13         point person for that.  We would

14         submit ten cases, and, again, this

15         is what Dr. Wait spent a great

16         deal of time with.  It is a

17         hundreds of hours project, in my

18         opinion, that is, going through

19         your cases, as we all know, and

20         finding cases that you think

21         should be tried or can be tried.

22         A great deal of time was spent on

23         that.

24                    This is the short story to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1           that long story.  After whittling

2           it down to these cases, we worked

3           all of these cases up.  Again, I

4           put this in the written materials.

5           All the experts were taken, all

6           the fact witnesses, all the family

7           members, all the treaters, all the

8           detailers, all the prescribers,

9           you know, the whole --

10              MR. SEEGER:  Can I ask you a

11          question, Dave?  I don't mean this

12          to be a provocative question, but

13          I have to ask it, and you are the

14          best guy to address it.  There

15          have been certain statements made

16          that cases were put up for trial,

17          were worked up and then were being

18          dismissed.  Some of this was

19          aggravating the judge, that people

20          either appeared to be trial ready

21          or they were getting cases set.

22              MR. MATTHEWS:  I appreciate

23          the question.

24              MR. SEEGER:  You are the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          best guy to address this.

2                  MR. MATTHEWS:  I think it's

3          me.  If you want to ask the

4          person, I think it's me.

5                  There was one case in

6          particular that was Sharon Rigby,

7          that was dismissed, the only case

8          that was dismissed prior to trial.

9          Sharon Rigby, I really don't think

10         I should talk about it because it

11         truly is attorney-client

12         information, and I'm not going to

13         talk about it, but Sharon Rigby

14         was dismissed for a variety of

15         reasons that needed to be

16         dismissed.  Other than that,

17         that's just simply not the case.

18                 MR. SEEGER:  By anybody

19         else, Dave?  Was anybody else --

20                 MR. MATTHEWS:  Not to my

21         recollection.  I think all the

22         cases that were up for trial were

23         mine, both stroke and heart

24         attack, I think.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1          MR. SEEGER:  Do you know how

2     many that would have been?  I

3     think you told us, but how many

4     cases were in the queue?

5          MR. MATTHEWS:  I would say

6     we had about eight or nine cases.

7     I'm sorry.  Eight cases, and then

8     Elvis Anderson was in Tribal Court

9     in the city.

10          MR. HERMAN:  Was your stroke

11     expert and specific causation

12     reports and depositions shared

13     with the New Jersey depository or

14     the MDL depository?

15          MR. MATTHEWS:  I don't know

16     the answer to that, but I know

17     that Tom Kline --

18          MR. LEVIN:  Well, Steve

19     Levine was an expert for the MDL.

20     My question to you was, did you

21     get a report?  Because we never

22     got a report from him in the MDL,

23     and he went by the wayside for

24     whatever reason, and Feldman is

FAC Resp. Amended Exhibit D -- 1250

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1           our stroke expert.

2                 MR. MATTHEWS:  Steve

3           Levine -- I have worked with Steve

4           Levine --

5                 MR. LEVIN:  He's Selikoff's

6           guy.

7                 MR. MATTHEWS:  I worked with

8           Steve Levine several years prior

9           to Vioxx.  That's how I knew Steve

10          Levine.  We worked on the PPA.  I

11          was real familiar with his work.

12          We had literally gotten, like I

13          said, two weeks, maybe two and

14          half weeks prior to trial, so I

15          have to believe a report was

16          furnished to the defendants, but

17          they didn't take his deposition,

18          to my memory right now.

19                MR. HERMAN:  The reason I

20          ask the question is, we were being

21          pushed for stroke cases not only

22          to try, but at the same time, we

23          were putting together a stroke

24          trial package.  There's a dearth

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1           of material that's provided to the

2           MDL depository on stroke, and if,

3           when you get back, you have a

4           chance to look at it, if you can

5           provide a list of what stroke

6           materials were provided to either

7           the New Jersey depository or the

8           MDL, it would be helpful.

9                MR. MATTHEWS:  I'll say

10          this.  I know, because I presented

11          both Plunkett and Moye, Plunkett,

12          a pharmacologist, and Moye, an

13          epidemiologist, for deposition in

14          the stroke case, Elvis Anderson.

15          So, there has been expert

16          testimony about epidemiology and

17          pharmacology.  I'll find that out

18          for you.

19                MR. BLIZZARD:  Dave, why

20          don't you explain Judge Wilson's

21          approach to the stroke cases, as

22          well as your development of the

23          Elvis Anderson case, because I

24          think some people may not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          understand that Wilson focused on

2          stroke because heart attack cases

3          had already been tried.  Why don't

4          you explain that.

5               MR. MATTHEWS:  Judge Wilson

6          believed we needed to get a stroke

7          case to trial, and he, being an

8          innovative judge, wanted to try

9          the first stroke case.  We, I

10         guess, were kind of elected,

11         again, by exclusion, to be the

12         firm that was going to go through

13         the cases.  So, I had contacted

14         all plaintiffs lawyers in Texas or

15         elsewhere, but had cases in Texas

16         that had strokes.  We were trying

17         to get through those cases because

18         Judge Wilson was really pushing us

19         to get these cases to get to

20         trial.  Not only did we get Dr.

21         Wait and his group to kind of

22         whittle away down to cases we

23         could try and my cases in Texas,

24         but we did the same thing with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1        stroke.  This is an ongoing
 2        battle, I'll say, with Merck as to
 3        what case or what cases would be
 4        tried.  So, that was another thing
 5        that was going on at the time.
 6              MR. LANIER:  Did we put
 7        those stroke cases up?  Did we put
 8        up two?
 9              MR. MATTHEWS:  I think so.
10        Let me just say, there was not a
11        great deal of discovery done.
12        Other than Elvis Anderson in the
13        Texas MDL, there wasn't a great
14        deal of discovery done.  The
15        plaintiffs were always trying to
16        push it to the side, let's get a
17        heart attack case, because we all
18        know in this room that stroke
19        cases were harder.  We had less
20        clinical trial data.
21              Let's see.  I can go on and
22        answer questions.  I had filed
23        some time ago to be part of the
24        Plaintiffs' Steering Committee,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1        and, frankly, I have not always

2        been involved in MDLs.  I maybe

3        avoided them, and I guess I'm

4        doing that less so now, but I did

5        for several years.  But I did file

6        a motion to be in the Federal MDL,

7        and I have included that in the

8        materials.

9             Looking at the Court's

10       order, pretrial 6(D), just to

11       quickly go through what the Court

12       had asked, and that's the extent

13       each common benefit firm made a

14       substantial contribution to the

15       outcome of the litigation, I do

16       believe our biggest contribution

17       was the stroke arena, because I

18       think we pushed it because we

19       happened to have one in what I

20       think was a desirable venue and

21       jurisdiction to try it.  We were

22       also getting pushed in Texas.  So,

23       I think that was probably one of

24       our bigger contributions.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1               I'll say that when Texas

2       didn't go as we had hoped with the

3       preemption ruling, I was ready to

4       try the Ledbetter case.  We were

5       going to try it.  It went south on

6       us.  That didn't slow us down.  We

7       continued to push litigation.

8               We again continued to work

9       with Chris' firm, Seeger Weiss in

10      New York and New Jersey, to push

11      those cases.  We were presenting

12      plaintiffs for deposition, taking

13      prescribers and working with

14      Chris' group to push that

15      litigation because Texas had

16      slowed down.

17              We also filed for the appeal

18      of Texas, and we worked prior to

19      that on all of the briefing.  I

20      hired an appellate lawyer and

21      spent $75,000, it is a typical

22      defense firm in Houston, and Ed is

23      familiar with them, with David

24      Gunn with Beck, Redden & Secrest,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          which is a very well known defense

2          group who I felt would help us on

3          the appellate and briefing points.

4          So, we spent 75, $85,000 in that

5          arena.

6               We continued to fight

7          through the preemption arguments.

8          I made all the arguments, which I

9          probably should not take credit

10          for.

11               MR. SEEGER:  Just as it's

12          coming down.

13               MR. MATTHEWS:  Let me back

14          up.  I only did about half of

15          them.

16               MR. BIRCHFIELD:  Did you

17          have cases in the trial pools that

18          were coming up?  What was the

19          status of the New Jersey cases?

20               MR. MATTHEWS:  Right at the

21          time the settlement was announced,

22          to my memory, we had several cases

23          in the trial pool.  Where they

24          were in the queue, I can't tell

Page 35

1        you.

2               MR. SEEGER:  I can tell you

3        sitting here right now, I can't

4        either.  I will tell you that

5        there was a big push to get 250

6        cases worked up so that Judge

7        Higbee would have a trial pool to

8        constantly dip into.  I do know

9        Dave had cases in that pool.  I

10       don't know where they were though.

11              MR. HERMAN:  At that time,

12       there was a large pool of cases in

13       New Jersey, and I know Tom Girardi

14       was pushing a large pool in

15       California at the same time.

16              MR. LANIER:  Thank you.

17              MR. HERMAN:  I want to thank

18       you because you have very

19       concisely cleared up some

20       misinformation that I know I

21       received thirdhand, and I think it

22       was important for me personally to

23       hear.

24              I also need to say that a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

```
 1          lot of strange things happened in
 2          this litigation.  If your tribal
 3          case had gone to trial -- we
 4          always deal with ifs, but there
 5          are a lot of mysterious things
 6          that Merck had happen in this
 7          case, and it is real tough for a
 8          front line trial lawyer to go
 9          ahead and prepare a case, have it
10          set up, know where it is going to
11          trial, and all of a sudden the
12          case disappears and you can't even
13          explain it to the client.
14                More importantly, the
15          negotiating committee for eleven
16          months found it very difficult
17          going in terms of stroke cases in
18          negotiations.  I'm certain lawyers
19          that prepared stroke cases, Merck
20          knew about.  At some point we were
21          able to get stroke cases included.
22          For my own part, the work you did
23          in stroke cases is a common
24          benefit, and I appreciate it.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

 1              MR. MATTHEWS:  Some of it
 2         was unwitting.
 3              MR. HERMAN:  I'd rather have
 4         unwitting contributions than
 5         witless contributions.
 6              MR. MATTHEWS:  I'm going to
 7         finish this real quick.  I'm going
 8         to wrap it up in a minute because
 9         I don't want to take any other
10         time.
11              Just to follow up, we had
12         Julie, Jason, Jeb and I, we had
13         four lawyers working on this
14         litigation since its inception.  I
15         think we were committed from the
16         beginning to the end until the
17         announcement of the settlement.
18         Consistency, I don't think it ever
19         waned.  I think we were always
20         involved 100 percent.
21              In terms of the PSC, I think
22         I was on the science committee.  I
23         did not do work on the science
24         committee.  I was more doing work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          in individual cases, preparing my

2          own experts.  We had Dr.

3          Zabalgortia, we had Entman, we had

4          Plunkett, Moye and others that we

5          were preparing and presenting for

6          deposition and trial.

7               The trial I talked about

8          with Andy.

9               Not involved in the

10         allocation, fee committee.

11              We were involved prior to

12         its withdrawal.

13              After negative consequences

14         in Texas, we continued to stay

15         involved.

16              I think that's what the

17         Court had asked that we talk

18         about.

19              MR. HERMAN:  Arnie, what do

20         you have on costs and hours?

21              MR. LEVIN:  Ed will do it.

22              MR. BLIZZARD:  Dave and

23         Julie and I have had a meeting

24         previously and talked about the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          cost submissions and the time

2          submission.  I think they are

3          still showing at Wegmann-Dazet as

4          not being approved at this point.

5          So, whatever we can do to help.  I

6          think it is a good idea to maybe

7          set an appointment with them and

8          go down in person.  And if I can

9          go down and help in person with

10         you, I'll do that, to make sure

11         that you've got whatever they need

12         to get your expenses and time

13         approved.

14              MS. RHOADES:  I think I have

15         another --

16              MR. LEVIN:  You have

17         $1,660,000 in expenses, so, it is

18         worth the trip to New Orleans.

19              MR. MATTHEWS:  I think

20         that's probably worth a trip.  We

21         obviously spent more than that.

22         I've already seen some problems,

23         Ed, you and I talked about this.

24              MR. HERMAN:  Let me give you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

```
 1          the contact, my partner,

 2          ldavis@hhkc.com, (504) 581-4892.

 3          Lenny can set up or connect you in

 4          with Phil Garrett, who is the

 5          independent CPA appointed by the

 6          Court.  I recommend with that much

 7          in expenses that you send someone

 8          knowledgeable.  They are helpful.

 9          They are there to help and assist,

10          not impede, and they will be happy

11          to go over what the expenses are.

12               MR. BIRCHFIELD:  If you have

13          a report from Steve Levine, will

14          you get that to Lenny?

15               MR. MATTHEWS:  I will give

16          it to Russ.

17               MR. BIRCHFIELD:  Lenny in

18          Russ' office, just e-mail it.

19               MR. MATTHEWS:  Okay.

20               Julie, is there something

21          you want to add?

22               MS. RHOADES:  Sounds great

23          to me.

24                         -   -   -
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1                C E R T I F I C A T E

2

3                I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13                I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM:  MORELLI RATNER
       Benedict Morelli, Esquire
       David Ratner, Esquire


BEFORE COMMITTEE MEMBERS:


ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese


RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm


ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP


PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2            MR. MORELLI:  Good morning,
 3       everyone.  I decided not to do a
 4       PowerPoint because Mark is here,
 5       and he's the best PowerPoint
 6       person I know.  I said I'm not to
 7       embarrass myself.  He's going to
 8       mark and critique me for the next
 9       year.
10            MR. SEEGER:  He's going to
11       do that anyway.
12            MR. MORELLI:  I want to say
13       that there are a couple of people
14       on the panel that don't really
15       know me that well, if at all.  I'm
16       in a very unique and unusual
17       situation in this litigation,
18       because I've been trying cases
19       since the '70s, and I've had a lot
20       of high profile cases, and at the
21       time when Mark asked me to assist
22       him on the Ernst trial, I had just
23       been elected the president of the
24       New York State Trial Lawyers
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1      Association.  At the same time

 2      that I was elected, I left for

 3      Houston and gave up my summer, two

 4      months of it.  I don't know a

 5      whole lot of people who decide

 6      that they are going to spend their

 7      summers in Houston.

 8           When I spoke to Mark and he

 9      asked me to help him on the Ernst

10      trial, we started out by taking

11      the depositions of the executives

12      of Merck, and I second seated him

13      with all of those depositions,

14      Scolnick, Reicin, Kim, Gilmartin,

15      I think six depositions in all.

16           And when he was off in

17      Houston finishing his preparation

18      of the trial, I took the national

19      sales manager's deposition, Mr.

20      Dunn, I did that myself.  When I

21      went to Houston and started

22      working with Mark, I got there at

23      the jury selection.  I was there

24      from jury selection through the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

 1        verdict for two months.

 2              As a trial lawyer, I think

 3        that I was always in control.  I

 4        decided which cases I was going to

 5        try, how I was going to try them,

 6        the order of the witnesses.  I've

 7        tried every kind of civil case in

 8        my career.  And for 25 straight

 9        years, I never lost a case.  And

10        when I took the bullet in the Cona

11        case, because that was the second

12        trial I was on with Mark Lanier, I

13        knew I was taking it.

14              MR. WEITZ:  Explain that.

15        Explain what you mean by that.

16              MR. MORELLI:  Let me go back

17        and explain about the fact that I

18        was on two trials with Mark.  One

19        was approximately two months, and

20        the other one was maybe a

21        month-and-a-half, and that was

22        Cona/McDarby.

23              The Cona/McDarby case was a

24        unique situation where Judge

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        Higbee asked us to try two cases

 2        at the same time.  Mark took the

 3        lead in trying the liability in

 4        the case, and the damages were

 5        tried separately by Mark's firm

 6        and by Weitz & Luxenberg.  I was

 7        part of that trial team for the

 8        entire time, from jury selection

 9        through verdict.

10             MR. WEITZ:  Also before

11        that, explain the prep that you

12        were involved with in the mock

13        trials.

14             MR. MORELLI:  We also had

15        mock trials, and I actually

16        allowed myself to be embarrassed

17        for the common good, of course, by

18        wearing the robes of the judge,

19        which were too long for me.  They

20        were all the way down to here.

21        (Indicating.)

22             MR. LEVIN:  I think you'll

23        grow into them.

24             MR. MORELLI:  My mother was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1          optimistic like you.

 2                   MR. LEVIN:  So was mine.

 3                   MR. MORELLI:  When I was 50,

 4          she told me I'd still be growing.

 5          If she was alive, she would still

 6          be telling me that.

 7                   But I was involved in the

 8          mock trials.

 9                   When Mark and I were taking

10          the depositions of the executives,

11          I sat next to him at every single

12          deposition.  I tried to give him

13          my experience, my advice, my

14          questions.  He would ask me, did I

15          leave out anything, or he would

16          take questions from me.  The two

17          of us actually gave up a lot of

18          our ego for this litigation,

19          because anybody who knows anything

20          about a trial lawyer knows that

21          they don't like to give up

22          control.  I never second seated

23          anyone in my entire career until

24          the Vioxx litigation.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          This litigation has been

2     unique and unusual, and I find

3     myself again not in control.  Not

4     in control during the whole

5     litigation.  Second seating in the

6     Ernst trial for two months; second

7     seating in Cona/McDarby, where I

8     know that I brought a lot of

9     maturity to that trial.  I

10    prepared witnesses, I prepared

11    documents.  I argued every motion

12    in limine in the Ernst trial in

13    Houston.  The uniqueness of this

14    is that never did I have the

15    prospect of a fee.  Never did I

16    discuss with Mark, am I going to

17    get paid?  Never did I have any

18    kind of an arrangement.  No one

19    offered to pay me.  Every single

20    thing I did, I did for the good

21    and the common good of this

22    litigation.

23          The first trial was a

24    verdict of $253 million, and I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1       have to say that I think I had a

2       lot to do with that.  I wrote a

3       summation over three or four

4       weeks, and I presented it to Mark

5       in the hotel, just not because I

6       thought that he was incapable of

7       doing it himself, because anyone

8       who has ever seen him knows how

9       capable he is, but because he had

10      asked me to join him, to give him

11      insight, to bring him experience.

12            I've been trying cases since

13      1977, from trip and fall cases to

14      DES.  There's nothing I haven't

15      tried.  There's no case that I

16      haven't tried.  I've tried more

17      cases than most lawyers who

18      practice law today, and when Mark

19      asked me to join him and to second

20      seat him, I took my ego and put it

21      aside and said okay.

22            When we were on the

23      Cona/McDarby trial in New Jersey,

24      we knew that the damages in that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1    case were in trouble because it

2    was all based on samples.  And the

3    treating doctor did not testify

4    that he gave the plaintiff

5    samples.  And I put the daughter

6    on the witness stand in that case,

7    and then I agreed to give the

8    summation in a case that I knew

9    was a loser.  Because as a trial

10   lawyer, and I've taught how to try

11   cases for a very, very long time,

12   I know you can't win a case in the

13   summation.  You can get money in

14   the summation, but you can't win

15   the case if it is a loser.

16         So, when I agreed to sum up

17   in that case, I did it for the

18   common good, because I wanted the

19   liability in the case to stay

20   pristine so that we would win.

21   And we did win the liability in

22   the case, and we won the liability

23   in the Cona/McDarby case.  The

24   Cona/McDarby verdict was a very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        big verdict.

2               Those two trials that I was

3        on, Ernst and Cona/McDarby, had as

4        much to do to shape the litigation

5        here and to bring about a global

6        settlement than anything.  I don't

7        think that there's anybody in this

8        litigation who has been on two

9        trial teams who gave up almost

10       four months of their career and

11       didn't have a case, it wasn't

12       their case personally.

13              Now, when I was sworn in as

14       the president of the New York

15       State Trial Lawyers, and by the

16       way, the second largest trial

17       association, bar association in

18       the country other than AAJ, I gave

19       up a lot of my presidency to spend

20       two months in Houston.  I didn't

21       see my family for two months in

22       the summer when my kids are home

23       and my wife wants to go to the

24       beach.  I didn't do any of that.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        I did it not because I thought

2        there was a pot of gold at the end

3        for me, but we had to win the

4        litigation.  I'm a trial lawyer.

5        We had to win the litigation.

6        That's all I cared about.

7             And please understand that

8        there was a lot of sacrifice made

9        because many of the perks of being

10       president of the New York State

11       Trial Lawyers I gave up to be on

12       this trial.  And, look, I believe

13       that I deserve a determination on

14       the merits.  There are a number of

15       people on this panel who I know

16       fairly well.  I'm not asking you

17       for any favors.  I don't deserve

18       any favors.  But I certainly

19       deserve full consideration being

20       in such a unique position.

21            Because when all of my cases

22       were brought in New Jersey, I

23       didn't warehouse cases, I didn't

24       toll any cases.  I filed them all.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1          I got medical records on every

 2          case.  And when Judge Higbee asked

 3          for people to put forth cases to

 4          move this litigation toward a

 5          global settlement, we stepped up

 6          to the plate.

 7              My firm, with fewer than 15

 8          lawyers, put five lawyers,

 9          including my partner, who is

10          sitting next to me, David Ratner,

11          and myself to prepare these cases.

12          And as a matter of fact, when

13          Judge Higbee called for what she

14          called the original 39 cases that

15          went to 10, because she said we

16          would try 10 cases at once, out of

17          those 10 cases, 4 were mine.  And

18          we prepared those cases.  I hired

19          a pathologist in Chicago, and

20          because I had a very unique death

21          case called Weiss, my client died

22          midair on his way to Hong Kong in

23          his wife's arms, and Merck was so

24          afraid of that case, they fought

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1      me tooth and nail to make sure

2      that that case never went to

3      trial.  I had to hire a lawyer in

4      Hong Kong to be able to get the

5      pathology slides, because they did

6      an autopsy in Hong Kong.

7           To this day, that case has

8      never been tried, because as my

9      four cases were part of the ten,

10     and that ten got reduced to eight,

11     then got reduced to four, and I

12     still had a case in there, then it

13     got reduced to two, and I was shut

14     out after I spent time, money and

15     effort, my personal time.  I

16     wasn't allowed to try any cases.

17          But it wasn't because -- and

18     by the way, my firm does

19     individual cases, personal injury,

20     medical malpractice and employment

21     discrimination.  That's the bread

22     and butter.  For three years, it

23     put such a strain on my firm

24     financially because I was in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          Vioxx business, and I was

2          hell-bent on making sure that we

3          won and that we got to the right

4          result.

5                  I've always been, you know,

6          tough in the courtroom, and it was

7          very, very difficult for me to

8          take a second seat and not, you

9          know, stand up in Houston at every

10         turn.  And I want you to know, the

11         economist was who I put on in

12         Ernst.  And anybody who has ever

13         put an economist on the stand

14         knows that it is like watching

15         grass grow, okay?  It is not

16         exactly what you would choose to

17         do.  Somebody would not be

18         fighting, let me put on the

19         economist.

20                 When I tell you that when we

21         did these trials, Ernst and

22         Cona/McDarby, it changed the

23         litigation.

24                 Now, look, I know that there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      are people who dedicated

2      themselves to the litigation and

3      were certainly essential to the

4      common good, and I'm not saying

5      I'm number one on the list, no

6      way.  There's people in this room,

7      in my opinion, who should be in

8      the top tier of people who get

9      compensated because of what they

10     dedicated to this litigation.

11          But it's my opinion that my

12     firm, what I gave up in time and

13     money, and let me tell you, when I

14     took the bullet in Cona, okay, I

15     did it publicly, live stream.  All

16     right?  And it is interesting,

17     because there was an article

18     written about me in New York

19     Magazine in March of 2000, and as

20     a result of that article, I was on

21     a television show for two years

22     called Power of Attorney, where we

23     tried cases on television.  A

24     couple of members of the panel

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        know this story.  And to show you

 2        that my son, my youngest son, who

 3        had come to watch me try cases and

 4        knew that it was so important for

 5        me to win, win, win, okay, he said

 6        to me, dad, I saw you on

 7        television today.  I said, yeah?

 8        He said, yeah.  He said, you were

 9        trying a case.  I said, yeah.  He

10        said, you lost.  He said, you lose

11        cases?  I said, only on

12        television.  Okay?

13             And on Vioxx, luckily it was

14        only on television in my head.

15        But we all know it wasn't just on

16        television.  And I tell you, in

17        those cases, not only did I bring

18        my experience as a trial lawyer --

19        and, by the way, you know, I could

20        have boards and PowerPoints and

21        everything, but I'm talking to you

22        the old-fashioned way, the way I

23        sum up.

24             I stand in front of a jury,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          I look them in the eye, and I

2          don't ask them, could you be fair

3          when I select the jury because I

4          know I'm going to get the answer

5          from them that they expect me to

6          hear.  So, I'm not going to ask

7          any of you could you be fair.  I'm

8          going to say, please be fair with

9          my firm.

10              And my partner will tell

11          you, because he -- I manage my own

12          office.  The finances, the

13          business, I interview clients, I

14          bring in business, all of that was

15          really hurt by my decision to

16          spend so much time in Vioxx.  Now,

17          I'm a big boy, and I'm going to

18          survive, but when you decide who

19          is in the most unique position of

20          anybody in this litigation, I hope

21          you think it's Benedict Morelli,

22          not the way it's spelled in the

23          e-mail, Bendict, it's Benedict

24          like the Pope.  Okay?  Benedict

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1        Morelli had a lot to do with the
 2        Vioxx litigation.
 3             And a lot of my of counsel
 4        clients, who normally give us
 5        individual cases, were hard
 6        pressed to do so, because they
 7        would say to me on the phone and
 8        to my partner, you guys are in the
 9        Vioxx business.  Morelli is not
10        around to try these cases.  He's
11        not around to look and see how it
12        should be tried or what judge it
13        is going to be in front of.  So,
14        we lost a lot of money because of
15        the Vioxx litigation, and I'm so
16        happy we did what we did, because
17        I think without Ernst, without
18        Cona/McDarby, and without a number
19        of people on this panel who pushed
20        forward even when it felt
21        impossible, because let me tell
22        you, they kept saying, we're not
23        going to settle these cases.
24             So, I had no cases, zero
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1    cases in the MDL.  I never

2    expected to be assessed.  All my

3    cases were in New Jersey.  So, I

4    certainly wasn't thinking, oh, I'm

5    going to get the common benefit

6    fund one day.  But think about how

7    strange it is that I would be in

8    this position, because at the time

9    I had 1,200 cases, I was on the

10   first trial and the third or

11   fourth trial, and I'm not even on

12   the panel making the decision of

13   how much money people get.  Once

14   again, not in control.

15            So, I have to leave it to

16   all of you and your good

17   conscience.  I just want my

18   partner to say one or two things

19   about the way it affected our

20   firm.

21            MR. RATNER:  When Ben was in

22   Houston and in New Jersey, he was

23   obviously not in the office.  When

24   he's not in the office, he's not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        there to interview clients, he's

2        not there to talk to prospective

3        referring attorneys, he's not

4        there to do things like that.  So,

5        that had one effect on the

6        business.

7             But there was a second and

8        greater effect, and that is when

9        we were preparing the four New

10       Jersey cases for trial, we took

11       the five most senior lawyers in

12       the office, me, Les Salmon, three

13       other people, who tried the bulk

14       of our personal injury cases, and

15       said, we're going to defer that

16       for a while and we're going to

17       prepare these four cases, the four

18       most important cases in the firm.

19            And I flew all around the

20       country preparing our prescribing

21       doctors, our treating doctors for

22       their depositions.  In every one

23       of the cases, the prescribing

24       doctor testified, had I known

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1       now -- had I known then what I
2       know now, I would not have given
3       Vioxx to this patient.  And all
4       the treating doctors testified
5       that Vioxx was the cause of the
6       heart attack in that particular
7       case.
8            We had our senior trial
9       lawyer, Les Salmon, taking all the
10      sales reps depositions in all of
11      these four cases.  So, we put our
12      full court press to get these
13      cases ready.  But what did that
14      mean?  That meant that I wasn't
15      available to try any cases in New
16      York.  Les, who got a $70 million
17      verdict in a medical malpractice
18      case last year, wasn't available
19      to try any cases in New York.  He
20      wasn't available to take any
21      depositions in New York.  He
22      wasn't available to conference
23      cases in New York.  I wasn't
24      available and Ben wasn't available

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1      to be on the phone to settle cases

2      in New York.  So, as a result of

3      that, our income and cash flow

4      were severely affected.  And we

5      did that because we thought we

6      were going to get money on these

7      four cases?  No.  Because we

8      thought that getting cases ready

9      for trial and pressing Merck and

10     pressing Merck and getting ready

11     to take depositions and making

12     them take doctor depositions and

13     making them prepare sales rep

14     depositions would put pressure on

15     them to bring them to the table.

16     And we hoped that it did, and we

17     think that it did, and we think we

18     should be compensated for it.

19          MR. MORELLI:  Just two

20     things in closing.  The unique and

21     unusual, that's what I want you to

22     think about when you think about

23     me, because I think I am, and in

24     this litigation, I certainly was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          unique and unusual.  I think about

2          now being assessed and maybe at

3          the end being lucky enough to get

4          my own assessment back.  How fair

5          do you think that would look when

6          somebody like me gave up so much?

7               MR. WEITZ:  Ben, how many

8          cases did you submit to the

9          settlement?  How many cases did

10         your firm submit?

11              MR. MORELLI:  860.  We were

12         on board from the beginning with

13         the settlement.  We applauded

14         Chris and everyone else who put

15         the settlement together.

16              MR. WEITZ:  Tell us about

17         your expenses.

18              MR. MORELLI:  I don't

19         remember them offhand, but I did

20         give the spreadsheet.

21              MR. WEITZ:  They were pretty

22         significant.

23              MR. LEVIN:  They were

24         $166,000.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1           MR. RATNER:  Sounds right.

2           MR. SEEGER:  Arnold

3      memorized all of them.

4           MR. MORELLI:  Let me just

5      answer that, because that's an

6      interesting thing that you would

7      know the exact amount.

8           MR. SEEGER:  Well, we have

9      it right here.

10          MR. LEVIN:  Ben, what do you

11     think this is?

12          MR. MORELLI:  No, no, no, I

13     appreciate that.  But let me

14     explain what they would have been

15     had we been able to try the four

16     cases that were part of the ten.

17     It would have been millions of

18     dollars.

19          MR. LEVIN:  Exactly.

20          MR. MORELLI:  Because in

21     this litigation, I don't think it

22     should be judged at how much your

23     expenses were, because we never

24     backed down, and we never backed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1        up in this litigation.  Every time

2        Judge Higbee asked for volunteers,

3        you can ask Buchanan, my firm was

4        right there ready to try cases.

5              As a matter of fact, after

6        Humeston got tried for the second

7        time with Mark, and I forget the

8        name of your case, Mark, in those

9        two cases, I had -- Judge Higbee

10       promised that our cases would be

11       tried next either with a trial

12       team or just with my office.  So,

13       I was willing to put up whatever

14       money it was for the common good.

15              MR. WEITZ:  Well, when I say

16       expenses also, I didn't mean just

17       your hard costs that you

18       submitted.  But you had a lot of

19       expenses on individual cases too,

20       right?

21              MR. MORELLI:  Absolutely.

22              MR. SEEGER:  I want to say,

23       none of us know where any of this

24       is heading, and we're just working

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1        as hard as we can to put something
 2        together for the judge to
 3        consider.  I just want to
 4        personally say, I know what you
 5        did, I know how hard you guys
 6        worked, and you really were team
 7        players, from somebody who was
 8        involved both in the MDL and New
 9        Jersey.  So, I think I thanked you
10        privately, but I want to thank you
11        on the record.
12             MR. WEITZ:  Well, I also
13        know Ben for 30 years, and I know
14        the firm Dave and Ben have.
15        Although you take a look at my
16        firm, I have a lot of people and I
17        contributed a lot of people to
18        this, but when these guys really
19        say that it truly affected their
20        income stream and the kind of work
21        that it did and their opportunity,
22        this is a firm that it really did.
23        So, I don't want that to go
24        lightly.
```

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

 1          MR. LEVIN:  Work with the

 2     accountants to straighten out

 3     those costs so that you can get

 4     approved.

 5          MR. MORELLI:  Okay.

 6          MR. SEEGER:  From my

 7     perspective, I think you've done a

 8     great job summing up your

 9     contributions, and it is a lot

10     harder to be number two on a trial

11     team than number one.

12          We have two minutes if there

13     are any questions.

14          MR. HERMAN:  First of all, I

15     do know you by reputation.  Your

16     reputation as a trial lawyer is

17     really important.  One of the

18     things that I think distinguished

19     this litigation is that, by and

20     large, these were not class action

21     lawyers handling the cases, they

22     were lawyers that know how to try

23     cases, that go in and try cases,

24     and that always has an effect.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1             We still believe people

2        settle cases out of fear, and

3        Merck had its own reasons, but I

4        think that contributions made by a

5        number of lawyers caused them to

6        give second thought to the fact

7        that they were spending over a

8        billion dollars to defend cases,

9        and there are a lot more coming

10        down the road.

11             Just a couple of things.

12             You've got to be aware of

13        the Fifth Circuit and look at the

14        Johnson factors, look at Judge

15        Fallon's decision in Murphy Oil.

16        Read it, because it is going to

17        affect common benefit in this

18        case.  There's no question about

19        it.  There's another case, Mobil

20        Oil, that came out last year in

21        the Fifth Circuit out of the

22        Eastern District.

23             Judge Fallon has indicated

24        that if there's no resolution, he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1         is going to put lawyers under oath

2         and have former assistant US

3         attorneys and maybe the special

4         masters question and make sure the

5         affidavit is in good shape.

6              I say those things to you

7         because I think you have to know

8         that.  You have to be aware of the

9         Fifth Circuit, which is very

10        different than the First, Second

11        or Eleventh.  So, I appreciate you

12        being here.

13             MR. MORELLI:  Thank you.

14        You didn't see anything in my

15        affidavit that gives you pause,

16        did you?

17             MR. HERMAN:  I saw a lot of

18        things that give me pause, but

19        none in your affidavit.

20             MR. BIRCHFIELD:  When did

21        you start with Vioxx?  When did

22        you first start?

23             MR. MORELLI:  Well, it is

24        interesting.  I started after it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1      was withdrawn from the market, and

2      that also puts me in a unique

3      position, because even though that

4      was true, I didn't warehouse the

5      tolling cases, I went right on the

6      first trial and actually six

7      depositions in the first trial.

8          I was not one of the

9      pioneers who started in '01 like

10     some of y'all.  So, that is

11     absolutely true.

12          MR. SEEGER:  Thank you, Ben.

13          MR. WEITZ:  Thank you.

14          MR. MORELLI:  Thank you.

15              -  -  -

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1              C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4   Public and Certified Court Reporter of

5   the State of New Jersey, Registered

6   Diplomate Reporter, Federally-Approved by

7   the United States District Court of

8   Pennsylvania, do hereby certify that the

9   foregoing is a correct transcript of the

10  testimony as taken stenographically by

11  and before me at the time, place and on

12  the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14  am neither a relative nor employee nor

15  attorney nor counsel of any of the

16  parties to this action, and that I am

17  neither a relative nor employee of such

18  attorney or counsel, and that I am not

19  financially interested in the action.

20

21  _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 1295

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM: MOTLEY RICE, LLC
      Fred Thompson III, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Amended Exhibit D -- 1296

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                     -  -  -
 2               MR. THOMPSON:  I appreciate
 3          you taking the time to listen to
 4          me.  I hope to go pretty quickly,
 5          because I understand that
 6          everybody is sort of a traveling
 7          show, and so if I say something
 8          that is boring or redundant, how
 9          about just pull your ear and I'll
10          move on to something else.
11               First of all, there's no
12          reason for me to come before you
13          and claim that I single-handedly
14          resolved the Vioxx litigation.
15          I'm actually looking at people who
16          did a tremendous job, and this is
17          the first opportunity that I've
18          actually had to congratulate you
19          and thank you on behalf of my
20          clients for getting a very solid
21          resolution to a case which had
22          tremendous issues of individual
23          causation, which it was a Joe-type
24          accomplishment for you, and I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1      appreciate that.

2           Having said that, I'm not

3      going to take undue credit.  I do

4      think that our firm did do

5      valuable constructive work that is

6      worthy of a common fund award, and

7      I do want to go down that list

8      very briefly for you just on some

9      individual items for your

10      consideration.

11           We submitted a time sheet.

12      That time sheet has actually been

13      bounced back to us for some

14      presentation faults, and we are

15      now in a 30-day cure period, but

16      substantially the hours will be

17      the same.  We did locate some

18      additional hours, but they don't

19      change the shape of the

20      submission.

21           We chose to participate in

22      the New Jersey state forum, and

23      all but very few hours are hours

24      that were expended in pursuing the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        New Jersey state consolidation.

2        We pressed our cases for trial,

3        and we, in fact, had an

4        opportunity and were on the list

5        to be on the next -- on a trial

6        cycle in the fall of 2007, at

7        which time Merck made due process

8        objections to the size of the

9        trial grouping, and we were, in

10       essence, asked to take a step back

11       and allow some other folks to go

12       forward.  And we, for the good of

13       the litigation, we, in fact,

14       agreed to do that.

15            We were on the list for

16       trial cases in the winter and

17       early spring of 2008, and, of

18       course, the settlement preempted

19       that.  But we were doing

20       preparation work for those cases

21       as well.

22            We did not in our fee

23       petition submit hours for

24       individual cases.  And that would

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1       include the cases that we were

2       working up as members of Judge

3       Higbee's trial group.  We did not

4       submit those hours, but let me

5       just suggest to you that given

6       Judge Fallon's opinion that he

7       views the majority of cases as

8       somewhat free riding cases, that

9       they were not worked up and that a

10      push down was somehow justified

11      for that, we in New Jersey

12      followed a procedure that Sol and

13      Chris and Dave Buchanan put out

14      that was designed to put

15      continuous pressure on Merck.  We

16      were actually nominating -- as a

17      group, we were nominating 250

18      cases per quarter, and we were

19      tendering those for depositions of

20      the plaintiffs, the family and

21      close friends, treater, prescriber

22      and two sales reps.  And so we

23      actually were working up a broad

24      number of cases in those pool

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

```
 1        settings.  Sometimes it felt like
 2        Dechert was pinning us down rather
 3        than us pinning them down, but
 4        that was the strategy, and we were
 5        good soldiers.  None of those
 6        hours show up in our fee petition,
 7        but I do want to point out that we
 8        were very active in pursuing that.
 9             As far as traditional common
10        fund work, one of the things that
11        our co-liaison, Sol Weiss -- early
12        on, we looked at the marketing
13        side, and we took on a substantial
14        responsibility in reviewing tens
15        of thousands of marketing
16        documents.  We identified the head
17        of the medical/legal office, Ellen
18        Westrick, who was present during
19        the period of time that Merck was
20        filing the petitions and filing
21        the various forms that were
22        required regarding the naproxen
23        cardioprotective theory.  We
24        worked those documents up, we
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          worked up the deposition of Ms.

2          Westrick, and we were the lead

3          counsel on that.

4               We also did a substantial

5          document review and a subpoena

6          practice with several third-party

7          PR firms, Ogilvy and DDB, and we

8          did that over a period of time.

9          We were in the process of

10         scheduling depositions when this

11         case changed its nature into a

12         claims facility.  One of the key

13         things that we looked at --

14               MR. HERMAN:  Excuse me.

15         When you say third-party PR

16         firms --

17               MR. THOMPSON:  Yes, sir.

18               MR. HERMAN:  -- are you

19         talking about Merck's PR machine?

20               MR. THOMPSON:  Yes, Ogilvy,

21         DDB.

22               MR. HERMAN:  Okay.

23               MR. THOMPSON:  One of the

24         things that we had looked at early

on was, if you look at the privilege logs, particularly the period around April of 2000, Merck threw a blanket over that period of time where they were considering, first of all, the VIGOR results, and then their public response, which was the VIGOR results were related to the naproxen cardioprotective theory.

Many of those documents were completely hidden away, because their general counsel, a lady named Joanne Lahner, was cc'd and attended practically every meeting for that period of time. We set out very strongly to try to get those documents, and we briefed it, we made motions to take her deposition. We had three hearings with Judge Higbee, one of which was an evidentiary hearing in which Ms. Lahner took the stand.

And we were proceeding, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1         thought we had -- we found,

 2         actually, some documents that the

 3         defendant tried to claw back,

 4         because they were very

 5         demonstrative of Ms. Lahner's

 6         editing and the way that she was

 7         trying to handle this.  We thought

 8         we were well on our way to getting

 9         Merck to make privilege releases

10         when all of a sudden Judge Higbee

11         went dark, and in retrospect, it

12         was clear that at that point in

13         time, there were some settlement

14         discussions going on.  But that

15         was an effort, and I'll just be

16         frank with you right now, I don't

17         think anybody has ever seen those

18         documents.  And if we ever do,

19         we're going to see a very clear

20         picture of some corporate venality

21         that Merck really doesn't want us

22         to ever see.

23              So, we participated in the

24         joint prosecution in New Jersey.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          We worked carefully with Jeff

2          Grand in providing order books,

3          motions in limine and various

4          things that would be a part of --

5          Judge Higbee's plan was to try to

6          routinize these cases so that she

7          could farm them out and have

8          trials by many state court judges.

9          And part of that was her making

10         preemptory rulings on many

11         evidentiary issues and many issues

12         of law.  And we were involved with

13         Jeff.  I don't want to claim much

14         credit beyond the fact that we

15         volunteered for that program,

16         Carmen Scott in our office drafted

17         it up, and we sent a series of

18         things that were included in that

19         effort.

20              I think we talked a little

21         bit about marketing already, but

22         we did review the marketing sales,

23         FDA DDMAC documents, and found a

24         series of hot documents, including

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1        some really great ones from Ms.

2        Westrick.

3             We participated early in

4        developing a business ethics

5        expert.  Chris probably remembers

6        this.  Mr. Michael Hoffman.  He

7        had a beautiful opinion that Judge

8        Higbee decided that she didn't

9        want to put in front of the jury.

10       So, if you are looking at it from

11       today back, maybe that was not a

12       big bearer of fruit, but looking

13       at it in a forward-looking aspect,

14       looking at it in terms of an

15       ongoing war in which there are

16       many battlefields in which there

17       are many things that need to be

18       addressed, we did expend the time

19       and the expense to develop that

20       expert.  And given another judge

21       who would accept that type of

22       business expert testimony, Dr.

23       Hoffman would be a good witness.

24             We worked also with Eric

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1      Weinberg on a damage causation

2      expert, I think it is Dr. Kostis

3      and Madigan, who were working on

4      trying to use -- trying to apply

5      some Framingham data to try to

6      show or illustrate the causation

7      trying to show an enhanced risk of

8      some substantial contributing

9      factor on these individual

10     causation cases, which, of course,

11     is the real tough part of this

12     case.

13          We used some pretty senior

14     people.  Don Migliori was going to

15     be our partner, who was going to

16     actually be on the trial team of

17     the cases, myself, Ann Ritter, who

18     did a substantial amount of

19     background work on the experts and

20     on the third-party documents.  Two

21     associates, Carmen Scott and Henry

22     Leventis.  This case has gone on

23     long enough that the law clerk in

24     our papers has now become an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          associate.  Josh is now an

2          associate.  I guess I will next

3          become of counsel before we're

4          finally through.

5               But that's sort of the quick

6          run through.

7               MR. LEVIN:  Don't become of

8          counsel.  That's where elephants

9          go to die.

10              MR. THOMPSON:  Well, I don't

11         want that.  I'll go senior, one of

12         the judges, the senior status.

13              That's just a very, very

14         quick overview.  Certainly I can

15         keep going on and on, but I think

16         that if you've heard from seven or

17         eight or nine people, you've

18         probably heard all of us claiming

19         credit for many of the same things

20         over and over again.

21              I do believe that we made an

22         effort in our submission not to

23         fluff it up, not to do a lot of

24         redundant time, not to do things

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1    beyond what the scope of our work

2    was.  I don't think we've

3    overstated anything, but we did do

4    productive work that was of

5    material benefit to the resolution

6    of this case.

7        I sometimes worry that the

8    folks in the MDL don't know what

9    exactly was going on in the state

10   court consolidation, just like I,

11   as a member of the state court

12   consolidation, don't know exactly

13   what was going on in the Federal

14   MDL.  Although I was lucky, I had

15   a good many friends who were

16   keeping me somewhat abreast of it.

17       But I don't want to give the

18   impression that the state court

19   litigation in New Jersey was a

20   side show.  It was well

21   coordinated between --

22       MR. SEEGER:  Nobody here

23   thinks that.

24       MR. LEVIN:  I'm in the MDL,

FAC Resp. Amended Exhibit D -- 1309

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
1         and I can assure you that Perry,

2         Mark and Chris have made it clear

3         to all of us, not that we didn't

4         know it already, that New Jersey

5         was not a side show.

6              MR. THOMPSON:  Okay.  Well,

7         in that case, I will end my

8         remarks on that subject.

9              MR. LEVIN:  You have three

10        superb advocates at this table.

11             MR. SEEGER:  Well, but the

12        important point you made is the

13        reason for these meetings is this

14        cross mixture of lawyers in state

15        and Federal litigations, some

16        people did both, is to make sure

17        everybody at the end of this

18        process has talked everything out.

19             MR. HERMAN:  The original

20        lawyers, at least when I became

21        involved, that were primary in

22        this litigation, were Lanier,

23        Birchfield, Seeger and some

24        others.  They were not in the MDL.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          They were in New Jersey, New York.

2          There was a group in Texas.

3               To the credit of Chris and

4          Andy, they both, for mutual

5          benefit, participated in the MDL,

6          and Perry and Mark and others were

7          trying cases.  Tom was organizing

8          California.  There were cases

9          tried in California.  So, there

10         were no side shows.  For whatever

11         comfort I can give you, the main

12         thing that we're looking at is the

13         quality of the lawyering, wherever

14         it was.  We're fortunate that we

15         had a lot of quality lawyering.

16              I think also it's important

17         for lawyers to know that other

18         lawyers give them credit.  When

19         Chris Placitella was here earlier,

20         he talked about him being local

21         counsel for your firm and also,

22         though, for the contributions that

23         you made, Fred, with regards to

24         Ogilvy and other things.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1            So, I think we're getting
 2       enough information.  We've had 100
 3       lawyers, actually, 106, submit
 4       affidavits, and 60 or so have said
 5       that they want to make oral
 6       presentations.  So, I think we're
 7       getting a pretty good view of the
 8       landscape.
 9            MR. WEITZ:  When you were
10       doing your work with Westrick and
11       Lahner and Ogilvy, were you
12       getting your direction from Sol as
13       co-liaison counsel to do that
14       work?
15            MR. THOMPSON:  Here's how we
16       handled that with Sol.  We were
17       careful to make sure that we were
18       not going off on some rogue
19       tangent.  The last thing we wanted
20       to do is everybody is busy, nobody
21       wants to do something that's not
22       productive.  So, we would talk
23       carefully with Chris about where
24       the litigation was going.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

```
 1              There was a sense early on
 2         that we would win this case on the
 3         science itself.  And it became, I
 4         don't want to say clear, but it
 5         became more and more apparent that
 6         the marketing fraud, the marketing
 7         overstatement and the deception
 8         was very important to us.  So, we
 9         checked in and we made sure that
10         Sol approved any kind of activity
11         that we were going to go down.
12              MR. WEITZ:  You did a lot of
13         your discovery in coordination
14         with Placitella?
15              MR. THOMPSON:  Yes, sir.
16         Yes, sir.
17              Well, when they say the
18         Court has no questions, that means
19         you haven't laid a glove on them.
20         So, I apologize if I haven't.
21              MR. SEEGER:  No, no.  It was
22         great.
23              MR. GIRARDI:  Thank you,
24         Fred.
```

FAC Resp. Amended Exhibit D -- 1313

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1                         -   -   -

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147

23        Notary Expiration:  1.2.10
             CCR Number:  30X100176200

24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
BEVERLY HILLS, CALIFORNIA
- - -


FIRM:          PANISH SHEA & BOYLE
               Brian Panish, Esquire

BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                        -  -  -
 2              MR. GIRARDI:  Mr. Panish,
 3         nice of you to accommodate us and
 4         get here early.  I know you ran
 5         down from San Francisco and got
 6         here as quickly as you could, and
 7         it is very helpful because some of
 8         these people are on their way back
 9         to New York.
10              As you can tell, Brian,
11         there's a court reporter here, and
12         the purpose of this really is for
13         Judge Fallon.  At the end of the
14         day, Judge Fallon is going to call
15         the shots, and he wanted to get
16         everybody's ideas and stories and
17         so forth.
18              The thing we're primarily
19         interested in is the work that you
20         performed for the overall good of
21         Vioxx, of the Vioxx litigation.
22         So, that's the focus of this.  We
23         have a pretty good idea, we have
24         seen your declaration, we've spent
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          time on that.  So, it's not quite

2          a situation where you have to

3          start from the beginning of the

4          world, but nonetheless, primarily

5          for Judge Fallon, we wanted to

6          make sure we had everything in one

7          place so that he could look at

8          your efforts, look at your

9          results, and then be able to

10         compare them to the efforts of

11         others and their results.  So,

12         with that, you may go forward.

13              MR. PANISH:  Thanks for

14         seeing me.  I'm proud to be here.

15         I want to thank everyone that

16         worked on the litigation.  I know

17         how hard it was.  I know all the

18         great work you did.  I read some

19         Ed Blizzard cross of Briggs

20         Morrison that I used in my trial,

21         and Chris and all of you and all

22         of your work.  I'm proud to have

23         been a part of it.  I'm not going

24         to take a ton of time.  I feel

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1       like the guy that finally got in

2       the game and they go run the

3       clock.  It's 50 to nothing.

4               What I would just like to

5       talk about are the contributions

6       my firm and myself made that we

7       believe contributed to the

8       ultimate resolution of the Vioxx

9       litigation.  We filed many cases

10      in California.  We were a member

11      of the PSC.

12              I tried the appellate case,

13      which I believe at the time there

14      had been a lot of losses in the

15      trials and that it was important

16      that we do the best we could on

17      that trial in California to move

18      the litigation towards resolution.

19      So, myself, my firm, my partner,

20      Kevin Boyle, with Tom Girardi's

21      firm, worked day and night from

22      September through January on the

23      trial.  I drafted the state

24      questionnaire for the jury, which

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        was gone into every single

2        question.  I don't have to tell

3        you what it is like to litigate.

4        I would say this.  I've tried

5        about 100 cases, and I have never

6        been in a trial that was as

7        contentious and as hard fought as

8        this case.  The lawyers were good

9        on the other side, and they had

10       many of them.  All of you know

11       that tried the cases how hard it

12       really was just compared to

13       regular cases, and most of my

14       cases are against large corporate

15       defendants that fight hard, but it

16       was especially hard, I thought, in

17       this case.

18            I thought that the

19       cooperation among the plaintiff

20       lawyers was excellent and

21       extraordinary, that much of the

22       work that we started with was

23       given to us by the lawyers, and we

24       were able to expand on that in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          terms of the jury questionnaire,

2          focus groups that we ran here and

3          jury consultants.  Part of it is

4          because some of the work that had

5          been done before we weren't

6          allowed to use, other focus groups

7          that had been done in the prior

8          trial from the MDL.  So we had to

9          do a lot of that ourselves.

10              Specifically in the

11          appellate case, the prescribing

12          physician was a Vietnam veteran

13          and flight surgeon, had been paid

14          $750,000 by Merck to run clinical

15          trials, had prescribed Vioxx and

16          was given 60,000 samples by Merck

17          and was an adverse witness to the

18          plaintiff.  I called him adversely

19          to cross-examine him.  He had been

20          paid 750 for clinical trials on

21          Vioxx himself.  So, I had to call

22          him as an adverse witness and did

23          get him to admit that if he had a

24          heart attack, he wouldn't have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          given it, although when Merck

2          examined him, he flip-flopped for

3          them.  But it was very difficult.

4               The California law is

5          different than a lot of states on

6          the learned intermediary and

7          failure to warn, and we had a

8          difficult time with our

9          prescribing physician and dealing

10         with the learned intermediary and

11         dealing with the judge and the

12         law.  We spent a lot of time on

13         briefing the law, arguing, working

14         on the verdict forms, not only for

15         this case, but for the next case.

16         This case ended up in a hung jury,

17         three final arguments made in the

18         trial.  Go back, jury questions

19         for three straight weeks.  Got

20         some good findings in the trial,

21         and we're prepared to retry the

22         case.  We changed experts, took

23         out Merck's -- after the trial,

24         Merck no longer was using the same

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        cardiologist, Dr. Friedman, who

2        had had over 75 meetings with

3        Merck lawyers and prepared to

4        testify in all the California

5        cases.  So, he was no longer

6        designated after that case.  Ready

7        for the retrial.

8             We had other cases, had put

9        up many cases for trial.  I had

10       other cases, Schechter case, other

11       cases that were going to be in the

12       mix.  Mr. Girardi had set up a

13       plan, in addition to trying to

14       have four or five cases going

15       simultaneous with ten or more

16       plaintiffs in each case, and we

17       had signed on to be part of that,

18       to try whatever number of cases

19       were necessary to be tried.

20            We spent hundreds of

21       thousands of dollars.  We

22       submitted all the time sheets.

23            MR. LEVIN:  Your time sheets

24       and your costs, the 400 plus

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1          thousand was approved by the

 2          accountant.

 3             MR. PANISH:  450 plus --

 4          plenty of costs, prepared to put

 5          in plenty more costs.  I think we

 6          were ready to try the case, and

 7          they knew they took their best

 8          shot, and they couldn't beat us.

 9          We were ready to continue on, and

10          I think they knew that.  Not that

11          they would ever admit it, but they

12          knew that we were ready to go and

13          continue forward, committed to

14          resolution of the litigation.  I

15          was fortunate to be there at court

16          when it was announced, and I was

17          proud to be a lawyer and to have

18          been part of that and to have

19          worked with Tom Girardi and Tom

20          directing us here and the great

21          leadership in California for all

22          of us.  In all cases, California

23          is important.  Los Angeles County

24          is the seventh largest state.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          California is an important player

2          in overall global litigation.

3               I've submitted my stuff.  I

4          can talk for a long time.

5               MR. SEEGER:  Who actually

6          tried the case with you?  I knew

7          about your role in the trial.

8               MR. PANISH:  My case for

9          Mr. Appell, just me.  There was

10          another plaintiff.  Mr. Arrigale

11          was represented by Tom Brandi.

12               MR. SEEGER:  You and Brandi

13          did it?

14               MR. PANISH:  My whole case,

15          just me.  I picked the jury, did

16          the final arguments, everything.

17          Three final arguments.

18               MR. SEEGER:  Why was that?

19               MR. PANISH:  There's a new

20          law.  The jury would have

21          questions on issues, and she would

22          give an hour and a half more for

23          each side to argue.  So we would

24          have to reprepare for those final

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

 1          arguments to deal with that issue.

 2          Then we went over Christmas, we

 3          came back January 3rd or after the

 4          New Year, they would have

 5          questions on another issue.  So

 6          now we have to prepare another

 7          final argument and give that final

 8          argument.

 9               MR. SEEGER:  That's the way

10          you do it?

11               MR. PANISH:  It's kind a new

12          law, and the judge wanted to try

13          to -- she wanted to get a

14          resolution.  She didn't want a

15          hung jury, obviously.  So, we did

16          it.  We didn't have any choice.

17          She said that's what we're doing,

18          so we did it.

19               MR. WEITZ:  How many cases

20          did you have filed?

21               MR. PANISH:  100 plus

22          probably.

23               MR. WEITZ:  All in LA?

24               MR. PANISH:  All in LA.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        Some were moved to MDL, but all

2        were filed in State Court, Los

3        Angeles.

4              MR. GIRARDI:  Brian, truly

5        you did -- not only did you do a

6        terrific job in that case, which I

7        thought had some difficulties,

8        because I think Sizemore and

9        O'Callahan would report to me

10        nightly how difficult a case it

11        was.  So, not only did you do a

12        great job on that case, but when

13        we were told to get 60 more cases

14        ready, 20 for Judge Chaney, 20 for

15        Judge McLaughlin and 20 for Judge

16        Chavez, you came to the fore and

17        immediately started running

18        through all of your cases to give

19        us the best ones to put in that

20        group, which was a massive amount

21        of work.  Obviously those things

22        never went on due to the

23        resolution of the case, but you

24        did a terrific job.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

```
 1              Also, I think it's great

 2         that last week in the Sunday

 3         edition of the Los Angeles Times,

 4         you were named the second best

 5         trial lawyer in California.

 6              MR. SEEGER:  Who was number

 7         one?

 8              MR. GIRARDI:  Oh, that was

 9         me.

10              MR. PANISH:  I'm glad to be

11         there.

12              MR. GIRARDI:  I'm just

13         teasing, obviously.  In all

14         honesty, you did a terrific job,

15         no kidding.  I think as far as the

16         California efforts, our two firms

17         carried the ball, and there's no

18         question about it.  You are to be

19         commended for all of your good

20         hard work, and it was a hell of a

21         contribution to the overall

22         resolution of these cases.

23              MR. SEEGER:  I only got to

24         know you through the case
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          recently, but I really learned

2          about you, first, through your

3          trial work.  So, based on what I

4          have known what you have done, I

5          have to second that.  Thank you.

6               MR. PANISH:  I want to thank

7          all of you guys, and, Tom, the

8          extraordinary efforts Mr. Girardi

9          did in California.  It wasn't

10         easy.  Lawyers were not stepping

11         up to try the cases despite what

12         they might tell you now.

13              MR. WEITZ:  We know.

14              MR. SEEGER:  As soon as

15         there was a loss, guys were

16         running for the hills.

17              MR. PANISH:  People would

18         dismiss cases on the day of trial.

19         Tom had tried the first case, and

20         it didn't go so well, and he

21         didn't bat an eyelash.  He was

22         prepared to go forward.  We'd

23         still be trying Vioxx cases.  I

24         thank you for giving me an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1           opportunity and for all the work.

2                   MR. GIRARDI:   Thank you.

3                   MR. SEEGER:   Thank you.

4                   MR. BLIZZARD:   Thank you.

5                       -   -   -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4    Public and Certified Court Reporter of

 5    the State of New Jersey, Registered

 6    Diplomate Reporter, Federally-Approved by

 7    the United States District Court of

 8    Pennsylvania, do hereby certify that the

 9    foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22         Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23         Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 1331

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRMS:     RANIER GAYLE & ELLIOT, L.L.C.
           Drew Ranier, Esquire
           Sarah Ranier, Esquire
           Brett M. Powers, Esquire
           PROVOST UMPHREY LAW FIRM, LLP
           Walter Umphrey, Esquire
           Darren Brown, Esquire
           WILLIAMS KHERKHER
           Steven J. Kherkher, Esquire
           John T. Boundas, Esquire
           Amy Carter, Esquire
           Brandon Steffey, Esquire
           THE WATTS FIRM
           Mikal Watts, Esquire
           Larry Wright, Esquire
           THE KAISER FIRM
           Grant Kaiser, Esquire
           John Furnish, Esquire
           Gerilyn Gordon, Esquire


COURT REPORTER:  Linda L. Golkow, RDR



GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Amended Exhibit D -- 1332

Page 2

 1   BEFORE FEE COMMITTEE MEMBERS:
 2
     ANDY D. BIRCHFIELD, ESQUIRE
 3   Beasley Allen Crow Methvin
     Portis & Miles, PC
 4
     EDWARD F. BLIZZARD, ESQUIRE
 5   Blizzard, McCarthy & Nabers
 6   THOMAS V. GIRARDI, ESQUIRE
     Girardi & Keese
 7
     RUSS M. HERMAN, ESQUIRE
 8   Herman, Herman, Katz & Cotlar, LLP
 9   W. MARK LANIER, ESQUIRE
     The Lanier Law Firm
10
     ARNOLD LEVIN, ESQUIRE
11   Levin, Fishbein, Sedran & Berman
12   TROY RAFFERTY, ESQUIRE
     Levin, Papantonio, Thomas, Mitchell,
13   Echsner & Proctor, P.A.
14   CHRISTOPHER A. SEEGER, Esquire
     Seeger Weiss, LLP
15
     PERRY WEITZ, ESQUIRE
16   Weitz & Luxenberg, P.C.
17
18
19
20
21
22
23
24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1                 -  -  -
 2            MR. BLIZZARD:  We've got a
 3       court reporter here today, and
 4       obviously we had individual time
 5       slots for everybody, but John
 6       called me earlier and said that
 7       you guys wanted to present as a
 8       group, and that's obviously fine
 9       with us.
10            The court reporter is going
11       to record everything because of
12       Judge Fallon's interest in
13       transparency.
14            Really the floor is yours.
15       However you want to organize it,
16       however you want to present, you
17       can start.
18            MR. RANIER:  Good.  Thank
19       you.  I would be shocked --
20            MR. HERMAN:  I'm sorry.
21       Just one other thing.  I know you
22       are familiar with the cases, but
23       Mobil out of the Fifth Circuit and
24       the Murphy Oil case has been
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1           settled now.  So, the only opinion

2           in Murphy Oil is the opinion that

3           the Fifth Circuit more or less

4           adopted or did not review

5           actually.  So, it would be Judge

6           Fallon's opinion in Murphy Oil

7           that is probably the same process

8           that's going to operate here, and

9           that's what the Judge has

10          indicated to this committee.

11               MR. RANIER:  I'll be very

12          surprised if we would use all of

13          our time with the combined five

14          firms.  I think we'll do less than

15          that.  We have a bit to say, but I

16          think it will be beneficial to all

17          of y'all's time to do this at

18          once.

19               MR. BLIZZARD:  I said this

20          to John out in the hall.  He may

21          have communicated it to y'all too.

22          We had a very inspirational

23          presentation this morning from

24          Shelly Sanford, who spoke really

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        only about Carlene and her work to

 2        start this litigation.  I wish

 3        that all of you could have heard

 4        it, because it was a wonderful

 5        presentation.  It really has

 6        inspired us all this morning to

 7        really try as best we can to do

 8        the right thing here.  So,

 9        whatever y'all want to say, go

10        ahead.

11             MR. HERMAN:  Drew, I'm sorry

12        to interrupt you again.  We need

13        everybody in this room to

14        introduce themselves.  We know a

15        number of you and some we don't.

16             MR. WRIGHT:  Larry Wright,

17        Watts Law Firm.

18             MR. WATTS:  Mikal Watts,

19        Watts Law Firm.

20             MR. FURNISH:  John Furnish

21        with the Kaiser Firm.

22             MR. STEFFEY:  Brandon

23        Steffey, Williams Kherkher.

24             MS. GORDON:  Gerilyn Gordon,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          The Kaiser Firm.

2                    MR. KAISER:  Grant Kaiser.

3                    MR. POWERS:  Brett Powers,

4          Ranier, Gayle & Elliot.

5                    MR. RANIER:  Drew Ranier.

6                    MR. UMPHREY:  Walter

7          Umphrey.

8                    MR. BROWN:  Darren Brown.

9                    MR. KHERKHER:  Steven

10         Kherkher.

11                   MS. CARTER:  Amy Carter.

12                   MR. BOUNDAS:  John Boundas

13         with Williams Kherkher.

14                   MR. GIRARDI:  I'm Tom

15         Girardi.

16                   MR. RANIER:  Well, I'll

17         start by saying good morning to

18         everybody and Seasons Greetings

19         with all the decorations coming

20         down the hall.  I'm Drew Ranier,

21         R-A-N-I-E-R, and I'm going to do

22         an overview of the efforts of the

23         Vioxx Litigation Consortium.  That

24         is what the five firms that are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1       here today call themselves and

2       have worked together on Vioxx

3       under that name.  Basically I will

4       do an overview, and then other

5       members of our group will address

6       several specific areas.

7            Mikal Watts will lead the

8       discussion on the trial work.

9       Grant Kaiser will do the

10      organization and function of the

11      Vioxx Litigation Consortium, how

12      it is organized.  Walter Umphrey

13      will talk about financial

14      commitment.  I'll talk some about

15      the PSC work that I did as a PSC

16      member.

17           So, there are a lot of

18      lawyers in this room who have done

19      exceptional work in this case and

20      have done top tier work in this

21      case, and we respect that, and we

22      know that.  We know how difficult

23      it was to do that and how much of

24      a commitment it required to do

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1        that.  So, we want to tip our hats
 2        to you all who have done so much,
 3        and we want to say that we have
 4        made a top tier commitment to this
 5        litigation also.  We are going to
 6        describe that here for you today,
 7        and that's what we're here to talk
 8        about.
 9             Let me just introduce the
10        firms briefly.  I know for some of
11        you this will be old hat, but just
12        for the record so we have it here,
13        John Eddie Williams could not be
14        here today because of family
15        commitments and a death in the
16        family --
17             MR. SEEGER:  By the way,
18        would you send him our regards.
19             MR. RANIER:  I will.  Thank
20        you.  I'm sure he'll be happy to
21        get them.
22             His reputation, first in his
23        class at Baylor Law School,
24        Fulbright & Jaworski, built one of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1          the largest and most successful

2          plaintiffs' practices in the

3          United States.  Just an absolutely

4          brilliant lawyer, senior partner

5          of Williams Kherkher Hart &

6          Boundas, 30 years of practice,

7          John Eddie.

8                  Walter Umphrey, who is

9          sitting on my left here, one of

10         the most successful litigators in

11         the United States, practiced for

12         43 years.  Walter was doing mass

13         torts before most of us in this

14         room even thought about going to

15         law school.  Baylor Law School is

16         named after him.  Words like

17         pioneer and legend and dean are

18         frequently used in referring to

19         Walter.  As I say, he's been doing

20         this for 43 years.

21                 Mikal Watts, who I know many

22         of you know well, the word that

23         comes to mind when I think about

24         Mikal is prodigious.  He is an

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1          incredible trial lawyer.  He just
 2          turned 40 years old.  At 60, I
 3          would be happy to have
 4          accomplished as much as he did in
 5          the courtroom.  His trial
 6          schedule, which he takes in
 7          stride, by anybody's imagination,
 8          even experienced trial lawyers, is
 9          incredible, is punishing.  It's
10          like every Monday or every other
11          Monday, he's there, and he's there
12          on big and important cases.  Mikal
13          has been practicing, even at the
14          age of 40, for 19 years.
15               Grant Kaiser on my right
16          supervised and directed some of
17          the most far reaching and biggest
18          litigation in United States
19          history.  Grant has been
20          practicing for 27 years, and I am
21          personally proud of every word
22          that has come out of the Vioxx
23          Litigation Consortium.  Every
24          piece of paper, nothing is not
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1    screened, goes through Grant to

2    make sure it is appropriate, and

3    we all know about it.  So, we are

4    in this very much as a group, and

5    we formed this group to do that

6    and take on the challenge that we

7    thought Vioxx presented.

8         In my own case, I've been

9    practicing for 33 years.  I did

10   three years of insurance defense

11   work after I graduated from the

12   University of Texas Law School,

13   although I'm from Lake Charles and

14   practice in Lake Charles, which is

15   25 miles this side or the other

16   side of the Sabine River.

17        My first toxic tort case was

18   tried in 1978 with Fred Baron, who

19   came to Lake Charles to try a

20   phosgene case with me.  Our jury

21   consultant was a woman named Lisa

22   Blue, who, of course, later became

23   Mrs. Fred Baron.

24        So, with the senior partners

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          alone in these five firms, we have

2          got about 152 years of experience

3          that we bring to the table or

4          brought to the table in this

5          litigation.

6                I've got a chart of how we

7          set ourselves up and how we formed

8          this organization.  And just to

9          say it quickly once at the

10         beginning, the purpose of this

11         organization that we formed with

12         these five firms is that we,

13         because of our past experiences,

14         wanted to build a litigation

15         machine and a litigation pipeline

16         that would last indefinitely and

17         would relentlessly and

18         continuously produce triable

19         cases.  We're glad the case

20         settled, but we started this out

21         and we continued to the very end

22         like we might have a Vioxx docket

23         for ten years, and we wanted to be

24         viable, financially viable and be

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          able to do that.  So, the common
2          sense of it is that five firms
3          that put all those resources
4          together, you know, another five
5          firms in this room that did that,
6          would be able to sustain this
7          thing longer and in a bigger way
8          than any one firm can.  That's the
9          underlying common sense thing
10         about what we did here.  It's
11         really not a lot more complicated
12         than that, but that we didn't get
13         these cases to settle them, we're
14         glad we did, but we didn't know if
15         they'd do individual settlements.
16         We tried to apply the maximum
17         amount of pressure to Merck, and
18         we did that through this
19         organization.  So, let me start by
20         just quickly going over the
21         organization.
22              We will have copies of these
23         provided later if they are too
24         small for anybody to see.  I'll

FAC Resp. Amended Exhibit D -- 1344

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          bring it up here where I can show

2          everybody.

3              The Vioxx Litigation

4          Consortium basically consisted of

5          36 attorneys from these firms, two

6          physicians, one CPA manager, five

7          Registered Nurse paralegals and 69

8          paralegals and staff.  We've got

9          the five firms and their

10         commitments in terms of attorneys

11         who worked on Vioxx down below

12         here.

13             In addition to the five

14         firms, we've got the Vioxx Center.

15         That was an independent -- it was

16         not in anybody's office.  We had a

17         separate office, an office

18         building down here on the corner

19         of 16 and 59 and had a whole

20         floor, I think, almost a whole

21         floor of that office building, if

22         not more.  In that Vioxx Center,

23         we had totally dedicated to Vioxx

24         four attorneys, one CPA manager,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          two physicians, five RN paralegals

2          and 38 paralegals and staff.  So,

3          that was the core dedicated center

4          of the Vioxx operation.  Grant

5          Kaiser is going to talk about how

6          that functioned and how it was

7          organized.  But that was the

8          center of the operation, and these

9          are the supporting and the

10         cooperating firms.  That's the way

11         it worked, but this thing is

12         Vioxx, totally dedicated to Vioxx.

13         That's what enabled us in many

14         ways to produce this flow of

15         continuous trial cases that we'll

16         talk about in a minute.

17              MR. SEEGER:  Drew, are

18         questions okay along the way or

19         would you rather do the

20         presentation?

21              MR. RANIER:  They are.  Why

22         don't you let me finish the

23         overview, and then we're going to

24         have individual people talk a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1            little more about the details of

2            this.

3                  MR. SEEGER:  I'm sorry I

4            interrupted.

5                  MR. RANIER:  Let me try and

6            just do that.

7                  While I'm on the subject,

8            here's a little more graphic form

9            of how that worked.  These are

10           approximate numbers.  We had

11           approximately 30,000 client

12           contacts, and those client

13           contacts went through the Vioxx

14           Center, which of course required a

15           substantial financial commitment,

16           complete medical records,

17           dedicated doctors, nurses and

18           lawyers, and then the five firms

19           vetting those cases.  And from the

20           30,000, we reduced that to 2,000

21           triable cases.  From those, at the

22           time of settlement, we had about

23           50 triable cases ready to go.

24           That includes the 30 that was the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1        last tranche that we put up in New

2        Jersey, and we were on schedule

3        and organized so we could produce

4        20 cases a month to try.  That was

5        our schedule at the time of

6        settlement.  So, with these 50, we

7        actually had 20 waiting in the

8        wings behind it, and we were going

9        to have 20 new ones up every

10       month.  That's basically the way

11       the organization worked.  Grant

12       can talk a little bit more about

13       that in detail later.

14            We're five firms.  We

15       operated as one firm.  We took all

16       of our resources, we pooled them

17       together.  We are asking for one

18       fee from common benefit.

19            Our presenters today and

20       their areas that they will cover

21       will be Mikal Watts, who will take

22       the lead, along with John Boundas,

23       Steve Kherkher and Amy Carter on

24       describing our trial work.  Grant

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        Kaiser is going to do the

2        organization and function of our

3        group.  I'll talk about our PSC

4        work and our time.  Walter Umphrey

5        is going to do financial

6        commitment.

7            I would like just to say a

8        few words about each of those

9        areas before I turn it over to

10       them from an overview standpoint.

11           In the trial area, a lot of

12       you know this, and I want to make

13       a general comment too about this

14       group.  While we did this sort of

15       standalone, not knowing where

16       things would go, I think it was

17       characterized from start to finish

18       by cooperation with our

19       colleagues.  A number of you

20       sitting at this table have been

21       co-counsel in cases that we have

22       had.  Andy Birchfield helped us

23       try a case.  He did a great job.

24       Chris Seeger is co-counsel in our

FAC Resp. Amended Exhibit D -- 1349

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          cases in New Jersey and would have

2          been soon trying cases with us.

3               We tried two cases to

4          verdict.  We tried a Merck pick in

5          the MDL, a defense pick.  You

6          know, a lot of firms dismiss cases

7          rather than going to trial, but

8          that was our case, and we stepped

9          up and tried that case.  That was

10         the snow shovel case, where the

11         guy shoveled snow for quite a long

12         time before he had a heart attack.

13              MR. BLIZZARD:  Drew, that

14         had nothing to do with his heart

15         attack.

16              MR. RANIER:  Ed, I agree

17         with you.  I don't describe that

18         as a bad case.  We'll talk more

19         about that later, too, on some of

20         the work we did on epi.  I totally

21         agree with you.

22              MR. BLIZZARD:  Just to

23         interrupt for a moment.  You may

24         be going to get to this too, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        Amy Carter was somebody who helped

2        on our trial on Mason.  John Eddie

3        graciously, when we needed help

4        getting ready for Mason, Amy had

5        just been in the Smith trial, and

6        so he said that Amy could come and

7        help us, and she did a great job

8        for us.

9             MS. CARTER:  Now you have

10       done about 50% of my entire

11       presentation.

12            MR. SEEGER:  You are off the

13       hook, Amy.

14            MR. RANIER:  I was just

15       about to mention that.  We tried

16       the two cases to verdict.  We

17       tried the Merck pick in the MDL,

18       one of those two cases.  We had

19       two cases fixed for trial in New

20       Jersey in November of 2007, and

21       for settlement related reasons,

22       that did not go to trial.  But the

23       judge continued it to January

24       pending settlement.  So, that was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1         there and totally worked up and

2         ready for trial.

3              We submitted two other cases

4         to the PSC.  The PSC approved,

5         they went through the approval

6         process.  Lisa Dagostino, I know,

7         and others reviewed those cases.

8         Merck vetoed both of those cases,

9         28-year-old female heart attack,

10        and a mid-50s sudden death cardiac

11        man.

12             MR. KAISER:  We don't know

13        why they vetoed them.

14             MR. RANIER:  We had one case

15        set in California in 2007.  We had

16        three others for trial set in

17        2008.  And we had another 30 that

18        we had nominated or were about to

19        be nominated for the next tranche

20        in New Jersey and more in the

21        pipeline behind that.

22             So, I want to again say from

23        the outset that we went from

24        30,000 to 2,000, but we didn't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

 1          inventory those cases.  They were

 2          not parked.  We built a trial

 3          machine, and we built a pipeline

 4          that flowed continuously with

 5          these cases.  They did not just

 6          sit there.

 7               Grant, I've said a lot

 8          already about organization and

 9          function.  I will let Grant do

10          that.

11               On the PSC, a general

12          comment I will make on that, I

13          will do some details later, is

14          that because I was on the PSC, I

15          was a direct pipeline to these

16          five firms into the PSC and back.

17          These five firms took that very

18          seriously.  They fully

19          participated, fully involved

20          themselves in the MDL and the PSC

21          process.  We did not always agree

22          with everybody there.  I did not

23          always agree.  But we fully

24          participated, and we were fully

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1            committed to it.  I was the chair

2            of the insurance committee and did

3            some other things that we'll talk

4            about later.

5                  Walter is going to talk

6            about financials.  Let's do a

7            summary chart on it here, and he

8            can go into some more detail.

9            This sort of sums it up for our

10           group, 13.5 million at the time of

11           settlement and 200,000 hours of

12           work.

13                 MR. HERMAN:  Have you got a

14           breakdown chart on the 13.5

15           million with you?

16                 MR. RANIER:  Walter does,

17           and Walter will present that.

18           That's at the time of settlement.

19                 Just to give you some idea

20           of the scope of that kind of

21           investment, the PSC, which I'm a

22           member of at the time of

23           settlement, Russ, correct me if

24           I'm wrong, but we were -- as a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1          group, we were at about 3.65

2          million or something in that range

3          at the time of settlement that we

4          put up in cash.  So, these five

5          firms had committed three or four

6          times that amount of money to this

7          litigation at that point.

8                    MR. HERMAN:  I'm not --

9                    MR. RANIER:  I understand.

10                   MR. HERMAN:  The actual

11         dollars that the firms put up of a

12         similar nature exceeded $50

13         million.  There were 3.5 million,

14         I believe, to 4.5 million

15         contributed to a common cost fund.

16         But the actual dollars spent by

17         the law firms participating in

18         Vioxx exceeded -- not counting

19         your 13.5, exceeded $50 million.

20         What the exact figure is, I can't

21         even estimate right now because

22         the CPAs are still working with

23         it.

24                   MR. LEVIN:  That didn't

Page 25

1           include individual case costs?

2                    MR. RANIER:  The 13.5

3           million?

4                    MR. LEVIN:  I don't know

5           what yours did.  The 50 million

6           that Russ says were common

7           expenses and that were held costs,

8           that didn't include individual

9           case costs for processing

10          individual cases?

11                   MR. RANIER:  I'm sorry.  I'm

12          getting my millions confused here.

13                   MR. LEVIN:  It is hard to

14          talk in millions.

15                   MR. RANIER:  The PSC, which

16          I was a member of, we had

17          contributed or raised about 3.65

18          at the time.

19                   MR. LEVIN:  That was the

20          assessment.  But then there were

21          common expenses in excess of $50

22          million for everybody.  And in

23          addition to that, the caseload

24          costs, the individual costs are

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           not in that 50.

2                   MR. RANIER:  And the

3           common benefit -- you are talking

4           about expenses that people

5           submitted as common benefit

6           expenses on the forms from all PSC

7           firms or all firms?

8                   MR. LEVIN:  All firms.

9                   MR. RANIER:  All firms.

10                  MR. SEEGER:  I think the

11          point he's trying to make is it

12          doesn't include case specific

13          expenses, it was just common.

14                  MR. KAISER:  Gotcha.

15                  MR. RANIER:  Well, some

16          relatively small percentage of our

17          firm costs were carried in that

18          13.5.  That is not our firm

19          overhead.  The only thing that

20          that 13.5 applies to is the Vioxx

21          Center.  So, it's clearly not

22          nearly everything that we spent on

23          this litigation.

24                  MR. SEEGER:  That's where

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

 1          the cases were processed?

 2                 MR. RANIER:  That's right.

 3          That's right.  And I mean they are

 4          back and forth to the firms, too,

 5          Chris.  It is a constant vetting

 6          process, vetting things with the

 7          five firms.  But that was the

 8          central coordination of that.

 9                 Before I turn it over to

10          Mikal about trial work, I would

11          like to suggest a few questions

12          for y'all to consider while you

13          are listening to the presentation

14          and while you're thinking about

15          fees in our case.

16                 First of all, how many firms

17          seeking common benefit fees did

18          more trial work than these five

19          firms in the Vioxx Litigation

20          Consortium?

21                 How many firms did more?

22                 How many firms made greater

23          financial contributions to the

24          litigation than these five firms?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1            How many firms contributed

2       more cases and more quality cases

3       to the litigation?

4            How many firms were active

5       in more venues?  Grant is going to

6       talk about Texas, California, New

7       Jersey, New Orleans and state

8       court, selected state courts.

9            How many firms contributed

10      more time to the litigation?

11           How many firms brought more

12      experience to the table than these

13      five firms?

14           We are seeking one fee.  We

15      believe the answer to each of

16      these questions is few or none.

17      That means that this group should

18      be in the top tier of common

19      benefit fee awards.

20           MR. HERMAN:  Let me ask some

21      questions about that.

22           Of the 13.5, you said that

23      relates to your center, correct?

24           MR. RANIER:  That relates to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1       everything but firm overhead.

2              MR. HERMAN:  I need to

3       understand that better, because

4       you have on other occasions said

5       to me that y'all spent a terrific

6       amount of money getting from

7       30,000 cases to 2,000 cases.

8              MR. RANIER:  That's where

9       that money --

10             MR. HERMAN:  Is that that

11      13.5?

12             MR. RANIER:  I think Walter

13      will get into more detail --

14             MR. HERMAN:  How does that

15      differ -- and I'm being perfectly

16      honest with you, and I've had this

17      disagreement from the beginning.

18      How does that differ from any law

19      firm's case selection where you

20      get -- I don't care whether you've

21      got a consortium, a single firm or

22      a 600 person firm, you get in

23      cases, you put doctors, nurses,

24      paralegals on them, and then you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1        determine which cases you are

2        going to jettison and which cases

3        you are going to keep.

4             Why is that 13.5 million to

5        be considered in any common

6        benefit?  Now, I'm not asking a

7        rhetorical question.  I'm asking a

8        question that really concerns me.

9        I don't think it just concerns me,

10       but that's something that you

11       really have to address and Walter

12       has to address, because right now,

13       in terms of the 13.5, I'm

14       completely unconvinced as to how

15       that differs from my individual

16       firm starting with 600 cases,

17       putting doctors and nurses on it

18       to get down to 120, which are my

19       firm's costs that I don't believe

20       I can recover not just in this

21       case, but in any case.

22            MR. RANIER:  Let me answer

23       in general terms first and then

24       talk about the details of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1        money.

2              MR. HERMAN:  I don't think

3        it would be fair to you, Drew, if

4        I didn't raise the question.

5              MR. RANIER:  I understand.

6        The way we have approached this is

7        we have taken Judge Fallon's

8        statements in Murphy Oil and have

9        read those carefully, and in his

10       orders -- and 6(D) is even in

11       there.  It says that the important

12       thing in determining these fees is

13       the overarching contribution that

14       the firm made to the litigation.

15       You can start cutting it as fine

16       as you want down to hours and CPAs

17       and everything like that, but the

18       bottom line on this is the

19       overarching contribution that you

20       made to the litigation.  I'm happy

21       to cut it fine and talk about

22       that, but that's where we're

23       coming from on this.

24              All of the other stuff in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          this case, great legal work, great

2          things done, I'm not criticizing

3          anybody about that.  It has to

4          stem and flow from a continuous

5          and strong supply of trial cases

6          and the ability to try a lot of

7          cases for a long time.

8                   MR. HERMAN:  Let me --

9                   MR. RANIER:  That's what

10          this chart is talking about.

11                   MR. HERMAN:  Let me put it

12          in a different perspective.

13               Your group not only tried a

14          case in the MDL that I monitored,

15          it was well tried --

16                   MR. RANIER:  Thank you.

17                   MR. HERMAN:  -- it was tried

18          to the highest level of trial

19          practice.  That's my view.  I

20          don't have a problem with anything

21          that went into that trial,

22          preparing it, who took the

23          depositions, what was done.  I

24          still do not see how I can recover

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

 1          for the 600 cases that I

 2          jettisoned after having physicians

 3          and nurses and paralegals and

 4          trial lawyers review and say, hey,

 5          these cases are not worthy of our

 6          representation in Vioxx.  That

 7          amount of money, let's take it out

 8          of your group, and why is my firm

 9          worthy of recovery and common

10          benefit?

11              MR. UMPHREY:  Russ, let me

12          answer that.  We're not asking for

13          that 5.7 million back.  That's

14          costs we absorbed.  We're not

15          asking for reimbursement of that.

16          We are talking about the screening

17          tests and to decide whether it is

18          a viable case or whether it is

19          not.

20              MR. KAISER:  Let me explain,

21          Russ.  I think we've gotten off on

22          the wrong track.  We're not

23          requesting reimbursement out of

24          the common benefit fee and expense

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

```
 1          fund of 13.6 million.  We're
 2          telling you what we invested in
 3          the case to push these cases
 4          along.  What we submitted, we've
 5          submitted.  It is a million and a
 6          half, 2 million maybe as common
 7          benefit.  So, we're not asking to
 8          reimburse that amount.
 9              MR. HERMAN:  Well, I think
10          that's really clear, Walter, and I
11          thank you for making it clear.
12              MR. LANIER:  So, what you
13          are saying is, what you spent for
14          common benefit is a million and a
15          half to 2 million, but you overall
16          committed that much money to try
17          to justify your involvement in the
18          litigation?
19              MR. HERMAN:  That makes a
20          lot of sense.
21              MR. LEVIN:  Which shows your
22          commitment to the case.
23              MR. KAISER:  Right.
24              MR. RANIER:  That's relevant
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          to fee, independent of expenses.

2                    MR. KAISER:  They understand

3          that.  This is about fee.

4                    MR. LEVIN:  It is part of

5          the gestalt process here.

6                    MR. WEITZ:  But, Drew, what

7          you are saying is, the amount of

8          money shows your commitment to the

9          litigation, and you want us to

10         take that into consideration in

11         evaluating the fee?

12                   MR. RANIER:  Right.

13                   MR. WEITZ:  That's really

14         what's being said.

15                   MR. HERMAN:  I have a weak

16         spot for Drew because he brought

17         Sarah with him.

18                   MS. RANIER:  It always

19         works.

20                   MR. HERMAN:  I see you back

21         there, Sarah.

22                   MR. SEEGER:  I'm still

23         afraid of her from the first time

24         I met her.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1          MR. RANIER:  Just a quick

2      note on -- that's it.

3          I think it is time that we

4      move to Mikal Watts to talk about

5      trial work.  Mikal.

6          MR. WATTS:  Before I do

7      that, Drew asked me to spend just

8      a couple of minutes to talk about

9      pre-recall work.

10         Let me just give you

11     background.  I tried a case

12     against Firestone in 2001, and

13     some guy calls me out of the blue

14     and wants me to try a Rezulin

15     case.  In 2001, myself,

16     Papantonio, Troy over there and

17     some other guys, Roe Frazier,

18     tried a big Rezulin case, got a

19     huge verdict.  That led to

20     something else.  Before you know

21     it, I'm doing Sulzer work and

22     trying cases with Blizzard and

23     we're involved.

24         My entry into this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          litigation actually is Andy's

2          fault.  I was, I think, at Mass

3          Torts Made Perfect in September of

4          2002, and to be honest with you, I

5          had never heard of Vioxx at that

6          time, and I was giving some speech

7          about the Rezulin verdict or the

8          Sulzer verdict, I don't remember,

9          but I'm listening to this speech

10         about Vioxx, and it seems to not

11         be getting a whole lot of traction

12         in terms of people understanding

13         because nobody has heard of it.

14         But I remember I respected Andy a

15         lot because we worked together on

16         Baycol and a whole lot of stuff,

17         and so I said, huh, and gave it

18         some thought.

19              Then a guy that came to work

20         for me named Chris Pinedo was

21         getting more and more involved

22         with Shelly Sanford on some stuff,

23         and so he came to me and said,

24         well, Shelly has some cases, and I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          think Mark is going to try them.

2          I had already seen a speech and

3          everything, and I decided

4          basically on strength of

5          association, this is before I was

6          even involved, I think, that

7          something has to be going on.

8               So, in the spring of '03 I

9          think it was, my firm

10         individually, this is before this

11         consortium came together, I made

12         the decision that we were going to

13         start getting involved.  I don't

14         want to be disingenuous, but based

15         on if Andy is in it and Lanier is

16         going to be in it, it is probably

17         going to be fun.  So, we got

18         involved, the Watts Law Firm got

19         involved at that time.

20              For about a year, we began

21         working on bringing cases.  I

22         think my affidavit said we took --

23         we pared it down to between three

24         and 4,000 cases to somewhere

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1    between 450 and 500 cases.

2    Unfortunately, a lot of the work

3    that I did was with a

4    cardiologist, a friend of mine, a

5    guy Allison put me in touch with

6    named Antonio Pacifico, who is a

7    very world renowned or was a very

8    world renowned cardiologist here

9    in Houston until he went down in a

10   Gulfstream right after the recall.

11        We also spent some time with

12   Joseph Burton, who I think was in

13   your original case, Andy, a guy I

14   use a lot in car cases working on

15   just grabbing all the COX-2 stuff

16   that, frankly, you guys had

17   developed, and spent a lot of time

18   working on that.  I think you and

19   I had some discussions about your

20   case before you tried it, and I

21   began working with Tommy Jacks,

22   who I think had cases in

23   Tennessee.  That's the way that

24   Larry, who now works with me, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1           I got hooked up.

2               So, my firm individually was

3           kind of working on getting up to

4           speed, if you will, on Vioxx.  I

5           don't pretend to be as involved as

6           Andy was or as Chris was, and I

7           think Mark, obviously, did some

8           wonderful work in preparation for

9           his eventual trial in 2005.

10              What happened is, the recall

11          was announced, our four firms were

12          working on welding rods.  I had

13          this case because I knew enough

14          about the COX-2s, knew enough

15          about the science and the

16          literature and what was involved.

17          I think we were flying out to

18          Miami or something, and Walter and

19          I had a discussion about it.  And

20          he said, why don't we try to wrap

21          this up and really get in in a big

22          way, and we flew in, the four of

23          us, like we did in welding rods.

24          So, I took all of our firm's work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1          product and all of our cases and

2          contributed them to this new

3          entity that led to that.

4                So, let me put that aside.

5          I'm not going to talk about money

6          or anything like.  The trial work,

7          it's probably no secret, maybe to

8          the chagrin of one or two of you

9          in some litigation, I like to go

10         out and try a bunch of cases.

11         Sometimes it works, Firestone,

12         Rezulin, Sulzer.  Sometimes it

13         doesn't, Baycol.  I felt like it

14         was important to catch up as fast

15         as we could to start assisting

16         with trying cases.

17                Obviously, Mark's verdict

18         blew the whole thing up and got

19         everybody really jacked up, but at

20         least from the standpoint of where

21         I was, we had been in the case for

22         over a year, had started this up

23         before everybody knew about Mark's

24         prodigious talent in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          courtroom.  I mean, they knew
2          about it, but the verdict.
3               Anyway, where we found
4          ourselves, or at least inside of
5          ourselves or where I found myself
6          is that when you looked at the
7          Ernst case that Mark had success
8          on versus the Irvin case that you
9          guys had trouble on, when I read
10         the transcripts, what I saw was
11         that Mark seemed to win the fight
12         about this guy was a marathoner
13         who didn't have a whole bunch of
14         risk factors, and maybe you guys
15         were losing the fight about risk
16         factors.  I looked at my docket of
17         cases and saw 95 percent of the
18         people having a whole bunch of
19         risk factors, looking like me, you
20         are probably overweight, you don't
21         exercise a lot and whatever it is.
22         So, to me, in setting up the
23         trials that I wanted to be
24         involved in, I thought it was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          important that we not just cherry

2          pick the very best cases, but we'd

3          be willing to show Merck that

4          we're going to try every one of

5          them since their attitude was,

6          we're going to make you try every

7          one of them.

8               I know that John is going to

9          talk about some stuff that I

10         pushed hard to start funding, and

11         that was to get some epi going

12         with respect to the presence of

13         risk factors, and I'm not going to

14         steal his thunder about that.  But

15         it was real clear to me that

16         somebody had to be willing to try

17         difficult cases, and to Andy's

18         credit, I thought he was already

19         doing that.

20              I volunteered, and Kherkher

21         over there and Boundas agreed.

22         There was no shortage of people

23         willing to do the plaintiffs'

24         picks, but we agreed to do the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1     defense pick.  I also agreed to

2     get involved in some case up in

3     Illinois that I knew nothing about

4     that involved a 290 pound

5     plaintiff.

6          MR. WRIGHT:  298.

7          MR. WATTS:  298, depending

8     upon the state of her diet.

9          So, in effect, when we were

10    assigned to try the defense pick

11    in Smith, there was an epi paper

12    out there about shoveling snow.  I

13    think the attributable risk was in

14    excess of 99 percent, the relative

15    risk was over 200.  We're not

16    really involved in shoveling snow

17    down here, but apparently somebody

18    writes about it up in the

19    Northeast.

20         MR. LANIER:  That's how it

21    made it through that screening

22    process from 30,000 to 2,000.  It

23    should have been 1,999.

24         MR. WATTS:  With my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1          prodigious ability to pick cases,

2          I get to try the case with a

3          relative risk of 200 and some

4          percent and a 290-pound plaintiff.

5              But the bottom line is, what

6          we tried to do and what I tried to

7          personally do is, this committee

8          had done some work that I thought

9          was real good work, and the

10         documents that were in some of

11         Mark's depositions were just

12         outstanding, but it was pretty

13         clear to me that at the time of

14         the first document attack, if you

15         will, reading through all the

16         documents was done, the people

17         that did it didn't know as much

18         about the litigation as we knew

19         three years later.  I thought

20         there would be some benefit of

21         going through and doing them all

22         over again from the standpoint of

23         just the corporate

24         representatives.  So, what I did

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          is, with respect to largely some

2          crosses that you had done, Nancy

3          Santanello, Alise Reicin, Briggs

4          Morrison, I worked with your firm,

5          and I forget the paralegal that

6          was so good.

7               MR. SEEGER:  Mike Wagner.

8               MR. WATTS:  Yes.  Somebody

9          worked with Russ Abney, and any

10          document with any one of those

11          people's name on it, and there

12          were, it seemed like hundreds of

13          thousands of them, I had them all

14          sent to me, any transcript, any

15          paper, and I just started anew as

16          if they had never been through the

17          process.  We found a bunch of very

18          interesting stuff that, frankly,

19          weren't in any of the previous

20          records.

21               Steve focused on it.  I

22          agreed to try that case.  John

23          worked up the science, and Steve

24          was doing a lot of the jury work

FAC Resp. Amended Exhibit D -- 1377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1          and the plaintiff work, and my job

2          was to do the corporate

3          representatives.

4               In the Schwaller case, same

5          kind of thing, although in that

6          case, I did the voir dire.  Andy

7          and I have been good friends a

8          long time.  I think Russ and I

9          called him and said, hey, do you

10         want to go play together, let's

11         try this case together.  And he

12         very appropriately, I thought, and

13         I think it's a testament to -- one

14         of the factors when the litigation

15         isn't going that well, did you

16         quit or did you keep fighting.

17         Well, Andy Birchfield kept

18         fighting, and I think we did too.

19         Obviously, the guys to my right

20         over here were great.

21              So, that's primarily what my

22         focus was in trial.  I think I

23         crossed Briggs Morrison for a day

24         and a half, I crossed Alise Reicin

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

```
 1          for a day and a half.
 2                MR. SEEGER:  Those are two
 3          difficult crosses.
 4                MR. WATTS:  Well, they were
 5          fun crosses.  They were fun
 6          crosses.  And I literally did
 7          documents, annotations I sent to
 8          Chris, sent to Mark, sent to Andy
 9          to try to move things along, sent
10          to Ed, you know, just from the
11          standpoint of anything that
12          anybody had missed when those
13          original sweeps were done to try
14          to get those into the record.
15                MR. BIRCHFIELD:  I'm still
16          amazed at your ability to go
17          through documents.  It's
18          phenomenal.
19                MR. WATTS:  Well, it helps
20          when you've got Amy Carter
21          standing right behind you on that.
22                But that's primarily the
23          role that I did in terms of trial
24          preparation.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1          MR. SEEGER:  Amy, was that

2      the other half of your

3      presentation?

4          MR. WATTS:  Actually, I

5      moved to San Antonio for about

6      three months for the Smith trial.

7      I just didn't show up for work for

8      about three months, stayed at my

9      house and did nothing but read

10     this stuff.  It actually was a

11     good thing because there was a lot

12     of stuff done.  I'm not used to

13     bragging about defense verdicts,

14     and don't want to because I don't

15     believe in excuses, but they were

16     hard cases that needed to be

17     tried.

18          I think at the same time of

19     that, we had in place a second

20     strategy, and I know Chris and I

21     talked and Mark and I talked, I

22     wanted to go up to New Jersey and

23     help out where I could.  And I

24     know Steve was taking very

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 50

1          significant steps to get us set as

2          fast as we could in New Jersey.

3          And then Walter's firm had another

4          effort going in California just to

5          apply as much trial pressure as we

6          could.  That continued up until

7          the time that you guys cut the

8          deal that you cut.  And so that

9          was kind of what we did with

10         respect to trials or what I did

11         with respect to trials.

12              If you have any questions,

13         I'll answer them.  Otherwise, I'll

14         pass it along.

15              MR. HERMAN:  I want to say I

16         frequented those trials.

17              MR. WATTS:  I know.

18              MR. HERMAN:  And I thought

19         they were extraordinarily well

20         tried.

21              MR. WATTS:  Thank you.

22              MR. HERMAN:  I have a

23         different view about trials than a

24         number of lawyers, and that is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

1          because everybody gets a dog filed

2          when you start off.  You get the

3          worst of the worst.  And sometimes

4          the defendants just have to know

5          that you may not win the case, but

6          you are going to bloody them in

7          the process.  So, I think it is

8          important -- lawyers that tell me

9          that they've never lost a case, I

10         have problems with that.  Like my

11         dad used to say, if you want to

12         get a $1 million verdict, just

13         mistry a $3 million case.

14               MR. WATTS:  I did that last

15         week.

16               MR. HERMAN:  I don't think

17         enough can be said about the

18         quality of the trial work.

19               MR. SEEGER:  I would like to

20         say something about that, too,

21         about Mike.  Because from the

22         minute we started working with

23         each other on Vioxx, he has really

24         been a team player.  In fact, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

1          think I probably know you at some

2          level better than most people in

3          the group other than Drew.  The

4          first trial that I had, Humeston,

5          which didn't go well, and luckily

6          Mark helped us right that one, you

7          were one of the first people to

8          write a very encouraging and

9          supportive e-mail to me which I

10         have saved.  I wanted to thank you

11         for that at the time.  You really

12         are a team player, and the work

13         you did was fantastic.

14              MR. WATTS:  Thank you.

15              MR. HERMAN:  There are a

16         couple of other things I think I

17         can safely say, which is that post

18         Katrina, the jury venire changed.

19         For those of us that have tried a

20         lot of cases in that particular

21         federal courthouse, some of the

22         rulings on evidentiary matters and

23         in limine made it difficult for

24         plaintiffs.  Sometimes it happens

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 53

```
 1        to us.
 2             From the overall
 3        perspective, when you've got 60 or
 4        70 defense firms, each one of them
 5        being paid by a corporate
 6        defendant to go to a particular
 7        venue and try 30 trials, they have
 8        an advantage over a plaintiff.
 9        So, I don't think there should be
10        any regrets.  I don't think there
11        should be any diminution in the
12        work that was done in the trials
13        that you folks conducted.  I have
14        no reservations about this, as I
15        said, and I want to make that
16        clear on the record.
17             MR. BOUNDAS:  If anyone has
18        any questions, feel free to cut me
19        off.
20             For the record, John Boundas
21        here from Williams Kherkher Hart
22        Boundas.
23             A lot of people in this
24        room, I think, know our law firm
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 54

1      and the commitment and

2      determination that we show.

3          MR. HERMAN:  I apologize.  I

4      have one continuing family

5      emergency.  Let me step out for

6      just one minute.

7              -  -  -

8          (Whereupon, a recess was

9      taken from 9:57 until 10:09 a.m.)

10             -  -  -

11         MR. BOUNDAS: Anyway, for the

12     record, John Boundas, Williams

13     Kherkher.

14         A lot of the people in this

15     room know our firm and the level

16     of commitment and determination

17     that we show when we get involved

18     in a litigation.  I'm proud to say

19     that John Eddie, our managing

20     partner, has built a firm that a

21     defendant knows when we get

22     involved in a case that we're

23     going to commit whatever time,

24     whatever resources, talent, money,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 55

 1        whatever it takes to see it

 2        through to the end.  Ed Blizzard

 3        was there with us when we tried, I

 4        think, 12 separate jury trials in

 5        fen-phen all over the United

 6        States.

 7             When we got involved in the

 8        Vioxx litigation, our partners in

 9        the VLC and we saw that this

10        litigation might break much the

11        same way, in that we may have to

12        do the same thing, take the same

13        approach and get ready, if

14        necessary, to try case after case

15        after case.  Merck was saying they

16        were going to try every case,

17        Mikal mentioned that, and we felt

18        like that's what they're saying,

19        that's what we're going to say.

20        We sort of took that approach.

21             We tried cases, we conducted

22        jury research.  We worked cases up

23        for trial.  We worked with and

24        developed a whole host of expert

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 56

1          witnesses, some of which I will

2          talk to you about later.  We were

3          out there on the front lines.

4                 As far as the quality of our

5          work, Russ, I appreciate what

6          you've said about us.  I think a

7          lot of you know, the lawyers in

8          this room, haven't gotten a chance

9          to work with Mikal and Steve and

10         Walter Umphrey and Grant and Drew.

11         I would put the quality of lawyers

12         in our group up against anyone.

13         And there were a lot of great

14         lawyers in this litigation and a

15         lot of lawyers whose work that we

16         used.  We used Mark Lanier's

17         depositions, and Andy helped us

18         tremendously.  So, this whole

19         litigation is to the credit of an

20         enormous number of people.  We're

21         not here saying we did it all, but

22         we are saying that we feel like we

23         were right there with everybody.

24                 I want to talk a minute

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 57

1          about the MDL and some of the work

2          that we did.  When cases needed to

3          get put up for trial, we were

4          there.  We were asked to put up

5          some plaintiff pick cases, we did

6          it, we put up two cases, they were

7          good cases, and Merck struck them.

8          And I think that speaks to the

9          quality of the kind of cases that

10         we were able to bring to the

11         table.

12              When a defense pick case

13         needed to be tried, we were there.

14         And I kind of felt like Mikey and

15         those Life Cereal commercials.

16         Well, who wants to try the defense

17         pick?  And all of a sudden they

18         pointed at me and Kherkher and

19         Mikal.  We stepped up and tried

20         that case.  It's been talked about

21         a little bit, the snow shoveling

22         issue.  After we lost the case, my

23         mom sent me an e-mail.  She grew

24         up in Chicago.  What were you guys

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 58

```
 1        doing trying that case?  Everybody

 2        knows when an old guy goes out to

 3        shovel snow, he's going to have a

 4        heart attack.  That's great.

 5             On the DecisionQuest issue,

 6        the shadow jury did award us $5

 7        million, so, we're going to try

 8        and recover some of that, spread

 9        it around.  But, you know, that

10        was a tough case.  And I think we

11        did a good job in the case.

12        Obviously we wanted to win.  Mr.

13        Smith was a great guy, and I think

14        he had a good case.  But what I

15        think it showed Merck was that

16        this is going to be a tough

17        litigation if they want to go try

18        every case when they pick one and

19        it is going to be contested all

20        the way down to the wire.  That's

21        what I think that showed.

22             New Jersey, again, when

23        cases needed to be submitted for

24        trial, and the PSC and Chris and
```

FAC Resp. Amended Exhibit D -- 1389

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 59

1      Dave Buchanan did a heck of a job

2      up there, when they were asking,

3      you guys need to submit cases, we

4      were there.  We submitted, I

5      think, 45 cases in New Jersey as

6      wave I through III for trial.  At

7      one point I think they only gave

8      us 10 slots and we submitted 20.

9      And so we submitted those cases.

10     We had 30 more cases literally

11     ready to go out the door for wave

12     IV, if necessary.

13         The way those cases got

14     submitted, I think Grant will

15     cover this a little bit, but we

16     had a team of lawyers, myself,

17     Grant, Amy, Steve, a bunch of

18     lawyers from our firm, nurses, to

19     go through all of those files, vet

20     the cases.  We would have long

21     meetings where we would go through

22     them and really tried to pick

23     cases that if Judge Higbee said,

24     hey, you guys are going to trial

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 60

1        five times in March, that we'd

2        have five cases to bring to the

3        table.  So, we really made some

4        efforts there.

5              MR. HERMAN:  I'm going to

6        interrupt you for one minute.  Did

7        you submit any stroke cases?

8              MR. BOUNDAS:  I don't think

9        Judge Higbee ever got --

10             MR. HERMAN:  In the MDL?

11             MR. BOUNDAS:  We did not.

12       Is that right, Grant?

13             MR. RANIER:  We were working

14       on it, Russ, and that's actually a

15       note I have.

16             Brett might have been on

17       that.

18             MR. HERMAN:  I think you are

19       correct, in fact, I know you are,

20       that there were not a lot of firms

21       submitting cases in the MDL in MI.

22       We didn't have any on stroke.  But

23       your firm did step up, and the

24       cases were tried.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 61

1                    With regard to

2            DecisionQuest, your mock jurors,

3            your shadow jurors were easy to

4            spot in the courtroom, including

5            the guy in the second to last row

6            reading the racing form.

7                    MR. WATTS:  He was our

8            sinker.

9                    MR. HERMAN:  I say that

10           because I want to emphasize again

11           that everyone around this table

12           has different views of different

13           things, but I think there's no

14           question about the willingness to

15           work up cases, to submit cases and

16           to try cases by the Vioxx

17           Litigation Consortium.

18                   What I personally would like

19           to hear and what we're trying to

20           do is to make a record that's

21           fair, and particularly fair to

22           you, to give you the opportunity,

23           is to talk more about

24           contributions beyond the trial

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 62

1        work because we know that.

2        Anybody that disputes that is

3        going to get a big argument from

4        me.  The other contributions that

5        you made, I think, are significant

6        enough that you ought to talk

7        about them or someone ought to

8        talk about them.

9              MR. BOUNDAS:  I've got some

10       of that.  I'm only going to be a

11       few minutes, but I do have some

12       other issues to cover.

13             For example, on, not just

14       the trial work, but in New Jersey,

15       we were working those cases up, we

16       were getting experts, depositions

17       were being taken.  Those cases in

18       the pipeline were being worked.

19             MR. BLIZZARD:  John, let me

20       ask you.  How many of them were

21       being worked up for trial where

22       you actually presented people for

23       depo?

24             MR. BOUNDAS:  I think we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 63

1          presented at least four plaintiffs

2          for depo, maybe more.

3               MR. KHERKHER:  Two of them

4          got shut down for various reasons,

5          but we were always there.  I mean,

6          Dave Buchanan was my new best

7          friend, and he told me exactly

8          what to say.  I mean, I feel

9          awkward trying to build ourselves

10          up when I look across the table

11          and I did it because of you guys.

12          I mean, I wasn't able to get in

13          the door if it wasn't for Dave

14          Buchanan.  He whispered in my ear

15          and told us what to say.  The only

16          compliment I got -- I mean,

17          granted, here I am learning how to

18          try a Vioxx case, and I saw Mark

19          Lanier try it and Chris Seeger try

20          it, but Judge Higbee, the best

21          compliment she ever gave me was,

22          you are the first one to raise

23          your hand that you want to try a

24          case.  We were going to try the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 64

1        Georgia cases, and we were going

2        to try the New York cases, the

3        Pennsylvania cases, and Sol Weiss

4        got in, and we tried to work with

5        everybody.  But when Russ says,

6        what did y'all contribute, we were

7        part of the team.  I mean, we were

8        ready to push this entire

9        litigation with the help of you

10       guys and get to the end result.

11       So, that's what we were doing.

12            MR. SEEGER:  I have to tell

13       you, Steve, on the trial front, I

14       think we are all in agreement when

15       I look at you and John and Mike, I

16       mean, we know who were the guys,

17       the trial lawyers in the trenches

18       every single time saying, coach,

19       put me in the game, put me in the

20       game.  You guys were there.

21       Nobody can dispute that.

22            MR. KHERKHER:  But as far as

23       the intangible contributions,

24       that's part of it.  What more can

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 65

1          I say other than, what gets us to

2          the end result is these trial

3          settings, knowing that -- when I

4          was at the University of Houston,

5          I wasn't good enough to play

6          football, but I was a ball boy.  I

7          was a water boy.  My claim to fame

8          is Lionel Wilson, the quarterback,

9          busted his helmet, and I fixed his

10         helmet.  He only missed one play,

11         he got back in the game, and he

12         scored the touchdown.  Did I score

13         the touchdown?  No.  But I was

14         part of the team.

15              MR. LANIER:  I always

16         thought you scored that, Kherkher.

17         That's not the way Susan told us

18         the story.

19              MR. LEVIN:  You are lucky it

20         was his head and not your head.

21              MR. KHERKHER:  Now, granted,

22         I wish I was on your side of the

23         table, but we're all part of the

24         team.  You guys are the owner,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 66

```
 1          general manager and quarterback,

 2          and maybe we're not the water

 3          boys, maybe we're just the

 4          superstar running backs that

 5          helped the whole team get to where

 6          we needed to be.  I mean, whether

 7          it is off in our building which

 8          was in Houston, Texas when we had

 9          meetings for the consortium and

10          other plaintiff lawyers, but I

11          still feel awkward because we

12          could not get here -- I mean, Andy

13          Birchfield, I didn't even know

14          him, he's giving me his cell

15          number so I can call him so he can

16          feed me information.

17               MR. BLIZZARD:  That was a

18          mistake.

19               MR. KHERKHER:  It helped me,

20          Russ, to provide you information

21          on -- other than trial settings,

22          what we helped this great team to

23          get to where you need to be

24          because I'm missing it other than
```

FAC Resp. Amended Exhibit D -- 1397

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 67

```
 1          just --
 2              MR. HERMAN:  Well, there's
 3          no question that preparing for
 4          trial, getting the experts, doing
 5          the mock juries, putting the cases
 6          up is extraordinarily significant.
 7          But fortunately in this room,
 8          there's not a lawyer here that
 9          doesn't try cases and hasn't been
10          through the wars.  We understand
11          completely the significance of
12          that and the gravity of it.  I
13          think there are other
14          contributions that you made
15          outside of that, and that's what
16          I'm trying to get at.
17              MR. BOUNDAS:  I've got some
18          of that.  Let me give you an
19          example.  At our firm, we had 12
20          attorneys commit time to Vioxx.
21          Some of them took expert depos,
22          presented plaintiffs, worked cases
23          up.  But Collyn Peddie, she's got
24          25 years of experience as an
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 68

1            appellate lawyer.  Anybody --

2                  MR. HERMAN:  Let me try and

3            help you out.  Y'all did send

4            expert depositions and reports to

5            the depository?

6                  MR. BOUNDAS:  Right.

7                  MR. HERMAN:  Now, that's a

8            contribution, okay, of common

9            benefit because other lawyers get

10           the advantage of that work

11           product.  That's the type of thing

12           that I'm asking you about and I'm

13           trying to --

14                  MR. BOUNDAS:  I'm getting to

15           it.

16                  MR. BIRCHFIELD:  Let me say

17           this to you because, please, don't

18           mishear what we're saying because

19           we know the tremendous value that

20           comes from trying cases, working

21           cases up and moving the docket.

22           So, we're not diminishing that at

23           all.  I think all Russ is saying

24           is that we've got that.  We've

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 69

1          heard you on that.  We've heard

2          you, but not only that, we knew.

3          I think Mikal's point is an

4          excellent one, and Mikal is

5          fearless, and he will try any

6          case, and they know it.

7               What John was saying on the

8          snow shoveling case, Merck

9          couldn't turn around -- they knew

10         there were some lawyers that could

11         set their case and they'd get a

12         dismissal and they could come to

13         the status conference and they

14         could report.  This is another

15         case that was set for trial and

16         dismissed by the plaintiff's

17         lawyer.  That did not happen.

18         That did not happen with you and

19         your group.

20              And so we know the value of

21         trying cases, the value of saying,

22         put me in, coach, we're here,

23         we've got cases ready to try,

24         working those up.  We're not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 70

1          diminishing that in any respect.

2          What we're saying is that we've

3          got that.

4                MR. HERMAN:  Let me put it a

5          different way.  There are

6          carnivorites and vegetarians.  And

7          the carnivorites like blood meat.

8          They want to try cases, and they

9          know how to do it.  We understand

10         how important that is.  You made

11         other contributions you should

12         talk about.  You've got a lot of

13         time to talk about it.

14               MR. WEITZ:  Let me highlight

15         a little bit about what Steve said

16         and what Andy said.  You have to

17         understand that a lot of us on the

18         committee went through what you

19         guys went through in the beginning

20         of your presentation, sifted

21         through thousands and thousands of

22         cases, put in an enormous

23         financial contribution into this,

24         had dozens of lawyers and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 71

1          paralegals working on this.  So,

2          we know not only the hard costs,

3          but the soft costs and the

4          dedication that the Texas group

5          put into it.  So, a lot of that or

6          all of that does not go on deaf

7          ears.  We get it, and we know the

8          contribution that makes towards

9          moving the litigation, and that's

10         what we're focused on.  It is not

11         just the hours, it is the quality

12         of work, it is a lot of the things

13         that Andy said about moving the

14         cases and having the ability and

15         the resources to do that.  So,

16         Andy is right.  We get that.

17             What we need a little bit

18         from you also is when you talk

19         about New Jersey and Judge Higbee

20         and the waves, I mean, Chris and I

21         were there, and we had most of the

22         cases on that docket.  We need to

23         know specifically cases that had

24         work done on them, not just put in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 72

 1          a tranche, but actually tell us,

 2          okay, this was done, there were

 3          Daubert motions that were done,

 4          the experts were proffered, there

 5          were motions in limine.  What

 6          stage did you get?  Because we

 7          know that you guys were ready to

 8          move cases, but did they actually

 9          get to a certain stage?  So, see

10          if you can focus on that.

11              MR. BOUNDAS:  This is all on

12          the page here.

13              MR. SEEGER:  Just hand in

14          your paper.

15              MR. BOUNDAS:  I'll answer

16          your question.

17              MR. HERMAN:  You had better

18          do it before I get another call.

19              MR. BOUNDAS:  We had the

20          Romans and Sanderson cases in New

21          Jersey.  They were the next cases

22          up for trial, and they were set I

23          think originally October, then I

24          think it occurred to me that Judge

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 73

1          Higbee must have known something.

2          She moved them up.  We worked

3          those cases up, we got experts.

4          I'm going to tell you about a

5          couple of the new experts that we

6          were going to bring to New Jersey

7          that we were going to offer and

8          actually offered our marketing

9          expert for common use.  But on

10         Romans and Sanderson, we worked

11         the cases up, we presented the

12         plaintiffs, we did the discovery.

13         We were literally spending months

14         getting ready for that trial.

15              And to give you one example,

16         we got Dr. Martin Wells, who is a

17         biostatistician from Cornell.  We

18         got him all the raw data from

19         Merck's clinical trials, the raw

20         stuff, the SAS files, all of that

21         stuff, and he went through that

22         data and was able to show some

23         very interesting things.  One was

24         that the signal shows up far

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 74

1          earlier in Merck's data than you

2          can ever imagine when you actually

3          analyze it the way they were

4          supposed to do it at the outset.

5               The second thing is what

6          Mikal mentioned, was that we saw

7          that risk factors were going to be

8          the dominant defense here.  So,

9          what Dr. Wells did was look at,

10         well, can we take Merck's data and

11         use it against them on the risk

12         factor issue.  And he came up with

13         a report showing that we can take

14         their own clinical trial data and

15         demonstrate that Vioxx is more

16         dangerous than all of these other

17         risk factors.  And so we were

18         going to present that in a graphic

19         way to show the jury that, look,

20         we're just using their data,

21         here's how the risk factors line

22         up and here's where Vioxx stacks

23         up.  We thought that was a big

24         piece.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 75

1            MR. LANIER:  Can I interrupt

2        and ask a question, please?

3            MR. BOUNDAS:  Sure.

4            MR. LANIER:  Two questions

5        on that point.

6            First, do you know if your

7        materials and the experts and the

8        Cornell fellow, for example, have

9        y'all given that material to the

10       MDL to put into the trial package?

11           MR. BOUNDAS:  Grant, I think

12       that was turned in.

13           MR. KAISER:  I'll have to

14       check.

15           MR. BOUNDAS:  I've got a

16       copy of the report.  I assume it

17       was turned in.  The thing you need

18       to know is that that report was

19       completed and filed -- or not

20       filed, I don't remember, it was

21       like a week before the settlement

22       was announced, so, I'm not sure

23       how it fell into that mix.

24           MR. HERMAN:  Can you check

FAC Resp. Amended Exhibit D -- 1406

Page 76

1          on that?

2                    MR. RANIER:  Mark, you are

3          right.  It needs to be there.

4                    MR. LANIER:  Right.  You

5          don't want on the record an

6          argument that that doesn't really

7          contribute to the common benefit

8          because it was done a week before

9          the settlement was announced, but

10         if you get it into the trial

11         package, then arguably it is

12         something that's out there now for

13         the people who maybe didn't take

14         the settlement.

15                   MR. LEVIN: It's also our

16         obligation and --

17                   MR. BOUNDAS:  You've got it,

18         and that's available.  So, I think

19         it has a double benefit.  One was

20         we were getting ready to try these

21         cases with some new stuff for

22         Merck, and we were working on

23         that.

24                   MR. BIRCHFIELD:  John, on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 77

1          the trial package point, because

2          this is a significant fact, and

3          I'm almost certain that

4          Mikal's cross-examination of the

5          corporate rep, I'm sure that was

6          submitted for the trial package.

7          Mikal took advantage of some

8          favorable Illinois law on a

9          corporate rep there and laid the

10         foundation for a tremendous number

11         of documents.  That's part of the

12         trial package.  That's the kind of

13         thing we're talking about.

14              MR. HERMAN:  Because it's

15         important.  The way that we

16         justify in this case common

17         benefit, because it's not a class

18         action, it's not a class action

19         settlement, it's a contractual

20         thing, is by saying, okay, for you

21         folks that didn't want to put your

22         cases in, you can't complain about

23         this settlement.  And the reason

24         you can't complain is here's a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 78

 1          trial package on MI, here's a

 2          trial package on stroke, go try

 3          your cases.

 4              I know we've all been in

 5          cases where people talk about

 6          trial packages and you would take

 7          that package and just throw it in

 8          a trash can.  I know what folks

 9          spent preparing and getting these

10          cases to trial.  Most of them cost

11          between a half a million and a

12          million and a half bucks.  The

13          trial package enables folks to try

14          cases for less than $200,000.

15              Getting that report into the

16          trial package now has value.  No

17          one can say it comes late because

18          there's still people out there

19          that say they are going to try

20          cases.  And we say, okay, here,

21          take it.  So, what you have to say

22          is very important, and it

23          shouldn't be --

24              MR. BOUNDAS:  I think also

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 79

1          as a side point, Grant Kaiser's

2          affidavit that we have submitted

3          has a large amount of materials

4          that we did submit to the trial

5          package.  I think Grant will cover

6          that.  I just can't tell you right

7          now if that report is in.

8                  Another report that we did

9          is we spent a lot of time

10         realizing that putting together

11         the marketing case in a really

12         coherent way for a jury, Ed did

13         this in his trial with Dr.

14         Pechmann, struck us as a good

15         idea.  We went out and worked with

16         Dr. Marvin Goldberg at Penn State

17         who put together a really first

18         rate comprehensive report going

19         through Merck's entire marketing

20         plan and really explaining how

21         calculated, devious, the kind of

22         message they were trying to get

23         across.  So, that was something

24         else that we had brought to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 80

 1          table.  And actually at one of the

 2          hearings, I offered to the New

 3          Jersey group that we would make

 4          that available for common use.

 5          Again, the case settles within a

 6          week of that designation date.

 7          So, the same issue, and I hear

 8          you, that we may need to get that

 9          out there.

10               So, on those cases, those

11          weren't just cases we threw in the

12          trial pool.  So, I also have to

13          add we were working with a lawyer

14          named Forest Horn at Martin &

15          Jones.  Forest was our co-counsel,

16          and I think you guys are meeting

17          with him.  He certainly

18          contributed.  So, not just putting

19          cases in the hopper, but we were

20          getting ready for the next trial.

21          Then there were trials after that

22          we were getting ready for.

23               Some other contributions.  I

24          mentioned our firm committed 12

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 81

1        lawyers at various stages.  We

2        submitted affidavits.  I'm not

3        going to rehash all that.

4              But to give you one example,

5        Collyn Peddie is a very

6        experienced appellate attorney,

7        very well known across the country

8        at this point for her work on

9        preemption issues --

10             MR. LEVIN:  She's been

11        terrific.

12             MR. BOUNDAS:  She's an

13        excellent lawyer.  And the Texas

14        MDL, we didn't file a lot of cases

15        there, but we saw in the Ledbetter

16        case that things were going south,

17        and that could hurt everybody.

18        And John Eddie stepped up to the

19        plate with Collyn's agreement and

20        said, hey, Collyn, will you go in

21        there and take that case on.  And

22        she took it on kind of late in the

23        game, she filed a motion for a new

24        trial, handled the entire appeal,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 82

1          which, you know, fortunately now

2          is dismissed due to the settlement

3          presence.  That wasn't our case.

4          We don't have a fee interest in

5          that case and never did.  Collyn

6          spent, I think, over 1,200 hours

7          on that case, arguing it, briefing

8          it, fighting it, all for the

9          common good.  I think we had 14

10         cases in Texas.  So, it certainly

11         helped our clients, but helped a

12         lot of other people.

13               Collyn also came to the MDL,

14         filed motions and numerous

15         responses to Daubert motions that

16         I'm sure are in the trial package,

17         they are excellent work product,

18         and I'm happy to say in that case

19         I don't recall a significant

20         evidentiary ruling that we lost.

21         Actually, we got Judge Fallon to

22         turn around on a couple of

23         important issues, one of which was

24         Dr. Graham's analysis of how many

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 83

1          people had been killed or had

2          heart attacks as a result of

3          taking Vioxx across the country.

4          As I understand, Judge Fallon had

5          not let that in before.  We got

6          that evidence in in that case.  I

7          think that was a benefit.  A lot

8          of people deserve the credit for

9          that.

10               Collyn did a lot of work

11         there.  I think in all, she spent

12         17, 1,800 hours on common benefit,

13         briefing, researching, doing a lot

14         of hard work with a person who's

15         extremely talented.  That's

16         another --

17               I'll leave it at this point

18         to let Amy cover her contribution.

19               MR. SEEGER:  John, if I can

20         ask you a question before you wrap

21         up.  If it's in there, it is easy,

22         but in your affidavit, actually,

23         it's the group because you have

24         multiple law firms, do they

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 84

1          outline contributions in terms of

2          legal briefing, discovery

3          contributions, things you did sort

4          of that go, like I say, beyond the

5          obvious stuff that we know, the

6          background stuff.  Amy, are you

7          going to be getting into this?

8               MR. BOUNDAS:  Yes.  For

9          example, we had two lawyers who

10         put on the mock trial.  That will

11         be in there.  We had a number

12         of -- like Jim Doyle and some

13         other lawyers took depos of Merck

14         expert witnesses, and that's going

15         to be in there.

16              MR. SEEGER:  Other than Drew

17         and his position on the PSC, were

18         there any members that had liaison

19         or positions on any committees?

20              MR. KAISER:  Yes.

21              MR. SEEGER:  That's in

22         there?

23              MR. KAISER:  My affidavit.

24              MR. RANIER:  It is in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 85

1      Mikal's affidavit, and I know it

2      is in Grant's.

3           MR. LANIER:  When you talked

4      about the way y'all were

5      coordinating through Drew and the

6      MDL, I was not an MDL lawyer, I

7      did my work --

8           MR. WATTS:  Short lived

9      liaison counsel.

10          MR. LANIER:  But I don't

11     have an intimate familiarity with

12     a lot of the MDL stuff.  I do have

13     intimate familiarity with a number

14     of other jurisdictions though.

15     And having tried three of these

16     cases, I have a decent grasp of

17     who the witnesses are.  When you

18     talk about the efforts y'all did

19     with your Cornell statistician,

20     one of the thoughts that occurs to

21     me is, did y'all integrate with

22     Drew to see whether or not you

23     were running a duplicate tract of

24     what was being done, or was this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 86

1       being done at the behest of the

2       MDL, or was this being done

3       independently and now looking to

4       merge into it?  Can you give me a

5       feel for how that was done?

6            MR. BOUNDAS:  To give you an

7       overall point, I flew around the

8       country and met with experts in

9       probably five or six different

10      states.  We had people -- we had

11      all kinds of expert work going on

12      that was not, hey, guys, go out

13      and get experts because we were

14      figuring we're going to have to

15      have to try cases.  We're going to

16      need five cardiologists and not

17      one.  We're going to need

18      epidemiologists.  A lot of that

19      was at the behest of the MDL.

20      I'll let Drew answer on Dr. Wells

21      specifically.  All I know is we

22      went out there and did it.

23            MR. BIRCHFIELD:  What about

24      in New Jersey?  I know you were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 87

1          working with Dave.  Was Marty

2          Wells, was Dave aware --

3               MR. POWERS:  Dave got us the

4          data.

5               MR. RANIER:  The way that

6          started was I called Dave Buchanan

7          and said, Dave, we would like to

8          take a look at the raw data.

9          Because everybody had seen the

10         runs, everybody knew that they

11         diluted the Konstam -- they

12         diluted the Konstam meta-analysis

13         with Alzheimer studies, and they

14         would get crossed on that.  But

15         nobody had ever gotten the actual

16         data itself under the --

17               MR. LANIER:  Actually,

18         Madigan did --

19               MR. SEEGER:  That's not

20         true.  I have to correct you on

21         that one.  Because we got in

22         electronic native format all of

23         the SAS files and all of the

24         backup.  I have to check with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 88

```
 1          Dave.  It could be that you may

 2          not have had it in your hands and

 3          you needed it for your guy.  But

 4          you've got to remember that

 5          Kronmal, who was a biostatistician

 6          from University of Washington, had

 7          gone through all of that, and then

 8          Madigan came along --

 9               MR. LANIER:  Madigan came in

10          and did the same thing.

11               MR. SEEGER:  -- and looked

12          at it in a little bit different

13          light.  Your guy was doing the

14          same thing.  I'm not diminishing

15          the idea, but I just want to be

16          clear on the record what was

17          available and what was not.

18               MR. WEITZ:  But it was done

19          in Jersey.

20               MR. BOUNDAS:  Some of it was

21          those experts weren't available

22          for that particular trial, and we

23          knew -- Kronmal is a good example.

24               MR. SEEGER:  We were trying
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 89

 1          to build a bullpen.

 2                  MR. LANIER:  I know a good

 3          example is y'all had asked me

 4          about using Krumholz, and Krumholz

 5          would not agree to helping y'all

 6          out, so y'all needed someone

 7          extra.  Krumholz, for example, had

 8          used that same data in our third

 9          trial to say the signal was there

10          in 2000.

11                  MR. BOUNDAS:  I think I read

12          his transcript.

13                  MR. RANIER:  Did he do the

14          risk factor data?  Did he break

15          out diabetes, high blood pressure,

16          and all of that like Wells did?

17                  MR. SEEGER:  That was done.

18                  MR. LANIER:  Yes.

19                  MR. WEITZ:  Walter?

20                  MR. UMPHREY:  I think one of

21          the main issues on common benefit

22          that we contributed was the

23          ethical issue.  When you folks

24          negotiated a settlement, I know

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 90

1          that we were at a difference of

2          opinion, and we were not in a

3          position to recommend that to any

4          of our clients, and we wouldn't

5          have done it.  Mr. Williams took

6          the lead in this issue and Drew

7          and worked it out satisfactorily

8          where we felt under the Texas

9          ethical rules we were okay.  I

10         think by doing that, we saved a

11         lot of problems for a lot of other

12         lawyers.

13                MR. LANIER:  And probably

14         helped a lot of other Texas

15         lawyers sign on even that had

16         cases in New Jersey, because I

17         would be bound by Texas rules in

18         New Jersey.  That was a big help.

19                MR. UMPHREY:  They never

20         would have had the numbers for the

21         settlement if not for our efforts

22         in that regard.

23                MR. SEEGER:  I guess I want

24         to be clear because we're taking

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 91

1          this down, and Walter, I have

2          nothing but the highest respect

3          for you, your firm, everybody.  I

4          think what we ultimately wound up

5          doing is getting a clarification

6          about what the language meant.

7          That was very helpful to you.  But

8          I can tell you from the very

9          moment it was negotiated and the

10         intention of the committee, we

11         very much had Texas as the big

12         concern because we know that

13         that's a very difficult state.  I

14         think that John Eddie was a little

15         uncomfortable with the way some of

16         the verbiage was, and we clarified

17         some things.  I want to just make

18         that clear for the record.

19              MR. UMPHREY:  I also think

20         this group contributed heavily by

21         cooperating with your group.  We

22         did that in the very beginning.

23         Nothing was ever withheld from you

24         or we didn't make full disclosure,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 92

1          full cooperation.  Whatever it may

2          be, we were there.  And I think we

3          should be given a plus mark for

4          that.

5                    MR. BIRCHFIELD:  I agree 100

6          percent on that, Walter, and that

7          was really the purpose of this

8          series of questions about, was

9          this coordinated through New

10          Jersey.  I mean, we all know that

11          there are lawyers out there that

12          have basically taken their cases

13          and done their own thing and run

14          their own show and kept it all to

15          themselves.  That plays different

16          in a common benefit setting than

17          someone who is coordinating and

18          communicating with the other

19          jurisdictions.  That was the

20          purpose of those questions.

21                    MR. BLIZZARD:  Let me say

22          something, too, because I think

23          this will be helpful.

24                    MR. UMPHREY:  I have always

Page 93

1          found over the years that when you

2          take good lawyers like those that

3          surround us at this table, when it

4          comes to fee division, good

5          lawyers are fair.  They recognize

6          the work of other lawyers and what

7          it contributed, and they are

8          willing to reward their friends

9          and their associates in the

10         economic aspect of it.

11              MR. SEEGER:  I agree with

12         that personally.

13              MR. BLIZZARD:  I just want

14         to say when we were getting ready

15         for Mason, our trial, right after

16         you guys had tried Smith, not only

17         did Mikal send me everything that

18         he had, but Steve and John and Amy

19         came and sat down with our team

20         and debriefed us on what had

21         happened, what witnesses worked,

22         what didn't work, what might be

23         helpful in the next trial.  That's

24         the way that teams approach

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 94

```
 1          things.  You guys didn't have to

 2          do that.  We had worked closely in

 3          the past, obviously, on fen-phen.

 4          We knew each other.  But it wasn't

 5          just that.  I mean, it is the kind

 6          of thing that John mentioned, John

 7          Eddie threw Collyn into the mix on

 8          preemption.  We know how important

 9          that was in Texas, but not only in

10          Texas, but nationally that

11          preemption issue was hanging over

12          our heads even after we settled

13          this case.  There was a period of

14          time that we sometimes forget

15          about where they could walk away

16          from the deal and leave 4.8

17          billion dollars, 85, don't want to

18          forget that 5.

19               MR. HERMAN:  Please don't.

20               MR. BLIZZARD:  A lot of

21          people in this room stepped up and

22          made not only commitments of work

23          and effort to try to fight the

24          preemption issue, but put money on
```

FAC Resp. Amended Exhibit D -- 1425

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 95

```
 1        the table to help fight that

 2        issue.  I think that the group

 3        here, as well as people on the

 4        committee itself, made, again, a

 5        team response to that threat.  I

 6        think that is a contribution that

 7        was made throughout this.  All of

 8        you guys said we're in this

 9        together.

10             MR. BOUNDAS:  I think in the

11        New Jersey litigation, there was a

12        high level of coordination.  It

13        wasn't just our case.  We had

14        Romans and Sanderson set.  I know

15        that Sol had a case set.  There

16        were probably two or three others.

17        Mark Lanier had one.  The idea

18        was, we're going to try all of

19        these cases at the same time,

20        we're going to share resources if

21        we have to have experts shuttle

22        from one courtroom to the other,

23        work on depo cuts together.  Steve

24        did a lot to coordinate that.  The
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 96

1       idea there was we're going to try

2       these four cases, and then Judge

3       Higbee said we're going to set

4       some in March, April or June if

5       this doesn't settle.  That was

6       really, I think, a team effort.

7           MR. KHERKHER:  We had three

8       meetings at Sol Weiss'

9       Philadelphia office that I

10      coordinated with the help of Dave

11      Buchanan, of course.  Again, I

12      feel every time I say something

13      great we did, I did it with the

14      help of you guys also.  But we

15      were a great team.  You are right,

16      Ed.  We were a great team.

17          MR. HERMAN:  I want to get

18      back to the ethics thing that

19      Walter mentioned.  This isn't our

20      opportunity to pat ourselves on

21      the back, but I think you should

22      know that Ed Blizzard during the

23      negotiation made everyone on the

24      negotiating committee aware of the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 97

1          Texas rules, and I think we had

2          three ethics experts before

3          anything was put on paper.  Ed was

4          extraordinarily conscientious, and

5          it did help.  We had a meeting --

6          I don't even remember where we had

7          a meeting.  We had a meeting where

8          you brought in, I think, Harry

9          Potter.

10              MR. KAISER:  In Atlanta.

11              MR. LANIER:  You were

12          excited when you heard Harry

13          Potter was coming.

14              MR. HERMAN:  Yes, I was.  I

15          looked for the little mark on his

16          head.

17              But you brought in a couple

18          of folks and, Walt, I thought that

19          meeting was extremely productive.

20          I think it is important to know

21          that without resolving the special

22          ethics agitation that comes from

23          Texas rulings in light of trial

24          practice, it not only solved it

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 98

```
 1          for Texas, but it had an impact in
 2          other jurisdictions as well.
 3          Because there were lawyers that
 4          really were looking to the Texas
 5          lawyers who were tag-alongs.  They
 6          don't do very much, but when they
 7          see some group of excellent
 8          lawyers come up with an issue,
 9          they immediately want to jump on
10          it.  And the fact that it was
11          resolved to the satisfaction of
12          your group had an impact beyond
13          Texas.  So, I'm glad you brought
14          that up.  I don't think we would
15          have recalled that contribution,
16          actually, and I think it was
17          significant.
18              I have some other
19          questions -- go ahead.  It is your
20          turn.
21              MS. CARTER:  I think it is
22          my turn.
23              You asked earlier, Russ,
24          what we sent in as far as expert
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 99

```
 1            reports and depositions and that

 2            sort of thing to the MDL package.

 3            Essentially John Eddie sent me in.

 4            I was first involved in Smith, and

 5            I did all of the deposition cuts

 6            and all of that behind the scenes

 7            stuff that everyone hates to do

 8            but takes up a lot of time.  There

 9            were many 4:00 morning meetings

10            with Carrie Jablonski where she

11            said, well, we have already done

12            this before and this is not how we

13            did it, and the Court has already

14            said off the record that this is

15            how he wants things done.  Sorting

16            all of that out during the Smith

17            trial took a lot of time and

18            aggravation.

19                 And at the end of the trial

20            when the Court was looking toward

21            Mason, he said that he would like

22            to see some continuity in the

23            plaintiff's side of the process

24            because that was such a difficult
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 100

1           aspect of getting the depositions

2           and the exhibits and everything

3           else done.  So, John Eddie

4           essentially sent me into the MDL

5           trial package because I was the

6           person who had done all of that.

7           So, I volunteered my time for the

8           Mason case.  We did not have a fee

9           interest in that case.  And I

10          again did all of the deposition

11          cuts and the exhibits and all of

12          those negotiations with Carrie

13          Jablonski at 3:00 in the morning

14          for the Mason trial, which I think

15          added a lot of continuity to the

16          second trial and helped with a lot

17          of headaches.

18              My other contribution was a

19          lot of time spent in New Jersey

20          getting ready for those last

21          trials.

22              The North Carolina cases

23          were the cases we were going to

24          try a week before, and I spent

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 101

```
 1          weeks in North Carolina
 2          interviewing fact witnesses and
 3          figuring out proof and all of
 4          those details that go into making
 5          a good case factually.  That's how
 6          I ended my days on Vioxx,
 7          basically in North Carolina.
 8                  MR. HERMAN:  Who was going
 9          to try that case?
10                  MR. KHERKHER:  I was.
11                  MS. CARTER:  Steve and John.
12                  MR. KHERKHER:  And Forest.
13          Those were actually Forest Horn's
14          cases, and he asked us to help him
15          try the cases.
16                  MR. HERMAN:  MIs?
17                  MR. KHERKHER:  Yes, both of
18          them.
19                  We actually had some cases
20          in Georgia that we were going to
21          try, and then we had a telephone
22          conference, and Paul Hanley out of
23          New York wanted to try those
24          cases.  We were going to work with
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 102

```
 1          Paul, but I forgot who his
 2          colleague was, they didn't want
 3          too many chefs, so we stepped
 4          aside.  That's when Judge Higbee
 5          said, Kherkher, you are the first
 6          one to raise your hand.  So, we
 7          were going to try any case,
 8          whether it was New York.  We were
 9          going to work together even if it
10          wasn't our plaintiff under our
11          contract, we were either going to
12          try the Pennsylvania cases, the
13          New York cases.  I think there
14          were New Jersey and then Georgia
15          and them North Carolina, and we
16          got the North Carolina cases.
17               MR. BIRCHFIELD:  Mikal, do
18          you have --
19               MR. WATTS:  I was going to
20          bring up something.  You asked
21          about the work that Wells did.  My
22          recollection of that in terms of
23          working with the MDL, and I think
24          Andy and I talked about this, I'm
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 103

1              a big fan of Moye.  I thought he

2              won our case on Rezulin.  But I

3              thought the cross about his report

4              that it screwed up and mentioning

5              the other drug was just

6              devastating.  And I told everybody

7              to listen.  I think that was kind

8              of the origin for -- and it is not

9              that we had contacted anybody in

10             terms of the necessity of getting

11             it done.  And that's when we

12             started contacting you about your

13             guy that wasn't available and

14             said, we've just got to do it.

15             So, I think it sprang from a

16             problem that came up, you know,

17             and I just thought that cross was

18             unsustainable to keep eating that

19             with your chief epi guy.

20                  MR. UMPHREY:  Russ, let me

21             mention one other point that you

22             may want to consider for common

23             benefit.  It is not a subject that

24             I like to talk about, but it is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 104

1        advertising.

2            That 4.7 million number, 3.7

3        million of that was spent on

4        advertising.  Now, you ask how

5        could that be a common benefit?

6        People have a right to know and be

7        informed if they have been exposed

8        to a certain product and they have

9        certain problems.  The average

10       person is not aware of that unless

11       they are educated and they have

12       responsible lawyers that can tell

13       them whether they have a case of

14       whether they don't.

15           MR. HERMAN:  Walter, I lost

16       that fight years ago.

17           MR. UMPHREY:  Let me finish

18       what I'm saying.

19           MR. HERMAN:  Let me say

20       something to you.  Judge Fallon in

21       every case that I know of that

22       he's handled, as well as the other

23       judges in the Houston District,

24       consider the number of cases that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 105

```
 1          you bring to the table as an
 2          important ingredient.  It really
 3          doesn't make any difference to me,
 4          frankly, whether you advertise
 5          them, whether you've got your
 6          referral sources sending you
 7          letters.  You are the lead lawyers
 8          in the case, you bring them to the
 9          table, that's got --
10              MR. UMPHREY:  You asked for
11          common benefit, and the common
12          benefit is we brought 1,000 cases
13          that are makeable, triable cases
14          to the table for consideration by
15          Merck on the settlement.  That's a
16          common benefit.  Those thousand
17          were screened very heavily, and
18          they were gotten through the
19          advertising process.  The other
20          thousand came from referrals from
21          other lawyers.  But for the
22          thousand people that will get a
23          benefit out of this, it certainly
24          is a benefit that should
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 106

```
 1          contribute to your consideration

 2          on the common benefit fund.  We

 3          don't expect to get our money

 4          back.  We're not asking for that.

 5          We just ask you that we be

 6          considered for those thousand

 7          meritorious cases that we did get

 8          through the advertising.

 9               MR. HERMAN:  There are very

10          few trial lawyers of your stature

11          in this country.  Unfortunately,

12          most of them have passed on.  I

13          have great respect for you.  I

14          don't believe that it makes -- in

15          my consideration, and I'm going to

16          level with you, I don't think the

17          fact that you advertise for cases

18          or you didn't means anything.

19          People that advertise for cases

20          have business plans.  They

21          consider how many cases they are

22          going to get in.  They vet them.

23          It all goes into the bottom line

24          of, are we going to be able to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 107

```
 1        handle these cases, how we're
 2        going the handle them.
 3             MR. BOUNDAS:  Well, Russ, I
 4        hope Judge Fallon would consider
 5        the fact that we spent a
 6        significant amount of money
 7        stirring up the pot, if you will,
 8        to help other folks, maybe even
 9        your clients, pick up the phone
10        and protect their legal rights.
11             MR. HERMAN:  I can assure
12        you he's going to read every word
13        of the transcript, and he
14        considers everything.  That's one
15        reason why it is transcribed and
16        we have affidavits.  But I always
17        like to be straight up so people
18        know where I'm coming from, and I
19        just consider advertising costs of
20        doing business whether you
21        advertise or not.  It's the same
22        cost that lawyers have when they
23        get themselves on seminar programs
24        that result in referrals.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 108

```
 1              MR. UMPHREY:  I'm not

 2         concerned about how it affects

 3         lawyers.  My point is that it is a

 4         common benefit to those folks that

 5         receive compensation that wouldn't

 6         have had it otherwise.  That's

 7         what I'm asking you to consider.

 8              MR. HERMAN:  I understand

 9         that, Walter, but I can't agree

10         with that, I'm just telling you

11         straight out.  Because you've got

12         those people that you are serving,

13         and this was really, with all due

14         respect, Ralph Nader when he

15         started this idea of lawyer

16         advertising, and I think that

17         Chief Justice Burger is the only

18         one at the Senate in those

19         original decisions, is that you

20         help those people, and that's what

21         we're supposed to do as plaintiff

22         lawyers.  And those people pay for

23         the help that you give them.  So,

24         you get good cases in whether they
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 109

 1         are through referrals or

 2         advertising or reputation.

 3         However you get those cases in,

 4         from my perspective, is not a

 5         factor I consider.

 6              What I do consider is the

 7         fact that you have 2,000 cases

 8         that you bring to the table,

 9         however you got them --

10              MR. KHERKHER:  Well, Russ,

11         that's where we respectfully

12         disagree.  One of the most sacred

13         things we have is due process, as

14         you know.  I remember on a

15         Saturday morning you and I argued

16         with Judge Fallon on the

17         advertising.  And so what Walter

18         is saying is, this money we spent

19         is allowing all these folks that

20         don't have Internet that just do

21         drywall, Bubba doesn't do

22         Internet, he does drywall, we help

23         them help you come to the table.

24         So, let's just agree to disagree.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 110

```
 1          I hear what you are saying.
 2               MR. SEEGER:  You are not
 3          totally disagreeing.  I think what
 4          Russ is saying, you got the cases,
 5          you brought them here --
 6               MR. KHERKHER:  But there's
 7          an intangible.  As you know, you
 8          did your share of advertising, and
 9          we all together woke up America to
10          protect their legal rights.
11               MR. HERMAN:  I understand
12          that, and I'm trying to say to you
13          that not only will the judge, but
14          we consider the number of cases
15          you bring to the table, no matter
16          how you got them, is very
17          important in determining a common
18          benefit.
19               MR. LANIER:  I think one of
20          the reasons this is getting a lot
21          of response maybe from the
22          committee is because there are a
23          lot of folks that did a whole lot
24          of advertising that no one has
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 111

1            really been putting that into the

2            record until y'all.  I think that

3            just may be some of the reaction,

4            if that makes sense.

5                 MR. BOUNDAS:  So, if anyone

6            has any more questions.

7                 MR. GIRARDI:  How many cases

8            did you submit to the settlement,

9            the exact number?

10                MR. WEITZ:  How many cases

11           did you submit to the settlement?

12                MR. FURNISH:  We had 2,021.

13           We registered in all but 53.

14                MR. WEITZ:  Where were those

15           cases filed?  In what

16           jurisdiction?  What percentages?

17                MR. BOUNDAS:  We filed

18           around 800 cases in the MDL.  We

19           filed, I think, 763, I could be

20           wrong by a few, in New Jersey.

21           So, 1500 plus were filed, and I

22           think 600 cases were tolled.  And

23           then we also filed cases in Texas,

24           California, Illinois, I believe,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 112

```
 1          Wisconsin.  We had cases all over

 2          the country, again, as part of the

 3          strategy to, if necessary, try

 4          cases.

 5               MR. WEITZ:  When you say

 6          "all over the country," you mean

 7          you filed them in district courts,

 8          and then they got transferred to

 9          state court?

10               MR. BOUNDAS:  No.  State

11          court.  For example, the Schwaller

12          case was actually tried in state

13          court in Illinois.

14               MR. KAISER:  And federal

15          district courts, too, so we could

16          make sure they would come back

17          there for trial so we wouldn't

18          clog up New Orleans.

19               MR. WEITZ:  Now, talk to us

20          about some of the cases that might

21          have been trial ready in any of

22          the other jurisdictions.

23               MR. BOUNDAS:  I think Darren

24          Brown from Provost Umphrey could
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 113

 1          speak about our California cases.

 2                MR. BROWN:  Set for trial in

 3          November, we had the Feldman case,

 4          which we had submitted to the

 5          trial docket as a plaintiff pick.

 6          It was a 69-year-old, one of the

 7          older plaintiffs that we had dealt

 8          with, but very few risk factors.

 9                MR. LEVIN:  That's not old.

10                MR. RAFFERTY:  That was set

11          for trial in November of '07?

12                MR. BROWN:  November of '07.

13                Along with four other

14          plaintiff picks.  Then Merck had

15          four defendant picks that were set

16          for trial, and we had one of

17          those.  Then we had three other

18          cases that were set for trial in

19          March and June of the following

20          year of '08, the Lativio case,

21          Espinoza case.  Of course, those

22          didn't go forward.  The settlement

23          was reached.

24                MR. BOUNDAS:  Then another

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 114

```
 1          example, we had a case in Cook

 2          County, Illinois, in Chicago,

 3          called the Mitchell case.  That

 4          case had a scheduling order.  Off

 5          the top of my head, I don't

 6          remember the trial date, but we

 7          were working it up, getting

 8          experts, and that was another case

 9          we were going to try.  I know it

10          had a date, but I can't tell you

11          exactly --

12               MR. KHERKHER:  Russ, another

13          thing I just remembered when you

14          asked me is, Judge Higbee said,

15          will anyone try a stroke case.

16          And we agreed to try the first

17          stroke case, Dave Buchanan and I,

18          and I think we were in the process

19          -- before you guys settled, we

20          were going to submit nine -- we

21          had nine stroke cases.  So, for

22          whatever that is worth.

23               Another thing, this might be

24          corny, but --
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 115

```
 1              MR. SEEGER:  That's actually

 2         worth a lot because there's an

 3         impression by a very small group

 4         of people that there were people

 5         out there not willing to try them.

 6         We were willing to try them, our

 7         firm was willing to try them,

 8         people at this table, all of us.

 9              MR. KHERKHER:  We had nine

10         cases we were going to submit, and

11         then y'all settled.

12              MR. HERMAN:  I'm just going

13         to make a comment that in the MDL,

14         for about four months, the judge

15         pushed us to put stroke cases up.

16         And we could not find a stroke

17         case to put up.  We got absolutely

18         no responses.  So that the fact

19         that you were willing to put up

20         stroke cases in New Jersey was of

21         obvious benefit.

22              MR. KHERKHER:  After Judge

23         Higbee told Dave and I that, and

24         she was impressed that we
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 116

```
 1          volunteered, Grant Kaiser and his

 2          team, we spent that weekend -- I

 3          don't know if you all know Glenda

 4          Grainger, and you are right, there

 5          were some tough ones, but we found

 6          nine, and then the settlement

 7          occurred.

 8                Another thing that might be

 9          silly, Russ, that may factor in, I

10          coordinated -- because we had

11          these four trial settings up in

12          New Jersey, I coordinated --

13          because I watched when Mark picked

14          his jury, the judge was kind

15          enough to give him two or three

16          days to read the questionnaires.

17          She didn't want that.  We had to

18          do it overnight.  I had an 18

19          wheeler with three copy machines,

20          and we were going to copy all

21          questionnaires for all trial

22          teams.  So, we had that set up.

23          Maybe that's a factor for common

24          benefit.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 117

1          MR. BLIZZARD:  Did you

2     submit the cost of the 18 wheeler?

3          MR. KHERKHER:  I didn't have

4     to put down a retainer because we

5     all settled because everything

6     happened simultaneously, but we

7     were ready to go.

8          MR. BLIZZARD:  One of the

9     things that I want to make sure we

10     cover is that there's been a lot

11     of time that was submitted to the

12     accountant and a lot of expenses

13     that have been submitted to the

14     accountant that for whatever

15     reason have been rejected.  That

16     has happened to a lot of people on

17     this side of the table as well,

18     and so whatever we need to do to

19     help get whatever records in order

20     to make it work for the

21     accountant, we'll do.

22          MR. LEVIN:  If you call the

23     accountant.

24          MR. KHERKHER:  That's my

Page 118

 1          biggest fear.  I have never billed

 2          for my time, so, I'm sure we left

 3          a lot of time on the table.

 4               MR. LEVIN:  We'll straighten

 5          it out.  Feel free to call me.

 6               MR. KHERKHER:  Yes, sir,

 7          thank you.

 8               MR. HERMAN:  If you call

 9          Lenny Davis in my office, he will

10          set up an appointment with Phil

11          Garrett and his team.  Phil

12          Garrett was chosen by the judge.

13          That firm and he, they do no

14          personal work for any lawyer

15          that's got a Vioxx claim, either

16          firm work or personal work.  So,

17          they are purely independent.  They

18          will drop what they are doing and

19          meet with you.  I really suggest

20          -- and I don't know what the

21          differences are as to what they've

22          accepted and what they haven't or

23          even the reason for it.  But we

24          have had lawyers continuously call

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 119

1          up, get an appointment, go meet

2          with them for a couple of hours,

3          and those things are resolved in

4          just one sitting.  I don't think

5          they are well resolved over the

6          phone.  But somebody very

7          knowledgeable about what your

8          costs are and the hours you

9          submitted, one of two people ought

10         to get an appointment and sit with

11         Phil Garrett.

12              MR. BOUNDAS:  Unless anyone

13         has any other questions on trial,

14         I'm not going to belabor the

15         point.

16              MR. RANIER:  Thank you,

17         John.

18                  Grant is next on the

19         organization and function and

20         having done this.

21                  I have got a question for

22         y'all.  If this is not an

23         appropriate question, it's a

24         record issue, but can the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 120

```
 1        committee consider how much common

 2        benefit fee is going to be gotten

 3        from us?

 4              MR. KAISER:  Generated by

 5        our cases.

 6              MR. RANIER:  Generated by

 7        our cases in deciding how much

 8        common benefit fee we're entitled

 9        to?  I mean, that may not be --

10              MR. LEVIN:  Just leave that

11        hanging.

12              MR. LANIER:  That's a dicey

13        thing that has to be parsed out,

14        because to an extent, there's the

15        issue if someone got 100 cases and

16        you did, Drew, common benefit work

17        for that person, then they need to

18        pay you for the 100.  If you did

19        common benefit, Drew, for someone

20        that has 5,000 cases, then they

21        benefited 50 times more from your

22        work than the person who had only

23        100 cases and arguably would be 50

24        times more.  By the same token,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 121

1          there's the other side of the

2          coin, too.  So, it is a two-edged

3          sword, and I don't know where we

4          land on it.

5               MR. HERMAN:  Let me just say

6          one other thing.  The judge

7          specifically has directed us not

8          to talk about allocating dollars

9          until he has determined what the

10         percentage is.  Anything that we

11         talk about in allocation or

12         consider in terms of dollars to

13         specific firms is a fiction in the

14         judge's mind.  He has to

15         determine, first, what the

16         percentage is going to be, and

17         then we have to deal with that

18         pot, so to speak.  Also, he's made

19         it very clear that whatever he

20         considers the pot to be, costs are

21         to be in addition to that.  So,

22         common benefit costs are very

23         important here, and it is easier

24         to deal with the costs than it is

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 122

1          with an unknown amount of common

2          benefit dollars.  I think you are

3          going to find in the next two or

4          three weeks, I think we have

5          California folks appearing Friday,

6          I'll tell you for your own -- so

7          you know what we know, 106 people

8          or firms submitted requests for

9          common benefit.  Less than 50 have

10         decided to come make a

11         presentation.  But when all of

12         that information is gathered in

13         the next three weeks, you are

14         going to see a motion and brief

15         file with the Court to set common

16         benefit, a pot, and costs.

17              You've taken various

18         positions, we've taken various

19         positions, but you need to know

20         that's coming.  It's coming before

21         any allocation is made.  I would

22         think the amount of dollars that

23         the Court says are going to be in

24         the common benefit pot and in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 123

```
 1          cost pot are going to affect all

 2          the considerations.

 3               MR. KHERKHER:  Russ, Judge

 4          Fallon is a tough grader.  I was

 5          telling someone the other day that

 6          -- I was practicing what I was

 7          going to tell you guys and how I

 8          did what Mark Lanier did, I knew

 9          all 200 jurors by name, I read

10          those questionnaires, I knew them

11          backwards and forwards.  And when

12          we were going through the

13          preemptive strikes before, Judge

14          Fallon knew them all too.  So,

15          here I am doing a great job, and

16          he's saying, oh, yeah, Mr.

17          Kherkher, that guy, his favorite

18          show is CSI.  Here's the hardest

19          working judge, stays up all night

20          and reads 200 questionnaires, and

21          so I know he's going to be tough.

22               MR. HERMAN:  Let me give you

23          one experience.

24               The first meeting I had with
```

Page 124

1          him, he said, I want all the

2          articles that have been published

3          dealing with Vioxx.

4               By the next meeting that

5          Chris and Andy and I had with him

6          before the PSC order came out, he

7          had read every one of the articles

8          and had about seven or eight

9          cross-examination questions for

10         us.  And I know that he did the

11         same thing with Merck.  So, the

12         important thing is, he will

13         remember, and this transcript will

14         remind him of the quality of the

15         work that you folks put forth.

16              Let me tell you, he was a

17         heck of a trial lawyer, I mean, a

18         very fine trial lawyer.  When he

19         was nominated for the presidency

20         of the state bar, he had universal

21         support by both the plaintiff bar

22         and the defense bar.  We all know

23         that doesn't happen very often.

24         So, not only are we trying to be

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 125

1        fair, if we're not fair, he's

2        going to make us fair.

3              MR. RANIER:  We know.

4              MR. WEITZ:  Drew, the short

5        answer is that the number of cases

6        that you have and the commitment

7        of everybody on those cases are

8        looked at, and the factors

9        involved surrounding the number of

10       cases will be weighed.

11             MR. RANIER:  I appreciate

12       that.  And the quality issue is

13       there, too.  If you produce

14       quality cases to drive the

15       litigation, you pay a bigger

16       common benefit tax than you would

17       if you --

18             MR. WEITZ:  Than if you are

19       just storing cases and warehousing

20       cases.  I think that all the

21       judges have made that point very

22       clear, and I think you guys have

23       distinguished yourself in that

24       category.

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 126

1          MR. KAISER:  If I might just

2      have a few minutes, and I think

3      this point has been made.

4          I'm going to take a couple

5      of minutes.  These were the 28,000

6      plus contacts we had.  We have

7      them from every state.  And like

8      Perry discussed, we did have a

9      very sophisticated filing strategy

10     where we evaluated every specific

11     case, where the best venue for

12     that case was.  And if we were in

13     a good Federal Court venue, we

14     were going to come back, we would

15     file it in that court.  Otherwise,

16     we would file it in Judge Fallon's

17     direct file.  And you take a risk

18     then if you are going to come back

19     to your home district or not.

20          But in state cases, the

21     same issues.  We filed where each

22     case needed to be filed.

23          To answer your question

24     specifically, Perry, we ended up

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 127

1          filing about half our cases in New

2          Jersey, about half of them in the

3          MDL, and I think there was 60 in

4          California and a handful in Texas

5          for obvious reasons.  I think this

6          has come across, but you know the

7          way Merck played this game, and

8          that is to throw everything at

9          you.  If you imagine a task force

10         set up with all the pieces, we

11         moved all the pieces all at once

12         back at Merck.  We did it with

13         trial settings, we did it with

14         experts, we did it with our

15         administration to be able to get

16         those cases in line for trials and

17         to be able to do that.  We all

18         know about what moves cases, and

19         that's verdicts and trial

20         settings.  That's the message that

21         we're trying to say, is that our

22         entire effort to put the pressure

23         on Merck was what our goal was.

24             You guys that negotiated the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 128

1        settlement know better than we do

2        what kind of pressure, having five

3        different trials going on in New

4        Jersey starting in October of

5        multiple plaintiffs each, had on

6        Merck.  We were told at the time

7        that it was extremely important to

8        put these cases up and got letters

9        and e-mails from Dave Buchanan

10       begging people to put cases up and

11       from Sol saying, this is enough, I

12       can't believe you aren't going to

13       do this, because then the Court is

14       going to pick them then.  So, you

15       are ruining the opportunity if you

16       don't do it.  So, we were there

17       for that.

18            That's really our point

19       here, is that our total effort was

20       to push all the pieces at once at

21       Merck, and I think we did that --

22       not every firm does that, and not

23       every group of firms did that.

24            To carry the analogy even

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 129

1          further, Walter will appreciate

2          this, we were all into the case in

3          terms of poker, too.  We put

4          everything in that we had.

5               MR. HERMAN:  Let me ask you

6          a question.  In cases that were

7          filed wherever they were filed,

8          I'm assuming in most of those

9          cases that were actual filed

10         cases, you had a Merck defense

11         counsel enter an appearance?

12              MR. KAISER:  Absolutely.

13              MR. HERMAN:  If you could

14         get me a list of those cases and

15         the defense firm that entered an

16         appearance, it will be of some use

17         to us in illustrating why we think

18         lawyers that did substantial

19         common benefit work should receive

20         compensation.

21              MR. KAISER:  We'll certainly

22         do that.

23              MR. HERMAN:  After all,

24         everyone at this table takes a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 130

```
 1        risk that none of those firms
 2        take, and those firms can be
 3        cross-referenced through American
 4        Lawyer with their earnings, which
 5        is something we intend to do.
 6             MR. KAISER:  I was
 7        day-to-day responsible for all the
 8        activities, so, if y'all have any
 9        questions from start to finish,
10        ask me about them, and we'll tell
11        you what the deal is.  You can do
12        it now or after Walter speaks or
13        whichever.
14             Thank you.
15             MR. RANIER:  Walter, do you
16        want to talk about the financial
17        commitment.
18             MR. UMPHREY:  Just for a
19        minute.  I think everybody has
20        covered most of the topics.  But
21        our firm did the accounting on the
22        Texas tobacco litigation, and we
23        inherited it to do on this.  So,
24        that's why I was asked to talk
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 131

1      about it.

2             But we have a total of 13.6.

3      This is not a recoverable expense

4      from the common fund or the

5      client.  This is our screening

6      costs.  These were cases that we

7      did develop for trial and the

8      expenses through the medical and

9      of what have you.  3.7 of this was

10     the advertising which we absorbed.

11     And the other million went towards

12     personal expenses of travel and

13     the firms.  We didn't reimburse

14     each firm as we went for

15     out-of-pocket expense on travel

16     and what have you, for a total of

17     13.6.

18             MR. HERMAN:  I'm sorry, I

19     can't read it.  Smith or

20     Schwaller?

21             MR. RAFFERTY:  Schwaller is

22     474.

23             MR. HERMAN:  Is that

24     500,000?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 132

1            MR. KAISER:  527,000 for

2        Smith, 474,000 for the Schwaller

3        case, which adds up to basically a

4        million.  Take the million out of

5        the other 3 point million total

6        that we spent on trial

7        development.  You have another 2

8        million that we spent beyond those

9        two cases that went to trial --

10           MR. HERMAN:  That's what I

11       want to understand, and I'll make

12       sure this gets circulated to the

13       committee.

14           MR. POWERS:  I have copies

15       for you.

16           MR. HERMAN:  Good.

17           MR. UMPHREY:  We understood

18       early on from Merck that we were

19       going to have to try each

20       individual case.  We prepared

21       these cases for that purpose.  We

22       didn't drive a nail halfway.  I

23       think that our involvement, our

24       preparation of these cases went a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 133

1          long way, as well as knowing that

2          we had the financial resources to

3          back it up to be a common benefit

4          for the final settlement of this

5          matter.  I will answer any other

6          questions you have.

7                MR. HERMAN:  The 3.1, other

8          than Smith and Schwaller, I want

9          to make sure.  I understand those

10         are the workup of cases that John

11         spoke about in New Jersey, et

12         cetera?

13               MR. KAISER:  Yes.

14               MR. UMPHREY:  We had 50

15         cases for trial at the time you

16         settled.

17               MR. HERMAN:  Have you

18         submitted costs other than Smith

19         and Schwaller on the workup of

20         those cases?

21               MR. KAISER:  No.

22               MR. HERMAN:  You should.

23               MR. WATTS:  No.

24               MR. HERMAN:  You should

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 134

1          itemize it, and you should submit

2          it.

3               MR. KAISER:  Okay.  We will.

4               MR. LEVIN:  Has Smith and

5          Schwaller been submitted?

6               MR. KAISER:  Yes.  The only

7          thing that hasn't been submitted

8          in the Smith case is the DQ

9          aspect.

10              MR. HERMAN:  You just take

11         care of that and then send us

12         whatever.

13              MR. BLIZZARD:  Grant, we're

14         going to need to see exactly what

15         the other 2 million is to

16         understand whether it should or

17         should not be submitted.

18              MR. HERMAN:  In fairness, we

19         have indicated to every lawyer and

20         every firm that actually worked up

21         cases for trial that the remainder

22         of that 3.1 beyond Smith and

23         Schwaller should be submitted as a

24         common benefit cost.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 135

1           MR. UMPHREY:  Right.

2           MR. KAISER:  We'll do that.

3           MR. HERMAN:  If we get that

4       within a week, that would --

5           MR. UMPHREY:  Whatever you

6       folks do for us, we appreciate.

7       But primarily we appreciate being

8       involved with good lawyers that

9       are prepared and that have been to

10      the well before and litigation

11      that helps our individual clients.

12      We thank you for your time.

13          MR. SEEGER:  Thank you.

14          MR. HERMAN:  Well, I think

15      we're honored to have you here

16      today, and I don't say that in a

17      condescending matter or in a light

18      manner.  You have always brought

19      to the table something special.

20          MR. UMPHREY:  I'm getting

21      older, and they don't let me out

22      very much.

23          MR. RANIER:  This is the PSC

24      piece.  We did a lot on the PSC.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 136

```
 1          I want to quickly go through some
 2          of the things that we did on the
 3          PSC that we haven't already
 4          discussed.  Of course, I served on
 5          the committee and meetings and the
 6          status conference and everything
 7          and went to almost every one of
 8          those.
 9              I chaired the insurance
10          committee, and I had the support
11          of these five firms, obviously,
12          but the work on that committee,
13          the discovery, the motions, I read
14          every policy, every insurance
15          policy.  We had a voluminous
16          amount of material on that.  One
17          of the interesting things on that
18          is that of course we established
19          that Merck had more insurance than
20          they said they did, but the big
21          thing here on liability is when
22          they got their extra insurance.
23          Basically they went from under 500
24          million to a billion dollars, and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 137

1         the year on that is like 1998.  It

2         is just about the same time when

3         we coordinated that with all the

4         time things that everybody had

5         done with trials that it is about

6         the time that, I think, they

7         unblinded Vioxx, that they had

8         results from the 090 study and a

9         couple of other studies that were

10        strongly suggesting that they had

11        some liability problems here.

12             Of course, we found out we

13        weren't the only persons that had

14        recognized that, but the insurance

15        companies had figured that out

16        also.  They took Merck to

17        arbitration in London.  So, there

18        was a whole body of evidence out

19        there regarding the insurer's

20        allegations and what evidence they

21        used to show that Merck knew and

22        misrepresented and covered up.  We

23        tried to get that from Judge

24        Fallon.  That was in May of 2007.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 138

 1              I don't know whether he had

 2          his eye on the settlement or not.

 3          He declined to produce that after

 4          our motions and lengthy briefs and

 5          whatever to order it produced.

 6          But our strategy at that point was

 7          to go through the Louisiana Direct

 8          Action Statute, and we were at the

 9          time of settlement working on

10          filing a direct action Vioxx case

11          that we could keep in Louisiana

12          court or to go get one -- either

13          to get removed and to go back to

14          Judge Fallon with arguments under

15          the Direct Action Statute, which

16          had been stronger for production

17          of that evidence.

18              But just for anybody who is

19          still doing this and general

20          information, there's a pot of

21          evidence out there.  We had an

22          insurance consultant that worked

23          with us on this and who

24          participates in a lot of these

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 139

1        arbitrations in London, and we've

2        confirmed that it's there.  It's

3        stuff that's probably not been

4        seen before.

5             MR. SEEGER:  Drew, can I ask

6        you a question?  I'm sorry to

7        interrupt.  I just want to make

8        sure I ask a couple of points.

9        The chart, I'm seeing this for the

10       first time, has this been provided

11       to the PSC, the chart that you are

12       working off of?

13            MR. RANIER:  It should be in

14       the depository because this is all

15       a matter of record.  We introduced

16       the chart with the motions.

17            MR. SEEGER:  That was

18       attached to the motions?

19            MR. RANIER:  Judge Fallon

20       has seen this.  This is our chart.

21       We did this.  Every policy.  Every

22       policy.  That's kind of a brief

23       summary of what was done on

24       insurance.  It is not only there

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 140

1          from the standpoint of financial

2          liquidity of Merck, but also

3          there's some important liability

4          aspects to this that haven't been

5          finished and are still out there.

6               LECG -- there's a mistake in

7          my affidavit.  I said in my

8          affidavit that LECG was paid

9          exclusively by the Vioxx

10         Litigation Consortium.  That's not

11         correct.  LECG is an econometrics

12         firm out of Boston, formerly the

13         Bridle Group, and we got engaged

14         with them early on various aspects

15         of Merck's business model and what

16         have you.  The PSC did share some

17         of the expense of the LECG group.

18         I can't remember exactly how much.

19         It is not a fantastically high

20         number, but it could be 10, 20,

21         $30,000.  And so my statement in

22         my affidavit that the Vioxx

23         Litigation Consortium paid for all

24         of that is not accurate.  We paid

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 141

1          for some of it, but the PSC paid

2          for some of it.

3               MR. HERMAN:  Let me stop you

4          so I can alert you to something.

5          First of all, if you find

6          something in your affidavit that

7          you want to add, subtract, in the

8          event that we do not resolve fee

9          issues and the Judge has looked at

10         everything and he issues his

11         opinion and there's still fee

12         issues unresolved, he's going to

13         embark on a Murphy Oil process.

14         Before that happens, you will be

15         given an opportunity to give

16         another look at your affidavits.

17              MR. RANIER:  It is not a big

18         deal.

19              MR. HERMAN:  I hadn't said

20         that before, and I wanted to make

21         sure I did say it.

22              MR. RANIER:  It was very

23         early on.  It was 2000.  It was, I

24         think, before the first MDL trial.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 142

1          It might have been after Ernst.

2          But Kenneth Gartrell, our

3          econometrics expert that we worked

4          with, in addition to Gerald, Dr.

5          Gerald, who was the former SEC

6          Commissioner, and we have an

7          expert report from him too, but

8          analyzed Merck's financial

9          situation.  And basically, if

10          nothing else, this is, in

11          retrospect, due diligence from the

12          PSC about actually how much cash

13          Merck could come up with in any

14          given settlement aside from

15          preemption and causation issues

16          and all of that.  So, the PSC had

17          developed this early on, and I

18          basically took the lead on that

19          and did that.  So, there are two

20          draft expert reports.

21               The third step was supposed

22          to be that we would develop Ken

23          Gartrell as the witness to say

24          what most people in their trials

FAC Resp. Amended Exhibit D -- 1473

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 143

```
 1        did on cross with regard to the

 2        economic reasons why Merck kept

 3        selling Vioxx, even though they

 4        knew they had problems with it

 5        from a scientific standpoint.

 6        While I heard a lot of that on

 7        cross, and I think there might

 8        have been a couple of witnesses,

 9        actually a California witness, I

10        remember one who actually

11        testified to this, this was all

12        part of that process.  The PSC

13        said, no, we're not going to spend

14        all of that money on that now.

15        We're going to let the individual

16        trials develop that.  That's where

17        that stayed, but that was part of

18        what was done for the PSC.

19             We've already talked a lot

20        about the Konstam coverup, and

21        that was not officially PSC.  We

22        developed Martin Wells on that,

23        but there was a lot of talk and

24        discussion about that especially
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 144

```
 1          with Dave Buchanan and me on the
 2          raw data and how much we needed to
 3          plumb that.  And the basic focus
 4          there was to undermine that risk
 5          factor defense, because I still
 6          think that the snow shoveling guy
 7          is the last guy in the world who
 8          ought to be taking Vioxx and
 9          anybody that's doing any kind of
10          exertion or whatever.  So, we can
11          call those bad cases, but I've
12          never really believed they are.  I
13          know they are hard to win with
14          juries.  But the more evidence we
15          had, and I think, for instance, in
16          the chart that we've got on Dr.
17          Wells, once the data is actually
18          plumbed -- I mean, in diabetes, I
19          mean, you could see the risk
20          factor in diabetes is 10.33.  I
21          mean, that's like lung cancer and
22          smoking.  That's how much more
23          likely you are to have a heart
24          attack if you've got diabetes
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 145

1          taking Vioxx than if not.

2                MR. WEITZ:  Drew, I don't

3          know if you read the Cona/McDarby

4          trial transcript.

5                MR. RANIER:  I attended a

6          couple of days of it, but I didn't

7          see that testimony.

8                MR. WEITZ:  In our mock

9          trials, we found out from the jury

10         that you needed to embrace the

11         risk factors, and we actually

12         completely embraced that theory in

13         the case.

14               MR. RANIER:  It was your

15         partner, Rob Gordon, who was

16         McDarby's lawyer?

17               MR. WEITZ:  He had actual

18         diabetes, and he was 90% occluded,

19         it was a defense pick, and had all

20         those things.  We actually

21         embraced the risk factors.

22               MR. WATTS:  I read that

23         transcript and used a lot of that.

24               MR. RANIER:  Here's your epi

Page 146

```
 1        number.
 2             MR. WEITZ:  It is
 3        staggering.
 4             MR. HERMAN:  We had a
 5        discussion early on, and Drew and
 6        I have been together in a lot of
 7        cases, and we always end up at the
 8        same place, but usually we don't
 9        agree as it goes along.  But I
10        agree with him, and I still do,
11        that it is the straw that broke
12        the camel's back and felt from the
13        beginning that somewhere along the
14        line some case was going to be
15        tried with a lot of risk factors,
16        and Vioxx was going to -- the jury
17        was going to accept that in a way
18        that it could be replicated.  And
19        I think, actually, the way Mark
20        tried his case, he was able to do
21        that.
22             MR. LANIER:  Yes.  I took
23        the edge of the desk, and I took a
24        cup, and I said, the edge of the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 147

1           desk is a cliff.  The cliff is a

2           heart attack.  And all of us are

3           different distances from that

4           cliff.  A 15-year-old kid may be

5           way over here, and I put the cup

6           over here.  And I said, you get

7           diabetes, you are a little closer.

8           You smoke, you are a little

9           closer.  You are overweight, you

10          are a male, you are over 50.  And

11          what Vioxx is, it's a shove.  It

12          is a shove towards the cliff.  You

13          can give that 15-year-old kid

14          Vioxx all day long.  Who you are

15          putting at risk is the person who

16          is already close to the edge of

17          the cliff.  You give them Vioxx,

18          and they are gone, and I knocked

19          that cup over.  I knocked the cup

20          over, and the jury goes 'ahhh'.  I

21          think there's a lot of truth to

22          that.

23               Then we took Krumholz and

24          added him to that.  Krumholz took

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 148

```
 1          the Framingham risk factors for a

 2          heart attack and all the different

 3          breakout rates, and he showed that

 4          if you take the Vioxx data, every

 5          one of those risk factors, Vioxx

 6          is a greater risk factor for a

 7          heart attack than diabetes, than

 8          all of these different things

 9          except for smoking.  That's the

10          only thing that beats it.

11               MR. HERMAN:  On the other

12          hand, we know it made the cases

13          tougher to try.

14               MR. RANIER:  Talk about

15          knocking the glass off, Percy

16          Foreman came to Lake Charles when

17          I was just out of law school and

18          was defending union members on

19          some union violence.  He sat

20          smoking a cigar -- you could smoke

21          in the courtrooms in those days.

22          He sat smoking a cigar during the

23          closing argument of the state, and

24          he had something in the cigar, in
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 149

1          the ash, so the ash never fell,

2          and he's right next to the jury.

3          True story.  And the ash kept

4          getting longer and longer, and

5          nobody was listening to the

6          state's argument.

7               MR. BIRCHFIELD:  He got that

8          from Abraham Lincoln.

9               MR. RANIER:  I saw him do

10         it.

11              MR. LANIER:  The only risk

12         factor that I deemed would damage

13         trial at one of these cases is

14         smoking, because people smoke in

15         spite of the fact that they have a

16         warning that it could cause a

17         heart attack.  Who is to say if

18         they had been warned about Vioxx,

19         they wouldn't have still taken it.

20         That was the one that was tough to

21         get over.  I mocked seven of

22         these, and that was the one that

23         was tough to get over.

24              MR. KHERKHER:  But, Mark,

FAC Resp. Amended Exhibit D -- 1480

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 150

1        you also would have educated the

2        jury how smoking is a horrible

3        addiction.

4             MR. LANIER:  If I had had

5        Russ' material maybe or Walter's,

6        I didn't know that stuff, or

7        Grant's.

8             MR. KAISER:  Thank you,

9        gentlemen.

10            MR. RANIER:  Thank you.

11            MR. WATTS:  Thank you.

12            MR. SEEGER:  Thank you.

13            MR. BLIZZARD:  Thank you.

14                 -  -  -

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 151

1            C E R T I F I C A T E

2

3            I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13            I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number: 1060147

23        Notary Expiration: 1.2.10
          CCR Number: 30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 2, 2008
- - -
NEW ORLEANS, LOUISIANA
- - -


FIRM:  ROBINS, KAPLAN, MILLER &
       CIRESI, LLP
       Gary Wilson, Esquire
       Tara Sutton, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin
Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -
 2              MR. HERMAN:  Everything is
 3         being taken down by Linda.  You
 4         are going to get a copy at the end
 5         of this.  The judge is very strong
 6         on transparency in the process,
 7         consistency.
 8              Secondly, if we don't
 9         resolve all the fee issues, he's
10         got a process where he's going to
11         come in and put all the lawyers
12         under oath and cross-examine them.
13         I hope we don't get that far, but
14         we appreciate you being here.
15              In addition to that, did you
16         all make a written submission?
17              MR. WILSON:  We did, yes.
18              MR. HERMAN:  Do me a favor.
19         When you get back, just fax me or
20         e-mail my office an affidavit
21         saying that this is yours, and
22         we'll put it in the file with
23         everybody else's.
24              I'm going to pass this down
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1          to this side of the table or the

 2          other side of the table.

 3               MS. SUTTON:  I wanted to

 4          thank everybody for giving us this

 5          opportunity.  It is especially

 6          important to us because we weren't

 7          on the PSC, and I think our work

 8          may have been a little less

 9          visible, and this gives us a

10          chance to talk about what we

11          thought our contributions to the

12          MDL were.  We, of course, realize

13          that our contributions don't even

14          begin to compare with what all of

15          you have put into this litigation

16          and bringing it to such a

17          successful conclusion.

18               We initially had applied to

19          be on the Plaintiffs' Steering

20          Committee, because we hoped to

21          bring our mass tort experience to

22          the litigation, our trial

23          experience, and, of course, our

24          financial resources.  But when
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1      that didn't happen, we stepped

2      back and we tried to look at how

3      it was we thought we could bring

4      our expertise and our experience

5      and bring the highest value we

6      could to the litigation.  So, we

7      decided to focus on the science

8      committee and the discovery

9      committee.  I wanted to first

10     maybe touch on the work we did in

11     the science committee and then

12     move over to the discovery

13     committee work.

14          On the science committee,

15     our partner, Roberta Walburn, who

16     was one of the vice chairs of the

17     committee, and really kind of some

18     of the main work that we did on

19     the science committee early on,

20     there was a request by John

21     Restaino and Carlene Lewis that we

22     have a really comprehensive review

23     of the law on how we are going to

24     prove causation and get our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          experts qualified under Daubert.

2          We volunteered in the summer of

3          2005 to take on that project and

4          do a very complete survey of an

5          analysis of the law on how you

6          prove causation.  It resulted in

7          July of 2005 this legal research

8          memo that we provided to the

9          members of the science committee

10         to use kind of as a roadmap of how

11         we were going to qualify experts

12         at trial.

13              I took a lot of grief

14         because this was pretty big, but

15         we were trying to make sure that

16         we did a very comprehensive --

17              MR. HERMAN:  Excuse me, I

18         don't mean to interrupt, but it

19         would be helpful to us when you

20         get back if you would send us a

21         copy of that.  I want to review it

22         in connection with the trial

23         package that's out there and take

24         a look at the depository and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

 1          whether it is in the depository.

 2                  MS. SUTTON:  Sure.  We can

 3          get it back to you.

 4                  We did this fairly quickly.

 5          We provided this to the science

 6          committee in July of 2005, so, it

 7          was just within a month or so

 8          after the request was made, and we

 9          know it was used and read very

10          closely by the folks --

11                  MR. HERMAN:  Don't send it.

12          Troy and Andy indicate that they

13          believe that it was used in the

14          trial package.  It is in the

15          depository.

16                  MS. SUTTON:  Okay.  And then

17          for that first trial, we worked

18          really closely with Andy's

19          partner, Paul Sizemore and Leigh

20          O'Dell, in helping write the legal

21          section of the main brief opposing

22          their Daubert motion on causation.

23          We wrote -- you folks wrote the

24          facts, but we provided the legal

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          section.  I think a lot of that

2          was used.

3               During the first trial, we

4          were also asked to do a lot of

5          spot legal research on some very

6          difficult issues like the

7          admissibility of post hoc analyses

8          of epidemiological data.  We also

9          did legal research on how you can

10         use Daubert challenges to go after

11         defense experts.  There was

12         learned intermediary research, a

13         lot of different legal research

14         memos we provided to the science

15         team.

16              We also were asked to do a

17         comprehensive labeling history for

18         Vioxx.  That was some work product

19         that we provided to the science

20         committee.  We have copies of

21         that, we can provide that as well.

22              MR. HERMAN:  Did you work

23         with Bert Black on that?

24              MS. SUTTON:  We did the work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          product at our office, but I know

2          he reviewed it.

3               MR. WILSON:  We were on the

4          phone with Bert a lot.

5               MS. SUTTON:  We talked to

6          Bert a lot.

7               We worked really closely

8          with Don Arbitblit.  Don was a

9          great help in helping us think

10         about the approach to causation

11         and epidemiology from a legal

12         standpoint and gave input into the

13         memo that we did.  We stayed very

14         involved in the science committee

15         through the billable time that --

16               MR. HERMAN:  Was your firm

17         involved in Celebrex or Bextra?

18               MS. SUTTON:  No, we aren't.

19               Did I miss anything about

20         the science committee?

21               MR. WILSON:  No.  I think

22         you covered it pretty well.  We

23         got a lot of feedback saying that

24         the work was good and it was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        useful.  So, we weren't just
 2        writing stuff into the air.  I
 3        think that was a major
 4        contribution.
 5            MR. WEITZ:  Did you have
 6        weekly meetings or conference
 7        calls or were they monthly or you
 8        didn't have them?
 9            MS. SUTTON:  The science
10        committee had a weekly conference
11        call.  Then there were
12        subcommittees, as well, that we
13        participated in that would meet
14        less frequently by phone.  But
15        there were a lot of calls.
16            Then the epidemiology group
17        that Don was part of, we would
18        meet as a smaller group on the
19        phone and talk about these
20        legal -- these are very difficult
21        legal issues, and we would talk
22        about how we were going to use the
23        science to prove causation and to
24        qualify the experts.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1              MR. WEITZ:  Did you have any

2        individual cases that you

3        submitted into the settlement?

4              MS. SUTTON:  Yes.

5              MR. WEITZ:  How many?

6              MS. SUTTON:  Close to 100.

7              MR. WEITZ:  Where did you

8        file those cases?

9              MS. SUTTON:  Minnesota.

10             MR. WEITZ:  Minnesota.  Had

11       you guys worked up any cases for

12       trial?

13             MS. SUTTON:  We're working

14       up one now.

15             MR. WILSON:  We may have one

16       case.

17             MS. SUTTON:  We have a

18       beautiful case we are going to

19       hopefully try next year.  It was

20       filed after the settlement.

21             MR. WEITZ:  After the

22       settlement.  It was an opt out

23       case?

24             MR. SEEGER:  It was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1      excluded.

2              MR. WILSON:  We applied for

3      the settlement, but it was

4      rejected because it was after the

5      settlement date.

6              MR. SEEGER:  Right.

7              MR. WILSON:  But it is a

8      Minnesota case, so the statute is

9      still good.  It is a great case.

10     It is a marathoner.  He had a

11     previous workup, no problems,

12     heart attack while running, and

13     he's got terrible mental sequelae.

14     He's basically in a nursing home,

15     46 years old.

16             MS. SUTTON:  So, we're

17     really looking forward to getting

18     that case back and trying it.

19             MR. LEVIN:  When you say

20     "Minnesota," you are filing it in

21     the Federal Court, you are coming

22     here and then they're going back?

23             MS. SUTTON:  Yes.  Our cases

24     were filed in Federal Court in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1          Minnesota.

2                MR. WILSON:  We have a

3          six-year statute of limitations.

4                MS. SUTTON:  Which is being

5          challenged now.  The Supreme Court

6          in Minnesota is going to look at

7          it.  We hope to get involved in

8          that, the briefing of that.

9                MR. LEVIN:  That happened in

10         Mississippi with the statute that

11         they had.  You will look at the

12         history.

13               MR. HERMAN:  Went to 6 to 3

14         and also eliminated most

15         out-of-state filings.

16               MR. LEVIN:  Right.

17               MS. SUTTON:  Andy, is your

18         firm going to be involved in that

19         Minnesota statute of limitations

20         issue?

21               MR. BIRCHFIELD:  Yes.

22               MS. SUTTON:  I would like to

23         talk to you when you get a minute.

24               MR. BIRCHFIELD:  Okay.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1              MS. SUTTON:  What we can do

2         to help on that.

3              MR. BIRCHFIELD:  I think

4         there was a conference call

5         yesterday, I believe.

6              MS. SUTTON:  Good.

7              Then the second thing was

8         really our work on the discovery

9         committee, and I know you've heard

10        from Anthony Irpino, who we worked

11        extremely closely with on the

12        privilege saga.  We were on the --

13        we got involved in the discovery

14        committee at the first meeting

15        that I think Dave Buchanan had,

16        and the first conference call, and

17        we brought up, based on that first

18        conference call, the idea of

19        really going hard after privilege

20        claims, because we had a lot of

21        success in doing that in the

22        tobacco litigation in Minnesota.

23             Dave said it was a problem,

24        and you were having problems in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          New Jersey with the privilege
 2          claims, so we asked to --
 3          suggested maybe a committee, a
 4          subcommittee be set up.  That
 5          happened, and Anthony chaired it
 6          and did just an incredible job.
 7               We asked to see those New
 8          Jersey logs, and Dave got them to
 9          us, and we painstakingly went
10          through those logs.  Gary and I
11          both wrote a letter that I think
12          Russ sent out in the summer of
13          '05, July of '05, that went
14          through all the deficiencies in
15          the log and basically grouped the
16          types of documents we thought
17          weren't privileged.  There were
18          science documents on the logs,
19          there were marketing documents on
20          the logs, there were things that
21          clearly weren't privileged.  We
22          gave many examples and laid out
23          the law, and we did the research
24          at our firm on why these things
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1        weren't privileged, and we wrote

2        the letter, and I know Russ sent

3        out the letter.  We built a great

4        record, and we got the MDL log,

5        they did an MDL log, and we went

6        and looked at that closely and did

7        another letter that went to the

8        defendants.  Then eventually we

9        drafted the first draft of the

10       motion to compel that Richard

11       Arsenault argued, I think it was

12       in October perhaps of '05, and

13       going through and saying there's

14       huge categories of documents that

15       should not be on this privilege

16       log.  They are not privileged.  I

17       think the judge really seemed to

18       listen.  He told them that their

19       logs weren't good and they needed

20       to provide new logs, and when they

21       did provide new logs, they

22       deprivileged a quarter of their

23       privileged documents.  I think

24       they went from 40,000 to 30,000

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          privileged documents.  Our firm,

2          along with other members of the

3          committee, we went through all of

4          those privileged documents.

5               Then I think the judge had

6          all 30,000 documents brought to be

7          reviewed in camera, which is, I

8          think, an amazing feat for -- I

9          mean, Judge Fallon gets a lot of

10         credit.  To get a judge to take

11         and look at all the privilege

12         documents in camera, that doesn't

13         happen very often in litigation.

14         So, he did look at them, and I

15         think he was ready to deprivilege

16         most of them when they went up to

17         the Fifth Circuit.

18               MR. LEVIN:  The Fifth

19         Circuit wasn't as kind to Judge

20         Fallon as you are.

21               MS. SUTTON:  I think --

22               MR. WILSON:  He kept it

23         alive, Arnie.

24               MS. SUTTON:  But I think the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          Fifth Circuit recognized that the

2          privileged documents had to be

3          reviewed, and I think the thing

4          that we'd advocated in our

5          committee is that there were too

6          many privileged documents.  He

7          couldn't look at all of them.  So,

8          he needed to sample them.  The

9          Fifth Circuit wrote a decision

10         that will be something used in all

11         litigation from now on that it is

12         okay to sample privileged

13         documents and make a privilege

14         determination based on sampling

15         and not looking at all of them.

16              We have been working,

17         frankly, our butts off at our firm

18         trying to get an appellate court

19         to put that in writing, and that

20         happened in Vioxx.  There was

21         sampling done in the Minnesota

22         tobacco litigation, but we never

23         got an order in the Supreme Court

24         on that.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1            MR. SEEGER:  They didn't

2       like the sampling, but it was okay

3       to do it.

4            MS. SUTTON:  Gary flew down

5       and helped on the Fifth Circuit

6       brief with Lenny, and everybody

7       pitched in on that mandamus brief.

8            MR. WILSON:  Irpino

9       especially worked on that.

10           MS. SUTTON:  Yes.  I think

11      that it is hard for us to know how

12      much influence the privilege

13      documents had on Judge Fallon and

14      his thinking about Vioxx and

15      Merck.  I mean, because you guys

16      know better than us, I think, the

17      impact it may have had on him, but

18      I think it definitely, I would

19      hope, helped educate the judge

20      about the games that were being

21      played and gave him an impression

22      that we hope helped contribute to

23      the success of the litigation.

24           MR. HERMAN:  What privilege

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              issue did Arsenault argue?

2                   MR. WILSON:  Actually, he

3              didn't argue it.  He relied upon

4              the brief.

5                   MR. HERMAN:  He didn't argue

6              it.

7                   MR. WILSON:  He stood up and

8              said, on this one, we're going to

9              rely on the brief, Your Honor.

10                  MS. SUTTON:  That was the

11             brief we wrote.

12                  MR. LEVIN:  It was a good

13             argument.

14                  MR. SEEGER:  The brief was

15             better than the argument.

16                  MR. WILSON:  It's a good

17             brief.

18                  MR. HERMAN:  Well, just one

19             other thing, and that is, the

20             Fifth Circuit actually departed

21             from the Federal rules, appellate

22             rules and also some internal rules

23             to snatch up that issue.  We're

24             not certain how that happened, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          certainly had they done what we

 2          interpret the rules to be, let's

 3          put it that way, as lawyers, then

 4          Judge Fallon's initial opinion

 5          would have held, and it would have

 6          meant that the litigation had

 7          really been spurred at that point.

 8               MR. LEVIN:  They never

 9          granted a mandamus and wrote an

10          opinion.  They had no

11          jurisdiction.

12               MS. SUTTON:  Exactly.

13               MR. WILSON:  I was there for

14          that.  We were over in Irpino's

15          office, the emergency stay was

16          there, we replied to that, and

17          then the next day we had to file

18          the brief.

19               MS. SUTTON:  Yes.  I mean,

20          Judge Fallon looked at all 30,000

21          documents.  He did what he needed

22          to do.  He should have been upheld

23          on that.

24               So, we also relied heavily
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          on Paul Rice in presenting his

2          textbook to the judge.  I know he

3          eventually adopted or used him as

4          the Special Master.

5               MR. HERMAN:  What are your

6          costs in the case?

7               MR. WILSON:  Just under

8          50,000 or just over 50,000.

9               MS. SUTTON:  50,418.22.

10               MR. HERMAN:  Primarily, what

11          are those costs?

12               MS. SUTTON:  We did 11 full

13          weeks of document review at the

14          document depository.

15               MR. WILSON:  In New York and

16          in Alabama.

17               MR. LEVIN:  So,

18          transportation and hotel lodging?

19               MS. SUTTON:  Right.

20               MR. HERMAN:  And partner

21          hours in the case?

22               MR. LEVIN:  1,950.

23               MR. WILSON:  In our

24          three-page thing --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              MR. LEVIN:  Did you say

2       partner hours?

3              MR. HERMAN:  Yes.

4              MR. LEVIN:  Partner hours --

5              MS. SUTTON:  That might be

6       right.

7              MR. WILSON:  We have a total

8       of 2,400 hours, partners and

9       associates.

10             MR. LEVIN:  The accountant

11      says you have 1,950.  You ought to

12      look into that.  The hours

13      reported are Peter Sutton Toepfer,

14      Roberta's, yours, Gary and

15      Zimmerman's and Tara's.

16             MS. SUTTON:  There's some

17      associates in there.

18             MR. LEVIN:  Jaycox, Moccio

19      and Narotsky.

20             MR. WILSON:  Do we talk to

21      the accountant about that, Arnold?

22             MR. HERMAN:  Yes, please.

23             MR. LEVIN:  Yes.

24             MR. HERMAN:  The accountant

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1        has made himself available, and so

2        you know, that CPA and the people

3        working with him do not do any

4        work whatsoever for any of the law

5        firms involved in the case or any

6        of the lawyers involved in the

7        case on a personal basis.  It is

8        Judge Fallon's choice.  But they

9        are extremely approachable.  If

10       you have any questions about their

11       review of either hours or dollars,

12       costs, they will straighten it out

13       with you.

14              MS. SUTTON:  Okay.

15              MR. WILSON:  Then we were

16       also on other committees.  We were

17       on the science -- well, we talked

18       about the science committee, but

19       we were on the law committee, Tara

20       mentioned we did the document

21       review, and we actually did the

22       document review.  I know there are

23       some people who would fly in and

24       spend the day there and then go to

FAC Resp. Amended Exhibit D -- 1505

Page 24

1      the Yankees game.  We did five-day

2      weeks.

3            MR. SEEGER:  And you worked.

4            MR. WILSON:  We went through

5      them.

6            MS. SUTTON:  We listened on

7      those conference calls when we'd

8      get yelled at.  We made sure we

9      were there five days a week.

10           MR. SEEGER:  All right.

11           MR. HERMAN:  You said you

12     were both in Montgomery and New

13     York?

14           MS. SUTTON:  Correct.

15           MR. WILSON:  And also here.

16     I think Toepfer was here for a

17     week.

18           MR. HERMAN:  Anybody else

19     have any questions?

20           MR. SEEGER:  I think we're

21     done.

22                 -  -  -

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1           C E R T I F I C A T E

2

3           I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13           I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM: Sanford Pinedo, LLP
PRESENTER:  Shelly A. Sanford, Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, P.C

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1          MR. BIRCHFIELD:  Shelly,
2     everything is being recorded for a
3     transcript and will be available
4     for future use if it's needed.
5     So, with that, the floor is yours.
6          Everybody here knows your
7     contribution and what you did in
8     starting this litigation, and it's
9     very much appreciated, but I want
10    you to take this time to say
11    whatever you want to say.
12         MS. SANFORD:  Thank you,
13    Andy.  There may be one point at
14    which I might have to go off the
15    record very briefly, and I hope
16    nobody minds.
17         MR. BIRCHFIELD:  Not at all.
18         MS. SANFORD:  I want to say
19    first what an honor it is for me
20    to have been a member of the PSC
21    and to have worked with each one
22    of you.  I will be brief on this
23    this morning.  Probably the
24    hardest thing I've had to do since

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

```
 1        Carlene died is to write the
 2        affidavit.  I'll try not to cry.
 3             MR. SEEGER:  Don't worry
 4        about it.
 5             MR. HERMAN:  Shelly, it
 6        might be easier if you consider
 7        you are talking to family.
 8             MR. LEVIN:  Because you are.
 9             MR. LANIER:  If worst comes
10        to worst, there are about six of
11        us that would jump in and testify
12        on your behalf and give the same
13        speech you are going to give
14        anyway.
15             MS. SANFORD:  Thank you.  I
16        would really like for this not to
17        be about me but to be about
18        Carlene.  She was the most humble
19        person I have ever known and
20        trusted each one of you as well.
21             Perry, I'm sorry you didn't
22        really have a chance to get to
23        know her.
24             MR. WEITZ:  I am, too.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1        MS. SANFORD:  A truly humble

2     and wonderful person.

3        I tried to put all that I

4     could in the affidavit.

5        Carlene's obituary was in

6     the New York Times, and part of

7     that was that she was a pioneer in

8     Vioxx.  So, I know that you get

9     that she's a pioneer in this

10    litigation.  I thought about

11    bringing that, but I think that's

12    a good testament to who she was

13    and what she did in this

14    litigation, that even the New York

15    Times would pick up the story on

16    her death.

17        Not to minimize her degree

18    at Harvard and her University of

19    Virginia law degree and the other

20    incredible things that she's done

21    in her life, but this was

22    extremely important to her, and

23    she dedicated herself to this

24    litigation.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1              It started for us in 2000,

2        eight years ago here at the St.

3        Regis, a little bit after that

4        with you, Chris, and Mark, of

5        course, with you and Tom and Andy,

6        your firm, everybody, but it's

7        been a little bit of a long road.

8        It was a five-and-a-half year road

9        for Carlene up until the time she

10       died.

11             She gave speeches in the

12       beginning of this litigation that

13       I would like to encourage you to

14       consider allowing her time for,

15       because for her it was not about

16       getting cases or gathering cases.

17       She believed that this was a bad

18       drug, wanted to encourage other

19       lawyers to come out and be

20       involved in this litigation.  So,

21       we went to a number of places that

22       were simply designed to encourage

23       people to file claims against

24       Merck and help this litigation

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1      move forward years before it ever

 2      came off the market.  I don't know

 3      how that is playing out in fee

 4      allocation considerations.

 5           MR. HERMAN:  Why don't you

 6      tell us about some of the places.

 7           MS. SANFORD:  I almost

 8      brought one of those speeches

 9      here, but it is a little bit too

10      hard.  I can supplement the file

11      with those if you guys would like

12      because many of those were

13      recorded.

14           MR. HERMAN:  I would like to

15      know the various places.

16           MS. SANFORD:  She went to

17      the Mass Torts Made Perfect in

18      2002.  We were there.  We started

19      the Vioxx litigation group at ATLA

20      with David Miceli, and Carlene

21      gave really a speech almost every

22      year at every convention, the

23      annual conventions we did, and

24      encouraged people to come up until
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          we turned that over in 2006.

2                    We went to Mealey's and did

3          a speech, and the actual

4          culmination of that was with

5          Mealey's right when Vioxx came off

6          the market and a number of you --

7               MR. BIRCHFIELD:  Pasadena.

8               MS. SANFORD:  --  gave

9          speeches there.  Yes, Pasadena.

10         But the thing that really spoke to

11         me about that particular speech,

12         people always complimented her and

13         said, we really think we want to

14         get in this litigation. Mark, you

15         know how effective Carlene was at

16         trying to persuade people to jump

17         in and encourage that.

18                    But she was in the hospital

19         the second time, the last time she

20         was in the hospital, and she got

21         an e-mail from a lawyer in New

22         York who had watched the Mealey's

23         presentation and just e-mailed her

24         and said, I don't know you, but

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1        you've restored my faith in

2        lawyers, a defense lawyer wrote

3        that, and Carlene showed that to

4        me and was just so touched that

5        somebody would do that.

6             We wrote articles for

7        various places, trial magazines,

8        but mostly it was ATLA and Mass

9        Torts Made Perfect and Mealey's.

10       We also did the Harris Martin and

11       those sorts of things.

12            So, there were really a

13       number of things.  They would

14       probably be reflected in the time.

15       I tried to capture those for her

16       in the pre-2005 formation of the

17       MDL time that we submitted, and I

18       would encourage you to look at

19       that because it did impact

20       lawyers.  I know that may not be a

21       common, common benefit time issue,

22       but it was important to Carlene,

23       and I think it was very effective

24       and helped the litigation move

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1      forward.
 2            Mark, I looked at your
 3      eulogy of Carlene, I listened to
 4      that yesterday, and what a tribute
 5      it was to her.  The things you
 6      said about her, about Vioxx,
 7      really stood out to me.   I think
 8      you know it is true, if you gave
 9      something to Carlene, you could
10      take it off your list.  It was
11      done.   That was very true in this
12      litigation.  You called her a
13      leader in the Vioxx fight, and I
14      think that's accurate.
15      Importantly, you told her girls
16      that there are pharmaceutical
17      companies that will never do
18      business the same way because she
19      took justice by the hand until it
20      came to fruition.  I believe that
21      is true and accurate.
22            I remember, again, shortly
23      before Carlene passed away,
24      watching a commercial with her on
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          TV of Tylenol.  The president of

2          Tylenol got on the commercial and

3          said, we have this problem with

4          our drug and we don't want you to

5          take it.  We would rather you not

6          take Tylenol than have this

7          problem.   Carlene looked at me

8          and said, I think we helped to

9          make a difference with that and

10         that kind of pride in what she

11         did.  It's remarkable, and I

12         believe it is true as well.  I'm

13         glad she had it.

14              It was easy to see that she

15         was a visionary about the Vioxx

16         litigation.  She walked into my

17         office in October of 2000 after

18         having visited with Ms. Bell and

19         said, this is a bad drug, and we

20         need to do something about it.

21         That's how she proceeded in this

22         litigation.  She looked at Vioxx

23         and said it is a bad drug, it is

24         hurting people, we've got to do

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1      something to help.  That's how she

2      looked at the litigation all the

3      way through.

4           It was a very proud moment

5      for her when Vioxx came off the

6      market, an extremely proud moment

7      when she was appointed to this

8      PSC, and even prouder when she

9      chaired the science committee.

10     When you voted her in, the taxi

11     ride to the airport after that was

12     one of the happiest moments that I

13     remember from her, and she was

14     very appreciative of that, and I

15     think did a tremendous job.

16          Here's where I'll go off the

17     record for one second.

18               -  -  -

19          (Whereupon, an

20     off-the-record discussion was

21     held.)

22               -  -  -

23        MR. BIRCHFIELD:  Shelly,

24     appointing Carlene and then you as

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1        chair of the science committee,

 2        that was probably one of the

 3        easiest and most obvious decisions

 4        that we made in this litigation.

 5            MS. SANFORD:  Thank you for

 6        that.  We didn't take it lightly,

 7        and I don't intend to overstate

 8        either one of our positions or

 9        understate them, but I think you

10        all know where we were in it and

11        at least where our heart was, and

12        you got the best of both of us,

13        and in particular, the best of

14        Carlene.

15            I think in regard to being a

16        visionary, she was able to

17        recognize a bad drug.  She was

18        able to look at Mrs. Ernst when

19        she came in the door and say, this

20        is the case that needs to go to

21        trial, and it needs to be tried by

22        Mark.  She was committed to that,

23        Mark, in a way that it's just

24        amazing to me.  She loved that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          trial, loved how you tried it,

2          loved being a part of it, loved

3          the result.  Happy, happy day for

4          her.  And we'll just say thank you

5          to you for being part of that.

6               She recognized the need for

7          giant people to be involved in

8          this litigation and encouraged, I

9          think, all of you in ways that

10         were, I hope, memorable to you

11         because she loved each one of you.

12              MR. HERMAN:  I think you

13         ought to know that it was a big

14         blow to everyone, not just in a

15         professional sense, but in a

16         personal sense, and there never

17         was a question at all as to who

18         would be recommended to fill the

19         spot on the PSC.  You always give

20         more and take less credit yourself

21         for what you do.  I know this

22         isn't easy for you, and you don't

23         find it easy to talk about

24         yourself.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1          MS. SANFORD:  No.

 2          MR. HERMAN:  So, I think

 3     some of us are going to have to do

 4     that for you.

 5          MR. SEEGER:  I was just

 6     about to say, true to character,

 7     she's talking about what everybody

 8     else did but her.  You were right

 9     there with Carlene from the very

10     beginning.  The very first meeting

11     I had was with the two of you.

12          Shelly, Carlene was a very

13     special person.  We all miss her.

14     It was a huge blow, and it felt

15     like there was just a huge hole in

16     our committee and in our team when

17     she left, but you filled it.

18     Even before that, you were so

19     active and so involved.

20          I don't want to go into all

21     the details like what you did on

22     the science committee and how you

23     supported every trial effort,

24     Andy, mine, Mark's, everybody's,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        Perry's.  You were always there
 2        moving us on, helping us,
 3        providing us with valuable
 4        information.  You have been steady
 5        and constant from the very minute
 6        I met you right here in this
 7        hotel.  So, I thank you.
 8            MR. LANIER:  I also want the
 9        record to reflect, and I think
10        those of us on the committee know
11        this, but I'm not certain, and I
12        hope this isn't something that I
13        know from some other means that I
14        shouldn't say, but the monies you
15        get from this have already been
16        pre-divided in such a way that
17        Carlene's children and her ex-law
18        partner are going to get the
19        lion's share compared to what you
20        get.  If you add those two
21        together, it is two to one, what
22        you would take out of this.   I
23        think that needs to be on the
24        record as well.  It's another good
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        reason for you to be talking not

 2        just about what you did, but about

 3        what Carlene did, because this is

 4        our chance for her offspring to

 5        get what's coming to them from her

 6        efforts.

 7             MR. LEVIN:  How are those

 8        pretty girls?

 9             MS. SANFORD:  They are good.

10        They are tremendous.  They are a

11        testament to their mom really.

12        Carla, the oldest, is at Harvard

13        and followed in her mom's

14        footsteps, and Christie is a

15        senior in high school.  They are

16        very good children.

17             MR. LEVIN:  It's good that

18        they have you.

19             MS. SANFORD:  Thank you.  It

20        is a joy for me to have them, and

21        thank you for the comments.  I'm

22        in awe of each one of you and the

23        things that you have done and have

24        been glad to be a part of it and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1        would give my all for you on any

 2        case that I was involved in with

 3        you, and I do believe that Merck

 4        is --

 5             MR. HERMAN:  It takes a lot

 6        of mules to pull one cart, and we

 7        wouldn't be where we are without

 8        your contribution and Carlene's.

 9             I just want to add a little,

10        because you are not making a

11        pretty good record for somebody

12        else to read even though we know

13        what you did.  I think your

14        participation on, for example, the

15        science committee, the trial

16        package committee, monitoring the

17        trials, giving the input, being

18        there from the beginning to the

19        end, the consistency with which

20        you and Carlene performed, and

21        even after Carlene was facing a

22        really untoward situation, there

23        wasn't any stop.  You guys just

24        kept plowing ahead.  You are still
```

FAC Resp. Amended Exhibit D -- 1524

Page 18

 1       not making the case for yourself.
 2            MR. LANIER:  Let me add, in
 3       the Ernst case, we go to trial in
 4       Ernst, no one has tried any Vioxx
 5       cases yet.  We are going where no
 6       man has gone before.  Alan Nies
 7       gets put on the stand.  I don't
 8       have a deposition of Alan Nies to
 9       read.  I have absolutely nothing
10       from Alan Nies.  So, I'm going
11       through documents, and I'm putting
12       together a cross with some of the
13       best stuff I had on Alan Nies.
14       You and Carlene found, in terms of
15       Alan Nies' "oh, I moved down here
16       to be with my grandkids," blah,
17       blah, blah.  He did not.  He moved
18       down here for a consulting job
19       making a quarter million dollars a
20       year for a sugarland company down
21       the freeway there.  And y'all
22       found that, which allowed me to
23       absolutely totally destroy his
24       credibility in the first five

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1        minutes of my cross-examination.

2        And that was y'all.

3            MS. SANFORD:  You did

4        destroy his credibility.  That was

5        very pleasant.  Thank you for

6        that.

7            MR. GIRARDI:  Shelly, let me

8        say this.  We were in this case in

9        2001.  I know you were and Chris

10       was in 2001.  Nobody at this table

11       knew how to spell Vioxx.  The only

12       reason this came about is you two

13       guys, no question about it.  If

14       you look at all of the bad drug

15       cases, you never see this sort of

16       a lead time between what you guys

17       did back in 2000 versus then it

18       gets withdrawn several years later

19       and then the MDL is set up in

20       2005.  All of that was because of

21       you.  I mean, no question about

22       it.

23            MR. LANIER:  I still recall

24       you helping me get ready to take

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        Alise Reicin's deposition.  Before

2        they pulled the drug off the

3        market, we deposed Alise Reicin,

4        got her locked into some lies

5        before she ever knew this thing

6        was going to go forward, and y'all

7        helped prep me for that.

8             MR. BIRCHFIELD:  We all know

9        your role early on and your

10       commitment throughout it.  Chris

11       mentioned the support and the help

12       that you gave.  Mark has mentioned

13       the role that you and Carlene

14       played in Ernst.  But you were

15       there for our trial.  I mean,

16       every MDL trial, you were there to

17       help.  So, we know your role

18       there.  We know the contribution

19       that you made on the committees,

20       the science committee and the

21       trial package and the stroke

22       committee.  I mean, all of that is

23       well known to the folks on this

24       committee.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          One of the things that may

2     not be as well known that would be

3     helpful, if you could spend a few

4     minutes talking about how y'all

5     really advanced the litigation

6     with your own cases.  We know

7     about Ernst, but you had other

8     cases that y'all had worked up

9     that were ready for trial that you

10    were pushing to get to trial.  Can

11    you talk to us a few minutes about

12    that?  That would be helpful.

13         MR. SEEGER:  Excellent

14    question.

15         MS. SANFORD:  Most

16    particularly the case that I think

17    was helpful in advancing the

18    litigation -- with the exception

19    of Ernst, which I think was an

20    amazing thing to be able to get to

21    trial within four months of the

22    MDL being formed.  Again, I will

23    say that Carlene was so

24    appreciative that the PSC

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          supported that, allowed that case

 2          to go to trial, encouraged it and,

 3          Mark, your role in that, but that

 4          that was able to go to trial then

 5          was tremendous.   We spent a very

 6          big amount of time with Mark's

 7          firm on that.

 8               We also had the Pikul case,

 9          which I think made a significant

10          difference in this litigation as

11          well.  When I say the Pikul case,

12          it is a case that we had in 2003.

13          We filed that he was a person who

14          had 50 milligram usage for more

15          than 30 months and got all of his

16          drugs from Merck-Medco directly.

17          They sent him the last 90-day

18          supply that killed him.  He had a

19          blood clot.  The clot was found by

20          the medical examiner here who had

21          pictures of the clot, testified in

22          that actual pathology record that

23          it was Vioxx related prior to

24          Vioxx even being withdrawn from
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1        the market.  The actual physician,
 2        I took his deposition, and he said
 3        Merck was in his office telling
 4        him that Vioxx was safe, go ahead
 5        and continue to prescribe it in 50
 6        milligram doses on a chronic
 7        basis, which was contrary to the
 8        label.  We had that case wired up,
 9        and Merck knew it, and so every
10        time it came to the table in the
11        MDL to be the trial case --
12             MR. SEEGER:  They ran away
13        from it.
14             MS. SANFORD:  -- they ran
15        away from it.  They said that it
16        is not representative because it
17        is too good and those sorts of
18        things.  And I think it had a lot
19        to do, in my opinion and Carlene's
20        opinion, with how the cases got
21        selected for trial and how
22        eventually they would have faced
23        that case.
24             MR. BIRCHFIELD:  That case
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        was trial ready?

2            MS. SANFORD:  It was trial

3        ready.  The doctors, the experts,

4        the plaintiff's depositions were

5        taken, the representatives.  It is

6        the only case that Carlene

7        considered, as she was in the

8        hospital the first time, possibly

9        filing mandamus for Judge Fallon

10       because he was not getting his day

11       in court, and it was ready at the

12       time the MDL was formed.  And of

13       course we didn't do that because

14       that's not really something we

15       would have done, but it was that

16       strongly felt in her that this was

17       a case that should be tried and

18       should have been the first trial

19       in the MDL.  And Merck's ability

20       to strike that was helpful to

21       other cases like Barnett and those

22       that got put on the table.  I

23       think that was significant.  Thank

24       you for asking that question.

FAC Resp. Amended Exhibit D -- 1531

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1        When I think of one of the things

2        I'm proud about, I'm proud for

3        Carlene about, that's one of the

4        things that comes up.

5             There are a few other things

6        I will go through very quickly,

7        but just fun little facts that I'm

8        proud of them.  The video news

9        release that was played in every

10       trial which Merck never mentioned

11       in there that there was a five

12       times risk of heart attack with

13       their drug.  They touted the

14       naproxen effects, and they sent

15       that out right after VIGOR was

16       released.  It was the first video

17       marketing material that we got.

18       It was document 0001 in 2001, and

19       that was something that Mark used

20       at the first trial.  It was a very

21       good piece.

22            The second piece of

23       information that was very

24       beneficial I think to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1        litigation overall was the "Be the

 2        Power" presentation.

 3            Tom, I don't know if you

 4        remember this, but you had a black

 5        and white PowerPoint presentation

 6        that you gave Carlene and I when

 7        we came down the second time to

 8        see you, and it was almost

 9        illegible.  We took it and we were

10        able to file a 30(b)(6) motion.

11        Carlene and I took the deposition

12        and got documents, and among those

13        documents was the "Be the Power"

14        video.  It was James Dunn's

15        production as it came in, and we

16        looked at it and saw this cartoon

17        basically that they had put

18        together undermining and

19        minimizing the effects.

20            MR. SEEGER:  Shelly,

21        something else just really

22        occurred to me.  You are so quiet

23        and you are so understated, but

24        you were really the central
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1        organizer of the West Coast, the
 2        East Coast, all of us, before the
 3        MDL, and you were still, even
 4        after the MDL was created, very
 5        much involved with lawyers all
 6        over the country, Mark, Tom's
 7        office, us.  So, you provided a
 8        lot of leadership in that respect.
 9             MS. SANFORD:  I appreciate
10        that.  Thank you.
11             We had meetings in Mark's
12        office with everybody in your new
13        office when it first came in, when
14        you first went there, Mark, after
15        we dogged you downtown for so many
16        years to get involved.
17             MR. SEEGER:  I know.  I
18        remember I couldn't find his
19        office the first time he invited
20        me down.
21             MS. SANFORD:  That "Be the
22        Power" presentation, I think, was
23        significant, and it was played in
24        -- every trial that had a verdict
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1       for plaintiffs included that

2       presentation, and that was as a

3       result of that, and that was when

4       Merck filed personal

5       Interrogatories against me and

6       Carlene and the request for

7       admission and tried to figure out

8       how we got that.  And then when we

9       were able to stop that from

10      happening, we got motions for

11      sanctions on that and those sorts

12      of things early on, because they

13      were just furious that we knew

14      about it.  But it was a very good

15      deal, and I was proud of that.

16            We had 10 million pages of

17      documents by the summer of 2002,

18      and that ultimately became part of

19      the repository, I think, in New

20      Jersey, and I thought that was a

21      very good factor.

22            MR. HERMAN:  Shelly,

23      everybody on this committee has

24      recognized that one hour of work

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1       by a lawyer of your caliber or

2       Carlene's may be worth 100 of

3       somebody else's.  So, hours aren't

4       the sine qua non, I think, for

5       this committee.

6            But I do want to get on the

7       record the last report that I

8       have, which is -- I rounded off

9       7,084 hours by the firm and your

10      own hours, close to 4,000.

11      That's significant because there

12      was a time when you weren't even

13      dealing with hours and Carlene

14      wasn't dealing with hours.  But in

15      an effort to be consistent, I want

16      to make sure your hours are stated

17      on the record.

18           What are your outstanding

19      costs at this point for you and

20      Carlene?

21           MS. SANFORD:  I did not

22      bring that with me.

23           MR. HERMAN:  Can you

24      ballpark it for us?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1           MR. LEVIN:  We have it here.

2           MS. SANFORD:  You do?  Maybe

3       300?

4           MR. HERMAN:  Arnie, do you

5       have it?

6           MR. LEVIN:  You have about

7       7,000 hours in the cases reported,

8       and for some reason, your costs --

9       take a look at this.

10          MR. BLIZZARD:  $79,000 in

11      costs.

12          MS. SANFORD:  In expenses in

13      addition -- I mean less the PSC

14      contribution --

15          MR. LEVIN:  That has nothing

16      to do with the assessments.

17          MR. HERMAN:  How much?

18          MR. LEVIN:  $79,000.

19          MR. HERMAN:  It sounds low

20      to me.

21          MS. SANFORD:  It is low in a

22      sense that very graciously Mark

23      and Carlene came to a deal on the

24      cases where Mark fronted.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          MR. SEEGER:  That explains

2     how --

3          MR. LEVIN:  That explains

4     Mark's costs now.

5          MS. SANFORD:  We paid a

6     significant amount, but Mark very

7     graciously contributed --

8          MR. HERMAN:  Check what you

9     and Carlene were out of pocket,

10    notwithstanding what Mark did, and

11    if it is different than around

12    80,000.  You have got Mark's

13    number.  Just call it into us

14    while we're here, and we'll put it

15    on the record.

16          MS. SANFORD:  I will

17    actually do that.  There was time

18    submitted for pre-MDL formation,

19    and I don't know what you are

20    doing with that.

21          MR. LEVIN:  We want to know

22    that.

23          MR. HERMAN:  We want to know

24    that.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          MR. LEVIN:  Get that in.

2          MS. SANFORD:  I submitted it

3     a year ago probably to your

4     office, Russ.

5          MR. LEVIN:  Well, then, it

6     is in there.

7          MR. HERMAN:  Well, then, we

8     should have it.

9          MR. SEEGER:  Shelly, do you

10     have somebody who can make a call

11     to Wegmann to make sure the

12     accountants have your pre-MDL

13     hours?

14          MR. HERMAN:  And your costs.

15          MR. LEVIN:  Shelly, I can

16     say this, that you are one of the

17     few, that every hour that you have

18     put in has been accepted by the

19     accountants.  There's nothing

20     rejected.  There's nothing under

21     review.  It's current --

22          MR. SEEGER:  That makes

23     Arnold very happy.

24          MR. LANIER:  Which also

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          brings up another point that I

2          think is useful on the record that

3          ties all of this together.

4                You and Carlene and Danny,

5          as this thing started, really were

6          a defense firm, and you lost and

7          burned some defense bridges by

8          stepping out in a plaintiff's

9          cause of action.  It is why you

10         weren't in a position to fund this

11         litigation and why I stepped in to

12         do your funding.  It is also why

13         you keep really good hours.  You

14         know how to do it.  They are

15         legitimate hours, and they are

16         real.

17               MS. SANFORD:  Thank you.

18               MR. LANIER:  But I say that

19         to underscore that I know for a

20         fact that y'all burned some

21         bridges with some defense clients

22         by, quote, going to the

23         plaintiff's side, closed quote.

24               MS. SANFORD:  We absolutely

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1          did, and Carlene gave up a major

2          defense client to do this

3          litigation that funded her and her

4          family very well.

5               MR. HERMAN:  The last thing

6          I want to say about you and

7          Carlene is Louie L'Amour wrote a

8          lot about Texas and a pioneer's

9          spirit.  In one of the books, one

10         of his novels, he talks about a

11         female pioneer.  And the phrase he

12         used was, "She was fit to ride the

13         river with," which in those days

14         meant they would stick to it and

15         be tough.  Everybody wants to be a

16         pioneer, but we're looking at one

17         right now.  It would be a

18         discredit to us if we discounted

19         the work that you and Carlene did

20         in the early stages of the

21         litigation.  I'm glad you started

22         with that.  I want you to know

23         that we recognize it, and it is

24         meaningful.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1              MS. SANFORD:  Thank you for

2         that, Russ.  I have one request in

3         that regard.  If you decide that

4         it's time that's valuable and able

5         to be recompensed in this, I would

6         accept that.  If you decide that

7         it isn't, I would encourage you to

8         rethink that on Carlene's time, as

9         she couldn't continue because she

10        passed away.

11             MR. HERMAN:  We're not deep

12        thinkers, Carlene.

13             MS. SANFORD:  But I will

14        give you that.  This is what we

15        submitted to them.  It is roughly

16        the same amount of hours

17        previously, and that's what we put

18        in there.

19             Russ, the picture that

20        Carlene hung on her wall that I

21        now have, actually, is a quote

22        from Abraham Lincoln, and it says,

23        "A lawyer's time and advice are

24        her stock in trade."

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1           MR. HERMAN:  I'm just going

2      to read the front page for the

3      record, and then I'll turn this in

4      myself when I get back.

5           From January 1st, 2000 to

6      April 5th, 2005, Carlene Lewis had

7      3,079 hours, and Shelly Sanford

8      had 3,596 hours, and Jeff Larson,

9      29 hours.  That's really a

10     significant amount of time when

11     you are talking about a five-year

12     stretch before the MDL really got

13     geared up.

14          MS. SANFORD:  Thank you for

15     that.

16          Couple of just final

17     comments, and I thank you very

18     much for listening to me on this.

19          MR. LEVIN:  Shelly, will you

20     call the accountants to make sure

21     that the time is straight?

22          MR. SEEGER:  We told her

23     that, Arnie.

24          MR. LEVIN:  This time

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1          appears to be not in there.

2                  MR. SEEGER:  She just gave

3          it to us.

4                  MR. HERMAN:  She just gave

5          it to me.

6                  MR. LEVIN:  I know, but he

7          has to get it in there.

8                  MR. HERMAN:  I'll take care

9          of it.

10                 MR. SEEGER:  Go ahead.

11                 MS. SANFORD:  I communicated

12         with Lenny on it probably a month

13         ago just to make sure that it was

14         included, and he was looking into

15         it with Regina on that issue.

16                 I think that in regards to

17         myself and to Carlene, what I'm

18         most proud of in this litigation

19         is that I think we might be river

20         ready, but we have a dogged

21         persistence, and I think that's

22         tantamount to who she was, and I

23         hope that I was able to honor her

24         in that in following that same

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1       persistence.  We just loved

2       working with you guys and

3       appreciate the opportunity to have

4       done it and thank you for that.

5            MR. BLIZZARD:  Shelly,

6       sometimes the most valuable

7       contribution somebody can make is

8       to inspire other people, and I

9       think Carlene did that, and I

10      really thank you for inspiring us

11      this morning.

12           MR. BIRCHFIELD:  Amen.

13           MR. SEEGER:  Well said, Ed.

14           MS. SANFORD:  Thank you.

15                -  -  -

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1            C E R T I F I C A T E

2

3

4        I, LINDA L. GOLKOW, a Notary
    Public and Certified Court Reporter of
5    the State of New Jersey, Registered
    Diplomate Reporter, Federally-Approved by
6    the United States District Court of
    Pennsylvania, do hereby certify that the
7    foregoing is a correct transcript of the
    testimony as taken stenographically by
8    and before me at the time, place and on
    the date hereinbefore set forth.

9

10

11

        I DO FURTHER CERTIFY that I am
12    neither a relative nor employee nor
    attorney nor counsel of any of the
13    parties to this action, and that I am
    neither a relative nor employee of such
14    attorney or counsel, and that I am not
    financially interested in the action.

15

16

17

18    _____
    Linda L. Golkow, RDR, CRR, CCR
19    Notary Number:  1060147
    Notary Expiration:  1.2.10
20    CCR Number:  30X100176200

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

JANUARY 23, 2009

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

NEW YORK, NEW YORK

- - -

FIRM:  SEEGER WEISS, LLP
        Christopher A. Seeger, Esquire
        David R. Buchanan, Esquire
        Jeffrey Grand, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers, LLP
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                      -  -  -
 2             MR. SEEGER:  I have to agree
 3        with everything everybody has said
 4        here except for Mark.  It is very
 5        difficult to talk about yourself,
 6        but you did a good job.  It is
 7        very difficult to talk about
 8        yourself especially when you are
 9        looking around the table at a
10        group of men that I feel honored
11        to work with and I have worked
12        with to a great degree.
13             Arnold, as much as I pick on
14        you, you are kind of a father
15        figure to me, and I love you.
16             Russ, I call you an uncle.
17             Perry is like a brother.
18             MR. LEVIN:  What you just
19        called me is old.
20             MR. SEEGER:  Trying the case
21        with Mark Lanier was really the
22        highlight of my professional life,
23        I've got to tell you.  I loved
24        every bit of it.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

         1            Andy, you and I have
         2       different styles.  You are the
         3       real deal.  You are a pitbull.  It
         4       really has been an honor working
         5       with you.  You are trustworthy as
         6       much as anybody can be.  Your
         7       interests have always been in the
         8       litigation, and I appreciate that.
         9            Ed Blizzard, you are a
        10       lawyer's lawyer.  I'm always
        11       intimidated around you because I
        12       feel like I'm going to say
        13       something stupid.
        14            I guess this is our
        15       opportunity to talk about
        16       ourselves, and what I'm really
        17       most comfortable doing, rather
        18       than trying to characterize what I
        19       did or present it in a way that
        20       would convince any of you that it
        21       was great work or not great work,
        22       I'm going to kind of do it on a
        23       factual basis.  Jeff and Dave are
        24       here to help me with it because I

FAC Resp. Amended Exhibit D -- 1549

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1        want to make sure I hit

 2        everything.  The one thing I feel

 3        very confident in saying, like

 4        others -- by the way, if I leave

 5        anybody out here that I have

 6        worked with, I don't intend to do

 7        that.  I'm sorry.  I'm going to

 8        try to give everybody credit as I

 9        go along for what they've done.

10        No man is an island in this

11        litigation.  We all pulled

12        together.

13             The one thing that I would

14        say when I look back, one of the

15        things I'm most proud of, what

16        Andy and I tried to do, I think

17        from day one when you and I

18        spoke -- and trust me, when this

19        thing broke in September 2004,

20        Andy and I always cooperated.  I

21        knew Mark Lanier, I was in his

22        office, but we weren't working day

23        by day, side by side with each

24        other.  When the case broke, Andy
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1         had a group of lawyers that really

2         supported him.  I had a group of

3         lawyers that sort of supported my

4         leadership.  We both could have

5         taken a very individualized

6         approach to this, and we didn't.

7         Even when there were rooms filled

8         that were supporting you or maybe

9         I was in a room when there were

10        more supporting me, we stuck

11        together.  I wanted to end that

12        way.  I think it is important that

13        we end this the way we started it.

14        We went around the country giving

15        away our information to everybody

16        and saying, we've got to be

17        unified, this is a monster

18        defendant, we will never beat them

19        if we are divided.  It wouldn't

20        have happened unless we had

21        everybody here and beyond these

22        walls.

23             We're all very lucky, I

24        think, because we were able to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          share this together, and then it

2          ended on a great note, and I think

3          that's good.

4               I'm going to talk a little

5          bit about what we did.  Like

6          others, we were really there right

7          from the beginning.  I wanted Dave

8          and Jeff to be here because in

9          some respects I got appointed to

10         the PSC, I took a front role in my

11         trials, and I got appointed to the

12         negotiating committee, but I think

13         we know that a lot of the work in

14         this case has been done by these

15         two guys.  Their fingerprints are

16         on almost everything that's

17         happened.  That's from the

18         earliest rulings to every trial.

19         Let me start off saying what our

20         roles were.  In New Jersey, we

21         were co-liaison and really co-lead

22         counsel from, what was it --

23              MR. BUCHANAN:   2003.

24              MR. SEEGER:  -- 2003, which

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1       is around the time when Judge

2       Higbee got in the case.  We were

3       litigating in New Jersey well

4       before that in front of another

5       judge, Judge Wah in Middlesex

6       County, but when the case was

7       coordinated to Judge Higbee,

8       everything we had was sent to her.

9            In the MDL, we were co-lead

10      counsel, we were obviously on the

11      steering committee.  I co-chaired

12      the trial committee, Dave

13      co-chaired the discovery

14      committee, and we really had

15      significant participation in

16      everything.  We were on the

17      negotiating committee, and by the

18      way, just as a footnote, I agree

19      with Ed's sentiments and Arnie's

20      and Russ'. Some of us had moments

21      where our strengths shined when

22      they needed to, kind of like a

23      football team.  Some guys have a

24      good game when other guys don't,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1          but I always felt like we were

 2          hitting on all cylinders, and when

 3          we needed someone to step up and

 4          fill a void like on the documents

 5          and details, Andy stepped up on

 6          the big picture, and, Ed, I think

 7          you did a great job.

 8                  Russ had a tremendous

 9          relationship with Doug Marvin

10          which, obviously, got us a lot of

11          information that we needed in

12          order to get to where we were.

13                  Arnold was there with a lot

14          of his experience and wisdom, so,

15          it was a great team effort.

16                  In addition, Jeff, and I

17          don't remember if it was Dave --

18          were you on the trial committee?

19              MR. BUCHANAN:   Yes.

20              MR. SEEGER:  Jeff was

21          involved, Dave was involved in the

22          trial committee by virtue of his

23          role in the discovery.  Dave and

24          Jeff were also involved on the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1        stroke committee.

 2             Our work really breaks down,

 3        and I'm not going to go through

 4        this whole thing.  I've got these

 5        notes in front of me.  It was a

 6        PowerPoint this morning, and now

 7        it's notes, but we are not using

 8        it.

 9             We've really been involved

10        in implementation of almost

11        everything from the beginning.  We

12        developed and executed a discovery

13        plan in New Jersey.  By the time

14        the drug was removed and the case

15        was MDL'd, we already had roughly

16        10 million documents reviewed,

17        circulated.  Some of that was Mark

18        Lanier's work, some of that was

19        Andy's work.  I'm not just saying

20        "us," but I'm saying we were

21        involved from the moment the

22        litigation started.

23             We had probably hundreds of

24        depositions done at that point.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1        Andy will talk about his
 2        contribution, but I know Dave
 3        Miceli was out there very early
 4        taking depositions.  Let's be
 5        honest.  Depositions get taken two
 6        and three times in the case, and
 7        you are going to take one, Mark,
 8        and you are going to nail the
 9        points you need, and Dave will
10        take one, and he will nail the
11        points, and I will nail my points.
12        But those earlier depositions, it
13        is not just like you throw them
14        out and say they are useless.  It
15        is all part of like a snowball
16        rolling down the hill.  To have a
17        guy out there doing depositions in
18        2001 and 2002 helped us, I think,
19        very much later on down the road
20        when we were able to go back and
21        say, this is what we need to
22        elaborate on, now we know a little
23        more about the discovery record,
24        and build upon that.  That is the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

```
 1        way this case really developed.
 2        It built like a little tiny flake
 3        of snow, and it developed into a
 4        monster snowball rolling down the
 5        hill at one point, and we were
 6        really going strong around the
 7        time we settled.  We were geared
 8        up to continue trying these cases
 9        if we needed.  Troy had tried one
10        when it settled.
11             Just to highlight a few, and
12        you guys jump in, we negotiated
13        many of the early CMOs, and when
14        it comes to the electronic
15        discovery that was done in this
16        case, and we continued in the MDL,
17        I'm not saying one did anything
18        better than the other.  I'm not
19        comparing jurisdictions.  I think
20        we complimented each other very
21        well.  The transition from state
22        court litigation to MDL was
23        seamless.  Arnie, you have done
24        hundreds of these.  Name a time
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1    when we have had this kind of

2    state/federal coordination where

3    the transition from what was going

4    on in the state courts and the

5    federal court was as seamless as

6    it was here.

7         MR. LEVIN:  The fact that

8    you had a lead in both major

9    litigations helped.

10        MR. SEEGER:  It helped, and

11   when you look around at the people

12   we have here, we all knew --

13        MR. WEITZ:  Chris, I said it

14   during my presentation.  It was

15   your interfacing with the New

16   Jersey group and with the MDL.

17        MR. LEVIN:  Exactly.

18        MR. WEITZ:  It was your

19   charismatic nature and hard work

20   that really accomplished that.

21        MR. SEEGER:  I appreciate

22   that.  I have to be honest with

23   you, thank you for that, and I

24   appreciate that, and it is nice to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1       get that at a time like now when

2       we are making our record.  There

3       were a lot of people.  Perry, you

4       went along with it.  Lanier, as

5       stubborn as he is, you came on

6       board.  You could have gone it

7       alone, and you were ready to, but

8       we pulled together, and we

9       convinced each other it was the

10      right move.

11          Russ, from the minute he got

12      involved in the MDL, hit the

13      ground running.  You learned the

14      case in a day.  You were exactly

15      what we needed.  Your instincts

16      were always right on the money

17      with every single motion we

18      needed, everything we needed to do

19      in the MDL.  One thing about why

20      you are the greatest liaison

21      counsel in the country is because

22      you are a trial lawyer and you are

23      a state court litigator.  You

24      respect what goes on in the state

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1          courts, and you complimented it.
 2          Look, we all deserve credit for
 3          that.
 4               I don't want to put you guys
 5          on the spot.  Can you give a
 6          little background of what you did
 7          in discovery like the SAS data and
 8          what Dr. Krumholz worked on and
 9          Dr. Ray and all of these other
10          experts.
11               MR. BUCHANAN:   Sure.  To
12          dial it back a little bit, New
13          Jersey was an outgrowth of some of
14          the earlier state court litigation
15          and what was happening in other
16          jurisdictions.  By the time New
17          Jersey got going in 2003, there
18          had been some scattered litigation
19          in other jurisdictions, but not
20          really centralized productions and
21          a meaningful -- to what I was
22          aware of.  I know there was some
23          activity in California, but there
24          wasn't really a judge that had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1      been as engaged in the process as

2      Judge Higbee ultimately became.

3           What we were able to

4      achieve, I think, in the year

5      before the drug was withdrawn was

6      we got an electronic document

7      repository up and running.  We

8      opened it up to people outside of

9      New Jersey so that people could

10     connect in, have access to

11     information.   We started actively

12     litigating disputed issues with

13     Merck.  Most of the earlier

14     productions were, frankly, pretty

15     sparse, pretty incomplete, and we

16     litigated some very significant

17     motions to compel in state court

18     and New Jersey that led to the

19     millions of pages that we

20     ultimately got.

21          This is the first case that

22     I've been involved in where

23     clinical trial data was crunched

24     and recrunched and reanalyzed and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1           the company's contentions and

2           their published articles were

3           actively, I think, disputed in a

4           meaningful way with the underlying

5           data.  We recognized early on,

6           frankly, because early on, this

7           case was only about 50 milligrams,

8           it was only about very high dose

9           use, we realized early on that we

10          needed to get the underlying data

11          and recrunch Merck's information.

12          So, unsurprisingly, we had to

13          litigate that issue.  We litigated

14          and won that issue and got the

15          underlying SAS data and got it in

16          the hands of experts.  Frankly,

17          Dick Kronmal became an MDL expert,

18          was a New Jersey expert first and

19          was retained long before the drug

20          was pulled and was looking at this

21          issue to make a 25 milligram case

22          to make the low dose case because

23          we didn't believe it was only a 50

24          milligram case.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1          MR. SEEGER:  Then later it

2     was the 18-month spin.

3          MR. BUCHANAN:   Then later

4     it was the 18-month spin.  This

5     analysis, to my knowledge, is

6     unprecedented certainly in the

7     depth and the extent to which it

8     took place in this MDL.

9          Merck made some very

10     critical statistical contentions.

11     Initially it is only a high dose

12     issue, that was before the drug

13     was pulled.  Later, it is only an

14     18-month issue.  You had to use it

15     X number of days.  I mean, some of

16     these factors are packed in, I

17     know it is in the resolution

18     program and reflected discounts

19     associated with that, but

20     ultimately, I think Dick Kronmal,

21     Wayne Ray, Harlan Krumholz, Nick

22     Jewell, Doug Zipes, I think they

23     all ultimately worked with the SAS

24     data, but they all worked with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        that data and analyzed an

2        reanalyzed Merck's contentions,

3        and I think we were able to take

4        it to Merck.  We were able to take

5        it to Merck on their core

6        defenses, and we fought for and

7        got information that Merck viewed

8        as crown jewels.  The SAS data and

9        the CTS data, their clinical trial

10       database, we had to go up to the

11       appellate division in New Jersey.

12            MR. SEEGER:  The truth is on

13       this -- I'm sorry to cut you off,

14       because I know Andy has to get in

15       the car by 3:00, so I want to get

16       him done.

17            The orders that were issued

18       in the New Jersey litigation in

19       some respects have been

20       implemented.  I mean, he did his

21       own thing, but Judge Fallon,  I

22       think, liked parts of those, he

23       used them, and other judges have

24       liked parts of those and used

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          them, if not used them in whole.

2                We also were very much

3          responsible in New Jersey for

4          getting some of the Merck Frosst

5          documents out of Canada, which

6          anybody involved in the discovery

7          knows they were pretty important

8          documents.

9                MR. GRAND:  Let me point out

10         one thing.  The Board of

11         Scientific Advisors' programmatic

12         review was only found one place in

13         all of the custodial files that

14         were produced, and it was in Merck

15         Frosst documents.

16               MR. BUCHANAN:  30 million

17         pages that were produced in one

18         person's file, and it is a very

19         hot document.  It is probably

20         exhibit number 5, top 5 for

21         everybody.

22               MR. SEEGER:  One thing I

23         want to say, and I say this

24         because I'm proud of my partners,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1        both Dave and Jeff are my

2        partners, as you know, I know the

3        work they did, and it's been

4        mentioned around that table by

5        everybody.  There really isn't a

6        case that didn't have their

7        fingerprints.  Jeff and Dave were

8        very much involved with helping

9        people doing their

10       cross-examination modules, sort of

11       laying out the case.  Dave worked

12       with Egilman, who people who don't

13       know how valuable Egilman is, but

14       he's a genius.  I know what he did

15       for you, Mark, and getting you

16       ready for trial, and Jeff worked

17       very closely with him and so did

18       Dave, and they worked with some of

19       the more important guys, Krumholz.

20            Perry, when I look back, I

21       can't tell you how many times I

22       called Jerry Kristal for things

23       and he was always there for us and

24       your guys.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1           Same thing with Andy's

2       office.  Leigh O'Dell, we called a

3       number of times, and if Andy was

4       on trial, Leigh was always

5       available.

6           So, I just want people to

7       understand that we weren't just

8       sort of trying our cases in New

9       Jersey and then doing what we did

10      sort of publicly.  We were doing

11      as much as we could behind the

12      scenes to support everybody,

13      including making everything we

14      had, even before the MDL,

15      available to everybody.  We had

16      meetings and gave binders out.  We

17      didn't ask people to commit to pay

18      us or anything.  Andy, when I say

19      "we," I mean you and I and our

20      firms, because we were there, and

21      Mark, too.

22          We took a number of

23      depositions.  Dave and Jeff, you

24      can look at this, and I'm going to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1        wing it.  You tell us what needs

2        to be covered here.

3            A couple of things about the

4        trial, the Humeston trial.  Russ

5        said to me after the Humeston loss

6        the first time that the losses

7        hurt a lot more than the wins feel

8        good.  I have never forgotten

9        that, because that is really the

10       best way to sum up how you feel.

11       Put aside the fact that we got the

12       judgment vacated with the help of

13       a lot of great people, we retried

14       the case with Mark, but that loss

15       still hurts.  You still feel it.

16       I will say this, and, Mark, I

17       think you'd agree.  I wasn't a

18       potted plant in our first phase of

19       our trial.  I helped work on

20       witnesses.  I was on my feet a few

21       times, not as much as you were.

22       My guys were very much involved in

23       helping prepare.   After Phase I,

24       we did go on to do the damages

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1        phase, which we all know in this

2        litigation, I'm not going to say

3        is the real tough part, because

4        you have to convince them Vioxx

5        kills and causes heart attacks,

6        which we did as a team and Mark

7        does beautifully, you then have to

8        show it caused a heart attack in

9        your client.   We were able to do

10       that with the Humeston II trial.

11            Then we had to go to a third

12       phase to get around the caps, the

13       Idaho caps and prove that the

14       conduct was intentional and

15       reckless.

16            Then we got the punitive

17       damages, and we had to show the

18       conduct was oppressive and

19       egregious and ultimately got a $20

20       million compensatory verdict and

21       27.5 in punitives, which I agree,

22       I think that turnaround sent a big

23       signal to Merck.  It showed them

24       something not just about Seeger

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

```
 1        Weiss, but about all of us.  With

 2        Andy getting his cases, not giving

 3        up on the Irvin  -- was it Irvin?

 4             MR. WEITZ:  Plunkett.

 5             MR. BIRCHFIELD:  Irvin.

 6             MR. SEEGER:  Getting it

 7        thrown out and retrying the case,

 8        it showed them that we don't go

 9        away easily, that we were going to

10        take the fight right to the very

11        bitter end.  Even though Humeston

12        didn't go our way the first time,

13        despite the fact that everyone,

14        including Merck, I think thought

15        they won that trial.  I think the

16        only people who thought we didn't

17        lose were the jurors that weren't

18        against us.  But they knew we were

19        just going to keep coming.  I

20        mean, if we lost, we were going to

21        figure a way around it.  We got a

22        gift from them, and we were helped

23        by Don Arbitblit's deposition with

24        Dr. Curfman on the allies to the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

```
 1        New England Journal of Medicine,
 2        but we were able to get that
 3        judgment vacated and then
 4        ultimately fixed.
 5             When you talk about the
 6        scope of the litigation, we were
 7        involved with either taking or
 8        involved with probably 20 or 30 of
 9        the corporate reps for the
10        company.  Is that fair?
11             MR. BUCHANAN:   I think
12        that's clearly true.  Frankly, we
13        were involved in far more than
14        that.  The point on one of the
15        slides, and I just thought it was
16        interesting, I'm sure we all had
17        an opportunity to go back to our
18        records and were a little
19        surprised at how involved we were
20        or weren't at various points in
21        time, but I just found something
22        from the summer of 2004, and it
23        was interesting, because it
24        reflected kind of the group of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

 1          people that was working together,

 2          Andy's firm was among them, Mark

 3          together with Carlene Lewis, and

 4          her firm was still in there, but

 5          we were framing our deposition

 6          program, formalizing the 15

 7          depositions we were going to take

 8          before early spring trials 2004,

 9          and frankly, those depositions,

10          Brian Daniels, Wendy Dixon, Eliav

11          Ehrich, Beth Seidenberg, Sherwood,

12          Bold, Cannuscio, Simon, Anstice,

13          Gilmartin, Kim, Schechter,

14          Scolnick, Silverman, those

15          depositions were all done.  Those

16          depositions were all done,

17          frankly, by April of 2005.

18               MR. SEEGER:  We're not

19          saying that they were done to the

20          satisfaction of everybody in the

21          world that would have read them,

22          but through that date in time,

23          they were state-of-the-art until

24          we got more information.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

1             MR. BUCHANAN:   I'm not

2        saying they were all done by us.

3        Seven of them were done by us, and

4        we were involved in the others,

5        but there's a lot of people that

6        had a hand in this.  I just

7        thought it was reflective of

8        really there had been a lot of

9        document review and other

10       meaningful progress in the

11       litigation by that summer of 2004

12       so that we identified all these

13       key players and, frankly, several

14       others that were unearthed after

15       that.

16            MR. SEEGER:  Prewithdrawal,

17       there were three experts we had

18       spent a lot of time with.  Wayne

19       Ray, we really found Wayne Ray.

20       We retained him for the

21       litigation.  Dave was going to put

22       as part of the presentation the

23       $25,000 check to him.

24            Dick Kronmal we had

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          retained.  Although Egilman is on

2          here, Egilman was Mark Lanier's

3          expert, and I think we assisted in

4          getting him ready and prepping

5          him.  Dave and Jeff spent a lot of

6          time working with him.

7              When the drug was withdrawn

8          from the market, the first thing

9          we did is we went on the road,

10         Andy, specifically, and us, and we

11         went to California, we had

12         meetings in Atlanta, we had a

13         meeting here in New York,

14         Pennsylvania, Texas.  I remember

15         that was the first time I met Ken

16         Bailey, actually, was in a big

17         room where we were sitting around

18         strategizing about Multi-District

19         Litigation strategy.  I met John

20         Eddie, I think, at the same time,

21         although they were in separate

22         parts of the room.  A lot of

23         people that were involved in the

24         litigation.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1              We helped coordinate a

 2         strategy, which ultimately our

 3         strategy for the MDL was, the case

 4         was so mature, really it could

 5         have gone anywhere.  We didn't

 6         really advocate for a particular

 7         jurisdiction.  We were very happy

 8         that Judge Fallon got it, most

 9         specifically because he's a highly

10         experienced judge who knows how to

11         control the litigants in his court

12         and keep the litigation moving.

13         That is something he does, and as

14         we all know, whether you're a

15         defense lawyer or a plaintiffs'

16         lawyer, you can't ask for anything

17         more than that from a judge.

18              MR. BIRCHFIELD:  He's the

19         hardest working judge in America.

20              MR. SEEGER:  He's absolutely

21         the hardest working judge in

22         America, I agree with that, and

23         you can go into that when you talk

24         about Katrina, what that was like.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1           When the MDL was created, I

2      believe with Andy's office, it was

3      our two firms that put together

4      the background papers for Judge

5      Fallon that really got him up to

6      speed.  Russ, you reviewed it and

7      helped out on it, and you were

8      still getting up to speed at that

9      point, and Arnie, you were, too.

10          Like I said before, we gave

11     away binders.  We gave away a lot

12     of the documents.

13          I'm going through this

14     quickly.  We talked about the

15     repository.

16          With Curfman, David Graham,

17     Nissen, Eric Topol, everybody has

18     heard everybody's contributions on

19     that, but we were very much

20     involved with putting together,

21     whether it was a cross-examination

22     or direct, putting those in kits

23     and helping people.

24          MR. BUCHANAN:   We second

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1          chaired Curfman, Topol, Nissen,

2          Graham, and frankly, I think Jeff

3          and Moshe spent substantial time

4          with whoever the primary examiners

5          were in the weeks up until that

6          point in time.

7               MR. SEEGER:  Perry and Mark

8          mentioned this before, but you

9          can't really, I think, put a value

10         on the importance of continually

11         pushing our docket in New Jersey

12         and convincing Judge Higbee with

13         Merck's assistance, because Merck,

14         every time they went into the

15         courtroom, said they were going to

16         litigate every single case, that

17         she needed to work up a huge trial

18         pool of cases, and we were able to

19         convince her as a team that she

20         needed to work up 250 cases.  I

21         think that effort was led by Dave

22         and Jeff, because they were really

23         hustling to put those cases in,

24         and it was highly critical.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

```
 1              To give you a context here,
 2         I learned something today.  It was
 3         really important.  If you guys go
 4         back and look at it, you may want
 5         to supplement the record with this
 6         kind of information.  Our common
 7         benefit time, our hours are very
 8         big.  We double checked them, we
 9         cross checked them, they have been
10         checked by an accountant, they are
11         on the money, about 45, 48,000
12         hours.  Our case specific hours,
13         because we are like you, Russ, we
14         keep track of everything, is well
15         in excess of 100,000 hours.  Now,
16         that gets taken care of through
17         the cases, I understand that, but
18         just to give you an idea of Seeger
19         Weiss' commitment, about 4 and a
20         half to 5 million in cash that is
21         common benefit, and then millions
22         more to kind of get the cases put
23         together and to litigate the case
24         for stuff that will be compensated
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1      through our contracts but won't be

2      included in common benefit, it

3      gives you a picture of just from

4      one firm's perspective, and then

5      you have nine here that have that

6      kind of effort, too, just how big

7      this really was.

8           MR. BUCHANAN:   One point on

9      that.  We pressed very hard in New

10     Jersey for an aggressive case

11     specific discovery program.  It

12     was pretty clear that Merck wanted

13     to do things one at a time or even

14     ten at a time.  But in late 2006

15     and 2007, to try and put the

16     hammer down, we tried to put

17     forward blocks of 250 cases at the

18     time, and there were firms that

19     stepped forward in a big way.

20     Perry, I remember your office

21     working up a huge number of cases.

22          MR. GRAND:  25 cases.

23          MR. BUCHANAN:   25 cases out

24     of 250 you stepped forward with,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

```
 1        and I'm sure your office --
 2              MR. SEEGER:  I think you put
 3        in like 20 at the end.
 4              MR. WEITZ:  Then we put the
 5        22 in at the end that you said
 6        would buckle their knees, which
 7        was 53 out of the 250.
 8              MR. BUCHANAN:  Which we
 9        did, and it was a very good
10        initiative on our part for New
11        Jersey.
12              But I looked at the number
13        of case specific depositions we
14        ended up doing outside of our
15        trial cases in those cases, and I
16        think it was 120.  It is over 100
17        depositions we did case
18        specifically in cases that we
19        didn't put in common benefit time
20        for.  I think there was clearly a
21        benefit to everybody to that
22        initiative, and I don't know what
23        people are putting in for or not
24        putting in for, but I just thought
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1       that was really overwhelming.

2              The other aspect of that,

3       too, Jeff, is the sales rep

4       discovery.  We pushed for and got

5       Merck to produce thousands of

6       custodial files, thousands of

7       sales rep custodial files at great

8       time, at great expense, over great

9       objection.  There's no question

10      that that's the reason the

11      documents move from 10 million

12      pages to 30 plus million pages

13      over the years.

14             MR. GRAND:  It is

15      measurable.  If people go back and

16      look at the financial statements

17      that Merck was putting out in the

18      last two years of litigation, and

19      you look at their set-asides for

20      defense costs, one year, the year

21      in which we got the 250 case

22      workup ordered, and the year in

23      which they had to produce over

24      1,000 custodial files in one year,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1           their defense costs jumped from

2           300 million to over a billion.

3           When it crossed that billion

4           threshold, there was no looking

5           back.

6                    MR. SEEGER:  They knew they

7           were in a battle at that point.

8                    Just to give you a flavor

9           for some of the key motion

10          practice that we were involved in.

11          Now, Arnold handled a lot of this

12          with Russ in the MDL, and some of

13          it kind of worked together, and

14          some of the issues you dealt with

15          were unique to the MDL like the

16          FDA discovery, which we didn't

17          have that going on in state court.

18          But there were some  things we

19          were able to build a foundation in

20          state court.  We did fight

21          preemption, you did it also,

22          Arnold, but we had to deal with it

23          in New Jersey.

24                   We had all kinds of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

 1          Landrigan/ Rubanick, which is the

 2          Daubert version in New Jersey,

 3          challenges to our prostacyclin

 4          hypothesis, the 18-month defense,

 5          the use of VIGOR and APPROVe, the

 6          correction, because they weren't

 7          peer reviewed.  So, we had issues

 8          there whether they were learned

 9          treatises, evidentiary issues.

10          They wanted to preclude FDA

11          experts.  We fought those battles

12          in state court.  These were

13          battles that Andy fought, as well,

14          but they had to be dealt with on

15          multiple fronts.  It wasn't

16          duplicative.  He had to do it his

17          way in front of Judge Fallon, and

18          we had to do it here.  But it was

19          all useful, it all worked

20          together, and it was stuff other

21          people could use.

22               The CLASS effect was a big

23          issue.  We could go on and on

24          about all of the things not just

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1          we, but that everybody did.  I'm

2          not going to bore you all with it.

3          You have all seen the theme grids.

4          I believe that started here, at

5          least steaming it out.  It then

6          became like a snowball.  Others

7          came in, made it better, made it

8          what it is today.

9               MR. BUCHANAN:   It is

10          important to note on the theme

11          grid, that exhibit database was

12          built for our first trial.  It was

13          built for Humeston I in the summer

14          of 2005, and Chris mentioned the

15          dozens of depositions that we

16          either took or were directly

17          involved in.  I mean, the

18          depositions, sure, that's a day or

19          two, but frankly, there were

20          people like Jeff and Tom Moore who

21          worked very closely with our firm,

22          me and other people, Chris, who

23          reviewed the millions of pages

24          necessary to take those

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1          depositions.  The exhibits that

2          were used or not used ultimately

3          got dumped into the theme grid.

4          We had a lot of input and help

5          from Pete Kaufman and some other

6          people in the PSC that helped out

7          when we really needed help to get

8          ready for the trial.  It was a

9          true collaborative effort.  It was

10         those depositions and the document

11         review that was the foundation,

12         and we freely shared it with

13         everybody after that.

14              MR. SEEGER:  I'm going to

15         conclude because I want Andy to

16         get going, he has to be out of

17         here by 3.

18              I try to take a very

19         realistic approach of what my firm

20         does, what my partners do, what

21         our contributions are.  In the

22         litigation, I think our

23         contributions were above and

24         beyond.  I give my partners most

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1        of that credit.  The work they did

2        was phenomenal.  If anybody was at

3        one of our trials, Humeston I or

4        II, and they saw Dave standing up

5        in that courtroom after we went

6        through a witness or an opening

7        statement or closing statement,

8        fighting off the objections of

9        that defendant, you would have

10       seen the work was masterful.  The

11       work done on the litigation was

12       masterful.

13            As far as my role in the

14       settlement negotiations, look, we

15       all know what I do best, what I

16       don't do best.  I'm not a detail

17       guy.  I'm not going to be losing

18       myself in details or confusing

19       anybody trying to act like I

20       understand them.  I'm kind of a

21       compromiser.  I try to build

22       alliances, I try to get

23       information and work things the

24       way I work them.  When there's

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

 1          disagreement in the group, I try

 2          to harmonize it.  I think I did a

 3          pretty good job doing that.

 4               I think I gave my views on

 5          the settlement that were helpful

 6          at times, and I knew when I was

 7          going to get in the way because I

 8          didn't want to read every "I" that

 9          was dotted or "T" that was

10          crossed, I got out of the way.

11               MR. LEVIN:  That's because

12          we didn't have to.  Ed and Andy

13          were doing it.

14               MR. SEEGER:  Ed and Andy

15          were doing it, and you know what,

16          we trusted them 100 percent

17          because we knew they were doing it

18          perfectly.

19               I'm going to conclude on

20          this.  In my firm, which is a

21          large firm, it's 30 lawyers, and

22          we have a lot of support staff.  I

23          say this humbly, and I hope my

24          partners sitting here don't think

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          I'm saying anything offensive.

2          I'm going to try to say this as

3          carefully as possible.  Most of

4          the revenue generation in this

5          firm is in these kinds of cases,

6          which I originate and work with

7          this team.  This is our mass tort

8          team.  When we're spending the

9          kind of hours that we're spending

10         on this litigation, you can trust

11         me when I tell you, this is not

12         something I'm bragging about, but

13         Vioxx at some point became a bet

14         the house proposition at Seeger

15         Weiss.  We were not out doing a

16         lot of other things.  The revenue

17         that is usually generated on the

18         cases I start and work with my

19         brilliant partners on wasn't

20         coming in because we were working

21         on Vioxx.  We were doing other

22         things, and I'm not going to say

23         we didn't do anything else, but

24         nothing that was generating the

FAC Resp. Amended Exhibit D -- 1588

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1          kind of revenue that we needed to

2          for the opportunities that we were

3          foregoing for doing this

4          litigation.

5               I'm going to conclude on

6          this one note.  Besides me and

7          Dave -- Dave's background, if you

8          all know, was at Fried Frank for

9          many years, a big defense firm,

10         used to defend cases like this,

11         came over in 1999, and his

12         reputation speaks for itself.

13         Anybody that has worked with Dave

14         knows that.

15              Jeff also comes out of a big

16         firm and has built a tremendous

17         reputation in this case, frankly.

18         People learned who he was and the

19         great work that he did.

20              Moshe Horn, also a partner,

21         Lawrence Nassif, also a partner.

22         Dion Kekatos, who did the briefing

23         in Local 68, also a partner.  We

24         had partners working on this case.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          Dion ran the appellate division in

2          the immigration department in the

3          U.S. Attorney's Office in the

4          Southern District of New York for

5          13 years.  He did the appellate

6          briefing in Local 68 which,

7          Arnold, as you know, allowed us to

8          open up a two-front war for a

9          while because we had the PI stuff

10         going, but while we had a

11         nationwide class certified for the

12         third-party payors, it was a

13         multi-billion dollar litigation

14         for them on that front alone.

15              MR. LEVIN:  It was a good

16         ride for us.

17              MR. SEEGER:  It was a good

18         ride.

19              I'm going to conclude with

20         that because I would like Andy to

21         speak, but I do want to say, once

22         again, everybody, we were all in

23         the right place at the right time.

24         Our talents came to bear at the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1        right place at the right time,

2        everybody at this table.  I

3        appreciate it.  It was great.  I

4        hope we get to do this again.

5             MR. LEVIN:  Having sat here

6        and know the time constraints, and

7        in particular know what Russ'

8        affidavit and the brief stated

9        with regard to the eight percent

10       fee that we're seeking, I would

11       suggest that we incorporate those

12       documents by reference for this

13       particular transcript.

14            MR. BIRCHFIELD:  Russ'

15       affidavit?

16            MR. LEVIN:  Russ' affidavit,

17       as well as the brief itself, the

18       factual elements.

19            MR. SEEGER:  It is all laid

20       out.

21            MR. LEVIN:  Because it will

22       fill in gaps that are not there in

23       the 30-minute presentation.

24            MR. SEEGER: I think I went

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1          32 minutes, so, I apologize.

2                    MR. LEVIN:  You spoke fast.

3                    MR. BLIZZARD:  I'll take

4          another minute from Andy.  I do

5          want to point out that when we

6          were in New Orleans working on the

7          details, Andy and I, the last few

8          nights, we had tremendous support

9          from Jeff and Dave.

10                   MR. SEEGER:  I'm sorry.  I

11         forgot about that.

12                   MR. BLIZZARD:  And Leigh

13         O'Dell.

14                   MR. SEEGER:  That's true.

15         Mark will remember this from our

16         trial.  No one man is an island

17         except for Flavahan.  We put him

18         on an island.

19                   Thank you.

20                       -   -   -

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

```
 1                C E R T I F I C A T E

 2

 3        I, LINDA L. GOLKOW, a Notary
      Public and Certified Court Reporter of
 4    the State of New Jersey, Registered
      Diplomate Reporter, Federally-Approved by
 5    the United States District Court of
      Pennsylvania, do hereby certify that the
 6    foregoing is a correct transcript of the
      testimony as taken stenographically by
 7    and before me at the time, place and on
      the date hereinbefore set forth.

 8

 9

          I DO FURTHER CERTIFY that I am
10    neither a relative nor employee nor
      attorney nor counsel of any of the
11    parties to this action, and that I am
      neither a relative nor employee of such
12    attorney or counsel, and that I am not
      financially interested in the action.

13

14

15

16

17
      _____
18          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147
19          Notary Expiration:  1.2.10
            CCR Number:  30X100176200
20

21

22

23

24
```

FAC Resp. Amended Exhibit D -- 1593

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

DECEMBER 1, 2008

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

ATLANTIC CITY, NEW JERSEY

- - -

FIRM:  SHELLER, P.C.
       Brian J. McCormick, Jr., Esquire
       Claudine O. Homolash, Esquire

BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -

 2              MR. SEEGER:  We do have a

 3         court reporter keeping track, so,

 4         if you could just put your names

 5         on the record when you start

 6         speaking.

 7              MR. MCCORMICK:  Brian

 8         McCormick, and with me is Claudine

 9         Homolash from the Sheller firm.

10              MR. HERMAN:  I'm sorry.  I'm

11         Russ Herman.  I don't think we've

12         met.  And would you give me your

13         partner's name, Sharon?

14              MR. MCCORMICK:  Claudine

15         Homolash.

16              MR. HERMAN:  Claudine?  How

17         does Claudine spell her name?

18              MS. HOMOLASH:

19         C-L-A-U-D-I-N-E.

20              MR. HERMAN: No, no, your

21         last name.

22              MS. HOMOLASH:

23         H-O-M-O-L-A-S-H.

24              MR. SEEGER:  Go ahead.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1            MR. MCCORMICK:  I'm going to
2       be brief.  I'll get you guys get
3       back on schedule.
4            Thanks for giving us a
5       chance to make a brief
6       presentation.
7            The affidavit that Steve
8       Sheller from my firm presented
9       back on October 31st, 2008, that
10      affidavit was based on a number of
11      discussions and conferences with
12      several of the attorneys who
13      worked on the various Vioxx
14      matters at the time in our firm.
15      I'm going to concentrate primarily
16      on three attorneys who worked
17      primarily on Vioxx matters from
18      the Sheller firm over the course
19      of 2005 and 2006.
20            Haile DeBass was one of the
21      attorneys who began work in
22      February of 2005, several weeks
23      before the MDL began.  Jonathan
24      Shub, another one of our

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1      attorneys, Gregory Waks.  Jon Shub

2      began work early in the case

3      working on the assessment and view

4      of the case.  He worked primarily

5      on the third-party payor complaint

6      in the beginning.  Mr.  DeBass'

7      became one of the managers of the

8      New York document depository at

9      Seeger Weiss.  He assisted Michael

10     Wagner of Seeger Weiss very

11     carefully, very closely.  Some of

12     his primary responsibilities that

13     he was given over the course of

14     the time were he would train the

15     other attorneys and the

16     paralegals.  He was asked to

17     allocate assignments among the

18     attorneys and the paralegals.  He

19     organized and managed the

20     deposition packages.  He helped

21     Michael Wagner allocate the seats

22     at the depository, which I

23     understand were scarce at times,

24     and he worked with Penny Herman at

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1     the document depository in New

2     Orleans on a pretty regular,

3     almost daily basis.

4          Mr.  DeBass responsibilities

5     were greatly increased in the fall

6     of 2005 after Hurricane Katrina

7     when he took over and the New York

8     depository became the primary

9     depository, and then again when

10    Mr. Wagner began to assist the

11    various attorneys at trial, was

12    traveling around the country.  I

13    think that the people who worked

14    with them on a daily basis at the

15    depository would say that, for a

16    while, Mr.  DeBass was the de

17    facto manager of the depository.

18         Mr. DeBass also helped work

19    on several of the bellwether cases

20    by preparing and organizing the

21    exhibits for use at trial and

22    preparing the trial exhibit

23    outlines.  One of the projects he

24    was able to specifically describe

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

1      was one with Dave Buchanan where

2      he worked for several days that

3      turned into several weeks on a

4      label project.  He also worked

5      extensively with the SAS database

6      and assisted the experts in

7      pulling documents and reviewing

8      that.

9           The way I understand it,

10     after Hurricane Katrina, Mr.

11     DeBass and several of the other

12     Sheller attorneys, including Mr.

13     Waks, became the primary attorneys

14     at the Seeger Weiss depository

15     working on the documents.

16          We also provided a paralegal

17     for the Humeston trial here in

18     Atlantic City in the fall of 2005,

19     who lived in Atlantic City.  His

20     name was Joseph Yanick.

21          Mr. Shub has made me aware

22     that he worked with several of the

23     other attorneys both in the

24     personal injury cases and the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

 1      third-party payor cases and

 2      interviewing and working with some

 3      of the experts.

 4            When Mr. DeBass began to

 5      become more busy with the

 6      administrative-type tasks in New

 7      York at the depository, we moved

 8      another attorney from our office

 9      named Gregory Waks up to New York,

10      who was working 12 to 13-hour days

11      in the document depository.

12            And, basically, to go

13      through the factors that are set

14      forth in rule or PTO 6(D),

15      substantial contribution, I think

16      has been explained, but any

17      attorneys who worked with Mr.

18      Shub, Mr. DeBass and Mr. Waks, I

19      think, recognize their

20      contribution.

21            The quality of the work,

22      Mr. DeBass' work, I believe was

23      unquestioned as he took on and was

24      given many more responsibilities

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

```
 1          than simply a document reviewer.
 2               Mr. Shub's work is known to
 3          many of you here, and I think is
 4          unquestionable.
 5               The consistency and duration
 6          of the work that the Sheller firm
 7          did, the firm dedicated several
 8          attorneys to the litigation.  It
 9          began in the very beginning, our
10          first time entry was in February
11          of 2005, and then the last entry
12          was in October of 2006, when 5,000
13          hours was billed individually by
14          the different attorneys at
15          Sheller, to the litigation.
16               The assistance of bellwether
17          cases, while we didn't try any of
18          the cases, Mr. DeBass was
19          apparently enormously helpful in
20          preparing for many of the trials,
21          and we dedicated a paralegal to
22          that trial team and offered help
23          wherever needed.
24               On the leadership
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

 1          committees, Mr. Shub served on the

 2          leadership of the third-party

 3          payor committee, and Mr. DeBass

 4          was very active in the discovery

 5          and trial preparation committees

 6          and the conference calls and the

 7          weekly meetings.

 8              All time spent by Sheller

 9          was specifically authorized or

10          requested by a member of the PSC

11          or one of the other committees.

12          It was never taken for granted

13          that their work was going to be

14          just done randomly.

15              I think it is important to

16          remember that the Sheller

17          attorneys did the unsung work, the

18          discovery work that, frankly, no

19          one really wants to do, but is

20          critical to a case like this.

21          After Mr. DeBass began to work

22          closely with Mr. Wagner and Ms.

23          Herman, then he took over more of

24          the responsibilities of the New

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

1      York depository.  As I said, he

2      was de facto manager.

3          I think it's also important

4      that Sheller, after we got into

5      the litigation through Mr. Shub's

6      different relationships, we

7      staffed it with very experienced

8      and able attorneys and really dug

9      into the work.  Many of the

10     attorneys who worked on that

11     project are still working on some

12     of the related cases and we

13     supported the cases to the end.

14          That's all I have.  I don't

15     have a PowerPoint, but I'm willing

16     to take questions on the work.

17          MR. SEEGER:  I have to make

18     the committee aware of something,

19     because it might be strange to

20     you, because John Shub is a

21     partner of mine.  John Shub was at

22     Sheller's office, and I forget

23     exactly when, about a year or so

24     ago, maybe two years ago,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1      transferred his practice to Seeger

2      Weiss.  I am very familiar with

3      what he did.  DeBass, he was a

4      contract lawyer for Sheller,

5      right?

6           MR. MCCORMICK:  Yes, he was.

7           MR. SEEGER:  We're talking

8      about document review,

9      essentially, right?  I want to

10     make sure I understand.

11          MR. MCCORMICK:  Right.  We

12     are.

13          MR. LEVIN:  Of your 1,800

14     hours that are recorded here by

15     the accountants, close to 1,400 of

16     it is from a contract employee.

17     Was he an attorney or a paralegal?

18          MR. MCCORMICK:  He was an

19     attorney.

20          MR. LEVIN:  How long was he

21     out of law school?

22          MR. MCCORMICK:  Mr.

23     DeBass had been -- I don't know

24     his exact resume, Arnie.  I would

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1          have to look that up.

 2                  MR. LEVIN:  But he was just

 3          picked up for this case?

 4                  MR. MCCORMICK:  I think he

 5          had worked on several cases with

 6          Sheller before and with Mr. Shub.

 7          I don't think he was picked

 8          specifically for the Vioxx case.

 9                  MR. LEVIN:  MR. Shub was the

10          most senior attorney that worked

11          on this case?

12                  MR. MCCORMICK:  Yes, he was.

13                  MR. LEVIN:  He had 162

14          hours, and DeBass had 1,388; is

15          that correct?

16                  MR. MCCORMICK:  I believe it

17          is more hours than that, but I'll

18          have to check on that.

19                  MR. LEVIN:  Was DeBass in

20          New York -- did I pronounce his

21          name right?

22                  MR. MCCORMICK:  It's DeBass.

23                  MR. LEVIN:  There's no E on

24          the end.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1            There were two depositories

2     in New York, as I understand it, a

3     third-party depository?

4            MR. SEEGER:  Yes.  I

5     actually know this.  The review

6     they did was really limited to the

7     third-party payors.  John Shub did

8     not have a leadership role in

9     those cases, but he --

10           MR. LEVIN:  He worked the

11    third-party cases.

12           MR. SEEGER:  Right.

13           MR. LEVIN:  And the

14    third-party cases was the Local 68

15    and others?

16           MR. SEEGER:  Correct.

17           MR. HERMAN:  Were the hours

18    kept contemporaneously or are

19    these reconstructed or do you

20    know?

21           MR. MCCORMICK:  They were

22    kept contemporaneously.

23           MR. HERMAN:  I'm sorry?

24           MR. MCCORMICK:  They were

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

 1        kept as they went.
 2              MR. HERMAN:  Okay.  Just so
 3        you will know and the record is
 4        clear, in the fall, on August 29,
 5        2005, Katrina hit New Orleans.
 6        That depository was moved to
 7        Houston and up and running in
 8        October of 2005.
 9              Penny Herman, I don't know
10        what Mr. DeBass did to work with
11        Penny Herman after 2005, but I'd
12        like to know more specifics on
13        that, because that depository
14        was -- the MDL depository was kept
15        in my office, and I'm not doubting
16        that he came and worked in that
17        office --
18              MR. MCCORMICK:  I don't
19        think he worked in that office.
20        I'm sorry if I've misled you.  I
21        meant he worked or was in contact
22        with Ms. Herman during the
23        turnover.
24              MR. HERMAN:  Okay.  I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1        understand.

 2               Because various requests

 3        would be made of the MDL

 4        depository.  She would relay those

 5        requests, if the material wasn't

 6        in the MDL depository, either

 7        to -- or generally to the

 8        depository in Chris Seeger's

 9        office and to Andy Birchfield's

10        office.  I suppose he would be one

11        of the people in New York that

12        would respond to those requests.

13               MR. MCCORMICK:  I'll try

14        and find out more.

15               MR. HERMAN:  I think I have

16        it now.  In other words, he was

17        working in New York at a

18        depository, and a request would

19        come in from the MDL depository,

20        he would respond.

21               MR. MCCORMICK:  Right.

22               MR. WEITZ:  How many cases,

23        individual cases has your firm

24        submitted to the settlement?
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          MR. MCCORMICK:  I believe

2      88 at this point.

3          MR. WEITZ:  Did your firm

4      work up any individual cases in

5      either the MDL or any of the other

6      state jurisdictions for trial?

7          MS. HOMOLASH:  We have just

8      plaintiff depositions.

9          MR. WEITZ:  Did you

10     participate in any of the trials

11     as a second chair or first chair?

12         MR. MCCORMICK:  No, none of

13     our attorneys did.

14         MR. WEITZ:  Thank you.

15         MR. SEEGER:  Thank you very

16     much.

17         MR. MCCORMICK:  Thank you.

18         MR. HERMAN:  Appreciate you

19     coming in.

20              -  -  -

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1               C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13               I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147

23          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
DECEMBER 3, 2008
- - -
HOUSTON, TEXAS
- - -

FIRM:          THE BRANCH LAW FIRM
               Turner W. Branch, Esquire
               Cindy Zedalis, Esquire
               Margaret Moses Branch, Esquire


BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC
EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers


THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP


W. MARK LANIER, ESQUIRE
The Lanier Law Firm
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman


TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.


CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR
          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

 1              - - -
 2              MR. GIRARDI:  Thank you.
 3              MR. BRANCH:  Cindy Zedalis
 4         from our office is going to
 5         present a summary, and I felt it
 6         was important to come and answer
 7         any questions you might have and
 8         to tell you that I did do my very
 9         best to attend.  I didn't miss any
10         of Judge Higbee's meetings in New
11         Jersey.  I think that can all be
12         verified by the attendance roles.
13         We did participate actively, I
14         think -- well, I don't think, I
15         know that were actively involved.
16              We had cases that we were
17         getting ready for trial.  We had
18         11 cases that we were putting up
19         for trial.  A lot of this I'm just
20         summarizing because we did make a
21         submission.
22              Those of you who were in New
23         Jersey, I saw on a regular basis.
24         Arnold, you were there.  Perry, I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          saw your office and you many

2          times.  Mr. Lanier, I saw there.

3          And I certainly saw my good friend

4          at the end of the table there.  We

5          never got to try a case.  We

6          tried.  We had two cases, Mary

7          Velasquez and Senator Ben

8          Altamirano from New Mexico up for

9          trial.  I thought they were good

10          plaintiffs.

11              Senator Altamirano was

12          President Pro-Tem of the New

13          Mexico Senate, and he had a

14          myocardial infarction associated

15          with Vioxx, and, unfortunately, he

16          had another myocardial infarction

17          a year ago tomorrow and died.  We

18          think that was probably

19          associated.  But he was one of the

20          clients we were putting up, as was

21          Mary Velasquez.

22              We participated whenever

23          asked by Eric Weinberg or others

24          on any study.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1            We did, and I think you can
 2        verify this, maybe some of you
 3        don't know, but we did retain, and
 4        I think she would tell you, Lynn
 5        Baker early on before anyone here
 6        did about checking out some
 7        conflict problems that we thought
 8        might exist.  And I think Mr.
 9        Lanier, Mark, can tell you that.
10        Some of her work was merged into
11        what happened eventually in the
12        global settlement, but I don't
13        take credit for her answering
14        questions that existed in the
15        global, but we did retain her
16        early on, like 2004, to address
17        those matters.  And then some of
18        the questions she did address
19        eventually while the settlement
20        was going on which we didn't know
21        about.
22            Here's Margaret.
23            (Whereupon, there was a
24        brief recess.)
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1              MR. BRANCH:  Do I take

2         credit for any new ideas or

3         creative ideas that hadn't been

4         developed by others?  No.  Do I

5         expect an extraordinary amount for

6         our effort?  No, we don't.  We

7         would just ask that we be treated

8         fairly, and I think our time

9         substantiates what we did.  I'll

10        be happy to answer questions.

11             I wanted to be here out of

12        respect for each of you, and I'm

13        honored to appear before you and

14        to thank you for what you guys did

15        for a lot of people that were

16        injured.  I know there's a lot of

17        complaints from time to time and

18        you are never given credit for

19        what you do, but I will say thank

20        you to all of you for what you

21        have done because I think you've

22        helped a lot of people that

23        otherwise would get no help.

24             I think with that, I will

Page 6

 1          let Cindy summarize.  Cindy
 2          Zedalis worked on this case for
 3          almost six years.  She's an
 4          attorney in our office, went to
 5          University of California Law
 6          School and works with our office.
 7          Her husband is a pediatric
 8          oncologist in Albuquerque, and he
 9          temporarily got transferred to
10          Tulane University Medical School,
11          and she attended the MDL, a lot of
12          those in New Orleans, but we were
13          mainly active in New Jersey with
14          Judge Carol Higbee.  I don't think
15          Cindy missed any hearings either.
16               We had three other people
17          working on this in our office.
18          Once the settlement was reached,
19          we had over, I think, about 28
20          people working on settlement
21          packages, contract folks.
22               MR. LEVIN:  How many cases
23          did you put in the settlement,
24          Turner?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          MR. BRANCH:  We're going to

2     tell you, but it is 1,919 cases --

3          MR. LEVIN:  It was a good

4     year.

5          MR. BRANCH:  -- we submitted

6     settlement packages on.

7          MS. ZEDALIS:  That's as of

8     Monday.

9          MR. BRANCH:  As of Monday.

10    I don't think it's growing much.

11    Cindy, you can address that.  I

12    think we're pretty much done.

13         MR. LEVIN:  Turner, that was

14    the year you and I were born.

15         MR. BRANCH:  That's right.

16    But we were fortunate enough to

17    work with other attorneys on

18    referrals, and we got a lot of

19    help from the New York attorneys,

20    and I certainly want to give

21    credit to that and to Mark Lanier

22    for helping us.  We were able to

23    -- most of our cases are

24    co-counsel cases, to submit that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1       many claims packages.  I think the

2       staff did a really good job on

3       those.  I don't take any credit

4       for those.  I did learn how to do

5       a claims package, and I can do

6       one.  I didn't do a lot of them.

7       I mainly complained, let's see

8       what we had done.  They did a good

9       job.

10              Cindy, I'll let you kind of

11      summarize what you think some of

12      our contributions were.

13              I was at the Borgata enough

14      to get a black card for playing

15      blackjack.  I don't know how long

16      you have to be there to do that,

17      but I did get a black card.

18      That's kind of it.  It's been an

19      interesting experience.  It has

20      been some of the most challenging

21      litigation.  Again, I think the

22      credit goes to all of you for

23      getting the results you did, and

24      we contributed a little, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1      that's about it.

2            Cindy, do you want to kind

3      of summarize?

4            MS. ZEDALIS:  I had passed

5      around kind of a highlight sheet,

6      a cheat sheet, basically

7      summarizing the work that our firm

8      did for the common benefit of all

9      the plaintiffs in the litigation.

10     And of the 7400 hours of legal

11     time that we incurred, none of

12     that was incurred for discovery of

13     our individual cases.  I was the

14     person responsible for going

15     through all the time sheets and

16     basically cutting out anything

17     spent on obtaining discovery from

18     clients, doing PPFs, which really

19     took up a large chunk of most

20     people's time, which I'm sure you

21     are all familiar from complaints

22     from your staff.  With the

23     exception of our trial cases, none

24     of that time is reflected in the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

```
 1          74 hours.  This was all --
 2               MR. LEVIN:  7400.
 3               MS. ZEDALIS:  7400 hours.  I
 4          don't think we would be here if it
 5          was 74 hours.
 6               So, in preparation, we had
 7          filed almost 2,500 claims,
 8          individual claims.  The majority
 9          of them were in New Jersey, 780 in
10          the MDL, almost 200 in the Texas
11          MDL, 238 in New Mexico that were
12          ultimately transferred to the MDL,
13          and the remaining in Washington,
14          D.C.  As Turner told you, we had
15          filed a little over 1900 cases or
16          enrolled 1900 cases and are either
17          dismissed or in the process of
18          dismissing some of those that
19          don't quite meet the settlement
20          criteria.
21               MR. HERMAN:  The CPA that's
22          getting all the information, I
23          would call and check with them.
24          You can e-mail my office.  I'll
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          give you the e-mail of my partner,

2          ldavis@hhkc.com.  Ask him to put

3          you in touch with Phil Garrett so

4          you can check with them

5          particularly on the expenses you

6          submitted.  He's an independent

7          CPA appointed by the Court.  He

8          doesn't have any connection in

9          doing any personal work for any of

10         the lawyers or firms.  I would say

11         50% of all firms submitting time

12         costs, they are going through

13         these and checking, and a number

14         of us have had to go back and sit

15         with them and explain things,

16         particularly on the costs.  I

17         don't know how much of your costs

18         right now they have accepted and

19         how much they haven't.

20              MS. ZEDALIS:  Will they tell

21         us?

22              MR. HERMAN:  Absolutely.

23              MS. ZEDALIS:  Because this

24         has been vetted.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1           MR. HERMAN:  Not only do
2      they tell you, they are there to
3      help, not to discourage.
4           MS. ZEDALIS:  I see.  That's
5      helpful.
6           MR. LEVIN:  Let me direct
7      myself to that.  We're in Houston
8      and we have a problem.
9           According to the accountant,
10     you have 323 hours approved.  That
11     means there's no hours under
12     submission, there's no hours that
13     are rejected.  Somehow they don't
14     have all of your hours.  According
15     to the accountant, you never
16     submitted any costs, and they
17     never approved any costs.  You
18     have to do what Russ says to
19     straighten that out.
20          MS. ZEDALIS:  I know we have
21     e-mail confirmations.
22          MR. LEVIN:  That's a big
23     difference, very big difference --
24          MR. HERMAN:  Fastest way to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          do this, I know you have a lot of

2          money at stake here, is call

3          Lenny, and he'll connect you with

4          Garrett.  Spend whatever time.  A

5          lot of the firms, I don't know how

6          many have gone to their office and

7          spent three or four hours and come

8          out of there with everything

9          reconciled.

10              MS. ZEDALIS:  I know our

11          package was about this thick, and

12          I thought we FedExed it also and

13          we e-mailed it because it was too

14          large for a single attachment, but

15          maybe something happened.

16              MR. BIRCHFIELD:  On the

17          expenses, and I know you will work

18          that out with the accountant, but

19          is this primarily -- what's

20          reflected in these expenses?  You

21          had mentioned --

22              MS. ZEDALIS:  Travel

23          expenses to and from Albuquerque

24          to New Jersey.  Travel expenses to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1          and from Albuquerque and New

 2          Orleans.  It's CLE conferences.

 3          It reflects -- we had payments

 4          made to the law firms, the Legal

 5          Consortium.  I think there were

 6          two payments of $25,000 apiece.

 7               MR. LEVIN:  That was in New

 8          Jersey?

 9               MS. ZEDALIS:  That was for

10          the New Jersey litigation.

11               MR. LEVIN:  As we

12          anticipate, that cost will come

13          back out of that fund because the

14          New Jersey leadership are going to

15          file a separate affidavit for

16          those costs, and when they are

17          approved, you will get your

18          $50,000 back.  So, they shouldn't

19          be in here.

20               MS. ZEDALIS:  Okay.

21               MR. SEEGER:  Wait a second

22          though.

23               MR. LEVIN:  It is an

24          assessment.
```

FAC Resp. Amended Exhibit D -- 1624

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

```
 1              MR. SEEGER:  No.  But the

 2         Jersey assessments weren't

 3         $50,000.  Was that for a specific

 4         project?

 5              MR. BRANCH:  I don't know.

 6         Why don't you check with the

 7         accountant.

 8              MR. LEVIN:  That's a

 9         different consortium.

10              MR. BRANCH:  That's probably

11         right.  We also had some things on

12         studies.

13              MS. ZEDALIS:  We had for Dr.

14         Kostis.

15              MR. WEITZ:  That was a

16         separate project.  That wasn't --

17         that was unrelated to --

18              MR. LEVIN:  Are you speaking

19         of the New Jersey consortium when

20         you say that, Eric Weinberg's

21         group?

22              MS. ZEDALIS:  That was for

23         Dr. Kostis.  The other larger sum,

24         I thought it was two payments of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1        $25,000.

2                MR. BRANCH:  It might have

3        been 15.

4                MS. ZEDALIS:  It wasn't to

5        Weinberg.  I thought it was to --

6                MR. WEITZ:  My firm, Weitz &

7        Luxenberg.  We'll find out.

8                MR. BRANCH:  It is what it

9        is, and we'll submit it.

10               MR. WEITZ:  Working with the

11       accountant will actually figure

12       out exactly what the payments were

13       for, and then we'll figure out how

14       you get reimbursed.

15               MR. SEEGER:  By the way, if

16       you can go back and see what

17       portions are for Kostis because

18       there was a $15,000 assessment.

19               MR. BRANCH:  I know we paid

20       that, and the rest of them, we

21       will have cancelled checks and

22       itemizations on, and I appreciate

23       Russ' idea of calling the

24       accountants, because we didn't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

```
 1        know we had an incomplete

 2        application.  For example, I

 3        didn't know we didn't have

 4        everything submitted.

 5             MR. HERMAN:  Turner, there

 6        are 106 firms, and among those

 7        firms are consortiums of firms

 8        that have submitted a packet.  It

 9        could be a snafu on our end.

10             MR. BRANCH:  We didn't

11        submit it with anyone else.

12             MR. HERMAN:  What I'm saying

13        is, when you get all of that

14        material at one time, but I'm

15        certain that Garrett and Wegmann-

16        Dazet --

17             MS. ZEDALIS:  Is he in

18        Covington?

19             MR. HERMAN:  In Metairie.

20        Right across the City Line in

21        Metairie.

22             They are very accessible,

23        they'll be happy to help.  If you

24        have any problem, call Lenny or
```

Page 18

1          myself while you are meeting or

2          after your meeting with them.

3          We'll take a personal interest.

4                    MR. BRANCH:  We thank you

5          for that, and we will do that.

6          Like I said, it is what it is, and

7          we will have the cancelled checks

8          and the verifications.

9                    MR. HERMAN:  Can you

10         ballpark the dollars within any

11         range of what you think in these

12         costs are expert witness costs?

13                   MR. BRANCH:  I thought we

14         had everything itemized as to

15         every single cost that we

16         submitted, Cindy.

17                   MS. ZEDALIS:  We paid some

18         experts on our trial cases.

19                   MR. BRANCH:  Of course, I

20         may be wrong, but I think we did.

21                   MR. SEEGER:  We'll work it

22         out.  We'll help figure it out.

23                   MR. BRANCH:  He's asking for

24         a ballpark.  Do you know what that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          would be?

2                    MS. ZEDALIS:  I couldn't

3          come up with it.

4                    MR. SEEGER:  We don't need

5          it for today.

6                    MR. WEITZ:  Cynthia, Chris

7          and I know your involvement in New

8          Jersey.  Our firms worked with you

9          guys.  As Turner said, you

10         attended all the conferences, you

11         had cases that you were pushing

12         for trial.  Explain to everybody

13         else about your 11 cases and what

14         waves they were in within Higbee's

15         court, if you had any that were

16         fully prepared for trial.

17                   MS. ZEDALIS:  They were

18         identified.  We had 11 cases on, I

19         think it was the first wave or

20         second wave trial calendar.  They

21         were supposed to go in March of

22         2008.  They were identified by

23         Judge Higbee as trial cases, I

24         believe, in December of 2006.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1       we had 11 clients, New Mexico

2       residents with heart attacks, and

3       a lot of time was spent reviewing

4       all of the records produced by

5       Merck.

6              MR. BRANCH:  You might

7       address the depositions like

8       Senator Altamirano and Mary

9       Velasquez.  The 11 we had, you

10      might just talk about depositions,

11      and we were back for a couple of

12      months doing depos, and we can

13      tell you about that.

14             MS. ZEDALIS:  One of the

15      lawyers in our office, Frank

16      Baldaramo, he had packed a bag for

17      three days, he was supposed to

18      attend one deposition in Cherry

19      Hill, I think it was in your

20      office, and he started buying his

21      clothes at Wal-Mart.  He was

22      there, I think, for

23      four-and-a-half weeks defending

24      depositions for our clients.  So,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          a lot of time was spent on those

2          11 trial cases, and we were ready

3          to go on those, including meeting

4          with the clients, talking to the

5          doctors, getting the hospital

6          records, traveling to -- I believe

7          all the depositions were conducted

8          in either Philadelphia -- I think

9          Ben Altamirano, who was our state

10         Senator, who is deceased now, and

11         Senator Pro-Tem of the New Mexico

12         State Senate, had a heart attack

13         after taking Vioxx, and he and his

14         wife both went and spent a few

15         days.

16              MR. BRANCH:  And the same

17         with the Velasquez family and the

18         others.

19              MS. ZEDALIS:  I can't

20         remember all the names off the top

21         of my head, but there were 11

22         clients, and they were all deposed

23         either in New Jersey or

24         Philadelphia.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1              MR. BRANCH:  James Frazier

2         from Roswell, and we had 11 that

3         were put up for trial that were

4         accepted.  We had more than that,

5         but they were found for various

6         reasons not to be representative

7         clients that should be put up for

8         trial at the time, and we ferreted

9         those out.

10             Ben Altamirano, the Senator,

11        was going to be one of the first

12        cases.  He was an excellent

13        plaintiff.  As Cindy said and I

14        started to say earlier, he was the

15        President Pro-Tem of the State

16        Senate of New Mexico and had been

17        in the Senate for 47 years.  I

18        think he would have made an

19        excellent exemplar plaintiff.  He

20        was great, and his wife was

21        wonderful too.

22             Mary Velasquez -- well, all

23        of them we put up were acceptable

24        because they were ferreted by

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          various and sundry people to be

 2          acceptable because we had a lot of

 3          rejects, too, of course that

 4          weren't acceptable.

 5               We did work those cases up,

 6          and I think, as Cindy said, they

 7          were going to be going.  Chris,

 8          you and Perry can tell us more

 9          exact, but I think they were going

10          to be in a wave that started

11          February or March.

12               MR. WEITZ:  That's right.

13               MR. SEEGER:  That's right.

14               MS. ZEDALIS:  Actually, the

15          11 cases that were selected, we

16          had the most of any firm with

17          representative clients in New

18          Jersey.  Our firm did.  That took

19          a large chunk of time.  I believe

20          we had cases set on the second

21          wave also, but thanks to you nice

22          people, the case settled.

23               MR. BRANCH:  We had a case

24          also set with judge -- is it Randy
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1        Wilson in Texas?  Mr. Lanier knows

2        about this, because we were

3        getting help from them and Tommy

4        Fibich.  But that case, of course,

5        when the judge granted his order

6        to take everything north to Austin

7        because of preemption, that case

8        went with him.  I think we had 206

9        Texas cases with --

10            MS. ZEDALIS:  Almost 200,

11        197 in the Texas MDL.

12            MR. BRANCH:  Cindy, anything

13        else you want to highlight or any

14        questions we can answer?

15            MR. BLIZZARD:  Turner, you

16        said that you had co-counsel

17        cases?  I think you said most of

18        your cases --

19            MR. BRANCH:  Most all of our

20        cases were co-counsel with

21        referring attorneys.

22            MR. BLIZZARD:  So, you have

23        referring attorneys?

24            MR. BRANCH:  Yes, we do.  We

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

 1          have to share on the fees.

 2                  MR. BLIZZARD:  Isn't that a

 3          terrible thing?

 4                  MR. BRANCH:  It is not so

 5          bad.

 6                  MR. SEEGER:  Thank you.

 7          Always great seeing you.

 8                  MR. BRANCH:  Good to see

 9          everyone.

10                      -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1               C E R T I F I C A T E

2

3               I, LINDA L. GOLKOW, a Notary

4     Public and Certified Court Reporter of

5     the State of New Jersey, Registered

6     Diplomate Reporter, Federally-Approved by

7     the United States District Court of

8     Pennsylvania, do hereby certify that the

9     foregoing is a correct transcript of the

10    testimony as taken stenographically by

11    and before me at the time, place and on

12    the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14    am neither a relative nor employee nor

15    attorney nor counsel of any of the

16    parties to this action, and that I am

17    neither a relative nor employee of such

18    attorney or counsel, and that I am not

19    financially interested in the action.

20

21    _____

22          Linda L. Golkow, RDR, CRR, CCR
              Notary Number:  1060147

23          Notary Expiration:  1.2.10
              CCR Number:  30X100176200

24

GOLKOW TECHNOLOGIES, INC. - 877.370.3377

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

JANUARY 23, 2009

- - -

HIGHLY CONFIDENTIAL

FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

NEW YORK, NEW YORK

- - -

FIRM:  THE LANIER LAW FIRM
       W. Mark Lanier, Esquire
       Richard D. Meadow, Esquire
BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, Mccarthy & Nabers, LLP
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR
        GOLKOW TECHNOLOGIES, INC.
      877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2            MR. LANIER:  Well, for the
 3       record, my name is Mark Lanier.
 4       I'm the principal of the Lanier
 5       Law Firm.  When I speak, if I
 6       speak in the first person, I mean
 7       it as a collective first person.
 8       It's the law firm and a lot of
 9       wonderful people.
10            I am, like everyone in this
11       room, not extremely comfortable
12       talking about ourselves and what
13       we have done, but I do view it as
14       a necessity to put it on the
15       record and do so for those
16       purposes, though I believe most
17       people in this room are aware of
18       each other and what we've done.
19            I echoed the positive
20       sentiments everyone else has said
21       about people around the table, but
22       I do, at the risk of spending a
23       little more time, view it
24       important to say from our
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1       perspective, because we are

2       recognized, I think, and I hope,

3       as some of the trial success

4       behind the Vioxx litigation.  From

5       our perspective, I have had some

6       particular help from the people in

7       this room that ought to be

8       recognized as I walk through this.

9            Andy is someone who from the

10      very beginning has sought out with

11      integrity to not only assist me in

12      anything that I needed help with,

13      but to try and integrate me

14      wherever he could into the MDL,

15      and I appreciate that very much.

16      Andy kept me abreast as much as he

17      could within the confines of

18      confidentiality within the

19      settlement discussions that were

20      ongoing and kept me out of the

21      dark and made it very easy for me

22      at the end ultimately to sign on

23      to the settlement program.  I

24      appreciate that.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

```
 1          Chris Seeger, I didn't know

 2      Chris before Vioxx, I don't know

 3      why, because I should have, but

 4      Chris and I met very early in the

 5      litigation.  He came down to my

 6      office long before the drug was

 7      pulled in November of '02, I

 8      believe, with Shelley and some

 9      others to see how we might put

10      together some litigation and

11      whether or not it was worth doing.

12      I got to work intimately with

13      Chris in part because he was

14      willing to forgive me for

15      inserting my foot in my mouth

16      while he was in the midst of

17      trying a heated war called

18      Humeston I.  Your graciousness not

19      just at letting bygones be

20      bygones, but your graciousness and

21      camaraderie of working with you,

22      Dave Buchanan, Jeff Grand, the

23      outstanding people you have on

24      your staff, brought pleasure to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1      the tasks that we did.

2           MR. SEEGER:  Similar for us.

3           MR. LANIER:  Tom Girardi and

4      I started talking on the phone in

5      reference to his cases out in

6      California.  He opened his door to

7      me.  He said, Lanier, come out

8      here and do what you want to do,

9      don't do anything you don't want

10     to do. I'll help you.  All the

11     wonderful, friendly Tom Girardi

12     things, always a positive voice,

13     always a source of encouragement,

14     something needed on dark days.  I

15     thank you, Tom, very much.

16          So much of what we did, I've

17     got Rick Meadow in here because I

18     couldn't have done this stuff

19     without Rick.  He's a lot of what

20     Lanier gets credit for.  I wanted

21     to bring him in and let him hear

22     me say that in front of y'all.

23          Troy and I have not worked

24     closely together, but Troy has

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1      done science work that I have

2      benefited from.  I want to thank

3      you for that, and I want to

4      recognize it.  It's helped me

5      understand a few issues that I

6      wouldn't have understood

7      otherwise.  Troy has never done

8      anything to minimize or to negate

9      any chores we were doing even when

10     we were running arguably

11     competitive paths.  It was always

12     for the best of the litigation,

13     and you're to be commended for

14     that.

15          Arnold Levin is someone I

16     wish I had more history with.

17          MR. SEEGER:  No, you don't.

18          MR. LEVIN:  No, you don't.

19          MR. LANIER:  I'm telling

20     you, this is my kind of guy.  I'll

21     stand with him.  It is apparent to

22     me, having walked into it at this

23     point, that, look, I know these

24     guys, and I know the briefing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          product they would have put out,

2          and it is apparent to me that you

3          have been involved in making sure

4          that the briefing product is of

5          the highest caliber.  You have

6          also given me some wisdom in just

7          the short time I've been working

8          on this committee, and you are

9          always smiling and you are always

10         encouraging, and I appreciate it.

11             Now I've got my dad, Russ,

12         who I affectionately refer to.

13         Russ has been wonderful in this

14         process, but y'all need to know

15         from a trial lawyer's perspective

16         what Russ was doing for me in the

17         other cases.  Russ did show up in

18         my cases which were outliers.

19         They weren't in the MDL.  Ernst

20         wasn't in any MDL.  Russ was

21         showing up, he was paying

22         attention, he would pull me aside

23         in the men's room, I remember

24         vividly in Atlantic City, saying,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1       hey, listen, you stay on target.

2       I've been doing this for umpteen

3       gazillion years, and I have known

4       Russ by reputation all my life, he

5       said, what you are doing is right,

6       it is dead on.  Don't let anybody

7       distract you.  Words of

8       encouragement that come from

9       decades of wisdom that's piled up,

10      and you shared that with me, and I

11      appreciate it.

12          Perry, I can't say enough

13      good things about what you've

14      done, and I really appreciate it.

15      Perry is the one who helped me

16      mend the fence with Chris.  Perry

17      is the one who helped plug me into

18      New Jersey.  Perry is the one who

19      had Ellen Relkin and Jerry Kristal

20      and Rob Gordon and great people to

21      work with, and it was a wonderful

22      opportunity.

23          Last, but certainly not

24      least, Ed Blizzard, who blazed a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1        trail from Fulbright, teaching me
 2        to leave that place as quickly as
 3        I could.  I've been delighted to
 4        get to know Ed a little bit
 5        closer.  I have always had the
 6        greatest amount of respect, and
 7        what he did helped in Texas, and
 8        as bad as our preemption decision
 9        was in Texas, it could actually
10        have been worse.
11             All of that is not said for
12        any other reason than the fact
13        that it is true, and I want it on
14        the record, and I want it typed up
15        under my name.
16             I graduated from college,
17        Lipscomb University in 1981.  I
18        have a degree in Hebrew and Greek.
19        I went to Texas Tech University
20        School of Law, graduated in 1984.
21             I went to Fulbright &
22        Jaworski, left in '89 to be a
23        plaintiff's lawyer, learned from
24        Ernest Cannon for a year before
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1          starting my own firm in 1990.

2                  I'm licensed in Texas and

3          New York.

4                  I've tried more cases than I

5          can count, first chaired almost a

6          billion dollars in verdicts.  I'm

7          not quite there, but almost, I'm

8          over 900 million.  I've tried

9          every kind of case that I can get

10         ahold of.  I've tried fraud cases,

11         railroad crossing cases, workers'

12         comp, med mal, asbestos, pharma,

13         product liability, commercial

14         disputes, Jones Act, admiralty,

15         FELA, jury verdicts in all those

16         different cases, multiple cases in

17         each area.  That's what I brought

18         to this table.

19                 I got involved in Vioxx

20         because Carlene Lewis called me

21         and said that I want you to try

22         our Vioxx cases, I want you

23         involved in this litigation, you

24         can make a difference, and would

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          you.  So, in 2002, I believe,

2          maybe it was 2001?

3               MR. SEEGER:  It was 2001.

4               MR. LANIER:  That's right.

5          Because I took Reicin's deposition

6          in 2002.

7               MR. SEEGER:  I don't know

8          why I'm interrupting.  I shouldn't

9          be interrupting.

10               MR. LANIER:  No.  I

11          appreciate that, Chris.

12               MR. SEEGER:  JAMA, right.

13               MR. LANIER:  Yes, 2001, I

14          believe, Carlene came to me and

15          said, would you do it.  I said,

16          sure.  She said, there's some

17          other people who are real

18          interested.  I said, let's all

19          meet, and so we met in my office.

20          Ultimately I took a number of

21          cases and I filed them.  The MDL

22          got set up.  I wanted to play in

23          the MDL arena, but I wasn't one of

24          the chosen few.  I didn't get to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        do the MDL thing, and I decided to

2        concentrate beyond that on what I

3        had and tried to bring to the

4        litigation how I could help.

5            I don't know any other law

6        firm other than Seeger Weiss that

7        was truly active in significant

8        ways in multiple arenas.  Chris

9        was in New Jersey and he was in

10       the MDL.  We were in Texas, and we

11       were in New Jersey.  The first

12       case we had was the Ernst case.

13       To understand the Ernst case, I

14       think it's important to understand

15       that it was what I call one-off

16       case.  It wasn't in any MDL.  I

17       mean, it was filed, and it was

18       going to trial before anything was

19       really kicking and breathing.  The

20       only way I win Ernst or we win,

21       that's the plural "I," the only

22       way we win Ernst is by getting our

23       own documents, getting our own

24       discovery, taking our own

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1        depositions.  There was a big

2        blessing to that.  I was able to

3        take depositions and force Merck

4        witnesses to give answers that,

5        frankly, I don't think they would

6        have given if they were only going

7        to have Judge Fallon or Judge

8        Higbee or somebody else, a

9        magistrate or somebody receive a

10       phone call about the deposition.

11       But when I'm able to get Judge Ben

12       Hardin on the telephone and he's

13       able to say, answer the question

14       right now, it doesn't matter what

15       any other jurisdiction is doing.

16       In that case in Texas, they have

17       got to be answered.

18            So, it was a wonderful

19       opportunity for us to get

20       discovery.  We had to put together

21       our own trial package.  I had to

22       get my own documents.  I had to

23       have my own experts.  I had to

24       have all of that because I had to

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        win a case that was ours to win.

2        I did it with some wonderful

3        people in my firm.  Myself, Mark

4        Lanier, was lead trial counsel in

5        Ernst, Cona/McDarby, Hermans/

6        Humeston for liability phases at

7        least in those other two, and for

8        punitives in Cona/McDarby.

9            I had a lead role in

10       pretrial discovery in depositions

11       of most of the significant

12       witnesses, Peter Kim, Raymond

13       Gilmartin, David Anstice, Ed

14       Scolnick, Alise Reicin, Louis

15       Sherwood, James Fries, Nancy

16       Santanello, Laura Demopoulos, Mal

17       Mixon.  I did these myself.

18           I developed and prepped a

19       number of different cardiologists

20       and epidemiologists that were key

21       to the success of the litigation.

22       Harlan Krumholz, David Egilman,

23       Dr. Weiner, Isaac Weiner, Dr.

24       Lucchesi, Dr. Zabalgoitia, Dr.

FAC Resp. Amended Exhibit D -- 1650

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

 1         Sassower, et cetera.

 2             I did provide critical

 3         assistance in preparation of Dr.

 4         Topol that's been detailed both on

 5         and off the record.

 6             I have Dr. Robert Leone with

 7         my firm.  Dr. Bob is a lawyer, but

 8         he's also a Ph.D. psychologist and

 9         a preeminent litigation

10         science-type guy, a jury

11         consultant.  There is no better.

12         He conducted expert and lay

13         witness preparation for not just

14         us, for other firms.  We did the

15         witness preparation for not just

16         the Cona end, but for the McDarby

17         end of the clients and the

18         experts.  We did the witness

19         preparation in Humeston II of

20         Humeston himself.

21             We analyzed Merck arguments,

22         themes.  He designed and conducted

23         three community attitude surveys

24         where we went in with phone banks

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1    and literally took thousands of

2    people and asked them exacting

3    questions that paralleled

4    precisely what the juror

5    questionnaires were going to be so

6    that we were able to come up with

7    a computer-generated score sheet

8    that, heavens, Dave Buchanan is

9    using in other cases I think in

10   New Jersey right now, too, the

11   community attitude survey, because

12   it is fantastic data that we've

13   got that we've used that we've

14   tried to share.

15        We designed and conducted

16   five jury studies both for our

17   cases and for cases beyond us.

18        We designed and conducted

19   four shadow juries or gallery

20   juries, including in Irvin I, the

21   first Federal Court case that Andy

22   tried, we did the gallery jury,

23   daily reports, daily information

24   to Andy and his trial team about

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1    that.  Dr. Bob designed themes, he

2    designed trial exhibits.

3         Rick Meadow managed the New

4    Jersey docket, was a liaison with

5    Judge Higbee for our firm.  He did

6    lead roles in pretrial discovery

7    and depositions of a number of

8    different people aside from the

9    ones that I did.  Argued our

10   motions and evidentiary hearings

11   in each of our trials.  Cut and

12   edited video depositions of Topol,

13   Gilmartin, Shapiro and Scolnick

14   and Curfman that people have used

15   in every trial.  These are

16   incredible cuts that are precision

17   cuts, nothing too long, nothing

18   too boring.

19        It was Rick Meadow that

20   discovered the FDA letters that

21   are being used by all of the

22   attorneys in the cases that I've

23   seen of late, the ones where Merck

24   was put on warning for a pattern

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1       and practice, discovery of FDA

2       letters that Merck never produced

3       in the litigation, but we got

4       through the FDA themselves.

5            Cut and edited the depos for

6       the critical Appendix C Shapiro

7       meta-analysis that made the

8       punitive difference in the

9       Cona/McDarby and Humeston II

10      cases.

11           Assisted in appellate

12      briefing in Cona/McDarby, which

13      was so successful, as Perry has

14      outlined.

15           Dara Hegar was responsible

16      for management of the trial

17      workup, Ernst, Cona, McDarby,

18      Hermans.  I think almost all of us

19      for a period of four years did

20      basically nothing but this work.

21           Ken Soh did work on the

22      Ernst case, written discovery,

23      depos of plaintiffs, sales reps,

24      prescribers, expert witnesses;

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1          argued, drafted dispositive

2          motions; developed expert

3          witnesses for all three trials.

4                Maura Kolb, another lawyer,

5          was in charge of trial exhibits;

6          defending depositions of

7          plaintiffs, sales reps, experts,

8          prescribers.

9                Meredith Gursky, same thing.

10                Evan Janush handled major

11          briefing and legal research for

12          the New Jersey cases, helped draft

13          the appellate arguments for Cona

14          and Hermans.

15                Kevin Parker, board

16          certified appellate lawyer,

17          handled all the major briefing and

18          the motions in Texas.

19                Phillip Sanov, Eugene

20          Egdorf, Taylor Campbell, all of

21          these lawyers that dedicated their

22          time to it did it in a wonderful

23          way.

24                What were our contributions?

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
1          If I go back and start with
2     discovery, we discovered a case.
3     We discovered a case that gives a
4     trial package that's a winning
5     trial package.
6          We played a key role in
7     securing damaging testimony from
8     key Merck witnesses played in all
9     trials.  You'll find my questions
10    played from the Anstice depo, my
11    questions played from the Scolnick
12    depo, the Gilmartin depo, the
13    Reicin depo, the Kim depo.
14          I went to Florida to depose
15    Lou Sherwood after the MDL depo
16    had taken place.  MDL got to go
17    first, and then I got to go for my
18    little Texas case.  I was told by
19    Dave Buchanan, who is a fantastic
20    lawyer, who has done an excellent
21    job, whose Scolnick deposition is
22    the best Scolnick out there that
23    anybody took, Dave Buchanan told
24    me, Lanier, just fly on out of
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1          here, you're wasting your time.
 2          Sherwood is a grandfather-type
 3          that the jury is going to love.
 4          He's going to kill us.  We've got
 5          the wonderful Sherwood memo that
 6          says these great things, but he
 7          explains it all away, and there's
 8          nothing we can do.  I said to him,
 9          well, Dave different lawyers have
10          different approaches, let's give
11          it a try.  I proceeded over the
12          next hour and a half in our humble
13          opinion, I think, to destroy
14          Sherwood so bad that the Merck
15          lawyer, Richard Josephson, called
16          a stop to the deposition, said
17          that we would restart the
18          deposition, or if not, Merck would
19          not be able to play any of the
20          deposition, but that all of a
21          sudden, everybody in the room was
22          feeling bad except us.  So, the
23          deposition stopped and was never
24          resumed, and as a result, Lou
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1      Sherwood was never able to be
2      played or used at any trial.  We
3      took him out of the litigation.
4           We took the lead in other
5      depositions including Fries out in
6      California, Dixon, Demopoulos, Mal
7      Mixon, Nies, Santanello, Sherwood,
8      provided and defended over 75
9      depositions.  I would have taken
10     more, but not being an MDL player,
11     I was not MDL authorized to take
12     depositions, and so I had to do
13     them outside the gate, if you
14     will.
15          We uniquely discovered the
16     incredibly damaging V-Squad Merck
17     videos that if nobody played in
18     their trials, they missed one of
19     the best pieces of evidence that
20     was most compelling.  Those were
21     videos we found.  We had to
22     personally find these things.
23          We found, as I mentioned,
24     the FDA warning letter in 1998

FAC Resp. Amended Exhibit D -- 1658

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          warning of a pattern of corporate

2          misconduct to David Anstice, the

3          other 19 FDA letters to Merck

4          regarding their products.  We were

5          the ones who forced the

6          productions of the original of

7          critical Merck evidence.  We

8          forced the production of original

9          Dodge Ball cards, so, we actually

10         had color cards, an original CV

11         card, so, we had that.

12             We were the ones who served

13         and found the Merck Manuals which

14         we used at trial because they

15         explained all the science.  We

16         were the ones who discovered that

17         Merck, between the 16th Edition

18         and the 17th Edition, took out the

19         critical pages that were the very

20         pages that explained how Vioxx

21         will cause a heart attack.  Merck

22         took it out the exact same year

23         they started marketing the drug.

24         It's either the most profound

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1    coincidence or something that's

2    phenomenal, because Merck has

3    never had an answer to it, we've

4    driven that stake home in their

5    heart every trial, and it's been a

6    death blow.  But those are things

7    we found, and we found them

8    independently as our law firm, and

9    they have been used by a number of

10   people.

11        Experts.  We retained and

12   prepped a number of different

13   cardiologists and epidemiologists.

14   Weiner, Krumholz, Egilman, Wayne

15   Ray, Benedict Lucchesi and others.

16   We did this.  Our experts, Harlan

17   Krumholz and David Egilman have

18   helped shape not only what we all

19   have benefited from in this

20   litigation, but what the common

21   benefit will continue to be to the

22   third-party payor cases in the AG.

23   We've changed the peer-reviewed

24   literature.  You can go to the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1        British Medical Journal, January

2        20th, 2007.  You can find in the

3        BMJ the lead article off the front

4        page, "Lessons from Vioxx:  What

5        have we Learned?"  What it is is a

6        peer-reviewed article by Harlan

7        Krumholz, David Egilman and all of

8        our experts that lays out the

9        story.  It has a picture of Judge

10       Higbee in the background behind

11       me, but it is an article that lays

12       it out in the top prestigious

13       Journal in England.

14            We have from the Annals of

15       Internal Medicine the seeding

16       trial, the ADVANTAGE seeding trial

17       written up by Egilman, Krumholz,

18       Hill and Ross, again,

19       peer-reviewed literature that

20       exposes what Merck has done that's

21       reliable now for anybody in any

22       trial.

23            We have from the JAMA, April

24       16th, 2008, the ghostwriting, we

FAC Resp. Amended Exhibit D -- 1661

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1      have it written up.  We've changed

2      the litigation in that respect.

3      It's something everybody can rely

4      on.

5           From the Annals of Internal

6      Medicine, we've got letters to the

7      editor or a letter from the editor

8      by Egilman that merited

9      publication that's there.  So, our

10     experts that we brought into the

11     fold didn't just assist in winning

12     these cases and didn't just assist

13     in setting up for appeal science

14     and other things, they have

15     published peer-reviewed articles

16     that affect things, as well, and

17     make the litigation better for

18     others.

19          Ultimately the plaintiffs

20     won five cases against Merck.  We

21     were lead counsel in three of

22     those five wins.  I echo what Ed

23     said.  Everyone in this room is a

24     trial lawyer and knows the costs

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1          of being involved in a case.
 2                  I would urge the record to
 3          understand that our cases were not
 4          two-week trials.  Our cases were
 5          generally six to eight weeks at
 6          least in front of the Court and
 7          jury.  Ultimately we spent six
 8          months in trial, and by "we," I
 9          mean almost everybody I listed,
10          and that does have the opportunity
11          costs of not being there for other
12          things.  That does have the real
13          costs, millions and millions and
14          millions of dollars that we put
15          out of our firm directly, and
16          ultimately the personal costs.
17          Six months away from my family and
18          other lawyers away from their
19          families, times where I've got
20          daughters graduating from high
21          school, missing important events
22          that are once-in-a-lifetime
23          events.
24                  Health effects.  Like Ed, I
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

 1        sleep four hours a night during

 2        trial.  You do that for two months

 3        in a row, and it takes a toll on

 4        you.  I think it was during the

 5        Ernst trial where it had affected

 6        my heart rhythm, and the judge had

 7        to call court for a Friday, and we

 8        quit early Thursday.  Unknown to

 9        Merck -- in fact, I don't know

10        that I have ever said it to

11        anybody in a public way, I guess

12        we're making a record of it now,

13        but because of health issues I was

14        having with an irregular heartbeat

15        and an arrhythmia, and it was an

16        arrhythmia case we were trying,

17        which made it kind of ironic, but

18        they had to check me into the

19        hospital under a pseudonym for

20        fear that the Merck contacts

21        within the hospital would know

22        what was going on during the

23        middle of the Ernst trial.

24        Ultimately we got that resolved

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1       with an ablation surgery, and my

2       health was better for the other

3       trials.

4              But these are legitimate

5       costs.  This is going on day in,

6       day out.  This is blood that we're

7       laying on the doorstep to fight

8       this battle.

9              We won the Ernst case first.

10      It was the first case to go to

11      trial.  We fought through all of

12      the issues.  We fought through the

13      issues of press.  The press was

14      everywhere.  It was rampant in

15      that case.  We fought through the

16      issues of Merck goofing with the

17      jury.  We get someone that Merck

18      swears was not them handing out at

19      the local filling station/

20      convenience store T-shirts during

21      trial that say, "Merck, a family

22      run company."  All sorts of things

23      like that that we got to fight

24      through.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

 1            The Ernst verdict, we won,

 2       and we didn't just win, we won

 3       big.  It was a case we weren't

 4       supposed to win.  It's a case that

 5       everybody said couldn't be won

 6       because, quote, it wasn't a heart

 7       attack.  It was a case that folks

 8       even in this room had urged me not

 9       to try because of the concern that

10       it would set bad precedent if

11       Merck won the first case, and we

12       really needed to have a big

13       plaintiffs' win first.  We went to

14       trial anyway through the hard work

15       of a number of different people,

16       including a number of people in

17       this room that helped us, and

18       Shelly Sanford and Carlene Lewis

19       and others.  We were able to score

20       not just a victory, but a big

21       victory.  It's the one that came

22       in, and the jury announced it

23       during the middle of the Reicin

24       deposition where Chris Seeger

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1        stands up on Page 853 of her

2        deposition and says, "250

3        million."

4              "MR. KLINE:  $250 million in

5        Ernst --

6              "MR. PATRYK:  Take a break.

7              "MR. KLINE:   -- Dr. Reicin,

8        what do you think of that?

9              "MR. PATRYK: Let's take a

10       break.  Let's take a break.

11             "MR. KLINE: What do you

12       think of that?

13             "MR. PATRYK:  We're taking a

14       break.

15             "MR. KLINE:  You can prepare

16       an answer when you get back on

17       Merck's conduct."

18             And Mr. Patryk comes back in

19       and says, "Counsel, given the

20       circumstances of the last 15

21       minutes, the witness is unable to

22       go forward today.  We have

23       promised her for a complete third

24       day, which we obviously have not

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1    accomplished."  Blah, blah, blah.

2             "MR. KLINE: What's the basis

3        for her not being able to

4        continue?

5             "MR. PATRYK: She's upset.

6             "MR. KLINE:  Too upset to

7        continue?

8             "MR. PATRYK: Yes."

9            It was a resounding win.  It

10       merited media coverage from the

11       John Stewart Daily Show to the New

12       York Times, Wall Street Journal,

13       Houston Chronicle, USA Today,

14       Fortune, Trentonian in Trenton,

15       New Jersey, East Brunswick's

16       paper, Connecticut, New Jersey,

17       Massachusetts, Ohio, International

18       Herald Tribune, Michigan, Canada,

19       Michigan, Michigan, Ohio, Ohio,

20       Ohio, Ohio, Michigan,

21       Massachusetts, Wisconsin,

22       Michigan, Connecticut, Illinois,

23       Canada, Milwaukee, Hawaii,

24       Washington Post, Germany, ABC

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          News, NBC News, CBS News, Science

2          Magazine, Good Morning America,

3          CNBC, Bloomberg, and others that

4          I'm not reading.

5               It merited great media

6          attention.  It put an immense

7          amount of pressure and started the

8          momentum in our favor to try to

9          get this stuff resolved.

10              It provided a roadmap for

11         other attorneys in the litigation.

12         My opening was one that was

13         modeled by a number of different

14         people in their trials, as were

15         other aspects of the trial.

16              After the Ernst verdict, we

17         took and answered countless calls

18         from attorneys all over the

19         country who had questions about

20         Vioxx cases generally, trial

21         workup, the science, the

22         depositions, the exhibits, the

23         experts.

24              It was at a presentation

FAC Resp. Amended Exhibit D -- 1669

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1     within a month after the Ernst

2     verdict when I was asked what

3     about multiple risk factor cases

4     like ultimately we got to explore

5     with Perry.  That's where I came

6     up with the glass on the edge of

7     the table, and I explained, I

8     think the best cases are the

9     multiple risk factor cases because

10    those are the people who least can

11    afford to be on such a dangerous

12    drug.

13         We produced a trial exhibit

14    list that I dare say everybody

15    looked at and used as a roadmap

16    throughout any other case that was

17    tried.

18         We importantly put every

19    exhibit we could into evidence

20    because that put those exhibits

21    into the public domain, and once

22    the IND was put into the public

23    domain in stage zero, they were

24    reported, and people could use

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

```
 1          them, and you could talk about

 2          them, and it was no longer

 3          privileged.

 4               We were urged by the

 5          president of the California bar at

 6          the time, by Shep Hoffman and

 7          others, they said, Lanier, don't

 8          try another case.  Let everybody

 9          else try them.  You've won, and

10          you've won big.  You don't want to

11          try another case.  Because if you

12          lose, then you've taken away the

13          momentum that the litigation has

14          from you.  Right now you're the

15          big gorilla.  You can beat them,

16          and you can beat them big.

17          There's no upside to you beating

18          them again, and if you lose, it

19          could hurt you.  I said, well,

20          they have got to be beat, and

21          we've got the key, and it's

22          unlocking the door, and until they

23          show me it won't unlock the door,

24          I'm going to do it again.  I was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

 1          told, well, you can't do it in

 2          Atlantic County, New Jersey.  I

 3          said, please give me a shot.  And

 4          through the work of Perry and the

 5          work of Chris, I got that shot.

 6              We went up there.  I met

 7          with Perry's firm.  Perry and I do

 8          have a longstanding relationship,

 9          and we go way back.  They were

10          very gracious to say, hey, Lanier,

11          you can try all the liability end,

12          we'll do case specific for

13          McDarby.  I met with them on

14          November 16, 2005 and again two

15          weeks later on December 1st, 2005

16          in their offices and taught them

17          the case and laid it all out

18          there.  They had great lawyers in

19          the room, they learned it, they

20          took it, and they ran with it, and

21          they did real good.

22              We tried Cona/McDarby.  I

23          did all of the liability in the

24          case except for a five-minute

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1    opening by Jerry, and did all of

2    the punitives.  We prepped our

3    witnesses.  We also were involved

4    and prepped McDarby and the

5    experts on all aspects of the

6    case.

7         We secured the first win

8    against Merck outside of Texas.

9    We broke Merck's winning streak

10   that was going on in New Jersey.

11   It was after the actual stage of

12   the trial, we got ready for the

13   punitives, and Merck moves in

14   front of the judge, "Your Honor, I

15   object to Mr. Lanier participating

16   in the punitive phase of this

17   trial."

18        Mr. Gordon's response was,

19   "Mr. Lanier was acting as counsel

20   on general matters of liability

21   for both plaintiffs throughout

22   this litigation.  It's been no

23   surprise.  He closed on that

24   matter.  As a matter of fact, from

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1      the Cona specific, Mr. Morelli

2      closed, not Mr. Lanier.  Mr.

3      Kristal intended to make a very

4      brief five-minute opening, and Mr.

5      Lanier, who is prepared, and is

6      the only one who is prepared at

7      this point to cross-examine, as he

8      was prepared to cross-examine

9      Rarick during the original case in

10     chief."

11          The Court said, "I don't

12     think there's been any

13     misrepresentation to the Court

14     about what's been going on here.

15     Mr. Lanier has covered almost --

16     has covered material that related

17     to liability to both parties all

18     through the trial.  Everyone

19     understood that's what was going

20     to be done."

21          She overruled their

22     objection, and I tried the

23     punitive stage of that case.

24          Merck found me to be one of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

```
 1        their disfavored weapons.  Merck,
 2        I think they developed a strategy.
 3        If they had a legal team that was
 4        winning, they kept the team in
 5        there.  I never faced the same
 6        lawyers twice.  They brought in
 7        six different firms to try the
 8        cases against us, and we took
 9        them.
10             After that, we were told,
11        don't try any more, you don't need
12        to, you've proven yourself, go
13        take care of the rest of your
14        firm.  Ultimately Merck will have
15        to deal with you whether they deal
16        with everyone else or not.  I
17        said, oh, I don't know, I don't
18        know.  I wanted to move it, so, we
19        went in Hermans and Humeston, and
20        after strategizing with Perry and
21        strategizing with Chris, it was
22        decided to do.  Chris very
23        graciously let me try the
24        liability for both cases, and
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1       Chris did the punitives by

2       himself.  Rick was up there

3       helping.

4           MR. SEEGER:  Case specific.

5           MR. LANIER:  Case specific,

6       as well.  I know we helped to prep

7       the witnesses, but Chris did all

8       of the case specific on Humeston

9       and the doctors and the sales

10      reps, as Perry's people had done

11      in McDarby.

12          During that trial, we

13      stopped Alan Nies' deposition from

14      being played in New Jersey.  Judge

15      Higbee ruled that Nies had to

16      appear live because he had done so

17      in Angleton in the Ernst trial,

18      and we were successful in showing

19      that ultimately he still had some

20      relationship with Merck such that

21      she was able to make that ruling.

22      They didn't bring Nies live at

23      trial because I had absolutely

24      destroyed Nies.  Nies was the one

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

1        who 3 minutes and 22 seconds into

2        the cross-examination started

3        yelling and shouting at me because

4        he was very upset, he lost his

5        cool.  So, they didn't bring Nies.

6        They couldn't afford to bring him

7        live.

8             This was a case where I was

9        still struggling with not being an

10       MDL lawyer, but trying to do what

11       I could.  I wanted Jerry Avorn

12       live on the stand.  I thought I

13       needed him.  I couldn't get him to

14       testify.  Chris Tisi couldn't get

15       him to testify for us.  We were

16       really stuck.  Ultimately what I

17       had to do was call Eric Topol, and

18       Eric Topol weighed in with Dr.

19       Avorn and talked him into coming

20       live, and then through some

21       negotiations with Chris, it worked

22       out for me to be able to put him

23       on.  And thank you again for that,

24       Chris.  Without you, I wouldn't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

 1      have been able to that.

 2            I got to put Ray Gilmartin

 3      on and cross-examine him live.

 4            If you look at the other

 5      cases, and I have brought with me

 6      and can attach these, if need be,

 7      the Garza case, the Barnett case,

 8      you will find over and over and

 9      over direct quotes where the

10      plaintiffs' attorneys are using my

11      lines that came directly from my

12      trials, from Ernst especially.

13      I've highlighted them in here, and

14      I'll be glad to attach these to

15      the record, but not one, two,

16      three, four, five, at least ten

17      different direct quotes using my

18      themes with my exact words in

19      Garza.  Same thing in Bartlett.

20      You will find the exact same

21      strategies, the exact same words,

22      my lines being echoed, my lines

23      being used.

24            MR. RAFFERTY:  Barnett.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

 1          MR. LANIER:  I'm sorry,

 2     Barnett.  What did I say,

 3     Bartlett?  Barnett.

 4          We did, in addition to this,

 5     do a good deal of work in the

 6     Texas MDL.  We tendered five

 7     different plaintiffs for trial in

 8     the Texas MDL.

 9          We had ten different

10     plaintiffs for trial workup in New

11     Jersey.

12          We continued to work

13     representing the  States of

14     Alaska, Utah, Michigan and

15     Colorado.

16          We assisted in the Texas MDL

17     as much as we could.  We assisted

18     with exhibits, testimony, experts.

19     We did briefing.

20          I think more so than any

21     other law firm, we spent a

22     disproportionate large amount of

23     our own money to fight this fight,

24     and I'm proud of the results and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 44

1          what actually happened.

2                As you know, we developed

3          and negotiated the juror

4          questionnaires in at least three

5          different jurisdictions.  We

6          selected winning juries in three

7          cases.

8                We worked on a number of

9          different bases.  I will tell you

10         this.  Our trial package that we

11         put together is strong enough

12         where even now I've been asked

13         today through an e-mail by the

14         Attorney Generals who are meeting

15         trying to decide whether or not to

16         engage in the trial package here,

17         could they buy my trial package

18         cheaper or would I give it to

19         them.  I have told them at this

20         point, no, I won't give anybody my

21         trial package, that's not my

22         client, that's not mine to do, and

23         yours has all of mine and more,

24         "yours" being the MDL.  Because

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

1        the MDL does, they have got the

2        benefit of everything we have done

3        and the things done outside of us.

4        So, I have made that point

5        already, but it does tell you the

6        merit of our trial package and

7        what we were doing.

8              The committees that I was on

9        y'all know, I have referenced in

10       some degree or another.

11             Final point on the Johnson

12       factors.

13             By the way, these are the

14       real Dodge Ball cards if y'all

15       have never seen them or never got

16       to use them.

17             Community attitude survey.

18             The gallery reports from

19       Irvin.

20             Seminars.  I've spoken at

21       dozens of seminars on this both

22       before and after the trials.

23       Everything on deconstructing a

24       Vioxx case, I've given all day

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 46

1       seminars on it.  I've given them

2       for ATLA, for a number of

3       different states.  I've got those

4       listed as well.

5            Community attitude surveys,

6       mock trial results from the mock

7       trials.  I've got all of this

8       stuff that we did that advanced

9       the litigation over a period of

10      almost seven years.

11           We did put into this

12      litigation in hard costs, not the

13      soft costs, in hard costs, over

14      $11 million.  You look at our

15      billable time alone for lawyers

16      and legal assistants, and at a

17      decent billable rate, it's $13

18      million.  We have 33,000 hours,

19      and I would be happy to go under

20      oath on all of those because I

21      guarantee you our hours are either

22      dead on or underreported.  Our

23      people worked vigorously hard to

24      make sure that we didn't put down

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1       anything that we didn't have

2       documentation for.  By that I mean

3       either e-mails, calendars,

4       receipts, something that indicated

5       that we did the work, when we did

6       it, how we did it.  So, we did

7       that as well.

8            The Vioxx litigation was

9       novel.  It's extremely

10      complicated.  It is difficult to

11      win at trial.  You are having to

12      juggle not only trial, but you are

13      having to juggle media efforts.

14      You are having to juggle what I

15      consider to be abhorrent tactics

16      by the defendants.  You have all

17      of that going on during these

18      trials.  It takes a great deal of

19      skill to do it, it takes a great

20      deal of experience to do it, and

21      it takes a great deal of expertise

22      to do it.  Through the help of a

23      lot of different people, we got to

24      lead that charge three times, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

 1    we led it successfully.

 2         Our New York office opened

 3    in November of '04.  That office

 4    was dedicated almost entirely to

 5    Vioxx work and nothing else.  We

 6    don't have an inordinate number of

 7    cases.  I have less than 1,000

 8    cases.  This is not the kind of

 9    thing where I was sitting there

10    with a treasure trove of my own

11    litigation.  We had enough, we had

12    some.

13         The consumer fraud verdict,

14    we got that, yes, that was good.

15    That led to the motion for Merck

16    to produce their hours and their

17    bills because Merck was protesting

18    the time that Perry and I put into

19    the files.  So, we filed a motion

20    saying, Judge, if you are going to

21    protest the time, why don't you

22    look at how much money and time

23    Merck paid their lawyers in this

24    case.  At that point, Merck backed

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1        off, and they said, okay, we will

2        accept that our hours and costs --

3               MR. MEADOW:  Were at least,

4        if not more than.

5               MR. LANIER:  -- were at

6        least, if not more than

7        plaintiffs, Perry's and ours.

8               Again, when you look at the

9        whole litigation, you look at how

10       much we know Merck spent, and you

11       compare it to even if there were

12       no reduction in the attorneys'

13       fees, Merck still almost outspent

14       the plaintiffs in fighting these

15       cases.

16               Long story short, nobody

17       does these things alone.  No law

18       firm does this alone.  It is with

19       great honor than that I have

20       fought what I call the Vioxx wars,

21       and y'all are my comrades in arms.

22       I may seem a little fussy at

23       times, and I may seem a little

24       prissy at times, and for that I

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 50

1       apologize, but I do truly

2       recognize the honor at fighting

3       with you guys.

4            I do give a shout out to

5       Jeff Grand, who is an unspoken

6       hero in my book, and I will hire

7       him away from you any time --

8            MR. SEEGER:  That's why I

9       made him partner.

10           MR. HERMAN:  I do want to

11      add one thing and make Mark

12      Lanier's testimony very clear.

13           Mark was conducting a

14      yeoman's effort, an extraordinary

15      trial lawyer outside the MDL.  But

16      unlike a number of other lawyers

17      who have testified in days

18      previously, he shared all of his

19      work product, which was very

20      important, and the sharing of work

21      product among plaintiff lawyers is

22      absolutely necessary.  So, when

23      Mark says he wasn't part of the

24      MDL, he may not have been part of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

1          the MDL, but his work product

2          ended up in the MDL in the

3          depository, was incorporated into

4          the MDL trial package, and I just

5          want to make that clear for the

6          record.

7                MR. LANIER:  Thank you.

8          It's an honor to be in there,

9          because y'all have done some

10          incredible work, and to have mine

11          added to yours is an honor to me.

12                Thank you.

13                     -   -   -

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

```
 1            C E R T I F I C A T E

 2

 3            I, LINDA L. GOLKOW, a Notary
       Public and Certified Court Reporter of
 4     the State of New Jersey, Registered
       Diplomate Reporter, Federally-Approved by
 5     the United States District Court of
       Pennsylvania, do hereby certify that the
 6     foregoing is a correct transcript of the
       testimony as taken stenographically by
 7     and before me at the time, place and on
       the date hereinbefore set forth.

 8

 9

10            I DO FURTHER CERTIFY that I
       am neither a relative nor employee nor
11     attorney nor counsel of any of the
       parties to this action, and that I am
12     neither a relative nor employee of such
       attorney or counsel, and that I am not
13     financially interested in the action.

14

15

16

17
       _____
18          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147
19          Notary Expiration:  1.2.10
            CCR Number:  30X100176200

20

21

22

23

24
```

FAC Resp. Amended Exhibit D -- 1688

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION

- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

- - -

DECEMBER 3, 2008

- - -

HOUSTON, TEXAS

- - -

FIRM:        THE SNAPKA LAW FIRM
             Kathryn Snapka, Esquire
             Anita Shahani, Esquire
BEFORE FEE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.
COURT REPORTER:  Linda L. Golkow, RDR
          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 - DEPS@GOLKOW.COM

FAC Resp. Amended Exhibit D -- 1689

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                        -  -  -

 2              MR. BIRCHFIELD:  Kathy, we

 3         appreciate you being here.  As you

 4         know, everything is being

 5         transcribed.  Judge Fallon wanted

 6         to make sure that everybody is

 7         aware of the Murphy Oil decision

 8         and the criteria that he's set out

 9         in that order.  Transparency is

10         key, and so we have a transcript

11         that will be available for his use

12         for whatever he decides is

13         appropriate.

14              Know that everything is

15         being taken down, and the floor is

16         yours.

17              MS. SNAPKA:  Great.

18              As I hope y'all remember, I

19         was involved in Vioxx back -- I

20         started in 2003.  I was initially

21         contacted with regard to four

22         cases, Benavides, Eller, Zajicek

23         and -- three cases and Garza.  I

24         became involved in Garza in 2004,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

     1          but I'll get to that in a second.

     2                  Do I need to attach by

     3          reference my affidavit and the

     4          cover letter to the hours,

     5          incorporate this?

     6                  MR. HERMAN:  No.

     7                  MS. SNAPKA:  I didn't know

     8          how formal we were being about

     9          that sort of thing.

    10                  I started in 2003 to

    11          investigate the medical causation

    12          and had many conversations with

    13          experts that I had used before,

    14          people literally in the field with

    15          their experiences with marketing,

    16          the heavy-handed marketing that

    17          was done.  Zajicek looked to be

    18          the best case.  It was a good case

    19          with no risk factors in a

    20          favorable venue, and I began

    21          preparing -- I filed my cases and

    22          began preparing Zajicek for trial.

    23                  In the meantime, because

    24          I've worked with them for years,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1          the law firm of Hockema Tippit &

2          Escobedo, as they were known at

3          the time, I was talking to David

4          Hockema, and David said his

5          partner, Joe Escobedo, was working

6          on a Vioxx case in Starr County,

7          and they were further along than I

8          was.  He said, you've done

9          pharmaceutical litigation, because

10         I had done a fen-phen case, and he

11         said, why don't you try the case

12         with us.  So, I said, that was

13         fine, I would bring what I had,

14         they would bring what they had.

15              I talked to Joe about the

16         depositions, the corporate

17         depositions that he had done.  One

18         of the things that was happening

19         was, particularly when Shelly was

20         taking the depositions, they were

21         saying, I don't know, I'm not

22         sure, you would have to talk to

23         somebody else who would know that.

24         So, Joe was actually one of the --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1        he was the first person to take

2        Bold, Tacconi, Silverstein and, of

3        course, Santanello.  He was the

4        first one to take the documents we

5        had distilled from the production

6        and take those depositions first.

7        I think they became obviously

8        critically important later.

9        Santanello was used in both Mark's

10       trial with the corporate rep and

11       in the Garza trial as the

12       corporate rep.

13            We prepared Garza and had a

14       trial setting, and we were getting

15       the case ready for trial.  It was

16       set for trial in November of 2004.

17       As you all know, it was removed,

18       remanded, and then I got the

19       Zajicek case -- as I said, I was

20       working both Zajicek, Eller, and

21       Benavides was not a strong case, I

22       did some research into it, but it

23       was not -- the plan was to try

24       Garza first and then to try

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1          Zajicek.

2                  MR. BIRCHFIELD:  Where was

3          Zajicek pending?

4                  MS. SNAPKA:  It was in

5          Jackson County, Texas.  As you

6          know, Andy, it was the case where

7          we went and visited with the

8          medical examiner, and he actually

9          was able to -- kept the blood and

10         was able to run it some years

11         after her death and found

12         rofecoxib in the blood.  So, I

13         think that had an impact, I

14         understand later on, from what you

15         told me.

16                 MR. BIRCHFIELD:  There's a

17         clause in the settlement agreement

18         just for that case.

19                 MS. SNAPKA:  That's right.

20         I never understood why other

21         people didn't do the same test,

22         because I thought it would be very

23         instructive on cases where

24         autopsies were performed and blood

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        was retained, but anyway, they may
 2        have.
 3              So, we were prepared for
 4        trial, we were ready to go to
 5        trial, and Merck got a continuance
 6        granted in November of 2004.  We
 7        got a resetting for February of
 8        2005.  And after the withdrawal --
 9        I'm just going to go in sequential
10        order because it is more logical
11        for me to do that.
12              At the time of the
13        withdrawal, I knew that Vioxx was
14        going to be important litigation.
15        And so what I did was, I had
16        already been in contact with
17        Shelly, I knew that she was
18        working with you, Mark.
19            MR. BIRCHFIELD:  Shelly
20        Sanford?
21            MS. SNAPKA:  Yes.  And
22        actually had been out to visit
23        David.
24            MR. BIRCHFIELD:  David
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1          Miceli?

2                MS. SNAPKA:  That's right.

3          David Miceli.  And so what I did

4          was, as far as Texas was

5          concerned, knowing from the

6          fen-phen litigation that the Texas

7          litigators would be and should be

8          out front in this litigation, I

9          set up a meeting at the Four

10         Seasons Hotel in October of 2004

11         and tried to get everybody I could

12         think of and encourage them to get

13         everybody they could think of so

14         that we could share the

15         depositions, the theories, what we

16         knew from preparing for the Garza

17         trial.

18               I remember I talked to Maura

19         from your office, Mark, and you

20         were in trial, and I think we

21         moved it, but y'all still weren't

22         able to make it, unfortunately,

23         for that meeting.

24               MR. LANIER:  Nine week

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

```
 1       trial.

 2            MS. SNAPKA:  We had probably

 3       40 people, and I thought that was

 4       important to get everybody

 5       together and everybody connected,

 6       show them what we had and make

 7       available what we had learned

 8       through the deposition process,

 9       but most importantly, the

10       documents that we had gleaned from

11       going through the millions of

12       pages of production as y'all are

13       aware.

14            I organized another meeting

15       December 8th, and I was trying to

16       remember -- one of the things I

17       would like to point out is the

18       hours I reconstructed are only

19       attorney hours.  The legal

20       assistant, who was my prime legal

21       assistant during this time period,

22       left to go sell real estate.  I

23       did not feel competent that I

24       could accurately represent legal
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

 1          assistant time, so, for the time

 2          period that I've submitted, those

 3          are only attorney hours, period.

 4          Nothing else.

 5               In any event, I know that

 6          you and Paul, Andy, you and Paul

 7          Sizemore came to one of the

 8          meetings that we had in Houston

 9          because I was trying to get

10          everybody that I could think of

11          together so that we could share

12          and present a unified and united

13          front.

14               I was also desperately

15          trying to get the Garza case to

16          trial because I knew the case, I

17          knew the case well, I knew that it

18          was in a really great venue, and

19          even though there were a lot of

20          risk factors which I thought was

21          critical to push that case for

22          trial, because it would

23          demonstrate that the target group

24          for Vioxx was going to be the most

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          affected, and I knew that we could

2          make that case based upon the

3          distinct fact pattern of Garza.

4                As you know, the MDL was

5          created, Merck removed it again,

6          less than 30 days before trial,

7          and everything sort of ground to a

8          halt at that time.

9                MR. BIRCHFIELD:  Just so you

10         know, Kathy, we just met with Joe

11         Escobedo, and Russ outlined for

12         him your tremendous effort, the

13         effort that both of y'all made in

14         getting that case remanded.  Joe

15         took us through the timeline of

16         the incredible struggle, the

17         timeline of getting that case

18         remanded and getting it sent back.

19         Let me tell you what Russ said to

20         Joe.  I mean, your effort in

21         getting that case remanded was

22         spectacular.  You dogged it all

23         the way.

24                MR. HERMAN:  I thought you

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

1        were tenacious, persistent, and

2        without you pushing that at every

3        PSC meeting and every status

4        conference, that case might still

5        be lingering now.

6              MS. SNAPKA:  Thank you very

7        much.  I appreciate that

8        recognition.  It means a lot to

9        me.

10             MR. BIRCHFIELD:  Joe

11       provided us with a detailed

12       timeline of the Garza case.

13             MS. SNAPKA:  I will say that

14       Joe is a tremendous lawyer, and he

15       is the one who literally looked at

16       every page of that production when

17       we were putting the case together.

18       I can't say enough about what he

19       personally did as far as getting

20       that prepared.  We were

21       prepared -- that was what was so

22       frustrating for me personally, is,

23       we were prepared to go to trial.

24       We were ready to go, and then we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1     did go.

2          In the meantime, what I was

3     doing was continuing -- I was

4     named by the Texas Supreme Court

5     as the plaintiffs' liaison

6     counsel, and then I continued in

7     that role, and we had -- and I

8     don't want to misrepresent, but it

9     was the first or second hearing I

10    think I was replaced by Tommy

11    Fibich as liaison, which certainly

12    made sense, because Tommy is in

13    Houston.  But I continued on the

14    Texas MDL, flying back and forth

15    and trying to push four trials.

16          In the meantime, I had

17    referred many other cases and

18    wanted to pick the best cases to

19    try.  In that mix was the Nettles

20    case, which was a young man who

21    suffered a catastrophic stroke.  I

22    was developing that case, meeting

23    with his neurologist, meeting with

24    his treating physicians,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1          proceeding with what I could

2          there.

3               I was also working on

4          Zajicek, because it was not

5          constrained by any of the Texas

6          MDL.  After we got it back out of

7          the Texas MDL, both Eller and

8          Zajicek, since they were pre-MDL

9          cases, both of those cases were

10         not subject to the constrictions

11         of time on either of the Texas MDL

12         or the federal MDL.  So, we

13         continued to pursue discovery,

14         retention and consultation with

15         experts.  And while we sought

16         remand -- Russ, you were there at

17         the emergency motion for remand in

18         July of 2005.  And then, of

19         course, your unfortunate

20         experience with the hurricane sort

21         of brought that to a standstill.

22              But we continued on with

23         discovery in Nettles and Zajicek.

24         And then of course in November, we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          got the great news that Garza got

2          the remand.

3               And honestly from that point

4          until we got the verdict, that was

5          what we did.  We prepared for

6          Garza, and I'm sure if -- I don't

7          want to duplicate what you've

8          heard, but we have an odd system

9          in Starr County where you start

10         trial for a week --

11              MR. LEVIN:  We heard.

12              MS. SNAPKA:  It is not like

13         you can say, okay, I'm going to

14         take a break and go try another

15         case and then come back.  So, what

16         you do is you get your daily copy,

17         and you plan what you are going to

18         do next.  There was a week in

19         there that is not accounted for

20         when my son had a tonsillectomy in

21         Houston.  Other than that -- other

22         than the tonsillectomy, I was back

23         at it.  And we stayed with the

24         Garza trial, and I outlined what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

 1          we did.  I selected the jury, I

 2          put on our cardiologist, I

 3          cross-examined Dr. Wheeler, I put

 4          on a plaintiff or two, and I was

 5          supposed to cross-examine Dr.

 6          Reicin.  And I kept asking over

 7          and over again, are you going to

 8          bring her?  And that's the one

 9          case they didn't bring her in.

10          So, I didn't get to cross-examine

11          her, which was a huge

12          disappointment to me.

13               After that, sometime during

14          that time period, they had

15          selected Arnold and Gomez for a

16          preemption motion, and I told

17          Anita to drop everything and begin

18          briefing.  We had briefed quite a

19          lot of it because she had filed

20          several responses in other cases,

21          and then we started to coordinate

22          with your office, Arnold.  I know

23          I was very protective because my

24          feelings always --

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1            MR. LEVIN:  It was your

 2       client.

 3            MS. SNAPKA:  It is my client

 4       and my case, and I appreciate very

 5       much the assistance, but I also

 6       appreciate the fact that I was

 7       allowed to speak and certainly

 8       present the facts.

 9            MR. LEVIN:  Collectively, we

10       did it.

11            MS. SNAPKA:  Collectively,

12       we did it.

13            Then when Nettles was

14       removed, again, I was there to try

15       and pull Nettles back because it

16       was the double remand case.  Andy,

17       you had some double remand cases,

18       and my goal was to get these cases

19       back to demonstrate that Merck was

20       simply trying to avoid going to

21       trial and would do anything.  I

22       have the transcripts where it was

23       discussed.  Even though it never

24       got remanded, I was there in my

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1        spot to try to get them remanded.

2             Zajicek proceeded, and we

3        actually -- the first trial

4        setting for Zajicek was actually

5        October of 2005.  Since the plan

6        was to try Garza first, we ended

7        up moving the Zajicek trial.  It

8        was set for trial in February of

9        2008.  It was set for trial at the

10       time that the settlement was

11       announced.

12            At the point at which

13       Zajicek -- where we were was, we

14       were going to do some genetic

15       testing on Vanessa Zajicek's blood

16       to eliminate the genetic tendency

17       toward arrhythmia because we

18       believed she didn't have it.  So

19       we were actually scheduled for a

20       hearing at the end of November on

21       the testing of the blood to again

22       eliminate that as a possibility

23       for her arrhythmia and sudden

24       cardiac death.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1              I was under the impression

2          that I was supposed to just stop

3          at November 9th, and I could be

4          wrong about that.

5              MR. HERMAN:  Well, why don't

6          you tell us since November 9 what

7          activities you've had.

8              MS. SNAPKA:  The primary

9          activity, honestly, I believed --

10         I was sitting in court when the

11         settlement was announced.  Of

12         course, I had no idea --

13         everybody was rumoring, and there

14         were people calling me saying send

15         us all of your cases, there's

16         going to be a settlement or

17         whatever.  So, as the settlement

18         was being explained, the one thing

19         that concerned me greatly was the

20         requirement that the attorney was

21         obligated to recommend the

22         settlement to all clients.  I

23         believed in my heart that that was

24         a violation of Texas ethics.  And

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

```
 1          although I was clearly not part of

 2          the plaintiffs' negotiating

 3          committee, I believed that I had a

 4          duty and responsibility to say

 5          something.  I understood that Lynn

 6          Baker had been retained, and so I

 7          was the one that called Charlie

 8          Silver, the professor who hired

 9          Lynn Baker, and I said, I need you

10          to review this.  I had a

11          conversation with Ed, and Ed kept

12          saying no, no, it is okay, we

13          talked to Lynn about it.  I

14          nonetheless wanted independent

15          confirmation that the settlement

16          was as good as it could be and

17          that everybody in the nation

18          could, without reservation,

19          participate in the settlement.

20               So, I personally retained

21          Charlie Silver, and then within a

22          day or two, Tommy Fibich joined me

23          in retaining Charlie Silver.  Then

24          there were several other people
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1          who also, we discussed it.  We

2          went to New Jersey and met with

3          Judge Higbee.  I believe that

4          there were some --

5               MR. SEEGER:  Which I

6          arranged for you.

7               MS. SNAPKA:  Absolutely,

8          Chris, thank you very much.  What

9          I appreciated from the committee

10         was that even though it was

11         difficult to discuss, that I think

12         everybody kept in mind that what

13         we were trying to do was to make

14         this settlement one that everyone

15         without reservation could enter

16         into and not feel that they had

17         any qualms whatsoever about it,

18         and I think we ended up

19         accomplishing that.

20              MR. BIRCHFIELD:  Your

21         initial reaction is certainly

22         understandable.  You got the

23         settlement agreement, and it had

24         to be for all clients.  But what

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1          you were not able to distill at

2          that moment is that we had been

3          working for 11 months to make sure

4          that it would be a settlement that

5          would work and would be in the

6          interest of every client

7          regardless of risk factors and all

8          of that.  And so that's why your

9          reaction was understandable.

10              MR. HERMAN:  Let me add what

11          I said earlier today in another

12          presentation.

13              First of all, throughout our

14          negotiations, Ed Blizzard was in

15          the forefront particularly in

16          terms of the Texas potential

17          ethics situation.  There wasn't

18          anything put on paper without the

19          retention of three ethics experts,

20          and Lynn Baker, actually, along

21          with two other ethics experts,

22          drafted the language of the

23          agreement.

24              Once the agreement went into

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          effect and Judge Higbee, Judge

2          Fallon and Judge Chaney looked at

3          it and it passed muster with them,

4          our collective feeling was not

5          that the lawyers in Texas were out

6          of line in getting the ethics

7          opinions that they needed to

8          satisfy themselves and their

9          clients.

10              MR. SEEGER:  I agree with

11          that, by the way.

12              MR. HERMAN:  We had a full

13          day meeting in Atlanta.  I believe

14          that Professor Silver was there.

15          I know that also they brought

16          Harry Potter in.  So, I want you

17          to know that we don't have an

18          adverse reaction at all to that

19          being done.  As a matter of fact,

20          once the Texas concern, legitimate

21          concern, was resolved --

22              MR. SEEGER:  I have to stop

23          you there, because there's

24          something very important, Kathy,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

 1        I'm sorry, but just because we are

 2        making a record.

 3             The agreement had not been

 4        changed.  There are people that

 5        have this impression.  It says

 6        exactly what it says.  It says

 7        exactly what we intended it to

 8        say.  I think at the end of the

 9        day, what happened was, we had

10        some letters passed around, some

11        documents clarifying, saying this

12        is how we understand this.

13             MS. SNAPKA:  The

14        interpretation.

15             MR. SEEGER:  That was really

16        because you guys had a concern

17        with it.  But the document, we

18        were very comfortable in the

19        beginning and still are.  This

20        sounds like a technicality --

21             MR. HERMAN:  After the

22        various points were expressed, it

23        not only had a good effect and a

24        better understanding for Texas,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1           but also for the country.  Because

2           there were other folks from other

3           states that were looking for a way

4           to criticize, and they had sort of

5           latched on to this issue.  When it

6           was resolved and the document was

7           fully understood, it went away for

8           everybody.

9                MS. SNAPKA:  And I know I

10          wasn't popular.  I understand

11          that.

12               MR. LEVIN:  You were never

13          not popular.

14               MR. SEEGER:  I hope we're

15          not leaving you with that

16          impression, but you were very

17          helpful.

18               MS. SNAPKA:  To the simple

19          extent that we are talking about

20          common benefit work done, I would

21          hope that my concerns and my

22          actions that I took in hiring

23          Charlie initially and then getting

24          everybody together to talk about

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1           it were viewed as ultimately

2           beneficial.  That's my purpose in

3           discussing it.  That's all I'm

4           saying.  That's what I meant.

5                MR. LEVIN:  We understand.

6                MR. HERMAN:  I think you can

7           be assured of that.

8                MS. SNAPKA:  Because you

9           said, go ahead and talk about what

10          it was after that.  That's what I

11          would say, is whatever I did

12          initially and ultimately in

13          working with everybody to get it

14          to where it is right now.  That's

15          what I'm trying to say.

16               MR. BIRCHFIELD:  Kathy, how

17          many cases have you submitted to

18          the settlement program?

19               MS. SNAPKA:  All of my

20          clients elected to go into the

21          settlement program, which is 87.

22               MR. WEITZ:  Other than

23          Nettles and Zajicek, did you have

24          any other cases that were on

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1        trial --

 2              MS. SNAPKA:  Yes.  Eller.

 3        In fact, what's really funny is,

 4        Eller is still set for trial.

 5        That's a very interesting one.

 6        And I talked to Phil Wittmann

 7        after that to say, you reported no

 8        trial settings, but we actually do

 9        have a trial setting in Eller.

10        It's a quirk, but, yes.  Eller has

11        been and continues to be set for

12        trial.

13              MR. BIRCHFIELD:  Have you

14        submitted Eller in the settlement?

15              MS. SNAPKA:  Yes.  Eller is

16        submitted, but the judge refused

17        to dismiss it while the settlement

18        was pending because --

19              MR. BIRCHFIELD:  In case it

20        doesn't pass the gates?

21              MS. SNAPKA:  That's correct.

22              MR. BLIZZARD:  Where was

23        Nettles pending?

24              MS. SNAPKA:  It was
```

Page 28

1          originally filed in Beaumont, and

2          then it was removed to Federal

3          Court.  Judge Crone remanded it.

4          It went back to Beaumont, to

5          Jefferson County, and then it went

6          into the Texas MDL where it was

7          removed again, and then it was in

8          the Federal MDL.  But there was

9          extensive discovery done on the

10         case.  Nettles was one of the

11         cases that was a Texas pick for

12         stroke.

13              MR. BLIZZARD:  But it was in

14         the Federal MDL ultimately?  Where

15         was it in terms of discovery when

16         it was removed the last time to

17         the federal MDL?

18              MS. SNAPKA:  The treating

19         physician, we had retained the

20         experts and designated them, the

21         case specific experts.  I believe

22         the case was removed at that time.

23              MR. BLIZZARD:  Depo of the

24         plaintiff.  Were there depos of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

```
 1        other experts?
 2              MS. SNAPKA:  Only of the
 3        treating/prescribing physician,
 4        who had given him the Vioxx.
 5              But to the extent that there
 6        were double removal cases, and I
 7        was, again, trying to demonstrate
 8        a pattern with Merck trying to
 9        avoid trials, I was up there every
10        time being annoying.
11              MS. SHAHANI:  Or dispatching
12        me to do that.
13              MS. SNAPKA:  If I couldn't
14        be there.
15              I believe that anything post
16        November 9 is pretty much taken
17        up -- I've already discussed the
18        issues, and that would be the only
19        thing that I would be submitting
20        additionally.  I don't know if I
21        can or will and whatever.
22              MR. BIRCHFIELD:  Any other
23        questions?
24              MR. SEEGER:  No.
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1          MR. BLIZZARD:  I was just

2      going to point out that currently

3      your hours are under review by the

4      accountant at least according to

5      this report that we have, and the

6      expenses are being shown as being

7      under review also.  Is there

8      anything we can do to help with

9      that?

10          MR. LEVIN:  He's probably

11      working on that because if you

12      were in trouble, they would be

13      rejected.

14          MS. SNAPKA:  That's good to

15      know.  Let me just say that --

16          MR. BIRCHFIELD:  Don't panic

17      if you get a rejection letter.

18      Just respond quickly and get us

19      involved.  It has happened quite

20      frequently.  You just need to work

21      at it.

22          MR. SEEGER:  We'll give you

23      Arnold's cell phone number.

24          MS. SNAPKA:  I think I have

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
 1        it, actually.
 2             One of the things they did
 3        do is they rejected all of my
 4        hours prior to the MDL, and I went
 5        nuts.
 6             MR. SEEGER:  They did with
 7        me too, though.  We all went
 8        there.
 9             MR. LEVIN:  They were
10        working under guidelines of the
11        MDL.  And then when all the state
12        litigants came in, it took them a
13        while to get oriented.
14             MS. SNAPKA:  I'll let y'all
15        know.
16             In 28 years of practicing
17        law, what I found with every type
18        of case is that corporations will
19        recognize, assess and contain
20        their risk only after trial or if
21        there's a threat of trial or
22        during trial.  I say that as a
23        perspective from a trial lawyer.
24        I was trained at Baylor like Ed
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1          was, and they taught us to try

2          cases.  That's all I know how to

3          do.  I'm not good at the other

4          stuff.  That was the one thing

5          that I thought, as far as a common

6          benefit, was they had me sort of

7          as a loose cannon out there.

8          Every time I possibly could, I was

9          going to push for a trial.  That's

10         where I was headed.  My only

11         regret is I didn't get to try more

12         cases.

13              Do y'all have any questions?

14              MR. SEEGER:  I think we

15         asked them.

16              MS. SNAPKA:  Thank you.

17              MR. BIRCHFIELD:  Thank you,

18         Kathy.

19                   -  -  -

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1                    C E R T I F I C A T E

2

3              I, LINDA L. GOLKOW, a Notary

4    Public and Certified Court Reporter of

5    the State of New Jersey, Registered

6    Diplomate Reporter, Federally-Approved by

7    the United States District Court of

8    Pennsylvania, do hereby certify that the

9    foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22        Linda L. Golkow, RDR, CRR, CCR
          Notary Number:  1060147

23        Notary Expiration:  1.2.10
          CCR Number:  30X100176200

24

FAC Resp. Amended Exhibit D -- 1721

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
JANUARY 23, 2009
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
NEW YORK, NEW YORK
- - -
FIRM:  WEITZ & LUXENBERG, P.C.
       Perry Weitz, Esquire

BEFORE COMMITTEE MEMBERS:
ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers, LLP
THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP
W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman
TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.
CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                  -  -  -
 2              MR. WEITZ:  My name is Perry
 3          Weitz from the law firm of Weitz &
 4          Luxenberg.
 5              Gentlemen, I must say to
 6          each and every one of you that
 7          working on this litigation with a
 8          lot of you at this table and
 9          serving with all of you on this
10          allocation committee has really
11          been an honor.  This has been a
12          difficult litigation, this
13          allocation process has been a
14          difficult process, and I think
15          that you all have distinguished
16          yourselves through your
17          professionalism, through the
18          respect and fairness that you have
19          shown all the lawyers that have
20          come before us.  This was a lot of
21          hard work, it was a lot of time,
22          it was a lot of traveling all of
23          these years in this litigation. I
24          commend all of you for your
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1    efforts.

2         I think Russ spoke

3    beautifully in describing the

4    litigation and everybody's

5    contributions.  I'm going to talk

6    about the New Jersey Vioxx

7    litigation because that's where

8    our cases were filed and that's

9    where we did our work, but I would

10   like to recognize, as Russ did,

11   all of the great work that was

12   done by the lawyers in the MDL and

13   the fabulous contributions they

14   made towards this global

15   settlement.

16        Many of them came before us,

17   as Russ commented on.  Russ laid

18   out the tremendous amount of

19   detail and work that had to be

20   done, and it really was a

21   Herculean effort, and they are to

22   be congratulated, as our lawyers

23   in the other states like Tom and

24   the LA lawyers for pushing the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1    cases on the docket and being

2    trial ready so often.  So, I would

3    like to commend all of those

4    lawyers that I didn't have as much

5    of an opportunity to work with as

6    I did in the New Jersey Vioxx

7    litigation.

8         I think that I'm in a pretty

9    unique position to be able to give

10   to this committee and to the

11   judges an objective and somewhat

12   subjective view when we get to

13   Weitz & Luxenberg's contribution,

14   but an objective view on how I saw

15   the New Jersey Vioxx litigation

16   evolve and how it evolved into

17   making a significant contribution

18   to the overall Vioxx global

19   settlement.  I would like to do

20   that for everybody and then

21   outline some of Weitz &

22   Luxenberg's contributions.

23        So, let me start with how I

24   saw it evolve in New Jersey.  From

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

```
 1        day one, in the New Jersey Vioxx
 2        litigation, there was no formal
 3        PSC, there were no committees.
 4        Chris Seeger was called liaison
 5        counsel with Sol Weiss from Anapol
 6        Schwartz, and because there were
 7        no formal committees and PSC, it
 8        was the type of place that if a
 9        lawyer wanted to do work, they did
10        the work.  They didn't wait for it
11        to be assigned to them like in the
12        MDL, they just took it upon
13        themselves and they did the work.
14             When I first started
15        following the Vioxx litigation and
16        it first started in New Jersey,
17        quite frankly, it was Seeger Weiss
18        and Seeger Weiss period.  There
19        were other lawyers that had filed
20        cases and were around, but Seeger
21        Weiss took the leadership role,
22        and they took the bull by the
23        horns as far as the work effort.
24        They had filed most of the cases
```

FAC Resp. Amended Exhibit D -- 1726

Page 6

1    and were pushing them on the

2    docket.  They had set up the

3    document depository there.  They

4    did most of the early discovery.

5    They set up the initial structure

6    for the New Jersey Vioxx

7    litigation.  They started to

8    obtain procedural and substantive

9    rulings that laid the groundwork

10   for other firms such as myself

11   when we came into the litigation

12   later, and they pushed the cases

13   on the calendar so that they could

14   get the first trial as they did in

15   Humeston I.

16        So, lawyers like myself who

17   came into the litigation are very

18   grateful to the Seeger Weiss

19   contribution and the things that

20   they did because it was a

21   Herculean effort.

22        Chris was, particularly, as

23   all of you know, the co-chair of

24   the MDL, as also being the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

```
 1        co-liaison counsel in New Jersey,

 2        and quite frankly, my first

 3        interfacing with Chris was having

 4        to do with what was going on in

 5        the New Jersey state courts.

 6        There was some conflict and

 7        friction between things going on

 8        with state court and the MDL, and

 9        Chris did a fantastic job of

10        interfacing with the lawyers from

11        the state court with the MDL to

12        make sure that there was a flow of

13        information so that the litigation

14        nationally was never hindered by

15        what was going on in state court

16        or what was going on in the MDL,

17        wanted to make sure that everybody

18        was on top of their game and was

19        getting the information.  That was

20        due to Chris' effort.

21             There were two other

22        significant developments that

23        occurred, I believe, in the New

24        Jersey Vioxx litigation that
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

 1         helped sculpt that litigation and

 2         make it a significant contribution

 3         towards the global settlement

 4         other than Seeger Weiss'

 5         leadership in New Jersey.

 6              The first thing I would like

 7         to talk about is Weitz &

 8         Luxenberg, which I will refer to

 9         as  W & L from now on or we'll be

10         here forever.

11              W & L became a significant

12         presence in New Jersey towards the

13         end of 2004, after the recall.  We

14         had filed approximately 4,000

15         Vioxx cases, and it was the

16         largest inventory of cases in New

17         Jersey.  Probably more

18         importantly, and more

19         significantly, we joined Seeger

20         Weiss in a leadership capacity at

21         that time where we tried to assist

22         them in every way by maintaining

23         an active day-to-day role in the

24         Vioxx litigation, actively

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1       participating in all the status

2       conferences, obtaining discovery

3       productions from the Court,

4       participating in all aspects of

5       legal briefing, legal motions,

6       legal arguments.  We fought with

7       them for more cases on the docket.

8       We pushed for them to advance

9       cases in discovery, and we

10      maintained beneficial trial

11      schedules and rulings so cases

12      could go to trial.

13           Now, many of you might be

14      asking yourself, well, why was

15      Weitz & Luxenberg's presence and

16      why was Weitz & Luxenberg's

17      leadership role more important

18      than maybe some other people?

19      Well, if you go back in time and

20      you think about the end of 2004 to

21      2005, at that time, Merck was

22      really testing all of the

23      plaintiff lawyers around the

24      country.  They were testing them

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1        in the MDL, they were testing them

2        in Jersey, they were testing them

3        in LA, they were testing them in

4        Texas.  They wanted to see if the

5        plaintiffs' lawyers had the

6        manpower, had the ability and the

7        skill, and whether the plaintiffs'

8        lawyers had the resources to

9        actually take them on in their

10       scorched earth case by case,

11       one-on-one defense strategy.  It

12       was a real test.  It was a real

13       difficult litigation.

14            The reason that W&L's

15       presence and leadership in New

16       Jersey were important was because

17       Merck knew that Weitz & Luxenberg

18       had the ability and the skill,

19       that we had the manpower, and that

20       we had the resources to take the

21       large inventory of cases that we

22       filed and not just stockpile them

23       and sit on them, but we were going

24       to push them and work them up for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          trial, and that we had the

2          capacity to assist Seeger Weiss at

3          that time in a leadership role

4          developing the litigation,

5          developing the law, developing the

6          cases and trying the cases.

7          That's where I think we

8          distinguished ourselves.

9              Merck knew that W & L had

10         some of the best pharmaceutical

11         and mass tort lawyers in the

12         country devoted specifically to

13         the Vioxx litigation.  I had a

14         nice chart for you guys, but I'll

15         go over it with you.

16             The most senior lawyers at

17         Weitz & Luxenberg were involved in

18         the Vioxx litigation on a

19         day-to-day basis.  I oversaw the

20         litigation, I had 25 years of

21         experience; Rob Gordon, 29 years

22         of experience, my partner; Jerry

23         Kristal, 32 years of experience,

24         Jerry, a great lawyer; Ellen

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

 1       Relkin, one of the best law people

 2       in pharmaceutical litigation was

 3       involved in every single piece of

 4       legal briefing, motions in the

 5       case and arguing the motions.

 6       Paul Pennock was pushing the cases

 7       on the docket, getting them ready,

 8       keeping the pressure on Merck so

 9       that we could have as many cases

10       possible on the docket so that

11       they had that pressure on them.

12            Rob Gordon and Jerry Kristal

13       were the first seats for Weitz &

14       Luxenberg in the McDarby trial.

15       Ellen Relkin did basically all of

16       that legal briefing.  These

17       lawyers have been involved in mass

18       tort litigation, pharmaceutical

19       litigation for over 20 years,

20       having some of the most

21       significant verdicts and

22       settlements in those litigations

23       ranging from asbestos to breast

24       implants to Propulsid, pretty much

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          every single pharmaceutical

2          litigation in the last 20 years.

3          Between these five lawyers, there

4          are over 150 verdicts, mass tort

5          verdicts, I would say, and over a

6          billion dollars in verdicts, and

7          clearly I've done multiple

8          multi-billion dollar settlements

9          in the mass tort world.

10              Weitz & Luxenberg also had

11         about 36 paralegals and lawyers

12         aside from them devoted full time

13         to the Vioxx litigation.  We

14         devoted 17,500 hours specifically

15         to the Vioxx common benefit.  We

16         were headquartered in New York and

17         New Jersey right in Merck's

18         backyard, and that played a

19         significant role in my opinion,

20         because for over 20 years, we had

21         litigated pharmaceutical and mass

22         tort cases in the New York and New

23         Jersey courts, and Merck knew who

24         W & L was.  They knew who they

FAC Resp. Amended Exhibit D -- 1734

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

```
 1       were dealing with.  They dealt

 2       with us in other litigations

 3       before.  They knew that we were

 4       not going away.  They knew that we

 5       were going to push our cases.

 6       They knew, I think as Russ nicely

 7       said, that W & L had to be

 8       involved in a global settlement

 9       for it to be successful,

10       otherwise, we had the capacity,

11       both manpower and resources and

12       ability, to litigate the cases on

13       our own.

14            The second significant

15       factor that I believe helped

16       sculpt the Vioxx litigation in New

17       Jersey was Mark Lanier.  After his

18       fabulous verdict in the Ernst

19       trial, Mark decided that he wanted

20       to come east and try to some cases

21       in New Jersey.  Mark and I had

22       been friends and had battled in

23       the asbestos wars together and

24       been colleagues for many years,
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1     and I knew Mark to be one of the

2     most talented trial lawyers in the

3     country.  Mark and I discussed the

4     Vioxx New Jersey landscape, and we

5     discussed how our firms could work

6     together to make New Jersey a

7     place that Merck had to seriously

8     worry about.

9          Mark and my partner, Rob

10    Gordon, had always talked about

11    trying a case together, and since

12    they were two of the best trial

13    lawyers in the country, I thought

14    that that would be fabulous for

15    the Vioxx litigation nationally

16    and wanted to try to make that

17    happen.  So, I reached out to our

18    leader, Chris Seeger, who was

19    really running the show in New

20    Jersey, and I arranged a dinner.

21    The three of us, Mark and Chris

22    and myself met for dinner.

23    Needless to say, there were some

24    big egos at that table, but really

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

```
 1        I must say -- in fact, I'll never
 2        forget that dinner.  I must say
 3        that in the interest of moving the
 4        litigation forward and trying to
 5        do what was best for the
 6        litigation nationally, the three
 7        of us joined forces.  We came up
 8        with a game plan that ultimately
 9        resulted in the McDarby/Cona trial
10        and the Humeston/Hermans trial.
11        McDarby and Cona were tried by W &
12        L and Mark Lanier, and
13        Humeston/Hermans were tried by
14        Chris Seeger and Mark Lanier.
15        These two trials resulted in
16        enormous victories that propelled
17        the litigation forward nationally
18        and really crystalized where
19        things, I believe, had to go for
20        Merck.
21            Let me be clear for the
22        record here.  The New Jersey Vioxx
23        litigation could not and would not
24        have been the success that it was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

1      without Chris Seeger, Dave

2      Buchanan, Jeff Grand and all the

3      lawyers at Seeger Weiss from the

4      beginning until the end if not for

5      Mark Lanier and his trial team

6      when they entered, and if not for

7      Weitz & Luxenberg, their

8      litigators and their trial team.

9           There were other lawyers involved,

10     there were other contributions

11     made, but these were the leaders,

12     these were the people that drove

13     that litigation.

14          Now let me get to Weitz &

15     Luxenberg a little bit where I

16     think this shifts from some

17     objectivity to some subjectivity.

18          W & L made a massive

19     financial contribution in Vioxx.

20     We spent approximately $25 million

21     on working up the Vioxx

22     litigation, working up individual

23     cases, pushing them on the docket

24     for advanced discovery, medicals,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1    hard and soft costs of having to

2    carry that litigation.  These are

3    not costs that I've submitted, but

4    I think it's important for this

5    committee to recognize, because as

6    I was trying to explain before

7    about Weitz & Luxenberg's presence

8    and the number of cases that we

9    had and why our leadership was

10   important, Merck knew this.  Merck

11   knew that the presence of our

12   inventory of cases and the fact

13   that we were moving them on the

14   docket, and our participation in

15   those cases put enormous pressure

16   on Merck.  This wasn't like some

17   firm that just was out there

18   advertising and had a bunch of

19   cases and they were sitting there.

20   So, that had a tremendous effect

21   on Merck.  They knew that we were

22   fully prepared regardless of the

23   time, the cost or the effort to

24   take on their scorched earth

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

 1          defense strategy.

 2                  W & L also paid over $1

 3          million in expenses specifically

 4          attributed to the common benefit.

 5          So, in short, I would like to go

 6          over with you in some specifics

 7          why W & L's work was the highest

 8          quality, how our work was

 9          consistent and relentless, it

10          never waivered, how we stayed

11          committed the whole time, how we

12          helped lead New Jersey,

13          participating in all aspects of

14          discovery, legal briefing and

15          argument, pushing cases on the

16          docket, trying cases and being

17          prepared until the end of the

18          litigation in the global

19          settlement, and how we believe

20          that contributed towards getting

21          Merck to the table.

22                  I would like to show you how

23          Weitz & Luxenberg contributed by

24          looking at five different turning

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          points in the litigation.  I think

2          those five turning points will

3          exemplify Weitz & Luxenberg's

4          quality of work and their

5          contribution.  It would be easier

6          for you to see if I had a

7          PowerPoint, but we don't.

8               What I would like to talk to

9          you about is the time around

10         November '05, it was a critical

11         time in the litigation.  The Ernst

12         case had been won and sort of, all

13         right, Ernst was done, and it was

14         very significant, but now some

15         time had gone by, and you guys

16         know how when there's some losses,

17         all of a sudden people are

18         starting to forget about a

19         victory.  We felt like the

20         litigation was slipping away

21         because the MDL hadn't won a case

22         yet, I think Plunkett had just

23         been lost, Humeston in New Jersey

24         had been lost, we hadn't won a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1    case there.  The second MDL trial,

2    Irvin, wasn't going great, I think

3    there was a hung jury, and Merck's

4    strategy was trying cases

5    individually, and plaintiffs'

6    lawyers around the country were

7    looking for the wrong kind of

8    case, they were looking for the

9    perfect case with no risk factors.

10   So, we got together, the New

11   Jersey leadership, Seeger Weiss,

12   Weitz & Luxenberg, and Mark

13   Lanier, and we went to Judge

14   Higbee, because we wanted to push

15   the cases, and we persuaded her to

16   amend the Case Management Order

17   and to create waves of advanced

18   discovery cases 1 through 5.  It

19   was literally hundreds and

20   hundreds of cases to put pressure

21   on Merck.  And it worked.  We were

22   able to get her to do that, and it

23   was very successful in that we

24   were all willing to put cases up

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1          and work them up and try to
 2          pressure Merck.
 3               The other thing that I think
 4          Weitz & Luxenberg did was we knew
 5          from prior mass tort experience
 6          that this litigation was Merck's
 7          defense strategy of one case at a
 8          time was only going to benefit
 9          them.  It was going to kill us and
10          cripple us.  We had to convince
11          Judge Higbee to consolidate cases.
12          We knew that that was the key to
13          our success in other mass tort
14          litigations.  So, W & L moved
15          before Judge Higbee and argued to
16          Judge Higbee for consolidation.
17          We argued that an educated jury
18          was a terrible thing to waste,
19          that we had to maximize the jury
20          once we had them and educate them,
21          that there were very limited
22          judicial resources out there, that
23          these trials were enormously
24          expensive, and that we needed to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

```
 1          capitalize and try more than one
 2          case at a time and that Merck was
 3          never going to be incentivized to
 4          settle unless we consolidated,
 5          because one case at a time just
 6          worked to their benefit, and there
 7          weren't enough judges to try one
 8          case at a time.
 9               Despite many doubters, we
10          were able to convince Judge
11          Higbee, and she agreed to
12          consolidate.  It was the first
13          time there was consolidation that
14          was ordered in a pharmaceutical
15          case in New Jersey, it was the
16          first time consolidation was
17          ordered nationally in the Vioxx
18          litigation.  Ellen Relkin from
19          Weitz & Luxenberg briefed the
20          issue and defeated Merck's motion
21          for severance.  This was a major
22          shifting in the litigation I
23          believe not only in New Jersey,
24          but nationally.  Let me tell you
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1    why I think that it was such an

2    important success.  It not only

3    pushed more cases out for trial to

4    put more pressure on Merck, but it

5    created what we like to call in

6    our firm, which we've gotten from

7    many jury analyses, subconscious

8    epidemiology.  That's basically

9    from when you are dealing with

10   these multiple causal risk factor

11   cases, when you pile up the cases,

12   more than one, but two, three,

13   four, a common denominator arises,

14   and that common denominator was

15   Vioxx.  So, the shadow jury ends

16   up focusing more on the Vioxx and

17   less on the risk factors, and we

18   thought that that was a very

19   significant factor, and we found

20   that to be true when we he spoke

21   to the shadow juror after the

22   McDarby/Cona case.

23        So, Judge Higbee orders her

24   first consolidation.  It wasn't

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1     quite as we thought it to be.  We

2     thought it was going to be a

3     Lanier case and a W & L case that

4     we were going to try together.

5     Judge Higbee had some other ideas,

6     and she decided that the

7     defendants were going to get their

8     choice of one of the consolidated

9     picks and the plaintiffs would get

10    one pick.  Merck chose a W & L

11    case named John McDarby for their

12    defense pick, and Mark Lanier

13    chose for plaintiffs the Cona

14    case.  Needless to say, there was

15    good reason for Merck picking the

16    John McDarby case.  This was a

17    specific causation dream case for

18    Merck.  It was a dream pick for

19    Merck, and let me explain why,

20    because it's important that

21    everybody understands this and how

22    it had an impact on the

23    litigation.

24         John McDarby was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

```
 1          74-year-old man, so, his gender
 2          and age went towards his risk
 3          factors.  He was a diabetic, which
 4          is one of the biggest known risk
 5          factors, and his diabetes was not
 6          in control.  He had metabolic
 7          syndrome, which was also another
 8          risk factor for MI; he had
 9          preexisting arteriosclerotic
10          disease, another risk factor for
11          MI; he had low HDL, another risk
12          factor for MI; was a former
13          smoker, and you can't see the
14          picture because I don't have the
15          PowerPoint, but he was in a
16          wheelchair.  The reason he was in
17          a wheelchair, and this was one of
18          Merck's defenses, was because when
19          John McDarby stood up in his
20          living room, he fell down and
21          fractured his hip.  Well, in his
22          hospital record, it said that he
23          was treated for a fractured hip,
24          and they never even knew he had a
```

FAC Resp. Amended Exhibit D -- 1747

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1        heart attack until hours later

 2        when tests were done.  Merck said

 3        Mr. McDarby's heart attack

 4        occurred because he fractured his

 5        hip and the trauma of the hip and

 6        his bad health and all of his risk

 7        factors.

 8             So, needless to say, they

 9        picked John McDarby out of

10        probably 20,000 cases in New

11        Jersey and out of 4,000 cases of

12        Weitz & Luxenberg for a very good

13        reason.  Not only that, they

14        wanted to put the nail in the

15        coffin with the John McDarby case,

16        because Merck had been going

17        around the country telling

18        everyone that their studies showed

19        that you only had an increased

20        risk for CV if you took the drug

21        consistently for 18 months.  John

22        McDarby had taken Vioxx

23        consistently with records for four

24        years.  They thought that this was
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

```
 1        an easy win for them because of
 2        all the risk factors that John
 3        McDarby had.  They wanted to show
 4        if somebody took Vioxx for even
 5        four years consistently, they
 6        would still win their case, and it
 7        didn't increase the risk.  So,
 8        there was no pressure on Weitz &
 9        Luxenberg.
10            Many other firms would have
11        walked away from this case.  Weitz
12        & Luxenberg didn't.  They were
13        committed to it.  It was a very
14        expensive case.  It was over $1
15        million in expenses and over 8,000
16        hours of attorneys and paralegals.
17        I think Vince Lombardi said, "When
18        the going gets tough, the tough
19        get going."  Well, Weitz &
20        Luxenberg got going.
21            Because John McDarby with
22        the case and the risk factors were
23        so enormous, Weitz & Luxenberg
24        were confronted with how to try
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

1       this case.  We had done some

2       internal mock trials, and we had

3       done some strategizing, and we had

4       realized that Merck's position in

5       the litigation that a person with

6       cardiac risk factors was a heart

7       attack waiting to happen and that

8       the plaintiffs could never prove

9       that Vioxx caused the injury had

10      to be reversed somehow.  It wasn't

11      going to be reversed by the way

12      the cases were being tried,

13      because prior to McDarby, the

14      plaintiffs' attorneys were trying

15      cases by trying to defend the risk

16      factors and saying Vioxx was a

17      mechanism related-based injury,

18      and that but for Vioxx, the risk

19      factors never would have caused

20      the heart attack.  They were

21      trying to defend the risk factors.

22      Well, we didn't think that that

23      was going to work because there

24      were 100 known risk factors, and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1       none of them were related to Vioxx

2       that caused heart attacks.  So,

3       faced with the overwhelming risk

4       factors in McDarby, we came up

5       with a new strategy.  We figured

6       we had to argue to the jury that

7       Merck was liable because they

8       targeted guys like John McDarby

9       with risk factors, elderly people,

10      osteoarthritis, that had these

11      risk factors, and John McDarby was

12      the last person in the world that

13      should be given Vioxx.  We came up

14      with the strategy that you had to

15      not defend the risk factors, but

16      embrace the risk factors and argue

17      substantial contributing factor to

18      the jury.  Let me explain that to

19      you.

20          We had from our asbestos

21      smoking lung cancer experience, we

22      probably tried more asbestos lung

23      cancer cases than anybody in the

24      country over the last 20 years,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

1    and in those asbestos lung cancer

2    cases, there are many different

3    causal factors.  There's asbestos,

4    there's smoking, there's other

5    toxins, other dusts, other

6    chemicals.  These guys are all

7    alcoholics and all of these

8    carcinogenic --

9        MR. LEVIN:  All?

10       MR. WEITZ:  Large percentage

11   of them.  They are construction

12   workers.

13       As a result of that, we had

14   to deal with all of those factors

15   to win the case, and the way that

16   we dealt with that was by

17   educating the jury on substantial

18   contributing factors, and not

19   trying to play down their other

20   exposures other than asbestos by

21   saying, oh, well, he didn't smoke

22   that much and oh, he didn't really

23   breathe in that much of other

24   fumes or other dusts.  We embraced

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

```
 1          the factors, we said each was a
 2          substantial contributing factor,
 3          and we educated the jury on that.
 4               Well, that's what we did in
 5          the McDarby case.  We took Vioxx,
 6          and we said, it does not have to
 7          be the sole cause, it does not
 8          have to be the dominant cause of
 9          his heart attack, it only has to
10          be a substantial contributing
11          factor.  We had our experts
12          emphasize this at trial, we
13          emphasized it in our openings, we
14          emphasized it in our closings, and
15          Rob Gordon and Jerry Kristal did a
16          fabulous job of demonstrating that
17          to the jury.  I could show you
18          guys this, but they basically took
19          a deck of cards, and it was New
20          Jersey, and they had a card that
21          showed a straight, an ace of
22          hearts, a King of clubs, a queen
23          of diamonds, a Jack of clubs and a
24          10 of hearts.  They showed that to
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

1          the jury.  They said, look, take

2          any one of those cards, they are

3          not the dominant cause, they are

4          not the sole cause of that

5          straight.  They said, each one of

6          those cards is a substantial

7          contributing factor in getting

8          that winning hand, that straight.

9          Then the cards turned over on the

10         PowerPoint, and it showed Vioxx,

11         it showed all Mr. McDarby's risk

12         factors, it showed

13         arteriosclerotic disease, it

14         showed low HDL, it showed

15         diabetes, it showed his gender.

16         We argued to the jury that it was

17         just like the straight.  Each one

18         of these was a substantial

19         contributing factor.  They didn't

20         have to be the dominant or sole

21         cause.  And it ended up being a

22         winning argument because the

23         appellate division ended up

24         affirming Weitz & Luxenberg's

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 34

1     substantial contributing factor

2     argument and rejecting Merck's but

3     for test argument.

4          They went on to say that in

5     a case such as this in which

6     multiple factors can be found by a

7     jury to contribute to McDarby's

8     condition, medical causation was

9     appropriately demonstrated that

10    proved an exposure to the

11    defendant's product was a

12    substantial contributing factor

13    for causing or exacerbating the

14    disease, and they confirmed the

15    compensatory damages in McDarby.

16    This set a great legal precedent

17    in New Jersey, and it also shifted

18    the way cases were tried

19    throughout the country in the

20    Vioxx litigation and I believe was

21    a huge benefit to the entire

22    litigation.

23          Another significant

24    contribution that I think was

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

1          made, everybody in the litigation

2          knew this has to do with the sales

3          representative trial package.

4          Everyone knew that Merck had a

5          huge sales force and was pushing

6          Vioxx on the prescribing doctors

7          and saying that Vioxx was not a CV

8          risk.  But no one had in mind to

9          use the sales rep doctors'

10          testimony to advance the failure

11          to warn case, the scientific

12          causation case and the punitive

13          damage case.  Well, Jerry Kristal

14          from Weitz & Luxenberg and a team

15          of lawyers from Weitz & Luxenberg

16          did a fabulous job on putting that

17          together.  In the fall of 2005,

18          the W & L lawyers did a massive

19          document search of the Vioxx

20          database, as well as sales reps'

21          personal and custodial files,

22          which yielded many hot documents.

23               In January of '06, Jerry

24          Kristal took several depositions

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

1        of Merck sales reps using over 100

2        exhibits uncovered in the document

3        review, and then he created a

4        trial package which he distributed

5        to counsel across the country as a

6        template to how to attack these

7        critical witnesses with hundreds

8        of hot documents catalogued.  This

9        was a critical element in the

10       McDarby trial because Dr. Braun,

11       the prescribing doctor, was one of

12       Merck's targets.  They had visited

13       him over 200 times.  They went to

14       him and tried to convince him that

15       there was nothing ever wrong with

16       Vioxx, that there wasn't an

17       increased risk, and this testimony

18       came out when Dr. Braun testified,

19       and it was critical to a heeding

20       presumption charge that I'm going

21       to get to in a minute.  So, that

22       trial package turned out to be

23       very useful to the common benefit.

24            Point two.  The McDarby

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

1        trial was won.  It was a

2        $13-and-a-half million verdict.

3        It was April of '06, the beginning

4        of April.  It was a $4-and-a-half

5        million compensatory verdict, it

6        was a $9 million punitive verdict.

7        It was a great result at a

8        critical time, and that was thanks

9        to Mark Lanier and his trial team

10       and Weitz & Luxenberg and their

11       trial team.  Mark Lanier was

12       trying the Cona case at that time,

13       but he took the lead in the

14       liability and the general

15       causation.  Weitz & Luxenberg

16       assisted him there.  Weitz &

17       Luxenberg tried the case specifics

18       on the McDarby case.  It was an

19       unbelievable team effort that

20       resulted in an unbelievable

21       verdict at a very critical time in

22       the litigation, a very critical

23       time.

24            It was also very important

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

1    because it was a defense pick.  It

2    was the most difficult specific

3    causation case we saw to date in

4    the litigation.  It was the first

5    verdict in New Jersey in Merck's

6    backyard.  It was not only a

7    compensatory verdict, but the

8    first punitive verdict in

9    pharmaceutical litigation in New

10   Jersey.  It was a reasonable

11   verdict, so there was good reason

12   that it would stick.

13        MR. SEEGER:  Which it has.

14        MR. WEITZ:  Right.  I'll get

15   to that.

16        It was the first

17   pharmaceutical consumer fraud

18   verdict in New Jersey.  Mark

19   Lanier did a great job on that.

20   It caused a flood of new cases to

21   be filed with risk factors in it.

22   Remember, everybody before this

23   was looking for no risk factors.

24   A flood of cases came in

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 39

1        pressuring Merck.

2            Another very important

3        aspect to the McDarby case and the

4        effect of the McDarby case was the

5        tremendous exposure we got in the

6        press.  This really was

7        invaluable, and I would like to go

8        over it.  It was not only valuable

9        because it talked about a

10       plaintiffs' verdict, but it was

11       valuable because it talked about

12       how the plaintiffs' verdict was

13       gotten.

14           The Wall Street Journal

15       wrote an article on April 6, they

16       interviewed Rob Gordon from my

17       office, and they talked about the

18       McDarby win.  Let me quote what

19       they said.  They said, "Mr.

20       McDarby's win turns one of Merck's

21       key defenses on its head that

22       Vioxx can't be blamed for heart

23       attacks in people with a number of

24       cardiovascular risk factors.  The

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 40

1         drug maker has consistently argued

2         that such risk factors make it

3         impossible to prove Vioxx caused

4         their injuries, and in the Vioxx

5         cases to go to trial so far,

6         plaintiffs' attorneys sought to

7         play down their clients' risk

8         factors.  But in this trial,

9         Attorney Rob Gordon billboarded

10        Mr. McDarby's poor health and

11        multiple risk factors, telling

12        jurors that his client was the

13        last person who should have been

14        on Vioxx."

15            The Wall Street Journal

16        wrote another article days later,

17        and they interviewed a juror, and

18        the juror, Lori Humphrey, said she

19        initially voted for Merck in both

20        phases before switching.  She

21        said, speaking of Vioxx and Mr.

22        McDarby, and this is a quote, "I

23        can't say it caused his heart

24        attack, but I can say it was a

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 41

 1          substantial contributing factor."

 2               Merck also got pummeled by

 3          the business magazines.  Business

 4          Week came out and said, "The

 5          punitive damages came despite what

 6          analysts said was a lack of

 7          evidence that Merck withheld

 8          critical data from the FDA.  It

 9          also came despite the fact that

10          McDarby had previous risk factors

11          for a heart attack, including the

12          fact that he's a diabetic.  The

13          lesson to be learned here was that

14          Merck's expectation that the

15          scientific evidence would help it

16          prevail in most cases may be

17          wishful thinking."

18               Reuters went on to say the

19          next day, "There's no way that

20          Merck is going to continue to

21          pursue this strategy of trying

22          every case.  It would be

23          foolhardily and very expensive.

24          This split verdict between McDarby

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 42

1          and Cona doesn't put Merck in a

2          great position."  What that meant

3          was it proved that consolidation

4          was so vital to the litigation,

5          because even if Merck lost one or

6          two cases but we won one, it was a

7          loss for Merck, and it didn't

8          matter, and the McDarby verdict

9          let the world and Wall Street know

10         that Merck's defense strategy was

11         an emperor without clothes.  Shock

12         waves literally blew through Wall

13         Street and through Merck's

14         boardroom.

15              To sum up the McDarby case

16         and its effect, consolidation

17         struck a major blow to Merck's

18         defense strategy.  The landscape

19         of the Vioxx litigation had been

20         abruptly changed forever.  The

21         blueprint to winning specific

22         causation in the Vioxx trial was

23         created in McDarby.  Do not defend

24         the risk factors, embrace them and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 43

1      educate the jury on substantial

2      contributing factor.

3           I would like to talk about

4      the contributions of the legal

5      precedent that was set by the

6      McDarby case and the fabulous work

7      that Ellen Relkin and some of the

8      other lawyers back at Weitz &

9      Luxenberg did during that McDarby

10     case.

11          The first thing I would like

12     to talk about is the first

13     appellate ruling in New Jersey to

14     recognize the heeding presumption

15     that applied for the first time

16     for pharmaceutical cases.

17          In the context of McDarby,

18     Ellen Relkin argued and persuaded

19     Judge Higbee to direct a verdict

20     on the issue of heeding

21     presumption, and Judge Higbee

22     later charged the jury that if you

23     find Merck failed to provide an

24     adequate warning, then the law

Page 44

1          requires you to presume that the

2          plaintiff's doctor would have

3          heeded that adequate warning and

4          would not have prescribed Vioxx to

5          Mr. McDarby.  This was a fabulous

6          precedential decision because it

7          took care of a host of other

8          defenses that Merck had, the

9          learned intermediary defense,

10         among several others.

11             The appellate division went

12         on to say that the heeding

13         presumption serves to reinforce

14         the basic duty to warn to

15         encourage manufacturers to produce

16         safer products and to alert users

17         of the hazards arising from the

18         use of those products.  That

19         comment is equally apt in a

20         pharmaceutical context citing

21         McDarby versus Merck.

22             The trial team of Weitz &

23         Luxenberg and Lanier did a

24         fabulous job in getting the Topol

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 45

 1      deposition, and it was the first

 2      time the Topol deposition was

 3      presented at trial, it was a

 4      nonparty deposition, and under New

 5      Jersey law, there are very complex

 6      evidentiary issues on trying to

 7      get a nonparty deposition in.  The

 8      Lanier and Weitz & Luxenberg trial

 9      teams did a masterful job of

10      persuading Judge Higbee to let it

11      in.  Dr. Topol's deposition became

12      a precedent in the New Jersey

13      litigation, and it was a very

14      important deposition to be read

15      in.

16          Ellen Relkin was able to

17      convince Judge Higbee to admit a

18      subgroup analysis in the APPROVe

19      study.  Remember, John McDarby was

20      a severe diabetic.  It was a key

21      component to our case, and there

22      was a subanalysis done in the

23      APPROVe study that showed that

24      there was a relative risk of an

Page 46

1       increase of somebody that took

2       Vioxx of 6.10 and a 510 percent

3       increased risk for cardiovascular

4       disease if you were a diabetic and

5       you took Vioxx.

6            We were able to get the

7       subanalysis in, the appellate

8       division affirmed Judge Higbee's

9       ruling, and that was very, very

10      important for the litigation

11      nationally.

12           The trial teams of Weitz &

13      Luxenberg and Lanier tag teamed

14      again.  They did a fabulous job in

15      that I think Mark set up Dr.

16      Rayburn and Rob came in and

17      punched him out.  Or vice versa,

18      Rob set him up and Mark punched

19      him out, I don't remember.  But

20      basically they got Dr.  Rayburn to

21      admit that he lied during the

22      Plunkett trial and he was not

23      board certified at the time.  This

24      was a key aspect of the McDarby

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 47

1       case because they discredited

2       Rayburn, but it was also important

3       because I think it gave Andy an

4       opportunity for a basis for a new

5       trial in Plunkett, which I think

6       that he got as a result of that.

7            Very key piece of precedence

8       that was set in the McDarby case

9       was creating appellate precedent

10      and establishing an exception to

11      the FDA rebuttal presumption of

12      adequacy, enabling future Vioxx

13      and other pharma cases to beat the

14      statutory defense.  What happened

15      here was we convinced Judge Higbee

16      and then the appellate division

17      that the record in McDarby to be

18      sufficient to support the

19      recognition of an additional basis

20      for overcoming the presumption of

21      adequacy set forth in the PLA.

22      And they adopted it.  And their

23      focus rested on plaintiffs' claims

24      of Merck's economically driven

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 48

 1      manipulation of the post market

 2      regulatory process not just

 3      overcoming the presumption of the

 4      warning.  And this was great work

 5      done by the appellate people at W

 6      & L.

 7          McDarby had been cited 68

 8      times, including 28 texts and law

 9      review articles and multiple

10      briefs.  It was cited in the Wyeth

11      versus Levine Supreme Court briefs

12      of the New England Journal of

13      Medicine and in the amicus briefs

14      of both former FDA commissioners

15      Kennedy and Kessler.  The McDarby

16      verdict was the only verdict in

17      the Vioxx litigation to stand up

18      on appeal, the compensatory

19      verdict, and survive appellate

20      scrutiny.  There was an 80-page

21      appellate decision that was

22      written confirming that

23      compensatory verdict and

24      excoriating Merck and its conduct.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 49

1          Judge Higbee, and I have the

2      transcript here that you can see

3      talking about the quality of work

4      at Weitz & Luxenberg, made a

5      comment on the record, "Ellen

6      Relkin," for instance, she cites,

7      "right there in the front row,

8      she's a great legal mind, and she

9      would do a lot of the legal

10     writing and a lot of the legal

11     arguments for the plaintiffs.

12     She's sitting right there in the

13     front row.  She wasn't the one

14     trying the case or getting the

15     headlines, but she was the one."

16     And Ellen's work really needs to

17     be commended because she was

18     responsible for that verdict being

19     affirmed.  Judge Higbee went on in

20     that transcript to compliment

21     other people in the litigation

22     also for making contributions.

23          Weitz & Luxenberg's

24     contribution to the common benefit

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 50

1        was as you just heard, Ellen's

2        legal precedents, the work she did

3        on numerous and countless motions

4        and briefs for the litigation,

5        helping other people at trial.

6              Jerry Kristal's exemplary

7        trial skills not only in McDarby,

8        but his exemplary attack on the

9        Merck sales reps and putting

10       together the trial package for

11       everybody in the country and

12       distributing it.

13             Rob Gordon's direct of the

14       case specific experts and opening

15       and closing and the strategy of

16       embracing the risk factors and

17       teaching the jury about

18       substantial contributing factor

19       and then going around the country

20       and lecturing about it and

21       teaching the different lawyers.

22             The mock trials that we

23       held.  Mark Lanier, myself, Rob

24       Gordon did a mock trial where we

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 51

```
 1          invited everybody in the country
 2          and all the lawyers in New Jersey
 3          to participate and learn from us.
 4          A lot of the lawyers, literally
 5          dozens of lawyers came and
 6          participated.
 7              I have an e-mail from Steve
 8          Stein from Levin Simes saying,
 9          "All of the above reflects the
10          incredible effort and work product
11          of Weitz & Luxenberg's trial team
12          in the McDarby case.  Rob, Jerry,
13          Ellen, Sherry and others who
14          worked for weeks sorting out and
15          organizing the documents and
16          taking powerful defense
17          depositions, I thank them very
18          much for making the information
19          and work product available to me
20          so I can pass it on to other
21          people.  Thank you very much."
22              The next turning point, and
23          I'm going to be done in five
24          minutes, is in January of '07, the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 52

1       litigation --  McDarby was won, we

2       had some losses.  We lost three in

3       a row, the last five or six cases

4       were lost, and Barnett was the

5       only case to be won, and that case

6       was remanded for a new trial.  So,

7       the leadership at Seeger Weiss,

8       Weitz & Luxenberg and Lanier got

9       together, and we said we've got to

10      do something about this, we have

11      to pressure Merck.  We went back

12      to Judge Higbee, and we persuaded

13      Judge Higbee to send out multiple

14      simultaneous consolidated trials,

15      push more cases out in a

16      consolidated fashion for trial.

17      To do that would hurt Merck.  It

18      did, and the defense costs went

19      up.  We had much more advanced

20      discovery and things started to

21      escalate.  W & L completely worked

22      up the Kieley case for trial, it

23      was the next case to go up for

24      trial.  I know Mark had another

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 53

1    case that was worked up for trial

2    and Chris had several cases that

3    were worked up for trial.

4         In addition, we had the next

5    wave of cases in advance

6    discovery, it was wave 3.  250

7    more cases that would go out.

8    This put even more pressure on

9    Merck.  I can't emphasize to you

10    how important this was.  I know

11    this was going on in LA also, so

12    it was coming on in different

13    fronts.  The same things were

14    going on with pressure in the MDL.

15    This was critical because we were

16    doing depositions of plaintiffs'

17    spouses, prescribing doctors,

18    sales reps, all in large numbers,

19    250 cases, and in a very limited

20    amount of time.  It was a huge

21    undertaking for all the

22    plaintiffs' firms, and it was very

23    expensive for Merck.  Dave

24    Buchanan from Seeger Weiss, he

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 54

1       kept saying this, and I have a

2       dozen e-mails, repeated that this

3       pressure will bring Merck to their

4       knees.  He kept sending e-mails

5       out.  Guys, we have to do this.

6       You've got to step up to the

7       plate.  You've got to get these

8       cases up, you've got to work them

9       up because it is going to bring

10      Merck to their knees.  Weitz &

11      Luxenberg tried to meet that

12      commitment.  We were not only

13      preparing the Kieley case for

14      trial and the Rossi cases, but we

15      put over 30 cases into the next

16      group.  Then the night before we

17      were supposed to submit the 250

18      cases, Mike Wagner, I have this

19      e-mail here on February 15 of

20      2007, sent out an e-mail to all

21      the lawyers in New Jersey.  "At

22      this time we are still 22 cases

23      short.  I ask all of you to please

24      forward me any 2005 cases you can

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 55

1        put in the next wave of

2        discovery."

3            Paul Pennock from my office

4        e-mailed him a half-hour later and

5        said, "I will send you a list of

6        22 additional cases by 8:15.  It

7        would be a huge strategical

8        blunder to not meet the judge's

9        request for 250 cases."  That's

10       how important that Weitz &

11       Luxenberg felt it was to push

12       these cases and keep that pressure

13       on Merck.

14            Turning point four.  The

15       fantastic work by Seeger Weiss in

16       obtaining a retrial in the

17       Humeston case.  In March of '07,

18       as I said, things in the

19       litigation had turned on us.  We

20       needed a victory.  The combination

21       of the Seeger Weiss trial team and

22       the Lanier trial team in Humeston

23       and Hermans resulting in a $47.5

24       verdict in Humeston was so timely

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 56

1        and so invaluable, I think it is

2        what pushed Merck to the table.

3            The last thing is, the

4        lawyers in New Jersey, including

5        Weitz & Luxenberg, by pushing the

6        Kieley and Rossi case and all

7        these cases that were set in these

8        waves, the last 250, the Seeger

9        Weiss firm, Lanier, Sol Weiss, Rob

10       Dassow, Morelli, Locks, everybody

11       was geared up pushing these cases

12       for trial and trying to get cases

13       up in the consolidated groupings

14       for trial.  We really put the

15       pressure on Merck, and I really

16       believe that was a significant

17       factor in Merck coming to the

18       table.  They knew that none of the

19       people in New Jersey were going

20       away and that everybody was ready

21       for trial.

22            To sum up, I think Weitz &

23       Luxenberg provided a significant

24       common benefit contribution with

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 57

1    leadership in New Jersey, the

2    quality of the work that we

3    provided, the large inventory of

4    cases that we worked up pressuring

5    Merck, the intensity and pressure

6    we put on Merck, moving the cases

7    on the docket, moving cases in

8    advanced discovery, the huge

9    success we had in persuading Judge

10   Higbee to consolidate cases which

11   advanced the litigation.

12        W & L inventing the strategy

13   of embracing the risk factors and

14   substantial contributing factor

15   changed the theory of the case.

16        The important legal

17   precedent that we established in

18   New Jersey with Ellen Relkin's

19   hard work through the McDarby

20   trial.

21        The sales rep package that

22   was invaluable by Jerry Kristal.

23        The McDarby verdict, its

24   timing, its exposure, its

Page 58

```
 1          precedential value was enormous,

 2          and the fact of our success on

 3          appeal with McDarby being the only

 4          case in the Vioxx litigation to

 5          survive the appellate scrutiny

 6          really solidified the great

 7          lawyering in New Jersey by the

 8          different trial teams and the work

 9          effort and I think was a

10          significant factor in bringing

11          Merck to the table.

12               I would just like to once

13          again thank all the lawyers and

14          the law firms at this table for

15          all of their fabulous

16          contributions.  Although the last

17          part of that might have sounded a

18          little heavy handed, I must say

19          for the record that I know all the

20          work the lawyers around this table

21          did, and if it was not for all the

22          lawyers around this table, that

23          settlement never would have come

24          about, and I on behalf of my
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 59

1          clients thank all of you, and it

2          was an honor to work with you.

3               Thank you.

4                    -  -  -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 60

```
 1              C E R T I F I C A T E
 2
                I, LINDA L. GOLKOW, a Notary
 3    Public and Certified Court Reporter of
      the State of New Jersey, Registered
 4    Diplomate Reporter, Federally-Approved by
      the United States District Court of
 5    Pennsylvania, do hereby certify that the
      foregoing is a correct transcript of the
 6    testimony as taken stenographically by
      and before me at the time, place and on
 7    the date hereinbefore set forth.
 8
 9
                I DO FURTHER CERTIFY that I
10    am neither a relative nor employee nor
      attorney nor counsel of any of the
11    parties to this action, and that I am
      neither a relative nor employee of such
12    attorney or counsel, and that I am not
      financially interested in the action.
13
14
15
16
17
      _____
18          Linda L. Golkow, RDR, CRR, CCR
            Notary Number:  1060147
19          Notary Expiration:  1.2.10
            CCR Number:  30X100176200
20
21
22
23
24
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -

VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 5, 2008
- - -

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -

BEVERLY HILLS, CALIFORNIA
- - -


FIRM:          WHITE & WETHERALL, LLP
               J. Stewart White, Esquire


BEFORE COMMITTEE MEMBERS:

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese
ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP
PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:  Linda L. Golkow, RDR


GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

```
 1                    -  -  -

 2              MR. SEEGER:  As you know,

 3         we're the Vioxx fee committee.

 4         We've got a court reporter taking

 5         everything down because Judge

 6         Fallon at some point may want to

 7         take a look at the transcript.

 8         You can say and do anything you

 9         want.  The floor is yours to

10         present any way you want.

11              You should probably state

12         your name for the record and tell

13         us your common benefit

14         contributions.

15              MR. WHITE:  I'm Stewart

16         White from the law firm of White &

17         Wetherall in Reno, Nevada.  It

18         used to be White Meany &

19         Wetherall, but we got rid of

20         Meany.

21              You will be happy to hear

22         that I had nothing whatsoever to

23         do with Barnett.

24              MR. SEEGER:  I'm very happy
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 3

1          to hear that.

2               MR. WHITE:  I've just got a

3          ten-minute analysis of the factors

4          of 6(D) that I think applied, and

5          I'll be kind of businesslike and

6          right to the point.  I want to

7          thank you for your time in doing

8          all of this.  I know it's got to

9          be hard for you.

10              But our case, as you

11         probably know, did not actually go

12         to trial.  It was scheduled very

13         close in October of '07 --

14              MR. WEITZ:  What was the

15         name of that case?

16              MR. WHITE:  Crandall versus

17         Merck.

18              We weren't on any of these

19         plaintiff committees.  We are on

20         the HT governing committee, but

21         there's four of us attorneys, so

22         we can't be on every one of them.

23         Nevertheless, I feel that our

24         pending Crandall case was one of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 4

1      many factors that must have gone

2      into the decision of Merck to

3      settle all the cases.  We were

4      just working them and pounding

5      them on this Crandall case with

6      great vigor from January '07, when

7      we selected it, all the way up to,

8      even past October of '07, right up

9      until the time the settlement was

10     announced.

11          The Court authorized in 6(D)

12     some appropriate -- the applicable

13     state courts for common benefit,

14     and that's me.

15          MR. WEITZ:  Did you have a

16     trial date?

17          MR. WHITE:  Yes.  October 1,

18     '07.

19          MR. BLIZZARD:  What

20     happened?

21          MR. WHITE:  When that Oxford

22     study came out -- my co-counsel

23     was Mark Robinson and all of his

24     people.  When that Oxford study

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 5

1          came out, what was it, VICTOR or

2          something, there was a lot of

3          additional good information in

4          that that Mark -- and it came out

5          in July or something, and we

6          wanted to make this one perfect,

7          and we stipulated to a

8          continuance.  We reset it for June

9          of the following year.  But we

10         kept working and deciding motions

11         even after that.  We didn't just

12         drop it.  We kept going.

13              MR. BLIZZARD:  So, the

14         VICTOR study came out in June.

15              MR. WHITE:  I don't know,

16         wasn't it June or July or

17         something like that?

18              MR. BLIZZARD:  Did you seek

19         a continuance around that time?

20              MR. WHITE:  Right.  Right.

21              MR. BLIZZARD:  It was in

22         Reno?

23              MR. WHITE:  Reno, Nevada.

24              Anyway, the affidavit

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1       factors.  One is -- the first one,

2       it says the extent to which my

3       firm made a substantial

4       contribution to the outcome.

5       Basically, that's so general, you

6       have to look at all of the other

7       factors.  It was selected in early

8       '07 by us for trial.  It was set

9       initially for June of '07 in a

10      prior case's spot, but we had a

11      lot of work done then basically on

12      Crandall, just concentrating on

13      that one case from January '07 --

14      December '06 on.  The defendant

15      got the trial moved back from June

16      '07 to October 1, '07, but we used

17      that additional time to prepare

18      even more.

19           The other factor, quality of

20      our firm's work.  Basically, they

21      did not win, Merck did not win one

22      motion of any substance whatsoever

23      during this entire litigation.

24      They only had two successes

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 7

1          really.  One is that they got that

2          trial moved back from June 20th of

3          '07 to October 1, a very short

4          period of time, not the several

5          many, many months they wanted

6          because of all of this pending

7          litigation.  The Court granted

8          their motion to stop my brother

9          from making so many speaking

10         objections at the doctors'

11         depositions.  That was it.  That

12         was the only two won.

13              This is the quality I want

14         to talk about.  We maneuvered

15         first to get all of the Reno Vioxx

16         cases before an experienced trial

17         judge.  Our firm was the only one

18         that was doing Vioxx in Nevada

19         basically.  We had some cases in

20         Reno or northern Nevada and some

21         cases in Las Vegas.

22              There was one other

23         attorney, Will Kemp, some of you

24         may know him, from Kemp &

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 8

1        Harrison.  He had some Vioxx

2        cases, but he said they were

3        really bad cases, so you go first.

4        So, we were going first, and we

5        did.

6              We got in front of an

7        experienced Judge Brent Adams with

8        whom we had other successes.  He

9        knew we were competent in drug

10       litigation.  He trusted us.  The

11       local defense counsel from Merck

12       was from Las Vegas.  The judge

13       didn't really know them.  The

14       other defense counsel were

15       primarily guys like Andrew Rudge

16       and Paul Boehm and David Blatt

17       from Williams & Connolly.  At some

18       depositions they would send people

19       from Venable in D.C. and Fulbright

20       & Jaworksi, I don't remember who,

21       Cooley Godward Kronish, Sedgwick

22       Detert, Hughes Hubbard & Reed.

23       They were paying a lot of

24       attention to the case, I think.

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 9

1            So, from the very beginning,

2       they wanted a role in selecting

3       the bellwether cases.  We did not

4       let them have a role.  The judge

5       denied them.  We told the judge

6       that we had a burden of proof, we

7       get to pick the case that goes

8       first, and we picked them.

9            MR. WEITZ:  That's a good

10      way to approach it.  I wish more

11      judges would do that.

12           MR. WHITE:  There's a lot of

13      good reasons.  I read all those

14      bellwether arguments.  There's

15      lots of good reasons to do it the

16      other way besides the way we did

17      it.  So far we have been able to

18      keep that out of Nevada in our HT

19      litigations and fen-phen and

20      everything else.  We just show him

21      that's the way we've always done

22      these mass torts, and they keep

23      doing it every year from then on.

24      I'm certainly not criticizing the

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1       way it works in the other

2       jurisdictions because there are

3       just some things that have to

4       happen like that.

5            MR. WEITZ:  I think we wish

6       that in all jurisdictions.

7            MR. WHITE:  That's what we

8       did.

9            And then the Court didn't

10      set the case out for two years

11      like they wanted to set it out.

12      They set it real quickly.  Then we

13      won all the other arguments, from

14      the timing of the sales rep

15      deposition, to using expert

16      reports on general causation that

17      were in the other litigation in

18      Nevada, using already decided

19      expert depo designations and

20      exhibit foundations from -- like

21      Robinson's case in Berwick in

22      California and the MDL.

23            My impression, basically, we

24      kept them pretty much on their

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 11

1          heels the whole time from January

2          '07 until October of '07, November

3          '07 when the settlement was

4          announced.

5               MR. WEITZ:  What was the

6          division of work between your firm

7          and Robinson's firm?

8               MR. WHITE:  Basically, as

9          you can see from the time, it

10         worked out 60 percent our work, 40

11         percent Mark's work.  They were

12         just invaluable along with Andrews

13         & Thornton in getting experts.

14         They had gone through the trial.

15         They knew the evidence.  They knew

16         all of those hundreds of thousands

17         of documents and which ones were

18         the best hot documents to use.

19         So, they were in charge basically

20         of getting our experts, of

21         handling all of our experts.  I

22         don't remember all their names.

23         Abramson and some of the others

24         that Mark Robinson's firm used and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 12

```
 1          Andrews & Thornton's firm used.

 2          They assisted in the treating

 3          physicians' depositions even to

 4          the point of coming over sometimes

 5          and helping us prepare them for

 6          the depositions, but not on all of

 7          them.

 8               And then at trial basically

 9          I was going to be doing like a lot

10          of the local people, my clients,

11          some of the smaller doctors, the

12          local doctors.  If they were

13          experts, Mark's firm's people were

14          going to handle them.  We had just

15          innumerable people at our disposal

16          from Mark's firm, and they helped

17          quite a bit as well.

18               Anyway, there's another

19          three factors I'm going to put

20          together, that one about

21          consistency, amount, duration and

22          intensity to the litigation,

23          commitment, level of partner

24          participation, and activities
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 13

1          surrounding the individual trials,

2          including non-MDL bellwether

3          trials that impacted proceedings.

4          The consistency, amount and

5          duration you can see from our time

6          sheets.  I've got like 1500 hours

7          in this from January until we

8          stopped.

9              My partner, Geoff, my

10         brother also, was involved in the

11         successful motion to remand the

12         Crandall case after Merck removed

13         it on the grounds of fraudulent

14         joinder.  We sued Merck and about

15         11 Merck sales reps that were from

16         Nevada in order to defeat federal

17         diversity jurisdiction.  We got

18         their names from a source that we

19         had that was a sales rep in the HT

20         litigation, and so we knew they

21         were Nevada people, and of course

22         they removed it on the grounds of

23         fraudulent joinder.  Geoff did all

24         of that work in June and August of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1        '05 on this case, Crandall.

2            We filed 20 lawsuits with

3        about five or six plaintiffs plus

4        their spouses in each case and

5        tried them all together.

6            MR. WEITZ:  How many total

7        cases?

8            MR. WHITE:  We had about 106

9        cases after we carefully vetted

10       them all.  We still have about 93

11       or 94 in the settlement that are

12       going through the settlement.

13           MR. WEITZ:  Did you file

14       them all in Reno state court?

15           MR. WHITE:  We filed about

16       half in Reno and about half in

17       Vegas.  If they lived in the

18       southern Nevada area, that's where

19       they went.  If they lived in

20       Carson City, little towns around

21       Reno, they went to Reno.

22           But Geoff did all that work,

23       and he was specifically involved

24       in all the treating doctors'

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 15

1          depositions, preparing them for

2          depositions, attending some of

3          them in April and June of 2007,

4          went to all the status conferences

5          with the Court, attended the

6          meetings, a lot of the meetings we

7          had with defense counsel and

8          co-counsel.  That's that partner.

9               David Meany, my partner,

10         became more deeply involved in it

11         when fen-phen slowed down a little

12         bit in the treating doctor depos

13         and a lot of those sales rep

14         depositions.  But he's a very good

15         researcher and writer, and he

16         handled all of that motion

17         practice that Merck just throws at

18         you continually.

19              Partner, Peter Wetherall,

20         was in Vegas.  He had pretty

21         peripheral involvement because we

22         had that HT trial coming up also

23         in October '07 at the same time as

24         this trial, and he was doing that

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 16

1          with Zoe Littlepage and Rainey

2          Booth, and he attended status

3          conferences, but he mostly just

4          kept them percolating down there.

5          The judges down there thought it

6          was okay if we went first.

7              We kind of worked out a

8          state coordination on our own.

9          All of our 20 cases were filed in

10         random number with different

11         judges, but Judge Adams, we

12         convinced, was a good one to do

13         these cases.  And so we basically

14         had all the Reno cases in front of

15         Judge Adams, and I forgot the name

16         of the judge down in Vegas.  All

17         the Vegas cases were in front of

18         that judge.  Periodically those

19         two judges would talk, but not

20         much.  But we kind of did our own

21         coordination with the cooperation

22         of Merck's counsel.

23              Then myself, participating

24         as a partner, and then I had one

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 17

 1      or two paralegals extensively

 2      involved really throughout, we're

 3      just concentrating on Crandall,

 4      though, we did the initial vetting

 5      of the case and getting all the

 6      medical records and plaintiff fact

 7      sheets and all of that.  That's

 8      kind of normal stuff.  Then the

 9      summer of 2005 remand stuff.

10          In late 2006, early 2007, we

11      decided that Crandall was a better

12      case than the case we had set for

13      June of '07, and convinced the

14      judge to let us switch cases in

15      January of '07.  There was -- the

16      ones we had set were a couple of

17      stroke cases and a heart attack,

18      and we thought there was much

19      better science for heart attack

20      cases.  So, we wanted to do a

21      heart attack like Crandall first.

22      So, we got the Court's permission

23      to move it in its place.  And

24      that's Jerry Crandall.  That's

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1          eventually -- the judge moved it

2          from June '07 back to October of

3          '07.  Crandall was a white male,

4          mid 40s, nonsmoker, no other real

5          risk factors.  Good health,

6          physically active, hiking, cross

7          country skiing, all of that,

8          taking 50 milligrams of Vioxx for

9          a couple of months before his

10         heart attack from his general

11         practitioner for thumb arthritis

12         in one thumb.  Thought it was a

13         really good representative case.

14         September 4, 2004, he's hiking up

15         Mt. Talac overlooking Lake Tahoe,

16         and the top of the mountain is

17         10,000 feet.  He goes 4,500 to

18         10,000 feet with his adult

19         daughter.  He was taking Vioxx

20         daily.  He specifically remembers

21         taking it that morning because he

22         says, I know from my hiking

23         experience coming down the

24         mountain, there's such a pounding

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 19

1      on your joints, and my joints hurt

2      a lot, and so I took Vioxx, I'm

3      sure, that morning.  He had a

4      heart attack while he was sitting

5      there resting up at the top.  He

6      could feel it was a heart attack.

7      There was no phone service or

8      anything up there.  But he's an

9      experienced hiker, and altitude

10     sickness, you use aspirin, so, he

11     always had aspirin in his

12     backpack, and he took an aspirin

13     right after he started down.  And

14     it turned into kind of a mild

15     heart attack.  That was okay.  I

16     didn't care -- I mean, it would

17     have been nice if he had really

18     great injuries, but it was still a

19     really good case.

20          MR. WEITZ:  It saved his

21     life.

22          MR. WHITE:  I think so.  So,

23     we switched that in there.  And

24     insofar as activities in this

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 20

1          trial that impacted the

2          proceedings on a common benefit

3          level, a lot of it had to do with

4          the jurisdiction in Nevada, which

5          I'll go into in a minute, and

6          probably a lot of it had to do

7          with having Robinson Calcagnie as

8          co-counsel, which helped a lot,

9          because they'd run that other

10         case.  I told you what their role

11         was.

12              One activity that I

13         mentioned already was suing the 11

14         sales reps.  That kept us out of

15         Federal Court, which we didn't

16         want to be there, and you'll see

17         why in a minute.  But we also

18         thought one of them might get us

19         some pretty good information about

20         the marketing of the drug.

21              An example of Merck not

22         winning any motion, the Court

23         denied Merck's telephonic motion

24         in May of '07 for a protective

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 21

1        order to not let us take

2        depositions of sales reps unless

3        they had actually detailed one of

4        our doctors.  The Court denied

5        that motion, our argument being

6        that, well, no, this sales rep

7        detailed Dr. A, and Dr. A infected

8        our doctor.  We took everybody's

9        deposition we wanted to take.  It

10       turns out that Merck prepared

11       those -- during their depositions,

12       they all said they were prepared

13       for two days for their

14       depositions, which lasted about

15       for half a day.  It was like

16       talking to a bunch of robots, all

17       identical, good looking, and they

18       all had the same answers to

19       everything.  It was just amazing.

20       But I mean we did make them do a

21       lot of work on those sales rep

22       depositions in Vegas and Reno.

23            Another activity of common

24       benefit was successfully opposing

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

```
 1        their attempt to keep us from

 2        talking ex parte to treating

 3        physicians and prescribers before

 4        their depositions, which I had

 5        never heard of until this case.

 6        But apparently Judge Fallon had

 7        granted that, and I had read that

 8        because I was on that list serve.

 9            Nevertheless, we argued to

10        the Court that we should be able

11        to prepare properly a treating

12        doctor or prescriber.  We told the

13        Court that we would keep track of

14        the documents that we were giving

15        to them, medical journal articles

16        and things to read beforehand, and

17        brought them to the deposition,

18        and it went off just fine with not

19        any problem.  The doctors gave

20        good factual testimony that was

21        then able to be used by our

22        specific causation experts later

23        on.

24            Another thing is, despite it
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 23

1          being a state court action, we got

2          a stipulation from Merck that we

3          could use the MDL produced

4          documents in this case, and we

5          could use the general causation

6          reports from the California cases

7          and MDLs.

8               But another really good

9          thing, I think, was that aspect

10         where we, over Merck's pretty

11         strong objections, got the Court

12         to grant our motion in August '07,

13         this was even after we got the

14         continuance, we were still working

15         on it, that we could use the depo

16         designations and the exhibit

17         foundations from Barnett and

18         Berwick and other trials in our

19         trial.  It saved everybody

20         hundreds and hundreds of hours,

21         because apparently that's quite a

22         grueling process.

23               One of the last two

24         things -- well, last thing really,

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 24

1         we got them to deny Merck's motion

2         that we each would only get a

3         certain number of hours of trial

4         time, which we had not ever

5         confronted that either.  The judge

6         said, no, you have a specific

7         amount, four weeks for this trial,

8         and use it up.  I'm not going any

9         further, and you guys work it out.

10        We were going to have to work it

11        out.  It wasn't going to be 60/40

12        or anything like that, nothing

13        specific.

14               So, all those things, I

15        think, helped Merck see that a big

16        verdict might be coming their way

17        in their case because they weren't

18        winning anything.

19               The other aspect, one of the

20        factors is on jurisdiction in

21        which non-MDL common benefit work

22        occurred, and that's one of the

23        main issues, because Nevada really

24        is a good, good jurisdiction for

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 25

1       drug litigation.  We have no

2       Daubert at all, and we take

3       special steps to file amicus

4       briefs for the Nevada justice

5       association when anybody tries it

6       to keep it out.  We give seminars

7       to plaintiff groups, and Geoff

8       does that mostly on Daubert.

9            Secondly, we have not only

10      the failure to warn cause of

11      action, but we have pretty much

12      pure strict products liability.

13      There's a 1994 Nevada Supreme

14      Court case, Allison versus Merck,

15      involving brain damage to a kid

16      from a measles/mumps rubella

17      vaccine, and it was held that if

18      the plaintiff can prove the

19      vaccine caused the brain damage,

20      then the vaccine failed to perform

21      in a manner reasonably to be

22      expected in light of its nature

23      and intended function.  While the

24      drug company is not an insurer of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1          their product, if it causes

2          injury, the manufacturer and the

3          distributors are responsible.  The

4          Court rejected specifically

5          comment K, 402A of the restatement

6          and said we don't have to consider

7          factors like usefulness and

8          reasonable risks and marketing and

9          everything like that.

10              MR. LEVIN:  We're all coming

11         to Nevada.

12              MR. WHITE:  It is a fine

13         cause of action to keep out all

14         that warning stuff, which is so

15         hard all the time.  That's a

16         really hard burden to meet that

17         one.

18              Thirdly, it is a small

19         state, Nevada is.  That has

20         several impacts.  You can get into

21         court relatively fast, in about a

22         year from filing, especially in

23         northern Nevada.  We have good

24         State and Federal trial and

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 27

```
 1          appellate judges experienced in

 2          drug litigation because we bring

 3          them drug litigation.  We are the

 4          only ones there that do that.

 5          They know us.  They know we know

 6          our business.  They trust us.  We

 7          see them at county and state bar

 8          meetings and other functions.  But

 9          it is not to say we have had

10          success in this and other cases

11          because of personal relationships.

12          It's just because they know that

13          typically we are right.  And

14          plaintiffs' attorneys usually are

15          right in these things, and we have

16          a history of being right with

17          these judges.

18              For example, I told you we

19          sued the sales reps on the

20          misrepresentation counts, and they

21          removed them, claiming fraudulent

22          joinder.  We made our motion to

23          remand.  You have to allege you

24          have a good claim against the
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 28

1          sales reps, and that should be all

2          that you need.  But we've been

3          doing this in Nevada with these

4          same federal judges so long that

5          we can attach to our motions to

6          remand other orders on remand on

7          the same cases with sales reps

8          like from our fen-phen cases.  The

9          same judge looking at his own

10         order where we sued sales reps in

11         fen-phen.  So, we didn't have to

12         reinvent the wheel and didn't

13         really have to spend a great

14         amount of time on motions to

15         remand.

16              It is a small state, quick

17         trial, good law, seasoned judges

18         who know our reputation, good

19         juries.  That's why we got a $16

20         million breast implant verdict

21         years ago not only against Dow

22         Corning, but Dow Chemical, I think

23         the only one in the nation.  In

24         that same month, in October of

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 29

 1          '07, that HT did go to trial and

 2          we got that 134 million verdict

 3          for three women, all tried at once

 4          with one jury and one judge.

 5               So when you have that 13

 6          factor, when the number of adverse

 7          verdicts happened, did their

 8          commitment to litigation ebb, our

 9          commitment didn't waiver.  There

10          were other states supplying other

11          law -- or the Federal Court, and

12          it worried us.  I'm not saying

13          that it didn't worry us, but it

14          didn't affect our commitment to

15          this litigation, and we pressed

16          on.

17               One other factor was we were

18          involved in the litigation with

19          the JP MDL.  That was in April of

20          '05 because we started on this

21          right as soon as they took it off

22          the market.

23               We don't have any

24          involvement in any of those other

Page 30

 1          factors.  We weren't on any of
 2          these committees or funding the
 3          litigation.  But I think Nevada is
 4          a good jurisdiction and a scary
 5          place for drug manufacturers.  We
 6          just set in Las Vegas a multi
 7          plaintiff HT trial for August of
 8          '09 when a lot of other courts are
 9          just waiting for Wyeth versus
10          Levine.  They tried to get them
11          stayed, and our judges wouldn't
12          stay them, so we are moving
13          forward on those.
14              I think that Merck could see
15          attorneys that were prepared.  We
16          took every doctor's deposition,
17          every sales rep's deposition.  We
18          had our exhibits list because the
19          judge wanted it in by June, even
20          before the continuance kind of
21          stuff.  All those exhibits,
22          hundreds and hundreds of pages,
23          all those arguments over that.
24          All the deposition designations,

HIGHLY CONFIDENTIAL – FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 31

```
1          case specific expert reports were

2          in.

3               MR. SEEGER:  Everybody here

4          has tried a Vioxx case, so we have

5          a sense.

6               MR. WHITE:  All that was

7          done, and we were ready to go, and

8          they knew it.  I think that

9          knowing that had an effect, as did

10         all the other attorneys that were

11         plugging away, pounding away at

12         Merck and not just sitting back

13         warehousing their cases, that's

14         what we were doing, and then

15         putting them through that.

16              Hourly rates in Reno, I

17         don't ever do an hourly rate, but

18         I checked with some other

19         plaintiff litigation guy, and they

20         are about $400, $450 an hour.  I

21         think costs are separate

22         proceedings, right.

23              So, I do hope that you can

24         see your way with these several
```

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 32

1        factors that I've talked to you

2        about that I think Crandall versus

3        Merck had a substantial common

4        benefit and that you can pay the

5        hours that my firm has put out,

6        about 14, 1500 hours, I forget

7        what it was, and Robinson has had

8        about 1000 hours on the same

9        thing.  I think it went a long

10       way.

11            MR. SEEGER:  We were

12       definitely aware of the case and

13       appreciate you coming here.

14            MR. WEITZ:  Thank you.

15            MR. WHITE:  Appreciate you

16       assisting me as well.

17                 -  -  -

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 33

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA L. GOLKOW, a Notary

 4   Public and Certified Court Reporter of

 5   the State of New Jersey, Registered

 6   Diplomate Reporter, Federally-Approved by

 7   the United States District Court of

 8   Pennsylvania, do hereby certify that the

 9   foregoing is a correct transcript of the

10   testimony as taken stenographically by

11   and before me at the time, place and on

12   the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I

14   am neither a relative nor employee nor

15   attorney nor counsel of any of the

16   parties to this action, and that I am

17   neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21   _____

22          Linda L. Golkow, RDR, CRR, CCR
             Notary Number:  1060147
23          Notary Expiration:  1.2.10
             CCR Number:  30X100176200
24
```