UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JANIE J. AUBERT, ET AL | * | CIVIL ACTION |
| VERSUS | * | NO:09-3566 |
| UNITED STATES OF AMERICA | * | SECTION "J" (1) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

This is a wrongful death and survival action brought by Plaintiffs Janie J. Aubert (Mrs. Aubert), Rhett J. Aubert (Rhett), and Ryan Aubert (Ryan), the widow and major children of decedent Herman Aubert (Mr. Aubert),[1] against the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 - 2680.[2] On March 15, 2008, Mr. Aubert died suddenly due to cardiac insufficiency.[3]

Plaintiffs claim Mr. Aubert's untimely death was caused by the medical negligence of his primary care physician (internist), Dr. Naheed Zahra Qayum (Dr. Qayum), of the Veterans Administration Medical Center in Reserve, Louisiana ("VA"). Specifically, plaintiffs alleges that, beginning in January 2008 and continuing through March 15, 2008, Dr. Qayum failed to timely order diagnostic tests and follow up on the results (including adenosine stress test results) and further failed to take timely action and implement appropriate medical treatment relative to

---

[1] See Certificate of Marriage re Herman Aubert (Exh. 27); Certificates of Live Birth re Rhett and Ryan Aubert (Exh. 29 *in globo*).

[2] Plaintiffs' Complaint (Rec. Doc. 1); Pre-Trial Order at pp. 2-4 (Rec. Doc. 54).

[3] Death Certificate of Herman Aubert (noting date of death was March 15, 2008, and "cardiac insufficiency" as to cause of death) (Exh. 28).

1


EXHIBIT
D

abnormal test results.  Plaintiffs also allege that the VA was negligent in handling the

communications within their own system as well as between themselves and an outside vendor,

Dr. Emmett Chapital (cardiologist), regarding outsourcing tests and the receipt of results.

Suffice to say, Plaintiffs contend that the confluence of medical treatment that fell below the

standard of care and the VA's inadequate if not stymied system of ordering and processing

diagnostic tests for symptoms of cardiac insufficiency caused Mr. Aubert's death, particularly

considering the constellation of serious risk factors noted in his VA medical records even

predating his January 3, 2008, visit leading up to the time of his death on March 15, 2008.[4]

The Government denied liability and pled, in the alternative, "other fault" for which it

was not liable.  More particularly, the Government's position is that, assuming there was any

breach of the standard of care, Dr. Emmett B. Chapital of Chapital Cardiology Clinic (Dr.

Chapital),[5] an outside vendor/independent contractor to whom Mr. Aubert was referred at the

critical time for further testing, was the responsible person and not the Government.[6]

All of the threshold elements of the Federal Tort Claims Act are met.[7]  VA personnel

---

[4]Plaintiff's Complaint at ¶ XIV (Rec. Doc. 1); Pretrial Order at §§ 6a (Pltf's Summary of Material Facts), 8b, c-k, m-p, s-z (Contested Issues of Fact) and 9g-j (Contested Issues of Law) (Rec. Doc. 54).

[5]"Plaintiffs have filed the necessary papers to convene a Medical Review Panel, under the Louisiana Medical Malpractice Act, with respect to Dr. Emmett Chapital's treatment of Mr. Aubert." Pretrial Order at § 7g (Rec. Doc. 54).

[6]See Government's Answer and Affirmative Defenses at ¶¶ IV, XVII, XXIII-XXV (Rec. Doc. 5); Pretrial Order at §§ 6b (Δ's Summary of Material Facts), 7d-e (Single Listing of Undisputed Facts), 8q-aa,ii-nn (Contested Issues of Material Fact) and 9b,c (Contested Issues of Law).

[7]See Government's Answer at ¶ ¶ XIII, XV (admitting venue is proper in this district and Plaintiffs have complied with the administrative prerequisites for filing the captioned matter) (Rec. Doc. 5).

who treated Mr. Aubert were employees of the United States of America through the Department of Veterans Affairs. More particularly, it is undisputed that Mr. Aubert's VA primary care physician, Dr. Naheed Qayum, was acting within the course and scope of her employment with the VA at all pertinent times.

This dispute culminated in a one and a half day bench trial held before this Court on March 14 and 15, 2011. Plaintiffs and Defendant submitted Post-Trial Memoranda. (Rec. Doc. 65 and 66) After reviewing the evidence presented at trial and the applicable law, the Court finds that Mr. Aubert's death was caused, in part, by medical negligence committed by the VA and its employee/physician, Dr. Naheed Qayum. Mr. Aubert's death was an unnecessary tragedy and this determination is based on the following findings of fact and conclusions of law. To the extent that any of the Court's findings of fact are conclusions of law and *vice versa*, they are so adopted.

## II. FINDINGS OF FACT

### A.  Treatment, Testing, and Diagnosis of Mr. Aubert

Mr. Aubert, a 65-year-old Vietnam War veteran,[8] was a patient at the VA clinic in Reserve, Louisiana, not far from his home. On January 3, 2008, Dr. Naheed Qayum saw Mr. Aubert for the first time for routine followup. His medical history revealed hypertension (HTN), Hyperlipidemia, degenerative joint disease, "history of borderline blood sugar," history of colon polyps (removed), history of a negative stress test within the last two years, and a family history heart problems (brother had heart surgery). On January 3rd, Mr. Aubert complained of shortness of breath on minor exertion. He further related two incidents that occurred while

---

[8]See Report of Honorable Discharge (Form DD 214) re Herman Aubert (Exh. 35).

sleeping involving shortness of breath with associated chest discomfort, which improved after sitting up in bed. Mr. Aubert reported no orthopnoea or leg swelling. He did report that he quit smoking about 40 years ago.[9] His prescription drug medications included Diclofenac,[10] Hydrochorothiazide,[11] Lisinopril[12] and Simvastin,[13] which were first prescribed by Dr. Carlos Ramirez, Mr. Aubert's primary care physician/internist for the period of May through July of 2007.[14]

Older VAMC medical records dated July 5, 2007, indicate the following medical diagnoses/impressions with respect to Mr. Aubert, to wit: sub-optimal Hypertension (HTN), Hyperlipidemia, Pre-diabetes, overweight, and significant risk of coronary artery disease (CAD).[15] Dr. Ramirez's July 5, 2007, medical history specifically states that Mr. Aubert had a family history of Diabetes Mellitis (DM) and that Mr. Aubert's brother had a history of CAD, including coronary artery bypass graft (CABG). Said progress notes further report that Mr.

---

[9]See Veterans Affairs Medical Clinic Reserve, La (VAMC) Progress Note dated January 3, 2008 (Exh. 19, pp. 22-23).

[10]See VAMC Medication Records (noting Diclofenac (75 mg's) twice a day for pain and inflammation) (Exh. 23, pp. 60, 64).

[11]Id. (noting Hydrochlorothiazide (50 mg's) every day as diuretic - part of component in Lotensin) (Exh. 23, pp. 59, 63).

[12]Id. (noting Lisinopril (40mg's) every day for heart/blood pressure to replace benazepril in Lotensin) (Exh. 23, pp. 58, 62).

[13]Id. (noting Simvastatin (80mg's) one-half every day for cholesterol) (Exh. 23, pp. 56, 58, 61).

[14]See VAMC Progress Notes dated January 3, 2008 and July 16, 2007 (Exh. 19 pp. 22 and 27).

[15]Id. dated July 5, 2007 (Exh 19 at pp. 30-31).

4

Aubert had a negative stress during the prior year.[16]

At the time Dr. Qayum first examined Mr. Aubert on January 3, 2008, she ordered an echocardiogram (ECG). Because his LDL (Bad Cholesterol) level of 153.6 mg/dL was "abnormally high," Dr. Qayum increased his Zocor (Simvastatin) from 20 to 40 milligrams daily but did not supplement with any other medication.[17]  Additionally, the electrocardiogram (EKG) conducted on January 3, 2008, showed "P mitrale," but no EKG changes and normal sinus rhythm.[18]  Her findings included: (1) shortness of breath on exertion, (2) paroxysmal nocturnal dyspnea (PND),[19] and (3) multiple risk factors CAD.  Her plan was to: (1) check electrocardiogram (EKG -which showed P mitrale), (2) schedule echocardiogram (ECG) with doppler, (3) in the event of wall motion abnormality, check nuclear stress test, (4) schedule Pulmonary Function Test (PFT)[20] and chest x-ray, and (4) have patient return after the results of ECG and PFT were processed.[21]

The ECG (Echo /w doppler) was not performed until almost a month later on February 1,

_____

[16]Id. (Exh. 19 at p. 30).

[17]See Patient Notification Letter dated January 3, 2008 (Exh. 19 at p. 20).

[18]See VAMC Progress Note dated January 3, 2008 (Exh. 19 at p. 23).

[19]Dyspnea is a feeling of difficult or labored breathing that is out of proportion to the patient's level of physical activity, which is symptomatic of a various disorders, including but not limited to pulmonary disorders (COPD), cardiovascular disease, and gastroesophageal reflux disease (GERD).

[20]See VAMC Order Summary - PFT Test Results dated January 30, 2008 (diagnosing shortness of breath (SOB) and dyspnea after severe exertion) (Exhibit 6 at p.121).

[21]See VAMC Progress Note dated January 3, 2008 (Exh. 19 at p. 23).

