IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

-------------------------------------------------------x
                                  :     CIVIL ACTION
                                  :     NO. 08-1633
                                  :
In Re: Vioxx Products Liability Litigation    :
                                  :     SECTION L, MAG. 3
                                  :
                                  :     HONORABLE ELDON E. FALLON
                                  :     HONORABLE DANIEL E. KNOWLES, III
                                  :
                                  :     In Relation To: MDL No. 1657
                                  :
                                  :
-------------------------------------------------------x

## ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY, P.C.'S REPLY TO THE VIOXX FEE ALLOCATION COMMITTEE'S RESPONSE TO OBJECTIONS TO RECOMMENDED COMMON BENEFIT FEE ALLOCATION

       Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C. ("Anapol"), Co-Plaintiffs' Liaison Counsel in the New Jersey Consolidated Vioxx Litigation, hereby replies to the Vioxx Fee Allocation Committee's ("FAC") Response to Anapol's Objections to Its Recommended Common Benefit Fee Allocation.

## I.     INTRODUCTORY STATEMENT

       On January 20, 2011, the FAC published a tentative allocation of $3,400,000.00 to Anapol for its common benefit fee. On February 4, 2011 Anapol, complying with a January 20, 2011 Order, objected, based upon its substantial involvement in the New Jersey State Court Coordinated Vioxx Litigation, as Co-Liaison Counsel, and a lack of transparency, as mandated by *In Re: High Sulfur Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir. 2008). For the reasons that follow, Anapol hereby maintains the FAC methodology was and remains fatally

flawed, but even under such faulty criteria, Anapol's common benefit award, compared to other proposed recipients, should easily surpass nine million dollars ($9,000,000.00).[1]

The FAC, on March 1, 2011, filed a Response to Anapol's Objection, as well as to the objections asserted by sixteen other firms. In addressing the objectors' criticisms levied against its methodology and factual basis for the allocations, the FAC conceded "the Anapol firm's contributions to the Vioxx Litigation." *See* FAC's Response, p. 14. In a broad, over sweeping statement, the FAC justified Anapol's low award because Anapol has "grossly overstated its contributions." *Id* at 16. The points and authorities in this Memorandum dispel any notion that Anapol overstated its work. The evidence in both Anapol's original filing, as well as in the instant submission, reflects continuous, sustained commitment of time and expenses for the common good of the Vioxx litigation in pleadings, motions, depositions, document review, experts, and leadership spanning a five year period before the litigation settled.

## II.   ARGUMENT – NEW JERSEY'S COORDINATED VIOXX LITIGATION

### A.   The New Jersey Coordination Was Integral to Vioxx's Success

In May 2003, more than a year before Vioxx was withdrawn from the market and almost eighteen months before the MDL was formed, Vioxx was designated as a mass tort in New Jersey. *See* Notice to the Bar of NJ containing Order dated May 20, 2003, attached hereto as Exhibit "A". Although relatively small at the time it was created, Merck answered discovery requests and initially produced documents. Before Vioxx was withdrawn from the market, New Jersey document reviewers developed a theory of liability and depositions of corporate representatives were taken to learn about Merck's personnel, its electronic programs/databases, and its early defense strategies. When the MDL eventually formed, it had the benefit of the groundwork laid by the New Jersey coordinated litigation.

---

[1]  *See generally Hensley v. Eckerhart*, 461 U.S. 424 (1983) for a discussion of proper *Johnson* factors and an admonition against attorney fee appeals with prolonged litigation. By slowly parceling out information, the FAC has prolonged the time for Anapol to receive, digest and understand all relevant facts to make an informed decision on the common benefit allocation process. Anapol's suggested award is the same for Ashcraft and Gerel, whose common benefit work, in Anapol's belief, was less valuable, and less than Herman, Herman, Katz & Cotlar, Plaintiffs Liaison Counsel in the MDL.

