Court Hearing

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY
CASE TYPE NO. 816

------------------------------x
IN THE MATTER OF IN RE:
VIOXX

STENOGRAPHIC TRANSCRIPT
OF:
------------------------------x    - MOTIONS -
PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
1201 BACHARACH BOULEVARD
ATLANTIC CITY, NJ  08401
DATE:   JULY 16, 2004
B E F O R E :
THE HONORABLE CAROL E. HIGBEE, J.S.C.
TRANSCRIPT ORDERED BY:
WILFRED CORONATO, ESQ. AND DAVID BUCHANAN, ESQ.
A P P E A R A N C E S :
DAVID BUCHANAN, ESQUIRE
SEEGER, WEISS
ATTORNEY FOR THE PLAINTIFFS
DAVID JACOBY, ESQUIRE
ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
ATTORNEY FOR THE PLAINTIFFS
WILFRED P. CORONATO, ESQUIRE
SETH D. ROTHMAN, ESQUIRE
THEODORE V.H. MAYER, ESQUIRE
CHARLES W. COHEN, ESQUIRE
HUGHES, HUBBARD & REED, LLP
ATTORNEYS FOR THE DEFENDANT, MERCK

*      *      *      *      *      *

REGINA A. TELL, CSR-CRR
OFFICIAL COURT REPORTER
1201 BACHARACH BOULEVARD
ATLANTIC CITY, NJ  08401

1

---

1    agenda - say we meet on Monday - the Wednesday before
2    each of you would have to forward to me an agenda of
3    what you want to discuss and exchange it with each
4    other.  On Monday you would meet, say, at 10:30, and
5    from 10:30 to 12:30 counsel would meet with each other
6    in my conference room.  You would break for lunch, and
7    at 1:30 I would meet with you to resolve any issues
8    that hadn't been resolved or to discuss with you issues
9    to determine what might require motions and what could
10   be resolved informally, and we'll have a court reporter
11   to put anything that we order that is actually decided
12   on the record, so we don't have to go into this issue
13   of what was said or what was decided.  And that's my
14   plan at this point.
15        Now, it may turn out that once a month is too
16   much or too little, I don't know, but I hope it is not
17   too little, but it might be too much, and if that's the
18   case then we'll rearrange it.  We can be flexible, but
19   this is what I plan to do from this point on.  So at
20   this point we can start with the first Monday in
21   August, and we'll assume from now on that's going to
22   happen.  If the Mondays turn out not to be -- if that's
23   not a good day I'll let you know.  And that's basically
24   a space issue.  All right.
25        Now, the next issue has to do with the fees

3

---

1              P R O C E E D I N G S
2         THE COURT:  We're doing a discovery motion In
3    Re: VIOXX.  At this point counsel has had a chance to
4    sign in?
5         (All attorneys indicated in the affirmative.)
6         THE COURT:  Up to now I pretty much kept a
7    hands-off approach and let you do your own thing, and
8    so far it has worked out well, I thought.  And,
9    actually, I still think it has up to now.  But now it
10   appears that there are disputes between the parties on
11   issues, and maybe I'm going to have to take a little
12   more hands-on, proactive approach, so my plan is that
13   from now on - at least for a few months to see how it
14   works - we're going to have monthly meetings.
15        My plan right now is to start doing that on
16   Mondays, the first Monday of the month.  My only
17   problem -- my only question is I have to make sure I
18   can get the conference room on that date, and the
19   person who does the conference room assigning isn't in
20   today, so I will be finding out for you to make sure
21   what day we can do that.
22        My thought is this, and I have picked Judge
23   Corodemus' brain about this, and it is basically more
24   or less what she has been doing or at least what she
25   tells me she has been doing, which is exchanging an

2

---

1    and how we're going to pay for these motions.  There
2    was an issue that has been raised, an issue of filing a
3    motion in VIOXX, and whether you have to pay fees for
4    every case you file or just the one case.  I think we
5    have resolved that within the courthouse.  That's
6    really not my province.  The fees don't go to me, and I
7    don't care who pays what, but I have discussed it with
8    the Presiding Judge, I have discussed it with Judge
9    Corodemus, I discussed with it the team leader, and
10   what we're going to do is have every case that involves
11   any motion that involves every case you'll only have to
12   pay one motion fee, and it could be filed under the
13   master.
14        Cases that involve less than one -- anything
15   less than all of the cases you have to file for each
16   individual docket number.  For example, the forum non
17   conveniens for only the nonNew Jersey plaintiffs  had
18   to be filed with each docket number.  And anything that
19   involves discovery issues will probably usually be able
20   to be filed under one docket number.  And that's the
21   way it is going to be done.
22        MR. CORONATO:  Your Honor, on that issue with
23   the forum nons the motion had to be filed in each
24   individual case or could you -- I think in the forum
25   non situation we had it under the In Re: VIOXX caption

4

1   and attached a rider saying in which case it applies.
2          THE COURT:  That's fine.  All I'm talking
3   about at this point is the fees.  And I'm just trying
4   to save you money on the fees --
5          MR. BUCHANAN:  We appreciate that.
6          THE COURT:  -- and the case when you're
7   filing one motion for every case, and it is the same
8   motion.  And that's the way we're going to do it.
9          Now, so those are -- hopefully those things
10  will ease the -- move the case ahead and keep us moving
11  on target.  As far as the discovery motion here it is
12  complex, there's a lot of different issues, obviously,
13  thrown at me.  Some of them I think I can resolve
14  fairly easily or at least to me they're not difficult,
15  and at this point I'm just going to tell you what I'm
16  going to do on some things.
17         There's an issue of depositions.  That seems
18  to me to be an easy issue.  The plaintiffs -- and I
19  guess there's always a tension in discovery.  The
20  plaintiffs have dealt with before in the past, I'm
21  sure, some corporate defendants who hide records or
22  conceal records or make it difficult to get things,
23  and, therefore, they're always suspicious of whatever
24  they can't get is what they want.  Defense counsel or
25  the corporate client is, obviously, suspicious of the

1   like that that don't apply to depositions at all.
2   Depositions are something that counsel can -- I mean,
3   it is just the legal department or the legal people
4   that deal with it or should be dealing with it, so, as
5   far as I'm concerned, all the sales rep deps should be
6   produced.  It is not legitimate to reduce it, to
7   restrict it to just those representatives who sold to
8   Merck, who sold to the plaintiffs' doctors.  I want all
9   the sales reps' deps to be produced.  As far as whistle
10  blowers and disgruntled employees, that appears to me
11  to be a fishing expedition, unless they are VIOXX
12  related.
13         If there's been a whistle blower who blew the
14  whistle or an employee who says they were fired because
15  of something relating to VIOXX, then that deposition
16  should be produced, but every disgruntled employees'
17  deposition, every person who claims they were
18  discriminated against, every person who -- every other
19  whistle blower, those people do not have to be
20  produced.
21         Suits by competitors, the same thing, if
22  they're suits by competitors that relate to VIOXX the
23  depositions should be produced.  If they're not
24  relating to VIOXX -- specifically to VIOXX -- they
25  don't have to be produced.

1   plaintiffs' attorneys and think their real goal is just
2   to disrupt their life and their business and to fish
3   for anything that they could possibly find when they
4   don't even know what they're doing.  And there's a
5   contrast between, you know, both sides are right
6   sometimes.
7          In this case, at least up until now, I don't
8   see that being a case with either side.  It appears to
9   me that Merck has been forthcoming with information,
10  and it appears to me the plaintiffs have been focused
11  on what they want.  There's still always going to be
12  tensions between the two, and, hopefully, we can
13  resolve those, but I understand that they're going to
14  exist no matter what.
15         As far as the depositions are concerned there
16  was an issue as to basically the defendant's only
17  wanting to produce corporate representatives'
18  depositions, and plaintiffs wanting much wider spread
19  depositions.  It is my position that the -- and I'm
20  going to order that the defendants do have to provide
21  depositions of both corporate people, and they do have
22  to provide sales representatives' depositions.
23         The arguments for Merck primarily that weigh
24  against the broad discovery that the plaintiff is
25  entitled to is disruption of business, secrets, things

1          As far as the drug ARCOXIA I don't think that
2   the plaintiffs should be entitled to anything regarding
3   that drug.  And I'm going to order that the defendants
4   can redact any information concerning that drug and
5   keep it private.
6          As far as the foreign marketing, the
7   arguments that the defense makes for that, as far as it
8   not being that relevant to plaintiffs' case, I think,
9   are valid.  If the plaintiff was asking you to produce
10  foreign marketing files or databases or something that
11  related only to foreign marketing I would not order you
12  to go get those and bring those out, but when we're
13  talking about documents that you're already producing,
14  and then you're redacting parts of them, when it goes
15  to the argument of Merck that they're overworking and
16  that their people have to do too much work in
17  production of the documents it is a lot easier not to
18  redact those sections then it is to redact them, and
19  they may lead to relevant information.  Therefore, I do
20  not think something should be redacted simply because
21  it's related to an international or foreign market.
22         The defendant has already acknowledged any
23  tests, studies, adverse patient reports from foreign
24  markets should be produced.  The other things that
25  relate to marketing, as far as I'm concerned, it is not

1  a basis to redact, just that it is a foreign market
2  that's involved.  That doesn't mean that you can't
3  still redact if it is a sensitive issue of how your
4  marketing -- in other words, you can still protect your
5  trade secrets, your -- not only your trade secrets but
6  the promotional secrets as to how you're doing
7  something.  If the redaction actually involves
8  something about the foreign market, how you're going to
9  approach it, and it comes under that, quote, "trade
10  secret" banner you can still redact that.  But you
11  can't just redact because it mentions international.
12      And the line, again, has to be pretty -- I
13  think the redactions should be few on that.  The bottom
14  line is when you're redacting for trade secrets, and
15  I'm not just talking about the formula for a drug;
16  obviously, trade secrets is a bigger concept than that.
17  It includes how to advertise sometimes and how to
18  market and things like that.  But when we're talking
19  about international marketing of VIOXX, a lot of what
20  it appears to me that anything international just being
21  redacted is much too broad.
22      There's been a suggestion that plaintiffs
23  should -- when documents are redacted that plaintiffs
24  should identify what's of interest to them.  Just by
25  the psychology of lawyers anything that is blacked out

1  is of interest to a lawyer.  What I'm going to require
2  is that the defendants indicate when they redact a
3  reason.  It can be anything.  You can put "trade
4  secret" or you can put "privileged" or you can -- but
5  there should be some reason placed alongside the
6  redactions.  If you have got an attorney sitting there
7  redacting -- and according to the papers a junior
8  attorney is redacting and then a senior attorney is
9  checking it, it is no more -- I think it is much less
10  work for you to put beside it why you redacted it.  For
11  example, if it has to do with ARCOXIA or some other
12  drug and doesn't have to do with VIOXX just put "other
13  drug."  But at least then they'll know a basis of what
14  you're alleging.
15      I agree in principle with defendants, and I
16  don't want the plaintiffs to -- that for the actual
17  VIOXX case I doubt very much whether foreign
18  regulations or foreign marketing is going to play much
19  of a role in this case, but I do, again -- and I
20  wouldn't order them to produce things that are just
21  related to foreign, but if it is in the middle of
22  something else it might lead to relevant information
23  and then the balance tips in your favor.
24      The HHPAC, that's the high level meetings,
25  right?

1      MR. MAYER:  Yes, your Honor.
2      THE COURT:  You're producing those minutes,
3  you're just redacting some of them, right?
4      MR. MAYER:  That's right, your Honor.  We're
5  producing the minutes, but because they will discuss
6  all drugs and sort of overall corporate strategy, as
7  well as VIOXX-specific issues, we're redacting
8  everything but the VIOXX-specific discussions in those.
9      THE COURT:  As long as -- I think that's
10  appropriate as long as -- and I think you can do that
11  and simply label it "no VIOXX mentioned, no VIOXX
12  mentioned, no VIOXX mentioned."  If it does involve
13  VIOXX then you have to put some other reason.  Any
14  reference to VIOXX should be produced.  I mean, I think
15  you should produce anything related to VIOXX.  If
16  there's some other reason why you can't produce
17  something related to VIOXX it should be clear to them.
18      I want the plaintiffs' counsel to be aware of
19  what redactions are relating to VIOXX because,
20  obviously, I'm going to be more likely to want to look
21  at them myself or have someone look at them in camera
22  or make a decision as to whether they're related or not
23  related.  And they might be -- they're going to be more
24  interested in that or should be.
25      So when you delete, if you delete it because

1  it doesn't have anything to do with VIOXX I don't have
2  any problem with that at that level.  But anything that
3  has to do with VIOXX should identify it has to do with
4  VIOXX, and it should be produced.  If it is not
5  provided it should be specified as to why it is not
6  being provided.  And I have no idea yet what to do with
7  SAM and FAX and IMED and whatever.  On that I guess I
8  might have to hear argument and explanations and
9  issues, unless you guys have been able to work that out
10  or unless you wanted to wait until the first meeting to
11  see if you can work it out.
12      MR. BUCHANAN:  Your Honor, actually, in our
13  reply, and, perhaps, I should have put this in a cover
14  letter, plaintiffs withdrew the motion with respect to
15  the sales force databases to see if we could narrow the
16  databases.  They made a fairly persuasive showing
17  through affidavits that there's significant duplication
18  through the sales force databases, and we're hopeful
19  that we can narrow 12 databases down to one or two and
20  really reduce any burden on the defendants.
21      THE COURT:  Well, then why don't we just set
22  that up, whatever is left of that, for the next
23  meeting.
24      MR. BUCHANAN:  I should also indicate for
25  completeness that we noticed the deposition of the two

1  witnesses who basically explained how there's
2  substantial duplication or the burden associated with
3  this bigger picture.
4       THE COURT:  One or both of them already
5  deposed?
6       MR. MAYER:  One of them.
7       THE COURT:  The J witness was already
8  deposed?
9       MR. MAYER:  Jacklyn was already deposed, and
10  she brought to her deposition the manuals for the
11  databases and so on.  So we feel that she shouldn't be
12  harassed again.
13       MR. BUCHANAN:  Well, harassed?  Your Honor,
14  she made assertions in her declaration about burden and
15  what not that I think, frankly, her testimony will
16  allow us to winnow down from 12 databases to two.
17  That's my hope.  That didn't come out in her
18  deposition.  I don't know how I'm going to be able to
19  meet and confer about winnowing this broader copy down.
20  If they want to produce her informally, fine, we can
21  have a conversation across the table.  I don't need
22  sworn testimony.  I'm not trying to harass anybody.
23  All I want is data.
24       THE COURT:  That sounds reasonable, doesn't
25  it?

13

1  counsel whether we could defer that deposition in its
2  entirety.  I want to understand from Miss Jacklyn how
3  we can get from this bigger set to a smaller set.
4       THE COURT:  I think that's a reasonable
5  request, counsel.
6       MR. MAYER:  We'll work with Mr. Buchanan on
7  that --
8       MR. BUCHANAN:  Okay.
9       MR. MAYER:  -- what the timing can be and so
10  on.
11       MR. BUCHANAN:  I would like to do it before
12  the August 1st conference.  Obviously, we'll
13  accommodate Miss Jacklyn's schedule so we can do that.
14       MR. MAYER:  I can't commit to whether that's
15  possible now, but we'll work it out because of people's
16  schedules because this time of year it is unbelievable.
17       MR. BUCHANAN:  I can't ask for more than
18  that, your Honor.  We would like to be in a position to
19  do it with you on the 1st, but --
20       THE COURT:  And, obviously, if there's other
21  issues on the 1st you'll exchange the agenda the
22  Wednesday before.  Is there anything else -- now what
23  else haven't I covered?
24       MR. BUCHANAN:  On the sales force systems,
25  sales force documents, generally, plaintiffs also

15

1       MR. MAYER:  Well, whether to produce her
2  informally, I don't know, it may be better to do it
3  formally than informally.
4       MR. BUCHANAN:  I'm open to either.
5       THE COURT:  How about the other guy?
6       MR. MAYER:  Mr. Petrimo.
7       MR. BUCHANAN:  He goes less to burden and
8  more to the trade secret aspect of it.  My primary
9  desire, frankly, is to understand better how we can get
10  from this larger set down to a smaller set.  I expect
11  he would testify, and I would be willing to defer his
12  deposition.
13       THE COURT:  How long are you talking about,
14  two hours?
15       MR. BUCHANAN:  He doesn't need more than an
16  hour or two.  Really.
17       THE COURT:  I thought you said two hours as
18  to Jacklyn.
19       MR. BUCHANAN:  Jacklyn -- half day for each
20  of them is what I requested, your Honor.
21       MR. MAYER:  You think Petrimo would be
22  shorter?
23       MR. BUCHANAN:  I think he would be shorter
24  because his declaration goes to the proprietary nature
25  of the systems, and I would be willing to discuss with

14

1  requested documents and materials from sales
2  representatives.  Now, defendants make a good point in
3  their opposition, and, frankly, I'm persuaded that the
4  incident point that what we -- a better approach would
5  be to focus on sales rep discovery associated with
6  cases.
7       In particular, there's 15 trial cases that
8  are up in the first wave.  What we would like
9  defendants to do is to gather the documents from the
10  sales representatives that called on the office that
11  prescribed the drug to the clients that are in that
12  suit.
13       So, rather, than talking about 6,500 sales
14  representatives and millions and millions of pages of
15  documents, which, frankly, plaintiffs don't have an
16  interest in seeing 67 copies of the same memo, why
17  don't we see if we can get a sufficient sampling of
18  sales force materials from the sales representatives
19  who actually called on the doctors?
20       THE COURT:  In the first 15 cases?
21       MR. BUCHANAN:  For the first 15 cases, then
22  in the subsequent cases we can do the same thing.
23       THE COURT:  Counsel, what do you think about
24  that?
25       MR. MAYER:  We would work on getting their

16

1  call notes for those physicians with regard to, you

2  know, with regard to the plaintiffs' positions during

3  the relevant period.

4     MR. BUCHANAN:  I want to be clear your Honor.

5  What I was proposing weren't, you know, just records

6  from their databases, I was referring to the documents

7  these sales representatives have concerning VIOXX.  I

8  mean, where they have actually the sales force

9  materials they actually used or individual notes and

10  what not of the doctors.

11     I mean, the defendants have said this is

12  really a -- they say what happened between the doctor.

13  This is what happened with the doctor and the patient,

14  what happened between the doctor and the sales

15  representative.  We just want the documents in the

16  first instance from that group.

17     THE COURT:  It seems to me that the issue

18  between what sales representatives and doctors were

19  exchanging and what information they're exchanging,

20  what discussions they had is going to be key in the

21  case --

22     MR. BUCHANAN:  We think so.

23     THE COURT:  -- at least from the defense

24  point of view.  I think it is one of your major

25  defenses, isn't it?  And, therefore, I think it is

1  really relevant, highly relevant that this information

2  be produced, and if we're limiting it to 15 cases and

3  15 doctors then I imagine -- or maybe slightly more --

4  that seems really reasonable.  And once we see how much

5  it is and what it is, and they have an idea of what

6  kind of records are kept for that kind of thing then we

7  can determine whether it has to be produced in other

8  cases.

9     Anything the defense has to say in opposition

10  to that?

11     MR. MAYER:  One, just, your Honor, in

12  response to your Honor's statement before the fact that

13  the physicians had the information needed certainly is

14  one of our major defenses, how much of that really

15  comes in through sales representatives since the

16  information comes largely through the product label and

17  other information that was disseminated to the doctors.

18     THE COURT:  There's a big dispute about

19  that.  The whole philosophy that the only thing doctors

20  know about medicine is what the sales

21  representatives -- or the only thing they know about

22  drugs is what the sales representatives tell them.  I'm

23  not sure -- I'm hoping that's not true, but --

24     MR. MAYER:  And I guess what I would like to

25  suggest here -- because there's some doctors who may

1  have seen two representatives, others may have seen 12

2  different representatives over a period of time, and

3  what I might suggest is we take a subset of the 15

4  because we might be talking about really 100

5  representatives here.

6     THE COURT:  I think 15 is a pretty small

7  subset.  Let's just stick with 15.  15 is reasonable.

8  What I suggest you do is I suggest that the defense

9  review what that would entail as far as how many

10  representatives you think that would entail for the

11  first 15 cases.  Then we can deal with it.  I'm not

12  going to order it be produced at this point.  I think

13  I'm going to order that it be produced eventually,

14  though.  I don't want to drag your feet, but what I

15  want you to do at this point is I want you to review

16  how many -- in the first 15 cases I want you to check

17  and see how many sales reps you think are involved.

18  Check maybe more carefully as to what it is they have

19  and how -- you know, for instance, I know under the FAX

20  thing I read it said that there's comments about the

21  doctors' assessments.

22     Obviously, I don't want some kind of

23  personal -- I don't think you should have to produce

24  some sales rep's personal comments about a doctor, but,

25  on the other hand, any dialogue between them, any

1  questions, any information on product I think is very

2  relevant, and the doctor has been asking me about this

3  or, you know, I informed the doctor about that or we

4  discussed this.  I think that's all extremely pertinent

5  and should be produced.

6     So why don't you look at the first 15 cases,

7  look at what a number of people that would be, the

8  amount of paper that would be or records or however

9  they're kept.

10     MR. MAYER:  We will do that before the next

11  conference.

12     THE COURT:  Okay.

13     MR. MAYER:  And we'll come with a proposal at

14  that time.

15     MR. JACOBY:  Your Honor, if I may, we would

16  like the record to be as clear as possible that we are

17  going to push as hard as we can.  We have tried at

18  every turn to be as reasonable as we can that this

19  subset of 15 and the physicians and the calls that were

20  made on those physicians not be whittled down any

21  further.  This is a central element of this litigation,

22  as it is in almost all pharmaceutical litigation.

23  There was a very important study -- I'm not going to go

24  into details, but there was a very important study

25  called VIGOR.  There was a comparative drug called

1   Naproxen.  It is important -- defendants will allege at
2   the time of trial -- and one of the central issues in
3   this case, there are no secrets here -- is that
4   Naproxen is not cardio protective.
5         We have no doubt whatsoever that when these
6   people went in, and I don't know if they made cold
7   calls or how many dropoffs they left, that in those
8   issues VIGOR was very well known.  It was questioned by
9   any number of physicians that we have already spoken
10  to.  They wanted to know about this study.  It rattled
11  them.  It upset them, and to cut this down any further,
12  your Honor, really puts us at a tremendous disadvantage
13  in these first 15 trials, so I would ask -- and this is
14  only one example of many, many examples that this
15  subset that we're somewhat agreeing to, as Mr. Buchanan
16  said, we have no interest in asking the defendants to
17  give us warehouses full of documents.  We want to
18  focus on this litigation, bringing these 15 people to
19  trial, but I would strenuously and as emphatically as I
20  can ask you not to cut that down any further.
21        If we have to take 100 depositions of those
22  detail people and their managers, their regional
23  managers because what these people told the doctors is
24  99 percent of the time what they were told to tell the
25  doctors, and we want to know who was doing the telling.

1   It is somewhat burdensome to us, the attorneys, but
2   that's what this litigation is all about.  This is one
3   of the areas, one of the several areas that the
4   litigation is going to turn on.
5         THE COURT:  You don't have to convince me.
6   That's why I have already given you the sales rep deps
7   in all the other cases, and that's why I intend to give
8   you almost probably everything -- you know, it might --
9         MR. JACOBY:  That's the point I stumbled on.
10        THE COURT:  You know, almost.  Maybe there's
11  still some things that should be protected.  I'm not
12  going to blanket it at this point.  I would agree with
13  the plaintiffs, though.  This appears to me to be in
14  the heart of the case, and really relevant information,
15  and I think it is the information that is going to have
16  to be -- and I understand why Merck as a corporate
17  entity sometimes you don't really -- you have policies
18  or information and then you have your sales reps, you
19  know, and --
20        MR. JACOBY:  Is that regional managers --
21  would that include regional managers?
22        THE COURT:  Is that what you want?
23        MR. JACOBY:  Yes.
24        THE COURT:  You asked for sales reps I
25  thought.

1         MR. JACOBY:  Within the purview of sales
2   reps -- perhaps, we weren't as articulate as we should
3   have been, we would include regional managers, which is
4   not such a big deal, there's not that many of them.  It
5   is a fairly confined geographical area we're talking
6   about, but we would ask to take the deposition of those
7   regional managers, as well.
8         THE COURT:  All right.  Let us know at the
9   next meeting how many sales reps are involved and how
10  many regional managers that would cover.  Maybe these
11  people all lived in the same region.  Probably not, but
12  possibly.  At least a few regions.  I don't know how
13  big a region a regional manager has.
14        MR. MAYER:  There's various players of
15  management above a sales representative, so -- but
16  there's a local layer that's within a fairly confined
17  region, but the reps are the people who have the calls
18  on the doctors.
19        THE COURT:  You know, I think this is key
20  information, and I think that the plaintiffs are
21  entitled to it.  So it is going to be hard to convince
22  me that they shouldn't get it.  I'm going to let you
23  speak to it at the next meeting, and you can make
24  whatever arguments you want as to what should be
25  protected in that or why it should be protected, but at

1   this point I'm leaning towards giving them wide
2   latitude in this sales rep area.
3         MR. MAYER:  We'll take a look at what's
4   involved with regard to these 15 plaintiffs in terms of
5   calls on the doctors and the information that was
6   communicated to the doctors and what we can do on that
7   regard and be prepared to discuss it on the 1st.
8         MR. BUCHANAN:  Your Honor, you were asking in
9   addition to the sales force issue or sales force
10  materials what other issues still needed to be
11  resolved, I believe.  There was the documents that are
12  being withheld that were created after April 2002.
13  Merck changed its label.  Plaintiffs contend that they
14  didn't change it adequately, but they did change it in
15  April, and they disclose some of the results and
16  characterized the results from the VIGOR trial that
17  Mr. Jacoby just mentioned.
18        They have offered to provide us several
19  things.  They have offered to provide us adverse
20  events, filings with the FDA, labeling information and
21  ads.  I think I got everything.  We have proposed, and
22  I think, you know, consistent with what you saw in our
23  other proposals.  What we wanted were documents from
24  the custodians.  They have already collected documents
25  from that have been withheld on the basis of that

1    objection.  Our argument is if they already gathered
2    the stuff, they have already gone through the stuff,
3    just produce it.  Don't withhold it because it was
4    created after April '02 is the sole basis for
5    withholding it.  From a relevancy perspective there are
6    clients who suffered injuries after April 2002.  My
7    firm represents somebody who had a heart attack in June
8    of '02.  There's no doubt that information relating to
9    safety, efficacy, whatever, whether it is reflected in
10   an e-mail or a filing with the FDA is going to be
11   relevant to what they consider to be the core issues in
12   the case, causation, regardless of when that is created
13   that's relevant to our case.
14          They create documents every day, and I don't
15   want all their documents.  We can't handle all of the
16   paper this company puts out, but we're asking for a
17   discrete set.  If you collect the documents from
18   somebody, give us those, and if we're going to take the
19   deposition of a witness, please supplement your
20   production for that witness so that we have all their
21   files relating to VIOXX.  That's all we have asked.
22          THE COURT:  Counsel?
23          MR. MAYER:  Well, first, I mean, we haven't
24   reviewed those documents.  Because you have to cut it
25   off somewhere in order to get done the very substantial

1    volume of witnesses that we have already whose files we
2    have already produced, which is something like 40
3    witnesses at this point.
4          THE COURT:  Well, I think there should be a
5    cutoff.  I think there should be a cutoff in time.  I
6    think for one thing present strategies and present
7    things that are going on we're getting into much
8    more -- this is an ongoing process with a drug that is
9    still on the market, and I do think that things that
10   are happening today I can't really -- are unlikely to
11   be relevant and likely to be in need of protection, but
12   that doesn't mean the cutoff should be the date that
13   warning was changed.  It seems to me the cutoff should
14   be a year later or something like that.  I don't know
15   what a reasonable time frame is for that.
16          MR. JACOBY:  Your Honor --
17          THE COURT:  Explain that to me.
18          MR. JACOBY:  All I wanted to say is just
19   generally in any litigation there's a continuous duty
20   on all of us to update our discovery, and when that is
21   invaded, and I think there has to be good reasons when
22   we put the cutoff dates on.  What I'm concerned about
23   is there are, we believe, a number of ongoing
24   studies --
25          THE COURT:  I thought that was covered.