2011. The ECG report summary stated the results were "ABNORMAL."[22] More particularly, the test results indicated: (1) aortic root not dilated - mild calcification of the aortic root; (2) normal LV systolic function with EF > 55% ; (3) normal RV systolic function; (4) mitral inflow patterns suggestive of E to A reversal; and (5) Grade I diastolic dysfunction.[23] The PFT showed a "mild obstructive pattern."[24]

On February 11, 2008, Mr. Aubert returned for the results of the aforesaid tests with complaints of even more frequent chest pains – i.e., "chest pain on and off at least 20 times in 1 month . . . ."[25] Additionally, within one month (since his January 3, 2008 visit), Mr. Aubert's lipid profile (LDL/Bad Cholesterol) level had increased from 153.6 to 173.1.[26] Along with the escalation of chest pain incidences, which were mostly at night, he further reported his blood pressure spiked with chest pain.[27] Mr. Aubert also reported that he was continuing to experience shortness of breath on *minor* exertion.[28] Dr. Quayam concluded "Grade I diastolic dysfunction" and "atypical" chest pain most likely due to reflux; however, she specifically noted Mr. Aubert's

---

[22]See Confidential Echo Report Summary for procedure date February 1, 2008 (Exh. 22 at p. 54/Exh. 40 at p. 45).

[23]See VAMC Progress Note dated February 11, 2008 (Exh. 19 at p. 14); *see also* Medical Package Information, Confidential Echo Report, procedure date February 1, 2008 (Exh. 22 at pp. 53-54/Exh. 40 at pp. 44-45).

[24]Id.

[25]Id. (Exh. 19 at p. 13).

[26]Id.

[27]Id. (noting that "blood pressure was high with chest pain").

[28]Id. (italicized emphasis added).

6

"multiple risk factors" for CAD and that she would order a thallium stress test.[29]  In the interim,

the only advice given to Mr. Aubert was to continue to comply with his prescription drug

therapy, no eating 2 to 3 hours prior to bedtime, avoid alcohol, soft drinks, caffeine or salt, and

raise the head of his bed to prevent reflux.  Dr. Qayum also prescribed Omeprazole for reflux.[30]

Mr. Aubert was not instructed to return to the clinic or to report to the hospital if chest pain

continued; rather, his instructions were simply to return after the stress test,[31] which was

inordinately and inexcusably delayed until March 11, 2008, as discussed below.

The VAMC's Order Summary reflects that Mr. Aubert's Adenosine Stress Test was

ordered by Dr. Qayum on February 11, 2008.[32]  It was not entered into the system until two days

later on February 13, 2008, along with her "provisional diagnosis" of "chest pain."[33]  Dr. Qayum

testified that she actually had to order the test twice.  The second time on February 13th her

order went into the system.  Dr. Qayum admitted that she followed up at that point by reordering

the stress test immediately on February 13th due to Mr. Aubert's "atypical chest pain and risk

factors;" however, the records clearly reflect that she did so without indicating any urgency

whatsoever.[34]  Most notably, Dr. Qayum admitted that she did not follow up on her patient

thereafter and had no idea why the process of getting a consult took so long in this case.  She did

---

[29]Id. (Exh. 19 at p. 14).

[30]Id.

[31]Id. ("rtn after stress test").

[32]VAMC Order Summary (Exhibit 6 at p. 111).

[33]See VAMC Consult Request (Exh. 5 at p. 40); VAMC's Coordination Care
Consultation Sheet (also noting request date 2/13/2008 for stress test) (Exh. 8 at EC-004).

[34]See (noting "routine," which means that the test was not ordered with any urgency).

testify that the whole VA New Orleans Center was experiencing problems with Consult Management. She explained that (1) this locality was still without a VA hospital post-Hurricane Katrina and (2) Consult Management in New Orleans (not her department in Reserve, Louisiana) was in charge of outsourcing cardiac diagnostic tests. Suffice it to say, Dr. Qayum's pat answer or, more appropriately, her excuse for failing to follow Mr. Aubert after the February 11th visit was that she was not in the Consult Management department – i.e., that's not my job.

Darleane Barnes, RN, who worked in the VA's Consult Management office, shed some light on the dead slow pace of the VA's outsourcing, receipt, and entry of stress test results during the period leading up to Mr. Aubert's death. She testified that on February 14, 2008 (the day after Dr. Qayum's order for a cardiac stress test consult was re-entered into the system), the VA changed its method of handling nuclear stress test consults. RN Barnes explained that, before February 14, 2008, stress test consult orders were handled by Radiology and, only thereafter, by herself (Darleane Barnes) in Consult Management.[35] RN Barnes was not assigned to Consult Management until February 4, 2008. She admitted that she was in training for a period of weeks and did not begin functioning independently until February 25, 2008. In the interim, Mr. Aubert's stress test order remained in limbo awaiting assignment to an outside vendor.

According to RN Barnes, she did not outsource Dr. Qayum's order to Chapital

---

[35]See also Email Chain dated February 14, 2008 (advising of a change in procedure for stress tests, which would no longer be handled by radiology or forwarded to cardiology service for approval but would instead be provided directly to the outsource nurse (Barnes) with results faxed back to Consult Management (Barnes) and then scanned into the system) (Exh. 4 at pp. 2-3).

Cardiology Clinic until February 27, 2008.[36]  She also did not keep a copy of her facsimile

transmittal sheet which would indicate the exact date upon which she processed the physician's

stress test order.  The only documentation retained by RN Barnes was the response from

Chapital Cardiology Clinic – i.e., the facsimile cover sheet and confirmation letter from Chapital

Cardiology Clinic dated March 5, 2008 advising that Mr. Aubert's appointment for his stress test

was scheduled on March 11, 2008.[37]

Considering the testimony of the VA's Radiologist Technician, Sandra Ortega, whose

department previously handled the process of stress test outsourcing, the Court finds that it is

more likely than not that RN Barnes did not issue the request to Dr. Chapital's office until on or

after March 1, 2008.  Ms. Ortega credibly testified that, for purposes of outsourcing stress tests,

the system changed starting *March 1, 2008* (not February 14, 2008).  She explained that prior to

March 1, 2008, when Radiology handled orders for cardiology consults (stress tests), the process

did not take any longer than two days.  The request would be entered into the system through

Radiology, one of the radiologists would go through the orders, and by next day approved orders

for stress tests would be assigned to Dr. Chapital – the only outside vendor for stress tests prior

to March 1, 2008.  Thereafter, his clinic would schedule the tests and fax the results back to

Radiology.  Additionally, at the end of each week, Dr. Chapital would bring over the CD ROM

upon which the actual test results were recorded.

Ms. Ortega's rendition of the facts regarding processing of stress test orders is

---

[36]See also Medical Record Consultation Sheet re Herman Aubert with Coordination Care
Fax Line dated February 27, 2008 (Exh. 8 at EC-004).

[37]See Chapital Cardiology Clinic's Facsimile Cover Sheet and Letter to Darleane Barnes
dated March 5, 2008 (Exh. 12 *in globo)*.

corroborated in significant particulars by the VA's Letter Agreement (Exh. 44) with Chapital

Cardiology Clinic pertaining to Nuclear Imaging, scheduling said diagnostic tests and

interpretation procedures.  The Letter Agreement provides:

> Scheduling and performing diagnostic imaging and nuclear
> imaging procedures
> Contractor's personnel will schedule the procedure within 24 hours
> of receiving authorization for the procedure.
> Contractor's personnel will perform the procedure within 10
> business days of authorization.
>
> Interpretation of procedures
> The time from procedure interpretation being forwarded to
> SLVHCS must be within 24 hours of procedure.
> If the results are abnormal or critical test values, the contractor
> must contact the ordering physician within 60 minutes of the
> results being available.
> Non-critical results must be forwarded to the Director of
> Radiology Service Line within no less than 24 hours from the
> date/time of the procedure.
>                         The examination results will be provided on CD
> and available to the SLVHCS staff within 24 hours of examination
> completion.  The examination images will be provided on CD
> within 24 hours of completion.  In the instances in which the CD
> copies are not available, a hard copy of the images (film) will be
> provided....[38]

It is undisputed that this Letter Agreement governed the outsourcing *vis-a-vis* SLVHCS

and Chapital Cardiology Clinic.  The system changed sometime in late February 2008 and at the

latest March 1, 2008, when Dr. Chapital was verbally apprised that reports were to be made to

the VA's Consult Management Department and not to Radiology.  Dr. Chapital credibly testified

in that regard, to wit: (1) on or about March 1, 2008, he was told that a "new entity" – Consult

---

[38]Letter Agreement for Nuclear Imaging and Lower Extremity Arterial Services between
Southeast Louisiana Veterans Health Care System and Chapital Cardiology Clinic effective
October 27, 2006 (Exh. 44).

Management – would be handling outsourcing and receipt of results, and (2) his new point of

contact was Darleane Barnes.

According to Dr. Chapital and his medical assistant (Cheryl Carter), Dr. Qayum's order

for an adenosine stress test was not received by Chapital Cardiology Clinic until March 4, 2008

– *a full three weeks after it was ordered.*  Most notably, Dr. Qayum admitted that she put the

request for consult in immediately but *not urgently*, notwithstanding Mr. Aubert's high risk

factors.  Upon receipt of the order on March 4, 2008, and consistent with the written agreement,

Ms. Carter contacted Mr. Aubert on March 5, 2008, and scheduled his stress test for March 11,

2008, which is well within the ten business day requirement.[39]

On March 11, 2008, Virgie Walker, RN, assisted Dr. Chapital by preparing the patient for

his test, taking a health history,[40] and administering the Adenosine intravenously.  Dr. Chapital

testified that Mr. Aubert came into his office stable and without pain.  The stress test revealed

perfusion abnormalities, which means that there was a decrease flow in the inferior and lateral

apex of the heart.[41]  Dr. Chapital's report includes the following impressions as to the EKG and

Adenosine Stress tests:

> The resting EKG is interpreted as normal sinus rhythm, ST segment depression
> and low to inverted T waves noted in inferior and lateral precordial leads,
> abnormal tracing.... During the adenosine portion of the examination there was
> marked ST segment depression and T wave inversion ranging from 2.0 mm to 4.0

---

[39]See Medical Record Consultation Sheet re Herman Aubert  (noting that on 3/4/08 Mr.
Aubert was contacted) (Exh. 8 at EC-007).