Even after the MDL's formation, New Jersey remained a central crucible for Vioxx litigation. Massive document productions continued to be produced in New Jersey. Depositions of influential Merck witnesses were taken by New Jersey counsel. Focused discovery in hundreds of individual cases took place. Judge Higbee repeatedly advised counsel she would push trials from the New Jersey docket. Transcripts of thirty-six (36) status conferences, monthly meetings and liaison counsel-only hearings between July 2004 and February 2008 reflect this aggressive approach, attached hereto as Exhibit "B". Many other sessions were held informally and without a transcript. Judge Higbee issued twenty-five (25) case management orders, almost one hundred (100) general orders and decisions and countless orders in individual cases. Anapol's comments appear prominently in these transcripts and Anapol cases appear in many of those orders.

New Jersey-only rulings benefited all litigants. For example, the Court, over objection, required Merck to produce the custodial file for each sales representative that visited a plaintiff's prescribing physician. Sales representative files often contained damaging liability and causation evidence buried within thousands of pages of documents. These productions and actual depositions of sales representatives served an invaluable purpose for the entire litigation. Counsel in New Jersey also successfully noticed Merck's then-CEO, Raymond Gilmartin's, deposition.

New Jersey also fully discovered and tried more individual cases than any jurisdiction. As Co-Lead Counsel with Seeger Weiss, Anapol implemented a strategy to maximize pressure on Merck by working up as many individual cases as possible. The Court set up numerous discovery pools of individual cases for detailed case specific discovery. One pool alone had 250 cases. This strategy left one very simple, yet vital, impression on Merck – plaintiffs were here to stay.

A strong, vibrant and large (almost 16,000 cases) New Jersey litigation forced Merck to defend a war on multiple fronts. Constant pressure placed upon Merck in New Jersey deserves

acknowledgement.  However, the proposed common benefit fees for New Jersey Counsel did not.[2]

**B.    Filing Cases In New Jersey Was A Strategic Decision That Should Not Negatively Impact One's Common Benefit Allocation**

Anapol's initial Complaints were filed against Merck, a New Jersey corporation, in New Jersey state court.  When Vioxx was withdrawn from the market and the MDL was established, Anapol and a number of other firms made a strategic decision to file all of its cases in New Jersey.  Many firms found the New Jersey state court forum fair, impartial, and a welcome venue wherein to try its cases without the inherent procedural hurdles confronting MDL courts.  In addition, some firms did not want to pay an MDL assessment on its cases because the litigation already was in active discovery and others had different reasons without common fund aspirations.  Plaintiffs' counsel freely exchanged information and shared the workload.  Anapol's senior partners took this position and Sol Weiss resigned his position on the MDL State Court Liaison Committee when membership required paying an assessment.  Anapol had been referred cases from firms who respected its ability and preferred that their clients' cases be in New Jersey.

While the New Jersey only firms did not intend to pay an assessment, it understood that they would not be free riders and could not utilize any work product from the MDL PSC.  In fact, Russ Herman admonished MDL lawyers not to work with New Jersey lawyers.  *See*, email dated June 15, 2007, attached as Exhibit "D".  Therefore, New Jersey established its own series of experts.  A consortium of New Jersey attorneys (Anapol; Cohen, Placitella & Roth; and Eric Weinberg) established a relationship with Dr. John Kostis, Professor and Chairman, Department of Medicine, UMDNJ-Robert Wood Johnson Medical School and Founding Director, Cardiovascular Institute of New Jersey.  Dr. Kostis developed an algorithm for setting a scientific percentage that Vioxx contributed to the risk for an MI in a person.  Case specific

---

[2]    *See,* the April 4, 2006 email from Rob Gordon, attached as Exhibit "C" acknowledging the quality and depth of work New Jersey lawyers willingly gave supporting Weitz & Luxenberg on the *McDarby* case and April 4, 2006 email from Mark Lanier thanking . . . Sol, Dave Jacoby . . . and so many others . . . make it possible for "vintage Lanier" to go at it.

cardiologists such as Nicholas DePace,[3] Harlan Krumholtz and Anthony Altobelli were developed in New Jersey by New Jersey lawyers. Dr. David Madigan, a biostatistician, was also presented by New Jersey lawyers.