1          MR. MAYER:  It is covered.
2          THE COURT:  That was covered.
3          MR. JACOBY:  That's what I wanted to know.
4          THE COURT:  Those things they agreed to give
5    you.  Those are the key things you would need, and they
6    do have to update those up to the present time.
7          MR. JACOBY:  I was unclear about that.
8          THE COURT:  Those categories that you already
9    named, the FDA things and the studies, they do have to
10   update those, but just their general correspondence,
11   even their marketing, at this point I don't think their
12   marketing is relevant anymore.
13          MR. BUCHANAN:  Your Honor, just one thing and
14   you asked --
15          THE COURT:  I mean today's marketing.
16          MR. BUCHANAN:  Today's marketing, you're
17   correct.  We're talking about April '02.  The label
18   gets changed.  They sent a Dear Doctor letter out
19   probably with a stack of other Dear Doctor letters that
20   sit on a doctor's desk.  The thing that doctors really
21   look at is the PDR, the PDR comes out in hard bound.
22   There are supplements.  Doctors vary as to when those
23   supplements get put into their various PDR's.  I think
24   it is only reasonable if there's going to be a date
25   cutoff that the date cutoff be the date -- and I don't

1    know when this is; you guys can tell us when the PDR,
2    the hard bound PDR was updated with a warning.  I
3    suspect that's the 2003 PDR whenever that comes out,
4    but we can confirm that.  Whenever it shows up in a
5    hard bound PDR, I think given your Honor's
6    inclinations --
7          THE COURT:  We'll address that at the August
8    1st meeting.  You'll find out what the PDR date is.  My
9    inclination is there should be a cutoff date, and if
10   the PDR date -- we'll see what it is.  Maybe that's a
11   reasonable cutoff date.
12          MR. MAYER:  When the label was changed the
13   letters were sent to the doctors by themselves with all
14   the changes highlighted in yellow, so they were
15   clearly --
16          MR. BUCHANAN:  That's the stack of letters,
17   your Honor.
18          THE COURT:  Yes, but, you know, the day
19   something is changed, I certainly want to see what
20   happens the day after and a couple weeks after and a
21   couple months after.  It seems to me that's when
22   there's going to be some interesting information, but I
23   don't think today's information is relevant or should
24   be delved into, so I stand by the fact that I think
25   there should be a cutoff date, and I don't think it is

1  the date the warning was changed, and as far as the
2  other -- the studies and things will include those, and
3  I want to memorialize these in orders, but we're not
4  going to memorialize this in an order until August 1st.
5      Now, the other things I have ordered about
6  the depositions, the foreign marketing and the --
7  hopefully we can arrange for an order that what I would
8  suggest is plaintiff's counsel draw up an order and
9  that you provide it with your agenda to defense counsel
10  on that Wednesday before the Monday, and then we can
11  talk about the order at the next meeting.  If you have
12  a counter order you can provide it a week before.  I
13  want you to provide it right away because the faster
14  you do it the better.
15      MR. BUCHANAN:  Well, I've got pretty good
16  notes, but we'll talk to the court reporter after and
17  get a copy of the transcript, as well, and try to make
18  sure we're truly consistent with everything that
19  occurred today.
20      MR. MAYER:  And with regard to the
21  depositions we may have to have some back and forth
22  about exactly -- understand exactly the scope of that.
23      MR. BUCHANAN:  I'm not sure what he was
24  referring to.
25      THE COURT:  I thought it was pretty clear.  I

1  are holding their VIOXX documents, and some of them
2  work primarily on VIOXX and are creating an enormous
3  number of documents daily.  It is a very burdensome
4  task to bring those depositions up to some kind of
5  rolling -- those documents up to some kind of rolling
6  cutoff date, so it depends in part on how many
7  depositions plaintiffs are planning on taking in these
8  cases which would be -- how difficult or impossible a
9  burden that would be.  And that we don't have an
10  indication of, but if it is a substantial burden which
11  will delay -- you know, become a factor in scheduling
12  depositions because if they're going to get more
13  documents neither side would want to go forward with
14  the deposition until they get those depositions.
15      MR. BUCHANAN:  At some point we have to be
16  practical, and I guess I'm trying to strike a practical
17  balance between the need for us to have relatively
18  current or thorough information for the deponents who
19  we are deposing going into the deposition.  If we
20  depose a witness who is involved in clinical trials,
21  and that person tells us that, yes, they were involved
22  in the clinical study so-and-so that was conducted in
23  mid 2003 concerning VIOXX, yes, they have a lot of
24  records, they have correspondence relating, they have
25  analysis they have created, all those things are not

1  don't think that depositions is a tough issue, but you
2  can get your copy of the transcript.  The court
3  reporter will be very happy to give everybody copies,
4  and then we'll discuss it, but I think that is pretty
5  clear.
6      MR. BUCHANAN:  Your Honor, with respect to
7  witnesses who we're actually going to depose on the
8  April '02 documents we talked about a date cutoff
9  generally.  Plaintiffs would just like a little more
10  forgiveness on a date cutoff as to the witness we're
11  actually going to depose.  As it relates to our
12  individual plaintiffs we're constantly providing new
13  authorizations.  They're constantly getting new medical
14  records.  They're as up to date as possible for the
15  people they're going to be deposing in this litigation.
16  We at least would like that courtesy with respect to
17  the witnesses we're going to depose.
18      MR. MAYER:  May I speak to that?
19      THE COURT:  Go ahead.
20      MR. MAYER:  A couple of things on that.  One,
21  it is quite distinct from a plaintiff whose plaintiff
22  medical record and ongoing medical condition is an
23  issue in the case, and each time a deponent is
24  scheduled there's -- if we had to then update the
25  collection, review all those documents, these people

1  going to be in the supplemental production they agreed
2  to make on an ongoing basis.  Are we going to go back
3  and redepose people after that?  Maybe that's the
4  combination, and maybe that's fine.  I know how the
5  arguments go on their side.  We're not producing a
6  witness the second time.  That's what happened with
7  their corporate representative, Miss Jacklyn.
8      THE COURT:  I'm not sure -- if what we're
9  talking about is anyone whose deps -- I mean, anybody
10  whose dep was taken, the discovery of their records
11  should be updated right before their deposition up to
12  whatever cutoff date we have.  That doesn't mean up to
13  today maybe because today is not going to be the cutoff
14  date.  The cutoff date is going to be something else.
15      MR. BUCHANAN:  Okay.
16      THE COURT:  If it does, however, fall in that
17  studies or something that was in that list of things
18  that they have agreed to provide up to the present time
19  I agree with you.  When they bring somebody in for a
20  deposition they have to meet with them in advance, and
21  they have to give you everything that falls in those
22  categories and everything up to whatever our cutoff
23  date is before they're deposed.
24      MR. BUCHANAN:  Or we risk the possibility of
25  having that person be deposed again, unfortunately.

1    THE COURT: But that doesn't mean up to

2  today.

3    MR. MAYER: Let me clarify a little bit the

4  categories we're updating on an ongoing basis. Those

5  are sets that aren't from witness files. They're

6  corporate -- from the corporate communications with the

7  FDA we're updating, which includes the reports of

8  studies and any safety-related studies as completed,

9  the promotion and advertising and labeling as they

10 change we provide them. So that's something we'll be

11 doing in any case on an ongoing basis. I think what

12 Mr. Buchanan was talking about is if Dr. X is being

13 produced for deposition what from Dr. X's own files

14 will have been produced by some point in advance of the

15 deposition giving them sufficient time to review it and

16 be prepared.

17    MR. BUCHANAN: Absolutely.

18    MR. MAYER: And the point I'm making is each

19 time we update a witness' production it is a big job.

20 Some of these witnesses it can involve 200,000 pages of

21 documents just to bring that one witness up to date.

22 Some of them it is less, but some of it is in that

23 order of magnitude. So it is a big job that requires a

24 substantial lead time, distracts energy from other work

25 that we'll continue to do to meet the discovery

33

1  commitments we have already made, and so any

2  arrangement we make on this just needs to take into

3  account that reality, and that's the point I want to

4  make.

5    MR. BUCHANAN: Your Honor, this litigation is

6  burdensome generally. Candidly, we're a small firm.

7  We have six lawyers and paralegals doing case specific

8  discovery repsonses. Whether it is fact sheets,

9  gathering medical records and reviewing them, complying

10 with our discovery obligation on the plaintiffs' side.

11 I understand the cost of litigation from my client's

12 perspective. We're complying with it, and I have got

13 to make sure the records are updated. They're not

14 going to take a deposition of my client if they don't

15 have all the medical records before. They're not going

16 to take them of the doctors before. That's their

17 threshold consideration. I understand we have to

18 strike a balance with somebody who has 200,000 pages.

19 All I'm asking is if they worked on these things, if

20 they worked on things that happened after 2003 relating

21 to VIOXX that are at issue in this case and they have

22 got correspondence relating to it we're going to

23 minimize the risk of a second deposition of somebody if

24 they can make a supplemental production concerning

25 those things that people worked on before their deps.

34

1  It is a practical issue that we're raising.

2    MR. MAYER: And what I would like to do, and

3  maybe this is something we really should try to work

4  out between counsel --

5    THE COURT: Maybe it may depend on the

6  category of witnesses. If the witnesses are scientists

7  or the witnesses are involved in clinical studies or

8  involved in that type of work or involved in regulatory

9  work it seems to me that they're probably the people we

10 want to have updated. If they're marketing/advertising

11 people it is more likely the current stuff is not

12 relevant and not necessary to be produced. That's my

13 take on it at least at this point.

14    MR. BUCHANAN: That makes a lot of sense,

15 your Honor. Frankly, the only issue I see is where we

16 have, as I indicated, somebody who has a post April

17 2002 injury, and the defense of the plaintiffs is going

18 to be they marketed around the label, and for that

19 plaintiff maybe in that case we can bring a concrete

20 issue to your Honor that says this person's got a claim

21 in this window of time; we're interested in documents

22 concerning marketing from that person. Maybe that's

23 the solution, but I think the suggestion of us trying

24 to frame something out to meet and confer is a good

25 idea.

35

1    THE COURT: All right.

2    MR. MAYER: Yes.

3    THE COURT: So we'll leave that open at this

4  point, but you've got my thoughts, and see if you can

5  work around it.

6    MR. MAYER: To fill in we are producing the

7  advertising. We would be producing the communications

8  with the physician and so on even for that post

9  April '02 plaintiff. The promotion is being produced.

10 The witness --

11    MR. BUCHANAN: I think we can frame something

12 with your Honor's guidance.

13    MR. MAYER: For us the key is to have

14 predictability and manageability, so every time a new

15 deponent is named we aren't scrambling around to update

16 our production then calling and saying we have to put

17 off the deposition and so on so we can get this thing

18 going on a reasonable basis.

19    MR. BUCHANAN: The next item was something

20 very technical, SAS databases or SAS electronic files.

21 SAS is a statistical analysis tool, as you probably

22 gleaned from the papers, that pharmaceutical companies

23 like the defendant use to analyze clinical trial data,

24 adverse event data, crunch numbers, and, you know,

25 lies, damn lies in statistics. I'm not accusing them

36

1   of that, but these analyses reflect the way in which
2   they have parsed their clinical trial data to tease out
3   results that are then presented to the FDA.
4           What we have asked for is, I think, broader
5   than what they have offered to give us.  We say let's
6   not draw a distinction based on the format of a
7   particular document.  If it is an e-mail, if it is a
8   document, if it is a database, and it relates to VIOXX
9   then, okay, and it is relevant, then tell us why it
10  shouldn't be produced.  And what they have said here
11  are two things.
12          One is that certain forms of SAS files their
13  electronic file discovery vendor just can't process.
14  Now, we say, so what, just give us the files, you know,
15  our experts who are biostatisticians know how to use
16  SAS, know how to use SAS files, and they'll be able to
17  use those to crunch the analysis, so just give us the
18  raw files.
19          The other thing they say is to the extent
20  they have to produce SAS files beyond -- which they
21  offered to give us -- that would be cumulative of the
22  raw clinical trial data that they give us.
23          Now, I think the important distinction here
24  is that SAS -- it is like there's an instruction or an
25  instruction list.  Go to this particular clinical

37

1   trial, pull out all patients who were between 40 and 60
2   who weighed between 140 and 200 pounds who were females
3   who had myocardial infarctions while on VIOXX 50
4   milligrams.  Do those things in a step, and then put
5   them into a report that looks like this.  They call it
6   a SAS program or a SAS routine.  That tells us a lot.
7           I mean, that tells us how did they get to the
8   results that they actually published to doctors?  How
9   did they get to the results they gave to the FDA?  We
10  want the raw SAS programs that tell us how they went
11  into the clinical trial data and parsed the data
12  because if there's room for nefarious activity there's
13  room for statistical analysis, and we think that the
14  raw files give us that.
15          They have offered to give us a few things.  I
16  mean, and I put this into the good start category.
17  They have offered to give us all the SAS data files
18  and, I believe, programs that they gave to the FDA.
19  They have offered to give us everything from VIGOR,
20  their big clinical trial, and they have offered to give
21  us the SAS files from two individuals, Deborah Shapiro
22  and Elise Rison.  I don't know why they're
23  circumscribing their SAS production based on those two
24  people.  There's really nothing in their papers about
25  the burden of producing additional SAS files.  There's

38

1   no assertion in their paper that these are the only
2   people who have it.  These are -- I suspect there's
3   probably a team of statisticians who sit on a floor
4   somewhere and -- you know, in White House, New Jersey
5   crunching clinical trial data.  I'm just concerned
6   without more information as to why we would
7   circumscribe the production though those people.
8           MR. MAYER:  I may have to ask Mr. Cohen to
9   help me with this because he has more intimate
10  understanding of these issues than I do, but these
11  files is something that they have to use very
12  extensively every time they do a clinical study and
13  report to the FDA, for example, and they have done I
14  guess it was over 100 clinical studies on VIOXX, and
15  each one has a clinical study report.
16          All of the data they present in there they
17  have to -- a statistician has to extract -- run a
18  program to extract the data from the clinical trial and
19  run these programs to create all the different displays
20  of all the data that are routinely provided in these --
21  for all of these clinical trials.  And we suspect that
22  the volume of this stuff is quite enormous.  And they
23  are getting the raw data.  They are getting what was
24  provided to the FDA.  They're getting the end result of
25  the analysis in terms of how it was presented and done,

39

1   whether it was done in an FDA report or some internal
2   reports, so that they can -- if they want to try to run
3   it different ways and see what they get they can do
4   that.  This gets into a whole huge area of kind of
5   collateral discovery and dispute as you have competing
6   statisticians running these programs all kinds of
7   different ways.
8           But what we have done is to try to deal with
9   what we think is a staggering volume in the amount of
10  data issue is to propose that the two -- primary two of
11  the scientists with the primary responsibility for the
12  VIGOR trial, the unblinded statistician in the clinical
13  monitor that we would produce their SAS files with
14  respect to the VIGOR trial, which I think we'll get
15  them that kind of high level stuff and the significant
16  analyses that were done with regard to that trial, and
17  I think gets us where we need to be with considerable
18  amount of less wasted effort really on both sides.  And
19  at least let's start with that and see if they really
20  find that they're missing anything of significance once
21  they have that.  Because I think that's going to be a
22  significant undertaking right there.
23          MR. BUCHANAN:  Your Honor, just a couple of
24  observations.  The VIGOR trial is an important trial in
25  the trials in this case you'll hear about that.  That

40

1    raw data demonstrates if somebody suffered a heart
2    attack on VIOXX it was 80 percent likely it was due to
3    VIOXX if they're in the 50 milligram dose.  Now there's
4    other clinical trials of different dosages.  And the 25
5    milligram dose they ran a trial of 4,000 people, and
6    undoubtedly they crunched those same numbers in that
7    case.  There were six more, I think, six times more
8    myocardial infarctions in the VIOXX arm than in the
9    Naproxen arm or five times, but the raw data in this
10   case is what's going to causation.  It is not
11   collateral.
12          I mean, these are the issues that our experts
13   are going to use to help infer general causation and
14   case specific causation.  I mean, it is properly
15   presented to the jury.  It is the raw data that's going
16   to flow to the analysis, and the way in which they
17   crunched the numbers in a different way and present
18   that to the FDA is quite telling, we think, of course,
19   to the deceptive and fradulent conduct in the Consumer
20   Fraud Act claim.  I would be happy to start with these
21   two custodians.
22          THE COURT:  Would other custodians have
23   different --
24          MR. MAYER:  They would run different -- there
25   are a number of statisticians who might have run the

1    analyses for this trial that was a dose finding study
2    or this trial that was an efficacy study for rheumatoid
3    arthritis or this trial that was for some other purpose
4    and that would have run these queries to create the
5    kind of standard reports to the FDA.  They are
6    getting -- and we're working out the final arrangements
7    for them to get all of the raw data that they worked
8    that from so they can run their own analyses of that
9    to the extent those studies --
10          THE COURT:  But they should be able to see
11   what analysis you ran.  They should be able to see your
12   analysis, also.
13          MR. MAYER:  Well, they do have that in the
14   reports themselves.  They show what analysis was run.
15          MR. BUCHANAN:  They don't show how the data
16   is parsed.  What it shows is how the data was parsed by
17   them, how they filtered it, how they sequenced it, how
18   they searched for it are the SAS programs.  That's what
19   shows it.  And I mean, if Miss Rison and Miss Shapiro,
20   who are apparently people who are actively involved in
21   crunching the numbers, can reach out to other
22   biostatisticians and can represent they have collected
23   what they think are the SAS files from other people,
24   that's fine.
25          I'll tell you in the Resulin litigation the

1    defendant in that case was Pfizer.  They produced all
2    the SAS files in that case on three CD's, okay?  We're
3    not talking about bringing a server and putting it in
4    this courtroom.  We're not talking about that type of
5    burden.  All the SAS files in that case on three CD's.
6          Now, was it a couple thousand SAS files?  It
7    was.  We examined them.  They were a key part of our
8    trial that we took the verdict in New York last year.
9    I don't know how to proceed really in building a
10   causation case without being able to analyze the data
11   the way you analyzed it.  So this is an important
12   position to the plaintiffs.
13          MR. MAYER:  I'll let Mr. Cohen speak to this
14   a little further.  I just wanted to backtrack a little
15   bit first, and because Mr. Buchanan in the course of
16   his argument made representations about what the data
17   in VIGOR showed, which we strongly disagree with, and
18   we'll rebut at the appropriate time.  The other data
19   that showed an equal number of heart attacks or equal
20   rates with no difference in rates between VIOXX and
21   other comparative drugs, no difference between VIOXX
22   and placebo, and I feel compelled to mention that every
23   time he mentions the rates in VIGOR.  But let me let
24   Charlie Cohen speak to this issue of the burden and why
25   we think it is absolutely necessary if we're going to

1    go down this road that we start with a couple of the
2    key custodians and see what's involved there and see if
3    it is really worth the burden on both sides and go from
4    there.
5          MR. COHEN:  Your Honor, hopefully, without
6    being too technical, Mr. Buchanan is right.  What
7    happens with the SAS files is whenever somebody asks
8    any question about what happened in a study you have to
9    go to the data and then somehow manipulate that data to
10   get an answer.  So the first thing that happens is all
11   of the clinical data, raw data, all of it goes into
12   this database called CTS.  And we have -- Merck has
13   agreed to produce it subject to confidentiality
14   requirements, and I think we're very close -- we had
15   very good discussions on trying to come up with a way
16   that we can just take the CTS database and hand it to
17   him so they get all the raw data right off the bat on a
18   computer system fully manipulatable with all the
19   database schemes so they know what they're getting.
20   They see the tables.  They see the files.  They see the
21   columns.  So their statisticians can run whatever they
22   want to run on that raw data, and they want to say we
23   ran the data and we got X and Merck ran the data and
24   they got Y.  They know that Merck -- I'm using letters,
25   but number Y they can say they know what Merck got

1  because Merck reported to it the FDA, and we're giving

2  them the SAS transport files that actually are from

3  Merck to the FDA, plus it is in writing in the case

4  study reports.

5      What basically happens in order to get this

6  done is first there's a thing called a SAS extraction

7  program that says, okay, I need to go to this big

8  database that has all the trials.  I might not be asked

9  to tell me something about all the trials.  I just want

10  to know about one trial.  So the first thing I have to

11  do is it takes the data out from the big database and

12  says, okay, here is the data for one trial.  So I have

13  a bunch of SAS programs that all they do is say take

14  some set of the data from here and put it into like a

15  working set.  I analogize it with if you make a working

16  set of documents you have produced you're not going to

17  take the whole document production, maybe you're only

18  interested in one witness, you make your own copy, you

19  bring that into your office.

20      Then every time they have to run anything to

21  make a clinical study report that goes to the FDA every

22  chart, every table, every result at all, how do they do

23  it?  They do it by writing a SAS program that says I

24  need to know -- this is what's required for me to tell

25  the FDA.  I need to know how to make that chart.  I

1  write a program.  They run it over that data set.  They

2  get a chart.

3      So this has to happen on every single study.

4  If we're talking about the entire clinical program of

5  VIOXX, and at the time the VIOXX NDA was the largest

6  NDA ever in the history of NDA's, we're talking about a

7  tremendous amount of stuff.  What our approach has been

8  is, look, what's really at issue in this case?  For the

9  most part it seems to be the VIGOR study, and they're

10  concerned that Merck is misrepresenting and alleging

11  that Merck is misrepresenting what the VIGOR study is

12  about.  But who is the chief of statisticians and the

13  clinical monitor for the bigger study?  And that's

14  Deborah Shapiro and Elise Rison.

15      So what we have said is let's try and meet

16  them here.  First, it is a just a tremendous burden,

17  and we don't think they need any of it anyway, but,

18  putting that aside, let's try and actually do something

19  about that.  So we have come up with something that

20  says, here, let's take this, and see what you think.

21  But the key points are any time anyone has any question

22  about this data there's going to be some SAS program,

23  and I can't guarantee that if I go through to all these

24  witnesses that I can find every last SAS data file.  It

25  is basically like asking the Court give me all your

1  Microsoft Excel spreadsheets.  It is like a category,

2  and even within the category there are multiple types;

3  the extractions, the programs, the data sets.

4      I mean, the data sets are exactly the same as

5  what's in the CTS program, which is what I want to give

6  them so they can run this themselves.  So at the end of

7  the day if what they want to know is what do we think

8  the raw data shows versus what did Merck say.  They

9  know what Merck said, and they can run their own

10  analysis, and then they can compare them.

11      MR. BUCHANAN:  Your Honor, what we want to

12  know is not just whether our expert differs with their

13  expert about what the data says or whether our expert's

14  conclusions on the data somehow differs with what they

15  told the FDA, our expert is going to want to know why

16  it differs.  Our expert wants to know, and they're

17  going to cross-examine our expert about why our expert

18  differs with their expert and why our expert differs

19  with the conclusions they reached in their filing with

20  the FDA.

21      What tells our expert how they parse their

22  data are the programs and the routines that were used

23  to query the data sets to organize it to filter it to

24  present to it the FDA.  And, frankly, the programs that

25  were used to parse that data that were not given to the

1  FDA are quite relevant to us.  If those programs show

2  that if you run the data one way you get this result

3  and that's not a good result, we don't want people to

4  know about that one, but if you run the other program

5  so if you filter certain people out or change the date

6  range so it is 40 to 60 rather than 40 to 80 you get a

7  completely different result we don't want to present

8  the data that way.  That program I think is quite

9  significant to what Merck knew and why it didn't

10  disclose that.

11      I do want to renew, though, something that I

12  stated a moment ago, and that is, perhaps, Rison and

13  Shapiro are good people to start with.  Perhaps those

14  are people that are worthy of starting with, and if

15  they can help us organize this data in a deliverable

16  way that we can understand, you know, that's certainly

17  better than giving me a hard drive with just a bunch of

18  scattered SAS files to pick and choose what to use and

19  what not to use.

20      THE COURT:  Why don't we start with what they

21  want to give you.  I agree with you.  It sounds like

22  this may be, again, just like the sales rep, this

23  sounds like a key element in the case, and I am

24  sympathetic to the fact that I think you are entitled

25  to get that.  The question is how should it be provided

1    and how difficult is it to provide it.  At this point

2    let's let them produce what they're going to produce,

3    and produce it as quickly as possible.  Get the deps of

4    these two people or after your people have had a chance

5    to analyze what they give you and then you can explore

6    with them what other SAS files there are and how else

7    it is kept and make a determination of what else you

8    need.

9        MR. BUCHANAN:  And I think there will be a

10   substantial amount with our experts to do with the data

11   they gave us, but I want to supplement my prior comment

12   with this, and there was a very large 25 milligram

13   study done.  Their argument is going to be, your Honor,

14   that VIGOR was 50 milligrams, doesn't apply to anybody

15   who was taking 25 milligrams.  You have to look at the

16   25 milligram data.  Our experts tell us they would like

17   to see the 25 milligram data, as well, from a study

18   that was done in 2000, 2001 and it is called the

19   ADVANTAGE Study.  4,000 people I think were in that

20   particular trial.  So I just ask that they give us the

21   SAS file for that one, as well.  Because they're going

22   to say VIGOR doesn't extrapolate to 25 milligrams, your

23   Honor.

24       THE COURT:  All right.

25       MR. MAYER:  That doesn't really change the

1    approach that we're proposing.

2        MR. BUCHANAN:  It doesn't?  Your Honor, I

3    want to be clear.  Will we be getting the 25 milligram

4    data from this very large study in their SAS

5    production?

6        THE COURT:  You should produce that, also,

7    and the person who is -- the names of the people who

8    were responsible for that.  The same way you're doing

9    the VIGOR study producing the files of the people who

10   were in charge of it you should do it for the 25

11   milligram study.

12       MR. MAYER:  For the record I hate having to

13   inject the merits in this argument, but there isn't

14   any -- they're speculating here about in effect saying

15   that Merck lied to the FDA about this.  Merck

16   provided --

17       THE COURT:  I'm not making any assumptions

18   about that.

19       MR. MAYER:  They have no basis to do that, so

20   we're going to provide this information, but this is a

21   fishing expedition.

22       MR. BUCHANAN:  It is statistics, your Honor.

23   I'll just stop at that.  The next item was the Merck

24   Frosst documents.  Those are -- this drug, I believe in

25   a --

1        THE COURT:  In Canada?

2        MR. BUCHANAN:  Canada.  I don't want

3    everything on Merck Frosst, I really don't.  They

4    offered to give us basically stuff they have already

5    produced, which would be the stuff in the FDA files

6    they filed in their NDA, so, obviously, we don't need

7    to request that.  We already have that.  And I think

8    their offer was documents sufficient to show the

9    testing of the drug.  There's a lot of lawyer

10   qualifiers in there.