[40]See Chapital Cardiology Clinic Patient Health History signed by Herman Aubert on
March 11, 2008 (Exh. 8 at EC-002 and 003).

[41]See Chapital Cardiology Clinic Facsimile Coversheet dated March 12, 2008, and Report
of Adenosine Spect Gated Cardiolite Examination administered on March 11, 2008 (Exh. 1 *in
globo*).

11

mm in the inferior and lateral precordial leads consistent with an ischemic response. The patient did experience some nonlimiting adenosine induced chest discomfort ....

IMPRESSION [as to EKG]:

1. **Stress test electrocardiographically positive for an ischemic response in inferior and lateral precordial leads.**
2. Adenosine induced nonlimiting chest discomfort.
3. No arrhythmias were observed either during the exercise or the recovery period.
4. The test was terminated at the completion of the adenosine drip.

\* \* \*

IMPRESSION [Tomographic Images]:

1. Adenosine SPECT Gated Cardiolite examination is **indicative of dilated right ventricular cavity with large partially reversible wall perfusion defect, large partially reversible lateral wall perfusion defect, moderate size reversible apical perfusion defect.**
2. There is evidence of **hemodynamically significant stress induced dilation of the LV cavity appreciated on this study.**
3. The gated portion of the examination reveals **moderate inferior apical and lateral wall hypokinesis with EF estimated range of 43%** and end distolic volume of 138 mL.
4. Clinical correlation is requested for **hemodynamically significant coronary artery disease.**[42]

The March 11, 2008, EKG administered as part of the stress test showed a *positive ischemic response.* Despite frank findings of myocardial ischemia noticed at the time of his testing, Dr. Chapital did not apprise either Mr. Aubert or his wife (in the waiting room) of the abnormal EKG findings. Dr. Chapital's excuses were that he was honoring his contract[43] – meaning that the VA handled all communication with the patient. Nevertheless, he readily

_____

[42]Id. (all emphasis added).

[43]See Letter Agreement for Nuclear Imaging and Lower Extremity Arterial Service Between Southeast Louisiana Veterans Health Care System and Chapital Cardiology Clinic (Exh. 44).

12

admitted that he was allowed to treat emergency situations,[44] with the caveat that those situations rarely happen. Dr. Chapital's testimony that he did not believe that Mr. Aubert was experiencing any pain when he left the clinic is clearly contradicted by the physician's own records and his admitted "concern" about the test results. Dr. Chapital testified that he endeavored to ensure that the VA received the examination results *as soon as possible* because he was "concerned."

According to Dr. Chapital and his medical assistant, his report of "abnormal" findings regarding Mr. Aubert was faxed to Darleane Barnes the next day (March 12, 2008).[45] He further testified that his numerous attempts to call Darleane Barnes and Dr. Qayum were unsuccessful and that he could not reach their voicemail; instead, their telephones just rang. Dr. Chapital did not attempt to contact Mr. Aubert or his wife though he had the patient's email address, cellular telephone, and home telephone contact numbers. Dr. Chapital testified that he continued to attempt telephone contact with the VA through March 14, 2008, to no avail.

Ms. Ortega in radiology did in fact recall being contacted by Dr. Chapital but testified that he did not report any abnormal findings to her. Ortega testified that she remembered his call trying to get in touch with someone in Consult Management and that she transferred the call. She credibly testified that, had he mentioned abnormal test results, her personal protocol was to enter a note in the system under the patient so that someone would be aware that the vendor is trying to report abnormal results.

RN Barnes testified that she worked in Consult Management the entire week (March 11

---

[44]Id. at unnumbered pp. 2-3 (regarding patient safety).

[45]See also Facsimile Coversheet dated March 12, 2008, and Adenosine Stress Report re Herman Aubert (Exh. 1 *in globo*).

13

through March 17, 2008 (when she went on leave)).  She denied receiving any faxed report, telephone calls, or voicemail messages from Dr. Chapital on her watch.  Similarly, Dr. Qayum testified that she received no telephone call and no voicemail messages from Dr. Chapital.

The faxed report of abnormal finding from Dr. Chapital's office was not processed until March 25, 2008 – i.e., unsurprisingly, the date upon which RN Barnes returned from leave.  RN Barnes admitted that there were other nurses in Consult Management but explained that they were on call for handling emergency matters.  RN Barnes returned on March 25, 2008, to a stack of reports and other documents which she sent to the scanning nurse.

The Court was not persuaded by RN Barnes' testimony that no report was received prior to her leave on March 17, 2008.  Indeed, the abnormal test results were in fact in the stack of documents that RN Barnes sent to scanning on March 25, 2008, and, more likely than not, the results were on her desk before she left for vacation on March 17, 2008.[46]  There is no evidence suggesting that Dr. Chapital's office faxed the result twice.  Indeed, the VA's snarled communications and sub-optimal performance of outsourcing during the "change over" (from Radiology to Consult Management for stress tests) tell a tale that not one of the VA's employee's dared tell.  More specifically, the Court finds that on February 13, 2008, the VA including Dr. Qayum "dropped the ball" and did not pick it back up until RN Barnes returned from leave on March 25, 2008.  Only then did the faxed abnormal stress test results belatedly find their way into the VA's medical record imaging system VISTA.

The VA's Nursing Encounter Triage Note entered March 17, 2008, states:

---

[46]See Utilization Review Consult Note entry date March 25, 2008, at 11:57 ("Results of cardiology consult is ready for review in VISTA IMAGING).

> Pt's spouse called requesting for results of the nuclear stress test
> done on 3/11/08.
> a[nswer]: Spouse advised that results are not in our system and to
> call back at a later date.  Spouse states that it has been 6 days and
> the results should be and insist[s] on Dr. Qayum calling her back.
> Spouse states that maybe Dr. Qayum can call the facility to get the
> results.  Will notify Dr. Qayum for disposition.[47]

Not only did Mr. Aubert's abnormal stress test results sit in a stack for weeks unattended, Ms.

Aubert's March 17, 2008, call was not addressed by Dr. Qayum.  Over a week later on March

25, 2008, which unsurprisingly coincides with Ms. Barnes return from leave, Mr. Aubert's

abnormal stress test results finally appeared in VISTA.  Thereafter, on March 25, 2008, again

without so much as a hint of urgency, Dr. Qayum wrote: "needs angiogram, refer to cardiology

will schedule for follow up."[48]  On that date, Dr. Qayum either called or had her staff call Mr.

Aubert to inform him of a return or routine appointment the next day but was informed by his

then widow (Janie Aubert) that he had passed away on March 15, 2008.[49]

    Ms. Aubert's message rang clear – i.e., dead or alive, she wanted her deceased husband's

March 11, 2008, stress test results.[50]  She was instructed by the Triage Nurse Michael Bernier

that her concern would be forwarded to the Primary Care Physician, Dr. Qayum, for

---

[47]Nursing Encounter Triage Note entered March 17, 2008 (Exh. 40 at p. 21).

[48]Dr. Qayum's March 25, 2008 Addendum (Exh. 40 at p. 20).

[49]Clinic Nurse Telephone Triage Note dated March 25, 2008 ("Other: per dr qayum, pt
was called to inform of rn appt tomorrow, pts wife answered phone and stated pt passed away
3/15/08") (Exh. 40 at p. 19); *see also* Dr. Qayum April 2, 2008, Addendum ("Stress test report
was posted in Vista on March 25, 2008, while trying to reach the patient I find out that patient
died.  I called his wife and gave my condolences on 3-25-2008") (Exh. 40 at p. 27);

[50]Clinic Nurse Telephone Triage Note dated March 25, 2008 (noting "wife still wants to
speak to pcp about test results") (Exh. 40 at p. 19).

15

disposition.[51]  The VA filed an incident report on March 26, 2008.[52]

### B. Disclosure of Adverse Events to Patient

Family practitioner Dr. Richard Wallace testified via deposition that, as Acting Chief of

Staff of the VA, he was asked to perform an "institutional disclosure."[53]  He explained that his

role in this process, which took place on April 1, 2008, at the VA's offices on Poydras Street,

was to: (1) express sincere concern about the loss of this veteran (a statement of empathy); (2)

disclose facts as the VA knew them at the time; and  (3) offer assistance which could include

instructions as to how to make a claim against the Government under the FTCA.  In addition to

himself, the VA's Quality/Risk Managers (Donna Collins/Cynthia Edwards), and VA Nurse

LeFlore, the Auberts (Janie, Rhett and Ryan) attended the April 1st meeting.[54]

Addressing Dr. Chapital's abnormal stress test results, Dr. Wallace testified that it was

not a definitive diagnosis, and Dr. Chapital was turning the information/results back over to the

VA physician for clinical correlation of his findings.[55]  He further testified that his role was not

that of investigation and rather it was in the nature of disclosure as discussed above.  Clearly, Dr.

Fred H. Rodriguez (who testified at trial) assumed the role as investigator regarding the adverse

---

[51]See Clinic Nurse Telephone Triage Note dated March 25, 2008 (Exh. 40 at pp. 19-20);
see also Deposition of Dr. Richard Wallace taken November 30, 2010, at pp. 68-69.

[52]See Dr. Qayum's March 26, 2008 Addendum ("patient died on march 15, 2008,
incident report reported to DR. KARCIOGLU on 3-25-2008, AND INCIDENT REPORT FILED
ON 3-26-2008).