Firms performed this work in New Jersey, under a contingency fee contract with their clients, without expectation of a common benefit fee to compensate them over and apart from the New Jersey mandated sliding contingent fee scale. This fact differentiated New Jersey from the MDL with its mandated 2% assessment against the lawyers' fee and 2% against the client for costs. So our clients could participate and receive compensation in the National Vioxx Settlement Program, Anapol absorbed the 8% assessment (later reduced to 6.5%). By accepting the assessment, we could submit our New Jersey work product for common benefit consideration.

The recommended allocations reflect a bias in favor of the MDL and against New Jersey. Not only are allocations for the MDL-primary firms greater than New Jersey-primary firms, but the hourly rates are excessively higher for the MDL firms as well. *See* spreadsheet, attached hereto as Exhibit "E". As the spreadsheet indicates, only six New Jersey firms received total compensation of over $1,000,000.00, whereas the MDL had at least seventeen firms with over $1,000,000.00 in earnings. The disparity in hourly rates is also telling as six MDL firms had hourly rates over $1,000.00 while only one firm in New Jersey had an hourly rate of that degree. These disparities deviate from the *Johnson* Factors and ought not stand.

The Objectors Co-Lead Counsel, Robert Arceneaux, has filed motions exposing a deal between the FAC and Michael Stratton, lead counsel for those attorneys who objected to an 8% assessment. Counsel will not repeat the allegations raised in Mr. Arceneaux's motions other than to say that it appears that certain counsel paid only a 4% assessment while New Jersey attorneys who performed common benefit were obligated to pay 6.5%. As a result, Mr. Stratton and the other objecting firms he represented, most of whom did not perform common benefit work, received $18,538,236.85 from the funds escrowed for common benefit distribution. Stratton Faxon thus received more common benefit than any objector to the common benefit fee

---

[3] Specifically mentioned by Rob Gordon, trial counsel for McDarby, in Exhibit "C".

allocations.  Anapol has filed a 60(B) Motion to globally reduce the assessment to 4% in light of the Stratton deal.

### C.    Anapol's Early Involvement In The Vioxx Litigation Should Be Rewarded

**FAC'S Position**

Anapol's appearance at a 2001 Vioxx organizational meeting and its filing of one of the first cases in New Jersey is not a measure of an attorney's contribution to a litigation.  *See* FAC's Response to Objections to Recommended Common Benefit Fee Allocation, at 15.

**Anapol's Reply**

Reference to the 2001 organizational meeting/first filing in Anapol's original submission simply denotes our law firm as one founding father of this litigation, a part of a small group of firms prosecuting Vioxx cases after VIGOR demonstrated a signal of increased ischemic event.

Before APPROVE forced Merck to withdraw Vioxx from the market, Anapol had already been named Co-Lead Counsel for the New Jersey coordination; had approximately fifty (50) cases on file, had reviewed internal Merck documents, had taken depositions of Merck witnesses, had actively refined theories of liability, had negotiated the terms of a Plaintiffs' Fact Sheet and Short Form Complaint, and exposed plaintiffs and treating physicians to depositions. This work fostered the "Vioxx Story" which was told at trial years later. Judge Fallon, in PTO 6(D), designated early Vioxx litigation as two of the fourteen factors which best describe a firm's common benefit participation.

> **"Whether counsel was already involved in the Vioxx litigation prior to the withdrawal of Vioxx from the market on September 30, 2004."**

> **"Whether counsel was involved in the Vioxx litigation prior to the JPMDL, and the time and expense incurred during such time that was for common benefit."**

The Court's Order clearly gives great weight and consideration to those firms, like Anapol, that invested personnel and financial resources prior to September 30, 2004.