11       What I would propose, and, perhaps, we can

12   work something out similar to what they did with the

13   custodians for this production here, maybe they can

14   identify for us 10, 15 people who were involved from

15   Merck Frosst's perspective in connection with the

16   development of the drug there.  We can look at that

17   list and make a proposal to them to produce to us the

18   custodial files of some portion of people from Merck

19   Frosst to satisfy the development issues we have with

20   the drug.

21       I mean, our concern is I guess when did they

22   know that they had an issue with thrombosis with this

23   drug?  Was it in the preclinical stage?  What efforts

24   were made to address this, squelch it, what not at the

25   development phase and how did that get up to the

1    executives here at Merck?

2        MR. MAYER:  First, we don't have an issue

3    with thrombosis with this drug.  Second, they have in

4    the project team minutes and in the reference to what

5    was the key stuff that was going on at Merck Frosst.

6    At Merck Frosst they don't do the clinical testing.

7    They were doing preclinical testing, and a lot of time

8    was spent on determining is this a selective COX-2

9    inhibitor or not and isolating the correct compound and

10   doing various kinds of assays in the laboratory to

11   determine that.  The safety testing, as Mr. Buchanan

12   notes, is included in the IND and NDA, so they have

13   that.

14       And so I guess what we were proposing to do

15   is there was some of these early tests that aren't --

16   they're not in humans, and they're often in the

17   laboratory that don't go to safety.  Not everything has

18   to go under the NDA if it is -- and we would provide

19   them enough information to know whether -- what these

20   laboratory tests that were done were done so they could

21   determine whether they really had an interest in

22   pursuing any of that because most of what was done at

23   that time -- I think probably all of it really isn't at

24   issue in this case.  No one is contesting this was a

25   selective COX-2 inhibitor and so on and so on.  So

1    that's what we were trying to limit before embarking
2    down the trail of a whole other set of witnesses in the
3    end they would not have any interest in.  They
4    complained earlier that we were proposing more
5    witnesses than they wanted, that we find some way to
6    find out what they're really interested in first.  And
7    maybe that's what Mr. Buchanan --
8         MR. BUCHANAN:  That's what I propose.  What I
9    said is don't just give us a dump truck of documents
10   from Merck Frosst.  Give us a list of, I don't know,
11   10, 15 people who, you know, you contend were the
12   executive and scientific level responsible for the
13   development of the drug.  We'll look at that list and
14   make a proposal on August 1st, your Honor.
15        THE COURT:  Okay.  All right.
16        MR. BUCHANAN:  Your Honor, one point of
17   clarification, I just want to understand.  I understand
18   your rulings, and I won't revisit them.  On foreign
19   marketing and foreign regulatory issues your indication
20   was that those materials --
21        THE COURT:  Those things that are being
22   provided that have references to foreign regulations
23   and marketing, anything must be -- should not be
24   redacted unless they're for some reason particularly
25   sensitive.

1         MR. BUCHANAN:  The following, your Honor,
2    there were two parts, I guess, to our motion.  One
3    related to the redaction; the other related to the
4    documents they had already gathered, and, you know,
5    from what I understand gathered, reviewed and withheld
6    on that basis.  And we would, obviously, like documents
7    they have already gathered, reviewed and withheld on
8    the same basis with your Honor's prior reasoning.
9         MR. MAYER:  I'm sorry, can you repeat that?
10        MR. BUCHANAN:  On the foreign --
11        THE COURT:  My ruling was contrary to that.
12   My ruling was they don't have to provide foreign
13   materials if they're just foreign materials.
14        MR. BUCHANAN:  I want to be clear, your
15   Honor.
16        THE COURT:  All right.  Only when there is a
17   reference to foreign things, included it in that they
18   shouldn't be redacted.  They don't have to seek out or
19   even if they already have them they don't have to
20   provide massive amounts of foreign material.
21        MR. JACOBY:  Your Honor, can I just have 10
22   seconds to confer with counsel before you excuse us?
23        MR. MAYER:  We may have a couple other
24   questions for your Honor before we go.
25        MR. JACOBY:  We have about another minute of

1    your time, if you would.
2         THE COURT:  That's fine.
3         MR. JACOBY:  I just have 10 seconds.
4         MR. MAYER:  Your Honor, we have one issue
5    that we wanted to alert you to.  We have gone back and
6    forth with Mr. Buchanan about confidentiality
7    designation with regard to the documents and pursuant
8    to the protective order we are planning to make a
9    motion with -- we're planning today to make a motion
10   with regard to preserving the confidentiality
11   designation of certain documents, and that would in the
12   ordinary course be filed Monday.  A possibility, in
13   view of the fact that we have this conference coming
14   up, would be to put that on the agenda for the
15   conference.
16        THE COURT:  I think that would be advisable.
17        MR. BUCHANAN:  My fingers can use a rest,
18   too, your Honor.
19        MR. JACOBY:  Your Honor, I respectfully, and
20   not lightly, would ask you to revisit a ruling if we
21   can revisit it -- obviously, if you indicate you don't
22   want to that it will end the discussion, but you had
23   earlier made a ruling on the drug ARCOXIA, but I wanted
24   to bring out on the record we have made a claim under
25   the Products Liability Act that this is a defectively

1    designed product, and we feel very strongly that under
2    the act a safer alternative design and evidence of that
3    is very, very important.  In any products case if
4    there's a successor product and that product is safer
5    that's going to be brought out to the jury.  It is
6    really a central issue.  Or on the other hand if that
7    COX-2 inhibitor has the same problems that we are
8    attributing to this COX-2 inhibitor, and it is endemic
9    to this collective inhibition of the COX-2 enzyme that
10   will come into this trial, and what I am concerned
11   about, your Honor, and maybe today it is the end of a
12   long day today and is not the day for it, but I would
13   ask if your Honor would consider letting us -- to allow
14   us to revisit this issue, but what I can foresee is
15   experts in their reports talking about ARCOXIA.  It is
16   related to this.
17        You should know, your Honor, that our
18   inquiries were very discrete.  We are not fishing here.
19   We have no interest in fishing.  They were very
20   discrete.  They were very focused on the defendants on
21   this drug.  Safety and efficacy will be the mantras of
22   this trial, as it is in any pharmaceutical litigation,
23   and I believe we have the right to explore the safety
24   and efficacy of this also COX-2 inhibitor.  I don't
25   want to go back and reargue things.  That's not my

1    intention, and I really thought long and hard before I

2    even brought it up, but if your Honor would consider

3    revisiting that issue or letting us amplify our

4    arguments on that at another time that's my request.

5            THE COURT:  Nothing you have said has changed

6    my mind.  You know, when you're developing a new

7    market, a new drug, you're still working on it.  It is

8    being sold somewhere internationally not in the United

9    States?

10           MR. MAYER:  Yes.

11           THE COURT:  I don't see it.  I don't see

12   plaintiffs' position.  And certainly I'm not going to

13   change my position now.  Can you ask for at some point

14   reconsideration based on an expert providing you with

15   additional information?  You know, at this point maybe

16   I would -- yes, I'm not going to preclude you from

17   doing that, but I can tell you right now I

18   don't -- there's other COX-2 inhibitors, right?

19           MR. JACOBY:  Yes.

20           MR. MAYER:  Yes.

21           THE COURT:  That your experts can compare it

22   to.  There's others.  I don't buy the idea that you're

23   going to be able to prove that there's a safer design

24   because they subsequently discovered a safer design.  I

25   don't understand that.

57

1            MR. JACOBY:  Or the converse that they have

2    the same problems with that selective COX-2 inhibitor

3    as they have with this one.  Again, your Honor, you

4    should understand they were developed at approximately

5    the same time, and there's two sides.

6            THE COURT:  They say they were developed

7    after.

8            MR. JACOBY:  It is my understanding they were

9    developed around -- they're contemporaneous products.

10   When they were brought out might be different.

11           MR. MAYER:  The one -- I mean, the

12   development of VIOXX started before the development of

13   ARCOXIA, but the development of a drug takes a long

14   period of time, so there is a period where they

15   overlapped, and the status of ARCOXIA now is it is

16   being sold in Europe.  It is under consideration by the

17   FDA for approval in the United States, but it is not an

18   alternative design for VIOXX.  It is not the successor

19   to VIOXX.  It is another chemically distinct compound

20   that has some overlapping indications and some distinct

21   indications, and that it would be marketed

22   coextensively with VIOXX.  It is in Europe.

23           MR. JACOBY:  It should be noted we have asked

24   for no marketing information -- again, we're not trying

25   to broaden this thing.  We're trying to focus it, but

58

1    we do believe strongly that there is information there

2    that will be very relevant to this trial, and we have

3    tried very hard to narrow the issues.

4            THE COURT:  Well, you're going to have to

5    present something more than you have presented to

6    convince me.

7            MR. JACOBY:  Very well, your Honor.

8            THE COURT:  All right.  All right.  Anything

9    else?  Let me just, again, I'll have my secretary

10   contact you with the date of the next meeting.  I'm not

11   positive it will be that first Monday in August, but

12   whatever it is we're going to try to pick it specific,

13   whether it is the second Monday or another day we're

14   going to try to have it monthly after that at least in

15   the beginning and see -- not in the beginning but in

16   the middle now we are at I hope.  I hope have we reached

17   the halfway point?  I guess not.

18           MR. BUCHANAN:  We have reached the one-year

19   point, your Honor.

20           THE COURT:  I know.

21           MR. COHEN:  Two million pages.

22           THE COURT:  How many deps have been taken?

23           MR. BUCHANAN:  Only the ones that were taken

24   as of the last status conference, your Honor.  There

25   were three that were set from May that New Jersey was

59

1    going to participate in.  We were cross-noticed by the

2    defendants, and the attorney for the primary taker of

3    those depositions who was in a coordinated action in

4    another state got dumped on as did we with significant

5    production shortly before those depositions so they

6    adjourned them.  I don't believe they have been

7    rescheduled in any way.

8            MR. MAYER:  I don't think that's the reason

9    for the adjournment, but they haven't been rescheduled.

10           THE COURT:  We can go off the record.

11           (Discussion off the record.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Court Hearing

C E R T I F I C A T I O N

    I, REGINA A. TELL, C.S.R., C.R.R., License Number
30X100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript to the best of
my knowledge and ability.

                                        7-20-04
                            _____
                            Regina A. Tell, CSR-CRR
                            Official Court Reporter
                            Atlantic County Courthouse
                            Mays Landing, New Jersey

60

```
                    STENOGRAPHIC TRANSCRIPT
                              OF:
------------------------------x  - MONTHLY MEETING -
          PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                  1201 BACHARACH BOULEVARD
                  ATLANTIC CITY, NJ  08401
          DATE:   NOVEMBER 18, 2004
     B E F O R E :
          THE HONORABLE CAROL E. HIGBEE, J.S.C.
     TRANSCRIPT ORDERED BY:
          THEODORE MAYER, ESQ. AND DAVID BUCHANAN, ESQ.
     A P P E A R A N C E S :
          CHRISTOPHER SEEGER, ESQUIRE
          DAVID BUCHANAN, ESQUIRE
          SEEGER, WEISS
          ATTORNEYS FOR THE PLAINTIFFS
          DAVID JACOBY, ESQUIRE
          GREGORY S. SPIZER, ESQUIRE
          ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
          ATTORNEYS FOR THE PLAINTIFFS
          SHANIN SPECTER, ESQUIRE
          LEE BALEFSKY, ESQUIRE
          MICHELLE L. TIGER, ESQUIRE
          KLINE & SPECTER
          ATTORNEYS FOR THE PLAINTIFFS
                 *         *         *
                         REGINA A. TELL, CSR-CRR
                         OFFICIAL COURT REPORTER
                         1201 BACHARACH BOULEVARD
                         ATLANTIC CITY, NJ  08401
     Court Hearing
     APPEARANCES CONTINUED . . .
          FREDERICK GERSON, ESQUIRE
          D'ALESSANDRO, JACOVINO & GERSON
          ATTORNEY FOR THE PLAINTIFFS
          J. PAUL SIZEMORE, ESQUIRE
          BEASLEY, ALLEN, CROW, METHVIN, PORTIS, MILES, P.C.
          ATTORNEY FOR THE PLAINTIFFS
          WENDY R. FLEISHMAN, ESQUIRE
          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
          ATTORNEY FOR THE PLAINTIFFS
          ESTHER BEREZOFSKY, ESQUIRE
          WILLIAMS, CUKER & BEREZOFSKY
          ATTORNEY FOR THE PLAINTIFFS
          ELLEN RELKIN, ESQUIRE
          WEITZ & LUXEMBERG
          ATTORNEY FOR THE PLAINTIFFS
          TERRENCE SMITH, ESQUIRE
          DAVIS, SAPERSTEIN & SALOMON, P.C.
          ATTORNEY FOR THE PLAINTIFFS
          WAYNE GREENSTONE, ESQUIRE
          NAGEL, RICE & MAZIE
          ATTORNEY FOR THE PLAINTIFFS
          DAVID J. COHEN, ESQUIRE
          SPECTER, ROSEMAN & KODROFF, P.C.
          ATTORNEY FOR THE PLAINTIFFS
          THEODORE V.H. MAYER, ESQUIRE
          CHARLES W. COHEN, ESQUIRE
          HUGHES, HUBBARD & REED, LLP
          ATTORNEYS FOR THE DEFENDANT, MERCK
          DIANE P. SULLIVAN, ESQUIRE
          ATTORNEYS FOR THE DEFENDANT
          OBSERVING COUNSEL FOR POTENTIAL PLAINTIFFS:
```

1    THE COURT:  Okay.  One of the first things I

2   got today an order admitting Shanin Specter.

3    MR. SPECTER:  That's me, your Honor.

4    THE COURT:  Hi.  Nice to meet you.

5    MR. SPECTER:  A pleasure.

6    THE COURT:  There's no problem.  I basically

7   have been agreeing that anybody who fits the required

8   certification and fits the requirements under the rules

9   is being admitted at this point.  I hope I don't regret

10  it.

11   MR. SEEGER:  You won't with Mr. Specter,

12  that's for sure.

13   MR. SPECTER:  Thank you, Judge.

14   THE COURT:  But there have been two questions

15  raised.  I think Merck's counsel had raised the issue

16  of whether or not there was a problem with the

17  certifications in that included in the certification

18  there was not a statement as required that counsel

19  would abide by the contingent fee arrangements by the

20  State of New Jersey.  Somebody from the defense raised

21  that.

22   MR. COHEN:  Will did last time.

23   THE COURT:  And it is not in this

24  certification either.

25   MR. SEEGER:  It's a New Jersey court rule.  I

---

1   mean, I would imagine any attorney seeking admission to

2   this Court would abide by the New Jersey court rules.

3    MS. SULLIVAN:  That's part of the rules.

4    MR. SEEGER:  There's a statement in there.

5   All right.  We'll fix that.

6    THE COURT:  Include that in future

7   statements.

8    MR. SPECTER:  Sure, Judge.

9    THE COURT:  And there's been a question about

10  the form of the orders in the sense that defense

11  counsel objects to them not -- to them saying all cases

12  as opposed to just the cases in which those attorneys

13  are involved.

14   MR. SEEGER:  There's a reason for that, and I

15  don't know if you guys -- but Mr. Specter, for example,

16  will be taking depositions in this case that will apply

17  to all cases, and he will be defending depositions and

18  dealing with experts, so we -- I think that's why we

19  have done it that way to sort of handle it as a

20  coordinated litigation where we're --

21   MR. MAYER:  Is he undertaking attorney/client

22  obligations to each one of your clients at Seeger,

23  Weiss?

24   MR. BUCHANAN:  No.  But here's the issue,

25  your Honor, if somebody is in a case that's part of the

---

1   coordinated litigation they have the right to take

2   discovery that applies as it relates to their case in a

3   deposition notice that's noticed for all cases.

4    MR. MAYER:  But that's a matter of the notice

5   of the deposition.

6    MR. BUCHANAN:  I guess we're not appreciating

7   the distinction.  I guess if they're asking does

8   Mr. Specter --

9    THE COURT:  I didn't understand why defense

10  cared.

11   MR. BUCHANAN:  We have been wrestling with

12  it, as well.  It is not clear to me.  I assume it is a

13  trial issue.

14   MS. SULLIVAN:  It is a trial issue.  It is

15  also a recordkeeping issue in terms of which

16  plaintiffs' lawyers to communicate with in certain

17  cases.

18   MR. MAYER:  And you guys have raised

19  issues -- you have your engineer's case you wanted that

20  to be separate.

21   MR. BUCHANAN:  Absolutely.

22   MR. MAYER:  We need to understand who is

23  appearing for which plaintiffs.

24   MR. SEEGER:  Would it resolve things if we

25  have in the future people appearing in their own cases

1  but we have an understanding, and we have a court
2  reporter here, that they're going to be able to take
3  and defend depositions in the cases so it applies to
4  all cases?
5      MS. SULLIVAN:  Yes.
6      MR. SEEGER:  It's just recordkeeping, okay.
7  That's okay.
8      THE COURT:  All right.  Mr. Buchanan, you're
9  going to prepare an order?
10     MR. BUCHANAN:  Yes.
11     THE COURT:  I hope we can actually get an
12 order out of this that is -- for once everybody agrees
13 what it says.
14     MR. BUCHANAN:  I thought when we went on the
15 record it was going to be a lot simpler.
16     THE COURT:  So, number one, the order is
17 going to say for all pro hacs that have been filed up
18 to the present times plaintiffs' counsel by December
19 1st is going to provide to defendants a list of which
20 cases, which lawyers are responsible for.  In the
21 future all certifications requesting admission pro hac
22 must include a statement concerning the New Jersey
23 contingency fee rule -- compliance with that rule, and
24 that the order itself -- that future orders should
25 reflect the names of the cases in which the attorney is

1  actually affiliated or has an affiliation with the
2  individual plaintiffs.
3      MR. BUCHANAN:  Attorney/client relationship?
4  As an attorney/client relationship?
5      THE COURT:  But it should be understood --
6  you can include in the order that it is understood that
7  any attorney admitted -- well, none of the attorneys
8  admitted are designated trial counsel, but all of the
9  attorneys admitted may have -- or will have the
10 ability -- there's no objection to them either trying
11 cases or taking deps, right?
12     MR. MAYER:  An attorney admitted in any one
13 case may take a deposition of a Merck witness that is
14 applicable to all cases.  I think that's what we're
15 talking about.  We're not talking about the deposition
16 of a physician being applicable to all cases
17 necessarily.
18     MR. SEEGER:  A treating physician.
19     MR. MAYER:  A treating physician, for
20 example.
21     THE COURT:  Okay.  We got it?
22     MR. BUCHANAN:  Just so we're clear, we're
23 going to provide a list to defense counsel of all cases
24 by December 1st that pro hac counsel already admitted
25 to this point are appearing in.

1      THE COURT:  It is basically a list of the pro
2  hac attorneys and which docket numbers they're
3  affiliated with directly.
4      MR. BUCHANAN:  We did provide that yesterday
5  but -- just for our firm.
6      MS. SULLIVAN:  Actually, Mr. Buchanan's firm
7  did.
8      MR. GERSON:  What about the case -- do we
9  need a new application if someone is admitted pro hac
10 and there's new cases coming along, do we need new
11 applications for each case?
12     MR. BUCHANAN:  I think the order so far had
13 indicated that the pro hac would be good in the cases
14 that were identified in the pro hac papers specifically
15 or in future cases where they're identified as counsel
16 on the complaint.
17     THE COURT:  Include that in the order.
18     MR. JACOBY:  Judge, you have somebody at the
19 door.
20     MS. MANGUAL:  I have a Mr. Mike Ferrara here.
21 He hasn't filed any cases, but he would like to
22 observe.
23     THE COURT:  Pull up a chair.  No one in the
24 room is from the press, are they?  We get a lot of
25 press calls, and we're ignoring them all, which I would

1  hope you guys would do, also.  Just a slight reminder
2  that we had agreed that this wasn't going to be tried
3  in the press.  Okay.  So that should take -- that order
4  should take care of that issue.
5      Now let's go on to some of the other issues
6  that you had asked about.  Let me look at the past
7  order.  I wanted to go back to the -- in October
8  Seeger, Weiss has submitted an order reflecting some
9  dates that were agreed to in October, and I think there
10 was some objection to that, but let's go over those
11 dates now and see what's been done and what hasn't been
12 done.
13     Merck was to update all previous productions,
14 and that was to be by January 2005, so that hasn't been
15 done yet, obviously.  That's a deadline for updating
16 what had previously been done up to the cutoff date to
17 the present, so that's being done, and by January 30th
18 it will be completed.
19     MR. COHEN:  I'm working on that.  We had the
20 issue of some of the document productions, for example,
21 the document productions having to do with sales
22 representatives calling on doctors had its own date
23 cutoff, and so the order, as phrased by plaintiffs'
24 counsel, just had it as everything, and I thought there
25 were a couple of areas -- that and the production I

1  made of people involved early on from the Canadian
2  subsidiary, Merck Frosst that had early involvement I
3  thought those two categories of documents should be
4  excluded from this order because they didn't fit the
5  rationale.
6         THE COURT:  Any problem with that?
7         MR. BUCHANAN:  Just so I'm clear, what I
8  thought I guess what defense counsel is concerned about
9  is they didn't want to read your prior order to say
10 they had to go back and get all the Merck Frosst
11 documents and all the documents from the sales force
12 and update those productions by January 2005.  Just so
13 we're clear on the record the Court had provided us
14 with a sampling of custodians from the sales force.
15 You recall you provided us with 20 names, and you said
16 come back if we want more, and, also, for Merck Frosst
17 there was a selection of representatives that we picked
18 from to get a representative custodial sampling in
19 response to our motion to compel.
20        So those document productions I think may be
21 revisited as it relates to other custodians, but I'm
22 going to intend to treat them on a different track in a
23 broader updated production that's going to be by
24 January of 2005.
25        MR. COHEN:  Is that an agreement those two

1  get excluded from this language?
2         MR. BUCHANAN:  I think that's right.  I want
3  to be clear we don't view you as having completed your
4  production as it relates to those two areas.  That was
5  my concern.
6         MR. COHEN:  For purposes of this order we can
7  still have that disagreement, and Ted can talk about
8  it, but in terms of --
9         THE COURT:  For this order it is going to be
10 except for Merck Frosst and sales rep documents.  All
11 other previous productions should be updated by January
12 30th, 2005.  That should be in the order.
13        MR. COHEN:  Then, your Honor, we had in there
14 the date cutoff of October 15th that we had talked
15 about, and there was some back and forth between the
16 parties, and the issue there is -- just to make sure
17 this isn't a moving target -- that in order to get a
18 set of documents out, you know, I want and collected
19 the next set of documents.  I can't, obviously, collect
20 a document written on January 30th and produce it on
21 January 31st, so this order should just say -- we think
22 it should just say -- it should be the document
23 production should be updated to include documents
24 through October 15th as part of this order, whether
25 there's a further discussion to something else.

1         MR. BUCHANAN:  There's New Jersey rules that
2  say we all have an obligation to seasonably update our
3  productions.  As it relates to plaintiffs' medical
4  records they're submitting authorizations to get
5  updated records shortly in advance of depositions.  We
6  expect as we depose people they will be updating
7  productions in connection with those depositions to the
8  extent in this stub period there's additional
9  documents.  That's what lawyers do, and that's what the
10 rules require.
11        So that was plaintiffs' concern, your Honor,
12 that there be hard and fast cutoffs that anything that
13 happens after October 15th is not relevant as they
14 continue to analyze APPROVe data, as they continue to
15 analyze other studies that they continue to crunch data
16 on they have a duty to seasonably update.
17        MR. MAYER:  We can meet this deadline.  If we
18 don't have a firm date, that's the date that we know in
19 collecting documents.  We are now in the process of
20 reviewing it.  We're racing to review it.  A large
21 group of people are working days, nights, weekends,
22 holidays trying to get these things out to get them the
23 ones that have then -- apply to people who have been
24 scheduled for deposition to get them out first and a
25 week before their deposition to get the rest out by the

1  deadline.  If you have a moving target it cannot be
2  done, so it is going to be very difficult to meet this
3  target as it is.
4         THE COURT:  I think this order should just
5  indicate that the records up to October 15th should be
6  produced by January 30th --
7         MR. BUCHANAN:  Okay.
8         THE COURT:  -- with those two exceptions.
9  What we get -- then we can address January 30th whether
10 you should get updates from October through January
11 30th.
12        MR. BUCHANAN:  My only concern, just so I was
13 clear, and maybe I wasn't --
14        THE COURT:  Except for custodial files of
15 deps?
16        MR. BUCHANAN:  For the depositions that were
17 taken if there's a stub period and somebody is involved
18 in APPROVe or something that's VIOXX related between
19 now and the time of their deposition I know Mr. Cohen
20 has done a good job of sending us supplemental
21 productions they gather in connection with their
22 preparation of witnesses.  I didn't want the order to
23 suggest a hard and fast rule defendants didn't have an
24 obligation to produce documents relating to VIOXX that
25 were created after October 15th, that was plaintiffs'

1  concern.

2     MR. COHEN:  That really needs to wait until

3  we discuss depositions because there are depositions

4  happening shortly.  I went and collected the documents,

5  and now we're in the processing phase, and then it

6  takes some time to do that, and if it is something

7  quick I don't know if I can tell you I can do it, and

8  that probably -- we should just wait until we talk

9  about depositions and then put in possible documents

10  when we talk about that.

11     THE COURT:  All right.  We have a provision

12  for the order, which we may have to add an additional

13  provision.

14     MR. COHEN:  Number one is now done.

15     THE COURT:  Now, Merck was going to provide

16  specific information concerning the APPROVe trial by

17  October 19th.  Was anything provided?

18     MR. BUCHANAN:  They did indeed make a

19  production, your Honor.  I have spoken with Mr. Cohen.

20  There is some debate among us as to whether they have

21  delivered everything.  There was some interim DSMB --

22  Data Safety Monitoring Board meetings.  We have the

23  minutes from those meetings, but there were

24  presentations made to the Data Safety Monitoring Board

25  or the External Safety Monitoring Board on this trial.

13

1  We would like that underlying data.  I have spoken with

2  Mr. Cohen informally, and I get the sense he is going

3  to do that, but he will probably tell us in a moment.

4     MR. COHEN:  Yes, absolutely.  Your Honor, I

5  have already collected them.  I got an original set.

6  He pointed out there was things he thought were

7  missing; we went back and there were additional

8  documents, and so I have collected them and they'll be

9  coming out quickly.

10     THE COURT:  And the patient letters and the

11  materials that's all been produced?

12     MR. COHEN:  We produced that.

13     MR. BUCHANAN:  Yes.

14     THE COURT:  Okay.  Great.  Now, then Merck

15  was to produce the electronic sales force data and the

16  FACTS database as previously ordered, I guess this

17  was --

18     MR. BUCHANAN:  They have made a --

19     THE COURT:  What's been produced on that?

20     MR. BUCHANAN:  Well, we have a disagreement

21  on that, your Honor.  They have produced printouts

22  of -- what they did is they took their electronic data,

23  they printed it out to paper, scanned it and sent us

24  unsearchable printouts of a database.  We think the

25  only reason to do that is to frustrate our attempt to

14

1  readily analyze that data.

2     They have extracted electronic data.  They

3  have turned it into pictures of data that can't be

4  easily organized, so we take exception to the form of

5  production.  We also take exception to the scope of the

6  production.  Your Honor's ruling was fairly clear.  As

7  you may recall, we pressed forcefully for the entire

8  sales force database because of notice issues of

9  knowledge issues and a whole other host of information

10  that could be reflected in the FACTS database.  This

11  was, again, prior to the withdrawal of the drug.

12     I think your Honor was concerned that while

13  we needed some representative sampling the entire

14  database may not be the right representative sampling,

15  but you did order, your Honor, that they produce to us

16  all of the sales call and interaction information,

17  including the doctor detail information for the

18  physicians who prescribed VIOXX for clients in this

19  case and for physicians in the same office as those

20  particular doctors.