[53]See Disclosure of Adverse Event Note dated April 1, 2008 (Exh. 7); VA Directive re
Disclosure of Adverse Events to Patients (Exh. 17).

[54]See Deposition of Richard Wallace, M.D. (Wallace Deposition), taken November 30,
2010, at pp. 12, 24, 42; Disclosure of Adverse Event Note dated April 1, 2008 (Exh. 7)

[55]See Wallace Deposition at pp. 33-34.

16

event.[56]

Dr. Wallace testified regarding the April 1st disclosures to the Aubert family. As to cause of death, he told the Aubert family that, given the history of Mr. Aubert's heart disease preceding his visit to Dr. Qayum and further considering that heart attack is the most common cause of death in the country, the most likely cause of Mr. Aubert's death was myocardial infarction (heart attack)/coronary heart disease.[57] He explained:

> At the time I am making that statement to the family there are a number of facts that are very clear. Number 1, the patient died very suddenly.... The patient has a report from a cardiologist that preceded that death that say[s] that it's consistent with underlying coronary artery disease.
> The patient has a medical record of several years duration which also indicates the underlying coronary disease.[58]

Dr. Wallace's Disclosure of Adverse Event Note specifically states under the section entitled "Questions Addressed in the Discussion," to wit:

---

[56]See Dr. Rodriguez' Memorandum to the ACOS Patient Safety and Performance Improvement Department dated March 27, 2008 (noting his telephone contact with Dr. Emmett Chapital regarding his request for a statement of procedures his clinic follows regarding the verbal reporting of abnormal test results and his procedures for submitting written reports and statement regarding the problems his clinic has been having communicating with the VA for the last several weeks since referrals of patients for cardiac studies switched from Radiology to Consult Management) (Exh. 3); Dr. Emmett B. Chapital's March 27, 2008, Letter/Statement (noting that his clinic's experience with the change effective March 1, 2008, in processing and oversight of nuclear stress testing by the VA being moved from Radiology to Consult Services has been less than satisfactory: his office had a good rapport with Radiology, and there was a physician on call each day available to discuss abnormal findings; in contrast, there is only one phone number, one fax number, and one nurse (Darlene Barnes) in Consult Services with no names and numbers of physicians supervising that department, and his phone calls went unanswered until he was finally able to contact a Consult Service nurse on 3/21/08 to discuss some patient matters) (Exh. 2).

[57]See Wallace Deposition at pp. 56-57.

[58]Id. at pp. 57-58.

17

> 1. How the process for management of abnormal test results has
> changed? We noted the establishment of direct lines of improved
> communication with external consultants; assignment of a nurse to
> review all incoming faxed test results for possible critical
> results;..."[59]

Dr. Wallace explained that the procedure had changed prior to the disclosure to the family and

that was discussed during the April 1, 2008, meeting.[60] He further explained that, as to the

claims process, as required under the directive, the Auberts were advised of their rights to make

a claim against the Government as he would have done with any family of a deceased veteran.[61]

Obviously, the Auberts got the wrong impression about the purpose and meaning of the

VA disclosures made in the context of the April 1st meeting. The Court finds that it was by no

stretch an admission of liability. In this regard, the Court recognizes that lay persons, such as the

Auberts, may have understandably misconstrued the VA's sincere expression of condolences and

candid disclosure of the Auberts' right to make a claim against the Government, including the

particulars of "how to" make such a claim. An in depth explanation of the claims administrative

process was clearly a mandated part of the adverse event disclosure process and not the

admission of liability that Plaintiffs perceived. The likelihood of an admission of liability in the

presence of the agency's risk manager, who was in attendance, would have been nil to none.

Indeed, the Court is convinced, insofar as this case is concerned, the value of Dr.

Wallace's testimony, a family practice/primary care physician, resides in his ability articulate the

standard of care which is applicable to Drs. Qayum and Chapital and/or what could have been

---

[59]See Disclosure of Adverse Event Note dated April 1, 2008 (Exh. 7).

[60]Wallace Deposition at p. 65.

[61]Id. at 66 -67 ("I did not advise them to file a complaint. I did not advise them to file
against the Government. I advised them of their right to file against the government.").

done by either or both Drs. Qayam and Chapital to save Mr. Aubert's life under the circumstances.

### C. Cause of Death: Expert Testimony

Mr. Aubert died a sudden death, and, more likely than not, the cause was a "heart attack" or myocardial infarction due to cardiac insufficiency.[62]  Plaintiffs presented two experts: Dr. Ira Gelb, a Board Certified Cardiologist, who testified as to the applicable standard of care;[63] and Dr. Cyril Wecht, a Board Certified Pathologist, who testified regarding causation.[64]  Plaintiffs' experts opined that, as of January 2008, Mr. Aubert was a "walking time bomb," and Dr. Qayum's delay in ordering, following up on, and then acting upon positive stress results, *inter alia,* constituted conduct that fell below the applicable standard of care and caused Mr. Aubert's death.  The Government's position articulated by Dr. Lawrence O'Meallie, a Board Certified Internist and Cardiologist, was that, without autopsy, it was impossible to determine cause of death with any accuracy, and Dr. Qayum's treatment of Mr. Aubert did not fall below the applicable standard of care for an internist/primary care physician.[65]

The Court finds that Mr. Aubert's sudden death was more likely than not caused by heart attack or myocardial infarction due to acute cardiac insufficiency.

---

[62]See Trial Testimony of Drs. Richard Wallace (by deposition), Ira Gelb and Cyril Wecht (all in agreement as to the cause of death).

[63]See Letter Opinion of Dr. Ira Gelb dated May 22, 2010 (Exh. 45); Curriculum Vitae of Dr. Ira Robert Gelb (Exh. 15).

[64]Letter Opinion of Dr. Cyril Wecht dated July 7, 2010 (Exh. 46); Curriculum Vitae of Dr. Wecht (Exh. 16).

[65]See Letter Opinion of Dr. Lawrence O'Meallie dated August 23, 2010 (Exh. 47); Curriculum Vitae of Dr. O'Meallie (Exh. 48).

19

1. Dr. Richard Wallace

As previously noted, Dr. Wallace testified via deposition that given the history of Mr.

Aubert's heart disease *preceding his visit to Dr. Qayum* and further considering that heart attack

is the most common cause of death in the country, the most likely cause of Mr. Aubert's death

was myocardial infarction (heart attack)/coronary heart disease.[66]  He further opined as to Dr.

Qayum's March 25, 2008, request for consult[67] issued after Mr. Aubert had died, to wit:

> Q.   And you saw where it says, "Stress test, largely reversible, defect
>      lateral wall inferior wall, report Vista." What does that mean to
>      you?
> A.   It means that the patient has ischemic or an area of the heart that is
>      not getting oxygen that can be reversed.
>                            * * *
> Q.   Well, as a general practitioner, family physician, by what
>      procedure would you anticipate that would be reversible by?
> A.   Well, it could be reversible anatomically by a reconstructive
>      procedure either coronary grafting or by PCI or stinting or it could
>      be a reversible lesion that is reversible through medications that
>      dilate the arteries.
>                            * * *
> Q.   Sure. What was stated why they were requesting a consult?
> A.   It's saying she's requesting an angiogram?
> Q.   Why?
> A.   Because the patient has a *highly* positive stress test with a large
>      reversible defect in the lateral wall.
> Q.   And who is saying that?
> A.   This Dr. Qayum.
>                            * * *
> Q.   What does angina mean?
> A.   Angina is when the heart aches because it is not getting enough

---

[66]See Wallace Deposition at p. 56-57.

[67]See Dr. Qayum's Consult Request dated 3/25/2008 (stating provisional diagnosis of
"highly positive stress test, angina," "please schedule for angiogram as early as possible, highly
positive stress test, large reversible defect lateral wall inferior wall" and "Relevant background:
angina +") (Exh. 20); see also Health Summary Addendum by Dr. Qayum Ref: Utilization
Review Consult dated 3/25/2008 ("needs angiogram") (Exh. 25 at p. 73);

oxygen.[68]

Regarding the spectrum of possible actions that could be taken by a hypothetical physician/vendor (such as Dr. Chapital) who is presented with abnormal test results and unable to communicate such results to the primary care physician, Dr. Wallace responded:

Q.   What can he do?
A.   The vendor could have taken independent action and said, if this test is so abnormal. I can't get anybody to contact the V.A., he could have acted responsibly to patient themselves and said despite this I am going to send you to the hospital.
          The vendor could say that I can't get through to the V.A. but if this information is so serious that I must notify someone, let me talk to the boss at the V.A., let me talk to the director, let me talk to the chief of staff ... well, I'll leave it at that.[69]

Dr. Wallace further testified that he was aware of no VA policy or procedure which prevents an outside consultant from taking action and admitting a patient directly to the E.R.[70] The sum and substance of Dr. Wallace's opinion was that such an outside vendor had options, including advising the patient himself of a positive ischemic response and recommending that he report to the E.R., admitting the patient to the E.R. himself, and notifying the VA's chief of staff of abnormal test results that needed to be addressed by surgical intervention on an urgent basis.

### 2. Dr. Ira Gelb

Dr. Ira Gelb, Plaintiffs' expert cardiologist, opined that the VA, Dr. Qayum, and Dr. Chapital breached the applicable standard of care in a number of particulars. Dr. Gelb opined:

(1) Dr. Chapital should have:

---

[68]Wallace deposition at pp. 70-72.

[69]Id. at pp. 78-79.

[70]Id. at p. 82.