### D.     Anapol's Contributions In The New Jersey Coordinated Litigation Were Substantial

#### FAC's Position

Anapol's involvement in New Jersey was mostly administrative in nature.  *See* FAC's Response to Objections to Recommended Common Benefit Fee Allocation, at 15.

#### Anapol's Reply

Anapol carried a heavy burden of the New Jersey litigation.  Anapol senior partners, Sol H. Weiss and David Jacoby, were appointed as Co-Lead Counsel in New Jersey with David Buchanan, Esquire of Seeger Weiss.

Anapol addressed nearly every generic issue that arose in New Jersey by negotiating countless case management orders and pre-trial orders; by arguing motions; by debating and discussing trial selection picks; by completing an exhaustive trial exhibit list for the Court's use; by coordinating fact sheet deficiency issues; by working with Merck on issues surrounding the collection of plaintiffs' medical records; and by housing and coordinating 10 million pages of sales representative files.  Anapol also created a timeline, in the form of a calendar, which embedded all sales bulletins/updates that the Merck sales representatives received, attached hereto as Exhibit "F".  Anapol provided this to all New Jersey plaintiffs' counsel and it served as a template for deposing Merck's sales representatives. Anapol also maintained an alternative document repository which allowed New Jersey counsel to access records from either our Cherry Hill, New Jersey, or Philadelphia offices.[4]

In addition to handling the aforementioned Co-Lead/Liaison Counsel responsibilities, Anapol worked on general liability theories.  Sol Weiss was a lead questioner at the following key depositions: (1) David Anstice who was the President of Human Health for Merck; (2)

---

[4] In its Response, the FAC indicates that a review of the motion papers and transcripts reveal that Anapol only had some involvement in the New Jersey work product.  This is a limited view. Anapol played a very large role in New Jersey and, as counsel knows, many issues are resolved with opposing counsel and/or the Court before there is a formal record.  The lack of a transcript for every issue that was decided in New Jersey should not lessen Anapol's efforts.

Wendy Dixon, Ph. D., who was a Senior Vice President of Marketing at Merck and played a large role in the Vioxx marketing strategy; (3) Thomas Musliner who was an Executive Director for Clinical Research Endocrine and Metabolism at Merck who authored many pieces involving the COX-2 compound; and (4) Terry Jacklin, a corporate representative with knowledge of all of Merck's databases.   David Jacoby was the lead examiner at the deposition of Robert Silverman, M.D., Ph.D., a leading supervisor in Merck Research Laboratories' Regulatory Department.

Anapol also contributed at many other critical depositions.   David Jacoby second chaired the deposition of Dr. Scolnick, Merck's lead scientist.   Mr. Jacoby performed document review in advance of and in support for Dr. Scolnick's deposition.   Sol Weiss provided support at the deposition of Raymond Gilmartin, Merck's former CEO.   Sol Weiss also second chaired the deposition of Dr. Alan Nies, the Director of Clinical Pharmacology at Merck and passed along key documents utilized by the lead examiner, Shanin Specter, Esquire.[5]

All of the witnesses that Anapol deposed were central figures at Merck.   Their testimony was important to the overall picture and the development of plaintiffs' case.   The fact that individual firms decided not to play deposition cuts in only fifteen trials does not mean that the work performed is not compensable.

Anapol also played a role in deposing and ultimately weakening Merck's general liability cardiology experts who tendered reports that Vioxx did not cause an increased risk of ischemic events.   Sol Weiss deposed David Vorchheimer, M.D. about signals of heart attacks in clinical trials and overwhelming evidence in epidemiology studies of an increased risk.   Mr. Weiss also deposed Nicholas Flavahan, Ph.D., a researcher with an emphasis on vascular cell biology.   Dr. Flavahan was offered as a general liability expert by Merck in the areas of COX-2 inhibitors and their mechanisms.   David Jacoby deposed Dr. Silverman and other Merck employees and exhibits.