21     We have gotten a handful of fields out of the

22  FACTS database, and there's ample testimony describing

23  the hundreds and hundreds of fields in the FACTS

24  database.  Your Honor ordered them to produce the FACTS

25  database as it relates to VIOXX details for those

15

1  particular physicians.  We haven't gotten that, and

2  we're a little concerned about why we would -- as it

3  relates to this database -- go off course and produce

4  pictures of data, rather than the data itself.

5     MR. COHEN:  I get this one, too?  Your Honor,

6  they did get the information and facts about the detail

7  calls with respect to VIOXX on the doctors.  They have

8  all of the fields that talked about who called on the

9  doctor, when, what the notes were, any advance

10  strategy, what the rep said to the doctor, what the

11  doctor said to the rep, what information about VIOXX

12  the doctor requested, what information about VIOXX the

13  representatives left, what they felt they accomplished

14  on the call, what they planned to say on the next call,

15  what reprints the reps left with the doctor, if they

16  recorded it, it is not required, and what samples the

17  representatives left, which is also not required.

18     When we were talking -- we were using the

19  term "call notes," and your Honor wanted to make sure

20  we weren't playing any semantic games as to did we have

21  something else relating to those detail calls that

22  weren't called call notes.  And, indeed, there's

23  another field called "customer notes," and it has

24  information about the doctor that the rep could put in.

25  It is not directly associated with the particular call,

16

1  and we have produced that in accordance with your

2  Honor's order, so all the information about what

3  happened to detail calls was produced.

4  　　　　MR. SEEGER:  But not electronically.

5  　　　　MR. COHEN:  Those were produced in .tif

6  files.

7  　　　　MR. SEEGER:  Which can't be searched.

8  　　　　MR. COHEN:  We are giving you the same text

9  files you get with all the other documents.

10  　　　　MR. SEEGER:  But you produced a substantial

11  amount of information in the case in a form that can be

12  searched, and that's the way we have been doing it.

13  And this particular item you basically gave us a piece

14  of paper.

15  　　　　MR. BUCHANAN:  Let me address this, as I have

16  seen the production specifically on these issues, your

17  Honor.  First issue, okay, they did indeed produce a

18  number of the fields that Mr. Cohen identified.  I

19  think some of those categories are, in fact,

20  descriptions of the type of information that would be

21  in the fields, and they're in -- multiple categories

22  are in one field, I think.  I caught a couple of

23  overlap fields, but, your Honor, we have no idea --

24  they have never produced the layout for this database,

25  okay?  We don't know about all the fields we're not

17

1  getting.

2  　　　　I don't care about fields that don't relate

3  to this case.  We don't.  We don't care about records

4  that don't relate to this case, but they have never

5  produced to us a layout of the database, and let me

6  just tell you how that would work.  For adverse event

7  data we finally got the adverse event data this past

8  week or the end of last week.  Merck was concerned

9  about the proprietary nature of that particular system.

10  It is called WAES.  You'll hear about it at some point

11  in this case.

12  　　　　They didn't want to produce the entire

13  database to us, and they asserted that certain fields

14  and certain tables in that database were administrative

15  functions, and they weren't really necessary.  So they

16  produced to us a record layout.  All of the fields that

17  were nonempty that, you know, would apply to any

18  patient or any reporter who reported a complaint about

19  VIOXX, and we went through that list, and we eliminated

20  fields based on the descriptions that counsel provided

21  to us that didn't appear to provide any potentially

22  relevant information.  We eliminated dozens of fields,

23  okay?  They have refused staunchly to give us any data

24  like that for FACTS, so if they're not going to give us

25  the entire record then they should at least tell us

18

1  what fields they're not giving us because I don't know.

2  　　　　Sure, all the stuff they have given us is

3  relevant, but I don't know what is not relevant that

4  they've not given us, and they have firmly taken the

5  position that we're not even entitled to see the record

6  layout.  I have asked over and over and over again, and

7  that's one way to deal with that issue in terms of --

8  　　　　MR. COHEN:  The difference there is

9  plaintiffs asked for the WAES database, and Merck

10  didn't object to producing it, and the question there

11  was just how to do something in a more efficient way so

12  as not to dump all kinds of garbage on them, be accused

13  of dumping something on them, and we worked very well

14  on that and got that produced.

15  　　　　Here we think your Honor was quite clear.  It

16  was the subject of a motion.  We went back and forth at

17  length on at least two occasions over what our

18  obligations were to produce, and we thought your Honor

19  was clear and said if it has to do with the calls made

20  on the doctor give it to them, and that's what we did.

21  　　　　MR. BUCHANAN:  Your Honor, it was even more

22  clear.  You said the FACTS record for the particular

23  sales -- before those particular doctors as it related

24  to VIOXX.  It was very specific and it was very

25  general, and it was supposed to be a database, okay?

19

1  It wasn't supposed to be .tifs that aren't searchable

2  from the database.

3  　　　　So as a threshold matter the data needs to be

4  produced in an electronic format so we can analyze it

5  the same way they have the ability to do it internally.

6  The defense counsel here has a database, okay?  They

7  created one from extracted data from facts.  They ran

8  reported, printed them and gave them to us.  Beyond

9  that I am not sure that we have all the fields, and all

10  I would ask, your Honor -- and this does not need to be

11  a document produced for broad dissemination.  As it was

12  with the WAES database they produced a layout.  I sat

13  down with Mr. Cohen before one of the conferences.  I

14  went through it based on the fields descriptions, and I

15  eliminated fields that are irrelevant.

16  　　　　MR. COHEN:  They deposed the person on this

17  database twice.  We actually gave them a second

18  deposition on this.

19  　　　　THE COURT:  On the FACTS?

20  　　　　MR. COHEN:  That was Terry Jacklyn.  They

21  have deposed him twice.  There was a document

22  production made in connection with one of those.

23  　　　　MR. BUCHANAN:  And they have never given the

24  field layout.

25  　　　　MR. COHEN:  And we had motions to compel, and

20

1    you said produce everything that has to do with the
2    calls and the doctors, and we have done that. I don't
3    know actually what the dispute is.
4         THE COURT: What else is in there?
5         MR. COHEN: There's information about the
6    reps which we have actually done their work for them in
7    order to actually figure out which rep called on the
8    doctor. You actually have to match up numbers. They
9    have codes and all that kind of stuff. We have done
10   that for them with that information. There is
11   administrative information such as when fields were
12   updated, and then there's some information about the
13   doctors that aren't specific to any particular call.
14        MR. BUCHANAN: Your Honor, they produced this
15   production -- first of all, we did not receive the
16   database schema, which is what technical persons or my
17   consultant would say you need to identify the names of
18   the fields and the tables. They didn't produce the
19   database schema for FACTS, which describes what
20   information they track concerning the doctors, what
21   information they track concerning the sales calls. I
22   mean, beyond, you know, the specific information to the
23   details there may be information about prescriber
24   concerns, you know, any issues the doctor had with the
25   drug, any issues that need to be addressed on future

21

1    all down. Just look at it, and that's it. Or you can
2    have -- submit it to me in camera, if you would prefer
3    to do that. We'll go off the record.
4         (Discussion off the record.)
5         THE COURT: Does that work, Mr. Cohen?
6         MR. COHEN: So we're going to call our client
7    and see which one they want to pick.
8         THE COURT: That's fine. So you can put that
9    in an order, that they have the option of either
10   submitting it to me in camera by -- what's a good
11   deadline, Mr. Cohen? December 5th or 10th?
12        MR. COHEN: Yes, sure. December 5th is fine.
13   December 5th is a Sunday, so it should be December 3rd.
14        THE COURT: December 3rd.
15        MR. BUCHANAN: Okay.
16        THE COURT: By December 3rd they're going to
17   either meet with you or have the documents -- or have
18   the material in my hands for an in camera review.
19        MR. BUCHANAN: There's only one issue, and I
20   know it is not just the depositions, it is a timing
21   matter.
22        THE COURT: They're going to have to be --
23   the SAS documents that were produced before they have
24   to be in an electronic database form. That is not
25   going to be acceptable -- to produce them in picture

23

1    visits. I don't know. We just don't have the fields.
2    Maybe they have given us everything. It seems that
3    particular aspect of this --
4         THE COURT: Those kind of things you just
5    mentioned should have already been encompassed in what
6    you have produced, right?
7         MR. COHEN: I'm not sure I understand that,
8    but everything that has to do with the calls made on
9    the doctor has been produced.
10        MR. BUCHANAN: I don't know what we have
11   gotten versus what we haven't gotten, and I don't think
12   it is too much to ask for them to just in a
13   confidential meeting produce to us the layout of the
14   database. I won't take it home. I didn't even keep a
15   record of what we had from WAES. I don't have a record
16   of that. We sat down, we negotiated it, we agreed on
17   it, and we got it. It took a while, but we got it.
18        THE COURT: You have two options, I think,
19   Mr. Cohen. One is to sit down with Mr. Buchanan
20   informally and not produce a copy of the layout of the
21   the -- and whatever fields there are in the FACTS
22   database and discuss with him generally why they should
23   or shouldn't be produced without him having the
24   opportunity to take a copy of that with him or keep it
25   or maintain it or even take notes where he writes it

22

1    form is not acceptable. That would slow us down so
2    much that it is just not acceptable, so you're going to
3    have to reproduce what you have already produced in a
4    database form, electronic database form. That should
5    be in the order also. Anything else?
6         MR. BUCHANAN: Well --
7         MR. COHEN: Is Microsoft Excel okay?
8         MR. BUCHANAN: They have already produced
9    .tifs of something that appears to be a report from a
10   database. If they'll just turn over that database now
11   prior to the -- prior to the resolution of the
12   additional fields so we have that to work with during
13   the interim period, and then your Honor had ordered
14   that they complete their production of FACTS data, I
15   believe, by 12/1. I may be off by a day or two, but I
16   think it was the end of November or the first day of
17   December, which would be 12/1. So we're concerned
18   about delaying the production of the remainder of the
19   database.
20        MR. COHEN: I don't need any more time.
21        MR. BUCHANAN: Okay. So then we can resolve
22   the additional fields in the separate schedule.
23        MR. COHEN: Okay.
24        MR. BUCHANAN: Fair enough, your Honor. And
25   you'll produce the supplemental production in whatever

24

1  database or Excel format you have?

2  MR. COHEN: Yes. Supplemental meaning --

3  MR. BUCHANAN: The one you're making at the

4  end of the month.

5  MR. COHEN: I have been ordered to. I am

6  going to comply with the Court's order.

7  THE COURT: Okay. The clinical trial

8  database, obviously, that's up to the Appellate

9  Division. The SAS files, have they been produced?

10  MR. BUCHANAN: They have been, your Honor, in

11  part. We're trying to determine whether we have all of

12  one particular category, and I'm not sure we have yet.

13  As your Honor may recall from the lengthy argument in

14  the motion to compel we sought the broad collection of

15  SAS files. Defendants had offered to give us

16  everything they gave to the FDA plus the SAS files from

17  a handful of custodians. The person involved in the

18  VIGOR trial, that would be Elise Rison and Deborah

19  Shapiro, the person involved in the ADVANTAGE trial.

20  You have since volunteered the data from the APPROVe

21  trial.

22  MR. COHEN: What you got was the -- when we

23  looked at the VIGOR trial it turned out that Deborah

24  Shapiro had a colleague that did a lot of the work, so

25  I felt we should produce that, as well, as part of our

1  reading the paper the way I have -- the company is

2  saying we didn't see this issue anywhere when you

3  combined all the studies. When you combine all the

4  studies you know -- we know we saw it in VIGOR, but

5  when you combine all the other trials you just don't

6  see the CV problem.

7  So they did a Meta-analysis, and that

8  Meta-analysis occurred over time. The SAS files are

9  what generated the Meta-analysis. I thought Deborah

10  Shapiro was involved at one point in the Meta-analysis.

11  Maybe she wasn't the only person that was, but I know

12  we need that. That is something if I have to make a

13  showing on I will come back and make a showing on, but

14  I think defendants by their own conduct have

15  demonstrated the substantial relevance of the

16  Meta-analysis. They're building a defense around it.

17  We would like the Meta-analysis SAS files.

18  THE COURT: Is that a problem?

19  MR. COHEN: My only concern, your Honor, is

20  the form we do some of these things in the sense that I

21  never know -- you know, I have an objection of

22  producing everything, and then they say, All right,

23  well, I want this, and then the next time they say, I

24  want something else, and then the next time they come

25  back and they say, I want something else. And it makes

1  offer from Deborah Shapiro, and that was a

2  statistician --

3  MR. BUCHANAN: We discussed at the subsequent

4  status conference getting the SAS files from the

5  Meta-analysis. I think it was my understanding that

6  Deborah Shapiro had that. I don't know that we have

7  all the SAS files from the Meta-analysis, and that's

8  what we're waiting on.

9  MR. COHEN: I will be honest to say that I

10  don't recall that agreement, but, in any event, there's

11  a broader issue just in terms of are we still -- are

12  you still asking for every SAS file in the company and

13  the Meta-analysis and then APPROVe, whenever that comes

14  out, and whenever that is available. If it is

15  something broader we may as well set that for an

16  argument and --

17  MR. BUCHANAN: I think the way your Honor

18  approached it, and I think this was a fair approach, we

19  split the baby, frankly, on SAS files in their favor on

20  this issue and said, Mr. Buchanan, look at what they

21  have produced to you. They're offering you this stuff,

22  if you need more, come back. One area I know we need

23  more, and one area we did address back in August, but

24  it may not have been on the record was the

25  Meta-analysis. You have seen -- and if you have been

1  it difficult when it happens in multiple fronts.

2  On any one given thing it is not too bad, but

3  this has happened on a number of these categories of

4  documents, and it just makes it difficult, and at some

5  point I want to just be able to argue with your Honor

6  and say we need to stop this because it is going to be

7  too burdensome. And what they're doing is really death

8  by a thousand cuts. So any one you'll say, Is that

9  really so hard, and I'll say, All right, that will take

10  me X amount of days, but then if they come back next

11  month and ask for another one and you ask me, Is that

12  so hard and I say, That will take me X amount of days,

13  well, by the time you add it all together, yes, it was

14  so hard, and it also didn't get me other things to try

15  to comply with your orders and on other schedules, so

16  that's just my only concern is really the process.

17  THE COURT: Okay. Your concern is noted, and

18  I'll keep it in mind on the next -- if we have repeated

19  problems with this, but at this point these particular

20  SAS documents should be produced, so you can include in

21  there what is it the Meta-phase?

22  MR. BUCHANAN: Meta-analysis.

23  THE COURT: The Meta-analysis should be

24  included, and the remainder of any SAS files that have

25  previously been ordered, and I will not informally

1  order any additional SAS files to be produced.  If
2  counsel needs additional SAS files of any type, other
3  than those that have already been ordered, you're going
4  to have to make a formal application for the same and
5  explain to me what the -- how they're really going to
6  make a difference.  Because there does have to come an
7  end to production, you know, and Merck has cooperated
8  and has been producing a lot of documents on a
9  relatively fast basis, and at some point the burden
10  does become too much.
11       MR. BUCHANAN:  Your Honor, I just want to
12  interject something at least for the record.  I
13  understand that Mr. Cohen perceives this as a death by
14  a thousand cuts, but there is a very strong argument
15  only in this case for far broader discovery than we
16  undertook.  We took focused discovery, and now we're
17  coming back for another piece of discovery.
18       THE COURT:  I agree.  There wouldn't be a
19  thousand cuts if he produced --
20       MR. BUCHANAN:  All the SAS files.
21       THE COURT:  -- all the SAS files or if they
22  produced all the sales rep files.
23       MR. COHEN:  They wanted a schedule -- they
24  wanted a certain set of materials.  They were holding
25  us to go very fast.  Basically what has gone on, and I

1  it.
2       MR. SEEGER:  I don't think that's being done.
3  California is not exactly ramped up and going.  There
4  isn't an MDL at this point, and there isn't a lot of
5  state court litigation outside of New Jersey, nothing
6  on this scale.  So maybe you're a little new to the
7  case, Miss Sullivan, but the truth is that on your end
8  you fought the broad request.  We pared it back.  We
9  gave you rifle shots, and you can't come back now and
10  say we're upset because you gave us rifle shots and we
11  tried to tailor discovery requests in a way you could
12  respond to them and then come back and say we need a
13  little bit more.
14       I mean, you know, you have to -- and the
15  other thing is you fought -- also, you didn't want to
16  produce anything after '02.  Now you took the drug off
17  the market, which was the right thing to do; it should
18  have been done a long time ago, but now you have a big
19  production burden, and we understand.  You should have
20  produced the '04 stuff when we asked for it.  We can go
21  back and forth about this all day.
22       MS. SULLIVAN:  One of the problems with
23  posturing on the transcript is it interferes with case
24  management, so I can respond --
25       THE COURT:  Look, there is no right or wrong

1  think Miss Sullivan or Mr. Mayer can speak to this is
2  really a change in their -- the way they're approaching
3  the case but then still asking us to meet these
4  deadlines, and that's causing a lot of concern.
5       MS. SULLIVAN:  It is an issue, your Honor,
6  and it sounds like the Court appreciates it, but this
7  is not just going on here, it is going on nationally in
8  other states, in Congress, in SCC document productions,
9  and so this litigation cries out for some reasonable --
10  and your Honor is making every effort to do that, but
11  reasonable case management where you have one uniform
12  document production sort of nationwide with deadlines
13  and protocols, and so that when Mr. Seeger asks for
14  something and he needs it in in New you took the drug off
15  California needs it in 15 days it just is unmanageable
16  and unworkable.  And the company has -- to meet these
17  deadlines -- bent over backwards.  And literally people
18  are working weekends, holidays to try to meet the
19  deadlines here and elsewhere, and at some point new
20  requests with these same deadlines are just untenable
21  and not and really not possible.
22       MR. SEEGER:  Could I just say one thing?
23       THE COURT:  I don't agree with that.  I mean,
24  I don't agree with the analysis that somehow what's
25  produced here has to be coordinated.  I just don't buy

1  on this, and I'm not suggesting that one side is right
2  or wrong.  Everybody has their positions and their
3  points of view.  I think I made it clear last time, and
4  I'm making it clear again, I don't think that for a
5  production of documents that we need to wait or slow it
6  down so that the MDL or the --there is no MDL judge
7  now.  If and when there is one appointed then maybe we
8  can be in touch with them and see if we can coordinate
9  some things, but we're not going to slow down this case
10  to wait for everybody else to catch up.  And at this
11  point the production of records I'm hoping is almost --
12  I mean, the way I look at it we're through a major,
13  major part of that.  I recognize plaintiffs are still
14  going to want some additional records, some additional
15  things, and that we haven't -- everything hasn't been
16  produced yet, and I realize, too, that you're still
17  under the gun, and I understand the pressure has ramped
18  up on you substantially, but I don't know if it is
19  production pressure as much as it is there's a lot of
20  pressure on Merck right now because of the fact that
21  there may be a lot more claims because the drug is off
22  the market.
23       MR. MAYER:  You know, let me make three
24  points, and, one, there is production pressure that's
25  ramped up.  Number two, what plaintiffs are trying to

1     do here is not a rifle shot, they're trying to litigate
2     a national litigation in this court, do a national
3     discovery in this court.  They announced in their
4     recent agenda that they're now going to broaden the
5     requests to additional custodians and so on.
6          Make no mistake, they're trying to do a
7     national, global kind of document discovery in this
8     case.  It is not geared toward a trial date in July; it
9     is geared toward the national management of the
10    litigation which these plaintiffs aspire to have.
11         And the third point I want to make --
12         THE COURT:  I don't see any change in the
13    plaintiffs -- I don't see any change in plaintiffs'
14    position from day one in this litigation.  This has
15    been litigation that has required a lot of production
16    of documents, and whether there's one case or 200 cases
17    or 2,000 cases the document production I don't see
18    where it would be that different.
19         MR. MAYER:  What has happened is -- one thing
20    that has happened is there are recent events and
21    ongoing events which now become a focal point of
22    plaintiffs' discovery, and so that we are trying to
23    update discovery to a point of those recent events and
24    being asked to produce witnesses to testify about those
25    things, and you can't -- when that happens in a case

1     you can't look at it as though the old schedule has
2     been unaffected by these new events.  It's simply
3     ignoring the reality of the fact that the litigation
4     has changed in terms of other events becoming relevant
5     that have to be looked at that are being examined about
6     when people show up for depositions, and you have to
7     take that into account in looking at what's a
8     reasonable schedule for witnesses for the depositions
9     and so on.  So that's the point I was making.
10         The third point I want to make is that when
11    we're in these conferences and trying to resolve
12    discovery disputes if counsel is going to make speeches
13    about the merits of the case and so on we're going to
14    have to respond to those because we think a lot of what
15    Mr. Seeger just said is not true, and I don't think it
16    makes much sense, frankly, to be arguing over the
17    merits of the case if we're trying to get through a
18    discovery conference.
19         THE COURT:  I agree with you on that.
20         MR. COHEN:  One point, actually, that wasn't
21    made, which was just what had happened was, you know,
22    we had a schedule in place and there was -- we had
23    discussions about what discovery was going to be taken,
24    and we agreed on a certain universe, and it had an
25    initial thing of 55 custodians.  And we were gearing

1     that towards these deadlines and then we had to update
2     it, so you ordered us to update those productions, but
3     now they're asking for an additional at least 20
4     custodians, another wave of depositions, and what I
5     just see from my perspective is that they want to on
6     the one hand say we're taking the narrow discovery to
7     get to this quick deadline and move to a quick trial,
8     but then on the other hand say we also want the rest of
9     the discovery we would normally not take to get a fast
10    trial date as the trade-off.  They actually want both.
11         They want to say we're doing something very
12    narrow to get a quick trial date and come back and say
13    now I want everything else, and there's no way we can
14    get that done in any kind of schedule.  To get done
15    what we're doing here, as you know, I said I didn't
16    think I could do it, and you told me, Do it, and I'm
17    working really hard to do it, but what they're doing
18    now basically is saying, Yeah, we make cuts.  We're
19    going to say, All right, you don't have to produce that
20    we just want this, get it fast.  And then they come
21    back and say, actually, no, I want the rest of it, too.
22         If they want that -- I'm not saying that some
23    of the documents they're asking for I couldn't produce
24    and something like that, but that just means a
25    different schedule, and if that's what we're litigating

1     we should just all be honest with the Court and say
2     this is what -- this is what the litigation is.  This
3     is what we really want.  We actually want another two
4     million pages.  We want these other additional
5     categories of documents, and if that means the
6     litigation gets pushed off for three or four months in
7     the grand scheme of things we would rather have those
8     documents to prepare our case, that's a perfectly fine
9     position for them to take, but they should just say so.
10         MR. BUCHANAN:  Your Honor, you issued an
11    initial discovery cutoff date in this case that
12    required all databases and all documents to be produced
13    by the end of July, okay?  That was the cutoff.
14    Defense came to us and said that's a lot of custodians,
15    that's a lot of documents, and what we did -- what
16    plaintiffs did is we went back and said why don't we
17    try to supplement custodial -- first of all, we won't
18    take all the custodians you say that you could
19    reasonably get done by the end of July.  We'll take
20    something less than that.  We took 55 rather than 78
21    like they said.  But let's get departmental files.
22    Let's get the company's formal files on a bunch of
23    issues.  Let's get the marketing files.  Let's get the
24    investor relation files.  Let's get the epidemiology
25    files.  Let's get the regulatory -- let's get the

1    departmental files that were supposed to substitute for
2    all these categories, and this isn't a point of debate.
3    This happened. They went back and looked in
4    departmental files, and for the most part the company
5    doesn't maintain its files like maybe a law firm does
6    or other pharmaceuticals do, they just don't. They
7    rely on custodians to keep the firm's records for the
8    most part. That means what we thought we were getting
9    in terms of departmental files as we go through we
10   don't have.
11       What I have recently done with defense
12   counsel is identify through review of four million
13   pages a number of custodians who are very central to
14   this for whom we do not have custodial records or we do
15   not have departmental files as it relates to issues.
16   They are relevant witnesses. They're relevant
17   documents. The Court never excused you guys from
18   producing all VIOXX materials by the end of July.
19       We agreed to focus your discovery because you
20   said it would not be tenable for you to do that by the
21   end of July, and we did focus it, and what I have
22   recently done is come back and say there's these other
23   witnesses who we think are relevant for depositions and
24   need to be deposed. That's what we're talking about
25   here, and, you know, they spoke about the first trial

37

1    cases, but the reality of it is these are cases in the
2    second wave and this third wave and fourth wave that
3    all have discovery cutoffs, as well. They all have
4    later discovery cutoffs. Discovery will proceeded in
5    an orderly manner. If I don't put witnesses in their
6    cue to gather this information there's going to be a
7    gap of six months when they decide to start making
8    productions of these people in three months. If I
9    don't give them witnesses who we think are also
10   relevant witnesses who they need to produce documents
11   for we're not going to get those documents until very
12   far down the line. So what I'm trying to do is
13   prioritize the productions so we can -- and this would
14   have been a great issue to confer about because I put
15   it in our agenda. I thought we could discuss it, and
16   maybe there's a way to resolve it.
17       MS. SULLIVAN: Maybe there is, Dave, because
18   the issue is not producing 11 or 15 people in December,
19   which is just -- and documents which is untenable. I
20   know you guys have been working hard. You have been
21   adjourning depositions that were scheduled because you
22   haven't had time to review the documents.
23       MR. SEEGER: See, it is very hard to sit here
24   quietly. You can't take shots like that, though.
25       MS. SULLIVAN: It's true, though.

38

1        MR. SEEGER: I'm not going to respond to it,
2    Judge, unless you need to hear discuss about it.
3        MS. SULLIVAN: The issue is the schedule,
4    your Honor, and what really needs to be done for the
5    first cases and what can be put off to give people --
6    they have been asking for time to review documents and
7    adjourn depositions and to give Mr. Cohen and our
8    people time to produce the documents.
9        MR. SEEGER: Your Honor, I would like to go
10   forward with the deposition. We had a deposition
11   scheduled for tomorrow. They produced last Friday 17
12   boxes of documents. I called Mr. Mayer and said this
13   is ridiculous, we're never going to get through it. We
14   have eight people working around the clock, and I had
15   two people working until 7:00 this morning from last
16   night to give me an outline. We will go forward
17   tomorrow, and I would like your Honor to tell them they
18   have to bring them back. I tried to save them a second
19   day for the witness. Ted said one day is fine, if you
20   commit to one day that's fine.
21       MR. MAYER: That is fine.
22       MR. SEEGER: You have to then stop your
23   co-counsel from taking shots this way.
24       MR. MAYER: I honestly don't think Miss
25   Sullivan is taking a shot. I think she is trying to

39

1    illustrate that we're talking about what is going on.
2    We have never taken a holiday from our production of
3    documents from the beginning of the discovery in this
4    case. We have been working very diligently to get
5    things done and to get the documents out. We produced
6    an enormous amount of documents. You have been
7    complying with the direction to get documents produced
8    a week in advance of depositions. What Miss Sullivan
9    was simply saying was on your side, too, you found that
10   volume overwhelming for certain witnesses in terms of
11   getting that reviewed a week in advance of depositions.
12       MR. SEEGER: And we're working through it.
13       MR. MAYER: Our point is simply --
14       MS. SULLIVAN: Getting it all done by
15   December 31st.
16       MR. MAYER: The schedule is ambitious, and it
17   is always good for courts to be ambitious in pushing
18   counsel on both sides to an ambitious schedule, but in
19   this particular case we think it is too ambitious and
20   that you can push very hard on us, and we'll work
21   extremely hard, and we're confident that plaintiffs are
22   going to work extremely hard, but we think that some
23   adjustment is going to be necessary if these
24   depositions truly need to be taken to get the case
25   ready. That's what was said.