21

       ◎    made immediate arrangements to transfer Aubert to a hospital for
urgent cardiac catheterization to determine need for angioplasty
and stenting (PTCA) or coronary bypass surgery (CABG), which
would have oxygenated the blood to inferolateral and apical walls
and in all likelihood averted his death on March 15, 2008; and

       ◎    contacted Dr. Qayum or any physician at the VA; simply faxing
the abnormal results the following day was insufficient and fell
below the standard of care.

(2) Dr. Qayum should have:

       ◎    contacted Dr. Chapital for the results of the stress test that was
delayed over one month in a severely ill patient; and

       ◎    prescribed coronary artery vasodilators and additional therapy to
lower LDL levels in the interim.[71]

Dr. Gelb opined that Aubert's constellation of risk factors, escalating complaints of symptoms

correlated with CAD, and test results (including 1/03/08 EKG "P mitrale," 2/01/08 ECG

"ABNORMAL" and 3/11/08 ETT highly positive/significantly abnormal) demanded prompt

testing and invasive procedures on an urgent basis to improve myocardial infusion and avoid

death.

      More particularly, as to conduct that fell below the applicable standard of care, Dr. Gelb

testified that: (1) the delay in getting tests performed by the cardiologist and results back to and

reviewed by Dr. Qayum unequivocally caused Mr. Aubert's death; (2) the VA treated Dr.

Chapital like a technician (not a physician) and the whole system "wreaks" of problems

accounting for the patient's demise; (3) on January 3, 2008, additional medication to dilate his

coronary arteries should have been implemented because, in addition to other noted risk factors

including symptoms of classical unstable angina, his LDL was very abnormal in that it should be

---

[71]See Dr. Ira J. Gelb's Letter Opinion dated May 22, 2010 (Exh. 45).

below 70 for a diabetic; (4) Mr. Aubert's ECG results showed changes consistent with myocardial damage – i.e., the same changes demonstrated with the stress test (only more pronounced); and (5) his March 11, 2008 abnormal ejection fraction of 43% showed ventricular, myocardial damage indicating "somebody who is in big trouble."

As to the standard of care applicable to an internist or primary care physician such as Dr. Qayum, Dr. Gelb essentially testified that the classic signs and symptoms should not have eluded her and should have been met with more aggressive treatment. In this regard, Dr. Gelb agreed that almost any student right out of medical school would recognize these classic signs and testified that it was a "no brainer." He further elaborated stating: "You don't need to be a rocket scientist to know what's going on" in the Mr. Aubert's case.

Specifically addressing Dr. Qayum's treatment that fell below the standard of care, Dr. Gelb testified that she should have prescribed vasodilators early on and that the physician's order merely adjusting his cholesterol medication (Zocor) was not enough. Specifically, he faulted Dr. Qayum for her failure to prescribe Nitroglycerin despite Mr. Aubert's escalating complaints of chest pain. Dr. Gelb emphasized that (1) Mr. Aubert's January 3, 2008, EKG was not normal since it showed P mitrale, (2) his February 1, 2008, ECG was decidedly abnormal showing diastolic dysfunction, and (3) Dr. Qayum ordered no testing on any type of urgent basis despite Mr. Aubert's history and complaints of 20 episodes of chest pain within a month.

Dr. Gelb noted that Dr. Qayum was Mr. Aubert's primary care physician, and she should have ordered the test pronto because delay in the process of ruling in or out life-threatening diseases like CAD could be deadly; therefore, the sooner there is intervention, the better the prognosis for the patient. Dr. Gelb opined that had more immediate arrangements been made to

23

address Mr. Aubert's demonstrated coronary insufficiency, Mr. Aubert would be alive.

In summary, Dr. Gelb believed that there were breaches of the standard of care and that the VA was guilty of medical negligence. He opined that VA physician, Dr. Qayum, should have timely instituted appropriate studies and followed up with her patient and the cardiologist. That was her responsibility as Mr. Aubert's primary care physician. Suffice it to say, after forming her provisional diagnosis (GERD), Dr. Qayum failed to fulfill her duty to move swiftly to rule out the obvious, imminent, serious, and life-threatening causes for Mr. Aubert's signs and symptoms – i.e., chest pain/angina and shortness of breath/ischemia due to coronary artery insufficiency or CAD. In Dr. Gelb's opinion, Mr. Aubert's risk of heart attack was imminent and foreseeable, and Dr. Qayum's failure to deal with the obvious life-threatening risk first and with due haste constituted a breach of the standard of care.

### 3. Dr. Cyril H. Wecht

Dr. Cyril H. Wecht, Plaintiffs' expert forensic pathologist, opined that an acute myocardial infarction[72] from myocardial ischemia, which had been confirmed on the adenosine stress test four days prior to Mr. Aubert's death on March 15, 2008, was the most likely cause of death. Dr. Wecht noted that Mr. Aubert's medical history amply demonstrated that he was at high risk for such an event, and he sought medical attention for definite symptoms of ischemia (dyspnea/shortness of breath on minor exertion) for at least two months prior to his death. According to Dr. Wecht, urgent medical attention was indicated at the time of Mr. Aubert's first visit in January 2008; however, it took well over two months before a definite diagnosis was

---

[72]Dr. Wecht explained that myocardial infarction is actual damage of the heart muscle as a result of myocardial ischemia (deprivation of oxygen to the heart muscle) because of compromised coronary arteries.

24

established *via* nuclear stress test. Dr. Wecht expressed his opinion that Mr. Aubert was managed inappropriately but deferred to other experts insofar as articulating the standard of care applicable to either Dr. Qayum or Dr. Chapital. Dr. Wecht believed that Mr. Aubert's death would have been averted had he been hospitalized and a work up performed at the time he sought medical attention. He further opined that had Mr. Aubert been treated pharmacologically or via stent or CABG at the time when frank myocardial ischemia was established, he would have had close to a 100% chance of survival.[73]

Dr. Wecht emphasized that medical and surgical treatment of coronary artherosclerosis has been widely successful in preventing death in patients like Mr. Aubert.[74] He opined that, with appropriate intervention, Mr. Aubert would have lived 12 to 15 more years. Dr. Wecht explained his opinion by pointing out that Mr. Aubert was already in the category of individuals likely to live to age 75 and beyond because he had already reached the 65-year mark and was still ticking even without treatment addressing his CAD.

Dr. Wecht was quite familiar with the clear evidence of Mr. Aubert's significantly compromised coronary arteries (arteriosclerotic cardiovascular disease) and hypertension. He explained that the latter (hypertension) can lead to enlargement of the heart, which, like CAD, also compromises cardiac activity. The clear evidence consisted of Mr. Aubert's increasing complaints, including shortness of breath on minor exertion and chest pain as well as diagnostic test results including but not limited to the March 11, 2008, EKG/Adenosine stress test.

---

[73]Dr. Gelb similarly testified that appropriate tests followed up with appropriate intervention, whether placement of a stent or bypass surgery, would have resulted in a 99% chance of survival in Mr. Aubert's case.

[74]See Dr. Cyril H. Wecht's Letter Report dated July 7, 2010 (Exh. 46).

In sum, Dr. Wecht observed that the results of the March 11, 2008, stress test were significant and disturbing, and something should have been done immediately. In his mind, the situation was urgent and not handled properly. Like all of the other experts, Dr. Wecht also testified that a three week or more delay in testing for someone who has any kind of definitive manifestation of coronary artery insufficiency is *a long time*. Dr. Wecht observed that Mr. Aubert was exhibiting classic symptoms of CAD the entire time he was treated by Dr. Qayum.

### 4. Dr. Larry O'Meallie

Dr. Lawrence O'Meallie, the Government's expert in the fields of cardiology and internal medicine, testified that previous electrocardiograms conducted on Mr. Aubert were normal, notwithstanding the fact that the medical evidence showed otherwise.[75] Similarly, Dr. O'Meallie testified that the results of the February 1, 2008, ECG was normal despite the fact that the VA's own medical records support the opposite conclusion.[76] As to Dr. Qayum's provisional diagnosis of GERD, Dr. O'Meallie noted that Mr. Aubert had a history of GI issues (not otherwise specified) and explained that symptoms of coronary disease can mimic gastrointestinal disorders. He concluded that Dr. Qayum's treatment did not fall below the applicable standard of care.

Initially, the Court notes that to the extent that the medical records reveal a history of GI issues with respect to Mr. Aubert, Dr. O'Meallie agreed that GERD was a benign condition. As

---

[75]Compare VAMC Progress Note dated January 3, 2008 (noting P mitrale but no EKG changes) (Exh. 19 at p. 23).

[76]Compare VAMC Progress Note dated February 11, 2008 (noting Grade I diastolic dysfunction, multiple risk factors, and will schedule thallium stress test) (Exh. 19 at p. 14); VAMC Echo (ECG) Report re February 1, 2008 Procedure (noting in the summary "ABNORMAL") (Exh. 22 at p.54)

26

noted by Dr. Gelb and Dr. Wecht, the medical evidence does in fact reveal a constellation of risk factors for and classic symptoms of CAD as well as abnormal findings pursuant to the initial EKG and ECG tests ordered by Dr. Qayum. Mr. Aubert's medical records, standing alone, amply demonstrate that Dr. Qayum suspected that Mr. Aubert's chest pain and ischemia could be caused by coronary artery insufficiency[77] notwithstanding a provisional diagnosis (GERD). The Court notes that Dr. Qayum ordered EKG's, an ECG w/doppler, and then Adenosine stress testing, but never on any type of urgent basis.

Dr. O'Meallie denied any knowledge of a change in stress test reporting procedures from Radiology to Consult Services during the pertinent time frame. He testified that such information would not affect his opinion in this matter in any event. Dr. O'Meallie also opined that there was no evidence that Mr. Aubert had an acute myocardial infarction.