---

[5] The FAC acknowledges that the taking of depositions is a team effort.   See FAC's Response, p. 31.   Anapol was an important member of the team.

### E.    Anapol Found And Developed Experts

**FAC'S Position**

The Fee Committee gives no credit to Anapol's work developing experts. *See* FAC's Response to Objections to Recommended Common Benefit Fee Allocation, at 15.

**Anapol's Reply**

Common benefit consideration for the development of experts should not solely rest on whether that expert ever testified at trial. There may be many reasons why an expert, who was qualified to testify, was not called, however, the work performed in developing that expert should not be overlooked.

One expert that Anapol found and developed was Dr. Steven Rich. Dr. Rich was affiliated with the prestigious University of Rochester. He is a geriatric specialist with a Bachelor's Degree in Pharmokinetics. At Rochester, he sat on his hospital's Formulary Committee and was a vocal opponent of Vioxx being on the hospital's formulary. Dr. Rich realized very quickly that Vioxx carried an increased risk for cardiovascular events and he made it his duty to speak out about its danger. He even had a letter published in the New England Journal of Medicine which criticized Vioxx.

Anapol retained Dr. Rich to serve as a general liability expert. He reviewed Merck's internal documents and the depositions of Merck witnesses. Anapol spent hours with Dr. Rich refining the scientific theories of the case. Anapol also spent considerable time preparing Dr. Rich for two full days of depositions in June/July, 2005. Dr. Rich was proffered as a general liability expert in *Humeston* I, as well as in Anapol's *Abdel-Malek* and *Kimmelman* cases, which were listed on the same trial schedule as *Humeston*. Attached hereto as Exhibit "G", *see* the Court's January 31, 2005 Order setting the *Humeston, Abdel-Malek and Kimmelman* cases for trial. The Court ultimately selected *Humeston* I as the first trial case but not before Anapol had completed fact and expert discovery and had aggressively prepared both the *Kimmelman* and *Abdel-Malek* cases for trial. Merck filed a motion to preclude Dr. Rich's testimony on the grounds that he was not qualified to testify at trial. Anapol filed a response. Judge Higbee denied Merck's motion – Dr. Rich was qualified as a general liability expert.

Dr. Rich was also proffered by Anapol as a general liability expert for the six cases (*Rodemoyer, DiTrolio, Levinson, Ortiz, Kimmelman and Biehls*) that were slated for trial in January, 2008. Dr. Rich was again extensively deposed in November, 2007 with regard to his general Vioxx opinions.

Dr. Mark Eisenberg, of McGill University in Montreal, Canada, was retained as a stroke expert. Dr. Eisenberg is not only a practicing cardiologist, but he is also the Director of Clinical Research of the McGill Cardiology Fellowship Program and an Associate Member of the McGill Department of Epidemiology and Biostatistics. Dr. Eisenberg reviewed all of the data related to Vioxx and strokes. After Anapol spent considerable time and expense (which was reimbursed to Anapol as a common benefit cost), working with Dr. Eisenberg, he prepared an extensive report which established that Vioxx carried an increased risk for strokes. To Anapol's knowledge, no other firm had developed a general liability stroke expert. Had the litigation continued, Anapol was prepared to try a stroke case with Dr. Eisenberg serving as the primary expert. *See* Dr. Eisenberg's May 1, 2007 expert report attached hereto as Exhibit "H".

In addition to establishing general liability experts, Anapol also developed and introduced instrumental case specific experts to the entire litigation. We understand that the FAC is not awarding common benefit time for the development of case specific experts. In certain instances, we do not disagree with this position.

However, we do seek a common benefit contribution for our work with Nicholas DePace, M.D., a Philadelphia/South Jersey cardiologist. Anapol has had a relationship with Dr. DePace for a number of years having first worked with him in the Fen-Phen litigation close to ten years ago.