40

1        MS. SULLIVAN:  One of the other issues, your

2   Honor, and maybe we can come to an agreement on this,

3   and I know Mr. Coronato was contacting you to try to

4   negotiate it, but to negotiate some protocols on case

5   management and depositions, and maybe when we break we

6   can do that, your Honor.  For example, from -- we

7   negotiated with Mr. Weiss from the Anapol firm limits

8   so that right now Merck is facing deposition notices in

9   California for the same witnesses that are being

10   produced here, and I suspect they'll get deposition

11   notices for the same witnesses that have been produced

12   here in other states.

13        So what has been negotiated with some of the

14   plaintiffs' counsel in other litigation is they'll

15   agree that they won't -- they'll depose those witnesses

16   here in New Jersey but not notice them in other states

17   where they have actions and not participate in

18   depositions in other states because at some point there

19   does need to be some reasonable coordination, so these

20   people are not deposed five, six, 10, 12 times in the

21   same litigation where the same questions and the same

22   subject matter are being covered, and, so, perhaps, we

23   can negotiate some reasonable limits in terms of

24   consistent with -- I brought some Case Management

25   Orders from other mass torts about limits on time and

1   numbers of deposition and coordinating with other

2   states.

3        MR. BUCHANAN:  Your Honor, you know, this

4   happens by necessity, okay?  It happens by necessity in

5   litigation where we have trial dates and we need to

6   take depositions.  We need to get our examinations

7   conducted.  If they want to cross-notice depositions in

8   multiple jurisdictions, and that's usually what the

9   defendants try to do rather than what the plaintiffs

10   try to do, that impedes on the examinations for the

11   primary lawyers.  That's why witnesses get produced on

12   more than one day.  That's why they get produced

13   multiple days.  There may be witnesses that go more

14   than one day.  But the rules are fine for that.  The

15   rules are designed to accommodate that.  If they want

16   coordination on the broader scale I don't understand

17   how what they have proposed is facilitating that.

18        What they have proposed is limiting our

19   ability to conduct an examination under New Jersey

20   rules, and I want -- this litigation should be governed

21   by New Jersey law, by New Jersey rules, not some other

22   standard or some other concern.  We're happy to work

23   with other counsel, and we have.  Mr. Sizemore from

24   Alabama has a number of cases.  He has cases here, as

25   well.  He has coordinated depositions in New Jersey.

1   Counsel from Texas in the past has coordinated in

2   certain depositions in New Jersey.  Plaintiffs' lawyers

3   have been able to accommodate that, and we have worked

4   well together.  I am not quite sure what they want

5   beyond that type of informal arrangement because some

6   blanket rule is going to limit our ability to prepare

7   the cases.

8        MS. SULLIVAN:  But as Mr. Seeger rightly

9   pointed out in connection with the Stempler argument

10   that this is not a one off case.  This is a mass tort

11   where the same issues and the same witnesses are going

12   to be noticed in other states and in other mass torts,

13   and your Honor has probably issued Case Management

14   Orders in the ones you have managed.  There's been some

15   reasonable limits and coordination on corporate witness

16   depositions to avoid duplication and burden on the

17   company witnesses.  And, in fact, many of the

18   plaintiffs' lawyers have agreed to those kind of

19   reasonable limits to avoid duplication.  They get their

20   discovery, but it minimizes the burden on the company

21   witnesses who were actively employed and have other

22   responsibilities.

23        MR. SEEGER:  This has gotten worked out,

24   though.  I think the only thing I would recommend -- I

25   can't argue with the basic premise that you don't want

1   a bunch of witnesses hauled in 12 different times.  I

2   think that's fair.  I think what we have done a good

3   job of is organizing with lawyers outside the country

4   where people have said, okay, it is going forward in

5   New Jersey we'll let the New Jersey lawyers take the

6   depositions.

7        MS. SULLIVAN:  They're being noticed

8   everywhere now, though.  That's the problem.

9        MR. SEEGER:  I think the way we should do it

10   so we don't have to involve the Court at this point is

11   once you start cross-noticing we're going to hear from

12   people.  We're going to find out who wants to question.

13   We're going to make time and room for them, and we'll

14   speak with you guys on your schedule.  If there's a

15   problem why don't we bring that to the Court.  But

16   right now I don't anticipate it.  There are mass torts

17   where orders have been entered, and there are mass

18   torts where they haven't been.

19        MS. SULLIVAN:  I'm not aware of any where it

20   doesn't have deposition protocol, and I'm surprised you

21   wouldn't want to agree to a basic deposition protocol.

22        MR. SEEGER:  Don't be surprised.  I'll

23   explain it.  In Jack Weinstein's court where he has

24   Zyprexa there's no deposition protocol because

25   everybody felt the protocol did no more than track the

1    federal rules.

2         MS. SULLIVAN:  Which limits depositions to

3    seven hours?

4         MR. SEEGER:  Yes.

5         MS. SULLIVAN:  I'm happy to agree to that

6    here, seven-hour limits on corporate issues.

7         MR. SEEGER:  We will track the New Jersey

8    Court Rules in New Jersey, and to the extent that you

9    think your client is being prejudiced or hurt in any

10   way you can bring those limitations to the judge, but I

11   don't think we have had a problem.

12        MS. SULLIVAN:  That's the issue.  We have had

13   a problem.  There has to be some -- or it would be good

14   to avoid disputes to have some reasonable protocols

15   consistent with what has happened in other litigations.

16   Seven-hour deposition unless good cause is shown for

17   further depositions or unless we agree, and there are

18   certainly witnesses we would agree that more than seven

19   hours would be appropriate, but I attended one where we

20   went until 7:00.  It is not fair to the witnesses, and

21   then to have them sit here for 10-hour depositions in

22   New Jersey and then have to do it again in California

23   and again in Mississippi, been managed in other

24   mass torts, and your Honor I'm sure has been involved

25   in it, where there's better coordination and some

45

1    limits so the witnesses are not spending their lives

2    running around giving depositions in VIOXX litigation.

3         THE COURT:  All right.  Let's stop because so

4    far we were moving very nicely, and then all the sudden

5    we got derailed.

6         MR. SEEGER:  There's blood in the water.

7         THE COURT:  We got derailed and everybody is

8    talking, and nothing, as far as I can tell you, quite

9    honestly in the last 40 minutes has meant a thing to

10   me.  I don't know if it meant anything to you.  Defense

11   needs time, and they're under a lot of pressure, and

12   their witnesses and their company is under pressure and

13   time pressure, and there's only so much they can do.  I

14   already knew it.  Plaintiffs want to move as fast as

15   they can.  At least they're pretending they want to

16   move as fast as they can until they actually get up to

17   trial, then they don't want to move as fast if they're

18   like every other plaintiff's lawyer.  They can't wait

19   to try the case until I set the date, and then it is

20   tomorrow, and then they want more time.

21        So I understand that, you know.  I already

22   know this, and we just wasted 40 minutes on nothing as

23   far as I'm concerned.  So let's forget all that, and if

24   you want -- I should have let you guys talk for an hour

25   first so you could have shouted those things back and

46

1    forth.

2         I have no problem with certain basic

3    protocols for depositions, particularly limiting the

4    amount of hours that can be taken in a single day.

5         MS. SULLIVAN:  Your Honor, what about to

6    avoid --

7         THE COURT:  I don't know about limiting.  You

8    know, I think that seven hours is enough for most

9    witnesses.  I do understand that there are sometimes

10   certain witnesses who know everything that that's a

11   problem for, but I don't have a problem with that, and

12   I don't have a problem with starting a beginning time

13   and ending time or at least generally, although some

14   people -- I don't know that I want to have an order

15   that you can't ever take a dep at night because,

16   obviously, some people are more available at night.

17        MS. SULLIVAN:  That's subject to agreement.

18        MR. SEEGER:  That's the only reason because

19   Adam Schechter, for example, Mr. Mayer and I agreed now

20   let's get through this stuff, and we will limit it to

21   one day, we have agreed to that, and I think we're able

22   to do that on a witness by witness basis.

23        MS. SULLIVAN:  Certainly we can agree, and

24   the order can say that, but it would be helpful to have

25   an order that sets forth the basic deposition protocol.

47

1         THE COURT:  You submitted one.

2         MS. SULLIVAN:  A proposed order, yes, your

3    Honor.

4         THE COURT:  So now what I would suggest you

5    do is sit down with plaintiffs' counsel and go over it

6    and see which of the provisions you agree to and which

7    ones they don't and then I'll make some decisions.

8         MR. BUCHANAN:  The one interesting issue is I

9    wasn't aware that depositions that have been noticed

10   here are now being cross-noticed in multiple

11   jurisdictions.  The ability to -- the fact that you

12   have to share now a deposition day if a day is a

13   presumptive examination time --

14        MR. SEEGER:  No, there's a limit.  You said

15   to limit the length of the day, you didn't suggest we

16   would limit all deps to one day because if we're

17   bringing in lawyers from Texas, Louisiana and other

18   parts of the country in these depositions we're

19   cross-noticing we may have to do what is common in MDL

20   limit it to a seven-hour day but two or three days in a

21   row, so New Jersey takes a day and then the rest of the

22   country takes a day.

23        MS. SULLIVAN:  We can discuss this, but the

24   Court highlighted what is in most of the Case

25   Management Orders is that the presumption is seven

48

1   hours, absent agreement of good cause, and there will
2   be witnesses that seven hours may not be enough, but
3   the overwhelming majority of the witnesses you should
4   be able to finish, even with coordinating with
5   co-counsel consistent with other mass torts in seven
6   hours, especially since most of them -- a lot of them
7   have been deposed once before.
8       MR. SEEGER:  We should sit and meet and not
9   waste your time on this.  The only point is when you
10  bring in other lawyers from other parts of the country
11  the seven-hour day and one-day limit becomes more
12  complicated, but why don't we see if we can reach an
13  agreement.
14      THE COURT:  It may be conflicting goals to
15  allow seven-hour only deps if there's a lot more
16  counsel involved.
17      MS. SULLIVAN:  They have done it before,
18  Judge.  They're very good at coordinating and they're
19  happy to have other folks help them.
20      MS. SULLIVAN:  You give us too much credit.
21  I don't know how I tell a lawyer from Texas with a case
22  or 20 cases to limit his questioning to two hours.  I
23  don't know how to enforce that.
24      MS. SULLIVAN:  It has clearly been done, and
25  hopefully we can come to an agreement, but there needs

1   to be some reasonable limits on deposition.
2       THE COURT:  So far have there have been deps
3   that have gone on for unreasonable times?
4       MR. JACOBY:  It has gone along rather
5   smoothly until this point.
6       THE COURT:  Has there been a problem?
7       MR. JACOBY:  No.  One witness said they had
8   to leave because of family, and we said absolutely
9   we're going to honor that.  We talked about it in
10  advance.  If you go into these things acting reasonably
11  and responsibly these things get worked out.
12      MR. SEEGER:  We finished early on a few.
13      MR. JACOBY:  We have accommodated every
14  chance we could, and we will continue to do that.  If
15  there's a problem they can always seek a protective
16  order.  I doubt seriously they're going to have to come
17  in front of you for a protective order because we're
18  not here to try to burden them or play games with them.
19  We're here to take depositions, and so far, I don't
20  know how many there have been, but one has gone an hour
21  or two late.  Absent that, there's not been the
22  slightest problems.  Witnesses told us -- we were
23  present in Boston, and a witness told us, listen, I
24  have family obligations, and we said we'll work through
25  lunch and we'll get you out of here.

1       MR. SIZEMORE:  It went four hours, Judge.
2       MR. BUCHANAN:  And there have been
3   situations, Judge, where plaintiffs' depositions -- a
4   plaintiff being deposed has gone -- had to be continued
5   to the next day or has gone to 7:00 or 7:30.  I know it
6   happened in depositions of my clients.  It happens.  It
7   happens with, I would say, less frequency than is being
8   suggested, but it has happened on both sides, and the
9   parties have been able to deal with it.  I think it is
10  being magnified right now for argument purposes.
11      MR. MAYER:  There have been some we thought
12  went too long where it continued to the next day where
13  there was time could have been spent more efficiently,
14  nothing that was worth bringing to the attention of the
15  judge for that one deposition, but in anticipation of a
16  lot of depositions coming up it would be -- work a lot
17  smoother if we have a protocol in place.  So we'll talk
18  about it.
19      THE COURT:  Maybe the protocols, and I'm just
20  throwing this out, I'm not suggesting this is the
21  order, but you're right, these are things that can be
22  negotiated and worked out.  Maybe it should be a
23  maximum of seven hours a day, unless counsel agree
24  otherwise, and a maximum of two days per witness,
25  unless counsel agree otherwise.

1       MR. SEEGER:  You know, your Honor, I would
2   like to have an opportunity to sit down with whoever
3   from the defense side is going to take this issue on
4   and negotiate something, but I think what you just
5   proposed is kind of what's been happening.
6       THE COURT:  If it is seven and a half hours
7   you're more likely to say let's take the other
8   half-hour today.
9       MR. SEEGER:  I said to Mr. Mayer in the one
10  instance of Adam Schechter, and he was reasonable, and
11  just for the record, I think the attorneys for Merck
12  have gone a great job, and they have worked hard and
13  they have accommodated us.
14      MS. SULLIVAN:  But --
15      MR. SEEGER:  I was trying to make a brief
16  point.
17      MS. SULLIVAN:  I thought you were finished.
18      MR. SPECTER:  It was a nice point, too.
19      MR. SEEGER:  When I called Mr. Mayer
20  yesterday I said Schechter is going to go another day.
21  He is probably going to go late because we couldn't get
22  through this immense production, so here is the option,
23  you go two days, we can bring him back another day or
24  we both agree we're going to push it a few days, and
25  I'll agree to one day, and that's exactly what we did.

1 We exchanged e-mails this morning, and it was done. I
2 think that's going to happen in this case.
3 Now that you started cross-noticing there's
4 something new injected here, and I don't know how it is
5 going to play out. I would like to try to get one or
6 two deps under our belt with the cross-noticing and see
7 if we can negotiate, and then if you want to formalize
8 or embody what we have agreed to with the rest of the
9 country in an order I think that works, but I'm not
10 aware of a problem right now, and the only change has
11 been the defendants want a cross notice.
12 MS. SULLIVAN: The problem is -- but the main
13 problem is the witnesses are now being noticed in other
14 states, and to try to avoid a situation where they're
15 just giving depositions multiple times and to try to
16 coordinate consistent with other litigations where, for
17 example, you the attorneys in New Jersey agree that
18 they won't notice depositions in other states, they'll
19 take the corporate witness discovery here and not
20 participate in depositions or notice depositions in
21 other states, that was the way it worked in other
22 litigations.
23 In another couple of mass torts the -- you
24 guys use prior depositions and only came for additional
25 depositions if there was good cause if a witness had

1 been deposed somewhere else. It was in the Case
2 Management Orders there.
3 MR. SEEGER: This is a little different here,
4 and, your Honor, I don't know how long you want to go
5 on, but I think we can sit and meet about it, but this
6 is one of those situations where the New Jersey -- the
7 cases in this mass tort started in New Jersey. New
8 Jersey became the focus point of the litigation as
9 opposed to what happened in other cases where there was
10 a federal MDL and then New Jersey came along later and
11 the New Jersey lawyers in that situation said, okay,
12 we'll work off the MDL product or cooperate, so I think
13 a lot of the country is going to be coming to New
14 Jersey, lawyers on both sides, plaintiffs and defense,
15 and look to organize and defend their cases.
16 MS. SULLIVAN: The problem is they're not
17 because we're getting notices.
18 MR. SEEGER: Let's try to sit down and work
19 this out.
20 THE COURT: Okay. We're not going to agree
21 on a deposition protocol today, but I do want counsel
22 before the next meeting to meet and discuss it.
23 MR. BUCHANAN: We'll put that in the order,
24 your Honor.
25 THE COURT: Have the depositions of these

1 people Brian Daniels, Ehrich, Musliner, Schechter --
2 Schechter is scheduled, right?
3 MR. SEEGER: He got rescheduled, but it is
4 only a little off.
5 THE COURT: Have Daniels, Ehrich and Musliner
6 been done?
7 MR. BUCHANAN: Yes, they have, your Honor.
8 THE COURT: And Silverman?
9 MR. SEEGER: Tomorrow.
10 THE COURT: You'll be taking Silverman. How
11 about Wendy Dixon?
12 MR. BUCHANAN: Set for the 15th.
13 THE COURT: And Anstice?
14 MR. MAYER: Still to be scheduled.
15 THE COURT: Plaintiffs have requested -- or
16 there's going to be -- deps between December 1st and
17 December 31st of Simon, Kim, Bold and Scolnick.
18 MR. MAYER: We offered a date for Simon,
19 actually, that somehow that I think we had written on
20 that two weeks ago, and somehow Mr. Buchanan didn't see
21 the letter.
22 MR. BUCHANAN: I haven't seen the letter.
23 MR. COHEN: That happens on both sides, so
24 we're not going to be --
25 MR. BUCHANAN: Your Honor, the only issue

1 with Dr. Simon is the volume of his supplemental
2 production. He is the pack rat of Merck. He had a
3 half million page initial production and an untold
4 volume supplemental production, so what we really need
5 to do with defense counsel is coordinate timing.
6 THE COURT: Maybe you just have to depose
7 Simon then we can go to trial.
8 MS. SULLIVAN: Sounds good.
9 MR. SEEGER: Maybe he is the only guy.
10 MR. BUCHANAN: He is the story teller.
11 THE COURT: When can the rest of his records
12 be produced or they have -- do you have a date for his
13 dep scheduled?
14 MR. MAYER: December 10th is the date we had
15 offered, so we were talking December 3rd to get the
16 documents produced.
17 MR. BUCHANAN: And I can tell your Honor
18 based on the experience with Mr. Schechter's documents
19 45,000 pages was 17 boxes. Dr. Simon's production, if
20 it is in the low hundred thousands of pages, as I
21 suspect it will be, probably what do you think 200,000
22 pages?
23 MR. COHEN: At least below 200,000 pages.
24 THE COURT: So you could produce that by
25 December 3rd?

1        MR. COHEN:  We're going to work very hard to

2    do that.

3        THE COURT:  Include in the order that Simon's

4    production will be by December 3rd.

5        MR. BUCHANAN:  Thank you.

6        THE COURT:  When are you going to be able to

7    depose him?

8        MR. BUCHANAN:  We're going to need three

9    weeks for 200 boxes of documents.

10       MR. SPECTER:  That's Christmas Eve, your

11   Honor.

12       THE COURT:  All right.  December 24th.

13       MR. BUCHANAN:  That one won't continue

14   day-to-day, your Honor.

15       MR. SEEGER:  Do you want to keep them short?

16       MR. COHEN:  Is an early date in January good

17   for you or do you want to give me a few more days?  Hit

18   the December 3rd.  I may have to do one of these where

19   I give you some paper and you may want me to take a few

20   extra days --

21       MR. BUCHANAN:  Here is a concept that would

22   really help, your Honor.  It is a concept of the

23   rolling production that has been described and

24   represented as something we're using here, but we're

25   really not in terms of these witnesses.  Like with

1    Mr. Schechter's production counsel was kind enough to

2    produce the stuff on paper, so we wouldn't have to blow

3    it out or load it up because we lose three days when we

4    have to load everything up and send it out to a vendor

5    to turn it into paper to facilitate a more speedy

6    review, but when they have 10,000 pages of Mr.-- Dr.

7    Simon's records ready send us a disk with the 10,000

8    pages or 50,000 or whatever small unit you guys can

9    produce these documents in so that we're not getting

10   200 boxes of documents for Dr. Simon two weeks before.

11   When you get a slug like that it is difficult to get

12   through it in that time frame.  If you get us several

13   boxes over time we can hit the deadlines and keep them.

14       MR. COHEN:  I do actually have problems with

15   that, some practical, some other, but I think the

16   better thing to do is find out, you know -- and we

17   mostly worked this through -- you know, you're going to

18   need three weeks for Simon, so we'll pick a date, and

19   I'll get it to you three weeks before.  I have problems

20   breaking it up for various reasons.

21       THE COURT:  All right.  So we'll make it

22   December 10th you'll produce all the Simon discovery,

23   and you're going to take him during the first week in

24   January.

25       MR. BUCHANAN:  That's fine.

1        THE COURT:  You guys pick a date during the

2    first week in January.  How about these other people?

3    Bold and Scolnick and Kim?

4        MR. MAYER:  Make sure Dr. Simon is around in

5    the first week of January.

6        MR. BUCHANAN:  We can accommodate that, your

7    Honor.

8        THE COURT:  It can be the last week of

9    December.  Whatever.

10       MR. MAYER:  On Bold we're working on dates

11   that would be in that probably mid December time frame.

12   I know Mr. Buchanan specifically wanted some particular

13   files before that's done, and the precise status of

14   that, and I don't know how much time he is going to

15   need with those before the deposition.

16       MR. BUCHANAN:  There are a couple categories

17   of documents.  He was in the epidemiology department in

18   Merck.  It is not entirely clear how much he touched

19   all these documents, but there are two categories of

20   supplemental production we have been looking for from

21   the defendants; one concerned a database they used to

22   track causality assessments or adjudications of adverse

23   events from clinical trials or even most marketing.  We

24   don't have that particular database yet.  We're waiting

25   on it.  That we need at least 10 days before to load it

1    up and analyze before the deposition.  There's also a

2    supplemental document production.  We don't have to

3    micromanage this, your Honor, I'm sorry.  I think for

4    him probably two and a half weeks before if you can

5    complete the production we'll be in a position to take

6    him.

7        MR. COHEN:  Let me give you a date when that

8    can be.  The database I haven't figured out exactly

9    what it is.  I'll tell you tomorrow.  The other

10   documents, the CV adjudication practice packages I have

11   already said no problem, that's coming.  I'm in the

12   process of collecting them.  I want to make sure I have

13   a whole set.

14       MR. BUCHANAN:  How big are they?

15       MR. COHEN:  I'll get you a volume tomorrow.

16       MR. BUCHANAN:  Is it 100,000 pages or more?

17       MR. COHEN:  I don't think so.  Total number

18   of events were only a few hundred.

19       MR. BUCHANAN:  I never had to ask that

20   question in a litigation before.

21       MR. COHEN:  For the record he is not in that

22   department because he is in the safety department.  It

23   was called WPF and E, but that E is not the same

24   epidemiology where this is coming from.  That doesn't

25   matter.  I don't have a problem producing the CV

1  adjudication package, so let's take a two and a half to
2  three week gap and work that out, no problem.
3      THE COURT:  For Bold, Kim and Scolnick can
4  they all be produced by December 31st then?
5      MR. MAYER:  No.
6      THE COURT:  Who can't?
7      MR. MAYER:  The documents or the witnesses?
8      THE COURT:  The witnesses and documents.
9      MR. MAYER:  Kim -- and this is what we talked
10  about last time.
11      THE COURT:  Kim is a problem?
12      MR. MAYER:  Dr. Kim is the president of Merck
13  Research Laboratories, so he is very busy.  He is very
14  involved in the issues surrounding the APPROVe trial.
15  We told you before that the APPROVe trial, the final
16  data is still being collected, and it will be early
17  next year before that final data set is available,
18  submitted to FDA, available to be reviewed by experts
19  and produced in the litigation and so on, and
20  scheduling issues aside, it doesn't make much sense for
21  Dr. Kim to be produced for deposition until that
22  APPROVe data is final.  So we discussed this last time
23  and said we could come back and reargue the issue
24  regarding the scheduling of Dr. Kim.
25      THE COURT:  How about Scolnick?

1      MR. MAYER:  Scolnick we're working on the
2  dates.  He is the former president of Merck Research
3  Laboratories and is now no longer with the company.
4      THE COURT:  You should have him by the 31st.
5      MR. MAYER:  We're trying to get dates for
6  him.
7      THE COURT:  By the 31st you should have him?
8      MR. MAYER:  I don't know the answer on the
9  schedule.  We're looking towards that.
10      MR. BUCHANAN:  His supplemental production
11  issues should be minor, your Honor, because he left in
12  2002.
13      MR. SEEGER:  Most of it has been produced
14  already.
15      MR. MAYER:  He left the position of president
16  of Merck Research Laboratories December 31, 2002.  He
17  stayed on with the company in another capacity.
18      MR. BUCHANAN:  Well, his VIOXX-related
19  materials will be far less voluminous than Dr. Simon.
20      THE COURT:  Scolnick and Bold are going to be
21  taken by December 31st.  Kim --
22      MR. MAYER:  Judge, I'm not sure that just
23  with the two and a half weeks that Mr. Buchanan wants
24  with the documents --
25      MR. BUCHANAN:  With Dr. Scolnick there's not

1  an issue.
2      MR. MAYER:  First I'm talking about Dr. Bold
3  because I'm not sure where that's going to fall within
4  the completion of that production, his schedule and the
5  holiday.
6      THE COURT:  Get Bold done by the 31st.  Bold
7  is by the 31st.  I'm going to give you a break on Kim,
8  though.  He sounds impressive.  If he is the president
9  then we have to give them more time.  What are we
10  thinking, mid January?
11      MR. MAYER:  I think that depositions can be
12  taken in February, Judge.  When the APPROVe data is
13  done and the results of which --
14      THE COURT:  We have to address that.  I don't
15  expect the production of APPROVe data to wait until you
16  conclude every final step of that APPROVe study.  I
17  mean, every single follow-up --
18      MR. MAYER:  Judge, we made the submission of
19  what we submitted to the FDA.  The submission to the
20  FDA of the final data comes -- it comes some time in
21  January.  That's the data that people are going to want
22  to talk about.  That's the data that's going to be --
23  the data that experts will opine about.  It is the data
24  that's relevant to the case.  It is the final data from
25  the study.  It won't exist until that time in the form

1  as the real and final numbers.  This is something that
2  the company is working extremely hard to get done to
3  get to the agency, to get it in the form that will be
4  the basis for whatever scientific papers and
5  presentations are made on this.
6      THE COURT:  I understand there has to be a
7  final APPROVe study, but there's certainly data that
8  exists now.
9      MR. MAYER:  They have the interim data.
10      THE COURT:  From the APPROVe study?
11      MR. MAYER:  From the APPROVe study.  This is
12  the finalization of the study because the study was --
13  the data that was available at the time that the
14  decision was made and the announcement was made by
15  interim data, and although the study was then stopped
16  promptly thereafter there was still a lot of data not
17  yet collected and not yet analyzed, and in any study
18  after the last patient out there's a period of time to
19  get the -- where the patients still have to see the
20  doctor for the last time, the reports have to come in
21  from the investigation, the data has to be -- the file
22  is then frozen and the required analyses are done.
23      Information is submitted to the regulatory
24  agencies, and that's the data that is the data that
25  will be the basis of what witnesses and experts in this

1    case will be talking about when they talk about the

2    APPROVe data.  So that's what we're -- that's why for a

3    witness like Dr. Kim he shouldn't be brought to be

4    deposed any more often than is necessary in view of

5    this position, and who undoubtedly will be asked about

6    the data.  We should put him up when the data is final,

7    your Honor.

8        MR. BUCHANAN:  One factual thing I wanted to

9    fill in, your Honor.  In the VIGOR trial, which was an

10   8,000-person trial last patient came out of that trial

11   the second week in February.  Frozen file April --

12   third week in April 2004.  Two months and a couple of

13   days after the last patient left the study they

14   reported the data to the public at large in a Digestive

15   and Disease Week presentation in May of 2000.  That was

16   a month after.  Three months after the last patient

17   left the study four times the size of this study.