Dr. O'Meallie agreed that it was *a long time* before the stress test got accomplished. Regarding the order for nuclear stress testing, the delay and the failure to follow up regarding same, Dr. O' Meallie testified:

> Q.   Were you aware that she thought he needed a nuclear stress test and ordered it but it didn't get effectuated for weeks?
> A.   Yes, it did not get done for weeks, I don't have any idea why. That was hardly her fault.
> Q.   Well, if she ordered it, don't you think it's a physician's duty to make sure it's getting done if she thinks it has to do with a heart condition or angina condition, where it might be classic signs of future heart problems.
> A.   Perhaps.[78]

---

[77]See Consult Request by Dr. Qayum dated February 13, 2008 (noting the provisional diagnosis of "chest pain" and requesting an "adenosine stress test").

[78]Trial Testimony of Dr. Larry O'Meallie on Cross-Examination.

Nevertheless, Dr. O'Meallie concluded that Dr. Chapital's conduct fell below the standard of care, noting that terms of any contract with the VA should have no bearing on his conduct as a professional. In this regard, Dr. O'Meallie opined that Dr. Chapital's failure to apprise Mr. Aubert of any abnormal results or discuss the implications of the abnormal stress test with him constituted breaches of the standard of care applicable to cardiologists. It was further Dr. O'Meallie's opinion that if Dr. Chapital felt that Mr. Aubert required immediate treatment on account of highly positive test results, Dr. Chapital could have informed Mr. Aubert directly and referred him to the Tulane Medical Center ER, where VA patients are routinely evaluated and treated. Dr. O'Meallie testified that it is the duty and responsibility of the testing physician (Dr. Chapital in this case) to inform both the patient and his referring physician of results on a prompt, if not immediate, basis, depending on the circumstances.

It is not disputed that the VA is a large system, and many VA physicians have cell phones and pagers. Nevertheless, these physicians, even primary care physicians (such as Dr. Qayum), have a duty to follow up on their patients and to ensure that tests they order are performed in sufficient time to be a diagnostic tool. Dr. Qayum failed to order testing on any type of urgent basis and failed to follow up to ensure that such tests were ever performed. It should come as no surprise that this primary care physician was attempting to schedule a return visit with a heart patient who had died after his belated Adenosine stress test.

The Court finds the reasoned approach of Dr. Gelb and Dr. Wecht to be most credible. Their reliance on evidence *in the medical records* supports their findings as to standard of care or professional duty owed to Mr. Aubert. Although Dr. O'Meallie is an extremely well-qualified expert, his testimony has far less factual support and therefore must be viewed as less credible.

28

Because the Court must make this credibility determination, those factors are weighed in finding that the Plaintiffs' experts' opinions are controlling in this case. Additionally, the Court notes that the testimony of Dr. Wallace is right in line with Dr. Gelb and Dr. Wecht, insofar as cause of death is concerned. All experts agreed that a three to four week delay for thallium stress testing in this case was an inordinately long time.

Indeed, the weeks-on-end delays are inexcusable, both in outsourcing the stress testing and then, on the back end, receiving, inputting results online, and reviewing transmitted results. Such "treatment" is tantamount to no treatment at all by the VA's physician, Dr. Qayum. Mr. Aubert might as well have had no diagnostic test performed at all to rule out or in CAD, despite his history, signs, and symptoms indicating that he was a "walking time bomb." Testing to rule out or in CAD, angina, or coronary insufficiency, all clearly suspected from the "get-go," was unreasonably and inexcusably delayed. The Court finds that Dr. Qayum's treatment of Mr. Aubert fell below the standard of care.

As for Chapital Cardiology Clinic/Dr. Emmett Chapital, all of the experts agreed that something should have been done by Dr. Chapital, and his conduct fell below the applicable standard of care. Dr. Chapital admittedly: (1) failed to contact or notify *any* physician at the VA regarding Mr. Aubert's abnormal/highly positive stress test and EKG results; (2) failed to advise Mr. Aubert or his wife of abnormal EKG results either before he left the office on March 11, 2008, or thereafter; and (3) failed to even consider admitting Mr. Aubert to the E.R. himself despite his concern about the highly positive stress test.[79] All of this conduct fell below the

---

[79]As previously noted at the outset, Dr. Chapital is the subject of a separate medical malpractice proceeding in state court. See State of Louisiana Patient Compensation Fund Letter and Petition for Damages (Exh. 43 *in globo*).

standard of care applicable to cardiologists and is causally related to Mr. Aubert's March 15,

2008, death. The Court further finds that there is nothing in the VA's policy, procedures, or

"Letter Agreement" which would have prevented an outside consultant, such as Dr. Chapital,

from taking necessary action to prevent what happened in this case. Moreover, and assuming

that there were any valid concerns about remuneration on Dr. Chapital's part, in addition to VA

benefits, Mr. Aubert also had private insurance which would have covered the cost of necessary

medical emergency treatment.[80]

### D. March 15, 2008, Death of Mr. Aubert

On March 11, 2008, Mrs. Aubert accompanied her husband to his appointment at

Chapital Cardiology Clinic for the adenosine stress test. She was aware that Mr. Aubert had

been experiencing chest pains with increasing frequency during the months of January and

February 2008. Mrs. Aubert testified that, because he was experiencing chest pains after the

March 11, 2008, adenosine stress test procedure, Mr. Aubert was offered nitroglycerine by the

staff at the Chapital Clinic. On cross-examination, Mrs. Aubert testified that neither Dr. Chapital

nor anyone on his staff shared either the results of the EKG or the stress done that day.

On their way home from the clinic on March 11, 2008, Mr. and Mrs. Aubert stopped at

Sam's and went their separate ways on foot in the store. Mr. Aubert later met up with Mrs.

Aubert, but he had commandeered a scooter. Apparently, he was experiencing some chest

discomfort merely walking the length of the store. Mrs. Aubert testified that Mr. Aubert had a

difficult night on March 14, 2008. However, the next morning (Saturday, March 15, 2008) he

---

[80]Trial Testimony of Mrs. Aubert (regarding private health care insurance in favor of Mr. Aubert).

felt better after resting in the lounge chair. They left home together and headed for the Mall of
Louisiana in Baton Rouge. They stopped for a light lunch, and Mr. Aubert exited the car after
finishing a cellular phone call with his son, Rhett. Upon entering the restaurant, Mr. Aubert
excused himself and did not return. After a few minutes passed and he did not answer his cell
phone, Mrs. Aubert asked one of the bus boys to check on her husband in the men's room. He
returned to tell her that Mr. Aubert was on the floor, crouched over on his knees. The bus boy
yelled for someone to call 911. A lady working in the restaurant attempted CPR; then the
EMT's arrived.

Mrs. Aubert was informed by the EMT's that Mr. Aubert was not going to be okay.
When Mrs. Aubert turned him over, it was obvious to her that Mr. Aubert had passed away.
Both sons, Rhett and Ryan, drove up to meet her at Baton Rouge General where the EMT's took
Mr. Aubert, and he was later pronounced dead.

### E. Damages: Wrongful Death and Survival Action

The family members each testified about their "extremely close" relationship as an
extended family unit. Indeed, both Mr. and Mrs. Aubert were born and raised in Reserve,
Louisiana, lived there all of lives and raised their children in Reserve. Mr. Aubert hunted with
his boys, Rhett and Ryan, up until the time of his death.[31] They also spent every holiday
together. In addition to spending time with his wife, Janie, and his sons on a daily basis, Mr.
Aubert dedicated much time to his only granddaughter. Prior to his death, Mr. Aubert picked up
Rhett's daughter on a daily basis from Riverside Academy in Reserve where she attended school.
Since Mr. Aubert was retired, he also ran the errands, handled the bills (if necessary), and even

---

[31]The Auberts' daughter pre-deceased them.

31

did some of the cooking. Ryan testified that he and his father "did pretty much everything together." Ryan credibly testified that his father checked on him "every single day" his entire life. In this regard, Ryan explained that he worked in a local grocery store, and his father would stop by just to talk, check on him, and see if he was going to be at the house for supper at night.

It is clear to the undersigned that Mrs. Aubert, Rhett, and Ryan suffer greatly as result of the loss of Mr. Aubert. The record reflects that Mrs. Aubert received medical treatment to address her mental and emotional suffering after the fact of Mr. Aubert's death.[82] She further testified at length regarding her despondence and inability to concentrate following the death of her husband. Mrs. Aubert had worked all of her life, since she was 18 years old. She explained that she was in "total shock" upon seeing her husband dead, and that remains on her mind to date.

Mrs. Aubert testified that she went to the doctor for medication because she was so depressed that she could not concentrate and perform her job at the bank as she had done for years, even after the death of her daughter. Mrs. Aubert admitted that she did not retire and was not fired by the bank. She testified that she just gave up and quit because of her inability to concentrate after her husband died. Mrs. Aubert credibly testified that her life without Mr. Aubert was very hard to accept, particularly after having lost her daughter.

### III. CONCLUSIONS OF LAW

#### A. The Standard of Care

Plaintiffs filed this claim pursuant to the Federal Torts Claims Act, 28 U.S.C. §§ 2671 -

---

[82]See Ochsner Clinic Foundation Records re Janie Aubert (noting that, in addition to having unexpectedly lost her husband, she was still grieving the death of her daughter) (Exh. 39 *in globo*).

2680 ("FTCA"). The FTCA is a limited waiver of the federal government's sovereign immunity.[83] This Act provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."[84] It is undisputed that Louisiana medical malpractice law governs this dispute since Mr. Aubert's treatment and death occurred in Louisiana.