As a result of this relationship, and before Vioxx was even withdrawn from the market, we met with Dr. DePace to develop him as a cardiology expert for Vioxx. We spent countless hours reviewing documents and scientific theories with Dr. DePace. We also prepared him for multiple-day depositions which he was required to endure. After spending endless time and energy preparing Dr. DePace to be a Vioxx expert, we, without hesitation, invited other firms to use Dr. DePace in their respective cases. Firms gladly took us up on our offer of assistance. The

Seeger Weiss firm presented Dr. DePace in the *Humeston* I trial. Also, Dr. DePace testified at the *Cona/McDarby* trial in New Jersey. *See* the Rob Gordon email, attached as Exhibit "C".

**F.     Anapol Deserves Credit For Its Work On Multiple Bellwether Trials**

**FAC'S Position**

The FAC has ruled that "work conducted in furtherance of individual cases that were not tried would not be deemed to be common benefit work." *See* FAC's Response to Objections to Recommended Common Benefit Fee Allocation, at 16.

**Anapol's Reply**

In order to keep the pressure on Merck, the strategy in New Jersey was to work up as many individual cases as possible. Judge Higbee ordered large discovery pools which required depositions of plaintiffs and other fact witnesses, treating and prescribing physicians and Merck sales representatives. Anapol always volunteered to have more than its share of cases included in these discovery pools. For example, on September 17, 2007, after consultation with the parties, Judge Higbee ordered the completion of core fact discovery in 250 cases. *See* September 17, 2007 Court Order, attached hereto as Exhibit "I". Of the 250 cases selected, Anapol agreed to complete discovery for fifteen of our plaintiffs. *Id.* Only the Seeger Weiss firm (with 15 cases as well) had as many cases to work up. This was a considerable undertaking given that this Order was entered while Anapol was in the midst of preparing six cases for trial. Our firm conservatively estimates that we took over 250 case specific depositions during the course of the Vioxx Litigation.

Undertaking discovery in these cases required significant resources. The time and expense outlays were extensive. Even though the work performed in all of these individual cases was strategically done to advance the litigation and, arguably, worthy of a common benefit award, Anapol has not and does not seek common benefit time for every case where individual discovery was performed.

However, Anapol does seek a common benefit allocation for the *Hatch* matter as well as for nine (9) other cases that were not just on discovery schedules, but trial settings as well. Attached hereto as Exhibit "J", *see* the December 9, 2005 Court Order scheduling trial in the

*Hatch* matter as well as the Court's August 9, 2006 Amended Scheduling Order attached hereto as Exhibit "K". The nine cases were: *Rodemoyer, Biehls, DiTrolio, Levinson, Kimmelman, Ortiz, Abdel-Malek, Williams-McCray* and *Groff.* In each of these cases, we were in trial prep mode – we had experts deposed and we deposed Merck's experts; depositions were designated for trial testimony; trial graphics and animations were being prepared; witness lists were created; exhibit lists were formulated; and conferences were held with the Court and defendant on various pre-trial issues. The preparation of these cases required a fervent commitment to the Vioxx cause. Had it not been for various issues, such as the Court selecting other cases for trial or settlement occurring, Anapol would have been on trial.