18       Now I don't know why it is taking that much

19   longer to crunch a study that's 25 percent of this

20   size, but we're talking about extra months for a much

21   smaller study.

22       MR. MAYER:  They aren't analogous.  The

23   presentation was already made at ACR, and you already

24   have the data --

25       MR. SEEGER:  I have a compromise.

65

1        MR. MAYER:  I'm telling you, obviously, the

2    agencies want the final data, are pressing the company

3    to get the data finalized.  We don't need, you know --

4    nothing one of us lawyers on either side of the table

5    says can make them work any faster to do something

6    they're doing on the faster schedule they possibly can,

7    and that's the facts.

8        MR. SEEGER:  I think there's a way to do

9    this.  Dr. Kim is one of those witnesses in the case,

10   and there aren't many, that is going to take more than

11   one day to depose because there's going to be a lot to

12   ask him.  You've already ruled that they need to

13   produce the interim data and basically produce the data

14   to us in its raw form before it is analyzed.  They want

15   to do their analysis on the data.  They want to do what

16   they want to do to it.

17       MR. COHEN:  There's no way -- we have never

18   discussed, nor have you ordered, and I would argue here

19   for a long time to produce raw data from APPROVe before

20   the APPROVe data is final.  You can't take something in

21   the middle of a study --

22       MR. SEEGER:  Before the analysis.  Maybe I

23   misspoke.  I thought --

24       MR. MAYER:  We produced interim data.  That's

25   what we produced.

66

1        MR. SEEGER:  We can look at the transcript.

2    I thought I heard your Honor say that she wanted the

3    data produced before -- so that our experts can look at

4    it in the form your experts looked at it.  I didn't

5    mean to tee up a new issue here, but let's stick with

6    Dr. Kim then I'll come back to that.  Why don't we

7    produce him prior to the end of January, and we'll do

8    the second day after the analysis is done.  Maybe it

9    changes his opinions, maybe it doesn't, but I think

10   that's the way to do it.  He is clearly going to go two

11   days.

12       MS. SULLIVAN:  That just increases the burden

13   he has to -- instead of just doing it once and getting

14   prepped and getting it done, your Honor, this is a

15   classic witness where you would like to avoid --

16   minimize the duplication.  We would like to

17   cross-notice it everywhere and have them do it just

18   once or maybe if you have to do it through the MDL

19   maybe twice.  So there is an interest in making sure

20   they have got substantially the APPROVe data available

21   so they can take his deposition and be done with it,

22   and there's really no prejudice to them if, you know,

23   if it happens in February versus January.

24       MR. SEEGER:  Well, I mean, there is.  There

25   is prejudice.  The obvious prejudice is, you know, we

67

1    would like to have the opportunity to question Dr. Kim

2    about data, you know, before the company, frankly, has

3    had a chance to go through it, run permutations of it,

4    and give him their analysis of it.  We would like to

5    ask him about the study.  What is wrong with that?  We

6    have the right to do that.

7        MR. BUCHANAN:  The data was sufficiently

8    concrete, your Honor, the week the drug was withdrawn.

9        MR. SEEGER:  Maybe there's another way to

10   split this baby.  We'll ask him questions up to the

11   point of the decision to take the drug off the market.

12   The second day can be the analysis of the data.  I

13   mean -- but I mean, I just never have been in a

14   litigation where the defendant says you have to give us

15   a chance to analyze this stuff, prepare our witness --

16       MR. MAYER:  That's not what we're saying.

17   We're saying we're all working from the same page.

18   None of us is going to have the final data until it is

19   final, and that's not going to happen until it is in

20   the form where it can be presented to the agency, which

21   we believe will be in January.

22       THE COURT:  Let me ask you this --

23       MR. COHEN:  I know you don't want to go on

24   for a long time, but there's good reasons why the

25   APPROVe will take longer than VIGOR.  I asked that

68

1   question in anticipation of Mr. Buchanan saying that,
2   and I have a lot of reasons, and I don't think you need
3   me to tell you all that, but it is clear that APPROVe
4   is just going to take longer than VIGOR to get the
5   final data out.
6       MR. SEEGER:  I can think of a few;
7   congressional hearings, SCC.
8       MR. COHEN:  It has to do with the fact that
9   there's a colonoscopy that everybody has to take at the
10  end of the study.  The study was broken before the end,
11  which means that almost nobody had it, so they have to
12  get everybody in.  It is an invasive procedure.  So you
13  can't have them come in for a doctor visit.  There are
14  people coming in today -- if any of those people had a
15  CV event during the last time when they were looked at
16  before, those records first come in from the doctors
17  and the hospitals then they go into the adjudication
18  process, and eventually get a package that sort of
19  thing that I'm producing to Mr. Buchanan on the other
20  study, and I think it goes on and on as to why it will
21  take longer, and I don't want to take the Court's time
22  unless you want me to, but it is a really more
23  complicated study, and the fact that it was stopped
24  early actually is one of the main reasons why it is
25  going to take longer to get together.

1       MR. SEEGER:  In light of the defense in this
2   case, which will be -- and they'll say it to juries --
3   that they acted responsibly, we didn't know, and we
4   found out a week before APPROVe.  I think it is really
5   important to us to find out what went into the decision
6   for the company to take a $2.5 billion a year drug off
7   the market.  I would really, frankly, as a lawyer in
8   the case like to question Dr. Kim on that right now,
9   and we'll do it based upon whatever production we can
10  get.  We can split the deposition in two days, and in
11  day two can deal with everything that happened after
12  September 30th if they think that's fair because they
13  don't want to send their witness into this deposition
14  unprepared without the data and their analysis, fine.
15  That would be fine.
16      MR. MAYER:  It is not an efficient use of his
17  time.  It is not an efficient use of time on both
18  sides.  We should produce this witness, as Miss
19  Sullivan said, once.  We should cross-notice him in all
20  the cases, and we should do that when he has the
21  information he needs to be able to testify to.  There's
22  plenty of other work being done.
23      THE COURT:  Your cross-notice procedure is a
24  voluntarily procedure?
25      MS. SULLIVAN:  I don't understand what you

1   mean.
2       THE COURT:  There's not going to be any
3   compulsion from people from other states to
4   participate?
5       MS. SULLIVAN:  We'll invite them, and we
6   would argue in other states that they were invited and,
7   therefore, they had their chance to depose the witness,
8   and courts will agree or disagree, but we're going to
9   do what we can to minimize the number of times --
10      THE COURT:  But you're going to let everybody
11  else know they're being deposed, and if they want to
12  participate --
13      MR. SPECTER:  But, Judge, of course, there
14  are many claims that will be brought against Merck in
15  the future, so that, you know, some claim gets brought
16  in Ohio a month after that event occurs it has no
17  relevance to that lawyer or client.  He wasn't on
18  notice of the event, so, I mean, it would be nice to be
19  able to limit Dr. Kim to two depositions of two days
20  each or whatever, but it is going to be difficult with
21  a key person like Dr. Kim.  The reality of litigation
22  like this is those folks end up being deposed quite a
23  bit.
24      MS. SULLIVAN:  They usually end up being
25  deposed in the MDL and once in a state but not what

1   you're talking about here where they're being noticed
2   again and again.  And most courts will say you have a
3   deposition, look at it, and absent good cause that
4   there's subject matter that the attorney that took the
5   deposition didn't inquire about -- particularly for a
6   high level executive like this --
7       MR. SEEGER:  I think you're right.  I think
8   the reality is, Miss Sullivan, that is going to play
9   out that way, but we are now talking about New Jersey.
10  It really isn't fair -- it isn't this court's issue
11  that you cross-notice the case and she can't -- and she
12  is being asked to control lawyers from, Texas and I
13  don't know how you do that.
14      MR. MAYER:  Let me make one other point, too,
15  with regard to Dr. Kim, which is he is the president of
16  Merck Research Laboratories.  We're making -- we're in
17  the process of updating the production through October
18  15th of 55 witnesses, I think it is, many of whom are
19  employees of Merck Research Laboratories.  Plaintiffs
20  have recently indicated interest in taking depositions
21  of some additional people who weren't on that list and
22  whose documents will have to be collected and produced,
23  so for Dr. Kim -- Dr. Kim's deposition should be taken
24  after those documents have been produced because so
25  many of these documents are from within his

1  organization and --
2      THE COURT: I'm not going to order that
3  Dr. Kim be taken in December at this point, and whether
4  he is going to be taken in January or February we can
5  deal with it at the next management meeting. But he is
6  not going to be ordered to be taken in December.
7      MR. SEEGER: That's fine.
8      THE COURT: And we'll discuss it -- we can
9  discuss it again. As far as the APPROVe study the
10 understanding is you have gotten the documents from
11 there that you are going to get.
12     MR. BUCHANAN: Subject to the exception we
13 highlighted earlier, your Honor.
14     MR. COHEN: The safety update reports?
15     MR. BUCHANAN: Yes, the other analyses you
16 send to the SMB.
17     MR. COHEN: And those are hard copy
18 documents. Those are hard copy documents shown to the
19 SMB.
20     MR. BUCHANAN: That's okay. You're saving
21 everything else. We're not talking about the SAS files
22 for this.
23     MR. COHEN: That's what I want to make sure.
24     THE COURT: And it is anticipated that the
25 APPROVe study will be wrapped up by the end of January?

1      MR. MAYER: Yes.
2      THE COURT: And it is anticipated that within
3  a short time after that you can provide everything on
4  that study to plaintiffs' counsel.
5      MR. MAYER: I'm not sure it will be
6  everything in the study, but we'll be talking about the
7  cardiovascular analysis, safety analysis which I think
8  is the part of it that both sides are most interested
9  in. I'm not sure all of the analysis in terms of the
10 cancer prevention data and so on will be finalized on
11 the same schedule that they're trying to get the
12 cardiovascular data analyzed first.
13     THE COURT: We'll look at that on another day
14 exactly what they're going to produce from them.
15     MR. SEEGER: Your Honor, we do have one
16 person that was left off inadvertently, but we have
17 spoken about, and that is Mr. Gilmartin, his
18 deposition.
19     THE COURT: Can that be taken by December
20 31st?
21     MR. MAYER: No, your Honor.
22     THE COURT: Who is he?
23     MR. SEEGER: Well, he is testifying today
24 before Congress. I guess he was prepared for that, but
25 he is not prepared to testify in the litigation at this

1  point?
2      MS. SULLIVAN: He was called to testify
3  before Congress.
4      MR. SEEGER: We're calling him.
5  Mr. Gilmartin.
6      MR. SPECTER: He was on TV last night on the
7  Leher News Hour, and that, apparently, was voluntary.
8  He is on TV all the time.
9      THE COURT: Mr. Seeger is on TV all the time.
10     MR. SEEGER: Have I been on TV?
11     THE COURT: You might not even need a dep.
12     MR. SPECTER: I have a question. When we
13 started this conference the Court said, quite properly,
14 we shouldn't try our case in the press, and we agree
15 with that, but I'm not sure that's going to apply.
16 Mr. Gilmartin is trying this case in the press, and it
17 seems to me Mr. Seeger, for example, should be able to
18 talk to the news media. I know you haven't ordered
19 him not to talk to the news media.
20     MR. SEEGER: I wouldn't discuss documents.
21     MR. SPECTER: It seems to me it can't go one
22 way, that the president of the company shouldn't be
23 allowed to talk to the TV networks, et cetera, but
24 people who advocate the other side of the coin as to
25 causation can't go on television and the like.

1      THE COURT: I'm not going to get into a
2  philosophical discussion about that. The fact is
3  counsel have represented to me and had agreed that
4  documents were not going to be released to the press
5  and that documents were not going to be placed on
6  websites, and that included both confidential and
7  nonconfidential documents, and that confidential
8  documents were going to be kept confidential. And it
9  is important, and it is not an issue of whether
10 documents that have been released to the press really
11 should have been confidential or not because there's a
12 lot of documents that were marked "confidential" that
13 shouldn't be confidential anymore. We had already
14 agreed on that, but, you know, there is no excuse for
15 court orders being violated. It is wrong.
16     MR. SPECTER: We agree.
17     THE COURT: All right. And nobody has
18 forbidden anybody to talk to the press in the past or
19 the present about the cases generally. It was the
20 release of documents we talked about.
21     Now -- but I think it is still better not to
22 try a case in the press. I don't know what value it
23 has.
24     MR. SEEGER: I tend to agree with that, your
25 Honor.

1    MS. SULLIVAN:  That was good.

2    MR. SEEGER:  I'm prepared -- to the extent

3  I'm quoted I'm prepared -- I haven't said anything out

4  there that would surprise you or violate any

5  confidence, so people know my views.  But the

6  deposition of Mr. Gilmartin is a very important

7  deposition because -- and it is different than the

8  Dr. Scolnick issue.  He has been vocal as a CEO.  He is

9  way more out there than most CEO's.  He gave

10  interviews, and he was involved in calls to analysts on

11  Wall Street with Dr. Scolnick describing what was going

12  on with the drug prelaunch, after launch, you know,

13  after VIGOR, before VIGOR, which is one of the

14  important clinical studies here.  His is an important

15  deposition in the case.  Does it have to be in

16  December?  Frankly, if that burden what Mr. Mayer is

17  trying to do in terms of organizing his teams and his

18  witnesses, I don't think it has to be December, but we

19  would like it in January.

20    THE COURT:  All right.  Let's address it at

21  the December conference.  He won't have to be produced

22  in December.  Does he have particular files or is

23  there -- would you need the APPROVe studies done

24  before --

25    MR. MAYER:  Yes, your Honor.

1    MR. COHEN:  This one we talked about last

2  time as needing a formal motion because we resisted

3  producing him at all.

4    THE COURT:  Okay.

5    MR. SEEGER:  So you want to protect him?

6    THE COURT:  As to whether he should be

7  produced at all?

8    MR. COHEN:  Yes.  You suggested we could do

9  that, and we discussed that here as to whether we

10  needed a briefing schedule now or next month or

11  whenever it is going to be.

12    MR. BUCHANAN:  If we're going to address it

13  at the next conference let's set it as a return date

14  for the next schedule and set a briefing schedule if

15  that works for your Honor.

16    THE COURT:  Does that work out for you

17  timewise?  You'll file a motion to preclude his

18  deposition at all or to limit his deposition or

19  whatever you want to do.

20    MS. SULLIVAN:  A motion to limit.

21    THE COURT:  And make it returnable -- well,

22  the next meeting is going to be December 16th, I think.

23  I wrote down the dates.  December 16th, January 13th,

24  February 17th and March 17th are the dates I have for

25  the rest of the meetings.  Those are Thursdays, and we

1  do have the conference room from 9:00 on, so it will be

2  up to you whether you want to meet at 11:00  or 10:00.

3  Should we say 10:30?  Let's say 10:30.  Then you guys

4  can have the pleasure of speaking for two hours before

5  I talk to you.

6    MR. SEEGER:  Despite appearances I like my

7  colleagues on the other side.

8    MR. BUCHANAN:  Your Honor, could you provide

9  those dates again?

10    THE COURT:  It is December 16, January 13,

11  February 17 and March 17.

12    MR. SPECTER:  And, your Honor, meeting with

13  counsel at 10:30 then meeting with the Court at 12:30?

14    THE COURT:  Right.

15    MR. SPECTER:  Thank you.

16    MR. BUCHANAN:  Your Honor, maybe my notes are

17  just bad.  Did we get a date for David Anstice or a

18  time frame to produce him?

19    MR. MAYER:  No.  David Anstice we're working

20  on that.  His job is in charge of all the business for

21  Merck in the Far East and Australia, and he is on the

22  road a great deal of his time, and we are working on a

23  date for that.  So we're trying to get a date in

24  December, early January, and we'll confer on that once

25  we have a date.

1    THE COURT:  He will be produced by January

2  5th?  Do you want to put that in there?

3    MR. BUCHANAN:  That's fine.  He was a

4  November deponent, your Honor.

5    THE COURT:  I know.

6    MR. MAYER:  I don't know when the date will

7  be.

8    THE COURT:  But by January 5th he is to be

9  produced.

10    MR. MAYER:  That's what we'll try to do.

11    THE COURT:  All right.  Now what other deps

12  are needed?  Let's go to what the defendants need for a

13  few minutes.  Since we seem to be concentrating on

14  plaintiffs' needs.  What is happening -- there was some

15  question about facts sheets that you haven't gotten,

16  information you haven't gotten, deps, and what do you

17  need and what can we order that will facilitate it?

18    MS. SULLIVAN:  Your Honor, I have a proposed

19  order.  There's four cases notwithstanding our best

20  attempts with letters and calls we have not been able

21  to gets facts sheets for.  There's also another 10

22  cases, mostly ones that the Anapol firm is associated

23  with, that we haven't been able to get facts sheets,

24  although they have been promised.  Let me give you the

25  name of the cases.  I apologize, your Honor.

1   THE COURT:  I'm wondering if you can't

2   simply -- I'm a little reluctant to dismiss cases

3   without some kind of formality, obviously.

4   MR. BUCHANAN:  Maybe these are on the agenda.

5   If they are they haven't been identified to me in terms

6   of the case name.

7   THE COURT:  What I would like to do is have

8   the defense file -- tell me if you think a different

9   idea would work better, Miss Sullivan.  What I'm

10  thinking is counsel should file one motion listing

11  those docket numbers that should be dismissed and

12  requesting that they be dismissed for failure to

13  provide discovery, including either facts sheets or

14  whatever, identifying what hasn't been produced.  Just

15  returnable on a regular motion schedule.

16  MR. SPIZER:  Can I respond?

17  THE COURT:  Counsel can respond, and plus you

18  can certainly show your plaintiffs that their cases are

19  on the verge of being tossed.  If I don't receive

20  opposition or if I don't receive reasonable reasons why

21  there should be some special extenuating circumstances

22  granted I'm going to dismiss them first without

23  prejudice, and if they're not provided within 90 days

24  with prejudice, if there's not a motion to reinstate

25  with an explanation.

---

1   MR. SPIZER:  Can I just ask, your Honor --

2   THE COURT:  That's the way we have to deal

3   with it.

4   MR. SPIZER:  Diane, the cases you're looking

5   to dismiss, are they cases where there's supplemental

6   facts sheet if --

7   MS. SULLIVAN:  The originals are deficient.

8   MR. SPIZER:  The supplemental those are not

9   open for dismissal at this point, you're just saying

10  the ones --

11  MS. SULLIVAN:  The ones are the original

12  facts sheet.

13  MR. SPIZER:  There's four --

14  MS. SULLIVAN:  There's four and then your 10

15  in terms of the deficiencies in the facts sheets.

16  MR. SPIZER:  But you're saying those aren't

17  open for dismissal, you just want to order you want

18  those produced?

19  MS. SULLIVAN:  Unless you're going to give me

20  the information I would include those 10 in the motion.

21  MR. SPIZER:  We don't want to waste the

22  Court's time because I don't think any of the

23  supplemental ones are -- they have been served in a

24  recent time line, so I don't think -- but I don't want

25  to waste the Court's time.

---

1   THE COURT:  Go over those 10 together and see

2   and include it in the order -- or in the proposed

3   motion what should be -- what you're going to get to

4   her and how fast.  Go ahead, what was the next thing?

5   MS. SULLIVAN:  The next thing is Merck served

6   a document demand on plaintiffs in early October.  We

7   got a letter back in late October that the plaintiffs

8   objected to the document demand, and it was your basic

9   give me the basis of the allegations made in the

10  complaint to help prepare for trial.

11  As the Court is well aware Merck has been

12  bending over backwards to meet discovery deadlines and

13  respond to discovery, and we would ask the plaintiffs

14  respond to the document demands made by Merck.

15  THE COURT:  What is --

16  MR. SPIZER:  If I can address that, I think

17  when we met initially -- this is going to go back a

18  year with the plaintiffs' facts sheets.  Part of the

19  concern in the discussions and the concern of

20  plaintiffs and I think the Court, as well, was the

21  facts sheet was pretty extensive, over 30 pages, and

22  throughout at least I know in our cases there have been

23  supplemental requests to that facts sheets which are

24  usually four or five pages.  It is a very extensive

25  discovery process, and the concern was knowing that

---

1   going into it I think we had -- we brought to the

2   attention of the Court and to defense counsel about

3   supplemental discovery, and even in the facts sheet

4   order, which is a part of this case and posted on the

5   website, et cetera, is that I believe a court order

6   needs to be ordered for there to be supplemental

7   discovery taken.

8   MS. SULLIVAN:  That's not true.

9   MR. SPIZER:  We did not object to

10  supplemental requests for the facts sheet.  For

11  example, if they said I didn't respond to section 5A we

12  have been responding to that, and I know the Seeger,

13  Weiss firm has, as well.  The issue was a separate and

14  new discovery request because the concern was that

15  these could be overloaded.  That was our first concern

16  that we don't think that was -- we thought there was a

17  court order in process, so if they wanted to take

18  supplemental discovery we could certainly take a look

19  at it before it was produced.  I thought that was part

20  of the facts sheet order.

21  The second part of their request --

22  THE COURT:  I don't think so.

23  MS. SULLIVAN:  No, your Honor.  If there was

24  a court order -- if there was an order saying -- there

25  was no court order.  Obviously, the plaintiffs --

**Transcript - Monthly Status Conference (2004/11/18)**

1      MR. COHEN:  We would object, and we would

2  come in and discuss it.  We could serve it, they could

3  object and we would come in and discuss it.

4      MR. SPIZER:  But the order said to seek or

5  clarify responses to the plaintiffs' facts sheet, which

6  we have abided by.  This is a new and separate request

7  that's not an expansion of the facts sheet.  It is a

8  new separate request.

9      MS. SULLIVAN:  But there was no prohibition

10  on serving supplemental discovery, and this is your

11  basic you have made these allegation tell me the facts

12  you're relying on to support the allegations, your

13  basic get ready for trial kind of discovery, and I'm

14  not sure why there was an objection.

15      MR. SPIZER:  Besides the court order, in

16  addition, a part of our objection was also they say it

17  is the garden variety, but as Merck has argued

18  countless times today this is a large production, many

19  documents, and if you look at many of these requests,

20  your Honor, they're overly broad and overly burdensome.

21  I think I pointed out one example in my letter.  In

22  essence, I think they said produce any document that

23  you might rely on potentially at trial and some other

24  broad based -- in essence, I would have to take their

25  entire production and almost return it to them.  It was

85

---

**Transcript - Monthly Status Conference (2004/11/18)**

1  a very wide ranging and broad -- it wasn't specific.

2  There were a few questions where if you're going to put

3  up a video of your client or photographs, I understand

4  that, but then there were many of these which were far

5  reaching and broad that, in essence, for us to protect

6  ourselves we would have to take our servers and just

7  reproduce them back to Merck, and I think a lot of

8  these issues, too, are covered in an entire list prior

9  to trial as to what documents we're going to use.  I

10  don't know if Chris had a point.

11      MR. SEEGER:  Your Honor, one of the problems,

12  if I remember this now, it just triggered my thinking.

13  These are in the form of contention document requests.

14  Produce the documents that support your claims.  I

15  mean, if you look at the Manual of Complex Litigation,

16  and there's a ton of case law that indicates it is

17  completely inappropriate at this point in the

18  litigation, if at all because we is haven't had a close

19  in discovery.  Second, we don't do them.  We haven't

20  done these in any of the mass tort cases where you had

21  to produce, you know, give us the documents that

22  support your claim that the label was inadequate.  Give

23  us the documents --

24      MS. SULLIVAN:  Have you looked at these?

25  Have you looked?  The first one asks for photographs or

86

---

**Transcript - Monthly Status Conference (2004/11/18)**

1  a day in the life films or videotapes that the

2  plaintiffs intend to use.

3      THE COURT:  We'll address this particular

4  document request at the next management meeting.  You

5  do have to respond to it.  There was no order saying

6  there couldn't be additional discovery from the

7  plaintiffs that I remember, and I certainly would order

8  that things like videos and photographs be produced and

9  other supplemental things that they may be interested

10  in.  I will not require plaintiffs to answer questions

11  such as state all the facts upon which you relied to

12  prove X, Y, Z.  Although it might be a standard

13  question in interrogatories it is a waste of time in

14  every case, let alone in this kind of case.

15      MR. SPIZER:  Can I ask a clarification point?

16      THE COURT:  Names of witnesses, obviously,

17  is -- it is a little early because we don't have the

18  deps -- we don't have the experts' names yet.

19  Obviously, you need to know at some point way before

20  trial who their experts are, and we have to have a

21  deadline for them naming experts, which we sort of

22  tentatively have, but, I mean, I recognize like

23  everybody else does that things are inching back a bit,

24  and will have to inch back, but I just want them to

25  inch back, not zoom back, you know?

87

---

**Transcript - Monthly Status Conference (2004/11/18)**

1      MR. SPIZER:  Clarification, your Honor, was

2  the document requests I think were captioned as In Re:

3  VIOXX litigation, so I'm not sure what type of -- were

4  they talking about every plaintiff that we have a suit

5  filed on or are they talking about the group in the

6  first 15.  That was another point that I wanted to

7  raise.  I didn't know of which -- I mean some of these

8  cases, obviously, are farther down the road, deps

9  haven't been taken, other issues like that.  I'm not

10  sure which ones they wanted.

11      MS. SULLIVAN:  Well, let me suggest this,

12  your Honor, consistent with your Honor's comment let me

13  do a revised set of the factual information that we

14  would like from the plaintiffs, serve it on them and

15  they can make any objections at the next conference,

16  and we can resolve it.

17      THE COURT:  Even though you haven't deposed

18  them every plaintiff has produced a facts sheet.

19      MR. SPIZER:  Right.

20      THE COURT:  And, similarly, you could ask

21  every plaintiff if they have any recent photographs of

22  themselves or photographs of deceased plaintiffs,

23  whatever.

24      MR. SPIZER:  I understand, your Honor.  I was

25  talking from a time line deadline standpoint, how they

88

1    wanted --

2         THE COURT:  Talk to each other and see if you

3    can work it out before the next meeting.

4         MR. SEEGER:  Your Honor, can I ask for one

5    thing because I'm not going to be able to stay for the

6    whole time.  There was only one other issue on the

7    plaintiffs' agenda if you wanted to address it now it

8    would be the issue of -- we put on our agenda to talk

9    about trial cases and submitting a proposal.

10        THE COURT:  All right.

11        MR. SEEGER:  One of the things that I would

12   like to propose, and I did briefly at the end of the

13   Stempler argument that we had is that in order to sort

14   of make this first round of trials meaningful in the

15   context of the litigation, which I think we all agree

16   is going to grow to many more cases that are on file

17   now is to select cases that would inform discussions of

18   the parties for purposes of settlement or whatever.

19        To accomplish that, and that is usually the

20   purpose why in other mass torts we have done what are

21   called bellwether cases where we select cases that

22   represent certain types of injuries or another

23   alternative would be plaintiffs would propose a handful

24   of cases and the defendants would propose a handful of

25   cases they like.  My proposal would be we would submit

1    to the other side and to your Honor for resolution if

2    we can't agree plaintiffs' five cases by November 30th

3    and maybe defendants could do that, as well, and we

4    would then consider those first 10 cases.  You would

5    have to make the decision if you want to try them all

6    together, but we would then take those cases and say

7    that's going to be -- those are going to be the trials

8    in May or June whenever they occur.