It is well-settled that, under Louisiana law, a hospital may be held liable for the negligence of its physician employees under the doctrine of *respondeat superior*.[85] The VA has not disclaimed responsibility for the acts of its physicians; thus, it accepts responsibility for the actions of the doctor (Dr. Qayum) who treated Mr. Aubert.[86] "In a malpractice action against a hospital, under a theory of respondeat superior, the standard of care and burden of proof involved is the same as for the physician whose activities are questioned."[87]

Section 9:2794 of the Louisiana Revised Statutes governs medical malpractice actions. This provision provides in pertinent part:

> In a malpractice action based on the negligence of a physician . . ., the plaintiff shall have the burden of proving:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar

---

[83]Vanhov v. United States, 2006 WL 3093646, at *6 (E.D. La. Oct. 30, 2006) (citing *Johnston v. United States*, 85 F.3d 217, 218-19 (5th Cir. 1996)).

[84]28 U.S.C. § 2674; Vanhov, 2006 WL 3093646 at *6.

[85]Little v. Pou, 42,872, p. 13 (La. App. 2 Cir. 1/30/08); 975 So. 2d 666, 674.

[86]Johns v. United States, 1998 WL 151282, at *8 (E.D. La. Mar. 30, 1998).

[87]Corley v. State of La., Dep't of Health & Hospitals, 32,613, p. 6 (La. App. 2 Cir. 12/30/99); 749 So. 2d 926, 930.

33

> community or locale and under similar circumstances; and where
> the defendant practices in a particular specialty and where the
> alleged acts of medical negligence raise issues peculiar to the
> particular medical specialty involved, then the plaintiff has the
> burden of proving the degree of care ordinarily practiced by
> physicians . . . within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or
> skill or failed to use reasonable care and diligence, along with his
> best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or
> the failure to exercise this degree of care the plaintiff suffered
> injuries that would not otherwise have been incurred.[88]

To prove medical malpractice, Plaintiffs must demonstrate: (1) the appropriate standard of

medical care, which is the degree of knowledge, skill, and ordinary care possessed and exercised

by physicians in the appropriate medical field; (2) that the VA practitioners either lacked or

failed to exercise this degree of medical care; and (3) that Plaintiffs' alleged harm was the

proximate result of the VA physician's failure to exercise that degree of care.[89]

    In Johns v. United States, the court explained:

> In determining whether the VA's medical services met the applicable standard of
> care, the Court must view the reasonableness of the health care provided by the
> VA at the time and under the circumstances that existed when the VA physicians'
> diagnoses were made. The VA was not required to exercise the highest degree of
> care possible; its duty was to exercise the degree of skill ordinarily employed by
> comparable physicians under similar circumstances.[90]

The Court previously found that Dr. Qayum, an internist/primary care physician, violated the

applicable standard of care when she failed to order diagnostic testing with the requisite amount

---

[88]LA. REV. STAT. ANN. § 9:2794.

[89]See McCraw v. La. State Univ. Med. Ctr., 627 So. 2d 767, 769 (La. App. 2 Cir. 1993).

[90]1998 WL 151282 at *8 (citations omitted).

of urgency and then failed to follow up on the testing that had been ordered for weeks on end. Additionally, Dr. Qayum failed to recognize the ultimate problem sooner and institute the appropriate studies earlier so that correct treatment could be implemented.

Dr. Wallace, a family practitioner/primary care physician with the VA, noted that Mr. Aubert's heart disease preceded his first visit with Dr. Qayum. Dr. Gelb opined that his symptoms and test results were noted as early as January 3, 2008, and thereafter required *prompt* testing and invasive procedures on an *urgent* basis to improve myocardial infusion and avoid death. Dr. Gelb further opined that, as primary care physician in charge of Mr. Aubert's treatment, Dr. Qayum should have followed up and contacted Dr. Chapital for the results of the stress test. Dr. Gelb credibly testified that Mr. Aubert clearly had coronary artery disease and unstable angina when first seen by Dr. Qayum. As of February 11, 2008, with his incidences of chest pains having escalated to 20 times a month, Dr. Gelb described Mr. Aubert as "a walking time bomb" and his classic signs as a "no-brainer," which even a student right out of medical school would recognize. Dr. Gelb testified that, at the very least, Dr. Qayum should have prescribed vasodilators early on and that simply increasing his cholesterol medication was not nearly enough. All of the experts agreed that a three week delay for a stress test was inordinately long, and Dr. Gelb believed that, under the circumstances presented by Mr. Aubert's condition, such a delay was an outrageous breach of the standard of care. Suffice it to say, Dr. Qayum could have at any time ordered a stress test on either an "urgent" or "stat" basis because she was the primary care physician and Mr. Aubert was *her* patient. Dr. Qayum admittedly never took any steps whatsoever to verify that her order for a stress test had ever been implemented.

There is more than sufficient evidence of the standard of care applicable to Dr. Qayum.

It is well-established that where medical disciplines overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of practice common to both disciplines.[91] Dr. Gelb articulated a standard of care for any physician, testifying that the abnormalities exhibited by Mr. Aubert cannot be ignored and that Dr. Qayum's failure to follow up constitutes a breach of the standard of care.

The Court further finds that the Government carried its burden with respect to "other fault" – meaning Dr. Chapital's. Most notably, the Government elicited testimony from Dr. Gelb on the issue of the standard of care applicable to the VA's consulting physician in this case. Dr. Gelb also opined that Dr. Chapital's conduct fell below the standard of care in that he should have admitted Mr. Aubert to the hospital after a highly positive stress test and, *at a bare minimum*, informed the patient of the abnormal results.[92]

As to Dr. Qayum, and based upon credible testimony of the Plaintiffs' experts discussed at length in this Court's findings of fact, the undersigned further finds that none of the tests

---

[91]See, e.g., Roberts v. Warren, 01-1342, at p. 2 (La. 6/29/01); 791 So. 2d 1278, 1280 (oral surgeon testified as to the standard of care required in basic general dentistry for tooth extraction); Campbell v. Hosp. Serv. Dist. No. 1, Caldwell Parish, 33,874, at p. 12 (La. App. 2 Cir. 10/26/00); 768 So. 2d 803, 811 ("Although the plaintiffs did not offer deposition testimony from an expert in emergency medicine, the record clearly shows that the diagnosis and treatment of angina leading to a MI is not peculiar to the practice of emergency room medicine and that plaintiffs' expert witnesses (both cardiologists) in this case were more than qualified to establish the [applicable] standard . . . [of care] . . . ."); Ricker v. Hebert, 94-1743 (La. App. 1 Cir. 5/5/95); 655 So. 2d 493, 495 ("In determining whether testimony regarding the standard of care will be limited under Revised Statute 9:2794(A) to a specialist who practices the same specialty as the defendant, the operative statutory phrase is 'where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved.'"); Slavich v. Knox, 99-1540 (La. App. 4 Cir. 12/15/99); 750 So. 2d 301, 304 (finding no error in allowing a general surgeon to testify as to the standard of care applicable to an internist who failed to diagnose the plaintiff).

[92]See Graphia v. United States, 1993 WL 69999, at *4-5 (E.D. La. Mar. 5, 1993).

36

ordered by Dr. Qayum were performed with the requisite degree of urgency. The Court

concludes that Dr. Qayum's actions and inactions with respect to *her* patient (Mr. Aubert) fell

below the requisite standard of care. The fact remains that no one from the VA called the

Auberts' residence until a week and a half passed after Mr. Aubert's death and more than five

weeks after Dr. Qayum initially ordered the adenosine stress testing. Dr. Qayum was Mr.

Aubert's primary care physician and breached her duty to follow up regarding tests that she

ordered over a month before his heart attack – the raison d'etre for ordering the stress test.

### B. Causation

Generally, cause-in-fact is the outset determination in the duty-risk analysis.[93]

"Cause-in-fact usually is a 'but for' inquiry which tests whether the accident would or would not

have happened but for the defendant's substandard conduct."[94] When there are concurrent

causes, the proper inquiry is whether the conduct at issue was a substantial factor in precipitating

the accident.[95]

Professor Robertson has articulated five steps to simplify the "mental gymnastics"

involved in the cause-in-fact analysis.[96] Professor Galligan summarized the steps as follows:

"(1) identify the injury; (2) identify the wrongful conduct; (3) correct the conduct; i.e., make the

wrong right; (4) ask whether the plaintiff would have still been hurt if the defendant hadn't done

---

[93]Boykin v. La. Transit Co., Inc., 96-1932 (La. 3/4/98); 707 So. 2d 1225, 1230.

[94]Id.

[95]Id. at n.10.

[96]Thomas C. Galligan, Cats or Gardens: Which Metaphor Explains Negligence? Or, Is Simplicity Simpler than Flexibility?, 58 LA. L. REV. 35, 43 (1997).

what it (allegedly) did wrong; and, (5) finally, answer the question just asked."[97]

Applying the instant facts to the foregoing steps, the Court finds that both Dr. Chapital and Dr. Qayum's respective breaches of the applicable standard of care caused Mr. Aubert's death. Had his noted heart condition been addressed at any time prior to the date of his death (March 15, 2008) by either physician in the manner previously described in this Court's findings of fact, he very likely would not have died of cardiac insufficiency. Both Dr. Chapital and Dr. Qayum had the opportunity to inform Mr. Aubert of the seriousness of his life-threatening condition, and each, in turn, failed to so inform Mr. Aubert, notwithstanding a duty to do so.

Dr. Gelb testified that if the VA had not delayed and followed up with respect to the panoply of positive findings, including the March 11, 2008, stress test, Mr. Aubert's life could have been saved either by stenting or a coronary bypass procedure. Dr. Wecht agreed with this assessment and opined that with such intervention Mr. Aubert's chance of survival was 99%, and he would have in all likelihood lived another 12 to 15 years. The Plaintiffs' experts concluded that either procedure could have been successfully conducted in January or February 2008 and could have also been successfully conducted in March at any time prior to his death on March 15, 2008. Accordingly, Plaintiffs are entitled to recover wrongful death damages from the Government.[98]

### C. Damages

Based on the Court's findings that the VA's breach of the applicable standard of care

_____

[97]Id.