Some Courts of Appeals have stated flatly that plaintiffs should not recover fees for any work on unsuccessful claims. *See, e.g., Bartholomew v. Watson*, 665 F.2d 910, 914 (9th Cir. 1982); *Muscare v. Quinn*, 614 F.2d 577, 579-81 (7th Cir. 1980); *Hughes v. Repko*, 578 F.2d 483, 486-87 (3d Cir. 1978). Others have suggested that prevailing plaintiffs generally should receive a fee based on hours spent on all nonfrivolous claims. *See, e.g., Sherkow v. Wisconsin*, 630 F.2d 498, 504-058 (7th Cir. 1980); *Northcross v. Board of Educ.*, 611 F.2d 624, 636 (6th Cir. 1979), *cert. denied*, 447 U.S. 911 (1980); *Brown v. Bathke*, 588 F.2d 634, 636-37 (8th Cir. 1978). Still other Courts of Appeals have held that recovery of a fee for hours spent on unsuccessful claims depends upon the relationship of those hours expended to the success achieved. *See, e.g., Copeland v. Marshall*, 641 F.2d 880, 891-92, n.18 (D.C. Cir. 1980) (*en banc*); *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981) (*en banc*), *cert. dismissed*, 453 U.S. 950 (1981); *Gurule v. Wilson*, 635 F.2d 782, 794 (10th Cir. 1980) (opinion on rehearing); *Lamphere v. Brown Univ.*, 610 F.2d 46, 47 (1st Cir. 11979). *Hensley*, 461 U.S. at 432.

Working up cases for trial benefitted all plaintiffs. It showed that plaintiffs would continue to advance the ball until our ultimate goal was met. By analogy, a defense verdict at trial had the same impact as any of our nine cases – none received a jury verdict. Lastly, the successful trial case payments were carved out of the settlement.[6] (*See* Exhibit 17.1.23 to the

---

[6] The "Definitions" Section of the Vioxx Settlement Agreement, Section 17.1.22, in defining an "Eligible Claimant", includes the following language:

> ...Notwithstanding the foregoing provisions of this Section 17.1.22, ....
> (ii) none of the Persons set forth on Schedule 17.1.22 (nor their respective

Vioxx Settlement Agreement – List of Excluded Persons, attached hereto as Exhibit "L"). No assessments were paid on these fees and the fees themselves were not placed into the common benefit pool. Based on the above precedents it was harmful error to exclude Anapol's trial preparation time and to exclude funds from successful verdicts. *See also Johnson v. Georgia Highway Express, Inc.*, 48 F.2d 714 (5th Cir. 1974).

The FAC had previously agreed with Anapol's position that its work on these nine cases was compensable as common benefit time. During Anapol's December 1, 2008 appearance before the FAC in Atlantic City, New Jersey, it was the FAC that directed us to submit our hours for our trial listed cases. *See* portions of the December 1, 2008 meeting transcript attached hereto as Exhibit "M". Per the FAC's instructions, we then submitted this supplemental common benefit time.

For these hours to now be rejected makes no sense and is in direct conflict with what the FAC previously indicated, and would appear appropriate under a proper *Johnson* Factor. Therefore, the 4,617.50 hours spent on the nine bellwether files should be included for common benefit purposes. For example, we understand that common benefit awards were made to firms such as Martin & Jones, PLLC for preparing plaintiffs for trials that never occurred in New Jersey.

## III.    CONCLUSION

The FAC proposed allocations make it appear New Jersey lawyers were "free riders" on the backs of the MDL lawyers, but *see*, *In Re Air Crash Disaster at Florida Everglades*, 549 Fed. 1006 (5th Cir. 1977) (one who hires and pays his own lawyer is not a free rider if the attorney is a contributor to the final results). Rather than debate whether certain MDL lawyers rode free on New Jersey's consolidated litigation, New Jersey lawyers were not "free riders" and

---

Legal Representatives), shall constitute "Eligible Claimants" (and accordingly none of such Persons (or their respective Legal Representatives) may participate in the Program).

*See* Exhibit "L".

their contributions to the final results were impermissibly discounted.

ANAPOL, SCHWARTZ, WEISS, COHAN,
FELDMAN AND SMALLEY, P.C.

SOL H. WEISS
GREGORY S. SPIZER

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing pleading has been served on liaison and co-lead counsels, Russ Herman, Andy Birchfield, and Christopher Seeger, Special Master Patrick Juneau by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, May 2, 2011

                    /s/ Sol H. Weiss

                    Sol H. Weiss