9         MS. SULLIVAN:  Your Honor, I don't have an

10   issue with that, presuming it comes from the first 15

11   cases that we have been working very hard on to get

12   ready for and meet the discovery deadlines in the Case

13   Management Order.  This Court's orders were clearly

14   tied to the first 15 cases in waves and then months

15   later other discovery deadlines for the second wave,

16   third wave, et cetera.  We have taken the plaintiffs'

17   depositions in all 15 of the first wave of cases.  We

18   have taken a number of treating doctor depositions in

19   the first 15.  I have looked at the first 15, and I

20   have looked at the cases to the extent we have gotten

21   medical record in the waves behind it and the first 15

22   are a representative bunch.  They have stroke cases.

23   They have MI cases.  They have GI bleed cases.  They

24   have death cases.  They have different dosages.

25        If Mr. Seeger is suggesting that we should

1    basically forget about the first 15 and move on to

2    another set of cases, your Honor's Case Management

3    Order set four-month intervals for discovery in each

4    wave of cases and would set this court back and these

5    deadlines back at least four months in terms of working

6    up new cases, new depositions, getting medical records

7    in new cases, and I don't see a basis or a reason for

8    it, particularly given all of the work that Merck has

9    done to produce documents key to these first 15 cases

10   in terms of sales rep documents, detail information

11   regarding the prescribers at issue in these cases, and

12   there's no good reason to do this, except whatever

13   strategic reasons the plaintiffs may have in not liking

14   the mix of the first 15, but when you look at the first

15   15 and compare it to the second wave and the third wave

16   it is representative -- the first 15 are pretty

17   representative in terms of the ages of the plaintiffs,

18   the duration of use of VIOXX, the different injuries

19   and we could find representative cases pretty easily.

20   And maybe Mr. Seeger's proposal -- I would, obviously,

21   have to discuss it with Merck and my colleagues here --

22   but they pick five and we pick five from this batch and

23   then we pick from among those 10; he picks from my list

24   and I pick from his list, and that may be a way to get

25   to a more representative sample of this first 15, but

1    there's no good reason for basically forgetting about

2    this first 15 cases.

3         If they don't want to pursue these cases my

4    suggestion would be that they dismiss them, and then we

5    can talk about the second wave and a schedule on that,

6    but there's no good reason to file cases that have this

7    mix of plaintiffs and this mix of injuries and say, you

8    know what, never mind, we don't want to pursue those,

9    let's move on to a different set of cases.

10        MR. SEEGER:  Only Miss Sullivan could make

11   that argument on that side of the table since she

12   wasn't here for the first year and a half that we had

13   been discussing this.

14        THE COURT:  Let's go off the record.

15        (Discussion off the record.)

16        THE COURT:  I know defense counsel wanted --

17   one other thing I want to put in the order, though that

18   the release can remove the Stempler -- there's a

19   standard release authorization, and it should allow in

20   it the release to the Dechert firm because that wasn't

21   on there, also, records, right?

22        MR. BUCHANAN:  I imagine what we're going to

23   do is we'll sit down with defense counsel and conform

24   the authorization consistent with your order.

25        THE COURT:  That's fine.

```
1              MR. BUCHANAN:  So I'll put that in the order.
2              THE COURT:  That can be a meeting between
3    counsel.  Let's take a break.  I'm tired, and I'm sure
4    you are.  Maybe we just want to break for the day.
5    Talk to each other, and let me know if you have other
6    issues you want to talk about or if you want to leave
7    the rest for the 15th.
8              MR. BUCHANAN:  I hate to be the marathon
9    person here, but there are some open issues, and they
10   were the requested depositions of a number of other
11   witnesses that I'll talk with counsel about and see if
12   we can set dates for and maybe we can.
13             THE COURT:  Take a break.  If you can work it
14   out, fine, if you can't then call me back and we'll
15   talk some more.
16             (End of proceedings.)
17
18
19
20
21
22
23
24
25
```

Court Hearing

                        C E R T I F I C A T I O N
          I, REGINA A. TELL, C.S.R., C.R.R., License Number
30X100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript to the best of
my knowledge and ability.
                        _____  11-22-04
                        Regina A. Tell, CSR-CRR
                        Official Court Reporter
                        Atlantic County Courthouse
                        Mays Landing, New Jersey

MATTHEW J. MAIORANA, ESQUIRE
SEEGER, WEISS *Status Conference (2004/12/16)*
ATTORNEYS FOR THE PLAINTIFFS
DAVID JACOBY, ESQUIRE
GREGORY S. SPIZER, ESQUIRE
SOL H. WEISS, ESQUIRE
ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
ATTORNEYS FOR THE PLAINTIFFS
LEE BALEFSKY, ESQUIRE
KLINE & SPECTER
ATTORNEYS FOR THE PLAINTIFFS
        *       *       *       *       *       *

                REGINA A. TELL, CSR-CRR
                OFFICIAL COURT REPORTER
                1201 BACHARACH BOULEVARD
                ATLANTIC CITY, NJ  08401

Court Hearing
    APPEARANCES CONTINUED . . .
        FREDERICK GERSON, ESQUIRE
        D'ALESSANDRO, JACOVINO & GERSON
        ATTORNEY FOR THE PLAINTIFFS
        J. PAUL SIZEMORE, ESQUIRE
        SCOTT LEVENSTEN, ESQUIRE
        BEASLEY, ALLEN, CROW, METHVIN, PORTIS, MILES, P.C.
        ATTORNEY FOR THE PLAINTIFFS
        WENDY R. FLEISHMAN, ESQUIRE
        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
        ATTORNEY FOR THE PLAINTIFFS
        ESTHER BERKZOFSKY, ESQUIRE
        WILLIAMS, CUKER & BEREZOFSKY
        ATTORNEY FOR THE PLAINTIFFS
        JERRY KRISTAL, ESQUIRE
        WEITZ & LUXEMBERG
        ATTORNEY FOR THE PLAINTIFFS
        SAM DAVIS, ESQUIRE
        DAVIS, SAPERSTEIN & SALOMON, P.C.
        ATTORNEY FOR THE PLAINTIFFS
        DAVID J. COHEN, ESQUIRE
        SPECTOR, ROSEMAN & KODROFF, P.C.
        ATTORNEY FOR THE PLAINTIFFS
        RICHARD D. MEADOW, ESQUIRE
        GENE EGDORF, ESQUIRE
        LANIER & ASSOCIATES, LLC
        ATTORNEYS FOR THE PLAINTIFFS
        JOSEPH MONACO, ESQUIRE
        TRIEF & OLK
        ATTORNEY FOR THE PLAINTIFFS
        MICHAEL GALPEN, ESQUIRE
        GENE LOCKS, ESQUIRE
        LOCKS LAW FIRM
        ATTORNEYS FOR THE PLAINTIFFS
        MOSHE MAIMON, ESQUIRE
        LEVY, PUILLORS & KONIGSBERG
        ATTORNEY FOR THE PLAINTIFFS

Court Hearing
    APPEARANCES CONTINUED . . .
        JENNIFER YOUNG, ESQUIRE
        SULLIVAN, PASAIN, BLOCK, McGRATH & CAMARO
        ATTORNEY FOR THE PLAINTIFFS
        RICHARD GALEX, ESQUIRE
        GALEX & WOLF

1

---

Transcript - Monthly Status Conference (2004/12/16)
        MICHAEL FERRARA, ESQUIRE
        THE FERRARA LAW FIRM
1           THE COURT:  All right.  I understand counsel
        ROBERT DASSOW, ESQUIRE
2   have been able to work out a lot of things or do you
        ATTORNEY FOR THE PLAINTIFFS
3   want to report to me on what you have done or what you
        ALEXANDER, HAWES & AUDET
4   have resolved and what you want to talk about first?
        CHRISTOPHER M. PLACITELLA, ESQUIRE
5           MR. BUCHANAN:  Certainly, your Honor.  One of
        ATTORNEY FOR THE PLAINTIFFS
6   the issues that you know has been lingering on the
        CHARLES W. COHEN, ESQUIRE
7   agenda now for several months has been a revised
        HUGHES, HUBBARD & REED, LLP
8   protective order reflecting some of your Honor's
        DIANE P. SULLIVAN, ESQUIRE
9   earlier rulings, as well as treatment for materials
        ATTORNEYS FOR THE DEFENDANT, MERCK
10  that are truly confidential even post withdrawal of the
        O'MELVENY & MEYERS, LLP
11  drug.  TTORNEY FOR THE DEFENDANT, MERCK

12          We have resolved in a form of stipulated

13  order, and we're going to finalize it after the

14  conference and submit it to your Honor, and there are

15  no open issues.  It is a matter of taking our

16  handwritten notes and putting it into the form to be

17  submitted to the Court.

18          THE COURT:  Great.

19          MR. BUCHANAN:  There does remain issues with

20  respect to defendants' treatment of confidential

21  information, but we can address that later in the

22  conference.

23          That's been the principle issue we have been

24  able to resolve.  We have exchanged some deposition

25  dates.  Timing may or may not be a concern.  I think as

2

---

Transcript - Monthly Status Conference (2004/12/16)
1   your Honor will recall, I alerted you to our concern

2   about not getting deposition dates until fairly

3   recently.  Many of those arrived to us today.  We need

4   to coordinate a little bit and find out the timing of

5   the document productions in connection with those

6   witnesses and see if we can firm it up, but we have a

7   general concern about the delay in the provision of

8   deposition dates, as well as the associated document

9   productions.  We're concerned that it is a process

10  that's been put in place to delay us.  Whether

11  intentionally or not, it certainly is having that

12  impact.

13          We may be able to talk about that.  I think

14  the schedule in connection with talking about trial

15  cases I think they may be wrapped up one in the same,

16  which we have not resolved in the proposal -- an agreed

17  proposal of the order of the first cases to go to

18  trial.  My suggestion would be since that issue drives

19  a lot of the further discussion that we start with that

20  or, perhaps, the pending motion for the deposition of

21  Mr. Gilmartin.

22          THE COURT:  Okay.

23          MS. SULLIVAN:  Your Honor, as Mr. Buchanan

24  has highlighted, the parties have been working very

25  hard to conduct discovery, get depositions scheduled.

3

---

Transcript - Monthly Status Conference (2004/12/16)
1   Many depositions have been scheduled and some taken.

2   Since the last court conference Mr. Cohen has been

3   working hard to get additional documents to the

4   plaintiffs.  The defendants are requesting, and we have

5   talked to the plaintiffs about this, some minimal

6   relief on the schedule.  Merck, like the Court, and

7   like the plaintiffs in this case, is interested in a

8   trial date almost consistent with your Honor's Case

9   Management Order No. 3.  The Court initially suggested

10  that the first 15 cases discovery would end on April

11  1st, 2005, looking toward a trial date some time in

12  early summer, and notwithstanding the change in

13  circumstances mandated by the withdrawal, conducting

14  and analyzing the data from the APPROVe study

15  we'll need some extension on that but not a

16  considerable amount of time.

17          The holiday schedule, the fact that many of

18  the witnesses that the plaintiffs would like to depose

19  are involved in gathering data and information for

20  finalizing the submission to the FDA for this APPROVe

21  study that their depositions -- the subject matter of

22  their depositions will center in part on the APPROVe

23  data, it is important to avoid duplicative depositions

24  of these witnesses, that that data be available and

25  analyzed by these witnesses before they're deposed, and

4

1    we have suggested a schedule to the plaintiffs.

2        We would like an extension of at least 60

3    days to -- in terms of fact discovery until the end of

4    April, your Honor, and then could suggest the discovery

5    for expert depositions and expert disclosures that

6    would get us a trial date, perhaps, in July if that

7    worked with the Court's calendar and consistent with an

8    expedited trial in these cases.

9        We have worked very hard, Judge, consistent

10   with the Court's order to work up the first 15 cases.

11   There have been -- even before the suggestion by the

12   plaintiffs -- that they didn't want to try any of the

13   first 15 cases, we had taken some 30 plus depositions

14   in those cases. We have -- since that time since

15   October, Judge, have taken an additional 15 treater

16   depositions. We have got others scheduled. We are

17   essentially -- except for a handful of depositions --

18   substantially complete in terms of the work-up of the

19   first 15 cases, and it is defendant's position that we

20   can submit something to the Court that the first 15

21   cases are, indeed, representative.

22       You have got a fair mix of injuries, cardiac

23   injuries, stroke injuries, GI and kidney injuries. The

24   duration of use is a wide range. You have short-term

25   users. You have long-term users. You have various

1    dosages in that mix. And because of the enormous time

2    and effort consistent with the Court's orders that, you

3    know, this was a random selection, it is an appropriate

4    way to select cases for trial as suggested by the

5    Manual on Complex Litigation that these cases -- from

6    these cases the first cases would be tried.

7        We have spent a lot of time working up the

8    cases. Experts have analyzed the cases, and if,

9    indeed, there is going to be a change from selection of

10   the initial trials from that wave of cases, certainly

11   in fairness, your Honor, the defendants would ask for

12   more time to work up -- if there was going to be

13   work-up of new cases -- and in connection with that

14   additional time could space out some of the corporate

15   witness depositions to permit the gathering of the data

16   from the APPROVe study, to permit the Merck witnesses

17   to focus many of the witnesses or at least a fair

18   number of them that the plaintiffs seek to depose are

19   going to be involved in FDA Advisory Committee on COX-2

20   inhibitors in February, and they have been working hard

21   to prepare for that and will be concentrating on that,

22   and so an extension of the schedule, permit those folks

23   to be deposed in March or April as opposed to in

24   February conflicting with the Advisory Committee.

25       So I guess the core issue, as Mr. Buchanan

1    flagged it, Judge, if we are going to stick with the

2    first 15 cases for trial selection -- and I'm happy to

3    make the argument as to why the Court should do that --

4    we need a brief extension of the schedule to permit a

5    handful of deponents to get scheduled, but if the Court

6    is going to go beyond the first 15 cases for trial

7    selection a more reasonable and longer extension of

8    time would be appropriate, Judge, to permit these

9    witnesses to be deposed in an orderly fashion and to

10   permit Merck to work up an additional slate -- a new

11   slate of cases.

12       Your Honor's Case Management Order that set

13   discovery deadlines had a four-month -- which is

14   reasonable in terms of conducting fact discovery -- had

15   a four-month gap between the first wave and the second

16   wave as far as the end date for discovery work-up. And

17   so that really is the core -- and there are other

18   things on the agenda to discuss, but the core issue is

19   more time for deposition scheduling, and, also,

20   frankly, Judge, to permit coordination on some of these

21   witnesses with, we hope, the MDL and, certainly, with

22   Texas and California where we're now getting multiple

23   notices for the same witnesses, and we would like to

24   minimize the duplication and resources of putting these

25   people up multiple times.

1        MR. MAYER: And to add a little more flesh on

2    where we are on the depositions we have produced on, I

3    think, this week the updated custodial files of the

4    list of witnesses that we were looking from for

5    plaintiffs' deponents. When we started the update

6    process plaintiffs had subsequently added additional

7    witnesses to that list, and we're getting those updated

8    files -- and we need to get the updated files produced

9    by the end of December 31st. And then we have a very

10   full January schedule. I think we have seven dates in

11   place for witnesses. We're trying to add at least two

12   or three more to the January schedule. We talked to

13   plaintiffs about who they particularly need for their

14   experts, and we're trying to get them moved up to the

15   front so we can be consistent with people's schedules,

16   and then we'll have another load of witnesses in

17   February and in March to get through the scheduling,

18   and then our proposal is the most senior people to be

19   in April when the others have been deposed on the

20   documents that have been produced.

21       MR. SEEGER: Judge, let me address a couple

22   things. I just think for the record it is important to

23   clarify something. My recollection of what's been

24   going on here for well over a year is the Court's

25   statements have been with regard to the first 15 that

1  if a proposal did not either come from counsel or from
2  you then the policy was typically first in first out.
3       The defendant hasn't really begun to do any
4  discovery in the first 15 cases, other than deposing a
5  few plaintiffs, until I raised the issue with the Court
6  during the Stempler hearing where we said we need to
7  start talking about trials.  Ever since then they have
8  been noticing depositions of treating doctors, and they
9  have really gotten a flurry of activity going on the
10  first 15.
11       The other thing is to the extent we were
12  going to talk about whatever guidance we get from the
13  manual, which is not law, but does provide guidance
14  with how trial cases are selected in MDL's and in state
15  courts, the manual says that the parties should
16  select -- "parties should select cases that are typical
17  of the mix of cases."  So if the Court remembers the
18  very first time we talked about this I was very up
19  front about the fact that I don't think the first 15
20  represent the mix.  It is a litigation that primarily
21  is going to be about myocardial infarctions.  Strokes
22  are also a main injury category, but people in the
23  first 15 cases who filed in '01 and '02 when it is our
24  position -- and I'm not trying to be over the top on
25  this, but it was our position that the information

1  wasn't made public by the company, people filed kidney
2  cases, and they filed all other types of cases.
3       So the first 15 will give us no guidance on,
4  you know, where this litigation is going.  Again, to
5  the extent you want to look at the manual it is Section
6  22.315, and I'll quote from it.  It says, "Test cases
7  should produce a sufficient number of representative
8  verdicts and settlements to enable the parties and the
9  Court to determine the nature and the strength of the
10  claims."
11       Our position on trial cases has always been,
12  and we have been meeting and we have all been talking
13  and working real hard to work through this, but our
14  position is we're not going to give you five people
15  that have had no risk factors for heart attack and then
16  suffered a heart attack on VIOXX.  We will all agree
17  for the sake of argument on this issue that that is a
18  very, very strong case, and that probably would never
19  see the light of day because the defendants would
20  settle that.
21       The litigation in your court, your Honor,
22  which is the central battle ground in the United States
23  is, you know, all the other people out there, all of
24  the people who did have risk factors for cardiac
25  issues, who smoked, who should have been warned about

1  the prothrombotic nature of the drug.
2       Now, if that isn't the battle ground then
3  there is no other battle ground here.  So our proposal
4  would be plaintiffs would take five cases that would be
5  representative of the group, and we have even said to
6  defendants, You have all your objections intact, if you
7  think that the statement I now make on the record that
8  these cases need to be representative of the injuries
9  if we, in fact, have not proposed that they can address
10  that with your Honor.  But until we really get the five
11  cases set for trial we're going to have these issues
12  that you're going to be confronted with at every status
13  conference about discovery and, you know, what they
14  need to do and what they don't need to do.
15       We still are hearing about the APPROVe study.
16  It was late September -- mid September when that study
17  blew up, and we knew what happened, the drug was pulled
18  off the market.  In one week they made a decision to
19  pull a $2 billion a year drug off the market, but now
20  we're sitting here in late December, and we're still
21  hearing they haven't analyzed the data, that their
22  people need to go to, you know, Advisory Committees.
23  We have already had Ray Gilmartin testify before
24  Congress.  When are our plaintiffs going to get this
25  information?  When are they going to get their day in

1  court?
2       So from our perspective that's what this is
3  about.  We're not looking to say to Merck, you know,
4  take five 25-year olds that have had no existing risk
5  factors and suffered a heart attack.  They're not going
6  to let that case see the jury no more than if they
7  select five cases that are so heavily confounded or
8  involve injuries that there's no science on will those
9  cases see a jury.  And I don't think your Honor has an
10  interest in trying hundreds of cases, so what generally
11  happens is we come up with bellwether cases.  It is
12  suggested in the manual.  It was done by Judge
13  Corodemus and Judge Friedman in New York.  There are
14  people in this room -- I have tried Resulin cases in
15  front of Justice Friedman in New York.  There are
16  people who are involved in asbestos.  There's always
17  been a method for proposing representative cases, and
18  that's what we're trying to do.
19       And then --
20       THE COURT:  Have you discussed which cases
21  you wanted to try with defense counsel?  Do you have
22  specifics?
23       MR. SEEGER:  We have discussed very
24  specifically, and, again, I believe that counsel has
25  acted in good faith on both sides and we may need your

1  guidance on this, but we have discussed specifics for
2  this, and I think the concern by Miss Sullivan and her
3  colleagues is that plaintiff is going to come up with
4  five 25-year olds, and everyone is going to say, Wow,
5  five 25-year olds don't have heart attacks when they're
6  on VIOXX, and that is not our intention here.
7      We really haven't made any progress.  I can
8  get into the specifics, but since we're negotiating on
9  it I don't think it would be appropriate to reveal the
10  things we have talked about specifically, but the basic
11  proposal from our side has been, you know, we will take
12  five cases.  You like the first 15.  Pick your five
13  from the first 15.  We submit those to you.  You can
14  either decide you're going to do a big consolidated
15  trial in the first case, and we haven't talked about
16  consolidation of cases, but we're going to want to
17  after we select the trial cases, or you can pick two or
18  three from the plaintiffs' side or two or three from
19  the defense list, then we just -- that's all we have to
20  do for the next four months is work on getting those
21  worked up.
22      Miss Sullivan, I think, has conceded today
23  that she thought the four-month scheduling, the trial
24  cases backed up four months by four months was a fair
25  schedule.  Well, we're in December, and, you know, I

1  issue that has been the sticking point -- certainly we
2  thought, and, you know, we can argue about it, but that
3  the first 15 cases did contain a representative number
4  of cardiac cases, stroke cases, wide range of ages,
5  wide range of users.  We spent a lot of time and money
6  working up those cases, and it is not worth burdening
7  the Court, but we did take 30 depositions before
8  Mr. Seeger raised the issue of going beyond the first
9  15.  We have taken 12 since then, and we're just about
10  finished.
11      MR. SEEGER:  They weren't treaters.  I want
12  to be clear.  They were plaintiffs.
13      MS. SULLIVAN:  That's actually not true.
14  Twelve of them were treaters, but we can quibble about
15  that issue.  The core issue, your Honor, if the Court
16  is going to be inclined, and we would argue that, you
17  know, the random selection that the Court has set up;
18  that is, that we have got the first filed cases that's
19  a random sampling and from that mix pick representative
20  cases is one of the ways that courts have done it and
21  insures that you do get a fair representative sample.
22      What Mr. Seeger is suggesting, and that is
23  that plaintiffs pick five cases and the defendants pick
24  five cases has actually been criticized in the manual
25  that Mr. Seeger referred to and that I have referred to

1  don't know if your Honor is inclined to give any extra
2  time to the defendant.  We oppose it.  We don't think
3  it is necessary or appropriate, but even if we were to
4  stick with the original schedule, which is April jury
5  selection --
6      MS. SULLIVAN:  In fairness, Mr. Seeger, that
7  was never -- the original schedule said discovery
8  deadline was April 2005.
9      MR. SEEGER:  I might be working off maybe
10  some of our discussions, but let's say jury selection
11  is May, all right, for the sake of argument without
12  holding -- you know, I don't want to fight over two
13  days or two weeks at this point in the case.  It is
14  late in the case.  What we want to do is see to it
15  these cases get ready for trial.  Now it is December,
16  so if jury selection is May 1 you have five months to
17  work up these cases.
18      THE COURT:  Have you given her a list of the
19  cases you want?
20      MR. SEEGER:  We can do that today before we
21  leave, but we haven't because we have been negotiating,
22  and we haven't been able to agree to a protocol.
23      MS. SULLIVAN:  And, your Honor, here is the
24  issue, I think that the plaintiffs and we could agree
25  on a reasonable discovery and expert schedule.  The

1  in the section that Mr. Seeger cites Section 2213 --
2  22.315.
3      THE COURT:  I reviewed the manual, and I
4  recognize that it talks about some randomness as a
5  preferable means.
6      MS. SULLIVAN:  Right.  And it is critical,
7  your Honor, of the mechanism that the plaintiffs
8  suggest where the courts let the parties choose the
9  cases where they submit 15 or five and we submit 15 or
10  five because what the judiciary says in the manual is
11  that that gets you the best cases and the worst cases
12  and doesn't give you reliable information for the mix.
13  And a better way to do it is from some random mix.  And
14  here we do have a system set up by the Court where
15  randomly the first 15 were accelerated for preparation
16  and presumably trial, and selecting from that mix is
17  bound to give you a more representative sample than
18  picking the best and worst cases submitted by the
19  parties.
20      MR. SEEGER:  I just have to again for the
21  record just disagree with the characterization of the
22  first 15.  I recall, your Honor, in many, many status
23  conferences saying discovery proceeds on all cases.
24  The only reference to the first 15 was if you didn't --
25  if your Honor didn't propose another system and the

1   parties couldn't agree then the first 15 would go, but
2   there was never a mandate by your Honor that the first
3   15 shall go.  It was -- I think I got the sense the
4   Court was always open to an alternative.
5       So, you know, why Merck would choose to do,
6   again, only 12 treating deps at the time we brought
7   this up, which is now, I think, a couple of months
8   since the Stempler argument and then since that date to
9   notice up deposition after deposition of treating
10  doctors -- we have one case I think they want five or
11  six treaters all the sudden.  That happened since we
12  raised the trial issue.  So I don't think they should
13  get relief or be rewarded for a condition which they
14  created as a strategy really to get out of having -- to
15  put themselves in a position to try the cases they
16  like.
17      The bottom line here is I'm not going to
18  argue with the fact -- I agree with Miss Sullivan on
19  one thing she said.  If the plaintiffs were to propose
20  their five best cases and they were to propose the five
21  worst that would not really advance the interests.
22  That's not our proposal.  The proposal is to propose
23  five cases that will inform this Court and courts
24  around the country on where the real battle ground is
25  in terms of these injuries, and, frankly, that is

1   people who were at risk for cardiac issues and were not
2   warned, took this drug then suffered while on the drug
3   an MI or a stroke.
4       I mean, another proposal could be we could
5   submit, your Honor, five or six cases to you and you
6   could look at them in advance of us submitting them to
7   the defendant to see they do cover the gamut, they
8   could strike two or three if they want.  But, you know,
9   to have to work up -- one of the proposals -- one of
10  the ideas that went out was, you know, let's look at --
11  give us 30 cases.  To get 30 cases ready for this
12  process -- to go through 30 cases you have to go
13  through all the meds.  It is a tremendous amount of
14  time for us while we're taking depositions, while we're
15  reviewing the discovery that we're getting in all of
16  this.  What I am proposing is something more modest
17  five and five.  If they don't like that we will submit
18  five cases to you and you can look at them and make a
19  judgment as to whether they're, in fact,
20  representative.
21      MR. SIZEMORE:  Judge, it is my understanding
22  that in California, which is the mirror of the
23  consolidated litigation we have here, what the judge in
24  that case has done is ordered the plaintiffs to produce
25  five cases, and those are the five cases that are going

1   to be tried, and I believe Mr. Mayer has some
2   affiliation with that case, and he can speak to that.
3       MR. MAYER:  The judge has not actually ruled
4   yet.
5       MR. SIZEMORE:  That is under consideration,
6   and that was my understanding of how the judge was
7   probably going to proceed.
8       MR. MAYER:  He is accepting briefing on the
9   issue, and he is making a ruling on that in January, so
10  he has not ordered any trial selection method yet.
11      MS. SULLIVAN:  And, your Honor, we were
12  working up these cases not to make a show that it
13  should be the first 15, but we have an order that says
14  expert reports are due in these cases in January and
15  February, and consistent with that we were getting that
16  done.  And it is a random sampling, and the plaintiffs
17  have not highlighted in terms of objective factors what
18  about the first 15 is not representative if you look at
19  the injuries and the plaintiffs there as compared with
20  the whole.
21      And if the Court is inclined not to choose
22  among that random sample that's already been worked up
23  then the proposal by Mr. Seeger doesn't get you
24  representative trials, it gets you the best and the
25  worst contained in the universe of claims or tends to.