[98]See Smith v. State of La.. Dep't of Health and Hospitals, 95-0038 (La. 9/3/96); 676 So. 2d 543, 548-49 (distinguishing between wrongful death and loss of chance of survival claims).

resulted in Mr. Aubert's death, Plaintiffs are entitled to recover damages.

### 1. Survival Damages

In a survival action for damages, "the elements of recovery include the decedent's pain and suffering, his loss of earnings, and other damages sustained by the victim from the time of his 'accident' to the time of his death."[99]  If a person dies instantaneously in an accident, there will be no survival action for pain, suffering, and mental anguish, but there may be a wrongful death action.  In the case at bar, Plaintiffs seek to recover for the pain and suffering of Mr. Aubert.  However, Plaintiffs have provided no evidence that Mr. Aubert suffered any conscious pain and suffering as a result of Defendant's negligence.  Plaintiffs are not entitled to recover damages for loss of earnings.[100]  Therefore, *with the exception of $2,978.95 for medical expenses incurred for the treatment of Mr. Aubert at Baton Rouge General Hospital on March 15, 2008 (Exh. 30),* Plaintiffs are not entitled to recover under Louisiana Civil Code article 2315.1.

### 2. Wrongful Death

Plaintiffs are entitled to recover damages for wrongful death.  The elements of damage for wrongful death are: (1) loss of love, affection, companionship, and services ; (2) loss of support; (3) medical expenses; and (4) funeral expenses.[101]  Mr. Aubert had already retired but received a Government pension at the time of his death.  Mrs. Aubert is entitled to recover loss of support damages relating to his pension, which stopped upon her husband's death – i.e., $115

---

[99]Johns v. United States, 1998 WL 151282, at *11 (E.D. La. Mar. 30, 1998).

[100]Id. at *12 (denying damages for loss of support in wrongful death medical malpractice claim when the victim has already retired).

[101]Subervielle v. State Farm Mut. Auto. Ins. Co., 08-0491, p. 3 (La. App. 4 Cir. 1/7/09); 32 So. 3d 811, 813.

per month X 193.5 months for a total of $22,218.00 for the loss of Mr. Aubert's veterans benefits. In addition, Mrs. Aubert produced adequate evidence of Mr. Aubert's funeral/burial expenses in the total amount of $8,187.96 ($7597.96 +$590.00).

With respect to Plaintiffs' claims for loss of love, affection, and companionship, they presented evidence that Mr. Aubert was loving and devoted husband and caring father. Mr. And Mrs. Aubert were married for approximately 40 years. He was described as the backbone of the family, providing companionship, services, and emotional support for his wife and both sons. Plaintiffs testified that their family was extremely close. The Auberts participated in daily activities as a family and shared every holiday. Mrs. Aubert was very dependant on her husband since she worked everyday at the bank and needed help with the house, errands, cooking, and family events.

Plaintiffs presented testimony that Mr. Aubert's death had a significant negative impact on his wife and both sons. Mrs. Aubert was devastated, depressed, and withdrawn, particularly considering Mr. Aubert's tragic death followed closely on the heels of the death of her only daughter. After considering the extensive testimony offered at trial, the Court awards Mrs. Aubert $600,000 and Ryan and Rhett Aubert each $150,000 for their respective losses. These award are reasonable and warranted considering the facts presented at trial and this Court's review of awards in comparable cases.

### D. Apportionment of Fault

The Court has found that the VA is liable for certain breaches of the standard of care owed Mr. Aubert, as set forth *in extenso* throughout this Court's opinion. In addition, the Court finds that Dr. Chapital also breached the standard of care in a manner which was a cause-in-fact

40

of Mr. Aubert's death.  The Government's liability must be apportioned in accordance with

Louisiana's current comparative fault regime.  Louisiana Civil Code Article 2323 provides:

> A. In any action for damages where a person suffers injury, death, or loss, the
> degree or percentage of fault of all persons causing or contributing to the injury,
> death, or loss shall be determined, regardless of whether the person is a party to
> the action or a nonparty, and regardless of the person's insolvency, ability to pay,
> immunity by statute . . ., or that the other person's identity is not known or
> reasonably ascertainable. . . .
>
> B. The provisions of Paragraph A shall apply to any claim for recovery of
> damages for injury, death, or loss asserted under any law or legal doctrine or
> theory of liability, regardless of the basis of liability.[102]

Article 2324 of the Civil Code provides for joint and divisible liability of joint tortfeasors.  This

provision limits a tortfeasor's liability to his percentage of fault:

> [L]iability for damages caused by two or more persons shall be a joint and
> divisible obligation.  A joint tortfeasor shall not be liable for more than his degree
> of fault and shall not be solidarily liable with any other person for damages
> attributable to the fault of such other person, . . . regardless of such other person's
> insolvency, ability to pay, degree of fault, immunity by statute or otherwise . . . .
> [103]

Comparative fault inevitably measures relative causation.  In <u>Watson v. State Farm Fire</u>

<u>and Casualty Insurance Co.,</u> the Louisiana Supreme Court stated that "[i]n determining the

percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at

fault and the extent of the causal relationship between the conduct and the damages claimed."[104]

In assessing the nature of the conduct of the parties. the court may consider various factors in

determining the degree of fault assigned, including: "(1) whether the conduct resulted from

---

[102]LA. CIV. CODE art. 2323.

[103]LA. CIV. CODE art. 2324.

[104]469 So. 2d 967, 974 (La. 1985).

41

inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought."[105]

Therefore, considering all of these factors after weighing all of the evidence presented at trial, including the credibility of the witnesses, the Court finds that the fault must be shared 50/50 by Dr. Qayum and Dr. Chapital. The causal relationship between both physicians' various breaches and Mr. Aubert's injury (in this case wrongful death) are clearly direct ones. Indeed, at any point in time, had either Dr. Qayum or Dr. Chapital done something prior to March 15, 2008, Mr. Aubert would not have suffered a heart attack and died of cardiac insufficiency. The Court will not belabor the credible points made over and over again by all experts across the board with respect to Dr. Chapital's breaches of the standard of care or the credible points made by Dr. Gelb and Dr. Wecht with respect to breaches of duty owed by Mr. Aubert's primary care physician/internist, Dr. Qayum. The fact remains that their actionable negligence combined to create a formidable and, ultimately, invincible snare that Mr. Aubert could not negotiate without having had some warning about the seriousness of his condition and prompt diagnosis and treatment of his life-threatening disease. In this Court's opinion, a 50/50 apportionment of fault between the cardiologist (Dr. Chapital) and Mr. Aubert's primary care physician/internist (Dr. Qayum, the VA physician) is appropriate.

_____

[105]Id.

In Hall v. Brookshire Brothers, Ltd., the Louisiana Supreme Court specifically held that any allocation of comparative fault must be applied prior to the imposition of the medical malpractice cap.[106]  In both Hall and Miller v. LAMMICO, the court noted that the damages sustained by a medical malpractice victim are distinct from the amount that can be recovered for those damages; thus, the proper application of Article 2323 requires calculation of the damages owed and allocation of comparative fault reduction of the damages award in accordance with the statutory framework Louisiana's Medical Malpractice Act.[107]  Most recently, in Douglas v. Children's Hospital, the Louisiana Fourth Circuit Court of Appeal applied the Hall construct to a case involving both state and private physicians.[108]

Following these procedures, the Court's calculation of damages owed by the Government is as follows:

|  |  | DAMAGES | VA's 50% Fault |
|---|---|---|---|
| • | Janie Aubert (surviving spouse) (which includes medical, funeral, burial, lost VA benefits, and loss of consortium, services...) | $633,384. 93 | $316,692.46 |
| • | Rhett Aubert  (major son) | $150,000.00 | $ 75,000.00 |
| • | Ryan Aubert  (major son) | $150,000.00 | $ 75,000.00 |

---

[106]02-2404, p. 23 (La. 6/27/03); 848 So. 2d 559, 573-74.

[107]Id.; see also Miller v. LAMMICO, 07-1352, p. 8-10 (La. 1/16/08); 973 So. 2d 693, 700.

[108]10-213, p. 33 (La. App. 4 Cir. 8/19/10); 2010 WL 3262223 (finding "nothing in the MLSSA that would support a different result from that obtained in Miller [v. LAMMICO]" and holding that application of fault percentages against the entire jury award is consistent with the general rule of comparative fault requiring courts to calculate damages in such a manner that each tortfeasor pays only for the portion of the damage he has caused).

43

$933,384.93          $ 466,692.46

Because the quantum owed by the Government in this case does not exceed the cap after apportionment of fault consistent with Hall, this Court need not further address the application of Louisiana's Medical Malpractice Cap.

Accordingly and for all of the above and foregoing reasons,

**IT IS ORDERED** that judgment will be rendered finding Defendant United States liable for medical malpractice and for damages in the total amount of Four Hundred Sixty Six Thousand Six Hundred Ninety Two ($466,692.46) Dollars to Plaintiffs, allocated $316,692.46 to Mrs. Aubert, $75,000.00 to Rhett Aubert, and $75,000.00 to Ryan Aubert, plus interest and costs.[109]

New Orleans, Louisiana, this 20th day of April, 2011.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

---

[109]"The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars *plus interest and cost.*" LA. REV. STAT. ANN. § 40:1299.42(B)(1) (emphasis added).

44