1   An approach, perhaps, where you do have a wider array
2   to choose from -- if they gave us what they thought
3   were their best 30; we gave another 30, and we picked
4   two or five from each of there you would get closer to
5   the middle, but when they say they are going to take
6   their five best cases and that should be in the mix,
7   and we should take another five cases and that should
8   be in the mix those would be the outliers.  It is not
9   going to give you representative cases that gives you
10  reliable information.
11      The Court is going to spend a lot of judicial
12  resources, the parties are going to spend a lot of
13  resources working up and trying these test cases in
14  order to get reliable information to assess the value
15  of the whole, and it is critically important that we do
16  get representative -- we agree on one thing, that we
17  should get representative cases.  And one way to do
18  that, as suggested by other courts, is a random
19  sampling such as the first filed and picking from that
20  mix, particularly since the plaintiffs -- at least I
21  haven't heard, your Honor, the plaintiffs outline
22  objectively what is it about that mix of cases that is
23  not representative.
24      THE COURT:  It is very simple.  I mean, there
25  is a natural order in most litigation, which is first

1  filed first tried.  So that's a simple means of

2  administrating cases.  Clearly that's not been

3  considered the most successful way to handle mass torts

4  because there's always been discussion about

5  representative cases, bellwether cases.  You just don't

6  want to try the first five cases if they're not the

7  best or worst or in the middle; just because they're

8  the first five necessarily.

9       And I never intended, and I said this right

10  from day one on the record and not on the record

11  initially for the first 15 to necessarily be the first

12  15 trials.  What I said right then was would someone

13  please propose to me how we're going to pick the first

14  trials.  And I have said that since day one, and nobody

15  really has and nobody still is.  And in the last couple

16  meetings I have specifically said, Give me your list of

17  which cases you want to try, and I'm sitting here right

18  now and I still don't have that.  And which case is it

19  you want to try?  If you have five let me know what

20  those five are.

21       But we're not going to keep putting this

22  off --

23       MR. SEEGER:  I agree.

24       THE COURT:  And in looking at the Manual for

25  Complex Litigation, which I did review again before

1  this -- with a focus on that -- it appears that they do

2  suggest that there should be a randomness to it, that

3  maybe just letting counsel choose has negatives.  So

4  since then I have been looking at other ways that we

5  could -- that I could focus.  It is difficult for me to

6  do that because it is true, I don't know what would be

7  a bellwether case or what would be a representative

8  case.  I don't have enough information about these

9  people -- maybe you don't either -- for me to have any

10  real sense of that.  But I think the defense is right

11  in the sense that if we have a random group of X number

12  of cases, whether it is 15 or 20 or 30, and plaintiffs

13  can't find one of those that they want to try then, you

14  know, I don't know why.

15       MR. SEEGER:  Well, the way --

16       THE COURT:  It doesn't have to be -- let me

17  just say this, the one thing I'm going to do today

18  is -- I plan on resolving this today.  I don't intend

19  to make it the first 15 by date because having looked

20  at those they represent heart attack, stomach ulcer,

21  gastrointestinal, stroke, kidney failure,

22  gastrointestinal, kidney blood clot.  My thought was

23  that we should start with heart attacks.  And we should

24  deal with heart attack cases first.

25       Now, whether we want to take the first 15

1  heart attacks by docket number, whether we want to take

2  the first 15 -- in which case we would take all the

3  heart attacks from the first 15 as some of those, so

4  some of the ones that defense has already worked up

5  would be included and then just add the next.  Whether

6  we want to skip to those -- another thought of mine was

7  we could take the rest of the 15 or 20 or whatever it

8  is from New Jersey cases only.  New Jersey plaintiffs.

9  Because it would be a speedier discovery process if the

10  next 10 that you had to take were all people that lived

11  in New Jersey and their doctors are in New Jersey or at

12  least they lived in this area.  It would keep the

13  jumping around the country to a minimum.

14       MR. SEEGER:  One of the cases -- just so you

15  know where you're going with this I think is okay.  I

16  mean, one of the cases we were going to submit to the

17  defendant is a young police officer, 52 when he had a

18  stroke -- his heart attack, rather, but's he's a New

19  Jersey resident, and he would be one of the first

20  cases.  We intend to propose a New Jersey resident.

21       MS. SULLIVAN:  He is in the first 15?

22       MR. SEEGER:  McFarland.

23       MS. SULLIVAN:  He is in the first 15?

24       MR. SEEGER:  No.  But I would also say, your

25  Honor, just one --

1       THE COURT:  Was he in the first 15 heart

2  attacks?

3       MR. BUCHANAN:  I didn't anticipate the

4  traunching, your Honor.  I can give you the docket

5  number.

6       THE COURT:  I had my secretary divide it up

7  into states so I can look at just the New Jersey cases,

8  and I had her divide them up into heart attacks so I

9  could look at just the heart attack cases.

10       MS. SULLIVAN:  Your Honor's suggestion is a

11  good one for representativeness because if they can

12  pick from, you know, the first 15 or first 30 heart

13  attacks and we can pick from the first 15 or first 30

14  heart attacks a couple of cases that's a random

15  selection, we're going -- we get closer to the middle

16  of the pile.

17       MR. SEEGER:  Actually --

18       THE COURT:  So what is your policeman's

19  number?

20       MS. SULLIVAN:  I guess I found out what their

21  best case is.

22       MR. BUCHANAN:  It is a New Jersey case.

23       MR. SEEGER:  First of all, Mr. McFarland's

24  case is a serious case.  He had a family history of

25  cardiovascular disease.  He was 52 years old.  He was

1  on the drug.  He was 25, 30 pounds overweight, and he
2  is now out of work and he has two young kids.  He is
3  the perfect test case.
4        See, the problem with taking the first 15 or
5  30 is if you look at the docket dates at that time we
6  had very little science.  Now we have discovery.  Now
7  we have the epidemiological studies that have come out.
8  Now, if your Honor would like us to take the first 15
9  MI's from the first 100 filed we can do that and then
10  we can figure out a system how to boil that down into
11  trial cases, but I would tell you if you're looking for
12  a New Jersey resident Mr. McFarland would be our
13  proposal for a trial case in April or May.  ·I'm sure
14  Mr. Weiss has a case he can propose, as well.  If you
15  want to stick with New Jersey I think that's a great
16  idea.
17        THE COURT:  I think maybe we should try to
18  pick a category --
19        MS. SULLIVAN:  Agreed your Honor.
20        THE COURT:  -- then choose somebody from
21  those categories.  Because right now you're right, we
22  probably have poor Mr. McFarland I'm sure that's now
23  the only person the defense doesn't want to now try.
24        MS. SULLIVAN:  Give me a few more names.
25        MR. SEEGER:  If that's true then they should

1  take care of Mr. McFarland.
2        THE COURT:  They would probably be happy now
3  if we just said they can pick anybody but him.
4        MR. SEEGER:  Well, the truth is to the extent
5  if you want to limit it to New Jersey and MI's in the
6  first cases Mr. McFarland is a New Jersey resident, and
7  he is the classical plaintiff.
8        THE COURT:  There was no reason to -- I mean,
9  as I said, it is not that New Jersey plaintiffs should
10  have any difference than anybody else than just for
11  discovery.  Defendants were indicating that they were
12  going to have -- if I'm going to add new people now,
13  and I still want you to be on an April time frame.
14        I also was concerned about counsel.
15  I didn't divide it up that way, but let's face it you
16  may want to have liaison counsel's case tried first.  I
17  don't know if that's a factor -- if that's important or
18  not important.
19        MS. SULLIVAN:  We may be able to reach
20  some -- we may be able to reach some agreement on the
21  counsel issue, but your Honor's suggestion that we look
22  at a batch of random cases based on filing date in New
23  Jersey, maybe the first 30 cardiac cases and each
24  select a couple from that mix is a reasonable way to
25  get your representative cases.  Having not looked at,

1  you know, the specifics beyond the first 15 it just
2  sounds like consistent with the manual a reasonable
3  way, rather than them saying I want Mr. McFarland and I
4  say I want Mrs. Smith.
5        MR. SEEGER:  Only because New Jersey came up.
6  It is fine, and this has been one of the problems, and,
7  again, I'm not being critical.  Miss Sullivan is doing
8  her job.  But if you want -- your Honor, how about this
9  as a proposal so we can resolve this?  Plaintiffs will
10  come up, it will be an MI case the first case.  The
11  plaintiffs will come up with 15 cases we believe run
12  the gamut.  We will give you detailed summaries of
13  their medical history then we will give that to
14  defendant.  Then the defendant could pick 10 out of
15  that 15 that they like, and you can make a decision as
16  to which ones will go first.
17        MS. SULLIVAN:  That's exactly, your Honor,
18  what the manual, as your Honor highlighted, was
19  critical of, that the parties shouldn't be the ones
20  proposing the cases; a random selection is more likely
21  to get you representative cases.  So your Honor's
22  proposal where we pick the first 30 MI cases in New
23  Jersey and Mr. Seeger and his colleagues pick two from
24  there and we pick two from there is likely to get you a
25  much more representative sampling of cases than the

1  plaintiffs' best 15 or our best 15.
2        MR. WEISS:  Your Honor, in all fairness that
3  does not get you what you're looking for because
4  there's going to be two pristine cases in the first 30
5  and there's going to be two dogs in the first 30.
6  They're going to pick the dogs.  We're going to pick
7  the pristine cases, and right back to where you
8  were before.  I think the Court needs to have some
9  guidance from both sides as to what the representative
10  bellwether cases should be, and you haven't gotten that
11  yet from either side.
12        MR. JACOBY:  Your Honor, I think what has
13  worked in the past on this in previous litigations is
14  you need -- we all need to have before we get the names
15  of cases we need to have selection criteria, and each
16  side has to put forward we want one person of 50 that's
17  been on the drug for a year and took it before the
18  label change.  We want one person that's been on the
19  drug for six months and been on the 25 milligram and
20  all these various things so you can look at those, you
21  can analyze those and when we sit down and apply those
22  criterion we find the cases.
23        I think we're doing it a little bit putting
24  the cart before the horse.  The initial inquiry has to
25  be the case selection criteria just as we all have it

1  when we take our cases we have to have it for trial,
2  and we have to in a sense defend to you and defend to
3  our opponents as they did us why we selected these
4  cases.  If we're truly going to get various dose and
5  duration, prelabel change and all the factors that go
6  in so when we do take the first five we will -- it is
7  never going to be perfect, but we will cover the
8  spectrum of litigation as much as we possibly can and
9  to look at the cases first and extrapolate is going
10 backwards.
11       MR. SEEGER:  The randomness, by the way, the
12 way I read the manual -- and I sat down last night and
13 read it and reread it because we were negotiating it --
14 the randomness I didn't feel related to what type of
15 case got selected, it related to what cases got tried.
16 It is first to narrow down that first group of cases
17 that are representative then the Court randomly will
18 select a handful -- five out of that.  That's how I
19 view randomness.
20       Also, these first cases are going to drive
21 the science motions.  The Landrick and Rubanick motions
22 are going to be first five or 10 cases, whatever your
23 Honor selects, so if we're not here at this point
24 litigating the central issue and that is giving this
25 drug to people -- not warning people who are at risk

29

1  for cardiac conditions and then they went ahead and had
2  it while on the drug it is not going to do much to
3  inform settlement discussions or anything else.
4       MS. SULLIVAN:  But to go to Mr. Seller's
5  point, your Honor.
6       MR. JACOBY:  Sellers?  Thank you so much.
7       MS. SULLIVAN:  That was bad.  To go to the
8  point that there were certain factors that the parties
9  may like, the parties can control that and your
10 proposal if, for example, if we throw all the New
11 Jersey MI's in the mix and they select some from there
12 and we select some from there they can look at the
13 factors they want, if they want somebody with 18 months
14 or more duration, if they want somebody in a certain
15 age range and vice versa, and it gets you at least a
16 more randomized selection process.
17       I mean, the parties can control further
18 factors than proposals from Mr. Seeger or my colleagues
19 of specific cases which tend to give you a skewed
20 sampling as opposed to a middle of the pack sampling.
21       MR. SEEGER:  Can I make a proposal --
22       THE COURT:  I was going to say I do think
23 that the idea of some -- which is what I was trying to
24 do in the most broad sense, which was the New Jersey
25 and heart attacks, it makes sense to also have other

30

1  criteria, and I think that does -- can keep the
2  randomness of it.  If you say that every plaintiff --
3  we're going to take the first 10 over 50 plaintiffs
4  that had heart attacks or we're going to take the first
5  10 --
6       MS. SULLIVAN:  I would like that.
7       THE COURT:  You know, New Jersey people.  I
8  don't know what it is that is important to put into the
9  criteria, but I'll tell you one thing I'm not going to
10 spend another three months doing this.  We're doing
11 this today.
12       MS. SULLIVAN:  Okay.
13       MR. SEEGER:  All right.
14       THE COURT:  So in the end I'm just a
15 pragmatist, and the bottom line is things have to get
16 done, and nobody is going to be 100 percent happy, and
17 nobody is going to get -- but on the other hand, I do
18 think it is extremely important -- I wouldn't even
19 spend this much time on it.  I would just say the first
20 15, but I do recognize what you just said about the
21 scientific hearings and things like that.  I don't want
22 to be spinning our wheels on some case that just
23 doesn't make a difference or try a case for a long time
24 and then have it be one but neither side thinks it is
25 representative so it is not going to matter.

31

1       We do want some type of -- I don't know if
2  you want to agree on some criteria and then -- I don't
3  know if the New Jersey thing, again, was only a
4  suggestion in order to make it easier for discovery so
5  that might be one good criteria.  You might think it
6  doesn't make any difference where they are.  But it
7  might make things quicker in the beginning to have
8  those people.
9       I think everybody agrees it should be heart
10 attacks.  So we have got one category that everybody
11 agrees on.
12       MS. SULLIVAN:  At some point --
13       THE COURT:  I think we have to eventually say
14 we're taking the first 15 or 20 with these criteria.
15       MR. JACOBY:  Right.
16       THE COURT:  And then we're not going and
17 looking at our files and picking the, you know, the
18 person with four kids.
19       MR. SEEGER:  I think we can do that.
20       MR. WEISS:  My suggestion, your Honor, is if
21 you give us five or 10 minutes to caucus with defense
22 counsel we might -- now that you gave us guidance --
23 come up with something.  Since we have been talking
24 almost around the clock for a better part of a week to
25 try to get this resolved --

32

1    THE COURT:  I think I have given you some
2  ideas of what I'm thinking.
3    MR. WEISS:  That would be helpful.
4    THE COURT:  Okay.  Then we'll go off the
5  record.
6    MR. MAYER:  Can I raise one more issue before
7  we do that?  This is Jeff Judd from O'Melveny and
8  Myers.  Jeff is working with us on the class actions,
9  the engineer's class action, so he is specifically here
10  to address that issue.
11    THE COURT:  Mr. Myers?
12    MR. JUDD:  No.  My name is Judd.  My law firm
13  is O'Melveny and Myers.
14    MR. MAYER:  If we can take care of that
15  business early Mr. Judd can go back to his office, and
16  I was wondering if we could take care of that.
17    THE COURT:  So before we break -- what issue
18  is there to deal with other than --
19    MR. SEEGER:  Maybe a couple of us could step
20  out and start talking about it?
21    THE COURT:  Well, the class action the
22  primary issue is the motion, right?
23    MR. BUCHANAN:  There's the motion for class
24  certification currently pending.
25    THE COURT:  And so far all I have is I have

33

1  got all the plaintiffs and I am waiting for the
2  defense.  Did we set timelines already?
3    MR. BUCHANAN:  We did.  Under the current
4  schedule, your Honor, their opposition brief is due
5  January 15th -- 17th, excuse me.  They have served
6  document requests.  We have responded.  They have
7  served interrogatories, 61 of them, about two weeks
8  ago, and we're working through them.
9    THE COURT:  So what is the issue, counsel?
10    MR. JUDD:  Our issue is one of timing.  We
11  clearly should have the opportunity to take plaintiff's
12  deposition, for instance.  We served a notice last
13  week.  It is currently set for next Monday, and that
14  isn't going to happen, I'm sure.  And, in fact, I'll be
15  surprised if it happens before the holiday, so we're
16  going to be into the holidays.
17    THE COURT:  What is wrong with next Monday?
18    MR. BUCHANAN:  Geez, your Honor --
19    THE COURT:  I didn't notice there was a
20  holiday or anything.  Is there a problem?
21    MR. BUCHANAN:  Realistically it will probably
22  happen the first week of January.
23    MR. JUDD:  If it happens the first week in
24  January we're not going to have sufficient time to fold
25  that into the briefing that we need to do, which is

34

1  currently due the 17th just by way of example.
2    MR. BUCHANAN:  Just a factual matter, they
3  served the notice December 10th, okay?  They served the
4  notice December 10th and wanted it for the 20th.  You
5  know, minimum statutory notice.  We're rolling it
6  basically, what, two weeks?  If they want another two
7  weeks for their brief, your Honor, I have no objection
8  to that.  These are the holidays.
9    MR. JUDD:  We received this (indicating) as
10  the document production in response to the first set of
11  request for documents on the 9th.  So I served a
12  request for deposition after I had a chance to review
13  this.  Fortunately, I guess, it was a fairly small
14  production so it didn't take long to review.  So
15  certainly it would hardly make sense to proceed with
16  the deposition if, in fact, there's going to be more
17  documents, which I assume there will, until we have had
18  the opportunity to receive and review the documents.
19  Because if we proceed with the deposition with this set
20  and then subsequent to that get a supplement then I'm
21  going to have to renotice -- or at least probably take
22  more of a deposition.
23    So this is not -- this is not a ploy to just
24  get more time.  I want to get some meaningful discovery
25  that I can do once and not have to continue renoticing.

35

1  And there are issues that are specifically addressed to
2  the class certification allegations in their motion,
3  and we should have the opportunity to explore that.
4  And we won't if we're held to the current schedule or
5  only given an additional two weeks, depending on what
6  they have by way of additional documents.
7    I'm certain there are more documents because
8  a number of these are specific in time frame.  For
9  instance, the prescription benefit plan only relates to
10  the 2004 time frame.  I don't know if it has changed
11  since 2000 or 1999, but I suspect it has, and that's
12  just one example.  But from my perspective we should
13  have the opportunity to get their documents, have a
14  meaningful review of them -- expedited but
15  meaningful -- and then take a deposition at the very
16  least, and I just don't -- I just don't know how --
17    THE COURT:  When do you expect all your
18  documents to be in his hands?
19    MR. BUCHANAN:  Your Honor, honestly, this is
20  the first time I heard there was a deficiency in the
21  production.  Have you sent a letter?  Excuse me.  Let
22  me just respond to a couple of things.  Factually, your
23  Honor, the first discovery request was served on the
24  plaintiff in this case I think it was October 25th,
25  okay?  This case has been on for over a year.  The

36

Transcript - Monthly Status Conference (2004/12/16)

1 first discovery request from the defense in this case
2 came after we advised your Honor in the October
3 conference that we were prepared to move for class
4 certification, and it is the first time they thought
5 about this case.
6 Now, with all due respect, at the last status
7 conference the Court advised they had 60 days from that
8 date, which was already 30 days after we filed the
9 motion and they filed their opposition.  This is not a
10 sand bag.  This is the first time I heard you had a
11 problem or suspect there's a deficiency.  I will do, as
12 you have done with me, I will go back and ask my client
13 if there's anything else.  I was told initially that's
14 all they had.  If there's additional materials I'll
15 produce them.  I expect them to be of the same form for
16 prior years, but I will do that.
17 Your Honor, there's a more global issue here,
18 though.  They served 61 interrogatories the first week
19 of December.  What's 60 days from, you know, the first
20 week of December?  That's well after their opposition
21 brief is done, and many of them are improper, but, in
22 any event, they then serve a deposition notice which
23 was actually the day after we made our production, but
24 it is the first time they have ever even come to us to
25 try to set a date.  They could have come to us and

37

Transcript - Monthly Status Conference (2004/12/16)

1 asked for a date at an earlier point in time and we
2 could have ironed out some of these issues.
3 I'm concerned there's something else at play
4 here.  It's no secret there are federal third-party
5 actions that have recently been filed.  There's an MDL
6 seeking to consolidate federal third-party actions.  It
7 seems like the intent here is to slow down our case so
8 some federal action can supersede what we have done now
9 for the last year in this court, and I am troubled by
10 that.  I am troubled by the delays in discovery, and
11 now they decide at this point in time, your Honor, you
12 can't put us in a position where we have to do class
13 certification without discovery.  I thought we did a
14 good job.  If there's deficiencies we'll cure them, but
15 I do think if there are any deficiencies that you have
16 observed will not trigger 50 boxes.
17 THE COURT:  I will not change the date for
18 the brief to be due other than giving you the two weeks
19 that counsel said, January 30th as opposed to the 17th.
20 MR. JUDD:  May I respond?  Will it change
21 anything?
22 THE COURT:  It is not going to change
23 anything either way.  I mean, the bottom line is you
24 have to take the dep of the plaintiff.  You take them
25 the first week in January.  He has got to make him

38

Transcript - Monthly Status Conference (2004/12/16)

1 available on a date that you choose during the first
2 week in January and/or the representative or whatever
3 it is, and then I want the briefs, and I really --
4 actually, I would like to -- if counsel hadn't agreed
5 to the 30th I was going to keep it to the 17th, and I
6 would prefer to it keep it to the 17th because I know
7 we're not going to have oral argument and decide this.
8 You understand, that's your brief then they're going to
9 file opposition -- and the bottom line is in your brief
10 you can argue that you need X, Y, Z additional
11 information, but I'm going to need to know why you need
12 it because you have had a year -- two years now.
13 MR. BUCHANAN:  There was a prior action.
14 This action is actually on for a year.
15 THE COURT:  It has been filed for a year.
16 MR. JUDD:  I understand that.
17 THE COURT:  So if you haven't gotten your
18 discovery, whose fault is that?  Not mine because I
19 have compelled discovery in this case any time I have
20 been asked for both sides, and I mean, I keep the
21 pressure on to give you what you need for both sides,
22 but if you don't ask for anything for a year, hey,
23 that's not my problem.
24 MR. BUCHANAN:  Your Honor, there's an
25 ancillary point, and I realize I should have held out

39

Transcript - Monthly Status Conference (2004/12/16)

1 and I could have had their opposition brief a few weeks
2 earlier, but there is one point.  These motions are
3 supposed to be and historically have been primarily
4 driven by pleadings and a preliminary inquiry into
5 merits and that's it, and that's why you don't need to
6 turn Local 68 inside out.  I didn't need to turn your
7 client inside out.
8 THE COURT:  I understand -- I'm just saying
9 even -- the bottom line is the discovery of the
10 deposition is -- we already had this argument, counsel.
11 We had this argument at the last meeting.  At the last
12 meeting it was discussed, and at the last meeting it
13 was discussed -- for some reason we talked about it in
14 chambers so maybe it wasn't on the record.
15 MR. BUCHANAN:  It is in the order, your
16 Honor.
17 THE COURT:  But there was discussion
18 specifically about the class action and the fact that
19 the certification motion and plaintiffs' counsel
20 expressed their concerns about the federal litigation,
21 and defense counsel indicated that they needed a little
22 time, they needed to get a dep, they needed to get some
23 records and then they would be ready.  So you get
24 another two weeks.  January 30th.  If that's a weekday.
25 If not, the first weekday before then, okay?

40

1   MR. DAVID COHEN:  If I might just raise an
2   issue briefly.  I'm David Cohen here on behalf of the
3   consumer class action that was filed in Camden and
4   recently transferred to you.  We had a discussion at
5   the last conference in your chambers.  I don't mean to
6   throw a wrench into any of this.  In fact, it sounds
7   great to me that certification in the class cases is
8   moving along on a good pace.  I'm just wondering
9   whether for the sake of consistency or with an eye
10  toward judicial economy whether it doesn't make sense
11  for us to file our class brief essentially
12  immediately -- this week or within a week and get on
13  the same track so that the -- because I understand the
14  same firm same attorneys are going to be defending our
15  case, as well.
16      It seems to me that if we file our class
17  brief within a week we could be in the same position
18  and save everybody some work.  I mean, obviously, I
19  would like to have a chance to talk about this with
20  counsel, but seeing as we're all right here now I'm
21  certainly willing to do whatever it takes to make this
22  easier on everybody.
23      MR. CHARLES COHEN:  Last time we had his case
24  which was in Federal Court we took depositions of the
25  plaintiffs and some very limited discovery and got

1   summary judgment.  So I think we need to do the same
2   thing here, take depositions of your named plaintiffs
3   and see if there's a summary judgment motion coming
4   down here for exactly the same reasons as what happened
5   in the federal case that we had.
6       MR. DAVID COHEN:  Well, in all fairness
7   summary judgment was based on facts that are
8   substantially different than the facts are today, and
9   the case was really decided on a choice of law issue
10  having to do with application of Pennsylvania law over
11  New Jersey law and based on the circumstances in that
12  case.  There was no resolution of that litigation on
13  the merits as they apply to New Jersey law or the
14  issues in front of your Honor.
15      MR. JUDD:  Nevertheless, your Honor, I would
16  like the opportunity to review the complaint, and it
17  would be my preference, and I, frankly, think it would
18  conserve the Court's resources if we had an opportunity
19  to evaluate the legal sufficiency and, perhaps, bring a
20  dispositive motion before proceeding with class
21  certification because if we can dispense with the case
22  on that basis it is much preferable than getting into
23  certification in discovery mode and then bringing a
24  dispositive motion later.
25      MR. DAVID COHEN:  Sure, but I can sit here

1   and say --
2       THE COURT:  Was it the same plaintiff?
3       MR. DAVID COHEN:  No, no, your Honor.
4   Different plaintiff same theory and a very similar
5   theory, if not exactly the same theory as pressed in
6   the engineer's case and from a review of your Honor 's
7   memorandum decision I can tell you right now we're not
8   going to be dismissed on a preliminary motion.  It is
9   the same --
10      MR. CHARLES COHEN:  I don't think either side
11  would agree --
12      MR. JUDD:  The little that I have heard
13  suggest that this is an inflated price theory, which
14  the courts in New Jersey have routinely thrown out as
15  simply not establishing, not being suitable for class
16  treatment because it requires a lot of individualized
17  proof by a plaintiff.
18      THE COURT:  Let me say this, I put a lot of
19  pressure on to have discovery done and have deadlines,
20  and I am holding Merck's feet to the fire.  There's no
21  question about that.  I'm not going to do it in a case
22  that was just filed and just transferred here, though.
23  I mean, one of the reasons why I'm being so restrictive
24  with Merck's discovery now is the engineering case has
25  been pending for a year or over a year, and we have

1   already had motions on it.  We have dealt with some of
2   the issues, and discovery supposedly has been ongoing
3   in it, so I don't have too much sympathy.  But in a
4   case where -- I mean, how long ago did you file your
5   action?
6       MR. DAVID COHEN:  I can tell you exactly.
7       THE COURT:  It was transferred from Camden.
8       MR. DAVID COHEN:  I gave a copy -- I gave a
9   copy of the complaint to Merck's attorneys at the last
10  conference, so I filed it six weeks ago, and it --
11      THE COURT:  It is a little soon maybe for me
12  to tell them they have to respond to your brief by
13  January 30th.  I'm not going to put your case on the
14  same time frame as the engineering case at this point.
15  I'm not saying that we shouldn't do something about it
16  quickly and that you shouldn't also arrange to have
17  your plaintiff's dep taken quickly and whatever needs
18  to be done or you file your summary judgment or
19  whatever has to be done.  Maybe you two should sit down
20  for a few minutes and talk about that or --
21      MS. FLEISHMAN:  Your Honor, there's a third
22  motion -- there's a third class action that was filed
23  on behalf of the plaintiffs for medical monitoring and
24  injunctive relief, and that was served on Merck in the
25  last six weeks, as well.